**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALEXANDER E. JONES, | ) |
| | ) Case No. 22-33553 (CML) |
| Debtor. | ) |
| | ) |
| | ) |

**EMERGENCY MOTION OF THE SANDY HOOK
<u>POST-TRIAL FAMILIES FOR RELIEF FROM THE AUTOMATIC STAY</u>**

> **THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST SEVEN DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**
>
> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**
>
> **EMERGENCY RELIEF IS NEEDED BY DECEMBER 16, 2022.**
>
> **THERE WILL BE A HEARING ON THIS MATTER ON DECEMBER 16, 2022 AT 1:00 P.M. (PREVAILING CENTRAL TIME) IN COURTROOM 401, 515 RUSK ST., HOUSTON, TX 77002.**

Neil Heslin and Scarlett Lewis (the "<u>Texas Post-Trial Plaintiffs</u>") and David Wheeler,

Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer

Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg,

William Sherlach and Robert Parker (the "Connecticut Plaintiffs" and together with the Texas Post-Trial Plaintiffs, the "Sandy Hook Post-Trial Families"),[1] creditors and parties-in-interest in the above-captioned chapter 11 case (this "Chapter 11 Case") of Alexander E. Jones ("Jones" or the "Debtor"), hereby move for relief from the automatic stay (this "Motion") pursuant to section 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code").  In support of this Motion, the Sandy Hook Post-Trial Families respectfully state as follows.

## PRELIMINARY STATEMENT

1.      After more than four years of litigation before courts in Texas and Connecticut and the recent verdicts and punitive damages awarded in such cases, the Sandy Hook Post-Trial Families are on the verge of having their judgments entered against Jones and Free Speech Systems, LLC ("FSS").  But the automatic stay triggered by this Chapter 11 Case has—for the third time this year—needlessly halted these actions.  The first stay stemmed from the bankruptcy cases commenced by Jones's shell companies, InfoW, LLC, IWHealth, LLC and Prison Planet TV, LLC (the "Shell Companies" and such cases, the "Shell Company Cases")—which were then defendants in the Sandy Hook Post-Trial Families' Cases (as defined below).[2]  As discussed *infra*, the Shell Company Cases were dismissed and, thus, the automatic stay terminated.  Thereafter, an automatic stay again was imposed when FSS petitioned for bankruptcy protection under

---

[1] Actions filed by Leonard Pozner, Veronique De La Rosa and Marcel Fontaine (the "Texas Pre-Trial Plaintiffs" and, together with the Texas Post-Trial Plaintiffs, the "Texas Plaintiffs") have not yet been tried.  The Texas Pre-Trial Plaintiffs support the relief sought herein but do not, at this time, seek relief as to their actions specifically.  Plaintiff Marcel Fontaine was not defamed as to the Sandy Hook mass-shooting but in regards to the Parkland mass-shooting.  For ease of reference, this Motion refers to all of the Texas Plaintiffs and Connecticut Plaintiffs together as the "Sandy Hook Families."  For the avoidance of doubt, the movants in this Motion are limited to the Sandy Hook Post-Trial Families and, therefore, such defined term is used throughout for convenience.  Any arguments or statements herein regarding the Chapter 11 Case and creditors' interests generally, however, including, in particular regarding the issue of nondischargeability, apply equally to all Sandy Hook Families.

[2] *In re InfoW, LLC, et al.*, Case Nos. 22-60020, 22-60021, 22-60022 (Bankr. S.D. Tex. 2022).

subchapter V (the "FSS Case").[3]  That stay was lifted on a consensual basis to allow certain state court actions in Texas and Connecticut to proceed to judgment, along with any appellate proceedings stemming therefrom.[4]  The FSS Lift Stay Orders were entered on notice to Jones individually and other alleged creditors of FSS, and Jones was a signatory to parts of the agreed stipulation and order pertaining to the Connecticut cases.

2.     Now, with a third automatic stay imposed by this Chapter 11 Case, the Sandy Hook Post-Trial Families ask that the automatic stay be lifted once again to allow the underlying state court verdicts against Jones[5] to proceed to judgment and any subsequent appeal(s) he may pursue to move forward.  Jones has asserted in the FSS Case that allowing FSS's and Jones's individual appeals to go forward at different times is problematic.[6]  The Sandy Hook Post-Trial Families disagree and will file their objection at the appropriate time.  Even if there were merit to Jones's contention, however, the solution is to provide an identical lift stay order in this Chapter 11 Case to those entered in the FSS Case, such that both debtors' appeals may proceed simultaneously.

3.     The Sandy Hook Post-Trial Families are the largest creditors of both Jones and FSS and stand to recover virtually all of the value of their respective estates.  The verdicts and judicial punitive damages awarded thus far total in excess of $1.5 billion.  As such, the Sandy Hook Post-Trial Families' view that proceeding to final resolution in their underlying state court cases is a prudent use of estate resources should receive overriding, if not dispositive, weight.

---

[3] *In re Free Speech Systems*, *LLC*, Case No. 22-60043 (Bankr. S.D. Tex. 2022).

[4] Case No. 22-60043, ECF Nos. 16 and 117 (collectively, the "FSS Lift Stay Orders").

[5] The Sandy Hook Post-Trial Families have the following cases pending against Jones (collectively, the "Sandy Hook Post-Trial Families' Cases"): (i) *Neil Heslin and Scarlett Lewis v. Alex E. Jones and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; and (ii) *Erica Lafferty, et al. v. Alex Jones, et al.*, Case No. UWY-CV18-6046436-S, in the Superior Court of the Judicial District of Fairfield at Bridgeport, Connecticut.

[6] Case No. 22-60043, ECF No. 300 (the "Stay Modification Motion").

4.      Jones and FSS wrongfully delayed inevitable judgments in the underlying litigation by repeatedly engaging in sanctionable conduct.  Indeed, judgments should have been rendered years ago.  And as previewed during the December 7 status conference in this Chapter 11 Case, the Sandy Hook Families believe their claims are nondischargeable under Bankruptcy Code section 523 in both this case and the FSS Case.  Therefore, there is no reason to delay entering judgments in the Sandy Hook Post-Trial Cases, which will be unaffected by either bankruptcy case.

5.      Lifting the stay as requested by this Motion is particularly innocuous given that any relief from the stay will not include enforcement activity; and, therefore, Jones will still have the breathing room afforded by the automatic stay in that regard.  Nor will prosecuting appeals require any involvement by Jones that would interfere with his ability to manage this Chapter 11 Case.  As such, modifying the automatic stay will not prejudice Jones or any other creditor.  Given these circumstances and the consensual FSS Lift Stay Orders, Jones's subsequent request to modify such orders is surprising and completely at odds with his frequently-voiced position that the verdicts, awards and rulings against him will be overturned on appeal.[7]

6.      For these reasons, and those below, the Sandy Hook Post-Trial Families respectfully request that the automatic stay be lifted (i) to allow the Sandy Hook Post-Trial Families' Cases to proceed to final judgment and (ii) once judgments are entered, to allow appeals, if any, to proceed and the Sandy Hook Post-Trial Families to respond and participate in any such appeals without further order of the Court.

---

[7] *See, e.g.* Tiffany Hsu, *'Do these people actually think they're getting any money?' Jones denounces the verdict, and fund-raises*, N.Y. TIMES (Oct. 12, 2022), https://www.nytimes.com/2022/10/12/us/politics/alex-jones-denounces-verdict.html.

## BASIS FOR EMERGENCY RELIEF

7.      The Sandy Hook Post-Trial Families respectfully request emergency consideration of this Motion in accordance with this Court's prior instructions.  Specifically, the Court stated at the initial status conference in this Chapter 11 Case on December 7, 2022 that the Sandy Hook Families may file a motion to lift the stay on or before December 12, 2022 to be heard contemporaneously with the Stay Modification Motion, which the Court scheduled for hearing on December 16, 2022 at 1:00 p.m. (prevailing Central Time).  Therefore, the Sandy Hook Post-Trial Families respectfully request that this Motion be heard on an emergency basis on December 16, 2022 at 1:00 p.m. (prevailing Central Time) in accordance with such instructions.

## JURISDICTION AND VENUE

8.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

9.      Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

10.      The statutory and procedural bases for the relief requested herein are Bankruptcy Code sections 105(a) and 362, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## BACKGROUND

### A.  The Underlying Cases

11.      Immediately following the Sandy Hook Elementary School shooting on December 14, 2012, Jones began broadcasting on his media program to an audience of millions that this shooting was a hoax, and that the Sandy Hook Post-Trial Families, among others, were crisis actors masquerading as grieving parents.  Jones urged his audience to "investigate," knowing full well

that this would make the families targets of his massive radio, web and social media audiences.

12.    The Sandy Hook Post-Trial Families brought suit against Jones and various entities he owns and controls (collectively, the "Jones Defendants") based on this conduct.  The Sandy Hook Post-Trial Families are not financial creditors.  They neither loaned Jones money nor fell victim to some fraudulent financial scheme.  Rather, they are involuntary creditors, as victims of Jones's decade-long monetization of repeated and systemic attacks on their character.

13.    In the Sandy Hook Post-Trial Families' Cases, Jones and FSS have engaged in pervasive discovery misconduct so egregious that state courts in both Connecticut and Texas resolved liability against Jones and FSS and further precluded them from introducing any evidence in support of any defense.  Jones and FSS engaged in tactics that delayed the cases for years and used the litigation to continue their attacks against the Sandy Hook Post-Trial Families.

14.    The recent punitive damages ruling of Connecticut Superior Court Judge Barbara N. Bellis, who has presided over the Connecticut cases since they were filed, gives significant insight into the extent to which Jones and FSS abused the judicial process in Connecticut:

> [D]espite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having-and continuing to utilize-an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence[.][8]

15.    In the Connecticut Plaintiffs' cases, verdicts totaling $965 million in compensatory damages were rendered in favor of the fifteen plaintiffs and against FSS and Jones on October 12,

---

[8] *Erica Lafferty, et al. v. Alex Jones, et al.*, Case No. UWY-CV18-6046436-S (Conn. Super. Ct. Nov. 10, 2022), ECF No. 1026, at 42 (the "Connecticut Punitive Damages Opinion"), attached as **Exhibit A**.

2022.  The trial court assessed a further amount of $473,139,555.94 in statutory and common law punitive damages on November 10, 2022.  Motions for remittitur and to set aside the verdict filed by FSS and Jones have been fully briefed and oral argument has been waived.  At a December 3, 2022 status conference, the Connecticut trial court recognized that the action was stayed as to Jones as a result of the filing of this Chapter 11 Case.  At that same status conference, the trial court set a report-back date of December 16, 2022 for the parties to advise whether it should proceed to rule on the post-verdict motions as to FSS only, or whether the automatic stay would be lifted as to Jones in this Chapter 11 Case, so that it could proceed as to both parties.

16.     In the Texas Post-Trial Plaintiffs' case, the trial court heard on November 22, 2022 their motion to enter a judgment comprising the entire jury verdict that had been rendered, along with costs and interest—totaling over $50 million.  At the hearing, the trial court orally granted the motion in its entirety.  Before the final judgment was signed by the trial court, however, Jones filed this Chapter 11 Case.  At the same hearing, the trial court also scheduled trial dates for the Texas Pre-Trial Plaintiffs' cases.  The trial for Sandy Hook parents Leonard Pozner and Veronique De La Rosa was set for March 2023, and the trial on behalf of the late Marcel Fontaine was set for October 2023.[9]

**B.  The Shell Companies' Bankruptcy Cases**

17.     Faced with imminent trials, Jones has attempted three times to use the bankruptcy process to stall the Sandy Hook Post-Trial Families' Cases.  *First*, on April 17 and 18, 2022, the Shell Companies—which at that time were defendants in the Sandy Hook Post-Trial Families' Cases—petitioned for relief under subchapter V of chapter 11 of the Bankruptcy Code.  Within

---

[9] Those trials were technically set as to Jones only, as the automatic stay in the FSS Case remains in place as to the Texas Pre-Trial Plaintiffs.  Counsel for the Texas Pre-Trial Plaintiffs had invited FSS to agree to lift the stay as to FSS so it can participate in the trial too, but before any meaningful conference could occur on the subject, Jones filed this Chapter 11 Case.

hours of these filings, the Sandy Hook Post-Trial Families' Cases were removed to bankruptcy court on the grounds of "related to" jurisdiction.  The sole basis for such removal was the commencement of the Shell Company Cases.  The removals effectively stayed the Sandy Hook Post-Trial Families' Cases, even against Jones and FSS, who were not then debtors.

18.     The U.S. Trustee moved to dismiss the Shell Company Cases, arguing that "[t]he strategy employed here—filing bankruptcy for three non-operating members of a larger enterprise to channel and cap liability against the other, revenue-generating members of that enterprise and its owner using a bankruptcy subchapter designed to aid small, struggling businesses—is a novel and dangerous tactic that is abusive and undermines the integrity of the bankruptcy system."[10]  The U.S. Trustee also argued that "Alex Jones and FSS hand-picked these three holding companies for bankruptcy as part of a scheme engineered solely to limit their own legal liability, to deny parties in interest a full accounting of their assets and to deny individuals their day in court and imminent recovery for established liability."[11]  The Sandy Hook Post-Trial Families also moved to dismiss the Shell Company Cases as bad-faith filings.[12]  In order to obtain immediate remand and retain their imminent trial dates, however, the Sandy Hook Post-Trial Families dismissed their causes of action against the Shell Companies, resulting in their respective cases being able to proceed.

19.     Shortly thereafter, the U.S. Trustee and the Shell Companies entered into a stipulation to dismiss the chapter 11 cases, which the Court so ordered on June 10, 2022.[13]  Jones and FSS are now the only remaining defendants in the Sandy Hook Post-Trial Families' Cases.

---

[10] *In re InfoW, LLC*, Case No. 22-60020, ECF No. 50 at 2 (Bankr. S.D. Tex. Apr. 29, 2022).

[11] *Id.* at 16.

[12] *Id.* at ECF Nos. 36, 42.

[13] *Id.* at ECF No. 114.

C.  **The FSS Case**

20.     Just weeks following the dismissal of the Shell Companies' Cases, Jones returned to bankruptcy court, this time on behalf of FSS, which on July 29, 2022 filed a petition under subchapter V of chapter 11 of the Bankruptcy Code.  On the same day, FSS also filed the *Emergency Motion for an Order Modifying the Automatic Stay to Allow the Heslin/Lewis State Court Suit to Continue to Judgment*.[14]  On August 1, 2022, the Court granted the uncontested motion and lifted the automatic stay as to FSS to permit certain of the actions pending in Texas to proceed to judgment by the Texas state court (the "Heslin/Lewis Lift Stay Order").[15]

21.     On July 31, 2022, the Connecticut Plaintiffs filed their *Emergency Motion for Relief from the Automatic Stay* to proceed with the Connecticut state court litigation in the FSS Case.[16] On August 29, 2022, an agreed order providing similar relief for the Connecticut Plaintiffs was entered by the Court (the "Connecticut Stipulation and Lift Stay Order").[17]  The Connecticut Stipulation and Lift Stay Order began with a carefully negotiated stipulation concerning how the Connecticut cases would proceed to trial.[18]  The Connecticut Stipulation and Lift Stay Order specifically provides that in addition to being permitted to proceed to judgment, "[a]ll appeals of any judgment in the State Court Litigation by the Connecticut State Court are also not stayed and may proceed after judgment without further order of the Bankruptcy Court."[19]  The Connecticut Stipulation and Lift Stay Order, as a so-ordered stipulation, is not only an order of the Court but also an agreement of the parties, including Jones, concerning how Jones and FSS would proceed

---

[14] *See In re Free Speech Systems, LLC*, Case No. 22-60043, ECF No. 2 (Bankr. S.D. Tex. 2022).

[15] *Id.* at ECF No. 16.

[16] *Id*. at ECF No. 15.

[17] *Id*. at ECF No. 117.  The Heslin/Lewis Lift Stay Order and the Connecticut Stipulation and Lift Stay Order collectively are referred to as the FSS Lift Stay Orders (as defined above).

[18] *See Id*. at ECF 117.

[19] *Id*. at 5.

to trial.

22.     Further, during the hearing on August 29, 2022 in the FSS Case, this Court clarified as follows: "I would note, just for the record, that the [Connecticut Stipulation and Lift Stay Order] allows the litigation to continue to final judgment, ***including any appeals***, but any enforcement of that order with respect to FSS is stayed . . . I have approved, I believe the Connecticut Plaintiffs have satisfied their duty at requisite cause and there's agreement on the record[.]"[20]   Jones registered no objections to either of the FSS Lift Stay Orders.

23.     The Sandy Hook Post-Trial Families now seek the same scope of relief in this Chapter 11 Case as granted by the FSS Lift Stay Orders.

## RELIEF REQUESTED

24.     For the reasons stated herein, the Sandy Hook Post-Trial Families respectfully submit that cause exists to lift the automatic stay in this Chapter 11 Case to allow entry of final judgments in the Sandy Hook Post-Trial Families' Cases.  Accordingly, the Sandy Hook Post-Trial Families request that, consistent with the FSS Lift Stay Orders, the Court grant this Motion and enter an order, substantially in the form attached hereto, modifying the automatic stay (i) to allow the Sandy Hook Post-Trial Families' Cases to proceed to final judgment and (ii) once judgments are entered, to allow appeals, if any, to proceed and the Sandy Hook Post-Trial Families to respond and participate in any such appeals without further order of the Court.

## BASIS FOR RELIEF

25.     Bankruptcy Code section 362(d) provides that a "court shall grant relief from the stay . . . for cause."  11 U.S.C. § 362(d)(1).  The term "cause" used in Bankruptcy Code section

---

[20] Case No. 22-60043, Aug. 29, 2022 Hr'g Tr. 10:15-25 (emphasis added).  Although this Court did not specifically address appeals in connection with the Heslin/Lewis Lift Stay Order, there is no reason to believe such relief is narrower than that contemplated by the Connecticut Lift Stay Order.  Such conclusion is also consistent with Jones's Stay Modification Motion filed in the FSS Case.

362(d)(1) is not defined in the Bankruptcy Code and whether cause exists must be determined on a case by case basis. *See In re Xenon Anesthesia of Tex., PLLC*, 510 B.R. 106, 112 (S.D. Tex. 2014). As a result, "this lack of definition affords 'flexibility to the bankruptcy courts'" to consider and grant requests for relief from the automatic stay. *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 251–53 (5th Cir. 2006) (quoting *Little Creek Dev. Co. v. Commw. Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986)). Courts within this Circuit have held that "[a]llowing a matter to proceed in another forum may constitute cause . . . [t]he Bankruptcy Code gives the court broad discretion to provide appropriate relief from the automatic stay as may fit the facts of a particular case." *Xenon*, 510 B.R. at 112 (citation omitted).

26.     In determining whether to lift the automatic stay to allow litigation against a debtor to proceed in another forum, courts in this District generally consider the following factors (the "*Xenon* Factors"):

(1) whether the relief will result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal has been established to hear the particular cause of action;

(5) whether the debtor's insurer has assumed full responsibility;

(6) whether the action primarily involves third parties;

(7) whether litigation in the other forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether the movant's success would result in a judicial lien avoidable by the debtor;

(10) interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the proceedings have progressed to the point that parties are ready for trial; and

(12) the impact of the stay on the parties and the balance of harm.

*Id.* (citing *inter alia, In re U.S. Brass Corp.,* 176 B.R. 11, 13 (Bankr. E.D. Tex. 1994) and *In re Sonnax Indus., Inc*., 907 F.2d 1280, 1286 (2d Cir. 1990)).   Rather than being imposed mechanistically, however, courts have held that "[t]hese factors need not be assigned equal weight, and only those factors relevant to the particular case need to be considered."  *In re U.S. Brass Corp.*, 176 B.R. at 13.  "Further, the decision to lift the stay may be upheld on judicial economy grounds alone."  *Xenon*, 510 B.R. at 112.

29.     Significantly, here, most of the *Xenon* Factors weigh strongly in favor of lifting the stay.  Specifically factors 1, 2, 4 and 7 through 12 support the requested relief.  The remaining factors are neutral or inapplicable, and none weighs in favor denying such relief.

## I.   Lifting the Stay Will Result in a Complete Resolution, Will Facilitate, Rather than Interfere with, this Chapter 11 Case and Will Not Prejudice Other Parties in Interest.[21]

30.     As matters presently stand, the automatic stay is lifted in the FSS Case such that the Sandy Hook Post-Trial families may respond or participate in appeals as against FSS, but such appeals are stayed as to Jones.  Relief from the automatic stay as to FSS was a part of carefully negotiated so-ordered stipulations that cannot simply be rewritten because now they do not suit Jones (especially when Jones could have objected to entry of either of the FSS Lift Stay Orders, but did not).  The Sandy Hook Post-Trial Families dispute that any material problem would be presented by bifurcated appeals.  But even assuming *arguendo* that there is some significant

---

[21] *Xenon* Factors 1, 2, 4, 7, 8 and 9.

inefficiency with appeals going forward at different times, the best and obvious course is to the lift the stay here.

31.     Damages assessments totaling in excess of $1.5 billion in the aggregate have been entered in certain of the Sandy Hook Post-Trial Families' Cases.  Thus, the Sandy Hook Post-Trial Families stand to receive substantially all of the value in the estates of both FSS and Jones.  Any argument that lifting the automatic stay, as requested by this Motion, would needlessly waste estate resources or somehow interfere with the Chapter 11 Case strains credulity.  It also permits Jones's appeal to be prosecuted at the same time as FSS's appeal, allowing the two debtors to share the cost of such appeal.

32.     Permitting the Sandy Hook Post-Trial Families' Cases to proceed to judgment and appeal will result in finality regarding the largest—if not only significant—claims in both this Chapter 11 Case and the FSS Case.  In turn, such finality will facilitate a resolution in each chapter 11 case by solidifying the quantum of claims that cannot be liquidated or otherwise adjudicated by this Court.  Nor is there any possible contention that the claims of the Sandy Hook Post-Trial Families would be subject to equitable subordination or give rise to an avoidable judicial lien. These claims cannot be undone in bankruptcy, and fixing the final liquidated amount of these claims will be final and binding on Jones and any other creditors he may have.

33.     Moreover, the Sandy Hook Families' claims are nondischargeable under Bankruptcy Code section 523(a)(6)[22] in both chapter 11 cases.[23]  Therefore, preventing judgments

---

[22] *See* Connecticut Punitive Damages Opinion at 43-44 (the "record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm;" was "wanton… and heinous" and reflected "depravity" and "reprehensibility").

[23] *See McClendon v. Springfield (In re McClendon)*, 765 F.3d 501 (5th Cir. 2014) (finding state court defamation judgment was a nondischargeable debt pursuant to section 523(a)(6)); *Purser v. Scarbrough (In re Scarbrough)*, 516 B.R. 897 (Bankr. W.D. Tex. 2014), *aff'd*, 836 F.3d 447 (5th Cir. 2016) (same); *Cantwell-Cleary Co. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 36 F.4th 509 (4th Cir. 2022) (finding the discharge exceptions in section 523(a) applicable in subchapter V cases).

from being entered and appeals from commencing does nothing more than delay the inevitable.[24]

And allowing Jones to continue to delay the final resolution of the Sandy Hook

Post-Trial Families' Cases, after the years of "unprecedented" abuse and delay imposed on them

in the state court cases, is wholly inequitable.  As illustrated *supra*, the underlying cases have been

delayed repeatedly by Jones's procedural gamesmanship.  To the extent Jones intends to appeal,

all appeals should proceed now.

## II.    **The Underlying Proceedings Have Progressed Passed the Trial Stage, and the Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation Would Be Served by Lifting the Stay**[25]

34.    The Sandy Hook Post-Trial Families' Cases have progressed to advanced stages,

including the rendering of verdicts and determinations of liability in several such cases.  The

advanced stage of the litigation strongly favors lifting the stay, as Jones will not be distracted by

any pre-trial or trial proceedings and will remain fully available to participate as needed in his

Chapter 11 Case.

35.    Further, without question, the Connecticut and Texas appellate courts are the only

forums that can determine any appeals in the Sandy Hook Post-Trial Cases.  As such, judicial

economy would be served by lifting the stay.  Entry of judgment, and any appellate processes, are

quite literally the final steps in these cases.

## III.    **The Balance of Harms Weighs in Favor of Lifting the Stay**[26]

36.    For all the reasons set forth herein, the balance of harms weighs heavily in favor of

lifting the stay.  After over four years of litigation, the Sandy Hook Post-Trial Families deserve

---

[24] *See Disciplinary Bd. of Pa. Sup. Ct. v. Feingold (In re Feingold)*, 730 F.3d 1268, 1278 (11th Cir. 2013) (finding the nondischargeability of a debt may be "a weighty factor[] in a bankruptcy court's evaluation of 'cause.'").

[25] *Xenon* Factors 10 and 11.

[26] *Xenon* Factor 12.

finality as to their claims.  That finality, in turn, will facilitate resolution in this Chapter 11 Case and the FSS Case and will not otherwise prejudice any party, including Jones.  Nor will lifting of the automatic stay prejudice any other creditors in either the FSS Case or this Chapter 11 Case for the reasons discussed herein.

37.     This is Jones's third attempt to use the bankruptcy system to halt the Sandy Hook Post-Trial Families' Cases.  The first set of chapter 11 cases were dismissed and the stay was lifted in the FSS Case to allow the Sandy Hook Post-Trial Families' Cases to proceed.  There is no reason for identical relief to be denied here.

## REQUEST FOR WAIVER OF BANKRUPTCY RULE 4001

38.     The Sandy Hook Post-Trial Families respectfully request that the 14-day stay imposed by Bankruptcy Rule 4001(a)(3) be waived to allow the Sandy Hook Post-Trial Families to proceed immediately in the Sandy Hook Post-Trial Families' Cases upon the lifting of the automatic stay as requested herein.  The Sandy Hook Post-Trial Families request this relief to (i) prevent abuse of the bankruptcy process; (ii) protect against prejudicial delay; and (iii) promote judicial efficiency.

## CONCLUSION

Based on the foregoing, the Sandy Hook Post-Trial Families respectfully request that this Court: (a) grant the Sandy Hook Post-Trial Families relief from the automatic stay (i) to allow the Sandy Hook Post-Trial Families' Cases to proceed to final judgment and (ii) once judgments are entered, to allow appeals, if any, to proceed and the Sandy Hook Post-Trial Families to respond and participate in any such appeals without further order of the Court; (b) waive the 14-day stay requirement under Bankruptcy Rule 4001(a)(3); and (c) grant such other and further relief as is just, proper and equitable.

Dated: December 12, 2022

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**
By: */s/ Avi Moshenberg*
Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
Telephone: (713) 337-5580
Fax: (713) 337-8850
Email: Avi.Moshenberg@mhllp.com
***Counsel for the Texas Plaintiffs***

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
Texas Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: 512-477-5000
Fax: 512-477-5011
Email: rchapple@cstrial.com
***Bankruptcy Counsel for the Connecticut Plaintiffs***

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, PC**
By: */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tyler W. Greenwood
Texas Bar No. 24123219
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 356-1280
Fax: (713) 658-2553
Email: jarrod.martin@chamberlainlaw.com
***Bankruptcy Counsel for the Texas Plaintiffs***

**AKIN GUMP STRAUSS HAUER & FELD LLP**
By: */s/ Marty L. Brimmage*
Marty L. Brimmage, Jr.
Texas Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Fax: (214) 969-4343
Email: mbrimmage@akingump.com

-and-

Ira S. Dizengoff (*pro hac vice* pending)
David M. Zensky (admitted *pro hac vice*)
Philip C. Dublin (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Fax: (212) 872-1002
Email: idizengoff@akingump.com
Email: dzensky@akingump.com
Email: pdublin@akingump.com
Email: sbrauner@akingump.com
Email: kporter@akingump.com
***Bankruptcy Counsel for the Sandy Hook Families***

**CERTIFICATE OF ACCURACY**

Pursuant to Bankruptcy Local Rule 9013-1(i), I hereby certify that the factual statements contained herein are true and correct, to the best of my personal knowledge, and that emergency relief is necessary in light of impending hearings and deadlines.

*/s/ Marty L. Brimmage* _____
Marty L. Brimmage


**CERTIFICATE OF SERVICE**


The undersigned certifies that on December 12, 2022, a true and correct copy of the foregoing Motion was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Marty L. Brimmage* _____
Marty L. Brimmage


**CERTIFICATE OF CONFERENCE**


The undersigned certifies that on December 12, 2022, I conferred with Debtor's counsel, and as of the filing of the Motion, Debtor's counsel has not responded to our requested regarding the Motion.

*/s/ Marty L. Brimmage* _____
Marty L. Brimmage

## **Exhibit A**

Connecticut Punitive Damages Opinion

```
NO: X06-UWY-CV18-6046436-S      : SUPERIOR COURT

ERICA LAFFERTY                  : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various

immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg. Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2]   In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas.  He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the date of the shooting.  Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach* v. *Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker.  Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

gain.  In fact, by May, 2013, Jones was alleged to make approximately $10 million annually.  Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ."  In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."  In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card.  Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

actually closed the year before.  They don't know that they've
sealed it all, demolished the building.  They don't know that
they had the kids going in circles in and out of the building
as a photo-op.  Blue screens, green screens, they got caught
using."  On July 7, 2015, Jones stated: "[b]ut what about how
for a mass shooting in Pakistan, they got photos of Sandy Hook
kids. . . . [I]t's like the same P.R. company is running this."
Additionally, on November 17, 2016, Jones told his audience that
he's seen "weird videos of reported parents of kids laughing
and then all of sudden they do the hyperventilating to cry and
go on TV."  Jones has also repeatedly asked his listeners to
"investigate" the events surrounding the Sandy Hook shooting
and that has led to individuals such as the plaintiffs being
subjected to "physical confrontation and harassment, death
threats, and a sustained barrage of harassment and verbal
assault on social media."

Throughout their complaints in each of the three cases,
the plaintiffs allege many more examples of comments made by

6

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

---

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

throughout the course of the litigation.   The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants.   The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly.   And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022..   On October 12, 2022, the jury reached its verdict as to the various plaintiffs.   Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice.   For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei."   *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

memorandum of law in opposition to the award of punitive damages
on November 4, 2022. The court heard oral argument on the issue
of punitive damages on November 7, 2022.

<u>Common Law Punitive Damages</u>

The Connecticut Supreme Court has most recently described
the well-settled common law rule followed in Connecticut
pertaining to punitive damages in *Bifolck* v. *Philip Morris,
Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury
Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn.
208, 235, 477 A.2d 988 (1984)], this court declined to
reconsider limits that it had placed on the recovery of punitive
damages.  In doing so, the court explained: 'Long ago, in *Hanna*
v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth
the rule which we have since followed regarding the appropriate
measure of [common-law] punitive damages.  In limiting our
measure to the expense of litigation less taxable costs, the
court noted that under the typical [common-law] rule the jury
was permitted to exercise a virtually unchecked discretion to

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.  Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim.  Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193

12

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn.
447-49.

"In Connecticut, common-law punitive damages, also called
exemplary damages, primarily are compensatory in nature. See
*Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610
A.2d 1212 (1992) (in Connecticut, common-law punitive damages
'are limited to the plaintiff's attorney's fees and nontaxable
costs, and thus serve a function that is both compensatory and
punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472,493, 97
A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive
damages are compensatory in nature, but also serve 'a punitive
and deterrent function'). 'To furnish a basis for recovery of
punitive damages, the pleadings must allege and the evidence
must show wanton or wilful malicious misconduct, and the
language contained in the pleadings must be sufficiently
explicit to inform the court and opposing counsel that such
damages are being sought. . . . If awarded, [common-law]
punitive damages are limited to the costs of litigation less*

*taxable costs, but, within that limitation, the extent to which*
*they are awarded is in the sole discretion of the trier.* . . .
Limiting punitive damages to litigation expenses, including
attorney's fees, fulfills the salutary purpose of fully
compensating a victim for the harm inflicted . . . while avoiding
the potential for injustice which may result from the exercise
of unfettered discretion by a jury. . . . We have long held that
in a claim for damages, proof of the expenses paid or incurred
affords some evidence of the value of the services . . . . *Label*
*Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d
703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614
A.2d 414 (1992)] (common-law punitive damages, when viewed in
the light of the increasing costs of litigation, also [serve]
to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*,
supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages
for 'wanton or malicious injuries' for more than two hundred
years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

14

and cases cited therein.  More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue.  As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.'  Id.   In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded.  Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

to torts is that punitive damages are awarded when the evidence
shows a reckless indifference to the rights of others or an
intentional and wanton violation of those rights. . . . An award
of punitive damages is discretionary, and the exercise of such
discretion will not ordinarily be interfered with on appeal
unless the abuse is manifest or injustice appears to have been
done." (Internal quotation marks omitted.) *Bridgeport Harbour
Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703,
cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal
withdrawn January 27, 2012), and cert. granted, 303 Conn. 905,
31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I,
LLC*, upheld an award of common law punitive damages, explaining
its reasoning as follows: "On the basis of the jury's finding
against [the defendant] on the plaintiff's fraudulent
misrepresentation claim, the [trial] court was satisfied that
the plaintiff had proven a reckless indifference to its
contractual and business interests to warrant an award of

16

punitive damages against [the defendant].  The [trial] court
further found that the plaintiff's fee agreement with counsel
was 30 percent of the first $6 million recovered and therefore
the plaintiff was seeking $54,600 in attorney's fees.  The
[trial] court agreed with the plaintiff that it could consider
its fee agreement with counsel to determine its award of
attorney's fees.  [The Appellate Court] conclude[d] that the
[trial] court's award of attorney's fees did not constitute an
abuse of its discretion, as it is consistent with the guidance
provided by our Supreme Court." (Footnote omitted.) *Bridgeport
Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing
*Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70,
828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services,
Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining
the amount of attorneys fees and costs to be awarded as common
law punitive damages, following the jury's award of attorneys
fees and costs. Awarding attorneys fees under the terms of a

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

the jury followed the law set forth in their instructions. See,
e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev.
Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the
contrary, we assume that the jury acted in accordance with the
charge."). The defendants also take the position that awarding
more than nominal damages would serve a hardship on the
defendants, including Free Speech Systems, LLC., which has filed
for bankruptcy. The record does not support this conclusory
claim of hardship with respect to Alex Jones, and the mere fact
that Free Speech Systems, LLC. has filed for bankruptcy does
not justify a nominal award of common law punitive damages.
Thus, to the extent that the defendants argue that enforcing
the retainer agreements would result in substantial unfairness
to the defendants, the court is not persuaded. Additionally,
the court rejects the defendants' due process argument for an
award of nominal damages only, as on these facts, a common law
punitive damages award limited to attorneys fees and costs
pursuant to the terms of a reasonable retainer agreement

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million;  as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million;  as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million;  as to Jennifer Hensel, $17.33 million;  as to Donna Soto,  $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million;  as to Jillian Soto-Marino, $22.93 million;  as to William Aldenberg, $30 million;  as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million.  Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

<u>Punitive Damages Pursuant to the Connecticut Trade Practices
Act (CUTPA), General Statutes § 42-110a et seq.</u>

General Statutes § 42-110g provides in relevant part: "(a)
Any person who suffers any ascertainable loss of money or
property, real or personal, as a result of the use or employment
of a method, act or practice prohibited by section 42-110b, may
bring an action . . . to recover actual damages. . . . *The court
may, in its discretion, award punitive damages* and may provide
such equitable relief as it deems necessary or proper."
(Emphasis added.)  "The language is clear and unambiguous; the
awarding of punitive damages is within the discretion of the
trial court."  (Internal quotation marks omitted.)  *Bridgeport
Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d
703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905,

31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA

are determined by the court, not the jury.  "It is reasonable

to conclude that the legislature provided that a claim for

punitive damages under CUTPA should be submitted to the trial

court, and not the jury, because it believed that the court

would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant
to CUTPA are separate and distinct from awards of attorney's fees.
"[T]he legislature did not intend to limit punitive damages awards
pursuant to § 42-110g (d) to 'the expenses of bringing the legal
action, including attorney's fees, less taxable costs. . . . Section
42-110g (a) expressly authorizes the trial court to award punitive
damages in addition to the award of attorney's fees authorized by §
42-110g (d).  Nothing in the language of the statute suggests that
punitive damages are the same as attorney's fees, consistent with
the common-law rule.  If the legislature had intended to impose such
a limitation, it presumably would have done so either by authorizing
the trial court to award double attorney's fees or by authorizing it
to award double punitive damages.  The fact that the legislature
enacted two distinct provisions indicates that it contemplated two
distinct types of awards. . . . Moreover, as we have indicated, both
this court and the Appellate Court have repeatedly, over the course
of many years, upheld multiple damages under the punitive damages
provision of CUTPA . . . and the legislature has never amended the
statute to provide otherwise."  (Citations omitted; footnote
omitted; internal quotation marks omitted.)  *Ulbrich* v. *Groth*, 310
Conn. 375, 449-50, 78 A.3d 76 (2013).

awarded for similar CUTPA violations, that it would be less
likely to be swayed by appeals to emotion and prejudice, and,
therefore, it would be less likely to render an award that was
an outlier. Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App.
22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility
of prejudice entering the decision-making process, the award of
attorney's fees [under CUTPA] has been placed in the hands of
the court" instead of jury); see also *MedValUSA Health Programs,
Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423]
(*Zarella, J.*, dissenting) (legislature vested authority to make
punitive damages award under CUTPA in court instead of in jury
to safeguard against risk of excessive awards) [cert. denied
sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546
U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)].
Accordingly, the concerns that underlie the common-law
limitation on punitive damages have far less weight when the
claim is submitted to the trial court instead of the jury."
*Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

outlier cases that call the fairness of the system into question
are above the median . . . . Accordingly, given the need to
protect against the possibility (and the disruptive cost to the
legal system) of awards that are unpredictable and unnecessary,
either for deterrence or for measured retribution, we consider
that a 1:1 ratio, which is above the median award, is a fair
upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich*
v. *Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims
under CUTPA and the punitive damages claims under maritime law
at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined
to adopt the same a one-to-one ratio of punitive damages to
compensatory damages as an upper limit for punitive damages in
CUTPA cases. Id., 453-54. Nevertheless, the court adopted the
factors that were considered by the United States Supreme Court
in *Exxon Shipping Co.* in determining whether the amount of
punitive damages awarded pursuant to CUTPA is excessive.  The
court explained that "in determining whether a punitive damages

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co.* discussed.  These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454-56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146-47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49, the Appellate Court explained that the trial court "found that among the more vexing, competing

considerations presented to the court in determining the amount

of the punitive award in this case is, on one hand, the issue

of deterrence, particularly in light of the [defendants']

financial net worth, and on the other hand, the issue of the

overall reasonableness and rationality of a high punitive award

in light of the amount of the plaintiff's actual recovery and

the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*,

supra, 554 U.S. 471] . . . [and] note[d] that because neither

compensation nor enrichment is a valid purpose of punitive

damages, an award should not be so large as to constitute a

windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory

factors bearing on its discretion, a broader, threshold

consideration is that high punitive awards may implicate

constitutional concerns.   In *Bristol Technology, Inc.* v.

*Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on

other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court

stated 'the United States Constitution imposes a substantive

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases.'  *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.  Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.  In [*Pacific Mutual Life Ins. Co*. v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc*. v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)].  The Court further

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however.  When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.  The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

conduct posed to prospective bidders; that its conduct was
inherently deceptive to bidders; that its effort to maximize
the bids by including the business property as part of the
auction was beneficial to the bank's interests; and that the
bank had a high net worth.  On the other hand, the court also
recognized that the jury's compensatory damages award was not
small, that the bank's conduct was not of a criminal nature and
that the punitive damages award should not constitute a windfall
to the plaintiffs.  In addition, we note that there was no
evidence that the bank's conduct constituted anything other than
an isolated incident."   (Internal quotation marks omitted.)
Id., 456.

"Although the trial court's punitive damages award in
[*Ulbrich*] undoubtedly was a large one, especially in light of
the large size of the compensatory damages award, [the Supreme
Court could not] conclude that the award constituted a manifest
abuse of discretion or that an injustice was done. . . . Rather,
[the Supreme Court concluded] that the trial court reasonably

could have concluded that the bank's reckless and deceptive
conduct, together with the fact that the motive for the conduct
was to increase the profitability of the auction to the bank,
the fact that the bank has a very high net worth and the fact
that there is an established practice in this state of awarding
multiple damages for CUTPA violations, warranted the amount of
the award. Accordingly, [the Supreme Court concluded] that the
size of the trial court's punitive damages award [which was
three times the compensatory award] did not constitute an abuse
of discretion."   (Citation omitted; footnote omitted.)   Id.,
456-57.

Here, the material allegations of the complaints, which
have been established by virtue of the defaults, entitle the
plaintiffs to an award of CUPTA punitive damages. In support of
their claim for CUTPA punitive damages, the plaintiffs, in their
briefs, support each Ulbrich factor with specific citations to
the record. The defendants, in taking the position that there
should be either no award of CUTPA punitive damages, or only a

39

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

40

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

concludes that despite the magnitude of the injuries and
ultimate outcome, there was a low incentive to bring and
maintain an action like this. The road to reach a verdict here
was a tortuous one, involving an unusual number of appeals, an
extraordinary number of court filings, and numerous forays into
federal court including bankruptcy court. Moreover, the trial
record establishes that the defendants remain in the unique
position of having-and continuing to utilize-an immense media
platform and audience to continue to target the plaintiffs, as
well as mocking the plaintiffs' attorneys, the court, and the
very jury that they selected. It is, quite simply, unprecedented
in American jurisprudence, and the court reaches the inescapable
conclusion that despite the magnitude of the harms caused to
the plaintiffs, there is little incentive to bring an action
like this against defendants such as these defendants, who have
continued to use their platform to attack.

With respect to deterrence, the defendants' financial
resources, and whether the award would financially destroy the

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

plaintiffs.  This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.


Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

costs in the total amount of $1,489,555.94, and awards CUTPA
punitive damages in the amount of $150,000,000.00.


<u>421277</u>

<u>Barbara N. Bellis</u>