```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3                              )  CASE NO: 22-33553-cml
                                )
 4                              )
                                )  Houston, Texas
 5   ALEXANDER E. JONES,        )
                                )  Monday, December 19, 2022
 6            Debtor.           )
                                )  3:00 P.M. to 4:24 P.M.
 7                              )
     ---------------------------)
 8

 9                            TRIAL

10        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For Free Speech Systems: RAYMOND WILLIAM BATTAGLIA
                              Law Offices of Ray Battaglia PLLC
14                            66 Granburg Circle
                              San Antonio, TX 78218
15
                              RJ SHANNON
16                            Shannon & Lee LLP
                              700 Milam Street, Suite 1300
17                            Houston, TX 77002

18   For US Trustee:          JAYSON B. RUFF
                              HA MINH NGUYEN
19                            Office of the US Trustee
                              515 Rusk Avenue, Suite 316
20                            Houston, TX 77002

21   For PQPR Holdings
     Limited, LLC:            STEPHEN WAYNE LEMMON
22                            Streusand Landon Ozburn Lemmon LLP
                              1801 S. Mopac Expressway, Suite 320
23                            Austin, TX 78746

24

25
```

```
 1   For the Creditors:       MARTY L. BRIMMAGE
                              SARA LYNNE BRAUNER
 2                            DAVID M. ZENSKY
                              Akin Gump Strauss Hauer & Feld LLP
 3                            2300 N. Field Street, Suite 1800
                              Dallas, TX 75201
 4
                              RYAN E. CHAPPLE
 5                            Cain & Skarnulis PLLC
                              303 Colorado Street, Suite 2850
 6                            Austin, TX 78701

 7                            AVI MOSHENBERG
                              NICK R. LAWSON
 8                            McDowell Hetherington LLP
                              1001 Fannin Street, Suite 2400
 9                            Houston, TX 77002

10   For Melissa A. Haselen: ELIZABETH CAROL FREEMAN
                              The Law Office of Liz Freeman
11                            PO Box 61209
                              Houston, TX 77208-1209
12
     For Debtor Alex Jones:   VICKIE L. DRIVER
13                            Crowe & Dunlevy, PC
                              2525 McKinnon Street, Suite 425
14                            Dallas, TX 75201

15                            SHELBY A. JORDAN
                              Jordan & Ortiz, PC
16                            500 N. Shoreline, Suite 900 N
                              Corpus Christi, TX 78401
17
     For Schwartz Associates: MICHAEL P. RIDULFO
18                            Kane Russell Coleman Logan
                              5151 San Felipe, Suite 800
19                            Houston, TX 77056

20   Court Reporter:          ZILDE MARTINEZ

21   Courtroom Deputy:        ZILDE MARTINEZ

22   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
23                            Mineola, NY 11501
                              Tel: 800-727-6396
24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

1          HOUSTON, TEXAS; MONDAY, DECEMBER 19, 2022; 3:00 PM

2               DEPUTY:  All right.

3               THE COURT:  Okay, good afternoon, everyone.  This

4      is Judge Lopez.  Today is December 19th.  I'm going to call

5      the 3 p.m. cases.  I'm going to call the Free Speech Systems

6      case, 22-60043 and I'm going to also call at the same time

7      22-33553, the Alexander Jones case.  I'm going to just tell

8      everyone I typically do this.  Just a reminder that there's

9      a number of folks on the cameras here appearing virtually.

10     I'm just going to ask everyone to please mindful of your

11     background.  I still consider video appearances as an

12     extension of appearance in the courtroom.  So the line is

13     completely muted at this time.  I'm going to take

14     appearances in the courtroom first and then I'm going to

15     open up the line.  For the folks who wish to remain on the

16     line, I see Mr. Jordan, Mr. Chapple, and Brimmage.  I'm

17     going to keep your line open.  I just ask that you please

18     keep your phone on mute.  But that way, you don't have to

19     keep hitting five star.  So why don't I just begin by taking

20     appearances.  And if you wouldn't mind just telling me in

21     which case you're making an appearance.  Sometimes I guess

22     that could be both.  Mr. Battaglia, I see you there.  Why

23     don't you go first?  Start the party.

24               MR. BATTAGLIA:  Good afternoon, Your Honor.  Ray

25     Battaglia for Free Speech Systems.  I'm appearing in both

1    cases.  I have with me today Patrick McGill, the chief

2    restructuring officer for Free Speech Systems.

3            THE COURT:  Okay.  Good to see you, Mr. McGill.

4    Okay.

5            MR. RUFF:  Good afternoon, Your Honor, Jayson Ruff

6    and Ha Nguyen from the U.S. Trustee's Office, appearing I

7    both cases.

8            THE COURT:  Okay.  Good afternoon.

9            MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi

10   Moshenberg and Nick Lawson here on behalf of the Texas

11   plaintiffs in both cases.  And we'll have Marty Brimmage and

12   David Zensky speak on our behalf today.

13           THE COURT:  Okay.  Good afternoon.

14           MR. LEMMON:  Your Honor, Steve Lemmon on behalf of

15   PQPR.  We are a party only in the FSS case.

16           THE COURT:  Okay.  Good afternoon.

17           MR. SHANNON:  Good afternoon, Your Honor, R.J.

18   Shannon on behalf of Shannon and Lee, LLP.  I'm just in the

19   Free Speech Systems.

20           THE COURT:  Okay, good afternoon.  Mr. Brimmage,

21   Mr. Zensky, if you can, just hit five star.  I know that

22   you're there.  You'll be making an appearance.  I can see

23   you now.  There are a number of people on the line and it's

24   just easier.  Got you.  All right.  Mr. Brimmage, did I get

25   you?

1          MR. BRIMMAGE:  You did, Your Honor.  Good

2     afternoon, Marty Brimmage with Akin Gump Strauss Hauer &

3     Feld, here on behalf in the FSS case, on behalf of the Texas

4     and Connecticut plaintiffs.  And I'm joined, today, Your

5     Honor, by my partners, Sara Brauner and David Zensky who

6     will both take speaking roles in this hearing today.  Also,

7     Your Honor, I just want to give the Court a heads up that

8     last week, the formation of a committee was announced and

9     appointed by the U.S. Trustee in the Alex Jones bankruptcy

10    case before Your Honor, the Chapter 11.  That is at Docket

11    42.

12         At Docket 56, just before the hearing today, we

13    filed a notice of appearance, Your Honor.  Akin Gump has

14    just earlier today been retained to represent that

15    committee.  So we will be appearing in the Alex Jones

16    Chapter 11 case on behalf of the committee.

17         And if I could, Your Honor, when the Court has one

18    second, I would just like to announce who the committee

19    members are.  We don't have to do it now, but I'm happy to

20    do it whenever the Court would like.

21         THE COURT:  Okay.  I did see the notice.  So I do

22    know who the committee members are.  Let me go ahead and

23    continue taking appearances at this point.  Mr. Zensky, did

24    I unmute your line?  I just want to make sure you've been

25    unmuted.  Oh, I did not.  I think I got you now though.

1            MR. ZENSKY:  There we go.  Can you hear me now,

2    Your Honor?

3            THE COURT:  Just fine.  Good afternoon, sir.

4            MR. ZENSKY:  Good afternoon, Your Honor.  David

5    Zensky, Akin Gump Strauss Hauer & Feld.  And with me is my

6    colleague, Sara Brauner, appearing for the Sandy Hook

7    families in both the FSS case and the Jones case today.

8            THE COURT:  Okay.  Good afternoon.

9            MS. FREEMAN:  Good afternoon, Your Honor.

10   Elizabeth Freeman on behalf of Melissa Haselden, the

11   Subchapter V Trustee for FSS.  We're appearing in the FSS

12   case.

13           THE COURT:  Okay.

14           MS. FREEMAN:  Additionally, Your Honor, appearing

15   remote on behalf of M3 is Brian Griffith.

16           THE COURT:  Okay.  I see you there, Mr. Griffith.

17   Good afternoon.  Ms. Haselden, Mr. Griffith, if any of you

18   want to speak today, go ahead and hit five star and let me

19   just be able to recognize you and at least unmute your line.

20           Ms. Driver, I see you there.  Do you want to make

21   an appearance at this time?  And if you hit five star, that

22   will -- I think I see you there.  Did I get you, Ms. Driver?

23           MS. DRIVER:  Yes, I think so.  Thank you, Your

24   Honor.  Vicki Driver on behalf of Alex Jones, appearing in

25   the Alex Jones case, as well as appearing in the FSS case on

1    behalf of Mr. Jones.  Also remote with me is Mr. Jordan.

2    And Mr. Jones is here and we are actually in the same

3    conference room, but I just have one camera set up.  If

4    there is any issue or concern with that, please let me know.

5         THE COURT:  Okay, no, thank you.  And good

6    afternoon, Mr. Jones.  Mr. Jordan, can you unmute your line.

7    Hit five star.  Did I unmute already?

8         MR. JORDAN:  I hit five star, but I'm not sure.

9         THE COURT:  I can hear you, so that's victory.

10   Anyone else wish to make an appearance?  Go ahead and hit

11   five star at this time.  Okay, there's a 713, last four

12   digits 2814.

13        MR. CHAPPLE:  Good afternoon, Your Honor.  This is

14   Ryan Chapple.  Can you hear me okay?

15        THE COURT:  Just fine.  Good afternoon, sir.

16        MR. CHAPPLE:  And I'm appearing for the

17   Connecticut plaintiffs in both matters.  Thank you, Your

18   Honor.

19        THE COURT:  All right.  There is an 832 number I'm

20   about to unmute.

21        MR. RIDULFO:  Your Honor, I believe that's me.

22   Good afternoon.  It's Mike Ridulfo, for Schwartz Associates.

23        THE COURT:  Okay.  Good afternoon.  Anyone else

24   wish to make an appearance?  You certainly can reserve your

25   opportunity to do so.  Okay.  It sounds like that's it for

1    now.  For the folks who have unmuted, please keep your line

2    on mute, but feel free to speak when appropriate

3           So Mr. Battaglia, why don't I start with you.

4    Maybe you and Ms. Driver can tell me where things stand and

5    where we're going.  I appreciate everyone coming today.

6           It sounds like a lot of things have gotten worked

7    out potentially, which is great.  Mr. Jones, I appreciate

8    you participating today.  It thought there were going to be

9    some contested issues today.  I think it's important

10   sometimes to just have a client -- obviously, the client

11   here just in case someone needed to hear from you and get

12   your thoughts on stuff, but we'll see where things go.  I

13   don't have any particular questions for you.  There were a

14   number of matters that were contested and I just thought it

15   made sense to just have, sometimes it's good to have the

16   client there.

17          Let me, Mr. Battaglia, turn to you.

18          MR. BATTAGLIA:  Yes, Your Honor.  Ray Battaglia

19   for Free Speech Systems.  I'm pleased to report that

20   substantially everything on both cases is resolved and I'll

21   let Ms. Driver speak as to the Alex Jones matters.  There

22   are some -- there is some dialog that I know needs to be had

23   and I think the M3 application has some opposition to it.

24   But let me go through the Free Speech matters on the Court's

25   docket and then I'll let Ms. Driver address hers.

1            There is a continued cash collateral hearing.

2     This would be the seventh interim cash collateral.  The

3     budget was circulated to the parties last week.  The

4     proposed order was circulated Sunday.  I have not received

5     any comments, save one, to the budget or the form of order.

6     There are some changes or tweaks in the order based on the

7     change in the way the debtor is operating.  So, for example,

8     it used to provide that we would pay fulfillment costs to

9     Blue Ascension.  We're not using Blue Ascension.  So that

10    had to be modified.

11           I also simplified it so I'm not referring to the

12    first interim, second interim, third interim.  It's just

13    first and subsequent.  But other than that, the order is

14    substantially in the same format as all of the preceding

15    interim orders.  We still have not concluded payment to PQPR

16    of a half million dollars.  I expect that will happen during

17    this period.  And when it does, we'll send the notice that's

18    required to be sent.

19           There is a limited objection of Alex Jones to the

20    cash collateral motion.  I'll let Ms. Driver address that

21    and we can talk about what needs to be done in that context

22    at that time.

23           THE COURT:  Okay.

24           MR. BRIMMAGE:  There is an application authorizing

25    the employment of Texas, appellate counsel for the Texas

1    matter.  That's the Martin Disiere firm and I'm sure I'm

2    mispronouncing the second name but there are no objections

3    to that.  The Court has noted, and it's not been lost on me

4    or my client, as has the U.S. Trustee's office, that the 60-

5    40 split proposed on fees and there is not what the Court is

6    likely to approve.  So with the caveat that Mr. Jones has

7    the right at some point to come back and ask for a

8    reallocation, we'll upload a new order authorizing their

9    employment on a 50-50 fee-splitting basis.

10           THE COURT:  I think that's fair.

11           MR. BRIMMAGE:  There is, at Docket 282, the

12   application to employ M3.  That has opposition from PQPR.

13   I'll let Mr. Lemmon address that and Miss Freeman.  There is

14   at Docket 289, the second emergency motion to extend the

15   time to file a plan of reorganization.  And let me just make

16   this one comment.  Obviously, we are proceeding in mediation

17   and we are proceeding.  We had, I think both parties have

18   met at least telephonically or video with the judges

19   recently.  And so there needs to be an exchange of

20   information before we really get going on that.  But they're

21   interrelated obviously.  The timing of a plan, and should we

22   file something that's a template, that may be a distraction

23   as opposed to an advantage.  So we've asked for an extension

24   through a date of your choice through February but,

25   obviously, Your Honor can extend it to whatever time period

1    you think is appropriate.

2            THE COURT:  Okay.

3            MR. BRIMMAGE:  Then there is in the Free Speech

4    case, a motion filed by Alex Jones, an emergency motion to

5    modify the stay orders.  I think that has been resolved.

6    But again, I'll let Miss Driver address that matter.  It's

7    her motion when she addresses the matters pending in the

8    Alex Jones case.  And I'm happy to proceed however you wish

9    to at this point.

10            THE COURT:  Okay.  Let me -- so actually, you know

11    what?  It's probably best for me to hear from Ms. Driver and

12    kind of just set the table for what we're dealing with in

13    the Jones case.  Miss Driver, I'm going to turn things over

14    to you and you can kind of tell me.  And then I'm going to

15    turn to Mr. Brimmage and just hear from the committee in the

16    Jones case, but just in terms of what's set for today and

17    what we have to kind of take up?

18            MS. DRIVER:  Certainly, Your Honor.  We have the

19    stay motions which sort of we're the opposite side of one

20    coin, filed by the plaintiffs in the Jones case and then

21    (indiscernible) case.  We've come to a resolution that if it

22    is the plaintiff's desire to spend the money on the

23    (indiscernible) counsel, that we are not going to stand in

24    the way of that.  It was our hope at the beginning that we

25    did want to preserve those amounts, but if that is not the

1   wish of the plaintiffs, then it is what it is.  And we will

2   just allow that to move forward.

3          So we have compromised with the plaintiffs.  This

4   panel Ms. Brauner was very helpful in getting us terms of

5   the order so that we could agree that essentially as long as

6   our appellate counsel is approved by this Court and their

7   fee structures approved by this Court, that we could again

8   pay those professionals and it wouldn't be an argument over

9   paying our counsel.  So I believe that there's an order

10  that's been uploaded to Your Honor that's been approved by

11  the parties.

12         The only other issue with that is a caveat to Mr.

13  Jones' salary from FSS and I'll get to that in a minute.  So

14  that resolves both of those motions I believe and there's

15  just a companion order for FFS that essentially mirrors that

16  order that will resolve their motion in our case.  And then

17  once the order is entered, we will withdraw the motion in

18  the FSS case.

19         THE COURT:  Okay.  What else are we taking?  I

20  know there was a joint admin.  Are you still going forward

21  with that, Ms. Driver?

22         MS. DRIVER:  Your Honor, we were trying to do that

23  for administrative convenience.  Unfortunately the U.S.

24  Trustee's office and Subchapter V Trustee did not agree with

25  us that joint administration was the right thing to do here.

1    I think it's just a bit of an administrative non sequitur

2    related to having a Chapter 11 case and Subchapter V case

3    jointly administered.  The good news is the first thing I

4    wanted was to end up in front of the same judge, which

5    happened automatically.  And then the second thing is that

6    we could have joint hearings, which appears to be happening

7    automatically.  And that we could jointly employ

8    professionals and have them file the applications jointly.

9    I think we could take care of this was just a really simple

10   limited order under an administration.  But just as we will

11   have, you know, we will have joint hearings without any

12   special permission between the cases and that employment

13   applications can be filed in both cases.  They don't --

14   while they need to deal with the conflict in both cases,

15   don't necessarily need to be different.  And then the app,

16   of course, can be filed in both cases identically.  And

17   then, of course, the fee sharing will be according to the

18   deal between FSS and Mr. Jones.

19            THE COURT:  So let me just tell you, Ms. Driver,

20   my thoughts on joint admin.  It's such a routine motion.  I

21   normally don't even, I normally just sign them without even

22   -- in this case, it is complicated because now, you know

23   you've got a CRO and then you've got an individual.  The

24   Sub-V 11 part doesn't really bother me that much.  What is

25   going to get confusing is if kind of what happened today

1    where, you know, Mr. Jones files a limited objection in a

2    Free Speech case with a Free Speech heading, it's just going

3    to start to get a little bit unruly and you have the Texas

4    plaintiffs in one case who may also be a member of the

5    committee in another case.  And it's just going to start to

6    get a little confusing.  And I want to make sure that they

7    understand what their roles are in one case versus the

8    other.  But I assure you, Miss Diver, I'm going to call

9    every case, every time I call a Free Speech case, I'm going

10   to jointly call the Jones case.  And if there's a hearing

11   set in the Free Speech case or the Jones case, anybody can

12   self-calendar a motion on those dates.  So they will

13   effectively be jointly administered.  Whatever is most

14   efficient in terms of filing motions and as long as

15   everyone's getting a fair and due process in each case.  I

16   can assure you I'd like to keep these cases separate because

17   I think I want to make sure that the parties understand

18   their roles, their separate roles in these cases including

19   creditors, right, including the Texas plaintiffs.  But I

20   also think it's going to get a little confusing if, for

21   example, Free Speech objects to a motion with their own

22   heading.  And I think that's going to get a little

23   confusing.

24          But effectively, I will always call these cases

25   together because they should be called together in my

1    opinion.  And maybe we'll have a one off every now and then,

2    but you will effectively have joint administration.  Fee

3    applications will be taken up in the most efficient manner.

4    So you don't have to worry about any of those issues with

5    me.  Whatever makes the most sense, as long as parties are

6    getting due process, you're not going to have a problem with

7    me on those things.  So you can upload an order if you want

8    or you can just take my word on it.  Whatever is the most,

9    whatever makes the most sense we'll take care of.

10           I just want to make sure that everyone kind of

11   knows, you know, if Jones is going to file the schedules,

12   then they can look to the schedules in that case and things

13   of that nature.  It just makes things easier.  But you won't

14   have to worry about dates and calendaring and separate

15   hearings going on.  I'm not doing that.  So you'll

16   effectively have joint administration.  Okay?

17           MS. DRIVER:  Your Honor with that, I don't see any

18   reason for us to do anything other than just withdraw the

19   joint administration motion.

20           THE COURT:  Okay.

21           MS. DRIVER:  And I think that'll just resolve the

22   objections.  We're just not here to try to spend political

23   capital to get into semantic arguments.  We're just trying

24   to work with everyone as best we can.

25           THE COURT:  I got it.  And I think the way that

1   you all did it today like, for example, with the lift stay

2   motions I think, yeah it creates a little bit of extra

3   paperwork but it keeps things clean in a way that everyone

4   can understand and I'm fine with it.  I have no issues with

5   that.  I think you also have a schedules extension motion,

6   right?

7          MS. DRIVER:  We do.  I believe it was on negative

8   notice but we have come to an agreement with the U.S.

9   Trustee on the amount and we've received no other

10  opposition.  So if Your Honor would like, we're just happy

11  to submit a certificate with no objection.  It would just be

12  a 30-day extension.  So it would be the 14 days we normally

13  get under the code plus 30.  So it would be a total of 45.

14  I think that puts us out just slightly past the 341 hearing.

15         THE COURT:  Can you just -- why don't we just pick

16  a date so there's no confusion and no foot faults or any of

17  that stuff.  Why don't we just pick a date?  Where does that

18  roughly put you?

19         MS. DRIVER:  January 15th, Your Honor.  And I'm

20  just looking at that to make sure it's not a weekend.

21         THE COURT:  Let's take a look.

22         MS. DRIVER:  Oh, it's a Monday.  Oh, it's a

23  Sunday.

24         THE COURT:  It's a Sunday.  And then the 16th is

25  MLK day.  Why don't I just give you the 17th?

```
 1           MS. DRIVER:  That would be wonderful.  Thank you,
 2   Your Honor.
 3           THE COURT:  All right, January 17th, schedules
 4   extension.  What's the docket number on that?  I'll just
 5   enter that.  This one, I'm going to -- I know everybody's
 6   been talking and I appreciate it.  I want -- it's important
 7   to get accurate schedules and if the professionals are
 8   telling me they need time to get this done, then it is what
 9   it is.  And if you need the time, it seems reasonable to me.
10   What's the docket number on that?
11           MS. DRIVER:  Your Honor, I apologize.  I don't
12   have the docket order right off.
13           THE COURT:  No, it's okay.  I just want to sign
14   the order right now.  And I'll just, what I'll do on the
15   order is I'll just say January 17th and that means January
16   17th.  That way, you kind of know what it is.
17           MS. DRIVER:  That's perfect.
18           THE COURT: And that means 11:59.  Right?
19   Whenever it gets signed.
20           MS. DRIVER:  I haven't told Mr. Jones we can file
21   up until midnight.  So thank you, Your Honor.
22           THE COURT:  Yeah.  Mr. Brimmage, let me hear from
23   you.  And then I think it's probably appropriate for me to
24   hear from the committee.  And you can tell me about the
25   committee members.  That the one I'm glad to hear that
```

1   you're hired counsel. And I know that you're thinking about

2   these things.  I'm just saying it so that it's said.  And

3   I'm sure that you've already started thinking about all of

4   these things.

5        And I want to make sure that the committee members

6   kind of, right, they're kind of involved in two separate

7   cases and individual capacities.  And then also probably

8   mediating and that's a lot.  And I want to make sure that

9   they just hear it from me and all the I'm sure the advice

10  that you're telling them about fiduciary duties and all of

11  that, they're incredibly important.  And I just want to make

12  -- I know that you're talking to them.  I've got you and Mr.

13  Chapple.  They don't need to hear the speech from me.  I'm

14  saying it so that it's on the record.  They're going to be

15  wearing multiple hats and it's really important that they

16  listen to the advice of counsel and listen to you and Mr.

17  Chapple as you advise them on their particular roles because

18  it's really important that they kind of understand the way

19  it is.  Sometimes there's overlap.  Sometimes there's not.

20  So no one needed me to say that. I'm just saying it so that

21  it's on the record.

22       So Mr. Brimmage with that, I'll -- and Mr. Zensky,

23  I'll turn it over to you.  If you have anything on behalf of

24  the committee.  I just appreciate that they, that they've

25  got good counsel.

1          MR. BRIMMAGE:  Absolutely, Your Honor.  And I'll

2     say a couple things and then I'll let Miss Brauner and Mr.

3     Zensky chime in.  So you're absolutely right.  There's a lot

4     going on in these two cases all at the same time.  And just

5     to level set, Your Honor, you have the Texas group of

6     plaintiffs and you have the Connecticut group of plaintiffs

7     who both have counsel and have appeared in the FSS case.

8     Just as a reminder, Mr. Chapple represents the Connecticut

9     plaintiffs and Mr. Moshenberg and Mr. Martin represent the

10    Texas plaintiffs.  And so you do have that going on.  And

11    just to also level set, Your Honor, the committee is

12    comprised of only members from the Texas and the Connecticut

13    plaintiffs group.  Just to let the Court know, there's

14    Robert Parker from the Connecticut plaintiffs group, Nicole

15    Hockley from the Connecticut plaintiffs group, Jennifer

16    Hensel from the Connecticut plaintiffs group, David Wheeler

17    from the Connecticut plaintiffs group, Leonard Pozner from

18    the Texas plaintiffs group and Scarlett Lewis from the Texas

19    plaintiffs group.

20         And so we understand what you said, Your Honor.

21    We actually completely agree there's a lot of things going.

22    There are fiduciary duties on behalf of the committee that

23    must be adhered to and we will be working with not only the

24    committee members, but also their separate counsel in the

25    cases to make sure that we're all doing the things that

1   we're supposed to do.  And, of course, if we have any

2   questions about it or need any guidance, Your Honor, we'll

3   come to you and lay that out.  But we appreciate you letting

4   us know and reminding us because we do take those

5   obligations very seriously.

6          Let me just say one other thing about -- go ahead

7   Your Honor, if you had anything to say.

8          THE COURT:  No, you don't need me to remind you.

9   I'm just saying that so it's on the record.  Not that anyone

10  needed to hear from the judge on that point, but just, I

11  just think it's important that it's said from the Court that

12  these things were on my mind and I was thinking about the

13  multiple hats that everybody has.  And that's, it can get

14  confusing and I just wanted to make sure that everybody was

15  listening to their counsel and individual counsels.  That's

16  it.  Go ahead.

17         MR. BRIMMAGE:  Thank you, Your Honor.  One

18  suggestion before I turn it over to Mr. Zensky and Miss

19  Brauner.  We're totally fine in how the Court wants to

20  handle the joint hearings and joint notices and all that

21  good stuff.  What might be helpful going forward to all of

22  us, and maybe this is just a me thing, but if Mr. Battaglia

23  on behalf of FSS, Miss Driver, on behalf of the Jones

24  bankruptcy proceeding, get together and file an agenda

25  before for the hearing so we can all be kept straight on

1    what's happening in which estate and what's going on.

2    That's not a complaint, it's just a suggestion because like

3    the representation issues, there's just a whole lot going on

4    all at the same time.  And I think that might just help us

5    keep all on the same page.  Just a suggestion, Your Honor.

6           THE COURT:  No, what I was thinking too, Mr.

7    Brimmage, is I think what may -- look, I think an agenda is

8    going to be necessary if we're going to call them together

9    and it may make sense.  And I'm, you know, someone just

10   reaching out to my case manager and if, you know, things are

11   coming up, just got a couple of dates, right?  What you know

12   may be important and we can, you know, we can have omnibus

13   date and then I'll pick it.  I'm happy to do it.  Whatever

14   is the most efficient there, Mr. Battaglia.  You all can get

15   together and you can pick, you know, if something's coming

16   up and you need a hearing on something, just pick a -- just

17   get my case manager and you can both self-calendar and there

18   can be an agenda filed, a joint agenda for that stuff.

19   Yeah, essentially, that's the way it would operate if it was

20   jointly administered.  So let's just, since we're kind of de

21   facto doing that, let's just continue doing that.  So it

22   makes sense to me.

23          MR. BRIMMAGE:  And with that, Your Honor, given

24   that Miss Brauner and Mr. Zensky had dealt with all the

25   other issues that the Court has heard about today, let me

1    turn it over to them for their thoughts.

2             THE COURT:  Mr. Zensky.

3             MR. ZENSKY:  Thank you.  Yeah, good afternoon,

4    Your Honor.  David Zensky.  Can you hear me?

5             THE COURT:  Just fine.  Good afternoon.

6             MR. ZENSKY:  Great, good afternoon, Your Honor.

7    As you, as you've heard and discussed with Miss Driver and

8    Mr. Battaglia, I think that all of the issues that the

9    family's had before today's hearing have been worked out.

10   As you know, we filed a motion, an emergency motion in the

11   Jones case to modify the stay, which was the flip side of

12   the coin of Mr. Jones motion in the FSS case as Miss Driver

13   described it.  Those have been resolved and you have before

14   you two proposed orders on consent.  In the Jones case, it's

15   Docket 55, and in the FSS case, it's Docket 329.  And

16   they're basically mirror images of each other.  There are

17   little tweaks in the FSS order because there had previously

18   been a form of relief in the Connecticut cases that was a

19   little different from the Texas cases.  So that's addressed

20   and that's not superseded by this order, this proposed

21   order.  In any event, subject to Your Honor having any

22   questions, those issues have all been worked out.

23            Mr. Battaglia referred to his motion at Docket 299

24   to extend the deadline for the filing of a plan.  The

25   families have not filed an objection to that and Mr.

 1    Battaglia has agreed that whatever extension the Court may
 2    grant for the plan, for the filing of a plan, it will also
 3    apply to the deadline for filing challenges to
 4    dischargeability in the FSS case.  So right now, I think
 5    those dates were staggered by about three weeks.  The
 6    current deadline for non-dischargeability actions is January
 7    5th.  So we would ask the Court at the same time as
 8    determining what to do on the plan deadline, treat that
 9    deadline as the same and extend it the same amount of time.
10    And of course, that's with the reservation of rights of all
11    parties as to legal and factual issues regarding those
12    motions.
13            THE COURT:  Okay, let me just see if we can kind
14    of clear the deck a little bit.  Is there any, as I
15    understand those motions, one is essentially agreeing to
16    lift the stay in each of those cases or to confirm that the
17    stay is lifted in one and then agreeing to lift the stay in
18    the other to allow final judgment to be entered in the
19    Connecticut cases and subject to -- I'd also have to approve
20    then appellate counsel at that time.  I want to make sure
21    it's clear in my mind that that's the part, that that's the
22    deal because I want to make sure that whatever I sign, when
23    a court in Connecticut looks at what I've done, that we all
24    have agreed what it is that I signed and what the party's
25    expectations are.

1         MR. BATTAGLIA:  Your Honor, Ray Battaglia for Free

2    Speech Systems.  And Miss Driver can elaborate further, but

3    generally speaking, obviously we need to retain appellate

4    counsel.  We're doing that in Texas with the matter before

5    the court today.  And I probably need a new order for you

6    with the 50-50 split.  And I'll do that.  On Connecticut

7    counsel, Norm Pattis, who has represented the debtor, both

8    debtors in the litigation is the almost certain candidate to

9    be the appellate counsel.  I will need a new application to

10   expand the scope and the terms of his employment.  And

11   essentially the orders that are before you today say there's

12   no objection to the joint representation by appellate

13   counsel of FSS and Alex Jones.  And it has some additional

14   language about their fee applications and how that process

15   goes forward.  But generally speaking, that's correct.

16   We're saying the cases can go forward to final judgment,

17   which means also post-trial motions and appellate

18   proceedings, and that the parties, the debtors will retain

19   their counsel and the plaintiffs won't object to retention

20   of joint counsel and some standards, in essence, regarding

21   compensation.  That's my appreciation of that.

22         THE COURT:  Okay, so let me, since you're standing

23   up there Mr. Battaglia, I'm going to give you on your

24   extension of the time to file, I want to hear thoughts on

25   two things.  I want to hear if anyone has any comments on me

1    just signing the orders.  It sounds like there's an agreed

2    order in both cases.  There's consent.  I've got no issues

3    with those proposed orders as filed.  I'm willing to sign

4    them right now and get those on the docket.  Subject to your

5    confirmation and your understanding on that, I can sign both

6    of those orders right now.  And I'm, I think February 17th,

7    Friday, February 17th, on the extension of the time to file

8    the plan and extension of the time to file an objection to

9    dischargeability.

10         MR. BATTAGLIA:  If Ms. Brauner will send me a

11   paragraph to add to the order, I'll upload a revised order

12   with February 17th as the date.  Obviously, we're reserving

13   the right to come back

14         THE COURT:  I can, I can add that in.  I don't

15   mind doing that.

16         MR. BATTAGLIA:  I hate, I don't like making you my

17   secretary, Judge.  That's not my intent.

18         THE COURT:  No, I mean it's just easier if I can,

19   if the folks want, I can just copy it.  You know we can just

20   use the same language that we did before and keep it.

21         MR. BATTAGLIA:  I think we did a separate

22   stipulation with Mr. Chapple on the extension of the

23   dischargeability.

24         THE COURT:  Oh.  I'd like to, well then why don't

25   you upload that?

1            MR. BATTAGLIA:  I'll do that, Judge.  And I'll

2     send it to Ms. Brauner and she can --

3            THE COURT:  But that's my understanding.  By

4     signing this order today, Mr. Zensky, whatever the deal was

5     last time an extension, Miss Brauner, the extension of

6     dischargeability, it's the same deal.  It'll run the same

7     way to February 17th and I want to make sure that February

8     17th is actually a real date.  I'm going to make sure.  Yes,

9     February 17 is a Friday.  Okay, Does that work for you?

10    Miss Brauner, Mr. Zensky, does that work for you?

11           MR. ZENSKY:  Your Honor, David Zensky.  Just to be

12    clear, February 17th is the new date, the new plan deadline

13    and then the dischargeability will be like three weeks after

14    that.

15           THE COURT:  That's correct.  Whatever the deal

16    was.

17           MR. ZENSKY:  The same deal once again.

18           THE COURT:  That's exactly right.

19           MR. ZENSKY:  That's great, Your Honor, thank you.

20           THE COURT:  Okay.  All right.  I'm going to sign

21    these orders lifting the stay right now so that then tells

22    me --

23           MS. DRIVER:  So --

24           THE COURT:  Go ahead.  Unless somebody tells me

25    otherwise.  Go ahead, Miss Driver.

1         MS. DRIVER:  I'm sorry, Your Honor.  I think it's

2    clear in the order that the only thing that we're really not

3    allowing to forward at this point is collection.  Obviously,

4    that will (indiscernible).

5         THE COURT:  I got that part.

6         MS. DRIVER:  Thank you, Your Honor.  I appreciate

7    that.

8         MR. ZENSKY:  Your Honor, just to be clear in your

9    comments, I think you referenced just the Connecticut

10    plaintiffs but the orders before you apply to the Texas

11    plaintiffs whose cases have gone to verdict and are ready

12    for judgment and whatever follows.  So the orders apply to

13    both.

14         THE COURT:  That's right.  Because that's the

15    definition of the Sandy Hook post trial families, right?

16         MR. ZENSKY:  Right.  Exactly Your Honor.

17         THE COURT:  That's exactly right.  No, no, I

18    appreciate the clarification on the record.  That's

19    important.  Thank you.

20         MR. ZENSKY:  You're welcome.

21         THE COURT:  Okay, I'm signing that order right now

22    and let me sign.  I'm sorry, I'll make sure I got this

23    right.  I just signed the lift stay order in the Free Speech

24    case and in the Jones case, so we should be -- now, and I'm

25    going to sign an order extending -- does anyone have any

1   objection to the extension of the time through February

2   17th?  Any objection to that?  And I am going to sign that

3   order.  Folks, give me a second.  I just want to clear the

4   deck because I'm going to enter these orders right now as we

5   speak.  We'll send them off to docketing so that we can at

6   least clear the deck and figure out what's really left.

7            Okay, I appreciate everyone's patience here.

8   Okay, I have now signed that order.  So that -- let me just

9   take up the Texas appellate counsel.  Is there any objection

10  to the Texas appellate counsel?

11           MR. BATTAGLIA:  None were received other than the

12  verbal concerns about the split on the allocation of fees.

13           THE COURT:  Subject to a 50/50 split, which I'll

14  upload, that's approved.  Okay.

15           MS. DRIVER:  Your Honor, I'm bootstrapping a

16  little here so I apologize.

17           THE COURT:  Go for it.

18           MS. DRIVER:  Is it possible for me to just file

19  the same application to be employed in Mr. Jones's case?  I

20  think we have maybe three additional creditors, making sure

21  those are served by mail if not bought via UCF, could we

22  just have a negative time period on that so we can get that

23  running?

24           THE COURT:  Yeah, I think that makes sense.

25           MS. DRIVER:  Okay.  And I think that, you know,

1    most of the claimants are truly represented in this matter,

2    in both matters.  So we'll make sure that any additional

3    creditors that we have on his side get that notice.

4         THE COURT:  Okay.  That sounds perfect.  So now

5    we're getting closer I think to actual contested issues.

6    All right, sounds like according to judge notes, don't trust

7    them, I think in the Free Speech case, we're left with M3

8    and cash collateral.

9         MR. BATTAGLIA:  That's correct, Your Honor.  Cash

10   collateral, as I said, the only comment is Alex Jones'

11   limited objection regarding his salary and I'll let Ms.

12   Driver speak to that.

13        THE COURT:  What's your position on that?

14        MR. BATTAGLIA:  Well, Your Honor, it is clear to

15   Mr. McGill and to me as debtor's counsel that in the absence

16   of Mr. Jones being on the air broadcasting and promoting

17   products that the FSS case is not tenable.  And so he is

18   he's a vital cog.  Compensation for people in his position

19   is considerably more than what we're paying.  We're paying

20   $20,000 per pay period.  There's an advisory about some

21   additional value that's basically -- that I submitted the

22   last hearing.  But his salary under his employment contract

23   prepetition was set at a million three.  And so we're not in

24   a position to pay a million three as it stands right now.

25   What's he worth to the debtor?  He's worth a lot and he's

1    worth more than he's getting paid.

2         From Mr. McGill's perspective, it's a question of

3    what are we currently able to pay?  The budget that has been

4    submitted to you in the cash collateral order shows a pretty

5    flat line period of time during this 30 days.  So our cash

6    is not inconsequential but it's not growing and it's not

7    likely to grow during this period.  We have some product

8    purchases we have to do that won't turn into revenue until

9    an out period.  So it's, you know, with concerns about

10   administrative insolvency of the kinds of things that are

11   liable to come before you in terms of professionals being

12   employed, we think he's worth more than that.  Whether we

13   can pay it and what that number is, is a question I leave up

14   to the Court and the parties.  It was set where it was set

15   because --

16        THE COURT:  Leave it up to me, huh?

17        MR. BATTAGLIA:  It is.  All things are, Judge.  At

18   the end of the day, it was set where it was set based on an

19   objection to the original cash collateral order.  It was set

20   at 10,000 a pay period.  It was increased subsequently to

21   20,000 pay period.  That's where we stand right now.

22   Obviously, now that he's in bankruptcy, in particular, he

23   has certain expenses that he's going to be obligated to

24   meet, that his only, his most significant source of revenue

25   -- and I won't speak for his only source -- will be whatever

1    compensation he received from Free Speech Systems.

2            THE COURT:  Okay, let me ask, does anyone have any

3    thoughts on or any comments with respect to cash collateral?

4    Ms. Driver, I'll turn to you last because I know -- let me

5    just kind of hear from everyone else first.

6            MS. DRIVER:  Absolutely, Your Honor.  Thank you.

7            MR. BRIMMAGE:  Your Honor, Marty Brimmage.

8            THE COURT:  Yes, sir.

9            MR. BRIMMAGE:  Whenever it's time, you let me

10   know.

11           THE COURT:  Now's a good time.

12           MR. BRIMMAGE:  Okay.  Your Honor, Marty Brimmage,

13   again.  A couple of thoughts, Your Honor.  We are definitely

14   in no position right now to agree to increase salary or

15   compensation for Mr. Jones as part of the cash collateral

16   order or anything else at this point.  This issue just very

17   recently came up.  We talked to Miss Driver about it and

18   we've let her know that we do not support that.  In fact, we

19   object to that at this point in time.  We have said that we

20   will work with her in the coming weeks to see if there's

21   something that we can work out in due course, but we're not

22   there yet.  And so we don't have authority to agree to it.

23   And we don't think it's the appropriate decision at this

24   point in time given where we are in the case and just -- the

25   committee has just now been formed and what else is going

 1    on?  But again, Your Honor, in good faith we're happy to

 2    work with Miss Driver and Mr. Battaglia and work through

 3    those issues.  And I think we told her that this morning, so

 4    this doesn't come as a surprise to her.  But we believe,

 5    Your Honor, at this point there should be no changes to the

 6    budget.  I think what you just heard from Mr. Battaglia is

 7    the money is not there.  So it seems like in addition to us

 8    not being in agreement at this point in time, I mean money

 9    just doesn't grow on trees.  So at this point in time, we

10    would respectfully request one of two things: either the

11    Court deny the cash collateral request as it relates to

12    increasing salary for Mr. Jones at this point in time or

13    that Miss Driver just withdraw it for now let's revisit it

14    in the coming weeks.

15             THE COURT:  Anyone else?  Mr. Battaglia.

16             MR. BATTAGLIA:  Your Honor, I do just want to be

17    clear that I think the November MOR shows the cash balance

18    of a million eight.  And obviously this is a very fluid

19    number in terms of when there are purchases of inventory

20    that have to be made and when cash comes in.  So I don't

21    want to suggest we're on our last nickel, but we are headed

22    into as many retail operation is, a quarter that will likely

23    be softer.  And we have changed the process that we're

24    working under in terms of a fulfillment group that's new.

25    And so our experience in really gauging what that's going to

1   mean, we think we have cut expenses significantly by doing

2   that and by changing the credit card processing.  But what

3   that means to the bottom line is kind of we don't know until

4   we see it in this first period.  So I wanted to clarify

5   that.

6           THE COURT:  Okay.  Let me --

7           MR. BRIMMAGE:  Your Honor, one other point that I

8   forgot to mention and I apologize.  The contract, the

9   contract on which Miss Driver I think is basing this, has

10  not been assumed or even been moved to be assumed and that

11  is a process that we all are familiar with that we can

12  undergo and see where that all plays out.  But that we think

13  from our standpoint, that is the process that should be

14  undertaken if that is the amount of money that they want Mr.

15  Jones to make pursuant to that employment agreement.

16          THE COURT:  Anyone else wish to be heard before I

17  turn -- let me hear from --

18          MS. FREEMAN:  Just very briefly, Your Honor.  From

19  the Subchapter V Trustee's viewpoint, it's an issue of

20  process.  And whatever the correct answer is, we believe is

21  something that should be determined after a motion is filed

22  and all parties have an opportunity to participate.

23          THE COURT:  Thank you.  Mr. Nguyen.

24          MR. NGUYEN:  Thank you, Your Honor.  I will be

25  brief.  The U.S. Trustee, we do oppose the salary increase.

1    This is the seventh interim cash collateral order.  We think

2    it's important to maintain the status quo given the posture

3    of the case with parties in the middle of mediation.  And

4    the contract that Miss Driver alluded to, it is a contract

5    that was signed back in April between Melinda Flores and Mr.

6    Jones.  I have serious concerns about who negotiated that

7    contract.  And just the last line for everyone, we are in a

8    Subchapter V case.  You have debtors that come before you

9    that don't nearly get about $40,000 every month.  You know,

10   debtors, debtors come to you and they file bankruptcy.

11   Everyone needs to tighten their financial belt and they need

12   to make things work.  If Mr. Jones wants to bring this case

13   through bankruptcy, he's going to have to work with what has

14   been negotiated.  This is, again, it's the seventh interim

15   cash collateral.  It's been like this since the beginning of

16   the case.  So I don't see any reason to change it now given

17   that the parties are in mediation.  And for those reasons,

18   we oppose the increase in salary.

19           THE COURT:  Okay.  I will say, though, you're

20   right, Mr. Nguyen, that there aren't many debtors who appear

21   that can generate the amount of revenue that Mr. Jones does,

22   right?  And that's the lifeblood of this company.  So it's

23   not the same.  Revenue is generated through the sale of

24   product and, you know, he's the guy that can sell it and so

25   it's not the same.  I'm not saying you're wrong.  I just got

 1    to balance that with the reality of where we are and you

 2    know, yeah that's all.  Just a thought.  It's true.

 3    Subchapter V and it's all that, but it's a unique situation

 4    here.  So, Miss Driver, here's -- let me hear from you.

 5         MS. DRIVER:  Yeah, let me offer -- well, first of

 6    all, I want to just talk about factors in seven cash

 7    collateral orders.  Mr. Jones told me, as his counsel, that

 8    he did agree to a smaller salary at the very beginning and

 9    it was increased slightly, but it was never to the -- he

10    never thought it was prejudicial to him seeking his full

11    salary.  So I hope the passage of time is not an issue here.

12         THE COURT:  That's not an issue.

13         MS. DRIVER:  This is the first time that -- yeah,

14    this is the first time the plaintiffs have seen his

15    employment contract and so I definitely understand the idea

16    that we would do it forever.  And without Mr. Jones, I think

17    it is pretty clear that Free Speech Systems would be

18    administratively insolvent and go to Chapter 7.  And right

19    now Mr. Jones can and may be forced to take third-party

20    employment if he cannot make what he needs to make to

21    survive.  And quite frankly, the same creditors that are

22    objecting to this really need us to maintain the assets and

23    the value of the homes, et cetera, so the backup value

24    doesn't decrease.

25         That said we can't put a budget in front of Your

 1    Honor yet.  We're just not there.  Mr. Schleizer and his

 2    team of BlackBriar are digging and we're trying to get that

 3    together.  But the good news is that any money that's coming

 4    in now is going to be fully transparent as to how it is

 5    spent and what it is spent for.  And we obviously are going

 6    to be, you know, sharing that information and bank accounts

 7    with everyone that really needs them.

 8         But what I might suggest in this situation is

 9    during the high months, he was making substantially less

10    because he had been asked to take a step down.  He

11    personally put $900,000 on the table into the Free Speech

12    System since the petition date for the purposes of paying

13    for shipping and some other things that the debtor couldn't

14    pay for it to keep the FSS debtor alive.

15         So there has been a much larger influx than deflux

16    of money from FSS to Mr. Jones.  However, I think having a

17    full hearing and looking at whether FSS wants to keep or

18    reject his contract is fair.  What I would request is that

19    he get his full salary for the month of December or January

20    only.  And then it is without any prejudice to the budget

21    going right back to where it was and we can have that full

22    and final hearing at the next hearing.

23         THE COURT:  The issue I think you're going to run

24    into, Miss Driver, with that, is that -- I don't have a

25    contract in front of me and we don't have any evidence.  And

1    unless that's going to get taken up today, then I don't know

2    how I can approve a salary based on a contract that won't be

3    admitted into evidence.

4         MS. DRIVER:  Your Honor, I do think that I did

5    designate it as an exhibit and I'm happy to offer it into

6    evidence, if you'd like.

7         THE COURT:  It's not filed on the docket.

8         MS. DRIVER:  Oh, I did serve it out on the

9    parties, Your Honor.  I did not put it on the docket.  Most

10   of things that are put on the docket here just published in

11   the press.  So I did just send it out on notice.

12        THE COURT:  I got it.

13        MS. DRIVER:  Understood, Your Honor.  I'm happy to

14   carry this, but I just didn't want another day to go by

15   without people understanding that, you know, he's got bills

16   to pay.  And some of these plaintiffs have claims, certainly

17   several against both entities, and so when you pull away

18   from one, you are by definition pulling against the other.

19   And so by keeping money in FSS and not having Alex make his

20   salary, then it is necessarily going to beg the question is,

21   can he continue financially to work for FSS?

22        THE COURT:  And here's a consideration, Miss

23   Driver.  As I look at the proposed budget over the next

24   couple of weeks, it shows cash negative.  I understand that

25   there's a, there's a cash balance, but it goes negative for

1   a couple of weeks.  And I'm concerned about that.  You know

2   does it make sense to kind of hold something, let's just say

3   in 30 days and take this up, take up a number?  I do

4   understand and I was here obviously and I agree with you

5   when the -- when I signed in the original -- or I should say

6   when I signed in this case the cash collateral budget, it

7   was certainly without prejudice to Mr. Jones coming in and

8   saying he wanted more, right?  That was just an agreement to

9   allow the process to continue.  And I signed that order.

10  And I do think, you know, he's filed a case.  He's here.

11  You know I think a committee just got formed.  And I think

12  normally what would happen is, you know, debtor's counsel

13  would speak to the committee.  And you know maybe there is a

14  number, but you know remember we're still talking FSS.

15  Which again, which is what confuses things, I think there's

16  a number.  Maybe it's 50, maybe it's something less than

17  that.  I don't know.  But maybe there's a number, but maybe

18  we can take it up at the beginning early and maybe we don't

19  have to wait.  Maybe we can just take that up early in the

20  beginning of the new year and come up with the number.  I

21  am, I am open to increasing that number.

22          There's a bankruptcy case.  There's professionals

23  involved.  He's got to file schedules and he's got to get

24  the schedules right.  And mediation, there's a lot going on.

25  And so I'm open to that.  And I'm also recognizing the fact

1    that I know primarily who's responsible for generating the

2    revenue for FSS.  And that's not lost upon me either.  So

3    there's a number.  If we need to have an evidentiary

4    hearing, then let's have it.  Let's have it early next year,

5    in a couple of weeks and, you know, I'm willing to take that

6    up.  But I'm asking the parties to really kind of talk about

7    this because we'll have a hearing if we need to.  But I'm

8    confident that professionals who are thinking about this

9    recognize that there's something there to agree upon.  We'll

10   just see, but the case is new.  But I got it.  FSS needs use

11   of cash collateral, so Ms. Driver, I'm not technically

12   overruling, I'm just saying let's kick it to a date where it

13   makes sense.  And I think you can hear me saying that I am

14   open to an increase.

15          MS. DRIVER:  Thank you, we appreciate that.  We're

16   having to kick it to the next cash collateral hearing.  And

17   Mr. Jones just wanted everyone to know that he's just, he's

18   just out of money and so we really are kind of down to the

19   brass tax at this point.

20          THE COURT:  Right.  I don't, I don't want to go

21   down that road because I know then that invites people to

22   then come back and say other stuff.  And let's just continue

23   to another hearing and then allow the -- let the process

24   play out, tee everything up.  I think there is a way, Ms.

25   Driver, if you wanted to file something without or maybe

1    just making sure that, you know, something got admitted into

2    the record.  I got it.  Let's just see if this can get

3    resolved.  Mr. Battaglia.

4          MR. BATTAGLIA:  Your Honor, if there is some

5    resolution on an adjustment to his salary between now and

6    whenever, because this cash collateral will require another

7    hearing at the end of January, but if sometime prior to that

8    there is, may I just file a notice of amended budget?

9          THE COURT:  That would make me really happy.

10         MR. BATTAGLIA:  Thank you.

11         THE COURT:  Okay.  So I'll sign the cash

12    collateral budget and then we'll take up everything at an

13    appropriate time.

14         MR. BATTAGLIA:  Do you have date, Your Honor, you

15    want to reset that at?

16         THE COURT:  Yeah, I knew you were going to ask me

17    that.

18         MR. BATTAGLIA:  I'm funny that way.

19         THE COURT:  When does the budget expire?

20         MR. BATTAGLIA:  January 20th, Your Honor.

21         THE COURT:  We can do the 20th.  That Thursday

22    looks good.  Or we can do January 18th in the afternoon.

23    It's the day after MLK day so the courts will be closed on

24    Monday, but obviously we'll be open on Tuesday.  So that's

25    why I'm thinking it may make sense.

```
 1              MR. BATTAGLIA:  The 18th, Your Honor?

 2              THE COURT:  The 18th or the 20th, what's best?

 3              MR. BATTAGLIA:  Either one.

 4              THE COURT:  Miss Driver, what's best for you?

 5              MS. DRIVER:  Either one is fine.

 6              THE COURT:  All right.  Let's do the 20th since

 7     that's the day, keep the pressure on the parties.

 8              MR. BATTAGLIA:  What time, Your Honor?

 9              THE COURT:  Why don't we do 10 a.m. for cash

10     collateral.

11              MS. DRIVER:  And Your Honor, is there time is

12     their time on that day if I wanted to schedule a related

13     motion regarding the contract extension or rejection, et

14     cetera?

15              THE COURT:  That's where we're going, yeah.

16              MS. DRIVER:  Thank you.

17              THE COURT:  And so that's going to kind of kick in

18     the agenda.  You know at some point if other people want to

19     follow motions on those days, they can certainly do it.

20     Wait, I'm looking at 2022.  That's what my staff is, that's

21     why they're turning around and they're looking at me that

22     I'm making updates.  They just don't want to tell the judge

23     publicly he's wrong.  It's okay.

24              How about the 19th?  You said the cash runs out on

25     the --
```

1             MR. BATTAGLIA:  The 20th.

2             THE COURT:  That's a Friday, Friday the 20th.  Can

3     we keep the same day in time?

4             MR. BATTAGLIA:  I think the parties have worked

5     well together.

6             THE COURT:  Oh, there's a 10:00 already.  So 11

7     a.m.?  It's okay, you can tell me publicly.  It's okay.

8     They were shuffling in front of me here like how do I

9     communicate to him?  I'll put January 20th at 11 a.m., 2023.

10            MS. DRIVER:  Okay.

11            THE COURT:  I got it right already.  I think that

12    leaves us with M3.

13            MR. BATTAGLIA:  The trustee's application to

14    employ M3, which has an objection filed by PQPR.

15            THE COURT:  Okay.

16            MR. BATTAGLIA:  The debtor obviously just has

17    concerns about administrative solvency in this case and the

18    flow of expenses.  That's the trustee -- that's the CRO's

19    position in this case.  We don't, we obviously came before

20    you and suggested that someone needs to do the evaluation

21    investigation and it shouldn't be us because we're

22    "tainted."  And so we're happy to have it be done.  We

23    understand the need for a financial advisor.  They selected

24    someone who's clearly capable.  Nobody has any issue with

25    that.  They're not the cheapest shop.  Well they're not in

1    town either, I'll leave it up to the Court on dealing with

2    Mr. Lemmon's objection and the trustee's.  But that's our

3    position, Your Honor.  They need somebody.  They're capable.

4    They're qualified.  We're just concerned about cost.

5           THE COURT:  Got it.  Okay.  Let me, Ms. Freeman,

6    let me just hear from you just briefly about kind of what

7    you think the outstanding issues are.

8           MS. FREEMAN:  Well I would ask Mr. Lemmon to

9    confirm, but I believe after the revised order was filed on

10   the docket at 330, that the sole remaining issue is a

11   question of whether or not there should be some sort of a

12   cap or budget on the fees that M3 is seeking.

13          MR. LEMMON:  That's correct, Your Honor.

14          THE COURT:  Okay.  Got it.  Okay.  What's your

15   position on that, Miss Freeman?

16          MS. FREEMAN:  Judge, it would be incorrect to say

17   that the trustee is not concerned about the economics in

18   this case.  I think she is, as much, if not more aware and

19   concerned about the economics of the FSS case and also the

20   Alex Jones case, which is tied directly to this.  The issue

21   that we have in agreeing to some sort of a cap is in part

22   policy and optics.  Miss Hazelden is a fiduciary and she has

23   been charged by the code and by this Court with undertaking

24   an investigation.  That investigation includes an

25   investigation of the PQPR debt, which is an insider of the

1    debtor.

2           She's not a commercial actor who has the ability

3    to cut a commercial deal.  Instead, she's a fiduciary that

4    is undertaking this investigation that all parties will be

5    looking at and relying on.  It is not appropriate for her

6    financial advisor to be the sole professional in this case

7    that is subject to some sort of a cap.  It could potentially

8    be chilling to their endeavors.  It could throw the results

9    of the investigation into question.  PQPR is a subject of

10   that investigation.  The optics are just not good for there

11   to be a cap placed at the front end at the time of their

12   engagement.

13          All professionals who appear in cases are trusted

14   to be responsible with their expenditures in cases.  And if

15   there is somehow an abuse or an imbalance of that trust,

16   that is something that shakes out when compensation is

17   sought.

18          THE COURT:  Miss Freeman, let me just ask you a

19   question since I got you here.  What can you tell me about

20   the status of kind of where things stand with the

21   investigation?

22          MS. FREEMAN:  We've looked -- we being the trustee

23   and her counsel -- have looked at a large number of things.

24   We have a lot of pieces of data.  There is still a lot of

25   information that is financial in nature that has not yet

1    been produced or actually was produced just now during this

2    hearing.  M3 has looked at a lot of pieces of a lot of

3    things but has not yet undertaken a tremendous amount of

4    work just because of large gaps in the data that exist and

5    because we don't yet have all of the supporting data or the

6    raw data that is behind the summaries that it has been

7    provided.

8         So it has some work to do and I don't want M3 to

9    find themselves in a position where they feel like they did

10   not have available resources to undertake the endeavor.

11        THE COURT:  Okay.  Mr. Lemmon, what can you tell

12   me?

13        MR. LEMMON:  Thank you, Your Honor, Steve Lemmon

14   for PQPR.  The Court may require -- may recall that in fact

15   it was us that proposed that the Sub V trustee conduct the

16   investigation.  We're in favor of the investigation.  We're

17   in favor of the Sub V trustee retaining whatever advisors

18   they think they need in order to conduct the investigation.

19   At the outset, we proposed that up to $100,000 to be spent

20   on this.  The Court will recall that it said that it wanted

21   a full investigation and asked us to cooperate.  And we

22   have.  We agree and we want them to do a full investigation.

23        Since that time, it's become obvious that there is

24   some question as to whether or not this case is going to be

25   administratively insolvent and I'm not sure that all parties

1    were aware of that at the time.  If the Court were to look

2    at the most recent operating reports, which were filed late

3    Friday, and in particular at Docket Number 324, the Court

4    would note that in November, the debtor lost $208,000.  The

5    debtor is projected to lose $360,000 in December.  The

6    debtor does have cash on hand of a million eight,

7    receivables of 269, but against that, it has unpaid bills

8    incurred since the time of the filing of the bankruptcy of a

9    million 350 -- I'm sorry, a million 359.  So net cash, you

10   know, very rough numbers, a little less than $500,000.

11           The debtor has professional fees that it paid last

12   month of 182,500.  Other than that, Your Honor, the debtor

13   has in the past only paid the professionals that were -- the

14   state court lawyers who you can tell those because they're

15   getting round numbers, you know, 150,000 or so.  M3 has been

16   on the job for about 60 days.  We've asked, but we haven't

17   been able to find out what M3's costs are so far that

18   they've incurred.  And I understand what the trustee's

19   lawyer is saying about the optics.  And we don't want to put

20   a governor just to put a governor on the thing, but we do

21   think that it is not unreasonable to ask for some sort of

22   budget, some sort of cap.  And, Judge, if they say we need

23   more, we're happy to come back, but we don't know what we're

24   dealing with here.  Well, you know, we -- I'm not going to

25   say it's irresponsible to write them a blank check, but I'm

1   saying that it is reasonable to ask for some sort of budget,

2   some sort of cap, some sort of estimate so that everybody

3   can know what they're dealing with here.  And in my mind,

4   some of the worst optics are walking in with open eyes into

5   an administrative insolvency situation which is good for

6   nobody, Judge.  And so for that reason, we're asking that

7   there be something, you know, we're -- look if they say we

8   found out this -- I'm just making this up -- we found out

9   this whole other avenue that we need to pursue.  Judge, you

10   know, it's going to be very difficult for us to stand here

11   and say we're totally against that, right?  We just want to

12   know what we're dealing with here and that's it.

13        THE COURT:  Thank you.  Anyone else wish to be

14   heard on this matter?  Let me just note that in the Free

15   Speech case, the Subchapter V trustee has requested the

16   appointment of M3 as financial advisor.  Mr. Griffith, I see

17   you there.  There's no one questioning whether M3 is

18   qualified to do the work or whether they're disinterested.

19   So those issues, and based on my review, my independent

20   review of their application, I find that they are obviously

21   qualified and that they are essentially therefore able to be

22   retained in this case.  I'm going to approve their

23   application.  I'm going to overrule the object.  I'm not

24   going to put a cap on this.  I'm going to say this.  The

25   work has to get done.  I ordered the work.  I want the work

1   to get done and the work to get done right.  I don't want

2   there to be any shortcuts or anyone to feel the pressure

3   that they have to do any shortcuts.  That being said, their

4   application as any other professional who is retained in

5   this case, has to file a fee application.  M3 knows that and

6   everyone will have an opportunity to review their

7   application.  That's bankruptcy.  There's a level of

8   transparency here in bankruptcy cases that gives everyone

9   the opportunity to see and file an objection when necessary

10  to do so.  And that's the way it will proceed.

11         I am concerned about the cost.  I am concerned

12  about the solvency of this debtor and where things are

13  going, but I don't want to sacrifice the work that I've

14  ordered.  I hear the arguments about the optics but I'm more

15  focused on the process and the work that needs to get done

16  and the fact that there will be transparency in the

17  application.  So I'm going to approve M3's application so

18  they can get to work.

19         This case is kind of -- I should say the Free

20  Speech case has been kind of paused because the parties are

21  in mediation and I appreciate that.  I don't want to push

22  and I want -- and I don't want to rush anything either.  I

23  have no idea what's going on in the mediation.  I just know

24  that the parties are in it and I want to give mediation

25  every opportunity to work if that's what the parties work if

1    that's what the parties want to continue to do.  I will let

2    you know, Miss Driver, I think there was a question about

3    whether you needed an order from me in the Jones case to

4    continue the mediation.  If Judge Isgur is comfortable

5    wrapping all that in, I'm fine.  I don't think you need one

6    from me.  But if feel like you do, kind of adding the Jones

7    case, then upload an order and let my case manager know and

8    I'll sign it. But I want to make this as efficient as

9    possible.  Mr. Jones is already a part of it and certainly

10   including you in that mediation, I don't see the need to

11   sign an order, but if you feel like you need one and the

12   parties feel like they want the extra comfort, then just

13   upload something and I'll sign it.  And if Judge Isgur feels

14   like he wants one, obviously, just let me know.  But if he's

15   comfortable proceeding, then someone let me know.

16          I'm also going to use the January date that we set

17   -- I want to get it right -- the 20th at 11.  I want to use

18   that as a status conference as well and maybe kind of keep

19   checking in and seeing what's going on with mediation and

20   seeing how that's going, just generally, and if it's

21   continuing or if anything has changed.  We'll continue to

22   use that.

23          I don't know who exactly is going to seek to be

24   retained as committee counsel, but I want to make that as

25   efficient as possible as well.  Get an application on file

1    and if there are no objections to it, then let's use

2    certificate of no objection.  Of if there's a tweak to it,

3    file a red line.  I want to make that as efficient as

4    possible.  If we need to have a hearing on it, obviously,

5    we'll have one.  Maybe we can use that date if we need to.

6    If not, then someone file something and let my case manager

7    know and maybe I'll sign that without the need for a hearing

8    on that.  But obviously everybody has the right to object

9    and take a look at stuff as well.

10            If anything comes up between now and then, just

11    let s know.  If an emergency comes up, I'm just an email

12    away from my case manager or a call away from my case

13    manager if someone needs to hear from me in a 24-hour

14    period.  I think we've covered everything, but if I missed

15    something, let me know.

16            MR. BATTAGLIA:  You've got them all, Judge.  Ray

17    Battaglia for Free Speech Systems.  There are a few things

18    that aren't on the docket, that if I just take a moment and

19    ask where we stand on some things.

20            THE COURT:  Okay.  There is one thing I have to

21    address at the very end.

22            MR. BATTAGLIA:  I'm happy to let you do that

23    first.

24            THE COURT:  No, no.  Miss Driver, did I cover all

25    the matters that were set for today?

1          MS. DRIVER:  I believe you did, Your Honor.  I was

2    just going to mention that Judge Isgur did ask Mr. Brimmage

3    and I to author an order for mediation.  So you can expect

4    that.  I'm going to press Mr. Brimmage and I to get that to

5    you this week before the holidays.

6          THE COURT:  Okay.

7          MS. DRIVER:  And then we will -- just to the

8    administrative insolvency of FSS, I just wanted to let Your

9    Honor know that I have been -- Mr. Battaglia and I have been

10   talking and Mr. Jones has a lot of business plans and

11   strategies that we really want to sit down and share with

12   Mr. McGill and I know that Mr. Battaglia is going to work

13   really hard to get us a sit down and really start to

14   implement some of this.  This company really went from a 6

15   or 7 million dollar revenue company to like a 1.9 million

16   dollar revenue company per month.  And we really got to get

17   back to those levels of production to make this a profitable

18   company that can try to pay back its creditors.

19         THE COURT:  Okay.  Thank you.  Obviously, I want

20   the committee involved in those issues as well.  That's a

21   committee issue.  And so, folks who are going to represent

22   the committee, obviously you all know what you're doing.

23   But if you need anything from the Court, you know how to

24   file motions and get things in front of me if you need to.

25   Is there anything in the Alex Jones case from the committee

1   that I need to address today?

2        MR. BRIMMAGE:  Your Honor, just one clarification

3   on a comment you must mentioned about our retention

4   application.  We will get that going just as soon as

5   possible, but I think there's a notice period and if the

6   hearing is on the 20th, I also just want to raise we've got

7   a lot of people who are trying to be out this week and next

8   week.  So we will get it done as soon as we can, but I just

9   wanted to raise that.  We're not going to drag our feet --

10        THE COURT:  Yeah, I'm not going to hold you to it.

11        MR. BRIMMAGE:  -- okay.

12        THE COURT:  Do it in the ordinary course.

13        MR. BRIMMAGE:  Okay.

14        THE COURT:  Whatever time it needs, it is what it

15   is.  And if you need a hearing, then we'll set a hearing, an

16   appropriate hearing time.  I'm not jamming anyone, no one on

17   that.

18        MR. BRIMMAGE:  Sounds good.  I appreciate it.  I

19   just wanted to clarify.

20        THE COURT:  No, I appreciate you doing that.

21        MR. BRIMMAGE:  I got a couple of quick emails from

22   some folks, like wait a second, wait, when?

23        THE COURT:  I wanted to make sure some poor

24   associate didn't think I was going to jam them.

25        MR. BRIMMAGE:  You just clarified that.  Thank

1    you.

2          THE COURT:  No, no, no.  All right.  I appreciate

3    the clarification.

4          MR. BRIMMAGE:  And let me ask Mr. Zensky or Miss

5    Brauner if they have anything they want to add on behalf of

6    the committee?

7          MR. ZENSKY:  Nothing right now, Your Honor.

8          THE COURT:  Okay.  Thank you.  And please tell the

9    associates to relax.  I promise I'm not jamming up.  Mr.

10   Battaglia?

11         MR. BATTAGLIA:  Yes, just a few things, Your

12   Honor.  First of all, I would note and it's been mentioned

13   all of the monthly operating reports have been filed.  We're

14   actually a day ahead right now.  We're not only not behind,

15   we're a day ahead.  Through November have been filed.

16   Expectation with Mr. McGill is that we will have P&L balance

17   sheets within the next 20 to 30 days.  Obviously the MORs

18   for a Sub V debtor are a little different, a little shorter,

19   but I think they're informative.  So we're catching up on

20   financial records and expect to have weekly sales reports,

21   MORs on time and distributed as appropriate.  So that's an

22   advisory to the Court.

23         The debtor filed at Docket Number 264 a motion to

24   reject a lease with REM, or executory contract, the REM

25   Financial Services contract.  I filed a C&O on that, ECF 294

 1    I have order.  So the proposed order was attached as an

 2    exhibit to the C&O.

 3              THE COURT:  264?

 4              MR. BATTAGLIA:  Was the motion and the C&O was

 5    294.  So whenever the Court gets an opportunity.  It's not

 6    urgent, but it's pending and I'd like to check the box.

 7              THE COURT:  No, no.  I appreciate you letting me

 8    know.

 9              MR. BATTAGLIA:  Secondarily, there was a TUFTA

10    lawsuit filed in state court that was removed by the debtor.

11    And Judge Parker in the Western District transferred it to

12    the home court, i.e. you.  There is an agreement among the

13    parties reflected in stipulation and there is no reason this

14    would have been called to your attention, but to abate

15    matters pending, there were four or five different triggers

16    that would remove it from suspension, one of them basically

17    based on the mediation.  And although it's in Western

18    District format for entry of an order, which means four

19    inches at the top --

20              THE COURT:  Which means that half the page is

21    empty at the top?

22              MR. BATTAGLIA:  Yes, sir, and we're happy to

23    reformat but we do need to get it entered because otherwise

24    I have a remand response deadline.

25              THE COURT:  No, that's fine.  Where do I find it?

1          MR. BATTAGLIA:  It's the sole associated case.  I

2     think there's one adversary.  Let me see.  I may have it.

3     It was 22-06017, but I'm not sure what it became when it

4     moved.  It's Neal Heslin, Scarlett Lewis, et al versus Alex

5     Jones, et al.

6          THE COURT:  I see it, yeah, I see it.  Where's the

7     stip?  On the joint stip, I see it.

8          MR. BATTAGLIA:  So nobody misses a deadline.

9          THE COURT:  Let me take a quick look at this.

10         MR. BATTAGLIA:  Mr. Moshenberg was involved in

11    that, so he can address it as well.

12         THE COURT:  Okay.  I read this before. Yeah, yeah.

13    Mr. Chapple is involved.  Is this the one, Mr. Martin, Mr.

14    Chapple, Mr. Battaglia?  You all signed that?

15         MR. BATTAGLIA:  Yes.

16         THE COURT:  All right.  I am not signing it at the

17    top.  You just won't get me to do it.  I will sign this stip

18    and order.  Let's see.  It works for me.  I'm just going

19    them some hell, the Western District.  Okay.  I will sign

20    both of those orders right now.  I just moved them over.

21    I'll get that done.

22         MR. BATTAGLIA:  Thank you, Your Honor.  So I owe

23    you an order on the Texas appellate counsel and I'll upload

24    that tomorrow at the latest.

25         THE COURT:  Okay.  Can you let my case manager

1   know so we know?

2          MR. BATTAGLIA:  I will copy her when I upload it.

3   And with that, I think we're done.  Oh, I think Mr. Shannon

4   --

5          THE COURT:  So that was going to be my question.

6   I know that there's been a motion for reconsideration filed

7   by Schwartz and Mr. Shannon.  The question was do you all

8   want a hearing on that?  And if so, when do you want a

9   hearing?  I'm happy to go it.  I'd rather do that as a one

10   off, which is probably a little bit different than an

11   omnibus matter.  I can take that up or do it on the papers.

12   You tell me.

13          MR. SHANNON:  Your Honor, I do think we would like

14   a hearing.

15          THE COURT:  Okay.

16          MR. SHANNON:  I believe sometime in the middle of

17   next month.  I understand if you don't want to do it with

18   everything else going on.

19          THE COURT:  No, no, I just think it's easier.  I'm

20   going to give you all a full and fair opportunity and I

21   don't want ten motions at the same time.

22          MR. SHANNON:  Understood, Your Honor.  I'm happy

23   to hear dates when the Court is available.  I can do this

24   offline with your case manager or however you'd like.  I

25   believe Mr. Ridulfo is on the line or Mr. Schwartz if you

1    want to schedule it now, Your Honor.

2         THE COURT:  What I'm going to ask you all to do is

3    to just get with my case manager.  We'll pick a time in --

4    can you just let -- well, let's just see.

5         MR. BRIMMAGE:  Your Honor, Marty Brimmage, if I

6    just may be heard briefly.

7         THE COURT:  Yeah.

8         MR. BRIMMAGE:  Are the parties envisioning an all

9    out evidentiary hearing on these motions or are these more

10   legal arguments?  And I just ask that from a time standpoint

11   and a preparation standpoint for the upcoming hearings.

12        THE COURT:  You're right one because that's what

13   I'm trying to understand.  One, do you need a hearing and

14   two, what's the hearing going to look like?

15        MR. SHANNON:  Sure.  So Your Honor I do think that

16   -- there are two motions that are pending.  One is a Rule 59

17   motion for a rehearing under Rule 59(a).  The other is an

18   administrative expense motion, which the crux of seeks

19   retroactive approval of limited employment before a limited

20   period and potentially a limited scope.  I think there are

21   three issues that come up under that.  And the first is, you

22   know, can the professionals actually present the evidence

23   and arguments, you know, about whether it meets the

24   standards for employment?  Two, does it actually meet those

25   standards?  And then three, are the actual evidentiary

1    matters right and if so, what is the appropriate amount of

2    the administrative expense claim?  So I could see doing that

3    in two stages possibly.  If that's the way the Court wants

4    to do it, I think that's fine.  On the other hand, I can see

5    doing it all as one.

6         THE COURT:  I want to do it all as one.  I want

7    you to tee it up and we'll deal with evidentiary issues

8    right there on the stop.  And I'll rule on them and take the

9    motion for reconsideration in both cases.  The answer is it

10   sounds like I just need to give you all a little bit of

11   time, maybe block off an hour or two.  I'm going to mess

12   this up, but why don't you get with my case manager.  Just

13   make sure that -- I know some folks have filed an object.  I

14   know Subchapter V Trustee has filed an objection, Mr. Jones

15   has filed an objection.  Just make sure whatever date we

16   pick, let's do it in January, pick a date where there's an

17   afternoon.  Block off an afternoon.

18        MR. SHANNON:  I'll get some options and then I'll

19   touch base with the parties to make sure.

20        THE COURT:  Right now, frankly, the afternoons --

21   again, that can change, so you really want to nail this

22   down, but right now the afternoons, the second and third

23   weeks, except for the 20th, obviously, those days look okay

24   if we need an afternoon.  But again, I want to make sure

25   that everyone who needs to be there can be there.  I'm not

1    going to jam anyone on some dates.  So let's just -- if the

2    parties can't work it and we need a status conference, then

3    obviously, I'll jump on early next week and we'll pick a

4    date and we'll go forward.  I think the issues are fairly

5    teed up already, nothing more to do than just kind of see

6    where we go.

7            MR. SHANNON:  Thank you, Your Honor.

8            THE COURT:  Thank you.  Mr. Ridulfo, that will

9    apply to Mr. Schwartz if he wants to go forward on his as

10   well.  We'll just pick a date and we'll do them both at the

11   same time.  I think the issues are fairly overlapping.

12           MR. RIDULFO:  They are, Judge, they are.

13           MR. SHANNON:  Yes, sir, I agree.  I agree.

14           THE COURT:  Okay.  Mr. Brimmage, in terms of tying

15   it up, I'm going to let them put on their case and if

16   there's evidentiary objections, I'm going to let you make

17   them and we'll take them up at that time.  I don't, I don't

18   know enough about how they're going to present their issues

19   and I don't want to prejudge it.  The motion for

20   reconsideration, those are pretty standard.  The motion for

21   an admin expense, I think it is kind of a little different

22   and I'm going to let them try to put them on their case.

23   I'm going to let anyone who wants to oppose whatever it is

24   oppose it.  And we'll take it up at that time.  Is there

25   anything else we need to talk about?

1          MR. BATTAGLIA:  Your Honor, that sounds totally

2     fair.  I just wanted to highlight we'll have to get some

3     discovery from them about how they envision their case

4     because I can envision there could be some discovery and

5     depositions in advance of the evidentiary hearing, but we'll

6     work through that before the hearing.

7          THE COURT:  I figured that and that's why I didn't

8     pick a date.  Because if I pick a date, I'm going to do the

9     exact same thing.  And you're going to start getting emails

10    about what does that mean?  And I wanted to pick a date

11    where it all makes sense.  Maybe the parties can kind of

12    figure it out.  I'll be open.  My case manager will know.

13    She'll get you a date.  But I think off docket makes a lot

14    more sense than kind of doing it on a joint basis.  Whatever

15    date you all pick, and it doesn't have to be January.  It's

16    whatever date makes sense.  And if the parties need a status

17    conference on it, just let me know.  Okay?

18         MR. BATTAGLIA:  Your Honor, for Free Speech

19    Systems, we have nothing further.  Thank you for the Court's

20    time today.

21         THE COURT:  Okay.  And for the Alex Jones case,

22    Miss Driver, anything else?

23         MS. DRIVER:  No, Your Honor, thank you so much for

24    your time.

25         THE COURT:  All right, folks.  Anything else we

1    need to talk about in the courtroom or on video?  All right,

2    everyone.  Thank you for your time.  Happy holidays to

3    everyone.  You all take care.

4          (Proceedings adjourned at 4:24 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATION

2

3     I certify that the foregoing is a correct transcript from

4     the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7     Sonya M. Ledanski Hyde

8

9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 27, 2022
```