IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **ALEXANDER E. JONES** | § | |
| | § | |
| Debtor. | § | Case No. 22-33553 |
| | § | |

**DEBTOR'S RESPONSE TO STATEMENT AND RESERVATION OF RIGHTS BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALEXANDER E. JONES REGARDING AMENDED SCHEDULES AND STATEMENTS**

TO THE HONORABLE CHRISTOPHER M. LOPEZ,
UNITED STATES BANKRUPTCY JUDGE:

Alexander E. Jones ("Debtor"), as debtor and debtor-in-possession in the above-captioned Chapter 11 Case, files this *Response* (the "Response") to the *Statement and Reservation of Rights of the Official Committee of Unsecured Creditors of Alexander E. Jones Regarding Amended Schedules and Statements* (the "Statement") and respectfully states as follows:

## RESPONSE

### I.  Introduction

Debtor files this Response to correct multiple misstatements of fact and misleading comments in the Statement. The Statement is unnecessary for several reasons: (a) the Committee and Debtor's counsel have weekly (and sometimes more frequent) calls to discuss this case, and none of the matters raised therein were ever mentioned, (b) nothing to Debtor's counsel's knowledge waives any right of the Committee or any party to continue to conduct any investigation of assets and liabilities upon the filing of schedules and statements of financial affairs and (c) the Committee attended every 341 meeting and asked questions, yet none of them hinted at these alleged issues. Unfortunately, because of the notoriety of Debtor and overwhelming scrutiny any

filing in this case brings, professional time and fees must be spent refuting the overreaching and paranoid conclusions alleged by the Committee in this superfluous Statement.

The Committee excoriates Debtor for seeking extensions of time to file schedules while at the same time admitting that it is taking a good deal of time to get information from third parties. This is the same dilemma Debtor faced when trying to reconstruct nonexistent financial records in order to prepare these vital disclosures. Furthermore, debtors in bankruptcy have a duty to amend their disclosures as additional or better information becomes available. The Committee criticizes Debtor for complying with one of the central tenants of bankruptcy. However, Debtor is going to continue complying with his duties as a debtor in bankruptcy, and will continue to amend his schedules as new or additional information comes to light, and will not be shamed into a failure to disclose.

It is the hope of Debtor that the parties can work together in future to answer questions and work through issues informally before they are filed of record with the Court.

**II.     Background Information Relevant to Schedules and SOFA**

On December 2, 2022, Debtor filed his voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Debtor continues in possession of his holdings and is managing as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

On December 13, 2022, the United States Trustee's Office appointed five of the plaintiffs with pre-petition litigation claims against Debtor as the members of an official committee of unsecured creditors (the "Committee") appointed in this Chapter 11 Case. No trustee or examiner has been requested or appointed in this Chapter 11 Case. Debtor is an employee of Free Speech

Systems, LLC ("FSS"). FSS filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 29, 2022.

On February 14, 2023, Debtor filed his Schedules [Dkt. 161] and Statement of Financial Affairs [Dkt. 162] (together, the "Original Schedules"). Subsequently, counsel for Debtor and the Committee had a call discuss the need to amend the Original Schedules. Debtor and his professionals worked nonstop to complete the filings.

Despite the agreement by Debtor's counsel, the Committee filed the *Emergency Motion of the Official Committee of Unsecured Creditors of Alexander E. Jones to Compel the Debtor to File Amended Schedules and Statements in Compliance with 11 U.S.C. § 521* (the "Motion to Compel") [Dkt. No. 189] seeking to force Debtor to do what he had already agreed to do, resulting in an additional, unnecessary hearing before the Court. This Court's order on the Motion to Compel provided Debtor ***more time than agreed*** to with the Committee to file the amendments and removed the requirement that any professional declare efforts to complete the filings. *See* Order on Motion to Compel [Dkt. No.206].

In compliance with the Order, on March 30 2023,[1] Debtor filed his amended Schedules [Dkt. No. 231] with explanatory detail attachments [Dkt. No. 233] and amended Statements of Financial Affairs [Dkt. No. 232] with explanatory detail attachments [Dkt. No. 233] (together, the "First Amended Schedules"). On April 4, 2023, the U.S. Trustee's office concluded the 341 meeting, commenting on the fulsomeness of the First Amended Schedules. At this meeting, Debtor's counsel explained that there were a few additional changes that would be made to the First Amended Schedules and noted each on the record for all parties to hear. The Committee

---

[1] The Court did order the filings to be done by noon; while the first filing did occur precisely at noon the others followed within minutes. Debtor's counsel's office experienced significant delays with their software used to complete these documents and apologizes for any delay.

**DEBTOR'S RESPONSE TO THE STATEMENT AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALEXANDER E. JONES REGARDING AMENDED SCHEDULES AND STATEMENTS – Page 3**

attended that 341 meeting, and indeed asked questions of Debtor, focusing on whether his personal efforts had resulted in the Texas Secretary of State's issuing tax forfeitures for certain entities.

On April 18, 2023, Debtor filed his second amended Schedules A/B, C and G [Dkt. No. 242] and Statement of Financial Affairs [Dkt. No. 243] (together, the "Second Amended Schedules") merely changing the few items mentioned on the record at the 341 meeting. Those items included the following:

1) Restating the percentage Debtor owns of his homestead to 80% and adjusting the value accordingly, correcting an error made by undersigned counsel in initially reading the prenuptial agreement;

2) Moving a watercraft that was erroneously placed under automobiles to the correct category of personal property;

3) Changing the previously unknown recipients of three transfers during the 90-day window to the proper recipients;

4) Deleting a reference to a receivable owed by Mountain Way Marketing given the recent FSS' position that such funds belonged to FSS;

5) Adding a specific reference to a second contract with ESG regarding celebrity endorsements;

6) Removing three handguns from the schedules due to their ownership by the Debtor's spouse; and

7) Completing Schedule C.

To be clear, every one of these were discussed at the 341 meeting on the record with a lawyer for the Committee present who asked questions of Debtor.

**DEBTOR'S RESPONSE TO THE STATEMENT AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALEXANDER E. JONES REGARDING AMENDED SCHEDULES AND STATEMENTS – Page 4**

Debtor's professionals have spent the last four months recreating Debtor's books and records so that Debtor would be able to file fulsome and compete disclosures as required. Debtor was cooperative and forthcoming to the extent of his memory, but the work demonstrated that he was not in possession of all of the information necessary to complete the filings. Pre-petition, Debtor did not manage his own financial affairs, and over the course of the past twenty years, has engaged multiple law firms to provide certain financial planning strategies, the majority of which were never fully implemented. In addition, Debtor has gone through a long and involved divorce, which divided some assets and dissolved certain trusts. The interviews of those lawyers, review of files sent, and research of certain secretary of state websites brought a certain sense of completeness of Debtor's corporate holdings; however, it does not provide a clear picture of assets owned by trusts or corporations.

Steps were taken to find any such assets held in corporate or trust entities, including the review of certain county records for all known or suspected corporate names, certain vehicle registrations in the state of Texas, and any other legal sources of information, and all such have been disclosed in the latest filings. The effort took hundreds of professional hours. Debtor has voiced his desire to engage someone post-petition to continue maintaining his books and records in the ordinary course of his business, a result of the painful process of recreating them after such a long period of ill-management. This is a positive improvement from a reorganization perspective.

### III. Specific Responses to Committee Statement

The Committee has made eight (8) claims that vary from untrue, misleading, and items that have been fully explained either by documents sent by Debtor's counsel to the Committee, conversations between Debtor and Committee professionals or testimony at the 341 meeting. This Response will address them in that order.

A. <u>Debtor Did Not Delete the Funds Held by the IRS</u>

The Original Schedules listed a $3,971,111 deposit held by the IRS in Item Number 28 on Schedule A/B. Such amount was reduced to $3,807,459 in the First Amended Schedule A/B and remained on the Second Amended Schedule A/B. *See* excerpts of the First Amended Schedule A/B and Second Amended A/B attached hereto as **Exhibit A** and incorporated herein by reference. This, this allegation of a deletion is untrue and puzzling.

B. <u>Debtor Does Not Directly Own PQPR Holdings, LLC or PLJR, LLC.</u>

Number 19 of form 106 requests that a debtor list "[n]on-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership and joint venture." Form 106, Number 19 does not ask for, nor require the listing of indirect interests; and in fact, listing those would be very confusing. In addition, the form itself requests percentage of ownership, which in an indirect sense would be misleading.

Despite Form 106 Number 19 not requesting disclosure of a debtor's indirect interests in companies, Debtor did disclose his indirect interests in PQPR Holdings, LLC and PLJR, LLC in the Global Notes and Supporting Information affixed to the front of both the First Amended Schedules and the Second Amended Schedules. *See* First Amended Schedules, pages 6 and 12 [Dkt. No 231] and Second Amended Schedules, Pages 5 and 12 [Dkt. No. 242], attached hereto as **Exhibit B** and incorporated herein by reference. Further, a corporate chart showing this relationship was emailed to the Committee on March 8, 2023. *See* Corporate Chart, attached hereto as **Exhibit C** and incorporated by reference.

Debtor's counsel is again puzzled by this misstatement on the part of the Committee. The filings clearly disclosed this indirect interest and Debtor's counsel even went so far as to create a

PowerPoint chart to illustrate the relationships/ownership to make it easy for the Committee to understand. This portion of the Statement is simply wrong.

      C.   <u>Increase in Debtor's Income Clearly Explained at 341 Meeting</u>

The Global Notes affixed to Debtor's Original Schedules noted that "Debtor's 2022 W-2 for his work as an employee of Free Speech Systems, as well as certain K-1s were unable to be located prior to the filing date. . . . Upon the receipt of the actual tax documents, if necessary, amendments will be made." *See* Original Schedules, page 4, the excerpt of which is attached hereto as **Exhibit D** and incorporated herein by reference.

Between the Original Schedules filing and the First Amended Schedules filing (a period of six weeks) Debtor's professionals were able to obtain those documents and complete the filing of the Debtor's 2021 taxes. As such, an amendment was made and explained in the Global Notes to the First Amended Schedules on page 14. The excerpt of such disclosure and explanation is attached hereto as **Exhibit E** and incorporated herein by reference. In addition, the U.S. Trustee asked for testimony on this subject at the 341 meeting. Due to the complexity of the answer, Robert Schleizer with BlackBriar Advisors was sworn in and testified as to the changes in income. No attendees at the 341 meeting asked for further clarification, including the Committee. Committee's allegations seem to characterize this update as mysterious and somehow evidence of wrongdoing on the part of Debtor. This was an update that was previewed and explained in detail at the 341 meeting and the Committee chose not to ask any follow up questions yet assert their misunderstanding in the Statement. This begs the question of why the Committee had a lawyer attend the meeting if such information was not shared with those who drafted and filed this Statement.

**DEBTOR'S RESPONSE TO THE STATEMENT AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALEXANDER E. JONES REGARDING AMENDED SCHEDULES AND STATEMENTS – Page 7**

D. <u>Audited Statements Prove 98.3% of Debtor's Cryptocurrency Was Contributed to FSS</u>

The Statement further erroneously states that Debtor owned cryptocurrency as of the Petition Date that should have been disclosed in the schedules. Debtor's interest in cryptocurrency on the Petition Date was zero and was accurately disclosed in Item 20 on the First Amended Schedules and the Second Amended Schedules. Excerpts showing both disclosures are attached hereto as **Exhibit F** and incorporated herein by reference. Debtor went even further in both filings to show a receipt in the wallet of $304.00 the day after the filing.

Debtor's financial advisors have also audited the totality of transfers from Debtor's cryptocurrency wallet to Debtor's bank account at Prosperity Bank (#9175) in the amount of $7,547,136.61 between August 3, 2021 and November 8, 2022. Of this amount, $7,044,043.00 was confirmed to be transferred to FSS. Debtor used $390,900 of the balance to purchase inventory referred to as the "Platinum" inventory when FSS had no ability to finance this purchase.

The total variance between the amounts transferred from the cryptowallet and what was contributed to FSS or used to purchase inventory sold by FSS, is $112,194, or 1.7% of the total. At this point, the value of the professional time to trace this remaining amount seems to meet the law of diminishing returns and thus work to finalize the audit has ceased. All of this has been discussed with the Committee as the audit was ongoing, and the results of the audit were shared, at the latest, on March 8, 2023 via email. A true and correct copy of a chart showing the tracing results is attached hereto as **Exhibit G** and is incorporated by reference.[2] It could be argued that such transfers to FSS should be disclosed in the statement of financial affairs. Such was not

---

[2] A more detailed chart was sent on March 8th to the Committee to allow their professionals to see the work performed and examine it. This is a "cleaned up" version.

**DEBTOR'S RESPONSE TO THE STATEMENT AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALEXANDER E. JONES REGARDING AMENDED SCHEDULES AND STATEMENTS – Page 8**

explicitly done and can be done if the Committee requests such. However, the Committee's allegation of $900,000 of undisclosed cryptocurrency is incorrect.

E. Debtor Did Not Disclose Transfers to Himself

The Statement also complains of the lack of disclosure of transfers between the AEJ 2018 Trust and Debtor. It is important here to note that Debtor sent the trust document governing this Trust to the Committee early on in the case, it is a grantor trust, and while it files its own tax return, its income or loss flows through directly to Debtor's tax return. The AEJ 2018 Trust only owns 100% of AEJ Austin Holdings, LLC. Despite the abysmal bookkeeping records, the transfers on money to these entities have largely followed their ownership structure, i.e., transfers from PQPR Holdings, LLC are sent to the AEJ 2018 Trust, which are transferred to AEJ Austin Holdings, LLC, which are then transferred to Debtor's accounts. As such, Debtor's financial professionals view distributions by and between those entities reporting on the same tax return are not transfers.

Notwithstanding the foregoing, early in this case, bank statements were sent to the Committee for each of the accounts held by these entities. Full disclosure of these transactions, transfers, and relationships have been made to the Committee, providing what one can only assume as the raw data behind their misleading assertion that "1.5 million of proceeds . . . associated with AEJ 2018 Trust shortly before the bankruptcy filing." However, the same cannot be said for the basis of the Committee's assertions, as the Committee has not previously shared with Debtor their concerns on this matter..

F. Changing Valuations from "Unknown" to "Known"

One of the major areas of inquiry still ongoing when the Original Schedules were filed included valuing many disclosed assets. Eighteen categories of personal property in Schedule A/B were marked "unknown." All but the *value* of certain claims was resolved in the First Amended

Schedules and carried forward to the Second Amended Schedules. A true and correct copy of First Amended Schedule A/B and Second Amended Schedule A/B are attached hereto as **Exhibit H** and are incorporated herein by reference. Changing the values from unknown to a dollar amount did increase the *appearance* of value of the Debtor's assets; but such facial change did not truly increase the valuation by "48%" as emphasized in the Committee's Statement. *See* Statement page 2. Rather, it showed the results of the continued due diligence by the Debtor and his professionals to drill down and find the values of the assets necessary for full and complete disclosure.

Debtor did locate a few additional assets of value between February 14, 2023 – an additional watercraft, and additional vehicle,[3] and certain unclaimed property, valued at under $90,000. This is hardly a "remarkable" increase as described in the Statement.

G.  Status of Discovery

While irrelevant to the completeness of the Schedules, the Committee references that it "has not received the lion's share of the discovery requested from the Debtor". *See* Statement, page.3. Debtor disagrees with this statement.

Since the appointment of the Committee, Debtor has received multiple drafts of 2004 document requests and spent hundreds of hours gathering, reviewing, and producing 6846 pages of 719 documents, and preparing to send another 7862 pages of 1499 documents. It is expected that more documents are to come but will largely be duplicative but will be produced to the Committee per their request irrespective of duplicity as soon as possible. In fact, Debtor is going to be requesting the production files from his lawyers defending the claims in state court of the Committee's members and those similarly situated with them. While their lawyers ostensibly have

---

[3] The vehicle "added" was listed as a lease in the Original Schedules and later determined to be bought out.

**DEBTOR'S RESPONSE TO THE STATEMENT AND RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALEXANDER E. JONES REGARDING AMENDED SCHEDULES AND STATEMENTS – Page 10**

this information, Debtor has not objected to using resources to get the documents from the defense lawyers and turning them over to the Committee pursuant to the applicable protective order.

Debtor does not use email, does not know the password to open any computer at his office, nor does he use the computer in his home. He often did business without written documentation, preferring to do "handshake" deals with friends and colleagues. He did not have an accountant or bookkeeper keeping "books" for him but rather paying bills as invoices were presented.  This leaves a large "hole" for documents where often-times one would expect to find a treasure-trove of emails. A lack of documents does not mean there is a large amount of documents to be shared – it may simply mean they do not exist.  This has been the subject of hours of conversations between counsel.

Debtor's professionals are in the process of imaging Debtor's phone, where most, if not all, of his written communications are kept.  His email account will be checked, but it is expected only to consist of information sent to him and not reviewed by him, so its relevance is questionable. Despite that, Debtor has agreed to all searches and production thus far.

### IV. Conclusion

The Committee's Statement, wholly unnecessary, is riddled with misstatements and misleading statements that Debtor could not ignore.  Debtor's professionals have been open with the Committee's professionals and facilitated open and honest communications, which to date have just led to hours of more calls and requests for documents that do not exist. Debtor retains hope that this process will be fair and equitable to all parties, and that goals remain focused on resolving issues amicably if possible.

| | |
|---|---|
| Dated:  April 20, 2023. | **CROWE & DUNLEVY, P.C.** |

By: */s/ Vickie L. Driver*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
2525 McKinnon St., Suite 425
Dallas, TX 75201
Telephone: 737.218.6187
Email: dallaseservice@crowedunlevy.com

-and-

Shelby A. Jordan
State Bar No. 11016700
S.D. No. 2195
Antonio Ortiz
State Bar No. 24074839
S.D. No. 1127322
**JORDAN & ORTIZ, P.C.**
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR ALEXANDER E. JONES**

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing pleading was served upon the parties registered to receive notice via the Court's ECF noticing system on this 20th day of April, 2023.

                                            */s/ Vickie L. Driver*
                                            Vickie L. Driver