# EXHIBIT 11

| NO.    X06-UWY-CV-18-6046436-S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 24, 2021 |

| NO.    X-06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 24, 2021 |

| NO.    X06-UWY-CV-18-6046438-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 24, 2021 |

### MOTION FOR SANCTIONS BASED ON THE JONES DEFENDANTS' FAILURE TO PRODUCE WEB AND SOCIAL MEDIA DATA AND ANALYTICS

"An order of the court must be obeyed until it has been modified or successfully challenged, and the consequences for noncompliance may be severe indeed." *Lafferty v. Jones*, 336 Conn. 332, 381 (2020) (quoting *Fox v. First Bank*, 198 Conn. 34, 40 n.3 (1985)), *cert. denied*, 2021 WL 1240941 (U.S. Apr. 5, 2021). For two and a half years, the Jones defendants have been under a court order to produce sales, marketing, and web-analytics data, including Google Analytics data. The Court set a "final" deadline for production of the "already overdue supplemental compliance" for June 28, 2021. Order, Dkt. 348.10, June 2, 2021. It expressly warned that "[f]ailure to comply with this order may result in sanctions including but not limited to a default." *Id.* The Jones

defendants violated that order and did so based on inaccurate and incomplete representations concerning the supposed difficulty of producing the requested information.

In addition, for more than two and a half years, the Jones defendants have been under a court order to produce all communications or documents concerning social media marketing and analytics. For years, they represented that they possessed none. The deposition of ███████ ███████████████████ came and went. Then, during a ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████

This conduct continues the pattern of "continuing misconduct" that "demonstrates a deliberate disregard for the court's orders." *Lafferty*, 336 Conn. at 380–81 (quoting approvingly *Emerick v. Town of Glastonbury*, 177 Conn. App. 701, 737 (2017)'s justification for affirming a sanction of dismissal). The Jones defendants' noncompliance is prejudicial and requires the entry of the most serious possible sanction.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Orders Requiring the Jones Defendants to Produce Web and Social Media Marketing and Analytics Data and the Jones Defendants' Previous Refusal to Produce Them

More than two and a half years ago, this Court ordered the Jones defendants to produce materials responsive to the plaintiffs' Requests for Production Nos. 15, 16, and 17, which covered marketing, sales, and web-analytics data. Order, Dkt. 148.00, Jan. 10, 2019; Defs.' Obj. to Plaintiffs' Rev. Disc. Requests, Dkt. 146.00, Jan 9, 2019.

The Court specifically addressed the Jones defendants' nonproduction of Google or other web analytics data on March 22, 2019. Ex. A, 3/22/19 Hrg. Tr. 19. After addressing it repeatedly with no result, it finally held that the "print out produced in response to production requests 15-17

is simply not full and fair compliance." Order, 255.10, June 10, 2019. It found that court-ordered "depositions confirm[ed] that the Google Analytics account is accessed and utilized by some employees of the defendants." *Id.* It warned that it would "consider appropriate sanctions for the defendants' failure to fully and fairly comply should they not produce the data within one week." *Id.*

They did not produce it. The Court sanctioned the Jones defendants for failure to produce that data, and for "repeatedly ignored court deadlines and continued to challenge the underlying merits of discovery, even after the court found the requisite good cause to allow discovery." *Lafferty*, 336 Conn. at 376. Based on this pattern of "obfuscation and delay," including on the discovery of web analytics, and other litigation misconduct, this Court imposed sanctions. *Id.* Those sanctions were affirmed by the Supreme Court. *Id.*

Even after sanctions were affirmed, the Jones defendants did not produce in response to the Court's orders. After contacting the Jones defendants' counsel requesting compliance with the long-outstanding discovery—and receiving no response—the plaintiffs moved re-compel it yet again. Mot. to Re-Compel Compliance, Dkt. 309.00, Nov. 12, 2020. During a telephonic meet-and-confer three days later, the Jones defendants took the position that they had no obligation to comply with existing discovery. Aff. of Meet & Confer ¶ 15, Dkt. 313.00, Nov. 18, 2020. The next day, the Jones defendants noticed removal for the second time in this case. Not. of Removal, Dkt. 312.00, Nov. 16, 2020.

The federal district court rejected that removal and remanded the case to this Court again on March 5, 2021. Remand, Dkt. 316.00, Mar. 5, 2021. The case was returned to this Court for the third time. The Jones defendants had been under court order to produce sales, marketing, and web-analytics data for more than two years. Rather than do so, they argued that this Court's sanctions

order—which had been based in large part on their refusal to produce exactly these still-outstanding materials—"necessarily terminated" their production obligations. Defs.' Mem. in Opp. to Mot. 1–2, Dkt. 332.00, May 5, 2021. They also argued, yet again, that the original discovery ordered by this Court was "excessive." *Id.* at 2. On May 14, 2021, the Court rejected their arguments, finding that "[t]he obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished." Order, Dkt. 339.10. Finally, it ordered set a "final" deadline of June 28, 2021 for production of the "already overdue supplemental compliance," including Google and any other web analytics. Dkt. 348.10. It expressly warned the Jones defendants that their failure to produce the analytics by the final deadline of June 28, 2021 "may result in sanctions including but not limited to a default." *Id.*

### B.   The Jones Defendants' Continued Refusal to Provide Court-Ordered Information

#### 1.   Google Analytics

June 28 was a Monday. On the Thursday afternoon before production was due, counsel for the Jones defendants sent the plaintiffs's counsel a letter representing that the Google Analytics data "cannot be produced as an export," and therefore could not be provided. Ex. B, Letter from Jay Wolman to Christopher Mattei, *et al.*, June 24, 2021. Instead, for the first time,[1] the Jones defendants proposed a "sandbox approach," where the plaintiffs would be allowed to access the Jones defendants' Google Analytics accounts and "inspect the dataset" for a limited period of time under the supervision of the Jones defendants. *Id.* The plaintiffs rejected this proposal, noting that they disagreed with the representation that the Analytics "cannot be produced" and that this

---

[1] Although Attorney Wolman's letter represents that he made this proposal at the June 2, 2021 hearing, the transcript of that hearing does not appear to have any reference to it. 6/2/21 Hrg. Tr. Plaintiffs' counsel have no memory of it being mentioned in a prior telephone conversation.

position was "not consistent with the information [the Jones defendants] provided to the Court." Ex. C, Letter from Christopher Mattei, *et al.*, to Jay Wolman, June 25, 2021.

The Jones defendants' counsel responded that "there is no inconsistency," and that "to export the raw data, one must be an Analytics 360 member, i.e. a premium member." Ex. D, Letter from Jay Wolman to Chris Mattei, June 25, 2021. "Free Speech Systems is not an Analytics 360 member," they continued. "[T]herefore it is impossible for it to export the data." *Id.* Defense counsel reiterated his position that, to obtain the discovery, the plaintiffs should pay $150,000 for the Jones defendants to obtain a premium Google Analytics membership. *Id.* In a meet-and-confer telephone call on July 13, 2021, counsel for the Jones defendants reaffirmed this statement. Pls.' Meet & Confer Aff. ¶ 10, Dkt. 426.00, July 26, 2021. He was asked: "So you're telling me that what data you do have access to through their Google Analytics platform, they cannot download or export?" *Id.* He responded: "Yes. Google does not allow it for non-Analytics 360 members, [the Jones defendants] do not have a 360 membership, ergo, it cannot be produced." *Id.*

### 2. Social Media Analytics

In addition to the analytics discussed above, the Court's order of January 10, 2019 ordered the production of:

> All communications and/or documents concerning marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast, either to, from, or concerning:
>
> a. Alphabet Inc., or any subsidiary or property thereof
> b. Facebook, Inc., or any subsidiary or property thereof
> c. Twitter, Inc., or any subsidiary or property thereof
> d. Oath Inc., or any subsidiary or property thereof
> e. Snap Inc., or any subsidiary or property thereof
> f. Apple Inc., or any subsidiary or property thereof

Defs.' Obj. ¶ 17, Dkt. 146.00; Dkt. 148.00. By including subsidiaries, this Request included

documents and communications concerning not only named social-media platforms like Facebook and Twitter, but also Instagram (owned by Facebook), Google (owned by Alphabet), and YouTube (owned by Alphabet).

The Jones defendants never produced any discovery materials regarding their social media data or analytics. The defendants responded to the plaintiffs' interrogatories regarding social media analytics by stating, "All responsive documents have been provided to plaintiff's counsel." Dkt. 218.00–222.00. During a subsequent hearing, the Jones defendants were asked explicitly about marketing and analytics, and responded, "[W]e have provided everything." Ex. E, 5/7/19 Hrg. Tr. 14:26–15:15.

After the sanctions against them were affirmed and the case returned to this Court, the Jones defendants still produced no such documents. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

A month later, █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████   To this date, the plaintiffs have not received these reports through formal discovery.

## II.     LEGAL STANDARD

Practice Book § 13-14 authorizes the Court to impose sanctions for a party's failure to comply with discovery orders. Pract. Book § 13-14(a). Section 13-14(b) sets forth a non-exhaustive list of potential penalties, including entry of non-suit, the award of fees associated with enforcement of court orders, evidentiary restrictions, etc.  The Court also has inherent power to order sanctions. *Evans v. Gen. Motors Corp.*, 277 Conn. 496, 522–24 (2006); *Millbrook Owners Ass'n, Inc. v. Hamilton Standard*, 257 Conn. 1, 14 (2001).

"[A] court may, either under its inherent power to impose sanctions in order to compel observance of its rules and orders, or under the provisions of [Practice Book] § 13–14, impose sanctions[.]" *Evans*, 277 Conn. at 522-24 (quoting *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 14). The decision "to enter sanctions . . . and, if so, what sanction or sanctions to impose, is a matter within the sound discretion of the trial court." *Evans*, 277 Conn. at 522-24. "[T]he court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court[.]" *Id.* (quoting *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 14). "The design of the rules of practice is both to facilitate business and to advance justice[.]" *Id.* (quoting same).

The standard for imposing and reviewing sanctions for violation of discovery orders requires that (1) "the order to be complied with must be reasonably clear"; (2) "the record must

establish that the order was in fact violated"; and (3) "the sanction imposed must be proportional to the violation." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18; *Giblen v. Ghogawala*, 111 Conn. App. 493, 497–98 (2008).  "In determining the proportionality of a sanction to a violation, we have in the past considered the severity of the sanction imposed and the materiality of the evidence sought . . . whether the violation was inadvertent or wilful . . . and whether the absence of the sanction would result in prejudice to the party seeking the sanction." *Giblen*, 111 Conn. App. at 497–98 (quoting *Forster v. Gianopoulos,* 105 Conn. App. 702, 711 (2008)).

## III.    ARGUMENT

This Court issued multiple applicable orders that were "reasonably clear." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. The record establishes "that the order[s] [were] in fact violated." *Id.* The Jones defendants' noncompliance is prejudicial to the plaintiffs: the relevant discovery is highly material, and the Jones defendants' refusal to produce it has compromised the plaintiffs' ability to use it in the discovery process. This Court warned the Jones defendants that "[f]ailure to comply with this order may result in sanctions including but not limited to a default." Order, Dkt. 348.10. Default is the appropriate sanction.

### A.  The Court's Orders Were Crystal Clear

In order for sanctions to issue, "the order to be complied with must be reasonably clear." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. The orders at issue at issue here were crystal. In its original order two and a half years ago, the Court ordered the Jones defendants to produce materials responsive to the plaintiffs' Requests for Production Nos. 15, 16, and 17, which covered marketing, sales, and web-analytics data. Dkt. 148.00. Request for Production No. 15 asked for "[a]ll marketing data, web analytics, sales analytics, and/or other web traffic data concerning you, Infowars, and/or any website, social-media, or other internet-based profile that you or the Jones

8

Defendants own and/or control." Pls.' First Spec. Req. for Prod'n ¶ 15. Request for Production No. 16 demanded "[a]ll marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast." *Id.* ¶ 16. Request for Production No. 17 requested "[a]ll communications and/or documents concerning marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast, either to, from, or concerning" all the major social media platforms. Pls.' First Spec. Req. for Prod'n ¶ 17. The Jones defendants' production obligations regarding social media and web analytics were clear.

On June 16, 2021, this Court sanctioned the defendants in part because of their repeated failure to produce Google Analytics. *Lafferty*, 336 Conn. at 376. In May, after the case's return to Connecticut Superior Court, this Court rejected their arguments against production and of analytics and held "[t]he obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished." Dkt. 339.10. In another follow-on order, the Court set a "final" deadline for production of the "already overdue supplemental compliance," including Google and any other web analytics, for June 28, 2021. Dkt. 348.10. It noted that it "decline[d] the Jones defendants' invitation to address, again, the scope of appropriate discovery" and that "the outstanding discovery responses were due over two years ago." *Id*. This order expressly warned the Jones defendants that their failure to produce the analytics by the final deadline of June 28, 2021 "may result in sanctions including but not limited to a default." *Id*.

### A.  The Jones Defendants Violated the Court's Orders

Another requirement for sanctions is that "the record must establish that the order was in fact violated." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. There is no question that the Court's orders were violated here.

#### 1.  The Jones Defendants Violated the Court's Orders to Produce Google Analytics Data

The Jones defendants did not produce the Google Analytics data by June 28, 2021. They still have not produced it. This is an unexcused violation of the Court's order, and it requires the imposition of sanctions.

#### 2.  The Jones Defendants Continued Their Pattern of Obfuscation and Delay with this Violation

The Jones defendants did not produce the Google Analytics data as ordered. As the Court has repeatedly said, a court-set deadline must be complied with, or a motion directed to that deadline needs to be filed and adjudicated before the deadline passes. The Jones defendants chose not to file that motion. Rather, they again chose unexcused disobedience of a Court order, forcing the plaintiffs to bring the violation to the Court's attention.

To excuse their noncompliance, moreover, the Jones defendants chose to rely on the notion that production would be very costly, an argument that the Court had already rejected. In support of their excuse, the Jones defendants made inaccurate and incomplete representations concerning the capabilities of their Google Analytics account. This began in argument before the Court on June 2, 2021. During that argument, the Jones defendants represented that utilizing the Google Analytics "export method" required "a premier membership" that "would cost at least $150,000." Ex. H, 6/2/21 Hrg. Tr. 15:10–16. (They maintained "this cost should be borne by [the plaintiffs]." *Id.* at 17:16–17.) They then argued that the data should not be produced at all, contending that "the

amount of labor . . . required is not proportionate to the needs of the case." *Id.* at 17:19–18:6. This Court rejected these arguments and ordered the Jones defendants to produce the data by June 28, 2021. Order, Dkt. 348.10, June 2, 2021 (noting that it "decline[d] the Jones defendants' invitation to address, again, the scope of appropriate discovery" and that "the outstanding discovery responses were due over two years ago").

Ignoring the fact that the Court had already rejected the argument, the Jones defendants raised this excuse again in their June 25 letter to counsel: "to export the raw data, one must be an Analytics 360 member, i.e. a premium member." Wolman Letter, June 25, 2021. "Free Speech Systems is not an Analytics 360 member," they continued. "[T]herefore it is impossible for it to export the data." *Id.* Free Speech Systems repeated this statement in its Notice of Compliance. It further represented that "Free Speech Systems does not possess, have custody, or control the Google Analytics dataset in a manner that would permit export." Dkt. 377.00 at 2, June 28, 2021.

These representations were inaccurate and misleading. The plaintiffs retained a Google Analytics expert to assess what export capabilities an ordinary Google Analytics account has, and submit his affidavit in support of this Motion. "Like all Google Analytics users, the users of the Infowars.com Google Analytics account have access to the Export function." Ex. I, Affidavit of Jordan Campbell ¶ 9. Indeed, the "EXPORT button is clearly visible on" the very screenshots the Jones defendants provided as an exhibit to their motion for a protective order on May 30, 2021. *Id.* This export function allows the user to export the Google Analytics data in 4 different formats: PDF, Google Sheets, XLSX and CSV." *Id.* ¶ 8. "Exporting in those formats keeps the data organized and allows it to be manipulated by the recipient, as the original user could do." *Id*. Using an expert protocol, the data ordered by the Court could be exported using this basic EXPORT

function.[2] *Id.* ¶ 10. The Jones defendants' claim that an expensive Google 360 membership is required to comply with the Court's order is inaccurate and misleading: "[I]t is not true that 'to export the dataset, one must be a Google Analytics 360 user.'" *Id.* ¶ 11.

Relying on the Analytics 360 excuse, the Jones defendants refused to produce the required Google Analytics data. Instead, they proposed a "sandbox approach" four days before the deadline. Wolman Letter, June 24, 2021. As the Jones defendants' letter itself admitted, this was not production, but an offer of inspection. *Id.* (noting proposal would allow the plaintiffs to "inspect the data set"). This approach, moreover, "would allow the Jones defendants to observe, surveil, and/or record all the plaintiffs' actions within the Google Analytics account, including any searches or other analysis that the plaintiffs or their experts might perform on the data while they had access to it." Campbell Aff. ¶ 16; Defs.' Notice of Compliance 2 n.3, Dkt. 377.00 (noting that the approach "would necessarily require supervision by Free Speech Systems"). This would be a clear invasion of the work-product doctrine. *See Barksdale v. Harris*, 30 Conn. App. 754, 760 (1993) ("The work product doctrine protects an attorney's . . . 'mental impressions, personal beliefs and countless other tangible and intangible [items].'" (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947))); Conn. Practice Book § 13-3 (codifying work-product privilege).[3]

---

[2] Exporting this data in this manner would require neither technical expertise nor an inordinate amount of labor. "[U]sing the free export function described above, a user of the relevant account could easily export complete, accurate and readily useable data as Excel (xlsx) files." Campbell Aff. ¶ 10. "[E]xporting the data would take a computer literate user following a simple protocol under a week to complete the exports and possibly would require even less time." *Id.* (noting that "a computer literate user" means "someone with simple data entry skills"). "The development of an appropriate export approach" would take "approximately 30 minutes." *Id.* Implementation of such a "step-by-step protocol . . . would be a simple process." *Id.*

[3] When plaintiffs' counsel raised these defects during the parties' meet-and-confer call of July 13, 2021, the Jones defendants acknowledged them but argued they were immaterial to it being sufficient production. Aff. of Attempt to Resolve Discovery Objection ¶ 9, Dkt. 426.00, July 26, 2021.

### 3. The Jones Defendants Violated the Court's Orders Regarding Social Media Data and Analytics

Likewise, for roughly two and a half years, the Jones defendants were under a court order to produce all available analytics for social media accounts under their control. They produced none. Meanwhile, they repeatedly represented that they had made all responsive production. *See* Dkt. 218.00-222.00. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

They still have not been formally produced in discovery. Even if they were, there is no indication that they would constitute complete production under the relevant requests for production. The Jones defendants violated the Court's order in failing to produce these documents for two and a half years—and potentially continuing to improperly withhold others.

### 4. Given the History of the Jones Defendants' Conduct, Default is the Only Appropriate Sanction

"[T]he sanction imposed must be proportional to the violation." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. Default and dismissal are the severest sanctions.[4] In general, Connecticut "practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure." *Millbrook Owners Ass'n, Inc. v. Hamilton Standard*, 257 Conn. 1, 16 (2001). But "'where a party [has] show[n] a deliberate, contumacious or unwarranted disregard for the court's authority,'" dismissal or default "of the entire case may constitute an appropriate sanction." *MacCalla v. Am.*

---

[4] There exist more Connecticut cases addressing sanctions of dismissal than default. However, our courts seem to deal with them interchangeably. There is no indication that a sanction of default must meet a test different from that for one of dismissal. For this reason, while this Motion emphasizes default cases, it refers at times to dismissal cases as well.

*Med. Response of Connecticut, Inc.*, 188 Conn. App. 228, 239 (2019) (quoting *Emerick v. Glastonbury*, 177 Conn. App. 701, 736 (2017) and affirming sanction of dismissal for attorney's improper behavior in deposition). Under such circumstances, the ultimate sanction "serves not only to penalize those whose conduct warrants such a sanction but also to deter those who might be tempted to such conduct in the absence of such deterrent." *Pavlinko v. Yale-New Haven Hosp.*, 192 Conn. 138, 145 (1984) (citation omitted).

In determining the proportionality of a sanction of default, Connecticut courts have "considered the severity of the sanction imposed and the materiality of the evidence sought . . . whether the violation was inadvertent or wilful . . . and whether the absence of the sanction would result in prejudice to the party seeking the sanction." *Forster v. Gianopoulos*, 105 Conn. App. 702, 711 (2008) (internal citations omitted); *Spatta v. American Classic Cars, LLC*, 150 Conn. App. 20, 27 (2014) (noting the "trial court may consider not only the presence of mistake, accident, inadvertence, misfortune or other reasonable cause . . . factors such as [t]he seriousness of the default, its duration, the reasons for it and the degree of contumacy involved . . . but also, the totality of the circumstances, including whether the delay has caused prejudice to the nondefaulting party").

First, after two and a half years, multiple court orders, a litigation sanction confirmed by our Supreme Court, and express warning that "[f]ailure to comply with this order may result in sanctions including but not limited to a default," Order, Dkt. 348.10, there can be no doubt that the Jones defendants' failure to comply is "deliberate" and "contumacious." *MacCalla*, 188 Conn. App. at 239; *Spatta*, 150 Conn. App. at 27.

Moreover, the materials sought here are significant to important aspects of the plaintiffs' case, and their deprivation is prejudicial. The plaintiffs' complaint alleges that "Jones has

deliberately employed [] false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." Sherlach Compl. ¶ 11. It alleged that "the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money . . . not because they are eager to educate or even to entertain their audience." *Id.* ¶ 103. It alleged that "[t]he false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience." *Id.* ¶ 98. These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims. *Id.* ¶¶ 465–474 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy"). Web-analytics and social media data for the Jones defendants' websites and social media profiles is potentially key for demonstrating these points.

Additionally, the Jones defendants' motivations for their actions are highly relevant not only for assessing what punitive damages are appropriate, but also in evaluating the intentionality of their actions, and/or whether their broadcasts were done with actual malice. Web and social analytics are relevant and could be material to these claims. Courts have held that "pressure to produce sensationalistic or high-impact stories *with little or no regard for their accuracy* would be probative of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 796-97 (D.C. Cir. 1987) (*en banc*) (emphasis in original). Likewise, "evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful

evidence." *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005). The Jones defendants' analytics are therefore potentially highly relevant to proving how these claims are borne out in the Jones defendants' business practices.

Moreover, the Jones defendants themselves have taken the position that the Google Analytics data is highly material. They claimed that their "records show that, at most, they made $342.55 from article and page referrals that contained the term 'Sandy Hook' out of a total of $10.6 million in overall sales generated from site traffic." Defs.' Emerg. Mot. 3, Dkt. 348.00. They argued that that amount contradicted "*the whole theory of the case*," which according to them, "is that [the Jones defendants] are *somehow motivated to do Sandy Hook stories to get money*." 6/2/21 Hrg. Tr. 17:19–18:6 (emphasis added). They "want[ed] to highlight" the data because, according to them, it "[s]eems like this is a loser of a story in terms of moneymaking." *Id.* In doing so, they were asking the Court simply to take their word that the data does not bear out the plaintiffs' "whole theory of the case"—and decide no one needs to see it at all. Whatever the illogic of this argument, it acknowledges that the data is highly material.[5]

This was not the first time the Jones defendants had argued this information is material. On June 12, 2019, the Jones defendants broadcast an episode of the Alex Jones Show entitled "GOOGLE'S ANALYTICS PROVE INFOWARS HAS NO SANDY HOOK MARKETING: Specialist destroys MSM agenda." Ex. J, Alex Jones Show, *Google's Analytics Prove Infowars Has No Sandy Hook Marketing*, Infowars.com (June 12, 2019). In it, FSS IT manager Michael Zimmerman joined Jones "to show and prove how, contrary to Democrat attorneys and judges,

---

[5] Notably, for these representations to be true, the Jones defendants must have enabled the e-commerce function of Google Analytics back in 2012, and they must have "very significant" e-commerce data that they have failed to provide the plaintiffs. Campbell Aff. ¶ 15. If they did not have this function enabled—and they do not have that data—then their representation cannot establish what it purports to establish, *id.*, and is misleading.

Infowars has no alleged 'Sandy Hook marketing' and makes no money from Sandy Hook video views, which happen to be less than 1% of all views." *Id.*

Lastly, the refusal to produce this information is prejudicial because it materially impedes discovery. The plaintiffs should have received this information years ago. They should have been able to depose the Jones defendants' ██████████ ██████████ regarding the performance of their social media. They should have been able to plan their approach to discovery based on a thorough analysis of both the withheld Google Analytics data and the late-produced and partial social media analytics.

For all these reasons, the Jones defendants' refusal to produce this information is highly prejudicial.

## IV.   CONCLUSION

For all the foregoing reasons, the plaintiffs' motion should be granted. The plaintiffs ask that the Court find as follows:

1. The Google Analytics data was not produced;

2. The non-production was deliberate and unexcused;

3. In an order to delay or avoid production, the Jones defendants presented misleading, inaccurate and incomplete information concerning the capabilities of their Google Analytics account;

4. The noncompliance is highly prejudicial;

5. The late and only partial production of social media analytics is also unexcused and prejudicial.

The plaintiffs request that the Court consider this conduct in combination with the additional sanctionable conduct committed by the Jones defendants to date in determining that the only proportional sanction is default.

<div style="margin-left: 40%;">

THE PLAINTIFFS,

By:  */s/ Christopher M. Mattei*
CHRISTOPHER M. MATTEI
ALINOR C. STERLING
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
Telephone:    (203) 336-4421
Fax:          (203) 368-3244
JURIS #32250

</div>

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been emailed and/or mailed, this day, postage prepaid, to all counsel and *pro se* appearances as follows:

**For Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC:**
Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103
jmw@randazza.com
P: 702-420-2001

Norman A. Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT  06511
P:  203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

**For Genesis Communications Network, Inc.**
Mario Kenneth Cerame, Esq. (and via USPS)
Brignole & Bush LLC
73 Wadsworth Street
Hartford, CT  06106
mario@brignole.com
mcerame@brignole.com
P: 860-527-9973

*/s/ Christopher M. Mattei*
CHRISTOPHER M. MATTEI
ALINOR C. STERLING
MATTHEW S. BLUMENTHAL

# EXHIBIT A

1

```
NO: XO6 UWY CV18-6046436-S:      NO: XO6 UWY CV18-6046437-S

ERICA LAFFERTY              :    WILLIAM SHERLACH

V                           :    V

ALEX EMRIC JONES            :    ALEX EMRIC JONES

*   *   *   *   *   *   *   *   *

NO: XO6 UWY CV18-6046438-S:       SUPERIOR COURT

WILLIAM SHERLACH            :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY

ALEX EMRIC JONES            :    MARCH 22, 2019

*   *   *   *   *   *   *   *   *
```

B E F O R E:

       THE HONORABLE BARBARA N. BELLIS,

                                Judge

A P P E A R A N C E S:

  Representing the Plaintiffs:

    ATTORNEY ALINOR C. STERLING
    Koskoff Koskoff & Bieder
    350 Fairfield Avenue
    Bridgeport, Connecticut 06604

  Representing the Defendant, Alex Jones:

    ATTORNEY NORMAN A. PATTIS
    ATTORNEY KEVIN M. SMITH
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

  Representing the Defendant, Midas Resources:

    ATTORNEY STEPHEN P. BROWN
    Wilson Elser Moskowitz Edelman & Dicker
    1010 Washington Boulevard
    Stamford, Connecticut  06901

2

Representing the Defendant, Cory Sklanka:

    ATTORNEY KRISTAN JAKIELA
    Regnier Taylor Curran & Eddy
    100 Pearl Street
    Hartford, Connecticut  06103

                    Recorded and Transcribed By:
                    Patricia Sabol
                    Court Monitor
                    400 Grand Street
                    Waterbury, Connecticut  06702

3

1        THE COURT:  Good afternoon.  Please be seated.

2        We're here on the Lafferty and related matters.

3   If you could please identify yourselves for the

4   record.

5        ATTY. STERLING:  Yes, your Honor.  Alinor

6   Sterling, Koskoff Koskoff & Bieder, for the

7   plaintiffs.

8        ATTY. BROWN:  Good afternoon, your Honor.

9   Stephen Brown from Wilson Elser on behalf of Midas

10  Resources.

11       ATTY. JAKIELA:  Good afternoon, your Honor.

12  Kristan Jakiela on behalf of Cory Sklanka.

13       ATTY. PATTIS:  Good afternoon, Judge.  Norm

14  Pattis on behalf of the Jones defendants.

15       ATTY. SMITH:  Kevin Smith, also on behalf of the

16  Jones defendants, your Honor.

17       THE COURT:  All right.  Just give me one moment.

18       So I'm sure plaintiffs' counsel and co-defense

19  counsel has seen the motion for extension of time that

20  was filed yesterday?

21       ATTY. STERLING:  Yes, your Honor.

22       THE COURT:  And there were also some RFA's that

23  the plaintiff filed yesterday.

24       So I'll hear both sides, but I actually just had

25  a question just to clarify.  When I read the March

26  21st Jones defendant motion, there was a statement on

27  page 3, Attorney Pattis, that said the defendants were

4

1      under the impression that their compliance had been

2      tendered.  And I'm wondering if you could explain

3      that.  Also, I did have a question for both sides.  If

4      memory serves, when I was addressing what limited

5      discovery there would be, I thought we had

6      interrogatories and requests for production.

7           ATTY. PATTIS:  I do have an explanation.  It will

8      take a few moments, and I'd ask you to bear with me.

9      I've had -- I have discussed with Mr. Jones and I have

10     his consent to relate the following.  And with your

11     permission, I'd also tender several affidavits today.

12     This is the history of -- I will take responsibility

13     for my side of the aisle.  I am counsel of record and

14     going forward I will be sole counsel of record.  Some

15     of the things that have occurred and for which the

16     Court appears prepared to act I don't think are the

17     fault of either my client or myself.  And I'm asking

18     you to reconsider the denial of the motion to extend

19     and here's why.  And I will get to the point you

20     raised.

21          THE COURT:  Can we get to it sooner rather than

22     later?

23          ATTY. PATTIS:  I'll get to it right now.

24     Initially, counsel was Mark Randazza and the Rondazza

25     firm.  Jay Wolman is the Randazza firm's

26     representative in Connecticut.  He was not counsel of

27     choice for Mr. Jones.

5

1        THE COURT:  Can I just stop you there, Attorney

2   Pattis?  Attorney Wolman was the one who filed his

3   appearance.

4        ATTY. PATTIS:  Understood.  I'm trying to explain

5   what -- I really am being responsive to your question.

6        THE COURT:  Okay.

7        ATTY. PATTIS:  Mr. Randazza was not permitted to

8   enter.  Barnes surfaced.  He is a close --

9        THE COURT:  I'm sorry.  I didn't hear that.  Mr.

10  --

11       ATTY. PATTIS:  Randazza was not permitted to

12  appear pro hac vice.  Barnes had Mr. Jones' ear.

13  Apparently they are -- these two knew one another

14  before this case.  This is where I've been given

15  permission to waive the attorney-client privilege as

16  to Barnes by Mr. Jones.  Barnes persuaded Jones that

17  he had viable privilege claims that Mr. Wolman did not

18  support.  In particular, a claim that under Griswold

19  versus Connecticut, you can claim the right to privacy

20  as a privilege with respect to some of these discovery

21  responses.  Mr. Wolman wouldn't sign on to that, and

22  there was a breakup.

23       At that point, Barnes contacted me some time in

24  late February.  And I filed an appearance under the

25  representation that I would be moving him in pro hac

26  vice.  As I represented to you earlier, I thought I

27  was going to be working under his direction.  And he

6

1    represented to me that he was going to manage Mr.

2    Jones' legal disputes related to these claims in

3    several jurisdictions.

4        When I was -- to get to the only question you've

5    asked, Alex Jones was under the impression and had

6    been told by Barnes that full compliance -- he had the

7    material to fully comply in late February.  And Jones

8    did not learn until apparently this week that that was

9    not the case.

10        THE COURT:  So let me just -- I apologize because

11   I want to make sure I'm understanding this.  So you're

12   telling me that Mr. Jones relied on the advice of

13   counsel who doesn't represent him in this case?

14        ATTY. PATTIS:  I am telling you that Mr. Barnes

15   -- correct.  Correct.  And so I will take

16   responsibility for that.  Okay.  I came in and I

17   represented to you last time we were here that I

18   expected Barnes to appear pro hac vice, and I was

19   going to file that motion.  I was informed shortly

20   thereafter that he would not be appearing.  And at

21   that point I turned up the heat and said, I need

22   discovery compliance.  And I received materials from

23   Barnes late on the day of March 20th.

24        THE COURT:  Because when you filed your motion --

25   one of your motions for extension of time, the one

26   that I denied, the motion had said that you hadn't

27   received or reviewed any documents yet.

7

1        ATTY. PATTIS:  Not -- if I said none, I
2    overstated it.  I had received several inches worth.
3        THE COURT:  I think you said that you had, on
4    March 18th, on that motion for extension of time, that
5    you had not been given any documents to review or
6    produce.  That was what you said in your March 18th
7    because I really --
8        ATTY. PATTIS:  I am going to correct that.  I was
9    given about two inches of documents, and I didn't seek
10    an order to do rolling discovery because I had -- and
11    I was given those documents on or about March 6th.  I
12    was also given some interrogatory responses on March
13    6th.  Those interrogatory responses were not
14    satisfactory to my way of thinking.  And I took steps
15    to get them amended.  I don't have them at this point.
16    But in terms of the bulk of documents, there are nine
17    point three --
18        THE COURT:  Let me just interrupt you, Attorney
19    Pattis, and I apologize, and I'm going to give you
20    honestly as much time as you need.  So I'm just trying
21    to figure out the March 21st motion that you filed
22    that I read very carefully that Mr. Jones was under
23    the impression that full compliance had been tendered,
24    I'm just trying to understand how he could be under
25    that impression if he hadn't signed off under oath on
26    the interrogatory responses.  So you wouldn't be
27    mistaken.  Regardless of what anyone told you, four

8

1    lawyers are involved now.  All right.  So four

2    different lawyers.  If you haven't signed

3    interrogatory answers under oath, how can you believe

4    that full compliance had been tendered?  It doesn't

5    seem to be a reasonable belief, if I accept that

6    version.

7         ATTY. PATTIS:  Well, I'm representing, as your

8    officer, the facts as I know them to be.

9         THE COURT:  I am not -- Attorney Pattis, I am not

10   in any way shape or form casting aspersions.  I accept

11   your representations as an officer of the Court.  But

12   your representation is what his impression was, what

13   he believed.  And that's why I started out asking

14   about interrogatory answers.  You can't -- how could

15   your client be under the impression that full

16   compliance had been tendered if he had never signed

17   the interrogatories under oath?

18        ATTY. PATTIS:  He had signed the interrogatories,

19   but not the requests for production.  I don't know if

20   I shared with you, I shared with co-counsel, that the

21   interrogatories, that responses came with some

22   handwritten material on it, confidential and subject

23   to protective order, which I recognize to be Mr.

24   Jones' handwriting.  And then he signed on the last

25   page.  That's meaningless to me.  I'm not going to

26   tender a document that's meaningless.

27        THE COURT:  So you have in front of you a set of

9

1       interrogatory answers that you're not satisfied with
2       that he signed under oath?
3              ATTY. PATTIS:  Right, I do.
4              THE COURT:  On that date.
5              ATTY. PATTIS:  March 6, 2019.  That was the day I
6       believe they were due.  At that point, I was operating
7       on the assumption, Judge, that I was his -- I was
8       local counsel for someone who had yet to appear.  They
9       were prepared over my signature.  I wasn't prepared to
10      sign off on them because I had had no opportunity to
11      do any due diligence.  And that was the reason for
12      seeking a continuance.
13             As to the request for production, here's the
14      backdrop on that:  The database that must be searched
15      here is composed of somewhere between nine point three
16      and nine point six million emails.  The request for
17      individual searches is extremely time-consuming.  For
18      example, in one of the --
19             THE COURT:  I accept that.  I accept what you're
20      saying that it's time-consuming, but not all of the
21      production requests were for emails.  There was
22      marketing information.  These were not all an e-mail
23      search.  So, for example, there would be, if I looked
24      at them -- I don't have them in front of me -- I'm
25      sure there are some production requests that are not
26      burdensome to respond to and no substantial compliance
27      was made.  And I'm not -- you are representing the

10

1    Jones defendants, but they are -- it's their

2    obligation to comply.  And I'm dealing with Attorney

3    Wolman's original representation with his first motion

4    for extension of time that there was going to be

5    significant document production by the initial

6    deadline, which didn't happen.  I think part of the

7    problem --

8         ATTY. PATTIS:  I can explain what happened there.

9         THE COURT:  I think part of the problem is that

10   your clients are maybe tying their own lawyers' hands

11   by getting other lawyers involved so that nobody knows

12   what anyone else is doing.  That would be the most

13   favorable light.

14        ATTY. PATTIS:  I understand that, but I don't

15   think --

16        THE COURT:  The least favorable light would be

17   manipulation.

18        ATTY. PATTIS:  I don't think it was willful.

19   With respect to the interrogatory responses, every

20   single answer that I see -- and they prepared this for

21   my signature.  I will not tender this.  Every single

22   answer was -- and this is, I think, a misapprehension

23   of law which you may recall you went out of your way

24   to correct when last we were here.  Every single

25   answer -- this is March 6, 2019 -- all responsive

26   unprivileged documents will be provided.  All

27   privileged documents will be logged and provided on a

11

1        privilege log.  Now, he was operating under the

2        assumption, which you corrected last time we were

3        here, that privilege logs can be tendered after

4        compliance.  At that point, Judge, from my

5        perspective, I'm local counsel.  I'm going to advise

6        him about the law.  I advise him about the law, and I

7        tell him we need compliance.  I warned my client's

8        in-house counsel, for lack of a better word, that the

9        Court has made clear on the record that a consequence

10       of noncompliance could be loss of a motion to dismiss.

11       I write a letter urgently to that lawyer late last

12       week saying, look, we've got to (indiscernible) this

13       stuff.  I don't know what's going to happen.

14            I have since spoken with Jones, met with personal

15       representatives and spent more hours this week than I

16       had to spend to try to get to the bottom of what

17       happened.  And here is what I am told.  And this is

18       based on interviews with my client, this is based on

19       interviews with the IT person who's culling through

20       his emails, this is based on interviews with personal

21       representatives of his, this is based on interviews

22       with Wolman, and this is based -- and I can, if

23       necessary, get an affidavit from Attorney Barnes.

24       This is from conversations and communications with all

25       of them.

26            Mr. Jones was told by Mr. -- Mr. Jones' IT

27       person -- and I have an affidavit from him -- named

1   Jeff Zimmerman, gave Barnes sixty thousand or so

2   documents in late February.  Barnes told my client

3   that this was full compliance and that it would be

4   tendered.  No one told Jones until Tuesday of this

5   week -- I don't recall the date, maybe the 19th.  The

6   19th is Tuesday.  Nobody told Jones until the 19th of

7   this week that that didn't happen.  At that point --

8   and I have authorization to tell you this -- I was

9   going to withdraw or make a motion to withdraw today

10   unless something else had happened because I cannot

11   defend an empty chair.

12       Now, Mr. Barnes has been eased out of the picture

13   and will no longer be involved in the case.  I have an

14   affidavit from Jones indicating to you that I've been

15   given sole authority and responsibility for the

16   management of discovery in this case.  The decision

17   not to tender partial discovery, that is entirely mine

18   because my view was, if I could seek an extension

19   until I could review it all, I would do so.  I have

20   not been local counsel enough in cases where I'm going

21   to sign --

22       THE COURT:  I understand that.  Can I just

23   interrupt you for one second?  And you can sit if you

24   want, whatever you're most comfortable with.  Does

25   anybody have either an extra copy or one copy -- and

26   I'll have Mr. Ferraro make a copy of it -- of the

27   interrogatories and production requests so that I can

1   look at them?

2        ATTY. STERLING:  I have them.

3        THE COURT:  Is that an extra set?

4        ATTY. STERLING:  I don't have, unfortunately, an

5   extra set.

6        ATTY. PATTIS:  Judge, to advance things, I can

7   give you a copy of the signed ones.  I brought copies

8   for everybody because I knew that this might come up

9   today.  So I'll just tender a copy to everyone to look

10  at.

11       THE COURT:  But these are the ones that you

12  didn't want to submit because you didn't feel they

13  were (indiscernible).

14       ATTY. PATTIS:  I had an opportunity -- when I

15  first got involved in this case, I put a call in to

16  Attorney Sterling, who is known to me for many years

17  as a reasonable person and, frankly, a friend.  And it

18  was made clear to me at this point there were some

19  reservations about my client's correspondence.  I

20  don't recall if it was with Ms. Sterling or Mr.

21  Mattei, but on March 6th when I received these things,

22  I discussed what the answers were.  I told them what

23  they were.  And somebody, I don't recall who it was --

24  and I'm sorry, Alinor -- that one of the answers

25  didn't satisfy them.  The question is, name all the

26  business entities and officers.  And then the claim

27  is, well, these entities don't exist anymore.  I think

14

1   the good faith answer is they're not asking at this

2   point who it is, but at the time relevant to the

3   lawsuit.

4        THE COURT:  Here's the thing, Attorney Pattis:  I

5   was told, not by you, but by the defendant Jones

6   through his first counsel that there was going to be

7   significant compliance even though they needed an

8   extension.  I'm struggling to find any good faith.

9   You're new to the game and I accept what you tell me,

10  truly I do, but any good faith on the part of the

11  defendant.  It's the defendant's discovery obligations

12  here.  So, for example, I'm just looking at the first

13  few interrogatories.  Even if some of the

14  interrogatories had been answered properly under oath

15  and then with the "to be provided", you know,

16  something that was properly responsive to the

17  interrogatories or production requests, not every one

18  of the production requests requires a search through

19  nine million or however many emails.

20       ATTY. PATTIS:  That is my call, and I am solely

21  responsible for that.  My view was, I was going to

22  respond once and then be done with it rather than get

23  involved in rolling discovery, which is difficult to

24  manage.  I did not consult with my client on that.  I

25  made that decision.  If there should be sanctions in

26  that regard, they should be directed toward me and not

27  -- me personally and not toward the client because I

15

1        made that decision.

2             Frankly, from my perspective, Judge, my state of

3        mind was, you know, I've learned nine point three

4        million -- for example, one of the search terms was

5        give us every email that you have about the Sandy Hook

6        families or family members.  When you identify the

7        plaintiffs, you identify their family members, it

8        comes to over a hundred people.  Each search of the

9        nine point three database takes about twelve hours.

10            THE COURT:  So if we just look at these.  This is

11       an easy one.  So the fifth interrogatory, identify any

12       witnesses you may call at a hearing on a special

13       motion to dismiss.  What's the answer to that under

14       oath?

15            ATTY. PATTIS:  The plaintiffs and Alex Jones.

16       That's satisfactory as far as I'm concerned.

17            THE COURT:  What about the first one, business

18       organizations?  Is that answered satisfactorily?

19       That's a pretty straightforward one.  I'd take about

20       two minutes to figure that.

21            ATTY. PATTIS:  After discussing with -- I don't

22       recall whom, but I tell you I did.  The second one,

23       the answer is one that doesn't satisfy my adversaries.

24       No employees are assigned the duties of marketing,

25       data research, analytics concerning Infowars.  The

26       only analytics are conducted by a third party Google

27       Analytics and Google Ad Manager.  No marketing

16

1    analytics were ever done related to Sandy Hook.  I

2    discussed that and the question was, well, can you

3    guys get the material from Google?  I'm told the

4    letter has been written to Google.  I've asked for it.

5    I don't yet have it.  So that's the answer, but I've

6    been informed that's an unsatisfactory answer.  And,

7    hence, the request for more time.

8         THE COURT:  What about the other interrogatories?

9         ATTY. PATTIS:  As to three, again, it may vary --

10   I don't think it varies.  I'd have to check.  There

11   were five sets.

12        THE COURT:  I'm not even looking at the

13   production requests.  I'm just looking at the

14   interrogatories.

15        ATTY. PATTIS:  No employees were assigned the

16   duties of investigating any matter concerning Sandy

17   Hook on behalf of the case defendants.  That's the

18   answer.

19        THE COURT:  What about the fourth one?

20        ATTY. PATTIS:  This may vary on the entity.  Two

21   domain names are used and owned by Free Speech Systems

22   to disseminate content concerning -- it's not a

23   complete sentence.  Two domain names are used by Free

24   Speech Systems to disseminate content concerning this

25   matter.  And they are Infowars dot com and Prison

26   Planet dot com.  That's it.

27        THE COURT:  All right.  So when you look at the

1    production requests, it looks like some of the

2    objections were sustained.  I'm not --

3         ATTY. PATTIS:  As to the financial matters and

4    tax returns, yes.

5         THE COURT:  Just roughly, let's say, just

6    roughly, there's probably, say, sixteen that they have

7    to respond to, just roughly.  So there have to be some

8    that you don't have the documents on.  For example,

9    number eleven -- and I don't have in front of me the

10   rulings.

11        ATTY. STERLING:  Your Honor, the rulings -- those

12   were done after the rulings.  So there's a couple

13   notations where an objection was sustained in its

14   entirety, but otherwise the language is the language

15   that the Court approved.  So that's fine.

16        THE COURT:  That would have taken around three

17   minutes to comply with.

18        ATTY. PATTIS:  I actually have compliance.  There

19   are no documents in my possession.  These are Court --

20   the Court ordered these documents sealed, and they are

21   placed in the lawyer's custody.  So that is the

22   answer.  And, again, this is a problem that I have

23   about the adequacy of the compliance, whether we need

24   to seek a Court order, but I called and made a phone

25   call because I remember reading something in the press

26   --

27        THE COURT:  It's possession or control, right?

18

1    ATTY. PATTIS:  Well, but the claim -- and I don't

2    know this as your officer and before I start flashing

3    documents around, I want to know it, but what I'm told

4    is the divorce transcripts were sealed and can only be

5    released with a Court order.  Now, what's paradoxical

6    to me about that is the proceedings were nonetheless

7    open to the public because I recall reading about it.

8        THE COURT:  So you're suggesting that even though

9    I've ruled this is the discovery in this case, that

10   Court order doesn't satisfy the ability to get the

11   transcript from his attorney?

12       ATTY. PATTIS:  I'm telling you that when I moved

13   for a continuance on March 6th, it was because

14   precisely of things like this, and I was unwilling to

15   put my name on it.  I'm just not.  And I don't think

16   that's unreasonable on my part.

17       THE COURT:  So were there any of the production

18   requests at all that you're in a position that you

19   feel that you have proper compliance at this point?

20       ATTY. PATTIS:  As of today, yes.  And I am told

21   -- I'd like to bring this -- I appreciate your

22   indulgence.  Jeff Zimmerman -- so here's what I have

23   done since -- before you denied my motion for

24   extension.  I've reached out to a data analytics firm

25   and described the universe of items that need to be

26   searched.  I have --

27       THE COURT:  I read that in your most recent

motion.

ATTY. PATTIS:  I didn't know you denied my motion.  I came back from an early day in court yesterday, so I had to get something out in a hurry.

THE COURT:  (Indiscernible) data analytics.

ATTY. PATTIS:  Whether my client will bear that expense or whether the plaintiffs will bear that expense, it's going to cost ninety to a hundred thousand dollars to have that information system by this firm go through the nine point three million emails and sort them.  Mr. Zimmerman has done plenty.  And he has completed under production request number one -- I have the following notes and I have received documents, Judge, in my office late Wednesday that I've not had a chance to review, but I'm told that 1A through N are completed, 2A through J, 3A through B, 4A through G, 7A through O, 8A through N.  17A through F.

THE COURT:  What about 18?  That should be pretty easy.

ATTY. PATTIS:  I'm told those are completed, but here's what I would like you to know and I have an affidavit if you need it.  This young man, Mr. Zimmerman, has been involved in this search for weeks.  To do a literal search of every term that the plaintiffs request would not be completed until April 15, 2019.  I didn't know that when I made my motion

20

1   for April 3rd, but one of the things that's occurred

2   is the Texas -- the same kid is generating data for

3   Texas.  And that case has been based on priority

4   because of the expedited schedule down there.

5       I'm also told, and I confirmed this this morning

6   in a conversation -- forgive me for not recalling his

7   name, the lawyer for Mr. Jones in Florida -- excuse

8   me, in Texas -- that today they've turned over twelve

9   thousand five hundred emails.  They are under an

10  order -- and I can get those and turn them over.  They

11  are under an order to complete discovery and/or face

12  fairly significant sanctions, and they're hoping to

13  have thousands more on Monday.

14      THE COURT:  Does he have -- Attorney Pattis, does

15  he have a different lawyer in the Texas case than --

16  it's not Mr. Wolman, it's not Mr. Barnes, it's not Mr.

17  Randazza?  It's somebody else?

18      ATTY. PATTIS:  No.  Here's what's going on in

19  Texas.  And, again, it's awkward to put on the record,

20  but I have authorization to do so.  Mr. Barnes has

21  apparently succeeded in being admitted pro hac vice in

22  Texas.  And, therefore --

23      THE COURT:  Who's the local counsel there?

24      ATTY. PATTIS:  Mark Enoch (phonetic spelling).

25      THE COURT:  So that's a different lawyer?

26      ATTY. PATTIS:  Right.  Enoch is local counsel in

27  Texas to the Jones defendants, and Mr. Barnes is pro

1    hac vice counsel.  And there's been a struggle there.

2    Candidly, Judge, what blew this into crisis mode for

3    me and led me to consider withdrawing is I received a

4    phone call and had my first communication with Texas

5    counsel on Monday.  And I had described a certain

6    email I had written to Barnes last week and the

7    failure to get a response to it.  And that email I'm

8    not prepared to share, but it warned of dire

9    consequences.  Three days passed and I didn't get a

10   response.  So I sent another email to Barnes saying,

11   you know, what's up?  Did you get my earlier email?

12   And I began to get responses.  And then my phone rang

13   off the hook with people in the Jones organization who

14   apparently did not know and then who had not been

15   shown my communication with Barnes.  And in those

16   communications, Jones learned for the first time that

17   although he believes that Barnes had a lot of

18   material, perhaps sixty thousand documents or emails

19   or whatnot since at least the end of February, which

20   is why Zimmerman thought he could turn them over and

21   Barnes had not done so.

22        THE COURT:  If I could backtrack a little bit.

23   So how many documents have been produced to date

24   roughly in the Texas action?  Just roughly, roughly.

25        ATTY. PATTIS:  I don't think a lot.  I think

26   twelve and a half thousand as of this morning.  There

27   was a glitch yesterday where Texas thought they sent a

1    file, but three thousand of the pages were blank and

2    this has led to more recriminations.  They intend to

3    send some thirty thousand more over the weekend or so

4    I'm told.  I was on a teleconference this morning

5    where arrangements were made to bring in four lawyers

6    over the weekend to produce.

7        And, Judge, what's more, I have been given

8    assurances that I will be given everything that is

9    tendered in Texas to tender here.  The problem is the

10    requests here are broader than the Texas requests.

11        THE COURT:  All right.  So if we can, if you

12    don't mind, can you just go through the

13    interrogatories and production requests that you

14    believe you are prepared to comply with at this point?

15        ATTY. PATTIS:  At this point I think I've made a

16    significant error and poorly served the Jones

17    defendants by not doing rolling discovery.  If I had

18    it to do again --

19        THE COURT:  Well, if you don't mind, just humor

20    me.  Can we just go through them and just identify

21    which ones you believe -- and I'm not holding you to

22    these exactly, but which ones you believe -- because

23    we're going to be together again on Tuesday.

24        ATTY. PATTIS:  I wanted to seek relief on that,

25    but I'm on trial, Mr. Smith and I, on a jury case.  We

26    were hoping we could be together to discuss this case

27    on the 2nd.  I know you need somebody to cover

1    Halbig's motions on the --

2        THE COURT:  I do.  I cannot go forward on that

3    case without somebody -- I just don't want to put

4    myself in that position.

5        ATTY. PATTIS:  I will have an associate here to

6    be a (indiscernible), but only Mr. Smith and I really

7    understand this issue.  So if you need to see us again

8    on discovery issues, we would request the 2nd.  One or

9    the other of us can be here.  We expect a verdict by

10   then.

11       THE COURT:  If you could just run through which

12   interrogatories first.  So there's five

13   interrogatories.  You already told me the answer to

14   number five.  So what about one, two, three and four

15   in the interrogatories?

16       ATTY. PATTIS:  I will give one --

17       ATTY. STERLING:  I'm sorry to interrupt, your

18   Honor.  I just want to see which defendant we're

19   talking about.

20       ATTY. PATTIS:  All five defendants.

21       ATTY. STERLING:  So all five.  Okay.

22       ATTY PATTIS:  I will tender all five and then

23   wait for the other side to tell me they think it's

24   insufficient and what I need to do to correct it.

25   That's the error I made.  I thought I should get it

26   all done at once.  I don't typically engage in motion

27   practice.

1      THE COURT:  Well, you're telling me that you,

2  already looking at them can --

3      ATTY. PATTIS:  I think it's a waste of time to

4  waste the Court's time on discovery disputes.  One is

5  sufficient on its face as worded.  I think it's worded

6  poorly.  Identify all business in which you have

7  ownership and/or control.  That speaks to today.  I

8  don't really think they asked about today.  I think

9  they meant to ask about a reach-back later.  So my

10  answer is facially satisfactory, but too cute for

11  words.  So I will tender it and let them say, no, we

12  meant later.

13      As to two, there is no one responsible for

14  marketing data, and we stand by that answer.  I'm

15  asking for the information that suggests that they

16  were in touch with Google Analytics.  At this point I

17  don't have it.  I spoke to a person in personnel this

18  week about that.

19      Three, as to employees, there are none.  I'm

20  prepared to tender that.  The domain names or the URL,

21  whatever they are, those are in here and I can tender

22  that and the answer to witnesses is the same for each.

23  So I can offer those today.

24      THE COURT:  All right.  And the production

25  requests, out of the sixteen or so, can you just --

26  you don't have to -- can you just identify which ones

27  that you would be able to make partial compliance to?

25

1          ATTY. PATTIS:  Yes.  May I have a moment, Judge?

2          THE COURT:  Take your time.

3          Attorney Sterling, do I have your only copy?

4          ATTY. STERLING:  You do.  It's --

5          THE COURT:  I'm going to give it back to you.  I

6     can have --

7          ATTY. STERLING:  Obviously I have more back at

8     the office, but it's -- I'm managing.  It's okay.

9          ATTY. PATTIS:  Judge, we have received this week

10    late in the day on the 20th what I was told were sixty

11    thousand emails.  We've had some difficulty

12    downloading them that has crashed our system, but as

13    of this moment, I have thirty-seven thousand of them

14    on a hard drive.  There are two issues.  One -- well,

15    there are three issues.  Whether any serious claims of

16    journalistic privilege are going to be interposed or

17    not.  But the pressing issue is the attorney-client

18    privilege.  I was on the phone with Texas counsel.

19    They are scrubbing to make sure there's nothing

20    privileged in here.  What we're trying to get them to

21    do is give us information from the so-called tip line

22    or confidential informant line.  I'm told that's some

23    fifty to sixty thousand emails.  And we should be able

24    to get those and produce them quite quickly.

25          As to the topics in one, Sandy Hook is what

26    crashed our system.  However, there are emails that

27    are responsive to Newtown, to Adam Lanza, to crisis

26

actors.  There are about eight -- I guess you won't

find it hard to believe.  There are about eighty-nine

hundred of them or more that relate to Wolfgang

Halbig.  And so we've got a number of them.

THE COURT:  Are there any production requests

that you can fully comply with at this point?

ATTY. PATTIS:  By --

THE COURT:  Except for 18.  I think you told me

18 you were all set on, the communications with any

other plaintiffs.

ATTY. PATTIS:  To be honest with you, Judge, I

didn't get what I got from Barnes until Wednesday

afternoon.  I was in a court trial until midday

yesterday.  It settled abruptly.  And so I have not

had a chance to look at what he sent me.  But I know

that I'm sitting on at least thirty-seven thousand

emails.  And I discussed an additional ten or twelve

thousand more.  So I believe that by Monday I can make

a showing of thirty to forty thousand emails.

The issue that came up in a conference call this

morning is whether there are attorney-client

privileges.  And because of the exigency in Texas

where there's a mandatory timeline, there was a

literal discussion about whether to waive the

attorney-client privilege so as to comply.  And no one

is comfortable with that.  So a series of lawyers are

being brought into the Texas firm to at least scan the

27

1    documents to make sure they're not turning over

2    privileged material.  So I think I'm close, but the

3    downside is, if Mr. Zimmerman --

4        THE COURT:  Attorney Pattis, isn't that usually

5    how it's done in these kind of cases, that there are a

6    team of young associates or young lawyers or whoever

7    on the document production --

8        ATTY. PATTIS:  And there has been.  I've spoken

9    to a young man who spent six days at Mr. Jones'

10    facility --

11        THE COURT:  Early on, though, before your

12    involvement.

13        ATTY. PATTIS:  Correct.  And so my -- I have two

14    people who are working full time on this matter right

15    now.  And I can't work on what I'm not given.  So my

16    contention is and my firm belief is, while I'm not

17    happy to be responsible for a file where there is no

18    compliance, but I'm hard-pressed to know what more I

19    could have done.  Perhaps I should not have appeared

20    or I should have waited to file an appearance together

21    with the pro hac vice counsel.  I didn't.  I relied on

22    him.  I know who he is.  I've seen him around.  I've

23    heard about him.  He represented and I was told that

24    he had the client's confidence.  What more should I

25    have done?  I tried to extend a professional courtesy

26    to someone who was apparently less than candid with

27    the client and sandbagged me.

28

1      THE COURT:  So besides the search of the emails,

2  what other document search is ongoing?

3      ATTY. PATTIS:  I called a person who is involved

4  in -- so I'm led to believe that the Jones defendant

5  and related entities employed as many as 75 people,

6  maybe 77.  I've heard two estimates.  So I have asked

7  for organizational charts that would help me

8  understand the difference between one entity and the

9  other and the relationship.  And I'm told they are

10  largely -- it's largely informally managed.

11      One of the issues that remains in dispute, and I

12  don't know if it's too late to object, they don't want

13  to give a list of all their employees like janitors,

14  this and that and everything else because Mr. Jones is

15  concerned about retaliation against people close to

16  him for political --

17      THE COURT:  Well, the objections were already

18  dealt with, and there is a process in place for

19  confidentiality issues.  So I suppose with something

20  like janitors' names, I got to think that you and

21  Attorney Sterling could probably reach an agreement as

22  to how not to publicize those names.

23      ATTY. PATTIS:  So I have spoken to a human

24  resources person to begin to get that data together.

25  I have met with individuals as recently as this

26  morning close to the Jones organization to try to get

27  to the bottom of all this.  I've been invited down to

29

1    do what I need to do, if I'm given time and need to go

2    down.  I don't know what more I could have done.  I

3    genuinely believed that Mr. Barnes had Mr. Jones'

4    confidence.  It was represented to me by Barnes and

5    others that he was brought in to manage the litigation

6    in the various courts.  And I did what a pro hac vice

7    counsel, or what a person sponsoring counsel does.  I

8    stood by and took a subordinate role.

9        Last week when it was clear that was working to

10   the client's detriment, I'll be candid, I consulted my

11   lawyer, who's Willie Dow.  And I described the

12   situation to try to find out what my ethical

13   obligations were.  And he basically said that I was in

14   a very precarious situation.  So I took the steps that

15   I needed to take to protect myself.  And the result is

16   that Mr. Barnes is no longer in the picture, and I am

17   it.  And I'm told I have full responsibility.

18       THE COURT:  You had mentioned sanctioning you,

19   which I've never done a sanction in sixteen years and

20   I'm sure not going to start now.  But this discovery

21   obligation is not your obligation.  It's the

22   defendant's obligation.  That is -- it's not what you

23   know, it's not what you don't know.  It is the party's

24   obligation to fully and fairly comply with requests

25   for disclosure and production.  So any sanctions would

26   be to the party here and not to you.

27       ATTY. PATTIS:  Well, except I did err.  I could

1    have done rolling discovery and I regret it now.

2    That's been the approach in Texas.  Of course, it

3    hasn't stopped things from --

4        THE COURT:  Has that motion to dismiss been

5    adjudicated yet?

6        ATTY. PATTIS:  No.  My understanding is that a

7    decision -- and Attorney Sterling can correct me if

8    I'm wrong -- a decision has to be tendered by June

9    2nd, I believe.

10       THE COURT:  Has it been argued?

11       ATTY. PATTIS:  No.  It will be argued in May.

12       ATTY. STERLING:  No, your Honor.

13       THE COURT:  So they're still doing their

14   discovery.

15       ATTY. STERLING:  They're doing rolling

16   production.  There's a holdup with discovery there, as

17   I understand it.  There was a ruling on the reporter's

18   privilege in which the privilege claim was largely

19   rejected.  And the plaintiffs in that case chose to go

20   forward with Mr. Jones' deposition and the deposition

21   of the corporate designees without documents, which

22   has now become a basis for a motion for sanctions in

23   that case, with them claiming they're prejudiced by

24   having to go forward, which they had to do because the

25   Texas timeline was so tight.

26       THE COURT:  So, Attorney Sterling, I've given

27   Attorney Pattis the entire floor the whole time and,

31

1          of course, I will give you equal time, but I have to

2          just tell you what I'm considering at this point so

3          you can respond to it and Attorney Pattis can respond

4          to it, as well.  I would like to -- I don't want to

5          wait until April 2nd.  I would like to address the

6          issue of whether your motion should be granted with

7          regard to precluding the motion to dismiss, whether

8          Attorney Pattis' motion for reconsideration on the

9          extension of time, whether the Court should reconsider

10         that.  But I would like to see if the landscape is

11         going to change.  If we were to come back Monday or

12         Tuesday and you were to tell me, well, I got the

13         twelve thousand five hundred documents today and the

14         other thirty thousand documents that were expected

15         over the weekend, so on Monday I had forty-two

16         thousand five hundred documents and I got the

17         interrogatory answers under oath and I got production

18         18 and whatever other production requests can be

19         satisfied, that, to me, would change the landscape a

20         little bit, perhaps.  So I think I would rather give

21         the defendants an opportunity to do that and then

22         address your motion and address Attorney Pattis'

23         motion.  It doesn't make a difference if it's heard

24         today or heard next week.

25              ATTY. STERLING:  Of course, your Honor, if that's

26         the Court's preference, that's what we'll do.  I mean,

27         I do have some responses to what's been said here

32

1      today.  I think that there's been a lot of indications

2      that Attorney Barnes was a bad actor.  I think if the

3      Court looks back down the timeline, though, December

4      10th is the date that the Court determined that

5      discovery would be permitted.  January 10th is the

6      date that the Court determined the content of the

7      interrogatories and request for production.  After

8      January 10th, we were in court on January 23rd,

9      January 31st, February 14th, and February 21st, and on

10     none of those days did defendant's counsel, who was

11     then Attorney Wolman, say anything about difficulties

12     in meeting a February 25th production date.

13          THE COURT:  Actually, the deadline was the 23rd,

14     right?

15          ATTY. STERLING:  I may be mis --

16          THE COURT:  I think you rounded it off.  But

17     that's not a court filing.  That's just discovery

18     responses.  So as far as I'm concerned it was the

19     23rd.

20          ATTY. STERLING:  Yes.

21          THE COURT:  Attorney Pattis, I know you're not

22     responsible for that because that was before you were

23     in the case, but you can see how it's troublesome to

24     the Court because nobody in this room wants to be

25     manipulated.  But when we have a February 23rd

26     deadline and the Jones defendant's counsel is in the

27     courtroom two days before we address, I believe, the

1   confidentiality order protective order and whatever
2   other issues were brought to me and I always ask, is
3   there anything else?  There was never a mention from
4   the Jones defense counsel that, in fact, there wasn't
5   going to be compliance.  So that's the problem.  That
6   would have been the time.  So can you respond to that?
7   I know that you're answering for somebody else, but
8   that's still what the case -- what's been going on,
9   that's the history.

10       ATTY. PATTIS:  So here's all I know based on the
11   interviews that I conducted this week:  Apparently Mr.
12   Zimmerman was not made aware of this data request
13   until sometime well after it was initially tendered.
14   This would have been sometime in January.  Zimmerman
15   has told others that he gave Jones what he had late in
16   February so that when Wolman appeared here on February
17   25th, I believe he knew that Jones was coming into the
18   (indiscernible), that Barnes was coming into the case,
19   but they were having this dispute about what to do
20   about privacy.  And Wolman would not sign on to the
21   Griswold claim.  And I can't say I blame him.

22       THE COURT:  All right.

23       ATTY. PATTIS:  But I understand what Attorney
24   Sterling says.  The thing that floored me this week, I
25   requested an affidavit from Zimmerman, and I was told
26   for the first time this week that strict compliance
27   with everything requested couldn't be done until April

34

1    15th.  And I had previously requested until April 3rd

2    myself thinking all this was done.  Now, it may be

3    that Attorney Sterling and I can work on what she

4    really means by family members and related people

5    because if you do the family members and related

6    people, they've actually searched the web to find out

7    who these are, that's like four hundred people.  And

8    if it's going to take twelve hours per search, where

9    are we going to be and when are we going to get there?

10   I can only tell you what I know.

11        THE COURT:  All right.  Sorry I interrupted you,

12   Attorney Sterling.  I'm sorry.

13        ATTY. STERLING:  Just a few more things.  All

14   with the mindset that we're trying to do expedited

15   discovery, and we have pushed hard on our side to be

16   available for expedited discovery.  The Court knows

17   how many times we've been back.  So this is just

18   turning into not expedited discovery, which means that

19   the discovery stay remains in place indefinitely.

20        The other -- and I'm really trying -- I have no

21   interest in casting stones at Attorney Pattis.  I know

22   the Court doesn't either.  So I would like my comments

23   to be understood in that regard.  It was on March 7th

24   that the Court warned both orally and in writing that

25   failure to produce on the 20th would potentially

26   result in denial of the anti-SLAPP.

27        On March 13th, we were back in court and Attorney

35

1    Pattis had indicated that he had advised people who

2    need to know of the Court's observations.  But not

3    only that, it was a Court order.  So it was out there

4    for all to see.  So that is just in and of itself

5    extremely problematic and the fact that things were

6    not provided to Attorney Pattis until March 18th.

7        The other thing that came up in the course of

8    this hearing, and, obviously, I haven't seen any of

9    the documents that have been referenced by Attorney

10   Pattis, is that Mr. Jones apparently signed his

11   affidavit on March 6th.  The representation from

12   Attorney Wolman was that compliance could be provided

13   on February 25th, including those interrogatories.

14       So I'm not in a position to reconcile all these

15   difficulties.  What I can do is point to them and say

16   to the Court, I understand Attorney Pattis is casting

17   this in the absolute rosiest light, but the record

18   doesn't look rosy.  So I will say one thing about the

19   sanction, and then I understand the Court's preference

20   to proceed on Tuesday, which is that the sanction that

21   we're asking for, which is denial of the anti-SLAPP on

22   a summary basis isn't a sanction on the merits.  It

23   just allows the case to proceed to the merits.  It

24   allows us to do full discovery.  From everything

25   that's been represented, trying to do this discovery

26   on an expedited basis isn't working very well.  This

27   is apparently a production of substantial numbers of

36

documents, if they materialize.  But our case law is
concerned with making sure that a determination on the
merits is what happens, and that denying the
anti-SLAPP would actually help us get to that point
because at this point we're just stalled.

THE COURT:  I'm not going to address that now,
but I've said many times now that that special motion
to dismiss is in jeopardy, but I wouldn't be denying
it.  I would be precluding it.  I wouldn't address the
merits of it.

But I do want to interrupt you because I would
like to address this to Attorney Pattis, as well.  One
of Attorney Pattis' comments, which I accept, that he
had originally asked for in his extension of time, I
think, for April 1st now, but when you checked with
the person who was doing the forensic examination, or
whatever you call it, that that wouldn't even be
possible.  It would be April 15th.  So, basically,
what the representation is is that it -- it sounds
like a solid month to do that forensic audit, or
whatever you call it, of the emails.  So I guess what
I'm saying in a way that that's probably more
difficult and more of a burden than was anticipated
that was ever mentioned by anyone at any point,
Attorney Wolman, and so forth.  So it might have been
impossible -- if it had been done properly, it might
have been impossible for the Jones defendant to have

1      met that first deadline, given the number of emails

2      and such.

3           ATTY. STERLING:  Possible, although, your Honor,

4      then the question arises, but if they were actually

5      attempting to do this, why didn't we hear about it

6      sooner?  It's the first thing I would say if I was

7      under a deadline like that.  And also with the focus

8      in this case on how hard we worked to set expedited

9      deadlines.

10          So I don't really have a response to that at this

11     point, your Honor.  It's very difficult from where I

12     sit because I don't have anything to review.  I don't

13     have a basis to know what's being produced.  I

14     don't -- the representations about what's being

15     searched have shifted over the course of the discovery

16     process.  I just -- is there another way to ask that

17     question of me, your Honor?  I'm not giving a good

18     answer, but I'm not quite sure what the Court's

19     concern is.

20          THE COURT:  Attorney Pattis, can I ask you, what

21     is the like -- you also mentioned the cost involved of

22     doing it.  To be honest, would you like me to be

23     straightforward here?

24          ATTY. PATTIS:  Yes.

25          THE COURT:  The Jones defendants at this point

26     are coming from a position of weakness.  They've blown

27     past the Court's deadlines.  There hasn't been a

38

1      single piece of paper or interrogatory answered.  And

2      now they're saying it's too costly.  Wouldn't the

3      better approach -- or that who's going to pay the

4      ninety thousand dollars, or whatever it was that you

5      said.  Wouldn't a better approach be to turn over

6      immediately the twelve thousand plus documents --

7           ATTY. PATTIS:  Yes, I intend to.

8           THE COURT:  The thirty thousand documents over

9      the weekend, pay the costs of having your forensic

10     examination of the emails instead of suggesting at

11     this point that the plaintiff should bear that cost,

12     answer the interrogatories that you identified the

13     production requests that you can -- and then change

14     the landscape in a way so there's some good faith.

15     This would be the first step.

16         ATTY. PATTIS:  That is entirely on me.  And I

17     wanted to comply fully because, candidly, I'm busy and

18     I don't want to be involved on a piecemeal basis.

19     That's my personal preference, but I'm not going to

20     get my way here.  So I think you're right.

21         As to the --

22         THE COURT:  I'm going to interrupt you again.

23     You are getting your way because nothing were to stop

24     me from ruling on that motion and precluding the

25     special motion to dismiss and just moving on with the

26     case.  So as far as I'm concerned, you did yeoman's

27     work in --

1    ATTY. PATTIS:  Can I order that piece of the

2    transcript?

3        Can I just respond to one thing?  I think it's

4    important to notice here that it was the plaintiffs

5    who have filed this action, and they sat on their

6    claims for years until it was convenient for them to

7    strike.  And then we had thirty days (indiscernible).

8    We had to file our motion in response.  There's no

9    case law about the scope of discovery here.  But I

10   don't think the Court really expected that there would

11   be nine point three million emails to search and that

12   searching each data firm one at a time was going to

13   take upwards of six to twelve hours.  So the Jones

14   defendants contend, not that I've seen it with my own

15   eyes, I'm making representations to you, that they've

16   been at this for weeks.  It's my recommendation that

17   they go to the data firm.  But here's the problem with

18   the data firm:  The data firm can only segregate and

19   locate items.  It can't do a privilege analysis.  So

20   there were several people in my office today.  We were

21   on the phone with people down in "Jonesville", as it

22   were, trying to identify by rule of thumb items in

23   which there could be no conceivable claims of

24   privilege.  And those should be things that came in

25   through a so-called tip line or attorney-client

26   privilege because at that point that's all I'm focused

27   on.  So I think there are ways to provide it, and I'd

40

1    be happy to do so if given permission.

2         THE COURT:  I think it's unfortunate that -- and,

3    again, I'm not laying blame on your feet because you

4    weren't even involved, but I went along with the

5    deadline.  The deadline that I ordered was the

6    deadline that Attorney Wolman had requested.  So I

7    gave him what he wanted.  It sounds like you pretty

8    handily, without much of a struggle, was able to

9    determine that this was going to be an expensive

10   search, and it was going to involve a lot of

11   documents.  If Mr. Jones' first attorney had done what

12   you're doing, I would have been back probably with

13   everyone maybe on January 30th, at which point I would

14   have been told this is going to be -- it's going to

15   take longer, it's nine million, or however many

16   emails, but instead what happened -- and I don't want

17   to beat a dead horse -- is that the deadlines were

18   missed and they were like moving targets.  This is --

19   It's just --

20        ATTY. PATTIS:  That may explain why there's been

21   a change in counsel.

22        THE COURT:  True.

23        ATTY. STERLING:  Your Honor, just a few things.

24   Two changes in counsel -- three.  But one is, I would

25   ask that with regard to the affidavits that Attorney

26   Pattis mentioned today, could we have those submitted?

27        ATTY. PATTIS:  Yes.

1     ATTY. STERLING:  And with regard to the

2  plaintiffs and the time we chose to file our

3  complaint, I really think this is not the time to try

4  to turn this on us.

5     ATTY. PATTIS:  Well, it bears noting that --

6     THE COURT:  No colloquy.  Thank you.

7     All right.  What else?  Anything today?  So

8  here's what I don't want to do:  I want to put these

9  issues to rest one way or the other.  And I had

10  intended to do it today.  I'm happy -- and since I'm

11  the one that actually wanted that, we can do it next

12  week.  But I understand you're not available, Attorney

13  Pattis, on the 26th?

14     ATTY. PATTIS:  Well, here's the story:  Mr. Smith

15  and I are trying a case.  The jury has been picked.

16  We do not want to be perceived as dogging this file.

17  Attorney Smith indicates tha he'll be here on Tuesday.

18  I would prefer that he not, since --

19     THE COURT:  Are you on trial on Monday?

20     ATTY. PATTIS:  Yes, all week.

21     THE COURT:  Monday, too.  Every day?

22     ATTY. PATTIS:  Yes.

23     THE COURT:  Can I ask what town?

24     ATTY. PATTIS:  Yes, Middletown.  The case is

25  State vs. Cuson (phonetic spelling).  We expect the

26  case, however, to end that week.  So the following

27  week is easy for us because it only takes one person

42

1    to monitor a jury.  I would prefer to have Mr. Smith

2    with me, but he'll be here Tuesday if you need him.

3         THE COURT:  Well, I think I originally intended

4    to just deal with Mr. Halbig's issues, but it would be

5    helpful if we could maybe even do it at nine o'clock

6    first thing and then you can get right on the road and

7    get to Middletown.  Quite frankly, I don't know if you

8    want to do it here or in Bridgeport, whatever will be

9    quicker for you.  But I just want to be able to

10   address at that point to see if there's some consensus

11   if the landscape has changed at all.  For example,

12   forty-three thousand documents were given and

13   interrogatory answers under oath.  I don't want to get

14   into a situation -- I don't want to get into ex parte

15   problems.

16        ATTY. PATTIS:  Would you consider calling Judge

17   Suarez in Middletown and ask for an eleven o'clock

18   start date on Tuesday?  I'd like to be here myself.

19   I'm the one who's made factual representations to you.

20   And Mr. Smith will do a great job, but I've taken

21   responsibility for this.

22        THE COURT:  Let me just see what time -- so it's

23   nine o'clock on Tuesday.

24        Ron, is that here or in Bridgeport.

25        THE CLERK:  It's scheduled in Bridgeport.

26        THE COURT:  All right.  I will do that, but it's

27   in Bridgeport and here's the problem:  I can't really

1    change the Tuesday date because I'm concerned about

2    notice to Mr. Halbig.  And I don't want him going to

3    the wrong court and the notice said Bridgeport.  So,

4    you know, I'm an early bird.  I can -- well, I can't.

5    I can't get anybody on the record.  This has to be on

6    the record, and I can't get a monitor before nine,

7    but --

8         ATTY. PATTIS:  We're happy to go to what we refer

9    to as the devil's backyard or the home court for

10   Koskoff Koskoff & Bieder.

11        Judge, I have a copy of the affidavits.  I think

12   there was a request that they be filed.

13        THE COURT:  Can you just give me one moment, if

14   you don't mind?

15        ATTY. PATTIS:  I'm also handing to counsel the

16   March 6th interrogatory responses, expecting to hear

17   back from them.

18        THE COURT:  Your start time with Judge Suarez

19   would otherwise have been ten, right?

20        ATTY. PATTIS:  That's my understanding, yes.

21        THE COURT:  So I'm sending this to him right now.

22   So just give me a moment.

23        ATTY. STERLING:  Your Honor, counsel has handed

24   me interrogatory responses that have handwritten on

25   them "confidential" and "subject to protective order".

26   Is that -- are you claiming them subject to protective

27   order?

44

1      ATTY. PATTIS:  No.  I'm simply giving -- I'm not

2   making claims as to this document.  I'm complying with

3   rolling discovery.  There may be issues as to a

4   protective order I'm not up to speed on.  What's more,

5   Judge, these are facially defective for two reasons.

6   Mr. Jones signed them, but there's no attestation that

7   he signed them.  I'll be happy to correct that, as

8   well.  There's a wrong certification date on it.

9   These were prepared for my signature without my

10  reviewing them.  But I want to give the other side the

11  information I have and I'll cure these.  But I'm

12  simply giving them what I have to try to tilt the

13  playing field.

14      ATTY. STERLING:  But I'm asking just a very

15  specific question, which is, are you claiming they are

16  subject to the protective order because they say

17  confidential and subject to protective order.  That

18  affects whether I can file them in court under seal or

19  not.

20      THE COURT:  My client wishes that they be so, so

21  I'm making that claim, yes, on his behalf.

22      ATTY. STERLING:  Okay.

23      ATTY. PATTIS:  But with reservations.  I'd prefer

24  to wait until I had a chance to get to the bottom of

25  it myself, but I don't want to (indiscernible).

26      ATTY. STERLING:  So the claim --

27      THE COURT:  These are just the interrogatories

45

1    you're talking about.

2         ATTY. STERLING:  Yes, your Honor.

3         THE COURT:  I think what I was anticipating when

4    I saw you on Tuesday was hopefully new answers under

5    oath with proper -- answers that fully and fairly

6    comply with the interrogatories.

7         ATTY. PATTIS:  I'll take care of that.

8         ATTY. STERLING:  So I'm handing them back to

9    counsel.  I don't have them now.

10        THE COURT:  All right.

11        ATTY. PATTIS:  I have retrieved them.  Thank you

12   for the courtesy, Attorney Sterling.

13        THE COURT:  All right.  So I'm sure Judge Suarez

14   will get back to me, unless he's out today.  As soon

15   as he does, I will tell Mr. Ferraro and he will let

16   you know, but hopefully we can go that way.  I think

17   if it works out, we can start right at nine.  We'll

18   make it our business to be done in a half an hour.

19   Mr. Ferraro tells me that Mr. Halbig has indicated to

20   him that he doesn't plan on attending.  So I'm still

21   going to go forward with the disqualification conflict

22   issue.  So it probably will not take long with respect

23   to Mr. Halbig's motions.  So it will probably just be

24   addressing this, but I don't want to get into Mr.

25   Halbig's case at all because I don't want to be

26   getting into any of the substance, just the

27   scheduling.

46

1          ATTY. STERLING:  Yes.  With regard to scheduling,

2    your Honor, since we understand that Mr. Halbig

3    intends not to be present, or at least that's the

4    representation now, would the Court want argument on

5    the plaintiff's side -- I assume not -- with regard to

6    the motion to dismiss and motion for change of venue?

7          THE COURT:  I'm not going to address any of his

8    motions if he's not there.  I placed it down for the

9    hearing on the conflict disqualification, and that I

10    need to do for the record.  So that's what I plan on

11    doing on that date.

12          Okay.  Anything else today?  So I will see you

13    hopefully Tuesday at nine and have a wonderful

14    weekend.  And we are adjourned.

15          (Court was adjourned.)

16

17

18

19

20

21

22

23

24

25

26

27

47

NO: XO6 UWY CV18-6046436-S:      NO: XO6 UWY CV18-6046437-S

ERICA LAFFERTY             :     WILLIAM SHERLACH

V                          :     V

ALEX EMRIC JONES           :     ALEX EMRIC JONES

*  *  *  *  *  *  *  *  *

NO: XO6 UWY CV18-6046438-S:      SUPERIOR COURT

WILLIAM SHERLACH           :     JUDICIAL DISTRICT OF WATERBURY

V                          :     AT WATERBURY

ALEX EMRIC JONES           :     MARCH 22, 2019

*  *  *  *  *  *  *  *  *

C E R T I F I C A T I O N


     I hereby certify the foregoing pages are a true and
correct transcription of the audio recording of the
above-referenced case, heard in the Superior Court, Judicial
District of Waterbury, at Waterbury, Connecticut, before the
Honorable Barbara N. Bellis, Judge, on the 22nd day of March,
2019.

     Dated this 27th day of March, 2019, in Waterbury,
Connecticut.


                              _____

                                   Patricia Sabol

                                   Court Monitor

# EXHIBIT B



Jay Marshall Wolman, JD
Licensed in CT, MA, NY, DC

**24 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

Matthew Blumenthal
<mblumenthal@koskoff.com>

Alinor Sterling
<asterling@koskoff.com>

**Re:    *June 28, 2021 | Deadline for Production of Google Analytics***

Dear Counsel,

As discussed today, and as you are aware, the deadline for production of the Google Analytics is on June 28, 2021.  The full dataset cannot be produced as an export, which thus means the only method of production is by live access to the dataset for your inspection.  And, the Court previously declined to order us to provide you with a log-in.  As a result, the only method for your inspection is the sandbox approach referenced during today's deposition.  I recall previously making this offer to you, either during a telephone conversation or during the June 2 hearing (the transcript of which we are requesting to verify), but was not memorialized in writing and which Attorney Mattei did not recollect.

This method of inspection is akin to traditional paper discovery, where the requesting party is let into the storeroom of documents organized as kept in the ordinary course of business. You will have full liberty to run whatever searches Google Analytics permits and have full access to inspect the dataset.  We envision two possible ways for this sandbox approach--we can provide you with a TeamViewer access to a Free Speech Systems computer connected to the Google Analytics or we can meet you at an agreed-upon location with a clean, new computer, where we will log-in the computer during the period of your inspection.

//

//

//

//

//

Randazza Legal Group
Page 2 of 2



Let us know which approach you prefer so that we can know if we are to meet up with you on or before the 28th.

Thank you for your attention to this matter.

Sincerely,

Jay M. Wolman

# EXHIBIT C



KOSKOFF KOSKOFF & BIEDER PC

June 25, 2021

Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103

**Re:    Erica Lafferty, et al. vs. Alex Emric Jones, et al.**

Attorney Wolman:

I write in response to your letter, dated June 24, 2021, concerning data contained in your client's Google Analytics software application.

During yesterday's deposition of Free Speech Systems' corporate designee, you raised for the first time that your client is not prepared to produce its Google Analytics data by June 28 as the Court directed. You had not previously raised this issue with anybody in our office.

As it stands, your client is required to produce that long overdue data by June 28 in accordance with the Court's Order, dated June 2, 2021 (DN 348.10).

We do not agree with your statement that the Google Analytics "cannot be produced as an export." Your position is not consistent with information you provided to the Court on June 2, 2021, nor is it consistent with our understanding of Google Analytics' capability.

Finally, your proposal is not acceptable in any way. You propose to retain sole possession of the data the Court has ordered produced. You propose to permit us to view the data for a limited period of time under conditions you set. You propose to observe us during the period of time we have access to the data in a manner that would allow you to retain a record of our activity.

You proposed this on the evening of Thursday, June 24, and ask that we make ourselves available on or before Monday, June 28.

We expect complete production of the Google Analytics data in compliance with the Court's orders.

Sincerely,

Christopher M. Mattei

# EXHIBIT D



<div align="right">

**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

</div>

<div align="right">

**25 June 2021**

</div>

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

       ***Re:***     ***Lafferty v. Jones | Google Analytics***

Dear Attorney Mattei:

To be clear, there is no inconsistency. As set forth on June 2, to export the raw data, one must be an Analytics 360 member, i.e. a premium member. Free Speech Systems is not an Analytics 360 member, therefore it is impossible for it to export the data. As further offered on June 2, if Plaintiffs wish to make Free Speech Systems an Analytics 360 member, they have been welcome to do so. This offer was made on the record. Plaintiffs have declined this manner of production so far.

                               Sincerely,

                               Jay M. Wolman

cc:      mblumenthal@koskoff.com, asterling@koskoff.com

# EXHIBIT E

```
NO:  UWY-CV18-6046437 S      :   SUPERIOR COURT
SHERLACH, WILLIAM            :   JUDICIAL DISTRICT
                                 OF FAIRFIELD
v.                           :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.          :   MAY 7, 2019
```
```
NO:  UWY-CV18-6046438 S      :   SUPERIOR COURT
LAFFERTY, ERICA, ET AL.      :   JUDICIAL DISTRICT
                                 OF FAIRFIELD
v.                           :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.    :   MAY 7, 2019
```
```
NO:  UWY-CV18-6046436 S      :   SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.    :   JUDICIAL DISTRICT
                                 OF FAIRFIELD
v.                           :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.    :   MAY 7, 2019
```

          BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S :
     Representing the Plaintiffs:
          ATTORNEY CHRISTOPHER MATTEI
          ATTORNEY ALINOR STERLING
          Koskoff, Koskoff & Bieder, PC
          350 Fairfield Avenue
          Bridgeport, CT  06604

     Representing the Defendants Alex Jones; Infowars, LLC; Free
     Speech Systems, LLC; Infowars Health, LLC; and Prison Planet
     TV, LLC:
          ATTORNEY KEVIN SMITH
          Pattis & Smith, LLC
          383 Orange Street
          1st Floor
          New Haven, CT  06511

     Representing the Defendant Cory Sklanka:
          ATTORNEY KRISTAN JAKIELA
          Regnier, Taylor, Curran & Eddy
          100 Pearl Street
          14th Floor
          Hartford, CT  06103

     Representing the Defendant Midas Resources, Inc.:
          ATTORNEY COLLEEN VELLTURO
          Wilson Elser Moskowitz Edelman & Dicker
          1010 Washington Boulevard
          Stamford, CT  06901

                              Recorded By:
                              Colleen Birney
                              Transcribed By:
                              Colleen Birney
                              Court Recording Monitor
                              1061 Main Street
                              Bridgeport, CT  06604

```
 1              THE COURT:  Lafferty v Jones.

 2              ATTY. MATTEI:  All here, Your Honor.

 3              THE COURT:  All right.  Just why don't you come

 4         on up and identify yourselves for the record, please.

 5              ATTY. STERLING:  Good morning, Your Honor;

 6         Alinor Sterling, Koskoff, Koskoff & Bieder, for the

 7         plaintiffs.

 8              ATTY. MATTEI:  Good morning, Your Honor; Chris

 9         Mattei for the plaintiffs.

10              ATTY. JAKIELA:  Good morning, Your Honor;

11         Kristan Jakiela, Regnier Taylor, on behalf of Cory

12         Sklanka.

13              ATTY. SMITH:  Good morning, Your Honor; Kevin

14         Smith for the Jones defendants.

15              ATTY. VELLTURO:  Good morning, Your Honor;

16         Colleen Vellturo for Midas Resources.

17              THE COURT:  All right.  So tell me what motions

18         need to be adjudicated today.  And I do want to just

19         state for the record what is probably clear to

20         everyone at this point.  I had said a few times that

21         I thought that there was substantial enough

22         compliance.  So in effect I have really extended --

23         had extended the deadlines for the defendant to

24         comply.  So that would be my ruling, just for the

25         record, on the issue of the additional time to

26         comply.  I understand it's not necessarily 100

27         percent complete compliance, but I think I've seen
```

1    enough of it at this point to afford the defendants

2    the opportunity to pursue their special motion to

3    dismiss.

4        So tell me what needs to be adjudicated today,

5    which filings.

6        ATTY. MATTEI:  Okay.  Your Honor, we have docket

7    entry 223.  These, I believe, are from the Lafferty

8    docket.  223, that is the Jones defendants' motion to

9    compel compliance, which I think we can deal with

10   pretty quickly.  The 227, which is our motion to

11   compel compliance.  I believe the Court addressed 234

12   at the last hearing.  We filed 235, which is ready

13   for adjudication.  And we also filed 236, which I

14   think given the Court's ruling that you just stated

15   and your ruling on 234, we probably have resolved the

16   issues there.

17       THE COURT:  So why don't we take up first the

18   issue -- 223 and the privilege log issue.

19       ATTY. SMITH:  Yes, Your Honor.  Your Honor, we

20   provided a privilege log to the plaintiffs and I

21   believe that Attorney Mattei and Attorney Pattis had

22   a discussion this morning that I was told about on my

23   way here, which I think resolves the issue, if I

24   understand the agreement.

25       THE COURT:  Okay.

26       ATTY. MATTEI:  Yes, Your Honor.  Attorney Pattis

27   and I spoke.  He agreed, and I hope this is what he

1    conveyed to Attorney Smith, that the motion to compel

2    compliance can be -- is now moot.  They submitted a

3    privilege log.  To the extent the plaintiffs wish to

4    claim a waiver, it would be now on us to file a

5    motion to compel disclosure.

6         THE COURT:  All right.  Okay.  So I can cross

7    that off the list.

8         ATTY. SMITH:  That's my understanding, Your

9    Honor.

10        THE COURT:  All right.  Then what's the next

11   matter that's ready to be adjudicated?  227 is it?

12        ATTY. MATTEI:  That's correct, Your Honor.

13        THE COURT:  And is there a corresponding

14   objection?

15        ATTY. MATTEI:  I believe that was filed last

16   night.

17        ATTY. SMITH:  Yes, Your Honor.  Attorney Pattis

18   filed last evening a response to --

19        THE COURT:  That's 239, right?

20        ATTY. SMITH:  Yes.

21        THE COURT:  And plaintiffs have had an

22   opportunity to read that?

23        ATTY. MATTEI:  Yes, Your Honor.

24        THE COURT:  And have you had an opportunity to

25   have any discussions after the filing of Attorney

26   Pattis's objection last night?

27        ATTY. MATTEI:  I spoke with Attorney Pattis in -

1        - in general about it.  My understanding as far as

2        the metadata issue, which I thought we had resolved

3        last week.  I defer to Kevin Smith on whether they're

4        renewing the objection to that.  But as I understood

5        it, Attorney Pattis said that if the Court is

6        inclined to require them to produce metadata

7        associated with the documents they've already

8        produced, that it would take two weeks to do that.

9        My understanding is that on that issue, we were

10       coming back here today just so they could tell us how

11       long it would take.

12            THE COURT:  I -- that was my understanding as

13       well that today we were going to address how long it

14       would take to produce the metadata because I was of

15       the opinion that the metadata should be produced.

16            ATTY. SMITH:  Understood, Your Honor.  And I

17       think that Attorney Pattis in his filing here

18       believes that we have produced what is reasonably

19       usable, which is what the Practice Book calls for.  I

20       indicated to Attorney Pattis what the Court's

21       inclination was.  And so you will also note that in

22       our response we said if the Court is going to order

23       that, then we would request an additional two weeks

24       to be able to produce that.

25            THE COURT:  So ordered.

26            All right.  Next?

27            ATTY. MATTEI:  Your Honor, in our motion we next

1      asked that the defendants clarify the source of

2      production for the documents they have produced.  You

3      may remember that at an earlier hearing, we raised

4      this issue --

5          THE COURT:  Well, I just want to back up for a

6      minute.  You're asking for something more than the

7      Practice Book requires.  Practice Book requires,

8      right, the production to be made by the party making

9      the production.  You're now asking for more details -

10     -

11         ATTY. MATTEI:  No.

12         THE COURT:  -- where the person who's making the

13     production got the information from?  No?

14         ATTY. MATTEI:  No, not at all.  What we're

15     asking for is clarification as to which defendant has

16     produced the documents, because what they've -- the

17     current state of the record is that they've said all

18     the Jones defendants have produced all the documents.

19      But they've also said that every Jones defendant

20     other than Free Speech Systems is dormant and active

21     and has no function.  And so we are left with

22     inconsistent representations about which defendants

23     have produced documents.  We believe that the reality

24     is that only Free Speech Systems has produced any

25     documents to us and that the other Jones entities

26     haven't produced any documents.  The problem is that

27     they filed responses to our request for production

1    saying that they all have.

2         THE COURT:  Well, I think that if the -- if the

3    responses to the request for production are -- if

4    that's the representation, the interrogatories are

5    signed off and the responses to the requests for

6    production have been made by the parties, then I

7    think that's your answer right there.  Whether you

8    agree that it was properly done is a different issue.

9     But then you've got to cue that up somehow.  But I

10   mean, when -- when it's filed on behalf of a party,

11   if you're now wanting to dig deeper, then you have to

12   dig deeper another way.  But you've already given me

13   the answer, which is they've indicated who's filed

14   it.  You may disagree with it, but --

15        ATTY. MATTEI:  Except that I think they made

16   different -- other representations in court orally.

17   And so if they want to proceed on that basis, it's

18   going to make the depositions a little bit more

19   difficult.  But we were just hoping to have some

20   clarification on that issue.

21        ATTY. SMITH:  Your Honor, I would stand by our

22   filing.  That's -- we've taken the same position as

23   the Court.

24        THE COURT:  I think -- I think you stand by the

25   filing.  If things were said differently in court,

26   then, you know, you can certainly inquire at the

27   depositions.  But I think that what really is -- has

1    more value is what was actually produced and signed

2    off on.  So if the indication was that all these

3    defendants have signed off and produced the

4    documents, then that's -- that's what you go on.

5        ATTY. MATTEI:  Very well, Your Honor.

6        THE COURT:  Okay.

7        ATTY. MATTEI:  The next has to do with the

8    manner of production.  And this is I think closely

9    related to the metadata issue.  Just so Your Honor is

10    aware, so we've received tens of thousands of

11    documents, some of which are bate stamped, some of

12    which are not.  The Practice Book requires that

13    materials be produced in a reasonably usable format.

14        THE COURT:  Right.

15        ATTY. MATTEI:  The biggest issue we see and the

16    one that may, I think, tease it out most clearly is

17    that they produced emails to us.  The face sheets of

18    those emails clearly show an attachment was

19    associated with the original email, but the

20    attachment has not been produced with the email

21    itself.  And so we don't know whether we've received

22    any attachment.  It may -- an attachment to the email

23    may be part of the production, but if it's -- if it's

24    not conveyed to us in a way where we can associate it

25    with the email, it's completely unusable to us.  And

26    so what we're asking is for a more rational

27    production that we can actually make sense of.

1          THE COURT:  That doesn't seem like an

2     unreasonable request.  How can you accommodate that?

3          ATTY. SMITH:  Your Honor, I believe, as Attorney

4     Mattei alluded to, that will probably be resolved by

5     virtue of getting everything in the native format

6     with the metadata.

7          THE COURT:  All right.

8          ATTY. SMITH:  So I think that will fold into

9     that.

10         THE COURT:  Let's -- okay.  Let's proceed on

11    that with that hope, okay?

12         ATTY. MATTEI:  Thank you, Your Honor.

13         THE COURT:  Okay.

14         ATTY. MATTEI:  The next issue has to do with Mr.

15    Jones's signed interrogatory responses that Attorney

16    Pattis described for the Court and which have not

17    been produced, because Attorney Pattis at the time

18    said I'm not -- I'm not satisfied with these; I'm

19    going to produce other interrogatory responses, which

20    I believe that they have.  But the record as it

21    stands right now is that Mr. Jones, a party to the

22    case, signed interrogatory responses that have not

23    been produced to us.

24         THE COURT:  Okay.  So here's -- this is news to

25    me.  So here's what I would say on that.  I now

26    retract my prior comments that there has been

27    substantial compliance, good-faith, substantial

1　　compliance because any interrogatory responses --

2　　anything that's been produced without the client's

3　　signature is really meaningless.  And I say that

4　　every day in every case.  So the product -- the

5　　responses need to be signed off by the party or

6　　they're -- so tell me how you're going to solve that

7　　problem.

8　　　　ATTY. SMITH:  Well, Your Honor, I think that

9　　that's not what Attorney Mattei is representing here.

10　　 What Attorney Mattei is representing, and Your Honor

11　　may recall, when we were in Waterbury --

12　　　　THE COURT:  No, I do.  I don't want to -- do you

13　　agree or disagree that the responses have not been --

14　　it's just the interrogatory responses that need to be

15　　signed, not the production.

16　　　　ATTY. MATTEI:  No.  What I'm saying, Your Honor,

17　　is that earlier in the discovery process, Mr. Jones

18　　apparently completed --

19　　　　THE COURT:  No.  I don't want to -- I don't want

20　　to revisit that.  I'm just trying to figure out if

21　　there's consensus or not.  So the interrogatory

22　　responses, have you received them signed by Mr.

23　　Jones?

24　　　　ATTY. MATTEI:  We've received a version of it,

25　　yes.

26　　　　THE COURT:  Okay.  The current version, the

27　　update -- supplemental, current version has -- so I'm

1    getting -- Attorney Smith --

2         ATTY. SMITH:  Yes, Your Honor.

3         THE COURT:  -- is saying they have been signed.

4         ATTY. MATTEI:  Correct.

5         THE COURT:  So we have -- so you have signed

6    interrogatories.

7         ATTY. MATTEI:  We do have them, yes, a version

8    of them.

9         THE COURT:  Okay.

10        ATTY. MATTEI:  What we don't have is the version

11   that Mr. Jones previously signed that Attorney Pattis

12   has described for the Court and which were responses

13   to our request for production, they simply declined

14   to produce them.

15        THE COURT:  I don't see why they have to.  They

16   don't -- they can -- not have to produce.  If they --

17   if they're working with their client and they have a

18   set of -- first of all, I thought it was just

19   interrogatory responses that got signed, not

20   production.

21        ATTY. MATTEI:  Correct.

22        THE COURT:  Okay.

23        ATTY. MATTEI:  But what we asked for in our

24   request for production and which the Court authorized

25   were statements like those Mr. Jones made in his

26   interrogatories, which he signed.  So in essence what

27   we have is we have a party who has made a signed

1      statement about matters at issue in this case which

2      are responsive to requests for production that have

3      not been produced.

4          THE COURT:  Well, you're arguing that it's a

5      signed statement, and I actually don't agree with

6      that.  I think that people can work with their

7      clients, have signed versions of interrogatory

8      responses, and if they decide not to let it go any

9      further, they don't have to produce it.  I don't

10     think that signing interrogatory responses makes it a

11     statement under the Practice Book.  So if he decided

12     that he did not think that those were sufficient

13     discovery responses and wants to rip it up and throw

14     it in the garbage, I don't think there's anything

15     wrong with that.  I think that's a normal practice if

16     you don't think that this -- just pulling on my own

17     practice, I would get responses back from my client

18     signed, and I would look at them and I would say I'm

19     not going to turn these over because this is

20     insufficient or whatever.  So I would start a new

21     version.  And then when I was satisfied that the

22     party had met their obligations under the Practice

23     Book and that nothing was misleading or omitted, then

24     I would produce the interrogatory responses.

25         You're pretty much saying that that's a

26     statement of Mr. Jones and should be produced, and I

27     disagree.  So if those were not proper answers, then

1    he can rip them out and throw them out as far as I'm

2    concerned.

3        ATTY. MATTEI:  Thank you, Your Honor.

4        THE COURT:  Okay.  What else?

5        ATTY. MATTEI:  The employee chart.  We were

6    provided with an employee chart in response to our

7    request for production that -- and which the Court

8    authorized, required a listing of all employees from

9    December 14th, 2012, to the present.  What we

10   understand is that they provided us with a list of

11   current employees, not a list that covers the

12   required time period.

13       THE COURT:  Okay.

14       ATTY. MATTEI:  And so what we're asking for is

15   an update --

16       THE COURT:  Attorney Smith, do you agree or

17   disagree that that's what was produced?

18       ATTY. SMITH:  I think, Your Honor, as far as I

19   understand, it is not going back entirely to 2012.

20   We have taken that back to the clients and said we

21   need the following.  And in our written response

22   here, Attorney Pattis indicates one week.  I believe

23   that might be an error.  I think he probably meant

24   two weeks given that we're trying to get the metadata

25   and all that within that time period.  But whatever

26   the Court orders --

27       THE COURT:  How long -- how long is the list of

1    employees to date?

2         ATTY. SMITH:  The --

3         THE COURT:  Roughly.

4         ATTY. SMITH:  -- the list --

5         THE COURT:  Just roughly.

6         ATTY. SMITH:  Right.  So presently the list is

7    like 80 of present employees.  And so I don't know

8    exactly how much there would be in that going back to

9    2012.  But we expect that that would be produced in

10   the course of doing this data dump for all the

11   metadata.

12        THE COURT:  Does that make a difference, a week

13   or two?

14        ATTY. MATTEI:  Well, on this one it does because

15   we have depositions scheduled for next week.

16        THE COURT:  It's got to be done in advance of

17   the depositions.  That's the problem.  I mean, as you

18   can imagine.

19        ATTY. SMITH:  I can imagine, Your Honor.

20        THE COURT:  So what do you suggest?  When is the

21   deposition that you need it for?

22        ATTY. MATTEI:  The first is scheduled for the

23   15th.

24        THE COURT:  So that's next -- a week from

25   tomorrow.

26        ATTY. SMITH:  Yes.

27        THE COURT:  So I think you've got to do it in a

1    week, at least give them 24 hours beforehand.  Okay?

2        ATTY. SMITH:  Yes, Your Honor.

3        THE COURT:  All right.

4        ATTY. MATTEI:  The sixth item I think has been

5    resolved by Attorney Pattis's response.

6        THE COURT:  All right.

7        ATTY. MATTEI:  And I think that that's it with

8    respect to that motion, Your Honor.

9        THE COURT:  All right.  What do you have next?

10   Or what do any of the defendants have that needs to

11   be adjudicated?

12       ATTY. MATTEI:  So this is number 5, Your Honor.

13    This has to do with their responses to requests for

14   production relating to marketing a business

15   materials.  In their response on file with the court,

16   what they've said is we have no records relating to

17   marketing specific to the Sandy Hook massacre.  The

18   request for production is much broader than that.

19   And in their filing today they've clarified that we

20   have no -- you have all the marketing materials of

21   any kind that are responsive to this request.

22       I guess what we'd ask is that the request for

23   production be updated to reflect that, just as you

24   had them do previously.  And the reason that's

25   important is because we've reviewed the --

26       THE COURT:  I agree that it should be updated.

27   I don't think that's burdensome to update it and then

1     there can be no confusion.

2           ATTY. MATTEI:  Yeah.

3           ATTY. SMITH:  To -- to update as regards to

4     marketing and the analytics, Your Honor?

5           THE COURT:  Right.  Because the --

6           ATTY. SMITH:  If we have some, yes.  As a -- to

7     this point, we have provided everything.  And then I

8     think that --

9           THE COURT:  Right.  But I think that you just

10    need to update the production response to indicate

11    that.

12          ATTY. MATTEI:  That's correct.

13          THE COURT:  That's it.  That's not burdensome.

14    Just so there can be no confusion.  All right.  What

15    else does the plaintiff have?

16          ATTY. MATTEI:  That's it, Your Honor.

17          THE COURT:  Okay.  What do the defense have?  I

18    did read Attorney Pattis's comments about having

19    regular status conferences.  And listen, I'm happy to

20    have them never or as often as you need them to keep

21    you on track.  So I defer -- I've deferred to the

22    group of you every time.  I will tell you, every time

23    you've come here, we have needed to tackle these

24    issues.  So what's the thought now about the next

25    time we have to reconvene?

26          ATTY. SMITH:  I suspect it should be after the

27    depositions.  So I would say maybe two weeks, three

1       weeks, whatever --

2             ATTY. MATTEI:  I think that's right, Your Honor.

3             THE COURT:  Okay.  So I leave it to you.  If,

4       again, if you want to do it in Waterbury where the

5       case is now pending, look for a Monday or Friday.

6       Otherwise, a Tuesday, Wednesday, or Thursday here.

7       And honestly, I don't care where you do it; whatever

8       works for everyone's schedule is fine with me.

9             All right.  Is that it for today?

10             ATTY. MATTEI:  Thanks, Judge.

11             ATTY. SMITH:  Yes, Your Honor.

12             THE COURT:  All right.  Good luck.

13

14                         *****

15             **(END OF TRANSCRIPT)**

16

17

18

19

20

21

22

23

24

25

26

27

```
NO:  UWY-CV18-6046437 S          :   SUPERIOR COURT
SHERLACH, WILLIAM                :   JUDICIAL DISTRICT
                                 :   OF FAIRFIELD
v.                               :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.              :   MAY 7, 2019
```
```
NO:  UWY-CV18-6046438 S          :   SUPERIOR COURT
LAFFERTY, ERICA, ET AL.          :   JUDICIAL DISTRICT
                                 :   OF FAIRFIELD
v.                               :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.        :   MAY 7, 2019
```
```
NO:  UWY-CV18-6046436 S          :   SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.        :   JUDICIAL DISTRICT
                                 :   OF FAIRFIELD
v.                               :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.        :   MAY 7, 2019
```

C E R T I F I C A T I O N

        I hereby certify the foregoing pages are a true and

correct transcription of the audio recording of the above-

referenced case, heard in Superior Court, Judicial District of

Fairfield, at Bridgeport, Connecticut, before the Honorable

Barbara N. Bellis, Judge, on the 7th day of May, 2019.


        Dated this 17th day of May, 2019, in Bridgeport,

Connecticut.


                                    Colleen Birney
                                    Court Recording Monitor

# EXHIBIT F

# Redacted Pursuant to Protective Order

# EXHIBIT G

# Redacted Pursuant to Protective Order

# EXHIBIT H

1

```
DKT NO:  X06-UWY-CV18046436-S   :  COMPLEX LITIGATION

ERICA LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY
v.                              :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                :  JUNE 2, 2021


DKT NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES
```

STATUS CONFERENCE

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE


A P P E A R A N C E S :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY ALINOR STERLING

  Representing the Defendant (s):
    ATTORNEY JAY MARSHALL WOLMAN for the defendant Alex Jones


                        Recorded and Transcribed by:
                        Debbie Ellis
                        Court Recording Monitor
                        400 Grand Street
                        Waterbury, CT  06702

2

1          THE COURT:  Good morning everyone.  We're on the
2     record in the Lafferty versus Jones matter.  So I'm
3     going to ask counsel for the plaintiffs first to
4     identify themselves for the record.
5          ATTY. STERLING:  Good morning, your Honor.  Alinor
6     Sterling from Koskoff Koskoff and Bieder for the
7     plaintiffs.  And with me today is my law partner Chris
8     Mattei.
9          THE COURT:  All right.  Good morning.  And for the
10    Jones defendant.
11         ATTY. WOLMAN:  Good morning, your Honor.  This is
12    Jay Wolman of Randazza Legal Group for Alex Jones, Free
13    Speech Systems Infowars, Infowars Health and Prison
14    Planet TV.
15         THE COURT:  Thank you.
16         And I know we did hear from counsel for Genesis
17    and we informed them that they were not required to
18    participate since the matter today did not involve them
19    and I think they are not participating.
20         So we are on the record with respect to the RFA
21    for motion for protective order entry number 348.  So I
22    did read everything.  I have the protective order at
23    348.  I have the plaintiffs June 1st --
24         ATTY. WOLMAN:  You still with us?
25         THE COURT:  I'm still here.  The camera is a
26    little shaky.
27         June 1st objection and then we have June 2nd

1        objection.  Attorney Ferraro, maybe you can help me.

2        Thank you.  Attorney Ferraro is the jack of all trades

3        here.  He fixes it all.

4             And then I have the supplemental objection that

5        was filed today.  So my first question is, Attorney

6        Wolman, have you had an opportunity to review that

7        supplemental objection?

8             ATTY. WOLMAN:  I did review it this morning, your

9        Honor, and I don't believe that it necessarily means

10       what the plaintiffs imply it means.

11            THE COURT:  Okay.  I just want to make sure that

12       you reviewed it.  I guess I want to make sure that I

13       didn't miss anything.  Those are the filings.  And I

14       understand you put it down as an emergency motion.

15            I think I pointed out in the past that when -- and

16       I expect that on occasion we will have very time

17       sensitive things and I appreciate the fact that an RFA

18       was filed, but I think what I had said in the past too

19       if you really have something that's urgent, you're

20       worried about missing a deadline or something, to also

21       e-mail Attorney Ferraro as that e-mail will get right

22       to him and it'll be even more responsive.  Although I

23       do think he was very responsive with this.

24            So in the future certainly file your RFA but if

25       you are really looking for a quick ruling, also e-mail

26       Attorney Ferraro and copy each other on it obviously.

27       So I understand that you want a ruling on this.  You're

4

1      not looking to file a reply?

2           ATTY. WOLMAN:  Correct, your Honor.

3           THE COURT:  Okay.  I don't really need argument on

4      it.  It was all pretty self-evident.  The only thing

5      that I would ask for argument on is the issue that was

6      just raised today in the supplemental objection with

7      respect to the discussions in February and March of

8      2020 with Attorney LaTronica.

9           ATTY. WOLMAN:  Yes.

10          THE COURT:  Who I believe is from Attorney Pattis'

11     office and plaintiffs' counsel.  If that's something,

12     Attorney Wolman, you want to respond to and then I'll

13     also hear from plaintiffs on that issue as well, if you

14     want to.

15          ATTY. WOLMAN:  Certainly.  Your Honor,

16     Mr. Latronica's e-mails were during the appellate stay

17     on this case.  There was no obligation to do anything

18     at that point.  Certainly, and once this case returned

19     from the courts of appeals, the Supreme Court of

20     Connecticut.  The case still as we dealt with the Midas

21     and Sklanka anti-SLAPP motions precluded discovery from

22     our clients and although your Honor did not reach that

23     issue, that was the position, certainly that had been

24     taken.  And we also had a large period between

25     certainly mid-November and early April when this case

26     was again in federal court.  But during that entire

27     time we had taken the position that if the supreme

5

1        court sustained the anti-SLAPP dismissal termination by

2        your Honor, that the discovery request attended to it

3        died with it.

4            And Mr. LaTronica's e-mails do not countermand

5        that or contradict that in any way but rather, in fact,

6        seem almost hopeful that should there be prevailing,

7        and your Honor's order reversed, then of course we'd be

8        back in the discovery phase of this case regarding the

9        anti-SLAPP motion.  So, in that contexts his e-mails

10       make perfect sense.

11           And so, while your Honor, on May 14th did rule

12       that, allow the motion to re-compel compliance and

13       overrule our argument, this was certainly an issue of

14       first impression and our belief that this was not a

15       requirement that those discovery requests were not

16       outstanding was a reasonable one.  And Mr. LaTronica's

17       e-mails, which were not raised I should note, in

18       response to the motion to re-compel were not raised at

19       that time, should not otherwise affect how the court

20       views this.

21           I should also, because the court asked the parties

22       to essentially meet and confer yesterday, we did do so.

23       And I'd like to certainly report on some of that if I

24       may.

25           THE COURT:  Please.

26           ATTY. WOLMAN:  We proposed removing certain terms

27       which had the largest hit that would potentially, you

6

1    know, be the most irrelevant as well; sales, marketing

2    and traffic.  The plaintiffs were not willing to do

3    that.  They did ask if we could be able to sort, for

4    example, by custodian of records to maybe figure that

5    out.  We are unable to sort by e-mail box.  We can sort

6    by senders of e-mails and the largest person in that

7    respect would be somewhere in the order of 7,500.  I

8    don't think that that really gets us anywhere in terms

9    of narrowing.

10        And on the issue of the Goggle analytics, you

11    know, we finally got a better sense that what they're

12    asking for is to export the entire Google analytics

13    account.

14        And so I have spoken with IT folks and I can

15    report that that is not a feature that Google analytics

16    has, unless you are a premium member.  And my

17    understanding is that to become a premium member of

18    Google analytics, one must pay at least $150,000.  If

19    the plaintiffs would like to pay $150,000 for that

20    membership, and I don't know that that's to be baseline

21    costs, we can entertain that.

22        However, I should note that in terms of the cost

23    benefit relationship of this case as we noted in our

24    motion, we're talking when you look at the amount of

25    sales overall, Sandy Hook did not represent 3 percent

26    of sales.  It did not represent three-tenths of a

27    percent --

7

1          THE COURT:  I don't want to interrupt you,

2     Attorney Wolman, but I wasn't going to have argument on

3     the entire motion since there's no argument of right

4     and I just wanted to get your thoughts on what was just

5     filed today with respect to Attorney LaTronica's

6     continued discovery objections.  But as I understand

7     your position he was, during the stay, while the case

8     was on appeal with the Connecticut Supreme Court, he

9     was continuing those discovery objections, although

10     there was a stay in the hopes that he won.

11          ATTY. WOLMAN:  In the event of a win, then we

12     would have been back in the anti-SLAPP discovery phase.

13          THE COURT:  Okay.

14          ATTY. WOLMAN:  Certainly it's appropriate for him

15     and our client to consider what do we need to do to

16     then comply with your Honor's orders.

17          THE COURT:  Okay.  Thank you.

18          Who's arguing for the plaintiffs?

19          ATTY. STERLING:  Your Honor, I am.

20          THE COURT:  Whenever you're ready.

21          ATTY. STERLING:  It's Alinor Sterling for the

22     record.

23          THE COURT:  If you want to just narrow your

24     comments to what Attorney Wolman raised.  Okay.  So he

25     also talked about the Google analytics and the search

26     and --

27          ATTY. STERLING:  Yes, your Honor.

8

1        THE COURT: -- other things.  I didn't expect to go

2    that far but certainly.

3        ATTY. STERLING:  Yes.  So, your Honor, I don't

4    think that Attorney Wolman's reading of Attorney

5    LaTronica's correspondence with us is a fair read.  At

6    that time the only discovery, in effect, was the

7    plaintiffs' first set of interrogatories and request

8    for production.

9        And Attorney LaTronica is indicating that the

10   Jones defendants understand they have an obligation to

11   respond to those.  It does not indicate that that

12   obligation to respond is contingent on the Supreme

13   Court's Ruling.  He simply indicates that they

14   understand they need an ESI consultant and that they

15   need to review discovery in files so that they can get

16   their discovery responses in order.

17       So what your Honor has been presented with is a

18   sort of excuse for not following the court's orders

19   which is that the defendants claim they had interpreted

20   the termination of the anti-SLAPP motion to have

21   necessarily terminated the limited discovery served in

22   connection with that motion.  And I'm quoting their

23   filing.

24       Attorney LaTronica's correspondence with us is

25   simply not consistent with that understanding.  And so

26   what I am suggesting the court do is not credit that

27   representation which is a representation concerning the

9

1      Jones defendants' subjective state of mind.  And really

2      is presenting an excuse for non-compliance, you know,

3      similarly with regard to the claim that this is a

4      question of first impression.

5          If it's a question of first impression, then and

6      it involves violation of a court order, then the

7      recourse that the Jones defendants had was to make a

8      motion to the court for clarification on what they

9      viewed as a question of first impression.

10         So I'm not going to go further then that, because

11     the court has asked me to limit my remarks in that

12     regard.  But from where we stand, these continued

13     excuses look very similar to the excuses that were made

14     in 2019.

15         With regard to the meet and confer yesterday, so

16     it appears that although they understood in 2020 that

17     they needed an ESI consultant, the Jones defendants

18     still don't have one.  And this came out in a couple

19     different ways.  Number one, counsel was indicating or

20     at least indicated yesterday that he did not understand

21     how to produce the Google analytics data.

22         We have worked with various ESI consultants, data

23     acquisition protocols are available.  That can be

24     accomplished, you know, the continued inability to

25     produce that information appears from our perspective

26     to be will.  And I would add to that, your Honor, we

27     believe, although we don't know because it's not

10

1        identified that what was submitted as Exhibit C to the

2        defendants' motion for protective order, which is a

3        printout based on which Attorney Wolman was arguing, is

4        a Google analytics printout.

5            What that demonstrates, it's never been produced

6        to us before.  What it demonstrates is that his client

7        has the ability to manipulate the data.  If he's

8        indicating that he's completely incapable of finding an

9        ESI consultant and working with a protocol, then maybe

10        we need to return to the idea of giving us a login to

11        the account.  I know the court didn't want to do that

12        but that would be one way to access the data.  The

13        other would be for them to work with an ESI consultant

14        on a limited basis and come up with a protocol.

15            You know, we were unable to substantively discuss

16        this yesterday because Attorney Wolman didn't have a

17        protocol to provide us with.  And by a protocol, I mean

18        a production protocol which is the kind of thing that's

19        used when this kind of information is produced.  The

20        lack of an ESI consultant also comes up as a problem,

21        again, when we inquired whether the 300,000 e-mails

22        that Attorney Wolman is referencing were duplicative of

23        anything that's already been produced.  That came up in

24        the contexts of considering whether the burden to

25        review might be significantly less because these

26        e-mails may have already been produced.

27            Attorney Wolman was unable to tell us whether any

1           of these 300,000 e-mails have been produced.  He just

2           couldn't tell us.  You know, there are other ways to

3           deal with the claim of burden based on privilege.  You

4           know, one way to alleviate a concern about privilege is

5           simply to sort documents for, you know, attorney's

6           e-mail addresses.  That could reduce the burden claimed

7           based on privilege substantially.

8                But again, there was not a proposal presented to

9           us yesterday for a streamlined approach to handling

10          this that we could consider.  And after two years of

11          waiting for these documents to be produced, we are at a

12          loss as to how to respond.  So I'll suspend my comments

13          there unless the court has questions.

14               ATTY. WOLMAN:  Your Honor --

15               THE COURT:  I do not.

16               ATTY. WOLMAN:  -- may I respond because I believe

17          Attorney Sterling misrepresented what the conference

18          was yesterday.

19               THE COURT:  Attorney Wolman.  Attorney Wolman, can

20          you wait.

21               ATTY. WOLMAN:  Yes, your Honor.

22               THE COURT:  Okay.  Thank you.  I was actually

23          going to tell you that I'll give you an opportunity to

24          respond to Attorney Sterling's arguments but I first

25          would like you to explain to me, if you can, what

26          Exhibit C is.

27               ATTY. WOLMAN:  Yes, your Honor.

12

1          THE COURT:  Please.

2          ATTY. WOLMAN:  Thank you.

3          Only recently did we have our clients run through

4    Google analytics what basically if you do a search on

5    Sandy Hook to find out how many sales are from referral

6    articles.  So if there's an article that uses the term

7    Sandy Hook in it and somebody then goes to the store

8    having read that article and then purchases a product,

9    that would be captured as related as a sale that was

10   generated from that.  That is only a piece of data that

11   was generated specifically for the purpose of this

12   litigation and was not something that my clients

13   generally had around.

14         I had asked, can we get this kind of data to find

15   out and then learn as a result, yes, it is three

16   thousands of a percent of all sales are attributable to

17   Sandy Hook as opposed to, for example --

18         THE COURT:  No. No.  Attorney Wolman, so that is

19   your explanation to the court as to what Exhibit C is?

20   I just want to make sure I'm understanding it.

21         ATTY. WOLMAN:  Yes, your Honor.

22         THE COURT:  Okay.  And then my next question

23   before I will then give you an opportunity to respond

24   to Attorney Sterling's argument is, given the

25   discussions during the stay that Attorney LaTronica had

26   with plaintiffs' counsel and given your statement that

27   this was an issue of first impression, I'm just

13

 1        wondering why the Jones defendants would wait almost

 2        six months to even object to the plaintiffs' November

 3        12th motion asking for the compliance.

 4             ATTY. WOLMAN:  Certainly, your Honor.  That's --

 5        Attorney Sterling says that it was our obligation to

 6        raise it as a motion with the court, well, not

 7        necessarily on an issue of first impression.  Somebody

 8        is going to raise it either as -- they're saying that

 9        it's still due and we're saying it's not.  They move to

10        re-compel, we object.

11             You know, we had met and conferred back in

12        November.  We addressed this back in November.  The

13        reason why it then took afterwards is, later is because

14        we had removed it to federal court depriving this court

15        of jurisdiction, necessarily terminating that even if

16        they were live discovery requests before this court,

17        they certainly would not have been live discovery

18        requests in the federal court where the April 26th

19        conference had not yet occurred under federal rules of

20        civil procedure.  So certainly they would have been

21        improper during that time.

22             Then once this case returned to this court, your

23        Honor sent a briefing schedule and we filed a timely

24        opposition.

25             THE COURT:  I'm just trying to figure out if there

26        was a concern that potentially, right, you had this

27        discovery compliance that the clock was ticking on, I

14

1    agree, not when it was in federal court but at least

2    when it was remanded back, I'm just wondering if there

3    was a concern that deadlines had been missed and that

4    you might be overdue with the answers and that you

5    would want direction on that if you were concerned that

6    you had discovery obligations that were overdue.

7        ATTY. WOLMAN:  Well, parties typically, your

8    Honor, do not expend resources when there is not a live

9    discovery issue.  So once your Honor issued the order

10   that stated that as a matter of first impression, that,

11   yes, we still had to comply with discovery that was

12   limited to anti-SLAPP motion that it terminated

13   anti-SLAPP motion but that we still necessarily had to

14   continue to produce.

15       We then, went, we are using a discovery vendor,

16   that's a misrepresentation.  Experting Google analytics

17   is not something that is common, your Honor.  And it's

18   a misrepresentation to say that we don't have the

19   information because you know what, I asked for was

20   saying how do you want it produced?  How?  I asked

21   point blank.  And she couldn't say how.  She said, oh,

22   it's my job to figure it out.  No it's not.  If you're

23   asking for something, tell me what you're asking for.

24   And then we can follow the instructions.  I do this all

25   the time, your Honor.  Whenever I ask someone to export

26   their Facebook data, I give them step by step

27   instructions as to how to do that to comply, so that

15

1      there's never a question that I'm not getting what I'm

2      asking for.  So, you know --

3          THE COURT:  Can you give me one moment, please,

4      and I'll let you continue.

5          Thank you.  On that point, I was just referencing

6      the Practice Book because I thought there were Practice

7      Book provisions that dealt with that issue that you

8      just raised about how, in what form and such, but in

9      any event, go ahead.  Continue.

10         ATTY. WOLMAN:  Thank you, your Honor.

11         And so we asked for that information as to how

12     they wanted it and she would not provide it saying you

13     figure it out.  Throwing her hands up.  So, you know,

14     I've asked our IT people and they said that there is an

15     export method and that you have to be a premier member.

16     And it would cost at least $150,000 to do so.

17         As to the inability to deduplicate based on what

18     Attorney Pattis had produced, we have at this time we

19     have an electronic discovery vendor.  At the time

20     Attorney Pattis was doing it, one was not being used.

21     So to be able to integrate what he produced into that

22     and figure out and deduplicate that is not something

23     that we are currently able to do because it's not from

24     the same time.

25         Similarly we cannot simply eliminate and sort for

26     things with attorney's names or domain names on it

27     because it appears often in messages where somebody

16

1       will forward an e-mail containing privileged matter or

2       reply or something to an e-mail that has privileged

3       information on it.  Each individual e-mail does

4       necessarily have to be reviewed and has to be reviewed

5       for relevance as well.

6            And I should also note that I disagree with the

7       reading of Mr. LaTronica's e-mails because they also

8       contemplate that of course there would be discovery in

9       this case afterwards.  If your Honor's orders sustained

10      they've served two more sets of discovery, of course

11      there would have to be discovery afterwards.

12           THE COURT:  So Attorney Wolman, getting back to

13      the format, did the and I don't have it in front of me,

14      did the request for production specify the form for

15      producing the electronically stored information?

16           ATTY. WOLMAN:  No.  All they're asking for now is

17      our Google analytics data.  So they're asking for

18      expert --

19           THE COURT:  -- the point that you raised.  When I

20      look at 13-9e, right 13-9 subsection e, if information

21      has been electronically stored and if a request for

22      production does not specify a form for producing a type

23      of electronically stored information, the responding

24      party, right, the Jones defendants, shall produce the

25      information in a form in which it is ordinarily

26      maintained or a form that is reasonably usable.  A

27      party need not produce the same electronically stored

17

1    information in more than one form.

2         So I know you were saying you asked in what form

3    and you didn't get an answer but doesn't the Practice

4    Book control on that?

5         ATTY. WOLMAN:  If it's kept in a form not by us.

6    It's not under our control.

7         THE COURT:  The Practice Book doesn't --

8         ATTY. WOLMAN:  We do not ordinarily maintain it in

9    a form.

10        THE COURT:  Attorney Wolman, the Practice Book

11   controls here since it wasn't -- it doesn't matter.

12   You're the producing party and that's what that

13   Practice Book section refers to.  So I would just, you

14   should probably just take a look at that if there are

15   any further issues.  Okay.

16        ATTY. WOLMAN:  It will cost, my understanding is

17   150,000 and the cost should be borne by them.

18        THE COURT:  Okay.  All right.  Anything else, sir?

19        ATTY. WOLMAN:  Just that the amount of labor

20   otherwise required is not proportionate to the needs of

21   this case and I want to highlight that again.  Three

22   thousands of a percent barely scratches the surface of

23   any justification for the whole theory of the case, is

24   that our clients are somehow motivated to do Sandy Hook

25   stories to get money.  Seems like this is a loser of a

26   story in terms of moneymaking.  It doesn't make money.

27   There's no evidence of that.  We now have this data and

18

1        so the court should look at it from a cost benefit

2        analysis that all this labor, if it's going to take me

3        if I have to do, you know, April to review 1,000

4        e-mails a day because I've got other cases and I'm the

5        only attorney here admitted in Connecticut, then that's

6        going to take me 300 work days.

7            THE COURT:  Okay.  So I will rule on it in writing

8        probably within the hour.  Okay.  Anything else that we

9        need to deal with today that doesn't involve the other

10       defendant, I don't want to have any discussions that

11       will impact him since he's not here?  We are all on the

12       same page as to what other filings, the deadlines are

13       for the other filings?

14           ATTY. STERLING:  We are, your Honor.  This is

15       Attorney Sterling for the record.  I have one issue.

16       We will be filing a motion to amend the protective

17       order shortly.  We'd like to add an attorneys' eyes

18       only designation.  When we do file that, your Honor, I

19       think it would be important to set a briefing schedule

20       because we'd like to have that ruling in place before

21       our clients are deposed or we respond with written

22       production.  So I just wanted to flag that to the court

23       and inquire whether we should e-mail Attorney Ferraro

24       when we file it or file an RFA.

25           THE COURT:  Can I suggest that you talk to

26       Attorney Wolman first because you definitely don't have

27       any problems agreeing on briefing schedules as far as I

1        can see.  So why don't you have that discussion off the

2        record with Attorney -- and also Attorney --

3            ATTY. WOLMAN:  Cerame.

4            THE COURT:  Thank you.  Since he would be involved

5        in that protective order as well.  So have the

6        discussion with all counsel in the case and see if you

7        can come to an agreement.  You'll file such and such a

8        motion on this date, the objection on this date, the

9        reply on this date or however you're going to proceed

10       and then you can either jointly e-mail Attorney Ferraro

11       or you can file something with the court laying out the

12       deadlines.

13           ATTY. WOLMAN:  Your Honor, if I may respond

14       briefly.  I'm not necessarily adverse to an AEO

15       designation.  In fact, this was part of what we

16       originally sought back in February 2019 and was

17       objected to.

18           THE COURT:  Right.  The only --

19           ATTY. WOLMAN:  One second.  May I --

20           THE COURT:  No.  Attorney Wolman, Attorney Wolman

21       here's the problem.

22           ATTY. WOLMAN:  It goes to this issue.

23           THE COURT:  No. No. No. Attorney Wolman, I didn't

24       require Attorney Cerame to participate today and we're

25       now touching upon issues that would affect him and I'm

26       very uncomfortable doing that.  So just the general

27       concept of reaching out to him with a briefing schedule

20

1    but I don't want to get into the nuts and bolts of

2    attorneys' eyes only because it would affect him in

3    discovery and I just really am uncomfortable doing that

4    today.  So I'm going to stop you there and have you

5    reach out jointly and hopefully you can all get on the

6    same page as to a briefing schedule.

7         ATTY. WOLMAN:  Your Honor, it affects the order

8    you're about to issue, though because if there's going

9    to be an attorneys' eyes only provision, we should be

10   entitled to invoke it as well and we'll need to be able

11   to review and mark for that as well.

12        THE COURT:  Okay.  So I suggest then when we get

13   off the record here, you immediately -- we'll go off

14   the record.  You sure can stay on and if you want to

15   try to invite Attorney Cerame to join you right now and

16   you can get a briefing schedule and if you make it

17   expedited enough, you'll get a ruling on the attorneys'

18   eyes only issue in time to satisfy you I'm sure.  Okay.

19   Unless anybody has anything else, we're going to go off

20   the record.  I'm going to exit.  Attorney Ferraro will

21   exit but you can have at least your discussions if you

22   want since I won't be involved in that and if you want

23   to invite the other attorney to participate and then

24   you can get something filed right away, Attorney

25   Wolman.

26        ATTY. WOLMAN:  I understand.  But the order, your

27   Honor's about to issue, if there's going to be

21

1          attorneys' eyes only, we will need time to as part of

2          this 300,000 e-mail document review to be able to

3          designate those as well as to the extent some are AEO

4          appropriately.

5                    THE COURT:  Okay.  All right.  So I am going to go

6          off the record.  Thank you, counsel.  Stay well.

7                    ATTY. WOLMAN:  Thank you, your Honor.

8                    ATTY. STERLING:  Thank you, your Honor.

9          *          *          *          *          *

22

1

2    DKT NO:   X06-UWY-CV18046436-S    :   COMPLEX LITIGATION

3    ERICA LAFFERTY                    :   JUDICIAL DISTRICT WATERBURY
     v.                                :   AT WATERBURY, CONNECTICUT
4    ALEX EMRIC JONES                  :   JUNE 2, 2021

5
     DKT NO: X06-UWY-CV186046437-S
6
     WILLIAM SHERLACH
7    V.
     ALEX EMRIC JONES
8

9    DKT NO:   X06-UWY-CV186046438-S

10   WILLIAM SHERLACH
     V.
11   ALEX EMRIC JONES

12                    E L E C T R O N I C
13                 C E R T I F I C A T I O N

14        I hereby certify the electronic version is a true and

15   correct transcription of the audio recording of the

16   above-referenced case, heard in Superior Court, G.A. 4 of

17   Waterbury, Connecticut before the Honorable Barbara N. Bellis,

18   Judge, on June 2, 2021.

19

20        Dated this 3rd day of June, 2021 in Waterbury,

21   Connecticut.

22

23

24

25   _____

26              Debbie A. Ellis
             Court Recording Monitor
27

# EXHIBIT I

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046436-S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST __23__, 2021 |

_____

| | | |
|---|---|---|
| NO.   X-06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST __23__, 2021 |

_____

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046438-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST __23__, 2021 |

_____

## AFFIDAVIT OF JORDAN CAMPBELL

I, JORDAN CAMPBELL, declare as follows:

1.      I am over eighteen and believe in the obligation of an oath.

2.      I make this affidavit after consideration of the Notice of Compliance dated June 28, 2021 filed by Alex Jones and Free Speech Systems, LLC, and the correspondence between Attorneys Christopher Mattei and Jay Wolman on June 24 and 25, 2021.

3.      I am the owner and operator of Good Soup Media, an online marketing agency, in London, Ontario, Canada.

4.      I am an expert in the use of Google Analytics and have worked extensively with

1

the program for 3+ years. I have spent upwards of $20,000 on online courses and education materials in order to increase my knowledge and expertise in my field. I have been working alongside my clients in their website development, monitoring and advertising efforts including, but not limited to the use of Google Ads, LinkedIn Advertising, Google Analytics, Website Design and Website Maintenance.

5.      In connection with the preparation of this affidavit, I have reviewed what I understand to be the production of the Google Analytics summary reports produced to date by Defendant Free Speech Systems, LLC in this litigation, which include one recently produced 5-page document consisting of screenshots of some Google Analytics information (Exhibit A) and one 35-page set of scanned images of more Google Analytics information (Exhibit B). I have also reviewed the Jones defendants' Emergency Motion for Protective Order, to which the 5 pages of Google Analytics screen shots were attached. I have also reviewed the Notice of Compliance concerning the production of Google Analytics data and correspondence between Jay Wolman and Christopher Mattei dated June 24 and 25, 2021 (Exhibits C and D, respectively).

**What Google Analytics Does**

6.      Google Analytics is a web analytics service offered by Google that is specifically built to collect, track, and report on website traffic and visitor information. Google Analytics collects and stores website visitor data. Some well-known examples of data that Google Analytics collects are: Users (number of website visitors), Sessions (number of times the website has been accessed), Average Time Spent on Site, Bounce Rate (percentage of users who leave after one page visit without interacting), Pages/Session (number of pages a user visits before leaving the site) etc.

7.      Google Analytics also has an ecommerce tracking function. "Ecommerce tracking is a feature of Google Analytics that tracks shopping activity on your website." https://www.hotjar.com/google-analytics/glossary/ecommerce-tracking/. The sales and payments data collected using the ecommerce function can be used in reports or exported like other Google Analytics data. It appears from the information shown on Exhibit A, in the Revenue column, that a user of the Infowars.com site set up ecommerce tracking within their Google Analytics account, so that ecommerce data is being collected as well.

**How to Export Data Collected by Google Analytics**

8.      Google Analytics data may be exported using the application's built-in function to export data. This export function allows the user to export the Google Analytics data in 4 different formats: PDF, Google Sheets, XLSX and CSV. Exporting in those formats keeps the data organized and allows it to be manipulated by the recipient, as the original user could do. Clicking the EXPORT button enables direct export of the selected data in a format, *e.g.,* as an Excel spreadsheet, suitable for analysis. Data so exported will be the actual data with 100% accuracy. In order to use the export function, the account user uses the report function to define the data to be exported and clicks the EXPORT button located at the top of the page.

9.      Like all Google Analytics users, the users of the Infowars.com Google Analytics account have access to the Export function. The EXPORT button is clearly visible on Exhibit A, as shown through the highlight below:



10.     It is my understanding that the Jones defendants have been ordered to produce the data from the relevant Google Analytics accounts for multiple years. While that is a substantial amount of data, by using the free export function described above, a user of the relevant account could easily export complete, accurate and readily useable data as Excel (xlsx) files.  In preparation to make this affidavit I considered and tested the export mechanism, and it is simple to use and functions correctly. I believe exporting the data would take a computer literate user following a simple protocol under a week to complete the exports and possibly would require even less time. (By a computer literate user, I mean someone with simple data entry skills.) The development of

DocuSign Envelope ID: EE5451C9-84B3-4A58-B8EE-52A83F0638F3

an appropriate export approach took me approximately 30 minutes. Following a step-by-step protocol, which could be provided, would be a simple process.

11.    The Jones Defendants state in the Notice of Compliance that "Free Speech Systems understands that, to export the dataset, one must be a Google Analytics 360 user. See https://marketingplatform.google.com/about/analytics/compare/ (noting that "access to raw data" is checked off only for Analytics 360, the non-free solution)." As described above, it is not true that "to export the dataset, one must be a Google Analytics 360 user." There are multiple ways to export the dataset, one of which I have described above.

**The Google Analytics Information that Has Been Produced**

12.    The Google Analytics information that has been produced in this case has not been produced either in the format in which Google Analytics information is usually stored or in another comparably usable format. Exhibit A appears to be screenshots of what appears to be a Google Analytics report. Exhibit B appears to be image copies of PDF reports. These formats deprive the recipient of the ability to access and manipulate the underlying data directly.

13.    The Google Analytics information that has been produced through Exhibits A and B also contain only a tiny fraction of the Google Analytics data that the application collects. For example, the information on Exhibits A and B is not organized day by day, but rather, the information is presented in yearly increments (and in some cases random time intervals). Daily data is available, and provides a far more complete dataset which, if produced in a format, such as Excel files, would be immediately suitable for and ready for analysis. These exhibits also do not provide any data related to Demographics (Age and Gender of website visitors), Location (where in the world the users accessed the website from), Ad Campaign Performance (including keywords used in campaigns and searches used to find the site), Source of the Traffic (where visitors were

before arriving on the Jones Defendants' website), User Interests, Browser and Operating System Information, or Custom Variables (metrics created by the Jones Defendants to track website specific performance). The reports provide very limited information on Individual Page Performance, Language, New vs. Returning Users, and Ecommerce information (sales performance, time to purchase, etc.).

14.    Exhibit A, unlike Exhibit B, contains some revenue data. Revenue data is available through Google Analytics' ecommerce function. In order for the ecommerce function to work, the user must set up ecommerce tracking. Google Analytics instructs:

> To see Ecommerce data in your Analytics reports, you need to:
> Enable Ecommerce for each view in which you want to see data.
> Add code to your site to collect the ecommerce data and send it to Analytics. To complete this task, you need to be comfortable editing HTML and coding in JavaScript, or have help from an experienced web developer.

https://support.google.com/analytics/answer/1009612?hl=en#zippy=%2Cin-this-article.    A  user with the technical capability to set up ecommerce tracking would certainly have the technical capability to understand that there are multiple means to export Google Analytics data.

15.    The Jones defendants state in their Emergency Motion for Protective Order that "In fact, Defendants' records show that, at most, they made $342.55 in sales from article and video page referrals that contained the term "Sandy Hook" out of a total of $10.6 million in overall sales generated from site traffic." In support of this statement, they reference the information that is attached to my affidavit as Exhibit A. (This same information was attached as Exhibit C in support of their Emergency Motion for Protective Order.) For the Google Analytics application to capture e-commerce data – that is, revenue information – for the time period shown on Exhibit A (Dec. 14, 2012 to March 29, 2021), the e-commerce function would have had to be enabled on or before December 14, 2012. If the e-commerce function was enabled throughout that entire period, then there is very significant additional

revenue data available that has not been provided to the plaintiffs. If the e-commerce function was not enabled as of December 14, 2012, then Google Analytics data cannot establish revenue for the entire period, and the claim that revenue is $342.55 is not supported by Exhibit A.

16.     Based on the description provided in their correspondence of June 24 and 25, 2021 (Exhibits C and D), the Jones defendants' proposed "sandbox approach" suffers from multiple technical defects. First, it offers the plaintiffs only limited-time access to the data. Second, through mirroring or other methods, it would allow the Jones defendants to observe, surveil, and/or record all the plaintiffs' actions within the Google Analytics account, including any searches or other analysis that the plaintiffs or their experts might perform on the data while they had access to it. Under this arrangement, plaintiffs or their experts would be unable to assure or verify that the Jones defendants did not do so. Having access to this information could give the Jones defendants key insight into plaintiffs' counsel's mental impressions, conclusions, opinions, or legal theories.

17.     I attach a copy of my curriculum vitae as Exhibit E.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_Jordan Campbell_
JORDAN CAMPBELL


Subscribed and sworn to before me this 23 day of August, 2021.


_Kerry McGladdery Dent_
Notary Public

7

My commission expires: <u>N/A  LSO# 59685G</u>

This affidavit was sworn by the affiant present in the City of London, in the County of Middlesex, in the Province of Ontario, via videoconferencing technology, before me, a Commissioner of Oaths, present in the City of London, in the County of Middlesex, in the Province of Ontario, pursuant to O. Reg. 431/20: Administering Oath Or Declaration Remotely.

This is Exhibit **"A"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry MacGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

All accounts > Infowars Shop
**All Web Site Data ▾**

Q  Try searching "Top channels by users"

Loading...

**Referral Traffic** ⊘

ALL » SOURCE: infowars.com ▸

All Users
0.00% Users

◯ + Add Segment

🖫 SAVE   ⬇ EXPORT   ⌄ SHARE   ✎ EDIT   ⊘ INSIGHTS

Dec 14, 2012 - Mar 29, 2021 ▾

**Explorer**

Summary   Site Usage   Ecommerce

Users ▾

Day  Week  Month

Primary Dimension: Referral Path   Other ▾

Secondary dimension ▾   Sort Type:  Default ▾

sandy-hook   ⊗  Q  advanced   ▦ ◉ Ιι ⬍ ≔

| Referral Path | Acquisition | | | Behavior | | | | Conversions | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Users ↓ | New Users | Sessions | Bounce Rate | Pages / Session | Avg. Session Duration | | Goal Conversion Rate | Goal Completions | Goal Value |
| | 0<br>% of Total:<br>0.00% (0) | 395<br>% of Total: 0.03%<br>(1,461,681) | 537<br>% of Total: 0.03%<br>(2,097,985) | 58.47%<br>Avg for View: 49.61%<br>(20.36%) | 2.80<br>Avg for View: 3.52<br>(-22.08%) | 00:02:51<br>Avg for View: 00:03:28<br>(-18.00%) | | 0.00%<br>Avg for View:<br>0.00% (0.00%) | 0<br>% of Total:<br>0.00% (0) | $0.00<br>% of Total: 0.00%<br>($0.00) |
| 1. /boston-mayor-vice-president-guaranteed-gun-control-reform-before-sandy-hook-s hooting/ (⮞) | 0 (0.00%) | 1 (0.25%) | 2 (0.37%) | 50.00% | 1.50 | 00:00:07 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 2. /christie-vetoes-gun-control-bill-angers-sandy-hook-parents/ (⮞) | 0 (0.00%) | 1 (0.25%) | 4 (0.74%) | 50.00% | 3.00 | 00:02:16 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 3. /confirmed-section-of-gotham-renamed-sandy-hook-in-latest-dark-knight-release/ (⮞) | 0 (0.00%) | 5 (1.27%) | 7 (1.30%) | 85.71% | 2.57 | 00:00:39 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 4. /connecticut-town-to-burn-violent-video-games-as-sandy-hook-returns-to-school/ (⮞) | 0 (0.00%) | 0 (0.00%) | 1 (0.19%) | 100.00% | 1.00 | 00:00:00 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 5. /connecticut-tries-to-hide-sandy-hook-truth/ (⮞) | 0 (0.00%) | 98 (24.81%) | 136 (25.33%) | 65.44% | 2.18 | 00:02:10 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 6. /dark-knight-rises-shows-sandy-hook-written-on-map/ (⮞) | 0 (0.00%) | 2 (0.51%) | 2 (0.37%) | 0.00% | 8.50 | 00:13:11 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 7. /exposed-sandy-hook-shooters-biggest-threat-still-lives/ (⮞) | 0 (0.00%) | 6 (1.52%) | 8 (1.49%) | 37.50% | 5.38 | 00:03:22 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 8. /father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press- conference/ (⮞) | 0 (0.00%) | 2 (0.51%) | 3 (0.56%) | 100.00% | 1.00 | 00:00:00 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 9. /fbi-releases-heavily-redacted-sandy-hook-records/ (⮞) | 0 (0.00%) | 39 (9.87%) | 56 (10.43%) | 46.43% | 3.41 | 00:05:19 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 10. /full-police-investigation-into-sandy-hook-shooting-released/ (⮞) | 0 (0.00%) | 1 (0.25%) | 1 (0.19%) | 100.00% | 1.00 | 00:00:00 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 11. /glenn-beck-to-devote-whole-show-to-debunking-conspiracy-theories-about-sandy- hook/ (⮞) | 0 (0.00%) | 1 (0.25%) | 1 (0.19%) | 100.00% | 1.00 | 00:00:00 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 12. /mayan-calendar-sandy-hook-peace-prize-obama-your-entire-reality-has-been-scrip ted-by-the-manipulation-masters/ (⮞) | 0 (0.00%) | 1 (0.25%) | 1 (0.19%) | 0.00% | 2.00 | 00:00:11 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 13. /msnbc-edit-portrays-gun-owners-as-heckling-father-of-sandy-hook-victim/ (⮞) | 0 (0.00%) | 1 (0.25%) | 1 (0.19%) | 0.00% | 4.00 | 00:01:08 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 14. /newtown-conn-voters-accept-50-million-to-demolish-rebuild-sandy-hook-school/ (⮞) | 0 (0.00%) | 1 (0.25%) | 1 (0.19%) | 100.00% | 1.00 | 00:00:00 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 15. /piers-morgan-admits-he-is-standing-on-the-graves-of-sandy-hook-victims/ (⮞) | 0 (0.00%) | 10 (2.53%) | 15 (2.79%) | 53.33% | 3.33 | 00:02:38 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 16. /revealed-sandy-hook-truth-exposed/ (⮞) | 0 (0.00%) | 218 (55.19%) | 290 (54.00%) | 57.59% | 2.89 | 00:02:47 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 17. /school-shooting-expert-threatened-over-sandy-hook-investigation/ (⮞) | 0 (0.00%) | 2 (0.51%) | 2 (0.37%) | 50.00% | 5.00 | 00:05:59 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 18. /state-of-connecticut-crafts-special-act-to-hide-sandy-hook-evidence/ (⮞) | 0 (0.00%) | 1 (0.25%) | 1 (0.19%) | 0.00% | 6.00 | 00:04:51 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 19. /video-were-crisis-actors-used-in-sandy-hook-massacre/ (⮞) | 0 (0.00%) | 4 (1.01%) | 4 (0.74%) | 75.00% | 1.75 | 00:00:43 | | 0.00% | 0 (0.00%) | $0.00 (0.00%) |
| 20. /why-people-think-sandy-hook-is-a-hoax/ (⮞) | 0 (0.00%) | | | | | | | | | |

Show rows: 50 ▾   Go to: 1   1 - 20 of 20   ◂ ▸

This report was generated on 3/29/21 at 12:20:22 PM. Refresh Report

DocuSign Envelope ID: EE5451C9-84B3-4A59-B8EE-52A83F0636F3



DocuSign Envelope ID: EE54451C9-84B2-4A58-B8EE-52A83F0636F3



This is Exhibit **"B"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

Go to report ⬚

**.ıl Analytics**   http://www.infowars.com
www.infowars.com

## Audience Overview

Jan 1, 2012 - Dec 31, 2012

⬤ All Users
100.00% Users

**Overview**

● Users

1,000,000

500,000

| March 2012 | May 2012 | July 2012 | September 2012 | November 2012 |

**Users**
40,152,262

**New Users**
38,413,391

**Sessions**
119,107,058

**Number of Sessions per User**
2.97

**Pageviews**
284,866,233

**Pages / Session**
2.39

**Avg. Session Duration**
00:05:22

**Bounce Rate**
56.41%

■ New Visitor   ■ Returning Visitor

22.2%   77.8%

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | service provider corporation | 1,137,641 | 13.16% |
| 2. | cellco partnership dba verizon wireless | 809,503 | 9.37% |
| 3. | comcast cable communications inc. | 567,629 | 6.57% |
| 4. | road runner holdco llc | 530,693 | 6.14% |
| 5. | sprint nextel corporation | 407,969 | 4.72% |
| 6. | at&t internet services | 376,275 | 4.35% |
| 7. | verizon online llc | 369,602 | 4.28% |
| 8. | (not set) | 238,061 | 2.75% |
| 9. | t-mobile usa inc. | 208,989 | 2.42% |
| 10. | cox communications | 190,163 | 2.20% |

© 2019 Google



Go to report ☒

## Audience Overview

All Users
100.00% Users

Jan 1, 2013 - Dec 31, 2013

Overview



● Users

3,000,000

2,000,000

1,000,000

| March 2013 | May 2013 | July 2013 | September 2013 | November 2013 |

■ New Visitor   ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 60,896,317 | 58,454,408 | 179,324,958 |



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.94 | 436,145,187 | 2.43 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:17:02 | 60.25% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | service provider corporation | 2,376,251 | 10.28% |
| 2. | cellco partnership dba verizon wireless | 1,569,696 | 6.79% |
| 3. | comcast cable communications inc. | 1,294,506 | 5.60% |
| 4. | (not set) | 1,269,750 | 5.50% |
| 5. | at&t internet services | 1,021,110 | 4.42% |
| 6. | sprint nextel corporation | 905,939 | 3.92% |
| 7. | verizon online llc | 881,541 | 3.82% |
| 8. | amazon.com inc. | 846,380 | 3.66% |
| 9. | time warner cable internet llc | 778,211 | 3.37% |
| 10. | road runner holdco llc | 646,535 | 2.80% |

© 2019 Google



.ıl Analytics    http://www.infowars.com
www.infowars.com        Go to report ⬈

## Audience Overview

All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

Overview



**Users**

1,500,000

1,000,000

500,000

| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

| Users | New Users | Sessions |
|---|---|---|
| 57,506,817 | 55,869,830 | 183,862,383 |

■ New Visitor   ■ Returning Visitor

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.20 | 411,548,207 | 2.24 |



| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:19:31 | 64.73% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 3,446,870 | 11.36% |
| 2. | service provider corporation | 2,385,219 | 7.86% |
| 3. | time warner cable internet llc | 1,961,074 | 6.46% |
| 4. | cellco partnership dba verizon wireless | 1,498,303 | 4.94% |
| 5. | at&t internet services | 1,450,113 | 4.78% |
| 6. | comcast cable communications inc. | 1,402,659 | 4.62% |
| 7. | sprint nextel corporation | 1,311,061 | 4.32% |
| 8. | verizon online llc | 1,158,766 | 3.82% |
| 9. | charter communications | 867,052 | 2.86% |
| 10. | t-mobile usa inc. | 780,604 | 2.57% |

© 2019 Google

DocuSign Envelope ID: EE5451C9-84B3-4A58-B8EE-52A83F0638F3

 Analytics

http://www.infowars.com
www.infowars.com

Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview



● Users
3,000,000
2,000,000
1,000,000

March 2015    May 2015    July 2015    September 2015    November 2015

■ New Visitor    ■ Returning Visitor

| | | |
|---|---|---|
| **Users** | **New Users** | **Sessions** |
| 64,126,790 | 62,914,640 | 191,984,644 |
| **Number of Sessions per User** | **Pageviews** | **Pages / Session** |
| 2.99 | 393,422,524 | 2.05 |
| **Avg. Session Duration** | **Bounce Rate** | |
| 00:02:50 | 65.06% | |



| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 7,885,701 | 18.74% |
| 2. | time warner cable internet llc | 2,246,416 | 5.34% |
| 3. | service provider corporation | 2,058,158 | 4.89% |
| 4. | at&t mobility llc | 1,707,000 | 4.06% |
| 5. | verizon online llc | 1,562,156 | 3.71% |
| 6. | cellco partnership dba verizon wireless | 1,420,387 | 3.38% |
| 7. | charter communications | 1,174,115 | 2.79% |
| 8. | comcast cable communications inc. | 1,131,853 | 2.69% |
| 9. | at&t internet services | 1,087,285 | 2.58% |
| 10. | cox communications | 795,294 | 1.89% |

© 2019 Google



http://www.infowars.com
**Analytics**   **www.infowars.com**                                    Go to report ⎘

## Audience Overview

⬤ **All Users**
100.00% Users                                              Jan 1, 2016 - Dec 31, 2016

**Overview**



⬤ Users
2,000,000

1,000,000

March 2016      May 2016      July 2016      September 2016      November 2016



■ New Visitor   ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 73,749,848 | 72,118,976 | 218,709,812 |



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.97 | 462,481,331 | 2.11 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:03 | 60.39% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 14,714,613 | 27.85% |
| 2. | time warner cable internet llc | 2,772,965 | 5.25% |
| 3. | at&t mobility llc | 2,717,392 | 5.14% |
| 4. | service provider corporation | 1,999,756 | 3.79% |
| 5. | charter communications | 1,660,629 | 3.14% |
| 6. | cellco partnership dba verizon wireless | 1,159,158 | 2.19% |
| 7. | comcast cable communications inc. | 1,078,205 | 2.04% |
| 8. | mci communications services inc. d/b/a verizon business | 1,039,698 | 1.97% |
| 9. | at&t internet services | 1,022,195 | 1.93% |
| 10. | comcast ip services l.l.c. | 1,010,817 | 1.91% |

© 2019 Google

**▂▮ Analytics**  http://www.infowars.com  **www.infowars.com**    Go to report ↗

## Audience Overview

◯ All Users
100.00% Users

Jan 1, 2017 - Dec 31, 2017

| Overview |

● Users



■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 54,966,386 | 52,108,330 | 178,788,381 |



21.4%

78.6%

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.25 | 388,814,008 | 2.17 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:04 | 57.48% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 12,491,560 | 34.25% |
| 2. | at&t mobility llc | 1,787,472 | 4.90% |
| 3. | time warner cable internet llc | 1,756,709 | 4.82% |
| 4. | mci communications services inc. d/b/a verizon business | 1,071,697 | 2.94% |
| 5. | charter communications | 1,022,690 | 2.80% |
| 6. | at&t internet services | 680,720 | 1.87% |
| 7. | comcast ip services l.l.c. | 618,121 | 1.69% |
| 8. | cellco partnership dba verizon wireless | 592,009 | 1.62% |
| 9. | comcast cable communications inc. | 580,920 | 1.59% |
| 10. | qwest communications company llc | 568,042 | 1.56% |

© 2019 Google

 Analytics   http://www.infowars.com
**www.infowars.com**

Go to report ☒

## Audience Overview

  **All Users**
100.00% Users

Jan 1, 2018 - Dec 31, 2018

**Overview**



● Users

| | |
|---|---|
| Users | New Users |
| **35,143,582** | **33,373,209** |

| Sessions |
|---|
| **132,867,188** |

■ New Visitor  ■ Returning Visitor



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **3.78** | **322,660,710** | **2.43** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:03:20** | **53.46%** |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 4,661,056 | 19.56% |
| 2. | cellco partnership dba verizon wireless | 1,562,546 | 6.56% |
| 3. | time warner cable internet llc | 1,388,162 | 5.82% |
| 4. | comcast cable communications llc | 1,180,283 | 4.95% |
| 5. | at&t mobility llc | 815,034 | 3.42% |
| 6. | charter communications | 717,740 | 3.01% |
| 7. | mci communications services inc. d/b/a verizon business | 707,107 | 2.97% |
| 8. | at&amp;t mobility llc | 605,826 | 2.54% |
| 9. | t-mobile usa inc. | 568,875 | 2.39% |
| 10. | at&amp;t corp. | 393,428 | 1.65% |

© 2019 Google

Analytics   Infowars Store
All Web Site Data

Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview

● Users

30,000

20,000

10,000

March 2015        May 2015        July 2015        September 2015        November 2015

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 319,533 | 319,533 | 481,817 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.51 | 2,014,486 | 4.18 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:01 | 54.01% |

| Language | | Users   % Users |
|---|---|---|
| | There is no data for this view. | |

© 2019 Google

.ıl Analytics   Infowars Store
All Web Site Data                                    Go to report ↗

## Audience Overview

All Users
100.00% Users                                        Jan 1, 2016 - Dec 31, 2016

**Overview**



● Users
150,000

100,000

50,000

March 2016        May 2016        July 2016        September 2016        November 2016

| Users | New Users | Sessions |
|---|---|---|
| 2,653,423 | 2,605,128 | 5,112,772 |

■ New Visitor  ■ Returning Visitor

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.93 | 34,287,444 | 6.71 |

39.7%   60.3%

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:48 | 29.52% |

| | Language | Users | % Users |
|---|---|---|---|
| 1. | en-us | 89,342 | 83.60% |
| 2. | c | 8,158 | 7.63% |
| 3. | en-gb | 3,913 | 3.66% |
| 4. | en-ca | 1,855 | 1.74% |
| 5. | en-au | 792 | 0.74% |
| 6. | nl | 216 | 0.20% |
| 7. | de | 215 | 0.20% |
| 8. | en | 168 | 0.16% |
| 9. | sv-se | 163 | 0.15% |
| 10. | fr | 144 | 0.13% |

© 2019 Google



Analytics    Infowars Store
All Web Site Data                                    Go to report

## Audience Overview

All Users
100.00% Users                                      Jan 1, 2017 - Dec 31, 2017

Overview



● Users
40,000

20,000

March 2017        May 2017        July 2017        September 2017        November 2017



| Users | New Users | Sessions |
|-------|-----------|----------|
| 3,132,247 | 3,057,641 | 7,531,369 |

■ New Visitor    ■ Returning Visitor

| Number of Sessions per User | Pageviews | Pages / Session |
|-----------------------------|-----------|-----------------|
| 2.40 | 34,282,728 | 4.55 |

23.7%

76.3%

| Avg. Session Duration | Bounce Rate |
|-----------------------|-------------|
| 00:03:42 | 48.64% |

| | Language | Users | % Users |
|---|----------|-------|---------|
| 1. | en-us | 2,780,017 | 88.50% |
| 2. | en-gb | 123,241 | 3.92% |
| 3. | en-ca | 58,528 | 1.86% |
| 4. | en-au | 23,738 | 0.76% |
| 5. | c | 21,559 | 0.69% |
| 6. | es-419 | 10,074 | 0.32% |
| 7. | en | 9,623 | 0.31% |
| 8. | es | 9,140 | 0.29% |
| 9. | de | 8,876 | 0.28% |
| 10. | pt-br | 8,249 | 0.26% |



| Language | | Users | % Users | |
|----------|---|-------|---------|---|
| 1. en-us | | 2,100,574 | ▮ | 90.19% |
| 2. en-gb | | 77,136 | ▮ 3.31% | |
| 3. en-ca | | 45,789 | ▮ 1.97% | |
| 4. en-au | | 18,442 | ▮ 0.79% | |
| 5. de-de | | 7,040 | ▮ 0.30% | |
| 6. en | | 6,950 | ▮ 0.30% | |
| 7. sv-se | | 4,642 | ▮ 0.20% | |
| 8. nl-nl | | 4,504 | ▮ 0.19% | |
| 9. pt-br | | 4,120 | ▮ 0.18% | |
| 10. es-es | | 3,912 | ▮ 0.17% | |

© 2019 Google

DocuSign Envelope ID: EE5451C9-84B3-4A58-B8EE-52A83F0638F3

.ıl Analytics   Infowars Shop
**All Web Site Data**

Go to report ☑

## Audience Overview

○  **All Users**
100.00% Users

Jan 1, 2014 - Dec 31, 2014

| Overview |

● **Users**



There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,402,377 | 1,401,792 | 2,097,803 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.50 | 7,594,153 | 3.62 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:28 | 48.60% |

| Language | Users | % Users |
|---|---|---|

There is no data for this view.

© 2019 Google

.ıl Analytics    Store.Infowars.com
**All Web Site Data**    Go to report ☑

**Audience Overview**

⭕ **All Users**
100.00% Users    Jan 1, 2014 - Dec 31, 2014

| Overview |
|---|

● Users

20,000

10,000



|  March 2014 |  May 2014 |  July 2014 |  September 2014 |  November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 638,543 | 633,189 | 1,227,787 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.92 | 8,610,108 | 7.01 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:20 | 14.19% |

**Service Provider**    **Users   % Users**

There is no data for this view.

© 2019 Google

Analytics Store.infowars.com
All Web Site Data

Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview



Users

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 12,427,399 | 12,366,595 | 31,089,027 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.50 | 82,033,098 | 2.64 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:52 | 59.53% |

| Service Provider | Users | % Users |
|---|---|---|

There is no data for this view.

© 2019 Google

 **Analytics** Store.infowars.com
**All Web Site Data**

Go to report ☒

## Audience Overview

All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

**Overview**



● Users

15,000

10,000

5,000

March 2016    May 2016    July 2016    September 2016    November 2016

| Users | New Users | Sessions |
|---|---|---|
| **1,238,750** | **1,186,990** | **2,064,364** |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **1.67** | **15,840,378** | **7.67** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:03:48** | **0.67%** |

■ New Visitor ■ Returning Visitor



29.2%

70.8%

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 8,370 | 35.31% |
| 2. | time warner cable internet llc | 1,146 | 4.84% |
| 3. | at&t mobility llc | 1,118 | 4.72% |
| 4. | charter communications | 855 | 3.61% |
| 5. | mci communications services inc. d/b/a verizon business | 591 | 2.49% |
| 6. | qwest communications company llc | 464 | 1.96% |
| 7. | at&t internet services | 453 | 1.91% |
| 8. | cellco partnership dba verizon wireless | 389 | 1.64% |
| 9. | comcast ip services l.l.c. | 376 | 1.59% |
| 10. | service provider corporation | 360 | 1.52% |

© 2019 Google

DocuSign Envelope ID: EE5451C9-84B3-4A59-B8EE-52A83F0636F3

 Analytics

Store.infowars.com
All Web Site Data

Go to report ☑

### Audience Overview

All Users
100.00% Users

Jan 1, 2017 - Dec 31, 2017

**Overview**



● Users

10,000

5,000

| | March 2017 | May 2017 | July 2017 | September 2017 | November 2017 |

■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 573,653 | 565,648 | 887,608 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.55 | 6,634,137 | 7.47 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:26 | 0.24% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 96,570 | 34.01% |
| 2. | time warner cable internet llc | 11,541 | 4.07% |
| 3. | at&t mobility llc | 9,652 | 3.40% |
| 4. | charter communications | 7,875 | 2.77% |
| 5. | mci communications services inc. d/b/a verizon business | 6,623 | 2.33% |
| 6. | qwest communications company llc | 4,644 | 1.64% |
| 7. | comcast ip services l.l.c. | 3,696 | 1.30% |
| 8. | at&t internet services | 3,525 | 1.24% |
| 9. | comcast cable communications inc. | 3,500 | 1.23% |
| 10. | cellco partnership dba verizon wireless | 3,395 | 1.20% |

© 2019 Google



**.ıl Analytics**    Store.infowars.com
**All Web Site Data**                                    Go to report ☑

## Audience Overview

| ○ | All Users<br>100.00% Users | | Jan 1, 2018 - Dec 31, 2018 |

| Overview |



● Users

| Users | New Users | Sessions | ■ New Visitor  ■ Returning Visitor |
| --- | --- | --- | --- |
| 219,487 | 213,073 | 326,323 |  |

| Number of Sessions per User | Pageviews | Pages / Session |
| --- | --- | --- |
| 1.49 | 2,161,727 | 6.62 |

| Avg. Session Duration | Bounce Rate |
| --- | --- |
| 00:02:57 | 0.30% |

| | Service Provider | Users | % Users |
| --- | --- | --- | --- |
| 1. | (not set) | 22,232 | 19.19% |
| 2. | hughes network systems | 4,491 | 3.88% |
| 3. | time warner cable internet llc | 4,443 | 3.84% |
| 4. | cellco partnership dba verizon wireless | 4,288 | 3.70% |
| 5. | comcast cable communications llc | 3,136 | 2.71% |
| 6. | at&t mobility llc | 2,397 | 2.07% |
| 7. | charter communications | 2,357 | 2.03% |
| 8. | t-mobile usa inc. | 2,351 | 2.03% |
| 9. | mci communications services inc. d/b/a verizon business | 2,031 | 1.75% |
| 10. | shaw communications inc. | 1,842 | 1.59% |

© 2019 Google

**.il Analytics** prisonplanet.tv

Go to report ⧉

**Audience Overview**

⬤ All Users
100.00% Users

Jan 1, 2012 - Dec 31, 2012

Overview



⬤ Users

20,000

10,000

March 2012    May 2012    July 2012    September 2012    November 2012

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,764,974 | 1,732,093 | 5,786,016 |

| Number of Sessions per User | Pageviews |
|---|---|
| 3.28 | 9,879,368 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:47 | 57.38% |

Prison Planet
TV Subscriptions

now
free (Kate 2018)

— website data

Language

% Users

© 2019 Google

Analytics  prisonplanet.tv

Go to report

## Audience Overview

**All Users**
100.00% Users

Jan 1, 2013 - Dec 31, 2013

### Overview

● Users



| March 2013 | May 2013 | July 2013 | September 2013 | November 2013 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| **1,920,622** | **1,865,236** | **7,064,061** |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **3.68** | **22,317,587** | **3.16** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:03:30** | **30.19%** |

| Language | Users | % Users |
|---|---|---|
| There is no data for this view. | | |

© 2019 Google

**.ıl Analytics** prisonplanet.tv

Go to report ☑

## Audience Overview

◯ All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

● Users



|  | March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,127,638 | 1,071,115 | 3,569,978 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.17 | 11,021,098 | 3.09 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:11 | 30.58% |

| Language |  | Users | % Users |
|---|---|---|---|

There is no data for this view.

© 2019 Google

.ıl **Analytics**   All Web Site Data

Go to report ⧉

**Audience Overview**

○ **All Users**
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

● Users

20,000

10,000

| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| | | |
|---|---|---|
| Users | New Users | Sessions |
| 478,463 | 478,244 | 1,533,631 |
| Number of Sessions per User | Pageviews | Pages / Session |
| 3.21 | 4,642,383 | 3.03 |
| Avg. Session Duration | Bounce Rate | |
| 00:02:44 | 31.90% | |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

DocuSign Envelope ID: EE5451C9-84B3-4A58-B8EE-52A83F0636F3

## Analytics   All Web Site Data

Go to report

### Audience Overview

○ All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

**Overview**

Users
15,000



| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| **1,084,793** | **1,058,039** | **3,570,065** |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **3.29** | **10,779,174** | **3.02** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:02:36** | **31.81%** |

| Language | Users | % Users |
|---|---|---|
| There is no data for this view. | | |

© 2019 Google

DocuSign Envelope ID: EE5451C9-84B3-4A58-B8EE-52A83F0636F3

**.ıl Analytics**   All Web Site Data

Go to report

**udience Overview**

⭘ **All Users**
100.00% Users

Jan 1, 2016 - Dec 31, 2016

Overview

● Users



| | March 2016 | May 2016 | July 2016 | September 2016 | November 2016 |

| Users | New Users | Sessions |
|---|---|---|
| **926,919** | **898,954** | **2,944,151** |

■ New Visitor   ■ Returning Visitor



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **3.18** | **8,423,176** | **2.86** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:02:18** | **35.69%** |

| | Language | Users | % Users |
|---|---|---|---|
| 1. | en-us | 25,923 | 88.41% |
| 2. | en-gb | 1,257 | 4.29% |
| 3. | en-ca | 552 | 1.88% |
| 4. | en-au | 206 | 0.70% |
| 5. | en | 94 | 0.32% |
| 6. | de | 89 | 0.30% |
| 7. | c | 86 | 0.29% |
| 8. | fr | 73 | 0.25% |
| 9. | nl-nl | 66 | 0.23% |
| 10. | nl | 59 | 0.20% |

© 2019 Google

**Analytics**   All Web Site Data

Go to report ☑

### Audience Overview

○ **All Users**
100.00% Users

Jan 1, 2017 - Dec 31, 2017

**Overview**

● Users
10,000

5,000



| March 2017 | May 2017 | July 2017 | September 2017 | November 2017 |

| Users | New Users | Sessions |
|---|---|---|
| 506,221 | 490,104 | 1,651,783 |

■ New Visitor  ■ Returning Visitor



20.2%

78.8%

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.26 | 4,764,686 | 2.88 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:24 | 35.25% |

| | Language | Users | % Users | |
|---|---|---|---|---|
| 1. | en-us | 449,908 | | 88.66% |
| 2. | en-gb | 21,075 | 4.15% | |
| 3. | en-ca | 9,808 | 1.93% | |
| 4. | en-au | 3,555 | 0.70% | |
| 5. | en | 1,703 | 0.34% | |
| 6. | fr | 1,598 | 0.31% | |
| 7. | c | 1,523 | 0.30% | |
| 8. | zh-cn | 1,291 | 0.25% | |
| 9. | de | 1,224 | 0.24% | |
| 10. | pt-br | 966 | 0.19% | |

**Analytics** All Web Site Data

Go to report

## Audience Overview

◯ **All Users**
100.00% Users

Jan 1, 2018 - Dec 31, 2018

**Overview**

● Users

6,000

4,000

2,000

| March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

| Users | New Users | Sessions |
|---|---|---|
| **287,199** | **276,141** | **918,042** |



■ New Visitor  ■ Returning Visitor

18.2%

81.8%

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **3.20** | **2,722,174** | **2.97** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:02:38** | **36.35%** |

| | Language | Users | % Users | |
|---|---|---|---|---|
| 1. | en-us | 261,387 | | 90.59% |
| 2. | en-gb | 8,739 | 3.03% | |
| 3. | en-ca | 5,103 | 1.77% | |
| 4. | en-au | 1,996 | 0.69% | |
| 5. | c | 1,227 | 0.43% | |
| 6. | de-de | 791 | 0.27% | |
| 7. | nl-nl | 636 | 0.22% | |
| 8. | fr | 635 | 0.22% | |
| 9. | pt-br | 620 | 0.21% | |
| 10. | zh-cn | 606 | 0.21% | |

**Analytics** infowarshealth.com

Go to report

Audience Overview

All Users
100.00% Users

Jan 1, 2012 - Dec 31, 2012

Overview

Users

3,000

2,000

1,000

March 2012    September 2012    November 2012

There is no data for this view.

**Users**
61,002

**Number of Sessions per User**
1.21

**Avg. Session Duration**
00:01:07

*[handwritten note: Infowars Health.com — web traffic — largest mass ; sells its products ; gives 12% out.]*

Language | Users | % Users
--- | --- | ---

There is no data for this view.

© 2019 Google

.ıl Analytics  infowarshealth.com

Go to report ⤢

## Audience Overview

◯ All Users
100.00% Users

Jan 1, 2013 - Dec 31, 2013

Overview

● Users

2,000

1,000

March 2013    May 2013    July 2013    September 2013    November 2013

| Users | New Users | Sessions |
|---|---|---|
| 135,193 | 133,084 | 182,012 |

There is no data for this view.

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.35 | 256,625 | 1.41 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:35 | 75.49% |

| Language | Users | % Users |
|---|---|---|

There is no data for this view.

© 2019 Google

Analytics   infowarshealth.com

Go to report

## Audience Overview

○ **All Users**
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

● Users

1,000

500



| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 57,814 | 55,127 | 75,585 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.31 | 105,682 | 1.40 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:25 | 75.07% |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

Analytics infowarshealth.com

Go to report

Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview



Users

1,000

500

March 2015      May 2015      July 2015      September 2015      November 2015

| Users | New Users | Sessions |
|---|---|---|
| 44,152 | 42,868 | 58,145 |

There is no data for this view.

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.32 | 84,199 | 1.45 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:39 | 73.93% |

| Language | | Users | % Users |
|---|---|---|---|
| | There is no data for this view. | | |

© 2019 Google

DocuSign Envelope ID: EE5451C9-84B2-4A58-B8EE-52A83F0636F3

**Analytics** infowarshealth.com

Go to report ☑

## Audience Overview

○ **All Users**
100.00% Users

Jan 1, 2016 - Dec 31, 2016

**Overview**

● Users



| Users | New Users | Sessions |
|---|---|---|
| 25,260 | 24,727 | 33,387 |

■ New Visitor


100%

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.32 | 197,181 | 5.91 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:09 | 24.73% |

| | Language | Users | % Users |
|---|---|---|---|
| 1. | ru | 13 | 76.47% |
| 2. | ru-ru | 4 | 23.53% |

© 2019 Google

DocuSign Envelope ID: EE5451C2-84B3-4A59-B8EE-52A83F0636F3

.ıl Analytics    infowarshealth.com                              Go to report ⧉

**Audience Overview**

⭕ All Users
   100.00% Users                                          Jan 1, 2017 - Dec 31, 2017

Overview

● Users



|        | March 2017 | May 2017 | July 2017 | September 2017 | November 2017 |
|--------|-----------|----------|-----------|----------------|---------------|

| Users | New Users | Sessions |
|-------|-----------|----------|
| 220 | 218 | 247 |

■ New Visitor  ■ Returning Visitor



| Number of Sessions per User | Pageviews | Pages / Session |
|------|------|------|
| 1.12 | 254 | 1.03 |

| Avg. Session Duration | Bounce Rate |
|------|------|
| 00:00:10 | 97.17% |

| Language | Users | % Users |
|----------|-------|---------|
| 1. ru | 160 | 72.73% |
| 2. ru-ru | 55 | 25.00% |
| 3. en-us | 3 | 1.36% |
| 4. c | 1 | 0.45% |
| 5. zh-cn | 1 | 0.45% |

© 2019 Google

Analytics   infowarshealth.com

Go to report ☑

**Audience Overview**

○ All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

Overview

● Users

1

0.5

| March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

| Users | New Users | Sessions |
|---|---|---|
| 2 | 2 | 2 |

■ New Visitor

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.00 | 3 | 1.50 |

100%

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:00:04 | 50.00% |

| Language | | Users | % Users |
|---|---|---|---|
| 1. en-us | | 2 | 100.00% |

© 2019 Google



August 16, 2018

**VIA FEDEX**

Philipp Schindler
Senior Vice President
Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Schindler:

We represent Free Speech Systems, LLC ("Free Speech") in certain federal court matters. Free Speech has forwarded to us your letter of August 9, 2018 regarding notice of termination of a Content Hosting Services Agreement ("CHSA"), dated December 12, 2013 and as amended on July 24, 2015. In accordance with its obligations in the court cases referenced above (as well as other litigated matters), Free Speech is required to preserve evidence including documents and videos posted pursuant to the CHSA.

It is not clear from your letter the specific grounds upon which Google is relying to terminate the CHSA. It is also not clear what is meant by your statement that "your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain." Please clarify what you mean by this statement and send us a copy of the CHSA, including all amendments, and any other documents that define "Content Owner" as referenced in the statement above.

Further, in light of its preservation obligations, Free Speech asks that Google refrain from deleting, destroying, dissolving, or otherwise rendering inoperable any videos or other documents posted by Free Speech or Alex Jones (or others at their direction) until Free Speech has retrieved all of the materials. We understand that Free Speech is currently unable to access these materials because its account is frozen.

You can email a copy of the CHSA to me at . Please do so as soon as possible.



August 16, 2018
Page 2

Thank you for your attention to this matter and please feel free to contact me if you have any questions or would like to discuss further.

Sincerely,

Partner



August 9, 2018

Via Federal Express and Email

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

**Attn:** Alex Jones and Buckley Hamman
Free Speech Systems, LLC (**"Partner"**)
3019 Alvin DeVane Blvd Suite 350
Austin, Texas 78741
nfowarsman76@gmail.com, buckley@infowars.com

**Attention: Legal Department**
**Re: Termination of Content Agreements**

Dear Sir

We write on behalf of Google LLC f/k/a Google Inc. (**"Google"**) to inform you that we are exercising our contractual rights to terminate the Content Hosting Services Agreement (**"CHSA"**), dated December 12, 2013, and as amended on July 24, 2015. This letter serves as written notice that Google is exercising its right to terminate the CHSA on 30 days prior written notice under section 11.2.

Accordingly, the CHSA will be terminated as of **September 10, 2018**. The Sections that are described as surviving in the **CHSA** will survive termination. Upon termination, your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain.

This notice is not a waiver of any claims or defenses available to Google, including those set forth under the agreements

Signed by an authorized representative of Google:

By:

Name:      2018.08.10
             07:08:00 -07'00'

Date:

CONFIDENTIAL ~ DMS Template ID: 4673368 (v1.1) ~ pg. 1



This is Exhibit **"C"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry MacGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

DocuSign Envelope ID: EE5451C9-84B3-4A58-B8EE-52A83F0636F3



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**24 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

Matthew Blumenthal
<mblumenthal@koskoff.com>

Alinor Sterling
<asterling@koskoff.com>

> **Re:     June 28, 2021 | Deadline for Production of Google Analytics**

Dear Counsel,

As discussed today, and as you are aware, the deadline for production of the Google Analytics is on June 28, 2021. The full dataset cannot be produced as an export, which thus means the only method of production is by live access to the dataset for your inspection. And, the Court previously declined to order us to provide you with a log-in. As a result, the only method for your inspection is the sandbox approach referenced during today's deposition. I recall previously making this offer to you, either during a telephone conversation or during the June 2 hearing (the transcript of which we are requesting to verify), but was not memorialized in writing and which Attorney Mattei did not recollect.

This method of inspection is akin to traditional paper discovery, where the requesting party is let into the storeroom of documents organized as kept in the ordinary course of business. You will have full liberty to run whatever searches Google Analytics permits and have full access to inspect the dataset. We envision two possible ways for this sandbox approach--we can provide you with a TeamViewer access to a Free Speech Systems computer connected to the Google Analytics or we can meet you at an agreed-upon location with a clean, new computer, where we will log-in the computer during the period of your inspection.

//

//

//

//

//

---

Randazza Legal Group
Page 2 of 2



Let us know which approach you prefer so that we can know if we are to meet up with you on or before the 28th.

Thank you for your attention to this matter.

Sincerely,

Jay M. Wolman

This is Exhibit **"D"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**25 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

> **Re:**   *Lafferty v. Jones* | *Google Analytics*

Dear Attorney Mattei:

To be clear, there is no inconsistency.  As set forth on June 2, to export the raw data, one must be an Analytics 360 member, i.e. a premium member.  Free Speech Systems is not an Analytics 360 member, therefore it is impossible for it to export the data.  As further offered on June 2, if Plaintiffs wish to make Free Speech Systems an Analytics 360 member, they have been welcome to do so.  This offer was made on the record.  Plaintiffs have declined this manner of production so far.

Sincerely,

Jay M. Wolman

cc:    mblumenthal@koskoff.com, asterling@koskoff.com

DocuSign Envelope ID: EE5451C9-84B2-4A58-B8EE-52A83F0636F3

This is Exhibit **"E"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*
_____

A COMMISSIONER FOR TAKING AFFIDAVITS

# Jordan Campbell

**275 Callaway Road, Unit 80 ● London, Ontario CANADA N6G 0N8**
**Phone: (1) 416-500-2105 ● E-Mail: goodsoupmedia@gmail.com**

## Experience

**Digital Marketing Consultant**                                             **2017 - Present**
**Good Soup Media – London, Canada**

Development and implementation of online marketing strategies for companies across North America including the use of Google Search and Display Ads, LinkedIn Sponsored Content and Sponsored Messaging Ads, Google Analytics tracking, Facebook Advertising and Email Campaign Planning & Distribution. Providing website design and website analysis services.

- Designing unique and custom-made online marketing strategies for clients
- Set-up and install appropriate website-based tracking tags for Google Analytics and ads purposes
- Detailed weekly reporting on campaign results and impact on website/landing page traffic

## Education

**Digital Social Media Consulting Course (DSMC)**
**Tai Lopez Knowledge Society - Online**                               **2019**
Focus on the latest software developments for streamlining workflows and developing the most up to date advertising strategies. Strategic planning for ad campaign design and metrics reporting.

**Social Media Master Plan Seminar**
**Tai Lopez Knowledge Society - Seminar**                               **2018**
In person intensive course designed to provide the latest and hands on experience in working with all online advertising platforms and data tracking/analysis programs (including Google, Facebook, Instagram, Snapchat, Twitter etc.) Detailed one-on-one coaching from professional online marketers.

**Social Media Marketing Agency (SMMA)**
**Tai Lopez Knowledge Society - Online**                               **2016-2017**

Had the opportunity to learn some of the most cutting-edge sales strategies and online marketing techniques based on the latest cognitive research and software tools available from one of the most successful online marketers of the last decade, Tai Lopez.

## Skills

- Google Analytics
- Google Ads
- LinkedIn Advertising
- Facebook Business Manager
- Website Design
- Email Marketing
- Social Media Content Development

# EXHIBIT J



THE
THE ALEX JONES SHOW
LISTEN NOWWAT

# RADIO SHOWNEWSVIDEOSSTORE

## BREAKING NEWSCONTACT

WATCH LIVE

BREAKING

STORE

# GOOGLE'S ANALYTICS PROVE INFOWARS HAS NO SANDY HOOK MARKETING
## Specialist destroys MSM agenda

**The Alex Jones Show** - JUNE 12, 2019



IMAGE CREDITS: TSTOKES / PIXABAY.

**Michael Zimmerman joins Alex Jones live in-studio to show and prove how, contrary to Democrat attorneys and judges, Infowars has no alleged 'Sandy Hook marketing' and makes no money from Sandy Hook video views, which happen to be less than 1% of all views.**





**Don't miss:**

### Fake News Exploits Generational Tech Gap To Smear Alex Jones

*Many of America's governmental representatives are not familiar with how modern social media and Big Tech algorithms actually work. Alex exposes how fake news can be used to smear him and other patriots because of the* generational technology gap.





**SUBSCRIBE NOW!**

# WE NEED YOUR SUPPORT!

donate to help the Infowar!

**DONATE TODAY!**

# DOWNLOAD
## the free Infowars app!









## RELATED ARTICLES



THE IMPEACHMENT AND GUN CONFISCATION FANTASY MUST END

SPECIAL REPORTS



## GUN-GRABBERS UNITE! BETO, BIDEN, KAMALA AND KLOBUCHAR ALL PLEDGE TO GO AFTER YOUR 2ND AMENDMENT

SPECIAL REPORTS

## THE TYRANNY BEHIND FREE HEALTHCARE

SPECIAL REPORTS

## DEMS PRAISE BETO'S BIZARRE HANDLING OF EL PASO SHOOTING

SPECIAL REPORTS

## DAVID KNIGHT SHOW: DEMOCRAT GAME SHOW – POWERBALL & AUCTION

SPECIAL REPORTS

## SEARCH

Search for articles 



I WANT YOU TO SAVE UP TO 75% OFF DOZENS OF PRODUCTS!

» SHOP NOW «

## LISTEN TO THE ALEX JONES SHOW – HERE'S HOW

Podcast | Listen | On Demand | Archive
WEEKDAYS 11–3PM AND SUNDAY 4–6PM
How To Get The Banned Infowars Podcasts On Your Smartphone - Find out how to subscribe to our shows!

## WATCH LIVE NOW



## LATEST STORIES

Watch Live: Democrats Call for Communist Revolution and Civil War During Third Presidential Debate

The Impeachment And Gun Confiscation Fantasy Must End

Come And Take It, Beto: You'll Never Get Our Guns

AOC Labels GOP Ad Slamming Socialism 'Racist'

Researchers Identify Areas of Eye That Change in Mild Alzheimer's Disease

In Show Of "Goodwill," Beijing Exempts US Pork, Soybeans From Trade-War Tariffs

## GET INFORMED

Get the latest breaking news & specials from Alex Jones and the Infowars crew.

First Name

Last Name

Email Address

SUBSCRIBE

## VISIT OUR STORE SHOP HERE→

### CHILL FORCE

**Your Price: $39.95**

On Sale: $23.97

Life is stressful. Get Chill Force. Support your body's natural systems in the fight against stress & help return to a state of healthy relaxation. The perfect pair with Brain Force or Turbo Force for "calm and clear" energy.





**60 Capsules**
Dietary Supplement

BUY NOW

LEARN MORE

## ILLUSTRATION



## POLLS

Who won the 3rd Democrat debate?

○ Andrew Yang

○ Cory Booker

○ Elizabeth Warren

○ Joe Biden

○ Amy Klobuchar

○ Julian Castro

- ○ Julián Castro
- ○ Bernie Sanders
- ○ Kamala Harris
- ○ Pete Buttigieg
- ○ Beto O'Rourke

| Vote | View Results |

**INFOWARS**

© 2019 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.

| Radio | Archive | About Alex Jones Show |
| Video | Watch Alex Jones Show | Subscribe |
| NewsWars | Most Recent | Contact |
| PPTV | D.M.C.A. | |
| Store | Corrections | |
| Infowars Life | | |
| T.O.S. | | |

**INFOWARS**

© 2019 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.