```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                      .
IN RE:                                .  Case No. 22-60043
                                      .  Chapter 11
FREE SPEECH SYSTEMS, LLC, et          .
al.                                   .
                                      .
               Debtors.               .
                                      .
. . . . . . . . . . . . . . . . . .   .
                                      .
IN RE:                                .  Case No. 22-33553
                                      .  Chapter 11
ALEXANDER E. JONES,                   .
                                      .  515 Rusk Street
                                      .  Houston, TX 77002
               Debtor.                .
                                      .  Friday, May 19, 2023
. . . . . . . . . . . . . . . . . .   .  10:01 a.m.




                     TRANSCRIPT OF STATUS CONFERENCE
               BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES CONTINUED.

Audio Operator:            Zilde Compean, ECR

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

| | |
|---|---|
| For Free Speech Systems, LLC: | Law Offices of Ray Battaglia, PLLC<br>By:  RAYMOND WILLIAM BATTAGLIA, ESQ.<br>66 Granburg Circle<br>San Antonio, TX 78218<br>(210) 601-9405 |
| For Alex E. Jones: | Crowe & Dunlevy, P.C.<br>By:  VICKIE L. DRIVER, ESQ.<br>2525 McKinnon Street, Suite 425<br>Dallas, TX 75201<br>(214) 420-2142 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By:  HA MINH NGUYEN, ESQ.<br>     JAYSON B. RUFF, ESQ.<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>(713) 718-4650 |
| For the Official Committee of Unsecured Creditors: | Akin Gump Strauss Hauer & Feld LLP<br>By:  DAVID M. ZENSKY, ESQ.<br>     SARA L. BRAUNER, ESQ.<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>(212) 872-8027 |
| For the Subchapter V Trustee: | The Law Office of Liz Freeman<br>By:  ELIZABETH CAROL FREEMAN, ESQ.<br>P.O. Box 61209<br>Houston, TX 77208-1209<br>(832) 779-3580 |
| Subchapter V Trustee: | Haselden Farrow PLLC<br>By:  MELISSA A. HASELDEN, ESQ.<br>Pennzoil Place<br>700 Milam, Suite 1300<br>Houston, TX 77002<br>(832) 819-1149 |
| For PQPR Holdings Limited, LLC: | Streusand Landon Ozburn Lemmon LLP<br>By:  STEPHEN WAYNE LEMMON, ESQ.<br>1801 S. Mopac Expressway, Suite 320<br>Austin, TX 78746<br>(512) 220-2688 |

```
APPEARANCES (Continued):

For the Texas             Willkie Farr & Gallagher LLP
Plaintiffs:               By:  JENNIFER JAYE HARDY, ESQ.
                          600 Travis Street, Suite 2310
                          Houston, TX 77002
                          (713) 510-1766

For Elevated Solutions    Walker & Patterson, P.C.
Group:                    By:  MIRIAM T. GOOTT, ESQ.
                               JOHNNY PATTERSON, ESQ.
                          4815 Dacoma
                          Houston, TX 77092
                          (713) 956-5577

For the Connecticut       Paul Weiss Rifkind Wharton &
Plaintiffs:               Garrison LLP
                          By:  KYLE KIMPLER, ESQ.
                               MARTIN SAVUCCI, ESQ.
                          1285 Avenue of the Americas
                          New York, NY 10019-6064
                          (212) 373-3253

Also Present:             PATRICK MAGILL, CRO
                          Free Speech Systems

                          BOB SCHLEIZER
                          BlackBriar Advisors

TELEPHONIC APPEARANCES:

For the Texas             Chamberlain Hrdlicka White Williams
Plaintiffs:               & Aughtry P.C.
                          By:  JARROD B. MARTIN, ESQ.
                          1200 Smith Street, Suite 1400
                          Houston, TX 77002
                          (713) 356-1280

For the Connecticut       Cain & Skarnulis PLLC
Plaintiffs:               By:  RYAN E. CHAPPLE, ESQ.
                          303 Colorado Street, Suite 2850
                          Austin, TX 78701
                          (512) 477-5000

                          Koskoff Koskoff & Bieder, P.C.
                          By:  CHRISTOPHER M. MATTEI, ESQ.
                          350 Fairfield Avenue, Suite 501
                          Bridgeport, CT 06604
                          (203) 587-4408
```

```
TELEPHONIC APPEARANCES (Continued):

For David Ross Jones        Stephen A. Roberts, P.C.
and Carol Jones:            By:  STEPHEN A. ROBERTS, ESQ.
                            1400 Marshall Lane
                            Austin, TX 78703
                            (512) 431-7337

For the Official            Akin Gump Strauss Hauer & Feld LLP
Committee of Unsecured      By:  KATHERINE PORTER, ESQ.
Creditors:                       ANNA KORDAS, ESQ.
                                 JAMES SALWEN, ESQ.
                            One Bryant Park
                            Bank of America Tower
                            New York, NY 10036-6745
                            (212) 872-1000

                            Akin Gump Strauss Hauer & Feld LLP
                            By:  MARTY L. BRIMMAGE JR., ESQ.
                            2300 North Field Street, Suite 1800
                            Dallas, TX 75201-2481
                            (214) 969-2885
```

1           (Proceedings commence at 10:01 a.m.)

2           THE COURT:  Okay.  Good morning, everyone.  This is

3   Judge Lopez.  Today is May 19th.  I'm going to call the 10 a.m.

4   case -- and I'm going to turn on my camera -- kind of a joint

5   status conference in the Alex Jones case and Free Speech.  So

6   why don't I -- you just intend to speak today, you can go ahead

7   and make an appearance.  If not, I'd ask everyone to just make

8   any electronic appearance on the court site.  Today is just for

9   me to get some information and share some thoughts, as well.

10          So I'll take appearances in the courtroom, and then

11  I'll turn on to online.

12          MR. BATTAGLIA:  Good morning, Your Honor.  Ray

13  Battaglia for Free Speech Systems.

14          THE COURT:  Okay.  Good to see you, Mr. Battaglia.

15          MR. BATTAGLIA:  Patrick McGill, the chief

16  restructuring officer, is in the courtroom, as well.

17          THE COURT:  McGill, good to see you.

18          MS. DRIVER:  Good morning, Your Honor.

19          THE COURT:  Morning.

20          MS. DRIVER:  Vickie Driver with Crowe and Dunlevy on

21  behalf of Mr. Jones and his estate, and my financial advisor,

22  Bob Schleizer, with BlackBriar Advisors, is here in the

23  courtroom, as well.

24          THE COURT:  Okay, thank you.

25          MR. LEMMON:  Your Honor.  Steve Lemmon for PQPR.

```
 1              THE COURT:  Okay.  Good morning.

 2              MS. FREEMAN:  Good morning.  Liz Freeman on behalf of

 3    Melissa Haselden, the Subchapter V trustee in the Free Speech

 4    case.

 5              THE COURT:  Okay.

 6              MS. FREEMAN:  And Ms. Haselden is here today, as

 7    well.

 8              THE COURT:  Good morning.  Good to see you,

 9    Ms. Haselden.

10              MR. NGUYEN:  Good morning, Your Honor.  Ha Nguyen for

11    the U.S. Trustee.  I also have Jayson Ruff with me.  We're just

12    sitting on different side of the tables today, but we're still

13    on the same side.

14              THE COURT:  Thought I was going to see a dueling

15    trustee fight here.  That would have been interesting.

16              Good morning, Ms. Goott.

17              MS. GOOTT:  Morning, Judge.  Miriam Goott and Johnny

18    Patterson on behalf of Elevated Solutions Group, and we are in

19    the way back.

20              THE COURT:  Oh, got it.  Thank you.

21              MR. ZENSKY:  Morning, Judge Lopez.  David Zensky of

22    Akin for the Official Committee of Unsecured Creditors in the

23    Alex Jones case.  And no, I'm not being colloquial, and I

24    haven't forgotten the names of our other founding partners.

25    But we're supposed to say that we're from Akin now.  We've
```

1  rebranded.

2          THE COURT:  Ah, got it.

3          MR. ZENSKY:  So David Zensky of Akin.

4          THE COURT:  It's good to see you in person.

5          MR. ZENSKY:  Nice to see you, Your Honor.  And my

6  partner, Sarah Brauner, is here today, and she's participating

7  in today's conferences, as well.

8          MS. BRAUNER:  Morning, Your Honor.

9          THE COURT:  Good morning.

10          MR. KIMPLER:  Good morning, Your Honor.  Kyle Kimpler

11  from Paul Weiss on behalf of the Connecticut plaintiffs.  I'm

12  joined by my colleague Martin Salvucci, and I believe on the

13  screen I have my co-counsel, Ryan Chapple, as well as Chris

14  McKay (phonetic).

15          THE COURT:  Morning.  Good morning to both of you.

16  It's good to see everyone.  It's always different when you see

17  someone in the box and you see them in person.  It's always an

18  interesting thing.  Good morning.

19          MS. HARDY:  Good morning, Your Honor.  Jennifer Hardy

20  of Willkie Farr on behalf of the Texas plaintiffs.  Mr. Jarrod

21  Martin is also on the line.  Avi Moshenberg wanted to be here,

22  but he has trial in Waco unfortunately.

23          THE COURT:  Morning.

24          Anyone else in the courtroom wish to make an

25  appearance.  And if you wish to make an appearance online, if

1   you're on the phone and you wish to make an appearance, why

2   don't you hit "five star."  Once I'll unmute your line, it'll

3   remain unmuted, so I just ask that you please just monitor

4   yourselves and keep your phone on mute.  Does anyone wish to

5   make an appearance who's online who may be speaking today?

6           Alrighty, there's a 512 number.

7           MR. ROBERTS:  Your Honor, this is Stephen Roberts on

8   behalf of David and Carol Jones.

9           THE COURT:  Okay, good morning.

10          All right.  I think -- and I'll check it

11  periodically, but I think I've gone up and down a few times, so

12  I think we're ready to proceed.

13          What I -- what would be helpful for me, we can start

14  with the FSSI or we can start with the Jones.  I just want to

15  know kind of where things stand generally, is mediation still

16  going on, what are the parties' thoughts.  I don't want to hear

17  anything specific about the mediation, just 10,000-foot level.

18  Is it productive?  Do the parties wish to continue with it?

19          MR. BATTAGLIA:  Your Honor, Ray Battaglia for Free

20  Speech Systems.  Try to skirt not saying anything too

21  substantive here, but yes, the mediation is ongoing.  Tell me

22  if this is too much detail, but a proposal was made by the UCC

23  that's joint to both FSS and Jones.  I'll tell you from the

24  debtor's perspective, we thought it was not performable and

25  weren't sure how to respond.  We've had some subsequent

1  conversations that we should, in fact, respond, and we will,

2  but it really requires the coordination of two debtors.  While

3  everybody thinks we're completely aligned and know what each

4  other is doing, that's really not the case.  But we need to sit

5  down, separate ourselves from some of the immediate issues,

6  day-to-day issues that we constantly confront, and and get a

7  response.

8          My client's thought, the chief restructuring officer,

9  Mr. McGill, is that, you know, we've had a plan on file for a

10  while, and not to use it as an aggressive measure, but perhaps

11  we ought to amend it and set it just to follow>  Our now

12  deceased colleague, Frank Monroe, used to say work expands to

13  meet the time allotted to complete it, and maybe some backstop

14  will be helpful.  And you know, to be to be frank, from my

15  perspective, Mr. McGill's perspective, this has gone on a

16  while.  It's -- the administrative costs are a huge burden on

17  the estate, and some finality would be best.  We don't at all

18  discount the thought that a settlement is the best way to go

19  forward here.  It's just taken a while to get to where we are.

20  Judge Isgur was appointed quite a while ago in this case and,

21  more recently, in the Jones case.

22          I appreciate that there was a lack of information,

23  baseline information, for the creditors that they wanted.  I

24  think that's largely been done.  I know they're doing a

25  significant amount of discovery.  But to a certain extent, I

1    see that as deck chairs on the Titanic.  They're not going to

2    appreciably move the needle, but I don't dispute their desire

3    to have the discovery and the documents and the information.

4    The debtor -- this debtor, Mr. McGill, met with the Committee's

5    financial advisors and reviewed the projections.  I think they

6    had a fruitful meeting yesterday.  So we're trying to get to

7    the point where there's enough information for there to be at

8    understanding of what's possible in this case.  Of course,

9    there are some interim steps and things that need to be

10   completed, and I'm happy to talk about that when you think it's

11   appropriate to address them.

12          THE COURT:  I mean, you're here now.  I mean, the

13   obvious question I've got is you've read Subchapter V trustee's

14   report.

15          MR. BATTAGLIA:  I have.

16          THE COURT:  What's your reaction to that report?

17   What thoughts do you have?  What actions are you going to take,

18   if at all, in connection with them?

19          MR. BATTAGLIA:  Well, the concept of the plan largely

20   pushes those issues to people who aren't -- that wouldn't be a

21   cynical reaction that they were somehow biased or prejudiced to

22   proceed, the biggest one, of course, being PQPR and Mr.

23   Lemmon's client.  The plan, as it stands right now, does not

24   propose to pay them cash unless and until they have an allowed

25   secured claim and transfers the rights to contest their claim

1    and seek any avoidance actions to the Sub V trustee, who would

2    continue after the plan confirmation.  I've had some

3    conversations with the creditor parties who want me to take a

4    position.  I certainly think that the debtor's position is that

5    there are clear and obvious questions about the validity of the

6    debt and therefore the validity of the lien.  But the plan does

7    not propose to pay that creditor in cash.  Maybe a small

8    reserve account would be established because, even avoiding the

9    questions of the issues of whether or not the claim should be

10   allowed, whether or not the claim should be subordinated,

11   there's a fundamental bankruptcy issue here that the collateral

12   value that their lien attaches to is not substantial.  The

13   debtor's cash balances are about 1,000,008 currently.  The

14   equipment that is listed on the schedules is largely broadcast

15   equipment, small amount of office furniture which is virtually

16   worthless.  We're talking about three-year-old broadcast

17   equipment that's installed in place, and the cost of removing

18   it and selling it probably exceeds its value.  And then,

19   there's, I think, $9 million of accounts receivable, and that

20   account receivable is receivable owed by PQPR, which they

21   dispute.

22          So from an asset value perspective and a treatment of

23   a secured claim perspective, I don't think their claim is

24   significant.  And so the plan doesn't

25          THE COURT:  What about claims against PQPR?  Not just

1  the allowance with a claim, but --

2          MR. BATTAGLIA:  It's -- the plan proposes to allow

3  another -- an independent party to evaluate and prosecute those

4  claims.

5          THE COURT:  But isn't Mr. McGill independent?

6          MR. BATTAGLIA:  Judge, from the outset, the

7  perspective that I've had in this case is whatever the debtor

8  does is suspect.  And that's not a -- I'm not casting

9  aspersions on me or Mr. McGill.

10          THE COURT:  No, I know that.  But at some point, the

11  debtor -- I mean, if Mr. McGill's decided to come in and be the

12  CRO, then he's going to have to be the CRO, and he's going to

13  have to take positions and --

14          MR. BATTAGLIA:  If the court thinks that --

15          THE COURT:  I'm not telling him what to do.  I just

16  think that, you know, that this is a case where anything I do,

17  anything that the debtor does, is going to be viewed one way or

18  the other.  We just -- everybody still has to do their job.

19  And I've tried to do mine to the best of my ability, and I

20  think everyone's got to take positions.  So I agree with you.

21  It won't shock anyone, I do think the case needs to progress.

22          And so let me hear from other parties.  I'm going to

23  share some thoughts, but I -- let me just say, I share your

24  sentiment that, at some point, I think the debtor has got to

25  put something on the table.  And either there's agreement or

1  not agreement, and I'll make decisions one way or the other.

2  But if you all have formed a position and you think there needs

3  to be a claim filed or an objection filed or something, then

4  file it, and I'll take it up and decide it based on the facts

5  and the law as I've always done.  So let me hear from some

6  other parties, but I appreciate the -- anyone.

7           Ms. Driver, you're just fine.  It's kind of a joint

8  hearing, so --

9           MS. DRIVER:  And I know, Your Honor -- thank you very

10 much -- I know that this was originally sort of an FSS talk

11 about the status report, so I just hate to jump ahead of the

12 Sub V Trustee.  But, you know, I think in a lot of ways, I

13 agree with what Mr. Battaglia said.  We definitely were later

14 to the party, so we're just getting up on six months in this

15 case.  It's not as far in most cases as I would be in six

16 months, but I think we just had challenges here that have just

17 been a little bit different.  I can say that I think that

18 myself and the professionals on Mr. Jones's side have gotten

19 more cooperation from him than we had originally anticipated.

20 I can tell you there are less documents in a case than I would

21 normally see and it's just not surprising to me that there were

22 issues in the underlying discovery related to lack of documents

23 being turned over because documents that you would normally

24 see, just we cannot find and, after looking as much as we have,

25 just don't think they truly exist.  This is just a little bit

1    more like an old -- like some of the old Texas wildcatters used

2    to do all and gas deals, you know, a little bit of spit in the

3    hand and a handshake.  And that's just really hard to find, I

4    think, for a lot of people, and so it's just unusual.

5            And so we're working as best as we can to get as much

6    as we can to whomever would like to see it to give them as much

7    comfort as we possibly can that the "there" that is there for

8    assets to be recovered has been disclosed.  And if there's a

9    finding of something else, we want to disclose as quickly as

10   possible.

11           So I will tell you that the -- we did receive the

12   offer that was sent.  I believe that the committee has it in a

13   presentation, the date that it was sent.  I don't know that

14   that's relevant so much.  Initially, we were not inclined to

15   respond, but we have talked everything through and are hoping

16   to respond.  I did want to note that, you know, we anticipate

17   filing a plan in a matter of weeks and not months, and we

18   really want to get moving.  I'm not sure we can get on the same

19   schedule as FSS, but I think we not only can dovetail but be

20   behind them, and again, in a matter of weeks, not months.

21   There is upcoming -- we have two nondischargeability cases that

22   we are litigating in Mr. Jones's case that are abated in the

23   FSS case, and we have an August 15th hearing, I believe,

24   scheduled in front of Your Honor to deal with the motion for

25   summary judgment that was filed.  And I think that's just going

1  to be a really important hearing because the two --

2  dischargeability cases are very interesting in that I just

3  don't see that there's a lot of midpoint.  There -- it either

4  is a dischargeable judgment, or it's not -- or claim, or it's

5  not a dischargeable claim.  And so, you know, I really feel

6  like there's going to need to be a ruling by this Court at the

7  end of the day.

8           The MSJ really focuses, and we had no opposition to

9  really accelerating hearing whether the judgments on their face

10 that have been entered qualify as a nondischargeable judgment

11 without a trial on the merits.  And so I think the two -- I

12 think the different parties have a diametric difference in our

13 own opinions to what we think is appropriate.  And as Your

14 Honor mentioned, we've all got a job to do, and you've been

15 willing to do your job, and we've really much -- really

16 appreciated that.  And unfortunately, in that case, I just

17 don't see a lot of midpoint.  And so there's probably just

18 going to need to be a decision.

19          But I think that August 15th hearing, or the ruling

20 date thereon, is going to be a big date in our case.

21          THE COURT:  I'm going to rule that day.

22          MS. DRIVER:  And I thank you, Your Honor.

23          THE COURT:  No, I'm going to rule that day.  You'll

24 have the answer.  I may go back and, you know, dot some I's and

25 make sure that my blue-booking was done correctly, but you'll,

1  you know, you'll have a decision that day, and then, you know,

2  give me a couple of days or so to -- unless something -- that's

3  my plan.  You know, again, I don't want to definitively say it

4  because, you know, never know what you're going to hear.  And

5  maybe someone can develop thoughts and sway the court.  Right?

6  I'd certainly want to -- but my intention is, as always is in

7  any case, to rule that day.  And -- but I understand that there

8  will need to be something in writing on that one.  And I

9  understand that, and so -- but it'll follow shortly thereafter.

10  But you'll know what the answer is that day.  That's my

11  intention, at least.

12         MS. DRIVER:  Thank you, Your Honor.  We have noticed

13  that you have been just really good at ruling from the bench,

14  and we greatly appreciate that.  That takes a lot of

15  preparation, and we appreciate it.

16         But we expect that our pleadings will be in just as

17  good shape and we hope to put just as good a shape pleadings in

18  front of Your Honor as the court claimants did, and we'll be

19  ready to move forward on that date.  I really think that we'll

20  have a plan on file in advance at that, and I think we'll have

21  confirmation date hopefully soon thereafter.

22         But Mr. Jones needs to face the reality that he has

23  $1.5 billion in nondischargeable debt.  I think his case goes

24  one way, and I think if he -- if everybody has to brace

25  themselves for trial on the merits, I think there's just a

1  different economic reality that he needs to deal with.

2         And so that's just a date certain that we know of

3  that we think is just a little bit of a fulcrum date.  We are

4  not waiting until that date to formulate a plan.  My internal

5  team has already circulated one.  We work almost daily on the

6  terms.  We're going to try to work with as many parties as we

7  can to get consent and agreement on some of those terms.  We

8  will get there with some folks, and we will not get there with

9  some folks and that's okay.  There are, you know, a few things

10  that are going to be coming up.  I believe that Mr. Jones has

11  finally come to economic terms with Free Speech Systems and

12  Mr. McGill on a new employment agreement that sort of has kind

13  of a toggle where we can get him up to an amount of money that

14  makes more sense for him to be making since he's been drawing

15  about 40 percent of what he was under a prepetition contract.

16  But it also gives the Free Speech Systems debtor the ability to

17  really count on Mr. Jones and his personal services in their

18  five-year plan, you know, so long as the terms are, you know,

19  within reason and acceptable to Mr. Jones.

20         So that really just gives it -- it's going to give us

21  two things.  One is that it'll get his income up now so he can

22  pay his administrative costs.  And then, two, it will give the

23  FSS debtor predictable terms for his employment in the future.

24  And it has more of a rational bonus structure that allows

25  Mr. Jones to make more money if FSS makes more money and to

1   make a base amount if it does not.  And it really just outlines

2   the terms of his employment in a way that a -- prior to the

3   tort claimants, I think it's just important to understand that

4   Mr. Jones and FSS was a wholly-owned LLC with very little to no

5   debt.  And so lines being blurred between a typical

6   100-percent-owned LLC that has no debt and its owner are not

7   totally unusual.  Doesn't necessarily mean that there's

8   something wrong, it just may just be what it is.  And Mr. Jones

9   came into this case with just a strange amount of debt in that

10  I've just never -- I've never dealt with an individual that

11  came in with no mortgage on their home, no liens on their cars,

12  no problems with the IRS, as a matter of fact, a deposit with

13  the IRS, and really just is dealing with tort claims.  So it's

14  just been an unusual debt position case.  It doesn't mean that

15  I'm attacking it any differently.  It's just unusual.

16          So some of the -- I will say that when I read the

17  Subchapter V trustee's report, I truly didn't find -- I thought

18  that they really analyzed the things very carefully, very

19  appropriately.  And when we look back to 2018, when these cases

20  were filed, there probably needed to be some changes made that

21  weren't made because there were not proper financial controls.

22  And so we've just focused a lot on getting those -- working

23  with Mr. McGill on the FSS side and with BlackBriar on

24  Mr. Jones's side to get those financial controls put in place.

25  And if there were improper transfers that need to be avoided,

1   we can look at doing that, and we are not opposed to looking at

2   doing any of that.  Since this is an individual, there may need

3   to be those claims at some point put into a trust with a third

4   party pursuing them.  I can imagine that Your Honor can believe

5   that if someone's to sue their wife for transfers, that's a

6   little hard on the home.  So if there are transfers that need

7   to be pursued against the wife, that may need to be an

8   independent third party.  We're still evaluating those, and

9   they're not ready to cede standing.  We're still investigating

10  those.

11          So I think that we're -- I think we've identified the

12  pockets of problems, and we've identified what an individual

13  needs to do to get out of a Chapter 11.  And we are just ready,

14  willing, and able to keep moving through that process while, on

15  a parallel track, continuing to utilize Judge Isgur in his

16  infinite wisdom, as well as infinite availability to us, to

17  continue to try to navigate towards a settlement.

18          THE COURT:  Okay.  Thank you.

19          Yeah, I'll hear from PQPR, and then I'll hear from

20  the Committee.

21          MR. LEMMON:  Thank you, Your Honor.  Steve Lemmon for

22  PQPR.  If I can just share a couple of things about PQPR's

23  perspective --

24          THE COURT:  Sure.

25          MR. LEMMON:  -- in this case, and that is that people

1    talk a lot about our lien, but they don't talk to us about our

2    lien.  My calls have gone largely unanswered regarding

3    attempting to have negotiations in this case.  That is a source

4    of frustration to my client.  The only thing we really hear

5    from the plaintiff group is a request for production of

6    documents, and we have not played any role, zero role, in the

7    negotiations so far.  That is not our choice.  We want to be

8    involved in the negotiations.  The settlement proposals that

9    are made aren't even sent to us, Judge, and they deal, in part,

10   I'm told -- I haven't seen them -- with our lien.  And that's a

11   problem for us.

12          Now, we have known from the beginning that there

13   would be questions about our our lien position.  The Court will

14   recall that we were the original advocates for having the Sub V

15   Trustee do the investigation.  We have made our person who did

16   the -- I'm going to use the very loose term -- review the

17   books, but -- I was going to say audit, but it's not really an

18   audit, but it was a review of the books to verify the amount of

19   the debt available.  We believe on the books, legally, we

20   believe we have a valid debt.  We're happy to have discussions

21   about that because we understand that we're an insider.  But

22   this has been a problem for us.  We would welcome a forum to

23   have a litigation of our lien position, and we are anxious to

24   do that.  And that's all I wanted to say.

25          THE COURT:  Thank you.

1          MR. ZENSKY:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. ZENSKY:  David Zensky of Akin.  I have a handout,

4  if I may hand up.  I've given it to counsel.

5          THE COURT:  Sure.

6          MR. ZENSKY:  Just to sort of walk through the

7  activities of the Committee and --

8          THE COURT:  Sure.

9          MR. ZENSKY:  Can I approach?

10          THE COURT:  Absolutely, thank you.

11          MR. ZENSKY:  So thank you for taking the time for a

12  status conference today.  One thing I'd like to do is show that

13  the Committee has been extremely active behind the scenes in

14  doing its job.  We have not had to file much in the way of

15  pleadings or objections at this point.  We did weigh in on the

16  schedules, as you know.  We were involved in the issue of the

17  lift stay regarding the appeals, but other than that, all our

18  work has been behind the scenes, and it has been quite a lot.

19          So I certainly will turn to next steps and plan and

20  mediation issues.  But if I could just walk the Court --

21          THE COURT:  Absolutely.

22          MR. ZENSKY:  -- through some of what we've been doing

23  since that's the purpose of today.

24          So if you start with Slide 2, Your Honor, we had very

25  typical goals for a committee at the outset of the case, which

1  we still do, and that was to make sure we could learn as much

2  as we could about the debtor's non-exempt assets, which are

3  table stakes for what would ultimately become a plan and have

4  to be used to pay creditors; second, estate claims and causes

5  of action; and then Mr. Jones's potential future income stream.

6  And it's not talking out of school to say those are the three

7  most important parts of any ultimate plan that is -- may come

8  before this Court.

9          So what have we done to further those goals?  So we

10  immediately opened a dialogue with Ms. Driver.  That has been

11  very robust and occurs on a weekly, if not multiple contacts

12  per week, and we immediately addressed the issue of asking for

13  a budget and raising the question of the debtor's spending

14  during the course of the case, and the debtor's -- pointing out

15  the debtor's fiduciary duty to his creditors, no different than

16  any other Chapter 11 debtor.  We engage two highly qualified

17  firms, as you know, to aid the Committee.  Your Honor, you

18  approved their engagements, Teneo and Nardello, and they've

19  been working vigorously behind the scenes, as well.  And

20  Mr. Battaglia, as you heard just mentioned, there was a meeting

21  yesterday between the professionals.

22          Of course, we have pursued discovery from Mr. Jones

23  and -- informal and formal.  And there have been weekly

24  conferences to discuss that with Ms. Driver.  We've also issued

25  2004 discovery to approximately 20 third parties, family

1  members, banking institutions, associates, and Mr. Jones, and

2  some of that has begun to bear fruit in terms of information

3  and documents.  As you know, we weighed in on the issue of the

4  schedules, and ultimately, I think, acceptable schedules were

5  filed.  And we have spent quite a bit of time looking at the

6  tax returns, the schedules, and the other discovery that we've

7  received.

8          So if you turn to Page 4, I think at a very high

9  level, what we have learned that correlates to the objectives I

10  laid out at the beginning are we know that the debtor is the

11  beneficiary, the settler, grantor, of multiple trusts and --

12  trusts and owned interest in trusts, and it's not always that

13  easy to follow.  Mr. Jones is also a current/former director,

14  owner, member, or manager of what seems to be two dozen or more

15  businesses.  Tracking that is time-consuming and complicated,

16  as well.

17          Third, and you've already seen this in your courtroom

18  with respect to Mountain Way, ESG, and other issues like that,

19  the debtor's family members and associates are engaged in,

20  Ms. Driver said, handshake business deals or all kinds of

21  dealings that circle around the universe of the businesses of

22  FSS and Jones and also make it more complicated to find out

23  what is there and what claims might be.  And then, we, of

24  course, have seen from the schedules and discovery that there

25  were several pieces of real estate that are not exempt assets,

1   they're not being claimed as the homestead and there's a big

2   issue brewing, which I'll get to regarding those assets in a

3   moment.

4           Your Honor indicated already that, of course, you had

5   read the Subchapter V trustee's report, in which the Subchapter

6   V trustee found financial gymnastics, if you will, in the run

7   up to of the bankruptcy and an increasing pattern of friends

8   and family transactions over the last decade accelerating in

9   and around 2018.  And I can say that we have seen that

10  substantiated in our discovery and found other instances of

11  liability management transactions in the run up to the

12  bankruptcy proceedings that will certainly need to be

13  addressed.

14          Now, the Subchapter V trustee, Your Honor, turning to

15  Page 5, also commented, and Ms. Driver, of course to her

16  credit, commented as well that there's not a lot of documents

17  that are easily found here.  There's not a lot of paper.  The

18  Subchapter V trustee report commented that prior to bankruptcy,

19  FSS lacked virtually any internal accounting controls.

20  Documentation of transactions was lacking.  And it won't

21  surprise you to hear that the same holds true for Mr. Jones.

22  It's very hard to get a full paper trail to find where cash is

23  going, where it's been, and where trusts are -- where the

24  assets of trusts have gone, and so on.

25          So the debtor's counsel has, I think, done her best

1  to help us get information, but it's still -- we're still

2  missing a lot, and there is more to be done in this regard.

3  And, of course, from the creditors' perspective, the documented

4  history of discovery misconduct that led us to be here today in

5  part, Your Honor, in the underlying state court cases doesn't

6  give them much comfort that we are still getting the full

7  picture of what has happened.

8         So to sort of bring this part of it to a head, we

9  filed our Rule 2004 request after meeting and conferring with

10  the debtor on the docket on March 13th.  It's quite extensive,

11  as you would imagine, and we've agreed to extend the date for

12  production until May 30th.  So far, we have not gotten a lot.

13  I think that's a common refrain you're going to hear.  But

14  there's also issues of spoliation we're concerned about.  We

15  were advised last week that the debtor dropped his phone in the

16  water, and we're not sure.  There hasn't been any testimony

17  about that yet.  And I'm not sure that Ms. Driver has the

18  information about what can be recovered or not from the phone,

19  but that was concerning to us in the midst of discovery to hear

20  that.  We haven't gotten any texts or emails at this point

21  other than what had been produced earlier in the state court

22  litigation.  I think we've only gotten about 1300 unique

23  documents from the debtor, notwithstanding all these trusts and

24  businesses and LLCs.  So maybe it will turn out there is no

25  more, but we are hopeful that discovery will continue to flow

1   and aid us in understanding what is there.

2          We're also actively engaged in discovery with third

3   parties.  As I've mentioned, we've already filed twenty 2004

4   requests, and we're continuing to negotiate with other third

5   parties about documents, and those will be filed in the near

6   future.  Depositions have begun.  There was a joint deposition

7   of Mr. Sisak (phonetic) this week, which Mr. Battaglia attended

8   and my colleague Ms. Porter, and there may have been others.

9   And there was important information learned in that.  And more

10  depositions are being negotiated and will be formally noticed

11  in the next few days.

12          So where we are, bringing the investigation part of

13  this to a close for today, if you look on Page 7, we have

14  identified very strong clawback actions that should be brought

15  to benefit the debtor's estate.  Ms. Driver alluded to one of

16  them regarding Mr. Jones's spouse, and the schedules reflect

17  that he paid her close to a million dollars in the run up to

18  the bankruptcy.  And that is something that the Committee, I

19  can assure you, is laser focused on.  We have sent Ms. driver a

20  demand letter to either bring the action or to cede standing to

21  the Committee.  We had asked for a response by yesterday, so

22  that letter has been out there about a week.  We laid out the

23  theories and bases for the claim, and we don't think that's

24  something that can be deferred for very long.  It's a lot of

25  money.  But the issue of whether there's an executory

1   obligation to continue making payments will have to be

2   addressed by a plan.  And certainly, the debtor believes that

3   there is an obligation, and we don't.  So we'll caucus with

4   Ms. Driver and see if we need to bring on a contested motion or

5   how that will be resolved.

6          There are other transfers to family members that we

7   have found that have every hallmark of intentional fraudulent

8   transfer on it, and that was part of our demand letter, as

9   well.  I won't get into specifics now.  But that is something

10  that may be before Your Honor sooner rather than later.

11         We have also identified what we think are millions of

12  dollars in suspect cash transfers that still require further

13  footing and information.  We cannot trace $1.5 million that

14  were transferred out of debtor accounts.  Maybe there's an

15  answer, but we don't have it yet.  There is another two and a

16  half million dollars of recently transferred cash that we just

17  don't understand the purpose, and we don't have transparency

18  into where it's going and what's happening with it.

19         I want to turn now to a topic that was not addressed

20  by any counsel yet, and that is the question of a budget for

21  this debtor, Your Honor.  On December 30th, we sent a letter to

22  Ms. Driver to request that the debtor formulate a budget,

23  engage in belt tightening, cited cases for that proposition

24  that a Chapter 11 debtor, an individual Chapter 11 debtor can't

25  expect to continue to live the lifestyle they did before

1   seeking the protection of the bankruptcy court.  We know that

2   the debtor was thinking about that because Ms. Driver alluded

3   to a budget in the emergency motion that was brought on about

4   the contract and in the first-day hearing in this case.  We

5   just got the budget on May 8th, so five months into the case,

6   and it proposed an astounding annual expenditure of more than

7   $700,000 a year, Your Honor, for a debtor with $1.5 billion of

8   unsecured debt, and that amount includes the daily spend to

9   maintain nonexempt assets.  So I mentioned earlier, there's

10   real estate that is not exempt, and the budget and the spend

11   has been to keep up properties that, under any plan, we don't

12   think the debtor will be allowed to retain.  We're very

13   concerned about that.  We -- despite just getting the budget of

14   May, the Committee has already responded and sent back a

15   proposed counter budget, if you will, that is still, by any

16   American standards, relatively frothy, proposing at least for

17   the duration of the case, in excess of $200,000 of annual

18   spending.  And we wait to see what the debtor's position on

19   that is.  So there are certain procedural vehicles in which

20   this issue may end up before you, but I think the discussions

21   are still ongoing, and there's nothing for the Court today on

22   that issue.

23          So turning to the mediation, Your Honor, we have

24   engaged extensively with Judge Isgur, beginning immediately

25   from when the Committee formed.  And, of course, Judge Isgur --

1  this will be no surprise to you -- has gone out of his way to

2  make himself available to the Committee, I assume to all other

3  parties as well.  But he has spent quite a deal of time with

4  the Committee and committee members.  We have raised several

5  potential paths forward to resolve both of the cases and

6  ultimately did issue a proposal to Mr. Battaglia and Ms. Driver

7  on May 8th that would address -- it was from the Committee and

8  the Sandy Hook families jointly -- that would address both

9  estates and would address both the sort of typical five-year

10 payout of a Chapter 11 debtor with dischargeable claims and

11 also propose a solution for the nondischargeable component, at

12 least --

13             THE COURT:  Got it.

14             MR. ZENSKY:  -- assuming that that is how this is

15 going to end up after Your Honor hears those motions.  This is

16 the first proposal made by any party in the case to deal with

17 both estates.  Mr. Battaglia does have a plan on file that was

18 not quite fully baked.  As you know, Mr. Jones hadn't weighed

19 in on it.  There's no contract with Mr. Jones.  This was a

20 proposal to deal with both cases.  It is surprising to us that

21 Mr. Jones sought bankruptcy protection, we've been in it six

22 months, and has not yet filed the plan and that we were the

23 first to come up with a suggestion here.  Ms. Driver said that

24 they're working on one.  We haven't been told any of the terms

25 yet, so I certainly can't weigh in on that.  I will tell you

1  exclusivity lapsed more than a month ago, so the Committee may

2  file its own plan at some point, as well.  I think we'll wait

3  and see what happens in the next short period in the mediation,

4  which we are committed to seeing through.  The ball's in the

5  debtor's courts.  We have a proposal out there, and we'd like a

6  response.  But we're certainly prepared to continue with the

7  mediation in good faith.

8        We do have the proposed contract that Mr. Battaglia

9  referred to, and we will also review that and engage with the

10  debtors on our view of the new contract for Mr. Jones, that

11  obviously it's not quite the same thing as a sub rosa plan, but

12  sort of locking in the two debtors into a new five-year

13  relationship is sort of a building block towards a particular

14  outcome, and I'm not sure whether we're at that stage yet, but

15  we will certainly engage in good faith on that issue.

16        I think that's what I wanted to cover.  I will --

17  just for the Court's edification, Ms. Driver said that there

18  were no -- there's no secured debt.  I think there are two

19  secured claims that were filed in the Jones case of someone

20  claiming a -- bank claiming a mortgage on a Winnebago, and I

21  think one of the nonexempt properties, there also may be a

22  mortgage.

23        THE COURT:  Thank you.  Thank you.

24        Any member of the families wish to be heard?

25        MR. KIMPLER:  God morning, Your Honor.  Kyle Kimpler

1   from Paul Weiss on behalf of the Connecticut plaintiffs.

2          I'm not going to echo what Mr. Zensky just said.  I

3   think he said it very well.  I want to take just a second to

4   talk about some of the FSS comments, just for the Court's

5   benefit.  We try to have a little bit of a line of demarcation

6   where the Committee is dealing with Jones issues, the families

7   individually are dealing more with the FSS issues.

8          THE COURT:  Uh-huh.

9          MR. KIMPLER:  I do think the PQPR issue is a large

10  issue in the FSS case.  It is certainly the family's position,

11  or at least my client's position, that it is incumbent on the

12  debtor to take a position on the validity of the PQPR debt.  I

13  think the idea that you file a plan with, like, a jump ball and

14  have other people fight about it, I do think, you know, is not

15  really discharging the -- what I would expect the debtor's duty

16  to be, especially if the debtor's trying to push the case

17  forward.

18         And I heard Mr. Battaglia say that people will view

19  him as being biased or prejudiced in whatever he does, but I

20  think he's looking at that backwards.  I think the bias and the

21  prejudice is when you don't pursue the claims.  I don't think

22  anybody will accuse Mr. Battaglia of having any type of

23  conflict of interest if he's actually pursuing an action to

24  invalidate the PQPR debt.  I think the FSS plan has another

25  issue, which is we do believe there are significant claims and

1  causes of action that FSS has against affiliates, including

2  PQPR.  And I don't think that plan really has a structure that

3  allows for those to be pursued.  It's again vesting Alex Jones

4  with ownership of the business.  And I think one thing that's

5  clear from what I've seen on the employment agreement that's

6  been contemplated is, you know, Alex Jones will continue to be

7  employed by FSS on the condition that he controls the business.

8          One finding, you know, that I think stuck out to me

9  from the Subchapter V trustee's report is that for FSS to be a

10  viable business it needs somebody like a Mr. McGill, somebody

11  with independence, somebody with the ability to run the

12  business in the interest of the business.  I don't know if

13  anyone's been proposed for that role, but I think what I'm

14  seeing is Mr. Jones would like to have complete control of FSS

15  as a condition of his employment, and I think this just leads

16  to a bunch of problems.  It's why it's hard -- as Mr. Zensky, I

17  think, appropriately noted, it's hard to treat them as two

18  truly separate estates or plans.  They kind of always come back

19  to being intertwined.

20          So the other thing I would just say is it's not just

21  a question of whether PQPR has a valid lien.  It's a question

22  of whether they have a valid claim.  I think Subchapter V

23  trustee report appropriately concludes that there's not even a

24  valid claim there or that that claim is at least subject to

25  disallowance, subordination, et cetera.  But it is not just an

1  issue of the lien.  We believe that the claim itself is

2  invalid.  I think it would be a good step forward for the

3  debtor to take a position on that, and so I'll leave it at

4  that.

5          Just briefly on the Alex Jones case, I just want to

6  say that the one part I certainly agree with Ms. Driver on is

7  that the dischargeability actions are important in this case.

8  I do think it accounts for a significant amount of, you know,

9  the parties being far apart because they have different views

10 on the outcome there.  And we heard, Your Honor, you know about

11 the need to resolve that this summer, and we're looking forward

12 to that.

13         Your Honor, I think that's all I really have to add

14 unless you have questions.  Thank you.

15         THE COURT:  No questions.  Thank you very much.

16         MS. HARDY:  Your Honor, Jennifer Hardy on behalf of

17 the Texas plaintiffs.

18         Your Honor, I also will not echo Mr. Zensky's

19 presentation.  We fully support and fully agree we're -- with

20 his characterization of where we are on the case.  The

21 Committee has spent a great deal of time focusing on discovery

22 and really answering kind of the basic questions that we need

23 in order to formulate a plan.  And we have, again, you know,

24 pushed forward an initial proposal.  We need a -- and if

25 mediation is viable here, which we very much hope it is, we

1  simply need a counterproposal from the debtor.  And we've

2  heard, you know, that they're looking -- that they are working

3  on that, that they're going to work together, they're going to

4  meet and are formulating a plan.  We want to engage with them,

5  and I think time will tell whether there is a mediated solution

6  here.

7          Every time I've risen, you've heard me say that we've

8  been working on a resolution to my clients' lift-stay motion.

9  As you may recall, we have -- several of our clients do not

10  have liquidated judgments.  We are still working on a

11  consensual resolution for that, but you know, I think, along

12  with the theme for today that we need to set deadlines and we

13  need to move things forward.  I think we also need to set an

14  evidentiary hearing for that lift-stay motion, as well, so that

15  that is one more issue that can be resolved, if it's not

16  resolved consensually ahead of time.

17          So I would ask that we reset that lift-stay motion

18  for an evidentiary hearing.  I have spoken with debtors'

19  counsel.  I believe June 9th, about three weeks from today,

20  would work for the parties if Your Honor has time that day.  We

21  will -- we do expect to have limited discovery ahead of that, a

22  small amount of discovery, so I don't think it can be much

23  sooner.

24          THE COURT:  Okay.  Let's see.  Let me -- I think the

25  best thing for me to do is reach out to -- sometime around

1  those days will work just fine for me.  I've got no issues with

2  setting the date.  The actual date and time, Ms. Saldana's the

3  one that's going to really know.

4          MS. HARDY:  Okay.

5          THE COURT:  Because a lot of times I say -- I set

6  times, and then she reminds me that I already kind of did

7  something already on that date.  So it's just easier, but

8  literally do it today.

9          MS. HARDY:  Okay.

10          THE COURT:  She'll be ready.

11          MS. HARDY:  We'll reach out to her today.

12          THE COURT:  It'll either be the 8th or the 9th.  I

13  might be able -- I think I have something on the 9th, but I

14  don't know how long that'll go.  But if you need time on the

15  9th, you'll have it.

16          MS. HARDY:  Okay.  Thanks.

17          THE COURT:  Okay.  Alrighty.  Thank you.

18          Anyone else wish to be heard?  Anyone on the line

19  wish to be heard?

20          Ms. Freeman.

21          MS. FREEMAN:  Liz Freeman on behalf of Melissa

22  Haselden, the Sub V trustee.  I don't want to belabor any of

23  the points that have been made elsewhere, but I wanted to make

24  ourselves, the trustee and I, available for any questions that

25  the Court may have and also let you know that the trustee has

1    continued to engage with all of the constituencies in the case.

2           We think that there has been a great deal of progress

3    made, but there is more work to be done.  There is certainly

4    some more discovery to be taken.  As I think everyone has

5    acknowledged, getting materials from certain of the parties is

6    very difficult.  I don't think it's -- in most instances, that

7    there is a refusal to provide information.  Frequently, the

8    information just doesn't exist.  And that's been a challenge

9    that the trustee had in preparing her report.  I understand the

10   challenge and the frustration that the Committee and the

11   creditors are experiencing, as well.

12          The balance is what is difficult to strike here.  You

13   know, what is, you know, pushing too long, you know, too far

14   out in terms of date in trying to discover everything

15   conceivable.  It's hard to prove a negative.  It's hard to know

16   what you don't know.  And so I am sympathetic to the efforts of

17   the creditors to discover as much as possible.  I just hope

18   that everybody is mindful of maintaining a balance of getting

19   enough information so that you're armed to go into a mediation

20   knowingly and to try to strike the best possible deal without

21   exhausting any and all potential time and dollars that you

22   have.  We are concerned about losing that balance, and we share

23   the Court's concern that the cases should move as quickly as

24   humanly possible, in part because of the expense and just the

25   time that's involved, but I do think that the conduct of the

1 creditors, in doing their investigation, has been very good.  I

2 don't mean to intimate that we think it's been pushed too far

3 too long yet, but we're concerned that we're going to be

4 reaching that point relatively soon.  So we want to go ahead

5 and put that out there.

6         THE COURT:  Got it.  Thank you.

7         MS. FREEMAN:  This Court is concerned about

8 transparency, and integrity of the bankruptcy process is key to

9 what we do in the bankruptcy cases and in this courtroom.  And

10 we -- the trustee remains very focused on keeping an eye on the

11 cases, tying up the loose ends that were identified in the

12 trustee's report.  And if we see something that is of concern,

13 we continue to be committed to bringing those issues to this

14 Court's attention, either through a trustee report or

15 encouraging the parties to file some sort of pleading.

16         And in that vein, there was a notice that was filed

17 at 596 regarding a resolution of crypto donations.  The trustee

18 is supportive of the agreed sharing between the Alex Jones

19 estate and the Free Speech estate itself.  The trustee is not

20 -- does not object to necessarily but does not want her silence

21 on the issue to be viewed as support with regards to anything

22 that is backward looking.  There are a lot of questions, you

23 know, and the creditors have a lot of -- identified a lot of

24 transfers, a lot of issues.  And we hope that there is a global

25 resolution, and we know that there will have to be some sort of

1  determination made or litigation made with regards to those

2  past acts.  And we're very focused on the forward looking right

3  now.  And so we just wanted it to be clear to all of the

4  parties and to the Court the trustee's position with regards to

5  crypto and also the continued need for transparency.

6          THE COURT:  Thank you.  I did want to take the time

7  to really thank Ms. Haselden and you, too, and all the other

8  professionals who worked on the report.  I thought -- some

9  eye-opening things in it, but I thought it was incredibly

10  helpful.  It's exactly what I think the case needed.  So I just

11  want to thank everyone for the amount of care that went into it

12  and the amount of work that went into it, and I thought it was

13  incredibly helpful for the process.

14          MS. FREEMAN:  I appreciate that.  And I couldn't

15  leave out, you know, Mo Meghji's team, Brian Griffith and Bill

16  Murphy, the folks at M3 --

17          THE COURT:  Yeah.

18          MS. FREEMAN:  -- who I thought just did --

19          THE COURT:  They just nailed it.

20          MS. FREEMAN:  -- phenomenal work.

21          THE COURT:  They did a phenomenal work.  So I really

22  want to thank them.

23          MS. FREEMAN:  Another point, the debtor in FSS did

24  file a plan.  And I think that the debtor knows that there will

25  be some revisions to any sort of plan going forward, and the

1  trustee will continue to work with the debtor's professionals.

2  An offer did come from the Committee that was a global offer

3  for both Alex Jones and Free Speech.  I greatly appreciate the

4  offer being formulated and circulated.  I've spoken with the

5  Committee.  I think there are certain structural issues.  You

6  know, ignoring consideration entirely, there's some -- certain

7  structural issues.  I think that there is good faith.  I

8  appreciate the forward progress.  But another concern that the

9  trustee has is that the realities and the expectations of the

10  parties on all sides could use some grounding.  And I hope that

11  the continued discovery and continued mediation and assistance

12  of Judge Isgur helps to facilitate that.  And I emphasize

13  again, on all sides.

14          THE COURT:  Got it.  Thank you.

15          MS. FREEMAN:  Yeah.  Trustee remains committed to

16  help.  I've offered to meet with the plaintiffs, I find myself

17  in New York quite a bit, and I extend this offer once again.

18  If anybody has any questions, would like to use the trustee or

19  myself as a sounding board, we remain committed to helping to

20  facilitate resolutions in these cases.  If there are any

21  particular concerns or questions, additional direction from the

22  Court, and expansion of the September 20th order, you know,

23  either at this time or in a future date, the trustee remains

24  ready and willing to help and carry out any further requests

25  from the Court.

```
 1              THE COURT:  Thank you very much.

 2              MS. HARDY:  Thank you.

 3              THE COURT:  Mr. Patterson, did you wish to address

 4  the Court?

 5              MR. PATTERSON:  Just a couple of things, Judge, and

 6  really, I just need some hearing dates.  Got a discovery issue

 7  that's going to happen with the Committee.  We're just going to

 8  need a hearing.  I was instructed by the Committee what I was

 9  going to do and when I was going to do it, and we're going to

10  need some guidance.  Maybe I'm wrong, maybe I'm not, but --

11              THE COURT:  Why don't you just --

12              MR. PATTERSON:  -- discovery has just gotten a little

13  bit out of hand for my guy.  It's going to be expensive.  And

14  anyway, we need a hearing.  I would like to address the two

15  subpoenas that he's received.  And then we have a pending

16  motion to reject at 244 that we're going to need to set for a

17  hearing, too.

18              THE COURT:  Why don't you reach out to Ms. Saldana.

19  If you need a hearing, you can probably get it within the next

20  -- when do you want a hearing, within the next two weeks?

21  Probably next week on the discovery issue?

22              MR. PATTERSON:  I've got a round of six or eight

23  depositions over the next couple of weeks, so after that,

24  anytime.  I mean, the discovery hearing, I think we probably

25  need pretty quick because they're wanting a turnaround.  But --
```

1          THE COURT:  Why don't you set -- I'll have Ms.

2    Saldana look at dates because I know we just plugged in a bunch

3    of things, and I don't want to overstep it.  But set something

4    up for the discovery sometime next week and then --

5          MR. PATTERSON:  That will be a general hearing, or do

6    you want my motion to quash, motion for protection?  I mean --

7          THE COURT:  If you get something on file early next

8    week, we can hear it really fast.  It's not going to --

9          MS. PATTERSON:  Just coordinate with Ms. Saldana?

10         THE COURT:  Uh-huh.  On a date on that.  And then you

11   want a hearing date on the other.  After your rounds of

12   depositions are over, just let her know and just -- we'll --

13   she'll -- I want dates.  I want to give out dates.  So what

14   you're hearing out of me is reach out to her, and she'll give

15   you dates on that.  But I think we can hear the motion to -- we

16   can hear that on a couple of days' notice.  That shouldn't be

17   too --

18         MR. PATTERSON:  Right.

19         THE COURT:  -- hard after that.

20         MR. PATTERSON:  Okay.

21         THE COURT:  Okay, thank you, Mr. Patterson.

22         MR. PATTERSON:  Thank you.

23         THE COURT:  Folks, I want to thank everyone for

24   everything we've heard today.  It's very much in line with what

25   I was hoping to hear.  My general thoughts are, you know, Judge

1    Isgur's so kind with his time.  Quite frankly, I find him one

2    of the best mediators in the country.  So the fact that he's

3    remained involved and engaged tells me that people are working

4    in good faith and trying their best to do it.  And I'm going to

5    just tell everyone, I think at some point, you know,

6    everybody's got to start putting their cards on the table, and

7    plans have to get filed and objections, if there are any, have

8    to get filed, and I have to resolve motions to lift the stay,

9    or if there's any declaratory judgment -- whatever is coming,

10   I've got to be able to resolve, and I know I've got one date

11   locked for the summary judgment in the Jones matter and the

12   adversaries, and I'm -- I'll be ready.  You know, we've got

13   great lawyers.  So I know the briefing will be excellent.

14          Tell everyone, I've just heard it a few times, not in

15   this case, but, you know, a lot gets cited about, you know,

16   other cases that get cited.  And I focus a lot on the

17   reasoning, not just the fact that there was another case in the

18   Southern District of Texas that did something, but the why is

19   really important to me.  I just share that as a thought.  The

20   facts of the case and whether the case -- similar or not

21   similar, but the fact that there were two cases in the Southern

22   District or in the Northern District that did something, it has

23   -- it's important if the reasoning, if the facts hold up, but I

24   think mediation should, one way or another, conclude in 60

25   days.  So I think July 21st will be the end of mediation unless

1   the parties are like -- you know, someone comes in and tells

2   me, like, we're just -- we just need another week or so.  And

3   obviously I'll be open to that.  But I think meditation should

4   end July 21st as an outside date.

5            I think parties should be prepared to not wait until

6   then.  I want -- Mr. Patterson, I want to set motion -- your --

7   I want to set your matters for hearing.  I want to hear the

8   motion to lift stay from Ms. Hardy's clients.  I -- there were

9   other matters, other objections that need to get filed if there

10  are discovery disputes.  I want them.  I don't want this to

11  drag so that we're sitting here on July 30, either -- mid-July

12  and still haven't resolved lots of the issues.  If there's a

13  deal to be struck, I think parties really need to understand

14  now's the time to really work productively because in 60 days,

15  I want, you know, I want a meaningful plan by both -- in both

16  cases, and we're going to progress on in one way or the other.

17  The trustee will file whatever the trustee is going to file at

18  that point and -- if anything, but this case can go in a couple

19  of different ways, and I think we just have to start making the

20  decision one way or the other as to which way it goes.

21            I need the debtor to take stronger positions,

22  Mr. Battaglia.  I will say that I don't want to have a plan

23  where the debtor is essentially not taking a position because

24  the debtor is supposed to be looking at this, and I need them

25  to tell me what they think.  So whatever the thoughts may be --

1   and if there are claims to be raised, I think we've got really

2   smart lawyers who can continue in mediation and still dual

3   track claim objections.  So there are issues.  And I can say

4   this comfortably because I know the quality of the lawyering

5   here.  If there's something that the Court needs to decide on

6   discovery issues or related issues, you know which ones to

7   bring and the ones that people should work out, but I don't

8   want anyone waiting a really long time to bring them.

9           I'd like to see greater activity in this case over

10  the next 60 days.  And I think not for the sake of just having

11  activity, but just because we really are moving.  I really need

12  to know, and we're going to set dates.  Mr. Battaglia, whenever

13  you want your -- whatever plan you're going to file that you

14  want to go forward with, file it and we'll set dates, I know

15  the Subchapter V rules are a little different where the Court

16  has to set them, but once I know that's the one that you want,

17  we'll pick dates and you'll go.  Just reach out to Ms. Saldana.

18  We'll set some dates and times for it, and you'll have an

19  outside date.

20          If the committee is planning on filing something, a

21  plan or something, file it.  Just let's see where this goes.

22  At the same time, I do agree with Ms. Freeman that if there is

23  a path for consensus, then let's bring it, let's have it.  But

24  I don't think there's going to be consensus, at least history

25  has taught me if people really start to put their cards on the

1 | table in July 1 with a July 21 outside date.

2 | You know, everyone watch their phones. All right?
3 | No one dropping their phones in the water over the next 20, 60
4 | days. Let's keep everything on the up and up and see where we
5 | go. Everybody's been working really hard, but I think it's now
6 | time for the court to resolve disputes that are out there.
7 | We'll see where things go.

8 | I really appreciate everyone's time, and I appreciate
9 | all the thoughts that went into today's presentation. I think
10 | what you're hearing out of me is I understand parties have been
11 | working really hard, but sometimes mediation works and
12 | sometimes it doesn't. And if it's going to work, then let it
13 | work. It's time for everyone to put their cards on the table.
14 | If not, then the Court will decide based on the facts and the
15 | law. And, you know, I really do stand to have the benefit of
16 | not really knowing what is going on outside of what is filed on
17 | the pleadings and what's in front of me in hearing. So I --
18 | really does allow me to just kind of rule based on how I see
19 | it, and that's what I intend to do. I don't know where the
20 | chips will fall, but they'll -- we'll see where things go.

21 | Anything else we need to talk about today?

22 | MR. BATTAGLIA: Your Honor, there is a hearing set
23 | next Thursday. It's the interim cash collateral hearing. I
24 | expect to present you also with a stipulation. We had a motion
25 | to assume the commercial lease that the debtor has, the sole

1  remaining commercial lease, And Mr. Butler, Lynn Butler,

2  represents the landlord.  He emailed me and consented to

3  another 60-day extension, so I'll probably be submitting a

4  stipulate on that extension.

5          THE COURT:  Yeah.  Whatever's the most efficient.  So

6  if there is no need for a hearing and you're just going to

7  continue the cash collateral hearing, then upload, you know an

8  agreed form of order, upload a -- you know, if there's

9  consensus.

10         MR. BATTAGLIA:  We'll follow our usual procedure of

11 circulating the cash collateral budget and the revised order.

12 I think one thing that parties might expect is that there will

13 be a line item for a different compensation level for Alex

14 Jones pursuant to a contract that you've not approved and I've

15 not asked you to yet.  But it'll be footnoted that he'll

16 continue under the existing compensation structure up until the

17 Court approves it.  So it won't be -- I won't be trying to pull

18 one over and get it approved in the cash collateral budget.  I

19 just want to make room for it so that if it comes up before the

20 Court and is approved and it's at a different level, I've got

21 authority under the budget.

22         THE COURT:  Got it.  Okay.

23         MR. BATTAGLIA:  There is a draft agreement.  It's

24 been circulated.  I've been -- tried very hard to be

25 transparent with all parties in this case, and so it has been

1  circulated by Ms. Driver to the UCC, which I assume is the

2  conduit to get things back to all parties on that side.  I will

3  share it with the U.S. Trustee's office.  I've shared it with

4  the Sub V trustee.  We'll take comments.  We may agree, we may

5  not, but but we'll bring something before the Court because

6  that issue does need to be remedied.

7          I was going to say a few comments in response to the

8  others, but I won't.  It's just not meaningful.  You know where

9  we are.  I'm trying to think if there are other operational

10 matters.  There's a Security State Bank motion to lift stay

11 that has -- they didn't set, but very likely, the budget will

12 also include an adequate protection.  That's on the RV.  We're

13 going to sell the RV at some point.  We've got to do some work

14 on it, but we're going to sell that.

15         THE COURT:  Okay.

16         MR. BATTAGLIA:  And the lift stay with the Texas

17 plaintiffs, I think Ms. Hardy and her cohorts have submitted a

18 9019 motion that resolves that.  I expect we're going to get

19 there, but obviously I understand their desire to get a hearing

20 date.

21         THE COURT:  Yeah.  Yeah.  And you'll get one, and Ms.

22 Saldana will be ready today to give everyone dates.  Just reach

23 out to her.  I'm notoriously bad at giving out hearing days

24 from the bench, only to be corrected when I get back.  So it's

25 just easier if you get it from her.

1          MR. BATTAGLIA:  And I don't think there were other

2   interim issues that I wanted to bring to your attention.

3          THE COURT:  The only thing I did meant to mention is

4   the reason I think it's important to pick the dates on -- for

5   the plan is I want any confirmation hearing to be live, and so

6   I got it -- there's going to have to be coordination to get

7   Mr. Jones here and anybody else whose scheduling -- issues like

8   that.  That's got to be a live hearing for me.  So everybody

9   just needs to start thinking about that in advance.  I wanted

10  to mention that because I know -- we have the hybrid portion, I

11  think parties who wish to -- obviously, parties can -- but if

12  you're going to participate in a confirmation hearing in one of

13  those cases, I want you here live, witnesses, to the extent

14  possible.  I want you here live.

15         MR. BATTAGLIA:  Understood.  And the last --

16         THE COURT:  Obviously, the debtor has to be here.

17         MR. BATTAGLIA:  -- thing I'd just say is I appreciate

18  the Court asking me and the debtor to live up to their

19  responsibilities in connection with PQPR.  I do want to remind

20  the Court that I had co-counsel in this case.

21         THE COURT:  Oh no, I completely understand.

22         MR. BATTAGLIA:  I'm a sole practitioner.  And I've

23  got how many lawyers in the courtroom.

24         THE COURT:  I -- that was not -- and no one should

25  read that as me making any statements about --

```
 1                MR. BATTAGLIA:  Understood.

 2                THE COURT:  -- Mr. Battaglia in any way or the CRO.

 3  I -- I'm just -- we're here today.  I'm just asking for -- no,

 4  and I completely -- and I remember the history really well.

 5                MR. BATTAGLIA:  I have --

 6                THE COURT:  Everything on it.

 7                MR. BATTAGLIA:  I have the bandwidth I have.

 8                THE COURT:  Got it.

 9                MR. BATTAGLIA:  So I will obviously live up to my

10  obligations.

11                THE COURT:  And that wasn't saying that you weren't.

12  It's just me expressing thoughts on -- you said you were going

13  to amend the plan.  That's what I meant.

14                MR. BATTAGLIA:  Wasn't taken.

15                THE COURT:  Okay.

16                MR. BATTAGLIA:  Thank you.

17                THE COURT:  I appreciate the clarification because I

18  don't want anyone to leave with that perception, as well.

19                All right, folks.  Thank you very much.  I've got an

20  eleven o'clock (indiscernible).  I'm going to just come back on

21  the bench at 11:15 a.m., just to step off and allow everyone to

22  get comfortable before we start at 11:15.  Thank you.

23                THE CLERK:  All rise.

24       (Proceedings concluded at 11:06 a.m.)

25                               * * * * *
```

1                          **C E R T I F I C A T I O N**

2

3             I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE: May 29, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25