```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                  )  CASE NO: 22-33553-cml
                                    )
 4    ALEXANDER E. JONES,           )  Houston, Texas
                                    )
 5              Debtor.             )  Thursday, June 8, 2023
                                    )
 6                                  )  1:32 p.m. to 2:12 p.m.
      ------------------------------)
 7

 8                                 TRIAL

 9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Elevated Solutions:  JOHNIE J. PATTERSON
                               Walker & Patterson, P.C.
13                             P.O. Box 61301
                               Houston, TX 77208
14
      For the Committee:       DAVID ZENSKY
15                             KATHERINE PORTER
                               Akin Gump Strauss Hauer & Feld LLP
16                             2300 N. Field Street, Suite 1800
                               Dallas, TX 75201
17
      For the Debtor:          CHRISTINA WALTON STEPHENSON
18                             Crowe & Dunlevy
                               2525 McKinnon Street, Suite 425
19                             Dallas, TX 75201

20    Court Reporter:          Zilde Compean

21    Courtroom Deputy:        Zilde Compean

22    Transcribed by:          Veritext Legal Solutions
                               330 Old Country Road, Suite 300
23                             Mineola, NY 11501
                               Tel: 800-727-6396
24
      Proceedings recorded by electronic sound recording;
25    Transcript produced by transcription service.
```

```
 1          HOUSTON, TEXAS; THURSDAY, JUNE 8, 2023; 1:32 PM

 2                      (Call to Order)

 3          THE COURT:  Okay.  Good afternoon, everyone.  This

 4    is Judge Lopez.  Today is June the 8th.  I'm going to call

 5    the 1:30 case.  The line is completely unmuted.  I'm hoping

 6    we can pull this off.  I'm going to call the Alex Jones case

 7    here on Motion for a Protective Order and Emergency Motion

 8    filed by Elevated Services Group.  We can go ahead and take

 9    appearances and then we'll see where we are.  Mr. Patterson,

10    I see you there.  Good afternoon.

11          MR. PATTERSON:  Good afternoon, Your Honor.

12    Johnie Patterson here on behalf of ESG.

13          THE COURT:  Okay.  Who wishes to make an

14    appearance on behalf of the Committee today?

15          MR. ZENSKY:  Good afternoon, Judge.  It's David

16    Zensky at Akin with my partner, Katherine Porter, appearing

17    for the Official Committee of Unsecured Creditors and Ms.

18    Porter will be arguing on the Motion today for the

19    Committee.

20          THE COURT:  Okay.  Good afternoon.  Ms.

21    Stephenson, do you wish to make an appearance?

22          MS. STEPHENSON:  Yes, Your Honor.  Christina

23    Stephenson for Alex Jones.

24          THE COURT:  Okay, and I see you there, Mr. Ruff.

25    Good afternoon.
```

1           MR. RUFF:  Yes, good afternoon, Your Honor.

2    Jayson Ruff for the U.S. Trustee's Office.  I'm more of an

3    observer today, but good afternoon.

4           THE COURT:  I thought I was going to be too, but

5    it sounds like I'm not.  Let's see where we are.  All right,

6    Mr. Patterson, I'll turn it over to you.

7           MR. PATTERSON:  Yes, Your Honor, and Mr. Dalessio

8    is also here in case we need him, but we've gotten --

9           THE COURT:  Good afternoon, sir.

10          MR. PATTERSON:  -- a couple of discovery requests

11   from the Committee.  We've talked to the Committee -- we've

12   talked to the Committee about it, about the broadness, the

13   burden.  They just sent a 2004 request instead.  I think

14   it's an appropriate -- an inappropriate use of 2004 just to

15   mine for documents.  That's not what 2004 is used, but more

16   importantly, the requests themselves, I mean, we can go

17   through them.  But the Court can look and see how broad they

18   are.  They've asked for the history of this company, all

19   bank statements, all copies of checks, all wire transfers,

20   all drafts.  It's -- it has no relation to anything going on

21   in this case and they're just in waiting to back off of it,

22   it appears.

23          THE COURT:  Okay.  Ms. Porter?

24          MS. PORTER:  Good afternoon, Your Honor.

25   Katherine Porter for the Committee.  The Committee requests

1    that this hearing -- that the Court deny ESG's Motion and

2    also compel ESG to comply with the Committee's discovery.

3    We filed an Objection and Countermotion yesterday at Docket

4    320, which sets forth the bases that we believe support

5    denial of ESG's Motion and the reasons that it's necessary,

6    at this juncture, to compel ESG to comply with the

7    Committee's discovery.  I will not repeat all of the

8    arguments from our papers, but I would like to highlight a

9    few points that we view as important for the Court.

10          The first, which I'd like to note at the outset,

11   is biased Motion.  ESG does not seek to narrow discovery.

12   It seeks to avoid discovery entirely.  They asked that the

13   Court enter an Order that denies all discovery from ESG to

14   the Committee.  And in the course of our correspondence with

15   ESG, we likewise have received no offer of some sort of

16   other selection of documents that ESG would consider

17   appropriate and be willing to provide to the Committee.  The

18   second thing that I would like to raise for the Court is

19   that the information that the Committee seeks from ESG is

20   actually very important.  As set forth in the Trustee's

21   Report and has been reported by the Debtor's counsel herself

22   multiple times on the record, this debtor routinely engaged

23   in handshake deals with insufficient, at best,

24   documentation, often with insiders.  And from our

25   understanding, those business practices continued with

 1   respect to ESG as they did with many of the Debtor's other

 2   counterparties.

 3          The information that the Committee seeks which is

 4   in ESG's possession is the only way for the Committee to get

 5   much of the information it needs to understand the business

 6   relationships that the Debtor had with ESG that are relevant

 7   to the pending Rejection Motion, which the Debtor has filed

 8   at Docket 244.  The number and identity of counterparties

 9   that are implicated by that Rejection Motion leaves a

10   mystery to the Committee and the financial implications of

11   that Rejection Motion, likewise, are opaque.  And we have

12   sought information from the Debtor in this respect, but we

13   certainly don't have clarity or confidence that we have the

14   full picture at this point.  And if --

15          THE COURT:  Can you repeat that Ms. -- Ms. Porter,

16   can you repeat that point?  I just want to make sure I

17   understand what you mean by that.

18          MS. PORTER:  Yes.  So, the Debtor has filed a

19   Rejection Motion at Docket No. 244, in which the Debtor

20   seeks to reject two contracts between the Debtor and ESG.

21          THE COURT:  Mm hm.

22          MS. PORTER:  We have received different

23   representations from the Debtor's counsel.  As the Debtor's

24   counsel herself gained a different understanding over time

25   about how many counterparties are implicated by the

1    contracts referenced in that Rejection Motion.  So, we don't

2    have, as the Committee, and this is set forth in the

3    Committee's Limited Objection and Response to the Rejection

4    Motion, which is filed at Docket No. 268, I believe.  We

5    don't have a complete picture about what the consequences of

6    that rejection would be because we don't have a good

7    understanding of those contracts or of the finances

8    implicated or how much money ESG is in possession of that's

9    filed under those contracts, which other counterparty

10   they're continuing to operate and function, etc., etc.  You

11   get the point, and I don't want to argue that Motion now

12   because that's not what's before the Court and I don't want

13   to stray too far down that path.  I raise it because it's

14   the reason why the Committee is so interested in gaining the

15   information it needs in order to carry out its obligations

16   to assess that Motion, come up with a final position on that

17   Motion and investigate the Debtor's affairs and to carry out

18   its obligations in this case.

19          So, the other thing I'd like to raise is that the

20   scope of the finances here, we understand, are not small.

21   We're not talking about small amounts of money, we're

22   talking about large amounts of money, and this has been put

23   forward in some filings that are before the Court, including

24   in our Limited Objection to the Rejection Motion, and it was

25   stated on the record by the Debtor's representative during

1    one of the 341 meetings with the U.S. Trustee.  And that

2    transcript is attached to our Limited Objection and Response

3    to the Rejection Motion.  Your Honor, does that answer your

4    questions --

5            THE COURT:  No, no, no.  It does.  Thank you.  I

6    just wanted to make sure I understood.

7            MS. PORTER:  -- on that point?

8            THE COURT:  Yup.

9            MS. PORTER:  Okay.  Thank you.  The third thing

10   that I would like to emphasize for the Court is that we do

11   not take it lightly to seek the Court's time and attention

12   on discovery matters.  The Committee has taken great pains

13   to work cooperatively and constructively with our parties in

14   the case to undertake its discovery work in this case.  And

15   we've granted extensions on deadlines, sought compromises

16   wherever possible and we've been successful so far in

17   reaching compromises with multiple parties and have not had

18   to seek the Court's attention yet, which is a reflection of

19   our approach to discovery in this case.  ESG, however, has

20   simply refused to engage.  And the Federal Rules of Civil

21   Procedure, the Federal Bankruptcy Rules and the Local Rules

22   of this Court all require a certain level of cooperation and

23   colloquiality between parties in connection with the

24   discovery process.  Unfortunately, we just haven't been able

25   to do that here, and the effort of the Committee to engage

1   with counsel for ESG are reflected in Exhibit 2 to our

2   Objection at ECF 320, and also at Exhibit -- the exhibit

3   that we submitted for this hearing, Your Honor, at Docket

4   No. 318, Exhibit 1.  I don't want to speak --

5           THE COURT:  So, has there -- has there been a meet

6   and confer?

7           MS. PORTER:  There has been one meet and confer.

8   It took place on May 16th.  At that meet and confer, it was

9   our understanding at the onset -- at that meet and confer,

10  there was only one document request pending.  It was the

11  document request --

12          THE COURT:  Let me -- let me ask you this -- Ms.

13  Porter, let me -- let me ask you a better question --

14          MS. PORTER:  Okay.  Yeah.

15          THE COURT:  -- because I -- I think mine was way

16  too open-ended.

17          MS. PORTER:  Okay.

18          THE COURT:  Since the Motion for the Protective

19  Order was filed, has there been any attempt to meet and

20  confer or any attempt to try to talk about these issues

21  before it got to me?

22          MS. PORTER:  Yes, Your Honor, multiple, multiple

23  attempts by the Committee.  In fact, if you'll recall on May

24  19th, a Status Conference was held in this Court unrelated

25  to discovery involving ESG, at which Mr. Patterson spoke and

1    mentioned that a Motion would be coming.  I was frankly very

2    surprised to hear that because I thought that we were

3    proceeding -- had agreement and were proceeding in

4    discovery.  So, I instantly sent an email to Mr. Patterson

5    and asked if -- asked to meet and confer.  He refused to set

6    a time.  I followed up multiple times asking to meet and

7    confer.  Again, he refused to set a time.  After the Motion

8    for the Protective Order was filed, I again asked for a

9    chance to meet and confer, and he refused to set a time.

10   And so, the answer to your question is, since May 19th, we

11   have not spoken, but the Committee has made multiple

12   attempts to speak.

13           THE COURT:  Mr. Patterson, is there a reason no-

14   one has -- there hasn't been any attempt to try to talk

15   about these issues?

16           MR. PATTERSON:  Yeah, one in particular.  When we

17   had our meet and confer when I first got into this case, we

18   talked, and I had in front of me the first discovery

19   request, which was -- I'll describe as outrageously broad,

20   and I let my concerns be known that there was only one

21   contested matter pending against my client.  It related to

22   the rejection of two contracts, and I couldn't see where

23   they were entitled to see every bank statement that he has

24   ever received since his company started, and it goes on from

25   there, 12 years of text communications.  And the response I

1   got was, "We'll just send you a 2004 and you'll do it that

2   way."

3                  THE COURT:  Yeah, but I'm looking --

4                  MR. PATTERSON:  Okay --

5                  THE COURT:  I'm looking at emails where --

6                  MR. PATTERSON:  -- if you're going to be heavy

7   handed.

8                  THE COURT:  And I'm looking at emails where folks

9   are trying to reach out to you, and you never responded.  Is

10  there a reason?

11                 MR. PATTERSON:  Because I was instructed what I

12  was going to do by the Committee.

13                 THE COURT:  C'mon, man.

14                 MR. PATTERSON:  And I told her, you can withdraw

15  if you want.  But we talked about it once and then nothing,

16  right, nothing, until I filed my Motion -- until I tell the

17  Court, "We're going to have a hearing" because I had already

18  told her we can't do this and she knew that was our position

19  and the Committee went ahead and did it anyway, and they --

20                 THE COURT:  I know, but I'm just asking since --

21                 MR. PATTERSON:  In fact, she knew what I was going

22  to do.

23                 THE COURT:  Okay.  Ms. --

24                 MR. PATTERSON:  So, how many times do I have to be

25  told --

1          THE COURT:  I don't think you have to be told

2    anything.  I just think if somebody --

3          MR. PATTERSON:  -- or confer regarding --

4          THE COURT:  I do think if somebody emails you, you

5    can respond to the email.  That's what I'm saying.

6          MR. PATTERSON:  That's -- that's true.  That's

7    true --

8          THE COURT:  Because essentially --

9          MR. PATTERSON:  -- and I did.

10          THE COURT:  -- I just think everybody's going to

11    leave it up to me to make the decision and I'll do it now.

12    But I'm not really sure it's that beneficial.  I'll make a

13    call.

14          MR. PATTERSON:  If -- if -- and the other -- I

15    mean, a perfect example, Judge.  I got a Notice of

16    Deposition for my client less than 24 hours before the

17    deposition, and then they go to take a Non-Appearance

18    Notice.  What is that?  I didn't get notice of that --

19          THE COURT:  I know.

20          MR. PATTERSON:  -- other than less than 24 hours

21    and told that I needed to appear with my client, which we

22    couldn't.  And so, just the attitude of the Committee

23    regarding this discovery was they're entitled to it.  I --

24    look, the other piece is, and what's been told to you is, my

25    client is just unwilling to cooperate.  Well, I would ask

1    the Committee, have they talked to anyone else?  I think she

2    said, "We're trying to work with all parties."  Well, my

3    client went and met with the FSS Sub-5 Trustee -- met,

4    physically, at his own expense and provided documents that

5    they asked for.  Did they ask them for any of this

6    information?  Are they coordinating?  I mean, my guy is

7    getting whipsawed here and it's just getting worse, and so -

8    -

9             THE COURT:  I don't think so.  I -- I think --

10            MS. PORTER:  May I respond?

11            THE COURT:  No, no.  I -- let me ask, so I'm going

12   through this.  I couldn't tell the scope in terms of the

13   time, but I've read your response and you said it was like

14   limited to two years.  Is that right?

15            MR. PATTERSON:  No.  It goes back -- it goes --

16            MS. PORTER:  My understanding is that --

17            THE COURT:  I couldn't tell.  I -- close to 2012

18   is what I saw on the request itself.

19            MR. PATTERSON:  Correct.

20            THE COURT:  But then I saw that your Response said

21   two years and I just couldn't make sense of it.

22            MR. PATTERSON:  Well, business has been -- it was

23   created two years ago, approximately two years ago.  So, the

24   banking information is two years, but electronic

25   communication they've asked for 11 years.

1          THE COURT:  Got it.

2          MR. PATTERSON:  Eleven plus.

3          THE COURT:  So, Ms. Porter, tell me what you're

4    really looking for?  Look, and I'm giving you an example.

5    So, when I see docs and communication concerning the

6    creation of Elevated Solutions Group, LLC, clearly, you're

7    not looking for every possible email ever created where

8    someone emails someone and said, "You know, by the way, you

9    know, look at what I created?"  It clearly can't be what

10   you're after, and I'm not saying -- this is why I really

11   wish parties should have -- could have and should have

12   talked about this, but now it's left in front of me, so I'll

13   make the decision.  Tell me what you're really after.

14         MS. PORTER:  Thank you, Your Honor.  I agree that

15   I really wish that we could have had a conversation with --

16         THE COURT:  No, no, no.  I don't -- let's just --

17   let's just put it all away and let's just -- I'm just going

18   to make decisions.  So, tell me what you're really after --

19         MS. PORTER:  Okay.  What we're --

20         THE COURT:  -- with 1 -- with 1, 2 and 3.

21         MS. PORTER:  Yes, I'd be --

22         THE COURT:  Maybe that's the better way of saying

23   it, and 4.

24         MS. PORTER:  Our understanding is that this entity

25   was created by the Debtor's father in 2021.  So, in the lead

1    ups to bankruptcy and what we'd like to understand is, why

2    it was created.  The Subchapter 5 Trustee's report clearly

3    outlined practice and pattern picked up in the lead up to

4    the bankruptcy of the Debtor and his family members creating

5    entities and negating an affiliate transaction, many of

6    which had the effect of moving money away from the eventual

7    Debtor's estate when they filed shortly thereafter.  So,

8    we're not looking for every piece of paper that relates to

9    ESG's creation, but to the extent that ESG -- and again, we

10   believe that these requests really only cover two years

11   because we think that they are directed to ESG and ESG

12   specific for two years.  So, we think that, by all the facts

13   and purposes, it's a two-year request.  But, in response to

14   request --

15            THE COURT:  So -- so, I'll limit it to two years.

16   Everything is limited to two years now.  So, two years --

17            MS. PORTER:  (indiscernible)

18            THE COURT:  Yeah (indiscernible)

19            MS. PORTER:  It was created in March of 2021, so

20   it's two plus -- two years and a few months.

21            THE COURT:  Okay.  So, it's -- so now all document

22   requests are now subject to March -- at least -- and we'll

23   go down the line and figure out which ones we take.  But

24   everything is as of March of 2021, when ESG was created.

25            MS. PORTER:  Yes.

```
1              THE COURT:  Okay.

2              MS. PORTER:  Thank you.

3              THE COURT:  So now, how do we -- how do we limit

4    the scope of 1, 2 and 3?  I'm not excluding you, Mr.

5    Patterson.  I'm including, kind of, a joint discussion here.

6    1, 2 and 3, tell me what you're really after?  I mean,

7    looking for documents and communications concerning the

8    creation of ESG, it seems like what you're looking for --

9    like, 1 and 2, theoretically could be combined in a way.

10   Tell me what you're really after there.  I'm just trying to

11   make sense of -- to get you what you're really -- what

12   you're really looking for and I got it.  If you're looking

13   for documents creating -- the creation and who the founders

14   were and who created and documents and communications

15   concerning that, I think that sounds like a reasonable

16   request.

17             MS. PORTER:  Yes, and -- yes, and the purpose of

18   the creation is also something that we're interested in.

19   The purpose was -- you know, what business purpose it could

20   have served is something that we're interested in about how

21   it was --

22             THE COURT:  And documents and communication

23   concerning the Debtor or Free Speech.  What are you really

24   after there?

25             MS. PORTER:  So, my expectation is that this is
```

1    not a large request because the Debtor doesn't email, or

2    text very much based on what we've learned so far in this

3    case.  And so, I believe that two years of communications

4    between the Debtor and Mr. Dalessio will not be very

5    extensive at all, will involve one text chain and perhaps a

6    few emails, is my expectation.  Something that if Mr.

7    Patterson is able to give me other information, I'd be happy

8    to consider it and discuss burden, but that's my

9    expectation.  So, any communication sent by or on behalf of

10   ESG to the Debtor or regarding the Debtor or FSS's business

11   arrangements with ESG, I expect will be a very small set at

12   the end of the day.

13           THE COURT:  Okay.  With respect to the -- with

14   respect to the accounts -- I'm just going to go down the

15   list, Mr. Patterson.  I'm going to give you an opportunity

16   to respond.  I just -- with respect to the accounts --

17           MR. PATTERSON:  Okay.

18           THE COURT:  -- could it not be limited to accounts

19   between ESG and the Debtor or Free Speech?

20           MS. PORTER:  So, my understanding --

21           THE COURT:  I'll tell you why (indiscernible)

22   this, because 6 gets me nervous.  Six gives me a little

23   heartburn in terms of some of the parties that are there and

24   that's where I'm going.

25           MS. PORTER:  So, the list in 6 comes from an email

1    that Mr. Dalessio sent to the Debtor's counsel, identifying

2    all of the actual and potential counterparties that he was

3    working on or work with Jones.  So, that is a targeted list,

4    all of which we know will lead to Jones, and the FSS and

5    work that ESG was the middleman and was bringing in funds

6    for the Debtor.  And so that's our response to 6.  It was

7    not a fishing expedition.  It's a targeted and careful list.

8    The reason that we believe the bank records are so

9    critically important is based on the fact that the Debtor

10   did not taper his contracts in any reliable way, nor did he

11   engage in typical business record maintenance practices or

12   email practices.  The only reliable source of information,

13   the best, reliable source of information that we have come

14   across in this case, are the bank records, because they show

15   the actual flow of funds.  And we have found no other

16   substitute for information or documents that even comes

17   close to reliability or completeness.  And that's why it's

18   so important --

19             THE COURT:  Isn't there a way to -- isn't there a

20   way to, kind of, limit the bank records to just -- and I --

21   just show you what you're looking for and typically -- and I

22   got it, ESG could have done other business, but if ESG was

23   doing other business unrelated to the Debtor or Free Speech,

24   I have no connection to it.  Are you looking for that

25   information, as well or are you looking for, kind of, a

1    targeted approach?  And I got it, there could be some loose

2    relationships between the parties and that's what you're

3    seeking to discover.  I'm just trying to explore what you're

4    looking for.

5         MS. PORTER:  Yes, so I could be wrong on this, and

6    this is something I wish I could have spoken about with

7    ESG's counsel, but I don't believe that ESG has any business

8    relationships that are wholly independent, unrelated in any

9    way, shape or form with the Debtor or FSS.  It was created

10   by the Debtor's father just two years ago and my

11   understanding is that the business arrangements they had all

12   come back to the Debtor at the end of the day.  And so, I

13   could be wrong about that and if there is a wholly and

14   distinct and utterly separate business arrangement that has

15   no (indiscernible) connection to the Debtor, we would be

16   willing to discuss redacting those from the production.

17   We're not seeking to get into Mr. Dalessio's private

18   business affairs or personal matters.  We're really only

19   interested in the Debtor.  My concern, Your Honor, is one

20   that I think you have anticipated, which is, we may have a

21   disagreement about whether a party ultimately is connected

22   to the Debtor at the end of the -- a counterparty was

23   connected to the Debtor at the end of the day, and I would

24   like to avoid those arguments, if possible, by having

25   complete bank records.  But that's something that I would be

1    very happy to work with Mr. Patterson to negotiate.

2           THE COURT:  Okay.  Mr. Patterson, let me hear from

3    you.

4           MR. PATTERSON:  This is -- this is where we ended

5    up.  It's a whole lot of speculation and you're putting the

6    burden on my guy to come up with this stuff and to prove

7    them wrong.  And that's just not the way that it happened.

8    The information that's related to the Debtor, the Sub-5

9    Trustee has been given, all of it.  He met with them, he

10   answered their questions, he produced documents, and they

11   even asked the Sub-Trustee -- the Sub-5 Trustee for any of

12   this.  So, you know, to put the burden on ESG to produce

13   everything, but redact information, again, is, I think --

14   he's got a business to run.  His business does do things not

15   related to FSS and Alex Jones, and to say that it doesn't --

16   again, I think she admitted she was just guessing or

17   speculating, and Mr. Jones' father doesn't have anything to

18   do with this business.  He was bought out months ago and I

19   can get you the date, but that information was also provided

20   to the Sub-5 Trustee, so --

21          THE COURT:  Months ago?  Months ago, as in, like,

22   how many months ago?

23          MR. PATTERSON:   I think -- I think December, but

24   I -- I have the information and I can get it for you.

25          THE COURT:  Got it.

1          MR. PATTERSON:  One second.

2          THE COURT:  Okay.  Fair enough.  I'm just thinking

3     -- so, you think some time in the last 6-8 months?

4          MR. PATTERSON:  October -- October of 2022.

5     October of 2022.

6          THE COURT:  Okay.

7          MR. PATTERSON:  And here's the other -- I'm sorry,

8     Your Honor.  I didn't hear what you said.

9          THE COURT:  No, no.  Go ahead.  No, no.  I'm just

10    listening to you.

11         MR. PATTERSON:  October 2022 and on hand she's

12    saying we're looking for communications from ESG and then

13    she immediately switches to Mr. Dalessio.  So, there was --

14    there was a relationship prior to ESG and there may be non-

15    ESG communications, as well.  I don't know that one way or

16    the other.  But the heading is where we got hung up last

17    time.  So, the bank account information, again, as it

18    relates to FSS or Mr. Jones, the Sub-5 Trustee has it.  And

19    my recommendation is, number one, ask and then review what's

20    there and see if there's follow up or additional information

21    that may be related.  But, quite frankly, I can't figure out

22    exactly what they want.  And I will say -- I know you were

23    looking at number 6.

24         THE COURT:  Mm hm.

25         MR. PATTERSON:  And we also, obviously, looked at

1    number 6.  ESG has no unwritten agreements with anyone

2    involved in this bankruptcy case.  There are none.  Mr.

3    Dalessio can testify to that under oath.  But he did not do

4    side deals, he did not do handshake deals, he did not do un

5    -- anything unwritten is what I've been provided, that

6    everything that he has that's related is in writing.  And

7    so, we can -- I think we can put that to rest as far as ESG

8    is concerned.  I know there's lots, or I've heard there's

9    lots of unwritten deals, but not with ESG.

10           THE COURT:  Okay.  Mr. Dalessio, and I say this in

11   the presence of your attorney, I don't know anything in

12   what's being presented to me.  So, anything I say is

13   certainly not a reflection upon what I think has happened or

14   hasn't happened at all.  I -- none of those issues are

15   before me.  I don't know anything.  I'm just here to resolve

16   a dispute among parties and discovery.  So, that's -- it's

17   been left to me, so I do it.  There are some parties who

18   seem to be logging in.  I'm going to ask that you please put

19   your phone on mute.  There's live court going on, and I'm

20   trying to avoid muting the entire line here.  So, why don't

21   we just start here?  I think -- I think with respect to --

22   just a second.

23           (indiscernible)

24           THE COURT:  I apologize.  I had to mute someone.

25   Let's see.

 1          (indiscernible)

 2          THE COURT:  All right.  I'm just going to mute the

 3     line.

 4          AUTOMATED VOICE:  Conference muted.

 5          THE COURT:  There are some folks who are dialing

 6     in for a 2 o'clock and haven't muted their lines, so I'll

 7     just speak and if anyone wishes to speak, they can hit 5*.

 8     Ms. Porter, can you hit 5*?  I want to just ask you a

 9     question.  Mr. Patterson, I'll ask that you hit 5* too.  I

10     just want to make sure that I've got you both on the line

11     here.

12          MS. PORTER:  I'm here, Your Honor.  Can you hear

13     me?

14          THE COURT:  Thank you.  Yup, I can hear you.  So,

15     with respect to the communications with the Debtor, how do

16     you -- so, I find -- and I've got it, we're going to limit

17     this to March of 2023, documents or communication --

18          MS. PORTER:  2021.

19          THE COURT:  2021, excuse me.  Right.  I think 1, 2

20     and 3 can be limited to documents concerning the -- I don't

21     think it needs to be all documents and communications

22     concerning the creation of ESG.  And I mean, obviously it's

23     whatever Mr. Dalessio has in his possession, custody and

24     control.  But I don't know how large of a scope that is, so

25     I am documenting communications with or concerning the

1    Debtor or with or concerning Free Speech.  I just don't know

2    how broad that is, but clearly, you're not looking for --

3    you're looking for certain types of documents and help me

4    articulate what you're looking for and I'll make sure you

5    get it.  I will say, I don't -- I view the Rejection

6    Discovery Request -- I think it would be appropriate for the

7    Committee to ask for documents concerning the scope of what

8    the rejection is, but I view the 2004 request wholly

9    different.  And so, I don't think these things overlap.

10            I do think that, you know, really the requests are

11   for two contracts and whether the Debtor has exercised its

12   business judgment on that.  I think the Debtor is going to

13   have to answer a lot of those questions and what the scope -

14   - the extent of the Rejection is and what that means.  But

15   I'm not sure ESG should be answering that question because

16   it's, kind of, the counterparty on this.  But I do think the

17   2004 -- that's why I think 2004 works in this instance.  But

18   help me articulate what it is that you're looking for

19   because I want to make sure that I can give some clear

20   instruction here and let you all go off and produce.  And I

21   don't know what the scope and extent of the documents is and

22   whether this is really all -- how much we're actually

23   talking about.  Especially if there's not a lot of email

24   communication.  That's what I'm trying to get my hands

25   wrapped around.  And I'll start the 2 o'clock as soon as I'm

1    done.

2            MS. PORTER:  Thank you.  I think what I would

3    articulate it as documents and communications concerning the

4    creation of Elevated Solutions Group, the purpose of

5    Elevated Solutions Group, the funding for Elevated Solutions

6    Group and any intended or actual business arrangements that

7    Elevated Solutions Group explores or enters into of and

8    concerning the Debtor or FSS.

9            THE COURT:  No, I --

10           MS. PORTER:  So --

11           THE COURT:  I think it's appropriate for now to

12   ask about -- concerning the creation and the funding.  That

13   I'll permit.  Creation, funding and intended business

14   partnerships at the time of its creation with business.

15   And Mr. Dalessio, I don't know what that means and whether

16   that's going to be overly burdensome.  But if it is, let me

17   know.  Not today.  You certainly have time because I'm

18   giving instruction here.  I think for documents and

19   communications with or concerning the Debtor, I think you're

20   really going towards the business relationship between ESG

21   and the Debtor --

22           MR. PORTER:  Correct.

23           THE COURT:  -- and business relationship with Free

24   Speech, as well.  So, that's the way I view 2 and 3.

25   Documents and communications regarding any accounts.  I do

1    think if there's accounts that relate to the business

2    relationship, they can be produced.  Mr. Patterson, you

3    know, maybe the parties can work on, kind of, an attorneys-

4    eyes-only to the extent that there's some issues there,

5    provide additional matters there.  I think that can be

6    appropriate in those circumstances.  It might be easier just

7    to do an attorneys-eyes-only just so they can see -- you can

8    see everything.  If not, if they want to redact, I'm going

9    to give Mr. Patterson the option to do that.  And I don't

10   know the extent of what this looks like.

11          I think 5 I'm going to exclude because I just

12   think it's covered in 1 and 2.  I could be wrong about that,

13   but I'm going to strike 5 and I'm going to give you 6, but

14   as it relates to business relationships between the Debtor

15   or Free Speech and one of these parties.  And I'm being

16   really serious about this.  I want to make sure this doesn't

17   -- some of this stuff can just be of interest for other

18   people that have no relationship with this case and no

19   interest in it, Ms. Porter.  And I'm not saying -- I just -

20   - I need this just treated with every level -- and I'm happy

21   to sign anything that protects confidentiality.  I don't --

22   here where appropriate.  If it's public knowledge, it's

23   public knowledge, but if it's not, I just -- I want to make

24   sure that you're only getting things that relate to this

25   case and if ESG was doing something with one of these other

1   parties, independent of the Debtor, I'm not interested and I

2   don't want you to -- it's irrelevant in my mind, and I'm

3   going to let them make -- they should be able to produce

4   that information.

5          MS. PORTER:  Thank you very much, Your Honor.  And

6   I just want to state for the Court's peace of mind that we

7   take our confidentiality obligations very, very seriously.

8          THE COURT:  I know you do.  I know you do.  And I

9   know Mr. Patterson does, as well.  I'm not worried about

10  that, but I am going to ask that you'll have a conversation

11  just in terms of getting appropriate -- there may already be

12  one of those out there --

13         MS. PORTER:  There is, yes.

14         THE COURT:  -- and if it is -- okay, well then,

15  let it apply.  I know -- and if anything comes up, just call

16  Rosario and she'll get you a hearing.  All right, folks.

17  Thank you very much.

18         MS. PORTER:  Thank you, Your Honor.

19         THE COURT:  I'm going to turn to my 2 o'clock --

20         MR. PATTERSON:  Judge --

21         THE COURT:  Yes, Mr. Patterson?

22         MR. PATTERSON:  A couple more -- a couple more

23  issues.  I think they're easy, but they're still there, is,

24  they required production in TIF format with OCR images and

25  along with separated or broken out metadata on any

1    electronic -- and everything produced electronically in that

2    format.  We can't -- ESG doesn't have that capability.  It

3    would require them to hire someone to do that and I think

4    it's inappropriate under the rules.

5              THE COURT:  Yeah, I'm not making -- produce it in

6    whatever form you have.

7              MR. PATTERSON:  All right, and finally is, are

8    these requests now combined -- because they're identical,

9    they sent two identical ones, one under 2004, and one --

10             THE COURT:  Yeah.  And again -- and I'm -- let me

11   make this really clear, Mr. Patterson, because I think it's

12   a fair question.  I view the Request for Rejection relating

13   to really going to what the Motion is asking me to do at

14   that time.  So, to the extent that there's a duplicate

15   request here that I'm covering in the 2004, I don't think

16   you need to respond to in the -- in connection with the

17   Motion to Reject.  Motion to Reject is asking me to approve

18   the Debtor's business judgment in rejecting two contracts,

19   and I think there are questions they can ask the Debtor that

20   they don't need to ask ESG.  So, to the extent I'm granting

21   something under a 2004, I'm not granting it under a

22   duplicate request here.  So, if it's covered -- if it's one

23   of the things that you produced here in one of the questions

24   here, I don't think it goes to the Motion to Reject.  I

25   think the Motion to Reject is about the Debtor's business

1    judgment.  But I do think it's fair for them to ask and

2    inquire from the Debtor, you know, once this contract is

3    rejected, what's the effect of that rejection and how far

4    does it reach?  I think that's something Ms. Stevenson's

5    going have to -- once the question, if it's raised to me,

6    I'm certainly going to ask at the hearing just so I

7    understand because I think it goes to business judgment.

8    And I'm sure that there may be a very well -- a good answer.

9    I'm not saying there's not, it's just another question for

10   another day.

11           MR. PATTERSON:  Right, and last, cost.  If we're

12   going to go to the bank and order this, I assume the

13   Committee will reimburse the cost because look, the right

14   way to do it is, subpoena the bank and I know why they

15   didn't do it, is because the bank charges them.  But it

16   costs us even more than it would be to go directly to the

17   bank and get this information.  It's going to have a cost

18   associated with it.

19           MS. PORTER:  We would be happy to work with Mr.

20   Patterson on all of this, regarding metadata, you know,

21   along with production --

22           THE COURT:  Yeah, that's what I mean.  I'm going

23   to let you all work it out.

24           MS. PORTER:  I don't think we need the Court

25   (indiscernible)

1            THE COURT:  I'm not asking them to go invent

2    anything and if there's a cost associated, the Committee --

3    and if the Committee has to incur it, you know, it'll be an

4    expense to the estate.  We're just going to get to the --

5    the Committee's got their work to do and I understand, Mr.

6    Patterson, that it'll be what it is.

7            MR. PATTERSON:  And I guess -- and final question,

8    are they going to redraft these or are we just going off of

9    your comments?

10           THE COURT:  Going off my comments.  I want to just

11   keep --

12           MR. PATTERSON:  All right.

13           THE COURT:  Unless anybody sees it differently, we

14   can just go off of the comments and let the parties work and

15   I'm going to let you all work on when -- I don't know what

16   date is provided in there.  I don't feel like making one up,

17   but I will if you need me to.  When do these documents --

18   when were they scheduled to be produced?  Let me just ask

19   that.  Maybe I ought to just give the -- June 20th?

20           MR. PATTERSON:  (indiscernible)

21           MS. PORTER:  (indiscernible)

22           THE COURT:  It says June 20th at --

23           MS. PORTER:  (indiscernible) June 20th, yes.

24   Under the Rule 2004 Requestion.

25           THE COURT:  Yeah.  Yeah, I see.  Is there already,

1    kind of, an examination scheduled Ms. Porter?

2              MS. PORTER:  A deposition?

3              MR. PATTERSON:  They've --

4              THE COURT:  In connection --

5              MS. PORTER:  No, we've asked -- we've asked for

6    dates, but we haven't yet received those --

7              THE COURT:  Okay.  So, I'm going to ask that you

8    all schedule a date.  I'm going to --

9              MR. PATTERSON:  Well, that was part of my

10   objection.  That's part of my objection is, they never set

11   one.  They didn't utilize it as an examination, they used it

12   as a document finding tool.  So, there was nothing ever

13   scheduled or noticed.

14             THE COURT:  So, what I'm going to do is, Ms.

15   Porter, I'm going to let you all work that out.  If you need

16   me to -- I don't -- I don't need to come up with a date now.

17   I'll let you all take a look at your schedules and stuff,

18   but I'm going to extend it till Friday the 23rd.  So, I'm

19   going to give everyone a few extra days so they can, kind

20   of, just see -- it was the 20th, now it'll go to the 23rd at

21   5 p.m.  I'll just push it out a few days in light of what

22   I've said, and hopefully the parties will get on the phone

23   and talk these issues through.  If not, just get them -- you

24   know, I guess Monday's a -- no, that's in two weeks.  So,

25   I'll be around all next week if anyone needs me.

```
1              MR. PATTERSON:  Thank you, Your Honor.

2              THE COURT:  All righty.  Thank you so much.

3              MS. PORTER:  Thank you, Your Honor.

4          (Proceedings adjourned at 2:12 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 15, 2023
```