IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **ALEXANDER E. JONES,** | § | |
| | § | |
| Debtor. | § | Case No. 22-33553 (CML) |
| | § | |

**ALEXANDER JONES' RESPONSE AND OBJECTION TO
RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES'
JULY MONTHLY OPERATING REPORT**

TO THE HONORABLE CHRISTOPHER M. LOPEZ,
UNITED STATES BANKRUPTCY JUDGE:

Alexander E. Jones ("Jones" or the "Debtor"), debtor and debtor-in-possession in the above-captioned Chapter 11 Case, hereby submits this objection and response (the "Response") to the *Reservation of Rights of the Official Committee of Unsecured Creditors in Respect of Alexander E. Jones' July Monthly Operating Report* [Docket No. 419] filed on August 29, 2023 (the "ROR"). In support of this Response, Jones respectfully represents as follows:

## I.     INTRODUCTION AND PRELIMINARY STATEMENT

1.     The ROR, filed by the Official Committee of Unsecured Creditors (the "UCC"), is the latest in a series of unwarranted and *unsupported* attacks on the Debtor. Numerous new outlets follow this case's record, looking for sensational information and sound bites to support the deplatforming of the Debtor and his company, Free Speech Systems, LLC. This most recent ROR reflects the UCC's use of this case's docket to communicate to the press, knowing there is no precedent for seeking the relief referred to, and thus refraining from seeking it but alluding to it.

2.     The ROR cherry picks July 2023, one isolated month out of a nine-month-old case,

and selectively reports information to distort the public's perception of the Debtor's actions in this case. When taken in appropriate context and viewed in light of other months' actual expenses, Debtor's July expenses were neither extraordinary nor exciting other than timing and seasonal fluctuations. However, the ROR is not about the Debtor's actual and accrued expenses during his bankruptcy case and is instead evidence of the continued histrionic attacks on his character and intentions. It is unfortunate that the UCC cannot, as all other third-party professionals have been able, work with the Debtor in substantive ways to enhance the estate and create greater recovery for its constituents. Instead, the UCC continues increasing professional costs by maintaining a "win at all costs" mindset.

II. THE UCC'S USE OF THE RESERVATION OF RIGHTS PLEADING

3. The UCC knows no rights are waived by not objecting to a monthly operating report. However, it uses this forum to suggest that a "claim" against Jones exists without providing evidence or proof. If the UCC believes it has justification to convert or dismiss this case, the Debtor welcomes the proper pleading and a chance to defend against any such claim. However, conversion would remove from the Debtor's estate any post-conversion wages, which is now well-established as the largest asset of this Chapter 11 estate. Any threat of conversion to Chapter 7 only emphasizes the individual UCC members' counsels' (who sit on the Committee in their stead) previously announced goal—to ensure that the Debtor is taken off the air and no longer has a public forum for his opinions and speech.[1] This intent to take away the Debtor's First Amendment rights,

---

[1] *See*, *Shut Him Down!*, YOUTUBE, https://www.youtube.com/watch?v=xFaxgchQczg (last visited Sept. 18, 2023 5:24PM) (Texas Plaintiffs' closing arguments and Connecticut Plaintiffs opening statement.)

> "[Connecticut Counsel] said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening.  Whether that means *walking away from public life*, to paying Sandy Hook families in full …" (emphasis added).

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 2**

whether one likes the content of his speech or not, is an inappropriate and unconstitutional use of this Court and the Bankruptcy Code. If Jones were taken off the air, *Jones nor Free Speech Systems, LLC would possess any possible source to pay the tort claimants any reasonable amount—and certainly not in the millions as anticipated*.

4. The ROR reflects the UCC's time (and tens, if not hundreds, of thousands of dollars in professional fees) investigating and criticizing Jones' monthly budgeting for groceries, childcare, accrual of property taxes, domestic support obligations, reducing the pre-petition deposit for his spousal support, and for maintenance and repair of estate assets. While Jones' expenses may be somewhat higher than the average American, he also has a job that requires him to work, research, network, and oversee his business in an unconventional industry and manner that necessitates additional support and costs that the average working American would not incur. However, because (as was stated by UCC counsel at the initial status conference in this case, then representing the UCC's constituents) they believe the Debtor is a liar and do not believe anything he says, any explanation of the basis for such expenses is simply disregarded.

5. Accordingly, Jones files this Response not only to make a record in defense of such expenses and their basis but also to provide some background on the amount of current personal funds Jones has invested in FSS (defined herein) to keep the business afloat. FSS should cover the expenses he is currently incurring personally.

### III. BACKGROUND

---

Quotes from *Texas Plaintiffs' Closing Arguments; See, also Connecticut Plaintiffs Opening Statement. See, YouTube* https://www.youtube.com/watch?v=xFaxgchQczg ("take Alex Jones platform … away … and make certain he cannot rebuild the platform.  Take him Jones out of this discourse … that is punishment."); Jonathan O'Connell, *Sandy Hook Families Sued Alex Jones. Then He Started Moving Money Around*, WASH. POST (Nov. 21, 2022), https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/.

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 3**

6. Jones hosts a syndicated radio and video talk show in Austin. Free Speech Systems, LLC ("FSS") is utilized to produce and syndicate much of the show under Jones' supervision. The primary source of FSS's income is the sale of high-end dietary supplement products, books, t-shirts, and other products to customers through the InfoWars website. These products are sold solely through promotion by the show hosts, of which Jones is the featured host and responsible for recruiting and retaining the other program hosts.

7. Almost all of the income Jones generates goes to FSS, and Jones has historically received draws or a salary therefrom.[2] It is only from his salary that Jones is able to then pay 50% of tort litigation expenses, 100% of his living expenses, *and* fund his own Chapter 11 case, including paying legal and professional fees, which, to date, he has not been able to do.

8. As of the FSS Bankruptcy Case filing and the Jones Bankruptcy Case, FSS and Jones were parties to an Employment Agreement dated April 14, 2022 (the "Employment Agreement"). Under the terms of the Employment Agreement, Jones agreed to produce his show on FSS's platform in exchange for an annual salary of One Million, Three Hundred Thousand Dollars and NO/100 ($1,300,000.00) plus a personal assistant who served as a part-time nanny for Jones' underage child, which provided FSS a predictable amount owed to Jones.

9. On or about August 2022, FSS ceased paying Jones his full compensation owed under the Employment Agreement, reducing his bi-weekly compensation from $50,000.00 to $20,000.00[3] (a 60% reduction). This payment reduction resulted in a $290,000.00 claim by Jones

---

[2] As discussed below, for the 10 years prior to the Jones Chapter 11, his draws ran approximately $2M per year, including significant business expense reimbursements. In the year before the Chapter 11, Jones entered into an Employment Agreement, voluntarily reducing his salary to $1.3M. When the FSS Chapter 11 was filed, the then-CRO unilaterally reduced his salary by more than 60%.

[3] Jones was paid only $10,000 per pay period under the *Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection* (the "Interim Cash Collateral Order") (Doc. No. 41). Jones' salary was increased to $20.000 per pay period in the Second *Interim Order Authorizing Debtor's Use of Cash Collateral and*

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 4**

against FSS as of December 2, 2022, and an ongoing claim accrual of $30,000.00 bi-weekly since based upon Jones' current compensation rate (as Jones has performed as agreed under the Prior Employment Agreement). The post-petition total due and owing to Jones by FSS under the Employment Agreement as of May 31, 2023, was **$680,000.00** (the "Administrative Claim"). Jones filed an *Application for Administrative Expense Claim* in the FSS Bankruptcy Case on July 6, 2023 [Docket No. 659] (the "Admin Claim Application"). These funds have not yet been paid to Jones' estate.

10. FSS and Jones then negotiated the terms of a new Employment Agreement, and a Joint Motion to Approve such Agreement was filed on August 29, 2023 [Docket No. 707] (the "Motion to Approve New Employment Agreement"). Jones, FSS, and the UCC are currently attempting to work through informal objections regarding the Admin Claim Application and the Motion to Approve New Employment Agreement. The Employment Agreement provides for a $1.5 million salary, $200,000 more than the prior agreement, compensating for the shift of Jones' personal assistant. It has been approved by the Subchapter V Trustee in the FSS case and FSS. The UCC has tentatively agreed to the increased salary so long as it is earmarked to pay professional fees, which Jones has agreed to do.

11. As part of the Employment Agreement, Jones has a written indemnity from FSS[4] mandating that all personal expenses related to The Alex Jones Show or litigation incurred by him be reimbursed. The premise for this indemnity is simple—Jones generates income, almost all of which is paid to FSS, in return for a draw or salary and an indemnity. Without the draw or salary, Jones cannot pay his personal living and Chapter 11 administrative expenses, much less pay a 50%

---

*Providing Partial Adequate Protection* (Doc. No. 98).

[4] Texas statute also provides for this indemnity.

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 5**

share of the tort litigation and appellate expenses, while FSS is withholding over 60% of his salary.

12. Prior to the filing of the FSS Bankruptcy Case, Jones personally paid from the proceeds of the sale of real property, over $785,000.00 to the Info-W, Info-Health, PPTV, and ultimately to FSS lawyers and professionals (either directly prior to filing the prior Info-W, Info-Health, PPTV Chapter 11 cases) without receiving a salary until July 2023. Jones accomplished this through distributions from the sale of his real property and other income sources. But for these payments, FSS would have failed.

13. In addition to the above, prior to the filing of the FSS Bankruptcy Case, Jones paid to FSS the personal contributions made to his personal Bitcoin wallet account (exceeding $7.2 million) in order to allow FSS to make payroll, purchase products, employ professionals, and conduct related FSS operations. Other than a remaining balance of approximately $16,000.00 in his Bitcoin wallet and purchase of inventory for FSS (described below), none of the donations of Bitcoin were used personally by Jones.[5]

14. After the FSS Bankruptcy Case was filed, it was discovered that the accounting department misdirected product purchases and that Marc Schwartz, the initial CRO, inadequately budgeted for product purchases. To ensure orders were shipped and so that FSS did not run out of inventory, Jones personally purchased almost $800,000 of products, funded half by Bitcoin sales he received and the other half from other personal funds. This written consignment purchase was to be on the same consignment basis that FSS used with third parties, whereby Jones paid full product costs and would receive approximately 60% of the gross sales in return. This agreement involved Elevated Solutions Group, and since FSS's termination of their agreement with ESG, such funds are held in suspense by FSS. As of the date hereof, such funds owed to Jones exceed

---

[5] Jones directly paid bonuses to certain FSS department heads.

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 6**

$332,000.

15. Upon making the first "consignment" acquisition for the benefit of FSS in August, Jones discovered that FSS also failed to budget in a timely manner to fund the shipping of pre-paid products and pre-paid shipping costs. As a result, FSS could not pay for the shipment of these pre-paid credit card orders (*with money in the FSS bank account*), which Jones discovered were over 30 days late. Jones then advanced $400,000.00 to pay for the shipping of credit-card purchasers who had pre-paid, but again, the CRO budget submitted and approved did not provide for shipment. Ultimately, Jones had to spend another $600,000 of his own personal funds to keep FSS operating and continue shipping pre-paid credit card sales.[6] These FSS infusions, along with extraordinary legal costs incurred in the Texas and Connecticut Litigation, significantly drained almost all of Jones' finances by the time he was forced to prepare for his own Chapter 11 case.

## IV. OBJECTION AND RESPONSE

16. Chapter 11 cases have statutorily appointed unsecured creditor committees to represent the interests of general unsecured creditors who might otherwise lack the incentive or means to participate in a meaningful way. 11 U.S.C. § 1102. In the Jones Bankruptcy Case, it is arguable that a UCC was an unnecessary and duplicative expense for the estate, given that the only constituents were already well and abundantly represented by counsel (including UCC counsel, who converted to UCC counsel from tort claimant counsel upon the Committee's appointment), and the Litigation Plaintiffs do not appear to have lost any incentive or means to participate in a meaningful way. Instead, the estate now has the added expense of addressing issues with three sets of counsel instead of two for every issue that arises. The estate must also shoulder the significant

---

[6] The initial $400,000 was ultimately repaid to Jones.

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 7**

financial burden of paying for the financial advisors[7] and investigative professionals[8] of the UCC.[9] Just the expense of all parties, including all parties in interest, that are reviewing and participating in document production and examinations under more than thirty-five (35) Rule 2004 Subpoenas and Examinations is extraordinary for a case with less than $15 million in assets.

17. It is inescapable that the UCC, made up only of tort claimants, is staunchly anti-Jones. While this UCC contends that it "takes very seriously its fiduciary obligation to maximize the value of Jones's estate for the benefit of creditors," (ROR at ¶1), it criticizes or hinders every attempt of the estate to increase such value. It questions the Debtor's business judgment. It seeks discovery and 2004 examinations with such frequency that it becomes nearly impossible to make any progress in the case. This is antithetical to the role of the UCC, which should not seek only to thwart the Debtor but to reorganize the Debtor. Moreover, many times, as can be seen in the instance of the July budget, the fees incurred to investigate and complain about Debtor issues greatly outweigh any potential or perceived benefit to be had by the substantive work. In fact, the fees of the UCC financial advisors totaled $263,126.70 for the months of April and May 2023, which exceeded the cost of the Debtor's own financial advisors, which totaled $227,725.00 for the same period.

18. The instant ROR is a perfect example of wasting estate assets. Based upon the July

---

[7] Teneo, financial advisors for the UCC, have filed interim compensation statements showing accrual of $463,183.70 in fees between January 19, 2023, and May 31, 2023. Docket Nos. 300, 301, 302, 384, and 405. This is an administrative burden for the estate.
[8] Nardello, though employed pro bono, reserves the right in their employment application and order to seek reimbursement of expenses exceeding $10,000. Docket Nos. 136 and 188.
[9] UCC legal counsel Akin Gump is ostensibly pro bono in the Jones Bankruptcy Case. However, their employment application reserves the right to seek payment of fees if they do not consent to any plan filed or settlement deal reached. Docket No. 157. Fee statements disclosed thus far show that fees incurred are exorbitantly high and the number of attorneys on every email, phone call, and hearing do not indicate that this has slowed over the course of the Jones Bankruptcy Case. If they are truly pro bono, Jones has no objection to overstaffing or using this case as a training tool for young lawyers; but holding this right to seek payment over his head is daunting. Upon information and belief, fees accrued by UCC professionals to date exceed the value of Jones' estate.

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 8**

Monthly Operating Report, which is on an accrual basis, the UCC complains about the Debtor's monthly spending and budgeting. Jones has a duty as a Chapter 11 Debtor to maintain his post-petition obligations. Jones *accrues* expenses for property taxes and maintains and repairs such property, and he *accounts* for pre-paid spousal support payments (which are required to be paid pursuant to a pre-marital agreement). He pays for child support obligations, childcare, tuition, and groceries. Jones' actual *cash* disbursements in July were $59,511, which were higher in part due to summer obligations for his minor children. In August, Jones' *cash* disbursements were reduced to $35,676, which included $4,482 in business expenses not reimbursed by FSS. In addition, Jones' estate incurs the costs and expenses of administration, while all of his income generated from his personal services goes to FSS, in the hopes that a salary will be returned sufficient to pay a majority of these expenses.[10]

19. Jones, as a Chapter 11 Debtor, is not limited to a Chapter 7 means test or disposable income budget. 7 *Collier on Bankruptcy* ¶ 1129.02[15][a] (16th ed. rev. 2014)). He does not have a cash collateral budget to which he must adhere. Jones is a talk show host of celebrity status and can only carry out his job and bring in income because he hires people to help him with household, business, and domestic tasks. Without this assistance in his business and personal life, he cannot continue his talk show and therefore bring in income to pay creditors. The Court in *In re Johnson* addressed a similar situation in analyzing the budget of an NHL hockey player, a Chapter 11 debtor, whose living expenses, upon first glance, were indeed higher than the typical Chapter 11 debtor. However, the *Johnson* Court found that the expenses were necessary for that debtor to generate the income necessary to pay creditors. *In re Johnson*, No. 14-57104, 2016 WL 8853601,

---

[10] Jones is pursuing other ventures that, if using FSS's platform, are split 70% to Jones and 30% to FSS, including his book revenue, that will generate some level of income.

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 9**

at *14 (Bankr. S.D. Ohio Nov. 10, 2016).

20. The UCC complains about the Debtor maintaining his home and other properties and about his paying taxes. The Debtor is required to maintain his post-petition expenses. He is required to maintain the value of estate assets.

> As courts have observed, "Chapter 11 clearly implies that a debtor-in-possession has the authority to pay and must pay debts incurred in the ordinary course of its business whether they are called expenses of administration or something else." *In re W. Farmers Assoc.,* 13 B.R. 132, 135 (Bankr.W.D.Wash.1981). A debtor-in-position has a "duty to protect and conserve property in its possession for the benefit of creditors." *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 169 (Bankr.S.D.N.Y.1990). "'Preserving the estate'... should not be interpreted narrowly.... Preservation of the estate may require, for example, outlays for repairs, upkeep, freight, insuring the value of the property and the hiring of custodians by the trustee." 4 Collier on Bankruptcy ¶ 503.06[1] (15th ed.2010). More generally, there can be no doubt that the Bankruptcy Code imposes upon a debtor-in-possession the duty to conduct the business of the estate in a manner that, at a minimum, preserves the value of the estate. A debtor-in-possession should be permitted to operate within the broad parameters of sound business judgment, and the debtor-in-possession's performance should not be assessed solely with the benefit of hindsight.

*In re Taub*, 427 B.R. 208, 224 (Bankr. E.D.N.Y. 2010), *aff'd*, No. 08 BK 44210 ESS, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011). If the value of such assets were to deteriorate because Jones was *not* paying these expenses, it is suspected this would also draw complaint from the UCC.

21. Jones' expenses are also higher because he pays many business expenses personally. Although FSS should cover these costs, FSS refuses to pay. Jones frequently pays out of pocket for networking and entertaining expenses, taking potential guests or networking contacts out for meals or other events. Furthermore, given the level of threat risk he is under, he requires personal security for any public appearances. If Jones wants security, he must provide it himself at a cost of $75 per hour. In fact, the manager of security for FSS has stated that given the threats to Jones and his family, he advises full-time security to be at his home and with Jones. FSS previously provided security for Jones, but such was stopped after the bankruptcy, and Jones has

insufficient funds to maintain the nearly $300,000 estimated annual expense leading into an election year. Just recently, FSS refused to send security with InfoWars host Owen Shroyer to his sentencing for his actions on January 6th, even though Shroyer held a press conference on the courthouse steps, publicizing InfoWars and thus benefitting FSS. Jones' father advanced those funds in the hope of protecting Shroyer and will seek reimbursement.

22. The UCC alludes to the threat of seeking dismissal, conversion, or appointment of a Chapter 11 trustee/or a preliminary injunction "to enjoin further waste of estate assets" (ROR, ¶1). Jones has already reduced household and business expenses and is seeking further ways to organize and clean up personal spending. However, there will always be a level of personal and business support required for his work. There is no way he can do the work he does or meet his legal or fiduciary obligations under the budget proposed by the UCC. Jones is trying to keep his rigorous working schedule so that he can propose a reasonable deal to pay creditors. If the UCC wants to force a conversion of the case, the value of the non-exempt assets is all that will be distributed to creditors. They cannot force him to work, much less to pay them in perpetuity. If they want the case dismissed, then all the parties will be no further along than when they started, and so much in the way of assets will have been wasted trying to reach an accord.

23. The UCC states that it "can no longer remain silent." ROR, ¶7. Yet, there has not been a second of this case where this UCC has been silent. They have treated a case with less than $15M in assets like it was a corporate mega case, and it has taken a toll on both the administrative expenses and the Debtor.

24. For the avoidance of doubt, the Debtor reserves his right to amend and/or supplement this Response on any basis and reserves all rights and remedies with respect to the ROR and otherwise in this Chapter 11 Case.

Dated: September 18, 2023.                    **CROWE & DUNLEVY, P.C.**

By: */s/ Christina W. Stephenson*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
2525 McKinnon St., Suite 425
Dallas, TX 75201
Telephone: 737.218.6187
E-mail: dallaseservice@crowedunlevy.com

-and-

Shelby A. Jordan
State Bar No. 11016700
S.D. No. 2195
Antonio Ortiz
State Bar No. 24074839
S.D. No. 1127322
**JORDAN & ORTIZ, P.C.**
500 North Shoreline Blvd., Suite 900
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
E-mail:  sjordan@jhwclaw.com
           aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com

**ATTORNEYS FOR ALEXANDER E. JONES**

**ALEXANDER JONES RESPONSE AND OBJECTION TO RESERVATION OF RIGHTS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF ALEXANDER E. JONES' JULY MONTHLY OPERATING REPORT – Page 12**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive electronic service via the Court's ECF noticing system on this 18th day of September 2023.

*/s/ Christina W. Stephenson*
Christina W. Stephenson