**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 (Subchapter V) |
| FREE SPEECH SYSTEMS LLC, | ) |
|  | ) Case No. 22-60043 (CML) |
| Debtor | ) |
|  | ) |
| In re: | ) |
|  | ) Chapter 11 |
| ALEXANDER E. JONES, | ) |
|  | ) Case No. 22-33553 (CML) |
| Debtor | ) |
|  | ) |

# EXHIBIT 25

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| FREE SPEECH SYSTEMS LLC, | ) | Case No. 22-60043 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ALEXANDER E. JONES, | ) | Case No. 22-33553 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**JOINT OBJECTION OF THE SANDY HOOK
FAMILIES TO DEBTORS' JOINT MOTION TO APPROVE
EMPLOYMENT CONTRACT PURSUANT TO 11 USC §§ 105 AND 363(b)**

The Connecticut Plaintiffs[1] and the Texas Plaintiffs[2] (collectively, the "Sandy Hook Families"), as creditors and parties in interest in the above-captioned chapter 11 cases (the "Bankruptcy Cases"), submit this objection (the "Objection") to *Debtors' Joint Motion to Approve Employment Contract Pursuant to 11 U.S.C. §§ 105 and 363(b)* [FSS Docket No. 707] (the "Motion") for the following reasons:[3]

---

[1]   The "Connecticut Plaintiffs" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, and Robert Parker.

[2]   The "Texas Plaintiffs" are Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine. For purposes of this Objection, Marcel Fontaine is one of the "Sandy Hook Families" for ease of identification, but his claims against the Debtors are distinct and not "Sandy Hook" related.

[3]   For the avoidance of doubt, the Sandy Hook Families also oppose Jones's *Motion for Allowance and Payment of Administrative Expenses Pursuant to 11 U.S.C. § 503(b)(1)* [FSS Docket No. 659] (the "Admin Claim Motion") for many of the same reasons set forth in this Objection, and to the extent necessary, will file an objection to the Admin Claim Motion prior to the deadline agreed upon by Jones for doing so.

# I. PRELIMINARY STATEMENT[4]

1.      Since Free Speech Systems LLC was created in 2007, Alex Jones has never received a salary from FSS greater than $640,000 per year.  FSS and its 100% owner, Jones, have never had a valid employment agreement.  Now in bankruptcy facing more than $1.5 billion in liabilities, Free Speech Systems and Alex Jones have decided that it is an opportune time to ***more than double Jones's salary.***  The Motion should be denied.  Having sought bankruptcy protection, Jones should not be granted a windfall merely so that he can continue his lavish lifestyle (including in July and August alone: $11,800 on "housekeeping;" $7,053 on "groceries;" $10,563 on "meals and entertainment" ***not*** accounted for as "business expenses;" $15,026 on "childcare;" and a staggering $19,331 to maintain non-exempt real property that Jones has refused to sell).[5]

2.      There is no justification for doubling Jones's salary in bankruptcy.

3.      The Debtors may argue that Jones's historical salary of no more than $640,000 per annum is only "part of the story" and that his "true earnings" were much more if one factors in the dividends that Jones, as the sole equity owner of FSS, took from the business. That argument, however, justifies denying—not approving—the Motion.  The entire purpose of subchapter V is to provide ***creditors—not the sole equity owner—***the net proceeds of a business.  By the Motion, the Debtors are simply converting what used to be the "net income" of FSS into "salary" for Jones for the obvious purpose of increasing Jones's income in recognition that, if the FSS Plan is confirmed, Jones will not be able to pay himself dividends over the next five years.  In doing so, the Debtors seek to reduce the payments to the Sandy Hook Families for the benefit of Jones.  And

---

[4]     Capitalized terms not otherwise defined in this Preliminary Statement share the meanings ascribed to them in the remainder of the Objection.

[5]     *See* July Monthly Operating Report, Jones Docket No. 392-1; August Monthly Operating Report, Jones Docket No. 446-1.

should the FSS Plan be confirmed and Jones's case be converted to a chapter 7 case, the Sandy Hook Families would potentially face obstacles in trying to recover from Jones's newly increased post-petition salary.

4.  The Debtors' attempt to circumvent subchapter V's requirements is only worsened by the fact that there is zero evidence in the record that Jones's newly proposed salary of $1.5 million (plus bonus) is reasonable or market tested. Indeed, the fact that Jones has historically received a salary of no more than $640,000 confirms that the new salary is neither reasonable nor market. Rather than presenting evidence, the Motion relies on an argument that Jones is critical to FSS's operations and that his departure would be disastrous to FSS. But that argument is true of many "mom and pop" small business that are 100% owned and operated by an individual. And that argument, if accepted, would justify paying the sole owner of any subchapter V debtor 99% of that business's net income as salary, merely to "keep the business alive," and thus gutting the purpose of subchapter V.

5.  The Debtors may also argue that, in the absence of a salary that Jones deems "acceptable," Jones will no longer work for FSS, thereby causing FSS to fail, and resulting in no payments to FSS's creditors, including the Sandy Hook Families. That argument also justifies denying the Motion. Initially, it proves that the Proposed Employment Agreement is nothing more than a retention agreement with an insider, governed solely by section 503 of the Bankruptcy Code, a standard that the Debtors have not even attempted to satisfy. Additionally, such argument is nothing more than unsubstantiated bullying. It is Jones—not the Sandy Hook Families—who has decided to file a subchapter V proceeding for FSS, presumably because his objective is to retain his 100% equity ownership in FSS. If Jones wants to force a liquidation of FSS unless his demands are met, he should say so clearly so that the parties can proceed accordingly. Jones's threat to

liquidate FSS cannot justify doubling his salary in bankruptcy. Likewise, although Jones has previously hinted that he could make more than $640,000 working elsewhere, he has never provided any evidence to substantiate those claims.

6.      Jones's unwillingness to commit to working for FSS is highlighted by the terms of the Proposed Employment Agreement itself. Among other troubling provisions, the Proposed Employment Agreement provides that Jones may terminate the Proposed Employment Agreement if *either* of the Bankruptcy Cases are not resolved in a way that is "acceptable" to Jones "in his sole discretion." PEA § 5.9.2. Jones's attempt to use the Proposed Employment Agreement—and his implied threat to quit working for FSS—to obtain a pocket veto over the ultimate resolution of both the Bankruptcy Cases is plainly inappropriate and demonstrates the degree to which the Motion and the Proposed Employment Agreement are inextricably tied to confirmation issues in both the Bankruptcy Cases. For that reason, the Sandy Hook Families respectfully suggest that consideration of the Motion is premature, and at best should be taken up in connection with confirmation.

7.      The Debtors have repeatedly reminded the Sandy Hook Families of the Court's statements at the December 19, 2022, cash collateral hearing that the Court was "open to an increase" in Jones's payments under the interim cash collateral orders.[6] The Sandy Hook Families respectfully request that the Court not sanction an attempt to more than double Jones's salary, especially when it is the Sandy Hook Families that will effectively fund that increase.

---

[6] Dec. 19, 2022 Hr'g Tr. at 39:13–14.

## II. BACKGROUND

### A. The Prepetition Litigation

8.  In May 2018, a subset of the Connecticut Plaintiffs brought an action in Connecticut state court against, among others, Free Speech Systems LLC ("FSS") and Alexander E. Jones ("Jones," and together with FSS, the "Debtors"), alleging defamation, intentional infliction of emotional distress, invasion of privacy, and civil conspiracy. They obtained judgments exceeding $1.4 billion against the Debtors and certain other defendants in consolidated litigation captioned *Lafferty* v. *Jones*, No. UWY-CV18-6046436-S, Docket No. 1044 (Conn. Super. Ct. Dec. 22, 2022).

9.  Also in 2018, the Texas Plaintiffs brought actions in Texas state court against the Debtors.[7] Actions brought by Neil Heslin and Scarlett Lewis were consolidated, and on January 13, 2023, Heslin and Lewis obtained judgments against the Debtors in the amount of $50,043,653.80. *See Heslin* v. *Jones*, Case No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas. Additional lawsuits filed by the other Texas Plaintiffs remain stayed on account of the Bankruptcy Cases. *See In re Free Speech Systems, LLC,* Case No. 22-60043 (CML) (the "FSS Docket") [FSS Docket No. 673]. Together, the Sandy Hook Families hold liquidated claims exceeding $1.5 billion, and three of the Texas Plaintiffs are still awaiting trial to liquidate their claims.

### B. Jones's Pre-2022 Employment Arrangements with FSS

10. For the first 14 years of FSS's corporate existence, Jones and FSS were not parties to any written agreement governing the terms of Jones's employment with FSS. Documents

---

[7]  *See Heslin* v. *Jones*, Case No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *Lewis* v. *Jones*, Case No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *Pozner* v. *Jones*, Case No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *Fontaine* v. *Jones*, Case No. D-1-GN-18-001605, in the 459th District Court for Travis County, Texas.

produced by FSS, in addition to Jones's tax returns, indicate that Jones's annual salary was no more than $640,000 between 2017 and 2021. *See Deposition Notes by Corporate Representative of Free Speech Systems, LLC, dated Feb. 15, 2022*. [FSS Docket No. 28-12]

11.     FSS's former Chief Restructuring Officer ("CRO") testified that Jones's salary was "separate from [any] draws" taken by Jones. *See FSS Docket No. 63 (the "Aug. 3, 2022 Hr'g Tr.")* at 152:21–23. Indeed, in 2021 and 2022, Jones withdrew $2,100,421.00 and $1,066,407.00, respectively, from FSS in the form of either cash payments made directly to Jones or as payments to third parties on Jones's behalf (together with all similar draws, the "Equity Draws"). *See* FSS Docket No. 549, *Subchapter V Trustee's Initial Findings of Free Speech Systems, LLC Investigation* at 22. FSS's former CRO also indicated that for the twelve years prior to December 31, 2021, the aggregate size of the Equity Draws exceeded $60,000,000. Aug. 3, 2022 Hr'g Tr. at 136:4–13.

## C.     The Putative April Employment Agreement

12.     On April 14, 2022, just days before Jones's Shell Entities[8] filed since-dismissed chapter 11 cases[9]—and for the first time during his tenure at FSS—Jones executed a purported employment agreement with FSS (the "Putative April Employment Agreement"), which supposedly increased Jones's annual salary from roughly $625,000 to $1,300,000. *See* Aug. 3, 2022 Hr'g Tr. at 154:12–155:7; 153:21–154:4. The Putative April Employment Agreement was executed by Melinda Flores, FSS's bookkeeper, purportedly on behalf of FSS. FSS itself disputes the validity of the Putative April Employment Agreement. Mot. ¶ 5 ("The validity of the [Putative

---

[8]     The "Shell Entities" are InfoW, LLC, IW Health, LLC, and Prison Planet TV, LLC.

[9]     *See In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex. Apr. 17, 2023); *In re IW Health, LLC*, Case No. 22-60021 (Bankr. S.D. Tex. Apr. 17, 2023); *In re Prison Planet TV, LLC*, Case No. 22-60022 (Bankr. S.D. Tex. Apr. 17, 2023).

April Employment Agreement] is disputed by FSS.").  Jones has not provided any evidence, or otherwise attempted to demonstrate, that Melinda Flores had the authority to bind FSS to the Putative April Employment Agreement.[10]

**D.     The Bankruptcy Cases**

13.     On July 29, 2022, FSS petitioned for bankruptcy relief under chapter 11.  *See Voluntary Petition of Free Speech Systems, LLC* [FSS Docket No. 1] (the "FSS Bankruptcy").  At the first-day hearing, FSS's former CRO acknowledged that—despite execution of the Putative April Employment Agreement almost four months prior—FSS had continued to pay Jones "about $8,000 every two weeks" for the entirety of that calendar year, implying an annual 2022 base salary of approximately $192,000.  *See* Aug. 3, 2022 Hr'g. Tr. at 155:21–23.[11]

14.     On December 2, 2022, Jones commenced his case (the "Jones Bankruptcy") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  *In re Alexander E. Jones*, Case No. 22-33553 (the "Jones Docket") [Jones Docket No. 1].

**E.     The Proposed Employment Agreement**

15.     The Debtors filed the Motion seeking approval of an employment agreement (the "Proposed Employment Agreement" or "PEA")[12] between FSS and Jones on August 29, 2023.  Among other provisions, the Proposed Employment Agreement provides that Jones will receive

---

[10]    Despite the Sandy Hook Families serving discovery requests in connection with the Putative April Employment Agreement on July 12, 2023, including with respect to Melinda Flores's ability to bind FSS, the Debtors have not responded to such discovery requests.

[11]    Notwithstanding FSS's prepetition course of conduct, FSS initially sought, on a post-petition basis, to pay Jones the full $54,166.67 allegedly due every two weeks under the Putative April Employment Agreement.  After the Sandy Hook Families objected, the Court entered an interim order providing that Jones would receive a salary of $10,000 for each pay period.  *See* FSS Docket Nos. 27, 41.  Subsequent orders doubled these payments to $20,000 every two weeks.  *See, e.g.*, FSS Docket No. 98.

[12]    The Proposed Employment Agreement is attached as Exhibit A to the Motion.

an annual salary of $1,500,000 in cash in addition to the opportunity to earn incentive bonuses to be paid each calendar year.  PEA § 4.

16.     Among other provisions described further herein, the Proposed Employment Agreement enumerates various circumstances under which Jones is entitled to immediately terminate the Proposed Employment Agreement if Jones, in his "sole discretion," does not find certain developments in the Bankruptcy Cases "acceptable."  PEA § 5.9.  One of these circumstances is if a plan is confirmed in either of the Bankruptcy Cases that is not "in a form acceptable to [Jones] in his sole discretion." PEA § 5.9.2.  Another is if the Court does not approve FSS's request to "abate any claims or causes of action against [Jones]."  PEA § 5.9.4.

17.     For the reasons that follow, the Court should deny the Motion.

### III.     ARGUMENT

**A.     The Proposed Employment Agreement Constitutes an Impermissible Attempt to Convert the Equity Draws Into a Salary Payment.**

18.     In blatant disregard of a fundamental principle of subchapter V—that a debtor's creditors are entitled to 100% of a debtor's disposable income over a prescribed period—the Proposed Employment Agreement constitutes a scarcely veiled attempt to siphon FSS's net income away from its creditors and directly to Jones.

19.     Section 1191(b) of the Bankruptcy Code allows a subchapter V debtor to confirm a plan if, among other requirements, the plan is "fair and equitable."  11 U.S.C. § 1191(b).  In turn, section 1191(c) provides that a plan is "fair and equitable" if "all of the projected disposable income of the debtor," for at least three years following the effective date of a plan, "will be applied to make payments under the plan."  11 U.S.C. § 1191(c).  Inherent in this statutory scheme is the fundamental tenet that a subchapter V debtor's creditors—and **_not_** its equity owners—are entitled

to the net income of the business in satisfaction of their claims during the period provided under a subchapter V plan.

20. It is true that, for many years prior to execution of the Putative April Employment Agreement, Jones did, through the Equity Draws, make payments to himself from the net income of FSS. Of course, Jones knew that upon commencement of the FSS Bankruptcy, he would no longer have—and indeed, does no longer have—the same unfettered access to FSS's net income. Dissatisfied with this outcome, Jones has sought approval of the Proposed Employment Agreement, which more than doubles the cash compensation Jones was receiving prepetition.

21. Importantly, if Jones was entitled to the Equity Draws prepetition at all, such an entitlement would be based on his equity ownership in—and **_not_** his employment with—FSS. The Proposed Employment Agreement effectively replaces Jones's purported prepetition right as an **_equity holder_** to withdraw cash from FSS with cash payments contractually owed to him under the Proposed Employment Agreement. By attempting to disguise these replacement cash payments as consideration under an employment contract, the Debtors transparently attempt to circumvent the clear statutory mandate—and basic tenet of the bankruptcy system—that a debtor's equity holders are not entitled to distributions ahead of its creditors.

22. Further, in the unique circumstances of the FSS Bankruptcy, in which Jones is both the sole equity owner and key employee of FSS, increasing Jones's salary has the important practical effect of reallocating the risk of FSS's failing to meet its projections from Jones to FSS's creditors (_i.e_, the Sandy Hook Families). If, for example, FSS does not achieve the income projections accompanying a plan in the FSS Bankruptcy—for which Jones is a determinative factor—Jones would still receive his full cash salary, and only FSS's creditors would bear the burden of this shortfall.

23.     The Sandy Hook Families submit that both the Proposed Employment Agreement's attempt to circumvent requirements of the Bankruptcy Code and to shift the risk of FSS's future performance to its creditors supply ample grounds to deny the Motion.

**B.     Approval of the Proposed Employment Agreement Is Prohibited by Section 503(c) of the Bankruptcy Code.**

24.     Even if the Court does not agree that the Proposed Employment Agreement constitutes an impermissible attempt to circumvent the requirements of subchapter V, the Motion should still be denied.  The Debtors' ***only*** standalone justification for approval of the Proposed Employment Agreement is their assertion that it is a sound exercise of the Debtors' business judgment and thus should be approved pursuant to section 363(b) of the Bankruptcy Code.  *See* Mot. ¶ 15.  But it is section 503(c)—and not section 363(b)—that governs the Court's assessment of the Proposed Employment Agreement.  And above all, the notion that an insider can more than ***double*** his salary by threatening to resign from the debtor is antithetical to section 503(c) and is precisely the sort of abuse that this section was enacted to prohibit.

**i.     Section 363(b) Is Inapplicable to the Proposed Employment Agreement.**

25.     The Debtors provide no explanation for their conclusory assertion that section 363(b) of the Bankruptcy Code governs approval of the Proposed Employment Agreement.  *See* Mot. ¶ 9.  Indeed, the Debtors do not cite to a single case in which a court approved entry into an employment agreement with an insider of the debtor under this section.  And neither of the two cases to which the Debtors do cite involves a transfer to a debtor's insider, approval of an employment agreement, or any other analogous facts showing why section 363(b) of the Bankruptcy Code should govern this analysis.[13]  *See* Mot. ¶ 15.

---

[13]   Indeed, *In re Mirant* does not even mention—let alone interpret—section 363(b).  348 B.R. 725, 744 (Bankr. N.D. Tex. 2006) (applying business judgment standard to approval of settlement pursuant to Bankruptcy Rule 9019).

26.     Contrary to the Debtors' statements, where transfers are made, or obligations incurred on behalf of, a debtor's insiders, section 503(c) of the Bankruptcy Code governs the analysis.  *See In re Country Fresh Holding Co. Inc.*, 2021 WL 2932680, at *11 (Bankr. S.D. Tex. July 12, 2021) ("[A]ny transaction outside the debtor's ordinary course of business is subject to the business judgment requirements of § 363(b) . . . However, transfers outside the ordinary course *made for the benefit of the debtor's insiders* are subject to [section 503(c)].") (internal citations omitted).  Indeed, the *In re Pilgrim's Pride Corp.* court explicitly rejected the argument that business judgment review applies to a court's approval of consulting and non-competition agreements between a debtor and its insiders, holding instead that these contracts should be considered under the more exacting standards of section 503(c)(3).  401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009).

### ii.     The Court Should Deny the Proposed Employment Agreement Under Section 503(c) of the Bankruptcy Code.

27.     The Proposed Employment Agreement plainly does not pass muster under section 503(c).  First and foremost, increasing an insider's salary more than twofold without providing any additional value to its creditors is precisely the kind of abuse of the bankruptcy system that section 503(c) was intended to prohibit.  *See id.* at 234 ("Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case.").

28.     The Proposed Employment Agreement is either a disguised retention payment prohibited by section 503(c)(1) of the Bankruptcy Code, a non-ordinary course transfer that is not justified and prohibited by section 503(c)(3) of the Bankruptcy Code, or both.  And even if the Proposed Employment Agreement could satisfy the applicable standards for approval under

11

section 503(c), the Debtors have not offered *any* evidentiary support to substantiate the appropriateness of the relief sought by the Motion.

> ### a. The Proposed Employment Agreement Is a Retention Payment Prohibited by Section 503(c)(1) of the Bankruptcy Code.

29.     Section 503(c)(1) of the Bankruptcy Code broadly prohibits allowance or payment of any "transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business," absent specific factual findings that neither the Debtors nor the record in these Bankruptcy Cases can support. *See* 11 U.S.C. § 503(c)(1).  Transfers subject to the requirements of section 503(c)(1) must satisfy "a set of challenging standards" and clear "high hurdles" that the Motion—which premises approval of the Proposed Employment Agreement entirely on the less demanding standards of section 363(b)—fails to address.  *See In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012) (observing that "[t]o the extent that either section 503(c)(1) or (c)(2) appl[ies], the transfer cannot be justified solely on the debtor's business judgment.").

> ### (i) Section 503(c)(1) Governs Because Jones Is an Insider and the Proposed Employment Agreement Seeks to Effect a Retentive Transfer.

30.     It is undisputed that Jones is an insider of FSS.  Further, the Proposed Employment Agreement itself demonstrates its retentive purpose.  *See* PEA § H (stating, in the recitals, that FSS "*desires to retain* the services of [Jones]") (emphasis added).  FSS submits that it will "benefit immensely" from a "binding contract that commits Jones to a good-faith effort to generate revenue for FSS" and that employing Jones is "necessary for the continued survival of FSS as a business." Mot. ¶ 13.  And although the Proposed Employment Agreement does contain provisions providing for bonus payments upon FSS achieving certain performance metrics, *see* PEA § 4.2, there are no specific performance metrics tied to the $1,500,000 base salary in the Proposed Employment

Agreement, other than the requirement that Jones perform ordinary course employment duties. *See* PEA § 4.1. This alone demonstrates its retentive purpose. *See In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("The Court must examine a proposed [incentive plan] mindful of the practice that Congress sought to eradicate and, at the risk of oversimplification, determine whether the proposed targets are designed to motivate insiders to rise to a challenge or ***merely to report to work***.") (emphasis added).

31.     Moreover, facts and circumstances surrounding the Proposed Employment Agreement only reinforce that this is a retentive transfer.  Counsel to Jones has previously and repeatedly speculated that Jones may depart FSS if he is not paid more than the $20,000 he now receives every two weeks.  At a hearing on December 19, 2022, for instance, counsel opined that "right now, Mr. Jones can and may be forced to take third-party employment if he cannot make what he needs to make to survive."  Dec. 19 Hr'g Tr. at 35:16–21; *see also* 40:23–25 ("And so by keeping money in FSS and not having Alex make his salary, then it is necessarily going to beg the question, can he continue financially to work for FSS?").  Two months later, counsel again observed that—while Jones was "making alternative plans to support [his] family"—it was his "absolute intention to keep working with FSS," before again indicating some need to increase his salary.  *See* Feb 14 Hr'g Tr. at 18:20–19:18.

32.     Notably, as FSS's sole owner, Jones should not need any incentive to work for FSS—if 100% ownership of a company does not incentivize its key employee, nothing can.  The fact that this may ***not*** have the same incentive effect that it had prepetition only further shows that the Proposed Employment Agreement is an impermissible attempt to compensate for Jones's loss of the Equity Draws and siphon away distributions from FSS's creditors.

13

> **(ii)** **The Motion Provides No Basis to Approve the Proposed Employment Agreement in Light of Section 503(c)(1)'s Requirements.**

33.     Incentive plans that do not run afoul of section 503(c)(1) typically feature expanded responsibilities and tie increased compensation to performance-based metrics that create new value for a debtor.  *See, e.g.*, *In re Dana Corp.* (*Dana II*), 358 B.R. 576, 577 (Bankr. S.D.N.Y. 2006) (enumerating "sound business judgment" factors).  The absence of these features, by contrast, may create an inference of impermissible retentive purpose.  Here, the Debtors have set forth no evidentiary support to show that the Proposed Employment Agreement satisfies the factors outlined in *In re Dana Corp.*, or that the Proposed Employment Agreement requires Jones to do anything Jones did not do prepetition, when Jones received a salary of no more than $640,000.  This lack of evidentiary support is fatal to approval of the Proposed Employment Agreement.  *See, e.g.*, *In re Country Fresh*, 2021 WL 2932680, at \*7 (requiring showing by a "preponderance of the evidence" that payments to insiders are properly incentivizing, rather than retentive, so as not to be barred by section 503(c) of the Bankruptcy Code).  And, as noted above, there are no performance metrics that Jones must achieve—other than that he perform the basic requirements of his job—to be entitled to the full amount of the $1,500,000 annual salary.

34.     Similarly, the Debtors have not provided any evidence as to whether the Proposed Employment Agreement can meet the narrow exception for permissible retention payments to insiders outlined in section 503(c)(1)(A)–(C).  *See* 11 U.S.C. § 503(c)(1) (requiring "a finding by the court ***based on evidence***" to satisfy requirements) (emphasis added).  For example—and despite requests for this information through discovery—the Debtors have not shown that Jones has been the recipient of a "bona fide job offer" that meets the standard outlined in section 503(c)(1)(A).

35.     Doubling an insider's salary with no attempt to show the increase is tied to performance metrics is plainly an obligation incurred for the purpose of retaining an insider.  *See In re Global Home Products, LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (section 503(c) enacted to "eradicate the notion that executives were entitled to bonuses ***simply for staying with the Company through the bankruptcy process***") (emphasis added).  As the Debtors have not addressed how this may be permissible in light of the "severely restrict[ive]" requirements of section 503(c)(1), the Proposed Employment Agreement should not be approved under section 503(c)(1) of the Bankruptcy Code.  *See id.* at 785; *see also In re Velo Holdings Inc.*, 472 B.R. at 209 ("The intent of section 503(c) is to 'limit the scope of . . . programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor.'") (quoting 4 Collier on Bankruptcy P 503.18).

### b.     Section 503(c)(3) Bars the Proposed Employment Agreement Regardless of any Retentive Purpose.

36.     Even if the Court determines that section 503(c)(1) of the Bankruptcy Code does not govern review of the Proposed Employment Agreement, section 503(c)(3)—which prohibits transfers or obligations that are (a) outside the ordinary course of business, and (b) not justified by the facts and circumstances of the case—supplies an independent basis for denying the Motion.

### (i)     The Proposed Employment Agreement is a Non-Ordinary Course Transaction.

37.     Despite the Debtors' plain assertions to the contrary, entry into the Proposed Employment Agreement is far from an ordinary course transaction.  As set forth above, FSS has—for the past 15 years—***never*** negotiated an employment agreement with Jones.  Unsurprisingly, the Debtors do not provide any explanation for how the Proposed Employment Agreement satisfies the applicable test for determining whether a transaction is in the ordinary course of a debtor's business.

38.     Courts evaluate the ordinariness of transactions with reference to both a "horizontal" and a "vertical" test.  *See, e.g.*, *Denton Cnty. Elec. Coop., Inc.* v. *Eldorado Ranch, Ltd.*, 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002) (citing *In re Roth Am., Inc.*, 975 F.2d 949, 954 (3d Cir. 1992)).  The horizontal test focuses on how businesses operate within a given industry, while the vertical inquiry focuses on the expectations of creditors.  *Id*.  Courts specifically look to the prepetition practices of a debtor when assessing the expectations of a hypothetical creditor.  *Roth Am., Inc.*, 975 F.2d at 953.

39.     At a minimum, the portion of the Proposed Employment Agreement representing an increase from Jones's salary prior to April 14, 2022, cannot satisfy the vertical test.[14]  Creditors would not reasonably have expected that Jones's salary would more than double as FSS faced massive liabilities and began to prepare for bankruptcy.  Indeed, courts approving payment of bonuses or substantial increases in salary as ordinary course transactions typically require ***years*** of substantially similar past practice.  *See, e.g.*, *Dana II*, 358 B.R. at 579, n.18; *In re Blitz U.S.A. Inc.*, 475 B.R. 209, 214 (Bankr. D. Del. 2012).  And here, where Jones and FSS have ***never been*** parties to a legitimate, written employment agreement, there can be no argument that entry into an agreement committing FSS to $1.5 million annual payments to Jones along with bonus compensation, indemnification, termination, and reimbursement provisions, among a host of other obligations, can be an ordinary course transaction.

40.     The Putative April Employment Agreement does not change this analysis.  *First*, even FSS disputes the validity of the Putative April Employment Agreement.  *Supra* ¶ 12.  *Second*, that the Putative April Employment Agreement is countersigned by Melinda Flores—FSS's

---

[14]     The Committee and the Sandy Hook Families sought discovery from both Jones and FSS in respect of the horizontal test, specifically whether Jones or FSS had considered salaries to comparable media personalities with similarly situated businesses.  Neither Jones nor FSS produced any responsive documents or communications.

bookkeeper who lacked the authority to bind FSS—raises serious doubts as to its validity. *Third*, executed on the eve of the Shell Entities' bankruptcy filings, the Putative April Employment Agreement contains many of the hallmarks of a fraudulent transfer, including that it obligates FSS to its insider, Jones, and was executed only after multiple lawsuits were filed against both Jones and FSS. *Finally*, FSS did not even treat the Putative April Employment Agreement as valid, as it never paid Jones the amounts to which he was supposedly entitled thereunder for four months following its execution. *Supra* ¶ 13. As such, the Putative April Employment Agreement does not change the analysis that the Proposed Employment Agreement is not a continuation of a prepetition practice. *See Graham* v. *135 Waverly Village Realty, LLC*, 2021 WL 3889793, at *17 (Bankr. S.D.N.Y. Aug. 31, 2021) (noting that "an immediate and large salary increase, paid by a relatively small company just after a bankruptcy filing to a person who is also the owner of the company, is not an 'ordinary' employment transaction").

> **(ii)** **The Facts and Circumstances of the Bankruptcy Cases Weigh Against Approval of the Proposed Employment Agreement.**

41.    Bankruptcy courts within the Fifth Circuit have routinely held that "facts and circumstances" for purposes of section 503(c)(3) demands greater scrutiny than mere "business judgment" under section 363(b). *See, e.g.*, *In re Pilgrim's Pride Corp.*, 401 B.R. at 236–37. Even where "a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it," by assessing whether "the transaction will serve the interests of creditors and the debtor's estate." *Id.* at 237. Such scrutiny is warranted for insider transactions, given "the obvious conflict of interest" between debtors and the insiders "who may themselves have been responsible in whole or part for devising and internally approving the proposed transaction." *Id.*

42.     In *In re Country Fresh Holding Company Inc.*, 2021 WL 2932680, at *13, Judge Isgur endorsed this reading of section 503(c) and articulated three factors for courts to consider in assessing a challenged transfer's justification by the facts and circumstances of the case: (a) the transfer's reasonableness in relation to the benefits conferred on creditors and the estate; (b) potential unfair discrimination among transferees, if any; and (c) the propriety of the process that led to the transfer, including the use of independent advisors.

43.     The Debtors have not offered any evidence—let alone explanation—to support that the Proposed Employment Agreement satisfies the *Country Fresh* factors (or any applicable legal standard).  Moreover, the Sandy Hook Families do not see any benefit in doubling Jones's annual salary with no apparent increases in Jones's responsibilities and obligations to FSS.  Indeed, especially as the Sandy Hook Families believe the Proposed Employment Agreement represents an impermissible attempt to convert Jones's prepetition Equity Draws into cash payments, and in so doing, siphon away distributions that would otherwise benefit creditors, the Proposed Employment Agreement provides little benefit to FSS's creditors.

**C.     The Terms of the New Employment Agreement Are Improper on Their Face and Impermissible Under the Bankruptcy Code.**

**i.     The Proposed Employment Agreement Is Unfavorable to FSS and Would Not Survive Business Judgment Scrutiny Even if Applicable.**

44.     In addition to the problems inherent in an employment agreement that would more than double an individual debtor's salary while he is in bankruptcy, the Proposed Employment Agreement does little to protect FSS, while highly compensating Jones.  For example, the Proposed Employment Agreement contains no restrictive covenants—such as a non-compete provision, non-solicit provision, or provisions restricting the disclosure of proprietary information.

45.     In fact, the only limitation on Jones pursuing business opportunities outside of FSS is a provision giving FSS a right of first refusal for opportunities that are "compatible with or in

competition with" FSS's operations. PEA § 3. Even if FSS exercises its right, Jones would nevertheless receive 70% of all revenue from the opportunity, despite using FSS's employees, platform, and resources. PEA §§ 3.1–3.2. And if Jones does not use FSS employees and resources, he would receive 100% of the funds. *Id.* This gives Jones the flexibility to openly compete with FSS on FSS's dime during the course of his employment and receive the vast majority of revenue from such competing project, thereby reducing the revenue available to FSS's creditors. This concern is particularly acute where, as here, Jones and FSS are likely to compete for revenue from the exact same pool of customers who choose to buy FSS and Jones's products. Importantly, this right of first refusal provision is only applicable prior to the termination of the Proposed Employment Agreement. Once terminated, which Jones may do without cause within as little as 90 days of entering into the contract, Jones may depart from employment with FSS and start a new venture in direct competition with FSS, including by hiring FSS employees and using FSS's proprietary information such as customer databases, thereby permanently diminishing or destroying FSS's revenue streams—all without violating the terms of the Proposed Employment Agreement. Again, such concerns are amplified given that Jones has a unique following of highly devoted listeners who are inclined to follow Jones's lead.

46.     Further, even though the Proposed Employment Agreement does not contain restrictive covenants that would survive termination, or any other post-employment obligations, Jones is entitled to receive severance and a release of all claims against him in the event of termination for no clear consideration. PEA § 5.6.5.

47.     Another fundamental problem with the Proposed Employment Agreement is that Jones may terminate it if he does not approve, in his sole discretion, of the bankruptcy plan in either of the Bankruptcy Cases. *See* PEA § 5.9.1. The Committee has already identified various

causes of action that FSS could pursue to recoup funds for the benefit of FSS creditors. Some of those causes of action could be brought against Jones's family and friends, who received millions of dollars in the months leading up to the Bankruptcy Cases. The inclusion of these provisions in the Proposed Employment Agreement fundamentally alters the parties' negotiating positions to the detriment of the Sandy Hook Families, as Jones can simply terminate the agreement and refuse to broadcast if either an FSS or Jones plan contemplated pursuing those estate causes of action. Given that the Debtors acknowledge that Jones's commitment is "vital to FSS" and "[w]hen Jones is absent from FSS broadcasts, FSS experiences gross revenue declines of as much as 40%," Mot. ¶ 14, such an action by Jones would cripple FSS.

48.     Jones can also terminate the Proposed Employment Agreement if he is not satisfied with the identity of "any of the Company's employees that would be serving in a governing role within the Company[,]" including any Chief Operating Officer appointed as part of FSS's plan. PEA § 4.6. Again, the agreement would allow Jones to refuse to broadcast—thereby sinking FSS's business—if he is unhappy with FSS's governing officers. The FSS Plan, however, presumes the need for such an officer given Jones's record in running the FSS business.

49.     Other aspects of the Proposed Employment Agreement lack clarity and cannot be approved in their current form. For example, the terms governing Jones's incentive bonuses are vague on their face. The bonus provisions allow Jones to receive additional compensation in a tiered structure if FSS outperforms its revenue projections. However, it is unclear as written whether such tiers are cumulative, or whether Jones would receive only the incremental bonus on account of each individual bracket of excess revenue set forth in each tier. PEA § 4.2.

50.     The Proposed Employment Agreement provides a windfall for Jones and minimal (if any) protection for FSS and its creditors. As such, even if section 363 were applicable—which

it is not—the Court should not defer to the Debtors' business judgment on such an agreement. *See, e.g., In re General Homes Corp.*, 199 B.R. 148 (S.D. Tex. 1996) (holding bankruptcy court erred in finding debtor properly exercised business judgment when it entered into new employment contracts that substantially increased three principal officers' salary and severance benefits after bankruptcy filing); *In re Dana Corp.*, 351 B.R. 96 (Bankr. S.D.N.Y. 2006) (denying debtor's request to enter in postpetition employment agreements with executives acknowledging section 503(c) was the proper standard and noting "while it may be possible to formulate a compensation package that passes muster under the section 363 business judgment rule or section 503(c) limitations, or both, this set of packages does neither.").

ii.     **The Relief Requested Is Premature and the Proposed Employment Agreement Constitutes an Impermissible *Sub Rosa* Plan.**

51.     The relief requested in the Motion is premature.  This is evidenced by the fact that the Debtors seek only interim approval of the Proposed Employment Agreement.  The issues raised by entry into the Proposed Employment Agreement—including giving Jones a blanket right to veto both the FSS and Jones plans and any governing officers of FSS, as well as providing for a release of all claims FSS holds against Jones—are properly resolved in connection with plan confirmation, which is currently contemplated to take place in the near term.  There is no need to waste the parties' time and estate resources litigating this matter prior to confirmation.  To the extent entry into the Proposed Employment Agreement is considered prior to confirmation, it should be denied because, in addition to the objections raised above, it is an impermissible *sub rosa* plan.[15]

---

[15]     As explained above, section 503(c) is the appropriate standard to evaluate entry into the Proposed Employment Agreement.  However, entry into the agreement is also impermissible under section 363(b) because it is a *sub rosa* plan.

52.     As discussed above, by its terms, Jones may terminate the Proposed Employment Agreement if he does not approve, in his sole discretion, of the bankruptcy plan in either of the Bankruptcy Cases.  *See* PEA § 5.9.2.  Moreover, he can also unilaterally dictate the identity of "any of the Company's employees that would be serving in a governing role within the Company[,]" including any Chief Operating Officer appointed as part of FSS's plan.  PEA § 4.6.  The Proposed Employment Agreement also explicitly contemplates a release of all of FSS's claims against Jones upon expiration or termination of the agreement.  PEA §§ G, 5.6.5.

53.     The Debtors claim that they "have determined in their business judgment that it is in the best interest of their estates to enter into the Proposed Employment Agreement."  Mot. ¶ 15.  While FSS argues that the Proposed Employment Agreement was "independently" negotiated by FSS's CRO and counsel, the terms of the Proposed Employment Agreement undercut such assertion.  By (i) stating that Jones's continued employment is critical to FSS's operations, ***and*** (ii) granting Jones a veto right over any FSS Plan, those parties have ensured that it is Jones—and Jones alone—that will dictate the terms of the FSS Plan.  Where a proposed transaction has "the practical effect of dictating some of the terms of any future reorganization plan, . . . [t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa*[.]"  *In re Braniff Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *see also In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("§ 363 does not authorize a debtor and the bankruptcy court 'to short circuit the requirements of a reorganization plan by establishing the terms of the plan *sub rosa* in connection' with a proposed transaction.").

54.     Thus, where a proposed transaction will impact the terms of a debtor's plan, "the parties and the district court must scale the hurdles erected in chapter 11."  *In re Continental Air*

*Lines, Inc.*, 780 F.2d at 1227; *see also In re Royal Alice Props., LLC*, 637 B.R. 465, 480 ("[w]hen a proposed transaction specifies the terms for adopting a reorganization plan, 'the parties and the district court must scale the hurdles erected in Chapter 11'"). "Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan." *Id.* at 1227-28.

55.  The Fifth Circuit has refused to approve proposed transactions under section 363(b) where, as here, the terms of the proposed transaction change the composition of the debtor's assets and dictate the terms of the plan. *In re Braniff Airways* is illustrative. There, the debtor sought to enter into a sale transaction that would exchange $2.5 million in cash and other assets for a $7.5 million scrip entitling an individual to travel on the airline. 700 F.2d at 939. The proposed transaction contained restrictions on to whom the scrip could be issued and limited its use to a reorganization plan. *Id.* The proposed transaction also provided for the release of all claims by all parties against the debtor, its secured creditors, and its officers and directors. *Id.* at 940. The court held that the proposed transaction "not only changed the composition of [the debtor]'s assets, the contemplated result under § 363(b), it also had the practical effect of dictating some of the terms of any future reorganization plan." *Id.* at 939-40. This, coupled with the fact that the proposed transaction provided for the release claims, *id.* at 940, prompted the Fifth Circuit to hold that the court did not have authority to authorize the transaction.

56.  Importantly, creditors objecting to a proposed transaction on the basis that it is a *sub rosa* plan must specify which of their rights are impacted. *In re Continental Airlines, Inc.*, 780 F.2d at 1228. Here, a litany of the Sandy Hook Families' rights are violated by the Debtors' entry into the Proposed Employment Agreement. As discussed, *see supra* ¶¶ 18-23, the doubling of Jones's salary to $1.5 million converts the Equity Draws into a salary that will be paid out of

FSS's coffers before any money flows to the Sandy Hook Families. This effectively lowers FSS's "disposable income," to which the Sandy Hook Families are entitled, and is therefore neither fair nor equitable to FSS's creditors. *See* 11 U.S.C. § 1191(c).

57.     And it is not only Jones's salary that circumvents plan confirmation requirements and the Sandy Hook Families' rights. Section 1123(a)(7) provides that a plan shall "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee[.]". 11 U.S.C. § 1123(a)(7). Similarly, section 1129(a)(5)(A) requires the appointment of any individual as a director, officer, or voting trustee of the debtor to be "consistent with the interests of creditors and equity security holders and with public policy[.]". 11 U.S.C. § 1129(a)(5)(A)(ii). The Debtors acknowledge that Jones's commitment is "vital to FSS" and "[w]hen Jones is absent from FSS broadcasts, FSS experiences gross revenue declines of as much as 40%." Mot. ¶ 14. But the Proposed Employment Agreement allows Jones to stop working if he does not personally approve of FSS's governing officers. Allowing Jones to effectively hold FSS's business hostage if he is unhappy with the governing officers of FSS is contrary to the Sandy Hook Families' interests and public policy.

58.     Entry into the Proposed Employment Agreement also violates section 1129(a)(11), which requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). The Debtors claim that "a binding contract that commits Jones to a good-faith effort to generate revenue for FSS is necessary for the continued survival of FSS as a business." Mot. ¶ 13. But the Proposed Employment Agreement does no such thing. If Jones is unhappy with either of the

bankruptcy plans or governing officers of FSS, he can simply terminate the agreement and refuse to broadcast. Without an agreement that actually binds Jones, confirmation of the plan is likely to be followed by the liquidation or need for further financial reorganization of FSS, as Jones's cooperation "is necessary for the continued survival of FSS as a business." Mot. ¶ 15.

59.     Where, as here, the terms of the Proposed Employment Agreement change the composition of the Debtors' assets, dictate some of the terms of the plan, and predetermine the release of claims, it should be rejected as an impermissible *sub rosa* plan.

*[Remainder of page intentionally left blank.]*

Dated: October 11, 2023

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**
By: */s/ Avi Moshenberg*
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone: (713) 337-5580
Fax: (713) 337-8850
E-mail: Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
By: */s/ Jarrod B. Martin*
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone: (713) 356-1280
Fax: (713) 658-2553
E-mail: jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
By: */s/ Jennifer J. Hardy*
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail: jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail: rstrickland@willkie.com
E-mail: slombardi@willkie.com
E-mail: csisco@willkie.com

*Co-Counsel to the Texas Plaintiffs*

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail: rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
E-mail: chopkins@paulweiss.com

*Co-Counsel to the Connecticut Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Objection has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 11th day of October 2023.

_/s/ Ryan E. Chapple_
Ryan E. Chapple