**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALEXANDER E. JONES, | ) Case No. 22-33553 (CML) |
| | ) |
| Debtor. | ) |
| | ) |

**STATEMENT BY THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS AND THE SANDY HOOK FAMILIES REGARDING**
**STATUS OF THE CHAPTER 11 CASE AND PROPOSED CREDITORS' PLAN**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 case of Alexander E. Jones (the "Debtor" or "Jones" and such case, the "Jones Case") and the Sandy Hook Families (as defined below) respectfully submit this statement (the "Statement") to (i) provide an update regarding the status of the Jones Case and (ii) propose a construct for a chapter 11 plan (the "Creditors' Plan")[1] as a viable path out of bankruptcy. In support of such a path, the Committee and the Sandy Hook Families respectfully state as follows.

**PRELIMINARY STATEMENT**

1.      It has been 11 months since Jones sought refuge in chapter 11 from more than $1.5 billion in liabilities and further litigation on the brink of judgment, and well over a year since Jones caused his company, Free Speech Systems, LLC ("FSS"), to seek similar asylum.[2] In that time, Jones has not presented any viable path to emergence. Nor has he done much of anything to preserve, let alone maximize, the value of his estate for the benefit of his creditors—predominantly the victims of Jones's relentless campaign to defame the families of children and others murdered

---

[1] A draft of the Creditors' Plan is attached hereto as **Exhibit A**.

[2] The Jones Case and the chapter 11 case of *In re Free Speech Systems, LLC*, 22-60043 (CML) (Bankr. S.D. Tex. July 29, 2022) ("FSS" and such case, the "FSS Case") are referred to collectively as the "Chapter 11 Cases."

at Sandy Hook Elementary School (the "Sandy Hook Families").  Indeed, Jones has yet to sell a single non-exempt asset.  He continues to enjoy his extravagant lifestyle and, based on his monthly operating reports, he has spent approximately $900,000 since commencing this case.  He has refused to adhere to a reasonable budget or engage with the Committee on ways to limit spending.  And he has resisted commencing meritorious avoidance actions against insiders.  In short, Jones has failed in every way to serve as the fiduciary mandated by the Bankruptcy Code in exchange for the breathing spell he has enjoyed for almost a year.  His time is up.

2.      This Court recently held that the lion's share of the Sandy Hook Families' claims against Jones are nondischargeable and made clear that the parties must move the Chapter 11 Cases towards conclusion.[3]  The Committee and the Sandy Hook Families agree.  Although the parties have been engaged in good faith (albeit intermittent) discussions regarding a path forward for much of the last year, no such resolution has been achieved.  The Committee and the Sandy Hook Families do not believe that the plan just filed by FSS[4] will advance the Chapter 11 Cases absent a global resolution involving both the FSS estate and the Jones estate.[5]  Nor can there be any dispute that a confirmable plan in the Jones Case will require the support of the Sandy Hook Families, who comprise virtually all the Debtor's creditors—both in number and claim amount.

3.      The Committee and the Sandy Hook Families attach to this Statement a plan construct that synthesizes the work the Committee has done to investigate Jones's assets and

---

[3] *E.g.* Sept. 26, 2023 Hr'g Tr. 16:1-2 (Court instructing FSS to prosecute a plan).

[4] *See Debtor's First Amended Plan of Reorganization Under Subchapter V of the Bankruptcy Code*, FSS Case, 22-60043 [ECF No. 756] (the "FSS Plan").

[5] Moreover—and concerningly—the FSS Plan purports to enjoin the Sandy Hook Families from pursuing ***any claims against Alex Jones***.  FSS Plan, Section 13.6 (temporarily enjoining Class 3-B Creditors (the Sandy Hook Families) from "taking any action to prosecute or collect all or any portion of their Claim ***against Alex Jones so long as the Plan in not in uncured default***.") (emphasis added).  This draconian and improper provision has the effect of granting a nonconsensual third-party release to Jones, as a non-debtor.  For the avoidance of doubt, the Committee and the Sandy Hook Families reserve all of their respective rights in connection with this provision and the FSS Plan, generally.

provides an actionable path forward to bring both Chapter 11 Cases to conclusion.  Specifically, the Creditors' Plan provides a framework for Jones—at his exclusive option and with the requisite creditor support—to either: (i) implement an orderly liquidation; or (ii) obtain a consensual release from more than $1.5 billion in largely nondischargeable judgments in exchange for adherence to a 10-year, fixed-payment schedule that pays creditors a small fraction of the amount of their claims, while preserving (in both scenarios) valuable estate causes of action against third parties. The decision is his.  But whatever alternative Jones chooses, the Creditors' Plan provides a clear path out of the quagmire of these cases.[6]

## THE CHAPTER 11 CASES MUST MOVE TOWARD CONCLUSION

4.      Since its appointment, the Committee has investigated potential sources of recovery for Jones's creditors, including potential estate causes of action.  Given the Debtor's chaotic business and record-keeping practices, the Committee recognized early on that complete disclosures would never be obtained.  Indeed, the Debtor claimed to lack many documents and professed ignorance about many matters pertaining to his businesses, personal finances, trusts, assets and personal and professional affairs.[7]  It also appeared that possession of, and responsibility for, business and financial records was often confused and comingled among the Debtor, his father (Dr. David Jones), FSS and PQPR Holdings Limited, LLC ("PQPR"), which Jones and his parents

---

[6] For the avoidance of doubt, prior to filing this Statement, the Committee and the Sandy Hook Families discussed with Jones, FSS and PQPR: (i) the importance of pushing the Chapter 11 Cases to conclusion; (ii) that the Committee and the Sandy Hook Families would be filing this Statement and attached Creditors' Plan construct and the general terms of such "toggle" plan construct; (iii) that the Committee and the Sandy Hook families will raise during the November 27 hearing the idea of setting a schedule for confirmation and the remainder of the Chapter 11 Cases; and (iv) that the Committee and the Sandy Hook Families have every intention of continuing to engage in good faith discussions regarding a potential consensual resolution, which resolution is expressly contemplated by the Creditors' Plan construct.

[7] It took the Debtor more than four months to file reasonably complete schedules and statements.  *Global Notes and Supporting Information Regarding Second Amended Schedules of Assets and Liabilities and Statement of Financial Affairs* [ECF No. 242]; *Global Notes and Supporting Information Regarding Second Amended Schedules of Assets and Liabilities and Statement of Financial Affairs* [ECF No. 243].  The Debtor has informed the Committee that these schedules and statements *still* require correction, and the Committee is aware of several omissions and errors contained therein.

3

own together.  Thus, the Committee was forced to seek records from a wide array of family members, associated businesses, trustees, financial institutions and others to fill significant information gaps.  The Committee's investigation ultimately included subpoenas to over 30 parties, multiple informal interviews and six depositions.

5.      All throughout, the Committee balanced the need for adequate disclosures about the Debtor's assets and estate claims, on one hand, with the desire to avoid draining the estate with costly discovery disputes, on the other.  Despite chronically late and incomplete discovery responses time and again from the Debtor, his family members and his various entities, the Committee deferred bringing discovery disputes to the Court and focused on achieving adequate consensual disclosures where possible.  As of the filing of this Statement, production by the Debtor, his entities and his family members remains incomplete—as documents and information that the Committee believes exist have yet to be provided.  Nevertheless, the Committee and the Sandy Hook Families have determined that the investigation is complete enough to propose the terms of the Creditors' Plan and identify the claims set forth in it.[8]  Given the posture of the Chapter 11 Cases, it is time to pivot from the investigation toward resolution.

6.      As noted above, the Committee similarly has endeavored to preserve the existing value of the Debtor's estate for the benefit of creditors.  The Committee and the Sandy Hook Families have tried to induce Jones to curb his excessive spending[9] and to convince him to sell

---

[8]Among other things, the Committee's investigation has revealed viable estate claims to recover fraudulent and preferential transfers from the Debtor to various family members and close associates prior to December 2, 2022, the date Jones commenced the Jones Case (the "Petition Date").  These include claims to recover more than $1.5 million in cash that Jones transferred to his wife, Erika Jones, and the transfer of real property to his father, David Jones, worth as much as $250,000 in what appears to be a textbook case of an intentional fraudulent transfer, among others.  These and other estate claims are preserved—and may be pursued or settled, as appropriate—in the Creditors' Plan.
[9] *Reservation of Rights of the Official Committee of Unsecured Creditors in Respect of Alexander E. Jones's July Monthly Operating Report* [ECF No. 419].

non-exempt assets.  These efforts were met with resistance and refusal at almost every turn.[10]

7.      Finally, the Committee and the Sandy Hook Families have engaged in good-faith discussions with the Debtor and other interested parties to explore a viable consensual plan.[11]  But the parties were unable to do so.  Then, on October 19th, this Court ruled on nondischargeability.[12]  The Court held that Jones cannot use bankruptcy to discharge over $1.1 billion in damages for defamation and emotional distress that Jones owes to the Sandy Hook Families.  Following the rulings, the parties reengaged in settlement talks, including an in-person meeting in New York, attended by representatives for the Committee, the Sandy Hook Families, Jones, FSS, PQPR and the Sub-V Trustee.  Following the meeting, the Committee, the Sandy Hook Families and Jones exchanged more proposals.  Discussions remain ongoing, and the Committee and the Sandy Hook Families remain hopeful that a deal can get done.  But, at this time, the parties remain far apart on how to resolve the staggering nondischargeable liability facing Jones and his largest asset, FSS.[13]

8.      There can be little doubt that the Chapter 11 Cases must resolve soon.  Jones's estate simply cannot fund an indefinite bankruptcy.  Indeed, the estate is not only bearing the costs of Jones's professionals,[14] but also hemorrhaging approximately $65,000 to $90,000 a month

---

[10] In fact, after months of discussions, Jones made clear to this Court and all parties that he had no intention of curtailing his lavish spending habits at all.  *Alexander Jones' Response and Objection to Reservation of Rights of the Official Committee of Unsecured Creditors in Respect of Alexander E. Jones's July Monthly Operating Report* [ECF No. 445].  Just last week, Jones finally filed a motion to sell certain personal property [ECF No. 485], which motion had laid dormant for months notwithstanding an agreement with the Committee and the Sandy Hook Families regarding notice procedures and countless requests to commence asset sales.

[11] Despite the fact that the Debtor's exclusivity lapsed months ago, the Committee and the Sandy Hook Families have chosen to avoid costs and save estate resources by continuing to attempt to work with the Debtor rather than file a plan and initiate contested plan proceedings.

[12] *Wheeler v. Jones (In re Alexander E. Jones)*, No. 23-03037, 2023 WL 6979358 (Bankr. S.D. Tex. Oct. 19, 2023); *Heslin v. Jones (In re Alexander E. Jones)*, No. 23-03035, 2023 WL 6938266 (Bankr. S.D. Tex. Oct. 19, 2023).

[13] FSS has also stopped responding to the Committee about providing crucial information that had been promised at the in-person meeting.  Absent the participation of representatives for Jones's largest asset, it is all but certain that no resolution can be achieved.

[14] Jones has incurred more than $3.5 million in professional fees and expenses since the commencement of the Chapter 11 Cases, which continue to accrue on a monthly basis.

(excluding legal and professional fees) to bankroll Jones's lifestyle.[15]   That monthly spend is draining assets that ***should*** be available to creditors.   Against this backdrop, and taking this Court's directive seriously, the Committee and the Sandy Hook Families offer the framework in the attached Creditors' Plan to propel these cases to conclusion.

## THE CREDITORS' PLAN

9.     The Creditors' Plan provides an actionable and comprehensive structure to conclude the Chapter 11 Cases.   Specifically, the Creditors' Plan provides Jones with a choice, which he may exercise at his exclusive option.   The first option or "toggle" is an orderly liquidation of Jones's estate.   Under this scenario, Jones's non-exempt assets will be sold and distributed to creditors, and he likely will face a lifetime of litigation and enforcement proceedings concerning the nondischargeable portions of the Sandy Hook Families' judgments.

10.     Alternatively, Jones may elect to receive a complete discharge for himself and FSS if he agrees to pay, from any source, at least $8.5 million per year, plus 50% of any income over $9 million per year, for 10 years, with a proportionate reduction of liabilities for each year of full payment.   And at the end of the payment period, Jones will be free from all liability, whether it is dischargeable or not.

11.     Under either scenario, the Creditors' Plan resolves all other claims against Jones's estate, including: (i) one secured claim; (ii) the non-dischargeable prepetition domestic support obligations; and (iii) general unsecured claims (which currently total under $200,000).   The Creditors' Plan further provides for subordination of certain insider claims asserted by FSS and Jones's spouse, which will not be entitled to any distribution.   Critically, and regardless of the path Jones chooses, the Creditors' Plan provides that the valuable estate claims identified through the

---

[15] The FSS Case is also incurring costs, which are paid from the FSS estate (to which value creditors are also entitled).

Committee's investigation and any other estate claims that may be discovered will be preserved and may be prosecuted or settled.

12.     In short, the Creditors' Plan offers two ways for the Debtor to conclude the Chapter 11 Cases.  The time has come for Jones to choose whether he is willing to pay his creditors a reasonable portion of what they are owed or would prefer to remain embroiled in costly and time-consuming litigation for years to come.

***

13.     Given these facts and the recently filed FSS Plan, it is critical to set a confirmation schedule for both Chapter 11 Cases.  Therefore, the Committee and the Sandy Hook Families intend, on Monday, November 27, to ask the Court for a scheduling order that contemplates confirmation proceedings in February, with any party that anticipates proposing a plan being required to do so in December.  The Committee and the Sandy Hook Families intend to file an amended version of the Creditors' Plan in that time frame and remain hopeful that such an amended plan will reflect a consensual resolution with Jones and FSS.  If no such resolution is achieved by the filing deadline, however, the Committee and the Sandy Hook Families will prosecute the Creditors' Plan and evaluate any competing plan Jones may propose.

Dated: November 22, 2023

Respectfully submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**
By: */s/ Marty L. Brimmage, Jr.*
Marty L. Brimmage, Jr.
Texas Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Fax: (214) 969-4343
E-mail: mbrimmage@akingump.com

*-and-*

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Fax: (212) 872-1002
E-mail: dzensky@akingump.com
E-mail: sbrauner@akingump.com
E-mail: kporter@akingump.com
E-mail: akordas@akingump.com

***Counsel to the Official Committee of Unsecured Creditors of Alexander E. Jones***

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  slascano@paulweiss.com
E-mail:  virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

**MCDOWELL HETHERINGTON LLP**
By: */s/ Avi Moshenberg*
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone: (713) 337-5580
Fax: (713) 337-8850
E-mail: Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

***Co-Counsel to the Texas Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on November 22, 2023, a true and correct copy of the foregoing Notice was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

 _/s/ Marty L. Brimmage, Jr._
Marty L. Brimmage, Jr.

**<u>Exhibit A</u>**

(Creditors' Plan)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ALEXANDER E. JONES, | ) Case No. 22-33553 (CML) |
|  | ) |
| Debtor. | ) |
|  | ) |

## CREDITORS' NON-UNIFORM INDIVIDUAL
## CHAPTER 11 PLAN OF REORGANIZATION FOR ALEXANDER E. JONES

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr.
Texas Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Fax: (214) 969-4343
E-mail: mbrimmage@akingump.com

*-and-*

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Fax: (212) 872-1002
E-mail: dzensky@akingump.com
E-mail: sbrauner@akingump.com
E-mail: kporter@akingump.com
E-mail: akordas@akingump.com

***Counsel to the Official Committee of Unsecured
Creditors of Alexander E. Jones***

**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Fax: (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  slascano@paulweiss.com
E-mail:  virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone: (713) 337-5580
Fax: (713) 337-8850
E-mail:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone: (713) 510-1766
Fax: (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Fax: (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

***Co-Counsel to the Texas Plaintiffs***

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ........................................................................................... 1
- A.     Defined Terms ....................................................................................... 1
- B.     Rules of Interpretation ........................................................................ 10
- C.     Computation of Time ........................................................................... 11
- D.     Reference to Monetary Figures............................................................ 11
- E.     Controlling Document ......................................................................... 12

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ...................... 12
- A.     Administrative Claims. ........................................................................ 12
- B.     Professional Fee Claims....................................................................... 12
- C.     Priority Tax Claims .............................................................................. 13

ARTICLE III. TREATMENT AND CLASSIFICATION OF CLAIMS ................................... 13
- A.     Classification of Claims ....................................................................... 13
- B.     Treatment of Claims ............................................................................ 14

ARTICLE IV. THE SANDY HOOK FAMILY TRUST ................................................... 16
- A.     The Sandy Hook Family Trust............................................................. 16
- B.     The Sandy Hook Family Trustee ......................................................... 16
- C.     Assignments ........................................................................................ 17
- D.     Sandy Hook Family Trust Assets ........................................................ 17
- E.     Litigation Assets .................................................................................. 17
- F.     Confidentiality .................................................................................... 18
- G.     Tax Treatment of Sandy Hook Family Trust Under Applicable Laws................. 18
- H.     Transferability and Certain Securities Law Matters ............................ 19
- I.      Retention of Professionals .................................................................. 19

ARTICLE V. TREATMENT OF NON-DISCHARGEABLE CLAIMS .................................. 19
- A.     Non-Dischargeable Claims .................................................................. 19
- B.     Optional Future Payments Election ..................................................... 20
- C.     Forbearance Period .............................................................................. 20
- D.     FSS Equity Interests............................................................................. 20
- E.     Optional Future Payments ................................................................... 21
- F.     Failure to Make the Optional Future Payments ................................... 21
- G.     Jones Annual Income Reports ............................................................. 21
- H.     Discharge Triggers............................................................................... 22
- I.      Appeals ................................................................................................ 22

ARTICLE VI. MEANS OF IMPLEMENTATION.........................................................................23

    A.     Plan Distributions.................................................................................................23

    B.     Jones Transfer Obligation ...................................................................................23

    C.     Jones Full Disclosure ..........................................................................................24

    D.     Obligation to Cooperate ......................................................................................24

    E.     Affirmative Covenants.........................................................................................24

    F.     Premarital Agreement ..........................................................................................25

    G.     Dissolution of Statutory Committees and Cessation of Fee and Expense Payment
         25

ARTICLE VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................25

    A.     Rejection of Executory Contracts and Unexpired Leases....................................25

    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........26

    C.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ........26

ARTICLE VIII. RETENTION OF EXEMPT PROPERTY ...........................................................28

ARTICLE IX. RELEASES AND EXCULPATIONS .....................................................................28

    A.     Releases................................................................................................................28

    B.     Exculpations.........................................................................................................28

ARTICLE X. CONDITIONS PRECEDENT TO EFFECTIVENESS ..........................................29

ARTICLE XI. EVENTS OF DEFAULT ........................................................................................29

ARTICLE XII. RETENTION OF JURISDICTION ......................................................................30

ARTICLE XIII. MODIFICATION OF PLAN................................................................................32

ARTICLE XIV. MISCELLANEOUS PROVISIONS....................................................................32

    A.     Immediate Binding Effect....................................................................................32

    B.     Discharge..............................................................................................................32

    C.     Reservation of Rights...........................................................................................32

    D.     Entire Agreement .................................................................................................33

    E.     No Admission ......................................................................................................33

The UCC and the Sandy Hook Families (each as defined below) propose the following Plan pursuant to the provisions of chapter 11 of the Bankruptcy Code.

## ARTICLE I.
## DEFINITIONS

A. *Defined Terms*

As used in this Plan, capitalized terms shall have the meanings set forth below.

1. "***Additional Payments***" shall have the meaning ascribed to such term in Article V.E2 of this Plan.

2. "***Administrative Claim***" means a Claim for which a holder asserts and is determined to be entitled to priority for costs and expenses of administration of the Debtor's estate pursuant to sections 503 and 507(a)(1) of the Bankruptcy Code.

3. "***Affiliate***" means an "affiliate" as defined by section 101(2) of the Bankruptcy Code, including [•].

4. "***Affirmative Covenant***" shall have the meaning ascribed to such term in Article VI.E of this Plan.

5. "***Affirmative Covenant Event of Default***" shall have the meaning ascribed to such term in Article VI.E of this Plan.

6. "***Aggregate Allowed Sandy Hook Family Claims Amount***" means $[•], the total amount in which the Sandy Hook Family Claims are Allowed.

7. "***Allowed***" or "***Allowed Amount***" means, with respect to any Claim against the Debtor, except to the extent that this Plan provides otherwise, any portion thereof: (a) that is allowed under the Plan, by Final Order, or pursuant to a settlement; (b) that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order); or (c) that is scheduled by the Debtors as not disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely Filed; *provided that*, with respect to a Claim described in clauses (b) and (c) above, such Claim shall be considered Allowed only if and to the extent that such Claim is not Disallowed and no objection to the allowance of such Claim is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.  For the avoidance of doubt, all Sandy Hook Family Claims shall be Allowed pursuant to Article III.B.4.b of this Plan.

8. "***Bar Date***" means the dates established by the Bankruptcy Court or otherwise provided for by the Bankruptcy Code, the Bankruptcy Rules, or this Plan by which any Proof of Claim must be Filed with respect to such Claims; *provided that* there shall be no applicable Bar Date for Claims for which this Plan excludes from the requirement of Filing Proofs of Claim.

9.      "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

10.      "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

11.      "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12.      "***Business Day***" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)), or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of Texas.

13.      "***Cash***" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

14.      "***Causes of Action***" means, collectively, any and all actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or pursuant to any other theory of law or otherwise.  Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

15.      "***Chapter 11 Case***" means the above-captioned case filed under chapter 11 of the Bankruptcy Code.

16.      "***Claim***" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtor or the Debtor's Estate.

17.      "***Claimant***" means the holder of a Claim.

18.      "***Clerk***" means the "bankruptcy clerk" as defined by rule 9001 of the Bankruptcy Rules.

19.      "***Confirmation***" means the entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

20.    "***Confirmation Date***" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

21.    "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

22.    "***Cooperation Event of Default***" shall have the meaning ascribed to such term in Article VI.D of this Plan.

23.    "***Cure Amount***" shall have the meaning ascribed to such term in Article VII.C of this Plan.

24.    "***David Jones***" means Jones's father, Dr. David Jones.

25.    "***Debtor***" means Jones, the debtor in the above-captioned Chapter 11 Case.  For the avoidance of doubt, Debtor shall refer to the Debtor as reorganized on or after the Effective Date in accordance with the Plan.

26.    "***Disallowed***" means any Claim, or any portion thereof, that (a) has been disallowed by Final Order or settlement, as provided in this Plan or the Confirmation Order; or (b) a Claim or interest or any portion thereof that is not scheduled or that is scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules, a Final Order of the Bankruptcy Court, or otherwise deemed timely Filed under applicable law; or (c) a Claim or any portion thereof that is not Allowed.

27.    "***Discharge Triggers***" means a Partial Discharge Trigger or a Full Discharge Trigger, as applicable.

28.    "***Disclosure Statement***" means the Creditors' Disclosure Statement as Filed or amended, including all exhibits and schedules attached thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

29.    "***Effective Date***" means the first Business Day after the Confirmation Date on which (a) all conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article XI of this Plan; (b) no stay of the Confirmation Order is in effect; and (c) the UCC declares the Plan effective.

30.    "***Entity***" means an "entity" as defined by section 101(15) of the Bankruptcy Code.

31.    "***Erika Jones***" means Jones's wife, Erika Wulff Jones.

32.    "***Estate***" means the estate created by sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case and all property (as defined in section 541 of the

3

Bankruptcy Code, including any Causes of Action) acquired by the Debtor after the Petition Date through the Effective Date.

33.     "***Event of Default***" shall have the meaning ascribed to such term in <u>Article XI</u> of this Plan.

34.     "***Executory Contract***" means a contract to which the Debtor is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

35.     "***Exempt Assets***" are all assets that are exempt pursuant to section 1123(c) of the Bankruptcy Code and enumerated in **<u>Exhibit A</u>**.

36.     "***Exculpated Parties***" means, collectively, and in each case, solely in its capacity as such: (a) the Sandy Hook Families; (b) the immediate family members of the Sandy Hook Families; (c) the UCC; (d) with respect to each of the foregoing (a)-(c), such Entities' respective employees, agents, financial advisors, and attorneys, including (i) counsel to the Sandy Hook Families, (ii) counsel to the UCC, and (iii) advisors to the UCC, including accountants, representatives, and other Professionals, each strictly in their capacity as such; and (d) solely upon the occurrence of the Full Discharge Trigger, if at all, Jones.

37.     "***Filed***" means filed with the Bankruptcy Court in the Chapter 11 Case.

38.     "***Final Order***" means, as applicable, an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, that has not been reversed, stayed, modified, or amended, as entered on the docket in this Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided that* the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

39.     "***Forbearance Period***" shall have the meaning ascribed to such term in <u>Article V.C</u> of this Plan.

40.     "***FSS***" means Free Speech Systems, LLC.

41.     "***FSS Case***" means the bankruptcy case of FSS, Case No. 22-60043 (CML).

42.     "***FSS Docket***" means the docket in the FSS Case.

43.     "***FSS Equity Interest Reversion***" shall have the meaning ascribed to such term in <u>Article V.H.3</u> of this Plan.

4

44.      "*Full Discharge Trigger*" means the tenth anniversary of the first Minimum Annual Payment; *provided that* the Full Discharge Trigger will not occur if there is any Event of Default under the Plan that the Sandy Hook Family Trustee does not, acting in accordance with the Sandy Hook Family Trust Agreement, waive.

45.      "*General Unsecured Claim*" means any Claim other than a Secured Claim, Priority Claim, Sandy Hook Family Claim, or Subordinated Claim.

46.      "*General Unsecured Claim Cash Pool*" means an amount in Cash of $20,000.00.

47.      "*Impaired*" means, with respect to any class of Claims, a class of Claims that is "impaired" as defined by section 1124 of the Bankruptcy Code.

48.      "*Insider*" means an "insider" as defined by section 101(31) of the Bankruptcy Code, including [•].

49.       "*Internal Revenue Code*" means the U.S. Internal Revenue Code of 1986, as amended.

50.      "*IRS*" means the Internal Revenue Service.

51.      "*Jones*" means Alexander E. Jones, the Debtor in the above-captioned Chapter 11 Case.

52.      "*Jones Docket*" means the docket in the Chapter 11 Case.

53.      "*Jones Annual Income Report*" shall have the meaning ascribed to such term in Article V.G of this Plan.

54.      "*Jones Annual Income*" means, for a given calendar year, all income earned by Jones or payments made or other consideration or assets transferred directly or indirectly to or for the benefit of Jones, whether in the form of wages, salary, dividends, distributions from trusts and partnerships, earnings of wholly-owned or controlled entities (including any grantor trusts), partnership or other "pass-through" income (including such income reported on IRS Schedule K-1), donations, or gifts, net of any U.S. federal, state or local taxes required to be paid on account of such income for the previous calendar year taking into account any allowable deductions as a result of any transfers to the Sandy Hook Family Trust.

55.      "*Jones Excess Income*" means all Jones Annual Income above $9,000,000.

56.      "*Jones Full Disclosure*" shall have the meaning ascribed to such term in Article VI.C of this Plan.

57.      "*Jones Transfer Obligation*" shall have the meaning ascribed to such term in Article VI.B of this Plan.

5

58.    "***Jones Trusts***" shall mean the Recharge Dynasty Trust, the 2022 Litigation Settlement Trust, the RXXCTTGAA Trust, the Green Leaf Trust, the AEJ 2018 Trust, the Missouri779384 Trust, and the Alexander E. Jones Descendent and Beneficiary Trust.

59.    "***Lien***" means a "lien" as defined by section 101(37) of the Bankruptcy Code.

60.    "***Litigation Assets***" are those litigation-related assets to be vested in the Sandy Hook Family Trust, as described in Article IV.E of this Plan.

61.    "***Litigation Committee***" shall have the meaning ascribed to such term in Article IV.B of this Plan.

62.    "***Material Misstatement***" shall have the meaning ascribed to such term in Article VI.C of this Plan.

63.    "***Minimum Annual Payment***" shall have the meaning ascribed to such term in Article V.E.1 of this Plan.

64.    "***Non-Dischargeability Ruling***" means a Final Order of a court of competent jurisdiction determining claims are not subject to discharge pursuant to section 1141(d) of the Bankruptcy Code.

65.    "***Non-Dischargeable Claims***" means any and all claims arising out of the following proceedings that have not been dismissed:  (a) *Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; (b) *Pozner* v. *De La Rosa, et al.*, Case No. D-1-GN-001842, in the Judicial District Court of Travis County, Texas; and (c) *Lafferty* v. *Jones*, Case No. UWY-CV18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court.

66.    "***Non-Dischargeable Claims Reduction Amount***" means (a) for a Minimum Annual Payment, 10% of each Non-Dischargeable Claim and (b) for any installment of a Minimum Annual Payment, the *pro rata* amount of 10% of each Non-Dischargeable Claim (with such *pro rata* amount to be calculated based on the proportion of the applicable installment to the Minimum Annual Payment).

67.    "***Optional Future Payments***" means the Minimum Annual Payments and the Additional Payments, if applicable.

68.    "***Optional Future Payments Election***" shall have the meaning ascribed to such term in Article V.A of this Plan.

69.    "***Partial Discharge Trigger***" means the payment of a Minimum Annual Payment, or any installment thereof, by or on behalf of Jones to the Sandy Hook Family Trust in accordance with this Plan.

70.    "***Petition Date***" means December 2, 2022, the date on which Jones commenced the Chapter 11 Case.

71.     "*Plan*" means this Creditors' Chapter 11 Plan of Reorganization of Alexander E. Jones, proposed by the UCC and the Sandy Hook Families, as it may be amended, modified, and/or supplemented from time to time.

72.     "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, each of which shall be acceptable to the UCC and the Sandy Hook Families.  The Plan Supplement may include the following (including drafts or forms, as applicable), or the material terms of the following, as applicable:  (a) Sandy Hook Family Trust Agreement; and (b) [•].

73.     "*Premarital Agreement*" is the agreement by and between Jones and Erika Jones, dated as of December 18, 2016.

74.     "*Priority Claim*" means an Administrative Claim, a Priority Tax Claim, or a Professional Fee Claim.

75.     "*Priority Claims Bar Date*" means the deadline for filing requests for payment of Priority Claims, except for Priority Tax Claims, which shall be thirty (30) days after the Effective Date.

76.     "*Priority Claims Objection Bar Date*" means the deadline for filing objections to requests for payment of Priority Claims, except for Priority Tax Claims, which shall be the later of (a) thirty (30) days after the Effective Date and (b) thirty (30) days after the Filing of the applicable request for payment of Priority Claims.

77.     "*Priority DSO Claim*" means an Allowed Claim for prepetition domestic support obligations that is entitled to priority under section 507(a)(1) of the Bankruptcy Code.

78.     "*Priority Tax Claim*" means a Claim for which the holder asserts and is determined to be entitled to priority under section 507(a)(7) of the Bankruptcy Code.

79.     "*Professional*" means an Entity retained pursuant to a Bankruptcy Court order in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

80.     "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been previously paid.

81.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtor with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

82.    "***Professional Fee Escrow Amount***" means the total amount of Professional Fee Claims estimated pursuant to <u>Article II.B.3</u> of this Plan.

83.    "***Protective Order***" means the *Stipulated Confidentiality Agreement and Protective Order* [Docket No. 159].

84.    "***Proof of Claim***" means a written proof of claim Filed against the Debtor in the Chapter 11 Case by the applicable Bar Date.

85.    "***PQPR***" means PQPR Holdings Limited LLC.

86.    "***Released Parties***" means, collectively, and in each case, solely in its capacity as such: (a) the Sandy Hook Families; (b) the immediate family members of the Sandy Hook Families; (c) the UCC; (d) with respect to each of the foregoing (a)-(c), such Entities' respective current and former Affiliates, and such Entities' and their current and former Affiliates' current and former successors, assigns, employees, agents, financial advisors, and attorneys, including (i) counsel to the Sandy Hook Families, (ii) counsel to the UCC, and (iii) advisors to the UCC, including accountants, representatives, and other Professionals, each strictly in their capacity as such; (e) minor members of Jones's family; (f) any Insider or Affiliate of Jones that has made, or has caused to be made, a Release Settlement Payment; and (g) solely upon the occurrence of, and to the extent of, a Discharge Trigger, if at all, Jones.

87.    "***Releasing Parties***" means (a) Jones and his Estate; (b) the UCC; (c) the Sandy Hook Families; and (d) any Insider or Affiliate of Jones that has made, or has caused to be made, a Release Settlement Payment.

88.    "***Release Settlement Payment***" means a payment to the Sandy Hook Family Trust of an amount of Cash equal to [•]% of the potential value of any Trust Cause of Action, as determined in accordance with the Sandy Hook Family Trust Agreement, against any Insider or Affiliate of Jones.

89.    "***Sandy Hook Families***" means Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, Richard M. Coan, as chapter 7 trustee for the estate of Erica Lafferty, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine.

90.    "***Sandy Hook Family Trust***" shall have the meaning ascribed to such term in <u>Article IV.A</u> of this Plan.

91.    "***Sandy Hook Family Trust Agreement***" is the agreement establishing and describing the Sandy Hook Family Trust, which shall be attached to the Plan Supplement and shall be in form and substance acceptable to the UCC and the Sandy Hook Families.

92.    "***Sandy Hook Family Trust Assets***" are (a) all Jones's assets, rights, and claims that are not Exempt Assets, whether owned by Jones directly, indirectly, or otherwise held for the benefit of Jones existing as of the Effective Date, in each case whether presently known or discovered at any time by the Sandy Hook Family Trustee, and including, but not limited to, Cash,

8

any tax refund to which Jones is entitled  (whether or not such refund is immediately available to Jones as of the Effective Date), 100% of Jones's equity ownership interests in FSS, Jones's full, direct or indirect ownership interests in PQPR, all assets held in Jones Trusts, any identified equitable or future interests in property, and any current contractual right entitling Jones to future royalties, (b) the Litigation Assets, (c) in the event Jones makes the Optional Future Payments Election, a life insurance policy in an amount acceptable to the Sandy Hook Family Trustee or the UCC, that Jones shall cooperate with the Sandy Hook Family Trust to procure as soon as reasonably practicable after the Effective Date, and (d) any Optional Future Payments, once made; *provided that* for any tangible asset that would otherwise vest in the Sandy Hook Family Trust pursuant to subsection (a) of the preceding paragraph, Jones may, in lieu of transferring the applicable tangible asset itself, cause an amount of Cash equal to the value of such asset (the "Replacement Cash") to be transferred to the Sandy Hook Family Trust; *provided, however, that* the amount of Replacement Cash must be acceptable to the UCC and the Sandy Hook Families; *provided, further, that* Cash that is already, or would otherwise become, a Sandy Hook Family Trust Asset cannot be used as Replacement Cash.  For the avoidance of doubt, all Optional Future Payments vest in the Sandy Hook Family Trust and become Sandy Hook Family Trust Assets immediately upon payment, and in no event shall any Optional Future Payment revert to or otherwise be refunded or returned to Jones.

93.     "***Sandy Hook Family Trust Interests***" means interests in the Sandy Hook Family Trust.

94.     "***Sandy Hook Families' Trust Interests Allocation***" shall have the meaning ascribed to such term in Article III.B.4.c of this Plan.

95.     "***Sandy Hook Family Claims***" means any Claim for which a Proof of Claim has been Filed in the Chapter 11 Case by any member of the Sandy Hook Families.

96.     "***Sandy Hook Family Trustee***" shall have the meaning ascribed to such term in Article IV.A of this Plan.

97.     "***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the list of Executory Contracts and Unexpired Leases that will be assumed by the Debtor pursuant to the Plan as of the Effective Date, which list shall be included in the Plan Supplement.

98.     "***Schedule of Rejected Executory Contracts and Unexpired Leases***" means the list of Executory Contracts and Unexpired Leases that will be rejected by the Debtor pursuant to the Plan as of the Effective Date, which list shall be included in the Plan Supplement.

99.     "***Schedules and Statements***" means, collectively, the Second Amended Schedules of Assets and Liabilities and Statement of Financial Affairs, filed at Jones Docket No. 242, and the Second Amended Schedules of Assets and Liabilities and Statement of Financial Affairs, filed at Jones Docket No. 243, as may be amended and supplemented from time to time.

100.     "***Secured Claim***" means a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such

Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim; *provided that* no Claim asserted by any Insider or Affiliate of the Debtor shall be a Secured Claim.

101.    "***Subordinated Claim***" means a Claim subject to subordination pursuant to sections 509(c) and/or 510(c) of the Bankruptcy Code, or any other provision of the Bankruptcy Code or applicable law subordinating such claim to any General Unsecured Claim or Sandy Hook Family Claim.

102.    "***Trust Causes of Action***" shall have the meaning ascribed to such term in Article IV.E.2 of this Plan.

103.    "***UCC***" means the Official Committee of Unsecured Creditors in this Chapter 11 Case, appointed pursuant to Jones Docket No. 42.

104.    "***Unexpired Lease***" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

105.    "***Unimpaired***" means, with respect to a class of Claims, a class of Claims that is not Impaired.

106.    "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of Texas.

B.    *Rules of Interpretation*

For purposes of the Plan:

1.    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

2.    any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions;

3.    any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified;

4.    any reference to an Entity as a holder of a Claim includes that Entity's successors and assigns;

5.    unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan;

6.      unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

7.      subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws;

8.      captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

9.      unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

10.     all references to docket numbers of documents Filed in this Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

11.     all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to this Chapter 11 Case, unless otherwise stated;

12.     all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties, or, if applicable, the Sandy Hook Family Trustee, that have such consent, acceptance, or approval rights, including by electronic mail;

13.     any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and

14.     the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

C.   *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.   *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

E.  *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

A.  *Administrative Claims.*

To the extent that Administrative Claims have not been paid in full or otherwise satisfied during this Chapter 11 Case, each holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed prior to the Effective Date, on the Effective Date or in the ordinary course of business, whichever is later; or (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter.  Any objection to an Administrative Claim must be Filed by the Priority Claims Objection Bar Date.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE PRIORITY CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTOR, THE ESTATE OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE WITHOUT THE NEED FOR ANY OBJECTION FROM THE DEBTOR OR ANY NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT OR ANY OTHER ENTITY.**

B.  *Professional Fee Claims.*

1.  **Final Professional Fee Applications and Payment of Professional Fee Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred through and including the Effective Date must be Filed no later than the Priority Claims Bar Date.  The Bankruptcy Court shall determine the Allowed Amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules.  Jones shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of a Final Order of the Bankruptcy Court.  Any objection to a Professional Fee Claim must be Filed by the Priority Claims Objection Bar Date.

2.      **Professional Fee Escrow Account**.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtor shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens or Claims shall encumber the Professional Fee Escrow Account or Cash held therein.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estate or the Debtor.

Distributions to holders of Professional Fee Claims shall be made in accordance with Article VI.A.1 of this Plan.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Sandy Hook Family Trust without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.      **Professional Fee Escrow Amount**.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtor before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtor no later than five (5) days before the anticipated Effective Date; *provided*, *however*, *that* such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtor may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be used by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account.

C.   *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.
## TREATMENT AND CLASSIFICATION OF CLAIMS

A.   *Classification of Claims*

All Claims against the Debtor of whatever nature, whether or not scheduled, liquidated or unliquidated, absolute or contingent, or arising from the rejection or assumption of an Executory

Contract and/or Unexpired Lease, whether resulting in a Claim that is Allowed or not, shall be bound by the provisions of this Plan. The Claims are hereby classified as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| 2 | Priority DSO Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to vote |
| 4 | Sandy Hook Family Claims | Impaired | Entitled to vote |
| 5 | Subordinated Claims | Impaired | Not entitled to vote (deemed to reject) |

B. *Treatment of Claims*

Holders of Claims classified in Article III.A that are Allowed shall be satisfied in the manner set forth below.

1. Class 1 – Secured Claims.

a. **Classification**. Class 1 consists of all Secured Claims.

b. **Treatment**. Each holder of a Secured Claim that is Allowed shall receive payment in full in Cash on account of such holder's Allowed Secured Claim.

c. **Voting**. Class 1 is Unimpaired under the Plan. Holders of Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

d. **Claimants**. There is one (1) Class 1 Claimant, the Security Bank of Crawford, which has Filed a Proof of Claim in the amount of $80,161.04 (Claim No. 2).

2. Class 2 – Priority DSO Claims.

a. **Classification**. Class 2 consists of all Priority DSO Claims.

b. **Treatment**. Each holder of a Priority DSO Claim that is Allowed shall receive payment in full in Cash on account of such holder's Allowed Priority DSO Claim.

c. **Voting**. Class 2 is Unimpaired under the Plan. Holders of Priority DSO Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

d. **Claimants**. There is one (1) Class 2 Claimant, holding a claim in the amount of $25,183.00 as identified in the Schedules and Statements. For the avoidance of doubt, Erika Jones is not entitled to any Priority DSO Claims and any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Class 5 Subordinated Claim.

14

3.  <u>Class 3 – General Unsecured Claims</u>.

a.  **Classification**.  Class 3 consists of all General Unsecured Claims.

b.  **Treatment**.  Each holder of a General Unsecured Claim that is Allowed shall be entitled to receive the holder's *pro rata* share of the General Unsecured Claim Cash Pool, such *pro rata* share to be calculated based on the total amount of Allowed General Unsecured Claims held by holders that make such election.  For the avoidance of doubt, however, any holder of a General Unsecured Claim that has waived that holder's Claim is not entitled to such *pro rata* share under this <u>Article III.B.3.b</u>.

c.  **Voting**.  Class 3 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

d.  **Claimants**.  At present, there are four (4) Class 3 Claimants, (a) American Express National Bank, which has Filed a Proof of Claim in the amount of $149,678.58 (Claim No. 1); (b) Reeves Law, PLLC, which has Filed a Proof of Claim in the amount of $24,611.13 (Claim No. 5); (c) the City of Austin, which has Filed a Proof of Claim in the amount of $86.60 (Claim No. 3); and (d) the IRS to the extent of any portion of its Claim in the amount of $586,884.64 (Claim No. 4) that is deemed to be a non-priority Claim.  However, additional Claims may be Allowed General Unsecured Claims if filed by the applicable Bar Date or other time period provided for by this Plan or an order of the Bankruptcy Court, and otherwise Allowed.

4.  <u>Class 4 – Sandy Hook Family Claims</u>.

a.  **Classification**.  Class 4 consists of all Sandy Hook Family Claims.

b.  **Allowance**.  On the Effective Date, the Sandy Hook Family Claims shall be Allowed in the Aggregate Allowed Sandy Hook Family Claims Amount.

c.  **Treatment**.  In the aggregate, holders of Sandy Hook Family Claims will receive a *pro rata* share of the Sandy Hook Family Trust Interests (the "***Sandy Hook Families' Trust Interests Allocation***").  Each holder of a Sandy Hook Family Claim shall receive a share of the Sandy Hook Families' Trust Interests Allocation in accordance with the Sandy Hook Family Trust Agreement.

d.  **Voting**.  Class 4 is Impaired under the Plan.  Holders of Sandy Hook Family Claims are entitled to vote to accept or reject the Plan.

e.  **Claimants**.  There are twenty-one (21) Class 4 Claimants consisting of individuals comprising the Sandy Hook Families.

5.  <u>Class 5 – Subordinated Claims</u>.

a.  **Classification**.  Class 5 consists of all Subordinated Claims.

15

b. **Treatment**.  Holders of Subordinated Claims, regardless of whether such claims are Allowed, are not entitled to any distributions or to receive or retain any property under the Plan.

c. **Voting**.  Class 5 is Impaired under the Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

d. **Claimants**.  At present, there is one (1) Class 5 Claimant, FSS, which has Filed a Proof of Claim in the amount of $0.00 (Claim No. 26).  However, additional Claims may be Subordinated Claims if filed by the applicable Bar Date or other time period provided for by this Plan, and otherwise Allowed.  For the avoidance of doubt, any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Subordinated Claim.

## ARTICLE IV.
## THE SANDY HOOK FAMILY TRUST

A. *The Sandy Hook Family Trust*

On or before the Effective Date, a trust shall be established for the benefit of the Sandy Hook Families (the "***Sandy Hook Family Trust***").  The Sandy Hook Family Trust shall be governed and administered in accordance with the Sandy Hook Family Trust Agreement, which sets forth, *inter alia*, the powers, authority, responsibilities, and duties of the Sandy Hook Family Trustee and the allocation of distributions of Sandy Hook Family Trust Interests to members of the Sandy Hook Families.

B. *The Sandy Hook Family Trustee*

The Sandy Hook Family Trust shall be administered by a trustee who shall be chosen by the Sandy Hook Families in accordance with the Sandy Hook Family Trust Agreement (the "***Sandy Hook Family Trustee***").  For the avoidance of doubt, if, for any reason the individual or entity chosen to serve as the Sandy Hook Family Trustee shall need to be replaced, the Sandy Hook Families shall appoint a subsequent Sandy Hook Family Trustee unless otherwise provided by the Sandy Hook Family Trust Agreement.  The Sandy Hook Family Trust Agreement shall establish an oversight committee (the "***Litigation Committee***") consisting of [•] Sandy Hook Families to oversee performance of the Sandy Hook Family Trustee's duties with respect to the Litigation Assets and otherwise serve the functions to be described in this Plan and the Sandy Hook Family Trust Agreement.

The Sandy Hook Family Trustee shall be responsible for all decisions and duties with respect to the Litigation Assets, subject to the authority granted to it under this Plan, the Confirmation Order, and the Sandy Hook Family Trust Agreement, as applicable, and shall file periodic public reports on the status of claims reconciliation and distributions, [which reports may be included in the quarterly reporting required by the U.S. Trustee].  In addition, the Sandy Hook Family Trustee shall issue quarterly written reports and engage in update calls upon reasonable request with representatives of the Sandy Hook Families.

The Sandy Hook Family Trustee shall owe fiduciary duties to all holders of Sandy Hook Family Trust Interests consistent with the fiduciary duties a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code owes to its constituents, and the Litigation Committee must consent to any proposed material action, including any settlement in respect of any action, by the Sandy Hook Family Trustee in accordance with the terms of the Sandy Hook Family Trust Agreement.

C.  *Assignments*

On the Effective Date, the Non-Dischargeable Claims will be assigned to the Sandy Hook Family Trust.

D.  *Sandy Hook Family Trust Assets*

On the Effective Date, all Sandy Hook Family Trust Assets other than the Optional Future Payments, if applicable, will vest in the Sandy Hook Family Trust.  For the avoidance of doubt, the Exempt Assets will not vest in the Sandy Hook Family Trust, unless proceeds of Exempt Assets constitute Replacement Cash.

The Sandy Hook Family Interests shall be transferrable at any time in the sole discretion of the Sandy Hook Family Trust in accordance with the terms of the Sandy Hook Family Trust Agreement; *provided that*, in the event that Jones makes the Optional Future Payments Election, the equity interests in FSS will be treated in accordance with Article V.D of this Plan.

Under section 1141(b) of the Bankruptcy Code, the Sandy Hook Family Trust Assets shall be assigned, transferred, and vest in the Sandy Hook Trust upon the occurrence of the Effective Date, free and clear of all Claims, Liens, encumbrances and interests; *provided, however, that* the Sandy Hook Family Trustee may abandon or otherwise not accept any assets that the Sandy Hook Family Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the Sandy Hook Family Trust in accordance with the terms of the Sandy Hook Family Trust Agreement.  Any assets that the Sandy Hook Family Trustee so abandons (whether before or after the Effective Date) or otherwise does not accept shall not be Sandy Hook Family Trust Assets.

E.  *Litigation Assets*

The following assets constitute "***Litigation Assets***" and will vest in the Sandy Hook Family Trust and be administered by the Sandy Hook Family Trustee in accordance with the terms described herein:

1.    **Initial Litigation Funding**.  A total of $[•] in Cash, which shall be funded by Jones's Estate to the Sandy Hook Family Trust for administrative expenses in connection with administering the Litigation Assets; *provided that* the source and manner of funding shall be acceptable to the Sandy Hook Family Trustee; *provided, further, that* a portion of the proceeds from liquidation of the Litigation Assets may be retained by the Sandy Hook Family Trustee in its discretion as continued funding for administration of the Litigation Assets.

2.    **Trust Causes of Action**.  All Causes of Action (a) belonging to Jones's Estate, whether or not initially asserted prior to Confirmation, including, but not limited to, any estate

claims or causes of action against or related to Jones, any Insider or Affiliate of Jones, and (b) the Texas State fraudulent conveyance action filed by Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine previously removed and then transferred to the Bankruptcy Court (together, such Causes of Action, the "***Trust Causes of Action***").

3.     **Release Settlement Payments**.   All Release Settlement Payments made to the Sandy Hook Family Trust shall immediately vest in the Sandy Hook Family Trust upon payment.

4.     **Books & Records**.   Jones's books and records, including all documents, communications, and information of Jones, any Jones Trusts, and any entities owned by Jones, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege, or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets.   All discovery obtained by the UCC during the Chapter 11 Case shall be transferred to the Sandy Hook Family Trust.

5.     **Investigative Powers**.   The Sandy Hook Family Trust and the Sandy Hook Family Trustee will retain the right to conduct any discovery related to the acts, conduct, or property, or to the liabilities and financial condition of Jones, or to any matter which may affect the administration of Jones's Estate or any Trust Causes of Action, or to Jones's right to a discharge, under Bankruptcy Rule 2004, to the full extent that such powers were available prior to the Effective Date.

6.     **Audit Powers**.   The Sandy Hook Family Trust or the Sandy Hook Family Trustee may retain a professional to conduct financial audits of Jones as necessary and request information from applicable third parties in connection with the same (including Erika Jones and David Jones) to ensure the veracity of financial disclosures and the accuracy of the Jones Income and the Optional Future Payments.

7.     **Privileges**.   All privileges in respect of the Trust Causes of Action, including the attorney-client privilege, held by Jones shall transfer to the Sandy Hook Family Trust.

F.   *Confidentiality*

The Sandy Hook Family Trustee shall be deemed a party to the Protective Order and shall be permitted to receive Discovery Material, Confidential Material, and Professionals' Eyes Only Material (each as defined in the Protective Order) in accordance with the terms thereof.

G.   *Tax Treatment of Sandy Hook Family Trust Under Applicable Laws*

The Sandy Hook Family Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable.   The Sandy Hook Family Trustee shall be the "administrator" of the Sandy Hook Family Trust within the meaning of Treasury Regulations section 1.468B-2(k)(3).   Notwithstanding the foregoing provisions of this Article IV.G, the Sandy Hook Family Trust shall be implemented with the objective of maximizing tax efficiency to the holders of Sandy Hook Family Trust Interests. In the event of a final determination under section 1313(a) of the Internal Revenue Code that the Sandy Hook Family

Trust does not qualify as a "qualified settlement fund", the holders of Sandy Hook Family Trust Interests and the Sandy Hook Family Trustee intend that the Sandy Hook Family Trust be treated as a partnership, liquidating trust or other tax-efficient entity for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Sandy Hook Family Trust to be treated as such a partnership or other tax-efficient entity.

The Sandy Hook Family Trustee shall be responsible for filing all tax returns of the Sandy Hook Family Trust and the payment, out of the assets of the Sandy Hook Family Trust in accordance with the Sandy Hook Family Trust Agreement, of any taxes due by or imposed on the Sandy Hook Family Trust. The Sandy Hook Family Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Sandy Hook Family Trust for all taxable periods through the dissolution thereof. Nothing in this Article IV.G shall be deemed to determine, expand, or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

H. *Transferability and Certain Securities Law Matters*

Unless the Sandy Hook Family Trust Agreement expressly provides otherwise, any and all Sandy Hook Family Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all Sandy Hook Family Trust Interests will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

I. *Retention of Professionals*

The Sandy Hook Family Trustee, upon consultation with the UCC prior to the Effective Date, may enter into employment agreements and retain professionals, including any necessary accountants, in furtherance of the administration of the assets of the Sandy Hook Family Trust, without further order of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF NON-DISCHARGEABLE CLAIMS

A. *Non-Dischargeable Claims*

Unless Jones makes the Optional Future Payments Election and satisfies all of the requirements thereunder in accordance with the Plan, the Plan will not discharge any Non-Dischargeable Claim and the rights of the Sandy Hook Families, acting through the Sandy Hook Family Trust, to exercise all rights, remedies, and other legal entitlements, whether arising under state, federal, or foreign law, with respect to the Non-Dischargeable Claims are expressly preserved and nothing to the contrary in the Plan will limit, affect, or otherwise impact such rights; *provided that* no individual holder of any Sandy Hook Family Claim shall be entitled to receive more than the aggregate Allowed amount of such Holder's Sandy Hook Family Claim on account of such Claims.

For the avoidance of doubt, if Jones does not timely make the Optional Future Payment Election in a manner consistent with this Plan, all Sandy Hook Family Trust Assets will still vest in the Sandy Hook Family Trust in accordance with <u>Article IV.D</u> of this Plan and all assignments to the Sandy Hook Family Trust shall still be made pursuant to <u>Article IV.C</u> of this Plan. Additionally, in such event, there shall be no restrictions on the ability of holders of Sandy Hook Family Trust Interests to exercise the governance and voting rights of the equity interests in FSS that have vested in the Sandy Hook Family Trust, or to transfer, sell, or otherwise dispose of such equity interests in FSS.

B. *Optional Future Payments Election*

In the event Jones elects to make the Optional Future Payments in accordance with its terms of this <u>Article V</u> (the "***Optional Future Payments Election***"), on or before the date that is two (2) Business Days prior to the commencement of solicitation of votes on the Plan, Jones shall deliver a notice in writing to counsel to each of the Sandy Hook Families, the Sandy Hook Family Trustee, and the UCC indicating that he has made such election. If Jones does not deliver notice of the Optional Future Payments Election by such date, he will be prohibited from making such election in the future unless otherwise agreed in the sole discretion of the Sandy Hook Family Trust. The Optional Future Payments Election will not affect the vesting of the Sandy Hook Family Trust Assets in the Sandy Hook Family Trust, or the Jones Transfer Obligation, which will occur independently by operation of law and regardless of whether Jones makes the Optional Future Payments Election.

C. *Forbearance Period*

Upon the receipt by counsel to the Sandy Hook Families, Sandy Hook Family Trustee, and UCC of the Optional Future Payments Election, the Sandy Hook Families will agree to forbear from exercising their rights with respect to the Non-Dischargeable Claims against Jones and FSS for so long as Jones continues to make the Optional Future Payments in accordance with <u>Article V.E</u> of this Plan until the occurrence of the Full Discharge Trigger or the occurrence of any Event of Default (the "***Forbearance Period***").

The Sandy Hook Family Trustee may, at the direction of the Sandy Hook Families, waive any Event of Default deemed waivable by <u>Article XI</u> of this Plan and the Forbearance Period shall be reinstated, in a writing sent by the Sandy Hook Family Trustee. Any such waiver may impose additional terms and conditions, including a requirement that Jones remedy the default that triggered the Event of Default.

D. *FSS Equity Interests*

If and only if Jones elects to make the Optional Future Payments Election, the Sandy Hook Family Trust shall hold all Jones's equity interests in FSS in trust during the Forbearance Period; *provided that* the Sandy Hook Family Trustee shall determine the most tax efficient and administratively feasible manner to hold such interest, subject to the consent of the holders of the Sandy Hook Family Trust Interests, and the Sandy Hook Family Trustee must at all times comply with its obligations under this Plan. For the avoidance of doubt, neither the Sandy Hook Family Trustee, nor any individual member of the Sandy Hook Families may (a) transfer, sell, or dispose

20

of Jones's equity interests in FSS or (b) exercise any voting power with respect to the FSS equity interests or otherwise control or manage FSS's business, in each case, during the Forbearance Period.

E. *Optional Future Payments*

Commencing on the Effective Date, if Jones has made the Optional Future Payments Election in a manner consistent with this Plan, Jones will transfer or cause to be transferred to the Sandy Hook Family Trust the following payments each calendar year until the occurrence of the Full Discharge Trigger:

1. $8,500,000 (such payments collectively, the "***Minimum Annual Payments***") by no later than January 30th of such calendar year.

2. [50]% of all Jones Excess Income (such payments collectively, the "***Additional Payments***"), if any, by no later than the date that is fifteen (15) days following delivery of the Jones Annual Income Report.

All Optional Future Payments will vest in the Sandy Hook Family Trust free and clear of all Claims, Liens, encumbrances and interests.

F. *Failure to Make the Optional Future Payments*

In the event that Jones timely makes the Optional Future Payments Election in a manner consistent with this Plan but fails to make the Optional Future Payments by the dates and in the manner prescribed by this Plan, the Sandy Hook Family Trustee shall notify Jones of his failure to make such payment. Jones shall have fifteen (15) days from the receipt of this notice to make the applicable Optional Future Payment, such time to be extended only by the Sandy Hook Family Trustee in accordance with the Sandy Hook Family Trust Agreement. In the event that Jones has not cured his failure to make the applicable Optional Future Payment and the time for making such payment has not been extended, all Sandy Hook Family Trust Assets vested in the Sandy Hook Family Trust shall remain Sandy Hook Family Trust Assets to be administered and distributed by the Sandy Hook Family Trustee in accordance with the Sandy Hook Family Trust Agreement, the FSS Equity Interest Reversion shall not occur, and the Forbearance Period shall cease. For the avoidance of doubt, Jones' failure to make Optional Future Payments shall not reinstate any Non-Dischargeable Claims that have already been partially discharged pursuant to the occurrence of a Partial Discharge Trigger.

G. *Jones Annual Income Reports*

Jones will report in writing, under oath, no later than April 18th of each year following the year in which the Effective Date occurs (the "***Jones Annual Income Report***") all Jones Annual Income. Jones shall certify that the Jones Annual Income Report fully reports all Jones Annual Income. The Sandy Hook Family Trust will have the right to audit the Jones Annual Income Report and request information from Jones and applicable third parties (including but not limited to David Jones and Erika Jones) to verify the Jones Annual Income Report and ensure that income, payments or any other type of asset or consideration that would otherwise be part of Jones Annual

Income is not being diverted to third parties instead of Jones.  Jones shall comply with all such requests and, as applicable, cooperate to ensure third parties likewise comply.

H. *Discharge Triggers*

1. **Partial Discharge Trigger**.  Upon the occurrence of each Partial Discharge Trigger, Jones will receive a partial discharge of the Non-Dischargeable Claims in the Non-Dischargeable Claims Reduction Amount.

2. **Full Discharge Trigger**.  In exchange for remitting all the Optional Future Payments in accordance with this <u>Article V</u>, upon the occurrence of the Full Discharge Trigger, Jones will receive:

   a. <u>Non-Dischargeable Claims Discharge</u>.  Jones will receive a discharge of all remaining Non-Dischargeable Claims.

   b. <u>Obligations Regarding Sandy Hook Family Trust Assets</u>.  Jones's obligations with respect to the Sandy Hook Family Trust Assets shall cease.

   c. <u>FSS Equity Interest Reversion</u>.  Jones's equity interests in FSS will fully revert to Jones (the "FSS Equity Interest Reversion").  For the avoidance of doubt, no member of the Sandy Hook Families nor the Sandy Hook Family Trustee will be able to exercise any voting power or any control over the equity interests in FSS upon the occurrence of the FSS Equity Interest Reversion.

For the avoidance of doubt, the Full Discharge Trigger shall not occur unless all Optional Future Payments have been remitted in accordance with the terms of this Plan or the Sandy Hook Family Trustee has modified or waived such Optional Future Payments in accordance with the terms of the Sandy Hook Family Trust Agreement.

3. [•].

I. *Appeals*

In the event Jones makes the Optional Future Payments Election in accordance with this <u>Article V</u>, upon the occurrence of the Effective Date, any appeals relating to the Non-Dischargeable Claims, whether relating to a judgment on the merits of such claims or a judgment regarding the dischargeability of such claims, will be dismissed with prejudice.  For the avoidance of doubt, the Non-Dischargeable Claims shall not be subject to discharge regardless of whether they are the subject of a Non-Dischargeability Ruling unless and until the occurrence of the Discharge Trigger.

## ARTICLE VI.
## MEANS OF IMPLEMENTATION

This Plan will be implemented in accordance with the following provisions:

A.  *Plan Distributions*

1.  **Distributions to holders of Allowed Priority Claims**.  Distributions to holders of Allowed Priority Claims will be made as follows:

    a.  Professional Fee Claims.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to the applicable Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court.  To the extent the funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed Amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied by the Sandy Hook Family Trustee in Cash once Allowed or as soon as reasonably practicable thereafter.

    b.  Priority Tax Claims and Administrative Claims.  Holders of Allowed Priority Tax Claims and Allowed Administrative Claims shall receive Cash, which shall be satisfied by the Sandy Hook Family Trustee once Allowed or as soon as reasonably practicable thereafter.

2.  **Distributions to holders of Allowed Secured Claims.**  Distributions to holders of Allowed Secured Claims will be made on the Effective Date, which shall be satisfied in Cash once Allowed or as soon as reasonably practicable thereafter.

3.  **Distributions to holders of Allowed General Unsecured Claims**.  Holders of Allowed General Unsecured Claims shall receive satisfaction of their *pro rata* share of the General Unsecured Claim Cash Pool in full in Cash on the Effective Date, or as soon as reasonably practicable thereafter.

4.  **Distributions to holders of Allowed Sandy Hook Family Claims**.  Distributions to holders of Allowed Sandy Hook Family Claims, by means of the Sandy Hook Family Trust, shall be made in accordance with provisions of Article III and Article IV herein.

B.  *Jones Transfer Obligation*

Jones shall be fully responsible for taking all necessary actions required to vest the Sandy Hook Family Trust Assets in the Sandy Hook Family Trust (the "***Jones Transfer Obligation***"). The Jones Transfer Obligation begins on the Confirmation Date and must be completed in full no later than 30 (thirty) days after the Confirmation Date.  To the extent that Jones fails or refuses to comply with the Jones Transfer Obligation, there shall be no limitation on the rights and ability of the Sandy Hook Families, the Sandy Hook Family Trustee, and the UCC to petition any court of

competent jurisdiction to enforce the Jones Transfer Obligation pursuant to section 1142(b) of the Bankruptcy Code, any other provision of the Bankruptcy Code, or applicable non-bankruptcy law.

C. *Jones Full Disclosure*

No later than the Effective Date, Jones shall provide an affidavit (the "***Jones Full Disclosure***") containing all facts and information concerning his assets and/or any Causes of Action, held either directly or indirectly and including the assets set forth on **Exhibit A**, and any transfers of the Debtor's property exceeding $5,000 as to a gift for no exchange of goods or services and $25,000 as to all other transfers in the [ten (10)] years prior to the Petition Date and running through the Effective Date.  Discovery of any Material Misstatement in the Jones Full Disclosure shall constitute an Event of Default under Article XI of this Plan.

"***Material Misstatement***" means an omission by Jones or his representatives to disclose in the Jones Full Disclosure (a) an asset of the estate, held either directly or indirectly and including the assets set forth on **Exhibit A**, that reasonably could be argued to have a value of $5,000 or more; (b) any voluntary or involuntary transfer of cash or property within the ten (10) years prior to the Petition Date that reasonably could be determined to have a value of $5,000 or more that was not made in exchange for any service, product or other asset; or (c) any other voluntary or involuntary transfer of cash or property within the ten (10) years prior to the Petition Date that reasonably could be argued to have a value of $25,000 or more.  It shall not be a defense to a default based on a Material Misstatement that the subject asset(s) or transfer(s) were omitted inadvertently or based on good faith, mistaken judgment.

D. *Obligation to Cooperate*

Jones shall cooperate in good faith with the Sandy Hook Families, the UCC, the Jones Estate, FSS, and their respective representatives, in carrying out the terms of this Plan, including by responding timely to reasonable discovery requests in connection with actions by the Sandy Hook Family Trustee, cooperating in pursuing and obtaining any tax refund or royalty amounts to which Jones is entitled, and working with the Sandy Hook Families and/or the Sandy Hook Family Trustee to obtain a life insurance policy for the benefit of the Sandy Hook Family Trust, as described in Article V.H.2 of this Plan, *provided that*, unless Jones makes the Optional Future Payments Election, Jones's obligations to cooperate in the procurement of a life insurance policy will be limited to providing information and documents reasonably requested by the insurer.  Failure to do so, in each case, shall constitute an Event of Default (the "***Cooperation Event of Default***").

E. *Affirmative Covenants*

Jones shall also abide by the following affirmative covenants (each, an "***Affirmative Covenant***"):

1.      Jones shall provide reasonable notice to the Sandy Hook Family Trustee in advance of the formation and/or incorporation of any trust or other entity on his behalf, or from which he expects to potentially receive distributions, dividends, or other payments, or in which he owns a direct or indirect beneficial interest;

24

2.      If Jones elects to make the Optional Future Payments Election, continued performance under Jones's employment agreement with FSS, which employment agreement shall be in a form and substance acceptable to the Sandy Hook Families; and

3.      [•].

Failure to comply with any Affirmative Covenant shall constitute an Event of Default (an "***Affirmative Covenant Event of Default***").

F.  *Premarital Agreement*

Jones shall, in any event and regardless of whether he makes the Optional Future Payments Election, cooperate with the Sandy Hook Family Trustee's efforts to investigate and pursue any Litigation Causes of Action arising from or related to payments made pursuant to Premarital Agreement for the benefit of the Sandy Hook Family Trust.

G.  *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in this Chapter 11 Case shall dissolve automatically and the members thereof shall be released and discharged from all rights and duties arising from, or related to, this Chapter 11 Case, except that the UCC will stay in existence solely for the limited purposes of (a) receiving payment for its fees and expenses, including filing and prosecuting final fee applications of UCC Professionals and (b) participating in any appeals of the Confirmation Order.  The Debtor, the Estate, and the Sandy Hook Family Trust shall not be responsible for paying any fees or expenses incurred by any statutory committee appointed in this Chapter 11 Case after the Effective Date.

**ARTICLE VII.**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.  *Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, and regardless of whether or not such Executory Contract or Unexpired Lease is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, unless such Executory Contract or Unexpired Lease: (a) was previously assumed or rejected by the Debtor, pursuant to a Final Order of the Bankruptcy Court; (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (c) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the date of entry of the Confirmation Order; or (d) with the consent of the UCC, is specifically designated as a contract or lease to be assumed on the Schedule of Assumed Executory Contracts and Unexpired Leases.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article VII.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by Jones in accordance with its terms, except as such terms are modified by the provisions of the

25

Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions and/or rejections of the Executory Contracts and Unexpired Leases assumed, assumed and assigned, and/or rejected pursuant to the Plan.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

Notwithstanding anything to the contrary in the Plan, the UCC reserves the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and/or the Schedule of Rejected Executory Contracts and Unexpired Leases to add or remove any Executory Contract or Unexpired Lease at any time prior to the Effective Date.  The UCC shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases and/or the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby.

For the avoidance of doubt, the Premarital Agreement shall be rejected under this Plan, and all Claims arising thereunder shall be treated as Subordinated Claims.

B.  *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (a) the date of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (b) the effective date of such rejection; or (c) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time may be Disallowed, forever barred from assertion, and may not be enforceable against the Debtor, the Debtor's Estate, or its property.**  For the avoidance of doubt, the notice of the occurrence of the Effective Date served on all parties in interest shall include provisions setting forth the deadline for filing Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan and Confirmation Order.

The UCC reserves the right to classify any Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases as Subordinated Claims.

C.  *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan and the Confirmation Order shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree (the "***Cure Amount***").  In the event of a dispute regarding (a) the amount of any payments to cure such a default; (b) the ability of the Debtor, as applicable, to provide "adequate assurance of future

performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment.  At least ten (10) calendar days prior to the deadline to object to Confirmation of the Plan, the UCC shall provide for notices of proposed assumption or assumption and assignment and proposed Cure Amounts to be sent to applicable counterparties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related Cure Amount must be Filed, served, and actually received by the UCC by the deadline to object to Confirmation of the Plan.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Amount.**  To the extent an Executory Contract or Unexpired Lease is deemed rejected pursuant to Article VII.A hereof, but the subject counterparty did not receive notice of such rejection by the UCC, such counterparty shall be afforded the ability to dispute whether such assumption satisfies the requirements of Section 365(b) of the Bankruptcy Code; *provided that*, to the extent the UCC and the subject counterparty are unable to consensually resolve any such dispute or the Court determines a Cure Amount in an adverse manner to the UCC, the UCC may deem such Executory Contract or Unexpired Lease to be rejected as of the Effective Date.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, as applicable.  Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to: (a) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (b) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or lease or a change, if any, in the ownership or control of the Debtor under such contract or lease to the extent contemplated by the Plan; (c) increase, accelerate, or otherwise alter any obligations or liabilities of the Debtor under such Executory Contract or Unexpired Lease; or (d) create or impose a Lien upon any property or asset of the Debtor.  Each such provision shall be deemed to not apply to the assumption or assumption and assignment of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption or assumption and assignment in accordance with the terms set forth in this Article VII.C, shall forever be barred and enjoined from objecting to the proposed assumption or assumption and assignment or to the validity of such assumption or assumption and assignment (including with respect to any Cure Amounts or the provision of

adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

## ARTICLE VIII.
## RETENTION OF EXEMPT PROPERTY

All of the Exempt Assets shall be retained by Jones.

## ARTICLE IX.
## RELEASES AND EXCULPATIONS

A. *Releases*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, as applicable, from any and all claims and Causes of Action asserted by or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement executed to implement the Plan or any Claim or obligation arising under the Plan; *provided that* upon each occurrence of a Partial Discharge Trigger, Jones shall be a Released Party with respect to, and receive a partial release from, the Non-Dischargeable Claims solely to the extent of the Non-Dischargeable Claims Reduction Amount resulting from such Partial Discharge Trigger; *provided, further, that* subject to the immediately preceding proviso, Jones shall otherwise not be a Released Party and there shall be no release or exculpation of the Trust Causes of Action, the Non-Dischargeable Claims, or any other Claims or Causes of Action against Jones, non-minor members of his immediate family, or their Insiders or Affiliates, as applicable, until the occurrence of the Full Discharge Trigger, to the extent applicable.**

B. *Exculpations*

**Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Plan, the Disclosure Statement, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case in connection with this Plan, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of this Plan, including the issuance of Trust**

28

Interests or Sandy Hook Family Trust Interests pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan, shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

## ARTICLE X.
## CONDITIONS PRECEDENT TO EFFECTIVENESS

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived, *provided that* the UCC may, in its sole discretion, waive any such condition.

1.      The Sandy Hook Family Trust shall be established and the Sandy Hook Family Trust Assets vested therein;

2.      If Jones makes the Optional Future Payments Election, Jones and FSS shall have entered into an employment agreement, in the form and substance acceptable to the Sandy Hook Families;

3.      The Professional Fee Escrow Account shall have been funded;

4.      Jones shall have complied with his obligation to deliver the Jones Full Disclosure;

5.      the Bankruptcy Court shall have approved the Disclosure Statement, which may be approved by the Confirmation Order; and

6.      The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance reasonably acceptable to the UCC.

## ARTICLE XI.
## EVENTS OF DEFAULT

Upon the occurrence of any of the following events of default (each, an "***Event of Default***"), the Discharge Trigger shall become null and void and the Sandy Hook Family Trust shall have all available remedies arising under the Plan and/or any applicable federal,

state or foreign law to collect upon the judgments underlying the Non-Dischargeable Claims previously assigned to the Sandy Hook Family Trust:

  1.     failure by Jones to adhere to the Jones Transfer Obligation;

  2.     failure by Jones to respond to inquiries or requests for information from the Sandy Hook Family Trustee;

  3.     failure by Jones to otherwise abide by any of the terms of the Plan;

  4.     the occurrence of a Cooperation Event of Default;

  5.     the occurrence of an Affirmative Covenant Event of Default;

  6.     any public statement by Jones, any representative on behalf of Jones, or any member of Jones's family with respect to the Sandy Hook Families or their immediate family members later held by an order of a court of competent jurisdiction to be defamatory, libelous, slanderous, or otherwise false;

  7.     a Material Misstatement in the Jones Full Disclosure, regardless of when discovered;

  8.     if electing to make the Optional Future Payments, failure by Jones to timely make the Optional Future Payments as set forth in this Plan; *provided that* jurisdiction respecting this item 8 shall be non-exclusive;

  9.     if electing to make the Optional Future Payments, failure by Jones to properly and timely report the Jones Annual Income in the Jones Annual Income Report; and

  10.    [•];

*provided that* items 1–5, 7–9 above shall be subject to a fifteen (15) day cure period.  For the avoidance of doubt, the occurrence of any Event of Default under the plan shall not limit or in any way restrict the Sandy Hook Families, the Sandy Hook Family Trustee, or the UCC's ability to petition any court to direct Jones or any other necessary party to execute or deliver any instrument to effectuate any transfer of property necessary to consummate the transfers contemplated by this Plan, or by the Sandy Hook Family Trust Agreement, pursuant to section 1142(b) of the Bankruptcy Code, any other provision of the Bankruptcy Code, or applicable non-bankruptcy law.

## ARTICLE XII.
## RETENTION OF JURISDICTION

  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters

arising out of, or related to, the Chapter 11 Case, the Plan and the Confirmation Order pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. classify, allow, or disallow Claims and direct distributions of funds under the Plan and to hear and determine any controversies pertaining thereto;

2. hear and determine any and all applications and adversary proceedings and other matters arising out of or related to the Plan;

3. enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, or vacated;

4. liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

5. adjudicate all Claims to any Lien on any property or any proceeds thereof;

6. decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

7. hear matters related to the Sandy Hook Family Trust;

8. adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection therewith;

9. hear and determine disputes arising in connection with the Optional Future Payments and the Discharge Trigger;

10. hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of this Plan, the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

11. adjudicate, decide, or resolve matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

12. enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case with respect to any person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any person or Entity's rights arising from or obligations incurred in connection with the Plan;

13. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article X of this Plan; and

14. adjudicate, decide, or resolve matters brought pursuant to section 1142(b) concerning the delivery and execution of documents required to effect transfers of property

necessary for consummation of transactions contemplated by this Plan, the Plan Supplement, or the Sandy Hook Family Trust Agreement.

## ARTICLE XIII.
## MODIFICATION OF PLAN

The UCC and the Sandy Hook Families may propose amendments or modifications of this Plan at any time prior to Confirmation, without leave of the Bankruptcy Court, so long as such amendment or modification meets the requirements of section 1127(a) of the Bankruptcy Code and does not constitute a material modification of the Plan requiring additional disclosure under section 1125 of the Bankruptcy Code. After the Confirmation Date, the UCC and the Sandy Hook Families may, with approval of the Bankruptcy Court, and so long as it does not materially or adversely affect the interests of holders of Claims, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of this Plan.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon Jones and any and all holders of Claims (irrespective of whether their Claims are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with Jones.

B. *Discharge*

The provisions of the Plan will bind Jones and all holders of Claims against Jones, whether or not they accept the Plan. On the Effective Date, all holders of Claims will be precluded and enjoined from asserting any Claim against Jones, Jones's Estate, or Jones's assets or property based upon any transaction or any activity of any kind that have occurred prior to the Effective Date, during the duration of this Plan; *provided, however, that* holders of Allowed Sandy Hook Family Claims shall not be precluded or enjoined from asserting such Claims if (a) Jones does not elect to make the Optional Future Payments Election; or (b) Jones does elect to make the Optional Future Payments Election, if the Forbearance Period is not in effect; *provided*, *further*, *that* upon occurrence of a Discharge Trigger, the Non-Dischargeable Claims shall be discharged in accordance with this Plan.

C. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by the UCC with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the UCC unless and until the Effective Date has occurred.

D. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

E. *No Admission*

Nothing in this Plan shall be deemed to be an admission or any kind on behalf of the UCC any member of the Sandy Hook Families.

[*Remainder of page intentionally left blank*]

## Exhibit A

**Jones Assets**