**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | |
| ALEXANDER E. JONES, | ) | Case No. 22-33553 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**PROPOSED SPECIFIC DISCLOSURE STATEMENT
FOR THE CREDITORS' NON-UNIFORM INDIVIDUAL
<u>CHAPTER 11 PLAN OF LIQUIDATION FOR ALEXANDER E. JONES</u>**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr.
State Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Fax: (214) 969-4343
E-mail: mbrimmage@akingump.com

*-and-*

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Melanie A. Miller (*pro hac vice* pending)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Fax: (212) 872-1002
E-mail: dzensky@akingump.com
E-mail: sbrauner@akingump.com
E-mail: kporter@akingump.com
E-mail: akordas@akingump.com
E-mail: melanie.miller@akingump.com

***Counsel to the Official Committee of Unsecured
Creditors of Alexander E. Jones***

**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail: rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
E-mail: slascano@paulweiss.com
E-mail: virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
E-mail:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

*-and-*

Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

***Co-Counsel to the Texas Plaintiffs***

Dated:  January 5, 2024

THIS SPECIFIC DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS SPECIFIC DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS SPECIFIC DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

The information contained in this specific disclosure statement (as may be modified from time to time, the "Specific Disclosure Statement") for the *Creditors' Non-Uniform Individual Chapter 11 Plan of Liquidation for Alexander E. Jones* (as may be amended, supplemented or otherwise modified from time to time, the "Creditors' Plan")[1] proposed by the Official Committee of Unsecured Creditors of Alexander E. Jones (the "UCC"), the Connecticut Plaintiffs,[2] and the Texas Plaintiffs[3] (collectively, the "Sandy Hook Families" and together with the UCC, the "Creditor Plan Proponents") in the individual chapter 11 case (the "Chapter 11 Case") of Alexander E. Jones ("Jones" or the "Debtor") pending before the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") is included herein for purposes of soliciting acceptances of the Creditors' Plan and may not be relied upon for any purpose other than to determine how to vote on the Creditors' Plan.  No solicitation of votes to accept the Creditors' Plan may be made except pursuant to section 1125 of Title 11 of the United States Code (the "Bankruptcy Code").  Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Specific Disclosure Statement does not constitute the Bankruptcy Court's approval of the Creditors' Plan. Before deciding whether to vote for or against the Creditors' Plan, each holder of a Claim entitled to vote should carefully consider all of the information in the Creditors' Plan and this Specific Disclosure Statement, including the risk factors described in Article VIII herein.

The Creditor Plan Proponents believe that the Creditors' Plan is the best alternative for resolution of the Chapter 11 Case.  As of the date hereof, the Debtor does not support the Creditors' Plan and has filed a competing chapter 11 plan [Docket No. 523] (the "Jones Plan") and a related proposed disclosure statement [Docket No. 533] (the "Jones Disclosure Statement").

This Specific Disclosure Statement contains, among other things, a summary of key provisions of the Creditors' Plan, an explanation of certain statutory provisions, and a description of certain relevant background and events that took place prior to and during the Chapter 11 Case.  Although the Creditor Plan Proponents believe that these summaries and descriptions are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of the Creditors' Plan or statutory provisions or every detail of events described.  In the event of any inconsistency or discrepancy between a description in this Specific Disclosure Statement and the

---

[1] Capitalized terms used but not otherwise defined in this Specific Disclosure Statement shall have the meaning ascribed to such terms in the Creditors' Plan.  The summary of the Creditors' Plan provided herein is qualified in its entirety by reference to the Creditors' Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement).  In the case of any inconsistency between this Specific Disclosure Statement and the Creditors' Plan, the Creditors' Plan and related documents will govern.

[2] The "Connecticut Plaintiffs" are (i) David Wheeler; (ii) Francine Wheeler; (iii) Mark Barden; (iv) Jacqueline Barden; (v) Nicole Hockley; (vi) Ian Hockley; (vii) Jennifer Hensel; (viii) Donna Soto; (ix) Carlee Soto-Parisi; (x) Carlos M. Soto; (xi) Jillian Soto Marino; (xii) William Aldenberg; (xiii) William Sherlach; (xiv) Robert Parker; and (xv) Erica Lafferty.  Due to Erica Lafferty's chapter 7 bankruptcy, the trustee of her chapter 7 estate currently represents her financial interest in this proceeding.

[3] The "Texas Plaintiffs" are: (i) Neil Heslin; (ii) Scarlett Lewis; (iii) Leonard Pozner; (iv) Veronique De La Rosa; and (v) the Estate of Marcel Fontaine (the "Fontaine Estate").

terms and provisions of the Creditors' Plan or any other documents incorporated herein by reference, the Creditors' Plan or such other document will govern for all purposes.  A copy of the Creditors' Plan to which this Specific Disclosure Statement relates is attached hereto as <u>Exhibit A</u>.

Factual information contained in this Specific Disclosure Statement has been provided by the Debtor, except where otherwise noted.  Specifically, in preparing this Specific Disclosure Statement, the Creditor Plan Proponents relied on statements in the Jones Disclosure Statement, statements in the Debtor's Schedules and Statements (as defined herein) and monthly operating reports filed in the Chapter 11 Case, financial data derived from the Debtor's books and records, information derived from the UCC's Investigation (as defined herein), and various assumptions regarding the Debtor's businesses and assets.  The Creditor Plan Proponents make no representations or warranties as to the accuracy of the information, including financial information, contained herein or attached hereto. The Creditor Plan Proponents expressly caution readers not to place undue reliance on any financial or forward-looking statements contained herein.

This Specific Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  The Creditor Plan Proponents or any other authorized party may seek to investigate, file, and prosecute Claims and Causes of Action and may object to Claims after the Confirmation or the Effective Date of the Creditors' Plan, irrespective of whether this Specific Disclosure Statement identifies any such Claims or objections to Claims.

The Creditor Plan Proponents have not authorized any entity to give any information about or concerning the Creditors' Plan other than that which is contained in this Specific Disclosure Statement.  Moreover, the Creditor Plan Proponents have not authorized any representations concerning the Debtor or the value of his property other than as set forth in this Specific Disclosure Statement.

If the Creditors' Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims (including those holders of Claims who do not submit ballots to accept or reject the Creditors' Plan, who vote to reject the Creditors' Plan, or who are not entitled to vote on the Creditors' Plan) will be bound by the terms of the Creditors' Plan.

Confirmation and the effectiveness of the Creditors' Plan are subject to certain material conditions precedent described herein and set forth in <u>Article XI</u> of the Creditors' Plan.  There is no assurance that the Creditors' Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Creditors' Plan to go effective will be satisfied (or waived).

This Specific Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.  This Specific Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local, or foreign regulatory agency, nor has the SEC nor any other agency passed upon the accuracy or adequacy of the statements contained in this Specific Disclosure Statement.  Any representation to the contrary is a criminal offense.

The Creditor Plan Proponents cannot assure you that the Specific Disclosure Statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Case (i) will contain any of the terms described in this Specific Disclosure Statement or (ii) will not contain different, additional, or material terms that do not appear in this Specific Disclosure Statement.  A holder of a Claim entitled to vote on the Creditors' Plan should not rely on this Specific

Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Creditors' Plan.

After carefully reviewing this Specific Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Creditors' Plan by voting in favor of or against the Creditors' Plan on the enclosed ballot and returning the same, to the address set forth on the ballot, in the enclosed return envelope so that it will be received by [·], no later than 5:00 p.m. Central Time on [·], 2024].

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M. CENTRAL TIME ON [·], 2024.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Creditors' Plan (the "<u>Confirmation Hearing</u>") to begin on February 27, 2024, at [·] Central Time.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Creditors' Plan be filed and served on or before February 16, 2024, in the manner described in <u>Article VI</u> below.

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................................1

II.     BACKGROUND AND THE UNDERLYING STATE COURT LITIGATION.......................2
        A.      The Connecticut Litigation .......................................................................................3
        B.      The Texas Litigation ................................................................................................3

III.    CRITICAL EVENTS DURING THE CHAPTER 11 CASE.......................................................4
        A.      Commencement of the Chapter 11 Case ....................................................................4
        B.      Appointment of the UCC ..........................................................................................4
        C.      Lift Stay Motions Filed by the Sandy Hook Families ...............................................5
        D.      Filing of Schedules and Statements ..........................................................................6
        E.      The Nondischargeability Adversary Proceedings ......................................................7
        F.      The UCC's Investigation ........................................................................................10
        G.      Mediation ..............................................................................................................17
        H.      Expiration of Exclusivity .......................................................................................18
        I.      Circumstances Leading to the Filing of the Creditors' Plan .....................................18
        J.      Debtor's Reinstatement on Social Media Platform ..................................................21

IV.     KEY ASPECTS OF THE CREDITORS' PLAN.....................................................................21
        A.      General Basis for the Creditors' Plan ......................................................................21
        B.      Treatment of Unclassified Claims ...........................................................................22
        C.      Classification and Treatment of Claims ...................................................................24
        D.      Treatment of Non-Dischargeable Claims .................................................................26
        E.      The GUC Trust .......................................................................................................26
        F.      The Debtor's Obligations and Covenants .................................................................28
        G.      Releases and Exculpation .......................................................................................29

V.      CREDITORS' PLAN LIQUIDATION ANALYSIS ...............................................................30

VI.     SOLICITATION AND VOTING PROCEDURES .................................................................30
        A.      Ballots and Voting Deadline ...................................................................................31
        B.      Holders of Claims Entitled to Vote .........................................................................31
        C.      Bar Dates for Filing Proofs of Claim ......................................................................31
        D.      Tabulation of Votes ................................................................................................32

VII.    CONFIRMATION PROCEDURES ......................................................................................32
        A.      The Confirmation Hearing ......................................................................................32
        B.      Confirmation Standards ..........................................................................................32
        C.      Best Interests Test / Liquidation Analysis ...............................................................33
        D.      Feasibility ..............................................................................................................34
        E.      Confirmation Without Acceptance by All Impaired Classes .....................................34
        F.      Alternative Plan .....................................................................................................35

VIII.   RISK FACTORS .................................................................................................................35
        A.      Risks Related to the Chapter 11 Case ......................................................................35
        B.      Risk of Variance in Financial Results ......................................................................37
        C.      Additional Factors to Be Considered .......................................................................38

IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
        CREDITORS' PLAN ..........................................................................................................39
        A.      Tax Treatment of Holders of a General Unsecured Claim.........................................40
        B.      Tax Treatment of the GUC Trust .............................................................................41
        C.      Withholding on Distributions and Information Reporting ..........................................41

X.      RECOMMENDATION AND CONCLUSION.......................................................................42

## <u>TABLE OF EXHIBITS</u>

<u>**Exhibit A**</u>**:**      **Creditors' Plan**

<u>**Exhibit B**</u>**:**      **Schedule of Assets**

<u>**Exhibit C**</u>**:**      **Schedule of Claims and Causes of Action**

<u>**Exhibit D**</u>**:**      **Creditors' Plan Liquidation Analysis** (*forthcoming*)

**THE CREDITOR PLAN PROPONENTS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ANNEXED TO THIS SPECIFIC DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

## I.    INTRODUCTION

The Creditor Plan Proponents submit this Specific Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain holders of Claims against the Debtor in connection with solicitation of acceptances of the Creditors' Plan.  A copy of the Creditors' Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[4]

This Specific Disclosure Statement is intended to describe certain aspects of the Creditors' Plan, including the treatment of Claims, as well as certain aspects of the Debtor's financial position and other related matters.  Moreover, this Specific Disclosure Statement is intended to expand on certain insufficient disclosures contained in the Jones Disclosure Statement and correct certain inconsistencies and errors set forth therein.  For the avoidance of doubt, however, and particularly given the status of discovery and the state of the Debtor's books and records (as described herein), this Specific Disclosure Statement does not purport to correct all insufficiencies, inconsistencies, or inaccuracies in the Jones Disclosure Statement.  Moreover, this Specific Disclosure Statement does not purport to raise all concerns the Creditor Plan Proponents have identified in respect of the Jones Plan or the Jones Disclosure Statement.  The Creditor Plan Proponents will identify such concerns at the appropriate time in accordance with the confirmation schedule established by the Bankruptcy Court and reserve all rights to make any additional statements, assertions or objections in connection with the same.

On December 2, 2022, the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Sandy Hook Families are the largest creditors of the Debtor, with verdicts and judicial damages awarded thus far totaling in excess of $1.5 billion.  The six-member UCC appointed by the Office of the United States Trustee (the "U.S. Trustee") comprises exclusively representatives of the Sandy Hook Families, which hold Claims that were determined to be nondischargeable, in substantial part, by the Bankruptcy Court (as discussed further herein).[5]  As a result of this Chapter 11 Case pending for over a year without a viable path to emergence[6] and the Debtor's mismanagement of his affairs and the Estate prior to and after filing for bankruptcy protection, the UCC and the Sandy Hook Families, as co-proponents of the Creditors' Plan within the meaning of section 1129 of the Bankruptcy Code, determined to propose the Creditors' Plan, which they believe presents the only viable path out of chapter 11 for the Debtor and his creditors.[7]  The Creditors' Plan (i) provides for the equitable treatment of Claims, including the Sandy Hook Families' nondischargeable unsecured Claims; (ii) preserves valuable Estate Causes of Action for the benefit of creditors; (iii) allocates greater value to unsecured creditors than would a liquidation under chapter 7 of the Bankruptcy Code; (iv) will garner the requisite support of the creditors entitled to vote on the Creditors' Plan and meets all other requirements for Confirmation under the Bankruptcy Code; (v) has been proposed by the Creditor Plan Proponents in good faith; (vi) is fair and equitable; (vii) is feasible; and (viii) is in the best interests of creditors.

Specifically, the Creditors' Plan seeks to implement an orderly liquidation under chapter 11 of the Bankruptcy Code, while simultaneously preserving valuable Estate Causes of Action against third parties.  Under the Creditors' Plan, the Debtor's non-exempt assets will be sold and the proceeds distributed to creditors.  In addition, Estate Causes of Action against third parties, including those already identified by

---

[4] The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, financial statements, and notes thereto appearing elsewhere in this Specific Disclosure Statement and the Creditors' Plan.

[5] As a result of the Bankruptcy Court's determination that the Sandy Hook Families' Claims were, in large part, nondischargeable, the rights and interests of the Sandy Hook Families may differ from those of other General Unsecured Creditors.

[6] The Creditor Plan Proponents do not currently believe that the Jones Plan is viable, confirmable, or appropriate given the facts and circumstances of the Chapter 11 Case, which objections will be detailed in advance of the Confirmation Hearing.

[7] The Creditor Plan Proponents reserve the right to modify the Creditors' Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 2019.

the UCC's Investigation or which may later be discovered, will be transferred to the GUC Trust, and value from the prosecution and or settlement of such actions by the GUC Trustee will be preserved and distributed to those creditors who elect to receive interests in the GUC Trust. **Importantly, Confirmation of the Creditors' Plan will not affect the FSS Case[8] and will not impair the ability of FSS, the Debtor's wholly owned entity that is subject to a bankruptcy proceeding under subchapter V of chapter 11 of the Bankruptcy Code, to prosecute the FSS Plan[9] and perform thereunder if confirmed.**

Critically, the Creditors' Plan does not contemplate a discharge of any of the Debtor's nondischargeable Claims, including the Non-Dischargeable Claims held by the Sandy Hook Families. Nor does the Creditors' Plan provide the Debtor with a release from any prepetition liability. Accordingly, each of the Estate's creditors holding nondischargeable Claims will be free to pursue, enforce, and collect on their judgments against the Debtor in litigation and enforcement proceedings following the expiration of the automatic stay.

**THE CREDITOR PLAN PROPONENTS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE CREDITORS' PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND ITS CREDITORS. AT THIS TIME, THE CREDITOR PLAN PROPONENTS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASE. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE CREDITOR PLAN PROPONENTS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE CREDITORS' PLAN VOTE TO ACCEPT THE CREDITORS' PLAN.**

## II.     BACKGROUND AND THE UNDERLYING STATE COURT LITIGATION

The Debtor is an individual living in the state of Texas who is involved in numerous media projects and enterprises. The Debtor's media career spans almost three decades. The Debtor is the sole owner of FSS, which is subject to a separate bankruptcy case under subchapter V of chapter 11 of the Bankruptcy Code. The Debtor's income, including the income resulting from the operations of his directly and indirectly owned companies, is derived primarily from the production of media content and marketing opportunities through various media channels and related enterprises.

On December 14, 2012, a lone gunman shot and killed 20 first graders and six adults at Sandy Hook Elementary School in Newtown, Connecticut. Starting that day, the Debtor began, and continued, broadcasting on his radio show and across various media platforms false assertions that the shooting never took place, that the children who were killed were fictional, or "holograms," and that their parents—as well as those children that survived the attack—were actors perpetrating a fraud for money or political purposes. The instances of the Debtor's defamatory statements were much more pervasive than "[o]ne day on his show," and the Debtor did far more than "cover the event's official narrative with skepticism," as the Debtor suggests in the Jones Disclosure Statement.[10] Indeed, the Debtor's campaign of defamation and lies spanned many years and resulted in pervasive harassment and profound damage to the Sandy Hook Families.

Since 2018, the families of those killed at Sandy Hook Elementary School, as well as other individuals defamed by the Debtor, commenced litigation against the Debtor, some of which resulted in

---

[8] "FSS Case" means *In re Free Speech Systems LLC*, Case No. 22-60043-CML (Bankr. S.D.T.X. July 29, 2022).
[9] "FSS Plan" means the *Debtor's First Amended Plan of Reorganization Under Subchapter V of the Bankruptcy Code* [Docket No. 756] in FSS Case No. 22-60043-CML.
[10] Jones Disclosure Statement at 7.

verdicts and judgments against the Debtor, as described in more detail below.  This litigation falls broadly into two categories:  the "Connecticut Litigation" and the "Texas Litigation."

### A.    The Connecticut Litigation

Beginning in May 2018, the Connecticut Plaintiffs commenced lawsuits in Connecticut state court against the Debtor, FSS, and certain of their affiliates for, among other things, defamation, intentional infliction of emotional distress, invasion of privacy, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").[11]  These actions proceeded together, with the lead docket being *Lafferty v. Jones*, X06-UWY-CV-18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court.  As the litigation proceeded, the Debtor used it as a new profit center, claiming on his show that he was a victim of the Connecticut court's tyranny and soliciting donations in connection with his legal fees in defending himself against these lawsuits.  At the same time, the Debtor obstructed discovery directed to him and otherwise abused the court process, including by threatening plaintiffs' counsel. After giving the Debtor multiple opportunities to change course, participate fairly in the judicial process, and comply with court orders, and faced with the Debtor's absolute recalcitrance, the trial court issued a default judgment against the Debtor and scheduled a trial on compensatory and punitive damages.  At that trial, the jury awarded $965 million to the Connecticut Plaintiffs in compensatory damages and over $470 million in additional common law and statutory punitive damages, for a total of $1,438,139,555.94 (the "Connecticut Judgment").

### B.    The Texas Litigation

**Heslin and Lewis.**  On April 16, 2018, Neil Heslin filed a lawsuit in Texas state court against the Debtor, FSS, and certain of their affiliates for defamation, conspiracy, and intentional infliction of emotional distress.[12]  On October 31, 2018, Scarlett Lewis filed a similar lawsuit,[13] which was subsequently consolidated with Heslin's case (the "Heslin and Lewis Action").  As with the Connecticut Litigation, the Debtor turned these actions into a profit center, using his updates on the status of the litigation to sell supplements and other products to his audience.  Again here, the Debtor and FSS engaged in egregious obstruction and litigation misconduct, as a result of which they were repeatedly sanctioned and held in contempt, leading to an eventual default judgment on liability.  After a nine-day damages trial, at which the Debtor admitted that the Sandy Hook shooting was "100% real," a jury awarded Heslin and Lewis more than $4 million in compensatory damages and approximately $45 million in exemplary damages, amounts that were later upheld by the trial court over objections by the Debtor that they were barred by Texas statute (the "Heslin and Lewis Judgment").

**Pozner and De La Rosa.**  A separate lawsuit against the Debtor and FSS in Texas state court was commenced by Leonard Pozner and Veronique De La Rosa on April 16, 2018 (the "Pozner and De La Rosa Action").[14]  This lawsuit similarly served as a source of profit for the Debtor and included "unreasonabl[e] and vexatious[]" failure by the Debtor and other defendants to comply with their discovery duties, ultimately leading to a default judgment on liability for defamation (the "Pozner and De La Rosa Judgment" and, together with the Heslin and Lewis Judgment, the "Texas Judgment").  A trial on damages was originally scheduled for the summer of 2022, but was stayed by the filing of the FSS Case and then subsequently further stayed by this Chapter 11 Case.

---

[11]*Lafferty v. Jones*, X06-UWY-CV-18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court; *Sherlach v. Jones*, X06-UWY-CV-18-6046437-S, in the Judicial District of Waterbury of the Connecticut Superior Court; and *Sherlach v. Jones*, X06-UWY-CV-18-6046438-S, in the Judicial District of Waterbury of the Connecticut Superior Court.
[12]*Heslin v. Jones,* Cause No. D-1-GN-18-001835 in the 261st District Court of Travis County, Texas.
[13]*Lewis v. Jones,* Cause No. D-1-GN-18-006623 in the 98th District Court of Travis County, Texas.
[14]*Pozner v. Jones*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas.

**Fontaine**.  Marcel Fontaine was the first party to bring defamation and intentional infliction of emotional distress claims against Jones and FSS, commencing a lawsuit in Texas state court on April 2, 2018 (the "Fontaine Action").[15]  Unlike the other Creditor Plan Proponents, Fontaine's claims do not relate to the Sandy Hook shooting.  Instead, his claims arise from InfoWars' false reporting identifying him—by name and photo—as the murderer of 17 students and educators at a separate school shooting on February 14, 2018 at Marjory Stoneman Douglas High School in Parkland, Florida.  Even though Fontaine had no relation to the shooting and had never set foot in the state of Florida, the InfoWars stories identifying him as the shooter spread to an audience of millions.  This falsehood had a significant and detrimental effect on Fontaine's life until his death in May 2022, at which point the Fontaine Estate took over the litigation.

## III.   CRITICAL EVENTS DURING THE CHAPTER 11 CASE

### A.   Commencement of the Chapter 11 Case

On December 2, 2022, the Debtor sought individual bankruptcy protection by commencing this Chapter 11 Case.  The Debtor continues in possession of his Estate and is managing his Estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The commencement of this Chapter 11 Case followed the filing for bankruptcy protection by FSS and certain of Jones's other controlled entitles, which cases—other than the FSS Case—were procedurally consolidated for purposes of joint administration and later dismissed.[16]

### B.   Appointment of the UCC

On December 13, 2022, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 42], an official committee of unsecured creditors (the "UCC") was appointed in the Chapter 11 Case by the U.S. Trustee for the Southern District of Texas.  The UCC comprises representatives of six of the Sandy Hook Families.  The UCC was formed to represent the interests of all unsecured creditors and to enable such creditors to play a meaningful role in this Chapter 11 Case.

On December 19, 2022, the UCC selected Akin Gump Strauss Hauer & Feld LLP ("Akin") to serve as its counsel in connection with the Chapter 11 Case, which retention was approved by the Bankruptcy Court.[17]  On January 5, 2023, the UCC selected Nardello & Co. ("Nardello"), to aid in its review of the Debtor's Estate and prepetition transactions, which retention was approved by the Bankruptcy Court.[18]  Finally, the UCC completed its selection of professionals with the retention of Teneo Capital LLC ("Teneo" and, together with Nardello and Akin, the "UCC Advisors") on January 19, 2023 to serve as generalized financial advisor to the UCC, which retention was approved by the Bankruptcy Court.[19]

Since its formation, the UCC, with the assistance of the UCC Advisors, has played a significant and crucial role in this Chapter 11 Case, including:  (i) investigating and analyzing the Debtor's financial

---

[15] *Fontaine v. Jones*, Cause No. D-1-GN-18-001605 in the 459th District Court of Travis County, Texas.

[16] *In re InfoW LLC, et al.*, Case No. 22-60020-CML (Bankr. S.D.T.X. April 17, 2022); *In re IWHealth, LLC*, Case No. 22-60021-CML (Bankr. S.D.T.X. April 18, 2022); *In re Prison Planet TV, LLC*, Case No. 22-60022-CML (Bankr. S.D.T.X. April 18, 2022); *see Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [Case No. 22-60020, Docket No. 114].

[17] *Order Authorizing the Official Committee of Unsecured Creditors of Alexander E. Jones to Retain and Employ Akin Gump Strauss Hauer & Feld LLP as Counsel, Effective as of December 19, 2022* [Docket No. 157] (the "Akin Retention Order").  Akin is serving as counsel to the UCC on a pro bono basis, subject to the terms of the Akin Retention Order.

[18] *Order Authorizing Retention and Employment of Nardello & Co. LLC as Specialized Forensic Financial Advisor to the Official Committee of Unsecured Creditors, Effective as of January 5, 2023* [Docket No. 188] (the "Nardello Retention Order").  Nardello is serving as an advisor to the UCC on a pro bono basis, subject to the terms of the Nardello Retention Order.

[19] *Order Authorizing the Retention and Employment of Teneo Capital LLC as Financial Advisor to the Official Committee of Unsecured Creditors, Effective as of January 19, 2023* [Docket No. 220] (the "Teneo Retention Order").  Teneo is serving as an advisor to the UCC at reduced rates, subject to the terms of the Teneo Retention Order.

affairs; (ii) identifying and evaluating prepetition transactions carried out by, for the benefit of, or on behalf of the Debtor; (iii) identifying and evaluating potential Causes of Action belonging to the Estate; (iv) analyzing the Debtor's multiple iterations of Schedules and Statements (as defined herein), monthly operating reports, and other Bankruptcy Court filings; (v) conducting depositions of and collecting discovery from interested parties and third parties; (vi) engaging in continual plan and settlement-related negotiations with the Debtor and other parties in interest; (vii) working with the Debtor's advisors to establish consensual procedures for the sale of certain assets; (viii) participating in mediation sessions with the Debtor and other parties in interest; and (ix) presenting its positions before the Bankruptcy Court in various filings as well as at numerous hearings and status conferences.

### C.      Lift Stay Motions Filed by the Sandy Hook Families

With certain exceptions, the filing of a chapter 11 case operates as a stay with respect to the commencement or continuation of litigation against a debtor that was or could have been commenced before the bankruptcy filing.  Therefore, upon the commencement of this Chapter 11 Case, litigation against the Debtor—including the pending Texas Litigation and the Connecticut Litigation—was stayed.

On December 12, 2022, certain of the Sandy Hook Families whose cases had gone to trial (the "Sandy Hook Post-Trial Families")[20] filed the *Emergency Motion of the Sandy Hook Post-Trial Families for Relief From the Automatic Stay* [Docket No. 38] (the "Post-Trial Lift Stay Motion") requesting that the automatic stay in this Chapter 11 Case be lifted to permit the underlying state court verdicts against the Debtor belonging to the Sandy Hook Post-Trial Families to proceed to final judgment, as well as for any appeals of such final judgments to move forward as required by state law.[21]  On December 19, 2022, the Bankruptcy Court held an emergency hearing on the Post-Trial Lift Stay Motion and that same day entered the *Agreed Order Modifying the Automatic Stay* [Docket No. 58] (the "Post-Trial Lift Stay Order"), granting the Post-Trial Lift Stay Motion, but enjoining the Sandy Hook Post-Trial Families (and others) from exercising any remedies to collect or enforce any judgment against the Debtor's assets or the Estate.

On January 20, 2023, Pozner and De La Rosa, whose cases had not gone to trial, filed their *Motion for Relief from the Automatic Stay Against Alexander E. Jones* [Docket No. 113] (the "Pozner and De La Rosa Lift Stay Motion") seeking to lift the automatic stay to permit their case to proceed to trial and final judgment, thereby allowing Pozner and De La Rosa to liquidate their claims against the Debtor and establish their right to recover from the Debtor in this case.  On February 7, 2023, the Debtor filed an objection to the Pozner and De La Rosa Lift Stay Motion [Docket No. 137].

Following the Debtor's objection to the Pozner and De La Rosa Lift Stay Motion and negotiations between the Debtor, FSS, Pozner, De La Rosa, and the Fontaine Estate,[22] the Debtor and FSS together filed a motion [Docket No. 324] (the "Pozner and De La Rosa Settlement Motion") on June 8, 2023 and a related proposed agreed order [Docket No. 359] seeking approval of a settlement (the "Pozner and De La Rosa Settlement") between the parties that would, among other things:

---

[20] The Sandy Hook Post-Trial Families include: Neil Heslin, Scarlett Lewis, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto, Jillian Soto-Marino, Mathew Soto, William Aldenberg, William Sherlach, Robert Parker and Rich Coan, Trustee for the Estate of Erica Lafferty/Erica Lafferty Ash.

[21] When the Post-Trial Lift Stay Motion was filed, the automatic stay in the FSS Case had already been lifted to permit the Sandy Hook Post-Trial Families' respective state court actions to proceed to final judgment.  *See Order Modifying Automatic Stay to Allow Heslin/Lewis Trial to Continue to Final Judgment* [Docket No. 16] and *Agreed Order Modifying Automatic Stay to Allow the Connecticut Litigation to Continue to Final Judgment* [Docket No. 117] in FSS Case No. 22-60043 (CML).

[22] While the Fontaine Estate did not file a lift stay motion, the Pozner and De La Rosa Settlement and the negotiations related thereto include the claims of the Fontaine Estate.

5

      **i.**       permit Pozner, De La Rosa, and the Fontaine Estate to establish liquidated claim amounts solely for bankruptcy purposes, including plan voting and distribution on account of their Claims;

      **ii.**      lift the automatic stay solely to allow pre-trial proceedings and discovery in the Pozner and De La Rosa Action to proceed if no documented consensual agreement among the Debtor, FSS, and the Sandy Hook Families with respect to a chapter 11 plan for each of the Debtor and FSS could be reached by August 31, 2023; and

      **iii.**     lift the automatic stay to allow the respective state court litigation in the Pozner and De La Rosa Action and the Fontaine Action to proceed to liquidate the respective parties' underlying state court claims (but not to permit Pozner, De La Rosa, or the Fontaine Estate to enforce any judgment against FSS or the Debtor or to otherwise seek to collect from FSS or the Debtor outside of their respective bankruptcy cases), if no documented consensual agreement among the Debtor, FSS, and the Sandy Hook Families with respect to a chapter 11 plan for each of Debtor and FSS could be reached by October 20, 2023 with respect to the Pozner and De La Rosa Action and December 1, 2023 with respect to the Fontaine Action, but with the possibility to extend any of the above deadlines by the agreement of the parties.

On June 29, 2023, the Bankruptcy Court held a hearing on the Pozner and De La Rosa Settlement Motion and granted the relief requested. On December 5, 2023, the Debtor and FSS filed the *Joint Notice Regarding Agreed Order on Debtors' Motion for Approval of Compromise and Settlement Under Federal Rule of Bankruptcy Procedure 9019* [Docket No. 514], indicating that the Debtor, FSS, and the Texas Plaintiffs have agreed to extend certain dates in the Pozner and De La Rosa Settlement Order such that, if no documented consensual agreement among the Debtor, FSS, and the Sandy Hook Families with respect to a chapter 11 plan for each of the Debtor and FSS can be reached by (i) May 1, 2024, then the automatic stay will lift solely to allow pre-trial proceedings and discovery to move forward in the Pozner and De La Rosa Action; and (ii) June 3, 2024, then the automatic stay will lift with respect to the commencement of a trial.

### D.     Filing of Schedules and Statements

On December 14, 2022, the Debtor filed the *Debtor's Motion for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Statements of Financial Affairs* [Docket No. 45] seeking an extension of the time within which the Debtor must file his schedules of assets and liabilities and statements of financial affairs (as amended, modified, and supplemented from time to time, the "Schedules and Statements") until January 16, 2022, for a total of 45 days from the Petition Date. Ordinarily, pursuant to Bankruptcy Rule 1007(c), schedules and statements must be filed within 14 days of the commencement of a chapter 11 case. The Bankruptcy Court granted this motion on December 19, 2022 [Docket No. 57], extending the requested deadline to January 17, 2022.

On January 12, 2023, the Debtor filed the *Stipulation and Agreed Order Regarding Additional Extension of Time for Debtor to File his Schedules and Statements* [Docket No. 88], by which the Debtor sought an additional 21-day extension of time to file his Schedules and Statements to February 14, 2023. On January 13, 2023, the UCC filed the *Statement and Reservation of Rights of the Official Committee of Unsecured Creditors of Alexander E. Jones in Respect of the Proposed Stipulation and Agreed Order Regarding Additional Extension of Time for Debtor to File his Schedules and Statements* [Docket No. 91] to emphasize the importance of transparency in the chapter 11 process, and the UCC's expectation of complete and accurate Schedules and Statements. On January 20, 2023, the Bankruptcy Court entered this

order with an additional 7-day extension, extending the requested deadline to February 14, 2023 [Docket No. 107].

On February 14, 2023, the Debtor filed his initial schedules and statements [Docket Nos. 161, 162] (the "Initial Schedules and Statements"). On March 3, 2023, the UCC filed the *Emergency Motion of the Official Committee of Unsecured Creditors of Alexander E. Jones to Compel Debtor to File Amended Schedules and Statements in Compliance with 11 U.S.C. § 521* [Docket No. 189], detailing the deficiencies and inaccuracies contained within the Initial Schedules and Statements. These deficiencies and inaccuracies included: (i) listing the value of several key assets as unknown; (ii) omitting assets listed as owned by the Debtor in public records; (iii) filing information inconsistent with the Debtor's monthly operating reports; (iv) various internal inconsistencies within the Initial Schedules and Statements; and (v) failing to disclose property transfers referenced in other filings. By its motion, the UCC sought an order from the Bankruptcy Court compelling the Debtor to file complete and accurate Schedules and Statements by March 24, 2023. On March 8, 2023, the Bankruptcy Court entered an order granting the UCC's motion [Docket No. 206], ordering the Debtor to file complete and accurate Schedules and Statements, but extending the compliance deadline to March 30, 2023.

On March 30, 2023, the Debtor filed his first amended Schedules and Statements (the "First Amended Schedules and Statements") [Docket Nos. 231, 232]. Concurrently, the Debtor filed a motion seeking authorization to file his Schedules and Statements under seal [Docket No. 230]. On April 18, 2023, the UCC filed its *Statement and Reservation of Rights by the Official Committee of Unsecured Creditors of Alexander E. Jones Regarding Amended Schedules and Statements* [Docket No. 241], detailing further inaccuracies in the Debtor's First Amended Schedules and Statements, which included: (i) failing to account for approximately $900,000 of cryptocurrency proceeds and $1.5 million of trust proceeds; (ii) failing to disclose certain ownership interests in LLCs; (iii) omitting a tax refund that was included on the initial Schedules and Statements; and (iv) failing to explain reported increases in the Debtor's wages and transfers of property to his family members.

On April 18, 2023, the Debtor filed his second amended Schedules and Statements (the "Second Amended Schedules and Statements") [Docket Nos. 242, 243]. On April 20, 2023, the Debtor filed the *Debtor's Response to Statement and Reservation of Rights by the Official Committee of Unsecured Creditors of Alexander E. Jones Regarding Amended Schedules and Statements* [Docket No. 245].

On November 26, 2023, the Debtor filed his third amended Schedules and Statements (the "Third Amended Schedules and Statements") [Docket Nos. 501, 502], and expressly noted therein that he was reserving the right to further amend or supplement the Schedules and Statements as necessary. On December 20, 2023, the Bankruptcy Court entered an order granting the Debtor's March 30, 2023 motion to file his Schedules and Statements under seal [Docket No. 530].

In light of the continuing deficiencies and inaccuracies in the Schedules and Statements, the UCC determined it was therefore necessary to independently investigate the Debtor's assets and confirm the information set forth in the various iterations of the Schedules and Statements. The disclosures contained in this Specific Disclosure Statement and the attachments hereto reflect the additional work the UCC and its advisors conducted in respect of the Debtor's assets and identify certain assets that were not disclosed in either the Schedules and Statements or the Jones Disclosure Statement but that should be available to make distributions on account of the creditors' Claims.

### E.     The Nondischargeability Adversary Proceedings

On March 10, 2023, the Texas Plaintiffs and the Connecticut Plaintiffs each filed adversary complaints (together, the "Nondischargeability Complaints") to confirm the nondischargeability of the

judgments and awards entered in the Texas Litigation and the Connecticut Litigation.[23]  The Texas Plaintiffs and the Connecticut Plaintiffs each asserted that, because the trial courts in each of the underlying actions had found that the Debtor's defamatory conduct was "willful and malicious," the resulting judgments and awards could not be discharged in bankruptcy, meaning that each judgment would remain enforceable and collectable against the Debtor even after the conclusion of this Chapter 11 Case, irrespective of the nature of the plan confirmed or other resolution of the case.  In making this argument, the Texas Plaintiffs and the Connecticut Plaintiffs relied on section 523(a)(6) of the Bankruptcy Code, which provides that debts resulting from "willful and malicious injury by the debtor to another entity" are nondischargeable.

The Nondischargeability Complaints originally named FSS as a defendant.  However, there was a threshold legal issue as to whether a corporate debtor proceeding under subchapter V, like FSS, is subject to the exceptions to discharge contained in section 523(a) of the Bankruptcy Code.  Because this issue was on appeal to the Fifth Circuit in a separate, unrelated case, the Texas Plaintiffs and the Connecticut Plaintiffs stipulated to dismissing FSS without prejudice from the Nondischargeability Complaints and otherwise set forth a briefing schedule for certain steps in the adversary proceedings to proceed against the Debtor.[24]  On May 5, 2023, the Debtor filed answers in each of the adversary proceedings.[25]

Thereafter, on May 12, 2023, certain of the Texas Plaintiffs  and the Connecticut Plaintiffs each filed motions for summary judgment, arguing that, because there was no genuine dispute as to any material fact, the Bankruptcy Court should find, solely on the basis of the record before it and without the need for another trial, that neither the Texas Judgment nor the Connecticut Judgment was dischargeable in this Chapter 11 Case.  The Texas Plaintiffs and the Connecticut Plaintiffs each argued, among other things, that because the Texas Judgment and Connecticut Judgment were based on default judgments establishing that the Debtor was liable for acts of defamation and intentional infliction of emotional distress against the Texas and Connecticut Plaintiffs, those default judgments (and the facts deemed admitted as a result of them) established that the Debtor had committed "willful and malicious injury" against them.  The Texas Plaintiffs further argued that the facts in the trial court record also established that the Debtor had committed willful and malicious injury against them.  The Connecticut Plaintiffs further argued that other factual findings from the trial court, such as those contained in jury instructions and a post-trial damages opinion, also established that the Debtor had committed willful and malicious injury against them.

On June 13, 2023, the Debtor filed responses to the respective motions for summary judgment.[26]  In his responses, the Debtor argued, among other things, that the issue of "willful and malicious injury" against each of the Texas Plaintiffs and the Connecticut Plaintiffs had not been actually litigated or necessarily decided in the underlying state court litigation because the Debtor had not been permitted to submit his liability defense, and thus the default judgments entered in the Texas Litigation and the Connecticut Litigation could not be used as a basis for a finding that either of the Texas Judgment and Connecticut Judgment were nondischargeable.  The Debtor also argued that the issue of his "willful and malicious injury" was not essential to certain of the state court judgments because the juries in the underlying litigation could have based their awards on a "recklessness" standard of liability for defamation and intentional infliction of emotional distress, not upon the stricter "intentional" standard required for a

---

[23] *See Complaint to Determine Dischargeability of Debt*, *Heslin v. Jones*, Adv. Pro. No. 23-03035-CML, dated March 10, 2023 [Docket No. 1]; *Adversary Complaint Seeking Judgment that Sandy Hook Judgment is Non-Dischargeable Under Bankruptcy Code § 523(a)*, *Wheeler v. Jones*, No. 23-03037-CML, dated March 10, 2023 [Docket No. 1].

[24] *See Stipulation and Agreed Order Regarding the Dismissal of FSS from the Jones Adversary Proceedings and Schedule for the Answer and Summary Judgment Briefing*, *Heslin v. Jones*, Case No. 23-03035-CML, dated April 12, 2023 [Docket No. 39]; *Wheeler v. Jones*, Case No. 23-03037-CML, dated April 12, 2023 [Docket No. 13].

[25] *See Defendant's Answer*, *Heslin v. Jones*, Case No. 23-03035-CML, dated May 5, 2023 [Docket No. 24]; *Defendant's Answer*, *Wheeler v. Jones*, Case No. 23-03037-CML, dated May 5, 2023 [Docket No. 56].

[26] *See Defendant's Response to Movants' Motion for Summary Judgment*, *Heslin v. Jones*, Adv. Pro. No. 23-03035-CML, dated June 13, 2023 [Docket No. 32]; *Defendant's Objection and Response to Movants' Motion for Summary Judgment*, *Wheeler v. Jones*, Adv. Pro. No. 23-03037-CML, dated June 13, 2023 [Docket No. 61].

finding of "willful and malicious" conduct.  Accordingly, the Debtor argued that the "willful and malicious" aspect had not been established at the Texas trial court level, which meant that the Texas Judgment was in fact dischargeable in bankruptcy.  The Debtor made similar arguments with respect to the Connecticut Litigation, arguing that a finding of "willful and malicious" conduct was not necessary for the jury to award damages in that trial, as each of those awards could have been made on a finding of recklessness, thereby making them dischargeable in bankruptcy.

On July 15, 2023, the Bankruptcy Court held a hearing on the motions for summary judgment.  On October 19, 2023, the Bankruptcy Court issued a memorandum decision in each adversary proceeding, as described below.

### 1. *Heslin,* et al. *v. Jones*

The Bankruptcy Court issued its *Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones*, dated October 19, 2023 [Adv. Pro. No. 23-03035, Docket No. 46] and granted partial summary judgment for the Texas Plaintiffs, holding that:  (i) the portion of the Texas Judgment that was awarded based on the Debtor's liability for defamation was nondischargeable in bankruptcy because the Debtor's defamatory acts had been intentional; but (ii) the portion (if any) of the Texas Judgment that had been awarded based on the Debtor's merely reckless conduct in committing intentional infliction of emotional distress would be dischargeable.[27]

In its ruling, the Bankruptcy Court first found that the default judgments entered against the Debtor at the state court level had "fully and fairly litigated" the allegations against him, even though the Debtor had not presented his liability defense at trial.  Accordingly, the issue of whether the Debtor had committed "willful and malicious" injury against the Texas Plaintiffs had in fact been "actually litigated and necessarily decided" by the state court.  Second, in determining whether a finding of "willful and malicious injury" was essential to the Texas Judgment with respect to the Debtor's liability for both defamation and intentional infliction of emotional distress, the Bankruptcy Court looked to the Texas Plaintiffs' allegations that the Debtor was deemed to have admitted, as well as to the language of the jury instructions.  In doing so, the Bankruptcy Court found that approximately $4.3 million of the damages awarded for defamation flowed from allegations of the Debtor's intent to harm, not allegations of the Debtor's recklessness, meaning that this portion of the Texas Judgment was not dischargeable.  With respect to the allegations of intentional infliction of emotional distress, however, while the Bankruptcy Court found that the Debtor had actually intended to cause the Texas Plaintiffs harm, it was not clear how much of the jury award for these acts was based on a finding of willful and malicious injury and how much was based on a finding of recklessness.  Because any damage award based merely on recklessness would be dischargeable in bankruptcy, the Bankruptcy Court granted only partial summary judgment to the Texas Plaintiffs and indicated that a trial on damages would be required for both the Heslin and Lewis Action and the Pozner and De La Rosa Action.  On November 2, 2023, the Debtor filed a motion for leave to appeal the Bankruptcy Court's order in the United States District Court for the Southern District of Texas.[28]

### 2. *Wheeler,* et al. *v. Jones*

The Bankruptcy Court issued its *Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones*, dated October 19, 2023 [Adv. Pro. No. 23-03037, Docket No. 76] and granted summary judgment for the Connecticut Plaintiffs on all claims, except with respect to the jury's award of common law punitive damages.  The Bankruptcy Court concluded that the default judgments

---

[27] There has not yet been a damages trial in the Pozner and De La Rosa Action, and the Fontaine Action has not yet proceeded to trial.

[28] *See Heslin v. Jones,* 23-CV-4238.

entered against the Debtor at the state court level in the Connecticut Litigation had "fully and fairly litigated" the allegations against him.  The Bankruptcy Court further concluded that the issue of whether the Debtor had committed "willful and malicious" injury against the Connecticut Plaintiffs was "actually litigated and necessarily decided" by the state court.  In reviewing the jury instructions, the Debtor's deemed admissions in the Connecticut Litigation, and the post-trial damages opinion, the Bankruptcy Court found that the compensatory damage and common law damage portions of the Connecticut Judgment were nondischargeable because they were awarded based on findings that the Debtor was intentionally liable for defamation and intentional infliction of emotional distress, but that the common-law punitive damage portion of the Connecticut Judgment could have been awarded based on the Debtor's merely reckless (rather than intentional) conduct.  The Bankruptcy Court therefore granted summary judgment on the approximately $1.12 billion in compensatory and CUTPA punitive damages awarded by the Connecticut District Court but denied summary judgment on $321.65 million in attorneys' fees and approximately $1.5 million in costs awarded as common law punitive damages.  On November 2, 2023, the Debtor filed a motion for leave to appeal the Bankruptcy Court's order in the United States District Court for the Southern District of Texas.[29]

### F.     The UCC's Investigation

Upon its appointment, the UCC immediately commenced an investigation into the Debtor's assets and financial condition (the "<u>UCC's Investigation</u>").  The UCC's Investigation has focused on obtaining the most complete and accurate information possibly relevant to, among other topics, identifying the Debtor's assets and claims and Causes of Action for the benefit of the Estate.

Importantly, the UCC's Investigation (i) was designed to determine the magnitude of value recoverable from the Debtor, through litigation or otherwise, for the benefit of creditors, and (ii) involved an evaluation of claims and Causes of Action concerning the Debtor and the Debtor's prepetition transfers, including determination of whether such transfers were fraudulent conveyances, the value recoverable from third parties in respect of such transfers, the ability of the fraudulent transfer recipients to satisfy any judgment against them, and the likelihood of successfully collecting upon any such judgments.  The initial findings of the UCC's Investigation provide support for the Creditors' Plan.

### 1.     Discovery Process

From the outset, the Debtor claimed to lack many documents and professed ignorance about many matters pertaining to his businesses, personal finances, trusts, assets, and personal and professional affairs.  In addition, possession of, and responsibility for, business and financial records was sometimes confused among the Debtor, his father (Dr. David Jones), FSS, and PQPR Holdings Limited, LLC ("<u>PQPR</u>"), which the Debtor and his parents indirectly own together.

Under these circumstances, the UCC determined that it was necessary to seek records from a wide array of third parties, including the Debtor's family members, associated businesses, trustees, financial institutions, and others to fill significant information gaps.  The UCC's Investigation ultimately included subpoenas to more than thirty parties, seven depositions, and informal discovery requests and interviews.

The UCC's Investigation encompassed document discovery served on the Debtor, certain of the Debtor's family members (the "<u>Family Members</u>"), certain associates of the Debtor (the "<u>Debtor Associates</u>"), certain entities related or connected to the Debtor (the "<u>Debtor Related Entities</u>"), certain of the Debtor's lawyers and accountants (the "<u>Debtor Professionals</u>"), and banks and financial institutions

---

[29] *See Wheeler v. Jones,* 23-CV-4240.

("Financial Institutions") with which the UCC had reason to believe the Debtor conducted business or maintained accounts.

With respect to document productions, the UCC obtained and reviewed:

| Party / Third Party Category | Party / Third Party | Documents Produced (approx.) |
|---|---|---|
| Debtor | Alex Jones | 34,100 documents |
| Family Members | Carol Jones, David Jones, Erika Jones, Marleigh Jones, Austin Rivera | 11,500 documents |
| Debtor Related Entities | FSS, Mountain Way, PQPR | 10,000 documents |
| Debtor Associates | Joey Dalessio/ESG, Robert Dew, Timothy Fruge, Anthony Gucciardi, Patrick Riley, Jonathan Shroyer, Michael Zimmerman, Auriam Services LLC, Charlie Cicack | 3,000 documents |
| Financial Institutions | Ally Bank, American Express, Axos Bank, BAM Trading Services, Bank of America, Bank of England, Coinbase, De Lage Landen, Frost Bank, JP Morgan, PayArc, PlainsCapital Bank, PNC Bank, Prosperity Bank, Security Bank, Swan Bitcoin | 1,300 documents |
| Debtor Professionals | Donald Carnes, David Minton, Eric Taube | 700 documents |

The UCC also conducted depositions of the Debtor, David Jones, Erika Jones, Patrick Riley, Charlie Cicack, Robert Schleizer (the Debtor's financial advisor), and Joseph Dalessio.

While the UCC has obtained significant information through its discovery requests and depositions, the productions received have been far from complete. Numerous requests for documents and information were answered only partially and incompletely. As of the filing of this Specific Disclosure Statement, the Debtor, certain Debtor Related Entities, and the Debtor's Family Members have failed to make complete productions of the documents and information requested. PQPR has also refused to provide basic information, including information respecting its value, despite the fact that the Debtor indirectly owns 72% of the entity.

### 2.        Assets & Estate Causes of Action

Based on the discovery obtained to date, the UCC has reached several preliminary conclusions concerning the Debtor's assets, financial condition and Estate Causes of Action, with additional

determinations developing as the UCC receives additional information from discovery efforts outlined above. These findings support the Creditors' Plan put forth by the UCC. Among these findings are the identification of the following: (i) valuable Estate clawback claims; and (ii) assets that may be missing from the Schedules and Statements.

           i.      **Assets**

**Exhibit B** to this Specific Disclosure Statement identifies the assets the UCC has identified to date in which the Debtor has an ownership interest and which the Creditor Plan Proponents believe are available to creditors for satisfaction of Claims. While the Jones Disclosure Statement contains a list of assets in **Article IV.B**, the Debtor's list is missing several notable and valuable assets (some of which are included in the Schedules and Statements and monthly operating reports). The assets that have been omitted from the Jones Disclosure Statement and or the Schedules and Statements are notated as such in **Exhibit B**. In addition, the Debtor holds an interest in the trusts described below, which the Creditor Plan Proponents believe hold property that should be available to creditors.

Among his assets, the Debtor claims a homestead interest in a property located in Austin, Texas (the "Homestead Property") under the Texas Property Code and the Texas Constitution. In his Schedules and Statements, the Debtor discloses the value of the Homestead Property as $3,266,000. The Debtor claims to own $2,612,800 of the Homestead Property and claims that the remainder is owned by his wife, Erika Jones. Specifically, the Debtor claims that he transferred a 20% interest in the Homestead Property to Erika Jones on February 2, 2022 via a special warranty deed recorded on July 14, 2022. The UCC's Investigation reveals that a material amount of Jones's and FSS's funds have been spent on home construction and other expenses related to the Homestead Property and Jones's other properties. Information available to the UCC does not specify which portion of this value was spent on the Homestead Properties. Section 522(o) of the Bankruptcy Code provides that property a debtor claims as a homestead "shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of." As such, to the extent that the Debtor made improvements to the property claimed as a homestead with the intent to hinder, delay, or defraud his creditors, the value of the property claimed as a homestead may be reduced accordingly. The UCC is still evaluating whether to challenge any portion of the property claimed to be exempt under section 522(o) of the Bankruptcy Code in light of the material improvements made in the years leading up to the bankruptcy filing and after the Texas Litigation and Connecticut Litigation had been commenced. The deadline for the Committee to object to the Debtor's list of property claimed as exempt has been extended to thirty days after the conclusion of the Confirmation Hearing.[30]

The Debtor is a settlor, grantor, beneficiary, and/or trustee of at least seven trusts. In his Third Amended Schedules and Statements, the Debtor changed the value of certain trusts to "$0", apparently indicating that the Debtor now believes the assets in these particular trusts are not reachable by creditors.[31] Specifically, of his seven trusts, the Debtor appears to acknowledge that he has control over the assets of three of the trusts and that the assets are available to satisfy creditor Claims. Of the remaining four trusts,

---

[30] *See Fifth Stipulation and Agreed Order Granting the Official Committee of Unsecured Creditors of Alexander E. Jones an Extension of Time to Object to a Claim of Exemptions and Other Related Relief* [Docket No. 526].

[31] *See* Third Amended Schedules and Statements, Global Notes to Schedule A/B: Property – Part 4 – Financial Assets (stating that changes to disclosures concerning the Alexander E. Jones Descendent and Beneficiary Trust include edits to "remove[] value as this trust has been reviewed and is not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary" and changes to disclosures concerning the Greenleaf Trust include edits to "remove[] value as this trust has been reviewed and is not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary"; corresponding edits were not made to other trusts).

the Debtor has taken or appears to have taken the position that the assets held by two trusts are not reachable by creditors and that two of the trusts have no actual value. Notwithstanding the Debtor's position, claims may exist to reach assets that were fraudulently transferred into any trusts and the trust structures may be pierced if they were not properly constituted or properly administered. In addition, with respect to the Debtor's trusts, the Creditor Plan Proponents specifically note the following:

- ***2022 Litigation Settlement Trust***. The Debtor is a "Third-Party Funding Contributor" of the 2022 Litigation Settlement Trust. In his Second Amended Schedules and Statements, the Debtor identifies that this trust owns (i) InfoW, LLC fka Infowars, LLC, (ii) IWHealth, LLC fka Infowars Health, LLC, and (iii) Prison Planet TV, LLC, and reports that these entities own cash and various intellectual property, including the domain name Infowars.com. In the Third Amended Schedules and Statements, the Debtor lists the value of this trust at $66,935, indicating that the Debtor acknowledges that the assets are available to satisfy creditor Claims.

- ***AEJ 2018 Trust***. The Debtor is a beneficiary and trustee of the AEJ 2018 Trust. The Debtor is also a donor of the AEJ 2018 Trust, due to the donation of his interest in PLJR Holdings, LLC ("PLJR") to AEJ Austin Holdings, LLC ("AEJ Holdings") held by the AEJ 2018 Trust. In his Third Amended Schedules and Statements, the Debtor reports that the trust holds $10,002 in assets, which comprise the funds in the trust's bank account. In his Third Amended Schedules and Statements, the Debtor (i) fails to disclose that the AEJ 2018 Trust owns 100% of AEJ Holdings, (ii) fails to disclose that the Debtor gifted his 90% interest in PLJR, which owns 80% of PQPR, to AEJ Holdings when AEJ Holdings was held by the AEJ 2018 Trust, and (iii) fails to ascribe any value to the AEJ 2018 Trust's indirect ownership of 72% of PQPR. While the value of the 72% interest in PQPR is not identified, it is believed to be substantial. By listing a value for the trust in his Third Amended Schedules and Statements, the Debtor acknowledges that assets held in the AEJ 2018 Trust are available to satisfy creditor Claims.

- ***Alexander E. Jones Descendant and Beneficiary Trust***. The Debtor is the grantor of the Alexander E. Jones Descendant and Beneficiary Trust. The global notes to both the Third Amended Schedules and Statements and the Second Amended Schedules and Statements[32] indicate that this trust holds three condominium units valued at a total of $2,399,800. Nevertheless, in his Third Amended Schedules and Statements, the Debtor lists the value of the trust as "$0" and states in the global notes that the trust is "not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary."[33] As such, the Debtor appears to contend that the assets held in the Alexander E. Jones Descendant and Beneficiary Trust are not available to satisfy creditor Claims. As noted herein, claims exist to challenge the trust and to recover at least two of the condominium units held in this trust: (i) a claim to avoid the transfer of Unit 6 (valued at $828,300) to the trust as fraudulent; and (ii) a claim to recover Unit 5 (valued at $767,400), which is owned by RCGJ LLC, an entity wholly owned by Jones.

- ***Green Leaf Trust***. The Debtor is settlor and trustee of the Green Leaf Trust. The Debtor previously disclosed that the trust holds $127,094 in assets.[34] In his Third Amended Schedules and Statements, however, the Debtor lists the value of this trust as "$0" and

---

[32] *See* Second Amended Schedules and Statements, Schedule A/B, Part 4, No. 25 and Third Amended Schedules and Statements Schedule A/B, Part 4, No. 25.

[33] Third Amended Schedules and Statements at 4.

[34] *Id.*

states that the trust is "not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary." As such, the Debtor appears to contend that the assets held in the Green Leaf Trust are not available to satisfy creditor Claims.

- ***Recharge Dynasty Trust***. The Debtor is settlor and trustee of the Recharge Dynasty Trust. In his Third Amended Schedules and Statements, the Debtor lists the value of the trust as "$0." The valuation identified for the Recharge Dynasty Trust appears to indicate that the trust holds no assets, rather than to indicate that the Debtor contends that assets of the trust are not available to satisfy creditor Claims.

- ***RXXCTTGAA Trust***. The Debtor is the settlor, beneficiary, and trustee of the RXXCTTGAA Trust. In his Third Amended Schedules and Statements, the Debtor discloses that the trust holds $0 in assets. This valuation appears to be an error, rather than a contention that the Debtor believes that any assets in the trust would not be available to satisfy creditor Claims. The Debtor appears to have overlooked a bank account for the trust which held $13,954.01 as of the Petition Date. In addition, the Debtor fails to disclose that the trust technically owns the Homestead Property.

- ***The Missouri779384 Trust***. The Debtor is settlor, beneficiary, and trustee of The Missouri779384 Trust. The trust holds $54,519 in assets. In the Third Amended Schedules and Statements, the Debtor lists the value available to the Estate as $54,519, indicating that the Debtor acknowledges that the assets from this trust are available to satisfy creditor Claims.

### ii.    Estate Causes of Action

**Exhibit C** hereto identifies the viable and material Causes of Action the UCC has identified to date. The Jones Plan and Jones Disclosure Statement similarly fail to disclose these actions with specificity. Specifically, the Jones Plan defines "Avoidance Action" to mean "any cause of action under any of sections 544, 545, 546, 547, 548, 549, 550, 551 or 553(b) of the Bankruptcy Code, which actions are waived except as specified in the Plan," without identifying any specific causes of action or the value of such causes of action. Based on the UCC's Investigation, the following viable Estate Causes of Action exist that are not adequately disclosed in the Jones Disclosure Statement and should be preserved for the benefit of creditors.

### a.    *Avoidance Actions Against Erika Jones*

**Claims To Avoid Incurrence of Obligations.** On May 3, 2022, the Debtor signed a ratification purporting to obligate himself to make payments and provide other gifts to his current wife, Erika Jones, under an alleged Premarital Agreement. The Debtor signed the ratification after he had been found liable for his statements regarding the Sandy Hook Families and approximately seven months before the commencement of this Chapter 11 Case. From the date of the Debtor's marriage in January 2017, until May 3, 2022, neither the Debtor nor Erika Jones had ratified the Premarital Agreement. The Premarital Agreement specifically requires ratification as a condition precedent in order for the Debtor to have any obligation to make any payment or provide other gifts to Erika Jones. Accordingly, the Estate holds colorable claims to avoid the purported incurrence of any payment obligations to Erika Jones shortly before the Debtor filed for bankruptcy protection as constructively and intentionally fraudulent under applicable law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*. The Debtor has refused to commence an avoidance action in respect of the incurrence of this obligation and has failed to identify any authority that would indicate that incurrence of obligations is not voidable under the circumstances.

14

**Claims To Avoid Fraudulent and Preferential Transfers of Cash.**  In the four years prior to the Petition Date, the Debtor transferred at least $1,464,193 in cash to Erika Jones for no consideration; of that, $833,943 was transferred in the one year prior to the Petition Date.  The Estate holds claims to avoid all $1,464,193 of such transfers over the four years prior to the Petition Date as fraudulent under applicable state and federal law.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*[35]  The Debtor has argued that the transfers are not avoidable because they were made under the purported Premarital Agreement.  As noted above, however, the Premarital Agreement did not call for any payments absent ratification, which did not occur until May 3, 2022, and the ratification itself may be avoided as a fraudulent obligation.  Even if the payments were made pursuant to a valid obligation under the Premarital Agreement, however, at least $833,943 in transfers were made within one year prior to the Petition Date and would be avoidable as preferential transfers.  *See* 11 U.S.C. § 547.

**Claims To Avoid Fraudulent Transfers of Cars.**  In or around 2019, the Debtor transferred a Range Rover to Erika Jones for no consideration.  The Range Rover was valued at $86,500 at the time of the transfer.  The Estate holds claims to avoid the transfer and recover the Range Rover as a fraudulent transfer under applicable state and federal law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.*  The Debtor has argued that the Range Rover was transferred to Erika Jones under the purported Premarital Agreement.  As noted above, however, the Premarital Agreement did not call for any cars to be provided to Erika Jones absent ratification, which did not occur until May 3, 2022, and the ratification itself may be avoided as a fraudulent obligation.  In addition to the Range Rover, the Debtor jointly owns a certain 2017 model Audi A8 vehicle with Erika Jones, which was valued at $91,500 at the time of purchase and is valued at $25,000 currently.  The Debtor, however, has failed to disclose the Audi as one of his assets (despite the fact that the Audi is listed as property of the Debtor in public records) and suggests that it was given to Erika Jones.  To the extent the Range Rover was a valid transfer under the Premarital Agreement, Erika Jones was required to return the Audi to be traded in and used as part of the purchase price of the Range Rover.  The Estate holds claims to recover the Audi (or its value) as well as the Range Rover (or its value).

### b.   *Avoidance Action Claims against David Jones*

**Claims To Avoid Fraudulent Transfers of Real Property.**  In or around April 2022, the Debtor transferred a tract of real property to David Jones for no consideration (the "Ranch").  The assessed value of the Ranch in 2023 was $249,870.  The Estate holds claims to avoid the transfer and recover the Ranch as intentionally and constructively fraudulent under applicable state and federal law.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*  The Debtor and David Jones may argue that the land is not recoverable to the Estate because the Debtor intended to gift the property in 2017.  Although the document purporting to transfer the Ranch was backdated to 2017, the document was actually created in 2022 and notarized in 2022 and the transfer took place in 2022.

**Claims To Avoid Fraudulent and Preferential Transfers of Cash.**  In the four years prior to the Petition Date, the Debtor transferred $553,388 in cash payments to David Jones.  Almost all of these transfers were made within one year prior to the Petition Date.  David Jones has indicated that these payments were likely made as reimbursements for various expenses he incurred on the Debtor's behalf, but has produced documents showing that only a portion of those transfers ($218,148) were actually made to reimburse David Jones for such expenses.  For the payments made purportedly to reimburse David Jones for expenses he incurred on the Debtor's behalf, the Estate holds claims to recover the transfers as preferences.  *See* 11 U.S.C. § 547.  For any payment that was made within four years prior to the Petition

---

[35] Transfers made within two years prior to the Petition Date may be avoided under the Bankruptcy Code.  *See* 11 U.S.C. § 548.  Transfers made within four years prior to the Petition Date may be avoided under applicable law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.*  Additional Claims and doctrines are available to reach transfers and obligations made before four years prior to the Petition Date.

Date and was not made as a reimbursement or otherwise for value, the Estate holds claims to recover such transfers as a fraudulent under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* As such, the Estate holds claims to recover all of the transfers made within one year prior to the Petition Date as either preferential or fraudulent transfers, and to recover any transfers made within four years of the Petition date not for value, or made with intent to hinder or delay creditors, as fraudulent transfers.

**Claims To Avoid Fraudulent Transfers of Cars.** In October 2022, the Debtor transferred at least three vehicles to David Jones, including a Ford F-150 Raptor, a Dodge Challenger, and a Toyota 4Runner. These vehicles had an approximate value of $105,000 at the time of the transfers. Although David Jones may defend the transfers, upon information belief, the vehicles were all gifts from the Debtor to David Jones, and David Jones paid no consideration for the vehicles. The Estate holds claims to avoid the transfers and recover the vehicles or the value of the vehicles as fraudulent transfers under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

**Additional Claims.** The Estate may hold various additional claims, including various torts, breaches of trust, breaches of contract claims, or other claims against David Jones arising out of David Jones's extensive control of the Debtor's personal finances, control over various entities and trusts involving the Debtor, involvement in moving and diverting funds between and amongst these entities, and influence over PQPR.

### c. *Avoidance Action Claims Against Jonathon Owen Shroyer*

**Claims to Avoid Fraudulent Transfers of Cars.** In or around September 2021, the Debtor gifted a 2016 model Dodge Charger vehicle to Jonathon Owen Shroyer. Mr. Shroyer did not pay any consideration for the vehicle. The Estate holds claims to avoid the transfer and recover the vehicle or its value) as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

### d. *Avoidance Action Claims Against Rex Jones*

**Claims To Avoid Fraudulent Transfer of a Car.** In or around January 2022, the Debtor gifted a 2019 model Toyota Tacoma vehicle to his son, Rex Jones. Rex Jones did not pay any consideration for the vehicle. The Estate holds claims to avoid the transfer and recover the vehicle (or its value) as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

### e. *Avoidance Action Claims Against Patrick Riley*

**Claims To Avoid Fraudulent Transfer of a Boat.** In or around March 2022, the Debtor gifted a 2003 Glastron boat vehicle to his friend and associate, Patrick Riley. Mr. Riley did not pay any consideration for the boat. The Estate holds claims to avoid the transfer and recover the boat (or its value) as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* Although Mr. Riley has suggested that the boat was gifted years ago, it was not registered in his name until March 2022, and the Debtor continued to pay expenses for the boat even after the Petition Date. In the alternative, if Mr. Riley successfully defends a claim to recover the boat, the Estate holds claims to recover the payments the Debtor has made on account of the boat since the date of the purported transfer to Mr. Riley.

**Claims To Avoid Fraudulent Transfer of a Watch.** Between 2019 and 2020, the Debtor gifted a Tudor watch to Mr. Riley. Mr. Riley did not pay any consideration for the watch. The Estate holds claims

to avoid the transfer and recover the watch as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

        **f.**    *Avoidance Action Claims Against the Alexander E. Jones Descendent and Beneficiary Trust, David Jones, Trustee*

      <u>**Claims To Avoid Fraudulent Transfer of Real Property.**</u>  In or around February 2019, the Debtor caused the RXXCTTGAA Trust to transfer a condominium known as Unit 6 to the Alexander E. Jones Descendant and Beneficiary Trust for no consideration.  Unit 6 is valued as at least $828,300.  In his Third Amended Schedules and Statements, the Debtor contends that the assets of the Alexander E. Jones Descendant and Beneficiary Trust are not controlled by the Debtor[36] and has suggested that the assets are not reachable by his creditors.  However, the RXXCTTGAA Trust is a revocable trust completely controlled by the Debtor, and the Debtor admits that its assets are available to the Debtor and his creditors under applicable law.  As such, the Estate holds claims to avoid the transfer and recover Unit 6 as a fraudulent transfer under applicable state and federal law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

      <u>**Claims re Ownership of Real Property.**</u>  The Debtor has contended that a condominium known as Unit 5 is not property of the Estate because it is owned by the Alexander E. Jones Descendant and Beneficiary Trust and claims that the assets of the trust are not available to creditors.[37]  This is not accurate.  Travis County property records indicate that Unit 5 is owned by RCGJ, LLC ("<u>RCGJ</u>"), an entity in which the Debtor has a 100% ownership interest. The Debtor has produced no document showing an effective transfer of Unit 5 from RCGJ to the Alexander E. Jones Descendant and Beneficiary Trust.  Unit 5 is valued as at least $767,400 and is available to Jones's creditors.  If necessary to collect the property, the Estate and creditors hold claims for turnover, conversion, and to declare Unit 5 property of the Estate.

      <u>**Claims to Avoid Fraudulent Transfer of Payments for Condos.**</u>  The Debtor has paid numerous expenses for three condos that the Debtor now contends are owned by the Alexander E. Jones Descendant and Beneficiary Trust and thus are not reachable by his creditors.  As noted, the Estate holds claims to recover Unit 5 and Unit 6.  In the alternative, if the Alexander E. Jones Descendant and Beneficiary Trust successfully defends claims to recover the condos, the Estate holds claims to recover the payments the Debtor has made on account of Unit 5 and Unit 6.  In addition, the Estate holds claims to recover payments made on account of the third condo.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

        **G.**    **Mediation**

      Prior to the Petition Date, on October 12, 2022, the Bankruptcy Court entered a *Stipulation and Agreed Order* in the FSS Case [FSS Case, Docket No. 233] (the "<u>Mediation Order</u>").  Among other things, the Mediation Order appointed the Honorable Marvin Isgur as mediator and ordered mediation among FSS, Jones (in his capacity as the sole member of FSS), the FSS subchapter V trustee, PQPR, the Texas Plaintiffs, and the Connecticut Plaintiffs.

      At a hearing on December 7, 2022, counsel for the Debtor indicated that the Debtor intended to participate in the FSS mediation in his capacity as Debtor in this Chapter 11 Case.[38]  Counsel for the Debtor also indicated that the Debtor was not seeking a separate mediation order to be entered in this Chapter 11 Case, but rather that the Debtor already viewed himself as "being subject to and participating" in the FSS

---

[36] Third Amended Schedules and Statements at 4.
[37] Second Amended Schedules and Statements at 4.
[38] Hr'g. Tr. at 7:1-14 *In re Alexander E. Jones*, Case No. 22-33553-CML and FSS Case No. 22-60043-CML (Bankr. S.D.T.X. Dec. 7, 2023).

mediation pursuant to the Mediation Order in his capacity as Debtor in this Chapter 11 Case.[39]  The UCC likewise indicated at the December 7 hearing that it was engaging in the FSS mediation pursuant to the Mediation Order.[40]

After nearly a year of mediation without resolution in either the FSS Case or this Chapter 11 Case, on September 26, 2023, the Bankruptcy Court terminated the mediation and instructed FSS to file a plan.[41]

### H.    Expiration of Exclusivity

Section 1121 of the Bankruptcy Code provides that only the debtor may file a plan until 120 days after the petition date (the "Exclusive Period").  In addition, section 1121(d) of the Bankruptcy Code permits a bankruptcy court to increase or reduce the Exclusive Period upon a showing of "cause."  After the Exclusive Period has expired, a creditor or any other party in interest may file a plan.  In this Chapter 11 Case, the Exclusive Period expired on April 1, 2023 without the Debtor filing a plan or requesting an extension of the Exclusive Period.

### I.    Circumstances Leading to the Filing of the Creditors' Plan

The UCC and the Sandy Hook Families engaged in good-faith discussions with the Debtor and other interested parties to explore a viable consensual chapter 11 plan and ultimate conclusion to this Chapter 11 Case, both during and following mediation.

As discussed above, on October 19, 2023, the Bankruptcy Court ruled on the nondischargeability of the Claims held by the Sandy Hook Families.  These rulings served as a catalyst for the parties to restart discussions regarding a consensual resolution of this Chapter 11 Case, including attending an in-person meeting in New York with representatives for the UCC, the Sandy Hook Families, the Debtor, FSS, PQPR, and the FSS Subchapter V Trustee.  Following the meeting, the UCC, the Sandy Hook Families, and the Debtor exchanged additional proposals.  However, the parties remained far apart on how to resolve the staggering nondischargeable liability facing the Debtor and the liability facing his largest asset, FSS.

On November 22, 2023, the UCC and the Sandy Hook Families filed the *Statement by the Official Committee of Unsecured Creditors and the Sandy Hook Families Regarding the Status of the Chapter 11 Case and Proposed Creditors' Plan* [Docket No. 498] (the "Case Status Statement"), attaching a construct detailing the material terms of a proposed plan that offered the Debtor a choice between (i) an orderly liquidation and (ii) a consensual release of more than $1.5 billion in largely nondischargeable Claims in exchange for a 10-year, fixed-payment schedule that would pay creditors at least $8.5 million a year from any source, including projected payments that FSS anticipates contributing to a creditor trust (the "Optional Future Payment Election"), in each scenario preserving valuable Estate Causes of Action against third parties for the benefit of creditors described above.  The UCC and the Sandy Hook Families made clear both in the Case Status Statement and during the hearing held by the Bankruptcy Court on November 27, 2023 that the Optional Future Payment Election represented a proposal that hopefully would be subject to continued discussions in an effort to reach consensus.

The Case Status Statement also requested that the Bankruptcy Court set a schedule for a hearing to consider confirmation of the FSS Plan and any plans filed in this Chapter 11 Case.  On December 1, 2023, the Bankruptcy Court entered the *Agreed Scheduling Order for Confirmation Hearing* [Docket Nos. 512, 513] (the "Confirmation Scheduling Order") representing an agreement among the UCC, the Texas Plaintiffs, the Connecticut Plaintiffs, and the Debtor regarding the schedule for consideration of any plans

---

[39] *Id.* at 10:24-11:10.
[40] *Id.* at 21:4-10.
[41] Hr'g. Tr. at 12:3-11, FSS Case No. 22-60043-CML (Bankr. S.D.T.X. Sept. 26, 2023).

filed in this Chapter 11 Case.  The Confirmation Scheduling Order governs, among other things, certain procedures related to Confirmation of the Creditors' Plan or any plan filed in the Chapter 11 Case, as well as plan-related discovery, setting forth the following dates and deadlines:

| Event[42] | Date |
|---|---|
| **Written Discovery Deadline.**  The deadline by which the Parties and any other parties in interest shall serve discovery relating to any plans, potential objections thereto, and any other matters to be heard at the Confirmation Hearing (the "<u>Requests</u>").  The Parties and other parties in interest may—and are encouraged to—serve Requests sooner.  The Parties and any other parties in interest shall serve responses and objections to any Requests within two weeks of service of the Requests.  For the avoidance of doubt, the Parties and any other parties in interest shall meet and confer in good faith regarding timing and any requested extension of response deadline. | **Tuesday, January 9, 2024** |
| **Objections to Provisional Approval of Disclosure Statements.**  The date by which the Parties and any other parties in interest shall file any objections to the provisional approval of any disclosure statements filed. | **Tuesday, January 16, 2024** |
| **Disclosure Statement Hearing Date.**  The date on which the Parties and any other parties in interest shall, subject to the Bankruptcy Court's availability, participate in a hearing regarding any disclosure statements filed to seek provisional approval thereof. | **[Wednesday-Friday, January 24-26], 2024** |
| **Substantial Completion of Document Production.**  The date by which the Parties and any other recipients of the Requests shall substantially complete the production of documents in response to the Requests.<br>***Parties and any other recipients of the Requests must commence production of documents in response to Requests as soon as reasonably possible and shall roll out document production in tranches, as available.  Parties and any other recipients of the Requests shall not wait until the substantial completion deadline to commence production.*** | **Friday, January 26, 2024** |
| **Solicitation Mailing/Publication Deadline.** | **Monday, January 29, 2024** |
| **Privilege Log Deadline.**  The date by which the Parties and any other recipients of the Requests shall have provided logs of documents responsive to the Requests that were withheld or redacted on the basis of any claim or privilege. | **Tuesday, January 30, 2024** |
| **Preliminary Witness Lists.**  The date by which the Parties and any other parties in interest shall exchange lists of witnesses each | **Thursday, February 1, 2024** |

---

[42] Capitalized terms used in this chart but not otherwise defined in this Specific Disclosure Statement shall have the meaning ascribed to such terms in the Confirmation Scheduling Order.

| | |
|---|---|
| such party in good faith expects to call at the Confirmation Hearing. | |
| **Fact Witness Depositions.** The dates during which the Parties and any other parties in interest shall conduct fact witness depositions. | **Friday, February 2 – Friday, February 9, 2024** |
| **Expert Reports.** The date by which the Parties and any other parties in interest shall simultaneously exchange expert reports, with a date for rebuttal reports (if needed) to be determined by the Parties and any other parties in interest intending to serve such reports. Bankruptcy Rule 7026 shall apply in its entirely to any expert reports exchanged. | **Thursday, February 15, 2024** |
| **Production of Materials Relied Upon in Expert Reports.** The date by which the Parties and any other parties in interest shall produce copies of any documents or data that were (a) relied on by such party's expert in forming the opinions contained in such report and (b) have not already been produced in these cases. | **Friday, February 16, 2024** |
| **Plan Objection Deadline.** The date by which objections to any plan must be filed. | **Friday, February 16, 2024** |
| **Exchange of Final Witness and Exhibit Lists.** The date by which the Parties and any other parties in interest shall serve a final list of witnesses and exhibits they intend to offer at the Confirmation Hearing. Witness lists shall identify all witnesses that each party will call and may call at the Confirmation Hearing and shall provide a brief summary of the anticipated testimony of each witness. | **Friday, February 16, 2024** |
| **Objections to Final Witness and Exhibit Lists.** The date by which the Parties and any other parties in interest must serve any objections to the final witness and exhibit lists. | **Tuesday, February 20, 2024** |
| **Expert Depositions.** The dates during which the Parties and any other parties in interest shall conduct expert witness depositions. | **[Tuesday, February 20, 2024 – Thursday, February 22, 2024]** |
| **Exchange of Exhibits.** The deadline by which the Parties and any other parties in interest shall exchange exhibits with each other. | **Friday, February 23, 2024, 12 pm CT** |
| **Filing of Final Witness and Exhibit Lists with the Clerk of the Court.** The deadline by which the Parties and any other parties in interest shall file final exhibit and witness lists with the Clerk of the Court. | **Friday, February 23, 2024, 12 pm CT** |
| **Final Pretrial Conference.** The date on which the Parties and any other parties in interest shall, subject to the Bankruptcy Court's availability, participate in a final pretrial conference. | **Friday, February 23, 2024** |
| **Reply to Objections.** The date by which the Parties and any other parties in interest must file their reply to all timely objections to their respective plans. | **Friday, February 23, 2024** |

| | |
|---|---|
| **Confirmation Hearing Dates.**  The timeframe in which the Parties and any other parties in interest shall complete trial.  For the avoidance of doubt, final approval of any disclosure statements filed will be sought during the Confirmation Hearing. | **Tuesday, February 27, 2024 – Thursday, February 29, 2024** |

Given that no discussion nor any progress toward settlement took place in the weeks that followed the filing of the Case Status Statement and related plan construct, and various representations made by Debtor that the Optional Future Payment Election construct was unacceptable to him, the Creditor Plan Proponents thereafter determined to file the Creditors' Plan contemplating only an orderly liquidation. Contemporaneously with the filing of the Creditors' Plan, the UCC sent a letter to the Debtor making clear that the Creditors' Plan was not intended to cut off discussions regarding a consensual resolution of the Chapter 11 Case.

### J.  Debtor's Reinstatement on Social Media Platform

On or around December 10, 2023, the administrators of the social media platform X (f/k/a Twitter) lifted a ban on the Debtor's account imposed by the website's previous owners.  The Debtor had been banned previously from the platform for violations of its abusive behavior policy.  The lifting of this ban will permit the Debtor once again to post messages, video clips, and other content on the platform for the first time since September 6, 2018.  Since his reinstatement on X, the Debtor has regularly posted clips, messages, and "reposts" promoting his radio show and other media partnerships, as well as links to his fundraising page and his online store, which markets and sells health supplements.   As of the date hereof, the Debtor has amassed nearly 2 million followers on X and has made a total of almost 50,000 posts.

## IV.  KEY ASPECTS OF THE CREDITORS' PLAN[43]

### A.  General Basis for the Creditors' Plan

The Creditors' Plan is premised on an orderly liquidation of the Debtor's assets, other than Exempt Assets, through the GUC Trust.  The GUC Trust will be administered by the GUC Trustee, who will be chosen by the Sandy Hook Families in accordance with the GUC Trust Agreement.  The following assets (collectively, the "GUC Trust Assets," detailed herein), among others, will be assigned on the Effective Date of the Creditors' Plan to the GUC Trust:

- The Debtor's assets, rights, and claims that are not Exempt Assets, whether owned by the Debtor directly, indirectly or otherwise held for the benefit of the Debtor existing as of the Effective Date, in each case whether presently known or discovered at any time by the GUC Trustee, and including, but not limited to:

    o  Cash;

---

[43] This **Article IV** is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Creditors' Plan and is qualified in its entirety by reference to the entire Creditors' Plan and exhibits thereto.  Although the statements contained in this Specific Disclosure Statement include summaries of the provisions contained in the Creditors' Plan and in documents referred to therein, this Specific Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions and should not be relied on for a comprehensive discussion of the Creditors' Plan.  Instead, reference is made to the Creditors' Plan and all such documents for the full and complete statement of such terms and provisions.  The Creditors' Plan itself (including attachments) will control the treatment of Claims under the Creditors' Plan.  To the extent there are any inconsistencies between this **Article IV** and the Creditors' Plan (including attachments), the latter shall govern.

- o      any tax refund to which the Debtor is entitled (whether or not such refund is immediately available to the Debtor as of the Effective Date);

- o      100% of the Debtor's equity ownership interests in FSS;

- o      the Debtor's full, direct, or indirect ownership interests in PQPR;

- o      all assets held in the Jones Trusts; and

- o      any current contractual right entitling the Debtor to future royalties, and any identified equitable or future interests in property;

- the Litigation Assets, including:

  - o      $500,000 in Cash as funded by the Debtor's Estate as initial litigation funding;

  - o      the Trust Causes of Action;

  - o      all Release Settlement Payments made to the GUC Trust; and

  - o      the Debtor's books and records, including all documents, communications, and information of the Debtor, any Jones Trusts and any entities owned or controlled by the Debtor, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets and all discovery obtained by the UCC during the Chapter 11 Case; and

- once all Professional Fee Claims have been irrevocably paid in full or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account.

**B.**      **Treatment of Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus are excluded from the classes of Claims set forth in <u>Article III</u> of the Creditors' Plan and the holders thereof are not entitled to vote on the Creditors' Plan.

**1.**      **Administrative Claims**

To the extent that Administrative Claims have not been paid in full or otherwise satisfied during the Chapter 11 Case, each holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (i) if such Administrative Claim is Allowed prior to the Effective Date, on the Effective Date or in the ordinary course of business, whichever is later or (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter. Any objection to an Administrative Claim must be Filed by the Priority Claims Objection Bar Date.

### 2.       Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred through and including the Effective Date must be Filed no later than the Priority Claims Bar Date.  The Bankruptcy Court will determine the Allowed Amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules.  The Debtor will pay to the Professionals the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of a Final Order of the Bankruptcy Court.  Any objection to a Professional Fee Claim must be Filed by the Priority Claims Objection Bar Date.

#### i.       *Professional Fee Escrow Account*

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtor will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account will be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens or Claims will encumber the Professional Fee Escrow Account or Cash held therein.  Funds held in the Professional Fee Escrow Account will not be considered property of the Estate or the Debtor.

Distributions to holders of Professional Fee Claims will be made in accordance with Article VI.A.1 of the Creditors' Plan.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account will promptly be paid to the GUC Trust without any further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

#### ii.       *Professional Fee Escrow Amount*

The Professionals will provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtor and Estate before and as of the Effective Date projected to be outstanding as of the Effective Date, and will deliver such estimate to the Debtor and the UCC no later than five (5) days before the anticipated Effective Date; *provided*, *however, that* such estimate will not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtor may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date will be used by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account.

### 3.       Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim will receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

C.      **Classification and Treatment of Claims**

1.      **Classification of Claims**

| SUMMARY OF EXPECTED RECOVERIES | | | | | |
|---|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Status** | **Voting Rights** | **Estimated Amount of Claims** | **Estimated Recovery[44]** |
| 1 | Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) | $114,500.04 | 100% |
| 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) | $0 | 100% |
| 3 | General Unsecured Claims | Impaired | Entitled to vote | $2,099,139,969.58 | [·]%[45] |
| 4 | Subordinated Claims | Impaired | Not entitled to vote (deemed to reject) | Unknown | 0% |

2.      **Treatment of Claims**

Holders of Claims classified in <u>Article III.A.</u> of the Creditors' Plan that are Allowed will be satisfied in the manner set forth below.

i.      Class 1 – Secured Claims.

**Classification**.  Class 1 consists of all Secured Claims.

**Treatment**.  Each holder of a Secured Claim that is Allowed will receive payment in full in Cash on account of such holder's Allowed Secured Claim.

**Voting**.  Class 1 is Unimpaired under the Creditors' Plan.  Holders of Secured Claims are conclusively presumed to have accepted the Creditors' Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  There are two Class 1 Claimants: (i) the Security Bank of Crawford, which has Filed a Proof of Claim in the amount of $80,161.04 (Claim No. 2); and (ii) Bank of

---

[44] The ranges set forth under Estimated Recovery are based on the range of values of the assets available to creditors as described in the Creditors' Plan Liquidation Analysis, attached hereto as **Exhibit D**.

[45] Estimated recoveries for General Unsecured Claims will be provided in connection with the filing of the Creditors' Plan Liquidation Analysis. Note, however, that estimated recoveries will depend on how many holders of General Unsecured Claims elect to receive GUC Trust Interests vs. how many elect to share in the GUC Election Cash Pool.

America, N.A., which has Filed a Proof of Claim in the amount of $26,354.73 (Claim No. 22).

ii.    Class 2 – Other Priority Claims.

**Classification**.  Class 2 consists of all Other Priority Claims.

**Treatment**.  Each holder of an Other Priority Claim that is Allowed will receive payment in full in Cash on account of such holder's Allowed Other Priority Claim.

**Voting**.  Class 2 is Unimpaired under the Creditors' Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Creditors' Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  Class 2 Claimants include one holder of a Priority DSO Claim who is not Erika Jones, including the Priority DSO Claim identified at item 4.12 in the Schedules and Statements.  Class 2 Claimants will also include any other holders of Other Priority Claims. For the avoidance of doubt, Erika Jones is not entitled to any Priority DSO Claims or any Other Priority Claims and any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Class 4 Subordinated Claim.

iii.    Class 3 – General Unsecured Claims.

**Classification**.  Class 3 consists of all General Unsecured Claims.

**Treatment**.  Each holder of a General Unsecured Claim that is Allowed will be entitled to receive, at such holder's election, (i) the holder's *pro rata* share of the GUC Election Cash Pool, such pro rata share to be calculated based on the total amount of Allowed General Unsecured Claims held by holders that make such election, or (ii) the holder's *pro rata* share of the GUC Trust Interests, such *pro rata* share to be calculated based on the aggregate amount of Allowed General Unsecured Claims that make such election.  For the avoidance of doubt, however, any holder of a General Unsecured Claim that has waived that holder's Claim is not entitled to such *pro rata* share under Article III.B.3.b of the Creditors' Plan.

**Voting**.  Class 3 is Impaired under the Creditors' Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  At present, there are twenty-five Class 3 Claims:  (i) twenty-one Class 3 Claims Filed by or on behalf of individuals comprising the Sandy Hook Families; (ii) one Class 3 Claim held by American Express National Bank, which has Filed a Proof of Claim in the amount of $149,678.58 (Claim No. 1); (iii) one Class 3 Claim held by Reeves Law, PLLC, which has Filed a Proof of Claim in the amount of $24,611.13 (Claim No. 5); (iv) one Class 3 Claim held by the City of Austin, which has Filed a Proof of Claim in the amount of $86.60 (Claim No. 3); and (v) one  Class 3 Claim held by the IRS, to the extent that any portion of its Claim in the amount of $586,884.64 (Claim No. 4) is deemed to be a non-Priority Tax Claim.   However, additional Claims may be Allowed General Unsecured Claims if filed by the applicable Bar Date or other time period provided for by the Creditors' Plan or an order of the Bankruptcy Court, and otherwise Allowed.

25

iv.     Class 4 – Subordinated Claims.

**Classification**.  Class 4 consists of all Subordinated Claims.

**Treatment**.  Holders of Subordinated Claims, regardless of whether such claims are Allowed, are not entitled to any distributions or to receive or retain any property under the Creditors' Plan.

**Voting**.  Class 4 is Impaired under the Creditors' Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Creditors' Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  At present, there is one Class 4 Claimant, FSS, which has Filed a Proof of Claim in the amount of $0.00 (Claim No. 26).  However, additional Claims may be Subordinated Claims if filed by the applicable Bar Date or other time period provided for by the Creditors' Plan, and otherwise Allowed.  For the avoidance of doubt, any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Subordinated Claim.

**D.     Treatment of Non-Dischargeable Claims**

The Creditors' Plan will not discharge any Non-Dischargeable Claim.  Moreover, the rights of the Sandy Hook Families, acting through the GUC Trust, to exercise all rights, remedies, and other legal entitlements, whether arising under state, federal or foreign law, with respect to the Non-Dischargeable Claims are expressly preserved, and nothing to the contrary in the Creditors' Plan will limit, affect, or otherwise impact such rights; *provided that* no individual holder of any Sandy Hook Family Claim will be entitled to receive more than the aggregate Allowed amount of such holder's Sandy Hook Family Claim on account of such Claims pursuant to the Creditors' Plan.

**E.     The GUC Trust**

On or before the Effective Date, the GUC Trust will be established and administered in accordance with the GUC Trust Agreement, which sets forth, *inter alia*, the powers, authority, responsibilities, and duties of the GUC Trustee.  The purpose of the GUC Trust will be the liquidation and administration of the GUC Trust Assets and making distributions to holders of GUC Trust Interests in accordance with the terms of the Creditors' Plan and the GUC Trust Agreement.

i.     *The GUC Trustee*

The GUC Trust will be administered by the GUC Trustee.  On or before the Effective Date, the GUC Trustee, on behalf of the Debtor, will execute the GUC Trust Agreement and will take all other steps necessary to establish the GUC Trust pursuant to the GUC Trust Agreement and consistent with the Creditors' Plan.  For the avoidance of doubt, if, for any reason the individual or entity chosen to serve as the GUC Trustee will need to be replaced, the Sandy Hook Families will appoint a subsequent GUC Trustee unless otherwise provided by the GUC Trust Agreement.  The GUC Trust Agreement will establish an oversight committee (the "Litigation Committee") consisting of members of the Sandy Hook Families appointed in accordance with the terms of the GUC Trust Agreement to oversee performance of the GUC Trustee's duties with respect to the GUC Trust Assets and otherwise serve the functions to be described in the Creditors' Plan and the GUC Trust Agreement.

The GUC Trustee will be responsible for all decisions and duties with respect to the GUC Trust Assets, subject to the authority granted to it under the Creditors' Plan, the Confirmation Order and the GUC Trust Agreement, as applicable, and will file with the Bankruptcy Court periodic public reports on the status of Claims reconciliation and distributions, which reports may be included in the quarterly reporting required by the U.S. Trustee.  In addition, the GUC Trustee will issue quarterly written reports and engage in update calls upon reasonable request with representatives of the Sandy Hook Families.

The GUC Trustee will owe fiduciary duties to all holders of GUC Trust Interests consistent with the fiduciary duties a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code owes to its constituents, and the Litigation Committee must consent to any proposed material action, including any settlement in respect of any action, by the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

### ii. *Assignments*

On the Effective Date, the Non-Dischargeable Claims will be assigned to the GUC Trust.

### iii. *GUC Trust Assets*

On the Effective Date, all GUC Trust Assets will vest in the GUC Trust.  For the avoidance of doubt, the Exempt Assets will not vest in the GUC Trust.  The GUC Trust Interests will only be transferrable in the sole discretion of the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

Under section 1141(b) of the Bankruptcy Code, the GUC Trust Assets will be assigned, transferred and vest in the GUC Trust upon the occurrence of the Effective Date, free and clear of all Claims, Liens, encumbrances, and interests; *provided, however, that* the GUC Trustee may abandon or otherwise not accept any assets that the GUC Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the GUC Trust in accordance with the terms of the GUC Trust Agreement.  Any assets that the GUC Trustee so abandons (whether before or after the Effective Date) or otherwise does not accept will not be GUC Trust Assets.

### iv. *Litigation Assets*

The following assets constitute the Litigation Assets and will vest in the GUC Trust and be administered by the GUC Trustee in accordance with the terms described herein and in the GUC Trust Agreement:

- **Initial Litigation Funding**.  A total of $500,000 in Cash, which will be funded by the Debtor's Estate to the GUC Trust for administrative expenses in connection with administering the Litigation Assets; *provided that* the source and manner of funding will be acceptable to the GUC Trustee; *provided, further, that* a portion of the proceeds from liquidation of the Litigation Assets may be retained by the GUC Trustee in its discretion as continued funding for administration of the Litigation Assets.

- **Trust Causes of Action**.  All Causes of Action (i) belonging to the Debtor's Estate (including those belonging to the Jones Trusts), whether or not initially asserted prior to Confirmation, including, but not limited to, any Estate Claims or Causes of Action against or related to the Debtor, any Insider or Affiliate of the Debtor, and (ii) the Texas State Court fraudulent conveyance action filed by Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine previously removed and then transferred to the Bankruptcy Court.

- **Release Settlement Payments**.  All Release Settlement Payments made to the GUC Trust will immediately vest in the GUC Trust upon payment.

- **Books & Records**.  The Debtor's books and records, including all documents, communications, and information of the Debtor, any Jones Trusts and any entities owned or controlled by the Debtor, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets.  All discovery obtained by the UCC during the Chapter 11 Case will be transferred to the GUC Trust.

- **Investigative Powers**.  The GUC Trust and the GUC Trustee will retain the right to conduct any discovery related to the acts, conduct or property, or to the liabilities and financial condition of the Debtor, or to any matter which may affect the administration of Jones's Estate or any Trust Causes of Action, or to the Debtor's right to a discharge, under Bankruptcy Rule 2004, to the full extent that such powers were available prior to the Effective Date.

- **Audit Powers**.  The GUC Trust or the GUC Trustee may retain a professional to conduct financial audits of the Debtor as necessary and request information from applicable third parties in connection with the same (including Erika Jones and David Jones) to ensure the veracity of financial disclosures.

- **Privileges**.  All privileges in respect of the Trust Causes of Action, including the attorney-client privilege, held by the Debtor will transfer to the GUC Trust.

### v. *Confidentiality*

The GUC Trustee will be deemed a party to the Protective Order and will be permitted to receive Discovery Material, Confidential Material, and Professionals' Eyes Only Material (each as defined in the Protective Order) in accordance with the terms thereof.

### F. The Debtor's Obligations and Covenants

The Debtor will be fully responsible for taking all necessary actions required to vest the GUC Trust Assets in the GUC Trust (the "Jones Transfer Obligation").  The Jones Transfer Obligation begins on the Confirmation Date and must be completed in full no later than thirty (30) days after the Confirmation Date. To the extent that the Debtor fails or refuses to comply with the Jones Transfer Obligation, there will be no limitation on the rights and ability of the Sandy Hook Families, the GUC Trustee, and the UCC to petition any court of competent jurisdiction to enforce the Jones Transfer Obligation pursuant to section 1142(b) of the Bankruptcy Code, any other provision of the Bankruptcy Code, or applicable non-bankruptcy law or to seek any other appropriate remedies under the Bankruptcy Code or applicable non-bankruptcy law.

No later than thirty (30) days after the Confirmation Date, the Debtor will provide an affidavit (the "Jones Full Disclosure") containing all facts and information concerning his assets, rights, claims, interests, and/or any Causes of Action, held either directly or indirectly and including the assets set forth on the Exempt Asset Schedule, and any transfers of the Debtor's property exceeding $5,000 as to a gift for no exchange of goods or services and $25,000 as to all other transfers in the ten years prior to the Petition Date

and running through the Effective Date.  Discovery of any Material Misstatement[46] in the Jones Full Disclosure will (i) void any discharge granted under the Creditors' Plan, and (ii) subject the Debtor to all penalties available under applicable law.

The Debtor will cooperate in good faith with the Sandy Hook Families, the UCC, the GUC Trustee, the Debtor's Estate, FSS, and their respective representatives, in carrying out the terms of the Creditors' Plan, including by responding timely to reasonable discovery requests in connection with actions by the GUC Trustee and cooperating in pursuing and obtaining any tax refund or royalty amounts to which the Debtor or the GUC Trust is entitled.

Prior to the Effective Date, the Debtor will also provide reasonable notice to the UCC in advance of the formation and/or incorporation of any trust or other entity on his behalf, or from which he expects to potentially receive distributions, dividends, or other payments, or in which he owns a direct or indirect beneficial interest.

The Debtor will, in any event, cooperate with the GUC Trustee's efforts to investigate and pursue any Causes of Action arising from or related to payments made pursuant to the Premarital Agreement for the benefit of the GUC Trust.

### G.    Releases and Exculpation

#### 1.    Releases by the Debtor

**Notwithstanding anything contained in the Creditors' Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, as applicable, from any and all claims and Causes of Action asserted by or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Creditors' Plan, the Confirmation Order, or any document, instrument, or agreement executed to implement the Creditors' Plan or any Claim or obligation arising under the Plan.  For the avoidance of doubt, Jones shall not be a Released Party and there shall be no release or exculpation of the Trust Causes of Action, the Non-Dischargeable Claims, or any other Claims or Causes of Action against Jones, non-minor members of his immediate family, or their Insiders or Affiliates, as applicable, subject to the ability of Insiders and Affiliates of Jones to become a Released Party by making a Release Settlement Payment.**

#### 2.    Exculpation

**Except as otherwise specifically provided in the Creditors' Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any**

---

[46] "<u>Material Misstatement</u>" means an omission by Jones or his representatives to disclose in the Jones Full Disclosure (a) an asset, right, claim, interest, or Cause of Action of the estate, held either directly or indirectly and including the assets set forth on the Exempt Asset Schedule, that reasonably could be argued to have a value of $5,000 or more; (b) any voluntary or involuntary transfer of cash or property within the ten years prior to the Petition Date that reasonably could be determined to have a value of $5,000 or more that was not made in exchange for any service, product or other asset; or (c) any other voluntary or involuntary transfer of cash or property within the ten years prior to the Petition Date that reasonably could be argued to have a value of $25,000 or more.  It shall not be a defense to a Material Misstatement that the subject asset(s) or transfer(s) were omitted inadvertently or based on good faith or mistaken judgment.

**Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Creditors' Plan, this Specific Disclosure Statement, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case in connection with the Creditors' Plan, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Creditors' Plan, the administration and implementation of the Plan, including the issuance of GUC Trust Interests pursuant to the Creditors' Plan, or the distribution of property under the Creditors' Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Creditors' Plan and the Confirmation Order.**

**The Exculpated Parties set forth above have, and upon Confirmation of the Creditors' Plan, shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Creditors' Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Creditors' Plan or such distributions made pursuant to the Creditors' Plan.**

## V.     CREDITORS' PLAN LIQUIDATION ANALYSIS

The projected recoveries set forth in in the liquidation analysis provided in **Exhibit D** (the "Creditors' Plan Liquidation Analysis") are for illustrative purposes only and to enable holders of Claims to carefully compare the estimated recoveries contemplated by the Jones Plan to those contemplated by the Creditors' Plan.  Projected recoveries may be significantly higher or lower than shown based on the outcome of the Trust Causes of Action for those holders of General Unsecured Claims who elect to receive GUC Trust Interests.  For the avoidance of doubt, all value held by the GUC Trust, net of costs and expenses, ultimately will be distributed to holders of GUC Trust Interests in accordance with the terms of the Creditors' Plan and the GUC Trust Agreement.

Moreover, the value available for distribution under the Creditors' Plan must be considered in connection with value that may be recoverable by the Sandy Hook Families, which comprises the near entirety of the creditor body in this Chapter 11 Case, outside of the Creditors' Plan in respect of their nondischargeable Claims against Jones and FSS.  Indeed, the preservation of such Claims and the ability to prosecute them immediately upon the Effective Date of the Creditors' Plan remains one of the most compelling reasons the Creditors' Plan is more favorable than the Jones Plan.

## VI.     SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Creditors' Plan (the "Solicitation Procedures").  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

A.      **Ballots and Voting Deadline**

Accompanying this Disclosure Statement is the order entered by the Bankruptcy Court approving the solicitation procedures, dated [·], 2024 [Docket No. [·]] (the "Solicitation Order").  The description of the solicitation and tabulation procedures contained in the Solicitation Order are incorporated by reference as if fully set forth herein.  **In order for your vote to count, you must follow the directions set forth in the Solicitation Order which contains a detailed description of the process for voting.**

A ballot for voting to accept or reject the Creditors' Plan is enclosed with this Disclosure Statement and has been mailed to holders of Claims entitled to vote.  After carefully reviewing the Disclosure Statement and all exhibits, including the Creditors' Plan, each holder of a Claim entitled to vote should indicate its vote on the enclosed ballot.  **All holders of Claims entitled to vote must (i) carefully review the ballot and instructions thereon, (ii) execute the ballot, and (iii) return it to the address indicated on the ballot by the Voting Deadline (defined below) for the ballot to be considered.**

In order for your vote on the Creditors' Plan to count, the original, signed ballot *must be actually received* by [·] **no later than 5:00 p.m. CST** [·]**, 2024** ("Voting Deadline"). Any ballot received by [·] after the Voting Deadline shall not be counted, unless the Bankruptcy Court orders otherwise. Ballots will not be counted if they are delivered by facsimile, by electronic means *other than* by email to the email address listed below, or that do not contain an original signature.

After completion of the ballot, creditors should return the executed ballot by mail or email to:

**By Mail To:**

**[·]**

**By Email to:**

**[·]**

B.      **Holders of Claims Entitled to Vote**

Except as otherwise provided in the Creditors' Plan, any holder of a Claim against the Debtor whose Claim is impaired under the Creditors' Plan is entitled to vote, if either (i) the Debtor has scheduled the holder's Claim at a specific amount other than $0.00 (and such Claim is not scheduled as "disputed," "contingent," or "unliquidated") or (ii) the holder of such Claim has filed a Proof of Claim on or before the deadline set by the Bankruptcy Court for such filings in a liquidated amount.  Any holder of a Claim as to which an objection has been filed (and such objection is still pending as of the time of confirmation of the Creditors' Plan) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Creditors' Plan. Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Creditors' Plan.

C.      **Bar Dates for Filing Proofs of Claim**

The Bankruptcy Court established a bar date for filing proofs of claim in this case of April 11, 2023.  The Bankruptcy Court further established a bar date for filing proofs of claim by governmental units of June 7, 2023.  The deadline for the filing of proofs of claim for Priority Claims is thirty (30) days after the Effective Date of the Creditors' Plan.

###### D.      Tabulation of Votes

A vote to accept or reject the Creditors' Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  A ballot that does not indicate the acceptance or rejection of the Creditors' Plan or that indicates both acceptance and rejection of the Creditors' Plan will be disregarded.  If the holder does not properly submit its ballot, or that holder's vote is disregarded, that holder and that holder's Claim will not be included in deciding whether the requisite number of class members and amount of Claims voted to accept or reject the Creditors' Plan.

## VII.   CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

###### A.      The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization (the "Confirmation Hearing").  The Bankruptcy Court has scheduled the Confirmation Hearing to begin on [·], 2024 at [·] (prevailing Central time).  The Confirmation Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Creditors' Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  Any objection to the Creditors' Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Texas; (3) state the name, address, phone number, and email address of the objecting party and the amount and nature of the Claim of such entity, if any; (4) state with particularity the basis and nature of any objection to the Creditors' Plan and, if practicable, a proposed modification to the Creditors' Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties no later than February 16, 2024 or such other date set by the Bankruptcy Court for filing objections to Confirmation of the Creditors' Plan:  (i) the Debtor, (ii) the Creditor Plan Proponents, (iii) the Office of the United States Trustee for the Southern District of Texas, and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**Unless an objection to the Creditors' Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

###### B.      Confirmation Standards

Among the requirements for Confirmation are that the Creditors' Plan: (i) is accepted by all Impaired classes of Claims or, if rejected by an Impaired class, that the Creditors' Plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of holders of Claims that are Impaired under the Creditors' Plan.

The following are certain requirements that must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before a bankruptcy court may confirm a plan of reorganization. The Creditor Plan Proponents believe that the Creditors' Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code, including those set forth below, other than those pertaining to voting, which has not yet taken place:

- The Creditors' Plan complies with the applicable provisions of the Bankruptcy Code.

- The Creditors' Plan has been proposed in good faith and not by any means forbidden by law.

- With respect to each holder within an Impaired class of Claims, as applicable, each such holder (i) has accepted the Creditors' Plan or (ii) will receive or retain under the Creditors' Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

- The Creditors' Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a class of Claims is Impaired under the Creditors' Plan, at least one class of Claims that is Impaired under the Creditors' Plan has accepted the Creditors' Plan, determined without including any acceptance of the Creditors' Plan by any insider.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Creditors' Plan provides for the payment of all such fees on the Effective Date.

- If the Debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the Debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

- To the extent a holder of an Allowed General Unsecured Claim objects to Confirmation of the Creditors' Plan: (i) the value, as of the Effective Date of the Creditors' Plan, of the property to be distributed under the Creditors' Plan on account of such Claim is not less than the amount of the Claim; or (ii) the value of the property to be distributed under the Creditors' Plan is not less than the projected disposable income of the Debtor (as defined in section 1325(b)(2) of the Bankruptcy Code) to be due under the Creditors' Plan, or during the period for which Creditors' Plan provides payments, whichever is longer.

**C.     Best Interests Test / Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim either (i) accept the Creditors' Plan or (ii) receive or retain under the Creditors' Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

In applying the best interests test, the Creditor Plan Proponents have considered the liquidation analysis attached to the Jones Disclosure Statement as **Exhibit [___]** (the "Jones Plan Liquidation Analysis"), which provides the Debtor's views regarding recoveries under the Jones Plan compared to recoveries in a chapter 7 liquidation, as well as the Creditors' Plan Liquidation Analysis attached hereto as **Exhibit D,**

33

which builds upon the information set forth in the Jones Plan Liquidation Analysis.  For the avoidance of doubt, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that the Bankruptcy Court will accept the Creditor Plan Proponents' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

Based on the Creditors' Plan Liquidation Analysis, the Creditor Plan Proponents believe that, under the Creditors' Plan, holders of Impaired Claims will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.  Indeed, the Creditors' Plan likely provides holders of General Unsecured Claims with a larger recovery because transferring the Estate assets to the GUC Trust will allow the GUC Trustee to liquidate assets in an organized fashion, thereby realizing greater recovery for the beneficiaries of the GUC Trust.  Moreover, the Creditors' Plan provides holders of Claims with a greater recovery because of the additional fees and expenses that would be incurred in a chapter 7 liquidation.  Accordingly, the Creditor Plan Proponents believe that the Creditors' Plan is in the best interests of creditors.

D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by a liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Creditors' Plan.

Since the Creditors' Plan contemplates a liquidation, for purposes of determining whether the Creditors' Plan meets the feasibility requirement, the Creditor Plan Proponents have analyzed their ability to meet their obligations under the Creditors' Plan in connection with the contemplated liquidation of the Debtor's assets and establishment of the GUC Trust.  The Creditor Plan Proponents anticipate that they will be able to make all payments required pursuant to the Creditors' Plan from the Estate assets, such as payment in full of Administrative Claims, Priority Claims, and Claims that are entitled to payment in full pursuant to the terms of the Creditors' Plan.  Therefore, the Creditor Plan Proponents believe that the liquidation of the Estate pursuant to the Creditors' Plan will meet the feasibility requirement of the Bankruptcy Code.

E.      Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (i) the plan otherwise satisfies the requirements for confirmation, (ii) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class, and (iii) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

1.      No Unfair Discrimination

The no "unfair discrimination" test applies to classes of claims that are of equal priority and are receiving different treatment under the Creditors' Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Creditor Plan Proponents does not believe the Creditors' Plan discriminates unfairly against any Impaired class of Claims.  The Creditor Plan Proponents believe the Creditors' Plan and the treatment of all classes of Claims under the Creditors' Plan satisfy the foregoing requirements for nonconsensual confirmation.

34

2.      **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims or interests in such class. As to a dissenting class, the test sets different standards depending on the type of claims or interests in such class. In order to demonstrate that a plan is fair and equitable with respect to a dissenting class, the plan proponent must demonstrate the following:

- <u>Secured Creditors</u>: Each holder of a secured claim (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>: Either (i) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

The Creditor Plan Proponents believe that the Creditors' Plan and treatment of all Classes of Claims therein satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Creditors' Plan. Specifically, there is no Impaired class of Secured Claims and therefore only the test with respect to unsecured creditors will apply.

F.      **Alternative Plan**

While the Debtor proposed an alternative plan for reorganization of the Debtor's Estate, the Jones Plan is not confirmable for a number of reasons that the Creditor Plan Proponents will address in an objection to Confirmation of the Jones Plan. The Creditor Plan Proponents believe that the Creditors' Plan, as described herein, provides the only viable path towards emergence from chapter 11 for the Debtor and thus enables holders of Claims to realize the only potential recovery under the circumstances of this case.

VIII.   **RISK FACTORS**

**Holders of Claims entitled to vote on the Creditors' Plan should read and consider carefully the risk factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Specific Disclosure Statement, before voting to accept or reject the Creditors' Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor's business or the Creditors' Plan and its implementation.**

A.      **Risks Related to the Chapter 11 Case**

1.      **Length of Litigation and Outcomes of the Trust Causes of Action**

The Trust Causes of Action are complex and fact intensive in nature. It is difficult to estimate the length of time it will take to settle or reach a judgment regarding the Trust Causes of Action and, therefore, difficult to estimate how long it will be before holders of GUC Trust Interests will receive recoveries on account of the Trust Causes of Action.

In addition, although the Creditor Plan Proponents believe, based on their own review of the Trust Causes of Action that the Trust Causes of Action are likely to be successful and yield substantial recoveries for holders of GUC Trust Interests, the assumed outcomes are speculative in nature and cannot be guaranteed.  Even assuming a positive result, it is impossible to determine the amount of recovery that holders of GUC Trust Interests would receive on account of a settlement or judgment regarding the Trust Causes of Actions.

## 2. Non-Confirmation of the Creditors' Plan

Although the Creditor Plan Proponents believe they will obtain the requisite votes to accept the Creditors' Plan and the Creditor Plan Proponents believe that the Creditors' Plan satisfies all other requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that parties, including the Debtor, will not seek to oppose Confirmation of the Creditors' Plan or that the Bankruptcy Court may otherwise decline to confirm the Creditors' Plan.  The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion in connection with the Creditors' Plan.  Section 1122 of the Bankruptcy Code requires that the Creditors' Plan classify Claims against the Debtor.  The Bankruptcy Code also provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims or interests of such class.  The Creditor Plan Proponents believe that all Claims have been appropriately classified in the Creditors' Plan.  There can be no assurance, however, that the Bankruptcy Court will conclude that such Claims are properly classified in the Creditors' Plan.  Moreover, under the Bankruptcy Code, only one plan can be confirmed by the Bankruptcy Court.  The Jones Plan is a competing plan, and such competing plan may be confirmed by the Bankruptcy Court in place of the proposed Creditors' Plan.

## 3. Conversion to Chapter 7

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds it would be in the best interests of creditors and/or the Debtor, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  In the event of a chapter 7 conversation, unlike under the Creditors' Plan, the GUC Trust, and thus creditors, would not control the liquidation or assets or the prosecution of any Estate Causes of Action.

## 4. Dismissal of the Chapter 11 Case

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtor, the Chapter 11 Case may be dismissed by order of the Bankruptcy Court.

## 5. Non-Occurrence of the Effective Date

Although the Creditor Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.  Moreover, if the conditions precedent to the Effective Date of the Creditors' Plan are not met, the Creditors' Plan may be vacated by the Bankruptcy Court.

## 6. Amendment, Waiver, Modification or Withdrawal of the Creditors' Plan

Except as otherwise specifically provided in the Creditors' Plan, the Creditor Plan Proponents reserve the right to modify the Creditors' Plan, whether such modification is material or immaterial, and seek confirmation of the Creditors' Plan consistent with the Bankruptcy Code.  The potential impact of any

36

such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Creditors' Plan on some or all of the classes or a change in the relative rights of such classes. All holders of Claims will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but before confirmation of the Creditors' Plan, the Creditor Plan Proponents seek to modify the Creditors' Plan, the previously solicited acceptances will be valid only if (i) all classes of adversely affected creditors and interest holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims.

## B.      Risk of Variance in Financial Results

This Specific Disclosure Statement and the Creditors' Plan contain financial information and estimates of value that demonstrate the feasibility of the Creditors' Plan. Information based on the financial information, estimates of value, and assumptions in this Specific Disclosure Statement was prepared for the limited purpose of furnishing recipients of the Specific Disclosure Statement with adequate information to make an informed judgment regarding acceptance of the Creditors' Plan. The estimates of value and assumptions should not be relied upon in any way or manner for any other purpose and should not be regarded as representations or warranties by the Creditor Plan Proponents or any other person as to the accuracy of such information or that any such valuations or assumptions will be realized. Those estimates of value and assumptions have not been, and will not be, updated on an ongoing basis, and they were not audited or reviewed by independent accountants or auditors. They reflect certain expectations concerning the market and economic conditions that are, and remain, beyond the Creditor Plan Proponents' control. Such estimates of value and assumptions are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the valuation estimates may be wrong in material respects. Actual results may vary and may continue to vary significantly from those contemplated by valuation estimates, and/or assumptions.

### 1.      The Specific Disclosure Statement May Contain Forward-looking Statements

This Specific Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statements other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward-looking statements necessarily are speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained in this Specific Disclosure Statement is an estimate only, based on information available to the Creditor Plan Proponents. As discussed in further detail below, this risk is exacerbated by the fact that such information originates in large part from the Debtor and other parties and never belonged to the Creditor Plan Proponents.

### 2.      Certain Tax Consequences

For a discussion of certain tax considerations for certain holders of Claims in connection with the implementation of the Creditors' Plan, see Article IX hereof. Each holder of a Claim should consult its own tax advisors regarding the tax consequences of the Creditors' Plan, based upon the particular circumstances pertaining to such holder.

C.  **Additional Factors to Be Considered**

1.  **No Representations Made Outside this Specific Disclosure Statement Are Authorized**

The information contained in this Specific Disclosure Statement is for purposes of soliciting acceptances of the Creditors' Plan and may not be relied upon for any other purpose. Except as otherwise provided herein or in the Creditors' Plan, no representations relating to the Debtor, the Chapter 11 Case or the Creditors' Plan are authorized by the Bankruptcy Court, the Bankruptcy Code or otherwise. Any representations or inducements made to secure your acceptance or rejection of the Creditors' Plan, other than as contained in or included with this Specific Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Creditor Plan Proponents and, if applicable, the U.S. Trustee.

2.  **Certain Information Herein Was Provided by the Debtor and Relied Upon by the Creditor Plan Proponents' Advisors**

Counsel to and other advisors retained by the Creditor Plan Proponents have relied upon information provided by the Debtor, as well as information gathered in the UCC's Investigation, in connection with the preparation of this Specific Disclosure Statement and the Creditors' Plan. Although counsel to and other advisors retained by the Creditor Plan Proponents have attempted to verify the information contained herein, certain statements rely on documents and representations received from the Debtor or from his affiliates. The Debtor's records are incomplete, and the Debtor and certain other parties did not fully comply with discovery requests. Although the Creditor Plan Proponents have undertaken great efforts to provide accurate and complete information in this Specific Disclosure Statement, the Creditor Plan Proponents cannot warrant or represent that the information contained herein is complete and accurate.

The statements contained in this Specific Disclosure Statement are made by the Creditor Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Specific Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Creditor Plan Proponents have used their reasonable diligence efforts to ensure the accuracy of all of the information provided in this Specific Disclosure Statement and in the Creditors' Plan, the Creditor Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Specific Disclosure Statement.

The financial information contained in this Specific Disclosure Statement has not been audited unless explicitly stated otherwise. In preparing this Specific Disclosure Statement, the Creditor Plan Proponents have relied predominantly on financial data derived from the Debtor's books and records that was available at the time of such preparation, together with information gathered in the course of the UCC's Investigation. While the Creditor Plan Proponents believe that the financial information received from the Debtor and relied upon in preparing this Specific Disclosure Statement fairly reflects the financial condition of the Debtor, the UCC is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

3.  **No Legal or Tax Advice Is Provided to You by this Specific Disclosure Statement**

**This Specific Disclosure Statement is not legal advice to you.** The contents of this Specific Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim. This Specific Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Creditors' Plan or object to Confirmation of the Creditors' Plan.

**4.      No Admissions Are Made by this Specific Disclosure Statement**

The information and statements contained in this Specific Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Creditor Plan Proponents) nor be deemed evidence of the tax or other legal effects of the Creditors' Plan on the Debtor, holders of Allowed Claims or any other parties in interest.  Except as otherwise provided in the Creditors' Plan, the vote by a holder of an Allowed Claim for or against the Creditors' Plan does not constitute a waiver or release of any Claims or rights of the Creditor Plan Proponents to object to that holder's Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or his Estate are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Specific Disclosure Statement.  The Creditor Plan Proponents and/or the GUC Trustee, as applicable, may seek to investigate, file, and prosecute objections to Claims and may object to Claims after the Confirmation or Effective Date of the Creditors' Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

**5.      No Duty to Update**

The statements contained in the Specific Disclosure Statement are made as of the date hereof, unless otherwise specified herein, and the delivery of the Specific Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Creditor Plan Proponents have no duty to update the Specific Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**IX.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE CREDITORS' PLAN**

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Creditors' Plan.  This discussion is only for general information purposes and only describes the expected tax consequences to holders of General Unsecured Claims.  It should not be relied upon for purposes of determining the specific tax consequences of the Creditors' Plan with respect to a particular holder.  This discussion does not address aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim subject to special treatment under U.S. federal income tax laws.  It also assumes that each holder of a Claim is a U.S. Holder (as defined below).  It is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or non-U.S. tax laws or U.S. federal estate or gift tax laws.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Specific Disclosure Statement.  These authorities may change, possibly retroactively, resulting in U.S. federal income tax consequences different from those discussed below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Creditors' Plan and no opinion of counsel has been sought or obtained with respect thereto.  The discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  No representations or assurances are being made to the holders of Claims with respect to the U.S. federal income tax consequences described herein.

As used herein, the term "U.S. Holder" means a beneficial owner of a Claim that is for U.S. federal income tax purposes (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; (iv) a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person; (v) the government of the United States, any state, political subdivision or territory thereof or the District of Columbia; or (vi) any Tribe.  If a partnership or other entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any Claims, you should consult your own tax advisor.

This discussion also does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full under the Creditors' Plan, or (ii) that are deemed to accept or deemed to reject the Creditors' Plan.  Additionally, this discussion does not address any consideration being received other than in a person's capacity as a holder of a Claim.

**The contents of this Specific Disclosure Statement should not be construed as legal, business or tax advice.  Holders should consult their own tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Creditors' Plan and the receipt of amounts from the GUC Trust, as well as any tax consequences arising under any state, local or non-U.S. tax laws or any other U.S. federal tax laws.  This Specific Disclosure Statement may not be relied for any purpose other than to determine how to vote on the Creditors' Plan or object to confirmation of the Creditors' Plan.**

### A.    Tax Treatment of Holders of a General Unsecured Claim

Pursuant to the Creditors' Plan, each U.S. Holder of a General Unsecured Claim that is Allowed will be entitled to receive, at such holder's election, (i) the holder's pro rata share of the GUC Election Cash Pool, such pro rata share to be calculated based on the total amount of Allowed General Unsecured Claims held by holders that make such election, or (ii) the holder's pro rata share of the GUC Trust Interests, such pro rata share to be calculated based on the aggregate amount of Allowed General Unsecured Claims that make such election.  The tax consequences to a U.S. Holder of a General Unsecured Claim will depends on whether such U.S. Holder elects to received cash or GUC Trust Interests and the tax status of the GUC Trust for U.S. federal income tax purposes.  The following discussion assumes that the GUC Trust is treated as "qualified settlement fund" (a "QSF") pursuant to Treasury Regulation section 1.468B-1 for U.S. federal income tax purposes.  If the GUC Trust is treated as a liquidating trust, partnership, or other entity for U.S. federal income tax purposes, the tax treatment of holders of GUC Trust Interests would differ materially from the consequences below and U.S. Holders should consult their tax advisors with respect to such tax treatment.

Each holder of a General Unsecured Claim that elects to receive their pro rata share of the General Unsecured Claim Cash Pool should be treated as exchanging its General Unsecured Claim for cash in a fully taxable exchange pursuant to Section 1001 of the Tax Code.  A holder of such General Unsecured Claims should generally recognize gain or loss equal to (i) the amount of Cash received in the exchange, and (ii) its adjusted tax basis, if any, in the General Unsecured Claim.

Assuming this treatment of the GUC Trust as a QSF is respected for U.S. federal income tax purposes, each holder of a General Unsecured Claim that elects receive a pro rata share of the GUC Trust

Interests generally is not expected to be treated as receiving a distribution from the GUC Trust unless and until such U.S. Holder is entitled to receive that distribution directly, and any amounts received by a U.S. Holder of a General Unsecured Claim from the GUC Trust generally are expected to be treated by such holder as if received directly from the Debtor.

The U.S. federal income tax consequences to a holder of a General Unsecured Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of such Claim may depend on a number of factors, including the nature and origin of such Claim, the U.S. Holder's method of accounting and the U.S. Holder's own particular tax situation. If a distribution is treated as a payment on account of damages that are not the result of physical injury or physical sickness, such distribution may be taxable as ordinary income to the holder. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Creditors' Plan affects them for U.S. federal, state, and local tax purposes, based on their particular tax situations.

### B.     Tax Treatment of the GUC Trust

On the Confirmation Date, the GUC Trust will be established in accordance with the GUC Trust Agreement. The GUC Trust is intended to qualify as a QSF and the remainder of this discussion assumes that this treatment is respected.

The GUC Trustee will be responsible for the payment of any taxes imposed on the GUC Trust or the GUC Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the GUC Trust Agreement. A QSF is subject to entity-level tax under generally applicable U.S. federal income tax principles at the maximum U.S. federal income tax rate applicable to trusts and estates (currently 37%, increasing to 39.6% beginning in 2026). The determination of taxable income of a QSF for U.S. federal income tax purposes is subject to certain exceptions, including: (i) any amounts transferred by or on behalf of the transferors to the QSF to resolve or satisfy a liability for which the transferor is liable and the QSF is established will generally be excluded from the QSF's income, other than dividends on stock of a transferor (or a related person of the transferor), interest on debt of a transferor (or a related person of the transferor) or payments in compensation for late or delayed transfers, (ii) any distribution of property by the QSF generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the QSF's adjusted tax basis in such property, and (iii) only limited, specified deductions will be permitted, including deductions for administrative costs and state and local taxes incurred by the QSF, and excluding any deductions that would generally be allowable to a corporation or partnership for expenses incurred in the course of a taxpayer's trade or business. In general, the adjusted tax basis of property received (or treated as received for U.S. federal income tax purposes) by a QSF from a transferor will be the fair market value of such property at the time of receipt. Notwithstanding the foregoing, the GUC Trust is not expected to recognize income with respect to the GUC Trust Agreement other than in respect of any payments in compensation for late or delayed transfers due thereunder.

The GUC Trustee will also be required to file tax returns on behalf of the GUC Trust and will be responsible for causing the GUC Trust to pay any taxes imposed upon the GUC Trust.

### C.     Withholding on Distributions and Information Reporting

Information reporting requirements may apply to distributions or payments pursuant to the Creditors' Plan. Certain distributions to holders of Claims under the Creditors' Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments to U.S. Holders may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 24%).

Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number, (ii) furnishes an incorrect taxpayer identification number, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return). Certain persons are exempt from backup withholding and information reporting, including governments of U.S. states or political subdivisions thereof and non-U.S. governments and, in certain circumstances, corporations and financial institutions. Holders of Claims are urged to consult their own tax advisors regarding the potential for and applicable law governing backup and other tax withholding in connection with the transactions contemplated by the Creditors' Plan. In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Creditors' Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE CREDITORS' PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S. OR OTHER APPLICABLE TAX LAWS.**

## X.  RECOMMENDATION AND CONCLUSION

The Creditor Plan Proponents believe that Confirmation of the Creditors' Plan is in the best interests of the creditors and urge all holders of Claims in voting classes to vote in favor of the Creditors' Plan.

Dated: January 5, 2024

**THE CREDITOR PLAN PROPONENTS**

**The Official Committee of Unsecured Creditors**

By:    */s/ Marty L. Brimmage, Jr.*
        Marty L. Brimmage, Jr.
        **Akin Gump Strauss Hauer & Feld LLP**
        *Counsel to the UCC*

42

**The Texas Plaintiffs**

By:      */s/ Avi Moshenberg*
         Avi Moshenberg
         **McDowell Hetherington LLP**
         *Counsel to the Texas Plaintiffs*


**The Connecticut Plaintiffs**

By:      */s/ Ryan E. Chapple*
         Ryan E. Chapple
         **Cain & Skarnulis PLLC**
         *Counsel to the Connecticut Plaintiffs*

43