**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| ALEXANDER E. JONES, | ) ) Case No. 22-33553 (CML) |
| Debtor. | ) ) |

**NOTICE OF FILING OF REVISED PROPOSED SPECIFIC DISCLOSURE STATEMENT FOR THE CREDITORS' NON-UNIFORM INDIVIDUAL CHAPTER 11 PLAN OF LIQUIDATION FOR ALEXANDER E. JONES AND RELATED BLACKLINE**

　　**PLEASE TAKE NOTICE** that, on January 5, 2024, the Official Committee of Unsecured Creditors appointed in the above-captioned case, the Connecticut Plaintiffs,[1] and the Texas Plaintiffs[2] (collectively, the "Creditor Plan Proponents") filed the *Proposed Specific Disclosure Statement for the Creditors' Non-Uniform Individual Chapter 11 Plan of Liquidation for Alexander E. Jones* [ECF No. 539] (as it may be amended, altered, modified, or supplemented, the "Specific Disclosure Statement") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

　　**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit A** is a slightly revised version of the Specific Disclosure Statement reflecting certain limited corrections (the "Revised Specific Disclosure Statement").

　　**PLEASE TAKE FURTHER NOTICE** that, for the convenience of the Court and all parties in interest, a changed pages only redline comparison of the Revised Specific Disclosure Statement against the originally filed Specific Disclosure Statement is attached hereto as **Exhibit B.**

---

[1] The "Connecticut Plaintiffs" are (i) David Wheeler; (ii) Francine Wheeler; (iii) Mark Barden; (iv) Jacqueline Barden; (v) Nicole Hockley; (vi) Ian Hockley; (vii) Jennifer Hensel; (viii) Donna Soto; (ix) Carlee Soto-Parisi; (x) Carlos M. Soto; (xi) Jillian Soto Marino; (xii) William Aldenberg; (xiii) William Sherlach; (xiv) Robert Parker; and (xv) Erica Lafferty. Due to Erica Lafferty's chapter 7 bankruptcy, the trustee of her chapter 7 estate currently represents her financial interest in this proceeding.

[2] The "Texas Plaintiffs" are: (i) Neil Heslin; (ii) Scarlett Lewis; (iii) Leonard Pozner; (iv) Veronique De La Rosa; and (v) the Estate of Marcel Fontaine.

*/s/ Marty L. Brimmage*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr.
Texas Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Fax:  (214) 969-4343
E-mail:  mbrimmage@akingump.com

*-and-*

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Melanie A. Miller (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Fax:  (212) 872-1002
E-mail:  dzensky@akingump.com
E-mail:  sbrauner@akingump.com
E-mail:  kporter@akingump.com
E-mail:  akordas@akingump.com
E-mail:  melanie.miller@akingump.com

***Counsel to the Official Committee of Unsecured
Creditors of Alexander E. Jones***

*/s/ Ryan Chapple*
**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  slascano@paulweiss.com
E-mail:  virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

*/s/ Avi Moshenberg*
**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
E-mail:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

***Co-Counsel to the Texas Plaintiffs***

Dated:  January 22, 2024

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 22, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>*/s/ Marty L. Brimmage, Jr.*</u>
Marty L. Brimmage, Jr.

**<u>Exhibit A</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ALEXANDER E. JONES, | ) | Case No. 22-33553 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**PROPOSED SPECIFIC DISCLOSURE STATEMENT
FOR THE CREDITORS' NON-UNIFORM INDIVIDUAL
CHAPTER 11 PLAN OF LIQUIDATION FOR ALEXANDER E. JONES**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr.
State Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Fax: (214) 969-4343
E-mail: mbrimmage@akingump.com

*-and-*

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Melanie A. Miller (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Fax: (212) 872-1002
E-mail: dzensky@akingump.com
E-mail: sbrauner@akingump.com
E-mail: kporter@akingump.com
E-mail: akordas@akingump.com
E-mail: melanie.miller@akingump.com

***Counsel to the Official Committee of Unsecured
Creditors of Alexander E. Jones***

**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
E-mail: rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: (203) 336-4421
E-mail: asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: kkimpler@paulweiss.com
E-mail: slascano@paulweiss.com
E-mail: virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
E-mail:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,
WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

*-and-*

Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

***Co-Counsel to the Texas Plaintiffs***

Dated:  January 22, 2024

THIS SPECIFIC DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION.   THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THE INFORMATION IN THIS SPECIFIC DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS SPECIFIC DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

The information contained in this specific disclosure statement (as may be modified from time to time, the "Specific Disclosure Statement") for the *Creditors' Non-Uniform Individual Chapter 11 Plan of Liquidation for Alexander E. Jones* (as may be amended, supplemented or otherwise modified from time to time, the "Creditors' Plan")[1] proposed by the Official Committee of Unsecured Creditors of Alexander E. Jones (the "UCC"), the Connecticut Plaintiffs,[2] and the Texas Plaintiffs[3] (collectively, the "Sandy Hook Families" and together with the UCC, the "Creditor Plan Proponents") in the individual chapter 11 case (the "Chapter 11 Case") of Alexander E. Jones ("Jones" or the "Debtor") pending before the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") is included herein for purposes of soliciting acceptances of the Creditors' Plan and may not be relied upon for any purpose other than to determine how to vote on the Creditors' Plan.  No solicitation of votes to accept the Creditors' Plan may be made except pursuant to section 1125 of Title 11 of the United States Code (the "Bankruptcy Code").   Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Specific Disclosure Statement does not constitute the Bankruptcy Court's approval of the Creditors' Plan.  Before deciding whether to vote for or against the Creditors' Plan, each holder of a Claim entitled to vote should carefully consider all of the information in the Creditors' Plan and this Specific Disclosure Statement, including the risk factors described in Article VIII herein.

The Creditor Plan Proponents believe that the Creditors' Plan is the best alternative for resolution of the Chapter 11 Case.  As of the date hereof, the Debtor does not support the Creditors' Plan and has filed a competing chapter 11 plan [Docket No. 523] (the "Jones Plan") and a related proposed disclosure statement [Docket No. 533] (the "Jones Disclosure Statement").

This Specific Disclosure Statement contains, among other things, a summary of key provisions of the Creditors' Plan, an explanation of certain statutory provisions, and a description of certain relevant background and events that took place prior to and during the Chapter 11 Case. Although the Creditor Plan Proponents believe that these summaries and descriptions are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of the Creditors' Plan or statutory provisions or every detail of events described.  In the event of any inconsistency or discrepancy between a description in this Specific Disclosure Statement and the

---

[1] Capitalized terms used but not otherwise defined in this Specific Disclosure Statement shall have the meaning ascribed to such terms in the Creditors' Plan.  The summary of the Creditors' Plan provided herein is qualified in its entirety by reference to the Creditors' Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement).  In the case of any inconsistency between this Specific Disclosure Statement and the Creditors' Plan, the Creditors' Plan and related documents will govern.

[2] The "Connecticut Plaintiffs" are (i) David Wheeler; (ii) Francine Wheeler; (iii) Mark Barden; (iv) Jacqueline Barden; (v) Nicole Hockley; (vi) Ian Hockley; (vii) Jennifer Hensel; (viii) Donna Soto; (ix) Carlee Soto-Parisi; (x) Carlos M. Soto; (xi) Jillian Soto Marino; (xii) William Aldenberg; (xiii) William Sherlach; (xiv) Robert Parker; and (xv) Erica Lafferty.  Due to Erica Lafferty's chapter 7 bankruptcy, the trustee of her chapter 7 estate currently represents her financial interest in this proceeding.

[3] The "Texas Plaintiffs" are: (i) Neil Heslin; (ii) Scarlett Lewis; (iii) Leonard Pozner; (iv) Veronique De La Rosa; and (v) the Estate of Marcel Fontaine (the "Fontaine Estate").

terms and provisions of the Creditors' Plan or any other documents incorporated herein by reference, the Creditors' Plan or such other document will govern for all purposes. A copy of the Creditors' Plan to which this Specific Disclosure Statement relates is attached hereto as **Exhibit A**.

Factual information contained in this Specific Disclosure Statement has been provided by the Debtor, except where otherwise noted. Specifically, in preparing this Specific Disclosure Statement, the Creditor Plan Proponents relied on statements in the Jones Disclosure Statement, statements in the Debtor's Schedules and Statements (as defined herein) and monthly operating reports filed in the Chapter 11 Case, financial data derived from the Debtor's books and records, information derived from the UCC's Investigation (as defined herein), and various assumptions regarding the Debtor's businesses and assets. The Creditor Plan Proponents make no representations or warranties as to the accuracy of the information, including financial information, contained herein or attached hereto. The Creditor Plan Proponents expressly caution readers not to place undue reliance on any financial or forward-looking statements contained herein.

This Specific Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Creditor Plan Proponents or any other authorized party may seek to investigate, file, and prosecute Claims and Causes of Action and may object to Claims after the Confirmation or the Effective Date of the Creditors' Plan, irrespective of whether this Specific Disclosure Statement identifies any such Claims or objections to Claims.

The Creditor Plan Proponents have not authorized any entity to give any information about or concerning the Creditors' Plan other than that which is contained in this Specific Disclosure Statement. Moreover, the Creditor Plan Proponents have not authorized any representations concerning the Debtor or the value of his property other than as set forth in this Specific Disclosure Statement.

If the Creditors' Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims (including those holders of Claims who do not submit ballots to accept or reject the Creditors' Plan, who vote to reject the Creditors' Plan, or who are not entitled to vote on the Creditors' Plan) will be bound by the terms of the Creditors' Plan.

Confirmation and the effectiveness of the Creditors' Plan are subject to certain material conditions precedent described herein and set forth in **Article XI** of the Creditors' Plan. There is no assurance that the Creditors' Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Creditors' Plan to go effective will be satisfied (or waived).

This Specific Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws. This Specific Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local, or foreign regulatory agency, nor has the SEC nor any other agency passed upon the accuracy or adequacy of the statements contained in this Specific Disclosure Statement. Any representation to the contrary is a criminal offense.

The Creditor Plan Proponents cannot assure you that the Specific Disclosure Statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Case (i) will contain any of the terms described in this Specific Disclosure Statement or (ii) will not contain different, additional, or material terms that do not appear in this Specific Disclosure Statement. A holder of a Claim entitled to vote on the Creditors' Plan should not rely on this Specific

Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Creditors' Plan.

After carefully reviewing this Specific Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Creditors' Plan by voting in favor of or against the Creditors' Plan on the enclosed ballot and returning the same, to the address set forth on the ballot, in the enclosed return envelope so that it will be received by [·], no later than 5:00 p.m. Central Time on [·], 2024].

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M. CENTRAL TIME ON [·], 2024.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Creditors' Plan (the "<u>Confirmation Hearing</u>") to begin on February 27, 2024, at [·] Central Time.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Creditors' Plan be filed and served on or before February 16, 2024, in the manner described in <u>Article VI</u> below.

**TABLE OF CONTENTS**

I.      INTRODUCTION...............................................................................................1

II.     BACKGROUND AND THE UNDERLYING STATE COURT LITIGATION......................2
        A.      The Connecticut Litigation ...............................................................3
        B.      The Texas Litigation ........................................................................3

III.    CRITICAL EVENTS DURING THE CHAPTER 11 CASE....................................4
        A.      Commencement of the Chapter 11 Case ...........................................4
        B.      Appointment of the UCC...................................................................5
        C.      Lift Stay Motions Filed by the Sandy Hook Families .......................5
        D.      Filing of Schedules and Statements ..................................................7
        E.      The Nondischargeability Adversary Proceedings.............................8
        F.      The UCC's Investigation ................................................................10
        G.      Mediation .......................................................................................18
        H.      Expiration of Exclusivity ...............................................................18
        I.      Circumstances Leading to the Filing of the Creditors' Plan ...........19
        J.      Debtor's Reinstatement on Social Media Platform..........................22

IV.     KEY ASPECTS OF THE CREDITORS' PLAN ................................................22
        A.      General Basis for the Creditors' Plan .............................................22
        B.      Treatment of Unclassified Claims ..................................................23
        C.      Classification and Treatment of Claims..........................................25
        D.      Treatment of Nondischargeable Claims ..........................................27
        E.      The GUC Trust ...............................................................................27
        F.      The Debtor's Obligations and Covenants .......................................29
        G.      Releases and Exculpation ...............................................................30

V.      CREDITORS' PLAN LIQUIDATION ANALYSIS............................................31

VI.     SOLICITATION AND VOTING PROCEDURES ...............................................31
        A.      Ballots and Voting Deadline ...........................................................32
        B.      Holders of Claims Entitled to Vote.................................................32
        C.      Bar Dates for Filing Proofs of Claim .............................................32
        D.      Tabulation of Votes ........................................................................33

VII.    CONFIRMATION PROCEDURES ..................................................................33
        A.      The Confirmation Hearing ..............................................................33
        B.      Confirmation Standards ..................................................................33
        C.      Best Interests Test / Liquidation Analysis ......................................34
        D.      Feasibility.......................................................................................35
        E.      Confirmation Without Acceptance by All Impaired Classes............35
        F.      Alternative Plan ..............................................................................36

VIII.   RISK FACTORS..........................................................................................36
        A.      Risks Related to the Chapter 11 Case .............................................36
        B.      Risk of Variance in Financial Results.............................................38
        C.      Additional Factors to Be Considered ..............................................39

IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
        THE CREDITORS' PLAN .............................................................................40
        A.      Tax Treatment of Holders of a General Unsecured Claim ..............41
        B.      Tax Treatment of the GUC Trust.....................................................42
        C.      Withholding on Distributions and Information Reporting................43

**X.      RECOMMENDATION AND CONCLUSION** ........................................................................ **43**

## TABLE OF EXHIBITS

**Exhibit A**:   **Creditors' Plan**

**Exhibit B**:   **Schedule of Assets**

**Exhibit C**:   **Schedule of Claims and Causes of Action**

**Exhibit D**:   **Creditors' Plan Liquidation Analysis**

**THE CREDITOR PLAN PROPONENTS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ANNEXED TO THIS SPECIFIC DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

## I.    INTRODUCTION

The Creditor Plan Proponents submit this Specific Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain holders of Claims against the Debtor in connection with solicitation of acceptances of the Creditors' Plan.  A copy of the Creditors' Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[4]

This Specific Disclosure Statement is intended to describe certain aspects of the Creditors' Plan, including the treatment of Claims, as well as certain aspects of the Debtor's financial position and other related matters.  Moreover, this Specific Disclosure Statement is intended to expand on certain insufficient disclosures contained in the Jones Disclosure Statement and correct certain inconsistencies and errors set forth therein.  For the avoidance of doubt, however, and particularly given the status of discovery and the state of the Debtor's books and records (as described herein), this Specific Disclosure Statement does not purport to correct all insufficiencies, inconsistencies, or inaccuracies in the Jones Disclosure Statement.  Moreover, this Specific Disclosure Statement does not purport to raise all concerns the Creditor Plan Proponents have identified in respect of the Jones Plan or the Jones Disclosure Statement.  The Creditor Plan Proponents will identify such concerns at the appropriate time in accordance with the confirmation schedule established by the Bankruptcy Court and reserve all rights to make any additional statements, assertions or objections in connection with the same.

On December 2, 2022, the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Sandy Hook Families are the largest creditors of the Debtor, with verdicts and judicial damages awarded thus far totaling in excess of $1.5 billion.  The six-member UCC appointed by the Office of the United States Trustee (the "U.S. Trustee") comprises exclusively representatives of the Sandy Hook Families, which hold Claims that were determined to be nondischargeable, in substantial part, by the Bankruptcy Court (as discussed further herein).[5]  As a result of this Chapter 11 Case pending for over a year without a viable path to emergence[6] and the Debtor's mismanagement of his affairs and the Estate prior to and after filing for bankruptcy protection, the UCC and the Sandy Hook Families, as co-proponents of the Creditors' Plan within the meaning of section 1129 of the Bankruptcy Code, determined to propose the Creditors' Plan, which they believe presents the only viable path out of chapter 11 for the Debtor and his creditors.[7]

> The Debtor has requested that this Specific Disclosure Statement include a statement regarding the Debtor's denial of any mismanagement of his affairs and Estate and his position that no such allegations have been proven in this Chapter 11 Case.  Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

The Creditors' Plan (i) provides for the equitable treatment of Claims, including the Sandy Hook Families' unsecured Claims that have been determined by the Bankruptcy Court to be largely nondischargeable; (ii) preserves valuable Estate Causes of Action for the benefit of creditors; (iii) allocates greater value to unsecured creditors than would a liquidation under chapter 7 of the Bankruptcy Code; (iv) will garner the requisite support of the creditors entitled to vote on the Creditors' Plan and meets all other requirements for Confirmation under the Bankruptcy Code; (v) has been proposed by the Creditor

---

[4] The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, financial statements, and notes thereto appearing elsewhere in this Specific Disclosure Statement and the Creditors' Plan.

[5] As a result of the Bankruptcy Court's determination that the Sandy Hook Families' Claims were, in large part, nondischargeable, the rights and interests of the Sandy Hook Families may differ from those of other General Unsecured Creditors.

[6] The Creditor Plan Proponents do not currently believe that the Jones Plan is viable, confirmable, or appropriate given the facts and circumstances of the Chapter 11 Case, which objections will be detailed in advance of the Confirmation Hearing.

[7] The Creditor Plan Proponents reserve the right to modify the Creditors' Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 2019.

Plan Proponents in good faith; (vi) is fair and equitable; (vii) is feasible; and (viii) is in the best interests of creditors.

Specifically, the Creditors' Plan seeks to implement an orderly liquidation under chapter 11 of the Bankruptcy Code, while simultaneously preserving valuable Estate Causes of Action against third parties. Under the Creditors' Plan, the Debtor's non-exempt assets will be sold and the proceeds distributed to creditors. In addition, Estate Causes of Action against third parties, including those already identified by the UCC's Investigation or which may later be discovered, will be transferred to the GUC Trust, and value from the prosecution and or settlement of such actions by the GUC Trustee will be preserved and distributed to those creditors who elect to receive interests in the GUC Trust.

Importantly, the Creditor Plan Proponents do not believe that confirmation of the Creditors' Plan necessarily must affect the FSS Case[8] or impair the ability of FSS, the Debtor's wholly owned entity that is subject to a bankruptcy proceeding under subchapter V of chapter 11 of the Bankruptcy Code, to prosecute the FSS Plan[9] and perform thereunder if confirmed. However, the Debtor recently disclosed in his objection to this Specific Disclosure Statement [Docket No. 551] (the "Jones Specific Disclosure Statement Objection") as follows: "[T]he Debtor has made it clear without a confirmed plan in his Chapter 11 Case, he is unwilling to work for FSS. Therefore, this statement needs to be corrected to reflect that the impact of the UCC Plan on the Debtor may have a substantial impact on the FSS Plan, potentially resulting in liquidation."[10] This was the first time the Debtor definitively and publicly affirmed that he will not continue working for FSS absent confirmation of a plan acceptable to him in this Chapter 11 Case. The Creditor Plan Proponents reserve the right to argue in connection with the Confirmation Hearing that Jones is improperly tying the outcome of his Chapter 11 Case to the outcome of the FSS Case, which is separately administered and seeks confirmation of its own plan. That said, to the extent Jones's statement is correct, the outcome of this Chapter 11 Case may have a material impact on the FSS Case.

Critically, the Creditors' Plan does not contemplate a discharge of any of the Debtor's nondischargeable Claims, including the Nondischargeable Claims held by the Sandy Hook Families. Nor does the Creditors' Plan provide the Debtor with a release from any prepetition liability. Accordingly, each of the Estate's creditors holding nondischargeable Claims will be free to pursue, enforce, and collect on their judgments against the Debtor in litigation and enforcement proceedings following the expiration of the automatic stay.

**THE CREDITOR PLAN PROPONENTS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE CREDITORS' PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND ITS CREDITORS. AT THIS TIME, THE CREDITOR PLAN PROPONENTS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASE. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE CREDITOR PLAN PROPONENTS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE CREDITORS' PLAN VOTE TO ACCEPT THE CREDITORS' PLAN.**

## II.     BACKGROUND AND THE UNDERLYING STATE COURT LITIGATION

The Debtor is an individual living in the state of Texas who is involved in numerous media projects and enterprises. The Debtor's media career spans almost three decades. The Debtor is the sole owner of FSS, which is subject to a separate bankruptcy case under subchapter V of chapter 11 of the Bankruptcy Code. The Debtor's income, including the income resulting from the operations of his directly and

---

[8] "FSS Case" means *In re Free Speech Systems LLC*, Case No. 22-60043-CML (Bankr. S.D.T.X. July 29, 2022).
[9] "FSS Plan" means the Debtor's First Amended Plan of Reorganization Under Subchapter V of the Bankruptcy Code [Docket No. 756] in FSS Case No. 22-60043-CML.
[10] *See* Jones Specific Disclosure Statement Objection 5

indirectly owned companies, is derived primarily from the production of media content and marketing opportunities through various media channels and related enterprises.

On December 14, 2012, a lone gunman shot and killed 20 first graders and six adults at Sandy Hook Elementary School in Newtown, Connecticut.  Starting that day, the Debtor began, and continued, broadcasting on his radio show and across various media platforms false assertions that the shooting never took place, that the children who were killed were fictional, or "holograms," and that their parents—as well as those children that survived the attack—were actors perpetrating a fraud for money or political purposes. The instances of the Debtor's defamatory statements were much more pervasive than "[o]ne day on his show," and the Debtor did far more than "cover the event's official narrative with skepticism," as the Debtor suggests in the Jones Disclosure Statement.[11]   Indeed, the Debtor's campaign of defamation and lies spanned many years and resulted in pervasive harassment and profound damage to the Sandy Hook Families.

Since 2018, the families of those killed at Sandy Hook Elementary School, as well as other individuals defamed by the Debtor, commenced litigation against the Debtor, some of which resulted in verdicts and judgments against the Debtor, as described in more detail below.  This litigation falls broadly into two categories:  the "Connecticut Litigation" and the "Texas Litigation."

> The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with the characterization of his actions and litigation history described herein.  Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

### A.     The Connecticut Litigation

Beginning in May 2018, the Connecticut Plaintiffs commenced lawsuits in Connecticut state court against the Debtor, FSS, and certain of their affiliates for, among other things, defamation, intentional infliction of emotional distress, invasion of privacy, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").[12]   These actions proceeded together, with the lead docket being *Lafferty v. Jones*, X06-UWY-CV-18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court.  As the litigation proceeded, the Debtor used it as a new profit center, claiming on his show that he was a victim of the Connecticut court's tyranny and soliciting donations in connection with his legal fees in defending himself against these lawsuits.  At the same time, the Debtor obstructed discovery directed to him and otherwise abused the court process, including by threatening plaintiffs' counsel. After giving the Debtor multiple opportunities to change course, participate fairly in the judicial process, and comply with court orders, and faced with the Debtor's absolute recalcitrance, the trial court issued a default judgment against the Debtor and scheduled a trial on compensatory and punitive damages.  At that trial, the jury awarded $965 million to the Connecticut Plaintiffs in compensatory damages and over $470 million in additional common law and statutory punitive damages, for a total of $1,438,139,555.94 (the "Connecticut Judgment").

### B.     The Texas Litigation

**Heslin and Lewis.**  On April 16, 2018, Neil Heslin filed a lawsuit in Texas state court against the Debtor, FSS, and certain of their affiliates for defamation, conspiracy, and intentional infliction of

---

[11] Jones Disclosure Statement at 7.

[12] *Lafferty v. Jones*, X06-UWY-CV-18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court; *Sherlach v. Jones*, X06-UWY-CV-18-6046437-S, in the Judicial District of Waterbury of the Connecticut Superior Court; and *Sherlach v. Jones*, X06-UWY-CV-18-6046438-S, in the Judicial District of Waterbury of the Connecticut Superior Court.

emotional distress.[13]  On October 31, 2018, Scarlett Lewis filed a similar lawsuit,[14] which was subsequently consolidated with Heslin's case (the "Heslin and Lewis Action").  As with the Connecticut Litigation, the Debtor turned these actions into a profit center, using his updates on the status of the litigation to sell supplements and other products to his audience.  Again here, the Debtor and FSS engaged in egregious obstruction and litigation misconduct, as a result of which they were repeatedly sanctioned and held in contempt, leading to an eventual default judgment on liability.  After a nine-day damages trial, at which the Debtor admitted that the Sandy Hook shooting was "100% real," a jury awarded Heslin and Lewis more than $4 million in compensatory damages and approximately $45 million in exemplary damages, amounts that were later upheld by the trial court over objections by the Debtor that they were barred by Texas statute (the "Heslin and Lewis Judgment").

       **Pozner and De La Rosa.**  A separate lawsuit against the Debtor and FSS in Texas state court was commenced by Leonard Pozner and Veronique De La Rosa on April 16, 2018 (the "Pozner and De La Rosa Action").[15]  This lawsuit similarly served as a source of profit for the Debtor and included "unreasonabl[e] and vexatious[]" failure by the Debtor and other defendants to comply with their discovery duties, ultimately leading to a default judgment on liability for defamation (the "Pozner and De La Rosa Judgment" and, together with the Heslin and Lewis Judgment, the "Texas Judgment").  A trial on damages was originally scheduled for the summer of 2022, but was stayed by the filing of the FSS Case and then subsequently further stayed by this Chapter 11 Case.

       **Fontaine**.  Marcel Fontaine was the first party to bring defamation and intentional infliction of emotional distress claims against Jones and FSS, commencing a lawsuit in Texas state court on April 2, 2018 (the "Fontaine Action").[16]  Unlike the other Creditor Plan Proponents, Fontaine's claims do not relate to the Sandy Hook shooting.  Instead, his claims arise from InfoWars' false reporting identifying him—by name and photo—as the murderer of 17 students and educators at a separate school shooting on February 14, 2018 at Marjory Stoneman Douglas High School in Parkland, Florida.  Even though Fontaine had no relation to the shooting and had never set foot in the state of Florida, the InfoWars stories identifying him as the shooter spread to an audience of millions.  This falsehood had a significant and detrimental effect on Fontaine's life until his death in May 2022, at which point the Fontaine Estate took over the litigation.

## III.  CRITICAL EVENTS DURING THE CHAPTER 11 CASE

### A.  Commencement of the Chapter 11 Case

       On December 2, 2022, the Debtor sought individual bankruptcy protection by commencing this Chapter 11 Case.  The Debtor continues in possession of his Estate and is managing his Estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The commencement of this Chapter 11 Case followed the filing for bankruptcy protection by FSS and certain of Jones's other controlled entites, which cases—other than the FSS Case—were procedurally consolidated for purposes of joint administration and later dismissed.[17]

---

[13] *Heslin v. Jones,* Cause No. D-1-GN-18-001835 in the 261st District Court of Travis County, Texas.

[14] *Lewis v. Jones,* Cause No. D-1-GN-18-006623 in the 98th District Court of Travis County, Texas.

[15] *Pozner v. Jones,* Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas.

[16] *Fontaine v. Jones,* Cause No. D-1-GN-18-001605 in the 459th District Court of Travis County, Texas.

[17] *In re InfoW LLC, et al.,* Case No. 22-60020-CML (Bankr. S.D.T.X. April 17, 2022); *In re IWHealth, LLC,* Case No. 22-60021-CML (Bankr. S.D.T.X. April 18, 2022); *In re Prison Planet TV, LLC,* Case No. 22-60022-CML (Bankr. S.D.T.X. April 18, 2022); *see Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [Case No. 22-60020, Docket No. 114].

### B.        Appointment of the UCC

On December 13, 2022, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 42], an official committee of unsecured creditors (the "UCC") was appointed in the Chapter 11 Case by the U.S. Trustee for the Southern District of Texas.  The UCC comprises representatives of six of the Sandy Hook Families.  The UCC was formed to represent the interests of all unsecured creditors and to enable such creditors to play a meaningful role in this Chapter 11 Case.

On December 19, 2022, the UCC selected Akin Gump Strauss Hauer & Feld LLP ("Akin") to serve as its counsel in connection with the Chapter 11 Case, which retention was approved by the Bankruptcy Court.[18]  On January 5, 2023, the UCC selected Nardello & Co. ("Nardello"), to aid in its review of the Debtor's Estate and prepetition transactions, which retention was approved by the Bankruptcy Court.[19]  Finally, the UCC completed its selection of professionals with the retention of Teneo Capital LLC ("Teneo" and, together with Nardello and Akin, the "UCC Advisors") on January 19, 2023 to serve as generalized financial advisor to the UCC, which retention was approved by the Bankruptcy Court.[20]

Since its formation, the UCC, with the assistance of the UCC Advisors, has played a significant and crucial role in this Chapter 11 Case, including:  (i) investigating and analyzing the Debtor's financial affairs; (ii) identifying and evaluating prepetition transactions carried out by, for the benefit of, or on behalf of the Debtor; (iii) identifying and evaluating potential Causes of Action belonging to the Estate; (iv) analyzing the Debtor's multiple iterations of Schedules and Statements (as defined herein), monthly operating reports, and other Bankruptcy Court filings; (v) conducting depositions of and collecting discovery from interested parties and third parties; (vi) engaging in continual plan and settlement-related negotiations with the Debtor and other parties in interest; (vii) working with the Debtor's advisors to establish consensual procedures for the sale of certain assets; (viii) participating in mediation sessions with the Debtor and other parties in interest; and (ix) presenting its positions before the Bankruptcy Court in various filings as well as at numerous hearings and status conferences.

### C.        Lift Stay Motions Filed by the Sandy Hook Families

With certain exceptions, the filing of a chapter 11 case operates as a stay with respect to the commencement or continuation of litigation against a debtor that was or could have been commenced before the bankruptcy filing.  Therefore, upon the commencement of this Chapter 11 Case, litigation against the Debtor—including the pending Texas Litigation and the Connecticut Litigation—was stayed.

On December 12, 2022, certain of the Sandy Hook Families whose cases had gone to trial (the "Sandy Hook Post-Trial Families")[21] filed the *Emergency Motion of the Sandy Hook Post-Trial Families for Relief From the Automatic Stay* [Docket No. 38] (the "Post-Trial Lift Stay Motion") requesting that the automatic stay in this Chapter 11 Case be lifted to permit the underlying state court verdicts against the Debtor belonging to the Sandy Hook Post-Trial Families to proceed to final judgment, as well as for any

---

[18] Order Authorizing the Official Committee of Unsecured Creditors of Alexander E. Jones to Retain and Employ Akin Gump Strauss Hauer & Feld LLP as Counsel, Effective as of December 19, 2022 [Docket No. 157] (the "Akin Retention Order").  Akin is serving as counsel to the UCC on a pro bono basis, subject to the terms of the Akin Retention Order.

[19] Order Authorizing Retention and Employment of Nardello & Co. LLC as Specialized Forensic Financial Advisor to the Official Committee of Unsecured Creditors, Effective as of January 5, 2023 [Docket No. 188] (the "Nardello Retention Order").  Nardello is serving as an advisor to the UCC on a pro bono basis, subject to the terms of the Nardello Retention Order.

[20] Order Authorizing the Retention and Employment of Teneo Capital LLC as Financial Advisor to the Official Committee of Unsecured Creditors, Effective as of January 19, 2023 [Docket No. 220] (the "Teneo Retention Order").  Teneo is serving as an advisor to the UCC at reduced rates, subject to the terms of the Teneo Retention Order.

[21] The Sandy Hook Post-Trial Families include: Neil Heslin, Scarlett Lewis, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto, Jillian Soto-Marino, Mathew Soto, William Aldenberg, William Sherlach, Robert Parker and Rich Coan, Trustee for the Estate of Erica Lafferty/Erica Lafferty Ash.

appeals of such final judgments to move forward as required by state law.[22]  On December 19, 2022, the Bankruptcy Court held an emergency hearing on the Post-Trial Lift Stay Motion and that same day entered the *Agreed Order Modifying the Automatic Stay* [Docket No. 58] (the "Post-Trial Lift Stay Order"), granting the Post-Trial Lift Stay Motion, but enjoining the Sandy Hook Post-Trial Families (and others) from exercising any remedies to collect or enforce any judgment against the Debtor's assets or the Estate.

On January 20, 2023, Pozner and De La Rosa, whose cases had not gone to trial, filed their *Motion for Relief from the Automatic Stay Against Alexander E. Jones* [Docket No. 113] (the "Pozner and De La Rosa Lift Stay Motion") seeking to lift the automatic stay to permit their case to proceed to trial and final judgment, thereby allowing Pozner and De La Rosa to liquidate their claims against the Debtor and establish their right to recover from the Debtor in this case.  On February 7, 2023, the Debtor filed an objection to the Pozner and De La Rosa Lift Stay Motion [Docket No. 137].

Following the Debtor's objection to the Pozner and De La Rosa Lift Stay Motion and negotiations between the Debtor, FSS, Pozner, De La Rosa, and the Fontaine Estate,[23] the Debtor and FSS together filed a motion [Docket No. 324] (the "Pozner and De La Rosa Settlement Motion") on June 8, 2023 and a related proposed agreed order [Docket No. 359] seeking approval of a settlement (the "Pozner and De La Rosa Settlement") between the parties that would, among other things:

> i.   permit Pozner, De La Rosa, and the Fontaine Estate to establish liquidated claim amounts solely for bankruptcy purposes, including plan voting and distribution on account of their Claims;
>
> ii.  lift the automatic stay solely to allow pre-trial proceedings and discovery in the Pozner and De La Rosa Action to proceed if no documented consensual agreement among the Debtor, FSS, and the Sandy Hook Families with respect to a chapter 11 plan for each of the Debtor and FSS could be reached by August 31, 2023; and
>
> iii. lift the automatic stay to allow the respective state court litigation in the Pozner and De La Rosa Action and the Fontaine Action to proceed to liquidate the respective parties' underlying state court claims (but not to permit Pozner, De La Rosa, or the Fontaine Estate to enforce any judgment against FSS or the Debtor or to otherwise seek to collect from FSS or the Debtor outside of their respective bankruptcy cases), if no documented consensual agreement among the Debtor, FSS, and the Sandy Hook Families with respect to a chapter 11 plan for each of Debtor and FSS could be reached by October 20, 2023 with respect to the Pozner and De La Rosa Action and December 1, 2023 with respect to the Fontaine Action, but with the possibility to extend any of the above deadlines by the agreement of the parties.

On June 29, 2023, the Bankruptcy Court held a hearing on the Pozner and De La Rosa Settlement Motion and granted the relief requested.  On December 5, 2023, the Debtor and FSS filed the *Joint Notice Regarding Agreed Order on Debtors' Motion for Approval of Compromise and Settlement Under Federal Rule of Bankruptcy Procedure 9019* [Docket No. 514], indicating that the Debtor, FSS, and the Texas Plaintiffs have agreed to extend certain dates in the Pozner and De La Rosa Settlement Order such that, if no documented consensual agreement among the Debtor, FSS, and the Sandy Hook Families with respect

---

[22] When the Post-Trial Lift Stay Motion was filed, the automatic stay in the FSS Case had already been lifted to permit the Sandy Hook Post-Trial Families' respective state court actions to proceed to final judgment.  *See Order Modifying Automatic Stay to Allow Heslin/Lewis Trial to Continue to Final Judgment* [Docket No. 16] and *Agreed Order Modifying Automatic Stay to Allow the Connecticut Litigation to Continue to Final Judgment* [Docket No. 117] in FSS Case No. 22-60043 (CML).

[23] While the Fontaine Estate did not file a lift stay motion, the Pozner and De La Rosa Settlement and the negotiations related thereto include the claims of the Fontaine Estate.

to a chapter 11 plan for each of the Debtor and FSS can be reached by (i) May 1, 2024, then the automatic stay will lift solely to allow pre-trial proceedings and discovery to move forward in the Pozner and De La Rosa Action; and (ii) June 3, 2024, then the automatic stay will lift with respect to the commencement of a trial.

### D.    Filing of Schedules and Statements

On December 14, 2022, the Debtor filed the *Debtor's Motion for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Statements of Financial Affairs* [Docket No. 45] seeking an extension of the time within which the Debtor must file his schedules of assets and liabilities and statements of financial affairs (as amended, modified, and supplemented from time to time, the "Schedules and Statements") until January 16, 2022, for a total of 45 days from the Petition Date. Ordinarily, pursuant to Bankruptcy Rule 1007(c), schedules and statements must be filed within 14 days of the commencement of a chapter 11 case. The Bankruptcy Court granted this motion on December 19, 2022 [Docket No. 57], extending the requested deadline to January 17, 2022.

On January 12, 2023, the Debtor filed the *Stipulation and Agreed Order Regarding Additional Extension of Time for Debtor to File his Schedules and Statements* [Docket No. 88], by which the Debtor sought an additional 21-day extension of time to file his Schedules and Statements to February 14, 2023. On January 13, 2023, the UCC filed the *Statement and Reservation of Rights of the Official Committee of Unsecured Creditors of Alexander E. Jones in Respect of the Proposed Stipulation and Agreed Order Regarding Additional Extension of Time for Debtor to File his Schedules and Statements* [Docket No. 91] to emphasize the importance of transparency in the chapter 11 process, and the UCC's expectation of complete and accurate Schedules and Statements. On January 20, 2023, the Bankruptcy Court entered this order with an additional 7-day extension, extending the requested deadline to February 14, 2023 [Docket No. 107].

On February 14, 2023, the Debtor filed his initial schedules and statements [Docket Nos. 161, 162] (the "Initial Schedules and Statements"). On March 3, 2023, the UCC filed the *Emergency Motion of the Official Committee of Unsecured Creditors of Alexander E. Jones to Compel Debtor to File Amended Schedules and Statements in Compliance with 11 U.S.C. § 521* [Docket No. 189], detailing the deficiencies and inaccuracies contained within the Initial Schedules and Statements. These deficiencies and inaccuracies included: (i) listing the value of several key assets as unknown; (ii) omitting assets listed as owned by the Debtor in public records; (iii) filing information inconsistent with the Debtor's monthly operating reports; (iv) various internal inconsistencies within the Initial Schedules and Statements; and (v) failing to disclose property transfers referenced in other filings. By its motion, the UCC sought an order from the Bankruptcy Court compelling the Debtor to file complete and accurate Schedules and Statements by March 24, 2023. On March 8, 2023, the Bankruptcy Court entered an order granting the UCC's motion [Docket No. 206], ordering the Debtor to file complete and accurate Schedules and Statements, but extending the compliance deadline to March 30, 2023.

On March 30, 2023, the Debtor filed his first amended Schedules and Statements (the "First Amended Schedules and Statements") [Docket Nos. 231, 232]. Concurrently, the Debtor filed a motion seeking authorization to file his Schedules and Statements under seal [Docket No. 230]. On April 18, 2023, the UCC filed its *Statement and Reservation of Rights by the Official Committee of Unsecured Creditors of Alexander E. Jones Regarding Amended Schedules and Statements* [Docket No. 241], detailing further inaccuracies in the Debtor's First Amended Schedules and Statements, which included: (i) failing to account for approximately $900,000 of cryptocurrency proceeds and $1.5 million of trust proceeds; (ii) failing to disclose certain ownership interests in LLCs; (iii) omitting a tax refund that was included on the initial Schedules and Statements; and (iv) failing to explain reported increases in the Debtor's wages and transfers of property to his family members.

On April 18, 2023, the Debtor filed his second amended Schedules and Statements (the "Second Amended Schedules and Statements") [Docket Nos. 242, 243]. On April 20, 2023, the Debtor filed the *Debtor's Response to Statement and Reservation of Rights by the Official Committee of Unsecured Creditors of Alexander E. Jones Regarding Amended Schedules and Statements* [Docket No. 245].

On November 26, 2023, the Debtor filed his third amended Schedules and Statements (the "Third Amended Schedules and Statements") [Docket Nos. 501, 502], and expressly noted therein that he was reserving the right to further amend or supplement the Schedules and Statements as necessary. On December 20, 2023, the Bankruptcy Court entered an order granting the Debtor's March 30, 2023 motion to file his Schedules and Statements under seal [Docket No. 530].

In light of the continuing deficiencies and inaccuracies in the Schedules and Statements, along with numerous other events that had transpired prior to and following the commencement of this Chapter 11 Case, the UCC determined it was necessary to independently investigate the Debtor's assets and confirm the information set forth in the various iterations of the Schedules and Statements in connection with its ongoing broad investigation. The disclosures contained in this Specific Disclosure Statement and the attachments hereto reflect the additional work the UCC and its advisors conducted in respect of the Debtor's assets and identify certain assets that were not disclosed in either the Schedules and Statements or the Jones Disclosure Statement but that should be available to make distributions on account of the creditors' Claims.

### E.     The Nondischargeability Adversary Proceedings

On March 10, 2023, the Texas Plaintiffs and the Connecticut Plaintiffs each filed adversary complaints (together, the "Nondischargeability Complaints") to confirm the nondischargeability of the judgments and awards entered in the Texas Litigation and the Connecticut Litigation.[24] The Texas Plaintiffs and the Connecticut Plaintiffs each asserted that, because the trial courts in each of the underlying actions had found that the Debtor's defamatory conduct was "willful and malicious," the resulting judgments and awards could not be discharged in bankruptcy, meaning that each judgment would remain enforceable and collectable against the Debtor even after the conclusion of this Chapter 11 Case, irrespective of the nature of the plan confirmed or other resolution of the case. In making this argument, the Texas Plaintiffs and the Connecticut Plaintiffs relied on section 523(a)(6) of the Bankruptcy Code, which provides that debts resulting from "willful and malicious injury by the debtor to another entity" are nondischargeable.

The Nondischargeability Complaints originally named FSS as a defendant. However, there was a threshold legal issue as to whether a corporate debtor proceeding under subchapter V, like FSS, is subject to the exceptions to discharge contained in section 523(a) of the Bankruptcy Code. Because this issue was on appeal to the Fifth Circuit in a separate, unrelated case, the Texas Plaintiffs and the Connecticut Plaintiffs stipulated to dismissing FSS without prejudice from the Nondischargeability Complaints and otherwise set forth a briefing schedule for certain steps in the adversary proceedings to proceed against the Debtor.[25] On May 5, 2023, the Debtor filed answers in each of the adversary proceedings.[26]

Thereafter, on May 12, 2023, certain of the Texas Plaintiffs  and the Connecticut Plaintiffs each filed motions for summary judgment, arguing that, because there was no genuine dispute as to any material

---

[24] See Complaint to Determine Dischargeability of Debt, Heslin v. Jones, Adv. Pro. No. 23-03035-CML, dated March 10, 2023 [Docket No. 1]; Adversary Complaint Seeking Judgment that Sandy Hook Judgment is Non-Dischargeable Under Bankruptcy Code § 523(a), Wheeler v. Jones, No. 23-03037-CML, dated March 10, 2023 [Docket No. 1].

[25] *See* Stipulation and Agreed Order Regarding the Dismissal of FSS from the Jones Adversary Proceedings and Schedule for the Answer and Summary Judgment Briefing, Heslin v. Jones, Case No. 23-03035-CML, dated April 12, 2023 [Docket No. 39]; Wheeler v. Jones, Case No. 23-03037-CML, dated April 12, 2023 [Docket No. 13].

[26] *See Defendant's Answer, Heslin v. Jones*, Case No. 23-03035-CML, dated May 5, 2023 [Docket No. 24]; *Defendant's Answer, Wheeler v. Jones*, Case No. 23-03037-CML, dated May 5, 2023 [Docket No. 56].

fact, the Bankruptcy Court should find, solely on the basis of the record before it and without the need for another trial, that neither the Texas Judgment nor the Connecticut Judgment was dischargeable in this Chapter 11 Case.  The Texas Plaintiffs and the Connecticut Plaintiffs each argued, among other things, that because the Texas Judgment and Connecticut Judgment were based on default judgments establishing that the Debtor was liable for acts of defamation and intentional infliction of emotional distress against the Texas and Connecticut Plaintiffs, those default judgments (and the facts deemed admitted as a result of them) established that the Debtor had committed "willful and malicious injury" against them.   The Texas Plaintiffs further argued that the facts in the trial court record also established that the Debtor had committed willful and malicious injury against them.   The Connecticut Plaintiffs further argued that other factual findings from the trial court, such as those contained in jury instructions and a post-trial damages opinion, also established that the Debtor had committed willful and malicious injury against them.

On June 13, 2023, the Debtor filed responses to the respective motions for summary judgment.[27] In his responses, the Debtor argued, among other things, that the issue of "willful and malicious injury" against each of the Texas Plaintiffs and the Connecticut Plaintiffs had not been actually litigated or necessarily decided in the underlying state court litigation because the Debtor had not been permitted to submit his liability defense, and thus the default judgments entered in the Texas Litigation and the Connecticut Litigation could not be used as a basis for a finding that either of the Texas Judgment and Connecticut Judgment were nondischargeable.  The Debtor also argued that the issue of his "willful and malicious injury" was not essential to certain of the state court judgments because the juries in the underlying litigation could have based their awards on a "recklessness" standard of liability for defamation and intentional infliction of emotional distress, not upon the stricter "intentional" standard required for a finding of "willful and malicious" conduct.  Accordingly, the Debtor argued that the "willful and malicious" aspect had not been established at the Texas trial court level, which meant that the Texas Judgment was in fact dischargeable in bankruptcy.  The Debtor made similar arguments with respect to the Connecticut Litigation, arguing that a finding of "willful and malicious" conduct was not necessary for the jury to award damages in that trial, as each of those awards could have been made on a finding of recklessness, thereby making them dischargeable in bankruptcy.

On July 15, 2023, the Bankruptcy Court held a hearing on the motions for summary judgment.  On October 19, 2023, the Bankruptcy Court issued a memorandum decision in each adversary proceeding, as described below.

### 1.   *Heslin,* et al. *v. Jones*

The Bankruptcy Court issued its *Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones*, dated October 19, 2023 [Adv. Pro. No. 23-03035, Docket No. 46] and granted partial summary judgment for the Texas Plaintiffs, holding that:  (i) the portion of the Texas Judgment that was awarded based on the Debtor's liability for defamation was nondischargeable in bankruptcy because the Debtor's defamatory acts had been intentional; but (ii) the portion (if any) of the Texas Judgment that had been awarded based on the Debtor's merely reckless conduct in committing intentional infliction of emotional distress would be dischargeable.[28]

In its ruling, the Bankruptcy Court first found that the default judgments entered against the Debtor at the state court level had "fully and fairly litigated" the allegations against him, even though the Debtor had not presented his liability defense at trial.  Accordingly, the issue of whether the Debtor had committed

---

[27] *See* Defendant's Response to Movants' Motion for Summary Judgment, Heslin v. Jones, Adv. Pro. No. 23-03035-CML, dated June 13, 2023 [Docket No. 32]; Defendant's Objection and Response to Movants' Motion for Summary Judgment, Wheeler v. Jones, Adv. Pro. No. 23-03037-CML, dated June 13, 2023 [Docket No. 61].

[28] There has not yet been a damages trial in the Pozner and De La Rosa Action, and the Fontaine Action has not yet proceeded to trial.

"willful and malicious" injury against the Texas Plaintiffs had in fact been "actually litigated and necessarily decided" by the state court. Second, in determining whether a finding of "willful and malicious injury" was essential to the Texas Judgment with respect to the Debtor's liability for both defamation and intentional infliction of emotional distress, the Bankruptcy Court looked to the Texas Plaintiffs' allegations that the Debtor was deemed to have admitted, as well as to the language of the jury instructions. In doing so, the Bankruptcy Court found that approximately $4.3 million of the damages awarded for defamation flowed from allegations of the Debtor's intent to harm, not allegations of the Debtor's recklessness, meaning that this portion of the Texas Judgment was not dischargeable. With respect to the allegations of intentional infliction of emotional distress, however, while the Bankruptcy Court found that the Debtor had actually intended to cause the Texas Plaintiffs harm, it was not clear how much of the jury award for these acts was based on a finding of willful and malicious injury and how much was based on a finding of recklessness. Because any damage award based merely on recklessness would be dischargeable in bankruptcy, the Bankruptcy Court granted only partial summary judgment to the Texas Plaintiffs and indicated that a trial on damages would be required for both the Heslin and Lewis Action and the Pozner and De La Rosa Action. On November 2, 2023, the Debtor filed a motion for leave to appeal the Bankruptcy Court's order in the United States District Court for the Southern District of Texas.[29]

    2.    ***Wheeler,*** et al. *v. Jones*

    The Bankruptcy Court issued its *Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones*, dated October 19, 2023 [Adv. Pro. No. 23-03037, Docket No. 76] and granted summary judgment for the Connecticut Plaintiffs on all claims, except with respect to the jury's award of common law punitive damages. The Bankruptcy Court concluded that the default judgments entered against the Debtor at the state court level in the Connecticut Litigation had "fully and fairly litigated" the allegations against him. The Bankruptcy Court further concluded that the issue of whether the Debtor had committed "willful and malicious" injury against the Connecticut Plaintiffs was "actually litigated and necessarily decided" by the state court. In reviewing the jury instructions, the Debtor's deemed admissions in the Connecticut Litigation, and the post-trial damages opinion, the Bankruptcy Court found that the compensatory damage and common law damage portions of the Connecticut Judgment were nondischargeable because they were awarded based on findings that the Debtor was intentionally liable for defamation and intentional infliction of emotional distress, but that the common-law punitive damage portion of the Connecticut Judgment could have been awarded based on the Debtor's merely reckless (rather than intentional) conduct. The Bankruptcy Court therefore granted summary judgment on the approximately $1.12 billion in compensatory and CUTPA punitive damages awarded by the Connecticut District Court but denied summary judgment on $321.65 million in attorneys' fees and approximately $1.5 million in costs awarded as common law punitive damages. On November 2, 2023, the Debtor filed a motion for leave to appeal the Bankruptcy Court's order in the United States District Court for the Southern District of Texas.[30]

    F.    **The UCC's Investigation**

    Upon its appointment, the UCC immediately commenced an investigation into the Debtor's assets and financial condition (the "UCC's Investigation"). The UCC's Investigation has focused on obtaining the most complete and accurate information possibly relevant to, among other topics, identifying the Debtor's assets and claims and Causes of Action for the benefit of the Estate.

    Importantly, the UCC's Investigation (i) was designed to determine the magnitude of value recoverable from the Debtor, through litigation or otherwise, for the benefit of creditors, and (ii) involved

---

[29] *See* Heslin v. Jones, 23-CV-4238.
[30] *See* Wheeler v. Jones, 23-CV-4240.

an evaluation of claims and Causes of Action concerning the Debtor and the Debtor's prepetition transfers, including determination of whether such transfers were fraudulent conveyances, the value recoverable from third parties in respect of such transfers, the ability of the fraudulent transfer recipients to satisfy any judgment against them, and the likelihood of successfully collecting upon any such judgments. The initial findings of the UCC's Investigation provide support for the Creditors' Plan.

1.     **Discovery Process**

From the outset, the Debtor claimed to lack many documents and professed ignorance about many matters pertaining to his businesses, personal finances, trusts, assets, and personal and professional affairs. In addition, possession of, and responsibility for, business and financial records was sometimes confused among the Debtor, his father (Dr. David Jones), FSS, and PQPR Holdings Limited, LLC ("PQPR"), which the Debtor and his parents indirectly own together.

Under these circumstances, the UCC determined that it was necessary to seek records from a wide array of third parties, including the Debtor's family members, associated businesses, trustees, financial institutions, and others to fill significant information gaps. The UCC's Investigation ultimately included subpoenas to more than thirty parties, seven depositions, and informal discovery requests and interviews.

The UCC's Investigation encompassed document discovery served on the Debtor, certain of the Debtor's family members (the "Family Members"), certain associates of the Debtor (the "Debtor Associates"), certain entities related or connected to the Debtor (the "Debtor Related Entities"), certain of the Debtor's lawyers and accountants (the "Debtor Professionals"), and banks and financial institutions ("Financial Institutions") with which the UCC had reason to believe the Debtor conducted business or maintained accounts.

With respect to document productions, the UCC obtained and reviewed:

| Party / Third Party Category | Party / Third Party | Documents Produced (approx.) |
|---|---|---|
| Debtor | Alex Jones | 34,100 documents |
| Family Members | Carol Jones, David Jones, Erika Jones, Marleigh Jones, Austin Rivera | 11,500 documents |
| Debtor Related Entities | FSS, Mountain Way, PQPR | 10,000 documents |
| Debtor Associates | Joey Dalessio/ESG, Robert Dew, Timothy Fruge, Anthony Gucciardi, Patrick Riley, Jonathan Shroyer, Michael Zimmerman, Auriam Services LLC, Charlie Cicack | 3,000 documents |
| Financial Institutions | Ally Bank, American Express, Axos Bank, BAM Trading Services, Bank of America, Bank of England, Coinbase, De Lage Landen, Frost Bank, JP Morgan, PayArc, PlainsCapital | 1,300 documents |

| | Bank, PNC Bank, Prosperity Bank, Security Bank, Swan Bitcoin | |
| Debtor Professionals | Donald Carnes, David Minton, Eric Taube | 700 documents |

The UCC also conducted depositions of the Debtor, David Jones, Erika Jones, Patrick Riley, Charlie Cicack, Robert Schleizer (the Debtor's financial advisor), and Joseph Dalessio.

While the UCC has obtained significant information through its discovery requests and depositions, the productions received have been far from complete. Numerous requests for documents and information were answered only partially and incompletely. As of the filing of this Specific Disclosure Statement, the Debtor, certain Debtor Related Entities, and the Debtor's Family Members have failed to make complete productions of the documents and information requested. PQPR has also refused to provide basic information, including information respecting its value, despite the fact that the Debtor indirectly owns 72% of the entity.

The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with this characterization of his actions throughout the discovery process. Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

> **2.    Assets & Estate Causes of Action**

Based on the discovery obtained to date, the UCC has reached several preliminary conclusions concerning the Debtor's assets, financial condition and Estate Causes of Action, with additional determinations developing as the UCC receives additional information from discovery efforts outlined above. These findings support the Creditors' Plan put forth by the UCC. Among these findings are the identification of the following: (i) valuable Estate clawback claims; and (ii) assets that may be missing from the Schedules and Statements.

> **i.    Assets**

**Exhibit B** to this Specific Disclosure Statement identifies the assets the UCC has identified to date in which the Debtor has an ownership interest and which the Creditor Plan Proponents believe are available to creditors for satisfaction of Claims. While the Jones Disclosure Statement contains a list of assets in **Article IV.B**, the Debtor's list is missing several notable and valuable assets (some of which are included in the Schedules and Statements and monthly operating reports). The assets that have been omitted from the Jones Disclosure Statement and or the Schedules and Statements are notated as such in **Exhibit B**. In addition, the Debtor holds an interest in the trusts described below, which the Creditor Plan Proponents believe hold property that should be available to creditors.

Among his assets, the Debtor claims a homestead interest in a property located in Austin, Texas (the "Homestead Property") under the Texas Property Code and the Texas Constitution. In his Schedules and Statements, the Debtor discloses the value of the Homestead Property as $3,266,000. The Debtor claims to own $2,612,800 of the Homestead Property and claims that the remainder is owned by his wife, Erika Jones. Specifically, the Debtor claims that he transferred a 20% interest in the Homestead Property to Erika Jones on February 2, 2022 via a special warranty deed recorded on July 14, 2022. The UCC's Investigation reveals that a material amount of Jones's and FSS's funds have been spent on home construction and other expenses related to the Homestead Property and Jones's other properties. Information available to the UCC does not specify which portion of this value was spent on the Homestead

Properties.  Section 522(o) of the Bankruptcy Code provides that property a debtor claims as a homestead "shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of."  As such, to the extent that the Debtor made improvements to the property claimed as a homestead with the intent to hinder, delay, or defraud his creditors, the value of the property claimed as a homestead may be reduced accordingly.  The UCC is still evaluating whether to challenge any portion of the property claimed to be exempt under section 522(o) of the Bankruptcy Code in light of the material improvements made in the years leading up to the bankruptcy filing and after the Texas Litigation and Connecticut Litigation had been commenced.  The deadline for the Committee to object to the Debtor's list of property claimed as exempt has been extended to thirty days after the conclusion of the Confirmation Hearing.[31]

The Debtor is a settlor, grantor, beneficiary, and/or trustee of at least seven trusts.  In his Third Amended Schedules and Statements, the Debtor changed the value of certain trusts to "$0", apparently indicating that the Debtor now believes the assets in these particular trusts are not reachable by creditors.[32]  Specifically, of his seven trusts, the Debtor appears to acknowledge that he has control over the assets of three of the trusts and that the assets are available to satisfy creditor Claims.  Of the remaining four trusts, the Debtor has taken or appears to have taken the position that the assets held by two trusts are not reachable by creditors and that two of the trusts have no actual value.  Notwithstanding the Debtor's position, claims may exist to reach assets that were fraudulently transferred into any trusts and the trust structures may be pierced if they were not properly constituted or properly administered.  In addition, with respect to the Debtor's trusts, the Creditor Plan Proponents specifically note the following:

- ***2022 Litigation Settlement Trust***.  The Debtor is a "Third-Party Funding Contributor" of the 2022 Litigation Settlement Trust.  In his Second Amended Schedules and Statements, the Debtor identifies that this trust owns (i) InfoW, LLC fka Infowars, LLC, (ii) IWHealth, LLC fka Infowars Health, LLC, and (iii) Prison Planet TV, LLC, and reports that these entities own cash and various intellectual property, including the domain name Infowars.com.  In the Third Amended Schedules and Statements, the Debtor lists the value of this trust at $66,935, indicating that the Debtor acknowledges that the assets are available to satisfy creditor Claims.

- ***AEJ 2018 Trust***.  The Debtor is a beneficiary and trustee of the AEJ 2018 Trust.  The Debtor is also a donor of the AEJ 2018 Trust, due to the donation of his interest in PLJR Holdings, LLC ("PLJR") to AEJ Austin Holdings, LLC ("AEJ Holdings") held by the AEJ 2018 Trust.  In his Third Amended Schedules and Statements, the Debtor reports that the trust holds $10,002 in assets, which comprise the funds in the trust's bank account. In his Third Amended Schedules and Statements, the Debtor (i) fails to disclose that the AEJ 2018 Trust owns 100% of AEJ Holdings, (ii) fails to disclose that the Debtor gifted his 90% interest in PLJR, which owns 80% of PQPR, to AEJ Holdings when AEJ Holdings was held by the AEJ 2018 Trust, and (iii) fails to ascribe any value to the AEJ 2018 Trust's indirect ownership of 72% of PQPR.  While the value of the 72% interest in PQPR is not

---

[31] *See* Fifth Stipulation and Agreed Order Granting the Official Committee of Unsecured Creditors of Alexander E. Jones an Extension of Time to Object to a Claim of Exemptions and Other Related Relief [Docket No. 526].

[32] *See* Third Amended Schedules and Statements, Global Notes to Schedule A/B: Property – Part 4 – Financial Assets (stating that changes to disclosures concerning the Alexander E. Jones Descendent and Beneficiary Trust include edits to "remove[] value as this trust has been reviewed and is not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary" and changes to disclosures concerning the Greenleaf Trust include edits to "remove[] value as this trust has been reviewed and is not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary"; corresponding edits were not made to other trusts).

identified, it is believed to be substantial.  By listing a value for the trust in his Third Amended Schedules and Statements, the Debtor acknowledges that assets held in the AEJ 2018 Trust are available to satisfy creditor Claims.

- *__Alexander E. Jones Descendant and Beneficiary Trust__*.  The Debtor is the grantor of the Alexander E. Jones Descendant and Beneficiary Trust.  The global notes to both the Third Amended Schedules and Statements and the Second Amended Schedules and Statements[33] indicate that this trust holds three condominium units valued at a total of $2,399,800.  Nevertheless, in his Third Amended Schedules and Statements, the Debtor lists the value of the trust as "$0" and states in the global notes that the trust is "not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary."[34]  As such, the Debtor appears to contend that the assets held in the Alexander E. Jones Descendant and Beneficiary Trust are not available to satisfy creditor Claims.  As noted herein, claims exist to challenge the trust and to recover at least two of the condominium units held in this trust: (i) a claim to avoid the transfer of Unit 6 (valued at $828,300) to the trust as fraudulent; and (ii) a claim to recover Unit 5 (valued at $767,400), which is owned by RCGJ LLC, an entity wholly owned by Jones.

- *__Green Leaf Trust__*.  The Debtor is settlor and trustee of the Green Leaf Trust.  The Debtor previously disclosed that the trust holds $127,094 in assets.[35]  In his Third Amended Schedules and Statements, however, the Debtor lists the value of this trust as "$0" and states that the trust is "not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary."  As such, the Debtor appears to contend that the assets held in the Green Leaf Trust are not available to satisfy creditor Claims.

- *__Recharge Dynasty Trust__*.  The Debtor is settlor and trustee of the Recharge Dynasty Trust.  In his Third Amended Schedules and Statements, the Debtor lists the value of the trust as "$0."  The valuation identified for the Recharge Dynasty Trust appears to indicate that the trust holds no assets, rather than to indicate that the Debtor contends that assets of the trust are not available to satisfy creditor Claims.

- *__RXXCTTGAA Trust__*.  The Debtor is the settlor, beneficiary, and trustee of the RXXCTTGAA Trust.  In his Third Amended Schedules and Statements, the Debtor discloses that the trust holds $0 in assets.  This valuation appears to be an error, rather than a contention that the Debtor believes that any assets in the trust would not be available to satisfy creditor Claims.  The Debtor appears to have overlooked a bank account for the trust which held $13,954.01 as of the Petition Date.  In addition, the Debtor fails to disclose that the trust technically owns the Homestead Property.

- *__The Missouri779384 Trust__*.  The Debtor is settlor, beneficiary, and trustee of The Missouri779384 Trust.  The trust holds $54,519 in assets.  In the Third Amended Schedules and Statements, the Debtor lists the value available to the Estate as $54,519, indicating that the Debtor acknowledges that the assets from this trust are available to satisfy creditor Claims.

---

[33] *See* Second Amended Schedules and Statements, Schedule A/B, Part 4, No. 25 and Third Amended Schedules and Statements Schedule A/B, Part 4, No. 25.

[34] Third Amended Schedules and Statements at 4.

[35] *Id.*

ii.   **Estate Causes of Action**

**Exhibit C** hereto identifies the viable and material Causes of Action the UCC has identified to date. The Jones Plan and Jones Disclosure Statement similarly fail to disclose these actions with specificity. Specifically, the Jones Plan defines "Avoidance Action" to mean "any cause of action under any of sections 544, 545, 546, 547, 548, 549, 550, 551 or 553(b) of the Bankruptcy Code, which actions are waived except as specified in the Plan," without identifying any specific causes of action or the value of such causes of action. Based on the UCC's Investigation, the following viable Estate Causes of Action exist that are not adequately disclosed in the Jones Disclosure Statement and should be preserved for the benefit of creditors.

a.   *Avoidance Actions Against Erika Jones*

**Claims To Avoid Incurrence of Obligations.** On May 3, 2022, the Debtor signed a ratification purporting to obligate himself to make payments and provide other gifts to his current wife, Erika Jones, under an alleged Premarital Agreement. The Debtor signed the ratification after he had been found liable for his statements regarding the Sandy Hook Families and approximately seven months before the commencement of this Chapter 11 Case. From the date of the Debtor's marriage in January 2017, until May 3, 2022, neither the Debtor nor Erika Jones had ratified the Premarital Agreement. The Premarital Agreement specifically requires ratification as a condition precedent in order for the Debtor to have any obligation to make any payment or provide other gifts to Erika Jones. Accordingly, the Estate holds colorable claims to avoid the purported incurrence of any payment obligations to Erika Jones shortly before the Debtor filed for bankruptcy protection as constructively and intentionally fraudulent under applicable law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* The Debtor has refused to commence an avoidance action in respect of the incurrence of this obligation and has failed to identify any authority that would indicate that incurrence of obligations is not voidable under the circumstances.

> The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with the Creditor Plan Proponents' position that the Premarital Agreement was not properly ratified. Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

**Claims To Avoid Fraudulent and Preferential Transfers of Cash.** In the four years prior to the Petition Date, the Debtor transferred at least $1,464,193 in cash to Erika Jones for no consideration; of that, $833,943 was transferred in the one year prior to the Petition Date. The Estate holds claims to avoid all $1,464,193 of such transfers over the four years prior to the Petition Date as fraudulent under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*[36] The Debtor has argued that the transfers are not avoidable because they were made under the purported Premarital Agreement. As noted above, however, the Premarital Agreement did not call for any payments absent ratification, which did not occur until May 3, 2022, and the ratification itself may be avoided as a fraudulent obligation. Even if the payments were made pursuant to a valid obligation under the Premarital Agreement, however, at least $833,943 in transfers were made within one year prior to the Petition Date and would be avoidable as preferential transfers. *See* 11 U.S.C. § 547.

**Claims To Avoid Fraudulent Transfers of Cars.** In or around 2019, the Debtor transferred a Range Rover to Erika Jones for no consideration. The Range Rover was valued at $86,500 at the time of the transfer. The Estate holds claims to avoid the transfer and recover the Range Rover as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et*

---

[36] Transfers made within two years prior to the Petition Date may be avoided under the Bankruptcy Code. *See* 11 U.S.C. § 548. Transfers made within four years prior to the Petition Date may be avoided under applicable law. *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.* Additional Claims and doctrines are available to reach transfers and obligations made before four years prior to the Petition Date.

*seq.*  The Debtor has argued that the Range Rover was transferred to Erika Jones under the purported Premarital Agreement.  As noted above, however, the Premarital Agreement did not call for any cars to be provided to Erika Jones absent ratification, which did not occur until May 3, 2022, and the ratification itself may be avoided as a fraudulent obligation.  In addition to the Range Rover, the Debtor jointly owns a certain 2017 model Audi A8 vehicle with Erika Jones, which was valued at $91,500 at the time of purchase and is valued at $25,000 currently.  The Debtor, however, has failed to disclose the Audi as one of his assets (despite the fact that the Audi is listed as property of the Debtor in public records) and suggests that it was given to Erika Jones.  To the extent the Range Rover was a valid transfer under the Premarital Agreement, Erika Jones was required to return the Audi to be traded in and used as part of the purchase price of the Range Rover.  The Estate holds claims to recover the Audi (or its value) as well as the Range Rover (or its value).

### b.   *Avoidance Action Claims against David Jones*

**Claims To Avoid Fraudulent Transfers of Real Property.**  In or around April 2022, the Debtor transferred a tract of real property to David Jones for no consideration (the "Ranch").  The assessed value of the Ranch in 2023 was $249,870.  The Estate holds claims to avoid the transfer and recover the Ranch as intentionally and constructively fraudulent under applicable state and federal law.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.  The Debtor and David Jones may argue that the land is not recoverable to the Estate because the Debtor intended to gift the property in 2017.  Although the document purporting to transfer the Ranch was backdated to 2017, the document was actually created in 2022 and notarized in 2022 and the transfer took place in 2022.

> The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with the Creditor Plan Proponents' position in respect of the transfer of the Ranch.  Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

**Claims To Avoid Fraudulent and Preferential Transfers of Cash.**  In the four years prior to the Petition Date, the Debtor transferred $553,388 in cash payments to David Jones.  Almost all of these transfers were made within one year prior to the Petition Date.  David Jones has indicated that these payments were likely made as reimbursements for various expenses he incurred on the Debtor's behalf, but has produced documents showing that only a portion of those transfers ($173,148) were actually made to reimburse David Jones for such expenses.  For the payments made purportedly to reimburse David Jones for expenses he incurred on the Debtor's behalf, the Estate holds claims to recover the transfers as preferences.  *See* 11 U.S.C. § 547.  For any payment that was made within four years prior to the Petition Date and was not made as a reimbursement or otherwise for value, the Estate holds claims to recover such transfers as a fraudulent under applicable state and federal law.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.  As such, the Estate holds claims to recover all of the transfers made within one year prior to the Petition Date as either preferential or fraudulent transfers, and to recover any transfers made within four years of the Petition date not for value, or made with intent to hinder or delay creditors, as fraudulent transfers.

**Claims To Avoid Fraudulent Transfers of Cars.**  In October 2022, the Debtor transferred at least three vehicles to David Jones, including a Ford F-150 Raptor, a Dodge Challenger, and a Toyota 4Runner.  These vehicles had an approximate value of $105,000 at the time of the transfers.  Although David Jones may defend the transfers, upon information belief, the vehicles were all gifts from the Debtor to David Jones, and David Jones paid no consideration for the vehicles.  The Estate holds claims to avoid the transfers and recover the vehicles or the value of the vehicles as fraudulent transfers under applicable state and federal law.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

**Additional Claims.**  The Estate may hold various additional claims, including various torts, breaches of trust, breaches of contract claims, or other claims against David Jones arising out of David

Jones's extensive control of the Debtor's personal finances, control over various entities and trusts involving the Debtor, involvement in moving and diverting funds between and amongst these entities, and influence over PQPR.

### c.     *Avoidance Action Claims Against Jonathon Owen Shroyer*

**Claims to Avoid Fraudulent Transfers of Cars.** In or around September 2021, the Debtor gifted a 2016 model Dodge Charger vehicle to Jonathon Owen Shroyer. Mr. Shroyer did not pay any consideration for the vehicle. The Estate holds claims to avoid the transfer and recover the vehicle or its value as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

### d.     *Avoidance Action Claims Against Rex Jones*

**Claims To Avoid Fraudulent Transfer of a Car.** In or around January 2022, the Debtor gifted a 2019 model Toyota Tacoma vehicle to his son, Rex Jones. Rex Jones did not pay any consideration for the vehicle. The Estate holds claims to avoid the transfer and recover the vehicle (or its value) as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

### e.     *Avoidance Action Claims Against Patrick Riley*

**Claims To Avoid Fraudulent Transfer of a Boat.** In or around March 2022, the Debtor gifted a 2003 Glastron boat vehicle to his friend and associate, Patrick Riley. Mr. Riley did not pay any consideration for the boat. The Estate holds claims to avoid the transfer and recover the boat (or its value) as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*. Although Mr. Riley has suggested that the boat was gifted years ago, it was not registered in his name until March 2022, and the Debtor continued to pay expenses for the boat even after the Petition Date. In the alternative, if Mr. Riley successfully defends a claim to recover the boat, the Estate holds claims to recover the payments the Debtor has made on account of the boat since the date of the purported transfer to Mr. Riley.

**Claims To Avoid Fraudulent Transfer of a Watch.** Between 2019 and 2020, the Debtor gifted a Tudor watch to Mr. Riley. Mr. Riley did not pay any consideration for the watch. The Estate holds claims to avoid the transfer and recover the watch as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

### f.     *Avoidance Action Claims Against the Alexander E. Jones Descendent and Beneficiary Trust, David Jones, Trustee*

**Claims To Avoid Fraudulent Transfer of Real Property.** In or around February 2019, the Debtor caused the RXXCTTGAA Trust to transfer a condominium known as Unit 6 to the Alexander E. Jones Descendant and Beneficiary Trust for no consideration. Unit 6 is valued as at least $828,300. In his Third Amended Schedules and Statements, the Debtor contends that the assets of the Alexander E. Jones Descendant and Beneficiary Trust are not controlled by the Debtor[37] and has suggested that the assets are not reachable by his creditors. However, the RXXCTTGAA Trust is a revocable trust completely controlled by the Debtor, and the Debtor admits that its assets are available to the Debtor and his creditors under applicable law. As such, the Estate holds claims to avoid the transfer and recover Unit 6 as a fraudulent

---

[37] Third Amended Schedules and Statements at 4.

17

transfer under applicable state and federal law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

**Claims re Ownership of Real Property.**  The Debtor has contended that a condominium known as Unit 5 is not property of the Estate because it is owned by the Alexander E. Jones Descendant and Beneficiary Trust and claims that the assets of the trust are not available to creditors.[38]  This is not accurate. Travis County property records indicate that Unit 5 is owned by RCGJ, LLC ("RCGJ"), an entity in which the Debtor has a 100% ownership interest.  The Debtor has produced no document showing an effective transfer of Unit 5 from RCGJ to the Alexander E. Jones Descendant and Beneficiary Trust.  Unit 5 is valued as at least $767,400 and is available to Jones's creditors.  If necessary to collect the property, the Estate and creditors hold claims for turnover, conversion, and to declare Unit 5 property of the Estate.

**Claims to Avoid Fraudulent Transfer of Payments for Condos.**  The Debtor has paid numerous expenses for three condos that the Debtor now contends are owned by the Alexander E. Jones Descendant and Beneficiary Trust and thus are not reachable by his creditors.  As noted, the Estate holds claims to recover Unit 5 and Unit 6.  In the alternative, if the Alexander E. Jones Descendant and Beneficiary Trust successfully defends claims to recover the condos, the Estate holds claims to recover the payments the Debtor has made on account of Unit 5 and Unit 6.  In addition, the Estate holds claims to recover payments made on account of the third condo.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

## G. Mediation

Prior to the Petition Date, on October 12, 2022, the Bankruptcy Court entered a *Stipulation and Agreed Order* in the FSS Case [FSS Case, Docket No. 233] (the "Mediation Order").  Among other things, the Mediation Order appointed the Honorable Marvin Isgur as mediator and ordered mediation among FSS, Jones (in his capacity as the sole member of FSS), the FSS subchapter V trustee, PQPR, the Texas Plaintiffs, and the Connecticut Plaintiffs.

At a hearing on December 7, 2022, counsel for the Debtor indicated that the Debtor intended to participate in the FSS mediation in his capacity as Debtor in this Chapter 11 Case.[39]  Counsel for the Debtor also indicated that the Debtor was not seeking a separate mediation order to be entered in this Chapter 11 Case, but rather that the Debtor already viewed himself as "being subject to and participating" in the FSS mediation pursuant to the Mediation Order in his capacity as Debtor in this Chapter 11 Case.[40]  The UCC likewise indicated at the December 7 hearing that it was engaging in the FSS mediation pursuant to the Mediation Order.[41]

After nearly a year of mediation without resolution in either the FSS Case or this Chapter 11 Case, on September 26, 2023, the Bankruptcy Court terminated the mediation and instructed FSS to file a plan.[42]

## H. Expiration of Exclusivity

Section 1121 of the Bankruptcy Code provides that only the debtor may file a plan until 120 days after the petition date (the "Exclusive Period").  In addition, section 1121(d) of the Bankruptcy Code permits a bankruptcy court to increase or reduce the Exclusive Period upon a showing of "cause."  After the Exclusive Period has expired, a creditor or any other party in interest may file a plan.  In this Chapter 11

---

[38] Second Amended Schedules and Statements at 4.
[39] Hr'g. Tr. at 7:1-14 *In re Alexander E. Jones*, Case No. 22-33553-CML and FSS Case No. 22-60043-CML (Bankr. S.D.T.X. Dec. 7, 2023).
[40] *Id.* at 10:24-11:10.
[41] *Id.* at 21:4-10.
[42] Hr'g. Tr. at 12:3-11, FSS Case No. 22-60043-CML (Bankr. S.D.T.X. Sept. 26, 2023).

Case, the Exclusive Period expired on April 1, 2023 without the Debtor filing a plan or requesting an extension of the Exclusive Period.

### I.      Circumstances Leading to the Filing of the Creditors' Plan

The UCC and the Sandy Hook Families engaged in good-faith discussions with the Debtor and other interested parties to explore a viable consensual chapter 11 plan and ultimate conclusion to this Chapter 11 Case, both during and following mediation.

As discussed above, on October 19, 2023, the Bankruptcy Court ruled on the nondischargeability of the Claims held by the Sandy Hook Families. These rulings served as a catalyst for the parties to restart discussions regarding a consensual resolution of this Chapter 11 Case, including attending an in-person meeting in New York with representatives for the UCC, the Sandy Hook Families, the Debtor, FSS, PQPR, and the FSS Subchapter V Trustee. Following the meeting, the UCC, the Sandy Hook Families, and the Debtor exchanged additional proposals. However, the parties remained far apart on how to resolve the staggering nondischargeable liability facing the Debtor and the liability facing his largest asset, FSS.

On November 22, 2023, the UCC and the Sandy Hook Families filed the *Statement by the Official Committee of Unsecured Creditors and the Sandy Hook Families Regarding the Status of the Chapter 11 Case and Proposed Creditors' Plan* [Docket No. 498] (the "Case Status Statement"), attaching a construct detailing the material terms of a proposed plan that offered the Debtor a choice between (i) an orderly liquidation and (ii) a consensual release of more than $1.5 billion in largely nondischargeable Claims in exchange for a 10-year, fixed-payment schedule that would pay creditors at least $8.5 million a year from any source, including projected payments that FSS anticipates contributing to a creditor trust (the "Optional Future Payment Election"), in each scenario preserving valuable Estate Causes of Action against third parties for the benefit of creditors described above. The UCC and the Sandy Hook Families made clear both in the Case Status Statement and during the hearing held by the Bankruptcy Court on November 27, 2023 that the Optional Future Payment Election represented a proposal that hopefully would be subject to continued discussions in an effort to reach consensus.

The Case Status Statement also requested that the Bankruptcy Court set a schedule for a hearing to consider confirmation of the FSS Plan and any plans filed in this Chapter 11 Case. On December 1, 2023, the Bankruptcy Court entered the *Agreed Scheduling Order for Confirmation Hearing* [Docket Nos. 512, 513] (the "Confirmation Scheduling Order") representing an agreement among the UCC, the Texas Plaintiffs, the Connecticut Plaintiffs, and the Debtor regarding the schedule for consideration of any plans filed in this Chapter 11 Case. The Confirmation Scheduling Order governs, among other things, certain procedures related to Confirmation of the Creditors' Plan or any plan filed in the Chapter 11 Case, as well as plan-related discovery, setting forth the following dates and deadlines:

| Event[43] | Date |
|---|---|
| **Written Discovery Deadline.** The deadline by which the Parties and any other parties in interest shall serve discovery relating to any plans, potential objections thereto, and any other matters to be heard at the Confirmation Hearing (the "Requests"). The Parties and other parties in interest may—and are encouraged to—serve Requests sooner. The Parties and any other parties in interest shall serve responses and objections to any Requests within two weeks | **Tuesday, January 9, 2024** |

---

[43] Capitalized terms used in this chart but not otherwise defined in this Specific Disclosure Statement shall have the meaning ascribed to such terms in the Confirmation Scheduling Order.

| | |
|---|---|
| of service of the Requests.  For the avoidance of doubt, the Parties and any other parties in interest shall meet and confer in good faith regarding timing and any requested extension of response deadline. | |
| **Objections to Provisional Approval of Disclosure Statements.**  The date by which the Parties and any other parties in interest shall file any objections to the provisional approval of any disclosure statements filed. | **Tuesday, January 16, 2024** |
| **Disclosure Statement Hearing Date.**  The date on which the Parties and any other parties in interest shall, subject to the Bankruptcy Court's availability, participate in a hearing regarding any disclosure statements filed to seek provisional approval thereof. | **Wednesday, January 24, 2024[44]** |
| **Substantial Completion of Document Production.**  The date by which the Parties and any other recipients of the Requests shall substantially complete the production of documents in response to the Requests.<br><br>***Parties and any other recipients of the Requests must commence production of documents in response to Requests as soon as reasonably possible and shall roll out document production in tranches, as available.  Parties and any other recipients of the Requests shall not wait until the substantial completion deadline to commence production.*** | **Friday, January 26, 2024** |
| **Solicitation Mailing/Publication Deadline.** | **Monday, January 29, 2024** |
| **Privilege Log Deadline.**  The date by which the Parties and any other recipients of the Requests shall have provided logs of documents responsive to the Requests that were withheld or redacted on the basis of any claim or privilege. | **Tuesday, January 30, 2024** |
| **Preliminary Witness Lists.**  The date by which the Parties and any other parties in interest shall exchange lists of witnesses each such party in good faith expects to call at the Confirmation Hearing. | **Thursday, February 1, 2024** |
| **Fact Witness Depositions.**  The dates during which the Parties and any other parties in interest shall conduct fact witness depositions. | **Friday, February 2 – Friday, February 9, 2024** |
| **Expert Reports.**  The date by which the Parties and any other parties in interest shall simultaneously exchange expert reports, with a date for rebuttal reports (if needed) to be determined by the Parties and any other parties in interest intending to serve such reports.  Bankruptcy Rule 7026 shall apply in its entirely to any expert reports exchanged. | **Thursday, February 15, 2024** |
| **Production of Materials Relied Upon in Expert Reports.**  The date by which the Parties and any other parties in interest shall | **Friday, February 16, 2024** |

---

[44] Date set subsequent to entry of the Confirmation Scheduling Order.

| | |
|---|---|
| produce copies of any documents or data that were (a) relied on by such party's expert in forming the opinions contained in such report and (b) have not already been produced in these cases. | |
| **Plan Objection Deadline.** The date by which objections to any plan must be filed. | **Friday, February 16, 2024** |
| **Exchange of Final Witness and Exhibit Lists.** The date by which the Parties and any other parties in interest shall serve a final list of witnesses and exhibits they intend to offer at the Confirmation Hearing. Witness lists shall identify all witnesses that each party will call and may call at the Confirmation Hearing and shall provide a brief summary of the anticipated testimony of each witness. | **Friday, February 16, 2024** |
| **Objections to Final Witness and Exhibit Lists.** The date by which the Parties and any other parties in interest must serve any objections to the final witness and exhibit lists. | **Tuesday, February 20, 2024** |
| **Expert Depositions.** The dates during which the Parties and any other parties in interest shall conduct expert witness depositions. | **[Tuesday, February 20, 2024 – Thursday, February 22, 2024]** |
| **Exchange of Exhibits.** The deadline by which the Parties and any other parties in interest shall exchange exhibits with each other. | **Friday, February 23, 2024, 12 pm CT** |
| **Filing of Final Witness and Exhibit Lists with the Clerk of the Court.** The deadline by which the Parties and any other parties in interest shall file final exhibit and witness lists with the Clerk of the Court. | **Friday, February 23, 2024, 12 pm CT** |
| **Final Pretrial Conference.** The date on which the Parties and any other parties in interest shall, subject to the Bankruptcy Court's availability, participate in a final pretrial conference. | **Friday, February 23, 2024** |
| **Reply to Objections.** The date by which the Parties and any other parties in interest must file their reply to all timely objections to their respective plans. | **Friday, February 23, 2024** |
| **Confirmation Hearing Dates.** The timeframe in which the Parties and any other parties in interest shall complete trial. For the avoidance of doubt, final approval of any disclosure statements filed will be sought during the Confirmation Hearing. | **Tuesday, February 27, 2024 – Thursday, February 29, 2024** |

Given that no discussion nor any progress toward settlement took place in the weeks that followed the filing of the Case Status Statement and related plan construct, and various representations made by Debtor that the Optional Future Payment Election construct was unacceptable to him, the Creditor Plan Proponents thereafter determined to file the Creditors' Plan contemplating only an orderly liquidation. Contemporaneously with the filing of the Creditors' Plan, the UCC sent a letter to the Debtor making clear that the Creditors' Plan was not intended to cut off discussions regarding a consensual resolution of the Chapter 11 Case.

J.       **Debtor's Reinstatement on Social Media Platform**

On or around December 10, 2023, the administrators of the social media platform X (f/k/a Twitter) lifted a ban on the Debtor's account imposed by the website's previous owners.  The Debtor had been banned previously from the platform for violations of its abusive behavior policy.  The lifting of this ban will permit the Debtor once again to post messages, video clips, and other content on the platform for the first time since September 6, 2018.  Since his reinstatement on X, the Debtor has regularly posted clips, messages, and "reposts" promoting his radio show and other media partnerships, as well as links to his fundraising page and his online store, which markets and sells health supplements.   As of the date hereof, the Debtor has amassed nearly 2 million followers on X and has made a total of almost 50,000 posts.

## IV.    KEY ASPECTS OF THE CREDITORS' PLAN[45]

A.       **General Basis for the Creditors' Plan**

The Creditors' Plan is premised on an orderly liquidation of the Debtor's assets, other than Exempt Assets, through the GUC Trust.  The GUC Trust will be administered by the GUC Trustee, who will be chosen by the Sandy Hook Families in accordance with the GUC Trust Agreement.  The following assets (collectively, the "GUC Trust Assets," detailed herein), among others, will be assigned on the Effective Date of the Creditors' Plan to the GUC Trust:

- The Debtor's assets, rights, and claims that are not Exempt Assets, whether owned by the Debtor directly, indirectly or otherwise held for the benefit of the Debtor existing as of the Effective Date, in each case whether presently known or discovered at any time by the GUC Trustee, and including, but not limited to:

  o       Cash;

  o       any tax refund to which the Debtor is entitled (whether or not such refund is immediately available to the Debtor as of the Effective Date);

  o       100% of the Debtor's equity ownership interests in FSS;

  o       the Debtor's full, direct, or indirect ownership interests in PQPR;

  o       all assets held in the Jones Trusts; and

  o       any current contractual right entitling the Debtor to future royalties, and any identified equitable or future interests in property;

- the Litigation Assets, including:

  o       $500,000 in Cash as funded by the Debtor's Estate as initial litigation funding;

---

[45] This **Article IV** is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Creditors' Plan and is qualified in its entirety by reference to the entire Creditors' Plan and exhibits thereto.  Although the statements contained in this Specific Disclosure Statement include summaries of the provisions contained in the Creditors' Plan and in documents referred to therein, this Specific Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions and should not be relied on for a comprehensive discussion of the Creditors' Plan.  Instead, reference is made to the Creditors' Plan and all such documents for the full and complete statement of such terms and provisions.  The Creditors' Plan itself (including attachments) will control the treatment of Claims under the Creditors' Plan.  To the extent there are any inconsistencies between this **Article IV** and the Creditors' Plan (including attachments), the latter shall govern.

> ○  the Trust Causes of Action;
>
> ○  all Release Settlement Payments made to the GUC Trust; and
>
> ○  the Debtor's books and records relating to prepetition transfers of Estate assets and related Causes of Action, including all documents, communications, and information of the Debtor, any Jones Trusts and any entities owned or controlled by the Debtor, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets and all discovery obtained by the UCC during the Chapter 11 Case; and

- once all Professional Fee Claims have been irrevocably paid in full or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account.

---

The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with the Creditor Plan Proponents' position regarding the transfer of privilege and does not consent to any such transfer. Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

---

**B.   Treatment of Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus are excluded from the classes of Claims set forth in <u>Article III</u> of the Creditors' Plan and the holders thereof are not entitled to vote on the Creditors' Plan.

**1.   Administrative Claims**

To the extent that Administrative Claims have not been paid in full or otherwise satisfied during the Chapter 11 Case, each holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (i) if such Administrative Claim is Allowed prior to the Effective Date, on the Effective Date or in the ordinary course of business, whichever is later or (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter. Any objection to an Administrative Claim must be Filed by the Priority Claims Objection Bar Date.

**2.   Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred through and including the Effective Date must be Filed no later than the Priority Claims Bar Date. The Bankruptcy Court will determine the Allowed Amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules. The Debtor will pay to the Professionals the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of a

Final Order of the Bankruptcy Court. Any objection to a Professional Fee Claim must be Filed by the Priority Claims Objection Bar Date.

i.      ***Professional Fee Escrow Account***

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtor will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account will be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens or Claims will encumber the Professional Fee Escrow Account or Cash held therein. Funds held in the Professional Fee Escrow Account will not be considered property of the Estate or the Debtor.

Distributions to holders of Professional Fee Claims will be made in accordance with <u>Article VI.A.1</u> of the Creditors' Plan. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account will promptly be paid to the GUC Trust without any further notice to or action, order or approval of the Bankruptcy Court or any other Entity.          */s/ Marty L. Brimmage*

ii.      ***Professional Fee Escrow Amount***

The Professionals will provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtor and Estate before and as of the Effective Date projected to be outstanding as of the Effective Date, and will deliver such estimate to the Debtor and the UCC no later than five (5) days before the anticipated Effective Date; *provided*, *however, that* such estimate will not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtor may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date will be used by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account.

**3.      Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim will receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

C.      **Classification and Treatment of Claims**

1.      **Classification of Claims**

| SUMMARY OF EXPECTED RECOVERIES | | | | | |
|---|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Status** | **Voting Rights** | **Estimated Amount of Claims** | **Estimated Recovery**[46] |
| 1 | Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) | $114,500.04 | 100% |
| 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) | $0 | 100% |
| 3 | General Unsecured Claims | Impaired | Entitled to vote | $1,872,210,665.85 | .48%[47] |
| 4 | Subordinated Claims | Impaired | Not entitled to vote (deemed to reject) | Unknown | 0% |

2.      **Treatment of Claims**

Holders of Claims classified in <u>Article III.A.</u> of the Creditors' Plan that are Allowed will be satisfied in the manner set forth below.

i.      <u>Class 1 – Secured Claims.</u>

**Classification**.  Class 1 consists of all Secured Claims.

**Treatment**.  Each holder of a Secured Claim that is Allowed will receive payment in full in Cash on account of such holder's Allowed Secured Claim.

**Voting**.  Class 1 is Unimpaired under the Creditors' Plan.  Holders of Secured Claims are conclusively presumed to have accepted the Creditors' Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  There are two Class 1 Claimants: (i) the Security Bank of Crawford, which has Filed a Proof of Claim in the amount of $80,161.04 (Claim No. 2); and (ii) Bank of

---

[46] The ranges set forth under Estimated Recovery are based on the range of values of the assets available to creditors as described in the Creditors' Plan Liquidation Analysis, attached hereto as **Exhibit D**.

[47] Estimated recoveries will depend on how many holders of General Unsecured Claims elect to receive GUC Trust Interests vs. how many elect to share in the GUC Election Cash Pool.

America, N.A., which has Filed a Proof of Claim in the amount of $26,354.73 (Claim No. 22).

ii.     <u>Class 2 – Other Priority Claims</u>.

**Classification**.  Class 2 consists of all Other Priority Claims.

**Treatment**.  Each holder of an Other Priority Claim that is Allowed will receive payment in full in Cash on account of such holder's Allowed Other Priority Claim.

**Voting**.  Class 2 is Unimpaired under the Creditors' Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Creditors' Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  Class 2 Claimants include one holder of a Priority DSO Claim who is not Erika Jones, including the Priority DSO Claim identified at item 4.12 in the Schedules and Statements.  Class 2 Claimants will also include any other holders of Other Priority Claims. For the avoidance of doubt, Erika Jones is not entitled to any Priority DSO Claims or any Other Priority Claims and any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Class 4 Subordinated Claim.

iii.     <u>Class 3 – General Unsecured Claims</u>.

**Classification**.  Class 3 consists of all General Unsecured Claims.

**Treatment**.  Each holder of a General Unsecured Claim that is Allowed will be entitled to receive, at such holder's election, (i) the holder's *pro rata* share of the GUC Election Cash Pool, such pro rata share to be calculated based on the total amount of Allowed General Unsecured Claims held by holders that make such election, or (ii) the holder's *pro rata* share of the GUC Trust Interests, such *pro rata* share to be calculated based on the aggregate amount of Allowed General Unsecured Claims that make such election.  For the avoidance of doubt, however, any holder of a General Unsecured Claim that has waived that holder's Claim is not entitled to such *pro rata* share under <u>Article III.B.3.b</u> of the Creditors' Plan.

**Voting**.  Class 3 is Impaired under the Creditors' Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  At present, there are twenty-five Class 3 Claims:  (i) twenty-one Class 3 Claims Filed by or on behalf of individuals comprising the Sandy Hook Families; (ii) one Class 3 Claim held by American Express National Bank, which has Filed a Proof of Claim in the amount of $149,678.58 (Claim No. 1); (iii) one Class 3 Claim held by Reeves Law, PLLC, which has Filed a Proof of Claim in the amount of $24,611.13 (Claim No. 5); and (iv) one Class 3 Claim held by the City of Austin, which has Filed a Proof of Claim in the amount of $86.60 (Claim No. 3).  However, additional Claims may be Allowed General Unsecured Claims if filed by the applicable Bar Date or other time period provided for by the Creditors' Plan or an order of the Bankruptcy Court, and otherwise Allowed.

iv.    Class 4 – Subordinated Claims.

**Classification**.  Class 4 consists of all Subordinated Claims.

**Treatment**.  Holders of Subordinated Claims, regardless of whether such claims are Allowed, are not entitled to any distributions or to receive or retain any property under the Creditors' Plan.

**Voting**.  Class 4 is Impaired under the Creditors' Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Creditors' Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  At present, there is one Class 4 Claimant, FSS, which has Filed a Proof of Claim in the amount of $0.00 (Claim No. 26).  However, additional Claims may be Subordinated Claims if filed by the applicable Bar Date or other time period provided for by the Creditors' Plan, and otherwise Allowed.  For the avoidance of doubt, any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Subordinated Claim.

**D.    Treatment of Nondischargeable Claims**

The Creditors' Plan will not discharge any Nondischargeable Claim.  Moreover, the rights of the Sandy Hook Families, acting through the GUC Trust, to exercise all rights, remedies, and other legal entitlements, whether arising under state, federal or foreign law, with respect to the Nondischargeable Claims are expressly preserved, and nothing to the contrary in the Creditors' Plan will limit, affect, or otherwise impact such rights; *provided that* no individual holder of any Sandy Hook Family Claim will be entitled to receive more than the aggregate Allowed amount of such holder's Sandy Hook Family Claim on account of such Claims pursuant to the Creditors' Plan.

**E.    The GUC Trust**

On or before the Effective Date, the GUC Trust will be established and administered in accordance with the GUC Trust Agreement, which sets forth, *inter alia*, the powers, authority, responsibilities, and duties of the GUC Trustee.  The purpose of the GUC Trust will be the liquidation and administration of the GUC Trust Assets and making distributions to holders of GUC Trust Interests in accordance with the terms of the Creditors' Plan and the GUC Trust Agreement.

i.    ***The GUC Trustee***

The GUC Trust will be administered by the GUC Trustee.  On or before the Effective Date, the GUC Trustee, on behalf of the Debtor, will execute the GUC Trust Agreement and will take all other steps necessary to establish the GUC Trust pursuant to the GUC Trust Agreement and consistent with the Creditors' Plan.  For the avoidance of doubt, if, for any reason the individual or entity chosen to serve as the GUC Trustee will need to be replaced, the Sandy Hook Families will appoint a subsequent GUC Trustee unless otherwise provided by the GUC Trust Agreement.  The GUC Trust Agreement will establish an oversight committee (the "Litigation Committee") consisting of members of the Sandy Hook Families appointed in accordance with the terms of the GUC Trust Agreement to oversee performance of the GUC Trustee's duties with respect to the GUC Trust Assets and otherwise serve the functions to be described in the Creditors' Plan and the GUC Trust Agreement.

The GUC Trustee will be responsible for all decisions and duties with respect to the GUC Trust Assets, subject to the authority granted to it under the Creditors' Plan, the Confirmation Order and the GUC Trust Agreement, as applicable, and will file with the Bankruptcy Court periodic public reports on the status of Claims reconciliation and distributions, which reports may be included in the quarterly reporting required by the U.S. Trustee.  In addition, the GUC Trustee will issue quarterly written reports and engage in update calls upon reasonable request with representatives of the Sandy Hook Families.

The GUC Trustee will owe fiduciary duties to all holders of GUC Trust Interests consistent with the fiduciary duties a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code owes to its constituents, and the Litigation Committee must consent to any proposed material action, including any settlement in respect of any action, by the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

ii.   *Assignments*

On the Effective Date, the Nondischargeable Claims will be assigned to the GUC Trust.

iii.   *GUC Trust Assets*

On the Effective Date, all GUC Trust Assets will vest in the GUC Trust.  For the avoidance of doubt, the Exempt Assets will not vest in the GUC Trust.  The GUC Trust Interests will only be transferrable in the sole discretion of the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

Under section 1141(b) of the Bankruptcy Code, the GUC Trust Assets will be assigned, transferred and vest in the GUC Trust upon the occurrence of the Effective Date, free and clear of all Claims, Liens, encumbrances, and interests; *provided, however, that* the GUC Trustee may abandon or otherwise not accept any assets that the GUC Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the GUC Trust in accordance with the terms of the GUC Trust Agreement.  Any assets that the GUC Trustee so abandons (whether before or after the Effective Date) or otherwise does not accept will not be GUC Trust Assets.

iv.   *Litigation Assets*

The following assets constitute the Litigation Assets and will vest in the GUC Trust and be administered by the GUC Trustee in accordance with the terms described herein and in the GUC Trust Agreement:

- **Initial Litigation Funding**.  A total of $500,000 in Cash, which will be funded by the Debtor's Estate to the GUC Trust for administrative expenses in connection with administering the Litigation Assets; *provided that* the source and manner of funding will be acceptable to the GUC Trustee; *provided, further, that* a portion of the proceeds from liquidation of the Litigation Assets may be retained by the GUC Trustee in its discretion as continued funding for administration of the Litigation Assets.

- **Trust Causes of Action**.  All Causes of Action (i) belonging to the Debtor's Estate (including those belonging to the Jones Trusts), whether or not initially asserted prior to Confirmation, including, but not limited to, any Estate Claims or Causes of Action against or related to the Debtor, any Insider or Affiliate of the Debtor, and (ii) the Texas State Court fraudulent conveyance action filed by Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine previously removed and then transferred to the Bankruptcy Court.

- **Release Settlement Payments**.  All Release Settlement Payments made to the GUC Trust will immediately vest in the GUC Trust upon payment.

- **Books & Records**.   The Debtor's books and records, including all documents, communications, and information of the Debtor, any Jones Trusts and any entities owned or controlled by the Debtor, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets.   All discovery obtained by the UCC during the Chapter 11 Case will be transferred to the GUC Trust.

- **Investigative Powers**.  The GUC Trust and the GUC Trustee will retain the right to conduct any discovery related to the acts, conduct or property, or to the liabilities and financial condition of the Debtor, or to any matter which may affect the administration of Jones's Estate or any Trust Causes of Action, or to the Debtor's right to a discharge, under Bankruptcy Rule 2004, to the full extent that such powers were available prior to the Effective Date.

- **Audit Powers**.  The GUC Trust or the GUC Trustee may retain a professional to conduct financial audits of the Debtor as necessary and request information from applicable third parties in connection with the same (including Erika Jones and David Jones) to ensure the veracity of financial disclosures.

- **Privileges**.  All privileges in respect of the Trust Causes of Action, including the attorney-client privilege, held by the Debtor will transfer to the GUC Trust.

    v.    *Confidentiality*

The GUC Trustee will be deemed a party to the Protective Order and will be permitted to receive Discovery Material, Confidential Material, and Professionals' Eyes Only Material (each as defined in the Protective Order) in accordance with the terms thereof.

**F.    The Debtor's Obligations and Covenants**

The Debtor will be fully responsible for taking all necessary actions required to vest the GUC Trust Assets in the GUC Trust (the "Jones Transfer Obligation").  The Jones Transfer Obligation begins on the Confirmation Date and must be completed in full no later than thirty (30) days after the Confirmation Date. To the extent that the Debtor fails or refuses to comply with the Jones Transfer Obligation, there will be no limitation on the rights and ability of the Sandy Hook Families, the GUC Trustee, and the UCC to petition any court of competent jurisdiction to enforce the Jones Transfer Obligation pursuant to section 1142(b) of the Bankruptcy Code, any other provision of the Bankruptcy Code, or applicable non-bankruptcy law or to seek any other appropriate remedies under the Bankruptcy Code or applicable non-bankruptcy law.

No later than thirty (30) days after the Confirmation Date, the Debtor will provide an affidavit (the "Jones Full Disclosure") containing all facts and information concerning his assets, rights, claims, interests, and/or any Causes of Action, held either directly or indirectly and including the assets set forth on the Exempt Asset Schedule, and any transfers of the Debtor's property exceeding $5,000 as to a gift for no exchange of goods or services and $25,000 as to all other transfers in the ten years prior to the Petition Date

and running through the Effective Date.  Discovery of any Material Misstatement[48] in the Jones Full Disclosure will (i) void any discharge granted under the Creditors' Plan, and (ii) subject the Debtor to all penalties available under applicable law.

The Debtor will cooperate in good faith with the Sandy Hook Families, the UCC, the GUC Trustee, the Debtor's Estate, FSS, and their respective representatives, in carrying out the terms of the Creditors' Plan, including by responding timely to reasonable discovery requests in connection with actions by the GUC Trustee and cooperating in pursuing and obtaining any tax refund or royalty amounts to which the Debtor or the GUC Trust is entitled.

Prior to the Effective Date, the Debtor will also provide reasonable notice to the UCC in advance of the formation and/or incorporation of any trust or other entity on his behalf, or from which he expects to potentially receive distributions, dividends, or other payments, or in which he owns a direct or indirect beneficial interest.

The Debtor will, in any event, cooperate with the GUC Trustee's efforts to investigate and pursue any Causes of Action arising from or related to payments made pursuant to the Premarital Agreement for the benefit of the GUC Trust.

### G.    Releases and Exculpation

#### 1.    Releases by the Debtor

**Notwithstanding anything contained in the Creditors' Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, as applicable, from any and all claims and Causes of Action asserted by or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Creditors' Plan, the Confirmation Order, or any document, instrument, or agreement executed to implement the Creditors' Plan or any Claim or obligation arising under the Creditors' Plan.  For the avoidance of doubt, Jones shall not be a Released Party and there shall be no release or exculpation of the Trust Causes of Action, the Nondischargeable Claims, or any other Claims or Causes of Action against Jones, non-minor members of his immediate family, or their Insiders or Affiliates, as applicable, subject to the ability of Insiders and Affiliates of Jones to become a Released Party by making a Release Settlement Payment.**

#### 2.    Exculpation

**Except as otherwise specifically provided in the Creditors' Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any**

---

[48] "Material Misstatement" means an omission by Jones or his representatives to disclose in the Jones Full Disclosure (a) an asset, right, claim, interest, or Cause of Action of the estate, held either directly or indirectly and including the assets set forth on the Exempt Asset Schedule, that reasonably could be argued to have a value of $5,000 or more; (b) any voluntary or involuntary transfer of cash or property within the ten years prior to the Petition Date that reasonably could be determined to have a value of $5,000 or more that was not made in exchange for any service, product or other asset; or (c) any other voluntary or involuntary transfer of cash or property within the ten years prior to the Petition Date that reasonably could be argued to have a value of $25,000 or more.  It shall not be a defense to a Material Misstatement that the subject asset(s) or transfer(s) were omitted inadvertently or based on good faith or mistaken judgment.

Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Creditors' Plan, this Specific Disclosure Statement, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case in connection with the Creditors' Plan, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Creditors' Plan, the administration and implementation of the Creditors' Plan, including the issuance of GUC Trust Interests pursuant to the Creditors' Plan, or the distribution of property under the Creditors' Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Creditors' Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Creditors' Plan, shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Creditors' Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Creditors' Plan or such distributions made pursuant to the Creditors' Plan.

## V.        CREDITORS' PLAN LIQUIDATION ANALYSIS

The projected recoveries set forth in in the liquidation analysis provided in **Exhibit D** (the "Creditors' Plan Liquidation Analysis") are for illustrative purposes only and to enable holders of Claims to carefully compare the estimated recoveries contemplated by the Jones Plan to those contemplated by the Creditors' Plan. Projected recoveries may be significantly higher or lower than shown based on the outcome of the Trust Causes of Action for those holders of General Unsecured Claims who elect to receive GUC Trust Interests. For the avoidance of doubt, all value held by the GUC Trust, net of costs and expenses, ultimately will be distributed to holders of GUC Trust Interests in accordance with the terms of the Creditors' Plan and the GUC Trust Agreement.

Moreover, the value available for distribution under the Creditors' Plan must be considered in connection with value that may be recoverable by the Sandy Hook Families, which comprises the near entirety of the creditor body in this Chapter 11 Case, outside of the Creditors' Plan in respect of their nondischargeable Claims against Jones and FSS. Indeed, the preservation of such Claims and the ability to prosecute them immediately upon the Effective Date of the Creditors' Plan remains one of the most compelling reasons the Creditors' Plan is more favorable than the Jones Plan.

## VI.       SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Creditors' Plan (the "Solicitation Procedures"). Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

### A.      Ballots and Voting Deadline

Accompanying this Disclosure Statement is the order entered by the Bankruptcy Court approving the solicitation procedures, dated [·], 2024 [Docket No. [·]] (the "Solicitation Order").  The description of the solicitation and tabulation procedures contained in the Solicitation Order are incorporated by reference as if fully set forth herein.  **In order for your vote to count, you must follow the directions set forth in the Solicitation Order which contains a detailed description of the process for voting.**

A ballot for voting to accept or reject the Creditors' Plan is enclosed with this Disclosure Statement and has been mailed to holders of Claims entitled to vote.  After carefully reviewing the Disclosure Statement and all exhibits, including the Creditors' Plan, each holder of a Claim entitled to vote should indicate its vote on the enclosed ballot.  **All holders of Claims entitled to vote must (i) carefully review the ballot and instructions thereon, (ii) execute the ballot, and (iii) return it to the address indicated on the ballot by the Voting Deadline (defined below) for the ballot to be considered.**

In order for your vote on the Creditors' Plan to count, the original, signed ballot *must be actually received* by [·] **no later than 5:00 p.m. CST** [·]**, 2024** ("Voting Deadline"). Any ballot received by [·] after the Voting Deadline shall not be counted, unless the Bankruptcy Court orders otherwise. Ballots will not be counted if they are delivered by facsimile, by electronic means *other than* by email to the email address listed below, or that do not contain an original signature.

After completion of the ballot, creditors should return the executed ballot by mail or email to:

**By Mail To:**

**[·]**

**By Email to:**

**[·]**

### B.      Holders of Claims Entitled to Vote

Except as otherwise provided in the Creditors' Plan, any holder of a Claim against the Debtor whose Claim is impaired under the Creditors' Plan is entitled to vote, if either (i) the Debtor has scheduled the holder's Claim at a specific amount other than $0.00 (and such Claim is not scheduled as "disputed," "contingent," or "unliquidated") or (ii) the holder of such Claim has filed a Proof of Claim on or before the deadline set by the Bankruptcy Court for such filings in a liquidated amount.  Any holder of a Claim as to which an objection has been filed (and such objection is still pending as of the time of confirmation of the Creditors' Plan) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Creditors' Plan. Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Creditors' Plan.

### C.      Bar Dates for Filing Proofs of Claim

The Bankruptcy Court established a bar date for filing proofs of claim in this case of April 11, 2023.  The Bankruptcy Court further established a bar date for filing proofs of claim by governmental units of June 7, 2023.  The deadline for the filing of proofs of claim for Priority Claims is thirty (30) days after the Effective Date of the Creditors' Plan.

### D. Tabulation of Votes

A vote to accept or reject the Creditors' Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. A ballot that does not indicate the acceptance or rejection of the Creditors' Plan or that indicates both acceptance and rejection of the Creditors' Plan will be disregarded. If the holder does not properly submit its ballot, or that holder's vote is disregarded, that holder and that holder's Claim will not be included in deciding whether the requisite number of class members and amount of Claims voted to accept or reject the Creditors' Plan.

## VII. CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### A. The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization (the "Confirmation Hearing"). The Bankruptcy Court has scheduled the Confirmation Hearing to begin on [·], 2024 at [·] (prevailing Central time). The Confirmation Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Creditors' Plan may be modified, if necessary, prior to, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. Any objection to the Creditors' Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Texas; (3) state the name, address, phone number, and email address of the objecting party and the amount and nature of the Claim of such entity, if any; (4) state with particularity the basis and nature of any objection to the Creditors' Plan and, if practicable, a proposed modification to the Creditors' Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties no later than February 16, 2024 or such other date set by the Bankruptcy Court for filing objections to Confirmation of the Creditors' Plan: (i) the Debtor, (ii) the Creditor Plan Proponents, (iii) the Office of the United States Trustee for the Southern District of Texas, and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**Unless an objection to the Creditors' Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

### B. Confirmation Standards

Among the requirements for Confirmation are that the Creditors' Plan: (i) is accepted by all Impaired classes of Claims or, if rejected by an Impaired class, that the Creditors' Plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of holders of Claims that are Impaired under the Creditors' Plan.

The following are certain requirements that must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before a bankruptcy court may confirm a plan of reorganization. The Creditor Plan Proponents believe that the Creditors' Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code, including those set forth below, other than those pertaining to voting, which has not yet taken place:

- The Creditors' Plan complies with the applicable provisions of the Bankruptcy Code.

- The Creditors' Plan has been proposed in good faith and not by any means forbidden by law.

- With respect to each holder within an Impaired class of Claims, as applicable, each such holder (i) has accepted the Creditors' Plan or (ii) will receive or retain under the Creditors' Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

- The Creditors' Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a class of Claims is Impaired under the Creditors' Plan, at least one class of Claims that is Impaired under the Creditors' Plan has accepted the Creditors' Plan, determined without including any acceptance of the Creditors' Plan by any insider.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Creditors' Plan provides for the payment of all such fees on the Effective Date.

- If the Debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the Debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

- To the extent a holder of an Allowed General Unsecured Claim objects to Confirmation of the Creditors' Plan: (i) the value, as of the Effective Date of the Creditors' Plan, of the property to be distributed under the Creditors' Plan on account of such Claim is not less than the amount of the Claim; or (ii) the value of the property to be distributed under the Creditors' Plan is not less than the projected disposable income of the Debtor (as defined in section 1325(b)(2) of the Bankruptcy Code) to be due under the Creditors' Plan, or during the period for which Creditors' Plan provides payments, whichever is longer.

**C.  Best Interests Test / Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim either (i) accept the Creditors' Plan or (ii) receive or retain under the Creditors' Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

In applying the best interests test, the Creditor Plan Proponents have considered the liquidation analysis prepared by the Debtor [Docket No. 555] (the "Jones Liquidation Analysis"), as well as the Creditors' Plan Liquidation Analysis attached hereto as **Exhibit D,** which, in part, builds upon the information set forth in the Jones Liquidation Analysis. For the avoidance of doubt, there can be no

assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that the Bankruptcy Court will accept the Creditor Plan Proponents' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

Based on the Creditors' Plan Liquidation Analysis, the Creditor Plan Proponents believe that, under the Creditors' Plan, holders of Impaired Claims will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code. Indeed, the Creditors' Plan likely provides holders of General Unsecured Claims with a larger recovery because transferring the Estate assets to the GUC Trust will allow the GUC Trustee to liquidate assets in an organized fashion, thereby realizing greater recovery for the beneficiaries of the GUC Trust. Moreover, the Creditors' Plan provides holders of Claims with a greater recovery because of the additional fees and expenses that would be incurred in a chapter 7 liquidation. Accordingly, the Creditor Plan Proponents believe that the Creditors' Plan is in the best interests of creditors.

### D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by a liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Creditors' Plan.

Since the Creditors' Plan contemplates a liquidation, for purposes of determining whether the Creditors' Plan meets the feasibility requirement, the Creditor Plan Proponents have analyzed their ability to meet their obligations under the Creditors' Plan in connection with the contemplated liquidation of the Debtor's assets and establishment of the GUC Trust. The Creditor Plan Proponents anticipate that they will be able to make all payments required pursuant to the Creditors' Plan from the Estate assets, such as payment in full of Administrative Claims, Priority Claims, and Claims that are entitled to payment in full pursuant to the terms of the Creditors' Plan. Therefore, the Creditor Plan Proponents believe that the liquidation of the Estate pursuant to the Creditors' Plan will meet the feasibility requirement of the Bankruptcy Code.

### E.      Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (i) the plan otherwise satisfies the requirements for confirmation, (ii) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class, and (iii) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination

The no "unfair discrimination" test applies to classes of claims that are of equal priority and are receiving different treatment under the Creditors' Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Creditor Plan Proponents does not believe the Creditors' Plan discriminates unfairly against any Impaired class of Claims. The Creditor Plan Proponents believe the Creditors' Plan and the treatment of all classes of Claims under the Creditors' Plan satisfy the foregoing requirements for nonconsensual confirmation.

### 2. Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims or interests in such class. As to a dissenting class, the test sets different standards depending on the type of claims or interests in such class. In order to demonstrate that a plan is fair and equitable with respect to a dissenting class, the plan proponent must demonstrate the following:

- <u>Secured Creditors</u>: Each holder of a secured claim (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>: Either (i) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

The Creditor Plan Proponents believe that the Creditors' Plan and treatment of all Classes of Claims therein satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Creditors' Plan. Specifically, there is no Impaired class of Secured Claims and therefore only the test with respect to unsecured creditors will apply.

### F. Alternative Plan

While the Debtor proposed an alternative plan for reorganization of the Debtor's Estate, the Jones Plan is not confirmable for a number of reasons that the Creditor Plan Proponents will address in an objection to Confirmation of the Jones Plan. The Creditor Plan Proponents believe that the Creditors' Plan, as described herein, provides the only viable path towards emergence from chapter 11 for the Debtor and thus enables holders of Claims to realize the only potential recovery under the circumstances of this case.

## VIII.   RISK FACTORS

**Holders of Claims entitled to vote on the Creditors' Plan should read and consider carefully the risk factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Specific Disclosure Statement, before voting to accept or reject the Creditors' Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtor's business or the Creditors' Plan and its implementation.**

### A.   Risks Related to the Chapter 11 Case

#### 1.   Length of Litigation and Outcomes of the Trust Causes of Action

The Trust Causes of Action are complex and fact intensive in nature. It is difficult to estimate the length of time it will take to settle or reach a judgment regarding the Trust Causes of Action and, therefore, difficult to estimate how long it will be before holders of GUC Trust Interests will receive recoveries on account of the Trust Causes of Action.

In addition, although the Creditor Plan Proponents believe, based on their own review of the Trust Causes of Action that the Trust Causes of Action are likely to be successful and yield substantial recoveries for holders of GUC Trust Interests, the assumed outcomes are speculative in nature and cannot be guaranteed. Even assuming a positive result, it is impossible to determine the amount of recovery that holders of GUC Trust Interests would receive on account of a settlement or judgment regarding the Trust Causes of Actions.

### 2.     Viability of Future Operations of FSS

In the Jones Specific Disclosure Statement Objection, the Debtor states that if a plan is confirmed over the Debtor's objection or that is not acceptable to him, he will cease working for FSS. If true, this could jeopardize confirmation of the FSS Plan. This may also jeopardize FSS's future operations and creditors' ability to collect against FSS on account of their nondischargeable Claims.

### 3.     Non-Confirmation of the Creditors' Plan

Although the Creditor Plan Proponents believe they will obtain the requisite votes to accept the Creditors' Plan and the Creditor Plan Proponents believe that the Creditors' Plan satisfies all other requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that parties, including the Debtor, will not seek to oppose Confirmation of the Creditors' Plan or that the Bankruptcy Court may otherwise decline to confirm the Creditors' Plan. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion in connection with the Creditors' Plan. Section 1122 of the Bankruptcy Code requires that the Creditors' Plan classify Claims against the Debtor. The Bankruptcy Code also provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims or interests of such class. The Creditor Plan Proponents believe that all Claims have been appropriately classified in the Creditors' Plan. There can be no assurance, however, that the Bankruptcy Court will conclude that such Claims are properly classified in the Creditors' Plan. Moreover, under the Bankruptcy Code, only one plan can be confirmed by the Bankruptcy Court. The Jones Plan is a competing plan, and such competing plan may be confirmed by the Bankruptcy Court in place of the proposed Creditors' Plan.

### 4.     Conversion to Chapter 7

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds it would be in the best interests of creditors and/or the Debtor, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. In the event of a chapter 7 conversation, unlike under the Creditors' Plan, the GUC Trust, and thus creditors, would not control the liquidation or assets or the prosecution of any Estate Causes of Action.

### 5.     Dismissal of the Chapter 11 Case

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtor, the Chapter 11 Case may be dismissed by order of the Bankruptcy Court.

### 6.     Non-Occurrence of the Effective Date

Although the Creditor Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

Moreover, if the conditions precedent to the Effective Date of the Creditors' Plan are not met, the Creditors' Plan may be vacated by the Bankruptcy Court.

### 7.     Amendment, Waiver, Modification or Withdrawal of the Creditors' Plan

Except as otherwise specifically provided in the Creditors' Plan, the Creditor Plan Proponents reserve the right to modify the Creditors' Plan, whether such modification is material or immaterial, and seek confirmation of the Creditors' Plan consistent with the Bankruptcy Code. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Creditors' Plan on some or all of the classes or a change in the relative rights of such classes. All holders of Claims will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but before confirmation of the Creditors' Plan, the Creditor Plan Proponents seek to modify the Creditors' Plan, the previously solicited acceptances will be valid only if (i) all classes of adversely affected creditors and interest holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims.

### B.     Risk of Variance in Financial Results

This Specific Disclosure Statement and the Creditors' Plan contain financial information and estimates of value that demonstrate the feasibility of the Creditors' Plan. Information based on the financial information, estimates of value, and assumptions in this Specific Disclosure Statement was prepared for the limited purpose of furnishing recipients of the Specific Disclosure Statement with adequate information to make an informed judgment regarding acceptance of the Creditors' Plan. The estimates of value and assumptions should not be relied upon in any way or manner for any other purpose and should not be regarded as representations or warranties by the Creditor Plan Proponents or any other person as to the accuracy of such information or that any such valuations or assumptions will be realized. Those estimates of value and assumptions have not been, and will not be, updated on an ongoing basis, and they were not audited or reviewed by independent accountants or auditors. They reflect certain expectations concerning the market and economic conditions that are, and remain, beyond the Creditor Plan Proponents' control. Such estimates of value and assumptions are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the valuation estimates may be wrong in material respects. Actual results may vary and may continue to vary significantly from those contemplated by valuation estimates, and/or assumptions.

### 1.     The Specific Disclosure Statement May Contain Forward-looking Statements

This Specific Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statements other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward-looking statements necessarily are speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained in this Specific Disclosure Statement is an estimate only, based on information available to the Creditor Plan Proponents. As discussed in further detail below, this risk is exacerbated by the fact that such information originates in large part from the Debtor and other parties and never belonged to the Creditor Plan Proponents.

2.        **Certain Tax Consequences**

For a discussion of certain tax considerations for certain holders of Claims in connection with the implementation of the Creditors' Plan, see Article IX hereof.  Each holder of a Claim should consult its own tax advisors regarding the tax consequences of the Creditors' Plan, based upon the particular circumstances pertaining to such holder.

C.        **Additional Factors to Be Considered**

1.        **No Representations Made Outside this Specific Disclosure Statement Are Authorized**

The information contained in this Specific Disclosure Statement is for purposes of soliciting acceptances of the Creditors' Plan and may not be relied upon for any other purpose.  Except as otherwise provided herein or in the Creditors' Plan, no representations relating to the Debtor, the Chapter 11 Case or the Creditors' Plan are authorized by the Bankruptcy Court, the Bankruptcy Code or otherwise.  Any representations or inducements made to secure your acceptance or rejection of the Creditors' Plan, other than as contained in or included with this Specific Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Creditor Plan Proponents and, if applicable, the U.S. Trustee.

2.        **Certain Information Herein Was Provided by the Debtor and Relied Upon by the Creditor Plan Proponents' Advisors**

Counsel to and other advisors retained by the Creditor Plan Proponents have relied upon information provided by the Debtor, as well as information gathered in the UCC's Investigation, in connection with the preparation of this Specific Disclosure Statement and the Creditors' Plan.  Although counsel to and other advisors retained by the Creditor Plan Proponents have attempted to verify the information contained herein, certain statements rely on documents and representations received from the Debtor or from his affiliates.  The Debtor's records are incomplete, and the Debtor and certain other parties did not fully comply with discovery requests.  Although the Creditor Plan Proponents have undertaken great efforts to provide accurate and complete information in this Specific Disclosure Statement, the Creditor Plan Proponents cannot warrant or represent that the information contained herein is complete and accurate.

The statements contained in this Specific Disclosure Statement are made by the Creditor Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Specific Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Creditor Plan Proponents have used their reasonable diligence efforts to ensure the accuracy of all of the information provided in this Specific Disclosure Statement and in the Creditors' Plan, the Creditor Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Specific Disclosure Statement.

The financial information contained in this Specific Disclosure Statement has not been audited unless explicitly stated otherwise.  In preparing this Specific Disclosure Statement, the Creditor Plan Proponents have relied predominantly on financial data derived from the Debtor's books and records that was available at the time of such preparation, together with information gathered in the course of the UCC's Investigation.  While the Creditor Plan Proponents believe that the financial information received from the Debtor and relied upon in preparing this Specific Disclosure Statement fairly reflects the financial condition of the Debtor, the UCC is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

3.      **No Legal or Tax Advice Is Provided to You by this Specific Disclosure Statement**

**This Specific Disclosure Statement is not legal advice to you.**  The contents of this Specific Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim.  This Specific Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Creditors' Plan or object to Confirmation of the Creditors' Plan.

4.      **No Admissions Are Made by this Specific Disclosure Statement**

The information and statements contained in this Specific Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Creditor Plan Proponents) nor be deemed evidence of the tax or other legal effects of the Creditors' Plan on the Debtor, holders of Allowed Claims or any other parties in interest.  Except as otherwise provided in the Creditors' Plan, the vote by a holder of an Allowed Claim for or against the Creditors' Plan does not constitute a waiver or release of any Claims or rights of the Creditor Plan Proponents to object to that holder's Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or his Estate are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Specific Disclosure Statement.  The Creditor Plan Proponents and/or the GUC Trustee, as applicable, may seek to investigate, file, and prosecute objections to Claims and may object to Claims after the Confirmation or Effective Date of the Creditors' Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5.      **No Duty to Update**

The statements contained in the Specific Disclosure Statement are made as of the date hereof, unless otherwise specified herein, and the delivery of the Specific Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Creditor Plan Proponents have no duty to update the Specific Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

IX.     **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE CREDITORS' PLAN**

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Creditors' Plan.  This discussion is only for general information purposes and only describes the expected tax consequences to holders of General Unsecured Claims.  It should not be relied upon for purposes of determining the specific tax consequences of the Creditors' Plan with respect to a particular holder.  This discussion does not address aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim subject to special treatment under U.S. federal income tax laws.  It also assumes that each holder of a Claim is a U.S. Holder (as defined below).  It is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or non-U.S. tax laws or U.S. federal estate or gift tax laws.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Specific Disclosure Statement.  These authorities may change, possibly retroactively, resulting in U.S. federal

income tax consequences different from those discussed below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Creditors' Plan and no opinion of counsel has been sought or obtained with respect thereto. The discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. No representations or assurances are being made to the holders of Claims with respect to the U.S. federal income tax consequences described herein.

As used herein, the term "U.S. Holder" means a beneficial owner of a Claim that is for U.S. federal income tax purposes (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; (iv) a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person; (v) the government of the United States, any state, political subdivision or territory thereof or the District of Columbia; or (vi) any Tribe. If a partnership or other entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any Claims, you should consult your own tax advisor.

This discussion also does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full under the Creditors' Plan, or (ii) that are deemed to accept or deemed to reject the Creditors' Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a holder of a Claim.

**The contents of this Specific Disclosure Statement should not be construed as legal, business or tax advice. Holders should consult their own tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Creditors' Plan and the receipt of amounts from the GUC Trust, as well as any tax consequences arising under any state, local or non-U.S. tax laws or any other U.S. federal tax laws. This Specific Disclosure Statement may not be relied for any purpose other than to determine how to vote on the Creditors' Plan or object to confirmation of the Creditors' Plan.**

### A.     Tax Treatment of Holders of a General Unsecured Claim

Pursuant to the Creditors' Plan, each U.S. Holder of a General Unsecured Claim that is Allowed will be entitled to receive, at such holder's election, (i) the holder's pro rata share of the GUC Election Cash Pool, such pro rata share to be calculated based on the total amount of Allowed General Unsecured Claims held by holders that make such election, or (ii) the holder's pro rata share of the GUC Trust Interests, such pro rata share to be calculated based on the aggregate amount of Allowed General Unsecured Claims that make such election. The tax consequences to a U.S. Holder of a General Unsecured Claim will depends on whether such U.S. Holder elects to received cash or GUC Trust Interests and the tax status of the GUC Trust for U.S. federal income tax purposes. The following discussion assumes that the GUC Trust is treated as "qualified settlement fund" (a "QSF") pursuant to Treasury Regulation section 1.468B-1 for U.S. federal income tax purposes. If the GUC Trust is treated as a liquidating trust, partnership, or other entity for U.S. federal income tax purposes, the tax treatment of holders of GUC Trust Interests would differ materially from the consequences below and U.S. Holders should consult their tax advisors with respect to such tax treatment.

Each holder of a General Unsecured Claim that elects to receive their pro rata share of the General Unsecured Claim Cash Pool should be treated as exchanging its General Unsecured Claim for cash in a fully taxable exchange pursuant to Section 1001 of the Tax Code. A holder of such General Unsecured Claims should generally recognize gain or loss equal to (i) the amount of Cash received in the exchange, and (ii) its adjusted tax basis, if any, in the General Unsecured Claim.

Assuming this treatment of the GUC Trust as a QSF is respected for U.S. federal income tax purposes, each holder of a General Unsecured Claim that elects receive a pro rata share of the GUC Trust Interests generally is not expected to be treated as receiving a distribution from the GUC Trust unless and until such U.S. Holder is entitled to receive that distribution directly, and any amounts received by a U.S. Holder of a General Unsecured Claim from the GUC Trust generally are expected to be treated by such holder as if received directly from the Debtor.

The U.S. federal income tax consequences to a holder of a General Unsecured Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of such Claim may depend on a number of factors, including the nature and origin of such Claim, the U.S. Holder's method of accounting and the U.S. Holder's own particular tax situation. If a distribution is treated as a payment on account of damages that are not the result of physical injury or physical sickness, such distribution may be taxable as ordinary income to the holder. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Creditors' Plan affects them for U.S. federal, state, and local tax purposes, based on their particular tax situations.

### B.      Tax Treatment of the GUC Trust

On the Confirmation Date, the GUC Trust will be established in accordance with the GUC Trust Agreement. The GUC Trust is intended to qualify as a QSF and the remainder of this discussion assumes that this treatment is respected.

The GUC Trustee will be responsible for the payment of any taxes imposed on the GUC Trust or the GUC Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the GUC Trust Agreement. A QSF is subject to entity-level tax under generally applicable U.S. federal income tax principles at the maximum U.S. federal income tax rate applicable to trusts and estates (currently 37%, increasing to 39.6% beginning in 2026). The determination of taxable income of a QSF for U.S. federal income tax purposes is subject to certain exceptions, including: (i) any amounts transferred by or on behalf of the transferors to the QSF to resolve or satisfy a liability for which the transferor is liable and the QSF is established will generally be excluded from the QSF's income, other than dividends on stock of a transferor (or a related person of the transferor), interest on debt of a transferor (or a related person of the transferor) or payments in compensation for late or delayed transfers, (ii) any distribution of property by the QSF generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the QSF's adjusted tax basis in such property, and (iii) only limited, specified deductions will be permitted, including deductions for administrative costs and state and local taxes incurred by the QSF, and excluding any deductions that would generally be allowable to a corporation or partnership for expenses incurred in the course of a taxpayer's trade or business. In general, the adjusted tax basis of property received (or treated as received for U.S. federal income tax purposes) by a QSF from a transferor will be the fair market value of such property at the time of receipt. Notwithstanding the foregoing, the GUC Trust is not expected to recognize income with respect to the GUC Trust Agreement other than in respect of any payments in compensation for late or delayed transfers due thereunder.

The GUC Trustee will also be required to file tax returns on behalf of the GUC Trust and will be responsible for causing the GUC Trust to pay any taxes imposed upon the GUC Trust.

C.         **Withholding on Distributions and Information Reporting**

Information reporting requirements may apply to distributions or payments pursuant to the Creditors' Plan.  Certain distributions to holders of Claims under the Creditors' Plan are subject to any applicable tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments to U.S. Holders may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 24%).

Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number, (ii) furnishes an incorrect taxpayer identification number, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).  Certain persons are exempt from backup withholding and information reporting, including governments of U.S. states or political subdivisions thereof and non-U.S. governments and, in certain circumstances, corporations and financial institutions.  Holders of Claims are urged to consult their own tax advisors regarding the potential for and applicable law governing backup and other tax withholding in connection with the transactions contemplated by the Creditors' Plan.  In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Creditors' Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE CREDITORS' PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S. OR OTHER APPLICABLE TAX LAWS.**

## X.         RECOMMENDATION AND CONCLUSION

The Creditor Plan Proponents believe that Confirmation of the Creditors' Plan is in the best interests of the creditors and urge all holders of Claims in voting classes to vote in favor of the Creditors' Plan.

Dated:  January 22, 2024

**THE CREDITOR PLAN PROPONENTS**

**The Official Committee of Unsecured Creditors**

By:     */s/ Marty L. Brimmage, Jr.*
           Marty L. Brimmage, Jr.
           **Akin Gump Strauss Hauer & Feld LLP**
           *Counsel to the UCC*

**The Texas Plaintiffs**

By:     */s/ Avi Moshenberg*
           Avi Moshenberg
           **McDowell Hetherington LLP**
           *Counsel to the Texas Plaintiffs*

**The Connecticut Plaintiffs**

By:     */s/ Ryan Chapple*
           Ryan E. Chapple
           **Cain & Skarnulis PLLC**
           *Counsel to the Connecticut Plaintiffs*

**Exhibit A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALEXANDER E. JONES, | ) Case No. 22-33553 (CML) |
| | ) |
| Debtor. | ) |
| | ) |

## CREDITORS' NON-UNIFORM INDIVIDUAL
## CHAPTER 11 PLAN OF LIQUIDATION FOR ALEXANDER E. JONES

*/s/ Marty L. Brimmage, Jr.*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr.
Texas Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Fax:  (214) 969-4343
E-mail:  mbrimmage@akingump.com

-and-

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Melanie A. Miller (*pro hac vice* pending)
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Fax:  (212) 872-1002
E-mail:  dzensky@akingump.com
E-mail:  sbrauner@akingump.com
E-mail:  kporter@akingump.com
E-mail:  akordas@akingump.com
E-mail:  melanie.miller@akingump.com

***Counsel to the Official Committee of Unsecured
Creditors of Alexander E. Jones***

*/s/ Ryan E. Chapple*
**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  slascano@paulweiss.com
E-mail:  virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

*/s/ Avi Moshenberg*
**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
E-mail:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

***Co-Counsel to the Texas Plaintiffs***

Dated:  January 22, 2024

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ............................................................................................... 1

    A.    Defined Terms ................................................................................... 1

    B.    Rules of Interpretation ....................................................................... 9

    C.    Computation of Time ....................................................................... 10

    D.    Reference to Monetary Figures ........................................................ 11

    E.    Controlling Document ...................................................................... 11

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ...................... 11

    A.    Administrative Claims. ..................................................................... 11

    B.    Professional Fee Claims. .................................................................. 11

    C.    Priority Tax Claims .......................................................................... 12

ARTICLE III. TREATMENT AND CLASSIFICATION OF CLAIMS ................................... 13

    A.    Classification of Claims ................................................................... 13

    B.    Treatment of Claims ........................................................................ 13

ARTICLE IV. THE GUC TRUST ...................................................................................... 15

    A.    The GUC Trust ................................................................................ 15

    B.    The GUC Trustee ............................................................................ 15

    C.    Assignments ................................................................................... 16

    D.    GUC Trust Assets ........................................................................... 16

    E.    Litigation Assets ............................................................................. 16

    F.    Confidentiality ................................................................................ 17

    G.    Tax Treatment of GUC Trust Under Applicable Laws ........................ 17

    H.    Transferability and Certain Securities Law Matters ........................... 18

    I.    Retention of Professionals ................................................................ 18

ARTICLE V. TREATMENT OF NONDISCHARGEABLE CLAIMS .................................... 18

ARTICLE VI. MEANS OF IMPLEMENTATION............................................................... 18

    A.    Plan Distributions............................................................................ 18

    B.    Jones Transfer Obligation ................................................................ 19

    C.    Jones Full Disclosure ...................................................................... 19

    D.    Additional Obligations..................................................................... 20

    E.    Premarital Agreement ...................................................................... 20

    F.    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment 20

ARTICLE VII. PROCEDURES FOR DISPUTED CLAIMS .................................................... 21

    A.      Objections to Prepetition Claims ................................................................ 21

    B.      Allowance of Claims .................................................................................. 21

    C.      Estimation of Claims .................................................................................. 21

    D.      No Distributions Pending Allowance ......................................................... 21

    E.      Resolution of Claims .................................................................................. 21

    F.      Retained Amounts ...................................................................................... 22

    G.      Late Filed Claims ....................................................................................... 22

    H.      Amendments to Claims ............................................................................... 22

ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......................... 22

    A.      Rejection of Executory Contracts and Unexpired Leases ......................... 22

    B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ........... 23

    C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ........ 24

ARTICLE IX. RETENTION OF EXEMPT PROPERTY ...................................................... 25

ARTICLE X. RELEASES AND EXCULPATIONS .............................................................. 25

    A.      Releases ....................................................................................................... 25

    B.      Exculpations ............................................................................................... 25

ARTICLE XI. CONDITIONS PRECEDENT TO EFFECTIVENESS .................................... 26

ARTICLE XII. RETENTION OF JURISDICTION .............................................................. 26

ARTICLE XIII. MODIFICATION OF PLAN ...................................................................... 28

ARTICLE XIV. MISCELLANEOUS PROVISIONS ........................................................... 28

    A.      Immediate Binding Effect .......................................................................... 28

    B.      Discharge .................................................................................................... 28

    C.      Reservation of Rights ................................................................................. 28

    D.      FSS Plan ..................................................................................................... 29

    E.      Entire Agreement ....................................................................................... 29

    F.      No Admission ............................................................................................. 29

## INTRODUCTION

The UCC and the Sandy Hook Families propose the following Plan pursuant to the provisions of chapter 11 of the Bankruptcy Code.  For the avoidance of doubt, other than as disclosed in the Specific Disclosure Statement, the Confirmation of the Plan does not necessarily determine the outcome of the FSS Case or impair FSS's ability to prosecute the FSS Plan and perform thereunder if confirmed.

## ARTICLE I.
## DEFINITIONS

A. *Defined Terms*

As used in the Plan, capitalized terms shall have the meanings set forth below.

1.      "***Administrative Claim***" means a Claim for which a holder asserts and is determined to be entitled to priority for costs and expenses of administration of the Debtor's estate pursuant to sections 503 and 507(a)(1) of the Bankruptcy Code.

2.      "***Affiliate***" means an "affiliate" as defined by section 101(2) of the Bankruptcy Code, and shall include with respect to Jones, without limitation, A. Emric Productions LLC, AEJ Austin Holdings LLC, AEJ Holdings, LLC, Austin Shiprock Publishing, LLC, Emric Productions, Free Speech Systems, LLC, Guadalupe County Land and Water LLC, Info W, LLC, IWHealth, LLC, Jones Productions, Jones Productions, LLC, Jones Report, LLC, JLJR Holdings LLC, Magnolia Management LLC, Magnolia Management, LP, Magnolia Holdings Limited Partnership, Magnolia Limited Partnership, Planet Infowars, LLC, PLJR Holdings LLC, Prison Planet TV, LLC, PQPR Holdings Limited LLC, RCGJ, LLC, and the Jones Trusts.

3.      "***Allowed***" or "***Allowed Amount***" means, with respect to any Claim against the Debtor, except to the extent that the Plan provides otherwise, any portion thereof:  (a) that is allowed under the Plan, by Final Order, or pursuant to a settlement; (b) that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order); or (c) that is scheduled by the Debtor as not disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely Filed; *provided that*, with respect to a Claim described in clauses (b) and (c) above, such Claim shall be considered Allowed only if and to the extent that such Claim is not Disallowed and no objection to the allowance of such Claim is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.

4.      "***Bar Date***" means the dates established by the Bankruptcy Court or otherwise provided for by the Bankruptcy Code, the Bankruptcy Rules, or the Plan by which any Proof of Claim must be Filed with respect to such Claims; *provided that* there shall be no applicable Bar Date for Claims for which the Plan excludes from the requirement of Filing Proofs of Claim.

5.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

6.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

7.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

8.      "*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)), or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of Texas.

9.      "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

10.     "*Causes of Action*" means, collectively, any and all actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or pursuant to any other theory of law or otherwise.  Causes of Action also include:  (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

11.     "*Chapter 11 Case*" means the above-captioned case filed under chapter 11 of the Bankruptcy Code.

12.     "*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtor or the Debtor's Estate.

13.     "*Claimant*" means the holder of a Claim.

14.     "*Claims Objection Bar Date*" means the deadline for filing objections to requests for payment of Claims, which shall be the later of (a) ninety (90) days after the Effective Date and (b) ninety (90) days after the Filing of the applicable Claim.

15.     "*Clerk*" means the "bankruptcy clerk" as defined by Bankruptcy Rule 9001.

16.     "***Confirmation***" means the entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

17.     "***Confirmation Date***" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

18.     "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

19.     "***Cure Amount***" shall have the meaning ascribed to such term in <u>Article VIII.C</u> of the Plan.

20.     "***David Jones***" means Jones's father, Dr. David Jones.

21.     "***Debtor***" means Jones, the debtor in the above-captioned Chapter 11 Case.  For the avoidance of doubt, Debtor shall also refer to the Debtor as reorganized on or after the Effective Date in accordance with the Plan.

22.     "***Disallowed***" means (a) any Claim, or any portion thereof, that has been disallowed by Final Order or settlement, as provided in the Plan or the Confirmation Order; (b) any Claim or interest, or any portion thereof, that is not scheduled or that is scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules, a Final Order of the Bankruptcy Court, or otherwise deemed timely Filed under applicable law; or (c) any Claim, or any portion thereof, that is not Allowed.

23.     "***Disputed***" means, with respect to a Claim, any such Claim, or any portion thereof, (a) to the extent neither Allowed nor Disallowed under the Plan or a Final Order, or (b) for which a Proof of Claim or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by Final Order.  To the extent only the Allowed amount of a Claim is disputed, such Claim shall be Allowed in the amount not disputed, if any, and Disputed as to the balance of such Claim.

24.     "***Effective Date***" means the first Business Day after the Confirmation Date on which (a) all conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to <u>Article XI</u> of the Plan; (b) no stay of the Confirmation Order is in effect; and (c) the UCC files a notice of the occurrence of the Effective Date.

25.     "***Entity***" means an "entity" as defined by section 101(15) of the Bankruptcy Code.

26.     "***Erika Jones***" means Jones's wife, Erika Wulff Jones.

27.     "***Estate***" means the estate created by sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case and all property (as defined in section 541 of the Bankruptcy Code, including any Causes of Action) acquired by the Debtor after the Petition Date through the Effective Date.

28.     "***Executory Contract***" means a contract to which the Debtor is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

29.     "***Exempt Assets***" are all of the Debtor's assets that are exempt pursuant to section 1123(c) of the Bankruptcy Code.

30.     "***Exempt Asset Schedule***" is the schedule enumerating all Exempt Assets.

31.     "***Exculpated Parties***" means, collectively, and in each case, solely in its capacity as such:  (a) the Sandy Hook Families; (b) the immediate family members of the Sandy Hook Families; (c) the UCC; and (d) with respect to each of the foregoing (a)-(c), such Entities' respective employees, agents, financial advisors, and attorneys, including (i) counsel to the Sandy Hook Families, (ii) counsel to the UCC, and (iii) advisors to the UCC, including accountants, representatives, and other Professionals, each in their capacity as such.

32.     "***Filed***" means filed with the Bankruptcy Court in the Chapter 11 Case.

33.     "***Final Order***" means, as applicable, an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, that has not been reversed, stayed, modified, or amended, as entered on the docket in this Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided that* the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

34.     "***FSS***" means Free Speech Systems, LLC.

35.     "***FSS Case***" means the bankruptcy case of FSS, Case No. 22-60043 (CML), pending before the Bankruptcy Court.

36.     "***FSS Docket***" means the docket in the FSS Case.

37.     "***FSS Plan***" means the *Debtors' First Amended Plan of Reorganization Under Subchapter V of the Bankruptcy Code*, filed at FSS Docket No. 756 (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof).

38.     "*General Unsecured Claim*" means any Claim other than a Secured Claim, Priority Claim, Other Priority Claim, or Subordinated Claim.

39.     "*GUC Election Cash Pool*" means an amount in Cash of $50,000.00.

40.     "*GUC Trust*" shall have the meaning ascribed to such term in <u>Article IV.A</u> of the Plan.

41.     "*GUC Trust Agreement*" means the agreement establishing and describing the GUC Trust, which shall be submitted in connection with the Plan Supplement and shall be in form and substance acceptable to the UCC and the Sandy Hook Families.

42.     "*GUC Trust Assets*" means (a) all Jones's assets, rights, and claims that are not Exempt Assets, whether owned by Jones directly, indirectly, or otherwise held for the benefit of Jones existing as of the Effective Date, in each case whether presently known or discovered at any time by the GUC Trustee, and including, but not limited to, Cash, any tax refund to which Jones is entitled (whether or not such refund is immediately available to Jones as of the Effective Date), 100% of Jones's equity ownership interests in FSS, Jones's full, direct or indirect ownership interests in PQPR, all assets held in the Jones Trusts, any current contractual right entitling Jones to future royalties, and any identified equitable or future interests in property, (b) the Litigation Assets, and (c) once all Professional Fee Claims have been irrevocably paid in full or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account.

43.     "*GUC Trust Interests*" means interests in the GUC Trust.

44.     "*GUC Trustee*" shall have the meaning ascribed to such term in <u>Article IV.A</u> of the Plan.

45.     "*Impaired*" means, with respect to any class of Claims, a class of Claims that is "impaired" as defined by section 1124 of the Bankruptcy Code.

46.     "*Insider*" means an "insider" as defined by section 101(31) of the Bankruptcy Code.

47.      "*Internal Revenue Code*" means the U.S. Internal Revenue Code of 1986, as amended.

48.     "*IRS*" means the Internal Revenue Service.

49.     "*Jones*" means Alexander E. Jones, the Debtor in the above-captioned Chapter 11 Case.

50.     "*Jones Full Disclosure*" shall have the meaning ascribed to such term in <u>Article VI.C</u> of the Plan.

51.     "*Jones Transfer Obligation*" shall have the meaning ascribed to such term in <u>Article VI.B</u> of the Plan.

52.     "***Jones Trusts***" shall mean the Recharge Dynasty Trust, the 2022 Litigation Settlement Trust, the RXXCTTGAA Trust, the Green Leaf Trust, the AEJ 2018 Trust, the Missouri779384 Trust, and the Alexander E. Jones Descendent and Beneficiary Trust.

53.     "***Lien***" means a "lien" as defined by section 101(37) of the Bankruptcy Code.

54.     "***Litigation Assets***" are those litigation-related assets and Causes of Action to be vested in the GUC Trust, as described in Article IV.E of the Plan.

55.     "***Litigation Committee***" shall have the meaning ascribed to such term in Article IV.B of the Plan.

56.     "***Material Misstatement***" shall have the meaning ascribed to such term in Article VI.C of the Plan.

57.     "***Nondischargeable Claims***" means any and all claims arising out of the following proceedings that have not been dismissed: (a) *Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; (b) *Pozner, et al.* v. *Jones*, Case No. D-1-GN-001842, in the Judicial District Court of Travis County, Texas; (c) *Lafferty* v. *Jones, et al.*, Case No. UWY-CV18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court; (d) *Sherlach* v. *Jones, et al.*, Case No. UWY-CV18-6046437-S, in the Judicial District of Waterbury of the Connecticut Superior Court; and (e) *Sherlach* v. *Jones, et al.*, Case No. UWY-CV18-6046438-S, in the Judicial District of Waterbury of the Connecticut Superior Court, in each case, to the extent such claims were determined to be nondischargeable by the Bankruptcy Court's memorandum decisions dated October 19, 2023,[1] or pursuant to any further Final Order.

58.     "***Other Priority Claim***" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, including any Priority DSO Claim.

59.     "***Petition Date***" means December 2, 2022, the date on which Jones commenced the Chapter 11 Case.

60.     "***Plan***" means this Creditors' Non-Uniform Individual Chapter 11 Plan of Liquidation for Alexander E. Jones, proposed by the UCC and the Sandy Hook Families, as it may be amended, modified, and/or supplemented from time to time.

61.     "***Plan Supplement***" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (or draft forms thereof, in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, each of which shall be acceptable to the UCC and the Sandy Hook Families.  The Plan Supplement

---

[1]     *Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones*, Adv. Pro. No. 23-03037 [Docket No. 76]; *Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones*, Adv. Pro. No. 23-03035 [Docket No. 46].

may include the following (including drafts or forms, as applicable), or the material terms of the following, as applicable:  (a) GUC Trust Agreement; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Exempt Asset Schedule; and (e) any other necessary documentation related to implementation of the Plan.

62.    "***Premarital Agreement***" is the agreement by and between Jones and Erika Jones, dated as of December 18, 2016.

63.    "***Priority Claim***" means an Administrative Claim, a Priority Tax Claim, or a Professional Fee Claim.

64.    "***Priority Claims Bar Date***" means the deadline for filing requests for payment of Priority Claims, which shall be thirty (30) days after the Effective Date.

65.    "***Priority DSO Claim***" means an Allowed Claim for prepetition domestic support obligations that is entitled to priority under section 507(a)(1) of the Bankruptcy Code.

66.    "***Priority Tax Claim***" means a Claim for which the holder asserts and is determined to be entitled to priority under section 507(a)(7) of the Bankruptcy Code.

67.    "***Professional***" means an Entity retained pursuant to a Bankruptcy Court order in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code.

68.    "***Professional Fee Claim***" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been previously paid.

69.    "***Professional Fee Escrow Account***" means an interest-bearing account funded by the Debtor with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

70.    "***Professional Fee Escrow Amount***" means the total amount of Professional Fee Claims estimated pursuant to Article II.B.3 of the Plan.

71.    "***Protective Order***" means the *Stipulated Confidentiality Agreement and Protective Order* [Docket No. 159].

72.    "***Proof of Claim***" means a written proof of claim Filed against the Debtor in the Chapter 11 Case by the applicable Bar Date.

73.    "***PQPR***" means PQPR Holdings Limited LLC.

74.     "***Released Parties***" means, collectively, and in each case, solely in its capacity as such:  (a) the Sandy Hook Families; (b) the immediate family members of the Sandy Hook Families; (c) the UCC; (d) with respect to each of the foregoing (a)-(c), such Entities' respective current and former Affiliates, and such Entities' and their current and former Affiliates' current and former successors, assigns, employees, agents, financial advisors, and attorneys, including (i) counsel to the Sandy Hook Families, (ii) counsel to the UCC, and (iii) advisors to the UCC, including accountants, representatives, and other Professionals, each strictly in their capacity as such; (e) members of Jones's family that are legally minors as of the Effective Date; and (f) any Insider or Affiliate of Jones that has made, or has caused to be made, a Release Settlement Payment.

75.     "***Releasing Parties***" means (a) Jones and his Estate; (b) the UCC; (c) the Sandy Hook Families; (d) any Insider or Affiliate of Jones that has made, or has caused to be made, a Release Settlement Payment; and (e) all holders of Claims, Interests, or Cause of Actions that (i) vote to accept the Plan or (ii) are Unimpaired and do not timely file an objection to the releases contained in Article X of the Plan that is not resolved before Confirmation.

76.     "***Release Settlement Payment***" means a payment to the GUC Trust of an amount of Cash acceptable to (a) prior to the Effective Date, the UCC, and (b) after the Effective Date, the GUC Trustee, as determined in accordance with the GUC Trust Agreement, on account of Trust Cause of Action against any Insider or Affiliate of Jones.

77.     "***Sandy Hook Families***" means Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, Erica Ash (aka Erica Lafferty), Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine.

78.     "***Sandy Hook Family Claims***" means any Claim for which a Proof of Claim has been Filed in the Chapter 11 Case by any member of the Sandy Hook Families.

79.     "***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the list of Executory Contracts and Unexpired Leases that will be assumed by the Debtor pursuant to the Plan as of the Effective Date, which list shall be included in the Plan Supplement.

80.     "***Schedule of Rejected Executory Contracts and Unexpired Leases***" means the list of Executory Contracts and Unexpired Leases that will be rejected by the Debtor pursuant to the Plan as of the Effective Date, which list shall be included in the Plan Supplement.

81.     "***Schedules and Statements***" means, collectively, the Third Amended Schedules of Assets and Liabilities [Docket No. 501] and the Third Amended Statement of Financial Affairs [Docket No. 502], as may be amended and supplemented from time to time.

82.     "***Secured Claim***" means a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as

determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim; *provided that* no Claim asserted by any Insider or Affiliate of the Debtor shall be a Secured Claim.

83. "*Specific Disclosure Statement*" means the Creditors' Specific Disclosure Statement as Filed or amended, including all exhibits and schedules attached thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

84. "*Subordinated Claim*" means a Claim subject to subordination pursuant to sections 509(c) and/or 510(c) of the Bankruptcy Code, or any other provision of the Bankruptcy Code or applicable law subordinating such claim to any General Unsecured Claim.

85. "*Trust Causes of Action*" shall have the meaning ascribed to such term in Article IV.E.2 of the Plan.

86. "*UCC*" means the Official Committee of Unsecured Creditors in this Chapter 11 Case, appointed pursuant to Docket No. 42.

87. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

88. "*Unimpaired*" means, with respect to a class of Claims, a class of Claims that is not Impaired.

89. "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

B. *Rules of Interpretation*

For purposes of the Plan:

1. in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

2. any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions;

3. any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified;

4. any reference to an Entity as a holder of a Claim includes that Entity's successors and assigns;

5.      unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan;

6.      unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

7.      subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws;

8.      captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

9.      unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

10.      all references to docket numbers of documents Filed in this Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

11.      all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to this Chapter 11 Case, unless otherwise stated;

12.      all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties, or, if applicable, the GUC Trustee, that have such consent, acceptance, or approval rights, including by electronic mail;

13.      any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and

14.      the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

C.  *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.  *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

E.  *Controlling Document*

In the event of an inconsistency between the Plan and the Specific Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**

A.  *Administrative Claims.*

To the extent that Administrative Claims have not been paid in full or otherwise satisfied during this Chapter 11 Case, each holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed prior to the Effective Date, on the Effective Date or in the ordinary course of business, whichever is later; or (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter.  Any objection to an Administrative Claim must be Filed by the Priority Claims Objection Bar Date.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE PRIORITY CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTOR, THE ESTATE OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE WITHOUT THE NEED FOR ANY OBJECTION FROM THE DEBTOR OR ANY NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT OR ANY OTHER ENTITY.**

B.  *Professional Fee Claims.*

1.  **Final Professional Fee Applications and Payment of Professional Fee Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred through and including the Effective Date must be Filed no later than the Priority Claims Bar Date.  The Bankruptcy Court shall determine the Allowed Amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules.  Jones shall pay to the Professionals the amount of the Allowed Professional Fee Claims owing to such Professionals in

Cash, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of a Final Order of the Bankruptcy Court.  Any objection to a Professional Fee Claim must be Filed by the Priority Claims Objection Bar Date.

      2.      **Professional Fee Escrow Account**.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtor shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens or Claims shall encumber the Professional Fee Escrow Account or Cash held therein.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estate or the Debtor.

Distributions to holders of Professional Fee Claims shall be made in accordance with Article VI.A.1 of the Plan.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the GUC Trust without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

      3.      **Professional Fee Escrow Amount**.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtor and Estate before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtor and the UCC no later than five (5) days before the anticipated Effective Date; *provided*, *however*, *that* such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtor, in consultation with the UCC, may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be used by the Debtor to determine the amount to be funded to the Professional Fee Escrow Account.

   C.   *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**
**TREATMENT AND CLASSIFICATION OF CLAIMS**

A.  *Classification of Claims*

All Claims against the Debtor of whatever nature, whether or not scheduled, liquidated or unliquidated, absolute or contingent, or arising from the rejection or assumption of an Executory Contract and/or Unexpired Lease, whether resulting in a Claim that is Allowed or not, shall be bound by the provisions of the Plan.  The Claims are hereby classified as follows:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to vote |
| 4 | Subordinated Claims | Impaired | Not entitled to vote (deemed to reject) |

B.  *Treatment of Claims*

Holders of Claims classified in Article III.A that are Allowed shall be satisfied in the manner set forth below.

   1.   Class 1 – Secured Claims.

      a.  **Classification**.  Class 1 consists of all Secured Claims.

      b.  **Treatment**.  Each holder of a Secured Claim that is Allowed shall receive payment in full in Cash on account of such holder's Allowed Secured Claim.

      c.  **Voting**.  Class 1 is Unimpaired under the Plan.  Holders of Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

      d.  **Claimants**.   There are two Class 1 Claimants, (i) the Security Bank of Crawford, which has Filed a Proof of Claim in the amount of $80,161.04 (Claim No. 2) and (ii) Bank of America, N.A., which has Filed a Proof of Claim in the amount of $26,354.73 (Claim No. 22).

   2.   Class 2 – Other Priority Claims.

      a.  **Classification**.  Class 2 consists of all Other Priority Claims.

      b.  **Treatment**.  Each holder of an Other Priority Claim that is Allowed shall receive payment in full in Cash on account of such holder's Allowed Other Priority Claim.

13

    c. **Voting**.  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

    d. **Claimants**.  Class 2 Claimants include one holder of a Priority DSO Claim who is not Erika Jones, including the Priority DSO Claim identified at item 4.12 in the Schedules and Statements.  Class 2 Claimants shall also include any other holders of Other Priority Claims.  For the avoidance of doubt, Erika Jones is not entitled to any Priority DSO Claims or any Other Priority Claims and any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Class 4 Subordinated Claim.

3.    <u>Class 3 – General Unsecured Claims</u>.

    a. **Classification**.  Class 3 consists of all General Unsecured Claims.

    b. **Treatment**.  Each holder of a General Unsecured Claim that is Allowed shall be entitled to receive, at such holder's election, (i) the holder's *pro rata* share of the GUC Election Cash Pool, such pro rata share to be calculated based on the total amount of Allowed General Unsecured Claims held by holders that make such election, or (ii) the holder's *pro rata* share of the GUC Trust Interests, such *pro rata* share to be calculated based on the aggregate amount of Allowed General Unsecured Claims that make such election.  For the avoidance of doubt, however, any holder of a General Unsecured Claim that has waived that holder's Claim is not entitled to such *pro rata* share under this <u>Article III.B.3.b</u>.

    c. **Voting**.  Class 3 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

    d. **Claimants**.  At present, there are twenty-five Class 3 Claims, (i) twenty-one Class 3 Claims Filed by or on behalf of individuals comprising the Sandy Hook Families; (ii) one Class 3 Claim held by American Express National Bank, which has Filed a Proof of Claim in the amount of $149,678.58 (Claim No. 1); (iii) one Class 3 Claim held by Reeves Law, PLLC, which has Filed a Proof of Claim in the amount of $24,611.13 (Claim No. 5); and (iv) one Class 3 Claim held by the City of Austin, which has Filed a Proof of Claim in the amount of $86.60 (Claim No. 3).  However, additional Claims may be Allowed General Unsecured Claims if filed by the applicable Bar Date or other time period provided for by the Plan or an order of the Bankruptcy Court, and otherwise Allowed.

4.    <u>Class 4 – Subordinated Claims</u>.

    a. **Classification**.  Class 4 consists of all Subordinated Claims.

b. **Treatment**.  Holders of Subordinated Claims, regardless of whether such claims are Allowed, are not entitled to any distributions or to receive or retain any property under the Plan.

c. **Voting**.  Class 4 is Impaired under the Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

d. **Claimants**.  At present, there is one Class 4 Claimant, FSS, which has Filed a Proof of Claim in the amount of $0.00 (Claim No. 26).  However, additional Claims may be Subordinated Claims if filed by the applicable Bar Date or other time period provided for by the Plan, and otherwise Allowed.  For the avoidance of doubt, any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Subordinated Claim.

## ARTICLE IV.
## THE GUC TRUST

A. *The GUC Trust*

On or before the Effective Date, a trust shall be established for the benefit of holders of General Unsecured Claims that elect to receive GUC Trust Interests (the "*GUC Trust*").  The GUC Trust shall be governed and administered in accordance with the GUC Trust Agreement, which sets forth, *inter alia*, the powers, authority, responsibilities, and duties of the GUC Trustee.

The purpose of the GUC Trust shall be the liquidation and administration of the GUC Trust Assets and making distributions to holders of GUC Trust Interests in accordance with the terms of the Plan and the GUC Trust Agreement.

B. *The GUC Trustee*

The GUC Trust shall be administered by a trustee who shall be chosen by the Sandy Hook Families in accordance with the GUC Trust Agreement (the "*GUC Trustee*").  On or before the Effective Date, the GUC Trustee, on behalf of the Debtor, shall execute the GUC Trust Agreement and shall take all other steps necessary to establish the GUC Trust pursuant to the GUC Trust Agreement and consistent with the Plan.  For the avoidance of doubt, if, for any reason the individual or entity chosen to serve as the GUC Trustee shall need to be replaced, the Sandy Hook Families shall appoint a subsequent GUC Trustee unless otherwise provided by the GUC Trust Agreement.  The GUC Trust Agreement shall establish an oversight committee (the "*Litigation Committee*") consisting of members of the Sandy Hook Families appointed in accordance with the terms of the GUC Trust Agreement to oversee performance of the GUC Trustee's duties with respect to the GUC Trust Assets and otherwise serve the functions to be described in the Plan and the GUC Trust Agreement.

The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust Assets, subject to the authority granted to it under the Plan, the Confirmation Order, and the GUC Trust Agreement, as applicable, and shall file with the Bankruptcy Court periodic public

reports on the status of claims reconciliation and distributions, which reports may be included in the quarterly reporting required by the U.S. Trustee.  In addition, the GUC Trustee shall issue quarterly written reports and engage in update calls upon reasonable request with representatives of the Sandy Hook Families.

The GUC Trustee shall owe fiduciary duties to all holders of GUC Trust Interests consistent with the fiduciary duties a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code owes to its constituents, and the Litigation Committee must consent to any proposed material action, including any settlement in respect of any action, by the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

C.  *Assignments*

On the Effective Date, the Nondischargeable Claims will be assigned to the GUC Trust.

D.  *GUC Trust Assets*

On the Effective Date, all GUC Trust Assets will vest in the GUC Trust.  For the avoidance of doubt, the Exempt Assets will not vest in the GUC Trust.  The GUC Trust Interests shall only be transferrable in the sole discretion of the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

Under section 1141(b) of the Bankruptcy Code, the GUC Trust Assets shall be assigned, transferred, and vest in the GUC Trust upon the occurrence of the Effective Date, free and clear of all Claims, Liens, encumbrances, and interests; *provided, however*, *that* the GUC Trustee may abandon or otherwise not accept any assets that the GUC Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the GUC Trust in accordance with the terms of the GUC Trust Agreement.  Any assets that the GUC Trustee so abandons (whether before or after the Effective Date) or otherwise does not accept shall not be GUC Trust Assets.

E.  *Litigation Assets*

The following assets constitute "***Litigation Assets***" and will vest in the GUC Trust and be administered by the GUC Trustee in accordance with the terms described herein and in the GUC Trust Agreement:

1.      **Initial Litigation Funding**.  A total of $500,000 in Cash, which shall be funded by Jones's Estate to the GUC Trust for administrative expenses in connection with administering the Litigation Assets; *provided that* the source and manner of funding shall be acceptable to the GUC Trustee; *provided, further, that* a portion of the proceeds from liquidation of the Litigation Assets may be retained by the GUC Trustee in its discretion as continued funding for administration of the Litigation Assets.

2.      **Trust Causes of Action**.  All Causes of Action (a) belonging to Jones's Estate (including those belonging to the Jones Trusts), whether or not initially asserted prior to Confirmation, including, but not limited to, any estate claims or causes of action against or related to Jones, any Insider or Affiliate of Jones, and (b) the Texas State Court fraudulent conveyance action filed by Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel

Fontaine previously removed and then transferred to the Bankruptcy Court (together, such Causes of Action, the "***Trust Causes of Action***").

3.      **Release Settlement Payments**.  All Release Settlement Payments made to the GUC Trust shall immediately vest in the GUC Trust upon payment.

4.      **Books & Records**.  Jones's books and records related to prepetition transfer of Estate assets and related Causes of Action, including all documents, communications, and information of Jones, any Jones Trusts, and any entities owned or controlled by Jones, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege, or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets.  All discovery obtained by the UCC during the Chapter 11 Case shall be transferred to the GUC Trust.

5.      **Investigative Powers**.  The GUC Trust and the GUC Trustee will retain the right to conduct any discovery related to the acts, conduct, or property, or to the liabilities and financial condition of Jones, or to any matter which may affect the administration of Jones's Estate or any Trust Causes of Action, or to Jones's right to a discharge, under Bankruptcy Rule 2004, to the full extent that such powers were available prior to the Effective Date.

6.      **Audit Powers**.  The GUC Trust or the GUC Trustee may retain a professional to conduct financial audits of Jones as necessary and request information from applicable third parties in connection with the same (including Erika Jones and David Jones) to ensure the veracity of financial disclosures.

7.      **Privileges**.  All privileges in respect of the Trust Causes of Action, including the attorney-client privilege, held by Jones shall transfer to the GUC Trust.

F.  *Confidentiality*

The GUC Trustee shall be deemed a party to the Protective Order and shall be permitted to receive Discovery Material, Confidential Material, and Professionals' Eyes Only Material (each as defined in the Protective Order) in accordance with the terms thereof.

G.  *Tax Treatment of GUC Trust Under Applicable Laws*

The GUC Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and Treasury Regulations section 1.468B-1 for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes to the extent applicable.  The GUC Trustee shall be the "administrator" of the GUC Trust within the meaning of Treasury Regulations section 1.468B-2(k)(3). Notwithstanding the foregoing provisions of this Article IV.G, (a) the GUC Trust shall be implemented with the objective of maximizing tax efficiency to the holders of GUC Trust Interests and (b) to the extent that the GUC Trust is not expected to be treated as a "qualified settlement fund" under applicable law or in the event of a final determination under section 1313(a) of the Internal Revenue Code that the GUC Trust does not qualify as a "qualified settlement fund," the holders of GUC Trust Interests and the GUC Trustee intend that the GUC Trust be treated as a partnership, liquidating trust, or other tax-efficient entity for U.S. federal income tax purposes and

17

will take all actions reasonably necessary to cause the GUC Trust to be treated as such a partnership or other tax-efficient entity.

The GUC Trustee shall be responsible for filing all tax returns of the GUC Trust and the payment, out of the assets of the GUC Trust in accordance with the GUC Trust Agreement, of any taxes due by or imposed on the GUC Trust. The GUC Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the GUC Trust for all taxable periods through the dissolution thereof. Nothing in this Article IV.G shall be deemed to determine, expand, or contract the jurisdiction of the Bankruptcy Court under section 505 of the Bankruptcy Code.

H. *Transferability and Certain Securities Law Matters*

Unless the GUC Trust Agreement expressly provides otherwise, any and all GUC Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all GUC Trust Interests will not be registered pursuant to the Securities Act or any applicable state or local securities law pursuant to section 1145 of the Bankruptcy Code, and will be exempt from the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

I. *Retention of Professionals*

The GUC Trustee, upon consultation with the UCC prior to the Effective Date, may enter into employment agreements and retain professionals, including any necessary accountants, attorneys, financial advisors, or other consultants, in furtherance of the administration of the assets of the GUC Trust, without further order of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF NONDISCHARGEABLE CLAIMS

The Plan will not discharge any Nondischargeable Claim and the rights of the Sandy Hook Families, acting through the GUC Trust, to exercise all rights, remedies, and other legal entitlements, whether arising under state, federal, or foreign law, with respect to the Nondischargeable Claims are expressly preserved and nothing to the contrary in the Plan will limit, affect, or otherwise impact such rights; *provided that* no individual holder of any Sandy Hook Family Claim shall be entitled to receive more than the aggregate Allowed amount of such Holder's Sandy Hook Family Claim on account of such Claims pursuant to the Plan.

## ARTICLE VI.
## MEANS OF IMPLEMENTATION

The Plan will be implemented in accordance with the following provisions:

A. *Plan Distributions*

1. **Distributions to holders of Allowed Priority Claims**. Distributions to holders of Allowed Priority Claims will be made as follows:

a. <u>Professional Fee Claims</u>.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to the applicable Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court.  To the extent the funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed Amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied by the GUC Trustee in Cash once Allowed or as soon as reasonably practicable thereafter.

b. <u>Priority Tax Claims and Administrative Claims</u>.  Holders of Allowed Priority Tax Claims and Allowed Administrative Claims shall receive Cash, which shall be satisfied by the GUC Trustee once Allowed or as soon as reasonably practicable thereafter.

2. **Distributions to holders of Allowed Secured Claims.**  Distributions to holders of Allowed Secured Claims will be made on the Effective Date, which shall be satisfied in Cash once Allowed or as soon as reasonably practicable thereafter.

3. **Distributions to holders of Other Priority Claims.**  Holders of Allowed Other Priority Claims shall receive Cash, which shall be satisfied by the GUC Trustee once Allowed or as soon as reasonably practicable thereafter.

4. **Distributions to holders of Allowed General Unsecured Claims**.  Holders of Allowed General Unsecured Claims shall receive, at their election, either (a) satisfaction of their *pro rata* share of the General Unsecured Claim Cash Pool in full in Cash on the Effective Date, or as soon as reasonably practicable thereafter, or (b) their *pro rata* share of GUC Trust Interests in accordance with the provisions of <u>Article III</u> and <u>Article IV</u> herein.

B. *Jones Transfer Obligation*

Jones shall be fully responsible for taking all necessary actions required to vest the GUC Trust Assets in the GUC Trust (the "***Jones Transfer Obligation***").  The Jones Transfer Obligation begins on the Confirmation Date and must be completed in full no later than 30 (thirty) days after the Confirmation Date.  To the extent that Jones fails or refuses to comply with the Jones Transfer Obligation, there shall be no limitation on the rights and ability of the Sandy Hook Families, the GUC Trustee, and the UCC to petition any court of competent jurisdiction to enforce the Jones Transfer Obligation pursuant to section 1142(b) of the Bankruptcy Code, any other provision of the Bankruptcy Code, or applicable non-bankruptcy law or to seek any other appropriate remedies under the Bankruptcy Code or applicable non-bankruptcy law.

C. *Jones Full Disclosure*

No later than thirty (30) days after the Confirmation Date, Jones shall provide an affidavit (the "***Jones Full Disclosure***") containing all facts and information concerning his assets, rights, claims, interests, and/or any Causes of Action, held either directly or indirectly and including the assets set forth on the Exempt Asset Schedule, and any transfers of the Debtor's property exceeding

$5,000 as to a gift for no exchange of goods or services and $25,000 as to all other transfers in the ten (10) years prior to the Petition Date and running through the Effective Date.  Discovery of any Material Misstatement in the Jones Full Disclosure shall (a) void any discharge granted under the Plan, and (b) subject Jones to all penalties available under applicable law.

"***Material Misstatement***" means an omission by Jones or his representatives to disclose in the Jones Full Disclosure (a) an asset, right, claim, interest, or Cause of Action of the estate, held either directly or indirectly and including the assets set forth on the Exempt Asset Schedule, that reasonably could be argued to have a value of $5,000 or more; (b) any voluntary or involuntary transfer of cash or property within the ten (10) years prior to the Petition Date that reasonably could be determined to have a value of $5,000 or more that was not made in exchange for any service, product or other asset; or (c) any other voluntary or involuntary transfer of cash or property within the ten (10) years prior to the Petition Date that reasonably could be argued to have a value of $25,000 or more.  It shall not be a defense to a Material Misstatement that the subject asset(s) or transfer(s) were omitted inadvertently or based on good faith or mistaken judgment.

D. *Additional Obligations*

Jones shall cooperate in good faith with the Sandy Hook Families, the UCC, the GUC Trustee, the Jones Estate, FSS, and their respective representatives, in carrying out the terms of the Plan, including by responding timely to reasonable discovery requests in connection with actions by the GUC Trustee and cooperating in pursuing and obtaining any tax refund or royalty amounts to which Jones or the GUC Trust is entitled.

Prior to the Effective Date, Jones shall also provide reasonable notice to the UCC in advance of the formation and/or incorporation of any trust or other entity on his behalf, or from which he expects to potentially receive distributions, dividends, or other payments, or in which he owns a direct or indirect beneficial interest.

E. *Premarital Agreement*

Jones shall, in any event, cooperate with the GUC Trustee's efforts to investigate and pursue any Causes of Action arising from or related to payments made pursuant to the Premarital Agreement for the benefit of the GUC Trust.

F. *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in this Chapter 11 Case shall dissolve automatically and the members thereof shall be released and discharged from all rights and duties arising from, or related to, this Chapter 11 Case, except that the UCC will stay in existence solely for the limited purposes of (a) receiving payment for its fees and expenses, including filing and prosecuting final fee applications of UCC Professionals and (b) participating in any appeals of the Confirmation Order.  The Debtor, the Estate, and the GUC Trust shall not be responsible for paying any fees or expenses incurred by any statutory committee appointed in this Chapter 11 Case after the Effective Date.

## ARTICLE VII.
## PROCEDURES FOR DISPUTED CLAIMS

A. *Objections to Prepetition Claims*

As of the Effective Date, objections to, and requests for estimation of Claims against the Debtor may only be interposed and prosecuted by the GUC Trustee.  Such objections and requests for estimation shall be served and filed on or before the Claims Objection Bar Date.

B. *Allowance of Claims*

After the Effective Date, the GUC Trustee shall have and shall retain any rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan or Allowed by Final Order prior to the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date, including the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim.

C. *Estimation of Claims*

The GUC Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the GUC Trustee may pursue supplementary proceedings to object to the Allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *No Distributions Pending Allowance*

No payment or distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

E. *Resolution of Claims*

Except as otherwise provided herein (including the release provisions hereof) or in the GUC Trust Agreement, Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the GUC Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether

known or unknown, that the GUC Trustee may hold against any person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The GUC Trustee may pursue any retained Claims, rights, Causes of Action, suits, or proceedings, as appropriate, in accordance with the Plan and the GUC Trust Agreement.

F.  *Retained Amounts*

The GUC Trustee shall withhold and retain from distribution (a) an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (b) such lesser amount as estimated by the Bankruptcy Court, or (c) such lesser amount as agreed to between the GUC Trustee and the holders thereof. As Disputed Claims are resolved pursuant to Article VII hereof, the GUC Trustee shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such Distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the GUC Trustee in its sole discretion.

G.  *Late Filed Claims*

Except as otherwise provided herein or as agreed by the GUC Trustee, any Proof of Claim filed after the Bar Date with respect to such Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely filed by a Final Order.

H.  *Amendments to Claims*

A Claim may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the GUC Trustee, and any such new, amended, or supplemented Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent permitted by applicable law.

## ARTICLE VIII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.  *Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, and regardless of whether or not such Executory Contract or Unexpired Lease is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, unless such Executory Contract or Unexpired Lease: (a) was previously assumed or rejected by the Debtor, pursuant to a Final Order of the Bankruptcy Court; (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (c) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor

on or before the date of entry of the Confirmation Order; or (d) with the consent of the UCC, is specifically designated as a contract or lease to be assumed on the Schedule of Assumed Executory Contracts and Unexpired Leases. Each Executory Contract and Unexpired Lease assumed pursuant to this Article VIII.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by Jones in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions and/or rejections of the Executory Contracts and Unexpired Leases assumed, assumed and assigned, and/or rejected pursuant to the Plan. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

Notwithstanding anything to the contrary in the Plan, the UCC reserves the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and/or the Schedule of Rejected Executory Contracts and Unexpired Leases to add or remove any Executory Contract or Unexpired Lease at any time prior to the Effective Date. The UCC shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases and/or the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to the Executory Contracts or Unexpired Leases affected thereby.

For the avoidance of doubt, the Premarital Agreement shall be rejected under the Plan, and all Claims arising thereunder shall be treated as Subordinated Claims.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (a) the date of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (b) the effective date of such rejection; or (c) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time may be Disallowed, forever barred from assertion, and may not be enforceable against the Debtor, the Debtor's Estate, or its property.** For the avoidance of doubt, the notice of the occurrence of the Effective Date served on all parties in interest shall include provisions setting forth the deadline for filing Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan and Confirmation Order.

The UCC and the GUC Trustee reserve the right to classify any Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases as Subordinated Claims.

C.  *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan and the Confirmation Order shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree (the "***Cure Amount***").  In the event of a dispute regarding (a) the amount of any payments to cure such a default; (b) the ability of the Debtor, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment.  At least ten (10) calendar days prior to the deadline to object to Confirmation of the Plan, the UCC shall provide for notices of proposed assumption or assumption and assignment and proposed Cure Amounts to be sent to applicable counterparties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related Cure Amount must be Filed, served, and actually received by the UCC by the deadline to object to Confirmation of the Plan.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Amount.**  To the extent an Executory Contract or Unexpired Lease is deemed rejected pursuant to Article VIII.A hereof, but the subject counterparty did not receive notice of such rejection by the UCC, such counterparty shall be afforded the ability to dispute whether such assumption satisfies the requirements of Section 365(b) of the Bankruptcy Code; *provided that*, to the extent the UCC and the subject counterparty are unable to consensually resolve any such dispute or the Court determines a Cure Amount in an adverse manner to the UCC, the UCC may deem such Executory Contract or Unexpired Lease to be rejected as of the Effective Date.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, as applicable.  Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease shall be deemed to have consented to the assumption or assumption and assignment, as applicable, of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to:  (a) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (b) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or lease or a change, if any, in the ownership or control of the Debtor under such contract or lease to the extent contemplated by the Plan; (c) increase, accelerate, or otherwise alter any obligations or

liabilities of the Debtor under such Executory Contract or Unexpired Lease; or (d) create or impose a Lien upon any property or asset of the Debtor.  Each such provision shall be deemed to not apply to the assumption or assumption and assignment of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption or assumption and assignment in accordance with the terms set forth in this Article VIII.C, shall forever be barred and enjoined from objecting to the proposed assumption or assumption and assignment or to the validity of such assumption or assumption and assignment (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

## ARTICLE IX.
## RETENTION OF EXEMPT PROPERTY

All of the Exempt Assets shall be retained by Jones.

## ARTICLE X.
## RELEASES AND EXCULPATIONS

A.  *Releases*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, as applicable, from any and all claims and Causes of Action asserted by or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise   Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement executed to implement the Plan or any Claim or obligation arising under the Plan.  For the avoidance of doubt, Jones shall not be a Released Party and there shall be no release or exculpation of the Trust Causes of Action, the Nondischargeable Claims, or any other Claims or Causes of Action against Jones, non-minor members of his immediate family, or their Insiders or Affiliates, as applicable, subject to the ability of Insiders and Affiliates of Jones to become a Released Party by making a Release Settlement Payment.**

B.  *Exculpations*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Plan, the Specific Disclosure Statement, the Plan Supplement, or any contract, instrument,**

release, or other agreement or document created or entered into before or during the Chapter 11 Case in connection with the Plan, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of GUC Trust Interests pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan, shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## ARTICLE XI.
## CONDITIONS PRECEDENT TO EFFECTIVENESS

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived, *provided that* the UCC may, in its sole discretion, waive any such condition.

1.  The GUC Trust shall be established and the GUC Trust Assets vested therein;

2.  The Professional Fee Escrow Account shall have been funded;

3.  Jones shall have complied with his obligation to deliver the Jones Full Disclosure;

4.  the Bankruptcy Court shall have approved the Specific Disclosure Statement, which may be approved by the Confirmation Order; and

5.  The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance reasonably acceptable to the UCC.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters

arising out of, or related to, the Chapter 11 Case, the Plan and the Confirmation Order pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      classify, allow, or disallow Claims and direct distributions of funds under the Plan and to hear and determine any controversies pertaining thereto;

2.      hear and determine any and all applications and adversary proceedings and other matters arising out of or related to the Plan;

3.      enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, or vacated;

4.      liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

5.      adjudicate all Claims to any Lien on any property or any proceeds thereof;

6.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan;

7.      hear matters related to the GUC Trust, including, without limitation, discovery matters under Bankruptcy Rule 2004;

8.      adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection therewith;

9.      hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of the Plan, the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

10.      adjudicate, decide, or resolve matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

11.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case with respect to any person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any person or Entity's rights arising from or obligations incurred in connection with the Plan;

12.      hear and determine any disputes concerning Material Misstatements;

13.      hear and determine any disputes concerning the Jones Transfer Obligation;

14.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article XI of the Plan; and

15.     adjudicate, decide, or resolve matters brought pursuant to section 1142(b) concerning the delivery and execution of documents required to effect transfers of property necessary for consummation of transactions contemplated by the Plan, the Plan Supplement, or the GUC Trust Agreement.

## ARTICLE XIII.
## MODIFICATION OF PLAN

The UCC and the Sandy Hook Families may propose amendments or modifications of the Plan at any time prior to Confirmation, without leave of the Bankruptcy Court, so long as such amendment or modification meets the requirements of section 1127(a) of the Bankruptcy Code and does not constitute a material modification of the Plan requiring additional disclosure under section 1125 of the Bankruptcy Code.  After the Confirmation Date, the UCC and the Sandy Hook Families may, with approval of the Bankruptcy Court, and so long as it does not materially or adversely affect the interests of holders of Claims, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### A. *Immediate Binding Effect*

Upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon Jones and any and all holders of Claims (irrespective of whether their Claims are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with Jones.

### B. *Discharge*

The provisions of the Plan will bind Jones and all holders of Claims against Jones, whether or not they accept the Plan.  On the Effective Date, all holders of Claims will be precluded and enjoined from asserting any Claim against Jones, Jones's Estate, or Jones's assets or property based upon any transaction or any activity of any kind that have occurred prior to the Effective Date, during the duration of the Plan; *provided, however, that* holders of Nondischargeable Claims shall not be precluded or enjoined from asserting such Claims or from pursuing collection actions against Jones or his present or future assets or property (other than GUC Trust Assets) with respect to such Claims, to the extent allowable under non-bankruptcy law.

### C. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by the UCC with respect to the Plan or the Specific Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the UCC unless and until the Effective Date has occurred.

D. *FSS Plan*

As further described in the Specific Disclosure Statement, Confirmation of the Plan need not determine the outcome of the FSS Case nor necessarily impair FSS's ability to prosecute the FSS Plan and perform thereunder if confirmed.

E. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

F. *No Admission*

Nothing in the Plan shall be deemed to be an admission or any kind on behalf of the UCC any member of the Sandy Hook Families.

[*Remainder of page intentionally left blank*]

29

**Exhibit B[1]**

**Schedule of Assets**

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| **1. Personal Bank Accounts / Cash** | | | |
| Total Bank Accounts | $885,026[6] | - | Included |
| Cash on hand | $1,000 | - | Included |
| **Subtotal:** | **$886,026** | **-** | |

---

[1] Capitalized terms used but not otherwise defined in this **Exhibit B** shall have the meanings ascribed to such terms in the Specific Disclosure Statement.

[2] This **Exhibit B** differs from the list of assets identified in Article IV.B of the Jones Disclosure Statement, as it only includes assets that are currently available for liquidation and immediate distribution to creditors. By contrast, various claims against third parties belonging to the Debtor's Estate are included in **Exhibit C**. This **Exhibit B** does not include an anticipated IRS refund valued by the Debtor at approximately $3.89 million, interests in certain executory contracts, contingent and unliquidated claims listed by the Debtor, and a cat. If and when the Debtor obtains any value on account of the foregoing, such value should be available to Jones's creditors. This **Exhibit B** incorporates by reference all assets listed in all iterations of the Debtor's Schedules and Statements and does not purport to re-list each individual asset. Additionally, this **Exhibit B** includes various assets uncovered by the Creditor Plan Proponents as a result of the UCC's Investigation that were not listed in the Jones Disclosure Statement or, in certain instances, the Debtor's Schedules and Statements. This **Exhibit B** remains subject to amendment in all respects.

[3] Unless otherwise specified herein, the value of each asset listed in this **Exhibit B** is obtained from the following sources: (i) the Debtor's Schedules and Statements; (ii) the Debtor's monthly operating reports filed in the Chapter 11 Case; (iii) the Jones Disclosure Statement; or (iv) the Jones Liquidation Analysis. The Creditor Plan Proponents have not separately valued each item identified by the Debtor, and inclusion of the value ascribed by the Debtor in this list does not necessarily indicate the Creditor Plan Proponents' agreement with such value.

[4] The claimed exempt status of the assets included herein and the value attributable to such exempt assets are derived from the Debtor's Schedules and Statements. The Creditor Plan Proponents reserve the right to dispute the Debtor's classification of certain assets or a portion thereof as exempt.

[5] Line items marked as "Included" in this column appear in Article IV.B of the Jones Disclosure Statement and/or the Debtor's Schedules and Statements. Notably, the Jones Disclosure Statement lumps certain assets together, while the Schedules and Statements provide a more detailed breakdown. To the extent an asset does not appear in either the Jones Disclosure Statement or the Schedules and Statements, it is marked as "Not included."

[6] According to the Jones Disclosure Statement, the Debtor has $1,056,913.67 in cash and securities held in several accounts. *See* Jones Disclosure Statement, Art. IV.B. The Jones Liquidation Analysis provides the most current information regarding the amounts in the Debtor's bank accounts and includes only a line item for "Total Bank Accounts" that is not broken out by specific bank accounts. The November 2023 monthly operating report filed by the Debtor [Docket No. 528] (the "November MOR") provides detail on a bank account level but is not up to date. Therefore, this **Exhibit B** reflects the most updated total bank accounts value and Cash as provided in the Jones Liquidation Analysis. The Creditor Plan Proponents reserve the right to update this **Exhibit B**.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| **2. Real Property[7]** | | | |
| Homestead, Austin Texas - 80% owned through RXXCTTGAA Trust and 20% transferred to Erika Jones in February 2022[8] | $3,266,000 | $2,612,800[9] | Included |
| Lake House (Lake Travis) ("Back of the Moon"), Austin, Texas | $1,750,000 | - | Included |
| Rental Property – WW ("Whispering Winds"), Austin, Texas | $505,000 (of which $28,883 is secured) | - | Included |
| Ranch in Guadalupe County, Texas | $ 2,189,220 | - | Included |
| **Subtotal:** | **$7,710,220 (of which $28,883 is secured)** | **$2,612,800** | |
| **3.  Entities and Trusts[10]** | | | |
| Free Speech Systems LLC | Unknown | - | Included |
| AEJ Austin Holdings LLC, including its bank account[11] | $10,000 | - | Included |
| Jones Productions LLC | Unknown | - | Included |
| Planet Infowars LLC | Unknown | - | Included |
| Austin Shiprock Publishing LLC | Unknown | - | Included |

---

[7] To avoid disclosure of any information that may be confidential or sensitive in nature, properties in this **Exhibit B** are referred to by the names utilized by the Debtor, rather than their addresses. *See Order Granting Emergency Motion for Entry of An Order Authorizing Debtor to File Schedules and Statements Under Seal* [Docket No. 530].

[8] Records show that the Debtor owns this property through the RXXCTTGAA Trust.  In the Debtor's Schedules and Statements, the Debtor appears to claim ownership of the property directly, rather than ownership through the trust. The Debtor also claims to have transferred 20% of the property to his wife Erika Jones in February 2022.  Regardless of whether owned directly or indirectly through the trust, the property should be available for distribution to creditors if the property is not properly exempt.

[9] The Debtor claims the entire 80% portion of the Homestead that he claims to own as exempt.  As noted above, the Creditor Plan Proponents reserve the right to dispute any exemptions claimed by the Debtor.

[10] The Creditor Plan Proponents have not independently valued the entities in which the Debtor has an interest. The values are derived from the Debtor's Schedules and Statements, as well as bank statements produced in discovery in connection with the UCC's Investigation.  Where assets held by such entities have been identified, they are included herein.  Intangible assets, such as domain names, intellectual property or goodwill, if any, have not been independently valued.  The Creditor Plan Proponents cannot verify that all assets held by the entities listed herein have been identified or disclosed or verify the value ascribed by the Debtor in respect of the Debtor's interest in these entities.  As set forth in the Jones Liquidation Analysis, the Debtor has attributed significantly less value to his entities and trusts than set forth in this **Exhibit B**.  The Creditor Plan Proponents reserve all rights with respect to the value of same.

[11] AEJ Austin Holdings ("AEJ Holdings") holds a note (the "Note") and security agreement (the "Security Agreement") from the AEJ 2018 Trust.  The Debtor acknowledges the AEJ 2018 Trust has defaulted under the Note. AEJ Holdings, therefore, has a claim against the AEJ 2018 Trust for the 90% interest in PLJR Holdings LLC, which in turn owns 80% of PQPR, pledged as collateral under the Security Agreement.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| Magnolia Management LLC | Unknown | - | Included |
| Magnolia Holdings, Limited Partnership LP | Unknown | - | Included |
| RCGJ LLC, including Unit 5 Clawson Road[12] | $767,400[13] | - | Not included |
| Jones Report LLC and its intellectual property, includes IP related to prisonplanet.com and jonesreport.com | $7,302 | - | Included |
| A. Emeric Productions LLC, including its bank account[14] | $485 | | Included |
| Guadalupe County Land and Water LLC | Unknown | - | Included |
| InfoW LLC | See below note for the 2022 Litigation Settlement Trust | - | Not included |
| IWHealth LLC | See below note for the 2022 Litigation Settlement Trust | - | Not included |
| Prison Planet TV LLC | See below note for the 2022 Litigation Settlement Trust | - | Not included |
| 90% interest in PLJR Holdings LLC, including its bank account and interest in PQPR | Unknown[15] | - | Not included |
| 72% interest in PQPR Holdings Limited LLC, including its bank accounts and inventory | Unknown[16] | - | Not included |
| AEJ 2018 Trust, including its bank account and indirect interest in PQPR | Unknown[17] | - | Included |
| Missouri779384 Trust, including its bank account | $54,519 | - | Included[18] |

[12] As more fully described in the Specific Disclosure Statement, the Debtor now contends that Unit 5 does not belong to the Debtor's Estate, which the Creditor Plan Proponents dispute.  *See* Specific Disclosure Statement, Art. III.F.2.ii.f. Given the Debtor's current position respecting this property, it is included in both **Exhibit B** (as property the Creditor Plan Proponents contend can be collected directly in a liquidation) and **Exhibit C** (as property that may be subject to claims to claw such property back into the Debtor's Estate).

[13] Value derived from the Second Amended Schedules and Statements.

[14] Appears to also be referred to as Emric Productions LLC in the Debtor's Schedules and Statements.

[15] PLJR has a bank account holding $3,111, and an interest in PQPR which cannot be valued at this time, but which the Creditor Plan Proponents believe to be substantial.

[16] PQPR has not provided the information necessary to ascribe a value, but the Creditor Plan Proponents believe it to be substantial.

[17] AEJ 2018 Trust has a bank account holding $10,002, and an interest in PQPR which cannot be valued at this time, but which the Creditor Plan Proponents believe to be substantial.

[18] This trust appears to be omitted from the Jones Disclosure Statement, but has been previously included in the Debtor's Schedules and Statements.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| RXXCTTGAA Trust, including its bank account[19] | $14,000 | - | Included[20] |
| 2022 Litigation Settlement Trust – includes InfoW LLC (holds intellectual property, including copyright and domains related to InfoWars.com), Prison Planet TV LLC (holds copyright and domains related to prisonplanet.tv) and IWHealth LLC[21] | $66,935 | - | Included[22] |
| Recharge Dynasty Trust | Unknown | - | Included |
| Alexander E. Jones Descendant and Beneficiary Trust | $1,632,400[23] | | Not included |
| Greenleaf Trust | $127,094[24] | | Not included |
| **Subtotal:** | **>$2,693,248[25]** | **-** | |
| **4. Personal Property[26]** | | | |
| 54 firearms | $73,744 | $10,211 | Included[27] |
| 19 watches and 1 pair of cufflinks | $54,622 | $12,500 | Included |

---

[19] This trust also holds the Homestead property.

[20] This trust appears to be omitted from the Jones Disclosure Statement, but has been previously included in the Debtor's Schedules and Statements. The Debtor has not disclosed the bank account or the ownership of the Homestead property.

[21] While ownership of certain domains has now been disclaimed by the Debtor, insufficient evidence has been provided as to the ownership of such assets.

[22] This trust appears to be omitted from the Jones Disclosure Statement, but has been previously included in the Debtor's Schedules and Statements.

[23] Although the Debtor contends that this trust owns three condos, which the Creditor Plan Proponents dispute, this total does not include Unit 5, which is included in the total for RCGJ LLC. The Debtor disputes that these assets are available to creditors.

[24] The Debtor disputes that these assets are available to creditors.

[25] This subtotal includes amounts from footnotes 15 and 17.

[26] Per the Jones Disclosure Statement, the combined value of the Debtor's three motor vehicles, other personal items such as electronics, sports equipment, and clothing, 49 firearms, and watches or other jewelry totals $171,636. *See* Jones Disclosure Statement, Art. IV.B. By contrast, the identified value of these items based on the Debtor's November MOR and the Third Amended Schedules and Statements is approximately $290,000. The Debtor has offered no explanation for the disparity. As such, this **Exhibit B** uses the greater value of the aforementioned items as set forth in the Third Amended Schedules and Statements and the November MOR. This **Exhibit B** also includes items that the Debtor omitted as noted. On November 11, 2023, the Debtor filed a motion [Docket No. 485] to sell certain personal property listed in this category in accordance with procedures agreed to by the Creditor Plan Proponents.

[27] Although the Debtor's most recent Schedules and Statements listed ownership of 51 firearms, the Debtor has subsequently confirmed ownership of 54 firearms, with a total value of $73,744, of which 52 are non-exempt property and 2 are claimed as exempt property.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| 4 Rolex watches – "black and blue stainless, all black stainless . . .gold blue face, [and] military style milgauss"[28] | $50,000 – $90,000[29] | - | Not included |
| 44 U.S. Silver Coins | $1,680 | - | Included |
| Furniture, fixtures, rugs, artwork and grill located in the Debtor's primary residence | $11,955 | $11,955 | Included |
| Lake House (furniture, fixtures, household goods, recreational equipment - see attachment) | $21,145 | | Included |
| Furniture, fixtures, rugs, artwork and other personal property located in real property other than the Debtor's primary residence or the Lakehouse | Unknown[30] | - | Not included |
| Electronics (television and monitor) | $660 | $660 | Included |
| Treadmill and 3 electric bikes | $2,385 | $2,385 | Included |
| Sunglasses and prescription glasses | $845 | $845 | Included |
| Clothing | $300 | $300 | Included |
| Contents of several storage facilities | Unknown | - | Included |
| Cryoniq cryogenic chamber | $4,000 | - | Included |
| A fossil, a polished stone, and two stone lamps | $23,690 | - | Not included |
| Subtotal: | $246,470-286,470[31] | $38,856 | |
| **5. Vehicles and Boats** | | | |
| 2017 Ford Expedition | $21,463 | - | Included |
| 2020 Dodge Charger | $70,618 | $70,618[32] | Included |
| 2016 Regal Boat 28 Express | $67,015 | - | Included |
| 2015 Regal Boat 24 Fasdeck & 2015 Magnum Trailer | $47,285 | - | Included |

---

[28] These watches were previously listed as property of the Debtor in December 2017, but have not been located in this Chapter 11 Case.  No explanation has been provided as to where the watches are presently located, or whether they were sold or gifted.

[29] The document identifying these watches as the Debtor's property does not describe the precise model or year of the watches, making independent valuation difficult. The approximate value set forth in this **Exhibit B** is based on similarly named Rolex watches made prior to 2016.  The value is derived from a variety of online luxury watch valuators, which estimated the watches at approximately $70,000. The provided range is plus/minus $20,000 of that value.

[30] The Debtor has furniture, fixtures, and goods in properties other than the primary residence and the Lakehouse, including property the Debtor purchased in an apartment and in a trailer on David Jones's property.

[31] The Jones Liquidation Analysis lists the Debtor's personal property as worth $171,536.

[32] This asset was not claimed as exempt by the Debtor in his Schedules and Statements.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| 2017 Audi A8[33] | $25,000[34] | - | Not included |
| 2006 Acura MDX[35] | $5,000[36] | - | Not included |
| **Subtotal:** | **$206,381** | **-** | |
| **6.  Other[37]** | | | |
| Inventory - Platinum | $307,081 | - | Not included |
| Inventory from Hi-Tech Pharmaceuticals | $760,854[38] | - | Included |
| GiveSendGo-Legal | $10,461 | - | Included |
| Prepayment-Legal Account | $50,000 | - | Included |
| Certain Unclaimed Property | $6,396[39] | - | Included |
| Rental Property Escrow | $6,245 | - | Included |
| Petty Cash for Childcare | $120 | | Not included |
| Prepaid Insurance | $1,859 | | Not included |
| Cryptocurrency[40] | $100,000 | - | Not included |
| Unspecified Accounts Receivable | $118,139 | | Not included |
| Receivable from Descendants Trust | $30,832[41] | | Not included |

---

[33] Public records indicate that this motor vehicle is owned by Alex Jones and Erika Jones.  As noted in the Specific Disclosure Statement, the Debtor has stated that the car was gifted to his wife, notwithstanding the ownership set forth in public records.  Even if the car was gifted, there are claims to recover the car for the benefit of the Estate.  Given the Debtor's current position respecting this property, it is included in both **Exhibit B** (as property the Creditor Plan Proponents contend can be collected directly in a liquidation) and **Exhibit C** (as property that may be subject to turnover and avoidance claims).

[34] Value was derived from KBB.com as of January 2, 2024.

[35] Public records indicate that this motor vehicle is owned by Alex Jones and Kelly Nichols.

[36] Value was derived from KBB.com as of January 2, 2024.

[37] Unless otherwise noted herein, the estimated values listed in this section are based on the values provided for such assets in the Jones Liquidation Analysis.

[38] This inventory is not included in the Jones Liquidation Analysis but was listed in the Third Amended Schedules and Statements.

[39]This asset is not included in the Jones Liquidation Analysis but was listed in the Third Amended Schedules and Statements.

[40] The Creditor Plan Proponents are in the process of identifying cryptocurrency owned but not disclosed by the Debtor.  To date, the Creditor Plan Proponents have confirmed that the Debtor owns approximately $100,000 in cryptocurrency that was held in various donation sites for the benefit of the Debtor but not disclosed.  The UCC's Investigation in respect of other cryptocurrency remains ongoing.

[41] Value derived from the November MOR.  The basis for the receivable identified by the Debtor is not specified.  In addition to the receivable identified by the Debtor in the November MOR, the Creditor Plan Proponents have identified significant claims against the Descendants Trust, as set forth in the Disclosure Statement and **Exhibit C**.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| Receivable from Erika Jones | $8,363[42] | | Not included |
| Undeposited Funds – Sale of Dodge Challenger | $72,000 | | Not included |
| Undeposited Funds - IRS checks held/not deposited | $514,358 | | Not included |
| Contingent receivable - Yougevity | $186,577 | | Not included |
| **Subtotal:** | **$1,406,035** | **-** | |
| **All Assets Total:** | **$13,148,380 - $13,188,380 (of which $28,883 is secured)** | **$2,722,274** | |

---

[42] Value derived from the November MOR.   The basis for the receivable identified by the Debtor is not specified.  In addition to the receivable identified by the Debtor in the November MOR, the Creditor Plan Proponents have identified significant claims against the Descendants Trust, as set forth in the Disclosure Statement and **Exhibit C**.

**Exhibit C[1]**

**Schedule of Claims and Causes of Action**

| Description of Claim[2] | Claim Amount[3] |
|---|---|
| **1. Claims against Erika Jones** | |
| Claims to avoid purported obligations under Section 14 of the Premarital Agreement under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | Monthly payments and other obligations |
| Claims to avoid and recover cash payments made within 4 years before the Petition Date as fraudulent transfers under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $1,464,193[4] |
| Claims to avoid and recover cash payments within 1 year before the Petition Date as preferences under 11 U.S.C. § 547. | $833,943[5] |
| Claims to recover Range Rover as a fraudulent transfer under 11 U.S.C. §§ 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $86,500[6] |
| Claims to recover Audi A8 as a fraudulent transfer under 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.*[7] | $91,500[8] |
| **Total (Transfers)** | **>$1,642,193** |

---

[1] Capitalized terms used but not otherwise defined in this **Exhibit C** shall have the meanings ascribed to such terms in the Specific Disclosure Statement.

[2] Additional information concerning the claims listed in this **Exhibit C** is set forth in Article III.F.2.ii of the Specific Disclosure Statement.

[3] The amounts listed in this **Exhibit C** represents the amount of any claim before the addition of prejudgment interest. The claim amount also has not been adjusted for cost of litigation, cost of collection, or litigation risk. The schedule focuses on transfers made within four years prior to the Petition Date, although claims exist to recover transfers made prior to that time.

[4] The Debtor prepaid one year's worth of payments to Erika Jones prior to the Petition Date, which prepayments purport to cover amounts allegedly due to Erika Jones under the Premarital Agreement through December 2023. If the Debtor begins to make new payments to Erika Jones in January 2024 and thereafter, the Estate will hold claims to recover those amounts as well. The Debtor did not purport to identify four years' worth of transfers in the Debtor's Schedules and Statements.

[5] Each of these preferential transfers is also included in the fraudulent transfer claims set forth in the prior row. These transfers are counted only once, however, in the total claims against Erika Jones.

[6] The value of the Range Rover included in this **Exhibit C** is as of the time of the transfer. The Debtor did not disclose this transfer in his Schedules and Statements.

[7] The Debtor owns the Audi A8 vehicle with Erika Jones. This vehicle is thus property of the Estate and is included on **Exhibit B** as an asset available in liquidation. The Debtor, however, has failed to list it among his assets and has suggested that the car was previously gifted to Erika Jones. As such, the Estate also has claims to turnover the property and claims to avoid any purported transfer and recover the value of the vehicle at the time of the purported transfer. Accordingly, this vehicle is included in this **Exhibit C**, as well as **Exhibit B**.

[8] This vehicle was valued at $91,500 at the time it was purchased. Thus, to the extent that the Debtor contends that it was transferred to Erika Jones at that time, the Estate holds claims to avoid the transfer and recover the value of the vehicle at the time of the purported transfer. In addition, as noted, the Creditor Plan Proponents contend that the vehicle (which is currently valued at $25,000) belongs to Jones and is part of the Estate. .

| Description of Claim[2] | Claim Amount[3] |
|---|---|
| **2. Claims against David Jones** | |
| Claims to avoid and recover transfer of ranch as a fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $249,870[9] |
| Claims to avoid and recover cash payments as preferential and fraudulent transfers under 11 U.S.C. §§ 544, 547, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $553,388[10] |
| Claims to avoid and recover transfers of Ford F-150 Raptor, Dodge Challenger Hellcat and Toyota 4Runner as fraudulent transfers under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $105,000[11] |
| Miscellaneous torts, breaches of trust, breaches of contract claims, or other claims | Unknown |
| **Total** | **$908,258** |
| **3. Claims against Jonathon Owen Shroyer** | |
| Claims to recover Dodge Charger Hellcat as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $31,000[12] |
| **Total** | **$31,000** |
| **4. Claims against Rex Jones** | |
| Claims to recover Toyota Tacoma as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $38,000[13] |

[9] This value is derived from the 2023 Blanco County Assessor record for the property. The Debtor disclosed the transfer, but provided an earlier valuation for this property in his Schedules and Statements.

[10] In the four years prior to the Petition Date, the Debtor transferred $553,388 in cash payments to David Jones. Almost all of the transfers were made within one year prior to the Petition Date. David Jones has indicated that these payments were likely made as reimbursements for various expenses he incurred on the Debtor's behalf, but has produced documents showing that only a portion of those transfers ($173,148) were actually made to reimburse David Jones for such expenses. For the payments made purportedly to reimburse David Jones for expenses he incurred on the Debtor's behalf within one year prior to the Petition Date, the Estate holds claims to recover the transfers as preferences. For any payment that was not made as a reimbursement or otherwise for value, the Estate holds claims to recover such transfers as a fraudulent transfer. The Debtor disclosed the majority of these transfers in his Schedules and Statements (but not all), and also included an additional transfer of $500,000 that was transferred and immediately returned to Alex Jones which is not included in this **Exhibit C**.

[11] The value for the Ford F-150 Raptor is the estimated value as the time of the transfer in October 2022, derived from Caredge.com. The value for the Dodge Challenger Hellcat is derived from the Debtor's First Amended Schedules and Statements [Docket No. 234]. The value for the Dodge Challenger Hellcat was likely slightly higher at the time of the transfer in October 2022. The value for the Toyota 4Runner is the estimated value as the time of the transfer in October 2022, derived from Cargurus.com. The Debtor disclosed that three cars were transferred to David Jones in his Third Amended Schedules and Statements, but appears to have made a mistake about two of the cars. The Debtor disclosed that he transferred a 2015 Challenger Hellcat, 2013 Ford Raptor, and 2019 Ford Raptor to David Jones, when in fact the UCC Investigation shows that the Debtor transferred a 2015 Challenger Hellcat, a 2012 Ford Raptor, and a 2019 Toyota 4Runner to his father in October 2022.

[12] This value is the estimated value as the time of the transfer in October 2021, derived from vehiclehistory.com. The Debtor did not disclose this transfer in his Schedules and Statements.

[13] Value for a Toyota Tacoma is the estimated value as the time of the transfer in January 2022 derived from Cargurus.com. The Debtor did not disclose this transfer in his Schedules and Statements.

| Description of Claim[2] | Claim Amount[3] |
|---|---|
| Total | **$38,000** |
| **5.  Claims against Patrick Reilly** | |
| Claims to recover Glastron boat as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, et seq. | $23,500[14] |
| Claims to recover Tudor watch as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, et seq. | $2,000[15] |
| Total | **$25,500** |
| **6.  Claims against Alexander E. Jones Descendent and Beneficiary Trust, David Jones, Trustee** | |
| Claims to recover Unit 6 Clawson Road as fraudulent transfer under 11 U.S.C. §§ 544; Tex. Bus. & Com. Ann. § 24.001, et seq. | $828,300[16] |
| Turnover claim to recover Unit 5 Clawson Road under 11 U.S.C. §§ 544 | $767,400[17] |
| Total | **$1,595,700** |

---

[14] This value is derived from the Second Amended Schedules and Statements, which sourced the value from Boatcrazy.com.

[15] This value is derived from information obtained by the UCC as part of the UCC's Investigation.  The Debtor did not disclose this transfer in his Schedules and Statements.

[16] This value is derived from the Second Amended Schedules and Statements.

[17] This value is derived from the Second Amended Schedules and Statements.

**Exhibit D**

**Global Notes to Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR THE CREDITORS' PLAN[1]

### I.   Best Interests Test

Under the "best interests" of creditors test set forth by section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a chapter 11 plan unless each holder of a claim either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor's estate were liquidated under chapter 7 of the Bankruptcy Code on the effective date.  *See* 11 U.S.C. § 1129(a)(7).  Accordingly, to demonstrate that the Creditors' Plan satisfies the "best interests" of creditors test, the Creditor Plan Proponents have prepared the following hypothetical liquidation analysis (the "Creditors' Plan Liquidation Analysis") based upon certain assumptions discussed herein.

The Creditor Plan Proponents submit that under the Creditors' Plan, each class of creditors will receive at least as much as such class would receive in a chapter 7 liquidation of the Debtor's assets because of, among other reasons, the fees payable to a chapter 7 trustee and professionals and the fire sale nature of asset sales in chapter 7.

### II.   Approach and Purpose of the Liquidation Analysis

Determining the costs of, and proceeds from, the hypothetical liquidation of the Debtor's assets in a chapter 7 case is an uncertain process involving significant estimates and assumptions that are inherently subject to uncertainties and contingencies.  The Creditors' Plan Liquidation Analysis is based in large part on the liquidation analysis prepared by the Debtor [Docket No. 555] (the "Jones Liquidation Analysis"),[2] along with the Creditor Plan Proponents' and their advisors' best judgment of how numerous issues in the liquidation process would be resolved.  This approach is particularly appropriate here given the nature of this Chapter 11 Case and the parties' relative knowledge regarding the Debtor's Estate.  Inevitably, certain assumptions in the Creditors' Plan Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  In addition, the Creditor Plan Proponents cannot judge with any degree of certainty the recovery that may result from litigation claims in a chapter 7 liquidation.  The Creditors' Plan Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtor's non-exempt assets were liquidated in accordance with chapter 7 of the Bankruptcy Code for purposes of comparing those recoveries to recoveries contemplated by the Creditors' Plan, as required by section 1129(a)(7) of the Bankruptcy Code.  The Creditors' Plan Liquidation Analysis is not intended, and should not be used, for any other purpose.

**NEITHER THE CREDITOR PLAN PROPONENTS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS IN A CHAPTER 7 LIQUIDATION OF THE DEBTOR'S ASSETS WOULD OR WOULD NOT APPROXIMATE THE**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Creditors' Plan or the Specific Disclosure Statement, to which the Creditors' Plan Liquidation Analysis is attached to as **Exhibit D**, as applicable.

[2] The Jones Liquidation Analysis, as filed, contemplates two different scenarios—one that takes into account the liquidation value of FSS and one that does not.  As discussed in further detail below, the Creditors' Plan Liquidation Analysis relies upon the scenario that does not account for the value attributable to FSS.  The outcome of the FSS Case will determine how such value is distributed to creditors.

ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE CREDITORS' PLAN LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

All of the limitations and risk factors set forth in the Specific Disclosure Statement are applicable to the Creditors' Plan Liquidation Analysis and are incorporated by reference herein. In particular, the underlying financial information of the Debtor in the Creditors' Plan Liquidation Analysis was not compiled or examined by any independent accountants in accordance with the standards promulgated by the American Institute of Certified Public Accountants. Nor were independent appraisals conducted, other than any appraisals procured by the Debtor, in preparing the Creditors' Plan Liquidation Analysis.

The Creditors' Plan Liquidation Analysis reflects the estimated Cash proceeds, net of liquidation-related costs, that would be available if the Debtor's non-exempt assets were liquidated under chapter 7 of the Bankruptcy Code and the proceeds were distributed in accordance with sections 726 and 1129(b) of the Bankruptcy Code.

The Creditors' Plan Liquidation Analysis includes estimates for costs and Claims that could be asserted and Allowed in a hypothetical chapter 7 liquidation, including trustee and professional fees required to facilitate the liquidation that otherwise would not exist in chapter 11. The Creditor Plan Proponents' estimate of Allowed Claims set forth in the Creditors' Plan Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Creditors' Plan.

NOTHING CONTAINED IN THE CREDITORS' PLAN LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE CREDITOR PLAN PROPONENTS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE CREDITORS' PLAN LIQUIDATION ANALYSIS.

### III. Global Assumptions

The Creditors' Plan Liquidation Analysis should be read in conjunction with the following global assumptions:

### 1. Assets Identified and Bases of Asset Values

The Creditors' Plan Liquidation Analysis is based on the liquidation of the Debtor's estimated Cash balance and non-exempt assets net of the costs to execute the administration of the liquidation. The Creditors' Plan Liquidation Analysis reflects the liquidation of the Debtor's non-exempt assets and the distribution of available proceeds to holders of Allowed Claims. The Creditors' Plan Liquidation Analysis includes the assets listed in the Jones Liquidation Analysis as well as other assets identified in the UCC's Investigation.

*Asset values set forth in the Jones Liquidation Analysis are incorporated in the Creditors' Plan Liquidation Analysis unless otherwise noted. If an asset or asset value was not listed in the Jones Liquidation Analysis and the Creditor Plan Proponents believe it should be available to creditors in any liquidation of the Debtor's Estate, the Creditor Plan Proponents endeavored to use the best source of value for such asset. In addition, certain asset values provided in the Creditors' Plan Liquidation Analysis may conflict with asset values provided in the Jones Liquidation Analysis and/or other pleadings in this Chapter 11 Case, including, but not limited to, the Debtor's recent monthly operating reports and the Debtor's Schedules and Statements. The Creditor Plan Proponents reserve all rights to dispute any values provided.*

### 2. Asset Value Discounts

The Creditors' Plan Liquidation Analysis adopts the estimated percentage recoveries for each asset listed in the Jones Liquidation Analysis.  For assets that were not listed in the Jones Liquidation Analysis, the Creditor Plan Proponents and their advisors used the best estimate of recovery percentages based on nature and type of asset.

### 3. Appointment of a Chapter 7 Trustee

The Creditors' Plan Liquidation Analysis assumes that the Bankruptcy Court would appoint one chapter 7 trustee (the "Chapter 7 Trustee") to oversee the liquidation of the Debtor's non-exempt assets. The Chapter 7 Trustee would be compensated in accordance with section 326 of the Bankruptcy Code.  The Creditors' Plan Liquidation Analysis adopts the estimate of Chapter 7 Trustee's fees included in the Jones Liquidation Analysis, which estimates the Chapter 7 Trustee's fees ranging from 3.26-3.31% of gross liquidation proceeds.  The Creditor Plan Proponents reserve the right to challenge this assumption at the appropriate time.

### 4. Chapter 7 Trustee Professionals

The Creditors' Plan Liquidation Analysis assumes that the Chapter 7 Trustee would retain its own professionals to assist in the liquidation of the Debtor's non-exempt assets and litigation of Claims and Causes of Action.  It is assumed that the Chapter 7 Trustee's primary legal, accounting, consulting, and other support, if any, would be provided by new professionals.  Because the Chapter 7 Trustee and, to the extent applicable, the Chapter 7 Trustee's professionals, must familiarize themselves with the Debtor's Estate, it is anticipated that the Debtor's Estate would incur significant incremental professionals' fees in the context of a chapter 7 liquidation, though such professionals may be retained on a contingency basis. The Creditors' Plan Liquidation Analysis adopts the estimate of Chapter 7 Trustee's professionals fees included in the Jones Liquidation Analysis, which estimates the Chapter 7 Trustee's professionals fees at 80% of the total Chapter 7 Trustee's fees.  The Creditor Plan Proponents reserve the right to challenge these assumptions at the appropriate time.

### 5. Start-Up Time

Given the state of the Debtor's books and records and the nature of the underlying assets and Claims in the Chapter 11 Case, it is anticipated that the Chapter 7 Trustee and any newly retained professionals may require up to three months to familiarize themselves with the Debtor's Estate, the assets, the Claims, and related matters before they begin pursuing remaining assets, if any, or litigating Claims.

### 6. Chapter 7 Process

It is assumed that the Chapter 7 Trustee would conduct the liquidation of the Debtor's non-exempt assets expeditiously, during which time all of the Debtor's non-exempt assets would be sold or monetized, and the Cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code.  Under section 704 of the Bankruptcy Code, a chapter 7 trustee must, among other duties, collect and convert property of the Estate as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed or fire sale recoveries.

### 7. Litigation Claims

The Debtor's total assets available for distribution consist of expected Cash proceeds from the sale of all of his non-exempt assets, plus unrealized value on account of future litigation claims (the "Litigation Claims").  The value of the Litigation Claims is based on the values provided in the Schedule of Claims and Causes of Action attached as **Exhibit C** to the Specific Disclosure Statement.  Recoveries on account of the Litigation Claims are estimated at 75% in a chapter 11 liquidation whereas recoveries in a chapter 7 liquidation are estimated at 50%.  The Creditors' Plan Liquidation Analysis assumes that gross recoveries from Litigation Claims are 25% less in a chapter 7 scenario as compared to the chapter 11 scenario because the Creditor Plan Proponents assume that there is a higher likelihood of settlement and pressure to expedite recoveries in a chapter 7 scenario, in part to provide funding for on-going administration of the chapter 7 estate and to fund further litigation.  The amount assumed for such gross recoveries and distributions in the Creditors' Plan Liquidation Analysis is for illustrative purposes only.  Realized recoveries may be materially higher or lower in amount.  Professional fees relating to recovery of the proceeds of the Litigation Claims are netted out of the value of such proceeds in the Creditors' Plan Liquidation Analysis based upon the assumption that such fees will be invoiced on a rolling basis as such Litigation Claims are prosecuted.

### 8. Value Attributable to Debtor's Ownership of FSS

As stated in the Specific Disclosure Statement, Confirmation of the Creditors' Plan does not by its terms determine the outcome of the FSS Case or impair FSS's ability to prosecute the FSS Plan and perform thereunder if confirmed.  Notwithstanding the foregoing, the Debtor recently stated that absent confirmation of a plan in this Chapter 11 Case that he supports, the Debtor is unwilling to continue working for FSS.[3]  If the Debtor, in fact, refuses to continue to work for FSS if the Creditors' Plan is confirmed or this Chapter 11 Case results in any other outcome that not to his liking, FSS—which indisputably belongs to creditors as the Debtor's most significant asset—inevitably will be forced to liquidate quickly.  If Jones does not refuse to work, however, the Creditor Plan Proponents presume that FSS will prosecute the FSS Plan or another reorganization that contemplates a creditor payment plan, then after that plan runs its full term, the future of FSS presumably after the expiration of the payment plan will be determined by the Debtor's creditors, who will be the residual owners of the entity after such payments are complete.  In light of these unique circumstances and the uncertainty regarding the future of FSS at this time, the Creditor Plan Proponents have determined to exclude the value of FSS from the Creditors' Plan Liquidation Analysis. Nor do the Creditor Plan Proponents take any position in respect of the value attributed to FSS in the Jones Liquidation Analysis and reserve all rights with respect to the same.

### IV. Conclusion

The Creditor Plan Proponents have determined that Confirmation of the Creditors' Plan will provide General Unsecured Claims with a recovery that is not less than what they would otherwise receive in connection with a hypothetical liquidation of the Debtor's Estate under chapter 7 of the Bankruptcy Code.

---

[3] *Debtor's Amended Objection to the Official Unsecured Creditor Committee's Disclosure Statement* [Docket No. 551].

**In re Alexander E. Jones Case No. 22-33553**
**Exhibit D: Creditors' Plan Liquidation Analysis**

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Total Bank Accounts (1)* | $ 885,026 | 100% | 100% | $ 885,026 | $ 885,026 | |
| Total Accounts Receivable (2) | $ 118,139 | 100% | 100% | $ 118,139 | $ 118,139 | |
| **Other Current Assets** | | | | | | |
| Cryptocurrency (3) | $ 100,000 | 95% | 95% | $ 95,000 | $ 95,000 | (a) |
| Cash on Hand (1) | $ 1,000 | 100% | 100% | $ 1,000 | $ 1,000 | |
| Federal Income Tax Receivable (4) | $ 3,370,713 | 100% | 100% | $ 3,370,713 | $ 3,370,713 | |
| GiveSendGo-Legal (1) | $ 10,461 | 100% | 100% | $ 10,461 | $ 10,461 | |
| Inventory Platinum (5) | $ 307,081 | 35% | 70% | $ 107,478 | $ 214,957 | (b) (j) |
| Inventory from Hi-Tech Pharmaceuticals | $ 760,854 | 35% | 70% | $ 266,299 | $ 532,598 | (c) (j) |
| Petty Cash for Child Care (1) | $ 120 | 100% | 100% | $ 120 | $ 120 | |
| Prepayment -Legal Account (6) | $ 50,000 | 100% | 100% | $ 50,000 | $ 50,000 | |
| Rental Property Escrow (7) | $ 6,245 | 0% | 0% | $ - | $ - | |
| Undeposited Funds - Car sale (10) | $ 72,000 | 100% | 100% | $ 72,000 | $ 72,000 | |
| Undeposited Funds - IRS checks held/not deposited (4) | $ 514,358 | 100% | 100% | $ 514,358 | $ 514,358 | |
| **Total Other Current Assets** | $ 5,192,832 | | | $ 4,487,429 | $ 4,861,207 | |
| **Total Current Assets** | $ 6,195,997 | | | $ 5,490,594 | $ 5,864,372 | |
| **Fixed Assets** | | | | | | |
| Homestead | $ - | 0% | 0% | $ - | $ - | |
| Lakehouse (8) | $ 1,750,000 | 63% | 95% | $ 1,102,500 | $ 1,662,500 | (k) |
| Ranch Property (8) | $ 2,189,220 | 92% | 95% | $ 2,014,082 | $ 2,079,759 | (k) |
| Rental Property (9) | $ 505,000 | 92% | 95% | $ 464,600 | $ 479,750 | (k) |
| **Vehicles and Marine Assets** | | | | | | |
| Dodge Charger | $ 70,618 | 79% | 95% | $ 55,788 | $ 67,087 | (l) |
| Ford Expedition (11) | $ 21,463 | 79% | 95% | $ 16,956 | $ 20,390 | (l) |
| 2017 Audi A8 | $ 25,000 | 79% | 95% | $ 19,750 | $ 23,750 | (d) (l) |
| 2006 Acura MDX | $ 5,000 | 79% | 95% | $ 3,950 | $ 4,750 | (e) (l) |
| Marine Assets (12) | $ 114,300 | 87% | 95% | $ 99,441 | $ 108,585 | (l) |
| **Total Vehicles and Marine Assets** | $ 236,381 | | | $ 195,885 | $ 224,562 | |
| **Total Fixed Assets** | $ 4,680,601 | | | $ 3,777,067 | $ 4,446,571 | |
| **Other Assets** | | | | | | |
| Interests In Trust (13) | $ 1,925,848 | 49% | 80% | $ 943,666 | $ 1,540,678 | (f) (m) |
| Ownership Interests in Non Public Entities (14) | $ 784,702 | 58% | 80% | $ 455,127 | $ 627,762 | (n) (q) |
| Personal Property (15) | $ 132,480 | 70% | 95% | $ 92,736 | $ 125,856 | (o) |
| Receivable from Descendants Trust (16) | $ 30,832 | 100% | 100% | $ 30,832 | $ 30,832 | (b) |
| Receivable from Mrs. Jones (16) | $ 8,363 | 100% | 100% | $ 8,363 | $ 8,363 | (b) |
| Certain Unclaimed Property | $ 6,396 | 50% | 80% | $ 3,198 | $ 5,117 | (c) |
| Contingent receivable - Yougevity (17) | $ 186,577 | 0% | 80% | $ - | $ 149,262 | (p) |
| **Total Other Assets** | $ 3,075,198 | | | $ 1,533,922 | $ 2,487,869 | |
| **TOTAL ASSETS** | $ 13,951,796 | | | $ 10,801,583 | $ 12,798,812 | |
| | | | | | | |
| Litigation Claims | $ 4,240,651 | 50% | 75% | $ 2,120,326 | $ 3,180,488 | (g) |
| **Total Recoveries** | $ 18,192,447 | | | $ 12,921,909 | $ 15,979,300 | |
| | | | | | | |
| **Liquidation Expenses****** | | | | | | |
| Trustee Fees (18) | | | | $ 424,485 | $ 524,920 | (h) |

In re Alexander E. Jones Case No. 22-33553
**Exhibit D: Creditors' Plan Liquidation Analysis**

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |
| Trustee Counsel (19) | | | | $ 339,588 | $ 419,936 | *(h)* |
| Liquidation Expenses | | | | | | |
| Real Estate (8,9) | | | | $ 377,759 | $ 377,759 | *(h)* |
| Personal Property (15) | | | | $ 13,910 | $ 26,496 | *(h)* |
| Contingency (20) | | | | $ 193,829 | $ 239,690 | *(h)* |
| **Total Liquidation Costs** | | | | **$ 1,349,570** | **$ 1,588,800** | |
| | | | | | | |
| **Net Proceeds** | | | | **$ 11,572,339** | **$ 14,390,500** | |
| | | | | | | |
| **Allocation of Net Proceeds** | | | | | | |
| Secured Creditors | | | | $ 114,550 | $ 114,550 | *(i)* |
| Legal and Professional Fees - Estimated | | | | $ 5,319,247 | $ 5,319,247 | *(h)* |
| **Total Secured and Administrative Claims** | | | | **$ 5,433,797** | **$ 5,433,797** | |
| | | | | | | |
| **Net Proceeds Available to Unsecured Creditors** | | | | **$ 6,138,542** | **$ 8,956,703** | |
| | | | | | | |
| General Unsecured Claims | | | | $ 1,872,210,666 | $ 1,872,210,666 | |
| **Estimated Recovery (%)** | | | | **0.33%** | **0.48%** | |

\* *Numerical notes correspond to notes contained in the Jones Liquidation Analysis [Docket No. 555] while lettered notes are explained below.*

\*\* *Certain liquidation discounts were adopted from the Jones Liquidation Analysis without verifying the accuracy of such discounts.*

\*\*\* *Unless otherwise noted, the source for the value provided herein is the Jones Liquidation Analysis.* **As described in the introduction to the Creditors' Plan Liquidation Analysis, the Creditor Plan Proponents relied on the information contained in the Jones Liquidation Analysis wherever feasible and reserve all rights to challenge the assumptions and values set forth therein. Where values contained in the Jones Liquidation Analysis differ from the values provided here, such changes are identified and explained in the notes contained herein.**

\*\*\*\* *The expense methodology and percentages are calculated based on the assumptions for such amounts included in the Jones Liquidation Analysis.*

Highlighted Items: *Asset and/or value not included in the Jones Liquidation Analysis.*

**Notes Provided by the Jones Liquidation Analysis**

1 *Bank account and cash on hand assumed to be 100% recoverable including net funds available in GiveSendGo account.*
2 *Accounts receivable are for contemporaneous services and are assumed to be 100% recoverable.*
3 *Unliquidated bitcoin reflected at no value. Estimated value $1,700 but cost to liquidate will exceed value.*
4 *Income tax receivable and undeposited funds total 3,885,071 and are assumed to be 100% collectible. The undeposited funds represent 2 refund checks received and held pending reconciliation when IRS systems are back online.*
5 *Inventory values reflected as recoverable values provided by FSS for similar products.*
6 *Prepaid legal represents retainer that will be offset against court approved legal fees.*
7 *Rental property escrow represents excess balance to be refunded to debtor and is 100% recoverable.*
8 *Lakehouse and Ranch property values based on realtor engaged to sell property estimated liquidation values under current market conditions. Fees and expenses of 8-9% are reflected in liquidation costs.*

**In re Alexander E. Jones Case No. 22-33553**
**Exhibit D: Creditors' Plan Liquidation Analysis**

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |

9 *Rental property value based on estimated ranges on Zillow and Realtor.com at 1/12/24. Fees and expenses of 8-9% are reflected in liquidation costs.*

10 *2019 Dodge Challenger sold for $72,000 on 12/29/23. Check received after close of business and deposited in January 2024.*

11 *2017 Ford expedition value based on current Autotrader range of values. Vehicle listed for sale.*

12 *Values based on projected sales prices from broker located at Capital Marine - broker located at marina boats are stored.*

13 *Interests in trusts valued at cash balance of 49% . No value of assigned for liquidation of non-cash assets.*

14 *Ownership in Non-Public entities ranges in value based on cash value of bank accounts.*

15 *Non-exempt personal property value ranges reflected at 70-100% based on Valuepro March 24, 2023 appraisal which include household goods, furniture, watches, jewelry, lake house furniture, firearms, and other non-exempt assets noted in the appraisal. Liquidation fees and expenses are estimated at 15-20%.*

16 *Other receivables for expenses paid by the estate are assumed collectible as related parties have sufficient unencumbered assets.*

17 *Contingent receivable based on discovery from Youngevity. Collectability not determined.*

18 *Trustee fees range from 3.26-3.31% of gross proceeds.*

19 *Trustee counsel estimated at 80% of trustee fees.*

20 *Contingency of 1.5% of gross proceeds for unknown costs and expenses.*


**Footnotes to the Creditors' Plan Liquidation Analysis[1]**

[1]*Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Creditors' Plan or the Specific Disclosure Statement.*

(a) ***Value Not Provided in the Jones Liquidation Analysis**. While "Bitcoin Account" is a line item in the Jones Liquidation Analysis, a corresponding value is not provided. As noted in the Schedule of Assets attached as **_Exhibit B_** to the Specific Disclosure Statement, the Creditor Plan Proponents are in the process of identifying cryptocurrency owned but not disclosed by the Debtor. To date, the Creditor Plan Proponents have confirmed that the Debtor owns approximately $100,000 in cryptocurrency that was held in various donation sites for the benefit of the Debtor but not disclosed. The UCC's Investigation in respect of other cryptocurrency remains ongoing. Due to volatility and cost to unwind both the Chapter 7 and 11 are discounted at 5%.*

(b) ***Value Inconsistent with Other Pleadings**. The value provided here is derived from the Jones Liquidation Analysis but differs from the value provided in other pleadings in this Chapter 11 Case, including, but not limited to, the November MOR and the Schedules and Statements.  The Creditor Plan Proponents reserve all rights to dispute any values provided.*

(c) ***Asset Not Provided in the Jones Liquidation Analysis**. The Debtor lists this asset and associated value in his Third Amended Schedules and Statements. Therefore, such value is included here.*

(d) ***Asset Not Provided in the Jones Liquidation Analysis.** Public records indicate that this motor vehicle is owned by Alex Jones and Erika Jones. As noted in the Specific Disclosure Statement, the Debtor has stated that the car was gifted to his wife, Erika Jones, notwithstanding the ownership set forth in public records. Even if the car was gifted, there are claims to recover the car for the benefit of the Estate. Given the Debtor's current position respecting this property, it is included in both **_Exhibit B_** to the Specific Disclosure Statement (as property the Creditor Plan Proponents contend can be collected directly in a liquidation) and **_Exhibit C_** to the Specific Disclosure Statement (as property that may be subject to turnover and avoidance claims). Therefore, such value is included here.*

(e) ***Asset Not Provided in the Jones Liquidation Analysis**. Value was derived from KBB.com as of January 2, 2024.*

In re Alexander E. Jones Case No. 22-33553
**Exhibit D: Creditors' Plan Liquidation Analysis**

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |

(f) *Value Not Provided in the Jones Liquidation Analysis . The Jones Liquidation Analysis lists a value of $131,466. However, the Creditor Plan Proponents value these trusts as worth at least $1,925,848 and additional detail regarding the value ascribed to each trust can be found in* __*Exhibit B*__ *to the Specific Disclosure Statement.   Therefore, such value is included here.*

(g) *Asset Not Provided in the Jones Liquidation Analysis . The value of the Litigation Claims is based on the values provided in the Schedule of Claims and Causes of Action attached as* __*Exhibit C*__ *to the Specific Disclosure Statement. Recoveries on account of the Litigation Claims are estimated at 75% in a Chapter 11 liquidation whereas recoveries in a Chapter 7 liquidation are estimated at 50%.*

(h) *The Creditor Plan Proponents incorporate this cost based on the Jones Liquidation Analysis but reserve all rights to challenge any expenses incurred or to be incurred, including legal and professional fees.*

(i) *Comprising filed claim of Security Bank of Texas ($80,161) and scheduled claim of Bank of America ($34,389).*

(j) *For liquidation of inventory in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage of 35% included in the Jones Liquidation Analysis and assumes a 70% recovery of value in a chapter 11 liquidation.*

(k) *For liquidation of real property in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage for each property included in the Jones Liquidation Analysis and assumes a 95% recovery of value in a chapter 11 liquidation.*

(l) *For liquidation of vehicles in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage for each vehicle included in the Jones Liquidation Analysis and assumes a 95% recovery of value in a chapter 11 liquidation.*

(m) *For liquidation of interests in trusts in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes an 80% recovery in a chapter 11 liquidation, which discount reflects incremental costs for litigation related to such trusts.*

(n) *For liquidation of the Debtor's ownership interests in non-public entities in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes an 80% recovery in chapter 11, which discount reflects incremental costs for litigation related to the ownership of such entities.*

(o) *For liquidation of personal property in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes a recovery of 95% in a chapter 11 liquidation.*

(p) *For liquidation of a contingent receivable liquidation in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes an 80% recovery in a chapter 11 liquidation, due to uncertainty regarding collections in either scenario.*

(q) *Insufficient information was provided to determine the value attributable to these entities. PQPR, in particular, has not provided the information necessary to ascribe a value, but the Creditor Plan Proponents believe it to be substantial.*



**<u>Exhibit B</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALEXANDER E. JONES, | ) | Case No. 22-33553 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**PROPOSED SPECIFIC DISCLOSURE STATEMENT**
**FOR THE CREDITORS' NON-UNIFORM INDIVIDUAL**
**CHAPTER 11 PLAN OF LIQUIDATION FOR ALEXANDER E. JONES**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr.
State Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Fax:  (214) 969-4343
E-mail:  mbrimmage@akingump.com

*-and-*

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Melanie A. Miller (admitted *pro hac vice* pending)
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Fax:  (212) 872-1002
E-mail:  dzensky@akingump.com
E-mail:  sbrauner@akingump.com
E-mail:  kporter@akingump.com
E-mail:  akordas@akingump.com
E-mail:  melanie.miller@akingump.com

***Counsel to the Official Committee of Unsecured Creditors of Alexander E. Jones***

**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  slascano@paulweiss.com
E-mail:  virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
E-mail:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

*-and-*

Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

***Co-Counsel to the Texas Plaintiffs***

Dated:  January ~~5~~22, 2024

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND AND THE UNDERLYING STATE COURT LITIGATION ........ 2
        A.      The Connecticut Litigation ........................................................................ 3
        B.      The Texas Litigation .................................................................................. 3

III.    CRITICAL EVENTS DURING THE CHAPTER 11 CASE ................................... 4
        A.      Commencement of the Chapter 11 Case .................................................... 4
        B.      Appointment of the UCC ........................................................................... 45
        C.      Lift Stay Motions Filed by the Sandy Hook Families ............................... 5
        D.      Filing of Schedules and Statements ........................................................... 67
        E.      The Nondischargeability Adversary Proceedings ..................................... 8
        F.      The UCC's Investigation ........................................................................... 10
        G.      Mediation .................................................................................................. 18
        H.      Expiration of Exclusivity .......................................................................... 18
        I.      Circumstances Leading to the Filing of the Creditors' Plan .................... 19
        J.      Debtor's Reinstatement on Social Media Platform .................................. 2122

IV.     KEY ASPECTS OF THE CREDITORS' PLAN .................................................... 22
        A.      General Basis for the Creditors' Plan ...................................................... 22
        B.      Treatment of Unclassified Claims ............................................................ 23
        C.      Classification and Treatment of Claims ................................................... 2425
        D.      Treatment of Non-DischargeableNondischargeable Claims ................... 27
        E.      The GUC Trust .......................................................................................... 27
        F.      The Debtor's Obligations and Covenants ................................................. 29
        G.      Releases and Exculpation ......................................................................... 30

V.      CREDITORS' PLAN LIQUIDATION ANALYSIS ............................................. 31

VI.     SOLICITATION AND VOTING PROCEDURES ................................................ 31
        A.      Ballots and Voting Deadline ..................................................................... 3132
        B.      Holders of Claims Entitled to Vote .......................................................... 32
        C.      Bar Dates for Filing Proofs of Claim ....................................................... 32
        D.      Tabulation of Votes ................................................................................... 3233

VII.    CONFIRMATION PROCEDURES ...................................................................... 3233
        A.      The Confirmation Hearing ........................................................................ 3233
        B.      Confirmation Standards ............................................................................ 33
        C.      Best Interests Test / Liquidation Analysis ................................................ 34
        D.      Feasibility ................................................................................................. 35
        E.      Confirmation Without Acceptance by All Impaired Classes .................... 35
        F.      Alternative Plan ........................................................................................ 36

VIII.   RISK FACTORS ................................................................................................... 36
        A.      Risks Related to the Chapter 11 Case ...................................................... 36
        B.      Risk of Variance in Financial Results ...................................................... 3738
        C.      Additional Factors to Be Considered ....................................................... 3839

IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
        THE CREDITORS' PLAN .................................................................................... 40
        A.      Tax Treatment of Holders of a General Unsecured Claim ....................... 41
        B.      Tax Treatment of the GUC Trust .............................................................. 42
        C.      Withholding on Distributions and Information Reporting ......................... 4243

## TABLE OF EXHIBITS

**Exhibit A:**    **Creditors' Plan**

**Exhibit B:**    **Schedule of Assets**

**Exhibit C:**    **Schedule of Claims and Causes of Action**

**Exhibit D:**    **Creditors' Plan Liquidation Analysis** *(forthcoming)*

**THE CREDITOR PLAN PROPONENTS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ANNEXED TO THIS SPECIFIC DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

## I.    INTRODUCTION

The Creditor Plan Proponents submit this Specific Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain holders of Claims against the Debtor in connection with solicitation of acceptances of the Creditors' Plan.  A copy of the Creditors' Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[4]

This Specific Disclosure Statement is intended to describe certain aspects of the Creditors' Plan, including the treatment of Claims, as well as certain aspects of the Debtor's financial position and other related matters.  Moreover, this Specific Disclosure Statement is intended to expand on certain insufficient disclosures contained in the Jones Disclosure Statement and correct certain inconsistencies and errors set forth therein.  For the avoidance of doubt, however, and particularly given the status of discovery and the state of the Debtor's books and records (as described herein), this Specific Disclosure Statement does not purport to correct all insufficiencies, inconsistencies, or inaccuracies in the Jones Disclosure Statement.  Moreover, this Specific Disclosure Statement does not purport to raise all concerns the Creditor Plan Proponents have identified in respect of the Jones Plan or the Jones Disclosure Statement.  The Creditor Plan Proponents will identify such concerns at the appropriate time in accordance with the confirmation schedule established by the Bankruptcy Court and reserve all rights to make any additional statements, assertions or objections in connection with the same.

On December 2, 2022, the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Sandy Hook Families are the largest creditors of the Debtor, with verdicts and judicial damages awarded thus far totaling in excess of $1.5 billion.  The six-member UCC appointed by the Office of the United States Trustee (the "U.S. Trustee") comprises exclusively representatives of the Sandy Hook Families, which hold Claims that were determined to be nondischargeable, in substantial part, by the Bankruptcy Court (as discussed further herein).[5]  As a result of this Chapter 11 Case pending for over a year without a viable path to emergence[6] and the Debtor's mismanagement of his affairs and the Estate prior to and after filing for bankruptcy protection, the UCC and the Sandy Hook Families, as co-proponents of the Creditors' Plan within the meaning of section 1129 of the Bankruptcy Code, determined to propose the Creditors' Plan, which they believe presents the only viable path out of chapter 11 for the Debtor and his creditors.[7]

The Debtor has requested that this Specific Disclosure Statement include a statement regarding the Debtor's denial of any mismanagement of his affairs and Estate and his position that no such allegations have been proven in this Chapter 11 Case.  Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

The Creditors' Plan (i) provides for the equitable treatment of Claims, including the Sandy Hook Families' ~~nondischargeable~~ unsecured Claims that have been determined by the Bankruptcy Court to be

---

[4] The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, financial statements, and notes thereto appearing elsewhere in this Specific Disclosure Statement and the Creditors' Plan.

[5] As a result of the Bankruptcy Court's determination that the Sandy Hook Families' Claims were, in large part, nondischargeable, the rights and interests of the Sandy Hook Families may differ from those of other General Unsecured Creditors.

[6] The Creditor Plan Proponents do not currently believe that the Jones Plan is viable, confirmable, or appropriate given the facts and circumstances of the Chapter 11 Case, which objections will be detailed in advance of the Confirmation Hearing.

[7] The Creditor Plan Proponents reserve the right to modify the Creditors' Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 2019.

largely nondischargeable; (ii) preserves valuable Estate Causes of Action for the benefit of creditors; (iii) allocates greater value to unsecured creditors than would a liquidation under chapter 7 of the Bankruptcy Code; (iv) will garner the requisite support of the creditors entitled to vote on the Creditors' Plan and meets all other requirements for Confirmation under the Bankruptcy Code; (v) has been proposed by the Creditor Plan Proponents in good faith; (vi) is fair and equitable; (vii) is feasible; and (viii) is in the best interests of creditors.

Specifically, the Creditors' Plan seeks to implement an orderly liquidation under chapter 11 of the Bankruptcy Code, while simultaneously preserving valuable Estate Causes of Action against third parties.  Under the Creditors' Plan, the Debtor's non-exempt assets will be sold and the proceeds distributed to creditors.  In addition, Estate Causes of Action against third parties, including those already identified in the UCC's Investigation or which may later be discovered, will be transferred to the GUC Trust, and value from the prosecution and or settlement of such actions by the GUC Trustee will be preserved and distributed to those creditors who elect to receive interests in the GUC Trust.

Importantly, ~~Confirmation~~the Creditor Plan Proponents do not believe that confirmation of the Creditors' Plan ~~will not~~necessarily must affect the FSS Case[8] ~~and will not~~or impair the ability of FSS, the Debtor's wholly owned entity that is subject to a bankruptcy proceeding under subchapter V of chapter 11 of the Bankruptcy Code, to prosecute the FSS Plan[9] and perform thereunder if confirmed.  However, the Debtor recently disclosed in his objection to this Specific Disclosure Statement [Docket No. 551] (the "Jones Specific Disclosure Statement Objection") as follows:  "[T]he Debtor has made it clear without a confirmed plan in his Chapter 11 Case, he is unwilling to work for FSS. Therefore, this statement needs to be corrected to reflect that the impact of the UCC Plan on the Debtor may have a substantial impact on the FSS Plan, potentially resulting in liquidation."[10]  This was the first time the Debtor definitively and publicly affirmed that he will not continue working for FSS absent confirmation of a plan acceptable to him in this Chapter 11 Case.  The Creditor Plan Proponents reserve the right to argue in connection with the Confirmation Hearing that Jones is improperly tying the outcome of his Chapter 11 Case to the outcome of the FSS Case, which is separately administered and seeks confirmation of its own plan.  That said, to the extent Jones's statement is correct, the outcome of this Chapter 11 Case may have a material impact on the FSS Case.

Critically, the Creditors' Plan does not contemplate a discharge of any of the Debtor's nondischargeable Claims, including the ~~Non-Dischargeable~~Nondischargeable Claims held by the Sandy Hook Families.  Nor does the Creditors' Plan provide the Debtor with a release from any prepetition liability.  Accordingly, each of the Estate's creditors holding nondischargeable Claims will be free to pursue, enforce, and collect on their judgments against the Debtor in litigation and enforcement proceedings following the expiration of the automatic stay.

**THE CREDITOR PLAN PROPONENTS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE CREDITORS' PLAN IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND ITS CREDITORS.  AT THIS TIME, THE CREDITOR PLAN PROPONENTS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASE.  FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE CREDITOR PLAN PROPONENTS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE CREDITORS' PLAN VOTE TO ACCEPT THE CREDITORS' PLAN.**

---

[8] "FSS Case" means *In re Free Speech Systems LLC*, Case No. 22-60043-CML (Bankr. S.D.T.X. July 29, 2022).
[9] "FSS Plan" means the Debtor's First Amended Plan of Reorganization Under Subchapter V of the Bankruptcy Code [Docket No. 756] in FSS Case No. 22-60043-CML.
[10] *See* Jones Specific Disclosure Statement Objection 5

## II.     BACKGROUND AND THE UNDERLYING STATE COURT LITIGATION

The Debtor is an individual living in the state of Texas who is involved in numerous media projects and enterprises.  The Debtor's media career spans almost three decades.  The Debtor is the sole owner of FSS, which is subject to a separate bankruptcy case under subchapter V of chapter 11 of the Bankruptcy Code.  The Debtor's income, including the income resulting from the operations of his directly and indirectly owned companies, is derived primarily from the production of media content and marketing opportunities through various media channels and related enterprises.

On December 14, 2012, a lone gunman shot and killed 20 first graders and six adults at Sandy Hook Elementary School in Newtown, Connecticut.  Starting that day, the Debtor began, and continued, broadcasting on his radio show and across various media platforms false assertions that the shooting never took place, that the children who were killed were fictional, or "holograms," and that their parents—as well as those children that survived the attack—were actors perpetrating a fraud for money or political purposes.  The instances of the Debtor's defamatory statements were much more pervasive than "[o]ne day on his show," and the Debtor did far more than "cover the event's official narrative with skepticism," as the Debtor suggests in the Jones Disclosure Statement.[~~10~~11]  Indeed, the Debtor's campaign of defamation and lies spanned many years and resulted in pervasive harassment and profound damage to the Sandy Hook Families.

Since 2018, the families of those killed at Sandy Hook Elementary School, as well as other individuals defamed by the Debtor, commenced litigation against the Debtor, some of which resulted in verdicts and judgments against the Debtor, as described in more detail below.  This litigation falls broadly into two categories:  the "Connecticut Litigation" and the "Texas Litigation."

> The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with the characterization of his actions and litigation history described herein.  Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

### A.     The Connecticut Litigation

Beginning in May 2018, the Connecticut Plaintiffs commenced lawsuits in Connecticut state court against the Debtor, FSS, and certain of their affiliates for, among other things, defamation, intentional infliction of emotional distress, invasion of privacy, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").[~~11~~12]  These actions proceeded together, with the lead docket being *Lafferty v. Jones*, X06-UWY-CV-18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court.  As the litigation proceeded, the Debtor used it as a new profit center, claiming on his show that he was a victim of the Connecticut court's tyranny and soliciting donations in connection with his legal fees in defending himself against these lawsuits.  At the same time, the Debtor obstructed discovery directed to him and otherwise abused the court process, including by threatening plaintiffs' counsel. After giving the Debtor multiple opportunities to change course, participate fairly in the judicial process, and comply with court orders, and faced with the Debtor's absolute recalcitrance, the trial court issued a default judgment against the Debtor and scheduled a trial on compensatory and punitive damages.  At that trial, the jury awarded $965 million to the Connecticut Plaintiffs in compensatory

---

[~~10~~11] Jones Disclosure Statement at 7.
[~~11~~12] *Lafferty v. Jones*, X06-UWY-CV-18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court; *Sherlach v. Jones*, X06-UWY-CV-18-6046437-S, in the Judicial District of Waterbury of the Connecticut Superior Court; and *Sherlach v. Jones*, X06-UWY-CV-18-6046438-S, in the Judicial District of Waterbury of the Connecticut Superior Court.

damages and over $470 million in additional common law and statutory punitive damages, for a total of $1,438,139,555.94 (the "Connecticut Judgment").

B. The Texas Litigation

**Heslin and Lewis.** On April 16, 2018, Neil Heslin filed a lawsuit in Texas state court against the Debtor, FSS, and certain of their affiliates for defamation, conspiracy, and intentional infliction of emotional distress.[213] On October 31, 2018, Scarlett Lewis filed a similar lawsuit,[314] which was subsequently consolidated with Heslin's case (the "Heslin and Lewis Action"). As with the Connecticut Litigation, the Debtor turned these actions into a profit center, using his updates on the status of the litigation to sell supplements and other products to his audience. Again here, the Debtor and FSS engaged in egregious obstruction and litigation misconduct, as a result of which they were repeatedly sanctioned and held in contempt, leading to an eventual default judgment on liability. After a nine-day damages trial, at which the Debtor admitted that the Sandy Hook shooting was "100% real," a jury awarded Heslin and Lewis more than $4 million in compensatory damages and approximately $45 million in exemplary damages, amounts that were later upheld by the trial court over objections by the Debtor that they were barred by Texas statute (the "Heslin and Lewis Judgment").

**Pozner and De La Rosa.** A separate lawsuit against the Debtor and FSS in Texas state court was commenced by Leonard Pozner and Veronique De La Rosa on April 16, 2018 (the "Pozner and De La Rosa Action").[415] This lawsuit similarly served as a source of profit for the Debtor and included "unreasonabl[e] and vexatious[]" failure by the Debtor and other defendants to comply with their discovery duties, ultimately leading to a default judgment on liability for defamation (the "Pozner and De La Rosa Judgment" and, together with the Heslin and Lewis Judgment, the "Texas Judgment"). A trial on damages was originally scheduled for the summer of 2022, but was stayed by the filing of the FSS Case and then subsequently further stayed by this Chapter 11 Case.

**Fontaine.** Marcel Fontaine was the first party to bring defamation and intentional infliction of emotional distress claims against Jones and FSS, commencing a lawsuit in Texas state court on April 2, 2018 (the "Fontaine Action").[516] Unlike the other Creditor Plan Proponents, Fontaine's claims do not relate to the Sandy Hook shooting. Instead, his claims arise from InfoWars' false reporting identifying him—by name and photo—as the murderer of 17 students and educators at a separate school shooting on February 14, 2018 at Marjory Stoneman Douglas High School in Parkland, Florida. Even though Fontaine had no relation to the shooting and had never set foot in the state of Florida, the InfoWars stories identifying him as the shooter spread to an audience of millions. This falsehood had a significant and detrimental effect on Fontaine's life until his death in May 2022, at which point the Fontaine Estate took over the litigation.

III. CRITICAL EVENTS DURING THE CHAPTER 11 CASE

A. Commencement of the Chapter 11 Case

On December 2, 2022, the Debtor sought individual bankruptcy protection by commencing this Chapter 11 Case. The Debtor continues in possession of his Estate and is managing his Estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case. The commencement of this Chapter 11 Case followed the filing

---

[213] *Heslin v. Jones,* Cause No. D-1-GN-18-001835 in the 261st District Court of Travis County, Texas.
[314] *Lewis v. Jones,* Cause No. D-1-GN-18-006623 in the 98th District Court of Travis County, Texas.
[415] *Pozner v. Jones,* Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas.
[516] *Fontaine v. Jones,* Cause No. D-1-GN-18-001605 in the 459th District Court of Travis County, Texas.

for bankruptcy protection by FSS and certain of Jones's other controlled entitles, which cases—other than the FSS Case—were procedurally consolidated for purposes of joint administration and later dismissed.[16][17]

### B.      Appointment of the UCC

On December 13, 2022, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 42], an official committee of unsecured creditors (the "UCC") was appointed in the Chapter 11 Case by the U.S. Trustee for the Southern District of Texas.  The UCC comprises representatives of six of the Sandy Hook Families.  The UCC was formed to represent the interests of all unsecured creditors and to enable such creditors to play a meaningful role in this Chapter 11 Case.

On December 19, 2022, the UCC selected Akin Gump Strauss Hauer & Feld LLP ("Akin") to serve as its counsel in connection with the Chapter 11 Case, which retention was approved by the Bankruptcy Court.[17][18]  On January 5, 2023, the UCC selected Nardello & Co. ("Nardello"), to aid in its review of the Debtor's Estate and prepetition transactions, which retention was approved by the Bankruptcy Court.[18][19]  Finally, the UCC completed its selection of professionals with the retention of Teneo Capital LLC ("Teneo" and, together with Nardello and Akin, the "UCC Advisors") on January 19, 2023 to serve as generalized financial advisor to the UCC, which retention was approved by the Bankruptcy Court.[19][20]

Since its formation, the UCC, with the assistance of the UCC Advisors, has played a significant and crucial role in this Chapter 11 Case, including:  (i) investigating and analyzing the Debtor's financial affairs; (ii) identifying and evaluating prepetition transactions carried out by, for the benefit of, or on behalf of the Debtor; (iii) identifying and evaluating potential Causes of Action belonging to the Estate; (iv) analyzing the Debtor's multiple iterations of Schedules and Statements (as defined herein), monthly operating reports, and other Bankruptcy Court filings; (v) conducting depositions of and collecting discovery from interested parties and third parties; (vi) engaging in continual plan and settlement-related negotiations with the Debtor and other parties in interest; (vii) working with the Debtor's advisors to establish consensual procedures for the sale of certain assets; (viii) participating in mediation sessions with the Debtor and other parties in interest; and (ix) presenting its positions before the Bankruptcy Court in various filings as well as at numerous hearings and status conferences.

### C.      Lift Stay Motions Filed by the Sandy Hook Families

With certain exceptions, the filing of a chapter 11 case operates as a stay with respect to the commencement or continuation of litigation against a debtor that was or could have been commenced

---

[16][17] *In re InfoW LLC, et al.*, Case No. 22-60020-CML (Bankr. S.D.T.X. April 17, 2022); *In re IWHealth, LLC*, Case No. 22-60021-CML (Bankr. S.D.T.X. April 18, 2022); *In re Prison Planet TV, LLC*, Case No. 22-60022-CML (Bankr. S.D.T.X. April 18, 2022); *see Stipulation and Agreed Order Dismissing Debtors' Chapter 11 Cases* [Case No. 22-60020, Docket No. 114].

[17][18] Order Authorizing the Official Committee of Unsecured Creditors of Alexander E. Jones to Retain and Employ Akin Gump Strauss Hauer & Feld LLP as Counsel, Effective as of December 19, 2022 [Docket No. 157] (the "Akin Retention Order"). Akin is serving as counsel to the UCC on a pro bono basis, subject to the terms of the Akin Retention Order.

[18][19] Order Authorizing Retention and Employment of Nardello & Co. LLC as Specialized Forensic Financial Advisor to the Official Committee of Unsecured Creditors, Effective as of January 5, 2023 [Docket No. 188] (the "Nardello Retention Order"). Nardello is serving as an advisor to the UCC on a pro bono basis, subject to the terms of the Nardello Retention Order.

[19][20] Order Authorizing the Retention and Employment of Teneo Capital LLC as Financial Advisor to the Official Committee of Unsecured Creditors, Effective as of January 19, 2023 [Docket No. 220] (the "Teneo Retention Order").  Teneo is serving as an advisor to the UCC at reduced rates, subject to the terms of the Teneo Retention Order.

before the bankruptcy filing.  Therefore, upon the commencement of this Chapter 11 Case, litigation against the Debtor—including the pending Texas Litigation and the Connecticut Litigation—was stayed.

On December 12, 2022, certain of the Sandy Hook Families whose cases had gone to trial (the "Sandy Hook Post-Trial Families")[20][21] filed the *Emergency Motion of the Sandy Hook Post-Trial Families for Relief From the Automatic Stay* [Docket No. 38] (the "Post-Trial Lift Stay Motion") requesting that the automatic stay in this Chapter 11 Case be lifted to permit the underlying state court verdicts against the Debtor belonging to the Sandy Hook Post-Trial Families to proceed to final judgment, as well as for any appeals of such final judgments to move forward as required by state law.[21][22] On December 19, 2022, the Bankruptcy Court held an emergency hearing on the Post-Trial Lift Stay Motion and that same day entered the *Agreed Order Modifying the Automatic Stay* [Docket No. 58] (the "Post-Trial Lift Stay Order"), granting the Post-Trial Lift Stay Motion, but enjoining the Sandy Hook Post-Trial Families (and others) from exercising any remedies to collect or enforce any judgment against the Debtor's assets or the Estate.

On January 20, 2023, Pozner and De La Rosa, whose cases had not gone to trial, filed their *Motion for Relief from the Automatic Stay Against Alexander E. Jones* [Docket No. 113] (the "Pozner and De La Rosa Lift Stay Motion") seeking to lift the automatic stay to permit their case to proceed to trial and final judgment, thereby allowing Pozner and De La Rosa to liquidate their claims against the Debtor and establish their right to recover from the Debtor in this case.  On February 7, 2023, the Debtor filed an objection to the Pozner and De La Rosa Lift Stay Motion [Docket No. 137].

Following the Debtor's objection to the Pozner and De La Rosa Lift Stay Motion and negotiations between the Debtor, FSS, Pozner, De La Rosa, and the Fontaine Estate,[22][23] the Debtor and FSS together filed a motion [Docket No. 324] (the "Pozner and De La Rosa Settlement Motion") on June 8, 2023 and a related proposed agreed order [Docket No. 359] seeking approval of a settlement (the "Pozner and De La Rosa Settlement") between the parties that would, among other things:

   i.    permit Pozner, De La Rosa, and the Fontaine Estate to establish liquidated claim amounts solely for bankruptcy purposes, including plan voting and distribution on account of their Claims;

   ii.   lift the automatic stay solely to allow pre-trial proceedings and discovery in the Pozner and De La Rosa Action to proceed if no documented consensual agreement among the Debtor, FSS, and the Sandy Hook Families with respect to a chapter 11 plan for each of the Debtor and FSS could be reached by August 31, 2023; and

   iii.  lift the automatic stay to allow the respective state court litigation in the Pozner and De La Rosa Action and the Fontaine Action to proceed to liquidate the respective parties' underlying state court claims (but not to permit Pozner, De La Rosa, or the Fontaine Estate to enforce any judgment against FSS or the Debtor or

---

[20][21] The Sandy Hook Post-Trial Families include: Neil Heslin, Scarlett Lewis, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto, Jillian Soto-Marino, Mathew Soto, William Aldenberg, William Sherlach, Robert Parker and Rich Coan, Trustee for the Estate of Erica Lafferty/Erica Lafferty Ash.

[21][22] When the Post-Trial Lift Stay Motion was filed, the automatic stay in the FSS Case had already been lifted to permit the Sandy Hook Post-Trial Families' respective state court actions to proceed to final judgment.  *See Order Modifying Automatic Stay to Allow Heslin/Lewis Trial to Continue to Final Judgment* [Docket No. 16] and *Agreed Order Modifying Automatic Stay to Allow the Connecticut Litigation to Continue to Final Judgment* [Docket No. 117] in FSS Case No. 22-60043 (CML).

[22][23] While the Fontaine Estate did not file a lift stay motion, the Pozner and De La Rosa Settlement and the negotiations related thereto include the claims of the Fontaine Estate.

Schedules and Statements by March 24, 2023.  On March 8, 2023, the Bankruptcy Court entered an order granting the UCC's motion [Docket No. 206], ordering the Debtor to file complete and accurate Schedules and Statements, but extending the compliance deadline to March 30, 2023.

On March 30, 2023, the Debtor filed his first amended Schedules and Statements (the "First Amended Schedules and Statements") [Docket Nos. 231, 232].  Concurrently, the Debtor filed a motion seeking authorization to file his Schedules and Statements under seal [Docket No. 230].  On April 18, 2023, the UCC filed its *Statement and Reservation of Rights by the Official Committee of Unsecured Creditors of Alexander E. Jones Regarding Amended Schedules and Statements* [Docket No. 241], detailing further inaccuracies in the Debtor's First Amended Schedules and Statements, which included: (i) failing to account for approximately $900,000 of cryptocurrency proceeds and $1.5 million of trust proceeds; (ii) failing to disclose certain ownership interests in LLCs; (iii) omitting a tax refund that was included on the initial Schedules and Statements; and (iv) failing to explain reported increases in the Debtor's wages and transfers of property to his family members.

On April 18, 2023, the Debtor filed his second amended Schedules and Statements (the "Second Amended Schedules and Statements") [Docket Nos. 242, 243].  On April 20, 2023, the Debtor filed the *Debtor's Response to Statement and Reservation of Rights by the Official Committee of Unsecured Creditors of Alexander E. Jones Regarding Amended Schedules and Statements* [Docket No. 245].

On November 26, 2023, the Debtor filed his third amended Schedules and Statements (the "Third Amended Schedules and Statements") [Docket Nos. 501, 502], and expressly noted therein that he was reserving the right to further amend or supplement the Schedules and Statements as necessary.  On December 20, 2023, the Bankruptcy Court entered an order granting the Debtor's March 30, 2023 motion to file his Schedules and Statements under seal [Docket No. 530].

In light of the continuing deficiencies and inaccuracies in the Schedules and Statements, along with numerous other events that had transpired prior to and following the commencement of this Chapter 11 Case, the UCC determined it was ~~therefore~~ necessary to independently investigate the Debtor's assets and confirm the information set forth in the various iterations of the Schedules and Statements in connection with its ongoing broad investigation.  The disclosures contained in this Specific Disclosure Statement and the attachments hereto reflect the additional work the UCC and its advisors conducted in respect of the Debtor's assets and identify certain assets that were not disclosed in either the Schedules and Statements or the Jones Disclosure Statement but that should be available to make distributions on account of the creditors' Claims.

### E.        The Nondischargeability Adversary Proceedings

On March 10, 2023, the Texas Plaintiffs and the Connecticut Plaintiffs each filed adversary complaints (together, the "Nondischargeability Complaints") to confirm the nondischargeability of the judgments and awards entered in the Texas Litigation and the Connecticut Litigation.[2324]  The Texas Plaintiffs and the Connecticut Plaintiffs each asserted that, because the trial courts in each of the underlying actions had found that the Debtor's defamatory conduct was "willful and malicious," the resulting judgments and awards could not and would not be discharged in bankruptcy, meaning that each judgment would remain enforceable and collectable against the Debtor even after the conclusion of this Chapter 11 Case, irrespective of the nature of the plan confirmed or other resolution of the case.  In making this argument, the Texas Plaintiffs and the Connecticut Plaintiffs relied on section 523(a)(6) of the

---

[2324] See Complaint to Determine Dischargeability of Debt, Heslin v. Jones, Adv. Pro. No. 23-03035-CML, dated March 10, 2023 [Docket No. 1]; Adversary Complaint Seeking Judgment that Sandy Hook Judgment is Non-Dischargeable Under Bankruptcy Code § 523(a), Wheeler v. Jones, No. 23-03037-CML, dated March 10, 2023 [Docket No. 1].

Bankruptcy Code, which provides that debts resulting from "willful and malicious injury by the debtor to another entity" are nondischargeable.

The Nondischargeability Complaints originally named FSS as a defendant. However, there was a threshold legal issue as to whether a corporate debtor proceeding under subchapter V, like FSS, is subject to the exceptions to discharge contained in section 523(a) of the Bankruptcy Code. Because this issue was on appeal to the Fifth Circuit in a separate, unrelated case, the Texas Plaintiffs and the Connecticut Plaintiffs stipulated to dismissing FSS without prejudice from the Nondischargeability Complaints and otherwise set forth a briefing schedule for certain steps in the adversary proceedings to proceed against the Debtor.[2425]   On May 5, 2023, the Debtor filed answers in each of the adversary proceedings.[2526]

Thereafter, on May 12, 2023, certain of the Texas Plaintiffs  and the Connecticut Plaintiffs each filed motions for summary judgment, arguing that, because there was no genuine dispute as to any material fact, the Bankruptcy Court should find, solely on the basis of the record before it and without the need for another trial, that neither the Texas Judgment nor the Connecticut Judgment was dischargeable in this Chapter 11 Case. The Texas Plaintiffs and the Connecticut Plaintiffs each argued, among other things, that because the Texas Judgment and Connecticut Judgment were based on default judgments establishing that the Debtor was liable for acts of defamation and intentional infliction of emotional distress against the Texas and Connecticut Plaintiffs, those default judgments (and the facts deemed admitted as a result of them) established that the Debtor had committed "willful and malicious injury" against them. The Texas Plaintiffs further argued that the facts in the trial court record also established that the Debtor had committed willful and malicious injury against them. The Connecticut Plaintiffs further argued that other factual findings from the trial court, such as those contained in jury instructions and a post-trial damages opinion, also established that the Debtor had committed willful and malicious injury against them.

On June 13, 2023, the Debtor filed responses to the respective motions for summary judgment.[2627]   In his responses, the Debtor argued, among other things, that the issue of "willful and malicious injury" against each of the Texas Plaintiffs and the Connecticut Plaintiffs had not been actually litigated or necessarily decided in the underlying state court litigation because the Debtor had not been permitted to submit his liability defense, and thus the default judgments entered in the Texas Litigation and the Connecticut Litigation could not be used as a basis for a finding that either of the Texas Judgment and Connecticut Judgment were nondischargeable. The Debtor also argued that the issue of his "willful and malicious injury" was not essential to certain of the state court judgments because the juries in the underlying litigation could have based their awards on a "recklessness" standard of liability for defamation and intentional infliction of emotional distress, not upon the stricter "intentional" standard required for a finding of "willful and malicious" conduct. Accordingly, the Debtor argued that the "willful and malicious" aspect had not been established at the Texas trial court level, which meant that the Texas Judgment was in fact dischargeable in bankruptcy. The Debtor made similar arguments with respect to the Connecticut Litigation, arguing that a finding of "willful and malicious" conduct was not

---

[2425] *See* Stipulation and Agreed Order Regarding the Dismissal of FSS from the Jones Adversary Proceedings and Schedule for the Answer and Summary Judgment Briefing, Heslin v. Jones, Case No. 23-03035-CML, dated April 12, 2023 [Docket No. 39]; Wheeler v. Jones, Case No. 23-03037-CML, dated April 12, 2023 [Docket No. 13].

[2526] *See Defendant's Answer, Heslin v. Jones*, Case No. 23-03035-CML, dated May 5, 2023 [Docket No. 24]; *Defendant's Answer, Wheeler v. Jones*, Case No. 23-03037-CML, dated May 5, 2023 [Docket No. 56].

[2627] *See* Defendant's Response to Movants' Motion for Summary Judgment, Heslin v. Jones, Adv. Pro. No. 23-03035-CML, dated June 13, 2023 [Docket No. 32]; Defendant's Objection and Response to Movants' Motion for Summary Judgment, Wheeler v. Jones, Adv. Pro. No. 23-03037-CML, dated June 13, 2023 [Docket No. 61].

necessary for the jury to award damages in that trial, as each of those awards could have been made on a finding of recklessness, thereby making them dischargeable in bankruptcy.

On July 15, 2023, the Bankruptcy Court held a hearing on the motions for summary judgment. On October 19, 2023, the Bankruptcy Court issued a memorandum decision in each adversary proceeding, as described below.

### 1.   *Heslin,* et al. *v. Jones*

The Bankruptcy Court issued its *Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones*, dated October 19, 2023 [Adv. Pro. No. 23-03035, Docket No. 46] and granted partial summary judgment for the Texas Plaintiffs, holding that:  (i) the portion of the Texas Judgment that was awarded based on the Debtor's liability for defamation was nondischargeable in bankruptcy because the Debtor's defamatory acts had been intentional; but (ii) the portion (if any) of the Texas Judgment that had been awarded based on the Debtor's merely reckless conduct in committing intentional infliction of emotional distress would be dischargeable.[27][28]

In its ruling, the Bankruptcy Court first found that the default judgments entered against the Debtor at the state court level had "fully and fairly litigated" the allegations against him, even though the Debtor had not presented his liability defense at trial.  Accordingly, the issue of whether the Debtor had committed "willful and malicious" injury against the Texas Plaintiffs had in fact been "actually litigated and necessarily decided" by the state court.  Second, in determining whether a finding of "willful and malicious injury" was essential to the Texas Judgment with respect to the Debtor's liability for both defamation and intentional infliction of emotional distress, the Bankruptcy Court looked to the Texas Plaintiffs' allegations that the Debtor was deemed to have admitted, as well as to the language of the jury instructions.  In doing so, the Bankruptcy Court found that approximately $4.3 million of the damages awarded for defamation flowed from allegations of the Debtor's intent to harm, not allegations of the Debtor's recklessness, meaning that this portion of the Texas Judgment was not dischargeable.  With respect to the allegations of intentional infliction of emotional distress, however, while the Bankruptcy Court found that the Debtor had actually intended to cause the Texas Plaintiffs harm, it was not clear how much of the jury award for these acts was based on a finding of willful and malicious injury and how much was based on a finding of recklessness.  Because any damage award based merely on recklessness would be dischargeable in bankruptcy, the Bankruptcy Court granted only partial summary judgment to the Texas Plaintiffs and indicated that a trial on damages would be required for both the Heslin and Lewis Action and the Pozner and De La Rosa Action.  On November 2, 2023, the Debtor filed a motion for leave to appeal the Bankruptcy Court's order in the United States District Court for the Southern District of Texas.[28][29]

### 2.   *Wheeler,* et al. *v. Jones*

The Bankruptcy Court issued its *Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones*, dated October 19, 2023 [Adv. Pro. No. 23-03037, Docket No. 76] and granted summary judgment for the Connecticut Plaintiffs on all claims, except with respect to the jury's award of common law punitive damages.  The Bankruptcy Court concluded that the default judgments entered against the Debtor at the state court level in the Connecticut Litigation had "fully and fairly litigated" the allegations against him.  The Bankruptcy Court further concluded that the issue of whether the Debtor had committed "willful and malicious" injury against the Connecticut Plaintiffs was "actually

---

[27][28] There has not yet been a damages trial in the Pozner and De La Rosa Action, and the Fontaine Action has not yet proceeded to trial.

[28][29] *See* Heslin v. Jones, 23-CV-4238.

litigated and necessarily decided" by the state court.  In reviewing the jury instructions, the Debtor's deemed admissions in the Connecticut Litigation, and the post-trial damages opinion, the Bankruptcy Court found that the compensatory damage and common law damage portions of the Connecticut Judgment were nondischargeable because they were awarded based on findings that the Debtor was intentionally liable for defamation and intentional infliction of emotional distress, but that the common-law punitive damage portion of the Connecticut Judgment could have been awarded based on the Debtor's merely reckless (rather than intentional) conduct.  The Bankruptcy Court therefore granted summary judgment on the approximately $1.12 billion in compensatory and CUTPA punitive damages awarded by the Connecticut District Court but denied summary judgment on $321.65 million in attorneys' fees and approximately $1.5 million in costs awarded as common law punitive damages.  On November 2, 2023, the Debtor filed a motion for leave to appeal the Bankruptcy Court's order in the United States District Court for the Southern District of Texas.[2930]

### F.      The UCC's Investigation

Upon its appointment, the UCC immediately commenced an investigation into the Debtor's assets and financial condition (the "UCC's Investigation").  The UCC's Investigation has focused on obtaining the most complete and accurate information possibly relevant to, among other topics, identifying the Debtor's assets and claims and Causes of Action for the benefit of the Estate.

Importantly, the UCC's Investigation (i) was designed to determine the magnitude of value recoverable from the Debtor, through litigation or otherwise, for the benefit of creditors, and (ii) involved an evaluation of claims and Causes of Action concerning the Debtor and the Debtor's prepetition transfers, including determination of whether such transfers were fraudulent conveyances, the value recoverable from third parties in respect of such transfers, the ability of the fraudulent transfer recipients to satisfy any judgment against them, and the likelihood of successfully collecting upon any such judgments.  The initial findings of the UCC's Investigation provide support for the Creditors' Plan.

#### 1.      Discovery Process

From the outset, the Debtor claimed to lack many documents and professed ignorance about many matters pertaining to his businesses, personal finances, trusts, assets, and personal and professional affairs.  In addition, possession of, and responsibility for, business and financial records was sometimes confused among the Debtor, his father (Dr. David Jones), FSS, and PQPR Holdings Limited, LLC ("PQPR"), which the Debtor and his parents indirectly own together.

Under these circumstances, the UCC determined that it was necessary to seek records from a wide array of third parties, including the Debtor's family members, associated businesses, trustees, financial institutions, and others to fill significant information gaps.  The UCC's Investigation ultimately included subpoenas to more than thirty parties, seven depositions, and informal discovery requests and interviews.

The UCC's Investigation encompassed document discovery served on the Debtor, certain of the Debtor's family members (the "Family Members"), certain associates of the Debtor (the "Debtor Associates"), certain entities related or connected to the Debtor (the "Debtor Related Entities"), certain of the Debtor's lawyers and accountants (the "Debtor Professionals"), and banks and financial institutions ("Financial Institutions") with which the UCC had reason to believe the Debtor conducted business or maintained accounts.

---

[2930] *See* Wheeler v. Jones, 23-CV-4240.

With respect to document productions, the UCC obtained and reviewed:

| Party / Third Party Category | Party / Third Party | Documents Produced (approx.) |
|---|---|---|
| Debtor | Alex Jones | 34,100 documents |
| Family Members | Carol Jones, David Jones, Erika Jones, Marleigh Jones, Austin Rivera | 11,500 documents |
| Debtor Related Entities | FSS, Mountain Way, PQPR | 10,000 documents |
| Debtor Associates | Joey Dalessio/ESG, Robert Dew, Timothy Fruge, Anthony Gucciardi, Patrick Riley, Jonathan Shroyer, Michael Zimmerman, Auriam Services LLC, Charlie Cicack | 3,000 documents |
| Financial Institutions | Ally Bank, American Express, Axos Bank, BAM Trading Services, Bank of America, Bank of England, Coinbase, De Lage Landen, Frost Bank, JP Morgan, PayArc, PlainsCapital Bank, PNC Bank, Prosperity Bank, Security Bank, Swan Bitcoin | 1,300 documents |
| Debtor Professionals | Donald Carnes, David Minton, Eric Taube | 700 documents |

The UCC also conducted depositions of the Debtor, David Jones, Erika Jones, Patrick Riley, Charlie Cicack, Robert Schleizer (the Debtor's financial advisor), and Joseph Dalessio.

While the UCC has obtained significant information through its discovery requests and depositions, the productions received have been far from complete. Numerous requests for documents and information were answered only partially and incompletely. As of the filing of this Specific Disclosure Statement, the Debtor, certain Debtor Related Entities, and the Debtor's Family Members have failed to make complete productions of the documents and information requested. PQPR has also refused to provide basic information, including information respecting its value, despite the fact that the Debtor indirectly owns 72% of the entity.

> The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with this characterization of his actions throughout the discovery process. Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

### 2. Assets & Estate Causes of Action

Based on the discovery obtained to date, the UCC has reached several preliminary conclusions concerning the Debtor's assets, financial condition and Estate Causes of Action, with additional determinations developing as the UCC receives additional information from discovery efforts outlined above. These findings support the Creditors' Plan put forth by the UCC. Among these findings are the identification of the following: (i) valuable Estate clawback claims; and (ii) assets that may be missing from the Schedules and Statements.

      i.    **Assets**

**Exhibit B** to this Specific Disclosure Statement identifies the assets the UCC has identified to date in which the Debtor has an ownership interest and which the Creditor Plan Proponents believe are available to creditors for satisfaction of Claims. While the Jones Disclosure Statement contains a list of assets in **Article IV.B**, the Debtor's list is missing several notable and valuable assets (some of which are included in the Schedules and Statements and monthly operating reports). The assets that have been omitted from the Jones Disclosure Statement and or the Schedules and Statements are notated as such in **Exhibit B**. In addition, the Debtor holds an interest in the trusts described below, which the Creditor Plan Proponents believe hold property that should be available to creditors.

Among his assets, the Debtor claims a homestead interest in a property located in Austin, Texas (the "Homestead Property") under the Texas Property Code and the Texas Constitution. In his Schedules and Statements, the Debtor discloses the value of the Homestead Property as $3,266,000. The Debtor claims to own $2,612,800 of the Homestead Property and claims that the remainder is owned by his wife, Erika Jones. Specifically, the Debtor claims that he transferred a 20% interest in the Homestead Property to Erika Jones on February 2, 2022 via a special warranty deed recorded on July 14, 2022. The UCC's Investigation reveals that a material amount of Jones's and FSS's funds have been spent on home construction and other expenses related to the Homestead Property and Jones's other properties. Information available to the UCC does not specify which portion of this value was spent on the Homestead Properties. Section 522(o) of the Bankruptcy Code provides that property a debtor claims as a homestead "shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of." As such, to the extent that the Debtor made improvements to the property claimed as a homestead with the intent to hinder, delay, or defraud his creditors, the value of the property claimed as a homestead may be reduced accordingly. The UCC is still evaluating whether to challenge any portion of the property claimed to be exempt under section 522(o) of the Bankruptcy Code in light of the material improvements made in the years leading up to the bankruptcy filing and after the Texas Litigation and Connecticut Litigation had been commenced. The deadline for the Committee to object to the Debtor's list of property claimed as exempt has been extended to thirty days after the conclusion of the Confirmation Hearing.[~~30~~31]

The Debtor is a settlor, grantor, beneficiary, and/or trustee of at least seven trusts. In his Third Amended Schedules and Statements, the Debtor changed the value of certain trusts to "$0", apparently indicating that the Debtor now believes the assets in these particular trusts are not reachable by creditors.[~~31~~32] Specifically, of his seven trusts, the Debtor appears to acknowledge that he has control over

---

[~~30~~31] *See* Fifth Stipulation and Agreed Order Granting the Official Committee of Unsecured Creditors of Alexander E. Jones an Extension of Time to Object to a Claim of Exemptions and Other Related Relief [Docket No. 526].

[~~31~~32] *See* Third Amended Schedules and Statements, Global Notes to Schedule A/B: Property – Part 4 – Financial Assets (stating that changes to disclosures concerning the Alexander E. Jones Descendent and Beneficiary Trust include edits to "remove[] value as this trust has been reviewed and is not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary" and changes to disclosures concerning the Greenleaf Trust include edits to "remove[] value as this trust has been reviewed and is not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary"; corresponding edits were not made to other trusts).

the assets of three of the trusts and that the assets are available to satisfy creditor Claims.  Of the remaining four trusts, the Debtor has taken or appears to have taken the position that the assets held by two trusts are not reachable by creditors and that two of the trusts have no actual value.  Notwithstanding the Debtor's position, claims may exist to reach assets that were fraudulently transferred into any trusts and the trust structures may be pierced if they were not properly constituted or properly administered.  In addition, with respect to the Debtor's trusts, the Creditor Plan Proponents specifically note the following:

- **_2022 Litigation Settlement Trust_**.  The Debtor is a "Third-Party Funding Contributor" of the 2022 Litigation Settlement Trust.    In his Second Amended Schedules and Statements, the Debtor identifies that this trust owns (i) InfoW, LLC fka Infowars, LLC, (ii) IWHealth, LLC fka Infowars Health, LLC, and (iii) Prison Planet TV, LLC, and reports that these entities own cash and various intellectual property, including the domain name Infowars.com.  In the Third Amended Schedules and Statements, the Debtor lists the value of this trust at $66,935, indicating that the Debtor acknowledges that the assets are available to satisfy creditor Claims.

- **_AEJ 2018 Trust_**.  The Debtor is a beneficiary and trustee of the AEJ 2018 Trust.  The Debtor is also a donor of the AEJ 2018 Trust, due to the donation of his interest in PLJR Holdings, LLC ("PLJR") to AEJ Austin Holdings, LLC ("AEJ Holdings") held by the AEJ 2018 Trust.  In his Third Amended Schedules and Statements, the Debtor reports that the trust holds $10,002 in assets, which comprise the funds in the trust's bank account.  In his Third Amended Schedules and Statements, the Debtor (i) fails to disclose that the AEJ 2018 Trust owns 100% of AEJ Holdings, (ii) fails to disclose that the Debtor gifted his 90% interest in PLJR, which owns 80% of PQPR, to AEJ Holdings when AEJ Holdings was held by the AEJ 2018 Trust, and (iii) fails to ascribe any value to the AEJ 2018 Trust's indirect ownership of 72% of PQPR.  While the value of the 72% interest in PQPR is not identified, it is believed to be substantial.  By listing a value for the trust in his Third Amended Schedules and Statements, the Debtor acknowledges that assets held in the AEJ 2018 Trust are available to satisfy creditor Claims.

- **_Alexander E. Jones Descendant and Beneficiary Trust_**.  The Debtor is the grantor of the Alexander E. Jones Descendant and Beneficiary Trust.  The global notes to both the Third Amended Schedules and Statements and the Second Amended Schedules and Statements[3233] indicate that this trust holds three condominium units valued at a total of $2,399,800.  Nevertheless, in his Third Amended Schedules and Statements, the Debtor lists the value of the trust as "$0" and states in the global notes that the trust is "not within the control of the Debtor, nor is Debtor entitled to direct the trust, nor is he a beneficiary."[3334]    As such, the Debtor appears to contend that the assets held in the Alexander E. Jones Descendant and Beneficiary Trust are not available to satisfy creditor Claims.  As noted herein, claims exist to challenge the trust and to recover at least two of the condominium units held in this trust: (i) a claim to avoid the transfer of Unit 6 (valued at $828,300) to the trust as fraudulent; and (ii) a claim to recover Unit 5 (valued at $767,400), which is owned by RCGJ LLC, an entity wholly owned by Jones.

- **_Green Leaf Trust_**.  The Debtor is settlor and trustee of the Green Leaf Trust.  The Debtor previously disclosed that the trust holds $127,094 in assets.[3435]  In his Third

---

[3233] *See* Second Amended Schedules and Statements, Schedule A/B, Part 4, No. 25 and Third Amended Schedules and Statements Schedule A/B, Part 4, No. 25.

[3334] Third Amended Schedules and Statements at 4.

[3435] *Id.*

identify any authority that would indicate that incurrence of obligations is not voidable under the circumstances.

**Claims To Avoid Fraudulent and Preferential Transfers of Cash.**  In the four years prior to the Petition Date, the Debtor transferred at least $1,464,193 in cash to Erika Jones for no consideration; of that, $833,943 was transferred in the one year prior to the Petition Date.  The Estate holds claims to avoid all $1,464,193 of such transfers over the four years prior to the Petition Date as fraudulent under applicable state and federal law.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*[3536]  The Debtor has argued that the transfers are not avoidable because they were made under the purported Premarital Agreement.  As noted above, however, the Premarital Agreement did not call for any payments absent ratification, which did not occur until May 3, 2022, and the ratification itself may be avoided as a fraudulent obligation.  Even if the payments were made pursuant to a valid obligation under the Premarital Agreement, however, at least $833,943 in transfers were made within one year prior to the Petition Date and would be avoidable as preferential transfers.  *See* 11 U.S.C. § 547.

**Claims To Avoid Fraudulent Transfers of Cars.**  In or around 2019, the Debtor transferred a Range Rover to Erika Jones for no consideration.  The Range Rover was valued at $86,500 at the time of the transfer.  The Estate holds claims to avoid the transfer and recover the Range Rover as a fraudulent transfer under applicable state and federal law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.*  The Debtor has argued that the Range Rover was transferred to Erika Jones under the purported Premarital Agreement.  As noted above, however, the Premarital Agreement did not call for any cars to be provided to Erika Jones absent ratification, which did not occur until May 3, 2022, and the ratification itself may be avoided as a fraudulent obligation.  In addition to the Range Rover, the Debtor jointly owns a certain 2017 model Audi A8 vehicle with Erika Jones, which was valued at $91,500 at the time of purchase and is valued at $25,000 currently.  The Debtor, however, has failed to disclose the Audi as one of his assets (despite the fact that the Audi is listed as property of the Debtor in public records) and suggests that it was given to Erika Jones.  To the extent the Range Rover was a valid transfer under the Premarital Agreement, Erika Jones was required to return the Audi to be traded in and used as part of the purchase price of the Range Rover.  The Estate holds claims to recover the Audi (or its value) as well as the Range Rover (or its value).

b.   *Avoidance Action Claims against David Jones*

**Claims To Avoid Fraudulent Transfers of Real Property.**  In or around April 2022, the Debtor transferred a tract of real property to David Jones for no consideration (the "Ranch").  The assessed value of the Ranch in 2023 was $249,870.  The Estate holds claims to avoid the transfer and recover the Ranch as intentionally and constructively fraudulent under applicable state and federal law.

> The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with the Creditor Plan Proponents' position in respect of the transfer of the Ranch.  Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

---

[3536] Transfers made within two years prior to the Petition Date may be avoided under the Bankruptcy Code.  *See* 11 U.S.C. § 548.  Transfers made within four years prior to the Petition Date may be avoided under applicable law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.*  Additional Claims and doctrines are available to reach transfers and obligations made before four years prior to the Petition Date.

*See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* The Debtor and David Jones may argue the land is not recoverable to the Estate because the Debtor intended to gift the property in 2017. Although the document purporting to transfer the Ranch was backdated to 2017, the document was actually created in 2022 and notarized in 2022 and the transfer took place in 2022.

**Claims To Avoid Fraudulent and Preferential Transfers of Cash.** In the four years prior to the Petition Date, the Debtor transferred $553,388 in cash payments to David Jones. Almost all of these transfers were made within one year prior to the Petition Date. David Jones has indicated that these payments were likely made as reimbursements for various expenses he incurred on the Debtor's behalf, but has produced documents showing that only a portion of those transfers ($~~218,148~~173,148) were actually made to reimburse David Jones for such expenses. For the payments made purportedly to reimburse David Jones for expenses he incurred on the Debtor's behalf, the Estate holds claims to recover the transfers as preferences. *See* 11 U.S.C. § 547. For any payment that was made within four years prior to the Petition Date and was not made as a reimbursement or otherwise for value, the Estate holds claims to recover such transfers as a fraudulent under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* As such, the Estate holds claims to recover all of the transfers made within one year prior to the Petition Date as either preferential or fraudulent transfers, and to recover any transfers made within four years of the Petition date not for value, or made with intent to hinder or delay creditors, as fraudulent transfers.

**Claims To Avoid Fraudulent Transfers of Cars.** In October 2022, the Debtor transferred at least three vehicles to David Jones, including a Ford F-150 Raptor, a Dodge Challenger, and a Toyota 4Runner. These vehicles had an approximate value of $105,000 at the time of the transfers. Although David Jones may defend the transfers, upon information belief, the vehicles were all gifts from the Debtor to David Jones, and David Jones paid no consideration for the vehicles. The Estate holds claims to avoid the transfers and recover the vehicles or the value of the vehicles as fraudulent transfers under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

**Additional Claims.** The Estate may hold various additional claims, including various torts, breaches of trust, breaches of contract claims, or other claims against David Jones arising out of David Jones's extensive control of the Debtor's personal finances, control over various entities and trusts involving the Debtor, involvement in moving and diverting funds between and amongst these entities, and influence over PQPR.

      c.     *Avoidance Action Claims Against Jonathon Owen Shroyer*

**Claims to Avoid Fraudulent Transfers of Cars.** In or around September 2021, the Debtor gifted a 2016 model Dodge Charger vehicle to Jonathon Owen Shroyer. Mr. Shroyer did not pay any consideration for the vehicle. The Estate holds claims to avoid the transfer and recover the vehicle or its value) as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

      d.     *Avoidance Action Claims Against Rex Jones*

**Claims To Avoid Fraudulent Transfer of a Car.** In or around January 2022, the Debtor gifted a 2019 model Toyota Tacoma vehicle to his son, Rex Jones. Rex Jones did not pay any consideration for the vehicle. The Estate holds claims to avoid the transfer and recover the vehicle (or its value) as a fraudulent transfer under applicable state and federal law. *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.*

e.      *Avoidance Action Claims Against Patrick Riley*

**Claims To Avoid Fraudulent Transfer of a Boat.**  In or around March 2022, the Debtor gifted a 2003 Glastron boat vehicle to his friend and associate, Patrick Riley.  Mr. Riley did not pay any consideration for the boat.  The Estate holds claims to avoid the transfer and recover the boat (or its value) as a fraudulent transfer under applicable state and federal law.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.  Although Mr. Riley has suggested that the boat was gifted years ago, it was not registered in his name until March 2022, and the Debtor continued to pay expenses for the boat even after the Petition Date.  In the alternative, if Mr. Riley successfully defends a claim to recover the boat, the Estate holds claims to recover the payments the Debtor has made on account of the boat since the date of the purported transfer to Mr. Riley.

**Claims To Avoid Fraudulent Transfer of a Watch.**  Between 2019 and 2020, the Debtor gifted a Tudor watch to Mr. Riley.  Mr. Riley did not pay any consideration for the watch.  The Estate holds claims to avoid the transfer and recover the watch as a fraudulent transfer under applicable state and federal law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

f.      *Avoidance Action Claims Against the Alexander E. Jones Descendent and Beneficiary Trust, David Jones, Trustee*

**Claims To Avoid Fraudulent Transfer of Real Property.**  In or around February 2019, the Debtor caused the RXXCTTGAA Trust to transfer a condominium known as Unit 6 to the Alexander E. Jones Descendant and Beneficiary Trust for no consideration.  Unit 6 is valued as at least $828,300.  In his Third Amended Schedules and Statements, the Debtor contends that the assets of the Alexander E. Jones Descendant and Beneficiary Trust are not controlled by the Debtor[36][37] and has suggested that the assets are not reachable by his creditors.  However, the RXXCTTGAA Trust is a revocable trust completely controlled by the Debtor, and the Debtor admits that its assets are available to the Debtor and his creditors under applicable law.  As such, the Estate holds claims to avoid the transfer and recover Unit 6 as a fraudulent transfer under applicable state and federal law.  *See* 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

**Claims re Ownership of Real Property.**  The Debtor has contended that a condominium known as Unit 5 is not property of the Estate because it is owned by the Alexander E. Jones Descendant and Beneficiary Trust and claims that assets of the trust are not available to creditors.[37][38]  This is not accurate.  Travis County property records indicate that Unit 5 is owned by RCGJ, LLC ("RCGJ"), an entity in which the Debtor has a 100% ownership interest. The Debtor has produced no document showing an effective transfer of Unit 5 from RCGJ to the Alexander E. Jones Descendant and Beneficiary Trust.  Unit 5 is valued at least $767,400 and is available to Jones's creditors.  If necessary to collect the property, the Estate and creditors hold claims for turnover, conversion, and to declare Unit 5 property of the Estate.

**Claims to Avoid Fraudulent Transfer of Payments for Condos.**  The Debtor has paid numerous expenses for three condos that the Debtor now contends are owned by the Alexander E. Jones Descendant and Beneficiary Trust and thus are not reachable by his creditors.  As noted, the Estate holds claims to recover Unit 5 and Unit 6.  In the alternative, if the Alexander E. Jones Descendant and Beneficiary Trust successfully defends claims to recover the condos, the Estate holds claims to recover the payments the Debtor has made on account of Unit 5 and Unit 6.  In addition, the Estate holds claims

---

[36][37] Third Amended Schedules and Statements at 4.
[37][38] Second Amended Schedules and Statements at 4.

to recover payments made on account of the third condo.  *See* 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq*.

### G.    Mediation

Prior to the Petition Date, on October 12, 2022, the Bankruptcy Court entered a *Stipulation and Agreed Order* in the FSS Case [FSS Case, Docket No. 233] (the "Mediation Order").  Among other things, the Mediation Order appointed the Honorable Marvin Isgur as mediator and ordered mediation among FSS, Jones (in his capacity as the sole member of FSS), the FSS subchapter V trustee, PQPR, the Texas Plaintiffs, and the Connecticut Plaintiffs.

At a hearing on December 7, 2022, counsel for the Debtor indicated that the Debtor intended to participate in the FSS mediation in his capacity as Debtor in this Chapter 11 Case.[39]  Counsel for the Debtor also indicated that the Debtor was not seeking a separate mediation order to be entered in this Chapter 11 Case, but rather that the Debtor already viewed himself as "being subject to and participating" in the FSS mediation pursuant to the Mediation Order in his capacity as Debtor in this Chapter 11 Case.[40]  The UCC likewise indicated at the December 7 hearing that it was engaging in the FSS mediation pursuant to the Mediation Order.[41]

After nearly a year of mediation without resolution in either the FSS Case or this Chapter 11 Case, on September 26, 2023, the Bankruptcy Court terminated the mediation and instructed FSS to file a plan.[42]

### H.    Expiration of Exclusivity

Section 1121 of the Bankruptcy Code provides that only the debtor may file a plan until 120 days after the petition date (the "Exclusive Period").  In addition, section 1121(d) of the Bankruptcy Code permits a bankruptcy court to increase or reduce the Exclusive Period upon a showing of "cause."  After the Exclusive Period has expired, a creditor or any other party in interest may file a plan.  In this Chapter 11 Case, the Exclusive Period expired on April 1, 2023 without the Debtor filing a plan or requesting an extension of the Exclusive Period.

### I.    Circumstances Leading to the Filing of the Creditors' Plan

The UCC and the Sandy Hook Families engaged in good-faith discussions with the Debtor and other interested parties to explore a viable consensual chapter 11 plan and ultimate conclusion to this Chapter 11 Case, both during and following mediation.

As discussed above, on October 19, 2023, the Bankruptcy Court ruled on the nondischargeability of the Claims held by the Sandy Hook Families.  These rulings served as a catalyst for the parties to restart discussions regarding a consensual resolution of this Chapter 11 Case, including attending an in-person meeting in New York with representatives for the UCC, the Sandy Hook Families, the Debtor, FSS, PQPR, and the FSS Subchapter V Trustee.  Following the meeting, the UCC, the Sandy Hook Families, and the Debtor exchanged additional proposals.  However, the parties remained far apart on

---

[39] Hr'g. Tr. at 7:1-14 *In re Alexander E. Jones*, Case No. 22-33553-CML and FSS Case No. 22-60043-CML (Bankr. S.D.T.X. Dec. 7, 2023).
[40] *Id*. at 10:24-11:10.
[41] *Id.* at 21:4-10.
[42] Hr'g. Tr. at 12:3-11, FSS Case No. 22-60043-CML (Bankr. S.D.T.X. Sept. 26, 2023).

how to resolve the staggering nondischargeable liability facing the Debtor and the liability facing his largest asset, FSS.

On November 22, 2023, the UCC and the Sandy Hook Families filed the *Statement by the Official Committee of Unsecured Creditors and the Sandy Hook Families Regarding the Status of the Chapter 11 Case and Proposed Creditors' Plan* [Docket No. 498] (the "Case Status Statement"), attaching a construct detailing the material terms of a proposed plan that offered the Debtor a choice between (i) an orderly liquidation and (ii) a consensual release of more than $1.5 billion in largely nondischargeable Claims in exchange for a 10-year, fixed-payment schedule that would pay creditors at least $8.5 million a year from any source, including projected payments that FSS anticipates contributing to a creditor trust (the "Optional Future Payment Election"), in each scenario preserving valuable Estate Causes of Action against third parties for the benefit of creditors described above. The UCC and the Sandy Hook Families made clear both in the Case Status Statement and during the hearing held by the Bankruptcy Court on November 27, 2023 that the Optional Future Payment Election represented a proposal that hopefully would be subject to continued discussions in an effort to reach consensus.

The Case Status Statement also requested that the Bankruptcy Court set a schedule for a hearing to consider confirmation of the FSS Plan and any plans filed in this Chapter 11 Case. On December 1, 2023, the Bankruptcy Court entered the *Agreed Scheduling Order for Confirmation Hearing* [Docket Nos. 512, 513] (the "Confirmation Scheduling Order") representing an agreement among the UCC, the Texas Plaintiffs, the Connecticut Plaintiffs, and the Debtor regarding the schedule for consideration of any plans filed in this Chapter 11 Case. The Confirmation Scheduling Order governs, among other things, certain procedures related to Confirmation of the Creditors' Plan or any plan filed in the Chapter 11 Case, as well as plan-related discovery, setting forth the following dates and deadlines:

| Event[4243] | Date |
|---|---|
| **Written Discovery Deadline.** The deadline by which the Parties and any other parties in interest shall serve discovery relating to any plans, potential objections thereto, and any other matters to be heard at the Confirmation Hearing (the "Requests"). The Parties and other parties in interest may—and are encouraged to—serve Requests sooner. The Parties and any other parties in interest shall serve responses and objections to any Requests within two weeks of service of the Requests. For the avoidance of doubt, the Parties and any other parties in interest shall meet and confer in good faith regarding timing and any requested extension of response deadline. | **Tuesday, January 9, 2024** |
| **Objections to Provisional Approval of Disclosure Statements.** The date by which the Parties and any other parties in interest shall file any objections to the provisional approval of any disclosure statements filed. | **Tuesday, January 16, 2024** |

---

[4243] Capitalized terms used in this chart but not otherwise defined in this Specific Disclosure Statement shall have the meaning ascribed to such terms in the Confirmation Scheduling Order.

| | |
|---|---|
| **Disclosure Statement Hearing Date.**  The date on which the Parties and any other parties in interest shall, subject to the Bankruptcy Court's availability, participate in a hearing regarding any disclosure statements filed to seek provisional approval thereof. | **[Wednesday  Friday**Wedn**esday**, January ~~24-26]~~24, 2024[44] |
| **Substantial Completion of Document Production.**  The date by which the Parties and any other recipients of the Requests shall substantially complete the production of documents in response to the Requests.  *Parties and any other recipients of the Requests must commence production of documents in response to Requests as soon as reasonably possible and shall roll out document production in tranches, as available.  Parties and any other recipients of the Requests shall not wait until the substantial completion deadline to commence production.* | **Friday, January 26, 2024** |
| **Solicitation Mailing/Publication Deadline.** | **Monday, January 29, 2024** |
| **Privilege Log Deadline.**  The date by which the Parties and any other recipients of the Requests shall have provided logs of documents responsive to the Requests that were withheld or redacted on the basis of any claim or privilege. | **Tuesday, January 30, 2024** |
| **Preliminary Witness Lists.**  The date by which the Parties and any other parties in interest shall exchange lists of witnesses each such party in good faith expects to call at the Confirmation Hearing. | **Thursday, February 1, 2024** |
| **Fact Witness Depositions.**  The dates during which the Parties and any other parties in interest shall conduct fact witness depositions. | **Friday, February 2 – Friday, February 9, 2024** |
| **Expert Reports.**  The date by which the Parties and any other parties in interest shall simultaneously exchange expert reports, with a date for rebuttal reports (if needed) to be determined by the Parties and any other parties in interest intending to serve such reports.  Bankruptcy Rule 7026 shall apply in its entirely to any expert reports exchanged. | **Thursday, February 15, 2024** |
| **Production of Materials Relied Upon in Expert Reports.**  The date by which the Parties and any other parties in interest shall produce copies of any documents or data that were (a) relied on by such party's expert in forming the opinions contained in such report and (b) have not already been produced in these cases. | **Friday, February 16, 2024** |
| **Plan Objection Deadline.**  The date by which objections to any plan must be filed. | **Friday, February 16, 2024** |

---

[44] Date set subsequent to entry of the Confirmation Scheduling Order.

as well as links to his fundraising page and his online store, which markets and sells health supplements. As of the date hereof, the Debtor has amassed nearly 2 million followers on X and has made a total of almost 50,000 posts.

## IV.    KEY ASPECTS OF THE CREDITORS' PLAN[4345]

### A.    General Basis for the Creditors' Plan

The Creditors' Plan is premised on an orderly liquidation of the Debtor's assets, other than Exempt Assets, through the GUC Trust. The GUC Trust will be administered by the GUC Trustee, who will be chosen by the Sandy Hook Families in accordance with the GUC Trust Agreement. The following assets (collectively, the "GUC Trust Assets," detailed herein), among others, will be assigned on the Effective Date of the Creditors' Plan to the GUC Trust:

- The Debtor's assets, rights, and claims that are not Exempt Assets, whether owned by the Debtor directly, indirectly or otherwise held for the benefit of the Debtor existing as of the Effective Date, in each case whether presently known or discovered at any time by the GUC Trustee, and including, but not limited to:

    o    Cash;

    o    any tax refund to which the Debtor is entitled (whether or not such refund is immediately available to the Debtor as of the Effective Date);

    o    100% of the Debtor's equity ownership interests in FSS;

    o    the Debtor's full, direct, or indirect ownership interests in PQPR;

    o    all assets held in the Jones Trusts; and

    o    any current contractual right entitling the Debtor to future royalties, and any identified equitable or future interests in property;

- the Litigation Assets, including:

    o    $500,000 in Cash as funded by the Debtor's Estate as initial litigation funding;

    o    the Trust Causes of Action;

    o    all Release Settlement Payments made to the GUC Trust; and

---

[4345] This **Article IV** is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Creditors' Plan and is qualified in its entirety by reference to the entire Creditors' Plan and exhibits thereto. Although the statements contained in this Specific Disclosure Statement include summaries of the provisions contained in the Creditors' Plan and in documents referred to therein, this Specific Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions and should not be relied on for a comprehensive discussion of the Creditors' Plan. Instead, reference is made to the Creditors' Plan and all such documents for the full and complete statement of such terms and provisions. The Creditors' Plan itself (including attachments) will control the treatment of Claims under the Creditors' Plan. To the extent there are any inconsistencies between this **Article IV** and the Creditors' Plan (including attachments), the latter shall govern.

     o      the Debtor's books and records relating to prepetition transfers of Estate assets and related Causes of Action, including all documents, communications, and information of the Debtor, any Jones Trusts and any entities owned or controlled by the Debtor, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets and all discovery obtained by the UCC during the Chapter 11 Case; and

- once all Professional Fee Claims have been irrevocably paid in full or Disallowed pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account.

> The Debtor has requested that this Specific Disclosure Statement include a statement that the Debtor disagrees with the Creditor Plan Proponents' position regarding the transfer of privilege and does not consent to any such transfer. Each of the Debtor and the Creditor Plan Proponents reserve all rights with respect to this point of disagreement.

### B.  Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus are excluded from the classes of Claims set forth in Article III of the Creditors' Plan and the holders thereof are not entitled to vote on the Creditors' Plan.

### 1.  Administrative Claims

To the extent that Administrative Claims have not been paid in full or otherwise satisfied during the Chapter 11 Case, each holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (i) if such Administrative Claim is Allowed prior to the Effective Date, on the Effective Date or in the ordinary course of business, whichever is later or (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter. Any objection to an Administrative Claim must be Filed by the Priority Claims Objection Bar Date.

### 2.  Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred through and including the Effective Date must be Filed no later than the Priority Claims Bar Date. The Bankruptcy Court will determine the Allowed Amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Rules. The Debtor will pay to the Professionals the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash, including from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of a Final Order of the Bankruptcy Court. Any objection to a Professional Fee Claim must be Filed by the Priority Claims Objection Bar Date.

     i.    ***Professional Fee Escrow Account***

| SUMMARY OF EXPECTED RECOVERIES | | | | | |
|---|---|---|---|---|---|
| Class | Claim/Interest | Status | Voting Rights | Estimated Amount of Claims | Estimated Recovery[44][46] |
| 1 | Secured Claims | Unimpaired | Not entitled to vote (presumed to accept) | $114,500.04 | 100% |
| 2 | Other Priority Claims | Unimpaired | Not entitled to vote (presumed to accept) | $0 | 100% |
| 3 | General Unsecured Claims | Impaired | Entitled to vote | $2,099,139,969.58 $1,872,210,665.85 | [ ].48%[45][47] |
| 4 | Subordinated Claims | Impaired | Not entitled to vote (deemed to reject) | Unknown | 0% |

**2.     Treatment of Claims**

Holders of Claims classified in <u>Article III.A.</u> of the Creditors' Plan that are Allowed will be satisfied in the manner set forth below.

     i.      <u>Class 1 – Secured Claims</u>.

**Classification**.  Class 1 consists of all Secured Claims.

**Treatment**.  Each holder of a Secured Claim that is Allowed will receive payment in full in Cash on account of such holder's Allowed Secured Claim.

**Voting**.  Class 1 is Unimpaired under the Creditors' Plan.  Holders of Secured Claims are conclusively presumed to have accepted the Creditors' Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  There are two Class 1 Claimants: (i) the Security Bank of Crawford, which has Filed a Proof of Claim in the amount of $80,161.04 (Claim No. 2); and (ii) Bank of America, N.A., which has Filed a Proof of Claim in the amount of $26,354.73 (Claim No. 22).

     ii.     <u>Class 2 – Other Priority Claims</u>.

---

[44][46] The ranges set forth under Estimated Recovery are based on the range of values of the assets available to creditors as described in the Creditors' Plan Liquidation Analysis, attached hereto as **Exhibit D**.

[45][47] Estimated recoveries for General Unsecured Claims will be provided in connection with the filing of the Creditors' Plan Liquidation Analysis. Note, however, that estimated recoveries will depend on how many holders of General Unsecured Claims elect to receive GUC Trust Interests vs. how many elect to share in the GUC Election Cash Pool.

**Classification**.  Class 2 consists of all Other Priority Claims.

**Treatment**.   Each holder of an Other Priority Claim that is Allowed will receive payment in full in Cash on account of such holder's Allowed Other Priority Claim.

**Voting**.   Class 2 is Unimpaired under the Creditors' Plan.   Holders of Other Priority Claims are conclusively presumed to have accepted the Creditors' Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.   Class 2 Claimants include one holder of a Priority DSO Claim who is not Erika Jones, including the Priority DSO Claim identified at item 4.12 in the Schedules and Statements.   Class 2 Claimants will also include any other holders of Other Priority Claims.   For the avoidance of doubt, Erika Jones is not entitled to any Priority DSO Claims or any Other Priority Claims and any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Class 4 Subordinated Claim.

iii.      Class 3 – General Unsecured Claims.

**Classification**.   Class 3 consists of all General Unsecured Claims.

**Treatment**.   Each holder of a General Unsecured Claim that is Allowed will be entitled to receive, at such holder's election, (i) the holder's *pro rata* share of the GUC Election Cash Pool, such pro rata share to be calculated based on the total amount of Allowed General Unsecured Claims held by holders that make such election, or (ii) the holder's *pro rata* share of the GUC Trust Interests, such *pro rata* share to be calculated based on the aggregate amount of Allowed General Unsecured Claims that make such election. For the avoidance of doubt, however, any holder of a General Unsecured Claim that has waived that holder's Claim is not entitled to such *pro rata* share under Article III.B.3.b of the Creditors' Plan.

**Voting**.   Class 3 is Impaired under the Creditors' Plan.   Holders of General Unsecured Claims are entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.   At present, there are twenty-five Class 3 Claims:  (i) twenty-one Class 3 Claims Filed by or on behalf of individuals comprising the Sandy Hook Families; (ii) one Class 3 Claim held by American Express National Bank, which has Filed a Proof of Claim in the amount of $149,678.58 (Claim No. 1); (iii) one Class 3 Claim held by Reeves Law, PLLC, which has Filed a Proof of Claim in the amount of $24,611.13 (Claim No. 5); and (iv) one Class 3 Claim held by the City of Austin, which has Filed a Proof of Claim in the amount of $86.60 (Claim No. 3); and (v) one Class 3 Claim held by the IRS, to the extent that any portion of its Claim in the amount of $586,884.64 (Claim No. 4) is deemed to be a non Priority Tax Claim.   However, additional Claims may be Allowed General Unsecured Claims if filed by the applicable Bar Date or other time period provided for by the Creditors' Plan or an order of the Bankruptcy Court, and otherwise Allowed.

iv.    Class 4 – Subordinated Claims.

**Classification**.  Class 4 consists of all Subordinated Claims.

**Treatment**.  Holders of Subordinated Claims, regardless of whether such claims are Allowed, are not entitled to any distributions or to receive or retain any property under the Creditors' Plan.

**Voting**.  Class 4 is Impaired under the Creditors' Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Creditors' Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Creditors' Plan.

**Claimants**.  At present, there is one Class 4 Claimant, FSS, which has Filed a Proof of Claim in the amount of $0.00 (Claim No. 26).  However, additional Claims may be Subordinated Claims if filed by the applicable Bar Date or other time period provided for by the Creditors' Plan, and otherwise Allowed.  For the avoidance of doubt, any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Subordinated Claim.

**D.    Treatment of ~~Non-Dischargeable~~Nondischargeable Claims**

The Creditors' Plan will not discharge any ~~Non-Dischargeable~~Nondischargeable Claim.  Moreover, the rights of the Sandy Hook Families, acting through the GUC Trust, to exercise all rights, remedies, and other legal entitlements, whether arising under state, federal or foreign law, with respect to the ~~Non-Dischargeable~~Nondischargeable Claims are expressly preserved, and nothing to the contrary in the Creditors' Plan will limit, affect, or otherwise impact such rights; *provided that* no individual holder of any Sandy Hook Family Claim will be entitled to receive more than the aggregate Allowed amount of such holder's Sandy Hook Family Claim on account of such Claims pursuant to the Creditors' Plan.

**E.    The GUC Trust**

On or before the Effective Date, the GUC Trust will be established and administered in accordance with the GUC Trust Agreement, which sets forth, *inter alia*, the powers, authority, responsibilities, and duties of the GUC Trustee.  The purpose of the GUC Trust will be the liquidation and administration of the GUC Trust Assets and making distributions to holders of GUC Trust Interests in accordance with the terms of the Creditors' Plan and the GUC Trust Agreement.

i.    *The GUC Trustee*

The GUC Trust will be administered by the GUC Trustee.  On or before the Effective Date, the GUC Trustee, on behalf of the Debtor, will execute the GUC Trust Agreement and will take all other steps necessary to establish the GUC Trust pursuant to the GUC Trust Agreement and consistent with the Creditors' Plan.  For the avoidance of doubt, if, for any reason the individual or entity chosen to serve as the GUC Trustee will need to be replaced, the Sandy Hook Families will appoint a subsequent GUC Trustee unless otherwise provided by the GUC Trust Agreement.  The GUC Trust Agreement will establish an oversight committee (the "Litigation Committee") consisting of members of the Sandy Hook Families appointed in accordance with the terms of the GUC Trust Agreement to oversee performance of the GUC Trustee's duties with respect to the GUC Trust Assets and otherwise serve the functions to be described in the Creditors' Plan and the GUC Trust Agreement.

28

The GUC Trustee will be responsible for all decisions and duties with respect to the GUC Trust Assets, subject to the authority granted to it under the Creditors' Plan, the Confirmation Order and the GUC Trust Agreement, as applicable, and will file with the Bankruptcy Court periodic public reports on the status of Claims reconciliation and distributions, which reports may be included in the quarterly reporting required by the U.S. Trustee.  In addition, the GUC Trustee will issue quarterly written reports and engage in update calls upon reasonable request with representatives of the Sandy Hook Families.

The GUC Trustee will owe fiduciary duties to all holders of GUC Trust Interests consistent with the fiduciary duties a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code owes to its constituents, and the Litigation Committee must consent to any proposed material action, including any settlement in respect of any action, by the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

ii.    *Assignments*

On the Effective Date, the Non-DischargeableNondischargeable Claims will be assigned to the GUC Trust.

iii.   *GUC Trust Assets*

On the Effective Date, all GUC Trust Assets will vest in the GUC Trust.  For the avoidance of doubt, the Exempt Assets will not vest in the GUC Trust.  The GUC Trust Interests will only be transferrable in the sole discretion of the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

Under section 1141(b) of the Bankruptcy Code, the GUC Trust Assets will be assigned, transferred and vest in the GUC Trust upon the occurrence of the Effective Date, free and clear of all Claims, Liens, encumbrances, and interests; *provided, however, that* the GUC Trustee may abandon or otherwise not accept any assets that the GUC Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the GUC Trust in accordance with the terms of the GUC Trust Agreement. Any assets that the GUC Trustee so abandons (whether before or after the Effective Date) or otherwise does not accept will not be GUC Trust Assets.

iv.    *Litigation Assets*

The following assets constitute the Litigation Assets and will vest in the GUC Trust and be administered by the GUC Trustee in accordance with the terms described herein and in the GUC Trust Agreement:

- **Initial Litigation Funding**.  A total of $500,000 in Cash, which will be funded by the Debtor's Estate to the GUC Trust for administrative expenses in connection with administering the Litigation Assets; *provided that* the source and manner of funding will be acceptable to the GUC Trustee; *provided, further, that* a portion of the proceeds from liquidation of the Litigation Assets may be retained by the GUC Trustee in its discretion as continued funding for administration of the Litigation Assets.

- **Trust Causes of Action**.  All Causes of Action (i) belonging to the Debtor's Estate (including those belonging to the Jones Trusts), whether or not initially asserted prior to Confirmation, including, but not limited to, any Estate Claims or Causes of Action against or related to the Debtor, any Insider or Affiliate of the Debtor, and (ii) the Texas State Court fraudulent conveyance action filed by Neil Heslin, Scarlett Lewis, Leonard

for no exchange of goods or services and $25,000 as to all other transfers in the ten years prior to the Petition Date and running through the Effective Date.  Discovery of any Material Misstatement[4648] in the Jones Full Disclosure will (i) void any discharge granted under the Creditors' Plan, and (ii) subject the Debtor to all penalties available under applicable law.

The Debtor will cooperate in good faith with the Sandy Hook Families, the UCC, the GUC Trustee, the Debtor's Estate, FSS, and their respective representatives, in carrying out the terms of the Creditors' Plan, including by responding timely to reasonable discovery requests in connection with actions by the GUC Trustee and cooperating in pursuing and obtaining any tax refund or royalty amounts to which the Debtor or the GUC Trust is entitled.

Prior to the Effective Date, the Debtor will also provide reasonable notice to the UCC in advance of the formation and/or incorporation of any trust or other entity on his behalf, or from which he expects to potentially receive distributions, dividends, or other payments, or in which he owns a direct or indirect beneficial interest.

The Debtor will, in any event, cooperate with the GUC Trustee's efforts to investigate and pursue any Causes of Action arising from or related to payments made pursuant to the Premarital Agreement for the benefit of the GUC Trust.

**G.      Releases and Exculpation**

**1.      Releases by the Debtor**

**Notwithstanding anything contained in the Creditors' Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, as applicable, from any and all claims and Causes of Action asserted by or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Creditors' Plan, the Confirmation Order, or any document, instrument, or agreement executed to implement the Creditors' Plan or any Claim or obligation arising under the Creditors' Plan.  For the avoidance of doubt, Jones shall not be a Released Party and there shall be no release or exculpation of the Trust Causes of Action, the ~~Non-Dischargeable~~Nondischargeable Claims, or any other Claims or Causes of Action against Jones, non-minor members of his immediate family, or their Insiders or Affiliates, as applicable, subject to the ability of Insiders and Affiliates of Jones to become a Released Party by making a Release Settlement Payment.**

**2.      Exculpation**

---

[4648] "Material Misstatement" means an omission by Jones or his representatives to disclose in the Jones Full Disclosure (a) an asset, right, claim, interest, or Cause of Action of the estate, held either directly or indirectly and including the assets set forth on the Exempt Asset Schedule, that reasonably could be argued to have a value of $5,000 or more; (b) any voluntary or involuntary transfer of cash or property within the ten years prior to the Petition Date that reasonably could be determined to have a value of $5,000 or more that was not made in exchange for any service, product or other asset; or (c) any other voluntary or involuntary transfer of cash or property within the ten years prior to the Petition Date that reasonably could be argued to have a value of $25,000 or more.  It shall not be a defense to a Material Misstatement that the subject asset(s) or transfer(s) were omitted inadvertently or based on good faith or mistaken judgment.

31

Except as otherwise specifically provided in the Creditors' Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Creditors' Plan, this Specific Disclosure Statement, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case in connection with the Creditors' Plan, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Creditors' Plan, the administration and implementation of the Creditors' Plan, including the issuance of GUC Trust Interests pursuant to the Creditors' Plan, or the distribution of property under the Creditors' Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Creditors' Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Creditors' Plan, shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Creditors' Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Creditors' Plan or such distributions made pursuant to the Creditors' Plan.

## V.   ~~CREDITORS' PLAN~~CREDITORS' PLAN LIQUIDATION ANALYSIS

The projected recoveries set forth in in the liquidation analysis provided in **Exhibit D** (the "Creditors' Plan Liquidation Analysis") are for illustrative purposes only and to enable holders of Claims to carefully compare the estimated recoveries contemplated by the Jones Plan to those contemplated by the Creditors' Plan.  Projected recoveries may be significantly higher or lower than shown based on the outcome of the Trust Causes of Action for those holders of General Unsecured Claims who elect to receive GUC Trust Interests. For the avoidance of doubt, all value held by the GUC Trust, net of costs and expenses, ultimately will be distributed to holders of GUC Trust Interests in accordance with the terms of the Creditors' Plan and the GUC Trust Agreement.

Moreover, the value available for distribution under the Creditors' Plan must be considered in connection with value that may be recoverable by the Sandy Hook Families, which comprises the near entirety of the creditor body in this Chapter 11 Case, outside of the Creditors' Plan in respect of their nondischargeable Claims against Jones and FSS.  Indeed, the preservation of such Claims and the ability to prosecute them immediately upon the Effective Date of the Creditors' Plan remains one of the most compelling reasons the Creditors' Plan is more favorable than the Jones Plan.

## VI.   SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Creditors' Plan (the "Solicitation Procedures").  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

In applying the best interests test, the Creditor Plan Proponents have considered the liquidation analysis ~~attached to the Jones Disclosure Statement as~~ **Exhibit [** ~~prepared by the Debtor [Docket No.~~ 555] (the "Jones ~~Plan~~ Liquidation Analysis")~~, which provides the Debtor's views regarding recoveries under the Jones Plan compared to recoveries in a chapter 7 liquidation~~, as well as the Creditors' Plan Liquidation Analysis attached hereto as **Exhibit D,** which, in part, builds upon the information set forth in the Jones ~~Plan~~ Liquidation Analysis.  For the avoidance of doubt, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that the Bankruptcy Court will accept the Creditor Plan Proponents' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

Based on the Creditors' Plan Liquidation Analysis, the Creditor Plan Proponents believe that, under the Creditors' Plan, holders of Impaired Claims will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.  Indeed, the Creditors' Plan likely provides holders of General Unsecured Claims with a larger recovery because transferring the Estate assets to the GUC Trust will allow the GUC Trustee to liquidate assets in an organized fashion, thereby realizing greater recovery for the beneficiaries of the GUC Trust.  Moreover, the Creditors' Plan provides holders of Claims with a greater recovery because of the additional fees and expenses that would be incurred in a chapter 7 liquidation.  Accordingly, the Creditor Plan Proponents believe that the Creditors' Plan is in the best interests of creditors.

### D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by a liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Creditors' Plan.

Since the Creditors' Plan contemplates a liquidation, for purposes of determining whether the Creditors' Plan meets the feasibility requirement, the Creditor Plan Proponents have analyzed their ability to meet their obligations under the Creditors' Plan in connection with the contemplated liquidation of the Debtor's assets and establishment of the GUC Trust.  The Creditor Plan Proponents anticipate that they will be able to make all payments required pursuant to the Creditors' Plan from the Estate assets, such as payment in full of Administrative Claims, Priority Claims, and Claims that are entitled to payment in full pursuant to the terms of the Creditors' Plan.  Therefore, the Creditor Plan Proponents believe that the liquidation of the Estate pursuant to the Creditors' Plan will meet the feasibility requirement of the Bankruptcy Code.

### E.      Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (i) the plan otherwise satisfies the requirements for confirmation, (ii) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class, and (iii) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

#### 1.      No Unfair Discrimination

36

A.        **Risks Related to the Chapter 11 Case**

1.        **Length of Litigation and Outcomes of the Trust Causes of Action**

The Trust Causes of Action are complex and fact intensive in nature.  It is difficult to estimate the length of time it will take to settle or reach a judgment regarding the Trust Causes of Action and, therefore, difficult to estimate how long it will be before holders of GUC Trust Interests will receive recoveries on account of the Trust Causes of Action.

In addition, although the Creditor Plan Proponents believe, based on their own review of the Trust Causes of Action that the Trust Causes of Action are likely to be successful and yield substantial recoveries for holders of GUC Trust Interests, the assumed outcomes are speculative in nature and cannot be guaranteed.  Even assuming a positive result, it is impossible to determine the amount of recovery that holders of GUC Trust Interests would receive on account of a settlement or judgment regarding the Trust Causes of Actions.

2.        **Viability of Future Operations of FSS**

In the Jones Specific Disclosure Statement Objection, the Debtor states that if a plan is confirmed over the Debtor's objection or that is not acceptable to him, he will cease working for FSS.  If true, this could jeopardize confirmation of the FSS Plan.  This may also jeopardize FSS's future operations and creditors' ability to collect against FSS on account of their nondischargeable Claims.

~~2~~3.        **Non-Confirmation of the Creditors' Plan**

Although the Creditor Plan Proponents believe they will obtain the requisite votes to accept the Creditors' Plan and the Creditor Plan Proponents believe that the Creditors' Plan satisfies all other requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that parties, including the Debtor, will not seek to oppose Confirmation of the Creditors' Plan or that the Bankruptcy Court may otherwise decline to confirm the Creditors' Plan.  The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion in connection with the Creditors' Plan.  Section 1122 of the Bankruptcy Code requires that the Creditors' Plan classify Claims against the Debtor.  The Bankruptcy Code also provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims or interests of such class.  The Creditor Plan Proponents believe that all Claims have been appropriately classified in the Creditors' Plan.  There can be no assurance, however, that the Bankruptcy Court will conclude that such Claims are properly classified in the Creditors' Plan. Moreover, under the Bankruptcy Code, only one plan can be confirmed by the Bankruptcy Court.  The Jones Plan is a competing plan, and such competing plan may be confirmed by the Bankruptcy Court in place of the proposed Creditors' Plan.

~~3~~4.        **Conversion to Chapter 7**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds it would be in the best interests of creditors and/or the Debtor, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  In the event of a chapter 7 conversation, unlike under the Creditors' Plan, the GUC Trust, and thus creditors, would not control the liquidation or assets or the prosecution of any Estate Causes of Action.

~~4~~5.        **Dismissal of the Chapter 11 Case**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtor, the Chapter 11 Case may be dismissed by order of the Bankruptcy Court.

### 56.    Non-Occurrence of the Effective Date

Although the Creditor Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur. Moreover, if the conditions precedent to the Effective Date of the Creditors' Plan are not met, the Creditors' Plan may be vacated by the Bankruptcy Court.

### 67.    Amendment, Waiver, Modification or Withdrawal of the Creditors' Plan

Except as otherwise specifically provided in the Creditors' Plan, the Creditor Plan Proponents reserve the right to modify the Creditors' Plan, whether such modification is material or immaterial, and seek confirmation of the Creditors' Plan consistent with the Bankruptcy Code.  The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Creditors' Plan on some or all of the classes or a change in the relative rights of such classes.  All holders of Claims will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but before confirmation of the Creditors' Plan, the Creditor Plan Proponents seek to modify the Creditors' Plan, the previously solicited acceptances will be valid only if (i) all classes of adversely affected creditors and interest holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims.

### B.    Risk of Variance in Financial Results

This Specific Disclosure Statement and the Creditors' Plan contain financial information and estimates of value that demonstrate the feasibility of the Creditors' Plan.  Information based on the financial information, estimates of value, and assumptions in this Specific Disclosure Statement was prepared for the limited purpose of furnishing recipients of the Specific Disclosure Statement with adequate information to make an informed judgment regarding acceptance of the Creditors' Plan.  The estimates of value and assumptions should not be relied upon in any way or manner for any other purpose and should not be regarded as representations or warranties by the Creditor Plan Proponents or any other person as to the accuracy of such information or that any such valuations or assumptions will be realized.  Those estimates of value and assumptions have not been, and will not be, updated on an ongoing basis, and they were not audited or reviewed by independent accountants or auditors.  They reflect certain expectations concerning the market and economic conditions that are, and remain, beyond the Creditor Plan Proponents' control.  Such estimates of value and assumptions are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the valuation estimates may be wrong in material respects.  Actual results may vary and may continue to vary significantly from those contemplated by valuation estimates, and/or assumptions.

### 1.    The Specific Disclosure Statement May Contain Forward-looking Statements

This Specific Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statements other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would,"

39

IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE ~~CREDITORS' PLAN~~CREDITORS' PLAN

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Creditors' Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders of General Unsecured Claims. It should not be relied upon for purposes of determining the specific tax consequences of the Creditors' Plan with respect to a particular holder. This discussion does not address aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim subject to special treatment under U.S. federal income tax laws. It also assumes that each holder of a Claim is a U.S. Holder (as defined below). It is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or non-U.S. tax laws or U.S. federal estate or gift tax laws.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date of this Specific Disclosure Statement. These authorities may change, possibly retroactively, resulting in U.S. federal income tax consequences different from those discussed below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Creditors' Plan and no opinion of counsel has been sought or obtained with respect thereto. The discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. No representations or assurances are being made to the holders of Claims with respect to the U.S. federal income tax consequences described herein.

As used herein, the term "U.S. Holder" means a beneficial owner of a Claim that is for U.S. federal income tax purposes (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; (iv) a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person; (v) the government of the United States, any state, political subdivision or territory thereof or the District of Columbia; or (vi) any Tribe. If a partnership or other entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any Claims, you should consult your own tax advisor.

This discussion also does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full under the Creditors' Plan, or (ii) that are deemed to accept or deemed to reject the Creditors' Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a holder of a Claim.

**The contents of this Specific Disclosure Statement should not be construed as legal, business or tax advice. Holders should consult their own tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Creditors' Plan and the receipt of amounts from the GUC Trust, as well as any tax consequences arising under any state, local or non-U.S. tax laws or any other U.S. federal tax laws. This Specific Disclosure Statement may not**

**HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE CREDITORS' PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S. OR OTHER APPLICABLE TAX LAWS.**

**X.     RECOMMENDATION AND CONCLUSION**

The Creditor Plan Proponents believe that Confirmation of the Creditors' Plan is in the best interests of the creditors and urge all holders of Claims in voting classes to vote in favor of the Creditors' Plan.

Dated:  January 5̶22, 2024


**THE CREDITOR PLAN PROPONENTS**


**The Official Committee of Unsecured Creditors**

By:         */s/ Marty L. Brimmage, Jr.*
            Marty L. Brimmage, Jr.
            **Akin Gump Strauss Hauer & Feld LLP**
            *Counsel to the UCC*


**The Texas Plaintiffs**

By:         */s/ Avi Moshenberg*
            Avi Moshenberg
            **McDowell Hetherington LLP**
            *Counsel to the Texas Plaintiffs*


**The Connecticut Plaintiffs**

By:         */s/ Ryan E̶. Chapple*
            Ryan E. Chapple
            **Cain & Skarnulis PLLC**

45

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ALEXANDER E. JONES, | ) Case No. 22-33553 (CML) |
|  | ) |
| Debtor. | ) |
|  | ) |

**CREDITORS' NON-UNIFORM INDIVIDUAL
CHAPTER 11 PLAN OF LIQUIDATION FOR ALEXANDER E. JONES**

*/s/ Marty L. Brimmage, Jr.*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr.
Texas Bar No. 00793386
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Fax:  (214) 969-4343
E-mail:  mbrimmage@akingump.com

-and-

David M. Zensky (admitted *pro hac vice*)
Sara L. Brauner (admitted *pro hac vice*)
Katherine Porter (admitted *pro hac vice*)
Anna Kordas (admitted *pro hac vice*)
Melanie A. Miller (*pro hac vice* pending)
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Fax:  (212) 872-1002
E-mail:  dzensky@akingump.com
E-mail:  sbrauner@akingump.com
E-mail:  kporter@akingump.com
E-mail:  akordas@akingump.com
E-mail:  melanie.miller@akingump.com

***Counsel to the Official Committee of Unsecured
Creditors of Alexander E. Jones***

*/s/ Ryan E. Chapple*
**CAIN & SKARNULIS PLLC**
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Stephanie P. Lascano (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  slascano@paulweiss.com
E-mail:  virobinson@paulweiss.com

***Co-Counsel to the Connecticut Plaintiffs***

*/s/ Avi Moshenberg*
**MCDOWELL HETHERINGTON LLP**
Avi Moshenberg
State Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  (713) 337-5580
Fax:  (713) 337-8850
E-mail:  Avi.Moshenberg@mhllp.com

**CHAMBERLAIN, HRDLICKA,**
**WHITE, WILLIAMS & AUGHTRY, PC**
Jarrod B. Martin
State Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, TX 77002
Telephone:  (713) 356-1280
Fax:  (713) 658-2553
E-mail:  jarrod.martin@chamberlainlaw.com

**WILLKIE FARR & GALLAGHER LLP**
Jennifer J. Hardy
State Bar No. 24096068
600 Travis Street
Houston, TX 77002
Telephone:  (713) 510-1766
Fax:  (713) 510-1799
E-mail:  jhardy2@willkie.com

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Ciara A. Sisco (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Fax:  (212) 728-8111
E-mail:  rstrickland@willkie.com
E-mail:  slombardi@willkie.com
E-mail:  csisco@willkie.com

*Co-Counsel to the Texas Plaintiffs*

Dated:  January 522, 2024

# **TABLE OF CONTENTS**

ARTICLE I. DEFINITIONS .................................................................................................1

    A.    Defined Terms ........................................................................................1

    B.    Rules of Interpretation ...........................................................................9

    C.    Computation of Time ............................................................................10

    D.    Reference to Monetary Figures ............................................................11

    E.    Controlling Document ..........................................................................11

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS .............11

    A.    Administrative Claims. .........................................................................11

    B.    Professional Fee Claims. .......................................................................11

    C.    Priority Tax Claims ...............................................................................12

ARTICLE III. TREATMENT AND CLASSIFICATION OF CLAIMS ........................13

    A.    Classification of Claims ........................................................................13

    B.    Treatment of Claims .............................................................................13

ARTICLE IV. THE GUC TRUST ...................................................................................15

    A.    The GUC Trust .....................................................................................15

    B.    The GUC Trustee ..................................................................................15

    C.    Assignments .........................................................................................16

    D.    GUC Trust Assets .................................................................................16

    E.    Litigation Assets ..................................................................................16

    F.    Confidentiality .....................................................................................17

    G.    Tax Treatment of GUC Trust Under Applicable Laws ........................17

    H.    Transferability and Certain Securities Law Matters ............................18

    I.    Retention of Professionals ...................................................................18

ARTICLE V. TREATMENT OF ~~NON-DISCHARGEABLE~~<u>NONDISCHARGEABLE</u> CLAIMS
18

ARTICLE VI. MEANS OF IMPLEMENTATION .........................................................18

    A.    Plan Distributions ................................................................................18

    B.    Jones Transfer Obligation .....................................................................19

    C.    Jones Full Disclosure ...........................................................................19

    D.    Additional Obligations ........................................................................20

    E.    Premarital Agreement ..........................................................................20

    F.    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment
20

## INTRODUCTION

The UCC and the Sandy Hook Families propose the following Plan pursuant to the provisions of chapter 11 of the Bankruptcy Code.  For the avoidance of doubt, other than as disclosed in the Specific Disclosure Statement, the Confirmation of the Plan shall not affectdoes not necessarily determine the outcome of the FSS Case and shall notor impair FSS's ability to prosecute the FSS Plan and perform thereunder if confirmed.

## ARTICLE I.
## DEFINITIONS

A. *Defined Terms*

As used in the Plan, capitalized terms shall have the meanings set forth below.

1.    "***Administrative Claim***" means a Claim for which a holder asserts and is determined to be entitled to priority for costs and expenses of administration of the Debtor's estate pursuant to sections 503 and 507(a)(1) of the Bankruptcy Code.

2.    "***Affiliate***" means an "affiliate" as defined by section 101(2) of the Bankruptcy Code, and shall include with respect to Jones, without limitation, A. Emric Productions LLC, AEJ Austin Holdings LLC, AEJ Holdings, LLC, Austin Shiprock Publishing, LLC, Emric Productions, Free Speech Systems, LLC, Guadalupe County Land and Water LLC, Info W, LLC, IWHealth, LLC, Jones Productions, Jones Productions, LLC, Jones Report, LLC, JLJR Holdings LLC, Magnolia Management LLC, Magnolia Management, LP, Magnolia Holdings Limited Partnership, Magnolia Limited Partnership, Planet Infowars, LLC, PLJR Holdings LLC, Prison Planet TV, LLC, PQPR Holdings Limited LLC, RCGJ, LLC, and the Jones Trusts.

3.    "***Allowed***" or "***Allowed Amount***" means, with respect to any Claim against the Debtor, except to the extent that the Plan provides otherwise, any portion thereof:  (a) that is allowed under the Plan, by Final Order, or pursuant to a settlement; (b) that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order); or (c) that is scheduled by the Debtor as not disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely Filed; *provided that*, with respect to a Claim described in clauses (b) and (c) above, such Claim shall be considered Allowed only if and to the extent that such Claim is not Disallowed and no objection to the allowance of such Claim is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order.

4.    "***Bar Date***" means the dates established by the Bankruptcy Court or otherwise provided for by the Bankruptcy Code, the Bankruptcy Rules, or the Plan by which any Proof of Claim must be Filed with respect to such Claims; *provided that* there shall be no applicable Bar Date for Claims for which the Plan excludes from the requirement of Filing Proofs of Claim.

51.     "**Jones Transfer Obligation**" shall have the meaning ascribed to such term in Article VI.B of the Plan.

52.     "**Jones Trusts**" shall mean the Recharge Dynasty Trust, the 2022 Litigation Settlement Trust, the RXXCTTGAA Trust, the Green Leaf Trust, the AEJ 2018 Trust, the Missouri779384 Trust, and the Alexander E. Jones Descendent and Beneficiary Trust.

53.     "**Lien**" means a "lien" as defined by section 101(37) of the Bankruptcy Code.

54.     "**Litigation Assets**" are those litigation-related assets and Causes of Action to be vested in the GUC Trust, as described in Article IV.E of the Plan.

55.     "**Litigation Committee**" shall have the meaning ascribed to such term in Article IV.B of the Plan.

56.     "**Material Misstatement**" shall have the meaning ascribed to such term in Article VI.C of the Plan.

57.     "**~~Non-Dischargeable~~<u>Nondischargeable</u> Claims**" means any and all claims arising out of the following proceedings:  (a) *Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; (b) *Pozner ~~v. De La Rosa~~, et al.* <u>v. *Jones*</u>, Case No. D-1-GN-001842, in the Judicial District Court of Travis County, Texas; (c) *Lafferty* v. *Jones*, *et al.*, Case No. UWY-CV18-6046436-S, in the Judicial District of Waterbury of the Connecticut Superior Court; (d) *Sherlach* v. *Jones, et al.*, Case No. UWY-CV18-6046437-S, in the Judicial District of Waterbury of the Connecticut Superior Court; and (e) *Sherlach* v. *Jones, et al.*, Case No. UWY-CV18-6046438-S, in the Judicial District of Waterbury of the Connecticut Superior Court, in each case, to the extent such claims were determined to be ~~non-dischargeable~~<u>nondischargeable</u> by the Bankruptcy Court's memorandum decisions dated October 19, 2023,[1] or pursuant to any further Final Order.

58.     "**Other Priority Claim**" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, including any Priority DSO Claim.

59.     "**Petition Date**" means December 2, 2022, the date on which Jones commenced the Chapter 11 Case.

60.     "**Plan**" means this Creditors' Non-Uniform Individual Chapter 11 Plan of Liquidation for Alexander E. Jones, proposed by the UCC and the Sandy Hook Families, as it may be amended, modified, and/or supplemented from time to time.

---

[1]     *Memorandum Decision on Connecticut Plaintiffs' Motion for Summary Judgment Against Jones*, Adv. Pro. No. 23-03037 [Docket No. 76]; *Memorandum Decision on Texas Plaintiffs' Motion for Summary Judgment Against Jones*, Adv. Pro. No. 23-03035 [Docket No. 46].

No. 1); (iii) one Class 3 Claim held by Reeves Law, PLLC, which has Filed a Proof of Claim in the amount of $24,611.13 (Claim No. 5); and (iv) one Class 3 Claim held by the City of Austin, which has Filed a Proof of Claim in the amount of $86.60 (Claim No. 3); and (v) one Class 3 Claim held by the IRS to the extent that any portion of its Claim in the amount of $586,884.64 (Claim No. 4) is deemed to be a non-Priority Tax Claim. However, additional Claims may be Allowed General Unsecured Claims if filed by the applicable Bar Date or other time period provided for by the Plan or an order of the Bankruptcy Court, and otherwise Allowed.

4.    Class 4 – Subordinated Claims.

a.  **Classification**.  Class 4 consists of all Subordinated Claims.

b.  **Treatment**.  Holders of Subordinated Claims, regardless of whether such claims are Allowed, are not entitled to any distributions or to receive or retain any property under the Plan.

c.  **Voting**.  Class 4 is Impaired under the Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

d.  **Claimants**.  At present, there is one Class 4 Claimant, FSS, which has Filed a Proof of Claim in the amount of $0.00 (Claim No. 26).  However, additional Claims may be Subordinated Claims if filed by the applicable Bar Date or other time period provided for by the Plan, and otherwise Allowed.  For the avoidance of doubt, any Claim asserted by, or on behalf of, Erika Jones on the basis of the Premarital Agreement will be treated as a Subordinated Claim.

**ARTICLE IV.**
**THE GUC TRUST**

A. *The GUC Trust*

On or before the Effective Date, a trust shall be established for the benefit of holders of General Unsecured Claims that elect to receive GUC Trust Interests (the "***GUC Trust***").  The GUC Trust shall be governed and administered in accordance with the GUC Trust Agreement, which sets forth, *inter alia*, the powers, authority, responsibilities, and duties of the GUC Trustee.

The purpose of the GUC Trust shall be the liquidation and administration of the GUC Trust Assets and making distributions to holders of GUC Trust Interests in accordance with the terms of the Plan and the GUC Trust Agreement.

B. *The GUC Trustee*

The GUC Trust shall be administered by a trustee who shall be chosen by the Sandy Hook Families in accordance with the GUC Trust Agreement (the "***GUC Trustee***").  On or before the Effective Date, the GUC Trustee, on behalf of the Debtor, shall execute the GUC Trust Agreement and shall take all other steps necessary to establish the GUC Trust pursuant to the GUC Trust Agreement and consistent with the Plan.  For the avoidance of doubt, if, for any reason the individual or entity chosen to serve as the GUC Trustee shall need to be replaced, the Sandy Hook Families shall appoint a subsequent GUC Trustee unless otherwise provided by the GUC Trust Agreement.  The GUC Trust Agreement shall establish an oversight committee (the "***Litigation Committee***") consisting of members of the Sandy Hook Families appointed in accordance with the terms of the GUC Trust Agreement to oversee performance of the GUC Trustee's duties with respect to the GUC Trust Assets and otherwise serve the functions to be described in the Plan and the GUC Trust Agreement.

The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust Assets, subject to the authority granted to it under the Plan, the Confirmation Order, and the GUC Trust Agreement, as applicable, and shall file with the Bankruptcy Court periodic public reports on the status of claims reconciliation and distributions, which reports may be included in the quarterly reporting required by the U.S. Trustee.  In addition, the GUC Trustee shall issue quarterly written reports and engage in update calls upon reasonable request with representatives of the Sandy Hook Families.

The GUC Trustee shall owe fiduciary duties to all holders of GUC Trust Interests consistent with the fiduciary duties a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code owes to its constituents, and the Litigation Committee must consent to any proposed material action, including any settlement in respect of any action, by the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

C. *Assignments*

On the Effective Date, the ~~Non-Dischargeable~~Nondischargeable Claims will be assigned to the GUC Trust.

D. *GUC Trust Assets*

On the Effective Date, all GUC Trust Assets will vest in the GUC Trust.  For the avoidance of doubt, the Exempt Assets will not vest in the GUC Trust.  The GUC Trust Interests shall only be transferrable in the sole discretion of the GUC Trustee in accordance with the terms of the GUC Trust Agreement.

Under section 1141(b) of the Bankruptcy Code, the GUC Trust Assets shall be assigned, transferred, and vest in the GUC Trust upon the occurrence of the Effective Date, free and clear of all Claims, Liens, encumbrances, and interests; *provided, however*, *that* the GUC Trustee may abandon or otherwise not accept any assets that the GUC Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the GUC Trust in accordance with the terms of the GUC Trust Agreement.  Any assets that the GUC Trustee so abandons (whether before or after the Effective Date) or otherwise does not accept shall not be GUC Trust Assets.

E.  *Litigation Assets*

The following assets constitute "***Litigation Assets***" and will vest in the GUC Trust and be administered by the GUC Trustee in accordance with the terms described herein and in the GUC Trust Agreement:

1.  **Initial Litigation Funding**.  A total of $500,000 in Cash, which shall be funded by Jones's Estate to the GUC Trust for administrative expenses in connection with administering the Litigation Assets; *provided that* the source and manner of funding shall be acceptable to the GUC Trustee; *provided, further, that* a portion of the proceeds from liquidation of the Litigation Assets may be retained by the GUC Trustee in its discretion as continued funding for administration of the Litigation Assets.

2.  **Trust Causes of Action**.  All Causes of Action (a) belonging to Jones's Estate (including those belonging to the Jones Trusts), whether or not initially asserted prior to Confirmation, including, but not limited to, any estate claims or causes of action against or related to Jones, any Insider or Affiliate of Jones, and (b) the Texas State Court fraudulent conveyance action filed by Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine previously removed and then transferred to the Bankruptcy Court (together, such Causes of Action, the "***Trust Causes of Action***").

3.  **Release Settlement Payments**.  All Release Settlement Payments made to the GUC Trust shall immediately vest in the GUC Trust upon payment.

4.  **Books & Records**.  Jones's books and records related to prepetition transfer of Estate assets and related Causes of Action, including all documents, communications, and information of Jones, any Jones Trusts, and any entities owned or controlled by Jones, including such documents, communications, and information protected by the attorney-client privilege, the work-product privilege, or any other applicable evidentiary privileges pertaining in any way to the Litigation Assets.  All discovery obtained by the UCC during the Chapter 11 Case shall be transferred to the GUC Trust.

5.  **Investigative Powers**.  The GUC Trust and the GUC Trustee will retain the right to conduct any discovery related to the acts, conduct, or property, or to the liabilities and financial condition of Jones, or to any matter which may affect the administration of Jones's Estate or any Trust Causes of Action, or to Jones's right to a discharge, under Bankruptcy Rule 2004, to the full extent that such powers were available prior to the Effective Date.

6.  **Audit Powers**.  The GUC Trust or the GUC Trustee may retain a professional to conduct financial audits of Jones as necessary and request information from applicable third parties in connection with the same (including Erika Jones and David Jones) to ensure the veracity of financial disclosures.

7.  **Privileges**.  All privileges in respect of the Trust Causes of Action, including the attorney-client privilege, held by Jones shall transfer to the GUC Trust.

## ARTICLE V.
## TREATMENT OF ~~NON-DISCHARGEABLE~~NONDISCHARGEABLE CLAIMS

The Plan will not discharge any ~~Non-Dischargeable~~Nondischargeable Claim and the rights of the Sandy Hook Families, acting through the GUC Trust, to exercise all rights, remedies, and other legal entitlements, whether arising under state, federal, or foreign law, with respect to the ~~Non-Dischargeable~~Nondischargeable Claims are expressly preserved and nothing to the contrary in the Plan will limit, affect, or otherwise impact such rights; *provided that* no individual holder of any Sandy Hook Family Claim shall be entitled to receive more than the aggregate Allowed amount of such Holder's Sandy Hook Family Claim on account of such Claims pursuant to the Plan.

## ARTICLE VI.
## MEANS OF IMPLEMENTATION

The Plan will be implemented in accordance with the following provisions:

A. *Plan Distributions*

1.      **Distributions to holders of Allowed Priority Claims**.  Distributions to holders of Allowed Priority Claims will be made as follows:

a.      Professional Fee Claims.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to the applicable Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court.  To the extent the funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed Amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied by the GUC Trustee in Cash once Allowed or as soon as reasonably practicable thereafter.

b.      Priority Tax Claims and Administrative Claims.  Holders of Allowed Priority Tax Claims and Allowed Administrative Claims shall receive Cash, which shall be satisfied by the GUC Trustee once Allowed or as soon as reasonably practicable thereafter.

2.      **Distributions to holders of Allowed Secured Claims.**  Distributions to holders of Allowed Secured Claims will be made on the Effective Date, which shall be satisfied in Cash once Allowed or as soon as reasonably practicable thereafter.

3.      **Distributions to holders of Other Priority Claims.**  Holders of Allowed Other Priority Claims shall receive Cash, which shall be satisfied by the GUC Trustee once Allowed or as soon as reasonably practicable thereafter.

4.      **Distributions to holders of Allowed General Unsecured Claims**.  Holders of Allowed General Unsecured Claims shall receive, at their election, either (a) satisfaction of their

## ARTICLE X.
## RELEASES AND EXCULPATIONS

A. *Releases*

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, as applicable, from any and all claims and Causes of Action asserted by or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement executed to implement the Plan or any Claim or obligation arising under the Plan.  For the avoidance of doubt, Jones shall not be a Released Party and there shall be no release or exculpation of the Trust Causes of Action, the ~~Non-Dischargeable~~Nondischargeable Claims, or any other Claims or Causes of Action against Jones, non-minor members of his immediate family, or their Insiders or Affiliates, as applicable, subject to the ability of Insiders and Affiliates of Jones to become a Released Party by making a Release Settlement Payment.

B. *Exculpations*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Plan, the Specific Disclosure Statement, the Plan Supplement, or any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Case in connection with the Plan, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of GUC Trust Interests pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan.

# ARTICLE XIV.
# MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon Jones and any and all holders of Claims (irrespective of whether their Claims are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with Jones.

B. *Discharge*

The provisions of the Plan will bind Jones and all holders of Claims against Jones, whether or not they accept the Plan.  On the Effective Date, all holders of Claims will be precluded and enjoined from asserting any Claim against Jones, Jones's Estate, or Jones's assets or property based upon any transaction or any activity of any kind that have occurred prior to the Effective Date, during the duration of the Plan; *provided, however, that* holders of ~~Non-Dischargeable~~Nondischargeable Claims shall not be precluded or enjoined from asserting such Claims or from pursuing collection actions against Jones or his present or future assets or property (other than GUC Trust Assets) with respect to such Claims, to the extent allowable under non-bankruptcy law.

C. *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by the UCC with respect to the Plan or the Specific Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the UCC unless and until the Effective Date has occurred.

D. *FSS Plan*

~~Nothing in the Plan shall affect the FSS Case or impair FSS's ability to prosecute and perform under the FSS Plan if confirmed.  Additionally, nothing in the Plan shall limit FSS's rights and obligations under the FSS Plan.~~

As further described in the Specific Disclosure Statement, Confirmation of the Plan need not determine the outcome of the FSS Case nor necessarily impair FSS's ability to prosecute the FSS Plan and perform thereunder if confirmed.

**Exhibit B[1]**

**Schedule of Assets**

~~**Schedule of Assets[1]**~~

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| **1. Personal Bank Accounts / Cash[6]** | | | |
| ~~Prosperity~~Total Bank ~~Account #9175~~Accounts | ~~$853~~ 885,026[6] | - | Included |
| ~~Bank of America Account #6078~~ | ~~$976~~ | | ~~Included~~ |
| ~~Bank of America Account #2913~~ | ~~$1,107~~ | | ~~Included~~ |

[1] Capitalized terms used but not otherwise defined in this **Exhibit B** shall have the meanings ascribed to such terms in the Specific Disclosure Statement.

~~[1] Capitalized terms used but not otherwise defined in this **Exhibit B** shall have the meanings ascribed to such terms in the Specific Disclosure Statement.~~

[2] This **Exhibit B** differs from the list of assets identified in Article IV.B of the Jones Disclosure Statement, as it only includes assets that are currently available for liquidation and immediate distribution to creditors.  By contrast, various claims against third parties belonging to the Debtor's Estate are included in **Exhibit C**.  This **Exhibit B** does not include an anticipated IRS refund valued by the Debtor at approximately $3.89 million, interests in certain executory contracts, contingent and unliquidated claims listed by the Debtor, and a cat.  If and when the Debtor obtains any value on account of the foregoing, such value should be available to Jones's creditors.  This **Exhibit B** incorporates by reference all assets listed in all iterations of the Debtor's Schedules and Statements and does not purport to re-list each individual asset.  Additionally, this **Exhibit B** includes various assets uncovered by the Creditor Plan Proponents as a result of the UCC's Investigation that were not listed in the Jones Disclosure Statement or, in certain instances, the Debtor's Schedules and Statements.  This **Exhibit B** remains subject to amendment in all respects.

[3] Unless otherwise specified herein, the value of each asset listed in this **Exhibit B** is obtained from the following sources: (i) the Debtor's Schedules and Statements; (ii) the Debtor's monthly operating reports filed in the Chapter 11 Case; ~~or~~ (iii) the Jones Disclosure Statement; or (iv) the Jones Liquidation Analysis.  The Creditor Plan Proponents have not separately valued each item identified by the Debtor, and inclusion of the value ascribed by the Debtor in this list does not necessarily indicate the Creditor Plan Proponents' agreement with such value.

[4] The claimed exempt status of the assets included herein and the value attributable to such exempt assets are derived from the Debtor's Schedules and Statements.  The Creditor Plan Proponents reserve the right to dispute the Debtor's classification of certain assets or a portion thereof as exempt.

[5] Line items marked as "Included" in this column appear in Article IV.B of the Jones Disclosure Statement and/or the Debtor's Schedules and Statements. Notably, the Jones Disclosure Statement lumps certain assets together, while the Schedules and Statements provide a more detailed breakdown.  To the extent an asset does not appear in either the Jones Disclosure Statement or the Schedules and Statements, it is marked as "Not included."

~~[6] According to the Jones Disclosure Statement, the Debtor has $1,056,913.67 in cash and securities held in several accounts. *See* Jones Disclosure Statement, Art. IV.B.  The Jones Disclosure Statement, however, does not provide a breakdown of specific balances in each bank account.  Therefore, the information listed in this section is derived from the November 2023 monthly operating report filed by the Debtor [Docket No. 528] (the "November MOR").~~

[6] According to the Jones Disclosure Statement, the Debtor has $1,056,913.67 in cash and securities held in several accounts. *See* Jones Disclosure Statement, Art. IV.B.  The Jones Liquidation Analysis provides the most current information regarding the amounts in the Debtor's bank accounts and includes only a line item for "Total Bank Accounts" that is not broken out by specific bank accounts.  The November 2023 monthly operating report filed by the Debtor [Docket No. 528] (the "November MOR") provides detail on a bank account level but is not up to date.  Therefore, this **Exhibit B** reflects the most updated total bank accounts value and Cash as provided in the Jones Liquidation Analysis. The Creditor Plan Proponents reserve the right to update this **Exhibit B**.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| ~~JPMorgan Chase Account #7518~~ | ~~$1,222~~ | ~~—~~ | ~~Included~~ |
| ~~JPMorgan Chase Account #3520~~ | ~~$1,207~~ | ~~—~~ | ~~Included~~ |
| ~~PNC Bank Account #5233~~ | ~~$621,427~~ | ~~—~~ | ~~Included~~ |
| ~~Security Bank of Crawford Account #8548~~ | ~~$1,053~~ | ~~—~~ | ~~Included~~ |
| Cash on hand | $1,000 | - | Included |
| **Subtotal:** | **$~~628,845~~886,026** | **-** | |
| **2. Real Property[7]** | | | |
| Homestead, Austin Texas - 80% owned through RXXCTTGAA Trust and 20% transferred to Erika Jones in February 2022[8] | $3,266,000 | $2,612,800[9] | Included |
| Lake House (Lake Travis) ("Back of the Moon"), Austin, Texas | $1,750,000 | - | Included |
| Rental Property – WW ("Whispering Winds"), Austin, Texas | $505,000 (of which $28,883 is secured) | - | Included |
| Ranch in Guadalupe County, Texas | $ 2,189,220 | - | Included |
| **Subtotal:** | **$7,710,220 (of which $28,883 is secured)** | **$2,612,800** | |
| **3.  Entities and Trusts[10]** | | | |
| Free Speech Systems LLC | Unknown | - | Included |

---

[7] To avoid disclosure of any information that may be confidential or sensitive in nature, properties in this **Exhibit B** are referred to by the names utilized by the Debtor, rather than their addresses.  *See Order Granting Emergency Motion for Entry of An Order Authorizing Debtor to File Schedules and Statements Under Seal* [Docket No. 530].

[8] Records show that the Debtor owns this property through the RXXCTTGAA Trust.  In the Debtor's Schedules and Statements, the Debtor appears to claim ownership of the property directly, rather than ownership through the trust. The Debtor also claims to have transferred 20% of the property to his wife Erika Jones in February 2022. Regardless of whether owned directly or indirectly through the trust, the property should be available for distribution to creditors if the property is not properly exempt.

[9] The Debtor claims the entire 80% portion of the Homestead that he claims to own as exempt.  As noted above, the Creditor Plan Proponents reserve the right to dispute any exemptions claimed by the Debtor.

[10] The Creditor Plan Proponents have not independently valued the entities in which the Debtor has an interest. The values are derived from the Debtor's Schedules and Statements, as well as bank statements produced in discovery in connection with the UCC's Investigation.  Where assets held by such entities have been identified, they are included herein.   Intangible assets, such as domain names, intellectual property or goodwill, if any, have not been independently valued.  The Creditor Plan Proponents cannot verify that all assets held by the entities listed herein have been identified or disclosed or verify the value ascribed by the Debtor in respect of the Debtor's interest in these entities.  As set forth in the Jones Liquidation Analysis, the Debtor has attributed significantly less value to his entities and trusts than set forth in this **Exhibit B**.  The Creditor Plan Proponents reserve all rights with respect to the value of same.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| AEJ Austin Holdings LLC, including its bank account[11] | $10,000 | - | Included |
| Jones Productions LLC | Unknown | - | Included |
| Planet Infowars LLC | Unknown | - | Included |
| Austin Shiprock Publishing LLC | Unknown | - | Included |
| Magnolia Management LLC | Unknown | - | Included |
| Magnolia Holdings, Limited Partnership LP | Unknown | - | Included |
| RCGJ LLC, including Unit 5 Clawson Road[12] | $767,400[13] | - | Not included[14] |
| Jones Report LLC and its intellectual property, includes IP related to prisonplanet.com and jonesreport.com | $7,302 | - | Included |
| A. Emeric Productions LLC, including its bank account[1514] | $485 | | Included |
| Guadalupe County Land and Water LLC | Unknown | - | Included |
| InfoW LLC | See below note for the 2022 Litigation Settlement Trust | - | Not included |
| IWHealth LLC | See below note for the 2022 Litigation Settlement Trust | - | Not included |
| Prison Planet TV LLC | See below note for the 2022 Litigation Settlement Trust | - | Not included |

---

[11] AEJ Austin Holdings ("AEJ Holdings") holds a note (the "Note") and security agreement (the "Security Agreement") from the AEJ 2018 Trust. The Debtor acknowledges the AEJ 2018 Trust has defaulted under the Note. AEJ Holdings, therefore, has a claim against the AEJ 2018 Trust for the 90% interest in PLJR Holdings LLC, which in turn owns 80% of PQPR, pledged as collateral under the Security Agreement.

[12] As more fully described in the Specific Disclosure Statement, the Debtor now contends that Unit 5 does not belong to the Debtor's Estate, which the Creditor Plan Proponents dispute. *See* Specific Disclosure Statement, Art. III.F.2.ii.f. Given the Debtor's current position respecting this property, it is included in both **Exhibit B** (as property the Creditor Plan Proponents contend can be collected directly in a liquidation) and **Exhibit C** (as property that may be subject to claims to claw such property back into the Debtor's Estate).

[13] Value derived from the Second Amended Schedules and Statements.

[14] RCGJ LLC is included, but its ownership of Unit 5 is not.

[1514] Appears to also be referred to as Emric Productions LLC in the Debtor's Schedules and Statements.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| 90% interest in PLJR Holdings LLC, including its bank account and interest in PQPR | Unknown[15] | - | Not included |
| 72% interest in PQPR Holdings Limited LLC, including its bank accounts and inventory | Unknown[16] | - | Not included |
| AEJ 2018 Trust, including its bank account and indirect interest in PQPR | Unknown[17] | - | Included |
| Missouri779384 Trust, including its bank account | $54,519 | - | Included[18] |
| RXXCTTGAA Trust, including its bank account[19] | $14,000 | - | Included[20] |
| 2022 Litigation Settlement Trust – includes InfoW LLC (holds intellectual property, including copyright and domains related to InfoWars.com), Prison Planet TV LLC (holds copyright and domains related to prisonplanet.tv) and IWHealth LLC[21] | $66,935 | - | Included[22] |
| Recharge Dynasty Trust | Unknown | - | Included |
| Alexander E. Jones Descendant and Beneficiary Trust | $1,632,400[23] | | Not included |
| Greenleaf Trust | $127,094[24] | | Not included |
| **Subtotal:** | **>$2,693,248**[25] | **-** | |

---

[15] PLJR has a bank account holding $3,111, and an interest in PQPR which cannot be valued at this time, but which the Creditor Plan Proponents believe to be substantial.

[16] PQPR has not provided the information necessary to ascribe a value, but the Creditor Plan Proponents believe it to be substantial.

[17] AEJ 2018 Trust has a bank account holding $10,002, and an interest in PQPR which cannot be valued at this time, but which the Creditor Plan Proponents believe to be substantial.

[18] This trust appears to be omitted from the Jones Disclosure Statement, but has been previously included in the Debtor's Schedules and Statements.

[19] This trust also holds the Homestead property.

[20] This trust appears to be omitted from the Jones Disclosure Statement, but has been previously included in the Debtor's Schedules and Statements.  The Debtor has not disclosed the bank account or the ownership of the Homestead property.

[21] While ownership of certain domains has now been disclaimed by the Debtor, insufficient evidence has been provided as to the ownership of such assets.

[22] This trust appears to be omitted from the Jones Disclosure Statement, but has been previously included in the Debtor's Schedules and Statements.

[23] Although the Debtor contends that this trust owns three condos, which the Creditor Plan Proponents dispute, this total does not include Unit 5, which is included in the total for RCGJ LLC.  The Debtor disputes that these assets are available to creditors.

[24] The Debtor disputes that these assets are available to creditors.

[25] This subtotal includes amounts from footnotes 15 and 17.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| **4. Personal Property[26]** | | | |
| ~~51~~54 firearms | $73,744 | $10,211 | Included[27] |
| ~~3 Glock 9mm firearms[28]~~ | ~~$1,444[29]~~ | ~~-~~ | ~~Not included~~ |
| 19 watches and 1 pair of cufflinks | $54,622 | $12,500 | Included |
| 4 Rolex watches – "black and blue stainless, all black stainless . . .gold blue face, [and] military style milgauss"[30][28] | $50,000 – $90,000[31][29] | - | Not included |
| 44 U.S. Silver Coins | $1,680 | - | Included |
| Furniture, fixtures, rugs, artwork and grill located in the Debtor's primary residence | $11,955 | $11,955 | Included |
| Lake House (~~Furniture~~furniture, fixtures, household goods, recreational equipment ~~at the Lake House~~ see attachment) | $21,145 | | Included |

[26] Per the Jones Disclosure Statement, the combined value of the Debtor's three motor vehicles, other personal items such as electronics, sports equipment, and clothing, 49 firearms, and watches or other jewelry totals $171,636. *See* Jones Disclosure Statement, Art. IV.B. By contrast, the identified value of these items based on the Debtor's November MOR and the Third Amended Schedules and Statements is approximately $290,000. The Debtor has offered no explanation for the disparity. As such, this **Exhibit B** uses the greater value of the aforementioned items as set forth in the Third Amended Schedules and Statements and the November MOR. This **Exhibit B** also includes items that the Debtor omitted as noted. On November 11, 2023, the Debtor filed a motion [Docket No. 485] to sell certain personal property listed in this category in accordance with procedures agreed to by the Creditor Plan Proponents.

[27] ~~The Jones Disclosure Statement only lists 49 firearms, while~~Although the Debtor's most recent Schedules and Statements ~~identify~~listed ownership of 51 firearms, ~~two of which~~the Debtor has subsequently confirmed ownership of 54 firearms, with a total value of $73,744, of which 52 are non-exempt property and 2 are claimed as exempt. ~~*See* Jones Disclosure Statement, Art. IV.B~~ property.

[28] ~~The Debtor initially included these three firearms in his Second Amended Schedules and Statements, but subsequently removed them, alleging that these items are owned by Erika Jones. Based on information obtained by the UCC as part of the UCC's Investigation, Erika Jones has denied owning these firearms.~~

[29] ~~Approximate value derived from similar items identified on the firearms inventory annexed to the Debtor's Schedules and Statements.~~

[30][28] These watches were previously listed as property of the Debtor in December 2017, but have not been located in this Chapter 11 Case. No explanation has been provided as to where the watches are presently located, or whether they were sold or gifted.

[31][29] The document identifying these watches as the Debtor's property does not describe the precise model or year of the watches, making independent valuation difficult. The approximate value set forth in this **Exhibit B** is based on similarly named Rolex watches made prior to 2016. The value is derived from a variety of online luxury watch valuators, which estimated the watches at approximately $70,000. The provided range is plus/minus $20,000 of that value.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| Furniture, fixtures, rugs, artwork and other personal property located in real property other than the Debtor's primary residence or the Lakehouse | Unknown[3230] | - | Not included |
| Electronics (television and monitor) | $660 | $660 | Included |
| Treadmill and 3 electric bikes | $2,385 | $2,385 | Included |
| Sunglasses and prescription glasses | $845 | $845 | Included |
| Clothing | $300 | $300 | Included |
| Contents of several storage facilities | Unknown | - | Included |
| Cryoniq cryogenic chamber | $4,000 | - | Included |
| A fossil, a polished stone, and two stone lamps | $23,690 | - | Not included |
| **Subtotal:** | **$246,470-286,470**[31] | **$38,856** | |
| **5.  Vehicles and Boats** | | | |
| 2017 Ford Expedition | $21,463 | - | Included |
| ~~2019 Dodge Challenger~~ | ~~$67,575~~ | ~~~~ | ~~Included~~ |
| 2020 Dodge Charger | $70,618 | $70,618[32] | Included |
| 2016 Regal Boat 28 Express | $67,015 | - | Included |
| 2015 Regal Boat 24 Fasdeck & 2015 Magnum Trailer | $47,285 | - | Included |
| 2017 Audi A8[33] | $25,000[34] | - | Not included |
| 2006 Acura MDX[35] | $5,000[36] | - | Not included |
| **Subtotal:** | **~~$303,956~~** **206,381** | **-** | |

[3230] The Debtor has furniture, fixtures, and goods in properties other than the primary residence and the Lakehouse, including property the Debtor purchased in an apartment and in a trailer on David Jones's property.

[31] The Jones Liquidation Analysis lists the Debtor's personal property as worth $171,536.

[32] This asset was not claimed as exempt by the Debtor in his Schedules and Statements.

[33] Public records indicate that this motor vehicle is owned by Alex Jones and Erika Jones.  As noted in the Specific Disclosure Statement, the Debtor has stated that the car was gifted to his wife, notwithstanding the ownership set forth in public records.  Even if the car was gifted, there are claims to recover the car for the benefit of the Estate. Given the Debtor's current position respecting this property, it is included in both **Exhibit B** (as property the Creditor Plan Proponents contend can be collected directly in a liquidation) and **Exhibit C** (as property that may be subject to turnover and avoidance claims).

[34] Value was derived from KBB.com as of January 2, 2024.

[35] Public records indicate that this motor vehicle is owned by Alex Jones and Kelly Nichols.

[36] Value was derived from KBB.com as of January 2, 2024.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| **6. Other[37]** | | | |
| Inventory - Platinum | $~~339,119[37]~~307,081 | - | Not included |
| Inventory from Hi-Tech Pharmaceuticals | $760,854[38] | - | Included |
| GiveSendGo-Legal | $~~38,109[38]~~10,461 | - | Included |
| Prepayment-Legal Account | $50,000[39] | - | Included |
| Certain Unclaimed Property | $6,396[39] | - | Included |
| Rental Property Escrow | $~~15,000~~6,245 | - | Included |
| Petty Cash for Childcare | $~~700[40]~~120 | | Not included |
| Prepaid Insurance | $1,859[41] | | Not included |
| Cryptocurrency~~42~~40 | $100,000 | - | Not included |
| Unspecified Accounts Receivable | $~~169,773[43]~~118,139 | | Not included |
| Receivable from Descendants Trust | $~~30,015[44]~~30,832[41] | | Not included |

[37] Unless otherwise noted herein, the estimated values listed in this section are based on the values provided for such assets in the Jones Liquidation Analysis.

~~[37] Value derived from the November MOR.~~

[38] This inventory is not included in the Jones Liquidation Analysis but was listed in the Third Amended Schedules and Statements.

~~[38] Value derived from the November MOR.~~

~~[39] Value derived from the November MOR.~~

[39] This asset is not included in the Jones Liquidation Analysis but was listed in the Third Amended Schedules and Statements.

~~[40] Value derived from the November MOR.~~

~~[41] Value derived from the November MOR.~~

~~42~~40 The Creditor Plan Proponents are in the process of identifying cryptocurrency owned but not disclosed by the Debtor. To date, the Creditor Plan Proponents have confirmed that the Debtor owns approximately $100,000 in cryptocurrency that was held in various donation sites for the benefit of the Debtor but not disclosed. The UCC's Investigation in respect of other cryptocurrency remains ongoing.

~~[43] Value derived from the November MOR.~~

~~[44] Value derived from the November MOR. The basis for the receivable identified by the Debtor is not specified. In addition to the receivable identified by the Debtor in the November MOR, the Creditor Plan Proponents have identified significant claims against the Descendants Trust, as set forth in the Disclosure Statement and **Exhibit C**.~~

[41] Value derived from the November MOR. The basis for the receivable identified by the Debtor is not specified. In addition to the receivable identified by the Debtor in the November MOR, the Creditor Plan Proponents have identified significant claims against the Descendants Trust, as set forth in the Disclosure Statement and **Exhibit C**.

| Description of Asset[2] | Estimated Value[3] | Amount Claimed as Exempt by Debtor[4] | Asset **Not** Included in the Jones Disclosure Statement or Schedules and Statements[5] |
|---|---|---|---|
| Receivable from Erika Jones | $~~10,221~~[45]8,363[42] | | Not included |
| Undeposited Funds – Sale of Dodge Challenger | $72,000 | | Not included |
| Undeposited Funds - IRS checks held/not deposited | $514,358 | | Not included |
| Contingent receivable - Yougeevity | $186,577 | | Not included |
| **Subtotal:** | $~~1,522,046~~1,406,035 | - | |
| **All Assets Total:** | $~~13,104,785~~13,148,380 -$~~13,144,785~~13,188,380 (of which $28,883 is secured) | $~~2,651,656~~2,722,274 | |

~~45  Value derived from the November MOR.    The basis for the receivable identified by the Debtor is not specified.~~
~~In addition to the receivable identified by the Debtor in the November MOR, the Creditor Plan Proponents have~~
~~identified significant claims against Erika Jones, as set forth in the Disclosure Statement and **Exhibit C**.~~

[42] Value derived from the November MOR.   The basis for the receivable identified by the Debtor is not specified.
In addition to the receivable identified by the Debtor in the November MOR, the Creditor Plan Proponents have
identified significant claims against the Descendants Trust, as set forth in the Disclosure Statement and **Exhibit C**.

**Exhibit C[1]**

**Schedule of Claims and Causes of Action[1]**

| Description of Claim[2] | Claim Amount[3] |
|---|---|
| **1. Claims against Erika Jones** | |
| Claims to avoid purported obligations under Section 14 of the Premarital Agreement under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | Monthly payments and other obligations |
| Claims to avoid and recover cash payments made within 4 years before the Petition Date as fraudulent transfers under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $1,464,193[4] |
| Claims to avoid and recover cash payments within 1 year before the Petition Date as preferences under 11 U.S.C. § 547. | $833,943[5] |
| Claims to recover Range Rover as a fraudulent transfer under 11 U.S.C. §§ 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $86,500[6] |

---

[1] Capitalized terms used but not otherwise defined in this **Exhibit C** shall have the meanings ascribed to such terms in the Specific Disclosure Statement.

[1] Capitalized terms used but not otherwise defined in this **Exhibit C** shall have the meanings ascribed to such terms in the Specific Disclosure Statement.

[2] Additional information concerning the claims listed in this **Exhibit C** is set forth in Article III.F.2.ii of the Specific Disclosure Statement.

[3] The amounts listed in this **Exhibit C** represents the amount of any claim before the addition of prejudgment interest. The claim amount also has not been adjusted for cost of litigation, cost of collection, or litigation risk. The schedule focuses on transfers made within four years prior to the Petition Date, although claims exist to recover transfers made prior to that time.

[4] The Debtor prepaid one year's worth of payments to Erika Jones prior to the Petition Date, which prepayments purport to cover amounts allegedly due to Erika Jones under the Premarital Agreement through December 2023. If the Debtor begins to make new payments to Erika Jones in January 2024 and thereafter, the Estate will hold claims to recover those amounts as well. The Debtor did not purport to identify four years' worth of transfers in the Debtor's Schedules and Statements.

[5] Each of these preferential transfers is also included in the fraudulent transfer claims set forth in the prior row. These transfers are counted only once, however, in the total claims against Erika Jones. The Debtor disclosed these transfers in his Schedules and Statements.

[6] The value of the Range Rover included in this **Exhibit C** is as of the time of the transfer. The Debtor did not disclose this transfer in his Schedules and Statements.

| Description of Claim[2] | Claim Amount[3] |
|---|---|
| Claims to recover Audi A8 as a fraudulent transfer under 11 U.S.C. § 544; Tex. Bus. & Com. Ann. § 24.001, *et seq.*[7] | $91,500[8] |
| **Total (Transfers)** | **>$1,642,193** |
| **2.  Claims against David Jones** | |
| Claims to avoid and recover transfer of ranch as a fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $249,870[9] |
| Claims to avoid and recover cash payments as preferential and fraudulent transfers under 11 U.S.C. §§ 544, 547, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $553,388[10] |
| Claims to avoid and recover transfers of Ford F-150 Raptor, Dodge Challenger Hellcat and Toyota 4Runner as fraudulent transfers under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $105,000[11] |
| Miscellaneous torts, breaches of trust, breaches of contract claims, or other claims | Unknown |
| **Total** | **>$908,258** |

---

[7] The Debtor owns the Audi A8 vehicle with Erika Jones.  This vehicle is thus property of the Estate and is included on **Exhibit B** as an asset available in liquidation.  The Debtor, however, has failed to list it among his assets and has suggested that the car was previously gifted to Erika Jones.  As such, the Estate also has claims to turnover the property and claims to avoid any purported transfer and recover the value of the vehicle at the time of the purported transfer.  Accordingly, this vehicle is included in this **Exhibit C**, as well as **Exhibit B**.

[8] This vehicle was valued at $91,500 at the time it was purchased.  Thus, to the extent that the Debtor contends that it was transferred to Erika Jones at that time, the Estate holds claims to avoid the transfer and recover the value of the vehicle at the time of the purported transfer.  In addition, as noted, the Creditor Plan Proponents contend that the vehicle (which is currently valued at $25,000) belongs to and is part of the Estate.

[9] This value is derived from the 2023 ~~assessor~~Blanco County Assessor record for the property.  The Debtor disclosed the transfer, but provided an earlier valuation for this property in his Schedules and Statements.

[10] In the four years prior to the Petition Date, the Debtor transferred $553,388 in cash payments to David Jones.  Almost all of the transfers were made within one year prior to the Petition Date.  David Jones has indicated that these payments were likely made as reimbursements for various expenses he incurred on the Debtor's behalf, but has produced documents showing that only a portion of those transfers ($~~218,148~~173,148) were actually made to reimburse David Jones for such expenses.  For the payments made purportedly to reimburse David Jones for expenses he incurred on the Debtor's behalf within one year prior to the Petition Date, the Estate holds claims to recover the transfers as preferences.  For any payment that was not made as a reimbursement or otherwise for value, the Estate holds claims to recover such transfers as a fraudulent transfer.  The Debtor disclosed the majority of these transfers in his Schedules and Statements (but not all), and also included an additional transfer of $500,000 that was transferred and immediately returned to Alex Jones which is not included in this **Exhibit C**.

[11] The value for the Ford F-150 Raptor is the estimated value as the time of the transfer in October 2022, derived from Caredge.com.  The value for the Dodge Challenger Hellcat is derived from the Debtor's First Amended Schedules and Statements [Docket No. 234].  The value for the Dodge Challenger Hellcat was likely slightly higher at the time of the transfer in October 2022.  The value for the Toyota 4Runner is the estimated value as the time of the transfer in October 2022, derived from Cargurus.com.  The Debtor disclosed that three cars were transferred to David Jones in his Third Amended Schedules and Statements, but appears to have made a mistake about two of the cars.  The Debtor disclosed that he transferred a 2015 Challenger Hellcat, 2013 Ford Raptor, and 2019 Ford Raptor to David Jones, when in fact the UCC Investigation shows that the Debtor transferred a 2015 Challenger Hellcat, a 2012 Ford Raptor, and a 2019 Toyota 4Runner to his father in October 2022.

| Description of Claim[2] | Claim Amount[3] |
|---|---|
| **3.  Claims against Jonathon Owen Shroyer** | |
| Claims to recover Dodge Charger Hellcat as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $31,000[12] |
| **Total** | **$31,000** |
| **4.  Claims against Rex Jones** | |
| Claims to recover Toyota Tacoma as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, *et seq.* | $38,000[13] |
| **Total** | **$38,000** |
| **5.  Claims against Patrick Reilly** | |
| Claims to recover Glastron boat as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, et seq. | $23,500[14] |
| Claims to recover Tudor watch as fraudulent transfer under 11 U.S.C. §§ 544, 548; Tex. Bus. & Com. Ann. § 24.001, et seq. | $2,000[15] |
| **Total** | **$25,500** |
| **6.  Claims against Alexander E. Jones Descendent and Beneficiary Trust, David Jones, Trustee** | |
| Claims to recover Unit 6 Clawson Road as fraudulent transfer under 11 U.S.C. §§ 544; Tex. Bus. & Com. Ann. § 24.001, et seq. | $828,300[16] |
| ~~Claims~~Turnover claim to recover Unit 5 Clawson Road under 11 U.S.C. §§ 544 | $767,400[17] |
| **Total** | ~~>~~**$1,595,700** |

---

[12] This value is the estimated value as the time of the transfer in ~~September~~October 2021, derived from vehiclehistory.com.  The Debtor did not disclose this transfer in his Schedules and Statements.

[13] Value for a Toyota Tacoma is the estimated value as the time of the transfer in January 2022 derived from Cargurus.com.  The Debtor did not disclose this transfer in his Schedules and Statements.

[14] This value is derived from the Second Amended Schedules and Statements, which sourced the value from Boatcrazy.com.

[15] This value is derived from information obtained by the UCC as part of the UCC's Investigation.  The Debtor did not disclose this transfer in his Schedules and Statements.

[16] This value is derived from the Second Amended Schedules and Statements.

[17] This value is derived from the Second Amended Schedules and Statements.

**Exhibit D**

**Global Notes to Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR THE CREDITORS' PLAN[1]

### I.  Best Interests Test

Under the "best interests" of creditors test set forth by section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a chapter 11 plan unless each holder of a claim either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor's estate were liquidated under chapter 7 of the Bankruptcy Code on the effective date.  *See* 11 U.S.C. § 1129(a)(7).  Accordingly, to demonstrate that the Creditors' Plan satisfies the "best interests" of creditors test, the Creditor Plan Proponents have prepared the following hypothetical liquidation analysis (the "Creditors' Plan Liquidation Analysis") based upon certain assumptions discussed herein.

The Creditor Plan Proponents submit that under the Creditors' Plan, each class of creditors will receive at least as much as such class would receive in a chapter 7 liquidation of the Debtor's assets because of, among other reasons, the fees payable to a chapter 7 trustee and professionals and the fire sale nature of asset sales in chapter 7.

### II.  Approach and Purpose of the Liquidation Analysis

Determining the costs of, and proceeds from, the hypothetical liquidation of the Debtor's assets in a chapter 7 case is an uncertain process involving significant estimates and assumptions that are inherently subject to uncertainties and contingencies.  The Creditors' Plan Liquidation Analysis is based in large part on the liquidation analysis prepared by the Debtor [Docket No. 555] (the "Jones Liquidation Analysis"),[2] along with the Creditor Plan Proponents' and their advisors' best judgment of how numerous issues in the liquidation process would be resolved.  This approach is particularly appropriate here given the nature of this Chapter 11 Case and the parties' relative knowledge regarding the Debtor's Estate.  Inevitably, certain assumptions in the Creditors' Plan Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  In addition, the Creditor Plan Proponents cannot judge with any degree of certainty the recovery that may result from litigation claims in a chapter 7 liquidation.  The Creditors' Plan Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtor's non-exempt assets were liquidated in accordance with chapter 7 of the Bankruptcy Code for purposes of comparing those recoveries to recoveries contemplated by the Creditors' Plan, as required by section 1129(a)(7) of the Bankruptcy Code.  The Creditors' Plan Liquidation Analysis is not intended, and should not be used, for any other purpose.

**NEITHER THE CREDITOR PLAN PROPONENTS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS IN A CHAPTER 7 LIQUIDATION OF THE DEBTOR'S ASSETS WOULD OR WOULD NOT APPROXIMATE THE**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Creditors' Plan or the Specific Disclosure Statement, to which the Creditors' Plan Liquidation Analysis is attached to as **Exhibit D**, as applicable.

[2] The Jones Liquidation Analysis, as filed, contemplates two different scenarios—one that takes into account the liquidation value of FSS and one that does not.  As discussed in further detail below, the Creditors' Plan Liquidation Analysis relies upon the scenario that does not account for the value attributable to FSS.  The outcome of the FSS Case will determine how such value is distributed to creditors.

ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE CREDITORS' PLAN LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

All of the limitations and risk factors set forth in the Specific Disclosure Statement are applicable to the Creditors' Plan Liquidation Analysis and are incorporated by reference herein. In particular, the underlying financial information of the Debtor in the Creditors' Plan Liquidation Analysis was not compiled or examined by any independent accountants in accordance with the standards promulgated by the American Institute of Certified Public Accountants. Nor were independent appraisals conducted, other than any appraisals procured by the Debtor, in preparing the Creditors' Plan Liquidation Analysis.

The Creditors' Plan Liquidation Analysis reflects the estimated Cash proceeds, net of liquidation-related costs, that would be available if the Debtor's non-exempt assets were liquidated under chapter 7 of the Bankruptcy Code and the proceeds were distributed in accordance with sections 726 and 1129(b) of the Bankruptcy Code.

The Creditors' Plan Liquidation Analysis includes estimates for costs and Claims that could be asserted and Allowed in a hypothetical chapter 7 liquidation, including trustee and professional fees required to facilitate the liquidation that otherwise would not exist in chapter 11. The Creditor Plan Proponents' estimate of Allowed Claims set forth in the Creditors' Plan Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Creditors' Plan.

NOTHING CONTAINED IN THE CREDITORS' PLAN LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE CREDITOR PLAN PROPONENTS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE CREDITORS' PLAN LIQUIDATION ANALYSIS.

### III. Global Assumptions

The Creditors' Plan Liquidation Analysis should be read in conjunction with the following global assumptions:

### 1. Assets Identified and Bases of Asset Values

The Creditors' Plan Liquidation Analysis is based on the liquidation of the Debtor's estimated Cash balance and non-exempt assets net of the costs to execute the administration of the liquidation. The Creditors' Plan Liquidation Analysis reflects the liquidation of the Debtor's non-exempt assets and the distribution of available proceeds to holders of Allowed Claims. The Creditors' Plan Liquidation Analysis includes the assets listed in the Jones Liquidation Analysis as well as other assets identified in the UCC's Investigation.

*Asset values set forth in the Jones Liquidation Analysis are incorporated in the Creditors' Plan Liquidation Analysis unless otherwise noted. If an asset or asset value was not listed in the Jones Liquidation Analysis and the Creditor Plan Proponents believe it should be available to creditors in any liquidation of the Debtor's Estate, the Creditor Plan Proponents endeavored to use the best source of value for such asset. In addition, certain asset values provided in the Creditors' Plan Liquidation Analysis may conflict with asset values provided in the Jones Liquidation Analysis and/or other pleadings in this Chapter 11 Case, including, but not limited to, the Debtor's recent monthly operating reports and the Debtor's Schedules and Statements. The Creditor Plan Proponents reserve all rights to dispute any values provided.*

2

### 2. Asset Value Discounts

The Creditors' Plan Liquidation Analysis adopts the estimated percentage recoveries for each asset listed in the Jones Liquidation Analysis. For assets that were not listed in the Jones Liquidation Analysis, the Creditor Plan Proponents and their advisors used the best estimate of recovery percentages based on nature and type of asset.

### 3. Appointment of a Chapter 7 Trustee

The Creditors' Plan Liquidation Analysis assumes that the Bankruptcy Court would appoint one chapter 7 trustee (the "Chapter 7 Trustee") to oversee the liquidation of the Debtor's non-exempt assets. The Chapter 7 Trustee would be compensated in accordance with section 326 of the Bankruptcy Code. The Creditors' Plan Liquidation Analysis adopts the estimate of Chapter 7 Trustee's fees included in the Jones Liquidation Analysis, which estimates the Chapter 7 Trustee's fees ranging from 3.26-3.31% of gross liquidation proceeds. The Creditor Plan Proponents reserve the right to challenge this assumption at the appropriate time.

### 4. Chapter 7 Trustee Professionals

The Creditors' Plan Liquidation Analysis assumes that the Chapter 7 Trustee would retain its own professionals to assist in the liquidation of the Debtor's non-exempt assets and litigation of Claims and Causes of Action. It is assumed that the Chapter 7 Trustee's primary legal, accounting, consulting, and other support, if any, would be provided by new professionals. Because the Chapter 7 Trustee and, to the extent applicable, the Chapter 7 Trustee's professionals, must familiarize themselves with the Debtor's Estate, it is anticipated that the Debtor's Estate would incur significant incremental professionals' fees in the context of a chapter 7 liquidation, though such professionals may be retained on a contingency basis. The Creditors' Plan Liquidation Analysis adopts the estimate of Chapter 7 Trustee's professionals fees included in the Jones Liquidation Analysis, which estimates the Chapter 7 Trustee's professionals fees at 80% of the total Chapter 7 Trustee's fees. The Creditor Plan Proponents reserve the right to challenge these assumptions at the appropriate time.

### 5. Start-Up Time

Given the state of the Debtor's books and records and the nature of the underlying assets and Claims in the Chapter 11 Case, it is anticipated that the Chapter 7 Trustee and any newly retained professionals may require up to three months to familiarize themselves with the Debtor's Estate, the assets, the Claims, and related matters before they begin pursuing remaining assets, if any, or litigating Claims.

### 6. Chapter 7 Process

It is assumed that the Chapter 7 Trustee would conduct the liquidation of the Debtor's non-exempt assets expeditiously, during which time all of the Debtor's non-exempt assets would be sold or monetized, and the Cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code. Under section 704 of the Bankruptcy Code, a chapter 7 trustee must, among other duties, collect and convert property of the Estate as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed or fire sale recoveries.

### 7.   Litigation Claims

The Debtor's total assets available for distribution consist of expected Cash proceeds from the sale of all of his non-exempt assets, plus unrealized value on account of future litigation claims (the "Litigation Claims").  The value of the Litigation Claims is based on the values provided in the Schedule of Claims and Causes of Action attached as **Exhibit C** to the Specific Disclosure Statement. Recoveries on account of the Litigation Claims are estimated at 75% in a chapter 11 liquidation whereas recoveries in a chapter 7 liquidation are estimated at 50%.  The Creditors' Plan Liquidation Analysis assumes that gross recoveries from Litigation Claims are 25% less in a chapter 7 scenario as compared to the chapter 11 scenario because the Creditor Plan Proponents assume that there is a higher likelihood of settlement and pressure to expedite recoveries in a chapter 7 scenario, in part to provide funding for on-going administration of the chapter 7 estate and to fund further litigation.  The amount assumed for such gross recoveries and distributions in the Creditors' Plan Liquidation Analysis is for illustrative purposes only.  Realized recoveries may be materially higher or lower in amount.  Professional fees relating to recovery of the proceeds of the Litigation Claims are netted out of the value of such proceeds in the Creditors' Plan Liquidation Analysis based upon the assumption that such fees will be invoiced on a rolling basis as such Litigation Claims are prosecuted.

### 8.   Value Attributable to Debtor's Ownership of FSS

As stated in the Specific Disclosure Statement, Confirmation of the Creditors' Plan does not by its terms determine the outcome of the FSS Case or impair FSS's ability to prosecute the FSS Plan and perform thereunder if confirmed.  Notwithstanding the foregoing, the Debtor recently stated that absent confirmation of a plan in this Chapter 11 Case that he supports, the Debtor is unwilling to continue working for FSS.[3]  If the Debtor, in fact, refuses to continue to work for FSS if the Creditors' Plan is confirmed or this Chapter 11 Case results in any other outcome that not to his liking, FSS—which indisputably belongs to creditors as the Debtor's most significant asset—inevitably will be forced to liquidate quickly.  If Jones does not refuse to work, however, the Creditor Plan Proponents presume that FSS will prosecute the FSS Plan or another reorganization that contemplates a creditor payment plan, then after that plan runs its full term, the future of FSS presumably after the expiration of the payment plan will be determined by the Debtor's creditors, who will be the residual owners of the entity after such payments are complete.  In light of these unique circumstances and the uncertainty regarding the future of FSS at this time, the Creditor Plan Proponents have determined to exclude the value of FSS from the Creditors' Plan Liquidation Analysis. Nor do the Creditor Plan Proponents take any position in respect of the value attributed to FSS in the Jones Liquidation Analysis and reserve all rights with respect to the same.

### IV. Conclusion

The Creditor Plan Proponents have determined that Confirmation of the Creditors' Plan will provide General Unsecured Claims with a recovery that is not less than what they would otherwise receive in connection with a hypothetical liquidation of the Debtor's Estate under chapter 7 of the Bankruptcy Code.

---

[3] *Debtor's Amended Objection to the Official Unsecured Creditor Committee's Disclosure Statement* [Docket No. 551].

**In re Alexander E. Jones Case No. 22-33553**
**Exhibit D: Creditors' Plan Liquidation Analysis**

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Total Bank Accounts (1)* | $ 885,026 | 100% | 100% | $ 885,026 | $ 885,026 | |
| Total Accounts Receivable (2) | $ 118,139 | 100% | 100% | $ 118,139 | $ 118,139 | |
| **Other Current Assets** | | | | | | |
| Cryptocurrency (3) | $ 100,000 | 95% | 95% | $ 95,000 | $ 95,000 | (a) |
| Cash on Hand (1) | $ 1,000 | 100% | 100% | $ 1,000 | $ 1,000 | |
| Federal Income Tax Receivable (4) | $ 3,370,713 | 100% | 100% | $ 3,370,713 | $ 3,370,713 | |
| GiveSendGo-Legal (1) | $ 10,461 | 100% | 100% | $ 10,461 | $ 10,461 | |
| Inventory Platinum (5) | $ 307,081 | 35% | 70% | $ 107,478 | $ 214,957 | (b) (j) |
| Inventory from Hi-Tech Pharmaceuticals | $ 760,854 | 35% | 70% | $ 266,299 | $ 532,598 | (c) (j) |
| Petty Cash for Child Care (1) | $ 120 | 100% | 100% | $ 120 | $ 120 | |
| Prepayment -Legal Account (6) | $ 50,000 | 100% | 100% | $ 50,000 | $ 50,000 | |
| Rental Property Escrow (7) | $ 6,245 | 0% | 0% | $ - | $ - | |
| Undeposited Funds - Car sale (10) | $ 72,000 | 100% | 100% | $ 72,000 | $ 72,000 | |
| Undeposited Funds - IRS checks held/not deposited (4) | $ 514,358 | 100% | 100% | $ 514,358 | $ 514,358 | |
| **Total Other Current Assets** | **$ 5,192,832** | | | **$ 4,487,429** | **$ 4,861,207** | |
| **Total Current Assets** | **$ 6,195,997** | | | **$ 5,490,594** | **$ 5,864,372** | |
| **Fixed Assets** | | | | | | |
| Homestead | $ - | 0% | 0% | $ - | $ - | |
| Lakehouse (8) | $ 1,750,000 | 63% | 95% | $ 1,102,500 | $ 1,662,500 | (k) |
| Ranch Property (8) | $ 2,189,220 | 92% | 95% | $ 2,014,082 | $ 2,079,759 | (k) |
| Rental Property (9) | $ 505,000 | 92% | 95% | $ 464,600 | $ 479,750 | (k) |
| **Vehicles and Marine Assets** | | | | | | |
| Dodge Charger | $ 70,618 | 79% | 95% | $ 55,788 | $ 67,087 | (l) |
| Ford Expedition (11) | $ 21,463 | 79% | 95% | $ 16,956 | $ 20,390 | (l) |
| 2017 Audi A8 | $ 25,000 | 79% | 95% | $ 19,750 | $ 23,750 | (d) (l) |
| 2006 Acura MDX | $ 5,000 | 79% | 95% | $ 3,950 | $ 4,750 | (e) (l) |
| Marine Assets (12) | $ 114,300 | 87% | 95% | $ 99,441 | $ 108,585 | (l) |
| **Total Vehicles and Marine Assets** | **$ 236,381** | | | **$ 195,885** | **$ 224,562** | |
| **Total Fixed Assets** | **$ 4,680,601** | | | **$ 3,777,067** | **$ 4,446,571** | |
| **Other Assets** | | | | | | |
| Interests In Trust (13) | $ 1,925,848 | 49% | 80% | $ 943,666 | $ 1,540,678 | (f) (m) |
| Ownership Interests in Non Public Entities (14) | $ 784,702 | 58% | 80% | $ 455,127 | $ 627,762 | (n) (q) |
| Personal Property (15) | $ 132,480 | 70% | 95% | $ 92,736 | $ 125,856 | (o) |
| Receivable from Descendants Trust (16) | $ 30,832 | 100% | 100% | $ 30,832 | $ 30,832 | (b) |
| Receivable from Mrs. Jones (16) | $ 8,363 | 100% | 100% | $ 8,363 | $ 8,363 | (b) |
| Certain Unclaimed Property | $ 6,396 | 50% | 80% | $ 3,198 | $ 5,117 | (c) |
| Contingent receivable - Yougevity (17) | $ 186,577 | 0% | 80% | $ - | $ 149,262 | (p) |
| **Total Other Assets** | **$ 3,075,198** | | | **$ 1,533,922** | **$ 2,487,869** | |
| **TOTAL ASSETS** | **$ 13,951,796** | | | **$ 10,801,583** | **$ 12,798,812** | |
| | | | | | | |
| Litigation Claims | $ 4,240,651 | 50% | 75% | $ 2,120,326 | $ 3,180,488 | (g) |
| **Total Recoveries** | **$ 18,192,447** | | | **$ 12,921,909** | **$ 15,979,300** | |
| | | | | | | |
| **Liquidation Expenses****** | | | | | | |
| Trustee Fees (18) | | | | $ 424,485 | $ 524,920 | (h) |

**In re Alexander E. Jones Case No. 22-33553**
**Exhibit D: Creditors' Plan Liquidation Analysis**

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |
| Trustee Counsel (19) | | | | $ 339,588 | $ 419,936 | *(h)* |
| Liquidation Expenses | | | | | | |
| Real Estate (8,9) | | | | $ 377,759 | $ 377,759 | *(h)* |
| Personal Property (15) | | | | $ 13,910 | $ 26,496 | *(h)* |
| Contingency (20) | | | | $ 193,829 | $ 239,690 | *(h)* |
| **Total Liquidation Costs** | | | | **$ 1,349,570** | **$ 1,588,800** | |
| | | | | | | |
| **Net Proceeds** | | | | **$ 11,572,339** | **$ 14,390,500** | |
| | | | | | | |
| **Allocation of Net Proceeds** | | | | | | |
| Secured Creditors | | | | $ 114,550 | $ 114,550 | *(i)* |
| Legal and Professional Fees - Estimated | | | | $ 5,319,247 | $ 5,319,247 | *(h)* |
| **Total Secured and Administrative Claims** | | | | **$ 5,433,797** | **$ 5,433,797** | |
| | | | | | | |
| **Net Proceeds Available to Unsecured Creditors** | | | | **$ 6,138,542** | **$ 8,956,703** | |
| | | | | | | |
| General Unsecured Claims | | | | $ 1,872,210,666 | $ 1,872,210,666 | |
| **Estimated Recovery (%)** | | | | **0.33%** | **0.48%** | |

* *Numerical notes correspond to notes contained in the Jones Liquidation Analysis [Docket No. 555] while lettered notes are explained below.*

** *Certain liquidation discounts were adopted from the Jones Liquidation Analysis without verifying the accuracy of such discounts.*

*** *Unless otherwise noted, the source for the value provided herein is the Jones Liquidation Analysis.* **As described in the introduction to the Creditors' Plan Liquidation Analysis, the Creditor Plan Proponents relied on the information contained in the Jones Liquidation Analysis wherever feasible and reserve all rights to challenge the assumptions and values set forth therein. Where values contained in the Jones Liquidation Analysis differ from the values provided here, such changes are identified and explained in the notes contained herein.**

**** *The expense methodology and percentages are calculated based on the assumptions for such amounts included in the Jones Liquidation Analysis.*

Highlighted Items: *Asset and/or value not included in the Jones Liquidation Analysis.*

**Notes Provided by the Jones Liquidation Analysis**

1 *Bank account and cash on hand assumed to be 100% recoverable including net funds available in GiveSendGo account.*
2 *Accounts receivable are for contemporaneous services and are assumed to be 100% recoverable.*
3 *Unliquidated bitcoin reflected at no value. Estimated value $1,700 but cost to liquidate will exceed value.*
4 *Income tax receivable and undeposited funds total 3,885,071 and are assumed to be 100% collectible. The undeposited funds represent 2 refund checks received and held pending reconciliation when IRS systems are back online.*
5 *Inventory values reflected as recoverable values provided by FSS for similar products.*
6 *Prepaid legal represents retainer that will be offset against court approved legal fees.*
7 *Rental property escrow represents excess balance to be refunded to debtor and is 100% recoverable.*
8 *Lakehouse and Ranch property values based on realtor engaged to sell property estimated liquidation values under current market conditions. Fees and expenses of 8-9% are reflected in liquidation costs.*

In re Alexander E. Jones Case No. 22-33553
**Exhibit D: Creditors' Plan Liquidation Analysis**

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |

9 *Rental property value based on estimated ranges on Zillow and Realtor.com at 1/12/24. Fees and expenses of 8-9% are reflected in liquidation costs.*

10 *2019 Dodge Challenger sold for $72,000 on 12/29/23. Check received after close of business and deposited in January 2024.*

11 *2017 Ford expedition value based on current Autotrader range of values. Vehicle listed for sale.*

12 *Values based on projected sales prices from broker located at Capital Marine - broker located at marina boats are stored.*

13 *Interests in trusts valued at cash balance of 49% . No value of assigned for liquidation of non-cash assets.*

14 *Ownership in Non-Public entities ranges in value based on cash value of bank accounts.*

15 *Non-exempt personal property value ranges reflected at 70-100% based on Valuepro March 24, 2023 appraisal which include household goods, furniture, watches, jewelry, lake house furniture, firearms, and other non-exempt assets noted in the appraisal. Liquidation fees and expenses are estimated at 15-20%.*

16 *Other receivables for expenses paid by the estate are assumed collectible as related parties have sufficient unencumbered assets.*

17 *Contingent receivable based on discovery from Youngevity. Collectability not determined.*

18 *Trustee fees range from 3.26-3.31% of gross proceeds.*

19 *Trustee counsel estimated at 80% of trustee fees.*

20 *Contingency of 1.5% of gross proceeds for unknown costs and expenses.*

**Footnotes to the Creditors' Plan Liquidation Analysis[1]**

[1]*Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Creditors' Plan or the Specific Disclosure Statement.*

(a) **Value Not Provided in the Jones Liquidation Analysis**. *While "Bitcoin Account" is a line item in the Jones Liquidation Analysis, a corresponding value is not provided. As noted in the Schedule of Assets attached as **Exhibit B** to the Specific Disclosure Statement, the Creditor Plan Proponents are in the process of identifying cryptocurrency owned but not disclosed by the Debtor. To date, the Creditor Plan Proponents have confirmed that the Debtor owns approximately $100,000 in cryptocurrency that was held in various donation sites for the benefit of the Debtor but not disclosed. The UCC's Investigation in respect of other cryptocurrency remains ongoing. Due to volatility and cost to unwind both the Chapter 7 and 11 are discounted at 5%.*

(b) **Value Inconsistent with Other Pleadings**. *The value provided here is derived from the Jones Liquidation Analysis but differs from the value provided in other pleadings in this Chapter 11 Case, including, but not limited to, the November MOR and the Schedules and Statements. The Creditor Plan Proponents reserve all rights to dispute any values provided.*

(c) **Asset Not Provided in the Jones Liquidation Analysis**. *The Debtor lists this asset and associated value in his Third Amended Schedules and Statements. Therefore, such value is included here.*

(d) **Asset Not Provided in the Jones Liquidation Analysis.** *Public records indicate that this motor vehicle is owned by Alex Jones and Erika Jones. As noted in the Specific Disclosure Statement, the Debtor has stated that the car was gifted to his wife, Erika Jones, notwithstanding the ownership set forth in public records. Even if the car was gifted, there are claims to recover the car for the benefit of the Estate. Given the Debtor's current position respecting this property, it is included in both **Exhibit B** to the Specific Disclosure Statement (as property the Creditor Plan Proponents contend can be collected directly in a liquidation) and **Exhibit C** to the Specific Disclosure Statement (as property that may be subject to turnover and avoidance claims). Therefore, such value is included here.*

(e) **Asset Not Provided in the Jones Liquidation Analysis**. *Value was derived from KBB.com as of January 2, 2024.*

In re Alexander E. Jones Case No. 22-33553
Exhibit D: Creditors' Plan Liquidation Analysis

| Description | Value*** | Estimated Recovery (%)** | | Estimated Recovery ($) | | Footnotes |
|---|---|---|---|---|---|---|
| | | Chapter 7 Liquidation | Chapter 11 Liquidation | Chapter 7 Liquidation | Chapter 11 Liquidation | |

(f) *Value Not Provided in the Jones Liquidation Analysis. The Jones Liquidation Analysis lists a value of $131,466. However, the Creditor Plan Proponents value these trusts as worth at least $1,925,848 and additional detail regarding the value ascribed to each trust can be found in **Exhibit B** to the Specific Disclosure Statement.   Therefore, such value is included here.*

(g) *Asset Not Provided in the Jones Liquidation Analysis. The value of the Litigation Claims is based on the values provided in the Schedule of Claims and Causes of Action attached as **Exhibit C** to the Specific Disclosure Statement. Recoveries on account of the Litigation Claims are estimated at 75% in a Chapter 11 liquidation whereas recoveries in a Chapter 7 liquidation are estimated at 50%.*

(h) *The Creditor Plan Proponents incorporate this cost based on the Jones Liquidation Analysis but reserve all rights to challenge any expenses incurred or to be incurred, including legal and professional fees.*

(i) *Comprising filed claim of Security Bank of Texas ($80,161) and scheduled claim of Bank of America ($34,389).*

(j) *For liquidation of inventory in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage of 35% included in the Jones Liquidation Analysis and assumes a 70% recovery of value in a chapter 11 liquidation.*

(k) *For liquidation of real property in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage for each property included in the Jones Liquidation Analysis and assumes a 95% recovery of value in a chapter 11 liquidation.*

(l) *For liquidation of vehicles in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage for each vehicle included in the Jones Liquidation Analysis and assumes a 95% recovery of value in a chapter 11 liquidation.*

(m) *For liquidation of interests in trusts in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes an 80% recovery in a chapter 11 liquidation, which discount reflects incremental costs for litigation related to such trusts.*

(n) *For liquidation of the Debtor's ownership interests in non-public entities in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes an 80% recovery in chapter 11, which discount reflects incremental costs for litigation related to the ownership of such entities.*

(o) *For liquidation of personal property in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes a recovery of 95% in a chapter 11 liquidation.*

(p) *For liquidation of a contingent receivable liquidation in a chapter 7, this analysis adopts the Debtor's low-point recovery percentage included in the Jones Liquidation Analysis and assumes an 80% recovery in a chapter 11 liquidation, due to uncertainty regarding collections in either scenario.*

(q) *Insufficient information was provided to determine the value attributable to these entities. PQPR, in particular, has not provided the information necessary to ascribe a value, but the Creditor Plan Proponents believe it to be substantial.*

