<u>L E A S E</u>

THIS LEASE is entered into by and between Landlord and Tenant on this ___9th___ day of ___June___, 200 8 in accordance with the terms and conditions hereinafter set forth.

W I T N E S S E T H

## ARTICLE I - BASIC PROVISIONS AND CERTAIN DEFINED TERMS

When used herein, the following terms shall have the indicated meanings:

1.   "<u>LANDLORD</u>": St. Croix Capital Management Group

    "<u>NOTICE ADDRESS</u>":  406 9th Ave., Suite 309
                           San Diego, Ca. 92101

2.   "<u>TENANT</u>":  Free Speech Systems, LLC (Alex Jones, Manager)

    "<u>NOTICE ADDRESS</u>":  3019 Alvin Devane, Suite 350
                           Austin, Texas 78741

3.   "<u>LEASED PREMISES</u>":  Approximately Seven Thousand Nine Hundred Five (7,905) square feet as shown on Exhibit "A."  The Leased Premises are known by street address as:  3019 Alvin Devane, Suite 350
                                         Austin, Texas 78741

4.   "<u>LEASE TERM</u>": 40 months

    "<u>COMMENCEMENT DATE</u>":  The latter of July 1, 2008 or upon substantial completion of the Tenant Improvements. Tenant shall have access to the Leased Premises thirty (30) days prior to the Commencement Date for the purposes of installing furniture, inspecting the HVAC system to insure proper working order and installation of phones and telecommunications.

    "<u>TERMINATION DATE</u>": That date which is Forty (40) months after the Commencement Date.

5.   "<u>BASE RENT</u>":  See Exhibit "D" attached hereto and incorporated by reference herin for all purposes.

6.   "<u>SECURITY DEPOSIT</u>": $5,533.50

7.   "<u>PERMITTED USE</u>":  General office, light manufacturing, warehousing, and any other use permitted under all applicable law and zoning that is approved in advance in writing by Landlord.

8.   "<u>ADDITIONAL RENT</u>":  Tenant shall pay Tenant's Share of the Operating Costs (as said terms are defined in <u>Article XXI</u>) in any calendar year during the lease term, which for calendar year 2008 is estimated to be $3.30 per square foot/yr.

9.   "<u>ADVANCE RENTAL</u>":  In addition to the Security Deposit referenced in <u>Article I.6</u> upon execution hereof, Tenant shall pay to Landlord the sum of $5,533.50 + NNN as Advance Rental.  Upon the Commencement Date, the Advance Rental shall be credited toward Tenant's Base Rent due hereunder.

Each of the foregoing provisions and defined terms shall be construed in conjunction with the references thereto contained in the other sections of this Lease.  Each reference in this Lease to any of the foregoing basic Lease provisions and defined terms shall be construed to incorporate each term set forth above under such basic Lease provisions or defined term.



EXHIBIT

A

ARTICLE II - Premises

Section 2.01.            Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the leased premises (the "Leased Premises") as described in Article I.3. hereinabove, which, for all purposes, shall be deemed to consist of that number of square feet stated in Article I.3. above.  The Leased Premises are located on part of the tract of property described in Exhibit "B", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes. The land described in Exhibit "B" (as may be reduced or increased from time to time as designated by Landlord) and any existing and future buildings, parking area, truck loading areas, service areas and other improvements now existing or hereafter erected thereon are sometimes herein referred to as the "Commercial Park."  Landlord reserves the right to place in, under, over or through the Leased Premises pipes, wires, lines, and facilities serving other areas of the Commercial Park provided such right is exercised in a manner which does not unreasonably interfere with Tenant's conduct of its business at the Leased Premises.

Section 2.02.            The Leased Premises shall be finished out in accordance with the Construction Rider (Exhibit "B") attached hereto and incorporated by reference herein for all purposes.

ARTICLE III - Term

Section 3.01.            The term of this Lease shall commence on the Commencement Date and shall terminate on the Termination Date unless sooner terminated in accordance with the terms and conditions hereinafter set forth. At the request of Landlord from time to time made, Tenant will execute one or more Memoranda or letters stating the commencement and termination dates of the Lease. During the last one hundred eighty (180) days of the lease term, Landlord shall have the right to place signs in, at, on and about the Leased Premises advertising it for rent or sale.

ARTICLE IV - Rental

Section 4.01.            As "Base Rent," Tenant covenants and agrees to pay to Landlord at its address set forth in Article I.1 or at such other address as Landlord may from time to time designate in writing the sum(s) set forth in Article I.5. All such Base Rent payments shall be made on the first day of each calendar month, monthly in advance, for each and every month in the term of this Lease following the Commencement Date. Upon the Commencement Date, the Advance Rental described in Article I.9 shall be applied toward the Base Rent for the first full calendar month following the Commencement Date.

Section 4.02.            All rent and other sums hereunder provided to be paid by Tenant shall be due and payable by Tenant without demand, deduction, abatement or set-off except as expressly provided herein.

All other sums and charges of whatever nature required to be paid by Tenant to Landlord pursuant to the terms of this Lease (including, without limitation, all payments set forth in Article XXI, below, entitled "Additional Rent") constitute additional rent (whether or not same be designated "Additional Rent") and failure by Tenant to timely pay such other sums or charges may be treated by Landlord as a failure by Tenant to pay Base Rent.

ARTICLE V - Utilities

Section 5.01.            Tenant will at its own cost and expense pay for all water, sanitary sewer, gas, electricity and other utilities used in the Leased Premises and will save and hold Landlord harmless from any charge or liability for same. Such payments shall be made directly to the supplier of any utility separately metered to the Leased Premises and on such equitable basis as may be determined by Landlord with respect to any such utilities which are metered to Tenant in common with other occupants of the Commercial Park.

Section 5.02.            No interruption or malfunction of any utility services for any reason whatsoever shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for any damages (including, without limitation, consequential or special damages) or entitle Tenant to be relieved from any of its obligations hereunder (including the obligation to pay rent) or grant Tenant any right of set-off or recoupment. In the event of any such interruption of any such services, Landlord shall use reasonable diligence to restore such service in any circumstances in which such interruption is caused by Landlord's fault.

ARTICLE VI - Use

Section 6.01.            Tenant will use the Leased Premises solely for the Permitted Use. Tenant will not use or permit use of the Leased Premises for any other purpose without the prior written consent of Landlord. Tenant, at its own expense, will comply with all federal, state, municipal and other laws, ordinances, rules and regulations applicable to the Leased Premises and the business conducted therein by Tenant and will comply with such regulations as Landlord may promulgate regarding sanitation, cleanliness and other matters. Tenant will not engage in any activity or permit any nature of construction by Tenant or any other condition at the Leased Premises which would cause Landlord's property insurance to be canceled, or the rate therefor increased (or at Landlord's option will upon demand pay any such increase); and will not commit any act which is a nuisance or annoyance to Landlord or to other tenants. In the event the Leased Premises are to be used for storage of merchandise, Tenant will not stack goods or merchandise higher than 24 inches below the bottom of the lowest fire sprinkler head (if the Leased Premises are sprinklered) or 24 inches below the bottom of the lowest roof joist (if the Leased Premises are not sprinklered). Tenant agrees to comply with all rules and regulations of any property owners' association or similar association covering the Leased Premises and those which may be prescribed by Landlord from time to time, a copy of which (if any) has been provided to Tenant.

Section 6.02.            Tenant will not store or handle "Hazardous Substances" (as hereinafter defined) in, on, or about the Commercial Park except for such types and in such quantities as are reasonably necessary for Tenant's business, in which case all such Hazardous Substances shall be handled and disposed of in accordance with all applicable laws, federal, state, and local.  In no event will Tenant dispose of Hazardous Substances in, on, or about the Commercial Park. Tenant will notify Landlord promptly when it becomes aware of the spillage, release, or other discharge of any Hazardous Substance in, on, or about the Commercial Park, however caused. Tenant will take all necessary steps to promptly clean up any spills, releases, or other discharges of Hazardous Substances caused by Tenant or Tenant's use of the Commercial Park or caused by any of Tenant's agents, employees, invitees, assignees, sublessees, contractors or customers or their respective uses of the Commercial Park.  Tenant agrees to indemnify and hold Landlord and Landlord's employees, directors, officers, and

agents harmless from all losses, claims, suits, actions, damages, or liability (including costs and expenses of defending against the aforesaid) arising from Tenant's breach of any provision of this Section or arising from any spills, releases, or other discharges of Hazardous Substances caused by Tenant or Tenant's use of the Commercial Park or caused by any of Tenant's agents, employees, invitees, assignees, sublessees, contractors or customers or their respective uses of the Commercial Park.  For the purpose of this Lease, Hazardous Substance shall mean any hazardous substance, hazardous waste, or hazardous material as such terms are defined in the Comprehensive Environmental Response, Compensation, and Liability Act. 42. U.S.C. Sect. 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Sect. 6901 et seq., and Hazardous Materials Transportation Act, 49 U.S.C. Sect. 1801 et seq., respectively, and other similar laws, federal, state, and local.  *THE INDEMNITY CONTAINED IN THIS SECTION (I) IS INDEPENDENT OF TENANT'S INSURANCE, (ii) WILL NOT BE LIMITED BY COMPARATIVE NEGLIGENCE STATUTES OR DAMAGES PAID UNDER THE WORKERS' COMPENSATION ACT OR SIMILAR EMPLOYEE BENEFIT ACTS, (iii) WILL SURVIVE THE END OF THE LEASE TERM, AND (iv) WILL APPLY EVEN IF A LOSS IS CAUSED IN WHOLE OR IN PART BY THE ORDINARY NEGLIGENCE OR STRICT LIABILITY OF LANDLORD OR TENANT BUT WILL NOT APPLY TO THE EXTENT A LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LANDLORD.  [THIS IS AN ALTERNATE CLAUSE TO BE USED IF THE ALTERNATE INDEMNITY AND INSURANCE PROVISIONS ARE USED.]*

ARTICLE VII - Common Area

Section 7.01.          A.     Landlord will provide a "Common Area" (as hereinafter defined) in the Commercial Park and make necessary repairs thereto.  Landlord may also provide lighting in the parking area in the Commercial Park.  During the term of this Lease, Tenant, its employees, customers and invitees shall have the non-exclusive use, along with others, of the Common Area subject to rules and regulations for the use of the Common Area (including parking) which Landlord shall have the right to establish, from time to time.  Landlord shall have the right, from time to time, to change the arrangement, layout and/or size of the Common Area; and to do and perform such other acts in the Common Area as Landlord shall, in its good faith judgment, determine to be advisable.

B.     Tenant and its employees may have the non-exclusive use of not more than twenty four (24) parking spaces at the Commercial Park.  The non-exclusive usage rights to the parking area herein granted to Tenant shall constitute a non-exclusive license existing during the term of this Lease but not thereafter.  Landlord shall have the right, from time to time, to designate employee parking areas, establish, modify and enforce rules and regulations with respect to the parking area and to police same.

C.     For purposes of this Lease, the phrase "Common Area" includes such areas and facilities within the Commercial Park as are from time to time so designated by Landlord.

Section 7.02.          Tenant will at all times keep all merchandise and personal property (including pallets containing same) within the Leased Premises and will not at any time display or store any merchandise or permit it to be on driveways or sidewalks or at any other point outside the Leased Premises, nor will Tenant in any other way use or obstruct such sidewalks, driveways or other area outside the Leased Premises.

Section 7.03.          Tenant will not load or unload any trucks or permit any trucks serving the Leased Premises, whether owned by Tenant or not, to be loaded or unloaded in the Commercial Park except in the area specifically designated for such use by Landlord.

Section 7.04.          Nothing in this Article or elsewhere in this Lease shall be construed as constituting the Common Area, or any part thereof, as part of the Leased Premises.

ARTICLE VIII - Assignment and Subletting

Section 8.01.          Tenant shall not assign this Lease or sublease the Leased Premises or any part thereof or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Leased Premises or sublease any operating department therein, and any attempt to do any of the foregoing shall be void and of no effect.  This prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law.

Section 8.02.          If this Lease be assigned or if the Leased Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge or hypothecation of the leasehold interest or grant of any concession or license within the Leased Premises or if the Leased Premises be occupied in whole or in part by anyone other than Tenant, Landlord may nevertheless collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and apply the net amount collected to the rent payable hereunder, but no such transaction or collection of rent or application thereof by Landlord shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties and obligations hereunder.

Section 8.03.          Should this Lease be assigned or the Leased Premises be subleased (whether in whole or in part) and the rent payable by such assignee or subtenant exceeds the rent payable hereunder (whether Base Rent or Additional Rent), Landlord shall be entitled to receive fifty percent (50%) of such excess upon Tenant's receipt thereof.

ARTICLE IX - Repair and Maintenance

Section 9.01.          Upon the condition precedent that Tenant shall have given Landlord prior written notice of the item damaged, Landlord will repair and maintain only the following portions of the Leased Premises: roof (exclusive of flashing around any rooftop air-conditioning unit); exterior walls (but not the doors, doorframes, windows or window frames); structural portions of the Leased Premises (consisting only of the foundation and members supporting the roof); fire sprinkler systems; and any utility lines (sewer, water, gas or electrical) located outside the boundaries of the Leased Premises that serve other premises in common with the Leased Premises.  If, however, damage to any of the foregoing is caused by the acts or omissions of Tenant, its agents, contractors, employees, customers or invitees, or any burglar, vandal, or unauthorized entrant *(to the extent it does not conflict with the terms of Article XII of this Lease)*, then notwithstanding the provisions of Article XI, Tenant shall bear the cost of such repairs.

<u>Section 9.02.A.</u>          Except as specifically provided for in <u>Section 9.02.B.</u> hereinbelow, all maintenance, repair and replacements other than those required to be made by Landlord in <u>Section 9.01</u> or <u>Articles XI</u> or <u>XVIII</u> will be made by Tenant at Tenant's cost and expense, including, without limitation, heating and air-conditioning equipment (whether roof mounted or otherwise affixed outside the Leased Premises), dock boards, truck doors, dock bumpers, electrical and plumbing equipment, all fixtures, all wiring and plumbing lines (whether exposed or not); doors, doorframes, molding, trim, windows, window frames, closure devices, hardware, plate glass, floor covering and warehouse floor. Tenant shall not make or permit any penetration in the roof above the Leased Premises and shall be responsible for all rooftop flashing around any rooftop air-conditioning unit. If any such roof penetration is required in connection with Tenant's repair responsibilities, Landlord shall perform such roof penetration at Tenant's cost, which shall be paid upon demand.

If Landlord considers necessary any repairs, maintenance or replacements required to be performed by Tenant, under this Lease, and if Tenant refuses or neglects to perform same after reasonable notice (except in the event of an emergency, when no prior notice shall be required), Landlord shall have the right (but shall not be obligated) to perform such repair, maintenance or replacement and Tenant will pay the cost thereof on demand.

<u>Section 9.02.B.</u>          On or before the Commencement Date, Tenant shall enter into a maintenance contract ("Contract") with an air-conditioning maintenance contractor ("HVAC Contractor") approved by Landlord for the maintenance and service of the HVAC system. Such Contract shall provide for maintenance of the HVAC system not less than quarterly and changing of the air filters not less than monthly. Tenant shall be responsible for the total cost of the basic charge of the Contract.  Tenant shall be responsible to provide Landlord with sufficient documentation that will reasonably enable Landlord to verify that Tenant has maintained the required Contract.

<u>Section 9.03.</u>          Tenant will not commit waste but will maintain the Leased Premises in a clean, attractive condition and in good repair, and shall also keep adjacent driveways and truck loading areas clean.  Upon termination of this Lease, Tenant will surrender the Leased Premises to Landlord broom-clean and in the same condition in which they existed at the commencement of this Lease, including but not limited to the removal of all trash and rubbish, and placing all mechanical (including HVAC), electrical, and plumbing systems and door hardware in good working order, excepting only ordinary wear and tear, and any damage required hereunder to be repaired by Landlord. Upon termination, Tenant will also surrender to Landlord all keys to the Leased Premises.

<u>Section 9.04.</u>          Landlord will have the right to enter the Leased Premises at any reasonable time (including during Tenant's business hours) to inspect the condition thereof, to make necessary repairs or to repair or maintain pipes, wires, and other facilities serving other premises in the Commercial Park or to show same to prospective purchasers or tenants.

<u>Section 9.05.</u>          Should any mechanic's liens or other liens or affidavits claiming liens be filed against the Leased Premises or the Commercial Park for any reason whatsoever incident to the acts or omissions of Tenant, its agents or contractors, Tenant shall cause the same to be cancelled and discharged of record by payment, bonding or otherwise, within fifteen (15) days after notice by Landlord.

ARTICLE X - Additions and Fixtures

<u>Section 10.01.</u>          Tenant will make no alterations or additions to the Leased Premises without the prior written consent of Landlord.  At such time as Tenant requests such written consent of Landlord, Tenant shall submit plans and specifications for such alterations or additions to Landlord.

<u>Section 10.02.</u>          Subject to the lien and security interest and other rights of Landlord referred to in <u>Article XIV</u>, Tenant shall remove only "Removable Trade Fixtures," as hereinafter defined (excluding all components of the HVAC system, pipes, paneling or other wall covering or floor covering), and, in addition to other applicable provisions of this Lease regarding such removal, the following shall apply:  (1) such removal must be made prior to the termination of the term of this Lease; (2) Tenant must not be in default of any obligation or covenant under this Lease at the time of such removal; and (3) such removal must be effected without damage to the Leased Premises or the building of which the Leased Premises are a part and Tenant must promptly repair all damage caused by such removal.  For the purposes hereof, the phrase "Removable Trade Fixtures" means the following:  all of Tenant's signs, tables, chairs, desks, racks, standards, wall brackets, hang-rods, shelves, equipment and other business machines.  If Landlord requests in writing, Tenant will by the termination of this Lease remove any or all alterations, additions, fixtures, equipment and other property installed by Tenant in the Leased Premises and will repair any damage caused by such removal and restore the Leased Premises to the condition called for in <u>Section 9.03</u>. If, by the termination of this Lease, Tenant fails to remove any Removable Trade Fixtures or all alterations, additions, fixtures, equipment and property which Landlord has requested that Tenant remove or Tenant fails to repair any damage caused by its removal, then Landlord shall have the right (but not the obligation) to remove such Removable Trade Fixtures and/or other alterations, additions, fixtures, equipment or property or repair any such damage caused by the removal thereof and thereupon Tenant will, on demand, pay to Landlord the cost of such removal, transportation and storage on any Removable Trade Fixtures (or other alterations, additions, fixtures, equipment and property installed or placed by Tenant in the Leased Premises), and the cost of repairing any such damage caused by the removal thereof together with interest on all such sums at the highest lawful rate.

All plumbing or electrical wiring connections (including computer and communications cables) exposed as a result of the removal of Tenant's Removable Trade Fixtures, or other alterations, additions, fixtures, equipment and property installed or placed by Tenant in the Leased Premises (if such removal is so requested by Landlord) shall be capped by Tenant in a safe and workmanlike manner.

<u>Section 10.03.</u>          Tenant shall pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed by any governmental authority or other taxing authority upon Tenant's leasehold interest under this Lease and all alterations, additions, fixtures (including Removable Trade Fixtures), inventory and other property installed or placed or permitted at the Leased Premises by Tenant.  Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment by Tenant to the governmental authority or other taxing authority assessing such charges.

Tenant will also pay all insurance premiums assessed or levied upon any alterations, additions, fixtures or property installed in the Leased Premises by the Tenant and all insurance related to Tenant's use, occupancy and operations within the Leased Premises and the Commercial Park.

ARTICLE XI - Fire and Destruction of Premises

Section 11.01.          If all or any portion of the Leased Premises, or all or any portion of any other buildings in the Commercial Park, should be destroyed or damaged by fire or any other risk, peril or casualty (whether or not covered by insurance), then Landlord shall have the election to terminate this Lease or (if the Leased Premises have been so damaged) to repair and reconstruct the Leased Premises to substantially the condition which existed at the time of Landlord's tender of possession of the Leased Premises to Tenant (with the exception of replacement of any floor covering), and Landlord will notify Tenant of its election within sixty (60) days after receipt of written notice from Tenant of such damage or destruction.

Section 11.02.          In any circumstances described above where Landlord elects to repair and restore the Leased Premises, this Lease shall continue in full force and effect, and such repairs will be made by Landlord within a reasonable time thereafter, subject to delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, Acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any other cause beyond the control of Landlord (all of the aforesaid causes for delay being herein sometimes referred to as "Force Majeure"). Base Rent shall abate proportionably during the period and to the extent that the Leased Premises are unfit for use by Tenant and not actually used by Tenant in the ordinary conduct of its business.

ARTICLE XII - Liability and Indemnity

Section 12.01.          *TENANT AGREES TO INDEMNIFY AND HOLD LANDLORD, LANDLORD'S AGENTS, EMPLOYEES, DIRECTORS, OFFICERS, INVITEES, LICENSEES AND VISITORS HARMLESS FROM ANY (i) HARM TO OR IMPAIRMENT OR LOSS OF PROPERTY OR ITS USE, (ii) HARM TO OR DEATH OF A PERSON, OR (iii) "PERSONAL AND ADVERTISING INJURY" AS DEFINED IN THE FORM OF LIABILITY INSURANCE TENANT IS REQUIRED TO MAINTAIN UNDER THE TERMS OF THIS LEASE (COLLECTIVELY "INJURY"), AND ALL RESULTING OR RELATED LOSSES, CLAIMS, ACTIONS, DAMAGES, AND REASONABLE EXPENSES, INCLUDING BUT NOT LIMITED TO COSTS, FEES AND EXPENSES OF DEFENDING AGAINST ALL OF THE AFORESAID, OCCURRING IN ANY PORTION OF THE LEASED PREMISES.  THE INDEMNITY CONTAINED IN THIS SECTION (a) IS INDEPENDENT OF TENANT'S INSURANCE, (b) WILL NOT BE LIMITED BY COMPARATIVE NEGLIGENCE STATUTES OR DAMAGES PAID UNDER THE WORKERS' COMPENSATION ACTS, (c) WILL SURVIVE THE END OF THE LEASE TERMS, and (d) WILL APPLY EVEN IF AN INJURY IS CAUSED IN WHOLE OR IN PART BY THE ORDINARY NEGLIGENCE OR STRICT LIABILITY OF LANDLORD OR TENANT BUT WILL NOT APPLY TO THE EXTENT AN INJURY IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LANDLORD.*

*LANDLORD AGREES TO INDEMNIFY AND HOLD TENANT, TENANT'S AGENTS, EMPLOYEES, DIRECTORS, OFFICERS, INVITEES, LICENSEES AND VISITORS HARMLESS FROM ANY INJURY, AND ALL RESULTING OR RELATED LOSSES, CLAIMS, ACTIONS, DAMAGES, AND REASONABLE EXPENSES, INCLUDING BUT NOT LIMITED TO COSTS, FEES AND EXPENSES OF DEFENDING AGAINST ALL OF THE AFORESAID, OCCURRING IN ANY PORTION OF THE COMMON AREA.  THE INDEMNITY CONTAINED IN THIS SECTION (a) IS INDEPENDENT OF TENANT'S INSURANCE, (b) WILL NOT BE LIMITED BY COMPARATIVE NEGLIGENCE STATUTES OR DAMAGES PAID UNDER THE WORKERS' COMPENSATION ACTS, (c) WILL SURVIVE THE END OF THE LEASE TERMS, AND (d) WILL APPLY EVEN IF AN INJURY IS CAUSED IN WHOLE OR IN PART BY THE ORDINARY NEGLIGENCE OR STRICT LIABILITY OF LANDLORD OR TENANT BUT WILL NOT APPLY TO THE EXTENT AN INJURY IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF TENANT.*

Section 12.02.          Tenant agrees to take out and maintain at all times during the lease term a policy of causes of loss-special form property insurance on its alterations and other personal property placed at the Leased Premises (including but not limited to the HVAC and plate glass).  Such policy shall contain a replacement cost endorsement. Such insurance policy shall contain a loss payable clause designating Landlord as insured as its interest may appear.  Tenant shall be responsible for the safety and personal well being of Tenant's employees, both within the Leased Premises and in the Common Area

Section 12.03.          Tenant will take out and maintain, at its own cost and expense, commercial general liability insurance coverage in a minimum amount of $1,000,000 per occurrence and $2,000,000 aggregate which shall include:  (i) coverage for bodily injury and death; (ii) products liability coverage; and (iii) contractual liability coverage insuring the obligations of Tenant under the terms of this Lease.  Such policy shall name Landlord (and any of its affiliates, subsidiaries, successors and assigns designated by Landlord) and Tenant as the insureds.

Section 12.04.          All policies must be issued by carriers having a Best's Rating of A or better and a Best's Financial Size Category of IX or better, be endorsed to be primary and noncontributing with Landlord's policies being excess and secondary to the extent of Tenant's responsibilities under this Lease, be endorsed to provide a waiver of subrogation in favor of Landlord, and contain a provision for thirty (30) days' prior written notice by the insurance carrier to Landlord required for cancellation, non-renewal, or substantial modification.  No deductible may be in excess of $10,000 without Landlord's prior written consent.  Tenant shall provide Landlord with written evidence of the issuance of all policies required under this Lease prior to the Commencement Date.

Section 12.05.          *LANDLORD AND TENANT RELEASE EACH OTHER FROM ALL CLAIMS OR LIABILITIES FOR DAMAGE TO THE LEASED PREMISES OR THE COMMERCIAL PARK, DAMAGE TO OR LOSS OF PERSONAL PROPERTY WITHIN THE COMMERCIAL PARK, AND LOSS OF BUSINESS OR REVENUES THAT ARE COVERED BY THE RELEASING PARTY'S PROPERTY INSURANCE OR THAT WOULD HAVE BEEN COVERED BY THE REQUIRED PROPERTY INSURANCE IF THE RELEASING PARY FAILS TO MAINTAIN THE PROPERTY COVERAGES REQUIRED BY THIS LEASE.  THE PARTY INCURRING THE DAMAGE OR LOSS WILL BE RESPONSIBLE FOR ANY DEDUCTIBLE OR SELF-INSURED RETENTION UNDER ITS PROPERTY INSURANCE.  LANDLORD AND TENANT WILL NOTIFY THE ISSUING PROPERTY INSURANCE COMPANIES OF THE RELEASE SET FORTH IN THIS SECTION AND WILL HAVE THE PROPERTY INSURANCE POLICIES ENDORSED, IF NECESSARY, TO PREVENT INVALIDATION OF COVERAGE.  THIS RELEASE WILL NOT APPLY IF IT INVALIDATES THE PROPERTY INSURANCE COVERAGE OF THE RELEASING PARTY.  THE RELEASE IN THIS SECTION WILL APPLY EVEN IF THE DAMAGE OR LOSS IS CAUSED IN WHOLE OR IN PART BY THE ORDINARY NEGLIGENCE OR STRICT LIABILITY OF THE RELEASED PARTY, BUT WILL NOT APPLY TO THE EXTENT THE DAMAGE OR LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE RELEASED PARTY.*

ARTICLE XIII - Security Deposit

Section 13.01.          Tenant will, promptly upon execution of this instrument, pay to Landlord the Security Deposit, which may be commingled by Landlord with its other funds and which shall be received and held by Landlord without liability for interest as security for the faithful performance of all of the terms and provisions of this Lease by Tenant, including the obligation to pay rent. If Tenant should default with respect to any covenant, duty or obligation of Tenant hereunder, then the Security Deposit, or any part thereof, may be applied by Landlord on the damages sustained by Landlord by reason of any such default or on indebtedness owing by reason of any failure of Tenant to make any required monetary payment hereunder. At any time or times when Landlord has made any such application of all or any portion of the Security Deposit, Landlord shall have the right at any time thereafter to require that Tenant pay to Landlord a sum equal to the amount(s) so applied by Landlord so that Landlord will always be in possession of a sum equal to the amount of the Security Deposit stated above.

ARTICLE XIV - Landlord's Lien

Section 14.01.          To secure the payment of all rent due and to become due hereunder and the faithful performance of this Lease by Tenant and to secure all other indebtedness and liabilities of Tenant to Landlord now existing or hereafter incurred, Tenant hereby gives to Landlord an express first and prior contract lien and security interest on all property (including fixtures, equipment, chattels and merchandise) which may be placed in the Leased Premises, and also upon all proceeds of any insurance which may accrue to Tenant by reason of destruction of or damage to any such property. All exemption laws are hereby waived in favor of said lien and security interest and in favor of Landlord's statutory lien. This lien and security interest may be foreclosed with or without court proceedings by public or private sale provided Landlord gives Tenant at least ten (10) days' notice of the time and place of said sale, and Landlord shall have the right to become the purchaser, upon being the highest bidder at such sale. Landlord shall, in addition to all of its rights hereunder, also have all of the rights and remedies of a secured party under the Texas Uniform Commercial Code.

Section 14.02.          In the event that Landlord shall have taken possession of the Leased Premises pursuant to the authority hereinafter granted in connection with an Event of Default or for any other lawful reason, Landlord shall have the right to keep in place and use all the furniture, fixtures and equipment at the Leased Premises, including that which is owned by or leased to Tenant, at all times prior to any foreclosure thereon by Landlord or repossession thereof by any lessor thereof or third party having a lien thereon. Landlord shall also have the right to remove from the Leased Premises and Commercial Park (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the county in which the Leased Premises are located or dispose of same in any manner acceptable to Landlord; and in such event, Tenant shall be liable to Landlord for costs incurred by Landlord in connection with such removal, storage and/or disposal and shall indemnify and hold Landlord harmless from all loss, damage, cost, expense and liability in connection with such removal, storage and/or disposal. Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

ARTICLE XV - Default, Remedies and Determination of Damages

Section 15.01.          Each of the following acts or omissions of Tenant or occurrences shall constitute an "Event of Default":

A.   Failure or refusal by Tenant to timely pay Base Rent or any other sum when due hereunder; or

B.   Failure or refusal by Tenant to comply with the obligations of Tenant set forth in Article VI and/or Article VIII of this Lease; or

C.   Failure or refusal by Tenant to timely perform or observe any other covenant, duty or obligation of Tenant under this Lease; provided, however, notwithstanding the occurrence of such Event of Default, Landlord shall not be entitled to exercise any of the remedies provided for in this Lease or by law unless such Event of Default continues beyond the expiration of fifteen (15) days following notice to Tenant of such Event of Default; or

D.   Abandonment or vacating of the Leased Premises or any significant portion thereof; or

E.   The entry of a decree or order for relief by a court having jurisdiction over Tenant or any guarantor of Tenant's obligations hereunder in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Tenant or any guarantor of Tenant's obligations hereunder or for any substantial part of either of said parties' property, or ordering the winding-up or liquidation of either of said parties' affairs; or

F.   The commencement by Tenant or any guarantor of Tenant's obligations hereunder of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law.

Section 15.02.          This Lease and the term and estate hereby granted and the demise hereby made are subject to the limitation that if and whenever any Event of Default shall occur, after such notice, if any, as is provided in Section 15.01, Landlord may, at its option, in addition to all other rights and remedies given hereunder or by law or equity, do any one or more of the following:

A.   Terminate this Lease or Tenant's right to possession of the Leased Premises; in either event, Tenant shall immediately surrender possession of the Leased Premises to Landlord;

B.   Enter upon and take possession of the Leased Premises and expel or remove Tenant and any other occupant therefrom, with or without having terminated the Lease; or

C.   Alter locks and other security devices at the Leased Premises as provided under Section 93.002 of the Texas Property Code. In the event Landlord exercises its rights to alter the locks at the Leased Premises, Landlord shall only be required to provide Tenant with a new key during Landlord's regular business hours, provided that in no event shall Landlord be required to provide Tenant a new key until such time as Tenant cures all defaults under the Lease and, if required by Landlord, Tenant pays to Landlord as a Security Deposit (as defined in Section 13.01) an amount equal to twice the monthly Base Rent due hereunder.

Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Leased Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant.

Upon the occurrence of an Event of Default, Landlord shall not be obligated to give any notice (written or oral) regarding Landlord's exercise of any remedies hereunder.  Tenant hereby waives (to the extent legally permissible) any and all notices otherwise required under statutory or common law.  To the extent of any inconsistency between this Lease and any statutory or common law, it is the agreement of the parties that this Lease shall prevail.

If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Leased Premises for such purpose), and thereupon Tenant shall be obligated to, and hereby agrees to pay Landlord, upon demand, all costs, expenses and disbursements incurred by Landlord in taking such remedial action.

Section 15.03.        In the event Landlord elects to terminate this Lease by reason of an Event of Default, Landlord may hold Tenant liable for all rent and other indebtedness accrued to the date of such termination, plus the difference between the total of all monthly rents and other charges provided in this Lease for the remainder of the Lease Term and the reasonable rent value of the Leased Premises for such period, such difference to be discounted to then-present value at a rate equal to the rate of interest which is allowed by law in the State of Texas when the parties to a contract have not agreed on any particular rate of interest  (or, in the absence of such law, at the rate of six percent per annum).  Actions to collect amounts due by Tenant provided for in this paragraph of Section 15.03 may be brought from time to time by Landlord during the aforesaid period, on one or more occasions, without the necessity of Landlord's waiting until expiration of such period.

In case of an Event of Default, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum provided to be paid above: broker's fees incurred by Landlord in connection with reletting the whole or any part of the Leased Premises; the costs of removing and storing Tenant's or other occupant's property; the costs of repairing, altering, remodeling or otherwise putting the Leased Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in enforcing Landlord's remedies.

Section 15.04.        Notwithstanding state common law, state statutes, or anything herein to the contrary and to the full extent permitted under applicable law, Tenant and Landlord agree that Landlord shall have no duty to relet the Leased Premises or otherwise mitigate damages under this Lease and Tenant hereby releases Landlord from any and all duty to relet the Leased Premises or otherwise mitigate damages.  Tenant agrees that Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished, because of Landlord's failure to relet the Leased Premises or collect rent due with respect to such reletting. Additionally, Tenant hereby waives any and all rights to plead such failure of Landlord to mitigate damages as a claim or affirmative defense in any proceeding based on any Event of Default by Tenant under this Lease.

In the event, and only in the event, that (despite such waiver and contrary to the intent of the parties hereunder) state law requires Landlord to attempt to mitigate damages, Landlord and Tenant agree that any such duty to attempt to mitigate shall be satisfied and Landlord shall be conclusively deemed to have used objectively reasonable efforts to relet the Leased Premises by doing the following: (a) posting a "For Lease" sign on the Leased Premises, and (b) advising Landlord's leasing staff of the availability of the Leased Premises.  Furthermore, if either (i) Landlord decides to relet the Leased Premises or (ii) a duty to relet is imposed upon Landlord by law, then Landlord shall be required to use only the same efforts Landlord then uses to lease premises in the Commercial Park generally.  Landlord shall not in any event be required to give any preference or priority to the leasing of the Leased Premises over any other space that Landlord may have available in the Commercial Park.  Landlord shall not be required to: (i) take any instruction or advice given by Tenant regarding reletting the Leased Premises; (ii) accept any proposed tenant unless such tenant has a credit-worthiness acceptable to Landlord in its sole discretion; (iii) accept any proposed tenant unless such tenant leases the entire Leased Premises upon terms and conditions satisfactory to Landlord in its sole discretion (after giving consideration to all expenditures by Landlord for tenant improvements, broker's commissions and other leasing costs); or (iv) consent to any assignment or sublease for a period which extends beyond the expiration of the current term or which Landlord would not otherwise be required to consent to under the provisions of this Lease.

If Landlord receives any payments from the reletting of the Leased Premises and is required to mitigate damages under applicable state law (despite the intent of the parties hereunder), any such payments shall first be applied to any costs or expenses incurred by Landlord as a result of Tenant's Event of Default under the Lease, including but not limited to leasing and brokerage fees (including expense to third-party brokers, to Landlord's affiliates and employees of Landlord and its affiliates), attorneys' fees, and construction expenses relating to reletting the Leased Premises (whether paid to a third-party contractor or to the Tenant as a construction allowance) and in no event shall Tenant be entitled to any excess of rent (or rent plus other sums) obtained by reletting over and above the rent herein reserved.

Section 15.05.        In the event that Landlord has to pursue any of its rights or remedies under this Lease, Landlord shall be entitled to recover from Tenant prejudgment interest and all costs incurred by Landlord in attempting to collect such sum, including reasonable attorneys' fees.

Section 15.06.        In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have a reasonable period, but in no event less than thirty (30) days, in which to commence to cure any such default.  Unless and until Landlord fails so to commence to cure any default after such notice or having so commenced thereafter fails to exercise reasonable diligence to complete such curing, Tenant shall not have any remedy or cause of action by reason thereof.  All obligations of Landlord hereunder will be construed as independent covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Commercial Park and not thereafter.

Section 15.07.        Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or any other sums due under this Lease will cause Landlord to incur various expenses not contemplated by this Lease, the exact amount of which is presently difficult to ascertain.  Accordingly, if any payment of Base Rent, or any other sum due from Tenant under this Lease shall not be received by Landlord when due, then, in addition to such required payment, Tenant shall also pay to Landlord a "Late Charge" equal to ten cents ($0.10) for each

one dollar ($1.00) so past due. Landlord and Tenant agree that such Late Charge represents a fair and reasonable estimate of the expenses that Landlord will incur by reason of such late payment by Tenant. Acceptance of such Late Charge by Landlord shall not constitute a waiver of Tenant's default with respect to any such past due amounts, nor prevent Landlord from exercising any other rights and remedies granted to Landlord under this Lease or at law or in equity. Such Late Charge shall constitute additional rental payable by Tenant under this Lease and is in addition to, and separate from, the Base Rent and other charges payable under this Lease by Tenant.

## ARTICLE XVI - Non-Waiver

Section 16.01.          Neither acceptance of rent by Landlord nor failure by Landlord to complain of any action, non-action or default of Tenant shall constitute a waiver as to any breach of any covenant or condition of Tenant contained herein nor a waiver of any of Landlord's rights hereunder. Waiver by Landlord of any right for any default of Tenant shall not constitute a waiver of any right for either a prior or subsequent default of the same obligation or for any prior or subsequent default of any other obligation. No right or remedy of Landlord hereunder or covenant, duty or obligation of Tenant hereunder shall be deemed waived by Landlord unless such waiver be in writing, signed by Landlord.

## ARTICLE XVII - Landlord-Tenant Relation

Section 17.01.          The relation created by this Lease Contract is that of landlord and tenant. No provision of this Lease shall be construed in such a way as to constitute Landlord and Tenant joint venturers or co-partners or to make Tenant the agent of Landlord or to make Landlord liable for the debts of Tenant.

## ARTICLE XVIII - Eminent Domain

Section 18.01.          If there shall be taken (the term "taken" including a voluntary conveyance in lieu thereof) during the term of this Lease all of the Leased Premises, by any authority having the power of eminent domain, then and in that event, the term of this Lease shall cease and terminate, and the date of such termination shall be, at Landlord's election, either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority. If a lesser part of the Leased Premises should be so taken, Landlord may elect to terminate this Lease or to continue this Lease in effect, but if Landlord elects to continue this Lease in effect, the Base Rent shall be reduced in proportion to the area of the Leased Premises so taken. When any such reduction in Base Rent has been computed by Landlord, Landlord shall notify Tenant as to the amount of such Base Rent and such sum shall be due and payable by Tenant to Landlord in accordance with the provisions of Article IV relating to the time and manner of Tenant's payment of Base Rent. At the request of Landlord, Tenant will execute a letter or other memorandum setting forth the amount of such Base Rent payable by Tenant. In the event that Landlord has elected to continue this Lease in effect, then upon Landlord's collection of the entire sum due and payable by such authority to Landlord by way of compensation and damages, Landlord shall restore the remaining portion of the Leased Premises so as to constitute such portion an enclosed building, with such nature of building improvements and facilities as Landlord furnished to Tenant at or prior to commencement of the lease term. Such restoration work shall be performed by Landlord within a reasonable period of time with reasonable allowances for Force Majeure (as defined in Section 11.02 above). Neither the restoration work, if any, by Landlord with respect to the Leased Premises nor the restoration work, if any, by Landlord with respect to any other portion of the Commercial Park shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or Commercial Park or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (with the exception of the aforesaid proportionate reduction in Base Rent) or grant Tenant any right of off-set or recoupment. In the event that any condemnation proceeds, whether by way of compensation or damages, are collected by any party holding a lien on Landlord's interest in the Leased Premises, such proceeds shall not be deemed to have been collected by Landlord, whether or not the payment to such lienholder is with the approval of Landlord.

Section 18.02.          Whether or not any portion of the Leased Premises may be taken by such authority, Landlord may nevertheless elect to terminate this Lease or to continue this Lease in effect in the event any portion of any building in the Commercial Park or more than ten percent (10%) of the Common Area of the Commercial Park be taken by such authority.

Section 18.03.          All sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold interest, whether as damages or as compensation, will be the property of Landlord. Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, otherwise payable to Tenant for the leasehold interest by reason of such taking. Tenant further grants to Landlord the exclusive authority to negotiate with such authority for payment both with respect to the interest of Landlord and the interest of Tenant in the Leased Premises and Tenant agrees that the authority having the power of eminent domain shall cause all checks and drafts issued by it in connection with any such taking of the fee or leasehold estate, whether as compensation or as damages, to be issued payable to the order of Landlord above or payable to the order of Landlord and "Landlord's Mortgagee" (as hereinafter defined).

## ARTICLE XIX - Holding Over

Section 19.01.          Tenant agrees upon the expiration or termination of this Lease immediately and peaceably to yield up and surrender the Leased Premises; notice to quit or vacate is hereby expressly waived. Tenant shall be liable to Landlord for any and all damages incurred by Landlord as the result of any failure by Tenant to timely surrender possession of the Leased Premises as required herein. If Tenant shall hold over after the expiration or termination of this Lease, such holding over shall be deemed (a) a tenancy at sufferance, in which event Base Rent and Additional Rent payable with respect to any such day during such tenancy at sufferance shall be one hundred fifty percent (150%) of the prorated, per day amount of such amounts payable immediately before the inception of such month to month tenancy or (b) at the sole discretion of Landlord, a tenancy from month to month, in which event Base Rent and Additional Rent payable with respect to any such month shall be one hundred fifty percent (150%) of such amounts payable immediately before the inception of such month to month tenancy, and in either case, the tenancy shall otherwise be subject to all of the same terms, conditions, and provisions set forth in this Lease.

## ARTICLE XX - Landlord's Mortgagee

Section 20.01.          Tenant agrees that its interest under this Lease shall be subordinate to any mortgage, deed of trust or similar device now or hereafter placed upon the Leased Premises or all or any portion of the Commercial Park by Landlord if the mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created so elects, and, upon notice to Tenant of such election, Tenant will execute any instruments required to evidence such subordination. Likewise, such mortgagee or beneficiary under said deed of

trust or lender for whose benefit any other security device is created may elect, by notice to Tenant, to make this Lease superior to such mortgage or deed of trust or other security device; and in the event of any such election, Tenant will execute any instruments required to evidence such superiority.

Section 20.02.        Tenant shall execute and deliver to Landlord, at such time or times as Landlord may request, a certificate stating:

    A.    Whether or not the Lease is in full force and effect;

    B.    Whether or not the Lease has been modified or amended in any respect, and submitting copies of such modifications or amendments, if any;

    C.    Whether or not there are any existing defaults under this Lease to the knowledge of Tenant, and specifying the nature of such defaults, if any; and

    D.    Such other information as may be reasonably requested.

The aforesaid certificate(s) shall be delivered to Landlord promptly upon receipt of a written request therefor, but in no event more than five (5) days following receipt of such request.

Section 20.03.        If Landlord does not own the fee to any portion of the property which constitutes the Commercial Park, but instead holds only a leasehold interest therein under a ground lease, then in such event, this instrument shall be a sublease agreement subject and subordinate to the underlying ground lease. If this Lease should be terminated as a result of termination of the said underlying ground lease (regardless of the reason for termination of such underlying ground lease), Tenant shall have no right or claim against Landlord by reason thereof. This Lease is made by Landlord and accepted by Tenant subject to any and all matters of record affecting the Leased Premises or the Commercial Park.

ARTICLE XXI - Additional Rent

Section 21.01.        Tenant shall pay to Landlord, as Additional Rent, at its address set forth in Article I.1 or at such other place designated by Landlord, Tenant's Share of the Operating Costs during any calendar year (or portion thereof) during the term hereof. The first amount which may be due hereunder shall be due within ten (10) days after Landlord submits to Tenant a bill or invoice therefor. In addition, Landlord shall have the right, exercisable by Landlord's giving notice to Tenant from time to time during the term of this Lease, to estimate Tenant's Share of any increases in Operating Costs, whereupon commencing on the future date during the term of this Lease indicated by Landlord in such notice. Tenant shall pay to Landlord on the first day of each month, monthly in advance, the monthly charge so indicated by Landlord as Landlord's estimate of Tenant's Share of such increased Operating Costs. Said amount shall be adjusted between Landlord and Tenant annually (and at the expiration or earlier termination of this Lease), and payment shall be made to, or credit made by, Landlord (as the case may be) in order that Landlord shall receive the precise amount due in payment of any Operating Costs for the preceding calendar year or any fractional calendar year.

Section 21.02.        For purposes of this Lease, the term "Operating Costs" shall include all expenses incurred with respect to the maintenance, management and operation of the Commercial Park of which the Leased Premises are a part, including, but not limited to, the following:

    A.    The aggregate of all costs, expenses and liabilities of every kind or nature paid or incurred by Landlord (to the extent that Landlord, in its good faith judgment, regards it as reasonably necessary or appropriate to provide the services and materials hereafter referred to and to pay and incur the costs, expenses and liabilities hereafter referred to in connection with operating, maintaining, managing and equipping the Common Area including, without limitation, subdivision maintenance fees or dues and also including a fair and equitable portion of Landlord's costs of maintaining common improvements in the vicinity of the Commercial Park (as determined by Landlord); property owners association fees or dues and similar charges; constructing, operating, repairing and maintaining any necessary on-site or off-site utilities; maintenance of rail lines serving the Commercial Park; exterior maintenance of the buildings in the Commercial Park, including periodic repainting of exterior walls, fascias and parapets and steam cleaning, sandblasting, filling holes and graffiti-removal procedures thereof; repairing and maintaining the structural portions of the buildings in the Commercial Park; repairing and maintaining the roof of the buildings in the Commercial Park; providing security services with respect to the Common Area, the cost of maintaining and repairing the fire sprinkler systems; the cost of supplying utilities to the Common Area; plus a property management fee payable to the manager of the Commercial Park based upon the gross receipts of the Commercial Park.

    B.    All taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums (whether now existing or hereafter arising, whether foreseen or unforeseen and whether under the present system of real estate taxation or some other system), levied, assessed, charged or imposed by any governmental authority or other taxing authority (or by any property owners' or similar association) or which accrue on the Commercial Park for each calendar year (or portion thereof) during the term of this Lease, including, without limitation, all penalties, interest and other charges (with respect to Taxes) payable by reason of any delay in or failure or refusal of Tenant to make timely payment as required under this Lease. Tenant waives any rights it may have pursuant to statutory or common law to protest the appraised value of the Commercial Park or to appeal the same (and all rights to receive notices of reappraisal as set forth in Sections 41.413 and 42.015 of the Texas Tax Code).

    C.    The total annual insurance premiums which accrue on all property insurance, boiler insurance, commercial general liability insurance, rent insurance and other insurance which, from time to time, may at Landlord's election be carried by Landlord with respect to the Commercial Park during any applicable calendar year (or portion thereof) occurring during the term of this Lease; provided, however, in the event that during any such calendar year all or any part of such coverage is written under a "blanket policy" or otherwise in such manner that Landlord was not charged a specific insurance premium applicable solely to the Commercial Park, then in such event, the amount considered to be the Insurance Premium with respect to such coverage for such calendar year shall be that amount which would have been the annual insurance premium payable under the rates in effect on the first day of such applicable calendar year for a separate Texas Standard Form insurance policy generally providing such type and amount of coverage (without any deductible amount) with respect to the Commercial Park (considering the type of construction and other relevant matters) irrespective of the fact that Landlord did not actually carry such type policy.

D.    The phrase "Tenant's Share" shall mean the proportion that the ground floor area of the Leased Premises (as indicated in Article I.3. of this Lease) bears to the total leased ground floor area in all the buildings in the Commercial Park on the first day of January for the relevant calendar year for which any calculation referred to in this Article XXI is being made.

E.    As Tenant's Share of Operating Costs, Tenant shall initially pay, on a monthly basis, the amount set forth in Article I.8. above.  Such amount shall be in addition to Base Rent and shall be paid at the same time and place for each installment of Base Rent.  Landlord reserves the right, upon thirty (30) days' written notice to Tenant, to adjust the monthly amount payable by Tenant for Tenant's Share of Operating Costs to reflect more accurately Landlord's estimate of the actual amount of such costs.  Additionally, as soon as reasonably practicable following the end of each calendar year of the Lease Term, Landlord shall submit to Tenant a statement of the actual amount of Operating Costs for such calendar year and the amount paid by Tenant as Tenant's share of such costs.  If Tenant has underpaid the actual amount of Tenant's Share of Operating Costs for such calendar year, Tenant shall pay to Landlord the full amount of the deficiency within ten (10) days of receipt of Landlord's statement.  If Tenant has overpaid the actual amount of Tenant's Share of Operating Costs, the surplusage shall be credited by Landlord to the next ensuing installment(s) of Tenant's Share of Operating Costs.

Section 21.03.    If there is presently in effect or hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease (herein referred to as "Rent Sales Tax"), then in addition to all rent and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax.  The term "Rent Sales Tax" shall not include any income taxes applicable to Landlord.

## ARTICLE XXII - Notice

Section 22.01.    Any notice which may or shall be given under the terms of this Lease shall be in writing and shall be either delivered to the Notice Address of either Landlord or Tenant, by hand, overnight delivery or United States registered or certified mail, adequate postage prepaid.  Either party's address may be changed from time to time by such party by giving notice as provided above.  No change of address of either party shall be binding on the other party until notice of such change of address is given as herein provided.  A signed return receipt shall be conclusive that such notice was delivered in due course of mail if mailed as provided above.  For purposes of the calculation of various time periods referred to herein, notice delivered by hand or overnight delivery shall be deemed received when delivered to the place for giving notice to a party referred to above and notice mailed in the manner provided above shall be deemed completed upon the earlier to occur of (i) actual receipt as indicated on the signed return receipt, or (ii) three (3) days after posting as herein provided.  Finally, any written notice addressed as provided hereinabove and actually received by the addressee, shall constitute sufficient notice for all purposes under this Lease.

## ARTICLE XXIII - Tenant's Signs

Section 23.01.    Tenant shall be responsible for the costs and installation of a sign, including any required licenses or permits.  Sign plans shall comply with all applicable laws, regulations, and ordinances and shall be prepared by Tenant in accordance with any existing sign criteria for the Commercial Park and submitted to Landlord for Landlord's prior written approval, which shall not be unreasonably withheld.  Except as approved by Landlord in writing, no sign, placard or advertisement, or exterior or interior window sign, placard or advertisement shall be painted, erected or displayed and no awnings shall be erected.  Any interior sign which is not designed or reasonably calculated to be seen from outside the Leased Premises may be placed and displayed by Tenant without Landlord's further consent.

## ARTICLE XXIV - Relocation

Section 24.01.    By providing Tenant with not less than ninety (90) days' advanced written notice, Landlord may require Tenant to relocate to another location in the Commercial Park, provided that the other location is equal in size or larger than the Leased Premises and contains similar leasehold improvements.  Landlord will pay Tenant's reasonable out-of-pocket moving expenses for moving to the other location.  "Moving expenses" means reasonable expenses payable to professional movers, utility companies for connection and disconnection fees, wiring companies for connecting and disconnecting Tenant's office equipment required by the relocation, and printing companies for reprinting Tenant's stationary and business cards.  A relocation of Tenant will not change or affect any other provision of this Lease that is then in effect, including rent and reimbursement amounts, except that the description of the suite or unit number will automatically be amended.

## ARTICLE XXV - Terminology and Miscellaneous

Section 25.01.    With respect to terminology in this Lease, each number (singular or plural) shall include all numbers, and each gender (male, female or neuter) shall include all genders. If any provision of this Lease shall ever be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Lease, but such other provisions shall continue in full force and effect.

The titles of the Articles in this Lease shall have no effect and shall neither limit nor amplify the provisions of the Lease itself.  This Lease shall be binding upon and shall accrue to the benefit of Landlord, its successors and assigns.

Section 25.02.    In all instances where Tenant is required hereunder to pay any sum or do any act at a particular indicated time or within an indicated period, it is understood that time is of the essence.

Section 25.03.    The obligation of Tenant to pay all rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitute independent, unconditional obligations to be performed at all times provided for hereunder.  Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien against or withhold, or deduct from or off-set against any rent and other sums provided hereunder to be paid by Landlord to Tenant.

Section 25.04.    Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential damages or special damages; and all liability of Landlord for damages for breach of any covenant, duty or obligation of Landlord hereunder may be satisfied only out of the interest of Landlord in the Commercial Park existing at the time any such liability is adjudicated in a proceeding as to which the judgment adjudicating such liability is non-appealable and not subject to further review.  The term "Landlord" shall mean only the owner, for the time being, of the Commercial Park, and in the event of the transfer by such owner of its interest in the Commercial Park, such owner shall

thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the lease term upon each new owner for the duration of such owner's ownership.

Section 25.05.          Intentionally Omitted

Section 25.06.          All monetary obligations of Landlord and Tenant (including, without limitation, any monetary obligation of Landlord or Tenant for damages for any breach of the respective covenants, duties or obligations of Landlord or Tenant hereunder) are performable exclusively in Austin, Travis County, Texas.  In the event that, under any circumstance, this Lease provides for interest to be payable at the maximum rate permitted by law (e.g., where "the highest lawful rate" or words of similar meaning are used) and at the time of such payment no such maximum exists, then the applicable rate of interest shall be one hundred fifty percent (150%) of the prime interest rate then in effect at such commercial bank as is designated by Landlord.

Section 25.07.          The doctrine of independent covenants will apply in all matters relating to this Lease, including, without limitation, all obligations of Landlord and Tenant to perform their respective obligations under this Lease.  The preceding sentence shall apply notwithstanding that Landlord may have defaulted in fulfilling a covenant to maintain or repair the Leased Premises even if such default results in the unsuitability of the Leased Premises for Tenant's intended commercial use.

Section 25.08.          Tenant hereby acknowledges and agrees that Landlord is not bound to perform or liable for the non-performance of any implied covenant or implied duty of Landlord not expressly set forth herein.  Tenant acknowledges and agrees that Landlord has made no warranty (either express or implied) that the Leased Premises are suitable for Tenant's intended commercial purpose.  Tenant agrees to perform all of its Lease obligations (including, without limitation, the obligation to pay rent), notwithstanding an alleged breach by Landlord of any warranty, whether expressly contained herein or imposed by applicable law.  Tenant agrees that Landlord shall incur no liability to Tenant by reason of any defect in the Leased Premises, whether apparent or latent.  Tenant represents and warrants that it has inspected the Leased Premises and that such are in good repair and condition and adequate for Tenant's use thereof.

Section 25.09.          Intentionally Omitted

Section 25.10.          Upon written request, Tenant shall provide to Landlord, within fourteen (14) days of such request, a copy of its most recent financial statement, including both a balance sheet and income statement.  Such request may be made by Landlord from time to time during the Lease Term, but not more often than annually.

Section 25.11.          If during the term of this Lease Tenant requests that Landlord prepare, review, or negotiate legal documentation for any reason other than a transaction solely between Tenant and Landlord, then Landlord reserves the right to charge Tenant a reasonable fee for the preparation, review and/or negotiation of such documentation.  Such fee shall be due and payable to Landlord on demand.

Section 25.12.          Intentionally Omitted

Section 25.13.          Attached hereto as Exhibit "A" and incorporated herein by reference are the terms regarding the Lease Commission pertaining to this Lease.  Attached hereto as Exhibit "B" and incorporated herein by reference are the terms regarding the Construction of Tenant Improvements pertaining to this Lease.  Attached hereto as Exhibit "C" and incorporated herein by reference are the terms regarding the Right of First Refusal pertaining to this Lease.

ARTICLE XXVI - Entire Agreement

Section 26.01.          This instrument (including all Riders and Exhibits) constitutes the entire agreement between Landlord and Tenant; no prior written or prior or contemporaneous oral promises or representations shall be binding.  This Lease shall not be amended, changed or extended except by written instrument signed by both parties hereto.

**Remainder of Page Intentionally Left Blank**

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original, on the day and year first written above.

**St. Croix Capital Management Group**

By: _____

Kenneth R. Satterlee
CEO

"LANDLORD"

**Free Speech Systems, LLC**

By: _____

By: _____
Name: _____Alex Jones_____
Title: _____Owner_____

"TENANT"

EXHIBIT "A"

LEASE COMMISSION

Section 1.01.        All leasing fees are earned when the Lease is executed.  Landlord will pay Tom Pitcock, at Capital Area Commercial, a leasing fee calculated and payable as follows:  four percent (4%) of all Base Rent to be paid for the term of the Lease and the same percentage of the Additional Rent stated or estimated in the Lease, payable as follows:  one-half of such amount at the time Landlord and Tenant execute the Lease and the remainder on the date of Tenant's paid occupancy of the Leased Premises.

Section 1.02.        All fees under this Lease are payable in Travis County, Texas.

Section 1.03.        If Landlord, Tenant, or any broker is a prevailing party in any legal proceeding brought as a result of a dispute under the Lease or any transaction related to or contemplated by the Lease, such party will be entitled to recover from the non-prevailing parties all costs of such proceeding, prejudgment interest, and reasonable attorneys' fees as described more fully in the Lease.

Section 1.04        Landlord and Tenant each agree to indemnify and hold harmless the other party from and against any and all claims for commissions when such claim is made under or through such indemnifying party.

EXHIBIT "B"

CONSTRUCTION OF TENANT IMPROVEMENTS

Work Letter

Landlord, at Landlord's sole cost and expense, shall construct the following:

- **Provide new paint and carpet**
- **Remove carpet where necessary for warehouse requirement**
- **Install new wall as shown on attached space plan**
- **Open wall in rear area to allow use of one roll up door**
- **Install 2 new doors to newly created storage room**
- **Thoroughly clean entire space including walls, white boards, restrooms and equipment room**

The Tenant Improvement work shall be constructed in a configuration mutually acceptable to Landlord and Tenant and attached as an Exhibit to the Lease. The Tenant Improvement work shall include the cost of design, architect and engineer's fees, cost of permits, materials, labor, general contractor's fees, construction and management fee for overhead and supervision.

Section 1.01.       A.       As of the time of execution of the Lease, Landlord and Tenant have agreed upon general plans and specifications for construction of the Tenant Improvements. Landlord shall within thirty (30) days hereafter prepare and submit to Tenant for Tenant's approval such plans and specifications proposed by Landlord.  Tenant shall cause the aforesaid submitted plans and specifications to be examined and reviewed and shall submit suggested modifications and revisions, if any, to Landlord within seven (7) days from the date Landlord submits such original plans and specifications to Tenant.  Landlord and Tenant shall continue such sequence of submission until a set of plans and specifications has been agreed to and initialed by both parties, and Landlord shall have no obligation to commence construction until such agreement has been reached.

               B.       If said plans and specifications are mutually agreed upon by Landlord and Tenant, Landlord shall with due diligence attempt to obtain all required permits and letters of utility availability (collectively referred to herein as a "Building Permit") from appropriate governmental authorities.  In the event a Building Permit is not issued to Landlord on the basis of said approved plans and specifications, Landlord and Tenant will attempt to make mutually agreeable revisions in said plans and specifications to enable Landlord to obtain a Building Permit.

               C.       For all purposes under the Lease, the "Construction Start-Up Date" shall mean the date by which both of the hereinafter stated circumstances shall have occurred:  (i) Landlord and Tenant have agreed in writing upon plans and specifications and (ii) Landlord has obtained the necessary Building Permit.

               D.       If the Construction Start-Up Date shall have occurred, the improvements on the Leased Premises will be erected by Landlord substantially in accordance with the plans and specifications agreed to by Landlord and Tenant and upon which the building permit is based (the "Plans and Specs").  Landlord may not make substantial changes in its construction work from the Plans and Specs without Tenant's approval; Tenant will not unreasonably withhold approval or disapproval of substantial changes proposed by Landlord, and Tenant shall indicate such approval or disapproval within five (5) days from submission of such changes to Tenant for Tenant's approval or disapproval.  Failure to indicate such approval or disapproval within such five (5) day period shall conclusively be deemed to be approval of any such proposed changes.

Section 1.02.       Tenant shall provide and install all other interior work, trade equipment, furniture, fixtures, and effects of every description necessary or appropriate for Tenant's business (other than those specifically stated in the Plans and Specs to be provided by Landlord), and all such items to be provided and installed by Tenant shall be new and modern and of first quality.  With respect to any labor performed or materials furnished by Tenant at the Leased Premises, the following shall apply:  All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk.  Labor and materials used in the installation of Tenant's furniture and fixtures, and in any other work on the Leased Premises performed by Tenant, will be subject to Landlord's prior written approval.  Any such approval of Tenant's labor shall constitute a revocable license authorizing Tenant to permit such labor to enter upon the Commercial Park and Leased Premises prior to the commencement of the Lease Term for so long as Tenant's labor does not interfere with labor utilized by Landlord or any other tenant.  With respect to any contract for any such labor or materials, Tenant acts as a principal and not as the agent of Landlord.  Tenant agrees to indemnify and hold Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees, contractors, subcontractors, laborers, materialmen or invitees or arising from any bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Leased Premises.  Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord; and any attempt to do so shall be void and of no effect.  Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant.  If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof.  All of Tenant's construction at the Leased Premises shall be performed in strict compliance with the working drawings, all applicable building codes and other legal requirements, and in a good and workmanlike manner satisfactory to Landlord's architect and in such manner as to not cause Landlord's fire and property insurance to be canceled or the rate therefor increased.  In the performance of such work, Tenant shall not interfere with or delay any work being done by Landlord's contractors.

Section 1.03.       If the Construction Start-Up Date shall have occurred, Landlord agrees that such construction of the Leased Premises will be completed on or before the time stated in the Plans and Specs unless Landlord's failure so to complete is caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Landlord (any one or more of the aforesaid reasons for Landlord's failure so to complete being herein referred to as "excusable delays"), in which event Landlord shall have a period of time equal to the total of all excusable delays in addition to the time specified above in which to complete such construction as aforesaid.

**Section 1.04.**       Upon completion by Landlord of the work to be performed by it in construction of the Leased Premises substantially in accordance with the Plans and Specs, Landlord will tender possession of such premises to Tenant. The work to be performed by Landlord in the construction of the Leased Premises shall be deemed to have been completed substantially in accordance with the Plans and Specs, notwithstanding that adjustments may be required to be made by Landlord in its work and that minor items of Landlord's work have not been fully completed, so long as Tenant would be able to use the Leased Premises. Completion substantially in accordance with the Plans and Specs by Landlord may, but need not be, evidenced by a certificate of completion or certificate of substantial completion issued by Landlord's architect. Tenant acknowledges and agrees that the Lease will commence on the Commencement Date and that rent is payable as of the Commencement Date even if the improvements set forth on this Construction Rider have not been commenced or completed.

**Section 1.05.**       All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease.



EXHIBIT "C"

## PERSONAL GUARANTY

In order to induce Kelly Trade Ventures, LLC ("Landlord") to execute the foregoing Commercial Lease (the "Lease") with Free Speech Systems, LLC ("Tenant"), for a certain Demised Premises in University Business Center Project, Travis County, State of Texas, the undersigned (whether one or more than one) has guaranteed and by this instrument does hereby guarantee the payment and performance of all liabilities, obligations and duties (including, but not limited to, payment of rent) imposed upon Tenant under the terms of the Lease, as if the undersigned has executed the Lease as Tenant thereunder.

The undersigned hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, including notices of default by Tenant under the Lease, and waives diligence, presentment and suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby.

The undersigned agrees that, within ten (10) days after a request from Landlord (but not more than once per calendar year), the undersigned must deliver to Landlord such financial statements as are reasonably required by Landlord to verify the net worth of the undersigned.

The undersigned further agrees that Landlord is not first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against the undersigned. Suit may be brought and maintained against the undersigned by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person. The liability of the undersigned is not affected by any indulgence, compromise, settlement or variation of terms which may be extended to Tenant by Landlord or agreed upon by Landlord and Tenant, and is not impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Tenant or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal Bankruptcy Code, or any similar law or statute of the United States or any state thereof. Landlord and Tenant, without notice to or consent by the undersigned, may at any time or times enter into such extensions, amendments, assignments, subleases, or other covenants respecting the Lease as they may deem appropriate; and the undersigned is not released thereby, but continues to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under the Lease as so extended, amended, assigned or otherwise modified.

It is understood that other agreements similar to this Guaranty may, at Landlord's sole option and discretion, be executed by other persons with respect to the Lease. This Guaranty is cumulative of any such agreements and the liabilities and obligations of the undersigned hereunder are in no event affected or diminished by reason of such other agreements. Moreover, in the event Landlord obtains another signature of more than one guarantor on this Guaranty or by obtaining additional guaranty agreements, or both, the undersigned agrees that Landlord, in Landlord's sole discretion, may (i) bring suit against all guarantors of the Lease jointly and severally or against any one or more of them, (ii) compound or settle with any one or more of the guarantors for such consideration as Landlord may deem proper, and (iii) release one or more of the guarantors from liability. The undersigned further agrees that no such action impairs the rights of Landlord to enforce the lease against any remaining guarantor or guarantors, including the undersigned.

If the party executing this Guaranty is a corporation, then the undersigned officer personally represents and warrants that the Board of Directors of such corporation, in a duly held meeting, has determined that this Guaranty may reasonably be expected to benefit the corporation.

The undersigned agrees that if Landlord employs an attorney to present, enforce or defend all of Landlord's rights or remedies hereunder, the undersigned must pay any reasonable attorney's fees incurred by Landlord in such connection.

This Guaranty binds the undersigned and the successors, heirs, executors and administrators of the undersigned, and inures to the benefit of Landlord and Landlord's heirs, executors, administrators, and assigns.

After twelve (12) months of timely rental payments, if Tenant is in good standing with the Landlord and upon review and approval by Landlord of Free Speech System LLC's balance statement, tax returns, and income statement, Alex Jones shall be relieved of the Personal Guaranty.

EXECUTED, this _____ day of 20___ to be effective the same day as the effective date of the Lease.

GUARANTOR(S):

Name: Alex Jones

_910 west Mary_
_Austin, TX 78704_
Address (printed or typed)

**Exhibit "D"**

**RENT SCHEDULE**

Months __1__ through __4____ of lease term      $ <u>0.00/SF/NNN</u>
Months __5__ through __16__ of lease term      $ <u>8.40/SF/ NNN ($5,533.50)</u>
Months __17__ through __28__ of lease term      $ <u>8.70/SF/ NNN ($5,731.12)</u>
Months __29__ through __40__ of lease term      $ <u>9.00 SF/NNN ($5,928.75)</u>
Months _____ through _____ of lease term      $_____
Months _____ through _____ of lease term      $_____
Months _____ through _____ of lease term      $_____
Months _____ through _____ of lease term      $_____
Months _____ through _____ of lease term      $_____
Months _____ through _____ of lease term      $_____

# FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment to Lease Agreement (the "**Amendment**") is by and between St. Croix Capital Management Group, as authorized agent for the owner of the Commercial Park ("**Landlord**") and Free Speech Systems, LLC, a Texas limited liability company ("**Tenant**").

Landlord and Tenant have entered into that certain lease dated June 9, 2008 (the "**Original Lease**") for the lease of certain premises more fully described in the Original Lease and known locally as 3019 Alvin Devane, Suite 350, Austin, Texas 78741.

Landlord and Tenant wish to amend the Original Lease, and to confirm certain other matters in the Original Lease or pertaining to the Original Lease. The Original Lease as amended and confirmed by this Amendment is referred to herein as the "**Lease**".

In consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, as of the effective date of this Amendment Landlord and Tenant hereby agree as follows:

1.      Leased Premises. Section 1.3 of the Original Lease is hereby amended to provide that effective on Landlord's Completion Date (as "Landlord's Completion Date" is defined in Exhibit "B" to this Amendment) the Leased Premises contain approximately 15,347 square feet. As set out in this Amendment, Landlord and Tenant are increasing the square footage of the Leased Premises effective on Landlord's Completion Date by the addition of approximately 7,442 square feet of additional area ("**7,442 Square Feet of Additional Area**"). This Amendment adds the 7,442 Square Feet of Additional Area to the 7,905 square footage of the Leased Premises stated in the Original Lease effective on Landlord's Completion Date, and additionally shows the total 15,347 total square feet of area of the Leased Premises effective on Landlord's Completion Date in cross-hatch in Lease Exhibit "F".

        Section 1.3 of the Original Lease is hereby additionally amended to provide that effective upon Landlord's Completion Date the Leased Premises are known by street address as: 3019 Alvin Devane, Suites 320 and 350, Austin, Texas 78741.

2.      Exhibit "F". The Original Lease is hereby amended effective upon Landlord's Completion Date (i) to include Exhibit "F" Map of Leased Premises attached to this Amendment, (ii) to provide that the Leased Premises are shown in cross-hatch

University Business Center Free Speech Systems First Amendment to Lease 6 16 09

1

on such Exhibit "F", and (iii) to provide that such Exhibit "F" is annexed to the Original Lease and incorporated therein and made a part thereof for all purposes.

3.  Commercial Park.  Section 2.01 of the Original Lease is hereby amended effective July 1, 2008 to provide that the Leased Premises are located on part of the tract of property described in Exhibit "E" which is annexed to the Original Lease, and that the land described in such Exhibit "E" (as it may be reduced or increased from time to time as designated by Landlord) and any existing and future buildings, parking areas, truck loading areas, service areas and other improvements now existing or hereafter erected thereon are sometimes therein referred to as the "Commercial Park."

4.  Exhibit "E".  The Original Lease is hereby amended effective July 1, 2008 to include Exhibit "E" Legal Description attached to this Amendment, and to provide that such Exhibit "E" is annexed to the Original Lease and incorporated there and made a part thereof for all purposes.

5.  Lease Term, Commencement Date and Termination Date.  Section 1.4 of the Original Lease is hereby amended effective as of the date of this Amendment to provide that the Lease Term is 76 months, that the Commencement Date is July 1, 2008, and that the Termination Date is the date which is 76 months after the Commencement Date.

As of the effective date of this Amendment, Section 1.4 of the Original Lease is hereby additionally amended to include the following:

Tenant shall be provided early access to Suite 320 of the Leased Premises to fixturize Suite 320 of the Leased Premises and to move Tenant's personal property into Suite 320 of the Leased Premises.  Tenant's activities in Suite 320 of the Leased Premises shall be conducted in such a manner so as not to impede Landlord's construction of the Tenant Improvements in such Suite 320.

6.  Exhibit "D".  As of the effective date of this Amendment, Exhibit "D" attached to the Original Lease is hereby deleted in its entirety and is hereby replaced by Exhibit "D" Base Rent Schedule attached to this Amendment.

7.  Security Deposit.  As of the effective date of this Amendment, Section 1.6 of the Original Lease is hereby amended to provide that the Security Deposit is $17,393.27.  Tenant has already paid $5,533.50 to Landlord as the security deposit. Tenant shall pay the remaining $11,859.77 of the security deposit to Landlord concurrently with Tenant's execution of this Amendment.

University Business Center Free Speech Systems First Amendment to Lease 6 16 09

8.      Grant of License.  Section 8.01 of the Original Lease is hereby amended effective on Landlord's Completion Date to include the following:

Provided however, that notwithstanding anything to the contrary in this Section 8.01, Tenant shall have the right from time to time to grant a license to one or more third parties for the use of all or any portion of the TV Studio space in the Leased Premises, as such space is shown on Exhibit "B-1" to this Lease, without any consent of Landlord.

9.      HVAC Maintenance.  Section 9.02.B. of the Original Lease is hereby amended effective on Landlord's Completion Date to include the following:

So long as Tenant and the HVAC Contractor have complied with the requirements of the Contract, and such maintenance, repair or replacement is recommended by the HVAC Contractor and is due to ordinary wear and tear and not due to any misuse or abuse by Tenant of the HVAC system or any failure of Tenant to comply with the requirements of the Contract, then during the period from Landlord's Completion Date through the day before the first annual anniversary of Landlord's Completion Date, Landlord, and not Tenant shall be responsible for the cost of any maintenance, repair or replacement of the HVAC system, excluding the cost of the Contract and the cost of any maintenance or service covered thereunder.

10.     Lease Exhibits.  Section 25.13 of the Original Lease is hereby deleted in its entirety and replaced by the following:

Attached hereto and incorporated herein by referenced are Exhibits "A", "B", "B-1", "C", "D", "E" and "F".

11.     Construction of Tenant Improvements.  As of the effective date of this Amendment, Exhibit "B" to the Original Lease is hereby deleted in its entirety and replaced by Exhibit "B" Construction of Tenant Improvements attached to this Amendment.

12.     Except as expressly revised and amended by this Amendment, the terms and conditions of the Original Lease are hereby ratified and confirmed by Landlord and Tenant.  In the event of any conflict between the terms and conditions of the Original Lease and this Amendment, the terms and conditions of this Amendment shall prevail.

13.     All capitalized terms used in this Amendment and not defined herein shall have the same meaning and definition as those used in the Original Lease.



14.     This Amendment shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and assigns. Each party hereto and the persons signing below warrant that the person signing below on such party's behalf is authorized to do so and to bind such party to the terms of this Amendment.

15.     This Amendment may be executed in any number of counterparts as may be convenient, and it shall not be necessary that the signatures of all parties be contained in any one counterpart hereof. The signature pages taken from separate individually executed counterparts of this Amendment may be combined to form multiple fully executed counterparts. A facsimile or electronic signature shall be deemed to be an original signature for all purposes. All executed counterparts of this Amendment shall be deemed to be originals, but all such counterparts, when taken together, shall constitute just one First Amendment.

The parties have executed this Amendment to be effective as of the latest date accompanying a signature by Landlord or Tenant below.

LANDLORD:

St. Croix Capital Management Group, as authorized agent for the owner of the Commercial Park

By: _____
    Kenneth R. Satterlee
    CEO

Date of Signature: 7.10.09

TENANT:

Free Speech Systems, LLC, a Texas limited liability company

By: _____

Printed Name: Alex Jones

Title: Owner - Free speech

Date of Signature: 7, 7, 9

EXHIBIT "B"

CONSTRUCTION OF TENANT IMPROVEMENTS

**This Exhibit "C" applies only to Suite 320 of the Leased Premises.  Landlord and Tenant acknowledge and agree that all obligations of Landlord and Tenant under the previous Exhibit "C" which was attached to the Original Lease have been satisfied in full and that neither Landlord nor Tenant has any further rights or obligations thereunder.**

Section 1.01.      A.      Landlord and Tenant have agreed upon general plans and specifications for construction of the Tenant Improvements as shown on Exhibit "B-1" annexed to this Lease and incorporated herein and made a part hereof for all purposes. The Tenant Improvements shown in such Exhibit "B-1" shall be deemed to be the "Tenant Improvements".

B.      Landlord shall with due diligence, at Landlord's cost and expense, obtain all required permits and letters of utility availability (collectively referred to herein as a "Building Permit") from appropriate governmental authorities. In the event a Building Permit is not issued to Landlord on the basis of such Exhibit "B-1" plans and specifications, Landlord and Tenant will make mutually agreeable revisions in such plans and specifications to enable Landlord to obtain a Building Permit.

C.      For all purposes under the Lease, the "Construction Start-Up Date" shall mean the date by which Landlord has obtained the necessary Building Permit.

D.      If the Construction Start-Up Date shall have occurred, the Tenant Improvements on the Leased Premises will be erected by Landlord, substantially in accordance with the plans and specifications agreed to by Landlord and Tenant and upon which the building permit is based (the "Plans and Specs"). Landlord may not make substantial changes in its construction work from the Plans and Specs without Tenant's approval. Tenant will not unreasonably withhold approval or disapproval of substantial changes proposed by Landlord, and Tenant shall indicate such approval or disapproval within five (5) days from submission of such changes to Tenant for Tenant's approval or disapproval. Failure to indicate such approval or disapproval within such five (5) day period shall conclusively be deemed to be approval of any such proposed changes.

TENANT SHALL PAY $30,000 OF THE COST AND EXPENSE OF THE TENANT IMPROVEMENTS, AND LANDLORD SHALL PAY THE REMAINDER OF THE COST OF THE TENANT IMPROVEMENTS (WHICH COST AND EXPENSE SHALL INCLUDE WITHOUT LIMITATION, DESIGN, ARCHITECT'S AND ENGINEER'S FEES, MATERIALS AND LABOR, GENERAL CONTRACTOR'S FEES, AND CONSTRUCTION SUPERVISION FEES). TENANT SHALL PAY $15,000 OF TENANT'S $30,000 SHARE OF SUCH COST AND EXPENSE TO LANDLORD CONCURRENTLY WITH TENANT'S EXECUTION OF THE FIRST AMENDMENT TO THIS LEASE, AND TENANT SHALL PAY THE REMAINING $15,000 OF TENANT'S $30,000 SHARE OF SUCH COST AND EXPENSE TO LANDLORD UPON THE DATE LANDLORD COMPLETES THE WORK TO BE PERFORMED BY IT IN CONSTRUCTION OF THE TENANT IMPROVEMENTS ("LANDLORD'S COMPLETION DATE").

Section 1.02.      Tenant shall provide and install all other interior work, trade equipment, furniture, fixtures, and effects of every description necessary or appropriate for Tenant's business (other than those specifically stated in the Plans and Specs), and all such items to be provided and installed by Tenant shall be new and modern and of first quality. With respect to any labor performed or materials furnished by Tenant at the Leased Premises, the following shall apply. All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk. Labor and materials used in the installation of Tenant's furniture and fixtures, and in any other work on the Leased Premises performed by Tenant, will be subject to Landlord's prior written approval. Any such approval of Tenant's labor shall constitute a revocable license authorizing Tenant to permit such labor to enter upon the Commercial Park and Leased Premises prior to LANDLORD'S COMPLETION DATE for so long as Tenant's labor does not interfere with labor utilized by Landlord or any other tenant. With respect to any such labor or materials, Tenant acts as a principal and not as the agent of Landlord. Tenant agrees to indemnify and hold Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act

University Business Center Free Speech Systems First Amendment to Lease 6 16 09

6

or omission of Tenant or Tenant's agents, employees, contractors, subcontractors, laborers, materialmen or invitees or arising from any bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Leased Premises.  Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord, and any attempt to do so shall be void and of no effect.  Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant.  If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof.  All of Tenant's construction at the Leased Premises shall be performed in strict compliance with the working drawings, all applicable building codes and other legal requirements, and in a good and workmanlike manner satisfactory to Landlord's architect and in such manner as to not cause Landlord's fire and property insurance to be canceled or the rate therefore increased.  In the performance of such work, Tenant shall not interfere with or delay any work being done by Landlord's contractors.

Section 1.03.    If Landlord's completion of the construction of the Tenant Improvements on the Leased Premises is delayed by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Landlord (any one or more of the aforesaid reasons for Landlord's failure so to complete being herein referred to as "excusable delays"), Landlord shall have a period of time equal to the total of all excusable delays in addition to the time otherwise specified in this Lease in which to complete such construction as aforesaid.

Section 1.04.    Upon completion by Landlord of the work to be performed by it in construction of the Tenant Improvements on the Leased Premises substantially in accordance with the Plans and Specs, Landlord will tender possession of **SUITE 320 OF** the Leased Premises to Tenant.  The work to be performed by Landlord in the construction of the Tenant Improvements on the Leased Premises shall be deemed to have been completed substantially in accordance with the Plans and Specs, notwithstanding that adjustments may be required to be made by Landlord in its work and that minor items of Landlord's work have not been fully completed, so long as Tenant would be able to use **SUITE 320 OF** the Leased Premises.  Completion substantially in accordance with the Plans and Specs by Landlord may, but need not be, evidenced by a certificate of completion or certificate of substantial completion issued by Landlord's architect.  Tenant acknowledges and agrees that except as otherwise expressly set out in this Lease, this Lease will commence on the Commencement Date and that rent is payable as of the Base Rent commencement date even if the Tenant Improvements set forth on this Exhibit have not been commenced or completed.

Section 1.05.    All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord, and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease.



EXHIBIT "B-1"

University Business Center Free Speech Systems First Amendment to Lease 6 16 0



EXHIBIT "D"

BASE RENT SCHEDULE

July 1, 2008 through October 31, 2008          $0 per month (rent abatement)

November 1, 2008 through the later of
(i) Landlord's Completion Date or
(ii) September 30, 2009                         $5,533.50 per month

The later of (i) the day after
Landlord's Completion Date or
(ii) October 1, 2009
through October 31, 2009                        $8,525.73 per month

November 1, 2009 through February 28, 2010      $8,816.38 per month

March 1, 2010 through October 31, 2010          $11,638.14 per month

November 1, 2010 through October 31, 2011       $12,021.82 per month

November 1, 2011 through October 31, 2012       $12,405.49 per month

November 1, 2012 through October 31, 2013       $12,789.17 per month

November 1, 2013 through October 31, 2014       $13,172.84 per month

EXHIBIT "E"

LEGAL DESCRIPTION

Lots 2 and 3, Block B, University Business Park, an addition in Travis County, Texas according to the map or plat thereof recorded in Book 85, Pages 52C, 52D and 53A, of the Plat Records of Travis County, Texas.

EXHIBIT "F"

MAP OF LEASED PREMISES



## SECOND AMENDMENT TO LEASE AGREEMENT

This Second Amendment to Lease Agreement (the "**Amendment**") is by and between TAAB Texas, LP, a California limited partnership ("**Landlord**") and Free Speech Systems, LLC, a Texas limited liability company ("**Tenant**").

St. Croix Capital Management Group, as authorized agent for the owner of the Commercial Park, and Tenant entered into that certain Lease dated June 9, 2008 (the "**Original Lease**") for the lease of certain premises more fully described in the Original Lease and known locally as 3019 Alvin Devane, Suite 350, Austin, Texas 78741 (the "**Leased Premises**").

Kenneth R. Satterlee and Candace C. Satterlee, Trustees of the Satterlee Family 1986 Trust dated April 24, 1986, William D. Ballard, and Mark C. Emerick and Christina M. Emerick, Trustees of the Emerick Family Trust dated March 7, 2003 ("**Original Landlord 1**") conveyed the Leased Premises and other real property to Landlord by Special Warranty Deed recorded as Document No. 2009209977 in the Official Public Records of Travis County, Texas and concurrently therewith assigned the Lease to Landlord by that certain Assignment and Assumption of Leases and Other Property Rights executed by Original Landlord 1 and Landlord.

Robert J. Lichter and Gail F. Lichter, Trustees of The Lichter Family Trust dated February 15, 2006, ("**Original Landlord 2**") conveyed the Leased Premises and other real property to Landlord by Special Warranty Deed recorded as Document No. 2009209976 in the Official Public Records of Travis County, Texas and concurrently therewith assigned the Lease to Landlord by that certain Assignment and Assumption of Leases and Other Property Rights executed by Original Landlord 2 and Landlord.

The Original Lease has been previously amended by that First Amendment to Lease Agreement dated as of July 10, 2009 (the "**First Amendment**") (the Original Lease as amended by the First Amendment is hereinafter referred to as the "**Original Lease**").

Landlord and Tenant wish to amend the Original Lease. The Original Lease as amended and confirmed by this Amendment is referred to herein as the "**Lease**".

In consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, as of the effective date of this Amendment Landlord and Tenant hereby agree as follows:

1.     Effective November 1, 2009, Exhibit "D" to the Original Lease is hereby deleted in its entirety and replaced by Exhibit "D" Base Rent Schedule attached to this Amendment.

2.     Tenant paid to Landlord $2,922.23 too much Base Rent for October 2009, and $2,034.00 too much Additional Rent for Tenant's Share of the Operating Costs for October 2009. Tenant paid to Landlord $197.62 too little Base Rent for each of November 2009, December 2009 and January 2010. $592.86 of such $2,922.23 excess Base Rent shall be immediately applied by Landlord to the payment of such $197.62 of Base Rent due from Tenant to Landlord for each of November 2009, December 2009 and January 2010, and the $2,399.37

remainder of such $2,922.23 excess Base Rent shall by applied by Landlord on Landlord's Completion Date to the payment of Base Rent due from Tenant to Landlord on Landlord's Completion Date.  Such $2,034.00 excess Additional Rent shall be applied by Landlord on Landlord's Completion Date to the payment of Additional Rent for Tenant's Share of the Operating Costs due from Tenant to Landlord on Landlord's Completion Date.

3.    As of the effective date of this Amendment, Exhibit "B" to the Original Lease is hereby deleted in its entirety and replaced by Exhibit "B" Construction of Tenant Improvements attached to this Amendment.

4.    Except as expressly revised and amended by this Amendment, the terms and conditions of the Original Lease are hereby ratified and confirmed by Landlord and Tenant.  In the event of any conflict between the terms and conditions of the Original Lease and this Amendment, the terms and conditions of this Amendment shall prevail.

5.    All capitalized terms used in this Amendment and not defined herein shall have the same meaning and definition as those used in the Original Lease.

6.    This Amendment shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and assigns.  Each party hereto and the persons signing below warrant that the person signing below on such party's behalf is authorized to do so and to bind such party to the terms of this Amendment.

7.    This Amendment may be executed in any number of counterparts as may be convenient, and it shall not be necessary that the signatures of all parties be contained in any one counterpart hereof.  The signature pages taken from separate individually executed counterparts of this Amendment may be combined to form multiple fully executed counterparts.  A facsimile or electronic signature shall be deemed to be an original signature for all purposes. All executed counterparts of this Amendment shall be deemed to be originals, but all such counterparts, when taken together, shall constitute just one Second Amendment.



The parties have executed this Amendment to be effective as of the latest date accompanying a signature by Landlord or Tenant below.

**LANDLORD:**

TAAB Texas, LP, a California limited partnership

By:   Lichter Venture Group, Inc., a California
      corporation
      General Partner

      By:   _____
            Robert J. Lichter
            President

Date of Signature:   _____


**TENANT:**

Free Speech Systems, LLC, a Texas limited liability company

By:   _Alex Jones_____

Printed Name:   _ALEX JONES_____

Title:   _OWNER_____

Date of Signature:   _1/22/10_____

# EXHIBIT "B"

## CONSTRUCTION OF TENANT IMPROVEMENTS

**This Exhibit "B" applies only to Suite 320 of the Leased Premises. Landlord and Tenant acknowledge and agree that all obligations of Landlord and Tenant under the previous Exhibit "B" which was attached to the Original Lease have been satisfied in full and that neither Landlord nor Tenant has any further rights or obligations thereunder.**

Section 1.01.      A.      Landlord and Tenant have agreed upon general plans and specifications for construction of the Tenant Improvements as shown on Exhibit "B-1" annexed to this Lease and incorporated herein and made a part hereof for all purposes.  The Tenant Improvements shown in such Exhibit "B-1" shall be deemed to be the "Tenant Improvements".

B.      Landlord shall with due diligence, at Landlord's cost and expense, obtain all required permits and letters of utility availability (collectively referred to herein as a "Building Permit") from appropriate governmental authorities.  In the event a Building Permit is not issued to Landlord on the basis of such Exhibit "B-1" plans and specifications, Landlord and Tenant will make mutually agreeable revisions in such plans and specifications to enable Landlord to obtain a Building Permit.  Landlord and Tenant agree that such Exhibit "B-1" plans and specification are final and shall not be changed or revised in any way by either Landlord or Tenant unless such change or revision is required to obtain the Building Permit.

C.      For all purposes under the Lease, the "Construction Start-Up Date" shall mean the date by which Landlord has obtained the necessary Building Permit.

D.      If the Construction Start-Up Date shall have occurred, the Tenant Improvements on the Leased Premises will be erected by Landlord, substantially in accordance with the plans and specifications agreed to by Landlord and Tenant and upon which the building permit is based (the "Plans and Specs").  Landlord may not make substantial changes in its construction work from the Plans and Specs without Tenant's approval. Tenant will not such approval or disapproval within five (5) days from submission of such changes to Tenant for Tenant's approval or disapproval.  Failure to indicate such approval or disapproval within such five (5) day period shall conclusively be deemed to be approval of any such proposed changes.

TENANT SHALL PAY $76,675.43 OF THE COST AND EXPENSE OF THE TENANT IMPROVEMENTS, AND LANDLORD SHALL PAY THE REMAINDER OF THE COST OF THE TENANT IMPROVEMENTS (WHICH COST AND EXPENSE SHALL INCLUDE WITHOUT LIMITATION, DESIGN, ARCHITECT'S AND ENGINEER'S FEES, MATERIALS AND LABOR, AND GENERAL CONTRACTOR'S FEES).  TENANT SHALL PAY $76,675.43 SHARE OF SUCH COST AND EXPENSE DIRECTLY TO LANDLORD'S CONTRACTORS.  EACH TIME ONE OF LANDLORD'S CONTRACTORS SUBMITS A DRAW REQUEST FOR A PAYMENT TO LANDLORD, LANDLORD SHALL FORWARD SUCH DRAW REQUEST TO TENANT AND TENANT SHALL IMMEDIATELY UPON RECEIPT THEREOF PAY  33% OF SUCH DRAW REQUEST DIRECTLY TO SUCH CONTRACTOR UNTIL SUCH TIME AS TENANT HAS PAID A TOTAL OF $76,675.43 TO LANDLORD'S CONTRACTORS.  THE DATE LANDLORD COMPLETES THE WORK TO BE PERFORMED BY IT IN CONSTRUCTION OF THE TENANT IMPROVEMENTS IS REFERRED AS "LANDLORD'S COMPLETION DATE".

Section 1.02.      Tenant shall provide and install all other interior work, trade equipment, furniture, fixtures, and effects of every description necessary or appropriate for Tenant's business (other than those specifically stated in the Plans and Specs), and all such items to be provided and installed by Tenant shall be new and modern and of second quality.  With respect to any labor performed or materials furnished to the Leased Premises, the following shall apply:  All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk.  Labor and materials used in the installation of Tenant's furniture and fixtures, and in any other work on the Leased Premises performed by Tenant, will be subject to Landlord's prior written approval.  Any such approval of Tenant's labor shall constitute a revocable license authorizing Tenant to permit such labor to enter upon the Commercial Park and Leased Premises prior to LANDLORD'S COMPLETION DATE for so long as Tenant's labor does not interfere with labor utilized by Landlord or any other tenant.  With respect to any contract for any such labor or materials, Tenant acts as a principal and not as the agent of Landlord.  Tenant agrees to indemnify and hold Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees, contractors, subcontractors, laborers, materialmen or invitees or arising from any bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Leased Premises.  Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord; and any attempt to do so shall not be void and of no effect.  Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant.  If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest

University Business Center Free Speech Systems Second Amendment to Lease 1 20 10

4



therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof. All of Tenant's construction at the Leased Premises shall be performed in strict compliance with the working drawings, all applicable building codes, and as to not cause Landlord's fire and property insurance to be cancelled or the rate therefore increased. Neither in the performance of such work nor in any other way, shall Tenant interfere with or delay any work to be done, or being done, by Landlord's contractors.

**Section 1.03.** If Landlord's completion of the construction of the Tenant Improvements on the Leased Premises is delayed by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Landlord (any one or more of the aforesaid reasons for Landlord's failure so to complete being herein referred to as "excusable delays"), Landlord shall have a period of time equal to the total of all excusable delays in addition to the time otherwise specified in this Lease in which to complete such construction as aforesaid.

**Section 1.04.** Upon completion by Landlord of the work to be performed by it in construction of the Tenant Improvements on the Leased Premises substantially in accordance with the Plans and Specs, Landlord will tender possession of **SUITE 320 OF** the Leased Premises to Tenant. The work to be performed by Landlord in the construction of the Tenant Improvements on the Leased Premises shall be deemed to have been completed substantially in accordance with the Plans and Specs, notwithstanding that adjustments may be required to be made by Landlord in its work and that minor items of landlord's work have not been fully completed, so long as Tenant would be able to use **SUITE 320 OF** the Leased Premises. Completion substantially in accordance with the Plans and Specs by Landlord may, but need not be, evidenced by a certificate of completion or certificate of substantial completion issued by Landlord's architect. Tenant acknowledges and agrees that except as otherwise expressly set out in this Lease, this Lease will commence on the Commencement Date and that rent is payable as of the Base Rent commencement date even if the Tenant Improvements set forth on this Exhibit have not been commenced or completed.

**Section 1.05.** All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease.



# EXHIBIT "B-1"

## INCLUSIONS & EXCLUSIONS
## UBC-FREE SPEECH

INCLUSIONS:

2. Electrical Plan
3. Mechanical Plan
4. Plumbing Plan
5. Building Permit and associated submission and processing fees
6. TAS review and final inspection
7. Temporary sanitation (Port-a-toilet)
8. On site trash removal (Dumpster)

B. Division 2 & 3:

1. Demolition as necessary (minimal)
2. Sand and buff slab as necessary
3. Necessary slab repair (minor)
4. CMU block wall install at two existing overhead doors

C. Division 6, 7 & 8:

1. Rough carpentry in restrooms and where necessary
2. Insulation in roof deck per the City of Austin Energy Code (6")
3. (1) Single pane storefront door between existing space and new space
4. (1) 6 0 X 7 0 Mohawk double door and Timely frame between existing and new warehouses w/ flush bolts installed on inactive door
5. (13) 3 0 X 7 0 Mohawk doors and Timely frames
6. Door hardware for all INTERIOR doors
7. Weld shut one existing, exterior, hollow metal door and frame

D. Division 9:

1. All walls per "Permit Set" plans dated 12-28-09 (see proposal) -"Walls around Warehouse and TV Studio/Control Room to deck, double deck on studio walls except where meeting Executive Office and Executive Restroom, all Office walls to underside of grid with single layer of gyp. board and gyp. board ceilings in TV Studio/Control Room."
2. Double wall with double gyp. board between TV Studio/Control Room (fixed glass window by others)
3. R-30 insulation in double wall
4. R-13 insulation in wall cavities
5. Restroom and handicap signage w/ necessary handicap grab bars
6. Fire tape in Warehouse and hallway at rear of TV Studio
7. Tape and float to ceiling all walls not receiving fire tape
8. Paint on all walls except Data Room and Warehouse
9. Acoustical ceilings @ 9'-0" A.F.F., with standard grid and standard 2 X 4 ceiling tiles in all rooms except TV Studio/Control Room, Data Room and Warehouse

University Business Center Free Speech Systems Second Amendment to Lease 1 20 10

7

14. Fire extinguishers per City of Austin requirements
E. Division 10:
    1. Toilet accessories as per "Permit Set" plans dated 12-28-09
    ~~2. (1) Standard mirror in all three Restrooms, one (Plate, Lenox or Catlin)~~
    2. All duct is to be square duct board, no metal duct installed
    3. (3) Standard toilets
    4. (3) Standard wall mounted lavatories
    5. (1) ADA Compliant shower in Executive Restroom
    6. (1) 40 gallon water heater
G. Division 16:
    1. TV Studio/Control Room:
        a. (18) Circuits dedicated for Audio/Video as per "Permit Set" plans
           dated 12-28-09
        b. All electrical to be fed from 600 Amp service in the existing space
        c. (2) 4" PVC pipes in wall with (3) 24" X 24" junction boxes
        d. Lighting and ceiling plugs as per "Permit Set" plans dated 12-28-09
    2. Office Area, General Areas and Warehouse:
        a. All electrical to be fed off of existing 600 Amp panel in existing space
        b. Lighting fixtures (all prismatic fixtures except where strip lights are
           noted) as per "Permit Set" plans dated 12-28-09
        c. (2) 4" PVC conduits run between existing and new Data Rooms
           (conduits to contain NO electrical per code)
        d. Demolition of existing 400 Amp panel in new lease space
        e. Temporary power

**EXCLUSIONS:**
1. New Asbestos Letter, will use current letter from previous inspection
2. Truck well
3. Sealed or stained concrete
4. Tiltwall cutting or coring
5. Additional masonry/CMU (beyond two overhead doors being closed up)
6. Formica cabinets or counter tops of any material
7. Tiltwall insulation
8. Ceramic tile of any kind
9. Exterior painting
10. Exterior building signage or additional circuits for exterior signage
11. Additional glass & glazing or plexi-glass beyond storefront door between two spaces
12. Additional electrical metering costs beyond standard install costs
13. ~~Exterior Glazing~~
15. Exhaust system
16. Phone wiring (by tenant, ring and string provided to pull phone wiring)
17. Additional "accent lighting" beyond the noted prismatic fixtures and strip light fixtures
18. Separate HVAC unit for Data/Server Room
19. Fire alarm system
20. Security system and card readers by tenant
21. Raised floors in TV Studio/Control Room

## EXHIBIT "D"

| | |
|---|---|
| July 1, 2008 through October 31, 2008 | $0 per month (rent abatement) |
| November 1, 2008 through October 31, 2009 | $5,533.50 per month |
| November 1, 2009 through the day before Landlord's Completion Date | $5,731.12 per month |
| Landlord's Completion Date* through October 31, 2010 | $11,638.14 per month |
| November 1, 2010 through October 31, 2011 | $12,021.82 per month |
| November 1, 2011 through October 31, 2012 | $12,405.49 per month |
| November 1, 2012 through October 31, 2013 | $12,789.17 per month |
| November 1, 2013 through October 31, 2014 | $13,172.84 per month |

* If Landlord's Completion Date is a date other than the first day of a calendar month, Tenant must pay on Landlord's Completion Date as base rent for the balance of such calendar month a sum equal to: that proportion of the base rent specified above for the number of days from Landlord's Completion Date to the end of the calendar month in which Landlord's Completion Date occurs bears to the total number of days in such month.

## SECOND AMENDMENT TO LEASE AGREEMENT

This Second Amendment to Lease Agreement (the "**Amendment**") is by and between TAAB Texas, LP, a California limited partnership ("**Landlord**") and Free Speech Systems, LLC, a Texas limited liability company ("**Tenant**").

St. Croix Capital Management Group, as authorized agent for the owner of the Commercial Park, and Tenant entered into that certain Lease dated June 9, 2008 (the "**Original Lease**") for the lease of certain premises more fully described in the Original Lease and known locally as 3019 Alvin Devane, Suite 350, Austin, Texas 78741 (the "**Leased Premises**").

Kenneth R. Satterlee and Candace C. Satterlee, Trustees of the Satterlee Family 1986 Trust dated April 24, 1986, William D. Ballard, and Mark C. Emerick and Christina M. Emerick, Trustees of the Emerick Family Trust dated March 7, 2003 ("**Original Landlord 1**") conveyed the Leased Premises and other real property to Landlord by Special Warranty Deed recorded as Document No. 2009209977 in the Official Public Records of Travis County, Texas and concurrently therewith assigned the Lease to Landlord by that certain Assignment and Assumption of Leases and Other Property Rights executed by Original Landlord 1 and Landlord.

Robert J. Lichter and Gail F. Lichter, Trustees of The Lichter Family Trust dated February 15, 2006, ("**Original Landlord 2**") conveyed the Leased Premises and other real property to Landlord by Special Warranty Deed recorded as Document No. 2009209976 in the Official Public Records of Travis County, Texas and concurrently therewith assigned the Lease to Landlord by that certain Assignment and Assumption of Leases and Other Property Rights executed by Original Landlord 2 and Landlord.

The Original Lease has been previously amended by that First Amendment to Lease Agreement dated as of July 10, 2009 (the "**First Amendment**") (the Original Lease as amended by the First Amendment is hereinafter referred to as the "**Original Lease**").

Landlord and Tenant wish to amend the Original Lease. The Original Lease as amended and confirmed by this Amendment is referred to herein as the "**Lease**".

In consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, as of the effective date of this Amendment Landlord and Tenant hereby agree as follows:

1.      Effective November 1, 2008, Exhibit "D" to the Original Lease is hereby deleted in its entirety and replaced by Exhibit "D" Base Rent Schedule attached to this Amendment.

2.      Tenant paid to Landlord $2,922.23 too much Base Rent for October 2009, and $2,034.00 too much Additional Rent for Tenant's Share of the Operating Costs for October 2009. Tenant paid to Landlord $197.62 too little Base Rent for each of November 2009, December 2009 and January 2010. $592.86 of such $2,922.23 excess Base Rent shall be immediately applied by Landlord to the payment of such $197.62 of Base Rent due from Tenant to Landlord for each of November 2009, December 2009 and January 2010, and the $2,399.37

remainder of such $2,922.23 excess Base Rent shall by applied by Landlord on Landlord's Completion Date to the payment of Base Rent due from Tenant to Landlord on Landlord's Completion Date.   Such $2,034.00 excess Additional Rent shall be applied by Landlord on Landlord's Completion Date to the payment of Additional Rent for Tenant's Share of the Operating Costs due from Tenant to Landlord on Landlord's Completion Date.

3.      As of the effective date of this Amendment, Exhibit "B" to the Original Lease is hereby deleted in its entirety and replaced by Exhibit "B" Construction of Tenant Improvements attached to this Amendment.

4.      Except as expressly revised and amended by this Amendment, the terms and conditions of the Original Lease are hereby ratified and confirmed by Landlord and Tenant.  In the event of any conflict between the terms and conditions of the Original Lease and this Amendment, the terms and conditions of this Amendment shall prevail.

5.      All capitalized terms used in this Amendment and not defined herein shall have the same meaning and definition as those used in the Original Lease.

6.      This Amendment shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, legal representatives, successors and assigns.  Each party hereto and the persons signing below warrant that the person signing below on such party's behalf is authorized to do so and to bind such party to the terms of this Amendment.

7.      This Amendment may be executed in any number of counterparts as may be convenient, and it shall not be necessary that the signatures of all parties be contained in any one counterpart hereof.  The signature pages taken from separate individually executed counterparts of this Amendment may be combined to form multiple fully executed counterparts.  A facsimile or electronic signature shall be deemed to be an original signature for all purposes.  All executed counterparts of this Amendment shall be deemed to be originals, but all such counterparts, when taken together, shall constitute just one Second Amendment.

The parties have executed this Amendment to be effective as of the latest date accompanying a signature by Landlord or Tenant below.

**LANDLORD:**

TAAB Texas, LP, a California limited partnership

By:   Lichter Venture Group, Inc., a California
corporation
General Partner

By: _____
Robert J. Lichter
President

Date of Signature: _____1 – 22 – 2010_____

**TENANT:**

Free Speech Systems, LLC, a Texas limited liability company

By: _____

Printed Name: _____

Title: _____

Date of Signature: _____

## EXHIBIT "B"

## CONSTRUCTION OF TENANT IMPROVEMENTS

**This Exhibit "B" applies only to Suite 320 of the Leased Premises. Landlord and Tenant acknowledge and agree that all obligations of Landlord and Tenant under the previous Exhibit "B" which was attached to the Original Lease have been satisfied in full and that neither Landlord nor Tenant has any further rights or obligations thereunder.**

Section 1.01.      A.      Landlord and Tenant have agreed upon general plans and specifications for construction of the Tenant improvements as shown on Exhibit "B-1" annexed to this Lease and incorporated herein and made a part hereof for all purposes.  The Tenant improvements shown in such Exhibit "B-1" shall be deemed to be the "**Tenant Improvements**".

B.      Landlord shall with due diligence, at Landlord's cost and expense, obtain all required permits and letters of utility availability (collectively referred to herein as a "**Building Permit**") from appropriate governmental authorities.  In the event a Building Permit is not issued to Landlord on the basis of such Exhibit "B-1" plans and specifications, Landlord and Tenant will make mutually agreeable revisions in such plans and specifications to enable Landlord to obtain a Building Permit.  Landlord and Tenant agree that such Exhibit "B-1" plans and specification are final and shall not be changed or revised in any way by either Landlord or Tenant unless such change or revision is required to obtain the Building Permit.

C.      For all purposes under the Lease, the "**Construction Start-Up Date**" shall mean the date by which Landlord has obtained the necessary Building Permit.

D.      If the Construction Start-Up Date shall have occurred, the Tenant Improvements on the Leased Premises will be erected by Landlord, substantially in accordance with the plans and specifications agreed to by Landlord and Tenant and upon which the building permit is based (the "**Plans and Specs**").  Landlord may not make substantial changes in its construction work from the Plans and Specs without Tenant's approval; Tenant will not unreasonably withhold approval or disapproval of substantial changes proposed by Landlord, and Tenant shall indicate such approval or disapproval within five (5) days from submission of such changes to Tenant for Tenant's approval or disapproval.  Failure to indicate such approval or disapproval within such five (5) day period shall conclusively be deemed to be approval of any such proposed changes.

TENANT SHALL PAY $76,675.43 OF THE COST AND EXPENSE OF THE TENANT IMPROVEMENTS, AND LANDLORD SHALL PAY THE REMAINDER OF THE COST OF THE TENANT IMPROVEMENTS (WHICH COST AND EXPENSE SHALL INCLUDE WITHOUT LIMITATION, DESIGN, ARCHITECT'S AND ENGINEER'S FEES, MATERIALS AND LABOR, AND GENERAL CONTRACTOR'S FEES).  TENANT SHALL PAY ITS $76,675.43 SHARE OF SUCH COST AND EXPENSE DIRECTLY TO LANDLORD'S CONTRACTORS.  EACH TIME ONE OF LANDLORD'S CONTRACTORS SUBMITS A DRAW REQUEST FOR A PAYMENT TO LANDLORD, LANDLORD SHALL FORWARD SUCH DRAW REQUEST TO TENANT AND TENANT SHALL IMMEDIATELY UPON RECEIPT THEREOF PAY  33% OF SUCH DRAW REQUEST DIRECTLY TO SUCH CONTRACTOR UNTIL SUCH TIME AS TENANT HAS PAID A TOTAL OF $76,675.43 TO LANDLORD'S CONTRACTORS.  THE DATE LANDLORD COMPLETES THE WORK TO BE PERFORMED BY IT IN CONSTRUCTION OF THE TENANT IMPROVEMENTS IS REFERRED AS "LANDLORD'S COMPLETION DATE".

Section 1.02.      Tenant shall provide and install all other interior work, trade equipment, furniture, fixtures, and effects of every description necessary or appropriate for Tenant's business (other than those specifically stated in the Plans and Specs), and all such items to be provided and installed by Tenant shall be new and modern and of second quality.  With respect to any labor performed or materials furnished by Tenant at the Leased Premises, the following shall apply:  All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk.  Labor and materials used in the installation of Tenant's furniture and fixtures, and in any other work on the Leased Premises performed by Tenant, will be subject to Landlord's prior written approval.  Any such approval of Tenant's labor shall constitute a revocable license authorizing Tenant to permit such labor to enter upon the Commercial Park and Leased Premises prior to LANDLORD'S COMPLETION DATE for so long as Tenant's labor does not interfere with labor utilized by Landlord or any other tenant.  With respect to any contract for any such labor or materials, Tenant acts as a principal and not as the agent of Landlord.  Tenant agrees to indemnify and hold Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees, contractors, subcontractors, laborers, materialmen or invitees or arising from any bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Leased Premises.  Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord; and any attempt to do so shall be void and of no effect.  Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant.  If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest

University Business Center Free Speech Systems Second Amendment to Lease 1 20 10

therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof.  All of Tenant's construction at the Leased Premises shall be performed in strict compliance with the working drawings, all applicable building codes and other legal requirements, and in a good and workmanlike manner satisfactory to Landlord's architect and in such manner as to not cause Landlord's fire and property insurance to be canceled or the rate therefore increased.  Neither in the performance of such work nor in any other way, shall Tenant interfere with or delay any work to be done, or being done, by Landlord's contractors.

Section 1.03.       If Landlord's completion of the construction of the Tenant Improvements on the Leased Premises is delayed by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Landlord (any one or more of the aforesaid reasons for Landlord's failure so to complete being herein referred to as "**excusable delays**"), Landlord shall have a period of time equal to the total of all excusable delays in addition to the time otherwise specified in this Lease in which to complete such construction as aforesaid.

Section 1.04.       Upon completion by Landlord of the work to be performed by it in construction of the Tenant Improvements on the Leased Premises substantially in accordance with the Plans and Specs, Landlord will tender possession of **SUITE 320 OF** the Leased Premises to Tenant.  The work to be performed by Landlord in the construction of the Tenant Improvements on the Leased Premises shall be deemed to have been completed substantially in accordance with the Plans and Specs, notwithstanding that adjustments may be required to be made by Landlord in its work and that minor items of Landlord's work have not been fully completed, so long as Tenant would be able to use **SUITE 320 OF** the Leased Premises.  Completion substantially in accordance with the Plans and Specs by Landlord may, but need not be, evidenced by a certificate of completion or certificate of substantial completion issued by Landlord's architect.  Tenant acknowledges and agrees that except as otherwise expressly set out in this Lease, this Lease will commence on the Commencement Date and that rent is payable as of the Base Rent commencement date even if the Tenant Improvements set forth on this Exhibit have not been commenced or completed.

Section 1.05.       All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease.

# EXHIBIT "B-1"

**INCLUSIONS & EXCLUSIONS**
**UBC-FREE SPEECH**

INCLUSIONS:
  A.   Division 1:
      1.   Architectural Plan
      2.   Electrical Plan
      3.   Mechanical Plan
      4.   Plumbing Plan
      5.   Building Permit and associated submission and processing fees
      6.   TAS review and final inspection
      7.   Temporary sanitation (Port-a-toilet)
      8.   On site trash removal (Dumpster)
  B.   Division 2 & 3:
      1.   Demolition as necessary (minimal)
      2.   Sand and buff slab as necessary
      3    Necessary slab repair (minor)
      4    CMU block wall install at two existing overhead doors
  C.   Division 6, 7 & 8:
      1.   Rough carpentry in restrooms and where necessary
      2.   Insulation in roof deck per the City of Austin Energy Code (6")
      3    (1) Single pane storefront door between existing space ad new space
      4.   (1) 6 0 X 7 0 Mohawk double door and Timely frame between existing and new
           warehouses w/ flush bolts installed on inactive door
      5.   (13) 3 0 X 7 0 Mohawk doors and Timely frames
      6.   Door hardware for all INTERIOR doors
      7.   Weld shut one existing, exterior, hollow metal door and frame
  D.   Division 9:
      1    All walls per "Permit Set" plans dated 12-28-09 (see proposal)
           -"Walls around Warehouse and TV Studio/Control Room to deck, double rock on
           studio walls except where meeting Executive Office and Executive Restroom, all
           Office walls to underside of grid with single layer of gyp. board and gyp. board
           ceilings in TV Studio/Control Room "
      2.   Double wall with double gyp. board between TV Studio/Control Room (fixed
           glass window by others)
      3.   R-30 insulation in double wall
      4.   R-13 insulation in wall cavities
      5.   Restroom and handicap signage w/ necessary handicap grab bars
      6.   Fire tape in Warehouse and hallway at rear of TV Studio
      7.   Tape and float to ceiling all walls not receiving fire tape
      8.   Paint on all walls except Data Room and Warehouse
      9.   Acoustical ceilings, @ 9'-0" A.F.F., with standard grid and standard 2 X 4
           ceiling tiles in all rooms except TV Studio/Control Room, Data Room and
           Warehouse
      10.  Rubber base cove in all rooms except Warehouse
      11.  FRP to 4'-0" A F F. in all Restrooms
      12.  Standard 1/8" VCT in all three Restrooms
      13.  $18.00 per yard carpet in all areas except Warehouse, Restrooms, Data Room
           and TV Studio/Control Room

      14. Fire extinguishers per City of Austin requirements

E.  Division 10:
1. Toilet accessories as per "Permit Set" plans dated 12-28-09
2. (1) Standard mirror in all three Restrooms

F.  Division 15:
1. Install **(5) new 5 TON** electric split system units (Trane, Lennox or Carrier)
2. All duct is to be square duct board, no metal duct installed
3. (3) Standard toilets
4. (3) Standard wall mounted lavatories
5. (1) ADA Compliant shower in Executive Restroom
6. (1) 40 gallon water heater

G.  Division 16:
1. TV Studio/Control Room:
    a. (18) Circuits dedicated for Audio/Video as per "Permit Set" plans dated 12-28-09
    b. All electrical to be fed from 600 Amp service in the existing space
    c. (2) 4" PVC pipes in wall with (3) 24" X 24" junction boxes
    d. Lighting and ceiling plugs as per "Permit Set" plans dated 12-28-09
2. Office Area, General Areas and Warehouse:
    a. All electrical to be fed off of existing 600 Amp panel in existing space
    b. Lighting fixtures (all prismatic fixtures except where strip lights are noted) as per "Permit Set" plans dated 12-28-09
    c. (2) 4" PVC conduits run between existing and new Data Rooms (conduits to contain NO electrical per code)
    d. Demolition of existing 400 Amp panel in new lease space
    e. Temporary power

**EXCLUSIONS:**
1. New Asbestos Letter, will use current letter from previous inspection
2. Truck well
3. Sealed or stained concrete
4. Tiltwall cutting or coring
5. Additional masonry/CMU (beyond two overhead doors being closed up)
6. Formica cabinets or counter tops of any material
7. Tiltwall insulation
8. Ceramic tile of any kind
9. Exterior painting
10. Exterior building signage or additional circuits for exterior signage
11. Additional glass & glazing or plexi-glass beyond storefront door between two spaces
12. Additional electrical metering costs beyond standard install costs
13. Exterior soffit work
14. Toilet partitions
15. Exhaust system
16. Phone wiring (by tenant, ring and string provided to pull phone wiring)
17. Additional "accent lighting" beyond the noted prismatic fixtures and strip light fixtures
18. Separate HVAC unit for Data/Server Room
19. Fire alarm system
20. Security system and card readers by tenant
21. Raised floors in TV Studio/Control Room



FREE SPEECH EXPANSION

AUSTIN TEXAS

CTT

CENTRAL TEXAS TILTWALL LP

A-3.0

FLOOR PLAN
6,925
Scale: 1/8"=1'-0"

PERMIT SET: NOT FOR
CONSTRUCTION USE
DATE: 12-28-09

## EXHIBIT "D"

### BASE RENT SCHEDULE

| | |
|---|---|
| July 1, 2008 through October 31, 2008 | $0 per month (rent abatement) |
| November 1, 2008 through October 31, 2009 | $5,533.50 per month |
| November 1, 2009 through the day before Landlord's Completion Date | $5,731.12 per month |
| Landlord's Completion Date* through October 31, 2010 | $11,638.14 per month |
| November 1, 2010 through October 31, 2011 | $12,021.82 per month |
| November 1, 2011 through October 31, 2012 | $12,405.49 per month |
| November 1, 2012 through October 31, 2013 | $12,789.17 per month |
| November 1, 2013 through October 31, 2014 | $13,172.84 per month |

* If Landlord's Completion Date is a date other than the first day of a calendar month, Tenant must pay on Landlord's Completion Date as base rent for the balance of such calendar month a sum equal to:  that proportion of the base rent specified above for the first full calendar month during which Landlord's Completion Date occurs, which the number of days from Landlord's Completion Date to the end of the calendar month in which Landlord's Completion Date occurs bears to the total number of days in such month.