# EMPLOYMENT AGREEMENT

This Employment Agreement (the "**Agreement**") is made and entered into and effective as of August 1, 2023, by and between Alexander E. Jones (the "**Executive**") and Free Speech Systems, LLC, a Texas limited liability company (the "**Company**" or "**FSS**"). The Executive and the Company are collectively referred to herein as the "**Parties**" and individually as a "**Party**."

## RECITALS

A. WHEREAS, on July 29, 2022, the Company filed for Chapter 11 Bankruptcy under Subchapter V in the Southern District of Texas Bankruptcy Court, Houston Division (the "**Bankruptcy Court**"), Case No. 22-60043 (the "**Company Bankruptcy Case**"); and

B. WHEREAS, on December 2, 2022, the Executive filed for Chapter 11 Bankruptcy in the Southern District of Texas Bankruptcy Court, Houston Division, Case No. 22-33553 (the "**Executive Bankruptcy Case**"); and

C. WHEREAS, Executive has continued to provide services to the Company from the date of filing of the Company Bankruptcy Case through the Effective Date of this Agreement at a rate of compensation provided for in a series of Orders in the Company Bankruptcy Case less than historically paid to Executive.

D. WHEREAS, Executive asserts that he is entitled to back pay as an administrative claim in the Company Bankruptcy Case and the terms and amount of that claim are disputed; and

E. WHEREAS, the Executive asserts that the claim described above is due and owing in full while the Company reserves all rights to object to such claim; and

F. WHEREAS, the Company filed a *Debtor's Plan of Reorganization Under Subchapter V of the Bankruptcy Code* (together with any amendments and/or supplements, the "**Company Plan**") which anticipates a contract with the Executive for a period of five (5) years in order to fulfil the obligations of the Company thereunder; and

G. WHEREAS, the Executive wishes to be employed by the Company pursuant to the Company Plan, so long as: (a) this Agreement is approved in a form and substance agreed upon by the Executive; (b) the Company Plan is approved by the Bankruptcy Court in a form and substance agreed upon by the Executive; (c) the Executive is provided approval as to the identity of the individual(s) or entity hired or contracted to fulfil the role of "professional management to operate its business during the Plan Period" as referenced in the Company Plan in Article 8 Section 8.1(e); and (d) all claims or causes of action held by the Company against the Executive (known or unknown) are stayed during the Plan Period (as defined by the Company Plan) and, upon the completion of the Company Plan, are fully and finally released with prejudice to re-filing in any forum whatsoever; and

H. WHEREAS, the Company desires to retain the services of the Executive and the Executive desires to continue such engagement under the terms set forth herein.



Page **1** of **15**

## AGREEMENT

NOW, THEREFORE, in consideration of the material advantages accruing to the Parties and the mutual covenants contained herein, and intended to be legally and ethically bound hereby, the Company and the Executive agree that the Executive shall be employed by the Company pursuant to the following terms and conditions:

1.  Term.  The Initial Term of this Agreement shall commence on the Execution Date and shall continue through the Effective Date (the "**Initial Term**") of the Company Plan. Effective immediately upon the Effective Date of the Company Plan, the Initial Term will cease, and the "**Five-Year Term**" as mandated by the Company Plan shall commence, provided Executive acknowledges in writing his agreement with the Company Plan. The Five-Year Term shall continue through the close of business on the fifth anniversary of the Effective Date, unless terminated earlier in accordance with the termination provisions set forth below. Together, the Initial Term and the Five-Year Term constitute the "**Employment Term**."

2.  Position and Duties.

    2.1.  Position.  During the Employment Term, the Executive shall have all such necessary duties, authority, and responsibility to direct the creation of all shows produced by the Company.

    2.2.  Duties.  During the Employment Term, the Executive shall:

       2.2.1.  Participate as the primary on air talent in an average of nineteen (19) new three (3) hour shows monthly ("**Minimum Shows**");

       2.2.2.  The Minimum Shows may be broadcast on any days of any week subject to the Executive's sole discretion; and

       2.2.3.  If in any week Executive is unable to live broadcast a minimum of five (5) shows, Executive shall assist in arranging the rebroadcast of material intended to appeal to the Alex Jones Show audience or arrange for a guest host to broadcast the show in his absence. This shall not vitiate the requirement in 2.2.1 above.

3.  Opportunities.  During the Employment Term, Executive agrees to devote substantial time and attention to his duties at the Company as necessary to perform those duties. However, the Parties, acknowledge, understand, and agree that in additional to performing services for the Company, Executive may also be offered certain external revenue-generating opportunities including, without limitation, the opportunity to produce other shows on other platforms, to make personal appearances, to author publications, and to endorse products (collectively the "**Opportunities**"). From and after the Effective Date through the term of this Agreement, Executive agrees that any Opportunity compatible with or in competition with the Company's operations shall be presented in writing to the Company as an Opportunity to be shared between the Executive and the Company as provided in this Section. In the event the Company does not accept the Opportunity within three (3) business days of submission, the Executive shall be free to pursue the Opportunity on his own, not using the Company's time, employees, assets, or facilities, and not sharing the Net Revenue as provided in this Section.  "**Net Revenue**" shall mean the

2

revenue remaining after the deduction of all properly documented expenses related to the Opportunities including inventory costs, shipping, fees, taxes, expenses incurred by Executive and documented under Section 4.3, etc., whether incurred by Executive or the Company. The Parties agree Executive's compensation (described in more detail in Section 4 below) will not be upward or downward adjusted in the event Executive accepts any external Opportunities. In the event the Company accepts the Opportunity, it shall be identified in Schedule 3 to this Agreement, and Net Revenue therefrom shall be treated as follows:

       3.1.    <u>From Execution Date Through Effective Date</u>.  During the Initial Term, any Opportunities performed by Executive shall be billed through the Company and the Parties agree to split all Net Revenue earned as follows: Seventy Percent (70%) to Executive and Thirty Percent (30%) to the Company.

       3.2.    <u>From the Effective Date through the Employment Term</u>.  During the Employment Term, to the extent the Executive performs any Opportunities using the Company's platform or using the Company's employees, such Opportunities shall be billed through the Company and the Parties agree to split all Net Revenue earned as follows: Seventy Percent (70%) to Executive and Thirty Percent (30%) to the Company unless otherwise agreed to by FSS and the Executive and documented in Schedule 3. In the event Executive performs Opportunities that do not utilize the Company's resources, including promotion on The Alex Jones Show or the work of the Company's employee, such Opportunities shall be billed exclusively by the Executive and all expenses therefore and revenue therefrom shall be the sole responsibility and benefit to the Executive.

    4.    <u>Compensation</u>.

       4.1.    <u>Base Salary</u>.  As compensation for Executive's services during the Employment Term, the Company shall pay the Executive a base salary in the amount (gross) of One Million, Five Hundred Thousand Dollars and NO/100 ($1,500,000.00), per year, (the "**Base Salary**") paid in equal sums in accordance with the Company's standard payroll schedule, and subject to all applicable payroll taxes and applicable federal and state wage laws. The Parties may, by mutual assent, agree to increase Executive's Base Salary or benefits in connection with a periodic review of Executive's performance.

       4.2.    <u>Incentive Bonus</u>.  For each calendar year of the Employment Term, the Executive shall have the opportunity to earn one of the following annual bonus tiers (the "**Bonus**") calculated as follows:

          4.2.1.  Ten Percent (10%) of revenue in excess of One Hundred Ten Percent (110%) of revenue as set forth in the Company Plan as confirmed by the Bankruptcy Court, in effect at the beginning of each applicable calendar year, ("**Tier 1 Bonus**"), plus;

          4.2.2.  Fifteen Percent (15%) of revenue in excess of One Hundred Twenty Percent (120%) of revenue as set forth in the Company Plan as confirmed by the Bankruptcy Court, in effect at the beginning of each applicable calendar year, ("**Tier 2 Bonus**"), plus;

      4.2.3. Twenty Percent (20%) of revenue in excess of One Hundred Thirty Percent (130%) of revenue as set forth in the Company Plan as confirmed by the Bankruptcy Court, in effect at the beginning of each applicable calendar year, ("**Tier 3 Bonus**").

      4.2.4. The payment of the amount of the Bonus for a given calendar year shall occur no later than March 15 of the calendar year following such calendar year in which the Bonus Tier level was achieved.

      4.2.5. Except as otherwise provided in Section 5, to be eligible to receive any portion of the Bonus, the Executive must be employed by the Company on the date the bonus is paid in accordance with Section 4.2.4.

     4.3. <u>Reimbursement of Expenses</u>.  The Company shall reimburse Executive for all reasonable documented out-of-pocket expenses (in compliance with the rules and regulations of the Internal Revenue Service and in accordance with the Company's policies and practices in effect at the time of incurring the expense) incurred by Executive in the course of performing his duties under this Agreement with respect to travel, entertainment, security, and other business-related expenses. Such expenses shall include those associated with any travel or personal appearances if such is associated with Opportunities revenue shared with the Company as described in Section 3. Any such expenses (other than hard costs charged and supported by invoices from third parties and paid by the Executive deducted to calculate Net Revenue) to be reimbursed in an amount exceeding $1,000, and expenses for any flights, lodging, entertainment, transportation rentals, or non-deminimus travel-related items or services, shall be pre-approved by the Company and the Executive unless otherwise agreed to in writing.

     4.4. <u>Employee Benefits</u>.  During the Employment Term, the Executive and each member of the Executive's immediate family (spouse and any eligible dependents) shall be entitled to participate in all employee benefit plans, practices and programs maintained by the Company, including any medical and other healthcare benefit plan, in each case, sponsored by the Company and as in effect from time to time (collectively, "**Employee Benefit Plans**") to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans.

     4.5. <u>Vacation</u>.  During the Employment Term, the Executive shall be entitled to any and all desired time off so long as his duties herein are being fully and effectively fulfilled.

     4.6. <u>Governance</u>.  The Company agrees that the Executive has approval of any hiring of any of the Company's employees that would be serving in a governing role within the Company upon the first day of the Five-Year Term, including, without limitation, any Chief Operating Officer appointed as part of the Company Plan; provided, however, that during the time after the Effective Date through the completion of all plan payments sufficient to close the Company's Bankruptcy Case, replacement of the COO shall be subject to the disclosure and approval of the Bankruptcy Court. In addition, Executive shall have ultimate hiring and firing authority over all production-side Company employees. Company shall Consult with Executive before severing business relationships with independent contractors, upon and after the Effective Date and must provide written advance notification of Company's decision related to hiring and firing no later than twenty-four (24) hours prior to notification thereof to an employee or applicant. In the event the Executive is not responsive to the Chief Operating Officer's notice within such

24-hour period, such approval is deemed to be given for the decision. In addition, if the termination is, in the business judgment of the Chief Operating Officer, necessary for the protection of other Company employees or to protect the business, the written approval process outlined in this section shall be waived, and the decision of the Chief Operating Officer will be deemed approved. Notwithstanding the above, Executive must make any approvals and exercise such authority described in this Section 4.6 with respect to Company employees for only lawful reasons and with a lawful basis and may not make such determinations with unlawful discriminatory or retaliatory animus or reasons. <u>Executive shall maintain the right to veto any sponsorship, marketing agreement, or other advertising relationship that could in any way be broadcast on the FSS platform</u>.

4.7. <u>Indemnification</u>. In the event that the Executive is made a party to or threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**"), other than any Proceeding initiated by the Executive or the Company related to any contest or dispute between the Executive and the Company or any of its Affiliates with respect to this Agreement or the Executive's employment hereunder, by reason of the fact that the Executive is or was a director or officer of the Company, or any Affiliate of the Company, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a limited liability company, partnership, joint venture, trust, or other enterprise, the Executive shall be indemnified and held harmless by the Company to the maximum extent permitted under applicable law from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees); provided however, that the Company shall not be required to provide indemnification under this paragraph for any acts taken by the Executive that are intentional or the result of wilful, unlawful, or criminal misconduct as decided by a court of competent jurisdiction on a final basis. Costs and expenses incurred by the Executive in defense of such Proceeding (including attorneys' fees) shall be paid by the Company in advance of the final disposition of such litigation upon receipt by the Company of: (i) a written request for payment; (ii) appropriate documentation evidencing the incurrence, amount and nature of the costs and expenses for which payment is being sought; and (iii) an undertaking adequate under applicable law made by or on behalf of the Executive to repay the amounts so paid if it shall ultimately be determined that the Executive is not entitled to be indemnified by the Company under this Agreement.

5. <u>Termination of Agreement</u>.

5.1. <u>Disability</u>. During the term of this Agreement, if Executive shall fail to perform the duties as specified herein and/or other essential functions of the job either with or without reasonable accommodation as a result of a physical or mental disability (as certified by a healthcare provider operating within the scope of their license and in good standing who would be similarly authorized under the provisions of the Family and Medical Leave Act to make such determinations) and such disability shall continue for a period of ninety consecutive (90) days out of any three hundred and sixty-five (365) day period, the Company may terminate this Agreement by providing written notice to Executive, to be effective as of a date specified in such notice.

5.2. <u>Death</u>. If Executive shall die during the term of this Agreement, this Agreement shall terminate as of the date of his verified death.

5.3. <u>Amounts Owed after Termination by Death or Disability</u>. If this Agreement is terminated because of Executive's death or disability, the Executive (or the Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the following:

5.3.1. any accrued but unpaid Base Salary which shall be paid in accordance with applicable Texas law; and

5.3.2. any unpaid Bonus with respect to the most recently completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date, but in no event later than March 15 of the calendar year following the calendar year in which the Bonus Tier level was achieved; and

5.3.3. reimbursement for unreimbursed business expenses properly incurred by the Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; and

5.3.4. such employee benefits, if any, as to which the Executive may be entitled under and in accordance with the terms of the Company's Employee Benefit Plans as of the Termination Date; provided, that in no event shall the Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein; and

5.3.5. a lump sum payment in an amount equal to either: (i) the *pro rata* portion of the prior year's Bonus, if any; or (ii) a bonus amount determined by the Company in its sole discretion that the Executive would have earned for the calendar year in which the Termination Date occurs, which shall be payable on the date that annual bonuses are paid to the Company's similarly situated employees, but in no event later than March 15 of the calendar year following the Termination Date.

5.4. <u>Termination Without Cause</u>. This Agreement may be terminated by either the Company or the Executive at any time and for any reason upon written notice with the Bankruptcy Court; *provided*, that unless otherwise provided herein, either Party shall be required to give the other Party at least ninety (90) days advance written notice of any termination of the Agreement. Upon termination of the Executive's employment during the Employment Term, the Executive shall be entitled to the compensation, including any Bonus calculated on a prorated basis for the period of employment in the applicable calendar year, and benefits described in Section 5.6, and shall have no further rights to any compensation or any other benefits from the Company or any of its their Affiliates.

5.5. <u>By Executive for Good Reason</u>. Executive may terminate this Agreement for Good Reason as of a date to be specified by providing written notice to the Company. Such notice must indicate the circumstances providing grounds for termination for Good Reason within five (5) business days of the date on which the Executive should have been reasonably aware of the facts that provide grounds for termination for Good Reason, and the Company is entitled to up to thirty (30) days from the date on which such notice is provided to cure such circumstances. If the Executive does not terminate his employment for Good Reason within fifteen (15) business days after the expiration of the Company's cure period, then the Executive will be deemed to have

waived his right to terminate for Good Reason with respect to such grounds. For purposes of this provision, "**Good Reason**" means:

  5.5.1. a material reduction in the Executive's Base Salary other than a general reduction in Base Salary that affects all similarly situated employees in substantially the same proportion;

  5.5.2. a material reduction in the Executive's Bonus opportunities;

  5.5.3. any material breach by the Company of any material provision of this Agreement;

  5.5.4. the Company's failure to obtain an agreement from any successor to the Company to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no succession had taken place, except where such assumption occurs by operation of law;

  5.5.5. in the event the Company's Plan is not approved in a form and substance agreed upon by the Executive;

  5.5.6. in the event the Executive's plan of reorganization or liquidation, is not approved in a form and substance agreed to by the Executive; or

  5.5.7. a material, adverse change in the Executive's authority, duties or responsibilities as being performed at the time of the occurrence (other than temporarily while the Executive is physically or mentally incapacitated or as required by applicable law).

  5.6. <u>Amounts Owed Following Termination by Company Without Cause or By Executive for Good Reason</u>.  If this Agreement is terminated during the Employment Term by the Executive for Good Reason (but not under subsections 5.5.5 or 5.5.6) or by the Company Without Cause, the Executive shall be entitled to receive the following:

  5.6.1. any accrued but unpaid Base Salary which shall be paid in accordance with applicable Texas law;

  5.6.2. any unpaid Bonus with respect to the most recently completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date, but in no event later than March 15 of the calendar year following the calendar year in which the Bonus Tier level was achieved;

  5.6.3. reimbursement for unreimbursed business expenses properly incurred by the Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy;

  5.6.4. such employee benefits (including any vested equity compensation), if any, as to which the Executive may be entitled under and in accordance with the terms of the Company's Employee Benefit Plans as of the Termination Date;

7

5.6.5. contingent upon Executive's execution of a Severance Agreement and Release of All Claims mutually agreeable to both Parties (the "**Release**") and such Release becoming effective within thirty (30) calendar days following the Termination Date (such 30-day period, the "**Release Execution Period**"), a lump sum (gross) payment in an amount equal to (i) three (3) months of the Executive's Base Salary in the year in which the Termination Date occurs, and (ii) the amount of the Bonus to which Executive was entitled, if any, for the most recently completed calendar year immediately preceding the Termination Date (collectively the "**Separation Payment**") to be paid within forty-five (45) days of the Termination Date; *provided*, that notwithstanding the above, the Company shall not be obligated to pay the Separation Payment until the 7-day revocation period in the Release has expired without any revocation by Executive, and, *provided further*, that if the Release Execution Period begins in one taxable year and ends in another taxable year, payment shall not be made until the beginning of the second taxable year; and

5.6.6. if the Executive timely and properly elects continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Company shall reimburse the Executive for the difference between the monthly COBRA premium paid by the Executive for himself and his eligible dependents and the monthly premium amount paid by similarly situated active employees of the Company. Such reimbursement shall be paid to the Executive on the first of the month immediately following the month in which the Executive timely remits the premium payment. The Executive shall be eligible to receive such reimbursement until the earliest of: (i) the 18-month anniversary of the Termination Date; (ii) the date the Executive is no longer eligible to receive COBRA continuation coverage; (iii) the date on which the Executive becomes eligible to receive substantially similar coverage from another employer; and (iv) Executive's eligibility for Medicare.

5.7    By Company for Cause. Company may terminate this Agreement by providing Executive with written notice of its asserted grounds for termination for Cause. Executive shall have a period of ten (10) days to cure such grounds for termination for Cause to the satisfaction of the Company; *provided, however*, that if the Company reasonably expects irreparable injury from a delay of ten (10) calendar days, the Company may give the Executive notice of such shorter period within which to cure as is reasonable under the circumstances, which may include the termination of the Executive's employment without notice and with immediate effect. If the Company determines such grounds for Termination for Cause have been cured within the ten (10) day period, it shall notify Executive in writing. If the Company determines such grounds have not been cured within the ten (10) day period, the Company shall notify the Executive in writing of the termination of this Agreement and his employment with the Company. The Company's obligation to pay the compensation set forth in Section 4 and its subparts and all of Executive's rights to benefits shall be forfeited as of the last day of the cure period or any subsequent date thereafter as determined by the Company. For purposes of this provision, "**Cause**" is defined as: (i) the failure of Executive to substantially perform his duties (other than any such failure resulting from incapacity due to physical or mental illness) after demand for substantial performance is delivered by the Company to Executive that specifically identifies the manner in which the Company believes that Executive has not substantially performed his duties; (ii) the material breach by Executive of any material provision of this Agreement; (iii) actual or threatened

physical violence against another person, including domestic violence, child abuse, and other forms of family violence; (iv) assault and/or battery, including sexual assault or other sex offenses; (v) violent or threatening behaviour toward another employee or a third party in any workplace setting; (vi) stalking, harassment, or similar forms of intimidation; (vii) illegal possession, use, or distribution of alcohol or drugs; (viii) crimes involving cruelty to animals as defined by state or federal law; (ix) crimes of dishonesty such as blackmail, extortion, fraud, money laundering, or racketeering; (x) theft-related crimes such as burglary, robbery, or larceny; or (xi) crimes against law enforcement, such as obstruction, resisting arrest, or harming a police officer or other law enforcement officer; and (xii) inability of the Company to confirm a plan in a form and substance acceptable to the Company. An allegation, indictment, charge, or arrest for (iii) through (xi) of the foregoing is not sufficient to constitute Cause; rather the admission by the Executive to the act or the finding by a court of competent jurisdiction that such act has been committed by the Executive shall be the event that constitutes Cause for purposes of this Section. For purposes of this provision, no act or failure to act on the part of the Executive shall be considered "wilful" unless it is done, or omitted to be done, by the Executive in bad faith or without reasonable belief that the Executive's action or omission was in the best interests of the Company.

5.8     *Amounts Owed After Termination by Executive Without Good Reason or Company for Cause*.  If this Agreement is terminated during the Employment Term by the Executive without Good Reason or by the Company for Cause, the Executive shall be entitled to receive the following:

5.8.1   any accrued but unpaid Base Salary which shall be paid in accordance with applicable Texas law;

5.8.2   any unpaid Bonus with respect to the most recently completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date, but in no event later than March 15 of the calendar year following the calendar year in which the Bonus Tier level was achieved; *provided*, that if the Executive's employment is terminated by the Company for Cause, then any such unpaid Bonus shall be forfeited;

5.8.3   reimbursement for unreimbursed business expenses properly incurred by the Executive, which shall be subject to and paid in accordance with the Company's expense reimbursement policy; and

5.8.4   such employee benefits (including any vested equity compensation), if any, as to which the Executive may be entitled under and in accordance with the terms of the Company's Employee Benefit Plans as of the Termination Date.

5.9.    *Executive's Rights to Terminate Due to Bankruptcy Orders*.  The Executive retains the right to immediately terminate this Agreement upon written notice to the Company in the event any of the following occur in the Executive's Bankruptcy Case or the Company's Bankruptcy Case:

5.9.1. This Agreement is not approved by the Bankruptcy Court in a form acceptable to the Executive in his sole discretion; or

5.9.2. The Company Plan or the Executive's plan of reorganization are not approved in a form acceptable to the Executive in his sole discretion; or

5.9.3. The Company hires or engages "professional management to operate its business during the Plan Period" as referenced in the Company Plan in Article 8 Section 8.1(e) that does not meet with the approval of the Executive as evidenced by his objection in writing: or

5.9.4. The Bankruptcy Court does not approve the Company's request to abate any claims or causes of action against the Executive during the Plan Period (as defined in the Company Plan), so long as the Company and the Executive are not in default under their respective confirmed plans and, upon the satisfaction of the claims pursuant to the Company Plan, fully and finally waiving all such claims.

5.9.5. Any termination hereunder requires no advance notice by the Executive and bears no further commitment for the Company to pay any amounts hereunder except those accrued through the date of termination.

5.9.6. The Parties acknowledge, understand, and agree any termination under this provision shall not result in any damages or other claims by the Company against the Executive.

5.10. Termination Date. The Executive's "**Termination Date**" shall be: (a) if the Executive's employment hereunder terminates on account of the Executive's death, the date of the Executive's death; (b) if the Executive's employment hereunder is terminated on account of the Executive's disability, the date that it is determined that the Executive has a disability for which no reasonable accommodation can be provided such that he can perform the essential functions of his job; (c) if the Company terminates the Executive's employment hereunder for Cause, the date the Notice of Termination is delivered to the Executive; (d) if the Company terminates the Executive's employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than ten (10) calendar days following the date on which the Notice of Termination is delivered; or (e) if the Executive terminates his employment hereunder with or without Good Reason, the date specified in the Executive's Notice of Termination, which shall be no less than ten (10) calendar days following the date on which the Notice of Termination is delivered. Notwithstanding anything contained herein, the Termination Date shall not occur until the date on which the Executive incurs a "separation from service" within the meaning of Section 409A of the Code.

5.11. Resignation of All Other Positions. Upon termination of the Executive's employment hereunder for any reason, the Executive shall be deemed to have resigned from all positions that the Executive holds as an officer or director (or a committee thereof) of the Company or any of its Affiliates.

6. Cooperation. The Parties agree that certain matters in which the Executive will be involved during the Employment Term may necessitate the Executive's cooperation in the future.

Accordingly, following the termination of the Executive's employment for any reason, to the extent reasonably requested by the Company, the Executive shall cooperate with the Company in connection with matters arising out of the Executive's service to the Company; *provided*, that the Company shall make reasonable efforts to minimize disruption of the Executive's other activities. The Company shall reimburse the Executive for reasonable expenses incurred in connection with such cooperation and, to the extent that the Executive is required to spend substantial time on such matters (as determined in the Company's sole discretion), the Company shall compensate the Executive at an hourly rate of One Thousand, Two Hundred Dollars and NO/100 ($1,200.00) per hour for the time spent on such matter.

7. Company Security.

   7.1. Security and Access. The Executive agrees and covenants:

   7.1.1. To comply with all Company security policies and procedures as in force from time to time including without limitation those regarding facilities access, monitoring, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems and equipment, e-mail systems, computer networks, passwords, and any and all other Company facilities, IT resources, and communication technologies ("**Facilities Information Technology and Access Resources**");

   7.1.2. Not to access or use any Facilities and Information Technology Resources except as authorized by the Company; and

   7.1.3. Not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Executive's employment by the Company, whether termination is voluntary or involuntary. The Executive agrees to notify the Company promptly in the event he learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology and Access Resources or other Company property or materials by others.

   7.2. Exit Obligations. Upon the voluntary or involuntary termination of the Executive's employment for any reason or the Company's written request at any time during the Executive's employment, the Executive shall immediately: (a) provide or return to the Company any and all Company property, including by way of example keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, smartphones, manuals, reports, files, work product, e-mail messages, recordings, disks, thumb drives or other removable information storage devices, and all Company documents and materials belonging to the Company and stored in any fashion, including, but not limited to, those that constitute or contain any confidential information or trade secrets belonging to the Company, that are in the possession or control of the Executive, whether they were provided to the Executive by the Company or any of its business associates or created by the Executive in connection with his employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Executive's possession or control, including those stored on any non-Company devices, computers, networks, storage locations and media in the Executive's possession or control.

8. <u>Section 409A</u>. This Agreement is intended to comply with Section 409A of the Code or an exemption thereunder and shall be construed and administered in accordance with Section 409A of the Code. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A of the Code or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A of the Code either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by the Executive on account of non-compliance with Section 409A. Notwithstanding any other provision of this Agreement, if any payment or benefit provided to the Executive in connection with his termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and the Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i) of the Code, then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of the Termination Date (the "**Specified Executive Payment Date**"). The aggregate of any payments that would otherwise have been paid before the Specified Executive Payment Date shall be paid to the Executive in a lump sum on the Specified Executive Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule. To the extent any reimbursements or in-kind benefits due to Executive under this Agreement constitute "deferred compensation" under Section 409A, any such reimbursements or in-kind benefits shall be paid to Executive in a manner consistent with Treas. Reg. Section 1.409A-3(i)(1)(iv).

9. <u>Acknowledgement</u>. The Executive further acknowledges: (i) that the amount of his compensation reflects, in part, his obligations and the Company's rights under Section 5, Section 6 and Section 7 of this Agreement; (ii) that he has no expectation of any additional compensation, royalties or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) that he will not be subject to undue hardship by reason of his full compliance with the terms and conditions of Section 4, Section 5 and Section 6 of this Agreement or the Company's enforcement thereof.

10. <u>Definitions</u>. The following terms as used in this Agreements shall have the meaning attributed to each such term:

10.1.1. "**Affiliates**" means, with respect to any Person, any other Person controlling, controlled by, or under common control with such Person. For purposes of this Agreement, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with" as used with respect to any Person) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise.

    10.1.2. "**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

    10.1.3. "**Person**" means any natural person, corporation, partnership, limited liability company, trust, unincorporated organization, or other entity.

  11. <u>Notice</u>.  Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

    If to the Company:    Free Speech Systems, LLC
               c/o Ray Battaglia
               The Law Offices of Ray Battaglia, PLLC
               66 Granburg Circle
               San Antonio, Texas 78218
               Email: rbattaglialaw@outlook.com

    If to the Executive:    Alexander E. Jones
               c/o Vickie L. Driver
               Crowe & Dunlevy, PC
               2525 McKinnon Ave, Suite 425
               Dallas, Texas 75201
               Email: vickie.driver@crowedunlevy.com

  12. <u>Successors and Assigns</u>.  This Agreement is personal to the Executive and shall not be assigned by the Executive. Any purported assignment by the Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise). This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

  13. <u>Governing Law: Jurisdiction and Venue</u>.  This Agreement, for all purposes, shall be construed in accordance with the laws of the State of Texas without regard to conflicts of law principles. The Parties agree any action or proceeding by either of the Parties to enforce this Agreement shall be brought only in a state or federal court located in Austin, Texas. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

  14. <u>Withholding</u>.  The Company shall have the right to withhold from any amount payable hereunder any federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation and may make any deductions required by law.

  15. <u>Entire Agreement</u>.  This Agreement contains all of the understandings and representations between the Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and

warranties, both written and oral, with respect to such subject matter. The Parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

16. <u>Modification and Waiver</u>.  No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Executive and a duly authorized officer of the Company. No waiver by either Party of any breach by the other Party hereto of any condition or provision of this Agreement to be performed by the other Party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

17. <u>Severability</u>.  Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The Parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law. The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

18. <u>Captions</u>.  Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

19. <u>Counterparts</u>.  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but taken together shall constitute one and the same instrument.

20. <u>Survival</u>.  Upon the expiration or other termination of this Agreement, the respective rights and obligations of the Parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the Parties under this Agreement. Specifically, and without necessarily excluding any other provisions of this Agreement, the obligations set forth in **Sections 4, 5, 6, 7, and 8** shall survive the termination of this Agreement.

21. Acknowledgment of Full Understanding.  THE EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS, AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EXECUTIVE ACKNOWLEDGES AND AGREES

THAT HE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF HIS CHOICE BEFORE SIGNING THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

FREE SPEECH SYSTEMS, LLC

By: _____

EXECUTIVE:

_____
Alexander E. Jones