```
 1                      UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF TEXAS
 2                           HOUSTON DIVISION

 3                                    )   CASE NO: 22-60043-cml
       FREE SPEECH SYSTEMS LLC,       )   Houston, Texas
 4                                    )
          Debtor.                     )   Monday, November 27, 2023
 5                                    )   2:02 PM to 4:48 PM
       ------------------------------)
 6                                    )   CASE NO: 22-33553-cml
       ALEXANDER E. JONES,            )
 7                                    )
          Debtor.                     )
 8     ------------------------------)

 9                                    TRIAL

10            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
11
       APPEARANCES:
12
       For Free Speech            RAYMOND BATTAGLIA
13     Systems and Alex Jones:    Law Office of Ray Battaglia
                                  66 Granburg Circle
14                                San Antonio, TX 78218

15     For Alex E. Jones:         VICKIE L. DRIVER
                                  Crowe & Dunlevy PC
16                                2525 McKinnon Street, Suite 425
                                  Dallas, TX 75201
17
       For the U.S. Trustee:      JAYSON RUFF
18                                HA MINH NGUYEN
                                  Office of the United States Trustee
19                                515 Rusk Street, Suite 3516
                                  Houston, TX 77002
20
       For Melissa Haselden:      ELIZABETH CAROL FREEMAN
21                                The Law Office of Liz Freeman
                                  PO Box 61209
22                                Houston, TX 77208-1209

23     For Leonard Pozner,        AVI MOSHENBERG
       et al.:                    McDowell Hetherington LLP
24                                1001 Fannin Street, Suite 2400
                                  Houston, TX 77002
25
```

```
 1   For Committee:           SARA BRAUNER
                              MARTY L. BRIMMAGE
 2                            KATHERINE PORTER
                              Akin Gump Strauss Hauer & Feld LLP
 3                            23 N. Field Street
                              Dallas, TX 75201
 4
     For Elevated Solutions   JOHNIE J. PATTERSON
 5   Group:                   Walker & Patterson, PC
                              P.O. Box 61301
 6                            Houston, TX 77208

 7   For Texas Plaintiffs:    JENNIFER J. HARDY
                              Willkie Farr & Gallagher LLP
 8                            600 Travis Street
                              Houston, TX 77002
 9
     For PQPR Holdings        STEPHEN WAYNE LEMMON
10   Limited, LLC:            Streusand Landon Ozburn Lemmon LLP
                              1801 S. Mopac Expressway, Suite 320
11                            Austin, TX 78746

12   For Connecticut          KYLE J. KIMPLER
     Plaintiffs:              Paul, Weiss, Rifkind, Wharton &
13                            Garrison LLP
                              1285 Avenue of the Americas
14                            New York, NY 10019

15   Also Present             ALEX E. JONES
                              PATRICK McGILL
16                            ALINOR STERLING
                              RYAN CHAPPLE
17                            ROBERT SCHLEIZER

18   Court Reporter:          UNKNOWN

19   Courtroom Deputy:        UNKNOWN

20   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
21                            Mineola, NY 11501
                              Tel: 800-727-6396
22
     Proceedings recorded by electronic sound recording;
23   Transcript produced by transcription service.

24

25
```

1          HOUSTON, TEXAS; MONDAY, NOVEMBER 27, 2023; 2:02 PM

2                        (Call to Order)

3          CLERK:  All rise.  Please be seated.

4          THE COURT:  Okay, good afternoon, everyone.  This

5     is Judge Lopez, who's turning on his camera now.  It is

6     November 27th.  I hope everyone had a great Thanksgiving.

7     I'm going to call the two o'clock case I've combined in Free

8     Speech Systems and the case of Alex Jones, here on a couple

9     of matters in each case.  Why don't I take appearances in

10    the courtroom.  If you know you're going to be speaking

11    today, I'd ask that you please hit five-star and I will

12    unmute your line.  Once I unmute your line, just please

13    monitor yourselves and we'll get started.

14         Ms. Driver good afternoon.

15         MS. DRIVER:  Good afternoon, Your Honor.  Vickie

16    Driver here on behalf of Mr. Jones, both in his individual

17    case as well as the 100 percent owner and manager of the FSS

18    entity, and Mr. Jones is here in the courtroom with us.

19         THE COURT:  Good afternoon to both of you.  Mr.

20    Battaglia, good afternoon.

21         MR. BATTAGLIA:  Good afternoon, Your Honor.  Ray

22    Battaglia for Free Speech Systems, Mr. Magill, the chief

23    officer is in the courtroom.

24         THE COURT:  Good afternoon to both of you.

25         MS. BRAUNER:  Good afternoon, Your Honor.  Sara

1   Brauner, Akin Gump Strauss Hauer & felt on behalf of the

2   Committee.  With me are my partners, Marty Brimmage and

3   Katherine Porter.

4            THE COURT:  All right.  Good afternoon.

5            MR. LEMMON:  Your Honor, Steve Lemmon for PQPR.

6            THE COURT:  Good afternoon, Mr. Lemmon.

7            MS. HARDY:  Good afternoon, Your Honor.  Jennifer

8   Hardy, Willkie Farr & Gallagher for the Texas plaintiffs.

9   Also in the courtroom is also Avi Moshenberg, also co-

10  counsel or the Texas plaintiffs.

11           THE COURT:  Good afternoon to both of you.  Mr.

12  Patterson, good afternoon.

13           MR. PATTERSON:  Afternoon, Your Honor.  Johnie

14  Patterson here on behalf of Elevated Solutions Group.

15           MR. NGUYEN:  Good afternoon, Your Honor.  Ha

16  Nguyen for the U.S. Trustee.

17           THE COURT:  Good afternoon.

18           MR. KIMPLER:  Hi, good afternoon, Your Honor.

19  Kyle Kimpler from Paul Weiss Rifkin Wharton and Garrison on

20  behalf of the Connecticut plaintiffs, joined in the

21  courtroom by my co-counsel Alinor Sterling and on the phone

22  by our local counsel, Ryan Chappell.

23           THE COURT:  All right.  Good afternoon.

24           MS. FREEMAN:  Good afternoon, Your Honor.  Liz

25  Freeman.  I am counsel for Melissa Haselden, the Subchapter

1   V for Free Speech Systems.

2          THE COURT:  Good afternoon.  All right, I'm going

3   to start unmuting a few lines here.  It may just be one.

4   It's a 202 number.

5          MR. RUFF:  Good afternoon, Your Honor.  Jayson

6   Ruff on behalf of the United States Trustee's Office.

7          THE COURT:  Okay.  Anyone else?  Let's see.  I

8   will check this in a little bit to see kind of where we are,

9   but Mr. Ruff, sounds like it's just you, and just give me a

10   second.  All right.  Who do I turn this over to?  Ms.

11   Driver?

12          MS. DRIVER:  If I may, Your Honor, Mr. Battaglia

13   said it was okay if I gave her a start today.

14          THE COURT:  Absolutely.

15          MS. DRIVER:  Your Honor, we do have a couple of

16   matters in each one.  I think that it was everyone's

17   agreement, the Committee, the Debtors, that we start with

18   the status conference that was set to sort of walk through

19   kind of where -- I'll say the Jones case is going and then

20   I'll let Mr. Battaglia chime in on his -- how the FSS

21   pattern would fit in.

22          THE COURT:  Okay.

23          MS. DRIVER:  I think you saw a couple of filings.

24   My request for the status conference and then the

25   Committee's -- I believe it was a -- I apologize.  I don't

1    have a name in front of me, but it was a statement, I think.

2         THE COURT:  Yeah.

3         MS. DRIVER:  Where essentially both of us are

4    saying let's just get the show on the road.  We had had a

5    informal standstill where we just weren't willy-nilly filing

6    plans over the top of one another to just sort of minimize

7    fees in this case.  On Monday before Thanksgiving holiday,

8    the Committee told me that they were ready to move forward

9    and file something with the Court.

10        My office was not, quite frankly, staffed enough

11   to finish up what we were doing.  We've been working on a

12   plan for quite some time.  It's been a little bit of a work

13   in progress kind of seeing how this case has been going and

14   what's been happening in the settlement negotiations, what

15   we think we can do.  But we believe it is imminently

16   possible, and our goal is to file a plan by the second week

17   of December.

18        I think starting with that date, I think we can

19   work through, and we don't need to "mushmash" all the

20   details in front of Your Honor today, but I'll let Ms.

21   Brauner kind of finish that up.  I think we'd be looking, to

22   have a confirmation hearing in probably the end of February.

23        And so, I think that gives us a little bit of time

24   to have a disclosure statement hearing in there which, my

25   personal opinion on disclosure statements and I haven't done

1    one in front of Your Honor, so you tell me different, I

2    think a disclosure statement says what I want to disclose

3    and if anybody else has objections to it, if they contact me

4    and they tell me what they want in there, I will say the

5    plaintiffs allege that -- who and who.  I will tell anybody

6    who has standing in this case, we say it this way, they say

7    it that way, and they disagree with me and that's just the

8    risk you need to know about.

9            And so I don't expect to have a really contested

10   disclosure statement hearing.  In this case, it may be a

11   little bit more sense for me to do my disclosure statement

12   and then for them to do sort of their disclosure statement,

13   depending on if we, you know, end up getting into a one-

14   track plan or a two-track plan.  But I don't see the

15   disclosure statement hearing as being something that should

16   take up a significant amount of Your Honor's time.

17           I do think the confirmation hearing at this point,

18   I -- we are dual tracking settlement negotiations.  We are

19   still trying to move towards a common exit, but candidly, I

20   don't -- I'm not so faithful in the outcome of those right

21   now that I wouldn't say that we should plan on not having a

22   contested confirmation.  I really would like to reserve time

23   to do that contested confirmation hearing.

24           THE COURT:  Okay.

25           MS. DRIVER:  But whether we want to try to nail

1    that down today or if we just want to work on some dates and

2    submit it later remains to be seen.  I think that the

3    message today for Your Honor and for, quite frankly, the

4    multiple numbers of media that are attending this hearing is

5    that Mr. Jones wants this case out of bankruptcy just as

6    much or more than anybody else in this case.

7            What you will see -- what you have seen and what

8    you will see coming up in our case, you've seen a motion to

9    sell the personal property.  It's got an objection deadline

10   coming up.  We don't get any objections.  I'll submit a, you

11   know, an order to get that granted and we're ready to start

12   selling off some personal property.  You'll also see a

13   motion to appoint a couple of brokers to sell some of the

14   nonexempt real estate so that we can start maximizing the

15   value of some those.

16           So, while it may not be the way that the Committee

17   and its members wanted to see it, there is and will be

18   progress in this case.  And I think all of the professionals

19   in the room and Mr. Jones being in the room can tell you, we

20   all want to get this thing out of bankruptcy and we're all

21   ready to go.

22           So, while it may have looked like we had some

23   warring pleadings and the press sure liked to cover it that

24   way, in reality, we agree on a lot more than we don't agree

25   on at this point, especially as to the process itself.  So

1    we wanted to make sure that we stated that for Your Honor.

2    And how that's going to work with the FSS confirmation, I'm

3    going to leave that to you and Mr. Battaglia to talk about.

4    But I think at this point, I'd be happy to turn it over to

5    Ms. Brauner.  She could address her client's position as to

6    sort of what I've addressed.

7              THE COURT:  I've got no issues with anything that

8    you said.  And I do think if that's the schedule that we're

9    on, that at some sense, there should be some coordination

10   with FSS as well.

11             MS. DRIVER:  Yes.

12             THE COURT:  And so that those dates kind of sync

13   up.  I think a lot of issues could overlap and I'm not -- I

14   don't want to do it twice.  I think it's going to be highly

15   -- it's not a good use of anyone's time to come twice.  But

16   obviously, every plan is going to have to stand on its own,

17   every case is on its own, but maybe we can all just kind of

18   pick a couple of days and tell me about, just at the 10,000

19   foot level --

20             MS. DRIVER:  Sure.

21             THE COURT:  The motion to reject and kind of where

22   things stand with that and I don't know if there's an issue

23   or if there's an issue just at the 10,000 foot level.

24             MS. DRIVER:  Ten thousand foot level, Your Honor,

25   I'm going to be able to just resolve anything that was not

1    resolved, meaning I'm going to have it just 100 percent

2    agreed upon motion because we're dropping the request as to

3    Elevated Solution Group.  In preparing for this motion in

4    this hearing today, I noticed that both of those contracts

5    have terminated upon their own terms.

6              THE COURT:  Yeah.

7              MS. DRIVER:  Those were filed back in April and

8    they were just protracted negotiations amongst all of the

9    parties, mostly FSS and ESG, that resulted in a joint

10   stipulation that Your Honor signed and quite frankly, Your

11   Honor, the only thing that's really left as far as I'm

12   concerned with ESG is if they feel like they have a damages

13   claim, you know, they need to bring it to this Court, but

14   they're terminated at this point.  So, I just don't have a

15   desire to spend the estate's resources trying to press for

16   rejection as of that --

17             THE COURT:  As of the April date?

18             MS. DRIVER:  The date of the -- the date of

19   motion.

20             THE COURT:  Yeah.

21             MS. DRIVER:  I just don't think it's worth our

22   time to do that today.

23             THE COURT:  Even a --

24             MS. DRIVER:  So, I'm just going to request that we

25   withdraw those requests for relief as moot, and I just

1    intend to move forward with the Mountain Way Marketing

2    contract with -- to which no one filed any objection.

3         THE COURT:  Okay.  Thank you.  Mr. Patterson, I

4    see you up there.  It might as well be a good time, and then

5    I'll turn to Ms. Brauner.

6         MR. PATTERSON:  Well, a couple of things.  Seeing

7    I have an out-of-town client, it would've been nice to know

8    that prior then ten after two, after he's already traveled

9    and come this way, the contracts haven't terminated.  They

10   may have expired, but with both contracts, he's owed

11   $300,000-plus on the platinum contract, which I believe the

12   stipulation assumed that contract.  I was told no

13   differently until they decide to go forward with some

14   rejection claim after the stipulation to continue that

15   contract and pay it out.

16        There's still inventory.  There's about three

17   hundred and forty, fifty thousand dollars owed if and when

18   that inventory is sold, pursuant to the stipulation, that

19   he's owed approximately, but Mr. Dalessio is here and he

20   could provide all that to the Court, so it's a little bit

21   frustrating.  There are facts.  Allowing the contracts to

22   expire doesn't resolve assumption or rejection.  There are

23   still issues.  We're going to fight this fight, I guess, at

24   confirmation unless they are agreeing to assume or agree

25   that they were assumed.

1           THE COURT:  If the contract ---

2           MR. PATTERSON:  I'm okay with that.

3           THE COURT:  The contract has expired, what is the

4    Debtor assuming?

5           MR. PATTERSON:  Well --

6           THE COURT:  I don't know if the contract expired.

7    I'm just kind of dealing with a hypothetical here.  The

8    contract has expired, what is the Debtor assuming under 360?

9           MR. PATTERSON:  Well, you've got to look at the

10   petition date, judge.  Whether it was an executory contract

11   on the date of the petition, right, and that determines

12   whether it can be assumed or rejected --

13          THE COURT:  Right.

14          MR. PATTERSON:  -- by the estate.  Now, if it runs

15   its course post-petition, we still have issues.  For

16   example, there are breaches.  There are claims for damages

17   or will be that accrued post-petition.  Now, what Ms. Driver

18   and the Debtor, I think, were trying to manipulate is some

19   date of rejection in order to push those, I believe,

20   intentional acts or breaches prepetition to cut off ESG from

21   being able to pursue those.

22          That's the issue.  So, it's a little more

23   complicated.  Yes, the contracts by their terms were one-

24   year contracts that as of today, that one-year term has run.

25   However, they were both renewable.  Whether acts that

1    constituted renewing these contracts occurred, I don't know.

2            THE COURT:  So, maybe they haven't -- maybe

3    they've expired, maybe they technically haven't.

4            MR. PATTERSON:  That's right.

5            THE COURT:  I got it.

6            MR. PATTERSON:  That's right.  Plus, we have to

7    deal with the damage claims and continued performance under

8    the platinum contract that was subject to the stipulation.

9            THE COURT:  Are you contemplating -- just so I

10   understand, if damages -- I get the deal that I approved,

11   and that deal has to get honored, right?

12           MR. PATTERSON:  That's right.

13           THE COURT:  Like the inventory is going to get

14   sold and every -- and it's going to get split in accordance

15   with its terms.  Are you saying that there are -- there may

16   be damages in addition or did the stip settle everything in

17   your opinion?

18           MR. PATTERSON:  Two contracts.  So, the stip, I

19   think if it's honored, will resolve those things.  I think

20   that's --

21           THE COURT:  I signed it.  It kind of has to be,

22   though.

23           MR. PATTERSON:  Well, we're here on a rejection

24   motion on that contract, Judge.

25           THE COURT:  No, no, no, agreed.

```
 1            MR. PATTERSON:  So, I agree with you but not
 2    everyone in this room, I think, agrees with that position.
 3    I agree with you that the stip resolved that part of the
 4    motion and so that performance needs to go forward.  I think
 5    assuming the stip is complied with and honored, probably
 6    resolves all of our platinum issues.  The Bourbon contract
 7    is something different.
 8            THE COURT:  Okay.
 9            MR. PATTERSON:  And so, what we want resolved is
10    our ability or how are we going to treat what we consider
11    post-petition breaches of that agreement.
12            THE COURT:  Okay.
13            MR. PATTERSON:  And that's, I think the Debtor was
14    trying to manipulate date of rejection and all those things,
15    and so we need to address it sometime and having Mr.
16    Dalessio travel over a holiday weekend down here only to be
17    told oh, we're withdrawing, I think is a little bit
18    problematic.
19            THE COURT:  I can --
20            MR. PATTERSON:  There's not a lot we can do.
21            THE COURT:  I can share some thoughts, now that
22    hopefully can provide some clarity to the parties about kind
23    of where we go.  Thank you.  No, no, I appreciate it.  Mr.
24    Battaglia.
25            MR. BATTAGLIA:  Just with respect to this
```

1    particular issue, the stipulation does provide for a run out

2    of remaining platinum inventory.

3          THE COURT:  Yeah.

4          MR. BATTAGLIA:  And we continue to abide by the

5    stipulation.  There are weekly reports.  I won't say that

6    there haven't been a hiccup or two because of the change of

7    our banking situation.

8          THE COURT:  Right.  No, no, no, I remember.

9          MR. BATTAGLIA:  But, so that was a timeliness

10   issue, not to my knowledge, there are no issues that we've

11   not distributed the amounts of money that we're supposed to

12   distribute.

13         THE COURT:  Okay.  Since you're standing up, Mr.

14   Battaglia, why don't I just ask you in terms of -- with

15   respect to FSS, you know, you filed a plan.  What do you

16   wish to tell me kind of at the -- kind of at the 10,000 foot

17   level before we dive in this stuff?

18         MR. BATTAGLIA:  I know the only opinion that truly

19   matters here is yours --

20         THE COURT:  No.

21         MR. BATTAGLIA:  -- at the end of the day, but --

22         THE COURT:  That ain't true.

23         MR. BATTAGLIA:  It's -- you know, my client has

24   instructed me to move ahead with the plan and plan

25   confirmation and I can't deny that there's a correlation

1    between the Alex Jones estate and the Free Speech estate.

2    And frankly, that's his ability to sit in the chair and

3    broadcast.  But other than that, in our opinion, they're

4    distinct plans.  One is a Sub V plan and one is a Chapter 11

5    plan, and we're ready to go.  We don't have a disclosure

6    statement issue.  We'd just as soon move ahead.

7             THE COURT:  Kind of giving me a preview, where do

8    things stand with cash collateral?

9             MR. BATTAGLIA:  So, there's an issue, clearly,

10   that they've raised.  We've decided that we waited long

11   enough to try to raise Alex Jones' salary and so we sent the

12   notice in November.  If you recall, if I back up a little

13   bit, September, you said you're not having another cash

14   collateral hearing.  And I said, well, then I guess I'll

15   just file a notice because we've got to operate in November.

16   And you said fine.  I filed that notice and included an

17   increase in Mr. Jones' salary to the million and a half

18   dollar annual level.

19            THE COURT:  The part that I was a little hazy on -

20   - and I don't want to take up evidence now -- it's just the

21   million and a half, is that operating under the agreement

22   that was subject to the motion or is it completely different

23   agreement?

24            MR. BATTAGLIA:  I believe the number comes from

25   there, but it's the number that Mr. Magill will testify he

```
 1   thinks is an appropriate level of compensation.  We're not
 2   trying to tie anybody's hands.  They want to oppose --
 3              THE COURT:  How do I --
 4              MR. BATTAGLIA:  -- employment contract --
 5              THE COURT:  How do I take that up today?  How do I
 6   take up --
 7              MR. BATTAGLIA:  Just --
 8              THE COURT:  How do I take up an employment
 9   agreement?
10              MR. BATTAGLIA:  I'm not asking you to approve an
11   employment contract.  He's still an at-will --
12              THE COURT:  You kind of ar.
13              MR. BATTAGLIA:  He's still an at-will employee.
14   You're just changing the salary that we're paying him.
15              THE COURT:  Don't you think that's an out of
16   ordinary course transaction?
17              MR. BATTAGLIA:  Think it's an ordinary course
18   transaction.
19              THE COURT:  You think it's ordinary course?
20              MR. BATTAGLIA:  Yes, sir.  Mr. Magill pays people
21   what he pays them and he's raised salaries --
22              THE COURT:  That would not --
23              MR. BATTAGLIA:  -- for individuals --
24              THE COURT:  -- in connection with --
25              MR. BATTAGLIA:  -- as long as it's in the cash
```

1    collateral order.

2             THE COURT:  I'm concerned about that.  I'll be

3    honest with you.

4             MR. BATTAGLIA:  I can see that obviously --

5             THE COURT:  But I will tell you, I've got no issue

6    with FSS paying, you know, Mr. Jones fair market value.

7    Like, let's be honest.  Like, that's how FSS makes money.

8             MR. BATTAGLIA:  Right.

9             THE COURT:  So we can't act like -- and I don't

10   think there -- need to be restrain in that respect, but I do

11   want to make sure that we're following the code in every

12   respect.  And because he's an insider, technically -- I'm

13   using bankruptcy terms here -- because he's technically an

14   insider, 503 has to get satisfied.

15            And I don't know how he was operating before.  I

16   remember there was an employment agreement way early.  I

17   think it was for like 1.3, but no one ever went forward on

18   the 1.3.

19            MR. BATTAGLIA:  He's been compensated based on

20   cash collateral negotiations between the plaintiffs and Free

21   Speech Systems.  And before his bankruptcy was filed, that

22   number had no relation to anything.  And it's something I

23   know they briefed that and opposed for a while.  $20,000 per

24   pay period was just something that I could avoid a fight

25   with the creditors in this case.

```
 1          THE COURT:  No, I remember.  I remember.
 2          MR. BATTAGLIA:  -- in a budget and I've always
 3    thought he was under compensated and obviously now that he's
 4    in bankruptcy, there have been negotiations and discussions
 5    since as far back as May and even this Court said he should
 6    be compensated fairly.  You didn't say what the number is
 7    and I appreciate that, but that's all we're trying to do is
 8    pay him a fair living wage and to a certain degree, this is
 9    a left pocket, right pocket issue.  I mean, I'm taking it
10    against one exposed estate and paying it to another exposed
11    estate.  But at the end of the day, you know --
12          THE COURT:  And they're two separate cases, right,
13    and they have to be analyzed separately in terms of what FSS
14    --
15          MR. BATTAGLIA:  I'm not trying to pre-ordain any
16    of the other provisions of the employment contract are
17    approved by Mr. Magill agreeing to pay a higher rate of pay
18    to Mr. Jones at this time.  It's just he thinks that this
19    fair compensation.  It should have been implemented a while
20    back, while we waited for negotiations to happen.  They
21    didn't bear fruit, obviously at odds with each other between
22    the creditors and Free Speech, and so we want to keep a
23    happy employee because --
24          THE COURT:  No, no, no.
25          MR. BATTAGLIA:  -- how we make money.
```

1          THE COURT:  I got it.

2          MR. BATTAGLIA:  So that's -- he believes that --

3          THE COURT:  What gives me a little heartburn is

4     that there was a motion on file where someone was asking me

5     to approve this same number and then --

6          MR. BATTAGLIA: But there --

7          THE COURT:  And then it stopped.  I got it.  It

8     was in a different deal, but it stopped.  Right?  And now no

9     one decided to press forward in connection with that and

10    now, that same number is popping up just in a different --

11    through a cash collateral motion?

12         MR. BATTAGLIA:  Would it have been different,

13    appreciably, if it was $10,000 a pay period less?  I mean,

14    we're not really trying to preordain all of Mr. Jones'

15    obligations under that contract or the bonus provision.

16         THE COURT:  No, it's just that it makes me have to

17    look at the procedural safeguards that are in the code --

18         MR. BATTAGLIA:  Understood.

19         THE COURT:  -- under 503 to make sure that those

20    are complied with, as I would in any case.  You know, I

21    don't know why someone didn't go forward.  I know -- well, I

22    do know.  Somebody -- there were negotiations and stuff

23    going on, but I don't know.

24         MR. BATTAGLIA:  I think the assumption was that

25    this was something that would be taking up in conjunction

1   with plan confirmation, ultimately, because --

2           THE COURT:  But if the plan is going to be --

3           MR. BATTAGLIA:  -- all of the provisions --

4           THE COURT:  -- confirmed, if you're going to see

5   plan confirmation, let's just say, in two, two-and-a-half

6   months, right, let's just -- I'm making up a number, a date

7   I should say, why aren't we taking that up in connection

8   with plan confirmation, assuming an agreement in connection

9   with plan confirmation and making sure that disposable

10  income goes there?  We're only talking 60 days.  Well, no,

11  maybe not more -- maybe more, because I suspect you're

12  talking two to three months and that's real money and I got

13  it.

14          MR. BATTAGLIA:  It is real money, and from my

15  perspective, my client's perspective, I want Mr. Jones being

16  productive in the chair.

17          THE COURT:  No, I got it.

18          MR. BATTAGLIA:  And that's important to me,.

19          THE COURT:  No, I got it.

20          MR. BATTAGLIA:  And I can't tell you the number of

21  times that we've had issues and questions and arguments

22  about the rate of pay.  And so I'm trying to remedy that as

23  I've been trying to remedy it since May of this year.  And,

24  and so if the number is not right because it's too close to

25  a contract number, Mr. Magill arrived at the number because

1    he thinks that's fair compensation, whether it's under

2    contract or as an at-will employee.  But, you know, two-and-

3    a-half months, I don't know.  Do I have this productive

4    employee for two-and-a-half months?  Does Mr. Jones care

5    whether he gets paid now or in two-and-a-half months?

6              THE COURT:  I'm sure he does.  Everybody --

7              MR. BATTAGLIA:  -- suspect he does.

8              THE COURT:  I'm sure he does.

9              MR. BATTAGLIA:  So, you know, he's been woefully

10   under compensated for over a year now.

11             THE COURT:  Okay.

12             MR. BATTAGLIA:  That's what we're trying to

13   remedy.

14             THE COURT:  I'm just thinking out loud.  I don't

15   want anybody to think --

16             MR. BATTAGLIA:  Clearly, it's the issue that's

17   going to come before the judge, before Your Honor today.

18             THE COURT:  Okay.  Thank you.  Mr. Brimmage, good

19   afternoon.

20             MR. BRIMMAGE:  Good afternoon, Your Honor.  Marty

21   Brimmage here on behalf of -- with Akin here on behalf of

22   the Unsecured Creditors Committee.  I'm going to just

23   provide some preliminary comments, Your Honor, and then Ms.

24   Brauner is going to come up and give you the substance on

25   behalf of the Committee.  But let me just start by saying on

1    behalf of all the Committee members and the Committee

2    advisers, we hope that the Court and its staff had a

3    relaxing and fun Thanksgiving holiday and weekend.

4            I'm standing here in a suit and tie, so it's clear

5    to me that that party is over and here we are.  So, let me

6    just start.  Let me level set.  The Alex Jones case was

7    filed in December the 2nd 2022.  We are approaching the one

8    year anniversary.  The FSS case was filed in July of 2022,

9    so we're looking at 16 months.  And of course, as you've

10   noted, and everybody has noted, we understand these are two

11   distinct cases, but they're very intertwined in many of the

12   issues that they have.  I think we just heard that in the

13   colloquy as it relates to the payment of Mr. Jones.

14           The Committee understands the unique nature of

15   these cases, Your Honor, and so do the Sandy Hook families.

16   We understand that they're unique in their procedural

17   aspects, that there's two cases, the sensitive nature of the

18   facts that led us here, the state court litigation that led

19   us here, and all that concerns.

20           And so we're clear.  Everybody knows that.  And

21   the Committee has spent significant time trying to reach a

22   consensual resolution.  We participated in discussions from

23   the get-go.  We've been motivated to participate and to

24   participate in good faith.  We participated in the mediation

25   that was ordered by this Court.  We provided a number of

1    proposals and feedback to proposals that have been provided

2    to us, and we earnestly engaged in those discussions.

3          And recently, when the Court issued its ruling on

4    the non-dischargeability motions, those discussions picked

5    up.  I think everybody was waiting to see how that turned

6    out, reasonably so, to see how do we go forward and what

7    does that mean?  So at the Debtor's request, Ms. Driver's,

8    she requested an in-person meeting and Akin agreed to host

9    in New York.

10         And so everybody, I think everybody you see in

11   this room and representatives of everybody you see in this

12   room came to New York and sat down in a big conference room

13   and spent half a day talking about a variety of issues and

14   settlement issues.  And I think it was constructive and it

15   was productive.  But to date, Your Honor, the parties remain

16   very far apart.  Like, not even close.  So, we applaud these

17   attempts to work constructively and to minimize the

18   disputes, and I just wanted the Court to note the Committee

19   has not run to you every time it has an issue.

20         We have tried to be judicious with our time with

21   your judicial resources.  We've tried to work out issues

22   where we can and when we can't, you know, we punted the ball

23   a little bit to later down the road.  And the Committee will

24   continue this approach.  It will continue to be judicious

25   with the Court's resource as well as the professionals and

1   the advisors.  It will continue to engage in consensual

2   negotiations and discussions.

3           But Your Honor, where we are now -- and I went

4   over the calendar and how long these cases have been pending

5   -- it's time to move the cases forward.  That's all there is

6   to it.  It's time to bring them to a resolution that

7   complies with the Bankruptcy Code -- the Court was just

8   talking about that with regard to 503 -- that respects the

9   underlying claims, the unsecured claims for sure, and maybe

10  more importantly -- and it's not in the code -- but provides

11  closure to the Sandy Hook families who desperately need and

12  deserve closure in these cases.

13          So the UCC filed its status report at ECF No. 498

14  and we don't intend to go over all of that stuff in the

15  background and what led to it today, Your Honor, but we do

16  want to highlight a couple of things.  With the Court's

17  permission, Ms. Brauner would like to go over some more

18  background and in more detail, but as I wrap it up, Your

19  Honor, I just can't say strongly enough that the Committee

20  is committed to engaging in constructive conversations to

21  try to reach a consensual resolution.

22          But at the same time, it is start -- it's time to

23  start a nonconsensual path.  If things can't get resolved,

24  consensually, where do these cases go and it's time to wrap

25  them up.  And so that's what we're here to discuss with you

1    today, Your Honor, and with that, I'll turn it over to Ms.

2    Brauner.

3              THE COURT:  Thank you.

4              MR. BRIMMAGE:  Happy to answer any questions the

5    Court may have.

6              THE COURT:  No, just for one of you.  I know Ms.

7    Driver kind of set a course, essentially, of a late February

8    timeline to try to hold some hearings.  I just want to know

9    from someone what your thoughts are about that timeline.

10             MR. BRIMMAGE:  Let me give you the someone who is

11   more in the know --

12             THE COURT:  Perfect.

13             MR. BRIMMAGE:  And we'll have to live up to

14   whatever those (indiscernible) are.

15             THE COURT:  All right.  Ms. Brauner, good

16   afternoon.

17             MS. BRAUNER:  Good afternoon, Your Honor.  Sara

18   Brauner, Akin, on behalf of the Committee again, for the

19   record.  As Mr. Brimmage previewed, this case has been

20   pending for almost a year the FSS case for even longer.  I

21   think you heard very clearly today, there's no real debate

22   among the parties that now is the time to push these cases

23   forward.

24             We will speak a little bit about the reasons why

25   in particular, we think the cases are intertwined and should

```
 1    move forward together and sort of on the same timeline, but
 2    just to answer your question  up front, we have spoken with
 3    Ms. Driver.  We are aligned in terms of the general
 4    parameters of a timeline to take it forward.  We're happy to
 5    try to settle an order and come back to you with any
 6    disputes, but we are generally aligned.
 7              THE COURT:  So -- and I will tell you before you
 8    kind of launch in, I'm just looking now and I'd like to just
 9    lock them in just so that -- February 27th, 28th, 29th, kind
10    of those three days.  That's like a Tuesday, Wednesday, and
11    Thursday.  I don't think I have anything so I can just have
12    my case manager kind of carve those dates out and just put
13    brackets around them just so that if you come back and those
14    dates may work, one of those dates, I don't want to -- and
15    again, this is going to require people having conversations
16    and making sure who can come in and making sure --
17              MS. BRAUNER:  Yeah, I would say --
18              THE COURT:  -- it all works.
19              MS. BRAUNER:  -- why don't we just attempt --
20              THE COURT:  I'm just telling you dates that I know
21    work.
22              MS. BRAUNER:  Yeah.
23              THE COURT:  There are dates that are filling up,
24    but I know that I can at least put a bracket around those
25    three days and I'm not sure you need all three, but just so
```

1    you can have flexibility within those three days for -- I

2    know that they work now and I can just have my case manager

3    kind of put a -- not schedule anything during that time.

4    They may not be the golden days, but at least we've got

5    something that I know I can --

6         MS. BRAUNER:  Why don't we bracket it for now.

7         THE COURT:  -- tell people.  Okay.

8         MS. BRAUNER:  I'm happy to --

9         THE COURT:  That's perfect.

10        MS. BRAUNER:  And just while we're on scheduling.

11        THE COURT:  Yep.

12        MS. BRAUNER:  We agree with Ms. Driver that in

13   terms of staging, presumably Jones would file a disclosure

14   statement.  We would file a supplemental or specific,

15   whatever you want to call it, disclosure statement

16   addressing any additional issues.  If we are moving forward

17   with a single plan, obviously, that is easier.  If we have

18   competing plans, our disclosure statement would address the

19   differences, the reasons for them, and the like.

20        THE COURT:  Got it.  Okay.

21        MS. BRAUNER:  So Your Honor, as I said, we're not

22   going to belabor what was in our status report.  We offered

23   that to the Court to provide some insight into what's been

24   going on, sort of beneath the surface.  We have endeavored

25   to bring to Your Honor only the things that we had to.

1    There have been ongoing discussions since the first day of

2    this case.  They have not always been easy, but I think they

3    have always been constructive.

4            And as Mr. Brimmage explained, we had a very

5    constructive in person meeting that I think did a lot to

6    progress the cases and to ensure that the parties understood

7    where every other party was coming from, which I think was

8    very helpful.  But now, as we take these cases forward,

9    there are a few issues in the Committee's view that are

10   coming to a head and will need to get addressed.

11           Ms. Driver previewed a couple of them and steps

12   have been taken.  We would say that additional steps need to

13   be taken in respect of several of them.  The first is the

14   issue of estate resources and the waste of those resources.

15   We've noted in several recent filings, it's no secret that

16   the Committee remains quite troubled by the amount of estate

17   value that is spent on a monthly basis.  We've watched for

18   months as MORs are filed revealing 60, 70, 80, 90 thousand

19   dollars a month in spend, and that's not professional fees.

20   That's spend on Mr. Jones's extravagant lifestyle.  That

21   needs to change.

22           Ms. Driver said that a motion was filed recently

23   in respect of personal property.  That's true.  We've been

24   discussing the motion with Ms. Driver for a long time.  It's

25   an important first step.  It's not enough.  That motion

1   should have been filed in the first weeks of the case and no

2   effort has been made on the docket yet to sell real estate.

3   We understand that's also in process.  It's another step

4   that needs to be taken at this point.

5           Mr. Jones needs to understand that a resolution to

6   this case will require a lot more than has taken place to

7   date.  We have seen positive movement in the last few weeks.

8   It's taken a year to get here, and it's our view that that

9   progress needs to accelerate dramatically if we are ever to

10  reach any sort of consensual resolution.

11          The second point, and again, this was flagged in

12  our status report, relates to estate causes of action.  The

13  Committee has undertaken an investigation that was extensive

14  and has uncovered what we believe to be viable estate causes

15  of action.  As of now, Mr. Jones has refused to commence

16  them.

17          The Committee submits that either the value of

18  those actions or the actions themselves need to be taken

19  forward for the benefit of creditors.  It's something that

20  can be taken up at confirmation in connection with

21  discussions around a consensual plan, but there is value

22  there that needs to be respected.

23          The third point in zooming out a little bit is the

24  extent to which these cases are connected.  You heard us say

25  this a few times.  We've said it in recent filings and

1    because of this relationship that I'll talk about in a

2    minute, the Committee and the Sandy Hook families believe

3    that any resolution really does need to happen in parallel,

4    whether that means confirmation on the same day, whether

5    that means a track that accounts for both plans, but the

6    issues really are intertwined.

7           Your Honor asked at a recent status conference did

8    FSS file a plan; that has now happened.  There can't really

9    be any dispute, in our view, that in order for the FSS plan

10   to be feasible, it requires Mr. Jones to commit to the

11   enterprise.  You heard Mr. Battaglia say that today.  FSS

12   and Mr. Jones have been telling us that since the beginning

13   of the case, that the success of FSS rises and falls with

14   Mr. Jones's effort.  We understand that.  We also understand

15   that liquidating FSS may not maximize value, but ultimately,

16   it will be up to Mr. Jones whether FSS succeeds, nobody

17   else.

18          And just finally, a side note and we won't get

19   into this extensively, to the extent Your Honor has not yet

20   looked at the FSS plan that was filed --

21          THE COURT:  I did.

22          MS. BRAUNER:  There's a provision.  It's section

23   13.6, for reference, that purports to enjoin creditors from

24   taking any action against Mr. Jones, not just in respect of

25   claims in the FSS case, but also in respect of claims in the

1    Jones case, so direct claims against Alex during the FSS

2    plan period.

3            So, clearly by its terms, the FSS plan has a

4    material impact on the Jones estate and the Jones case.  The

5    Committee certainly reserves all rights with respect to that

6    provision which we believe is inappropriate and the plan

7    generally, but just to make clear, I don't think there can

8    be any hiding the ball that these cases are intertwined.

9            It's also clear to us that Mr. Jones will be

10   unlikely to be able to confirm any plan in his case without

11   the support of the Sandy Hook families.  It's no secret,

12   again, the Sandy Hook families comprise the vast majority of

13   the creditors in the Jones case.  So moving forward with a

14   Jones plan that doesn't have our support as the members of

15   the Committee and the Sandy Hook families, will be

16   challenging in our view.

17           And it's all of this coming together that caused

18   the Committee and the Sandy Hook Families to put together

19   the plan construct that we did.  And I want to be clear

20   about a couple of things.  We're not going to go into the

21   details of the plan, but the plan is not intended to be a

22   liquidation of FSS.  The plan is at base a liquidating 11

23   with respect to Jones' estate.  That does not mean that it

24   contemplates, in either scenario, FSS liquidating.  Jones

25   can either select the toggle which I'll talk about in a

1    second, or he can decline to select the toggle in which case

2    his estate will liquidate, having nothing to do with the go-

3    forward path for FSS.

4            And the creditors' plan gives that choice and

5    frankly all choices to Mr. Jones himself.  Mr. Jones can

6    either elect into the toggle and the toggle is a payment

7    plan.  It's currently contemplated to be a ten-year payment

8    plan with $8.5 million a year and then a sharing of 50-50

9    over 9 million.  That number is something that we are still

10   discussing with Jones and FSS and we'll continue to do so.

11           And if we can reach a consensual resolution as to

12   what makes sense, we will have a consensual plan that our

13   current plan construct contemplates.  If no consensus can be

14   reached, our plan would default to a liquidation for Jones'

15   estate.  His estate would liquidate its current value.  He

16   would make no future payments and creditors within the

17   bounds of applicable state law would be free to pursue him.

18           The choice is really his but continuing on in

19   Chapter 11 for another two months, six months, eight months

20   just doesn't make sense which is sort of what brought us

21   here and brought us to the idea of the schedule that Ms.

22   Driver articulated and that we certainly support.  So, we

23   would propose with Your Honor's permission, endeavoring to

24   settle an order and submitting to the Court an order setting

25   forth the contours of what a schedule would look like, and

1    of course, coming back to Your Honor with any concerns or

2    questions.

3              THE COURT:  Thank you.  All right, Ms. Driver, I

4    know you probably want to say something, so I'll let you get

5    back up.

6              MS. DRIVER:  Your Honor, are we still in the

7    status conference or do you --

8              THE COURT:  Well, no --

9              MS. DRIVER:  -- move straight --

10             THE COURT:  -- I just know you -- I know you're

11   going to want to respond to a couple of things that were

12   said, so I might as well give you the floor now and then we

13   can kind of get into the substance of the hearing.

14             MS. DRIVER:  Sure.  Your Honor, Ms. Brauner said

15   she wasn't going to get into the terms of the plan, but then

16   she got the terms of the plan.  So I guess I need to respond

17   slightly to that, especially considering media coverage we

18   have at this -- and then I --

19             THE COURT:  I'm not worried about the media

20   coverage.

21             MS. DRIVER:  Yeah, and --

22             THE COURT:  Y'all may be, I'm not.  Just -- let's

23   just focus on what we're doing here and I -- but I get it.

24   I get it.

25             MS. DRIVER:  And I don't speak to the media

1   outside of it, only my pleadings and my statements to Court

2   or what go to the media and that this case does have some

3   media impact.

4          THE COURT:  No, no.  I got it.

5          MS. DRIVER:  In that there are media impact

6   issues.  So I did want to just note that for the record,

7   plan that's on file, that the creditors have put on file,

8   have asked in order to have any chance of getting rid of the

9   nonchargeable judgment for Mr. Jones to commit $85 million

10  and to run his business with FSS in his media empire for ten

11  years.  So their desire now is for him to work to do this

12  and do this at a level that he has never done it before.

13  So, there's no financial -- there are no financial that will

14  ever show that Mr. Jones ever made that for a period of ten

15  years.

16         There's no plan that I've ever seen for an

17  individual that goes past five years.  There is the

18  statement that they have the value of a non-dischargeable

19  judgment that they're trying to exchange for this.  The

20  issue for that is for a 49-year-old man going into a media -

21  - in a media company in a world that is changing probably

22  faster than I can blink.

23         It's just completely outrageous to say or think

24  that they're going to fight and in one pleading in front of

25  Your Honor today, say he's never made more than $641,000 a

1    year, so he should not be given his $1.5 million salary, but

2    in their plan, say he should guarantee us $8.5 million a

3    year for ten years.

4         They're just -- they're so diametrically

5    different.  It's just, it has been very difficult for us to

6    figure out where they are going.  To tell us he's never made

7    more than $700,000 but that somehow in some world he's going

8    to be expected to pay 8.5 million a year for ten years,

9    they're just not living it.  That's just -- neither one of

10   those are rooted in reality.  We are moving through this

11   case.  To hear Ms. Brauner speak, I just -- it doesn't feel

12   like we agree on all the things that we agree on.

13        We agree on so, so, so, so much, but I feel like

14   so much is said in our pleadings for client management.  So,

15   I'm -- I also want to note that I have always referred to

16   them as the plaintiffs because there are people that are in

17   their constituency that were never related to anyone who's a

18   victim at Sandy Hook.  So I usually refer to them as the

19   plaintiffs and I am not doing that in any way to disrespect

20   anyone, but hopefully to give respect to everyone who has

21   claims.

22        So, Your Honor, I think I'm just back up here just

23   to say happy to work on an order.

24        THE COURT:  Okay.

25        MS. DRIVER:  We want to get out in the same amount

1    of time.  We are still moving to liquidate nonexempt assets

2    and a lot of the expense that has been complained about over

3    and over again is truly -- it is, we are reserving funds to

4    pay property taxes on the homestead that he is entitled to

5    maintain and on the nonexempt property that he needs to

6    liquidate.  And if we had not been escrowing for those taxes

7    properly and escrowing for those insurance payments

8    properly, the U.S. Trustee would have had the right to come

9    in and move to dismiss our case, rightfully so.

10           So, a very large amount of the money that they

11    complain is spent every month is truly escrowed for these

12    things to maintain the assets.  So it's just, we feel that

13    it is misstated on a common basis about how much he's

14    actually spending.  But anyone here can look up the MORs and

15    see exactly what is spent, if one can read it such that they

16    understand the escrows.

17           THE COURT:  Thank you.  So, the only thing I was

18    going to ask is, the proposed order that's at least being

19    contemplated with scheduling, this is a hyper technical

20    point, but if it's going to include FSS, then go ahead --

21    Subchapter V, I have to set the scheduling for that and

22    then, you know, the other, in the Jones case, this is a

23    technical Chapter 11, then y'all would, you know, ask me for

24    hearings and I can approve them.

25           But if you're going to do kind of a global dual

1    track -- dual being FSS and Jones case -- then maybe it

2    makes sense to include Mr. Battaglia in those conversations.

3    I didn't enter an order.  I saw the plan got filed in the

4    Subchapter V.

5           I didn't enter an order because I wanted us to

6    have a hearing so that we understood, but technically

7    Bankruptcy Rule 3017.1, I believe, is the one that tells me

8    that I've got to enter in order in the Subchapter V cases,

9    and so I just, if there's going to be an order, then maybe

10   it makes sense for everyone to kind of have it dual tracked,

11   so that we're all on the same page in terms of -- but

12   obviously, they don't need a disclosure statement hearing.

13          And it can change -- it can look a little

14   different or Mr. Battaglia or I can enter a separate order

15   that looks like this one.  I just want to make sure that

16   you're not showing up multiple times or being asked to do

17   extra stuff, but I think that makes sense --

18          MR. BATTAGLIA:  I'm always thrilled to come see

19   you, Judge.

20          THE COURT:  Huh?

21          MR. BATTAGLIA:  I said, I'm always thrilled to

22   come see you, Judge.

23          THE COURT:  But it's got to make sense.

24          MR. BATTAGLIA:  Just one more comment before you -

25   - you're going to decide how you want to set these.  I

1    understand that.

2         THE COURT:  No, I think y'all can come back.  I

3    think y'all can settle an order.

4         MR. BATTAGLIA:  I just want to say that, you know,

5    the fact that FSS and Jones are linked because he is the

6    talent, as they say on the left coast, is undeniable.  But

7    these bankruptcy cases are not.  They're procedurally

8    different.  The statute for confirmation is entirely

9    different and they're really -- they really don't have to be

10   tried together, but --

11        THE COURT:  They don't.  I'd just rather -- I

12   don't want someone to come -- I don't want to take up their

13   case and then have something where there was a witness who

14   needed to show up twice.  Would do it -- I'd rather do it

15   all at one time.  But the confirmation standards are really

16   different and they're going to be taken up.

17        MR. BATTAGLIA:  Well, they are, I don't have an --

18        THE COURT:  No, no --

19        MR. BATTAGLIA:  -- absolutely priority rule.

20        THE COURT:  No, that's exactly right.

21        MR. BATTAGLIA:  Feasibility is a much more limited

22   question for my estate than it is -- but look.  Ultimately,

23   Mr. Jones can convert or file a liquidating plan and still

24   agree to be employed by FSS.  So there -- that's the

25   bankruptcy linkage that really isn't there that's advertised

1    to you by the plaintiffs in this case.

2         THE COURT:  No, no, I think there are two separate

3    cases under two separate sections of the Bankruptcy Code,

4    both with different confirmation standards.  One has a

5    disclosure statement requirement, one doesn't.  The

6    requirements for plan confirmation, the contents of the

7    plan, they're all very different, and they'll be taken

8    differently.  I just want to take the evidence up at one

9    time.  I don't want, for example, if Mr. Jones had to come,

10   I don't want him coming twice, if he had to come twice.

11   That would just be --

12        MR. BATTAGLIA:  I've stated my case.  The Court

13   will set it as it -- and I'll participate with counsel.  If

14   the Court is telling me you want to set confirmation

15   contemporaneously or reasonably contemporaneously, then

16   that's -- I'll work with counsel to achieve that.

17        THE COURT:  Okay.

18        MR. BATTAGLIA:  But I just want to --

19        THE COURT:  Yeah, no --

20        MR. BATTAGLIA:  -- client's position --

21        THE COURT:  I agree.

22        MR. BATTAGLIA:  -- ready to go forward.

23        THE COURT:  Okay.  So, let me just ask with

24   respect to the rejection motion, Ms. Driver, -- I mean, let

25   me share a thought.  Let me see if Mr. Patterson will agree

```
 1    to this.  If you're not going forward today, or you don't
 2    want to -- here's what -- I will just share these thoughts.
 3    Whatever -- I don't -- that stipulation didn't assume a
 4    contract under 365.  No one asked me to do it but they
 5    settled claims.
 6              MS. DRIVER:  That's correct.
 7              THE COURT:  And those claims and the payments
 8    under them are going to be honored according to the letter
 9    of the words, all the way through.
10              MS. DRIVER:  That's correct, Your Honor.
11              THE COURT:  And it resolves everything until that
12    inventory gets sold, until I think the stip says, until it
13    doesn't make any sense to keep trying to market it and that
14    determination can't get made.  So if a -- if any of these
15    agreements are going to be rejected to the extent that they
16    remain executory or not, I guess the rejection date, any
17    request for a rejection date would have to be as of the date
18    that I sign the order, if you will.  I don't want to take up
19    any kind of pre me signing the stip language, because I
20    don't know how that flows through and I don't want to --
21    it's going to -- it's going to complicate matters.
22              So, Mr. Patterson, I think what I'm saying is that
23    the deal that's on those stips is going to get honored and
24    if anybody wants to reject those agreements for cleanup
25    purposes or what have you, whatever claims existed post-
```

1    petition will exist post-petition and any rejection would be

2    as of a date whenever that gets taken up, if and when, and

3    so any pre -- any pre-rejection damages that you may be

4    entitled to post-petition, that your client may be entitled

5    to, would not be impacted by any motion to reject that I

6    would consider.

7            I'll make up something.  If something gets taken

8    up in January, let's just -- oh, mid-December, I could maybe

9    sign an order in mid-December, but it would be rejected as

10   of that mid-December date and then those would be

11   prospective damages after December.  But anything pre, you

12   know, as of the petition date through the rejection date,

13   would be subject to either admin claims or just the general

14   damages claim. But it would not be affected by the

15   rejection.

16           MR. PATTERSON:  As long as that's clear, because I

17   think that that's in -- I could be wrong, but I think that's

18   inconsistent if the rejection is -- I'm making it up.

19   Rejection is today, I think it sweeps everything from today

20   back to the petition date to the petition date.  But look, I

21   don't care.  I could be dead wrong.  If we carve out post-

22   petition claims under this contract and leave them intact,

23   as admin or post-petition claims, I mean, we can't classify

24   them because we don't know what they are.  I'm not

25   suggesting --

1          THE COURT:  No, no, I agree with you, but

2     rejection would get treated, potentially the damages would

3     get treated as a, you know, as a prepetition.  But I would -

4     - it would have to be very clear that that -- nothing in the

5     rejection in any future motions to reject would have to

6     honor the deal that I signed.  We're not going to -- can't

7     go back on that at all --

8          MR. PATTERSON:  No --

9          THE COURT:  -- in any way.

10          MR. PATTERSON:  Well, now that's more -- but we

11     don't have anything in front of me.  I'm just saying,

12     anything that's coming my way to reject, has to honor that

13     deal.

14          MR. PATTERSON:  That's fine and I'm good with that

15     on the platinum.  The Bourbon, that's the problem.  If, for

16     example, right, I'm just -- they come into this case and

17     knowing they're going to reject the -- a contract.  Let's

18     not even put a name on it.  An executory contract.  I'm not

19     suggesting that this is exactly what happened, but there is

20     a scenario in which a Debtor could say it's going to get

21     rejected.

22          I kind of have a free shot at doing whatever,

23     breaching this contract in however I want to do it knowing

24     that that's all going to get swept back.  Any damages

25     related to my breach or my actions or inactions are going to

1   be swept back prepetition and they're just general unsecured

2   claims, and in this case, what is a general unsecured claim?

3   Literally, what is it?  Even if it's $100,000, it's nothing

4   compared to the claims in this case.

5        And I believe as the lawyer that it may not have

6   been discussed, it may not have been intentional, but there

7   are post-petition acts that I believe they are attempting to

8   sweep back and reclassify as general unsecured claims

9   related to these contracts.  I shouldn't say contracts.

10   We've talked about platinum and I'm okay with that.

11        THE COURT:  Yeah, because platinum is really --

12   it's -- the stip I see is more like an admission that these

13   are admin claims, right, and so they kind of deal with their

14   own.  On the Bourbon claim, I think you have the right to

15   then come in, if they decide to go forward with it at some

16   point, and then come in and make the argument that it

17   shouldn't get caught into rejection damages, the post-

18   petition breaches, right --

19        MR. PATTERSON:  Correct.

20        THE COURT:  -- in and of themselves.

21        MR. PATTERSON:  Correct.

22        THE COURT:  I think --

23        MR. PATTERSON:  And they shouldn't be classified

24   as general unsecured claims.

25        THE COURT:  And I think everybody would have the

1    right to then --

2              MS. DRIVER:  That's correct.

3              THE COURT:  Yeah.

4              MS. DRIVER:  I think that's where this -- I think

5    that's where my view of this hearing and Mr. Patterson's

6    maybe got sideways, is that I think Mr. Patterson, my

7    understanding is he intended to make this a damages hearing

8    and (indiscernible) things, and I only intended to have a

9    rejection motion.  And so truly today, that's just not -- I

10   had no intention to go forward on what damages were incurred

11   and when, and had I known that he was flying a witness in

12   from North Carolina, I would have been more than happy to

13   discuss this with him.  I did bring my client in, but the

14   reality is, is that given --

15             THE COURT:  Hold on.

16             MS. DRIVER:  -- that the expired --

17             THE COURT:  I was making progress here.

18             MR. PATTERSON:  Yeah, and we just go backwards.

19   But yeah --

20             THE COURT:  No, no.

21             MR. PATTERSON:  I mean --

22             THE COURT:  I got it.

23             MR. PATTERSON:  All she has to do is look at my

24   witness list.

25             THE COURT:  And let's just take a look at this.

1   So, if, in other words, no one goes forward today, but the

2   understanding on the platinum is ---

3            MS. DRIVER:  That's correct.

4            THE COURT:  -- those are going to get paid in the

5   ordinary course and no one's going to be able to claw those

6   back, if you will, because I signed an order --

7            MS. DRIVER:  Anyone.

8            THE COURT:  -- and parties are going to get paid

9   in accordance with the terms of that.

10           MR. PATTERSON:  Well, then everyone's going to

11   perform.  Mr. Jones has got to hold up his part of the

12   bargain and he can't just --

13           THE COURT:  The order says what it says, in other

14   words, Mr. Patterson.  The order says what it says.

15           MR. PATTERSON:  Yes.  Yes.

16           THE COURT:  And everybody will live to the terms

17   of that deal, and on Bourbon, if you take it up, well,

18   everybody's rights are reserved but you kind of know, no

19   nunc pro tunc, if you will, I think, which is going to -- an

20   issue.  I thought that was a gating issue, but I also think

21   it just sat out there for a while and --

22           MS. DRIVER:  It did.

23           THE COURT:  -- it just never got taken up, so I

24   didn't know if it was just stale or something else.

25           MS. DRIVER:  It -- at this point, Your Honor, it

1    is just kind of stale as to those two contracts.  So, that

2    was why at the beginning I mentioned that I'll simply be

3    going forward with the Mountain Way Marketing one, which is

4    the only one that was non-contested by anyone and I have a

5    proffer for Mr. Jones and we can just at least get that part

6    of it out of the way.  And I can just either withdraw as

7    moot or withdraw without prejudice the remaining relief in

8    the motion.

9              THE COURT:  Okay.  That works for me.

10             MS. DRIVER:  Okay.

11             THE COURT:  Mr. Patterson, what your thoughts?

12             MR. PATTERSON:  Frustrated that we have to come

13   down here to do this when we even talked on the phone,

14   literally -- Mr. Dalessio left his Thanksgiving weekend with

15   his kids to come down here and literally, I don't hear any

16   of this until ten after two when the hearing starts.  So

17   yeah, I'm frustrated.  I'm frustrated for him, not me.  I'm

18   just doing my job.  This isn't his job and, you know,

19   they've yanked him around for a year now.  They held his

20   money.  They're still refusing to allow other contracts to

21   be paid.

22             So yeah, it's very, very frustrating.  And then to

23   have him travel and spend the money and not spend time with

24   his kids, and come down here to have someone say, oh, you

25   know, we spoke this morning.  She didn't say, oh, we're not

1    going to prosecute.  She didn't say we're withdrawing.

2              THE COURT:  He's leaving with --

3              MR. PATTERSON:  So, yeah.

4              THE COURT:  He's leaving with some comfort that

5    I'm going to honor the deal.  And I know that's not -- may

6    not be the most, but I know he's going to take some comfort

7    that no one's going to try to back door him on the plan.

8              MR. PATTERSON:  Well, he had that comfort when we

9    entered it, Judge, and --

10             THE COURT:  No, I agree with you.

11             MR. PATTERSON:  And then we get this.

12             THE COURT:  I got it.

13             MR. PATTERSON:  Right?  So how many ups and downs

14   do we get?  So you asked me, I'm frustrated.  I'm very

15   frustrated and we have additional claims that again are just

16   going to be, are we be paid on time?  Are we going to pay

17   timely?  Are they going to actually market the product like

18   it's anticipated?  Are we going to continue to get our

19   accounting or we're going to get them sporadically, like

20   we've gotten them?  So, yeah, I'm frustrated.

21             My client's really frustrated.  This is a lot of

22   money.  We're talking about $300,000.  So, yes, I'm

23   frustrated with both estates because there are other

24   contracts and there's more money.  Right, and there's also

25   activities to subvert these contracts, which I know it's not

1  for today, but yeah, I'm frustrated.  I'm frustrated with

2  the lawyers here and the actions of the Debtors.  Yes.

3           THE COURT:  Thank you.

4           MR. PATTERSON:  Thank you, Judge.

5           THE COURT:  All righty.  So, well, not to take up

6  on the motion to reject.  I think the minutes will then

7  reflect that the motion has been -- being withdrawn.

8           MS. DRIVER:  Except for -- if we could get

9  Mountain Way done?

10           THE COURT:  Oh, Mountain Way, but -- yeah, but I

11  think Mountain Way isn't objected to, so do you want to --

12           MS. DRIVER:  I don't need to make a record if no

13  one wants it.  Happy to get a default order on that.

14           THE COURT:  Yeah. What's the order that you have

15  on file?

16           MS. DRIVER:  Your Honor --

17           THE COURT:  Where is it?

18           MS. DRIVER:  I think it was attached to the

19  original motion, so it has --

20           THE COURT:  244?

21           MS. DRIVER:  -- all of them.

22           THE COURT:  Right?

23           MS. DRIVER:  244.  That's correct, Your Honor.

24           THE COURT:  Let's see.

25           MS. DRIVER:  So I'll need to revise that to simply

1    say as to the Mountain --

2            THE COURT:  No, no, let me see if I can just do

3    this.  But before I do that, me look at the -- did you file

4    a proposed order with this, maybe?  Let me see.  If not,

5    I'll see if I can pull it off.  I want to -- but I want to

6    look at it before I can -- I don't want to --

7            MS. DRIVER:  I'm happy to have my --

8            THE COURT:  -- over promise and under deliver,

9    here.

10           MS. DRIVER:  I'm happy to have my --

11           THE COURT:  Hold on.  Here's your proposed order.

12   Let's see.  Each of the contracts set forth on Exhibit 1.  I

13   can just delete or strike through what you have as your

14   Exhibit 1.  Let me just show you.  Hold on, let me tell you

15   what I'm --

16           MS. DRIVER:  It's Page 15 of that document.

17           THE COURT:  Hold on.  Let me see if I got -- all

18   right.  I can just strike these two agreements and just go

19   with Mountain Way.  There's no objection to it.

20           MS. DRIVER:  Thank you, Your Honor.

21           THE COURT:  Okay.  But then I would just then note

22   -- just so we have a formal record for the Mountain Way

23   team, that there was a motion to reject lease or executory

24   contract filed at Docket No. 244.  That motion was

25   originally filed on April 19th, 2023.  I've reviewed the

1   certificate of service and find that there's been proper

2   service of the motion.  There were no objections filed with

3   respect to the Mountain Way contract.  There's been proper

4   notice of today's hearing.

5          There hasn't been an objection filed in -- well,

6   it looks like seven months here, so there has been uber due

7   process provided to those parties and I really would have

8   listened to any argument there.  We're going to carve out

9   what I would call the ESG contracts that are listed on

10  Exhibit 1, and I will grant the motion with respect to the

11  Mountain Way at 244.  I'm going to find it's a proper

12  exercise of the Debtor's business judgment.  No one has

13  questioned that today.  No objections were filed and I will

14  grant the relief requested therein.  Okay.

15         MS. DRIVER:  Thank you, Your Honor.

16         THE COURT:  So that takes care of that and I will

17  --

18         MS. DRIVER:  I think that's everything in the

19  Jones matter.

20         THE COURT:  All righty.  So Mr. Battaglia, let me

21  tell you where I am on cash collateral and I want the

22  Committee to hear me out, too.  Or -- and the -- and what

23  I'll call the plaintiffs.  The code speaks of -- under 503

24  of transfers, right, and that's any mode of direct or

25  indirect transfer of property of the Debtor, property

1    including cash.  And doesn't really speak with respect to

2    just employment agreements.

3           It does speak to transfers with respect to retain

4    an employee or any out of the ordinary course transactions.

5    And I think what y'all are proposing today falls within the

6    -- I don't know if it's a retention payment or not, but I do

7    think parties are entitled to know what at least the

8    proposed terms were for the at-will employment.  I don't

9    think there's been enough notice of that, but I'm telling

10   you what I'm willing to do today because I think this is

11   ordinary course, according to me.

12          If -- you know, if Mr. Jones is -- was

13   traditionally, you know, prebankruptcy paid, I don't know,

14   $644,000, $650,000 -- a number was floated there -- you

15   know, case has been going on for a while.  I -- you know, I

16   don't see why he couldn't at least get paid that or a small

17   number about -- you know, say -- let's just say, you know,

18   keep a clean number.  You know, maybe $60,000 a month, which

19   is more than what's going to -- getting contemplated now.

20          And then if you all want to -- and I've got no

21   issue with it.  I mean, we can set a short hearing and come

22   back and try to get a number that's approved that's larger.

23   But I think parties would be entitled to at least short

24   notice at an actual hearing where we can have a 503(c)

25   hearing, but I don't think using the cash collateral motion

1    today is going to get me comfortable that we're going to

2    satisfy due process with respect to 503(c) and those issues

3    that are raised therein, and I think parties are able to do

4    it.

5              But if there was a kind of close to ordinary,

6    close to prebankruptcy number there, because the $20,000 was

7    negotiated.  I remember.  I remember that from the InfoW

8    Prison Planet things, that number, and it just carried on

9    through.  But with the assurance that we're going to have a

10   plan process that's going to culminate in something by the

11   end of February, you can have a short hearing on the 503(c)

12   stuff in a couple of weeks if you want it.

13             I don't see why we couldn't go to some, I don't

14   know, $55,000 or $60,000 number for three months because

15   that's close to pre -- that's a pretty ordinary course to

16   me, prebankruptcy.  I'm getting close to prebankruptcy

17   number with some small adjustment there.

18             MR. BATTAGLIA:  If I can -- if we can take a break

19   --

20             THE COURT:  Yeah.  No, no, no --

21             MR. BATTAGLIA:  I do want to respond --

22             THE COURT:  I'm throwing thoughts out here now.

23             MR. BATTAGLIA:  -- a little bit.  I need to talk,

24   obviously, to Mr. Jones.

25             THE COURT:  No, no, no.  I -- no, I got it.  That

1    doesn't mean that parties can just say no, Lopez, you know,

2    put them to their evidence.  Let's go.  I'm here.  I'm just

3    telling people to --

4              MR. BATTAGLIA:  I understand.

5              THE COURT:  -- think about this.  I'm -- because

6    really what we're talking about with respect to cash

7    collateral is, what, 90 days at most, right?  You know,

8    December, January, February.  Well, than 90 days, right?

9              MR. BATTAGLIA:  Now, we've paid the November at

10   the full -- the rate --

11             THE COURT:  I know.  But y'all can adjust.

12             MR. BATTAGLIA:  -- going forward, and Your Honor,

13   look the W-2 income, that's part of his compensation

14   historically.  He's been paid $2.1 million or more for ten

15   years.

16             THE COURT:  Maybe.

17             MR. BATTAGLIA:  But --

18             THE COURT:  I just don't have any evidence.

19             MR. BATTAGLIA:  I understand.  I understand.

20             THE COURT:  Right.  That's where I'm going.

21             MR. BATTAGLIA:  Let me visit with them and --

22             THE COURT:  And you can have a short hearing, but

23   I think going this route -- you know, so it could be, you

24   know, middle of December, we're here and we're dealing with

25   everything.  But I don't want to pick a date, right, because

1    --

2            MR. BATTAGLIA:  May I have five minutes?

3            THE COURT:  No, no, no, no, absolutely.  I think

4    everybody should think about it.  I'm just throwing stuff

5    out here.  But we've settled -- we've resolved rejection.

6    We've resolved at least the status conference portion in

7    terms of plan timing.  The question is what does cash

8    collateral look like for the next 90 days for FSS and I get

9    the Committee's concerns in the, kind of in the Jones case.

10   And I'm thinking about now through the lens of the FSS case

11   and what do you pay there?

12           The other thing I would throw out, and I don't

13   want to blindside anyone, I think there's been a pending

14   motion to intervene in the PQPR adversary, and I'm going to

15   grant that.  I think there's important matters that need to

16   get resolved.  There have been a lot of issues that have

17   been raised there.  I think PQPR could be owed every dollar

18   of it.  I have no idea.

19           I just think that issue is going to have to get

20   litigated, and obviously the folks who are asking me to

21   intervene have a vested interest, and whether that's an

22   issue or not -- but that's certainly not a today issue one

23   bit, and I'm not taking it up.  I'm just talking what cash

24   collateral looks like for the next 90 days, but I don't want

25   to blindside anyone in terms of kind of where we're going

1    and what's coming down the line and what I may sign.  I

2    don't want to -- I want to be as upfront as possible.

3            So why don't you all think about it.  If we need

4    to hold an evidentiary hearing, you know me.  I'll be here

5    all day, and I've asked that the air get turned on because I

6    think it was a little cold this morning and they turned up

7    the heat, but now, allegedly the AC, but I can't promise

8    that.  Those are out of my hands, but I -- let's see.  It's

9    3:04.  Why don't I come back at, like, 3:15.

10           MR. BATTAGLIA:  That'd be fine.

11           THE COURT:  Thank you.

12           MR. BATTAGLIA:  Thank you, Your Honor.

13           CLERK:  All rise.

14           (Recess)

15           CLERK:  All rise.

16           THE COURT:  Please be seated.  I'll just hang out

17   here.

18           MR. BATTAGLIA:  I'll step out, Judge.  No worries.

19   Thank you.

20           THE COURT:  I'm just going to sign the order that

21   I promised everyone I'd sign a little earlier.

22           MS. HARLEN:  Your Honor, may I speak?

23           THE COURT:  Can you just get closer to a mic?

24           MS. HARLEN:  Sorry.  Oh, yeah.  I'm Danielle

25   Harlen with Crowe and Dunlevy.  I just wanted to let you

 1  know, they're still discussing, but they're -- will be back

 2  in here shortly.

 3          THE COURT:  Okay.  No worries.  I'm just going to

 4  sign the order.  I'm completely fine.  Working on the

 5  rejection order, so we're all good.  Just give me one

 6  minute.

 7          Okay, why don't somebody tell me where we are?

 8          MR. BATTAGLIA:  I think the mutual Debtors'

 9  decision is to ask the Court to approve the rate of pay in

10  the cash collateral order and to present evidence.

11          THE COURT:  Okay.  Let's go.

12          MR. BATTAGLIA:  And so I would call Patrick

13  Magill.

14          THE COURT:  Okay.  Magill, can you please raise

15  your right hand?  Do you swear to tell the truth, the whole

16  truth, and nothing but the truth?

17          THE WITNESS:  I do.

18          THE COURT:  Okay.  Please be seated and I will let

19  the record reflect that the witness has been duly sworn in.

20                  DIRECT EXAMINATION OF PATRICK MAGILL

21  BY MR. BATTAGLIA:

22  Q    Good afternoon, Mr. Magill.  Can you tell the Court

23  what your role is in this case?

24  A    Chief restructuring officer of Free Speech Systems.

25  Q    And what are your duties in that connection?

1    A    I manage the bankruptcy process and I am -- run the

2    business.  I'm chief operating officer of the business.

3    Q    What is your role in connection with the compensation

4    of employees?

5    A    Day-to-day operations include the review of all

6    expenses including salaries and duties.

7    Q    Have you, outside of Free Speech Systems, been a CRO or

8    a CEO of other businesses?

9    A    Yes.

10   Q    And have you had experience in that capacity in the

11   retention and compensation of employees?

12   A    Yes.

13   Q    How many employees have you managed, would you say,

14   over the last dozen years or so?

15   A    A thousand.

16   Q    You're familiar with what Mr. Jones' role is with Free

17   Speech Systems, are you not?

18   A    Yes.

19   Q    Can you tell the Court how important he is to the

20   operations of Free Speech Systems?

21   A    He's in a role -- without Alex Jones in Free Speech

22   Systems, there is no Free Speech Systems.  So he is the one

23   individual in the company that's indispensable.

24   Q    And have you conducted an analysis of gross revenue

25   generated by the business when Mr. Jones is not on the air?

1   A    Yes.

2   Q    And what has your analysis concluded?

3   A    When Alex is not in the studio on the air, we suffer

4   about a 40 percent reduction in revenues day-to-day.

5   Q    And that's on short term or long term?

6   A    It really doesn't matter.  It's usually long term. If

7   he's gone for a week to ten days, let's say he's on

8   vacation, there's a significant reduction in revenues.

9   Q    Do you know what Mr. Jones's compensation historically

10  has been from Free Speech Systems?

11  A    It usually has run on a salary basis.  It runs in the

12  600 range.  In the profit sharing, as he was experiencing

13  when he was not in bankruptcy, several million dollars a

14  year.  It's ranged on the low end, you know, $4 million

15  total compensation.  I believe there was one year where he

16  had about an $8 million compensation.

17  Q    Is it extraordinary for a small business owner to take

18  compensation in multiple forms?

19  A    No, it's very common for any -- someone, particularly

20  for tax purposes, to take a salary, a reasonably modest

21  salary for pick up purposes and then to take bonuses or

22  profit share at the end of the year or during the year.

23  Q    What's --

24  A    It's very common.

25  Q    What's Mr. Jones's current rate of -- prior to

1   November, rate of pay?

2   A     Prior to November --

3   Q     2023.

4   A     -- 2023, I believe he was making roughly $540,000 a

5   year, 560, something in that range.

6   Q     $20,000 a pay --

7   A     $20,000 biweekly.

8   Q     And do you know how that number came to be?

9   A     I really don't.  That was set about the time that I

10  showed up in October, so that was basically the pay that he

11  had when I arrived.

12  Q     Do you believe that's an appropriate rate of

13  compensation?

14  A     No.

15  Q     Why not?

16  A     I believe it's too low.  I mean, the pay represents a

17  small amount relative to the revenues that is generated 100

18  -- virtually 100 percent of all the revenues of Free Speech

19  is a direct relation shift to Alex's effort.  So, we

20  estimate this year we'll do about $30 million in revenue.

21  So, our -- my position was at the time that that was

22  significantly lower than it should have been.  And taking

23  into consideration his gross compensation in years past, it

24  was a fraction of what he used to make.

25  Q     How many hosts are there for the broadcast on Infowars?

1    A    There are three.

2    Q    And who are they?

3    A    They're Harrison Schmidt and Owen Shroyer.

4    Q    And Mr. Jones?

5    A    And Mr. Jones.

6    Q    Mr. Shroyer been broadcasting for the last 30 days?

7    A    No.  He has been a host of the federal government.

8    Q    What effect has that had on the estate's ability to

9    generate revenue?

10    A    Well, let's put a crimp on us.  We've had to do some

11    substitute hosting.  We've moved some people around.  We

12    have a pretty -- we run a pretty lean ship at Free Speech,

13    so we have a pretty thin bench for talent like that.  So

14    we've managed to get by with two hosts and some substitute

15    hosts.

16    Q    But in terms of revenue, have you noticed a meaningful

17    decline in revenue with Mr. Shroyer's absence?

18    A    There has been some decline, yes.

19    Q    With respect to current payroll, how are employees

20    paid?  In advance, in arrears?

21    A    They're paid in arrears.

22    Q    So if the Court were to approve the payment that's

23    proposed in the cash collateral order, is that an inducement

24    for Mr. Jones to stay?

25    A    No.

1   Q   Do you -- what's your understanding of his commitment

2   to continue employment if you pay this increased amount?

3   A   Well, there's no tie between the increase in pay and

4   his commitment to stay.  He's an at-will employee.  So there

5   was never a discussion with Alex or myself regarding, if I

6   gave him this money, would he stay; if I didn't give him

7   this money, would he leave.  That was never a discussion I

8   had with him.

9   Q   How long have you been in discussions with Mr. Jones

10   and his professionals about altering his -- the amount he's

11   paid?

12   A   We started this conversation, I believe, in May of 2023

13   and we decided to have this discussion.  So we included the

14   increase or the potential increase in the cash collateral

15   budget in June of 2023 to the full amount, but we did

16   bifurcate it out on the cash collateral budget to include

17   the proposed increase underneath the regular -- his regular

18   pay on top.  So, we split that out in there.  So, we've been

19   operating, talking to Alex about this since May or June of

20   this year.

21   Q   Since you were retained in this case in October, what

22   have you done with respect to employee payment -- excuse me.

23   Let me strike that, try a better question.  Have you altered

24   any employee's pay or salary since you've been involved as

25   an employee, as the CRO of this company?

1    A    Yes.

2    Q    How many employees would you say you've adjusted pay

3    for?

4    A    Fifteen to twenty.

5    Q    And do you consider that to be the ordinary course of

6    your operations as the CRO?

7    A    Yes.

8    Q    How did you come up with the annualized rate of $1.5

9    million?

10   A    Took a look at what the -- what he had been making

11   roughly in the past, in terms of basic pay, plus what I

12   consider to be a reasonable, you could call it profit

13   sharing.  You could call it additional pay.  We also looked

14   at the proposed $1.3 million contract that he had, which

15   there's some question about whether that was a legal

16   contract or not, but there was a $1.3 million number at some

17   point.

18        So, we took that.  I took a look at that, plus I

19   analyzed what amount of money he generates on an annual

20   basis and I looked at that and the 1.5 represents roughly 5

21   percent of annual revenues, and I felt like for somebody

22   who's indispensable like Mr. Jones is, that seemed like a

23   reasonable amount to pay him.

24   Q    And why do you believe it's an exercise of your

25   business judgment to increase the rate of pay to the level

1    that's proposed in the cash collateral budget?

2    A    Well, I think everybody, the environment that we have

3    currently at Free Speech is one that everybody needs to make

4    a contribution.  We want to reward people for making those

5    contributions and so with the case of Mr. Jones or for

6    anybody else, if there's somebody that's producing the way

7    we need to produce in that company, it needs to be market

8    rate.

9        One of the things that we all need to be aware of is,

10   is that Free Speech Systems does suffer from the ability to

11   adequately recruit employees because of the notoriety of the

12   case.  And so, when you have people that are performing at a

13   very high level, it's important as CRO of the company to

14   make sure they're not overcompensated, but they're

15   adequately compensated to move the company forward.

16              MR. BATTAGLIA:  May I have one minute, Your Honor?

17              THE COURT:  Of course.

18              MR. BATTAGLIA:  Pass the witness, Your Honor.

19              THE COURT:  Okay.  Cross examination?

20              CROSS EXAMINATION OF PATRICK MAGILL

21   BY MR. PATTERSON:

22   Q    Mr. Magill, we established that Jones is the sole owner

23   of Free Speech Systems, correct?

24   A    Correct.

25   Q    Hundred percent owner?

1    A    Yes.

2    Q    And you agree that under this new cash collateral

3    proposal, FSS would be increasing its payment to Jones to

4    about $57,000 every two weeks, correct?

5    A    I believe, it ends up being roughly $75,000 a month, so

6    I don't know how that works on a biweekly basis.

7    Q    Okay.  You disagree that it's about $60,000 every two

8    weeks?

9    A    I'd have to do the math.  I'm going to take your word

10    for it.  That sounds about right.  Yeah.

11    Q    Okay.  It also sounds about right that FSS was paying

12    Jones about $20,000 every two weeks under the current cash

13    collateral set up; isn't that right?

14    A    That sounds right.

15    Q    Now, that pay increase to Jones, does that come with

16    any job responsibilities?

17    A    He remains to be the CEO of the company and on air

18    talent.  Yes.

19         MR. PATTERSON:  I'm going to object as

20    nonresponsive.  I'm asking a little bit of a different

21    question.

22         THE COURT:  Well, hold on.  I get to rule on your

23    objection.

24         MR. PATTERSON:  Fair enough, Judge.

25         THE COURT:  Overruled.  You can go ahead.

1    BY MR. PATTERSON:

2    Q    Well, let me get a little more clarity.  What new job

3    responsibilities is Alex Jones getting that accompanies this

4    pay raise?

5    A    None.

6    Q    Okay.  Is there any sort of new duties at all that

7    Jones is taking on in exchange for this pay raise?

8    A    No.

9    Q    Okay.  Any sort of commitments at all that he's made in

10   exchange for this pay raise?

11   A    No.

12   Q    So why is FSS doing this now?  Why now?

13   A    Because he is grossly underpaid.  It's the -- it's not

14   that he's being overpaid now.  He's been underpaid.  This is

15   a way for us to do what we do with any other employee, which

16   is when you take a look what they're doing and we assess

17   whether they've been -- their pay is commensurate with the

18   talent in the additive way in which this company is being

19   done, we make payment and salary adjustments.

20         In this particular case, it's not a matter that he need

21   -- he's doing more for more money.  He's just been underpaid

22   and this is -- I spent five months trying to get this

23   resolved and I couldn't get it resolved.  So, this is the

24   way we did it.

25   Q    Well, sir, you understand that Free Speech Systems owes

1   over a billion dollars in liabilities, correct?

2   A    I'm very -- yes, I'm aware of that.

3   Q    Okay.  Do you think it's the time to pay people that

4   you think are underpaid more money?

5   A    I believe it's -- I think it's important for the

6   company to be able to compensate people, to continue to make

7   money so that we can pay this back.

8   Q    So you can pay this back.  So the idea being, it's good

9   policy to pay people correctly, so they don't leave?  That's

10  the point?

11  A    No, it -- well, I mean, they may leave, they may not

12  leave.  That wasn't the case with Alex and the case of Alex

13  was he was underpaid and I wanted to make sure that every --

14  he, along with everybody else, is paid commensurate.  It's

15  not just him I've outlined.  There are other people that

16  have been in the company that have been -- that have been

17  underpaid and I've gone to them and I've taken a look at

18  what they've done, the value that they add, and I've

19  adjusted their pay accordingly.  It's not just Alex.

20  Q    Let me understand this.  Is it your testimony today

21  that Alex Jones is committed to staying on with Free Speech

22  Systems, no matter how much he's paid?

23  A    Yes.

24  Q    Okay.  So, you're saying that he's being underpaid and

25  he's happy about it, there's no problem.  He's going to stay

1   with the company.  So why on earth are we paying him all

2   this extra money?

3   A    Well, he's not happy about it.  And you know, it's a

4   situation whether he's happy, whether or not the actual

5   issue is when you build a business, when you have a bankrupt

6   business, which is the business that I'm in as CRO, you come

7   in, you see where the soft spots are, where you need to

8   improve them, where you don't.  And if there are people that

9   are adding to the benefit of the company and they're not

10  adequately compensated, you adjust that and that's what I

11  did here.

12  Q    You adjust this so they don't leave.  That's the whole

13  point.

14  A    There was no -- there was no indication with Alex.  I

15  meet with Alex on a weekly basis.  There was never a quid

16  pro quo between this increase in pay and whether he was

17  going to leave or not leave.  This was judgment that I made

18  based on my business judgment of how to run this company.

19  Q    Let me understand this, okay?  You're getting a great

20  deal on someone.  You've got this person who you say is

21  indispensable to the company.  He's creating millions of

22  dollars for the company and he's getting underpaid and

23  you're getting a great deal, and he has not made any

24  indication that he's going to leave.  And for whatever

25  reason, for no new responsibilities, no new commitments,

1    you're saying, I'm going to triple how much I'm going to pay

2    him every two weeks?  That's your position here, because

3    it's just the right thing to do.  It has nothing to do with

4    him --

5    A    It's good business.

6    Q    Why is it good business?

7    A    I've explained this to you.  I'll try to do this again.

8    when you have a staff and you have people that are working

9    for you in this business, you need to make sure that you're

10   not only competitive, you don't wait for people to threaten

11   to leave or to leave.  You're proactive in the way you do

12   things.  In the case of Alex Jones, it was very clear that

13   this is a half a million dollars a year for a man who

14   contributes 100 percent of the revenue of the business

15   needed to have a pay adjustment.  I do not wait until

16   there's a fire alarm or somebody threatens to quit in order

17   to be able to fix the problem.  I try to fix the problem

18   before it happens.

19   Q    Sir, you said he didn't need to pay adjustment earlier.

20   You said it's very common for business owners to take a

21   small salary and then get a percentage of the profits.  That

22   was very normal.

23   A    That was -- that's normal when you're not in

24   bankruptcy, yes.

25   Q    It's also normal when you're not the owner of the

1    business, perhaps, but he is the owner of the business.

2    A    I'm not sure I understand your question.

3    Q    Well, my point is that his -- there's actually nothing

4    wrong with his guaranteed salary.  It's false that it had

5    been at the 500o, 600, whatever number we're talking about.

6    That falls in line with how much an owner charges.  You're

7    using apples and oranges, using a standard for someone who's

8    not the owner of the business.

9    A    No, if Alex Jones was just an employee, I would still

10   pay him the same amount of money.  Doesn't make any

11   difference.  What I was saying earlier was, when somebody

12   makes the case that he was only making X number of dollars

13   on a W-2, in cases like that when you're not in bankruptcy,

14   it's very common to have an owner of a business take a

15   smaller amount of a salary and a larger amount of bonus of

16   profit sharing for tax purposes.  That was the point of that

17   discussion.

18   Q    And when an owner is not profiting under that

19   arrangement, they don't get extra money.  They just get

20   their salary.  If they're just an owner that gets a lower

21   salary and then reap the profits.  If there are no profits,

22   they just get the small salary.

23   A    Clearly.  Clearly, if there was no profits, taking a

24   profit share, he wouldn't.  That is correct.

25   Q    Well, he doesn't get profits here.

1   A    That's correct.

2   Q    On the FSS plan.

3   A    I understand.

4   Q    So why are we treating him differently?

5   A    We're not treating him differently.  It's a gross

6   compensation issue we're talking about here.  The parsing of

7   words between W-2 and salary is a misrepresentation of what

8   we're talking about.  We're talking about gross compensation

9   for a talent of Alex Jones.  It's a compensation issue.  How

10  you get paid, whether it's profit sharing or whether it's

11  bonus or whether it's W-2, those things, I don't look at.  I

12  look at the total compensation package.

13       As Mr. Jones does not have the ability to share in the

14  profits, which I will admit are very nice right now, because

15  of the bankruptcy, the compensation issue has to be looked

16  at in total.  And the only way I can compensate him for the

17  talent and the work that he is doing is through a W-2, and

18  that's what we're talking about right now.

19  Q    Sir, I didn't hear you compare -- in your opening

20  testimony, I didn't hear you compare any other companies

21  when you determined what would be a fair market value to pay

22  Alex Jones.  It's fair to say that you didn't use any

23  comparable companies when figuring out how much to pay him?

24  A    This is a very -- yeah, it's very hard to find

25  comparative companies in the media space that we're in right

1   now, so --

2   Q    Right.

3   A    I do not have that.

4   Q    So you're just looking at it with nothing, no baseline,

5   no comparison.  You're just kind of looking at it and

6   deciding how much do you think Alex Jones ought to get?

7   A    That's 40 years of experience, sir.

8   Q    With no comparables.

9   A    I run a lot of businesses.  I know what a percentage is

10  to a man like Alex Jones as a comparison to the revenue that

11  he's generating.  I -- you're right.  I don't have any

12  comparisons.  They're not available.   I use my business

13  judgment on that.

14  Q    So when you said it was a fair market value, it wasn't

15  a fair market value.  It was just your judgment.

16  A    Okay.  Right.  It was my judgment.  Yes.

17  Q    Yeah, it was not a fair market value.  You're --

18  A    -- do a survey.  You're a hundred percent right.  I did

19  not go and get a survey.  It was my judgment.  Yes.

20  Q    Now, this is obviously not a severance payment; you

21  agree with me, sir?

22  A    That's correct.

23  Q    And obviously, these aren't incentive payments because

24  he's getting paid no matter how well FSS does, right?

25  A    Yeah, that's correct.

1    Q    Right.  And I think you were testifying earlier about

2    how it's important to keep him happy, but there's no

3    incentive in this structure to make him happy.  He gets paid

4    regardless of how well he does his job.

5    A    He gets paid for the job that he does.  Yes.

6    Q    So if FSS' sales go way down, he's still going to get

7    paid the same amount of money?

8    A    Yes.

9    Q    In the salary.  Yeah.  And if it goes up, it's still

10   regardless, right?  There's no incentive for him to work

11   harder, to do a better job to earn this money.  It's just a

12   raise that you think in your discretion he ought to get?

13   A    That is correct.

14   Q    Have not been presented with any offers from any

15   competing employers, correct?

16   A    Not that I'm aware of, no.

17   Q    You're not aware of any?

18   A    I'm not, no.

19            MR. PATTERSON:  Judge, if I can get a minute,

20   confirm --

21            THE COURT:  Of course.

22            MR. PATTERSON:  Judge, I'm going to pass to my co-

23   counsel.

24            THE COURT:  Thank you.

25            CROSS EXAMINATION OF PATRICK MAGILL

1    BY MR. KIMPLER:

2    Q    Good morning, Mr. Magill.  Kyle Kimpler from Paul Weiss

3    on behalf of the Connecticut plaintiffs.  I wanted to follow

4    up a couple of questions on your analysis of what the fair

5    market value is for Jones' salary.  Before I do, the salary

6    that's proposed under the cash collateral order right now,

7    you agree that's wages.  What you're proposing to pay, the

8    60 -- $57,000 every -- biweekly, that would be reported as

9    W-2 wages for Mr. Jones; is that correct?

10   A    That's correct.

11   Q    Okay.  And you understand that historically Mr. Jones

12   has received W-2 wages and then additional flowthrough

13   income as the 100 percent owner of Free Speech Systems; is

14   that correct?

15   A    That's the way I understand it, yes.

16   Q    Okay.  And when you did your analysis of whether or not

17   Mr. Jones was underpaid, you looked to both of those forms

18   of compensation?

19   A    I did, yes.

20   Q    And so you believe that in assessing the right amount

21   to pay Mr. Jones, what used to be taken as equity

22   compensation should be instead converted to W-2 wages?

23   A    A portion of that, yes.

24   Q    Okay.  How much W-2 wages did FSS pay Mr. Jones in

25   2022?

1    A    I'm not certain about that, but it's -- I would just

2    have to guess.  I'm not -- I don't recall it right off the

3    top of my head.

4    Q    If I told you it was less than $350,000, would you have

5    any reason to disagree with me?

6    A    That sounds low.

7    Q    That sounds low?  Have you seen Mr. Jones's tax

8    returns?

9    A    Not recent tax returns, no.

10   Q    Okay.  Are you aware that Mr. Jones filed an

11   administrative claim motion against FSS?

12   A    Yes.

13   Q    And you're aware that FSS filed an objection to that?

14   A    Yes.

15   Q    Okay.  That objection, which is at Docket 732, FSS

16   states that Jones's W-2 income has historically accounted

17   for less than 20 percent of his annual income.  Jones's

18   total income from FSS has exceeded $2.5 million a year.  So,

19   if I'm reading that right, 2.5 million a year, that's the

20   total all-in compensation.  I think you used a similar

21   number earlier, right?

22   A    I don't recall using $2.5 million but I used the term

23   total compensation, yes.

24   Q    Do you think his total compensation on average has been

25   around $2.5 million a year?

1    A    I would think it would be at least that, yes.

2    Q    Okay.  And if 20 percent of that is W-2, what does that

3    tell you his average annual W-2 income is?

4    A    Six hundred, whatever that number is.  Yeah, whatever

5    that --

6    Q    You have 2.5 million, it was 10 percent, you'd be at --

7    A    Two-fifty.

8    Q    All right, so 20 percent would be?

9    A    Five hundred.

10   Q    five hundred.

11   A    Yeah.

12   Q    Okay.  And in 2022, you don't know if he actually got

13   $500,000?

14   A    I do not, no.

15   Q    Okay.  And you have no reason to disagree with me that

16   he received maybe less than 350,000?

17   A    I have no basis to know one way or the other.

18   Q    Okay.  Do you know how much he was getting paid

19   biweekly immediately before FSS filed?

20   A    No.

21   Q    Would it surprise you if it was only $8,000 every two

22   weeks?

23   A    It would surprise me, but the way that he drew money

24   out of the -- out of the company, I don't know.  It's -- he

25   looked at it as, I'm sure, total compensation.  So, I don't

1    know what he was doing on W-2s.  I don't know.

2    Q    So, as we look for a fair market value of W-2 income,

3    who do you think determined, prior to your involvement, how

4    much W-2 income Mr. Jones had?

5    A    Probably Alex.

6    Q    So, if he himself agreed, for example in 2022, to pay

7    himself less than $350,000 of W-2 income, you don't think

8    that's an important data point in your consideration?

9    A    No.

10   Q    Why not?

11   A    Because it's not total compensation.  Here again,

12   you're talking about W-2 and W-2 is only part of

13   compensation.  There's also profit sharing and bonuses that

14   go into that.  I'm confident, based on what everybody's

15   talked about, about way Alex spends money that he was making

16   -- he was being compensated more than $350,000 a year.  So,

17   no, I don't believe that.  I don't think that's relevant

18   here.

19   Q    You believe he's entitled to the income that the

20   business creates?

21   A    All I'm saying is, is if you say W-2 of 350,000 or

22   250,000 or 8,000, it's -- that's not the total compensation

23   this man makes.  And so as he does not have access to profit

24   sharing or bonuses or anything else, when you compare year

25   to year the compensation this man has made to just relate it

1    to just W-2 is a false equivalent.

2    Q    You understand in a Subchapter V case, a Debtor has to

3    pay 100 percent of net disposable income to its creditors?

4    A    Yes.

5    Q    So, and you understand that in many Subchapter V cases,

6    there are similar ma and pa type businesses with a single

7    owner?

8    A    Yes.

9    Q    So, your position today is that the equity draws that

10    that owner takes that are supposed to go to creditors can

11    instead be changed to a fixed salary and that that's

12    appropriate under the Bankruptcy Code?

13    A    I'm not sure exactly how to answer that question.

14    Q    Okay.

15    A    I'm -- what you're asking me is -- I'm not a lawyer.

16    I'm a CPA.  Okay, so I don't know what's appropriate, what's

17    not.  What I do know is what's appropriate compensation for

18    a man who generates $30 million a year in the business.

19    We're talking about gross compensation.

20    Q    Has Mr. Jones -- are you aware that Mr. Jones believes

21    that he has a binding contract with FSS today?

22    A    A binding contract with it?  Like an employment

23    agreement?

24    Q    Yes.

25    A    I don't believe he does.  No, I don't believe he

1    believes that.

2    Q    You don't think he believes that?

3    A    No.

4    Q    You're aware that he filed an administrative expense

5    claim motion against FSS saying that he had a binding, valid

6    contract that was going to pay him $1.9 a year?

7    A    I know that his lawyers filed it, but in my

8    conversations with Alex, Alex believes, and so do I, that he

9    views himself as an at-will employee.

10           THE COURT:  Are you implying that Alex Jones'

11   lawyers filed something without his permission?

12           THE WITNESS:  No, I don't -- no, Your Honor.  What

13   I'm saying is I don't think Alex Jones --

14           THE COURT:  Just want to clean the record.

15           THE WITNESS:  It's --

16           THE COURT:  Because I want to make sure that we

17   have a clean record, that there's no implication.  Ms.

18   Driver, you don't have to address it.  I'm just cleaning the

19   record.

20           MS. DRIVER:  It's just been withdrawn --

21           THE COURT:  It's -- I understand that, but if

22   something was filed, I want to make sure.

23           THE WITNESS:  Your Honor --

24           THE COURT:  There's no -- that there's no

25   insinuation in any way that Ms. Driver has filed something

1    that was not one way -- approved without anyone's knowledge.

2    I just want to make sure that we clear the record on that

3    and I got your point.  I'm not saying you haven't had those

4    conversations.  I just want to make sure we just have a

5    clean record on kind of what we're saying and what we're not

6    saying.

7              THE WITNESS:  Are you looking for a response from

8    me, Your Honor?

9              THE COURT:  Not at all.

10             THE WITNESS:  All right.

11             THE COURT:  I just want to make sure that we have

12   a clean record.

13             THE WITNESS:  Okay, fair enough.

14   BY MR. KIMPLER:

15   Q    Has Mr. Jones been performing his duties at FSS during

16   this case as you would expect him to?

17   A    Yes.

18   Q    Doing the shows that he's committed to do?

19   A    Yes.

20   Q    Selling the products that he's supposed to be selling?

21   A    Yes.

22   Q    Okay.  You're aware of the original plan that FSS filed

23   in this case in February?

24   A    Yes.

25   Q    And you're aware of the projections that were filed in

1   the February plan?

2   A    Yes.

3   Q    How much in that plan did FSS predict would be paid to

4   creditors in the year 2024?

5   A    I just have to go by memory.  It's a long time ago.  I

6   would -- few million dollars?  I don't know.

7   Q    Told you it was $8 million, would you disagree?

8   A    No, I wouldn't.  It's been a while since I've looked at

9   the original plan, but.

10  Q    So, in February you had -- you said you started these

11  discussions with Mr. Jones about increasing his salary, I

12  think you said in May?

13  A    Yes.

14  Q    All right.  So, in February before any of this came up,

15  FSS files a plan.  Says, we're going to pay our creditors $8

16  million in 2024.  You with me?

17  A    Okay.  Yeah.

18  Q    All right.  And you guys filed a new plan last week?

19       MR. BATTAGLIA:  Your Honor, I'm going to object.

20  Mischaracterizes the plan.  Plan said it would pay net

21  disposable income.  Rejections have qualifiers in them.

22       THE COURT:  I don't know where we're going, Mr.

23  Kimpler.  Where are we going with this?

24       MR. KIMPLER:  If you just give me one second, Your

25  Honor, I think you'll see.  We are going to --

```
 1                    THE COURT:  I don't --
 2                    MR. KIMPLER:  -- issue of --
 3                    THE COURT:  I don't want you to --
 4                    MR. KIMPLER:  This is not getting into plan
 5      confirmation.  This is -- we'll quickly go back to his
 6      salary.
 7                    THE COURT:  All right, I'll give you a little.
 8                    MR. KIMPLER:  Okay.
 9                    THE COURT:  I'll give you a little latitude.
10      BY MR. KIMPLER:
11      Q    Last week you filed new projections.  Do you know what
12      the proposed distribution to creditors in 2024 is?
13      A    I don't recall.
14                    MR. BATTAGLIA:  Objection, Your Honor.
15      Mischaracterizes the record.
16                    THE COURT:  Yeah.
17                    MR. KIMPLER:  Objection is --
18                    THE COURT:  I'm not taking it as evidence.
19      BY MR. KIMPLER:
20      Q    What -- would you disagree if I said it was $4 million?
21      A    Probably not.
22      Q    So, the projections for what FSS can pay its creditors
23      in 2024, 50 percent less.  Is Mr. Jones taking any reduction
24      in salary?
25      A    No.
```

1    Q    So, even though the projections of what would be paid

2    to creditors will decrease by 50 percent, Mr. Jones will get

3    the same amount?

4    A    Correct.

5    Q    And you're supportive of that?

6    A    I am.

7    Q    You understand that FSS filed a motion seeking an

8    employment contract with Mr. Jones?

9    A    Yes.

10   Q    In that motion, FSS said -- I'm quoting -- "It's

11   necessary" to get a contract with Mr. Jones.  Do you agree

12   with that?

13   A    I do.

14   Q    Why do you think it's so important to have a --

15   A    Yeah --

16   Q    -- contract with Mr. Jones?

17   A    Long term for the feasibility of the plan, it's

18   important for us to get Alex signed up to a long term deal

19   for the plan, the feasibility of the plan going forward.

20   Yes.

21   Q    Are you getting that today?

22   A    I'm sorry, what am I getting?

23   Q    A long term contract with Mr. Jones?

24   A    I would hope so, but that's between now and plan

25   confirmation.  Right now, I don't have one.

1    Q    So you're going to pay somebody before you have the

2    contract?

3    A    I'd pay Mr. Jones the same amount of money, whether he

4    was at-will or not.  I feel from the bankruptcy perspective

5    for the benefit of the confirmation of the plan and the

6    feasibility of the plan, it's important that we have a

7    contract with him.  If we were not in bankruptcy or wasn't

8    filing a plan, I wouldn't feel the need to do one.

9    Q    What does FSS get in exchange for increasing Mr. Jones'

10   salary?

11   A    We get his services.

12   Q    Don't you have them today?

13   A    Yes.

14   Q    So what does FSS get by increasing Jones salary?

15   A    His continued services.  His services.

16   Q    That implies to me that you may lose those services?

17   A    No.

18   Q    There's no risk you're going to lose the services?

19   A    I don't know that.

20   Q    You don't know.

21   A    I don't know if he's going to leave or not.  He has --

22   I mean, he has not said he's going to leave.  I have no

23   commitment long term either way.  This is an at-will.  In my

24   opinion he's like -- the way I look at Alex Jones is the way

25   I look at anybody else at Free Speech.  They're an at-will

1    employee.  They can leave anytime they want.  If they're

2    fairly compensated -- all of our employees are fairly

3    compensated and treated fairly, they will be productive

4    members of the company.  That's the whole purpose is to

5    create that kind of environment.  And that's all I'm doing

6    with Alex is the same thing I've done with everybody else in

7    the company.  No different.

8    Q    Other than getting his services, is there anything else

9    that FSS gets by granting this salary increase now?

10   A    No.

11            MR. KIMPLER:  No further questions from me, Your

12   Honor.  Thank you.

13            THE COURT:  Thank you very much.  Anyone else have

14   any questions?

15            MR. LEMMON:  Yes, Your Honor.

16            CROSS EXAMINATION OF PATRICK MAGILL

17   BY MR. LEMMON:

18   Q    Mr. Magill, I understand that you're of the view that

19   Mr. Jones is not going to leave FSS, but let me ask you,

20   because you did the projections, what will FSS' revenues be

21   in 2024 if Mr. Jones is not there?

22   A    Well, hard to say.  A fraction.

23   Q    Well, seven-eighths can be a fraction, but --

24   A    I would say it would go from -- if you use 100 percent,

25   I would say you're looking at 15 to 20 percent.

1             MR. LEMMON:  Thank you.  Nothing further, Your

2     Honor.

3             THE COURT:  Thank you.  Anyone else have any

4     questions?

5             MR. BATTAGLIA:  Just a couple.

6                REDIRECT EXAMINATION OF PATRICK MAGILL

7     BY MR. BATTAGLIA:

8     Q    You know who Joe Rogan is?

9     A    I do.

10    Q    Do you know what he's paid?

11    A    I've -- I don't know that I've heard what he's paid.

12    Q    Do you know, from your understanding, whether it's more

13    or less than what you're proposing to pay Alex Jones?

14    A    It's multiple --

15            MR. PATTERSON:  Objection, Your Honor.  First of

16    all, it's hearsay and he's speculating.  He just said he

17    doesn't know.

18            THE COURT:  I'm going to allow it.

19    BY MR. BATTAGLIA:

20    Q    What about Tucker Carlson?

21            MR. PATTERSON:  Objection, Your Honor.

22    (indiscernible) laid a foundation that he knows what Tucker

23    Carlson makes.

24            THE COURT:  Well, I think you've got to let him

25    ask the question and then we can see if the foundation is

1   laid or not.  I'm going to allow it.

2   BY MR. BATTAGLIA:

3   Q    There are a universe of media personalities that --

4   whose compensation is not public; is that correct?

5   A    That is correct.

6   Q    And is there, to your knowledge, a resource that you

7   could find out what a market would pay for a particular

8   celebrity who's got a following of X number of unique views?

9   Is there something that you could look at to discover that?

10  A    No.

11          MR. BATTAGLIA:  Pass the witness, Your Honor.

12          THE COURT:  So, I just have a question.  Is there

13  any documents in the record that can support any of what I

14  just heard?

15          MR. BATTAGLIA:  There are --

16          THE COURT:  In other words, I heard about $4

17  million profit sharing documents.  Is there any document in

18  the record that I can --

19          MR. BATTAGLIA:  Your Honor --

20          THE COURT:  It's -- you're asking me, so how do I

21  know that that's the number?  How do I know that what he's

22  saying is supported by evidence?  I know that's what he

23  said.  I'm just asking if there are any documents that

24  support --

25          MR. BATTAGLIA:  Well, I'm sure --

1          THE COURT:  -- the 600, the 540, his analysis.  Is

2     there any documents?  Today was the day that you all wanted

3     to go forward, so I'm just asking, are there any documents

4     that are in the record right now?

5          MR. PATTERSON:  Yes, Your Honor, I can give you --

6          THE COURT:  No, I'm asking Mr. Battaglia.

7          MR. BATTAGLIA:  Your Honor, to the extent it's a

8     best evidence issue, of course, a witness can testify with

9     knowledge.

10          THE COURT:  He certainly can.  I'm just asking if

11     there's any documents that can support any of what I just

12     heard.

13          MR. BATTAGLIA:  I would expect that ledgers --

14          THE COURT:  No, no, I'm asking what you all

15     presented today.

16          MR. BATTAGLIA:  I have not presented a document.

17          THE COURT:  All right.  Thank you very much.  Any

18     other witnesses?

19          MR. BATTAGLIA:  Yes, sir.  Call Bob Schleizer.

20          THE COURT:  Okay, Mr. Schleizer.

21          MR. PATTERSON:  Judge, before that goes, I think

22     we (indiscernible) clarity.  I don't think he was on the

23     witness and exhibit list, Your Honor.  I'm just going to --

24          THE COURT:  Let's find out.

25          MS. DRIVER:  He was on my witness and exhibit

1    list, Your Honor, and I filed it for everything that was set

2    today.  I was going to let Mr. Battaglia ask him the

3    questions because it was his motion.  If there's an

4    objection to that --

5              THE COURT:  I think it's fine.  Why don't we just

6    let him proceed.  Sir, can you please raise your right hand?

7    Do you swear to tell the truth, the whole truth, and nothing

8    but the truth?

9              THE WITNESS:  I do.

10             THE COURT:  Okay.  Please be seated.  Can you just

11   state your name for the record and spell your last name?

12             THE WITNESS:  Robert Schleizer, S-C-H-L-E-I-Z-E-R.

13             THE COURT:  Thank you very much and I'll just let

14   the record reflect that the witness has been duly sworn in.

15             DIRECT EXAMINATION OF ROBERT SCHLEIZER

16   BY MR. BATTAGLIA:

17   Q    Mr. Schleizer, what do you do for a living?

18   A    I am a financial advisor.

19   Q    How long have you been doing that?

20   A    Since 1987.

21   Q    And have you been involved in bankruptcy cases in the

22   past?

23   A    Yes.

24   Q    Give the Court an overview of what your involvement has

25   been?

1   A     I have served in a number of different capacities from

2   financial advisor to chief restructuring officer.  I've been

3   trustee in a number of different cases as a liquidating

4   trustee and also as a receiver.

5   Q     And what is your role in the Alex Jones Chapter 11

6   bankruptcy case?

7   A     I'm Mr. Jones' financial advisor.

8   Q     And you've been approved to be employed by this Court,

9   correct?

10   A     Yes.

11   Q     And in that capacity, have you had an opportunity to

12   review Mr. Jones' financial information, historical records?

13   A     As -- yes, I have.

14   Q     Are you familiar with his total compensation from Free

15   Speech Systems historically?

16   A     I've seen his tax returns.  I've also looked at some

17   analysis that was performed by -- prepared by former

18   accountants of his, and I have seen it dating back to 2012.

19   Q     Can you tell the Court what Mr. Jones' historical

20   compensation has been, say, for the last five to seven

21   years?

22   A     The last couple of years have been a bit of a challenge

23   because of the bankruptcy, but from 2012 to 2020, his W-2

24   compensation was about $2.8 million.  His overall draws,

25   distributions from the company were an additional $50.3

1    million, of which 30 million went to the IRS.  So he netted

2    about five -- it was about $5.9 million a year average

3    between 2012 and 2020.  Two thousand -- but his, you know,

4    again, the W-2 compensation they've been discussing has not

5    really been relevant to what has been compensated for by the

6    company.

7    Q    In your opinion, is it extraordinary for a small

8    business owner to take compensation through means other than

9    a W-2 compensation?

10   A    No, not at all.  And in fact, Free Speech Systems is

11   not even a separate reporting entity.  Mr. Jones shows that

12   on a Schedule C on his tax return.

13            MR. BATTAGLIA:  A moment, Your Honor.  Pass the

14   witness, Your Honor.

15            THE COURT:  Thank you very much.  Any cross?

16            CROSS EXAMINATION OF ROBERT SCHLEIZER

17   BY MR. KIMPLER:

18   Q    Good afternoon, Mr. Schleizer.  Again, Kyle Kimpler

19   from Paul Weiss on behalf of the Connecticut plaintiffs.

20   Mr. Schleizer, did I hear you say that Mr. Jones had W-2

21   wages -- well, let me just ask you.  What do you believe the

22   average W-2 wages that Mr. Jones has received historically

23   to be?

24   A    For which period of time?

25   Q    Let's start with 2022.

1   A    2022 is $333,000.  And I'm sorry, 2022 -- I believe

2   that's right, $333,000.

3   Q    For the entire year?

4   A    That was his W-2 compensation.  He also had

5   distribution of $1,067,000.

6   Q    And that's on account of his equity interests?

7   A    No, that's additional distributions to cover expenses.

8   Q    Okay.  What is the W-2 income in 2021, ballpark, if you

9   know?

10   A    $635,000.

11   Q    Okay.  And before that?

12   A    If you go back to 2012, it was zero and it stepped up.

13   I don't think he drew more than $200,000 as a W-2 employee

14   until 2017.

15   Q    Okay.  And do you know who set these amounts of W-2

16   compensation?

17   A    I'm sorry?

18   Q    Do you know who set those amounts?

19   A    I do not.

20   Q    Okay.  To your knowledge, has Mr. Jones ever received

21   W-2 compensation from FSS in an amount greater than

22   $640,000?

23   A    Not to my knowledge.

24        MR. KIMPLER:  No questions.  Thank you.

25        THE COURT:  Thank you.  Any other questions for

1    this witness?  Thank you very much for your time, sir.  Oh,

2    I should ask, any redirect?

3           MR. BATTAGLIA:  No, Your Honor.

4           THE COURT:  Okay.  Thank you very much for your

5    time, sir.

6           THE WITNESS:  Thank you.

7           MS. DRIVER:  Your Honor, I don't have any

8    witnesses, but after Mr. Battaglia is done, I did want to

9    see if we could move for the admission, just a few documents

10   from the from the docket.

11          THE COURT:  All right.

12          MR. BATTAGLIA:  Same, Your Honor.  No additional

13   witnesses and I know that the Trustee's -- Sub V Trustee's

14   report commissioned by this Court does contain relevant

15   information.  We ask that be taken --

16          THE COURT:  Thank you.  Anyone else who supports

17   the relief requested in cash collateral have any witness or

18   any evidence to present to the Court?

19          MS. DRIVER:  Your Honor, if I may, I would just

20   move for judicial notice of the MORs that have been filed in

21   both Mr. Jones and FSS cases.  Those do contain some of the

22   historical information that was referenced in Mr. Magill's

23   direct testimony.

24          THE COURT:  Any objection, just taking judicial

25   notice of the MORs?

1            MR. PATTERSON:  No, Your Honor.

2            THE COURT:  Okay.

3            MS. DRIVER:  Thank you, Your Honor.

4            THE COURT:  Actually, hold on.

5            MS. BRAUNER:  I think we want to make sure that

6     they're being admitted for limited purpose --

7            THE COURT:  Yeah, they're not being admitted.  I'm

8     just taking judicial notice of them.

9            MS. DRIVER:  Thank you.

10           THE COURT:  Thank you.  Any other evidence or does

11    your side rest, Mr. Battaglia?

12           MR. BATTAGLIA:  -- rest, Your Honor.

13           THE COURT:  Okay.  Any evidence in opposition?

14    Okay.  Mr. Battaglia, what do you wish to tell me in

15    closing?

16           MR. BATTAGLIA:  Your Honor, we filed the notice

17    with the increased salary on November 3rd, as I recall, and

18    I advised the Committee and other counsel here that that was

19    happening, and of course, we didn't get this objection until

20    the 21st.  I'm not sure if the delay was prominent and we

21    disclosed it and try to be as transparent as possible.

22           The increase in salary, Your Honor, that Mr.

23    Magill is proposing here is because he believes it's an

24    appropriate rate of compensation.  And historically, the

25    compensation since the filing of this Chapter 11 case, you'd

1    mentioned the predecessor bankruptcies.  Actually, Mr. Jones

2    wasn't compensated there.  It started with the very first

3    cash collateral order at 10,000 per pay period and it was

4    kicked up to 20,000 per pay period that I negotiated with --

5            THE COURT:  No, no, no.  We've been here from day

6    one.  I remember.

7            MR. BATTAGLIA:  But never -- honestly, that number

8    was not negotiated with Mr. Jones.  It was a number to --

9            THE COURT:  No, I agree with -- I remember.  I

10   remember.  (indiscernible).

11           MR. BATTAGLIA:  Move ahead with the case and not

12   have cash collateral be a consuming issue, which it hasn't

13   been for a while.  When Mr. Jones filed in December and

14   shortly there thereafter, it did become an issue about

15   whether it was fair compensation, what his contributions

16   are.  There is a prepetition employment contract.  Frankly,

17   I don't give it any credence.  It's executed by someone

18   without authority to execute it and it's meaningless, but it

19   -- I can -- I know what its intent was.  It's irrelevant for

20   today's purposes.

21           But Mr. Magill has come to his own conclusion,

22   exercising his own business judgment, not only being

23   involved in this case for now a year and seeing firsthand

24   what the contributions of the various parties are, but also

25   through his vast experience in running other businesses,

1    what an appropriate salary is.  There's not a real good

2    comparator for market value for this business.  It's just

3    unique.  You look at any celebrity compensation and the

4    actor and actress compensation varies so broadly and

5    ultimately, it's based on the contribution that each

6    individual makes to the venture going forward and what's an

7    appropriate rate of pay.

8             And Mr. Magill has made an evaluation and an

9    analysis of what he believes to be fair compensation in this

10   set of circumstances.  A lot has been made about the fact

11   that W-2 income has historically been at a different level.

12   It's been zero before, according to the evidence.  That's

13   certainly not fair.

14            THE COURT:  I don't know -- I don't know, what

15   evidence are you referring?

16            MR. BATTAGLIA:  Mr. Schleizer's testimony.

17            THE COURT:  Okay.

18            MR. BATTAGLIA:  That W-2 income has varied.  And

19   it has varied significantly over the -- even $300,000 in the

20   last -- 2022 I guess.

21            THE COURT:  Let me ask you a question.  What

22   evidence do I have that Mr. Jones has even agreed to this?

23   What statements do I have on the record that Mr. Jones has

24   even agreed to the compensation that was proposed?  In other

25   words, it can be proposed.  What evidence is there in the

1    record that he's even agreed to this amount?  What

2    statements do I have from any of the witnesses that shows

3    that Mr. Jones has agreed to the compensation and won't come

4    back two weeks later and ask for more?  And I'm not saying

5    he would.  I'm just asking, what evidence do I have that

6    this budget will hold?

7              MR. BATTAGLIA:  Well, Your Honor, I think the fact

8    --

9              THE COURT:  Just asking for the -- just asking for

10   statements.  You all wanted to go forward today, so today is

11   the day we take evidence.  What evidence do we have in the

12   record that Mr. Jones has agreed to any of this?

13             MR. BATTAGLIA:  Mr. Jones' counsel is supporting

14   the effort to move that and --

15             THE COURT: I know, but that's a different

16   question.

17             MR. BATTAGLIA:  And I'll happily more to reopen

18   the --

19             THE COURT:  We can't do that.  I'm just asking.

20   Today was the day.  You all wanted to go forward, so today,

21   we take evidence.  What evidence do I have in the record

22   that Mr. Jones -- I got it.  He supports it.  But can he

23   come back two weeks later and ask for more?  Has he agreed

24   to accept this through the budget period?

25             MR. BATTAGLIA:  Well, if he --

1            THE COURT:  Through plan confirmation, February?

2    What evidence do I have?  What I understand, from what the

3    witnesses told me, CRO said they didn't have discussions

4    about staying on or potentially staying on for any longer

5    period.  So, what evidence do I have?  I

6              mean, I'm being asked to approve, right, like a

7    million-and-a-half dollar salary, the number in and of

8    itself doesn't really -- I told everybody they can come back

9    in a couple of weeks and put it on, but the number itself is

10   being supported by statements from a CRO and not one

11   document in the record to support any of the relief

12   requested and I'm being asked to approve based on the

13   testimony at least two times W-2 salary and total

14   compensation of which no one can provide me a firm number of

15   what the total compensation was, because there's no evidence

16   in the record to support it.

17           Now, somebody wants to tell me that this is all

18   ordinary course.

19           MR. BATTAGLIA:  Well, Your Honor, he's an at-will

20   employee and that's clearly --

21           THE COURT:  Where is the evidence that shows that

22   he's always been an at-will employee?  Where was that

23   evidence to show that he was always an at-will?  What

24   statement on the right has been saying that since

25   prepetition, Mr. Jones served as an at-will employee?

1          MR. BATTAGLIA:  Mr. Magill testified that he's

2     been an at-will employee, in his opinion, since the

3     bankruptcy --

4          THE COURT:  In his opinion, but I'm talking about

5     documentation.  What documentation?  There was evidence that

6     there was a $1.3 million contract, that there was a motion

7     to assume it, and that motion was withdrawn.  What documents

8     do I own -- is there, was there a contract or was there not

9     a contract?  I know FSS disputed it.  What evidence do I

10    have that Mr. Jones has even been an at-will employee

11    prepetition?  I got that he was paid total compensation and

12    that came from two different sources, right, and that makes

13    -- that doesn't -- that's normal.

14          What evidence do I have now?  So now, you're going

15    to take traditional W-2 plus profit sharing.  That was

16    prebankruptcy.  Now, you're going to come -- now, we're just

17    going to have straight W-2.  That sound like outside of the

18    ordinary course, when ordinary course was a combination of

19    the two?

20          MR. BATTAGLIA:  Well, the ordinary course of the

21    business at large is that employees are compensated on W-2

22    income and they're paid --

23          THE COURT:  What evidence do I have in the record

24    that what you're telling me is accurate?

25          MR. BATTAGLIA:  Mr. Magill testified that he has

1   given employees raises of their salary, 20 of the employees

2   he's given raises in the ordinary course --

3          THE COURT:  I did hear that.

4          MR. BATTAGLIA:  -- of the business.

5          THE COURT:  I did hear that.

6          MR. BATTAGLIA:  And that as the CRO it's within

7   his province to decide what people are paid based on their -

8   -

9          THE COURT:  So, let's just take the Jones case off

10  the table.  Can a CEO in a large Chapter 11 case, can the

11  board just double a CEO's salary and just call it ordinary

12  course and submit a budget?  Just saying, CEO prepetition

13  wasn't compensated enough.  We're going to double the CEO's

14  salary, right?  It's got to have -- and the CEO, you think a

15  CEO can do that?  And let's just call it a Fortune 500

16  company.

17         MR. BATTAGLIA:  I think there are a lot of

18  variables we left out.

19         THE COURT:  But you -- but not really, because

20  what you're saying is it's ordinary course.  Let's just say,

21  take the same facts.

22         MR. BATTAGLIA:  Well, but they aren't the same

23  facts because prepetition this --

24         THE COURT:  CRO determines.  CRO determines that

25  he's not getting paid what he should.

1          MR. BATTAGLIA:  The facts here are that the

2     employee was paid considerably more even than what we're

3     proposing to pay prepetition.

4          THE COURT:  Give me the same -- give you the same

5     set of facts.

6          MR. BATTAGLIA:  And it was arbitrarily reduced as

7     a result of the bankruptcy --

8          THE COURT:  (indiscernible) same set of facts.

9     Let's just call it a Fortune 500 company that's in

10    bankruptcy right now.  CEO compensation is 50 million bucks

11    a year.  It got reduced to 20 during the case.  Can the CRO

12    unilaterally raise at to $100 million?

13         MR. BATTAGLIA:  Can the CRO -- can the board,

14    under your original --

15         THE COURT:  Let's just call it a privately held

16    company.  Can the CRO approve, unilaterally approve a salary

17    increase to $100 million?

18         MR. BATTAGLIA:  I'm going to -- the salary

19    increase to a number that is less than they historically

20    made in order for the benefit of the business going forward?

21    I understand the Court's point, but I -- it was the ordinary

22    course to pay this employee considerably more than what the

23    CRO is --

24         THE COURT:  What evidence do I have that?

25         MR. BATTAGLIA:  Mr. Schleizer testified to what

1    the compensation has been.

2            THE COURT:  Based on tax returns that are not in

3    evidence, right?

4            MR. BATTAGLIA:  But there's been no best evidence

5    objection lodge nor, I think --

6            THE COURT:  No, but I still have to make a ruling

7    on this, right?

8            MR. BATTAGLIA:  I think the witness can testify

9    from having reviewed documents and materials to what the

10   numbers are and that's what he's done here.  I think it's

11   valid evidence and it's in the record.

12           THE COURT:  Okay.  I'm just pushing the contours

13   of what you're saying.

14           MR. BATTAGLIA:  I know.  You do it all the time.

15   It really pisses me off.  (Laughter)

16           THE COURT:  I'm just pushing --

17           MR. BATTAGLIA:  It's irritating, Judge.  Stop.

18           THE COURT:  I just need to understand kind of

19   where we are and what I'm being asked to do.  Okay?

20           MR. BATTAGLIA:  I don't think this --

21           THE COURT:  So, here's the question.  What if I

22   say no?  Where does that leave your budget?  Right?  Because

23   what you're asking me to do is do an up or down vote today.

24   That's what you're asking me.  You're asking me to approve

25   cash collateral with that budget or not.  There's no gray

1    area now, where we are.

2           MR. BATTAGLIA:  Well, there's been gray area on

3    every budget when someone says that there's a modification

4    that needs to be made because the numbers are not

5    sustainable.  So, I'm going to pay, Mr. Magill is going to

6    pay what the Court tells me he's allowed to pay.  That's

7    been consistent throughout this case, whether it's the U.S.

8    Trustee's Office or a question the Court raises and says I

9    can't approve this number and it's amended.

10          THE COURT:  Okay.

11          MR. BATTAGLIA:  And we'll act accordingly.

12          THE COURT:  Thank you, Mr. Battaglia.  Mr.

13   Kimpler, I'll start by asking you what's wrong with the

14   proposition?  $20,000 was a made up -- well, I shouldn't say

15   a made up number.  It was a negotiated number.  Doesn't

16   reflect -- may not reflect fair market value for top talent

17   services.  Why shouldn't I approve it today?

18          MR. KIMPLER:  Because the only way you can approve

19   it is under Section 503.  Under Section 503, you have to

20   have an evidentiary record that either there is no retentive

21   purpose or that the facts and circumstances of the case

22   justify it.  I haven't even heard those arguments.

23          THE COURT:  But isn't that exactly what Mr. Magill

24   said?  He said he -- there was no retentive purposes.  It

25   was an at-will employee.

1          MR. KIMPLER:  Well, that's what they say.  I think

2     they struggle to provide any explanation of why now.  Why

3     are we here today?  Confirmation's in three months.  Claims

4     to have an admin claim for all the amounts he's owed that

5     could get treated at confirmation.  Been talking about this

6     since May.  Why are we here today?

7          THE COURT:  What happens if he's -- if Mr. Jones

8     elects to not be a part of FSS anymore?  I mean, it's -- I

9     get the concern that they have.  It's real.

10          MR. KIMPLER:  There's nothing we can do about

11     that, Your Honor.  It's -- at the end of the day, Mr. Jones

12     has to make a decision.  Does he want to continue working

13     for FSS, including, under situations where Bankruptcy Code

14     requires 100 percent of his net disposable income to be paid

15     to creditors or in situations where his case may not go like

16     he wants to.

17          That is, I think frankly, the elephant in this

18     room.  I think it's exactly why the Creditors Committee told

19     you, I think correctly, earlier today that these two cases

20     are inextricably intertwined.  Mr. Jones, to my knowledge,

21     has not given a solid commitment to work for FSS.  And we're

22     kind of in this weird world here today where we're talking

23     about approving a salary increase but not actually doing a

24     contract.

25          But if you look at the contract, they actually

```
1    proposed, it had a lot of really funky provisions like, oh,
2    I can quit if I don't get a release or I can quit if the FSS
3    plan doesn't go the way I want it to.
4              THE COURT:  It's not in evidence.
5              MR. KIMPLER:  Those are in the docket, Your Honor.
6    You can take judicial notice of what the FSS plan says.
7              THE COURT:  No.  The record is closed.
8              MR. KIMPLER:  Or the employment motion.  The
9    employment motion has been filed and has not been withdrawn.
10             THE COURT:  I agree.
11             MR. KIMPLER:  So, we're being asked to approve a
12   salary increase but not a contract.  The contract has a
13   whole bunch of other issues that we haven't even talked
14   about today, but I -- listen, at the end of the day, Mr.
15   Jones has to make the decision.  Does he want to continue
16   working for FSS or does he think he's got greener pastures
17   elsewhere?  And nobody can answer that question except for
18   Mr. Jones.
19             THE COURT:  Thank you.
20             MR. KIMPLER:  Can I go though --
21             THE COURT:  Yeah, absolutely.
22             MR. KIMPLER:  -- if I could?
23             THE COURT:  I did kind of take over your
24   presentation.  I apologize.
25             MR. KIMPLER:  I promise to be short, and Your
```

1    Honor, we've taken way too much of your time today.

2              THE COURT:  No, you haven't.  I'm --

3              MR. KIMPLER:  Very much appreciated.

4              THE COURT:  I'm here Monday through Friday, you

5    know.

6              MR. KIMPLER:  Your Honor, I'll try not to dwell

7    here, but I do think the background here is important.  I

8    think to your question, well, why not do a little bit more

9    under this cash collateral order; I think it begs the

10   question of what has he traditionally received as a salary?

11   And I think you heard today very clearly, he has never --

12   the 20,000 a month or sorry, 20,000 biweekly he receives

13   right now, that works out to exactly $500,000 a year salary.

14             That is right down the middle of the fairway of

15   what he has traditionally received.  It is actually

16   significantly more than what he received in 2022.  Now, the

17   only response to that is well, yeah, but that's just W-2

18   wages.  He gets all these equity draws.  And if what we're

19   going to do is say, well, when you're in a Subchapter V

20   case, you get to take what used to be equity draws and

21   convert it to salary, so that that now becomes a fixed

22   operating expense, then what we are saying is that is

23   something that will be borne entirely by creditors.

24             We're shifting all of the risk to the creditors

25   who are funding that.  And I think it's a blatant, I would

1    say, violation of Subchapter V.  I'm not aware of any case

2    where a Debtor, here tripled their W-2 wages.  And the only

3    reason that is being done, I think we can all agree, is

4    because Jones recognizes that he's not going to be able to

5    take equity draws for the next five years.

6          He's never received a salary higher than 640,000.

7    I think it's mostly been less than that and I think it -- I

8    think we heard from Mr. Schleizer that in 2022 it has to be,

9    the prepetition period leading up to this cases has to be

10   the most relevant benchmark for what is reasonable when we

11   think about facts and circumstances under 503(c)(3) and the

12   evidence before you, $331,000.  That's less than he's

13   getting paid already under the current cash collateral

14   order.

15         And who set those amounts?  Nobody can come up

16   with anybody other than Mr. Jones that would have had the

17   decision making authority at FSS to determine how much his

18   salary was.  To ignore that, I think would be to put our

19   heads in the sand.  Mr. Jones determined himself that an

20   annual salary in 2022 of less than 350,000 was sufficient.

21         I won't go through the history here, Your Honor,

22   of the employment motion being filed and not prosecuted and

23   then coming forward on this budget.  I do think that

24   procedurally this is all very funny and I would also say

25   it's very unclear to me whether FSS has already made a

1   payment to Mr. Jones of $60,000, which in my view would be

2   in violation of Section 503.

3          But in any event, there's no basis for the Court

4   to approve it here today.  We believe first and foremost

5   that this is not an ordinary course transaction.  I'm not

6   going to dwell on that, but there's obviously no evidence

7   before you that he's ever received any type of W-2 wages

8   commensurate with this.  There's no evidence that he's ever

9   had an employment contract with FSS.

10         We cite a case in our employment agreement

11  objection, Graham v. Waverly.  This is a Judge Wiles

12  decision out of the Southern District of New York in 2021

13  that says, "Salary increases to a CEO are not ordinary

14  course."  I think that's doubly true given the magnitude of

15  the increase we're talking about here.

16         So if this is not an ordinary course transaction,

17  we all agree that Jones is an insider, it's very clearly

18  governed by Section 503.  Your Honor knows the history, I'm

19  sure, of 503, that Congress passed that in 2005 as part of

20  the BAPCPA amendments, that they intended to "eradicate the

21  notion that executives are entitled to bonuses simply for

22  staying with the company."  We cited several cases in our

23  papers, including out of this district, the Country Fresh,

24  the Pilgrim's Pride, and the General Homes case.

25         So if we're governed by Section 503, and I think

1   this is important, the Debtor has cited no case to the

2   contrary.  There is not a single case that has been cited to

3   you that says that you could approve this under Section 363.

4   We've cited numerous cases saying it's governed by Section

5   503.  So let's talk about 503 quickly.

6           We believe this is governed by Section 503(c)(1).

7   We believe the purpose here is to retain Jones.  We believe

8   there's no evidence -- I think this is undeniably true --

9   that the Debtor here has met any of the criteria of Section

10  502(c)(1), including that he has a bona fide job offer.  You

11  heard he doesn't.  So, the only issue under 503(c)(1) is

12  whether or not the purpose of this increased payment is

13  retention.

14          So, what did you hear today about why this is

15  being done?  Why now?  Why, after being in bankruptcy for 11

16  months, have we finally decided that enough is enough.  I

17  need more money.  What we heard was, we need him in the

18  chair.  When he's not on air, the profits drop.  We don't

19  disagree with any of that, Your Honor.  I a hundred percent

20  agree that the value of FSS is tied to Mr. Jones working for

21  FSS.

22          But that is not the question under 503.  Question

23  is, what are we doing?  And I think the negative implication

24  of everything you heard today is that Jones may leave.  He

25  may say, I've had enough.  I'm not going to get any equity

1   draws out of this company for the next five years and I'm

2   only getting $500,000 a year.  Now, yeah, that's more than I

3   received in W-2 wages in 2022, but I want more.

4           What else is FSS getting?  They're not even

5   getting a contract, Your Honor.  They're not even getting a

6   firm commitment.  They're not getting a covenant not to

7   compete.  They're literally just saying, we're going to pay

8   you more and you are required to do nothing in return.  So,

9   in the absence of any compelling indication that this is

10  being done for incentive purposes, that this is tied to any

11  type of metrics, I believe the only rational conclusion that

12  it's being done to retain him, which is exactly what

13  503(c)(1) prohibits.

14          But if we go to 503(c)(3), then that first of all,

15  I think you'd have to make a decision that the purpose of

16  this salary increase is not retention, because that'd be

17  governed by C1.  But then, you go to the facts and

18  circumstances test.  Now, in the employment agreement

19  motion, not a single argument was made for how they passed

20  muster under 503.  In the cash collateral notice, not a

21  single argument was made.

22          Today at the hearing, I have not heard a single

23  argument for why this passes muster under 503(c).  But let

24  me tell you why I think it does not pass muster on the facts

25  and circumstances test.

1          First of all, I believe the purpose here is to

2     subvert the intent of Subchapter V.  As I said, we're

3     replacing equity draws with salary.  You heard very clearly

4     that when I'm -- when Mr. Magill is thinking about what is

5     the appropriate amount to pay Jones, he's saying, well, let

6     me figure out what you used to get in your equity draws.

7     Let me get you some of that back.

8          Now, the Bankruptcy Code says the net disposable

9     income goes to creditors.  If you just apply that as a firm

10    rule, you wouldn't include any of that.  But they're very

11    clearly saying, well, we should consider some portion and

12    here they're saying some portion is a million dollars a

13    year.  A million dollars a year of what used to be equity

14    income is now going to become W-2 wages.

15         So, what we're doing is we are increasing the

16    fixed operating costs of FSS and decreasing the net

17    disposable income.  That is, I submit, anathema to the

18    purposes of Subchapter V and I think it cuts against any

19    argument that the facts and circumstances of these unique

20    cases support it.

21         The other part of the facts and circumstances test

22    I think is important is that there's no guardrails on what

23    happens to this extra money.  Mr. Jones gets an extra, under

24    this construct, what, $60,000 a month?  Creditors of Mr.

25    Jones, we are deeply concerned that that will be squandered.

1   From August to October, Mr. Jones spent $242,000 on personal

2   expenses; $80,000 a month.  Very quickly, $12,000 on

3   housekeeping.

4           THE COURT:  I'm not interested in any of that

5   argument.

6           MR. KIMPLER:  Your Honor, if I could just --

7           THE COURT:  No --

8           MR. KIMPLER:  -- shot here.  The facts and

9   circumstances suggest what is unique about this case that

10  requires a departure from what Congress said in 2005?  What

11  -- that you're not supposed to give these types of increased

12  to executives.  So, what are the facts and circumstances?

13  FSS has traditionally not paid this and Mr. Jones, to our

14  view, doesn't need the money, but I hear you, I'll move on.

15          THE COURT:  Thank you.

16          MR. KIMPLER:  The last thing, Your Honor.

17  Confirmation is three months from now.  What are the facts

18  and circumstances that require you on this record to make a

19  decision today?  What is the pressing need here?  The facts

20  and circumstances should say that there is some unique thing

21  about this case that requires you to act today.  I don't see

22  any reason these issues couldn't be taken up at

23  confirmation.  Maybe we'll know more at the time we get to

24  confirmation about what's happening to FSS and Mr. Jones,

25  what Mr. Jones wants to do.

1        Maybe some of these issues will be obviated.  If

2    not, they're free to say that to go forward, they need this

3    level of compensation.  Maybe they'll have an actual

4    contract they're seeking approval of.  But I see no reason

5    that between now and February, this issue has to be decided.

6    And I think the only inference for why it does, is again,

7    one that signals what's going on here as a retentive

8    purpose.

9        Your Honor, that's all I have.  Thank you very

10   much.

11       THE COURT:  Thank you very much.

12       MR. KIMPLER:  Happy to answer any questions.

13       MR. BATTAGLIA:  Let me respond to what Mr. Kimpler

14   said, at least some of it.  You know, it's interesting that

15   this is a left pocket, right pocket issue.  The money is not

16   escaping the sphere, whether it's Alex Jones or Free Speech

17   Systems.  At the end of the day, it's staying in a

18   bankruptcy estate, and I heard guardrails and I sit here and

19   I'm trying to remember what pleading the Committee or the

20   plaintiffs have filed in the Jones case saying, you're

21   overspending.

22       Now, there's some, some reservation of rights, but

23   have they addressed with you that they think that what Mr.

24   Jones is spending and what he's spending it on is

25   inappropriate?  Have they come forward with all of these

1      lawyers sitting here and the dozens more back in their

2      offices and said, you know what, he's overspending?  This is

3      a right pocket, left pocket issue that for my estate's

4      purpose, where the money goes after I pay it is not my issue

5      and shouldn't be my issue and can't be my issue.

6              It's theirs apparently, but they don't -- where

7      have they been?  Where have they been?  So, you know, let's

8      talk about 503(c)(1) first of all.  There's no evidence

9      there's a retentive purpose here.  Here's what the evidence

10     is, is that for reasons that really have nothing to do with

11     Mr. Jones, he's been under compensated since July of 2022.

12     And we hear that $330,000 number.  It's depressed because

13     the creditors kept him from getting more in the cash

14     collateral orders from July through the end of the year.

15             It was either 10,000 per pay period or 20,000 per

16     pay period.  So they've created a number of their own

17     creation and now they want to beat Mr. Jones and Free Speech

18     Systems up with that number.  And ultimately, as Mr. Magill

19     has testified, that's not the point.  The point is

20     historical compensation for this gentleman is substantially

21     greater, substantially greater than what we're proposing to

22     pay him.

23             Yes, it's coming instead of on his Schedule C in

24     his tax return, which it's historically been shown as, it's

25     going to show up on his 1040.  And he's going to get a W-2

1    for it.  That that's a distinction of no difference as far

2    as I'm concerned.  What's fair and appropriate compensation

3    for the contribution that this man makes?

4            And you have no evidence that there's any

5    retentive purpose, that the purpose here is that he's been

6    under compensated for reasons not -- that he's not

7    responsible for, that efforts have been made since before

8    May to try to adjust this inappropriate level of

9    compensation, and I can't go into settlement conversations,

10   but I'll tell you that the Committee has been responsible

11   for the delays since May of trying to remedy this issue.

12           And now, they're telling you by God, they haven't

13   even come before you with an employment contract.  Where's

14   the employment contract?  The same one that they oppose.

15   They don't want the employment contract.  They recognize

16   that he's vitally important to the business, but they're

17   opposed to an employment contract that compensates him

18   fairly.

19           So I don't think 501(c)(1) is relevant here.  It's

20   not a retentive purpose.  Facts and circumstances, well,

21   facts and circumstances arbitrarily under compensated,

22   substantially under compensated for a long period of time.

23   Efforts made by the FSS Debtor over a substantial period of

24   time, try to remedy this situation that have fallen on deaf

25   ears or been opposed.  And so, Mr. Magill, because he wants

1    to compensate all of his employees fairly, has included it

2    in a budget and been as transparent as he can be by showing

3    it to parties from cash collateral orders since June,

4    there's a reference of trying to raise it.  And now, he's

5    just decided we can't -- we just can't wait forever.

6           We've already waited some six or seven months

7    since this issue has been brought before the parties to this

8    case, and the time is now.  So, Your Honor, we think the

9    facts and circumstances tests are met, if it's required to

10   be met, 501(c)(1) is not relevant because there's no

11   evidence before the Court of a retentive purpose and try as

12   they might to say that that's their opinion of what it is,

13   the evidence is to the contrary.

14          THE COURT:  Thank you.

15          MR. BRIMMAGE:  Your Honor, just briefly.

16          MR. BATTAGLIA:  I'm sorry, Mr. Brimmage represents

17   the Creditors Committee in the Jones case.  He has no

18   standing to be present --

19          THE COURT:  Did you file an objection, Mr.

20   Brimmage?

21          MR. BRIMMAGE:  We did not.  That's what I wanted

22   to point out.  I heard a lot of vitriol pointed towards the

23   Committee.  The Committee has not weighed in on this.  And

24   that's all I wanted to remind the Court, despite -- I mean,

25   Ms. Brauner is over here kicking me, not letting me stand

1    up, but if I had my way, I would.

2              THE COURT:  thank you.

3              MR. BRIMMAGE:  But I just wanted to draw the

4    distinction, Your Honor.

5              THE COURT:  Okay.  Anyone else wish to be heard?

6    All right, so before the Court is the consideration of

7    motion to use cash collateral and in the Free Speech case.

8    I think we ought to be clear about that, 22-60043.  I would

9    note -- I may hold the record for this, but I'm hoping not

10   to -- there have been 16 interim orders that have been

11   entered in connection with this, for the use of cash

12   collateral.  I probably do hold it under a Subchapter V for

13   that.

14             But this case is unique and the facts and

15   circumstances of these cases are unique.  Let me just lay

16   out some law and I'll -- and then I'll kind of -- so, what

17   is the use of cash collateral?  Technically we're here

18   because Section 363(c)(2) of the Bankruptcy Code says that

19   the Debtor can't use cash collateral unless the entity that

20   has an interest in such cash collateral consents, and we

21   actually have consent here today.

22             So technically, the Debtor can use cash

23   collateral.  The reason that we're here is that the budget

24   is separate.  The Debtor can't use it for any purpose, but

25   the Debtor is authorized to use cash and the secured lender

1    has no objection to the cash that is being proposed in the

2    budget.  But technically, that's why we're here.  So, the

3    question is, is there anything in the budget itself, secured

4    creditor consents, but is there anything in the budget that

5    the Bankruptcy Code itself says can't be used for that

6    purpose?

7            So in other words, there can be consent under

8    Section 363.  The cash can be used, but it can't be used for

9    a purpose that runs counter to anything in the Bankruptcy

10   Code.  So what is being asked today is to increase Mr.

11   Jones' budgeted salary from what has been about 20,000

12   biweekly to a little over 57,000 biweekly.

13           The Court has considered the evidence before me

14   and if the salary is going to be approved, here's -- I think

15   the objecting parties are raising the fact that this may

16   violate Section 503 of the Bankruptcy Code, and what does

17   503 of the Bankruptcy Code say?  It says, after notice and a

18   hearing -- and after notice and a hearing, the term notice

19   and a hearing is defined in section -- is construed under

20   Section 102 of the Bankruptcy Code.

21           So notice -- it's a construction term -- that

22   talks about after appropriate notice under the

23   circumstances, the Court can allow payments, administrative

24   post-petition bankruptcy payments, but they can't violate

25   503(c).  So, the question, what does 503(c) say?  It says

1    they can't be allowed nor paid any transfer made to the

2    benefit of an insider of the Debtor for the purpose of

3    inducing them to stay.

4          So question is, you know -- and then C3 would say,

5    there shall not be allowed nor paid any other transfer

6    that's outside of the ordinary course of business and not

7    justified back -- based on the facts and circumstances of

8    the case.

9          The word transfer is defined in Section 101 of the

10   Bankruptcy Code to determine any mode of disposition of

11   property, whether direct or indirect.  Here, we're talking

12   about payment of cash, so there, it would be a transfer of

13   property.

14         Question is, does any of this violate the code?

15   Notice what we're here for.  I'm going to make a couple of

16   points.  We're here on the use of cash collateral.  That's

17   what today's hearing was about.  There's been proper notice

18   of the use of cash collateral.  I don't think there's been

19   proper notice and hearing, appropriate notice of the

20   circumstances of essentially doubling or maybe more than

21   doubling the proposed salary for Mr. Jones.  Right?

22         Is that appropriate notice and hearing of that

23   line item?  I don't think so.  All right.  That's really

24   what's being asked for me here, but it's a completely

25   separate code provision.  We have notice of the use of cash

1    collateral.  That's been consented.  That's been approved.

2    This budget has been out.  The notice has been out for a

3    little over, like, 23, 24 days.  I don't think that's enough

4    notice because we don't know the details.  It was just a

5    line item.

6            That's all that we had before today was notice of

7    a line item to increase salary for over two-and-a-half times

8    with no followup documentation, no statement that Mr. Jones

9    is going to be an at-will employee.  No notice of that

10   Debtor didn't believe it violated Section 503 of the

11   Bankruptcy Code, and the Debtor may be operating in its best

12   interest, but the Bankruptcy Code has something to say about

13   this.  And so the question is, what's the evidence before

14   the Court?

15           What's being asked is to approve about a $1.5

16   million salary, right, a little over 57,000 on a biweekly

17   basis with no contract on the terms that it's going to be

18   at-will, based on historical compensation of which I have no

19   evidence of other than testimony of mister -- of the CRO and

20   Mr. Jones's personal financial advisors.  I think they're

21   being honest, but I have no evidence to know.  I don't know

22   what Jones was paid historically.  There's no evidence here.

23   Nobody submitted a document today and today was the day

24   everybody wanted to go forward with evidence.

25           So is there proper notice of today's -- of a 503

1    request for an admin claim?  No.  That's why I said, we

2    should come back in two weeks.  You could have came back on

3    short notice.  There was a motion out there.  Everybody

4    could have came back and asked for the very relief requested

5    today on notice, providing evidence, giving parties notice

6    of what the terms are that is going to be contemplated, so

7    that parties have the ability to contemplate it.

8            No evidence of any of this.  There's just a line

9    item and we find out today what that line item consists of.

10   So, there's not notice of -- there's not proper notice of a

11   503 request, and that's what we have.  So, we don't even get

12   to 503(c)(1) or (c) -- there's not even enough notice of a

13   hearing requesting approval of an admin claim, right?  But

14   then let's go further.

15           You know, is there a retentive base to it?  I

16   don't know.  It doesn't sound like it based on the evidence,

17   but the counter is also, is just as frightening, right?

18   We're going to increase someone's salary 2X, 3X, 2.5X of

19   what's traditionally been paid during the case, maybe not

20   historically, but certainly during the course of the case,

21   2.5, with no assurances that someone's going to stay for any

22   longer than a week.  No assurances, that we have any

23   assurance that Mr. Jones would even agree to the amount

24   that's been paid.

25           I have evidence that prebankruptcy, Mr. Jones was

1    compensated through a combination of a W-2 and profit

2    sharing.  I don't -- I can't understand how it's the

3    ordinary course of business, right, to then change and come

4    up with an at-will agreement where there's no structure

5    behind that payment and we're just going to pay it based

6    upon Mr. Magill saying that he thinks that that's fair

7    compensation.

8          It didn't sound like ordinary course of business

9    to me.  It sounds like Mr. Magill is trying to get Mr. Jones

10    compensated, and I've got no issues with that.  I really

11    don't and I think Mr. Jones is entitled to fair market

12    compensation, but we need a hearing on that.  We need

13    evidence on what he was traditionally paid and what's fair

14    market value for someone, Mr. Jones.  I don't know what it

15    is.

16          It sounds like 20,000 every -- you know, biweekly

17    isn't enough and he's certainly based on the amount that

18    he's generating, I certainly think he'd be entitled to more,

19    but we don't have any evidence.  We don't have evidence.

20    There's no documents here and I'm being asked to approve a

21    million-and-a-half dollar salary based upon -- without a

22    shred, a document to show what the historical prepetition

23    practice was.  There's no baseline here.  It's testimony.

24    That testimony isn't supported by any documentary evidence.

25          This violates -- it may violate 503(c)(3).  I

1   don't have any evidence that it doesn't and the Bankruptcy

2   Code says you can't allow or pay it until I can prove that

3   it's not out of the ordinary course of business.  You know,

4   Mr. Magill may I have a view of what he can do and raise

5   salaries in the ordinary course of business.  Ordinary

6   course of business is a tricky term.

7           Ordinary course of business during the case,

8   ordinary course of business based on historical practices

9   that the company did prepetition?  Can't start changing

10  stuff in bankruptcy that wasn't happening before bankruptcy.

11  That's the -- that's where this is going.  You can -- right?

12  You can continue to sell in the ordinary course of business.

13  You continue to pay salaries in the ordinary course of

14  business, but you change terms, you increase numbers, you

15  change the way compensation is structured, you still have to

16  come to Court and people -- notice and a hearing on it.

17          And when it comes to insiders, 503 says you've got

18  to hold a hearing and you've got to make sure that before

19  this is allowed or paid that it's not for a retentive --

20  it's not for a retentive basis and it's not -- it's, right,

21  based on the facts and circumstances.  I don't have any

22  facts and circumstances to justify this, but I'm open to it.

23  I just don't think we have it today and today is not the

24  vehicle to try to shove this through.

25          The problem that we have.  This -- today is about

1    the use of cash collateral and there have been, I know, 16

2    interim orders.  The 17th threatens to look a little

3    different, a lot different, based upon the evidence.  I

4    agree with Mr. Battaglia wholeheartedly.  FSS has to

5    exercise its business judgment as FSS and Mr. Jones is the

6    talent.  There's no question about that and there's no

7    dispute about that at all.

8          The only way FSS makes money is if Mr. Jones hosts

9    the show.  That's been the -- that's been true since the

10   beginning of this case and the numbers justify it.  There's

11   no question about that.  I just think you got to come back

12   and ask.  I think we've got to make sure that the code is

13   satisfied.

14         So I'm, you know, based upon the evidence that

15   I've heard, you know, it sounds like, you know, around

16   $650,000 has been prepetition.  That's what he was getting

17   paid.  And I know Mr. Kimpler told me that it could be

18   lower, 300K.  I don't have any evidence of that, but there

19   was a lot of discussion and no one seemed to dispute that

20   650 was the right number prepetition, somewhere in that

21   ballpark.  So I'm okay with going up to that number.

22         I don't want to do the -- I'll let the CRO do the

23   biweekly math on what that number is, but if you want to go

24   higher, just come back and file a motion and ask for -- ask

25   for it.  Ask for, you know, but get me comfortable that this

1    is -- like, I don't know if it's business judgment without

2    knowing that Mr. Jones is even going to accept the money or

3    want to come back two weeks later.

4            I'm not saying that he will or he won't.  I'm just

5    saying I don't have any -- one way or the other and I think

6    there's a way to fairly compensate insiders, and look.

7    People can agree or disagree with what I'm saying.  It's not

8    really my concern.  My concern is just following the code

9    and making sure that there's been proper notice and hearing

10   and pushing all the -- making sure that we're following

11   process.  Today is just about the use of cash collateral.

12   And I'm going to authorize a budget that says this number.

13           If I then ultimately allow a different number, we

14   can -- that sounds like the budget can be easily reflected

15   because it sounds like PQPR is going to consent to that

16   number, if it falls within -- at least within the 1.5.

17   They're not consenting to it today.  Let's just figure out

18   if that's the right number.  But it's got to be based more

19   on -- today is not the procedural vehicle to go through this

20   and I don't have the evidence to get me comfortable that

21   503(c) was even on the table today for a hearing and that we

22   followed the code.

23           It's the code that's speaking today and it's only

24   my duty to follow it as faithfully as possible.  And I think

25   that's what I'm doing today, so I'm going to deny -- I'm

1  going to grant the use of cash collateral and I'm going to

2  approve it subject to a budget of whatever.

3           MR. BATTAGLIA:  $25,000, Your Honor.  That's 650

4  divided by --

5           THE COURT:  I'll let you all do the math on what

6  that number comes to.

7           MR. BATTAGLIA:  Your Honor, may I revise the

8  budget --

9           THE COURT:  Yeah.

10          MR. BATTAGLIA:  -- upload an order?

11          THE COURT:  And upload an order and I'll approve

12  that.  And again, if you all want to have a hearing on any

13  of the motions that you filed, any motion to approve the

14  employment agreement or any -- we'll take it up on two

15  weeks' notice and I've got no issue taking those motions up.

16  Parties have the right to seek relief requested.

17          And again, I'm not against holding Mr. Jones to a

18  higher -- to granting him a higher number.  It just has to

19  be processed in terms of where we are today.  And, so I'm

20  not denying anything.  I'm just saying what I would grant

21  based upon the record before me today in terms of the use of

22  cash collateral.

23          MR. BATTAGLIA:  Your Honor, the form of order

24  tracks the others and set a hearing date.  I don't know,

25  after the September hearing you sort of changed things with

1    --

2              THE COURT:  Yeah --

3              MR. BATTAGLIA:  -- like (indiscernible).

4              THE COURT:  If it's up to me, we do something in

5    January.

6              MR. BATTAGLIA:  But my budget runs through the end

7    of December.

8              THE COURT:  Well, then you'll -- well, no, no.

9    Well, then you'll something to the end of December.  If you

10   can work something out, just kind of --

11             MR. BATTAGLIA:  I'm happy to do like I did in

12   November with the budget numbers being at this -- the salary

13   number at 25, to submit a notice before the end --

14             THE COURT:  I'm okay with that, if it stays

15   consistent.  I'm okay with that.

16             MR. BATTAGLIA:  I get consent from the --

17             THE COURT:  Subject -- yeah.

18             MR. BATTAGLIA:  -- creditor.  I'll do that and

19   then we can set a hearing.

20             THE COURT:  And then we can talk early January,

21   but I would ask that sometime this week, a scheduling order,

22   just get it uploaded and just let Ms. Saldana know where we

23   are about that.

24             MR. BATTAGLIA:  And I've got an order I need,

25   that's passed the negative notice.  I'll discuss with Ms.

```
 1  Saldana.

 2             THE COURT:  You got it.  I have signed and Ms.

 3  Driver, on the rejection motion, what I was able to do was

 4  kind of delete the first two boxes but then move the

 5  (indiscernible) box up, so it's the only contract and I just

 6  changed it to contract as opposed to contracts, and I signed

 7  that order.

 8             MS. DRIVER:  Thank you, Your Honor.

 9             THE COURT:  All righty?  Anything else we need to

10  take care of today?

11             MR. BATTAGLIA:  No, sir.

12             THE COURT:  All righty, folks.  Thank you very

13  much.  Have a good day.

14             CLERK:  All rise.

15         (Proceedings adjourned at 4:48 p.m.)

16

17

18

19

20

21

22

23

24

25
```

1                              <u>CERTIFICATION</u>

2

3       I certify that the foregoing is a correct transcript from

4       the electronic sound recording of the proceedings in the

5       above-entitled matter.

6

7       *[signature: Sonya M. Ledanski Hyde]*

8

9

10      Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20      Veritext Legal Solutions

21      330 Old Country Road

22      Suite 300

23      Mineola, NY 11501

24

25      Date:  December 4, 2023