```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3    ALEXANDER E. JONES and        )  CASE NO: 22-33553-cml
      OFFICIAL COMMITTEE of         )
 4    UNSECURED CREDITORS,          )  Houston, Texas
                                    )
 5              Debtor.             )  Tuesday, September 24, 2024
                                    )  2:31 PM to 3:06 PM
 6    ------------------------------)
                                 HEARING
 7

         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
 8              UNITED STATES BANKRUPTCY JUDGE
      APPEARANCES:
 9

      For Chapter 7              CHRISTOPHER R. MURRAY
10    Trustee:                   Jones Murray LLP
                                 602 Sawyer Street, Suite 400
11                               Houston, TX 77007
                                 832-529-1999
12

      For Christopher            ERIN JONES
13    Murray, Chapter 7          Jones Murray LLP
      Trustee:                   602 Sawyer Street, Suite 400
14                               Houston, TX 77007
                                 832-529-1999
15

                                 JOSHUA WOLFSHOHL
16                               Porter Hedges LLP
                                 1000 Main Street, 36th Floor
17                               Houston, TX 77002
                                 713-226-6000
18

      For U.S. Trustee:          HA MIN NGUYEN
19                               Office of the United States Trustee
                                 515 Rusk Street, Suite 3516
20                               Houston, TX 77002
                                 202-590-7962
21

      For Free Speech            ANNIE E. CATMULL
22    Systems, LLC:              O'Connor Wechsler PLLC
                                 4400 Post Oak Parkway, Suite 2360
23                               Houston, TX 77027
                                 281-814-5977
24

25
```

```
 1   For Texas Plaintiffs      AVI MOSHENBERG
                               Lawson & Moshenberg PLLC
 2                             801 Travis Street, Suite 2101, #838
                               Houston, TX 77002
 3                             903-316-9155

 4                             JARROD MARTIN
                               Chamberlain Hrdlicka
 5                             1200 Smith Street, Suite 1400
                               Houston, TX 77002
 6                             713-356-1280

 7   For PQPR Holdings         RHONDA MATES
     Limited, LLC:             Streusand Landon Ozburn Lemmon LLP
 8                             1801 S. Mopac Expressway, Suite 320
                               Austin, TX 78746
 9                             512-236-9900

10   For Connecticut          KYLE KIMPLER
     Plaintiffs:              ALAN HALPERIN
11                             Paul Weiss
                               1285 Avenue of the Americas
12                             New York, NY 10019
                               212-373-3253
13
                               RYAN CHAPPLE
14                             Cain & Skarnulis PLLC
                               303 Colorado Street, Suite 2850
15                             Austin, TX 78701

16   For BlackBriar           VICKIE L. DRIVER
     Advisors, LLC:           Crow & Dunlevy, P.C.
17                             2525 McKinnon Street, Suite 245
                               Dallas, TX 75201
18                             214-420-2142

19   Court Reporter:          ROSARIO SALDANA

20   Courtroom Deputy:        ZILDE MARTINEZ

21   Transcribed by:          Veritext Legal Solutions
                               330 Old Country Road, Suite 300
22                             Mineola, NY 11501
                               Tel: 800-727-6396
23


24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

1                                    INDEX

2    PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3

4

5

6    GOVERNMENT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

7

8

9

10

11   PLAINTIFFS' EXHIBITS                              RECEIVED

12

13

14

15   GOVERNMENT'S EXHIBITS                             RECEIVED

16

17

18

19

20

21

22

23

24

25

1       HOUSTON, TEXAS; TUESDAY, SEPTEMBER 24, 2024; 2:31 P.M.

2                          (Call to Order)

3           THE COURT:  Afternoon, everyone.  This is Judge

4    Lopez.  I thank everyone for patience today.  I'm going to

5    call the -- what is the 2:00 p.m. case?  23-33553, the Alex

6    Jones case here in connection with a motion to sell.

7               Why don't I take appearances in the courtroom and

8    then I'll take appearances from folks online.  If you wish

9    to make an appearance, I would ask that you please hit five-

10   star.  Okay.

11          MR. MURRAY:  Good afternoon, Judge.  Chris Murray,

12   Chapter 7 Trustee.

13          THE COURT:  Okay.  Good afternoon.  Mr. Nguyen,

14   good afternoon.

15          MR. NGUYEN:  Good afternoon, Your Honor.  Ha

16   Nguyen for the U.S. Trustee.

17          THE COURT:  Okay.

18          MS. JONES:  Good afternoon, Your Honor.  Erin

19   Jones for Christopher Murray, Chapter 7 Trustee.

20          THE COURT:  Okay.  Good afternoon.

21          MR. WOLFSHOHL:  Good afternoon, Your Honor.

22   Joshua Wolfshohl for Christopher Murray, Chapter 7 Trustee.

23          THE COURT:  Okay.

24          MS. CATMULL:  Good afternoon, Your Honor.  Annie

25   Catmull, C-A-T-M-U-L-L, here on behalf of O'Connor Wechsler

 1    PLLC.  Thank you.

 2           MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi

 3    Moshenberg here on behalf of the Texas plaintiffs.

 4           THE COURT:  Okay.  On the line I've got a 512

 5    number.  Ms. Mates, you may have muted yourself.

 6           MS. MATES:  I did.  Thank you.  Rhonda Mates on

 7    behalf of PQPR.

 8           THE COURT:  Okay.  There's a 214 number.

 9           MS. DRIVER:  Good afternoon, Your Honor.  Vickie

10    Driver on behalf of Alex Jones.

11           THE COURT:  Good afternoon.  There's an 832

12    number.

13           MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

14    Martin also with Avi Moshenberg for the Texas families.

15           THE COURT:  Okay.  And a 212 number.

16           MR. KIMPLER:  Good afternoon, Your Honor.  Kyle

17    Kimpler on behalf of the Connecticut Plaintiffs.  I am

18    joined with my co-counsel, Ryan Chapple and (indiscernible).

19           THE COURT:  Okay, good afternoon.  Anyone else who

20    wishes to make an appearance?  I would ask that you just

21    please hit five-star, and I will unmute your line.  Other

22    than that, I will turn to Mr. Murray.  Good afternoon.

23           MR. MURRAY:  Good afternoon, Judge.  We've got two

24    things on for today.  We have a status in the PQPR

25    adversary, and then we also have a hearing on my motion to

1    wind down FSS.  And unless Your Honor prefers a different

2    course, Mr. Wolfshohl was going to handle the sale motion

3    hearing first, and then Ms. Jones could handle the status

4    update on PQPR.

5         THE COURT:  Okay with me.

6         MR. WOLFSHOHL:  And, Your Honor, I think while

7    this is probably largely legal in nature, the objection that

8    the U.S. Trustee filed, the way I would suggest we proceed,

9    unless there is any issue with this, is that I simply

10   proffer the Trustee's testimony.  Most of what I think he is

11   going to say through the proffer is my argument.  Happy to

12   proceed that way.  Happy to make opening arguments.  It

13   doesn't matter to me.  I want to just move the thing along.

14        THE COURT:  Mr. Nguyen?

15        MR. NGUYEN:  No objection to Mr. Wolfshohl's

16   suggestion.

17        THE COURT:  Okay.  Mr. Wolfshohl, you're going to

18   proffer the testimony of Mr. Murray.

19        Mr. Murray, why don't you stand up.  Raise your

20   right hand.  Do you swear to tell the truth, the whole

21   truth, and nothing but the truth?

22        MR. MURRAY:  I do.

23        THE COURT:  Okay.  We will proceed by proffer.

24   Counsel is going to make statements.  I'm going to ask you

25   if they are true and correct, if there's any corrections you

1    would make.  You would be adopting the proffer as your

2    testimony.  Do you understand that?

3                    MR. MURRAY:  I do.

4                    THE COURT:  Okay.  Mr. Wolfshohl, you may proceed.

5                    MR. WOLFSHOHL:  Thank you, Your Honor.  First off,

6    can we -- the Trustee would like to move to admit Exhibits 1

7    through 16.  They were filed on the docket at Docket Number

8    847.

9                    THE COURT:  Any objection to the admission of 1

10   through 16 at 847?

11                   Okay, they are admitted.

12                   (Exhibits 1 through 16 admitted into evidence)

13                   MR. WOLFSHOHL:  Thank you, Your Honor.  If called

14   to testify, the Trustee would testify that when he was

15   appointed, shortly after he was appointed, Your Honor

16   entered a dismissal order for FSS.  Referring to FSS, Your

17   Honor understands that that's Free Speech Systems.

18                   Upon that dismissal order getting entered, the

19   Trustee analyzed the dismissal order, understood that from

20   the dismissal order, the Court was retaining jurisdiction

21   over certain matters and was also specifically delineating

22   certain things that the Trustee was to do, including taking

23   control over cash of the estate.  And the Trustee believed

24   at the time and still believes that that was within the

25   Court's authority to do that.

1            The Trustee immediately upon his appointment began

2     discussions with the various parties in the case to

3     primarily focus on how to deal with the FSS entity and how

4     to essentially wind the company down.  Those parties

5     included the Texas and the Connecticut plaintiffs.  The

6     Debtor and the Debtor's representatives -- and when I say

7     the Debtor, I am talking about Alex Jones specifically.

8     The FSS professionals, PQPR, which Your Honor I think -- I

9     believe you understand that they assert a lien on certain

10    assets of FSS -- as well as numerous prospective buyers and

11    bidders.

12            The Trustee also consulted with Tranzon and 360,

13    the entities that he has gotten the Court to enter an order

14    approving the retention of in connection with the sale

15    process.  He visited the FSS studios with Tranzon and he

16    communicated with Tranzon about various things that they

17    needed in order to basically put a bid package together.

18    Information gathering, diligence, creating marketing

19    materials.  Like I said, putting together bid packages and

20    also setting up a process for communicating with parties who

21    had inquiries about the assets and were interested in

22    potentially participating in an auction process.

23            That was an iterative process.  There were

24    continuous over the course of several weeks communications

25    with Tranzon about how that process would look.  The trustee

1    also analyzed the various information that he was getting

2    from the various parties as well as from prospective bidders

3    to determine what the highest and best -- what the process

4    that would yield the highest and best result for creditors.

5            The Trustee is asking the Court for authority to

6    winddown FSS through an orderly auction and sale process.

7    The Trustee believes that's consistent with the FSS LLC

8    agreement, Your Honor.  The operating agreement is at

9    Exhibit 3.  He also believes it's consistent with state law

10   as well as the Court's prior order and statements made by

11   the Court on the record.

12           The auction process that the Trustee is asking for

13   approval to proceed with is multi-phase.  It starts with a

14   sealed bid process for the IP assets.  And then depending on

15   what the result of that is, there might be an actual auction

16   process with the IP assets.

17           THE COURT:  Can you make a distinction between the

18   IP assets that you're describing?  And I know that Mr. Jones

19   wanted a clarification about certain other IP assets.  I

20   just want to make sure that there's clarity what I'm being

21   asked.  I know that there's some language in the order that

22   kind of clarifies it, but perhaps you can clarify it now.

23           MR. WOLFSHOHL:  Sure, Your Honor.  And if I don't

24   clarify it correctly, I will let Mr. Murray correct me.

25           But the idea is that we are selling in this

1    process -- and it's not that we won't come back to Your

2    Honor to discuss selling intellectual property assets of

3    Alex Jones --

4             THE COURT:  For purposes of what I'm being asked

5    for today.

6             MR. WOLFSHOHL:  Today it would be intellectual

7    property of FSS.

8             THE COURT:  Okay.

9             MR. WOLFSHOHL:  And so that is the clarification.

10   I think that's what we included in the redline that we

11   uploaded today, Your Honor.  I don't know if Mr. Murray has

12   anything different to say about that.

13            THE COURT:  I just want to make sure that there's

14   clarity that -- I'm reading the proposed order.  It says

15   that you're not going to sell or purport to sell any

16   personal IP of Mr. Jones.  So I'm understanding if it comes

17   to the point where there's someone disagreeing that someone

18   would then come to me and then I can sort out whether this

19   is -- what bucket it goes.  But it's not your intention I

20   think to sell personal IP.

21            Go ahead, Mr. Murray.

22            What I'm trying to do is just make sure to

23   anticipate, provide some level of clarity so that we have a

24   level playing field.

25            MR. MURRAY:  So for today I am seeking authority

1    to sell the IP that FSS owns.  There is some concern from

2    Mr. Jones that he is asserting rights to personal IP that

3    are not alienable in his view.  I am not today seeking

4    authority to sell any IP owned in the Chapter 7 estate

5    directly.  I anticipate filing a motion soon to add

6    potentially IP from the individual estate to the sale

7    process.  And that's in response to some requests I've

8    gotten from potential bidders.  I don't think that's for

9    today.

10           It's also my intention when we do that to reserve

11    all of Mr. Jones' rights, whatever they are.  I don't intend

12    to litigate ownership of the IP as part of this process; I'm

13    simply trying to sell what I have.

14           THE COURT:  Understood.  Thank you.

15           MR. WOLFSHOHL:  Thank you, Your Honor.  And the

16    process would then, after the actual auction of the IP

17    assets, there would be what we were referring to in the

18    motion as remaining assets auction, which would include

19    certain things like hard assets as well as other assets that

20    are -- personal property that's located at the FSS studios.

21           Your Honor, the Trustee is also asking for

22    permission to pay fees and commission out of the FSS cash so

23    that the FSS cash -- because this process obviously is being

24    done for the benefit of FSS and its creditors that the costs

25    of that be allocated to FSS.  That includes the 326 trustee

1    fee.  And in our reply brief we tried to address what we

2    believe is the law that supports a 326 fee based on that

3    disbursement.

4          THE COURT:  I think you all are looking at this

5    wrong, at least the way you just described it.  And let me

6    tell you.  And I'll just put it out there.

7          When I converted this -- when I dismissed FSS, I

8    did a couple of things.  I explicitly told Mr. Murray that

9    he was in charge of the bank account and that he had control

10   of the equity of FSS.  He's in charge.  And that's -- and I

11   said it on the record, and I remember Ms. Catmull was

12   sitting in the same -- right around there.  And I said --

13   because I didn't want dual seven trustees being around.  All

14   this can be done with one trustee.  He's in charge of the

15   equity of FSS and he can do what he wants with it.

16         I know folks are -- I've heard that some folks may

17   take issue with that.  And that's fine.  And I know that the

18   Texas plaintiffs tried to argue that they were in charge of

19   the -- the Chapter 7 trustee, before I dismissed this case,

20   which I had authority to do unless the court orders

21   otherwise under 349, I gave Murray the bank account and the

22   equity, made sure that he had the equity in FSS.

23         The creditors of FSS are one and the same of the

24   creditors of Mr. Jones.  They are the same.  So this is not

25   being done for the benefit of FSS creditors.  This is being

1   done for the benefit of the Jones creditors who sued FSS and

2   Jones.  And now the Trustee holds the equity for them.

3   Everything is going to them through this estate.  But

4   there's cash there, and you're just using a particular

5   portion of the cash that's available through FSS to then

6   liquidate the FSS stuff.  But ultimately it will be

7   distributed through the Jones Chapter 7 case for the benefit

8   of the same creditors who have been appearing.  They're in

9   one and the same.  And the families here and PQPR, they're

10   all standing here in the same -- that case is gone.  But

11   what was left was Murray being in control of FSS and having

12   the equity.

13          So the Trustee is going to try to convince me that

14   somehow being in control of FSS equity means that all you

15   can do is sell it.  And he's going to have to point to a

16   provision in the Bankruptcy Code that says that.  Because if

17   not, then you step into the shoes.  And there's plenty --

18   you step into the shoes as the equity holder, and you can do

19   whatever you want.  If you want to wind it down, you can

20   wind it down.  There's some clarity about you can't --

21   you're not today seeking to sell assets that belong solely

22   to Mr. Jones.  But I got it.  But there's different buckets

23   of the stuff that Mr. Murray holds in his capacity as

24   Chapter 7 trustee.  One of them, before I dismiss this case,

25   is what goes there.  Because that was to address the very

1   concern that Kyle Kimpler, who is looking at me, was afraid

2   to, of rush to the courthouse.  And I still remember him

3   holding up the pistol in his hands and saying, you know,

4   we're going to go off to the races.

5        This was intended to -- it wasn't going to happen

6   because he was in charge of the bank account.  There wasn't

7   going to be a run.  And he has the equity of FSS.  This is

8   being distributed for the benefit of Jones' creditors.  It

9   just happened to be the same.

10       And so I got it, but I just want to make sure

11  everybody is really clear that your exercise of business

12  judgement, if that's what you're telling me, these are for -

13  - this is going to go -- you can call them the Texas

14  families and the Connecticut -- they're still the same

15  people here.  They may go to pay bills of orders that I

16  entered.  You know, towards professionals.  And that's cash

17  that went out that was FSS cash.  But I just want to make

18  really, really, really clear.  And this is -- I'm just

19  telling you the way I construed my orders when I converted

20  this case that he wasn't doing stuff for FSS; he was doing -

21  - he held FSS, and he was going to distribute it in this

22  estate for the benefit.

23       I'm just telling everybody the way I've construed

24  these orders the entire time, which is why I took issue when

25  someone tried to then go, from what I heard, tried to go

1    seize cash from professionals which they were paid and were

2    trying to go after the professional.  You know, wait for me

3    to issue an order.  Then the order gets paid, and now the

4    professional has to hold it in an escrow or in an IOLTA

5    account because they're -- I'm just telling you that's the

6    way I've always seen this.  If I need to clarify my order or

7    add sentences, that's consistent with what I said today.

8    And I was there.  And it's consistent with what I said where

9    Mr. Murray asked me to clarify exactly what his role was.

10    There's been no change in what that is.  He holds the stuff.

11    He can distribute it, or he can do what he wants.  And

12    there's no -- you can do a couple of different things.  If

13    you own the equity or if you hold the equity, you step into

14    the shoes, you can do it.  Just as if he owned the business

15    or any other Chapter 7 trustee.

16            This case gets more attention because of what the

17    equity interest is.  It's a really simple case.  If this was

18    just a guy named Alex Jones who owned a business called Free

19    Speech that no one had ever heard of, this would be a really

20    simple dispute.  We wouldn't even be here today.  But we are

21    where we are.  And let's just go through it.  But I just --

22    anyway.

23            Go ahead and continue your proffer.

24            MR. WOLFSHOHL:  So I appreciate that, Your Honor.

25            THE COURT:  I understand that -- I'm just saying

1    that's the way I view -- that's always been what I have been

2    saying.  And so I got it.  I just want to make sure that

3    we're really precise on the language that we're using and

4    what Mr. Murray understands where the distribution is going

5    to go.  He's the Chapter 7 Trustee.  He makes distributions

6    in Chapter 7 cases in which he is administering.  It just so

7    happens it's going to go to the same people, but that was

8    always the plan.

9            MR. WOLFSHOHL:  Your Honor's comments are very

10   helpful.  I hope -- and I actually think by what you just

11   said it's consistent with what we thought that you wanted us

12   to do.  I hope Your Honor appreciates that part of why we

13   felt the need to come in here and get the order that we're

14   asking for -- and I do think that there's reason under 363

15   to get this order even though maybe the actual assets we're

16   selling are not property of the Alex Jones estate, part of

17   why we have felt the need to do this is because of --

18           THE COURT:  It is property of the Alex Jones

19   estate, because Alex Jones owned the equity interest in FSS.

20   541, all legal or equitable interests.  All.  And all has

21   got to mean all.

22           MR. WOLFSHOHL:  Okay.  And I prefer that

23   interpretation.

24           THE COURT:  No, no, it's not my interpretation.

25   It's Congress.  Congress used the word all.  All legal and

1    equitable interests of the debtor become property of the

2    estate.  All means all.  And we can't shortchange what all

3    means.  And -- and upon conversion unless otherwise ordered.

4    I know what I said on the record there.  And if I need to

5    amend the seven order, I'm happy to do it.  If you want me

6    to bring FSS back up here, I'll do that, too.  It's just

7    going to cost a lot of money.  And we're spending a lot of

8    money today, I think.  I'm concerned because -- but no one

9    disputes that Alex Jones owned a hundred percent of the

10   equity interest in FSS.  And all has got to mean all.  And

11   we don't get to kind of pick and choose what all means.  I

12   just -- I am just calling it like I see it.  And that's been

13   consistent with my rulings in Envision as well.  Envision

14   Healthcare.  I said all legal and equitable interest comes

15   in.  Any smidgeon of it comes in.  And if you own the equity

16   interest in FSS, then it is property of his estate.  It

17   would be property of his estate if he just filed Chapter 7.

18   He'd have to list it on his schedules.

19         I'm just a little confused about what we're doing

20   here today.  And again, I'm -- well, I don't know what's

21   different than any other bankruptcy case in which someone

22   who filed Chapter 7 and they owned the business and what

23   you're asking me for today.

24         MR. WOLFSHOHL:  Well, Your Honor, a turnover order

25   is the reason we feel like we need the protection of your

1    additional order.  Yeah.

2            THE COURT:  I know what you're asking.  I

3    understand what you're asking me for today.  But what I'm

4    saying is it's already there.  What you're asking for is

5    belt and suspenders.  Let's not act like it's not already

6    there.

7            MR. WOLFSHOHL:  I would prefer to --

8            THE COURT:  If a Chapter 7 debtor owned equity

9    interest of a donut shop, he would have to list it on his

10   schedule.  Right?  Owning a hundred percent interest in a

11   donut shop, right?  People can go sue a donut shop if they

12   want to.  But that doesn't mean, you know, the Chapter 7

13   trustee of a debtor, depending on how they claim the

14   exemptions or not, wouldn't own a hundred percent interest.

15   Because it's property of the estate until it gets exempted

16   out.  That's all.  Right?

17           I understand the concerns today and I understand

18   the need to be clear.  I understand what you're asking for.

19   But what you're asking me for really is belt and suspenders.

20           MR. WOLFSHOHL:  I think that's right.

21           THE COURT:  And I've got it.  I just...

22           MR. WOLFSHOHL:  And, Your Honor, we may not be

23   here if we didn't have sort of the overhang of this turnover

24   order that's still out there.  We removed that case to the

25   Western District of Texas.  But frankly everybody at this

```
1    point is wanting Your Honor to issue orders to make sure --
2    and I appreciate what you're saying, and we've always
3    approached it --
4              THE COURT:  I had a case yesterday -- and I don't
5    want to get into -- I think it's before Judge Bradley, isn't
6    it?
7              MR. WOLFSHOHL:  That is correct, Your Honor.
8              THE COURT:  I'm going to -- stayed out of Jersey
9    business yesterday.  I'll stay out of Austin business today.
10   You know, I'm not going to do that.
11             But I'm just telling you I know what I did.  I'll
12   create the -- happy to go through the expense.  Not me.
13   Doing it, I'll do it.  I don't want to -- I'm not going to
14   get in the way of what Judge Bradley is going to do.  I'm
15   not going to tell another bankruptcy judge on what timetable
16   to go or what to do.  I'm going to allow Judge Bradley to
17   (indiscernible).  I've got it.
18             So for purposes of selling today, tell me what you
19   all want.
20             MR. WOLFSHOHL:  Your Honor, we want you to enter
21   the order that was uploaded in the redline -- well,
22   reflecting the redline changes obviously that we uploaded
23   today.  We're asking -- we think that the Code authorizes
24   it.  We think Your Honor's prior order authorizes it.  We
25   think it's authorized under state law.  We think it's
```

1    authorized under the FSS operating agreement.  WE have

2    overwhelming support from the vast majority of the creditors

3    that the plaintiff's PQPR I understand supports the sale

4    process.  Their liens are being preserved so that we can

5    resolve those through the adversary proceeding.  It also has

6    a status conference set today.

7         We also just think that this sale is in the best

8    interest of the estate because it's going to yield the

9    highest potential recovery.  And even if you think of these

10   creditors as being part of different estates, it's better

11   for their creditor claims to get more money even if you're

12   looking at it as the FSS versus Alex Jones.  I agree with

13   Your Honor.  They are all the same creditors essentially.

14   And we think this is in the best interest of the estate.

15        And I can address Mr. Nguyen's arguments after he

16   makes them in his closing, but I just think that this is

17   within the Trustee's business judgement.  I think it's

18   appropriate for a number of the reasons Your Honor has

19   mentioned today.  And the Trustee would ask that the sale be

20   approved or the winddown process be approved pursuant to the

21   order.

22        THE COURT:  Let me make sure I'm clear about what

23   the process is.  You're going to hold and just kind of

24   follow Texas law.  Hire someone, a professional to go out

25   there and just help wind the process down.

1          Mr. Murray, do I understand that you believe this

2     is going to yield the highest amount of return for

3     creditors?

4          MR. MURRAY:  Yes, I do.  And even aside from the

5     authority issue --

6          THE COURT:  Tell me why.

7          MR. MURRAY:  Well, the conclusion that this would

8     be the best interest of the estate is based on in large part

9     input from Tranzon and the professionals who auction

10    business assets and IP in particular in other cases.  They

11    have a national reputation.  I've worked with them in other

12    cases.  They are the ones who proposed sort of a two-stage

13    auction process.  Start with the IP and then sell the rest

14    of it later.  Because who ends up buying the IP will have a

15    lot to do -- will inform very much how we sell the rest of

16    it.  So that's sort of the basis for splitting it up.

17         But in addition to this Court's authority, which

18    I've always thought was clear and I think it always has been

19    and I think the jurisdiction has always been there, I do

20    need a sale order.  I would need that to sell anything else.

21    And I do want and would appreciate the Court's order because

22    it also sets out for the parties sort of what the process is

23    and sort of sets expectations, so people know how to engage

24    the sale process.

25         THE COURT:  Do I understand it right that Mr.

```
 1    Jones doesn't -- subject to this resolves the objection?
 2              MR. WOLFSHOHL:  It does.
 3              THE COURT:  It does, right?  For purposes of this
 4    order, right?
 5              MR. WOLFSHOHL:  His limited objection related to
 6    his --
 7              THE COURT:  Yes.
 8              MR. WOLFSHOHL:  Yes.  That is resolved by what we
 9    put in the redline and the new order.
10              THE COURT:  The relief requested today.
11              MR. WOLFSHOHL:  That's right.  His objection is
12    resolved is my understanding.
13              THE COURT:  Texas and Connecticut have filed
14    statements in support.
15              MR. WOLFSHOHL:  That's correct, yes.
16              THE COURT:  No party has objected to this other
17    than the Office of the United States Trustee.  Is that
18    correct?
19              MR. WOLFSHOHL:  That's right.
20              THE COURT:  Everybody with an economic interest
21    has not objected to this relief requested, right?
22              MR. WOLFSHOHL:  Yes.
23              THE COURT:  Okay.  Well, the Office of the United
24    States has standing to be heard.  Any proceeding?  Do we
25    have a watchdog?  Let me hear what they have to say. .
```

1          MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

2    the U.S. Trustee.

3          Your Honor, I just wanted to start out by saying I

4    really do appreciate the Chapter 7 Trustee and his effort.

5    I remember the day the Cout was considering conversation of

6    this case.  I called Mr. Murray and Mr. Murray agreed to

7    take on a very difficult case.  Not all of our panel trustee

8    was willing to do it.  Mr. Murray was there.  You know, we

9    just have differences in opinion in terms of the legality

10   and the statute and the Code.  There's (indiscernible)

11   between Mr. Murray.  We have good relationship.  We work

12   well together, and we work on many cases, Your Honor.

13         But we filed this objection to the winddown motion

14   particularly because of our reading of the statute and our

15   understanding.  I know Your Honor says under 541 all means

16   all.  But there are basic tenets of American corporation

17   laws that the U.S. Supreme Court has said that -- you know,

18   just because you own a hundred percent of the equity, you

19   don't own a hundred -- the estate itself doesn't own the

20   assets.

21          So over the ten years I've been doing this, I've

22   examined individual debtors that own businesses like Your

23   Honor have seen.  And when we examine them, for example --

24         THE COURT:  Is it easier if I just amended my

25   order?  Because everybody knows that's what I intended to

1    do.  Would it just make it easier for you if I just amended

2    the order?

3              MR. NGUYEN:  That would be, Your Honor.  Under 349

4    if you bring those assets in.  But it's a little bit --

5              THE COURT:  That was always the intent.  Right?

6    And we can disagree about that.  But I'm just saying that

7    was always the intent.  Everybody knew.  Everybody

8    understood that at the time.  If that wasn't clear or -- no

9    one raised it to me then when winddown was being discussed.

10   If you want me to do that, I am more than happy -- because

11   it sounds like everybody needs it anyway -- I'm more than

12   happy to clarify in my order that all the assets -- if it

13   didn't include it in the assets, that's why he has the cash,

14   right?  That's why he's got the cash and that's why he's got

15   the equity interest.  He's got everything.  That was always

16   the intent as to what was going on.  But if that makes this

17   easy, I'm happy to do it.  Because I think you and I

18   actually agree a lot here.  I just think we're getting in

19   the technicalities here.  But that certainly was what I

20   ordered at the time.

21             MR. NGUYEN:  Your Honor, it's not the

22   technicality.  It's actually what the Code says.  And in

23   reading your order, there was two retention of jurisdiction.

24   One was the PQPR litigation and two was the bank account --

25             THE COURT:  And then they came back and asked me

1    for clarification.  I'm just saying I'm happy to do it.  And
2    no one is going to dispute it.  I'm happy to do it.  If that
3    makes everybody's life happier, I'm happy to do it.

4            MR. NGUYEN:  It would make things easier, Your
5    Honor.  But it's a little bit unusual to dismiss a case but
6    retain all of the assets with --

7            THE COURT:  Unless otherwise ordered by the Court.
8    We don't have to get into what's unusual or not.  Everything
9    is case specific.  That's why the -- I think that's why
10   Congress gave everyone flexibility, because you just don't
11   know what you don't know.  And this case is certainly
12   different than any other case out there.  I shouldn't say
13   that.  There are some others that resemble it.

14           MR. NGUYEN:  Your Honor, I understand amending the
15   order.  And I think it would be very helpful in terms of
16   actually clarifying what Mr. Murray has the actual --
17   because in everyday cases where you have owners that come in
18   here that have an equity interest, I don't ask them -- for
19   example, Debtor Nguyen owns a donut shop, you know, and the
20   donut shop is a corporation, all Debtor Nguyen has to do is
21   list the hundred percent.  I don't ask for the mixing bowls
22   and the chairs and stuff like that.

23           THE COURT:  No, no, I understand that.  And I
24   think my statements were a little different.  But I think
25   clarifying on the record -- I don't think anybody is going

1     to --

2              MR. NGUYEN:  But I think there's an issue with

3     that too in terms of the allocation.  Because the creditor

4     bodies are the same, but they are two different entities.

5     And I think there's certain creditors when you upstream it,

6     there's going to be issues of allocations.

7              THE COURT:  I'm just authorizing a sale.  Where

8     the money goes people can fight about.  But I'm just

9     authorizing a winddown here.  I think everybody's rights are

10    reserved as to where the money goes.  I'm just -- this is

11    more bidding procedures to me.

12             MR. NGUYEN:  Your Honor, if you clarify the order

13    to include all of FSS hard assets as property of the estate,

14    the U.S. Trustee won't have any objection.  I think you are

15    able -- you have discretion under 349 to order otherwise.

16    As long as that order is clear, we're fine with that.

17             THE COURT:  Mr. Wolfshohl, what about that?  And I

18    think you can work with Ms. Driver just to make sure that I

19    don't -- anything that we were to write to amend the order

20    just doesn't run afoul the deal that you all agreed to

21    today, or reserves rights, or does something.  I just don't

22    want -- I'm going to give you all the assets of FSS.  I'm

23    going to clarify that that's what you always had, the assets

24    of FSS.  And I just want to make sure that other people look

25    at it so that no one then -- I sign something and then

1    somebody comes in and asks me to reamend the order.

2              MR. WOLFSHOHL:  Maybe we could chat about that.

3    Because I think that's largely where the proposed order gets

4    us.  But it would be even more clear if -- you're talking

5    about amending the dismissal order, to clarify that?  That

6    would help -- I think it would help.  We could propose some

7    language.

8              THE COURT:  I'm just saying just run it by the

9    trustee, run it by folks.  You know who needs to look at it.

10   Just upload the order.  And I'm telling you, I will do it --

11   if folks can't agree with it, I will go back and read what I

12   did.  And I feel like it's a clarifying order.  It's not

13   really amending the order.  Well, it's more -- I don't want

14   to come up with bankruptcy terms for orders, but you know

15   what I mean.  It's more of a -- whether you can call it --

16   you can call it -- I don't care what you call it.  You can

17   call it amended order or modified order, a clarifying order.

18             MR. WOLFSHOHL:  An order in furtherance.

19             THE COURT:  Just make -- what I want to do is just

20   have Mr. Nguyen take a look at the language and just make

21   sure that everybody's comfortable with the terms so that no

22   one then comes back and gets it here.  But if that's the

23   case -- we're in agreement.  And I think you all need the

24   clarity anyway one way or the other.

25             So I'll sign -- get me that language.  I'll sign

1    that, and then I'll sign this.

2              MR. WOLFSHOHL:  Okay.  We can do that, Your Honor.

3              THE COURT:  Okay.

4              MR. NGUYEN:  Thank you, Your Honor.

5              THE COURT:  All right, folks.  Status conference,

6    PQPR, and then I'll turn to Stewart.

7              MS. JONES:  Thank you, Your Honor.  Erin Jones for

8    Christopher Murray, Chapter 7 Trustee.  And I think

9    everybody else is on the line.

10             THE COURT:  I just want to know briefly just kind

11   of where we are.

12             MS. JONES:  The Trustee has been in discussions

13   with the parties in this litigation, PQPR and the

14   Connecticut families regarding potential resolution to this,

15   as obviously the resolution of the PQPR issue is going to

16   ultimately impact how funds get distributed.  And so we have

17   to get to this point, a decision point in order to sort of

18   move forward.

19             However, we haven't quite gotten there yet.  We

20   continue to have conversations.  I think it is important to

21   have a trajectory forward towards a resolution.  And we'll

22   run parallel tracks, as we always do, trying to reach a

23   business solution.  But I do think it would make sense.  And

24   I will let the other parties speak as well.  But there are

25   pending MSJs that are full briefed.  I don't know whether

1   Your Honor wants to hear argument on that at some point.

2          THE COURT:  No.

3          MS. JONES:  Not today, obviously.

4          THE COURT:  No, no, no, no.  What I'm saying is if

5   they're fully briefed MSJs, I'm just going to turn to them,

6   and I'll get working on them.

7          MS. JONES:  Okay.  And then otherwise, if that

8   doesn't resolve everything, maybe come in for a scheduling

9   conference to discuss the scheduling order to maybe just

10  kind of get a path towards trial.

11         THE COURT:  So what I'll do is then just rule on

12  the MSJs and then after I rule on the MSJs, I'll give

13  parties a few days and then everybody can kind of give

14  everyone kind of an opportunity to read it and think about

15  it.  And then I'll call the parties maybe four or five days

16  later and we'll talk scheduling at that point.

17         MS. JONES:  That would work for the trustee.

18         THE COURT:  Okay.  All right, folks.

19         (Whereupon these proceedings were concluded at

20  3:06 PM)

21

22

23

24

25

```
1                        CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 26, 2024
```