**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 7** |
| | § | |
| **ALEXANDER E. JONES,** | § | **Case No. 22-33553 (CML)** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |

**TRUSTEE'S <u>EXPEDITED</u> MOTION FOR ENTRY OF AN ORDER IN FURTHERANCE**
**<u>OF THE SALE OF ASSETS OF FREE SPEECH SYSTEMS, LLC</u>**
**[Relates to Docket No. 859]**

> **This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**
>
> **Represented parties should act through their attorney.**
>
> **Expedited relief has been requested. If the Court considers the motion on an expedited basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the expedited consideration is not warranted, you should file an immediate response.**

Christopher R. Murray, the Chapter 7 Trustee (the "***Trustee***") for the bankruptcy estate of

Alexander E. Jones ("***Jones***" or the "***Debtor***") files this expedited motion (the "***Motion***") for entry

of an order in further of the sale of assets of Free Speech Systems, LLC ("***FSS***"), including (i)

authorizing and approving the auction and sale of the non-cash assets of FSS free and clear of all

liens, claims and encumbrances and (ii) granting related relief.  In support of this Motion, the

Trustee respectfully states as follows:

1

## PRELIMINARY STATEMENT

1.     On September 25, 2024, the Court entered the *Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC* [Docket No. 859] (the "***Winddown Order***"), which authorized the Trustee to, amongst other things, auction and sell (i) intellectual property assets of FSS and related personal property (i.e., servers on which such intellectual property is stored) (collectively, the "***IP Assets***"), and (ii) any Remaining Assets that remained unsold after the IP Assets Auction.[1]  In accordance with the Winddown Order, the Trustee, with the assistance of Tranzon360 and estate professionals, undertook an extensive marketing process to elicit bids for the IP Assets.

2.     There were ultimately two Qualified Bidders—joint bidders, Global Tetrahedron, LLC ("***Global Tetrahedron***") and the Connecticut Families, and First United American Companies, LLC ("***FUAC***")—after the initial sealed bid round.[2]  The initial sealed bids covered overlapping but non-identical lots of assets and the bid submitted by Global Tetrahedron and the Connecticut Families contained consideration in the form of a waiver of the Connecticut Families' rights to cash proceeds from the sale of the IP Assets.  Under the initial Global Tetrahedron sealed bid, the dollar value of the Connecticut Families' waiver was contingent on the ultimate amount of an otherwise higher bid, so the Trustee determined in his reasonable business judgment to hold the auction scheduled for November 13, 2024 by written submission of highest and best offers.

---

[1] For the avoidance of doubt, the assets offered in the IP Assets Auction <u>did not</u> include Alex Jones' personal social media accounts, book rights, or rights in a videogame, which were the subject of the *Emergency Motion for Entry of an Order Authorizing (i) the Sale of Intellectual Property Assets in Connection with the Winddown of Free Speech Systems, LLC and (ii) the Assumption and Assignment of Executory Contracts* [Docket No. 882] (the "***Jones IP Assets Motion***").  The Trustee and interested parties continue to negotiate the Jones IP Assets Motion.  In addition, no domain names that the Debtor has asserted rights to are included in this sale, and the Trustee reserves all rights with respect to such domain names.

[2] All capitalized terms used but not otherwise defined in this paragraph shall have the meaning ascribed to them in the Winddown Order.

Global Tetrahedron, with the Connecticut Families, and FUAC each submitted their highest and best offers.  FUAC submitted a bid for $3,500,000, and Global Tetrahedron submitted a bid in a stated amount of "no less than $7 million," consisting of a cash payment of $1,750,000, plus the Connecticut Families' waiver of certain cash proceeds for the benefit of other unsecured creditors of FSS.   The Trustee selected the final Global Tetrahedron/Connecticut Families' bid as the Successful Bid and the final FUAC bid as the Backup Bid.  Global Tetrahedron, the Connecticut Families, and the Trustee have also negotiated the Asset Purchase Agreement, attached hereto as **Exhibit A** (the "***Asset Purchase Agreement***"), in good faith, at arms' length and with no collusion.

3.      The Trustee now seeks approval of (i) his selection of the Global Tetrahedron/Connecticut Families' bid as the Successful Bid, (ii) the free and clear sale of the Purchased Assets (as defined in the Asset Purchase Agreement) to War Is Over LLC (the "***Purchaser***"), an entity formed by Global Tetrahedron for the purpose of acquiring the Purchased Assets, and (iii) the approval of the Asset Purchase Agreement.  The Trustee seeks further authorization from the Court to close the sale transaction contemplated under the Asset Purchase Agreement.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. § 1408.

6.      The bases for the relief requested herein are sections 105, 363, and 704(a) of title 11 of the United States Code (the "***Bankruptcy Code***") and rules 2002, 6004, and 9014 of the

15668356

Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***").

## **BACKGROUND**

### I.    **Bankruptcy Proceedings**

7.     On July 29, 2022 (the "***Petition Date***"), FSS filed its voluntary petition for relief under chapter 11 subchapter V of the Bankruptcy Code.  For reasons stated on the record at the hearing on June 14, 2024, the Court entered the Dismissal Order dismissing FSS's chapter 11 case (the "***FSS Case***"). [*See* Docket Nos. 955 and 956].

8.     On December 2, 2022 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (prior to the Conversion Date, the "***Jones Chapter 11 Case***", and after the Conversion Date, the "***Jones Chapter 7 Case***").  The Debtor is an employee of FSS.  100 percent of the outstanding membership interests in FSS are owned by the Debtor's bankruptcy estate.

9.     On December 13, 2022, the United States Trustee for Region 7 (Southern and Western Districts of Texas) (the "***U.S. Trustee***") appointed the Official Committee of Unsecured Creditors in the Jones Chapter 11 Case pursuant to Bankruptcy Code section 1102(a)(1).

10.     The Debtor continued managing his assets as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code until the Court entered its *Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [Docket No. 708] on June 14, 2024 (the "***Conversion Date***").  On June 21, 2024, the Court entered an order dismissing the FSS Case [Case No. 22-60043, Docket No. 956] (the "***Dismissal Order***"), while retaining exclusive jurisdiction over several adversary proceedings and the approval of

15668356

professional fees and expenses.  On the Conversion Date, the U.S. Trustee appointed Christopher R. Murray as the Chapter 7 Trustee in the Jones Chapter 7 Case.

11.     On August 22, 2024, the Trustee filed the *Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC* [Docket No. 829].

12.     On September 25, 2024, the Court entered the *Order Supplementing Order Dismissing Case* [Case No. 22-60043, Docket No. 1021] (the "***Supplemental Dismissal Order***"), which provided that effective as of the entry of the Dismissal Order, the property of FSS's bankruptcy estate was deemed vested in the bankruptcy estate of Jones as property of his estate to be administered by the Trustee.  The Trustee continues to operate FSS pursuant to the terms of the Dismissal Order, the Supplemental Dismissal Order, and the Jones estate's ownership of 100 percent of the membership interest in FSS.

13.     On September 25, 2024, the Court entered the Winddown Order, authorizing the Trustee to market and sell FSS's non-cash assets using a sealed bid process for the IP Assets.

14.     On November 18, 2024, FUAC filed the *Emergency Motion to Disqualify Global Tetrahedron, LLC's Bid* [Docket No. 913] ("***Motion to Disqualify***"), which is ultimately a procedurally improper objection to this Motion.

## II.     Auction Process

15.     On September 16, 2024, the Court authorized [Docket No. 844] the Trustee to employ and retain Tranzon360 as the Trustee's Agent to sell the Assets of FSS.  With respect to the intellectual property assets of FSS, the Court-approved engagement letter specifically calls for an auction by "Sealed Bid with a round of virtual live bidding amongst competitive bidders, if deemed appropriate and necessary by Trustee and Agent." [Docket No. 828, Ex. C].  This process was further described and defined in the Winddown Order.

15668356

16.     Upon its employment, Tranzon360 posted preliminary auction information on the 360AssetAdvisors.com website billing the sale as a "Sealed Bid Offering," including a description of the property being offered, the sealed bid deadline, a highlight of the terms and bid process and noted that the sale was "Pending Bankruptcy Court Approval." Following the entry of the Winddown Order on September 25, 2024, Tranzon360 added a link to the auction information page for parties to submit a form, requesting a non-disclosure agreement ("**NDA**").

17.     On September 27, 2024, in accordance with the Winddown Order, the Trustee filed the *Notice of Auction for the Sale of Assets of Free Speech Systems, LLC Free and Clear of Any and All Claims, Interests, and Encumbrances* [Docket No. 862] ("**Sale Notice**") and served the Sale Notice on the service lists in the Jones Chapter 7 Case and the FSS Case.

18.     After entry of the Winddown Order, Tranzon360 initiated a marketing campaign to promote the sale of the IP Assets, which included a combination of newspaper advertisements, emails to targeted audiences, posts on business investor trade sites and press releases.

19.     To respond to qualified inquiries, Tranzon360 created a Sealed Bid Package, attached hereto as **Exhibit B** (the "**Sealed Bid Package**"), which included: (i) an explanation of the bid process, (ii) a description of the assets being sold, (iii) a categorization of the assets into specific lots based on Tranzon360's and the Trustee's reasonable business judgment about what categorization would elicit the highest or otherwise best offers for the Assets, (iv) a bid form, and (v) terms of sale.

20.     In early October, Tranzon360 began working with FSS staff and the Trustee's professionals to obtain information to assist bidders in performing due diligence and populating this information into a data room available to those bidders who had executed an NDA.

15668356

21.     Tranzon360 had over 30,000 views on the auction information page and received 232 requests to sign an NDA.  Tranzon360 reviewed each request to confirm verifiable company contact information and/or contacted parties to validate their interest.  Many parties were unreachable or expressed interest in only the Remaining Assets Auction.  Ultimately, Tranzon360 qualified 64 parties to receive an NDA, of which 42 parties signed the NDA and received a bid package.  NDA parties were contacted to ascertain interest level and of the 42 parties, 15 parties requested and/or were granted access to the data room.

22.     Between September 19, 2024 and November 8, 2024, Tranzon360 (i) continued to work with FSS to add pertinent materials to the data room, (ii) worked with the Trustee's counsel regarding a form asset purchase agreement, and (iii) actively contacted parties inquiring about the sale, discussed the sale process, answered questions about the offering and assessed interest levels and likely bid participation.

23.     On November 1, 2024, Tranzon360 provided a report to the Trustee of marketing activity and inquiries and communicated expectations to receive between two to four bids from the most serious potential bidders.

24.     During the week of November 4, Tranzon360 narrowed its likely bidder expectations to two parties, and spoke to each of these anticipated bidders in detail about the bid process, answering questions and offering its availability to address further follow-up questions prior to the bid deadline.  In accordance with the Winddown Order, the deadline for submission of sealed bids was November 8, 2024, at 2:00 p.m. (prevailing Central Time) (the "*IP Assets Bid Deadline*").

25.     The Trustee, through his professionals, received two bids before the IP Assets Bid Deadline: one joint bid from Global Tetrahedron and the Connecticut Families and one from

FUAC (FUAC, together with the Global Tetrahedron and the Connecticut Families, the "***Qualified Bidders***"). Both parties wired the required Good Faith Deposits (as defined in the Winddown Order) for their respective bids and gave proof of committed financing reasonably satisfactory to the Trustee.

26.     The initial bid submitted by FUAC (the "***FUAC Initial Bid***"), attached hereto as **Exhibit C**, provided a cash bid totaling $1,200,000.00 for Lots 1-4, and FUAC apportioned the value of its bid between those Lots. The FUAC Initial Bid was broken out in the following way:

| Lot | Lot Bid | Intellectual Property Allocation | Equipment/Inventory Allocation |
|---|---|---|---|
| Lot 1 – Production | $600,000.00 | $275,000.00 | $275,000.00 |
| Lot 2 – E-Commerce | $500,000.00 | $250,000.00 | $250,000.00 |
| Lot 3 – Domains | $50,000.00 | | |
| Lot 4 – Contested Domains | $50,000.00 | | |

FUAC attributed $50,000 of its Lot 1 bid to personal property, equipment, and furniture located on Building 2 on the FSS premises, which was originally excluded from the bid package and thus not in the allocations in the table above. This was noted on an addendum page to the bid form. FUAC elected to group the FUAC Initial Bid together, such that its bid on each lot was contingent upon its bid on all the other lots.

27.     The initial bid submitted by Global Tetrahedron and the Connecticut Families (the "***GT Initial Bid***", and together with the FUAC Initial Bid, the "***Initial Bids***"), attached hereto as **Exhibit D**, provided a cash bid totaling $1,000,000.00 for Lots 1-2 and additional consideration described below,[3] and Global Tetrahedron and the Connecticut Families apportioned their bid between those Lots. The GT Initial Bid was broken out in the following way:

| Lot | Lot Bid | Intellectual Property Allocation | Equipment/Inventory Allocation |
|---|---|---|---|

---

[3] The Winddown Order provides that bids may include "must clearly state which of the Assets the Potential Bidder seeks to acquire. Each Sealed Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any (collectively, the "Purchase Price"). The Purchase Price should be a specific amount in U.S. Dollars (not a range)". Winddown Order at 6.

8

| Lot 1 – Production | $998,000.00 | $998,000.00 | $1,000.00 |
| Lot 2 – E-Commerce | $1,000.00 | $1,000.00 | |
| Lot 3 – Domains | | | |
| Lot 4 – Contested Domains | | | |

Global Tetrahedron and the Connecticut Families elected to group the GT Initial Bid together, such that their bid on each lot was contingent upon their bid on the other lot.

28.     In addition to the cash bid, the Connecticut Families included consideration in the form of a "***Distributable Proceeds Waiver***", which is set out in section 2.c of the bid letter attached to the GT Initial Bid and which is attached hereto as **Exhibit E** (the "***GT Initial Bid Letter***").  The GT Initial Bid Letter provided that, the Connecticut Families would waive their right to receive proceeds from the sale and assign the right to receive those proceeds to all other unsecured creditors such that those creditors would receive a greater cash recovery pursuant to the GT Initial Bid than they otherwise would under a bid with a higher cash purchase price.  This waiver was, in essence, a bid trigger that would increase the value of the bid in response to the amounts of alternative bids, requiring a recursive and contingent analysis based on hypothetical competing bids that may or may not be made.  The GT Initial Bid Letter also provided that a portion of future revenues derived from the sale of the assets to Global Tetrahedron would be provided to the Connecticut Families and the Texas Families as an additional form of consideration.

29.     Tranzon360 contacted each of the bidders, walked through their bids and informed the bidders that they would be notified in the next couple of days if they would be invited to another round of bidding.  *See* Winddown Order ¶ 8.

30.     Between November 8 and November 11, the Trustee, in consultation with his professionals, analyzed the FUAC Initial Bid and the GT Initial Bid.  The Trustee's analysis considered (a) the bids themselves in relation to each lot or group of lots, (b) Tranzon360's assessment, based on its discussion with bidders, of their potential interest in varying lot groupings,

15668356

(c) the potential value to the estate and its creditors of the Distributable Proceeds Waiver in the GT Initial Bid in relation to other bids, the qualification of the GT bid trigger, assessing the value of the Initial Bids in relation to each Lot (including attribution of value to certain lot components if they were sold piecemeal at the Remaining Assets Auction), and how to achieve the highest or otherwise best offers for the Lots.

31.     The Trustee, in consultation with his professionals, assessed two possible options regarding an additional round of bidding, both of which fell within the discretion granted to the Trustee to set the terms of the bid process under the Winddown Order and as further described within the Bid Package documents provided to the bidders, which the bidders signed and acknowledged when submitting their initial bids.  The first option was to conduct a round of live bidding through a video conference.  The discussion about this option included mock scenarios to present and manage the various lots and lot packages, the explanation of attributing potential piecemeal auction value to certain lots and the on-the-fly calculation of the Distributable Proceeds Waiver.  The second option was to provide an updated version of the bid form, placing lots in lot combinations to satisfy all of the potential scenarios the Trustee believed the bidders desired, and to ask for "final and best offers."  This process is a customary strategy in sealed bid sales. The benefit is that it forces bidders to put their best offer forward regardless of other bids.  The discussion about this option included a recognition that this approach would ensure all lot and bidding permutations could be easily compared, and that Global Tetrahedron and the Connecticut Families, like FUAC, would be required to attribute a specific dollar allocation to its bid or otherwise explain any contingencies with enough specificity for the Trustee to evaluate the potential benefit to the estate and its creditors. The final-and-best offer format would also provide

15668356

the Trustee time to evaluate the comparable cash value of the Distributable Proceeds Waiver in the context of the final competing bids and lots.

32.     The Trustee determined in his reasonable business judgement, and in consultation with his professionals, that the "final and best" overbid strategy (i) was in the best interest of all bidding parties, (ii) would provide a more equitable method of evaluating the bids, (iii) would provide the best method of maximizing value to the creditors, and (iv) was consistent with the terms of the Sealed Bid Package and Winddown Order and his discretion under the Winddown Order, "prior to conclusion of an Auction (if any) [to] impose such other terms and conditions upon bidders as the Trustee determines to be in the best interests of the Debtor's estate, FSS and their creditors in this bankruptcy case."  Winddown Order ¶ 13. This discretion was also communicated to all bidders in the Sealed Bid Package, which provided that "[t]he Bid Process and Terms with any amendments or modifications expressly made by Sales Agent constitute all the terms and conditions with respect to the sale of the Property; however Sales Agent reserves the right to modify the Bid Process and Terms, as may be necessary and shall notify Bidder accordingly." Sealed Bid Package, Term 25.

33.     Messages were sent to the Qualified Bidders on Monday, November 11, 2024, at 4:39 p.m. (prevailing Central Time), notifying them of the auction format selected for the next round of bidding and providing them with a revised overbid form and instructions to submit their best and final offers by the date and time of the IP Assets Auction on November 13, 2024, at 10:30 a.m. (prevailing Central Time).  The revised bid form included the original lots, as well as a number of additional lot groupings to maximize optionality.  The revised bid form was designed, in the Trustee's business judgment and with assistance of his advisors, to allow (a) parties to make bids that were non-contingent on winning any other lots and to bid on multiple asset packages, giving

15668356

themselves multiple possible routes to win lots, and (b) the Trustee to more easily compare bids to consider the highest or otherwise best offers for the asset groupings, including the two parties' bids, and to evaluate the potential value a lot might bring if sold piecemeal in the Remaining Assets Auction.

34.     Tranzon360 had conversations with FUAC and Global Tetrahedron after providing them with the overbid form.  These conversations were intended to ensure that each bidder understood the form and the bid process, allowed Tranzon360 to answer any questions and ensure that each bidder understood what "highest and best" meant.  Neither bidder voiced any objection to the process and both bidders confirmed that they understood the process. Specifically, both bidders understood that, under this procedure, there would be no additional opportunity to overbid. Neither bidder objected to that procedure at the time.

35.     Before the deadline, the Qualified Bidders both submitted their final and best offers. The "best and final" approach worked as intended—both bids submitted were significantly higher than each bidder's initial bid, and in the case of Global Tetrahedron and the Connecticut Families, provided a specific allocation of Distributable Proceeds Waiver value (in their estimation) to their GT Final Bid, which ultimately made that portion of their bid easier for the Trustee to analyze than the formulation in their initial bid.

36.     The final bid submitted by FUAC (the "**FUAC Final Bid**"), attached hereto as **Exhibit F**, was broken out in the following way:

| Lot Group | Bid |
|---|---|
| Group 1 Production and E-Commerce Intellectual Property Only (Lot 1b & 2b) | |
| Group 2 Production and E-Commerce IP, Equipment & Inventory (Lot 1a & 2a) | $3,350,000.00 |
| Group 3 Domain Names (Lot 3 & 4) | $150,000.00 |
| Group 4 All Intellectual Property, Equipment, Inventory & Domains (Lots 1-4) | $3,500,000.00 |
| Group 5 All Intellectual Property & Equipment (no Inventory) (Lots 1a & 2b) | $3,100,000.00 |
| Group 6 All Intellectual Property & Inventory (no equipment) (Lots 1b & 2a) | $2,850,000.00 |
| Group 7 Equipment & Inventory (no IP) (Lots 1c & 2c) | $750,000.00 |

37.     The final bid submitted by Global Tetrahedron and the Connecticut Families (the "***GT Final Bid***", and together with the FUAC Final Bid, the "***Final Bids***"), attached hereto as **Exhibit G**, provided a bid of $7,000,000.00 comprised of $1,750,000.00 in cash plus the Distributable Proceeds Waiver (as modified by the bid letter attached with the GT Final Bid form), which provided for the Connecticut Families' waiver of their claim to the proceeds of the Purchased Assets.  The GT Final Bid also provided that Global Tetrahedron would pay the Connecticut Families and Texas Families a percentage of future revenues realized from the Purchased Assets.

38.     The GT Final Bid was broken out in the following way:

| Lot Group | Bid |
|---|---|
| Group 1 Production and E-Commerce Intellectual Property Only (Lot 1b & 2b) | |
| Group 2 Production and E-Commerce IP, Equipment & Inventory (Lot 1a & 2a) | |
| Group 3 Domain Names (Lot 3 & 4) | |
| Group 4 All Intellectual Property, Equipment, Inventory & Domains (Lots 1-4) | $7,000,000.00 |
| Group 5 All Intellectual Property & Equipment (no Inventory) (Lots 1a & 2b) | $7,000,000.00 |
| Group 6 All Intellectual Property & Inventory (no equipment) (Lots 1b & 2a) | |
| Group 7 Equipment & Inventory (no IP) (Lots 1c & 2c) | |

39.     The Trustee analyzed each bid to determine its total benefit to FSS unsecured creditors. The key difference between the two final bids was that the GT Final Bid included the Distributable Proceeds Waiver. This mechanism would add material value for unsecured creditors other than the Connecticut Families (the "***Gift Class***"), who would receive a portion of the recovery to which the Connecticut Families were otherwise entitled.

40.     The amount of the Distributable Proceeds Waiver depends on two variables which, at this time, can be estimated. The first is the amount of administrative costs of the sale, which are paid before unsecured creditors. Administrative costs include auctioneer fees and expenses, legal and other professional fees and expenses and the Trustee's statutory commission. The Trustee estimates the total of these costs will be $650,000.

41.     The second variable is the Gift Class's share of the claims pool. The GT Final Bid asserts that the Connecticut Families currently hold 96.7% of all liquidated claims. Aside from the Connecticut Families, the claims pool primarily consists of the claims of Texas Families (some of whose claims are not yet liquidated) and PQPR Holdings (whose claim is subject to pending litigation), and the claims of other unsecured creditors.

42.     Using these assumptions, the Trustee calculated the value to the Gift Class under the backup bid as well as under the winning bid. At $3,500,000, the backup bid yields recovery to the Gift Class of $94,050.  In contrast, under the winning bid, at a $7,000,000 cash equivalent amount, the Gift Class would receive $209,550.  To accomplish that recovery under the actual purchase amount of $1.75 million under the winning bid, the Connecticut Families would waive $173,250 of proceeds.

| | | Backup Bid | Winning Bid (Cash Equivalent) | Winning Bid |
|---|---|---|---|---|
| | | | | |
| | | | | |
| Purchase Cash | | 3,500,000 | 7,000,000 | 1,750,000 |
| less: Administrative Costs | | (650,000) | (650,000) | (650,000) |
| Net Purchase Cash | | 2,850,000 | 6,350,000 | 1,100,000 |
| | | | | |
| Connecticut Families' Share | 96.7% | 2,755,950 | 6,140,450 | 1,063,700 |
| Gift Class's Share | 3.3% | 94,050 | 209,550 | 36,300 |
| Total Creditor Proceeds | | 2,850,000 | 6,350,000 | 1,100,000 |
| | | | | |
| Gift Class's Share | | 94,050 | 209,550 | 36,300 |
| Distributable Proceeds Waiver | | - | - | 173,250 |
| Gift Class Total Recovery | | 94,050 | 209,550 | 209,550 |

43.     The Trustee then stress-tested the assumptions in this analysis by evaluating alternative estimates for administrative costs and Connecticut Family shares of the claims pool. This was necessary because the amount of the waiver cannot actually exceed the net proceeds to which the Connecticut Families would otherwise be entitled to, creating a natural limit to the

implied cash equivalent bid of the offer. Under any reasonable assumptions, however, there is more than enough cash available to fund the required waiver. For example, if the Court assumes that the administrative costs are $750,000 and the Connecticut Families share of the claims pool is ultimately determined to be only 75%, the winning bid would provide greater value to the Gift Class than any bid up to approximately $4.75 million. That is because this is the amount at which the Distributable Proceeds Waiver amount reaches 100% of the Connecticut Families' share, or the maximum amount they could contribute under this mechanism.

| | | Backup Bid | Winning Bid (Cash Equivalent) | Winning Bid |
|---|---|---|---|---|
| Purchase Cash | | 3,500,000 | 4,750,000 | 1,750,000 |
| less: Administrative Costs | | (750,000) | (750,000) | (750,000) |
| Net Purchase Cash | | 2,750,000 | 4,000,000 | 1,000,000 |
| Connecticut Families' Share | 75.0% | 2,062,500 | 3,000,000 | 750,000 |
| Gift Class's Share | 25.0% | 687,500 | 1,000,000 | 250,000 |
| Total Creditor Proceeds | | 2,750,000 | 4,000,000 | 1,000,000 |
| Gift Class's Share | | 687,500 | 1,000,000 | 250,000 |
| Distributable Proceeds Waiver | | - | - | 750,000 |
| Gift Class Total Recovery | | 687,500 | 1,000,000 | 1,000,000 |

44. Based on this analysis, the Trustee determined that the GT Final Bid was the highest and best bid received and selected that bid as the winning bidder. In accordance with the Winddown Order, the Trustee had three (3) business days to file a notice with the Court designating the successful bid and bidder and the backup bid and bidder. On November 14, 2024, the Trustee filed the notice of the successful bidder and backup bidder [Docket No. 903].

## REQUESTED RELIEF

45. The Trustee seeks entry of an order, substantially in the form attached hereto, approving the Trustee's selection of the GT Final Bid and authorizing the Trustee (i) to sell the Purchased Assets free and clear of all liens, claims, and encumbrances to the Purchaser and (ii) to

enter the Asset Purchase Agreement attached hereto in furtherance of the Winddown Order and to close the sale of the Purchased Assets.

## BASIS FOR RELIEF

### I. The Court Should Approve the Auction and Sale of the Purchased Assets as a Sound Exercise of Business Judgment.

46.     Section 704(a) of the Bankruptcy Code provides the duties of a chapter 7 trustee, and in particular directs the trustee "to collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the ***best interests*** of parties in interest."  11 U.S.C. § 704(a)(1) (emphasis added).  A trustee "has the duty to maximize the value of the estate." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 352 (1985).

47.     Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Generally, a trustee "must demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder can raise the cash necessary to complete the deal."  *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (citing 3 COLLIER ON BANKRUPTCY ¶ 363.02[1][f] (15th ed. rev. 2009)).  Ordinarily, the business judgment test boils down to a judicial review of whether the trustee is appropriately seeking approval of a sale of the highest, or otherwise best, offer available.  *See, e.g.*, *In re C.W. Min. Co.*, 2010 WL 841396, at *10 (Bankr. D. Utah Mar. 2, 2010).

48.     A trustee's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets and when there is "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."

15668356

*See, e.g., In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").  Whether the proffered reason for the business judgment is sufficient depends on the facts of each case.  *See Cont'l Air Lines*, 780 F.2d at 1226.

49.     Once a trustee articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).  The business judgment rule protects certain trustee decisions from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  Thus, if a trustee's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

50.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale de-signed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir.

17

1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

51.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

52.     It is well-settled that where there is a court-approved auction process, a full and fair price is presumed for the assets sold because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is true here where the Purchased Assets have been subjected to a marketing process and intensively scrutinized by the Trustee and his retained advisors. As a result, the Trustee and creditors can be assured that, taking into account current economic conditions, the consideration obtained will be fair and reasonable and at or above market.

53.     Here, the marketing, auction, and sale were in accordance with the Winddown Order entered by the Court.  As intended, the bidding procedures promoted active bidding from interested parties.  The requirement that the Qualified Bidders submit their final and best offers also enhanced the outcomes of the auction because it caused the Qualified Bidders to reasonably assess the value of the Purchased Assets and submit a bid sufficiently high to overcome any other bidder.  Both of the Qualified Bidders were subject to the same requirements in the same timeframe.  The auction maximized the value realized for the Purchased Assets because it leads to materially greater recoveries for general unsecured creditors of FSS.  *See In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015) (debtor is not required to "mechanically accept a bid with the highest dollar amount"); *In re Diplomat Const., Inc.*, 481 B.R. 215, 219 (Bankr. N.D. Ga. 2012) ("The highest bid does not always equate to the best bid for the estate"); *In re LeBlanc Inc.*, 299 B.R. 546, 552 (Bankr. N.D. Iowa 2003) (approving the trustee's proposed sale of a lower offer and stating that "accepting the [higher] offer . . . would delay closing. The value to the trustee of closing sooner on the [lower] offer detracts from [the] incremental offer of $ 25,000.00."); *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (approving of a trustee's business judgment where the trustee "carefully weighed the competing bids [including their risk factors and other provisions] rather than mechanistically recommending the facially higher bid"); *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) ("bankruptcy courts have broad flexibility in determining which of several bidders should be deemed the successful bidder at a § 363(b) sale"); *In re Landscape Properties, Inc.*, 100 B.R. 445, 448 (Bankr. E.D. Ark. 1988) (approving recommended purchaser on the basis that, although the purchasers was "not making the highest offer on the property, it [made] the better offer."); *In re Tresha-Mob, LLC*, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019) (citation omitted) ("While the bid that brings in

the most cash often wins, it is 'common knowledge' that the 'highest bid is not always the best bid,' especially if there are 'conditions sufficient to overbalance the difference between the two.').

54.     Despite the higher cash offer received from FUAC, the GT Final Bid offered greater value to FSS's unsecured creditors.  The Trustee knows the universe of claims based on the claims register of FSS as of the date of the auction.  It is within the Trustee's business judgment to assess the value of claims for the purposes of making a decision about whether a bid will lead to better value for creditors.  With respect to the contested alleged claims and liens of PQPR, after reviewing materials, including the Subchapter V Trustee's report and the completed summary judgment briefing pending before this Court with respect to PQPR's purported claim, the Trustee determined that the value of this claim, if it has value, is highly speculative and unlikely to materially impact recoveries to unsecured creditors of FSS in this case.  Accordingly, secured claims which the Trustee believes are valid, perfected, and unavoidable amount to $143,255.24.  Similarly, claims asserting priority status under Bankruptcy Code section 507 total $30,214.37.  The Trustee currently holds over $7,500,000.00 in cash, which is more than sufficient to cover the valid, perfected, and unavoidable secured claims and priority claims against FSS.

55.     Accordingly, only general unsecured claims are affected by the results of the auction and particularly the Distributable Proceeds Waiver.  Based on the claims register, the Connecticut Families together hold claims totaling $1,549,568,859.95 for final and liquidated judgments against FSS and the Debtor.[4]  All other liquidated claims total $50,838,557.14.[5]  As a

---

[4] The Trustee is not prosecuting appeals of those judgments on behalf of FSS, and such appellate rights are property of FSS, which are vested in the bankruptcy estate of the Debtor as property of his estate to be administered by the Trustee pursuant to the Supplemental Dismissal Order. The Fifth Circuit has found that defensive appellate rights are property under state law, become property of the debtor's estate, and may be sold by the trustee. *See Croft v. Lowry (In re Croft),* 737 F.3d 372, 377 (5th Cir. 2013).

[5] There are three Texas Plaintiffs that filed contingent and unliquidated claims against FSS, which claims have not been liquidated.  Even if they were liquidated, the amount of the Connecticut Families' claims so far dwarfs any

result, the Connecticut Families hold approximately 96.7% of the amount of claims in the general unsecured creditors' claim pool.

56.     The GT Final Bid is ultimately the highest and best offer to those creditors who have not voluntarily given up part of their interests so that other creditors might recover a greater amount on their claims.

## II. The Court Should Approve the Trustee's Entry into the Asset Purchase Agreement as an Exercise of Sound Business Judgment.

57.     As noted above, the business judgment rule shields a trustee or debtor-in-possession's decisions from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a trustee articulates a valid business justification, the court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation). The business judgment rule protects certain decisions—such as the Trustee's entry into a purchase agreement—from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."). If a trustee's actions satisfy the business judgment rule, then the transaction in question should be

---

likely judgments that the Texas Plaintiffs would receive that recoveries for non-Connecticut Families unsecured creditors would still be greater under the GT Final Bid.

15668356

approved under section 363(b)(1) of the Bankruptcy Code.  Based on this rationale, courts have authorized a trustee's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

58.     The Trustee, the Purchaser, Global Tetrahedron, and the Connecticut Families negotiated the Asset Purchase Agreement in good faith and at arms' length and with no collusion. The consideration for the Purchased Assets provided by the cash component of $1,750,000 (the "**Cash Purchase Price**") and the Distributable Proceeds Waiver is fair and reasonable consideration for the Purchased Assets.  The Trustee has articulated a sound business purpose for entering into the Asset Purchase Agreement because the Cash Purchase Price and the Distributable Proceeds Waiver will create a better recovery for general unsecured creditors than the FUAC Final Bid.

59.     The total consideration constitutes reasonably equivalent value and fair and adequate consideration for the Purchased Assets under the Bankruptcy Code and the laws of the United States and any state, territory, or possession thereof.  The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable and were not entered into with the intent to nor for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Trustee, Jones, FSS, or any of their respective creditors under any applicable laws.  Neither the Trustee, the Purchaser, nor the Connecticut Families are entering into the Asset Purchase Agreement or proposing to consummate the Sale Transaction fraudulently, for the purpose of statutory or common law fraudulent conveyance, or to fraudulently transfer assets, whether under the Bankruptcy Code or under the laws of the United States, or any state, territory, or possession thereof or any other applicable jurisdiction.

**III. Sale Should Be Approved Free and Clear Under Section 363(f) of the Bankruptcy Code.**

60.     The Court has already authorized the sale of the Purchased Assets free and clear of all liens, claims, charges, encumbrances and interests pursuant to section 363(b) and (f) of the Bankruptcy Code.  Winddown Order ¶ 2.  Section 363(f) of the Bankruptcy Code permits a trustee to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

61.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Purchased Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "***Encumbrances***"), except with respect to any Encumbrances that may be assumed Encumbrances under the purchase agreement of a successful bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

62.     Any Encumbrance that will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Trustee, the Debtor's estate, or FSS may possess with respect thereto.  The Trustee requests authority to convey the Purchased Assets to the respective successful bidders free and clear of all Encumbrances including liens, claims, rights, interests, charges, and

23

encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the sale and to be held until further determination of this Court.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

63.     To implement the foregoing successfully, the Trustee requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Trustee has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

64.     The Trustee will provide notice of this Motion to the following parties or their counsel: (a) the United States Trustee for the Southern District of Texas; (b) counsel for the Debtor; (c) counsel for the Sandy Hook Families; (d) the holders of the 20 largest unsecured claims against the Debtor; (e) the Office of the United States Attorney for the Southern District of Texas; (f) the Texas state attorney general; (g) the Internal Revenue Service; (h) all known holders of liens, encumbrances, and other claims secured by the Assets; (i) all known creditors of FSS; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no further notice is required.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests entry of the Proposed Order (i) approving the auction and authorizing and approving the sale of the Purchased Assets of FSS free and clear of all liens, claims and encumbrances, (ii) authorization to enter into the Asset Purchase Agreement with the Purchaser, (iii) authorizing the Trustee to close the sale with the Purchaser, and (iv) granting such other and further relief as may be just and proper.

15668356

Dated: November 18, 2024
   Houston, Texas

        Respectfully submitted,

    By: */s/ Joshua W. Wolfshohl*
     Joshua W. Wolfshohl (Bar No. 24038592)
     Michael B. Dearman (Bar No. 24116270)
     Jordan T. Stevens (Bar No. 24106467)
     Kenesha L. Starling (Bar No.24114906)
     **PORTER HEDGES LLP**
     1000 Main Street, 36th Floor
     Houston, Texas 77002
     Telephone: (713) 226-6000
     Facsimile: (713) 226-6248
     jwolfshohl@porterhedges.com
     mdearman@porterhedges.com
     jstevens@porterhedges.com
     kstarling@porterhedges.com

     *and*

     Erin E. Jones (TX 24032478)
     **JONES MURRAY LLP**
     602 Sawyer Street, Suite 400
     Houston, Texas 77007
     Telephone: (832) 529-1999
     Fax: (832) 529-3393
     erin@jonesmurray.com

     *Counsel for Christopher R. Murray, Chapter 7 Trustee*

## CERTIFICATE OF SERVICE

   I, the undersigned, hereby certify that a copy of the foregoing document was served on November 18, 2024 on all parties receiving ECF service in the above-captioned case and by U.S. First-Class Mail, postage prepaid on the attached service list.

     */s/ Joshua W. Wolfshohl*
     Joshua W. Wolfshohl

15668356