IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE:  ALEXANDER E. JONES | § | |
| | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor. | § | Chapter 7 |

| | | |
|---|---|---|
| Alexander E. Jones, as debtor and as owner and sole Manager of Free Speech Systems, LLC | § § § | |
| | § | |
| **Plaintiffs** | § | |
| vs. | § | **Adversary Proceeding _____** |
| | § | |
| Christopher Murray, as the Chapter 7 Trustee and Global Tetrahedron, LLC, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker and Erica Ash | § § § § § § § § § | |
| | § | |
| **Defendants** | § | |

**PLAINTIFFS' COMPLAINT AND EMERGENCY APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION
PURSUANT TO BANKRUPTCY RULE 7065**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

This is the request of Alexander E. Jones ("Jones") for himself and on behalf of Free

Speech Systems, LLC ("FSS") (Jones and FSS are sometimes herein called the "Jones Plaintiffs")

for this Court (a) to enter temporary restraining orders; (b) order for expedited discovery; (c) after

hearing, enter a preliminary injunction; and (d) after trial issue permanent injunctive and

declaratory relief, among other things declaring that (i) the sixteen people and entities the Trustee

designated collectively as the "successful bidder" are disqualified from the Auction which was the

subject of this Court's Order of September 25, 2024 [Dkt. #859], (ii) First United American

Companies ("First United") whom the Trustee designated as the Backup Bidder, is the true winner of the Auction and (iii) that Alex Jones's intellectual property (defined as the "Jones IP Rights") [1] cannot be sold or transferred.  This Motion will demonstrate why this relief, and the other relief herein requested is appropriate.  It is supported by the Declaration of Alex Jones attached hereto as Exhibit 1.

## I.
## PARTIES

1.      Plaintiff **Alex Jones** is an individual and the sole manager of Free Speech Systems, LLC (previously FSS) and the owner of the Jones Persona and Jones IP Rights and has standing to bring this Complaint seeking the relief herein requested particularly regarding the Jones Persona and Jones IP Rights.

2.      Defendant **Global Tetrahedron LLC** is a participant in the violations herein complained of including the collusive bidding committed in connection with the Auction, the illicit purported acquisition of the Jones IP Rights (including the Jones Persona) and the receipt and use of confidential and proprietary information of Jones and/or FSS (and who holds any assets acquired as a result of dealings with the Trustee in trust).  By participating in the Auction and filing papers in this bankruptcy it has appeared in this case and may be served with process by serving its legal counsel of record.

---

[1]      Alex Jones's intellectual property rights referenced herein consist of and are defined to mean (i) internet domain names containing in whole or in part, the name Jones, "Alex Jones,' 'Alex E. Jones," (ii) Jones's image or likeness, (iii) Jones's unique voice (iv) other features  of Jones which are unique, defining and associated with him (which are called the "Jones Persona"), and (v)  the program and broadcasting content Jones has made or which he has produced over the years for all of his media programs and outlets  (which are herein called along with the Jones Persona, the "Jones IP Rights"). See Jones Dec. ¶¶ 3-4.  The Jones IP Rights were purportedly included in the Trustee's sale notwithstanding this Court's instructions that any disputed assets would first be brought to the Court for a resolution of the dispute.  This instruction and caution was wholly ignored as the Trustee simply listed for sale assets the Trustee marked "disputed."

3.      Defendants  Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash, (sometimes herein called the "**Connecticut Plaintiffs**") are participants in the violations herein complained of including the collusive bidding committed in connection with the Auction, the illicit purported acquisition of the Jones IP Rights (including the Jones Persona), and the receipt and use of confidential and proprietary information of Jones and/or FSS (and who hold any assets acquired as a result of dealings with the Trustee in trust).  By participating in the Auction and filing papers in this bankruptcy they have appeared in this case and may be served with process by serving their legal counsel of record.

4.      Defendant **Chris Murray**, is the Trustee of the Chapter 7 Case who has violated the terms and provisions of the Sale Order (hereafter defined), violated the conditions of the Court's order of October 25, 2024 to not sell any of the Jones IP Rights (including the Jones Persona) or other assets title to which are subject to dispute without bringing matter of those assets to the Court for ownership determination prior to sale and participated in the collusive bidding that took place in the Auction.  He has appeared in this case and may be served with process by serving his attorney of record, Joshua Wolfshohl, Porter Hedges, LLP.

## II.
## INTRODUCTION AND PRELIMINARY STATEMENT

5.      The Court knows that in its Order of September 25, 2024 [Dkt. #859] it authorized/ordered among other things,

- the Trustee to solicit and determine bidders by Friday **November 8** who would be qualified to participate in an online auction of FSS assets on Wednesday **November 13** at 10:30 AM [Order ¶5];

- "joint bids" were not permitted, only those of "a person or entity" [Order ¶6];

- each bid was required to "clearly set forth the purchase price" being offered which was required to be stated as "a specific amount in U.S. Dollars (not a range)" [Order ¶6, 2nd dot];

- each person or entity was to submit a bid agreeing to abide by and honor all of the Bid Terms [Order ¶6,5th dot];

- each person or entity bidding was to confirm it had engaged in no collusion with respect to the Auction [Order ¶11];

- no "sale of any individual or personal intellectual property rights of Alex Jones or his chapter 7 bankruptcy estate" was permitted [Order ¶11]; and

- if there were to be any changes to the sale protocol, the Trustee must announce the change at the Auction and on the record (which, as the Court knows, did not occur) [Order ¶12].

6.    First United American Companies, the entity the Trustee designated as the "Backup Bidder" but who this Court should declare to be the true successful bidder at the Auction, followed all the rules submitting a cash bid in US Dollars of $3,500,000.00.  Exhibit 2.

7.    Incredibly, however, each and every one of the above-listed requirements was disregarded by the "successful bidder."  For starters, the "successful bidder" was not one "person or entity" but there were sixteen persons and one entity, consisting of (1) Defendant Global Tetrahedron, LLC, ("Tetrahedron") which is the owner and operator of what can best be described as a series of satirical publications, (2) Mark Barden, (3) Jacqueline Barden, (4) Francine Wheeler, (5) David Wheeler, (6) Ian Hockley, (7) Nicole Hockley, (8) Jennifer Hensel, (9) William Aldenberg, (10) William Sherlach, (11) Carlos M. Soto, (12) Donna Soto, (13) Jillian Soto-Marino, (14) Carlee Soto Parisi, (15) Robert Parker, and (16) Erica Ash (each of whom received their own separate non-final damage award, in the non-final Connecticut Suit which is presently on appeal in Connecticut).

8.    And the sixteen separate people and one entity designated as the "successful bidder" did not present a "purchase price" stated in a specific U.S. dollar amount but submitted

more or less a purchase formula in the form of a forbidden range which was computed in a most bizarre fashion.  See Exhibit 3.  Specifically:

- According to their "offer," Tetrahedron put up $1,750,000;

- The sixteen (16) other "joint bidders" did not put any money up; rather they agreed to "commit to forego up to 100% of their entitlement to their portion" of what they would get from Tetrahedron's $1,750,000;

- But the catch was the Connecticut Plaintiffs only agreed to collectively "forgo" just enough to give the Texas Plaintiffs $100,000 more than the Texas Plaintiffs' collective distribution would be from the First United bid money were First United the successful bidder.  In other words, it was not even a bid of a number but it was a formula for a number which could not be determined until they knew what First United bid was, which would dictate how much of the Tetrahedron proceeds the Connecticut Plaintiffs would have to forgo - as if the Texas Plaintiffs' receipt of more money determined the Purchase Price of the assets to be auctioned.

9.     Using examples the Defendants themselves did in their bid found in Exhibit 3, with Tetrahedron's bid of $1,750,000, if First United bid $3,000,000 – it actually bid $3,500,000 but we will use the $3,000,000 as the Defendants did in Exhibit 3 – First United should clearly win, because $3,000,000 is higher than $1,750,000.  But not in the warped (or corrupt) logic of the Defendants – including the Trustee.

10.     According to the Defendants twisted logic, they could actually increase the $1.75 offer by the Connecticut Plaintiffs just agreeing to give some of their Tetrahedron distribution, to the Texas Plaintiffs.   So, if First United bid $3,000,000 of which the Connecticut/Texas split would be $2,250,000/$750,000, but Connecticut gave Texas $312,500 of their $2,250,000 Tetrahedron money – raising Texas's distribution to $850,000 – that would mean the Texas Plaintiffs would get

$100,000 more under the Tetrahedron deal than the First United deal.  And this would then magically transmogrify Tetrahedron's $1.75M offer into an over $3M offer!

11.     While whoever accepts this will be subjected to ridicule nationwide and perhaps worldwide, that is what the Trustee, Tetrahedron and the Connecticut Plaintiffs present to this Court with an apparent straight face.  And this is not only clear from Exhibit 3 which has these machinations, but Exhibit 4, which is a simple sheet that shows the Joint Bid of Tetrahedron to be "up to" $7,000,000.  And the way they get this is by the Connecticut Plaintiffs simply agreeing to give all of their Tetrahedron distribution to the Texas Plaintiffs such that the Texas Plaintiffs get the $1,750,000 and to them this is just as if Tetrahedron had offered $7,000,000.  The nonsense is self-evident.

12.     Aside from the sheer nonsense of this, it assumes that there are no other creditors who would need to share in this distribution or expenses to pay. Even more fundamentally it assumes that the Connecticut Plaintiffs' $1,500,000,000 unconstitutional damage award will be upheld in the appeal which is currently pending.  If that unconstitutional judgment is reversed— as it surely will be -- the Connecticut Plaintiffs will have given up nothing and Tetrahedron will have all of the FSS assets (and some of Alex Jones' assets) and not have to return them.

13.     Thus, this set of Joint Bidders submitted both the November 8 Joint bid and the November 13th Joint bid that contained a form of a bifurcated, non-cash, "floating bid" designed to only top whatever a higher bid was received, but not with cash but with the promise of an inter-creditor transfer of part of the Tetrahedron bid.  No announcement was ever made that joint bids, bifurcated bids, floating amounts or other form of non-final "best and highest" bid structures was even in the contemplation of the Trustee and the Defendants, which it clearly was and must have been the subject of conspiratorial negotiation and agreement.

14.     And the Trustee sold Tetrahedron and these sixteen people Alex Jones's IP rights, albeit with a "disputed" designation, thus giving them an argument that they somehow own intellectual property and internet domain names (i) containing the name Jones, "Alex Jones," 'Alex E. Jones," his image or likeness, unique voice and other defining features (the "Jones Persona") and (ii) the content made or produced over the years by Jones (collectively the "Jones IP Rights").

15.     Based on this flagrantly non-compliant Frankenstein bid, before this Court had conducted a hearing on this monstrosity and certainly before it had been approved, and also before a definitive agreement had even been signed, in a coordinated effort with the other Defendants, it is _known_ that the Trustee came to Austin and

(a) took the Alex Jones Show and InfoWars programing off the air;

(b) fired employees, expressing a "fear" of employee theft (later tempered as to layoffs);

(c) permitted the Tetrahedron to in some manner re-design or re-direct the InfoWars website to its own, touting that Tetrahedron was the new owner of InfoWars; and

(d) shut down the revenue stream of FSS's inventory of perishable consumer products. Jones Dec. ¶8.

16.     It is not known what else the Trustee did or with whom he spoke but there surely were others.  It is also known that officers and agents of Tetrahedron gave scores of interviews with media outlets, announcing themselves as owners of InfoWars and its inventory of perishable consumer goods. See Exhibit 5.  Tetrahedron executives also announced their plans to use Mr. Jones InfoWars and Mr. Jones's own personally owned prior programing and begin a systematic effort to confuse Mr. Jones's personal public following with messages espousing gun control in a manner such that Mr. Jones's personal following would be utterly confused and misled.  Further, it is known that these actions threatened to cause social media platforms such as X (formerly Twitter) to cancel Mr. Jones social media platforms and contacts.

17.     In addition to this Court declaring that First United is the successful bidder and disqualifying Tetrahedron and its sixteen Connecticut associates (for lack of a better term), Mr. Jones asks that this Court declare his rights and ownership of the Jones Persona, and his sole or in the alternative joint ownership of the Jones IP Rights, such declaration also declaring if any such Jones IP Right is jointly owned, the terms and conditions on which it can be sold and/or used, in part to make certain that consumers and members of the public are not misled or confused.

18.     This Complaint asks that the Trustee, Tetrahedron, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash, their attorneys, agents, partners, affiliates and all those acting in concert with any of them (collectively, "Enjoined Persons"), among other things herein set forth, be temporarily restrained and enjoined (both negatively and mandatorily) such that each Enjoined Person shall:

    a.  Cease to use, directly or indirectly, any Jones IP Rights;

    b.  Cease from using any reference to Alex Jones in their business or operations or suggesting or inferring that they have any rights to use of Alex Jones's name or persona;

    c.  Return to the business offices of FSS and to the control of its duly elected Manager, Alex Jones, and his Chapter 7 Trustee, all assets of FSS and/or Alex Jones that have been taken along with all copies (whether hard copies or digital, video, or other copying or storage forms);

    d.  Identify to Alex Jones all assets (tangible or intangible) of FSS and/or Alex Jones known to have been taken, copied, or in any manner duplicated by anyone;

    e.  Cease and refrain from (i) any interference with the operation and management by Alex Jones of the business of FSS, including InfoWars, and (ii) dealing with any and all third

parties in matters that relate to or concern the assets of FSS and/or Alex Jones, without the express written permission of this Court;

f.   Cease to advise or publish that any of the Enjoined Parties owns or has acquired the right to own, any assets or business of FSS and/or Alex Jones and/or InfoWars, including without limitation any Jones IP Rights;

g.   Notify in writing all persons any of the Enjoined Parties have told they own or have acquired the right to own, any assets or business of FSS and/or Alex Jones, including without limitation any Jones IP Rights, that such statements previously made to the contrary were made in error.

19.   The Jones Plaintiffs also request that they be granted expedited discovery, with permission to serve the Enjoined Parties with limited requests for production and that depositions be allowed of at least the Trustee, the corporate representative of Tetrahedron, and any of Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash or their attorneys or agents who have been involved in the arrangements, understandings and agreements among the Defendants concerning the matters herein set forth.

## III.
## JURISDICTION

20.   This Court has jurisdiction to consider this Complaint under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 1 57(b), and to the extent necessary, the Jones Plaintiffs consent to the Court entering a final order consistent with Article III of the United States Constitution.

## IV.
## BACKGROUND FACTS

A.  **MR. JONES AS A MEDIA DEFENDANT HAD HIS CONSTITUTIONAL RIGHTS UNLAWFULLY STRIPPED**

21.     Alex Jones is what the United States Supreme Court refers to as a "media defendant" and as such is entitled to very significant Constitutional protections which he was denied in Connecticut and which the Defendants seek to continue to deprive him of in this Court. *See, e.g., Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 3, 110 S. Ct. 2695, 2697 (1990) ("...the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a **media defendant** for speech of public concern….  Foremost, where a **media defendant** is involved, a statement on matters of public concern must be provable as false before liability can be assessed…") (emphasis added; internal citations omitted).   Successfully asserting claims of libel and intentional infliction against a media defendant like Mr. Jones requires a plaintiff to demonstrate by "clear and convincing evidence that the defendant acted with actual malice—that is with knowledge that the published material was false or with reckless disregard of whether it was false." *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021) (emphasis added; internal citations; quotes omitted) (*citing New York Times Co. v. Sullivan*, 376 U. S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).   The Sandy Hook tragedy and the ensuing efforts to achieve gun control legislation nationwide, were and still are public controversies and matters of public concern and the Connecticut Plaintiffs, Defendants herein, are public figures who have voluntarily thrust themselves into those public controversies, including this process.  They did so almost immediately after the tragedy itself.

22.     Approximately six years after the Sandy Hook tragedy, the Connecticut Plaintiffs (Defendants herein) sued Mr. Jones and FSS in a small Connecticut court just a few miles from the shooting.  Progress of the case was delayed when Mr. Jones unsuccessfully sought to avail himself of Connecticut's anti-Slapp laws.  A few months after the case returned to the trial court,

"death penalty" sanctions were rendered against Mr. Jones and FSS that improperly stripped him of his constitutional rights.  In very short summary, while general terms like "discovery abuse" and "cavalier attitude" were used in the transcript of the sanctions hearing, the trial court was very specific that there were three – and only three – reasons for annulling Mr. Jones's constitutional rights as a media defendant.

23.     The first reason was Jones's lawyers asked for permission to depose Hillary Clinton, a friend of one or more of the Connecticut Plaintiffs[2] and whom Mr. Jones believed was directly or indirectly involved in the case either as part of the gun control agenda or as revenge on Jones since Mr. Trump appeared as a guest on one of Mr. Jones' broadcasts during Trump's 2016 campaign against Hillary Clinton.

24.     The second reason was that Alex Jones's lawyers could not then-retrieve irrelevant and never-used "Google Analytics" data that the Connecticut Plaintiffs thought would show "sales, pricing, web traffic, that is, hits on the website and hits on the Infowars store website."  This was done even though when the subject is a media broadcaster in a libel case, "profit motive" is irrelevant.  *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2685-86 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels.")

25.     Like the second reason, the third reason was Alex Jones's lawyers could not retrieve in a form and format to the liking of the Connecticut Plaintiffs, any accounting "subaccounts" from their accounting journal entries, again which the Connecticut Plaintiffs presumably hoped to use

---

[2] Erica Ash, formerly Erica Lafferty, even gave a 5 minute speech at the 2016 Democratic National Convention after which she introduced her friend Hillary Clinton, with whom she had become close given their shared desire to effect gun control legislation and elect pro-control political candidates.

to show a profit motive, which is irrelevant to whether a media defendant has been proven to have committed malicious libel.

26.     As a result of these three – and only these three – reasons, the trial court essentially (a) struck Mr. Jones's answer and all his constitutional defenses; (b) held Mr. Jones legally and factually liable for everything the Connecticut Plaintiffs' claimed in their pleadings, whether true or not, including actions and statements by unrelated third parties – all without the Connecticut Plaintiffs having to offer any proof at all; (c) judicially decreed that Mr. Jones had subjective knowledge of the falsity of everything the Connecticut Plaintiffs claimed he and third parties said or did -- whether true or not -- without the Connecticut Plaintiffs having to offer any proof at all; (d) judicially decreed that all that was left was a trial on the Connecticut Plaintiffs' damages, which were presumed and which the Connecticut Plaintiffs needed only to demonstrate by a preponderance of the evidence; and (e) ordered Mr. Jones to effectively remain silent during the damages trial, forbidding Mr. Jones from defending himself or challenging anything the Connecticut Plaintiffs said.

27.     As a result of this unprecedented deprivation of basic concepts of due process, on October 12, 2022, the six (6) jurors – all of whom lived around or near Sandy Hook elementary school -- awarded unconstitutional, duplicative "compensatory" damages of collectively almost $1,000,000,000 and approximately $450,000,000 in collective punitive damages (the "Connecticut Judgment").  In similar circumstances, a much smaller yet still substantial judgment based on a similar default was entered against Mr. Jones in Texas (the "Texas Judgment") on behalf of a smaller group of victims' families (the "Texas Plaintiffs").

## B.  MR. JONES AND HIS COMPANY FSS FILE BANKRUPTCY; JUDGMENTS ARE APPEALED AND WILL BE REVERSED

28.     Mr. Jones filed his Chapter 11 bankruptcy case and, unable to resolve his liability by settlement, agreed to the conversion of this case to a Chapter 7 case now pending before this Court.   Pending in this bankruptcy are issues associated with the dischargeability of the unconstitutional Connecticut Judgment and the Texas Judgment.   Because the Connecticut Judgment is on appeal there – and most assuredly will be reversed -- by statute and case law it is stayed from execution and thus is not final in a traditional sense.  Execution on the Texas judgment which is also on appeal and most certainly will be reversed, is accomplished by posting collateral equivalent to the net worth of Alex Jones upon conclusion of this Chapter 7 case.

29.     Additionally, collection on both the Connecticut and Texas judgments is stayed by, among other stays, the "automatic stay" found in 11 U.S.C. 362, as the Court determines the outcome of the corresponding parties' Objections to the Dischargeability of those Judgments. Even apart from the statutory stay of the Connecticut Judgment, until a final discharge order is entered granting or denying a discharge in whole or in part of the Connecticut Judgment and the Texas Judgment, no collection of the Judgments may be attempted without this Court lifting the automatic stay, upon notice and hearing.   This Court has not done so, nor has this Court been asked to do so.

## C.   TRUSTEE IS GIVEN RIGHTS OVER CERTAIN OF MR. JONES'S ASSETS AND THOSE OF HIS FSS

30.     In around June 2024, this Court dismissed FSS from bankruptcy and gave the Chapter 7 Trustee, Defendant Chris Murray effective control over FSS's assets and most of those of Mr. Jones.  On August 22, 2024, the Trustee filed a Motion requesting permission to auction off FSS assets. [Dkt. #929].   In September 2024, this Court entered the "Sale Order" (herein sometimes referred to as the "Order") [Dkt. #859] permitting the Auction of certain assets but

under strict conditions. One of those conditions was that none of Alex Jones's "individual or personal intellectual property rights" could be sold.  Order ¶31.

31.    When it became clear that the Trustee nevertheless intended to attempt to sell some aspects of the Jones IP, Alex Jones objected to the sale of any intellectual property containing his name, likeness, original voice, image, and any other components of his Jones IP Rights. Specifically, Jones objected that such assets could not be sold (e.g., Jones "X" personal account, *etc.*) including any assets containing his name or the Jones Persona and Jones IP Rights.  On October 25, 2024, this Court conducted a further hearing and issued an order on the objection of Jones to the proposed sale of certain property comprising the Jones Persona and Jones IP Rights which the Trustee had indicated an intention to sell as part of the Auction Order process.  This Court made clear that there should be no sale of any asset by the Trustee where ownership was disputed or contested by any party ("Disputed Assets"), and that the only assets to be sold would include non-Disputed Assets as those determined by the Court.  Among other things, the Court expressed a concern of the potential for title disputes arising all over the country as a purchaser attempted to claim title to a Disputed Asset, and instructed all parties before the Court, including Alex Jones, the Trustee, and the Connecticut and Texas Plaintiffs, that any disputed asset must first be brought to the Court for an ownership determination by the Court and thus were not to be a part of the November Auction.

### D.  THE NOVEMBER AUCTION/SALE

32.    In its Order of September 25, 2024 [Dkt. #859] this Court authorized/ordered among other things,

- the Trustee to solicit and determine bidders by Friday November 8 who would be qualified to participate in an online auction of FSS assets on Wednesday November 13 at 10:30 AM [Order ¶5];

- "joint bids" were not permitted, only those of "a person or entity" [Order ¶6];

- each bid was required to "clearly set forth the purchase price" being offered which was required to be stated as "a specific amount in U.S. Dollars (not a range)" [Order p. 6, 2nd dot];

- each person or entity was to submit a bid agreeing to abide by and honor all of the Bid Terms [Order p.5th dot];

- each person or entity bidding was to confirm it had engaged in no collusion with respect to the Auction [Order ¶11];

- no "sale of any individual or personal intellectual property rights of Alex Jones or his chapter 7 bankruptcy estate" was permitted Order ¶11]; and

- if there to be any changes to the sale protocol, the Trustee must announce the change at the Auction and on the record (which, as the Court knows, did not occur).

33.     On November 8, 2024, the Trustee received two bids and determined them to qualify both bidders.  First United's confidential bid was for cash of $1,200,000.00 and the Tetrahedron/Connecticut Plaintiffs joint bid was for less cash ($1,000,000) with a component formula waiver by the Connecticut Families in an amount intended to top any lower bidder.  In the Joint Bid, cash to the estate would never exceed $1 million.   As mentioned, the Trustee qualified both bidders but made no announcement about the dramatic differences in the bid structures or components.

34.     After receiving both bids, the Trustee announced a cancellation of any auction and issued a new Bid Form titled "highest and best bid" deadline.   Nothing in any statement or oral notice discussed any joint bidding, disclosed any agreement to accept a non-cash component, or discussed a non-cash but "deemed cash" component where the Connecticut Plaintiffs could increase a third party's Purchase Price by foregoing their share of the ensuing distribution of the sale proceeds. All of this was known to the Trustee and known to the Joint Bidders, but unknown to anyone else including the highest cash bidder, First United.  Of course, none of this was announced at the Auction or made known to the Court.

35.     On Wednesday November 13, the Trustee received bids from First United American Companies [Exhibit 2] for $3,500,000 and from Tetrahedron, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash [Exhibits 3 & 4][3] for $1,750,000 with the Connecticut Plaintiffs agreeing to forego some portion of their distribution of the $1,750,000 in favor to the Texas Plaintiffs, which did not even purport to increase the cash price.

36.     On Thursday, November 14, 2014, the Trustee filed a "Notice of Successful Bidder and Backup Bidder [Dkt. # 903].  First United American Companies was designated by the Trustee as the "Backup Bidder."

37.     The Trustee notified that the "successful bidder" was not one "person or entity" but that there were sixteen of them consisting of (1) Defendant Global Tetrahedron, LLC, ("Tetrahedron") which is the owner and operator of what can best be described as a series of satirical magazines, (2) Mark Barden, (3) Jacqueline Barden, (4) Francine Wheeler, (5) David Wheeler, (6) Ian Hockley, (7) Nicole Hockley, (8) Jennifer Hensel, (9) William Aldenberg, (10) William Sherlach, (11) Carlos M. Soto, (12) Donna Soto, (13) Jillian Soto-Marino, (14) Carlee Soto Parisi, (15) Robert Parker, and (16) Erica Ash (each of whom received their own separate non-final damage award, in the non-final Connecticut Suit which is presently on appeal in Connecticut).

38.     As stated, these sixteen separate people and entities designated as the "successful bidder" did not present a "purchase price" stated in a specific U.S. dollar amount.   Rather, their "offer" was a range computed in the most bizarre fashion.  See Exhibit 3.

- According to their "offer," Tetrahedron put up $1,750,000; and

---

[3] Exhibit 4 actually shows the bid at $7,000,000 and the nonsense of this has previously been explained.

- The sixteen (15) other "joint bidders" did not put any money up; rather they agreed to "commit to forego in favor of the Texas Plaintiffs up to 100% of their entitlement to their portion" of what they would get from Tetrahedron's $1,750,000, agreeing only to collectively "forgo" just enough to give the Texas Plaintiffs $100,000 more than the Texas Plaintiffs' collective distribution would be from the First United bid.

39.     And Tetrahedron  and the fifteen people associated with Tetrahedron acquired Alex Jones's IP rights, albeit with a "disputed" designation, thus giving them an argument that they somehow own intellectual property and internet domain names containing the name Jones, "Alex Jones," 'Alex E. Jones," his image or likeness, unique voice and other defining features (the "Jones Persona") and the content made or produced by Jones  (collectively the "Jones IP Rights").

40.     At ¶7 of the Trustee's Motion [Dkt. #829], the Trustee represented that operations of FSS would be terminated and employees released **only** "at the conclusion of the asset sales…" which he represented had not yet occurred.  Yet before this Court could conduct a hearing on this non-compliant arrangement and certainly before it had been approved, and also before a definitive agreement had even been signed, in a coordinated effort among all Defendants, it is _known_ that the Trustee came to Austin and (a) took InfoWars programing off the air; (b) fired employees who were working at a business that generated significant cash, as the Trustee himself acknowledged; and (c) took control of FSS's inventory of perishable consumer products sold.  Jones Dec. ¶8.  It is not known what else the Trustee did or whom he spoke with.  The Trustee's counsel later represented to the Court that the Trustee closed everything down and terminated operations out of some fear that employees would somehow steal or convert assets once they found out who the "winning bidders" were, a claim Mr. Jones roundly rejects. Jones Dec. ¶8.  These acts violated the Trustees assurances to the Court. Further, FSS is a Texas limited liability company and Alex Jones is the manager.  Whether the Trustee is a "member" or more likely, an assignee of a membership interest, neither status gives him the right to usurp the statutory functions of the manager –who is unquestionably Alex Jones, unless the Trustee has a membership resolution that removes Mr. Jones

as the manager.   In short, the Trustee acted contrary to his representations to the Bankruptcy Court and contrary to Texas law.

41.    It is also known that officers and agents of Tetrahedron gave scores of interviews with media outlets, announcing themselves as owners of InfoWars and its inventory of perishable consumer goods.  Exhibit 5.  The InfoWars website on November 14, 2024, showed control of the InfoWars Website was transferred to Tetrahedron.  Again, the Defendants' announced their plans to use Mr. Jones InfoWars and Mr. Jones's own personally owned prior programing and begin a systematic effort to confuse Mr. Jones's personal following with messages espousing gun control in a manner such that Mr. Jones's personal following would be utterly confused and misled.  Jones Dec. ¶¶6 & 10. Further, it is known that these actions threatened to cause social media platforms such as X (formerly Twitter) to cancel Mr. Jones social media platforms and contacts.

**V.**
**CLAIMS AND CAUSES OF ACTION**

**A.  JONES IP RIGHTS**

42.    Each and every statement herein above and hereafter set forth is incorporated herein by reference.

43.    Mr. Jones has property rights in the Jones IP Rights, which he brings this action to both obtain a declaration of ownership of, and to protect through injunctive relief against anyone's unauthorized use thereof, including without limitation, Alex Jones's unique and personal name, image, likeness, unique voice, and/or other personal identifying attributes associated with Alex Jones which belong to him personally and cannot be sold.  Among other things, consumers will suffer massive market confusion if his personal rights are marketed by anyone other than himself. Jones Dec. ¶¶6 & 10. The Connecticut Plaintiffs have made plain their desire to destroy Alex Jones personally.  They and Tetrahedron have made plain their intention to use this case as a vehicle to

advance their position on social issues (such as their anti-Second Amendment gun control positions) with which Alex Jones is publicly associated but on the opposite side. Should they be the purchasers there is no doubt they would not simply hide or not use the assets, but rather would likely seek to use them in active opposition to some of the very things Alex Jones's unique and personal name, image, likeness, unique voice, and/or other personal identifying attributes are associated with by his followers. Allowing the purchase of anything associated with Alex Jones's unique and personal name, image, likeness, unique voice, and/or other personal identifying attributes associated with Alex Jones which belong to him personally such that they could be used by Tetrahedron and/or the Connecticut Plaintiffs, would be on the same level as what the Fifth Circuit enjoined when the unique assets and good will of the NAACP were sought to be seized and sold by a deeply conservative Mississippi group that had gotten a judgment against the NAACP and had begun levying on its assets. *See Henry v. First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (5th Cir. 1979); see also *Pennzoil Co. v. Texaco, Inc*., 481 U.S. 1, 22, 107 S. Ct. 1519, 1532 (1987). The unique and personal name, image, likeness, unique voice, and/or other personal identifying attributes, belong to Alex Jones personally and use by others could be used to wreak havoc in the market place, particularly if they were to fall into the hands of others those bent on his destruction.

44.    Moreover, Order ¶31 specifically states that none of Alex Jones's "individual or intellectual property rights" could be sold and yet they were. The Trustee purported to sell some or all of the Jones IP Rights doing so under an ambiguous and meaningless "undisputed" label. Mr. Jones seeks declaratory relief that no such sale is valid, and the entry of an injunction both precluding their use and mandating their return.

45.    Without limiting the generality of the foregoing, the actions of the Defendants in attempting to sell the Jones IP Rights, violates this Court's orders which are contractual in nature.

Numerous categories of assets alleged to have been sold contain the "disputed" notation indicating the Trustee sold and the Defendants bought assets whose ownership is in dispute, when that was forbidden by the Court.

46.    Further, programming and written materials alleged to have been sold to Tetrahedron and the Connecticut Plaintiffs, are either solely owned by Alex Jones, or at worst jointly owned with him, as he himself created all content and thus holds the rights to them. Jones Dec. ¶4.  This means, and declarations are herein sought so stating, that they cannot be sold or marketed without Mr. Jones's approval which he expressly does not give to Tetrahedron and/or the Connecticut Plaintiffs.  Jones Dec. ¶10.   The Trustee appears to have not only sold them but sold them to ardent gun control advocates who intend to use those jointly owned assets (at worst as they are likely solely owned by Mr. Jones as the creator) for the polar opposite purposes to which Mr. Jones has and will use them.  The nature of Tetrahedron's business and its stated intentions, creates the probability of consumer confusion and a significant dilution in the value of the Jones IP Rights.  This is a violation of what the Court had explicitly stated should not happen and it violates copyright law.

47.    Mr. Jones seeks monetary damages for all losses he has sustained and will sustain as a result of these unauthorized and illegal acts.

## B.  DECLARATORY AND INJUNCTIVE RELIEF REGARDING THE AUCTION

48.    Each and every statement herein above and hereafter set forth is incorporated herein by reference.

49.    Mr. Jones seeks a declaration that Tetrahedron, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto

Parisi, Robert Parker, and/or Erica Ash, are not the successful bidders at the Auction and that the form and substance of their offer is non-compliant, for the reasons herein set forth.

50.     Mr. Jones seeks an injunction that precludes the Trustee from attempting to negotiate with any of the Defendants and/or seeking or receiving any additional offers for or on behalf of the Defendants.

51.     Mr. Jones seeks a declaration that First United American Companies is the successful bidder.  Mr. Jones also seeks an injunction requiring the Trustee to finalize the sale of assets to First United and complete it expeditiously.

52.     Without limiting the generality of the forgoing, the Jones Plaintiffs seek further declaratory relief that joint bids were not allowed and the Defendants conspired to breach and violate this requirement. The Trustee's "Notice of Successful Bidder" [Dkt. #903] states that the successful bidder was a "joint bid by Global Tetrahedron, LLC ('Global Tetrahedron') and the Connecticut Families…"  The Trustee blatantly and fragrantly violated the Sale Order which specifically contemplates in numerous places that Qualified Bidders must be a singular "person or entity."  See e.g., Sale Order ¶6 "To participate in the bidding process for the IP Assets or otherwise participate in the IP Assets Auction, a ***person or entity***…". There is no mechanism for "joint bids" or even an explanation of what that is or means.   Not only this but allowing two bidders to work together to submit a "joint bid" is to not just countenance but participate in illegal, collusive bid rigging, which the Defendants assured the Bankruptcy Court would not occur.   The Trustee received approval to conduct an auction, which means that all interested bidders were to competitively and openly bid.  It appears Tetrahedron was going to bid cash.   The Connecticut Plaintiffs could only "credit bid" some or all of their non-final, unconstitutional judgment that is currently on appeal in Connecticut and is the subject of Mr. Jones Counterclaims filed in Federal Court challenging the Connecticut Judgment as having been procured in multiple violations of Mr.

Jones's civil rights (discussed below). Such a credit bid of such a contingent asset is worthless and that is presumably why they did not do it.

53. The Trustee appears to have simply taken it upon himself to allow two bidders to secretly team up --- which is the black letter definition of collusive bidding – and do so by allowing the Connecticut Plaintiffs to "forego" some of their portion of the Tetrahedron $1,750,000 and act like their forgoing somehow magically increased the $1,750,000 simply because the Texas Plaintiffs would somehow receive more. It is unknown whether Tetrahedron would have bid more cash if not allowed to collude with the Connecticut Plaintiffs. Irrespective, to allow them to "team up" is bid collusion and it is both illegal and in violation of the Sale Order.

54. Without limiting the generality of the forgoing, the Jones Plaintiffs seek further declaratory relief that an auction was required but did not occur and the reason the Auction the Court approved was cancelled was to facilitate collusion, as it would have been impossible make the bizarre bid of Tetrahedron and the Connecticut Plaintiffs in an auction context. But the Trustee represented to everyone that a transparent auction would occur where all bidders could see what the others were bidding and consider whether to increase their bid. In light of the collusive bidding that the Trustee participated in, it is obvious why the Trustee would decide at the last minute to cancel the Auction and instead engage in private negotiations. If the bidding is in cash, then auctions are the best way to achieve maximum value. But a bid where a creditor "foregoes" a portion of what he/she would receive is virtually meaningless, impossible to bid against and impossible to even make in an online auction. But more importantly, it is not a cash bid in U.S. Dollars expressed as a number and not a range. As to the remainder concept of profit sharing among the creditors based on the "approved" amounts of their claims, the non-final, unconstitutional Connecticut Judgment is virtually impossible to value let alone bid against and will be reversed. Hence, the Trustee's decision to abandon the auction format is inexplicable apart

from his participation in bid rigging and in violation of the Sale Order that approves and requires an auction.

55.     Without limiting the generality of the forgoing, the Jones Plaintiffs seek further declaratory relief that not only was a "joint bid" by Tetrahedron and the Connecticut Plaintiffs impermissible and illegal collusion, but no consideration was also permissible except cash.  In numerous places, the Sale Order states that "[t]he Purchase Price should be a specific amount in U.S. Dollars (not a range)."  Yet this was violated as the Trustee announced that Tetrahedron put up a smaller amount of cash than First United American Companies, LLC but the Connecticut Plaintiffs had contributed some a varying range of "foregoing" of a portion of their share of sales proceeds.  This is not a cash bid.  In fact, it is difficult to understand and literally impossible to value.  The entire arrangement violates the bid protocols and is neither legal, moral or ethical.

## VI.
## EMERGENCY INJUNCTIVE RELIEF REQUESTED

56.     By this filing, the Jones Defendants ask that the Trustee, Tetrahedron, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash, their attorneys, agents, partners, affiliates and all those acting in concert with them (collectively, "Enjoined Persons"), among other things herein set forth, be temporarily restrained, enjoined and ordered (both negatively and mandatorily) to

  a.  Cease to use, directly or indirectly, any Jones IP Rights;

  b.  Cease from using any reference to Alex Jones in their business or operations or suggesting or inferring that they have any rights to use of Alex Jones's name or persona;

  c.  Return to the business offices of FSS and to the control of Alex Jones, who is the duly elected Manager of FSS, all assets of FSS and/or Alex Jones that have been taken;

d.  Identify to Alex Jones all assets (tangible or intangible) of FSS and/or Alex Jones known to have been taken and/or secreted;

e.  Cease and refrain from (i) any interference with the operation and management by Alex Jones of the business of FSS, including InfoWars, and (ii) dealing with any and all third parties in matters that relate to or concern the assets of FSS and/or Alex Jones, without the express written permission of this Court;

f.  Cease to advise or publish that any of the Enjoined Parties owns or has acquired the right to own, any assets or business of FSS and/or Alex Jones, including without limitation any Jones IP Rights; and

g.  Notify in writing all persons to whom any of the Enjoined Parties has told they own or have acquired the right to own, any assets or business of FSS and/or Alex Jones, including without limitation any Jones IP Rights, and advise them that statements previously made to the contrary were made in error.

## VII.
## ARGUMENTS AND AUTHORITIES
## ON INJUNCTIVE AND TEMPORARY RELIEF

57.     Bankruptcy Rule 7065 has certain limitations not applicable to Section 105 injunctions, but both confer on the bankruptcy courts all of the traditional injunctive powers of a court of equity,[4] and authorize and empower this Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the pending and ongoing bankruptcy cases, aid in the preservation of the assets of the Debtor estates, and aid in the promulgation and confirmation of a chapter 11 plan that will maximize

---

[4] *See* S. Rep. 95-989, at 12 (1978); H.R. Rep. No. 95-595, at 11, 342 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5973, 6298.

recovery to all of the Debtors' creditors and prevent abuses and violation of Court Orders or the rights of a Chapter 7 debtor or third parties.[5]   Here defendants have trampled on the rights of Alex Jones as the owner of his Persona and the owner or co-owner of Jones IP Rights as well as third parties relying on the faithful and honest performance of their fiduciary duties to the Court and the bankruptcy estate of Jones.  As explained by a leading bankruptcy treatise:

> Section 105 is an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case.  The basic purpose of section 105 is to assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction.  *See*, Collier on Bankruptcy ¶ 105.01 (2001).

58.    The Bankruptcy Court has exclusive jurisdiction over property of the Debtors' estate pursuant to 28 U.S.C. § 1334, in whatever form and wherever located.  This includes a Chapter 7 debtor's exempt property and his personal rights including the Jones Persona and the Jones IP Rights.  Thus, the powers conferred on this Court by section 105(a) are accordingly broader than the automatic stay provisions and permit this Court to enter an injunction even in a situation that is not included within the automatic stay.  *See In re AP Indus., Inc*., 117 B.R. 789, 801 (Bankr. S.D.N.Y. 1990); *In re Stadium Mgmt. Corp*., 95 B.R. 264, 266-78 (D. Mass. 1988).[6] In this case the automatic stay should be found to be applicable at the time of the entry of the §

---

[5]       *In re A.H. Robins*, 788 F.2d at 1002 ("The statutory power of the bankruptcy court to enjoin actions involving the debtor or its property is not, however, limited to section 362. . . . It has been repeatedly held that 11 U.S.C. § 105 . . . 'empowers the bankruptcy court to enjoin parties other than the bankrupt' from commencing or continuing litigation.") (citing *Otera Mills, Inc. v. Sec. Bank & Trust*, 25 B.R. 1018, 1020 (D.N.M. 1982)); *In re Johns-Manville Corp)*, 40 B.R. at 226 ( "In the exercise of its authority under § 105, the Bankruptcy Court may use its injunctive authority to `protect the integrity of a bankrupt's estate and the Bankruptcy Court's custody thereof and to preserve to that Court the ability to exercise the authority delegated to it by Congress.' Pursuant to the exercise of that authority the Court may issue or extend stays to enjoin a variety of proceedings which will have an adverse impact on the Debtors' ability to formulate a Chapter 11 plan.") (citations omitted).

[6]       *See also* S. Rep. No. 95-989, at 12 (1978); H.R. Rep. No. 95-595, at 342-43 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5973, 6298 ("The court has ample other powers to stay actions not covered by the automatic stay. Section 105[] of proposed title 11 . . . grants the power to issue orders necessary or appropriate to carry out the provisions of title 11.").

105 injunctive relief as to certain relief and "automatically" applicable to the exempt or protected rights of Alex Jones in his Jones Persona and Jones IP Rights, as the case may be.

59.      In considering the propriety of an injunction pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court is generally required to consider a modified version of the typical elements for injunctive relief set out below, with a particular emphasis on the element of "the public interest."[7]   However, in a less stringent application of Rule 65 injunctions, these injunction elements are:

> factors to be balanced and not prerequisites that must be satisfied.  These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements. 'A fixed legal standard is not the essence of equity jurisprudence.'"  *In re Eagle-Picher*, 963 F.2d at 858 (citations omitted).

60.      Section 105 is of critical import in this case.   Section 363(n) is the mechanism by which a Trustee may set aside a collusive bid scheme.  However, court generally hold that *only the trustee* has standing to avoid a sale under § 363. *See In re Butan Valley, N.V.*, 2009 U.S. Dist. LEXIS 119542, 2009 WL 5205343 at *2 (S.D. Tex. Dec. 23, 2009).  However, who avoids a sale if the Trustee is a participant in the secret agreements, as alleged here?   Case law has now developed such that *In re Butan Valley* is no longer good authority.  Courts now look at whether the claimant is within the "zone of interest that Congress intended to protect in § 363(n).[8]  "U.S.

---

[7]      *Am. Film Techs.*, 175 B.R. at 849.  *See also Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (citing four similar considerations: (a) the movant's reasonable probability of success on the merits; (b) irreparable harm to the movant if relief is not granted; (c) the possibility of harm to other interested parties; and (d) the public interest); *In re Eagle-Picher Indus., Inc. ,* 963 F.2d at 858 (same).

[8]      The statute itself plainly states: "The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale . . . ." I, 363(n).  *In re New Energy Corp.*, No. 12-33866 HCD, 2013 Bankr. LEXIS 3665, at *7-8 (Bankr. N.D. Ind. Feb. 26, 2013). However, *Rumsey Land Co. v. Res. Land Holdings, LLC,* Civil Action No. 16-cv-2117-CMA-MLC, 2018 U.S. Dist. LEXIS 54482, at *20 (D. Colo. Mar. 5, 2018) recognizes that § 363(n) "statutory standing" is no longer jurisdictional:

> Thus "questions of so-called 'statutory standing' like the one presented in this case, despite no longer falling under the technical label of prudential standing, are not jurisdictional." *Niemi*, 770 F.3d at 1345. Recently, the Bankruptcy Appellate Panel of the Tenth Circuit recognized the question of a non-debtor, non-trustee's "statutory standing" "isn't actually a matter of standing at all; instead, it

Bankruptcy law has a strong public policy against enforcing collusive or price-fixed bids in …
contracts." *In re SageCrest II, LLC,* No. 3:16-cv-00021 (VAB), 2018 U.S. Dist. LEXIS 54245, at
*13 (D. Conn. Mar. 30, 2018).   Importantly, it has also been noted that "Section 363(n)
*complements the court's overall authority to withhold approval of sales lacking in good faith by
reason of finding collusion between the purchaser and other bidders….*" *In re Edwards*, 228 B.R.
552, 563 n.23 (Bankr. E.D. Pa. 1998).   Thus, where the participants involved lack good faith and/or
engage in a collusive bidding scheme, and the Trustee joins in that lack of good faith, it is the Court
that controls the decision of voiding the bid of a participant with its power to enjoin pursuant to
§105.   Again, to be clear, the Jones Plaintiff only wish the bid of Tetrahedron and the Connecticut
Plaintiffs declared void, and that First United's bid be accepted.

61.     The November 8, 2024, offer by the Joint Bidders was known to the Trustee on that
date.   After this knowledge, this was not only a secret agreement among the two Joint bidders *but
also the Trustee* who all failed to fairly and transparently give all bidders the new conditions that
the Trustee would accept – likely because they made no sense and were implemented solely to
benefit Tetrahedron and the Connecticut Plaintiffs.   Here the Trustee, after consultation with only
the Joint Bidder changed the Sale Order process from a Court ordered Auction to a single
opportunity to make a "highest and best bid" that, was it turned out, applied only to prejudice the
one bidder who was offering the most cash consideration – First United. With the Trustee's

---

merely asks whether a particular federal cause of action 'encompasses a particular plaintiff's
claim.'" *In re Peeples*, 880 F.3d 1207, 1213 (B.A.P. 10th Cir. 2018) (internal quotation marks
omitted, quoting *Lexmark*, 134 S. Ct. at 1387, 1388).
    …. Thus the issue Defendants attempt to treat as jurisdictional is instead *whether Romanowski fails
to state a claim because his alleged interest or injury is not within the "zone of interests" that
Congress intended to protect in § 363(n). In re Peeples*, 880 F.3d at 1213 Defendants' Rule 12(b)(1)
motion fails with respect to Romanowski's Section 363(n) claim because it does not raise a
jurisdictional issue. Nor can the court construe the motion as one brought under Rule 12(b)(6)
(through Rule 12(c), since Defendants have answered) because none of the parties brief the
applicable "zone of interests" doctrine. *Id. Rumsey* at *2

knowledge, Tetrahedron and the Connecticut Plaintiffs were not ever going to make a highest and best offer bid, only offering only a fraction of the amount of cash along with a nonsensical formula that would "top" the legitimate highest and best offer of $3.5 million with "fake dollars" in the form of returning to the estate the Joint Bidder's dividend up to the amount necessary to win the bid, *but with a back in percentage guaranty on revenues of the operation of the assets when acquired*.  Under the secret bidding agreement, the estate would never get more cash, but the joint-bidder Connecticut Judgment holders would reduce their claimed right to a dividend, in exchange for a future share of the profits (that other creditors did not get).

62.     As to Plaintiff-movant Alex Jones, to be entitled to this temporary restraining order, the Jones Plaintiffs must show the following:

  a.  a substantial likelihood of success on the merits (that is, his Jones Persona and Jones IP Rights) should not be sold even if listed by FSS;

  b.  a substantial threat that the Jones Plaintiffs will suffer irreparable injury if the injunction is denied;

  c.  the threatened injury outweighs any damage that the injunction might cause the Defendants; and

  d.  granting the injunction will not disserve the public interest.

*See, Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999); *Morales v. City of S. Padre Island*, 2010 U.S. Dist. LEXIS 55362 *7-8 (S.D. Tex. June 4, 2010).  The decision to grant or deny injunctive relief is left to the sound discretion of the district court. *Mississippi Power & Light Company v. United Gas Pipe Line Company*, 760 F.2d 618, 621 (5th Cir. 1985).

63.     Bankruptcy Courts often endorse even more lenient standard under section 105(a), holding for instance, that a movant need not demonstrate irreparable harm in order to enjoin proceedings that would defeat or impair a bankruptcy court's jurisdiction over the case before it.

*See, e.g., Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) holding that bankruptcy court's finding that

> "all four of the traditional elements required to support a preliminary injunction" were present "was an unnecessary exercise . . . since 'a bankruptcy court can enjoin proceedings in other courts *when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it.* In other words, the court does not need to demonstrate an inadequate remedy at law or irreparable harm.'") (quoting *In re L&S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993)); *LTV Steel Corp. v. Bd. of Educ. (In re Chateaugay Corp)*, 93 B.R. 26, 29 (S.D.N.Y. 1988) ("The usual grounds for injunctive relief such as irreparable injury need not be shown in a proceeding for an injunction under section 105(a).").

64. And this is precisely what the Court made clear in the October 25, 2024 hearing. No assets that are contested or disputed would be sold until the Trustee brought the contest or dispute to the bankruptcy court to decide. Yet the Trustee simply designated Jones IP as "disputed" and has purported to have sold the Jones IP Rights.

65. In this instance, the blatant attempt of the Defendants to ignore this Court's instruction and caution are coupled with the knowing and intentional ignoring of this Courts bid procedures set out in the Sale Order and to advertise for sale Jones "disputed" title to all assets using his Jones Persona or Jones IP Rights. Jones made his dispute and claims known, and this Court made its pronouncement on how to handle such disputes, both of which were ignored by the Defendants.

66. The Jones Plaintiffs have met their burden of proof as to the likelihood of success on the merits to support the injunctive relief. The Jones Plaintiffs have shown that the Defendants have knowingly and intentionally taken action and threaten to continue that action which usurps this Court Sale Order, the mandates regarding disputed claims to assets, and Alex Jones' property rights regarding the Jones Persona and the Jones IP Rights.

67.     Jones has provided this Court with the legal and factual basis of his claim to the Jones Persona and the Jones IP Rights.  The likelihood of a successful result of Alex Jones pressing his rights is very high and will be even greater if an injunction against Defendants is entered.  The fact of concluding the proposed sale of Jones Persona or Jones IP Rights will directly and adversely impact and damage these the rights, make the Court's Sale Order impossible to fully restore Jones's property rights and complicate the ability of the Court to enforce its orders if suits must now be filed in multiple jurisdictions where Jones Persona or Jones IP Rights is used to confuse the public and replicate Jones as if an authentic.  The value of the sale process and the asset to be protected by the injunctive relief sought herein, far exceeds the purported recovery of the Trustee in this sale, in particular by rejecting the winning collusive bidder and recognizing the only legitimate cash bid submitted (that is several million dollars higher than the collusive bid).

68.     The Defendants are now taking steps to control this, and all property involved in the Sale Order by their actions and demands as if title had transferred, even though no title has been approved for transfer and such transfer would be in violation of this Court's Sale Order, sale approval, and Alex Jones property rights.

69.     The actions and demands are the product of private and privileged information, which was gained by the Trustee as a Fiduciary and furnished to the Trustee by the Defendants notwithstanding the Defendants were not qualified bidders based on the disqualifying collusive bidding and the nature of the bid in violation of the Sale Order.  The Trustee knew of the joint bid and knew that it would not result in any additional cash to the estate and would only result in a higher dividend to the Texas Plaintiffs who would receive a greater share the Connecticut Plaintiffs' allowed claims to the $1.75 million cash consideration.  The fact that the Trustee knew that one bidder's plan to top the highest cash bidder with the "agreement" that did not increase the cash consideration at all, and failed to disclose that the Trustee would accept something other than

cash, i.e., some inter-creditor transfer of rights, which will evaporate when the Alex Jones appeal is lost and/or (ii) the Connecticut Plaintiffs' claim is held non-dischargeable.  Thus, if Alex Jones wins his dispute with the Connecticut Plaintiff in the appeals court or is discharged here, and they have no "allowed" claim and *no non-dischargeable debt* then the actual value of the bid was always only a fraction of the First United.  Thus, it is impossible to "value" the Joint Bid at anything more than its cash value of $1.75 million or ½ the amount of the First United offer.

70.     Jones is faced with the sale of his Persona, including his name and Jones IP content, made available to a bidder that intends to use the Persona and IP to mimic Jones, confuse Jones's audiences as to the truth and source of this use, and otherwise gain an economic advantage by destroying Jones's right to the exclusive use of his Persona.

71.     The balance of harms strongly favors an injunction of the Defendants.  "An irreparable injury is one that cannot be prevented or fully rectified by a final judgment following a trial." *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). An injury is irreparable if the plaintiff cannot be adequately compensated in damages, or if those damages are incapable of calculation— that is, if there is no adequate remedy at law. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). *Ayiba v. Wells Fargo Bank, N.A.*, 2011 U.S. Dist. LEXIS 139884 (S.D. Tex., Dec. 5, 2011); *Collins v. Aggreko, Inc.*, 884 F. Supp. 450, 452 (D. Utah 1995); *See also In re F.T.L., Inc.*, 152 B.R. 61, 64 (Bankr. E.D. Va. 1993) (finding no substantial harm where injunction was temporary).[9]  Trial on the merits of this sale is not a long process and it is clear from the case authority that this Court will has the jurisdiction to resolve that claims promptly.

---

[9]     *Cf. In re Continental Airlines, Inc.*, 203 F.3d 203, 217 n.17 (3d Cir. 2000) (ultimately finding insufficient support for permanent release of claims against non-debtor, but nevertheless indicating that a temporary injunction would have been "quite a different matter").

_

72.     Injunctive relief will impose a minimal burden because: (1) it will be temporary; (2) it is reasonably limited in scope; (3) if the sale to Tetrahedron/Connecticut Plaintiffs is not approved or simply delayed pending formal court approval, only a limited period of time will have lapsed.   Accordingly, the injunctive relief sought in the Motion will benefit the estate greatly but will not prejudice the Defendant.

73.     In this case the irreparable harm being suffered by the Jones Plaintiffs clearly outweighs whatever damage Defendants could claim as a result of an injunction.  The damages to Alex Jones, if his intellectual property (his Jones Persona and Jones IP Rights) is sold to a third party "as if" such third party may at its discretion use such property in any manner it elects, as the owner, will substantially harm Alex Jones by creating total public confusion as to the authenticity of a message, who is making the content or delivering the messages, whether or not it is approved or endorsed by Alex Jones, and the like.

74.     Defendants will be caused no harm because the sale proceedings will merely be delayed for a short time pending the resolution of this Adversary.  Certainly, if Defendants suffer any harm, it would not be irreparable.  *TGI Friday's, Inc. v. Great Northwest Rests., Inc.*, 652 F. Supp. 2d 763, 772773 (N.D. Tex. 2009) (irreparable harm outweighs money damage).

75.     Finally, The Court's issuance of an injunction would not disserve the public interest. *TGI Friday's, Inc.*, F. Supp. 2d at 767.  In conducting this analysis, the court determines whether broad public interests are disserved by the entry of the requested injunctive relief.  *Id.* The injunction requested thus would serve to ensure the fair and equal treatment of all bidders, a strong public policy of bankruptcy court sales.

76.     Additionally, the public interest is not to conduct a sale that will result in litigation over multiple uses of the Jones Persona or Jones IP Rights and in particular where the Jones IP has

been coupled with third parties not involved in any Jones disputes (*e.g.* the Jones IP "Jones – Crowder" proposed to be sold.

77.    Moreover, the public interest is served by protecting parties from being deprived of their due process rights, and not only the lack of all due process in the suffering of the loss of personal rights but the due process of use of their property pursuant to the a sale in violation of this Court's orders, the bankruptcy code prohibiting collusive bidding, and the public interest of not promoting pubic confusion as to the Jones Persona or the Jones IP Rights and the rights of third parties.

78.    The injunctive relief sought herein will serve the public interest by preventing a sale that (a) violates this Court's orders, (b) will prevent the misuse of the Jones Persona and Jones IP Rights, (c) confuse the public and harass public discourse as to the authentic Alex Jones persona, (d)  misuse the Jones IP Rights to publish works that purport to be the work of the real Alex Jones, and (e) will create a "level playing field" to assure equality of any public discourse regarding the true source of any publication or communication purporting to be that of Alex Jones or published by or authorized by the real Alex Jones.

79.    Additionally, there is a strong public interest in the resolution of the claims that restrict the use and sale of Jones Persona and Jones IP Rights and not initiate a procedure that assures litigation among third parties, Jones and the ultimate owners or users of Jones Persona and Jones IP Rights.

80.    **<u>Notice to the Trustee and Defendants</u>**: Federal Rule of Civil Procedure 65(b), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7065, contemplates notice to the Defendants. The Trustee's counsel has been notified of the nature of the complaint and the demands regarding not concluding a sale or delivering possession of assets, rights, or intellectual property to the purported winning bidders.

81.     Contemporaneous with this filing, counsel for the Defendants have been served notice of the filing and copies of the relevant pleadings and will advise promptly upon notice of the setting of the hearing.

82.     Likewise, copies of papers have been sent by email or facsimile, where possible, to each of the relevant firms and such firms will be able to participate in the preliminary injunction hearing that the Debtors are seeking as well as to seek other appropriate relief after notice and hearing, including the Creditors' Committees and the service list.

83.     The Debtors believe that this notice is adequate in light of the circumstances and in light of the temporary nature of the relief.

84.     The Debtors have no other remedy at law that will avoid the threatened injury, which is occurring, and may occur without further notice.  The Debtor will further seek, upon order of this Court and notice and opportunity to be heard, a preliminary injunction that continues until trial on the merits of the Debtors' claims, and an expedited pre-trial scheduling expedited motion practice, discovery times, and trial.

## VIII.
## REQUEST FOR EXPEDITED, ACCELERATED DISCOVERY

85.     The Jones Plaintiffs also request that they be granted expedited discovery, with permission to serve the Enjoined Parties with limited requests for production and that depositions be allowed of at least the Trustee, the corporate representative of Tetrahedron, and any of Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash or their attorneys or agents who have been involved in the arrangements, understandings and agreements among the Defendants concerning the matters herein set forth.

86.     Specifically, the Jones Plaintiffs seek discovery of factual information directly related to the Auction or sales process related to the purchase of Alex Jones or FSS's assets, including the interference with the operation and management by Alex Jones of the business of FSS, including InfoWars. Because of the exigent circumstances discussed herein, and this Court's broad discretion in directing discovery and managing its docket, an Order that establishes expedited and accelerated discovery are warranted. Such an order will serve the interests of justice, promote judicial economy, and conserve party resources by enabling parties to quickly and efficiently identify and litigate core issues in dispute. Pursuant to Rules 16(b), 26(d), 30(a)(2), 33(a), 33(b)(2), and 34(b) of the Federal Rules of Civil Procedure, Jones Plaintiffs thus move the Court for an order permitting expedited discovery.

87.     Conscious of the time constraints and the inherent burdens of discovery, Jones Plaintiffs will carefully tailor their discovery requests to ensure the full, fair, and efficient development of the factual record necessary to adjudicate this matter. The discovery will be focused on only those issues for which the Jones Plaintiffs intend to move for preliminary injunction.

88.     This Court has broad discretion to manage the timing of discovery, especially where a request for a preliminary injunction makes it infeasible to wait for the normal discovery deadlines to serve and respond to discovery requests. *See Integra Bank N.A. v. Pearlman*, No. 6:06-cv-1952, 2007 WL 419634, at •3 (M.D. Fla. Feb. 2, 2007) (the Federal Rules of Civil Procedure "expressly provide that a Court may shorten the time for a party to provide discovery"); *see also* Fed. R. Civ. P. 26(d)(1) (permitting deviation from normal rule when "authorized … by court order"); *id.*, Advisory Committee Notes ("Discovery can begin earlier if authorized … by … order … .This will be appropriate in some cases, such as those involving requests for a preliminary injunction …."); Fed. R. Civ. P. 30(a)(2), 33(a), 33(b)(2), and 34(b).

89.     Expedited discovery is particularly appropriate in the preliminary injunction context, *see, e.g., Fimab*, 601 F. Supp. at 3; *Ellsworth Assocs., Inc. v. United States,* 917 F.Supp. 841 (D.D.C. 1996), in part because such discovery "better enable[s] the court to judge the parties' interests and respective chances for success on the merits." *Educata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (granting expedited discovery). Motions for expedited discovery are appropriate where the movant demonstrates a need to obtain inspection of documents in a shortened time period. *See Integra Bank N.A.,* 2007 WL 419634, at *3. Here, the need for expedited discovery is apparent: absent expedited proceedings, Jones will suffer irreparable harm by allowing the sale of his Persona, including his name and Jones IP content, to a bidder that intends to use the Persona and IP to mimic Jones, confuse Jones audiences as to the truth and source of this use, and otherwise gain an economic advantage by destroying Jones right to the exclusive use of his Persona.

90.     In short, because application of the ordinary discovery timetable will cause irreparable harm to the Jones Plaintiffs, the Jones Plaintiffs respectfully request an order directing expedited discovery and hearing of the forthcoming preliminary injunction motion in the form proposed by Plaintiffs.

## CONCLUSION

The Jones Plaintiffs request that this Court declare that the sixteen people and entities the Trustee designated collectively as the "successful bidder" are disqualified from the Auction and First United American Companies whom the Trustee designated as the Backup Bidder, is the true winner of the Auction and that the Alex Jones intellectual property[10] cannot be sold or transferred

---

[10]     Alex Jones's intellectual property and internet domain names (i) containing the name Jones, "Alex Jones," 'Alex E. Jones", his image or likeness, unique voice and other defining features  (the "Jones Persona") and (ii) the content made or produced by Jones  (collectively the "Jones IP Rights") were purportedly included in the Trustee's sale notwithstanding this Courts instructions that any disputed assets (the Trustee simply listed for sale assets the

to anyone without Jones consent, which he has given to First united.  Further, the Jones Plaintiffs

pray that this Court (a) to enter temporary restraining order; (b) an order for expedited discovery;

(c) after hearing, enter a preliminary injunction; and (d) after trial issue permanent injunctive and

declaratory relief for the matters herein addressed, and for damages, attorney's fees, costs, pre and

post judgment interest, and for such other relief, legal or equitable, to which the Jones Plaintiffs

shall show themselves justly entitled.

Dated: November 18, 2024

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
***Jordan & Ortiz, P.C.***
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
            aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES**

Ben C Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
            wbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

---

Trustee marked "disputed") would first be brought to the Court for a determination of the dispute.  This instruction and caution was wholly ignored.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing document was served electronically to subscribers of the Court's electronic noticing system on November 18, 2024.

*/s/ Shelby A. Jordan*
Shelby A. Jordan