```
 1   other places that you go, you know, like Yahoo News or --  I
 2   don't even know if Yahoo is around anymore but, like, you
 3   know, with the landing page on your feed, or if you have a
 4   phone or anything like that?
 5        A    No.
 6        Q    No, okay.
 7                  Now, you said, Mr. Gilleo, that you kind of
 8   heard of Alex Jones, you thought he was a conservative kind
 9   of talk show host, but that's pretty much the extent of what
10   you knew about him; is that fair?
11        A    Fair enough, yeah.
12        Q    All right.  And you hadn't heard about this case at
13   all before you had come in today?
14        A    No.
15        Q    Have you ever heard the name Owen Shroyer?
16        A    No.
17        Q    All right.  Rob Dew?
18        A    No.
19        Q    Did you ever hear the name, Joe Biggs?
20        A    Not familiar.
21        Q    What about Stewart Rhodes?  Have you ever heard that
22   name before?
23        A    It doesn't sound familiar.
24        Q    Have you ever heard the name Olly Alexander?
25        A    No.
26        Q    Okay.  All right.
27                  So, in this case, you may have picked up on
```

EXHIBIT 13

1

```
 1   this from Judge Bellis' remarks, but it's already been
 2   decided that Alex Jones, in making claims that the Sandy
 3   Hook shooting never happened, that it was a hoax, that the
 4   parents were actors, that all of that has already been
 5   decided, that he did those things, that he defamed the
 6   parents, and that he intentionally inflicted emotional
 7   distress on them.  And, so, the issues that are -- that the
 8   jury is going to be called upon to decide here, really have
 9   to do with the extent of the harm he caused.  And in the
10   civil justice system, as you know, the only remedy for
11   people who have been hurt as a result of the actions from
12   others, is to come in and the jury has to decide how much
13   money to award in order to hold the wrongdoer accountable.
14   And I wonder, just as a concept, how you feel about that,
15   the idea of awarding money damages in a civil lawsuit where
16   somebody has been harmed by another?
17        A    Again, this is the first time I've been in court --
18        Q    Right.
19        A    -- as far as civil.  As far as damages to go towards
20   families and things like that, is that what you are saying?
21        Q    Yeah.
22        A    Based on the information that would be actually
23   presented and stuff like that, would be kind of where I
24   would get my, you know, as far as answers and stuff like
25   that.  I don't -- right now, I don't know one way or another
26   care which way.
27        Q    You would want to hear the evidence, obviously;
```

2

```
 1  right?
 2      A   Correct.  I mean, I can't just go on hearsay.  It's
 3  just based on what somebody said, so.
 4      Q   Right.
 5      A   So, based on whatever testimony, whatever comes
 6  forward, would be the information that I would probably
 7  derive my answers and stuff from.
 8      Q   Right.  But just as a concept, let's say we proved
 9  that the families had suffered, and I will give you kind of
10  the basic types of injuries that were -- we've alleged here
11  and claimed which are mental anguish, pain and suffering,
12  psychological injuries, anxiety, hypervigilance, feeling of
13  lack of security.  We've also claimed that as a result of
14  Mr. Jones' conduct, our families experienced harassment and
15  threats by folks who believed that they were actors.  And,
16  so, if you assume for a moment that we've proven that to
17  your satisfaction that the evidence has been presented, what
18  do you think should happen in a situation like that?
19      A   I think that probably the families should get some
20  compensation for that, for what they actually went through,
21  the loss to the family and stuff like that.
22      Q   And, here, you know, there isn't any claim that
23  Mr. Jones had anything to do with the shooting itself or
24  anything like that.  It really has to do with what he did in
25  the aftermath, and so the injuries that you'll be
26  considering are not the suffering as a result of the loss of
27  their children, but the suffering and pain as a result of
```

1   Judge going to tell me I can do? So --

2        ATTY. MATTEI: But some jurors might say, well,
3   I don't -- I don't think --

4        THE COURT: No. I don't agree, Attorney Mattei.
5   I think that you are putting him in almost on the
6   spot. It doesn't even help you anyway because they
7   don't know. It doesn't matter what they think. It's
8   a matter of if the Judge is -- if this is the law
9   that the Judge gives you, will you be able to follow
10  it. How do you feel about it? You sure can ask
11  about how you feel about it. And if they say, well,
12  I don't like that instruction and I -- it's going to
13  be impossible for me to do that, you can get at it a
14  different way, but --

15       ATTY. MATTEI: But when you start off on -- I'm
16  sorry.

17       THE COURT: No. That's all right. Go ahead.

18       ATTY. MATTEI: When you start off by saying --
19  first of all, I don't like saying what the law is.

20       THE COURT: But, you can talk to Attorney Pattis
21  and come up with a neutral, one sentence, which is a
22  neutral recitation of what it is.

23       ATTY. MATTEI: But, if I start off in an area
24  pressing about damages where I say, here is what the
25  judge is going to instruct you, will you do that? I
26  have no -- I've, at that point, made signal to them
27  that they really shouldn't disagree with that. And

4

```
 1    what I want to understand is, what they really feel.
 2    I don't -- I want to get to the point --
 3            THE COURT:  So, you basically you are asking the
 4    plaintiffs aren't claiming, you know, broken legs or
 5    a physical injury like that, they are claiming more
 6    of an emotional injury, mental injury.  Is that what
 7    you are trying to get at?
 8            ATTY. MATTEI:  Yeah.  How do you --
 9            THE COURT:  How do you feel about that?
10            ATTY. MATTEI:  How do you feel about that?
11            THE COURT:  Well, there is nothing wrong with
12    that, Attorney Pattis.
13            ATTY. PATTIS:  No.  But, what --  so, I listened
14    as the state -- I know not the state -- as the
15    plaintiffs, mental anguish, pain and suffering,
16    hypervigilant, harassment to others.  I thought,
17    well, now we are really starting to get into the case
18    because our argument will be that whatever Mr. Jones
19    said, it didn't proximately  cause the harm they
20    describe, and they cannot attribute it with
21    admissible evidence to Jones.  They can speculate
22    about it, we'll ask for a motion for directed verdict
23    at the close of their -- close of the case.  You'll
24    rule on that issue.
25            But as to -- what prompted me to finally
26    object, was when Attorney Mattei said something to
27    the affect that we may not be able to present
```

evidence of lost wages, this sort of thing.  And it seemed to me that that was beyond voir dire and into indoctrination, you know, almost apologizing for what they don't have.  I think the question is, if the Court -- I would agree with the Court that there ought to be a way to say, if the Court were to instruct you that if proven mental anguish is compensable, would you be willing to follow that instruction or do you have some principle objection to even considering it?  I think that's the extent of the proper inquiry.  I think we went well beyond that here.

ATTY. MATTEI:  The point I was making with respect to lost wages was, I was just trying to help him distinguish between the somewhat, you know, I think what we would call consider to be more subjective injuries than something like --

THE COURT:  Well, I don't want to preview the evidence.  I do agree with that, but I think that it is proper inquiry to question about the type of damages.  But I think you have to almost couch it in a way that you are not putting them on the spot and not proving the evidence.  So --

ATTY. MATTEI:  Okay.  I will -- I will do that.

THE COURT:  Do you want to sort of form the language so we don't have to bring this poor man in and out?  Do you want to have a little discussion

```
 1          Some people might think, well, gees, you know,
 2  it's just words, not really something that, you know, a big
 3  fuss should be made over.  Some people might think, well,
 4  no, lies can really do a lot of damage, and it's appropriate
 5  for a lawsuit.  I'm just wondering, kind of hearing this for
 6  the first time, I know you probably never thought about it
 7  before, how the issue strikes you?
 8      A   I guess the severity.  I mean, there is times where
 9  lies can just be, you know, can roll right off your back,
10  they don't mean anything.  But, I guess, if the lies are
11  enough where it actually causes pain and suffering, the
12  families, the family members, things like that, I could see
13  that.
14      Q   I mentioned to you that it's already been decided --
15  certain facts have already been decided.  That is that
16  Mr. Jones published the statements and what they were.
17  Okay.  Do you have any concern about not being able to
18  decide that issue yourself if the Court were to tell you,
19  hey, that's not for you to consider, that's already been
20  decided?  Would you find yourself wondering about that or
21  wanting to reconsider that?
22      A   The only question I guess I would have, basically if
23  it's already been decided, then what's -- so, it sounds like
24  what you are saying is that he's already guilty; right?
25      Q   I think liable is the word I would use.
26      A   Liable.
27      Q   He's already been found liable, yup.
```

1  that have happened in public events that you found yourself
2  questioning whether they were being reported accurately, or
3  concerned that you weren't getting the full story, or
4  anything like that?
5     A   Nothing that comes to mind.
6     Q   Okay. And is it your view that people have a
7  responsibility to kind of educate themselves about, you
8  know, what the reality is in the world today to the extent
9  they can?
10    A   Oh, absolutely. We can't just go on hearsay just
11 based on what somebody said. You are better off just, if
12 you have any doubts or anything, just go on try to find out
13 some information on your own. Do your own, you know,
14 investigating, or reading, whatever.
15    Q   Are there any beliefs in your own life that you have
16 that you hold so closely, and so firmly, and so strongly,
17 that it might be difficult for you to follow, you know, the
18 Court's instructions? For example -- let me just give you
19 an example here. You know, there is no dispute here that
20 Mr. Jones' speech and conduct was not protected by the First
21 Amendment, okay. It's been decided. On the other hand --
22         ATTY. PATTIS: Objection, Judge. May we
23    approach?
24         THE COURT: You may.
25         (SIDEBAR).
26         ATTY. MATTE: It's been decided that Mr. Jones'
27    speech or conduct was not protected by the First

```
 1    Amendment.
 2         ATTY. PATTIS:  It wasn't according to the
 3    limited liability default.
 4         ATTY. MATTEI:  Your Honor, he's been found
 5    liable for defamation.  Defamation is not protected
 6    speech.  It's clear.
 7         THE COURT:  (INDISCERNIBLE) it was --
 8    (INDISCERNIBLE) it wasn't up to summary judgment
 9    (INDISCERNIBLE).
10         ATTY. MATTEI:  But it is not a defense in this
11    case.
12         THE COURT:  (INDISCERNIBLE) you see everyone is
13    saying that it can't be -- something can't be a
14    defense.  That's different. But you can't say that I
15    didn't make a judicial finding.
16         ATTY. PATTIS:  Well, I don't know
17    (INDISCERNIBLE).
18         THE COURT:  I think --
19         ATTY. PATTIS:  (INDISCERNIBLE) a finding.
20         Can we be heard on this, because this is likely
21    to be a lightning rod issue in the case?  I'm sorry,
22    Judge.
23         THE COURT:  That's all right.
24         Just bear with us, sir.
25         THE CLERK:  Again, yes.
26         (JUROR EXITS).
27         ATTY. PATTIS:  Judge, my objection.
```

```
 1        THE COURT:  I thought you were going to --
 2        ATTY. MATTEI:  Rephrase it for you.
 3        THE COURT:  I need to go refill my water bottle.
 4   I need to refill my water bottle.
 5        ATTY. MATTEI:  One way I might say it is --
 6        THE COURT:  This is what I wanted to see.  You
 7   don't have to --
 8        ATTY. MATTEI:  Thank you.
 9        You will not be called upon to decide whether
10   or not Mr. Jones' speech and conduct was protected by
11   the First Amendment.
12        THE COURT:  That is true.
13        ATTY. MATTEI:  Okay.
14        THE COURT:  Attorney Pattis, you don't have an
15   issue with that?
16        ATTY. PATTIS:  I don't.
17        THE COURT:  Because that is --
18        ATTY. PATTIS:  That is true.  That's the law of
19   the case.
20        THE COURT:  Okay.  So far so good.
21        ATTY. MATTEI:  And, I would think I could ask,
22   and you will be instructed that defamation and speech
23   that intentionally causes, inflicts emotional
24   distress, is not protected by the First Amendment.
25        ATTY. PATTIS:  I would object to that.
26        THE COURT:  And I agree.  Why can't you just say
27   there are no First Amendment issues that you will be
```

```
 1    addressing, something along those lines?  You are
 2    not -- there are no.  Just simple.
 3            ATTY. MATTEI:  Okay.
 4            THE COURT:  Okay.
 5            ATTY. MATTEI:  I mean, I do think, Judge, that
 6    it is important that, to the extent they, in their
 7    own minds feel, like the First Amendment may be a
 8    defense, that they be informed that that is not true.
 9            THE COURT:  Well, then, you can say to the
10    extent in your own mind that you think that it could
11    have been a defense, that you are -- that is not
12    something that you are going to consider in this case
13    given the Court's rulings or whatever you want to
14    say.  That is true.
15            Attorney Pattis, that is true; correct?
16            ATTY. PATTIS:  It is.
17            THE COURT:  Okay.  Make it -- you want to make
18    sure that they are, even if it's in their mind, that
19    it doesn't come into play here and you are entitled
20    to that.  And what you just said serves your purpose,
21    is not objectionable, and I agree with it.
22            What is it, else, that you wanted to add to
23    that you are not -- that you are not getting?
24            ATTY. MATTEI:  Well, I mean, I don't know what
25    the follow ups may be, but, I --
26            THE COURT:  Well, why don't we play it out by
27    ear.
```

```
 1           objection?
 2                ATTY. MATTEI:  Yes, that is an objection.
 3                ATTY. PATTIS:  May I speak to Attorney Mattei
 4           for a moment?
 5                THE COURT:  Yes.
 6                I think I'm going to have to start putting
 7           coffee on that.
 8       Q   The plaintiffs will claim that others harassed them
 9   because of what Jones said and that Jones' speech in itself
10   was harassing; does that make sense to you?
11       A   Yes.
12       Q   The Judge will give you guidance on how to construe
13   harassment in that context.  Our defense is that he did no
14   such thing or -- our defense is that whatever he did, did
15   not substantially cause harm to the plaintiffs; does that
16   make sense?
17       A   Yes.
18       Q   And I want to be clear, because I don't want to get
19   in trouble with the Court or with my adversary.  The Judge
20   has already ruled that he's liable for his speech.  So, the
21   question here is, how much harm did he cause with it?
22       A   Correct.
23       Q   And for the harassment that he and his agents caused;
24   does that make sense?
25       A   Yes.
26                ATTY. PATTIS:  May I speak to Attorney Mattei,
27           Judge?
```

```
 1   the sake of a unanimous verdict; does that make sense?
 2        A    Correct.
 3        Q    The jurors -- the plaintiffs come into this case
 4   entitled to nominal damages.  The Judge will tell you what
 5   that is.  If they get more, they have to prove that; does
 6   that make sense?
 7        A    Yes.
 8        Q    We've kept you up here so long, I'm afraid to ask
 9   more questions, not because I don't have them, but because I
10   think I know that you feel comfortable serving as a fair and
11   impartial juror in this case?
12        A    Mm-hmm.
13        Q    Is there anything about the questions we've asked you
14   or the manner in asking them that makes you reluctant to
15   serve?
16        A    No.
17        Q    And you said you would like to serve?
18        A    Yes.
19             ATTY. PATTIS:  Thank you, sir.
20             THE COURT:  I just want to follow up before we
21        excuse you.  And I know Attorney Pattis did correct
22        himself, but I just want to make clear, because of
23        decisions that I've made in this case, the defendant
24        has no defenses to the case, liability has been
25        established, and if you were selected here, you would
26        be called upon just to address the amount of damages?
27             THE JUROR:  I understand.
```

```
 1   that you are going to be deciding in this case if you are
 2   selected to serve, it's on the question of the extent of the
 3   harm and suffering that was caused by Alex Jones.  You are
 4   not going to be asked to consider the, for example, the pain
 5   and suffering that the families went through as a result of
 6   the loss of their children.
 7       A   Mm-hmm.
 8       Q   You'll hear evidence about how they experienced the
 9   years after that, but the issue is really about Mr. Jones'
10   conduct.  And, so, I just wanted to make sure that you
11   understood that you are going to be considering not even
12   whether Mr. Jones made those statements.  That's already
13   been decided --
14       A   Right.
15       Q   -- but just the extent of the harm that was caused.
16   Is that something if the Judge gave you instructions on how
17   to did that, that you feel you could do?
18       A   I think I could.
19       Q   Okay.
20       A   But as I said before --
21       Q   In consultation with your other jurors?
22       A   Exactly.  As I said before, that's not something I
23   feel that I'm qualified to do on my own, you know what I
24   mean?  How would I know?
25       Q   So, the Judge, I expect, would instruct you that part
26   of your duty as a juror is to listen and exchange views with
27   the other jurors to see if you can come to a consensus on
```

```
 1   about that?
 2       A    Exactly.
 3       Q    Right?
 4       A    Exactly.
 5       Q    Because why would anybody ever do that; right?
 6       A    Right.
 7       Q    Okay.  Now, I think I probably spoke for most people
 8   in the courtroom when I say that that's a perfectly natural
 9   reaction to have, but your only obligation in this case is
10   going to be to decide how much harm and damage those
11   statements caused setting aside, you know, your personal
12   view that, obviously, you know, it wasn't true; right?
13       A    Right.
14       Q    Okay.  Do you think you could do that if the Judge
15   instructed you that way?
16       A    Yes.
17       Q    Okay.  I see that you are married.  Your wife
18   Patricia is retired?
19       A    That's true.
20       Q    How long have you been married?
21       A    Forty years.
22       Q    Congratulations.
23       A    Thank you.
24       Q    And do you have any children, sir?
25       A    I had three.  I lost one from the cancer.
26       Q    I'm very sorry about that.
27       A    But I have two.
```

```
 1              THE COURT:  All right.  Welcome back, sir.
 2              THE JUROR:  Good afternoon.
 3              THE COURT:  I hope you had a nice lunch hour.
 4              THE JUROR:  It was good, thank you.
 5              THE COURT:  All right.  Make yourself
 6   comfortable.
 7              And, Attorney Mattei, whenever you are ready.
 8              ATTY. MATTEI:  Thank you.  Your Honor.
 9   CONTINUED DIRECT EXAMINATION BY ATTY. MATTEI:
10       Q    And thank you Mr. Bleau.  I hope you had a pleasant
11   lunch.
12              All right.  Getting back to where we left off,
13   we were talking about idea of damages.
14       A    Right.
15       Q    And I think you and I talked about the idea of
16   punitive damages; do you recall that?
17       A    Yes.
18       Q    All right.  And I just want to make sure that, you
19   know, as you are sitting here right now having heard what
20   Judge Bellis described about the case, and knowing that the
21   case, if you are selected to it on it, that this case is a
22   different case entirely from what you may have heard about
23   in Texas; do you understand that, right?
24       A    Yes, I understand.
25       Q    We are in Connecticut, there are 15 plaintiffs here,
26   we are seeking punitive damages.  In our mind, this is a
27   very substantial case, and we intend to prove very
```

1   substantial damages.  And I just want to make sure that as
2   you are sitting here, there are no limits without having
3   heard the evidence that you feel you would apply to the
4   damages in this case based on anything you've heard here or
5   anything you've heard a month ago concerning other
6   litigation?
7       A   Right now, there are no limits of what I would
8   expect --
9       Q   Okay.
10      A   -- for the damages.
11      Q   All right.  And if you are selected, sir, I take it
12  that you would base your verdict solely on the evidence you
13  hear in this courtroom and on the instructions that the
14  Court gives you?
15      A   Yes.
16      Q   All right.  So, thank you very much for your time.  I
17  appreciate it.  Thank you, Mr. Bleau.
18              ATTY. MATTEI:  Nothing further, Your Honor, at
19      this time.
20              THE COURT:  Attorney DeMatteo?
21  CROSS-EXAMINATION BY ATTY. DEMATTEO:
22      Q   Good afternoon, Mr. Bleau.
23      A   Hi.
24      Q   My name is Chris DeMatteo, I'm an attorney with
25  Pattis & Smith, and we represent the defendants.
26              So, I did hear before lunch you discussed your
27  job at the training school and what you did there.

```
 1   case.
 2          This is a civil trial. It's specifically a hearing
 3   in damages, and that means that liability has been
 4   established and that as a result, the plaintiffs are
 5   entitled to at least nominal damages, and at the start, you
 6   know, unless and until the plaintiffs prove more than that;
 7   do you understand that concept?
 8        A    I think so.
 9        Q    It is the jury's role to place a value on damages?
10        A    Okay.
11        Q    Now, I saw that just part way through your
12   questionnaire you mentioned that you were sued for being in
13   a car accident twice?
14        A    Yes.
15        Q    When did those occur starting with the first one?
16        A    The first one, about five years ago, and the second
17   one, in 2019.
18        Q    And then you said the potentially one yet to be
19   served?
20        A    Yes.
21        Q    Okay. What do you know about that? Without getting
22   into too many specifics, but that this could relevant?
23        A    At the beginning of the year, there was an impromptu
24   ice storm and I was on my way to work, and I slipped going
25   down the hill, and was honking my horn to alert people that
26   I was in a car that was slipping on ice, and got into a car
27   accident, and the case has not been closed yet. The claim
```

```
 1      A    No.
 2      Q    Okay.  Well, in this case we are saying, and Alex
        Jones has been held to have intentionally engaged in a
        wrongdoing.  And in cases like that, the jury is to consider
        something called punitive damages.  In other words, measure
        the wrongdoing, this conduct, and where that conduct is
        extreme, outrageous, and severe, again the Judge is going to
        give you all the appropriate words --
 9      A    Okay.
10      Q    -- but where if that conduct is to a degree that is
        extreme and severe, again, in the Judge's words, the jury is
        to determine how much damages to assess him so that it's to
        punish that conduct.
14      A    Mm-hmm.
15      Q    Does that seem fair to you?
16      A    Yes.  I agree with the system in how it is done.  So,
        yes, it does seem fair to me.
18      Q    Okay.  What do you think about -- what about damages
        for punishing a person.  Why do you think that -- what
        would be your thought about why that seems to be fair in
        terms of what a case can do?
22      A    I'm -- I believe if someone has purposely done
        something to hurt others, then a punishment needs to be put
        in place, and if that is a financial punishment, then it
        makes sense to me in that way.
26      Q    Do you think that can help deter future conduct?
27      A    I think that depends on the person.
```

```
 1        Q    Some people never learn; right?
 2        A    Some don't, sir.
 3        Q    Okay.  And I know you didn't wake up this morning
 4   expecting to answer any questions like this?
 5        A    No, sir.
 6        Q    And in terms of the claims that we are making that
 7   there was substantial --  that the conduct was egregious in
 8   ways that we will set forth, and they ought to be punished
 9   with damages, and that Alex Jones needs to be held
10   accountable to the families; does that make sense to you?
11        A    Yes.
12        Q    Okay.  I mean, some people -- some people --  my
13   family don't really believe strongly in the system.  I don't
14   know how I'm related to these people, but I happen to be.
15   But are you comfortable, or do you have any qualms, even the
16   little qualms about a system that allows --  in which jurors
17   determine accountability and based on dollars and cents,
18   rather than jail time in this case?
19        A    I think that a panel of people is a good way to do
20   things, however, I think those people should be very
21   educated on what they are deciding about.
22        Q    Right.  Well, actually you would be happy -- well
23   educated meaning -- well, one of the -- you'll be happy to
24   know that our job is to present the evidence to the jury, of
25   course.
26        A    Right.
27        Q    And I don't want you to think that it's going to all
```