BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
                              )  CASE NO: 22-33553-cml
                              )
ALEXANDER JONES,              )  Houston, Texas
                              )
          Debtor.            )  Thursday, November 14, 2024
                              )
                              )  2:29 PM to 3:25 PM
-----------------------------)
```

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Chapter 7 Trustee:     CHRISTOPHER R. MURRAY
                           ERIN ELIZABETH JONES
                           Jones Murray LLP
                           602 Sawyer Street, Suite 400
                           Houston, TX 77007

                           JOSHUA W. WOLFSHOHL
                           Porter Hedges LLP
                           1000 Main Street, 36th Floor
                           Houston, TX 77002

For the U.S. Trustee:      HA MINH NGUYEN
                           Office of the U.S. Trustee
                           515 Rusk Street, Suite 3516
                           Houston, TX 77002

For PQPR Holdings          STEPHEN WAYNE LEMMON
Limited LLC:               Streusand Landon Ozburn Lemmon LLP
                           1801 S. Mopac Expressway, Suite 320
                           Austin, TX 78746

For First United          WALTER J. CICACK
American Companies, LLC   Hawash Cicack & Gaston LLP
                           711 W. Alabama Street, Suite 200
                           Houston, TX 77006

For Alexander Jones          VICKIE L. DRIVER
                             Elliott Thomason & Gibson LLP
                             511 N. Akard, Suite 202
                             Dallas, TX 75201

                             SHELBY A. JORDAN
                             Jordan & Ortiz PC
                             500 N. Shoreline Blvd., Suite 804
                             Corpus Christi, TX 78401

For Global Tetrahedron:      JOHN R. ASHMEAD
                             Seward & Kissel LLP
                             One Battery Park Plaza
                             New York, NY 10004

For the Connecticut          KYLE KIMPLER
Families:                    Paul Weiss Rifkind Wharton &
                             Garrison LLP
                             1285 6th Avenue
                             New York, NY 10019

For the Texas Families:      JARROD B. MARTIN
                             Chamberlain Hrdlicka White
                             Williams & Aughtry, P.C.
                             1200 Smith Street, Suite 1400
                             Houston, TX 77002

For X Corp.:                 JONATHAN WEICHSELBAUM
                             Latham & Watkins, LLP
                             Time-Life Building
                             1271 6th Avenue
                             New York, NY 10020

Court Reporter:              UNKNOWN

Courtroom Deputy:            ZILDE MARTINEZ

Transcribed by:              Veritext Legal Solutions
                             330 Old Country Road, Suite 300
                             Mineola, NY 11501
                             Tel: 800-727-6396

HOUSTON, TEXAS; THURSDAY, NOVEMBER 14, 2024; 2:29 PM

(Call to Order)

THE COURT: Okay. Good afternoon. This is Judge Lopez. Today is November 14th. I'm going to call a 230 emergency request for a status conference in the Jones case.

Why don't I take appearances in the courtroom and then we'll turn to the folks on the line. The line is completely muted. So, if you wish to make an appearance, why don't you hit five star?

MR. MURRAY: Good afternoon, Judge. Chris Murray. I'm the Chapter 7 Trustee.

THE COURT: Okay, good afternoon.

MS. JONES: Good afternoon, Your Honor. Erin Jones --

THE COURT: Why don't you get to a mic? Let's all make sure we can all hear each other.

MS. JONES: Erin Jones for the Chapter 7 Trustee.

THE COURT: Thank you.

MR. WOLFSHOHL: Joshua Wolfshohl for the Chapter 7 Trustee.

MR. NGUYEN: Ha Nguyen for the US Trustee, Judge.

THE COURT: Good afternoon.

MR. LEMMON: Your Honor, Steve Lemmon for PQPR. I want to apologize to the Court in advance. I don't expect that this is going to go on for too long, but if it does,

I'm actually in Judge Perez's courtroom right now.

THE COURT:  Sounds like a better place to be.  I completely understand.  I don't know how long this is going to go.  I don't know where we're going.  I don't know what's going on.  But if you need to leave at any point, I completely understand.  No worries.

Here's a 713 number.

MR. CICACK:  Your Honor, Walter Cicack, C-I-C-A-C-K, on behalf of First United American Companies.

THE COURT:  Okay.  There's a 214 number.

MS. DRIVER:  Good afternoon, Your Honor.  Vickie Driver here and my co-counsel Shelby Jordan on behalf of Mr. Jones.

THE COURT:  Okay.  Let's see.  There's a 917 number.

MR. ASHMEAD:  Good afternoon, Your Honor.  John Ashmead on behalf of Global Tetrahedron.

THE COURT:  Global who, Mr. Ashmead?

MR. ASHMEAD:  Tetrahedron.

THE COURT:  Thank you.

MR. ASHMEAD:  Sure.

THE COURT:  A 212 number.

MR. KIMPLER:  Good afternoon, Your Honor.  It's Kyle Kimpler on behalf of the Connecticut family.

THE COURT:  Okay, good afternoon.  An 832 number.

MR. MARTIN:  Good afternoon, Your Honor.  Jarrod Martin for the Texas family.

THE COURT:  All righty.  And a 212 number.

MR. WEICHSELBAUM:  Good afternoon, Your Honor. John Weichselbaum, W-E-I-C-H-S-E-L-B-A-U-M, on behalf of X Corp.

THE COURT:  Okay.  Mr. Cicack, you filed a request for a status conference.  Why don't you get us started?  I will level set the playing field in terms of my level of knowledge.  So I remember we were here sometime in mid-October.  There was a request to clarify what could be sold in an auction and I was not comfortable signing the order because I couldn't make sense of what exactly was going to be sold.  And I wanted to make sure that there was clarity as to what parties were going to sell and what was going to be purchased in terms of if there was a separation between what were state assets and Mr. Jones's assets.  And that's where I left things.  Maybe you can, I just want you to kind of start me from there to your knowledge.  And someone else can fill in the gaps.  But that's what I know.  And I'm now learning about an auction and it sounds like you're not happy with the auction.  So maybe you can kind of tell me where things are and I'll listen to other folks.

MR. CICACK:  Thank you, Your Honor.  First, let me say that I apologize for my attire.  I am in California.  I

don't have a jacket or tie with me.  Let's put all that to the side.  Let's get to why we're here.  I don't care about it.

MR. CICACK:  Thank you, Your Honor.  All right.  I just wanted to make sure that I said that.

First of all, Your Honor, my client that was designated as the backup bidder in connection with the auction of the Infowars and FSS assets, that designation was made this morning at Docket Number 903.

THE COURT:  So why don't we start a little bit, backtrack a little bit for me.

MR. CICACK:  So there was an auction.

THE COURT:  There was an auction.  When was the auction?

MR. CICACK:  Well, what happened, Your Honor, what happened is, is that there were qualifying bids made.

THE COURT:  Okay.

MR. CICACK:  And then rather than what the original plan, which was to have an open auction, the trustee decided that rather than do that, he was going to go to basically a sealed, secretive best and highest offer as opposed to having an auction where everybody was present and could, you know, see what other people did and overbid.  So that's what he decided to do.

THE COURT:  And to your knowledge, when was this

decision made?  I'm telling you, the last public knowledge I have – and again, I -- was in October where there was confusion about the assets that were going to be sold. That's where I left things.  So you're telling me that there was a kind of a closed bid to your knowledge.  You submitted a, your client submitted a bid?  Is that what it is?  All right.

MR. CICACK:  My client as, as other people, submitted bids that were then to be determined whether or not "they were qualified" --

THE COURT:  Right.

MR. CICACK:  -- to attend the open auction.  On Monday of this week, we were notified that in light of the types of bids that the trustee received, that the trustee decided instead of going to an online live auction, he was going to scrap that idea and go to a field bid, high and best.  And so that's -- and he sent out revised bid forms and things of that nature.

THE COURT:  How did you know what you were bidding on?

MR. CICACK:  The trustee gave us a list of the assets we were bidding on.  We knew what we were bidding on.

THE COURT:  The reason I'm asking is I didn't know what you all were bidding on in the middle of October.  So it sounds like that issue somehow got resolved.

MR. CICACK:  I think there might be, there is a question on what the trustee called Lot 4, as to whether or not, you know, Lot 4 --

MAN 1:  Judge, I think (indiscernible)

THE COURT:  I'll get there.  I can't wait to hear about this.  Go ahead.  Lot 4 was designated as disputed domains.  So I wasn't involved in anything that happened before then.  All I know is that there was some assets that were called "disputed domains."

In order to access any of this information, you had to sign a non-disclosure agreement and then have access to the data room, which we did.  And so that's what we did.

And then this morning, we found out that after providing the best bid, highest and best field bid, we found out that we were chosen as the backup bidder.

THE COURT:  Right.

MR. CICACK:  Sometimes those things happen.  You know, if you lose, you lose.  But then --

THE COURT:  Wait, hold on.  I have questions.  So you were designated the backup bidder.  Did you have an opportunity to bid higher?

MR. CICACK:  No.  And not only that, Your Honor --

THE COURT:  Wait, wait.  Hold on a second.  Do you know what the winning bid was?

MR. CICACK:  We don't, Your Honor.  That's exactly

right.  Not only do we not know what the winning did is, we found out from a news article that the trustee, despite no disclosure, despite telling me contrary, the trustee allowed the parents to do a credit flip bid on an unsecured claim.  No disclosure at all in any of the filings that there was going to be allowed a credit bid.  In fact, I specifically asked Mr. Murray in a conversation we had, is there, are you going to allow a credit bid?  And he told me no.

And so now we find out that, in fact, the highest and best bid apparently was not the highest and best bid, but was allowed to credit bid apparently up to $1.5 billion.  And we don't even know.  I've been on the phone blowing up everybody that you see on the picture here, everybody's email, everybody's cell phone, what happened?  Tell us what happened.  Nobody has responded.  So we don't know what the winning bid was.  We don't know what the creditor bid amount was.  We don't know any of that information, which is why we have asked for this status conference.

There's been no disclosure.  There's been no transparency.  In fact, the disclosures have been inaccurate.

THE COURT:  Wait, wait.  Do you know what the winning bid is now?

MR. CICACK:  No, no.

THE COURT:  Okay.  Ms. Driver, I'll turn to you

and then I'll turn to the trustee.  I just want to make sure that I understand.  So who won the auction?  Do you know that?

MR. CICACK:  Global Tetrahedron, which I understand is the Onion and the Connecticut families combined.

THE COURT: What's the Onion?

MR. CICACK:  A satirical, you know, publisher website.

THE COURT:  I don't understand.

MR. CICACK:  If you put it in a website --

THE COURT:  I'm not doing it.  So Global Tetrahedron won the auction.  Okay.

MR. CICACK:  We don't know how much they did and we don't know how much the credit bid was.  If the auction was --

THE COURT:  No, no, I got it.  I got it.  Ms. Driver, what do you know?

MS. DRIVER:  Your Honor, so far the timeline sounds accurate.  As Mr. Jones was not party to any bid, he did not get direct communications, although the trustee and his counsel have tried to keep me up to date as much as they can with information that's publicly available and available to other parties.

What I do understand is that this morning, the

Infowars website was shut down.  Mr. Jones was told he's not allowed to broadcast today.  He did broadcast for a while.  And I understand that the employees are being let go.  What I don't understand is how much was bid, how much of it is some sort of a credit bid gift from the Connecticut families --

THE COURT:  I got it.

MS. DRIVER:  -- who only hope at this point -- you know, Your Honor's own order in the motion for summary judgment said that the ultimate amount of the non-dischargeable debt owed to the Connecticut families could change if Jones succeeds on his state court appeal.  That appeal is still pending.  So I don't know -- I can see nowhere in the bankruptcy code or in any case where an unsecured creditor has ever been allowed to confer value to an estate and how we could value that in a vacuum not knowing if they actually have a final judgment.  I'm just unclear and quite frankly, I'm very concerned that there are employees who didn't know that they were going to lose jobs on a sale that hasn't been closed and money hasn't been transferred as of 8 a.m. this morning.

It's been very quick.

THE COURT:  Okay.

MS. DRIVER:  And we were very disappointed to see that there was not a live auction where this could be held

in a realm where overbids could be had.

THE COURT:  Okay.  Let me hear from the trustee or his counsel.

MR. MURRAY:  I'm happy to talk to you, Judge. What you've just heard is mostly inaccurate and I think we're talking about something totally different.

THE COURT:  Let's start with, was there an auction?

MR. MURRAY:  Yes.

THE COURT:  There was an auction.  Mr. Cicack says he didn't know.  He doesn't know what the winning bid is and he was not given an opportunity to -- his client wasn't given a bid to bid higher.

MR. MURRAY:  Right.  So --

THE COURT:  Is that right?  Let's just start here.

MR. MURRAY:  That's not true.

MR. CICACK:  Mr. Cicack, he's saying you're not telling -- that's not accurate.  Okay.  So now someone tell me, was there an auction where if somebody said, I bid 10. You got 10 minutes.  Let's go to a higher number.  When I think auction --

MR. MURRAY:  This is the auction procedure that the Court approved in September --

THE COURT:  But then you all came back to me --

MR. MURRAY:  -- to add assets.

THE COURT:  -- to add stuff.

MR. MURRAY:  We didn't add them.

THE COURT:  And you're saying that I approved some secret --

MR. MURRAY:  No, no.  I wish I could have a chance to explain.

THE COURT:  Here's your chance.

THE COURT:  FSS has assets.  We filed a motion to wind those assets down at auction.  We hired an auctioneer. We had a process.  We had a timeline.  We had a marketing process.  There was a list of those assets.  That was never in doubt.  The Court approved that.  Everybody got notice of that.  That's the auction that happened.  We came in October because there was a request to include --

THE COURT:  They don't even know the winning bid.

MR. MURRAY:  No, they do.

THE COURT:  He says he doesn't know it.  Well, Mr. Cicack, they're saying that you don't know the winning bid. They're saying you do know it.

MR. MURRAY:  No.

MR. CICACK:  No.  Your Honor, I guarantee you if you ask Mr. Murray whether he has told us what the winning bid is, he's going to say no.

THE COURT:  He just said you know it.

MR. CICACK:  We don't know.

MR. MURRAY:  The winning --

MR. CICACK:  He's lying.  He's not saying that.  I think what he's trying to do is parse his words.

THE COURT:  All right.  Let's figure it out.  He says he doesn't know the winning bid.

MR. MURRAY:  No.  Under the procedures the Court approved, we're required to say who the winning bidder was.

THE COURT:  Does he know the winning bid?

MR. MURRAY:  He doesn't know the amount.  He knows who won.

THE COURT:  Oh my God.  But how's he going to overbid?

MR. MURRAY:  We asked for a round of highest and best bids and his --

THE COURT:  But how do you know it's the highest and best?  I mean --

MR. MURRAY:  Because I had both of the bids and I analyzed them.

THE COURT:  Yeah.  But how do you match one against the other and say, okay, now somebody put this on the table.  Can you go higher?

MR. MURRAY:  Because one person bid just cash and another party bid cash and another mechanism.

THE COURT:  Was there a credit bid?  Was there a credit bid by the families?

MR. MURRAY:  Sort of.  It's not a credit bid because they're not secured creditors.

THE COURT:  I want -- that's it.  We're holding an evidentiary hearing and I'm going to figure out exactly what happened.  No one should feel comfortable with the results of this auction.  We're going to hold an evidentiary hearing and I'm going to -- today's just a status conference.  I'm going to understand exactly what happened.  I'm going to give parties an opportunity to fully explain it to me.  I'm not comfortable with the process and the highest level of transparency that took place.  I approved --

MR. MURRAY:  Your Honor --

THE COURT:  No.  Hold on.  I approved an auction. Auction means you go, I bid 20.  We go, someone says the highest current bid is 20.  Go to 25, go to 30.  How can I say -- you don't know -- he doesn't know what the highest bid is so his client couldn't overbid.  His client couldn't bid higher than the current bid because no one knows what it is.

MR. MURRAY:  Well, he could have been more.  We asked for highest and best and his bid wasn't the best --

THE COURT:  But he doesn't know what the last bid was.  I mean how do we know that you got the highest and best?

MR. MURRAY:  I could explain it.  I guess we'll do

that --

THE COURT:  No, no, no.  I'm going to stay quiet.  I want you to explain to me your process.

MR. MURRAY:  All right.  FSS has many different categories of assets.  It's got some domain names.  It has IP, it has trademarks, it has equipment, it has inventory that it sells.  When we started the bidding process, what the auctioneer advised was, let's have a round where people can submit sealed bids that say which lots they're interested in and how much they would pay for each one of those.  And then under the auction procedures, when those come in, we evaluate that and decide how to proceed to, if we do at all, to the next auction.  The order is very clear that there doesn't even have to be another auction.  I could decide based on the qualifying bids.

We ended up only getting two bidders, but they bid on slightly different sets of assets.  And so we talked with the auctioneer and we said, how do we do this?  How do we go lot by lot and say, well, how much for this and how much for that?  Some bidders wanted some assets but not others.  Some bidders wanted one lot but only if they got the others.  So there wasn't a real way to do an apples-to-apples money bid.

There's another layer of complexity, Judge.  It's not just money for the assets.  What the Connecticut families did with their bid with Global Tetrahedron is they

said if Global Tetrahedron, that if this is the winning bid, they will waive -- they're unsecured -- of FSS, which I think I need to maximize their value, they would waive their potential recovery and give it to all the other unsecured creditors so that those other unsecured creditors would be better off than they would be under an alternative only cash offer.  That's why it wasn't simple.

We thought about all the different ways that we could do an auction.  It was never going to be a live auction on the courthouse steps.  That was not ever the way we were going to do this.  And we never said we were going to do it that way.  We told everybody, we said, here's a bid form that's different permutations of combinations of lots that we think people are interested in bidding on.  Submit your bid form and tell us what you think, what you would be willing to bid on each one of these things and give us your highest and best.  And then once I get those, I can analyze them against each other and figure out which one was better.

We did that.  And I've got a spreadsheet and I can show you the analysis that we did and I can walk through it. The bid that Mr. Cicack presented was for $3.5 million.

THE COURT:  No, no.  Don't put the numbers on because no one knows anybody else's numbers.  We'll have an evidentiary hearing.  I don't -- today it's just a status conference.  He doesn't know everybody else's number, so

let's not put anybody else's number out there today, not for purposes of today.

So I got it.  He put a bid.

MR. MURRAY:  Right.  And the alternative bid had a cash number that was lower than his, but with this other mechanism, the creditors ended up significantly better off. And that's why I chose to select that as the winning bidder. And that's what we gave notice of.

Now we want and the buyer wants an additional order with some of the additional bells and whistles of a sale order and good faith findings and things like that.  So we intend to file a motion and come back and ask for that at which time we can lay out in detail the way the math worked. But it's not something where I can just say the winning bidder was X dollars because that dollar amount isn't really known yet.  I know within bounds what it is.  I know because there's a mechanism.  I know that it's certainly much better than the second offer.  It could be way, way even more better.  But that depends on things like how much costs are and what the ultimate claims pool ends up being.  But all I know is I have a virtually guaranteed gift essentially from one group of creditors to another.  And I've never seen this before in any other case and we did a lot of research but we've never found it.

But I've always thought my goal was to maximize

the recovery for unsecured creditors.  And under one bid, they're clearly better than they were under the other.  And that's how I made the decision.  And this was not an attempt to sell assets that we asked the Court for permission for in October.  That's a totally separate issue.  It's a completely separate set of assets that we are not -- they've always been excluded from this auction and we're not dealing with those today.

These are the assets of FSS that back in September, we said we want to wind down, we want to sell them.  All of the creditors agreed.  Let's sell FSS.  Let's wind down FSS.  And Ms. Driver is wrong.  I didn't fire the employees today.

THE COURT:  Did I give you authority to authorize waivers of recoveries?

MR. MURRAY:  No, no.

MR. KIMPLER:  Your Honor, may I be heard please?

THE COURT:  In a moment, Mr. Kimpler.

MR. MURRAY:  I do want to say the employees have not been let go.  I was in Austin this morning talking with them.

THE COURT:  That's a whole other issue.  I don't know anything about that.  I'm just learning about what happened here.

MR. MURRAY:  Yeah.  But you got, yeah.  And so we

have a disappointed bidder who's making lots of accusations about a process and calling it secretive. It's not. Sealed bid doesn't mean it's not an auction. It doesn't mean the public couldn't participate. We had hundreds of people requesting information.

THE COURT: He doesn't know who the winning bidder -- he doesn't know the winning bid.

MR. MURRAY: Because it's hard to describe the number.

THE COURT: Oh, no, it is secretive. He doesn't know the winning bid, right? No one knows what the winning bid number is. No one knows what the winning bid number is. They don't know.

MR. MURRAY: I can bring those numbers --

THE COURT: I'm just saying it's not like he's completely unfounded. I understand it's more complex than maybe Mr. Cicack understood it, but perhaps my concern is the lack of transparency in the process. He doesn't know. He doesn't know. And maybe it's the better deal. I don't know whether it is or it isn't. I just know there wasn't transparency in the process. So people, some persons putting up cash and some persons putting up cash and agreeing to a waiver, it sounds like, but no one knows what everyone else is doing. Okay.

Mr. Kimpler, you asked to speak.

MR. KIMPLER:  Yes, Your Honor.  I would like to just clarify because there's a lot of aspersions being made that are completely unfounded here.

First of all, the bid -- as Mr. Murray just said, what you last heard in October is a totally separate issue.

THE COURT:  Got it.  I got that.

MR. KIMPLER:  None of that is being -- so this is just the order that you entered on September 25th.

THE COURT:  Right.  I'm with you.

MR. KIMPLER:  Okay.  If you look at Page 6 --

THE COURT:  I read my order, I read my order.

MR. KIMPLER:  -- Docket (indiscernible) --

THE COURT:  I read my order.  Are you telling me that I approved this process?  The way Mr. Murray just described it?

MR. KIMPLER:  Your Honor, it specifically --

THE COURT:  I'm just asking you.  I'm asking you if you're saying --

MR. KIMPLER:  Okay.  Yeah, I believe it is.

THE COURT:  Okay.  I just disagree.  And that's okay.

MR. KIMPLER:  If I could just explain, Your Honor, maybe won't agree, but I'd like you at least know where I'm coming from.

THE COURT:  We won't agree.

MR. KIMPLER: Okay. The definition of purchase price --

THE COURT: I read it, I read it. You'll have your day in court.

MR. KIMPLER: -- explicitly --

THE COURT: You'll have your day in court. You'll have your day in court. I read it.

MR. KIMPLER: Okay. Your Honor, I have no problem explaining what we did. My client --

THE COURT: I'm not worried about him. My concern is not what your client did. Not at all. I don't know. I have zero concerns about what your client did. I'm more focused on the process and the transparency in the process. That's what -- your clients -- my concern is the process itself. Your clients were participants in the process and I got no issues with them.

MR. KIMPLER: And we faced the exact same concern that Mr. Cicack did. On Monday, we were informed that we were supposed to submit a best and final bid.

THE COURT: Got it.

MR. KIMPLER: We knew that. I didn't hear anybody object to that on Monday or Tuesday or Wednesday.

THE COURT: I got it.

MR. KIMPLER: We had to have the same discussion that he had to have with his client. Well, I don't know

what the other bid is.  We didn't know --

THE COURT:  Okay.

MR. KIMPLER:  But it was an even playing field.
That's all I'm saying, Your Honor.  There was no disparity
of information that we had information he didn't or vice
versa.

THE COURT:  And I hope I'm not conveying that
somehow you knew more than Mr. Cicack.  I hope I'm not
conveying that because that's not my intent or that your
clients did anything.

MR. KIMPLER:  When we heard --

THE COURT:  I'm more concerned about the process.

MR. KIMPLER:  When we heard there was not going to
be an option, but instead, a request for a best and final
bid on Wednesday morning, I went back.  I looked at your
order.  I said, can they do that?  And I said, I found
multiple paragraphs where they said they could do that.  I
had no idea that the trustee was doing that until we got the
same notice that Mr. Cicack got.

THE COURT:  That makes two of us.  I got it.  Mr.
Jordan ---

MR. JORDAN:  Thank you, Your Honor.

THE COURT:  The families, in my opinion, I don't
think they did anything as far as I know.  They haven't done
anything wrong.  You haven't done anything wrong.  What

you're hearing out of me is I'm concerned about the process where even today, Mr. Cicack has no idea what the winning bid is, but he's the backup bidder.  It just seems odd.  Maybe I can say it that way and got it.  Your client won, but they don't even know what the winning bid was.

MR. KIMPLER:  We know what our --

THE COURT:  I'm just saying that's just odd.  That's the part that -- you don't even know what the backup bid is.  Sounds like.

MR. KIMPLER:  In my view, the bids should be made public.  I have no problem with that.

THE COURT:  I got it.  That's what I, that's what I'm finding odd.

MR. KIMPLER:  There's no --

THE COURT:  That's what I'm finding odd, Mr. Kimpler.  It's the process.  That's what I'm finding odd.  That's what I mean.  In every bankruptcy case, it's public.  People know who the winning bidder was.  There's no -- there's full transparency.

MR. KIMPLER:  Yeah.  I think what Mister Murray was saying was the idea was they announced the identity of the bidders this morning.  There was going to be a request for a hearing to get a sale order.  All of the terms would be public and everybody would have a chance at that hearing, which is typical, I think, of many sale hearings to then

object to the sale.  You could quote everybody, and fairly so, for saying you should have disclosed all of the terms this morning when the notice was filed on the docket.  And that could have been done.  I think that there are still agreements being negotiated.  That's frankly an issue with Mr. Ashmead's client and FSS, not me.

But I think the idea was they're trying to finalize the documents.  They will then publish the final sale agreement.  They'll go for a hearing and it will all be public.  I don't think anybody ever thought that this wasn't going to be 100 percent transparent.

THE COURT:  Okay.

MR. KIMPLER:  The objection that there was not a traditional auction where everyone's in the same room, I think that's just a different dispute and we can have an evidentiary hearing on whether that was necessary.

MR. CICACK:  Your Honor, may I respond just really briefly?

THE COURT:  No.  Hold on a second.  I'm going to hear from Mr. Jordan and I'll hear from Mr. Cicack.

MR. CICACK:  Thank you, Your Honor.

MR. JORDAN:  Thank you, Your Honor.  And I'll be very, very brief.  The biggest concern we have is that the sale has been put in place.  I tried to get on the website because we were told that the business was shut down.  Alex

Jones was instructed not to go on the website, to no broadcast, and I tried to get on and in was closed.  Now, maybe the trustee says, no, I, decided not to close the sale and let me give it to the buyers and let everybody sort through the problems.

Because one of the problems we have, and again, I'll be very brief.  You instructed us that if there's disputes about the IP, that you don't want that property sold, you want it to come to you first.  Let you decide and then have a clean sale.  But they sold hundreds of websites, a hundred websites with Alex Jones' names.  They sold one with Alex Jones and another very high profile on talk radio that has nothing to do with the case.  They sold those with only a notation disputed when you said don't do that.

So the only thing I would like to ask the Court is, can we stop this treatment of the sale as if it had closed and as if the buyer is now the owner and he's telling people what to do and just put it off for a few days or time that you need to give us an evidentiary hearing.  That's the only request I have.

THE COURT:  Mr. Jordan, no one has told me here, and I don't want to read into this, that my understanding of what Mr. Kimpler was describing to me was that someone was, and I think Mr. Murray did the same thing, was going to file a motion and they were going to ask for a traditional sale

order.  And that that would be subject to dispute.  So I don't -- if somehow -- I don't know what you're talking about with the website being down.  I do recall in the prior October hearing, there were some questions about websites and I said, let's just figure out what's property of the estate and what's not property of the estate, let's just have clarity so that buyers know exactly what they're going to buy.  And if I needed to make the call, then let me make the call.

I don't know, but I'm being told that that has nothing to do with what's being described here.  So maybe it does make sense to have an evidentiary hearing on this.  Mr. Cicack.

MR. CICACK:  Yes.  Your Honor, the one thing that I think has come across loud and clear is the fact that it was never disclosed at any time that any bidder was going to be allowed to make a credit bid or waive claims.  And in fact, your sale order says that the purchase price should be in a specific amount of US dollars not a range.

And what we're hearing today is that Mr. Murray can't even tell you what the amount is.  And if we knew and it was full disclosure and they came to you and said, Your Honor, we've now decided that we're going to allow or request the authority to allow credit bids or waivers of claim to be considered, if we knew that, we might have bid

something differently.

THE COURT:  Let me ask --

MR. CICACK:  We did not have full disclosure.

THE COURT:  Mr. Murray, are you contemplating, now you identified the successful bidder and the backup bidder, filing a motion for approval of this sale?

MR. MURRAY:  Well, I am now.  I thought it was approved in September.  Apparently nobody understood that.

THE COURT:  Mr. Kimpler, it sounds like there was a misunderstanding as well, Mr. Kimpler, because I think you were contemplating that someone was going to file a motion and this would be all public knowledge as to what it was. But now it seems like that's not the case.

MR. KIMPLER:  All I can say is in any 363 auction I've ever been in, I assume there is an auction.  You don't always get the full purchase agreement the next day.

THE COURT:  I agree.  No, no, no, I agree.

MR. KIMPLER:  That if it needs to be public, it will all be public.  That's my understanding.

THE COURT:  You were contemplating me signing an order too.

MR. KIMPLER:  I believe that you would need to sell -- I'm sorry, sign an order.  I think the order that you entered in September authorized the trustee to sell the asset.  I think a buyer understandably would like a sale

order with traditional findings and things that you see in a sale order.  You have obviously not approved that.  We have to come back and get your approval.  And the way this would typically work is you would file a motion.  You do it pretty quickly after an auction.  And we'll come back and we'll defend the sale if there are people that want to object to it.

THE COURT:  My understanding of what the trustee was describing was that he didn't need one.  And so that's why I said we need to have an evidentiary hearing to then determine what it was.  And if someone's going to file a motion, then that would then serve the purpose of having the evidentiary hearing.  Mr. Wolfshohl.

MR. WOLFSHOHL:  That is the intent, Your Honor, to file a motion and then come before the Court.  I think Mr. Murray, I believe what he was alluding to is that the sale process had been approved because we do think it had been approved.  What we intend to come in front of the Court with is the details of the offer that was the winning bidder and ask the Court --

THE COURT:  So has the sale closed?

MR. WOLFSHOHL:  It has not.  Absolutely not.

THE COURT:  So can you -- if they're disconnected, just tell me they're disconnected.

MR. WOLFSHOHL:  Okay.

THE COURT:  Mr. Jordan and Ms. Driver, I think are connecting the results of that -- well, the result of the process that you had with -- like the closing of a website and stuff like that -- is there a connection between the two?

MS. DRIVER:  Yes, Your Honor.

THE COURT:  No, no.  Hold on, Ms. Driver.  I need to hear from Mr. Wolfshohl.

MS. DRIVER:  Oh.

THE COURT:  What I'm saying is that's my understanding is that what you described.  I was trying to convey what you described and just ask Mr. Wolfshohl if there's a connection between the two.

MR. WOLFSHOHL:  Well, there's a connection but it's not for the reason that I think that they think.

THE COURT:  Okay.

MR. WOLFSHOHL:  It's not because there was a sale that has occurred.  It's because as a result of us doing the notice, which now set in motion the fact that we're moving forward with a particular bidder, there is significant concern now that everybody knows who it is that the assets need to be locked down.  We were always contemplating that FSS was going to be shut down and wound down.  Mr. Murray has conveyed to the employees that we're going to pay beyond, like all -- I think through the end of the year.

THE COURT:  Hold on a second.  I apologize. There's someone, I'm just going to mute your line.  I'm hearing folks on the line, if you can mute your line. Sounds like one of you is in New York because I can hear the fire truck in the back, bringing me back to Queens.  If you can just mute your lines.  I apologize.

MR. WOLFSHOHL:  So, Your Honor, in answer, there's for sure a correlation.  There's been an announcement as to the winning, as to who the winning bidder is and I understand Your Honor's concern with it.  The idea was we would be coming back into court with a motion and an order that would set out all the details of it.  But now that everybody knows who the winning bidder is, in Mr. Murray's business judgment, I think he exercised it the way he should have.

He went to Austin and began the process of securing assets, locking things down.  It is true that, you know, the servers are down and the show is not currently being publicized, but he has the ability to do that whether we're selling the assets or not.  And because of who the buyer is, there is a significant concern that assets would start going out the back door because people don't like who the buyer is that's been selected.  We intend to be in court next week before Your Honor to ask for approval of the sale. Mr. Murray had the ability to wind down the FSS operations

at any time.  He chose to go down there and basically make sure that everything was secure because there was an announcement as to who the winning bidder was and that bidder is somebody that I don't think everybody is going to be happy about.  And so we have not transferred anything. We haven't given the buyer access to anything.  We haven't executed any documents with the buyer.  We are still putting the final touches on the APA that we intend to file when we file the motion to approve the APA.

So I think what Mr. Murray was saying is we believe that the sale and the sale process was approved, but we are coming in front of Your Honor with details about what the sale is.  We're going to have an APA.  And I think what I hear Your Honor saying is you want to hear about how we made the decision and how the process went and that's going to be part of what we present to the Court when we come before Your Honor.

THE COURT:  The other question I have for you is it sounds like some websites were sold.  And you're telling me that they're not related to the stuff that you people were asking for on the 18th.  But I do recall -- whenever we met in October -- but I do recall us having a conversation about, you know, if there's some confusion between what Mr. Jones thinks is his assets versus what the trustee thinks is property of the estate, let me make the call.  But I also

said if you and the Jones folks can agree on what is purely estate asset versus what's not, you know, I probably don't have an issue.  I think I said something to that effect.  But I don't know.

It sounds like they're telling me that you sold some stuff that they think is Jones' related stuff.  And my concern what I said on the 18th and I got it, it may be the same or different assets.  I think I said I wanted to make sure that the buyer didn't purchase something and then later have to set up litigation on the back end.  I'd rather deal with it on the front end and say this is estate property, but I found it and then you can go, parties can then go appeal me as opposed to kind of go to state court and fighting about it there.

MR. WOLFSHOHL:  I remember that.

THE COURT:  There is a concern they're expressing that some of this is going to be subject to dispute.  And I'm just trying to make sure.  I know you told me that's different.  But I think we also talked generally about concepts.  Are there some things in here that folks are disputing from your understanding or -- they seem to be shaking their head yes.  And again, I don't want to get into what's going on.  I just want to make sure that you all feel comfortable that the buyer knows that these are true estate assets and that there's no -- someone's going to ask me if

the trustee was authorized to sell it.  Right?

MR. WOLFSHOHL:  Yeah.  And I think -- look, Your Honor, I remember the conversation we had in mid-October about this issue.  And if Your Honor recalls, we were talking about the things that we were asking for permission to sell that were in the individual bankruptcy estate.  And we did tell Your Honor we might come back with an agreement as to how we were going to deal with those assets.  But I did say, and I don't know if Your Honor remembers, I did say, Your Honor, I want to make sure that we're not going back and, you know, retreading issues related to the order that you had entered in September, the wind down order.

THE COURT:  Agreed.  You all can only sell estate assets, right?

MR. WOLFSHOHL:  Well, we can only sell -- in this instance, we can only sell assets that belong to FSS which, you know -- and Your Honor didn't give us, we haven't come back to you on the other assets.  Now, if what Ms. Driver and Mr. Jordan are saying is that, oh, some of the assets that are in FSS' name, we think those are also individual assets, we can have that discussion with them, but this is a different conversation in my view than the one in mid-October.

THE COURT:  It very well may be.  I'm just trying to flesh out all the issues so that when we show up on

whatever date we show up, I want to make sure that Mr. Ashmead's client knows exactly what they purchased and that there's no, if I sign an order, that the order gives him at least some comfort that he can say my clients own this free and clear. And I suspect he's going to want something to say that. If anybody challenges it later, that you would have an order of the bankruptcy court, a final order of the bankruptcy court that they could then go use and protect their clients. And I'm thinking, Mr. Ashmead, about your client. If they're the successful bidder, you weren't -- I'm not sure you were here on the last conversation. There was a different set of assets and I just did not want to create a situation where somebody purchased assets and then got sued in some state court in the middle of you know, who knows where. And, you know, and it was because we didn't do the hard work up front. And I'd wanted to just smoke out these issues before then.

And it was, yeah, I agree with Mr. Wolfshohl. It was a different set of assets that we were describing then, but I, conceptually, was just concerned about that issue.

MR. WOLFSHOHL: And I think what Your Honor did --

THE COURT: Just about what, 541 stuff or not.

MR. WOLFSHOHL: That's all the more reason we come in next week, right? I mean I think that would be a perfect opportunity for us to lay out in the sale order so that

there is no confusion and so that we're not inviting a situation where Your Honor is having to deal with disputes, you know, every, you know, week and a half because somebody's complaining that something was or was not on the list of assets.

So I think that that would be a perfect thing to include within. And I would suspect that Mr. Ashmead is going to want that specifically in the sale order and that's part of why they had requested that we actually, you know, proceed with a more traditional sale order that includes things like good faith findings and things like that.

THE COURT: Mr. Weichselbaum, I think you had your hand up. I just want to make sure I was responsive to you, sir.

MR. WEICHSELBAUM: Thank you, Your Honor. For the record, Jonathan Weichselbaum of Latham Watkins. I'm appearing on behalf of X Corp and my colleagues, Caroline Reckler and Chris Harris, apologize that they're not able to make it. Caroline, Ms. Reckler is traveling back from being from (indiscernible) this morning.

I thought this was a good point, just a good time to just make one remark about the assets that you were discussing about the October, the mid-October hearing.

THE COURT: Can you tell me where your client fits in all this again? Can you just remind me?

MR. WEICHSELBAUM:  So, it's X --

THE COURT:  Oh, go ahead.

MR. WEICHSELBAUM:  So in October, part of the assets that you are talking about right now, were Alex jones' X account, his Twitter account, formerly Twitter.

THE COURT:  Yes.

MR. WEICHSELBAUM:  So we tried to, you know, go on the record, Your Honor and note that X reserves all its rights with respect to the sale of Alex Jones' X account and just given everything that's been going on, we would hope that we would receive proper notice and opportunity to be heard if there's ever an attempt to sell Alex Jones' X account.  I understand that's not what is happening with the notice that was filed today, but we just wanted to make an appearance before Your Honor today and note that for the right.

THE COURT:  You want to make sure it wasn't sold. Your point is you want to make sure that it wasn't sold. But if any assets were related to that, that you reserved your right to come into court and talk about it?

MR. WEICHSELBAUM:  Correct.  And if there is a sale in the future that relates to Alex Jones' X account, we would like to receive proper notice and opportunity to be heard.

MR. WOLFSHOHL:  And I confirmed that with Ms.

Reckler probably an hour ago.

THE COURT:  Okay.  Thank you.

MR. LEMMON:  Your Honor --

THE COURT:  Hold on.  Mr. Cicack hasn't spoken yet. It sounds like you all want to file a motion.

MR. LEMMON:  Your Honor --

THE COURT:  Hold on a second.  Mr. Cicack, go ahead.

MR. CICACK:  Okay.  Just one point of clarification.  Because, in our view, this sale was done contrary to the sale order and disclosures and transparency, what we would request, since Mr. Murray has conceded there were only two bids, what we would request is that Mr. Murray turn over to both of the bidders, what their original bids were and then what the final and best bids were so that we would have knowing exactly what each of us bid both on the original bid and then on the final invest bid.  So we would know.  Right now, we don't know.  And despite confidentiality issues, Mr. Murray just in public told everybody what our bid was.  And so we're sort of behind the eight ball.  So we would request that we be given copies of the original bid that qualified the Onion people and then the final bid.  And we have no problem with disclosing ours to the winning bidder. But for full transparency, I think that's important.

THE COURT:  Okay.

MR. LEMMON:  Very briefly, Your Honor.  Steve Lemmon on behalf of PQPR.  I had many of the same questions that everybody else did.  And because I was only 100 feet down the hall, I was able to buttonhole Mr. Wolfshohl and Mr. Murray before this hearing and to learn a little more.  I'm still learning about the proposed sale.

I don't at all doubt Mr. Murray's good faith in proceeding with the sale the way he has done it.  All I'm asking is that we have enough time, if the deal will allow, you know, to study what's going on.  I can see ways in which this might be beneficial to everybody.  It's unconventional.  But I think everybody just needs to look at it just for a little bit.

THE COURT:  I want to make a couple of points clear.  So my understanding is that Mr. Murray is going to file some kind of motion to approve the sale and parties will have an opportunity to object.  And parties will have the opportunity to see what the winning bid is, what the backup bid was.  There'll be public transparency on what occurred, okay?  And who the winning buyer is and who the backup bidder is and the procedure.  It sounds like we're going to have an evidentiary hearing.  It sounds like I don't need to call one on my own.  It seems like that these issues are going to get teed up publicly in connection with

the motion to approve because I think Mr. Kimpler is correct and Mr. Ashmead's client is probably going to want some findings from me.  And that's going to require a hearing.

I personally don't care who wins the auction.  I just care about the process and I care about transparency in the process.  I don't care who wins or loses.  I care about process and transparency and that people feel like the process that we ran satisfies due process requirements and understandings in connection with the code.  And if there are disputes about, which is not surprising and I don't know who's listening, but it's not out of the ordinary for, in connection with a sale, for someone to say, Debtor is trying to sell assets one through seven.  I think I own this asset or it's not property of the estate.  It's got to come out of this.  And I want to be the one to kind of resolve any of those disputes up front and not let them travel so that there's some confusion that I sanctioned the sale of assets that were not property of the estate.  I want to feel good about anything that was sold.

So there's going to have to be a list.  Here's what we sold in this connection.  And this is what they did and this is what they purchased.  I stress that Mr. Cicack and Mr. Kimpler, both of you represent different clients.  I don't think from what I've heard today, that you all have done anything other than be bidders in an auction.  And I

don't want anyone to read into anything.  Mr. Ashmead's client, I don't want to read anything that something happened that people didn't know.

There's going to be a process now.  There will be transparency.  I'm a little concerned about the fact that Mr. Cicack, you don't know who the winning bidder is and you're the backup bidder.  But it sounds like we're all going to find out and there's going to be public knowledge and you will have the ability to take discovery just like everyone else in connection with the sales.

So I don't know.  I think what makes the most sense is for the trustee to file a motion, get it on the docket, and then maybe we hold a short status conference and then pick a date that makes the most sense.  Maybe that -- and again, maybe everybody gets comfortable once they see the process.  I don't know.  Maybe.

MR. ASHMEAD:  Your Honor, it's John Ashmead.  May I be heard?

THE COURT:  Yes, of course.

MR. ASHMEAD:  Your Honor, John Ashmead for Global Tetrahedron. I'd just like to say, Your Honor, you came around to exactly the point of where we want to be and our concern given the attention that this process has drawn, given the questions concerning the assets, Free Speech versus Jones, given the status conference that we're on

right now, that we, of course, want a motion and a sale approval and to be out there and to get the findings that you customarily get.  So you honed right in on what we want and what is our concern.  And just so it's clear and I know Your Honor already understands this, my client observed the requirements of the bidding process that we assumed everyone else did.

And then from everything I've heard today, we're in exactly the same position as the other bidders in terms of knowledge.  And we're told to put our final and best foot forward in a final sealed bid, we did that.  And we're told last night, we were the winner.  And at which point, we had calls this morning to start working on an APA and to talk about a sale order and a motion.  So that's where we are. And it sounds just as Your Honor has said that this will all work its way out in that process.  That's all I have, Your Honor.

THE COURT:  Okay.  Let's just play it out.  Ms. Driver.

MS. DRIVER:  Your Honor.  I apologize.  Thank you so much.   I think I am just very concerned that we have shut down a company that the Mr. Cicack's client from what I understand required an ongoing company that was making an extraordinary amount of cash, employing 30-some-odd people in the Austin area that got shut down this morning solely

because there may be a sale to an identified bidder.  I think there's an assumption that people in that building were going to commit crimes because of that.  And I don't know what the evidence is of that.

And I just wish if we can go back to where we were yesterday when Mr. Ashmead's client found out he was the winning bidder, I think that puts us in status quo where we can get to this evidentiary hearing.  But if everything remains shut down, I don't think we are at a status quo, and I don't think we remain at a status quo pending that evidentiary hearing.

THE COURT:  Why don't you get something on file.  Ask me to rule on something.  Tee something up for me and we'll deal with it early next week and let's figure out where we are.  I can't rule on, I need to -- I need something teed up that I can rule on and then we can bring folks in here and have an small evidentiary hearing.  I don't think it needs to be that -- right?  I can't technically take evidence today, but I want to make sure that we have process.  If that concern that you have and if it turns out that folks have really been let go or I don't know the difference between lockdown and let go maybe, but let's have the hearing.  Let's figure it out and we'll see where it goes.  All right?  But if you file something, reach out to my case manager and we hold the date, probably Monday

or Tuesday.

MS. DRIVER:  I'm just afraid we just don't lose all of our employees over the weekend because of this.  The cat may be out of the bag unfortunately.

THE COURT:  I understand.  I understand.  I don't want to put -- well, I don't want to put the trustee on the spot and we're here to talk about A and now we're talking about related B and C but we're out talking about it, the issues related to the sale and the concerns that Mr. Cicack has and that's going to get resolved.  There will be an open and transparent process and we'll know what it is.  We won't be long on that.  I just don't know how much time folks are going to need.  Maybe after seeing stuff, you agree with some part of it, not part of it.  I know Ms. Lake is going to be hyper-technically concerned about issues related to exactly what was sold and maybe we need to see that.  Maybe you have an issue.  Maybe you don't, I don't know.

Everybody says they followed the process.  Let's figure, let's find out.  And let's hold a hearing, but it sounds like we're going to have one now.  My big concern is that folks thought there wasn't going to be one, but now everybody seems to agree that there is one.  Let's have it and let's have it open and transparent where everybody gets to see it.  Again, I want to be clear.  I don't care who wins or loses.  I care about process and that, you know,

there's always going to be someone who doesn't win, but that's not the issue.  The issue is if we, did we run a full and fair process?  Well, let's find that out.

Ms. Driver, if there's other issues you wish to address with the Court, just file something and we'll take a look at it and we can take it up on an emergency basis.  But I got to know what the emergency issue is and what the specific ask is.  And that's what I need to understand, but maybe everybody can be a little bit smarter sooner rather than later.

Thank you very much.  You all have a good day.

(Proceedings adjourned at 3:25 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  November 26, 2024