# EXHIBIT 12

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 7 |
| | § | |
| ALEXANDER E. JONES, | § | Case No. 22-33553 (CML) |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

**TRUSTEE'S <u>EXPEDITED</u> MOTION FOR ENTRY OF AN ORDER IN FURTHERANCE OF THE SALE OF ASSETS OF FREE SPEECH SYSTEMS, LLC**
**[Relates to Docket No. 859]**

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

Expedited relief has been requested. If the Court considers the motion on an expedited basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the expedited consideration is not warranted, you should file an immediate response.

Christopher R. Murray, the Chapter 7 Trustee (the "***Trustee***") for the bankruptcy estate of Alexander E. Jones ("***Jones***" or the "***Debtor***") files this expedited motion (the "***Motion***") for entry of an order in further of the sale of assets of Free Speech Systems, LLC ("***FSS***"), including (i) authorizing and approving the auction and sale of the non-cash assets of FSS free and clear of all liens, claims and encumbrances and (ii) granting related relief.  In support of this Motion, the Trustee respectfully states as follows:

1

## PRELIMINARY STATEMENT

1.     On September 25, 2024, the Court entered the *Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC* [Docket No. 859] (the "***Winddown Order***"), which authorized the Trustee to, amongst other things, auction and sell (i) intellectual property assets of FSS and related personal property (i.e., servers on which such intellectual property is stored) (collectively, the "***IP Assets***"), and (ii) any Remaining Assets that remained unsold after the IP Assets Auction.[1]  In accordance with the Winddown Order, the Trustee, with the assistance of Tranzon360 and estate professionals, undertook an extensive marketing process to elicit bids for the IP Assets.

2.     There were ultimately two Qualified Bidders—joint bidders, Global Tetrahedron, LLC ("***Global Tetrahedron***") and the Connecticut Families, and First United American Companies, LLC ("***FUAC***")—after the initial sealed bid round.[2]  The initial sealed bids covered overlapping but non-identical lots of assets and the bid submitted by Global Tetrahedron and the Connecticut Families contained consideration in the form of a waiver of the Connecticut Families' rights to cash proceeds from the sale of the IP Assets.  Under the initial Global Tetrahedron sealed bid, the dollar value of the Connecticut Families' waiver was contingent on the ultimate amount of an otherwise higher bid, so the Trustee determined in his reasonable business judgment to hold the auction scheduled for November 13, 2024 by written submission of highest and best offers.

---

[1] For the avoidance of doubt, the assets offered in the IP Assets Auction <u>did not</u> include Alex Jones' personal social media accounts, book rights, or rights in a videogame, which were the subject of the *Emergency Motion for Entry of an Order Authorizing (i) the Sale of Intellectual Property Assets in Connection with the Winddown of Free Speech Systems, LLC and (ii) the Assumption and Assignment of Executory Contracts* [Docket No. 882] (the "***Jones IP Assets Motion***").  The Trustee and interested parties continue to negotiate the Jones IP Assets Motion.  In addition, no domain names that the Debtor has asserted rights to are included in this sale, and the Trustee reserves all rights with respect to such domain names.

[2] All capitalized terms used but not otherwise defined in this paragraph shall have the meaning ascribed to them in the Winddown Order.

Global Tetrahedron, with the Connecticut Families, and FUAC each submitted their highest and best offers.  FUAC submitted a bid for $3,500,000, and Global Tetrahedron submitted a bid in a stated amount of "no less than $7 million," consisting of a cash payment of $1,750,000, plus the Connecticut Families' waiver of certain cash proceeds for the benefit of other unsecured creditors of FSS.   The Trustee selected the final Global Tetrahedron/Connecticut Families' bid as the Successful Bid and the final FUAC bid as the Backup Bid.  Global Tetrahedron, the Connecticut Families, and the Trustee have also negotiated the Asset Purchase Agreement, attached hereto as **Exhibit A** (the "*Asset Purchase Agreement*"), in good faith, at arms' length and with no collusion.

3. The Trustee now seeks approval of (i) his selection of the Global Tetrahedron/Connecticut Families' bid as the Successful Bid, (ii) the free and clear sale of the Purchased Assets (as defined in the Asset Purchase Agreement) to War Is Over LLC (the "*Purchaser*"), an entity formed by Global Tetrahedron for the purpose of acquiring the Purchased Assets, and (iii) the approval of the Asset Purchase Agreement.  The Trustee seeks further authorization from the Court to close the sale transaction contemplated under the Asset Purchase Agreement.

## JURISDICTION AND VENUE

4. The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

5. Venue is proper pursuant to 28 U.S.C. § 1408.

6. The bases for the relief requested herein are sections 105, 363, and 704(a) of title 11 of the United States Code (the "*Bankruptcy Code*") and rules 2002, 6004, and 9014 of the

3

Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***").

## **BACKGROUND**

### I.       **Bankruptcy Proceedings**

7.       On July 29, 2022 (the "***Petition Date***"), FSS filed its voluntary petition for relief under chapter 11 subchapter V of the Bankruptcy Code.  For reasons stated on the record at the hearing on June 14, 2024, the Court entered the Dismissal Order dismissing FSS's chapter 11 case (the "***FSS Case***"). [*See* Docket Nos. 955 and 956].

8.       On December 2, 2022 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (prior to the Conversion Date, the "***Jones Chapter 11 Case***", and after the Conversion Date, the "***Jones Chapter 7 Case***").  The Debtor is an employee of FSS.  100 percent of the outstanding membership interests in FSS are owned by the Debtor's bankruptcy estate.

9.       On December 13, 2022, the United States Trustee for Region 7 (Southern and Western Districts of Texas) (the "***U.S. Trustee***") appointed the Official Committee of Unsecured Creditors in the Jones Chapter 11 Case pursuant to Bankruptcy Code section 1102(a)(1).

10.       The Debtor continued managing his assets as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code until the Court entered its *Order Converting Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [Docket No. 708] on June 14, 2024 (the "***Conversion Date***").  On June 21, 2024, the Court entered an order dismissing the FSS Case [Case No. 22-60043, Docket No. 956] (the "***Dismissal Order***"), while retaining exclusive jurisdiction over several adversary proceedings and the approval of

15668356

professional fees and expenses. On the Conversion Date, the U.S. Trustee appointed Christopher R. Murray as the Chapter 7 Trustee in the Jones Chapter 7 Case.

11.    On August 22, 2024, the Trustee filed the *Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC* [Docket No. 829].

12.    On September 25, 2024, the Court entered the *Order Supplementing Order Dismissing Case* [Case No. 22-60043, Docket No. 1021] (the "**Supplemental Dismissal Order**"), which provided that effective as of the entry of the Dismissal Order, the property of FSS's bankruptcy estate was deemed vested in the bankruptcy estate of Jones as property of his estate to be administered by the Trustee. The Trustee continues to operate FSS pursuant to the terms of the Dismissal Order, the Supplemental Dismissal Order, and the Jones estate's ownership of 100 percent of the membership interest in FSS.

13.    On September 25, 2024, the Court entered the Winddown Order, authorizing the Trustee to market and sell FSS's non-cash assets using a sealed bid process for the IP Assets.

14.    On November 18, 2024, FUAC filed the *Emergency Motion to Disqualify Global Tetrahedron, LLC's Bid* [Docket No. 913] ("**Motion to Disqualify**"), which is ultimately a procedurally improper objection to this Motion.

## II.    Auction Process

15.    On September 16, 2024, the Court authorized [Docket No. 844] the Trustee to employ and retain Tranzon360 as the Trustee's Agent to sell the Assets of FSS. With respect to the intellectual property assets of FSS, the Court-approved engagement letter specifically calls for an auction by "Sealed Bid with a round of virtual live bidding amongst competitive bidders, if deemed appropriate and necessary by Trustee and Agent." [Docket No. 828, Ex. C]. This process was further described and defined in the Winddown Order.

5

16.     Upon its employment, Tranzon360 posted preliminary auction information on the 360AssetAdvisors.com website billing the sale as a "Sealed Bid Offering," including a description of the property being offered, the sealed bid deadline, a highlight of the terms and bid process and noted that the sale was "Pending Bankruptcy Court Approval." Following the entry of the Winddown Order on September 25, 2024, Tranzon360 added a link to the auction information page for parties to submit a form, requesting a non-disclosure agreement ("**NDA**").

17.     On September 27, 2024, in accordance with the Winddown Order, the Trustee filed the *Notice of Auction for the Sale of Assets of Free Speech Systems, LLC Free and Clear of Any and All Claims, Interests, and Encumbrances* [Docket No. 862] ("**Sale Notice**") and served the Sale Notice on the service lists in the Jones Chapter 7 Case and the FSS Case.

18.     After entry of the Winddown Order, Tranzon360 initiated a marketing campaign to promote the sale of the IP Assets, which included a combination of newspaper advertisements, emails to targeted audiences, posts on business investor trade sites and press releases.

19.     To respond to qualified inquiries, Tranzon360 created a Sealed Bid Package, attached hereto as **Exhibit B** (the "**Sealed Bid Package**"), which included: (i) an explanation of the bid process, (ii) a description of the assets being sold, (iii) a categorization of the assets into specific lots based on Tranzon360's and the Trustee's reasonable business judgment about what categorization would elicit the highest or otherwise best offers for the Assets, (iv) a bid form, and (v) terms of sale.

20.     In early October, Tranzon360 began working with FSS staff and the Trustee's professionals to obtain information to assist bidders in performing due diligence and populating this information into a data room available to those bidders who had executed an NDA.

21.     Tranzon360 had over 30,000 views on the auction information page and received 232 requests to sign an NDA.  Tranzon360 reviewed each request to confirm verifiable company contact information and/or contacted parties to validate their interest.  Many parties were unreachable or expressed interest in only the Remaining Assets Auction.  Ultimately, Tranzon360 qualified 64 parties to receive an NDA, of which 42 parties signed the NDA and received a bid package.  NDA parties were contacted to ascertain interest level and of the 42 parties, 15 parties requested and/or were granted access to the data room.

22.     Between September 19, 2024 and November 8, 2024, Tranzon360 (i) continued to work with FSS to add pertinent materials to the data room, (ii) worked with the Trustee's counsel regarding a form asset purchase agreement, and (iii) actively contacted parties inquiring about the sale, discussed the sale process, answered questions about the offering and assessed interest levels and likely bid participation.

23.     On November 1, 2024, Tranzon360 provided a report to the Trustee of marketing activity and inquiries and communicated expectations to receive between two to four bids from the most serious potential bidders.

24.     During the week of November 4, Tranzon360 narrowed its likely bidder expectations to two parties, and spoke to each of these anticipated bidders in detail about the bid process, answering questions and offering its availability to address further follow-up questions prior to the bid deadline.  In accordance with the Winddown Order, the deadline for submission of sealed bids was November 8, 2024, at 2:00 p.m. (prevailing Central Time) (the "**IP Assets Bid Deadline**").

25.     The Trustee, through his professionals, received two bids before the IP Assets Bid Deadline: one joint bid from Global Tetrahedron and the Connecticut Families and one from

7

FUAC (FUAC, together with the Global Tetrahedron and the Connecticut Families, the "***Qualified Bidders***"). Both parties wired the required Good Faith Deposits (as defined in the Winddown Order) for their respective bids and gave proof of committed financing reasonably satisfactory to the Trustee.

26. The initial bid submitted by FUAC (the "***FUAC Initial Bid***"), attached hereto as **Exhibit C**, provided a cash bid totaling $1,200,000.00 for Lots 1-4, and FUAC apportioned the value of its bid between those Lots. The FUAC Initial Bid was broken out in the following way:

| Lot | Lot Bid | Intellectual Property Allocation | Equipment/Inventory Allocation |
| --- | --- | --- | --- |
| Lot 1 – Production | $600,000.00 | $275,000.00 | $275,000.00 |
| Lot 2 – E-Commerce | $500,000.00 | $250,000.00 | $250,000.00 |
| Lot 3 – Domains | $50,000.00 | | |
| Lot 4 – Contested Domains | $50,000.00 | | |

FUAC attributed $50,000 of its Lot 1 bid to personal property, equipment, and furniture located on Building 2 on the FSS premises, which was originally excluded from the bid package and thus not in the allocations in the table above. This was noted on an addendum page to the bid form. FUAC elected to group the FUAC Initial Bid together, such that its bid on each lot was contingent upon its bid on all the other lots.

27. The initial bid submitted by Global Tetrahedron and the Connecticut Families (the "***GT Initial Bid***", and together with the FUAC Initial Bid, the "***Initial Bids***"), attached hereto as **Exhibit D**, provided a cash bid totaling $1,000,000.00 for Lots 1-2 and additional consideration described below,[3] and Global Tetrahedron and the Connecticut Families apportioned their bid between those Lots. The GT Initial Bid was broken out in the following way:

| Lot | Lot Bid | Intellectual Property Allocation | Equipment/Inventory Allocation |
| --- | --- | --- | --- |

---

[3] The Winddown Order provides that bids may include "must clearly state which of the Assets the Potential Bidder seeks to acquire. Each Sealed Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any (collectively, the "Purchase Price"). The Purchase Price should be a specific amount in U.S. Dollars (not a range)". Winddown Order at 6.

| Lot 1 – Production | $998,000.00 | $998,000.00 | $1,000.00 |
|---|---|---|---|
| Lot 2 – E-Commerce | $1,000.00 | $1,000.00 | |
| Lot 3 – Domains | | | |
| Lot 4 – Contested Domains | | | |

Global Tetrahedron and the Connecticut Families elected to group the GT Initial Bid together, such that their bid on each lot was contingent upon their bid on the other lot.

28.     In addition to the cash bid, the Connecticut Families included consideration in the form of a "***Distributable Proceeds Waiver***", which is set out in section 2.c of the bid letter attached to the GT Initial Bid and which is attached hereto as **Exhibit E** (the "***GT Initial Bid Letter***").  The GT Initial Bid Letter provided that, the Connecticut Families would waive their right to receive proceeds from the sale and assign the right to receive those proceeds to all other unsecured creditors such that those creditors would receive a greater cash recovery pursuant to the GT Initial Bid than they otherwise would under a bid with a higher cash purchase price.  This waiver was, in essence, a bid trigger that would increase the value of the bid in response to the amounts of alternative bids, requiring a recursive and contingent analysis based on hypothetical competing bids that may or may not be made.  The GT Initial Bid Letter also provided that a portion of future revenues derived from the sale of the assets to Global Tetrahedron would be provided to the Connecticut Families and the Texas Families as an additional form of consideration.

29.     Tranzon360 contacted each of the bidders, walked through their bids and informed the bidders that they would be notified in the next couple of days if they would be invited to another round of bidding.  *See* Winddown Order ¶ 8.

30.     Between November 8 and November 11, the Trustee, in consultation with his professionals, analyzed the FUAC Initial Bid and the GT Initial Bid.  The Trustee's analysis considered (a) the bids themselves in relation to each lot or group of lots, (b) Tranzon360's assessment, based on its discussion with bidders, of their potential interest in varying lot groupings,

9

(c) the potential value to the estate and its creditors of the Distributable Proceeds Waiver in the GT Initial Bid in relation to other bids, the qualification of the GT bid trigger, assessing the value of the Initial Bids in relation to each Lot (including attribution of value to certain lot components if they were sold piecemeal at the Remaining Assets Auction), and how to achieve the highest or otherwise best offers for the Lots.

31.     The Trustee, in consultation with his professionals, assessed two possible options regarding an additional round of bidding, both of which fell within the discretion granted to the Trustee to set the terms of the bid process under the Winddown Order and as further described within the Bid Package documents provided to the bidders, which the bidders signed and acknowledged when submitting their initial bids.  The first option was to conduct a round of live bidding through a video conference.  The discussion about this option included mock scenarios to present and manage the various lots and lot packages, the explanation of attributing potential piecemeal auction value to certain lots and the on-the-fly calculation of the Distributable Proceeds Waiver.  The second option was to provide an updated version of the bid form, placing lots in lot combinations to satisfy all of the potential scenarios the Trustee believed the bidders desired, and to ask for "final and best offers."  This process is a customary strategy in sealed bid sales. The benefit is that it forces bidders to put their best offer forward regardless of other bids.  The discussion about this option included a recognition that this approach would ensure all lot and bidding permutations could be easily compared, and that Global Tetrahedron and the Connecticut Families, like FUAC, would be required to attribute a specific dollar allocation to its bid or otherwise explain any contingencies with enough specificity for the Trustee to evaluate the potential benefit to the estate and its creditors. The final-and-best offer format would also provide

10

the Trustee time to evaluate the comparable cash value of the Distributable Proceeds Waiver in the context of the final competing bids and lots.

32.     The Trustee determined in his reasonable business judgement, and in consultation with his professionals, that the "final and best" overbid strategy (i) was in the best interest of all bidding parties, (ii) would provide a more equitable method of evaluating the bids, (iii) would provide the best method of maximizing value to the creditors, and (iv) was consistent with the terms of the Sealed Bid Package and Winddown Order and his discretion under the Winddown Order, "prior to conclusion of an Auction (if any) [to] impose such other terms and conditions upon bidders as the Trustee determines to be in the best interests of the Debtor's estate, FSS and their creditors in this bankruptcy case."   Winddown Order ¶ 13. This discretion was also communicated to all bidders in the Sealed Bid Package, which provided that "[t]he Bid Process and Terms with any amendments or modifications expressly made by Sales Agent constitute all the terms and conditions with respect to the sale of the Property; however Sales Agent reserves the right to modify the Bid Process and Terms, as may be necessary and shall notify Bidder accordingly." Sealed Bid Package, Term 25.

33.     Messages were sent to the Qualified Bidders on Monday, November 11, 2024, at 4:39 p.m. (prevailing Central Time), notifying them of the auction format selected for the next round of bidding and providing them with a revised overbid form and instructions to submit their best and final offers by the date and time of the IP Assets Auction on November 13, 2024, at 10:30 a.m. (prevailing Central Time).  The revised bid form included the original lots, as well as a number of additional lot groupings to maximize optionality.  The revised bid form was designed, in the Trustee's business judgment and with assistance of his advisors, to allow (a) parties to make bids that were non-contingent on winning any other lots and to bid on multiple asset packages, giving

themselves multiple possible routes to win lots, and (b) the Trustee to more easily compare bids to consider the highest or otherwise best offers for the asset groupings, including the two parties' bids, and to evaluate the potential value a lot might bring if sold piecemeal in the Remaining Assets Auction.

34.     Tranzon360 had conversations with FUAC and Global Tetrahedron after providing them with the overbid form.  These conversations were intended to ensure that each bidder understood the form and the bid process, allowed Tranzon360 to answer any questions and ensure that each bidder understood what "highest and best" meant.  Neither bidder voiced any objection to the process and both bidders confirmed that they understood the process. Specifically, both bidders understood that, under this procedure, there would be no additional opportunity to overbid. Neither bidder objected to that procedure at the time.

35.     Before the deadline, the Qualified Bidders both submitted their final and best offers. The "best and final" approach worked as intended—both bids submitted were significantly higher than each bidder's initial bid, and in the case of Global Tetrahedron and the Connecticut Families, provided a specific allocation of Distributable Proceeds Waiver value (in their estimation) to their GT Final Bid, which ultimately made that portion of their bid easier for the Trustee to analyze than the formulation in their initial bid.

36.     The final bid submitted by FUAC (the "**FUAC Final Bid**"), attached hereto as **Exhibit F**, was broken out in the following way:

| Lot Group | Bid |
| --- | --- |
| Group 1 Production and E-Commerce Intellectual Property Only (Lot 1b & 2b) | |
| Group 2 Production and E-Commerce IP, Equipment & Inventory (Lot 1a & 2a) | $3,350,000.00 |
| Group 3 Domain Names (Lot 3 & 4) | $150,000.00 |
| Group 4 All Intellectual Property, Equipment, Inventory & Domains (Lots 1-4) | $3,500,000.00 |
| Group 5 All Intellectual Property & Equipment (no Inventory) (Lots 1a & 2b) | $3,100,000.00 |
| Group 6 All Intellectual Property & Inventory (no equipment) (Lots 1b & 2a) | $2,850,000.00 |
| Group 7 Equipment & Inventory (no IP) (Lots 1c & 2c) | $750,000.00 |

12

37.     The final bid submitted by Global Tetrahedron and the Connecticut Families (the "**_GT Final Bid_**", and together with the FUAC Final Bid, the "**_Final Bids_**"), attached hereto as **<u>Exhibit G</u>**, provided a bid of $7,000,000.00 comprised of $1,750,000.00 in cash plus the Distributable Proceeds Waiver (as modified by the bid letter attached with the GT Final Bid form), which provided for the Connecticut Families' waiver of their claim to the proceeds of the Purchased Assets.   The GT Final Bid also provided that Global Tetrahedron would pay the Connecticut Families and Texas Families a percentage of future revenues realized from the Purchased Assets.

38.     The GT Final Bid was broken out in the following way:

| Lot Group | Bid |
|---|---|
| Group 1 Production and E-Commerce Intellectual Property Only (Lot 1b & 2b) | |
| Group 2 Production and E-Commerce IP, Equipment & Inventory (Lot 1a & 2a) | |
| Group 3 Domain Names (Lot 3 & 4) | |
| Group 4 All Intellectual Property, Equipment, Inventory & Domains (Lots 1-4) | $7,000,000.00 |
| Group 5 All Intellectual Property & Equipment (no Inventory) (Lots 1a & 2b) | $7,000,000.00 |
| Group 6 All Intellectual Property & Inventory (no equipment) (Lots 1b & 2a) | |
| Group 7 Equipment & Inventory (no IP) (Lots 1c & 2c) | |

39.     The Trustee analyzed each bid to determine its total benefit to FSS unsecured creditors. The key difference between the two final bids was that the GT Final Bid included the Distributable Proceeds Waiver. This mechanism would add material value for unsecured creditors other than the Connecticut Families (the "**_Gift Class_**"), who would receive a portion of the recovery to which the Connecticut Families were otherwise entitled.

40.     The amount of the Distributable Proceeds Waiver depends on two variables which, at this time, can be estimated. The first is the amount of administrative costs of the sale, which are paid before unsecured creditors. Administrative costs include auctioneer fees and expenses, legal and other professional fees and expenses and the Trustee's statutory commission. The Trustee estimates the total of these costs will be $650,000.

13

41. The second variable is the Gift Class's share of the claims pool. The GT Final Bid asserts that the Connecticut Families currently hold 96.7% of all liquidated claims. Aside from the Connecticut Families, the claims pool primarily consists of the claims of Texas Families (some of whose claims are not yet liquidated) and PQPR Holdings (whose claim is subject to pending litigation), and the claims of other unsecured creditors.

42. Using these assumptions, the Trustee calculated the value to the Gift Class under the backup bid as well as under the winning bid. At $3,500,000, the backup bid yields recovery to the Gift Class of $94,050. In contrast, under the winning bid, at a $7,000,000 cash equivalent amount, the Gift Class would receive $209,550. To accomplish that recovery under the actual purchase amount of $1.75 million under the winning bid, the Connecticut Families would waive $173,250 of proceeds.

| | | Backup Bid | Winning Bid (Cash Equivalent) | Winning Bid |
|---|---|---|---|---|
| Purchase Cash | | 3,500,000 | 7,000,000 | 1,750,000 |
| less: Administrative Costs | | (650,000) | (650,000) | (650,000) |
| Net Purchase Cash | | 2,850,000 | 6,350,000 | 1,100,000 |
| | | | | |
| Connecticut Families' Share | 96.7% | 2,755,950 | 6,140,450 | 1,063,700 |
| Gift Class's Share | 3.3% | 94,050 | 209,550 | 36,300 |
| Total Creditor Proceeds | | 2,850,000 | 6,350,000 | 1,100,000 |
| | | | | |
| Gift Class's Share | | 94,050 | 209,550 | 36,300 |
| Distributable Proceeds Waiver | | - | - | 173,250 |
| Gift Class Total Recovery | | 94,050 | 209,550 | 209,550 |

43. The Trustee then stress-tested the assumptions in this analysis by evaluating alternative estimates for administrative costs and Connecticut Family shares of the claims pool. This was necessary because the amount of the waiver cannot actually exceed the net proceeds to which the Connecticut Families would otherwise be entitled to, creating a natural limit to the

14

implied cash equivalent bid of the offer. Under any reasonable assumptions, however, there is more than enough cash available to fund the required waiver. For example, if the Court assumes that the administrative costs are $750,000 and the Connecticut Families share of the claims pool is ultimately determined to be only 75%, the winning bid would provide greater value to the Gift Class than any bid up to approximately $4.75 million. That is because this is the amount at which the Distributable Proceeds Waiver amount reaches 100% of the Connecticut Families' share, or the maximum amount they could contribute under this mechanism.



44.     Based on this analysis, the Trustee determined that the GT Final Bid was the highest and best bid received and selected that bid as the winning bidder. In accordance with the Winddown Order, the Trustee had three (3) business days to file a notice with the Court designating the successful bid and bidder and the backup bid and bidder.  On November 14, 2024, the Trustee filed the notice of the successful bidder and backup bidder [Docket No. 903].

## REQUESTED RELIEF

45.     The Trustee seeks entry of an order, substantially in the form attached hereto, approving the Trustee's selection of the GT Final Bid and authorizing the Trustee (i) to sell the Purchased Assets free and clear of all liens, claims, and encumbrances to the Purchaser and (ii) to

15668356

enter the Asset Purchase Agreement attached hereto in furtherance of the Winddown Order and to close the sale of the Purchased Assets.

**BASIS FOR RELIEF**

## I. The Court Should Approve the Auction and Sale of the Purchased Assets as a Sound Exercise of Business Judgment.

46.     Section 704(a) of the Bankruptcy Code provides the duties of a chapter 7 trustee, and in particular directs the trustee "to collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the ***best interests*** of parties in interest." 11 U.S.C. § 704(a)(1) (emphasis added). A trustee "has the duty to maximize the value of the estate." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 352 (1985).

47.     Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Generally, a trustee "must demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder can raise the cash necessary to complete the deal." *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (citing 3 COLLIER ON BANKRUPTCY ¶ 363.02[1][f] (15th ed. rev. 2009)). Ordinarily, the business judgment test boils down to a judicial review of whether the trustee is appropriately seeking approval of a sale of the highest, or otherwise best, offer available. *See, e.g.*, *In re C.W. Min. Co.*, 2010 WL 841396, at *10 (Bankr. D. Utah Mar. 2, 2010).

48.     A trustee's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets and when there is "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."

16

See, e.g., *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").  Whether the proffered reason for the business judgment is sufficient depends on the facts of each case.  *See Cont'l Air Lines*, 780 F.2d at 1226.

49.     Once a trustee articulates a valid business justification, the court should review that request under the business judgment rule.  *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation).  The business judgment rule protects certain trustee decisions from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").  Thus, if a trustee's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

50.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale de-signed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir.

17

1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

51.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

52.     It is well-settled that where there is a court-approved auction process, a full and fair price is presumed for the assets sold because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is true here where the Purchased Assets have been subjected to a marketing process and intensively scrutinized by the Trustee and his retained advisors. As a result, the Trustee and creditors can be assured that, taking into account current economic conditions, the consideration obtained will be fair and reasonable and at or above market.

18

53.     Here, the marketing, auction, and sale were in accordance with the Winddown Order entered by the Court.  As intended, the bidding procedures promoted active bidding from interested parties.  The requirement that the Qualified Bidders submit their final and best offers also enhanced the outcomes of the auction because it caused the Qualified Bidders to reasonably assess the value of the Purchased Assets and submit a bid sufficiently high to overcome any other bidder.  Both of the Qualified Bidders were subject to the same requirements in the same timeframe.  The auction maximized the value realized for the Purchased Assets because it leads to materially greater recoveries for general unsecured creditors of FSS.  *See In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015) (debtor is not required to "mechanically accept a bid with the highest dollar amount"); *In re Diplomat Const., Inc.*, 481 B.R. 215, 219 (Bankr. N.D. Ga. 2012) ("The highest bid does not always equate to the best bid for the estate"); *In re LeBlanc Inc.*, 299 B.R. 546, 552 (Bankr. N.D. Iowa 2003) (approving the trustee's proposed sale of a lower offer and stating that "accepting the [higher] offer . . . would delay closing. The value to the trustee of closing sooner on the [lower] offer detracts from [the] incremental offer of $ 25,000.00."); *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (approving of a trustee's business judgment where the trustee "carefully weighed the competing bids [including their risk factors and other provisions] rather than mechanistically recommending the facially higher bid"); *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) ("bankruptcy courts have broad flexibility in determining which of several bidders should be deemed the successful bidder at a § 363(b) sale"); *In re Landscape Properties, Inc.*, 100 B.R. 445, 448 (Bankr. E.D. Ark. 1988) (approving recommended purchaser on the basis that, although the purchasers was "not making the highest offer on the property, it [made] the better offer."); *In re Tresha-Mob, LLC*, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019) (citation omitted) ("While the bid that brings in

the most cash often wins, it is 'common knowledge' that the 'highest bid is not always the best bid,' especially if there are 'conditions sufficient to overbalance the difference between the two.').

54.     Despite the higher cash offer received from FUAC, the GT Final Bid offered greater value to FSS's unsecured creditors.  The Trustee knows the universe of claims based on the claims register of FSS as of the date of the auction.  It is within the Trustee's business judgment to assess the value of claims for the purposes of making a decision about whether a bid will lead to better value for creditors.  With respect to the contested alleged claims and liens of PQPR, after reviewing materials, including the Subchapter V Trustee's report and the completed summary judgment briefing pending before this Court with respect to PQPR's purported claim, the Trustee determined that the value of this claim, if it has value, is highly speculative and unlikely to materially impact recoveries to unsecured creditors of FSS in this case.  Accordingly, secured claims which the Trustee believes are valid, perfected, and unavoidable amount to $143,255.24.  Similarly, claims asserting priority status under Bankruptcy Code section 507 total $30,214.37.  The Trustee currently holds over $7,500,000.00 in cash, which is more than sufficient to cover the valid, perfected, and unavoidable secured claims and priority claims against FSS.

55.     Accordingly, only general unsecured claims are affected by the results of the auction and particularly the Distributable Proceeds Waiver.  Based on the claims register, the Connecticut Families together hold claims totaling $1,549,568,859.95 for final and liquidated judgments against FSS and the Debtor.[4]  All other liquidated claims total $50,838,557.14.[5]  As a

---

[4] The Trustee is not prosecuting appeals of those judgments on behalf of FSS, and such appellate rights are property of FSS, which are vested in the bankruptcy estate of the Debtor as property of his estate to be administered by the Trustee pursuant to the Supplemental Dismissal Order. The Fifth Circuit has found that defensive appellate rights are property under state law, become property of the debtor's estate, and may be sold by the trustee. *See Croft v. Lowry (In re Croft)*, 737 F.3d 372, 377 (5th Cir. 2013).

[5] There are three Texas Plaintiffs that filed contingent and unliquidated claims against FSS, which claims have not been liquidated.  Even if they were liquidated, the amount of the Connecticut Families' claims so far dwarfs any

result, the Connecticut Families hold approximately 96.7% of the amount of claims in the general unsecured creditors' claim pool.

56.     The GT Final Bid is ultimately the highest and best offer to those creditors who have not voluntarily given up part of their interests so that other creditors might recover a greater amount on their claims.

## II. The Court Should Approve the Trustee's Entry into the Asset Purchase Agreement as an Exercise of Sound Business Judgment.

57.     As noted above, the business judgment rule shields a trustee or debtor-in-possession's decisions from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a trustee articulates a valid business justification, the court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation). The business judgment rule protects certain decisions—such as the Trustee's entry into a purchase agreement—from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."). If a trustee's actions satisfy the business judgment rule, then the transaction in question should be

---

likely judgments that the Texas Plaintiffs would receive that recoveries for non-Connecticut Families unsecured creditors would still be greater under the GT Final Bid.

approved under section 363(b)(1) of the Bankruptcy Code. Based on this rationale, courts have authorized a trustee's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

58. The Trustee, the Purchaser, Global Tetrahedron, and the Connecticut Families negotiated the Asset Purchase Agreement in good faith and at arms' length and with no collusion. The consideration for the Purchased Assets provided by the cash component of $1,750,000 (the "**Cash Purchase Price**") and the Distributable Proceeds Waiver is fair and reasonable consideration for the Purchased Assets. The Trustee has articulated a sound business purpose for entering into the Asset Purchase Agreement because the Cash Purchase Price and the Distributable Proceeds Waiver will create a better recovery for general unsecured creditors than the FUAC Final Bid.

59. The total consideration constitutes reasonably equivalent value and fair and adequate consideration for the Purchased Assets under the Bankruptcy Code and the laws of the United States and any state, territory, or possession thereof. The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable and were not entered into with the intent to nor for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Trustee, Jones, FSS, or any of their respective creditors under any applicable laws. Neither the Trustee, the Purchaser, nor the Connecticut Families are entering into the Asset Purchase Agreement or proposing to consummate the Sale Transaction fraudulently, for the purpose of statutory or common law fraudulent conveyance, or to fraudulently transfer assets, whether under the Bankruptcy Code or under the laws of the United States, or any state, territory, or possession thereof or any other applicable jurisdiction.

### III. Sale Should Be Approved Free and Clear Under Section 363(f) of the Bankruptcy Code.

60.     The Court has already authorized the sale of the Purchased Assets free and clear of all liens, claims, charges, encumbrances and interests pursuant to section 363(b) and (f) of the Bankruptcy Code.  Winddown Order ¶ 2.  Section 363(f) of the Bankruptcy Code permits a trustee to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

61.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Purchased Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "***Encumbrances***"), except with respect to any Encumbrances that may be assumed Encumbrances under the purchase agreement of a successful bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

62.     Any Encumbrance that will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Trustee, the Debtor's estate, or FSS may possess with respect thereto.  The Trustee requests authority to convey the Purchased Assets to the respective successful bidders free and clear of all Encumbrances including liens, claims, rights, interests, charges, and

23

encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the sale and to be held until further determination of this Court.

## **WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)**

63.     To implement the foregoing successfully, the Trustee requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Trustee has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **NOTICE**

64.     The Trustee will provide notice of this Motion to the following parties or their counsel: (a) the United States Trustee for the Southern District of Texas; (b) counsel for the Debtor; (c) counsel for the Sandy Hook Families; (d) the holders of the 20 largest unsecured claims against the Debtor; (e) the Office of the United States Attorney for the Southern District of Texas; (f) the Texas state attorney general; (g) the Internal Revenue Service; (h) all known holders of liens, encumbrances, and other claims secured by the Assets; (i) all known creditors of FSS; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no further notice is required.

## **CONCLUSION**

WHEREFORE, the Trustee respectfully requests entry of the Proposed Order (i) approving the auction and authorizing and approving the sale of the Purchased Assets of FSS free and clear of all liens, claims and encumbrances, (ii) authorization to enter into the Asset Purchase Agreement with the Purchaser, (iii) authorizing the Trustee to close the sale with the Purchaser, and (iv) granting such other and further relief as may be just and proper.

24

15668356

Dated: November 18, 2024
       Houston, Texas

Respectfully submitted,

By: */s/ Joshua W. Wolfshohl*
    Joshua W. Wolfshohl (Bar No. 24038592)
    Michael B. Dearman (Bar No. 24116270)
    Jordan T. Stevens (Bar No. 24106467)
    Kenesha L. Starling (Bar No.24114906)
    **PORTER HEDGES LLP**
    1000 Main Street, 36th Floor
    Houston, Texas 77002
    Telephone: (713) 226-6000
    Facsimile: (713) 226-6248
    jwolfshohl@porterhedges.com
    mdearman@porterhedges.com
    jstevens@porterhedges.com
    kstarling@porterhedges.com

    *and*

    Erin E. Jones (TX 24032478)
    **JONES MURRAY LLP**
    602 Sawyer Street, Suite 400
    Houston, Texas 77007
    Telephone: (832) 529-1999
    Fax: (832) 529-3393
    erin@jonesmurray.com

    *Counsel for Christopher R. Murray, Chapter 7 Trustee*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a copy of the foregoing document was served on November 18, 2024 on all parties receiving ECF service in the above-captioned case and by U.S. First-Class Mail, postage prepaid on the attached service list.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

25

15668356

## **EXHIBIT E**

### **GT Initial Bid Letter**

**Global Tetrahedron, LLC**
730 N. Franklin Street, Suite 700
Chicago, IL 60654

**PRIVATE AND STRICTLY CONFIDENTIAL**
**NOT FOR PUBLIC DISCLOSURE**

November 8, 2024

Porter Hedges LLP
1000 Main Street
Houston, Texas 77002
Attn: Joshua W. Wolfshohl, Michael B.
Dearman

Jones Murray LLP
602 Sawyer Street, Suite 400
Houston, Texas 77007
Attn: Erin Jones

Tranzon Asset Advisors
1108A North Dixie Avenue
Elizabethtown, Kentucky 42701
Attn: Kelly Toney, Ed Durnil

ThreeSixty Asset Advisors
3075 E. Thousand Oaks Blvd.
Westlake Village, California 91362
Attn: Jeff Tanenbaum

**Re: Sealed Bid for Sale of Free Speech Systems, LLC Assets**

Global Tetrahedron, LLC ("Global Tetrahedron") and the Connecticut Families[1] (collectively with Global Tetrahedron, the "Bidders", "we", "our", or "us") are pleased to submit this joint sealed bid (this "Bid") to acquire certain assets of Free Speech Systems, LLC ("FSS") on the terms and subject to the conditions set forth herein in accordance with that certain *Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC*, Case No. 22-33553, Docket No. 859 (together with any supplemental orders entered in connection therewith, the "Bidding Procedures Order").[2] The terms of our Bid are set forth below.

### 1. Identity of Bidders

The acquiring entity will be Global Tetrahedron.[3] Global Tetrahedron is a limited liability company organized under the laws of the state of Delaware. The majority member of Global Tetrahedron is Jeff Lawson (co-founder and former CEO of Twilio, a customer-

---

[1] The "Connecticut Families" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Bidding Procedures Order or that certain *Offering Memorandum* transmitted in connection therewith, as applicable.

[3] If selected as the Successful Bidder, Global Tetrahedron may determine to form a new subsidiary entity for the purpose of acquiring the Acquired Assets (as defined below). If applicable, Global Tetrahedron will provide prior written notice of such entity's formation to the Chapter 7 Trustee, and will cooperate in good faith to provide additional information with respect thereto, as may be requested by the Chapter 7 Trustee.

service software company), and the Chief Executive Officer is Ben Collins. Global Tetrahedron is a digital media company and newspaper organization that publishes satirical articles on international, national, and local news including *The Onion,* a satirical publication which has been operating since 1988. Global Tetrahedron, by and through its articles of association, is legally empowered to complete the transaction contemplated herein, and Ben Collins is authorized to execute this bid letter on its behalf. In connection with this Bid, Global Tetrahedron has included proof of its financial capacity to close the transaction.

The Connecticut Families currently hold $1.4381 billion in liquidated judgments against FSS and Alexander E. Jones ("Jones" and, together with FSS, the "Debtors"). The Connecticut Families—who constitute the vast majority of the beneficiaries of the Debtors' estates—believe that consummation of the transaction set forth in this Bid is in the best interest of the Debtors' estates, their creditors, and all parties in interest. Not only will consummation of the Bid maximize monetary recovery to all creditors, including the Texas Families,[4] but it will also safeguard certain material assets of FSS to ensure that they are not used to harm the Connecticut Families, the Texas Families, or other parties in the future.

This Bid is made jointly by Global Tetrahedron and the Connecticut Families, each as principals, and not as brokers or agents.[5] Each of the Bidders certifies that it is legally empowered to complete the transactions on the terms contemplated herein.

## 2. Identity of Assets and Purchase Price

By this Bid, Global Tetrahedron seeks to acquire the following assets free and clear of all liens, claims, charges, and other encumbrances in accordance with section 363(f) of the Bankruptcy Code and the Bidding Procedures Order: (a) all undisputed Lot 1 assets of FSS, including all production equipment; and (b) all undisputed Lot 2 assets of FSS that constitute non-physical IP Assets (collectively, the "Acquired Assets").

The aggregate consideration for the Acquired Assets to be provided by the Bidders consists of the following:

    a. Cash Consideration – Cash consideration in the amount of $1 million to be funded by Global Tetrahedron (the "Purchase Price").

    b. Future Revenues – Global Tetrahedron shall pay a portion of future revenues derived from the Acquired Assets to the Connecticut Families and the Texas Families on a *pro rata* basis, as determined by the allowed amount of their claims in the Jones chapter 7 case (the "Future Revenue Payments").[6] Global Tetrahedron

---

[4]    The "Texas Families" are Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine.

[5]    The Connecticut Families are represented by Koskoff Koskoff & Bieder, PC, which is authorized to submit this bid letter on their behalf.

[6]    Future Revenue Payments shall consist of payments from the sale of merchandise, promotional items, and other assets.

shall cooperate in good faith with the Connecticut Families and the Texas Families to determine the amount and timing of such Future Revenue Payments.

c. <u>Distributable Proceeds Waiver</u> – To the extent an alternative Qualified Bid is submitted by a third party that consists of cash consideration in a higher amount than the Purchase Price set forth herein, the Connecticut Families commit to forego receipt of the Distributable Proceeds Waiver Amount (as defined herein), and shall assign the Distributable Proceeds Waiver Amount to the Chapter 7 Trustee for the benefit of all other unsecured creditors of FSS. The waiver described in this section (the "<u>Distributable Proceeds Waiver</u>") is intended to enhance the terms of this Bid, such that creditors other than the Connecticut Families will receive *greater* cash recovery pursuant to this Bid than they would under an alternative Qualified Bid, notwithstanding a higher cash purchase price. As used herein, the "<u>Distributable Proceeds Waiver Amount</u>" shall mean the lesser of the following to which the Connecticut Families would be entitled to receive pursuant to this Bid:

   i. The portion of the distributable cash proceeds (excluding any Future Revenue Payments) to which the Connecticut Families would be entitled from the sale of the Acquired Assets pursuant to this Bid (the "<u>Connecticut Distributable Proceeds</u>") necessary for other unsecured creditors of FSS (including the Texas Families) to recover $1 more, in the aggregate, than they would recover from the sale of the Acquired Assets to the otherwise highest Qualified Bid or as set forth in any settlement agreement by and among the Connecticut Families and the Texas Families approved by the Bankruptcy Court; or

   ii. The full amount of the Connecticut Distributable Proceeds; *provided* that, in the event the cash amount set forth in this Bid is subsequently increased, the amount of such waiver shall not exceed $2 million without the prior written consent of the Connecticut Families.[7]

Through implementation of the Distributable Proceeds Waiver, if applicable, other unsecured creditors, including principally the Texas Families, can reasonably be expected to receive at least as much as they would otherwise obtain under a competing bid for an amount up to *$4 million* or even higher amounts in the event the cash consideration in this Bid is increased at auction. For the avoidance of doubt, the Distributable Proceeds Waiver shall be in addition to and separate from the Purchase Price and the Future Revenues set forth herein.

---

[7] The Distributable Proceeds Waiver shall apply only with respect to the Connecticut Distributable Proceeds derived from the sale of the Acquired Assets if this Bid is consummated, and shall not apply to, or otherwise affect the Connecticut Families' entitlement to the Future Revenues Payments or any other liquidation or collection proceeds from the Debtors or their estates that are deemed unrelated to this Bid.

### 3. Committed Financing

As referenced in the funds verification letter submitted contemporaneously herewith, Global Tetrahedron has in excess of $1.2 million in cash on hand and will not require third-party financing in connection with this Bid.

### 4. Contingencies, Authorizations, and Diligence

Consummation of the transaction contemplated by this Bid is not conditioned on obtaining, or the sufficiency of, any financing, internal approvals, or on the outcome or review of due diligence. The Bidders have completed all of their due diligence as of the date hereof, including all business, legal, accounting, title, and other confirmatory diligence. The Bidders do not believe there are any conditions or material issues that will impede their ability to close the transaction contemplated herein on the timeline contemplated by the Bidding Procedures Order.

The terms of this Bid have been reviewed and approved by Global Tetrahedron's Managing Member, General Counsel and legal advisors and the Connecticut Families and their legal advisors. All necessary authorization and approvals have been received by the Bidders with respect to the submission of this Bid and the consummation of the transaction contemplated herein.

Each of the Bidders hereby acknowledges and represents that it (a) has had an opportunity to conduct any and all due diligence prior to submitting this Bid; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making this Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection herewith.

### 5. Irrevocability

Subject to mutually agreeable definitive documentation to be executed by and among the Bidders and the Chapter 7 Trustee, the terms of this Bid shall be irrevocable and binding upon the Bidders unless and until the Chapter 7 Trustee accepts a higher bid and the Bidders are not selected as the Backup Bidder. The Bidders hereby agree to serve as the Backup Bidder in accordance with the Bidding Procedures Order if this Bid is selected as the next highest or otherwise best bid.

For the avoidance of doubt, the Bidders' respective commitments to provide the Purchase Price, Future Revenue Payments, and Distributable Proceeds Waiver are each contingent upon the acquisition of all of the Acquired Assets (irrespective of the purchase price allocated to any particular asset) on the terms set forth herein unless otherwise expressly agreed to by the Bidders, jointly in writing.

## 6. Contacts

In the event you require any clarification or further information, please do not hesitate to contact:

**Global Tetrahedron**

| | | | |
|---|---|---|---|
| Ben Collins | Paula Brillson | John R. Ashmead | Robert J. Gayda |
| Chief Executive Officer | General Counsel | Seward & Kissel LLP | Seward & Kissel LLP |
| Global Tetrahedron, LLC | Global Tetrahedron, LLC | One Battery Park Plaza | One Battery Park Plaza |
| ███████████ | ███████████ | New York, NY 10004 | New York, NY 10004 |
| | | ashmead@sewkis.com | gayda@sewkis.com |
| | | cc: matott@sewkis.com | |

**Counsel to the Connecticut Families**

| | | |
|---|---|---|
| Kyle J. Kimpler | Alinor C. Sterling | Christopher M. Mattei |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Koskoff Koskoff & Bieder, PC | Koskoff Koskoff & Bieder, PC |
| (212) 373-3253 | (203) 336-4421 | (203) 336-4421 |
| kkimpler@paulweiss.com | asterling@koskoff.com | cmattei@koskoff.com |

We welcome the opportunity to discuss our Bid at your convenience, and we look forward to engaging further in this process, including by participating in any auction.

Please feel free to contact us with any questions or comments.

Very truly yours,

Ben Collins
Chief Executive Officer
Global Tetrahedron, LLC

Christopher M. Mattei
Koskoff Koskoff & Bieder, PC
Counsel to the Connecticut Families

**<u>EXHIBIT D</u>**

**GT Initial Bid**

Case 23-33233 Document 951-4 Filed in TXSB on 11/05/24 Page 34 of 159

# Bid Form | Bid Deadline: November 8, 2024 @ 2 pm CST



| | | | |
|---|---|---|---|
| **Buyer Name** | Ben Collins | **Buyer Company** | Global Tetrahedron, LLC |
| **Phone 1** | ████████████ | **Phone 2** | |
| **Address** | ████████████████ | **City** | Chicago |
| **State/Zip** | ██████ | **Email** | ████████████ |
| **Partner \*** | The Connecticut Families (as defined in, and to the extent set forth in, the accompanying Bid Letter) | | |

\*Any party with a vested interest in the purchase must be disclosed

| LOT | Group ('x') | LOT BID | Intellectual Property Allocation | Equipment/Inventory Allocation |
|---|---|---|---|---|
| **Lot 1** Production \| Note Equipment Allocation if Applicable | ☑ | $ 999,000 | $ 998,000 | $ 1,000 |
| **Lot 2** E-Commerce \| Note Inventory Allocation if Applicable | ☑ | $ 1,000 | $ 1,000 | $ 0 |
| **Lot 3** Domains \| Approximately 280 Domains | ☐ | $ | | |
| **Lot 4** Contested Domains \| Approximately 37 Domains | ☐ | $ | | |

*If your bid for any lots are contingent upon other lots, please indicate which lots are to be grouped together by placing an 'x' in the Group column above.*

\*Trustee reserves the right to accept or reject any non-conforming bid.

**Please Email Bids to the Following Parties (if you prefer to mail, please see the Sale Order & Procedures Posted to the website for a list of address.**
jeff@360assetadvisors.com, ktoney@tranzon.com, edurnil@tranzon.com, jwolfshohl@porterhedges.com, mdearman@porterhedges.com, erin.jones@jonesmurray.com

I hereby submit my bid for the Packages above in accordance with the terms and conditions of this bid package.

X _____████████_____

Name: Ben Collins

Title: CEO

Date: November 8, 2024

| | |
|---|---|
| **10% Deposit Amount Submitted** | $ 100,000 |
| **Form of Payment Accepted** | Wire Transfer Only |

| Auctioneer Use Only: | |
|---|---|
| **Received Date** | |
| **Received By** | |

| OFFERING | BID FORM | TERMS |
|---|---|---|

## EXHIBIT C

**FUAC Initial Bid**

ALEXANDER E. JONES PRESTIGE SYSTEMS INFOWARS | Offering Memorandum

**tranzon 360**

# Bid Form | Bid Deadline: November 8, 2024 @ 2 pm CST

| Buyer Name | First United American Companies, L... | | Buyer Company | | |
|---|---|---|---|---|---|
| Phone 1 | | | Phone 2 | | |
| Address | C/O walter cicack, 711 W Alabama, H... | | City | Houston | |
| State/Zip | TX/77006 | | Email | wcicack@hcgllp.com ( Walter Cicack, a... | |
| Partner * | | | | | |

*Any party with a vested interest in the purchase must be disclosed

| LOT | | Group (*x*) | LOT BID | Intellectual Property Allocation | Equipment/Inventory Allocation |
|---|---|---|---|---|---|
| LOT — See Attached – Addendum | | | | | |
| Lot 1 Production | Note Equipment Allocation if Applicable | ✓ | $ 600,000.00 | $275,000.00 | $ 275,000.00 ✱ |
| Lot 2 E-Commerce | Note Inventory Allocation if Applicable | ✓ | $ 500,000.00 | $250,000.00 | $ 250,000.00 |
| Lot 3 Domains | Approximately 280 Domains | ✓ | $ 50,000.00 | | |
| Lot 4 Contested Domains | Approximately 37 Domains | ✓ | $ 50,000.00 | | |

✱✱ 450,000

*If your bid for any lots are contingent upon other lots, please indicate which lots are to be grouped together by placing an 'x' in the Group column above.*

*Trustee reserves the right to accept or reject any non-conforming bid.*

**Please Email Bids to the Following Parties (If you prefer to mail, please see the Sale Order & Procedures Posted to the website for a list of address.**
jeff@360assetadvisors.com, ktoney@tranzon.com, edumil@tranzon.com, jwojtsholl@porterhedges.com, mdearman@porterhedges.com, erin.jones@jonesmurray.com

I hereby submit my bid for the Packages above in accordance with the terms and conditions of this bid package.

X _____

Name: Charles Cicack

Title: Sole Member/Manager of FUAC

Date: November 7, 2024

| | Auctioneer Use Only: | | |
|---|---|---|---|
| 10% Deposit Amount Submitted | $ 120,000.00 | Received Date | |
| Form of Payment Accepted | Wire Transfer Only | Received By | |

BID FORM        TERMS

## Addendum

\* Includes Servers in Bldg 2, and generator
outside of bldg 3

\*\* Personal property, equipment, and furniture located
in Bldg 2. Does not include automobiles

**EXHIBIT B**

**Sealed Bid Package**

# Offering Memorandum

### Intellectual Property
### Production Equipment

Chapter 7 Bankruptcy, Case No. 22-33553

# ALEXANDER E. JONES

## FREE SPEECH SYSTEMS    INFOWARS

## SEALED BID OFFERING

October 11, 2024

| STRATEGIC | CREATIVE | COLLABORATIVE |
|---|---|---|

Sales Agent, on behalf of Trustee, makes every effort to provide accurate information; however in no way is accuracy of the information provided guaranteed. Prospective Buyer shall bear full responsibility and burden for due diligence regarding the Assets offered for sale and to confirm the accuracy of any provided information. Prospective Buyers are recommended to inspect all Assets and perform their own due diligence. Any decision to purchase or not to purchase is the Prospective Buyer's sole and independent decision and at Prospective Buyer's sole risk. No recourse or cause of action will lie against Trustee or Sales Agent should purchaser become dissatisfied with its decision at a later date. No broker or co-broker commissions shall be paid by Trustee or Sales Agent.



720-704-5421 | 360assetadvisors.com







Multiple Purchase Opportunities for Production Rights, Web Traffic, Social Media, E-Commerce Business, or Bid on the Entire Asset Pool

Infowars Archival Library & Production Rights

Social Media Accounts w/ over 1M Followers

Health, Wellness and Preparedness E-Commerce Site

100's of Domain Names

Approx. 7,000 sq. ft. of Production Facility Equipment

| OFFERING | BID FORM | TERMS |
|---|---|---|

**ALEXANDER E. JONES** FREE SPEECH SYSTEMS INFOWARS | Offering Memorandum

# Important Notes



This packaging and offering is intended for parties interested in either i) a purchase of one or more of the intellectual property lots offered individually, or ii) a purchase of Intellectual property along with a subset of production equipment. A separate piecemeal auction of the production facility assets (if not sold thru this offering) and other personal property (i.e. vehicles, gym equipment, etc.), is scheduled to take place on December 10. For more information go to 360Bid.sale.

Also note that any party bidding on intellectual property and production equipment assets with the interest and intention of continuing operations of the Infowars operation from its current facility must make necessary arrangements with the facility landlord. Bids submitted shall assume that the bidder does not require use of the facility, or has made necessary arrangements for future occupancy, and shall therefore not be contingent upon such arrangements.

This document is subject to updates, revisions and corrections.

OFFERING                    BID FORM                    TERMS

**ALEXANDER E. JONES** FREE SPEECH SYSTEMS INFOWARS | Offering Memorandum

# Offering Summary



| | | |
|---|---|---|
| **ASSETS** | Lot 1 - Infowars Production<br>• Production Rights & Materials<br>• Domain Names<br>• Social Media Accounts<br>• Podcast Sites<br>• Newsletter Subscribers<br>• Production Equipment (Optional)<br><br>Lot 2 - Infowars Store<br>• Product Trademarks<br>• Domain Names<br>• E-Commerce Platform<br>• Product Vendor Contacts<br>• Associated Customer Lists<br><br>Lots 3<br>• 100's of Domain Names (not otherwise included with Lots 1 & 2) | Page 5 |
| **TURNKEY OPPORTUNITY** | This is an asset sale of various lots of intellectual property, which may be bid upon individually or in various combinations.  Should a bidder be interested in continuing to operate the Infowars business from where it currently operates, this bid package provides an option to include production specific equipment in the bid. However, please note that any arrangements to continue occupancy at the production facility must be arranged by buyer prior to its bid, as all bids are considered irrevocable and without contingency.  For more information regarding the following, please go to the data room or contact ThreeSixty.<br>- Building Management Contact Information<br>- Management Team Interview | Page 8 |
| **PRODUCTION EQUIPMENT** | The production equipment necessary to continue operations on-site is located in approximately 7,000 sq ft of office space at the Infowars facilities.  In the event a bidder is interested in negotiating lease terms and remaining on-site, this equipment may be included in the offer.  A list of equipment and photographs can be found in the data room.  Equipment only offers will not be entertained through this offering.  Equipment remaining after the sealed bid process will be sold at online auction on December 10. | Page 9 |

**ALEXANDER E. JONES** | FREE SPEECH SYSTEMS | INFO**WARS**  |  Offering Memorandum

# Offering Summary



| | | | |
|---|---|---|---|
| BID FORM | 1 | ANY AND ALL OFFERS MUST BE SUBMITTED USING THE FORM IN THIS PACKAGE AND SHALL BE SUBJECT TO THE TERMS DEFINED HEREIN AND HIGHLIGHTED BELOW; | Page 10 |
| | 2 | OFFERS MUST BE RECEIVED BY FRIDAY, NOVEMBER 8, 2024 AT 2 PM CST; HOWEVER, TRUSTEE RESERVES THE RIGHT TO AMMEND DATES AT ITS SOLE DISCRETION; | |
| | 3 | BIDS MUST BE ACCOMPANIED BY A 10% DEPOSIT PAYABLE TO THE TRUSTEE ALONG WITH PROOF OF FINANCIAL ABILITY TO CLOSE. | |

See Bid Form Provided within this Package

| | | |
|---|---|---|
| TERMS | TERM HIGHLIGHTS | Page 11 |

- Trustee reserves the right to accept or reject any offer.  In the event an offer is accepted, it shall be subject to overbid and US Bankruptcy Court approval.  Trustee may evaluate offers against other bulk offers, as well as anticipated revenues from a piecemeal sale of the production assets.
- Buyer is responsible for any costs associated with transfer of ownership;
- In the case of intangible property, right, title and interest in the Assets is being offered, whereby Buyer shall be granted the rights to any of debtor's intellectual property subject to Buyer's own discovery and responsibility for transfer and associated transfer costs;
- The Assets are being sold "As-Is" without warranty or guarantee of title. Neither Trustee nor Auctioneer make any representations or warranties regarding the Assets and all Assets are sold by Trustee and Auctioneer without any corresponding grant of rights or clearance from any third parties. Buyer is responsible to conduct its own due diligence and rely on its own discovery.  This Offering Memorandum reflects the Trustee's understanding of the Assets that are part of the Debtor's bankruptcy estate and that the Trustee has authority to sell, provided however that while the Sale Order provides that the Assets may be sold free and clear of all liens, claims, charges, encumbrances and interests, ownership of certain Assets, the authority to sell certain Assets, or the ability of a buyer to take certain Assets may be contested by other parties.;
- Bids shall be in US dollars on a cash basis and shall be irrevocable and non-contingent.
- Deposits and payments are due in the form of wire transfer only;

See Section "Bid Process & Terms" which combined with above and the terms in the Sale Order and any terms included in an applicable asset purchase agreement between the parties represent the complete Terms of Sale.   However, if there is a conflict between these terms and the Order, the Order controls.

| OFFERING | BID FORM | TERMS |
|---|---|---|

**ALEXANDER E. JONES** **FREE SPEECH SYSTEMS** **INFOWARS** | Offering Memorandum

# Lot 1 – Infowars Production Assets



- Production Rights, Archives and Materials
- Trademark
  - Infowars
- Domain Names
  - Infowars.com, net, .org
  - Banned.video
  - Over (100) Additional domains pointing to Infowars.com and banned.video (excluding InfowarsStore related domains)
- Social Media Accounts

*Including Access Credentials for Accounts for InfoWars, Banned.Video & The War Room on:*
  - X, Telegram, Gab, Gettr And Others
- Podcast Sites

*Including Access Credentials for Accounts for InfoWars, Banned.Video, The War Room, Sunday Night Live, The American Journal, Others on:*
  - Spreaker, iHeart Radio, Castbox, Deezer, Podcast Addict, TuneIn And Others
- Newsletter Subscribers
  - Sendy Account with approximately 228,000 Active Subscriber
- Historical Revenues
  - Infowars revenue was largely generated through the InfowarsStore based on the show's promotion of the site.
  - In addition, the company did sell some advertising generating approx. 800k – 900k per year; this revenue is not based on any transferable contracts and thus represents historical data only, not an indicator or guarantee of future income.

- Production Equipment [Optional] – Allocated Value Must be Provided on Bid Form

*Equipment List and Photos to be Provided in the Dataroom, and to include only those assets within the Infowars Studio Suites as broadly described below (Office suites, gym and vehicles not to be included in this offering)*

*Information is based on company provided financials; data has not been verified by Auctioneer or Trustee, and provides no guarantee or warranty of future sales.

| OFFERING | BID FORM | TERMS |

**ALEXANDER E. JONES** FREE SPEECH SYSTEMS INFOWARS | Offering Memorandum

# Lot 2 – InfowarsStore.com



- Trademarks
  - Infowars Life
  - (15) Product Trademarks including: Bodease, Survival Shield X-2, The Real Red Pill, DNA Force and others
- Domain Names
  - InfowarsStore.com
  - Over (30) Additional related domain names
- E-Commerce Site (Hosted on Magento.com Platform)*

*The following data was generated from the company's e-commerce platform, Magento. Note that company financials do not reconcile precisely with these sales, but rather show revenue of 10-12% less. Company states that this discrepancy is based on: i) returns that are not reflected in the e-commerce site, and ii) merchant and processing fees that are netted out of sales before being booked into the accounting system. Figures have been rounded.*

- 2024 (thru 9/30/24)
  - Sales                                    $22,400,000
  - Orders                                   181,300
  - Returning : New Customer Sales           $14.6M : 7.7M
  - Customer Transactions                    46,000
- 2023
  - Sales                                    $35,000,000
  - Orders                                   283,900
  - Returning : New Customer Sales           $24.4M : 10.6M
  - Customer Transactions                    60,000
  - Over 400,000 Past and Active Customers and Associated Order History dating back to 2015
- Vendor Lists
  - Vendor Contacts, Contracts, and Order History
  - Company sells a combination of purchased products and consigned products
- Remaining Inventory – Allocated Value Must be Provided on Bid Form

*An inventory list will be provided in the dataroom. Bidder must provide an allocation of bid price to the inventory, which will be used as a basis for any adjustments in inventory levels between the bid and closing.*

*Information is based on data from the company's e-commerce site; data has not been verified by Auctioneer or Trustee, and provides no guarantee or warranty of future sales.

| OFFERING | BID FORM | TERMS |
|---|---|---|

ALEXANDER E. JONES  FREE SPEECH SYSTEMS  INFOWARS  |  Offering Memorandum

# Lot 3 Domain Names



*The company's remaining domain names – those not related to or pointing to Infowars.com or infowarsstore.com – will be offered as a single lot.  The following is a sampling of domains; A full listing domains can be found in the data room.*

Approx.. (280) Domains (not designated to another lot) | Approx. 37 pending expiration in October/Early November

- realcoffeeparty.com
- theinfowarrior.com
- dontbegoogle.com
- theendofus.com
- evilcities.com
- radioviewer.com
- myprivacyshop.com
- supersurvivalstore.com
- literallyridiculous.com
- memebrew.com
- memekitchin.com
- nextnewsmedia.com
- postnewsera.com
- action7.news
- newsguardwatch.org
- summitnews.store
- endgamefilm.com
- whatisendgame.com
- prisonplanet.tv
- prisonplanetnews.org
- conspiracyfact.info

| OFFERING | BID FORM | TERMS |

# Turnkey Opportunity



A purchase of all available Lots including Production Equipment, and along with a building lease and retention of key facility personnel may provide for a quick turnkey purchase opportunity of Infowars. The following information is provided to assist a Buyer to facilitate a turnkey purchase; however, cannot be deemed as contingencies for a sale of the Assets.

**FACILITY LEASE**

Infowars occupies production offices and studios in Austin, Texas. Buyer must secure its arrangement with the building sufficient to submit a non-contingent bid on the Assets. Arrangements for building access must be negotiated between bidder and the building management. Building Management contact information can be provided upon request.

**MANAGEMENT TEAM**

Interviews with company management may be arranged by ThreeSixty upon request and Trustee approval. Please contact us to coordinate such introductions.

ALEXANDER E. JONES  FREE SPEECH SYSTEMS  INFOWARS  |  Offering Memorandum

# Production Equipment



The Infowars facilities currently occupy two distinct sections of the same building.  As noted above, any party interested in maintaining operations at the site must make separate and non-contingent arrangements for future access with the property managers.  For purpose of this offering, only the equipment located in the portion of the building used for the Production is being made available for purchase along with a bid on Lot 1.  No bids are being considered for production equipment separate from a bid on Lot 1.  The following is a sampling of images from the production facility.  Additional photos and a listing of equipment is located in the data room.
















OFFERING | BID FORM | TERMS

# Bid Form | Bid Deadline: November 8, 2024 @ 2 pm CST



| | | | |
|---|---|---|---|
| Buyer Name | | Buyer Company | |
| Phone 1 | | Phone 2 | |
| Address | | City | |
| State/Zip | | Email | |
| Partner * | | | |

*Any party with a vested interest in the purchase must be disclosed

| LOT | Group ('x') | LOT BID | Intellectual Property Allocation | Equipment/Inventory Allocation |
|---|---|---|---|---|
| Lot 1 Production \| Note Equipment Allocation if Applicable | ☐ | $ | $ | $ |
| Lot 2 E-Commerce \| Note Inventory Allocation if Applicable | ☐ | $ | $ | $ |
| Lot 3 Domains \| Approximately 280 Domains | ☐ | $ | | |

*If your bid for any lots are contingent upon other lots, please indicate which lots are to be grouped together by placing an 'x' in the Group column above.*

*Trustee reserves the right to accept or reject any non-conforming bid.

**Please Email Bids to the Following Parties (if you prefer to mail, please see the Sale Order & Procedures Posted to the website for a list of address.**
jeff@360assetadvisors.com, ktoney@tranzon.com, edurnil@tranzon.com, jwolfshohl@porterhedges.com, mdearman@porterhedges.com, erin.jones@jonesmurray.com

I hereby submit my bid for the Packages above in accordance with the terms and conditions of this bid package.

| 10% Deposit Amount Submitted | $ |
|---|---|
| Form of Payment Accepted | Wire Transfer Only |

X _____

Name:

Title:

Date:

| Auctioneer Use Only: | |
|---|---|
| Received Date | |
| Received By | |

| OFFERING | BID FORM | TERMS |
|---|---|---|

**ALEXANDER E. JONES** FREE SPEECH SYSTEMS INFOWARS | Offering Memorandum

# Bid Process & Terms



The following terms are subject in all respects to the Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC [Case No. 22-33553 (CML), Bankr. S.D. Tex., Docket No. 859] (the "Order"). If there is a conflict between these terms and the Order, the Order controls.

1. Sealed Bid Sale. All Property is being offered through a sale process referred to herein as a sealed bid offering ("Sealed Bid"), wherein interested parties ("Recipient", "Buyer", "Bidder") are being asked to submit offers to the Sales Agent ("Sales Agent", "Auctioneer") for the right, title and interest in certain intellectual, intangible and/or personal property ("Assets") for consideration by the Seller ("Seller", "Trustee", "Estate"). The Trustee reserves the right to accept or reject bids, evaluate offers compared to other offers received and/or projected revenues from a piecemeal auction, and open up the Sealed Bid for live bidding between competitive bidders ("Auction"). The Sealed Bid and any subsequent auction shall be referred to as the Bid Process as is further defined herein, and all bids submitted to Sales Agent are subject to the terms and conditions specified below.

2. Bid Deadline. All bids must be submitted to Sales Agent on or before 2:00 p.m. CST, Friday, November 8, 2024 ("Bid Deadline"). Bids received after the Bid Deadline may not be considered, as determined in Trustee's sole discretion. This deadline does not in any way limit the Trustee's right to extend the deadline.

3. Required Bid Information. All bids submitted to Sales Agent must include the following:
   i. Properly completed and signed Bid Submittal Form in adherence to the terms and instructions
   ii. Receipt of a 10% deposit (the "Deposit") in the form and amount as defined below
   iii. Proof of financial capacity to close in a form deemed acceptable by Trustee

4. Deposits. All bids must be accompanied by a deposit of ten percent (10%) of bidder's total bid. Deposits must be submitted to the Trustee in the form of a wire transfer. After the conclusion of the Sealed Bid or Auction, as applicable, the deposits of the high bidder ("High Bidder") and next highest bidder ("Back-up Bidder"), for each lot, will be held by Trustee until the closing of the Sale transaction. If Trustee closes with the High Bidder, the High Bidder's deposit will be credited towards the final purchase price. If the High Bidder does not close, it forfeits its deposit and the Trustee will close with the Back-up Bidder and its deposit will be credited towards the purchase price. If Trustee closes with the High Bidder, the Trustee will return the full deposit to the Back-up Bidder within five (5) business days. The deposits of any and all other bidders at the Auction or any party whose bid has been rejected will be returned in full within five (5) business days after rejection or otherwise the completion of the Bid Process.

5. Due Diligence. All prospective Bidders are responsible to perform their own due diligence prior to submitting their bid. For additional information, interested Bidders may contact Jeff Tanenbaum at jeff@360assetadvisors.com, or by calling +1-720-704-5421.

6. Notice. Bidders may be advised by notice(s) of additions, deletions or alterations in any document forming a part of the Sealed Bid Package any time prior to the Bid Deadline. Such revised documents will be available to prospective Bidders.

7. Submission of Bid. Except as otherwise permitted by this Sealed Bid Package, all bids submitted must be unconditional and without alteration to the Bid Form. Any bid conditioned upon any change in any of the documents provided in the Sealed Bid Package, either by way of addition or deletion, may be summarily rejected by Trustee, in its sole discretion. All Bidders must complete, execute and return to Sales Agent the Bid Submittal Form, executed by the Bidder together with the required Deposit before any bids will be considered.

8. Bids Are Irrevocable. By submitting a bid, the Bidder is making an irrevocable offer to purchase the Assets bid upon. The Bidder acknowledges and agrees that by submission of its bid, it is accepting the terms and conditions set forth in these Instructions. Upon submission of a bid, the offers contained therein are irrevocable.

# Bid Process & Terms | Cont'd



9. Notification. Sales Agent and Trustee will review all bids received by the Bid Deadline. If Sales Agent and Trustee determine that one or more qualified bids are competitive in nature ("Qualified Bid(s)"), the Sales Agent and Trustee reserve the right to convert the Sealed Bid to an Auction between Qualified Bidders. Qualified Bidders will be notified within 72 hours of the Sealed Bid deadline. If Sales Agent and Trustee determine that no Auction will be held, the Sales Agent and Trustee will determine whether or not any Qualified Bids will be accepted or rejected.

10. Auction. If an Auction is held, it will take place on November 13, 2024 at 10:30am CT (unless announced otherwise). Only Qualified Bidders and advisors will be allowed to participate in the Auction. The highest bid or bid combination, as determined by Sales Agent and Trustee, will be the lead bid at the Auction. The Auction will open at the highest bid amount. Qualified Bidders will be allowed to overbid in minimum bid increments as determined by Sale Agent at the time of Sale. Sales Agent shall moderate the auction process, which allows the opportunity for it to present any and all competitive bid options, which may include lot combinations, as well as the cash equivalent of anticipated sales from a piecemeal auction the Production Equipment lot. The Auction will conclude once the highest bid and next highest bid have been awarded, rejected or held subject to further consideration.

11. Bankruptcy Court Approval. If one or more bids are awarded by the Trustee, whether before or as a result of an Auction, the Trustee is authorized to proceed to close the Sale, and the Sale is not subject to further approval by the Bankruptcy Court.  The Trustee must, however, file a notice of successful bidder(s) with the Court following the award of bid(s).  Be advised there is some risk that the Sale may nevertheless be subject unforeseen objections by interested parties

12. Closing and Final Payment. Bidder will be responsible for payment in full to the Trustee within five (5) business days of bid award or at such later date as may mutually be agreed by the Trustee and the respective winning bidder(s) ("Closing Date").  Sales Agent shall provide Bidder with an Invoice and wire instructions, reflecting the bid amount, the buyers' premium and sales tax.  Should any of the lots be subject to a Purchase Agreement, such Purchase Agreement will be posted to the data room prior to the Sealed Bid closing date, and the winning bidder shall be responsible to execute such Purchase Agreement upon the award of bid.

13. Sales Tax.  Local sales tax requirements will apply to all sales will be applied to the final purchase price where applicable.

14. Receipt of Intangible Property.  Bidder shall be the sole party responsible to facilitate the transfer of intellectual property rights, provided however, that Sales Agent or Trustee shall provide or obtain necessary signatures on documents as requested by Buyer to effectual legal transfers, as needed, and shall provide access credentials to accounts where noted in the data room. In such cases that intangible property is stored on computer hardware or in cloud-based servers, Trustees IT consultant will work with Bidders to facilitate the transfer of such intangible property

15. Removal of Personal Property.  This Bid Process contemplates a sale of the production equipment assets in Bulk to a Buyer removing them from the facility within 14 days of the Closing Date.  The Buyer shall be responsible to provide an insurance policy with acceptable limits naming the Trustee, Sales Agent and Building Owners as additional insured, and shall be responsible for any damage to persons or property during Asset removal.  Should the Buyer enter into a lease agreement with the building owners, it shall sign a waiver releasing the Trustee and Sales Agent from any further obligations to Personal Property fulfilment on the Closing Date.

16. System Maintenance.  Bidders acknowledge that certain assets being purchased may be subject to ongoing maintenance costs, including but not limited to webhosting, e-commerce platform, cloud-based storage sites, data backup systems, etc.  Upon the Closing Date, Bidder shall become immediately responsible to maintain such services, subject only to any transition period agreement that may be negotiated between the Parties.

# Bid Process & Terms | Cont'd



17. Inventory Adjustments.  Upon bid submittal, Bidder is asked to provide an allocation of its bid for product inventory where applicable. Bidder acknowledges that the inventory as reported in the data room may change prior to Closing. In such case, the formula for the purchase price adjustment shall be set forth in the asset purchase agreement between the parties.

18. Trademarks.  This sale may include transactions with separate buyers for the Infowars and Infowars Life trademarks, and Infowars related domain names allocated in the bid package to each lot.  Each buyer acknowledges that the terms of sale and Purchase Agreements related to each transaction will grant the other party licensure rights to use their purchased domain names and trademarks without further cost or obligation to the other party.

19. Failure to Pay. If a successful bidder fails to consummate the Sale due to a breach or failure to perform on the part of such successful bidder, then the Deposit shall be forfeited to, and retained irrevocably by, the Trustee, and may be used by the Trustee to pay the fees and expenses of the Trustee's professionals, and the Trustee specifically reserves all rights and remedies against the defaulting successful bidder, including the right to seek damages from, and/or the specific performance of, the defaulting successful bidder. In addition thereto, Sales Agent may, at its discretion, either resell Bidder's Assets without further notice to Bidder and/or dispose of the Property at the Bidders sole expense. Any difference between the bid price for Assets by the defaulting Bidder and the price received by Trustee at a resale shall be paid to Trustee by the defaulting Bidder. In addition, a defaulting Bidder shall be deemed to have granted Trustee a security interest in the Property, which Trustee shall retain as collateral security for Bidder's obligation to Trustee.

20. Financing. All transactions must be made in U.S. cash funds.  The Sale is not contingent upon the bidder securing or obtaining financing.

21. Absence of Warranties. The Bidder understands and agrees: (1) that any description or sample of the Assets given or furnished by Trustee and Sales Agent is solely for identification, and does not create any warranty expressed or implied, that the Property actually conforms to such description or sample, (2) that Bidder or agent on Bidder's behalf has inspected or has had the opportunity to inspect, all of the Assets upon which Bidder will be bidding and/or does purchase, (3) that all Assets are purchased and accepted by Bidder "AS IS", "WHERE IS" and "WITH ALL FAULTS". TRUSTEE AND SALES AGENT MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES WHATSOEVER WHETHER WRITTEN, ORAL OR IMPLIED AS TO QUALITY, QUANTITY, CONDITION, USABILITY, SALABILITY, YEAR, PERFORMANCE, OR OTHER SPECIFICATIONS, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WARRANTY AGAINST PATENT, TRADEMARK, COPYRIGHT OR TRADE SECRET INFRINGEMENT, (4) in the event there are manufacturer warranties in effect for the Assets purchased, Bidder must make all claims thereunder directly with the provider of the warranty. No statement or statements of any other paragraph herein shall be construed to in any way contradict the provisions of this paragraph.

22. Customer Lists and PII. As part of the conveyed Intellectual Properties, certain customer data may be transferred to the buyer.  Neither Trustee nor Sales Agent can guarantee buyer's rights regarding the use of such customer data which may be subject to the Company's posted privacy statements or other limitations.  In addition, under no circumstances shall any of the assets being sold imply the inclusion of personally identifiable information (PII) with regards to Company personnel, including personnel records, personal data stored on personnel computers, or historical email content.

# Bid Process & Terms | Cont'd



23. Indemnification. Bidder shall indemnify, hold harmless and defend Trustee, Sales Agent, and any professionals employed or otherwise retained by the Trustee or the Sales Agent from and against any and all losses, damages, liabilities and claims, including attorney fees, costs and expenses arising out of or based upon or resulting from, (1) any act or omission relating to or affecting the Property bid on or purchased by Bidder, (2) the claim of any third party claiming or challenging title to any Asset purchased by Bidder or claiming infringement of any proprietary interest, (3) the claim of any person resulting from offering for sale or selling the Property purchased by Bidder.

24. Limits of Liability. In no event shall Sales Agent's liability to Bidder exceed the purchase price actually paid. A Bidder's claim shall be limited to the amount paid for the Assets, and shall not extend to any obligation; risk; liability; right; claim; remedy for loss of use, revenue or profit; liability of Bidder to any third party; personal injury; or any other direct, indirect, incidental or consequential damages. Sales Agent is acting as an agent only and is not responsible for the acts of its principles.

25. Rights Reserved.  If any provision of these Terms and Conditions shall be held invalid, illegal, unenforceable or inoperative, the balance of Terms of Sale shall remain in full force and affect as if such provisions had not been included. The Bid Process and Terms with any amendments or modifications expressly made by Sales Agent constitute all the terms and conditions with respect to the sale of the Property; however Sales Agent reserves the right to modify the Bid Process and Terms, as may be necessary and shall notify Bidder accordingly.

26. The venue and jurisdiction for any dispute in this matter shall be in the United States Bankruptcy Court, Southern District of Texas.

**<u>EXHIBIT F</u>**

**FUAC Final Bid**

ALEXANDER E. JONES   FREE SPEECH SYSTEMS   INFOWARS

# IP Assets Auction Overbid Form

Highest & Best Bid Deadline: November 13, 2024 @ 10:30 am CST

| Buyer Name | First United American Companies | Buyer Company | |
|---|---|---|---|
| Phone 1 | ███████████ | Phone 2 | ███████████ |
| Address | c/o Walter Cicack, 711 W. Alabama | City | Houston |
| State/Zip | TX / 77006 | Email | wcicack@hcgllp.com |
| Partner * | Charles Cicack | | |

## Bid Packages

Note: Bids for each package below are <u>non-contingent on winning any other lots</u>. You may bid on multiple packages; We will consider your highest and best package option when evaluating bids.

| LOTS | BID |
|---|---|
| Lot 1a \| Production IP with Equipment (Building 2 & 3) | $ |
| Lot 1b \| Production IP without Equipment | $ |
| Lot 1c \| Production Equipment Only (Building 2 & 3) | $ |
| Lot 2a \| E-commerce IP with Inventory | $ |
| Lot 2b \| E-commerce IP without Inventory | $ |
| Lot 2c \| Inventory Only | $ |
| Lot 3 \| Domain Names | $ |
| Lot 4 \| Contested Domain Names | $ |
| **LOT GROUPS** | |
| Group 1 \| Production AND E-commerce Intellectual Property Only (Lot 1b & 2b) | $ |
| Group 2 \| Production AND E-commerce IP, Equipment & Inventory (Lot 1a & 2a) | $ 3,350,000.00 |
| Group 3 \| Domain Names (Lot 3 & 4) | $ 150,000.00 |
| Group 4 \| All Intellectual Property, Equipment, Inventory & Domains (Lots 1 -4) | $ 3,500,000.00 |
| Group 5 \| All Intellectual Property & Equipment (no inventory) (Lots 1a & 2b) | $ 3,100,000.00 |
| Group 6 \| All Intellectual Property & Inventory (no equipment) (Lots 1b & 2a) | $ 2,850,000.00 |
| Group 7 \| Equipment & Inventory (no IP) (Lots 1c & 2c) | $ 750,000.00 |

I hereby submit my over bid for the Packages above in accordance with the terms and conditions of the bid package and sale order. All bids are irrevocable and final.

X _____

Name: Charles Cicack
Title: Sole Member / Manager of FUAC
Date: 11/12/2024

tranzon 360

**<u>EXHIBIT G</u>**

**GT Final Bid**

**ALEXANDER E. JONES**  FREE SPEECH SYSTEMS  INFOWARS

# IP Assets Auction Bid Instructions

Highest & Best Bid Deadline: November 13, 2024 @ 10:30 am CST

The following will outline the overbid process for the IP Assets Auction being used for the sale of the FSS assets, as per the Bidding Procedures as outlined in the Winddown Order dated entered in the US Bankruptcy Court, Southern District of Texas on September 25, 2024 in the matter of Alexander E. Jones, Case No. 22-33553.

1. This will be a final call for highest and best bids, wherein the Auctioneer and Trustee shall evaluate bids submitted and award the bids to the best single or combination of bids received based on the highest financial benefit to the creditors.

2. In its evaluation of the best combination of bids, the Trustee reserves the right to attribute value to lots based on their projected piecemeal auction value. Any lots 'awarded' on this basis will the be sold at the scheduled December 10 auction or such other date as may be determined. Consistent with the Winddown Order, any bids that include components of consideration apart from the cash purchase amounts should quantify the amounts of such consideration in specific dollar amounts with as much specificity as possible and avoiding references to any formulas or other contingencies.

3. Bids will not be accepted on any lots that are contingent upon another lot, however, various group lots have been provided to support combined lot bids. If for instance, you are the high bidder on Lot 3, but only want it if combined with Lots 1 & 2, then you will want to bid on Group 4, as a winning bid for lot 3 would stand regardless of the outcome of other lots you may have bid upon. If you want Lot 3 as part of Group 4 but would also want it if you lost all other lots, then you will want to bid on both Lot 3 and Group 4.

4. As described above, Bidders are urged to submit bids on multiple Lots or Group Lots for the best chances of being awarded lots in this sale.

5. Please note that the winning bidder of equipment will be responsible to remove the equipment from the facilities within 15 days of closing, unless arrangements have been made with the landlord for longer term facility access.

6. Please note that the winning bidder of inventory will be responsible to remove the inventory from the facilities within 15 days of closing, unless arrangements have been made with the landlord or warehouse facility for longer term facility access. This includes inventory located at a third-party warehouse facility in Denver Colorado.

7. Please note that the sale of equipment to a non-IP buyer will exclude any servers or computers which house intellectual property that cannot otherwise be efficiently extracted. This will be determined at Trustee sole discretion, with guidance from its IT consultant.

8. This round of bidding is only open to invited, qualified bidders, and invited bidders are reminded that this bid document, and the auction process are all governed by the non-disclosure agreement entered by the bidder.

---

**Please Email Bids to the Following Parties:**
jeff@360assetadvisors.com, ktoney@tranzon.com, edurnil@tranzon.com,
jwolfshohl@porterhedges.com, mdearman@porterhedges.com,
chris@jonesmurray.com, erin.jones@jonesmurray.com

---

tranzon® 360

**ALEXANDER E. JONES** | **FREE SPEECH SYSTEMS** | **INFOWARS**

# IP Assets Auction Overbid Form
Highest & Best Bid Deadline: November 13, 2024 @ 10:30 am CST

| | | | |
|---|---|---|---|
| Buyer Name | Ben Collins | Buyer Company | Global Tetrahedron, LLC |
| Phone 1 | ██████████ | Phone 2 | |
| Address | ██████████ | City | Chicago |
| State/Zip | █████ | Email | ██████████ |
| Partner * | The Connecticut Families (as defined in, and to the extent set forth in, the previously submitted Bid Letter) | | |

# Bid Packages

Note:  Bids for each package below are <u>non-contingent on winning any other lots</u>.  You may bid on multiple packages; We will consider your highest and best package option when evaluating bids.

| LOTS | BID |
|---|---|
| Lot 1a \| Production IP with Equipment (Building 2 & 3) | $ |
| Lot 1b \| Production IP without Equipment | $ |
| Lot 1c \| Production Equipment Only (Building 2 & 3) | $ |
| Lot 2a \| E-commerce IP with Inventory | $ |
| Lot 2b \| E-commerce IP without Inventory | $ |
| Lot 2c \| Inventory Only | $ |
| Lot 3 \| Domain Names | $ |
| Lot 4 \| Contested Domain Names | $ |
| LOT GROUPS | |
| Group 1 \| Production AND E-commerce Intellectual Property Only (Lot 1b & 2b) | $ |
| Group 2 \| Production AND E-commerce IP, Equipment & Inventory (Lot 1a & 2a) | $ |
| Group 3 \| Domain Names (Lot 3 & 4) | $ |
| Group 4 \| All Intellectual Property, Equipment, Inventory & Domains (Lots 1 -4) | $ 7,000,000 ** |
| Group 5 \| All Intellectual Property & Equipment (no inventory) (Lots 1a & 2b) | $ 7,000,000 ** |
| Group 6 \| All Intellectual Property & Inventory (no equipment) (Lots 1b & 2a) | $ |
| Group 7 \| Equipment & Inventory (no IP) (Lots 1c & 2c) | $ |

I hereby submit my over bid for the Packages above in accordance with the terms and conditions of the bid package and sale order. All bids are irrevocable and final.

**Not less than $7,000,000, as set forth in more detail in the accompanying Final Bid Letter

X _____

Name:  Ben Collins

Title:    CEO

Date:   November 13, 2024

tranzon 360

**Global Tetrahedron, LLC**
730 N. Franklin Street, Suite 700
Chicago, IL 60654

**PRIVATE AND STRICTLY CONFIDENTIAL**
**NOT FOR PUBLIC DISCLOSURE**

November 13, 2024

Porter Hedges LLP
1000 Main Street
Houston, Texas 77002
Attn: Joshua W. Wolfshohl, Michael B.
Dearman

Jones Murray LLP
602 Sawyer Street, Suite 400
Houston, Texas 77007
Attn: Christopher R. Murray, Erin Jones

Tranzon Asset Advisors
1108A North Dixie Avenue
Elizabethtown, Kentucky 42701
Attn: Kelly Toney, Ed Durnil

ThreeSixty Asset Advisors
3075 E. Thousand Oaks Blvd.
Westlake Village, California 91362
Attn: Jeff Tanenbaum

**Re:  Best And Final Bid to Acquire Certain Assets of Free Speech Systems, LLC**

Global Tetrahedron, LLC ("Global Tetrahedron") and the Connecticut Families[1] (collectively with Global Tetrahedron, the "Bidders", "we", "our", or "us") are pleased to submit this revised best and final joint bid (this "Final Bid") to acquire certain assets of Free Speech Systems, LLC ("FSS") on the terms and subject to the conditions set forth herein in accordance with that certain *Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC*, Case No. 22-33553, Docket No. 859 (together with any supplemental orders entered in connection therewith, the "Bidding Procedures Order").[2]  The terms of this Final Bid modify the initial bid submitted by the Bidders on November 8, 2024 (the "Initial Bid") solely to the extent set forth herein.  The Bidders have submitted a completed *IP Assets Auction Overbid Form* (the "Overbid Form") contemporaneously herewith in accordance with the Chapter 7 Trustee's instructions, though the terms of this Final Bid shall control in the event of any discrepancy between this Final Bid and the Overbid Form.

## 1.  Increased Consideration of At Least $7 Million

We have meaningfully improved the consideration provided in our Initial Bid—our Final Bid should now be valued at ***over $7 million of total cash consideration for the Group 5***

---

[1]    The "Connecticut Families" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Bidding Procedures Order or that certain *Offering Memorandum* transmitted in connection therewith, as applicable.

*assets*.  While this Final Bid focuses on the Group 5 assets, we are also willing to acquire the Group 4 assets on the same terms as set forth herein; *provided* that this Final Bid does not allocate value to any assets not included in Group 5.   The aggregate consideration provided by the Bidders consists of the following:

a. <u>Cash Consideration</u> – Cash consideration in the amount of $1,750,000 to be funded by Global Tetrahedron (the "<u>Purchase Price</u>").  **The Purchase Price reflects an increase of $750,000 as compared to our Initial Bid**.

b. <u>Distributable Proceeds Waiver</u> – As part of this Final Bid, the Connecticut Families commit to forego up to **100% of their entitlement to the $1,750,000** Purchase Price funded by Global Tetrahedron so that such amounts can be distributed to other unsecured creditors of FSS.  **As a result, and as set forth below, this Final Bid is better for other unsecured creditors of FSS even when compared to other Qualified Bids that offer up to $7 million of cash consideration for the same Group 5 assets**. The below table illustrates the effect of the Distributable Proceeds Waiver as compared to alternative Qualified Bids submitted at a range of purchase prices.

| Proposed Cash Purchase Price of Alternative Qualified Bid | Recovery to Non-Connecticut Family creditors under Alternative Qualified Bid[3] | Recovery to Non-Connecticut Family creditors under Global Tetrahedron Final Bid | Recovery to Connecticut Families under Alternative Qualified Bid | Recovery to Connecticut Families under Global Tetrahedron Final Bid[4] |
|---|---|---|---|---|
| $2,000,000 | $500,000 | $600,000 | $1,500,000 | $1,150,000 |
| $3,000,000 | $750,000 | $850,000 | $2,250,000 | $900,000 |
| $5,000,000 | $1,250,000 | $1,350,000 | $3,750,000 | $400,000 |
| $7,000,000 | $1,750,000 | 1,750,000 | $5,250,000 | $0 |

As illustrated above, to the extent a third party submits an alternative Qualified Bid for the same assets that consists of cash consideration in a higher amount than the Purchase Price set forth herein, the Connecticut Families shall effectuate a Distributable Proceeds Waiver

---

[3]     This table, and the Distributable Proceeds Waiver calculations set forth herein, conservatively assume that the Connecticut Families are entitled to 75% of all distributable proceeds and all other creditors are entitled to 25%.  This allocation is intended to demonstrate the *minimum* effect of the Distributable Proceeds Waiver—the Connecticut Families currently hold 96.7% of all liquidated claims against the Debtors.  To be clear, to the extent the Connecticut Families' allowed claims ultimately represent more than 75% of all unsecured claims, this Final Bid should be valued at an amount higher than $7 million because the Connecticut Families will be able to forego receipt of more than $1,312,500 in favor of other creditors.  The Connecticut Families reserve all rights with respect to the allowed amounts of all other claims.

[4]     In the event an alternative Qualified Bid is submitted that provides for cash consideration in an amount greater than $1,750,000, the recovery to be received by the Connecticut Families under this Final Bid equals the cash Purchase Price under this Final Bid ($1,750,000) minus the recovery to Non-Connecticut Family creditors, consistent with the Distributable Proceeds Waiver.

(as defined in the Initial Bid) and shall forego receipt of the Distributable Proceeds Waiver Amount, which shall be assigned to the Chapter 7 Trustee for the benefit of all other unsecured creditors of FSS. The "Distributable Proceeds Waiver Amount" is revised under this Final Bid so that it shall equal an amount necessary for other unsecured creditors of FSS (including the Texas Families) to recover **$100,000** more (an increase from the $1 amount set forth in the Initial Bid), in the aggregate, than they would recover from the sale of the Acquired Assets to the otherwise highest Qualified Bidder.

c. <u>Future Revenues</u> – Consistent with our Initial Bid, Global Tetrahedron shall pay a portion of future revenues derived from the Acquired Assets to the Connecticut Families and the Texas Families on a *pro rata* basis, as determined by the allowed amount of their claims in the Jones chapter 7 case (the "<u>Future Revenue Payments</u>").[5] Global Tetrahedron shall cooperate in good faith with the Connecticut Families and the Texas Families to determine the amount and timing of such Future Revenue Payments. While the present value of the Future Revenue Payments is inherently uncertain and difficult to value, such payments must nonetheless be considered by the Chapter 7 Trustee (the Connecticut Families—the largest creditors of FSS—place considerable value on such payments).

## 2. Acquired Assets

As set forth in the Overbid Form, the Bidders seek to acquire the "Group 5" assets, which includes the assets comprising Lot 1a (production IP with equipment) and Lot 2b (e-commerce IP without inventory) (the "<u>Acquired Assets</u>").[6] In addition, the Bidders are willing to acquire the Group 4 assets on the same set of terms; *provided* that they allocate no portion of the Purchase Price to any asset included in Group 4 that is not part of Group 5.

*        *        *

We look forward to discussing this Final Bid with the Chapter 7 Trustee and his advisors. We are confident that this Final Bid, especially when giving consideration to the Distributable Proceeds Waiver and Future Revenue Payments, constitutes the best and highest bid for the Acquired Assets.

The Connecticut Families, **holders of 96.7% of all liquidated claims against FSS and Jones**, wholly support the terms of this Final Bid and urge the Chapter 7 Trustee to deem this Final Bid the Successful Bid. The Connecticut Families trust that the Chapter 7 Trustee, in fulfilling his fiduciary duties, would not sell the Acquired Assets to any purchaser offering less than $7 million for such assets, as such bid would offer less value to unsecured creditors. Moreover, the Connecticut Families implore the Chapter 7 Trustee

---

[5] Future Revenue Payments shall consist of payments from the sale of merchandise, promotional items, and other assets.

[6] If selected as the Successful Bidder, Global Tetrahedron may determine to form a new subsidiary entity for the purpose of acquiring the Acquired Assets. If applicable, Global Tetrahedron will provide prior written notice of such entity's formation to the Chapter 7 Trustee, and will cooperate in good faith to provide additional information with respect thereto, as may be requested by the Chapter 7 Trustee.

to remember that the best interest of creditors in ***this case*** is served by ensuring that the assets being sold will not be used to continue harassing, victimizing, and defaming the Connecticut Families (i.e., the very reason this bankruptcy case exists).

Please feel free to contact us with any questions or comments.

Very truly yours,

Ben Collins
Chief Executive Officer
Global Tetrahedron, LLC

Christopher M. Mattei
Koskoff Koskoff & Bieder, PC
Counsel to the Connecticut Families

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| In re: | § | Chapter 7 |
| | § | |
| ALEXANDER E. JONES, | § | Case No. 22-33553 (CML) |
| | § | |
| Debtor. | § | |
| | § | |

## ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING SALE OF PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (III) GRANTING OTHER RELATED RELIEF
### [Relates to Docket No. _____]

Upon the motion (the "Motion"),[1] dated November 18, 2024, of the Trustee, pursuant to sections 105, 363, 365, and 704 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002(a)(2), 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules") seeking, among other things, entry of an order (this "Sale Order") authorizing and approving the sale of the Purchased Assets to War Is Over LLC (together with its affiliates, including Global Tetrahedron, LLC, the "Purchaser"); and this Court having entered the *Order (I) Authorizing and Approving the Auction and Sale of Assets of Free Speech Systems, LLC Free and Clear of All Liens, Claims and Encumbrances and (II) Granting Related Relief* [Docket No. 859] (the "Winddown Order") authorizing, among other things, the Trustee to sell the assets of Free Speech Systems LLC ("FSS") free and clear of liens, claims, charges, encumbrances and interests pursuant to 11 U.S.C. § 363(b) and (f) pursuant to one or more asset sales; and this Court having entered the *Order Supplementing Order*

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

*Dismissing Case* [Case No. 22-60043, Docket No. 1021], which deemed all property of the FSS bankruptcy estate to have vested in the bankruptcy estate of the above-captioned debtor Alexander E. Jones ("Jones" or the "Debtor") and under the control of the Trustee; and upon the Trustee determining, after conducting a sale process in accordance with the Winddown Order, that the joint bid submitted by the Purchaser and the Connecticut Families constitutes the highest and best bid for the Purchased Assets; and upon the *Notice of Successful Bidder and Backup Bidder in the Auction for the Assets of Free Speech Systems, LLC Free and Clear of Any and All Claims, Interests, and Encumbrances* [Docket No. 903] (the "Notice of Successful Bidder") declaring such joint bid the Successful Bid; and upon FSS and the Trustee (together, the "Seller") and the Purchaser having negotiated that certain *Asset Purchase Agreement*, dated as of November [●], 2024 (the "Asset Purchase Agreement"), a copy of which is annexed to the Motion as **Exhibit A**; and this Court having conducted a hearing to consider the Motion and the transactions contemplated under the Asset Purchase Agreement (collectively, the "Sale Transaction") on November [●], 2024 (the "Sale Hearing"), at which all interested parties were offered an opportunity to be heard with respect to the Sale Transaction; and it appearing that due and sufficient notice of the Motion, the Sale Hearing, and the Sale Order was provided; and all objections to Sale Transaction and this Sale Order having been withdrawn, resolved, or overruled; and upon this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon the record of the Sale Hearing and this chapter 7 case; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

    A.    **Findings of Fact and Conclusions of Law**. Findings of fact and conclusions of

15668021

law herein constitute this Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing. This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof. Further, findings of fact and conclusions of law in the Winddown Order are incorporated herein by reference.

B. **Jurisdiction and Venue**. The Court has jurisdiction to consider the relief requested herein pursuant to 28 U.S.C. § 1334 and venue is proper before this Court pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

C. **Bases for Relief**. The bases for the relief requested in the Motion are sections 105, 363, 365, and 704 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 9007, and 9014, and Bankruptcy Local Rule 9013-1. The consummation of the transaction contemplated by the Asset Purchase Agreement and this Sale Order is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and the Seller and the Purchaser have complied with all of the applicable requirements of such sections and rules in respect of such transaction.

D. **Notice**. Based upon the record of the Sale Hearing, and as previously determined by this Court in the Winddown Order, (i) notice of the Motion, the Sale Hearing, and the relief sought in this Sale Order has been provided to all parties in interest and was proper, timely, adequate, and complied in all respects with section 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, the Local Rules, and the Winddown Order, and has been provided to all parties in interest, (ii) such notice was and is good, sufficient, and

3

appropriate under the circumstances and reasonably calculated to reach and apprise all holders of liens, claims, encumbrances, and other interests, of their right to appear and be heard, and was provided in accordance with the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the procedural due process requirements of the United States Constitution, (iii) no other or further notice of, opportunity to object to, or other opportunity to be heard regarding the Motion, the Sale Hearing, the Sale Transaction, or of the entry of this Sale Order is necessary or shall be required, and (iv) emergency relief being justified under all relevant circumstances.

E.  **Compliance with Winddown Order**.  On September 25, 2024, the Court entered the Winddown Order, which authorized, among other things, the Trustee to sell the assets of FSS free and clear of liens, claims, charges, encumbrances, and interests pursuant to sections 363(b) and (f) of the Bankruptcy Code in one or more asset sales.  The procedures set forth in the Winddown Order provided a full, fair, and reasonable opportunity for any entity or Person to make an offer to purchase the Purchased Assets.  The Seller, the Purchaser, and the Connecticut Families complied with the Winddown Order and the procedures set forth therein, as appropriately modified by the Trustee in the exercise of his business judgment and in accordance and compliance with such procedures.  The Purchaser and the Connecticut Families were designated the Successful Bidder for the Purchased Assets in accordance with the Winddown Order.

F.  **Authority.**  The Purchased Assets constitute property of the Jones estate and title thereto is vested in such estate within the meaning of section 541 of the Bankruptcy Code.  The Seller (i) has full power and authority to execute the Asset Purchase Agreement, (ii) has all of the power and authority necessary to consummate the Sale and all transactions contemplated by the Asset Purchase Agreement, (iii) has taken all action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Seller of the Sale and all transactions

4

contemplated thereby, and (iv) requires no further consents or approvals, other than this Sale Order.

G. **Marketing and Sale Process**. As demonstrated by (a) the Motion, the testimony and other evidence proffered or adduced at the Sale Hearing, and the representations of counsel made on the record at the Sale Hearing: (i) the Trustee and his professionals engaged in a robust and extensive marketing and sale process pursuant to the Winddown Order; (ii) the Trustee and his advisors conducted a fair and open sale process; (iii) the sale process and the procedures set forth in the Winddown Order were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets; and (iv) the sale process conducted by the Trustee and his professionals pursuant to the Winddown Order obtained the highest and best value for the Purchased Assets, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Purchased Assets.

H. **Highest and Best Value; Business Judgment**. The consideration to be provided by Purchaser and the Connecticut Families consists of (i) cash consideration in the amount of $1,750,000 (the "Cash Purchase Price") and (ii) a commitment by the Connecticut Families to forego the Distributable Proceeds Waiver Amount (as defined below) and the assignment of the Distributable Proceeds Waiver Amount to the Trustee for the benefit of all other unsecured creditors of FSS. The "Distributable Proceeds Waiver Amount" means the amount necessary for all other holders of allowed unsecured creditors of FSS to recover $100,000 more, in the aggregate, than they would recover from the sale of the Purchased Assets to the Backup Bidder, up to 100% of the Connecticut Families' entitlement to the Cash Purchase Price. The Cash Purchase Price and the Distributable Proceeds Waiver to be provided by the Purchaser and the Connecticut Families,

respectively, under the Asset Purchase Agreement and pursuant to this Sale Order is fair and reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws of the United States, any state, territory or possession or the District of Columbia. Such consideration constitutes the highest and best bid for the Purchased Assets and is in the best interests of the estate, its, and all other parties in interest. No other person or entity, or group of persons or entities, has offered to purchase the Purchased Assets for an amount that would provide greater value to the chapter 7 estate than the Purchaser and the Connecticut Families.

I. **Selection of Purchaser**. On November 14, 2024, the Trustee filed the Notice of Successful Bidder designating the Purchaser and the Connecticut Families as the Successful Bidder and First United American Companies, LLC as the Backup Bidder.

J. **Sound Business Purpose**. The Trustee has demonstrated good, sufficient, and sound business purposes and justifications for entry into the Asset Purchase Agreement, and the other agreements, documents, and instruments deliverable thereunder or attached thereto or referenced therein (collectively, the "Transaction Documents"), and approval of the Sale Transaction. The Trustee's entry into and performance under the Transaction Documents (i) constitute a sound and reasonable exercise of the Trustee's business judgment consistent with his fiduciary duties, (ii) provide value and are beneficial to the Jones and FSS estates, and are in the best interests of such estates and their stakeholders, and (iii) are reasonable and appropriate under the circumstances. The business justification for the Sale Transaction includes, but is not limited to, the Cash Purchase Price, the Distributable Proceeds Waiver, and the other terms set forth in the Asset Purchase Agreement constituting the highest and best offer received for the

6

Purchased Assets.

K.  **Time of the Essence**.  Time is of the essence in effectuating the Sale Transaction without interruption, and to maximize the value that the Purchaser and the Trustee may realize from entering into the Asset Purchase Agreement.  Accordingly, cause exists to lift the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a)(3) and 6004(h) and permit the immediate effectiveness of this Sale Order.

L.  **Sale Free and Clear**.  Except as otherwise expressly provided herein, the Trustee is authorized to sell the Purchased Assets to the Purchaser free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), property interests, rights, liabilities, encumbrances, pledges, and other interests of any kind or nature whatsoever against the Trustee, Jones, or FSS, or the Purchased Assets owned by the Trustee, Jones, or FSS, including, without limitation, all Excluded Liabilities (as defined in the Asset Purchase Agreement) and any debts, claims, rights, causes of action, and/or suits arising under or out of, in connection with, or in any way relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee retirement or benefit plan claims, severance claims, retiree healthcare or life insurance claims, and/or claims for taxes of or against the Trustee, Jones, or FSS and/or the Purchased Assets to the maximum extent available under applicable law, and any derivative, vicarious, transferee, or successor liability claims, rights, or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior or subsequent to the commencement of this case, whether known or unknown, whether fixed or contingent, whether anticipated or unanticipated, whether yet accrued or not, and whether imposed by agreement,

15668021

understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to the Trustee, Jones, FSS, their respective interests in the Purchased Assets, the operation of FSS's business prior to closing the Sale Transaction, or the transfer of the Trustee's interests in the Purchased Assets to the Purchaser, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of liens, claims, interests, or encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion have either consented to or are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. In addition, one or more of the other subsections of section 363(f) of the Bankruptcy Code apply and, therefore, holders of liens, claims, interests, or encumbrances with an interest in the Purchased Assets owned by the Trustee, Jones, or FSS are adequately protected by having their claims that constitute interests in such Purchased Assets attach solely to the proceeds of the Sale Transaction in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale Transaction and by providing for the distributions provided for herein. All persons having claims of any kind or nature whatsoever against the Trustee, Jones, FSS, or the Purchased Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such claims against the Purchaser or any of its assets, property, affiliates, successors, assigns, or the Purchased Assets. The Purchaser would not have entered into the Asset Purchase Agreement, and the Purchaser would not have provided the consideration thereunder and set forth herein if the Trustee was not authorized to sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests. A sale of the Purchased Assets, other than one free and clear of all liens, claims, encumbrances, and other interests would yield substantially less value, with less certainty than the Sale Transaction.

M.    **Arm's-Length Sale**.  The consideration to be provided by the Purchaser and the Connecticut Families including, for the avoidance of doubt, the Cash Purchase Price and the Distributable Proceeds Waiver, was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the Purchased Assets under the Bankruptcy Code and the laws of the United States and any state, territory, or possession thereof. The terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable and were not entered into with the intent to nor for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Trustee, Jones, FSS, or any of their respective creditors under any applicable laws.  Neither the Trustee, the Purchaser, nor the Connecticut Families are entering into the Asset Purchase Agreement or proposing to consummate the Sale Transaction fraudulently, for the purpose of statutory or common law fraudulent conveyance, or to fraudulently transfer assets, whether under the Bankruptcy Code or under the laws of the United States, or any state, territory, or possession thereof or any other applicable jurisdiction.

N.    **Good Faith**.  The Sale Transaction was negotiated by the Trustee, the Purchaser, the Connecticut Families, and their respective professionals, and the Asset Purchase Agreement was and entered into, based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.  The Purchaser and the Connecticut Families are consummating the Sale Transaction, and the Purchaser is entering into the Asset Purchase Agreement, in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and the court decisions applying or interpreting such provision, and is therefore entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code with respect to all aspects of the transactions contemplated by the Asset Purchase Agreement and this Sale Order and otherwise has proceeded in good faith in all respects in

connection with Sale Transaction. Neither the Trustee, nor the Purchaser, nor the Connecticut Families, nor any of the professionals of the foregoing parties has engaged in any conduct that would cause or permit the Sale Transaction, the Asset Purchase Agreement, or any related action or the Sale Transaction contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of section 363(m) of the Bankruptcy Code. Neither the Purchaser nor the Connecticut Families has violated section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, neither the Purchaser nor the Connecticut Families has acted in a collusive manner with any person in connection with the Sale Transaction, and the price obtained for the Purchased Assets was not controlled by any agreement among bidders. The prospective performance of the Purchaser and the Connecticut Families, including the payment of amounts owing under the Asset Purchase Agreement and implementation of the Distributable Proceeds Waiver are in good faith and for valid business purposes and uses.

O.      **Insider Status**:   Neither the Purchaser nor the Connecticut Families are an "insider" of Jones, FSS, or the Trustee, as that term is defined in section 101(31) of the Bankruptcy Code.

P.      **No Successor Liability**:   No sale, transfer, or other disposition of the Purchased Assets pursuant to the Asset Purchase Agreement and this Sale Order will subject the Purchaser to any liability for claims, obligations or encumbrances asserted against Jones, FSS, or the Trustee or their respective interests in such Purchased Assets by reason of such transfer under any laws, including any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger, or substantial continuity or similar theories. By virtue of the consummation of the Sale Transaction contemplated by the Asset Purchase

15668021

Agreement, (i) the Purchaser is not a continuation of Jones, FSS, their respective estates, or the Trustee, there is no continuity or continuity of enterprise between, on the one hand, the Purchaser, and, on the other hand, Jones, FSS, and/or the Trustee, and there is no common identity between, on the one hand, the Purchaser and, on the other hand, Jones, FSS, and/or the Trustee; (ii) the Purchaser is not holding itself out to the public as a continuation of Jones, FSS, or their respective estates, or the Trustee; and (iii) the Sale Transaction does not amount to a consolidation, merger, or de facto merger of, on the one hand, the Purchaser and, on the other hand, Jones, FSS, or their respective estates, or the Trustee, on the other hand. Accordingly, the Purchaser is not and shall not be deemed a successor to Jones, FSS, their respective estates, or the Trustee as a result of the consummation of the Sale Transaction contemplated by the Asset Purchase Agreement.

Q. **Validity of Transfer**. The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Purchaser with any and all legal, equitable and beneficial right, title, and interest of the Trustee in and to the Purchased Assets, free and clear of all Claims (other than as set forth in the Asset Purchase Agreement). The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

R. **Backup Bid**. First United American Companies, LLC was designated as the Backup Bidder. The bid submitted by First United American Companies, LLC is the Backup Bid and shall remain open as the Backup Bid in accordance with the Winddown Order.

S. **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. The sale of the Purchased

Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Trustee, FSS, and the Purchaser intend to close the Sale Transaction as soon as reasonably practicable. The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to the transactions contemplated by this Sale Order.

        T.    **Final Order**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. In the absence of a stay pending appeal, Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after the entry of this Sale Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

A.    **Motion is Granted**

        1.    To the extent not already approved pursuant to the Winddown Order, the Motion and the relief requested therein is granted and approved as set forth herein.

B.    **Objections Overruled**

        2.    All objections, statements, and reservations of rights to the relief granted herein that have not been withdrawn with prejudice, waived, or settled are overruled and denied on the merits

12

with prejudice.

C.     **Asset Purchase Agreement Approved and Authorized**

3.     The Asset Purchase Agreement, including the Sale Transaction contemplated thereby, and all of the terms and conditions thereof, are hereby authorized and approved in their entirety and are incorporated herein by reference.  The failure specifically to include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement, and the Trustee's entry therein, be authorized and approved in its entirety.

4.     The Trustee is authorized under 11 U.S.C. § 363(b) and (f) to sell and transfer the Purchased Assets free and clear of all liens, claims, encumbrances, and interests pursuant to the terms of the Asset Purchase Agreement, with all liens, claims, encumbrances, and interests to attach to the proceeds of the Sale Transaction in the same amount and priority, with the same validity and enforceability, and subject to the same defenses as existed immediately before the closing of the sale except as otherwise provided herein.

5.     Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Trustee is authorized to execute, deliver, perform under, consummate, and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the obligations under and comply with the terms of the Asset Purchase Agreement and the Winddown Order, as applicable, and to consummate the Sale Transaction contemplated herein and in the Asset Purchase Agreement, including, without limitation, by taking any and all further actions as may be (i) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Successful Bidder, or reducing to possession, the Purchased Assets, (ii) necessary, appropriate, or desirable to implement the Sale Transaction pursuant to and

13

in accordance with the terms and conditions of the Asset Purchase Agreement and this Sale Order, or (iii) necessary or appropriate to the performance of the Trustee's obligations contemplated by the Asset Purchase Agreement, all without further order of the Court.

6.      The Asset Purchase Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not, based on the Trustee's business judgment, and in consultation with the Purchaser (or their designees or representatives), have a material adverse effect on the estates of Jones or FSS or their respective creditors.  The Trustee may make any such modification, amendment, or supplement of the Asset Purchase Agreement solely with the prior written consent of the Purchaser.  For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the estate of Jones or FSS or their respective creditors shall require Court approval.

D.      **Order Binding**

7.      This Sale Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets.

8.      This Sale Order and the terms and provisions of the Asset Purchase Agreement shall be binding on all of Jones's and FSS's creditors (whether known or unknown), Jones, FSS, the Purchaser, the Connecticut Families, the Trustee, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting a lien,

15668021

claim, or encumbrance or assert any interest or cause of action in the Purchased Assets. The provisions of this Sale Order and the terms and provisions of the Asset Purchase Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order, and the terms and provisions of the Asset Purchase Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Asset Purchase Agreement, shall continue in these or any superseding cases and shall be binding upon Jones, FSS, the Purchaser, the Connecticut Families, the Trustee, and their respective successors and permitted assigns, and any such successor shall continue to hold the Purchased Assets and any proceeds of the same strictly in trust for the benefit of the Purchaser.

E.      **Distributable Proceeds Waiver**

9.      The Distributable Proceeds Waiver and the Distributable Proceeds Waiver Amount are hereby approved. The Connecticut Families shall forego the Distributable Proceeds Waiver Amount and assign such amount to the Trustee for the benefit of all other unsecured creditors otherwise entitled to proceeds of FSS assets as part of the Sale Transaction and in connection with the closing thereof.

F.      **Transfer of Purchased Assets**

10.     All persons or entities in possession of some or all of the Purchased Assets are directed to surrender possession of such assets to the Purchaser or its designee at the time of the Asset Purchase Agreement's closing. To the extent provided by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, and conveyed to the Purchaser on account of the filing or pendency of Jones's or FSS's bankruptcy cases or the consummation of the Sale Transaction.

G.      **Standing**

15

11. The Purchaser and the Connecticut Families are parties in interest and shall have the ability to appear and be heard on all issues that would affect the rights of the Purchaser or the Connecticut Families under this Sale Order, any issues related to or otherwise connected to the Sale Transaction, and the Asset Purchase Agreement. The Purchaser and the Connecticut Families has standing to seek to enforce, among other things, the terms of this Sale Order.

H. **Automatic Stay**

12. The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of their respective remedies under the Asset Purchase Agreement or any other Transaction Documents. The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to consummate the Asset Purchase Agreement and implement the provisions of this Sale Order.

I. **No Interference**

13. Subject to the terms, conditions, and provisions of this Sale Order, all Persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Seller to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Sale Order and shall not interfere with the Purchaser's ownership or operation of the Purchased Assets.

J. **Good Faith**

14. Neither the Trustee, the Purchaser, the Connecticut Families, nor any of the professionals of any of the foregoing parties has engaged in any action or inaction that would cause or permit the Sale Transaction to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

15. The sale of the Purchased Assets, the consideration to be paid, including the Cash

15668021

Purchase Price and the Distributable Proceeds Waiver, and entry into the Asset Purchase Agreement is undertaken by the parties thereto without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Purchaser and the Connecticut Families shall be protected by section 363(m) of the Bankruptcy Code in the event that this Sale Order is reversed or modified on appeal. The reversal or modification on appeal of the authorization provided herein to enter into the Asset Purchase Agreement and consummate the Sale Transaction contemplated thereby shall not affect the validity of such transactions, unless such authorization is duly stayed pending such appeal. The Purchaser and the Connecticut Families are entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code. The Sale Transaction is not subject to avoidance pursuant to section 363(n) or chapter 5 of the Bankruptcy Code and the Purchaser and the Connecticut Families are entitled to all of the protections and immunities thereunder.

K. **Free and Clear**

16. The Asset Purchase Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code in full such that the sale of the Purchased Assets shall be free and clear of any and all interest of any kind or nature whatsoever in the Purchased Assets of any entity (collectively, "Interests"), including, without limitation: (a) all liens and encumbrances relating to, accruing, or arising at any time prior to the closing date (collectively, the "Liens"); and (b) all debts arising under, relating to, or in connection with any act of FSS or Jones or any claims (as defined in Bankruptcy Code section 101(5)), liabilities (including successor or successor-in-interest liability), obligations, demands, guarantees, options in favor of third parties, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the FSS or Jones bankruptcy

15668021

cases, and whether imposed by agreement, understanding, law, equity, or otherwise (collectively, the "Claims"). For the avoidance of doubt, the terms "Liens" and "Claims," as used herein, include, without limitation, (a) rights with respect to any Liens and Claims that purport to give any party a right of setoff or recoupment against, or right or option to affect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase option, termination of, any of the Trustee's, FSS's, Jones's, or Purchaser's interest in the Purchased Assets, or any similar rights and (b) in respect of taxes, restrictions, rights of first refusal, charges of interest of any kind and nature, if any, and including, without limitation, any restrictions of use, voting, transfer, receipt of income, or other exercise of any of the attributes of ownership relating to, accruing, or arising at any time prior to the closing, with the exception of any permitted encumbrances or assumed liabilities that are expressly assumed by the Purchaser pursuant to the Asset Purchase Agreement. The sale of the Purchased Assets will not subject the Purchaser to any liability for any Liens, Claims, and Interests whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Asset Purchase Agreement.

17. Except as provided in the Distributable Proceeds Waiver, all holders of Liens, Claims, and Interests who did not object, or withdrew their objections to the Sale Transaction, are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of Liens, Claims, and Interests are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Liens, Claims, and Interests, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against or in which they assert Liens, Claims, and Interests, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to

the Sale Transaction, subject to any rights, claims, and defenses of the Trustee or the estates of Jones or FSS, as applicable. Those holders of Liens, Claims or Interests who did object and that have an interest in the Property fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

18.     Except as otherwise provided in the Asset Purchase Agreement, effective upon the closing, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, vendors, trade creditors, litigation claimants, and other creditors are hereby forever barred, estopped, and permanently enjoined from asserting, commencing, or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its affiliates, successors, assigns or designees, or their respective assets and property (including, without limitation, the Purchased Assets), any (a) Claim arising under or out of, in connection with, or in any way relating to, the Jones, FSS, the Trustee, the Purchased Assets, the operation or ownership of the Purchased Assets by the Trustee prior to the closing, or the Sale Transaction, (b) successor or transferee liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien, Claim, or Interest; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to

19

renew any license, permit, or authorization to operate any business or conduct any of the businesses operated with respect to such assets.

19. Following the closing of the Sale Transaction, no holder of any Lien, Claim, or Interest shall interfere with the Purchaser (or its designee's) title to or use and enjoyment of the Purchased Assets based on or related to any such Lien, Claim, or Interest or based on any action the Trustee, Jones, or FSS may take.

20. The Purchaser shall not be deemed, as a result of any action taken in connection with the Asset Purchase Agreement, the consummation of the Sale Transaction, or the transfer, operation, or use of the Purchased Assets to (a) be a legal successor, or otherwise be deemed a successor to Jones or FSS (other than as set forth in the Asset Purchase Agreement and any liabilities assumed in accordance therewith), (b) have, de facto or otherwise, merged with or into Jones or FSS, or (c) be an alter ego or a mere continuation or substantial continuation of Jones, FSS, or the enterprise of Jones or FSS including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, tax law, products liability law, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any doctrine with respect to Jones's or FSS's liability under such law, rule, or regulation.

21. All persons are enjoined from in any way pursuing the Purchaser, or any affiliates or representatives of the Purchaser, or the Purchased Assets to recover any lien, claim, or encumbrance or assert any interest or cause of action, which such person has against Jones, FSS, or the Purchased Assets, which has been released pursuant to this Sale Order.

22. Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental

entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

L.    **Transaction Closing**

23.    Closing of the foregoing Sale Transaction shall occur in accordance with the Asset Purchase Agreement, and subject to satisfaction of the conditions set forth in the Asset Purchase Agreement, including but not limited to, the contingencies and the conditions precedent to closing set forth in Article VI of the Asset Purchase Agreement.

24.    At or as promptly as practical after the closing of the Sale Transaction, the Trustee is authorized and directed to pay from the Sale Transaction proceeds the reasonable, and ordinary and customary closing costs, including reasonable and customary professional fees directly related to the Sale Transaction, transfer taxes, delinquent or owing taxes, other fees or costs to be paid by the Trustee on behalf of Jones or FSS, pursuant to the Asset Purchase Agreement.

M.    **Binding Order**

25.    The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of any subsequent orders which may be entered dismissing this chapter 7 case or modifying the *Order Supplementing Order Dismissing Case* [Case No. 22-60043, Docket No. 1021].

26.    To the extent there is any conflict between the terms of this Sale Order and the Asset Purchase Agreement, the terms of this Sale Order shall control. Nothing in any other order of the Court shall conflict with or derogate from the provisions of the Asset Purchase Agreement or any other Transaction Document or the terms of this Sale Order.

N.    **Waiver**

27.    The 14-day stay of this Sale Order under Fed. R. Bankr. P.6004(h) is waived, for

cause, and this Sale Order is effective immediately upon its entry.

O.     **Exclusive Jurisdiction**

28.     The Court shall retain exclusive jurisdiction with respect to the implementation, enforcement, terms and provisions of this Sale Order and the Asset Purchase Agreement.

P.     **Inconsistencies with Prior Orders or Pleadings**

29.     To the extent this Sale Order is inconsistent or conflicts with any prior order or pleading in this Chapter 7 Case, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified to conform herewith.

**Signed: _____, 2024**

_____
**HONORABLE CHRISTOPHER M. LOPEZ**
**UNITED STATED BANKRUPTCY JUDGE**

# EXHIBIT A

## Asset Purchase Agreement

# ASSET PURCHASE AGREEMENT

**dated as of November [          ], 2024**

**among**

**WAR IS OVER LLC,**
**as Purchaser**

**and**

**FREE SPEECH SYSTEMS, LLC AND CHRISTOPHER R. MURRAY, SOLELY AS**
**CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF**
**ALEXANDER E. JONES, as**
**Seller**

15620508

# TABLE OF CONTENTS

**Page**

██████████ PURCHASE AND SALE OF ASSETS ..................................................................... 2

1.1     Purchase and Sale of Purchased Assets ......................................................... 2
1.2     Assumption of Liabilities .............................................................................. 3
1.3     Consideration for Purchased Assets .............................................................. 3

██████████ THE CLOSING ........................................................................................................ 4

2.1     Time and Place; Effective Time .................................................................... 4
2.2     Closing Deliveries of Seller .......................................................................... 4
2.3     Closing Deliveries of Purchaser .................................................................... 5

██████████ REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 6

3.1     Organization and Authority of Seller; Enforceability ................................... 6
3.2     No Conflicts; Consents and Approvals ......................................................... 6
3.3     Litigation; Governmental Orders ................................................................... 6
3.4     Purchased Assets ........................................................................................... 6

██████████ REPRESENTATIONS AND WARRANTIES OF PURCHASER ..................... 7

4.1     Organization ................................................................................................. 7
4.2     Authority ....................................................................................................... 7
4.3     Consents and Approvals ................................................................................ 7
4.4     Litigation ....................................................................................................... 7
4.5     Brokers .......................................................................................................... 7
4.6     Sufficiency of Funds ..................................................................................... 7

██████████ COVENANTS AND AGREEMENTS ...................................................................... 7

5.1     Confidentiality ............................................................................................... 7
5.2     Sale Order ..................................................................................................... 8
5.3     Further Actions .............................................................................................. 8
5.4     Transaction Costs .......................................................................................... 8
5.5     Tax Matters ................................................................................................... 9
5.6     Removal of Purchased Assets or New Lease Arrangement ........................... 9

██████████ CLOSING CONDITIONS ........................................................................................ 9

6.1     Conditions to Obligations of Purchaser ........................................................ 9
6.2     Conditions to Obligations of Seller ............................................................ 10
6.3     Non-Survival of Representations and Warranties........................................ 11

██████████ AS IS SALE ............................................................................................................ 11

7.1     As Is Sale ..................................................................................................... 11

██████████ TERMINATION ...................................................................................................... 11

i

| 8.1 | Termination | 11 |
| 8.2 | Effect of Termination | 12 |
| 8.3 | Fees and Expenses | 12 |
| ████████ | MISCELLANEOUS | 13 |
| 9.1 | Notices | 13 |
| 9.2 | Amendments and Waiver; Exclusive Remedies | 14 |
| 9.3 | Entire Agreement | 14 |
| 9.4 | Third Party Beneficiaries | 14 |
| 9.5 | Governing Law | 14 |
| 9.6 | Neutral Construction | 15 |
| 9.7 | Severability | 15 |
| 9.8 | Extended Meanings | 15 |
| 9.9 | Counterparts; Facsimile Delivery | 15 |
| 9.10 | Submission to Jurisdiction | 15 |
| 9.11 | Waiver of Jury Trial | 16 |
| 9.12 | Further Assurances | 16 |
| ████████ | DEFINITIONS | 17 |
| 10.1 | Certain Definitions | 17 |
| 10.2 | Interpretation | 20 |

Exhibits

Exhibit A      Form of Bill of Sale
Exhibit B      Form of Assignment of Intellectual Property

Schedules

Schedule 1.1(a)(i)      Assigned Intellectual Property
Schedule 1.1(a)(ii)      Assigned Personal Property
Schedule 1.1(a)(iii)      Assigned Inventory
Schedule 1.1(b)(xi)      Excluded Domain Names
Schedule 1.3(c)      Allocation of Purchase Price

## Asset Purchase Agreement

This Asset Purchase Agreement (this "***Agreement***") dated as of November [   ], 2024, is by and between War Is Over LLC, an Illinois Limited Liability Company (the "***Purchaser***"), and Christopher R. Murray, solely in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of Alexander E. Jones (the "***Trustee***") and Free Speech Systems LLC, a Texas limited liability company ("***FSS***" and together with the Trustee, "***Seller***"). Capitalized terms used in this Agreement and not otherwise defined have the respective meanings given to them in Article X.

WHEREAS, a voluntary case for reorganization of the estate of FSS under the Bankruptcy Code was filed in the Bankruptcy Court on July 29, 2022, styled *In re Free Speech Systems, LLC*, Case No. 22-60043, which case was later dismissed by order of the Bankruptcy Court [Case No. 22-60043, Docket No. 956] (the "***Dismissal Order***") on June 21, 2024;

WHEREAS, a voluntary case for the reorganization of the estate of Alexander E. Jones ("***Jones***") was commenced under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") on December 2, 2022(the "***Petition Date***"), styled *In re Alexander E. Jones*, Case No. 22-33553, which case was later converted into a case under chapter 7 of the Bankruptcy Code (the "***Bankruptcy Case***") on June 14, 2024;

WHEREAS, by appointment of the United States Trustee dated June 14, 2024, Christopher Murray was appointed as Chapter 7 Trustee for the bankruptcy estate of Jones;

WHEREAS, on September 25, 2024, the Bankruptcy Court entered its Order Authorizing the Winddown of FSS [Case No. 22-33553, Docket No. 859], which authorized, amongst other things, the Seller to sell FSS's assets free and clear of liens, claims, charges, encumbrances and interests pursuant to 11 U.S.C. § 363(b) and (f) in one or more asset sales (the "***Winddown Order***");

WHEREAS, on September 25, 2024, the Bankruptcy Court entered its Order Supplementing Order Dismissing Case [Case No. 22-60043, Docket No. 1021], which deemed all property of the FSS bankruptcy estate to have vested in the Jones bankruptcy estate and under control of the Trustee as of the date of entry of the Dismissal Order;

WHEREAS, this Agreement is entered pursuant to the Winddown Order;

WHEREAS, pursuant to the Winddown Order, and upon the terms and conditions set forth in this Agreement and upon entry of the Sale Order, and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Purchased Assets, and in connection with the purchase of the Purchased Assets, Purchaser has agreed to assume certain liabilities of the Seller as set forth in Section 1.2, upon the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in reliance upon and in consideration of the representations, warranties and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1

15620508

███████

## PURCHASE AND SALE OF ASSETS

    1.1   <u>Purchase and Sale of Purchased Assets</u>.

    (a)   <u>Purchase and Sale</u>. Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein, in the Sale Order, and in the Winddown Order, at the Closing the Seller shall sell, convey, transfer, assign, grant and deliver to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), and Purchaser shall purchase, acquire and accept delivery from the Seller on the Closing Date, all right, title and interest of the Seller in and to all of the assets, rights and entitlements of the Seller, whether tangible or intangible, real or personal, of every kind and nature as described in the November 4, 2024 Offering Memorandum (other than the Excluded Assets) (collectively, the "***Purchased Assets***"), including, without limitation, the following:

    (i)   all Intellectual Property listed on <u>Schedule 1.1(a)(i)</u>; (y) all versions thereof, design files, data rights and documentation; and (z) all rights of Seller with respect to the foregoing, remedies against past, present and future infringement, misappropriation or other unauthorized use thereof and rights to protection of interests therein under the applicable Laws of all jurisdictions (collectively, the "***Assigned Intellectual Property***");

    (ii)   all production equipment and other tangible property of any kind or nature related to the maintenance, use, or preservation of the Assigned Intellectual Property (and interests in any of the foregoing) that are owned by the Seller on the Closing Date, other than Assigned Inventory, as listed on <u>Schedule 1.1(a)(ii)</u> (collectively, the "***Assigned Personal Property***");

    (iii)   all items of inventory pertaining to the operation of the business of Seller that are not sold prior to the Closing Date, as listed on <u>Schedule 1.1(a)(iii)</u> (collectively, the "***Assigned Inventory***");

    (iv)   to the extent transferable by Seller, all Licenses relating to the Purchased Assets.

    (b)   <u>Excluded Assets</u>. Other than the Purchased Assets, Purchaser expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets, properties, rights or interests of Seller, and all such other assets, properties, rights and interests are expressly excluded from the Purchased Assets (the "***Excluded Assets***") and nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to either of the Purchaser. Excluded Assets include the following assets, properties, rights and interests of Seller:

    (v)   the articles of incorporation, minute books, stock books and other corporate records of Seller having primarily to do with the corporate organization and capitalization of Seller;

    (vi)   all cash and cash equivalents, bank accounts, investments, securities and certificates of deposit;

15620508

(vii)    all rights of Seller under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by Seller or Purchaser in connection with the transactions contemplated hereby, or any side agreement between Seller and Purchaser entered into on or after the date of this Agreement;

(viii)    the books and records and other written and electronic materials related thereto of the Seller;

(ix)    personally identifiable information of the Seller's employees and independent contractors, including personnel records, personal data stored on the Seller's computers or other electronic devices, and historical email content the historic emails of the Seller's employees and independent contractors;

(x)    all physical assets located in Building 2 on the Business Property as of the Closing Date other than the Assigned Personal Property;

(xi)    all vehicles;

(xii)    any assets transferred or otherwise disposed of by Seller pursuant to an order of the Bankruptcy Court prior to the Closing or not in violation of this Agreement;

(xiii)    all rights, claims, refunds, loss carry forwards, abatements, variances, allocations, claims for relief, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, interests and causes of action (including any commercial tort claims and all guarantees, indemnities, warranties and similar rights), and defenses;

(xiv)    all rights, claims or causes of action by or in the right of Seller against any current or former director or officer of the Seller; and

(xv)    all excluded domain names listed on Schedule 1.1(b)(xi);

(xvi)    any claims, rights, or actions under Chapter 5 of the Bankruptcy Code.

1.2    Assumption of Liabilities.

(a)    Excluded Liabilities. Purchaser shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever, *provided however* that the Purchaser shall assume all Liabilities that relate to, arise from or are in connection with the operation or ownership of the Purchased Assets from and after Closing, subject in all respects to the Sale Order.

1.3    Consideration for Purchased Assets.

(a)    Consideration. The aggregate purchase price shall be $1,750,000.00 in cash plus the Distributable Proceeds Waiver  (the "***Purchase Price***"). The Purchase Price is inclusive of the amount of the Deposit.  At the Closing, the Purchase Price, less the amount of the Deposit, shall be paid by Purchaser, or an Affiliate of the Purchaser, to Seller by wire transfer of immediately

15620508

available funds to the bank account designated by Seller (the "***Cash Payment***"), and the Connecticut Families will have executed and delivered to the Trustee all necessary documentation in furtherance of the Distributable Proceeds Waiver.

(b)      Deposit. Global Tetrahedron, LLC on behalf of the Purchaser, has deposited with $100,000.00, counsel to Seller, as a good faith deposit (the "***Deposit***") the sum of approximately 5.71% of the cash portion of the Purchase Price.  If the transactions hereunder are consummated, the Deposit will be applied against the Purchase Price in the manner provided in Section 1.3(a).  If the transactions hereunder are not consummated as result of a termination under section 8.1(d), the Deposit shall be forfeited to, and be retained irrevocably by, the Trustee in accordance with the Winddown Order; for the avoidance of doubt, if the transactions hereunder are not consummated as a result of a termination under sections 8.1(a), (b) by the Seller, (c), or (e), the Deposit shall be promptly returned to the Purchaser.

(c)      Allocation of Purchase Price. Purchaser allocates the Purchase Price among the Purchased Assets as set forth on Schedule 1.3(c), which Schedule 1.3(c) shall be prepared by Purchaser.  Purchaser and Seller shall further cooperate in determining (in accordance with all applicable Treasury Regulations promulgated under Section 1060 of the Internal Revenue Code) the allocation of the final Purchase Price among the Purchased Assets.

## THE CLOSING

2.1      Time and Place; Effective Time.  The consummation of the transactions contemplated hereby shall take place at a closing (the "***Closing***") to be held remotely via the exchange of documents and signatures at 10:00 a.m. Central Time on the first (1st) Business Day following the satisfaction and fulfillment or waiver of the conditions set forth in Article VI (other than conditions to be satisfied simultaneously at the Closing),which date shall not be earlier than the  first day following the entry of the Sale Order by the Bankruptcy Court (the "***Closing Date***"). The sale, transfer, assignment, conveyance and delivery of the Purchased Assets described in this Agreement will be effective as of the Effective Time; provided, however, that Purchaser shall have ten (10) days from the Closing Date to conduct an inventory of the Purchased Assets and notify Seller in writing and with specificity of any material dispute (a "***Dispute Notice***") regarding the Purchased Assets (the "***Reconciliation Period***").  If any such dispute cannot be mutually resolved by the Seller and Purchaser and/or requires an adjustment to the Purchase Price, either party may file a motion with the Bankruptcy Court seeking judicial assistance to resolve such dispute.  For the avoidance of doubt, Seller shall hold all funds received from the Purchaser in escrow until such time that the Reconciliation Period has passed without a Dispute Notice being served, and if a Dispute Notice has been served, such funds shall be held in escrow pending mutual written agreement with respect to distribution of such funds or a final Court order directing distribution of such funds..

2.2      Closing Deliveries of Seller.  At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser the following instruments, certificates and other documents in order to consummate the transactions contemplated hereby, including the transfer of the Purchased Assets to Purchaser pursuant to Section 1.1:

(a)    Instruments of Transfer and Assignment.

(i)    a Bill of Sale, substantially in the form attached hereto as Exhibit A, duly executed by the Trustee on behalf of the Seller (the "***Bill of Sale***");

(ii)    an Assignment of Intellectual Property, substantially in the form attached hereto as Exhibit B, duly executed by the Trustee on behalf of the Seller (the "***Assignment of Intellectual Property***");

(iii)    evidence that the Bankruptcy Court has entered the Sale Order, which shall be a final order and which shall be in all respects consistent with the terms of this Agreement and otherwise satisfactory to Purchaser and the Connecticut Families;

(iv)    such other bills of sale, deeds, endorsements, assignments and other goods and sufficient instruments of conveyance and transfer as may reasonably be necessary to vest in Purchaser all the right, title and interest of Seller in, to or under any or all of the Purchased Assets; and

(v)    such other documents reasonably necessary for the Connecticut Families to assign to the Trustee the Distributable Proceeds Waiver Amount in accordance with the Sale Order.

2.3    Closing Deliveries of Purchaser. At the Closing, Purchaser shall make the payment and deliver to Seller the following instruments, certificates and other documents in order to pay for the Purchased Assets    :

(a)    Cash Payment. The Cash Payment to the accounts designated in writing by Seller at least two (2) Business Days prior to the Closing Date to be held in escrow subject to the satisfaction and fulfillment or waiver of the conditions set forth in Article VI.

(b)    Instruments of Assumption.

(i)    the Bill of Sale, duly executed by Purchaser;

(ii)    the Assignment of Intellectual Property, duly executed by Purchaser;

(iii)    copies of any transfer Tax forms and returns required to be filed by Purchaser prior to or on the Closing Date in connection with the transactions contemplated hereby;

(iv)    a copy of the resolutions adopted by the Purchaser evidencing its authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an officer of Purchaser; and

(v)    such other documents related to the transactions contemplated by this Agreement that the Seller may reasonably request.

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller, to induce Purchaser to enter into this Agreement and to close hereunder, hereby represents and warrants to Purchaser as follows:

3.1     Organization and Authority of Seller; Enforceability.  FSS is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.  The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by the Bankruptcy Court. Assuming the due authorization, execution and delivery of this Agreement, this Agreement and the documents to be delivered hereunder constitute a legal, valid and binding obligation of the Seller, enforceable against it in accordance with their respective terms.

3.2     No Conflicts; Consents and Approvals.  Except as required by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, company agreement or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. No consent, approval, waiver or authorization is required to be obtained by Seller from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Seller of this Agreement, and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby and thereby.

3.3     Litigation; Governmental Orders. Except for contested matters and adversary proceedings in the Bankruptcy Court, and *Lafferty v. Jones*, No. UWY-CV18-6046436-S (Conn. Super. Ct. Dec. 22, 2022); *Heslin* v. *Jones,* Case No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *Lewis* v. *Jones,* Case No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *Pozner* v. *Jones,* Case No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *Fontaine* v. *Jones,* Case No. D-1-GN-18-001605, in the 459th District Court for Travis County, Texas; as of the date hereof, there are no pending or, to the Knowledge of the Seller threatened Actions by any Person or Governmental Authority against or relating to Seller which relate to the business of Seller or Purchased Assets or to which any of the Purchased Assets are subject.

3.4     Purchased Assets.  To the best knowledge of the Seller, Seller has good and valid title to all of the Purchased Assets; *provided however* that the foregoing representation shall not apply to the transferability of any social media accounts, the concerns raised by certain parties regarding such transferability being known to both the Seller and the Purchaser.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser, to induce Seller to enter into this transaction and to close hereunder, hereby represents and warrants to Seller as follows:

4.1     <u>Organization</u>.  Purchaser is duly organized, validly existing and in good standing under the laws of the Illinois.

4.2     <u>Authority</u>.  Purchaser has all requisite power and authority to enter into and deliver this Agreement to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by Purchaser. Assuming the due authorization, execution and delivery of this Agreement and subject to the effectiveness of the Winddown Order and the Sale Order, this Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

4.3     <u>Consents and Approvals</u>.  Except as required by the Bankruptcy Court, the execution, delivery and performance by Purchaser of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Purchaser; and (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Purchaser. No consent, approval, waiver or authorization is required to be obtained by Purchaser from any Person (including any Governmental Authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

4.4     <u>Litigation</u>.   There are no pending or, to the knowledge of Purchaser, threatened Actions by any Person or Governmental Authority against or relating to Purchaser (or any Affiliate of Purchaser) or by which Purchaser or its assets or properties are or may be bound which, if adversely determined, would have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement and to        consummate on a timely basis the transactions contemplated hereby or thereby.

4.5     <u>Brokers</u>.  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Purchaser directly with Seller without the intervention of any Person on behalf of Purchaser in such manner as to give rise to any valid claim by any Person against Seller for a finder's fee, brokerage commission or similar payment.

4.6     <u>Sufficiency of Funds</u>.  Purchaser has sufficient funds, or at and as of the Closing will have sufficient funds, in an aggregate amount necessary to pay the Cash Payment and to consummate all of the other transactions contemplated by this Agreement.

## COVENANTS AND AGREEMENTS

5.1     <u>Confidentiality</u>.  Except as otherwise explicitly provided in this Agreement, the information obtained by Purchaser, or its officers, employees, agents or representatives, during

the period from the date of this Agreement through the earlier of the Closing or the termination of this Agreement, in connection with the negotiation, execution and performance of this Agreement, the consummation of the transactions contemplated hereby, or otherwise, shall be held in confidence by Purchaser, and Purchaser shall cause its Affiliates and its and their respective directors, officers, employees, consultants, counsel, accountants, and other agents to hold such information in confidence.

5.2     Sale Order.  Promptly, but no later than five (5) calendar days, following the date that this Agreement has been duly executed and delivered by Purchaser, Seller shall file with the Bankruptcy Court a motion seeking the entry of the Sale Order (the "*Sale Motion*"). The Sale Motion shall request a waiver of the 14-day stay provided by Fed. R. Bank. P. 6004(h) with respect to the Sale Order. Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court, on an expedited basis, of the Sale Order approving, among other things, the sale of Purchased Assets to Purchaser free and clear of all Encumbrances without successor liability and the Distributable Proceeds Waiver, which shall be in form and substance reasonably acceptable to Purchaser, the Connecticut Families, and the Trustee, including filing any briefing or other documentation in support thereof. The Sale Order shall include, among other things, findings that this Agreement was negotiated, proposed and entered into without collusion, in good faith and from arms-length bargaining positions, and neither the Seller nor the Purchaser engaged in any act or omission that would permit this Agreement to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code, and Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Purchaser shall take such actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event that the Sale Order shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect thereto), Seller and Purchaser will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Purchaser shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

5.3     Further Actions.  Upon the terms and subject to the conditions set forth in this Agreement and subject to the requirements of the Bankruptcy Code and the Bankruptcy Court, Seller and Purchaser shall each use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under applicable Laws to consummate the transactions contemplated hereby and satisfy the conditions to its obligations to close the transactions contemplated hereby.

5.4     Transaction Costs.  Purchaser shall pay all transaction costs and expenses (including any legal, accounting and other professional fees and expenses) that it incurs in connection with the negotiation, execution and performance of this Agreement and the consummation of the transactions contemplated hereby. Seller shall pay all transaction costs and expenses (including legal, accounting and other professional fees and expenses) that it incurs in connection with the negotiation, execution and performance of this Agreement and the consummation of the transactions contemplated hereby.

15620508

   5.5 <u>Tax Matters</u>. Purchaser, on the one hand, and Seller, on the other hand, will (i) provide each other with any assistance that may reasonably be requested by the other in connection with the preparation of any Tax Return, audit or other examination by any taxing authority or judicial or administrative proceedings relating to liability for Taxes, (ii) each retain and provide the other with any records or other information that may be relevant to that Tax Return, audit, examination or proceeding, and (iii) provide each other with any final determination of any such audit, examination or proceeding that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, Purchaser, on the one hand, and Seller, on the other hand, will retain until the applicable statutes of limitations (including any extensions) have expired copies of all records or information that may be relevant to Tax Returns filed by the other for all Tax periods or portions thereof ending before or including the Closing Date. After the expiration of all applicable statues of limitations, such records and information may be destroyed by either party if such party sends to the other party written notice of its intent to destroy such records and information, specifying with particularity the contents of the records and information to be destroyed. Such records and information may then be destroyed after the 30th day after such notice is given unless the party receiving the notice objects to the destruction, in which case the party that provided the notice will deliver, at the objecting party's expense, such records to the objecting party.

   5.6 <u>Removal of Purchased Assets or New Lease Arrangement</u>. No later than thirty days after the Closing Date, Purchaser will either (i) have removed all of the Purchased Assets from the physical business premises (the "***Business Property***") of the Seller or (ii) have entered into an assignment and assumption of the existing lease of the Business Property to the Purchaser or a new lease arrangement covering the Business Property, in either case which includes a release of the Seller's obligations under the existing lease for the Business Property. In addition, no later than thirty days after the Closing Date, Purchaser will be solely responsible for the maintenance of all information technology, systems and accounts, and any software licenses necessary to operate, preserve, access or use any Assigned Intellectual Property; provided, however, that Seller shall maintain all information technology, systems and accounts and shall cooperate with Purchaser to timely transfer control of the foregoing until such time as Purchaser is in full possession and control of the foregoing. In connection with the foregoing, Seller shall provide Purchaser reasonable access to the Business Property upon prior written request to the Trustee to allow Purchaser to remove the Purchased Assets if elected by Purchaser and which access shall not be unreasonably withheld.

### CLOSING CONDITIONS

   6.1 <u>Conditions to Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or fulfillment at or prior to the Closing of the following conditions, any of which may be waived in whole or in part by Purchaser in writing:

   (a) all representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing (other than any

9

representation or warranty that is expressly made as of a specified date, which shall be true and correct in all material respects as of such specified date only);

(b)     Seller shall have performed and complied in all material respects with all the covenants and agreements required by this Agreement to be performed or complied with by it at or prior to the Closing;

(c)     there shall be in effect no Law or injunction issued by a court of competent jurisdiction making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement. There shall not be pending or threatened in writing by any Governmental Authority of competent jurisdiction any proceeding (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, or seeking to obtain from Purchaser or any of its Affiliates in connection with the sale and purchase of the Purchased Assets to be acquired by Purchaser any material damages, or (ii) seeking to prohibit Purchaser or any of its Affiliates from effectively controlling or operating any portion of the business of Seller or the Purchased Assets to be acquired by Purchaser;

(d)     no Governmental Order shall be in effect which restrains or enjoins the consummation of the transactions contemplated by this Agreement;

(e)     Seller shall have delivered to Purchaser all of the certificates, instruments and other documents required to be delivered by it at or prior to the Closing pursuant to Section 2.2;

(f)     the Bankruptcy Court shall have entered the Sale Order, which shall be a final order and which shall be in all respects consistent with the terms of this Agreement and otherwise satisfactory to Purchaser and the Connecticut Families, and no order staying, reversing, modifying, or amending the Sale Order shall be in effect; and

(g)     all Assumed and Assigned Contracts shall have been assigned by Seller to Purchaser pursuant to sections 105 and 365 of the Bankruptcy Code.

6.2     <u>Conditions to Obligations of Seller</u>.    The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction or fulfillment at or prior to the Closing of the following conditions, any of which may be waived in whole or in part by Seller in writing:

(a)     all representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which shall be true and correct in all material respects as of such specified date only);

(b)     Purchaser shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with at or prior to the Closing;

15620508

(c)    there shall be in effect no Law making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement. There shall not be pending or threatened in writing by any Governmental Authority of competent jurisdiction any proceeding (i) challenging or seeking to restrain, prohibit, alter or materially delay the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement, or seeking to obtain from Purchaser or any of its Affiliates in connection with the sale and purchase of the Purchased Assets to be acquired by Purchaser any material damages, or (ii) seeking to prohibit Purchaser or any of its Affiliates from effectively controlling or operating any portion of the business of Seller or the Purchased Assets to be acquired by Purchaser;

(d)    Purchaser shall have delivered to Seller the Cash Payment and all of the certificates, instruments and other documents required to be delivered by Purchaser at or prior to the Closing pursuant to <u>Section 2.3</u>.

6.3    <u>Non-Survival of Representations and Warranties</u>.    None of the representations, warranties, covenants and agreements of Seller contained in this Agreement or other instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants and agreements, shall survive the Closing Date.

**AS IS SALE**

7.1    <u>As Is Sale</u>.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER WRITTEN OR ORAL, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION, ANY WARRANTY AGAINST PATENT, TRADEMARK, COPYRIGHT OR TRADE SECRET INFRINGEMENT. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PURCHASED ASSETS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**TERMINATION**

8.1    <u>Termination</u>.  This Agreement and the transactions contemplated hereby may be terminated and abandoned:

(a)    by either Seller or Purchaser at any time prior to the Closing with the mutual written consent of the other;

(b)　　unless the Closing has not occurred as a result of a breach of this Agreement as provided for under section 8.1(d) or 8.1(e) by the party seeking such termination, by either Seller or Purchaser, upon three (3) days written notice of such termination filed with the Bankruptcy Court and served upon the non-terminating party, if the Closing has not occurred on or prior to 5:00 p.m., Houston, Texas time on December 31, 2024 (the "*Termination Date*");

(c)　　by either Seller or Purchaser if any Governmental Authority with jurisdiction over such matters shall have issued a final and non-appealable Governmental Order permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; *provided*, *however*, that neither Seller nor Purchaser may terminate this Agreement pursuant to this <u>Section 8.1(c)</u> unless the party seeking so to terminate this Agreement has used commercially reasonable efforts to oppose any such Governmental Order or to have such Governmental Order vacated or made inapplicable to the transactions contemplated by this Agreement;

(d)　　by Seller (provided that neither Seller nor any Affiliate thereof is in material breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Purchaser shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is incapable of being cured or is not cured within three (3) days of receipt of written notice thereof from Seller;

(e)　　by Purchaser (provided that neither Purchaser nor any Affiliate thereof is in material breach of any of the representations, warranties, covenants or other agreements contained herein), but only (i) if Seller shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is incapable of being cured or is not cured within three (3) days of receipt of written notice thereof from Purchaser;

8.2　　<u>Effect of Termination</u>.  In the event of a termination of this Agreement under Section 8.1, this Agreement will become void and of no further force or effect, except for the provisions of (a) Section 8.3 relating to the payment of fees and expenses, and (b) this Section 8.2. Notwithstanding any provision of this Agreement or the documents to be delivered hereunder to the contrary, neither the termination of this Agreement, nor anything contained in this Section 8.2, will be deemed to release any party from any liability due to, or prevent the other party from exercising their rights and remedies under this Agreement or any ancillary document with respect to, the breach by any such party of the covenants or agreements of such party in the Agreement or any ancillary document, in each case, prior to the date of such termination *provided however*, that such right to terminate shall be Purchaser's sole and exclusive remedy for any breach by Seller.

8.3　　<u>Fees and Expenses</u>.  Each of the parties hereto will be responsible for and pay its own legal, accounting and other fees and expenses, including, without limitation, reasonable attorneys' and accountants' fees and expenses and the fees and expenses of financial consultants, investment bankers, lenders and other consultants, incurred in connection with the transactions contemplated hereby, including, without limitation, the due diligence review, and the negotiation, preparation and execution of this Agreement, any ancillary agreements and any other instrument or documented contemplated hereby.

**MISCELLANEOUS**

9.1 _Notices_. All notices, requests, demands, claims and other communications that are required or may be given pursuant to this Agreement must be in writing and delivered personally against written receipt, by reputable international overnight courier, by telecopy or facsimile or by registered or certified mail, return receipt requested, postage prepaid, to the parties at the following addresses (or to the attention of such other Person or at such other address as any party may provide to the other party by notice in accordance with this Section 9.1):

if to Purchaser, to:

War Is Over, LLC
c/o Global Tetrahedron, LLC
Attn: Paula Brillson, Esq.
[•]
[•]
Email: pbrillson@theonion.com

With copies (which will not
constitute notice hereunder) to:

Seward & Kissel LLP
Attn:   John R. Ashmead, Esq.
          Andrew J. Matott, Esq.
One Battery Park Plaza
New York, NY 10004
Email: ashmead@sewkis.com
          matott@sewkis.com

if to the Seller, to:

Christopher R. Murray, Chapter 7 Trustee
602 Sawyer Street, Suite 400
Houston, Texas 77007
Email: chris@jonesmurray.com

With copies (which will not
constitute notice hereunder) to:

Joshua W. Wolfshohl
Porter Hedges LLP
1000 Main St., 36th Floor
Houston, Texas 77002
Email: jwolfshohl@porterhedges.com

and

13

Erin E. Jones
Jones Murray LLP
602 Sawyer Street, Suite 400
Houston, Texas 77007
Email: erin@jonesmurray.com

Any such notice or other communication will be deemed to have been given (i) if personally delivered, when so delivered, against written receipt, or (ii) if sent by reputable international overnight courier, when so delivered with delivery confirmed by the courier service.

9.2     Amendments and Waiver; Exclusive Remedies.  This Agreement may not be modified or amended except in writing signed by the party or parties against whom enforcement is sought. The terms of this Agreement may be waived only by a written instrument signed by the party or parties waiving compliance. No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise provided. No delay on the part of any party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. Whenever this Agreement requires or permits consent by or on behalf of a party, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Agreement.  The rights and remedies herein provided shall be the exclusive rights and remedies available to the parties hereto at law or in equity.

9.3     Entire Agreement.  This Agreement and the related documents contained as Exhibits and Schedules hereto or expressly contemplated hereby contain the entire understanding of the parties relating to the subject matter hereof and supersede all prior written or oral and all contemporaneous oral agreements and understandings relating to the subject matter hereof. The Exhibits and Schedules to this Agreement are hereby incorporated by reference into and made a part of this Agreement for all purposes.

9.4     Third Party Beneficiaries.  This Agreement is made for the sole benefit of the parties hereto and their respective successors, executors and permitted assigns, and nothing contained herein, express or implied, is intended to or shall confer upon any other Person any third-party beneficiary right or any other legal or equitable rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement (except to the extent that any Affiliates of Seller is expressly covered by an indemnity herein).

9.5     Governing Law.  This Agreement will be governed by and construed and interpreted in accordance with the substantive Laws of the State of Texas, without giving effect to any choice of law or conflicts of Law provision or rule that would cause the application of the Laws of a jurisdiction other than Texas. Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in Section 9.1. Until the settlement of the case of Seller before the Bankruptcy Court, the parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over

14

the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such court. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith. The prevailing party shall be entitled to recoup legal fees and costs (including, without limitation, the award of interim attorneys' fees and expenses on a claim-by-claim or partial basis) incurred by the prevailing party.

       9.6    <u>Neutral Construction</u>.  The parties hereto agree that this Agreement was negotiated fairly between them at arms' length and that the final terms of this Agreement are the product of the parties' negotiations. Each party represents and warrants that it has sought and received legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The parties hereto agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that no provisions of this Agreement should be construed against either party on the grounds that such party drafted or was more responsible for drafting such provision.

       9.7    <u>Severability</u>.  In the event that any one or more of the provisions or parts of a provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement or any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction, *provided* that any such reform or construction does not affect the economic or legal substance of the transactions contemplated hereby in a manner adverse to any party.

       9.8    <u>Extended Meanings</u>.  Words importing the singular include the plural and vice versa and words importing gender include all genders, unless the context otherwise requires.

       9.9    <u>Counterparts; Facsimile Delivery</u>.  This Agreement may be executed and delivered in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. This Agreement may also be executed and delivered by facsimile, PDF or other electronic file with the same force and effect as if originally executed copies of this Agreement had been delivered by the parties hereto. If this Agreement is executed and delivered in counterparts or by a facsimile, PDF or other electronic file, any party may thereafter require that both parties originally execute and deliver a sufficient number of additional copies of this Agreement so that each party may have two fully executed originals of this Agreement.

       9.10   <u>Submission to Jurisdiction</u>.   ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE BANKRUPTCY COURT AND, TO THE

EXTENT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT ACCEPT JURISDICTION TO ADJUDICATE SUCH MATTER MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF TEXAS IN EACH CASE LOCATED IN HARRIS COUNTY, STATE OF TEXAS. EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN WILL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION, OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

9.11    Waiver of Jury Trial. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

9.12    Further Assurances. In addition to the actions, documents, files, pleadings and instruments specifically required to be taken or delivered by this Agreement, whether on or before or from time to time after the Closing, and without further consideration, each party hereto shall make commercially reasonable efforts to take such other actions, and execute and/or deliver such other documents, data, pleadings, files, information and instruments, as the other party hereto or its counsel may reasonably request in order to effectuate and perfect the transactions contemplated by this Agreement, including without limitation, such actions as may be necessary to transfer to Purchaser and to place Purchaser in possession or control of, all of the rights, properties, assets and businesses intended to be sold, transferred, conveyed, assigned and delivered hereunder, or to assist in the collection of any and all such rights, properties and assets or to enable Purchaser to exercise and enjoy all rights and benefits of Seller with respect thereto.

15620508

██████
**DEFINITIONS**

10.1  <u>Certain Definitions</u>.  The following terms, when used herein, shall have the respective meanings set forth below:

***"Affiliate"*** means, with respect to any Person, (i) any other Person directly or indirectly Controlling, Controlled by or under common Control with, such Person, (ii) any other Person that owns or Controls 10% or more of any class of equity securities (including any equity securities issuable upon the exercise of any option or convertible security) of such Person or any of its Affiliates, (iii) any director, partner, member, officer, manager, agent, employee or relative of such Person, or (iv) any alter ego of such Person.

***"Agreement"*** has the meaning set forth in the preamble hereto.

***"Assigned Intellectual Property"*** has the meaning set forth in <u>Section 1.1(a)(i)</u>.

***"Assigned Inventory"*** has the meaning set forth in <u>Section 1.1(a)(iii)</u>.

"***Assigned Licenses***" has the meaning set forth in <u>Section 1.1(a)(vi)</u>.

***"Assignment of Intellectual Property"*** has the meaning set forth in <u>Section 2.2(a)(ii)</u>.

***"Assigned Personal Property"*** has the meaning set forth in <u>Section 1.1(a)(ii)</u>.

***"Assigned Studies"*** has the meaning set forth in <u>Section 1.1(a)(v)</u>.

***"Bankruptcy Case"*** has the meaning set forth in the recitals hereto.

***"Bankruptcy Code"*** has the meaning set forth in the recitals hereto.

***"Bankruptcy Court"*** has the meaning set forth in the recitals hereto.

***"Bill of Sale"*** has the meaning set forth in <u>Section 2.2(a)(ii)</u>.

***"Business Day"*** means any day other than Saturday, Sunday or any day on which banks in Texas are required or authorized to be closed.

***"Cash Payment"*** has the meaning set forth in <u>Section 1.3(a)</u>.

***"Claims"*** shall mean all claims, causes of action, choses in action, rights of recovery and rights of set-off of whatever kind or description against any Person arising out of or relating to the Purchased Assets, the business of Seller or relating to Seller.

***"Closing"*** has the meaning set forth in <u>Section 2.1</u>.

***"Closing Date"*** has the meaning set forth in <u>Section 2.1</u>.

17

"*Connecticut Families*" means Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash.

"*Contract*" means any contract, agreement, indenture, note, bond, instrument, lease, conditional sales contract, mortgage, license, franchise agreement, concession agreement, insurance policy, security interest, guaranty, binding commitment, purchase order or other agreement or arrangement, whether written or oral.

"*Control*" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"*Deposit*" has the meaning set forth in <u>Section 1.3(a)</u>.

"*Distributable Proceeds Waiver*" means, in accordance with the Sale Order and on the terms set forth herein,  the commitment by the Connecticut Families to forgo the Distributable Proceeds Waiver Amount and the assignment of the Distributable Proceeds Waiver Amount to the Trustee for the benefit of all other unsecured creditors of FSS.

"*Distributable Proceeds Waiver Amount*" means the amount set forth in the Sale Order.

"*Effective Time*" means 12:01 a.m. Houston, Texas time on the Closing Date.

"*Encumbrance*" means any lien (statutory or otherwise), claim (as defined in Section 101(5) of the Bankruptcy Code), hypothecation, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), or similar interests, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest or other right, in favor of a third party or a Seller, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"*Excluded Assets*" has the meaning set forth in <u>Section 1.1(b)</u>.

"*Excluded Liabilities*" has the meaning set forth in <u>Section 1.2(b)</u>.

"*Governmental Authority*" means any government or political subdivision thereof, any governmental entity, quasi-governmental entity, administrative agency, department, commission, board, authority, division, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, municipal, local or foreign.

"**Governmental Order**" means any Law, judgment, injunction, decree, stipulation or determination issued, promulgated or entered by or with any Governmental Authority of competent jurisdiction.

"**Intellectual Property**" means all worldwide intellectual property rights, registered or unregistered, including any (i) trademarks, service marks, trade dress, logos, labels, advertising and package design, trade names, corporate names and domain names, the goodwill associated therewith, and any registrations and applications for registration thereof, (ii) copyrights, and any registrations and applications for registration thereof, including copyrights in any Software, (iii) URLs, domain names, and Internet web sites; (iv) trade secrets and confidential business information (whether patentable or unpatentable and whether or not reduced to practice), know-how, research and development information, Software, drawings, specifications, designs, plans, proposals, technical data, bills of materials, copyrightable works, financial marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, (vi) copies and tangible embodiments thereof (in whatever form or medium), (vii) licenses granting rights with respect to any of the foregoing; and (viii) registrations and applications for registration with respect to any of the foregoing.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, any successor statute thereto and the rules and regulations promulgated thereunder.

"**Law**" means any statute, law (including common law), decree, permit, License, ordinance, order, regulation, rule, code or requirement of any Governmental Authority.

"**Licenses**" shall mean any of the licenses, permits, certificates, exemptions, registrations, and other authorizations necessary or proper for the use or operation of the Purchased Assets.

"**Permitted Encumbrances**" means Liens for Taxes, assessments or other similar charges not yet due and payable.

"**Person**" means any individual, general or limited partnership, firm, corporation, limited liability company, association, trust, unincorporated organization, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the recitals hereto.

"**Purchase Price**" has the meaning set forth in Section 1.3(a).

"**Purchased Assets**" has the meaning set forth in Section 1.1(a).

"**Purchaser**" has the meaning set forth in the preamble hereto.

"**Sale Order**" means an order of the Bankruptcy Court approving this Agreement and the Distributable Proceeds Waiver pursuant to sections 105, 363, and 365 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to Purchaser, the Connecticut Families and the Trustee.

"**Seller**" has the meaning set forth in the preamble hereto.

"**Software**" means computer programs, including any and all software implementations or algorithms, module and methodologies whether in source code, object code or other form, databases and compilations, including any and all data and collections of data, descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing and all documentation, including user manuals and training materials related to any of the foregoing, used in the business of Seller or relating to the Intellectual Property.

"**Subsidiary**" means, with respect to any Person, any corporation, general or limited partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries) owns or controls (by contract or otherwise), directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are (a) generally entitled to vote for the election of the board of directors or other governing body of such legal entity or (b) generally entitled to share in the profits or capital of such legal entity.

"**Tax**" means any federal, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding), together with any interest, penalties (civil or criminal), additions to or additional amounts imposed by, any Governmental Authority with respect thereto.

"**Tax Return**" means a report, return or other information required to be supplied to a Governmental Authority with respect to any Tax.

"**Termination Date**" has the meaning set forth in Section 8.1(b).

"**Trustee**" has the meaning set forth in the recitals hereto.

"**Update**" has the meaning set forth in Section 5.7.

"**Winddown Order**" has the meaning set forth in the recitals hereto.

10.2    Interpretation.    For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders, (ii) references herein to "Articles," "Sections," "subsections" and other subdivisions without reference to a document are to the specified Articles, Sections, subsections and other subdivisions of this Agreement, (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions within a Section or subsection, (iv) the words "herein," "hereof," "hereunder," "hereby" and other words of similar import refer to this Agreement as a whole and not to any particular provision, (v) the words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation", (vi) the word "or" shall not be exclusive, (vii) all references to any period of days (other than references to a period of "Business Days") shall be deemed to be to the relevant number of calendar days, and (viii) all references to "$" shall be deemed to mean U.S. dollars.

20

[**SIGNATURE PAGES TO FOLLOW**]

21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

---

**PURCHASER:**

_____

_____

Name: _____

Title: _____

---

**SELLER:**

FREE SPEECH SYSTEMS LLC AND CHRISTOPHER R. MURRAY ON BEHALF OF THE BANKRUPTCY ESTATE OF ALEXANDER E. JONES

_____

Name: Christopher Murray
Title:  Solely in his capacity as Chapter 7 Trustee for the Bankruptcy Estate of Alexander E. Jones

---

**EXHIBIT A**
**FORM OF BILL OF SALE**

**BILL OF SALE**

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Free Speech Systems LLC, a Texas limited liability company ("***FSS***"), and Christopher R. Murray, as Chapter 7 Trustee of the Bankruptcy Estate of Alexander E. Jones (together with FSS, the "***Seller***"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to _____, a _____ ("***Purchaser***"), all of its right, title, and interest in and to the Purchased Assets, as such term is defined in the Asset Purchase Agreement, and any other tangible personal property included in the Purchased Assets, dated as of _____ (the "***Purchase Agreement***"), by and between Seller and Purchaser, to have and to hold the same unto Purchaser, its successors and assigns, forever.

Purchaser acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

(*Signature page follows*)

- 2 -

15620508

IN WITNESS WHEREOF, Purchaser and Seller have duly executed this Bill of Sale as of
_____.

**SELLER**:

**FREE SPEECH SYSTEMS LLC
AND CHRISTOPHER R. MURRAY
ON BEHALF OF THE
BANKRUPTCY ESTATE OF
ALEXANDER E. JONES**

By:_____
_
Name: Christopher Murray

Title: Solely in his capacity as Chapter
7 Trustee for the Bankruptcy Estate of
Alexander E. Jones

**PURCHASER**:

**WAR IS OVER, LLC**

_____

By:_____
_
Name: _____

Title: _____

15620508

**EXHIBIT B**

**ASSIGNMENT OF INTELLECTUAL PROPERTY**

This Assignment of Intellectual Property (this "***Agreement***"), is entered into as of _____, by Free Speech Systems LLC, a Texas limited liability company ("***FSS***"), and Christopher R. Murray, as Chapter 7 Trustee of the Bankruptcy Estate of Alexander E. Jones (together with FSS, the "***Assignor***"), and War is Over LLC, an Illinois Limited Liability company (the "***Assignee***"), pursuant that certain Asset Purchase Agreement, by and between the Assignor and the Assignee, dated _____ (the "***Purchase Agreement***"). The Assignor and the Assignee are each referred to individually as "***Party***," and collectively as "***Parties***."

The Assignor and the Assignee desire to ensure that the Assignee is the sole owner of all right, title and interest in, to and under all Assigned Intellectual Property (as defined in the Purchase Agreement).

In consideration of the mutual promises contained in this Agreement and the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Definitions.  Capitalized terms used in this Agreement but not defined herein have the meaning given to them in the Purchase Agreement.

2.      Assignment.  The Assignor hereby, absolutely and unconditionally, conveys, sells, assigns, transfers, grants and sets over unto the Assignee, all of such Assignor's worldwide rights, title and interest and benefit in and to the Assigned Intellectual Property owned by such Assignor and related to or associated with the business of the Assignor, including without limitation all common law rights for which no applications of or registrations exist, all applications to register any of the Assigned Intellectual Property Rights, and all registrations that have been or may be granted for any of the Assigned Intellectual Property Rights set forth on Schedule 1 to this Agreement, together with all rights of action, both at law and in equity with respect thereto, including without limitation all rights to sue, settle any claim, and collect all damages for any past, present, or future infringement or misappropriation of such Assigned Intellectual Property, including without limitation the goodwill of the businesses connected to the use of any of such Assigned Intellectual Property, the same to be held and enjoyed by the Assignee, its successors and assigns forever, as fully and entirely as the same could have been held and enjoyed by the Assignor if this sale had not been made and the Assignee does hereby accept such sale, assignment, transfer, grant, conveyance and set over.

3.      Warranties.     Each Party represents, warrants, and covenants to the other Party that: (i) such Party has the full power, authority and legal right to enter into and perform this Agreement; and (ii) this Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.

4.      Recordation. The Assignor authorizes and requests the U.S. Patent and Trademark Office, or any foreign equivalent thereto, and any other Governmental Authority (as defined in the

- 5 -

Purchase Agreement), to record the Assignee as owner of the Assigned Intellectual Property and of the entire title and interest in, to and under the same, for the use and enjoyment of the Assignee, its successors, assigns and other legal representatives.

5.    <u>Cooperation</u>.  The Assignor hereby covenants and agrees that it will communicate to the Assignee, its successors, legal representatives and assigns, any material facts (including, but not limited to, information relating to use or non-use, enforceability, or infringement of the Assigned Intellectual Property) known to it with respect to the Assigned Intellectual Property and testify in any legal proceeding, sign all lawful papers, execute all applications (including, but not limited to, powers of attorney, specific assignments, transfers and assurances), make all rightful oaths and use its reasonable best efforts at the request of the Assignee to aid the Assignee, its successors, legal representatives and assigns in obtaining and enforcing protection for such Assigned Intellectual Property and in enjoying the full benefits thereof.  The Assignor hereby constitutes and appoints the Assignee the true and lawful attorney of the Assignor to act as the Assignor's attorney-in-fact solely for the purpose of executing any documents and taking all necessary steps to cause the Assignor to perform any of its obligations set forth in this Agreement.

6.    <u>Further Assurances</u>.

a.    Assignor hereby agrees to execute and deliver such other documents and to take all such other actions (at Assignee's cost) which Assignee, its successors and/or assigns may reasonably request to effect the terms of this Assignment, and to execute and deliver any and all affidavits, testimonies, declarations, oaths, samples, exhibits, specimens and other documentation as may be reasonably required to effect the terms of this Assignment and its recordation in relevant state and national trademark offices.

b.    Assignor hereby irrevocably designates and appoints Assignee and its duly authorized officers and agents as Assignor's agent and attorney-of-record, coupled with an interest and with full power of substitution, to act for and on Assignor's behalf and instead of Assignor, to execute and file any such document or documents and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by Assignor, including the power to insert on this Assignment any further identifying information describing the parties or the marks listed in Schedule I hereto, that may be necessary or desirable in order to comply with the rules of the United States Patent and Trademark Office, or rules of other entities including but not limited to United States or foreign governments or patent and trademark offices, for recordation of this document.

7.    <u>Future Use of the Assigned Intellectual Property</u>.  After the Effective Date, Assignor agrees to make no further use of the Assigned Intellectual Property or use any domain names, social media handles or any marks confusingly similar thereto, anywhere in the world, and Assignor agrees to not challenge Assignee's use or ownership, or the validity, of the Assigned Trademarks. Assignor hereby acknowledges and agrees that from and after the date hereof, the Assignee shall be the exclusive owner of the Assigned Intellectual Property.

8.    <u>No Waiver</u>.  The failure of any party to enforce any terms or provisions of this Assignment shall not waive any of its rights under such terms or provisions. This Assignment shall bind and inure to the benefit of the respective parties and their assigns, transferees and successors.

15620508

9.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

10.    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

11.    Governing Law. This Agreement and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

12.    Entire Agreement; Modification.  This Agreement and the Purchase Agreement constitute the entire agreement between the parties concerning the subject matter hereof.  This Agreement replaces and fully supersedes any prior verbal or written understandings, communications, or representations between the parties.  This Agreement will not be modified except by a subsequently dated written amendment signed by a duly authorized representative of each party.

13.    Severability.  If any provision of this Agreement is held to be illegal or unenforceable, such provision will be limited or eliminated to the minimum extent necessary so that the remainder of this Agreement will continue in full force and effect and enforceable.

*(Signature page follows)*

- 7 -

IN WITNESS WHEREOF, the Assignors and the Assignee have executed this Agreement as of the day and year first above written.

| ASSIGNOR: |
| --- |
| FREE SPEECH SYSTEMS LLC AND CHRISTOPHER R. MURRAY ON BEHALF OF THE BANKRUPTCY ESTATE OF ALEXANDER E. JONES |
| _____ |
| Name:  Christoper Murray<br>Title: Solely in his capacity as Chapter 7 Trustee for the Bankruptcy Estate of Alexander E. Jones |
| ASSIGNEE: |
| WAR IS OVER LLC<br>_____ |
| _____ |
| Name:<br>Title: |
| |

**SCHEDULE 1.1**

**Offering Memorandum**

# Offering Memorandum

### Intellectual Property
### Production Equipment

Chapter 7 Bankruptcy, Case No. 22-33553

# ALEXANDER E. JONES

## FREE SPEECH SYSTEMS  INFOWARS

# SEALED BID OFFERING

October 11, 2024

| STRATEGIC | CREATIVE | COLLABORATIVE |
|-----------|----------|---------------|

Sales Agent, on behalf of Trustee, makes every effort to provide accurate information; however in no way is accuracy of the information provided guaranteed. Prospective Buyer shall bear full responsibility and burden for due diligence regarding the Assets offered for sale and to confirm the accuracy of any provided information. Prospective Buyers are recommended to inspect all Assets and perform their own due diligence. Any decision to purchase or not to purchase is the Prospective Buyer's sole and independent decision and at Prospective Buyer's sole risk. No recourse or cause of action will lie against Trustee or Sales Agent should purchaser become dissatisfied with its decision at a later date. No broker or co-broker commissions shall be paid by Trustee or Sales Agent.



720-704-5421 | 360assetadvisors.com



**ALEXANDER E. JONES** | **FREE SPEECH SYSTEMS** | **INFOWARS** | Offering Memorandum





Multiple Purchase Opportunities for Production Rights, Web Traffic, Social Media, E-Commerce Business, or Bid on the Entire Asset Pool

Infowars Archival Library & Production Rights

Social Media Accounts w/ over 1M Followers

Health, Wellness and Preparedness E-Commerce Site

100's of Domain Names

Approx. 7,000 sq. ft. of Production Facility Equipment

| OFFERING | BID FORM | TERMS |

# Important Notes



This packaging and offering is intended for parties interested in either i) a purchase of one or more of the intellectual property lots offered individually, or ii) a purchase of Intellectual property along with a subset of production equipment.  A separate piecemeal auction of the production facility assets (if not sold thru this offering) and other personal property (i.e. vehicles, gym equipment, etc.), is scheduled to take place on December 10.  For more information go to 360Bid.sale.

Also note that any party bidding on intellectual property and production equipment assets with the interest and intention of continuing operations of the Infowars operation from its current facility must make necessary arrangements with the facility landlord.  Bids submitted shall assume that the bidder does not require use of the facility, or has made necessary arrangements for future occupancy, and shall therefore not be contingent upon such arrangements.

This document is subject to updates, revisions and corrections.

# Offering Summary



| ASSETS | Lot 1 - Infowars Production | Page 5 |
|---|---|---|

**ASSETS**

Lot 1 - Infowars Production
- Production Rights & Materials
- Domain Names
- Social Media Accounts
- Podcast Sites
- Newsletter Subscribers
- Production Equipment (Optional)

Lot 2 - Infowars Store
- Product Trademarks
- Domain Names
- E-Commerce Platform
- Product Vendor Contacts
- Associated Customer Lists

Lots 3
- 100's of Domain Names (not otherwise included with Lots 1 & 2)

*Page 5*

**TURNKEY OPPORTUNITY**

This is an asset sale of various lots of intellectual property, which may be bid upon individually or in various combinations.  Should a bidder be interested in continuing to operate the Infowars business from where it currently operates, this bid package provides an option to include production specific equipment in the bid.  However, please note that any arrangements to continue occupancy at the production facility must be arranged by buyer prior to its bid, as all bids are considered irrevocable and without contingency.  For more information regarding the following, please go to the data room or contact ThreeSixty.
- Building Management Contact Information
- Management Team Interview

*Page 8*

**PRODUCTION EQUIPMENT**

The production equipment necessary to continue operations on-site is located in approximately 7,000 sq ft of office space at the Infowars facilities.  In the event a bidder is interested in negotiating lease terms and remaining on-site, this equipment may be included in the offer.  A list of equipment and photographs can be found in the data room.  Equipment only offers will not be entertained through this offering.  Equipment remaining after the sealed bid process will be sold at online auction on December 10.

*Page 9*

OFFERING | BID FORM | TERMS

**ALEXANDER E. JONES** | FREE SPEECH SYSTEMS | *INFOWARS* | Offering Memorandum

# Offering Summary



| BID FORM | 1 | ANY AND ALL OFFERS MUST BE SUBMITTED USING THE FORM IN THIS PACKAGE AND SHALL BE SUBJECT TO THE TERMS DEFINED HEREIN AND HIGHLIGHTED BELOW; | Page 10 |
| | 2 | OFFERS MUST BE RECEIVED BY FRIDAY, NOVEMBER 8, 2024 AT 2 PM CST; HOWEVER, TRUSTEE RESERVES THE RIGHT TO AMMEND DATES AT ITS SOLE DISCRETION; | |
| | 3 | BIDS MUST BE ACCOMPANIED BY A 10% DEPOSIT PAYABLE TO THE TRUSTEE ALONG WITH PROOF OF FINANCIAL ABILITY TO CLOSE. | |
| | | See Bid Form Provided within this Package | |

| TERMS | TERM HIGHLIGHTS | Page 11 |
| | - Trustee reserves the right to accept or reject any offer. In the event an offer is accepted, it shall be subject to overbid and US Bankruptcy Court approval. Trustee may evaluate offers against other bulk offers, as well as anticipated revenues from a piecemeal sale of the production assets. | |
| | - Buyer is responsible for any costs associated with transfer of ownership; | |
| | - In the case of intangible property, right, title and interest in the Assets is being offered, whereby Buyer shall be granted the rights to any of debtor's intellectual property subject to Buyer's own discovery and responsibility for transfer and associated transfer costs; | |
| | - The Assets are being sold "As-Is" without warranty or guarantee of title. Neither Trustee nor Auctioneer make any representations or warranties regarding the Assets and all Assets are sold by Trustee and Auctioneer without any corresponding grant of rights or clearance from any third parties. Buyer is responsible to conduct its own due diligence and rely on its own discovery. This Offering Memorandum reflects the Trustee's understanding of the Assets that are part of the Debtor's bankruptcy estate and that the Trustee has authority to sell, provided however that while the Sale Order provides that the Assets may be sold free and clear of all liens, claims, charges, encumbrances and interests, ownership of certain Assets, the authority to sell certain Assets, or the ability of a buyer to take certain Assets may be contested by other parties.; | |
| | - Bids shall be in US dollars on a cash basis and shall be irrevocable and non-contingent. | |
| | - Deposits and payments are due in the form of wire transfer only; | |
| | See Section "Bid Process & Terms" which combined with above and the terms in the Sale Order and any terms included in an applicable asset purchase agreement between the parties represent the complete Terms of Sale. However, if there is a conflict between these terms and the Order, the Order controls. | |

**ALEXANDER E. JONES** **FREE SPEECH SYSTEMS** **INFOWARS** | Offering Memorandum

# Lot 1 – Infowars Production Assets



- Production Rights, Archives and Materials
- Trademark
  - Infowars
- Domain Names
  - Infowars.com, net, .org
  - Banned.video
  - Over (100) Additional domains pointing to Infowars.com
    and banned.video (excluding InfowarsStore related domains)
- Social Media Accounts

  *Including Access Credentials for Accounts for InfoWars, Banned.Video & The War Room on:*
  - X, Telegram, Gab, Gettr And Others
- Podcast Sites

  *Including Access Credentials for Accounts for InfoWars, Banned.Video, The War Room, Sunday Night Live, The American Journal, Others on:*
  - Spreaker, iHeart Radio, Castbox, Deezer, Podcast Addict, TuneIn And Others
- Newsletter Subscribers
  - Sendy Account with approximately 228,000 Active Subscriber
- Historical Revenues
  - Infowars revenue was largely generated through the InfowarsStore based on the show's promotion of the site.
  - In addition, the company did sell some advertising generating approx. 800k – 900k per year; this revenue is not based on any transferable contracts and thus represents historical data only, not an indicator or guarantee of future income.

- Production Equipment [Optional] – Allocated Value Must be Provided on Bid Form

  *Equipment List and Photos to be Provided in the Dataroom, and to include only those assets within the Infowars Studio Suites as broadly described below (Office suites, gym and vehicles not to be included in this offering)*

*Information is based on company provided financials; data has not been verified by Auctioneer or Trustee, and provides no guarantee or warranty of future sales.

| OFFERING | BID FORM | TERMS |

ALEXANDER E. JONES  FREE SPEECH SYSTEMS  INFOWARS  |  Offering Memorandum

Page 6

# Lot 2 – InfowarsStore.com



- Trademarks
    - Infowars Life
    - (15) Product Trademarks including: Bodease, Survival Shield X-2, The Real Red Pill, DNA Force and others
- Domain Names
    - InfowarsStore.com
    - Over (30) Additional related domain names
- E-Commerce Site (Hosted on Magento.com Platform)*

*The following data was generated from the company's e-commerce platform, Magento. Note that company financials do not reconcile precisely with these sales, but rather show revenue of 10-12% less. Company states that this discrepancy is based on: i) returns that are not reflected in the e-commerce site, and ii) merchant and processing fees that are netted out of sales before being booked into the accounting system.. Figures have been rounded.*

- 2024 (thru 9/30/24)
    - Sales                                              $22,400,000
    - Orders                                            181,300
    - Returning : New Customer Sales      $14.6M : 7.7M
    - Customer Transactions                   46,000
- 2023
    - Sales                                              $35,000,000
    - Orders                                            283,900
    - Returning : New Customer Sales      $24.4M : 10.6M
    - Customer Transactions                   60,000
    - Over 400,000 Past and Active Customers and Associated Order History dating back to 2015
- Vendor Lists
    - Vendor Contacts, Contracts, and Order History
    - Company sells a combination of purchased products and consigned products
- Remaining Inventory – Allocated Value Must be Provided on Bid Form

*An inventory list will be provided in the dataroom. Bidder must provide an allocation of bid price to the inventory, which will be used as a basis for any adjustments in inventory levels between the bid and closing.*

*Information is based on data from the company's e-commerce site; data has not been verified by Auctioneer or Trustee, and provides no guarantee or warranty of future sales.

| OFFERING | BID FORM | TERMS |
|---|---|---|

**ALEXANDER E. JONES** **FREE SPEECH SYSTEMS** **INFOWARS**  |  Offering Memorandum

# Lot 3 Domain Names



*The company's remaining domain names – those not related to or pointing to Infowars.com or infowarsstore.com – will be offered as a single lot. The following is a sampling of domains; A full listing domains can be found in the data room.*

Approx.. (280) Domains (not designated to another lot) | Approx. 37 pending expiration in October/Early November

- realcoffeeparty.com
- theinfowarrior.com
- dontbegoogle.com
- theendofus.com
- evilcities.com
- radioviewer.com
- myprivacyshop.com
- supersurvivalstore.com
- literallyridiculous.com
- memebrew.com
- memekitchin.com
- nextnewsmedia.com
- postnewsera.com
- action7.news
- newsguardwatch.org
- summitnews.store
- endgamefilm.com
- whatisendgame.com
- prisonplanet.tv
- prisonplanetnews.org
- conspiracyfact.info

| OFFERING | BID FORM | TERMS |

Case 22-33553 Document 951-1 Filed in TXSB on 11/06/24 Page 127 of 159

# Turnkey Opportunity



A purchase of all available Lots including Production Equipment, and along with a building lease and retention of key facility personnel may provide for a quick turnkey purchase opportunity of Infowars. The following information is provided to assist a Buyer to facilitate a turnkey purchase; however, cannot be deemed as contingencies for a sale of the Assets.

**FACILITY LEASE**

Infowars occupies production offices and studios in Austin, Texas. Buyer must secure its arrangement with the building sufficient to submit a non-contingent bid on the Assets. Arrangements for building access must be negotiated between bidder and the building management. Building Management contact information can be provided upon request.

**MANAGEMENT TEAM**

Interviews with company management may be arranged by ThreeSixty upon request and Trustee approval. Please contact us to coordinate such introductions.

Case 22-33553 Document 951-21 Filed in TXSB on 11/05/24 Page 128 of 155

**ALEXANDER E. JONES** FREE SPEECH SYSTEMS **INFOWARS** | Offering Memorandum

# Production Equipment



The Infowars facilities currently occupy two distinct sections of the same building.  As noted above, any party interested in maintaining operations at the site must make separate and non-contingent arrangements for future access with the property managers.  For purpose of this offering, only the equipment located in the portion of the building used for the Production is being made available for purchase along with a bid on Lot 1.  No bids are being considered for production equipment separate from a bid on Lot 1.  The following is a sampling of images from the production facility.  Additional photos and a listing of equipment is located in the data room.















OFFERING BID FORM TERMS

**ALEXANDER E. JONES** FREE SPEECH SYSTEMS INFOWARS | Offering Memorandum

# Bid Form | Bid Deadline: November 8, 2024 @ 2 pm CST



| | | | |
|---|---|---|---|
| Buyer Name | | Buyer Company | |
| Phone 1 | | Phone 2 | |
| Address | | City | |
| State/Zip | | Email | |
| Partner * | | | |

*Any party with a vested interest in the purchase must be disclosed

| LOT | Group ('x') | LOT BID | Intellectual Property Allocation | Equipment/Inventory Allocation |
|---|---|---|---|---|
| **Lot 1 Production** \| Note Equipment Allocation if Applicable | ☐ | $ | $ | $ |
| **Lot 2 E-Commerce** \| Note Inventory Allocation if Applicable | ☐ | $ | $ | $ |
| **Lot 3 Domains** \| Approximately 280 Domains | ☐ | $ | | |
| *If your bid for any lots are contingent upon other lots, please indicate which lots are to be grouped together by placing an 'x' in the Group column above.* | | | | |

*Trustee reserves the right to accept or reject any non-conforming bid.

| **Please Email Bids to the Following Parties (if you prefer to mail, please see the Sale Order & Procedures Posted to the website for a list of address.** |
|---|
| jeff@360assetadvisors.com, ktoney@tranzon.com, edurnil@tranzon.com, jwolfshohl@porterhedges.com, mdearman@porterhedges.com, erin.jones@jonesmurray.com |

I hereby submit my bid for the Packages above in accordance with the terms and conditions of this bid package.

| 10% Deposit Amount Submitted | $ |
|---|---|
| Form of Payment Accepted | Wire Transfer Only |

X _____

Name:

Title:

Date:

| Auctioneer Use Only: | |
|---|---|
| Received Date | |
| Received By | |

| OFFERING | BID FORM | TERMS |
|---|---|---|

# Bid Process & Terms



The following terms are subject in all respects to the Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC [Case No. 22-33553 (CML), Bankr. S.D. Tex., Docket No. 859] (the "Order"). If there is a conflict between these terms and the Order, the Order controls.

1. **Sealed Bid Sale.** All Property is being offered through a sale process referred to herein as a sealed bid offering ("Sealed Bid"), wherein interested parties ("Recipient", "Buyer", "Bidder") are being asked to submit offers to the Sales Agent ("Sales Agent", "Auctioneer") for the right, title and interest in certain intellectual, intangible and/or personal property ("Assets") for consideration by the Seller ("Seller", "Trustee", "Estate"). The Trustee reserves the right to accept or reject bids, evaluate offers compared to other offers received and/or projected revenues from a piecemeal auction, and open up the Sealed Bid for live bidding between competitive bidders ("Auction"). The Sealed Bid and any subsequent auction shall be referred to as the Bid Process as is further defined herein, and all bids submitted to Sales Agent are subject to the terms and conditions specified below.

2. **Bid Deadline.** All bids must be submitted to Sales Agent on or before 2:00 p.m. CST, Friday, November 8, 2024 ("Bid Deadline"). Bids received after the Bid Deadline may not be considered, as determined in Trustee's sole discretion. This deadline does not in any way limit the Trustee's right to extend the deadline.

3. **Required Bid Information.** All bids submitted to Sales Agent must include the following:
   i. Properly completed and signed Bid Submittal Form in adherence to the terms and instructions
   ii. Receipt of a 10% deposit (the "Deposit") in the form and amount as defined below
   iii. Proof of financial capacity to close in a form deemed acceptable by Trustee

4. **Deposits.** All bids must be accompanied by a deposit of ten percent (10%) of bidder's total bid. Deposits must be submitted to the Trustee in the form of a wire transfer. After the conclusion of the Sealed Bid or Auction, as applicable, the deposits of the high bidder ("High Bidder") and next highest bidder ("Back-up Bidder"), for each lot, will be held by Trustee until the closing of the Sale transaction. If Trustee closes with the High Bidder, the High Bidder's deposit will be credited towards the final purchase price. If the High Bidder does not close, it forfeits its deposit and the Trustee will close with the Back-up Bidder and its deposit will be credited towards the purchase price. If Trustee closes with the High Bidder, the Trustee will return the full deposit to the Back-up Bidder within five (5) business days. The deposits of any and all other bidders at the Auction or any party whose bid has been rejected will be returned in full within five (5) business days after rejection or otherwise the completion of the Bid Process.

5. **Due Diligence.** All prospective Bidders are responsible to perform their own due diligence prior to submitting their bid. For additional information, interested Bidders may contact Jeff Tanenbaum at jeff@360assetadvisors.com, or by calling +1-720-704-5421.

6. **Notice.** Bidders may be advised by notice(s) of additions, deletions or alterations in any document forming a part of the Sealed Bid Package any time prior to the Bid Deadline. Such revised documents will be available to prospective Bidders.

7. **Submission of Bid.** Except as otherwise permitted by this Sealed Bid Package, all bids submitted must be unconditional and without alteration to the Bid Form. Any bid conditioned upon any change in any of the documents provided in the Sealed Bid Package, either by way of addition or deletion, may be summarily rejected by Trustee, in its sole discretion. All Bidders must complete, execute and return to Sales Agent the Bid Submittal Form, executed by the Bidder together with the required Deposit before any bids will be considered.

8. **Bids Are Irrevocable.** By submitting a bid, the Bidder is making an irrevocable offer to purchase the Assets bid upon. The Bidder acknowledges and agrees that by submission of its bid, it is accepting the terms and conditions set forth in these Instructions. Upon submission of a bid, the offers contained therein are irrevocable.

# Bid Process & Terms | Cont'd



9. Notification. Sales Agent and Trustee will review all bids received by the Bid Deadline. If Sales Agent and Trustee determine that one or more qualified bids are competitive in nature ("Qualified Bid(s)"), the Sales Agent and Trustee reserve the right to convert the Sealed Bid to an Auction between Qualified Bidders. Qualified Bidders will be notified within 72 hours of the Sealed Bid deadline. If Sales Agent and Trustee determine that no Auction will be held, the Sales Agent and Trustee will determine whether or not any Qualified Bids will be accepted or rejected.

10. Auction. If an Auction is held, it will take place on November 13, 2024 at 10:30am CT (unless announced otherwise). Only Qualified Bidders and advisors will be allowed to participate in the Auction. The highest bid or bid combination, as determined by Sales Agent and Trustee, will be the lead bid at the Auction. The Auction will open at the highest bid amount. Qualified Bidders will be allowed to overbid in minimum bid increments as determined by Sale Agent at the time of Sale. Sales Agent shall moderate the auction process, which allows the opportunity for it to present any and all competitive bid options, which may include lot combinations, as well as the cash equivalent of anticipated sales from a piecemeal auction the Production Equipment lot. The Auction will conclude once the highest bid and next highest bid have been awarded, rejected or held subject to further consideration.

11. Bankruptcy Court Approval. If one or more bids are awarded by the Trustee, whether before or as a result of an Auction, the Trustee is authorized to proceed to close the Sale, and the Sale is not subject to further approval by the Bankruptcy Court.  The Trustee must, however, file a notice of successful bidder(s) with the Court following the award of bid(s).  Be advised there is some risk that the Sale may nevertheless be subject unforeseen objections by interested parties

12. Closing and Final Payment. Bidder will be responsible for payment in full to the Trustee within five (5) business days of bid award or at such later date as may mutually be agreed by the Trustee and the respective winning bidder(s) ("Closing Date").  Sales Agent shall provide Bidder with an Invoice and wire instructions, reflecting the bid amount, the buyers' premium and sales tax.  Should any of the lots be subject to a Purchase Agreement, such Purchase Agreement will be posted to the data room prior to the Sealed Bid closing date, and the winning bidder shall be responsible to execute such Purchase Agreement upon the award of bid.

13. Sales Tax.  Local sales tax requirements will apply to all sales will be applied to the final purchase price where applicable.

14. Receipt of Intangible Property.  Bidder shall be the sole party responsible to facilitate the transfer of intellectual property rights, provided however, that Sales Agent or Trustee shall provide or obtain necessary signatures on documents as requested by Buyer to effectual legal transfers, as needed, and shall provide access credentials to accounts where noted in the data room. In such cases that intangible property is stored on computer hardware or in cloud-based servers, Trustees IT consultant will work with Bidders to facilitate the transfer of such intangible property

15. Removal of Personal Property.  This Bid Process contemplates a sale of the production equipment assets in Bulk to a Buyer removing them from the facility within 14 days of the Closing Date.  The Buyer shall be responsible to provide an insurance policy with acceptable limits naming the Trustee, Sales Agent and Building Owners as additional insured, and shall be responsible for any damage to persons or property during Asset removal.  Should the Buyer enter into a lease agreement with the building owners, it shall sign a waiver releasing the Trustee and Sales Agent from any further obligations to Personal Property fulfilment on the Closing Date.

16. System Maintenance.  Bidders acknowledge that certain assets being purchased may be subject to ongoing maintenance costs, including but not limited to webhosting, e-commerce platform, cloud-based storage sites, data backup systems, etc.  Upon the Closing Date, Bidder shall become immediately responsible to maintain such services, subject only to any transition period agreement that may be negotiated between the Parties.

# Bid Process & Terms | Cont'd



17. Inventory Adjustments.  Upon bid submittal, Bidder is asked to provide an allocation of its bid for product inventory where applicable. Bidder acknowledges that the inventory as reported in the data room may change prior to Closing. In such case, the formula for the purchase price adjustment shall be set forth in the asset purchase agreement between the parties.

18. Trademarks.  This sale may include transactions with separate buyers for the Infowars and Infowars Life trademarks, and Infowars related domain names allocated in the bid package to each lot.  Each buyer acknowledges that the terms of sale and Purchase Agreements related to each transaction will grant the other party licensure rights to use their purchased domain names and trademarks without further cost or obligation to the other party.

19. Failure to Pay. If a successful bidder fails to consummate the Sale due to a breach or failure to perform on the part of such successful bidder, then the Deposit shall be forfeited to, and retained irrevocably by, the Trustee, and may be used by the Trustee to pay the fees and expenses of the Trustee's professionals, and the Trustee specifically reserves all rights and remedies against the defaulting successful bidder, including the right to seek damages from, and/or the specific performance of, the defaulting successful bidder. In addition thereto, Sales Agent may, at its discretion, either resell Bidder's Assets without further notice to Bidder and/or dispose of the Property at the Bidders sole expense. Any difference between the bid price for Assets by the defaulting Bidder and the price received by Trustee at a resale shall be paid to Trustee by the defaulting Bidder. In addition, a defaulting Bidder shall be deemed to have granted Trustee a security interest in the Property, which Trustee shall retain as collateral security for Bidder's obligation to Trustee.

20. Financing. All transactions must be made in U.S. cash funds.  The Sale is not contingent upon the bidder securing or obtaining financing.

21. Absence of Warranties. The Bidder understands and agrees: (1) that any description or sample of the Assets given or furnished by Trustee and Sales Agent is solely for identification, and does not create any warranty expressed or implied, that the Property actually conforms to such description or sample, (2) that Bidder or agent on Bidder's behalf has inspected or has had the opportunity to inspect, all of the Assets upon which Bidder will be bidding and/or does purchase, (3) that all Assets are purchased and accepted by Bidder "AS IS", "WHERE IS" and "WITH ALL FAULTS". TRUSTEE AND SALES AGENT MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES WHATSOEVER WHETHER WRITTEN, ORAL OR IMPLIED AS TO QUALITY, QUANTITY, CONDITION, USABILITY, SALABILITY, YEAR, PERFORMANCE, OR OTHER SPECIFICATIONS, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WARRANTY AGAINST PATENT, TRADEMARK, COPYRIGHT OR TRADE SECRET INFRINGEMENT, (4) in the event there are manufacturer warranties in effect for the Assets purchased, Bidder must make all claims thereunder directly with the provider of the warranty. No statement or statements of any other paragraph herein shall be construed to in any way contradict the provisions of this paragraph.

22. Customer Lists and PII. As part of the conveyed Intellectual Properties, certain customer data may be transferred to the buyer.  Neither Trustee nor Sales Agent can guarantee buyer's rights regarding the use of such customer data which may be subject to the Company's posted privacy statements or other limitations.  In addition, under no circumstances shall any of the assets being sold imply the inclusion of personally identifiable information (PII) with regards to Company personnel, including personnel records, personal data stored on personnel computers, or historical email content.

# Bid Process & Terms | Cont'd



23. Indemnification. Bidder shall indemnify, hold harmless and defend Trustee, Sales Agent, and any professionals employed or otherwise retained by the Trustee or the Sales Agent from and against any and all losses, damages, liabilities and claims, including attorney fees, costs and expenses arising out of or based upon or resulting from, (1) any act or omission relating to or affecting the Property bid on or purchased by Bidder, (2) the claim of any third party claiming or challenging title to any Asset purchased by Bidder or claiming infringement of any proprietary interest, (3) the claim of any person resulting from offering for sale or selling the Property purchased by Bidder.

24. Limits of Liability. In no event shall Sales Agent's liability to Bidder exceed the purchase price actually paid. A Bidder's claim shall be limited to the amount paid for the Assets, and shall not extend to any obligation; risk; liability; right; claim; remedy for loss of use, revenue or profit; liability of Bidder to any third party; personal injury; or any other direct, indirect, incidental or consequential damages. Sales Agent is acting as an agent only and is not responsible for the acts of its principles.

25. Rights Reserved.  If any provision of these Terms and Conditions shall be held invalid, illegal, unenforceable or inoperative, the balance of Terms of Sale shall remain in full force and affect as if such provisions had not been included. The Bid Process and Terms with any amendments or modifications expressly made by Sales Agent constitute all the terms and conditions with respect to the sale of the Property; however Sales Agent reserves the right to modify the Bid Process and Terms, as may be necessary and shall notify Bidder accordingly.

26. The venue and jurisdiction for any dispute in this matter shall be in the United States Bankruptcy Court, Southern District of Texas.

**SCHEDULE 1.1(a)(i)**

**Intellectual Property**

| SerialNumber | Wordmark | Image | Status | GoodsAndServicesTruncated |
|---|---|---|---|---|
| 86108873 | INFOWARS | Image for 86108873 | Live | IC 038: Broadcasting of radio, internet radio, and on-line video programs.; IC 009: Digital media, namely, DVDs, high definition digital discs, and downloadable audio featuring news, current events, social commentary, political commentary, and documentaries.; IC 016: Bumper stickers; [ Magazines in the field of news, current events, social commentary, and politics; Pens; ] Stickers.; IC 024: Fabric flags.; IC 025: Hats; T-shirts.; IC 035: On-line retail gift shops.; IC 041: Entertainment services, namely, providing radio programs in the field of news, current events, social commentary, and politics via a global computer network; Entertainment services, namely, the provision of continuing programs featuring news and commentary delivered by radio and internet; Production and distribution of radio programs; Providing on-line non-downloadable articles in the field of news, current events, social commentary, and politics; Radio entertainment services, namely, radio programs featuring... |
| 87943543 | FIREPOWER RADIO | Image for 87943543 | Dead | (ABANDONED) IC 038: Broadcasting of radio programs; Broadcasting of internet radio programs; Broadcasting of downloadable audio programs; Broadcasting of on-line video programs.; (ABANDONED) IC 009: Digital media, namely, downloadable audio files featuring news, current events, social commentary, interviews, and political commentary; downloadable audio recordings featuring a continuing audio program in the field of news, current events, social commentary, interviews, and political commentary downloadable via a global computer network.; (ABANDONED) IC 041: Entertainment services, namely, providing podcasts in the field of news, current events, social commentary, interviews, and political commentary; Entertainment services, namely, providing radio programs in the field of news, current events, social commentary, interviews, and political commentary via a global computer network; Entertainment services, namely, providing webcasts in the field of news, current events, social commentary,... |
| 86108885 | PRISON PLANET | Image for 86108885 | Dead | (CANCELLED) IC 038: [ Broadcasting of on-line video programs ].; (CANCELLED) IC 041: [ Entertainment services, namely, the provision of continuing video programs featuring news, current events, social commentary, and political commentary delivered by a global computer network; Providing on-line non-downloadable articles in the field of news, current events, social commentary, and political commentary; Providing on-line publications in the nature of e-books in the field of news, current events, social commentary, and political commentary ]. |
| 87227011 | THE ALEX JONES SHOW | Image for 87227011 | Dead | (CANCELLED) IC 038: [ Broadcasting of radio and internet radio programs; Broadcasting of television programs; Broadcasting of on-line video programs; Broadcasting of downloadable audio programs ].; (CANCELLED) IC 009: [ Digital media, namely, downloadable audio files featuring news, current events, social commentary, interviews, and political commentary ].; (CANCELLED) IC 041: [ Entertainment services in the nature of production of radio and internet programs; Entertainment services in the nature of production of downloadable audio programs; Entertainment services in the nature of production of on-line video programs; Entertainment services in the nature of production of television programs; Entertainment services, namely, providing podcasts in the field of news, current events, social commentary, interviews, and political commentary; Entertainment services, namely, providing radio programs in the field of news, current events, social commentary, interviews, and political... |
| 86108879 | PRISON PLANET | Image for 86108879 | Dead | (CANCELLED) IC 035: [ Subscription to online articles, e-books, online videos, documentaries, and films featuring news, social commentary, political commentary, and current events ]. |
| 86108877 | PRISON PLANET | Image for 86108877 | Dead | (ABANDONED) IC 025: T-shirts. |

| SerialNumber | Wordmark | Image | Status | GoodsAndServicesTruncated |
|---|---|---|---|---|
| 87938971 | BODEASE | Image for 87938971 | Live | IC 005: Dietary and nutritional supplements. |
| 87939303 | ALPHA POWER | Image for 87939303 | Live | IC 005: Dietary and nutritional supplements. |
| 87943348 | HONOR ROLL | Image for 87943348 | Live | IC 005: Dietary and nutritional supplements. |
| 87943386 | HAPPEASE | Image for 87943386 | Live | IC 005: Dietary and nutritional supplements. |
| 87943414 | GUT FUSION | Image for 87943414 | Live | IC 005: Dietary and nutritional supplements. |
| 86402016 | SURVIVAL SHIELD | Image for 86402016 | Live | IC 005: Dietary and nutritional supplements. |
| 86402809 | SURVIVAL SHIELD X-2 | Image for 86402809 | Live | IC 005: Dietary and nutritional supplements. |
| 86402827 | INFOWARS LIFE | Image for 86402827 | Live | IC 005: Dietary and nutritional supplements. |
| 87939004 | POLLEN BLOCK | Image for 87939004 | Live | IC 005: Dietary and nutritional supplements. |
| 87938998 | IMMUNE WALL | Image for 87938998 | Live | IC 005: Dietary and nutritional supplements. |
| 87938991 | FLORALIFE | Image for 87938991 | Live | IC 005: Dietary and nutritional supplements. |
| 87938950 | THE REAL RED PILL | Image for 87938950 | Live | IC 005: Dietary and nutritional supplements. |
| 87938860 | ICUREN | Image for 87938860 | Live | IC 005: Dietary and nutritional supplements. |
| 87938327 | DNA FORCE | Image for 87938327 | Live | IC 005: Dietary and nutritional supplements. |
| 87943358 | EXTENDAWISE | Image for 87943358 | Live | IC 005: Dietary and nutritional supplements. |
| 87943450 | ULTIMATE FEMALE FORCE | Image for 87943450 | Live | IC 005: Dietary and nutritional supplements. |
| 86402175 | SUPER MALE VITALITY | Image for 86402175 | Dead | (ABANDONED) IC 005: Dietary and nutritional supplements. |
| 86402225 | SUPER FEMALE VITALITY | Image for 86402225 | Dead | (ABANDONED) IC 005: Dietary and nutritional supplements. |
| 87943286 | LIVING CLEANSE | Image for 87943286 | Dead | (ABANDONED) IC 005: Dietary and nutritional supplements. |
| 86402053 | FLUORIDE SHIELD | Image for 86402053 | Dead | (ABANDONED) IC 005: Dietary and nutritional supplements. |
| 87943436 | VASOBEET | Image for 87943436 | Dead | (ABANDONED) IC 005: Dietary and nutritional supplements made in whole or significant part of beets. |
| 86402820 | WAKE UP AMERICA | Image for 86402820 | Dead | (ABANDONED) IC 030: Coffee. |

Infowars Related - Included with Lot 1 Production Assets

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration St | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 90 | infowarsdata.com | com | 12 | 1 | Active | 8 years, 6 months | 2/14/25 | Active | Epik |
| 91 | infowarsdomains.com | com | 15 | 1 | Active | 3 years, 5 months | 3/24/25 | Active | Epik |
| 93 | infowarspets.com | com | 12 | 1 | Active | 1 years, 10 months | 10/19/24 | Pending | Epik |
| 97 | infowarsstream.com | com | 14 | 1 | Active | 6 years, 8 months | 12/1/24 | Active | Epik |
| 98 | infowarsteam.com | com | 12 | 1 | Active | 13 years, 9 months | 11/9/24 | Pending | Epik |
| 183 | buyinfowars.com | com | 11 | 1 | Active | 6 years, 0 months | 8/10/26 | Active | GoDaddy |
| 193 | infowarsarmy.com | com | 12 | 1 | Active | 6 years, 0 months | 8/27/26 | Active | GoDaddy |
| 194 | infowarsdefense.com | com | 15 | 1 | Active | 6 years, 0 months | 3/15/26 | Active | GoDaddy |
| 195 | infowarsdirect.com | com | 14 | 1 | Active | 6 years, 0 months | 8/10/26 | Active | GoDaddy |
| 196 | infowarselect.com | com | 13 | 1 | Active | 8 years, 11 months | 9/10/25 | Active | GoDaddy |
| 197 | infowarselects.com | com | 14 | 1 | Active | 8 years, 11 months | 9/10/25 | Active | GoDaddy |
| 198 | infowarsessentials.com | com | 18 | 1 | Active | 7 years, 6 months | 2/24/25 | Active | GoDaddy |
| 203 | infowarslifeselect.com | com | 18 | 1 | Active | 8 years, 11 months | 9/10/25 | Active | GoDaddy |
| 204 | infowarslifeselects.com | com | 19 | 1 | Active | 8 years, 11 months | 9/10/25 | Active | GoDaddy |
| 206 | infowarsnow.com | com | 11 | 1 | Active | 5 years, 11 months | 9/15/24 | Pending | GoDaddy |
| 207 | infowarsselect.com | com | 14 | 1 | Active | 8 years, 11 months | 9/10/25 | Active | GoDaddy |
| 208 | infowarsselects.com | com | 15 | 1 | Active | 8 years, 11 months | 9/10/25 | Active | GoDaddy |
| 209 | infowarssupersale.com | com | 17 | 1 | Active | 6 years, 0 months | 8/10/26 | Active | GoDaddy |
| 210 | infowarssupersales.com | com | 18 | 1 | Active | 6 years, 0 months | 8/10/26 | Active | GoDaddy |
| 231 | 1776to1984.com | com | 10 | 1 | Active | 16 years, 4 months | 4/1/25 | Active | Name |
| 234 | 1984to1776.com | com | 10 | 1 | Active | 16 years, 4 months | 4/1/25 | Active | Name |
| 237 | 911chronicles.com | com | 13 | 1 | Active | 16 years, 4 months | 4/1/25 | Active | Name |
| 261 | americakiller.com | com | 13 | 1 | Active | 15 years, 2 months | 6/28/25 | Active | Name |
| 274 | biashow.com | com | 7 | 1 | Active | 12 years, 3 months | 5/19/25 | Active | Name |
| 280 | broinarms.com | com | 9 | 1 | Active | 12 years, 3 months | 5/19/25 | Active | Name |
| 281 | brotherinarmsshow.com | com | 16 | 1 | Active | 12 years, 3 months | 5/19/25 | Active | Name |
| 282 | brotherinarmsshow.com | com | 17 | 1 | Active | 12 years, 3 months | 5/19/25 | Active | Name |
| 283 | brothersinarmshow.com | com | 17 | 1 | Active | 12 years, 3 months | 5/19/25 | Active | Name |
| 284 | brothersinarmsshow.com | com | 18 | 1 | Active | 12 years, 3 months | 5/19/25 | Active | Name |
| 291 | darkskiesconspiracy.com | com | 19 | 1 | Active | 14 years, 2 months | 6/28/25 | Active | Name |
| 351 | infowars.net | net | 8 | 1 | Active | 23 years, 7 months | 1/3/25 | Active | Name |
| 352 | infowars.org | org | 8 | 1 | Active | 20 years, 0 months | 3/8/25 | Active | Name |
| 353 | infowars.productions | productions | 8 | 1 | Active | - | 8/6/25 | Active | Name |
| 354 | infowarsart.com | com | 11 | 1 | Active | 13 years, 4 months | 4/22/25 | Active | Name |
| 355 | infowarsartilary.com | com | 16 | 1 | Active | 13 years, 4 months | 4/22/25 | Active | Name |
| 356 | infowarsartilery.com | com | 16 | 1 | Active | 13 years, 4 months | 4/22/25 | Active | Name |
| 357 | infowarsartillary.com | com | 17 | 1 | Active | 13 years, 4 months | 4/22/25 | Active | Name |
| 358 | infowarsartillery.com | com | 17 | 1 | Active | 13 years, 4 months | 4/22/25 | Active | Name |
| 359 | infowarsbabes.com | com | 13 | 1 | Active | 11 years, 5 months | 3/10/25 | Active | Name |
| 360 | infowarsbabes.net | net | 13 | 1 | Active | 11 years, 5 months | 3/10/25 | Active | Name |
| 361 | infowarscoffee.com | com | 14 | 1 | Active | 12 years, 0 months | 8/3/25 | Active | Name |
| 362 | infowarsdaily.com | com | 13 | 1 | Active | 13 years, 1 months | 7/29/25 | Active | Name |
| 363 | infowarsdefensefund.com | com | 19 | 1 | Active | 6 years, 3 months | 5/23/25 | Active | Name |
| 365 | infowarsfood.com | com | 12 | 1 | Active | 8 years, 11 months | 9/10/25 | Active | Name |
| 366 | infowarsguardian.com | com | 16 | 1 | Active | 11 years, 11 months | 8/31/25 | Active | Name |
| 369 | infowarshome.com | com | 12 | 1 | Active | 9 years, 6 months | 2/26/25 | Active | Name |
| 371 | infowarshousehold.com | com | 17 | 1 | Active | 9 years, 6 months | 2/26/25 | Active | Name |
| 372 | infowarsinsider.com | com | 15 | 1 | Active | 13 years, 2 months | 6/6/25 | Active | Name |
| 373 | infowarsinsider.net | net | 15 | 1 | Active | 13 years, 2 months | 6/6/25 | Active | Name |
| 374 | infowarsinvestigates.com | com | 20 | 1 | Active | 12 years, 5 months | 3/28/25 | Active | Name |
| 375 | infowarsinvestigations.com | com | 22 | 1 | Active | 12 years, 5 months | 3/28/25 | Active | Name |
| 376 | infowarslegalfund.com | com | 17 | 1 | Active | 6 years, 3 months | 5/23/25 | Active | Name |
| 377 | infowarslife.com | com | 12 | 1 | Active | 11 years, 0 months | 8/9/25 | Active | Name |
| 380 | infowarsmedia.com | com | 13 | 1 | Active | 6 years, 0 months | 8/6/25 | Active | Name |
| 381 | infowarsmonthly.com | com | 15 | 1 | Active | 13 years, 6 months | 2/19/25 | Active | Name |
| 382 | infowarsnews.com | com | 12 | 1 | Active | 13 years, 6 months | 2/9/25 | Active | Name |
| 383 | infowarsnews.net | net | 12 | 1 | Active | 13 years, 6 months | 2/9/25 | Active | Name |
| 384 | infowarsnewsletter.com | com | 18 | 1 | Active | 6 years, 0 months | 8/7/25 | Active | Name |
| 385 | infowarsnightly.com | com | 15 | 1 | Active | 13 years, 1 months | 7/29/25 | Active | Name |
| 386 | infowarsnightlynews.com | com | 19 | 1 | Active | 13 years, 1 months | 7/29/25 | Active | Name |
| 387 | infowarsplanet.com | com | 14 | 1 | Active | 14 years, 0 months | 8/2/25 | Active | Name |
| 388 | infowarssocial.com | com | 14 | 1 | Active | 14 years, 0 months | 8/2/25 | Active | Name |
| 389 | infowarsspecialreport.com | com | 21 | 1 | Active | 13 years, 1 months | 7/29/25 | Active | Name |
| 390 | infowarstonight.com | com | 15 | 1 | Active | 13 years, 1 months | 7/29/25 | Active | Name |
| 391 | infowarstv.live | live | 10 | 1 | Active | - | 9/12/25 | Active | Name |

FSS Domains List

Infowars Related - Included with Lot 1 Production Assets

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration St | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 392 | infowarsunited.com | com | 14 | 1 | Active | 14 years, 1 months | 7/23/25 | Active | **Name** |
| 394 | infowarsunited.org | org | 14 | 1 | Active | 14 years, 1 months | 7/23/25 | Active | **Name** |
| 395 | infowarsvod.com | com | 11 | 1 | Active | 6 years, 0 months | 8/6/25 | Active | **Name** |
| 398 | infowarsweekly.com | com | 14 | 1 | Active | 13 years, 6 months | 2/19/25 | Active | **Name** |
| 399 | infowarsworldnews.com | com | 17 | 1 | Active | 14 years, 1 months | 7/23/25 | Active | **Name** |
| 400 | infowarsworldnews.net | net | 17 | 1 | Active | 14 years, 1 months | 7/23/25 | Active | **Name** |
| 401 | infowarsworldnews.org | org | 17 | 1 | Active | 14 years, 1 months | 7/23/25 | Active | **Name** |
| 415 | newstruth.us | us | 9 | 1 | Active | 24 years, 0 months | 8/8/25 | Active | **Name** |
| 441 | planetinfowars.com | com | 14 | 1 | Active | 14 years, 0 months | 8/2/25 | Active | **Name** |
| 458 | redpillparty.com | com | 12 | 1 | Active | 11 years, 3 months | 5/15/25 | Active | **Name** |
| 471 | roadtoconspiracy.com | com | 16 | 1 | Active | 14 years, 4 months | 4/5/25 | Active | **Name** |
| 476 | secretsofsurvivalfilm.com | com | 21 | 1 | Active | 12 years, 4 months | 4/26/25 | Active | **Name** |
| 490 | theinfowarsshop.com | com | 15 | 1 | Active | 14 years, 1 months | 7/26/25 | Active | **Name** |
| 491 | theinfowarsshop.info | info | 15 | 1 | Active | 14 years, 1 months | 7/26/25 | Active | **Name** |
| 496 | theinfowarsstore.info | info | 16 | 1 | Active | 14 years, 1 months | 7/26/25 | Active | **Name** |
| 497 | theinfowarsstore.mobi | mobi | 16 | 1 | Active | - | 7/26/25 | Active | **Name** |
| 505 | theroadtoconspiracy.com | com | 19 | 1 | Active | 14 years, 4 months | 4/5/25 | Active | **Name** |
| 508 | truthisbulletproof.com | com | 18 | 1 | Active | 11 years, 3 months | 5/3/25 | Active | **Name** |
| 509 | truthmedia.us | us | 10 | 1 | Active | 24 years, 0 months | 8/8/25 | Active | **Name** |
| 511 | truthnews.us | us | 9 | 1 | Active | 24 years, 0 months | 8/8/25 | Active | **Name** |
| 519 | uberfreedom.com | com | 11 | 1 | Active | 13 years, 7 months | 1/13/25 | Active | **Name** |
| 521 | urgentradio.net | net | 11 | 1 | Active | 13 years, 6 months | 2/21/25 | Active | **Name** |
| 524 | violetblog.com | com | 10 | 1 | Active | 19 years, 5 months | 3/14/25 | Active | **Name** |
| 534 | washingtonwars.com | com | 14 | 1 | Active | 7 years, 6 months | 1/30/25 | Active | **Name** |
| 574 | infowarsmag.biz | biz | 11 | 1 | Active | 24 years, 1 months | 7/5/25 | Active | **Ionos** |
| 575 | infowarsmag.com | com | 11 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 576 | infowarsmag.info | info | 11 | 1 | Active | 12 years, 2 months | 6/7/25 | Active | **Ionos** |
| 577 | infowarsmag.net | net | 11 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 578 | infowarsmag.org | org | 11 | 1 | Active | 12 years, 3 months | 5/7/25 | Active | **Ionos** |
| 579 | infowarsmag.us | us | 11 | 1 | Active | 24 years, 1 months | 7/5/25 | Active | **Ionos** |
| 580 | infowarsmagazine.com | com | 16 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 581 | infowarsmagazine.net | net | 16 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 582 | infowarsmagazine.org | org | 16 | 1 | Active | 12 years, 3 months | 5/7/25 | Active | **Ionos** |
| 583 | infowarsnewspaper.com | com | 17 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 584 | infowarsnewspaper.net | net | 17 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 585 | infowarsnewspaper.org | org | 17 | 1 | Active | 12 years, 3 months | 5/7/25 | Active | **Ionos** |
| 594 | infowarsthemagazine.com | com | 19 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 595 | infowarsthemagazine.net | net | 19 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 596 | infowarsthemagazine.org | org | 19 | 1 | Active | 12 years, 3 months | 7/5/25 | Active | **Ionos** |
| 602 | theinfowarsmag.com | com | 14 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 603 | theinfowarsmag.net | net | 14 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 604 | theinfowarsmag.org | org | 14 | 1 | Active | 12 years, 3 months | 7/5/25 | Active | **Ionos** |
| 605 | theinfowarsmagazine.com | com | 19 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 606 | theinfowarsmagazine.net | net | 19 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 607 | theinfowarsmagazine.org | org | 19 | 1 | Active | 12 years, 3 months | 7/5/25 | Active | **Ionos** |
| 608 | theinfowarsnewspaper.com | com | 20 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 609 | theinfowarsnewspaper.net | net | 20 | 1 | Active | 12 years, 1 months | 7/6/25 | Active | **Ionos** |
| 610 | theinfowarsnewspaper.org | org | 20 | 1 | Active | 12 years, 3 months | 7/5/25 | Active | **Ionos** |
| 615 | banned.video | video | 6 | 1 | Active | 5 years, 3 months | 7/4/25 | Active | **SquareSpace** |
| 616 | ifwvideo.com | com | 8 | 1 | Active | | 5/5/25 | Active | **SquareSpace** |
| 617 | infowars.art | art | 8 | 1 | Active | | 5/8/25 | Active | **SquareSpace** |
| 620 | infowars.us | us | 8 | 1 | Active | | 4/9/25 | Active | **SquareSpace** |
| 621 | infowarsads.com | com | 11 | 1 | Active | | 2/23/25 | Active | **SquareSpace** |
| 622 | infowarsbitcoin.com | com | 15 | 1 | Active | | 3/29/25 | Active | **SquareSpace** |
| 623 | infowarsbtc.com | com | 11 | 1 | Active | | 3/29/25 | Active | **SquareSpace** |
| 627 | defendinfowars.com | com | 14 | 1 | Active | | 11/16/24 | Active | **SquareSpace** |
| 629 | ifw.cloud | cloud | 3 | 1 | Active | | 4/16/25 | Active | **SquareSpace** |
| 632 | saveinfowars.com | com | 12 | 1 | Active | | 11/16/24 | Active | **SquareSpace** |
| 636 | infowarscrypto.com | com | 14 | 1 | Active | | 3/29/25 | Active | **SquareSpace** |
| 637 | infowarsguns.com | com | 12 | 1 | Active | | 3/31/25 | Active | **SquareSpace** |
| 638 | infowarsjobs.com | com | 12 | 1 | Active | | 10/23/25 | Active | **SquareSpace** |
| 640 | infowarsphone.com | com | 13 | 1 | Active | | 2/26/25 | Active | **SquareSpace** |
| 642 | infowarstech.com | com | 12 | 1 | Active | | 5/12/25 | Active | **SquareSpace** |
| 643 | infowarsvideo.com | com | 13 | 1 | Active | | 8/6/25 | Active | **SquareSpace** |
| 564 | infowarsbunker.com | com | 14 | 1 | Active | 3 years, 10 months | 10/29/25 | Active | **CloudFlare** |

Infowars Related - Included with Lot 1 Production Assets

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration St | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 565 | infowars.com | com | 8 | 1 | Active | 25 years, 5 months | 6/9/33 | Active | **CloudFlare** |
| 569 | theinfowar.tv | tv | 10 | 1 | Active | - | 5/20/25 | Active | **CloudFlare** |
| 613 | infowarsstaging.com | com | 15 | 1 | Active | | 3/1/25 | Active | **CloudFlare** |

"Pending" indicates recently expired domains that may remain renewable or domains expiring soon.

FSS Domains List                                                            InfowarsStore Related - Included with Lot 2 E-Commerce Assets

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration St | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 145 | rebelzencbd.com | com | 11 | 2 | Active | 1 years, 2 months | 6/22/25 | Active | **Epik** |
| 192 | inforwarsstoredevelopment.com | com | 25 | 2 | Active | 6 years, 9 months | 11/28/24 | Active | **GoDaddy** |
| 199 | infowarshealthdoctor.com | com | 20 | 2 | Active | 9 years, 4 months | 4/24/25 | Active | **GoDaddy** |
| 200 | infowarshealthdr.com | com | 16 | 2 | Active | 9 years, 4 months | 4/24/25 | Active | **GoDaddy** |
| 201 | infowarshealthinsider.com | com | 21 | 2 | Active | 9 years, 4 months | 4/25/25 | Active | **GoDaddy** |
| 202 | infowarshealthpunch.com | com | 19 | 2 | Active | 9 years, 4 months | 4/9/25 | Active | **GoDaddy** |
| 205 | infowarsmarketplace.com | com | 19 | 2 | Active | 7 years, 6 months | 2/18/25 | Active | **GoDaddy** |
| 364 | infowarsenergy.com | com | 14 | 2 | Active | 12 years, 3 months | 5/9/25 | Active | **Name** |
| 367 | infowarshealth.com | com | 14 | 2 | Active | 13 years, 9 months | 11/22/24 | Active | **Name** |
| 368 | infowarshealthnews.com | com | 18 | 2 | Active | 13 years, 3 months | 5/2/25 | Active | **Name** |
| 370 | infowarshop.com | com | 11 | 2 | Active | 14 years, 4 months | 4/3/25 | Active | **Name** |
| 378 | infowarslife.net | net | 12 | 2 | Active | 11 years, 0 months | 8/9/25 | Active | **Name** |
| 379 | infowarslife.org | org | 12 | 2 | Active | 10 years, 11 months | 8/9/25 | Active | **Name** |
| 477 | shopfreespeech.com | com | 14 | 2 | Active | 16 years, 6 months | 2/18/25 | Active | **Name** |
| 489 | theinfowarsshop.biz | biz | 15 | 2 | Active | 24 years, 1 months | 7/25/25 | Active | **Name** |
| 492 | theinfowarsshop.net | net | 15 | 2 | Active | 14 years, 1 months | 7/26/25 | Active | **Name** |
| 493 | theinfowarsshop.org | org | 15 | 2 | Active | 24 years, 1 months | 7/26/25 | Active | **Name** |
| 494 | theinfowarsshop.us | us | 15 | 2 | Active | 24 years, 1 months | 7/25/25 | Active | **Name** |
| 495 | theinfowarsstore.biz | biz | 16 | 2 | Active | 24 years, 1 months | 7/25/25 | Active | **Name** |
| 498 | theinfowarsstore.net | net | 16 | 2 | Active | 14 years, 1 months | 7/26/25 | Active | **Name** |
| 499 | theinfowarsstore.org | org | 16 | 2 | Active | 14 years, 1 months | 7/26/25 | Active | **Name** |
| 500 | theinfowarsstore.us | us | 16 | 2 | Active | 24 years, 1 months | 7/25/25 | Active | **Name** |
| 586 | infowarsshop.biz | biz | 12 | 2 | Active | 24 years, 7 months | 1/14/25 | Active | **Ionos** |
| 587 | infowarsshop.com | com | 12 | 2 | Active | 15 years, 5 months | 3/11/25 | Active | **Ionos** |
| 588 | infowarsshop.net | net | 12 | 2 | Active | 14 years, 7 months | 1/15/25 | Active | **Ionos** |
| 589 | infowarsshop.org | org | 12 | 2 | Active | 14 years, 7 months | 1/15/25 | Active | **Ionos** |
| 590 | infowarsstore.biz | biz | 13 | 2 | Active | 24 years, 7 months | 1/14/25 | Active | **Ionos** |
| 591 | infowarsstore.com | com | 13 | 2 | Active | 14 years, 7 months | 1/15/25 | Active | **Ionos** |
| 592 | infowarsstore.net | net | 13 | 2 | Active | 14 years, 7 months | 1/15/25 | Active | **Ionos** |
| 593 | infowarsstore.org | org | 13 | 2 | Active | 14 years, 7 months | 1/15/25 | Active | **Ionos** |
| 598 | shopinfowars.biz | biz | 12 | 2 | Active | 24 years, 7 months | 1/14/25 | Active | **Ionos** |
| 599 | shopinfowars.net | net | 12 | 2 | Active | 14 years, 7 months | 1/15/25 | Active | **Ionos** |
| 600 | shopinfowars.org | org | 12 | 2 | Active | 14 years, 7 months | 1/15/25 | Active | **Ionos** |
| 618 | infowars.market | market | 8 | 2 | Active | | 5/12/25 | Active | **SquareSpace** |
| 619 | infowars.store | store | 8 | 2 | Active | | 11/25/24 | Active | **SquareSpace** |
| 639 | infowarspantry.com | com | 14 | 2 | Active | | 6/7/25 | Active | **SquareSpace** |
| 641 | infowarsplatinum.com | com | 16 | 2 | Active | | 10/18/24 | Pending | **SquareSpace** |
| 570 | infowarslifestyle.com | com | 17 | 2 | Active | 0 years, 7 months | 1/4/25 | Active | **CloudFlare** |
| 612 | warroomshop.com | com | 11 | 2 | Active | | 5/14/25 | Active | **CloudFlare** |
| 614 | americanjournalshop.com | com | 19 | 2 | Active | | 5/14/25 | Active | **CloudFlare** |

"Pending" indicates recently expired domains that may remain renewable or domains expiring soon.

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration Status | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1776defiant.com | com | 11 | 3 | Active | 3 years, 7 months | 12/31/24 | Active | Epik |
| 7 | action7.news | news | 7 | 3 | Active | 0 years, 0 months | 1/9/25 | Active | Epik |
| 8 | af4abb8de2579b191fc3f18c1bdc444c.com | com | 32 | 3 | Active | 5 years, 6 months | 2/14/25 | Active | Epik |
| 14 | americaninvisibilityproject.com | com | 27 | 3 | Active | 3 years, 4 months | 4/23/25 | Active | Epik |
| 15 | americanmediabroadcast.com | com | 22 | 3 | Active | 4 years, 11 months | 9/13/25 | Pending | Epik |
| 16 | bidenera.news | news | 8 | 3 | Active | 0 years, 0 months | 1/19/25 | Active | Epik |
| 17 | blueskies.news | news | 9 | 3 | Active | 0 years, 0 months | 11/13/24 | Pending | Epik |
| 20 | censored2020.com | com | 12 | 3 | Active | 3 years, 10 months | 10/27/24 | Pending | Epik |
| 22 | censoredbyjack.com | com | 14 | 3 | Active | 4 years, 0 months | 8/26/25 | Active | Epik |
| 23 | censoredelection.com | com | 16 | 3 | Active | 3 years, 10 months | 10/27/24 | Pending | Epik |
| 26 | coalitiontodefendfreespeech.com | com | 27 | 3 | Active | 7 years, 8 months | 12/7/24 | Active | Epik |
| 27 | coffeeparty.tv | tv | 11 | 3 | Active | - | 2/16/25 | Active | Epik |
| 28 | cookinmemes.com | com | 11 | 3 | Active | 5 years, 7 months | 1/9/25 | Active | Epik |
| 33 | defendowen.com | com | 10 | 3 | Active | 4 years, 7 months | 1/23/25 | Active | Epik |
| 34 | deportillegalaliens.us | us | 19 | 3 | Active | 23 years, 10 months | 10/15/24 | Pending | Epik |
| 40 | electionnight.news | news | 13 | 3 | Active | 0 years, 0 months | 10/27/24 | Pending | Epik |
| 41 | electiontheft.news | news | 13 | 3 | Active | 0 years, 0 months | 10/15/24 | Pending | Epik |
| 42 | electiontheft.org | org | 13 | 3 | Active | 4 years, 10 months | 10/15/24 | Pending | Epik |
| 43 | endthechinesevirus.com | com | 18 | 3 | Active | 4 years, 3 months | 5/8/25 | Active | Epik |
| 44 | essentialradios.com | com | 15 | 3 | Active | 3 years, 7 months | 1/11/25 | Active | Epik |
| 47 | evovod.com | com | 6 | 3 | Active | 5 years, 6 months | 2/26/26 | Active | Epik |
| 48 | fakenewswars.us | us | 12 | 3 | Active | 23 years, 8 months | 12/6/24 | Active | Epik |
| 49 | fightchinesevirus.com | com | 17 | 3 | Active | 4 years, 3 months | 5/8/25 | Active | Epik |
| 56 | freespeechsystems.info | info | 17 | 3 | Active | 16 years, 6 months | 2/1/25 | Active | Epik |
| 57 | freespeechsystems.net | net | 17 | 3 | Active | 16 years, 7 months | 1/2/25 | Active | Epik |
| 58 | freespeechsystems.org | org | 17 | 3 | Active | 16 years, 6 months | 2/1/25 | Active | Epik |
| 59 | freespeechsystems.us | us | 17 | 3 | Active | 24 years, 7 months | 1/1/25 | Active | Epik |
| 62 | freezedriedessentials.com | com | 21 | 3 | Active | 3 years, 7 months | 1/11/25 | Active | Epik |
| 63 | freezedriedpreparedness.com | com | 23 | 3 | Active | 3 years, 7 months | 1/11/25 | Active | Epik |
| 66 | futurenews.news | news | 10 | 3 | Active | 0 years, 0 months | 11/12/24 | Pending | Epik |
| 67 | goblinfire.com | com | 10 | 3 | Active | 5 years, 7 months | 1/10/25 | Active | Epik |
| 68 | goblinlove.com | com | 10 | 3 | Active | 4 years, 9 months | 11/13/24 | Pending | Epik |
| 69 | goblinnest.com | com | 10 | 3 | Active | 4 years, 9 months | 11/13/24 | Pending | Epik |
| 71 | hopkinsworld.com | com | 12 | 3 | Active | 6 years, 9 months | 11/22/24 | Active | Epik |
| 75 | imnotbragging.news | news | 13 | 3 | Active | 0 years, 0 months | 11/18/24 | Active | Epik |
| 76 | imnotbragging.show | show | 13 | 3 | Active | - | 11/18/24 | Active | Epik |
| 79 | infocomms.org | org | 9 | 3 | Active | 5 years, 8 months | 12/18/24 | Active | Epik |
| 80 | infocomms.social | social | 9 | 3 | Active | - | 12/18/24 | Active | Epik |
| 100 | joeroganexposed.com | com | 15 | 3 | Active | 5 years, 7 months | 1/10/25 | Active | Epik |
| 105 | libertycdn.com | com | 10 | 3 | Active | 5 years, 8 months | 1/12/25 | Active | Epik |
| 108 | martiallaw911.name | name | 13 | 3 | Active | 0 years, 0 months | 8/30/24 | Pending | Epik |
| 109 | maskskill.com | com | 9 | 3 | Active | 3 years, 9 months | 11/2/24 | Pending | Epik |
| 111 | medicalsharia.com | com | 13 | 3 | Active | 3 years, 9 months | 11/2/24 | Pending | Epik |
| 112 | memebrew.com | com | 8 | 3 | Active | 5 years, 7 months | 1/9/25 | Active | Epik |
| 113 | memekitchin.com | com | 11 | 3 | Active | 5 years, 7 months | 1/9/25 | Active | Epik |
| 115 | newsguardexposed.com | com | 16 | 3 | Active | 5 years, 7 months | 1/12/25 | Active | Epik |
| 116 | newsguardtruth.com | com | 14 | 3 | Active | 5 years, 7 months | 1/12/25 | Active | Epik |
| 117 | newsguardwatch.news | news | 14 | 3 | Active | 0 years, 0 months | 1/12/25 | Active | Epik |
| 118 | newsguardwatch.org | org | 14 | 3 | Active | 4 years, 8 months | 12/1/25 | Active | Epik |
| 119 | nextearth.news | news | 9 | 3 | Active | 0 years, 0 months | 11/4/24 | Pending | Epik |
| 121 | nextnewsmedia.com | com | 13 | 3 | Active | 5 years, 7 months | 1/10/25 | Active | Epik |
| 122 | nextterra.news | news | 9 | 3 | Active | 0 years, 0 months | 11/4/24 | Pending | Epik |
| 126 | notbragging.show | show | 11 | 3 | Active | - | 12/5/24 | Active | Epik |
| 128 | nov3rd.news | news | 6 | 3 | Active | 0 years, 0 months | 10/27/24 | Pending | Epik |
| 129 | novaxnoflight.com | com | 13 | 3 | Active | 3 years, 10 months | 10/8/24 | Pending | Epik |
| 131 | onlinehealthnow.com | com | 15 | 3 | Active | 1 years, 11 months | 9/23/24 | Pending | Epik |
| 132 | operationwin2020.com | com | 16 | 3 | Active | 4 years, 7 months | 1/2/25 | Active | Epik |
| 133 | orderoffreedom.com | com | 14 | 3 | Active | 5 years, 7 months | 1/10/25 | Active | Epik |
| 136 | posthuman.news | news | 9 | 3 | Active | 0 years, 0 months | 11/12/24 | Pending | Epik |
| 137 | postnewsera.com | com | 11 | 3 | Active | 5 years, 7 months | 1/10/25 | Active | Epik |
| 138 | prisonplanet.us | us | 12 | 3 | Active | 24 years, 4 months | 4/9/25 | Active | Epik |
| 140 | provemewrong.show | show | 12 | 3 | Active | 0 years, 0 months | 11/4/24 | Pending | Epik |
| 142 | readinessradios.com | com | 15 | 3 | Active | 3 years, 7 months | 1/11/25 | Active | Epik |
| 147 | ronpaulcommandbase.com | com | 18 | 3 | Active | 16 years, 8 months | 12/15/24 | Active | Epik |
| 148 | ronpaulwarroom.com | com | 14 | 3 | Active | 16 years, 8 months | 12/15/24 | Active | Epik |
| 153 | stonepetition.com | com | 13 | 3 | Active | 4 years, 9 months | 11/15/24 | Pending | Epik |
| 154 | stopfakenewscoalition.com | com | 21 | 3 | Active | 7 years, 8 months | 12/7/24 | Active | Epik |
| 155 | theadvance.info | info | 10 | 3 | Active | 6 years, 2 months | 12/6/24 | Active | Epik |
| 156 | theadvance.news | news | 10 | 3 | Active | - | 12/6/24 | Active | Epik |
| 158 | theamericanjournal.news | news | 18 | 3 | Active | 0 years, 0 months | 12/17/24 | Active | Epik |
| 160 | thegreatresistance.news | news | 18 | 3 | Active | 0 years, 0 months | 11/30/24 | Active | Epik |

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration Status | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 162 | theliberator.co | co | 12 | 3 | Active | 23 years, 8 months | 12/6/24 | Active | Epik |
| 165 | thereconreview.com | com | 14 | 3 | Active | 4 years, 5 months | 3/2/25 | Active | Epik |
| 166 | theresistance.video | video | 13 | 3 | Active | 0 years, 0 months | 8/26/25 | Active | Epik |
| 167 | thewarroom.show | show | 10 | 3 | Active | 0 years, 0 months | 9/13/25 | Active | Epik |
| 168 | thisis1776.com | com | 10 | 3 | Active | 5 years, 1 months | 7/2/25 | Active | Epik |
| 172 | trumpsecrets.news | news | 12 | 3 | Active | 0 years, 0 months | 10/15/24 | Pending | Epik |
| 174 | vaxtofly.com | com | 8 | 3 | Active | 3 years, 10 months | 10/8/24 | Pending | Epik |
| 177 | wokeyleaks.news | news | 10 | 3 | Active | 0 years, 0 months | 2/2/25 | Active | Epik |
| 182 | becomeasupermale.com | com | 16 | 3 | Active | 9 years, 7 months | 1/6/25 | Active | GoDaddy |
| 184 | buythisforlife.com | com | 14 | 3 | Active | 9 years, 8 months | 12/4/24 | Active | GoDaddy |
| 185 | calicaravan.com | com | 11 | 3 | Active | 5 years, 9 months | 11/26/24 | Active | GoDaddy |
| 188 | emricsessentials.com | com | 16 | 3 | Active | 7 years, 1 months | 3/17/25 | Active | GoDaddy |
| 213 | literallyridiculous.com | com | 19 | 3 | Active | 6 years, 6 months | 2/1/26 | Active | GoDaddy |
| 214 | madein1776.com | com | 10 | 3 | Active | 11 years, 0 months | 8/27/25 | Active | GoDaddy |
| 215 | massifnews.com | com | 10 | 3 | Active | 5 years, 9 months | 11/10/24 | Pending | GoDaddy |
| 216 | newswars.video | video | 8 | 3 | Active | 0 years, 0 months | 11/26/24 | Active | GoDaddy |
| 217 | newswarsstore.com | com | 13 | 3 | Active | 5 years, 5 months | 3/6/25 | Active | GoDaddy |
| 218 | newswarsvideo.com | com | 13 | 3 | Active | 5 years, 5 months | 11/28/24 | Active | GoDaddy |
| 221 | rightsideselects.com | com | 16 | 3 | Active | 9 years, 9 months | 11/25/24 | Active | GoDaddy |
| 222 | sayyestojeunesse.com | com | 16 | 3 | Active | 6 years, 0 months | 8/10/24 | Active | GoDaddy |
| 223 | secretb12.com | com | 9 | 3 | Active | 9 years, 7 months | 1/6/25 | Active | GoDaddy |
| 225 | solus.news | news | 5 | 3 | Active | 0 years, 0 months | 11/10/24 | Pending | GoDaddy |
| 226 | succulentdinosaur.com | com | 17 | 3 | Active | 5 years, 5 months | 3/1/25 | Active | GoDaddy |
| 227 | supersurvivalstore.com | com | 18 | 3 | Active | 7 years, 2 months | 6/5/25 | Active | GoDaddy |
| 229 | tryrightside.com | com | 12 | 3 | Active | 9 years, 10 months | 10/16/24 | Pending | GoDaddy |
| 230 | x2nascentiodine.com | com | 15 | 3 | Active | 9 years, 7 months | 11/26/24 | Active | GoDaddy |
| 232 | 1776to1984.net | net | 10 | 3 | Active | 16 years, 4 months | 4/1/25 | Active | Name |
| 233 | 1776to1984.org | org | 10 | 3 | Active | 16 years, 7 months | 4/1/25 | Active | Name |
| 235 | 1984to1776.net | net | 10 | 3 | Active | 16 years, 4 months | 4/1/25 | Active | Name |
| 236 | 1984to1776.org | org | 10 | 3 | Active | 16 years, 7 months | 4/1/25 | Active | Name |
| 238 | 911chronicles.net | net | 13 | 3 | Active | 16 years, 4 months | 4/1/25 | Active | Name |
| 239 | 911chronicles.org | org | 13 | 3 | Active | 16 years, 7 months | 4/1/25 | Active | Name |
| 266 | arnoldexposed.com | com | 13 | 3 | Active | 19 years, 9 months | 10/30/24 | Pending | Name |
| 267 | arnoldexposed.net | net | 13 | 3 | Active | 19 years, 9 months | 11/17/24 | Active | Name |
| 268 | arnoldexposed.org | org | 13 | 3 | Active | 19 years, 9 months | 11/17/24 | Active | Name |
| 269 | arnoldtheinvader.com | com | 16 | 3 | Active | 19 years, 9 months | 10/30/24 | Pending | Name |
| 271 | babynimmo.com | com | 9 | 3 | Active | 11 years, 9 months | 5/24/25 | Active | Name |
| 272 | beckdeception.com | com | 13 | 3 | Active | 14 years, 7 months | 1/21/25 | Active | Name |
| 275 | biglieobama.com | com | 11 | 3 | Active | 15 years, 7 months | 1/29/25 | Active | Name |
| 276 | biglieobama.net | net | 11 | 3 | Active | 15 years, 7 months | 1/29/25 | Active | Name |
| 277 | bigliesobama.com | com | 12 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 278 | bigliesobama.net | net | 12 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 285 | brothersinarmsshow.net | net | 18 | 3 | Active | 12 years, 3 months | 5/19/25 | Active | Name |
| 289 | cuckley.com | com | 7 | 3 | Active | 7 years, 5 months | 3/19/25 | Active | Name |
| 290 | darkskies.us | us | 9 | 3 | Active | 24 years, 2 months | 6/27/25 | Active | Name |
| 292 | deathoftherepublic.com | com | 18 | 3 | Active | 15 years, 5 months | 3/23/25 | Active | Name |
| 293 | deathoftherepublic.info | info | 18 | 3 | Active | 15 years, 5 months | 3/23/25 | Active | Name |
| 294 | deathoftherepublic.net | net | 18 | 3 | Active | 15 years, 5 months | 3/23/25 | Active | Name |
| 295 | deathoftherepublic.us | us | 18 | 3 | Active | 24 years, 5 months | 3/22/25 | Active | Name |
| 296 | deepblackthemovie.com | com | 17 | 3 | Active | 14 years, 9 months | 11/19/24 | Active | Name |
| 297 | deepblackthemovie.net | net | 17 | 3 | Active | 14 years, 9 months | 11/19/24 | Active | Name |
| 301 | donaldmcronald.com | com | 14 | 3 | Active | 9 years, 5 months | 3/17/25 | Active | Name |
| 302 | dontbegoogle.com | com | 12 | 3 | Active | 6 years, 3 months | 5/11/25 | Active | Name |
| 303 | emporerobama.com | com | 12 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 304 | emporerobama.net | net | 12 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 305 | endgamefilm.com | com | 11 | 3 | Active | 17 years, 6 months | 2/8/25 | Active | Name |
| 306 | endgamemovie.org | org | 12 | 3 | Active | 17 years, 0 months | 8/8/25 | Active | Name |
| 307 | endgamethefilm.com | com | 14 | 3 | Active | 17 years, 6 months | 2/8/25 | Active | Name |
| 308 | endgamethemovie.com | com | 15 | 3 | Active | 17 years, 6 months | 2/8/25 | Active | Name |
| 309 | endgamethemovie.net | net | 15 | 3 | Active | 17 years, 6 months | 8/8/25 | Active | Name |
| 310 | endgamethemovie.org | org | 15 | 3 | Active | 17 years, 0 months | 8/8/25 | Active | Name |
| 314 | falloftherepublic.com | com | 17 | 3 | Active | 15 years, 5 months | 3/23/25 | Active | Name |
| 315 | falloftherepublic.info | info | 17 | 3 | Active | 15 years, 5 months | 3/23/25 | Active | Name |
| 316 | falloftherepublic.net | net | 17 | 3 | Active | 15 years, 5 months | 3/23/25 | Active | Name |
| 317 | falloftherepublic.org | org | 17 | 3 | Active | 15 years, 0 months | 8/24/25 | Active | Name |
| 318 | falloftherepublic.us | us | 17 | 3 | Active | 24 years, 5 months | 3/22/25 | Active | Name |
| 319 | falloftherepublicfilm.com | com | 21 | 3 | Active | 15 years, 1 months | 7/3/25 | Active | Name |
| 320 | falloftherepublicmovie.com | com | 22 | 3 | Active | 15 years, 1 months | 7/3/25 | Active | Name |
| 322 | gangstagov.us | us | 10 | 3 | Active | 24 years, 2 months | 6/15/25 | Active | Name |
| 324 | gangstergov.us | us | 11 | 3 | Active | 24 years, 2 months | 6/15/25 | Active | Name |
| 333 | glennbeckdeception.com | com | 18 | 3 | Active | 14 years, 7 months | 1/21/25 | Active | Name |

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration Status | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 334 | globalistconquest.com | com | 17 | 3 | Active | 11 years, 11 months | 9/24/24 | Pending | Name |
| 349 | infobabe.us | us | 8 | 3 | Active | 24 years, 5 months | 3/10/25 | Active | Name |
| 350 | infobabes.us | us | 9 | 3 | Active | 24 years, 5 months | 3/10/25 | Active | Name |
| 416 | newswars.io | io | 8 | 3 | Active | 0 years, 0 months | 6/19/25 | Active | Name |
| 419 | newworldorderplaybook.com | com | 21 | 3 | Active | 13 years, 9 months | 11/1/24 | Pending | Name |
| 421 | nwoplaybook.com | com | 11 | 3 | Active | 13 years, 9 months | 11/12/24 | Pending | Name |
| 422 | obamadeception.com | com | 14 | 3 | Active | 8 years, 1 months | 7/28/25 | Active | Name |
| 423 | obamadeception.net | net | 14 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 424 | obamadeception.us | us | 14 | 3 | Active | 24 years, 3 months | 5/28/25 | Active | Name |
| 425 | obamadeception2.net | net | 15 | 3 | Active | 11 years, 0 months | 8/2/25 | Active | Name |
| 426 | obamaenemywithin.com | com | 16 | 3 | Active | 11 years, 0 months | 8/2/25 | Active | Name |
| 427 | obamafalloftherepublic.com | com | 22 | 3 | Active | 15 years, 1 months | 7/10/25 | Active | Name |
| 428 | obamafalloftherepublic.net | net | 22 | 3 | Active | 15 years, 1 months | 7/10/25 | Active | Name |
| 429 | obamafilm.net | net | 9 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 430 | obamaslave.com | com | 10 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 431 | obamaslave.net | net | 10 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 432 | obamaslavery.com | com | 12 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 433 | obamaslavery.net | net | 12 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 434 | obamaslaves.com | com | 11 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 435 | obamaslaves.net | net | 11 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 436 | obamatakeover.net | net | 13 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 437 | offworldsocial.com | com | 14 | 3 | Active | 5 years, 7 months | 1/3/25 | Active | Name |
| 438 | planetarychange.net | net | 15 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 439 | planetarychange.org | org | 15 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 440 | planetinfowar.com | com | 13 | 3 | Active | 14 years, 0 months | 8/2/25 | Active | Name |
| 442 | policestate4.com | com | 12 | 3 | Active | 14 years, 5 months | 3/1/25 | Active | Name |
| 443 | powercult.com | com | 9 | 3 | Active | 14 years, 10 months | 10/7/24 | Pending | Name |
| 446 | prisonplanet.biz | biz | 12 | 3 | Active | 24 years, 5 months | 3/3/25 | Active | Name |
| 447 | prisonplanet.info | info | 12 | 3 | Active | 20 years, 4 months | 3/4/25 | Active | Name |
| 448 | prisonplanet.net | net | 12 | 3 | Active | 20 years, 5 months | 3/4/25 | Active | Name |
| 449 | prisonplanet.org | org | 12 | 3 | Active | 20 years, 4 months | 3/4/25 | Active | Name |
| 450 | prisonplanetnews.com | com | 16 | 3 | Active | 14 years, 1 months | 7/23/25 | Active | Name |
| 451 | prisonplanetnews.net | net | 16 | 3 | Active | 14 years, 1 months | 7/23/25 | Active | Name |
| 452 | prisonplanetnews.org | org | 16 | 3 | Active | 14 years, 1 months | 7/23/25 | Active | Name |
| 455 | realcoffeeparty.com | com | 15 | 3 | Active | 14 years, 6 months | 2/16/25 | Active | Name |
| 456 | realcoffeeparty.net | net | 15 | 3 | Active | 14 years, 5 months | 3/9/25 | Active | Name |
| 469 | riseoffema.com | com | 10 | 3 | Active | 14 years, 5 months | 3/1/25 | Active | Name |
| 472 | schoolof1776.com | com | 12 | 3 | Active | 10 years, 4 months | 4/21/25 | Active | Name |
| 473 | schoolof1776.net | net | 12 | 3 | Active | 10 years, 4 months | 4/21/25 | Active | Name |
| 474 | schoolof1776.org | org | 12 | 3 | Active | 10 years, 4 months | 4/21/25 | Active | Name |
| 475 | schoolof1776.us | us | 12 | 3 | Active | 24 years, 4 months | 4/20/25 | Active | Name |
| 478 | slaveobama.com | com | 10 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 479 | slaveobama.net | net | 10 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 480 | slavesofobama.com | com | 13 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 481 | slavesofobama.net | net | 13 | 3 | Active | 15 years, 7 months | 1/23/25 | Active | Name |
| 484 | theendgamemovie.com | com | 15 | 3 | Active | 17 years, 6 months | 2/8/25 | Active | Name |
| 486 | theglobalistconquest.com | com | 20 | 3 | Active | 11 years, 11 months | 9/24/24 | Pending | Name |
| 488 | theinfowarrior.com | com | 14 | 3 | Active | 15 years, 5 months | 3/10/25 | Active | Name |
| 502 | theobamadeception.net | net | 17 | 3 | Active | 15 years, 7 months | 1/24/25 | Active | Name |
| 503 | theriseisthefall.com | com | 16 | 3 | Active | 13 years, 2 months | 6/26/25 | Active | Name |
| 504 | theriseoffema.com | com | 13 | 3 | Active | 14 years, 5 months | 3/1/25 | Active | Name |
| 516 | uarechange.com | com | 10 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 517 | uarechange.net | net | 10 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 518 | uarechange.org | org | 10 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 520 | urgentradio.com | com | 11 | 3 | Active | 13 years, 6 months | 2/21/25 | Active | Name |
| 522 | v4tw.com | com | 4 | 3 | Active | 6 years, 3 months | 5/10/25 | Active | Name |
| 526 | wakeupamericacoffee.biz | biz | 19 | 3 | Active | 24 years, 0 months | 8/1/25 | Active | Name |
| 527 | wakeupamericacoffee.co | co | 19 | 3 | Active | 24 years, 0 months | 8/1/25 | Active | Name |
| 528 | wakeupamericacoffee.com | com | 19 | 3 | Active | 12 years, 0 months | 8/2/25 | Active | Name |
| 529 | wakeupamericacoffee.net | net | 19 | 3 | Active | 12 years, 0 months | 8/2/25 | Active | Name |
| 530 | wakeupamericacoffee.org | org | 19 | 3 | Active | 12 years, 6 months | 8/2/25 | Active | Name |
| 531 | wakeupamericacoffee.us | us | 19 | 3 | Active | 24 years, 0 months | 8/1/25 | Active | Name |
| 532 | warroom.show | show | 7 | 3 | Active | 0 years, 0 months | 9/7/25 | Active | Name |
| 533 | warroomshow.com | com | 11 | 3 | Active | 6 years, 11 months | 9/7/25 | Active | Name |
| 540 | wearechange.info | info | 11 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 541 | wearechange.mobi | mobi | 11 | 3 | Active | - | 9/20/24 | Pending | Name |
| 542 | wearechangenews.com | com | 15 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 543 | wearechangenews.net | net | 15 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 544 | wearechangenews.org | org | 15 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 545 | wearechangeworld.com | com | 16 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |
| 546 | wearechangeworld.org | org | 16 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | Name |

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration Status | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 556 | youarechange.com | com | 12 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | **Name** |
| 557 | youarechange.net | net | 12 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | **Name** |
| 558 | youarechange.org | org | 12 | 3 | Active | 16 years, 11 months | 9/20/24 | Pending | **Name** |
| 573 | freedomnugget.com | com | 13 | 3 | Active | 14 years, 4 months | 4/3/25 | Active | **Ionos** |
| 597 | ranter.us | us | 6 | 3 | Active | 24 years, 4 months | 4/13/25 | Active | **Ionos** |
| 601 | soldiersoftherepublic.com | com | 21 | 3 | Active | 12 years, 6 months | 2/7/25 | Active | **Ionos** |
| 624 | battleplan.news | news | 10 | 3 | Active | | 4/15/25 | Active | **SquareSpace** |
| 625 | bidensupporters.com | com | 15 | 3 | Active | | 5/11/25 | Active | **SquareSpace** |
| 626 | blackpilled.news | news | 11 | 3 | Active | | 1/7/25 | Active | **SquareSpace** |
| 628 | freespeechsystems.com | com | 17 | 3 | Active | | 1/2/26 | Active | **SquareSpace** |
| 630 | newswars.com | com | 8 | 3 | Active | | 8/29/25 | Active | **SquareSpace** |
| 631 | prisonplanet.com | com | 12 | 3 | Active | | 6/14/25 | Active | **SquareSpace** |
| 633 | sharebannedvideos.com | com | 17 | 3 | Active | | 8/25/25 | Active | **SquareSpace** |
| 634 | summit.store | store | 6 | 3 | Active | | 6/5/25 | Active | **SquareSpace** |
| 644 | memeworld.news | news | 9 | 3 | Active | | 7/15/25 | Active | **SquareSpace** |
| 572 | ifw.io | io | 3 | 3 | Active | 0 years, 0 months | 10/1/27 | Active | NameCheap |
| 611 | prisonplanet.tv | tv | 12 | 3 | Active | - | 3/4/25 | Active | Register.com |
| 560 | 79days.news | news | 6 | 3 | Active | 0 years, 0 months | 11/4/25 | Active | **CloudFlare** |
| 561 | banthis.tv | tv | 7 | 3 | Active | - | 8/26/25 | Active | **CloudFlare** |
| 562 | conspiracyfact.info | info | 14 | 3 | Active | 0 years, 9 months | 11/1/25 | Active | **CloudFlare** |
| 563 | freeworldnews.tv | tv | 13 | 3 | Active | - | 5/19/25 | Active | **CloudFlare** |
| 566 | madmaxworld.tv | tv | 11 | 3 | Active | - | 3/6/25 | Active | **CloudFlare** |
| 567 | newsmakers.store | store | 10 | 3 | Active | 0 years, 0 months | 10/30/25 | Active | **CloudFlare** |
| 568 | summitnews.store | store | 10 | 3 | Active | 0 years, 0 months | 10/30/25 | Active | **CloudFlare** |
| 571 | americanelection.news | news | 16 | 3 | Active | 0 years, 0 months | 2/2/25 | Active | **CloudFlare** |

"Pending" indicates recently expired domains that may remain renewable or domains expiring soon.

FSS Domain Names

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration Status | Registrar per FSS |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 2020electioncenter.com | com | 18 | 3 | Status TBD | 4 years, 0 months | 8/25/25 | Active | Epik |
| 19 | cantcensortruth.com | com | 15 | 3 | Status TBD | 4 years, 0 months | 8/25/25 | Active | Epik |
| 24 | civilwarishere.com | com | 14 | 3 | Status TBD | 5 years, 0 months | 8/6/25 | Active | Epik |
| 30 | cuckdorsey.com | com | 10 | 3 | Status TBD | 4 years, 0 months | 7/26/25 | Active | Epik |
| 35 | derpstate.news | news | 9 | 3 | Status TBD | 0 years, 0 months | 7/24/25 | Active | Epik |
| 52 | forbiddeninformation.org | org | 20 | 3 | Status TBD | 4 years, 0 months | 8/26/25 | Active | Epik |
| 53 | fortressview.com | com | 12 | 3 | Status TBD | 4 years, 1 months | 7/26/25 | Active | Epik |
| 77 | infoambush.com | com | 10 | 3 | Status TBD | 18 years, 1 months | 7/26/25 | Active | Epik |
| 78 | infoambush.net | net | 10 | 3 | Status TBD | 18 years, 1 months | 7/26/25 | Active | Epik |
| 81 | infodriveby.com | com | 11 | 3 | Status TBD | 18 years, 1 months | 7/26/25 | Active | Epik |
| 82 | infodriveby.net | net | 11 | 3 | Status TBD | 18 years, 1 months | 7/26/25 | Active | Epik |
| 107 | martiallaw911.info | info | 13 | 3 | Status TBD | 0 years, 1 months | 7/23/25 | Active | Epik |
| 143 | real360win.com | com | 10 | 3 | Status TBD | 0 years, 2 months | 6/17/25 | Active | Epik |
| 152 | starthavingkids.com | com | 15 | 3 | Status TBD | 1 years, 0 months | 7/24/25 | Active | Epik |
| 163 | themostbanned.com | com | 13 | 3 | Status TBD | 4 years, 0 months | 8/26/25 | Active | Epik |
| 173 | universitywars.com | com | 14 | 3 | Status TBD | 6 years, 0 months | 8/7/25 | Active | Epik |
| 114 | myprivacyshop.com | com | 13 | 3 | Status TBD | 3 years, 7 months | 1/11/25 | Active | GoDaddy |
| 178 | agendabasedthinking.com | com | 19 | 3 | Status TBD | 5 years, 9 months | 11/9/24 | Pending | GoDaddy |
| 186 | clarityshot.com | com | 11 | 3 | Status TBD | 10 years, 9 months | 11/13/24 | Pending | GoDaddy |
| 189 | fluoridecleanse.com | com | 15 | 3 | Status TBD | 10 years, 9 months | 11/13/24 | Pending | GoDaddy |
| 190 | fluorideshield.com | com | 14 | 3 | Status TBD | 10 years, 9 months | 11/13/24 | Pending | GoDaddy |
| 191 | getrightside.com | com | 12 | 3 | Status TBD | 0 years, 7 months | 1/3/25 | Active | GoDaddy |
| 224 | silverbulletcolloidalsilver.com | com | 27 | 3 | Status TBD | 10 years, 9 months | 11/13/24 | Pending | GoDaddy |
| 262 | americasmasher.com | com | 14 | 3 | Status TBD | 15 years, 0 months | 6/28/25 | Active | Name |
| 270 | asiawars.com | com | 8 | 3 | Status TBD | 6 years, 0 months | 8/12/25 | Active | Name |
| 286 | championoftyranny.com | com | 17 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 311 | enemiesoftherepublic.com | com | 20 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 312 | evilcities.com | com | 10 | 3 | Status TBD | 15 years, 1 months | 7/16/25 | Active | Name |
| 313 | evilisloose.com | com | 11 | 3 | Status TBD | 14 years, 3 months | 5/27/25 | Active | Name |
| 321 | gangstagov.com | com | 10 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 325 | gangsterinchief.com | com | 15 | 3 | Status TBD | 15 years, 2 months | 6/16/25 | Active | Name |
| 326 | gangsterinchief.com | com | 15 | 3 | Status TBD | 15 years, 2 months | 6/16/25 | Active | Name |
| 328 | gansterinchief.com | com | 14 | 3 | Status TBD | 15 years, 2 months | 6/16/25 | Active | Name |
| 329 | georgewashingtonposse.com | com | 21 | 3 | Status TBD | 11 years, 0 months | 8/20/25 | Active | Name |
| 330 | georgewashingtonposse.com | com | 22 | 3 | Status TBD | 11 years, 0 months | 8/20/25 | Active | Name |
| 335 | goodguyswithguns.com | com | 16 | 3 | Status TBD | 12 years, 1 months | 7/20/25 | Active | Name |
| 336 | goodguyswithguns.info | info | 16 | 3 | Status TBD | 12 years, 1 months | 7/20/25 | Active | Name |
| 337 | goodguyswithguns.net | net | 16 | 3 | Status TBD | 12 years, 1 months | 7/20/25 | Active | Name |
| 338 | goodguyswithguns.org | org | 16 | 3 | Status TBD | 12 years, 1 months | 7/20/25 | Active | Name |
| 344 | humanpreservationsystem.org | org | 23 | 3 | Status TBD | 11 years, 8 months | 12/6/24 | Active | Name |
| 345 | iamwithgeorgewashington.com | com | 23 | 3 | Status TBD | 11 years, 0 months | 8/25/25 | Active | Name |
| 346 | ickenomics.com | com | 10 | 3 | Status TBD | 11 years, 0 months | 8/18/25 | Active | Name |
| 347 | ickonomics.com | com | 10 | 3 | Status TBD | 11 years, 0 months | 8/18/25 | Active | Name |
| 348 | imwithgeorgewashington.com | com | 22 | 3 | Status TBD | 11 years, 0 months | 8/20/25 | Active | Name |
| 417 | newworldorder4zombies.com | com | 21 | 3 | Status TBD | 14 years, 0 months | 8/25/25 | Active | Name |
| 418 | newworldorderforzombies.com | com | 23 | 3 | Status TBD | 14 years, 0 months | 8/25/25 | Active | Name |
| 420 | newworldorderzombies.com | com | 20 | 3 | Status TBD | 14 years, 0 months | 8/25/25 | Active | Name |
| 444 | poweredbytruth.net | net | 14 | 3 | Status TBD | 11 years, 0 months | 8/14/25 | Active | Name |
| 445 | printtwopoint0.com | com | 14 | 3 | Status TBD | 12 years, 0 months | 8/3/25 | Active | Name |
| 453 | radioviewer.com | com | 11 | 3 | Status TBD | 10 years, 0 months | 8/4/25 | Active | Name |
| 454 | radioviewers.com | com | 12 | 3 | Status TBD | 10 years, 0 months | 8/4/25 | Active | Name |
| 457 | redbloodparty.com | com | 13 | 3 | Status TBD | 11 years, 0 months | 8/16/25 | Active | Name |
| 459 | republicdestroyer.com | com | 17 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 460 | republickiller.com | com | 14 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 461 | republicsfall.com | com | 13 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 462 | republicslaststand.com | com | 18 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 468 | riseandfallofthenwo.com | com | 19 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 485 | theendofus.com | com | 10 | 3 | Status TBD | 13 years, 2 months | 6/26/25 | Active | Name |
| 487 | theinfopimp.net | net | 11 | 3 | Status TBD | 15 years, 0 months | 8/10/25 | Active | Name |
| 513 | twofacedobama.com | com | 13 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 514 | twofaceobama.com | com | 12 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 515 | tyrannyschampion.com | com | 16 | 3 | Status TBD | 15 years, 2 months | 6/28/25 | Active | Name |
| 535 | wasselhoff.com | com | 10 | 3 | Status TBD | 11 years, 2 months | 6/28/25 | Active | Name |
| 548 | wearewithgeorgewashington.com | com | 25 | 3 | Status TBD | 11 years, 0 months | 8/20/25 | Active | Name |
| 549 | werewithgeorgewashington.com | com | 24 | 3 | Status TBD | 11 years, 0 months | 8/20/25 | Active | Name |
| 550 | whatisendgame.com | com | 13 | 3 | Status TBD | 17 years, 0 months | 8/8/25 | Active | Name |
| 551 | whatisendgame.net | net | 13 | 3 | Status TBD | 17 years, 0 months | 8/8/25 | Active | Name |
| 552 | whatisendgame.org | org | 13 | 3 | Status TBD | 17 years, 0 months | 8/8/25 | Active | Name |
| 553 | whatistheendgame.com | com | 16 | 3 | Status TBD | 17 years, 0 months | 8/8/25 | Active | Name |
| 554 | whatistheendgame.net | net | 16 | 3 | Status TBD | 17 years, 0 months | 8/8/25 | Active | Name |
| 555 | whatistheendgame.org | org | 16 | 3 | Status TBD | 17 years, 0 months | 8/8/25 | Active | Name |

*** We believe these domains to be owned by FSS but have not been found in their registrar accounts; buyer to purchase under this status unless updated. ***

"Pending" indicates recently expired domains that may remain renewable or domains expiring soon.

FSS Podcast Sites

| Brand/Name Promoted | Podcast/Broadcast Site |
| --- | --- |

Sale includes right, title and interest to FSS podcast accounts; ThreeSixty and the Trustee will use its best efforts to obtain access credentials to active accounts which we believe to include the following.

| Brand/Name Promoted | Podcast/Broadcast Site |
| --- | --- |
| InfoWars | Speaker: https://www.spreaker.com/podcast/the-alex-jones-show-infowars-com--5039062 |
| InfoWars | Speaker: https://www.spreaker.com/podcast/infowars-hourly-updates--5905490 |
| InfoWars | Speaker: https://www.spreaker.com/podcast/infowars-com-freedom-nuggets--1460712 |
| Infowars | iHeart Radio: https://www.iheart.com/podcast/53-infowars-hourly-updates-118517866/ |
| Infowars | Castbox: https://castbox.fm/channel/The-Alex-Jones-Show---Infowars.com-id4697438?country=us |
| Infowars | Castbox: https://castbox.fm/channel/Infowars-Hourly-Video-Podcast-id5100714?country=us |
| Infowars | Deezer: https://www.deezer.com/show/3457812 |
| Infowars | Deezer: https://www.deezer.com/us/show/1000069265 |
| Infowars | Podcast Addict: https://podcastaddict.com/podcast/infowarscom-freedom-nuggets/5160125 |
| Infowars | Podchaser: https://www.podchaser.com/podcasts/the-alex-jones-show-infowarsco-3991858 |
| Infowars | Podchaser: https://www.podchaser.com/podcasts/infowars-hourly-updates-5390012 |
| Infowars | JioSaavn: https://www.jiosaavn.com/shows/infowars-hourly-updates/1/Qya-7VW7wUE_ |
| Infowars | JioSaavn: https://www.jiosaavn.com/shows/alex-jones-show-infowars.com/1/ZcrxZRZKrGM_ |
| Infowars | Apple: https://podcasts.apple.com/us/podcast/infowars-hourly-video-podcast/id1728591628 |
| 2020 Election Countdown | Speaker: https://www.spreaker.com/podcast/election-countdown--4557747 |
| 2020 Election Countdown | iHeart Radio: https://www.iheart.com/podcast/966-election-countdown-72161971/ |
| 2020 Election Countdown | Castbox: https://castbox.fm/channel/Election-Countdown-id3349145?country=us |
| 2020 Election Countdown | Deezer: https://www.deezer.com/us/show/1683472 |
| 2020 Election Countdown | Podcast Addict: https://podcastaddict.com/podcast/election-countdown/3087873 |
| 2020 Election Countdown | Podchaser: https://www.podchaser.com/podcasts/election-countdown-1409277 |
| 2020 Election Countdown | JioSaavn: https://www.jiosaavn.com/shows/election-countdown/1/vGwe8mUU4Ts_ |
| 2020 Election Countdown | Apple: https://podcasts.apple.com/us/podcast/election-countdown/id1532311845 |
| American Countdown | Speaker: https://www.spreaker.com/podcast/american-countdown--4304431 |
| Banned.Video | Speaker: https://www.spreaker.com/podcast/banned-video-live--3610503 |
| Banned.Video | Castbox: https://castbox.fm/channel/BANNED.video-LIVE-id2411079?country=us |
| Banned.Video | Deezer: https://www.deezer.com/us/show/603222 |
| Banned.Video | Podcast Addict: https://podcastaddict.com/podcast/bannedvideo-live/2453429 |
| Banned.Video | Podchaser: https://www.podchaser.com/podcasts/bannedvideo-live-1014820 |
| Banned.Video | JioSaavn: https://www.jiosaavn.com/shows/banned.video-live/1/ZEBcuw1Hp-w_ |
| Sunday Night Live | Speaker: https://www.spreaker.com/podcast/sunday-night-live--4735003 |
| Sunday Night Live | Castbox: https://castbox.fm/channel/Sunday-Night-Live-id5721283?country=us |
| Sunday Night Live | Podcast Addict: https://podcastaddict.com/podcast/infowars-hourly-updates/4530351 |
| The American Journal | Speaker: https://www.spreaker.com/podcast/the-american-journal--4723388 |
| The American Journal | iHeart Radio: https://www.iheart.com/podcast/966-the-american-journal-76474035/ |
| The American Journal | Podchaser: https://www.podchaser.com/podcasts/the-american-journal-1574203 |
| The American Journal | Castbox: https://castbox.fm/channel/The-American-Journal-id4545706?country=us |
| The American Journal | Podchaser: https://www.podchaser.com/podcasts/the-american-journal-1574203 |
| The War Room | TuneIn: https://tunein.com/radio/WarRoom-p1030575/ |
| The War Room | Speaker: https://www.spreaker.com/show/warroom |
| The War Room | iHeartRadio: https://www.iheart.com/podcast/966-war-room-29787300/ |
| The War Room | Castbox: https://castbox.fm/channel/id2382114 |
| The War Room | Deezer: https://www.deezer.com/show/541122 |
| The War Room | Podcast Addict: http://podplayer.net/?podId=2448315 |
| The War Room | Podchaser: https://www.podchaser.com/podcasts/war-room-557018 |
| The War Room | JioSaavn: https://www.jiosaavn.com/shows/War-Room/1/6kuN6TnqSmQ_ |
| Owen Shroyer | Speaker: https://www.spreaker.com/podcast/infowars-30-minutes-with-owen-shroyer--6108620 |
| Ron Gibson | Podcast Addict: https://podcastaddict.com/podcast/rongibsonchannel/4251596 |
| Ron Gibson | Castbox: https://castbox.fm/channel/Alex-Jones-and-Infowars-Shows-Commercial-Free---RonGibsonChannel-on-Odysee-id6210618?country=us |

FSS Social Media Sites

| Brand/Name Promoted | Social Media Site | # Followers/Subscribers |
|---|---|---|

Sale includes right, title and interest to FSS social media accounts; ThreeSixty and the Trustee will use its best efforts to obtain access credentials to active accounts which we believe to include the following.

| Brand/Name Promoted | Social Media Site | # Followers/Subscribers |
|---|---|---|
| Infowars | X (formerly Twitter): https://x.com/infowars | 508k |
| Infowars | Gab: https://gab.com/INFOWARS | 17.8k |
| Infowars | Minds: https://www.minds.com/Infowars | 112k |
| Infowars | Telegram: https://t.me/infowarslive | 29.3k |
| Infowars | Gettr: https://gettr.com/user/infowars | 462.5k |
| Infowars | Bitclout: https://bitclout.com/u/InfoWars | 1.2k |
| Infowars | Sovren: https://sovren.media/u/infowars/ | 185 |
| Infowars | Buzzbii: https://www.buzzbii.com/infowars | 55 |
| Infowars | YubNub: https://yubnub.social/INFOWARS | 20 |
| Infowars | Parler: https://parler.com/profile/infowars/ | TBD |
| Banned.Video | X (formerly Twitter): https://x.com/BANNEDdotVIDEO | 9.6k |
| Banned.Video | Telegram: https://t.me/BANNEDdotVIDEO | 7.1k |
| Banned.Video | Bitchute: https://www.bitchute.com/channel/9c7qJvwx7YQT/ | 161k |
| Banned.Video | Gab: https://gab.com/groups/20802 | 2.6k |
| Banned.Video | Gettr: https://gettr.com/user/banneddotvideo | 37.8k |
| Banned.Video | Sovren: https://sovren.media/u/freeworldnewstv/ | 36 |
| Banned.Video | MeWe: https://mewe.com/group/5fd137578124437597a9e23f | TBD |
| Banned.Video | Bitclout: https://bitclout.com/u/BANNEDdotVIDEO | 373 |
| Banned.Video | Buzzbii: https://www.buzzbii.com/BANNEDdotVIDEO | 29 |
| Banned.Video | Xephula: https://xephula.com/pages/BANNEDdotVIDEO | 9874 |
| The War Room | X (formerly Twitter): https://x.com/WarRoomShow | 36.6k |
| The War Room | Truth Social: https://truthsocial.com/@allidoisowen | 14.7k |
| The War Room | Bitchute: https://www.bitchute.com/channel/9c7qJvwx7YQ1/ | 25.6k |
| The War Room | Telegram: https://t.me/Owen_Shroyer | 5.6k |
| The War Room | Minds: https://www.minds.com/WarRoomShow/ | 2k |
| The War Room | Gettr: https://gettr.com/user/allidoisowen (Owen Shroyer) | 39.9k |
| The War Room | Sovren: https://sovren.media/u/warroomshow/ | 55 |
| The War Room | Minds: https://www.minds.com/allidoisowen/ (Owen Shroyer) | 519 |
| The War Room | Gab: https://www.gab.com/allidoisowen/ (Owen Shroyer) | 21.3k |
| The Answer to 1984 is 1776 | Instagram: https://www.instagram.com/theanswerto1984is1776/ | 16.7k |

FSS Intellectual Property                                                                                    Other Property

| Asset Description |
| --- |
| Infowars Production Rights & Materials |
| Newsletter Subscribers (Sendy) |
| E-Commerce Platform (Magento) |
| Product Vendor Contacts |

**SCHEDULE 1.1(a)(ii)**

**Personal Property**

**Asset Purchase Agreement - Free Speech Systems, LLC**

Schedule 1.1(a)(ii)

| Asset Tag | Description | Item | Category | Location |
|---|---|---|---|---|
| 269 | Desktop Generic | Desktop | Computer Equipment | Black box |
| 270 | Desktop Generic | Desktop | Computer Equipment | Black box |
| 2676 | Desktop Generic | Desktop | Computer Equipment | Black box |
| 178 | LG Curved Monitor | Monitor | Computer Equipment | Black box |
| 271 | LG Curved Monitor | Monitor | Computer Equipment | Black box |
| 29 | iMac | Desktop | Computer Equipment | E-Commerce office |
| 30 | New iMac | Desktop | Computer Equipment | E-Commerce office |
| 256 | iMac | Desktop | Computer Equipment | Production Office |
| 252 | LG Curved Monitor | Monitor | Computer Equipment | Production Office |
| 15 | iMac | Desktop | Computer Equipment | CS Conference room |
| 653 | Server rack | Rack | Computer Equipment | CS server room |
| 657 | ProCurve Switch 4208vl | Switch | Computer Equipment | CS server room |
| 7 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Customer Service |
| 241 | Apple Mac Pro | Desktop | Computer Equipment | Production Office |
| 242 | LG Curved Monitor | Monitor | Computer Equipment | Production Office |
| 243 | LG Curved Monitor | Monitor | Computer Equipment | Production Office |
| 1 | iMac | Desktop | Computer Equipment | E-Commerce |
| 53 | iMac | Desktop | Computer Equipment | E-Commerce |
| 2 | iMac | Desktop | Computer Equipment | E-Commerce |
| 27 | Canon Printer | Large Printer | Computer Equipment | E-Commerce |
| 14 | HP DesignJet | Large Printer | Computer Equipment | E-Commerce |
| 40 | LG Curved Monitor | Monitor | Computer Equipment | E-Commerce |
| 141 | New iMac | Desktop | Computer Equipment | Empty office |
| 142 | UniFi switch 48 | Switch | Computer Equipment | Empty office |
| 18 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room |
| 19 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room |
| 20 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room |
| 21 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room |
| 26 | Desktop Generic | Desktop | Computer Equipment | Facility manager room |
| 148 | LG Curved Monitor | Monitor | Computer Equipment | Front waiting room / office |
| 152 | LG Curved Monitor | Monitor | Computer Equipment | Front waiting room / office |
| 112 | iPad | Tablet | Computer Equipment | Gym |
| 74 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage |
| 75 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage |
| 76 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage |
| 77 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage |
| 78 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage |
| 71 | Server rack | Rack | Computer Equipment | Gym / storage |
| 50 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT |
| 52 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT |
| 55 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT |
| 58 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT |
| 59 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT |
| 41 | iMac | Desktop | Computer Equipment | IT |
| 47 | iMac | Desktop | Computer Equipment | IT |
| 48 | iMac | Desktop | Computer Equipment | IT |
| 56 | iMac | Desktop | Computer Equipment | IT |
| 57 | iMac | Desktop | Computer Equipment | IT |
| 51 | MacBook Pro | Laptop | Computer Equipment | IT |
| 46 | LG Curved Monitor | Monitor | Computer Equipment | IT |
| 10 | Dell Desktop | Desktop | Computer Equipment | Customer Service Office |
| 61 | LG Curved Monitor | Monitor | Computer Equipment | Customer Service Office |
| 153 | Thinksmart hub | Video conference | Computer Equipment | Small conference room |
| 309 | iMac | Desktop | Computer Equipment | Producers room |
| 308 | Mac Mini | Desktop | Computer Equipment | Production Break Room |
| 237 | LG Curved Monitor | Monitor | Computer Equipment | Security entrance |
| 238 | LG Curved Monitor | Monitor | Computer Equipment | Security entrance |
| 8 | Dell Desktop | Desktop | Computer Equipment | Customer Service Office |
| 202 | Desktop Generic | Desktop | Computer Equipment | Studio B |
| 203 | Desktop Generic | Desktop | Computer Equipment | Studio B |
| 161 | Desktop Generic | Desktop | Computer Equipment | Studio B |
| 206 | Desktop Generic | Desktop | Computer Equipment | Studio B |
| 214 | iMac | Desktop | Computer Equipment | Studio B |
| 204 | iMac | Desktop | Computer Equipment | Studio B |
| 205 | iMac | Desktop | Computer Equipment | Studio B |
| 220 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B |
| 221 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B |
| 222 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B |
| 223 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B |
| 224 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B |
| 325 | Desktop Generic | Desktop | Computer Equipment | Studio C |
| 315 | Desktop Generic | Desktop | Computer Equipment | Studio C |
| 332 | Desktop Generic | Desktop | Computer Equipment | Studio C |
|  | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio C |

Asset Purchase Agreement - Free Speech Systems, LLC

Schedule 1.1(a)(ii)

| Asset Tag | Description | Item | Category | Location |
|-----------|-------------|------|----------|----------|
| 801 | Dell Precision T3600 | AUTOCAD | Computer Equipment | Studio C Server Room |
| 814 | Dell Precision T3600 | AUTOCAD | Computer Equipment | Studio C Server Room |
| 812 | Mac Mini | Desktop | Computer Equipment | Studio C Server Room |
| 813 | Mac Mini | Desktop | Computer Equipment | Studio C Server Room |
| 807 | Supermicro SuperServer 1029P-MT SYS-1029P-MT | Rack | Computer Equipment | Studio C Server Room |
| 284 | Desktop Generic | Desktop | Computer Equipment | Studio J |
| 285 | Desktop Generic | Desktop | Computer Equipment | Studio J |
| 277 | Desktop Generic | Desktop | Computer Equipment | Studio J |
| 278 | Desktop Generic | Desktop | Computer Equipment | Studio J |
| 280 | iMac | Desktop | Computer Equipment | Studio J |
| 191 | Pixel Plex | Monitor | Computer Equipment | Studio J |
|  | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio J |
| 297 | iMac | Desktop | Computer Equipment | Writers Room |
| 37 | Fridge | Break Room | Facilities | Accounting office |
| 39 | Large TV | TV | Facilities | Accounting office |
| 38 | Vacuum | Vacuum | Facilities | Accounting office |
| 33 | TV | TV | Facilities | E-Commerce office |
| 6 | Fridge | Break Room | Facilities | CS breakroom |
| 4 | Coffee Grinder | Coffee grinder | Facilities | CS breakroom |
| 5 | Coffee Maker | Coffee maker | Facilities | CS breakroom |
| 13 | TV | TV | Facilities | CS Conference room |
| 244 | Large TV | TV | Facilities | Producer's Office |
| 22 | Zebra RF Gun | RF Gun | Facilities | Facility manager room |
| 23 | Zebra RF Gun | RF Gun | Facilities | Facility manager room |
| 24 | Zebra RF Gun | RF Gun | Facilities | Facility manager room |
| 25 | Zebra RF Gun | RF Gun | Facilities | Facility manager room |
| 113 | Air compressor | Air compressor | Facilities | Gym |
| 95 | Hoist Bench | Gym equipment | Facilities | Gym |
| 96 | Hoist Bench | Gym equipment | Facilities | Gym |
| 97 | Hoist Bench | Gym equipment | Facilities | Gym |
| 98 | Hoist HD-3700 | Gym equipment | Facilities | Gym |
| 103 | Keiser Biaxial Chest press | Gym equipment | Facilities | Gym |
| 101 | Keiser Infinity series | Gym equipment | Facilities | Gym |
| 104 | Keiser Leg press | Gym equipment | Facilities | Gym |
| 105 | Keiser seated leg curl | Gym equipment | Facilities | Gym |
| 102 | Keiser Upper Back | Gym equipment | Facilities | Gym |
| 106 | Massage table | Gym equipment | Facilities | Gym |
|  | Massage table | Gym equipment | Facilities | Gym |
|  | Punching bag | Gym equipment | Facilities | Gym |
|  | Punching bag | Gym equipment | Facilities | Gym |
| 100 | Rouge Echo Bike | Gym equipment | Facilities | Gym |
| 107 | RowERG | Gym equipment | Facilities | Gym |
| 93 | Squat Rack | Gym equipment | Facilities | Gym |
| 94 | Squat Rack | Gym equipment | Facilities | Gym |
| 99 | Teeter | Gym equipment | Facilities | Gym |
| 122 | Teeter | Gym equipment | Facilities | Gym |
| 92 | TF Leg Press | Gym equipment | Facilities | Gym |
| 108 | Weight rack with weights 10-60 lbs | Gym equipment | Facilities | Gym |
| 109 | Weight rack with weights 65-100lbs | Gym equipment | Facilities | Gym |
| 111 | PA System | Speaker | Facilities | Gym |
| 110 | TV | TV | Facilities | Gym |
| 70 | Ac Unit | AC Unit | Facilities | Gym / storage |
| 82 | BBQ Pit | BBQ Pit | Facilities | Gym / storage |
| 84 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 85 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 86 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 87 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 88 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 89 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 90 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 91 | Philips Selecon Studio light | Lights | Facilities | Gym / storage |
| 73 | Electric pallet jack | Pallet jack | Facilities | Gym / storage |
| 72 | Pallet jack | Pallet jack | Facilities | Gym / storage |
| 64 | Safe | Safe | Facilities | Gym / storage |
| 67 | Safe | Safe | Facilities | Gym / storage |
| 65 | Safe | Safe | Facilities | Gym / storage |
| 66 | Safe | Safe | Facilities | Gym / storage |
| 69 | Shipping container | Safe | Facilities | Gym / storage |
| 79 | Drone storage case | Storage case | Facilities | Gym / storage |
| 144 | Fridge | Break Room | Facilities | Gym Break room |
| 145 | Fridge | Break Room | Facilities | Gym Break room |
| 146 | Fridge | Break Room | Facilities | Gym Break room |
| 147 | Fridge | Break Room | Facilities | Gym Break room |
| 143 | Euhomy Ice box | Kitchen | Facilities | Gym Break room |

**Asset Purchase Agreement - Free Speech Systems, LLC**

Schedule 1.1(a)(ii)

| Asset Tag | Description | Item | Category | Location |
|---|---|---|---|---|
| 121 | Air tower elite | Gym equipment | Facilities | Gym Cold Room |
| 126 | Elliptical | Gym equipment | Facilities | Gym Cold Room |
| 118 | Resistance Fitness Bike | Gym equipment | Facilities | Gym Cold Room |
| 119 | Resistance Fitness Bike | Gym equipment | Facilities | Gym Cold Room |
| 120 | Resistance Fitness Bike | Gym equipment | Facilities | Gym Cold Room |
| 125 | Treadmill | Gym equipment | Facilities | Gym Cold Room |
| 123 | Trueform trainer | Gym equipment | Facilities | Gym Cold Room |
| 124 | Trueform trainer | Gym equipment | Facilities | Gym Cold Room |
| 114 | Joovv red light | Lights | Facilities | Gym Cold Room |
| 116 | Joovv red light | Lights | Facilities | Gym Cold Room |
| 117 | Joovv red light | Lights | Facilities | Gym Cold Room |
| 115 | TV | TV | Facilities | Gym Cold Room |
| 140 | Large TV | TV | Facilities | Morning Host office |
| 42 | Large TV | TV | Facilities | IT |
| 49 | Large TV | TV | Facilities | IT |
| 43 | Large TV | TV | Facilities | IT |
| 60 | TV | TV | Facilities | IT |
| 138 | Large TV | TV | Facilities | Sales office |
| 11 | TV | TV | Facilities | Customer Service Office |
| 62 | TV | TV | Facilities | Customer Service Office |
| 136 | Large TV | TV | Facilities | Afternoon Host office |
| 137 | Large TV | TV | Facilities | Afternoon Host office |
| 157 | Fridge | Break Room | Facilities | Small conference room |
| 154 | TV | TV | Facilities | Small conference room |
| 303 | Coffee Maker | Coffee maker | Facilities | Podcast studio |
| 311 | TV | TV | Facilities | Producers room |
| 307 | Fridge | Break Room | Facilities | Production Break Room |
| 305 | Coffee Grinder | Coffee grinder | Facilities | Production Break Room |
| 306 | Coffee Maker | Coffee maker | Facilities | Production Break Room |
| 304 | Large TV | TV | Facilities | Production Break Room |
| 232 | Large TV | TV | Facilities | Production Conference room |
| 236 | Safe | Safe | Facilities | Security entrance |
| 9 | Large TV | TV | Facilities | Customer Service Office |
| 266 | Safe | Safe | Facilities | Studio J |
| 298 | TV | TV | Facilities | Writers Room |
| 17 | Cabinet | Cabinet | Office Furniture | Customer Service |
| 28 | Cabinet | Cabinet | Office Furniture | Facility manager room |
| 32 | Cabinet | Cabinet | Office Furniture | Purchasing office |
| 35 | Cabinet | Cabinet | Office Furniture | Accounting office |
| 44 | Cabinet | Cabinet | Office Furniture | IT |
| 45 | Cabinet | Cabinet | Office Furniture | IT |
| 134 | Cabinet | Cabinet | Office Furniture | Green screen room |
| 12 | Whiteboard | Whiteboard | Office Furniture | CS Conference room |
| 139 | Whiteboard | Whiteboard | Office Furniture | Sales office |
| 155 | Whiteboard | Whiteboard | Office Furniture | Small conference room |
| 233 | Whiteboard | Whiteboard | Office Furniture | Production Conference room |
| 234 | Whiteboard | Whiteboard | Office Furniture | Production Conference room |
| 3 | Table | Table | Office Furniture | E-Commerce |
| 16 | Conference Table | Table | Office Furniture | CS Conference room |
| 83 | Conference Table | Table | Office Furniture | Gym / storage |
| 156 | Conference Table | Table | Office Furniture | Small conference room |
| 231 | Conference Table | Table | Office Furniture | Production Conference room |
| 135 | Cabinet | Cabinet | Office Furniture | Bull pen |
| 208 | Cabinet | Cabinet | Office Furniture | Studio B |
| 209 | Cabinet | Cabinet | Office Furniture | Studio B |
| 239 | Cabinet | Cabinet | Office Furniture | Production Office |
| 312 | Cabinet | Cabinet | Office Furniture | Studio C |
| 636 | Cabinet | Cabinet | Office Furniture | Studio C |
| 31 | Couch | Couch | Office Furniture | E-Commerce office |
| 36 | Couch | Couch | Office Furniture | Accounting office |
| 63 | Couch | Couch | Office Furniture | Customer Service Office |
| 151 | Couch | Couch | Office Furniture | Front waiting room / office |
| 299 | Couch | Couch | Office Furniture | Writers Room |
| 34 | Desk | Desk | Office Furniture | Accounting office |
| 54 | Big White Desk | Desk | Office Furniture | IT |
| 149 | Big White Desk | Desk | Office Furniture | Front waiting room / office |
| 150 | Big White Desk | Desk | Office Furniture | Front waiting room / office |
| 172 | Studio B Desk | Desk | Office Furniture | Studio B |
| 253 | Big White Desk | Desk | Office Furniture | Production Office |
| 254 | Big White Desk | Desk | Office Furniture | Production Office |
| 255 | Big White Desk | Desk | Office Furniture | Production Office |
| 257 | Big White Desk | Desk | Office Furniture | Production Office |
| 258 | Big White Desk | Desk | Office Furniture | Production Office |
| 259 | Big White Desk | Desk | Office Furniture | Production Office |

Asset Purchase Agreement - Free Speech Systems, LLC

Schedule 1.1(a)(ii)

| Asset Tag | Description | Item | Category | Location |
|---|---|---|---|---|
| 261 | Desk | Desk | Office Furniture | Studio J |
| 265 | Desk | Desk | Office Furniture | Studio J |
| 286 | Desk | Desk | Office Furniture | Studio J |
| 287 | Desk | Desk | Office Furniture | Studio J |
| 302 | Desk | Desk | Office Furniture | Podcast studio |
| 310 | Desk | Desk | Office Furniture | Producers room |
| 317 | Desk | Desk | Office Furniture | Studio C |
| 329 | Desk | Desk | Office Furniture | Studio C |
| 334 | Desk | Desk | Office Furniture | Studio C |
| 349 | Desk | Desk | Office Furniture | Studio C |
| 651 | Big White Desk | Desk | Office Furniture | IT |
| 652 | Big White Desk | Desk | Office Furniture | IT |
| 313 | Avcom portable spectrum analyzer | Analyzer | Production Equipment | Studio C |
| 185 | Distribution Amplifier Pro Plus | Audio Amplifier | Production Equipment | Studio J |
| 159 | AD 22S Audio Delay | Audio Delay | Production Equipment | Studio B |
| 182 | AD 22S Audio Delay | Audio Delay | Production Equipment | Studio J |
| 291 | AD 22S Audio Delay | Audio Delay | Production Equipment | Studio C |
| 184 | Scarlett 18i20 | Audio Interface | Production Equipment | Studio J |
| 791 | BD600 | Broadcast Delay | Production Equipment | Studio C |
| 321 | Airtools 6100 | BroadcastDelay | Production Equipment | Studio C |
| 322 | Airtools 6100 | BroadcastDelay | Production Equipment | Studio C |
| 170 | Camera with Tripod | Camera | Production Equipment | Studio B |
| 171 | Camera with Tripod | Camera | Production Equipment | Studio B |
| 173 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J |
| 174 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J |
| 175 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J |
| 176 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J |
| 177 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J |
| 210 | Sony Carl Zeiss | Camera | Production Equipment | Studio B |
| 211 | Panasonic Camera | Camera | Production Equipment | Studio B |
| 225 | Camera with Tripod | Camera | Production Equipment | Studio B |
| 226 | Camera with Tripod | Camera | Production Equipment | Studio B |
| 228 | Sony Carl Zeiss | Camera | Production Equipment | Studio B |
| 283 | Sony Carl Zeiss | Camera | Production Equipment | Studio J |
| 288 | Camera crane with Camera | Camera | Production Equipment | Studio J |
| 335 | Sony Carl Zeiss | Camera | Production Equipment | Studio C |
| 351 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C |
| 355 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C |
| 356 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C |
| 357 | Sony camera with tripod | Camera | Production Equipment | Studio C |
| 361 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C |
|  | Sony Carl Zeiss | Camera | Production Equipment | Studio C |
|  | Canon Camera | Camera | Production Equipment | E-Commerce |
|  | Sony Carl Zeiss | Camera | Production Equipment | Studio J |
|  | Sony Carl Zeiss | Camera | Production Equipment | Studio J |
| 196 | Sony remote control unit | Camera controller | Production Equipment | Studio B |
| 207 | DJI Ronin M | Camera controller | Production Equipment | Studio B |
| 260 | Sony remote control unit | Camera controller | Production Equipment | Studio J |
| 276 | NovaStar LED digital video display | Camera controller | Production Equipment | Studio J |
| 331 | Sony remote control unit | Camera controller | Production Equipment | Studio C |
| 183 | 6200 DAB | Digital Audio Broadcast Processor | Production Equipment | Studio J |
| 320 | 6200 DAB | Digital Audio Broadcast Processor | Production Equipment | Studio C |
| 811 | Optimod 6200 DAB | Digital Audio Broadcast Processor | Production Equipment | Studio C Server Room |
| 68 | Drone | Drone | Production Equipment | Gym / storage |
| 187 | NC1 I/O | Input Output Module | Production Equipment | Studio J |
| 188 | NC1 I/O | Input Output Module | Production Equipment | Studio J |
| 314 | NC1 I/O | Input Output Module | Production Equipment | Studio C |
| 127 | Socanland Light | Lights | Production Equipment | Green screen room |
| 128 | Socanland Light | Lights | Production Equipment | Green screen room |
| 131 | Socanland Light | Lights | Production Equipment | Green screen room |
| 132 | Socanland Light | Lights | Production Equipment | Green screen room |
| 133 | Socanland Light | Lights | Production Equipment | Green screen room |
| 212 | Socanland Light | Lights | Production Equipment | Studio B |
| 213 | Socanland Light | Lights | Production Equipment | Studio B |
| 215 | Socanland Light | Lights | Production Equipment | Studio B |
| 229 | Socanland Light | Lights | Production Equipment | Studio B |
| 230 | Socanland Light | Lights | Production Equipment | Studio B |
| 235 | Socanland Light | Lights | Production Equipment | Security entrance |
| 240 | Socanland Light | Lights | Production Equipment | Studio B |
| 336 | Socanland Light | Lights | Production Equipment | Studio C |
| 337 | Socanland Light | Lights | Production Equipment | Studio C |
|  | Socanland Light | Lights | Production Equipment | Studio B |
|  | Socanland Light | Lights | Production Equipment | Studio J |
|  | Socanland Light | Lights | Production Equipment | Studio J |

Asset Purchase Agreement - Free Speech Systems, LLC

Schedule 1.1(a)(ii)

| Asset Tag | Description | Item | Category | Location |
|---|---|---|---|---|
| | Socanland Light | Lights | Production Equipment | Studio J |
| | Socanland Light | Lights | Production Equipment | Studio J |
| | Socanland Light | Lights | Production Equipment | Studio J |
| | Socanland Light | Lights | Production Equipment | Studio J |
| | Socanland Light | Lights | Production Equipment | Studio C |
| | Light | Lights | Production Equipment | Studio J |
| | Socanland Light | Lights | Production Equipment | Studio C |
| | Socanland Light | Lights | Production Equipment | Studio B |
| | Socanland Light | Lights | Production Equipment | Studio C |
| | Socanland Light | Lights | Production Equipment | Studio C |
| | Socanland Light | Lights | Production Equipment | Studio C |
| | Socanland Light | Lights | Production Equipment | Studio C |
| | Socanland Light | Lights | Production Equipment | Studio C |
| | Socanland Light | Lights | Production Equipment | Studio B |
| | Socanland Light | Lights | Production Equipment | Studio B |
| 169 | The Garnet Microphone | Microphone | Production Equipment | Sound Booth |
| 167 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio B |
| 168 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio B |
| 326 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C |
| 350 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C |
| 784 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C |
| 785 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C |
| 797 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C |
| 786 | Gibralter Network | Network Rack | Production Equipment | Studio C |
| 323 | Clear-com MS-702 | Rack | Production Equipment | Studio C |
| 324 | Clear-com HME DX210 | Rack | Production Equipment | Studio C |
| 338 | Evo SNS 16B64TB-2X10C | Rack | Production Equipment | Studio C Server Room |
| 339 | Dell 3930 Rack | Rack | Production Equipment | Studio C Server Room |
| 340 | HP ProLiant DL360e Gen 8 | Rack | Production Equipment | Studio C Server Room |
| 341 | Haivision Encoders | Rack | Production Equipment | Studio C Server Room |
| 342 | Evo Server Rack | Rack | Production Equipment | Studio C Server Room |
| 343 | Supermicro SuperServer 1029P-MT SYS-1029P-MT | Rack | Production Equipment | Studio C Server Room |
| 344 | UC-IRD Receiver Decoder | Rack | Production Equipment | Studio C Server Room |
| 345 | Wave Stream Redundancy Controller | Rack | Production Equipment | Studio C Server Room |
| 346 | Tanberg E5770 | Rack | Production Equipment | Studio C Server Room |
| 347 | Tandberg EN5990 Digital Encoder | Rack | Production Equipment | Studio C Server Room |
| 362 | Creston AV3 | Rack | Production Equipment | Studio C |
| 808 | Supermicro SuperServer 1029P-MT SYS-1029P-MT | Rack | Production Equipment | Studio C Server Room |
| 274 | Digital radio control | Radio control | Production Equipment | Studio J |
| 792 | EW G4 | Radio control | Production Equipment | Studio C |
| 794 | True Diversity Receiver 500 | Receiver | Production Equipment | Studio C |
| 795 | True Diversity Receiver 500 | Receiver | Production Equipment | Studio C |
| 796 | True Diversity Receiver 500 | Receiver | Production Equipment | Studio C |
| 166 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio B |
| 181 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio J |
| 289 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio C |
| 290 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio C |
| 247 | Tricaster Server | Server | Production Equipment | Studio B |
| 248 | Tricaster Server | Server | Production Equipment | Studio B |
| 292 | Behringer x32 Rack | Server | Production Equipment | Studio C |
| 294 | Tricaster Server | Server | Production Equipment | Studio C |
| 295 | Tricaster Server | Server | Production Equipment | Studio C |
| 296 | BlackMagic Atem production switcher | Server | Production Equipment | Studio C |
| 654 | Server | Server | Production Equipment | CS server room |
| 655 | Server | Server | Production Equipment | CS server room |
| 656 | Server | Server | Production Equipment | CS server room |
| 781 | IOT/Embedded System | Server | Production Equipment | Studio C |
| 798 | Rockford R331 | Server | Production Equipment | Studio C |
| 799 | Rockford R331 | Server | Production Equipment | Studio C |
| | Server | Server | Production Equipment | CS server room |
| 158 | Wheatstone Strata 32 | Soundboard | Production Equipment | Studio B |
| 160 | ETC | Soundboard | Production Equipment | Studio B |
| 197 | Newtek | Soundboard | Production Equipment | Studio B |
| 249 | Newtek | Soundboard | Production Equipment | Studio B |
| 273 | Newtek | Soundboard | Production Equipment | Studio J |
| 275 | ETC | Soundboard | Production Equipment | Studio J |
| 279 | Wheatstone Strata 32 | Soundboard | Production Equipment | Studio J |
| 319 | Wheatstone Strata 32 | Soundboard | Production Equipment | Studio C |
| 330 | Newtek | Soundboard | Production Equipment | Studio C |
| 787 | Access Rack | Stereo | Production Equipment | Studio C |
| 788 | Access Rack | Stereo | Production Equipment | Studio C |
| 162 | ProSafe GS728TP | Switch | Production Equipment | Studio B |
| 190 | Switch 48 | Switch | Production Equipment | Studio J |
| 783 | Catalyst 3650 24 4X1G | Switch | Production Equipment | Studio C |

Page 5

Asset Purchase Agreement - Free Speech Systems, LLC

Schedule 1.1(a)(ii)

| Asset Tag | Description | Item | Category | Location |
|---|---|---|---|---|
| 800 | Smart Videohub | Switch | Production Equipment | Studio C Server Room |
| 809 | ProCurve Switch 4208vl | Switch | Production Equipment | Studio C Server Room |
| 810 | DXS-1210-12SC | Switch | Production Equipment | Studio C Server Room |
| 129 | Large TV | TV | Production Equipment | Green screen room |
| 130 | Large TV | TV | Production Equipment | Green screen room |
| 198 | Large TV | TV | Production Equipment | Studio B |
| 199 | Large TV | TV | Production Equipment | Studio B |
| 200 | Large TV | TV | Production Equipment | Studio B |
| 201 | TV | TV | Production Equipment | Studio B |
| 216 | TV | TV | Production Equipment | Studio B |
| 217 | Large TV | TV | Production Equipment | Studio B |
| 218 | Large TV | TV | Production Equipment | Studio B |
| 219 | Large TV | TV | Production Equipment | Studio B |
| 227 | Large TV | TV | Production Equipment | Studio B |
| 250 | Large TV | TV | Production Equipment | Studio C |
| 251 | Large TV | TV | Production Equipment | Studio C |
| 262 | Large TV | TV | Production Equipment | Studio J |
| 263 | Large TV | TV | Production Equipment | Studio J |
| 264 | Large TV | TV | Production Equipment | Studio J |
| 267 | TV | TV | Production Equipment | Studio J |
| 268 | Large TV | TV | Production Equipment | Studio J |
| 272 | Large TV | TV | Production Equipment | Black box |
| 281 | Large TV | TV | Production Equipment | Studio J |
| 282 | Large TV | TV | Production Equipment | Studio J |
| 300 | TV | TV | Production Equipment | Podcast studio |
| 301 | TV | TV | Production Equipment | Podcast studio |
| 352 | Large TV | TV | Production Equipment | Studio C |
| 353 | Large TV | TV | Production Equipment | Studio C |
| 354 | Large TV | TV | Production Equipment | Studio C |
| 358 | TV | TV | Production Equipment | Studio C |
| 359 | TV | TV | Production Equipment | Studio C |
| 360 | TV | TV | Production Equipment | Studio C |
|  | Large TV | TV | Production Equipment | Studio J |
|  | Large TV | TV | Production Equipment | Studio J |
|  | Large TV | TV | Production Equipment | Studio J |
|  | Large TV | TV | Production Equipment | Studio J |
|  | Large TV | TV | Production Equipment | Studio J |
|  | Large TV | TV | Production Equipment | Studio J |
| 348 | SmartOnline UPS | UPS | Production Equipment | Studio C Server Room |
| 802 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room |
| 803 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room |
| 804 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room |
| 805 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room |
| 806 | SmartOnline UPS | UPS | Production Equipment | Studio C |
| 163 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B |
| 164 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B |
| 165 | Smart Videohub 40x40 | Video Broadcaster | Production Equipment | Studio B |
| 179 | ATEM 1 M/E Production Studio 4k | Video Broadcaster | Production Equipment | Studio J |
| 180 | Design Video Assist | Video Broadcaster | Production Equipment | Studio J |
| 186 | LU2000 | Video Broadcaster | Production Equipment | Studio J |
| 189 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio J |
| 192 | Ultimatte 12 4k | Video Broadcaster | Production Equipment | Studio C |
| 193 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C |
| 194 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C |
| 195 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C |
| 245 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B |
| 246 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B |
| 293 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio C |
| 316 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio C |
| 318 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio B |
| 327 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio C |
| 328 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio C |
| 333 | Ultimatte 12 4k | Video Broadcaster | Production Equipment | Studio C |
| 782 | KiPro Rack | Video Broadcaster | Production Equipment | Studio C |
| 789 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio J |
| 790 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C |

*This is an unaudited list of assets provided by FSS from their asset management system.*
*Items under an estimated $500 at cost value do not appear on the list.*

**SCHEDULE 1.1(a)(iii)**

**Inventory**

**Free Speech Systems LLC**
**Inventory Look Forward**
*as of 11/5/2024*



| | Name | CURRENT INVENTORY | | | CURRENT SALES | | | |
|---|---|---|---|---|---|---|---|---|
| | | Quantity | Cost | Total Cost | Current Sales Price | Total Sales @ Current Price | Avg Units Sold per Day (f) | Days Inv Remaining |
| (a) | Books | N/A | N/A | 130,186.47 | N/A | N/A | N/A | 180+ |
| (a) | DVD's & Videos | N/A | N/A | 123,150.72 | N/A | N/A | N/A | 180+ |
| (a) | T-Shirts and Apparel | N/A | N/A | 126,014.31 | N/A | N/A | N/A | 180+ |
| (a) | Misc Other | N/A | N/A | 110,044.25 | N/A | N/A | N/A | 180+ |
| | | | | 489,395.75 | | | | |
| | | | | | | | | |
| (e) | Survival Shield X-3 1 oz. Bottle | 28 | 3.50 | 98.00 | 29.95 | 838.60 | 265 | - |
| (c) | BodEase | 14,040 | 7.37 | 103,474.80 | 48.70 | 683,748.00 | 350 | 40 |
| | The Real Red Pill Plus | 715 | 7.35 | 5,255.25 | 79.95 | 57,164.25 | 75 | 10 |
| (c) | Vitamin Mineral Fusion | 7,166 | 8.26 | 59,191.16 | 54.95 | 393,771.70 | 275 | 26 |
| | CBD Full Spectrum Tincture | 945 | 29.00 | 27,405.00 | 99.95 | 94,452.75 | 20 | 47 |
| | DNA Force Plus | 2,105 | 18.50 | 38,942.50 | 89.95 | 189,344.75 | 45 | 47 |
| | Vitamin C With Zinc | 6,582 | 7.65 | 50,352.30 | 29.95 | 197,130.90 | 100 | 66 |
| | Survival Shield X-2 - Nascent Iodine | 26,730 | 3.70 | 98,901.00 | 29.95 | 800,563.50 | 375 | 71 |
| (d) | Super Concentrated Beet Extract Essence VasoBeet | 9,132 | 3.30 | 30,135.60 | 23.95 | 218,711.40 | 110 | 83 |
| (d) | Brain Force Ultra | 13,231 | 8.00 | 105,848.00 | 29.97 | 396,533.07 | 150 | 88 |
| (d) | Ultra 12 | 8,138 | 5.00 | 40,690.00 | 32.95 | 268,147.10 | 70 | 116 |
| (d) | Prebiotic Fiber | 18,248 | 6.96 | 127,006.08 | 22.45 | 409,667.60 | 40 | 456 |
| (b) | Alex Jones "Great Reset" Book | 3,908 | 9.76 | 38,142.08 | 55.00 | 214,940.00 | 6 | 651 |
| | | | | 725,441.77 | | 3,925,013.62 | | |
| | | | | | | | | |
| | **TOTALS** | | | 1,214,837.52 | | 3,925,013.62 | | |

| TOP 15 NUTRITIONAL SUPPLEMENT PRODUCTS | | |
|---|---|---|
| Product | Annual Units | Manufacturer |
| Nitric Boost | 106,000 | A, B |
| X3 | 58,500 | C |
| Vitamin Mineral Fusion | 45,000 | A, B |
| BF Plus | 44,000 | A, B |
| X2 | 42,500 | C |
| Bodease | 39,500 | A, B |
| BF Ultra | 34,500 | C, A |
| Red Pill Plus | 29,500 | A, B |
| Fish Oil | 23,500 | A |
| DNA Force | 21,500 | A, B |
| Winter Sun | 17,500 | C |
| Ultimate Bone Broth | 17,000 | A, B |
| Ultra 12 | 17,000 | C |
| Down n Out | 16,500 | C, A |
| Vasobeet | 15,500 | C |

| | |
|---|---|
| A | Vendor A |
| B | Vendor B |
| C | Vendor C |

(a)  Numerous inventory items with an aggregate cost of approximately $500,000.  This is slow moving inventory and is not tracked on an item by item basis.  It is assumed it will be deeply discounted.

(b)  FSS has already recovered 100% of the inventory cost through the weekly settlement with Jones.  We will not be able to sell the remaining inventory during the liquidation period.

(c)  Bodese and VMF are popular products with a fast production lead time and have been re-ordered.  Inventory in-transit is not included in the quantity disclosed

(d)  Inventory is slow moving and will be discounted to try and boost sales, but very unlikely that FSS can sell the remaining quantity available for sale and will need to explore other monetization methods.

(e)  Inventory is no longer available in the FSS Store, the remaining inventory is to cover returns / exchanges.

(f)  Daily unit sales averages are calculated based on the 30-days prior to this analysis with the exception of Vitamin Mineral Fusion, Vitamin C and X-2, which are calculated using the actual days in stock

**ALL QUANTITIES ARE UNAUDITED AND INVENTORY IS WAREHOUSED BY A THIRD PARTY FULFILLMENT COMPANY**
**SALES PRICES ARE SUBJECT TO CHANGE AT THE DISCRETION OF MANAGEMENT**

**SCHEDULE 1.1(b)(xi)**

**Excluded Domain Names**

FSS Domain Names

| Reference # | Domain | TLD | Length | Lot | Registrar Status | Age | Expiration | Expiration Status | Registrar per FSS | |
|---|---|---|---|---|---|---|---|---|---|---|
| 9 | alejandrojones.com | com | 14 | 7 | Active - Contested | - | 10/22/25 | Active | **Epik** | |
| 10 | alexjonesexposed.org | org | 16 | 7 | Active - Contested | 4 years, 10 months | 10/29/24 | Pending | **Epik** | |
| 11 | alexjonesplan.com | com | 13 | 7 | Active - Contested | - | 10/22/25 | Active | **Epik** | |
| 12 | alexjonesplantosaveamerica.com | com | 26 | 7 | Active - Contested | - | 10/22/25 | Active | **Epik** | |
| 13 | alexjoneswasright.news | news | 17 | 7 | Active - Contested | 0 years, 0 months | 2/26/26 | Active | **Epik** | |
| 32 | defendjones.com | com | 11 | 7 | Active - Contested | 0 years, 0 months | 8/6/25 | Active | **Epik** | †† No Registrar Access |
| 54 | freealexjones.com | com | 13 | 7 | Active - Contested | 4 years, 8 months | 12/28/24 | Active | **Epik** | |
| 101 | jonescrowder.com | com | 12 | 7 | Active - Contested | 1 years, 0 months | 8/7/25 | Active | **Epik** | †† No Registrar Access |
| 157 | theajreport.com | com | 11 | 7 | Active - Contested | 4 years, 0 months | 8/26/25 | Active | **Epik** | †† No Registrar Access |
| 187 | defendalexjones.com | com | 15 | 7 | Active - Contested | 5 years, 6 months | 2/4/25 | Active | **GoDaddy** | |
| 240 | alexanderemerickjones.com | com | 21 | 7 | Active - Contested | 7 years, 5 months | 3/2/25 | Active | **Name** | |
| 241 | alexemericjones.com | com | 15 | 7 | Active - Contested | 7 years, 5 months | 3/1/25 | Active | **Name** | |
| 242 | alexemerickjones.com | com | 16 | 7 | Active - Contested | 7 years, 5 months | 3/1/25 | Active | **Name** | |
| 243 | alexjones.net | net | 9 | 7 | Active - Contested | 24 years, 0 months | 8/26/25 | Active | **Name** | |
| 244 | alexjones.org | org | 9 | 7 | Active - Contested | 24 years, 0 months | 8/26/25 | Active | **Name** | |
| 245 | alexjonesbroadcasting.com | com | 21 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 246 | alexjonesbroadcasting.net | net | 21 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 247 | alexjonesbroadcasting.org | org | 21 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 248 | alexjonescoffee.com | com | 15 | 7 | Active - Contested | 12 years, 0 months | 8/3/25 | Active | **Name** | |
| 249 | alexjonesinvestigates.com | com | 21 | 7 | Active - Contested | 12 years, 5 months | 3/28/25 | Active | **Name** | |
| 250 | alexjonesinvestigations.com | com | 23 | 7 | Active - Contested | 12 years, 5 months | 3/28/25 | Active | **Name** | |
| 251 | alexjonesmobile.mobi | mobi | 15 | 7 | Active - Contested | - | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 252 | alexjonesradio.com | com | 14 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Active | **Name** | †† No Registrar Access |
| 253 | alexjonesradio.net | net | 14 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 254 | alexjonesradio.org | org | 14 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 255 | alexjonesshow.com | com | 13 | 7 | Active - Contested | 16 years, 11 months | 8/31/25 | Active | **Name** | |
| 256 | alexjonesshow.net | net | 13 | 7 | Active - Contested | 16 years, 11 months | 8/31/25 | Active | **Name** | |
| 257 | alexjonesshow.org | org | 13 | 7 | Active - Contested | 16 years, 11 months | 8/31/25 | Active | **Name** | †† No Registrar Access |
| ~~258~~ | ~~alexjoneswakeupamerica.com~~ | ~~com~~ | ~~22~~ | ~~7~~ | ~~Active - Contested~~ | ~~12 years, 0 months~~ | ~~8/2/25~~ | ~~Active~~ | ~~Name~~ | |
| ~~259~~ | ~~alexjoneswakeupamerica.net~~ | ~~net~~ | ~~22~~ | ~~7~~ | ~~Active - Contested~~ | ~~12 years, 0 months~~ | ~~8/2/25~~ | ~~Active~~ | ~~Name~~ | |
| 287 | charlottejones.com | com | 14 | 7 | Active - Contested | 16 years, 11 months | 8/31/25 | Active | **Name** | |
| 288 | charlottejones.us | us | 14 | 7 | Active - Contested | 23 years, 11 months | 8/30/25 | Active | **Name** | |
| 298 | deplorablejones.com | com | 15 | 7 | Active - Contested | 7 years, 11 months | 9/12/25 | Active | **Name** | |
| 403 | jonesbroadcasting.net | net | 17 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 404 | jonesbroadcasting.org | org | 17 | 7 | Active - Contested | 16 years, 11 months | 8/31/24 | Pending | **Name** | †† No Registrar Access |
| 406 | jonesnewsnetwork.com | com | 16 | 7 | Active - Contested | 16 years, 1 months | 7/8/25 | Active | **Name** | †† No Registrar Access |
| 464 | rexjones.info | info | 8 | 7 | Active - Contested | 16 years, 11 months | 8/31/25 | Active | **Name** | |
| 465 | rexjones.org | org | 8 | 7 | Active - Contested | 16 years, 11 months | 8/31/25 | Active | **Name** | |
| 466 | rexjones.us | us | 8 | 7 | Active - Contested | 23 years, 11 months | 8/30/25 | Active | **Name** | |

*Note: Information provided is based on third party sources deemed reliable; however, subject to change and buyer diligence.

"Pending" indicates recently expired domains that may remain renewable or domains expiring soon.