IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE:  ALEXANDER E. JONES | § | |
| | § | CASE NO. 22-33553 (CML) |
| | § | |
| Debtor. | § | Chapter 7 |

ALEXANDER E. JONES RESPONSE AND OBJECTION TO THE TRUSTEE'S
EXPEDITED MOTION FOR ENTRY OF AN ORDER IN FURTHERANCE OF THE
SALE OF ASSETS OF FREE SPEECH SYSTEMS, LLC
[Dkt #915]

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

ALEXANDER E. JONES files this Response and Objection to the Trustee's Expedited

Motion for Entry of an Oder in Furtherance of the Sale of Assets of Free Speech Systems, LLC

("FSS") [incorporating herein the facts, conclusions and arguments in the set out in Adversary

No.  24-03238] and would show as follows:

I
PRELIMINARY STATEMENT

1.      The Trustee offered for sale the going concern assets of Free Speech Systems, LLC

("FSS") that currently (through November 13, 2024) was grossing approximately $5M to $7M+ a

month, netting approximately 15%-20% (up to $5M to $10M annually after tax and costs of

operations) which earnings would be available for payment of Connecticut and Texas judgment

claims, *if they are ever liquidated by law or by agreement.*  [Judicial Notice, Trustee's reports filed

and FSS Monthly operating reports filed in the FSS case].

2.      To accomplish this sale the Trustee initiated what may have been originally

intended to be a normal, non-complex bankruptcy sale for cash or cash equivalents, but soon turned

into the Trustee accomplishing the will of the Connecticut Plaintiffs.  By the Connecticut Plaintiffs

participation as a Joint Bidder the Connecticut Plaintiffs seek to monetize their $1.45 billion

stayed, non-final Judgment *long before their "stayed" Judgment is final on appeal*[1] and designed

to "punish"[2] Alex Jones by the acquisition of the "InfoWars" name and brand together with all of

its customers/listeners data and access long before their "stayed" Judgment is final on appeal, for

the express purpose of destruction of both.   In this process the Trustee, for instances, testified that

he was presented with a demand from the Connecticut Plaintiffs that they have a veto power over

the determination of a successful bidder.[3]   The Trustee testified that he refused this demand,

however, the bid process actually employed by the Trustee reflects an just such an unfair, biased,

---

[1]   *Henry v. First Nat'l Bank*, 595 F.2d 291, 200 (5th Cir. 1979):
  In the ordinary case a state court judgment must have been approved by the highest court of the
  state before it becomes immediately enforceable. *See New York Times v. Sullivan*, 376 U.S. 254, 84
  S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161
  (1948).
As this Court has only recently has been made aware, a Connecticut Statute automatically stays civil judgments
through the first full round of appeal, just as referenced by the Supreme Court in *Henry*:
  "Connecticut Practice Book – Rules of Court:
  "Sec. 61-11. Stay of Execution in Noncriminal Cases (a) Automatic stay of execution Except where
  otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order
  shall be automatically stayed until the time to [take] file an appeal has expired. If an appeal is filed,
  such proceedings shall be stayed until the final determination of the cause. If the case goes to
  judgment on appeal, any stay thereafter shall be in accordance with Section 71-6 (motions for
  reconsideration), Section 84-3 (petitions for certification by the Connecticut supreme court), and
  Section 71-7 (petitions for certiorari by the United States supreme court)."

*State v. Charlotte Hungerford Hosp*., 308 Conn. 140, 146, 60 A.3d 946, 950 (2013).  While Stayed, Collateral Estoppel
Is Not Applicable:  A party must receive one opportunity for appellate review before it will be subject to the application
of collateral estoppel. *citing Commissioner of Motor Vehicles v. DeMilo & Co*., supra, 233 Conn. 268.

  This Court was told in writing in the Connecticut Plaintiffs Opposition to Jones's (sic) Claim Objection [Jones
Ex. 13] that because Jones had not obtained a stay, collateral estoppel could properly be applied. Id. at ¶17.   The
Connecticut Judgment has always been stayed automatically by Sec. 61-11 Connecticut statute.  The representation
and argument was bogus when made, and remains so.

[2]  The announced motives of this Joint Bidders' non-cash scheme was to ***destroying the "going concern"*** of
FSS so that the owner and debtor Jones could never repay the Judgment – that is, *to buy and shut down*, and liquidate
all activities but keep the customer lists for harassment and "InfoWars" brand and IP for purposes of future attacks on
the debtor Jones and public confusion of product-purchasers and listeners.

[3]  The Trustee testified that this demand was in a written form that he was requested to sign, but did not have a
copy.  A request was made of the Trustee's counsel to produce the report, and the indication was that it would be
produced.  The Connecticut Plaintiffs have publicly announced that acquiring joint control of the FSS assets was for
the purpose of using those assets, in their words, to "punish" Alex Jones.

approach to an asset sale in that it *guaranteed that the Joint Bidders would be the winning bidder*.

3.      This scheme involved, in lieu of a cash payment, the Connecticut Plaintiffs developed a scheme, unknown to any bidders other than the Connecticut Bidders and their joint partner Global Tetrahedron (the "Joint Bidders"), and ultimately the Trustee, by which the Trustee would accept a "topping" or "floating" bid in any final offer [*See*, Jones Ex. 8] even though such acceptance violated the bid instructions of no "formulas" or "contingencies" [*See*, Exhibit 6, ¶2, last sentence] and made a mockery of a fair and transparent auction and bidding process.

4.      Explained in detail below, there were specific provisions of this Courts Sale Order requiring an Auction, or if changes to the Auction protocol and procedures were to be made by the Trustee (*e.g. cancelling any auction at all*) the Trustee must make an "*announcement on the record at the auction*" of any proposed changes.  This was not done.  Instead, after the initial bids were solicited and received, and the Trustee knew the demand of the Connecticut Plaintiffs that they be guaranteed the winner, the Trustee capitulated and changed the protocol by canceling the Auction and putting in place a purported single right to make a "highest and best bid".  This was only done after the Trustee reviewed and "approved" the two initial qualified bids made:

> a.   The FUAC's cash bid of $1.2 million (anticipating an auction process to a final bid); and
>
> b.   The Joint Bid (by Global Tetrahedron and the Connecticut Plaintiffs) which was for $1 million cash, and a formula that was to be applied *using the competitor's highest bid* based on the Connecticut Families waiver of their share[4] of a possible future estate dividends from this sale proceeds sufficient to provide for

---

[4]      Creditors without an allowed claim have no share of dividends.  A creditor whose claim has only been filed and presumed allowed, and show claim is judicially determined to be zero, have no share of dividends.

a dividend to all other creditors equivalent to what they would have received under the competitor's bid, plus $1.00.[5]  Under no circumstance was the cash to increase over the $1 million bid and of course, with this topping bid the Joint Bidders were guaranteed to always be over the amount of the competitor FUAC *by $1.00*.

Remarkably, the Trustee "accepted" *both bids*, then without explanation cancelled the expected Auction, and initiated a new bidding protocol that provided a single additional round of "*best and final offers*" to be received, *provided these offers did not include or rely on "formulas" or "contingencies.*"  Of course, any right to make a "topping bid" never discloses the best and final, only the amount above the other "best and final" bid.  In fact, all that FUCA knew about the expected bidding requirements (which were in writing) said nothing about floating or topping bids that required a formula and used contingencies to be determined.  FUCA knew nothing about the complex "topping bid" or "floating bid" *that had been approved by the Trustee* and that required both formulas and contingencies to be quantified.

5.      In the second round of bidding the Trustee received two additional *purported* "best and final offers" from both bidders:

(i)      The FUAC's cash bid of $1.2 million was increased to $3.5 million [*See, Jones* Exhibit 7];

(ii)     The Joint Bid cash bid of 1 million was increased to $1.75 million (coincidently, *one-half the amount* of the FUAC's bid) and as anticipated, included a topping or floating bid based on not $1.00 over the FUCA bid

---

[5]      This formula bid could only be calculated or known by applying the waiver amount needed to meet, then beat by $1.00, the competitor FUCA's bid – in other words, a topping bid right not given to any other bidder and bid consideration based on a non-final judgment of unknown final value.

but $100,000.00 over the FUCA's bid (again, *without any additional cash going to the estate*), but capped at $7 million amount of any waiver[6] (again, coincidentally, *exactly twice the amount* of the FUCA final and best offer. [*See*, Jones Exhibit 8]

6.     Thus, the Joint Bidder would be able to acquire the business no matter the amount of the other (and actual) "highest and best offer" bid.   The Connecticut Plaintiffs did not need veto power over the winning bidder – they were the guaranteed winning bidder.

7.     But the scheme and manipulation of this Court Sale Order does not end here.  As this Court is aware, within only hours before the winning be being announced on November 14, 2024 (even though the amount of the winning bid was not being disclosed) the Trustee traveled to Austin, mandated not only the Alex Jones Show go dark, but that all operations, sales, and activities cease.   FUCA as the successful backup bidder, and later Alex Jones, both complained in person and in writing, resulting on Monday November 18, 2024, in a Motion to disqualify the winning bidder filed by the approved backup bidder, and an Adversary Proceeding seeking relief from the purported sale and a including injunctive relief and a TRO, but reciting only a minimum fact statement of known or suspected facts and events.

8.     Also on November 18, 2024, the Trustee filed his Motion for approval of the Sale reciting in the proposed order that the winning bid was $1.75 million in *cash and receipt of a dividend waiver sufficient to create a $100,000.00 overbid dividend to the other unsecured creditors*, calculated under its bid formula.   In other words, the winning bid (which this Court questioned why the backup bidder had not been told the amount of the winning bid) was disclosed as written in the Joint Bid as a $100,000 over bid plus the cash payment.   At this point there was

---

[6]     Although it is clear that the best and final Joint Bid was to be capped at $7 million or less, calculated to only over bid the

no disclosure by the Trustee that the Joint Bid had an internal inconsistency in referencing the $7 million cap – at one point the proposal states "not less than" $7 million, while the remainder of the Joint Bid references "not more than" $7 million and several pages and a Chart illustrating how the bid amount is calculated which cannot exceed $7 million.

9.    Likewise,  on November  24, 2024 (a full 10 days after the Motion to Approve the Sale judicial admission of the amount and calculation of the Joint Bid) the Trustee replied to the FUAC objection to the sale [Dkt #931] in which FUAC complained that the purported winning bid was in fact a floating calculation based on an approved topping bid formula;  that is, the Joint Bidders submitted a bid that floated up (or down) based on the amount of the FUAC Bid, providing that the Joint Bidders bid $100,000.00[7] net more to the future estate dividends to other creditors than would the FUAC bid, *with a cap in the "formula" of the waiver not to exceed $7 million*. In response to the "floating bid" or topping bid submitted by the Joint Bidders, the Trustee responded:

- The "Floating" Nature of the Successful Bid. The majority of FUAC's challenges rest on the notion that the amount of the Successful Bid included "impermissible formulas and contingencies." This is incorrect. The Successful Bidders provided the amount of the bid with the addition of the *Distributable Proceeds Waiver* (as defined in the [Trustee's] Sale Motion).  Sale Motion ¶ 37. The Successful Bid did not contain prohibitable contingencies, such as securing financing. The Trustee valued the bid in the exercise of his reasonable business judgment—which a trustee must necessarily do when considering non-cash components of a bid. Sale Motion ¶¶ 38–44. FUAC's protests regarding contingency are ultimately moot in any event because the Trustee was authorized to waive any procedures or requirements with respect to Qualified Bidders. *See* Winddown Order ¶ 29.

*See*, pg. 8 ¶ 13.  Again, just as the Trustee's Motion to Approve the Sale, *there was no claim that*

---

[7]    This same bidding format was approved by the Trustee that it provided for a topping bid of $1.00 over the FUCA bid, but this topping bid process was undisclosed to FUAC (the Trustee told FUCA to avoid making a bid with formulas or contingencies, both of which are required to be determined by the Joint Bid).  The Trustee approved this absurd bid format (although it appears counsel for the Trustee and counsel for the Joint Bidders had discussion of the problems the bid crated) but no such communications were disclosed, and "negotiations" were claimed by the winning bidders to be covered by a "common interest" privilege form non-disclosure (so much for full transparency) who instructed the Trustee not to answer the questions.

*the Joint Bid was a fixed $7 million amount*, without consideration of any waiver of dividends cap.

10.     In fact, not until December 5, 2024, at the deposition of the Trustee was it disclosed that the Trustee now claims that upon observing the internal inconsistencies of the Joint Bid, he made the unilateral decision that the bid was for $7 million.  The Trustee now claims that this was his intent in accepting the winning bid but is unclear when he noted the inconsistencies, never discussed the inconsistencies with the bidders and never told anyone (other than possibly his lawyers) of this unilateral decision.  The Trustee permitted pleading to be filed reciting the floating bid based on the $100,000.00 over the FUAC bid, including that recitation in the Trustee's Motion to Approve the Sale [Dkt #915].  Instead of rejecting any argument that the bid was not a fixed sum, the Trustee recited the signature statement of the bidders that "I hereby submit my bid for the Packages above *in accordance with the terms and conditions of this bid package*." [citing the Trustee's Sale Motion, Ex. C at 2.].  Of course, the Joint Bid contained the prohibited formula requirement to know the amount of the bid, and the contingencies of their bid that was dependent on the amount of the FUAC highest and best bid.  The right to make a floating or topping bid *in a single bid auction* guarantees a win, unless the "cap" is exceeded.  Likewise, an undisclosed right to a topping bid can never be considered the "highest and best offer" because no one know what the topping bidder might have bid if compelled to bid a best fixed bid.  This Court cannot know the Joint Bidders' highest and best offer because the Joint Bidders were given the privilege of bidding on the basis of what FUAC's *actual* "highest and best offer" was.  FUAC was not given that privilege, nor told that the other bidder was given that privilege.

11.     Jones believes that the obvious intrinsic unfairness of a process advertised as a "final highest and best offer" without "formulas" or "contingencies" caused the Trustee to realize the impact of his decision and disclaim the accuracy of his own pleadings.  And, because of the

discovered typo made in the Joint Bid of  "not less than $7 million", the Trustee decide that a "fixed bid amount" of $7 million was what he accepted.  And a "fixed bid" amount would cure the criticism that he allowed a topping bid.  However, even according to the Trustee, the bid of the Joint Bidders was not $7 million, but *not less than $7 million* so, again according to the Trustee, even the Trustee cannot say how much the Joint Bidders' highest and best offer may be, only the bottom number of their highest and best offer.

## II.
## JONES "STANDING" TO
## INTERPOSE OBJECTIONS TO THE SALE

12.     Jones clearly has standing to object to the claims involving the sale of his claimed IP Property or Persona right and property interests (including Intellectual Property) that the Trustee sought and received bids to purchase as "Contested Domain Names", and that the court prohibited to be sold [*e.g.*, Lot 4 made a part of the Trustee's bid package].   This is a direct injury to Alex Jones property rights as well as the indisputable fact that Alex Jones is *"potentially concerned with, or affected by, a proceeding." Truck Insurance Exchange v. Kaiser Gypsum Company, Inc., 602 U.S. 268, 269 (2024).  See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a party in interest right to participate].

13.     As part of the Connecticut Plaintiffs manipulating the Joint Bidding, the Connecticut Plaintiffs published threats to all prospective bidders, threatening to "*go after ... any new Infowars owner acting as a vehicle for Jones's (sic) <u>continued control of the business</u>*."

The breakup of Infowars this week is just the start of Alex Jones's lesson in accountability.

The CT families will go after his future income and any new Infowars owner acting as a vehicle for Jones's continued control of the business.

Stay tuned.
https://t.co/SpETn5lsQz

 Chris Mattei (@ChrisMatteiCT) on X
x.com

Any legitimate purchaser of the InfoWars-FSS assets would be interested in the going concern value.  Not so for the Plaintiffs – their announced intent is to destroy the InfoWars brand and FSS business.  Of course, "the business" of Alex Jones as an acknowledged "media figure" is almost indistinguishable from InfoWars, and such co-interest represents Jones' first amendment right to "freedom of the press" and the corollary right to free speech.  The intent of the Connecticut Plaintiffs is entirely political, designed to remove Alex Jones from any ability to practice his constitutional rights as a media figure.  Jones is *justifiably "… concerned with, or affected by, (this) proceeding."*

14.    The Connecticut Plaintiffs seek to purchase the FFS and Jones property at a bankruptcy code § 363 sale, instead of seeking an execution sale on its Judgment (which the laws of Connecticut prohibit until the stayed judgment is final) so that upon the § 363 purchase, the buyers may claim to not be bound by the Texas law regarding premature execution on a judgement and the judgment later reversed on appeal.  Under Texas law the buyers have liability for the return of the assets taken and the value of those assets if an operating company.[8]  The Joint Bidders,

---

[8]    In Texas, a person is entitled to recover his property that has been seized through execution of a writ issued by a court if the judgment on which the execution is issued is later reversed or set aside, unless the property has been sold at an execution sale.  Tex. Civ. Prac. & Rem. Code Ann. § 34.021 (1986).  If the property has been sold, a person who would otherwise be entitled to recover the property is *entitled to recover from the judgment creditor the market value of the property sold at the time of the sale.* § 34.022.

including each individual member of the Connecticut Plaintiffs, are expressly threatening and promising the destruction of the Jones' property and property rights in both FSS and those jointly-owned assets (as to many of the FSS owned assets) without assurances that upon reversal of the Connecticut Judgment, Jones has a right to recover his property and property rights or if sold or destroyed, a claim against the Connecticut Plaintiffs for the value of such property wrongfully taken.  Jones is *justifiably "… concerned with, or affected by, (this) proceeding."*  These rights are wholly inconsistent with the demands and intentions of the Connecticut Plaintiffs to enforce a political ideology through a bankruptcy proceeding.



*Figure 1*[9]

### III.
### TRUSTEE'S VIOLATION OF THE COURT'S INSTRUCTIONS AND THE TRUSTEES' OWN BID INSTRUCTIONS

15.     Jones incorporated herein the statements and arguments referenced in §§ 1 through 15 above as if set out herein verbatim.

**A.     Modification of the Auction Process"**

16.     The Trustee received the two "initial bids" and thereafter, without following the instructions for changes in the Auction process (only made by announcement on the record of the

---

[9]      https://www.youtube.com/watch?v=GmDNz7irGgw - November 14, 2024 regarding the assistance in purchasing the Jones assets to shut them down.

changes) determined to initiate a "best and final" non-auction protocol.  The Trustee had already received the $1 million bid with a toping term that the bidder would pay $1 more than any higher bid made by the other bidder and accepted that bid.   Incredibly, with the knowledge of the Trustee, the new Bidding terms included a provision that instructed the bidders to *avoid submitting a bid that contained "references to any formulas or "contingencies"* (even though the Trustee had already accepted a bid that contained "formulas or other contingencies"). [Ex. 6 Trustee's IP Assets Auction Bid Instructions 11-11-2024.].

B. **The Trustee *Changes the Terms* of the Announced Winning Bidder's Bid When Sued by Jones**

17.     It was discovered at the deposition of the Trustee that after he accepted the offer, and announced the successful bidder, entered into negotiations to modify the Joint Bidders' bid. These negotiations were commenced when Jones sought a TRO and FUAC south to set aside the sale.  To date, no one knows the precise terms of the proposed sale, or how the value or terms are calculated.  There is no written agreement or understanding of the auctioneer's fees or how those fees will be calculated.    Jones noticed the Joint Bidder Global Tetrahedron ("GT") for its deposition and request for documents and GT refused to participate in any discovery.  As of the Trustee's deposition, no modified written APA agreement was produced so no one but the Trustee and Joint Bidders know what may have been discussed, and neither is talking.  The Joint Bidders and the Trustee claimed at the Trustee's deposition a "common interest" privilege so as to refuse to disclose the contents of their claimed common-interest privileged communications.

C. **The Trustee Ignored This Court's Instructions to Not Sell Disputed Jones IP**

18.     To begin the bidding process, in part the Trustee produced and circulated a "bid form" for bidders that contained a schedule designated as "Lot 4" "Contested Domains" assets, consisting of the Jones protected and disputed Intellectual Property.   Both bid forms were filled-

in with bids for Lot 4 to purchase and acquire the disputed Lot 4. [*See*, Trustee's Motion for Order in Furtherance of Sale, Ex. A, pg. Dkt # 915-1 pg. 74-75]. Of course, this is precisely what this Court instructed the parties not to be done.

19.     After the Trustee's auction, Jones discovered through the bid documents produced, that the Trustee accepted cash bid from both bidders on Lot 4. Jones objected to this violation of the Courts instructions on November 15th and on November 18, 2024, filed an Adversary Proceeding objecting to this sale. Upon Jones filing his TRO complaining, among other things, this sale of the contested Domain Names, for the first time, the Trustee changed the title to the Lot 4 contested Domain Names to "*Excluded Domain Names*" [*See,* Exhibit 10, Schedule 1.1.(b)(xi) attached to Trustee's proposed APA]. It is not clear whether both or either bidders agree that they will waive their bid and amount for Lot 4 and it appears the Trustee has not even sought an agreement by the winning bidder to forego the Joint Bidders claim to Lot 4 that their bid covers.

## IV.
## ENCUMBRANCE OR LIEN OBSTICLES TO THE SALE

20.     Jones incorporated herein the statements and arguments referenced in §§ 1 through 15 above as if set out herein verbatim.

21.     The Trustee has not dealt with the two encumbrances against a significant portion of the assets to be sold. There is an existing lien in favor of PQPR, and an existing non-appealed turnover order in favor of the Texas Plaintiffs covering all of the FSS assets, and this Court sale order has been appealed by the Texas Plaintiffs.

22.     Although the sale purports to be free of all liens, claims and encumbrances, the amount of these encumbrances exceed $100,000,000.00 and neither has been resolved so that neither the creditors nor this Court has any idea whether this sale will generate funds for any creditor distributions at all.

23.     Next is the Texas Business Organization Code governing the acts and conduct of a Texas limited liability company.  Even were FSS in a Chapter 7 case, and in particular now that it is not, the TBOC must be complied with to assure any sale of the assets of FSS could or would pass clear title.  The Chapter 7 estate holds an undetermined interest in the assets of FSS, including the assets made the basis of the appealed order of this Court authorizing the sale.

24.     Although the Trustee may have Texas Business Organization Code ("TBOC") may have rights as an assignee at law, the status of those rights has not been determined and are certainly subject to debate and conflicting decisions of bankruptcy and appellate courts.  It does not appear to be disputed that the Trustee has no rights in the individual assets of FSS, which recognizes the settled law that owners of a Texas limited liability company have no rights in the LLC's assets based on their LLC ownership membership.

25.     The same rule applies with respect to Alex Jones as the *sole owner* of FSS – Jones does not as an owner have rights in the FSS Assets.

26.     Alex Jones is, however, the sole manager of FSS and has not consented, nor has he been asked to consent, to the sale of all or substantially all of the FSS assets.

27.     Alex Jones further has rights, as at least a joint copyright owner, in all programming, and he has a co-interest at least in intellectual property acquired by the joint efforts of FSS and Alex Jones, which such joint ownership has not bee determined.   As an example, the "brand" Infowars was jointly built by the assets and efforts jointly by FSS and Alex Jones, and co-ownership of such IP that is so tied to Alex Jones persona, is a protected personal right of Alex Jones.

28.     Each of these issues, or all of these issues, have been resolved between Jones and FUAC bidder, through Jones commitment to continue to be employed and continue to work and

develop the co-interest in all FSS property purchased by FUAC.

29.     None of these issues have been resolved with the Joint Bidders inasmuch as they seek to own and destroy those brands and assets in their effort to ensure that Alex Jones has no platform from which he may employ is persona and talents to earn a living.  Accordingly, this bad faith motives permeate the entire bid structure that seeks to use as if legal consideration for the purchase of these FSS assets when in fact they have no such legal status.

30.     A sale to be acknowledge backup bidder, without all of the problems and complexities of the Trustee's proposed sale, is certainly in the best interests of the estate and all creditors, not just the Connecticut Plaintiffs.

## V.
## IRREPARABE HARM TO THE ESTATE OF ALEX JONES

31.     Jones incorporated herein the statements and arguments referenced in §§ 1 through 15 above as if set out herein verbatim.

32.     In Texas, the execution on or turnover of assets of a judgment debtor to collect an *unstayed* Judgment on appeal, although the recognized manner to collect on such judgment, there is protection in the event that the judgment is reversed on appeal.  [*See, supra* Note 8.].  However, where a bankruptcy court has jurisdiction over a debtor's property, those assets can be ordered sold but not through a credit on a non-final judgment as a part of the purchase price.

33.     In this case FSS was not in bankruptcy when the Court ordered the sale of FSS's assets, and the Joint Bidders proposed purchase price of $7 million as a "gift" by the individual Connecticut Plaintiffs used to purchase the assets and based on a dollar-for-dollar consideration of the *value of the stayed, non-final, Connecticut Judgment*.  This Court must order that the protections of the Texas law on judgment sales will be applicable to any sale by this Court based on value attributable to the stayed, non-final Judgment.

34.     The harm, under these circumstances is irreparable simply because the individual Connecticut Plaintiffs, in their announced effort to force the sale FSS assets for the purpose of keeping Alex Jones from utilizing those assets to earn a living.  A Section 363 sale does not contain a similar provision that would allow Alex Jones to recover *entitled to recover from the judgment creditor the market value of the property sold at the time of the sale*.   Thus, if the joint and several judgments against Jones and FSS is reversed on appeal in any substantial amount Alex Jones may be relegated to collecting nothing, because the Connecticut Plaintiffs, are arranging this purchase in order to such down and destroy the value of the going concern of FSS.   That going concern, so long as owned or participated by Alex Jones, likely exceeds $30 million to $50 million, which will be lost with no remedy if this sale occurs.

## VI.
## CONSTITUTIONAL OBSTICLES TO THE ALEX JONES DEBT

35.     Jones incorporates herein all of the arguments set out above, and in his Adversary Proceeding seeking injunctive relief prohibiting this sale, as well as his counterclaim against the Connecticut Plaintiffs based on constitutional grounds and deprivation of constitutional rights under 42 U.S.C. § 1983 (being transferred to this Court by stipulation of the parties from the District Court, WD-TX).[10]

---

[10]     Recently the Connecticut Plaintiffs filed in Travis County District Court (Austin, Texas) papers to domesticate in Texas the Connecticut Judgment which is currently on appeal in Connecticut.  They then filed state court actions for turnover and seeking a receiver, representing to the Texas State District Court that this Court had by "final order" found the actual damages award in the Connecticut Judgment were non-dischargeable.  The Jones Parties removed these matters to the Western District of Texas and filed an answer, affirmative defenses and Counterclaims. *Erica Lafferty, et al Plaintiffs (Judgment Creditors) vs Alexander E. Jones, et al,* Civil Action No. 1:24-cv-1198 in the United States District Court Western District (Austin Division).  In addition, the Jones Parties filed a motion to transfer the venue of that case including the Counterclaims to this Court as this Court has the "first filed" case of related cases (i.e., the Discharge ability Adversary Proceeding[10]) making this Court the "Home" Court.  The Connecticut Plaintiffs have filed a motion to remand their collection case to state court but may have tentatively agreed to the venue transfer.  In either event, the Jones Parties are quite confident that Fifth Circuit authority mandates that the venue issue be considered by the Western District of Texas before the remand and the venue transfer motion must be granted, transferring to this Court the Connecticut Plaintiffs' collection efforts and the Counterclaims asserted against them for violating Alex Jones's Constitutional rights. *Concierge Auctions, L.L.C. v. ICB Props. of Mia., L.L.C.,* 2023 U.S. App. LEXIS 20513, at *3-4 (5th Cir. 2023).

36.     Jones alleges that the Connecticut Judgment should be reversed on appeal and clarifies to this Court those constitutional rights and remedies that the Connecticut Judgment ignored in rendering the death penalty sanctions of liability, then conducting a "death penalty" trial by excluding most all evidence of lack of damages.

37.     First, under Connecticut law -- assuming that states' collateral estoppel law applies, as it should – the Connecticut Judgment cannot collaterally estop this Court as the Connecticut Judgment has not been subject to appellate review.  The Connecticut Supreme Court has held that "[a] party must receive one opportunity for appellate review before it will be subject to the application of collateral estoppel." *State v. Charlotte Hungerford Hosp*., 308 Conn. 140, 146, 60 A.3d 946, 950 (2013) *citing Commissioner of Motor Vehicles v. DeMilo & Co*., supra, 233 Conn. 268.  The Connecticut Plaintiffs surely know this requirement of Connecticut law and also know appellate review has not occurred.  Yet this Court was not advised of this and thus led into error in ruling that the Connecticut Judgment had collateral estoppel effect.

38.     Second, there are a host of United States Supreme Court mandates that apply when: (a) a media defendant, which Mr. Jones clearly is, is sued as he was in Connecticut; (b) the suit covers matters of public concern, which the Sandy Hook tragedy and ensuing national pushes for gun control legislation clearly are; and (c) the Connecticut Plaintiffs have voluntarily thrust themselves into those public controversies and thus become public figures, which the Connecticut Plaintiffs surely did as almost immediately after the tragedy they began using the tragedy as a platform from which they publicly urged gun control legislation and endorsed and campaigned for gun control political candidates at every level of state and federal government.  In fact, Connecticut Plaintiff Erica Lafferty (now Erica Ash) gave an approximately five (5) minute speech at the 2016 Democratic National Convention introducing her friend Hillary Clinton whom she supported

because of Secretary Clinton's positions on gun control.

39.     Among the many ignored Constitutional mandates is that the Connecticut Plaintiffs were Constitutionally required to demonstrate by "***clear and convincing evidence*** that [Mr. Jones] acted with actual malice—that is, with knowledge that the published material was false or with reckless disregard of whether it was false." *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021) (emphasis added; internal citations; quotes omitted) (*citing New York Times Co. v. Sullivan*, 376 U. S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).  This Constitutional requirement effectively preempts any state law to the contrary and yet was tossed into the waste bin by the Connecticut state court's default judgment ruling.  Neither have they been presented to or considered by this Court.  All of these will be addressed in the soon-to-be-filed Jones Motion to Reconsider.

*Other Constitutional Federal Requirements Were Not Addressed*

40.     Binding federal authority, not presented to this Court on other issues include the established principal that this Court is fully empowered to review state court cases "…where state procedural law was inadequate to allow full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice" *Allen v. McCurry*, 449 U.S. 90, 100-03, 101 S. Ct. 411, 418-19 (1980).  The Jones Parties anticipate their Motion to Reconsider will be filed by December 4, 2024.

41.     Likewise, the Supreme Court has clearly held that "deeply rooted in the common-law rule, predating the First Amendment, [is the requirement for] a ***showing of malice*** on the part of the defendant [by] plaintiffs to recover punitive or enhanced damages." *Herbert v. Lando*, 441 U.S. 153, 161-62, 99 S. Ct. 1635, 1641 (1979).  A showing of malice must, in turn, be made by "clear and convincing" evidence: "The Court has also determined that for … public figures, a showing of *New York Times* malice is subject to a clear and convincing standard of proof."

*Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 15, 110 S. Ct. 2695, 2703-04 (1990).  Nothing close to this has been done and these and other points to be made in the Jones Motion to Reconsider doom any award of punitive damages and certainly doom the Connecticut Plaintiffs' efforts to avoid their discharge.

<u>Asking the Jury to Deprive a Citizen of His Constitutional Rights</u>

42.     Although always a consideration, it has become obvious that motivating this litigation is not the recovery of a monetary amount for an actual and legally recognized injury, or even allowing punitive damages reflecting any reasonable application of punitive or exemplary damages law or statutes, but is the political activism and political motive and goal to take The Alex Jones Show of the air and "out of the public discourse:"

> **"Berkowitz said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening.   Whether that means *walking away from public life*, to paying Sandy Hook families *in full* ...."[11]**

> <u>**Damages *"should be awarded in an amount that assures Alex Jones is off any platform ... taken out of this discourse* ...."[12]**</u>

43.     With the admissions of the nature of the bid that, based on a floating offer to topping bid instead of the highest and best bid of the competing bidders, it is now clear that this has always been litigation to quiet all future Alex Jones 1st Amended protected broadcasts because of his conservative leaning content and to silence his voice to his 50 million followers.  That Alex Jones is a threat to political ideology could not be better demonstrated by the statements of the buyer's

---

[11]     https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/

[12]     Video quotes from both *Texas Plaintiffs' closing arguments; statement*). *See*, *Youtube* https://www.youtube.com/watch?v=xFaxgchQczg  "take Alex Jones platform ... away ... and make certain he cannot rebuild the platform.  Take him Jones out of this discourse ... that is punishment.  *See, also* Connecticut Plaintiffs opening statements both arguing that Alex Jones 1st Amendment rights must be silenced.

bad faith motives for this purchase – to shut down and destroy the FSS business, and to use the IP to connect with Alex Jones customers through IP identifying internet communication to confuse, harass, and potentially threaten the thousands of customers of the FSS website and confuse the source of what the buyer touts as gun control ideology.   Although Motive is ordinarily irrelevant to the purchase of an asset at a legitimate auction, this is far from an ordinary judgment and far from an ordinary or legitimate auction.

      44.    *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 15-17, 110 S. Ct. 2695, 2703-07 (1990) cast considerable doubt on the ability of these defamation damages to ever withstand judicial scrutiny:

> "In 1964, we decided in *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule…".

Jones is a clearly a media defendant, sued in Connecticut and Texas.  The Sandy Hook tragedy and ensuing national pushes for gun control legislation clearly are matters of matters of public concern that are at the heart of both suits.  The Connecticut Plaintiffs have voluntarily thrust themselves into those public controversies and thus become public figures, which the Connecticut Plaintiffs surely did as almost immediately after the tragedy they began using the tragedy as a platform from which they publicly urged gun control legislation and endorsed and campaigned for gun control political candidates at every level of state and federal government.  In fact, Connecticut Plaintiff Erica Lafferty (now Erica Ash) gave an approximately five (5) minute speech at the 2016 Democratic National Convention introducing her friend Hillary Clinton whom she supported because of Secretary Clinton's positions on gun control.  *See, also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 15-17, 110 S. Ct. 2695, 2703-07 (1990)

      45.    There is no liability for a media defendant without proved showing of fault and

fault cannot be presumed.[13]

46.     Finally, the death penalty sanctions were extreme and unconstitutional. Unconstitutional "death penalty" sanctions were heaped on Mr. Jones.  Specifically, among the penalties imposed, the Connecticut trial judge:

(A)     struck Mr. Jones's answer and all his constitutional defenses, making it procedurally as if Mr. Jones had simply not shown up;

(B)     *held Mr. Jones legally and factually liable for everything the Connecticut plaintiffs claimed in their pleadings,*[14] **_whether true or not_**, including actions and statements by unrelated third parties – all without plaintiffs having to offer any proof at all;

---

[13]     "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz v. Robert Welch*, 418 U.S. 323, 347, 94 S. Ct. 2997, 3010 (1974)

In other words, [in *Gertz*] the Court fashioned 'a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.'… the Court believed that this result was justified on the grounds that "placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result." *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 15-16, 110 S. Ct. 2695, 2704 (1990)

[14]     The Connecticut Complaint is not sufficiently specific.  First, the Complaint identifies no "express statements" that were allegedly made by Mr. Jones that are libelous.  In a traditional libel complaint, precise statements are quoted so that the court and parties can review and assess the words and context.  The Connecticut Complaint, although prolix, nowhere clearly highlights the precise allegedly libelous statements Mr. Jones was accused of making.

Second, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the libelous "statement" and more importantly, why it was libelous. As one example of numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when he would move.  See e.g., Connecticut Complaint, ¶¶222; 230; 240; 259; 264.  Was this libelous?  Was it true?  The jury was told it was maliciously libelous without explanation.  Or another example is the repeated reference to one of the Connecticut Plaintiffs asking about cue cards while being interviewed on TV. See e.g., Connecticut Complaint, ¶¶ 102;  103; 105; 112; 113 ("ok, do I read off the card?"). Was this libelous?  Was it true?  It did not matter.  The jury was told it was maliciously libelous without explanation.

Finally, it is clear that the Connecticut Plaintiffs sought to hold Mr. Jones responsible for what independent third parties said and did.  In one example of many, the Connecticut Plaintiffs identified Defendant Wolfgang Halbig as an independent journalist and investigator who resides in Sorrento, Florida and who was the creator and operator of "the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com."  It also identified Defendant Cory T. Sklanka as a journalist who works with Halbig.  Connecticut Complaint, ¶¶ 36 & 37.  Although Halbig's name is used over 77 times in the Connecticut Compliant, other than a few references to Halbig's appearance as an occasional guest on Mr. Jones' show [Connecticut Complaint, ¶ 68] there are no allegations that would even remotely make Mr. Jones responsible for Halbig's statements and actions other than the completely unverified and

(C) judicially decreed that Mr. Jones had subjective knowledge of the falsity of everything

the Connecticut plaintiffs claimed he and third parties said or did -- whether true or not --

without plaintiffs having to offer any proof at all;

(D) judicially decreed that all that was left was a trial on plaintiffs' damages, which were

presumed and which the Connecticut plaintiffs needed only to demonstrate by a

preponderance of the evidence; and

(E) ordered Mr. Jones to effectively remain silent during the damages trial, forbidding Mr.

Jones from defending himself or challenging anything the plaintiffs said.

This placed an unconstitutional burden of Alex Jones that no person could overcome, much less a

trial 28 miles from the most hideous crime upon children – with only Alex Jones left to blame after

the death of the shooter, and his mother (the adult that armed him with death weapon).

47.     Jones only this day has received the opinion of the first Appellate Court of

Connecticut reversing $150 million in CUPTA punitive damages arising from the product (his

speech) liability claim the court found the speech that itself was silent with regard to the

defendants' products.

**VII.**
**CONCLUSION**

48.     This Court entered an order that had all the appearances of a normal bankruptcy

---

conclusory allegation that "Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut." Connecticut Complaint, ¶ 74. The lone exception is the unverified, unsupported, conclusory and inaccurate statement that Halbig was "at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants." Connecticut Complaint, ¶87. This lone, conclusory allegation is nothing but sheer conjecture and certainly nothing that overcomes Mr. Jones's first amendment rights. Yet the jury was told Mr. Jones was maliciously responsible for everything Halbig did.

Third, the Connecticut Complaint is replete with acts of third parties in allegedly stalking some of the Connecticut Plaintiffs. Connecticut Complaint, ¶¶ 14; 15 ("They have confronted strange individuals videotaping them and their children."); 16; 55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.). With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

auction which was hijacked by the Joint Bidders dominance over the Trustee and this process.  The only bidder (bidding twice the amount of cash as the Joint Bidders) that played fully and completely by the rules, and who was deprived of any transparency of what bid conduct was being sanctioned by the Trustee, and the post-announced winning bidder conduct that makes no practical, much less legal sense, is the approved second bidder.  This Court should disqualify the Joint Bid and Joint Bidders for multiple reasons and enter an order awarding the Joint Bid to the backup bidder.   Doing so (i) does justice to this Court system that has been abused;  (ii). resolves all of the collateral IP and Jones Personal claims, including copyrights and co-ownership;  (iii). resolves all issues of the TBOC;  and  (iv). leaves the *status quo* as now in place in Texas, just as the stayed Connecticut judgment keeps those the status quo in place in Connecticut and ends what was destined to be endless litigation.

WHEREFORE, Alex E. Jones prays for the relief above requested and for such other and further relief as Alex E. Jones may be entitled, both at law and in equity.

Dated:  December 6, 2024

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
***Jordan & Ortiz, P.C.***
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
         aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES**

Ben C Broocks

State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that a true and correct copy of the foregoing document was served electronically to subscribers of the Court's electronic noticing system on December 6, 2024

<u>*/s/ Shelby A. Jordan*</u>
Shelby A. Jordan