IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| ALEXANDER E. JONES | § | CASE NO. 22-33553 |
| *Debtor* | § | |

**FIRST UNITED AMERICAN COMPANIES, LLC'S RESPONSE TO TRUSTEE'S
EXPEDITED MOTION FOR ENTRY OF AN ORDER IN FURTHERANCE
OF THE SALE OF ASSETS OF FREE SPEECH SYSTEMS, LLC, AND
OBJECTION TO THE PROPOSED SALE TO GLOBAL TETRAHEDRON, LLC**
(Relates to Docket Nos. 859 and 915)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, FIRST UNITED AMERICAN COMPANIES, LLC

("FUAC"), a party-in-interest and the highest cash bidder in the recent "auction" of

certain of the assets of Free Speech Systems, LLC ("FSS"), and files this Response to

Trustee's Expedited Motion for Entry of an Order in Furtherance of the Sale of Assets

of Free Speech Systems, LLC (the "Motion"), and objects to the Trustee's proposed

sale of assets of FSS to Global Tetrahedron, LLC, an affiliate of the Onion (referred to

hereinafter sometimes as the "Onion").

### INTRODUCTION

1.      The Trustee of the Alexander Jones Chapter 7 case, Christopher Murray (the

"Trustee"), recently undertook to sell certain FSS assets (the "Assets") pursuant to this

Court's Sale Order at Docket No. 859 (the "Sale Order").  **Exhibit 1**.

2.      The Trustee filed a Notice of Successful Bidder and Backup Bidder on

November 14, 2024, at Docket 903 ("Notice of Successful Bidder").  **Exhibit 2**.  In

the Notice of Successful Bidder, the Trustee designated the Onion and Connecticut Families (as defined in **Ex. 2**) as the Successful Bidder, despite the fact that the Connecticut Families are not paying the estate any money and they are not acquiring any of the Assets.  (Collectively, the Onion and Connecticut Families are sometimes referred to herein as the "Joint Bidder")

3.      Both FUAC's and the Onion's initial bids were determined by the Trustee to be the only two "qualifying bids." **Ex. 1** at ¶ 5; *Compare* **Exhibit 3** (FUAC's initial bid) with **Exhibit 4** (the Onion's initial bid).  FUAC's initial bid was $1,200,000 and the Onion's was $1,000,000.  There were no other qualified bids for the online live auction that was scheduled for November 13, 2024. **Ex. 1** at ¶5.

4.      After receiving the initial bids, the Trustee and Tranzon unilaterally decided to deviate from the scheduled live auction approved by the court and conduct a secret highest and best bid process without court approval and contrary to the Sale Order. **Ex. 1** at ¶12; *See also,* **Exhibit 5** (Tranzon's November 11, 2024 email changing the Court's ordered sales process); **Exhibit 6** (the "new" unauthorized bidding instructions that were issued by the Trustee and Tranzon).  The Trustee scrapped the live auction process despite representing to the Court that his intention was to have a live "open-cry" auction after initial bids were qualified.  See the Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC (**Dkt. 829**, at ¶¶5, 22, 29, 34).

5.      In response to the new unauthorized bidding instructions, FUAC submitted its cash bid of $3.5 million for all of the Assets.  **Exhibit 7**.  The only other qualified bidder, the Joint Bidder, submitted a bid of $1.75 million cash plus a "Distributable Proceeds Waiver" from the Connecticut Families that was contingent upon the amount of the otherwise highest alternative Qualified Bid and calculatable by a formula such that the Waiver would equal "the amount necessary for all other holders of allowed unsecured creditors of FSS to recover $100,000 more, in the aggregate, than they would recover from the sale of the Purchased Assets to the Backup Bidder, up to 100% of the Connecticut Families' entitlement to the Cash Purchase Price." See the Proposed Sale Order, **Dkt. 915-8**, pg. 5-6, at ¶H; also see **Exhibit 8**, pgs. 4 and 5.

6.      All exhibits and filings on the Court Docket system that are referenced herein are incorporated by their reference.

### SUMMARY OF ARGUMENT

7.      FUAC, the designated Backup Bidder, objects to the Sale to the Onion for multiple independent reasons, as set forth below.  This summary is not intended to be exhaustive.

8.      The Trustee improperly abandoned the Court-ordered live auction process in favor of a secret bid procedure without proper authority or disclosure.  The Sale Order (**Ex. 1**) explicitly required any changes to the auction process to be announced on the record at the live auction and disclosed to all qualified bidders.  Moreover, the Trustee obtained the Sales Order by representing to the Court that he would

conduct a live auction after the initial bids were qualified. See **Dkt. 829**, ¶¶5, 22, 29, 34.  The Trustee's unilateral decision to conduct a secret bid process just two days before the scheduled auction (**Ex. 5**) violated these requirements and fundamentally altered the competitive dynamics of the sale without court approval or required disclosures.

9.      The sale process was fatally flawed in its execution.  The Trustee violated not only the Sale Order but his own original bid procedures (**Exhibit 9**), as well as the unauthorize new bid instructions (**Ex. 6**), by among other things, accepting a supposedly "highest and best" from the Joint Bidder that utilized formulas and contingencies that he explicitly told bidders would not be permitted.  This created an inherently unfair process where some bidders were required to submit firm cash offers (**Ex. 7**) while the Joint Bidder was permitted to submit a floating contingent bid that would automatically adjust to "top" competing bids (**Ex. 8**).

10.     Third, the Trustee improperly accepted as consideration a unique "Distributable Proceeds Waiver" (sometimes referred to herein as the "Waiver" or "DPW") that provides zero actual value to the estate.  The DPW was introduced in the Joint Bidder's initial bid (**Ex. 4**) and expanded in its final bid (**Ex. 8**) (sometimes referred to hereafter of the "Joint Final Bid"), representing an unprecedented attempt to transmute a contingent waiver of potential future distributions into present consideration for an asset purchase.  This construct fails both legally and practically—it provides no additional value to the estate, rests entirely on multiple

contingencies, it violates the Sale Order, was not disclosed, and fundamentally undermines the integrity of the sale process.

11.     The record demonstrates impermissible collusion between the Trustee, the Onion, and the Connecticut Families in violation of Section 363(n) of the Bankruptcy Code.  The parties orchestrated a scheme to control the price through a floating bid mechanism specifically designed to depress the cash price offered by the Onion while creating the illusion of higher total consideration.  This collusion is evident in the progression from the initial bid of the Joint Bidder (**Ex. 4**) through the unauthorized change in sale procedures (**Ex. 5**) to the structure of the Final Joint Bid (**Ex. 8**).  The Trustee's participation in this scheme potentially transforms what might otherwise be mere bidder misconduct into outright deception and completely undermined the integrity of the sale process.  In furtherance of this impermissible collusion, the Trustee has allowed the Joint Bidder to amend the Final Joint Bid <u>after</u> he had accepted and filed with the Court the Notice of Successful Bidder (**Ex. 2**).

12.     The proposed sale also fails to protect PQPR's secured claim.  The cash proceeds from the Onion's portion of the bid of $1,750,000 (**Ex. 8**), which translates into approximately $1,100,000 of net sales proceeds after administrative costs associated with the sale or taken into account, are significantly less than PQPR's secured claim, and the DPW offers nothing to secured creditors.  The sale cannot be approved as it clearly fails to protect PQPR's interests.

13.     These procedural and substantive defects cannot be remedied.  They go to the heart of what makes a bankruptcy sale process fair and transparent.  The Motion must be denied.  The only appropriate remedy is to reject the Final Joint Bid and close on FUAC's all-cash bid of $3,500,000 (**Ex. 7**), which has been designated as the Backup Bidder.

**ARGUMENT AND AUTHORITIES**

**1.      Standing**

14.     As a threshold preliminary matter, FUAC has standing to be heard in this matter and lodged its objection to the proposed sale to the Proposed Purchaser.  The Supreme Court has made clear that a "party in interest" is meant to be interpreted broadly and should include any party who is "potentially concerned with, or affected by, a proceeding." *Truck Insurance Exchange v. Kaiser Gypsum Company, Inc.*, 602 U.S. 268, 269 (2024).  Moreover, the Sale Order specifically reserves FUAC's standing with regard to the auction and any related items. **Ex. 1** at ¶30.

**2.      Sale Process**

   **2.1     The Auction Process was Changed from a Live Auction to a Secret Bid Process in Violation of the Sale Order and Contrary to the Trustee's Representations to the Court.**

15.     The Trustee's decision to abandon the Court-ordered live auction process in favor of a secret bid procedure represents a clear and material violation of the Sale Order.  This unauthorized deviation fundamentally altered the nature of the sale process and prejudiced FUAC's rights as a qualified bidder.

16.     The Sale Order explicitly prescribed the process for any modifications to the auction procedures.  Specifically, paragraph 12 of the Sale Order provides that the Trustee was authorized to implement procedures other than the scheduled live online auction "only as he and his advisors announced on the record at the Auction." **Ex. 1** at ¶12.  This requirement was not merely procedural window-dressing—it was a carefully crafted provision designed to ensure transparency and fairness with respect to any modifications to the sale process.

17.     The IP Assets Auction was scheduled for November 13, 2024 at 10:30 a.m. (Prevailing Central Time). **Ex. 1**, ¶5.

18.     Under the Sale Order's explicit terms, any changes to the sale process were required to be announced at this Auction and placed "on the record."  The Trustee and Tranzon failed to comply with either requirement.  Instead, on November 11, 2024, two days before the scheduled live auction, the Trustee and Tranzon unilaterally communicated their decision to switch to a secret highest and best bid process, citing the purported "complexity" of the bids as justification. **Ex. 5**.  The Trustee did so without notifying the Court that he "cancelled" the live auction and despite the fact that the Trustee told the Court that he would conduct a live auction and that is what he obtained bankruptcy court approval to do. See **Dkt. 829**.

19.     The Trustee's justification to violate the Sale Order and his representations to the Court rings particularly hollow given that FUAC's initial bid was straightforward and uncomplicated—a pure cash offer of $1,200,000. **Ex. 3**.  The supposed

"complexity" arose solely from the Connecticut Families' attempt to introduce a unique and problematic form of "consideration" through the DPW. Rather than address this complexity through the transparent process mandated by the Sale Order, the Trustee opted to move the entire sale process behind closed doors cloaked in secrecy.

20.    Moreover, the Sale Order required that any changes to the sale process had to be disclosed to all Qualified Bidders including FUAC. **Ex. 1** at ¶12, 21. In addition, if the Trustee cancelled the live auction, he was required to file notice of such cancellation with the Court. He did not do that. Instead, the Trustee made additional material changes to the sale procedures that were not disclosed or approved by the Court. The clandestine nature of these changes demonstrates the Trustee chose to abandon the transparent process mandated by the Sale Order (and which he represented to the Court) in favor of a secret procedure to shield these modifications from scrutiny by FUAC and this Court.

21.    The Trustee's decision to conduct a secret bid process materially prejudiced FUAC in multiple significant ways. It deprived FUAC of the opportunity to participate in a live auction where it could actively compete against other bidders. The secret process also concealed critical information about the nature of competing bids and the Trustee's willingness to accept a non-traditional "unique" form of consideration that no bankruptcy trustee in history has ever accepted before. This lack of transparency prevented FUAC from adjusting its bidding strategy in response

to real-time market feedback, while fundamentally altering the competitive dynamics of the sale process without proper disclosure or court authorization.

22.    The Sale Order's requirements for modifying the auction procedures were not mere suggestions—they were mandatory provisions designed to protect the integrity of the sale process and ensure transparency, and fair treatment of all qualified bidders. The Trustee's unilateral decision to abandon these requirements in favor of a secret process represents a clear violation of both the letter and spirit of the Sale Order, and were contrary to the representations the Trustee made to the Court to obtain the Sale Order (See **Dkt. 829**).

### 2.2    The Onion's Initial Bid Materially Deviated from Required Bid Procedures.

23.    The fundamental flaws in the sale process are starkly illustrated by examining the Joint Bidder's initial bid (**Ex. 4**) and the unauthorized new bid instructions issued by the Trustee after his receipt of the initial bids (**Ex. 6**). From the outset, the Onion and Connecticut Families were engaged in a scheme to circumvent proper bidding procedures through the use of an improper form of consideration. The Onion's initial bid package reveals a calculated attempt to introduce a unique and problematic form of consideration that violated multiple requirements of the Sale Order and the initial bid instructions. **Ex. 1**, **Ex. 4**, and **Ex. 9**.

24.    The Joint Bidder's initial bid was comprised of two components: a cash bid of $1,000,000 and a unique "Distributable Proceeds Waiver" concept introduced by

the Connecticut Families.  The Trustee's handling of the deposit requirement alone demonstrates the problematic nature of this structure.  By accepting a deposit of only $100,000, representing 10% of just the cash portion of the bid, the Trustee implicitly confirmed that he attributed zero value to the DPW component.  The bid package clearly required "a cash deposit equal to ten percent (10%) of the Purchase Price of such Sealed Bid."  If the DPW had any real value, the deposit amount would necessarily have been larger.  In fact, the Trustee confirmed that he did not waive the 10% cash deposit requirement for any of the bidders.

25.    The DPW's structure fundamentally violated the Sale Order's basic requirements.  It was explicitly designed to be contingent upon and calculated by reference to other qualified bids, with the DPW amount "floating" based on a formula tied directly to competing bid amounts.  This directly contravened the Sale Order's explicit requirement that bids be for "a specific amount in U.S. dollars (not a range)."  Moreover, the Sale Order contemplated that only cash and non-cash items with a readily ascertainable cash value (such as gold or bitcoin) would be acceptable forms of consideration. **Ex. 1**.  The DPW, being contingent on future events and other bids, had no ascertainable value.  Having accepted the fundamentally flawed initial bid of the Joint Bidder, the Trustee's subsequent conduct only compounded the procedural defects, creating a cascading series of violations that further undermined the integrity of the sale process.

### 2.3    The Trustee's Contradictory Response.

26.     After receiving the Joint Bidder's initial bid, including the DPW, rather than reject the DPW outright or seek Court clarification, the Trustee issued new bid instructions that fundamentally altered the sale process and violated the Sale Order by converting the approved live auction to a secret process. **Ex. 6**.  These new instructions stated that bids should "quantify the amounts of such consideration in specific dollar amounts with specificity and avoiding references to any formulas or other contingencies."  This created an untenable situation: either the instructions were intentionally misleading to bidders like FUAC who took them at face value and submitted straightforward cash bids, or it was meant to signal that the formula-based contingent DPW consideration included in the Joint Bidder's initial bid would not be accepted.  In either case, the Trustee then contradicted his own new instructions by accepting the Final Joint Bid which continued to rely on a formula-based and contingent DPW.  Moreover, the new bid instructions called for "highest and best bids."  The Final Joint Bid did not satisfy that requirement because of the floating component of the DPW, which was to provide the non-Connecticut unsecured creditors with $100,000 more than they might otherwise receive from the otherwise highest Qualified Bidder.

27.     The Trustee's conduct was even more problematic given his representation to undersigned counsel that he would not allow the holders of unsecured claims to credit bid.  When undersigned counsel specifically asked if he would allow the

Connecticut Families (or any creditor) to credit bid, he responded unequivocally "No." While the Trustee may now argue that the DPW is technically not a credit bid, he knew that counsel's fundamental concern was whether an unsecured creditor could use their claim as "currency."

28.     This pattern of conduct—accepting the Joint Bidder's initial bid, issuing contradictory new instructions, and ultimately accepting the Joint Final Bid that violated the Sale Order (**Ex. 1**) and the new instructions (**Ex. 6**), and was contrary to what the Trustee represented to the Court (See **Dkt. 829**)—demonstrates that the integrity of the sale process was fatally compromised from the outset. The Trustee's actions suggest a predetermined outcome rather than a fair and transparent sale process as required by the Sale Order and applicable law.

### 2.4     The Sale Process was Fatally Flawed.

29.     The sale process suffered from fatal procedural defects that cannot be remedied and require that the Motion be denied. The process was compromised by a series of unauthorized changes, misleading communications, and fundamental departures from the Sale Order's requirements and basic principles of full disclosure and transparency.

30.     The initial deviation occurred on November 11, 2024, when Tranzon abruptly announced via email that "based on the complexity of the bids as received," the final round auction would "take the form of a request for highest and best bids." **Ex. 5**. This cursory explanation for abandoning the Court-ordered live auction process was

demonstrably pretextual. There was nothing complex about FUAC's straightforward cash bid of $1,200,000. The only "complexity" arose from the Joint Bidder's attempt to introduce its improper DPW scheme—a complexity that should have resulted in an immediate rejection (or the very least a request for clarification from the bankruptcy court), rather than a wholesale unauthorized change to the sale process.

31.     The new bid instructions that followed this announcement created an inherently contradictory framework (**Ex. 6**). While purporting to require that any bids that include components of consideration apart from the cash purchase amounts "should quantify the amounts of such consideration in specific dollar amounts with as much specificity as possible and avoiding references to any formulas or other contingencies," the Trustee already knew the Joint Bidder's initial bid relied on a formula-based DPW that was contingent upon the amount of the otherwise highest Qualified Bid so that unsecured creditors other than the Connecticut Families would receive $1 more than they would under the otherwise highest Qualified Bid. **Exs. 4 & 6**. The new instruction was either a misleading facade designed to give the appearance of a fair procedure, or it represented the Trustee's actual requirements which he then inexplicably abandoned to accommodate the Final Joint Bid.

32.     Not only were the new procedures unauthorized and in violation of the Sale Order, the Trustee's conduct was even more problematic in the execution of these new procedures. The bid instructions explicitly stated that bid amounts should be in

specific dollar amounts and avoid references to formulas or other contingencies.  Yet the Joint Final Bid, which the Trustee accepted, was built entirely around contingencies and formulas and was not in a specific dollar amount.  The DPW component was expressly designed to float based on competing bids, making it impossible to evaluate without reference to other offers.  This directly violated both the letter and spirit of the bid instructions.

33.    Most troublingly, these procedural irregularities appear designed to obscure rather than illuminate the true nature of the bids.  By abandoning the transparent process of a live auction in favor of secret bids, the Trustee eliminated the ability of qualified bidders to understand and respond to competing offers.  This lack of transparency was particularly prejudicial given that one bidder—the Joint Bidder— was permitted to structure its bid in direct response to other bids through its floating DPW mechanism, while other bidders (e.g., FUAC) were kept in the dark about this arrangement.

34.    The culmination of these flaws is evident in the Trustee's acceptance of the Final Joint Bid and his filing of the Notice of Successful Bidder.  Despite the explicit requirements in both the Sale Order and the new bid instructions that bids be expressed in specific dollar amounts without contingencies or formulas, the Trustee accepted a bid that violated every aspect of these requirements.  This wasn't merely a technical violation—it fundamentally undermined the integrity of the entire sale process.

35.    These procedural defects cannot be dismissed as mere technical violations. They go to the heart of what makes a bankruptcy sale process fair and transparent. When a trustee abandons court-ordered procedures, issues contradictory instructions, and then selectively enforces those instructions to favor certain bidders, the entire process is tainted.

### 3.    The Distributable Proceeds Waiver Fails as Valid Consideration and Provides No Value to the Estate.

36.    The Trustee's acceptance of the Distributable Proceeds Waiver as consideration represents an unprecedented and legally unsupportable departure from established bankruptcy principles.  The DPW fails both as a matter of law and practical application—it provides no actual value to the estate as a whole while introducing unacceptable contingencies and speculative outcomes into what was designed and approved to be a straightforward asset sale.

37.    One fundamental defect of the DPW is its complete failure to provide any additional value to the estate.  The estate will receive exactly the same amount from the Final Joint Bid—$1,750,000 in cash—regardless of how the Connecticut Families might later choose to allocate their theoretical future distributions. **Ex. 8** at p.4-5.  The reallocation of potential distributions among creditors cannot, by definition, increase the value available to the estate or the creditor body as a whole. This renders the DPW meaningless as consideration from the estate's perspective.

38.    The DPW's structure is particularly problematic because it represents an attempt to transmute a contingent waiver of potential future distributions into present consideration for an asset purchase.  The waiver's value depends entirely on multiple speculative events occurring: (1) the Connecticut Families prevailing in their pending appeals, (2) their claims ultimately being allowed in the bankruptcy case, and (3) there being sufficient funds for distribution to make the waiver meaningful.  **Ex. 8** at p.4-5.  These are not mere administrative contingencies—they go to the very existence of the thing being offered as consideration.

39.    Moreover, the DPW's floating nature—designed to automatically adjust based on competing bids—reveals its true purpose as a price control mechanism rather than legitimate consideration. **Ex. 8**.  The Connecticut Families structured the DPW to "equal an amount necessary for other unsecured creditors of FSS to recover $100,000 more than they would receive from the sale of the Acquired Assets to the otherwise highest Qualified Bidder." **Ex. 8** at p.4.  This formula-based approach means the DPW has no fixed value, making it impossible to evaluate as consideration at the time of bid submission.  Additionally, by definition, it is not a "highest and best bid," as it is designed to float up if necessary to top the otherwise highest Qualified Bidder.

40.    The DPW also fundamentally upends the nature of bankruptcy sales and creditor rights.  The estate—not the creditors—owns the assets being sold.  The Connecticut Families' attempt to leverage their potential future distributions as

current currency rests on the faulty premise that they have some present right to direct or control the sale process.  While creditors may waive rights to future distributions, such waivers cannot constitute valid currency for a current asset purchase by a third party.  The DPW was in furtherance of the Connecticut Families' continued attempt to bludgeon the Trustee into allowing them to control who would acquire the Assets.  Unfortunately, the Trustee eventually succumbed to the Connecticut Families' pressure tactics.

41.    The novelty of using a contingent waiver of future distributions as purchase currency highlights the fundamental problems with the DPW structure.  Creditors may certainly waive their rights to distributions, but attempting to monetize such waivers as currency for a third-party asset purchase distorts basic bankruptcy principles.  This is particularly true where, as here, the underlying claims remain disputed and the distributions themselves are speculative.

**4.    Integrity of the Process & Reasonable Expectations of the Participants.**

42.    The Sale Order provided for the "Auction" to be held on November 13, 2024, through Tranzon's selected online auction platform. **Ex. 1** at ¶18.  The Sale Order does not allow for the Trustee to change to a secret bid process unless the procedure changes were announced "on the record at the Auction" and the proposed changes were not inconsistent with the Sale Order and disclosed to all Qualified Bidders. **Ex. 1** at ¶12.  The change the Trustee made was certainly inconsistent with the Sale Order and also contrary to what the Trustee represented to the Court.  See **Dkt. 829**.

43.     Clearly, this provision was intended to ensure that Qualified Bidders were provided with full disclosure concerning any proposed changes and designed to further the goal of transparency, one of the pillars of bankruptcy.

44.     At the very minimum, if the Trustee wished to change to a secret bid "highest and best" sale process, such change had to be announced at the Auction and full disclosure would have had to have been made concerning the identities of the Qualified Bidders and what their Qualified Bids were. **Ex. 1** at ¶21.  Only with such disclosure would Qualified Bidders have a fair opportunity to submit highest and best bids.  And, even then, Court approval was most likely still required to permit the drastic change the Trustee implemented.

45.     Rather than follow the Sale Order and provide full disclosure, the Trustee decided to cloak the process in secrecy. **Ex. 5**.  Most likely, he made this decision because of his consideration of the DPW as currency, as he understood, rightfully so, that disclosure of that fact would have been brought to this Court's attention immediately.

46.     This Court has the task of balancing (1) the governing principle in confirming a sale, which is to secure the highest benefit for the estate, and (2) the need to preserve the integrity and formality of the auction process and to recognize the reasonable expectations of the parties who participated in the auction. *Corporate Assets, Inc., v. Paloian*, 368 F.3d 761 (7th Cir. 2004); See *In re Financial News*

*Network, Inc.*, 980 F.2d 165 (2d Cir. 1992); *Four B. Corp. v. Food Barn Stores* and (*In re Food Barn Stores, Inc.*), 107 F.3d 558 (8th Cir. 1997).

47.     In this case, FUAC's bid was the highest cash bid and provides the estate the most benefit. **Ex. 7**.  The Final Joint Bid, even if it were accepted at its argued face value, does not provide the most benefit to estate or the creditor body as a whole. **Ex. 8** at p.4.  Arguably, it might offer more benefit to the creditors who are not part of the Connecticut Families group, but that is only because the Connecticut Families have decided to waive a right to which they might otherwise be entitled.

48.     Even more concerning is the fact that the use of the Waiver as currency was not disclosed even though the Trustee knew that the Joint Bidder was relying on the waiver concept as currency from the Joint Bidder's initial bid. **Ex. 4** at p.4.  Had the Trustee followed the Sale Order, other Qualified Bidders would have known that the Connecticut Families were offering a non-cash waiver as part of the consideration in the Joint Bid. **Exs. 1 & 4**.  And with that knowledge, which full disclosure and transparency required, Qualified Bidders would have been able to react and adjust accordingly.

49.     FUAC had a reasonable expectation that the Trustee would follow the Sale Order.  Further, FUAC expected that it would be given the same opportunity as the other Qualified Bidders.  FUAC was not told that the Trustee was considering something like the DPW as currency.  No reasonable bidder would ever believe that something like that was possible.  Nothing like it has even been accepted in any

bankruptcy case in the entire country. Also, very importantly, FUAC reasonably expected that "highest and best" actually meant highest and best, and that no formulas or contingencies would be considered. As discussed, the Trustee accepted the Final Joint Bid despite the fact it included contingencies and a formula designed to provide "$100,000 more than the otherwise highest bid." FUAC also expected that the final bid would not be allowed to be amended after the fact, but that is exactly what the Trustee allowed the Joint Bidder to do.

**5.** **The Trustee did not Reasonably Exercise his Business Judgment**

50.    The bankruptcy court reviews the trustee's business judgment to determine independently whether the judgment is a reasonable one. 3 Collier on Bankruptcy ¶ 363.02[4] (Richard Levin & Henry) Sommer eds., 16th ed. 2020. The Trustee must attempt to maximize value for the benefit of the estate.

51.    Here, the proposed sale should not be approved because the Trustee failed to follow the Court ordered sales process and its own bid instructions. And, the Trustee failed to provide all bidders with full disclosure and transparency.

52.    The Trustee's acceptance of the Waiver as currency is unprecedented. There is not a reported case in the entire country where such a contingent and amorphous type of currency has been recognized. The DPW is impossible to value. The Connecticut Families' judgment is on appeal. The ultimate outcome of such appeal cannot be known. However, it is fair to consider that the sheer magnitude of the dollar amount of the judgment should give any court pause to accept it at face value

before the appeal process runs its course.  Finally, the PQPR secured claim remains unresolved.  Both the Debtor and the Trustee have had ample time to seek the Court's determination of the amount of the secured claim.  But, for whatever reasons, that has not happened.

53.    The Trustee's speculation about the ultimate outcome of PQPR's claim is just that—rank speculation.  His "acceptance" of the Final Joint Bid was not a reasonable exercise of his business Judgment for all of the reasons stated herein.

**6.    <u>Collusion</u>**

54.    The record reveals a sophisticated arrangement by the Onion and Connecticut Families to manipulate the sale process through the use of artificial consideration, ultimately undermining the fundamental integrity of this sale.  This was not merely cooperation between bidders—which alone would be concerning—but rather a coordinated effort to control the sale price while creating the appearance of higher total consideration.

55.    U.S. bankruptcy law has a strong and well-established public policy against enforcing collusive or price-fixed bids in sale contracts.  As articulated in *In re SageCrest II, LLC*, this prohibition is fundamental to maintaining the integrity of bankruptcy sales. No. 3:16-cv-00021 (VAB), 2018 U.S. Dist. LEXIS 54245, at *13 (D. Conn. Mar. 30, 2018).  More specifically, Section 363(n) of the Bankruptcy Code provides courts the authority to withhold approval of sales lacking good faith

due to collusion between purchasers and bidders. *In re Edwards*, 228 B.R. 552, 563 n.23 (Bankr. E.D. Pa. 1998).

56.    The Joint Bidder's strategy, evident from its initial bid, was to use the Connecticut Families' potential future distributions as a mechanism to control the effective purchase price. **Ex. 4**.  Rather than compete on a cash basis, the Onion structured its bid around a floating waiver that would automatically adjust to exceed any competing bid, while never requiring more than $1,750,000 in actual cash consideration.  This arrangement created complex administrative challenges to the Trustee that ultimately led to fatal deviations from the planned sale process. **Ex. 5**.

57.    The Section 363(n) prohibition applies with particular force to agreements that seek to control, rather than merely affect, the price. *In re New York Trap Rock Corp.*, 42 F.3d 747, 753-54 (2d Cir. 1994).  Here, the Onion and Connecticut Families crafted their arrangement specifically to ensure the Onion would acquire the assets with minimum cash outlay.  Their joint bid was premised entirely on topping competing bids with theoretical value while maintaining a fixed ceiling on actual cash consideration. **Ex. 4 & 8**.

58.    The complexity of this arrangement influenced the sale process in ways that ultimately undermined the process itself and lacked transparency.  The original live auction format was abandoned in favor of secret bids (**Ex. 5**) accommodating the very kind of formula-based, contingent consideration the Sale Order and bid instructions prohibited.

59.     Most concerning is how this arrangement undermined the fundamental principle that bankruptcy sales should maximize value for the estate.  Under the Joint Bidder's bid structure, the estate would never receive more than $1,750,000 in cash, regardless of competing bids. **Ex. 8**.  Instead, the Connecticut Families would simply adjust their waiver of speculative future distributions—consideration that provides no actual value to the estate.

60.     The sophisticated nature of this scheme is particularly evident in how it was structured to appear compliant with sale requirements while fundamentally altering the competitive dynamics of the bidding process.   After the initial joint bid introduced the DPW concept (**Ex. 4**), each subsequent modification served to further entrench this mechanism for controlling the effective purchase price while maintaining the appearance of competitive bidding.

61.     This type of price control mechanism, however carefully constructed, is precisely what Section 363(n) is designed to prevent.  When sophisticated parties collaborate to create artificial consideration and control sale prices, the integrity of the entire bankruptcy sale process is compromised.  The Court's responsibility to ensure fair and transparent sales requires rejection of such arrangements, regardless of how they are presented.

62.     Both the Joint Bidder's initial bid (**Ex. 4**) and the Joint Final Bid (**Ex. 8**) disclosed to the Trustee the Joint Bidder's ultimate intent to suppress the cash amount bid by the Onion through the Connecticut Families' loan to the Onion of

23

enough non-cash currency to allow the Onion to top other Qualified Bids, and then the Onion would pay back the amount the Connecticut Families gave up with the DPW through future revenues. See **Ex. 4**, pg. 3 of 6; and **Ex. 8**, pg. 5 of 6.

63.     By the very nature of the Joint Bidder's submissions, they were structured to ensure that the Onion, the Connecticut Families' preferred Purchaser, would be permitted to acquire the assets with the minimum amount of cash outlay. This structure is a clear attempt to control the sales price.

64.     Incredibly, the Trustee ultimately decided to sanction the Joint Bidder's scheme. In furtherance of this scheme, the Trustee has subsequently allowed the Joint Bidder to change their final bid <u>after</u> the Trustee filed the Notice of Successful Bidder.

<u>**Conclusion**</u>

For all these reasons, FUAC respectfully requests that the Court deny the Motion and order that the Trustee close with the selected Backup Bidder (i.e., FUAC), and grant FUAC such further relief as may be appropriate under circumstances.

Respectfully submitted,

 /s/ Walter J. Cicack
WALTER J. CICACK
State Bar No. 04250535
wcicack@hcgllp.com
HAWASH CICACK & GASTON LLP
711 W. Alabama St., Suite 200
Houston, Texas 77006
(713) 658-9015 - tel/fax
**Attorneys for First United American Companies, LLC**

24

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing document has been served through the Court's ECF noticing system on this 6th day of December, 2024.

 */s/ Walter J. Cicack*
Walter J. Cicack