# X Corp. Exhibit L

# In The Matter Of:

*Alexander E. Jones, Debtor*

---

*Christopher Murray*

*December 5, 2024*

---

*CONTINENTAL COURT REPORTERS, INC.-Houston*

*2 Riverway, Suite 750*

*Houston, Texas  77056*

*(713) 522-5080  |  (800) 779-6981*

*www.TexasDepos.com*

Original File 241205CM_ts.txt

**Min-U-Script® with Word Index**

## Page 1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION

 3   IN RE:                )
                           )     CHAPTER 11
 4   ALEXANDER E. JONES    )     CASE NO. 22-33553
                           )
 5         Debtor          )
                           )
 6

 7           ORAL VIDEOTAPED DEPOSITION OF

 8                CHRISTOPHER MURRAY

 9                DECEMBER 5, 2024

10

11        ORAL VIDEOTAPED DEPOSITION OF CHRISTOPHER MURRAY,

12   produced as a witness at the instance of First United

13   American Companies, LLC and duly sworn, was taken in the

14   above-styled and numbered cause on the 5th day of

15   December, 2024, from 9:42 a.m. to 5:40 p.m., before

16   Melinda Barre, Certified Shorthand Reporter in and for

17   the State of Texas, reported by computerized stenotype

18   machine at the offices of Porter Hedges, 1000 Main

19   Street, 36th Floor, Houston, Harris County, Texas,

20   pursuant to the Bankruptcy Rules of Procedure and the

21   provisions stated on the record or attached hereto.

22

23

24

25
```

## Page 2

```
 1                  APPEARANCES

 2

 3   FOR CHAPTER 7 TRUSTEE CHRISTOPHER MURRAY:

 4        Mr. Joshua Wolfshohl
          Ms. Kenesha L. Starling (via Zoom)
 5        Mr. Michael B. Dearman (via Zoom)
          PORTER HEDGES LLP
 6        1000 Main Street, 36th Floor
          Houston, Texas 77002
 7        Telephone: 713.226.6000
          E-mail: jwolfshohl@porterhedges.com
 8                kstarling@porterhedges.com
                  mdearman@porterhedges.com
 9

10   FOR FIRST UNITED AMERICAN COMPANIES, LLC:

11        Mr. Walter J. Cicack
          HAWASH CICACK & GASTON LLP
12        711 West Alabama Street, Suite 200
          Houston, Texas 77006
13        Telephone: 713.658.9015
          E-mail: wcicack@hcgllp.com
14

15   FOR THE U.S. TRUSTEE:

16        Mr. Ha Nguyen
          UNITED STATES DEPARTMENT OF JUSTICE
17        515 Rusk Street, Suite 3516
          Houston, Texas 77002
18        Telephone: (202) 590-7962
          E-mail: ha.nguyen@usdoj.gov
19

20   FOR ALEXANDER JONES:

21        Mr. Ben C. Broocks
          BROOCKS LAW FIRM, P.L.L.C.
22        248 Addie Roy Road, Suite B-301
          Austin, Texas 78746
23        Telephone: 512.201.2000
          E-mail: bbroocks@broockslawfirm.com
24

25
```

## Page 3

```
 1                  APPEARANCES

 2

 3   FOR ALEXANDER JONES:

 4        Mr. Shelby A. Jordan (via Zoom)
          JORDAN & ORTIZ, P.C.
 5        500 N. Shoreline Boulevard, Suite 804
          Corpus Christi, Texas 78401
 6        Telephone: 361.884.5678
          E-mail: sjordan@jhwclaw.com
 7

 8   FOR X CORP.:

 9        Ms. Caroline A. Reckler (via Zoom)
          Mr. Christopher Harris (via Zoom)
10        Mr. Jonathan J. Weichselbaum (via Zoom)
          LATHAM & WATKINS
11        233 S. Wacker Drive, Suite 5800
          Chicago, Illinois 60606
12        Telephone: 312.876.7663
          E-mail: caroline.reckler@lw.com
13                christopher.harris@lw.com
                  jon.weichselbaum@lw.com
14

15   FOR CONNECTICUT PLAINTIFFS:

16        Mr. Paul A. Paterson (via Zoom)
          Mr. Kyle Kimpler (via Zoom)
17        Ms. Vida Robinson (via Zoom)
          PAUL, WEISS, RIFKIND, WHARTON & GARRISON
18        1285 Avenue Of The Americas
          New York, New York 10019
19        Telephone: 212.373.3000
          E-mail: ppaterson@paulweiss.com
20                kkimpler@paulweiss.com
                  virobinson@paulweiss.com
21

22        Mr. Ryan Chapple (via Zoom)
          CAIN & SKARNULIS, PLLC
23        303 Colorado Street, Suite 2850
          Austin, Texas 78701
24        (512) 477-5000
          rchapple@cstrial.com
25
```

## Page 4

```
 1                  APPEARANCES

 2

 3   FOR TEXAS PLAINTIFFS:

 4        Ms. Deanna Drenga (via Zoom)
          Mr. Niko Letsos (via Zoom)
 5        WILLKIE FARR & GALLAGHER LLP
          787 Seventh Avenue
 6        New York, New York 10019
          Telephone: 212.728.8000
 7        E-mail: ddrenga@willkie.com
                  nletsos@willkie.com
 8

 9   ALSO PRESENT: Russell McKean and Robert Pierce,
                   Videographers
10
                 Paula Brillson, General Counsel of
11               The Onion

12               Chrystal Karstedt (via Zoom)
                 Legal Assistant for Shelby Jordan
13               Jordan & Ortiz, P.C.

14               Natalie Faust, Zoom Host

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

                          INDEX

                                                    PAGE
CHRISTOPHER MURRAY

Examination by Mr. Cicack ..........................9
Examination by Mr. Broocks .......................132
Examination by Ms. Reckler .......................257
Examination by Mr. Wolfshohl .....................276
Re-Examination by Mr. Cicack .....................277
Re-Examination by Mr. Broocks ....................278
Further Examination by Mr. Cicack ................288
Further Examination by Mr. Broocks ...............293
Examination by Mr. Paterson ......................296
Signature Page ...................................297
Court Reporter's Certificate .....................299


                         EXHIBITS

EXHIBIT          DESCRIPTION                       PAGE

Exhibit 1      Order Granting Trustee's Motion      30
               for Entry of an Order
               Authorizing the Winddown of
               Free Speech Systems, LLC

Exhibit 2      Notice of Successful Bidder and      30
               Backup Bidder in the Auction
               for the Assets of Free Speech
               Systems, LLC Free and Clear of
               any and all Claims, Interests,
               and Emcumbrances

Exhibit 3      Bid Form                             52

Exhibit 4      Bid Form                             54

Exhibit 5      11-11-24 Email from Jeff             80
               Tanenbaum to Melissa Allen;
               Subject, Notice re. FSS Overbid
               Process

Page 6

                     EXHIBITS (cont.)

EXHIBIT          DESCRIPTION                       PAGE

Exhibit 6      IP Assets Auction Bid               80
               Instructions

Exhibit 7      IP Assets Auction Overbid Form      84

Exhibit 8      IP Assets Auction Bid               98
               Instructions

Exhibit 9      Offering Memorandum                 11

Exhibit 14     Spreadsheet                         90

Exhibit 15     Spreadsheet                         90

Exhibit 16     Spreadsheet                         90

Exhibit 17     Free Speech Systems Sales          127
               Activity Report

Exhibit 18     Motion for Expedited Sale          132

Plf Exhibit 1  Trustee's Motion for Entry of      258
               an Order Authorizing the
               Wind-Down of Free Speech
               Systems, LLC

Plf Exhibit 2  Order Granting Trustee's Motion    258
               for Entry of an Order
               Authorizing the Winddown of
               Free Speech Systems, LLC

Plf Exhibit 3  Trustee's Motion for Authority     263
               to Sell the Intellectual
               Property Assets

Plf Exhibit 4  Notice of Revised Proposed         267
               Order Granting Trustee's
               Emergency Motion for Entry of
               an Order Authorizing (I) the
               Sale of Assets in Connection
               with the Winddown of Free

Page 7

                     EXHIBITS (cont.)

EXHIBIT          DESCRIPTION                       PAGE

Plf Exhibit 5  Twitter User Agreement             265

Plf Exhibit 6  X Terms of Service                 268

Plf Exhibit 7  Infowars Post                      273

Plf Exhibit 8  Infowars Post                      274

Plf Exhibit 9  War Room Post                      275

09:42:57-09:43:51                                  Page 8

1    **THE VIDEOGRAPHER:** This is the video
2 recorded deposition of Christopher Murray.  Today's date
3 is December 5th, 2024.  The time is 9:42 a.m. Central
4 Time, and we are now on the record.
5    Can I get all attorneys present to please
6 identify yourselves and who you represent for the
7 record.
8    **MR. CICACK:** Yes.  This is Walter Cicack,
9 spelled C-i-c-a-c-k.  I represent First United American
10 Companies, LLC.
11    **MR. BROOCKS:** My name is Ben Broocks, and
12 I represent Alex Jones.
13    **MR. NGUYEN:** Good morning.  My name is
14 Ha Nguyen.  I represent the United States Trustee.
15    **MR. WOLFSHOHL:** Joshua Wolfshohl with
16 Porter Hedges; and I represent the Chapter 7 trustee,
17 Chris Murray.
18    **THE VIDEOGRAPHER:** And can I get the
19 attorneys present by Zoom to please identify yourselves
20 and who you represent.
21    **MR. JORDAN:** Shelby Jordan.  I represent
22 Alex Jones.
23    **MS. RECKLER:** Good morning, Caroline
24 Reckler.  I represent X Corp.
25    **MR. PATERSON:** Good morning.  Paul

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

09:43:52-09:44:58                                                    Page 9

1  Paterson from Paul Weiss for the Connecticut plaintiffs,
2  together with Vida Robinson from Paul Weiss.
3     MS. DRENGA: This is Deanna Drenga from
4  Willkie Farr & Gallagher on behalf of the Texas
5  plaintiffs, also with my colleague Niko Letsos.
6     MR. CHAPPLE: Good morning. Ryan Chapple
7  for the Connecticut plaintiffs.
8     MR. MATTEI: Good morning. Chris Mattei
9  on behalf of the Connecticut plaintiffs.
10    THE VIDEOGRAPHER: All right. Would the
11  court reporter please swear in the witness.
12    CHRISTOPHER MURRAY,
13  having been first duly sworn, testified as follows:
14    EXAMINATION
15    QUESTIONS BY MR. CICACK:
16  Q.  Please state your name, please.
17  A.  Christopher Murray.
18  Q.  Okay. Mr. Murray, what is your relationship to
19  the Alex Jones bankruptcy?
20  A.  I'm the Chapter 7 trustee.
21  Q.  Okay. And you're here today to give your
22  deposition in connection with the motion that you filed
23  for entry of an order in furtherance of the sale of the
24  assets of Free Speech Systems?
25  A.  Yes.

---

09:44:59-09:46:13                                                   Page 10

1  Q.  Okay. And you understand there's a hearing set
2  for 1:00 p.m. on Monday, December 9th for the judge to
3  consider that motion?
4  A.  Yes.
5  Q.  Let me ask you just a little bit about your
6  background.
7     Approximately how many cases have you
8  handled as a Chapter 7 trustee?
9  A.  Several hundred.
10 Q.  Okay. And have you handled any cases as a
11 Chapter 11 trustee?
12 A.  Yes.
13 Q.  How many approximately?
14 A.  Oh, a handful. Maybe four or five.
15 Q.  Okay. Do you also have what I would consider
16 to be a more traditional background practice -- I mean,
17 bankruptcy practice as well?
18 A.  Yes.
19 Q.  And represent creditors and debtors both?
20 A.  Usually debtors and trustees, occasionally
21 creditors.
22 Q.  Okay. Now, as a trustee in either a Chapter 11
23 or Chapter 7, how many times have you been involved in
24 selling assets through Bankruptcy Code 363?
25 A.  Oh, dozens.

---

09:46:15-09:47:56                                                   Page 11

1  Q.  Dozens. Okay. And how many times have those
2  situations included an auction?
3  A.  Probably at least a dozen, maybe two dozen.
4  Q.  Okay. In terms of the complexities involved,
5  how does the auction that occurred here in connection
6  with the Alex Jones matter compare to the other auctions
7  that you've handled?
8  A.  I'd say it's on the more complex side.
9  Q.  Have you ever handled a situation where the
10 auction was actually done at the courthouse before the
11 judge?
12 A.  Yes.
13 Q.  How many times has that happened approximately?
14 A.  Oh, a handful. Maybe three or four.
15 Q.  Okay. And I assume you've also handled 363
16 sales as a trustee, where you asked the Court to approve
17 a sale that didn't include an auction?
18 A.  Yes.
19    (Murray Exhibit 9 was marked for
20    identification.)
21    BY MR. CICACK:
22 Q.  All right. Let me ask you to look at what has
23 been previously marked as Exhibit 9.
24 Q.  Okay.
25    MR. WOLFSHOHL: The offering memorandum?

---

09:47:59-09:49:10                                                   Page 12

1     MR. CICACK: Yeah.
2     BY MR. CICACK:
3  Q.  Now, is this the bid package that was sent out
4  in connection with the auction of the Free Speech
5  Systems assets?
6  A.  Yes. This is the initial bid package.
7  Q.  And how many potential bidders received this
8  package?
9  A.  I don't know. I think around a dozen.
10 Q.  Did you keep track of who received the package?
11 A.  Personally, no.
12 Q.  Okay. Was somebody responsible for keeping
13 track of who received the bid package?
14 A.  Yeah, my auctioneer.
15 Q.  And who was that?
16 A.  Jeff Tanenbaum.
17 Q.  And who prepared the bid package?
18 A.  The auctioneer. And also, I participated in it
19 and so did my counsel.
20 Q.  And who is your counsel?
21 A.  Mr. Wolfshohl here, other members of his firm,
22 also Erin Jones.
23 Q.  Okay. So it was a collaborative product?
24 A.  Yes.
25 Q.  Okay. And did you give final approval to the

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1   language that is in Exhibit 9?
2   **A.   Yes.**
3   Q.   So did you give it a final review and approval
4   before it was provided to potential bidders?
5   **A.   Yes.  I read it and approved it.**
6   Q.   Okay.  It doesn't include what I think we call
7   lot 4.
8      Do you recall when lot 4 was added?
9   **A.   I'm not sure what you're talking about.**
10  Q.   Okay.  Let's go look at the pages here.  If you
11  go to like page -- the pages are on the top.  You see
12  starting at page 5 it says lot 1?
13  **A.   Okay.  I see that.**
14  Q.   And I'm sorry.  You're looking at the wrong
15  page.
16  **A.   I'm sorry.  You want me on 5?**
17  Q.   Yeah.  No.  Actually, page -- yeah, page 5 on
18  top.  See where it says lot 1 and the next page says
19  lot 2?
20  **A.   Yes.**
21  Q.   And the next page says lot 3, right?
22  **A.   I see that.**
23  Q.   Those were the assets that were being sold,
24  correct?
25  **A.   Yes.**

1   Q.   At some point in time there was a lot 4 that
2   included assets that were also included in the sale?
3   **A.   I believe so, yes.**
4   Q.   Okay.  And I just want to know, do you recall
5   when that was added?
6   **A.   No.**
7   Q.   And do you recall generally what the lot 4
8   assets were?
9   **A.   Are you talking about the disputed domain**
10  **names?**
11  Q.   I believe so.
12  **A.   Okay.  That's my understanding.**
13  Q.   Okay.  And what do you understand about those
14  assets?
15  **A.   That among the domain names that FSS had to**
16  **sell, Mr. Jones was asserting -- I think he called it a**
17  **liberty interest, in those domain names, suggesting that**
18  **either the estate didn't own them or that they couldn't**
19  **be sold.**
20     **We agreed to designate those as disputed**
21  **domain names so that bidders would know that if they**
22  **were going to acquire those domain names, there might be**
23  **a fight later on.**
24  Q.   Why were they not included in the original bid
25  package?

1   **A.   I don't know.**
2   Q.   And when you say you agreed to include them as
3   disputed, who was the agreement with?
4   **A.   Mr. Jones requested it.**
5   Q.   Okay.  So it was an agreement with Mr. Jones?
6   **A.   His counsel at the time.**
7   Q.   And who was that?
8   **A.   Ms. Driver and -- I can't remember her last**
9   **name, but there was an IP lawyer as well.**
10  Q.   All right.  Let me ask you -- going back to
11  Exhibit 9, let me ask you to look at page 4.  And when
12  I'm talking about the pages, I'm talking about the
13  page numbers on the top right.
14  **A.   Okay.**
15  Q.   Page 4.  So you see where it says "bid form,"
16  and then there's Nos. 1, 2 and 3?
17  **A.   I see that.**
18  Q.   Okay.  No. 3 says, "Bids must be accompanied by
19  a 10 percent deposit payable to the trustee, along with
20  proof of financial ability to close."
21     Did I read that correctly?
22  **A.   Yes.**
23  Q.   Okay.  Did you waive the deposit requirement
24  for any of the bidders?
25  **A.   No.**

1   Q.   And we'll get into more detail about this, but
2   as I understand it, there were only two bidders.
3   **A.   Ultimately we only received two bids, yes.**
4   Q.   All right.  So there was only two formal bids
5   received?
6   **A.   Yes.**
7   Q.   Okay.  And one was from First United, right?
8   **A.   Yes.**
9   Q.   If I just call it First United, you'll know
10  that we're talking about my client, First United
11  American Companies, LLC?
12  **A.   Yes.  Your client, yes.**
13  Q.   All right.  And tell me, how are you
14  comfortable referring to the other bidders, just so I
15  can use the terminology that we'll both know we're
16  talking about them?
17  **A.   That's a good question because it's a lot of**
18  **words.**
19  Q.   Can we just agree, maybe we'll just call them
20  the joint bidders?
21  **A.   That's fine.  Or the successful bidders.**
22  Q.   Okay.  I don't like that term.  I like the
23  joint bidders better.  But I get you.
24     All right.  So other than the joint
25  bidders and the bids submitted by First United, there

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

**09:53:52-09:55:21** Page 17

1  were no other formal bids that were submitted?
2  A. No.
3  Q. Okay. And we'll get into this more later but I
4  just -- there were other people who at least showed
5  interest at some point in time, right?
6  A. Yes.
7  Q. Where it says here that each bid must be
8  accompanied with proof of financial ability to close,
9  were -- both of the bids submitted, did they show
10 financial ability to close?
11 A. Yes.
12 Q. So that requirement wasn't waived?
13 A. No.
14 Q. Now, you also reserve -- if you go down to the
15 next, where it says "terms" and it says "terms
16 highlights," do you see that?
17 A. Yes.
18 Q. The first sentence there says, "The trustee
19 reserves the right to accept or reject any offer."
20    Do you see that?
21 A. Yes.
22 Q. Did you reject any offers?
23 A. No.
24 Q. All right. Let's go down a little bit further
25 down to the bullet point down towards the end, where it

---

**09:56:42-09:58:08** Page 19

1  A. That's what it says, yeah.
2  Q. Well, is that accurate?
3  A. Yes.
4  Q. Okay. Let's go back to the top of the -- where
5  it says "Terms." The first sentence we looked at,
6  "Trustee reserves the right to accept or reject any
7  offer," the second sentence there says, "In the event an
8  offer is accepted, it shall be subject to overbid and
9  U.S. bankruptcy court approval."
10    Do you see that?
11 A. I do.
12 Q. Okay. Now, there were two qualified bidders.
13 Is that right?
14 A. Yes.
15 Q. All right. And were either of those qualified
16 bids subjected to an overbid?
17 A. They both were.
18 Q. Okay. The accepted bid by First United was for
19 $3.5 million. Is that right?
20 A. I want to make sure we're talking about the
21 same thing because we were talking about qualified bids
22 and now we're talking about accepted bids. There were
23 two rounds of bids.
24 Q. Right. So when you say, "In the event an offer
25 is accepted, it shall be subject to an overbid," you're

---

**09:55:23-09:56:39** Page 18

1  says, "Bids shall be in U.S. dollars on a cash basis and
2  shall be irrevocable and noncontingent."
3    Do you see that?
4  A. I do.
5  Q. When it says the "bids shall be in U.S. dollars
6  on a cash basis," what does that mean?
7  A. That means that people should bid an amount of
8  dollars for the assets they're bidding on.
9  Q. What does it mean when it says cash basis?
10 A. That it's not a loan or something else but that
11 it's cash that should be paid.
12 Q. The next bullet point says, "Deposits and
13 payments are due in the form of wire transfer only."
14 A. I see that.
15 Q. So there were two deposits that were made,
16 correct?
17 A. Yes.
18 Q. Were they made by wire transfer only?
19 A. They were.
20 Q. Then where it says "Payments," what does that
21 refer to?
22 A. I understand that to refer to payment of the
23 purchase price later.
24 Q. Okay. So the payment of the purchase price can
25 only be made via wire transfer?

---

**09:58:13-09:59:30** Page 20

1  talking about the qualified bids?
2  A. Here, I believe that is what that is referring
3  to, yes.
4  Q. And so each of the qualified bids was subject
5  to an overbid?
6  A. Under this term, yes.
7  Q. What does that mean, "under this term"?
8  A. Well, you're asking me about the terms that are
9  on the page, and I'm trying to answer your questions.
10 Q. Okay. Well, let's just take First United, for
11 instance. First United made -- its original qualified
12 bid was for $1.2 million, correct?
13 A. I think that's right.
14 Q. Okay. And how was that bid subjected to an
15 overbid?
16 A. So the way the procedures worked, we took
17 qualified bids, and at my election we could have a live
18 auction or some other auction format at my discretion.
19 So there would be anticipated another opportunity to bid
20 after those initial bids.
21 Q. Okay. Well, you only had one other qualified
22 bidder, right, which was the joint bidders?
23 A. Yes.
24 Q. How did they know what to overbid? How did
25 they know what the bid was that they had to overbid?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

| | |
|---|---|
| 09:59:33-10:01:02       Page 21 | 10:03:01-10:04:24       Page 23 |

**Page 21**

1  A.  **They didn't.**
2  Q.  They didn't.  Okay.  So in order to be able to
3  overbid, don't you have to know the bid that you're
4  competing against?
5  A.  **I don't think so.**
6  Q.  Why not?
7  A.  **What we announced was a second sealed bid**
8  **round, where we asked for highest and best offers.  The**
9  **point of doing it that way is to encourage bidders to**
10  **bid as much as they're willing to bid to get top dollar**
11  **from each bidder.**
12     **That would be undermined if the bidders**
13  **knew each other's bids.**
14  Q.  Okay.  Then why wasn't that disclosed in the
15  offering memorandum, that you were not going to subject
16  qualified bids to an overbid?
17  A.  **Well, the offering memorandum is the initial**
18  **bid procedures that are subject to my discretion to**
19  **changes, to further amendment as announced throughout**
20  **the process.**
21  Q.  As announced at the auction, correct?
22  A.  **Throughout the process.**
23  Q.  We'll get to that in a minute.
24     All right.  So it's your testimony that
25  the original qualified bids were subjected to an overbid

**Page 23**

1  highest and best process basically?
2  A.  **Yes.**
3  Q.  All right.  Was that a determination that you
4  made on your own?
5  A.  **No.**
6  Q.  And did you seek input from, for instance, your
7  auctioneer on that?
8  A.  **Yes, I did.**
9  Q.  Okay.  And did you seek counsel input on that
10  as well?
11  A.  **I did.**
12  Q.  Okay.  So you essentially converted the live
13  auction process to a sealed bid process?
14  A.  **It was a sealed bid process that ultimately did**
15  **not convert to a live bid auction.  It stayed a sealed**
16  **bid process.**
17  Q.  Did you consider, since you were changing what
18  is in the sentence that's here that we just went over --
19  did you consider going and asking the Court for
20  permission to do that?
21  A.  **Well, I didn't change the sentence that's on**
22  **the page.  I don't know what you mean.**
23  Q.  Well, it says, "The trustee reserves the right
24  to accept or reject bids, evaluate offers compared to
25  other offers received and/or projected revenues from a

| | |
|---|---|
| 10:01:05-10:02:57       Page 22 | 10:04:27-10:05:35       Page 24 |

**Page 22**

1  through the sealed bidding process?
2  A.  **Yes.**
3  Q.  Okay.  Okay.  So let's go to, if we could,
4  page 11 of Exhibit 9.
5  A.  **Okay.**
6  Q.  All right.  No. 1, where it says "sealed bid
7  sale."  Do you see that?
8  A.  **I do.**
9  Q.  All right.  I think it's the second full
10  sentence starts with, "The trustee reserves the right to
11  accept or reject bids."
12     Are you there?
13  A.  **Uh-huh.**
14  Q.  All right.  "Evaluate offers compared to other
15  offers received and/or projected revenues from a
16  piecemeal auction and open up the sealed bid for live
17  bidding between competitive bidders."
18     And that's defined as the auction,
19  correct?
20  A.  **I see that.**
21  Q.  All right.  And did you open up the accepted
22  bids to live bidding?
23  A.  **No.**
24  Q.  And you determined that instead of having a
25  live auction, that you would move to a sealed bid,

**Page 24**

1  piecemeal auction and open up the sealed bid for live
2  bidding between competitive bidders," right?
3     And you didn't do that.
4  A.  **You asked me if I changed what's on the page in**
5  **the initial bid procedures.  I did not change the**
6  **initial bid procedures.**
7  Q.  Okay.  When you decided not to go to a live
8  bidding procedure, did you consider going to the Court
9  and asking for the Court's permission to do that?
10  A.  **No.**
11  Q.  Did you think that the sale order allowed you
12  to do that?
13  A.  **Yes.**
14  Q.  Okay.
15     **MR. PATERSON:** Sorry to interrupt.  I'm
16  told there are people online waiting to get on the Zoom.
17  So if the court reporter or whoever wouldn't mind
18  letting them in?
19     **MR. CICACK:** Can we just go off the record
20  for a minute.
21     **THE VIDEOGRAPHER:** The time is --
22     **MR. WOLFSHOHL:** They've been let in the
23  room.
24     **THE VIDEOGRAPHER:** Okay.  They are in,
25  Walter.  Do you still want to go off?

**CONTINENTAL COURT REPORTERS, INC.**
(713) 522-5080

1    MR. CICACK: No.
2    THE VIDEOGRAPHER: Okay. Thanks.
3    MR. WOLFSHOHL: Walt, did you want them to
4  announce?
5    MR. CICACK: Are they just listening?
6    MR. WOLFSHOHL: I don't know. The only
7  other people that I know might ask questions are X.
8    MS. RECKLER: This is Caroline Reckler. I
9  have two of my colleagues. I didn't announce them. I
10  apologize. I don't think they're the new people who
11  joined, but if you're seeing the names Christopher
12  Harris or Jon Weichselbaum, they're with me.
13    MR. PATERSON: Yeah. And it was just Kyle
14  Kimpler from Paul Weiss who just joined.
15    MR. CICACK: Okay.
16    MR. KIMPLER: Sorry for the interruption.
17  Thank you.
18    BY MR. CICACK:
19  Q.  All right, sir. Let's go to page 12.
20  A.  (Witness complies.)
21  Q.  Now, again, this is page 12 of Exhibit 9. I
22  want to go to paragraph 9, where it -- the last sentence
23  of paragraph 9 says, "If sales agent and trustee
24  determine that no auction will be held, the sales agent
25  and trustee will determine whether or not any qualified

1  bids will be accepted or rejected."
2  A.  I see that.
3  Q.  All right. Did you determine that an auction
4  would not be held?
5  A.  I determined we wouldn't hold a live auction.
6  Q.  Okay. So is it your testimony that an auction
7  did take place?
8  A.  Yes.
9  Q.  Okay. So you didn't determine to not have an
10  auction, right?
11  A.  I determined not to have a live auction.
12  Q.  All right. But just so we're clear, your
13  testimony is that an auction did, in fact, happen?
14  A.  Yes.
15  Q.  Okay. And when did that auction happen?
16  A.  It happened over the days between receiving the
17  initial bids that were announced as qualified bids and
18  the deadline to submit highest and best sealed bids.
19  Q.  Okay. And so if we go back -- if you could, go
20  back to page 11 of Exhibit 9, paragraph 1. You see
21  where it defines what an auction is? There's a defined
22  term auction.
23    Do you see that?
24  A.  Yes.
25  Q.  All right. So it's your testimony that as that

1  term is defined there, that occurred?
2  A.  No.
3  Q.  Okay. So the defined term auction here on
4  paragraph 1 of page 11, that did not occur?
5  A.  The defined term, as I understand it, in these
6  initial bid procedures is defined to refer to a live
7  bidding auction; and I determined not to do that.
8  Q.  Just so we're clear, so what's defined here as
9  the auction didn't occur?
10  A.  This defined term on this page, yeah, I decided
11  not to do that.
12  Q.  Okay. So let's go to page -- back to page 12
13  of Exhibit 9. And so when it talks about auction,
14  paragraph 10, and using the defined term auction, that
15  didn't happen, right? So nothing in paragraph 10
16  happened?
17  A.  I don't know. I'd have to read paragraph 10.
18  Q.  Take your time and read it.
19  A.  Okay. Could you remind me the question?
20  Q.  Okay. My question is that nothing set out in
21  paragraph 10 actually happened?
22  A.  That's not true.
23  Q.  Okay. So what happened in paragraph 10?
24  A.  Qualified bidders only were allowed to
25  participate in the auction that we conducted.

1  Q.  Well, but the auction as defined here is a live
2  auction.
3  A.  Oh, I suppose -- okay. Yeah. If you're
4  viewing it that way, then yes, the auction with a
5  capital A didn't happen.
6  Q.  So nothing in paragraph 10 happened?
7  A.  Yeah. I think the defined term's in each
8  sentence. Sure.
9  Q.  So it didn't happen. You decided just to scrap
10  this Provision 10? I understand you think you had the
11  discretion to do that, but I just want to make sure
12  we're clear.
13    Nothing in paragraph 10 actually happened?
14  A.  I didn't hold a live auction.
15  Q.  Okay. And at the auction you did have the
16  auction didn't lead off with an announced lead bid, did
17  it?
18  A.  No.
19  Q.  Okay. And the auction didn't open at a highest
20  bid amount?
21  A.  No.
22  Q.  And qualified bidders were not allowed to
23  overbid in minimum increments?
24  A.  Within what paragraph 10 is saying, no, they
25  weren't. That didn't happen.

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  Q.  All right.  Now, let me ask you to look at
2  paragraph 11, where it says "Bankruptcy Court Approval."
3  It says, "If one or more bids are awarded by the
4  trustee, whether before or as a result of the auction,
5  the trustee is authorized to proceed to close the sale
6  and the sale is not subject to further approval by the
7  bankruptcy court."
8      Did I read that correctly?
9  A.  Yes.
10 Q.  Is that accurate?
11 A.  At the time this document was done, yes, that's
12 accurate.
13 Q.  Did something change about that?
14 A.  Yes.
15 Q.  What was that?
16 A.  At the time we issued these procedures, I had a
17 wind-down order that authorized me to sell assets of
18 FSS.  Subsequent to that, the Court entered an order
19 that made the assets of FSS assets of the Chapter 7
20 individual bankruptcy estate.  And that to me triggered
21 a requirement to get court approval under 363.
22 Q.  And that is the motion we're here about today?
23 A.  Yes.
24 Q.  All right.  Let's go to page -- I'm sorry, same
25 page.  Let's go to paragraph 12.

1      Paragraph 12 talks about closing and final
2  payment, correct?
3  A.  Yes.
4  Q.  All right.  The second full sentence says,
5  "Sales agent shall provide bidder with an invoice and
6  wiring instructions, including the bid amount, the
7  buyer's premium and sales tax."
8      Do you see that?
9  A.  I see that.
10 Q.  Okay.  And has a sales agent provided the joint
11 bidder with an invoice?
12 A.  I don't know.
13 Q.  Okay.  And when it talks about the buyer's
14 premium, what is that?
15 A.  My understanding of a buyer's premium is it's
16 an additional amount charged on top of a bid by the
17 auction house.
18 Q.  Okay.  And is that present in this case?
19 A.  No.
20 Q.  All right.  I think that's all for Exhibit 9
21 right now.
22    (Murray Exhibit 1 was marked for
23    identification.)
24    BY MR. CICACK:
25 Q.  Let's go if we could to Exhibit 1, which I

1  think is the sale order.
2  A.  Are we going to need 9 again?
3  Q.  I try to keep the paper at a minimum.
4  A.  Okay.
5  Q.  All right.  And you're familiar with this
6  order?
7  A.  Yes.
8  Q.  All right.  Let's go to page 3.  And the first
9  sentence there talks about Tranzon's commission?
10 A.  I see that.
11 Q.  And as I understand what this is saying is that
12 Tranzon's commission can be paid from the proceeds of
13 the sale without further approval of the bankruptcy
14 court.  Is that your understanding?
15 A.  Let me read this.
16 Q.  Yeah, sure.
17 A.  Okay.  Could you remind me your question?
18 Q.  Yeah.  So my question is that, as I appreciate
19 it, Tranzon's commission will be paid from the
20 closing -- the proceeds from the closing and further
21 court approval is not needed for that.
22 A.  Yes.  That's my understanding.
23 Q.  All right.  So if the Court approves the sale
24 to the joint bidders as you've requested, what is
25 Tranzon's commission?

1  A.  I don't know.
2  Q.  Have you not calculated it yet?
3  A.  I understand there will be a range.  I've made
4  estimates of it.
5  Q.  Okay.  When you say a range, isn't it based on
6  a certain percentage?
7  A.  Yes.
8  Q.  So why a range?  Why can't you tell us what the
9  exact commission amount would be?
10 A.  Because the compensation will ultimately depend
11 in part on the amount of the distributable proceeds
12 waiver, and I don't know what that amount is yet.
13 Q.  Okay.  So if I hear you, what you're saying is
14 that the distributable proceeds waiver, if the sale goes
15 through as contemplated, it will have a value; and at
16 some point that will be determined and Tranzon will get
17 paid a commission on that value from the cash proceeds,
18 correct?
19 A.  Yes.  That is my understanding.
20 Q.  Okay.  It's not like the Connecticut families
21 or any other creditors are going to pay Tranzon, right?
22 You're going to pay Tranzon?
23 A.  Yes.
24 Q.  From the million-750?
25 A.  Yes.

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

10:19:11-10:21:26                                    Page 33

1 Q.   Okay.  So the distributable proceeds waiver,
2 and I think we'll spend a fair amount of time on that;
3 but tell me why it is that you can't determine what that
4 is now.
5 A.   I believe the amount will be based on how much
6 cash is available to the general unsecured creditors of
7 FSS from the sale, and that will be net of
8 administrative costs of the sale.  And that I don't know
9 for certain right now.
10 Q.   Okay.  And is there a range?
11 A.   I've estimated a range.
12 Q.   What is your estimated range?
13 A.   Oh, I don't know.  There's lots of spreadsheets
14 and analysis.  I don't remember exactly.
15 Q.   Okay.  Did you do that or did Tranzon do that?
16 A.   I did that.
17 Q.   Okay.
18 A.   Well, we both did.
19 Q.   I didn't see any spreadsheets in your
20 production, but I did see some in Tranzon's production.
21 So that's why I'm asking that question.
22 A.   Okay.  I did spreadsheets.
23 Q.   Okay.  I don't have extra copies of these right
24 now, but I'll get some at the break.  If I could just
25 hand you these documents and ask you if these look like

---

10:21:28-10:23:17                                    Page 34

1 the spreadsheets that you were talking about?
2 A.   Yes.
3 Q.   Okay.  So I'll make copies later on, but I just
4 want to make sure.  This is what you're talking about?
5 A.   Among others, but yes.
6 Q.   And so when you're determining Tranzon's
7 compensation, you're considering the value that you
8 ascribe to the distributable proceeds waiver as sales
9 revenues?
10 A.   I'm not sure I understand your question.
11 Q.   Well, as I understand it, their compensation is
12 based on sales revenues.
13 A.   Yes.
14 Q.   Revenues from the sales, correct?
15 A.   That's my understanding.
16 Q.   All right.  So when you're determining their
17 compensation, Tranzon's compensation, you're including
18 whatever value you ascribe to the distributable proceeds
19 waiver as part of the sales revenues?
20 A.   Well, I haven't determined their compensation
21 yet.
22 Q.   Okay.  So are you saying that they may not be
23 compensated on the portion of the sale that's
24 attributable to the distributable proceeds waiver?
25 A.   Yeah.  I'm saying I'm not sure exactly how

---

10:23:19-10:24:18                                    Page 35

1 their compensation would be based on the distributable
2 proceeds waiver.
3 Q.   Okay.  So whatever value is ascribed to that,
4 you're not sure today how Tranzon's going to get
5 compensated on that?
6 A.   That's right.
7 Q.   Have you had any conversations with Tranzon
8 about that?
9 A.   Yes.
10 Q.   Okay.  And who did you speak to about that?
11 A.   Jeff Tanenbaum.
12 Q.   Okay.  Were any of your communications with him
13 about this issue via e-mail or text?
14 A.   I don't think so.
15 Q.   All verbal?
16 A.   I think we talked about it a couple of times.
17 Q.   In person or over the phone?
18 A.   Over the phone.
19 Q.   Can you just tell me, generally speaking, what
20 was the gist of that conversation?
21 A.   The gist of the conversation was this
22 distributable proceeds waiver is unique.  We'll need to
23 figure out what appropriate compensation is under your
24 engagement letter and given the value of your services
25 based on that kind of consideration being paid in the

---

10:24:20-10:25:32                                    Page 36

1 auction.
2 Q.   But y'all have not reached a final resolution
3 to that?
4 A.   No.
5 Q.   Okay.  Just for my sake, can we -- instead of
6 calling it the distributable proceeds waiver, can we
7 just call it the waiver and we'll know what we're
8 talking about?
9 A.   Sure.
10 Q.   It's just a lot to say.
11 A.   We could call it the DPW.
12 Q.   That's what I call it, but that's almost worse.
13 A.   Yeah.  It is more syllables.
14 Q.   It's almost worse.  All right.
15     Let's go to page 5 of Exhibit 1, please.
16 A.   Okay.  I'm there.
17 Q.   Okay.  And so you see right in the middle on
18 paragraph 5 it says, "The IP assets auction" --
19 A.   Yes.
20 Q.   -- "if applicable"?  And it says that it will
21 be held November 13th at 10:00 a.m. through Tranzon's
22 selected online auction platform, correct?
23 A.   I see that.
24 Q.   That didn't happen, right?
25 A.   Right.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

10:25:33-10:27:34                                    Page 37

1  Q.  Okay.  Now, just as an aside, is the remaining
2  asset auction going to go forward on the 10th?
3  A.  No.
4  Q.  Okay.  Have you announced that yet to anybody?
5  A.  I don't know.
6  Q.  Okay.  Can we rely on you telling us today that
7  it's not going to happen?
8  A.  It's not going to happen on the 10th.
9  Q.  All right.  Can you explain why?
10  A.  Well, the remaining assets auction comes after
11  the IP assets auction and sale; and that hasn't
12  concluded yet.
13  Q.  But it might on the 9th theoretically?
14  A.  It might.
15  Q.  But even if the judge were to unqualifiedly
16  approve your motion, the remaining asset sale is not
17  going to happen on the 10th?
18  A.  Right.
19  Q.  Okay.  And do you plan to notice out to people
20  when it's going to happen?
21  A.  Yes.  We will provide a notice when the new
22  date is set.
23  Q.  Okay.  Let's go to page 8 of Exhibit 1,
24  paragraph 8.  It says, "No later than five business days
25  following the IP asset's bid deadline, the trustee will

---

10:27:37-10:28:52                                    Page 38

1  determine which potential bidders are qualified bidders
2  and will notify the potential bidders whether sealed
3  bids submitted constitute qualified bids, which will
4  enable the qualified bidders to participate in the IP
5  assets auction if held," correct?
6  A.  Yes.
7  Q.  I read it right?
8  A.  You said "the" instead of "such," but
9  substantively it was correct.
10  Q.  All right.  So the only qualified bidders were
11  First United and the joint bidders?
12  A.  Yes.
13  Q.  And you notified both of them that their bids
14  were qualified?
15  A.  Yes.
16  Q.  But the IP assets auction as defined here did
17  not happen?
18  A.  Right.  There was no live auction.
19  Q.  But you also didn't determine that you weren't
20  going to have an auction, right?
21  A.  When?
22  Q.  At any point?  Well, let me ask you this.  Do
23  you believe that your authority allowed you to not go
24  forward with any auction if that's what you decided to
25  do?

---

10:28:53-10:30:53                                    Page 39

1  A.  Yes.
2  Q.  Okay.  You didn't make that decision, though,
3  did you?
4  A.  Right.
5  Q.  Okay.  So you decided to go forward with an
6  auction, just not the live auction?
7  A.  Yes.
8  Q.  And would you agree that, if you go back to
9  page 5, that the definition of the IP assets auctions
10  just like the definition that was in the bid procedures
11  we looked at -- I'm sorry, the bid package we looked, IP
12  assets auction is defined as the live auction?
13  A.  That's how I understand this, yes.
14  Q.  All right.  So let's go to -- if we could, go
15  to page 9, in particular, paragraph 12.  I'm not going
16  to read it.  If you would read paragraph 12, I've got
17  some questions to ask you about that.
18  A.  Okay.
19  Q.  All right.  Now, is this one of the provisions
20  that you believe gives you discretion to move from the
21  live auction process?
22  A.  Yes.
23  Q.  And as you discussed, you decided to change the
24  process from a live auction to a sealed bid process?
25  A.  It was always a sealed bid process.  I decided

---

10:30:56-10:32:10                                    Page 40

1  not to have a live auction as well.
2  Q.  But you decided to still have an auction using
3  the qualified bidders, right?
4  A.  Yes.
5  Q.  For instance, you had the authority, I think --
6  and tell me if I'm wrong.  You had the authority to stop
7  at the qualified bid procedures, right, and take the
8  qualified bids and say, I'm going with this one, and not
9  even move forward with an auction?
10  A.  Yes.
11  Q.  You decided not to do that?
12  A.  Right.
13  Q.  Okay.  So instead, rather than move forward as
14  set forth here in the live auction process, you decided
15  not to go with a live auction process?
16  A.  Yes.
17  Q.  But you still decided to go forward with a
18  subsequent auction?
19  A.  Yes.
20  Q.  All right.  And so that subsequent auction was
21  a different procedure than the live auction?
22  A.  Yes.
23  Q.  All right.  And did you have the live auction
24  and announce your change in procedures at the live
25  auction?

---

**CONTINENTAL COURT REPORTERS, INC.**
(713) 522-5080

Alexander E. Jones, Debtor

Christopher Murray<br>December 5, 2024

---

10:32:10-10:33:47      Page 41

1 **A.  No.**
2 Q.  Why not?
3 **A.  There wasn't a live auction.**
4 Q.  Well, am I wrong that -- it seems to me that
5    paragraph 12 authorizes you to implement other
6    procedures as you may announce at the auction.
7 **A.  With a capital A, yeah, that's what it says.**
8 Q.  Right.  That's the live auction?
9 **A.  Right.  And there wasn't one.**
10 Q.  Right.  Well, then what about this paragraph do
11    you think authorizes you to make changes in the
12    procedures without announcing it at the live auction?
13 **A.  I thought you asked me if this paragraph is one**
14    **of the several paragraphs that gives me discretion to**
15    **change procedures, and I said yes.**
16 Q.  Okay.  Well, this paragraph, though, says that
17    if you change procedures, you've got to announce it at
18    the live auction.
19 **A.  This paragraph says that?**
20 Q.  Right.  And you didn't do that?
21 **A.  No.**
22 Q.  Okay.  Did you cancel the IP auction?
23 **A.  Are you referring to the defined term?**
24 Q.  Yeah, the defined term.
25 **A.  We didn't have a live auction.**

---

10:33:49-10:35:06      Page 42

1 Q.  Did you formally cancel it?
2 **A.  I'm not sure what you mean by that.**
3 Q.  Did you file any sort of notice with the Court
4    that you were canceling the live auction?
5 **A.  I did not file a notice that there would not be**
6    **a live auction.**
7 Q.  Did you file any notice with the Court
8    notifying the Court that you were moving -- that you
9    were not going to go forward with the live auction?
10 **A.  I did not file a notice.**
11 Q.  Okay.
12 **A.  No.**
13 Q.  Now, tell me, when you decided to move from a
14    live auction to other procedures, what were those other
15    procedures?
16 **A.  I decided not to have a live auction.  Your**
17    **question assumes that I did and then changed my mind.**
18    **So could you ask your question again?**
19 Q.  Well, wait a second.
20 **A.  There was a premise there.**
21 Q.  This sales order says there's going to be a
22    live auction.
23 **A.  It says there could be.**
24 Q.  Look at page 5.  So are you telling me that at
25    the time that this sale order was entered, it wasn't

---

10:35:10-10:36:33      Page 43

1    your intent to have a live auction?
2 **A.  I didn't know.**
3 Q.  Okay.  So it wasn't -- you didn't know whether
4    you were going to have a live auction or not?
5 **A.  That's right.**
6 Q.  And so it wasn't your intent to have a live
7    auction at the time.  Maybe you would; maybe you
8    wouldn't?
9 **A.  That's right.**
10 Q.  So how were bidders supposed to know whether or
11    not you were going to move forward with a live auction?
12 **A.  We told you.**
13 Q.  Well, this paragraph 12 says you're supposed to
14    tell them at the live auction.
15 **A.  That's what that paragraph says.**
16 Q.  Okay.  So the procedure you changed to, the
17    procedure you decided to use, okay, what was that
18    procedure?
19 **A.  We asked for the two qualified bidders to**
20    **submit their highest and best offers on a bid form to**
21    **indicate which lots they wanted and what their bids were**
22    **on those items.**
23 Q.  Did you disclose to the qualified bidders who
24    the other qualified bidders were?
25 **A.  No.**

---

10:36:34-10:38:06      Page 44

1 Q.  Okay.  Did you disclose to the qualified
2    bidders what the amounts of the qualified bids were?
3 **A.  No.**
4 Q.  Why not?
5 **A.  Because the point of a highest and best bid**
6    **round is that the bidders don't know what the others are**
7    **going to bid and, therefore, there is this tension that**
8    **causes them to want to bid more.  If you knew what the**
9    **other bidders were bidding, you'd just bid one dollar**
10    **more and the estate would lose the chance of getting**
11    **significantly higher bids.**
12 Q.  Well, wait a second.  How does knowing the
13    original qualified bid give you any information about
14    what the bidder might ultimately bid in terms of his
15    highest and best?  Explain that to me.
16 **A.  At a minimum, it tells you where they started.**
17 Q.  Okay.  And so you decided not to communicate,
18    not to disclose to either of the qualified bids what
19    their starting bids were?
20 **A.  What the other's starting bids -- that's right.**
21    **I did not disclose the amount of the bids to the other**
22    **bidders.**
23 Q.  Did you -- and you didn't disclose the
24    identities?
25 **A.  No.**

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  Q.  To either of them?

2  **A.  No.**

3  Q.  All right.  So tell me the provisions or

4  provision of this sale order that you believe allowed

5  you to move from a live auction to another procedure

6  without announcing that change at the live auction

7  itself.

8  **A.  Paragraph 29 is one of them.**

9  Q.  Anything else?

10 **A.  As I sit here right now, I can read through the**

11 **document and try and point out more.**

12 Q.  All right.  So let's go back, just so -- that's

13 all you can identify now?

14 **A.  It's the first one that comes to mind.  I'm**

15 **happy to spend more time looking.**

16 Q.  Okay.  Well, maybe we'll do that in a minute.

17    Let's go back to page 5.  The IP assets

18 auction, do you see that?

19 **A.  Yes.**

20 Q.  Okay.  That didn't happen, right?

21 **A.  There was no live auction, that's right.**

22 Q.  Did you cancel it?

23 **A.  I didn't hold it.**

24 Q.  Okay.  Is that different than canceling it?

25 **A.  Yes.**

1  Q.  Okay.  What's the difference?

2  **A.  Well, you cancel something that's been**

3  **scheduled and is going to happen.  That hadn't happened**

4  **yet.**

5  Q.  Well, this was certainly scheduled?

6  **A.  "The IP assets auction, if any, will be held**

7  **November 13th."**

8  Q.  "Subject to rescheduling or cancellation."

9     So I'm asking you, did you reschedule or

10 did you cancel?  What did you do?

11 **A.  Well, maybe we're talking past each other.  I**

12 **informed both qualified bidders that we weren't going to**

13 **have a live auction.**

14 Q.  Okay.  So are you telling me then you canceled

15 it?

16 **A.  I didn't hold a live auction.  I'm not -- I**

17 **characterize it and apparently think about it**

18 **differently than you do.**

19 Q.  Well, I'm looking at the order.  It says,

20 "Subject to rescheduling or cancellation," and I'm just

21 trying to figure out, did you reschedule it or did you

22 cancel it?

23 **A.  It didn't happen.**

24 Q.  Didn't happen.  Okay.  All right.  And you

25 didn't file a notice with the Court to tell the Court

1  that it didn't happen, right?

2  **A.  Yes.  I mean, no, I did not.**

3  Q.  Don't you think the Court thought it was going

4  to happen?

5  **A.  I don't know.**

6  Q.  Well, look at paragraph 17 on page 11 of the

7  order.  It says, "If the IP assets auction is canceled,

8  then the trustee shall file a notice with the Court of

9  such election within two business days of determination

10 of such election by the trustee."

11 **A.  I see that.**

12 Q.  All right.  So you think there's a substantive

13 difference between not holding it and canceling it?

14 **A.  Yes.**

15 Q.  Okay.  You don't think this paragraph makes it

16 pretty clear the Court wanted to know if you weren't

17 going to go forward with the live auction, the Court

18 wanted you to file a notice?

19 **A.  That's not how I interpreted that.**

20 Q.  Okay.  Let's go to paragraph 29 of the exhibit.

21 And this is the paragraph that you say that you think

22 allows you to change the procedures without announcing

23 those changed procedures at the live auction?

24 **A.  Yes.**

25 Q.  Okay.  All right.  So let's look at, if we

1  could, down at the bottom where it talks about imposing

2  additional terms and provisions here.

3     Did you extend the deadlines for anyone to

4  submit sealed bids?

5  **A.  No.**

6  Q.  Did you adjourn any auction?

7  **A.  No.**

8  Q.  Did you modify the auction and sales procedures

9  or add procedural rules that were reasonably necessary

10 or advisable under the circumstances for conducting the

11 auction?

12 **A.  The capital A auction, no, because there wasn't**

13 **a live auction.**

14 Q.  Okay.  Did you cancel any auction, capital A

15 auction?

16 **A.  No.**

17 Q.  Did you reject any sealed bids, qualified bids

18 or -- did you reject any sealed or qualified bids?

19 **A.  No.**

20 Q.  Also it says, next sentence says, "For the

21 avoidance of doubt, the trustee reserves the right at

22 any point prior to the selection of the successful

23 bidder at the IP assets auction or successful bidders at

24 the remaining assets auction to terminate the sales

25 price contemplated hereunder with respect to any and all

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

10:45:26-10:47:57                                          Page 49

1   of the FSS assets and seek to sell any and all assets by
2   alternative means."
3       Do you see that?
4   **A.  Yes.**
5   Q.  All right.  And you did not at any point
6   terminate the sale process, correct?
7   **A.  No.**
8   Q.  Okay.  Is there anything that you think in
9   paragraph 29 that's inconsistent with paragraph 12?
10  **A.  I'm not sure how to answer that.  I'm not sure**
11  **they are inconsistent.**
12  Q.  Okay.  Let me ask you this.  I mean, do you
13  think it's reasonable for the bidders to rely on you to
14  follow the sale order?
15  **A.  Yes.**
16  Q.  Okay.  Let's look at paragraph 30 of Exhibit 1.
17  **A.  Okay.**
18  Q.  Now, where it says here, the last sentence,
19  "All parties reserve the right to seek" -- sorry,
20  second-to-last sentence.  "All parties reserve the right
21  to seek court relief, included on an expedited basis,
22  with regard to the auctions and any related items."
23      Would you agree that my client has the
24  right to seek court relief in connection with the sale
25  motion?

---

10:47:58-10:49:22                                          Page 50

1   **A.  Looks like this sentence gives you rights with**
2   **respect to a capital A auction, which I thought we**
3   **established didn't happen.**
4   Q.  Okay.  But isn't that a related item, though?
5   What happened, isn't that related?
6   **A.  I don't have a view on that.**
7   Q.  Okay.  So is it your position that my client
8   doesn't have the right to come in and argue that the
9   sale as you are requesting it should not be approved?
10  **A.  You're already doing that.  You're already**
11  **making --**
12  Q.  No.  But I'm asking you.  You're the trustee.
13      Are you saying -- are you taking the
14  position we don't have the right to contest the sale?
15  **A.  Of course you can contest the sale, and you've**
16  **done it.**
17  Q.  Let's go to page 6 of the sale order.  I want
18  to talk about this bullet point, "Identity of assets and
19  purchase price."
20      Do you see that?
21  **A.  Yes.**
22  Q.  All right.  The last sentence says, "The
23  purchase price should be a specific amount in U.S.
24  dollars, not a range."
25  **A.  Yes.**

---

10:49:22-10:50:50                                          Page 51

1   Q.  Okay.  What is the purchase price that the
2   joint bidders are paying?
3   **A.  1.75 million.**
4   Q.  That's all?
5   **A.  That's the purchase price cash component of**
6   **their bid.**
7   Q.  Okay.  Does the noncash component have a cash
8   value?
9   **A.  Well, I disagree that it's a noncash -- yes, it**
10  **does.  The other components of the bid do have a value.**
11  Q.  Okay.  You don't -- all right.  Well, we'll get
12  to that.
13      Are you saying that the waiver, the DPW,
14  is not a -- is different than a noncash component?
15  **A.  I guess you could characterize it that way,**
16  **yes.**
17  Q.  Well, that was a bad question or a bad answer,
18  one or the other.
19      Are you saying that it is a noncash
20  component?
21  **A.  Yeah.  It's a noncash -- it's a nonpurchase**
22  **cash component but it could be measured in a cash**
23  **equivalent.**
24  Q.  And on the bid that you accepted, what is the
25  cash equivalent?

---

10:50:53-11:05:03                                          Page 52

1   **A.  7 million.**
2   Q.  And where did you get that from?
3   **A.  The bid form.**
4   Q.  All right.  We will get to that.
5       **MR. CICACK:** Do you want to take a quick
6   break?
7       **THE WITNESS:** Sure.
8       **MR. WOLFSHOHL:** Sure.
9       **THE VIDEOGRAPHER:** The time is 10:50, and
10  we are off the record.
11      (Recess taken)
12      **THE VIDEOGRAPHER:** The time is 11:02, and
13  we are back on the record.
14      (Murray Exhibit 3 was marked for
15  identification.)
16  **BY MR. CICACK:**
17  Q.  Thank you, sir.  Let's look, if we can, move to
18  Exhibit 3, which is the initial form, or bid form, that
19  was submitted by First United.
20  **A.  I don't have Exhibit 3 unless it got**
21  **paper-clipped in with the other ones.  No.  I don't have**
22  **a 3.**
23  Q.  This is marked as 3.  There you go.
24  **A.  Okay.**
25  Q.  Sorry about that.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

1  A.  No problem.
2  Q.  All right.  So Exhibit 3 is a copy of the First
3  United bid, initial bid, correct?
4  A.  Yes.
5  Q.  You've seen that before, right?
6  A.  I have.
7  Q.  And it was pretty easy to understand, was it
8  not?
9  A.  Yes.
10  Q.  Okay.  And did you understand that the total
11  amount being bid was 1,200,000 for all of the assets
12  being sold?
13  A.  Yes.
14  Q.  Okay.  And you received the 10 percent deposit,
15  correct?
16  A.  Yes.
17  Q.  And you determined that this was a qualified
18  bid and met all the requirements?
19  A.  I determined it was a qualified bid.
20  Q.  Did it not meet all the requirements?
21  A.  Not 100 percent but not enough to not make it a
22  qualified bid.
23  Q.  Okay.  What requirements didn't they meet?
24  A.  Well, there's a nonconforming addendum to the
25  lots, where I think your client wanted to include a

---

1  couple of assets that were not contemplated in the
2  initial bid.  That's what the addendum was.  But I,
3  nevertheless, qualified the bid.
4  Q.  Well, in fact, the assets that are listed on
5  the addendum, weren't they after we -- after we notified
6  you or Tranzon that these were not part of the original
7  package, weren't they added to the data room?
8  A.  Yes, yes.
9  Q.  All right.  And did you understand that First
10  United's intent was to continue the business that was
11  ongoing there as an ongoing concern?
12  A.  Yes.
13  Q.  Were there any other potential bidders that you
14  talked to that you understood were also interested in
15  maintaining the operating business as a going concern?
16  A.  No.  I mean, not that I talked to.
17  Q.  So does that mean that there were others that
18  you just don't remember?
19  A.  No.  I vaguely recall there was one party -- at
20  least one party in the data room that was interested in
21  acquiring some of the e-commerce platform, and whoever
22  that was never submitted a bid.
23     (Murray Exhibit 4 was marked for
24     identification.)
25     BY MR. CICACK:

---

1  Q.  All right.  Let's look at bid -- Exhibit 4,
2  which is the --
3  A.  Do you want this one back?
4  Q.  No, no.  It's marked.
5  A.  Okay.  I've got 4.
6  Q.  All right.  Beautiful.  This is the bid with
7  accompanied letter that was submitted by the joint
8  bidders?
9  A.  Yes.
10  Q.  And as I understand it, this bid was ultimately
11  qualified?
12  A.  Yes.
13  Q.  Okay.  And how much -- what was the amount bid
14  by the joint bidders in this bid?
15  A.  They bid a million.
16  Q.  All right.  Had you had any discussions with
17  Global Tetrahedron before they submitted this bid?
18  A.  Yes.
19  Q.  Okay.  How many discussions?  Do you recall how
20  many discussions you had with them?
21  A.  Personally, I can think of three phone calls.
22  Q.  Okay.  Can you explain just in general what
23  those calls were about?
24  A.  Yes.  One was with Mr. Collins, and my
25  recollection is he was asking generally how's the

---

1  auction going to work.  And I referred him to the
2  auctioneer and the auction process.
3     A similar call with the general counsel of
4  Global Tetrahedron, and I'm blanking on the last name,
5  Blinson, Brinson, something like that.  And that was a
6  very brief call as well.  And I referred her to counsel
7  for those types of questions, if there were legal
8  questions.
9     And then there was a third call with -- I
10  don't remember the gentleman's name but I believe he was
11  the owner or one of the majority owners of Global
12  Tetrahedron, and that was around the same time but
13  before the auction process had gotten going.
14  Q.  And what was that call?
15  A.  I think he was just inquiring generally about
16  the assets.  Nothing stands out about it though in my
17  memory.
18  Q.  Did you know that Global Tetrahedron had some
19  affiliation or association with The Onion?
20  A.  Yes.
21  Q.  How did you learn that?
22  A.  Well, actually the first call I had with them,
23  they said, We're The Onion.  And I found out later that
24  their name was different.
25  Q.  And when did you learn that Global Tetrahedron

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

| 11:11:26-11:12:54 | Page 57 |
| --- | --- |

1  intended to make a joint bid with the Connecticut
2  families?
3  **A.  The moment their bid came in.**
4  Q.  You did not know that before then?
5  **A.  No, I did not.**
6  Q.  Had you had any conversations with anyone on
7  behalf of the Connecticut families about the Connecticut
8  families making a bid?
9  **A.  Yes.**
10  Q.  Who?
11  **A.  I talked to Kyle Kimpler.  He's counsel for the**
12  **Connecticut families.**
13  Q.  Anybody else?
14  **A.  I also talked to Avi Moshenberg, who is counsel**
15  **to the Texas families; and the topic of Connecticut's**
16  **participation might have come up.**
17  Q.  Okay.  So in your discussion with Mr. Kimpler,
18  it was discussed that the Connecticut families might be
19  making an offer?
20  **A.  No, not exactly.  They -- and this was before**
21  **even the auction process, but they had expressed an**
22  **interest in influencing the outcome of the auction by**
23  **use of -- by virtue of the fact that they were the**
24  **outsized creditor in the case.**
25  Q.  Do you recall that you and I had a conversation

| 11:12:56-11:14:26 | Page 58 |
| --- | --- |

1  where I asked you whether you were -- allow unsecured
2  creditors to credit bid?
3  **A.  Vaguely, yes.**
4  Q.  And do you recall that you told me that you
5  were not going to allow that?
6  **A.  Yes.**
7  Q.  Okay.  So the waiver, the DPW, you don't -- you
8  consider that qualitatively different than a credit bid?
9  **A.  Right.  It's not a credit bid.**
10  Q.  Okay.  I mean, didn't you understand from our
11  conversation that I had a concern about the unsecured
12  creditors using their claim as currency?
13  **A.  I'm not sure I remember it that way, but I do**
14  **remember that conversation was long before we submitted**
15  **these bid procedures and set up the process.**
16  Q.  But you would agree with me that the use of the
17  waiver, the DPW, is essentially using a claim as
18  currency?
19  **A.  I guess that's one way to put it.**
20  Q.  All right.  So in your conversations with
21  Mr. Kimpler, did you-all discuss -- or did he tell you
22  how they might want to use their claim?
23  **A.  No.**
24  Q.  Okay.  Can you tell me any more specifics about
25  the conversations?

| 11:14:28-11:15:51 | Page 59 |
| --- | --- |

1  **A.  It was pretty vague, and what I told**
2  **Mr. Kimpler was I don't know how they could use their**
3  **claim.  It's not my role.  But that if they wanted to**
4  **propose something or make a bid, I would consider it.**
5  **But it's not like we had a detailed conversation about**
6  **how they might do it or what it would look like.**
7  Q.  Okay.  The concept of a distributable proceeds
8  waiver, the first time you saw that was when they made
9  the bid?
10  **A.  Yes.**
11  Q.  Had you ever heard of such a thing before?
12  **A.  No.**
13  Q.  The concept of it was not something that
14  Mr. Kimpler talked to you about?
15  **A.  No.**
16  Q.  Did he provide any examples of how they might
17  want to use their claim as currency?
18  **A.  No, only just the highest level notion that**
19  **they wanted to use their claim in the bid process but**
20  **nothing specific about how or what that would manifest**
21  **as.**
22  Q.  And did you have an understanding of why they
23  wanted to do that?
24  **A.  Yes.**
25  Q.  What was your understanding?

| 11:15:52-11:17:45 | Page 60 |
| --- | --- |

1  **A.  They told me that they didn't want anyone**
2  **allied with Alex Jones to acquire the assets and**
3  **continue his business.**
4  Q.  Was that a factor that you took into
5  consideration at all?
6  **A.  Not at all.**
7  Q.  And what was the value of the joint bid that's
8  shown on Exhibit 4?
9  **A.  Well, the purchase price is 1 million; and then**
10  **there's this additional consideration that you referred**
11  **to as the waiver.**
12  Q.  Okay.  Well, did you attribute any value to it?
13  **A.  Yes.**
14  Q.  So what value did you attribute to it?
15  **A.  Not a specific amount.**
16  Q.  Why not?
17  **A.  Because at this point it was a concept, and I**
18  **knew it would have some value.  And then at some point**
19  **we decided we were going to do another round of last and**
20  **best, so it wasn't really necessary to figure out**
21  **exactly how much value there was here because there was**
22  **going to be another round.**
23  Q.  And as I appreciate it, the distributable
24  waiver here as set out here was designed so that
25  whatever was required so that the unsecured creditors

**CONTINENTAL COURT REPORTERS, INC.**
(713) 522-5080

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

1  other than the Connecticut families would receive one
2  dollar more than they would have received in the
3  otherwise highest qualified bid?
4  A.  Yes.  That's my understanding of it.
5  Q.  Right.  So basically -- so since you had a
6  qualified bid of a million-2, right, from my client,
7  right, wouldn't you then have valued this distributable
8  waiver at at least 200 and one dollar?
9  A.  No.
10  Q.  Well, that's what it's saying, right?
11  A.  No, I don't think so.
12  Q.  Well, I thought it's saying that we're going
13  to -- I thought we agreed that what it's saying is,
14  We're going to give you a waiver that has a value of one
15  dollar more than what the other bid was?
16  A.  One dollar more to the non-Connecticut
17  creditors of FSS.
18  Q.  Okay.  Did you go through an analysis then as
19  to, you know, what they would get under one bid and what
20  they would get in another bid?
21  A.  Yes.
22  Q.  Before you did the final bid, you went through
23  that analysis?
24  A.  Not in the level of detail I did on the final
25  bid, but back of the envelope, yes.

---

1  Q.  Okay.
2  A.  I thought through what it might be.
3  Q.  And what was your back of the envelope in terms
4  of what the value of this distributable proceeds waiver
5  was?
6  A.  That it had some value but that a million
7  dollars plus some value was enough to get into the next
8  round.
9  Q.  But you required a 10 percent deposit?
10  A.  I did.
11  Q.  But you didn't require any deposit on this?
12  A.  Right.
13  Q.  Why?
14  A.  Because it's not purchase money.
15  Q.  Well, it's being used to purchase, isn't it?  I
16  don't understand what you mean by purchase money.  You
17  mean it's not cash?
18  A.  Right.  It's not -- it's a noncash component.
19  We sort of talked about this before the break.
20  Q.  Right.  But you also told me it had a cash
21  value.
22  A.  Yes.
23  Q.  Okay.  And so are you telling me now that you
24  didn't require them to put a deposit down on whatever
25  that cash value might be?

---

1  A.  That's right.  I didn't.
2  Q.  Okay.  And did you understand from this bid
3  that the Connecticut families were not going to be
4  acquiring any assets?
5  A.  That was my understanding, yes.
6  Q.  Did you understand that their -- the
7  Connecticut families' involvement here was simply to
8  provide an enhancement to The Onion's bid?
9  A.  Yes.
10  Q.  Let me ask you to look at page 3 of 6.  This
11  time I'm going to the top.
12  A.  Which exhibit now?
13  Q.  Exhibit 4.
14  A.  Oh, the bid letter, I guess?
15  Q.  Yeah.
16  A.  Okay.
17  Q.  All right.  So it talks about the cash
18  consideration and then future revenues on the bottom.
19  A.  Yes.
20  Q.  Did you give any consideration to this concept
21  of future revenues?
22  A.  No.
23  Q.  Okay.  So in terms of valuing this bid, the
24  fact that there is a future revenue component did not
25  factor into your decision to qualify it one way or the

---

1  other?
2  A.  Right.  I didn't give any value consideration
3  to it, no.
4  Q.  Right.  And even in the final bid where it
5  includes the future revenues, you didn't give any
6  consideration or value to it?
7  A.  Right, I did not.
8  Q.  Not even -- completely disregarded from your
9  standpoint?
10  A.  Yes.
11  Q.  All right.  So let's look at page 4 of 6.
12  A.  Okay.
13  Q.  All right.  And so I'm looking at C(i).  And
14  would you agree with me that's really where the
15  discussion is about what was intended from this
16  distributable waiver?
17  A.  Let me take a look.
18  Q.  Yeah.  Just look at it.  The intended benefit,
19  if you would.
20  A.  Okay.
21  Q.  Would you agree with me that's sort of the meat
22  of it?  This is the value they're going to give,
23  explaining how it would work?
24  A.  Yes.
25  Q.  All right.  And so let me make sure that you

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

11:23:50-11:25:00                                          Page 65

1  and I are on the same page -- I think we are -- that the
2  concept that is being proposed here is that the
3  Connecticut families would waive whatever rights they
4  had to a distribution from another qualified bid in a
5  sufficient amount so that the other unsecured creditors
6  would receive what they would have received under the
7  other qualified bid plus one dollar?
8  **A.  Yes.  I would have phrased it a little bit**
9  **differently but yes.**
10 Q.  Why don't you phrase it in your language?
11 **A.  Well, I think you said the money from the other**
12 **bid, but it would be the money from their bid that they**
13 **would have received and they're giving a portion of it**
14 **to the other creditors such that those creditors are**
15 **better off than they would have been under the**
16 **alternative bid.**
17 Q.  By one dollar?
18 **A.  Yes.**
19 Q.  By one dollar.  Okay.  Right.  So the money
20 would come from The Onion bid?
21 **A.  Right.**
22 Q.  But the comparison would be what they would
23 have gotten under the other highest qualified bid?
24 **A.  Yes.  That's how I understand it.**
25 Q.  Okay.  So just using numbers, using the

---

11:25:04-11:26:33                                          Page 66

1  $1.2 million initial bid that my client made, if, for
2  instance, you were to determine that the other unsecured
3  creditors other than the Connecticut unsecured creditors
4  would receive from that $1.2 million a hundred thousand
5  dollars, if that's the calculation and the determination
6  you made, your understanding is that what would happen
7  in this waiver is that the Connecticut families would
8  waive their rights to the million dollars that was being
9  offered by Onion sufficient so that the other unsecured
10 creditors would receive 100,000 and one dollar?
11 **A.  Economically, yes, but not as a waiver.  More**
12 **as like a gift of the proceeds they would have gotten to**
13 **those other creditors is how I would interpret it.  That**
14 **those proceeds that they're entitled to would be**
15 **assigned to me to then be given over to the other**
16 **creditors.  That's how I thought about it but yes.**
17 **You'd figure out what the other unsecureds**
18 **would get under the alternative bid, add a dollar, and**
19 **then they'd contribute cash from their procedures to get**
20 **to that number.**
21 Q.  Okay.
22 **A.  I think we're saying the same thing.**
23 Q.  I just want to make sure that we're on the same
24 page.  So it's basically a dollar more of value?
25 **A.  Right, for the non-Connecticut plaintiffs -- or**

---

11:26:37-11:27:50                                          Page 67

1  **creditors of FSS, yes.**
2  Q.  And in all of the time that you've been doing
3  this, being a trustee and bankruptcy practitioner,
4  you've never seen anything like this, right?
5  **A.  Exactly like this, no.**
6  Q.  Very unique.  Would you agree?
7  **A.  It is unique.**
8  Q.  And would you agree that the reason why you
9  didn't -- that you decided not to move forward with the
10 online -- I mean the live auction, is because how unique
11 this waiver is?
12 **A.  That's part of it.**
13 Q.  Certainly it was a consideration for your
14 decision?
15 **A.  Yes.**
16 Q.  All right.  Did you give any thought because of
17 how unique this was to go into the Court and asking the
18 Court to clarify whether or not this was something that
19 you could give credit to?
20 **A.  Yes.**
21 Q.  All right.  Why didn't you do that?
22 **A.  I didn't think I needed to.**
23 Q.  Okay.  And why not?
24 **A.  Because I think the decision here is one of my**
25 **business judgment, and I feel like I understand my**

---

11:27:54-11:29:47                                          Page 68

1  **fiduciary obligation to the creditors.  And I felt like**
2  **it was pretty clear that this added value to the**
3  **creditors, and that that was a reasonable decision.**
4  Q.  Would you agree that part of your fiduciary
5  duty is to follow the sales order, correct?
6  **A.  Sure, all orders.**
7  Q.  Right.  And part of your fiduciary duty is to
8  make sure that the bidding procedures that are provided
9  to qualified bidders are followed, correct?
10 **A.  Yes.**
11 Q.  When you first received Exhibit 4 and you
12 reviewed it, did you understand the waiver?
13 **A.  Yes, I think so.**
14 Q.  Did you seek to have any clarification
15 discussions with the joint bidders?
16 **A.  On what it meant?  I don't think so, no.**
17 Q.  Okay.  Well, did you have any discussions with
18 anybody representing the Connecticut families or
19 The Onion after you received Exhibit 4?
20 **A.  Yes.**
21 Q.  Who?
22 **A.  I think I got a text message from Kyle Kimpler**
23 **asking for a call shortly after the bids came in.**
24 Q.  Okay.  And did you speak to Mr. Kimpler?
25 **A.  Eventually, yes, but not in response to that**

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

11:29:50-11:31:23                                      Page 69

1   text.
2   Q.   All right.  So I'm interested in the timeline
3   between -- let's look at the date of this thing.  The
4   date, I believe, is November 8th, right, is when you
5   received the bid from the joint bidders, right?
6   A.   Yes.  I think that was a Friday.  Is that
7   right?
8   Q.   I think it was, too.  And then on Monday is
9   when I believe you determined that you would not go
10  forward with the online auction?
11  A.   Right.  Monday is when we told the two
12  qualified bidders that they were qualified and how we
13  were going to proceed.
14  Q.   Okay.  So between the time you received
15  Exhibit 4 and you told the qualified bidders how you
16  were going to proceed on Monday, the 11th, did you speak
17  to anybody with The Onion or the Connecticut families?
18  A.   I spoke to Mr. Kimpler on a single phone call,
19  and that's it.
20  Q.   Okay.  And what was that call about?
21  A.   We were discussing whether there was progress
22  on ongoing negotiations between the Connecticut and the
23  Texas families about how to split the proceeds of the
24  sale and how to divide up -- or rather, which portion of
25  the claims pool they would ultimately have.

---

11:31:26-11:32:47                                      Page 70

1       Those discussions have been going on for
2   months.
3   Q.   Do you know, are those discussions still
4   ongoing?
5   A.   I believe they are.
6   Q.   Do you know if there's been any resolution?
7   A.   I don't believe so.  If there is, I'm not aware
8   of it.
9   Q.   Right.  I think you mentioned that you talked
10  to the attorney for the Texas families about the
11  possibility of the Texas families also using their
12  claim?
13  A.   No.  I talked to Mr. Moshenberg, and he was --
14  we had talked generally about the families influencing
15  or having some sort of veto over what would happen in
16  the auction.
17  Q.   And what was the substance of that call?
18  A.   There were a few of them over time, but the
19  substance was there was a potential agreement between
20  Connecticut and Texas on how they would split the
21  proceeds among them.  And that had as a requirement that
22  I as trustee would participate in that agreement and
23  only allow the sale of these assets to a bidder that
24  Connecticut approved of.  And I refused to do that, and
25  I rejected that request.

---

11:32:57-11:34:22                                      Page 71

1   Q.   And is that a subject that you talked to
2   Mr. Kimpler about as well?
3   A.   Yes.
4   Q.   The attorney representing Texas, what's his
5   name again?
6   A.   Avi Moshenberg.
7   Q.   Moshenberg.  Okay.  Mr. Moshenberg, was he
8   requesting an agreement from you as well?
9       MS. DRENGA: I'm going to object to form
10  on behalf of the Texas plaintiffs.
11  A.   I'm sorry.  Could you say it again?
12      BY MR. CICACK:
13  Q.   Yeah, sure.  Mr. Moshenberg, did he also ask
14  you to agree not to sell any of the assets to a party
15  that the Texas families did not approve of?
16  A.   I don't know if he said it.
17      I think she's going to renew her
18  objection.
19      MS. DRENGA: I'm renewing it.
20  A.   Okay.  I don't remember the exact word or how
21  it came up.  But I know that Texas had wanted me to
22  agree to that as part of their proposed agreement with
23  Connecticut.
24      BY MR. CICACK:
25  Q.   And did you ever see any proposed agreement

---

11:34:30-11:36:07                                      Page 72

1   between Connecticut and the Texas families in writing?
2   A.   Yes.
3   Q.   Okay.  Do you know what the status of it is
4   now?
5   A.   No.
6   Q.   As far as you know, it's still being
7   negotiated?
8   A.   I don't know what the status of it is.
9   Q.   Okay.  And did that agreement contemplate that
10  you would be a party to it?
11  A.   Yes.
12  Q.   And did that agreement set out that you would
13  agree not to sell the assets to any party that the Texas
14  families and the Connecticut families didn't approve?
15  A.   I think it was just the Connecticut families,
16  but my understanding is that that was part of what they
17  were proposing for me to agree to; and I said no.
18  Q.   So when you received Exhibit 4 and saw that,
19  the distributable proceeds waiver concept, when did you
20  decide that it would be something that you would at
21  least consider?
22  A.   Probably shortly upon reading it.
23  Q.   And why did you not disclose to the other
24  qualified bidder that you were willing to consider this
25  waiver concept?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

11:36:10-11:37:40                                    Page 73

1  A.  For the same reason I didn't tell the other
2  bidder what the bid was.
3  Q.  Well, I'm not suggesting you tell them the
4  amount.  But the concept itself --
5  A.  Oh, I see what you're saying.
6  Q.  -- it's not cash, right?  I mean, why didn't
7  you disclose to the qualified bidders that this was a
8  concept you were at least considering?
9  A.  Well, I definitely disclosed that I was
10  considering noncash options.  But there's a couple
11  reasons why I didn't disclose exactly what the noncash
12  was.  And one of them is the whole point of a sealed bid
13  auction is each bidder has a little bit of anxiety that
14  they're going to be outdone.  And to the extent you
15  don't know what's in the other bid, that would put
16  pressure on you to bid more.  That's sort of maximizing
17  the benefit of the sealed bid process.
18      And another aspect was the way their
19  waiver works is it's making use of the fact that they
20  have an unsecured claim against FSS, and that's
21  something that your client didn't have.  So telling you
22  about it wouldn't create any kind of apples-to-apples
23  bidding along those lines.
24      So that was sort of the other reason not
25  to tell you exactly what the other bid was.

---

11:37:59-11:40:02                                    Page 74

1  Q.  Would you agree that the initial bid made by
2  the joint bidders was not a specific dollar amount?
3  A.  I mean, the purchase cash amount is a specific
4  dollar amount; and the amount of the distributable
5  proceeds waiver is calculable.  But what exact dollar
6  amount it would have been, no, I don't know.
7  Q.  Okay.  So through the time you received the
8  initial bid from the joint bidders through the time that
9  you received their highest and best bid on
10  November 13th, did you have any discussions that we
11  haven't talked about with anybody representing The Onion
12  or representing the Connecticut families?
13  A.  No.  It's just that one phone call with
14  Mr. Kimpler.
15  Q.  Okay.
16  A.  During that time period, yeah.
17  Q.  Okay.  So what did you do as the trustee to
18  determine that you were willing to accept this waiver as
19  currency?  Did you do any due diligence?  Did you -- you
20  know, what did you do to get yourself comfortable that
21  you would accept it?
22  A.  I consulted with my counsel.
23  Q.  Mr. Wolfshohl?
24  A.  Yes.
25  Q.  Anybody else?

---

11:40:02-11:41:33                                    Page 75

1  A.  Others in his firm.
2  Q.  Okay.
3  A.  Also Erin Jones.
4  Q.  And did you rely on any written legal advice?
5  A.  No.
6  Q.  Okay.  Did you do any due diligence or
7  investigation to determine whether a waiver such as this
8  was ever used in any bankruptcy sale anywhere in the
9  United States ever?
10  A.  I'm sorry.  Say that again.
11  Q.  Yep.  I'm just trying to figure out did you do
12  any investigation, any research, any due diligence to
13  determine whether the concept that was being proposed
14  here had ever been done before?
15  A.  Yes.
16  Q.  Did you find anything?
17  A.  Nothing quite like this, no.
18  Q.  Did you find anything that you thought was
19  close?
20  A.  Yes.
21  Q.  What?
22  A.  There were a few cases here and there where
23  there were claims waivers, not structured like this but
24  where courts upheld the business judgment of a trustee
25  considering that.

---

11:41:37-11:43:27                                    Page 76

1      There are plenty of cases that deal with
2  noncash consideration, assumed liabilities, things like
3  that which add value to a bid.  That's what comes to
4  mind.  Maybe analogous situations but not exactly this,
5  no.
6  Q.  Did you attempt to determine whether or not
7  Global Tetrahedron would increase the cash portion of
8  its bid if you rejected the waiver concept?
9  A.  Essentially yes.
10  Q.  Tell me about that.
11  A.  Well, it was the way we did the second bid.  We
12  said, We want your highest and best, which I think
13  implies that they should bid more cash if they are
14  willing to.  And I also asked for them -- all bidders to
15  make any noncash components as specific and
16  noncontingent as possible so that I could evaluate them.
17  Q.  You didn't have any conversations with anybody
18  at Global Tetrahedron?
19  A.  About the bids, no.
20  Q.  Or asking them if they would be willing to
21  increase their cash portion so that it was -- it would
22  make up for the distributable waiver?
23  A.  Yeah.  I didn't, no.
24  Q.  Okay.  All right.  Did you give any
25  consideration to -- well, let me ask you this.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

11:43:33-11:45:30                                    Page 77

1    When over the weekend did you decide not
2 to have a live auction?
3 A.  I'm not sure exactly when, but it was some
4 point over that weekend.  But there were discussions
5 with, you know, my advisors continuously through that
6 process.  I don't know when exactly the inflection point
7 was reached and I decided not to do a live auction.
8 Q.  Okay.  Did you give any consideration to what a
9 live auction would look like with one bidder bidding
10 cash and another bidder bidding cash and a waiver?
11 A.  Yes.
12 Q.  What did you visualize that looking like?
13 A.  We thought it would be chaotic.
14 Q.  Why?
15 A.  Well, because the cash amounts might change.
16 The nature of the waiver and how it's calculated might
17 change.  And also because the different -- the bidders
18 had bid initially on different lots.
19    So trying to game out how to set up
20 apples-to-apples live bidding on different things, we
21 went through lots of different permutations and
22 scenarios and it did not seem workable.
23 Q.  And would it be fair to say that it wasn't
24 workable because of the waiver?
25 A.  It's not workable because of all of those

---

11:45:32-11:47:29                                    Page 78

1 things.
2 Q.  Well, if -- let's assume that Global
3 Tetrahedron did not have a waiver and all it bid was
4 money.  Would you have gone forward with the live
5 auction?
6 A.  I don't know.  I think it would have depended
7 on the lots and the bids.  We would have gone through it
8 and thought about it differently.  I don't know what the
9 decision would have been on that.
10 Q.  In making your decision not to move forward
11 with the live auction, before you made that decision did
12 you go back and look at the sale order thoroughly?
13 A.  I remember reviewing the sale order again, yes.
14 Q.  Now, when you considered this waiver, did you
15 do anything internally to value the Connecticut
16 families' claim?
17 A.  Yes.
18 Q.  What did you do?
19 A.  Referred to the claims register in the FSS
20 case.  I mean, that was primarily it.
21 Q.  Okay.  You know that their claim is based on a
22 judgment, correct?
23 A.  Yes, that's my understanding.  Several
24 judgments.
25 Q.  Several judgments.  And you know those

---

11:47:31-11:48:49                                    Page 79

1 judgments are subject to appeal?
2 A.  Yes.
3 Q.  And those appeals are ongoing?
4 A.  That's my understanding.
5 Q.  Okay.  And so you understand that there's a
6 chance that those judgments could be vacated, all or a
7 portion of them?
8 A.  Yes.
9 Q.  Okay.  So did you do any due diligence to reach
10 a conclusion of how likely that is?
11 A.  Yes.
12 Q.  What did you do?
13 A.  Well, I --
14    (Small interruption)
15 A.  Go ahead again.
16    BY MR. CICACK:
17 Q.  What due diligence did you do to come to your
18 conclusion as to how likely the appeals would be
19 successful?
20 A.  Well, I didn't analyze the likelihood of
21 success of the appeals in any detail.  What I did was I
22 looked at the claims register, saw that the claims were
23 based on judgments in fixed amounts.  I noticed that no
24 one had objected to those claims even though the case
25 had been pending for a year and a half.

---

11:48:51-11:50:36                                    Page 80

1    And I concluded that it was unlikely that
2 the appeal would make a significant impact or a
3 significant-enough impact on the value of the
4 Connecticut claims to alter my judgment.
5 Q.  Okay.  Did you realize that Alex Jones had
6 filed an objection to the claim?
7 A.  Against FSS?
8 Q.  No.  That Alex Jones filed a claim -- an
9 objection against the Connecticut families.
10 A.  I think we're talking about different claims.
11 There are claims against FSS and there are claims
12 against Alex Jones personally or his estate.  I'm
13 talking about the FSS claims.
14 Q.  Well, they're the same claims, right?
15 A.  No.  They have different payees.  I mean, there
16 are different responsible parties.
17 Q.  But they're joint and several, right?
18 A.  That could be.
19    (Murray Exhibits 5 and 6 were marked for
20    identification.)
21    BY MR. CICACK:
22 Q.  All right.  If we could, let's turn to
23 Exhibit 6.
24 A.  Okay.  That's the big one there?  Oh, no.
25 Q.  No, I don't think it's --

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

11:50:36-11:51:58                                    Page 81

1  A.  I was thinking of 9, sorry.
2  Q.  We already talked about 9.  I'm hoping not to
3  go back to it.
4      All right.  So these were what I would
5  call updated bid procedures, correct?
6  A.  Sure, yes.
7  Q.  And these were the bid procedures that were
8  prepared, I assume, over the weekend after you received
9  the initial bids?
10 A.  Yes.
11 Q.  Okay.  And who prepared these?
12 A.  It was a combination of people.  It was the
13 same ones who prepared the initial bid ones, the
14 auctioneer, Jeff Tanenbaum, and then also my counsel was
15 involved in it.  I also reviewed and commented on it.
16 Q.  Okay.  And ultimately you approved those?
17 A.  I did.
18 Q.  Did either of the qualified bidders have any
19 input in these bid procedures?
20 A.  No.
21 Q.  And were they prepared over the weekend?
22 A.  They were definitely finalized over the
23 weekend.  I don't know if there was any kind of draft of
24 this before.
25 Q.  Well, was there any draft like this before you

---

11:52:02-11:53:49                                    Page 82

1  received the initial bidding, the bids?
2  A.  No.
3  Q.  Okay.  And it's your belief that these
4  additional bid procedures or instructions were
5  authorized by the sales order, correct?
6  A.  Yes.
7  Q.  And is it your understanding that these bid
8  procedures, bid instructions are accurate?
9  A.  I'm not sure what you mean by that.  They're
10 bid procedures.
11 Q.  All right.  Well, can the qualified bidders
12 rely on them?
13 A.  Yes.
14 Q.  Okay.  You're not attempting to mislead anybody
15 here, right, in these bid instructions?
16 A.  No.
17 Q.  Well, let's look at the second paragraph.  Now,
18 it says here -- let's go down to the bottom, where it
19 says that "Any bids that include components of
20 consideration apart from the cash purchase amounts
21 should quantify the amounts of such consideration in
22 specific dollar amounts with as much specificity as
23 possible and avoiding references to any formulas or
24 contingencies."
25     Do you see that?

---

11:53:49-11:55:13                                    Page 83

1  A.  Yes.
2  Q.  Okay.  Now, the initial bid that was made by
3  the joint bidders included a waiver that was dependent
4  on what the other qualified bid was?
5  A.  Yeah.
6  Q.  Right?  All right.  So the amount of the waiver
7  was contingent on something else?
8  A.  It depended on something else, yes.
9  Q.  All right.  So you like the word "dependent"
10 versus "contingent"?
11 A.  Well, yeah.  I think of it as being a little
12 bit different but yeah.
13 Q.  And also the waiver that was in the initial bid
14 also included a formula, did it not?
15     MR. WOLFSHOHL:  Objection, form.
16 A.  Yes.
17     BY MR. CICACK:
18 Q.  Okay.  And so by these bid instructions here
19 were you attempting to communicate to the joint bidders
20 that the concept of the distributable waiver, as set
21 forth in the initial bid, needed to be changed in some
22 way?
23 A.  I was communicating that I wanted whatever
24 noncash components anyone wanted to include would be as
25 specific as possible so I would have an easier time

---

11:55:17-11:56:43                                    Page 84

1  evaluating them.
2  Q.  The one that was in the initial bid by the
3  joint bidders included a formula, included a
4  contingency?
5  A.  Yes.
6  Q.  Okay.
7  A.  Well, I think I said dependency but yeah.
8  Q.  Did you give consideration to going back to the
9  Court to ask the Court to approve these additional bid
10 instructions?
11 A.  No.
12     (Murray Exhibit 7 was marked for
13     identification.)
14     BY MR. CICACK:
15 Q.  All right.  Let's go to Exhibit 7, please.
16 A.  This is your final bid?
17 Q.  This is First United's final bid.
18 A.  Okay.
19 Q.  All right.  And you received this bid, correct?
20 A.  Yes.
21 Q.  And did you understand it?
22 A.  Yes.
23 Q.  It's not very complicated, right?
24 A.  There's some complexity, but I understand it.
25 Q.  Well, you understood that First United was

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

11:56:46-11:58:43                                          Page 85

1  willing to pay $3.5 million for all of the assets that
2  were for sale?
3  **A.  Yes.**
4  Q.  All right.  No formula, no contingencies, just
5  straight-up cash, right?  You understood that?
6  **A.  Yes.**
7  Q.  Now, this bid package included lot 4, the
8  contested domain names.  Are the contested domain names
9  being sold now?
10 **A.  No.**
11 Q.  When did you take lot 4 out of the sale?
12 **A.  I'm not sure exactly when.**
13 Q.  I've seen a limited objection by X, formerly
14 Twitter, about selling FSS's Twitter account.
15 **A.  Yes.**
16 Q.  Is the X account, has that been omitted from
17 the sale now?
18 **A.  There are discussions around that.  I don't**
19 **think that there is anything decided on that.**
20 Q.  Okay.  And the discussions that you're
21 referring to are between whom?
22 **A.  These are discussions between me, X and the**
23 **successful bidders, the joint bidders, about how**
24 **potentially to resolve the limited objection.**
25 **Oh, and you.  But you didn't respond.**

---

11:58:49-12:00:56                                          Page 86

1  Q.  Yeah.  There was an e-mail.  I'm not sure how
2  to respond, but we'll see.
3  All right.  And this bid that is
4  Exhibit 7, you accepted this bid as the backup bid,
5  correct?
6  **A.  Yes.**
7  Q.  And it remains the backup bid today?
8  **A.  Yes.**
9  Q.  Despite the fact that the Connecticut families'
10 lawyers have urged you to reject it, haven't they?
11 **A.  Yes.**
12 Q.  And you've told them no?
13 **A.  Yeah.  I've not -- yes, you're right.  I told**
14 **them no.**
15 Q.  If the Court does not approve the sale to the
16 joint bidders, do you have any objection selling the
17 assets to First United?
18 **A.  No.**
19 Q.  All right.  Let's look, if we can, at
20 Exhibit 8.
21 **A.  Okay.  Got it.**
22 Q.  And Exhibit 8 is the bid and letter that was
23 from the joint bidders that you accepted as the
24 successful bid, correct?
25 **A.  Yes.**

---

12:01:08-12:02:37                                          Page 87

1  Q.  Let me ask you to look at the letter that's
2  attached to it.  And if you could go to page 4 of 6 on
3  the top, you know, the court document portion.
4  **A.  I got it.**
5  Q.  All right.  The cash consideration was
6  increased by $750,000, right?
7  **A.  Yes.**
8  Q.  Went from 1 million to 1,750,000?
9  **A.  Yes.**
10 Q.  First United's bid went from 1.2 million to
11 3.5 million, correct?
12 **A.  Yes.**
13 Q.  An increase of 2.3 million in cash?
14 **A.  On the First United bid, yes.**
15 Q.  This letter also describes a distributable
16 proceeds waiver, correct?
17 **A.  Yes.**
18 Q.  And if you go to the next page, it describes
19 future revenues?
20 **A.  Yes.**
21 Q.  Now, the future revenues is not something that
22 you considered at all, right?
23 **A.  That's right.**
24 Q.  No value, no consideration.  From your
25 standpoint it had no impact on anything that you were

---

12:02:42-12:04:15                                          Page 88

1  doing?
2  **A.  Right.  It didn't impact my decision on which**
3  **bid was better.**
4  Q.  Right.  And you didn't give it any value at
5  all?
6  **A.  Right.**
7  Q.  Okay.  Now, let's look at the distributable
8  proceeds waiver.  Going to page 4 of 5.
9  **A.  4 of 6?**
10 Q.  4 of 6.  So I'd like for you to read -- it
11 starts with "as illustrated above."  And just read that
12 entire paragraph going onto the next page.
13 **A.  Out loud?**
14 Q.  No.  Just because I want to ask you some
15 questions about it.
16 **A.  Okay.**
17 Q.  So as I understand this distributable waiver,
18 just like the one that was in the initial bid, which was
19 designed to give the non-Connecticut unsecured creditors
20 a dollar more than they would otherwise get, this
21 distributable waiver says, We've now increased that one
22 dollar to 100,000 more?
23 **A.  Yes.**
24 Q.  All right.  Have you done anything to determine
25 what that distributable waiver amount would have to be

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

12:04:21-12:05:52                                    Page 89

1  in order to get the -- in order for the non-Connecticut
2  families to recover a hundred thousand dollars more than
3  they would have if you had accepted First United's bid?
4  **A.   Yes.**
5  Q.   Okay.  And what is that?
6  **A.   So I took First United's bid.**
7  Q.   Right.
8  **A.   And estimated from that how much cash would**
9  **flow through to FSS unsecureds and of that portion, how**
10 **much non-Connecticut would get, added a hundred**
11 **thousand, and then went back over to the joint bidders'**
12 **bid, with their cash amount, how much net would be**
13 **available for unsecured creditors, and would Connecticut**
14 **get enough of that cash to cover the first amount.**
15 Q.   Okay.  When you calculated how much the
16 non-Connecticut families would receive from the
17 $3.5 million, what was the number that you came to?
18 **A.   I don't remember it exactly.  It's on a couple**
19 **of the spreadsheets you showed me earlier.**
20 Q.   All right.
21       MR. CICACK: This may be a good time then
22 to maybe -- maybe we can make these exhibits.  I just
23 didn't have time to make copies last night.
24       Can we take a break and maybe get some
25 copies of these?

---

12:05:52-12:56:07                                    Page 90

1       MR. WOLFSHOHL: Yeah, sure.
2       MR. CICACK: Are you okay taking a quick
3  break?
4       THE WITNESS: That's fine.
5       THE VIDEOGRAPHER: The time is 12:05 p.m.
6  We're off the record.
7       (Luncheon recess)
8       (Murray Exhibits 14 through 16 were marked
9  for identification.)
10      THE VIDEOGRAPHER: The time is 12:54 p.m.
11 Central Time.  We are back on the record.
12      BY MR. CICACK:
13 Q.   Hi, Mr. Murray.  I have put before you what
14 we've marked as Exhibits 14, 15 and 16.  Right before we
15 took a break you had said that there were some
16 spreadsheets or calculations you put together to
17 determine what the actual amount of the bid was for the
18 joint bidders?
19 **A.   Yes.**
20 Q.   And these were documents that were produced to
21 us, I think, yesterday; and before I go through them I
22 want to make sure.  Are these the calculations that you
23 were talking about?
24 **A.   So Exhibit 16 is the spreadsheets I was talking**
25 **about.  Exhibits 14 and 15 I believe are spreadsheets**

---

12:56:14-12:57:51                                    Page 91

1  **that Mr. Tanenbaum prepared.**
2  Q.   Okay.  Have you gone through Exhibits 14 and 15
3  with Mr. Tanenbaum?
4  **A.   Yes.**
5  Q.   Okay.  Can you just kind of walk us through
6  Exhibit 14 and explain to us what you understand 14 to
7  be?
8  **A.   I'm trying to figure out the difference between**
9  **14 and 15 because I'm not sure what was going on there.**
10 Q.   Well, I think the difference is that --
11 **A.   I recognize what's going on.**
12 Q.   Okay, good.  I was hoping you'd help me there,
13 too.
14 **A.   Exhibit 15 is an earlier version of 14.**
15 Q.   Okay.
16 **A.   But what I think Mr. Tanenbaum was trying to do**
17 **on this spreadsheet is compare the result for the**
18 **non-Connecticut creditors under two different scenarios,**
19 **the backup bid and the successful bid, the joint bid.**
20       **And the logic of this is you start with**
21 **the cash that would come in from a sale under either**
22 **bid, net out administrative costs, and then of the net**
23 **available for unsecureds, figure out how much would go**
24 **to the non-Connecticut creditors.**
25       **And in this version, this is using very**

---

12:57:53-12:59:26                                    Page 92

1  **conservative assumptions on costs -- and by**
2  **conservative, I mean would tend to favor the First**
3  **United in the comparison -- and the percentage of the**
4  **claims pool held by Connecticut.**
5  Q.   That's the 25/75 break?
6  **A.   Yes.**
7  Q.   Okay.
8  **A.   And so under the backup bid you end up with the**
9  **$687,500 that would make it to non-Connecticut creditors**
10 **of FSS under that bid.  But under the joint bid analysis**
11 **they would receive a million dollars, which is**
12 **significantly higher.**
13 Q.   Right.  That's what I thought.  But their bid
14 was that they would provide a waiver up to the amount
15 needed to make it a hundred thousand dollars more?
16 **A.   So it describes the mechanism of the waiver**
17 **that way, I agree with you.  But we asked for highest**
18 **and best bids and their bid was a cash equivalent**
19 **7 million.**
20 Q.   Have you talked to them about that?
21 **A.   Yes.**
22 Q.   So are they -- and what do they say about this
23 provision, this paragraph that talks about a hundred
24 thousand dollars more?  They like don't -- disregard it?
25 Doesn't mean anything?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

12:59:28-13:00:25                                    Page 93

1  A.  I can't speak for them.
2  Q.  But what did they tell you?  I mean that's what
3  it says, right?
4  A.  They told me that they believe it should only
5  be a hundred thousand.  I believe it should be more
6  because they asked for last and best.  They gave
7  effectively a range.  And I think if I say, Give me your
8  last and best offer and they say, Oh, I'll pay between 4
9  and 6, I'll take 6 and say thank you.
10  Q.  Okay.
11  A.  And in subsequent discussions my understanding
12  is they agree with my interpretation of their final bid.
13  Q.  But they told you that they intended it to be
14  only a hundred thousand more?
15  A.  Yes.
16  Q.  That's what they told you?
17  A.  They told me that they think that their bid is
18  that, yes.
19  Q.  Well, they're the ones that prepared it.  So
20  that would have to be their intent then?
21  A.  Yeah.
22  Q.  So the Connecticut family representative, who
23  was this?  Mr. Kimpler?
24  A.  In those discussions it was -- a few of their
25  lawyers were on that call but I think Mr. Kimpler.

---

13:00:28-13:01:29                                    Page 94

1  Q.  Any of the Connecticut families on that call?
2  A.  Like family members?
3  Q.  Yeah.
4  A.  No, I don't think so.
5  Q.  I mean, they're the ones that are making the
6  proposal, not the lawyers, right?  Correct?
7  A.  Making the proposal?  It's the proposal of the
8  joint bidders but it's delivered by the counsel who
9  describe it.
10  Q.  All right.  So counsel for the Connecticut
11  families told you that they thought their bid was
12  of a distributable waiver that would secure the other
13  unsecured creditors a hundred thousand dollars more?
14  A.  Yes.
15     MR. PATERSON: I'll object at this time
16  and just ask if we could have some questioning --
17     MR. BROOCKS: What is --
18     MR. PATERSON: -- a common interest that
19  comes into play.
20     MR. BROOCKS: Hang on.  If you're going to
21  make a privilege objection, then make it, but none of
22  this speaking bullshit.
23     MR. PATERSON: Well, it is a privilege
24  objection.
25     MR. BROOCKS: Then make it and quit making

---

13:01:30-13:02:20                                    Page 95

1  a speech.
2     MR. PATERSON: Well, it depends on the
3  timing of this conversation.  If it's referencing
4  something after the sale motion, the TRO complaint by
5  Mr. Jones was filed, then it's absolutely a privilege
6  objection.
7     MR. BROOCKS: Then make your privilege
8  objection in the proper way, sir.
9     MR. PATERSON: Okay.  Then I'll ask the
10  witness --
11     (Cross talk)
12     MR. BROOCKS: -- not to answer?
13     MR. PATERSON: -- not to answer that
14  question on the basis of privilege to the extent the
15  conversation with the Connecticut plaintiffs'
16  representative is after the sale motion was filed.
17     And by that I mean, just to be more
18  precise, after the complaint by Mr. Jones was filed
19  seeking a TRO.
20     BY MR. CICACK:
21  Q.  Were these conversations before that?
22  A.  No.  They were after that.
23     MR. BROOCKS: Well, thank you.
24     BY MR. CICACK:
25  Q.  All right.  So the Connecticut families

---

13:02:26-13:03:17                                    Page 96

1  communicated -- through their lawyers communicated to
2  you that they believed that their bid was that you would
3  receive -- that the other unsecured creditors would
4  receive a hundred thousand dollars more under their
5  waiver than they would receive under the FUAC bid?
6     MR. PATERSON: Again, I'm going to object
7  and request that the witness not answer to the extent
8  that this is after the Connecticut families were
9  announced as the winning bidder.
10     MR. WOLFSHOHL: It's their privilege, too.
11     MR. BROOCKS: How is it their privilege?
12     MR. WOLFSHOHL: Because it's a joint
13  privilege.
14     MR. PATERSON: Common interest.
15     MR. WOLFSHOHL: Common interest privilege.
16     MR. BROOCKS: Well, you've got to both
17  say, We have an agreement to that effect.
18     MR. WOLFSHOHL: We do have an agreement to
19  that effect, yes.
20     MR. CICACK: Is it in writing?
21     MR. WOLFSHOHL: No.
22     MR. BROOCKS: When was the agreement
23  reached?
24     MR. WOLFSHOHL: The agreement was reached
25  whenever you sued us.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

13:03:18-13:04:05                                    Page 97

1    MR. BROOCKS: The joint -- was there just
2  an assumed or was there any conversation --
3    MR. WOLFSHOHL: No.  There was a
4  discussion about it.
5    MR. BROOCKS: When was that?
6    MR. WOLFSHOHL: It was after the -- it was
7  when -- I believe the first discussion of it was when
8  Mr. Cicack filed the emergency request for a status
9  conference.
10    MR. BROOCKS: And what happened then?  I'm
11  trying to get a feel.  I want to flesh it out for the
12  Court.  Did y'all have a conversation about it?
13    MR. WOLFSHOHL: Yeah, a conversation about
14  it.  That's it.
15    MR. BROOCKS: Who was a part of the
16  conversation?
17    MR. WOLFSHOHL: The lawyers that were
18  involved in the conversation.
19    MR. BROOCKS: What was agreed?
20    MR. WOLFSHOHL: It was agreed that we were
21  having communications based on a common interest
22  privilege.  That's what was agreed.  That was it.
23    BY MR. CICACK:
24  Q.  You would agree with me that their bid says
25  that the distributable proceeds waiver is intended so

---

13:04:11-13:05:37                                    Page 98

1  that the other unsecured creditors would receive a
2  hundred thousand dollars more, and they even say an
3  increase from the one dollar amount in the initial bid?
4    MR. WOLFSHOHL: Objection to form.
5    (Murray Exhibit 8 was marked for
6    identification.)
7    BY MR. CICACK:
8  Q.  Let's look at Exhibit 8.
9  A.  Okay.
10  Q.  So page 5 of 6.  All right?  It says right
11  there, "The distributable proceeds waiver amount is
12  revised under this final bid so that it shall equal an
13  amount necessary for other unsecured creditors of FSS,
14  including the Texas families, to recover 100,000 more
15  (an increase from one dollar amount set forth in the
16  initial bid) in the aggregate that they would recover
17  from the sale of the acquired assets to the otherwise
18  highest qualified bidder," right?
19    That's what it says?
20  A.  That's what that sentence says, yes.
21  Q.  Right.  So isn't that communicating to you that
22  what they're doing is the one dollar more offer that
23  they made in the initial bid, they're now increasing
24  that to $100,000 more?
25  A.  Right.  The number in this sentence increased

---

13:05:40-13:06:54                                    Page 99

1  from 1 to 100,000, yes.
2  Q.  Right.  Okay.  But because they put $7 million
3  on the front page, you are disregarding that entire
4  paragraph?
5  A.  I'm not disregarding it.  I'm trying to make
6  sense of what I interpret to be somewhat contradictory
7  statements in the bid.
8  Q.  So before you accepted this bid, did you seek
9  clarification?
10  A.  No.
11  Q.  Why not?  By your own testimony it's
12  contradictory.  Why didn't you seek clarification?
13  A.  Because under any of the possible
14  interpretations, the bid was significantly better than
15  yours.
16  Q.  Right.  But under one interpretation it's
17  contingent, is it not?
18  A.  No.
19  Q.  Sure it is.  If it's a hundred thousand -- if
20  you were to interpret this that you would -- that the
21  unsecured creditors would receive $100,000 more than
22  what they would receive under the First United bid, then
23  this bid is contingent on what the First United bid was,
24  the amount.
25  A.  Okay.  Yes, I guess in that sense.  I view

---

13:06:57-13:07:54                                   Page 100

1  contingent as it's a bid depending on whether something
2  else happens, not that the amount changes based on
3  something else.
4  Q.  And it's also a formula, right?  You've got to
5  do a mathematical equation to get there?
6  A.  Yeah.  There's math.
7  Q.  Okay.  So despite the fact that the bidding
8  procedures, the new bidding procedures said no formula,
9  no contingency, and your own testimony is that there's
10  an internal contradiction in the bid, you did not seek
11  clarification?
12    MR. WOLFSHOHL: Objection to form,
13  misstates the bid instructions.
14  A.  Well, yeah.  That's not what the bid form says,
15  and I do think that there is some tension between the
16  different components of the bid.
17    BY MR. CICACK:
18  Q.  And you didn't seek clarification?
19  A.  At that time, no.
20  Q.  And you accepted their bid as the highest and
21  best?
22  A.  Yes.
23  Q.  Okay.  So what does highest and best mean to
24  you?
25  A.  To me it is the best return for the creditors

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1   of the estate.
2   Q.   So would you have accepted a highest and best
3   bid from First United that said, We'll pay a hundred
4   thousand dollars more than the next highest bid?
5        Would you have accepted that?
6   A.   I don't know.
7   Q.   Okay.  But that's essentially what you've
8   accepted here is a bid that says, We'll guarantee a
9   return to the other unsecured creditors of a hundred
10  thousand dollars more than whatever the other guy bids?
11       MR. WOLFSHOHL: Objection, form.
12  A.   No.  I accepted the bid the way I interpret it,
13  which is they bid no less than 7 million and I start
14  with the 7 million bogey and do the math from there,
15  notwithstanding this change in a sentence later in the
16  letter.
17       BY MR. CICACK:
18  Q.   Did you do a calculation to determine the value
19  of the waiver if what you were attempting to determine
20  is what a hundred thousand dollars more would give
21  the -- would go to the unsecured creditors who are not
22  the Connecticut families?
23  A.   Yes.
24  Q.   Is that in Exhibits 14, 15 and 16 that I
25  provided you?

1   A.   Let me see.  No.  It's not on any of these.
2   Q.   Did you do the calculation for that?
3   A.   Yes.
4   Q.   All right.  You personally?
5   A.   Yes.
6   Q.   In a spreadsheet, on a PDF?  On what?
7   A.   It was in a version of the spreadsheet that is
8   reflected in Exhibit 16.
9   Q.   Okay.
10       MR. CICACK: Was that produced?
11       MR. WOLFSHOHL: I don't know.  It probably
12  wasn't.  Because I think these were documents that Jeff
13  had worked on, and he didn't -- if you want, I can give
14  it to you.  I do think that maybe he prepared something
15  that was like early on, just to see what the calculation
16  would be if you interpreted it that way.
17       MR. CICACK: All right.  Can we get that
18  at a break, you think?
19       MR. WOLFSHOHL: Yeah.  I've got to go look
20  for it, but it was never something that was considered
21  very long.  So I don't know when in the process that was
22  looked at, but it wasn't something that Jeff prepared.
23  And these were the documents that Jeff produced to us.
24       MR. CICACK: Okay.
25       BY MR. CICACK:

1   Q.   So just so the testimony is clear here,
2   whatever the Connecticut families told you about what
3   they thought their bid said, you told you that after
4   the complaint was filed by Alex Jones?
5   A.   Your TRO, yeah, yeah.
6   Q.   And it's your position that any conversations
7   that you had with the Connecticut family lawyers about
8   their bid and what they intended by their bid after Alex
9   Jones filed his complaint is subject to a privilege?
10  A.   Yes.
11  Q.   Are you going to be in attendance on Monday at
12  the hearing?
13  A.   Yes.
14  Q.   Do you plan to tell the judge that your
15  conversations with the Connecticut families about their
16  bid and what they intended by their bid is privileged?
17  A.   Discussions with counsel preparing for a
18  hearing in a joint defense scenario, yeah, that's
19  definitely privileged.
20  Q.   Your discussions with the Connecticut families?
21  A.   Yeah.
22  Q.   Okay.  So in terms of their discussions with
23  you about what they intended by their bid and those
24  discussions that occurred after Alex Jones filed his
25  TRO, you're intending to tell the judge those are

1   privileged?
2        MR. PATERSON: Objection, asked and
3   answered and calls for a legal conclusion.
4        MR. WOLFSHOHL: I mean, look, restate the
5   question.
6        BY MR. CICACK:
7   Q.   I just want to know, are you intending to rely
8   on this privilege at this sale hearing?
9   A.   I don't know.  I don't know.
10       MR. BROOCKS: Well, you've got to make up
11  your mind right now.  You're not going -- no, no, no.
12  You're not going to be able to get to the hearing and,
13  all of a sudden, spring out what you would not tell us
14  in the discovery.  So I think that's a decision that
15  needs to be made.
16       And my point is, and this is directed to
17  the attorneys.  Are y'all still negotiating and talking
18  when this TRO was filed?  Because if you're still
19  talking and negotiating opposite positions, you can't
20  possibly have a common interest.
21       MR. WOLFSHOHL: No.  What he's testified
22  to is that he accepted what he interpreted the bid to
23  be.
24       MR. BROOCKS: Okay.
25       MR. WOLFSHOHL: Since then there was a

1  discussion, and his interpretation is what we intend to
2  go forward on.  That's the discussion.
3      MR. BROOCKS: But he --
4      MR. WOLFSHOHL: He interpreted.  That's
5  what's relevant -- but that's what's relevant.  And
6  what's relevant is what he accepted.  He accepted his
7  interpretation.  That's what he based his decision on.
8      MR. BROOCKS: And my point to you is going
9  to be the point on Monday, is that when two parties are
10 having a discussion -- however you want to frame it,
11 disagreement, I thought X, you thought Y -- that is not
12 a common interest.  Those are two parties negotiating
13 and expressing --
14     MR. WOLFSHOHL: No, I get it.  I
15 understand.
16     MR. BROOCKS: So, you know, that's a ...
17     MR. WOLFSHOHL: I'm telling you this is
18 what he's testified to.  He accepted an offer based on
19 his interpretation.
20     MR. BROOCKS: But we're not talking about
21 that.  We're talking about the ensuing discussions that
22 occurred about what he thought they thought and the
23 discussions that --
24     MR. WOLFSHOHL: Look, let me talk to him
25 during a break.  This is all just kind of coming up and

1  I don't --
2      MR. CICACK: Yeah, that's fine.
3      MR. WOLFSHOHL: There's no question that
4  we have a common interest privilege based on the fact
5  that you used both people and that we established it
6  when we discussed.  I have to talk about what this
7  particular -- you're raising something that I hadn't
8  even thought about.
9      MR. BROOCKS: Okay.
10     MR. WOLFSHOHL: So let me talk about it
11 during a break.  Okay?
12     MR. BROOCKS: Okay.
13     BY MR. CICACK:
14 Q.  All right.  You interpreted it to be based on
15 $7 million?
16 A.  Yes.
17 Q.  You concede that there is contradictory
18 language in the letter?
19 A.  Yes.
20 Q.  And you concede, I think, that before accepting
21 the bid and filing your notice of successful bidder and
22 backup bidder, you did not seek clarification from the
23 joint bidders?
24 A.  Right.
25 Q.  Did you consider the possibility that -- well,

1  let's go back to Exhibit 8.  Sorry about that.
2  A.  Okay.
3  Q.  Exhibit 8, page 2 of 6.
4  A.  Okay.
5  Q.  Did you consider that when they put $7 million
6  there and they said not less than $7 million, that what
7  was really intended was up to $7 million?
8      Did you consider that as a possibility?
9  A.  I don't remember considering that, no.
10 Q.  Okay.  Let's go back to page 4 of 6.  Are you
11 there?
12 A.  Yes.
13 Q.  You see that sort of grid in the middle of the
14 page?
15 A.  Yes.
16 Q.  If I hear you correctly, you are saying that
17 you considered their offer to be the last -- basically
18 the last line in that grid that says $7 million?
19 A.  No.
20 Q.  Okay.  Then explain to me what you mean by
21 $7 million.
22 A.  I take 7 million to be the top of their range.
23 You asked me about the chart.
24 Q.  Well, you told me that you interpreted their
25 bid to be -- that that was their bid, $7 million.

1  A.  Yes.
2  Q.  Okay.  Now you're talking about top of a range?
3  A.  You referred to the chart.  I'm not sure I
4  understand what you're asking.
5  Q.  Well, what I'm asking you is the way you
6  interpreted their bid is -- do you see where it says
7  "proposed cash purchase price of alternative bid"?
8  A.  I see that.
9  Q.  It says 2 million, 3 million, 5 million,
10 7 million.  Do you see that?
11 A.  Yes.
12 Q.  You interpreted their bid to mean the last one
13 there that says 7 million and across?  That's how you
14 interpreted their bid?
15 A.  No, because I disagree with the way the grid is
16 prepared.  I don't think it's useful.
17 Q.  It's their bid.  You didn't prepare it.
18 A.  What's your question?
19 Q.  You interpreted -- you thought -- you took
20 their bid to be the last line on that grid?
21 A.  No.  I took it to be the first number on the
22 first page, 7 million.
23 Q.  Well, isn't that the last line on that grid,
24 7 million?
25 A.  They happen to be the same number.

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1 Q. All right. So are you saying that this grid
2 where it talks -- the last line where it says
3 $7 million, is that what you -- at this point is that
4 what you consider their bid to be?
5 A. I really don't know how to answer your question
6 other than I considered their bid to be the 7 million
7 they put on the first page.
8 Q. Okay.
9 A. This chart I don't think illustrates my
10 thinking.
11 Q. Well, what did you think the purpose of this
12 chart was then?
13 A. I thought it was meant to illustrate different
14 scenarios of how you would compare their bid with
15 alternative competing bids.
16 Q. Right. And isn't the $7 million the
17 alternative competing bid?
18 A. Yes, but not under the chart because I think
19 the chart's math is wrong. Maybe that's why we're
20 talking past each other.
21 Q. Okay. So when you see the 7 million on page 1,
22 you're interpreting that to be what the distributable
23 waiver would be -- necessary would be if the alternative
24 bid was $7 million?
25 A. I don't understand how you're asking this

1 question.
2 Q. All right. You tell me. $7 million, how do
3 you get to $7 million?
4 A. They bid $7 million.
5 Q. How did they get there? Explain it. How did
6 they get there? You've got a million 750 in cash,
7 right?
8 A. (Witness nods head affirmatively.)
9 Q. Where did the rest of the money come from?
10 A. So I interpret the 7 million to be sort of the
11 implied equivalent value.
12 Q. Implied equivalent value of what?
13 A. Of the competing bid.
14 Q. Okay. So, in other words, the last line in the
15 chart?
16 A. No.
17 Q. Okay. So walk me through it. How do you get
18 to the 7 million?
19 A. Have you got Exhibit 16?
20 Q. I do.
21 A. Okay.
22 Q. It's the one page, yeah.
23 A. All right. So there's essentially two charts
24 in one there. Do you see the bottom one?
25 Q. Yeah.

1 A. Where you see the middle column and it says
2 "winning bid 7 million"?
3 Q. Yep.
4 A. What this illustrates is what I think the gift
5 class would get in comparison to the backup bid using
6 the math we talked about a few minutes ago, subtracting
7 out an estimate of administrative claims, multiplying by
8 the percentages, and then you do your comparison.
9     And under 7 million the 209,000 is
10 obviously greater than the 94,000. So that's better for
11 the creditors.
12 Q. And what's the above number starting at
13 4,350,000?
14 A. So the above number, a couple of assumptions
15 change here to make it more conservative. The
16 administrative costs are assumed to be higher.
17 Connecticut's share of the claims pool is assumed to be
18 much lower.
19     And what this is showing is what I
20 would -- I guess, now that you're allowing me to
21 explain, the problem with the chart that you were
22 referencing in the bid, that it did not account for the
23 existence of administrative costs that would have to get
24 paid before unsecured creditors get paid.
25     So they can say their bid is 7 million,

1 but it actually might not be better than a bid of, say,
2 6 million because the available cash for the waiver has
3 a natural ceiling that is dictated by how much the admin
4 claims are and what the percentage of the claims are.
5     So what this upper chart shows is even
6 though they say it's 7 million, they really only have
7 enough cash to give away to beat a bid of 4.35 million.
8 But that's still a lot higher than the 3.5. So this is
9 kind of academic.
10 Q. But how come under the top chart you're using
11 75 percent/25 percent?
12 A. Because those are more conservative
13 assumptions. What I was trying to do was saying, Look,
14 there is some perhaps uncertainty about the ultimate
15 allowed amount of the unsecured claims; say they lose a
16 couple of the appeals and the Connecticut percentage
17 goes down. I wanted to make sure that even under those
18 different outcomes, I wanted to make sure that the
19 winning bidder was still actually better and it was.
20     Now, if you go with 96.7 that's on the
21 claims register as it is today, it's not even a close
22 comparison. This is sort of putting every assumption in
23 favor of justifying a First United American winning bid
24 and it just doesn't get there.
25 Q. Well, why under the -- on the top illustration,

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

13:24:14-13:25:39                                    Page 113

1  why aren't you using $7 million as the cash equivalent?
2  A.  Oh, because the point was to show -- well, I
3  couldn't.  Then it would be the same as the chart below
4  it.
5  Q.  No, it wouldn't because it would be different
6  percentages?
7  A.  That's true.  It would just be way higher.
8  Q.  Okay.
9  A.  The reason it doesn't start with 7 is because
10  this is doing the math sort of in reverse to say, what
11  is the most that you could reasonably say that bid is
12  worth?  They say it's 7 million, but when you account
13  for admins, it really only is equivalent to a 4.35.
14  That's what that's meant to show.
15  Q.  So let me ask you this.  What if their bid
16  actually was, despite your interpretation, that it was
17  just a hundred thousand dollars more than what the other
18  unsecured creditors would have gotten under the FUAC
19  bid?  Humor me for a second.  Let's assume that actually
20  what they put in the letter is what they meant.  Okay?
21  A.  (Witness nods head affirmatively.)
22  Q.  So would you agree with me that that is
23  basically a bid that says a hundred thousand dollars
24  more than the other guy?
25  A.  If I understood your question, assuming and

---

13:25:43-13:26:42                                    Page 114

1  humoring you that your presumption is correct, are you
2  correct, sure.
3  Q.  Okay.  And that's not the type of bid you would
4  have accepted from anybody, is it?
5  A.  I don't know.
6  Q.  You don't know if you would have?  Well, you
7  said highest and best.  Give me your highest and best,
8  give me your best bid.  Isn't that what it means?
9  A.  That's what I thought.  And then your client
10  came in saying you would have bid more.
11  Q.  My client said that?
12  A.  You said that.
13  Q.  Okay.
14  A.  Well, let's get back to actual questions and
15  try to be productive.
16  Q.  So you would not have expected any of the
17  bidders, when you're asking for highest and best, to
18  come in with a bid that says, I bid X amount but if
19  somebody else bids more, then I'll bid a hundred
20  thousand dollars more than that other bid?
21  MR. WOLFSHOHL: Objection, form.
22  BY MR. CICACK:
23  Q.  Would you expect to see that when you call for
24  a highest and best?
25  MR. WOLFSHOHL: Objection to form.

---

13:26:48-13:27:55                                    Page 115

1  A.  No.
2  BY MR. CICACK:
3  Q.  Okay.  Also in terms of future revenues, if
4  First United was -- or anybody wanted to make a bid that
5  said, you know, Part of this bid will be cash plus a
6  percentage of future business revenues, is that
7  something you would have accepted?
8  A.  I would have considered it.
9  Q.  Under the heading of highest and best?
10  A.  Well, I'm going to consider any bids that are
11  made.
12  Q.  But isn't that kind of bid, by definition,
13  contingent and based on a formula?
14  MR. WOLFSHOHL: Objection to form.
15  BY MR. CICACK:
16  Q.  If I say to you -- let me rephrase it.
17  If I say to you, I'm going to bid, for
18  instance, a hundred thousand dollars plus 5 percent of
19  profits for five years.  All right?  That's contingent
20  on profits, right?
21  A.  (Witness nods head affirmatively.)
22  Q.  Correct?
23  A.  Yes.
24  Q.  And in order to determine what that is, you
25  have to do math, right?  You have to do a formula?

---

13:27:58-13:29:07                                    Page 116

1  A.  Yes.
2  Q.  All right.  So based on your bid instructions,
3  you couldn't have accepted something like that?
4  MR. WOLFSHOHL: Objection, form.
5  A.  I would have considered it.  I don't know if I
6  would have accepted it as the highest and best.
7  BY MR. CICACK:
8  Q.  Why?
9  A.  Because you're talking about a bid I haven't
10  even seen.  I'd have to analyze it and think about it.
11  Q.  All right.  So are you saying that under the --
12  let's look back at Exhibit 6.  That's the bid
13  instructions, the new ones.
14  A.  Give me a second.
15  Q.  No worries.
16  A.  I think it's got your bid attached to it.  Is
17  it that one?
18  Q.  No, no.  It's the new bid.
19  A.  Just this page?
20  Q.  Just that page.
21  A.  I gotcha.  Okay.  Yes, I have it.
22  Q.  I want to look at page 2.
23  A.  Okay.
24  Q.  So you say you want a specific dollar amount
25  and avoiding references to formulas and other

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

1  contingencies, right?
2  A.  Right.
3  Q.  Isn't that communicating to the bidder to avoid
4  using a formula and avoid using contingencies?
5  A.  Yes.
6  Q.  Okay.  But despite that, if someone made a bid
7  that was contingent on something else or did include a
8  formula, you still would have considered it?
9  A.  Yes.
10  Q.  Okay.  All right.  So let's go back and, if we
11  could, look at 14 and 15 again.
12  A.  Okay.
13  Q.  Exhibits 14 and 15.  I think you said that you
14  think 15 was created before Exhibit 14 was created?
15  A.  Yeah.  Now I think it might be the other way
16  around.
17  Q.  All right.  Well, let's just walk through
18  Exhibit 14 real quick and you can explain to us what
19  this is.
20  A.  I thought we did this one already.
21  Q.  Did we?  Okay.  How about 15?
22  A.  It's the same.  The only difference I can tell
23  is that the proceeds waiver changes by a hundred grand.
24  But I think that's a plug in the spreadsheet.  I don't
25  think that's the result.  Like I said, this wasn't my

---

1  spreadsheet.  I think Jeff created this.
2  Q.  Are these essentially what the numbers look
3  like if you assume that the waiver is a certain amount?
4  A.  I'm not sure how to answer that.
5  Q.  Why?  Is it a bad question or that you just
6  don't know?
7  A.  Both.
8  Q.  Okay.  Don't worry.  I'm not offended.
9      All right.  Did you talk to Jeff about
10  these?
11  A.  Yeah.
12  Q.  Okay.  So let's look at 14.  And it shows there
13  that there's a distributable proceeds waiver of 750,
14  correct?
15  A.  Yes, 85.
16  Q.  Now, why was that used?  What's the purpose?
17  What is this trying to show?
18  A.  I don't know.  I didn't make this spreadsheet.
19  But it looks like the 750 is what Connecticut would have
20  available to gift under their waiver mechanism because
21  it's basically their percentage of the net proceeds
22  after admins.
23  Q.  Okay.
24  A.  I can't see the formula.
25  Q.  Assuming the other assumptions are correct,

---

1  that's what you --
2  A.  Yeah.  That's the amount Connecticut would be
3  able to give to the other creditors.
4  Q.  If you'd look at the third page of this exhibit
5  that is marked TRANZON887.
6  A.  Okay.
7  Q.  Okay.  So this changes in terms of the
8  percentages, right?  It goes from 25/75 to 3.3 to 996.7,
9  right?
10  A.  Yes.
11  Q.  And then the distributable proceeds waiver
12  changes to 173,250?
13  A.  Yeah.
14  Q.  Do you know why that number is used there?
15  A.  No.  I can't tell from this.  I don't know why
16  that's there.
17  Q.  That's okay.  That makes two of us.
18      So let's look at Exhibit 15.
19  A.  Okay.
20  Q.  This is 889.  So this appears to be the same as
21  Exhibit 14 except it has a distributable proceeds waiver
22  of 650?
23  A.  Yes.
24  Q.  And why is that number being used there?
25  A.  I don't know.

---

1  Q.  All right.  Okay.  Now, based on the
2  distributable proceeds waiver as you interpreted it,
3  what amount of money would the alternative bidder have
4  had to have bid in order to be a higher bid?
5  A.  I think I understand your question.  That's
6  what Exhibit 16 top half is meant to show, and it's the
7  4.35.  But that's if Connecticut falls to 75 percent of
8  the claims pool, admins go up to 750.  It depends on
9  those assumptions.
10  Q.  Let's assume -- the bottom of 16, the
11  percentages there, that's based just on a claims
12  register analysis?
13  A.  Yeah.  The claims filed in the FSS case.
14  Q.  Just taking them at face value?
15  A.  Yeah.
16  Q.  Okay.  No analysis about what claims might
17  survive or not survive at the end of the day, just
18  whatever the claim amount was?
19  A.  Some analysis but that's essentially what the
20  register reflects.
21  Q.  So if you use those numbers then, those
22  percentages, what is the amount that the other bid, the
23  other qualified bid, would have to have been to be
24  higher than the joint bid?
25  A.  Yeah.  That I can't do in my head.  I would

---

**CONTINENTAL COURT REPORTERS, INC.**
(713) 522-5080

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

13:36:11-13:38:44                                        Page 121

1  need the spreadsheet, and I would just change the
2  assumptions.
3  Q.  Okay.  Has that been done?
4  A.  Yes.
5  Q.  And who did it?
6  A.  I did it.
7  Q.  Okay.  So is that something that you have
8  available that you could provide to us?
9  A.  I don't know.  I have the spreadsheet I can
10  show you.  I don't know if I saved a version of it with
11  that math in there.  I can tell you that the alternative
12  bid, to be better, would have to be way, way higher,
13  like 15 or 20 million or something like that.
14  Q.  Okay.  The amount that was -- the cash amount
15  that was bid by the joint bidders, has that been fully
16  funded?
17  A.  Yes.
18  Q.  And you have that in your IOLTA account?
19  A.  No.  I have it in a Chapter 7 estate account.
20  Q.  Got it.  Okay.  Who is The War is Over?
21  A.  I think that's the joint bidders' designee
22  entity to acquire the assets.
23  Q.  Have you determined that The War is Over has
24  the same owners as Global Tetrahedron?
25  A.  No.  I don't think I've looked at that.

---

13:38:47-13:39:54                                        Page 122

1  Q.  Okay.  Well, you requested, I think, in the
2  bidding procedures, that any bidder identify any
3  partners or other sources where money's coming from,
4  right?
5  A.  Yes, yes.
6  Q.  Do you know whether or not all of Global
7  Tetrahedron's money came from Global Tetrahedron?
8  A.  Yes.
9  Q.  How do you know that?
10  A.  So there were two wires that I got.  I got the
11  deposit and then I got the difference.  And when my bank
12  sends me a wire, it says who sent it; and Global
13  Tetrahedron was the account holder that sent the money.
14  Q.  Are you confident that somebody didn't give
15  them the money to do that?
16  A.  I don't know if they did or not, no.
17  Q.  Would it matter to you -- if they were not the
18  source of the money but it came from a third party,
19  wouldn't that be something you'd want to know?
20  A.  Maybe.  But the context here is they had
21  already given me proof that they had that amount of
22  money in the bank before they bid.
23  Q.  No, they didn't.
24  A.  Yes, they did.
25  Q.  How did they do that?

---

13:39:55-13:41:19                                        Page 123

1  A.  They sent me a letter from their financial
2  advisor, certifying that they had that much money in the
3  bank.
4  Q.  Not that they had a million-750.  I didn't see
5  that letter.
6  A.  Oh, you're right.  It was 1.2.  That's right.
7  Q.  So it would matter to you where the additional
8  money came from?
9  A.  I don't know.
10  Q.  Okay.  Well, then if it didn't matter, why
11  would you on the bid form request that disclosure of any
12  partners?
13  A.  Well, what we asked for in the bid form
14  initially, the goal was to understand whether bidders
15  were real.  We had hundreds of requests for information.
16  Several of them never responded to follow-ups.  And
17  given the notoriety of the assets we were concerned
18  there might be some shenanigans.  So we wanted to make
19  sure that the people who were bidding were legitimate
20  bidders.
21  Q.  Okay.  Who prepared the motion to approve the
22  sale?
23  A.  My counsel did and I helped with it.
24  Q.  Did any of the attorneys for the joint bidders
25  help in preparation of the motion?

---

13:41:22-13:42:50                                        Page 124

1  A.  I think they might have reviewed a draft before
2  it was filed.
3  Q.  And did they make any comments?
4  A.  I don't remember.
5  Q.  Now, let me ask you to go back to Exhibit 8.
6  And I want to go through with you the last paragraph of
7  Exhibit 8, starting at -- well, it's actually the
8  second-to-last paragraph starting on page 5 of 6 at the
9  bottom where it says "The Connecticut families."
10  A.  I see that.
11  Q.  All right.  The second sentence says, "The
12  Connecticut families trust that the Chapter 7 trustee in
13  fulfilling his fiduciary duties would not sell the
14  acquired assets to any purchaser offering less than
15  $7 million for such assets, as such bid would offer less
16  value to unsecured creditors."
17      Do you see that?
18  A.  I do.
19  Q.  Okay.  I thought you just told me that in your
20  calculations the alternative bid would have to be like
21  15 million?
22  A.  Depending on the assumptions.
23  Q.  They're making the bid, right, and they're
24  saying 7 million, correct?  They're not saying
25  15 million; they're saying 7 million.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

13:42:53-13:44:07                                      Page 125

1  A.  That's what their sentence says.
2  Q.  Okay.  The next sentence says, "Moreover, the
3  Connecticut families implore the Chapter 7 trustee to
4  remember that the best interest of creditors in this
5  case is served by ensuring that the assets being sold
6  will not be used to continue harassing, victimizing and
7  defaming the Connecticut families (i.e., the very reason
8  this bankruptcy case exists)."
9       Was that a consideration to you at all?
10 A.  No.
11 Q.  Were there any societal concerns that were of
12 consideration to you?
13 A.  No.
14 Q.  Did the fact that 35, 40 people would lose
15 their job if you accepted the joint bid, was that a
16 consideration at all?
17 A.  I'm sorry.  Say that again.
18 Q.  The fact that 30 to 40 people would lose their
19 jobs when you accepted the Connecticut family joint bid
20 as opposed to the First United bid, was that a
21 consideration at all?
22 A.  No.
23 Q.  All right.  But you knew that the employees of
24 FSS were not going to continue if you accepted the joint
25 bid?

---

13:44:09-13:45:52                                      Page 126

1  A.  I mean, that's my assumption.  I don't know
2  that for sure.
3       Actually, I'm not sure I answered that
4  correctly.  Could you state the question again?
5  Q.  Yeah.  I'm just saying did you understand that
6  by accepting the joint bid, that the employees of FSS
7  would no longer be employed?
8  A.  Sort of.  I assumed they wouldn't be employed
9  by FSS eventually.  I also assumed that the majority of
10 them would be employed by whatever entity Mr. Jones went
11 to to continue his business.
12 Q.  Okay.  If First United American had bid in
13 excess of $7 million cash, would you have accepted that
14 as the highest and best bid?
15 A.  Probably.
16 Q.  How much would it have had to have bid for you
17 to accept the cash as the highest and best bid?
18 A.  I don't know exactly what the number would be.
19 Q.  Okay.  Do you have a range?
20 A.  Kind of.  It's sort of in the range we've been
21 talking about.  The reason is if there were a number, I
22 can test that against ranges of assumptions to see
23 whether it's better or worse.  That was another reason
24 to do the highest and best bid.  3.5 is what was
25 offered, and it was clearly worse than all of the

---

13:45:54-14:06:58                                      Page 127

1  assumptions.
2  Q.  But 7 million, you would have probably accepted
3  that?
4  A.  Sitting here today, yes.  I would have done
5  more assumptions -- or I mean, I would have done more
6  analysis and looked at it differently.  We might have
7  had to do additional process.  I don't know.  That's not
8  what happened.
9       MR. CICACK:  If we could take a break and
10 get that document that you said --
11      MR. WOLFSHOHL:  Oh, yeah, yeah.  Let me go
12 see if I can ...
13      MR. CICACK:  And then I think that I
14 will -- once we do that, I think I'll pass the witness.
15      MR. WOLFSHOHL:  Okay.
16      THE VIDEOGRAPHER:  The time is 1:45, and
17 we are off the record.
18      (Recess taken)
19      (Murray Exhibit 17 was marked for
20 identification.)
21      THE VIDEOGRAPHER:  The time is 2:06 p.m.
22 Central Time, and we are back on the record.
23      BY MR. CICACK:
24 Q.  Okay.  Mr. Murray, at the break were going
25 to look for something.  Can you explain what you were

---

14:07:01-14:08:06                                      Page 128

1  going to look for and what you found?
2  A.  Yeah.  I think you were asking me if I had done
3  a version of the analysis to see what the competing bid
4  would have to be if the waiver was calculated only with
5  the hundred thousand, something like that.  And I
6  remember doing that analysis.
7       I could not during the break find that
8  spreadsheet, but I will keep looking for you.
9  Q.  Okay.  Thank you.
10      Could you look at what I've marked as
11 Exhibit 17, which is -- the Bates mark on that is
12 TRANZON 795.
13 A.  I see it.
14 Q.  Can you tell me what that is, if you know.
15 A.  Yeah.  I think this is a snapshot of what the
16 auction process was looking like at a particular time.
17 I'm not sure when.
18 Q.  And was this prepared by you or Tranzon?
19 A.  Tranzon.
20 Q.  Have you seen this before?
21 A.  I have.
22 Q.  Okay.  And does it -- based on what you've seen
23 here, is it accurate?
24 A.  Yeah.  I mean, it would depend on when; but
25 yeah, it looks like it was accurate as of whenever it

---

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

14:08:08-14:09:33                                    Page 129

1   was made, like toward the end of October. I think
2   that's about right.
3   Q.  Yeah.  It looks like October 30th.  Okay.
4   A.  Oh, yeah.  That's what it says on the document,
5   October 31st.  That sounds about right.
6   Q.  October 31st.  All right.  In the data room
7   you're able to track who accesses it, right?
8   A.  Yes.
9   Q.  All right.
10  A.  Well, not me but the auctioneer does.
11  Q.  When you filed your sale motion, there are
12  documents that are attached to the sale motion that
13  purport to transfer and assign assets, right?
14  A.  Are you talking about the APA?
15  Q.  Yeah.
16  A.  Yes.
17  Q.  And maybe I missed it, but how did you envision
18  that the distributable proceeds waiver would be
19  documented?
20  A.  At what time?
21  Q.  When the sale closed.
22  A.  I'm not sure.
23  Q.  Okay.  Have you seen any documentation
24  concerning how the distributable proceeds waiver gets
25  from you and then to the other unsecured creditors?

---

14:09:38-14:11:21                                    Page 130

1   A.  I think we talked about it being addressed in
2   the sale order itself, but I don't remember if it's
3   anywhere else.
4   Q.  Okay.  But have you seen any drafts or anything
5   like that?
6   A.  No, not that comes to mind.
7   Q.  Okay.  Just one other question.  I'm going to
8   hand this to you.  I don't want to make it an exhibit
9   but I'd like for you to look at these and just tell me
10  if you know what they are because I think they might be
11  better asked of Jeff tomorrow.
12  A.  Sure.
13  Q.  But I just want to make sure.  If you've got a
14  lot of knowledge about them, I might ask you about them.
15  A.  Yeah.  I think I know what these are.
16  Q.  Can you tell us?
17  A.  Yeah.  So over that weekend, after we got the
18  initial bids, we were sort of trying to figure out how
19  to proceed with the auction process.  And one of the
20  possibilities was a live multi-round bid.
21      Jeff Tanenbaum had prepared, a couple of
22  couple of spreadsheets -- I don't know if they're all
23  here -- where he -- and you probably should ask him
24  about it -- where he projected what that kind of bid
25  might look like round after round, making certain

---

14:11:25-14:12:27                                    Page 131

1   assumptions about what the bidders might do, how we
2   might divide up the lots.
3       At that time we thought it might even be
4   possible that some portion of the assets might go to
5   your client based on how different bidders were bidding
6   on different lots.  My recollection is this was very
7   difficult to make sense of or follow, and there were
8   many, many versions of this.  And that was part of the
9   thinking about why a traditional live auction just
10  wasn't going to be practical, given the nature of the
11  two bids and the nature of the interest in the lots.
12  Q.  Okay.  But as far as you know, the actual
13  person that prepared the documents I put in front of you
14  was Jeff?
15  A.  Yeah.  It's him or somebody in his shop, yeah.
16  Q.  Let me get them back.  I'm not going to mark
17  them as an exhibit.
18      Thank you, sir.
19      MR. CICACK:  I'm going to pass the
20  witness.
21      Thank you very much.
22
23
24
25

---

14:12:28-14:13:40                                    Page 132

1       EXAMINATION
2       QUESTIONS BY MR. BROOCKS:
3   Q.  Mr. Murray, my name is Ben Broocks.  I
4   represent Alex Jones.
5       MR. WOLFSHOHL:  Before you begin to
6   question, I just need to clarify.  I am not waiving my
7   position that Alex Jones does not have standing to
8   object to the sale.  I am going to let you proceed.  I
9   just want you to know so that there's no confusion that
10  that is not a position that the trustee is waiving.
11      MR. BROOCKS:  Okay.
12      BY MR. BROOCKS:
13  Q.  Mr. Murray, Ben Broocks is my name.  I want to
14  ask you to kind of pick up where you were leaving off
15  there a minute ago, to get clear on what exactly this --
16  I'm going to call it the waiver, try to use some of
17  Mr. Cicack's terminology.  This will be No. 18.
18      (Murray Exhibit 18 was marked for
19  identification.)
20      BY MR. BROOCKS:
21  Q.  This is document 915.  This is your motion for
22  expedited sale.
23  A.  Okay.
24  Q.  Take a look through that and see if you can
25  confirm that that's what that is.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

14:14:06-14:15:21                                                    Page 133

1  A.  Yeah.  This looks like the motion that we're
2  hearing on Monday, I think.
3  Q.  Yeah.  And so just for clarity, I tried to -- I
4  have the page numbers on the bottom right in red, and
5  they kind of go sequentially throughout the entirety of
6  the document, I think.
7  A.  Yeah.  I see that.  It looks like that's the
8  case.
9  Q.  I hope I did it that way.  Anyway, take a look
10 at the first one, which is the basic motion itself.  And
11 I want you to look at page red numbered 14.  Okay?  And
12 I want you to walk me through that so I can understand
13 what that is.
14 A.  You're talking about the chart?
15 Q.  Yes, I am.
16 A.  Yeah.  So this is the chart we had talked about
17 with Mr. Cicack a little bit ago.
18 Q.  Well, it's one of two.  Just so you'll know
19 where I'm going, on the next page there's another chart.
20 We're going to do them both.
21    So walk me through the first one.
22 A.  All right.  So the first column here -- well,
23 this is meant to show how much money goes to the
24 non-Connecticut creditors under different scenarios.
25 Q.  Hold on one second.  I'm going to put this up,

---

14:15:25-14:16:32                                                    Page 134

1  Chris, so we can all see it on that screen, I hope.
2  Okay?
3  A.  Yeah.  That's what I've got in front of me in
4  hard copy.
5  Q.  Okay, good.  Excellent.  So go ahead.
6  A.  So it's meant to demonstrate an estimate of
7  what the non-Connecticut creditors of FSS would get
8  under different scenarios.  And then there's the backup
9  bid, which is First United American's bid.
10 Q.  Walk me through each one of these columns.
11 Start on one and walk me through it.
12 A.  Which column?
13 Q.  Whichever you want.
14 A.  Backup bid.
15 Q.  Okay.
16 A.  So the bid was 3.5 million cash.
17 Q.  That's for First United?
18 A.  Yes.  Less an estimated admin cost of 650.
19 Q.  Stop it right there.  What goes into the admin
20 cost?
21 A.  It's a few things.  Well, first of all, it's
22 the costs associated with the sale of these assets.  So
23 it includes an estimate of the legal fees associated
24 with this process, the trustee commission, the
25 auctioneer's commission, and also the auctioneer's

---

14:16:36-14:17:57                                                    Page 135

1  expenses.
2  Q.  And what did you assume the auctioneer's
3  commission was going to be on this?
4  A.  It was based on the percentages in his
5  engagement letter and the cash amounts that were bid on
6  the assets.  And there's a different percentage -- I
7  don't remember exactly what they are -- different
8  percentage for IP assets and for tangible assets.  There
9  was an allocation done and estimate of what the fees
10 would be.
11 Q.  Can you give me a percentage, a netted-out
12 percentage?
13 A.  I don't even remember.  Somewhere between 10
14 and 20, but it's -- I don't remember exactly.
15 Q.  And has your auctioneer agreed to these numbers
16 that you use in here?
17 A.  On this -- what do you mean?  I haven't heard
18 him disagree with the estimate; but I don't have an
19 agreement with him on what his exact commission should
20 be, if that's what you're asking.
21 Q.  Well, let me try to rephrase the question.
22    So the winning bid in your estimation, the
23 joint bid, was how much total in your estimation?
24 A.  7.
25 Q.  $7 million?

---

14:17:59-14:19:07                                                    Page 136

1  A.  (Witness nods head affirmatively.)
2  Q.  All right.  Now, what was his percentage of
3  that 7 million on paper supposed to be?
4  A.  I estimated it at the same as the backup bidder
5  because that 7 million isn't purchase money cash.  So
6  his commission would be calculated on the cash that
7  comes in.
8  Q.  That's what I'm trying to nail down.  You are
9  not going to pay your auctioneer on anything other than
10 the cash portion of the joint bidders' bid, right?
11 A.  I'm not sure because I think there is a little
12 bit of ambiguity in what his commission is.  There's
13 certainly value created by the process that's not
14 reflected in the purchase price.  And how and whether
15 that gets compensated, I don't know that yet.
16 Q.  But your position is that his commission,
17 whatever that percentage number is, should be computed
18 more or less on 1.75 million, not 7 million?
19 A.  Well, I think that's what the minimum would be,
20 yeah, and not 7 million.
21 Q.  And you've expressed that to him, that that's
22 your belief and opinion, correct?
23 A.  Yes.
24 Q.  And what has he said in response?
25 A.  He said, We'll talk about it.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

1  Q.  What does that mean?

2  A.  I think it means at some point in the future we

3  will negotiate what an appropriate amount of

4  compensation should be based on a nontraditional

5  purchase price scenario that we have here.

6  Q.  And I guess I'm wanting to get clarity here for

7  what happens on Monday.  The judge can understand that

8  under no conditions are you going to give him 10 percent

9  or 20 -- whatever the percentage is, of $7 million.

10  It's going to be some plus or minus around that 1.75.

11     Would that be fair to say?

12  A.  As I sit here today, I expect that we will

13  agree on some sort of number in that range; and I also

14  expect that we'll come back to get court approval of

15  that.

16  Q.  Okay.  Now, the percentage that you get, what

17  is your percentage?

18  A.  So mine is a statutory percentage, but it's

19  roughly 3 percent of cash realized.

20  Q.  What will that 3 percent be based on?

21  A.  Cash only.

22  Q.  1.75 if the joint bidders are successful?

23  A.  Yeah, it will be significantly lower than the

24  winning bid.

25  Q.  Explain to us carefully so I can understand it,

---

1  if the global bid that you say the joint bidders

2  exceeded was 7 million, why wouldn't you and the

3  auctioneer get a percentage of the gross amount?

4  A.  Well, because our compensation is calculated

5  and determined different ways.  His is based on an

6  employment application and an application to the Court

7  based on what we negotiate but also based on, I believe,

8  the value that's added and that he can demonstrate.

9     My commission is calculated by a statutory

10  formula with definitions on what can be considered.  And

11  my understanding is it's based on cash that flows

12  through the estate, not a theoretical value.

13  Q.  Now, you told Mr. Cicack earlier that you've

14  been involved in hundreds, or scores, of 363 sales and

15  sales similar to this, I guess, didn't you?

16  A.  Yeah.  I think I said a couple dozen or a few

17  dozen.

18  Q.  Have you ever done a transaction where it was

19  noncash consideration as a component?

20  A.  Yes.

21  Q.  Like what kind of noncash consideration?

22  A.  I've seen it with --

23  Q.  I'm asking where you've done it though.  You.

24  A.  Where I've done it?

25  Q.  Yeah.  Where you've been involved.

---

1  A.  I've sold assets where people have assumed

2  liabilities as part of that.

3  Q.  So assumption of liabilities.  What other kind

4  of forms of noncash consideration have you been involved

5  in deal-wise?

6  A.  Claims waivers or settlements.

7  Q.  Explain that.

8  A.  So it's not uncommon to sell an asset to a

9  party that has other types of interest in the case.

10  Maybe they're a creditor; maybe there's an adversary

11  proceeding.  And part of the sale might also be a

12  settlement of those claims.  So that would be noncash

13  consideration.

14  Q.  Give me a hypothetical so I can understand

15  that.  If you'd just flesh that out a little bit.

16  A.  Perhaps the estate is suing you for a

17  preference for a hundred thousand dollars but I'm also

18  selling a beach house for a million, and we say -- I'm

19  selling the beach house and you make an offer that says

20  I'll give you a million dollars for the beach house but

21  you have to waive the preference claim against me,

22  something like that, where it's not quite cash but it

23  does have value to the estate.  I guess, in that case,

24  the value is negative, but ...

25  Q.  But it's a tangible finite number?

---

1  A.  Yeah, or an estimate.  If it's pending

2  litigation, I don't know necessarily what the value of a

3  claim is.  It might be a range.

4  Q.  And how has your compensation been in those

5  situations?  Did you take that noncash component into

6  account?

7  A.  No.

8  Q.  That was just something you did?  You only got

9  money in your compensation on the cash actually

10  received?

11  A.  Yeah.  And my compensation gets calculated like

12  at the end of the case, after everything's been settled

13  and you know exactly how much cash went through.  And

14  then the math is applied.  It's actually done by a

15  software formula.

16  Q.  Tell me again how many auctions you've been

17  involved in.

18  A.  Maybe a couple dozen.

19  Q.  And how many of those auctions have you ever

20  had noncash components?

21  A.  A small number, a handful.

22  Q.  Give me --

23  A.  I don't know.  Maybe less than five.

24  Q.  Give me the examples of what the noncash

25  components were of those five.  Don't guess.  If you

---

1  don't know, you don't know.
2  **A.  I don't remember any specific one.**
3  Q.  So as you sit here right now, your testimony is
4  that you've been involved in auctions where there was
5  noncash components but you can't remember any specific
6  kinds of noncash components?
7  **A.  Right.**
8  Q.  Okay.  Now, you told Mr. Cicack earlier that
9  you went back and did a little due diligence to try to
10  figure out whether -- I'm sorry.  Strike that.
11     MR. BROOCKS: When I say strike that, that
12  means I just want a paragraph return, ma'am.
13     BY MR. BROOCKS:
14  Q.  And that's not for you, that strike that.  So
15  I'll start over.
16     Now, you were presented by the joint
17  bidders with this waiver as a part of their bid, right?
18  **A.  Yes.**
19  Q.  Okay.  Tell us again what you did to confirm
20  that it was not illusory or that it was real.  What did
21  you do?
22  **A.  I did the analysis we've been discussing, which**
23  **was evaluating from the perspective of unsecured**
24  **creditors of FSS whether they would be better off under**
25  **a bid with that mechanism or an alternative.**

1  Q.  Yeah.  Maybe my question wasn't clear.
2     What did you do to determine the
3  commercial reasonableness of this apart from running
4  numbers?  Did you call anybody, for example, say, Hey --
5  one of your fellow trustees and say, Hey, have you ever
6  seen this before?
7     Did you do that?
8  **A.  I did not talk to any other trustees about**
9  **that.**
10  Q.  Did you do any research?  You're a lawyer,
11  right?
12  **A.  Yes.**
13  Q.  Did you do any legal research?
14  **A.  Yes.**
15  Q.  What did you find?
16  **A.  I didn't find any cases on point.**
17  Q.  Do you use Westlaw or Lexis or what do you use?
18  **A.  I use Westlaw.**
19  Q.  I punched the term into Westlaw and Lexis.  I
20  couldn't find a case that had done this before.
21     Did you do the same thing?  Did you plug
22  that phrase in and see if any cases came up on it?
23  **A.  I did and I had the same search result you did.**
24  Q.  Meaning what?
25  **A.  Meaning I did not find any cases that did**

1  **this --**
2  Q.  Did you find any Law Review articles that
3  discussed it?
4  **A.  I don't think so, no.**
5  Q.  Did you consult any outside experts on this?
6  **A.  In a sense.  I consulted my own counsel.**
7  Q.  Other than your lawyers?
8  **A.  No.**
9  Q.  I'm assuming I'm not going to be able to find
10  out what your lawyer told you.  Maybe I could.
11     But other than your lawyer, you didn't
12  talk to anybody else then?
13  **A.  No.**
14  Q.  Okay.  So you didn't talk to your colleagues.
15  You did legal research.  You couldn't find anything that
16  even mentioned it case-wise, and you couldn't find any
17  scholarly discussions on it and you didn't talk to any
18  experts?
19  **A.  I didn't find anything exactly on it but I did**
20  **find analogous situations that I talked about --**
21  Q.  Give me the most analogous situation you
22  believe that you found.
23  **A.  Oh, I don't remember the case name.  But there**
24  **was a case where there was a challenge to a trustee's**
25  **decision to accept a lower bid that came with a claims**

1  **waiver.  That's analogous to this.**
2  Q.  One case.  Any other -- was that one case that
3  you found?
4  **A.  That was one that I found, yeah.**
5  Q.  Can you think of any others that you found that
6  you thought were analogous?
7  **A.  Nothing comes to mind.**
8  Q.  Can you give me the case name?
9  **A.  No.  I said I don't remember it.**
10  Q.  Do you have it in your computer?  Could you get
11  it for me?
12  **A.  I could probably find it somewhere.**
13  Q.  But other than that one case, you can't think
14  of one single thing you found that gave you any view,
15  and then we could give the Court comfort that this has
16  ever been done before?
17  **A.  Exactly like this, no.**
18  Q.  Even close other than that one case?
19  **A.  Yeah, no.  As I sit here, no.**
20  Q.  Let's go back to the chart.
21     Now, you were explaining to me this chart,
22  and we got sidetracked on the administrative expenses of
23  the 650.  So we're on page 14 of Exhibit 9 -- or docket
24  No. 915, page 14.  Continue.  You're walking us through
25  the backup bid.  This is First United's.

---

14:27:21-14:28:26                                    Page 145

1     Give me the numbers here.
2  A.  All right.  It was purchase cash of 3.5 less
3  the admins, and then that was the net purchase cash.
4  And that's what I considered to be the cash that would
5  be available for the unsecured creditors.
6     Then you multiply the assumption about the
7  percentages of how much would Connecticut get, how much
8  would the others get.  And there's no waiver mechanism
9  under the backup bid.
10 Q.  Now, you've only got two creditors here, right?
11 Is that right?
12 A.  It's two groups of creditors.  It's the
13 Connecticut creditors and everyone else.
14 Q.  So everyone else is in the gift class share?
15 A.  Yes.
16 Q.  Okay.  Keep going.
17 A.  All right.  And then it shows how much cash
18 from the available cash would make it to that class.
19 And it's $94,050.
20 Q.  Okay.  So had First United's bid been accepted
21 under this chart here, your backup bid, everybody other
22 than the Connecticut group would have gotten $94,050?
23 A.  Right.
24 Q.  Okay.  Now go to the next column.
25 A.  All right.  This is the winning bid, cash

---

14:28:29-14:29:25                                    Page 146

1  equivalent.  So it's using as a bogey the 7 million.
2  And if it were 7 million cash --
3  Q.  Which it's not.
4  A.  Right, which it's not -- you get cash for
5  creditors of 6.35 million.
6  Q.  I apologize.  Why did you call it a cash
7  equivalent?
8  A.  Because I'm trying to make a noncash item
9  comparable to a cash item.
10 Q.  Right, no.  I know that.  I gathered that.  But
11 a cash equivalent -- strike that.  Let me start over.
12    You have a financial background, don't
13 you?
14 A.  Some, sure.
15 Q.  Yeah.  And so you know what a cash equivalent
16 is in accounting terminology?
17 A.  Yeah.
18 Q.  What is it?
19 A.  I think it's -- actually, I'm not sure.  I
20 think it depends on the context.
21 Q.  Give me some examples of cash equivalents.
22 Stocks, bonds?
23 A.  Deposit accounts.  Maybe that's it.  I don't
24 know.
25 Q.  But you would agree with me that the waiver,

---

14:29:27-14:30:16                                    Page 147

1  this deferred waiver that you're talking about, is not a
2  cash equivalent in any technical sense of that term,
3  wouldn't you?
4     MR. WOLFSHOHL: Objection, form.
5  A.  Right.  The waiver is not a cash equivalent.
6  That's true.
7     BY MR. BROOCKS:
8  Q.  Okay.  So it's a little bit misleading for you
9  to use that phrase.  Wouldn't you agree with that?
10    Would you think that's -- you'd change
11 that if you could right now?
12    MR. WOLFSHOHL: Objection to form.
13 A.  No, I wouldn't because that's not what this
14 column is showing.  This column is showing if it were
15 actually cash, what would happen.
16    BY MR. BROOCKS:
17 Q.  Okay.  If it were.  Let's make believe it is.
18 So keep going.  Winning bid, cash equivalent 7 million.
19    But that is the joint bidders' number,
20 isn't it?
21 A.  Yes.
22 Q.  Okay.  Keep going.
23 A.  All right.  So if cash of 7 million came in as
24 the purchase price less admins, then you would get
25 Connecticut families share, gift class families share.

---

14:30:20-14:31:39                                    Page 148

1  And then you see that the projection there is $209,550
2  would have gone to the gift class.
3  Q.  Okay.  What's the third column?
4  A.  The third column is what would have to go --
5  the third column is figuring out how much of
6  Connecticut's cash they would actually have to give to
7  make it as if the winning bid was -- if they had paid
8  7 million cash.  That's what it's trying to make it
9  apples to apples.
10 Q.  Now, you say make it as if they paid 7 million.
11 That's a little bit inaccurate, isn't it?  You're
12 talking about focusing on what you're calling the gift
13 class's distributable portion?
14 A.  Yes.
15 Q.  So you were going to -- your analytical lens,
16 if you will, was focused on how much money has to go to
17 one group of creditors to make them equivalent to -- as
18 if the bid had been 7 million?
19 A.  That's right.
20 Q.  And why were you doing that?
21 A.  I was doing that to see if that was possible,
22 if 7 million was really the right thing to compare with.
23 Because depending on the assumptions, it might be that
24 Connecticut wouldn't have actually enough cash out of
25 the 1.75 to true the other guys up to what they would

---

1  have gotten under a 7 million cash.
2  Q.  I'm going to restate what I think you just
3  said.
4      So I hear you saying that you wanted to
5  see if the Connecticut families' distributable portion
6  was large enough at 7 million so that if they transfer
7  or gifted or somehow communicated their part to the
8  other guys, the other creditors, the other creditors
9  would come out as if the deal had been at 7 million?
10 A.  That's right.
11 Q.  Now, have you ever in your career valued a deal
12 depending on what one finite group of creditors got and
13 put a value on the whole deal based on what one portion
14 got?
15 A.  In a sense, yes.
16 Q.  In a sense, yes?
17 A.  Well, in a sense, every case is like that.
18 There's a fulcrum class of creditors, and maximizing
19 that class is what I try to do in every case.  So I make
20 decisions based on maximizing that.
21 Q.  Sure.  But I'm asking about you got, using your
22 terminology, two classes of creditors.  And you're
23 saying if Connecticut gives up something and Texas gets
24 more or the gift class gets more, that means that the
25 transaction value is actually what the gift class would

1  have gotten had they gotten a $7 million deal.  Have you
2  ever done something like that before, or is this the
3  first time?
4  A.  First time.
5  Q.  Why did you do it here?
6  A.  Because that's what was presented.
7  Q.  Were you trying to make this deal work for the
8  Connecticut plaintiffs?
9  A.  No.
10 Q.  You weren't?
11 A.  No.
12 Q.  Okay.  All right.  Now, you've got -- on the
13 right-hand column here you've got 36.  Walk me through
14 these numbers right there.
15     What are those numbers that I've
16 highlighted?  36,300 and 173, what are those numbers?
17     Sorry, let me try to do this a little more
18 elegantly here.
19     What are those?
20 A.  So that tells you how much cash Connecticut
21 needs to come up with.  Because what this does is you
22 start with that middle column.  And if it were 7 million
23 actual dollars paid on the purchase price, the gift
24 class would have gotten the 209,550.  I say if they need
25 to get 209,550, they're already getting 36.3 under the

1  winning bid's actual cash.  And then the difference,
2  that 173, is what Connecticut would have to chip in to
3  make the non-Connecticut creditors as well off as they
4  would have been had it been $7 million cash purchase
5  price.
6  Q.  So in other words, of the 1,063,000 that the
7  Connecticut families would have gotten, they have to
8  give 173,250 of it somehow to the Texas -- or to the
9  gift class?
10 A.  Yes.
11 Q.  And that would then bring the gift class up to
12 receiving 209,550?
13 A.  Yes.
14 Q.  And why do you have on the second column a dash
15 here under "distributable proceeds waiver"?
16     Why is that just a dash?
17 A.  Because there isn't a waiver if all of the
18 7 million notional consideration is in cash.
19 Q.  Okay.  And you used the $7 million number again
20 because you were saying that is what your estimation of
21 the actual winning bid was?
22 A.  Well, sort of.  That's what the joint bidders
23 said their bid was valued at, and this was testing to
24 see if that works.
25 Q.  Okay.  Now, let's go to the next chart on

1  page 15.
2      What is this chart and why is it different
3  than the one on the previous page?
4  A.  So this one is changing some assumptions to
5  make the backup bidder relatively more attractive.  And
6  it does that by increasing the administrative costs,
7  which reduces the amount of money that goes to creditors
8  which, therefore, reduces the amount that Connecticut
9  has to give away.  And then it changes the percentage of
10 the claims pool of Connecticut down to 75 percent which
11 also lowers the amount they have to give away.
12     And then I apply those -- in this chart,
13 it's better to start with the winning bid on the right
14 column.
15 Q.  Well, let's just do it the same way.
16     Backup bid, that's First United, right?
17 A.  Yeah.
18 Q.  3.5 million.  You've increased the
19 administrative costs to 750.
20     What is -- how do you account for the
21 additional hundred thousand dollars?
22 A.  It's an estimate.  It's not going to be exactly
23 650.  I thought 750 was on the higher end of a
24 reasonable range of what those might be.
25 Q.  So you just arbitrarily went from 650 on the

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

1   first chart to 750 on the next chart.  And why?
2       MR. WOLFSHOHL: Objection to form.
3       BY MR. BROOCKS:
4   Q.  Why did you do that?
5   A.  I increased it to see that even if expenses
6   were more than I expect, if they're on a higher end of a
7   range of potential outcomes, would Connecticut's bid
8   still really be better?
9   Q.  So just an arbitrary number you pulled out of
10  the sky, a hundred thousand?
11      MR. WOLFSHOHL: Objection to form.
12  A.  I wouldn't characterize it as arbitrary.
13      BY MR. BROOCKS:
14  Q.  How would you characterize it?
15  A.  I'd characterize it as a number I picked that I
16  thought was at the higher end of what a reasonable range
17  of administrative costs might be.
18  Q.  Who would the extra hundred thousand in your
19  reasonable range have gone to?
20  A.  I don't know.  Any of the categories of costs.
21  Q.  All right.  So then you've got Connecticut
22  families' share at 75 percent is 2 million 62 gift class
23  share -- why did you call it the gift class share?
24      Why did you call it that?
25  A.  I don't know who came up with that phrase.  I

---

1   mean, they're essentially receiving a gift from
2   Connecticut.  So it's descriptive, I guess.
3   Q.  Well, let me jump on that a minute.
4       In your understanding of the structure
5   you've got here, is the money that comes in being
6   distributed to the Connecticut plaintiffs and they are
7   gifting personally to the other claimants some money; or
8   is it never getting down to them?  Is it going directly
9   from you to them in your thinking?
10      MR. CICACK: Hey, somebody should put
11  their phone on mute.
12  A.  No.
13      MS. DRENGA: Object to form as well.
14  Sorry.
15  A.  My understanding is that the amount that this
16  waiver is proceeds Connecticut would get that they're
17  assigning to me to then be given to the gift class.
18      BY MR. BROOCKS:
19  Q.  So, again, I'm just trying to follow the flow
20  of funds.  So in your thinking as the deal you put
21  together and approved, the money is actually the
22  Connecticut plaintiffs'.  They are assigning it back to
23  you, step 1.  Is that right?
24  A.  Yes.
25  Q.  So they get a distribution, they assign it back

---

1   to you with an instruction that says, But we want you to
2   give it to the other group of creditors?
3       MR. WOLFSHOHL: Objection to form.
4       BY MR. BROOCKS:
5   Q.  Is that how it works?
6   A.  Yes.
7   Q.  Okay.  And you're calling the recipients of the
8   Connecticut plaintiffs instruction to you a gifted
9   class?
10  A.  Yeah.  It would be the class of allowed claims
11  that are not Connecticut claims, right.
12  Q.  But the term you used was gift.  That's what
13  I'm trying to focus on.
14  A.  That's the term that's on the page there, yes.
15  Q.  So the Connecticut plaintiffs, in essence, are
16  gifting to the Texas plaintiffs?
17      MR. WOLFSHOHL: Objection, form.
18      BY MR. BROOCKS:
19  Q.  Is that a fair way for the Court to understand
20  it?
21  A.  Yeah.  They're offering to give a portion of
22  their proceeds to another class.
23  Q.  Right.  Now, do you have any understanding about
24  the negotiations that took place between the Texas and
25  the Connecticut families, if any at all?

---

1       MS. DRENGA: Object to form.
2   A.  Well, with respect to this bid?
3       BY MR. BROOCKS:
4   Q.  Yeah.
5   A.  No, none at all.
6   Q.  Do you know if the Texas guys agreed to it?
7       MS. DRENGA: Objection to form.
8       BY MR. BROOCKS:
9   Q.  Do you know?
10  A.  I don't know.
11  Q.  You don't know whether they agreed to it or
12  not?
13      MS. DRENGA: Objection.
14  A.  No, I don't.
15      BY MR. BROOCKS:
16  Q.  Well, what if they say, No, we don't want it?
17  Does that mess up your plan?
18  A.  Well, they can file an objection if they would
19  like to.
20  Q.  Well, I'm just asking, does it mess up your
21  structure if Connecticut or -- I mean, if Texas
22  plaintiffs, which, I guess, are in the gift class, say,
23  Hang on, we don't want that?
24      Does that mess up your structure, cause it
25  to not work?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  A.  I'd have to think through it again.
2  Q.  Go ahead.  Think it through.
3  A.  I'm not sure it would because there are
4  creditors other than Texas who would benefit.  But if
5  the entire recipient class -- if everybody other than
6  Connecticut, you're saying, said they didn't want
7  this --
8  Q.  Well, Connecticut is going to be the one giving
9  the money away, right?
10  A.  Uh-huh.
11  Q.  So I'm saying the recipients of the gift, if
12  they say, I don't want it, does that mess up your
13  structure?
14  A.  I don't think so.
15  Q.  Okay.  But you hadn't thought about that until
16  just now, had you?
17  A.  Yeah.  I hadn't.
18  Q.  And you have no understanding one way or the
19  other whether or not there's any agreements that have
20  taken place between any of these creditors to accomplish
21  this structure, have you?
22  A.  Yeah.  I'm not aware of anything like that.
23  Q.  And you haven't asked?
24  A.  No.
25  Q.  How many other creditors are there in the gift

1  class -- strike that.  Let me start over.
2      How many creditors are there in the gift
3  class?
4  A.  I don't remember.
5  Q.  Give me a number, just your best judgment.
6  A.  I don't know.  Probably a couple dozen.
7  Q.  You haven't talked to any of them, have you?
8  A.  Ever?
9  Q.  I mean, about this structure, about the deal
10  here we're talking about.
11  A.  No.  I haven't talked to anybody about this
12  structure.
13  Q.  So what are the tax consequences of this
14  gifting from the Connecticut plaintiffs to the Texas --
15  to the gift class?
16      Is there income tax consequences?
17  A.  I don't know.
18  Q.  You haven't looked at that?
19  A.  No.
20  Q.  What about to the estate, are there income tax
21  consequences to the estate based on this distribution
22  that you're going to make and then the receiving back
23  from Connecticut and the gifting down?  Are there income
24  tax consequences of that?
25      Have you thought about that?

1  A.  I have thought about it.  I don't believe there
2  are.
3  Q.  And why do you believe there are not?
4  A.  Because it's not increasing the amount of cash
5  coming into the estate.  So it's not income from the
6  estate's perspective.
7  Q.  Have you researched it?
8  A.  No.
9  Q.  Have you asked any experts, accountants or
10  lawyers about the tax consequences?
11  A.  No.
12  Q.  How about the sales tax consequences?  Does
13  this gifting affect the sales tax consequences of the
14  sale in general?
15  A.  I don't know.
16  Q.  Hadn't thought about that, had you?
17  A.  No, I hadn't.
18  Q.  Okay.  Now, let's keep going here on the chart
19  on page 15.  Yeah, I guess, 15.
20      Now you increased the 650 to 750.  Which
21  column should we look at next?  You tell me.
22  A.  I'm not sure what you're asking.
23  Q.  I'm asking you to explain the chart on page 15.
24  We've just gone through the backup bid, and I'm asking
25  you now, which column would you like to address next?

1  A.  Well, so what we were discussing was the backup
2  bid shows you how much cash comes to the backup bidder.
3  I thought we had finished because we'd gotten over to
4  the third column and I was explaining how you get to the
5  173.
6  Q.  I'm sorry.  Maybe I missed.
7  A.  Oh, you switched to the other chart.
8  Q.  I turned the page on you.  That's 15.
9  A.  All right.
10  Q.  Remember we went up to 750 on the
11  administrative costs?
12  A.  Then I started looking at the paper and not the
13  screen.  Now I'm back with you.
14  Q.  Fair enough.  Which column should we go to
15  next, sir, on page 15?
16  A.  All right.  Well, what this shows is under
17  these revised assumptions how much cash the gift class
18  gets under the backup bid, 687,500.
19  Q.  Let me help you.  Start with the second column
20  that says "Winning Bid Cash Equivalent."  Okay.  Winning
21  bid cash equivalent.  Now, we saw on the previous page,
22  winning bid cash equivalent was 7 million, which is what
23  you said you thought the deal was that you took, right?
24  A.  Yes.
25  Q.  All right.  Now, you've got winning bid cash

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

14:44:55-14:46:07                                                    Page 161

1  equivalent 4,750,000.  How do you get a winning bid of
2  4,750,000 if you thought you had a $7 million winning
3  bid?
4  A.  This chart is showing what the maximum cash
5  equivalent winning bid would be given the cash available
6  to Connecticut under their bid.
7  Q.  Say that again.  I didn't follow you.  I'm
8  sorry.
9  A.  The first chart takes 7 million and says if it
10  were 7 million cash, what would the gift class get and
11  how much do you have to add to get to that number?
12  Q.  Well, I thought you said it was a winning bid
13  of 7 million.
14  A.  What?
15  Q.  You said it was the winning bid, 7 million,
16  didn't you?
17  A.  Yeah.
18  Q.  All right.  And you've got -- on the second
19  chart here on page 15 you call it the winning bid.  How
20  did you come up with a winning bid number of
21  4.75 million?
22  A.  That's the number of cash equivalent that you
23  get if you take all of Connecticut's actual cash and
24  gift it.
25  Q.  All of the cash from the 7 million?

---

14:46:09-14:47:36                                                    Page 162

1  A.  No, from the 1.75.
2  Q.  But if the winning bid is $7 million, why does
3  that number change to 4.75?  I'm just confused about
4  that.  Isn't the winning bid $7 million, as you just
5  said?
6  A.  Yes.
7  Q.  Why is it different on this second chart?
8  A.  It's the purchase cash equivalent number.
9  Q.  And how did you decrease it from 7 million to
10  4.75 million again?
11  A.  So I didn't.  I backed into this number.  I
12  started with the amount of cash from the winning bid,
13  1.75, under these revised assumptions, and saw how much
14  would the gift class get and how much would Connecticut
15  get.
16     And Connecticut gets 750,000.  The gift
17  class gets 250,000.  Now, assuming Connecticut gave all
18  of its money to the gift class, the gift class ends up
19  with a million bucks.  What would the purchase price
20  cash equivalent where they would get a million bucks is
21  the middle column, and that's only 4.75.
22     And what I'm trying to show is that even
23  though they said the bid is worth 7 million under a
24  variety of assumptions, it's actually not that great;
25  but it's still much greater than 3.5.

---

14:47:41-14:48:58                                                    Page 163

1  Q.  So let me just make sure I'm following you.  So
2  we're going to go to the right-hand chart, the winning
3  bid right-hand chart, 1,750,000.  Okay?
4     And you're going to say, Okay, of the
5  cash, 1.75, which is the actual amount of cash that the
6  joint bidders bid, right, 1.75?
7  A.  Yes.
8  Q.  If you divvy that out at 75/25 and the
9  Connecticut people get 750,000 and they give all of that
10  to the other creditors, other creditors now have a
11  million dollars, right?
12  A.  Yes.
13  Q.  And now we're over here.  Now, the other
14  creditor, what you're calling the gift class, now with a
15  million dollars, you're trying to say -- that's where
16  I'm a little bit losing you.
17     So now, with a million dollars, how do you
18  then get to 4.75 from the million?
19  A.  So if the gift class is getting a million under
20  these ratios, that means Connecticut is getting
21  3 million.  So you've got to be able to get to 4 million
22  proceeds for unsecureds, add back the admins, and then
23  you get to a 4.75 purchase price that would be necessary
24  to achieve it.
25  Q.  I see.  So you're saying that if the gift class

---

14:49:01-14:50:20                                                    Page 164

1  got a million dollars and if that was 25 percent of the
2  distributable cash available, then 75 percent would be
3  3 million, which is 4, and then with 750 in expenses,
4  that would mean a $4.75 million deal?
5  A.  Yes.
6  Q.  In what possible way is this relevant?
7  A.  It's relevant because it demonstrates that
8  there is sufficient cash component of the winning bid
9  such that the waiver is enough to defeat a bid of
10  3.5 million.  It's still superior.
11  Q.  Why did you do it this way?
12     I mean, you already knew that from the
13  7 million, didn't you?  You knew there was plenty of
14  cash.  Why did you have to do it this way, too?  I'm
15  just curious?
16  A.  This way is testing it sort of in reverse.
17  It's using different assumptions that are sort of at the
18  end of the range that would be the least favorable to
19  the winning bidder so that I could satisfy myself that
20  even if my assumptions are off, it actually still is
21  better than the backup bidder.
22  Q.  So you're saying assuming that the Connecticut
23  plaintiffs got only 75 percent, that would still be
24  enough money that they could give it up to you and you
25  could give it back down to the gift class and distribute

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  it out, assuming they'd take it, that they would have
2  gotten enough money such that it would have netted out
3  to a $4.75 million deal based on what this minority of
4  creditors got or would have gotten hypothetically?
5  **A.   Right.**
6  Q.   Now, you would agree with me, I think you said
7  it was -- their bid was a range, right?
8  **A.   Yeah.   That's a way to read part of the way**
9  **they described it.**
10 Q.   Now, if I understood you a minute ago, the
11 Connecticut plaintiffs were disputing with you your
12 belief that it was a $7 million -- their offer was
13 7 million.
14     Did I hear you correctly?
15     **MR. WOLFSHOHL:** Objection to form.
16     BY MR. BROOCKS:
17 Q.   Let me strike that and start over.
18     Did the Connecticut plaintiffs agree with
19 you that they bid $7 million?
20 **A.   I'm not sure how to answer that because I think**
21 **you're asking the same question that somebody objected**
22 **on privilege to.**
23 Q.   Well, let's be clear.  I think I can ask -- I
24 think I'm going to be able to ask about -- certainly I'm
25 building a predicate to this.  If somebody is going to

1  assert a privilege, then speak now.
2     But is it your understanding that they
3  disputed with you your interpretation of their offer?
4     **MR. WOLFSHOHL:** I object to the form based
5  on the characterization because I don't think that's
6  what was said.  I don't think it was said that they
7  disputed it.  I think what he said was he contacted them
8  and spoke to them about what his interpretation was.
9     That's how I heard the testimony.
10    BY MR. BROOCKS:
11 Q.   Is what Mr. Wolfshohl said right?
12 **A.   Yes.**
13 Q.   Okay.  So why did you contact them -- strike
14 that.
15    Did you contact them with your
16 understanding because you thought there might be a
17 disagreement?
18 **A.   No.**
19 Q.   Why did you contact them about it?
20 **A.   I didn't contact them about it.  It came up in**
21 **another context.**
22 Q.   What was the context of that?
23 **A.   I think it came up for the first time after we**
24 **circulated a draft of the sale motion.**
25 Q.   Elaborate.  What happened?

1  **A.   We drafted a sale motion and sent a draft of it**
2  **to the joint bidders.**
3  Q.   Saying 7 million?
4  **A.   Well, with this analysis that's laid out in the**
5  **motion and, yes, saying 7 million.**
6  Q.   And somebody called you back and said, Hey,
7  that's not the deal, we didn't give 7 million?
8  **A.   Now, that is the question he objected to**
9  **before.**
10    **MR. WOLFSHOHL:** Yeah, you can answer it.
11    **THE WITNESS:** Oh, I can answer?  Okay.
12    **MR. WOLFSHOHL:** Yeah.  We're not waiving
13 the common interest privilege.  The discussion over the
14 clarification can be discussed.
15    **THE WITNESS:** Okay.
16    BY MR. BROOCKS:
17 Q.   So who is it that you had the conversation
18 with?
19 **A.   There were several lawyers on the call.  I**
20 **think primarily it was Kyle Kimpler.**
21 Q.   Sorry?
22 **A.   It was Kyle Kimpler.**
23 Q.   And who does he represent?
24 **A.   He represents the Connecticut families.**
25 Q.   What did he say?

1  **A.   He said that he thought -- my understanding is**
2  **that he thought the waiver amount was really only a**
3  **hundred thousand more than what the cash equivalent**
4  **would have been under the First United bid.  And I told**
5  **him, No, I think it's based on the at least 7 million**
6  **number, which ended up being more money for the**
7  **creditors.**
8  Q.   So Mr. Kimpler, was he one of the architects of
9  the Connecticut offer to begin with?
10 **A.   I don't know.  I think so, but I don't know.**
11 Q.   And so -- well, help the Court understand about
12 the conversation.
13    Who said what and when?  How did it end?
14 I want the details on this.  What happened?
15 **A.   It was a pretty brief conversation.  I said, I**
16 **calculate the waiver amount based on a 7 million bid**
17 **because their bid form says no less than 7 million.**
18    **There's another part that says, you know,**
19 at least a hundred thousand more.  And that's less cash
20 under most scenarios.  So I can see why they would want
21 to pay less cash.
22    **I said, No, I disagree with that.  I**
23 accepted the bid as I interpreted it, which was with the
24 7 million.
25 Q.   Did they say, Oh, okay, you're right.  Did they

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

14:54:26-14:55:30                              Page 169

1  say that or, Let's think about it?  How did it end?
2  A.  I don't think it concluded on that call, but my
3  understanding is they've since agreed with our
4  interpretation.
5  Q.  No, no, no.  I'm not asking for your
6  understanding.  I want to be very specific.
7        So you had a phone conversation.  You've
8  talked about you say 7 million.  They say, No, that
9  wasn't what we intended.  And how did the conversation
10  conclude?
11  A.  I think we both stated our positions and then
12  talked about other things.
13  Q.  And so that would have been a conversation that
14  happened after this document, document No. 915, which
15  was filed on 11-18, so the conversation you're referring
16  to would have been precipitated by this filing here?  Is
17  that right?
18  A.  You mean came before it, yeah.
19  Q.  How soon before it?  This is on a Monday.
20  A.  I don't know.  Maybe a day or two, maybe the
21  same day.  But it was before we filed it.
22  Q.  And it was precipitated by what?  What
23  precipitated the discussion?
24  A.  I think they wanted to have a discussion about
25  the draft of the motion.

---

14:55:31-14:56:23                              Page 170

1  This motion here that became 915?
2  A.  Yes.
3  Q.  Okay.  Now, what happened next on that subject?
4  A.  On that call?
5  Q.  No.  On the subject of you're saying 7 million;
6  they're saying, No, it's a hundred thousand more than
7  First United -- what happened since?
8  A.  They've since agreed with my interpretation.
9  Q.  I don't want to read your digest version.  I
10  don't want you to accelerate to they've since agreed.
11  What happened next?
12        Did you talk to somebody?
13  A.  I didn't.
14  Q.  Who did?
15  A.  My counsel talked to their counsel.
16  Q.  When?
17  A.  I don't know.
18  Q.  When did you find out?
19  A.  At some point over the last several days.
20  Q.  Can you be more specific over the last several
21  days?
22  A.  No.
23  Q.  Because we're sitting here on December 5th.  So
24  when between November the 18th and December 5th did you
25  finally find out that they were not -- they were going

---

14:56:25-14:57:16                              Page 171

1  to accept your understanding?
2  A.  I cannot remember when that happened.
3  Q.  I mean, was it within the last week?
4  A.  I don't know.
5  Q.  It could have been?
6  A.  Sure.
7  Q.  But you had no more conversations with them
8  about it?
9  A.  Me personally, no.
10  Q.  Me personally as opposed to who?
11  A.  Well, me and the people who represent me.
12  Q.  Did anybody that represents you have any
13  conversation with them other than -- more than one
14  conversation with them?
15  A.  I think so, yes.
16  Q.  What was the back and forth as you understand
17  it that was going on between your side and the
18  Connecticut side on this subject?
19  A.  I think we were discussing whether my
20  interpretation or their interpretation was correct, but
21  I don't know any more specifics.  I wasn't on those
22  calls.
23  Q.  How many conversations did you have with
24  anybody on your team about that subject?
25  A.  Probably three or four.

---

14:57:19-14:58:15                              Page 172

1  Q.  Over a series of several days?
2  A.  Yeah.
3  Q.  So would it be fair to say that until you had
4  the final conversation, it could have been yesterday as
5  far as you know, you didn't really have a deal fixed
6  with them, did you?
7        MR. WOLFSHOHL:  Objection to form.
8  A.  Well, I disagree with that.
9        BY MR. BROOCKS:
10  Q.  You do?
11  A.  (Witness nods head affirmatively.)
12  Q.  You think there was a meeting of the minds even
13  though they say they didn't view it the same way you
14  did?  You still think there was a meeting of the minds?
15  A.  I mean, not on that point, no.
16  Q.  Purchase price is probably the most significant
17  part of any deal, isn't it?
18  A.  It's an important part of lots of deals.
19  Q.  And you didn't have an agreement on the
20  purchase price on November the 18th, did you?
21  A.  No.  We didn't have an agreement on exactly
22  what the waiver amount would be.
23  Q.  I want you to answer my question, sir.
24        Did you or did you not have an agreement
25  on the purchase price on November the 18th?  Yes or no?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

14:58:18-14:59:23                                     Page 173

1  **A.  We did.**
2  Q.  You did.  And what was that agreement?
3  **A.  There were two possibilities of how to**
4  **interpret it.  I was going to get at least one of them**
5  **and both of them were better than the alternative.**
6  Q.  Maybe I'm not asking my question clearly
7  enough.  So I'm going to try it one more time.
8      Did you or did you not have a meeting of
9  the minds with the Connecticut plaintiffs on what the
10  purchase price of these assets was going to be on
11  November 18th?  Not alternatives, what could have been,
12  what was better, was there a meeting of the minds
13  between the two groups on that date, November 18th?
14  **A.  Yes.**
15  Q.  And what was that meeting of the minds?  Tell
16  us what it was.
17  **A.  That I was going to get at least a hundred**
18  **thousand more for the other unsecured class.**
19  Q.  But that wasn't your reading of the deal
20  accepted.  You thought it was 7 million?
21  **A.  No.  But I knew they -- that they would at**
22  **least have to contribute that and I thought I --**
23  Q.  And you call that a meeting of the minds?
24  **A.  On that point, yeah.**
25  Q.  Okay.  Now, let's go to the chart that they

---

14:59:43-15:01:11                                     Page 174

1  have put in their bid, Exhibit 8.
2  **A.  I believe that's right.**
3  Q.  Let me try to put it up on the screen here.
4  Let's see here.
5      Now, this is the chart that -- Exhibit 8
6  that they put in their final bid to you which you
7  accepted.  True?
8  **A.  Yes.**
9  Q.  And, in fact, you filed the document with the
10  court.  This is on -- let's see here.  It's not dated on
11  this, but you filed a document with the court when you
12  got this, saying, We've reached a deal, November the
13  13th, I believe it was.  10:30 was your deadline, and
14  later that afternoon you filed something with the court
15  saying, We've reached a deal, correct?
16  **A.  No.  It was the next day, I think.**
17  Q.  I apologize.
18  **A.  And it was not saying we reached a deal.  It**
19  **was announcing who the winner of the auction was.**
20  Q.  But it was an announcement based on your
21  acceptance of their offer as we see here on Exhibit 8,
22  wasn't it?
23  **A.  Based on my determination that this bid was the**
24  **best bid.**
25  Q.  You were explaining to Mr. Cicack, and I didn't

---

15:01:13-15:02:14                                     Page 175

1  follow you, that this chart was wrong.
2      Why was it wrong?
3  **A.  It doesn't count for the administrative costs**
4  **that come off the top.**
5  Q.  So how would you fix it?
6  **A.  I did the other chart that's in our motion.**
7  Q.  Did you realize it was wrong when you first
8  read it?
9  **A.  Yes.**
10  Q.  Did you call them up and say, Hey, guys, this
11  is wrong?
12  **A.  No.**
13  Q.  Why?
14  **A.  Because I don't think the chart, this**
15  **illustrative chart, means anything in the context of the**
16  **bid.  I view this chart as being something that's trying**
17  **to convince me of how great their bid is.  I viewed it**
18  **skeptically.  I think their bid is good.  It's not as**
19  **good as this chart seems to think it is, but it's still**
20  **better than the alternative.**
21  Q.  Now, when you see the words here, that "offer
22  up to 7 million," what did you understand the phrase "up
23  to 7 million" to mean?
24  **A.  Exactly what it says.**
25  Q.  Well, tell me.  "Up to 7 million," in your

---

15:02:16-15:03:25                                     Page 176

1  parlance, it was 7 million?
2  **A.  Uh-huh.  No.  The phrase "up to 7 million" does**
3  **not mean 7 million.  It's up to 7 million.**
4  Q.  What does that mean to you -- or did it mean?
5  **A.  It means an amount up to 7 million.**
6  Q.  Well, how close up to 7 million did it go?
7  **A.  Up to 7 million is what it says and that's how**
8  **I read it.**
9  Q.  I guess my question is how did you interpret
10  "up to 7 million" to mean 7 million?
11  **A.  Ah.  In the context of the other information in**
12  **this bid, including the first page that says "not less**
13  **than 7 million."  There's reference to the 7 million**
14  **number a few different places.  I interpreted them**
15  **together to be 7 million.**
16  Q.  I see.  So when they say over here on the first
17  page "not less than 7 million" and then over here on the
18  second page they say "up to 7 million," you just thought
19  that was -- you kind of met them in the middle, up to
20  7 million and not less than 7 million.  We'll just take
21  7 million and you thought that was the deal.  Is that
22  right?
23      MR. WOLFSHOHL:  Objection to form.
24  **A.  I took this as a bid of 7 million.**
25      BY MR. BROOCKS:

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

15:03:26-15:04:30                                    Page 177

1 Q.  How did you reconcile and rationalize up to
2 7 million and not less than 7 million?  How did you
3 rationalize those as making sense on any level?
4     MR. WOLFSHOHL: Objection to form.
5 **A.  I interpreted the bid as a whole to be a bid**
6 **with a cash equivalent of 7 million, and that's the bid**
7 **that I announced that I accepted.**
8     BY MR. BROOCKS:
9 Q.  And what language did you look at in this that
10 you could point us to that enabled you to do that?
11 **A.  It's the whole thing.**
12 Q.  Just the gestalt of the whole document as a
13 whole, just kind of the look and feel of it?
14 **A.  Yeah.  I have to take it as a whole.  Some of**
15 **the sentences in here are a little contradictory.  Some**
16 **of them have nothing to do with the considerations that**
17 **I'm considering.  There's a chart that I don't agree**
18 **with what it's presenting.**
19 **    But I asked for highest and best bid.**
20 **They gave me these data points.  I interpreted it as a**
21 **$7 million bid and that we would have a waiver that**
22 **would be calculated keyed off of that.  And that's what**
23 **I accepted.**
24 Q.  Now, would it be fair to say you didn't have
25 any of these same questions on First United's bid?  That

---

15:04:33-15:05:52                                    Page 178

1 was pretty straightforward, wasn't it?  You understood
2 it perfectly?
3 **A.  No.  That one was much easier to analyze.**
4 Q.  And you didn't talk to anybody on the other
5 side, these joint bidders, about the confusion and the
6 confusing wording of their bid, did you?
7 **A.  No.**
8 Q.  You didn't authorize any of your team to have
9 those conversations, did you?
10 **A.  Well, I mean, at what time?  Prior to accepting**
11 **it?**
12 Q.  Yeah.
13 **A.  No, no.**
14 Q.  Now, so just looking again, continuing to look
15 at their Exhibit 8, now, we looked at -- when Mr. Cicack
16 was talking to you earlier about their first offer,
17 their initial bid, which I believe is Exhibit 3 --
18     MR. CICACK: 4.
19     THE WITNESS: Is it 3 or 4?
20     MR. CICACK: 4.
21     MR. BROOCKS: Yeah, okay.  Here we go.
22     THE WITNESS: Which one are we on?
23     MR. BROOCKS: Exhibit 4.
24     THE WITNESS: Okay.  Give me a second.  Of
25 course it's at the bottom of the stack.  All right.

---

15:05:55-15:08:12                                    Page 179

1     MR. BROOCKS: Give me a second while I
2 pull it up.
3     BY MR. BROOCKS:
4 Q.  This is 915, I guess, the same document we were
5 looking at.  This is the GT's original bid.  Okay?
6 Joint bidders, Global Tetrahedron, Onion.  This is their
7 initial bid.
8     Well, wait.  Maybe it's 5.  Yeah, the bid
9 letter.  I've got it as a portion of document No. 915.
10     Okay.  Now, I want to ask you and I want
11 you to take as much time as you need to.  But I want you
12 to look at the distributable proceeds waiver section of
13 their initial bid.  Okay?  And I want you to compare
14 that for us with the distributable waiver portion of the
15 final bid that is 915-17.
16     And I'm going to try to do this in a way
17 that -- let me see if I can do this, make it easy for us
18 all to see and follow you.
19     Okay.  You can see what I'm trying to do.
20 I want to look at the original --
21 **A.  I've got the hard copies here.**
22 Q.  Okay, perfect.  I want you to tell me where you
23 think those are -- confirm for us that they're the same,
24 in other words.
25 **A.  All right.  Let me take a look.**

---

15:08:46-15:10:21                                    Page 180

1 **    Are you wanting me to compare just that**
2 **paragraph?**
3 Q.  Well, the concept.  Distributable proceeds
4 waiver, other than the one dollar versus a hundred
5 thousand dollars, right, aren't they the same?  Is there
6 any difference?
7 **A.  That's what I'm trying to figure out.**
8 **    Okay.  So your question is are they the**
9 **same?**
10 Q.  Are they the same?  I think originally they
11 were going to top any other competing bid by one dollar,
12 and then in their final they say we're going to top it
13 by a hundred thousand dollars.  Other than that
14 difference, was there any other substantive difference
15 that you could see between the two?
16 **A.  No.  It doesn't look like it.**
17 Q.  Okay.  And you would have looked at that,
18 didn't you, because in the final version it says "as
19 defined in the initial bid," they're actually making
20 kind of an incorporation by reference, right?
21 **A.  Yes.**
22 Q.  So you understood that the waiver, if you will,
23 was identical in their initial bid to their final bid
24 except for the one dollar going up to a hundred thousand
25 dollars, right?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

15:10:24-15:11:22                                              Page 181

1  A.  Yes.
2       MR. WOLFSHOHL: Objection to form.
3       BY MR. BROOCKS:
4  Q.  Now, what did you think this meant when they
5  say "the distributable" -- I'm looking now in the final
6  version.  This will be Exhibit 915-7.
7       It says, "The distributable proceeds
8  waiver amount is revised under this final bid so that it
9  shall equal an amount necessary for the unsecured
10  creditors of FSS, including the Texas families, to
11  recover a hundred thousand more, an increase from the
12  one dollar"?
13      What did you think that meant?
14 A.  I think it meant that they were saying a
15 hundred thousand more than they would have gotten under
16 an alternative bid.
17 Q.  But that's not what you understood their deal
18 to be in total?  You thought it was 7 million, not a
19 hundred thousand more?
20 A.  Well, what they're saying here is it's not just
21 one dollar now; it's a hundred thousand dollars more
22 than it would have been under an alternative bid.  But
23 at the time they submit this they have no idea what the
24 other bids are, and they give this whole range, saying,
25 well, maybe if it's 2 or maybe if it's 7, this is how

---

15:11:25-15:12:08                                             Page 182

1  great it would be.
2       So I interpret them to say, I'll give you
3  a hundred thousand dollars more depending on what the
4  other one is, up to some ceiling.  And I say, Give me
5  your highest and best, and somebody says, Well, sure,
6  it's more than some number I don't know, I'm going to
7  take the top of that range.
8       And that's how I interpret this.
9  Q.  That's how you interpreted it?
10 A.  That's right.
11 Q.  But that's not what they said, is it?
12 A.  In that sentence that's not what they said, but
13 it is what they said on the first page, where they say
14 not less than 7 million.
15 Q.  Uh-huh.  And this was part of the discussion
16 that you had with them when you had that telephone call
17 sometime after the 18th, right?  And y'all are framing
18 your positions as to what they offered and what you
19 thought they offered?
20      MR. WOLFSHOHL: Objection to form.
21      BY MR. BROOCKS:
22 Q.  Is that fair?
23      MR. WOLFSHOHL: It misstates the
24 testimony.
25 A.  I thought the call was before then but yeah,

---

15:12:11-15:13:27                                             Page 183

1  the one call that we had talked about.
2       BY MR. BROOCKS:
3  Q.  And then there were several calls, I think you
4  testified, after that too, right?
5  A.  Yeah.  I think there were other calls with my
6  counsel but I don't know how many.
7  Q.  Did the Connecticut plaintiffs try to negotiate
8  with you guys to your understanding at all?
9  A.  No.
10 Q.  Okay.  Now, they just ultimately said, Okay,
11 Chris, we'll do it your way?
12 A.  I think they agreed with my interpretation.
13 Q.  Okay.  And then based on -- now I'm looking
14 again at 915-7.  Based on your interpretation, they put
15 a value of $7 million -- let me see if I can do this
16 better.
17      They put a $7 million valuation on their
18 offer, right?
19 A.  Yes.
20 Q.  Let me highlight this if I can.  Here we go.
21      And how did you understand they came up
22 with that?
23 A.  They essentially quadrupled the cash amount.
24 In their thinking, with the 75/25 split of the claims
25 pool, Connecticut has three times as much as the other

---

15:13:29-15:14:50                                             Page 184

1  unsecureds.  So they can effectively multiply by 4 the
2  effect of the cash purchase price.
3  Q.  Well, so how did they come up with 7 million?
4  A.  They took 1.75, assumed that they were going to
5  get three-quarters of it, assumed that they gifted that
6  to the other creditors, and then that is the equivalent
7  as if it had been 7 million cash.
8  Q.  Okay.  So if you go back to their initial
9  offer, which is 915-4 -- 915-5, I guess, what was the
10 face value of this offer with the same concepts if it's
11 a buck?
12 A.  I think they describe it in their letter.
13 Yeah.  It's the same multiple.  It's 4 million.
14 Q.  I'm sorry.  Say that again.
15 A.  They calculate it --
16 Q.  Let me strike.  I apologize for talking over
17 you.
18      The original bid, the initial bid they
19 submitted, which is 915-5, what was the grossed-up
20 amount for that initial bid?
21 A.  4.
22 Q.  4 million.  Where do you see that?
23 A.  So they describe it -- it's the same math
24 because it's a $1 million bid with a 4 multiplier.  But
25 if you look at page 4 of their initial bid, they sort of

---

1  describe their thinking.
2  Q.  And so based on this, you're extracting and
3  deriving a --
4  A.  It's there.
5  Q.  Where?
6  A.  The last paragraph there on your screen.
7  Q.  Tell me where to go.
8  A.  Full paragraph, "Through implementation of the
9  distributable proceeds waiver ... under a competing bid
10  for an amount up to 4 million and even higher amounts in
11  the event of a cash consideration."
12       So that's where they say the 4 million.
13  Q.  I see.  Okay.  And that's how you understood
14  it?
15  A.  I mean, I disagree that it's worth that much;
16  but that's how I understood they were presenting their
17  offer.
18  Q.  Okay.  Good.  Thank you.
19       Now, if I understood you correctly, you
20  know the Connecticut plaintiffs have a 1-point-something
21  billion dollar judgment against Mr. Jones in Connecticut
22  and that's under appeal?
23  A.  Yeah.  I think there's several different
24  judgments that add up to that amount.
25  Q.  Yeah.  And you know that irrespective of what

1  the Court of Appeals does, it can go to the Connecticut
2  Supreme Court and then the United States Supreme Court,
3  right?
4  A.  I don't know all the procedures available.  I
5  understand they're on appeal.
6  Q.  But you've never looked at any of the
7  underlying issues that are on appeal or are the subject
8  of that Connecticut case, have you?
9  A.  No.
10  Q.  And you don't have any way of reasonably
11  handicapping whether or not this thing will be sustained
12  by any court, do you?
13  A.  I disagree with that.
14  Q.  Tell us what your thought is.
15  A.  Well, claims are filed; and they're liquidated
16  judgments.  And those are prima facie correct amounts in
17  the bankruptcy case.  And in a year and a half of a
18  pretty contentious case nobody objected to them.
19  Q.  Well, Alex Jones has, you know that?
20  A.  He didn't object to the FSS claims.
21  Q.  Well, FSS aren't in bankruptcy, are they?
22  A.  Well, not anymore.
23  Q.  So why would someone object to a claim for an
24  entity that isn't in bankruptcy?
25  A.  Well, during the year and a half that the case

1  was pending before the conversion they could have.
2  Q.  Okay.  Could have.  But what's the relevance of
3  that point right now?  FSS is not in bankruptcy.
4  A.  Well, you said I had no analysis and I'm
5  telling you I looked at a case and saw a history that in
6  a very contentious case a year and a half went by, and
7  nobody raised the possibility that, oh, my goodness,
8  these judgments are subject to some really great
9  appellate argument.
10  Q.  Okay.  So you think because in your mind
11  somebody should have filed something on FSS and didn't,
12  that, therefore, the judgments are meritorious?  Is that
13  what you're thinking?
14       MR. WOLFSHOHL: Objection to form.
15  A.  No.  I think they're likely to be allowed
16  claims.
17       BY MR. BROOCKS:
18  Q.  Do you know anything about libel law?
19  A.  No.
20  Q.  Do you know anything about the constitutional
21  protection that's afforded to a media defendant, sir?
22  A.  Well, I shouldn't say no.  I'm not an expert in
23  it.  I have an understanding of what those claims are.
24  Q.  Have you ever read New York Times v. Sullivan?
25  Have you ever read that case?

1       MR. WOLFSHOHL: Objection to form.
2  A.  I read it in law school.  I don't know if I've
3  read it since.
4       BY MR. BROOCKS:
5  Q.  Have you ever read Gertz?  Have you read that
6  case?
7  A.  That sounds familiar.
8  Q.  Milkovich?
9  A.  I don't know.
10  Q.  You know that in United States Supreme Court
11  jurisprudence that -- strike that question.
12       You know Alex Jones is a media defendant,
13  isn't he?
14       MR. WOLFSHOHL: Objection to form.
15  A.  I don't know whether he is or not.
16       BY MR. BROOCKS:
17  Q.  Is that important?
18       MR. WOLFSHOHL: Objection to form.
19  A.  No, not for this.
20       BY MR. BROOCKS:
21  Q.  Not for this.  Not for the validity of the
22  judgments entered against him?
23       MR. WOLFSHOHL: Objection to form.
24  A.  It might be relevant to the validity of the
25  judgments but not from a consideration of the

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

15:18:26-15:19:22                                      Page 189

1  **information I have today which bid is better.  It's not**
2  **relevant to that.**
3      **BY MR. BROOCKS:**
4  Q.  Okay.  But the Connecticut plaintiffs are
5  foregoing a distribution from you based upon a
6  presumption that they're entitled to something, aren't
7  they?
8  **A.  Yes.**
9  Q.  And if it comes back that the United States
10  Supreme Court says or this Bankruptcy Court says that
11  the law wasn't followed, these are unwaivable Supreme
12  Court mandates that require, for example -- strike that.
13      Let me come at it a different way.
14      You know New York Times v. Sullivan says
15  that a media defendant cannot be found to have committed
16  libel unless the plaintiffs here, the Connecticut
17  family, prove by clear and convincing evidence malice.
18      You know that's the law, don't you?
19      **MR. WOLFSHOHL:** Objection to form.
20      **MR. PATERSON:** Objection to form.
21      **MR. WOLFSHOHL:** Calls for a legal
22  conclusion.
23      **BY MR. BROOCKS:**
24  Q.  You know that's the law, don't you?
25      **MR. PATERSON:** Objection, form.

---

15:19:59-15:20:59                                      Page 191

1  sir?
2      **MR. WOLFSHOHL:** Objection to form.
3  **A.  I don't think so.**
4      **BY MR. BROOCKS:**
5  Q.  Have you been effectively running FSS for how
6  long?
7      **MR. WOLFSHOHL:** Objection to form.
8      **BY MR. BROOCKS:**
9  Q.  Let me start over.
10      Have you been running FSS?
11  **A.  I don't know how to answer that.**
12  Q.  Why don't you try truthfully.
13  **A.  I have been put in control of the FSS assets.**
14  **Since my appointment, FSS has continued to run under**
15  **essentially the same management of Mr. Jones.**
16  Q.  Are you overseeing it?
17  **A.  Yes.**
18  Q.  Have you ever looked at Google Analytics with
19  respect to FSS?
20  **A.  No.**
21  Q.  Ever asked about it?
22  **A.  No.**
23  Q.  Do you know what it is?
24  **A.  No.**
25  Q.  Have you ever used it at all in any of your

---

15:19:23-15:19:57                                      Page 190

1  **A.  I don't know.  And I think I said I don't**
2  **really remember New York Times against Sullivan.  I**
3  **remember having read it.  I don't remember what it said**
4  **or what's in it.**
5      **BY MR. BROOCKS:**
6  Q.  I'm just kind of jogging neurons from your law
7  school days.  You don't really know?
8  **A.  I don't know the answer to your question.**
9  Q.  Do you know why this judge in Connecticut put
10  the death penalty sanction on Mr. Jones?  Do you know
11  why she did that?
12      **MR. WOLFSHOHL:** Objection to form.
13  **A.  My understanding is it was in response to**
14  **discovery abuses.**
15      **BY MR. BROOCKS:**
16  Q.  Is that all you know?
17  **A.  Yeah.**
18  Q.  That's not relevant to you at all to know the
19  three reasons that she gave on November 15th of 2021 why
20  she did what she did?
21      **MR. WOLFSHOHL:** Objection to form.
22      **BY MR. BROOCKS:**
23  Q.  Not relevant?
24  **A.  No.**
25  Q.  Have you ever used Google Analytics before,

---

15:21:01-15:22:04                                      Page 192

1  businesses?
2  **A.  No.**
3  Q.  I'm sorry.  Do you even know what it is?
4  **A.  Yeah, I have no idea what it is.**
5  Q.  Okay.  How many companies would you say you've
6  been a trustee of, where you've supervised kind of
7  the -- given oversight to the operations?
8  **A.  Probably a couple dozen.**
9  Q.  Okay.  But if this Connecticut judgment goes
10  away, then doesn't the consideration that they're
11  waiving go away, too?
12      **MR. WOLFSHOHL:** Objection to form.
13  **A.  It would depend which judgment went away and**
14  **why.**
15      **BY MR. BROOCKS:**
16  Q.  Let's say all the Connecticut judgments
17  away, that some court says that the law was not followed
18  and those judgments are invalid.  I'll give you an
19  example.
20      Judge Lopez in his opinion cites
21  intentional infliction of emotional distress, which
22  constitutes $560 million of the damages awarded to these
23  Connecticut plaintiffs.  You know that, right?
24      Does that sound familiar?
25  **A.  What was your question?**

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

15:22:06-15:22:49                                          Page 193

1  Q.  You know that the Connecticut plaintiffs got
2  over -- collectively 560 some-odd million dollars based
3  on intentional inflection of emotional distress.  You
4  know that, don't you?
5  A.  That sounds right.
6  Q.  And you know that the United States Supreme
7  Court has said that the grounds for intentional
8  infliction are the same for a media defendant as
9  New York Times v. Sullivan.
10     You know that, don't you?
11        MR. PATERSON: Object to form.
12        BY MR. BROOCKS:
13  Q.  Do you know that?
14  A.  I don't know that.
15  Q.  But you know that "knew or should have known"
16  negligence standard -- that's a negligence standard,
17  isn't it, "knew or should have known"?
18        MR. PATERSON: Object to form.  Calls for
19  legal conclusion.
20        BY MR. BROOCKS:
21  Q.  Are you a lawyer, sir?
22  A.  I was waiting for the objection.
23  Q.  He did.  I'm asking you a question.
24     Are you a lawyer?
25  A.  Yeah.

---

15:22:49-15:23:36                                          Page 194

1  Q.  Okay.  Do you ever make legal conclusions when
2  you do your business?
3        MR. WOLFSHOHL: Objection, form.
4        BY MR. BROOCKS:
5  Q.  Sometimes?
6  A.  Yes.
7  Q.  Okay.  Is "knew or should have known" the
8  language of negligence?
9        MR. WOLFSHOHL: Objection to form.
10        MR. PATERSON: Object to form.
11        BY MR. BROOCKS:
12  Q.  In your experience?
13  A.  I need some context there.  I don't know what
14  you're talking about.
15  Q.  Well, let's keep going.
16     If the judgment of the Connecticut
17  plaintiffs goes away because the wrong standards were
18  used, the Constitution's mandates were not followed,
19  doesn't that mean that the Connecticut plaintiffs'
20  waiver quote/unquote is worthless?
21     They're not waiving anything.  They don't
22  have anything to waive if it goes away, right?
23  A.  I want to be careful.  I agree with what you're
24  saying but I want to be precise.
25  Q.  Of course.

---

15:23:36-15:24:25                                          Page 195

1  A.  If the judgments goes away, that's one thing.
2  But for their waiver to not have value, they would have
3  to not have allowed claims.  I'm not sure that's exactly
4  the same thing.
5  Q.  Okay.  So your presumption is that they have --
6  their claims are allowed.  That's your assumption?
7  A.  Yes.
8  Q.  Let's assume they're not allowed.
9  A.  Okay.
10  Q.  But they've been objected to.  What would your
11  opinion be then?
12  A.  Well, an objection doesn't mean they're not
13  allowed.
14  Q.  It hasn't been determined yet, has it?
15  A.  Well, there is no objection to the FSS claims.
16  Q.  But there is no FSS in bankruptcy, right?
17     Let's focus on Alex.  If Alex Jones has
18  properly objected -- I'm just asking you
19  hypothetically -- he's objected to these claims, they're
20  not allowed, are they, as to him?
21        MR. WOLFSHOHL: Objection to form.
22  A.  I mean, without any other information, yes.  I
23  think that sounds right.
24        BY MR. BROOCKS:
25  Q.  Okay.  And if the Connecticut judgments go

---

15:24:29-15:25:31                                          Page 196

1  away, irrespective of what a court of appeals might do,
2  irrespective.  I'm talking about as it works its way
3  through the United States Supreme Court, doesn't that
4  mean -- and I think you agreed with me, but that doesn't
5  mean that the entirety of their quote/unquote waiver is
6  worthless?
7  A.  Yeah.  And just as I understand it, if the
8  Connecticut plaintiffs ultimately have no valid claims
9  against the FSS assets, then yeah, the waiver is
10  worthless because the waiver is based on the claims that
11  they would have received from the FSS assets.
12  Q.  And I'm going to come back to that in a moment.
13     But if the assets are sold to the
14  Connecticut plaintiffs in some joint venture with Onion,
15  they're being sold to the joint bidders, right?  That's
16  the Connecticut plaintiffs.
17     You furrowed your brow at me.
18     That's who the buyer, isn't it?
19  A.  I'm trying to understand your question.
20  Q.  Let me start over.  The joint bidders consist
21  of, you know, Global Tetrahedron and the Connecticut
22  plaintiffs collectively?
23  A.  Yes.
24  Q.  Okay.  If the Connecticut plaintiffs go away,
25  their judgment goes away, they got zero, the waiver is

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  worth nothing. You said that yourself, right?
2  **A. Right. If they don't have allowed claims with**
3  **respect to FSS assets, their waiver is not worth**
4  **anything because it's based on the proceeds from those**
5  **assets.**
6  Q. But this sale, if it's approved on Monday, will
7  have already gone through, right, and Mr. Jones will be
8  deprived of his assets as well as FSS's. Isn't that
9  right?
10 **A. I'm not sure Jones would be deprived of**
11 **anything. I don't understand your question.**
12 Q. So you're saying right now that nothing
13 belonging to Alex Jones is being sold on Monday?
14 Nothing?
15 **A. These are assets of FSS.**
16 Q. Nothing belonging to Alex Jones? There's
17 nothing in there that belongs to him?
18 **A. Well, by definition, I can't sell anything**
19 **that's not part of the bankruptcy asset.**
20 Q. But FSS itself is not in bankruptcy. You've
21 agreed with me on that, I think, right?
22 **A. No. The FSS assets are in the Chapter 7**
23 **bankruptcy case.**
24 Q. For Alex Jones?
25 **A. Yes.**

1  Q. Okay. But I'm going to come back to that, but
2  I'm tempted to dive into it. Let me just try to make
3  this point real quick, which is, if this transaction
4  goes through, it will be virtually impossible to undo it
5  even if the judgments go away, right?
6  **A. I don't know that one way or the other.**
7  Q. You don't have an opinion one way or the other?
8  **A. As I sit here right now, no, I don't know.**
9  Q. Well, let's talk about this thing about you say
10 the assets of FSS. You're the custodian of those
11 assets, right? What would you call yourself?
12 **A. I'm the trustee.**
13 Q. Okay. Now, do you do corporate law?
14 **A. Sometimes. What are you talking about?**
15 Q. Well, the Texas Business Organizations Code.
16 I'll be very precise about that.
17    Do you know anything about that?
18 **A. Some things.**
19 Q. You know that applies to limited liability
20 companies. You know that, don't you?
21 **MR. WOLFSHOHL: Objection to form.**
22 **A. A Texas LLC, I would think so.**
23 **BY MR. BROOCKS:**
24 Q. And FSS is a Texas LLC, isn't it?
25 **A. Yes.**

1  Q. Who's the manager of that LLC?
2  **A. I think the managing member is Alex Jones.**
3  Q. I didn't say managing member; I said manager.
4  **A. Oh, the manager? I think that might also be**
5  **Alex Jones.**
6  Q. You know there's a difference between a manager
7  and a member of an LLC, don't you?
8  **A. Yes.**
9  Q. What is the difference?
10 **A. I think the manager is just an office and the**
11 **managing member is somebody who also owns it.**
12 Q. Well, the managers -- I'll correct you. The
13 managers are just like the board of directors. It's
14 just the managers.
15 **A. Okay.**
16 Q. Then the members are like stockholders. Okay?
17 You can just accept that.
18    Now, have you seen any documentation that
19 would remove Alex Jones as the manager of FSS?
20 **A. No.**
21 Q. Have you seen any corporate documentation that
22 would -- or anything from the court -- let me strike
23 that.
24    Have you seen anything from this Court
25 that rationalizes why an LLC, the assets of an LLC would

1  be deemed to be the assets of the individual owner of
2  the -- the member of the LLC? Have you ever seen any
3  analysis as to how that works?
4  **MR. WOLFSHOHL: Objection, form.**
5  **A. Yes.**
6  **BY MR. BROOCKS:**
7  Q. What have you seen?
8  **A. I've seen analysis provided to me by my**
9  **counsel.**
10 Q. I said from the court.
11 **A. From the court, no.**
12 Q. So you've never seen anything that would, say,
13 for example, pierce the corporate veil or hold Alex
14 Jones and FSS as alter egos such that the assets of the
15 one become the other? You've never seen anything like
16 that from a court, have you?
17 **A. An analysis of it, no.**
18 Q. How is it then that you believe that the --
19 well, strike that.
20    Do you believe that the Texas Business
21 Organizations Code is irrelevant to what you're doing?
22 Do you believe that?
23 **A. No.**
24 Q. In fact, if the TBOC requires Alex Jones'
25 consent as the manager to a sale of substantially all of

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

| 15:29:09-15:29:59 | Page 201 |
|---|---|

1  FSS's assets you don't have that consent, do you?
2      MR. WOLFSHOHL: Objection to form.
3  A.  I don't know.
4      BY MR. BROOCKS:
5  Q.  You don't know whether you have his consent or
6  not?
7  A.  No.  I haven't asked.
8  Q.  Okay.  You don't have it then, do you?
9  A.  I mean, I'm pretty sure he doesn't want this
10  sale to happen because you're asking me these questions.
11  Q.  Right.  That's my point is that if the manager
12  of an LLC has to be consenting on a sale of -- strike
13  that.
14      Let me come at it a different way.
15      You would agree with me that the
16  transaction you're contemplating is a sale of
17  substantially all of the assets of FSS, wouldn't you?
18  A.  Yes.
19  Q.  Okay.  And you don't have the manager's consent
20  to that, do you?
21  A.  I don't have Alex Jones' consent.
22  Q.  Isn't he the manager?
23  A.  I think at one time he was.  I don't know if he
24  is now.
25  Q.  Who's the manager now?

| 15:30:02-15:30:53 | Page 202 |
|---|---|

1  A.  I don't know the answer to that question.
2  Q.  Who's the member now?
3  A.  I think you're asking me a question that I -- I
4  don't know how to answer that question.
5  Q.  Well, truthfully.  Just what do you think?
6  A.  Well, the truth is I don't know but you don't
7  seem satisfied with that.
8  Q.  Well, you didn't say you don't know.  You said,
9  I don't know how to answer it.
10  A.  Okay.  I don't know.
11  Q.  You're not the member, are you, sir?
12      MR. WOLFSHOHL: Objection, form.
13  A.  I think I might be.
14      BY MR. BROOCKS:
15  Q.  Who would know?
16  A.  I'm not sure it matters.  The process I'm doing
17  is based on the authority under the bankruptcy code and
18  Judge Lopez's order saying the assets of FSS are under
19  my control as trustee.
20  Q.  And I'm going to come to the question, to the
21  punch line here, in a minute, whether or not that's been
22  a fully informed order.  Because if you're not the
23  manager and you're not the member and at most you're an
24  assignee of a membership interest, I'm curious as to how
25  you think that the proper structure -- how this is

| 15:30:56-15:31:50 | Page 203 |
|---|---|

1  properly structured where all of the assets are being
2  sold when neither the members nor the managers have
3  approved it.  I'm just curious about that.
4      MR. WOLFSHOHL: Objection to form.
5      BY MR. BROOCKS:
6  Q.  Can you help me understand where the Texas
7  Business Organizations Code plays a role in these
8  processes at all?
9      MR. WOLFSHOHL: Objection to form.
10  A.  No.
11      BY MR. BROOCKS:
12  Q.  You just don't know?  You never thought about
13  it at all, have you?
14  A.  I've thought about it.  I don't know the
15  answer.
16  Q.  Okay.  Now, you said a minute ago when
17  Mr. Cicack was talking to you about it, he called you --
18  or you talked to him during this process and you said --
19  you assured him, I think you said, that there would be
20  no credit bids from the Connecticut plaintiffs.  They
21  would not be allowed to credit bid their judgment, if
22  you will, in the purchase.  And you said yes, I believe
23  I said that.
24      I think I heard you.  Tell me if I'm
25  wrong.

| 15:31:51-15:33:07 | Page 204 |
|---|---|

1  A.  Yeah.  I think I said something like that early
2  on.
3  Q.  Okay.  Now, what is the difference between a
4  credit bid in your -- strike that.
5      What is a credit bid as you use that term?
6  A.  I understand a credit bid to be a right that a
7  secured creditor has to bid the value of their
8  collateral in lieu of cash on an asset.
9  Q.  So, in other words, to give a claim or to give
10  up a portion of their claim in bidding on assets?
11  A.  Yeah.  Their claim on the collateral itself,
12  right.
13  Q.  And how is that different than what is
14  happening here?
15  A.  Well, here the Connecticut families are not
16  secured creditors.  They don't have a claim on the
17  assets of FSS other than their claim in the bankruptcy.
18  So they're not credit bidding on the assets being sold
19  in that sense.  They're not using the value of the
20  assets for their bid.
21      What they're doing is using the value of
22  the cash they would get from this process and giving
23  that to other creditors.
24  Q.  And you knew -- when Mr. Cicack asked you that
25  question, you knew what he was trying to get to, didn't

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  you?
2      MR. WOLFSHOHL: Objection to form.
3  A.  I'm not sure I did.
4      BY MR. BROOCKS:
5  Q.  What did you think?  What did you think he was
6  trying to get to?
7  A.  I thought he was asking if I expected there to
8  be credit bidding and I didn't because there are no
9  secured creditors.
10 Q.  But you knew what they were going to do because
11 you had already gotten the joint bidders' initial bid,
12 hadn't you?
13     MR. WOLFSHOHL: Objection to form.
14 A.  No.  That's not true.
15     MR. WOLFSHOHL: Mischaracterizing the
16 testimony.
17     BY MR. BROOCKS:
18 Q.  Excuse me.  This conversation happened before
19 the credit bid came in, the first one -- I'm sorry.
20 Strike that.  Start over.
21     Happened before the joint bidders' first
22 bid came in?
23 A.  Long before, yes.
24 Q.  Long before.  Now, and when you saw the joint
25 bid come in, saw what they were doing using some of the

1  Connecticut creditors' judgment, you didn't feel the
2  need to call Mr. Cicack and explain to him, Hey, let me
3  just clarify what actually their bid is looking like?
4  You didn't feel the need to do that, did you?
5  A.  No.
6  Q.  Now, you talked about several times not
7  disclosing what one bidder is doing to other bidders
8  because you wanted to ensure top dollar.  I was struck
9  by that comment.
10     You didn't disclose to one bidder what
11 others were doing because you wanted to create a
12 tension, I think was -- one time you used that phrase.
13     Do you recall telling us about that a
14 minute ago?
15 A.  Yes.
16 Q.  Tell me about that.  What do you mean by that?
17 A.  The purpose of doing a sealed bid last and best
18 like we did is you want to capture the possibility that
19 one bidder wants something much more than another bidder
20 does, and you realize more value than you would in a
21 back and forth incremental increase.
22     That's more complicated when there's
23 different lots and different subsets of assets, and it's
24 more complicated when there's different types of
25 consideration.  So the less each bidder knows about how

1  many other bidders there are, what kind of consideration
2  they're offering, and what kind of lots they're bidding
3  on the better, because that incentivizes each bidder to
4  really offer as much as they're able to.
5  Q.  And it keeps one of the bidders from saying,
6  well, hell, if bidder A is -- I'm bidder B.  If bidder A
7  is coming up with $500,000, I'm going to incrementally
8  increase that just a little bit more.  That's what
9  you're trying to avoid.
10     You want the best offer, not just some
11 incremental increase is what I think I'm hearing you
12 say?
13 A.  Yes.
14 Q.  Okay.  And you felt like your structure
15 accomplished that?
16 A.  Yeah.
17 Q.  Now, tell me again why you decided to go --
18 strike that.
19     You would agree with me that your original
20 filings in this case told the judge you wanted to have a
21 live outcry auction, right?
22 A.  No.
23 Q.  You didn't agree to that.  You don't agree to
24 that?
25 A.  No.

1  Q.  I don't have a hard copy of this, I don't
2  think.  This is doc No. 839, authorizing the wind-down.
3      Isn't this the motion you filed in August
4  that started the process that culminated?
5  A.  Yes.
6  Q.  Okay.  Let's see here if I can -- I didn't mark
7  it.
8  A.  I think you passed what you were going for.
9  Q.  Do you see it?
10 A.  Uh-huh.
11 Q.  Tell me where I missed it.
12 A.  A little bit up.
13 Q.  Oh, you're right.  There you go.
14     So now I'm looking at page 3.  I've got it
15 in green here.  I'm going to start right here.  It says,
16 "The IP assets to be auctioned do not include the
17 individual or personal intellectual property of Alex
18 Jones that may be owned by him or the estate.  The sale
19 of the IP assets would include a customary, qualifying
20 and sealed bid, followed by an online open-cry auction
21 of qualified bidders."
22     Isn't that what you were telling the
23 judge?
24 A.  That's what that sentence says.
25 Q.  I'm sorry.  Maybe I misspoke.

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1    My question to you I had at the outset
2    was -- I said, You would agree with me that your
3    original filings in this case told the judge you wanted
4    to have a live open-cry auction, and you said no?
5    **A.   That's right.**
6    Q.   That's not what this is, open-cry auction of
7    qualified bidders?
8    **A.   That's what those words say in one sentence of**
9    **the preliminary statement, that is not what the motion**
10   **says.**
11   Q.   Oh, I see.  "The sale of the IP assets would
12   include a customary qualifying and sealed bid round,
13   followed by an online open-cry auction of qualified
14   bidders" does not mean open-cry auction?
15   **A.   I mean the rest of the motion talks about how**
16   **the follow-on open-cry auction is optional and that I**
17   **have discretion to change the procedures.**
18   Q.   I'm not going to do it right this second.  So
19   if I did a word search, I would find the word "optional"
20   in here?
21   **A.   I don't know.**
22   Q.   Okay.  But how did you -- you will agree with
23   me that at least when you wrote this motion in August
24   that you were contemplating primarily an open-cry
25   auction structure?

1    **A.   Oh, yes.  That was in mind.  That was something**
2    **we were contemplating.**
3    Q.   And that was the structure you were going to
4    employ until you changed it?
5    **A.   No.  That was -- well, it was a possibility**
6    **that I declined to pursue but sure.**
7    Q.   I'm not trying to be clever about this.  I
8    thought you had said and I thought this document
9    confirmed it that you intended it to be an open-cry
10   auction, and you claim you had the right to change it
11   and you did.  Not that it stayed mushy throughout.  You
12   intended it to be an open-cry auction and then you
13   ultimately decided to go a different way.
14       I thought that's what you were trying to
15   say.
16   **A.   Well, what I'm trying to say is yes, we**
17   **anticipated it might be an open-cry auction.  And**
18   **depending on how things had gone, that might have been**
19   **the best way to do it.**
20       **I don't think I guaranteed or promised**
21   **that that's what was going to happen.**
22   Q.   I'm not asking -- I'm not supplying those
23   words.  You're putting those words into my question that
24   I didn't put in there because I'm trying to come to the
25   point, and I'll just come right to it.

1    When did you change from the auction to
2    the sealed best offer and why?  When and why did you
3    make that change?  That's where I was going.
4    **A.   So leaving aside my disagreement with your**
5    **characterization, I decided not to do a live auction**
6    **sometime after receiving the initial bids and before**
7    **announcing that I wasn't going to do it.  But the**
8    **decision was made then.  It was after we got the initial**
9    **bids.**
10   Q.   And why?  Why did you make that decision?
11   **A.   Because of the nature of the bids.**
12   Q.   Explain that to us.  I want to hear the
13   details.  What do you mean?
14   **A.   It was two different things.  It was the two**
15   **bidders were bidding on slightly different assets and**
16   **valuing them differently, and one of the bidders was**
17   **proposing a form of compensation that was different from**
18   **the purchase cash price.  That made apples-to-apples**
19   **bidding impractical.**
20   Q.   Were there any other reasons besides those two
21   that you decided to go to the sealed best offer bid
22   versus the open-cry auction?
23   **A.   I mean, the format was also recommended to do**
24   **that by the auctioneer.  But my understanding of his**
25   **reasons were the same as the two I just gave.**

1    Q.   So, again, is there any other reasons you can
2    give us for why you decided to go to the sealed bid
3    versus the open-cry auction other than those two
4    reasons?
5    **A.   Not thinking of any.**
6    Q.   Huh?
7    **A.   I'm not remembering any, no.**
8    Q.   And I think your testimony was the first time
9    that you even heard -- suspected, dreamed, whatever --
10   that there was going to be some sort of a waiver by the
11   Connecticut plaintiffs was when you received their
12   initial bid?
13   **A.   No.  I mean, I imagined they might possibly do**
14   **something in that vein.  But no, before I saw this**
15   **distributable proceeds waiver in this mechanism was the**
16   **first time was when they submitted their bid.**
17   Q.   Explain that to me.  What did you think that
18   they might do?
19   **A.   I don't know.**
20   Q.   You just said -- you just said, "I imagined
21   they might possibly do something in that vein."
22       What did you mean by that?  What did you
23   imagine they might do?
24   **A.   I didn't know a specific thing that they would**
25   **do.  I said I thought they might try to use their claim**

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

15:42:54-15:43:49                                    Page 213

1  in some way to make a bid, and I didn't know what that
2  was going to look like until I saw this.
3  Q.  How would they use the claim to make a bid?
4  A.  I just said I don't know.
5  Q.  I'm just reading your words.
6      "I imagined they might try to do something
7  in that vein."
8      Give me the possibilities of what you
9  thought they might do.  I'm just trying to understand
10 the universe of possibilities.
11 A.  I didn't have specific ideas in mind for what
12 they might do.
13 Q.  You can't give me anything specific?
14 A.  Well, you asked me what I thought and no.
15 Q.  And you never had any conversations with them
16 at all before the initial bid about what they were
17 thinking, directly or indirectly?
18 A.  Oh, I had many conversations with them about
19 what they were thinking.  About a bid?
20 Q.  Yeah.
21 A.  No.
22 Q.  And after the bid came in -- and when I say
23 you, I mean you or your representatives, too.  I'm not
24 just talking about you, Chris Murray -- did you have
25 conversations, you or your representatives, with these

---

15:43:52-15:45:04                                    Page 214

1  Connecticut plaintiffs or Tetrahedron after their
2  initial bid came in about the structure of this waiver?
3  A.  I don't know everything that all my
4  representatives said.  I did not have any discussion
5  with them about this.
6  Q.  Do you have any reason to believe your
7  representatives, any of them -- lawyers, auctioneers,
8  anybody -- had conversations with the Connecticut
9  plaintiffs or Tetrahedron about this waiver concept or
10 their bid?
11 A.  So I imagine Jeff Tanenbaum had discussions.  I
12 think he had discussions with both bidders about the
13 next round of bidding, answering questions about it.  So
14 I know we had encouraged.
15     I don't know if he also said this; but we
16 encouraged in the procedures that, If you've got a
17 formula or contingency, please make it more specific so
18 I can evaluate it.  That might have also been conveyed
19 by him, but you can ask him about that.
20     And First United American has asked
21 several times, Are we going to get another chance to
22 bid?  Are we going to get another chance?  No.  No,
23 you're not.  It's last and best.
24 Q.  I'm trying to ask a much more specific
25 question.  And you said, I imagine Tanenbaum did this.

---

15:45:07-15:46:00                                    Page 215

1  I want to know what you believe.
2      Do you believe that Tanenbaum or any of
3  your representatives had conversations with the joint
4  bidders about this waiver structure that they were
5  proposing?
6  A.  About this waiver structure, no, I don't know.
7  Q.  You don't have any clue one way or the other?
8  A.  I do have a clue but you said you only want to
9  know what I know for sure; so I'm telling you I don't
10 know.
11 Q.  Well, let me rephrase.
12     What is your reason to believe that
13 Tanenbaum or any of your representatives spoke to
14 these people about this waiver?
15 A.  Because when we were deciding how to proceed
16 with the auction, we had problems with -- not problems
17 with, but it's difficult -- and I think these hours of
18 back and forth are showing this -- it's difficult to
19 analyze their waiver and exactly what it's worth.  It's
20 hard to pin it down.
21     So we talked about how are we going to get
22 them in the next round --
23 Q.  We?
24 A.  My team.
25 Q.  Okay.

---

15:46:00-15:46:57                                    Page 216

1  A.  How are we going to get them, the joint
2  bidders, to give us something that's easier to analyze
3  and better for creditors.
4      So then part of that was the last and
5  best.  Part of it was the bid procedures that said,
6  Please be specific in dollar amounts.  We really wanted
7  to encourage that.  We didn't get it.  Didn't get all
8  that we wanted but that's what we were encouraging.
9      And I also know, because you're asking me
10 what do I know, that Jeff Tanenbaum had discussions with
11 both bidders in between the rounds about how to submit
12 their bids and what was going to happen.  And I don't
13 know what those discussions were.  So that's --
14 Q.  But do you know he had them?
15 A.  Yes.
16 Q.  Because he reported back to you he had them?
17 A.  Yeah.
18 Q.  What did he tell you?
19 A.  That he had those discussions.  But I don't
20 know what was in them.  I don't remember anything even
21 more specific than that.
22 Q.  But he told you that he'd had discussions with
23 the joint bidders about their waiver structure and how
24 they --
25 A.  Not about the waiver structure, about the bids.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

15:46:59-15:47:50                                              Page 217

1  Q.  Let me -- again, waiver structure.
2  Conversations that anybody on your team had about the
3  waiver.
4  A.  Oh, I have no idea.  I don't know.
5  Q.  Nothing comes to your mind one --
6  A.  Specific to the waiver --
7       THE REPORTER: Let him -- please, the
8  question first.
9       BY MR. BROOCKS:
10  Q.  Nothing comes to your mind about anything that
11  your team would have reported back to you about
12  conversations they had with any of the joint bidders
13  about their waiver structure?
14  A.  I'm not aware of any discussions with the joint
15  bidders about the waiver structure.
16  Q.  Now, if the Court comes back and decides that
17  the bid of the joint bidders is noncompliant with these
18  instructions, would you agree with me that First United
19  is the winning bid?  You're not going to have another
20  contest are you, in other words?
21       MR. WOLFSHOHL: Objection, form.
22       BY MR. BROOCKS:
23  Q.  Go ahead.
24  A.  I don't know.
25  Q.  What's your opinion?

---

15:47:54-15:49:34                                              Page 218

1  A.  It would depend on what the Court rules and why
2  and what guidance or orders we get.
3  Q.  So you don't have an opinion as you sit here
4  right now that if the joint bidders' bid is not accepted
5  by the Court -- you don't have an opinion as to whether
6  you would go with a backup bid versus start over?
7  A.  I think it's definitely possible that if for
8  whatever reason I can't close with the joint bidder,
9  that I would close with a backup bidder.  That's what
10  the process is supposed to be.
11  Q.  Okay.  Isn't that what the process is supposed
12  to entail?
13  A.  Yeah.  The process anticipates a backup bidder.
14  If I didn't think I would ever close with a backup
15  bidder, I wouldn't designate them as a backup bidder.
16  Q.  Now, you got in your car and drove from Houston
17  to Austin on the day that -- on, I guess, that Friday
18  after you submitted the notice of the bid, notice of
19  acceptance of the joint bidders' bid?
20  A.  I don't know which day of the week it was.  I
21  think it was the 14th, a Thursday or Friday.
22  Q.  Why did you come up there to Austin?
23  A.  I went to Austin because I wanted to meet with
24  Alex Jones and I wanted to meet with the FSS staff to
25  tell them who I selected as the winning bidder so that

---

15:49:40-15:50:57                                              Page 219

1  they could hear it from me and ask me questions before
2  they saw it on the news or heard it from somebody else.
3       I wanted to talk to the employees in
4  particular to reassure them that this didn't mean they
5  were all immediately fired, that I was going to continue
6  to pay them, there was going to be a transition period
7  and that I was going to pay them through the end of the
8  year.
9       And I wanted them to have that assurance
10  because I'd been in the unfortunate position of shutting
11  down companies on short notice many times, and I feel
12  like I owe it to employees, if I can, to give them some
13  lead time, some assurance, do what I can to help them
14  out because they're not -- it's not their fault what's
15  going on.
16       I also wanted to talk to Alex Jones
17  because his representatives had told me and I had heard
18  him say on his show that, If we lose the auction, I've
19  got another studio ready to go.  I fully expected him to
20  say, All right, I'm going to go.  I'm going to take my
21  guys and go to the other studio.
22       I thought that's what was going to happen.
23  So what I wanted to do was negotiate in person with him
24  how to make that transition happen, say, When do you
25  want to leave?  How do you want to do this?  What are

---

15:51:00-15:52:03                                              Page 220

1  you taking?  Because it's -- I wanted that to be as
2  smooth as possible and not as disruptive to employees
3  and everybody else.  That's why I went to Austin.
4  Q.  What representatives are you talking about?
5  A.  Bob Schleizer and Vickie Driver.
6  Q.  What did they tell you exactly?
7  A.  At what point?
8  Q.  You just said his representative told you about
9  Alex Jones going to be able to --
10  A.  Oh, oh, oh ...
11  Q.  What did they tell you?
12  A.  No, that was earlier.  I had asked -- I said --
13  I don't remember exactly when, but I had said in a
14  meeting with Bob -- I said, Does Alex Jones know that he
15  might lose this auction and, if so, is there any -- what
16  is he going to do?
17       And I think I also asked if he knew if
18  there was any -- I'm trying to remember exactly what I
19  said.  I said, But does he have an alternative plan, is
20  what I was essentially asking.
21       And he said, Yes, he knows he might lose
22  and he has a backup plan.
23  Q.  Did you fire any employees that day?
24  A.  No.
25  Q.  Why would someone think that you did?  Can you

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

1  help me figure out why?
2      What might have been said or done in your
3  conduct that might have been perceived as a termination
4  notice to employees?
5  A.  I don't know.  And that's a question I'm going
6  to have for you one day.  I do not know why anybody
7  would think I did that or why they would tell a court
8  that I did that.
9  Q.  Did you pull the plug on any of Alex Jones'
10 broadcasts that day?
11 A.  No.  What I did was I temporarily disconnected
12 the feed from two of the websites.  But the broadcast
13 never stopped.
14 Q.  Why did you temporarily disconnect the feed?
15 A.  I disconnected the feed because it was one of
16 several things we were doing that morning to put a pause
17 in place so that we could start some sort of transition
18 or some orderly process in light of who the winning
19 bidder was.
20 Q.  So what specifically did you do on this feed
21 thing?
22 A.  The feed thing?
23 Q.  You say you disconnected, "I disconnected the
24 feed because it was one of the several things we were
25 doing that morning to put a pause in place."

---

1  A.  Yes.
2  Q.  What did you do to physically disconnect the
3  feed?
4  A.  Oh, I didn't physically do anything.  I, in the
5  room with Bob, asked one of the employees to disconnect
6  the feed from those two websites.
7  Q.  And the feed showing what?
8  A.  There's just a constant broadcast feed on
9  Infowars.
10 Q.  Showing programming?
11 A.  Yes.
12 Q.  Why did you want to disconnect the feed right
13 then?
14 A.  Because I didn't want any -- I wanted to take a
15 break from broadcasting so that I could talk with Alex
16 Jones and work out some sort of transition and discuss
17 what we were going to do next.
18 Q.  So did you disconnect the feed before or after
19 you talked to Alex Jones?
20 A.  I never talked to Alex Jones.  He refused to
21 talk to me.
22 Q.  So you just disconnected the feed?
23 A.  I did that.  I also took the Infowars stores.
24 I stopped doing new orders temporarily.
25 Q.  Why?

---

1  A.  Well, a lot of reasons for that.  There's
2  inventory control, there's issues with the credit card
3  processor.  And I -- you have people buying products on
4  a website, and if they find out that somebody they don't
5  like has now bought their website, I didn't want a wave
6  of canceled orders coming in, which would have cost us
7  way more than the profit on those products.
8  Q.  So you just stopped taking orders?
9  A.  Yeah.  I paused taking orders.
10 Q.  You say paused.  That verb you use, "paused,"
11 you said that a couple of times.
12     What's the difference between stopping and
13 pausing?
14 A.  Well, stopping implies for all time, I think,
15 and pausing implies that I intend to resume.  And that's
16 what I did.
17 Q.  So when you disconnected the feed for Alex
18 Jones' shows, you intended to resume it?
19 A.  Absolutely.
20 Q.  With Alex?
21 A.  So two possibilities here.  I fully expected
22 him to continue doing his show on some other platform
23 because that's what I had been led to believe he was
24 planning on doing.  I have no intention of stopping him
25 speaking or doing a show, whatever.  That's not what I

---

1  care about.
2      So I thought his show was going to
3  continue or resume somewhere else.  I also thought it
4  was possible it would continue or resume on that very
5  platform because I had not closed with the joint
6  bidders.  The joint bidders had said -- they had
7  indicated that they intended to buy the assets and
8  create some sort of site or something making fun of Alex
9  Jones or making light of him using the Infowars
10 platform.
11     And in that scenario the broadcast,
12 whatever, would resume under that management and with
13 that goal.
14 Q.  Just under a ridiculing, harassing kind of a --
15 basically harassment of Alex Jones?
16 A.  I don't know exactly what they wanted to do,
17 but I knew they wanted to use the assets.  So whatever
18 it is, it was going to resume or they couldn't close or
19 something went wrong or the judge rejects the bid, as
20 you're hoping, and then I'll close with First United
21 American and they will want to resume with Alex Jones
22 doing exactly the same show that's on there now.
23     So I did mean pause.  It was a pause to
24 try to figure out the next steps, but it was going to
25 resume one way or the other.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  Q.  Did you actually resume programming for Alex?
2  A.  Well, the programming never stopped, but I did
3    reconnect the two websites.
4  Q.  When did you do that?
5  A.  The next morning, I think.
6  Q.  Why?
7  A.  Because it was now -- based on the hearing with
8    the Court, there was some concern about the auction; and
9    we would need to have a hearing on it.  I felt like that
10   was probably going to take a little bit more time.  And
11   I wanted to restore the status quo with respect to
12   operations because the company is profitable.
13 Q.  Not as profitable as it was before you cut them
14   off, right?
15 A.  Sales are lower.
16 Q.  Paused.  I guess I should use your word.
17     They're not as profitable as they were
18   before you paused their sales, were they?
19 A.  Yeah, yeah.  They're not.
20 Q.  If the Connecticut bidders -- back to this
21   waiver thing -- if that structure goes through, how much
22   credit does Alex Jones get for these judgments that are
23   against him if your deal goes through with the joint
24   bidders?
25 A.  I don't know.

1  Q.  What do you think?
2  A.  I don't know.
3  Q.  Well, take a guess.  You're the trustee.  Give
4    me your best judgment.
5      Doesn't he get the benefit of the sale
6    proceeds applied against his judgment?
7  A.  I guess I don't know what you're asking because
8    I don't think he's a creditor in the case.
9  Q.  Let me rephrase.  You're auctioning off assets,
10   right?
11 A.  Yes.
12 Q.  And the proceeds will be used to pay creditors?
13 A.  Yes.
14 Q.  How much credit will Alex Jones get on the
15   Connecticut judgment if your deal goes through with
16   them?
17 A.  Well, where I'm confused, the Connecticut
18   creditors will get paid from these auction proceeds
19   based on their claims against FSS.
20 Q.  Okay.
21 A.  So I'm not understanding your question about
22   whether Jones would get credit.
23 Q.  Let me rephrase.
24     Your $7 million deal goes through to the
25   joint bidders, right?  Assuming hypothetically.

1  A.  Okay.
2  Q.  Okay.  Does Alex Jones get any kind of credit
3    on his judgments for that sale?
4  A.  I don't know.
5  Q.  What do you think?
6  A.  I think he would get some sort of credit
7    because you can't get double satisfaction on a claim.
8    And I think you said they were jointly and severally
9    liable.
10 Q.  So if your $7 million deal goes through, just
11   like you fantasized or dreamed of it or whatever -- let
12   me rephrase.  I don't want to be derogatory here.
13     Your $7 million deal goes through as you
14   planned and hoped in the joint bid, what is your best
15   estimate as to how much credit Alex Jones would get on
16   the judgments against him?
17 A.  I do not know how to estimate that.  I don't
18   know what that is.
19 Q.  Well, you've talked about the Connecticut
20   plaintiffs giving up a portion of their judgment and
21   giving it to Texas.
22     Does it go to the Texas guys or does
23   Connecticut get debited because of what they would have
24   gotten but they gifted it over?  Give me your best
25   judgment on that.

1  A.  Oh, I see what you're asking.
2  Q.  What did you think I was asking?
3  A.  I wasn't sure.
4  Q.  You can feel free to ask me to clarify.  But
5    you see what I'm asking now, right?
6  A.  No.  What are you asking?
7  Q.  Okay.  Let me try it again.
8      There is an auction that's going to take
9    place or has taken place.  If it goes through, the
10   $7 million as you have intended it to do, won't Alex
11   Jones get some benefit or credit on the judgments that
12   are outstanding against him from this auction proceeds?
13 A.  I would imagine he would get some sort of
14   credit, but I don't know what it is or how much.
15 Q.  Who would decide?
16 A.  I don't know that either.
17 Q.  Would you assume that if the Connecticut
18   plaintiffs forwent some gifted portion, would Alex
19   nevertheless get the benefit of a deduction for what
20   they forwent; or would it only be what the Connecticut
21   plaintiffs actually got?
22 A.  Yeah.  So the way I would think of it is --
23   because this is some hypothetical other proceeding --
24 Q.  Sure.
25 A.  -- if somebody got value on account of a claim

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

16:01:10-16:02:14                                    Page 229

1  and somebody was entitled to credit for it, yeah, they'd
2  probably get that credit because they decided to gift
3  that credit to somebody else, I wouldn't think would
4  change that credit. But that's just me speculating
5  on -- I mean, I don't really know.
6  Q.  Now, you told the bidders -- and turns out
7  there were two, that they could not use ranges; they had
8  to use actual dollar amounts, right? They could not use
9  ranges. They had to use cash, right?
10 A.  I think I said U.S. dollars, not a range, yeah.
11 Q.  Were you trying to make the cash bidders
12 believe that they should not submit a bid with any kind
13 of formulas or contingencies at all? Was that your
14 goal?
15 A.  I was trying to discourage that, yes.
16 Q.  Not forbid it, but discourage it?
17 A.  Well, I'm going to consider value, even if it's
18 not exactly the way I want it. But obviously it's
19 easier to compare U.S. dollars in fixed amounts. That's
20 easy.
21 Q.  So what you were really trying to say was,
22 We'll consider it if you do contingencies and ranges and
23 all that. We really don't like it, but we will consider
24 it. Nothing -- you weren't intending to communicate an
25 ironclad "thou shalt not" kind of thing?

---

16:02:19-16:03:21                                    Page 230

1  A.  Well, no. We had the rules. We wanted fixed
2  amounts in dollars. But if somebody makes a
3  nonconforming bid, I'm going to consider it.
4  Q.  At what point do you disqualify them, say, You
5  made a nonconforming bid?
6  A.  It would depend.
7  Q.  On what?
8  A.  Well, it would depend on whether the creditors
9  would be better off accepting the nonconforming bid. We
10 got a nonconforming bid from First United American in
11 the first round, and it caused us to change exactly what
12 assets were being sold because it was better.
13 Q.  How was there a nonconforming bid?
14 A.  They added assets that were not in the original
15 asset group.
16 Q.  The consideration was not nonconforming; it's
17 just they were asking for things that weren't in the
18 group for sale. Is that what you're saying?
19 A.  Well, yeah. Then they allocated some
20 consideration to the nonconforming part, so I'm not sure
21 what you mean. But no, they did a fixed dollar amount
22 but they included assets that were not part of the
23 initial form. And, of course, I considered that.
24 Q.  Now, look at the asset purchase agreement.
25 That's, I believe -- I'm going to take it back to 915.

---

16:03:33-16:17:12                                    Page 231

1  I don't know what exhibit number that was.
2  MR. BROOCKS: Do you remember? 915-1, the
3  first half? Let's take a quick, two minutes off the
4  record.
5  THE VIDEOGRAPHER: The time is 4:03. We
6  are off the record.
7  (Recess taken)
8  THE VIDEOGRAPHER: The time is 4:15, and
9  we are back on the record.
10 BY MR. BROOCKS:
11 Q.  Now, in terms of you going to Austin and
12 meeting with the employees and all that, were you
13 worried that they were going to steal stuff?
14 A.  Not specifically. As in steal computers and
15 leave with them? No.
16 Q.  What were you worried they were going to do?
17 A.  I was worried they might try to delete
18 historical content or otherwise make it difficult to
19 take control of the intellectual property assets.
20 Q.  So what did you do to ensure that didn't
21 happen?
22 A.  Well, one of the things was I engaged an IT
23 expert who began the process of imaging hard drives and
24 things like that.
25 Q.  And who was the IT expert?

---

16:17:14-16:18:12                                    Page 232

1  A.  A guy named Pat Newton.
2  Q.  Who does he work with?
3  A.  I think it's called N&N Forensics or IT -- I
4  can't remember the name of his firm.
5  Q.  And when did you engage Pat to do that?
6  A.  A couple months ago.
7  Q.  Was it at the same time you're up there in
8  Austin?
9  A.  Oh, he had been engaged before then.
10 Q.  Had he begun mirroring hard drives?
11 A.  Yes. He had begun that process earlier.
12 Q.  Now, if attorney/client-privileged
13 communications are on those hard drives, you're not
14 intending to give those to the purchaser or The Onion,
15 are you, or the joint bidders?
16 A.  No.
17 Q.  How are we going to ensure that that doesn't
18 happen? Will you give us an opportunity -- strike that.
19 Let me start over.
20     You haven't given images of any of the
21 computer systems to any of the joint bidders, have you?
22 A.  No.
23 Q.  Have you given them to anybody?
24 A.  No.
25 Q.  Would you allow Alex Jones and his team to

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

16:18:14-16:19:22                                      Page 233

1  peruse those hard drives to make sure there's nothing of
2  a confidential or sensitive nature on there before they
3  go out?
4  **A.  Yeah. I'm sure we could work something out on**
5  **that.**
6  Q.  Okay. But, again, when we had the emergency
7  hearing that precipitated Mr. Wolfshohl's filing of the
8  emergency motion, I thought he had told the judge that
9  y'all were concerned the employees were going to be
10  walking out with things when they found out who bought
11  it. Did I misunderstand?
12  **A.  I'm not sure exactly what he was referring to.**
13  **I mean, there was concerns about the security of the**
14  **assets; but I didn't have the image of somebody, you**
15  **know, taking a TV off the wall and leaving with it.**
16  Q.  But you were concerned about deletions of
17  information from the systems?
18  **A.  Yes. I was concerned about that.**
19  Q.  And your protection of that -- against that is
20  to have the hard drives imaged?
21  **A.  That's part of it, yes.**
22  Q.  I guess what I'm trying to do is had that begun
23  at the time that you're up there in Austin?
24  **A.  Yeah. That had begun before.**
25  Q.  So, again, your testimony is that you did not

---

16:19:25-16:20:37                                      Page 234

1  fire anybody?
2  **A.  I didn't fire anybody, no.**
3  Q.  Now, have you engaged in any -- I'm going to
4  strike that. Let me start over. I hate the term
5  "intellectual property." It is a meaningless term. It
6  is a meaningless term. It can be anything from a trade
7  secret to a trademark to a copyright to a service mark
8  to a trade -- it can just encompass the waterfront. Do
9  you agree with that?
10  **A.  I don't agree it's a meaningless term. I agree**
11  **it can be amorphous.**
12  Q.  Let's use your term, an amorphous term. Do you
13  have any understanding about what joint rights a
14  generator of copyright material may have, for example,
15  of a broadcast? Do you have any understanding of that
16  at all?
17  **A.  No, not much.**
18  Q.  Well, what is your understanding?
19  **A.  I think it's possible for two people to have**
20  **rights in the same mark -- I mean, in the same**
21  **copyrighted material or someone might have an implied**
22  **license to use it; but I don't really understand the ins**
23  **and outs of that.**
24  Q.  Has anybody analyzed that from a standpoint of
25  what you're selling?

---

16:20:40-16:21:36                                      Page 235

1  **A.  Yes.**
2  Q.  Who?
3  **A.  Counsel.**
4  Q.  Who? Josh?
5  **A.  I'm not sure specifically who.**
6  Q.  Who do you think?
7  **A.  Well, I don't know because you're asking about**
8  **kind of a broad thing like who analyzed the things**
9  **you're selling. Maybe we could talk about something**
10  **specific.**
11  Q.  Part of what you're selling is programming.
12  You're selling past programs, aren't you?
13  **A.  I'm selling the historical, yeah.**
14  Q.  If that historical work product has been
15  generated by, you know, more than one copyright, you
16  know, people that contributed and collaborated on it,
17  don't they all have an interest in the copyright from
18  your understanding?
19  **A.  Whatever rights they have they have.**
20  Q.  So you're not trying to figure out who has what
21  co-rights, co-ownership rights in terms of getting that
22  sorted out before the sale occurs, are you?
23  **A.  On the FSS assets, no.**
24  Q.  Even though others probably do have
25  co-ownership rights, you agree?

---

16:21:37-16:22:19                                      Page 236

1        MR. WOLFSHOHL: Objection, form.
2  **A.  I don't know about probably or not.**
3        BY MR. BROOCKS:
4  Q.  You don't know what the adverb is. I thought
5  you just agreed with me that you do have joint ownership
6  if you have collaborated in the creation of a copyright
7  of a work.
8        MR. WOLFSHOHL: Objection, form.
9        BY MR. BROOCKS:
10  Q.  Right? That's your understanding?
11  **A.  I don't think I said that. I think I said --**
12  Q.  Let's start over. Let's start over.
13        Okay. Do you agree with me that if more
14  than one person collaborates to create a copyrightable
15  work, there can be joint ownership of that copyrightable
16  work?
17  **A.  I don't know the answer to that.**
18  Q.  Don't have a clue one way or the other?
19  **A.  I don't know.**
20  Q.  If I'm correct that you can enjoin owners,
21  could that create a problem from a sales standpoint
22  here?
23        MR. WOLFSHOHL: Objection, form.
24  **A.  No.**
25        BY MR. BROOCKS:

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

16:22:19-16:23:13                                    Page 237

1  Q.  Why?
2  A.  Because what I'm selling is whatever the estate
3  owns, as is/where is.
4  Q.  You're representing title, aren't you?
5  A.  Yeah, to what I'm selling.
6  Q.  So how can you say you have title if you don't,
7  if it's jointly owned with other people?  How can you
8  represent that?
9      MR. WOLFSHOHL:  Objection to form.
10  A.  I'm not sure I understand your question.
11      BY MR. BROOCKS:
12  Q.  Okay.  If two people jointly own a product,
13  okay, then one person doesn't own it; two people do,
14  right?
15  A.  As far as it goes, yeah, that sounds right.
16  Q.  And so you as the seller can't sell a piece of
17  property or a product or a copyrighted work or a program
18  that is jointly owned by you and someone else, can you?
19      MR. WOLFSHOHL:  Objection to form.
20  A.  I don't know the answer to that.
21      BY MR. BROOCKS:
22  Q.  What do you think?
23  A.  I'm not going to guess.
24  Q.  How many programs are you selling?
25  A.  What do you mean "programs"?

---

16:23:15-16:24:24                                    Page 238

1  Q.  Well, you're selling a library of previous
2  shows, aren't you?
3  A.  Yes.
4  Q.  Who has the copyright on those?
5  A.  I don't know.  It would depend on the show.
6  Q.  Okay.  Who do you think possibly does?
7  A.  I don't know.
8  Q.  But it's possible that Alex Jones, for example,
9  may have copyrightable interests in some of these
10  programs, right?
11  A.  I don't know what rights he has.
12  Q.  You haven't even looked?
13  A.  I don't know what rights he has.
14  Q.  Don't you think it ought to be sorted out what
15  he does and doesn't own from a copyright standpoint on
16  programming?
17  A.  I don't know how to answer that question.
18  Q.  Truthfully.  Just give me your best judgment.
19  Don't you think it ought to be sorted out who owns this
20  thing?  Is it jointly owned?  Is it owned by Alex and
21  more than one person?  I mean, does FSS even have an
22  interest at all?
23      Don't you think those kinds of issues
24  ought to be sorted out before a sale takes place?
25  A.  I'm selling what the estate owns.  If people

---

16:24:25-16:25:23                                    Page 239

1  have disputes about that, there's forms for addressing
2  it.
3  Q.  But didn't you tell the judge you weren't going
4  to be selling anything that belonged to Alex Jones?
5  A.  We're not selling any assets of the Alex Jones
6  individual estate; and we're not selling his individual
7  IP, as I understand it.
8  Q.  Wouldn't a joint copyright interest in a
9  previous show constitute Alex Jones' IP?
10  A.  Yeah.  I'm not understanding what you're
11  asserting, and that's why I don't know how to answer the
12  question.
13  Q.  Okay.  Well, now, we talked about fiduciary.
14  To whom do you believe you owe a fiduciary duty, sir?
15  A.  The estate and its creditors.
16  Q.  Which?  Is it to both?
17  A.  Both.
18  Q.  Okay.  Now, let's take creditors.  Well, tell
19  me.  When you say to "the estate and its creditors,"
20  what do you mean?  Can you be more specific?
21  A.  No.  I mean the estate and its creditors.
22  Q.  Is that the creditors as a group versus one
23  particular creditor?
24  A.  Yeah.  It's the creditors as a group.
25  Q.  Okay.  So whether they benefit the Connecticut

---

16:25:26-16:26:27                                    Page 240

1  plaintiffs or the Texas plaintiffs is not the issue;
2  it's the creditors as a theoretical body?
3  A.  Right.  I don't think I have a duty to any
4  particular creditor except as in their capacity as a
5  member of the creditor group.
6  Q.  Now, you had said earlier that you'd gotten
7  some phone calls from Moshenberg -- I think I'm
8  pronouncing the name correctly.  I don't know.
9  Moshenberg.  Does that sound right?
10  A.  Moshenberg.  And it's Cicack while we're at it.
11      MR. CICACK:  That's okay.  I've been
12  called a lot worse.
13      MR. BROOCKS:  Tell me I didn't
14  mispronounce your name.
15      MR. CICACK:  Yeah.  It's okay.
16      BY MR. BROOCKS:
17  Q.  What's his name again, the gentleman I'm
18  talking about?
19  A.  Moshenberg.
20  Q.  Mr. Moshenberg.  You were talking about him
21  calling you about a veto over sales.
22      MS. DRENGA:  Objection to form.
23      BY MR. BROOCKS:
24  Q.  Do you remember that?
25  A.  Yeah.  We had discussed, yeah, that -- yes,

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

16:26:31-16:27:20                                    Page 241

1  yes.
2  Q.  Okay.  About when did that conversation happen
3  in relation to, you know, bids?  Give me a time.  Give
4  me an orientation here.
5  A.  Oh, before the bidding.
6  Q.  Before the initial bid came in?
7  A.  (Witness nods head affirmatively.)
8  Q.  Was it only one conversation?
9  A.  I don't remember.
10  Q.  Could have been more?
11  A.  I talk to him a lot on lots of cases.  So I
12  don't know how many times this came up.
13  Q.  Well, you talk to him about lots of cases.  You
14  mean other than this Alex Jones case?
15  A.  Yes.
16  Q.  So you have other cases he's involved in?
17  A.  Yes.
18  Q.  Okay.  Well, I want to focus on this veto over
19  sales conversation.  How many conversations would you
20  say you've had with anybody on the Connecticut or Texas
21  plaintiffs' side about them wanting a veto of sales?
22      MS. DRENGA: Objection to form.
23  A.  So veto to sales?
24      BY MR. BROOCKS:
25  Q.  Yeah, them wanting a veto right over your

16:27:23-16:28:43                                    Page 242

1  sales, who you sold --
2  A.  Oh, yeah.  I thought he described it as -- or I
3  think of it as a veto over who the buyer could be.
4  Q.  Okay.
5  A.  Or excluding certain people from the auction.
6  And that concept has been requested or come up probably
7  a dozen different times in different calls and meetings
8  and exchanges.
9  Q.  Give us a sense for -- I want to be as specific
10  as you can about what that demand was or request,
11  however you want to frame it.
12  A.  Yeah.  I'm trying to be as specific as I can
13  because it came up in different ways, but the gist was a
14  request that we do a process so that certain parties
15  would not be able to acquire certain assets.  That's
16  what I understand.
17  Q.  What parties?  Did anybody get named?
18  A.  The families.
19  Q.  No, I'm sorry.  That the families didn't want
20  purchasing the assets.
21  A.  Not excluding specific purchasers but just more
22  of a concept of they want to be able to approve of who
23  buys it.  That was the request.
24  Q.  And what was the basis for, if one was
25  articulated, for why that would be something they could

16:28:46-16:29:46                                    Page 243

1  dictate to you?
2      MS. DRENGA: Objection, form.
3  A.  Well, I don't think they did have a good basis
4  for that.
5      BY MR. BROOCKS:
6  Q.  Did they articulate one, though?
7  A.  At different times there were versions of,
8  Well, if we hold all the claims, why can't we decide
9  what happens?
10      And my response was, You actually don't
11  hold all the claims and also I'm refusing to exclude
12  anyone from the auction.
13  Q.  Did the fiduciary duty you owe to creditors
14  enter into your thinking when you're having these
15  conversations?
16  A.  Yes.
17  Q.  Would you agree with me that it created some
18  sort of a tension in your thinking?  I mean, Gosh,
19  creditors are asking to whom I owe duties or asking me
20  for this approval right.  Did that create any kind of
21  tension or conflict in your thinking?
22  A.  Not a conflict.  Maybe some tension just
23  because a large percentage of the creditors were asking
24  for something.  But it's what I said earlier.  I owe a
25  duty to creditors and the estate as a whole, not to what

16:29:50-16:31:04                                    Page 244

1  any particular group would prefer.
2  Q.  Uh-huh.  Okay.  And did you have a common
3  retort that you would use?
4  A.  Yeah.  I was consistent.  I was not going to
5  exclude anyone from the auction.  I wasn't going to give
6  anyone a veto.
7  Q.  Now, you say that you saw a partial agreement
8  or an agreement of some sort that people sent you
9  embodying this.  Did I hear you correctly to say that?
10      MS. DRENGA: Objection to form.
11  A.  Yeah.  I've seen different versions of a term
12  sheet.
13      BY MR. BROOCKS:
14  Q.  That says what?
15  A.  Primarily it sets out how the Connecticut and
16  Texas families would share in different types of
17  proceeds and then includes a provision that it's
18  contingent on the buyer being a buyer that is acceptable
19  to those groups.
20  Q.  Now, could we have a copy of that?  Is it one
21  document or more than one?
22  A.  It's different versions of a term sheet.  I
23  don't know how many versions there are.
24      MR. BROOCKS: Josh, could we get that?
25      MR. WOLFSHOHL: We don't have any issue

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1   with giving it. I mean, we didn't create the document.
2   We've never done anything to it. We've just seen it.
3       MR. BROOCKS: Can we get a copy?
4       MR. WOLFSHOHL: I don't have a problem
5   with it. Understand it's not my document. If somebody
6   tries to file something to try to prevent that, I don't
7   know if they will, but it's -- you know, I have copies
8   of it. We never --
9       MR. BROOCKS: Well, if we haven't seen
10  some filing by tomorrow morning, like I might want to
11  show it to the -- we've already talked about it. So I
12  can't imagine what the objection would be using the best
13  evidence of it.
14      BY MR. BROOCKS:
15  Q.  What is your best recollection of the proviso
16  that contained the right of approval?
17      MS. DRENGA: Objection, form.
18  A.  I mean, just what I've said.
19      BY MR. BROOCKS:
20  Q.  Say it again.
21  A.  **That the deal proposed in the term sheet is**
22  **contingent upon the purchaser being acceptable to the**
23  **parties, the family parties.**
24  Q.  So is it a term sheet that would apply in this
25  context to the bid here?

1   A.  **Yes. It's talking about the sale of the FSS**
2   **assets is how I understood it. It's a term sheet to**
3   **resolve Connecticut/Texas disputes over who should get**
4   **which percentage of the proceeds, and part of that was**
5   **that deal wouldn't -- was contingent on the outcome of**
6   **this auction and sale process being to a buyer of their**
7   **liking.**
8       MR. BROOCKS: Well, we would sure like to
9   see that.
10      BY MR. BROOCKS:
11  Q.  Now, let me ask you to turn your attention back
12  to this alternative purchase agreement. You know what
13  I'm talking about? I don't have the precise exhibit
14  number here.
15  A.  Yeah.
16  Q.  It's attached as Exhibit 1 to your 915 filing.
17  And I'm going to ask you about -- go to the red page 22,
18  if you will.
19  A.  **Is it in your book?**
20  Q.  It should be in the 915 book, page 22.
21  A.  **915 dash what, though?**
22  Q.  1.
23  A.  **I've got it, yeah.**
24  Q.  Now, I'm sorry. Let me start at a more basic
25  spot. I'll come back to that in a second.

1       Let me go to the section on consideration
2   of purchase price. I apologize. Let me just thumb to
3   it there. Look on page 7. Just start there under
4   section 1.3, which is consideration for the purchased
5   assets.
6   A.  Okay.
7   Q.  Read that to us. I'm tired of hearing myself
8   talk.
9   A.  **"The aggregate purchase price shall be**
10  **$1,750,000 in cash plus the distributable proceeds**
11  **waiver (the purchase price)."**
12  Q.  Stop right there. That's what I want to focus
13  on.
14      So it's 1.75 million in cash plus the
15  distributable proceeds waiver?
16  A.  **Yes.**
17  Q.  Now, have you guys agreed -- strike that.
18      Is that supposed to be a dollar figure,
19  reducible to a dollar figure, this distributable
20  proceeds waiver?
21  A.  **Yes. At some time in the future the dollar**
22  **amount will be known.**
23  Q.  And you don't know what it is right now?
24  A.  **No.**
25  Q.  What do you think it is?

1   A.  **It's the estimates that I had in --**
2   Q.  Give me a number.
3   A.  **Probably -- can I refer to --**
4   Q.  You can refer to anything you want to refer to.
5   Just tell me what you think that number is.
6   A.  **I mean, it could be in a range, but I'm trying**
7   **to find the -- where is this? Somewhere around 200,000.**
8   Q.  $200,000?
9   A.  **That's the distributable proceeds amount, the**
10  **waiver amount, yeah.**
11  Q.  Where did you get that from?
12  A.  **Well, that's what I had on this spreadsheet we**
13  **were discussing earlier.**
14  Q.  Show me which one, which exhibit number is
15  that?
16  A.  **This one's not marked. Is it 14? I think it's**
17  **16. Do you have a copy of it?**
18  Q.  I don't know that I've got --
19  A.  **Here. You can take mine. I've got two of**
20  **them.**
21  Q.  And you're referring to this?
22  A.  **I referred to the wrong cell.**
23  Q.  What's the Bates number on the document you're
24  referring to?
25  A.  **TRANZON893.**

16:37:22-16:40:18                                    Page 249

1  Q.  It's the last page of my book here from the
2  Tranzon production.  Okay.  That is going to be what you
3  were talking with Mr. Walter about as Exhibit 16.
4       And so what you believe to be the
5  distributable proceeds waiver number, tell me where that
6  number is on this document.
7  A.  So bottom right.
8  Q.  Let me just pull this up real quick.
9       THE REPORTER:  Can we go off the record
10  for a moment, please.
11      THE VIDEOGRAPHER:  Going off the record at
12  4:37 p.m.
13      (Recess taken)
14      THE VIDEOGRAPHER:  The time is 4:39 p.m.
15  We are back on the record.
16      BY MR. BROOCKS:
17  Q.  Now we're looking at Exhibit 16, which is
18  TRANZON893.  And tell us where you think the
19  distributable proceeds waiver that the APA
20  contemplates -- tell us where it is and where to find it
21  on this.
22  A.  So there's two examples of it on this exhibit
23  because it ultimately is going to depend on the
24  percentage of the claims pool that Connecticut is and
25  the administrative claims amount.

16:40:19-16:42:31                                    Page 250

1       But in the top of the chart in that
2  example, the most that it could be would be -- it would
3  be 650.
4  Q.  Now, when you say the top of the chart, is what
5  you're referring to -- I'm going to do this real
6  quick -- is it this top portion here?
7  A.  Yeah.
8  Q.  So what I've got in blue?
9  A.  Right.  Then if you look at the bottom
10  right-hand corner -- well, there's the line.
11  Distributable proceeds waiver there is 650.
12  Q.  Okay.  So I'm going to do that real quick.  Let
13  me just circle that.
14      So you're saying that in -- I did a
15  rectangle.
16      So what you're talking about then would
17  be -- work with me baby -- that 650 right there on that
18  line?
19  A.  Yes.
20  Q.  Okay.  And that's determined by -- that's based
21  on a winning bid of $4,350,000?
22  A.  No.  That's based on -- wait.  Let me let you
23  ask your question so I know what I'm answering.
24  Q.  Well, that $650,000 that you're directing our
25  attention to that I've spent great pains to try to draw

16:42:36-16:44:13                                    Page 251

1  a circle, or indicate, is based on a winning bid of
2  4 million 300-something thousand dollars, isn't it?
3  A.  Right.  Using that cash equivalency analysis we
4  did before, yeah.
5  Q.  So that would be right here.  That's the
6  4 million I'm talking about.  You'd agree with me on
7  that?
8  A.  Right.  If that were the cash amount, it tells
9  you how much the gift class would have gotten with those
10  assumptions, 900; and then the 650 is what Connecticut
11  would have to kick in so that the gift class would be as
12  good off under the winning bid as they would have been
13  under that 4.35.  And in that case it's 650.
14  Q.  Well, let me ask you this.  If your contract
15  says -- but you're sure that -- well, before I get to
16  that, give me the -- you say you're going to give me
17  another possibility?
18  A.  Uh-huh.
19  Q.  What's the other possibility?
20  A.  The same line on the chart below, the 173.
21  Q.  Uh-huh.  Let me mark that.
22  A.  And the difference there is just the
23  assumptions.
24  Q.  Okay.  So 173 will go right there.  Let me
25  close that out.

16:44:13-16:45:27                                    Page 252

1       So have I marked those correctly?  So the
2  possibilities are either -- let me break this down --
3  650 or 173?
4  A.  Yeah.  Those are two possibilities.
5  Q.  Well, how many of them are there?
6  A.  Oh, as many as -- it depends on what the
7  ultimate percentage is and what the administrative --
8  Q.  What do you mean, the ultimate percentage?
9  A.  The percentage of the claims pool that
10  Connecticut represents because that will determine how
11  much they can contribute.
12  Q.  What are the ranges of possible claims pools
13  we're talking about?
14  A.  Reasonably probably between 80 and 95.
15  Q.  Not 75?
16  A.  75 would be, I think, an unlikely outcome.
17  Q.  Well, I'm just trying to get something that the
18  Court and all of us can understand.
19      When you say in your APA that the
20  aggregate purchase price shall be this plus the
21  distributable waiver, you're referring to somewhere
22  between 650 and $173,000.  Is that right?
23  A.  And possibly lower and possibly higher.  I'm
24  using these as examples of what it would be under
25  different assumptions.

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  Q.  What could it be as high as and as low as?
2  **A.  Oh, I don't know.**
3  Q.  Well, who can figure that out?
4  **A.  Well, we won't have to.  One day the claims**
5  **pool will be set and we will know that number, and the**
6  **administrative claims amount will be known and we will**
7  **know that number.  And then it's very straightforward**
8  **math.**
9  Q.  So when you sign a contract, though, and you
10  want the judge to approve you to sign this contract we
11  see as part of your motion -- it's Exhibit 915-1,
12  right -- you want him to authorize you to sign that
13  tomorrow, don't you, or Monday?
14  **A.  Yeah.  I want him to approve the APA.**
15  Q.  If he approves it, you would sign it, wouldn't
16  you?
17  **A.  If we close, yeah.**
18  Q.  Well, I'm not trying to be clever here; I'm
19  just trying to understand.
20      If the judge on Monday says, Mr. Murray,
21  you've done it right; I approve the sale, when would you
22  sign this agreement?
23  **A.  At closing, whenever that is.**
24  Q.  When would that be?
25  **A.  I don't know.  Probably pretty soon.**

1  Q.  What's left to be done?
2  **A.  I don't know.  I'd have to look at all the**
3  **conditions precedent and everything.  There might be**
4  **other documents that have to be signed at the same time.**
5  **But I've received the money; and if the APA has**
6  **been approved, it won't be long.**
7  Q.  So won't be long meaning a week at most.  Would
8  you agree with that?
9  **A.  It could be less, could be more.  I don't know.**
10  Q.  Well, who will put the number in and how will
11  that number be computed on this distributable waiver?
12      When we get down to that one-week
13  timeframe and now you're going to sign, who will fill in
14  that number?
15  **A.  It will not be a number at the time this is**
16  **signed.  It will be a reference to a definition, and it**
17  **will be calculated when it can be calculated.**
18  Q.  Okay.  So if I go over here to Distributable
19  Proceeds Waiver, that definition in your agreement says
20  "means in accordance with the sale order" and on the
21  terms set forth herein, "the commitment of the families
22  to forego the distributable proceeds waiver amount."
23      And then the "distributable proceeds
24  waiver amount" means the amount set forth in the sale
25  order?

1  **A.  That's right.**
2  Q.  And "in the sale order" means the order the
3  bankruptcy court approves in the agreement?
4  **A.  That's right.**
5  Q.  Okay.  Then you go to the section itself, and
6  it says "promptly but no later than five days."  This is
7  the sale order.
8      But I don't see anywhere in section 5.2
9  where the judge is supposed to fill in a blank for what
10  that distributable waiver amount is or how it's supposed
11  to even be determined.
12  **A.  Yeah.  I don't think the judge does fill it in.**
13  **My understanding is the reference to the sale order is**
14  **to the order that we're seeking approval of now.**
15  Q.  You've got the sale order defined in your
16  contract, don't you?  Right?  You've got that defined
17  right there.  Am I wrong?
18  **A.  Yeah.  That's the order that we're trying to**
19  **get entered.**
20  Q.  And in that order that you want to have
21  entered, you're going to include a mechanism by which
22  the judge will set the amount?
23  **A.  There will be a formula that explains how it's**
24  **calculated, a description of it, yes.**
25  Q.  A formula.  And that formula will then become,

1  in your mind -- so when it says that the -- back on
2  page 3 when it says the consideration is the aggregate
3  purchase price of 1.75 million cash plus the
4  distributable proceeds waiver, that's going to be a
5  formula; that ain't going to be a number, is it?
6  **A.  Yeah.  That portion of it will be something**
7  **that will be calculated later based on a formula, yeah.**
8  Q.  Okay.  And you are coming on Monday, right?
9  You'll be there?
10  **A.  Yes.**
11  Q.  Right?
12  **A.  Yes.**
13  Q.  Okay, good.  I just want to make sure.
14      No need for a subpoena or anything like
15  that, right?
16  **A.  No.**
17  Q.  Okay.
18      **MR. BROOCKS:** I think I'll pass the
19  witness right now.  I think somebody else wanted to ask
20  you some questions.
21      **MR. WOLFSHOHL:** Latham?
22      **MS. RECKLER:** Can you hear me?  This is,
23  for the record, Caroline Reckler of Latham & Watkins.
24
25

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

16:51:13-16:52:22                                    Page 257

1   EXAMINATION
2   QUESTIONS BY MS. RECKLER:
3   Q.   I will be extremely brief.  I think we're going
4   to touch on topics that we have not covered for the last
5   eight hours.
6        Just for the record again, my name is
7   Caroline Reckler.  I represent X Corp., which owns and
8   operates the social media site X, formerly known as
9   Twitter.
10       Mr. Murray, I'm going to ask you some
11  questions about the pending sale motion.  As I
12  mentioned, I will be brief.  If you have any questions
13  or you'd like me to repeat or clarify anything, please
14  let me know; or if you can't hear me, I will speak up or
15  repeat myself.
16       Also just to confirm, were you able to
17  print out -- I think we had six exhibits.  Was somebody
18  able to prepare those for you?
19  A.   I saw those.  I don't have them in front of me.
20       THE WITNESS: Josh, are those them?
21       MR. WOLFSHOHL: Is it just six documents,
22  Caroline?
23       MS. RECKLER: It's six documents, some of
24  which we've already talked about.
25  A.   All right.  I've got them.

---

16:52:24-16:53:13                                    Page 258

1   BY MS. RECKLER:
2   Q.   Thank you.
3        And just, again, for the record, you're
4   the Chapter 7 trustee in this case?
5   A.   Yes.
6   Q.   Okay.  And what does that job entail?
7   A.   I administer the estate and reduce its assets
8   to money for the benefit of creditors.
9   Q.   Would you say that part of your job is to
10  familiarize yourself with the assets of the estate?
11  A.   Yes.
12  Q.   And with its operations?
13  A.   Yes.
14  Q.   And its employees?
15  A.   Yes.
16       (Plaintiffs' Exhibit 1 was marked for
17       identification.)
18  BY MS. RECKLER:
19  Q.   Okay.  If you'd look at Exhibit 1, do you have
20  that in front of you?
21  A.   Is this the wind-down order?
22  Q.   No.  It should be docket No. 829, the Trustee's
23  Motion for Entry of an Order Authorizing the Wind-Down
24  of Free Speech Systems, LLC.
25  A.   Okay, yes.  I have that.

---

16:53:15-16:54:23                                    Page 259

1   Q.   And you recognize this motion?
2   A.   Yes.
3   Q.   And did you review the motion before it was
4   filed?
5   A.   Yes.
6   Q.   And did you provide comments to counsel?
7   A.   Yes.
8   Q.   Were they incorporated?
9   A.   Yes.
10  Q.   And did you authorize the filing of the motion
11  before counsel filed it?
12  A.   Yes.
13  Q.   Okay.  If you'd turn to the back of the motion,
14  do you see a certificate of service?
15  A.   Yes.
16  Q.   Is X Corp. listed anywhere there?
17  A.   I'll page through it.
18       Do you represent it's not?
19  Q.   I do represent it is not.  It's also
20  alphabetical.
21  A.   I see it there.  I do not see X on here.
22  Q.   Okay.  So, to your knowledge, this motion was
23  not served on X Corp.?
24  A.   Not according to the certificate of service,
25  right.

---

16:54:24-16:55:48                                    Page 260

1   Q.   Okay.  If you turn to page 3 of the motion,
2   paragraph 5.
3   A.   Okay.
4   Q.   If you read -- and I'll give you the time to do
5   so -- that paragraph, do you see that it refers to,
6   quote, social media accounts, end quote?
7   A.   Yes.
8   Q.   Okay.  And do you see that it mentions there in
9   that context that those social media accounts were some
10  of the assets that were going to be sold?
11  A.   Yes.
12  Q.   Okay.  Can you describe the social media
13  accounts that were contemplated.
14  A.   Yes.  They're the social media accounts of FSS
15  that included at least three on the X platform, I think
16  Infowars, Banned.video.  The War Room had one.  And then
17  some other social media accounts on other platforms.
18  Q.   And do you know what other platforms?
19  A.   No.  It's written down somewhere, but most of
20  them I'd never heard of.
21  Q.   Okay.  Do you know just -- do you happen to
22  know how many platforms?
23  A.   I think about a dozen.
24  Q.   Okay.  Do you agree that the social media
25  accounts referenced there does not specify that any of

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

16:55:51-16:57:01                                          Page 261

1   those were X accounts?
2   A.  In this paragraph, no.  Yeah.
3   Q.  Was there any other reference in this motion
4   specifically to X accounts?
5   A.  I don't know.  I don't think so.
6   Q.  Okay.  Can you turn to Exhibit 2.
7   A.  This is the wind-down order.  Okay.
8   Q.  Yeah.  So do you recognize this as the order
9   granting the wind-down motion that was shown as
10  Exhibit 1?
11  A.  Yes, I do.
12  Q.  Okay.  And this order, is it fair to say it
13  authorized the sale of the social media assets that we
14  just discussed in the motion?
15  A.  Yes.
16  Q.  And as part of that wind-down process, what
17  assets did you seek to sell?
18  A.  The assets of FSS.  So it would be all the
19  intellectual property assets and the other assets of
20  FSS.
21  Q.  And did you conduct diligence?  Did you or your
22  team conduct diligence on the assets that you proposed
23  to sell before the motion was filed?
24  A.  Yes.
25  Q.  Okay.  And you were trying to sell the social

---

16:57:04-16:58:16                                          Page 262

1   media assets as part of that process?
2   A.  Yes.
3   Q.  Okay.  Can you describe or detail what X
4   accounts the estate uses.
5   A.  I think, primarily the Infowars and the
6   Banned.video, those are the ones I'm familiar with.
7   Q.  But there could be more?
8   A.  There could be more, yes.
9   Q.  Okay.  Who has access to these accounts?
10  A.  I believe Alex Jones does and other employees
11  of FSS.
12  Q.  Okay.  And do you know what user name is
13  associated with the X accounts?
14  A.  I do not.
15  Q.  Do you know who controls the passwords?
16  A.  Yes.  In the sense that it's FSS employees,
17  it's a combination of two people whose last names I
18  don't know.
19  Q.  Okay.  But if you asked them for those
20  passwords, would they provide them to you?
21  A.  I don't know.
22  Q.  Do you know how regularly these accounts are
23  used?
24  A.  I believe they're used constantly.
25  Q.  Okay.  And do you know who puts content on

---

16:58:19-16:59:15                                          Page 263

1   these accounts?
2   A.  Yes.  It's FSS employees.
3   Q.  And do you know how many followers there are on
4   each account?
5   A.  No, I don't.
6   Q.  Okay.  I know you've mentioned that these
7   accounts are used, these X accounts are used constantly.
8       Do you have any idea when they were last
9   used?
10  A.  No, I don't.
11  Q.  Would it be fair to say today?
12  A.  That wouldn't surprise me.
13  Q.  In the last week?
14  A.  Probably, yes.
15      (Plaintiffs' Exhibit 3 was marked for
16      identification.)
17      BY MS. RECKLER:
18  Q.  Okay.  Can you turn to Exhibit 3.
19  A.  Okay.
20  Q.  Do you recognize this as the trustee's motion
21  for authority to sell the intellectual property assets?
22  A.  Yes.
23  Q.  And did you review this motion before it was
24  filed?
25  A.  Yes.

---

16:59:16-17:00:08                                          Page 264

1   Q.  And did you provide comments to counsel on the
2   motion?
3   A.  I did.
4   Q.  And were they incorporated?
5   A.  Yes.
6   Q.  And did you authorize counsel to file the
7   motion?
8   A.  Yes.
9   Q.  Can you turn to paragraph 5, please.
10  A.  Okay.
11  Q.  Do you see that it lists -- or refers to the X
12  accounts?
13  A.  What page are you on?
14  Q.  Excuse me.  I am on page 5, paragraph --
15  A.  I heard paragraph 5.
16  Q.  I'm sorry.
17  A.  I'm with you now.
18      MR. BROOCKS: I'm sorry.  Where are we?
19      THE WITNESS: Page 5.
20  A.  You're talking about the social media accounts
21  chart there in the middle?
22      BY MS. RECKLER:
23  Q.  Yes.
24  A.  Yeah, I see that.
25  Q.  And you see that it refers to the X accounts?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

17:00:12-17:02:06                                          Page 265

1  A.  I see one X account on there, The Real Alex
2  Jones X account, I think.  Yeah.
3  Q.  Yep.  Okay.  Can you turn to Exhibit A at the
4  end of this motion.
5  A.  Okay.
6  Q.  Do you see reference to the X terms of service
7  listed at the bottom of the chart?
8  A.  I see that, yes.
9      (Plaintiffs' Exhibit 5 was marked for
10     identification.)
11     BY MS. RECKLER:
12 Q.  Will you turn to Exhibit 5.
13 A.  Okay.  I see that.
14 Q.  Are these the X terms of service that you
15 referred to in Exhibit A to the motion?
16 A.  I think so, yes.
17 Q.  Why did you specify or list an X account and
18 the X terms of service on this motion but not in the
19 wind-down motion?
20 A.  I don't know.
21 Q.  Okay.  And if you'd turn to the back of the
22 motion, do you see a certificate of service?
23 A.  Remind me.  That's tab 4 or 3?
24 Q.  Exhibit 3.
25 A.  Okay.  Yes, I see it.

---

17:02:10-17:03:32                                          Page 266

1  Q.  And was X Corp. served with this motion?
2  A.  I don't see them on the certificate of service
3  list.
4  Q.  Will you take my word that X Corp. received a
5  copy of this motion but not the wind-down motion?
6  A.  Yeah.  I have no reason to doubt you.
7  Q.  Do you know why X Corp. would have received one
8  motion but not the other motion?
9  A.  I think at some point counsel for X entered an
10 appearance; and then you would have started getting
11 electronic notice of docket entries, even if you weren't
12 on the certificate of service.  That might be.
13 Q.  Okay.  But that would have only occur -- strike
14 that question.
15     Mr. Jones objected to the motion to sell
16 the intellectual property, correct?
17 A.  Yes.
18 Q.  Am I correct that no order has been entered on
19 that motion?
20 A.  That's right.
21 Q.  And, in fact, isn't it correct that the
22 bankruptcy court held a hearing on that motion and
23 deferred ruling on the issue of ownership regarding the
24 X accounts?
25 A.  Yes.

---

16:46:10-17:04:57                                          Page 267

1      (Plaintiffs' Exhibit 4 was marked for
2      identification.)
3      BY MS. RECKLER:
4  Q.  Can you turn to Exhibit 4.
5  A.  Okay.  I've got it.
6  Q.  Do you recognize this notice?
7  A.  Yes.
8  Q.  And what is this?
9  A.  I think this is where we noticed a revised
10 order on the motion we were discussing.
11 Q.  Okay.  And can you turn to the bottom of
12 paragraph 2 on page 3 and read aloud the blue text that
13 was added to the revised order.
14 A.  Yes.  "Notwithstanding the foregoing, this
15 order does not purport to grant property rights to the
16 purchaser beyond that which is actually owned by the
17 Chapter 7 Jones estate, or divest authority in the
18 trustee to sell assets which are not owned by the
19 Chapter 7 Jones estate; and consistent with the sale
20 order and this order, the trustee shall not warrant any
21 title to any social media accounts, nor shall any
22 damages incurred by the acquisition and use by any
23 purchaser of the social media accounts found to be void,
24 voidable or without legal binding rights be indemnified
25 by the trustee."

---

17:05:01-17:06:11                                          Page 268

1  Q.  Okay.  Setting the documents aside, are you
2  generally aware of what X is?
3  A.  Yes.
4  Q.  Do you have an account on X of your own?
5  A.  No.
6  Q.  Have you ever posted on X?
7  A.  No.
8  Q.  Have you ever seen the Infowars X account or
9  any Free Speech Systems X account?
10 A.  No.
11 Q.  Do you have any familiarity with the content
12 posted on the Infowars X account?
13 A.  Some, yes.
14     (Plaintiffs' Exhibit 6 was marked for
15     identification.)
16     BY MS. RECKLER:
17 Q.  Can you turn to Exhibit 6.
18 A.  Okay.
19 Q.  Do you recognize this document?
20 A.  Yes.
21 Q.  And what is this document?
22 A.  I think this is the X revised terms of service.
23 Q.  Okay.  And have you read this before?
24 A.  No.
25 Q.  Have you read any X terms of service?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

17:06:15-17:07:30                                Page 269

1  A.  I read the one we discussed previously.
2  Q.  Okay.  Can you turn to page 4 of Exhibit 6.
3  A.  All right.
4  Q.  Do you see the sentence that says, "By using
5  these services, you agree to be bound by these terms"?
6  A.  I'm sure it's there.
7  Q.  The last sentence of the first paragraph.
8  A.  Which number section is it?  I think I'm on the
9  wrong page.
10  Q.  It says -- at the top of the page it says "X
11  Terms of Service.  If you live outside the European
12  Union, EFTA States, or the United Kingdom, including if
13  you live in the United States."
14  A.  Okay.  Now I see that.  All right.
15  Q.  And do you see the sentence at the end of the
16  first full paragraph that says, "By using these services
17  you agree to be bound by these terms"?
18  A.  I see that, yes.
19  Q.  Okay.  Are you aware of whether the X accounts
20  have been used after November 15th?
21  A.  No.
22  Q.  Okay.  I think your previous testimony was you
23  thought it was fairly likely that they had been used in
24  the last week.
25  A.  Yeah.  I don't know for sure but it could be.

---

17:07:34-17:09:08                                Page 270

1  It seems likely.
2  Q.  Okay.  So by continuing to use the X accounts,
3  the debtor has agreed -- excuse me, the trustee has
4  agreed to be bound to the new terms of the service,
5  correct?
6  A.  That's what that sentence says, yes.
7  Q.  Okay.  And if you turn to page 9 --
8  A.  I haven't got page numbers, so if you could
9  tell me the heading of the section.
10  Q.  Yeah, fair enough.  It says "Your License to
11  Use the Services."
12  A.  Okay.  I'm there.
13  Q.  Do you want to take a second to read those two
14  paragraphs to yourself.
15  A.  Yes, please.
16     Okay.  I've seen it.
17  Q.  Okay.  Under the terms of service X is granting
18  the user a license to use the X software and name.  Is
19  that correct?
20  A.  That's how I understand it, yes.
21  Q.  Okay.  And turning very briefly now to the
22  auction, when the auction was conducted, were you aware
23  that the bankruptcy court had not yet ruled on whether
24  the X accounts were estate assets available for sale?
25  A.  Yes.

---

17:09:09-17:10:30                                Page 271

1  Q.  Did any bidder ask questions about the X
2  accounts?
3  A.  Not that I know of personally.
4  Q.  Are you aware of any bidder conducting
5  diligence specifically related to the X accounts?
6  A.  At what time?
7  Q.  Prior to the conclusion of the auction.
8  A.  No.
9  Q.  Did any bidder assign a specific value to any
10  of the X accounts, again, prior to the conclusion of the
11  auction?
12  A.  No, I don't think so.
13  Q.  Do you recall any discussion with any bidder
14  about any of the X accounts prior to the conclusion of
15  the auction?
16  A.  That I was in personally, no.
17  Q.  Did your advisors or colleagues tell you of any
18  conversations that they had about the X accounts?
19  A.  No.
20  Q.  Do your advisors and colleagues typically
21  report to you or tell you in your capacity as the
22  trustee of any meaningful conversations about the estate
23  assets?
24  A.  Yes.
25  Q.  So you would have expected them to report a

---

17:10:33-17:12:24                                Page 272

1  meaningful conversation about the auction and assets
2  reported to be sold as part of that process?
3  A.  Yes.
4  Q.  So based on what you've said, would it be fair
5  to say that neither bidder said anything about being
6  unwilling to purchase the assets if it could not get the
7  X accounts?
8  A.  Yeah.  I think that's right.
9  Q.  When you conducted the auction, did you
10  understand that you might be trying to sell something to
11  which you did not have -- the estate did not have
12  ownership?
13  A.  I think that's a possibility, yes.
14  Q.  If you'll give me one second, I think I
15  actually might be done.
16     I actually have one or two last questions.
17  I'm going to ask my colleague, Mr. Harris, to share his
18  screen for an exhibit I don't have printed out,
19  unfortunately.
20     THE VIDEOGRAPHER:  We do not have a Zoom
21  laptop up there for him to see any share screen.
22     THE WITNESS:  I haven't got a screen.
23  Maybe you could e-mail it to Josh?
24     BY MS. RECKLER:
25  Q.  Sure.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

17:12:26-17:15:23                                                Page 273

1  A.  What is it?  We might already have it
2     somewhere.
3  Q.  No.  Actually, this is something I don't think
4     you-all have.  All right.  We will e-mail them to you
5     quickly.
6        MR. WOLFSHOHL: Is this coming from Chris,
7     Caroline?
8        MS. RECKLER: Yep.
9        MR. WOLFSHOHL: I think I just got it.
10    Which one?
11       MS. RECKLER: Could you just pull each one
12    up.  I have two questions about each.  This will be very
13    quick.
14       MR. WOLFSHOHL: Here's the first one.
15 A.  Okay.  I've got it.
16    (Plaintiffs' Exhibit 7 was marked for
17    identification.)
18    BY MS. RECKLER:
19 Q.  Can you describe this post.
20 A.  Okay.  It says, "Canada will strengthen border
21    security."
22 Q.  Yes.  Is it fair to say that that is a post on
23    the Infowars X handle?
24 A.  Yeah.  That's what it looks like.
25 Q.  And can you just look towards the bottom.

---

17:15:25-17:16:41                                                Page 274

1     There's a time and a date.
2        Can you tell me what the time and the date
3     is.  It's right under the picture.
4  A.  I'm seeing a couple of them here.  And there's
5     things popping up on Windows, so give me just a second.
6  Q.  Sure.
7  A.  Yeah, I see it.  It looks like it's just after
8     midnight on the 3rd of December.
9  Q.  Okay.  And if we could pull up the next
10    document.
11 A.  Exhibit J?
12 Q.  Yeah.
13    (Plaintiffs' Exhibit 8 was marked for
14    identification.)
15 A.  All right.  Scrolling.
16    BY MS. RECKLER:
17 Q.  Is that a post on the Infowars X account?
18 A.  Yes.  That's what it looks like.
19 Q.  Okay.  If you could scroll a little bit down,
20    there's a white box.  Underneath there it says a date
21    and a time.  Could you tell me what the date and time
22    is.
23 A.  1:01 p.m. on November 25th.
24 Q.  Okay.  And if you could pull the third one.
25 A.  Sure.  Exhibit K?

---

17:16:43-17:17:23                                                Page 275

1  Q.  Yep.
2     (Plaintiffs' Exhibit 9 was marked for
3     identification.)
4  A.  All right.  Okay.  I've got it.
5     BY MS. RECKLER:
6  Q.  And is that a post on an X account, The War
7     Room's X account -- excuse me, The War Room show X
8     account?
9  A.  Yes.  I see "War Room Show."  Yes, I see that.
10 Q.  And that's like a post on an X account?
11 A.  Yeah.  That's what it looks like.
12 Q.  Okay.  And at the bottom could you just tell me
13    the date and time again, please.
14 A.  2:32 p.m. on December 4th.
15 Q.  Thank you.
16    MS. RECKLER: I have no further questions.
17    MR. WOLFSHOHL: I have a couple.
18
19
20
21
22
23
24
25

---

17:17:24-17:18:30                                                Page 276

1        EXAMINATION
2        QUESTIONS BY MR. WOLFSHOHL:
3  Q.  I'm Joshua Wolfshohl for the trustee.
4     Mr. Murray, you discussed with
5  Mr. Broocks, and I think Mr. Cicack, the conversation
6  that you testified occurred right before the filing of
7  the motion with the Connecticut families regarding your
8  interpretation of the distributable proceeds waiver,
9  right?
10 A.  Yeah.  That phone call that Kyle was on, yeah.
11 Q.  Yeah.  And in that conversation did you agree
12  to hold off on filing the motion until you got
13  confirmation that they were in agreement with how you
14  were characterizing it?
15 A.  Yes.
16 Q.  Did you get that confirmation before filing the
17  motion?
18 A.  Yes.
19 Q.  Has that been incorporated into the proposed
20  order yet?
21 A.  No.
22 Q.  Okay.  Have there been discussions about
23  revising the order to conform with what you put in the
24  motion?
25 A.  Yes.

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  Q.  Okay.
2      MR. WOLFSHOHL: No further questions.
3      RE-EXAMINATION
4      QUESTIONS BY MR. CICACK:
5  Q.  So the conversation that you had, you said that
6  you told Mr. Kimpler that you would hold off filing the
7  motion until there was an agreement?
8  A.  Yes.
9  Q.  Okay.
10 A.  On the motion.
11 Q.  The agreement being on how the distributable
12 proceeds waiver worked?
13 A.  Right. We shared a version of the sale motion
14 that explained what my reasoning was on that.
15 Q.  Right.
16 A.  But we weren't going to file the sale motion
17 until we had agreement on the sale motion with the joint
18 bidders.
19 Q.  Agreement as to what? As to your
20 interpretation of the DPW?
21 A.  Yes.
22 Q.  Okay. But didn't you have -- wasn't there a
23 sale order attached to the motion?
24 A.  There was.
25 Q.  Okay. And the sale order that was attached to

1  the motion includes the Connecticut families'
2  interpretation, not yours. Isn't that right?
3  A.  That's right. It does.
4  Q.  Okay.
5      MR. CICACK: No further questions.
6      RE-EXAMINATION
7      QUESTIONS BY MR. BROOCKS:
8  Q.  Why is that?
9  A.  It's an oversight.
10 Q.  On whose part?
11 A.  I guess mine because I reviewed it before it
12 was filed. I hadn't noticed that that had not been
13 updated.
14 Q.  So going back to 191 -- if we can pull it back
15 up real quick.
16     This is the motion -- 191 is the motion
17 you filed in the order referring to the sale, right?
18 A.  Yeah. I don't know which exhibit you're
19 referring to.
20 Q.  It's the notebook that I've got, 191. That's
21 right.
22 A.  Yeah.
23 Q.  Okay. Now, I want to make sure. You said that
24 you agreed not to file this until you had an
25 understanding of what?

1  A.  I wasn't going to file the motion until the
2  joint bidders agreed to the draft of the motion.
3  Q.  Which included your understanding of the
4  7 million --
5  A.  Yes, exactly. My explanation of what I
6  interpret their bid as being, yes.
7  Q.  So when you filed it, you had reached an
8  agreement, you're saying, on November 18th. By that
9  date you had reached an agreement that they had
10 capitulated to your understanding, in other words?
11 A.  Yes.
12 Q.  Okay. And you're saying, if we look at the
13 final tab 8. I'd ask you to go there real quick.
14 A.  Yep. I'm there.
15 Q.  Now, this order, which is 915-8, look on
16 paragraph red No. 5 of page 5. Is this the provision
17 that you're saying was a mistake?
18 A.  Yes.
19 Q.  Read it out loud to us.
20 A.  "The consideration to be provided by the
21 purchaser and the Connecticut families consists of (1)
22 cash consideration in the amount of $1,750,000, the cash
23 purchase price, and (2) a commitment by the Connecticut
24 families to forego the distributable proceeds waiver
25 amount as defined below and the assignment of the

1  distributable proceeds waiver amount to the trustee for
2  the benefit of all other unsecured creditors of FSS.
3  The distributable proceeds waiver amount means the
4  amount necessary for all other holders of allowed
5  unsecured creditors of FSS to recover $100,000 more in
6  the aggregate than they would recover from the sale of
7  the purchased assets to the backup bidder up to
8  100 percent of the Connecticut families' entitlement to
9  the cash purchase price."
10 Q.  Okay. And you're saying that's wrong?
11 A.  That's right.
12 Q.  That's right; that's wrong?
13 A.  Right. That is right. That is -- that's
14 right; that's wrong.
15 Q.  Well, this is not a -- I mean, this is not a
16 one paragraph. This is like a 22-page order.
17 A.  Yeah, it is.
18 Q.  How did it happen here? How did that happen?
19 A.  I mean, I can only speculate. I think it's
20 because we -- my counsel and I were the primary drafters
21 of the motion, which expressed my interpretation and my
22 understanding of the bid. And the sale order was
23 drafted in the first instance by the joint bidders. And
24 this is just a provision that I overlooked and didn't
25 realize it was different from my interpretation.

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

17:24:27-17:25:32                                     Page 281

1  **MR. CICACK:** That is unadulterated
2  bologna. This whole thing is ridiculous.
3  **BY MR. BROOCKS:**
4  Q. I'm just trying to follow what you're saying.
5  You're saying that the order was drafted
6  by the Connecticut plaintiffs?
7  **A. By the joint bidders.**
8  **MR. WOLFSHOHL:** Sale orders are always
9  drafted by the buyer.
10  **BY MR. BROOCKS:**
11  Q. Now, the motion itself was drafted by your
12  lawyers, though, right?
13  **A. Yes.**
14  Q. That's 190 at 915 base.
15  Now, I want to ask you to take a look with
16  me -- just before I do that, you're saying that the
17  error was made because the Connecticut parties, the
18  joint bidders, drafted this, not you-all?
19  **A. Yes.**
20  Q. And you-all just weren't careful enough to read
21  it and catch it.
22  When did you catch it?
23  **A. Oh, sometime after it was filed.**
24  Q. Well, like yesterday?
25  **A. No, before that; but I don't remember when.**

---

17:25:34-17:26:36                                     Page 282

1  Q. And you can't give me like -- again, I'm trying
2  to figure out within the last 24 hours or was it --
3  **A. No. It was sometime before my deposition was**
4  **first set. I think I noticed it when I was prepping for**
5  **that original date we had before we moved it.**
6  Q. Okay.
7  **A. So maybe over a week ago.**
8  Q. And so you'll notice on the bottom left of that
9  document, what's that little number right there that
10  says "1566802"? What is that number?
11  **A. I think it's a document ID stamp.**
12  Q. Have you ever seen one before?
13  **A. Yes.**
14  Q. What do they do?
15  **A. It's usually for, like, iManage or some**
16  **document management program that law firms use. And it**
17  **puts a footer on there so that you can go in the system**
18  **and find the document again if it gets separated from**
19  **the rest of it.**
20  Q. And you're saying that the motion itself, the
21  body of 915, was drafted by your lawyers, right?
22  **A. Yeah.**
23  Q. So is that the same number on that bottom left
24  of that as it was on the --
25  **MR. WOLFSHOHL:** Come on.

---

17:26:37-17:27:38                                     Page 283

1  **A. I don't know.**
2  **BY MR. BROOCKS:**
3  Q. Let's read it together.
4  **MR. WOLFSHOHL:** You know how that works.
5  It gets saved on somebody's system, and it gets filed.
6  **MR. BROOCKS:** I'm going to let you explain
7  that to me more carefully.
8  **BY MR. BROOCKS:**
9  Q. But if you would let me, the number 15668356 on
10  your motion --
11  **A. Yeah.**
12  Q. -- is the same footer number that's on the
13  proposed formal order, right?
14  **A. No. It's a different order.**
15  Q. It's 15668021 versus 15668356?
16  **A. Right.**
17  Q. Okay. And so does that indicate to you that
18  the same law firm prepared it?
19  **A. It indicates to me that the version that was**
20  **filed was most recently saved or stamped by the same law**
21  **firm that did both documents. It tells me nothing about**
22  **who drafted the first draft of that document.**
23  **MR. BROOCKS:** Josh, you were saying I knew
24  or should have -- what are you saying I got wrong? I'm
25  just curious. I don't understand what you're saying.

---

17:27:39-17:28:30                                     Page 284

1  **MR. WOLFSHOHL:** When you get something
2  from someone else and you save it on your system, it
3  puts a file stamp of your iManage number on the
4  document. And we filed it. They didn't file it. We
5  filed it, but they prepared it. That's what he's
6  saying.
7  **MR. BROOCKS:** And I'm not -- this ain't
8  your deposition.
9  **MR. WOLFSHOHL:** I understand.
10  **MR. BROOCKS:** But I wanted to make sure
11  I'm clear on this. You're saying that this is their
12  number?
13  **MR. WOLFSHOHL:** No. It's our number. It
14  got saved on our system because we ultimately filed the
15  motion with all the attachments, and everything got
16  saved on our system. But we were not the scriveners of
17  the order.
18  **MR. BROOCKS:** Well, look, I accept
19  everything you've said; but it would be a real simple
20  matter if you just got the transmittal e-mail that they
21  sent it to you on. That would be problem solved.
22  **MR. WOLFSHOHL:** I can do it. Not a
23  problem. I'll do that.
24  **MR. BROOCKS:** Okay.
25  **MR. WOLFSHOHL:** I'll give you the e-mail

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1  where it lays out who's doing what.  Literally it says
2  that.
3      BY MR. BROOCKS:
4  Q.  Let me go back to this and make sure I'm clear
5  on this, Chris.
6      So your testimony is, is when the motion
7  itself, 915, is drafted, that the agreement had been
8  reached between you and the Connecticut plaintiffs and
9  the joint bidders as to what the consideration was going
10 to be stated as.
11     That agreement was reached?
12 A.  So I'm not sure it was reached -- it was
13 reached by the time it was filed.  I'm not sure it was
14 reached by the time the motion was first drafted.
15 Q.  By the time it was filed?
16 A.  Yes.
17 Q.  Okay.  So by the time it was filed, you know,
18 on November 18th, in your mind there was no
19 misunderstanding that the joint bidders understood that
20 it was -- the $7 million number was the waiver amount,
21 nothing below that?
22 A.  Right.  They agreed to my interpretation by the
23 time this was filed.
24 Q.  And, yet, they sent -- I'm not saying I agree
25 or disagree.  I'm just trying to get it nailed down.

1      This document that we're looking at, the
2  proposed form order, which says something totally
3  different, was sent earlier by the joint bidders for you
4  to attach?
5  A.  Yeah.  I don't know when the first draft came
6  over.  We filed it with the motion.
7  Q.  But clearly your testimony is they sent it --
8  the joint bidders sent you this form of order?
9  A.  Well, I said they drafted it in the first
10 instance.  It went through different rounds of
11 revisions.  I don't know who did the final revisions on
12 it but ...
13 Q.  Surely it wouldn't be your law firm if they got
14 it from somebody else?
15 A.  No.  I think it was.  I think we just missed
16 this.
17 Q.  And the joint bidders submitted something to
18 you and saw it got filed, and your testimony is that
19 they knew that it was wrong.  Is that your testimony?
20 A.  I imagine they missed it, too.  I don't know.
21 Q.  That's a pretty big miss, isn't it?
22 A.  I'm not sure.  Yeah.  I mean, it's incorrect.
23 It's not what my interpretation was.
24 Q.  You're saying you realized it when?
25 A.  I think I was preparing for it whenever we had

1  the first date for my depo.
2  Q.  The first date of your depo.  What are you
3  talking about?  The one we're having right now?
4  A.  Yeah.  This one was rescheduled.  It had been
5  set for a week or whatever the earlier date was.
6  Q.  Last week, in other words?
7  A.  I think so.  I don't remember what day it was.
8  Q.  And did you pick up the phone and call the
9  joint bidders and say, Hey, guys, we've got a problem
10 here, you know, wrong order?
11 A.  I didn't call them.
12 Q.  Who did?
13 A.  I imagine my counsel did.
14 Q.  You say you imagine.  Do you know he did?
15 A.  No.
16 Q.  Well, why do you think anybody made a phone
17 call?
18 A.  Because we noticed an error.  We knew we'd have
19 to get a revised sale order, and I imagine that
20 discussion's been happening.
21 Q.  I don't want you to use the word "I imagine."
22 I don't like that because I'm not sure what that means.
23     Do you know, did you tell your lawyer,
24 We've got to call these guys and tell them, Hey, we've
25 got a bad order form in here?

1  A.  I said, We need to fix the order.
2  Q.  Did you instruct anybody to call the joint
3  bidders and tell them there was a problem?
4  A.  No.
5  Q.  Has that call taken place to your knowledge?
6  A.  I believe so.
7  Q.  Why do you believe that?
8  A.  Because that's what I would expect would happen
9  to address this error.
10 Q.  Okay.
11     MR. BROOCKS: Thank you.
12     MR. CICACK: John, I've got a couple more
13 questions.
14     MR. BROOCKS: I've got no more.
15     FURTHER EXAMINATION
16     QUESTIONS BY MR. CICACK:
17 Q.  So you filed this on November 18th of 2024,
18 correct?
19 A.  Yes.
20 Q.  And you noticed the mistake about a week ago?
21 A.  I think so, yeah.
22 Q.  Okay.  And had anybody representing the
23 Connecticut parents called you or communicated to you to
24 let you know about this mistake?
25 A.  Me personally?  No.

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

17:32:49-17:33:58                                          Page 289

1  Q.   Okay.  Do you know if they called your counsel?
2  A.   I do not know.
3  Q.   Okay.  So your testimony is that you discovered
4  this mistake getting ready for your deposition?
5  A.   Yes.
6  Q.   Okay.  And looking at it, tell me what the
7  mistake is.
8       Is it just this one sentence that says,
9  "The distributable proceeds waiver amount means the
10 amount necessary for all other holders of allowed
11 unsecured creditors of FSS to recover 100,000 more in
12 the aggregate than they would recover from the sale of
13 the purchased assets to the backup bidder, up to a
14 hundred percent of the Connecticut families' entitlement
15 to the cash purchase price," is that the only mistake,
16 that sentence?
17 A.   That's the only one that comes to mind.
18 Q.   Okay.  And do you have an agreement with the
19 Connecticut parents what this is going to say after the
20 change is made?
21 A.   You mean the exact language?
22 Q.   Yeah.
23 A.   I don't know.
24 Q.   Where it says, "The distributable proceeds
25 waiver amount means," do you have an agreement on what

---

17:34:01-17:35:20                                          Page 290

1  is going to be put there in terms of what it means?
2  A.   I think we agree on what it means and what it
3  should say.  I haven't seen the exact language.
4  Q.   Tell me what the agreement is of what it means.
5  A.   It would be consistent with what's in the sale
6  motion.
7  Q.   I can't even understand what's in the sale
8  motion.  So why don't you explain it to me.
9       Tell me -- you're sitting here right
10 now -- your understanding what goes in there.  What
11 would you put in there?
12 A.   It's the amount that gives the non-Connecticut
13 creditors the amount they would have received had the
14 purchase price been in $7 million cash.
15 Q.   The alternative price, the other qualified
16 bidder?
17 A.   No.  Well, right.  If the other one were
18 7 million, right.
19 Q.   Okay.  Now, this is pretty good evidence of
20 what the Connecticut families intended in their bid,
21 isn't it?
22      MR. WOLFSHOHL: Objection, form.
23      BY MR. CICACK:
24 Q.   Okay.  We'll get to that.
25      Who for the Connecticut families was

---

17:35:21-17:36:11                                          Page 291

1  responsible for drafting this order?
2  A.   I don't know.
3  Q.   Don't you think that we should all be able to
4  depose that person to figure out exactly what they
5  intended when they drafted this sale order?
6      MR. PATERSON: Objection to form.
7      BY MR. CICACK:
8  Q.   You can answer.
9  A.   It's not up to me.
10 Q.   I'm asking you, don't you think that we should
11 have the ability and the right to talk to the person who
12 actually drafted it?
13 A.   No.
14 Q.   Why not?
15      MR. PATERSON: Objection to form.
16 A.   Because it doesn't matter who drafted it; it
17 matters what the order that we proposed says, and it
18 matters what the judge signs.
19      BY MR. CICACK:
20 Q.   Well, you don't think it matters what they
21 intended when they made the bid?
22      MR. PATERSON: Objection to form.
23 A.   I think what our agreement is is what matters.
24      BY MR. CICACK:
25 Q.   Well, the fact of the matter is when you

---

17:36:14-17:37:26                                          Page 292

1  accepted their bid, you had a different understanding
2  than they did as to what the distributable proceeds
3  waiver meant?
4  A.   Yeah.  That's possible, yeah.
5  Q.   No.  It's not possible; it's the truth, right?
6      You had a different understanding than
7  they did on what the distributable proceeds waiver
8  amount means, correct, when you accepted their bid?
9  A.   I had a different understanding than what is
10 reflected in the sale order.  I don't know what was in
11 their mind at the time.
12 Q.   It's pretty good evidence, right here, right?
13      MR. PATERSON: Objection, form.
14 A.   I don't know.
15      BY MR. CICACK:
16 Q.   You don't think this is good evidence?  It
17 tracks exactly what's in their letter.
18 A.   It's some evidence of what was in their mind,
19 yes.
20 Q.   Okay.  So you know that, as Mr. Broocks went
21 through earlier, the two of you -- at the time that you
22 accepted their offer and filed the Notice of Successful
23 Bidder, you and the Connecticut families did not have a
24 meeting of the mind as to what this "distributable
25 proceeds waiver amount" meant?

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

1    MR. WOLFSHOHL: Objection to form.
2  A.  Yeah.  I disagree with that characterization.
3    BY MR. CICACK:
4  Q.  Okay.  Well, you thought it meant something
5  different than what's in the sale order, though, right?
6  A.  Yes.
7  Q.  Okay.
8    MR. CICACK: No further questions.
9    FURTHER EXAMINATION
10    QUESTIONS BY MR. BROOCKS:
11  Q.  I just asked you just a minute ago, "When you
12  recognized this problem, did you pick up the phone and
13  call?
14    "No.
15    "Did anybody call?
16    "No.  I assumed -- I imagined calls would
17  have taken place."
18    I said, "Do you know anybody that called?
19    "No."
20    Do you remember just telling me that?
21  A.  I think that's roughly what I said.
22  Q.  Yeah.  I mean, remember you used the word
23  "imagined"?  I said I don't like that word.
24    Should I go back and read it to you?
25  A.  What's your question?

1  Q.  Your question is you just told him that you-all
2  got on the phone and talked to these people and got it
3  straightened out.  You didn't talk to anybody.
4  A.  I didn't talk to anybody, no.
5  Q.  Nobody, to your knowledge, talked to anybody?
6    MR. WOLFSHOHL: He just asked questions
7  about the order.
8    BY MR. BROOCKS:
9  Q.  Nobody, to your knowledge, talked to anybody on
10  the joint bidders' side to straighten anything out.
11  Isn't that what you just told me before I was --
12  A.  No.
13  Q.  You didn't tell me that?  Who told -- okay.
14  Strike that.
15    Who is it, your sworn testimony, on your
16  side that called anybody on the joint bidders' side to
17  fix this problem?  Who made the call?
18  A.  I'm going to answer your question this way.  My
19  counsel told me that there was an agreement.  My counsel
20  told me that there was an acknowledgment that the sale
21  order was wrong and that it would get fixed.
22    I surmised from that that that there was a
23  phone call between someone.  And when you asked me to my
24  knowledge was there a phone call, I said, I think so.
25    And you said, Oh, I don't want that.  I

1  want you to tell me what you know.
2    And I said, I don't know who called who.
3    Did somebody call somebody --
4  Q.  You said "I imagine so."
5  A.  You know what?  You're right.
6  Q.  So now you're saying that Mr. Wolfsohl told
7  you -- and that's fine.  If that's what he told you, I'm
8  not disputing that that's what he said.  But that's your
9  testimony today, is that Mr. Wolfsohl told you he'd
10  called and got it straightened out?
11  A.  No.  He told me it was resolved.  He didn't
12  tell me who he called or if he called or if somebody
13  else called.  I imagine there was a phone call.
14    All I know is that there's an agreement
15  between us and the joint bidders that the sale order
16  needs to be revised to reflect our agreement.
17  Q.  And you don't have anything in writing that you
18  can point us to at all that would substantiate that?
19  A.  I don't think so, not as I sit here.
20  Q.  All right.  Thank you.
21    MR. PATERSON: If no one has any other
22  questions, this is Paul Paterson of Paul Weiss for the
23  Connecticut families.  I'll be brief.  I just have a
24  couple of questions.
25

1    EXAMINATION
2    QUESTIONS BY MR. PATERSON:
3  Q.  You testified a few minutes ago about different
4  interpretations of the successful bidders.  Do you
5  recall that testimony?
6  A.  Yes.
7  Q.  And under both of those interpretations, in
8  your business judgment, was the successful bidders' bid
9  preferable to the First United bid?
10  A.  Yes.
11    MR. PATERSON: I have no further
12  questions.
13    MS. DRENGA: This is Deanna Drenga on
14  behalf of the Texas plaintiffs.  We just want to note
15  that we reserve our questions for the hearing.  Thank
16  you.
17    THE VIDEOGRAPHER: Are we done?
18    The time is 5:40 p.m., and we are off the
19  record.
20    (Proceedings concluded at 5:40 a.m.)
21
22
23
24
25

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

---

Page 297

CHANGES AND SIGNATURE

1

2  WITNESS NAME: CHRISTOPHER MURRAY

3  DATE OF DEPOSITION: December 5, 2024

4  PAGE LINE  CHANGE                    REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

---

Page 298

1      I, CHRISTOPHER MURRAY, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted above.

4

5                    _____

6                    CHRISTOPHER MURRAY

7  THE STATE OF _____)

8  COUNTY OF _____)

9      Before me, _____, on this day

10 personally appeared CHRISTOPHER MURRAY, known to me or

11 proved to me on the oath of _____ or through

12 _____ (description of identity card

13 or other document) to be the person whose name is

14 subscribed to the foregoing instrument and acknowledged

15 to me that he/she executed the same for the purpose and

16 consideration therein expressed.

17     Given under my hand and seal of office on this _____

18 day of _____, _____.

19

20                    _____

21                    NOTARY PUBLIC IN AND FOR
                       THE STATE OF _____

22 My Commission Expires: _____

23

24 _____No Changes Made _____ Amendment Sheet(s) Attached

25

---

Page 299

1            IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS

2                      HOUSTON DIVISION

3  IN RE:                    )

4  ALEXANDER E. JONES,       )    CHAPTER 11
                             )    CASE NO. 22-33553

5      Debtor                )

6            REPORTER'S CERTIFICATE
          ORAL DEPOSITION OF CHRISTOPHER MURRAY

7                December 5, 2024

8      I, Melinda Barre, Certified Shorthand Reporter in

9  and for the State of Texas, hereby certify to the

10 following:

11     That the witness, CHRISTOPHER MURRAY, was duly sworn

12 by the officer and that the transcript of the oral

13 deposition is a true record of the testimony given by

14 the witness;

15     That the deposition transcript was submitted on

16 _____, to the witness or to the

17 attorney for the witness for examination, signature and

18 return to me by _____;

19     That pursuant to information given to the

20 deposition officer at the time said testimony was taken,

21 the following includes counsel for all parties of

22 record:

23     Mr. Joshua Wolfshohl, Ms. Kenesha L. Starling,
   and Mr. Michael B. Dearman, attorneys for Chapter 7

24 Trustee Christopher Murray
       Mr. Walter J. Cicack, attorney for First United

25 American Companies, LLC

---

Page 300

1      Mr. Ha Nguyen, attorney for U.S. Trustee
       Mr. Ben C. Broocks and Mr. Shelby A. Jordan,

2  attorney for Alexander Jones
       Ms. Carolina A. Reckler, Mr. Christopher Harris,

3  and Mr. Jonathan J. Weichselbaum, attorneys for
   X Corp.

4      Mr. Paul A. Paterson, Mr. Kyle Kimpler,
   Ms. Vida Robinson, and Mr. Ryan Chapple, attorneys for

5  Connecticut Plaintiffs
       Ms. Deanna Drenga and Mr. Niko Letsos, attorneys

6  for Texas Plaintiffs
       Ms. Paula Brillson, attorney for The Onion

7

8      I further certify that I am neither counsel for,

9  related to, nor employed by any of the parties or

10 attorneys in the action in which this proceeding was

11 taken, and further that I am not financially or

12 otherwise interested in the outcome of the action.

13     Further certification requirements will be

14 certified to after they have occurred.

15     Certified to by me this _____ day of

16 December, 2024.

17

18

19                    _____

20                    Melinda Barre
                       Texas CSR 2192
                       Expiration:  12/31/25

21                    CONTINENTAL COURT REPORTERS, INC.
                       Firm Registration No. 61

22                    Expires:  01/31/2025
                       Two Riverway Building

23                    2 Riverway, Suite 750
                       Houston, Texas  77056

24                    (713) 522-5080

25

---

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

Page 301

```
 1                    FURTHER CERTIFICATION
                    BY COURT REPORTING FIRM
 2

 3        The original deposition was/was not returned to the

 4   deposition officer on _____;

 5        If returned, the attached Changes and Signature page

 6   contains any changes and the reasons therefor;

 7        If returned, the original deposition was delivered

 8   to Mr. Walter J. Cicack, Custodial Attorney;

 9        That $_____ is the deposition officer's charges

10   to First United American Companies, LLC for preparing

11   the original deposition transcript and any copies of

12   exhibits;

13        That a copy of this certificate was served on all

14   parties shown herein.

15        Certified to by me this _____ day of

16   _____, _____.

17

18

19                     _____
                       Diane S. Richer
20                     Operations Manager
                       CONTINENTAL COURT REPORTERS, INC.
21                     Firm Registration No. 61
                       Expires:  01/31/2025
22                     Two Riverway Building
                       2 Riverway, Suite 750
23                     Houston, Texas  77056
                       (713) 522-5080

24

25
```

**$**

**$1 (1)**
184:24
**$1,750,000 (2)**
247:10;279:22
**$1.2 (3)**
20:12;66:1,4
**$100,000 (3)**
98:24;99:21;280:5
**$173,000 (1)**
252:22
**$200,000 (1)**
248:8
**$209,550 (1)**
148:1
**$3.5 (3)**
19:19;85:1;89:17
**$4,350,000 (1)**
250:21
**$4.75 (2)**
164:4;165:3
**$500,000 (1)**
207:7
**$560 (1)**
192:22
**$650,000 (1)**
250:24
**$687,500 (1)**
92:9
**$7 (36)**
99:2;106:15;107:5,6,
7,18,21,25;109:3,16,
24;110:2,3,4;113:1;
124:15;126:13;135:25;
137:9;150:1;151:4,19;
161:2;162:2,4;165:12,
19;177:21;183:15,17;
226:24;227:10,13;
228:10;285:20;290:14
**$750,000 (1)**
87:6
**$94,050 (2)**
145:19,22

**A**

**ability (4)**
15:20;17:8,10;
291:11
**able (14)**
21:2;104:12;119:3;
129:7;143:9;163:21;
165:24;207:4;220:9;
242:15,22;257:16,18;
291:3
**above (3)**
88:11;111:12,14
**absolutely (2)**
95:5;223:19
**abuses (1)**
190:14

**academic (1)**
112:9
**accelerate (1)**
170:10
**accept (11)**
17:19;19:6;22:11;
23:24;74:18,21;
126:17;143:25;171:1;
199:17;284:18
**acceptable (2)**
244:18;245:22
**acceptance (2)**
174:21;218:19
**accepted (39)**
19:8,18,22,25;22:21;
26:1;51:24;86:4,23;
89:3;99:8;100:20;
101:2,5,8,12;104:22;
105:6,6,18;114:4;
115:7;116:3,6;125:15,
19,24;126:13;127:2;
145:20;168:23;173:20;
174:7;177:7,23;218:4;
292:1,8,22
**accepting (4)**
106:20;126:6;
178:10;230:9
**access (1)**
262:9
**accesses (1)**
129:7
**accompanied (3)**
15:18;17:8;55:7
**accomplish (1)**
157:20
**accomplished (1)**
207:15
**accordance (1)**
254:20
**according (1)**
259:24
**account (23)**
85:14,16;111:22;
113:12;121:18,19;
122:13;140:6;152:20;
228:25;263:4;265:1,2,
17;268:4,8,9,12;
274:17;275:6,7,8,10
**accountants (1)**
159:9
**accounting (1)**
146:16
**accounts (31)**
146:23;260:6,9,13,
14,17,25;261:1,4;
262:4,9,13,22;263:1,7,
7;264:12,20,25;
266:24;267:21,23;
269:19;270:2,24;
271:2,5,10,14,18;272:7
**accurate (6)**
19:2;29:10,12;82:8;
128:23,25

**achieve (1)**
163:24
**acknowledgment (1)**
294:20
**acquire (4)**
14:22;60:2;121:22;
242:15
**acquired (2)**
98:17;124:14
**acquiring (2)**
54:21;63:4
**acquisition (1)**
267:22
**across (1)**
108:13
**actual (9)**
90:17;114:14;
131:12;150:23;151:1,
21;161:23;163:5;229:8
**actually (31)**
11:10;13:17;27:21;
28:13;56:22;112:1,19;
113:16,19;124:7;
126:3;140:9,14;
146:19;147:15;148:6,
24;149:25;154:21;
162:24;164:20;180:19;
206:3;225:1;228:21;
243:10;267:16;272:15,
16;273:3;291:12
**add (6)**
48:9;66:18;76:3;
161:11;163:22;185:24
**added (8)**
13:8;14:5;54:7;68:2;
89:10;138:8;230:14;
267:13
**addendum (1)**
53:24;54:2,5
**additional (8)**
30:16;48:2;60:10;
82:4;84:9;123:7;127:7;
152:21
**address (2)**
159:25;288:9
**addressed (1)**
130:1
**addressing (1)**
239:1
**adjourn (1)**
48:6
**admin (3)**
112:3;134:18,19
**administer (1)**
258:7
**administrative (14)**
33:8;91:22;111:7,16,
23;144:22;152:6,19;
153:17;160:11;175:3;
249:25;252:7;253:6
**admins (6)**
113:13;118:22;
120:8;145:3;147:24;

163:22
**adverb (1)**
236:4
**adversary (1)**
139:10
**advice (1)**
75:4
**advisable (1)**
48:10
**advisor (1)**
123:2
**advisors (3)**
77:5;271:17,20
**affect (1)**
159:13
**affiliation (1)**
56:19
**affirmatively (6)**
110:8;113:21;
115:21;136:1;172:11;
241:7
**afforded (1)**
187:21
**afternoon (1)**
174:14
**again (36)**
25:21;31:2;42:18;
71:5,11;75:10;78:13;
79:15;96:6;117:11;
125:17;126:4;140:16;
141:19;151:19;154:19;
157:1;161:7;162:10;
178:14;183:14;184:14;
207:17;212:1;217:1;
228:7;233:6,25;
240:17;245:20;257:6;
258:3;271:10;275:13;
282:1,18
**against (18)**
21:4;73:20;80:7,9,
11,12;126:22;139:21;
185:21;188:22;190:2;
196:9;225:23;226:6,
19;227:16;228:12;
233:19
**agent (4)**
25:23,24;30:5,10
**aggregate (6)**
98:16;247:9;252:20;
256:2;280:6;289:12
**ago (11)**
111:6;132:15;
133:17;165:10;203:16;
206:14;232:6;282:7;
288:20;293:11;296:3
**agree (46)**
16:19;39:8;49:23;
58:16;64:14,21;67:6,8;
68:4;71:14,22;72:13,
17;74:1;92:17;93:12;
97:24;113:22;137:13;
146:25;147:9;165:6,
18;177:17;194:23;

201:15;207:19,23,23;
209:2,22;217:18;
234:9,10,10;235:25;
236:13;243:17;251:6;
254:8;260:24;269:5,
17;276:11;285:24;
290:2
**agreed (22)**
14:20;15:2;61:13;
97:19,20,22;135:15;
156:6,11;169:3;170:8,
10;183:12;196:4;
197:21;236:5;247:17;
270:3,4;278:24;279:2;
285:22
**agreement (41)**
15:3,5;70:19,22;
71:8,22,25;72:9,12;
96:17,18,22,24;135:19;
172:19,21,24;173:2;
230:24;244:7,8;
246:12;253:22;254:19;
255:3;276:13;277:7,
11,17,19;279:8,9;
285:7,11;289:18,25;
290:4;291:23;294:19;
295:14,16
**agreements (1)**
157:19
**Ah (1)**
176:11
**ahead (4)**
79:15;134:5;157:2;
217:23
**ain't (2)**
256:5;284:7
**Alex (56)**
8:12,22;9:19;11:6;
60:2;80:5,8,12;103:4,8,
24;132:4,7;186:19;
188:12;195:17,17;
197:13,16,24;199:2,5,
19;200:13,24;201:21;
208:17;218:24;219:16;
220:9,14;221:9;
222:15,19,20;223:17,
20;224:8,15,21;225:1,
22;226:14;227:2,15;
228:10,18;232:25;
238:8,20;239:4,5,9;
241:14;262:10;265:1
**allied (1)**
60:2
**allocated (1)**
230:19
**allocation (1)**
135:9
**allow (4)**
58:1,5;70:23;232:25
**allowed (17)**
24:11;27:24;28:22;
38:23;45:4;112:15;
155:10;187:15;195:3,

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

6,8,13,20;197:2;
203:21;280:4;289:10
**allowing (1)**
111:20
**allows (1)**
47:22
**almost (2)**
36:12,14
**along (2)**
15:19;73:23
**aloud (1)**
267:12
**alphabetical (1)**
259:20
**alter (2)**
80:4;200:14
**alternative (18)**
49:2;65:16;66:18;
108:7;109:15,17,23;
120:3;121:11;124:20;
141:25;173:5;175:20;
181:16,22;220:19;
246:12;290:15
**alternatives (1)**
173:11
**always (2)**
39:25;281:8
**ambiguity (1)**
136:12
**amendment (1)**
21:19
**American (7)**
8:9;16:11;112:23;
126:12;214:20;224:21;
230:10
**American's (1)**
134:9
**among (3)**
14:15;34:5;70:21
**amorphous (2)**
234:11,12
**amount (88)**
18:7;28:20;30:6,16;
32:9,11,12;33:2,5;
44:21;50:23;53:11;
55:13;60:15;65:5;73:4;
74:2,3,4,4,6;83:6;
88:25;89:12,14;90:17;
92:14;98:3,11,13,15;
99:24;100:2;112:15;
114:18;116:24;118:3;
119:2;120:3,18,22;
121:14,14;122:21;
137:3;138:3;152:7,8,
11;154:15;159:4;
162:12;163:5;168:2,
16;172:22;176:5;
181:8,9;183:23;
184:20;185:10,24;
230:21;247:22;248:9,
10;249:25;251:8;
253:6;254:22,24,24;
255:10,22;279:22,25;

280:1,3,4;285:20;
289:9,10,25;290:12,13;
292:8,25
**amounts (13)**
44:2;77:15;79:23;
82:20,21,22;135:5;
185:10;186:16;216:6;
229:8,19;230:2
**analogous (5)**
76:4;143:20,21;
144:1,6
**analysis (17)**
33:14;61:18,23;
92:10;120:12,16,19;
127:6;128:3,6;141:22;
167:4;187:4;200:3,8,
17;251:3
**analytical (1)**
148:15
**Analytics (2)**
190:25;191:18
**analyze (5)**
79:20;116:10;178:3;
215:19;216:2
**analyzed (2)**
234:24;235:8
**and/or (2)**
22:15;23:25
**announce (5)**
25:4,9;40:24;41:6,17
**announced (8)**
21:7,19,21;26:17;
28:16;37:4;96:9;177:7
**announcement (1)**
174:20
**announcing (5)**
41:12;45:6;47:22;
174:19;211:7
**answered (2)**
104:3;126:3
**anticipated (2)**
20:19;210:17
**anticipates (1)**
218:13
**anxiety (1)**
73:13
**anymore (1)**
186:22
**APA (5)**
129:14;249:19;
252:19;253:14;254:5
**apart (2)**
82:20;142:3
**apologize (5)**
25:10;146:6;174:17;
184:16;247:2
**apparently (1)**
46:17
**appeal (5)**
79:1;80:2;185:22;
186:5,7
**appeals (6)**
79:3,18,21;112:16;

186:1;196:1
**appearance (1)**
266:10
**appears (1)**
119:20
**appellate (1)**
187:9
**apples (2)**
148:9,9
**apples-to-apples (3)**
73:22;77:20;211:18
**applicable (1)**
36:20
**application (2)**
138:6,6
**applied (2)**
140:14;226:6
**applies (1)**
198:19
**apply (2)**
152:12;245:24
**appointment (1)**
191:14
**appreciate (2)**
31:18;60:23
**appropriate (2)**
35:23;137:3
**approval (12)**
12:25;13:3;19:9;
29:2,6,21;31:13,21;
137:14;243:20;245:16;
255:14
**approve (11)**
11:16;37:16;71:15;
72:14;84:9;86:15;
123:21;242:22;253:10,
14,21
**approved (8)**
13:5;50:9;70:24;
81:16;154:21;197:6;
203:3;254:6
**approves (3)**
31:23;253:15;255:3
**Approximately (3)**
10:7,13;11:13
**arbitrarily (1)**
152:25
**arbitrary (2)**
153:9,12
**architects (1)**
168:8
**argue (1)**
50:8
**argument (1)**
187:9
**around (6)**
12:9;56:12;85:18;
117:16;137:10;248:7
**articles (1)**
143:2
**articulate (1)**
243:6
**articulated (1)**

242:25
**ascribe (2)**
34:8,18
**ascribed (1)**
35:3
**aside (3)**
37:1;211:4;268:1
**aspect (1)**
73:18
**assert (1)**
166:1
**asserting (2)**
14:16;239:11
**asset (7)**
37:2,16;139:8;
197:19;204:8;230:15,
24
**assets (110)**
9:24;10:24;12:5;
13:23;14:2,8,14;18:8;
29:17,19,19;36:18;
37:10,11;38:5,16;39:9,
12;45:17;46:6;47:7;
48:23,24;49:1,1;50:18;
53:11;54:1,4;56:16;
60:2;63:4;70:23;71:14;
72:13;85:1;86:17;
98:17;121:22;123:17;
124:14,15;125:5;
129:13;131:4;134:22;
135:6,8,8;139:1;
173:10;191:13;196:9,
11,13;197:3,5,8,15,22;
198:10,11;199:25;
200:1,14;201:1,17;
202:18;203:1;204:10,
17,18,20;206:23;
208:16,19;209:11;
211:15;224:7,17;
226:9;230:12,14,22;
231:19;233:14;235:23;
239:5;242:15,20;
246:2;247:5;258:7,10;
260:10;261:13,17,18,
19,19,22;262:1;
263:21;267:18;270:24;
271:23;272:1,6;280:7;
289:13
**asset's (1)**
37:25
**assign (3)**
129:13;154:25;271:9
**assigned (1)**
66:15
**assignee (1)**
202:24
**assigning (2)**
154:17,22
**assignment (1)**
279:25
**associated (2)**
134:22,23;262:13
**association (1)**

56:19
**assume (9)**
11:15;78:2;81:8;
113:19;118:3;120:10;
135:2;195:8;228:17
**assumed (10)**
76:2;97:2;111:16,17;
126:8,9;139:1;184:4,5;
293:16
**assumes (1)**
42:17
**assuming (7)**
113:25;118:25;
143:9;162:17;164:22;
165:1;226:25
**assumption (5)**
112:22;126:1;139:3;
145:6;195:6
**assumptions (21)**
92:1;111:14;112:13;
118:25;120:9;121:2;
124:22;126:22;127:1,
5;131:1;148:23;152:4;
160:17;162:13,24;
164:17,20;251:10,23;
252:25
**assurance (2)**
219:9,13
**assured (1)**
203:19
**attach (1)**
286:4
**attached (6)**
87:2;116:16;129:12;
246:16;277:23,25
**attachments (1)**
284:15
**attempt (1)**
76:6
**attempting (3)**
82:14;83:19;101:19
**attendance (1)**
103:11
**attention (2)**
246:11;250:25
**attorney (2)**
70:10;71:4
**attorney/client-privileged (1)**
232:12
**attorneys (4)**
8:5,19;104:17;
123:24
**attractive (1)**
152:5
**attributable (1)**
34:24
**attribute (2)**
60:12,14
**auction (155)**
11:2,5,10,17;12:4;
20:18,18;21:21;22:16,
18,25;23:13,15;24:1;
25:24;26:3,5,6,10,11,

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

13,15,21,22;27:3,7,9,
13,14,25;28:1,2,4,14,
15,16,19;29:4,30:17;
36:1,18,22;37:2,10,11;
38:5,16,18,20,24;39:6,
6,12,12,21,24;40:1,2,9,
14,15,18,20,21,23,25;
41:3,6,8,12,18,22,25;
42:4,6,9,14,16,22;43:1,
4,7,11,14;45:5,6,18,21;
46:6,13,16;47:7,17,23;
48:6,8,11,12,13,14,15,
23,24;50:2;56:1,2,13;
57:21,22;67:10;69:10;
70:16;73:13;77:2,7,9;
78:5,11;128:16;
130:19;131:9;174:19;
207:21;208:20;209:4,
6,13,14,16,25;210:10,
12,17;211:1,5,22;
212:3;215:16;219:18;
220:15;225:8;226:18;
228:8,12;242:5;
243:12;244:5;246:6;
270:22,22;271:7,11,15;
272:1,9

**auctioned (1)**
208:16
**auctioneer (10)**
12:14,18;23:7;56:2;
81:14;129:10;135:15;
136:9;138:3;211:24
**auctioneers (1)**
214:7
**auctioneer's (3)**
134:25,25;135:2
**auctioning (1)**
226:9
**auctions (6)**
11:6;39:9;49:22;
140:16,19;141:4
**August (2)**
208:3;209:23
**Austin (7)**
218:17,22,23;220:3;
231:11;232:8;233:23
**authority (6)**
38:23;40:5,6;202:17;
263:21;267:17
**authorize (4)**
178:8;253:12;
259:10;264:6
**authorized (4)**
29:5,17;82:5;261:13
**authorizes (2)**
41:5,11
**authorizing (2)**
208:2;258:23
**available (12)**
33:6;89:13;91:23;
112:2;118:20;121:8;
145:5,18;161:5;164:2;
186:4;270:24

**Avi (2)**
57:14;71:6
**avoid (3)**
117:3,4;207:9
**avoidance (1)**
48:21
**avoiding (2)**
82:23;116:25
**awarded (1)**
29:3;192:22
**aware (7)**
70:7;157:22;217:14;
268:2;269:19;270:22;
271:4
**away (15)**
112:7;152:9,11;
157:9;192:10,11,13,17;
194:17,22;195:1;
196:1,24,25;198:5

**B**

**baby (1)**
250:17
**back (58)**
15:10;19:4;26:19,20;
27:12;39:8;45:12,17;
52:13;55:3;61:25;62:3;
78:12;81:3;84:8;89:11;
90:11;107:1,10;
114:14;116:12;117:10;
124:5;127:22;131:16;
137:14;141:9;144:20;
154:22,25;158:22;
160:13;163:22;164:25;
167:6;171:16;184:8;
189:9;196:12;198:1;
206:21;215:18;216:16;
217:11,16;225:20;
230:25;231:9;246:11,
25;249:15;256:1;
259:13;265:21;278:14,
14;285:4;293:24
**backed (1)**
162:11
**background (3)**
10:6,16;146:12
**backup (27)**
86:4,7;91:19;92:8;
106:22;111:5;134:8,
14;136:4;144:25;
145:9,21;152:5,16;
159:24;160:1,2,18;
164:21;218:6,9,13,14,
15;220:22;280:7;
289:13
**bad (4)**
51:17,17;118:5;
287:25
**bank (3)**
122:11,22;123:3
**bankruptcy (25)**
9:19;10:17,24;19:9;

29:2,7,20;31:13;67:3;
75:8;125:8;186:17,21,
24;187:3;189:10;
195:16;197:19,20,23;
202:17;204:17;255:3;
266:22;270:23
**Bannedvideo (2)**
260:16;262:6
**base (1)**
281:14
**based (50)**
32:5;33:5;34:12;
35:1,25;78:21;79:23;
97:21;100:2;105:7,18;
106:4,14;115:13;
116:2;120:1,11;
128:22;131:5;135:4;
137:4,20;138:5,7,7,11;
149:13,20;158:21;
165:3;166:4;168:5,16;
174:20,23;183:13,14;
185:2;189:5;193:2;
196:10;197:4;202:17;
225:7;226:19;250:20,
22;251:1;256:7;272:4
**basic (2)**
133:10;246:24
**basically (7)**
23:1;61:5;66:24;
107:17;113:23;118:21;
224:15
**basis (7)**
18:1,6,9;49:21;
95:14;242:24;243:3
**Bates (2)**
128:11;248:23
**beach (3)**
139:18,19,20
**beat (1)**
112:7
**Beautiful (1)**
55:6
**became (1)**
170:1
**become (2)**
200:15;255:25
**began (1)**
231:23
**begin (2)**
132:5;168:9
**begun (4)**
232:10,11;233:22,24
**behalf (5)**
9:4,9;57:7;71:10;
296:14
**belief (3)**
82:3;136:22;165:12
**belonged (1)**
239:4
**belonging (2)**
197:13,16
**belongs (1)**
197:17

**below (4)**
113:3;251:20;
279:25;285:21
**Ben (3)**
8:11;132:3,13
**benefit (9)**
64:18;73:17;157:4;
226:5;228:11,19;
239:25;258:8;280:2
**besides (1)**
211:20
**best (44)**
21:8;23:1;26:18;
43:20;44:5,15;60:20;
74:9;76:12;92:18;93:6,
8;100:21,23,25;101:2;
114:7,7,8,17,24;115:9;
116:6;125:4;126:14,
17,24;158:5;174:24;
177:19;182:5;206:17;
207:10;210:19;211:2,
21;214:23;216:5;
226:4;227:14,24;
238:18;245:12,15
**better (23)**
16:23;65:15;88:3;
99:14;111:10;112:1,
19;121:12;126:23;
130:11;141:24;152:13;
153:8;164:21;173:5,
12;175:20;183:16;
189:1;207:3;216:3;
230:9,12
**beyond (1)**
267:16
**bid (409)**
12:3,6,13,17;14:24;
15:15;17:7;18:7;19:18;
20:12,14,19,25;21:3,7,
10,10,18;22:6,16,25;
23:13,14,15,16,24:1,5,
6;27:6;28:16,20;30:6,
16;37:25;39:10,11,24,
25;40:7;43:20;44:5,7,
8,9,13,14;51:6,10,24;
52:3,18;53:3,3,11,18,
19,22;54:2,3,22;55:1,6,
10,13,14,15,17;57:1,3,
8;58:2,8,9,15;59:4,9,
19;60:7;61:3,6,15,19,
20,22,25;63:2,8,14,23;
64:4;65:4,7,12,12,16,
20,23;66:1,18;69:5;
73:2,12,15,16,17,25;
74:1,8,9;76:3,8,11,13;
77:18;78:3;81:5,7,13,
19;82:4,7,8,10,15;83:2,
4,13,18,21;84:2,9,16,
17,19;85:7;86:3,4,4,7,
22,24;87:10,14;88:3,
18;89:3,6,12;90:17;
91:19,19,19,22;92:8,
10,10,13,18;93:12,17;

94:11;96:2,5;97:24;
98:3,12,16,23;99:7,8,
14,22,23,23;100:1,10,
13,14,16,20;101:3,4,8,
12,13;103:3,8,8,16,16,
23;104:22;106:21;
107:25,25;108:6,7,12,
14,17,20;109:4,6,14,
17,24;110:4,13;111:2,
5,22,25;112:1,7,23;
113:11,15,19,23;114:3,
8,10,18,18,19,20;
115:4,5,12,17;116:2,9,
12,16,18;117:6;120:4,
4,22,23,24;121:12,15;
122:22;123:11,13;
124:15,20,23;125:15,
19,20,25;126:6,12,14,
16,17,24;128:3;130:20,
24;134:9,9,14,16;
135:5,22,23;136:10;
137:24;138:1;141:17,
25;143:25;144:25;
145:9,20,21,25;147:18;
148:7,18;151:21,23;
152:13,16;153:7;
156:2;159:24;160:2,
18,20,21,22,25;161:1,
3,5,6,12,15,19,20;
162:2,4,12,23;163:3,6;
164:8,9;165:7,19;
168:4,16,17,23;174:1,
6,23,24;175:16,17,18;
176:12,24;177:5,5,6,
19,21,25;178:6,17;
179:5,7,8,13,15;
180:11,19,23,23;181:8,
16,22;184:18,18,20,24,
25;185:9;189:1;
203:21;204:4,5,6,7,20;
205:11,19,22,25;206:3,
17;208:20;209:12;
211:21;212:2,12,16;
213:1,3,16,19,22;
214:2,10,22;216:5;
217:17,19;218:4,6,18,
19;224:19;227:14;
229:12;230:3,5,9,10,
13,21;241:6;245:25;
250:21;251:1,12;
279:6;280:22;290:20;
291:21;292:1,8;296:8,
9
**bidder (50)**
20:22;21:11;30:5,11;
44:14;48:23;70:23;
72:24;73:2,13;77:9,10;
96:9;98:18;106:21,22;
112:19;117:3;120:3;
122:2;136:4;152:5;
160:2;164:19,21;
206:7,10,19,19,25;
207:3,6,6,6;218:8,9,13,

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

15,15,25;221:19;271:1,
4,9,13;272:5;280:7;
289:13;290:16;292:23
**bidders (119)**
12:7;13:4;14:21;
15:24;16:2,14,20,21,
23,25;19:12;20:22;
21:9,12;22:17;24:2;
27:24;28:22;31:24;
38:1,1,2,4,10,11;40:3;
43:10,19,23,24;44:2,6,
9,22;46:12;48:23;
49:13;51:2;54:13;55:8,
14;68:9,15;69:5,12,15;
73:7;74:2,8;76:14;
77:17;81:18;82:11;
83:3,19;84:3;85:23,23;
86:16,23;90:18;94:8;
106:23;114:17;121:15;
123:14,20,24;131:1,5;
137:22;138:1;141:17;
151:22;163:6;167:2;
178:5;179:6;196:15,
20;206:7;207:1,5;
208:21;209:7,14;
211:15,16;214:12;
215:4;216:2,11,23;
217:12,15,17;224:6,6;
225:20,24;226:25;
229:6,11;232:15,21;
277:18;279:2;280:23;
281:7,18;285:9,19;
286:3,8,17;287:9;
288:3;295:15;296:4
**bidders' (11)**
89:11;121:21;
136:10;147:19;205:11,
21;218:4,19;294:10,
16;296:8
**bidding (27)**
18:8;22:1,17,22;
24:2,8;27:7;44:9;68:8;
73:23;77:9,10,20;82:1;
100:7,8;122:2;123:19;
131:5;204:10,18;
205:8;207:2;211:15,
19;214:13;241:5
**Bids (63)**
15:18;16:3,4,25;
17:1,9;18:1,5;19:16,21,
22,23;20:1,4,17,20;
21:13,16,25;22:11,22;
23:24;26:1,17,17,18;
29:3;38:3,3,13;40:8;
43:21;44:2,11,18,19,
20,21;48:4,17,17,18;
68:23;76:19;78:7;81:9;
82:1,19;92:18;101:10;
109:15;114:19;115:10;
130:18;131:11;181:24;
203:20;211:6,9,11;
216:12,25;241:3
**bid's (1)**

151:1
**big (2)**
80:24;286:21
**billion (1)**
185:21
**binding (1)**
267:24
**bit (15)**
10:5;17:24;65:8;
73:13;83:12;133:17;
136:12;139:15;147:8;
148:11;163:16;207:8;
208:12;225:10;274:19
**blank (1)**
255:9
**blanking (1)**
56:4
**Blinson (1)**
56:5
**blue (2)**
250:8;267:12
**board (1)**
199:13
**Bob (3)**
220:5,14;222:5
**body (2)**
240:2;282:21
**bogey (2)**
101:14;146:1
**bologna (1)**
281:2
**bonds (1)**
146:22
**book (3)**
246:19,20;249:1
**border (1)**
273:20
**both (19)**
10:19;16:15;17:9;
19:17;33:18;38:13;
46:12;96:16;106:5;
118:7;133:20;169:11;
173:5;214:12;216:11;
239:16,17;283:21;
296:7
**bottom (16)**
48:1;63:18;82:18;
110:24;120:10;124:9;
133:4;178:25;249:7;
250:9;265:7;267:11;
273:25;275:12;282:8,
23
**bought (2)**
223:5;233:10
**bound (3)**
269:5,17;270:4
**box (1)**
274:20
**break (15)**
33:24;52:6;62:19;
89:24;90:3,15;92:5;
102:18;105:25;106:11;
127:9,24;128:7;

222:15;252:2
**brief (5)**
56:6;168:15;257:3,
12;295:23
**briefly (1)**
270:21
**bring (1)**
151:11
**Brinson (1)**
56:5
**broad (1)**
235:8
**broadcast (4)**
221:12;222:8;
224:11;234:15
**broadcasting (1)**
222:15
**broadcasts (1)**
221:10
**Broocks (123)**
8:11,11;94:17,20,25;
95:7,12,23;96:11,16,
22;97:1,5,10,15,19;
104:10,24;105:3,8,16,
20;106:9,12;132:2,3,
11,12,13,20;141:11,13;
147:7,16;153:3,13;
154:18;155:4,18;
156:3,8,15;165:16;
166:10;167:16;172:9;
176:25;177:8;178:21,
23;179:1,3;181:3;
182:21;183:2;187:17;
188:4,16,20;189:3,23;
190:5,15,22;191:4,8;
192:15;193:12,20;
194:4,11;195:24;
198:23;200:6;201:4;
202:14;203:5,11;
205:4,17;217:9,22;
231:2,10;236:3,9,25;
237:11,21;240:13,16,
23;241:24;243:5;
244:13,24;245:3,9,14,
19;246:8,10;249:16;
256:18;264:18;276:5;
278:7;281:3,10;283:2,
6,8,23;284:7,10,18,24;
285:3;288:11,14;
292:20;293:10;294:8
**brow (1)**
196:17
**buck (1)**
184:11
**bucks (2)**
162:19,20
**building (1)**
165:25
**bullet (3)**
17:25;18:12;50:18
**bullshit (1)**
94:22
**business (14)**

37:24;47:9;54:10,15;
60:3;67:25;75:24;
115:6;126:11;194:2;
198:15;200:20;203:7;
296:8
**businesses (1)**
192:1
**buy (1)**
224:7
**buyer (6)**
196:18;242:3;
244:18,18;246:6;281:9
**buyer's (3)**
30:7,13,15
**buying (1)**
223:3
**buys (1)**
242:23

**C**

**calculable (1)**
74:5
**calculate (2)**
168:16;184:15
**calculated (13)**
32:2;77:16;89:15;
128:4;136:6;138:4,9;
140:11;177:22;254:17,
17;255:24;256:7
**calculation (4)**
66:5;101:18;102:2,
15
**calculations (3)**
90:16,22;124:20
**call (50)**
13:6;16:9,19;36:7,
11,12;56:3,6,9,14,22;
68:23;69:18,20;70:17;
74:13;81:5;93:25;94:1;
114:23;132:16;142:4;
146:6;153:23,24;
161:19;167:19;169:2;
170:4;173:23;175:10;
182:16,25;183:1;
198:11;206:2;276:10;
287:8,11,17,24;288:2,
5;293:13,15;294:17,23,
24;295:3,13
**called (14)**
14:16;167:6;203:17;
232:3;240:12;288:23;
289:1;293:18;294:16;
295:2,10,12,12,13
**calling (5)**
36:6;148:12;155:7;
163:14;240:21
**calls (11)**
55:21,23;104:3;
171:22;183:3,5;
189:21;193:18;240:7;
242:7;293:16
**came (24)**

57:3;68:23;71:21;
89:17;114:10;122:7,
18;123:8;142:22;
143:25;147:23;153:25;
166:20,23;169:18;
183:21;205:19,22;
213:22;214:2;241:6,
12;242:13;286:5
**Can (110)**
8:5,18;16:15,19;
18:24;24:19;31:12;
35:19;36:5,6;37:6,9;
45:10,13;50:15;52:17;
55:21,22;58:24;82:11;
86:19;89:22,24;91:5;
102:13,17;111:25;
117:18,22;121:9,11;
126:22;127:12,25;
128:14;130:16;132:24;
133:12;134:1;135:11;
137:7,25;138:8,10;
139:14;144:5,8;
156:18;165:23;167:10,
11,14;168:20;170:20;
179:17,19;183:15,20;
184:1;186:1;199:17;
203:6;208:6;212:1;
214:18,19;219:12,13;
220:25;228:4;234:6,8,
11;236:15,20;237:6,7,
18;239:20;242:10,12;
245:3;248:3,4,19;
249:9;252:11,18;
253:3;254:17;256:22;
260:12;261:6;262:3;
263:18;264:9;265:3;
267:4,11;268:17;
269:2;273:19,25;
274:2;278:14;280:19;
282:17;284:22;291:8;
295:18
**Canada (1)**
273:20
**cancel (7)**
41:22;42:1;45:22;
46:2,10,22;48:14
**canceled (3)**
46:14;47:7;223:6
**canceling (3)**
42:4;45:24;47:13
**cancellation (2)**
46:8,20
**capacity (2)**
240:4;271:21
**capital (3)**
28:5;41:7;48:12,14;
50:2
**capitulated (1)**
279:10
**capture (1)**
206:18
**car (1)**
218:16

**card (1)**
223:2
**care (1)**
224:1
**career (1)**
149:11
**careful (2)**
194:23;281:20
**carefully (2)**
137:25;283:7
**Caroline (6)**
8:23;25:8;256:23;
257:7,22;273:7
**case (36)**
30:18;57:24;78:20;
79:24;120:13;125:5,8;
133:8;139:9,23;
140:12;142:20;143:23,
24;144:2,2,8,13,18;
149:17,19;186:8,17,18,
25;187:5,6,25;188:6;
197:23;207:20;209:3;
226:8;241:14;251:13;
258:4
**cases (10)**
10:7;10;75:22;76:1;
142:16,22,25;241:11,
13,16
**case-wise (1)**
143:16
**cash (123)**
18:1,6,9,11;32:17;
33:6;51:5,7,22,22,25;
62:17,20,25;63:17;
66:19;73:6;74:3;76:7,
13,21;77:10,10,15;
82:20;85:5;87:5,13;
89:8,12,14;91:21;
92:18;108:7;110:6;
112:2,7;113:1;115:5;
121:14;126:13,17;
134:16;135:5;136:5,6,
10;137:19,21;138:11;
139:22;140:9,13;
145:2,3,4,17,18,25;
146:2,4,6,9,11,15,21;
147:2,5,15,18,23;
148:6,8,24;149:1;
150:20;151:1,4,18;
159:4;160:2,17,20,21,
22,25;161:4,5,10,22,
23,25;162:8,12,20;
163:5,5;164:2,8,14;
168:3,19,21;177:6;
183:23;184:2,7;
185:11;204:8,22;
211:18;229:9,11;
247:10,14;251:3,8;
256:3;279:22,22;
280:9;289:15;290:14
**catch (2)**
281:21,22
**categories (1)**

153:20
**cause (1)**
156:24
**caused (1)**
230:11
**causes (1)**
44:8
**ceiling (1)**
112:3;182:4
**cell (1)**
248:22
**Central (3)**
8:3;90:11;127:22
**certain (7)**
32:6;33:9;118:3;
130:25;242:5,14,15
**certainly (4)**
46:5;67:13;136:13;
165:24
**certificate (5)**
259:14,24;265:22;
266:2,12
**certifying (1)**
123:2
**challenge (1)**
143:24
**chance (4)**
44:10;79:6;214:21,
22
**change (23)**
23:21;24:5;29:13;
39:23;40:24;41:15,17;
45:6;47:22;77:15,17;
101:15;111:15;121:1;
147:10;162:3;209:17;
210:10;211:1,3;229:4;
230:11;289:20
**changed (6)**
24:4;42:17;43:16;
47:23;83:21;210:4
**changes (7)**
21:19;41:11;100:2;
117:23;119:7,12;152:9
**changing (2)**
23:17;152:4
**chaotic (1)**
77:13
**CHAPPLE (2)**
9:6,6
**Chapter (14)**
8:16;9:20;10:8,11,
22,23;29:19;121:19;
124:12;125:3;197:22;
258:4;267:17,19
**characterization (3)**
166:5;211:5;293:2
**characterize (5)**
46:17;51:15;153:12,
14,15
**characterizing (1)**
276:14
**charged (1)**
30:16

**chart (44)**
107:23;108:3;109:9,
12,18;110:15;111:21;
112:5,10;113:3;
133:14,16,19;144:20,
21;145:21;151:25;
152:2,12;153:1,1;
159:18,23;160:7;
161:4,9,19;162:7;
163:2,3;173:25;174:5;
175:1,6,14,15,16,19;
177:17;250:1,4;
251:20;264:21;265:7
**charts (1)**
110:23
**chart's (1)**
109:19
**chip (1)**
151:2
**Chris (7)**
8:17;9:8;134:1;
183:11;213:24;273:6;
285:5
**Christopher (4)**
8:2;9:12,17;25:11
**Ci (1)**
64:13
**CICACK (74)**
8:8,8;9:15;11:21;
12:1,2;24:19;25:1,5,15,
18;30:24;52:5,16;
54:25;71:12,24;79:16;
80:21;83:17;84:14;
89:21;90:2,12;95:20,
24;96:20;97:8,23;98:7;
100:17;101:17;102:10,
17,24,25;104:6;106:2,
13;114:22;115:2,15;
116:7;127:9,13,23;
131:19;133:17;138:13;
141:8;154:10;174:25;
178:15,18,20;203:17;
204:24;206:2;240:10,
11,15;276:5;277:4;
278:5;281:1;288:12,
16;290:23;291:7,19,
24;292:15;293:3,8
**C-i-c-a-c-k (1)**
8:9
**Cicack's (1)**
132:17
**circle (2)**
250:13;251:1
**circulated (1)**
166:24
**circumstances (1)**
48:10
**cites (1)**
192:20
**claim (26)**
58:12,17,22;59:3,17,
19;70:12;73:20;78:16,
21;80:6,8;120:18;

139:21;140:3;186:23;
204:9,10,11,16,17;
210:10;212:25;213:3;
227:7;228:25
**claimants (1)**
154:7
**claims (50)**
69:25;75:23;78:19;
79:22,22,24;80:4,10,
11,11,13,14;92:4;
111:7,17;112:4,4,15,
21;120:8,11,13,16;
139:6,12;143:25;
152:10;155:10,11;
183:24;186:15,20;
187:16,23;195:3,6,15,
19;196:8,10;197:2;
226:19;243:8,11;
249:24,25;252:9,12;
253:4,6
**clarification (7)**
68:14;99:9,12;
100:11,18;106:22;
167:14
**clarify (5)**
67:18;132:6;206:3;
228:4;257:13
**clarity (2)**
133:3;137:6
**class (36)**
111:5;145:14,18;
147:25;148:2;149:18,
19,24,25;150:24;151:9,
11;153:22,23;154:17;
155:9,10,22;156:22;
157:5;158:1,3,15;
160:17;161:10;162:14,
17,18,18;163:14,19,25;
164:25;173:18;251:9,
11
**classes (1)**
149:22
**class's (1)**
148:13
**clear (12)**
26:12;27:8;28:12;
47:16;68:2;103:1;
132:15;142:1;165:23;
189:17;284:11;285:4
**clearly (3)**
126:25;173:6;286:7
**clever (2)**
210:7;253:18
**client (11)**
16:10,12;49:23;50:7;
53:25;61:6;66:1;73:21;
114:9,11;131:5
**close (15)**
15:20;17:8,10;29:5;
75:19;112:21;144:18;
176:6;218:8,9,14;
224:18,20;251:25;
253:17

**closed (1)**
129:21;224:5
**closing (4)**
30:1;31:20,20;
253:23
**clue (3)**
215:7,8;236:18
**Code (5)**
10:24;198:15;
200:21;202:17;203:7
**collaborated (2)**
235:16;236:6
**collaborates (1)**
236:14
**collaborative (1)**
12:23
**collateral (2)**
204:8,11
**colleague (2)**
9:5;272:17
**colleagues (4)**
25:9;143:14;271:17,
20
**collectively (2)**
193:2;196:22
**Collins (1)**
55:24
**column (19)**
111:1;133:22;
134:12;145:24;147:14,
14;148:3,4,5;150:13,
22;151:14;152:14;
159:21,25;160:4,14,19;
162:21
**columns (1)**
134:10
**combination (2)**
81:12;262:17
**comfort (1)**
144:15
**comfortable (2)**
16:14;74:20
**coming (7)**
105:25;122:3;159:5;
207:7;223:6;256:8;
273:6
**comment (1)**
206:9
**commented (1)**
81:15
**comments (3)**
124:3;259:6;264:1
**commercial (1)**
142:3
**commission (14)**
31:9,12,19,25;32:9,
17;134:24,25;135:3,
19;136:6,12,16;138:9
**commitment (2)**
254:21;279:23
**committed (1)**
189:15
**common (9)**

94:18;96:14,15;
97:21;104:20;105:12;
106:4;167:13;244:2
**communicate (3)**
44:17;83:19;229:24
**communicated (4)**
96:1,1;149:7;288:23
**communicating (3)**
83:23;98:21;117:3
**communications (3)**
35:12;97:21;232:13
**Companies (5)**
8:10;16:11;192:5;
198:20;219:11
**company (1)**
225:12
**comparable (1)**
146:9
**compare (7)**
11:6;91:17;109:14;
148:22;179:13;180:1;
229:19
**compared (2)**
22:14;23:24
**comparison (5)**
65:22;92:3;111:5,8;
112:22
**compensated (3)**
34:23;35:5;136:15
**compensation (14)**
32:10;34:7,11,17,17,
20;35:1,23;137:4;
138:4;140:4,9,11;
211:17
**competing (7)**
21:4;109:15,17;
110:13;128:3;180:11;
185:9
**competitive (2)**
22:17;24:2
**complaint (4)**
95:4,18;103:4,9
**completely (1)**
64:8
**complex (1)**
11:8
**complexities (1)**
11:4
**complexity (1)**
84:24
**complicated (3)**
84:23;206:22,24
**complies (1)**
25:20
**component (10)**
51:5,7,14,20,22;
62:18;63:24;138:19;
140:5;164:8
**components (9)**
51:10;76:15;82:19;
83:24;100:16;140:20,
25;141:5,6
**computed (2)**

136:17;254:11
**computer (2)**
144:10;232:21
**computers (1)**
231:14
**concede (2)**
106:17,20
**concept (16)**
59:7,13;60:17;63:20;
65:2;72:19,25;73:4,8;
75:13;76:8;83:20;
180:3;214:9;242:6,22
**concepts (1)**
184:10
**concern (4)**
54:11,15;58:11;
225:8
**concerned (4)**
123:17;233:9,16,18
**concerning (1)**
129:24
**concerns (2)**
125:11;233:13
**conclude (1)**
169:10
**concluded (4)**
37:12;80:1;169:2;
296:20
**conclusion (8)**
79:10,18;104:3;
189:22;193:19;271:7,
10,14
**conclusions (1)**
194:1
**conditions (2)**
137:8;254:3
**conduct (3)**
221:3;261:21,22
**conducted (3)**
27:25;270:22;272:9
**conducting (2)**
48:10;271:4
**conference (1)**
97:9
**confident (1)**
122:14
**confidential (1)**
233:2
**confirm (4)**
132:25;141:19;
179:23;257:16
**confirmation (2)**
276:13,16
**confirmed (1)**
210:9
**conflict (2)**
243:21,22
**conform (1)**
276:23
**confused (2)**
162:3;226:17
**confusing (1)**
178:6

**confusion (2)**
132:9;178:5
**Connecticut (146)**
9:1,7,9;32:20;57:1,7,
7,12,18;61:1;63:3,7;
65:3;66:3,7;68:18;
69:17,22;70:20,24;
71:23;72:1,14,15;
74:12;78:15;80:4,9;
86:9;89:13;92:4;93:22;
94:1,10;95:15,25;96:8;
101:22;103:2,7,15,20;
112:16;118:19;119:2;
120:7;124:9,12;125:3,
7,19;145:7,13,22;
147:25;148:24;149:5,
23;150:8,20;151:2,7;
152:8,10;153:21;
154:2,6,16,22;155:8,
11,15,25;156:21;157:6,
8;158:14,23;161:6;
162:14,16,17;163:9,20;
164:22;165:11,18;
167:24;168:9;171:18;
173:9;183:7,25;
185:20,21;186:1,8;
189:4,16;190:9;192:9,
16,23;193:1;194:16,
19;195:25;196:8,14,16,
21,24;203:20;204:15;
206:1;212:11;214:1,8;
225:20;226:15,17;
227:19,23;228:17,20;
239:25;241:20;244:15;
249:24;251:10;252:10;
276:7;278:1;279:21,
23;280:8;281:6,17;
285:8;288:23;289:14,
19;290:20,25;292:23;
295:23
**Connecticut/Texas (1)**
246:3
**Connecticut's (5)**
57:15;111:17;148:6;
153:7;161:23
**connection (4)**
9:22;11:5;12:4;
49:24
**consent (5)**
200:25;201:1,5,19,
21
**consenting (1)**
201:12
**consequences (7)**
158:13,16,21,24;
159:10,12,13
**conservative (4)**
92:1,2;111:15;
112:12
**consider (18)**
10:3,15;23:17,19;
24:8;58:8;59:4;72:21,
24;106:25;107:5,8;

109:4;115:10;229:17,
22,23;230:3
**consideration (38)**
35:25;60:5,10;63:18,
20;64:2,6;67:13;76:2,
25;77:8;82:20,21;84:8;
87:5,24;125:9,12,16,
21;138:19,21;139:4,
13;151:18;185:11;
188:25;192:10;206:25;
207:1;230:16,20;
247:1,4;256:2;279:20,
22;285:9
**considerations (1)**
177:16
**considered (11)**
78:14;87:22;102:20;
107:17;109:6;115:8;
116:5;117:8;138:10;
145:4;230:23
**considering (6)**
34:7;73:8,10;75:25;
107:9;177:17
**consist (1)**
196:20
**consistent (3)**
244:4;267:19;290:5
**consists (1)**
279:21
**constant (1)**
222:8
**constantly (2)**
262:24;263:7
**constitute (2)**
38:3;239:9
**constitutes (1)**
192:22
**constitutional (1)**
187:20
**Constitution's (1)**
194:18
**consult (1)**
143:5
**consulted (2)**
74:22;143:6
**contact (4)**
166:13,15,19,20
**contacted (1)**
166:7
**contained (1)**
245:16
**contemplate (1)**
72:9
**contemplated (4)**
32:15;48:25;54:1;
260:13
**contemplates (1)**
249:20
**contemplating (3)**
201:16;209:24;210:2
**content (3)**
231:18;262:25;
268:11

109:4;115:10;229:17,
22,23;230:3
**contentious (2)**
186:18;187:6
**contest (2)**
50:14,15;217:20
**contested (2)**
85:8,8
**context (9)**
122:20;146:20;
166:21,22;175:15;
176:11;194:13;245:25;
260:9
**contingencies (6)**
82:24;85:4;117:1,4;
229:13,22
**contingency (3)**
84:4;100:9;214:17
**contingent (11)**
83:7;10;99:17,23;
100:1;115:13,19;
117:7;244:18;245:22;
246:5
**continue (10)**
54:10;60:3;125:6,24;
126:11;144:24;219:5;
223:22;224:3,4
**continued (1)**
191:14
**continuing (2)**
178:14;270:2
**continuously (1)**
77:5
**contract (4)**
251:14;253:9,10;
255:16
**contradiction (1)**
100:10
**contradictory (4)**
99:6,12;106:17;
177:15
**contribute (3)**
66:19;173:22;252:11
**contributed (1)**
235:16
**control (4)**
191:13;202:19;
223:2;231:19
**controls (1)**
262:15
**conversation (31)**
35:20,21;57:25;
58:11,14;59:5;95:3,15;
97:2,12,13,16,18;
167:17;168:12,15;
169:7,9,13,15;171:13,
14;172:4;205:18;
241:2,8,19;272:1;
276:5,11;277:5
**conversations (22)**
35:7;57:6;58:20,25;
76:17;95:21;103:6,15;
171:7,23;178:9;
213:15,18,25;214:8;
215:3;217:2,12;

241:19;243:15;271:18,
22
**conversion (1)**
187:1
**convert (1)**
23:15
**converted (1)**
23:12
**conveyed (1)**
214:18
**convince (1)**
175:17
**convincing (1)**
189:17
**co-ownership (2)**
235:21,25
**copies (6)**
33:23;34:3;89:23,25;
179:21;245:7
**copy (7)**
53:2;134:4;208:1;
244:20;245:3;248:17;
266:5
**copyright (8)**
234:7,14;235:15,17;
236:6;238:4,15;239:8
**copyrightable (3)**
236:14,15;238:9
**copyrighted (2)**
234:21;237:17
**co-rights (1)**
235:21
**corner (1)**
250:10
**Corp (7)**
8:24;257:7;259:16,
23;266:1,4,7
**corporate (3)**
198:13;199:21;
200:13
**correctly (9)**
15:21;29:8;107:16;
126:4;165:14;185:19;
240:8;244:9;252:1
**cost (3)**
134:18,20;223:6
**costs (12)**
33:8;91:22;92:1;
111:16,23;134:22;
152:6,19;153:17,20;
160:11;175:3
**counsel (30)**
12:19,20;15:6;23:9;
56:3,6;57:11,14;74:22;
81:14;94:8,10;103:17;
123:23;143:6;170:15,
15;183:6;200:9;235:3;
259:6,11;264:1,6;
266:9;280:20;287:13;
289:1;294:19,19
**count (1)**
175:3
**couple (17)**

35:16;54:1;73:10;
89:18;111:14;112:16;
130:22;138:16;140:18;
158:6;192:8;223:11;
232:6;274:4;275:17;
288:12;295:24
**course (4)**
50:15;178:25;
194:25;230:23
**court (65)**
9:11;11:16;19:9;
23:19;24:8,17;29:2,7,
18,21;31:14,21,23;
42:3,7,8;46:25,25;47:3,
8,16,17;49:21,24;
67:17,18;84:9,9;86:15;
87:3;97:12;137:14;
138:6;144:15;155:19;
168:11;174:10,11,14;
186:1,2,2,12;188:10;
189:10,10,12;192:17;
193:7;196:1,3;199:22,
24;200:10,11,16;
217:16;218:1,5;221:7;
225:8;252:18;255:3;
266:22;270:23
**courthouse (1)**
11:10
**courts (1)**
75:24
**Court's (1)**
24:9
**cover (1)**
89:14
**covered (1)**
257:4
**create (7)**
73:22;206:11;224:8;
236:14,21;243:20;
245:1
**created (5)**
117:14,14;118:1;
136:13;243:17
**creation (1)**
236:6
**credit (25)**
58:2,8,9;67:19;
203:20,21;204:4,5,6,
18;205:8,19;223:2;
225:22;226:14,22;
227:2,6,15;228:11,14;
229:1,2,3,4
**creditor (8)**
57:24;139:10;
163:14;204:7;226:8;
239:23;240:4,5
**creditors (89)**
10:19,21;32:21;33:6;
58:2,12;60:25;61:17;
65:5,14,14;66:3,3,10,
13,16;67:1;68:1,3;
88:19;89:13;91:18,24;
92:9;94:13;96:3;98:1,

13;99:21;100:25;
101:9,21;111:11,24;
113:18;119:3;124:16;
125:4;129:25;133:24;
134:7;141:24;145:5,
10,12,13;146:5;
148:17;149:8,8,12,18,
22;151:3;152:7;155:2;
157:4,20,25;158:2;
163:10,10;165:4;
168:7;181:10;184:6;
204:16,23;205:9;
216:3;226:12,18;
230:8;239:15,18,19,21,
22,24;240:2;243:13,19,
23,25;258:8;280:2,5;
289:11;290:13
**creditors' (1)**
206:1
**Cross (1)**
95:11
**culminated (1)**
208:4
**curious (4)**
164:15;202:24;
203:3;283:25
**currency (4)**
58:12,18;59:17;
74:19
**custodian (1)**
198:10
**customary (2)**
208:19;209:12
**cut (1)**
225:13

**D**

**damages (2)**
192:22;267:22
**dash (3)**
151:14,16;246:21
**data (4)**
54:7,20;129:6;
177:20
**date (15)**
8:2;37:22;69:3,4;
173:13;274:1,2,20,21;
275:13;279:9;282:5;
287:1,2,5
**dated (1)**
174:10
**day (11)**
120:17;169:20,21;
174:16;218:17,20;
220:23;221:6,10;
253:4;287:7
**days (8)**
26:16;37:24;47:9;
170:19,21;172:1;
190:7;255:6
**deadline (3)**
26:18;37:25;174:13

**deadlines (1)**
48:3
**deal (27)**
76:1;149:9,11,13;
150:1;7;154:20;158:9;
160:23;164:4;165:3;
167:7;172:5,17;
173:19;174:12,15,18;
176:21;181:17;225:23;
226:15,24;227:10,13;
245:21;246:5
**deals (1)**
172:18
**deal-wise (1)**
139:5
**Deanna (2)**
9:3;296:13
**death (1)**
190:10
**debited (1)**
227:23
**debtor (1)**
270:3
**debtors (2)**
10:19,20
**December (6)**
8:3;10:2;170:23,24;
274:8;275:14
**decide (4)**
72:20;77:1;228:15;
243:8
**decided (25)**
24:7;27:10;28:9;
38:24;39:5,23,25;40:2,
11,14,17;42:13,16;
43:17;44:17;60:19;
67:9;77:7;85:19;
207:17;210:13;211:5,
21;212:2;229:2
**decides (1)**
217:16
**deciding (1)**
215:15
**decision (14)**
39:2;63:25;67:14,24;
68:3;78:9,10,11;88:2;
104:14;105:7;143:25;
211:8,10
**decisions (1)**
149:20
**declined (1)**
210:6
**decrease (1)**
162:9
**deduction (1)**
228:19
**deemed (1)**
200:1
**defaming (1)**
125:7
**defeat (1)**
164:9
**defendant (4)**

**deadlines (1)**
187:21;188:12;
189:15;193:8
**defense (1)**
103:18
**deferred (2)**
147:1;266:23
**defined (19)**
22:18;26:21;27:1,3,
5,6,8,10,14;28:1,7;
38:16;39:12;41:23,24;
180:19;255:15,16;
279:25
**defines (1)**
26:21
**definitely (4)**
73:9;81:22;103:19;
218:7
**definition (6)**
39:9,10;115:12;
197:18;254:16,19
**definitions (1)**
138:10
**delete (1)**
231:17
**deletions (1)**
233:16
**delivered (1)**
94:8
**demand (1)**
242:10
**demonstrate (2)**
134:6;138:8
**demonstrates (1)**
164:7
**depend (8)**
32:10;128:24;
192:13;218:1;230:6,8;
238:5;249:23
**depended (2)**
78:6;83:8
**dependency (1)**
84:7
**dependent (2)**
83:3,9
**depending (6)**
100:1;124:22;
148:23;149:12;182:3;
210:18
**depends (4)**
95:2;120:8;146:20;
252:6
**depo (2)**
287:1,2
**depose (1)**
291:4
**deposit (8)**
15:19,23;53:14;62:9,
11,24;122:11;146:23
**deposition (5)**
8:2;9:22;282:3;
284:8;289:4
**Deposits (2)**
18:12,15

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

**deprived (2)**
197:8,10
**deriving (1)**
185:3
**derogatory (1)**
227:12
**describe (7)**
94:9;184:12,23;
185:1;260:12;262:3;
273:19
**described (2)**
165:9;242:2
**describes (2)**
87:15,18;92:16
**description (1)**
255:24
**descriptive (1)**
154:2
**designate (2)**
14:20;218:15
**designed (2)**
60:24;88:19
**designee (1)**
121:21
**Despite (4)**
86:9;100:7;113:16;
117:6
**detail (4)**
16:1;61:24;79:21;
262:3
**detailed (1)**
59:5
**details (2)**
168:14;211:13
**determination (4)**
23:3;47:9;66:5;
174:23
**determine (19)**
25:24,25;26:3,9;
33:3;38:1,19;66:2;
74:18;75:7,13;76:6;
88:24;90:17;101:18,
19;115:24;142:2;
252:10
**determined (14)**
22:24;26:5,11;27:7;
32:16;34:20;53:17,19;
69:9;121:23;138:5;
195:14;250:20;255:11
**determining (2)**
34:6,16
**dictate (1)**
243:1
**dictated (1)**
112:3
**difference (15)**
46:1;47:13;91:8,10;
117:22;122:11;151:1;
180:6,14,14;199:6,9;
204:3;223:12;251:22
**different (57)**
40:21;45:24;51:14;
56:24;58:8;77:17,18,

20,21;80:10,15,16;
83:12;91:18;100:16;
109:13;112:18;113:5;
131:5,6;133:24;134:8;
135:6,7;138:5;152:2;
162:7;164:17;176:14;
185:23;189:13;201:14;
204:13;206:23,23,24;
210:13;211:14,15,17;
242:7,7,13;243:7;
244:11,16,22;252:25;
280:25;283:14;286:3,
10;292:1,6,9;293:5;
296:3
**differently (5)**
46:18;65:9;78:8;
127:6;211:16
**difficult (1)**
131:7;215:17,18;
231:18
**digest (1)**
170:9
**diligence (9)**
74:19;75:6,12;79:9,
17;141:9;261:21,22;
271:5
**directed (1)**
104:16
**directing (1)**
250:24
**directly (2)**
154:8;213:17
**directors (1)**
199:13
**disagree (9)**
51:9;108:15;135:18;
168:22;172:8;185:15;
186:13;285:25;293:2
**disagreement (3)**
105:11;166:17;211:4
**disclose (9)**
43:23;44:1,18,21,23;
72:23;73:7,11;206:10
**disclosed (2)**
21:14;73:9
**disclosing (1)**
206:7
**disclosure (1)**
123:11
**disconnect (5)**
221:14;222:2,5,12,
18
**disconnected (6)**
221:11,15,23,23;
222:22;223:17
**discourage (2)**
229:15,16
**discovered (1)**
289:3
**discovery (2)**
104:14;190:14
**discretion (6)**
20:18;21:18;28:11;

39:20;41:14;209:17
**discuss (2)**
58:21;222:16
**discussed (9)**
39:23;57:18;106:6;
143:3;167:14;240:25;
261:14;269:1;276:4
**discussing (6)**
69:21;141:22;160:1;
171:19;248:13;267:10
**discussion (13)**
57:17;64:15;97:4,7;
105:1,2,10;167:13;
169:23,24;182:15;
214:4;271:13
**discussions (29)**
55:16,19,20;68:15,
17;70:1,3;74:10;77:4;
85:18,20,22;93:11,24;
103:17,20,22,24;
105:21,23;143:17;
214:11,12;216:10,13,
19,22;217:14;276:22
**discussion's (1)**
287:20
**disputed (5)**
14:9,20;15:3;166:3,7
**disputes (2)**
239:1;246:3
**disputing (2)**
165:11;295:8
**disqualify (1)**
230:4
**disregard (1)**
92:24
**disregarded (1)**
64:8
**disregarding (2)**
99:3,5
**disruptive (1)**
220:2
**distress (2)**
192:21;193:3
**distributable (68)**
32:11,14;33:1;34:8,
18,24;35:1,22;36:6;
59:7;60:23;61:7;62:4;
64:16;72:19;74:4;
76:22;83:20;87:15;
88:7,17,21,25;94:12;
97:25;98:11;109:22;
118:13;119:11,21;
120:2;129:18,24;
148:13;149:5;151:15;
164:2;179:12,14;
180:3;181:5,7;185:9;
212:15;247:10,15,19;
248:9;249:5,19;
250:11;252:21;254:11,
18,22,23;255:10;
256:4;276:8;277:11;
279:24;280:1,3;289:9,
24;292:2,7,24

**distribute (1)**
164:25
**distributed (1)**
154:6
**distribution (4)**
65:4;154:25;158:21;
189:5
**dive (1)**
198:2
**divest (1)**
267:17
**divide (2)**
69:24;131:2
**divvy (1)**
163:8
**doc (1)**
208:2
**docket (3)**
144:23;258:22;
266:11
**document (30)**
29:11;45:11;87:3;
127:10;129:4;132:21;
133:6;169:14,14;
174:9,11;177:12;
179:4,9;210:8;244:21;
245:1,5;248:23;249:6;
268:19,21;274:10;
282:9,11,16,18;283:22;
284:4;286:1
**documentation (3)**
129:23;199:18,21
**documented (1)**
129:19
**documents (11)**
33:25;90:20;102:12,
23;129:12;131:13;
254:4;257:21,23;
268:1;283:21
**dollar (35)**
21:10;44:9;61:2,8,
15,16;65:7,17,19;
66:10,18,24;74:2,4,5;
82:22;88:20,22;98:3,
15,22;116:24;180:4,11,
24;181:12,21;185:21;
206:8;216:6;229:8;
230:21;247:18,19,21
**dollars (39)**
18:1,5,8;50:24;62:7;
66:5,8;89:2;92:11,15,
24;94:13;96:4;98:2;
101:4,10,20;113:17,23;
114:20;115:18;139:17,
20;150:23;152:21;
163:11,15,17;164:1;
180:5,13,25;181:21;
182:3;193:2;229:10,
19;230:2;251:2
**domain (7)**
14:9,15,17,21,22;
85:8,8
**done (23)**

11:10;29:11;50:16;
75:14;88:24;121:3;
127:4,5;128:2;135:9;
138:18,23,24;140:14;
142:20;144:16;150:2;
221:2;245:2;253:21;
254:1;272:15;296:17
**double (1)**
227:7
**doubt (2)**
48:21;266:6
**down (20)**
17:14,24,25,25;48:1;
62:24;82:18;112:17;
136:8;152:10;154:8;
158:23;164:25;215:20;
219:11;252:2;254:12;
260:19;274:19;285:25
**dozen (10)**
11:3,3;12:9;138:16,
17;140:18;158:6;
192:8;242:7;260:23
**dozens (2)**
10:25;11:1
**DPW (5)**
36:11;51:13;58:7,17;
277:20
**draft (9)**
81:23,25;124:1;
166:24;167:1;169:25;
279:2;283:22;286:5
**drafted (14)**
167:1;280:23;281:5,
9,11,18;282:21;
283:22;285:7,14;
286:9;291:5,12,16
**drafters (1)**
280:20
**drafting (1)**
291:1
**drafts (1)**
130:4
**draw (1)**
250:25
**dreamed (2)**
212:9;227:11
**DRENGA (15)**
9:3,3;71:9,19;
154:13;156:1,7,13;
240:22;241:22;243:2;
244:10;245:17;296:13,
13
**Driver (2)**
15:8;220:5
**drives (5)**
231:23;232:10,13;
233:1,20
**drove (1)**
218:16
**due (7)**
18:13;74:19;75:6,12;
79:9,17;141:9
**duly (1)**

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

9:13
**During (6)**
74:16;105:25;
106:11;128:7;186:25;
203:18
**duties (2)**
124:13;243:19
**duty (6)**
68:5,7;239:14;240:3;
243:13,25

**E**

**earlier (13)**
89:19;91:14;138:13;
141:8;178:16;220:12;
232:11;240:6;243:24;
248:13;286:3;287:5;
292:21
**early (2)**
102:15;204:1
**easier (4)**
83:25;178:3;216:2;
229:19
**easy (3)**
53:7;179:17;229:20
**e-commerce (1)**
54:21
**Economically (1)**
66:11
**effect (3)**
96:17,19;184:2
**effectively (3)**
93:7;184:1;191:5
**EFTA (1)**
269:12
**egos (1)**
200:14
**eight (1)**
257:5
**either (9)**
10:22;14:18;19:15;
44:18;45:1;81:18;
91:21;228:16;252:2
**Elaborate (1)**
166:25
**election (3)**
20:17;47:9,10
**electronic (1)**
266:11
**elegantly (1)**
150:18
**else (23)**
18:10;45:9;57:13;
74:25;83:7,8;100:2,3;
114:19;117:7;130:3;
143:12;145:13,14;
219:2;220:3;224:3;
229:3;237:18;256:19;
284:2;286:14;295:13
**e-mail (6)**
35:13;86:1;272:23;
273:4;284:20,25

**embodying (1)**
244:9
**emergency (3)**
97:8;233:6,8
**emotional (2)**
192:21;193:3
**employ (1)**
210:4
**employed (3)**
126:7,8,10
**employees (14)**
125:23;126:6;219:3,
12;220:2,23;221:4;
222:5;231:12;233:9;
258:14;262:10,16;
263:2
**employment (1)**
138:6
**enable (1)**
38:4
**enabled (1)**
177:10
**encompass (1)**
234:8
**encourage (2)**
21:9;216:7
**encouraged (2)**
214:14,16
**encouraging (1)**
216:8
**end (15)**
17:25;92:8;120:17;
129:1;140:12;152:23;
153:6,16;164:18;
168:13;169:1;219:7;
260:6;265:4;269:15
**ended (1)**
168:6
**ends (1)**
162:18
**engage (1)**
232:5
**engaged (3)**
231:22;232:9;234:3
**engagement (2)**
35:24;135:5
**enhancement (1)**
63:8
**enjoin (1)**
236:20
**enough (13)**
53:21;62:7;89:14;
112:7;148:24;149:6;
160:14;164:9,24;
165:2;173:7;270:10;
281:20
**ensuing (1)**
105:21
**ensure (3)**
206:8;231:20;232:17
**ensuring (1)**
125:5
**entail (2)**

218:12;258:6
**enter (1)**
243:14
**entered (7)**
29:18;42:25;188:22;
255:19,21;266:9,18
**entire (3)**
88:12;99:3;157:5
**entirety (2)**
133:5;196:5
**entitled (3)**
66:14;189:6;229:1
**entitlement (2)**
280:8;289:14
**entity (3)**
121:22;126:10;
186:24
**entries (1)**
266:11
**entry (2)**
9:23;258:23
**envelope (2)**
61:25;62:3
**envision (1)**
129:17
**equal (2)**
98:12;181:9
**equation (1)**
100:5
**equivalency (1)**
251:3
**equivalent (26)**
51:23,25;92:18;
110:11,12;113:1,13;
146:1,7,11,15;147:2,5,
18;148:17;160:20,21,
22;161:1,5,22;162:8,
20;168:3;177:6;184:6
**equivalents (1)**
146:21
**Erin (2)**
12:22;75:3
**error (3)**
281:17;287:18;288:9
**essence (1)**
155:15
**essentially (11)**
23:12;58:17;76:9;
101:7;110:23;118:2;
120:19;154:1;183:23;
191:15;220:20
**established (2)**
50:3;106:5
**estate (28)**
14:18;29:20;44:10;
80:12;101:1;121:19;
138:12;139:16,23;
158:20,21;159:5;
208:18;237:2;238:25;
239:6,15,19,21;243:25;
258:7,10;262:4;
267:17,19;270:24;
271:22;272:11

**estate's (1)**
159:6
**estimate (9)**
111:7;134:6,23;
135:9,18;140:1;
152:22;227:15,17
**estimated (5)**
33:11,12;89:8;
134:18;136:4
**estimates (2)**
32:4;248:1
**estimation (3)**
135:22,23;151:20
**European (1)**
269:11
**Evaluate (4)**
22:14;23:24;76:16;
214:18
**evaluating (2)**
84:1;141:23
**even (32)**
37:15;40:9;57:21;
64:4,8;79:24;98:2;
106:8;112:5,17,21;
116:10;131:3;135:13;
143:16;144:18;153:5;
162:22;164:20;172:12;
185:10;192:3;198:5;
212:9;216:20;229:17;
235:24;238:12,21;
255:11;266:11;290:7
**event (3)**
19:7,24;185:11
**Eventually (2)**
68:25;126:9
**everybody (3)**
145:21;157:5;220:3
**everyone (2)**
145:13,14
**everything's (1)**
140:12
**evidence (6)**
189:17;245:13;
290:19;292:12,16,18
**exact (6)**
32:9;71:20;74:5;
135:19;289:21;290:3
**exactly (35)**
33:14;34:25;57:20;
60:21;67:5;73:11,25;
76:4;77:3,6;85:12;
89:18;126:18;132:15;
135:7,14;140:13;
143:19;144:17;152:22;
172:21;175:24;195:3;
215:19;220:6,13,18;
224:16,22;229:18;
230:11;233:12;279:5;
291:4;292:17
**EXAMINATION (7)**
9:14;132:1;257:1;
276:1;288:15;293:9;
296:1

**example (7)**
142:4;189:12;
192:19;200:13;234:14;
238:8;250:2
**examples (5)**
59:16;140:24;
146:21;249:22;252:24
**exceeded (1)**
138:2
**Excellent (1)**
134:5
**except (3)**
119:21;180:24;240:4
**excess (1)**
126:13
**exchanges (1)**
242:8
**exclude (1)**
243:11;244:5
**excluding (1)**
242:5,21
**Excuse (4)**
205:18;264:14;
270:3;275:7
**Exhibit (96)**
11:19,23;13:1;15:11;
22:4;25:21;26:20;
27:13;30:20,22,25;
36:15;37:23;47:20;
49:16;52:14,18,20;
53:2;54:23;55:1;60:8;
63:12,13;68:11,19;
69:15;72:18;80:23;
84:12,15;86:4,20,22;
90:24;91:6,14;98:5,8;
102:8;107:1,3;110:19;
116:12;117:14,18;
119:4,18,21;120:6;
124:5,7;127:19;
128:11;130:8;131:17;
132:18;144:23;174:1,
5,21;178:15,17,23;
181:6;231:1;246:13,
16;248:14;249:3,17,
22;253:11;258:16,19;
261:6,10;263:15,18;
265:3,9,12,15,24;
267:1,4;268:14,17;
269:2;273:18;273:16;
274:11,13,25;275:2;
278:18
**Exhibits (9)**
80:19;89:22;90:8,14,
25;91:2;101:24;
117:13;257:17
**existence (1)**
111:23
**exists (1)**
125:8
**expect (5)**
114:23;137:12,14;
153:6;288:8
**expected (5)**

114:16;205:7;
219:19;223:21;271:25
**expedited (2)**
49:21;132:22
**expenses (4)**
135:1;144:22;153:5;
164:3
**experience (1)**
194:12
**expert (3)**
187:22;231:23,25
**experts (3)**
143:5,18;159:9
**explain (17)**
37:9;44:15;55:22;
91:6;107:20;110:5;
111:21;117:18;127:25;
137:25;139:7;159:23;
206:2;211:12;212:17;
283:6;290:8
**explained (1)**
277:14
**explaining (4)**
64:23;144:21;160:4;
174:25
**explains (1)**
255:23
**explanation (1)**
279:5
**expressed (3)**
57:21;136:21;280:21
**expressing (1)**
105:13
**extend (1)**
48:3
**extent (3)**
73:14;95:14;96:7
**extra (2)**
33:23;153:18
**extracting (1)**
185:2
**extremely (1)**
257:3

## F

**face (2)**
120:14;184:10
**facie (1)**
186:16
**fact (14)**
26:13;54:4;57:23;
63:24;73:19;86:9;
100:7;106:4;125:14,
18;174:9;200:24;
266:21;291:25
**factor (2)**
60:4;63:25
**fair (13)**
33:2;77:23;137:11;
155:19;160:14;172:3;
177:24;182:22;261:12;
263:11;270:10;272:4;

273:22
**fairly (1)**
269:23
**falls (1)**
120:7
**familiar (4)**
31:5;188:7;192:24;
262:6
**familiarity (1)**
268:11
**familiarize (1)**
258:10
**families (57)**
32:20;57:2,7,8,12,15,
18;61:1;63:3;65:3;
66:7;68:18;69:17,23;
70:10,11,14;71:15;
72:1,14,14,15;74:12;
80:9;89:2,16;94:1,11;
95:25;96:8;98:14;
101:22;103:2,15,20;
124:9,12;125:3,7;
147:25,25;151:7;
155:25;167:24;181:10;
204:15;242:18,19;
244:16;254:21;276:7;
279:21,24;290:20,25;
292:23;295:23
**families' (8)**
63:7;78:16;86:9;
149:5;153:22;278:1;
280:8;289:14
**family (6)**
93:22;94:2;103:7;
125:19;189:17;245:23
**fantasized (1)**
227:11
**far (4)**
72:6;131:12;172:5;
237:15
**Farr (1)**
9:4
**fault (1)**
219:14
**favor (2)**
92:2;112:23
**favorable (1)**
164:18
**feed (14)**
221:12,14,15,20,22,
24;222:3,6,7,8,12,18,
22;223:17
**feel (7)**
67:25;97:11;177:13;
206:1,4;219:11;228:4
**fees (2)**
134:23;135:9
**fellow (1)**
142:5
**felt (3)**
68:1;207:14;225:9
**few (8)**
70:18;75:22;93:24;

111:6;134:21;138:16;
176:14;296:3
**fiduciary (7)**
68:1,4,7;124:13;
239:13,14;243:13
**fight (1)**
14:23
**figure (18)**
35:23;46:21;60:20;
66:17;75:11;91:8,23;
130:18;141:10;180:7;
221:1;224:24;235:20;
247:18,19;253:3;
282:2;291:4
**figuring (1)**
148:5
**file (15)**
42:3,5,7,10;46:25;
47:8,18;156:18;245:6;
264:6;277:16;278:24;
279:1;284:3,4
**filed (43)**
9:22;80:6,8;95:5,16,
18;97:8;103:4,9,24;
104:18;120:13;124:2;
129:11;169:15,21;
174:9,11,14;186:15;
187:11;208:3;259:4,
11;261:23;263:24;
278:12,17;279:7;
281:23;283:5,20;
284:4,5,14;285:13,15,
17,23;286:6,18;
288:17;292:22
**filing (10)**
106:21;169:16;
233:7;245:10;246:16;
259:10;276:6,12,16;
277:6
**filings (2)**
207:20;209:3
**fill (3)**
254:13;255:9,12
**final (21)**
12:25;13:3;30:1;
36:2;61:22,24;64:4;
84:16,17;93:12;98:12;
172:4;174:6;179:15;
180:12,18,23;181:5,8;
279:13;286:11
**finalized (1)**
81:22
**finally (1)**
170:25
**financial (5)**
15:20;17:8,10;123:1;
146:12
**find (21)**
75:16,18;128:7;
142:15,16,20,25;143:2,
9,15,16,19,20;144:12;
170:18,25;209:19;
223:4;248:7;249:20;

282:18
**fine (4)**
16:21;90:4;106:2;
295:7
**finished (1)**
160:3
**finite (2)**
139:25;149:12
**fire (3)**
220:23;234:1,2
**fired (1)**
219:5
**firm (6)**
12:21;75:1;232:4;
283:18,21;286:13
**firms (1)**
282:16
**First (85)**
8:9;9:13;16:7,9,10,
25;17:18;19:5,18;
20:10,11;31:8;38:11;
45:14;52:19;53:2;54:9;
56:22;59:8;68:11;
84:17,25;86:17;87:10,
14;89:3,6,14;92:2;
97:7;99:22,23;101:3;
108:21,22;109:7;
112:23;115:4;125:20;
126:12;133:10,21,22;
134:9,17,21;144:25;
145:20;150:3,4;
152:16;153:1;161:9;
166:23;168:4;170:7;
175:7;176:12,16;
177:25;178:16;182:13;
205:19,21;212:8,16;
214:20;217:8,18;
224:20;230:10,11;
231:3;269:7,16;
273:14;280:23;282:4;
283:22;285:14;286:5,
9;287:1,2;296:9
**five (6)**
10:14;37:24;115:19;
140:23,25;255:6
**fix (3)**
175:5;288:1;294:17
**fixed (6)**
79:23;172:5;229:19;
230:1,21;294:21
**flesh (2)**
97:11;139:15
**flow (2)**
89:9;154:19
**flows (1)**
138:11
**focus (4)**
155:13;195:17;
241:18;247:12
**focused (1)**
148:16
**focusing (1)**
148:12

**follow (9)**
49:14;68:5;131:7;
154:19;161:7;175:1;
179:18;281:4
**followed (6)**
68:9;189:11;192:17;
194:18;208:20;209:13
**followers (1)**
263:3
**following (2)**
37:25;163:1
**follow-on (1)**
209:16
**follows (1)**
9:13
**follow-ups (1)**
123:16
**footer (2)**
282:17;283:12
**forbid (1)**
229:16
**forego (2)**
254:22;279:24
**foregoing (2)**
189:5;267:14
**Forensics (1)**
232:3
**form (84)**
15:18;18:13;43:20;
52:3,18,18;71:9;83:15;
98:4;100:12,14;
101:11;114:21,25;
115:14;116:4;123:11,
13;147:4,12;153:2,11;
154:13;155:3,17;
156:1,7;165:15;166:4;
168:17;172:7;176:23;
177:4;181:2;182:20;
187:14;188:1,14,18,23;
189:19,20,25;190:12,
21;191:2,7;192:12;
193:11,18;194:3,9,10;
195:21;198:21;200:4;
201:2;202:12;203:4,9;
205:2,13;211:17;
217:21;230:23;236:1,
8,23;237:9,19;240:22;
241:22;243:2;244:10;
245:17;286:2,8;
287:25;290:2;291:6,
15,22;292:13;293:1
**formal (3)**
16:4;17:1;283:13
**formally (1)**
42:1
**format (2)**
20:18;211:23
**formerly (2)**
85:13;257:8
**forms (2)**
139:4;239:1
**formula (18)**
83:14;84:3;85:4;

100:4,8;115:13,25;
117:4,8;118:24;
138:10;140:15;214:17;
255:23,25,25;256:5,7
**formulas (3)**
82:23;116:25;229:13
**forth (8)**
40:14;83:21;98:15;
171:16;206:21;215:18;
254:21,24
**forward (14)**
37:2;38:24;39:5;
40:9,13,17;42:9;43:11;
47:17;67:9;69:10;78:4,
10;105:2
**forwent (2)**
228:18,20
**found (4)**
56:23;128:1;143:22;
144:3,4,5,14;189:15;
233:10;267:23
**four (3)**
10:14;11:14;171:25
**frame (2)**
105:10;242:11
**framing (1)**
182:17
**Free (5)**
9:24;12:4;228:4;
258:24;268:9
**Friday (3)**
69:6;218:17,21
**front (5)**
99:3;131:13;134:3;
257:19;258:20
**FSS (60)**
14:15;29:18,19;33:7;
49:1;61:17;67:1;73:20;
78:19;80:7,11,13;89:9;
92:10;98:13;120:13;
125:24;126:6,9;134:7;
141:24;181:10;186:20,
21;187:3,11;191:5,10,
13,14,19;195:15,16;
196:9,11;197:3,15,20,
22;198:10,24;199:19;
200:14;201:17;202:18;
204:17;218:24;226:19;
235:23;238:21;246:1;
260:14;261:18,20;
262:11,16;263:2;
280:2,5;289:11
**FSS's (3)**
85:14;197:8;201:1
**FUAC (2)**
96:5;113:18
**fulcrum (1)**
149:18
**fulfilling (1)**
124:13
**full (4)**
22:9;30:4;185:8;
269:16

**fully (4)**
121:15;202:22;
219:19;223:21
**fun (1)**
224:8
**funded (1)**
121:16
**funds (1)**
154:20
**furrowed (1)**
196:17
**further (12)**
17:24;21:19;29:6;
31:13,20;275:16;
277:2;278:5;288:15;
293:8,9;296:11
**furtherance (1)**
9:23
**future (10)**
63:18,21,24;64:5;
87:19,21;115:3,6;
137:2;247:21

## G

**Gallagher (1)**
9:4
**game (1)**
77:19
**gathered (1)**
146:10
**gave (6)**
93:6;144:14;162:17;
177:20;190:19;211:25
**general (4)**
33:6;55:22;56:3;
159:14
**generally (6)**
14:7;35:19;55:25;
56:15;70:14;268:2
**generated (1)**
235:15
**generator (1)**
234:14
**gentleman (1)**
240:17
**gentleman's (1)**
56:10
**Gertz (1)**
188:5
**gestalt (1)**
177:12
**gets (11)**
129:24;136:15;
140:11;149:23,24;
160:18;162:16,17;
282:18;283:5,5
**gift (36)**
66:12;111:4;118:20;
145:14;147:25;148:2,
12;149:24,25;150:23;
151:9,11;153:22,23;
154:1,17;155:12;

156:22;157:11,25;
158:2,15;160:17;
161:10,24;162:14,16,
18,18;163:14,19,25;
164:25;229:2;251:9,11
**gifted (5)**
149:7;155:8;184:5;
227:24;228:18
**gifting (5)**
154:7;155:16;
158:14,23;159:13
**gist (3)**
35:20,21;242:13
**given (10)**
35:24;66:15;122:21;
123:17;131:10;154:17;
161:5;192:7;232:20,23
**gives (5)**
39:20;41:14;50:1;
149:23;290:12
**giving (6)**
65:13;157:8;204:22;
227:20,21;245:1
**Global (15)**
55:17;56:4,11,18,25;
76:7,18;78:2;121:24;
122:6,7,12;138:1;
179:6;196:21
**goal (3)**
123:14;224:13;
229:14
**goes (21)**
32:14;112:17;119:8;
133:23;134:19;152:7;
192:9;194:17,22;
195:1;196:25;198:4;
225:21,23;226:15,24;
227:10,13;228:9;
237:15;290:10
**Good (18)**
8:13,23,25;9:6,8;
16:17;89:21;91:12;
134:5;175:18,19;
185:18;243:3;251:12;
256:13;290:19;292:12,
16
**goodness (1)**
187:7
**Google (2)**
190:25;191:18
**Gosh (1)**
243:18
**gotcha (1)**
116:21
**grand (1)**
117:23
**grant (1)**
267:15
**granting (2)**
261:9;270:17
**great (5)**
162:24;175:17;
182:1;187:8;250:25

**greater (2)**
111:10;162:25
**green (1)**
208:15
**grid (6)**
107:13,18;108:15,
20,23;109:1
**gross (2)**
138:3
**grossed-up (1)**
184:19
**grounds (1)**
193:7
**group (10)**
145:22;148:17;
149:12;155:2;230:15,
18;239:22,24;240:5;
244:1
**groups (3)**
145:12;173:13;
244:19
**GT's (1)**
179:5
**guarantee (1)**
101:8
**guaranteed (1)**
210:20
**guess (22)**
51:15;58:19;63:14;
99:25;111:20;137:6;
138:15;139:23;140:25;
154:2;156:22;159:19;
176:9;179:4;184:9;
218:17;225:16;226:3,
7;233:22;237:23;
278:11
**guidance (1)**
218:2
**guy (3)**
101:10;113:24;232:1
**guys (10)**
148:25;149:8;156:6;
175:10;183:8;219:21;
227:22;247:17;287:9,
24

## H

**Ha (1)**
8:14
**half (6)**
79:25;120:6;186:17,
25;187:6;231:3
**hand (2)**
33:25;130:8
**handful (3)**
10:14;11:14;140:21
**handicapping (1)**
186:11
**handle (1)**
273:23
**handled (5)**
10:8,10;11:7,9,15

**Hang (1)**
94:20;156:23
**happen (35)**
26:13,15;27:15;28:5,
9,25;36:24;37:7,8,17,
20;38:17;45:20;46:3,
23,24;47:1,4;50:3;
66:6;70:15;108:25;
147:15;201:10;210:21;
216:12;219:22,24;
231:21;232:18;241:2;
260:21;280:18,18;
288:8
**happened (20)**
11:13;26:16;27:16,
21,23;28:6,13;46:3;
50:5;97:10;127:8;
166:25;168:14;169:14;
170:3,7,11;171:2;
205:18,21
**happening (2)**
204:14;287:20
**happens (3)**
100:2;137:7;243:9
**happy (1)**
45:15
**harassing (2)**
125:6;224:14
**harassment (1)**
224:15
**hard (9)**
134:4;179:21;208:1;
215:20;231:23;232:10,
13;233:1,20
**Harris (2)**
25:12;272:17
**hate (1)**
234:4
**head (7)**
110:8;113:21;
115:21;120:25;136:1;
172:11;241:7
**heading (2)**
115:9;270:9
**hear (9)**
32:13;107:16;149:4;
165:14;211:12;219:1;
244:9;256:22;257:14
**heard (9)**
59:11;135:17;166:9;
203:24;212:9;219:2,
17;260:20;264:15
**hearing (13)**
10:1;103:12,18;
104:8,12;133:2;
207:11;225:7,9;233:7;
247:7;266:22;296:15
**Hedges (1)**
8:16
**held (7)**
25:24;26:4;36:21;
38:5;46:6;92:4;266:22
**hell (1)**

207:6
**help (7)**
91:12;123:25;
160:19;168:11;203:6;
219:13;221:1
**helped (1)**
123:23
**herein (1)**
254:21
**Here's (1)**
273:14
**hereunder (1)**
48:25
**Hey (8)**
142:4,5;154:10;
167:6;175:10;206:2;
287:9,24
**Hi (1)**
90:13
**high (1)**
253:1
**higher (13)**
44:11;92:12;111:16;
112:8;113:7;120:4,24;
121:12;152:23;153:6,
16;185:10;252:23
**highest (29)**
21:8;23:1;26:18;
28:19;43:20;44:5,15;
59:18;61:3;65:23;74:9;
76:12;92:17;98:18;
100:20,23;101:2,4;
114:7,7,17,24;115:9;
116:6;126:14,17,24;
177:19;182:5
**highlight (1)**
183:20
**highlighted (1)**
150:16
**highlights (1)**
17:16
**historical (3)**
231:18;235:13,14
**history (1)**
187:5
**hold (10)**
26:5;28:14;45:23;
46:16;133:25;200:13;
243:8,11;276:12;277:6
**holder (1)**
122:13
**holders (2)**
280:4;289:10
**holding (1)**
47:13
**hope (2)**
133:9;134:1
**hoped (1)**
227:14
**hoping (3)**
81:2;91:12;224:20
**hours (3)**
215:17;257:5;282:2

**house (4)**
30:17;139:18,19,20
**Houston (1)**
218:16
**how's (1)**
55:25
**Huh (1)**
212:6
**Humor (1)**
113:19
**humoring (1)**
114:1
**hundred (38)**
10:9;66:4;89:2,10;
92:15,23;93:5,14;
94:13;96:4;98:2;99:19;
101:3,9,20;113:17,23;
114:19;115:18;117:23;
128:5;139:17;152:21;
153:10,18;168:3,19;
170:6;173:17;180:4,
13,24;181:11,15,19,21;
182:3;289:14
**hundreds (2)**
123:15;138:14
**hypothetical (2)**
139:14;228:23
**hypothetically (3)**
165:4;195:19;226:25

**I**

**ID (1)**
282:11
**idea (4)**
181:23;192:4;217:4;
263:8
**ideas (1)**
213:11
**identical (1)**
180:23
**identification (18)**
11:20;30:23;52:15;
54:24;80:20;84:13;
90:9;98:6;127:20;
132:19;258:17;263:16;
265:10;267:2;268:15;
273:17;274:14;275:3
**identify (4)**
8:6,19;45:13;122:2
**identities (1)**
44:24
**Identity (1)**
50:18
**ie (1)**
125:7
**illusory (1)**
141:20
**illustrate (1)**
109:13
**illustrated (1)**
88:11
**illustrates (2)**

109:9;111:4
**illustration (1)**
112:25
**illustrative (1)**
175:15
**image (1)**
233:14
**imaged (1)**
233:20
**images (1)**
232:20
**imagine (12)**
212:23;214:11,25;
228:13;245:12;286:20;
287:13,14,19,21;295:4,
13
**imagined (5)**
212:13,20;213:6;
293:16,23
**imaging (1)**
231:23
**iManage (2)**
282:15;284:3
**immediately (1)**
219:5
**impact (4)**
80:2,3;87:25;88:2
**implement (1)**
41:5
**implementation (1)**
185:8
**implied (3)**
110:11,12;234:21
**implies (3)**
76:13;223:14,15
**implore (1)**
125:3
**important (2)**
172:18;188:17
**imposing (1)**
48:1
**impossible (1)**
198:4
**impractical (1)**
211:19
**inaccurate (1)**
148:11
**incentivizes (1)**
207:3
**include (11)**
11:17;13:6;15:2;
53:25;82:19;83:24;
117:7;208:16,19;
209:12;255:21
**included (13)**
11:2;14:2,2,24;
49:21;83:3,14;84:3,3;
85:7;230:22;260:15;
279:3
**includes (4)**
64:5;134:23;244:17;
278:1
**including (6)**

30:6;34:17;98:14;
176:12;181:10;269:12
**income (4)**
158:16,20,23;159:5
**inconsistent (2)**
49:9,11
**incorporated (3)**
259:8;264:4;276:19
**incorporation (1)**
180:20
**incorrect (1)**
286:22
**increase (9)**
76:7,21;87:13;98:3,
15;181:11;206:21;
207:8,11
**increased (6)**
87:6;88:21;98:25;
152:18;153:5;159:20
**increasing (3)**
98:23;152:6;159:4
**incremental (2)**
206:21;207:11
**incrementally (1)**
207:7
**increments (1)**
28:23
**incurred (1)**
267:22
**indemnified (1)**
267:24
**indicate (3)**
43:21;251:1;283:17
**indicated (1)**
224:7
**indicates (1)**
283:19
**indirectly (1)**
213:17
**individual (5)**
29:20;200:1;208:17;
239:6,6
**inflection (2)**
77:6;193:3
**infliction (2)**
192:21;193:8
**influencing (2)**
57:22;70:14
**information (6)**
44:13;123:15;
176:11;189:1;195:22;
233:17
**informed (2)**
46:12;202:22
**Infowars (9)**
222:9,23;224:9;
260:16;262:5;268:8,
12;273:23;274:17
**initial (42)**
12:6;20:20;21:17;
24:5,6;26:17;27:6;
52:18;53:3;54:2;66:1;
74:1,8;81:9,13;82:1;

83:2,13,21;84:2;88:18;
98:3,16,23;130:18;
178:17;179:7,13;
180:19,23;184:8,18,20,
25;205:11;211:6,8;
212:12;213:16;214:2;
230:23;241:6
**initially (2)**
77:18;123:14
**input (3)**
23:6,9;81:19
**inquiring (1)**
56:15
**ins (1)**
234:22
**instance (7)**
20:11;23:6;40:5;
66:2;115:18;280:23;
286:10
**instead (4)**
22:24;36:5;38:8;
40:13
**instruct (1)**
288:2
**instruction (2)**
155:1,8
**instructions (10)**
30:6;82:4,8,15;
83:18;84:10;100:13;
116:2,13;217:18
**intellectual (6)**
208:17;231:19;
234:5;261:19;263:21;
266:16
**intend (2)**
105:1;223:15
**intended (18)**
57:1;64:15,18;93:13;
97:25;103:8,16,23;
107:7;169:9;210:9,12;
223:18;224:7;228:10;
290:20;291:5,21
**intending (4)**
103:25;104:7;
229:24;232:14
**intent (4)**
43:1,6;54:10;93:20
**intention (1)**
223:24
**intentional (3)**
192:21;193:3,7
**interest (18)**
14:17;17:5;57:22;
94:18;96:14,15;97:21;
104:20;105:12;106:4;
125:4;131:11;139:9;
167:13;202:24;235:17;
238:22;239:8
**interested (3)**
54:14,20;69:2
**interests (1)**
238:9
**internal (1)**

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

100:10

**internally (1)**
78:15

**interpret (10)**
66:13;99:6,20;
101:12;110:10;173:4;
176:9;182:2,8;279:6

**interpretation (21)**
93:12;99:16;105:1,7,
19;113:16;166:3,8;
169:4;170:8;171:20,
20;183:12,14;276:8;
277:20;278:2;280:21,
25;285:22;286:23

**interpretations (3)**
99:14;296:4,7

**interpreted (16)**
47:19;102:16;
104:22;105:4;106:14;
107:24;108:6,12,14,19;
120:2;168:23;176:14;
177:5,20;182:9

**interpreting (1)**
109:22

**interrupt (1)**
24:15

**interruption (2)**
25:16;79:14

**into (16)**
16:1;17:3;60:4;62:7;
63:25;67:17;94:19;
134:19;140:5;142:19;
159:5;162:11;198:2;
210:23;243:14;276:19

**invalid (1)**
192:18

**inventory (1)**
223:2

**investigation (2)**
75:7,12

**invoice (2)**
30:5,11

**involved (10)**
10:23;11:4;81:15;
97:18;138:14,25;
139:4;140:17;141:4;
241:16

**involvement (1)**
63:7

**IOLTA (1)**
121:18

**IP (19)**
15:9;36:18;37:11,25;
38:4,16;39:9,11;41:22;
45:17;46:6;47:7;48:23;
135:8;208:16,19;
209:11;239:7,9

**ironclad (1)**
229:25

**irrelevant (1)**
200:21

**irrespective (3)**
185:25;196:1,2

**irrevocable (1)**
18:2

**is/where (1)**
237:3

**issue (4)**
35:13;240:1;244:25;
266:23

**issued (1)**
29:16

**issues (3)**
186:7;223:2;238:23

**item (3)**
50:4;146:8,9

**items (2)**
43:22;49:22

**J**

**Jeff (13)**
12:16;35:11;81:14;
102:12,22,23;118:1,9;
130:11,21;131:14;
214:11;216:10

**job (3)**
125:15;258:6,9

**jobs (1)**
125:19

**jogging (1)**
190:6

**John (1)**
288:12

**joined (1)**
25:11,14

**joint (92)**
16:20,23,24;20:22;
30:10;31:24;38:11;
51:2;55:7,14;57:1;
60:7;68:15;69:5;74:2,
8;80:17;83:3,19;84:3;
85:23;86:16,23;89:11;
90:18;91:19;92:10;
94:8;96:12;97:1;
103:18;106:23;120:24;
121:15,21;123:24;
125:15,19,24;126:6;
135:23;136:10;137:22;
138:1;141:16;147:19;
151:22;163:6;167:2;
178:5;179:6;196:14,
15,20;205:11,21,24;
215:3;216:1,23;
217:12,14,17;218:4,8,
19;224:5,6;225:23;
226:25;227:14;232:15,
21;234:13;236:5,15;
239:8;277:17;279:2;
280:23;281:7,18;
285:9,19;286:3,8,17;
287:9;288:2;294:10,
16;295:15

**jointly (5)**
227:8;237:7,12,18;
238:20

**Jon (1)**
25:12

**Jones (63)**
8:12,22;9:19;11:6;
12:22;14:16;15:4,5;
60:2;75:3;80:5,8,12;
95:5,18;103:4,9,24;
126:10;132:4,7;
185:21;186:19;188:12;
190:10;191:15;195:17;
197:7,10,13,16,24;
199:2,5,19;200:14;
208:18;218:24;219:16;
220:9,14;222:16,19,20;
224:9,15,21;225:22;
226:14,22;227:2,15;
228:11;232:25;238:8;
239:4,5;241:14;
262:10;265:2;266:15;
267:17,19

**Jones' (5)**
200:24;201:21;
221:9;223:18;239:9

**Jordan (2)**
8:21,21

**Josh (5)**
235:4;244:24;
257:20;272:23;283:23

**Joshua (2)**
8:15;276:3

**judge (21)**
10:2;11:11;37:15;
103:14,25;137:7;
190:9;192:20;202:18;
207:20;208:23;209:3;
224:19;233:8;239:3;
253:10,20;255:9,12,22;
291:18

**judgment (19)**
67:25;75:24;78:22;
80:4;158:5;185:21;
192:9,13;194:16;
196:25;203:21;206:1;
226:4,6,15;227:20,25;
238:18;296:8

**judgments (20)**
78:24,25;79:1,6,23;
185:24;186:16;187:8,
12;188:22,25;192:16,
18;195:1,25;198:5;
225:22;227:3,16;
228:11

**jump (1)**
154:3

**jurisprudence (1)**
188:11

**justifying (1)**
112:23

**K**

**keep (8)**
12:10;31:3;128:8;

145:16;147:18,22;
159:18;194:15

**keeping (1)**
12:12

**keeps (1)**
207:5

**keyed (1)**
177:22

**kick (1)**
251:11

**Kimpler (18)**
25:14,16;57:11,17;
58:21;59:12,14;68:22,
24;69:18;71:2;74:14;
93:23,25;167:20,22;
168:8;277:6

**kind (26)**
35:25;73:22;81:23;
91:5;105:25;112:9;
115:12;126:20;130:24;
132:14;133:5;138:21;
139:3;176:19;177:13;
180:20;190:6;192:6;
207:1,2;224:14;227:2;
229:12,25;235:8;
243:20

**kinds (2)**
141:6;238:23

**Kingdom (1)**
269:12

**knew (18)**
21:13;44:8;60:18;
125:23;164:12,13;
173:21;193:15,17;
194:7;204:24,25;
205:10;220:17;224:17;
283:23;286:19;287:18

**knowing (1)**
44:12

**knowledge (6)**
130:14;259:22;
288:5;294:5,9,24

**known (6)**
193:15,17;194:7;
247:22;253:6;257:8

**knows (2)**
206:25;220:21

**Kyle (6)**
25:13;57:11;68:22;
167:20,22;276:10

**L**

**laid (1)**
167:4

**language (7)**
13:1;65:10;106:18;
177:9;194:8;289:21;
290:3

**laptop (1)**
272:21

**large (2)**
149:6;243:23

**last (34)**
15:8;25:22;49:18;
50:22;56:4;60:19;
89:23;93:6,8;107:17,
18;108:12,20,23;
109:2;110:14;124:6;
170:19,20;171:3;
185:6;206:17;214:23;
216:4;249:1;257:4;
262:17;263:8,13;
269:7,24;272:16;
282:2;287:6

**later (10)**
14:23;17:3;18:23;
34:3;37:24;56:23;
101:15;174:14;255:6;
256:7

**Latham (2)**
256:21,23

**Law (13)**
143:2;187:18;188:2;
189:11,18,24;190:6;
192:17;198:13;282:16;
283:18,20;286:13

**lawyer (7)**
15:9;142:10;143:10,
11;193:21,24;287:23

**lawyers (12)**
86:10;93:25;94:6;
96:1;97:17;103:7;
143:7;159:10;167:19;
214:7;281:12;282:21

**lays (1)**
285:1

**lead (3)**
28:16,16;219:13

**learn (2)**
56:21,25

**least (14)**
11:3;17:4;54:20;
61:8;72:21;73:8;
164:18;168:5,19;
173:4,17,22;209:23;
260:15

**leave (2)**
219:25;231:15

**leaving (3)**
132:14;211:4;233:15

**led (1)**
223:23

**left (3)**
254:1;282:8,23

**legal (10)**
56:7;75:4;104:3;
134:23;142:13;143:15;
189:21;193:19;194:1;
267:24

**legitimate (1)**
123:19

**lens (1)**
148:15

**less (19)**
101:13;107:6;

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

124:14,15;134:18;
136:18;140:23;145:2;
147:24;168:17,19,21;
176:12,17,20;177:2;
182:14;206:25;254:9
**Letsos (1)**
9:5
**letter (15)**
35:24;55:7;63:14;
86:22;87:1,15;101:16;
106:18;113:20;123:1,
5;135:5;179:9;184:12;
292:17
**letting (1)**
24:18
**level (3)**
59:18;61:24;177:3
**Lexis (2)**
142:17,19
**liabilities (3)**
76:2;139:2,3
**liability (1)**
198:19
**liable (1)**
227:9
**libel (2)**
187:18;189:16
**liberty (1)**
14:17
**library (1)**
238:1
**license (3)**
234:22;270:10,18
**lieu (1)**
204:8
**light (2)**
221:18;224:9
**likelihood (1)**
79:20
**likely (5)**
79:10,18;187:15;
269:23;270:1
**liking (1)**
246:7
**limited (3)**
85:13,24;198:19
**line (9)**
107:18;108:20,23;
109:2;110:14;202:21;
250:10,18;251:20
**lines (1)**
73:23
**liquidated (1)**
186:15
**list (2)**
265:17;266:3
**listed (3)**
54:4;259:16;265:7
**listening (1)**
25:5
**lists (1)**
264:11
**Literally (1)**

285:1
**litigation (1)**
140:2
**little (19)**
10:5;17:24;65:8;
73:13;83:11;133:17;
136:11;139:15;141:9;
147:8;148:11;150:17;
163:16;177:15;207:8;
208:12;225:10;274:19;
282:9
**live (62)**
20:17;22:16,22,25;
23:12,15;24:1,7;26:5,
11;27:6;28:1,14;38:18;
39:6,12,21,24;40:1,14,
15,21,23,24;41:3,8,12,
18,25;42:4,6,9,14,16,
22;43:1,4,6,11,14;45:5,
6,21;46:13,16;47:17,
23;48:13;67:10;77:2,7,
9,20;78:4,11;130:20;
131:9;207:21;209:4;
211:5;269:11,13
**LLC (11)**
8:10;16:11;198:22,
24;199:1,7,25,25;
200:2;201:12;258:24
**loan (1)**
18:10
**logic (1)**
91:20
**long (7)**
58:14;102:21;191:6;
205:23,24;254:6,7
**longer (1)**
126:7
**look (63)**
11:22;13:10;15:11;
29:1;33:25;42:24;47:6,
25;49:16;52:17;55:1;
59:6;63:10;64:11,17,
18;69:3;77:9;78:12;
82:17;86:19;87:1;88:7;
98:8;102:19;104:4;
105:24;112:13;116:12,
22;117:11;118:2,12;
119:4,18;127:25;
128:1,10;130:9,25;
132:24;133:9,11;
159:21;177:9,13;
178:14;179:12,20,25;
180:16;184:25;213:2;
230:24;247:3;250:9;
254:2;258:19;273:25;
279:12,15;281:15;
284:18
**looked (14)**
19:5;39:11,11;79:22;
102:22;121:25;127:6;
158:18;178:15;180:17;
186:6;187:5;191:18;
238:12

**looking (17)**
13:14;45:15;46:19;
64:13;77:12;128:8,16;
160:12;178:14;179:5;
181:5;183:13;206:3;
208:14;249:17;286:1;
289:6
**Looks (10)**
50:1;118:19;128:25;
129:3;133:1,7;273:24;
274:7,18;275:11
**Lopez (1)**
192:20
**Lopez's (1)**
202:18
**lose (7)**
44:10;112:15;
125:14,18;219:18;
220:15,21
**losing (1)**
163:16
**lot (17)**
13:7,8,12,18,19,21;
14:1,7;16:17;36:10;
85:7,11;112:8;130:14;
223:1;240:12;241:11
**lots (14)**
33:13;43:21;53:25;
77:18,21;78:7;131:2,6,
11;172:18;206:23;
207:2;241:11,13
**loud (2)**
88:13;279:19
**low (1)**
253:1
**lower (5)**
111:18;137:23;
143:25;225:15;252:23
**lowers (1)**
152:11
**Luncheon (1)**
90:7

## M

**ma'am (1)**
141:12
**maintaining (1)**
54:15
**majority (2)**
56:11;126:9
**makes (3)**
47:15;119:17;230:2
**making (14)**
50:11;57:8,19;73:19;
78:10;94:5,7,25;
124:23;130:25;177:3;
180:19;224:8,9
**malice (1)**
189:17
**management (3)**
191:15;224:12;
282:16

**manager (11)**
199:1,3,4,6,10,19;
200:25;201:11,22,25;
202:23
**managers (4)**
199:12,13,14;203:2
**manager's (1)**
201:19
**managing (3)**
199:2,3,11
**mandates (2)**
189:12;194:18
**manifest (1)**
59:20
**many (28)**
10:7,13,23;11:1,13;
12:7;55:19,20;131:8,8;
140:16,19;157:25;
158:2;171:23;183:6;
192:5;207:1;213:18;
219:11;237:24;241:12,
19;244:23;252:5,6;
260:22;263:3
**mark (6)**
128:1;131:16;
208:6;234:7,20;251:21
**marked (26)**
11:19,23;30:22;
52:14,23;54:23;55:4;
80:19;84:12;90:8,14;
98:5;119:5;127:19;
128:10;132:18;248:16;
252:1;258:16;263:15;
265:9;267:1;268:14;
273:16;274:13;275:2
**material (2)**
234:14,21
**math (10)**
100:6;101:14;
109:19;111:6;113:10;
115:25;121:11;140:14;
184:23;253:8
**mathematical (1)**
100:5
**MATTEI (2)**
9:8,8
**matter (7)**
11:6;122:17;123:7,
10;284:20;291:16,25
**matters (5)**
202:16;291:17,18,
20,23
**maximizing (3)**
73:16;149:18,20
**maximum (1)**
161:4
**may (6)**
34:22;41:6;89:21;
208:18;234:14;238:9
**Maybe (35)**
10:14;11:3,14,16,19;
43:7,7;45:16;46:11;
76:4;89:22,22,24;

102:14;109:19;122:20;
129:17;139:10,10;
140:18,23;142:1;
143:10;146:23;160:6;
169:20,20;173:6;
179:8;181:25,25;
208:25;235:9;243:22;
272:23;282:7
**mean (83)**
10:16;18:6,9;20:7;
23:22;42:2;47:2;49:12;
54:16,17;58:10;62:16,
17;67:10;73:6;74:3;
78:20;80:15;82:9;92:2,
25;93:2;94:5;95:17;
100:23;104:4;107:20;
108:12;126:1;127:5;
128:24;135:17;137:1;
154:1;156:21;158:9;
164:4,12;169:18;
171:3;172:15;173:23;
176:3,4,4,10;178:10;
185:15;194:19;195:12,
22;196:4,5;201:9;
206:16;209:14,15;
211:13,23;212:13,22;
213:23;219:4;224:23;
229:5;230:21;233:13;
234:20;237:25;238:21;
239:20,21;241:14;
243:18;245:1,18;
248:6;252:8;280:15,
19;286:22;289:21;
293:22
**Meaning (3)**
142:24,25;254:7
**meaningful (2)**
271:22;272:1
**meaningless (3)**
234:5,6,10
**means (20)**
18:7;49:2;114:8;
137:2;141:12;149:24;
163:20;175:15;176:5;
254:20,24;255:2;
280:3;287:22;289:9,
25;290:1,2,4;292:8
**meant (13)**
68:16;109:13;
113:14,20;120:6;
133:23;134:6;181:4,
13,14;292:3,25;293:4
**measured (1)**
51:22
**meat (1)**
64:21
**mechanism (6)**
92:16;118:20;
141:25;145:8;212:15;
255:21
**media (16)**
187:21;188:12;
189:15;193:8;257:8;

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

260:6,9,12,14,17,24;
261:13;262:1;264:20;
267:21,23
**meet (4)**
53:20,23;218:23,24
**meeting (9)**
172:12,14;173:8,12,
15,23;220:14;231:12;
292:24
**meetings (1)**
242:7
**member (9)**
199:2,3,7,11;200:2;
202:2,11,23;240:5
**members (4)**
12:21;94:2;199:16;
203:2
**membership (1)**
202:24
**memorandum (3)**
11:25;21:15,17
**memory (1)**
56:17
**mentioned (4)**
70:9;143:16;257:12;
263:6
**mentions (1)**
260:8
**meritorious (1)**
187:12
**mess (4)**
156:17,20,24;157:12
**message (1)**
68:22
**met (2)**
53:18;176:19
**middle (7)**
36:17;107:13;111:1;
150:22;162:21;176:19;
264:21
**midnight (1)**
274:8
**might (60)**
14:22;25:7;37:13,14;
44:14;57:16,18;58:22;
59:6,16;62:2,25;77:15,
16;112:1;117:15;
120:16;123:18;124:1;
127:6;130:10,14,25;
131:1,2,3,4;139:11;
140:3;148:23;152:24;
153:17;166:16;188:24;
196:1;199:4;202:13;
210:17,18;212:13,18,
21,23,25;213:6,9,12;
214:18;220:15,21;
221:2,3;231:17;
234:21;245:10;254:3;
266:12;272:10,15;
273:1
**Milkovich (1)**
188:8
**million (184)**

19:19;20:12;51:3;
52:1;55:15;60:9;62:6;
66:1,4,8;85:1;87:8,10,
11,13;89:17;92:11,19;
99:2;101:13,14;
106:15;107:5,6,7,18,
21,22,25;108:9,9,9,10,
13,22,24;109:3,6,16,
21,24;110:2,3,4,6,10,
18;111:2,9,25;112:2,6,
7;113:1,12;121:13;
124:15,21,24,25,25;
126:13;127:2;134:16;
135:25;136:3,5,18,18,
20;137:9;138:2;
139:18,20;146:1,2,5;
147:18,23;148:8,10,18,
22;149:1,6,9;150:1,2,2;
151:4,18,19;152:18;
153:22;160:22;161:2,
9,10,13,15,21,25;
162:2,4,9,10,19,20,23;
163:11,15,17,18,19,21,
21;164:1,3,4,10,13;
165:3,12,13,19;167:3,
5,7;168:5,16,17,24;
169:8;170:5;173:20;
175:22,23,25;176:1,2,
3,3,5,6,7,10,10,13,13,
15,17,18,20,20,21,24;
177:2,2,6,21;181:18;
182:14;183:15,17;
184:3,7,13,22,24;
185:10,12;192:22;
193:2;226:24;227:10,
13;228:10;247:14;
251:2,6;256:3;279:4;
285:20;290:14,18
**million-2 (1)**
61:6
**million-750 (2)**
32:24;123:4
**mind (18)**
24:17;42:17;45:14;
76:4;104:11;130:6;
144:7;187:10;210:1;
213:11;217:5,10;
256:1;285:18;289:17;
292:11,18,24
**minds (6)**
172:12,14;173:9,12,
15,23
**mine (3)**
137:18;248:19;
278:11
**minimum (4)**
28:23;31:3;44:16;
136:19
**minority (1)**
165:3
**minus (1)**
137:10
**minute (10)**

21:23;24:20;45:16;
132:15;154:3;165:10;
202:21;203:16;206:14;
293:11
**minutes (3)**
111:6;231:3;296:3
**mirroring (1)**
232:10
**Mischaracterizing (1)**
205:15
**mislead (1)**
82:14
**misleading (1)**
147:8
**mispronounce (1)**
240:14
**miss (1)**
286:21
**missed (5)**
129:17;160:6;
208:11;286:15,20
**misspoke (1)**
208:25
**misstates (2)**
100:13;182:23
**mistake (6)**
279:17;288:20,24;
289:4,7,15
**misunderstand (1)**
233:11
**misunderstanding (1)**
285:19
**modify (1)**
48:8
**moment (3)**
57:3;196:12;249:10
**Monday (14)**
10:2;69:8,11,16;
103:11;105:9;133:2;
137:7;169:19;197:6,
13;253:13,20;256:8
**money (30)**
62:14,16;65:11,12,
19;78:4;110:9;120:3;
122:7,13,15,18,22;
123:2,8;133:23;136:5;
140:9;148:16;152:7;
154:5,7,21;157:9;
162:18;164:24;165:2;
168:6;254:5;258:8
**money's (1)**
122:3
**months (2)**
70:2;232:6
**more (93)**
10:16;11:8;16:1;
17:3;29:3;36:13;44:8,
10;45:11,15;58:24;
61:2,15,16;66:11,24;
73:16;76:13;88:20,22;
89:2;92:15,24;93:5,14;
94:13;95:17;96:4;98:2,
14,22,24;99:21;101:4,

10,20;111:15;112:12;
113:17,24;114:10,19,
20;127:5,5;136:18;
149:24,24;150:17;
152:5;153:6;168:3,6,
19;170:6,20;171:7,13,
21;173:7,18;181:11,15,
19,21;182:3,6;206:19,
20,22,24;207:8;214:17,
24;216:21;223:7;
225:10;235:15;236:13;
238:21;239:20;241:10;
242:21;244:21;246:24;
254:9;262:7,8;280:5;
283:7;288:12,14;
289:11
**Moreover (1)**
125:2
**morning (9)**
8:13,23,25;9:6,8;
221:16,25;225:5;
245:10
**Moshenberg (1)**
57:14;70:13;71:6,7,
7,13;240:7,9,10,19,20
**most (9)**
113:11;143:21;
168:20;172:16;202:23;
250:2;254:7;260:19;
283:20
**motion (81)**
9:22;10:3;29:22;
37:16;49:25;95:4,16;
123:21,25;129:11,12;
132:21;133:1,10;
166:24;167:1,5;
169:25;170:1;175:6;
208:3;209:9,15,23;
233:8;253:11;257:11;
258:23;259:1,3,10,13,
22;260:1;261:3,9,14,
23;263:20,23;264:2,7;
265:4,15,18,19,22;
266:1,5,5,8,8,15,19,22;
267:10;276:7,12,17,24;
277:7,10,13,16,17,23;
278:1,16,16;279:1,2;
280:21;281:11;282:20;
283:10;284:15;285:6,
14;286:6;290:6,8
**move (10)**
22:25;39:20;40:9,13;
42:13;43:11;45:5;
52:17;67:9;78:10
**moved (1)**
282:5
**moving (1)**
42:8
**much (44)**
21:10;33:5;55:13;
60:21;82:22;89:8,10,
12,15;91:23;111:18;
112:3;123:2;126:16;

131:21;133:23;135:23;
140:13;145:7,7,17;
148:5,16;150:20;
160:2,17;161:11;
162:13,14,25;178:3;
179:11;183:25;185:15;
206:19;207:4;214:24;
225:21;226:14;227:15;
228:14;234:17;251:9;
252:11
**multiple (1)**
184:13
**multiplier (1)**
184:24
**multiply (2)**
145:6;184:1
**multiplying (1)**
111:7
**multi-round (1)**
130:20
**Murray (23)**
8:2,17;9:12,17,18;
11:19;30:22;52:14;
54:23;80:19;84:12;
90:8;13;98:5;127:19,
24;132:3,13,18;
213:24;253:20;257:10;
276:4
**mushy (1)**
210:11
**must (2)**
15:18;17:7
**mute (1)**
154:11
**myself (3)**
164:19;247:7;257:15

## N

**N&N (1)**
232:3
**nail (1)**
136:8
**nailed (1)**
285:25
**name (19)**
8:11,13;9:16;15:9;
56:4,10,24;71:5;132:3,
13;143:23;144:8;
232:4;240:8,14,17;
257:6;262:12;270:18
**named (1)**
232:1;242:17
**names (9)**
14:10,15,17,21,22;
25:11;85:8,8;262:17
**natural (1)**
112:3
**nature (5)**
77:16;131:10,11;
211:11;233:2
**necessarily (1)**
140:2

**necessary (8)**
48:9;60:20;98:13;
109:23;163:23;181:9;
280:4;289:10
**need (12)**
31:2;35:22;121:1;
132:6;150:24;179:11;
194:13;206:2,4;225:9;
256:14;288:1
**needed (4)**
31:21;67:22;83:21;
92:15
**needs (3)**
104:15;150:21;
295:16
**negative (1)**
139:24
**negligence (3)**
193:16,16;194:8
**negotiate (4)**
137:3;138:7;183:7;
219:23
**negotiated (1)**
72:7
**negotiating (3)**
104:17,19;105:12
**negotiations (2)**
69:22;155:24
**neither (2)**
203:2;272:5
**net (6)**
33:7;89:12;91:22,22;
118:21;145:3
**netted (1)**
165:2
**netted-out (1)**
135:11
**neurons (1)**
190:6
**nevertheless (2)**
54:3;228:19
**new (11)**
25:10;37:21;100:8;
116:13,18;187:24;
189:14;190:2;193:9;
222:24;270:4
**news (1)**
219:2
**Newton (1)**
232:1
**next (26)**
13:18,21;17:15;
18:12;48:20;62:7;
87:18;88:12;101:4;
125:2;133:19;145:24;
151:25;153:1;159:21,
25;160:15;170:3,11;
174:16;214:13;215:22;
222:17;224:24;225:5;
274:9
**NGUYEN (2)**
8:13,14
**night (1)**

89:23
**Niko (1)**
9:5
**nobody (4)**
186:18;187:7;294:5,
9
**nods (6)**
110:8;113:21;
115:21;136:1;172:11;
241:7
**noncash (21)**
51:7,9,14,19,21;
62:18;73:10,11;76:2,
15;83:24;138:19,21;
139:4,12;140:5,20,24;
141:5,6;146:8
**noncompliant (1)**
217:17
**nonconforming (8)**
53:24;230:3,5,9,10,
13,16,20
**non-Connecticut (13)**
61:16;66:25;88:19;
89:1,10,16;91:18,24;
92:9;133:24;134:7;
151:3;290:12
**noncontingent (2)**
18:2;76:16
**none (2)**
94:21;156:5
**nonpurchase (1)**
51:21
**nontraditional (1)**
137:4
**nor (2)**
203:2;267:21
**Nos (1)**
15:16
**note (1)**
296:14
**notebook (1)**
278:20
**notice (18)**
37:19,21;42:3,5,7,
10;46:25;47:8,18;
106:21;218:18,18;
219:11;221:4;266:11;
267:6;282:8;292:22
**noticed (6)**
79:23;267:9;278:12;
282:4;287:18;288:20
**notified (2)**
38:13;54:5
**notify (1)**
38:2
**notifying (1)**
42:8
**notion (1)**
59:18
**notional (1)**
151:18
**notoriety (1)**
123:17

**notwithstanding (2)**
101:15;267:14
**November (16)**
36:21;46:7;69:4;
74:10;170:24;172:20,
25;173:11,13;174:12;
190:19;269:20;274:23;
279:8;285:18;288:17
**number (54)**
66:20;89:17;98:25;
108:21,25;111:12,14;
119:14,24;126:18,21;
136:17;137:13;139:25;
140:21;147:19;151:19;
153:9,15;158:5;
161:11,20,22;162:3,8,
11;168:6;176:14;
182:6;231:1;246:14;
248:2,5,14,23;249:5,6;
253:5,7;254:10,11,14,
15;256:5;269:8;282:9,
10,23;283:9,12;284:3,
12,13;285:20
**numbered (1)**
133:11
**numbers (12)**
15:13;65:25;118:2;
120:21;133:4;135:15;
142:4;145:1;150:14,
15,16;270:8

---

## O

**object (12)**
71:9;94:15;96:6;
132:8;154:13;156:1;
166:4;186:20,23;
193:11,18;194:10
**objected (8)**
79:24;165:21;167:8;
186:18;195:10,18,19;
266:15
**objection (79)**
71:18;80:6,9;83:15;
85:13,24;86:16;94:21,
24;95:6,8;98:4;100:12;
101:11;104:2;114:21,
25;115:14;116:4;
147:4,12;153:2,11;
155:3,17;156:7,13,18;
165:15;172:7;176:23;
177:4;181:2;182:20;
187:14;188:1,14,18,23;
189:19,20,25;190:12,
21;191:2,7;192:12;
193:22;194:3,9;
195:12,15,21;198:21;
200:4;201:2;202:12;
203:4,9;205:2,13;
217:21;236:1,8,23;
237:9,19;240:22;
241:22;243:2;244:10;
245:12,17;290:22;

291:6,15,22;292:13;
293:1
**obligation (1)**
68:1
**obviously (2)**
111:10;229:18
**occasionally (1)**
10:20
**occur (3)**
27:4,9;266:13
**occurred (5)**
11:5;27:1;103:24;
105:22;276:6
**occurs (1)**
235:22
**October (4)**
129:1,3,5,6
**off (25)**
24:19,25;28:16;
52:10;65:15;90:6;
127:17;132:14;141:24;
151:3;164:20;175:4;
177:22;225:14;226:9;
230:9;231:3,6;233:15;
249:9,11;251:12;
276:12;277:6;296:18
**offended (1)**
118:8
**offer (26)**
17:19;19:7,8,24;
57:19;93:8;98:22;
105:18;107:17;124:15;
139:19;165:12;166:3;
168:9;174:21;175:21;
178:16;183:18;184:9,
10;185:17;207:4,10;
211:2,21;292:22
**offered (4)**
66:9;126:25;182:18,
19
**offering (6)**
11:25;21:15,17;
124:14;155:21;207:2
**offers (7)**
17:22;21:8;22:14,15;
23:24,25;43:20
**office (1)**
199:10
**omitted (1)**
85:16
**once (1)**
127:14
**one (134)**
16:7;20:21;29:3;
39:19;40:8;41:9,13;
44:9;45:8,14;51:18;
54:19,20;55:3,24;
56:11;58:19;61:1,8,14,
16,19;63:25;65:7,17,
19;66:10;67:24;73:12;
74:13;77:9;79:24;
80:24;84:2;88:18,21;
98:3,15,22;99:16;

108:12;110:22,24,24;
116:17;117:20;130:7,
19;133:10,18,21,25;
134:10,11;141:2;
142:5;144:2,2,4,13,14,
18;148:17;149:12,13;
152:3,4;157:8,18;
168:8;171:13;173:4,7;
178:3,22;180:4,11,24;
181:12,21;182:4;
183:1;195:1;198:6,7;
200:15;201:23;205:19;
206:7,10,12,19;207:5;
209:8;211:16;215:7;
217:5;221:6,15,24;
222:5;224:25;231:22;
235:15;236:14,18;
237:13;238:21;239:22;
241:8;242:24;243:6;
244:20,21;248:14;
254:2;260:16;265:1;
266:7;269:1;272:14,
16;273:10,11,14;
274:24;280:16;282:12;
287:3,4;289:8,17;
290:17;295:21
**ones (7)**
52:21;81:13,13;
93:19;94:5;116:13;
262:6
**one's (1)**
248:16
**one-week (1)**
254:12
**ongoing (5)**
54:11,11;69:22;70:4;
79:3
**Onion (10)**
56:19,23;65:20;66:9;
68:19;69:17;74:11;
179:6;196:14;232:14
**Onion's (1)**
63:8
**online (6)**
24:16;36:22;67:10;
69:10;208:20;209:13
**only (31)**
16:2,3,4;18:13,18,
25;20:21;25:6;27:24;
38:10;59:18;70:23;
93:4,14;112:6;113:13;
117:22;128:4;137:21;
140:8;145:10;162:21;
164:23;168:2;215:8;
228:20;241:8;266:13;
280:19;289:15,17
**onto (1)**
88:12
**open (4)**
22:16,21;24:1;28:19
**open-cry (1)**
208:20;209:4,6,13,
14,16,24;210:9,12,17;

211:22;212:3
**operates (1)**
257:8
**operating (1)**
54:15
**operations (3)**
192:7;225:12;258:12
**opinion (7)**
136:22;192:20;
195:11;198:7;217:25;
218:3,5
**opportunity (2)**
20:19;232:18
**opposed (2)**
125:20;171:10
**opposite (1)**
104:19
**optional (2)**
209:16,19
**options (1)**
73:10
**order (72)**
9:23;21:2;24:11;
29:17,18;31:1,6;42:21,
25;45:4;46:19;47:7;
49:14;50:17;68:5;
78:12,13;82:5;89:1,1;
115:24;120:4;130:2;
202:18,22;254:20,25;
255:2,2,7,13,14,15,18,
20;258:21,23;261:7,8,
12;266:18;267:10,13,
15,20,20;276:20,23;
277:23,25;278:17;
279:15;280:16,22;
281:5;283:13,14;
284:17;286:2,8;
287:10,19,25;288:1;
291:1,5,17;292:10;
293:5;294:7,21;295:15
**orderly (1)**
221:18
**orders (7)**
68:6;218:2;222:24;
223:6,8,9;281:8
**Organizations (3)**
198:15;200:21;203:7
**orientation (1)**
241:4
**original (12)**
14:24;20:11;21:25;
44:13;54:6;179:5,20;
184:18;207:19;209:3;
230:14;282:5
**originally (1)**
180:10
**others (8)**
34:5;44:6;54:17;
75:1;144:5;145:8;
206:11;235:24
**other's (2)**
21:13;44:20
**otherwise (4)**

61:3;88:20;98:17;
231:18
**ought (3)**
238:14,19,24
**out (64)**
12:3;27:20;35:23;
37:19;45:11;46:21;
56:16,23;60:20,24;
66:17;72:12;75:11;
77:19;85:11;88:13;
91:8,22,23;97:11;
104:13;111:7;130:18;
139:15;141:10;143:10;
148:5,24;149:9;153:9;
163:8;165:1,2;167:4;
170:18,25;180:7;
219:14;221:1;222:16;
223:4;224:24;229:6;
233:3,4,10,10;235:20,
22;238:14,19,24;
244:15;251:25;253:3;
257:17;272:18;279:19;
282:2;285:1;291:4;
294:3,10;295:10
**outcome (3)**
57:22;246:5;252:16
**outcomes (2)**
112:18;153:7
**outcry (1)**
207:21
**outdone (1)**
73:14
**outs (1)**
234:23
**outset (1)**
209:1
**outside (2)**
143:5;269:11
**outsized (1)**
57:24
**outstanding (1)**
228:12
**over (47)**
23:18;26:16;35:17,
18;66:15;70:15,18;
77:1,4;81:8,21,22;
89:11;121:20,23;
130:17;141:15;146:11;
158:1;160:3;163:13;
165:17;167:13;170:19,
20;172:1;176:16,17;
184:16;191:9;193:2;
196:20;205:20;218:6;
227:24;232:19;234:4;
236:12,12;240:21;
241:18,25;242:3;
246:3;254:18;282:7;
286:6
**overbid (11)**
19:8,16,25;20:5,15,
24,25;21:3,16,25;28:23
**overlooked (1)**
280:24

**overseeing (1)**
191:16
**oversight (2)**
192:7;278:9
**owe (5)**
219:12;239:14;
243:13,19,24
**own (9)**
14:18;23:4;99:11;
100:9;143:6;237:12,
13;238:15;268:4
**owned (7)**
208:18;237:7,18;
238:20,20;267:16,18
**owner (2)**
56:11;200:1
**owners (3)**
56:11;121:24;236:20
**ownership (4)**
236:5,15;266:23;
272:12
**owns (5)**
199:11;237:3;
238:19,25;257:7

## P

**package (10)**
12:3,6,8,10,13,17;
14:25;39:11;54:7;85:7
**page (91)**
13:11,12,15,17,17,
18,21;15:11,13,15;
20:9;22:4,23;22:24;4;
25:19,21;26:20;27:4,
10,12,12;29:24,25;
31:8;36:15;37:23;39:9,
15;42:24;45:17;47:6;
50:17;63:10;64:11;
65:1;66:24;87:2,18;
88:8,12;98:10;99:3;
107:3,10,14;108:22;
109:7,21;110:22;
116:19,20,22;119:4;
124:8;133:4,11,19;
144:23,24;152:1,3;
155:14;159:19,23;
160:8,15,21;161:19;
176:12,17,18;182:13;
184:25;208:14;246:17,
20;247:3;249:1;256:2;
259:17;260:1;264:13,
14,19;267:12;269:2,9,
10;270:7,8;279:16
**pages (3)**
13:10,11;15:12
**paid (11)**
18:11;31:12,19;
32:17;35:25;111:24,
24;148:7,10;150:23;
226:18
**pains (1)**
250:25

**paper (3)**
31:3;136:3;160:12
**paper-clipped (1)**
52:21
**paragraph (55)**
25:22,23;26:20;27:4,
14,15,17,21,23;28:6,
13,24;29:2,25;30:1;
36:18;37:24;39:15,16;
41:5,10,13,16,19;
43:13,15;45:8;47:6,15,
20,21;49:9,9,16;82:17;
88:12;92:23;99:4;
124:6,8;141:12;180:2;
185:6,8;260:2,5;261:2;
264:9,14,15;267:12;
269:7,16;279:16;
280:16
**paragraphs (2)**
41:14;270:14
**parents (2)**
288:23;289:19
**parlance (1)**
176:1
**part (34)**
32:11;34:19;54:6;
67:12;68:4,7;71:22;
72:16;97:15;115:5;
131:8;139:2,11;
141:17;149:7;165:8;
168:18;172:17,18;
182:15;197:19;216:4,
5;230:20,22;233:21;
235:11;246:4;253:11;
258:9;261:16;262:1;
272:2;278:10
**partial (1)**
244:7
**participate (3)**
27:25;38:4;70:22
**participated (1)**
12:18
**participation (1)**
57:16
**particular (7)**
39:15;106:7;128:16;
219:4;239:23;240:4;
244:1
**parties (10)**
49:19,20;80:16;
105:9,12;242:14,17;
245:23,23;281:17
**partners (2)**
122:3;123:12
**party (7)**
54:19,20;71:14;
72:10,13;122:18;139:9
**pass (3)**
127:14;131:19;
256:18
**passed (1)**
208:8
**passwords (2)**

262:15,20
**past (3)**
46:11;109:20;235:12
**Pat (2)**
232:1,5
**PATERSON (26)**
8:25;9:1;24:15;
25:13;94:15,18,23;
95:2,9,13;96:6,14;
104:2;189:20,25;
193:11;18;194:10;
291:6,15,22;292:13;
295:21,22;296:2,11
**Paul (6)**
8:25;9:1,2;25:14;
295:22,22
**pause (4)**
221:16,25;224:23,23
**paused (5)**
223:9,10,10;225:16,
18
**pausing (2)**
223:13,15
**pay (10)**
32:21,22;85:1;93:8;
101:3;136:9;168:21;
219:6,7;226:12
**payable (1)**
15:19
**payees (1)**
80:15
**paying (1)**
51:2
**payment (3)**
18:22,24;30:2
**payments (2)**
18:13,20
**PDF (1)**
102:6
**penalty (1)**
190:10
**pending (4)**
79:25;140:1;187:1;
257:11
**people (26)**
17:4;18:7;24:16;
25:7,10;37:19;81:12;
106:5;123:19;125:14,
18;139:1;163:9;
171:11;215:14;223:3;
234:19;235:16;237:7,
12,13;238:25;242:5;
244:8;262:17;294:2
**perceived (1)**
221:3
**percent (17)**
15:19;53:14,21;62:9;
112:11;115:18;120:7;
137:8,19,20;152:10;
153:22;164:1,2,23;
280:8;289:14
**percent/25 (1)**
112:11

**percentage (24)**
32:6;92:3;112:4,16;
115:6;118:21;135:6,8,
11,12;136:2,17;137:9,
16,17,18;138:3;152:9;
243:23;246:4;249:24;
252:7,8,9

**percentages (7)**
111:8;113:6;119:8;
120:11,22;135:4;145:7

**perfect (1)**
179:22

**perfectly (1)**
178:2

**perhaps (2)**
112:14;139:16

**period (2)**
74:16;219:6

**permission (2)**
23:20;24:9

**permutations (1)**
77:21

**person (8)**
35:17;131:13;
219:23;236:14;237:13;
238:21;291:4,11

**personal (1)**
208:17

**Personally (10)**
12:11;55:21;80:12;
102:4;154:7;171:9,10;
271:3,16;288:25

**perspective (2)**
141:23;159:6

**peruse (1)**
233:1

**phone (16)**
35:17,18;55:21;
69:18;74:13;154:11;
169:7;240:7;276:10;
287:8,16;293:12;
294:2,23,24;295:13

**phrase (7)**
65:10;142:22;147:9;
153:25;175:22;176:2;
206:12

**phrased (1)**
65:8

**physically (2)**
222:2,4

**pick (3)**
132:14;287:8;293:12

**picked (1)**
153:15

**picture (1)**
274:3

**piece (1)**
237:16

**piecemeal (2)**
22:16;24:1

**pierce (1)**
200:13

**pin (1)**

**place (10)**
26:7;155:24;157:20;
221:17,25;228:9,9;
238:24;288:5;293:17

**places (1)**
176:14

**plaintiffs (41)**
9:1,5,7,9;66:25;
71:10;150:8;154:6;
155:8,15,16;156:22;
158:14;164:23;165:11,
18;173:9;183:7;
185:20;189:4,16;
192:23;193:1;194:17;
196:8,14,16,22,24;
203:20;212:11;214:1,
9;227:20;228:18,21;
240:1,1;281:6;285:8;
296:14

**plaintiffs' (12)**
95:15;154:22;
194:19;241:21;258:16;
263:15;265:9;267:1;
268:14;273:16;274:13;
275:2

**plan (5)**
37:19;103:14;
156:17;220:19,22

**planned (1)**
227:14

**planning (1)**
223:24

**platform (6)**
36:22;54:21;223:22;
224:5,10;260:15

**platforms (3)**
260:17,18,22

**play (1)**
94:19

**plays (1)**
203:7

**please (15)**
8:5,19;9:11,16,16;
36:15;84:15;214:17;
216:6;217:7;249:10;
257:13;264:9;270:15;
275:13

**plenty (2)**
76:1;164:13

**plug (3)**
117:24;142:21;221:9

**plus (9)**
62:7;65:7;115:5,18;
137:10;247:10,14;
252:20;256:3

**pm (9)**
10:2;90:5,10;127:21;
249:12,14;274:23;
275:14;296:18

**point (36)**
14:1;17:5,25;18:12;
21:9;32:16;38:22;44:5;

45:11;48:22;49:5;
50:18;60:17,18;73:12;
77:4,6;104:16;105:8,9;
109:3;113:2;137:2;
142:16;170:19;172:15;
173:24;177:10;187:3;
198:3;201:11;210:25;
220:7;230:4;266:9;
295:18

**points (1)**
177:20

**pool (9)**
69:25;92:4;111:17;
120:8;152:10;183:25;
249:24;252:9;253:5

**pools (1)**
252:12

**popping (1)**
274:5

**Porter (1)**
8:16

**portion (21)**
34:23;65:13;69:24;
76:7,21;79:7;87:3;
89:9;131:4;136:10;
148:13;149:5,13;
155:21;179:9,14;
204:10;227:20;228:18;
250:6;256:6

**position (7)**
50:7,14;103:6;132:7,
10;136:16;219:10

**positions (3)**
104:19;169:11;
182:18

**possibilities (7)**
130:20;173:3;213:8,
10;223:21;252:2,4

**possibility (9)**
70:11;106:25;107:8;
187:7;206:18;210:5;
251:17,19;272:13

**possible (15)**
76:16;82:23;83:25;
99:13;131:4;148:21;
164:6;218:7;220:2;
224:4;234:19;238:8;
252:12;292:4,5

**possibly (6)**
104:20;212:13,21;
238:6;252:23,23

**post (5)**
273:19,22;274:17;
275:6,10

**posted (2)**
268:6,12

**potential (7)**
12:7;13:4;38:1,2;
54:13;70:19;153:7

**potentially (1)**
85:24

**practical (1)**
131:10

**practice (2)**
10:16,17

**practitioner (1)**
67:3

**precedent (1)**
254:3

**precipitated (4)**
169:16,22,23;233:7

**precise (4)**
95:18;194:24;
198:16;246:13

**predicate (1)**
165:25

**prefer (1)**
244:1

**preferable (1)**
296:9

**preference (2)**
139:17,21

**preliminary (1)**
209:9

**premise (1)**
42:20

**premium (3)**
30:7,14,15

**preparation (1)**
123:25

**prepare (2)**
108:17;257:18

**prepared (16)**
12:17;81:8,11,13,21;
91:1;93:19;102:14,22;
108:16;123:21;128:18;
130:21;131:13;283:18;
284:5

**preparing (2)**
103:17;286:25

**prepping (1)**
282:4

**present (3)**
8:5,19;30:18

**presented (2)**
141:16;150:6

**presenting (2)**
177:18;185:16

**pressure (1)**
73:16

**presumption (3)**
114:1;189:6;195:5

**pretty (12)**
47:16;53:7;59:1;
68:2;168:15;178:1;
186:18;201:9;253:25;
286:21;290:19;292:12

**prevent (1)**
245:6

**previous (5)**
152:3;160:21;238:1;
239:9;269:22

**previously (1)**
11:23;269:1

**price (32)**
18:23,24;48:25;

50:19,23;51:1,5;60:9;
108:7;136:14;137:5;
147:24;150:23;151:5;
162:19;163:23;172:16,
20,25;173:10;184:2;
211:18;247:2,9,11;
252:20;256:3;279:23;
280:9;289:15;290:14,
15

**prima (1)**
186:16

**primarily (5)**
78:20;167:20;
209:24;244:15;262:5

**primary (1)**
280:20

**print (1)**
257:17

**printed (1)**
272:18

**prior (5)**
48:22;178:10;271:7,
10,14

**privilege (16)**
94:21,23;95:5,7,14;
96:10,11,13,15;97:22;
103:9;104:8;106:4;
165:22;166:1;167:13

**privileged (3)**
103:16,19;104:1

**Probably (20)**
11:3;72:22;102:11;
126:15;127:2;130:23;
144:12;158:6;171:25;
172:16;192:8;225:10;
229:2;235:24;236:2;
242:6;248:3;252:14;
253:25;263:14

**problem (10)**
53:1;111:21;236:21;
245:4;284:21,23;
287:9;288:3;293:12;
294:17

**problems (2)**
215:16,16

**procedural (1)**
48:9

**procedure (6)**
24:8;40:21;43:16,17,
18;45:5

**procedures (34)**
20:16;21:18;24:5,6,
27:6;29:16;39:10;40:7,
24;41:6,12,15,17;
42:14,15;47:22,23;
48:8;58:15;66:19;68:8;
81:5,7,19;82:4,8,10;
100:8,8;122:2;186:4;
209:17;214:16;216:5

**proceed (6)**
29:5;69:13,16;
130:19;132:8;215:15

**proceeding (2)**

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

139:11;228:23
**Proceedings (1)**
296:20
**proceeds (69)**
31:12,20;32:11,14,
17;33:1;34:8,18,24;
35:2,22;36:6;59:7;
62:4;66:12,14;69:23;
70:21;72:19;74:5;
87:16;88:8;97:25;
98:11;117:23;118:13,
21;119:11,21;120:2;
129:18,24;151:15;
154:16;155:22;163:22;
179:12;180:3;181:7;
185:9;197:4;212:15;
226:6,12,18;228:12;
244:17;246:4;247:10,
15,20;248:9;249:5,19;
250:11;254:19,22,23;
256:4;276:8;277:12;
279:24;280:1,3;289:9,
24;292:2,7,25
**process (43)**
21:20,22;22:1;23:1,
13,13,14,16;39:21,24,
24,25;40:14,15;49:6;
56:2,13;57:21;58:15;
59:19;73:17;77:6;
102:21;127:7;128:16;
130:19;134:24;136:13;
202:16;203:18;204:22;
208:4;218:10,11,13;
221:18;231:23;232:11;
242:14;246:6;261:16;
262:1;272:2
**processes (1)**
203:8
**processor (1)**
223:3
**produced (3)**
90:20;102:10,23
**product (4)**
12:23;235:14;
237:12,17
**production (3)**
33:20,20;249:2
**productive (1)**
114:15
**products (2)**
223:3,7
**profit (1)**
223:7
**profitable (3)**
225:12,13,17
**profits (2)**
115:19,20
**program (2)**
237:17;282:16
**programming (5)**
222:10;225:1,2;
235:11;238:16
**programs (4)**

235:12;237:24,25;
238:10
**progress (1)**
69:21
**projected (3)**
22:15;23:25;130:24
**projection (1)**
148:1
**promised (1)**
210:20
**promptly (1)**
255:6
**pronouncing (1)**
240:8
**proof (3)**
15:20;17:8;122:21
**proper (2)**
95:8;202:25
**properly (2)**
195:18;203:1
**property (8)**
208:17;231:19;
234:5;237:17;261:19;
263:21;266:16;267:15
**proposal (3)**
94:6,7,7
**propose (1)**
59:4
**proposed (11)**
65:2;71:22,25;75:13;
108:7;245:21;261:22;
276:19;283:13;286:2;
291:17
**proposing (3)**
72:17;211:17;215:5
**protection (2)**
187:21;233:19
**prove (1)**
189:17
**provide (9)**
30:5;37:21;59:16;
63:8;92:14;121:8;
259:6;262:20;264:1
**provided (6)**
13:4;30:10;68:8;
101:25;200:8;279:20
**Provision (6)**
28:10;45:4;92:23;
244:17;279:16;280:24
**provisions (3)**
39:19;45:3;48:2
**proviso (1)**
245:15
**pull (7)**
179:2;221:9;249:8;
273:11;274:9,24;
278:14
**pulled (1)**
153:9
**punch (1)**
202:21
**punched (1)**
142:19

**purchase (43)**
18:23,24;50:19,23;
51:1,5;60:9;62:14,15,
16;74:3;82:20;108:7;
136:5,14;137:5;145:2,
3;147:24;150:23;
151:4;162:8,19;
163:23;172:16,20,25;
173:10;184:2;203:22;
211:18;230:24;246:12;
247:2,9,11;252:20;
256:3;272:6;279:23;
280:9;289:15;290:14
**purchased (3)**
247:4;280:7;289:13
**purchaser (6)**
124:14;232:14;
245:22;267:16,23;
279:21
**purchasers (1)**
242:21
**purchasing (1)**
242:20
**purport (2)**
129:13;267:15
**purpose (3)**
109:11;118:16;
206:17
**pursue (1)**
210:6
**put (28)**
58:19;62:24;73:15;
90:13,16;99:2;107:5;
109:7;113:20;131:13;
133:25;149:13;154:10,
20;174:1,3,6;183:14,
17;190:9;191:13;
210:24;221:16,25;
254:10;276:23;290:1,
11
**puts (5)**
262:25;282:17;284:3
**putting (2)**
112:22;210:23

## Q

**quadrupled (1)**
183:23
**qualified (57)**
19:12,15,21;20:1,4,
11,17,21;21:16,25;
25:25;26:17;27:24;
28:22;38:1,3,4,10,14;
40:3,7,8;43:19,23,24;
44:1,2,13;48:6;12;
48:17,18;53:17,19,22;
54:3;55:11;61:3,6;
65:4,7,23;68:9;69:12,
12,15;72:24;73:7;
81:18;82:11;83:4;
98:18;120:23;208:21;
209:7,13;290:15

**qualify (1)**
63:25
**qualifying (2)**
208:19;209:12
**qualitatively (1)**
58:8
**quantify (1)**
82:21
**quick (11)**
52:5;90:2;117:18;
198:3;231:3;249:8;
250:6,12;273:13;
278:15;279:13
**quickly (1)**
273:5
**quit (1)**
94:25
**quite (2)**
75:17;139:22
**quo (1)**
225:11
**quote (2)**
260:6,6
**quote/unquote (2)**
194:20;196:5

## R

**raised (1)**
187:7
**raising (1)**
106:7
**range (24)**
32:3,5,8;33:10,11,
12;50:24;93:7;107:22;
108:2;126:19,20;
137:13;140:3;152:24;
153:7,16,19;164:18;
165:7;181:24;182:7;
229:10;248:6
**ranges (5)**
126:22;229:7,9,22;
252:12
**rather (2)**
40:13;69:24
**rationalize (2)**
177:1,3
**rationalizes (1)**
199:25
**ratios (1)**
163:20
**reach (1)**
79:9
**reached (14)**
36:2;77:7;96:23,24;
174:12,15,18;279:7,9;
285:8,11,12,13,14
**read (34)**
13:5;15:21;27:17,18;
29:8;31:15;38:7;39:16,
16;45:10;88:10,11;
165:8;170:9;175:8;
176:8;187:24,25;

188:2,3,5,5;190:3;
247:7;260:4;267:12;
268:23,25;269:1;
270:13;279:19;281:20;
283:3;293:24
**reading (3)**
72:22;173:19;213:5
**ready (2)**
219:19;289:4
**real (11)**
117:18;123:15;
141:20;198:3;249:8;
250:5,12;265:1;
278:15;279:13;284:19
**realize (4)**
80:5;175:7;206:20;
280:25
**realized (2)**
137:19;286:24
**really (19)**
60:20;64:14;107:7;
109:5;112:6;113:13;
148:22;153:8;168:2;
172:5;187:8;190:2,7;
207:4;216:6;229:5,21,
23;234:22
**reason (11)**
67:8;73:1,24;113:9;
125:7;126:21,23;
214:6;215:12;218:8;
266:6
**reasonable (5)**
49:13;68:3;152:24;
153:16,19
**reasonableness (1)**
142:3
**reasonably (4)**
48:9;113:11;186:10;
252:14
**reasoning (1)**
277:14
**reasons (7)**
73:11;190:19;
211:20,25;212:1,4;
223:1
**reassure (1)**
219:4
**recall (10)**
13:8;14:4,7;54:19;
55:19;57:25;58:4;
206:13;271:13;296:5
**receive (12)**
61:1;65:6;66:4,10;
89:16;92:11;96:3,4,5;
98:1;99:21,22
**received (28)**
12:7,10,13;16:3,5;
22:15;23:25;53:14;
61:2;65:6,13;68:11,19;
69:5,14;72:18;74:7,9;
81:8;82:1;84:19;
140:10;196:11;212:11;
254:5;266:4,7;290:13

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

**receiving (5)**
26:16;151:12;154:1;
158:22;211:6
**recently (1)**
283:20
**Recess (5)**
52:11;90:7;127:18;
231:7;249:13
**recipient (1)**
157:5
**recipients (2)**
155:7;157:11
**RECKLER (23)**
8:23,24;25:8,8;
256:22,23;257:2,7,23;
258:1,18;263:17;
264:22;265:11;267:3;
268:16;272:24;273:8,
11,18;274:16;275:5,16
**recognize (6)**
91:11;259:1;261:8;
263:20;267:6;268:19
**recognized (1)**
293:12
**recollection (3)**
55:25;131:6;245:15
**recommended (1)**
211:23
**reconcile (1)**
177:1
**reconnect (1)**
225:3
**record (19)**
8:4,7;24:19;52:10,
13;90:6,11;127:17,22;
231:4,6,9;249:9,11,15;
256:23;257:6;258:3;
296:19
**recorded (1)**
8:2
**recover (8)**
89:2;98:14,16;
181:11;280:5,6;
289:11,12
**rectangle (1)**
250:15
**red (4)**
133:4,11;246:17;
279:16
**reduce (1)**
258:7
**reduces (2)**
152:7,8
**reducible (1)**
247:19
**RE-EXAMINATION (2)**
277:3;278:6
**refer (6)**
18:21,22;27:6;248:3,
4,4
**reference (6)**
176:13;180:20;
254:16;255:13;261:3;

265:6
**referenced (1)**
260:25
**references (2)**
82:23;116:25
**referencing (2)**
95:3;111:22
**referred (7)**
56:1,6;60:10;78:19;
108:3;248:22;265:15
**referring (12)**
16:14;20:2;41:23;
85:21;169:15;233:12;
248:21,24;250:5;
252:21;278:17,19
**refers (3)**
260:5;264:11,25
**reflect (1)**
295:16
**reflected (3)**
102:8;136:14;292:10
**reflects (1)**
120:20
**refused (2)**
70:24;222:20
**refusing (1)**
243:11
**regard (1)**
49:22
**regarding (2)**
266:23;276:7
**register (5)**
78:19;79:22;112:21;
120:12,20
**regularly (1)**
262:22
**reject (8)**
17:19,22;19:6;22:11;
23:24;48:17,18;86:10
**rejected (3)**
26:1;70:25;76:8
**rejects (1)**
224:19
**related (4)**
49:22;50:4,5;271:5
**relation (1)**
241:3
**relationship (1)**
9:18
**relatively (1)**
152:5
**relevance (1)**
187:2
**relevant (9)**
105:5,5,6;164:6,7;
188:24;189:2;190:18,
23
**relief (2)**
49:21,24
**rely (5)**
37:6;49:13;75:4;
82:12;104:7
**remaining (4)**

37:1,10,16;48:24
**remains (1)**
86:7
**remember (38)**
15:8;33:14;54:18;
56:10;58:13,14;71:20;
78:13;89:18;107:9;
124:4;125:4;128:6;
130:2;135:7,13,14;
141:2,5;143:23;144:9;
158:4;160:10;171:2;
190:2,3,3;216:20;
220:13,18;231:2;
232:4;240:24;241:9;
281:25;287:7;293:20,
22
**remembering (1)**
212:7
**remind (3)**
27:19;31:17;265:23
**remove (1)**
199:19
**renew (1)**
71:17
**renewing (1)**
71:19
**repeat (2)**
257:13,15
**rephrase (6)**
115:16;135:21;
215:11;226:9,23;
227:12
**report (2)**
271:21,25
**reported (3)**
216:16;217:11;272:2
**reporter (4)**
9:11;24:17;217:7;
249:9
**represent (16)**
8:6,9,12,14,16,20,21,
24;10:19;132:4;
167:23;171:11;237:8;
257:7;259:18,19
**representative (3)**
93:22;95:16;220:8
**representatives (8)**
213:23,25;214:4,7;
215:3,13;219:17;220:4
**representing (6)**
68:18;71:4;74:11,12;
237:4;288:22
**represents (3)**
167:24;171:12;
252:10
**request (7)**
70:25;96:7;97:8;
123:11;242:10,14,23
**requested (4)**
15:4;31:24;122:1;
242:6
**requesting (2)**
50:9;71:8

**requests (1)**
123:15
**require (3)**
62:11,24;189:12
**required (2)**
60:25;62:9
**requirement (4)**
15:23;17:12;29:21;
70:21
**requirements (3)**
53:18,20,23
**requires (1)**
200:24
**reschedule (2)**
46:9,21
**rescheduled (1)**
287:4
**rescheduling (2)**
46:8,20
**research (4)**
75:12;142:10,13;
143:15
**researched (1)**
159:7
**reserve (4)**
17:14;49:19,20;
296:15
**reserves (5)**
17:19;19:6;22:10;
23:23;48:21
**resolution (2)**
36:2;70:6
**resolve (2)**
85:24;246:3
**resolved (1)**
295:11
**respect (6)**
48:25;50:2;156:2;
191:19;197:3;225:11
**respond (2)**
85:25;86:2
**responded (1)**
123:16
**response (4)**
68:25;136:24;
190:13;243:10
**responsible (3)**
12:12;80:16;291:1
**rest (3)**
110:9;209:15;282:19
**restate (2)**
104:4;149:2
**restore (1)**
225:11
**result (4)**
29:4;91:17;117:25;
142:23
**resume (9)**
223:15,18;224:3,4,
12,18,21,25;225:1
**retort (1)**
244:3
**return (3)**

100:25;101:9;141:12
**revenue (1)**
63:24
**revenues (13)**
22:15;23:25;34:9,12,
14,19;63:18,21;64:5;
87:19,21;115:3,6
**reverse (2)**
113:10;164:16
**review (4)**
13:3;143:2;259:3;
263:23
**reviewed (4)**
68:12;81:15;124:1;
278:11
**reviewing (1)**
78:13
**revised (9)**
98:12;160:17;
162:13;181:8;267:9,
13;268:22;287:19;
295:16
**revising (1)**
276:23
**revisions (2)**
286:11,11
**ridiculing (1)**
224:14
**ridiculous (1)**
281:2
**right (364)**
9:10;11:22;13:21;
15:10,13;16:4,7,13,24;
17:5,19,24;19:6,13,15,
19,24;20:13,22;21:24;
22:6,9,10,14,21;23:3,
23;24:2;25:19;26:3,10,
12,25;27:15;29:1,24;
30:4,20,21;31:5,8,23;
32:21;33:9,23;34:16;
35:6;36:14,17,24,25;
37:9,18;38:7,10,18,20;
39:4,14,19;40:3,7,12,
20,23;41:8,9,10,20;
43:5,9;44:20;45:3,10,
12,20,21;46:24;47:1,
12,25;48:21;49:5,19,
20,24;50:8,14,22;
51:11;52:4;53:2,5;
54:9;55:1,6,16;58:9,
20;61:5,6,7,10;62:12,
18,20;63:1,17;64:2,4,7,
11,13,25;65:19,21;
66:25;67:4,16,21;68:7;
69:2,4,5,7,11;70:9;
73:6;76:24;80:14,17,
22;81:4;82:11,15;83:6,
6,9;84:15,19,23;85:4,5;
86:3,13,19;87:5,6,22,
23;88:2,4,6,24;89:7,20;
90:14;92:13;93:3;94:6,
10;95:25;98:10,10,18,
21,25;99:2,16;100:4;

102:4,17;104:11;
106:14,24;109:1,16;
110:2,7,23;115:19,20,
25;116:2,11;117:1,2,
10,17;118:9;119:8,9;
120:1;122:4;123:6,6;
124:11,23;125:23;
129:2,5,6,7,9,13;133:4,
22;134:19;136:2,10;
141:3,7,17;142:11;
145:2,10,11,17,23,25;
146:4,10;147:5,11,23;
148:19,22;149:10;
150:12,14;152:13,16;
153:21;154:23;155:11;
157:9;160:9,16,23,25;
161:18;163:6,11;
165:5,7;166:11;
168:25;169:17;174:2;
176:22;178:25;179:25;
180:5,20,25;182:10,17;
183:4,18;186:3;187:3;
192:23;193:5;194:22;
195:16,23;196:15;
197:1,2,7,9,12,21;
198:5,8,11;201:11;
204:6,12;207:21;
208:13,15;209:5,18;
210:10,25;218:4;
219:20;222:12;225:14;
226:10,25;228:5;
229:8,9;236:10;
237:14,15;238:10;
240:3,9;241:25;
243:20;245:16;247:12,
23;249:7;250:9,17;
251:3,5,8,24;252:22;
253:12,21;255:1,4,16,
17;256:8,11,15,19;
257:25;259:25;266:20;
269:3,14;272:8;273:4;
274:3,15;275:4;276:6,
9;277:13,15;278:2,3,
17,21;280:11,12,13,13,
14;281:12;282:9,21;
283:13,16;285:22;
287:3;290:9,17,18;
291:11;292:5,12,12;
293:5;295:5,20

**right-hand (4)**
150:13;163:2,3;
250:10

**rights (12)**
50:1;65:3;66:8;
234:13,20;235:19,21,
25;238:11,13;267:15,
24

**Robinson (1)**
9:2

**role (2)**
59:3;203:7

**room (8)**
24:23;54:7,20;129:6;

222:5;260:16;275:7,9

**Room's (1)**
275:7

**roughly (2)**
137:19;293:21

**round (11)**
21:8;44:6;60:19,22;
62:8;130:25,25;
209:12;214:13;215:22;
230:11

**rounds (3)**
19:23;216:11;286:10

**ruled (1)**
270:23

**rules (3)**
48:9;218:1;230:1

**ruling (1)**
266:23

**run (1)**
191:14

**running (3)**
142:3;191:5,10

**Ryan (1)**
9:6

## S

**sake (1)**
36:5

**sale (94)**
9:23;11:17;14:2;
22:7;24:11;29:5,6;
31:1,13,23;32:14;33:7,
8;34:23;37:11,16;
42:25;45:4;49:6,14,24;
50:9,14,15,17;69:24;
70:23;75:8;78:12,13;
85:2,11,17;86:15;
91:21;95:4,16;98:17;
104:8;123:22;129:11,
12,21;130:2;132:8,22;
134:22;139:11;159:14;
166:24;167:1;197:6;
200:25;201:10,12,16;
208:18;209:11;226:5;
227:3;230:18;235:22;
238:24;246:1,6;
253:21;254:20,24;
255:2,7,13,15;257:11;
261:13;267:19;270:24;
277:13,16,17,23,25;
278:17;280:6,22;
281:8;287:19;289:12;
290:5,7;291:5;292:10;
293:5;294:20;295:15

**sales (27)**
11:16;25:23,24;30:5,
7,10;34:8,12,14,19;
42:21;48:8,24;68:5;
82:5;138:14,15;
159:12,13;225:15,18;
236:21;240:21;241:19,
21,23;242:1

same (44)
19:21;29:24;56:12;
65:1;66:22,23;73:1;
80:14;81:13;108:25;
113:3;117:22;119:20;
121:24;136:4;142:21,
23;152:15;165:21;
169:21;172:13;177:25;
179:4,23;180:5,9,10;
184:10,13,23;191:15;
193:8;195:4;211:25;
224:22;232:7;234:20,
20;251:20;254:4;
282:23;283:12,18,20

**sanction (1)**
190:10

**satisfaction (1)**
227:7

**satisfied (1)**
202:7

**satisfy (1)**
164:19

**save (1)**
284:2

**saved (5)**
121:10;283:5,20;
284:14,16

**saw (14)**
59:8;72:18;79:22;
160:21;162:13;187:5;
205:24,25;212:14;
213:2;219:2;244:7;
257:19;286:18

**saying (61)**
28:24;31:11;32:13;
34:22,25;50:13;51:13,
19;61:10,12,13;66:22;
73:5;107:16;109:1;
112:13;114:10;116:11;
124:24,24,25;126:5;
149:4,23;151:20;
157:6,11;163:25;
164:22;167:3,5;170:5,
6;174:12,15,18;181:14,
20,24;194:24;197:12;
202:18;207:5;230:18;
250:14;279:8,12,17;
280:10;281:4,5,16;
282:20;283:23,24,25;
284:6,11;285:24;
286:24;295:6

**scenario (3)**
103:18;137:5;224:11

**scenarios (6)**
77:22;91:18;109:14;
133:24;134:8;168:20

**scheduled (2)**
46:3,5

**Schleizer (1)**
220:5

**scholarly (1)**
143:17

**school (2)**

188:2;190:7

**scores (1)**
138:14

**scrap (1)**
28:9

**screen (7)**
134:1;160:13;174:3;
185:6;272:18,21,22

**scriveners (1)**
284:16

**scroll (1)**
274:19

**Scrolling (1)**
274:15

**sealed (24)**
21:7;22:1,6,16,25;
23:13,14,15;24:1;
26:18;38:2;39:24,25;
48:4,17,18;73:12,17;
206:17;208:20;209:12;
211:2,21;212:2

**search (2)**
142:23;209:19

**second (24)**
19:7;21:7;22:9;30:4;
42:19;44:12;76:11;
82:17;113:19;116:14;
124:11;133:25;151:14;
160:19;161:18;162:7;
176:18;178:24;179:1;
209:18;246:25;270:13;
272:14;274:5

**second-to-last (2)**
49:20;124:8

**secret (1)**
234:7

**section (7)**
179:12;247:1,4;
255:5,8;269:8;270:9

**secure (1)**
94:12

**secured (3)**
204:7,16;205:9

**security (2)**
233:13;273:21

**seeing (2)**
25:11;274:4

**seek (13)**
23:6,9;49:1,19,21,
24;68:14;99:8,12;
100:10,18;106:22;
261:17

**seeking (2)**
95:19;255:14

**seem (2)**
77:22;202:7

**seems (3)**
41:4;175:19;270:1

**selected (2)**
36:22;218:25

**selection (1)**
48:22

**sell (16)**

14:16;29:17;49:1;
71:14;72:13;124:13;
139:8;197:18;237:16;
261:17,23,25;263:21;
266:15;267:18;272:10

**seller (1)**
237:16

**selling (18)**
10:24;85:14;86:16;
139:18,19;234:25;
235:9,11,12,13;237:2,
5,24;238:1,25;239:4,5,
6

**sends (1)**
122:12

**sense (12)**
99:6,25;131:7;143:6;
147:2;149:15,16,17;
177:3;204:19;242:9;
262:16

**sensitive (1)**
233:2

**sent (11)**
12:3;122:12,13;
123:1;167:1;244:8;
284:21;285:24;286:3,
7,8

**sentence (30)**
17:18;19:5,7;22:10;
23:18,21;25:22;28:8;
30:4;31:9;48:20;49:18,
20;50:1,22;98:20,25;
101:15;124:11;125:1,
2;182:12;208:24;
209:8;269:4,7,15;
270:6;289:8,16

**sentences (1)**
177:15

**separated (1)**
282:18

**sequentially (1)**
133:5

**series (1)**
172:1

**served (3)**
125:5;259:23;266:1

**service (14)**
234:7;259:14,24;
265:6,14,18,22;266:2,
12;268:22,25;269:11;
270:4,17

**services (4)**
35:24;269:5,16;
270:11

**set (16)**
10:1;27:20;37:22;
40:14;58:15;60:24;
72:12;77:19;83:20;
98:15;253:5;254:21,
24;255:22;282:4;287:5

**sets (1)**
244:15

**Setting (1)**

268:1
**settled (1)**
140:12
**settlement (1)**
139:12
**settlements (1)**
139:6
**Several (16)**
10:9;41:14;78:23,25;
80:17;123:16;167:19;
170:19,20;172:1;
183:3;185:23;206:6;
214:21;221:16,24
**severally (1)**
227:8
**shall (13)**
18:1,2,5;19:8,25;
30:5;47:8;98:12;181:9;
247:9;252:20;267:20,
21
**shalt (1)**
229:25
**share (10)**
111:17;145:14;
147:25,25;153:22,23,
23;244:16;272:17,21
**shared (1)**
277:13
**sheet (5)**
244:12,22;245:21,
24;246:2
**Shelby (1)**
8:21
**shenanigans (1)**
123:18
**shop (1)**
131:15
**short (1)**
219:11
**shortly (2)**
68:23;72:22
**show (19)**
17:9;113:2,14;
118:17;120:6;121:10;
133:23;162:22;219:18;
223:22,25;224:2,22;
238:5;239:9;245:11;
248:14;275:7,9
**showed (2)**
17:4;89:19
**showing (7)**
111:19;147:14,14;
161:4;215:18;222:7,10
**shown (2)**
60:8;261:9
**shows (7)**
112:5;118:12;
145:17;160:2,16;
223:18;238:2
**shutting (1)**
219:10
**side (8)**
11:8;171:17,18;

178:5;241:21;294:10,
16,16
**sidetracked (1)**
144:22
**sign (6)**
253:9,10,12,15,22;
254:13
**signed (2)**
254:4,16
**significant (2)**
80:2;172:16
**significant-enough (1)**
80:3
**significantly (4)**
44:11;92:12;99:14;
137:23
**signs (1)**
291:18
**similar (2)**
56:3;138:15
**simple (1)**
284:19
**simply (1)**
63:7
**single (2)**
69:18;144:14
**sit (7)**
45:10;137:12;141:3;
144:19;198:8;218:3;
295:19
**site (2)**
224:8;257:8
**Sitting (3)**
127:4;170:23;290:9
**situation (2)**
11:9;143:21
**situations (4)**
11:2;76:4;140:5;
143:20
**six (3)**
257:17,21,23
**skeptically (1)**
175:18
**sky (1)**
153:10
**slightly (1)**
211:15
**Small (2)**
79:14;140:21
**smooth (1)**
220:2
**snapshot (1)**
128:15
**social (12)**
257:8;260:6,9,12,14,
17,24;261:13,25;
264:20;267:21,23
**societal (1)**
125:11
**software (2)**
140:15;270:18
**sold (15)**
13:23;14:19;53:12;

85:9;125:5;139:1;
196:13,15;197:13;
203:2;204:18;230:12;
242:1;260:10;272:2
**solved (1)**
284:21
**somebody (26)**
12:12;114:19;
122:14;131:15;154:10;
165:21,25;167:6;
170:12;182:5;187:11;
199:11;219:2;223:4;
228:25;229:1,3;230:2;
233:14;245:5;256:19;
257:17;286:14;295:3,
3,12
**somebody's (1)**
283:5
**somehow (2)**
149:7;151:8
**some-odd (1)**
193:2
**someone (7)**
117:6;186:23;
220:25;234:21;237:18;
284:2;294:23
**sometime (4)**
182:17;211:6;
281:23;282:3
**Sometimes (1)**
194:5;198:14
**somewhat (1)**
99:6
**Somewhere (7)**
135:13;144:12;
224:3;248:7;252:21;
260:19;273:2
**soon (2)**
169:19;253:25
**sorry (27)**
13:14,16;24:15;
25:16;29:24;39:11;
49:19;52:25;71:11;
75:10;81:1;107:1;
125:17;141:10;150:17;
154:14;160:6;161:8;
167:21;184:14;192:3;
205:19;208:25;242:19;
246:24;264:16,18
**sort (26)**
42:3;62:19;64:21;
70:15;73:16,24;
107:13;110:10;112:22;
113:10;126:8,20;
130:18;137:13;151:22;
164:16,17;184:25;
212:10;221:17;222:16;
224:8;227:6;228:13;
243:18;244:8
**sorted (4)**
235:22;238:14,19,24
**sound (2)**
192:24;240:9

**sounds (5)**
129:5;188:7;193:5;
195:23;237:15
**source (1)**
122:18
**sources (1)**
122:3
**speak (6)**
35:10;68:24;69:16;
93:1;166:1;257:14
**speaking (3)**
35:19;94:22;223:25
**specific (27)**
50:23;59:20;60:15;
74:2,3;76:15;82:22;
83:25;116:24;141:2,5;
169:6;170:20;212:24;
213:11,13;214:17,24;
216:6,21;217:6;
235:10;239:20;242:9,
12,21;271:9
**specifically (5)**
221:20;231:14;
235:5;261:4;271:5
**specificity (1)**
82:22
**specifics (2)**
58:24;171:21
**specify (2)**
260:25;265:17
**speculate (1)**
280:19
**speculating (1)**
229:4
**Speech (5)**
9:24;12:4;95:1;
258:24;268:9
**spelled (1)**
8:9
**spend (2)**
33:2;45:15
**spent (1)**
250:25
**split (3)**
69:23;70:20;183:24
**spoke (3)**
69:18;166:8;215:13
**spot (1)**
246:25
**spreadsheet (10)**
91:17;102:6,7;
117:24;118:1,18;
121:1,9;128:8;248:12
**spreadsheets (9)**
33:13,19,22;34:1;
89:19;90:16,24,25;
130:22
**spring (1)**
104:13
**stack (1)**
178:25
**staff (1)**
218:24

**stamp (2)**
282:11;284:3
**stamped (1)**
283:20
**standard (2)**
193:16,16
**standards (1)**
194:17
**standing (1)**
132:7
**standpoint (5)**
64:9;87:25;234:24;
236:21;238:15
**stands (1)**
56:16
**start (23)**
91:20;101:13;113:9;
134:11;141:15;146:11;
150:22;152:13;158:1;
160:19;165:17;191:9;
196:20;205:20;208:15;
218:6;221:17;232:19;
234:4;236:12,12;
246:24;247:3
**started (5)**
44:16;160:12;
162:12;208:4;266:10
**starting (6)**
13:12;44:19,20;
111:12;124:7,8
**starts (2)**
22:10;88:11
**state (2)**
9:16;126:4
**stated (2)**
169:11;285:10
**statement (1)**
209:9
**statements (1)**
99:7
**States (9)**
8:14;75:9;186:2;
188:10;189:9;193:6;
196:3;269:12,13
**status (4)**
72:3,8;97:8;225:11
**statutory (2)**
137:18;138:9
**stayed (2)**
23:15;210:11
**steal (2)**
231:13,14
**step (1)**
154:23
**steps (1)**
224:24
**still (17)**
24:25;40:2,17;70:3;
72:6;104:17,18;112:8,
19;117:8;153:8;
162:25;164:10,20,23;
172:14;175:19
**stockholders (1)**

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

199:16
**Stocks (1)**
146:22
**stop (3)**
40:6;134:19;247:12
**stopped (4)**
221:13;222:24;
223:8;225:2
**stopping (3)**
223:12,14,24
**stores (1)**
222:23
**straighten (1)**
294:10
**straightened (2)**
294:3;295:10
**straightforward (2)**
178:1;253:7
**straight-up (1)**
85:5
**strengthen (1)**
273:20
**Strike (21)**
141:10,11,14;
146:11;158:1;165:17;
166:13;184:16;188:11;
189:12;199:22;200:19;
201:12;204:4;205:20;
207:18;232:18;234:4;
247:17;266:13;294:14
**struck (1)**
206:8
**structure (20)**
154:4;156:21,24;
157:13,21;158:9,12;
202:25;207:14;209:25;
210:3;214:2;215:4,6;
216:23,25;217:1,13,15;
225:21
**structured (2)**
75:23;203:1
**studio (2)**
219:19,21
**stuff (1)**
231:13
**subject (17)**
19:8,25;20:4;21:15,
18;29:6;46:8,20;71:1;
79:1;103:9;170:3,5;
171:18,24;186:7;187:8
**subjected (3)**
19:16;20:14;21:25
**submit (6)**
26:18;43:20;48:4;
181:23;216:11;229:12
**submitted (13)**
16:25;17:1,9;38:3;
52:19;54:22;55:7,17;
58:14;184:19;212:16;
218:18;286:17
**subpoena (1)**
256:14
**Subsequent (4)**

29:18;40:18,20;
93:11
**subsets (1)**
206:23
**substance (2)**
70:17,19
**substantially (2)**
200:25;201:17
**substantiate (1)**
295:18
**substantive (2)**
47:12;180:14
**substantively (1)**
38:9
**subtracting (1)**
111:6
**success (1)**
79:21
**successful (12)**
16:21;48:22,23;
79:19;85:23;86:24;
91:19;106:21;137:22;
292:22;296:4,8
**sudden (1)**
104:13
**sued (2)**
96:25;106:5
**sufficient (3)**
65:5;66:9;164:8
**suggesting (2)**
14:17;73:3
**suing (1)**
139:16
**Sullivan (4)**
187:24;189:14;
190:2;193:9
**superior (1)**
164:10
**supervised (1)**
192:6
**supplying (1)**
210:22
**suppose (1)**
28:3
**supposed (8)**
43:10,13;136:3;
218:10,11;247:18;
255:9,10
**Supreme (7)**
186:2,2;188:10;
189:10,11;193:6;196:3
**sure (82)**
13:9;19:20;28:8,11;
31:16;34:4,10,25;35:4;
36:9;42:2;49:10,10;
52:7,8;58:13;64:25;
66:23;68:6,8;71:13;
77:3;81:6;82:9;85:12;
86:1;90:1,22;91:9;
99:19;108:3;112:17,
18;114:2;118:4;
123:19;126:2,3;
128:17;129:22;130:12,

13;136:11;146:14,19;
149:21;157:3;159:22;
163:1;165:20;171:6;
182:5;195:3;197:10;
201:9;202:16;205:3;
210:6;215:9;228:3,24;
230:20;233:1,4,12;
235:5;237:10;246:8;
251:15;256:13;269:6,
25;272:25;274:6,25;
278:23;284:10;285:4,
12,13;286:22;287:22
**Surely (1)**
286:13
**surmised (1)**
294:22
**surprise (1)**
263:12
**survive (2)**
120:17,17
**suspected (1)**
212:9
**sustained (1)**
186:11
**swear (1)**
9:11
**switched (1)**
160:7
**sworn (2)**
9:13;294:15
**syllables (1)**
36:13
**system (5)**
282:17;283:5;284:2,
14,16
**Systems (6)**
9:24;12:5;232:21;
233:17;258:24;268:9

**T**

**tab (2)**
265:23;279:13
**talk (25)**
50:18;95:11;105:24;
106:6,10;118:9;
136:25;142:8;143:12,
14,17;170:12;178:4;
198:9;219:3,16;
222:15,21;235:9;
241:11,13;247:8;
291:11;294:3,4
**talked (36)**
35:16;54:14,16;
57:11,14;59:14;62:19;
70:9,13,14;71:1;74:11;
81:2;92:20;111:6;
130:1;133:16;143:20;
158:7,11;169:8,12;
170:15;183:1;203:18;
206:6;215:21;222:19,
20;227:19;239:13;
245:11;257:24;294:2,

5,9
**talking (49)**
13:9;14:9;15:12,12;
16:10,16;19:20,21,22;
20:1;34:1,4;36:8;
46:11;80:10,13;90:23,
24;104:17,19;105:20,
21;108:2;109:20;
116:9;126:21;129:14;
133:14;147:1;148:12;
158:10;178:16;184:16;
194:14;196:2;198:14;
203:17;213:24;220:4;
240:18,20;246:1,13;
249:3;250:16;251:6;
252:13;264:20;287:3
**talks (9)**
27:13;30:1,13;31:9;
48:1;63:17;92:23;
109:2;209:15
**Tanenbaum (12)**
12:16;35:11;81:14;
91:1,3,16;130:21;
214:11,25;215:2,13;
216:10
**tangible (2)**
135:8;139:25
**tax (8)**
30:7;158:13,16,20,
24;159:10,12,13
**TBOC (1)**
200:24
**team (7)**
171:24;178:8;
215:24;217:2,11;
232:25;261:22
**technical (1)**
147:2
**telephone (1)**
182:16
**telling (11)**
37:6;42:24;46:14;
62:23;73:21;105:17;
187:5;206:13;208:22;
215:9;293:20
**tells (4)**
44:16;150:20;251:8;
283:21
**temporarily (3)**
221:11,14;222:24
**tempted (1)**
198:2
**tend (1)**
92:2
**tension (6)**
44:7;100:15;206:12;
243:18,21,22
**term (27)**
16:22;20:6,7;26:22;
27:1,3,5,10,14;41:23,
24;142:19;147:2;
155:12,14;204:5;
234:4,5,6,10,12,12;

244:11,22;245:21,24;
246:2
**terminate (2)**
48:24;49:6
**termination (1)**
221:3
**terminology (4)**
16:15;132:17;
146:16;149:22
**terms (26)**
11:4;17:15,15;19:5;
20:8;44:14;48:2;62:3;
63:23;103:22;115:3;
119:7;231:11;235:21;
254:21;265:6,14,18;
268:22,25;269:5,11,17;
270:4,17;290:1
**term's (1)**
28:7
**test (1)**
126:22
**testified (6)**
9:13;104:21;105:18;
183:4;276:6;296:3
**testimony (22)**
21:24;26:6,13,25;
99:11;100:9;103:1;
141:3;166:9;182:24;
205:16;212:8;233:25;
269:22;285:6;286:7,
18,19;289:3;294:15;
295:9;296:5
**testing (2)**
151:23;164:16
**Tetrahedron (15)**
55:17;56:4,12,18,25;
76:7,18;78:3;121:24;
122:7,13;179:6;
196:21;214:1,9
**Tetrahedron's (1)**
122:7
**Texas (33)**
9:4;57:15;69:23;
70:10,11,20;71:4,10,
15,21;72:1,13;98:14;
149:23;151:8;155:16,
24;156:6,21;157:4;
158:14;181:10;198:15,
22,24;200:20;203:6;
227:21,22;240:1;
241:20;244:16;296:14
**Thanks (1)**
25:2
**theoretical (2)**
138:12;240:2
**theoretically (1)**
37:13
**therefore (3)**
44:7;152:8;187:12
**thinking (14)**
81:1;109:10;131:9;
154:9,20;183:24;
185:1;187:13;212:5;

213:17,19;243:14,18,
21
**third (8)**
56:9;119:4;122:18;
148:3,4,5;160:4;
274:24
**thoroughly (1)**
78:12
**thou (1)**
229:25
**though (15)**
39:2;41:16;50:4;
56:16;79:24;112:6;
138:23;162:23;172:13;
235:24;243:6;246:21;
253:9;281:12;293:5
**thought (64)**
41:13;47:3;50:2;
61:12,13;62:2;66:16;
67:16;75:18;77:13;
78:8;92:13;94:11;
103:3;105:11,11,22,22;
106:8;108:19;109:13;
114:9;117:20;124:19;
131:3;144:6;152:23;
153:16;157:15;158:25;
159:1,16;160:3,23;
161:2,12;166:16;
168:1,2;173:20,22;
176:18,21;181:18;
182:19,25;186:14;
203:12,14;205:7;
210:8,8,14;212:25;
213:9,14;219:22;
224:2,3;233:8;236:4;
242:2;269:23;293:4
**thousand (36)**
66:4;89:2,11;92:15,
24;93:5,14;94:13;96:4;
98:2;99:19;101:4,10,
20;113:17,23;114:20;
115:18;128:5;139:17;
152:21;153:10,18;
168:3,19;170:6;
173:18;180:5,13,24;
181:11,15,19,21;182:3;
251:2
**three (6)**
11:14;55:21;171:25;
183:25;190:19;260:15
**three-quarters (1)**
184:5
**throughout (4)**
21:19,22;133:5;
210:11
**thumb (1)**
247:2
**Thursday (1)**
218:21
**timeframe (1)**
254:13
**timeline (1)**
69:2

**times (16)**
10:23;11:1,13;35:16;
183:25;187:24;189:14;
190:2;193:9;206:6;
214:21;219:11;223:11;
241:12;242:7;243:7
**timing (1)**
95:3
**tired (1)**
247:7
**title (3)**
237:4,6;267:21
**today (11)**
9:21;29:22;35:4;
37:6;86:7;112:21;
127:4;137:12;189:1;
263:11;295:9
**Today's (1)**
8:2
**together (5)**
9:2;90:16;154:21;
176:15;283:3
**told (40)**
24:16;43:12;58:4;
59:1;60:1;62:20;69:11,
15;86:12,13;93:4,13,
16,17;94:11;103:2,3;
107:24;124:19;138:13;
141:8;143:10;168:4;
207:20;209:3;216:22;
219:17;220:8;229:6;
233:8;277:6;294:1,11,
13,19,20;295:6,7,9,11
**tomorrow (3)**
130:11;245:10;
253:13
**took (11)**
20:16;60:4;89:6;
90:15;108:19,21;
155:24;160:23;176:24;
184:4;222:23
**top (22)**
13:11,18;15:13;19:4;
21:10;30:16;63:11;
87:3;107:22;108:2;
112:10,25;120:6;
175:4;180:11,12;
182:7;206:8;250:1,4,6;
269:10
**topic (1)**
57:15
**topics (1)**
257:4
**total (3)**
53:10;135:23;181:18
**totally (1)**
286:2
**touch (1)**
257:4
**toward (1)**
129:1
**towards (2)**
17:25;273:25

**track (3)**
12:10,13;129:7
**tracks (1)**
292:17
**trade (2)**
234:6,8
**trademark (1)**
234:7
**traditional (2)**
10:16;131:9
**transaction (4)**
138:18;149:25;
198:3;201:16
**transfer (5)**
18:13,18,25;129:13;
149:6
**transition (4)**
219:6,24;221:17;
222:16
**transmittal (1)**
284:20
**Tranzon (10)**
32:16,21,22;33:15;
35:7;54:6;128:12,18,
19;249:2
**TRANZON887 (1)**
119:5
**TRANZON893 (2)**
248:25;249:18
**Tranzon's (9)**
31:9,12,19,25;33:20;
34:6;17;35:4;36:21
**tried (1)**
133:3
**tries (1)**
245:6
**triggered (1)**
29:20
**TRO (5)**
95:4,19;103:5,25;
104:18
**true (6)**
27:22;113:7;147:6;
148:25;174:7;205:14
**trust (1)**
124:12
**Trustee (41)**
8:14,16;9:20;10:8,
11,22;11:16;15:19;
17:18;19:6;22:10;
23:23;25:23,25;29:4,5;
37:25;47:8,10;48:21;
50:12;67:3;70:22;
74:17;75:24;124:12;
125:3;132:10;134:24;
192:6;198:12;202:19;
226:3;258:4;267:18,
20,25;270:3;271:22;
276:3;280:1
**trustees (3)**
10:20;142:5,8
**trustee's (3)**
143:24;258:22;

263:20
**truth (2)**
202:6;292:5
**truthfully (3)**
191:12;202:5;238:18
**try (21)**
31:3;45:11;114:15;
132:16;135:21;141:9;
149:19;150:17;173:7;
174:3;179:16;183:7;
191:12;198:2;212:25;
213:6;224:24;228:7;
231:17;245:6;250:25
**trying (49)**
20:9;46:21;75:11;
77:19;91:8,16;97:11;
99:5;112:13;118:17;
130:18;136:8;146:8;
148:8;150:7;154:19;
155:13;162:22;163:15;
175:16;179:19;180:7;
196:19;204:25;205:6;
207:9;210:7,14,16,24;
213:9;214:24;220:18;
229:11,15,21;233:22;
235:20;242:12;248:6;
252:17;253:18,19;
255:18;261:25;272:10;
281:4;282:1;285:25
**turn (15)**
80:22;246:11;
259:13;260:1;261:6;
263:18;264:9;265:3,
12,21;267:4,11;
268:17;269:2;270:7
**turned (1)**
160:8
**turning (1)**
270:21
**turns (1)**
229:6
**TV (1)**
233:15
**Twitter (3)**
85:14,14;257:9
**two (48)**
11:3;16:2,3,4;18:15;
19:12,23;25:9;43:19;
47:9;69:11;91:18;
105:9,12;110:23;
119:17;122:10;131:11;
133:18;145:10,12;
149:22;169:20;173:3,
13;180:15;211:14,14,
20,25;212:3;221:12;
222:6;223:21;225:3;
229:7;231:3;234:19;
237:12,13;248:19;
249:22;252:4;262:17;
270:13;272:16;273:12;
292:21
**type (1)**
114:3

**types (4)**
56:7;139:9;206:24;
244:16
**typically (1)**
271:20

---

**U**

---

**ultimate (3)**
112:14;252:7,8
**Ultimately (12)**
16:3;23:14;32:10;
44:14;55:10;69:25;
81:16;183:10;196:8;
210:13;249:23;284:14
**unadulterated (1)**
281:1
**uncertainty (1)**
112:14
**uncommon (1)**
139:8
**Under (64)**
20:6,7;29:21;35:23;
48:10;61:19;65:6,15,
23;66:18;91:18,21;
92:8,10,10;96:4,5;
98:12;99:13,16,22;
109:18;111:9;112:10,
17,25;113:18;115:9;
116:11;118:20;133:24;
134:8;137:8;141:24;
145:9,21;149:1;
150:25;151:15;160:16,
18;161:6;162:13,23;
163:19;168:4,20;
181:8,15,22;185:9,22;
191:14;202:17,18;
224:12,14;247:3;
251:12,13;252:24;
270:17;274:3;296:7
**underlying (1)**
186:7
**undermined (1)**
21:12
**Underneath (1)**
274:20
**understood (13)**
54:14;84:25;85:5;
113:25;165:10;178:1;
180:22;181:17;185:13,
16,19;246:2;285:19
**undo (1)**
198:4
**unfortunate (1)**
219:10
**unfortunately (1)**
272:19
**Union (1)**
269:12
**unique (5)**
35:22;67:6,7,10,17
**United (41)**
8:9,14;16:7,9,10,25;

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

19:18;20:10,11;38:11;
52:19;53:3;75:9;84:25;
86:17;87:14;92:3;
99:22,23;101:3;
112:23;115:4;125:20;
126:12;134:9,17;
152:16;168:4;170:7;
186:2;188:10;189:9;
193:6;196:3;214:20;
217:18;224:20;230:10;
269:12,13;296:9

**United's (8)**
54:10;84:17;87:10;
89:3,6;144:25;145:20;
177:25

**universe (1)**
213:10

**unless (2)**
52:20;189:16

**unlikely (2)**
80:1;252:16

**unqualifiedly (1)**
37:15

**unsecured (30)**
33:6;58:1,11;60:25;
65:5;66:2,3,9;73:20;
88:19;89:13;94:13;
96:3;98:1,13;99:21;
101:9,21;111:24;
112:15;113:18;124:16;
129:25;141:23;145:5;
173:18;181:9;280:2,5;
289:11

**unsecureds (5)**
66:17;89:9;91:23;
163:22;184:1

**unwaivable (1)**
189:11

**unwilling (1)**
272:6

**up (78)**
22:16,21;24:1;57:16;
58:15;69:24;71:21;
76:22;77:19;92:8,14;
104:10;105:25;107:7;
120:8;131:2;132:14;
133:25;142:22;148:25;
149:23;150:21;151:11;
153:25;156:17,20,24;
157:12;160:10;161:20;
162:18;164:24;166:20,
23;168:6;174:3;
175:10,22,22,25;176:2,
3,5,6,7,10,18,19;177:1;
179:2;180:24;182:4;
183:21;184:3;185:10,
24;204:10;207:7;
208:12;218:22;227:20;
232:7;233:23;241:12;
242:6,13;249:8;
257:14;272:21;273:12;
274:5,9;278:15;280:7;
287:8;289:13;291:9;

293:12

**updated (2)**
81:5;278:13

**upheld (1)**
75:24

**upon (3)**
72:22;189:5;245:22

**upper (1)**
112:5

**urged (1)**
86:10

**use (35)**
16:15;43:17;57:23;
58:16,22;59:2,17,19;
73:19;120:21;132:16;
135:16;142:17,17,18;
147:9;204:5;212:25;
213:3;223:10;224:17;
225:16;229:7,8,8,9;
234:12,22;244:3;
267:22;270:21,11,18;
282:16;287:21

**used (21)**
62:15;75:8;118:16;
119:14,24;125:6;
151:19;155:12;190:25;
191:25;194:18;206:12;
226:12;262:23,24;
263:7,7,9;269:20,23;
293:22

**useful (1)**
108:16

**user (2)**
262:12;270:18

**uses (1)**
262:4

**using (25)**
27:14;40:2;58:12,17;
65:25,25;70:11;91:25;
111:5;112:10;113:1;
117:4,4;146:1;149:21;
164:17;204:19,21;
205:25;224:9;245:12;
251:3;252:24;269:4,16

**Usually (1)**
10:20;282:15

**V**

**vacated (1)**
79:6

**vague (1)**
59:1

**vaguely (2)**
54:19;58:3

**valid (1)**
196:8

**validity (2)**
188:21,24

**valuation (1)**
183:17

**value (52)**
32:15,17;34:7,18;

35:3,24;51:8,10;60:7,
12,14,18,21;61:14;
62:4,6,7,21,25;64:2,6,
22;66:24;68:2;76:3;
78:15;80:3;87:24;88:4;
101:18;110:11,12;
120:14;124:16;136:13;
138:8,12;139:23,24;
140:2;149:13,25;
183:15;184:10;195:2;
204:7,19,21;206:20;
228:25;229:17;271:9

**valued (3)**
61:7;149:11;151:23

**valuing (2)**
63:23;211:16

**variety (1)**
162:24

**veil (1)**
200:13

**vein (3)**
212:14,21;213:7

**venture (1)**
196:14

**verb (1)**
223:10

**verbal (1)**
35:15

**version (10)**
91:14,25;102:7;
121:10;128:3;170:9;
180:18;181:6;277:13;
283:19

**versions (5)**
131:8;243:7;244:11,
22,23

**versus (7)**
83:10;180:4;211:22;
212:3;218:6;239:22;
283:15

**veto (8)**
70:15;240:21;
241:18,21,23,25;242:3;
244:6

**via (2)**
18:25;35:13

**Vickie (1)**
220:5

**victimizing (1)**
125:6

**Vida (1)**
9:2

**video (1)**
8:1

**VIDEOGRAPHER (18)**
8:1,18;9:10;24:21,
24;25:2;52:9,12;90:5,
10;127:16,21;231:5,8;
249:11,14;272:20;
296:17

**view (5)**
50:6;99:25;144:14;
172:13;175:16

**viewed (1)**
175:17

**viewing (1)**
28:4

**virtually (1)**
198:4

**virtue (1)**
57:23

**visualize (1)**
77:12

**void (1)**
267:23

**voidable (1)**
267:24

**W**

**wait (4)**
42:19;44:12;179:8;
250:22

**waiting (2)**
24:16;193:22

**waive (5)**
15:23;65:3;66:8;
139:21;194:22

**waived (1)**
17:12

**waiver (134)**
32:12,14;33:1;34:8,
19,24;35:2,22;36:6,7;
51:13;58:7,17;59:8;
60:11,24;61:8,14;62:4;
64:16;66:7,11;67:11;
68:12;72:19,25;73:19;
74:5,18;75:7;76:8,22;
77:10,16,24;78:3,14;
83:3,6,13,20;87:16;
88:8,17,21,25;92:14,
16;94:12;96:5;97:25;
98:11;101:19;109:23;
112:2;117:23;118:3,
13,20;119:11,21;
120:2;128:4;129:18,
24;132:16;141:17;
144:1;145:8;146:25;
147:1,5;151:15,17;
154:16;164:9;168:2,
16;172:22;177:21;
179:12,14;180:4,22;
181:8;185:9;194:20;
195:2;196:5,9,10,25;
197:3;212:10,15;
214:2,9;215:4,6,14,19;
216:23,25;217:1,3,6,
13,15;225:21;247:11,
15,20;248:10;249:5,
19;250:11;252:21;
254:11,19,22,24;
255:10;256:4;276:8;
277:12;279:24;280:1,
3;285:20;289:9,25;
292:3,7,25

**waivers (2)**

75:23;139:6

**waiving (5)**
132:6,10;167:12;
192:11;194:21

**walk (8)**
91:5;110:17;117:17;
133:12,21;134:10,11;
150:13

**walking (2)**
144:24;233:10

**wall (1)**
233:15

**Walt (1)**
25:3

**Walter (3)**
8:8;24:25;249:3

**wants (1)**
206:19

**War (6)**
121:20,23;260:16;
275:6,7,9

**warrant (1)**
267:20

**waterfront (1)**
234:8

**Watkins (1)**
256:23

**wave (1)**
223:5

**way (49)**
20:16;21:9;28:4;
51:15;58:13,19;63:25;
73:18;76:11;83:22;
92:17;95:8;101:12;
102:16;108:5,15;
113:7;117:15;121:12,
12;133:9;152:15;
155:19;157:18;164:6,
11,14,16;165:8,8;
172:13;179:16;183:11;
186:10;189:13;196:2;
198:6,7;201:14;
210:13,19;213:1;
215:7;223:7;224:25;
228:22;229:18;236:18;
294:18

**ways (2)**
138:5;242:13

**website (2)**
223:4,5

**websites (3)**
221:12;222:6;225:3

**week (9)**
171:3;218:20;254:7;
263:13;269:24;282:7;
287:5,6;288:20

**weekend (6)**
77:1,4;81:8,21,23;
130:17

**Weichselbaum (1)**
25:12

**Weiss (4)**
9:1,2;25:14;295:22

**CONTINENTAL COURT REPORTERS, INC.**
(713) 522-5080

**weren't (13)**
  28:25;38:19;46:12;
  47:16;54:5,7;150:10;
  229:24;230:17;239:3;
  266:11;277:16;281:20
**Westlaw (3)**
  142:17,18,19
**what's (28)**
  24:4;27:8;46:1;71:4;
  73:15;91:11;105:5,5,6;
  108:18;111:12;118:16;
  148:3;187:2;190:4;
  217:25;219:14;223:12;
  240:17;248:23;251:19;
  254:1;282:9;290:5,7;
  292:17;293:5,25
**whenever (4)**
  96:25;128:25;
  253:23;286:25
**Whichever (1)**
  134:13
**white (1)**
  274:20
**whole (10)**
  73:12;149:13;177:5,
  11,12,13,14;181:24;
  243:25;281:2
**Who's (4)**
  199:1;201:25;202:2;
  285:1
**whose (2)**
  262:17;278:10
**willing (6)**
  21:10;72:24;74:18;
  76:14,20;85:1
**Willkie (1)**
  9:4
**wind-down (9)**
  29:17;208:2;258:21,
  23;261:7,9,16;265:19;
  266:5
**Windows (1)**
  274:5
**winner (1)**
  174:19
**winning (35)**
  96:9;111:2;112:19,
  23;135:22;137:24;
  145:25;147:18;148:7;
  151:1,21;152:13;
  160:20,20,22,25;161:1,
  2,5,12,15,19,20;162:2,
  4,12;163:2;164:8,19;
  217:19;218:25;221:18;
  250:21;251:1,12
**wire (4)**
  18:13,18,25;122:12
**wires (1)**
  122:10
**wiring (1)**
  30:6
**Within (4)**
  28:24;47:9;171:3;

**282:2**
**without (6)**
  31:13;41:12;45:6;
  47:22;195:22;267:24
**witness (23)**
  9:11;25:20;52:7;
  90:4;95:10;96:7;110:8;
  113:21;115:21;127:14;
  131:20;136:1;167:11,
  15;172:11;178:19,22,
  24;241:7;256:19;
  257:20;264:19;272:22
**Wolfshohl (114)**
  8:15,15;11:25;12:21;
  24:22;25:3,6;52:8;
  74:23;83:15;90:1;
  96:10,12,15,18,21,24;
  97:3,6,13,17,20;98:4;
  100:12;101:11;102:11,
  19;104:4,21,25;105:4,
  14,17,24;106:3,10;
  114:21,25;115:14;
  116:4;127:11,15;
  132:5;147:4,12;153:2,
  11;155:3,17;165:15;
  166:4,11;167:10,12;
  172:7;176:23;177:4;
  181:2;182:20,23;
  187:14;188:1,14,18,23;
  189:19,21;190:12,21;
  191:2,7;192:12;194:3,
  9;195:21;198:21;
  200:4;201:2;202:12;
  203:4,9;205:2,13,15;
  217:21;236:1,8,23;
  237:9,19;244:25;
  245:4;256:21;257:21;
  273:6,9,14;275:17;
  276:2,3;277:2;281:8;
  282:25;283:4;284:1,9,
  13,22,25;290:22;
  293:1;294:6;295:6,9
**Wolfshohl's (1)**
  233:7
**word (9)**
  71:20;83:9;209:19,
  19;225:16;266:4;
  287:21;293:22,23
**wording (1)**
  178:6
**words (13)**
  16:18;110:14;151:6;
  175:21;179:24;204:9;
  209:8;210:23,23;
  213:5;217:20;279:10;
  287:6
**work (13)**
  56:1;64:23;150:7;
  156:25;222:16;232:2;
  233:4;235:14;236:7,
  15,16;237:17;250:17
**workable (3)**
  77:22,24,25

**worked (3)**
  20:16;102:13;277:12
**works (6)**
  73:19;151:24;155:5;
  196:2;200:3;283:4
**worried (1)**
  231:13,16,17
**worries (1)**
  116:15
**worry (1)**
  118:8
**worse (5)**
  36:12,14;126:23,25;
  240:12
**worth (6)**
  113:12;162:23;
  185:15;197:1,3;215:19
**worthless (3)**
  194:20;196:6,10
**writing (3)**
  72:1;96:20;295:17
**written (2)**
  75:4;260:19
**wrong (21)**
  13:14;40:6;41:4;
  109:19;175:1,2,7,11;
  194:17;203:25;224:19;
  248:22;255:17;269:9;
  280:10,12,14;283:24;
  286:19;287:10;294:21
**wrote (1)**
  209:23

**Y**

**y'all (5)**
  36:2;97:12;104:17;
  182:17;233:9
**year (5)**
  79:25;186:17,25;
  187:6;219:8
**years (1)**
  115:19
**Yep (6)**
  75:11;111:3;265:3;
  273:8;275:1;279:14
**yesterday (3)**
  90:21;172:4;281:24
**York (4)**
  187:24;189:14;
  190:2;193:9
**you-all (5)**
  58:21;273:4;281:18,
  20;294:1

**Z**

**zero (1)**
  196:25
**Zoom (3)**
  8:19;24:16;272:20

**1**

**1 (22)**
  13:12,18;15:16;22:6;
  26:20;27:4;30:22,25;
  36:15;37:23;49:16;
  60:9;87:8;99:1;109:21;
  154:23;246:16,22;
  258:16,19;261:10;
  279:21
**1,063,000 (1)**
  151:6
**1,200,000 (1)**
  53:11
**1,750,000 (2)**
  87:8;163:3
**1.2 (2)**
  87:10;123:6
**1.3 (1)**
  247:4
**1.75 (12)**
  51:3;136:18;137:10,
  22;148:25;162:1,13;
  163:5,6;184:4;247:14;
  256:3
**1:00 (1)**
  10:2
**1:01 (1)**
  274:23
**1:45 (1)**
  127:16
**10 (14)**
  15:19;27:14,15,17,
  21,23;28:6,10,13,24;
  53:14;62:9;135:13;
  137:8
**10:00 (1)**
  36:21
**10:30 (1)**
  174:13
**10:50 (1)**
  52:9
**100 (2)**
  53:21;280:8
**100,000 (5)**
  66:10;88:22;98:14;
  99:1;289:11
**10th (3)**
  37:2,8,17
**11 (7)**
  10:11,22;22:4;26:20;
  27:4;29:2;47:6
**11:02 (1)**
  52:12
**11-18 (1)**
  169:15
**11th (1)**
  69:16
**12 (10)**
  25:19,21;27:12;
  29:25;30:1;39:15,16;
  41:5;43:13;49:9

**12:05 (1)**
  90:5
**12:54 (1)**
  90:10
**13th (4)**
  36:21;46:7;74:10;
  174:13
**14 (19)**
  90:8,14,25;91:2,6,6,
  9,14;101:24;117:11,13,
  14,18;118:12;119:21;
  133:11;144:23,24;
  248:16
**14th (1)**
  218:21
**15 (21)**
  90:14,25;91:2,9,14;
  101:24;117:11,13,14,
  21;119:18;121:13;
  124:21,25;152:1;
  159:19,19,23;160:8,15;
  161:19
**1566802 (1)**
  282:10
**15668021 (1)**
  283:15
**15668356 (2)**
  283:9,15
**15th (2)**
  190:19;269:20
**16 (11)**
  90:8,14,24;101:24;
  102:8;110:19;120:6,
  10;248:17;249:3,17
**17 (3)**
  47:6;127:19;128:11
**173 (6)**
  150:16;151:2;160:5;
  251:20,24;252:3
**173,250 (2)**
  119:12;151:8
**18 (2)**
  132:17,18
**18th (9)**
  170:24;172:20,25;
  173:11,13;182:17;
  279:8;285:18;288:17
**190 (1)**
  281:14
**191 (3)**
  278:14,16,20
**1-point-something (1)**
  185:20

**2**

**2 (10)**
  13:19;15:16;107:3;
  108:9;116:22;153:22;
  181:25;261:6;267:12;
  279:23
**2.3 (1)**
  87:13

Alexander E. Jones, Debtor

Christopher Murray
December 5, 2024

**2:06 (1)**
127:21
**2:32 (1)**
275:14
**20 (3)**
121:13;135:14;137:9
**200 (1)**
61:8
**200,000 (1)**
248:7
**2021 (1)**
190:19
**2024 (2)**
8:3;288:17
**209,000 (1)**
111:9
**209,550 (3)**
150:24,25;151:12
**22 (2)**
246:17,20
**22-page (1)**
280:16
**24 (1)**
282:2
**25 (1)**
164:1
**25/75 (2)**
92:5;119:8
**250,000 (1)**
162:17
**25th (1)**
274:23
**29 (3)**
45:8;47:20;49:9

**3**

**3 (26)**
13:21;15:16,18;31:8;
52:14,18,20,22,23;
53:2;63:10;108:9;
137:19,20;163:21;
164:3;178:17,19;
208:14;256:2;260:1;
263:15,18;265:23,24;
267:12
**3.3 (1)**
119:8
**3.5 (8)**
87:11;112:8;126:24;
134:16;145:2;152:18;
162:25;164:10
**30 (2)**
49:16;125:18
**300-something (1)**
251:2
**30th (1)**
129:3
**31st (2)**
129:5,6
**35 (1)**
125:14
**36 (1)**

150:13
**36,300 (1)**
150:16
**36.3 (1)**
150:25
**363 (4)**
10:24;11:15;29:21;
138:14
**3rd (1)**
274:8

**4**

**4 (44)**
13:7,8;14:1,7;15:11,
15;54:23;55:1,5;60:8;
63:13;64:11;68:11,19;
69:15;72:18;85:7,11;
87:2;88:8,9,10;93:8;
107:10;163:21;164:3;
178:18,19,20,23;184:1,
13,21,22,24,25;185:10,
12;251:2,6;265:23;
267:1,4;269:2
**4,350,000 (1)**
111:13
**4,750,000 (2)**
161:1,2
**4.35 (4)**
112:7;113:13;120:7;
251:13
**4.75 (6)**
161:21;162:3,10,21;
163:18,23
**4:03 (1)**
231:5
**4:15 (1)**
231:8
**4:37 (1)**
249:12
**4:39 (1)**
249:14
**40 (2)**
125:14,18
**4th (1)**
275:14

**5**

**5 (24)**
13:12,16,17;36:15,
18;39:9;42:24;45:17;
80:19;88:8;98:10;
108:9;115:18;124:8;
179:8;260:2;264:9,14,
15,19;265:9,12;279:16,
16
**5.2 (1)**
255:8
**5:40 (2)**
296:18,20
**560 (1)**
193:2

**5th (3)**
8:3;170:23,24

**6**

**6 (19)**
50:17;63:10;64:11;
80:19,23;87:2;88:9,10;
93:9,9;98:10;107:3,10;
112:2;116:12;124:8;
268:14,17;269:2
**6.35 (1)**
146:5
**62 (1)**
153:22
**650 (13)**
119:22;134:18;
144:23;152:23,25;
159:20;250:3,11,17;
251:10,13;252:3,22
**687,500 (1)**
160:18

**7**

**7 (109)**
8:16;9:20;10:8,23;
29:19;52:1;84:12,15;
86:4;92:19;101:13,14;
107:22;108:10,13,22,
24;109:6,21;110:10,
18;111:2,9,25;112:6;
113:9,12;121:19;
124:12,24,25;125:3;
127:2;135:24;136:3,5,
18,20;138:2;146:1,2;
147:18,23;148:8,10,18,
22;149:1,6,9;150:22;
151:18;160:22;161:9,
10,13,15,25;162:9,23;
164:13;165:13;167:3,
5,7;168:5,16,17,24;
169:8;170:5;173:20;
175:22,23,25;176:1,2,
3,3,5,6,7,10,10,13,13,
15,17,18,20,20,21,24;
177:2,2,6;181:18,25;
182:14;184:3,7;
197:22;247:3;258:4;
267:17,19;273:16;
279:4;290:18
**75 (8)**
112:11;120:7;
152:10;153:22;164:2,
23;252:15,16
**75/25 (2)**
163:8;183:24
**750 (10)**
110:6;118:13,19;
120:8;152:19,23;
153:1;159:20;160:10;
164:3
**750,000 (2)**

162:16;163:9
**795 (1)**
128:12

**8**

**8 (16)**
37:23,24;86:20,22;
98:5,8;107:1,3;124:5,
7;174:1,5,21;178:15;
274:13;279:13
**80 (1)**
252:14
**829 (1)**
258:22
**839 (1)**
208:2
**85 (1)**
118:15
**889 (1)**
119:20
**8th (1)**
69:4

**9**

**9 (18)**
11:19,23;13:1;15:11;
22:4;25:21,22,23;
26:20;27:13;30:20;
31:2;39:15;81:1,2;
144:23;270:7;275:2
**9:42 (1)**
8:3
**900 (1)**
251:10
**915 (13)**
132:21;144:24;
169:14;170:1;179:4,9;
230:25;246:16,20,21;
281:14;282:21;285:7
**915-1 (2)**
231:2;253:11
**915-17 (1)**
179:15
**915-4 (1)**
184:9
**915-5 (2)**
184:9,19
**915-7 (2)**
181:6;183:14
**915-8 (1)**
279:15
**94,000 (1)**
111:10
**95 (1)**
252:14
**96.7 (1)**
112:20
**996.7 (1)**
119:8
**9th (2)**
10:2;37:13