UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

ALEXANDER E. JONES and          )   CASE NO: 22-33553-cml
OFFICIAL COMMITTEE OF           )
UNSECURED CREDITORS,            )   Houston, Texas
                                )
          Debtors.              )   Wednesday, December 10, 2024
                                )
                                )   1:31 p.m. to 10:27 p.m.
------------------------------)


                              TRIAL

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:   BEN. C. BROOCKS
                          Broocks Law Firm PLLC
                          6207 Bee Cave Road, Suite 120
                          Austin, TX 78746

                          SHELBY A. JORDAN
                          Jordan & Ortiz, PC
                          500 N. Shoreline Blvd.
                          Suite 804
                          Corpus Christi, TX 78401

For Chapter 7 Trustee:    JOSHUA W. WOLFSHOHL
                          KENESHA STARLING
                          JORDAN STEVENS
                          Porter Hedges LLP
                          1000 Main Street, 36th Floor
                          Houston, TX 77002

                          ERIN ELIZABETH JONES
                          Jones Murray LLP
                          602 Sawyer Street, Suite 400
                          Houston, TX 77007

For First United          WALTER J. CICACK
American Companies, LLC:   Hawash Cicack & Gaston LLP
                          711 W. Alabama Street, Suite 200
                          Houston, TX 77006

For the Connecticut            KYLE KIMPLER
Families:                      Paul Weiss Rifkind Wharton &
                               Garrison LLP
                               1285 6th Avenue
                               New York, NY 10019


Global Tetrahedron, LLC:       GREGG JEFFREY COSTA
                               JASON GOLDSTEIN
                               Gibson Dunn & Crutcher, LLP
                               811 Main Street, Suite 3000
                               Houston, TX 77002


For the U.S. Trustee:          HA MINH NGUYEN
                               Office of the U.S. Trustee
                               515 Rusk Street, Suite 3516
                               Houston, TX 77002

For PQPR Holdings              STEPHEN WAYNE LEMMON
Limited LLC:                   Streusand Landon Ozburn Lemmon LLP
                               1801 S. Mopac Expressway, Suite 320
                               Austin, TX 78746


For Marcel Fontaine:           AVI MOSHENBERG
                               Lawson & Moshenberg PLLC
                               801 Travis Street, Suite 2101, #838
                               Houston, TX 77002

For David Wheeler:             PAUL ANDREW PATERSON
                               VIDA J. ROBINSON
                               Paul Weiss Rifkind Wharton &
                               Garrison
                               1285 Avenue of the Americas
                               New York, NY 10019


For Francine Wheeler:          RYAN E. CHAPPLE
                               Cain & Skarnulis PLLC
                               303 Colorado Street
                               Suite 2850
                               Austin, TX 78701


Court Reporter:                Unknown


Courtroom Deputy:              Unknown


Transcribed by:                Veritext Legal Solutions
                               330 Old Country Road, Suite 300
                               Mineola, NY 11501
                               Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHRISTOPHER MURRAY | 8 | 139 | 336 | 352 |

| EXHIBITS | RECEIVED |
|---|---|
| Exhibit 968-20 | 10 |
| Exhibit 20 | 234 |
| Exhibit 4 | 28 |
| Exhibit 13 | 31 |
| Exhibit 1 | 34 |
| Exhibit 31 | 349 |
| Exhibit 27 | 307 |
| Exhibit 26 | 284 |
| Exhibit 18 | 142 |
| Exhibit 11 | 26 |

HOUSTON, TEXAS; WEDNESDAY, DECEMBER 11, 2024; 1:30 PM

(Call to Order)

THE COURT:  Good afternoon, this is Judge Lopez. Today is December the 10th.  I'm going to call the 1:30 case, a continuation of the Alex Jones case in connection with the motion to sell assets.  Why don't I take appearances in the courtroom.  My camera is officially on. All right.  We can get started.  Mr. Broocks, good afternoon.

MR. BROOCKS:  Ben Broocks with my colleague Shelby Jordan for Alex Jones.

THE COURT:  Good afternoon.  Mr. Wolfshohl, good afternoon.

MR. WOLFSHOHL:  Joshua Wolfshohl, Kenesha Starling, and Jordan Stevens on behalf of the Chapter 7 Trustee, Chris Murray.

THE COURT:  Okay, good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.

THE COURT:  Good afternoon.

MR. CICACK:  Walter Cicack, C-I-C-A-C-K, on behalf of First United American Companies.

THE COURT:  Good afternoon.

MR. KIMPLER:  Good afternoon, Your Honor.  Kyle Kimpler from Paul Weiss, on behalf of the Connecticut

families with my partners Paul Paterson and Vida Robinson and then on the phone my co-counsel Mr. Ryan Chapple.

THE COURT: Good afternoon.

MR. COSTA: Good afternoon, Your Honor. Greg Costa from Gibson Dunn for Global Tetrahedron, along with Jason Goldstein, my partner.

THE COURT: Good afternoon.

MR. NGUYEN: Good afternoon, Your Honor. Ha Nguyen for the U.S. Trustee.

THE COURT: Good afternoon.

MR. LEMMON: Your Honor, Steve Lemmon for PQPR.

THE COURT: Okay. Good afternoon.

MR. MOSHENBERG: Good afternoon, Your Honor. Avi Moshenberg for the Texas Plaintiffs.

THE COURT: Good afternoon. And let's see. So, okay. Before we get started, I don't know if I can indulge, ask somebody to just close that door. I just want to make sure -- thank you, sir.

Okay. Mr. Wolfshohl, let's get the witness cam up, please.

MR. WOLFSHOHL: Your Honor, I'd like to call Chris Murray, Chapter 7 Trustee to the stand.

THE COURT: Okay. Mr. Murray, why don't you come on up? Mr. Murray, can you please raise your right hand? Do you swear to tell the truth, the whole truth, and nothing

but the truth?

THE WITNESS:  I do.

THE COURT:  Okay.  We'll let the record reflect the witness has been properly sworn in.  Mr. Murray, if you can state your name for the record and spell your last name.

THE WITNESS:  Chris Murray, M-U-R-R-A-Y.

THE COURT:  Mr. Wolfshohl, whenever you're ready.

MR. WOLFSHOHL:  Thank you, Your Honor.

DIRECT EXAMINATION OF CHRIS MURRAY

BY MR. WOLFSHOHL:

Q    Mr. Murray, what's your role in this case?

A    I'm the Chapter 7 Trustee.

Q    Okay.  And what is this case?

A    This is the Alex Jones individual Chapter 7 case.

Q    What are you asking the Court to do today?

A    I'm asking the Court to approve my proposed sale of assets of FreeSpeech Systems to Global Tetrahedron.

Q    What's the relation of FreeSpeech Systems to the Alex Jones estate?

A    So, there's two.  The estate owns 100 percent of the membership interest in FSS, but also it owns the assets of the FSS Chapter 11 estate.

Q    And what do you base that on, that statement?

A    So, FSS filed for bankruptcy on its own.  Its assets went into a Chapter 11 estate.  Upon dismissal of that case,

or as of the dismissal of that case, those assets were vested in the Chapter 7 individual estate of which I'm the trustee.

Q   And if you go to Exhibit 20.

A   I'm there.

Q   Can you identify that document?

A   Yeah.  This is the order supplementing, order dismissing case that vests the assets in the estate.

THE COURT:  Mr. Wolfshohl, are we still -- are we using the same binder from last time?

MR. WOLFSHOHL:  We are, Your Honor.

THE COURT:  Okay.  Thank you.  Thank you.

MR. WOLFSHOHL:  I apologize.

THE COURT:  No, no, no.  No worries.  I want to make sure.

MR. WOLFSHOHL:  And can you make Ms. Starling the presenter, Your Honor?

THE COURT:  Oh, yeah, sure.  Give me one moment.

MR. WOLFSHOHL:  -- on the screen.  And Your Honor, I would move to admit Exhibit 20.

THE COURT:  Any objection to the admission of 20?

MR. BROOCKS:  No objection.

THE COURT:  It's admitted.

MR. WOLFSHOHL:  Thank you, Your Honor.

MR. BROOCKS:  No objection, Your Honor.

THE COURT:  Oh, thank you.  968-20 is admitted.  I thought I heard you.  Thank you.

(Exhibit 968-20 entered into evidence)

BY MR. WOLFSHOHL:

Q    Is that what you're referring to, Mr. Murray, when you say there was an order entered that vested the assets in the estate?

A    Yes, exactly.

Q    And did you come to the Court to get permission to run a sale process?

A    I did.

Q    Did the Court enter an order allowing that?

A    Yes, it did.

Q    Okay.  And is that the document at Exhibit 8?

A    Yes, 8 is the winddown order.

Q    Okay.  And when I say winddown order, you understand it to be this?

A    Yes, exactly.

Q    Okay.  I want to talk for a second about PQPR.  What is PQPR's relationship to the FSS assets?

A    So, PQPR asserts a debt owed by FSS and asserts that it is secured.

Q    Okay.  Did you evaluate that in connection with assessing the bids in this case?

A    Yes.

Q    Okay.  And what is -- what's the claim?  I mean what's the claim amount that PQPR has asserted?

A    So, they filed a proof of claim in the FSS case asserting about 68 million is owed from FSS.

Q    Okay.  Are there any other secured creditors against FSS?

A    Well, I'm not sure PQPR is secured, but there are a couple on the claims register, yes.

Q    Okay.  And did you account for those in connection with assessing the overall claims and the bids?

A    I did, yes.

Q    Okay.  What was your assessment of those?

A    That even if they're still outstanding, they would only be about a couple hundred thousand dollars.

Q    Okay.  How much money are you currently holding in terms of FSS money?

A    FSS cash, we have about $4.2 million.

Q    Okay.  Is there anything else that you've got that's not being sold today?

A    Yes.

Q    What is that?

A    The biggest other asset of FSS is holdbacks that the credit card processors have.

Q    So, what does the PQPR disputed secured claim lien cover?

A   So, PQPR's lien, as I understand it, is a blanket lien on everything of FSS.

Q   And would they -- are they asserting a lien including on the assets you're selling?

A   Yes.

Q   What about on that cash that you mentioned?

A   Yeah.  I think their lien they're asserting is on everything, including the proceeds of the assets, which is what the cash is.

Q   Okay.  And did you already tell me what the other non -- the other assets that you're not selling are?  I'm sorry.

A   So, I mentioned the credit card processor holdbacks. That's another 4.4 million or so.  And then there's other sundry assets that are not included in this sale because they're unrelated to the media business, and that's, I think, a vehicle and maybe a couple of other smaller items.

Q   Okay.  And describe the holdback amounts that you just referenced.

A   So, the credit card processors, when somebody makes an order on the InfoWars store and they pay with a credit card, the processor takes that number, charges their bank, brings the money in.  But before they remit it to FSS, they hold it for a period of time because they wait for things like chargebacks and disputed transactions.  And so, the amount that they're currently holding back between the two

processors is about 4.4 million.

Q    Okay, so do you consider -- what do you consider the value of that to be?

A    Oh, almost entirely 4.4 million.  That will eventually come into the estate, I believe.

Q    Okay.  So, as far as the assets you're not selling, am I right in adding, just the math, it's about $8.6 million?

A    Yes.  Plus whatever I get on that vehicle.

Q    And -- okay.  So, other than the vehicle, any other physical assets?

A    Not that I can remember.  I think there might be some, but --

Q    And do you dispute the amount of the PQPR debt?

A    Oh, yes.

Q    Okay.  Do you dispute that it's secured?

A    Yes.

Q    Is that being litigated currently?

A    It is.

Q    Is that litigation that you brought?

A    No.

Q    Who brought it?

A    So, that litigation was brought by, I suppose, my predecessors during the Chapter 11 phase of the FSS case in an adversary proceeding over which the Court retained jurisdiction.

Q   When you say the court retained jurisdiction, what are you referring to?

A   I'm referring to the order dismissing the FSS case.

Q   Is that Exhibit 2?

A   Let me look.  Yes.

Q   And what's -- and just to be clear, is that -- if you look at Exhibit 2, Paragraph 4B, is that what you're referring to?

A   Yes, exactly.

Q   Okay.  So, that -- is that currently still pending in this Court?

A   Yes.

Q   Okay.  What's the status of the litigation?

A   I think we've got pending motions for summary judgment.

Q   Okay.  Were those filed before your appointment?

A   Yes.

Q   What's your understanding of the basis -- or have you reviewed them?

A   I have.

Q   Okay.  Have you reviewed the -- all the claims in that case?

A   Yes.

Q   Okay.  What's your understanding of the basis for the challenge of the purported secured claim?

A     So, my understanding is that two things are being challenged.  One is the debt that's asserted, asserting that it's not really a debt, that it's more like an equity contribution, wasn't properly documented, things like that, those types of arguments.  And the other is that the lien is also not valid, that it would be avoidable as a fraudulent transfer, that it was created in anticipation of a bankruptcy filing for the purpose of harming other creditors.

Q     Anything else?

A     And also I think that the amounts were not properly kept track of.  That's what comes to mind.

Q     Are there challenges based on the timing of the filing of the secured security interest?

A     Yes.  Yes.  That would be part of the fraudulent transfer claim.  The timing was, I understand, coincident with the Sandy Hook litigation, and that's one of the badges of fraud is you anticipate you might lose a big judgment, so you start to transfer away assets.

Q     So, if you start with a number of $60 million, have you assessed what the potential -- what your view is the potential best case scenario for the PQPR liens?

A     Yeah.  So, I really don't think they have a security interest at all.

                    MR. LEMMON:  Your Honor?

THE COURT:  Yes.

MR. LEMMON:  I object to that -- you're on?  Yes. I object to that question.  On behalf of PQPR, I don't have a problem with the trustee talking in generalities, but I don't think that it's appropriate for the Trustee to render testimony regarding the specifics of the claim that he did not bring, and that if he does, then I think it's subject to cross examination.

THE COURT:  I think he's certainly subject to cross.

MR. LEMMON:  Well, I object to him specifically opining regarding what he thinks the value of the claim is.

THE COURT:  I'll overrule that.

MR. LEMMON:  Thank you.

THE COURT:  Thank you.  Let me just be clear.  I'm not -- he can testify about what he thinks the value is in connection with the sale for purposes of today.  It's not a finding one way or the other as to what the Court may ultimately rule, if I'm to decide any such issues, but I think it goes to the business judgment question, and he's certainly subject to cross examination.

BY MR. WOLFSHOHL:

Q    Do I need to repeat the question?

A    Yes, please.

Q    Okay.  Well, first off, when you were first appointed,

what did you do to evaluate the PQPR claims?

A    So, I talked to the parties and their counsel in the case.

Q    What parties?

A    So, all of them.  I spoke with Mr. Jones' counsel at the time.  I spoke with PQPR's counsel, Mr. Lemmon who was just talking.  I spoke with the CRO, his counsel.  I spoke with the Subchapter 5 Trustee and her counsel.  I spoke with counsel for the Connecticut families, the Texas families, and there was an Unsecured Creditors Committee that had counsel, and I spoke with them as well.

Q    Had the Unsecured Creditors Committee analyzed these claims?

A    Yes, they had.

Q    And how many times have you talked to these various parties just trying to assess the value of the PQPR claim?

A    Numerous times.

Q    Did you review the report that the Subchapter 5 Trustee prepared?

A    Yes.

Q    Did that discuss this as well?

A    I believe so.  I reviewed it closer to the time I was appointed, not in a while.

Q    Have you reviewed the positions taken by PQPR relative to what portion of their claim is actually secured?

A    Yes.

Q    Okay.  What did you assess from that?

A    So, I understood from the summary judgment briefing that PQPR says, look, even if the lien is not valid with respect to past debts, it should at least be valid and secure, the 6.3 million or so that was advanced after the lien was created and recorded.

Q    And have you taken that into account in connection with assessing whether they have an actual security interest in any amount?

A    Yes.

Q    Okay.  And since that initial evaluation, have you done anything else to inform your view of the PQPR claims?

A    Yes.

Q    What have you done?

A    I've engaged in settlement discussions with PQPR almost since my appointment.

Q    Okay.  And have they been extensive?

A    Extensive.

Q    Have you mediated?

A    We did an informal mediation by Zoom.

Q    Okay.  And did -- are you -- how far along are you in settlement discussions?

A    We've got a draft agreement we've been sharing back and forth.

Q    Okay.  And I don't want to get into the specifics of the agreement, but how long have you been exchanging drafts?

A    Oh, months.

Q    Okay.

A    Well, drafts probably just weeks, but we've been talking for months.

Q    Do you believe that you're close to a settlement?

A    Very close.

Q    Okay.  Are the monetary terms resolved?

A    Yes.

Q    Okay.  What's left?

A    The last drafts I saw of the settlement agreement, the only thing unresolved was the scope of the release language.

Q    Okay.  And are you still trying to get it across the finish line?

A    Yes.

Q    And based on where the settlement negotiations stand, do you -- what's your assessment as to whether you have enough cash to satisfy the monetary terms of the settlement?

A    I would definitely have enough cash to satisfy the terms of the settlement if we reach it.

Q    Is it a close call?

A    No, it's an order of magnitude that -- yeah.

Q    So, setting aside the amount that you believe you've essentially agreed to as far as the settlement amount, if

you take the worst case scenario in your mind, how much -- I mean, if you -- if the settlement falls apart and then that settlement, you know, that you're talking about doesn't actually get to the finish line, what's the worst case scenario that you believe the potential exposure is?

MR. BROOCKS:  Objection.  Calls for speculation.

MR. WOLFSHOHL:  I think he's already testified about it, Your Honor.

MR. BROOCKS:  I wasn't talking to you.  I was talking to the Court.

THE COURT:  Yeah.

MR. WOLFSHOHL:  I'm talking to the Court, too.

THE COURT:  That's speculation.  Sustained.

BY MR. WOLFSHOHL:

Q   Mr. Murray, based on your analysis of the PQPR claims, what do you believe is the best case scenario and you -- as to the value of the liens?

MR. BROOCKS:  Objection, speculation.

MR. WOLFSHOHL:  Your Honor --

THE COURT:  No, he can testify to that.  It's not speculating.  It's his understanding.

THE WITNESS:  So, as I understand the litigation, I think if PQPR is as successful as it could reasonably be, they might end up with a secured claim for about $6.3 million.

BY MR. WOLFSHOHL:

Q     All right.  And is the settlement that you've negotiated with PQPR significantly less than that?

MR. CICACK:  Your Honor, objection.  We're talking about a settlement agreement.  The best evidence of the settlement agreement is the settlement agreement itself.  We don't have the settlement --

THE COURT:  I'm just taking it -- I'm not saying -- no settlement until I sign it, so he can certainly provide his understanding as to what he thinks.

MR. CICACK:  Well, it's relevance, then.  It's not relevant.  What his understanding of a settlement agreement that hasn't been reached yet?  What relevance does that have?

THE COURT:  Well, no, I think it goes to his -- whether he considered PQPR at all.  It's not in any of the -- PQPR isn't in any of the pleadings, so I think it's -- I think I've got to hear what he thought about PQPR.

BY MR. WOLFSHOHL:

Q     And how does your assessment of the PQPR claim affect your analysis of the sale?

A     So, the way I think about it is if PQPR's claim is valid and they do really well in the litigation as I see it, they'll have a secured claim for about 6.3, and I've already got more than enough other assets to satisfy that secured

claim, so it won't have any effect on how the proposed sale impacts creditors -- unsecured creditors.

Q    And if you proceed with the settlement that you've largely negotiated, is it even less of an impact?

A    Oh, yeah.  Yes.

Q    Has PQPR objected to the proposed sale?

A    No, they have not.

Q    The -- PQPR itself, the company, who owns it?

A    I believe it's owned by -- in part by --

MR. BROOCKS:  Your Honor, objection.  There's no foundation for this.

THE COURT:  Overruled.

MR. WOLFSHOHL:  He's the trustee of the bankruptcy.

THE COURT:  Yeah, overruled.  He's been talking to PQPR's counsel.  I think he can say who owns it.

MR. WOLFSHOHL:  Well, I'll -- yeah.

BY MR. WOLFSHOHL:

Q    Who owns it, Mr. Murray?

A    Well, the estate owns 72 percent of it indirectly.

Q    The bankruptcy estate that you preside over?

A    Right, and that's by virtue of Alex Jones' individual indirect ownership of PQPR interests that became part of his individual estate upon the filing of his bankruptcy case.

Q    And is that reflected in Mr. Jones' schedules?

A    I believe so, yes.

Q    Okay, and that's at Exhibit 4.  Is that right?

A    Yeah.  These are the conversion schedules.

Q    Take a look at them and identify them for the Court.

A    Which part are you asking me about?

Q    I'm just asking -- look at the documents and tell me if you have reviewed them.

A    Yeah.  Oh, at one point, yes, I did review those.  These are his conversion schedules.

Q    Was this part of what you reviewed when you were appointed?

A    Yes.  No.  This came after.  This was filed a little bit after I was appointed, but I did review it.

Q    When you say conversion schedules, what are you talking about?

A    I'm talking about the schedules that a Debtor is required to file after their case is converted from Chapter 11 to Chapter 7.

Q    And you testified a second ago that the -- when you said that bankruptcy estate owns 72 percent, you referred to it as indirect.  What do you mean by that?

A    That's right.  My understanding is it's held through intermediate entities and trusts.

Q    If -- did you take into account the fact that your bankruptcy estate owns 72 percent of PQPR when you were

assessing the value of its claims?

A    Yes.

Q    What impact did that have?

A    So, not much, but it gave me some comfort that even if I was totally wrong about the strength of PQPR's claims, that whatever recovery they got from the sale of these assets would largely be enjoyed by the Chapter 7 estate creditors, which are largely the same as the FSS creditors.

Q    Let's talk about the sale process.  Did you conduct a sale process?

A    Yes.

Q    Okay.  Did you determine a winning bidder?

A    Yes.

Q    Who did you select as the successful bidder?

A    That's Global Tetrahedron in their joint bid with the Connecticut families.

Q    And what is Global Tetrahedron?

A    My understanding is it's the entity that owns the Onion.

Q    Okay.  And what's that?

A    That's a satirical newspaper.

Q    And when you say the Connecticut families, who are you referring to?

A    I'm referring to the judgment creditors who have judgments out of Connecticut courts against FSS and Alex

Jones.

Q    And what's your understanding of the judgments?

A    Is that -- well, there are several of them, but they total now approximately $1.4 billion.

Q    And when you say now, what do you mean by that?

A    I'm saying the total amount of the judgments was reduced recently.

Q    When?

A    So my understanding is on Friday a Connecticut appellate court affirmed the judgments but reduced them by about $150 million.

Q    Okay.  When you made your decision on selection of a successful bidder, had that happened yet?

A    No.

Q    Okay.  So, what were you basing it on then?

A    So, I was basing it on the amount of the judgments as reflected in the proofs of claim filed in the FSS case.

Q    Are the Connecticut families the largest creditors in the case?

A    By far.

Q    Okay.  Did you designate a backup bidder in your sale process?

A    I did.

Q    And who's that?

A    That is the First United American Company.

Q    And who do you understand that to be?

A    I understand it to be Charlie Cicack's company.

Q    Okay.  And that entity's objected to the sale, correct?

A    They have.

Q    Okay.  And did you inform the two bidders of who you selected?

A    Yes, I did.

MR. WOLFSHOHL:  Okay.  And if you go to Exhibit 11, is that document -- well, first off, Your Honor, I'd move to admit Exhibit 11.  This is a notice that was filed on the Court's docket.

MR. BROOCKS:  No objection.

THE COURT:  It's admitted.

(Exhibit 11 entered into evidence)

BY MR. WOLFSHOHL:

Q    Is that the notice that you filed?

A    Yes, it is.

Q    Okay.  And when was that filed?

A    November 14th.

MR. WOLFSHOHL:  And let me just -- housekeeping matter.  Your Honor, I'd like to move to admit the schedules that Mr. Murray spoke about at Exhibit 4.  These are Mr. Jones' schedules.  They're signed by Mr. Jones.  They're filed on the docket.

THE COURT:  Which exhibit is that?

MR. WOLFSHOHL:  It's Exhibit 4.

THE COURT:  Oh, thank you.

MR. BROOCKS:  We're going to object to this, Your Honor.  This seems to be a combination, a compilation of things.  We're going to object to this right now.

THE COURT:  Counsel?

MR. WOLFSHOHL:  Your Honor, these are the schedules filed by Mr. Broocks' client in the bankruptcy case.

THE COURT:  Yes.  What I'm trying to ---

MR. WOLFSHOHL:  Prior --

THE COURT:  Is it --

MR. WOLFSHOHL:  If you go --

THE COURT:  I guess maybe the better way of me asking is, is it a straight copy or is it -- are there pages missing?  Is it a complete set?

MR. WOLFSHOHL:  It's a complete set, Your Honor.

MR. BROOCKS:  If it's a complete set, Your Honor, then I have no objection.  Looked to me like it was cobbled together.

THE COURT:  Okay.

MR. WOLFSHOHL:  That's just because of the way that the schedules were set up.  They have an initial set up.

THE COURT:  The way I'll do it, Mr. Broocks, I'll

admit it, but if you can -- if you later find out that it's an incomplete set, then we'll supplement it with the complete version.

(Exhibit 4 entered into evidence)

MR. WOLFSHOHL:  That's right.  That's --

THE COURT:  Okay?

MR. WOLFSHOHL:  The intent is for it to be the complete version.

THE COURT:  Okay.

BY MR. WOLFSHOHL:

Q    Mr. Murray, during the sale process -- I may have already asked this --  how many bidders ultimately came to the table?

A    Two.

Q    Okay.  Let's talk about what it is that you're asking the Court to approve a sale of.  What is FSS?

A    So, FSS is the company that owned and operated the InfoWars platform.

Q    And what's that?

A    So, it's a media platform.  It broadcasts shows and original content.  It's also linked to some ecommerce platforms that sell products.

Q    And how does it make money?  Is it through selling products like you described?

A    It's -- yeah, it's through the ecommerce, primarily

selling vitamins and supplements, but also some branded merchandise and other items.

Q   And is the way that you're able to run this through the sale process what we talked about earlier, which is the FSS assets are now part of the Alex Jones estate; is that right? I think you just testified about that.

A   Yes.

Q   Which of the assets are you asking the Court for authority to sell?

A   So, it's everything linked to -- essentially everything linked to the media operations and the related ecommerce. So, that's the intellectual property associated with InfoWars and those media operations.  It's the production equipment that goes along with that.  It's the ecommerce platform there, the inventory.

Q   Okay.  If you go to Exhibit 13, please.

A   Okay.

Q   Can you identify that document?  Take a look -- take some time to look at it.

A   Yeah, this is the proposed asset purchase agreement that I'm asking permission to enter into.

Q   It's 13.  Were you a part of preparing this document?

A   Yes.

Q   Okay.  Was it -- when was it negotiated?

A   Sometime after the designation of the successful

bidder.

Q   Okay.  And have you reviewed it in its entirety?

A   Yes.

Q   Okay.  And if you go to just past Page 20 -- actually just after 21.

A   Okay.

Q   Is that a signature block for you?

A   Yes.

Q   Okay.  And you're asking the Court for authority today to enter into this agreement?

A   Yes.

MR. WOLFSHOHL:  Okay.  Your Honor, I move to admit Exhibit 13.

MR. BROOCKS:  I want to make sure I'm clear on what he's admitting it for.  This is the draft that was submitted --

MR. WOLFSHOHL:  With the motion.

MR. BROOCKS:  -- with the motion on November the 18th, that Mr. Murray is asking for today to approve.

MR. WOLFSHOHL:  That's right.

MR. BROOCKS:  To the extent that it's simply a tender or a proffer he's asking to approve, we have no objection, but we do definitely object to the form of the agreement, but if it's only being proffered for purposes of showing what he's asking you to do, then we have no

objection.

THE COURT:  Okay.  I think that's the purpose of it, so I'll admit it for that purpose.

(Exhibit 13 entered into evidence)

BY MR. WOLFSHOHL:

Q    Mr. Murray, are there any FSS assets that are being excluded from the proposed sale?

A    Yes.

Q    What are those?

A    So, it doesn't include the cash and the credit card holdbacks, those two big assets, and it -- I think we also exclude specifically vehicles and causes of action.

Q    What else?

A    I'd have to refer to the agreement here.

Q    Well, let me ask you this.  You heard a lot of testimony yesterday about what was identified as Lot 4 in the bid process?

A    Right.

Q    Okay.  Are -- what was Lot 4?

A    So, Lot 4 was the domain names owned by FSS that we designated as disputed because Alex Jones has asserted some kind of interest in those because they involve his name.

Q    Okay.  And just to be clear, did you file a motion in October seeking to sell certain intellectual property assets of the Jones estate?

A     Yes.

Q     Okay.  Are these disputed domain names, are they -- were they part of that motion?

A     No.  Totally different.  That motion dealt with social media accounts and some other IP that would have been part of -- that was just part of the Alex Jones individual Chapter 7 estate.  This sale only deals with FSS assets.

Q     Were those ever a part of the sale?

A     No.

Q     Okay.  So, when you say Lot 4 and what was listed, they're not those assets that were subject to that October motion?

A     Right.  Not -- right.

Q     Why did you think that these were property of FSS?

A     Because they're listed in the FSS schedules and they appeared in the -- or they appeared in the registrars of domain names controlled by FSS.

Q     Okay.  And if you go to Exhibit 1 when you say the FSS schedules, take a look at that for me.

A     Okay.  I see that.

Q     Okay.  Identify that document for me.

A     Right.  So, this is amended schedules of FSS.  I believe these are the most recent schedules that were filed in that case.

Q     Okay.  And have you looked at these since you were

appalled as the Trustee for the Alex Jones estate?

A    Yes.

Q    Okay.  Did you rely on them in connection with figuring out what it is you were selling?

A    Yes.

MR. WOLFSHOHL:  Okay.  Your Honor, I'm going to move to admit Exhibit 1.  These are the schedules from -- the last schedules filed in the FSS case.

MR. BROOCKS:  Your Honor, we're going to -- if it's a limited proffer again, for what was filed and what he relied on, then that's fine.  I'm not admitting to the authenticity or the accuracy or anything like that, just this is what he claims he relied on.  To that extent, that's fine.

THE COURT:   Mr. Wolfshohl?

MR. WOLFSHOHL:  Your Honor, if I need it for anything else, I'll do that later.  I think it's fine for that purpose.  But, I mean, just to be clear, these are on the docket.  I think Your Honor can take judicial notice of them.  They were filed when Mr. Jones was in control of FSS before Mr. Murray was appointed.  I don't know why we would get into any kind of dispute over what they are.

THE COURT:  Why don't you just admit it for that purpose and I'll also take judicial notice that it was filed in the FSS case.

(Exhibit 1 entered into evidence)

MR. WOLFSHOHL:  Thank you, Your Honor.

BY MR. WOLFSHOHL:

Q    And so, you said that they were -- that those domain names that you referred to as disputed, you said they were listed in the FSS schedules --

A    Yes.

Q    -- to your knowledge?  Okay.  Were those domain names listed in Alex Jones' schedules at Exhibit 4?

A    No.

Q    Okay.  And, in fact, you've seen some of the objections, or at least Mr. Jones' objections, talking about intellectual property that you're trying to sell that belonged to Mr. Jones; have you seen that?

A    I have seen that.

Q    Okay.  I want you to look -- go back to Exhibit 1.

A    The FSS schedules?

Q    No, exhibit -- sorry.  Exhibit 4.  That's the Jones schedules.

A    Okay.

Q    Are you pretty familiar with the way that these schedules are formatted?

A    Yes.

Q    I mean schedules generally.

A    Schedules generally.  The global notes are sui generis.

Q    How often do you review schedules as a Chapter 7 Trustee?

A    Every day.

Q    Okay.  So, you're -- this is a form that you're accustomed to?

A    Yes.

Q    Okay.  If you go to Number 26 for the personal property line items.

A    Schedule A/B, I guess?

Q    Yeah, Schedule A/B.

A    Okay.  I don't really have easy-to-see page numbers, but it's Page 7 of Schedule A/B.  Is that what you're talking about?

Q    That's what I'm talking about.

A    I'm sorry.  Your question?

Q    Yeah.  I'm just making sure you're there.

A    There.

Q    Are you there?  Okay.  So, you've seen the allegations that Mr. Jones has made about how the Trustee is trying to sell his intellectual property.  Have you seen that?

A    Yes.

Q    Has he mentioned copyrights?

A    Yes.

Q    Has he -- and he's mentioned intellectual property?

A    Yeah.  I think he referred to his persona.

Q   Okay.  And on Number 26, as a trustee, do you understand that to be where -- or what is that?  What is 26?

A   So, 26 is on the Schedule A/B for individuals, and it says -- and this is where you would list patents, copyrights, trademarks, trade secrets, and other intellectual property.  Examples:  internet domain names, websites, proceeds from royalties, and licensing agreements.

Q   What did Mr. Jones check in that disclosure?

A   He checked the no box.

Q   Was this the only set of schedules that were filed in the Alex Jones case?

A   No.  I under -- I think this is the most recent.  I understand there were prior iterations.

Q   Okay.  So, did Mr. Jones have a number of opportunities to file these schedules?

A   Yes.

Q   Okay.  And then have you heard him argue that -- well, let's go back.  Go to Page 11.  Can you see number 53?

A   Number -- okay.  Okay, yes.

Q   What do you -- how would you characterize Number 53 in the A/B schedules?

A   Yeah, so this is kind of the catch-all.  If there's any other kind of property that doesn't fit under the prior questions, it says, do you have any other property of any kind that you did not already list?  Examples, season

tickets, country club memberships.

Q   Did Mr. Jones list domain names here?

A   Let me read it.  He did list something.  Access to helicopter service.  No mention of domain names.

Q   Did he mention websites?

A   No.

Q   Did he mention social media accounts?

A   No.

Q   Did he mention intellectual property?

A   No.

Q   Did he mention copyrights?

A   No.

Q   Did Mr. Jones sign these schedules?

A   Yes, he did.

Q   If you go to the last page.  It's right under where it says, "Under penalty of perjury, I declare I have read the summary and schedules filed with this declaration and that they are true and correct."  Is that --

A   Yes, I see that.

Q   Is that Mr. Jones' name?

A   Yeah, it's a slash S signature, yes.

Q   And who filed these on his behalf?

A   His counsel would have.  I think Ms. Driver's office did.

Q   Okay.  And if you go to -- do you know where Schedule C

is --

A    Yes.

Q    -- this document?

A    Yes.  Let me go there.  I'm there.

Q    I'm still on the same exhibit, then, and it's just past 13.  It's right after A/B, and it goes to C.  Before we get to the content of this, what is Schedule C?

A    Schedule C is where an individual elects which exemptions regime and then designates what they'd like to exempt from their bankruptcy estate.

Q    Have you seen Mr. Jones' arguments in recent pleadings that the assets that he claims you're trying to sell, these IP assets, intellectual property assets, are exempt property?

A    He has said that.

Q    Okay.  And have you looked at these exemptions that Mr. Jones filed?

A    Yes, I have.

Q    Is there anywhere that he lists those assets as exempt?

A    I don't recall, but may I take a look?

Q    Yeah.

A    Yeah, he does not claim any IP or copyright exemptions.

Q    Okay.  So, is there any reference in his schedules to these assets that he's now claiming you can't sell?

A    No.

Q   Okay.  But notwithstanding that, is it accurate that the Lot 4 assets are not part of this sale?

A   Yes, that's correct.

Q   Okay.  And if -- just to double confirm, if you go to, back to Exhibit 13.

A   The APA?

Q   The APA.  If you go to the second page of the APA.

A   Okay.

Q   1.1B, you see where it says Excluded Assets?

A   I do.

MR. WOLFSHOHL:  Let me let the monitor catch up. Page 2 of the APA.  Your Honor, the screen's behind, but I want to make sure that you're looking -- do you have it in front of you?

THE COURT:  I'm -- yeah.

MR. WOLFSHOHL:  Okay.

BY MR. WOLFSHOHL:

Q   Okay, so you see where it says Excluded Assets?

A   Yes.

Q   And then it has sort of a list of excluded assets.  You go to Exhibit 3 and look at xv.

A   Page 3?

Q   Sorry, Page 3, xv.

A   Okay.

Q   And you see -- what does that say?

A    That's xv.  "All excluded domain names listed on Schedule 1.1B6."

Q    Okay.  If you go to the last page of Exhibit 13, or second to last page.

A    Yeah, that's the reference schedule --

Q    Okay.

A    Excluded Domain Names.

Q    Okay, and if you turn that to the back of that page, you see that items listed there?

A    Yes.

Q    Okay.  Are those the assets, the disputed domain names, sorry, from Lot 4 that got pulled from the sale?

A    Yes.  That's right.

Q    How did you first determine that those were contested or disputed?

A    Alex Jones's counsel told me that they were disputing the transferability or ownership of those domains.

Q    And you heard -- you listened to -- you were here yesterday during Mr. Tannenbaum's testimony?

A    Yes, I was.

Q    Okay.  And do you remember us talking about two different versions of what he referred to as the offering memorandum?

A    Yes.

MR. WOLFSHOHL:  Okay.  And if you go to -- Your

Honor, I think that 21 and 14 were admitted yesterday.

THE COURT:  That's my understanding.

MR. WOLFSHOHL:  Thank you.

BY MR. WOLFSHOHL:

Q    If you go to 21, what date was that, the date of the offering memorandum, the first page?

A    October 11th.

Q    And then, if you go to Exhibit 14.

A    Okay.

Q    What's the date of that?

A    November 4.

Q    And did you hear Mr. Tannenbaum testify about what they did with the disputed domain names with respect to these two documents?

A    Yeah, they created -- we created them --

MR. BROOCKS:  Your Honor, I'm going to object to him talking about that.  If he has testimony we'd like to hear it, but repeating what somebody else allegedly said would be --

MR. WOLFSHOHL:  I just asked him if he heard what he said.

THE COURT:  I think it's -- for that purpose, it's fine.

BY MR. WOLFSHOHL:

Q    Okay.  Do -- let me ask you.  Do you think that there's

any question whether FSS owns these domain names?

A     No.

Q     Okay.  Why did you change the offering -- why did you direct Mr. Tannenbaum to change the offering memorandum to designate them as contested?

A     To create a separate lot for them.

Q     Okay.  Did you speak with Debtor's counsel about that?

A     Yes, I did.

Q     Okay.  And did --

A     It was their request that we designate in some way those assets that Mr. Jones was at that time asserting an interest in.

Q     Okay, so just so I'm getting it straight, Exhibit 21 is -- you took the listing of domain names off the schedules filed by FSS and put them in there, and then Exhibit 14, you modify it because *Debtor's counsel says designate them as contested so people know about that?

A     Exactly.

Q     Got it.  Okay.  And then just to close the loop, why did the APA -- notwithstanding that they were in Lot 4 and bid on, why did the APA take them out?

A     Well, we asked a successful bidder to do it --

Q     Why --

A     -- agreed.

Q     Why did you do that?

A    Oh, we were trying to resolve a potential objection to the sale.

Q    Okay.  And did they agree to that?

A    They did.

Q    Okay.  What about social media accounts?  Are there any social media accounts that are being excluded from the sale?

A    Yes, there are.

Q    Which ones?

A    So, there are three social media accounts on the X platform, the InfoWars, Band.video, and TheWarRoom, as I recall, and those three X accounts owned by FSS are excluded from the sale.

Q    Okay.  And I think you saw that yesterday, we discussed it.  Is there an agreement as to how that's going to play out as far as the exclusion of them?

A    Yes, that resolves X's limited objection to the sale.

Q    Okay.  And so, those are being removed; is that right?

A    That's right.

Q    Okay.  Any other excluded assets?

A    I mean, the vehicles, the causes of action, that's what comes to mind.

Q    Okay.  Let's talk about the value of the winning bid relative to creditors.  How much are you asking the Court -- or what's the purchase price you're asking the Court to approve?

A    Notionally, $7 million.

Q    But what is it in dollars and other things, please?

A    Right.  So, it's a combination of two things.  It's a combination of a cash purchase price of $1.75 million and then a mechanism they've called the distributable proceeds waiver, which transfers cash from the Connecticut creditor, or the Connecticut families, to the non-Connecticut unsecured creditors of FSS.

Q    Based on your understanding of the concept, who benefits from it?

A    So, the unsecured creditors of FSS benefit from the distributable proceeds waiver.

Q    Other than Connecticut?

A    Well, they benefit in the sense that they consent and want it, but the money goes to the non-Connecticut creditors.

Q    So, it doesn't prefer any particular creditors other than Connecticut, it just applies to them generally?

A    Right.

Q    Okay.  In assessing what the value of that might be, did you do an analysis of the overall creditor claims pool?

        MR. BROOCKS:  Object.  Ambiguity (indiscernible) that.  I'd like a little bit more specificity there. What do you mean "that"?  He said, in assessing the value of that. I don't know what he's talking about.

BY MR. WOLFSHOHL:

Q    In assessing the value of the distributable proceeds waiver, did you assess the claims pools of FSS?

A    Yes.

Q    Okay.  I want to go through that with you, your analysis.  And just to be clear, when assessing the value of the bids, from what standpoint were you assessing value?

A    So, I'm trying to maximize the return to the unsecured creditors.  That's my focus in the process.  They're the -- the unsecured creditors are the fulcrum security or the fulcrum class.  Any additional dollar I get in a sale goes to them.  That's where my focus is, maximizing that value.

Q    So, let's talk about -- I'm going to go to the (indiscernible).  Talk about your analysis of the unsecured creditors.  In your -- can you go to Exhibit 24, please?

A    Okay, I got it.

Q    In the bottom chart, you see where it says Connecticut family share, and it says 96.7 percent?

MR. BROOCKS:  I don't believe there's been any foundation for this witness to testify about this chart.

THE COURT:  It's already in evidence.

MR. BROOCKS:  It is in evidence, but there's no reference that he has any knowledge of it.  Not that he can't establish --

MR. WOLFSHOHL:  I'll do it.  I don't think that's

necessary from an evidentiary standpoint, but I'll do it.

THE COURT:  I don't think so either.  You can ask him.

BY MR. WOLFSHOHL:

Q    Mr. Murray, how did this document -- are you familiar with this document?

A    Yes.

Q    Okay.  Did you prepare it?

A    Yes.

Q    Okay.  Did you have help?

A    Yes.

Q    Who participated?

A    I worked collaboratively with Mr. Tannenbaum on it.

Q    Did you hear Mr. Tannenbaum testify yesterday about it?

A    Yes.

Q    Okay.  Did you agree with his testimony about it?

A    Yes.

Q    Okay.  And did you spend a significant amount of time preparing it?

A    Yes.

Q    Okay.  And what was the purpose of it?

A    The purpose of this was for me to figure out, under different scenarios and different bids, how much money was going to make it to the unsecured creditors of FSS.

Q    Because you said that's your primary objective, right?

A    Yes.

Q    Okay.  Starting with the 96.7 percent that you use in the chart below, I want to talk about that for a second. I'm going to call this claim allocations.  Is that a fair way to describe that or would you use a different word?

A    So far, so good.

Q    All right.  So, I'm -- when you think about the claims for (indiscernible), do you -- does that make any sense to kind of group them?  I mean, Connecticut, you just said 96.7 percent.  Are there any other large claims?

MR. BROOCKS:  Excuse me, Your Honor.  I'm going to object to the leading of the witness.  We'd love to hear what Mr. Murry says on his own without leading.

THE COURT:  That is leading.

MR. WOLFSHOHL:  Okay.

THE COURT:  I'll agree with that.

BY MR. WOLFSHOHL:

Q    Mr. Murray, you just testified the Connecticut -- or sorry, that in this chart you allocated 96.7 percent to Connecticut creditors?

A    Yeah.

Q    So, the claims pool for FSS has a couple --

MAN:  Can you see this?

MR. WOLFSHOHL:  Yeah, I can see it over the monitor.

MAN:  Can Your Honor see it?

THE COURT:  I can.  (indiscernible) you write on it, I will (indiscernible) let the competing whiteboards go at it.  It's nice.  Yeah.

THE WITNESS:  So -- yeah, so there's a few different categories of claims that make up the unsecured claims pool of FSS.

BY MR. WOLFSHOHL:

Q    Okay.  So (indiscernible) group?

A    Yes.  I mean, the first one, I would say, is Connecticut with its judgment claims.

Q    Okay.  We're going to say (indiscernible).

A    Okay.

Q    -- there, and --

A    Then next I would say after that is the Texas families, their group of claims.

Q    All right.

A    I guess next, since I'm looking at Mr. Lemmon, PQPR has claims.  And then nothing else stands out.  Maybe we just have another category.

Q    when you assessed the bids, what did you think that the amount of the Connecticut claims were?

A    So kind of starting with the claims register in the FSS case, the Connecticut judgments there -- I think there's maybe 15 claims or so.  Those totaled about $1.55 billion,

with a B.

Q    Okay.  What about Texas?

A    Liquidated Texas claims are about $50 million, but they have a few judgments that are not liquidated as to damages yet, so $50 plus.

Q    (indiscernible) plus.  And then you just testified about your assessment of the PQPR claim.  When you attributed the (indiscernible) percent that we referred to in Exhibit 4, what were you setting the PQPR (indiscernible) for that?

A    For that analysis, I treated it as zero dollars.

Q    Okay.  And is that for the same reason that you testified about a second ago?

A    Yes.

Q    Okay.

A    Yes.

Q    And then what about -- you said other miscellaneous (indiscernible) stated.  What did that (indiscernible)?

A    So, yeah.  So, on the claims register there's maybe about a dozen other miscellaneous claims that are under a million dollars total.  I'm not sure if those are still outstanding, because FSS is generally current on its debts other than to PQPR.

Q    Okay.  And so is -- I realize that these are not precise numbers, but is this how you came to the 96.7

percent analysis?

A    Yes.  That's roughly -- Connecticut's roughly 97 percent of that claims pool.

Q    And that's where you got the number that you used in Exhibit 24?

A    Right, that's kind of --

MR. BROOCKS:  Your Honor, again --

MR. WOLFSHOHL:  I think that's what he said, Your Honor.

MR. BROOCKS:  Just let him say it.

MR. WOLFSHOHL:  Okay.

BY MR. WOLFSHOHL:

Q    Is -- how did you get the number in Exhibit 24?

A    Right, so the bottom chart on 24, this sort of starting point is at 96.7 percent.  That is based on these numbers from the claims register.

Q    Okay.  And we've had a development since; you just testified about it?

A    Yes.

Q    What is that development?

A    So, the Connecticut Appellate Court affirmed the Connecticut families' judgment but remitted them or reduced them by an amount of $150 million.

Q    Okay.  So, 150.  What's 150l (indiscernible).

A    So, by my math, it's about $1.4 billion of affirmed

Connecticut family claims.

Q    You didn't know about that whenever you assessed the value (indiscernible)?

A    No.

Q    Nothing's changed -- that didn't change the Texas amount, right?

A    No, it did not.

Q    And I'm going to leave PQPR the same.  We'll talk about PQPR potentially being higher in your other analysis, but (indiscernible).  Does that look right?

A    Yeah, I'm with you so far.

Q    And this isn't set out in the motion, but have you at least, since the affirmance of the big chunk of the judgment, have you come up with what the percentage might be for Connecticut if you just apply the new number?

A    I think it rounds off around 93 percent of the pool.

Q    Exactly or roughly?

A    Roughly.

Q    Okay.  Now, in the motion you refer to a sort of stress test that you applied to it.  What does that mean?

A    So, I'm trying to figure out what cash goes to the unsecured creditors under these scenarios and I'm really trying to figure out the value of this distributable proceeds waiver.  And that is going to depend on a couple of things that I don't know yet, like what the ultimate

percentage of the claims pool Connecticut is, what the admin costs are.  I need to know those things to know how much money the Connecticut plaintiffs are going to have to play with out of the proceeds of the sale.

Q    Okay.

A    And so, the stress test is changing the assumptions from this first chart to make them more favorable to the First United bid to see, is there any way I can accept the First United bid?  Is the First United bid going to be better under different scenarios?  And so, that's what the concept of the stress test was for.

Q    And the -- what percentage did you use for purposes of that calculation?

A    So, for the percentage of the Connecticut families, I took it all the way down to 75 percent of the pool.

Q    Okay.  Is the -- in exhibit -- are you still on Exhibit 24?

A    Yes.  I got it in front of me.

Q    If you go to that top chart.

A    Okay.

Q    Is that the application of that 75/25 that you just discussed?

A    Yes.

Q    Okay.  Let's just, for purposes of being complete, let's apply this, the 75 percent -- so just, what kind of

changes to these numbers would have to happen?  We're going to go through each of them.

A    So --

Q    -- for you to get to 75/25?

A    So, the Connecticut judgments are such an outsized part of the pool.  For them to get down to only being 75 percent of the pool, their judgment itself would have to be reduced by over a billion dollars.

Q    So, they'd have to have a reduction of over a billion to get to that?

A    That's right.

Q    So, is there another alternative -- well, would the Texas judgments going up also affect it?

A    It would.

Q    Okay.  And are there some Texas judgements that are unliquidated?

A    Yeah, I think there's three that are not yet liquidated and if those went up, it would also tend to reduce the Connecticut percentage of the pool.

THE COURT:  Mr. Wolfshohl, can I get you to move that mic, just -- that mic.  I just want to make sure -- of if you can speak a little bit louder, the mic will catch it.

MR. WOLFSHOHL:  Maybe just a little closer to me.

THE COURT:  Yeah.  Thank you.

MR. WOLFSHOHL:  Is that a little bit better, Your

Honor?

THE COURT:  Perfect.  Thank you.

BY MR. WOLFSHOHL:

Q    So, you'd have to -- let me just -- I got distracted but on the Connecticut, you'd have to have it go what, below 400 million?

A    Yeah, about that.  It depends on what happens to the Connecticut numbers, but roughly, yes.

Q    Okay.

A    I mean, the Texas numbers.

Q    And the Texas number would have to go up?

A    Yes.  Or it could go up.  Yeah.

Q    And have you considered in the 75 percent stress test the possibility that PQPR has a large claim?

A    Yes.

Q    Okay. And what -- how would you come up with a number like that?  You just testified that you don't think it's worth really much --

A    So --

Q    -- but give an analysis of what you think would potentially make it come into play.

A    So, yeah.  Using my kind of reasonable best case that I think might happen with them, they would get their 68 million debt affirmed and only 6.3 million of it would be secured.  And in that scenario, the 6.3 would be paid out of

other assets, so they'd end up with about 62 million of unsecured claims.

Q   Just to be clear for the Court, when you say it'd be paid from other assets, that's because you said you're holding 8.6 million that could pay it?

A   Yes.

Q   Even if it's in the best case scenario, in your view? And none of this accounts for the numbers you've agreed to on the settlement, right?

A   Right, yeah.  That's correct.  I mean, under the settlement, there'd be zero because the settlement would resolve all those claims.

Q   Okay.  And so, I'm not -- I can't think this quick on my feet, but do you think that these sort of example numbers that include massive changes in your thinking, does that get you to even the 75 percent?

A   Yeah, just eyeballing it, it's probably a little bit higher than 75 percent, but yeah, close.

Q   So, was this part of how you came up with the 75 percent for purposes of the stress test that you described?

A   Yeah, that was part of it.

Q   What other things factored into that?

A   So, I -- so, my knowledge of sort of the negotiating history between the Connecticut and Texas families about what a reasonable agreed split between them on the claims

pool might look like and also proposals that I know were circulated during the Chapter 11 phase of the case.

Q    Have you reviewed the Chapter 11 plan that was filed by Alex Jones?

A    Not recently, but a while ago, yeah.

Q    Was -- did that inform your assessment of a potential 75/25 split?

A    Oh, yes, yes.

Q    Why is that?

A    Because it incorporated a proposed settlement that would have set the Texas families at 25 percent, so that would have been a 75/25 split --

Q    And that was --

A    -- understanding.

Q    That was proposed by Alex Jones?

A    It was his plan, yeah.

Q    Okay.  And what about -- did you look at the 9019 motion that was filed by Mr. Jones regarding this?

A    I don't remember looking at that.

Q    Okay.  What other things factored into you using this number just to get a sense as to whether it made sense?

A    Yeah.  So, sort of historically and throughout the Chapter 7 phase of this case, I have been aware of discussions between Texas and Connecticut about what a fair split would be and 75 percent sort of the high end of -- or

the low end of what Connecticut would receive under the range of percentages that have been discussed.

Q    And so, taking into account these potentially massive reductions that would be required as well as this sort of case history that you've analyzed since being appointed, is that where you got to this as something to use as a data point?

A    Yeah.  It's sort of, from Connecticut's perspective, I would think kind of the worst reasonable case for them for what percentage they might end up with of the claims pool.

Q    Okay.  All right.  Now, let's apply that to how you came up with your numbers in Exhibit 24, just for purposes of --

A    Okay.

Q    -- of lining it up.  So, first I want to do it with the First United bid.  I'll write Exhibit 24 here.  That's where you're going to get your answers.  FUAC.  That -- when I write FUAC, you understand that to be First United?

A    Yeah, I understand that to be the backup bid.

Q    Okay.  When you apply -- let's start with the 96.7 percent.  That's the amount that you used, I think, in the first chart in the motion?

A    Right, yeah.

Q    Okay.  If you apply that percentage -- and look.  Let's go back to the -- first let's start with the

(indiscernible).  To calculate what the 96.7 percent impact is, did you -- if you look at -- start with the backup bid. You see that it says less administrative costs?

A    Yes.

Q    Okay, what's that meant to be?

A    So, I'm looking for recovery for unsecured creditors, and admins get paid off the top of the sale process.  So, I estimated what the cost of the sale process would be, and in this base case, I estimated that at $650,000.

Q    Are those numbers that came from you?

A    Yes.

Q    Okay.  What go into that?

A    So, it's three main drivers there.  The first one would be Tranzon360's commission and expenses as auctioneer. There's also legal fees and costs.  And then there's a statutory commission for me as Trustee.

Q    I'll start with legal fees.  What were you -- going into this number, what did you plug in?  First of all, do you know exactly?

A    No, I don't know exactly.

Q    Okay.  What did you plug in?

A    So for this, if I recall, I did about 250 for legal fees, 350 for the auctioneer, and 50 for the Trustee is how I remember that.

Q    Okay.  And the 350, what's that based on?

A    So, that's based on a couple of assumptions, but it's based on what Tranzon360's percentages would be of the $3.5 million purchase price.  And it's a little complicated because they get one percentage on personal property, but then they get a sliding scale percentage on intellectual property.  And so there's going to be an exercise of allocating that 3.5 million between those buckets and doing the math, but it works out to roughly $350,000 when you include their expenses.

Q    And then what about your fee?

A    And then my fee is, it's roughly -- I used roughly 50,000.  It's actually -- it would actually be more than that in the backup bid, but I use the 50,000 because that's what it would be under the winning bid.

Q    Okay.  So, for purposes of comparison?

A    For purposes of comparison is -- yeah.

Q    And it's the same number all the way across.  Why would it -- why did you use that as the same number all the way across?

A    This is -- sort of was the starting point of the analysis.  So, it's just to -- for comparison purposes.

Q    Okay.  Would the -- for the winning bid, you heard Mr. Tannenbaum testify yesterday about his compensation?

A    Yes.

Q    Has that been finally resolved?

A    No.

Q    And did -- does the -- if the winning bid prevails or the successful bid prevails and the judge enters an order approving it, does that affect your compensation relative to what it would be if First United was the winning bidder?

A    I'm sorry.  Could you ask that again?  I lost you in that.

Q    Yeah.  What's the difference between what you get paid on the successful bid versus if First United is awarded the bid?

A    In Tranzon360 or --

Q    No --

A    -- Trustee --

Q    -- for you.

A    Oh, for me?

Q    -- as the Trustee.

A    So, if the backup bid were selected and we closed on it, my Trustee commission would be a little over $50,000 more than it is under the winning bid.

Q    Okay.  And when you applied the same number here, what were you doing?  What was the purpose of that?

A    It was to get sort of a baseline.  I mean, the admin claims are not the main driver of the analysis, but it's sort of a plug here to get to what the cash is before I then divide it among the different claims class -- or categories.

Q    Okay.  And when you apply the analysis in Exhibit 24 what -- if you go that, where it says (indiscernible), what's that refer to?

A    So, that refers to the non-Connecticut creditors.

Q    Okay.  So -- and then, you testified that that's one of your primary concerns is what those creditors get, right?

A    That is the primary concern.

Q    Okay.  What do they get under -- using the 96.7 percent, what do they get under the First United bid?

A    Yeah, so with these assumptions, the non-Connecticut creditors would get about $94,000 under the backup bid.

Q    What about if you apply the stress test model, the one up above?

A    So --

Q    The 75/25.

A    So, right.  So, under that model, the administrative costs are increased.  It's a more conservative estimate. And then, with the 75 percent we just discussed, the non-Connecticut families would get $688,000.

Q    Why did you increase the administrative costs?

A    It was a way of testing to make sure that the backup bid wasn't actually better because the more admins come off the top, the less money goes to the unsecureds and the less money goes to Connecticut, so they have less to play with in terms of their distributable proceeds waiver.  They have

less to give away.  So, it's sort of a limit on the power of Connecticut's bid.

Q    Okay.  So what did that number end up being?

A    About 388,000.  I'm sorry.  I said three.  I meant six -- 688.  Yeah, it's 687,500, but it looks like you're rounding to thousands.

Q    Okay.  Now, want a -- your GT/CT, the -- I'm going to use that as the Global Tetrahedron and Connecticut joint bid.  Under the 96.7 percent assumption, what do creditors get -- what do non-Connecticut creditors get under that assumption?

A    Okay, so that's the --

Q    Well, let's start with the -- let's start with the middle.

A    Okay.  Now I see what you're saying.  Okay, yeah, so this is the winning bid cash equivalent column.

Q    Right.

A    And that --

Q    What does into that analysis?

A    So, this sort of assumes, evaluates a $7 million purchase price minus the plug for the admins, and then you throw that amount into the claims pool and see how much Connecticut in the gift class would get.  It says gift class.  It's non-Connecticut class.  And the non-Connecticut creditors would get about $210,000 in that scenario.

Q   Okay.  So, why would you be -- if you go to the right and it says gift class recovery for the 1.75 million, why is that the same as it is under the analysis of a $7 million bid, so the Court can understand it?

A   Because that's what the winning bid was.  The winning bid said a distributable proceeds waiver sufficient to make the creditors as well off as they would have been under a $7 billion bid that was on the bid form.

Q   Okay.  So, under -- and this is -- let me just make sure this is clear.  This is the 96.7 percent model.  This is 75 (indiscernible) model.

A   That's right.

Q   That's -- I'm just going to round up, $210,000?

A   Yes.

Q   Okay.  And then if you go to the 75/25 split up at the top, what amount does what you're referring to as the gift class get under that scenario?

A   So, the gift class ends up getting $1 million.

Q   Now, I'm going to ask you a question.  You've heard the questions that Mr. Broocks asked Mr. Tannenbaum about Exhibit 19 which is -- can you identify that document?

A   Yeah, this is the final bid form and letter for Global Tetrahedron and the Connecticut families.

Q   And if you go to -- well, first off, how did you interpret this bid?

A   So, I interpret this as a $7 million bid, but a notional $7 million because it's not $7 million cash.  It's a bid that has a cash component plus this other mechanism that ends up giving the non-Connecticut families what they would have gotten under $7 million.

Q   Non-Connecticut families or non-Connecticut creditors?

A   Creditors.  Creditors.  Right, because there might be other creditors.  That's right.

Q   Okay.  And if you go to the top of the third page of the letter?

A   Okay.

Q   You heard Mr. Broocks asking Mr. Tannenbaum a lot about this, this mechanism that they placed in here in this letter.  What is your understanding of that relative to what you believe was in there?

A   So, what this is; this is, I believe, Connecticut saying the waiver amount only needs to be $100,000 more than what the non-Connecticut creditors would receive under the next best bid.

Q   Okay.  And I want to, just for purposes of this chart, let's calculate what that would be if -- first of all, is that your understanding of what -- when you accepted this or designated it as a successful bid, was that your understanding of the bid?

A   No.  That was not my interpretation of this bid, but I

understand that that's what it says.

Q   Okay.  Are there other places that tell you something different in this document?

A   Yes.

Q   Okay.  Like what?

A   So the bid form, starting point is the $7 million bid.

Q   Okay.   Where else?

A   And so, it further describes it as not less than $7 million.  The letter refers to at least $7 million, over $7 million.  So, in trying to figure out what the distributable proceeds waiver amount is, I do it based on comparing it to a $7 million bid as if it were cash.

Q   Do you understand the concept of the distributable proceeds waiver?

A   Yes.

Q   Okay.  And how do you apply that without looking at this mechanism that they placed in the bid letter?

A   So, my understanding of the distributable proceeds waiver is, is it's Connecticut giving enough of its cash to the other creditors to make those creditors better off than the alternative.  It's meant to enhance the value of the bid with Global Tetrahedron in comparison to other bids.  And they don't know at this highest and best stage what the other bid is.  They speculate as to what it might be and what that might mean, but I take them at, max it out.  Take

it at the $7 million they say and get as much for that other class as I can, and that's how I interpret this bid.

Q    Did you speak with Mr. Tannenbaum about analyzing the bid?

A    Yes.

Q    Okay.  Did you discuss with him conversations that he had with the representative of Global Tetrahedron?

A    I don't think we -- no -- well, I mean, it depends on what time.  We've -- I've talked to him since, but --

Q    Okay.  Let me ask you this.  I'm just going to put a column here.  I'll call it 100,000 over.  So, what would the distribution to non-Connecticut creditors if you apply this 100,000 over mechanism?

A    So --

Q    In the 96.7 percent scenario.

A    So, if you just took the distributable proceeds waiver and ignore the bid form, $100,000 more would be 94 plus 100 for 194,000.

Q    What about if you apply the 75/25 analysis that's in --

A    Same math, except now you're adding 100 to 688 for a total of 788.

Q    Okay.  So, under even that analysis, is it a higher amount than the First United --

A    Yes.

Q    As far as distribution to unsecured claims?

A    Distribution to non-Connecticut claims?

Q    Yep.

A    Yes, it's higher by 100.

Q    When was the first time that you saw the concept of a distributable proceeds waiver?

A    That was when we received the initial round, sealed bids.

Q    Had you ever discussed that with --

MR. BROOCKS:  Your Honor, may I take a picture of that so I can -- I can't really see it -- so I can look at it --

MR. WOLFSHOHL:  -- Ben, come over here and do it.

MR. BROOCKS:  Would you mind if I -- I don't want to take it without your permission.

THE COURT:  Oh, absolutely.  Go for it.

MR. BROOCKS:  Thank you.

MR. WOLFSHOHL:  No worries, no worries.

BY MR. WOLFSHOHL:

Q    Had you ever discussed this concept with anyone on behalf of the Connecticut parties before this bid got submitted?

A    No.

Q    What about before the first bid got submitted?

A    No.

Q    Okay.  Had you ever talked to them about anything like

this?

A    Only in a very vague sense that I knew Connecticut wanted to use the power of its oversized claim to influence the process, but nothing like this mechanism.

Q    Okay.  Did you speak to them after they submitted their first bid?

A    No.

Q    About this?

A    No.

Q    Did you have any conversations with anyone on behalf of the Connecticut parties after the first bid was submitted? Not the bid that's at 19, but the first one that was submitted on November 8th?

A    No.

Q    About any other topics?

A    Well, are you talking about between the first and second bids?

Q    Yes.

A    Yeah, I think I had one phone call, but strictly unrelated to the auction.

Q    Okay.  Who was that with?

A    That was with Mr. Kimpler.

Q    What was the discussion about?

A    The discussion was about the ongoing discussions between Texas and Connecticut, about how to divide up the

proceeds, and I had been sort of shuttling potential settlement proposals between those two parties.

Q   Okay.  And were they -- did you understand that they had been discussing a settlement?

A   Yes, they had been for months.

Q   Okay.  Had you ever -- did you ever, like, provide any comments to settlements or anything like that that they exchanged?

A   No.  I might have suggested different ways of dividing up the proceeds, but I was mostly shuttling messages between those two camps.

Q   About the division of proceeds?

A   Yes.

Q   Why is that important to you as the Chapter 7 Trustee?

A   I mean, it's not in the sense that I'm just recovering for creditors, whoever they end up being.  It's helpful for the administration of the case to not have ongoing litigation or fights over what the claims amounts are.

Q   That's actually what I was getting at.  Is it less of a headache if you can figure that out so you don't have to wait for appeals?  That's really what I'm getting at.

A   Well, yeah.  It might shorten the case because we might not have to wait for appeals.  I mean, even some of the Texas judgments are not liquidated at all in the first instance.

Q    Okay.  And so, based on this analysis, do you believe that the sale that you're asking the Court to approve is in the best interest of creditors?

A    Absolutely.

Q    Okay.  And why is that?

A    Because under all the different scenarios we've discussed, all the different interpretations of the distributable proceeds waiver, every one of those numbers on that chart is higher than what the non-Connecticut creditors would get under the backup bid.

Q    I want to -- have you -- has there been a -- let's talk about the sale process.  Did you conduct a sale process leading up to your selection of this bid?

A    Yes.

Q    And who did you employ?

A    As auctioneer?

Q    Yeah, as auctioneer.  Sorry.

A    Tranzon360.

Q    Okay.  And if you go to Exhibit 6, is that the -- what is that?

A    Well, that's the employment app for Tranzon360.

Q    Okay.  And if you go to Exhibit 7, what's that document?

A    That's the order authorizing -- it's misspelled, but it's authorizing me to employ Tranzon360.

Q    Okay.  Did you ask the Court to approve a winddown and sale process?

A    I did.

Q    Okay, and is that the -- is that approved through the order that we referenced a second ago as Exhibit 8?

A    The winddown order, yes.

Q    Yeah.  And did you describe -- in the motion to approve this order, did you describe a sale process that you anticipated?

A    Yes.

Q    How did you describe it?

A    I think we described it as a sealed bid auction to be followed by a live auction, if that made sense.

Q    Okay.  And when did the motion get filed?

A    Before the order.  Which tab?

Q    I don't know that we have it in our exhibit book.  I think it's in --

A    Okay.

Q    -- exhibits.

A    I don't remember the exact date.

Q    Was it early in the case for you?

A    No, not too early.  I think it was some -- maybe August.

Q    Okay.  At that point, did you have a good sense as to what this auction process might look like?

A    Not beyond wanting to have a process to auction the assets.

Q    Okay.  And did anyone object to the winddown motion?

A    Yes.

Q    Okay, who?

A    Mr. Jones filed a limited objection.

Q    Is that what was filed by his prior counsel?

A    I don't know which of his counsel filed it.

Q    Okay.  Was that resolved in the order?

A    It was.

Q    Okay.

A    It was resolved with language that we added to the winddown order.

Q    Okay.  No one else objected?

A    No.

Q    Okay.  And what do you believe that the winddown order gave you authority to do?

A    I think it gave me authority to conduct an auction process for the assets of FSS.

Q    Okay.  And was it important to you -- or what were the things that were important to you with respect to the winddown order, like as far as what kind of parameters, stuff like that?  Tell the Court what was important.

A    Well, generally speaking, I wanted authority to do an auction process.  I wanted there to be notice of what that

process would be.  But I also wanted there to be flexibility in terms of that process so that depending on how things unfolded, I could change procedures as necessary to maximize value.

Q    Did -- at the time that you filed the motion, had the supplemental dismissal order been entered yet?

A    I think they might have gotten entered on the same day.

Q    The same day as the motion was filed or the same day as the winddown order was entered?

A    Oh, so -- I'm sorry.  I'm looking at the order, so now I'm confused about which document.

Q    Had the supplemental dismissal order been entered when you actually filed the motion proposing this?

A    Oh, no.  No, it had not.

Q    Okay.  And so, were you anticipating this being sort of a traditional 363 sale or something different just because you were selling non-debtor assets at that point in your mind?

A    Oh, so when we filed the motion, it was clear to me that the estate held 100 percent of the membership interests of FSS.  And I wanted to liquidate FSS, and the creditors told me they wanted me to do that, and they filed motions in support or statements in support.  And so, I wanted 363 sort of protections for buyers to get top dollar, but the idea was more seeking authority to wind down.  That's why it's

called that, as opposed to sort of a more traditional motion to sell under 363.

Q    And did the Court give you more clarity through the entry of the supplemental order?

A    Yes.

Q    Okay.  But that didn't happen until well after you filed this motion?

A    Right.

Q    If you go to Exhibit 6.  Sorry.  No.  Stay on Exhibit 8.  Go to Paragraph 6 of Exhibit 8.

A    Paragraph 6.  Okay.

Q    Okay, are you with me?  So, you see where the definition of bid requirements, down at the bottom?

A    Yes.  I see where the term is defined.

Q    Okay.  And you see it says, in connection with its sealed bid, and then you look at all this like sort of two pages, you see that, the two pages after that?

A    These look like bullet point terms?  Is that what you're talking about?

Q    Paragraph 6 of the winddown order.  Yeah, I'm just going through -- those bullet points.  That's what I'm talking about.

A    Okay.  I see those.

Q    Okay.  Those are defined as bid requirements, correct?

A    Yes.  Yes.

Q    Okay.  And how do you view the bid requirements here for purposes of operating a sale process?

A    So, it's a starting point.  It sets sort of the basic ground rules for what the auction process would be.

Q    Are each one of these hard and fast rules?

A    I've got to look at each one of them.  I think some of them are, but some of them are more aspirational guidelines.

Q    Well, for example, do you see where, the third bullet point where it says identity of assets and purchase price?

A    Yeah, I see that.

Q    Okay.  Do you see where it says purchase price should be a specific amount in U.S. dollars?

A    Yes.  It says not a range.  Yeah.

Q    And then go to Paragraph 7.

A    Okay.

Q    This is the paragraph immediately following the bid requirements.  Do you see in the middle of Paragraph 7 where it says "Provided, however"?  Read that to the Court.

A    "Provided, however, that the Trustee's right to modify the foregoing bid requirements to modify any deadlines in Paragraph 4 of the order, to modify any procedures at the IP assets auction, if any, and/or to terminate discussions with any potential bidders at that time are fully preserved to the extent not materially inconsistent with this order."

Q    So, where it says your right to modify bid

requirements, if you couple that with the end of that, do you believe that that's meant -- what do you believe that's meant for?

A    That's the discretion I was referencing earlier that I was asking the Court to give me to modify these procedures if it would be in the best interest of the estate and its creditors, if it would increase the value to do so.

Q    I just -- have you run sale processes before?

A    Yes.

Q    Is any sale process perfect?

A    No.

Q    Have you ever had a sale process where you asked for bids and not a single qualified bid came in?

A    That has happened.

Q    Have you had bid processes where you got bids in, multiple bids, but none of them were technically qualified?

A    Yes.  I sort of view that as the same answer as the first one.

Q    Okay.

A    I didn't get any qualified bids in an auction.

Q    But as a Trustee, do you often try to sort of qualify bids just so you can get to a sale process?

A    Yes.

Q    Okay.  Why do you do that?

A    Well, I usually think of it as you kind of have your

first round to try to get people interested and then you want to weed out people who aren't serious and then have a second more competitive round among the people who are interested.  So, the weeding out is, you've got to put in a bid deposit.  You can't have a financing contingency.  I want people that I'll be able to close with if they win the bid.

Q    But are provisions like this where -- like Paragraph 7, is that meant to give you some flexibility for that just so you can kind of --

A    Yes.

Q    -- deal with the situation on the ground?

A    Yes.

Q    Okay.  But you are always trying to stay consistent with the general terms of the order and your obligations as a Trustee, right?

A    Yeah, of course.  Yes.

Q    Okay.  And if you go to exhibit -- or Paragraph 29.

A    Okay.

Q    Have you reviewed that order -- or, sorry, that paragraph?

A    Yes.

Q    Okay.  And is that a similar concept you were trying to give yourself flexibility?  Is that kind of why you asked the Court to include that in the order?

A     Yes.

Q     Okay.  Did the sale process that you ran have multiple rounds of bidding?

A     It did.

Q     How many?

A     Two rounds of bidding.

Q     Okay.  What was the first round?

A     So the first round was a sealed bid round.

Q     Is that how it was described that it was going to be in the winddown order?

A     Yes.

Q     Is that also what was described in the offering memorandum?

A     Yes.

Q     Okay.  Why was the first round -- why did you know or why did you ask or direct people to do a sealed bid in the first round?  What was the purpose of that?

A     Well, that was -- I mean, that's what Mr. Tannenbaum recommended.  He persuaded me that that was the most appropriate way to deal with this particular kind of asset.

Q     Is that why you asked the Court to approve that process, the sealed bid process?

A     Yes.

Q     Okay.  And that's what's set out in the winddown order, right?

A    Yes.

Q    Okay.  And the winddown order, does it also contemplate the possibility of converting a sealed bid into a live auction?

A    Yes.

Q    In fact, you expected that that probably would happen, right?

A    Yeah, I expected that.

Q    Okay, but do you read the winddown order as requiring it?

A    No.

Q    Okay.  Are there -- how many places in the order do you think make it clear that it's not required?

A    More than just the two paragraphs you pointed out.

Q    Okay.  Let's go to -- back to Exhibit 14.

A    Okay.

Q    Did you participate in the preparation of this sum with Mr. Tannenbaum?

A    I did.

Q    Okay.  And I think we've talked about this as there's the 21 and 14.  These are slightly different.  But are the bid instructions the same in both of them generally?

A    Well, this is the one that includes Lot 4.  This is the more recent one.

Q    That's right.

A    Okay.

Q    But is it your understanding, other than the change of Lot 4, are there any other, to your knowledge, material changes?

A    No, I don't think so.

Q    Okay.  And if you go to Page 12.

A    Okay.

Q    First off, at the top of Page 12, does it specifically say that there's a conflict between this and the winddown order, the winddown order controls?

A    Yeah, that's what it says.

Q    Can you see the description of the sealed bid sale?

A    Yes.

Q    Okay.  And do you believe that's consistent with the winddown order?

A    I do.

Q    Okay.  And you see Exhibit 9 -- or sorry, Paragraph 9?

A    Notification?

Q    Yes.

A    Okay.  Yes.

Q    You see where it says, "If sales agent and Trustee determine that one or more qualified bids are competitive in nature, the sales agent and the Trustee reserve the right to convert the sealed bid to an auction"?

A    Yes, I see that.

Q    Okay.  And so was the concept that you were going to start with sealed bid and convert to auction, if it made sense?  Is that the concept that you were trying to employ?

A    Yes.

Q    Okay.  And you set an auction, correct, a live auction?  I'm sorry, you scheduled a time for a live auction?

A    Yeah, I think we noticed a time when the live auction would occur.  Yes.

Q    Okay.  When was the sealed bid deadline?

A    I think it was on the 8th.

Q    Okay.  And what was the time that was originally set as the live auction, if it was going to be held?

A    That was, I think -- it's in the order.  I think it's the 13th.

Q    Okay.  Did you get -- how many bids did you get in the first round?

A    Just two.

Q    Okay.  Who were those bids from?

A    First United and Global Tetrahedron.

Q    Go to Exhibit 15.

A    Okay.

Q    What's that document?

A    This is First United's bid -- initial bid.

Q    Okay.  Did you review it when it came in?

A    Yes.

Q    Who's the bidder?

A    It's First United American Companies.

Q    I think I've already asked you this, but who do you understand that to be?

A    I understand that to be Charlie Cicak's company.

Q    Okay.  And what was your understanding of what First United was going to do with the assets?

A    My understanding is they wanted to acquire them to continue the business in essentially its form -- its current form.

Q    Okay.  Were you aware of any arrangements between First United and Alex Jones?

A    At that time, no.

Q    Okay.  Are you aware of any now?

A    Yes.

Q    What are they?

A    I don't know the details, but I believe Mr. Jones has agreed to work --

         MR. BROOCKS:  Objection, Your Honor.  He said he doesn't the details.  He can't be speculating here.  Speculation.

         THE COURT:  Sustained.

BY MR. WOLFSHOHL:

Q    Did First United use the correct bid form?

A    Yes.

Q   Did they alter it?

A   They did.

Q   How did they alter it?

A   Well, they added an addendum.  There's a couple of asterisks there and then on a second page of the bid form, they described that they wanted to add some additional assets beyond what was originally contemplated for the auction.

Q   And did you allow for them to add the assets?

A   Yes.  We ended up adding those assets to the auction, if that's what you're asking.

Q   Yeah.  I think that's what I'm asking.

A   But I didn't reject the bid because of the change.

Q   What's the -- now, what's the -- you said they added some assets.  Which assets did they add?

A   So, it's laid out in their addendum.  It was some -- I believe some assets in -- yeah, some assets in another building.

Q   Okay.  How much was the bid for?

A   $1.2 million.

Q   Is it for all the assets that were included in the bid form originally?

A   Yes.

Q   Did they make the required deposit?

A   Yes, they did.

Q   And how was that received?

A   They paid a wire, $120,000.

Q   Are you holding that amount?

A   I am.

Q   Okay.  Turn to Exhibit 16.

A   Okay.

Q   What's that document?

A   This is the Global Tetrahedron and Connecticut families joint bid, the initial bid.

Q   How do you know the Connecticut families are a part of it?

A   They're listed on the bid form as a partner.

Q   Okay.  Prior to this, did you have any idea that the Connecticut families were going to do a joint bid with Global Tetrahedron?

A   No.

Q   Okay.  Did they use the correct bid form?

A   Yes.

Q   Did they include additional terms?

A   Yes, they did.

Q   Go to Exhibit 17.  Is that what you're referring to?

A   Yes.  This is their bid letter, I think they called it.

Q   And I think I asked you part of this question before, but had you ever discussed -- or first off, is this the first that you heard of the distributable proceeds waiver

concept?

A    Yes.

Q    Okay, and if you go to Paragraph 2 where it says identity of assets and purchase price?

A    Okay.

Q    What's the cash consideration?  Well, first off, on the -- going back to the bid at (indiscernible), what's the cash price set out in that bid form?

A    It's $1 million between the first two lots.

Q    Okay.  And is -- now, go back to 17 in Paragraph 2, that 2A, does that also reflect that cash dollar amount?

A    Yeah, cash consideration, $1 million.

Q    Okay.  What about future revenues?  Is that something that you factored into your analysis?

A    Take a look.  Oh, yes.  Oh, yeah.  No, it did not figure into my analysis.

Q    Why not?

A    For a couple reasons.  One is, as I understand it, Global Tetrahedron saying, if we get the assets, the money we get in the future, we're going to give it to the families.  That -- whatever they do with the revenue in the future is kind of up to them, so it doesn't impact my decision.  I don't consider it to be part of the consideration for the auction because I have to treat all creditors in the class equally, and this is just to the

families.  So, if PQPR hadn't allowed claim and they didn't participate, it would be unfair to them.  So, I don't think it could be part of the bankruptcy auction and it's also sort of something in the future that's hard to value, so I did not ascribe any value to this for the purposes of evaluating the bid.

Q    What about the distributable proceeds waiver?  Did you ascribe value to that?

A    Yes.

Q    Have you ever seen that before?

A    No.

Q    Have you seen other types of non-cash consideration in sale processes before?

A    Oh, sure.  Yeah.

Q    Just nothing exactly like this?

A    Nothing like this where one group of creditors gives their recovery to another group of creditors.  I've never seen that.

Q    Why is that particularly relevant to this case, the facts of this case?

A    Well, it's relevant because I think that mechanism is the only reason the Global Tetrahedron bid is better for unsecured creditors than the First United bid is.

Q    How often have you seen a case where one creditor group holds 96 percent of the overall claims pool?

MR. MOSHENBERG: Objection, Your Honor. Mischaracterizes (indiscernible) liquidated claims pool (indiscernible) pool.

THE COURT: I think that's a fair characterization. I'll sustain the objection.

MR. WOLFSHOHL: I'll ask it that way, Your Honor.

BY MR. WOLFSHOHL:

Q   How often have you seen a scenario where the liquidated claims pool has one creditor representing 96 percent -- 967 percent of the claims pool?

A   In the Chapter 7 world, it's not that uncommon.

Q   It's not that uncommon? Okay. What about claims this size?

A   Oh, I've never had a case that had a billion-dollar claim before.

Q   What about a billion-dollar claim that had a judgment attached to it?

A   Not that either.

Q   So, did -- I think I asked you. They did -- you said they did use the correct claim form, and then we were at the bid letter. That's Exhibit 17?

A   Right. Yeah.

Q   And I think you said this already, but did you ever discuss with them this concept, this distributable proceeds waiver with the Connecticut creditors?

A    No, I never discussed it with them.

Q    What -- prior to this.

A    Well, prior to this, yes.

Q    Okay.  What about after this, between getting this and their final bid?  Did you discuss it with them between then -- those two times?

A    During the auction?  No.  No.  During the -- between the first and second bids, I did not talk to them about this.

Q    Okay.  You didn't talk to them at all about this?

A    No, not at all.

Q    Did you ever talk to Global Tetrahedron about this before they submitted their bid?

A    Before they -- no.

Q    What about between the first bid and the second bid?  Did you talk to them about it then?

A    No.

Q    Okay.  And you heard Mr. Tannenbaum testify that he spoke to both bidders between the first and second bid rounds?

A    Yes, I think he did.

Q    Okay.  But you didn't?

A    No, I did not personally talk to -- no.  I did not.

Q    Either of them?

A    Either of them.

Q    Okay.

A    Well, about this.  I did have the one call with Mr. Kimpler about something else, but --

Q    Okay.  Did this joint bid include the required deposit?

A    Yes.

Q    Okay.  And that was a deposit of 10 percent of the cash price; is that right?

A    Yes.  And -- right.  They deposited $100,000.

Q    Okay.  And you -- did you receive that by wire?

A    I did.

Q    Are you holding that now?

A    I am, yes.

Q    Did you receive any other bids?

A    No.

Q    Did you qualify these bids as qualified bidders?

A    Yes, I did.

Q    Okay.  Did you determine whether to have another round of bids?

A    Yes.

Q    Why?

A    Well, neither one of these was far and away better, where I could just -- where I felt like it made sense to just accept that and not have another round.  They were two that bid on slightly different combinations of the assets, but they seemed roughly competitive.  And so, after talking

with the auctioneer, we thought it would be best to have another round of bidding.

Q    So, let me stop you there for a second.  You said that they weren't far and away better than the other, such that you wouldn't go to a next step?

A    Yes.

Q    Does -- you believe the winddown order allows you to just sell after getting the initial sealed bid rather than having any further rounds?

A    Yes, I think it does.

Q    Okay.  But you decided to do another round.

A    Wait.  You said sell.  I think I can --

Q    Yeah.

A    -- pick a bidder based on one round.  I don't think I can --

Q    Designate --

A    Yeah.  Okay.

Q    You can come back to the Court (indiscernible).  I said that wrong.  So, you believe that the wind-down order was intentionally -- it intentionally allows you to just sell, if you receive sealed bids that are so good that you just don't need -- that a live auction doesn't make sense or any other process?

A    Yeah.  I mean, what I have in mind is I have no idea what bids are going to come in the first round, and if I

only received one bid, I might just take it and try to sell to that person.  Or if I received three bids and one was for $10 million and the other two were for $50 and $75, I would probably just not have another round and proceed to try to sell to the $10 million bidder.

Q   So, you believe the winddown order in that example where you have a $10 million bid and two really small bids, you don't think the winddown order requires you to go and do an auction between a $10 million bid and a $50,000 bid?

A   No.  I think it gives me the discretion to accept and reject bids.

Q   Okay.  And that's -- is that part of the flexibility that you were looking for whenever you asked the Court to enter the winddown order?

A   Yes.  That's the flexibility I understood that I had.

Q   Okay.  So, did you speak with Mr. Tannenbaum about having another round?

A   Yes, yes.

Q   Did you talk to him about what that might look like?

A   Yes, quite a bit.

Q   Was the concept of a live auction part of the discussion?

A   Yes, that's sort of what we started with when we discussed it.

Q   And go to -- 23.  Sorry about that.

A    Okay.

Q    Who prepared that document?

A    This is all Jeff.  This is Jeff Tannenbaum's spreadsheet.

Q    Yeah.  I got it.  Was that part of your analysis in trying to determine whether you could reasonably go forward with the live auction process?

A    I mean, it's one of the things we talked through, yeah.

Q    Okay.  What things did you consider in assessing how to proceed?

A    So, there's really two big things that made this difficult to figure out.  One was the different lots, that First United wanted all of the lots; Global Tetrahedron in their initial bid, only wanted the first two lots.  And we didn't know -- and based on the values they ascribed to those different lots, we were thinking, well, maybe there's a way to fit this together where they both win but get different things.

So, that was one thing we were trying to figure out, and how do we structure it so that they bid against each other to get the best dollars there.  But the other thing, which was maybe even a bigger consideration was this distributable proceeds waiver, which requires a lot of thought and math to figure out exactly what it's worth.  And so, we tried to go through hypothetical scenarios of, well,

what if we had Global Tetrahedron against First United in this round on these assets?

What if we had those two and then a placeholder for a future auction with an indicative value.  That's somewhere in here.  All those different sort of permutations of how to do it.  And then the, how are we going to figure out and resolve cash on the one hand and then cash plus distributable proceeds with uncertainties?  We don't know what the percentage is of the Connecticuts.

We don't know what the admins are going to be.  And we just thought, how are we going to do that round after round and have it be meaningful and practical.  And we quickly realized it's just not going to work to do it in a live, you know, traditional, you know, 50 here, 75 there kind of thing.

Q   Okay.  Did -- when considering your options, did you also discuss with Mr. Tannenbaum sort of options that might exist for our next round?

A   Yes.  And so what -- at some point he said, well, why don't we just keep the sealed bid process going and have another last and best sealed bid round; and the idea there would be the bidders would have to designate for each lot what they're actually willing to pay without having any idea what anybody else was bidding.  And that would sort of pressure everybody to put their best foot forward, their top

dollar on a lot-by-lot basis.

Q    Okay.  And did you believe that the -- after talking about it with Mr. Tannenbaum did you -- and looking at the winddown order, did you believe that that was something you could do under the winddown order?

A    Oh, yes.  I thought I had the discretion to do that.

Q    Okay.  But whatever it is that resulted from that sealed -- second round sealed bid highest and best process, you anticipated getting Court authority and blessing of what process you ran; is that right?

A    Well, I didn't think I'd come back to Court to approve that second round of bidding.  I thought I'd come back to Court to approve the sale with whoever that bidder was selected to be.

Q    Yeah, that's what I was asking.  That's what I was asking.  You may have said this, but what is it -- what is your understanding of sort of the benefit of having a highest and best request from bidders?

A    So, well, it's what I mentioned, and it's what Mr. Tannenbaum said yesterday, is if bidders have different views of what different lots are worth, and you might think, oh, this one I think is worth a million bucks, and the other guy thinks it's only worth half that, if you did that lot head-to-head, you'd never get the full million.  You'd only get $500,000 plus a dollar, because that's when the bidding

would stop.  But if that bidder really wants it, they might bid a million, and the next closest bid is way behind it.

So, there's that dynamic and then there's also the fact that because one of the bidders is using sort of this different waiver mechanism, if I have the two that the parties tell me this is their last and best, now I have something concrete that I can actually compare and analyze and do all the math that we've just been doing to see which one's better.

Q    Had you ever been a part of a last and best auction format?

A    Yes.

Q    Do you have any examples?

A    We did one last year in this Court.

Q    What case was that?

A    It was White Oak Resources.

Q    And how did that play out?

A    That also started out with different lots, some oil and gas interests, Louisiana, Mississippi, Texas, I think, and different bidders wanted different lots.  We had sort of an informal auction where one party said they wanted something, another -- then I'd go to the other party.  They'd increase their bid, increase their bid.  I eventually picked one, filed a sale motion with what I thought was the best bid.  Bidding had stopped.  And then one of the other parties

said, oh, wait.  No, I called my partners.  I got more money.  So, we kind of reopened it and it was right outside the door there is one of the other bidders said, now I have more authority to bid more.  And then we came into this courtroom and then the determination by the judge was, all right, we're going to set a deadline.  This has to end by 2:30.  Everybody give your best and final bid to Mr. Murray.  And that's what happened.

Q    Did it -- how did it play out?

A    Phenomenally well for the estate.  The winning bid was multiples of where the bidding had been, and it was multiples above the next highest bidder.

Q    I think you said this already, but in addition, you were talking about the sort of difficulty of doing a live auction with these multiple lots.  Did it affect your analysis of whether a live auction would work when you consider how the bids were playing -- were coming in with contingencies as to, like, if I'm buying this lot, I have to have that lot also.  I mean, was that -- did that factor in?  And I'm probably saying it wrong, but can you kind of tell me if that factored in?

A    Yes.  So, both of the initial bids, on the bid form there was a place to select my bid on one lot's contingent on you accepting my bid on another lot, and both bidders selected all of those.  So, it was kind of all or nothing.

But I could tell by the values they ascribed to the different lots, or at least I thought I could tell, that maybe the bidders didn't really care about another lot.

So, for example, Global Tetrahedron bid a million dollars for some of the lots, but ascribed a very small dollar amount to the physical assets, leading me to think that really all they cared about was intellectual property. And it was less pronounced, but there was a similar dynamic the other way with the First United bid.

Q    What was that?

A    From their indication, they indicated that they valued the equipment and the hard assets much more highly than Global Tetrahedron did.  So, in a last and best round lot by lot, I thought there was a pretty good chance that we would get a bid that I could accept from Global Tetrahedron just for the IP, and then maybe sell the physical assets to First United.

Q    Did Global Tetrahedron and Connecticut bid include the assets that were added?

A    Yes.

Q    -- I'm sorry, in the first round, that were added to the form by the First United bid.  Did they add -- did they include those assets?

A    Yes.

Q    In their first round?

A    Oh, in their first round, they didn't add any assets, but the second round lots included those assets.  So, their final bid did include them.

Q    Was that also another complication of doing a live round, is that they were slightly different assets that were being bid on?

A    No.  That would have been pretty easy to overcome, I think.

Q    And so, the determination was to ask everybody to submit a highest and best, and did you -- what deadline did you set for that?

A    We used the deadline or the anticipated original date for the live auction of the 13th at 10:30 in the morning.

Q    So, it was the same time that the parties were going to come to a live auction, you just changed the format, asked them, you know, instead of a live auction, send us highest and best?

A    Yeah.  That's exactly how I viewed it.  I viewed it, we were changing the format.  It's not going to be live auction.  It's going to be last and best, but we've already got a date on the calendar.  Let's use it for that.

Q    Okay.  Did you -- if you look at Exhibit 25.

A    Okay.  I'm there.

Q    Are you familiar with that document?

A    Yes.

Q    Did you look at it before Mr. Tannenbaum sent it?

A    Yes.

Q    Okay.  And you heard Mr. Tannenbaum testify as to who he sent it to?

A    Yes.

Q    Okay.  Did he send it to both bidders?

A    My understanding is he sent to both -- this exact email to both bidders at the same time.

Q    Okay.  Did -- to your knowledge, did either bidder after receiving this email saying this is what we're going to do, did either bidder object?

A    No.

Q    Okay.  Go to Exhibit 26.

A    Okay.

Q    What is that?

A    This is the bid package for the best and final round, the bid form and then some instructions.

Q    Okay.  And are these instructions meant to be tailored to this sort of best and final round concept?

A    Yes, exactly.  They were tailored for that last and best round.

Q    Did you review them before they went out?

A    I did.

Q    And then why was there a subsequent email sent at Exhibit 27?

A    Oh, this was an amended bid form.

Q    And you heard Mr. Tannenbaum testify about that, but did you -- do you remember that? Do you remember why that was done?

A    I do. I remember that we wanted to add groups on the bid form on 27. It's groups five, six, and seven. And it's some additional permutations and combinations of the bids. And my recollection is this was to tease out exactly what I referenced a minute ago, that maybe we would be able to sell some components to one bidder but not to the other. So, you know, maybe we carve out the inventory. Maybe we carve out the equipment. Maybe we'll get someone to bite on that so that -- you know.

Q    Is that just kind of to create flexibility to try to get higher prices?

A    Yes. Yes, for sure.

Q    And I think we talked a little bit about this, but did you ultimately get bids that for -- in the best and final -- I'm using best and final. I think I previously said highest and best, but in that final round, did you get bids from both of these parties?

A    I did.

Q    How many?

A    Two. One from each of those parties.

Q    Okay. And I think you testified about this already,

but I just want to make sure the record's clear. Between the first and second round bids, did you discuss the auction with either of the parties or either of the groups of bidders?

A No.

Q Between the first and second rounds, did you inform the bidders, either bidders -- either of the bidders of the contents of the others' bids?

A No.

Q Okay. Between the first and second rounds of the bids, did you inform the bidders of the identities of the other bidders?

A No.

Q Between the first and second rounds of bids, did either bidder object to the highest and best sealed bid process?

A No.

Q Okay. Let's go to Exhibit 18. What's -- are you familiar with that document?

A Yes.

Q What is it?

A This is First United's final bid form.

Q Okay. And if you go to -- well, what's this a bid for? Let's start with that.

A So, the bid form essentially makes six bids on groups two through seven in different amounts.

Q    Okay.  And the highest one, sort of in the middle of the numbers, the highest one is 3.5 million.  What do you understand that to be?

A    So, group four is kind of everything.  It's all the lots, and they bid 3.5 million for all the lots.

Q    Okay.  And the other line items that are lower, what are those meant to be?

A    Those are meant to be bids in lower amounts for subsets of all the lots.

Q    Okay.  And what is your understanding of what that means based on the bid form?

A    That I could choose to accept one of those bids for that subset if it, you know, sort of fit or maybe complemented what the other bid was.

Q    Okay.  Is this type of combination part of why this best and final round was -- or format was, in your view, kind of made it easier to manage?

A    Well, I'd say it makes it easier to maximize the value if the bidders ultimately want different types of things.

Q    You heard Mr. Tannenbaum testify.  Let me ask you, if you came -- this came into your thought process.  Were you also thinking about whether some of the items might be sold later?

A    Yes.  Well, that's possible, too.

Q    Okay.  And was there a mechanism under the winddown

order to potentially sell other assets that weren't sold as part of this IP auction process?

A   Yes.

Q   Okay.  Can you turn to Exhibit 19?

A   Okay.

Q   What's that document?

A   This is the Global Tetrahedron Connecticut Final Bid Form and letter.

Q   Was this on the revised bid form that was sent to the two bidders?

A   Yes.

Q   Okay, and it's got a dollar amount in two different categories.  What are those -- what does that signify?

A   It's $7 million and they're saying that they want Group 4 for $7 million and Group 5 for $7 million.  They bid the same amount on both.

Q   Okay, and did you understand this to be a $7 million cash bid?

A   No.

Q   Okay, and how do you know that?

A   Well, there's an asterisk that says, "Not less than $7 million as set forth in more detail in the bid letter."

Q   Okay, and what was the cash portion of this purchase going to be?

A   $1.75 million.

Q    And what was your -- I'm sorry.  I'll just go through here.  Let me go back and just ask you a question about the backup bid.  Was the bid amount of the backup bid on Exhibit 18, was that higher than their original bid?

A    Oh.  Oh, yeah.  It was, like, almost three times as much.

Q    Okay, and so, in your view, did that -- did the highest and best process work in the context of that bid?

A    It certainly got the bid up, yes.

Q    Yeah.  Okay, so the cash amount you said on Exhibit 19, you said was $1.75 million.  Was that also higher than the first bid?

A    Yes.

Q    Okay.  By how much?

A    The first bid was a million, so 75 percent higher.

Q    Okay, and how did you interpret the value of the distributable proceeds waiver?

A    So, I valued it in terms of, what are the non-Connecticut unsecured creditors going to get?  And I keyed that off of what they would have gotten under a $7 million bid.

Q    And did you base that on the statement in the bid form that it was no less than $7 million?

A    Yes.

Q    Okay, and are there inconsistencies within this bid

letter?

A    Yes because the reference to the distributable proceeds waiver talks about $100,000 more than what a competing bid would get.  But they don't know what the competing bid is when they do this, so I took them at the high end of the maximum of what that could be, which is the $7 million they put on the bid form.

Q    And did you -- if you go down to the bottom of the bid form, you see where it says -- where the two asterisks, it says, "Not less than $7 million"?

A    Yes.

Q    And then if you go to the first page of the bid letter, number 1, you see where it says, "Increased consideration of at least $7 million"?

A    Right.  That's what I see.

Q    And then down below that, you see where it says, "Over $7 million of cash consideration"?

A    Yes.

Q    Is that part of how you based your analysis of their claim on a $7 million notational value, as you referred to it?

A    Yes.

Q    Okay.  But as we talked about earlier, whether your interpretation applies or whether this mechanism that you said was in the letter, are both of them -- under your 96.7

percent analysis, are both of them significantly higher than

what non-Connecticut unsecured creditors get

(indiscernible)?

A     Right.  They're both better.

Q     And is the same true if you apply this test with the

75/25?

A     Yes.

Q     Is that how you assessed the value of the bids?

A     Yes, that's how I determined which one was the

successful bidder.

Q     And that's because you were assessing what the value

was to unsecured creditors, right?

A     That's right.

Q     Okay.  I think we already went through this, but you

filed, at Exhibit 11 -- go to Exhibit 11.  That's the notice

you filed of successful bidder?

A     Yes.

Q     Okay.  Does that notice say that you've already entered

into a contract with the successful bidder?

A     No.

Q     Okay.  At the time that you designated or filed this

document, have you transferred any assets to the successful

bidder?

A     No.

Q     Have you transferred any assets to them since?

A    No.

Q    Why not?

A    They haven't bought anything yet.  We haven't closed. The Court hasn't approved a sale.

Q    Okay.  At the time you designated the successful bidder, had you received the purchase price from them?

A    No.

Q    Okay.  Had you received any cash from them?

A    I got the deposit, the 120.

Q    Okay.  Have you since gotten the purchase price --

A    1,020.  It's one million or $100,000 from them.  Sorry.

Q    Have you since received the purchase price from them?

A    Yes.

Q    Okay, and how are you holding that?

A    I'm holding that in a segregated account.

Q    Okay.  Is that pending Court ruling on the sale?

A    Pending approval of the sale, if it happens, yes.

Q    Okay, and if it's not approved, what would you do with it?

A    I'll give it back.

Q    Okay.  At the time that you designated the successful bidder when you filed this notice, did you have an agreed asset purchase agreement yet?

A    No.

Q    Did you have an agreed asset purchase agreement with

First United at that point?

A    No.

Q    Okay.  Have you since negotiated an asset purchase agreement with the successful bidder?

A    Yes.

Q    Is that the document at Exhibit 13?

A    Yes, that we were discussing?  Yeah, that one.

Q    At the time that you designated the successful bidder, did you have an agreed timeline for things like removing assets and stuff like that?

A    No.

Q    Have you negotiated that since?

A    Yes.

Q    Okay.  At the time that you designated the successful bidder, did you have an agreement with respect to who would pay the costs and liabilities incurred between the time of executing and closing?

A    No.

Q    Have you since negotiated that?

A    Yes.

Q    Okay, and is that in the APA?

A    Yes.

Q    At the time you designated the successful bidder, did you know exactly what the amount of the distributable proceeds waiver was?

A      No.

Q      Okay, and have you since created more clarity as to that?

A      Yes.

Q      Okay, and I want to -- hold on one second.  Have you discussed anything else that's been negotiated since the designation of the successful bid with the bidder?

A      Yes.

Q      May I ask you something?  How could you designate a successful bid without knowing all of these things at the time that you designated them?

A      I mean, I never know what the final deal terms -- almost never know what the final deal terms will be at the time of an auction.  But I knew that any reasonable resolution of those pending items, whichever way it went, it was still going to be the better bid.

Q      But if some of these lingering items that were being negotiated still, as I think you pointed out, that's common.  If, in the negotiations, if ultimately you came to the conclusion that something changed in a way that made it not as good as the First United bid, what would you be doing at this point?

A      It would depend on what it is and how and why.  But if it was no longer in the estate's best interest, I could pull the motion.  I'd stop it.

Q    Okay, and in your experience in bankruptcy auctions and sale processes, are all sales terms known at the time that the auction concludes?

A    Usually not.

Q    Okay.  Have you ever been a part of sale of a company that had ongoing operations?

A    Yes.

Q    And is it -- does that tend to be a more complex transaction?

A    Yes.

Q    And have you ever, in the context of selling a going concerned business, have you ever designated a winning bidder at an auction despite the fact that there were things like post-closing price adjustments and things like that?

A    Yes.

Q    Okay, and that didn't stop you, in those situations, from designating the bidder as the high bidder?

A    No, and then filing a sale motion?  No.

Q    Okay, and when you're in that situation, assessing bids, how do you make a determination if the bidders have purchase terms that include things like purchase price adjustments?

A    Well, I sort of estimate what the range of outcome is and see if it makes sense to proceed with them or not.  I mean, if there's not enough clarity to make that

determination, I won't go forward with the sale motion.

Q    Why do you think that there was enough clarity here to make that determination?

A    Because we had just run a competitive process.  Only two people showed up to bid and under all of those different scenarios and permutations, one was just better than the other.

Q    Was it better by a significant margin?

A    By a lot.

Q    Okay, and at the time that you designated -- I think you may have answered this already, but at the time you designated the successful bidder, did you anticipate returning to Court to get the final terms of the sale approved?

A    Yes.

Q    Okay.  So, you knew you didn't have everything worked out at that moment in time that you designated them, right?

A    Right.

Q    Okay.

A    Yes.

Q    And did you expect that the same thing would have been true for the First United bid?

A    Yes.  That would have been true for them, too.

Q    Okay, because you had not resolved -- you hadn't completely negotiated and come to terms on a sale motion,

excuse me, an asset purchase agreement, that's what I meant.

A    Right.  We didn't have an agreed APA with First United either.

Q    And when you've been in asset sale transactions in bankruptcy, in your experience, which party typically drafts the sale order?

A    The buyer usually does that.

Q    Okay.  Is that what happened here?

A    Yes.

Q    Okay, and have you looked at the motion -- sorry, the order that was attached to the motion?

A    Yes.

Q    I think that that is Exhibit 12.

A    You mean our original proposed order?

Q    The original proposed order, yes.

A    Okay.  Which tab did you say?

Q    Exhibit 12.

A    Okay.

Q    First off, when did -- do you understand that the successful bidder had a different view than your view of this calculation right here?  The calculation of the distributable proceeds waiver and what impact it had on the consideration?

A    Yes.

Q    Okay.  When did you first learn of that?

A    Sometime after we designated them the successful bidder.

Q    Okay.  Before filing the motion, did you get a resolution on that?

A    Yes.

Q    Okay.  What was the resolution?

A    The resolution was they agreed with my interpretation.

Q    Okay.  So, the resolution was this, instead of this?

A    Exactly.

Q    So, it's kind of -- I'm sorry (indiscernible)

A    Sorry.  These numbers.

THE COURT:  Can you just say the numbers out loud, Mr. Wolfshohl, just so we have a clean record?

MR. WOLFSHOHL:  Yeah, yeah.  I will.

BY MR. WOLFSHOHL:

Q    So, I'm going to start with your assumption, which was the 96.7 percent analysis.  It's a difference between $210,000 going to general unsecured claims versus $194,000.

A    Right.

Q    Okay, and then in the stress test analysis of 75/25, it was a difference between $1 million going to general unsecured creditors versus $788,000, right?

A    Yes.

Q    Okay, and so, before filing the motion, did you understand that this was agreed to, this number?

A     Yes.

Q     Okay.

          MR. BROOCKS:  This number -- I'm so sorry.

          MR. WOLFSHOHL:  I'm sorry.

BY MR. WOLFSHOHL:

Q     The distributable proceeds waiver being enough for the non-Connecticut creditors to get $210,000 in the scenario of 96.7 percent, and a million in the scenario of 75/25?

A     Yes.

Q     Okay.

          MR. BROOCKS:  Your Honor, I'm going to object to that.  (a) that's completely (indiscernible) ambiguous.  I don't understand a word he just said.  Partly, maybe because my angle is not great.  I would -- this is a very important point.  I would ask that be restated in a succinct way by the witness.

          THE COURT:  I understood it.  We can proceed.

          MR. WOLFSHOHL:  Okay.

          THE COURT:  It's just the two numbers, all right. He understood those two numbers to be the deal.  That's --

          MR. WOLFSHOHL:  That's right.

          THE COURT:  That's the simple way of --

          MR. BROOCKS:  Both or one or the other?

          THE COURT:  His understanding of under -- both. My understanding is his understanding of under the 96.7

percent or the 75/25, he understood, under the 96.7, under that scenario and under that scenario.  That's what he testified to.  I'll let you cross him on it.

MR. BROOCKS:  Okay.

BY MR. WOLFSHOHL:

Q    And is there a mistake in the sale order, from your standpoint?

A    Yes.

Q    Okay.

A    Well, the original proposed sale order, yeah.  There's a mistake.

Q    Okay, and if you go to Exhibit 12.  The sale order is kind of in the middle of that document.

THE COURT:  Which exhibit?

MR. WOLFSHOHL:  It's Exhibit 12, Your Honor.  It's the motion in front of you --

THE COURT:  Ah, yes, yes.  I just have the motion. Are you saying there's a --

THE WITNESS:  This isn't the order.  This is just the motion.

THE COURT:  Yeah, yeah.

MR. WOLFSHOHL:  Exhibit 12?  You don't have the whole thing?  I have that in mine.

THE WITNESS:  The proposed -- it's not in my book.

THE COURT:  It's not in my book either.

THE WITNESS:  I mean, it's on the docket.

MR. WOLFSHOHL:  I'll tell you what, let's do this. (indiscernible) It is my Exhibit 28.  I think it might have been in my -- I have it in my book, Your Honor.  I don't know what the issue is there.  But could we pull it up on the docket?  There you go.  (indiscernible) and when you go to Page 5 --

MR. BROOCKS:  Which exhibit number?

MR. WOLFSHOHL:  Exhibit 12.

MR. BROOCKS:  (indiscernible)

THE COURT:  Well --

MR. BROOCKS:  (indiscernible) clearly numbered.

THE COURT:  Mr. Wolfshohl, let me ask.  Maybe now is a good time to do that, to just take a 5-10 minute break. How much longer do you think you've got?

MR. WOLFSHOHL:  Not much longer, but I wouldn't mind taking -- I'm actually kind of tired from standing, so I wouldn't mind taking like maybe 10 minutes.

THE COURT:  What does "not much longer" mean?

MR. WOLFSHOHL:  15 or 20 minutes.

THE COURT:  Okay.  Yeah, let's just take a break. Mr. Murray, I'll remind you that you're still under oath and we'll proceed, and I'll let the parties figure out the order.  Thank you.

CLERK:  All, rise.

(Recess)

CLERK:  All, rise.

THE COURT:  Please be seated.  Okay.  We are back on the record.  Mr. Murray, I'd remind you that you're still under oath.

THE WITNESS:  Thank you, sir.

THE COURT:  Okay.  Mr. Wolfshohl, whenever you're ready to proceed, you may proceed.

MR. WOLFSHOHL:  Thank you, Your Honor.

THE COURT:  Ms. Starling, I guess I should ask you, do I need to make you the presenter again?

MS. STARLING:  Yes, please.

THE COURT:  Okay.  Not a problem.  Mr. Wolfshohl, can you just give me one moment, I'm going to --

MR. WOLFSHOHL:  No problem, Judge.

THE COURT:  Well, you may already be the --

MS. STARLING:  I am.  Thank you.  Thank you, Judge.

THE COURT:  Okay.

MR. WOLFSHOHL:  Am I okay proceeding, Your Honor?

THE COURT:  Yes, absolutely.  Whenever you're ready.

MR. WOLFSHOHL:  Oh, I'm sorry.  I wasn't sure.

THE COURT:  No worries.  No, no.  I apologize.  I should have been clearer.  Thank you.

MR. WOLFSHOHL:  Oh no.  It's okay.  I think we were talking about the proposed sale order that got uploaded with the motion.  And I think Ms. Starling has that up on the screen now.

THE COURT:  I don't think so.  But maybe I'm wrong.

MR. WOLFSHOHL:  (indiscernible)

THE WITNESS:  I see it on mine.  It's the motion that we are here on, 915, it's 915.

MS. STARLING:  Oh, it's the wrong one.  Sorry about that.

MR. BROOCKS:  Your Honor, I tried to make a point of this earlier during the break, but they gave us, originally, their exhibits.

THE COURT:  Mm hmm.

MR. BROOCKS:  And Exhibit 12 was the entirety of your docket number 915.  They gave amended exhibit lists the night before, or Sunday night.  Exhibit 12 in their new exhibit list, which amends the previous one, does not include anything other than the motion itself, 915, without any of the 1-2-3-4-5-6-7.  So, there's not going to be -- he's talking now -- unless you're going to put --

MR. WOLFSHOHL:  No, no.  I'm willing.  Let's just make it Exhibit 30.  Okay?

MR. BROOCKS:  (indiscernible)

MR. WOLFSHOHL:  Can we just make it 30, Your Honor?  Because we inadvertently called -- yeah.

THE COURT:  I'm easy.

MR. WOLFSHOHL:  Okay.

THE COURT:  30 it is.

MR. WOLFSHOHL:  Let's go with 30.  Okay.  Let's mark this Exhibit 30.

THE COURT:  Okay.

MR. WOLFSHOHL:  Everybody needs to tell me if I say 12 accidentally because that's what I'm looking at in my book.  So --

THE COURT:  Can you just identify the docket number so that we can clearly identify 30.

MR. WOLFSHOHL:  It's -- yes, Your Honor.  It's 915 with all of the attachments to it.

THE COURT:  Okay.

MR. WOLFSHOHL:  So --

THE COURT:  You got it.

MR. BROOCKS:  And this order is specifically 915-8.

MR. WOLFSHOHL:  That's right.

THE COURT:  It's the 915-8, the order, along with all attachments to the order?

MR. WOLFSHOHL:  That's right, Your Honor.

THE COURT:  Okay.  Thank you.

BY MR. WOLFSHOHL:

Q    So, prior to filing the motion, had you reached a resolution of this discrepancy in the way that the distributable claims or proceeds waiver was calculated?

A    Yes.

Q    Okay, and you reached that agreement with the Connecticut Families and Global Tetrahedron?

A    Yes.

Q    Okay, and the motion got filed, and as you know, the motion describes it the way that we had been talking about it.  Am I characterizing that right?

A    Yes.

Q    Okay.

          MR. BROOCKS:  Objection.

          MR. WOLFSHOHL:  And I'll clarify.

BY MR. WOLFSHOHL:

Q    When you look at Exhibit 24, when I talk about what we've been talking about.  You see Exhibit 24?

A    Yes.

Q    Okay.  What I'm talking about is these calculations that you ran based on your understanding of how to calculate the distributable proceeds waiver.

A    Yes.

Q    Okay, and is it your understanding that when you filed the motion and you described it this way, that there was an

agreement that that was how it was going to work?

A    Yes.

Q    Okay.  But you do -- or do you understand that, before you reached that agreement that they had a different view of it?

A    Yes.

Q    "They", being the Connecticut Families and Global Tetrahedron.  And is their definition of it what's in the sale order that was uploaded in 915?

A    Yes.

Q    Okay, and why is that?

A    It's because they drafted the sale order, and we did not notice that that had not been updated by the time we filed the motion.

Q    Okay.

THE COURT:  It's your fault, Kimpler.  I'm blaming you, Mr. Kimpler.

MR. KIMPLER:  Guilty.

MR. WOLFSHOHL:  Judge, I appreciate that.  It's probably more my fault than it is Mr. Kimpler's fault.  And so, if you go to Page -- Ms. Starling, can you go to Page 5, just to sort of point out the mistake?  Yeah, it's that paragraph right there.  You see where -- the one at the bottom.

THE WITNESS:  That was Paragraph H?

MR. WOLFSHOHL:  Yeah, it's H.

MS. STARLING:  (indiscernible)

MR. WOLFSHOHL:  Yeah, that's it.

BY MR. WOLFSHOHL:

Q    Do you see that, where it says -- where it has the definition of distributable proceeds waiver amount?

A    Right.  That's talking about the $100,000 more.

Q    Okay, and so, in your view, was this just filed in error and we didn't catch it?

A    Yeah.

Q    Okay.

A    That should have been updated.

Q    Is this method of calculating it what we talked about over here?

A    Yes, that's --

Q    And when I say, "over here", I'm talking about on this chart.  Not the way that we interpreted it, which is the middle chart, which shows it as -- we'll do this for Mr. Broocks.  210 to unsecured creditors or a million, depending on where the claims fall in this range.  But it's the -- the calculation that's in the order we uploaded is the 194K thousand, the 788,000.  Is that essentially where the discrepancy lies?

A    Yes.

Q    Okay, and I think we talked about it yesterday, but

there's been a -- has there been a revised order uploaded since?

A     Yes, there has been.

Q     Yeah, and does that address a number of issues?

A     Yes.

Q     Okay, and that was filed -- that's not an exhibit, right?

A     I don't know if it is.

Q     Okay.  It was -- I think it was uploaded well after the exhibit filing deadline.  But is the order that was filed at Docket 974, is that what you're asking the Court to approve?

A     Yeah.  Whatever our most recent sale order is.  That's it, yeah.

          MR. WOLFSHOHL:  Could you pull that up (indiscernible)?  Your Honor, I'm going to pull up the revised order.  Actually, pull up the redline.  Okay.  I'm going to pull that up just so Your Honor can see what it is that changed.  All right.  It looks like it's up.  Okay.

BY MR. WOLFSHOHL:

Q     First off, is this the only -- the change I'm talking about, is that the only change that got made to the revised order?

A     No.

Q     What other changes got made?

A     I think there were changes to resolve the X Corp.

objection.

Q    Okay, and are those reflected in this redline?

A    I can't see it right here, but my understanding is that yes, they're in there.

Q    Okay.  Is that -- do you remember us talking about that with Ms. Reckler at the beginning of the hearing yesterday?

A    Yes.

Q    Okay.  Were you involved in that process?

A    Yes.

Q    Okay, and are you asking the Court to approve a sale order that includes the changes that deal with the X Corp. limited objection?

A    Yes, I am.

Q    Okay.  If you go to Page 6.

        MR. WOLFSHOHL:  Can you scroll so that we could see the entirety of (indiscernible)?  Is that possible?

BY MR. WOLFSHOHL:

Q    Is that the revision to the definition of distributable proceeds waiver amount?

A    Yes, this is still Paragraph H?

Q    Yes.

A    Okay.

Q    And who drafted this revision?

A    I think we drafted it together.

Q    And --

A    Connecticut Families.

Q    Okay, and what's different about this than what we calculated here?

A    So, this is a little more precise and a little better for the non-Connecticut Families than what we described in the motion.

Q    Okay.  Was this meant to deal with the reservation of rights that was filed by the Texas Plaintiffs?

A    Yes.  My understanding is, Connecticut proposed this exact formulation in an effort, in part, to resolve that reservation of rights.

Q    Okay, and you see where it says, "an amount greater than 750"?  Where does that number come from?  Does it just come out of nowhere or what's the purpose of that number?

A    So, as I understand this, they're committing to a floor of 750 for the distributable proceeds waiver amount.  But -- and that's based on the conservative assumptions in Paragraph 43, that's the 75/25 we've been talking about as Paragraph 43 and that chart.  But it's preserving Texas' right to say, "Well, actually the percentages turned out even more in our favor, so we should get more than 750." So, that potential up-side is preserved for Texas.

Q    Okay.  So -- and just to tie Paragraph 43 to the exhibit that we've been talking about.  If you go to Exhibit 24, it's not what we called the sort of stress test or

conservative calculation, that 75/25 that we talked about (indiscernible)?

A     Yes.

Q     Okay, and so, if you look at that -- is this number at the bottom where it says, "distributable proceeds waiver" and it says $750,000?

A     Yes.

Q     Is that where that number comes from?

A     Yes, and that's basically Connecticut giving all of the proceeds they would get under the 75/25, under the winning bid to the non-Connecticut creditors.

Q     So, it's basically setting a floor at the conservative estimate that you had on what would be distributable at a 75/25 split?

A     Yes.

Q     Okay, and that's meant to -- was that meant to address the reservation of rights?  Is that your understanding that Texas claimants filed?

A     Yes.

Q     Okay, and it preserves their right to come back and say, "Wait a minute.  75/25 is not right.  It's 50/50.  It should be even higher"?

A     Yes, that's how I read that.

Q     Okay, and so, have you calculated how that impacts the effect on creditors relative to these numbers here?

A    Yes.  Yes, I have.

MR. BROOCKS:  Your Honor, I'd object.  He keeps saying, "these numbers here" (indiscernible)

MR. WOLFSHOHL:  I'm sorry.  I'll point it out.  I have --

MR. BROOCKS:  (indiscernible)

MR. WOLFSHOHL:  No, no.  I have a whiteboard here.

MR. BROOCKS:  And the record certainly won't -- the record will not reflect (indiscernible)

MR. WOLFSHOHL:  I'll do a little bit better now.

THE COURT:  Okay.

BY MR. WOLFSHOHL:

Q    So, this whiteboard that you and I have been working on that lists what creditors get in each of these scenarios?

A    Yes.

Q    Okay.  We have three columns.  One is analyzing what they get with the First United bid.  We have a middle column, which is your assessment at the time that you analyzed these bids of what unsecured creditors, other than Connecticut, were getting under the bid.  And we compared those to the First United bid under each of these scenarios. Then we also analyzed it under this corporation of the mechanism that we didn't agree with or the bid that we didn't -- where we had a disagreement as to the interpretation.  That's this one that shows the 100,000

over, right.  And then I'm going to create a last column, and this is the sale order.  So, this is based on what Connecticut Families agreed to do, in part, to resolve -- well, in part, to clarify the sale order that had the wrong description.  That was part of it.  But also, to resolve the Texas claimants' reservation of rights filing.  And I want to calculate what the numbers are with that, if you have 750 as a floor.

A     Okay.

Q     So, looking at Exhibit 24.

A     Okay.

Q     You can't do it exactly because we didn't run this calculation because we didn't know that they were going to do that.  But if you're at 96.7 percent, what I'll call the base case, do you know how much -- if you have a 750,000 floor, how much the non-Connecticut creditors get?

A     Yes.  I can figure that out.

Q     Okay, and how would you figure it out?

A     So, on Exhibit 24, starting with that base case, the first chart with the 96.7, the one that creates that scenario, under the winning bid column, I can see that the non-Connecticut creditors are already getting 36,300 and to that, I would add the waiver of 750.

Q     So, what does that come to?

A     That comes to 786,300.

Q   Okay.  What about if you have the sort of conservative stress test analysis of 75/25?

A   Yeah, and in the stress test scenario, the gift class recovery is a million because it's the 250 that they were already getting under that scenario, plus the 750.

Q   Okay.  So, it doesn't change on the 75/25, basically?

A   Right.

Q   It just (indiscernible) Connecticut remains at 95-plus percent of the claims?

A   Yes, that's right.

Q   Mr. Murray, do you have a -- do you care who wins this auction or who wins the bidding rounds?

A   No.

Q   Okay.  Are there creditors in your case that do?

A   Yes.

Q   How do you know that?

A   They've told me.

Q   And when you say, "they", who do you mean?

A   I'm talking specifically about the Connecticut Families.

Q   Okay.  When did you first learn that they care about that?

A   Very early on after my appointment.

Q   Okay.  Have they asked you to give them a veto right over who you sell to?

A      Yes.

Q      How have you responded to that?

A      I've refused to do that.

Q      Okay.  How many times have you refused?

A      Many times.  The request has been made many times in many ways.

Q      How have you approached this instead?

A      I've conducted an open process.  I haven't excluded anyone from participating.

Q      Have you continued to let the business keep running in the process?

A      Yes.

Q      From the beginning of your appointment?

A      From the beginning, we've let the business continue to operate because I've always known that there is a possibility that somebody might buy it to keep it in place.  And so, of course, I was preserving the assets for that possibility, as well.

Q      Do you believe that you applied any bias to either bidder?

A      No, no bias.

Q      What is your goal in the sale process?

A      I'm trying to maximize the recovery for the unsecured creditors of FSS.  That's it.

Q      Is timing of the essence or is time of the essence in

trying to get to a finish line on the sale?

A    Absolutely.

Q    And why is that?

A    For a couple different reasons.  One, both the successful bidder and my backup bidder have both expressed an interest in closing very quickly.  And also, because -- particularly because the identity of the successful bidder is known, there's a considerable amount of tension within the operations of FSS and uncertainty among the employees.  And the longer that situation goes on, the more untenable it gets.  So, I'm very interested in wrapping this up one way or the other as soon as possible.

Q    Any other things that make it important to move quickly?

A    I suppose since it's a Chapter 7 case, not a Chapter 11, the guidance that I receive, as a trustee, is to try to monetize assets as quickly as practicable.

Q    What about the location where the operations are run, is that a leased location?

A    Yes.  FSS operates out of a leased location.

Q    Okay, and is there also -- are there also concerns about the timing of that lease?

A    Well, the lease expires at the end of this calendar year.

Q    So, December 31?

A     Yes.

Q     Okay.  So, later this month.  I don't have it as an exhibit, but have you -- did Mr. Cicack provide you with a new offer from First United?

A     I viewed it, sort of, as a revised offer.  But yes, he did.

Q     Okay, and when did you receive that?

A     I think just one or two days ago.

Q     Okay, and I'm sure he's going to ask you about it, but can you describe its contents, generally, to the Court?

A     So, it was a letter that said, "We're offering the $3.5 million we've been offering, but we are also now going to offer --", I think it was $500,000, "-- to the non-Connecticut plaintiffs."

Q     In addition to the $3.5 million?

A     Yes.

Q     Do you think that you can accept an offer that earmarks money for a group of creditors without the one you're not paying consenting?

A     No, and it's for the same reason I rejected that future revenue provision that would have gone just to the families. If it's going to go through the bankruptcy process and through a bankruptcy sale, all the creditors in a class have to be treated the same or consent.  It's how I understand it, and I understand that the Connecticut Families do not

consent to not receiving what their pro rata share would have been (indiscernible) gives 500 to the non-Connecticut Families.

Q   But in the sale that you're proposing to the Court, is what's significant about that, the fact that they are consenting in that scenario?

A   Yes.  It doesn't work without Connecticut's consent.

Q   Do you have any control over that?

A   None.

Q   Okay.  What are you asking the Court to do today?

A   I'm asking the Court to approve my proposed sale to whom I've designated as the successful bidder on the terms of the proposed APA and with the provisions in our revised sale order.

MR. WOLFSHOHL:  Your Honor, I'll pass the witness.

THE COURT:  Thank you.

MR. BROOCKS:  Your Honor, with your permission, what I'd like to do is take a picture of, with the new column added, and then mark that as an exhibit so we can talk -- I'll look at it as the record has got to be clear.

THE COURT:  You can take the picture.  I'll let you try to move it in, and I'll see what people want to do.

MR. BROOCKS:  Okay.

MR. PATERSON:  And Your Honor, we have just a few questions for this witness.  Happy to do them now, happy to

do them after Mr. Broocks.  We defer to the Court on that.

THE COURT:  Yeah.  I'm going to let him take the picture, just so he's not standing in your way, and then I'll let you ask.

MR. PATERSON:  Thank you.

THE COURT:  Counsel, if you can just state your name for the record, and you may proceed whenever you're ready.

MR. PATERSON:  Certainly, Your Honor.  Paul Paterson from Paul Weiss for the Connecticut Families.

DIRECT EXAMINATION OF CHRISTOPHER MURRAY

BY MR. PATERSON:

Q   Good afternoon, Mr. Murray.

A   Good afternoon, sir.

MR. PATERSON:  Your Honor, could I hand up a couple of copies of Mr. Jones' objection to the sale motion?  I just want to ask the witness about an item on it.

THE COURT:  Sure, as long as the other side has seen it.

MR. PATERSON:  It's Docket 969.

THE COURT:  All right.

MR. BROOCKS:  Is it an exhibit?

MR. PATERSON:  It's Docket 969.

MR. BROOCKS:  Is it an exhibit?  I said.

MR. PATERSON:  I don't think it's an exhibit, no.

MR. BROOCKS:  I'm going to go have to dig that up if you don't mind waiting.

THE COURT:  Yeah.  No, no, no, absolutely.  Why don't you take one of the copies?  I can pull it up here on the docket.

MR. BROOCKS:  Thank you.

THE COURT:  No, you can hold on to it.  Yeah, my gift.

BY MR. PATERSON:

Q   And Mr. Murray, when the Court's ready, if I could ask you --

THE COURT:  Whenever you're ready, counsel.

MR. PATERSON:  Thank you, Your Honor.

BY MR. PATERSON:

Q   Turn to Paragraph 38.  It's on Page 17 of 29.

A   I don't have a copy.

Q   Oh.  I apologize.  Here's mine.

THE COURT:  Which paragraph, counsel?

MR. PATERSON:  Paragraph 38, Your Honor.

THE COURT:  All right.

BY MR. PATERSON:

A   So, this is the corrected objection?

Q   And I should ask you, just turning to the 5th page, what is this document?

A   This looks like it's Docket 969, the corrected

Alexander E. Jones response and objection to the trustee's expedited motion for entry of an order in furtherance of the sale of assets of Free Speech Systems, LLC.

Q    Thank you, and if I could ask you to turn to Paragraph 38.

A    38.

Q    It's on Page 17 of 29.

        MR. BROOCKS:  Your Honor, I would object to this. This isn't his document and he hasn't even asked (indiscernible)

        THE COURT:  It's your pleading, isn't it?

        MR. BROOCKS:  I know it is, but he hasn't asked the foundational question, "Have you ever seen this before? Have you read it?" (indiscernible).  At least it would be nice to know he's seen the document.

        MR. PATERSON:  Just asking about a statement in the document, Your Honor.  Just --

        THE COURT:  I'll overrule.

        MR. BROOCKS:  (indiscernible) has he read it?  Has he seen it?

        THE COURT:  I'll overrule.

BY MR. PATERSON:

Q    You'll see, Mr. Murray, in Paragraph 38, do you see the sentence that starts with the bolded word, "Importantly, each of these issues or all of these issues have been

resolved between Jones and FUAC through Jones' commitment to continue to be employed and continue to work and develop the co-interest in all FSS property purchased by FUAC that have not been pursued or resolved by the trustee."  Do you see that sentence?

A     I do.

Q     And my question for you is, do you know anything at all about Mr. Jones' co-interest in the FSS property purchased by FUAC under the terms of its bid?

A     Nothing beyond --

MR. BROOCKS:  Objection.  That mischaracterizes what that says, Your Honor.

THE COURT:  Yeah.  It says -- the document says what it says.

MR. PATERSON:  Should I --

MR. BROOCKS:  There's no term "co-interest" in that sentence.

THE COURT:  Yeah.  I didn't read that word either.

MR. PATERSON:  Third line, Your Honor.  "Continue to work and develop the co-interest in all FSS property purchased by FUAC."

THE COURT:  Now I do see it.  Yeah.

BY MR. PATERSON:

Q     Do you know anything about the co-interest of Mr. Jones and FSS Property purchased by FUAC?

A    No, I don't know anything about that.

Q    And more generally, do you know anything about --
anything at all about the arrangements between Mr. Jones and
First United concerning the First United bid?

A    No, I don't.

Q    Do you know if Mr. Jones has worked with First United
as part of its bid?

A    I gather that now, but no, I don't know that for a
fact.

Q    And what do you know about that?

A    Nothing.  In fact, the only thing I know for sure is, I
was told multiple times before the bidding started, that
there was no agreement between the two.

Q    And do you know whether that was correct or not?

A    I don't have any reason to doubt it.  There might be an
agreement now.  I just don't know.

Q    If I could ask you to turn to Page 11 of this
objection.

A    Okay.

Q    You see the statement, it's about halfway down, just
under the blue highlighted text, saying, "The Sandy Hook
tragedy has not been a topic of Alex Jones' broadcasts and
opinions for many, many years"?  Do you see that statement?

A    I see that sentence, yes.

Q    And do you know that Mr. Jones talked yesterday on his

show about how he was neither going to stop exposing the Sandy Hook families?

A    I was not aware that he said that on his show, if he did.  I just don't know.

MR. BROOCKS:  Objection (indiscernible)

THE COURT:  Yeah, it's hearsay and I'm not sure it's relevant either.

MR. PATERSON:  And like I said, no further questions, Your Honor.

THE COURT:  Thank you.  Does anyone else, I should say?

MR. CICACK:  No questions here, Your Honor.

THE COURT:  Okay.

MR. BROOCKS:  All right, Your Honor.  Thank you.  I'm teasing.  I'm teasing.  Thank you.  So, may I proceed, Your Honor?

THE COURT:  Yes.  We'll proceed with cross-examination.

CROSS-EXAMINATION OF CHRISTOPHER MURRAY

BY MR. BROOCKS:

Q    Yeah, Mr. Murray, I want to first (indiscernible)

THE COURT:  Before you begin, Mr. -- I just wanted to just do a little bit of housekeeping.  I'm going to give folks, for closing, 20 minutes per table.  Just get your statements together, 20 minutes per table.  You all figure

out how you want to do it.  I'm not going to listen to anything else.  I will put everyone on a timer.  You all can split it up.  Depending on where this goes, I'm comfortable with where we are now.

MR. CICACK:  Your Honor, just as a housekeeping, I don't know how long Mr. Broocks (indiscernible)

THE COURT:  Well, that's why I'm going to let you talk to him.  He talked a lot there in the opening.  So, we'll limit him on closing.

MR. BROOCKS:  Are we talking about cross, Your Honor?

THE COURT:  Yeah.  I'm talking about -- cross is fine.

MR. CICACK:  But what I wanted to suggest is, I don't know how long Mr. Broocks has, but I believe I'm going to have at least two hours.

THE COURT:  Of cross?

MR. CICACK:  Yes.

THE COURT:  Yeah.  No, we're finishing tonight.  I don't care if we leave at 11.

MR. BROOCKS:  (indiscernible)

THE COURT:  We're not trying to jam you.  It was a three-hour direct, so I can -- I'm going to give you as much time as you want to cross.  I didn't want to jam them on time and I'm not going to jam anyone on cross.  What I am

saying is, closing I can control.

MR. BROOCKS:  Understood, Your Honor.

THE COURT:  That's where we're going.

MR. BROOCKS:  I just wanted --

THE COURT:  And I'm not bringing anyone back tomorrow.  No, we're done today.

MR. BROOCKS:  Okay, Your Honor, I'm going to -- do I have the presenter, Your Honor?

MS. STARLING:  (indiscernible)

MR. BROOCKS:  I think I do.  I've got the (indiscernible)

BY MR. BROOCKS:

Q   Now just again, as a matter of clarity, I was trying to figure out how to make the top -- this is the picture that I took of the chart that Mr. Wolfshohl was discussing.  Would you just take a look at what I've got up on the screen and compare that to the chart so I can mark -- you can confirm that it's an accurate picture.

A   Yeah.

Q   Okay.

A   Yeah, it's accurate.

MR. BROOCKS:  And Your Honor, I would like to introduce this as Jones Exhibit 18.

MR. WOLFSHOHL:  No objection, Your Honor.

THE COURT:  No objection to the admission of the

(indiscernible) All right.  It's admitted.

(Exhibit 18 entered into evidence.)

MR. BROOCKS:  I'll try one more time to make this -- it's coming up small.

THE COURT:  Mr. Broocks, I'm just going to ask that you just, kind of, make sure either you speak into the mic or speak loud enough for the mic to catch you, or I'll angle it for you, just so we can all hear each other.  I want to make sure we have a good record.

MR. BROOCKS:  Yes, Your Honor, and frankly, what I just said was probably more to myself than anything else.  But I was going to try to make the top part, I just can't figure out how to do it, but the line -- the blue line here on Exhibit 19, I believe I said, is -- or I'm sorry, yeah, 18.

THE COURT:  Okay.

MR. BROOCKS:  Is it 18, Judge?  I forgot what I said.

THE COURT:  I think you said 18.

MR. BROOCKS:  Okay.  I thought so, too.  But on Exhibit 18 --

THE COURT:  We will just confirm it.  To the extent it's not, we will -- I think I'm comfortable correcting the record just to make sure it's the latest number.

MR. BROOCKS:  Okay.  So, on Jones, yeah.

THE COURT:  Yes.

BY MR. BROOCKS:

Q    So, above the blue line, the numbers, I'm going to call, grouping A and then below the blue line, B, just so -- and he's got Exhibit 24 here, but that's just so you and I, again, for clarity to move things along.  Okay?

A    All right.

Q    All right, now, and I will come back to this, but explain to us, very, very briefly, because I am going to come back to it in some detail.  What is this chart below the line, the blue line, the B chart, so to speak?  What is that, did you say now?  Tell me again, what is it?

A    So, below the line, the numbers indicate the recoveries for the non-Connecticut creditors under different scenarios.

Q    Now, I want you to look at Exhibit 12.  Now, Exhibit 12 is your motion filed on November the 18th asking this Court on Monday, the 18th of November to approve your deal with Tetrahedron and Connecticut Plaintiffs, correct?

A    Yeah, this is the motion to approve the sale.

Q    Right, and it contains two charts, one on Page 14 and one on Page 15.  Correct?

A    Yes.

Q    Now, going back to Exhibit 18, which was the document that you and Mr. Wolfshohl spent a lot of time on, the

bottom part, the B part here, which of these two charts corresponds with or relates to what's in Exhibit -- I mean, the two charts on Exhibit 12 relate to Exhibit 18, Jones Exhibit 18.

A     So, the Page 14 chart relates to that first row under the headings.

Q     Okay.  Let me just pull this up real quick.  So, okay now, you're saying the first now, and now I'm focusing on the screen.  I've got Exhibit 18 up, which is your motion for the judge to enter it.  And I'm going to take you to Page 14 of that and now you're telling us that the chart on Page 14 of Exhibit 18 relates to which row on Jones 18?

A     The first row.

Q     This GTCT?

A     No, that's a column.  It's the first row under the headings.

Q     FUAC?

A     That's a column too.

Q     Which row?  Just tell me -- tell me which row.

A     Rows go horizontally, so I'm referring to the row under the headings.

Q     I'm on that (indiscernible)

A     The one that starts with the 96.7.

Q     Okay.  This here, the 96.7.  This row.  Which row does that relate to on Exhibit 12?  Your Exhibit 12?

A    It doesn't.  It relates to the chart as a whole.  You asked what they relate to, but they're not the same chart.

Q    Well, help us, as I try to understand and correlate the row -- the chart on Page 14 of Exhibit 12 to what you've shown the Judge on Jones 18.  Where -- we marked on it, but the 96.7, 94,210, 194 -- show us on Page 14 of the exhibit where those numbers can be found.

A    Oh, okay.  So, using the assumptions that underly this chart, the 96.7, what the whiteboard is showing is the recovery for the non-Connecticut creditors.  And then that first column, the FUAC column, there's a 94,000, that corresponds to what's called the gift class share on the chart on Page 14.

Q    So, I'm going to do this, the gift class 94,000, you rounded it, it's 94,000.  Is that the number right there of the gift class shares on the first column of Exhibit 12?

A    That's where that number comes from, yes.

Q    Okay, and by this, you're intending to show what?  I'm looking now at Exhibit 12.  What does that Exhibit 12 show in that column?

A    So, Exhibit 12 is showing, under the backup bid, and under these assumptions, how much money the non-Connecticut creditors get and that's where you get the 94,000, which is rounded in the whiteboard chart.

Q    And let's be clear, that means, on the assumption that

the Connecticut plaintiffs had 96.7 percent of the claims, everybody else got 3.3 and you've got $650,000 of the administrative claims, taking First United's backup bid, you say 3.3 percent of that is $94,050?

A    Right.  That's what the non-Connecticut creditors get.

Q    Okay.  Now take us to the column on -- again, I'm backing back and forth here in the Jones GTCT (indiscernible) the column that says GTCT and then the row that says 210,000.  Where do I see that on this chart?

A    So, that is -- if you look at the winning bid cash equivalent column, that's what you've just highlighted.

Q    I see.  So, you were just rounding up on Exhibit --

A    Just rounding (indiscernible)

Q    I see.  And I'm going to come back to that.  Now, well tell me, how did you get 210,000 again, under the GTCT?

A    So, it's assuming a $7 million cash equivalent bid and then applying the 96.7 and then the 3.3 percent to find out what the non-Connecticut creditors would receive in that scenario.

Q    Well, I don't understand.  How did you come up with 210,000, 209,500?  Give me the numbers you derived that from.

A    Well, they're in the column there.

Q    Okay.

A    $7 million is the (indiscernible) purchase cash or

actually, it's cash, minus the administrative costs.  Then you get the net purchase cash.

Q    Which is $6.5 million, 6.35.

A    Right, and then that's what goes to the creditors.  And then you multiply by the percentage share of the creditor pool to find out that Connecticut gets $6.1 million there and then the non-Connecticut creditors get the 209,550 and then that number is just repeated below where you've highlighted.

Q    So, the -- if $1.75 million -- I'm sorry.  If the $1.75 million Global Tetrahedron offer is considered to be -- is deemed to be $7 million, right, if it's deemed to be $7 million, that's what your right column focuses on, the winning bid, right, 1.75?  Am I correct?

A    No.

Q    The winning bid in the third column on Page 14 is -- you're referring to Global Tetrahedron, aren't you?

A    Yes.

Q    Okay, and that's $1.75 million, right?

A    Of purchase cash, yes.

Q    Yes.  Minus 650, 650,000, which are your administrative fees, leaves (indiscernible) and the Connecticut Family share is one million sixty-three?

A    Yes.

Q    And the gift class share that everybody else at 3.3

percent is really $36,300, right?

A    Yes.

Q    Okay.  Now, what you're saying, in effect, is that --

and you've got the gift class share as $36,300.  Now, how

much -- they're having to give -- the Connecticut people are

having to give money to everybody else to get them up to the

210, right?

A    Yes.

Q    How much are they giving?

A    173,250.

Q    I see.  So, the Global Tetrahedron portion to the 3.3

is going to be 36,000 bucks and the Connecticut Plaintiffs

are going to have to give $173,250 to get to $210,000?

A    Yes.

Q    Okay.  So, now, when you gave this -- well, I'm going -

-

        MR. BROOCKS:  Again, I apologize, Your Honor.  I'm

going to be skipping around quite a bit.

BY MR. BROOCKS:

Q    But the order that you're now asking the Judge to enter

doesn't accept this chart at all, does it?

A    It doesn't talk about it.

Q    Yeah, in fact -- in fact, I'm going to go ahead and

mark this new order that your lawyer filed yesterday as

Jones Exhibit 19.

MR. WOLFSHOHL:  No objection, Your Honor.

THE COURT:  Okay.  That's the order we were talking about earlier.  No, we just looked at a redline earlier.  So, now you're going to admit the order?

MR. BROOCKS:  I'm going to admit it.

THE COURT:  Okay.

MR. BROOCKS:  The clean version, as I get it here.

THE COURT:  Can I just have a Jones 19?  I just want to identify a docket number so that we have it clear.  It should be --

MR. BROOCKS:  Jones -- let's see.  I'm going to -- bear with me.  Let me grab it here real quick, Judge.  It's --

MR. WOLFSHOHL:  Your Honor, it's Docket 974.

THE COURT:  Docket 974 will now be Jones 19.

BY MR. BROOCKS:

Q    Now, I'm going to put it up on the screen.  The new order --

MR. BROOCKS:  I'm sorry, Judge.  What's the docket number?

THE COURT:  974.  Mr. Broocks, I want to make sure the mic is getting close to you, or just pivot, turn it to you.

MR. BROOCKS:  Well, one second.  I'm going to put it -- it's the wrong case.  All right.  So, let me do this.

Let me just put it up on the screen here.  I will -- ma'am, I'm going to run you ragged, ma'am.  I apologize.

BY MR. BROOCKS:

Q    Now this is the new order, right, 974, Docket Number 974 in this case, that you're asking His Honor to enter. Right?

A    Yes.

Q    Okay.  Now, in your new order -- okay, now in your new order that you're asking His Honor to sign, you're saying, you're asking His Honor to find -- and let's just read it together.  "The consideration to be provided by the purchaser and the Connecticut Families."  I thought the Connecticut Families were the purchasers?  Am I wrong?

A    Yes.

Q    So, the purchaser is who?

A    The purchaser is Global Tetrahedron.

Q    So, the Connecticut Families aren't the purchasers?

A    They're not the purchasers of the assets, no.

Q    Okay.  So, when you say, "purchaser", you mean Global Tetrahedron, effectively?

A    Yes.

Q    Okay.  So, the purchaser and the Connecticut Families, the consideration provided by them consists of cash consideration in the amount of $1.7 million and a commitment by the Connecticut Families to forego the distributable

proceeds waiver amount, as defined below, and the assignment of the distributable proceeds waiver amount to the trustee for the benefit of all other unsecured creditors.  Now, they can't tell you what to do with that money.  Can they, sir?

A     They can in an order, yes.

Q     Now, the Judge can, of course.  But the Connecticut Plaintiffs can't tell you what to do.  Can they?

A     I'm not sure I understand your --

Q     Well, if they give -- if they forego, the money is now in your hands, can they instruct you as to what to do with it?

A     They are instructing me as to what to do with it.

Q     But that's what I'm saying.  I know they are, but is that proper?  Can one of the creditors tell you what to do?

A     No.

Q     Okay, good.  Now, it says, "The distributable proceeds waiver amount means $750,000 of the cash purchase price that the Connecticut Families would otherwise be entitled to receive based on the assumptions set forth in Paragraph 43 of the motion."  So, now this is the order you wanted His Honor to sign, put his (indiscernible) on.  Okay, that's going to take us now to Paragraph 43 of the order -- of the motion that you filed.  Not 42, we'd be looking at 43, right?

A     This refers to Paragraph 43.

Q    Well, I mean, it doesn't refer to it, that's what it's -- you're asking His Honor to -- I asked you multiple times, what are you asking the Court to do?  You said, "Enter this order."  The order you want His Honor to enter says, "The distributable proceeds waiver amount means $750,000 of the cash purchase price that the Connecticut Families would otherwise be entitled to received based on the assumption set forth in Paragraph 43 of the motion."  So, again, my question is, you want His Honor, in his order, to say, basically to his, the District Judge and the Fifth Circuit, that he is referring now to Paragraph 43 of the order you guys filed, which is Docket Number 915.  That's what that means, right?

MR. WOLFSHOHL:  Objection to form.  He's talking about the order.  I think you mean the motion.

MR. BROOCKS:  I apologize.  The motion.  The motion.

BY MR. BROOCKS:

Q    Paragraph 43 of the motion.  That's what you want His Honor to say, right?

A    No.

Q    No?  What does that mean?

A    What it means is, and it's hard to see because you've only got half the sentence, you're asking me about, on the screen.

Q   I wish I had it.  This is what your lawyer --

MR. BROOCKS:  Josh, do you have another -- I don't have but one copy of the final, of the new one, I should say.

MR. WOLFSHOHL:  It's on the docket.

MR. BROOCKS:  I understand.  He can't read it he says.  So, I was asking if you have a --

MR. CICACK:  It's my Exhibit 27, and he can bring it up.

MR. BROOCKS:  I've got it up on -- okay.  Well, I'm going to use mine.  I want to work on mine.

BY MR. BROOCKS:

Q   So, I apologize.  You're going to have to just bear with me on this.  Now --

THE COURT:  Why don't I do this and let's -- just for -- you're referring to the order at 974?

MR. BROOCKS:  The order at --

THE COURT:  You're looking at --

MR. BROOCKS:  -- 974, Page 6, top of the page.

BY MR. BROOCKS:

A   Someone's got another hard copy --

THE COURT:  No, no.  Hold on a second.  Let's --here -- you said Page 6 of the order?

MR. BROOCKS:  Of the new order.

THE COURT:  All right.  All right.  I'm going to

parachute in here.  Oh, wait.  Here we go.  All right, Mr. Murray.  You want me to go up or down?

MR. BROOCKS:  (indiscernible)

THE WITNESS:  Now, I think I can see what you're talking about.

THE COURT:  Bigger?  You got it.

MR. BROOCKS:  (indiscernible) if you don't mind, Your Honor.

THE COURT:  No, no, no.  Not a problem at all.

MR. BROOCKS:  Okay.  Now, Your Honor, you're going to have to drive for me here.

THE COURT:  No, no, no.

MR. BROOCKS:  Okay.

BY MR. BROOCKS:

Q    So, second to the last line says, the description of what you want His Honor to sign.  This is his order you want him to sign, right?

A    I would like him to sign the proposed order.

Q    Yeah, and you want him to say, "The distributable proceeds waiver amount means $750,000 of the cash purchase price that the Connecticut Families would otherwise be entitled to receive based on the assumption set forth in Paragraph 43 of the motion."  That's what you want him to say?

A    Yes.

Q    So, we'll go back to Docket Number 915 to look at Paragraph 43 to figure out what it is you want him to say. Right?

A    No, I don't -- I don't interpret it that way. (indiscernible)

Q    Okay.  Well, let's just -- I would like you to just do this --

MR. BROOCKS:  Your Honor.  Can you go -- I'd like to go back to Exhibit 12, Paragraph 43.  And that's what I'm going to do, but I'm going to --

THE COURT:  Why don't I do this to make your life a little easier.

MR. BROOCKS:  Perfect.  Page 14, Paragraph 43.

THE COURT:  All righty.  I'll make it bigger.

MR. BROOCKS:  Perfect.

BY MR. BROOCKS:

Q    Now, the $750,000 distributable proceeds waiver amount that you want His Honor to refer to is that in Paragraph 43 of Docket Number 915, right?

A    No.

Q    Isn't that what you said in your new motion?

A    No.

Q    It says -- maybe I misread it.  "The distributable proceeds waiver amount means $750,000 of the cash purchase price that the Connecticut Families would otherwise be

entitled to receive based on the assumption set forth in Paragraph 43 of the motion."  Is this the motion that we have up on the screen, 915, that you're talking about?

A    That's the motion it refers --

Q    Is this Paragraph 43?

A    Yes.

Q    Okay, and you want His Honor to reference Paragraph 43, just as you asked him to here, so that everybody can figure out what the $750,000 means, right?

A    No.

Q    What is the relevance of having the Judge sign an order that references Paragraph 43 of your motion, sir?

A    It described where Connecticut is getting the $750,000 number from.  It's not asking the Court to endorse Paragraph 43 --

Q    I'm sorry.  I thought, if you keep looking at your new order, you want the Judge to say the cash purchase price and distributable proceeds to be provided by the purchaser and Connecticut Families is fair and reasonable consideration for the assets."  But I thought you wanted him to put his stamp and say, "This is fair and reasonable", what's in Paragraph 43.  Did I misread your order?

A    Yes.

Q    So, what does it mean when you ask him to say, in your new order, 974, that the distributable proceeds waiver

amount to be provided constitutes reasonably equivalent, fair in consideration and fair value.  What do you want him to say?  What does that mean?

A    I want him to say --

Q    Page -- hold on a second.  Page 6 --

MR. WOLFSHOHL:  Your Honor of the --

THE COURT:  Oh.

MR. WOLFSHOHL:  Yeah.

THE COURT:  I'm a little rusty.

MR. BROOCKS:  Okay.  So, if you could just go down a little bit, Judge.  A little bit more, a little bit more, a little bit more, a little bit more and now right in the middle, it says, "The cash purchase price."

BY MR. BROOCKS:

Q    Mr. Murray, please read that sentence, where it starts, "The cash purchase price".  Read that to us.

A    "The cash purchase price and the distributable proceeds waiver to be provided by the purchaser and the Connecticut Families, respectively, under the asset purchase agreement, and pursuant to this sale order, is fair and reasonable consideration for the purchase assets and constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transfers Act, the Uniform Fraudulent Conveyance Act, and any other applicable

laws of the United States, any state, territory or

possession or the District of Columbia."

Q    Okay.  Now, that's what you want His Honor to find,

right?

A    That's the finding I'm asking for, yes.

Q    And so, the first phrase says the "cash purchase

price".  That's the $1.75 million, right?

A    Yes.

Q    And then the distributable proceeds waiver, that's what

you've said in the previous thing references everybody back

to Paragraph 43 of y'all's motion, right?

A    No.  You keep saying that.  That's not what that

sentence says.

Q    Okay.  What does -- in that sentence, what does "the

distributable proceeds waiver" mean?

A    It's referring to the distributable proceeds waiver,

defined earlier in the order.

Q    What does that term mean?

A    It's defined in the order.

Q    I understand.  What does it mean?  Give me the

definition.

A    It's -- the waiver is the mechanism by which

Connecticut is transferring cash that it would otherwise

receive to the non-Connecticut creditors.

Q    What does the term -- what is that number?  Maybe

that's a better way to ask it. What is the distributable proceeds waiver number that you want His Honor to say is fair and reasonable consideration?

MR. WOLFSHOHL: Your Honor, I'm going to object to the form. It's stated as the distributable --

THE COURT: Yeah, I --

MR. BROOCKS: I don't have to testify.

THE COURT: Yeah. No, no, no. I got it, but I think he's asking a question, and I think he's entitled to an answer. I --

BY MR. BROOCKS:

A    Yeah. I think you're referring to the distributable proceeds waiver amount, which is a separate defined term. That is a number, and that number here is 750, as qualified in the rest of the paragraph.

Q    Okay. So, thank you. So, when you have His Honor -- you want him to sign a document saying, I'm going to translate, $1.75 million, which is the cash purchase price --

MR. BROOCKS: I'm sorry, Your Honor. Go down a little bit more. Go back -- okay.

BY MR. BROOCKS:

Q    You want His Honor to find that the cash purchase price of 1.75 and then the distributable proceeds means $750,000. Is that what you just said?

A    As qualified in the rest of that other paragraph, but yes.

Q    As qualified, meaning referring back to Paragraph 43 of the motion?

A    No.  Meaning, referring to the "provided, however" language that comes later.

Q    You mean, that comes above?

A    Later in that paragraph, above this paragraph.

Q    I'm sorry.  So, where is the, "provided, however" you're talking about?  You can mark it, I think.  Just put your finger on it, on the screen.

A    I'm looking at a screen and --

Q    So am I.

A    -- you keep jumping all over the place.

THE COURT:  Mr. Murray, would you -- is the "provided, however" above or below --

THE WITNESS:  It's Paragraph H.

THE COURT:  Okay.  No, I'm just saying, maybe is it on an earlier page or --

THE WITNESS:  Yeah, yeah.  It's up in the beginning and it's Paragraph H --

THE COURT:  Okay.

THE WITNESS:  -- that defines (indiscernible)

(Crosstalk)

THE COURT:  We're in H.

THE WITNESS:  Right, and the distributable proceeds waiver is $750,000 cash, and then the next page it says, "provided, however, that Texas has the right to say that it should be more."

BY MR. BROOCKS:

Q    Okay.  Is that the "provided, however" you were talking about?

A    That's what I was referring to.

Q    Okay.  Now, so back to this, you want His Honor to find that the cash purchase price, the $1.75 million and the distributable proceeds waiver amount of $750,000 -- we'll come back to the proviso, is fair, reasonable and --

A    Right.  All those other things, yes.

Q    All those other good things.  Okay.  Now -- and then you want him to say --

MR. BROOCKS:  Move down just a little bit more, Your Honor.

BY MR. BROOCKS:

Q    You want His Honor to say that such consideration -- do you see where I am right there, "such consideration"?

A    I see it, yeah.

Q    You're meaning the 1.75 and the $750,000, right?

A    Yes.

Q    Of the waiver part, constitutes the highest and best bid for the purchased assets and is in the best interest of

the estate.  It's and all other parties in interest, right?

A    Yes.

Q    No other person or entity or group of persons or entities has offered to purchase the purchased assets for an amount that would provide greater value to the Chapter 7 estate than the purchaser in the Connecticut Families. That's what you want His Honor to say?

A    Yes.

Q    So, you want him to basically bless what you found, right, and make it his words?

A    I want him to -- I'm asking for him to approve the transaction and to make a finding that is in the best interest of the estate, yes.

Q    Okay, and again, I'm going to try to unpack a lot of this, but I just want to make sure, while it's fresh in our minds, let's go back up to the "provided however" that you want him to say.  Okay now, "provided however".  You read that to us.  Just read it out loud.

A    "Provided however that all rights of the Texas families to assert that the distributable proceeds waiver amount should be greater than $750,000 are fully preserved and at such time as the allowed amounts of all claims against FSS are determined, the Texas families may request that the Court increase the distributable proceeds waiver amount up to an amount not to exceed the net purchase cash as defined

in Paragraph 43 of the motion, to the extent that the Texas families would have recovered more if the successful bidder provided a cash purchase price of $7 million and the Connecticut Families had not agreed to the distributable proceeds waiver."

Q    Okay.  Now, so, just so I'm clear on what you want His Honor to say, you want His Honor to say that the 1.75 plus the $750,000 distributable proceeds waiver amount is not actually cash or the highest and best value and fair consideration, unless the Texas Plaintiffs come back later and say, "No, it isn't."  Is that what I'm reading this to say?

A    No.  There were a few mistakes in there.  Could you go part by part?

Q    Yeah.  You want His Honor -- well, I think we agree to the first part.  You want His Honor to say that the cash purchase price of 1.75 and the distributable proceeds waiver amount, which is $750,000, which ain't cash, right?

A    I disagree with that.

Q    You think it is cash?

A    Absolutely, it's cash.

Q    So, you could take that to the bank and write it and say, "Cash my check for the distributable proceeds waiver amount"?

A    The non-Connecticut creditors will be able to when they

receive it.

Q   Okay.  Now, it says -- but you want His Honor to say that the cash purchase price and the $750,000 is fair and reasonable consideration, reasonably equivalent value and then in the last sentence -- the second to the last sentence, is the highest and best bid for the purchased assets.  That's what you want him to say, right?

A   Yes.

Q   Unless the Texas Plaintiffs say, "No, it isn't", later on?

A   Well, there's a lot more to it than that.

Q   But isn't it as simple, and my concept is, the Texas Plaintiffs you're trying to make His Honor sign an order that says that this is the highest and best unless the Texas Plaintiffs say, "No, it isn't."  Is that effectively what this order says?

A   No, and as I was trying to say before you stopped my answer and asked another question was, the Texas Plaintiffs can ask for a higher amount if these other conditions are met, and they would otherwise have been entitled to it.

Q   What are the other conditions that they have to meet, in the order that you want His Order to sign?

A   If they would have received more, based on a different outcome in terms of the claims pool, and the comparative notional bid of $7 million.

Q    But what does that mean?  I mean, can you be even more basic for me than that?  Because I'm not quite sure I followed your term.  What -- in laymen's terms, what are the conditions that would make this 1.75 and $750,000 not the actual best bid?  What conditions are they?  Be simple about it, please.

A    I really don't understand your question.  It's -- this is a complicated mechanism that takes a little bit of time to explain and walk through and it's not amenable to a five-word answer to your question.

Q    Fair enough.  Let's read it sentence by sentence then.  "Provided however, that all of the rights of the Texas families to assert that the distributable proceeds waiver amount should be greater than $750,000, are fully preserved."  Did I read that correctly?

A    Yes.

Q    That means they ain't going anywhere, they're not waived.

A    Right.  The Texas families preserve their rights.  That's how I read that.

Q    And they can come in and argue that "It isn't 750.  That's not the best price."  They could argue it should be more, can't they?  That's what you're trying to get His Honor to say.

A    I don't believe that this allows them to argue later

that the finding that this is a fairly reasonable equivalent value is what they're preserving.  They're preserving the right to say that they're entitled to more under the mechanism.

Q    I'm sorry.  The distributable proceeds waiver amount should be greater than $750,000, are fully preserved.  Isn't that what your order says that you want His Honor to sign?

A    No.  What your question is conflating is Texas' right to say that under the waiver, they're entitled to more than $750,000.  With the finding, we're asking for -- that the consideration they're receiving is fair and reasonable.

Q    Okay (indiscernible)

A    I think those are two different things and I wish you would let me --

Q    Go ahead.  I apologize.

A    You cut off my answer almost every time I answer.

Q    I apologize.  Go ahead, Mr. Murray.  Say what you want to say.

A    Ask your next question.

Q    Are you finished?  I want you to feel the liberty to say whatever it is you want to say.

MR. WOLFSHOHL:  Your Honor, I'm going to object.  He's badgering the witness intentionally.

THE COURT:  I'm not sure.  I think they're badgering each other.  Why don't we just get a question and

an answer going here.

MR. BROOCKS:  Yeah.  Let me start over, and I'll try to be clear.

BY MR. BROOCKS:

Q   Provided however, that all of the rights of the Texas families to assert that the distributable proceeds waiver amount should be greater than $750,000 are fully preserved.

A   Yes.

Q   True?

A   Yes.

Q   So, they can come back as a result of this and argue that it should be more than that.  Right?  That's what you want His Honor to say?

A   Yes.

Q   Okay.  "Now, at such time that the allowed amounts of all claims against FSS are determined, the Texas families may request that the Court increase the distributable proceeds waiver amount up to an amount --" and then I will pick back up.  So, what you're saying is, you're tying something to the time that the allowed amounts of all claims are determined.  What does that mean?

A   That means, after we know what the claims pool is and what the percentages are.

Q   So, you don't know what they are now?

A   That's right.  I don't.

Q    Okay, and these are the assumptions that you've made over here on Jones 18, that it could be as high as what, 96.7 or as low as 75/25, right?

A    Yes.

Q    Now, but your assumption of 750, isn't that based on the 75/25?

A    Yes, it is.

Q    So, they could come back and argue that it shouldn't be 75/25, it should be something even less than 75/25, shouldn't it?  That's what you're trying to say.

A    I think they're saying that if it turns out to be less than 75, they can come back and (indiscernible) --

Q    And when you say they, this is you.  This ain't them.  This is you.  This is your form of order for His Honor, isn't it?

A    Well, yeah.  This is the order that I'd like the court to enter.  Yes.

Q    Okay, and you want him to say, I'm going to find that the amount based on a 75/25 assumed liability ratio that the Texas plaintiffs can actually argue, it shouldn't be 75/25.  It should be something, maybe 50/50 or something like that.  Isn't that what the effect of that is?

A    No, it's saying that the 750, the 750,000 is based on that conservative assumption, but --

Q    The 75/25.

A     But if later on it turns out that Connecticut has 70 percent, Texas would come back and say, no, 750 is not enough.  I need a little more.

Q     Right.  That's what --

A     They're preserving that right.  That's how I understand it.

Q     That's what I'm trying to say.  So the 75/25 is what you've got His Honor saying.  But you're saying, but, says the judge, you want him to say, but the Texas plaintiffs can come back and say that sharing ratio ain't right.  It should be -- you said 70/30.  It could be 60/40, couldn't it?

A     Yeah.  I just don't read this as asking the court to say that 75/25 is the right amount.  I'm asking the court to say that a $750,000 distributable proceeds waiver plus the cash is fair consideration.

Q     And it's the best, I believe you said, and it's the best -- the highest and best bid for the assets.

A     For the estate, yes.

Q     Yeah, for the estate.  Now, I'm going to pause right there and I'll come back to this.  I don't want you to lose this train of thought about the -- well, I'll go ahead and do it now.  Just get it out of the way.  Now, you say in the order that you want His Honor -- you want His Honor to -- you want this to be his order, not you, his.  You want him to sign his name on this, that at such time as the allowed

amounts of all claims are determined.  When will that be?

A    Sometime in the future.

Q    How will that be -- how will that determination be made?

A    It'll be after the end of the claims process, any claims objections, any amendments to claims.  That's usually the last thing that happens in a case.

Q    Okay.  So what are the kinds of things that could cause the allowed claims of the Connecticut versus everybody else to go down for Connecticut; in other words, not 75/25, but like you say, 70/30 or 60/40?  What are kinds of things that could affect that?

A    There'd have to be an objection to the claim that was sustained because the claims themselves, as filed, are prima facie true and accurate.

Q    Well, I'm just asking what kind of things could cause it to go down.

A    Somebody would have to object to it and prevail on the objection.

Q    Well, what are some of the objections you might expect to see?

A    Might object that it's duplicative of another claim, that it doesn't have sufficient documentation behind it.

Q    Well, we saw, for example, the Connecticut Court of Appeals just lowered -- knocked out some portion of the

Connecticut judgment.  Would that be the kind of thing that might cause the judgment to go down?

A    Oh, yes.  Yes, of course.

Q    And that's kind of what you're referring to when you have -- or His Honor would be referring to if he signed your order saying at such time as the amounts are adjusted.  That's one of the factors that could cause Connecticut to go down, right?

A    Right.  But I mean, I'm not asking the court to determine now what the claim amounts are.

Q    You're just asking the court to put a footnote there or a placeholder so the Texas people can come back and say it shouldn't be 75/25.  It should be something different.  That's what I think you're trying to say.

A    Yeah.  I mean, not to -- not to split hairs.  I'm just trying to be accurate.  It's not saying what the claim split is, and it's not saying the claim split could be changed by the court later.  What it's saying is this is $750,000 based on that conservative assumption, and Texas can ask for more of a waiver amount if it turns out that Connecticut had less.

Q    Okay.  Now let me --

          MR. BROOCKS:  Your Honor, may I take the presenter back?

          THE COURT:  Yeah.

BY MR. BROOCKS:

Q   Now, you testified at some length --

THE COURT:  Hold on, Zilde.  Hold on.

MR. BROOCKS:  Yeah.

THE COURT:  I've got to get my stuff.  I've got to get my screen back first.  Just a second.  I'll give you your podium back.  Here you go.

MR. BROOCKS:  Okay.  Good.

BY MR. BROOCKS:

Q   Now, you testified at some length about the PDQ -- what's the name of the company?  PDQR?  PDQD?

A   PQPR.

Q   And you said at great length how you analyzed their claim from a legal standpoint to decide that you thought it had zero value.  Did I understand you correctly?

A   Roughly, yes.

Q   Okay, and that's because you're a lawyer, right?  You're trained as a lawyer, and you're trained as a trustee, too, aren't you?

A   Well, I talked to my lawyers in this case and several other people about it.  Yeah.

Q   But in order to make an evaluation about the merits of a claim and what it's -- you know, what the defense is and all that, you've got to apply some legal judgment, don't you?

A     Yeah.  I mean, I did.

Q     You did.  Okay.  Now, so now you know that of the $900 million of compensatory damages in this case, you know that $563 million of those are for emotional distress in the Connecticut family.  You know that, don't you?

A     I don't remember the exact numbers, but that sounds right.

Q     Sounds about right.  Now, you also know that the New York Times v. Sullivan case says that where a public media defendant like Mr. Jones is concerned, he can't be held liable for anything, any damages at all, except with the plaintiffs proving by clear and convincing evidence that he knew it was false or was reckless and disregarded.  You know that's the law of the United States Supreme Court interpreting the Constitution, don't you?

MR. WOLFSHOHL:  Your Honor, I'm going to object. I'm not going to object just because it calls for a legal conclusion.  But he hasn't established that Mr. Murray knows anything about this area of law.  I don't think it's relevant.

MR. BROOCKS:  Well, he's a lawyer and he's testifying about claims reductions and things like that.  I just want to know if he took -- if he knows the law on this.

MR. WOLFSHOHL:  I'm a lawyer and I couldn't testify about intellectual property law, so.

MR. PATERSON:  Your Honor, I'd also object based on relevance.  There's no indication any of those arguments have actually been raised on appeal in that Connecticut case.

MR. BROOCKS:  Interesting question.

THE COURT:  I am going to just -- just tell me where you're going with this, Counsel.

MR. BROOCKS:  Where I'm going with this, is, Your Honor --

THE COURT:  Maybe you can just submit --

MR. BROOCKS:  -- is talking now about the claims adjustment process and how things can go, cause this, Judge, the Connecticut plaintiffs', you know, awards to go down, their percentage of the claim.  I am going to show him that under the New York Times standard, which is in the Hustler case, that applies to intentional infliction of emotional distress.  It's the same standard.  That's what it says. And I'm asking him, does he know that's the law because if that's the case, what the Connecticut plaintiffs did in their jury charge, as you said, Your Honor, when you did your order, you said that it's intended to inflict or knew or should have known, and that's a negligence standard. Now, my point to you is -- the question to the witness, Your Honor, is if a negligence standard is under intentional infliction and the United States Supreme Court says it's got

to be by clearing convincing evidence of intent, isn't that one of the grounds that could cause this judgment to go down radically?

MR. PATERSON:  Your Honor, I'm trying to (indiscernible) --

THE COURT:  Yeah, and I'm going to -- I don't know what fancy law school Mr. Murray went to, but I suppose he read New York Times v. Sullivan there.  But I do think my order -- I don't -- I'm going to object to your lawyer's statement saying that he didn't -- you wouldn't know that.  But my order says what it says, and it's based upon findings.  That's from a -- you know, that the jury -- state court jury instructions.  So --

MR. BROOCKS:  That's my point.

THE COURT:  No, but my point is I'm comfortable with you arguing that a Connecticut court could find something different or lower the amount even more or something.  But do that.  I don't think we need to kind of get into -- I have no -- the reason I'm saying this, I have no idea and there's no foundation as to what is actually being argued on appeal.  I don't even know if that case is even being cited to any Connecticut supreme court or not.  Maybe they are, maybe they're not.  But I do think it's a fair question to ask whether the Connecticut -- I don't know.  I guess I don't know what they call it.  The

Connecticut supreme court could lower it further.  I think that's a fair question.  But I don't think we need to kind of get into --

MR. BROOCKS:  Okay.

THE COURT:  -- anything more than that.

MR. WOLFSHOHL:  Your Honor, I'm going to object based on relevance, just because Mr. Murray is the Chapter 7 trustee.  The appellate rights (indiscernible) --

THE COURT:  What I'm saying is y'all talked about that, the appellate -- you talked about the appellate court, right, judgment?  I'm just saying I think he's allowed to ask whether another court could lower it more and whether that would affect stuff.

MR. WOLFSHOHL:  That's a fair (indiscernible) --

THE COURT:  That's what I'm saying.  But I don't think you need to go into where it is, and I don't know if we need to (indiscernible) --

MR. BROOCKS:  Well, Your Honor, and if I may respond briefly, the reason I'm trying to do something is because anything is possible.  I mean, you know, the Martians could attack tomorrow.  I mean, that's why I'm trying to differentiate, you know, possibility in the abstract from --

THE COURT:  Well, that's why I'm trying to finish tonight, because I want to make sure that the Martians don't

--

MR. BROOCKS:  Okay.

THE COURT:  -- attack us in the morning.  But let's just keep going.

MR. BROOCKS:  Okay.  Let's keep going.

BY MR. BROOCKS:

Q    But would it be fair to say that when the order that you want His Honor to sign, where the Texas -- where you have him saying that the Texas plaintiffs are reserving their rights to argue that when the claims -- that such amounts of all claims are finally determined, these are the kind of things that you're talking about could go into the equation that could lower the Connecticut plaintiffs' relative percentage, right, in general?

A    Yes, as it relates to how much Texas would be entitled to under the distributable proceeds waiver.

Q    And if it turns out that the Connecticut plaintiffs, that they -- even if it's the United States Supreme Court interpreting its own case law, even if the United States Supreme Court says that the award of $1-point-something billion violates the United States Constitution, their claim would go to zero, wouldn't it?

A    I don't know how that would play out.  But sure, I suppose it's possible.  Martians attack.  It's possible.

Q    Sure, sure.  Yeah.  But if the United States Supreme

Court -- this is not one of those Martians attack questions. If the United States Supreme Court says that the Connecticut judgment violated the Constitution and vacates it, makes it zero, what is the waiver worth that they're giving here?

A    I think it'd still be worth 750 because it's a floor.

Q    Even though they're not giving anything up because their percentage would have gone -- they don't have anything to give up.

A    Their percentage goes to zero, then they do have nothing to give up.  Yeah, you're right.  In that scenario, the DPW would be zero.

Q    And you do know that the -- there was no liability finding against Mr. Jones in Connecticut.  It was a sanction award.  You know that, don't you?

MR. PATERSON:  Objection, relevance.

MR. WOLFSHOHL:  Objection, relevance, Your Honor. That's (indiscernible) --

THE COURT:  Yeah.  We can -- we can just kind of move on.  I don't know what -- I don't know where we're --

MR. BROOCKS:  But you -- I'll withdraw the question, Judge.

THE COURT:  I don't know where we are any more.

MR. BROOCKS:  I'll withdraw the question.

BY MR. BROOCKS:

Q    Now, you don't know whether or not the Texas judgment

could go away, do you?  It could go to zero too, couldn't it?

A    I don't know the appellate status of those.

Q    But --

A    I don't know.

Q    You don't know the appellate status of it?

A    I think they're on appeal.  I know some of them aren't even liquidated yet.

Q    But you haven't read any of the appellate Texas appellate briefing?

A    No.

Q    So you don't know what's going on up there, do you?

A    With the Texas appeals?

Q    Yeah.  For the Texas plaintiffs.

A    No.  I don't -- I don't know about that.

Q    Okay.  So I'm simply asking if the Texas supreme court vacates the award to Texas, their part of this thing goes away too, doesn't it?

A    I mean, I don't know.  I suppose if, yeah, the judgments on which their claims are based are vacated or something or zeroed out before the case ends and I make distributions and somebody objects to their claim on that basis and it's sustained, yes, their recovery would disappear.

Q    Now, but if the recovery disappears and His Honor signs

this 363 order, the sale of FSS and its assets, that doesn't get undone, does it, sir?

A    No.  It wouldn't.

Q    So if the Texas and/or the United States Supreme Court or the Connecticut, if some appellate court undoes or zeros out either or both of these plaintiffs, the 363 order still stands and Mr. Jones and his assets are still gone to grant a global Tetrahedron, true?

A    I don't think any of these are Mr. Jones's assets. These are estate assets.

Q    Whoever they belong to, they're gone.

A    Right.  But I mean, if I get the gist of your question, I'm going to try to answer it so we can move along.  If the judge approves the 363 sale and then Martians attack and all the servers and everything is gone, I think Global Tetrahedron is stuck and you can't undo the sale.

Q    Yeah.  Well, let's translate it a little bit more specifically and a little bit less derisively from the Martians attack to the Supreme Court of America undoing a judgment or two, wouldn't that -- zeroing out the plaintiffs, wouldn't that mean nevertheless that the assets you're selling, this transaction, cannot be undone?  True?

            MR. COSTA:  Asked and answered, Your Honor.  And, I mean --

            THE COURT:  I agree.

MR. COSTA:  The trustee didn't file their bankruptcy court.

THE COURT:  I --

MR. COSTA:  They're in bankruptcy court.  That involves asset sales.

THE COURT:  I mean, I agree.  I think we should move on to another topic.

MR. BROOCKS:  I shall, Your Honor.

BY MR. BROOCKS:

Q   Now, let's talk about the distributable proceeds waiver amount.  Now, isn't it true that you had never heard of a distributable -- in fact, I'm going to put some stuff up here that I showed His Honor in my opening statement.  I said to him, and I want you to tell me if you agree with me. I told His Honor that you had never heard the term.  This is my opening statement.  You heard my opening statement, didn't you?

A   Yes, I did.

Q   Okay.  I said the trustee and his advisors had never heard the term distributable proceeds waiver before you got this November the 8th letter from them.  Is that true?

A   Right.  Before the initial bids, I'd never heard that term.

Q   I told him that you'd searched Westlaw and you couldn't find any cases or law review articles or any scholarly

writing that even discussed a distributable proceeds waiver. Is that true?

A    That's right.

Q    Okay.  Now, I told him that you consulted no outside experts at all about a distributable proceeds waiver and what it meant and whether they've even seen it before.  Is that true?

A    I mean, aside from my counsel, but no, outside of our team, no, I didn't.

Q    Okay.  Now, a distributable proceeds waiver I told him is nothing like an assumption of liabilities or transfer of assets in lieu of cash.  Is that true?

A    I would disagree with that.

Q    Which part would you disagree with?

A    It's nothing like an assumption of liabilities or transfer of assets.  I'd say it's somewhat like those things.

Q    Somewhat like which?

A    Both of those things.

Q    A distributable proceeds waiver where Connecticut says to Texas, we don't want any, you're going to take our part, is like an assumption of liabilities?

A    Yeah, I think in some respects it is.

Q    So who is assuming -- who is assuming what liabilities in a distributable proceeds waiver context like this?

A    Well, that's not the way in which I think they're similar.

Q    Okay.  How are they similar?

A    They're similar because the distributable proceeds waiver, like an assumption of liabilities and like a transfer of assets in lieu of cash are all things that could impact recovery of general unsecured creditors one way or another.  That's how they're similar.

Q    Now, an assumption of liabilities would mean that you're selling -- as trustee, you're selling a business and it's got a lease or some, you know, bank debt or whatever it is, and the buyer says, I'll pay a million bucks, and I'll assume personally that liability.  That's an assumption of liability, isn't it?

A    Yes.

Q    You're taking on liability.  Did the Connecticut plaintiffs or the Texas plaintiffs take on any liabilities in the distributable proceeds waiver?

A    No.

Q    Okay.  Now, they're not transferring cash assets in lieu of cash, are they?  They're not transferring any assets?

A    Well, they are transferring their entitlement to cash to another group of creditors.

Q    They're not transferring any assets in lieu of cash.

A    Except the cash is an asset.  But I see what you're saying.  Yes.  They're not transferring anything other than their distributable proceeds waiver.

Q    And you would agree with me, as you did in your deposition, that a distributable proceeds waiver is not a cash equivalent?

A    I'm not sure what you mean by that.

Q    Well, didn't you tell me in your deposition this was not a cash equivalent, this distributable proceeds waiver?  Do you remember telling me that?

A    I don't -- I'm trying to understand what you're asking about.  It is cash.  But we have --

THE COURT:  Mr. Moshenberg, I can hear you.  I just want to make sure -- just if we can keep the whispering down.  I want to be able to hear the witness.

BY MR. BROOCKS:

Q    Remember I said, you told me, right, the waiver is not a cash equivalent.  That's true.  Remember that?

A    Okay.  I don't remember the context of the discussion we were in, but I thought we were talking about the difference between the purchase price cash and the distributable proceeds waiver.  And, yeah, those are not the same thing.

Q    Is the waiver -- the distributable proceeds waiver, in your opinion, a cash equivalent?

A    I mean, it could be.

Q    Is it?  Yes or no?

A    I don't know what you're asking.

Q    I'm asking you, is it a cash equivalent?

A    It is a cash item.  Cash is equivalent to cash.  I mean, I just don't know what you're asking.

Q    Okay.  So you -- what did you mean when you said -- you can read whatever you want to read.  I don't really care what you read.  You did say the words, true, the waiver is not a cash equivalent.  That's true.  That's what you told me in your deposition, right?

A    Oh, you were asking me the financial technical sense of a cash equivalent, as in a deposit or demand account in the M1 and M2.  And yeah, it's not one of those things, but it is measurable in cash.

Q    Okay.  But I mean, I asked you, did you know what a cash equivalent was, like securities and bonds and things that have measurable value.  Remember?  That was the discussion.  And you said you understood that perfectly.  I said, well, this is not a cash equivalent.  And you said, no, it's not.  Am I wrong or am I right?

A    Right.

Q    Right.

A    We were talking about how to compare these things in cash equivalent, and you suggested that, because I had

something of a financial background, I knew what that meant in a technical sense.  And in a technical sense, I don't think a waiver is a cash equivalent because you can't take a waiver to the bank and deposit it.  Can I measure the waiver in terms of cash?  Yes, I can.

Q   Okay.  Well, let me go back then into -- and I'm going to move over here to my flip chart.  Now, in your distributable proceeds waiver concept, you have the Connecticut plaintiffs foregoing money that they would otherwise be entitled to, I guess, under the 1.75 and basically telling you gift it to the other party, other creditors, right?  That's your concept.

A   Yes, that's right.

Q   All right.  Now, had you talked to the Texas plaintiffs or anybody else and said, hey, is that okay with you?

A   No.

Q   You didn't talk to them?

A   No, I didn't.

Q   Did anybody tell you they'd talked to them?

A   No.

Q   Did the Texas -- you ever heard of -- well, strike that.

Have you ever heard of phantom income?  You ever heard of that term?

A   Yes.

Q    What's that phantom income mean?

A    My understanding of phantom income is that when a debt gets resolved or some other kind of debt goes away, it is deemed income for income tax computation.

Q    Well, did you look at whether or not the Texas plaintiffs are going to have to pay income tax on the increased portion of the distributable proceeds waiver they get?  Did you look at that at all?

A    No.

Q    In fact, the motion that you want His Honor to sign basically has a Texas plaintiffs reserving their right to say it ain't fair.  Isn't that right?

A    They can reserve their right to ask for more if the ratio of claims is not what they estimate in 43.

MR. WOLFSHOHL:  Judge, I'm also just going to object.  I think (indiscernible) speaks for itself (indiscernible) --

THE COURT:  Well, I agree.

MR. BROOCKS:  Yeah.  But I just want to make sure Your Honor knows what they're asking you to sign.  And that's what I'm trying to walk through here.

BY MR. BROOCKS:

Q    Now you say that the claims -- that the Texas plaintiffs -- all right.  So you didn't talk to the Texas plan to see if they agreed with this?

A    No.

Q    You didn't think you needed to?

A    No.

Q    Did Connecticut people tell you they'd talked to the Texas plaintiffs?

A    I didn't talk to the Connecticut -- are you talking about during the (indiscernible) --

Q    At any point in time, have the Connecticut people told you, yep, Texas is okay with getting this, they think this is right.  They'll take it.  Anybody told you that?

A    Yes.

Q    When did they tell you that?

A    They told me when they said that this language resolved their reservation of rights, that they agreed with what's in the proposed order.  They have agreed to that.  So yes, they have told me that.

Q    So when this order that you filed Sunday night is the first time you found out that Texas plaintiffs would conditionally be okay with it, right?  That'd be a fair way to say it?

A    I think it was after that is the first time they said, yeah, I've seen this order and I'm okay with it.  It resolves what --

Q    Give me a date.  I'm just confused about what timeframe.

A    Earlier today.

Q    Earlier today was the first time when they said this was okay with them.

A    Yes.

Q    But you filed this document on the 9th.  Isn't today the 10th?

A    I didn't get Texas's permission first.  You asked me, has Texas ever told me they're okay with it.  And I said, yeah, they did today.  But I didn't ask them before.

Q    Okay.  So with the time you filed on the 9th, yesterday evening or whatever, this form of order, yesterday morning, actually, you didn't know whether the Texas plaintiffs were even in agreement with this, did you?

A    No, and I can't think of a single bankruptcy case where I ask the creditors if they wanted more money before trying to get it for them.

Q    But you can't think of a single case where you've done a distributable proceeds waiver structure at all, can you?  You've never done it before.

A    You're right about that.  Yes.

Q    Yeah.  So now I want to focus on this concept of the distributable proceeds waiver as a concept.  So if -- and I'm going to divide the world into the Connecticut plaintiffs.

          MR. BROOCKS:  Can y'all hear me?  Your Honor, can

you hear me okay?

THE COURT:  Yes, just fine.

BY MR. BROOCKS:

Q   The Connecticut plaintiffs and the other parties.  A distributable proceeds waiver says effectively that Connecticut is going to give back to you -- going to get the distribution and give it -- and give up their portion back to you with instructions for you to gift it to the other creditors.  Is that what you got, how it works?

A   Yes.

Q   Okay.

A   That's how they describe it in their letter.

Q   Yeah.  Now what I also told His Honor -- in fact, let me go to exhibit -- I want to go to --

A   Actually, before you ask, could I ask one of my colleagues if there's a bottle of water I could have?

Q   Now, Mr. Murray, I want to go to exhibit -- and this is the winning bid, Global Tetrahedron, final bid, winning bid. Right?

A   Okay.

Q   And this is the letter that they attach and the chart that they included in the winning bid.

A   Yes, I see that.

Q   What'd that chart tell you?  What was it?

A   This is a chart where they're trying to illustrate why

they think the distributable proceeds waiver is worth the equivalent of a $7 million cash bid from the perspective of general unsecured creditors.

Q   Okay.  So now what I've got here, and I'm going to -- again, this is just -- I'm going to make sure you and I are in agreement.  This is the same chart.  I just pulled it out.  This is what I use in my opening.  This is the same chart from the letter.  Would you agree with that?

A   It looks like it, yeah.

Q   Yeah, and so all I've done here is just change the name First United to Tetrahedron.  Everything else is the same, right?

A   Okay.  Yeah, that looks right.

Q   Yeah.  And so the 25/75 -- this chart is based on a 25/75 split, isn't it?

A   Yes.

Q   Okay, and so this chart says -- has basically under the -- as I've got it here, the recovery to the non-Connecticut plaintiffs, meaning everybody else, at $2 million.  Let me just go be more precise.  So at $2 million, the -- let me do it this way.  At $2 million, would you agree with me that that charge basically says under First United's bid, had they bid $2 million, it would have been $500,000 to the non-Connecticut and 1.5 to the Connecticut.  That would have been split?

A    That's what the chart says.  Yeah.

Q    Yeah, and on the Global tetrahedron, it's 437, $1,312,500.  That's what the chart says.

A    Yes.

Q    Now, would you agree with me that $500,000 under the first -- if they had a $2 million bid is higher than 437? You would, wouldn't you?

A    Five hundred is more than 437.  Yes.

Q    And would you agree with me that according to the concept in the Global Tetrahedron's bid letter, that they were going to transfer basically $162,500 of their proceeds over to the non-Texas, non-Connecticut people to get them at 600,000?  Would you agree with that roughly?

A    Yeah.  I see what you're doing there.  I agree with that.

Q    And would you agree that 500,000 now is less than 600,000?

A    Yes.

Q    And that, would you agree with me that that -- that creates a new deemed Tetrahedron purchase price of 2.1 million?

A    Under the chart, yeah.

Q    Yeah.  That's their chart.

A    Right.

Q    Right, and that's what they told you.

A     Well --

Q     Now --

A     I don't know what the new Tetrahedron purchase price means here.  So I'm not -- I'm not sure I understand what you mean.

Q     Well, in other words, it says if tetrahedron paid $2.1 million.

A     No, that's --

Q     That's not right?

A     No.  No, it's not.

Q     Well, fix it for me.  What would Global Tetrahedron's global price be deemed to be?

A     So if I'm understanding what you're trying to do, the error you've made is you're adding $100,000 non-Connecticut recovery to the total purchase price.  But really just being added to that class of recovery.  So if the non-Connecticut creditors got 600,000 and they were getting 25 percent, the implied cash price is 2.4 million.

Q     Hang on.  So, if that's the split, 1.75 million, that leaves 437.  That's the 75/25 split, right?  That's $2 million.

A     Yes.

Q     That's what they're telling you, right?  Okay.  Now, what do they have to do to get $100,000 in value more than 500,000.  How much do they have to give them?

A     They have to give them the 162.5 that you've done right there.  That part's right.

Q     That part's right.  Now, you're saying that the new deemed purchase price isn't 2.1.  How much is it?

A     It's 2.4.

Q     2.4.  Where's my math wrong?

A     Well, your math is wrong because the 600 needs to be 25 percent of the total purchase price under the logic of the chart.

Q     I see.

A     Six hundred is a fourth of 2.4 million.  The mistake you're making is that to get 100,000 to a 25 percent, you have to have 400,000 to work with.  So the purchase price has to go up by 400,000 for every 100,000 you're adding.

Q     So it's right, except instead of 2.1, it should be 2.4.

A     Right.  I mean, that's the whole reason why the distributable proceeds waiver is so powerful is it essentially is a multiple of what the purchase price is based on the ratio of Connecticut and non-Connecticut.

Q     Well, it's just a mathematical -- in other words, if Texas -- if Connecticut -- the more they give to Texas, in your understanding, the more -- the greater the Tetrahedron purchase price becomes, right?

MR. WOLFSHOHL:  Objection to form.  Nobody's ever said that it's going to Texas (indiscernible) --

MR. BROOCKS:  I misspoke.  The other creditors.  I misspoke.

THE COURT:  Okay.  I'll sustain the objection.

MR. BROOCKS:  The other creditors.

THE COURT:  The other creditors.

MR. BROOCKS:  That's what I meant.

BY MR. BROOCKS:

Q    Go ahead.

A    State it again?

Q    Yes.  In other words -- in other words, the other creditors' receipt of money, less for the Connecticut and more for the other creditors, in your parlance, makes the Tetrahedron purchase price higher.

A    Yeah.  For comparative purposes, yeah.  Its implied cash equivalent purchase prices is much higher.  Yes.

Q    Okay.  So let's do it this way then.  Let's take 3.5 million.  That's what First United bid, right?

A    Okay.

Q    Now under the split 75/25, that would be -- is my number right on that?

A    That's beyond what I can do in my head.  I don't have a calculator.  But if 25 percent of 3.5 is 875, yeah, that looks right.

Q    Okay, and then on the 175,000 -- I'm sorry, 1,750,000, it's still 437 for the non-Connecticut and 1.312 million,

right?

A    Yeah.  Those are the same numbers as we had on the first one.  So yes, that's right.

Q    Exactly.  So even though the First United bid is higher nominally and everybody, all creditors would get more money, wouldn't they, under The First United bid?

A    Yeah.

Q    So you would agree 875, more than 437?

A    Yeah.  I think it's exactly double, isn't it?

Q    Now how much would -- am I right that to get the non-Connecticut people's recovery up above 875, the Connecticut plaintiffs have to transfer $537,000.  Does that look right to you?

A    Yes.  Yes.

Q    Okay.  Now, and that gets them -- in their $100,000 incremental estimation, that gets them above the First United.

A    Yeah, I'm with you.  I agree.

Q    And nobody writes a check for any additional money.  It's just one creditor foregoing amounts in favor of others.  That's how that gets to --

A    I mean, at the end of the case, I'll write the checks and they'll be in different amounts, but yeah.

Q    Okay, and nobody writes more than 1.75 million for the succeeding bid.

A     That's right.

Q     Now, I've got down here the new Tetrahedron price is 3.6 million.  Do you disagree with that?

A     I do.

Q     What's the new Tetrahedron price that these, when they give $100,000 more than First United?

A     I'm pretty sure it needs to be 3.9 million.

Q     3.9.  Okay.  Now, but would you agree with me that what you're asking this court to find is that one creditor saying I don't -- well, let me ask -- strike that and ask it this way.

Is the key to your value assumption -- I'm going to put Connecticut plaintiffs and other creditors.  Can you see my writing, my pitiful penmanship?

A     I see what you're writing.  I think I understand it.

Q     Okay.  I've just got worthless penmanship.  Now, is what makes the value greater ,in your mind, the fact that the Connecticut plaintiffs are going down or the other creditors are going up?

A     You mean in terms of what they're getting from proceeds or in terms of their share of the pool?

Q     Yeah, the 1.75 million.  Is the fact that their 1.75 million versus 3.6 million, 3.5 million is what makes 1.75 higher than 3.5 the fact that the Connecticut proceeds go down, they take less or because the other creditors go up,

take more?

A    It's because the other creditors' recovery goes up.

Q    So it doesn't matter whether the Connecticut plaintiffs go down or up.  It just -- it's whether somebody else goes up.

A    Right, because Connecticut's consenting to the treatment.  So I focus on what the other creditors (indiscernible) --

Q    Well, I'm not asking about consent.  We'll come to that in a moment.  But I want to focus right now on just the dynamic of what, in your mind, makes a $1.75 million dollar offer into something, a $3.9 million dollar offer.  And it's not because the Connecticut plaintiffs take less.  It's because everybody else gets more.

A    Right.  That's exactly right.

Q    Okay, and you base that on no research, no case law, no accounting principle, no document you can show us where anybody's ever done this before.  Just what you and your lawyer talked about?

A    Well, no, I do it based on my interpretation of what my fiduciary duty is to maximize benefit to the estate.  The marginal dollars go to that class of creditors.  I'm trying to maximize their recovery.

Q    I'm glad you said that.  Now, when you say the estate, you mean everybody together, right?  You're not talking

about individuals.  You're talking about the estate as a whole.

A    Yes.

Q    And the estate as a whole would get more money on a $3.5 million offer than a 1.75, wouldn't it, as a whole?

A    Well, the more cash would come in, but it wouldn't benefit the unsecured creditors.  It's that Fulcrum Security that I'm focused on.

Q    Yeah, and I'm -- I understand you are.  My question to you, however, is if you're looking at it from the estate's perspective, which is higher, 3.5 million of cash or 1.75 million of cash?

A    I mean, 3.5 is a higher number than 1.75.  But I've got to look at what's better for the estate and its creditors. It's not just an amount of money.  And if the unsecured creditors get less, even though more money flows through the estate, that's a worse outcome, in my view.

Q    Now, okay, now you understood that the Global Tetrahedron Connecticut families' "bid" included this concept, this $100,000 incremental rise, didn't it?

A    Yes.

Q    And so the bid -- in summary, the bid that they made, that you're accepting, is embodied in Exhibit 19, said we want to bid $100,000 more than anybody else.  Would you agree with that?

A    Almost.

Q    Okay.  Fix it.

A    They want to bid or they want the distributable proceeds waiver to be an amount that gives the non-Connecticut creditors $100,000 more than they would get under another bid, under a competing bid.

Q    And there's no doubt in your mind that that's what their offer says, is there?

A    That's what that portion of their offer says.  Yes.

Q    Okay, and that's, you know -- well, okay, but that's part of the offer, right?

A    Yeah.  Yeah.

Q    Did you consider that?

A    Yes.

Q    Did you factor that into your thinking in terms of your finding that the Global Tetrahedron Connecticut offer was higher?  Did you factor that in at all?

A    Yes.

Q    Tell me how you did that.

A    I looked.  It's what we did on the chart over here.

Q    This has -- this reflects the $100,000 -- I'm sorry, I don't see that in your chart that you filed in your motion. I don't see the $100,000 factored in.  Did I miss that? Maybe I did.

A    I factored it into my thinking.  It's not in the

motion, I don't think.

Q    Yeah.  The motion that you filed to ask the court to approve, on Paragraph 43 in particular, does that take into account the $100,000 incremental increase or decrease, whatever?

A    I mean, it takes it into account.  It's not specifically spelled out.

Q    What does it say here in your chart?  Show me where I'm missing it.

A    Well, you can infer it.  I mean, I'm focused on the gift class share and the backup bid is 687 and the winning bid is a million.  And that's more than $100,000 difference.  So it considers the 100,000.  It just doesn't consider it to be dispositive.  So it's not talked about.

Q    I'm not quite sure understood a single word you said.  Where in -- let me try it again.  This is my fault.  Where on the chart that you have in this motion that you want His Honor to put in his order approving or are referencing, where does it say anything about a $100,000 incremental increase?

A    I'm still going to disagree with you.  I'm not asking the court to endorse this chart.

Q    Okay.

A    That's not what I'm asking.

Q    All right.

A    I'm asking him to make a finding that the distributable proceeds waiver is fair and is reasonably equivalent consideration and those other things that we talked about. That was a premise in your question that I disagreed with.

Q    Okay.  But with that premise and qualifier in mind, show me on the chart where their $100,000 incremental offer is taken into account.

A    That's not in the chart.

Q    Why not?

A    Because that's not what the chart is meant to show.

Q    But you did take it into account in putting the chart together, you're saying?

A    I took it into account in deciding in my analysis of the bids and which one was better.

Q    How so?  How did you take it into account?

A    Well, I took it into account by thinking if that's the only thing in the bid that you look at and that's the only thing you consider, and you interpret it that way, that it's only 100,000 more recovery for that group, is 100,000 more better for that group?  Yes, obviously.  It's more money.

Q    I don't see that referenced in either Paragraph 42 or 43.  Did I miss it in 42 or 43, for that matter?

A    I don't think I discussed it in either of those two paragraphs.

Q    You just had it in your brain.

A    Yeah.

Q    Yeah.  Now, you say here on Paragraph 43, you factor in $750,000 of administrative costs.  And I believe with Mr. Wolfshohl, you broke that down for us.  You said that includes legal fees, which I think you said you penciled in a couple hundred thousand dollars, and then I think you said you had auctioneer fees for we heard for Mr. Tannenbaum and then yourself, right?

A    Yes.

Q    Now, did I understand you to say that you penciled in $350,000 for your auctioneer?

A    I think that's about right.  Yeah.

Q    Now, where'd you get that number?

A    That was roughly the percentages of the commissions based on estimated allocation of how much of the purchase price goes to IP and how much of it goes to personal property.  Those percentages were different.

Q    Was the amount that you penciled in for your auctioneer based on, related to or tied in any way to what the First United bid was?

A    Yes.

Q    Tell me how.

A    So under the winning bid, which we agree, it's a lower purchase price amount, if you just look at the percentage as applied to that winning bid, that's a lower commission for

the auctioneer.

Q    What would it be?

A    I don't know.  I don't have that in front of me.  It's a lower number because it's lower percentages times -- or it's percentages times a lower purchase amount.

Q    Okay.

A    But the backup bid is a higher cash amount.  So if we went with that bid, obviously the auctioneer would make more money in that scenario.  That was the basis on which I picked what I estimated for the auctioneer's expenses because even though we haven't figured out exactly how to apply his commission structure to the distributable proceeds waiver, I think it would be fair to compensate him as if at least he got as much as he would have gotten under a competing bid because he's creating the same value for the unsecured creditors.  He's adding that to the case, and so that's why I used that as an approximation of what his commission might end up being.

Q    So bottom line is, you compensated him as if the First United bid had been accepted?

A    Yeah.  That was what I used as an estimate for that.

Q    Okay, and then you said, I believe, your fee is 3 percent, right?

A    Yes.

Q    Okay, and you said that was roughly $50,000, I think

you said to Mr. Wolfshohl.

A    Right.  Yes, on the winning bid amount.  Yeah.

Q    Yeah.  Based on the winning bid amount.  So three -- so if I take my little computer here and calculator, you took 3 percent of 1.75 million?

A    Yeah.  It was a long time ago, but yeah, if you've got the calculator there.  Yeah.

Q    Yeah.  So if I do $1,750,000 times 0.03, 52,000.  You took your commission based on 1.75.

A    Yes.

Q    But you gave your auctioneer based on 3.5 million.

A    Yes.

Q    Now, why is that?

A    Because what I was trying to do was treat the auctioneer fairly because we're taking a bid that has a lower purchase price, but he still added the value of at least the other bid.  So I wanted to true him up.  I did not increase mine because my commission is calculated on the statutory formula.  And I don't believe it can be calculated with reference to an alternative bid like that.  It's only the cash that flows through.  So if I had accepted the backup bid and we closed on the backup bid, I would get 3 percent of the 3.5 million.  But accepting Global Tetrahedron, I'm only going to get 3 percent of the 1.75.

Q    Why wouldn't you get 3 percent of 7 million?

A     The 3 percent of the higher amount?

Q     Why wouldn't you get three --

          MR. WOLFSHOHL:  Objection, asked and answered (indiscernible) --

          THE WITNESS:  Yeah, because the cash doesn't flow through the estate.  So --

BY MR. BROOCKS:

Q     I'm sorry.  I'm sorry.  I misunderstood you.  I thought you said when the distributable waiver proceeded was effectuated, the Connecticut plaintiffs would not get their money.  Basically, they would get it, but give it to you to give back down to the other people.  I thought that's what you just told me.

A     Yeah, that's the way they describe how the transfer of cash would occur.

Q     But wouldn't that therefore mean that the cash equivalent value of that waiver would go through the estate?

A     No, I don't think so.

Q     Why not?

A     Well, if you're talking about the commission, the commission's calculated on disbursements at the end.  And so if I take a disbursement of one creditor and move it to a disbursement of the other creditor, A plus B is still C.  So, you know, A minus X plus B plus X is still going to be C.  So the commission doesn't go up just because there's an

intercreditor transfer.

Q   Now, your motion that you -- or sorry, the order that you want His Honor to enter, doesn't it recite effectively a seven -- or it refers to -- the motion you filed -- sorry, let me start that over.  I don't like the way that came out.

The order that you want His Honor to sign approving this Transaction assumes a $7 million, effectively, purchase price, doesn't it?

A   I mean, it refers to it.  But no, it's not a finding that $7 million was paid.  Is that what you're asking?

Q   Well, maybe, but what is the -- what is the final purchase price you're asking His Honor to approve for the Global Tetrahedron purchaser and the Connecticut families? What's the purchase price?

A   It's the 1.75 million.

Q   Okay.

A   Plus the distributable proceeds waiver of 750 between the creditors with the right of Texas to argue that it should be more should the ratio of the claims end up being different.

Q   So answer my question then.  If you have to take a pencil or a calculator, I'm happy to lend you my telephone. What is the final purchase price that you want His Honor to enter?  Do the math for me.  Add everything up, without the Texas plaintiffs being able to argue more.

A     Okay.  It's the 1.75.

Q     Okay.

A     Plus the 750 distributable proceeds waiver.

Q     So should I add 1.75 and $750,000?  Is that what that means?

A     No, because that -- well, I mean, you could, but I'm not sure that would be meaningful because what --

Q     I just want to know what the purchase price is.  That's all I want.

A     Right.  But what I'm telling you is when I'm comparing the two offers, I'm not comparing the purchase price, whatever that is.  I'm comparing what the unsecured creditors get.

Q     Yeah, and I want to know what did the purchase -- what is the purchase price of the asset you sold?  Can you answer that question with a number?

          MR. PATERSON:  Objection, Your Honor.  Asked and answered.

          THE COURT:  Yeah.  I think that's been answered a lot.

          MR. BROOCKS:  Well, I sure haven't heard the answer in a number, Judge.

          THE COURT:  Yeah, you have.

          MR. WOLFSHOHL:  Your Honor, I'm going to --

          THE COURT:  Yeah, you have.  Yeah, you have.

MR. BROOCKS:  Okay.

THE COURT:  Let's keep going.

MR. BROOCKS:  Okay.

THE COURT:  It may not be the number or the formula that anyone likes, but it's been articulated a lot, right?

BY MR. BROOCKS:

Q    So, is the number that the cash -- back to exhibit -- the motion, at Paragraph 43, is it 4.75 million?  Is that the purchase price?

MR. PATERSON:  Objection, Your Honor.  Asked and answered again.

MR. BROOCKS:  I don't think that's been asked.

THE COURT:  I'll let him answer this question and then we can move on to another topic.

BY MR. BROOCKS:

Q    Is the $4,750,000 that you've got in Paragraph 43 of your motion that is referenced in the judge's order, is that the purchase price?

A    No.

Q    Is it higher or lower?

A    The purchase price is a combination of the judgment distributable proceeds waiver and the cash purchase price.

Q    Is it higher or lower than 4.75 million?

A    I don't know.

Q    Maybe what?  Maybe yes, maybe no?

A    I don't know.

MR. PATERSON:  Objection, asked and answered.

THE COURT:  Agreed.

MR. BROOCKS:  I'll move on, Your Honor.

BY MR. BROOCKS:

Q    So now let me ask you this.  You told the court in your motion to approve 915 that the purchase price was $7 million, didn't you?

A    Yes.

Q    Okay.  But it ain't 7 million.  Even notional values of distributable proceeds, it ain't 7 million, is it?

A    It is 7 million, notionally.

Q    How'd you get that?

A    It's on the bid form.

Q    They're paying -- they're paying you seven -- that's what you -- well, I'm asking you, did you get $7 million in the purchase price?

A    No.

Q    You told the court that you did in your motion 915, didn't you?  I'll find it if I need to.  But didn't you tell them that you accepted a bid for 7 million?

A    You'll have to find what that's referring to.

Q    You don't know?

A    I've never said I was getting 7 million cash purchase

price.

Q    You've never said you're getting 7 million purchase price?

A    No.  There's a bid that is notionally referred to as a $7 million bid.  I don't know.  I'm not sure what sentence you're referring to here.

Q    Well, let me do this real quick.  I'm going to find it for you.  So looking at Exhibit 12, in your motion, top of Page 3, you told the court that Global Tetrahedron submitted a bid in an updated amount of no less than $7 million, didn't you?

A    And the rest of the sentence says, consisting of a cash payment plus the distributable proceeds waiver.

Q    I got that.  But you said that they submitted a bid in a stated amount no less than 7 million, right?

A    Yes, that's what those words say.

Q    Okay, and what does no less than 7 million mean?

A    I think it means what it says.

Q    What is that?

A    No less than 7 million.

Q    I'm sorry.  What does it mean?

A    No less than 7 million.

Q    Could be more?

A    Yes.

Q    And what would cause this bid to be more than 7

million?

A    I don't know.

Q    Now, the currency, so to speak, of the auction -- there was no auction.  It was a -- this was a sealed bid, right? You didn't do an auction.

A    I disagree with you.

Q    You think this was an auction?

A    I think this is a form of auction.

Q    Yeah, and the currency that was offered by the winning bidder was cash and this distributable proceeds waiver. That was the currency?

A    Yes.

Q    Yeah.  Did you tell anybody else at all that you were going to be willing to accept something besides cash or a cash equivalent?

A    Yes.

Q    Who did you tell?

A    Well, the bid procedures refer, make reference to noncash components.

Q    And so by that noncash component, you think a normal reasonable person would think, well, one creditor forgoing a certain amount of its proceeds.  They should have realized that, right?  Is that what you're thinking?

A    I don't know how they would have interpreted it.

Q    Well, you'd never heard of it before.

A    Right.

Q    So do you think anybody else would have thought of that?

A    I don't know.

Q    But if you'd had an open outcry bid, it's open outcry -- strike that.

You were supposed to have an open outcry auction, weren't you?

A    We intended to do that and then decided not to.

Q    And the high bidder, I think, in the initial round was going to be the opening bid in the live auction, wasn't it? Isn't that how you intended it to be?

A    That's how you usually start one.  Yeah.

Q    Yeah, and so then you would say, I've got an opening bid of a million dollars, who will give me 1.1 million?  And then you go up from there, right?  Isn't that how --

A    Just like on TV.

Q    Just like on TV.  You've got your little paddle there and your wife's nudging you, don't go any higher and you get caught up in the heat of the moment.  But doesn't that ensure that everybody hears what someone else is doing and can top that bid?

A    Right.  In that kind of an auction, that's how that works.

Q    Yeah.  But -- and that's how you were structuring this

at the outset.  Isn't that right?

A    It's how we thought it would probably go.

Q    And that's what His Honor thought too.  Isn't that what you told him you were going to do?

A    Yeah.

MR. PATERSON:  Objection, calls for speculation.

MR. BROOCKS:  He just said yes, but okay.

THE COURT:  Yeah, he answered the question.

MR. BROOCKS:  Yeah.

BY MR. BROOCKS:

Q    So you decided to change that.  You got the initial bids on November the 8th, right?  And you formally changed that auction process, taking it away, what day?

A    It was whatever -- well, I didn't take it away or change it.  It was a sealed bid with an option for a live auction, and I declined to proceed with live auction.  But not quibbling over that.  The decision was conveyed to the bidders on that Monday.  The 8th was the Friday and then --

Q    Friday was the 8th, and what day do you think you conveyed it?

A    I think it was Monday the 11th.

Q    You told them we're not going to do a live auction?

A    It was whatever the date of that email, Exhibit 25, is.

Q    You said we're going to do that -- we want you guys to give us your highest and best bid.

A    Right.

Q    And now, if Mr. -- if the First United group had said, well, hey, wait a minute, we'll put up 3.5 million and we'll give the non-Connecticut creditors $500,000, could they have done that?

A    Sorry.  Who?  If who did that?

Q    If First United, the competing bidder, had said -- had known and said, wait a minute, they're going to bid 1.75 in this waiver, we'll bid 3.5 million and we'll put 500,000 in. Could they have done that?

A    But for your example, put the 500,000 into what?

Q    To the non-Connecticut creditors.

A    Oh, I mean, they could have made that bid.  I mean, they could have tried.  I would have considered it.

Q    Well, how much value would that have had in your mathematics of how you do values?

A    None, because the -- well, it would have been worth 3.5 million for sure because that's cash that comes into the estate.  But I can't bring 500,000 into the estate and then discriminate among the creditors giving it to them unevenly.

Q    So the Connecticut plaintiffs can discriminate, but you can't.

A    That's right, because it's their money.  It's their right to consent.

Q    So even if Texas United had bid 3.5 and the Connecticut

plaintiffs would have gotten, you know, the lion's share of that and First United said, if we now know the currency of your auction is, you know, who some -- the non-Connecticut guys getting more money, they couldn't have said, well, we will give 500,000 earmarked for them.  That wouldn't have worked.

A     They can't because they don't have that kind of currency.  First United doesn't have an outsized unsecured claim in the case.  It's not something they are capable of bidding.

Q     Okay.  Now, you understood, you thought, when you submitted your motion on Monday -- let me get -- let me get the calendar and get the times right.  Okay.  The --

THE COURT:  Mr. Broocks, how much more time do you think you have?  I'm just trying to find a logical -- I'm trying to find a logical stopping point for a break and I don't know if now makes sense or not.

MR. BROOCKS:  I'm going to try to be through before 6:30.

THE COURT:  Mr. Murray, let me --

MR. BROOCKS:  Is that okay?

THE COURT:  Let me just ask the witness.  Do you want --

THE WITNESS:  I'm good.

THE COURT:  Do you want to push through until

about 6:30, and then we'll take a break?

THE WITNESS:  Yeah, that sounds fine.

THE COURT:  Okay.  Let's keep going.

THE WITNESS:  If Mr. Broocks promises to be finished by then.

MR. BROOCKS:  I made no promises.  I promise nothing to you.  I'll promise to His Honor.

BY MR. BROOCKS:

Q   But let's so get the dates right.  So the 8th of November was the day, Friday, the date that the initial bids were submitted.

A   Yes.

Q   Now, before the 8th, on or before the 8th, you were actually in the midst and knee-deep in discussions with the Connecticut and Texas plaintiffs about a deal between the two of them where the Texas plaintiffs would get 3 million bucks and they would withdraw all their claims and the Connecticut plaintiffs would -- isn't that about right?

A   Yeah.  I'm vaguely remembering that, yes.

Q   Yeah.  Well, let me see if I can refresh your memory a little bit more.  Your lawyer, Mr. Wolfshohl, gave us, at our request, what I'm going to mark as Jones 20, I believe.

THE COURT:  Sounds right.

MR. BROOCKS:  Your Honor, I don't have a --

THE COURT:  No worries.

MR. BROOCKS:  May I approach?

THE COURT:  Yes.

MR. WOLFSHOHL:  Mr. Broocks, is this already on your exhibit list?

MR. BROOCKS:  No, it's not.

MR. WOLFSHOHL:  I haven't seen this (indiscernible) --

MR. BROOCKS:  It's what you gave me.  It's your letter.

MR. WOLFSHOHL:  I did -- right, I did give it to you.  It's just (indiscernible) --

MR. BROOCKS:  December the 8th.  You emailed it to me on December the 8th.

THE COURT:  Subject to cross-examination.  They don't really need to put something on a witness and exhibit list.  I don't know if it's for purposes of (indiscernible) --

MR. WOLFSHOHL:  No, I just -- I mean, I haven't seen it.  So (indiscernible) --

THE COURT:  Oh, I got it.

MR. WOLFSHOHL:  I mean, I know what it is.  But I don't have it in the witness -- or exhibit (indiscernible) --

THE COURT:  I don't know if he's crossing the witness for on it or for what purpose he's offering it.  I

don't -- I don't know if he can use it or not.

BY MR. BROOCKS:

Q    Now, I'm going to hand you --

        MR. BROOCKS:  Your Honor, may I approach?

        THE COURT:  Yes.

        MR. BROOCKS:  This is for the witness and, Your Honor, I'll (indiscernible) --

        THE WITNESS:  Thank you.

        THE COURT:  Thank you.

BY MR. BROOCKS:

Q    This is a letter we got from Mr. Wolfshohl on December the 8th, which was Sunday, I guess.  Have you seen this before?

A    Let me take a look.  Oh yeah, I've seen this.

Q    Now -- yeah, and this is the two page -- first two pages of the letters where Wolfshohl and his team are responding.  And then I'm going to -- if I can take the Elmo here.

A    I don't need it.  I've got a copy.

Q    Now, this is --

        MR. BROOCKS:  Am I not -- am I messing up?  Did I do something wrong?

        THE COURT:  Why don't we just go old school.  Why don't we -- don't put it up on the screen.  Just point him to it.

BY MR. BROOCKS:

Q   Okay.  So on the third page, what is -- what am I looking at on the third page?  It's an email from who to who?

A   Is this the Leslie Liberman email?

Q   And Leslie -- yes, that's right.  And Ms. Liberman, she works for Paul Weiss.

A   Let me take a look here.

        MR. WOLFSHOHL:  Oh, but are you asking about that or the term --

        MR. BROOCKS:  I'm asking who all's on it.

        MR. WOLFSHOHL:  Oh.

BY MR. BROOCKS:

Q   Can you tell us?  I mean, I'm just asking you.  Do you know who Lieberman is?

A   Yeah, but hang on.  I'm not sure I've seen this before.  Was this attached to the cover letter that we sent you?

Q   This is it.  This is what your lawyer sent me on December the 8th.  That's why I'm going to ask you about it.  I can't put him on.

A   Okay.  Yeah.  I think I know what this is.

        MR. BROOCKS:  Your Honor, if I could just get the --

        THE COURT:  Let's just go old school.  Just point to the papers and let's keep going.  I don't know if this

thing is going to work.  If it works, it works.

MR. BROOCKS:  I don't want the Elmo anymore.  I just want the regular presenter.

THE COURT:  Ah, the regular presenter.

MR. BROOCKS:  Yeah, the regular.

THE COURT:  This podium.

MR. BROOCKS:  Yeah, this is the --

THE WITNESS:  That's not it.  I think that's your letter.  I think that's the letter this is responding to.

MR. BROOCKS:  Let me see here.  This is it.  Yeah. Here we go.

BY MR. BROOCKS:

Q   Now, I'm just simply asking you, there's a lot of lawyers.  Liberman's from Paul Weiss.  That's representing the Connecticut plaintiffs, right?

A   Yeah.  The Paul Weiss team represents Connecticut families.

Q   Okay, and then Kyle Kimpler and then who is John Ashmead?

A   I think that's Global Tetrahedron's counsel at one point.

Q   Okay.  Lots of lawyers on here, right?  Erin Jones is your lawyer, your personal or your partner, right?

A   She's not my personal lawyer.  She is my partner. She's my attorney in this case.

Q    Your attorney.  Okay.  Now, it says please find a draft of a proposed sale order.  We would appreciate any comment.  So on November 15th, Friday, the November 15th at 6:43, that's when the proposed sale order is being sent by the -- who does Paul Weiss represent?  The Connecticut plaintiffs?

A    The Connecticut families, yes.

Q    Okay, and they're sending the proposed form of order.  This is the original form that it ended up getting attached on November the 18th, wasn't it?

A    I don't know if they're exactly the same, and I don't know what version of the order this is.  But yes, they're sending a draft sale order.

Q    Okay.  Well, let's just look at Paragraph H.  Okay.  No, it's not H.

A    G in this one.

Q    Is it G in this one?

A    Yeah.

Q    You've seen this before, haven't you?

A    No, I just saw it go by.

Q    I see.  Okay.  So in the order that Paul Weiss, the Connecticut plaintiffs are sending on Friday night, it says the consideration to be provided by the purchaser and the Connecticut families consists of -- you read it.

A    Yeah.  So it's -- it consists -- I'm sorry.  Oh.  Consists of the cash consideration amount of 1.750 or

1,750,000. Sorry, it's getting late. And, two, commitment by the Connecticut families to forego the distributable proceeds waiver amount as defined below and the assignment of distributable proceeds waiver amount to the trustee for the benefit of all other unsecured creditors of FSS.

Q   And the distributable proceeds amount means what?

A   And then this is the definition that was in the order we talked about before, it looks like.

Q   This is the one you filed that you asked His Honor to sign on November the 18th.

A   Right. But that had the language that was not what we had agreed to. Right.

Q   Well, this is what I want to focus on.

A   Right.

Q   Read the language here. The distributable proceeds waiver amount means what?

A   This is what we just read before, or the other one. Distributable proceeds waiver amount means the amount necessary for all other holders of allowed unsecured creditors of FSS to recover $100,000 more in the aggregate than they would recover from the sale of the purchased assets backup bidder, up to 100 percent, the Connecticut families' entitlement to the cash purchase price. Right.

Q   All right. Now, you read that pretty fast, but I think

I followed you.

A     I'm sorry.

Q     This is not anywhere near what the new order is you're asking His Honor to enter, is it?

A     That's right.  It's different.

Q     Yeah.  This is the -- this says, hey, we're going to give 100,000 more.  We're asking -- you're asking His Honor to sign an order saying it's 100,000 more than the First United bid.

A     Well, this is a draft I didn't ask anyone to sign.  But yes, that language was in the first sale order.

Q     But it's in the first -- it's in the order that we marked as -- what was it, exhibit number --

A     That's right.  It was in -- it was in the first proposed order to the motion.

Q     That you wanted His Honor to sign.

A     Yeah.

Q     That was an erroneous order.

A     Yes.

Q     But it was sent to you by the Connecticut plaintiffs and you put it in -- sorry.

A     Yeah.  That portion of it, yeah, I agree, came from Connecticut.  What I'm just trying to make sure is that I don't know if what is in this email, I don't know what changes there are between that and the first order we filed.

Q    Fair enough.  But this Paragraph G is that we just read that the Paul Weiss folks sent you is what ended up being filed on November the 18th that you're saying was filed in error.

A    Yeah.  It looks like it ends up being what the Paragraph H was.

Q    Now, I don't know the Paul Weiss lawyers.  But I think they're pretty smart, don't you think?

A    They're very smart people.

Q    They're top notch, aren't they?

A    They are.

Q    You think this was a mistake they made?  They misunderstood?

A    I don't know.

Q    What do you think?

A    I think they drafted this based on the way they interpreted their bid, but not the way they agreed to treat it for the purposes of seeking court approval of the deal.

Q    So by November the 15th, on November the 15th, you had already basically accepted their offer as you understood it, hadn't you?

A    I don't know.  I know that we finally agreed on what the distributable proceeds waiver definition should be --

Q    No, no.  I'll get to that --

A    I wanted to --

Q    I'll get to that.  I'll get to when you finally agreed --

A    I can't answer that?

Q    I want to talk about what you --

        MR. PATERSON:  Objection.

        THE COURT:  Everybody's talking over each other.

        MR. BROOCKS:  I apologize, but I want -- I've got -- I'm trying to land this airplane in 15 minutes, Judge. And I don't want -- I want to ask very precise questions and, if I don't, I apologize.

BY MR. BROOCKS:

Q    I'm not asking you what you ultimately agreed.  I'm going to come to that.  As of November the 15th at 6:43 p.m., Paul Weiss sends you an order, a form of order that reflects not what you ultimately agreed in your mind, but the $100,000 (indiscernible) that concept, right?

A    Right.

Q    Okay.  Now, when did you first realize that they thought the deal was not 7 million but $100,000 more than First United?

A    I don't remember when.  I don't remember.

Q    Well, give us an approximation.

A    I mean, it was around this time period.

Q    Well, I'd like you to be a little bit more precise than that if you can.  Here's your calendar here.  You get this

on the 15th, Friday the 15th, at 6:43, and you're going to file your motion with this erroneous order on Monday the 18th.  When did you first realize, sir, that they thought it was $100,000 more than the First United bid?

A    It was sometime in that time period.  I don't know.

Q    Can you be more specific?

A    No.

Q    Was it -- could it -- could it have been sometime during the week of the 18th?

MR. PATERSON:  Asked and answered.

MR. WOLFSHOHL:  Your Honor, if he doesn't know the answer, he doesn't know the answer.

THE COURT:  He doesn't know.

MR. BROOCKS:  Well, he's testified it was -- he told -- he covered us at great length with Mr. Wolfshohl.  I'm trying -- I think I'm going to impeach him right now.  I'm going to impeach that.  I'm going to show him he knew.  He knew this.  He didn't realize this until a couple of days ago.

THE COURT:  I'll let you ask the question.

BY MR. BROOCKS:

Q    When did you -- can you give us, the court -- I got the calendar up there.  Can you say under oath that you didn't realize this thing sometime during the week of the 18th?  Is it possible?

A    No.  I realized that there was a disagreement in interpreting the bid between this $100,000 deal and the $7 million notional amount.  I realized that before we filed our sale motion.  And I know that --

Q    Sometime before the 18th?

A    Sometime before the 18th, and I know that because we had agreed on the version before we filed the sale motion.  So I must have known about the disagreement before then.  As between the 15th and the 18th, I don't remember exactly when that happened.

Q    But now you had a disagreement with them and you say it was ultimately resolved.  You were still discussing that back and forth with them during the week of the 18th, weren't you?

A    No, that's not true.  We had resolved that discussion before we filed the motion.  And I thought we filed the motion on the 18th.

Q    Now, are you sure you resolved it before the 18th?

A    Yes.

Q    Do you remember telling me that you couldn't -- and when I deposed you and asked you about this, that you didn't really know when you resolved it?  Do you remember that?

A    Yeah.  I remember you asked me about that, and that was my answer.

Q    You remember you didn't know when it was resolved?

A    That's right.

Q    And I asked you, could it have been sometime during the week of the 15th, even a couple of days ago, and you said, it's possible?  Remember that?

A    Yeah, I remember not remembering.

Q    Okay.  But now you remember?

A    Yeah, I do.

Q    So you didn't remember on Thursday when I deposed you, but now you remember when you resolved it?

A    Yes.

Q    Okay.  Why did you -- what happened to the -- what refreshed your memory, sir?

A    I discussed with counsel and I reviewed the emails and I remembered, oh, yeah, we did resolve it before that date. I just didn't remember the timeline when you were asking me in the deposition.

Q    So would you agree with me that the $100,000 over First United is not the same thing as $7 million?

A    Different things.

Q    And neither of those two -- well, let me write this. Let me write it up here so I don't get myself confused.  So the bid that you got said at least 7 million, that's what the bid sheet said that they gave you, right?

A    Right.  Yes.

Q    The proposed form of order that they submit said

$100,000 more than First United, right?

MR. WOLFSHOHL:  Objection.  That's not an accurate statement as to what the order says.

THE COURT:  I think the order -- the term is the backup bidder.

MR. BROOCKS:  The backup bidder.  Apologize.

THE COURT:  That's what the letter says.  I'm just trying to get you there.

BY MR. BROOCKS:

Q    That's what -- and that's what their form of order said, right, number two?

A    In the exhibit you handed me.  Yes.

Q    And in the form of order you submitted to His Honor on November the 18th.

A    Yes.

Q    Okay.  Now, the chart that you put in your motion said, on Paragraph 43, put the fair market value, or the cash equivalent value, I believe, at roughly $4.6 million, right?

A    In paragraph 43.  Yes, that's right.

Q    Okay.  Now, and I've asked you, tell me now what it is, the purchase price that you believe you sold it for, that you want His Honor to enter.  Tell me what goes right there in that number four.

A    Purchase price is the combination of 1.75 million in cash plus the distributable proceeds waiver.

Q   Which is $750,000?

A   Yes.

Q   So 1.75 -- let me do the math for you.  1.75 plus $750,000.  That's what you want His Honor -- that's what you believe the purchase price in the order -- what's that number?  1,750,000 plus 750,000 is what?  2,500,000, and that's what the purchase price is today in your mind?

A   No, because I don't think you can add those two together.  I think it's misleading.  But the sum of those two numbers is that.

Q   I thought you just told me to.

A   No, because -- no.  I'm going to give you the same answer every time you ask this question.

MR. BROOCKS:  Okay.  Well, then, now, Your Honor, I'm going to just ask you as I close here, quickly take a look back at Jones Exhibit 20.  Now --

THE WITNESS:  Twenty?

MR. BROOCKS:  Yeah, now again, this is -- we've got an email here.  And if you keep flipping.

THE WITNESS:  Oh, Jones 20.

MR. BROOCKS:  Yes, Jones 20.

THE WITNESS:  I have it.

BY MR. BROOCKS:

Q   Past the order.  And I apologize.  The pages aren't numbered.  So you get to a term sheet.  See that there?

A    Yeah.

Q    And that term sheet, what is the -- what is this term sheet?

A    Hang on.  I think there's multiple term sheets.  I want to know --

Q    There's two.

A    Okay.  Which one do you want me on?

Q    Well, there's -- let's go -- let's go from the end and work up.  So if you start at the very end --

            MR. WOLFSHOHL:  What document are we talking about?

            MR. BROOCKS:  Jones 20.  Your letter.

            MR. WOLFSHOHL:  I don't think this is in evidence.

            MR. BROOCKS:  I'm fixing to do it right now.

            MR. WOLFSHOHL:  Okay.  So you're -- okay.  You're about to.

            MR. BROOCKS:  Yeah.

            THE COURT:  I don't think it needs to be into evidence if you're cross-examining the witness.

            MR. BROOCKS:  I'm going to get him to identify the contents and I'm going to ask him -- then I'm going to ask him to -- then I'm going to move to admit it after he identifies the contents.

BY MR. BROOCKS:

Q    So, Jones 20, if you start backward, there's a term

sheet with a redline November the 8th, 2024.

A    Okay.

Q    Right?  And then if you keep going further than that, there is a -- it looks like a clean term sheet, November the 8th, 2024.

A    Going back up through the document?

Q    Yes.

A    Yeah, I see the clean one here.

Q    Okay.

A    Sure, I've got it.

Q    So this is -- to summarize, Jones 20 is a letter your lawyer -- Wolfshohl is your lawyer, right?

A    Yeah.

Q    Sent to me, attached to which is an email exchange from the Connecticut plaintiffs transmitting a form of order, right?

A    Yes.

Q    Also transmitting a draft term sheet, a redline term sheet and a final term sheet.

A    A clean term sheet.

Q    A clean term sheet.

        MR. BROOCKS:  Your Honor, I'm going to move to admit Jones 20.

        THE COURT:  Any objection to the admission of Jones 20?

MR. WOLFSHOHL:  No, Your Honor.

MR. BROOCKS:  Now, Jones 19, that I need to --

THE COURT:  Jones 20 is admitted.

(Jones Exhibit 20 entered into evidence)

MR. BROOCKS:  Now, 18 and 19, what are those?  I just did that, 20.  And I think I moved to admit, Your Honor, the chart.  I believe I did.

THE COURT:  That chart?

MR. BROOCKS:  Yes.

THE COURT:  The picture of the chart.  Yes, that has been admitted as Jones either -- I think that may be Jones 18.

MR. BROOCKS:  And then Jones 19.

THE COURT:  Is the order.

MR. BROOCKS:  The new form of order.

THE COURT:  The new form of order is Jones 19.  That's been admitted.

MR. BROOCKS:  Okay.  I'm trying to belt the suspenders.

THE COURT:  And I will confirm.  Jones 18, 19 and 20 have been admitted.

BY MR. BROOCKS:

Q   Now, I said I was going to finish by 6:30, and I'm going to.  Now, finally, let me get you to turn back to Exhibit 1, trustee's Exhibit 1.

A     Okay.

Q     Now, you testified about this with Mr. Wolfshohl.

A     Okay.  Yes.

Q     Right.  What is Exhibit 1?

A     It's Free Speech Systems' amended schedules.

Q     Now, did you put this together?

A     No.

Q     Okay.  Now, but it's what you and Mr. Wolfshohl talked about, and it's admitted into evidence, right?

A     Yes, I think it's admitted.

Q     Now, I want you to read to us Paragraph 5.

A     All right.  The intellectual property rights?

Q     Yeah.

A     Oh, you've got it on the screen.  Any omission of intellectual property from the schedules and statements shall not be an admission that such intellectual property rights have been abandoned, have been terminated, or otherwise expired by their terms, or have been assigned or otherwise transferred pursuant to a sale, acquisition or other transaction.  In accordance with all the foregoing, the debtor reserves all its rights with respect to the legal status of any and all intellectual property rights, regardless of whether such intellectual property rights are or are not listed on the schedules and statements.  And this is the Free Speech Systems' schedules.

Q    Now, you didn't -- my question was, did you read -- I just asked you to read it.  You did.  Thank you.  Now, you didn't read that to the judge when you were talking about intellectual property rights, did you, sir?  Yes or no?

A    No.  No, I didn't.

Q    Now, you have been around a lot of businesses in your career as a trustee, haven't you?

A    Yes.

Q    Have you ever had an LLC that was a creditor, a debtor?

A    Yes.

Q    You ever had a LLC that was what I'll call a mom and a pop shop?

A    Yes.

Q    Where the owner was essentially, you know, one or two people, a family that basically had a family run LLP, LLC.

A    Plenty of single member LLCs, yes.

Q    And you understand that because of that, the Texas statutes and the Texas business organizations code say that a judgment creditor against an LLC can't even collect on the assets.  All he can get is the charging order.  You know that's the law, don't you?

A    Yeah, the charging -- yeah, I'm familiar with that.

Q    So if you get a judgment against Alex Jones, for example, individually, you can't recover against the assets of FSS.  All you can do is get a charging order.  That's

what the law is in the state of Texas statutorily, true?

A    That's how I understand that.

Q    Now, and you know that oftentimes in a busy mom and pop shop, the record formalities aren't observed.  I mean, sometimes what's -- it's just intermingled.  You know that, don't you?

A    Sometimes that happens.  Yeah.

Q    Yeah, and you know that the law is that in contract contracts, that the fact that you haven't kept formalities cannot be used as a basis for piercing the corporate veil by statute.  You know that's the law.

MR. WOLFSHOHL:  Objection, relevance, Your Honor.

MR. PATERSON:  And legal conclusion.

THE COURT:  What is the, yeah, all of it?

MR. BROOCKS:  Sorry?

THE COURT:  What's the legal relevance?

MR. BROOCKS:  The legal relevance is this.  He made a big deal when he's talking to Wolfshohl about the fact that Mr. Jones didn't schedule his intellectual property rights.  It's a mom-and-pop shop and they've got it in here --

THE COURT:  I'm going to strike this line of questioning.

MR. BROOCKS:  Okay.

THE COURT:  I don't -- I don't know -- I don't

know that, nor is there any evidence to confirm what FSS is or is not today.  So I'm going to strike that.

MR. BROOCKS:  Well, he was talking about it.

THE COURT:  He answered questions when (indiscernible) --

MR. BROOCKS:  All right.  I apologize.  Let me move on then.

THE COURT:  I just want to be clear.

MR. BROOCKS:  Yes, go ahead.

THE COURT:  He answered questions about whether there was something on a page, whether it was included on these pages or not.  That's what he answered.

BY MR. BROOCKS:

Q    Now, you know that a LLC has members and managers, don't you?

A    That's my understanding.

Q    And the member's the equivalent of a stockholder and a manager is the equivalent effectively of the board of directors, true, of corporations?

A    That sounds right.  Yes.

Q    Okay.  Now, and you know that you can't -- one cannot sell all or substantially all of the assets of an entity, whether it's a LLC or a corporation, without approval of both the members and managers.  You know that, don't you?

MR. PATERSON:  Objection, relevance and legal

conclusion.

MR. WOLFSHOHL:  Objection, relevance.

MR. BROOCKS:  I'll come to the relevance in a second.  Let me ask the questions.

THE COURT:  I'll answer -- he can answer that question.  But I don't understand.  Well, maybe the next question will explain what the relevance is.

MR. BROOCKS:  Yeah.

THE WITNESS:  Sorry.  Just state it again.

BY MR. BROOCKS:

Q   Yeah.  You know that the sale of all or substantially all of the assets of an LLC requires member and manager approval.

A   I don't know that, but it sounds right.

Q   Okay.  Did you get Mr. Jones's approval?

A   No.

Q   Okay.  Now, do you know whether or not any of the assets that you sold contain privacy rights of any of the consumers, that they were -- that FSS agreed not to sell their assets, their name and information?  Do you know whether that's part of your deals, your documents?

MR. WOLFSHOHL:  Objection, first, to characterizing it as sold assets, and secondly, this is also irrelevant and Mr. Jones doesn't have standing to assert these types of issues --

THE COURT:  No, and --

MR. WOLFSHOHL:  -- relates to people that aren't even in the courtroom.

THE COURT:  I don't see the relevance.  It's opening up questions as to -- Jones certainly was served with all the motions in these cases and so his clients never -- he never objected.  So, I mean, I get it, you can raise these questions now, but certainly no one raised those issues before me at some point.

MR. BROOCKS:  It's privacy rights is what I'm trying to ask about.

THE COURT:  I'm talking about your original point about whether anybody talked to Jones or whether Jones -- anyone asked Jones.  And privacy rights, I think, is beyond where we are.  So let's land the plane.

MR. BROOCKS:  Seat belt signs are on, tray tables up.  Your Honor, thank you.  I'll pass the witness.

THE COURT:  Thank you.  Before we take our break, let me just -- Mr. Murray, I want to ask just something, just a clarification question for me, and I'll let -- we'll take our break, but I don't want to forget to do it.  And it's going to get late and I'm going to forget.  And then I'm looking at my notes here.  So can you turn to on the binder -- let's just say kind of Exhibit 19, which is the Global Tetrahedron final bid.

THE WITNESS:  Okay.

THE COURT:  I know I had a discussion yesterday and you heard it with Mr. Tanenbaum about Group 4 and Group 5.

THE WITNESS:  Yeah.

THE COURT:  Group 4 defines Lots 1 through 4. Group 5 defines Lots 1-A and 2-B.  He was right about that. Okay, and seven million.  And can you flip to 18, and 18 has First America -- First United American Company's bids.  And they are kind of separate bids in different lots, right?

THE WITNESS:  Yes.

THE COURT:  So my question to you is -- well, let me ask you the same question I asked Mr. Tanenbaum.  Do you believe -- what lot do you believe the purchaser is purchasing?

THE WITNESS:  Lot 4.

THE COURT:  Lot 4.  Or Group 4, or I should say Group 5?

THE WITNESS:  Oh, I'm sorry.  No, Group 4 --

THE COURT:  Group 4.

THE WITNESS:  -- is what I meant to say because, yeah, Group 4 is all of the lots.

THE COURT:  Which is all of it, right?

THE WITNESS:  Yes.  Yeah.

THE COURT:  So here's my question to you, because

19, really, right, had four and five.  But had you accepted five there, and let's just say all the other lots, three, six and seven, did you consider accepting Global Tetrahedron for Lot 5 with the waiver, and then Lots 3, 6 and 7, which would have added essentially 3.75 million in cash, plus the 1.75 million, plus the distributor proceeds waiver?

THE WITNESS:  So --

THE COURT:  Four takes it all.  That's my question.  Did you consider kind of declaring -- let me ask a better question.  Did you consider declaring First United American Company as the winner of three, six and seven, and Global Tetrahedron the winner of five?

THE WITNESS:  So, yes, but so, so Group 4 is like all of them.

THE COURT:  Right.  I'm saying just three, six and seven and five.  Right.  Avoiding four.  Essentially, you --

THE WITNESS:  Yeah.  So if I ignore four and you're saying, what if I just --

THE COURT:  Did you consider just taking three, six and seven on this bid and then four on the other bid?  You essentially get all the lots, but you get $5.5 million plus the distributable proceeds waiver.

THE WITNESS:  Right.  So, yes, we considered that.  There's an issue with it, though, because it's not quite perfect because there isn't a lot for just the inventory by

itself.  So there wasn't a bid on that.

THE COURT:  Wait, let me just make -- help me understand.  So, like, Lots, I'm saying 3, 6 and 7.  So three is three and four.  Six is 1-B and 2-A.  Seven is 1-C and 2-C.  So if you take those out, what you have left is 1-A and 2-B, which is what someone could have been.  And then there could have been a fight about 1-A and 2-B.  But you get all the money.

THE WITNESS:  Right.

THE COURT:  Did you consider that?

THE WITNESS:  We did.  And what we considered was, and we talked about this, or we, me and Jeff Tanenbaum talked about it.

THE COURT:  Okay.

THE WITNESS:  Because the joint bidders bid on Group 4 and on Group 5 with the same amount, we viewed that as being --

THE COURT:  Right.

THE WITNESS:  -- as being as being sort of two simultaneous bids, the same way that 18 is sort of like five simultaneous bids.

THE COURT:  So you think Global Tetrahedron bid on four and five simultaneously?

THE WITNESS:  Yes.  I think they're saying we're bidding on five and then --

THE COURT:  But we're also willing to do four.  So you --

THE WITNESS:  We're also willing to do four, but also --

THE WITNESS:  So what if you just told them, you want five, you got five, but I'm going to take all these others and I'm going to get all the money.

THE WITNESS:  Right.  I think it wouldn't have been fair to them to do that because they were also saying, if you're going to look at Group 4, this is what our bid is.  And so that I feel like they're saying on Group 4, they're competing with anybody else bidding on Group 4 at this amount.

THE COURT:  Did you call them and ask them?

THE WITNESS:  No, I didn't.

THE COURT:  Is it fair to the other side then, to -- without that understanding, to have declared them the winner of all the other assets in which no one else put a bid on?

THE WITNESS:  Yeah.

THE COURT:  In other words, you took four, you accepted -- they're saying five, but they're not putting anything in five that's not in five.  So the question is, does this mean they're bidding on five but willing to do four?  Like I want five, but I'm willing to do four, but

I've got to have five.  Or does it mean I want four and five?  Or does it mean four or five, you get to pick.  Because Mr. Tanenbaum seemed to suggest that it was four or five, but you get to pick, which is what made me ask the question, how come you guys didn't just declare the winner and try to get 5.75 million plus the waiver?

THE WITNESS:  So I view it as they say, we want to get five.  We want to get four.  They're bidding on both.  And the alternative, the best bid on 18 was for all of it for their highest amount.  And so I did that sort of head-to-head comparison.  The reason that I think -- I see what you're saying.

THE COURT:  I'm just asking if you considered it.

THE WITNESS:  We did consider it.  We did consider it.

THE COURT:  And you rejected that in favor of the interpretation that you have.

THE WITNESS:  That's right.

THE COURT:  Okay.  That's what I needed to know.  Okay.  That was my questions.  I just want to make sure that I understood.  Let's take our break.  And how long should we break?  I know folks may want to raid the vending machines.  Why don't we take -- Mr. Cicack, how much?  Should we take 10 minutes?  Start at 6:50.  Are you ready?  Will you be ready to go by 6:50?

MR. CICACK:  I'll do my best.

THE COURT:  I mean, to start.

MR. CICACK:  Yeah, no, I get it.

THE COURT:  Okay.

MR. CICACK:  I think so.

THE COURT:  Okay.  Thank you.  Thank you.

CLERK:  All rise.

(Recess)

THE COURT:  Okay.  We're back on the record in Jones.  Folks, it's going to start getting hot around here. So I just -- if you feel like loosening ties, taking off blazers, I don't care about any of that stuff.  Let's just get comfortable everyone, and let's proceed.

THE WITNESS:  I'm sorry, Judge.  You had asked me a couple questions at the end and I think I misunderstood one of your questions.  I want to make sure that I was answering it right.  Can I --

THE COURT:  I'm sure somebody can ask you on redirect.  I think it's improper for --

THE WITNESS:  Oh, okay.  I understand.  All right.

MR. CICACK:  May I proceed, Your Honor?

THE COURT:  Mm-hmm.

MR. CICACK:  Thank you.

CROSS-EXAMINATION OF CHRISTOPHER MURRAY

BY MR. CICACK:

Q    All right.  Mr. Murray, we took your deposition a couple days ago, right?

A    Yes.

Q    Do you recall that?

A    I do.

Q    Okay.  (indiscernible) is going to help me.  I appreciate it very much.  The first thing I want to talk to you about is trustee's Exhibit 14.

A    Okay.

Q    Are you ready?

A    Mm-hmm.

Q    Okay.  All right.  Can you tell the court what this is a copy of?

A    Yeah.  This is the revised offering memorandum we were talking about; well, not us, but the other lawyer.

Q    This is the revised offering memorandum that was sent to potential bidders, correct?

A    Yes.

Q    And you reviewed it and approved it?

A    Yes.

Q    And as far as you know, everything in it was accurate?

A    Yes.

Q    And bidders who are interested could rely on it, correct?

A    Yes.

Q    All right.  Let me ask you to look at page -- what's on the top, Page 4.

A    Okay.

Q    All right.  Now under terms, highlights, the first sentence there, scroll down just a little bit, please.  All right.  The first sentence under terms, term highlights.  It says, the trustee reserves the right to accept or reject any offer, correct?

A    Yes.

Q    All right, and there were two bids that were made that were accepted, correct?

A    Yeah.  In the first round.  Yes.

Q    First United and the joint bid of Global Tetrahedron and the Connecticut families.

A    Yes.

Q    Okay.  Let's go to the next sentence.  In the event that an offer is accepted, it shall be subject to overbid and U.S. bankruptcy court approval.  You see that?

A    Yes.

Q    Okay.  So neither of the bids that you accepted were subject to an overbid.  Isn't that right?

A    I disagree with you.

          MR. WOLFSHOHL:  Objection to form, Your Honor.

          THE COURT:  What's the form?  What's the --

          MR. WOLFSHOHL:  He's misstating what happened.

THE COURT:  He just asked the question.  It's cross examination and Mr. Murray disagrees.  It's good old cross-examination.  I'll allow it.

BY MR. CICACK:

Q    You told me you accepted two bids.

A    In the first round.  Yes.

Q    Okay, and then it says, in the event that an offer is accepted, it shall be subject to overbid, right?

A    Yes.

Q    All right.  Neither of the two offers that you accepted were subject to an offer bid, an overbid, right?  They were never subject to an overbid.

A    Oh, I think I see what you're saying.  Right.  That's correct.

Q    Okay.  Now, if we go down further in the terms down at the end where it says bid shall be in U.S. dollars on a cash basis and shall be irrevocable and noncontingent.  See that?

A    Yes.

Q    Now, after that it says -- the next line says deposits and payments are due in the form of a wire transfer only.  Correct?

A    Yes, I see that.

Q    And deposits mean the deposits that were made with the bids that you accepted, right?

A    Yes.

Q    And those were made to you by wire transfer only, right?

A    Both of them were wires.  Yes.

Q    Yeah, and payments, that means the amount of money that's going to be paid by the bid that you ultimately accept.

A    Right.

Q    Okay, and the one that you have asked the court to approve has two components to it, I think, right?  A cash component and this thing called the distributable proceeds waiver, correct?  And if I understand your testimony correctly, the current -- the cash portion of it has already been paid to you?

A    Yes, it has.

Q    By wire transfer?

A    Yes.

Q    The distributable proceeds waiver, is that going to be sent to you by wire transfer?

A    No, it'll probably be sent out by me by check.

Q    But your bidding procedures say that the payments are going to be made to you by wire transfer only.

A    Yeah, that bullet point says that.

Q    All right.  So that bullet point is wrong.

A    Sure.

Q    All right.  Let's go -- if we could, go to Page 11 on

the top, the paragraph that says one sealed bid.  The next page.  Sorry.

A    Okay.

Q    Maybe we went too far.

A    No, I think this is the exhibit that just --

Q    There we go.

A    Did the printed one include that?  Or I'm sorry.  Where are we?

Q    This is what I'm asking about right here.

A    Oh, oh.  Okay.  Yeah.

Q    Where it says sealed bid sale.

A    Yep.

Q    All right.  All right.  So going down about, I don't know, three or four lines down, the sentence that starts, the trustee reserves the right to accept or reject bids, evaluate offers compared to other offers received, and/pr projected revenue -- I'm sorry, and/or projected revenues from a piecemeal auction, and open up the sealed bid for live bidding between the competitive bidders.  And that's defined as the auction, correct?

A    Okay.  Yes.

Q    All right, and you had two sealed bids that you accepted, right?  One from First United and one from the joint bidders.

A    Yes.

Q    And those bids were not then subjected to a live bidding, was it? Were they?

A    They were not.

Q    And these bidding procedures define auction as the live bidding between the competitive bidders who provided sealed bids that you accepted.

A    Is that that sentence you just read?

Q    Yes.

A    Yes.

Q    Let's go to the next page, if we could. Now, under notification, Paragraph 9, right, the second sentence, second full sentence starts, if sales agent and trustee determine that one or more qualified bids are competitive in nature, and you define those as qualified bids, right?

A    Okay.

Q    Right, and we know we have two qualified bids that were accepted, right?

A    Right.

Q    All right. The sales agent and trustee reserve the right to convert the sealed bid to an auction between the bidders.

A    I see that.

Q    Right, and you decided not to do that, right?

A    Right.

Q    Okay, and then it says, qualified bidders will be

notified 72 hours sealed bid deadline.  And then if sales agent and trustee determine that no auction will be held, the sales agent and trustee will determine whether or not any qualified bids will be accepted or rejected.

A    I see that.

Q    Right.  So this is the provision, I believe, that you rely on, or at least one of them, where you rely on that you didn't even have to go to an auction.  If you had a bid through the sealed bid process that you thought was just really good, you could accept it.

A    Yeah, I don't think that I was required to have a live auction.

Q    Right.  Well, what I'm getting to here is that this provision says that if you have qualified bids before you even go to an auction, whether it's a live auction or otherwise, this is saying you had the right to accept them, right?  Accept one over the other, right then and there.

A    Oh, you mean that I could just end it after the first round on the qualified bids?

Q    Right.

A    Yes, I could do that, I think.

Q    Right, and you didn't end it after the first round, right?

A    Right.

Q    You decided to go to a second round?

A     Yes.

Q     Okay.  Where in this bid process here does it say that that second round will be anything other than a live auction?

A     Let me take a look.  So the first one that comes to mind is Bid Term 25, where it says rights reserved.  And you see at the end it says, however, sales agent reserves the right to modify the bid process and terms as may be necessary and shall notify bidders accordingly.  And when we changed the bid terms to do an alternative auction, we let you know.

Q     So that's the provision you're relying on, that it's communicating to people that you might not go to a live auction?

A     That's one of them.  Another one is at the beginning of the bid terms where it says that it's --

Q     Where?  What paragraph are you at?

A     Page 12 at the top.

Q     All right.

A     Where it says that these bid procedures are subject in all respects to the winddown order.  And if there's a conflict, the winddown order controls.  And that winddown order, as we discussed a lot earlier, I believe gives me discretion to change these bid terms and procedures.

Q     Okay, and we'll go through the winddown order, I

promise you that.  All right.  So let's go to Paragraph 10 on Page 12, which talks about auction.

A    Okay.

Q    Right.  So where, where it says if an auction is held, it'll take place on November 13, 2024 at 10:30 a.m., correct?

A    Yes, that's what it says.

Q    But it wasn't held, was it?

A    Well, right, as you just showed me twice, Auction, with a capital A, refers to a live auction.  We didn't have that, so that didn't happen.

Q    So as Mr. Tanenbaum testified yesterday, this auction here that says will be taking place on November 13th at 10:30 a.m., that auction was canceled, wasn't it?

A    I disagree with that characterization.

Q    How do you define cancel?  Isn't canceled defined as a planned event that doesn't go through?

A    I'm not sure how you're defining it.  I can try to explain what I mean by my answer.  These procedures said there might be an auction.  If there is, it'll be on this date.  I never said, okay, everybody, I got the bids.  We're going to have the live auction.  It's going to be on this date and then changed my mind and say, oh wait, wait, wait, no, it's canceled.

Q    It was scheduled.  What are you talking about?  It was

scheduled.  It's in the -- it's in the winndown order.  It was scheduled for November 13th.  It's in the winndown.  Are you telling me it wasn't scheduled?

A    I'm telling you that if it was going to happen, it was happening on that date.

Q    Are you telling this court that it wasn't scheduled?

A    If it was going to happen, it was going to happen on that date.

Q    No.  I'm asking you a simple question.  Was it scheduled?

A    I'm giving you the same answer.

Q    All right.  Let's go -- so you're not going to tell me whether it was scheduled or not?  Is that what you're telling me?

A    I'm telling you that if it was going to happen, that's what it was scheduled for.

Q    If we could go, please, to trustee's Exhibit 8.

A    Okay.  I'm there.

Q    I'm not sure I am yet.

A    Is this the winndown order as well?

Q    Yes.

A    Okay.

Q    Can we go to Page 5, please?

A    Okay.  I'm there.

Q    All right.  You see on page -- well, I'll catch up here

a little bit.  Page 5.  Can you go down a little bit?  A little bit further, please?  All right.  See in the middle where it says IP auction, if applicable?

A    I think it says if any, but yeah.  Oh, oh, I see where you are on the left.  Yeah.

Q    All right.  So it says the IP assets auction, if any, will be held on November 13th, correct?

A    Right.

Q    So it's scheduled here for November 13th.

A    Yeah.  If it happens, It's scheduled for that time. Right.

Q    All right.  Well, let's go further down.  It says subject to rescheduling or cancellation by the trustee in his reasonable discretion.  What happened?  Was it rescheduled or was it canceled?

A    It didn't happen.

Q    I know it didn't happen because it was canceled.

A    I'm going to give you the same answer to that every time.

Q    All right.  So when Mr. Tanenbaum told me yesterday that he agreed that it was canceled, you disagree with him?

A    I would characterize it differently, but --

Q    Characterize it for the court.  If you don't like the word cancel, what word do you like?

A    It didn't happen.  I view canceled as if I said, all

right, I've decided we're going to do this auction and, wait, wait, wait. I changed my mind. It's canceled. This was if we were going to have it, it's scheduled for a time. I didn't think I needed to cancel it. It wasn't canceled because it wasn't set. There was a placeholder time for it if it was going to happen. But I didn't announce an auction and then cancel it. That's not how I interpret this.

Q   So you're telling me the IP assets auction was not planned to occur on November 13, 2024?

A   If it was going to occur, it was going to occur at this time.

Q   Let's look, if we could, at Page 11.

A   Okay.

Q   Of this order. On page -- I'm sorry, Page 11. Yes. Are we there? Yeah. Look at Paragraph 17. If the IP assets auction is canceled, then the trustee shall file a notice with the court of such election within two business days of the determination of such election by the trustee. You see that?

A   I do.

Q   And you didn't file any notice with the court telling the court that this IP assets auction was not going to occur?

A   I did not file a notice that the auction was canceled, no.

Q   And that's the reason why you're fighting so hard with me about not saying it was canceled, right?  Because right there it says you were supposed to file a notice with the court.

A   Yeah.

Q   And you didn't do that.

A   And I just don't interpret this provision the way you do.

Q   I mean, you have a planned event, then you decide not to have it.  How is that not canceling?

A   It's just going to be the same answer.

Q   So you said it wasn't scheduled.

AUTOMATED VOICE:  Our system will end this conference in five minutes.  To extend this call for one hour, please enter -- your conference has been extended for 60 minutes.

BY MR. CICACK:

Q   All right.  I will move on.  If we could go back -- if we could go back to the trustee's Exhibit 14, please.

A   Okay.

Q   And we'll go back -- yeah, if we could go back to Paragraph 10.

A   Auction?

Q   Auction.

A   Okay.

Q   Auction.  The only place in this that talks about an auction, right?  This is the auction that you have in the bidding procedures.  This is the explanation of what the auction is going to be, at least what you planned at that time.

A   I'm sorry.  What's the question?

Q   Right.  This is -- this is the communication to bidders about what you -- at least at the time that this was forwarded to people of what the auction -- what you intended the auction to be.

A   The capital A is defined.  Yeah.

Q   Okay, and let's go down to the sentence that starts with, the auction will open at the highest bid amount.  Do you see that?

A   The Auction, capital A, which is defined as a live auction, will open with the highest bid amount.  Yes.

Q   That didn't happen, right?

A   Right.  Because we didn't have a live auction.

Q   All right, and then it says qualified bidders will be allowed to overbid in minimum bid increments as determined by the sale agent at the time of the sale, correct?  That's what it says?

A   Yes.

Q   And that didn't happen.

A   Right.  Because we didn't have a live auction.

MR. CICACK:  Give me one second, Your Honor.

THE COURT:  Mm-hmm.

MR. CICACK:  All right.  I apologize for the delay, Your Honor.

THE COURT:  Take your time.

BY MR. CICACK:

Q    Let's go to Paragraph 11.

A    Okay.

Q    This talks about the closing and final payment, correct?

A    No, that's 12, I think.  Are you at 12?

Q    I'm sorry.

A    I got you.

Q    Okay.  I'm sorry.  Let's go to 11.  My apologies.  All right.  So Paragraph 11, the first sentence says, if one or more bids are awarded by the trustee, whether before or as a result of an auction, the trustee is authorized to proceed to close the sale, and the sale is not subject to further approval by the bankruptcy court.  You see that?

A    Yes.

Q    All right, and the bid that was awarded by the trustee was the joint bidders' bid, correct?

A    Yes.

Q    All right, and was that awarded before an auction occurred?

A     Awarded before an auction.  I'm sorry.  I'm not --

Q     When was it awarded?  What did you -- when did you determine that they were the winning bidder, the joint bidders?

A     On November 13th.

Q     Okay.  Was that before or after an auction occurred?

A     After.

Q     All right.  So, and we already -- and it didn't -- it wasn't the result of a live auction, right?

A     Right.

Q     And that's how this defines live auction?

A     Right.  This defines live auction as an auction.  I do consider that what we did to be a form of auction.

Q     But this, when it said the first sentence here says, is if one or more bids were awarded by the trustee, whether before or as a result of an auction.  That's an uppercase Auction, right?

A     Right.

Q     That means a live auction, right?

A     Right.

Q     Okay.

A     And there wasn't a live auction.

Q     All right.  So the bid -- your testimony is the bid that the joint bidders made that you approved wasn't the result of an auction, right?

A    It wasn't the result of a live auction.

Q    It wasn't the result of a live auction, and you didn't award it to them before the auction process was over, right?

A    What are you -- what are you asking?  I don't --

Q    You don't understand that question?  It's just -- it's a temporal question.  The auction ended when?

A    On November 13th.

Q    And you awarded it to them when?

A    At the end of the auction.

Q    Okay.  Well, when did you file the notice?

A    We filed the notice on the 14th in the morning.

Q    Okay.  All right.  So you awarded it to them after the auction?

A    Well, yeah, after we received the final bids.

Q    Well, this says that you can award it before the auction, right?  And doesn't that mean that's because you have the right to accept a sealed bid without going to an auction?

A    Live auction.

Q    Right.  You have -- you had the right to accept one of the sealed bids and not even have any auction process?

A    Yes, I think that's right.

Q    And you opted not to do that.

A    Right.  I opted to have a next round of sealed bids, which I consider to be a form of auction.

Q    But not a live auction.

A    That's right.

Q    And so what this sentence says is that you award a bid, which you did, whether before or after -- I mean, before or as a result of the auction.  So when you ordered the bid, it wasn't before the auction, right?  And it wasn't as a result of a live auction.

A    So I'm sorry, which paragraph are you talking about now?

Q    Paragraph 11, first sentence.  If one or more bids are awarded by the trustee.  We've already established you awarded the joint bidders, whether before or as a result of an auction.

A    I see that.

Q    Right.  That didn't happen.  There's not another alternative here that says whether before or after, even during an auction that isn't an uppercase live Auction.

A    Right.  This sentence talks in terms of capital A, Auction.  Live auction.  There wasn't a live auction.  So I'm not sure what the sentence has to do with anything.  We didn't have a live auction.

Q    Okay.  So what you're saying is because you decided not to have a live auction, the bid processes, process and terms that are set out in this exhibit don't matter?  They don't apply?

A    No, I'm not saying that either.

Q    Well, Paragraph 11 doesn't apply, right?

A    The paragraphs and the sentences that refer to an Auction with a capital A may or may not apply, depending on what they say.  But you keep trying to conflate the auction process that we had with sealed bids with auction, with a live Auction, capital A.  And I'm just trying to answer your questions truthfully and directly and precisely.  And I'm having a hard time doing it because of the way you're asking the questions.  But let's --

Q    Well, I'm taking the definitions that are in your own bid procedures.

A    Right.

Q    I think what you're demonstrating to the court is how difficult and chaotic these were given the fact that you moved to a live auction.

        MR. WOLFSHOHL:  Your Honor, I'm going to object and move to strike.  He's testifying.  He just made a statement.  He didn't ask a question.

        THE COURT:  I'll sustain.

BY MR. CICACK:

Q    You will agree with me that these bidding procedures that we're looking at, trustee's Exhibit 14, don't really talk about and don't give any real guidance to anyone of what would happen if you decided not to have a live auction.

A    Right.   This initial bid package does not give guidance on what would happen in an alternative scenario.   That's true.

Q    If we could go back to trustee's Exhibit 8?   Are we there?  Yep.   Thank you.   So let's go to Page 5, if we could.

A    Okay.

Q    Now, we talked about this November 13th date as the date for an auction, a live auction, if you were going to go forward with a live auction, correct?

A    Yes.

Q    Okay.   Now, let's go down Paragraph 6, and it defines what a sealed bid is.   And would you agree with me that the bids that you accepted on the first round by First United and the joint bidders, those both fit within the definition of what is defined here as the sealed bid?

A    Yes.

Q    If we can go to Page 6, the second bullet point there, where it says identity of assets and purchase price.   So this last sentence there says the purchase price should be specific amount in U.S. dollars, not a range, right?

A    Yes.

Q    All right.   If we could go to Page 8, Paragraph 7.   The first part of Paragraph 7 talks about who the qualified bids were, right?

A      Okay.  Yeah, I see that.

Q      And just like First United and the joint bidders were

the sealed bid, they also were the qualified bidders.

A      Yes.

Q      But then it says, provided, however, that the trustee's

right to modify the foregoing bid procedures, to modify any

deadlines, to modify any procedures at the IP assets

auction, if any, and to terminate discussions with any

potential bidders at any time are fully preserved to the

extent not materially inconsistent with this order, correct?

A      I see that, yes.

Q      All right.  Now, I believe that you testified in

response to Mr. Wolfshohl's questions that you thought this

paragraph gave you the discretion to change the sale

procedures.

A      Yes.

Q      Okay.  So let's go through that.  The first thing here

is it says, provided that the trustee's right to modify the

foregoing bid requirements.  Right?  You didn't change the

bid requirements, right?

Q      No.

Q      Okay.  To modify any deadlines in Paragraph 4 of the

order.  Were any of those deadlines modified?

A      No.

Q      Okay.  To modify any procedures at the IP asset

auctions, if any.  Right?  Did that happen?

A    There was no live auction.

Q    Okay.  Next one.  And to terminate discussions with any potential bidders at any time.  And you didn't terminate discussions with any bidders at any time?

A    No.

Q    So nothing here where it says provided, however, these rights you reserve, nothing here deals with changing the bidding procedures, does it?

A    I'm sorry.  Say that again.

Q    Nothing in Paragraph 7 reserves for you the right to change the bidding procedures?

A    I think it does.  I think it lets me change the procedures for the IP assets auction.

Q    What does it say that?

A    It's the third part of that four-part phrase.

Q    who, where it says to modify any procedures at the IP assets auction?

A    Yeah.

Q    But there wasn't an IP assets auction.

A    You said it didn't give me any leeway to modify, and I'm saying, yes, it does --

Q    It did, as long as you did it at the auction.  So in other words, if you had the live auction, if you did what you were planning to do and have a live auction and the

qualified bidders showed up the live auction, at the live auction, you had the right to change the procedures.

A    So if I understand the question, I think this lets me modify the procedures for the IP assets auction, if any. You're saying that because that's a live auction, if I didn't want to have a live auction, I would first have to start a live auction to say that I'm not having a live auction to change the procedures.  Sure.

Q    Absolutely.  That's what it says.

A    That doesn't make any sense.

Q    But that's what it says, sir.  This is the order that you asked the judge to enter.  And you know, you're telling me it makes no sense.

A    I'm saying your interpretation of it doesn't make any sense.  But ask another question.

Q    How does my --

A    I mean, it says what it says.

Q    Yeah.  An IP asset --

          THE COURT:  Hold on a second.  Hold on.  I know it's late.  But we've got to keep decorum.

          MR. CICACK:  All right.

          THE COURT:  The witness and the questioner.

          MR. CICACK:  Thank you.

BY MR. CICACK:

Q    IP assets auction.  That is defined as the live

auction.

A      Yes.

Q      Okay, and you did not try to modify any procedures at the live auction, right?

A      There wasn't a live auction.  Right.

MR. CICACK:  Your Honor, this is a very -- I can't get a straight answer.

THE COURT:  I think he has said, and Mr. Murray, I don't want to put words in your mouth, that there was not a live auction.

MR. CICACK:  Right.  So then he didn't --

BY MR. CICACK:

Q      So then the question is, you didn't modify procedures at a live auction.

A      Yeah, and I'm just saying the resistance you're getting from me is you're drawing a conclusion from the fact that there was no live auction that I don't necessarily draw.

THE COURT:  No, no.  But I think, Mr. Murray, just so we can move this along, you will agree that since there wasn't a live auction, there were no procedures amended at a live auction that never occurred.

THE WITNESS:  Yes, that's right.  Yes.

MR. CICACK:  Okay.

THE COURT:  Okay.

THE WITNESS:  Yes.

MR. CICACK:  Thank you.  All right.

THE COURT:  I'm here.

MR. CICACK:  I appreciate it.

BY MR. CICACK:

Q    Let's go to Paragraph 8.  Paragraph 8 says that not later than five business days following the IP assets bid deadline, the trustee shall determine which potential bidders are qualified bidders and will notify the potential bidders whether sealed bids submitted constitute qualified bids, which will enable such qualified bidders to participate in the IP assets auction if held.  I read it correctly?

A    Yes.

Q    Right.  So again, First United and the joint bidders, they constituted qualified bids.

A    Yes.

Q    And this sentence says that would enable them to participate in the live auction, if held.

A    Right.

Q    And there was no live auction to be held, right?  It didn't happen.

A    That's right.

Q    All right.  Let's go to Paragraph 12.  I'm sorry, Page 9, Paragraph 12.

A    Okay.

Q    And if you look at the top of this page, if we could scroll up a little bit.  Can we scroll up?  No, no.  Yeah, you're on the right place.  But I want you to scroll up the page a little bit, if you don't mind, to the top.  Yeah. You see the title of that section of this order is IP assets auction and sale?  Do you see that?

A    Yes.

Q    When it says IP assets auctions, that's the live auction, correct?

A    As defined earlier.  Yes.

Q    Okay.  Now, if you could scroll down to 12.  All right. Paragraph 12 says that you're authorized to implement such other procedures as may be announced from time to time on the record at the auction.  Did I read that right?

A    Yes.

Q    All right.  It says you're authorized to implement other procedures that you announce on the record at the live auction, correct?

A    Yes.

Q    And since there was no live auction, there were no announced other procedures and certainly no announced other procedures on the record, correct?

A    Right.  There wasn't a live auction, so I didn't announce new procedures at the auction, at a live auction.

Q    And this also goes on to say that if you were going to

implement other procedures, you would disclose orally and in writing to all of the qualified bidders, correct?

A    Yes.

Q    Now, when you decided to go to a secret -- strike that.

When you decided to go to a second round of sealed bidding in a secret process, did you disclose to each bidder who were the remaining qualified bidders?

A    No, and it wasn't a secret process.

Q    Sure, it was secret.  I mean, the bidders had no idea what was going on.  They didn't know what they were bidding against.  They didn't know who they were bidding against.  They didn't know what they were bidding against.

A    Well, that's the whole point of a sealed bid auction.  But you said secret process.  And I told all the bidders, including you, what that process was going to be, and nobody complained until after they lost.  That's why I don't --

Q    Well, you didn't have a -- you had a conversation with me?

A    We emailed your client.

Q    But you didn't talk to me.  You said you told me.

A    I didn't talk to you during the auction process.  That's right.  Personally, me to you.  I did not.

Q    All right.  So let's go to Page 14.  I mean, Page 10, Paragraph 14.

A    Okay.

Q    Now this is the provision that talks about filing the successful -- the notice of successful bidder.

A    Yes.

Q    Okay.  Is there any other provision in here, in this order about that issue?

A    Oh, I don't know.

Q    Okay.  Well, let me ask you this, sir.  If you could -- you filed -- I'll just cut the chase.  You filed your notice of successful bidder, I believe, on November 14th.

A    Yes.

Q    Right?

A    Yes.

Q    And why did you do that?  Why did you file it on the 14th?

A    I think that was the --

Q    That's the deadline?

A    I don't know.  I'm trying to remember.

Q    Well, Paragraph 14 says that it should be filed no later than three business days following the conclusion of the IP assets auction.

A    And I guess this was the next day.  Yeah.

Q    So it's pursuant to this provision that you filed it then?

A    Yeah.  I mean, I think this requires to file a notice of successful bid.  And I filed a notice of successful bid.

Q    But this paragraph is talking about the live auction, right?  That's what this Paragraph 14 is talking about. It's not talking about some other auction.  It's talking about the live auction.

A    Oh, okay.  Yeah, I see what you're saying now.  Yeah.

Q    Okay.  So did you understand this provision to mean that you had to file the notice of successful bid within three business days of any auction?

A    Yeah, that's how I interpreted it.  I interpreted this as meaning I needed to file a notice of successful Bid.  I didn't appreciate that IP assets auction was defined earlier as only a live auction.  I didn't interpret it that way when I filed my notice of successful bidder.

Q    When you decided to go to the second round and not have the live auction, did you consider at least coming back to the court and explaining to the court that the contemplated live auction was not going to be held and that you would seek approval of different procedures?

A    I don't remember it specifically.  We might have discussed it within our team.  I mean, we ultimately didn't do that, but I don't remember if we discussed specifically seeking permission to change the auction process.

Q    Let's go to paragraph -- same document, Paragraph 29.

A    Okay.

Q    So this provision is one of the other provisions that I

think you relied on to tell the court that you had the
discretion to not go forward with a live auction and instead
change the procedure, correct?

A     Yes.

Q     All right, and again, this provision says to announce
at an auction modified or additional procedures for such
auction.

A     Yeah, I see that.

Q     Right.  Auction, again, being defined as the live
auction, right?

A     Yes.

Q     All right  So this provision, even this provision says
you want to change the procedures, you're supposed to
announce them at the live auction, right?

A     Let me read it to make sure I agree with you there.  I
think the wording is a little bit different than that
Paragraph 7 we were looking at.

Q     Tell me how.

A     So what this is saying is trustee's rights are fully
preserved in his reasonable business judgment and in a
manner consistent with his duties to applicable law to
modify or waive any procedures or requirements with respect
to all potential bidders, qualified bidders.  And then it
says, or to announce at an auction, modified procedures for
such auction.  So, I read this to say that if I'm modifying

the auction, live auction, I have to do it at the live auction. But I don't see that qualification applying to the earlier clause that authorizes me to modify or waive any procedures or requirements.

Q    Now, when this order was entered, which I believe was September 25th, it was still your plan to have a live auction, right?

A    Yes.

Q    Let's go to, if we could, I believe this is (indiscernible).

A    Is that the order, the proposed --

Q    No, I'm going to the actual motion now. And it's … I think that's in the other book too. This is First United's Exhibit 26.

A    Okay.

Q    Are you there?

A    I see it.

Q    Okay. And this is the motion that was filed for entry of an order authorizing the wind down of Free Speech Systems, correct?

A    Yeah. I can't see the whole thing, but I take your word for it.

Q    And this is the motion that was approved, and the order that we just went through was issued in response to this motion, correct?

A     Yeah.  The order was entered in response to this motion, yes.

Q     All right.  If you could, go to page 2 of this motion.

MR. CICACK:  Your Honor, do you have it?

THE COURT:  Mm hmm.

MR. CICACK:  Okay, great.

BY MR. CICACK:

Q     If we can go to page 2 of the motion, down at the bottom, where it's paragraph 5, down at the bottom.  And this is, just so everybody's clear, this is the motion that you filed with the Court, where you were telling the Court how you wanted to proceed with the auction, correct?

A     That's right.

Q     Let's look at paragraph 5.  It says that you propose, being the Trustee, a two-phase auction for the assets of FSS.  In phase one, you're going to be auctioning off the intellectual property, correct?

A     Yes.

Q     And that's defined as IP assets.

A     Yes.

Q     Along with remaining property, and that says its defined below, right?

A     Yes.

Q     All right.  Now, can you read the rest of that paragraph?  I'm not going to read it, but if you could read

it?

A    Starting where?

Q    At the top.

A    It starts midsentence.

Q    Start with the first full sentence, the IP assets.

A    Okay, I got you.  The IP assets would include FSS's right title --

Q    I'm not asking you to read it out loud.  I'm just asking you to read it to yourself.

A    Oh.

Q    I think the Judge has already made it clear that we could all read …

     THE COURT:  That was five hours ago.

     MR. CICACK:  Our comprehension might be different, but we could all read.

BY MR. CICACK:

A    Yeah, I see it.

Q    But I would like you to read the last sentence of that paragraph.

A    I thought you might.  The sale of the IP assets would include a customary, qualifying, and sealed-bid round, followed by an online, open-cry auction of qualified bidders.

Q    Okay.  There, you're telling the judge that the IP asset auction is going to culminate in an open-cry auction

of qualified bidders.

A    That's what I'm saying in that sentence.

Q    Right.  You're not saying, and you didn't say, or some other procedure I might decide on down the road.  It doesn't say that, right?

A    Not in that sentence.  It says elsewhere in the motion, and in a proposed order, yes, not in that sentence.

Q    Okay.  Well, we'll get to that.  We'll get to it. Let's go to paragraph 22.

A    Okay.

Q    And this starts on page 6.  And if we could go down to page 7, where again, in the box, it talks about an IP assets auction, right?  And it says …

A    I see that.

Q    All right.  And when you filed the motion, you anticipated the auction to occur October 30, correct?

A    Yes.

Q    When the order was finally entered, that date was moved back two weeks, correct?

A    Yes.

Q    Let's go to, if we could, go to paragraph 29. Paragraph 29 … on page 12.  All right, the third sentence starts, in particular, the Trustee proposes a sealed bid process and open auction for the IP assets.  You see that?

A    Yes.

Q   All right.  There's nothing in that sentence that says that you might try to change the procedures or that you wanted the reservation to do something else.  You're telling the Judge here, you propose an open auction for the IP assets.  That's what you're telling the Judge.

A   That's what that sentence says.

Q   Let's go to paragraph 33 of this motion.  If you could read paragraph 33, I want to ask you, I want to ask you questions about the last full sentence that is before the citing, case citings.

A   Read it to myself?  Oh, actually, I lost the first part of the paragraph.

Q   It starts -- what I want to ask you about in paragraph 13 starts with:  The ultimate successful bids for the assets, after being subject to further market check in the form of the auctions, if any, will constitute the Trustee's reasonable business judgment, the highest, or otherwise best offers for the assets, and will provide a greater recovery for the estates than any known or practical available alternative.  You see that?

A   Yes.

Q   And auctions is defied, upper case, meaning life auction.  Right?

A   I didn't see the definition of that term in this document.  I don't know if it's defined the same way as it

was in the other one.  But if it is, that's what it is.  I mean, it says what it says.

Q    Let's go to the next paragraph.  The second full sentence on paragraph 34 says:  The Trustees determination to sell the assets through live auction process, and to enter into a purchase agreement with successful bidder for the IP assets, or issue invoices to successful bidders in the case of the piecemeal sale of the remaining assets, will be a valid and sound exercise of the Trustee's business judgment. Did I read that correctly?

A    Yes.

Q    So, what you're telling the Court here, is that the live auction would be a valid and sound exercise of the Trustee's business judgment.

A    Yes, that's what that says.  Yes.

Q    Now, in fairness, I think you said that you thought, in the motion, that there was something in the motion that gave you, or communicated to the Court, that you might want to change the procedures.  Do you know where that is?

A    I don't have the document on me.

Q    You don't recall?

A    Specifically what was in the motion, no.  I focused more on what's in the order.

Q    You just testified five minutes ago that there was something in the motion that communicated to the Court that

you wanted the discretion to move away from an on -- to a live auction.  Did I get that wrong?

A    No.  I don't remember exactly what I said.  My impression was that in the motion and in the proposed order with that motion, I was asking, I was saying I was saying I was thinking I was going to do a live auction, but I might, I wanted the discretion to do other things too.  So, that's what I was asking for.

Q    And then, what I'm asking you now is, tell me, in the motion, tell me in the motion that for entry of an order authorizing the winddown sale of Free Speech Systems, that you have in front of you, where you said to the Judge, I want the right or the discretion to do something other than live auction.

A    I don't have it in front of me.

Q    It is in front of you.

A    No, it's not.  There's one paragraph of it on a screen.

Q    I'll give you my copy.

A    Okay. Can I read those into the record, Wal?

Q    I'd love you to.  Go right ahead, as long as you adopt them.

A    I won't go that far.  Well, I'm not seeing the phrase that I thought I was thinking of.  I must have been thinking of the order.

Q    There you go.  All right.

MR. CICAK:  Can we please pull up my Exhibit 15? Before we do that, Your Honor, I'd like to move to admit First United's Exhibit 26, which is the motion --

MR. WOLFSHOHL:  No objection, Your Honor.

THE COURT:  Can you just give me a docket number?

MR. CICACK:  Yes.  It's Docket Number 829.

THE COURT:  829?  It's admitted.

(Exhibit 26 is entered in evidence)

MR. CICACK:  I might have misspoke.  That's Exhibit, I'm sorry, that's Exhibit 26.  I want to make sure that's right.

THE COURT:  829 is Exhibit 26.  You got it.  Thank you.  We're on the same page.

BY MR. CICACK:

Q   All right.  Sir, do you have First United's Exhibit 15 up yet?

A   Yeah, I see it on the screen there, the top part of it.

Q   Okay.

MR. CICACK:  Your Honor, just to make sure, I believe that Exhibit 15 has already been admitted.

THE COURT:  On the Trustee's --

MR. CICACK:  No, no, I'm sorry --

THE COURT:  Your 15?

MR. CICACK:  Yeah, my 15.

THE COURT:  This public notice was admitted.

MR. CICACK:  Yes.

THE COURT:  If it's the same one that was up before --

MR. CICACK:  Yes, it was.

THE COURT:  Okay.

MR. CICACK:  This is the one.

BY MR. CICACK:

Q    Did you see this public notice before it was sent out?

A    I don't know.

Q    Let me ask you to look at what has been marked as First United Exhibit 16.

A    Is this the press release?

Q    Yes.

A    Yeah, I did review this.

Q    You did see this before?

A    Yes.

Q    All right.  So, let me ask you some questions about this.  This is First United 16.  Can you read the first paragraph?

A    Austin, Texas, insert date.  Following an order of the US Bankruptcy Court in the Southern District of Texas, auction firms Tranzon Asset Advisors and 360 Asset Advisors, have announced its process for the sale of Alex Jones InfoWars' assets with an initial bid deadline of November 8th.

Q   Okay.  And then, if you would, if you would scroll down to the third to last paragraph that starts with all bids submitted.  A little bit further, please.  Yeah, right there.  See where the paragraph that starts, all bids submitted by a bidder with a 10 percent deposit, by the November 8th deadline, will be reviewed by the auction firms and the Trustee for conformity, qualification, and competitiveness.  Read that correctly?

A   Yes.

Q   Next sentence.  Bidders whose bids qualify and are deemed competitive will be invited to a live bidding section on November 13th.  Did I read that correctly?

A   Yes.

Q   And the only bidders who were qualified and deemed competitive were First United and the joint bidders, right?

A   Yes.

Q   But we weren't invited to a live bidding session on November 13th, were we?

A   Right, because there wasn't one.

Q   And next sentence:  Multiple bidding rounds may be required to determine the highest or otherwise best bid or bids.  Correct?

A   Yes.

Q   And this notice, you know this notice was published to the public, right?

A    It was a press release that I think was distributed to media agencies.

Q    Now, I'd like to talk to you about Trustee's Exhibit 18.  I'm sorry, 19.

A    This is the final successful bid?

Q    Right.

A    Okay, I got it.

Q    And I'm going to try -- I shouldn't even say that, I apologize.  I am going to retread because, quite frankly, I didn't understand a lot of what I had heard earlier.  So, I'm going to try to make this a little bit clearer.

A    Okay.

Q    And I do apologize ahead of time.  All right, so, this is the bid that was submitted by the joint bidders.  And this is the bid that you ultimately approved and you filed a notice with the Court saying that you accepted it, correct?

A    Correct.  Yes, yes.

Q    And there were two components to this, right, that you accepted: the $1,750,000 in cash, and then what has been called the distributed proceeds waiver.  So, I'll just call it a waiver for now, unless it becomes important.  So, if we could scroll through that a little.  Oh, you have that.

A    I've got this one in hard copy, so …

Q    Beautiful, all right, so do I.  So, that's going to make things a lot easier.  All right.

MR. CICACK:  And Your Honor, you have a hard copy as well?

THE COURT:  Yes.

MR. CICACK:  All right, thank you.

BY MR. CICACK:

Q    So, I believe your testimony is that you interpreted the waiver to be an amount equal to what the Connecticut families would cede or transfer or gift, whatever word you want to use, to the other unsecured creditors, based on a hypothetical $7 cash bid.

A    Right.  Yes.

Q    And if we could go through the Trustee's Exhibit 24 real quickly, so we know that we're dealing with apples to apples.  Are you there, sir?

A    I am, yes.

Q    And I want to focus on the bottom of that exhibit.

A    The one with the $7 million?

Q    Yeah, the one that has the winning bid cash equivalent.

A    Got it.

Q    $7 million.

A    I'm there.

Q    All right.  So, this shows the bottom of Trustee Exhibit 24, it shows what you considered the bid to be, by the joint bidders, with the assumption of adding in your assumptions about administrative costs and then the relative

creditor allocations.

A    Yes, that's right.

Q    And if I got you correctly, the distributable proceeds waiver that you calculated, assuming administrative costs of $650,000, and assuming this 96.7 to 3.3 percent allocation, you valued it at $173,250.

A    Yes.

Q    So, in looking at the letter that came with it, that is the letter that is dated ==

A    Are you back in 19?

Q    Yeah, did I leave 19?  I'm sorry.

A    No, we were at 24 and we went to the --

Q    And I'm going to go back and forth between the two a little bit.

A    I've got my finger holding the spots.  I'm ready.

Q    Thank you.  So, Trustee's Exhibit 19.

A    Okay.

Q    The letter that went with the bid form.  If we go to the third page of that letter --

A    Okay.

Q    -- at the top, about three lines down, it says:  The distributable proceeds waiver amount is revised under this final bid, so that it shall equal an amount necessary for other unsecured creditors of FSS to recover, essentially, $100,000 more than what they would receive under a

qualified, the other highest qualified bid.

A    Yes.

Q    So, basically, what they are telling you here is that the distributable proceeds waiver is basically enough so that it will be $100,000 more than what the other guy bid. That's what they're saying here.

A    That's right.

Q    Right.  And they're even referring you back to their original bid, where they said the distributable proceeds waiver would be $1 more than the highest other bid, right?

A    Yes.

Q    So, despite the fact that they're telling you right here the distributable proceeds waiver is $100,000 more than the amount that the other unsecured creditors would get from the other qualified bid, you disregarded this and you decided, in your mind, this was a bid that was a notional $7 million bid.

           AUTOMATED VOICE:  Our system will end this conference in five minutes.  To extend this call for … your conference has been extended for 60 minutes.

BY MR. CICACK:

A    I'm sorry, say it one more time.

Q    Despite this language, you interpret this bid to mean that the distributable proceeds waiver was equal to what the other unsecured creditors would get under a notional,

hypothetical $7 million?

A    Yes, that's right.

Q    Okay.  And so, you disregarded here what the author of the bid is telling you what the distributable waiver is.  You disregarded it.

A    I didn't disregard it.  I considered it and regarded it.

Q    But that's not what you accepted.

A    Well, I regarded it in the context of a document that has other information in it.  I tried to make sense of some contradictory indications and had my interpretation of what it meant.  And that's what I (indiscernible).

Q    But when you filed the notice of successful bidder with the Court, you were accepting a bid that you believed, where the distributable proceeds waiver, was based on a $7 million notional, hypothetical bid.  Right?

A    I did it knowing that there were two interpretations.

Q    But you only accepted one.

A    Well, yeah, I accepted one, but knowing that it was amenable to this other interpretation, which is why I made sure that under both interpretations, it was the best.

Q    Yeah, but except that if the bid was $100,000 more than the other guy, by definition, that is not highest and best, is it?

A    With reference to the other bidder, right.  That's why

I had to reconcile.

Q   That's why you had to decide it was really $7 million instead of $100,000 more than the other guy, because as Ms. Tanenbaum said yesterday and you're telling me now, you know, if somebody makes a bid that says it's $100,000 more than the other guy, that's not highest and best.

A   And that's not exactly what this is, but yeah, I agree with you.  They had no way of knowing what the other bidder was, which is why I took them up what they said on the previous page, that said this is the distributable proceeds waiver when compared to another offer up to $7 million.  So, I took them at the top of that range.

Q   So, this letter is not a negotiated document, is it?

A   No, it's not.

Q   You had no input in drafting it, right?

A   None.

Q   It came from the joint bidders, right?

A   Yes.

Q   And aren't the joint bidders the best people to tell you what they intended from this bid?

A   Yes.

Q   All right.  And didn't they tell you that their intent was for this bid to $100,000 more than the other guy?  Didn't they tell you that after you questioned them about it?

A      Wait, are you asking what they told me in this letter or what they told me later?

Q      What they told you later.

A      Oh, what they told me later is that they interpreted it that way.

Q      What's the interpretation?  They're the author of the letter, right?  So, their interpretation is what they meant, right?

A      Well, before -- so I can answer you -- before, you were asking me how I interpreted it when I made the determination of best bidder, and now you're asking me what I knew about what they meant when I heard about it later.  I'm not sure what you're asking.

Q      No.  I'm asking you, they told you after you accepted the bid, their bid, and filed a notice with the Court that you accepted it, they told you that you were mistaken, that this bid was not based on a notional $7 million; it was based on $100,000 more than the other guy.  They told you that.

A      They did.

Q      All right.  Then, recognizing that that would not be a highest and best bid, you then convinced them to agree with the $7 million interpretation.

            MR. WOLFSHOHL:  Objection, assuming facts not in evidence.

THE COURT:  Counsel, what's your response?

MR. CICACK:  Facts are in evidence.  They changed the bid.

MR. WOLFSHOHL:  He just laid out an entire question with an argument.

THE COURT:  Now you're making a new argument.  Are you saying there's not facts in evidence or …?

MR. WOLFSHOHL:  Yeah.  The question included assumption of facts not in evidence.

THE COURT:  What was the fact that's not in evidence?

MR. WOLFSHOHL:  He said, you changed the bid based on the fact that you need to do -- you want to just rephrase?

MR. CICACK:  I'll rephrase.

BY MR. CICACK:

Q   So, let's set the stage for the Court.  You file your notice, thinking, interpreting, that they meant $7 million.  After you talk to them, after you filed the notice, and you talked to them, you learn that this $100,000 more that you disregarded, they really meant that.  That's what they meant.  That's what they intended.  You learned that, right?

A   Yes.

Q   Okay.  So, you had your interpretation and their interpretation.  Or, not their interpretation, but them

telling you what they meant, right?

A    Yes.

Q    And they were the author of this document?

A    Yes.

Q    All right.  And then you had a conversation with them, where then you convinced them to change their bid so that it would be consistent with your interpretation of $7 million.

A    Well, I think they adopted my interpretation.  I'm not sure I would agree they changed the bid.  The letter didn't change.

Q    The letter didn't change, but their intent -- they told you they meant $100,000 more.  And then, after the fact, you and them agreed, no, no, that's not really what it is, it's really $7 million.  Right?  I mean, that's what happened.

A    Yeah.  I guess more or less, yes.

Q    Okay.  That's what happened.  And that was after you did, you filed with the Court the notice of successful bidder.

A    Yes.

Q    Did you go back to First United and say hey, I allowed the joint bidders to change their bid.  I'll now want to give you the same opportunity to change your bid.

A    I did not say that to First United, no.

Q    Now, despite the fact that you, that you testified that even when you, even the interpretation you took, you

acknowledge that Exhibit, Trustee's Exhibit 19, included contradictory terms, correct?

A    Yes.

Q    You didn't go back to the Connecticut family or Global Tetrahedron to get a clarification, right?

A    No.  What do you mean before -- yeah.  Yes.

Q    Now, let's look at -- I think you went over this with Mr. Broocks a little bit, but I want to make sure that we go through it.  It is First United's Exhibit 29.

A    Okay.

Q    You see that?

A    Yes.

Q    And this is an email from Leslie Liberman to Paula --

A    I'm sorry, I'm in my book.  What's the …?

Q    Oh, I'm sorry, this is --

A    The one that's freestanding?

Q    Yes.

A    This is the letter from Porter Hedges that had the Liberman email on it.

Q    Yeah.

A    Okay.

Q    My exhibit doesn't include --

A    Oh, I got you, it's just what was produced, okay.

        MR. CICACK:  Just so the record is clear, Your Honor, I'd like to admit First United's Exhibit 29.  I

believe it's been admitted in other forms, but I want to make sure that it is clear what I'm talking about.

THE COURT:  Any objection?

MR. WOLFSHOHL:  No, Your Honor, I think this is the same thing that Mr. Broocks had admitted.

BY MR. CICACK:

Q   All right.  So, let's look at --

THE COURT:  It's admitted.  Let me just -- to the extent it's not, it is.

MR. WOLFSHOHL:  Thank you.

BY MR. CICACK:

Q   Let's look at Exhibit 29, First United's 29.  I'm going to try to keep those constant if I can.  All right.  So, this is an email from Leslie Liberman dated November 15, to Paula Brillson and a lot of people are cc'd.  Do you see that?

A   Yeah, I'm not on this email but yes, I see lots of names.

Q   Lots of names, including people representing you.

A   Yes, that's right.

Q   And people, you know, lots of lawyers representing the Connecticut families, right?

A   Yes.

Q   Do you ever wonder how they can afford all these lawyers?

MR. PATTERSON:  Objection, relevance.

THE COURT:  Sustained.  That's sustained.

BY MR. CICACK:

Q   All right, let's go, this is dated November 15th. Right?

A   You're talking about the email?

Q   Yeah, the email and the attached proposed order.

A   Okay, yeah.  I didn't see the date of the order at first.  Yeah, they all have a November 15th date.

Q   Now, if I have this right -- tell me if I do or don't -- but if I have this right, this email, and the proposed order, was sent after you had a conversation, I think with Mr. Kimpler, where you believe that you and he agreed that rather than their accepted offer be $100,000 more, that you guys agreed, no, it's going to be $7 million.

MR. COSTA:  Objection, Your Honor.  It wasn't an accepted offer of $100,000 more.  He said he always thought it was the $7 million that he accepted.

THE WITNESS:  That's fine.

MR. COSTA:  It misstates the record.

MR. CICACK:  It doesn't misstate the record at all.

THE COURT:  I'll let him.  Mr. Murray, you can answer the question if you --

BY MR. CICACK:

A     Could you say it again?

Q     This November 15th letter is after the conversation you had with Mr. Kimpler, where you two agreed that the offer would be amended or changed or whatever you want to use, but it would be conformed to be consistent with your interpretation as opposed to the $100,000 more offer.

MR. PATERSON:  Objection, (indiscernible) not in evidence, that conversation with Mr. Kimpler.

THE COURT:  I thought he testified that he talked to Mr. Kimpler, as to the dates.

MR. PATERSON:  He testified that he talked to him, I think on the 18th.  That's why it's not (indiscernible) no testimony about (indiscernible).

THE COURT:  Right, but he can testify that … well, Mr. Murray can answer the question.

THE WITNESS:  Sure, I can answer it.

MR. COSTA:  And I'll object again, misstates the record.  The first page says $7 million, and that's how he testified he understood it when he accepted it.

THE COURT:  Mr. Murray can clarify.

MR. CICACK:  I want you to be accurate and honest, but I know that's hard.  I know that's hard for you.

THE COURT:  Mr. Murray can clarify.  Folks, Mr. Murray can clarify his understanding.

MR. CICACK:  It's getting late.  I apologize, Your

Honor.

THE COURT:  Noon around here.

BY MR. CICACK:

A    Let me try to answer.  What's your question?  Maybe if you like break it down to the different pieces.

Q    You testified earlier about a conversation that you and Mr. Kimpler had, about you -- his, what he told you he meant and what you interpreted, right?

A    Yes.

Q    And you're telling us that that occurred on the 18th of November?

A    I don't remember exactly when that occurred.

Q    It occurred before or after this email.

A    I don't know, probably after.

Q    Okay, well, let's --

A    But I don't remember.

Q    Okay.

A    All I remember is that it happened before the 18th. But also, just to clarify, you had asked me, when I had a discussion with Mr. Kimpler where we agreed, and that, we didn't have a conversation like that.  We had a conversation where he discussed his point of view and it was different from mine.  We later got an email communication between counsel that they agreed with my interpretation.  So, I think that might have been the disconnect.  There wasn't a

call where Mr. Kimpler agreed with me, at least not a call I was on.

Q   Okay.  But was that email produced?

A   I have no idea.

Q   All right.  So, whether it was by email, or whether it was by call, you told him what you interpreted it to be; he told you what they intended.  But at some point in time, they said, okay, we'll go with your interpretation.

A   Yes.

Q   All right.  Now, if you look at Exhibit 29, and --

A   This is the same one?

Q   Yeah.

A   Okay, got it.

Q   First United Exhibit 29.  Can you go to page 5 of that?

A   Yeah.

Q   It talks about what the distributable proceeds waiver means, correct.

A   Yes.

Q   This was what you filed with the Court, right?

A   I didn't file this with the Court, but what we filed with the Court had this language, about the $100,000 more.  Yeah, this is exactly what we covered with Mr. Broocks.

Q   Right.  And this what Mr. Kimpler told you, we'll agree it's not this, we'll agree that it is the way you interpreted.

A    Say that again?

Q    This was what Mr. Kimpler told you was their intent.

A    This reflects what he told me their intent was.

MR. CICACK:  So, if we can go to Exhibit 28, First United Exhibit 28, if we could.

BY MR. CICACK:

Q    This is the actual order that was filed where you asked the Court to approve the setup to the joint bidders, correct?

A    Yes.

MR. CICACK:  Your Honor, I move that Exhibit, First United Exhibit 28 be admitted.

THE COURT:  I think it's already in.  If it's the same version as --

MR. CICACK:  I think it's Trustee's 30.

THE COURT:  Yeah.  If you're talking about the order with kind of the … yeah, the order that was filed with the motion?

MR. CICACK:  Yeah, 1915-8.

THE COURT:  Yes, that's been admitted.

MR. CICACK:  Okay, thank you.

BY MR. CICACK:

Q    So, if we go to page --

THE COURT:  If not, it's admitted double just to kind of cover … yeah.  But I believe it has been.

BY MR. CICACK:

Q   So, you see this order, page 5, includes the same language, about -- and I'm saying it in a shortcut way, but we know what we're talking about, the $100,000 more, right? On page 5, in H?

A   Is that what's on the screen?

Q   There you go.

A   There it is, okay, yeah, because it was H in the order and it was G in the draft.  Yeah, I see the language in there.

Q   So, the one that got actually filed with the Court still included the provision that Mr. Kimpler told you they intended?

A   Yes.

Q   Okay.  When did you figure out that you, that your proposed order included this language?

A   I think I first noticed it when preparing for my deposition on the first date we had it set for before we pushed it, and I don't remember what that date was, but I'm pretty sure we were preparing, and that's when I looked at the order and said this has, you know, language that needs to be updated.

Q   Do you recall when that was?  What --?

A   Only in reference to when the deposition was first set, and I don't remember.

Q    So, your deposition was taken on December 5th?

A    Yeah, but --

Q    It's about a week earlier, right?

A    Yeah, I think you'd noticed it first for like a week earlier than that.  I just don't remember which date it was.

Q    Late November?

A    I don't remember which date it was.

Q    So, I believe it was approximately 10 days between when we first noticed your depo and when this order was filed.  Does that sound about right, filed November 18th?

A    Yeah, this was filed November 18th, and I think my first depo was set like the end of November, whenever that was.  Yeah.  And it was preparing for that, so a day or two before that.

Q    So, approximately, it was about 10 days after this order was filed --

A    That sounds about right.

Q    -- that you learned that it didn't say what you thought you and Mr. Kempler had agreed to.

A    Right.

Q    Okay.  And let's see, if we could go back to Exhibit 29, my Exhibit 29.  You see that, that's the email from Leslie Liberman.

A    Okay.

Q    And that's dated November 15th.

A    Yes.

Q    And that attaches a draft order, and the draft order still has the same language in it, right?

A    Yeah, I think this is what we just covered a minute ago, yes.

Q    See, all of those people who cc'd Kyle Kimpler, let's see, who else?  Christopher Mattei.  I mean, look at all these people, Michael Dearman, Paul Paterson.  I think he's here.  All of these people, there's got to be 15 people on this cc list, right?

A    It's a lot of people.  Do you want me to count them?

Q    Some of them with Paul Weiss firm in New York, right?

A    Yes.

Q    Okay.  And so you're telling us that the $100,000 or more language was wrong.  You and Mr. Kimpler had come to an agreement.  But you had to find it out yourself, and nobody on this email list called you and said, hey, you filed an order that was wrong.

A    Well, yeah, just to be clear, though, that language was in an email on the 15th.  I don't, I'm not sure we had an understanding of what the language was on the 15th.  We did have it by the 18th when the order was filed.  And nobody noticed that it had not updated this language between the 15th and the 18th until I noticed it.

Q    Wait a second, nobody on your side noticed.

A    Oh, that's right.  I don't know what they noticed or when.

Q    Well, I mean, they're at Paul Weiss.  There's like, you know, an army of these people.  You don't think that they noticed?

MR. PATERSON:  Objection, speculation.

MR. CICACK:  Well, I don't think it's speculation to ask whether or not he thinks that they noticed something in a filed document.

THE COURT:  I think he's talking about the army of people on this email is, I suspect, what he's objecting to.

MR. PATERSON:  (indiscernible) the question.

THE COURT:  Or the question, or all of it.

MR. CICACK:  I'm hitting some nerves over here, I think.

THE COURT:  Let's just keep going.  Question, answer, question answer.

BY MR. CICACK:

Q    Question.  You had to learn it yourself, nobody on behalf of the Connecticut families called you and said, hey, Chris, you filed an order that doesn't include what we talked about.  Nobody said that to you, right?

A    Right.  No, they didn't.

Q    You had to find it out yourself.

A    I discovered it on my own, yes.

Q    All right, now, the new order that was just recently filed --

MR. CICACK:  Is that already in evidence, Your Honor?

THE COURT:  Yes.  I believe it is Jones 19.

BY MR. CICACK:

Q    Okay, Jones 19.  Do you have a hard copy there, sir?

A    No.

MR. CICACK:  Your Honor, do you have a hard copy?

THE COURT:  I do.  No, I got it up.  I can get it up really fast.  I think it's Docket 974 if I remember correctly.

MR. CICACK:  Thanks.

THE WITNESS:  It's your 27, Jones's 19?

MR. CICACK:  Yes.

THE WITNESS:  Okay, got it.

MR. CICACK:  If I could, Your Honor, just so the record is clear, could I have my Exhibit 27, which is the order at 974 admitted?

THE COURT:  I'll admit it again.

(Exhibit 27 entered in evidence)

MR. CICACK:  Thank you.  I'm trying not to ask to admit things that have already been admitted, but I just want to make sure about that one.

BY MR. CICACK:

Q     Let's to go page 5 of that order.

A     Okay.

Q     Now, this order, again, changes what the distributable proceeds waiver means, correct?

A     Yeah, it defines it differently than the other order does, right.

Q     Right.  And in between the other order and this order, you and Mr. Kimpler came to some sort of decision that it actually meant something different that isn't in either of the orders.

A     Could you go one step at a time?  I'm starting to lose you.

Q     Okay.  Your interpretation of the $7 million --

A     Yeah.

Q     -- Mr. Kimpler eventually agreed with.

A     Right.  He didn't tell me they agreed.  I know Connecticut agreed.

Q     Connecticut agreed.  They eventually agreed.  That wasn't in any order, right?

A     Not one that was filed.

Q     Right.  Okay.  So, you have the initial order that was filed that has the $100,000 more, right?

A     Yeah.

Q     Then you have the agreement that it would be $7 million, right?  And now, we have a third agreement as to

what the distributable proceeds waiver means.

A     Right.

Q     Now, so you'll agree with me that what is now included as the definition of the distributable proceeds waiver, was not in the bid that you accepted.

A     Right.

Q     Correct, right.  So let me ask you now to look at page 6 of this document, the second to last sentence on page 6.

A     Such consideration?

A     Yeah.  I'll read it for you.  Such consideration constitutes the highest and best bid for the purchased assets, and is in the best interests of the estate and all of its other parties and interests.  Correct?  That's what it says?

A     Yes.

Q     Well, how could this be the highest and best bid when you just testified it wasn't even in the bid that you accepted?

A     I read this as the Court is finding the consideration in the proposed transaction to be in the best interests of the estate.  The way it's defined up here is not inconsistent with the bid.  It's not spelled out this way in the bid.

Q     There's nothing in the bid that says the distributable proceeds waiver is $750,000.

A    That's right, it doesn't say that, no.

Q    So, you essentially have let them change their bid twice now.

A    Well, I've, I would say I've gotten them to agree to increasingly more beneficial terms to the estate.  I mean, this is still keyed off of a $7 million notional bid.  They've just set a floor of 750.  So, there was once upon a time an interpretation that it was only $100,000 more.  And I accepted the bids knowing that that might be the interpretation I'd have to live with later, because it was better than the alternative.  Then I got them to agree with my interpretation that it should be keyed on a $7 million notional bid and that improved the recovery for unsecured creditors other than Connecticut.  And then, as we continued to talk, and in response to Texas's reservation of rights, Connecticut offered to put a floor on that amount and made it even better for the other unsecured creditors.  So, I --

Q    There was a progression.

A    Absolutely.  On the definition of the distributable proceeds waiver that Connecticut was willing to accept, yes, it improved.

Q    But that was the biggest portion of the bid, wasn't it?

A    No.

Q    It wasn't a bigger portion, that $1,750,000 --

A    Oh, I don't know how you're saying biggest.  It was a

very significant part of the bid.

Q    Well, you're testifying it had more value than $1,750,000.

A    Yeah.  No, it was definitely a big part of the bid.

Q    All right.  So, you took the biggest part of the bid and you allowed them to change it and progress it throughout the process after you filed with the Court a notice of successful bidder.

A    Yeah, I continued to get better and better terms.  And all of those were always better than the alternative.

Q    Well, no, they're not, because you didn't allow us, you didn't allow First United to make better terms.  You didn't come back to us and say, I let the Connecticut Families change their bid and increase it and make it even better.  Let me give you a chance to do that now.  You didn't do that.

            MR. WOLFSHOHL:  Objection.  Is there a question?

BY MR. CICACK:

Q    You didn't do that.  That's the question.

A    No, after we got the last and best, I picked the best one, and then I continued to work on that one to see if I could get better terms with respect to this definition, and I did.

Q    But it wasn't the highest and best because they already told you that they intended it to be $100,000 more than the

other guy.  That can't be highest and best.

A     No, it was in the best interest of the estate, because it was better than the alternative.

Q     Okay, so your testimony now is that despite the fact you called for highest and best, that that wasn't really important.  It was what -- it was what -- highest and best didn't mean anything, it was just what was in the best interest of the estate.

A     No, highest and best was the option so I could pick the bidder.  I can still negotiate terms of the final transaction later, and of course I'm going to try to do that in the interest of the estate.

Q     So, you're telling the Court that you could accept a bid, and on a competitive bidding process, accept a bid and then renegotiate it afterwards and allow the bidder to change their terms?

A     Yeah, just as if there were some post-closing adjustment or something else to be negotiated later.

Q     Here's the difference.  Their bid was $100,000 more than the other guy.  That's not highest and best.  That's what you called for.  That's the difference.

          MR. PATERSON:  Objection he's testifying, it's not a question.

          THE COURT:  Folks, this is cross-examination. Let's keep going.

BY MR. CICACK:

Q   Right?

A   I'm sorry, say it again.

THE COURT:  Now, you made it a question.  That's all we needed right there.

MR. CICACK:  No.

THE COURT:  You said you said right, and it sounded like you ended your statement with a question and that got you over the hump.

BY MR. CICACK:

Q   My question is, though, that the bid that was officially made that you accepted, by the Connecticut, by the joint business, was not a highest and best bid, either by what their own telling you what they intended.

A   Yeah, and I just disagree with that characterization.  The bid came in.  I interpreted it as a highest and best bid.  That's why I said 7 million.  I found out they said they thought something different, and I said -- you know, and then they ended up agreeing with my interpretation.  And then we ended up with something even better for the Creditors afterward.

Q   Let me ask you to look -- to go back to the Trustees, Exhibit 19, please.

A   Okay.  The final joint bid?

Q   Yeah.

A     Okay.

Q     The letter, second page.

A     Okay.  I might (indiscernible).

Q     It's the one with the maybe --

A     The colorful chart.

Q     The colorful chart.

A     All right.

Q     And you see it in this -- in the chart, what they're doing is they're telling you what they would do top the alternative qualified bid by 1 million -- by $100,000.  That's what they're telling you, right?

A     Yeah, more, or less, yeah.

Q     Yeah.  So, what they're telling you, and they've given you three examples of what the proposed alternative bid was at $2 million, or whether it was at $3 million, or whether it was at $5 million.  What they're telling you here is we'll give enough distributable waiver so that we top that alternative qualified bid by $100,000 as to what is going to go to the Connecticut, the non-Connecticut Creditors.  That's what they're telling you.

A     Yeah, I think that's what this is trying to illustrate.

Q     Right.  But despite that, you interpreted it to mean $7 million.

A     Yeah, I mean, I largely disregarded the chart because there's --

Q   Okay.  Let's go to the next just the paragraph right underneath.  It says, as illustrated above, to the extent a third party submits an alternative qualified bid for the same assets that consist of cash consideration in a higher amount than the purchase price is set forth in -- herein, the Connecticut Family shall effectuate distributable proceeds waiver as defined in the initial bid and forego receipt of the distributable proceeds waiver amount, which shall be assigned to the Chapter 7 trustee for the benefit of the unsecured Creditors.  Right?

A   Yes.

Q   All right.  So, what that sentence says is that they're going to provide a distributable proceeds waiver to the extent a third party submits a bid that is higher than $1.75 million.

A   Right.

Q   Right?  What if the alternative bid was less than $1.75 million?

A   I guess, under that sentence the waiver would probably be zero.

Q   Exactly.  It'd be nothing, right?

A   Come on.  Come on.  Come on, what --

Q   This was not a highest and best.  They're telling you -- they're telling you right there that if there's not a qualified bid that tops $1.75, there's no distributable

waiver.

A    The way that sentence reads, there would not be a distributable proceeds waiver amount. I guess the other bid would have been lower than $1.75.

Q    Now, you testified earlier, I think, that for a while, the Connecticut Families have been sort of pressuring you to give them veto rights over whomever is going to buy the assets of FSX.

A    I mean, they've been asking for that, yes.

Q    Okay. Now let me go -- let's go back to exhibit -- the Exhibit 29. That's the exhibit -- what's the number, 19.

A    That's where we are, okay.

Q    It's the bid, right?

A    Okay.

Q    All right. Let's go, I want you to look at the revision that says future revenues. It's on Page 3.

A    Oh, is C future revenues?

Q    Yeah, sorry.

A    Letter C, okay, yeah, I'm with you.

Q    Okay. And you didn't consider this as being any sort of value to the estate, right?

A    Right.

Q    And what this says to me, tell me if you're -- if you see it differently, what this tells me is what the joint bidders are telling you is that whatever the distributable

proceeds waiver that the Connecticut Families are required to give, that Global Tetrahedron is going to pay them back from future revenues.

A    I don't know if it's pay them back, it's they're going to give them a share of the future revenues along with the Texas Families as well, is how I read it.

Q    Now, isn't really what was happening here is that the Connecticut Families were essentially loaning to Global Tetrahedron this amorphous non-cash currency so that they could acquire the property at $1.75 million.  And then, they would get their money back on the back end.  Isn't that really what's going on here, sir?

A    I don't think so, and I don't think I have any way of knowing that.

Q    Okay.

A    One way or the other.

Q    But wouldn't you agree with me that the fact that the Connecticut Families are allowing Global Tetrahedron to use this currency, that doesn't that have the effect of suppressing the amount of cash that Global Tetrahedron would be willing to put up?

A    Wait so you mean by currency you're talking about the waiver?

Q    I'm talking about the waiver.

A    Yeah.  I view it as having kind of a multiplying effect

on the value of the cash portion.  Yeah, for sure.

Q    All right.  So, and you never talked to Global Tetrahedron and said, hey, if I don't accept this distributable proceeds waiver, would you be willing to pay more cash?

A    I mean, I sort of did that when I said, give me your highest and best.  I never told them I was accepting the distributable proceeds waiver.

Q    But did you ever even talk to them about the possibility of them paying more cash and not accepting the distributable proceeds waiver?

A    I mean, I didn't talk to them at all, other than what we communicated to both bidders at the same time in rounds one and round two.

Q    Okay.  Now, but you didn't -- you didn't instruct your attorneys or anybody else to see if Global Tetrahedron would pay more money, pay more cash, if the distributable waiver concept was not acceptable.

A    No, I don't think I communicated that.

Q    You would agree with me that cash is better than the distributable proceeds waiver, right?

A    No.

Q    Oh, okay.  So, cash is it.  Why is that?

A    Well, if it were, the backup bidder would have won.  What I'm focused on is recovery for the unsecured Creditor

class.  And the distributable proceeds waiver makes the recovery of that class superior when compared to another cash bid.

Q    Bad question.  Cash equal to what you've determined to be the distributable proceeds waiver is better, right?  Cash is always better.

A    Oh, for the unsecured?  Yeah.  You're saying if the unsecured Creditor somehow got more cash than they would have gotten under the waiver?

Q    Or the same amount of cash.

A    Well, no, they're the same.  I mean, if --

Q    Well, how would they be the same?  Because cash, there's no uncertainties to cash, right?  Cash is cash.  Right?  What if -- but with the -- you have to admit that the distributable proceeds waiver is subject to uncertainty, it's subject to contingency.  The Texas Family's lawyers have already told you that.  You built something into the final order that took into account uncertainty and contingencies, right?

MR. PATERSON:  Objection.  Compound, Your Honor.

THE COURT:  Yeah, that was about seven questions in there, yeah.

MR. CICACK:  That was more of an argument, Your Honor, sorry.

THE COURT:  All right.

MR. PATERSON:  Does that count against his 20 minutes?

MR. CICACK:  All right.

BY MR. CICACK:

Q    But you can see that the distributable proceeds waiver has some uncertainties and has some contingencies, right?

A    Absolutely.

Q    All right.  Cash does not.  Cash is -- cash, as they say, is king, right?

A    Cash has uncertainties, too.

Q    Not once you got it.

A    Well, right, once I got it but.

Q    All right.  Now, the distributable process -- proceeds waiver, it doesn't -- that doesn't give any more value to the estate as a whole, right?

A    Like, you mean the total amount of cash in the estate? No, it doesn't.

Q    Right.  And I think you testified earlier that your fiduciary duty is to the estate.

A    For the estate and its Creditors.

Q    Well, do you have a fiduciary duty to an individual Creditor?

A    No.  I feel like I have an individual or I have a fiduciary duty to maximize the return to the fulcrum class of Creditors.

Q   Okay.  But the Connecticut parents, the Connecticut Family, are not maximizing it.  They can't get anything.

A   Well, they are.  They want this to happen.  They consent to it.  They are getting what they want and that's better than --

Q   They're getting what they want.

A   Right, and it's better than not getting what they want.  It's maximizing the return to them, too.

Q   You know what a fiduciary is, right?

A   Yes.

Q   I mean, sometimes a fiduciary has somebody that they're responsible for, right?  That they have a fiduciary duty to.

A   Yes.

Q   Sometimes when you exercise a reasonable fiduciary duty, you've got to tell the person no.  That doesn't -- that's irrational, right?  I mean, why didn't you, right?  I mean, sometimes when you're exercising a fiduciary duty, you've got to tell the person that you have the fiduciary duty to -- you're just going to tell them no, that you -- we're not going to -- I know you want to do this, but it's not your best interest.

A   Well, in the abstract, I kind of need to know what kind of fiduciary duty you're talking about in that situation.

Q   Well, my point is that they --

A   You want me to lecture Connecticut on what --

Q    Yeah.

A    -- they should be wanting.

Q    I do.  No, not what they want, but what's in their best interest.  Isn't $750,000 more in their best interest than basically, you know, giving in to their hatred for Alex Jones?

MR. PATERSON:  Objection.

THE COURT:  Objection.  I'm even objecting.  Let's -- I think we're going around and around on the same topics now.  Let's -- I think we've got to wrap this up.

MR. CICACK:  All right.

BY MR. CICACK:

Q    Let's talk about non-cash components.  The distributable proceeds waiver is a non-cash component, right?

A    Yeah, it's a non-purchase cash component, but you can measure it with a cash amount, and it will be cash when it's distributed.

Q    Okay.  And you had said that you had seen, though you haven't seen one of these, you've had -- you've been involved in sales where other non-cash components have been accepted, right?

A    Yes.

Q    And what were the examples that you gave?

A    Oh, I don't remember.  There's sometimes post-closing

adjustments, cost-sharing agreements, assumed liabilities. I think there were a couple that we talked about.  Claims waivers.

Q    And all of those situations benefit the estate as a whole, correct?

A    Not necessarily.

Q    Okay.  Have you -- have you been involved in a sale where somebody provided a waiver that benefited just one particular Creditor or a group of particular Creditors, unsecured Creditors?

A    Well, oftentimes a waiver will only impact the fulcrum class.  That's the way the waterfall works in the absolute priority room.

Q    I'm talking about unsecured -- general unsecured Creditors who are in the same class.

A    Okay.

Q    I mean, I want you to give me an example where in a sale you accepted non-cash consideration that didn't go to the benefit of the estate as a whole.  Do you have an example of that kind?

A    I can't think of a specific example as I sit here.

Q    Okay.  Now, you would agree to me -- with me that what is essentially happening here, if this sale goes through, is that a very large portion of the unsecureds are basically dictating this sale.

A    Yeah.

Q    All right.  Now, don't you think that that is a really bad precedent for bankruptcies?  I mean -- I mean you've said it.

A    No.

Q    Oh, you don't?

A    No, not at all.

Q    All right.  So, you think that unsecured Creditors, no matter how large they are, should be able to dictate what property is sold to whom and for what?  Unsecured.

A    I didn't say that.  I thought you asked me if I thought it was a bad thing that Creditors in a case --

Q    You said --

A    -- were getting what they wanted.  I don't see how that's a bad thing.  As long as it complies with the bankruptcy rules and the non-consenting Creditors do better than they would otherwise, I think I've got to accept that.

Q    You had mentioned an example of White Oak interest earlier.

A    I think White Oak Resources, I mentioned.

Q    Yeah.  Can you just briefly tell us what happened there?

A    Again?

Q    Yeah because I didn't understand it, to be honest with you, sorry.

MR. PATERSON:  Objection, asked and answered.

THE COURT:  He can answer.  Mr. Cicack, how much longer do you have?

MR. CICACK:  Maybe 10 minutes.

THE COURT:  Okay.

BY MR. CICACK:

A    So, in that case, there were a bunch of different lots of oil and gas interests in Mississippi, Louisiana, and Texas.  I'd gotten different bids from different parties for them.  We had kind of an informal auction where one party bid on some amount.  I went to the other parties and said, here's what I have, went back and forth a few times.  As I recall, we filed a motion to sell to one of those parties. Somebody objected, said, no, I'll pay more.  So, we talked to them, and we went back and forth a couple of times, and this process continued right up to the courthouse steps as we came in for a hearing on the sale hearing.  They were still trying to bid, coming in, oh, let me call my client, I have more.  And the judge said, all right, the process has to come to an end at some point.  At, I think, it was 2:30 in the afternoon.  He said, come in at 2:30 and give your last and best offer on a piece of paper to Mr. Murray. He'll pick, and that'll be it.  And that's what we did.  And that was my example of a recent, respectively a sealed bid last and best round.

Q    But in that case, all of the bidders knew who the other bidders were.

A    They did.

Q    And they knew what the previous bids were.

A    They did.

Q    Okay.  Let me ask you to look at the -- this -- the APA.

AUTOMATED VOICE:  Our system will end this conference in five minutes.  To extend this call for one hour -- your conference has been extended for 60 minutes.

BY MR. CICACK:

Q    Do you know what exhibit that is?  I think it's the Trustees Exhibit 13.

A    Oh, the APA?

Q    The APA.

A    Yeah, that's 13.

Q    Okay.  Now, as I appreciated the entity that is going to take the assets is an entity called The War Is Over?

A    Yes.

Q    All right.  Do you know what the affiliation is between The War Is Over and Global Tetrahedron?

A    Yes.

Q    What?

A    As I understand it, Global Tetrahedron created this entity to be the vehicle that is purchasing the assets.

Q    Okay.  And is it your understanding that Global Tetrahedron owns it?

A    That's my understanding.

Q    And no other owner?

A    I don't know.

Q    You don't know.  So, you don't know if in order to come up with the 1,750,000 Global Tetrahedron partnered with somebody else?

A    Well, they didn't disclose it on their form if they did.

Q    All right.  But you don't know that, right?  You've never asked them that question, right?

A    No, we did on the bid form.  We asked to list all partners and people who are financially involved, and they didn't list anyone else except for the Connecticut Families who are involved to the extent of the distributable proceeds waiver.

Q    But you didn't ask that -- you didn't -- they didn't disclose The War Is Over.

A    No.

Q    And you haven't asked the purchaser, War Is Over, who is, you know, whether or not it's all Global Tetrahedron or somebody else.  You don't know that.

A    No and I'm not sure it matters.

Q    Well, why wouldn't it matter?  You want to know who the

partners were.  Why would you put it on the bid form if you didn't want to know who the partners were?

A    So, Global Tetrahedron comes in and says, I'm going to pay you this amount for these assets.  And then on the purchase agreement, they say, I want you to hand the assets to this other party.  I don't care what Global Tetrahedron does with its assets.  From that same point, it just doesn't matter who they're (indiscernible) is.

Q    Okay.  Well, they increased their bid from a 1 million to a 1,750,000.

A    Yes.

Q    And the additional $750,000, you don't know if that came from Global Tetrahedron or somebody else or a portion came from different sources.  You don't know.

A    I mean, they might have lied to me, but the final bid form also has a line for partners, and they didn't disclose any of the partners in Connecticut Families.

        MR. CICACK:  All right, Your Honor, I'm very close.

BY MR. CICACK:

Q    Oh, one other thing.  You recall that you and I had a conversation fairly early in the process where I specifically asked you whether or not you were going to allow unsecured Creditors to credit bidding.

A    Yes, I vaguely recall that.

Q    Right.  And you told me you would not allow them to credit bids.

A    I recall discussing that I did not expect any credit bids because there were no secured Creditors.  I think you said something like, are they going to credit bid?  And I said, I don't know how they could credit bid they're unsecured.  And you were referring to the Families.

Q    Also, do you recall we had a conversation where I specifically asked you if you would object if First United entered into an employment agreement with Alex Jones that was -- became effective upon the sale of the assets?

A    Yeah, I said I had no problem with that.

Q    Right.  So, you didn't say that when you were asked earlier about whether or not you were told that there might be some relationship between Alex Jones and First United, right?

A    Nobody asked me that question.

Q    Well, I thought they did.  All right.  So, let's make it clear.  You told me you did not have any objection if First United entered into an employment agreement with Alex Jones where it became effective upon the sale of the assets.

A    Yeah, effective.  I think what I told you was I don't care what deal you make with Alex Jones is what I said.

Q    But I specifically asked you that question, right?

A    I don't doubt you.  I believe you.  And that would have

been my answer.  I don't care what agreement you make with Alex Jones.

Q    All right.  Now, I want to go back.  This will be the last question about this.  Back to exhibit, Trustees Exhibit 24.

A    Okay.

Q    To that chart.

A    Got it.

Q    And we talked about the lower portion of that chart, correct?

A    The one with the $7 million.

Q    Yeah.

A    Yeah, okay.

Q    Let's stay on that, okay?  So, you're assuming there a 96.7 and a 3.3 percent allocation, right?

A    Right.

Q    But the deal that has now been worked is it's a 75-25 split, right?

A    I mean the floor is based on what would happen in a 75-25 scenario, yes.

Q    And that's embedded in the sale -- the new sale agreement that you've asked the Court to approve, right?

A    Well, I think I said it's referenced in that agreement, but I'm not asking the Court to fix the ratios by virtue of the sale order.

Q    No, but 750 --

A    The 750 --

Q    -- assumes that.

A    The 750 is a floor that is being set.  Yeah, that I am asking to set.

Q    All right.  And so, if you were to take this calculation you did and change the allocations from 96.7 to 75 and 3.3 to 25, have you done that?

A    Yeah, that's the chart immediately above it on the same exhibit.

Q    No, it's not.  No, it's not.

A    It's pretty close.

Q    No, it's not, let's look above it.

A    Yeah, okay, sure.

Q    Let's look above it.

A    Oh, with respect to the first and third columns, that's what that chart is meant to show but --

Q    Let's look at --

A    -- go ahead and ask.

Q    Can we go to the -- that's assuming a 4,750,000 winning bid, not 7.

A    No, that's not right.

Q    It says right there purchase, 3, 400, 4,750,000 cash equivalent.  That's what it says.

A    But the analysis of this chart, the chart below the

analysis starts with a 7 and works down to a number.  The chart on the top the analysis starts with the 1 million and works up to what the cash equivalent would be.  It doesn't start with the 475.

Q    Well, your testimony was that you interpreted it as 7 million.  So, and then you have -- you have that below.  So, let's look at the below chart if we can.  So, the below chart if you took the 7 million and you put the 75-25, isn't it the case that if those were the assumptions you made that the distributable proceeds waiver would not be enough at about 17 1/2 percent, right?

A    Oh, let me see what -- if I understand what you're asking.  Where is the 17 1/2 percent?

Q    All right, let me go back.  Let's say -- let's say we go below the line --

A    Right, there is a point where they don't have enough cash.

Q    Right.  And they don't have enough cash under a 75-25 do they?  If you're assuming a $7 million cash equivalent winning bid.

A    I just don't understand your question because it's --

Q    Okay, well, let me I'll --

A    -- (indiscernible).

Q    -- be more specific.  If you're assuming -- if you're assuming a $7,000 -- $7 million cash equivalent winning bid.

A     Okay.

Q     And the net amount is $6,350,000.

A     Right.

Q     And you then assume that the gift class share is 25 percent, right?  The math there is that they'd be entitled to $1,000,587 -- 87 and 500.

A     Right.

Q     All right.  The Connecticut Families couldn't do that, right?

A     Yeah, they could because the Connecticut Families under that scenario would be getting 4 or $5 million so they'd have plenty of cash to fund the difference.

Q     No, the most they could possibly is 1.1 million because the distributable waiver is only coming from --

A     Oh, I see what --

Q     Right?  The most currency the -- that anybody -- under your own analysis the most currency they have is a 1.1 million, right?

A     Right.

Q     Right.  So, --

A     But okay.

Q     Right, that's it.  So, if in fact your interpretation was correct or that you were right, and we know you weren't, but if you were right and the Texas -- the other unsecured Creditors were entitled to 25 percent, the distributable

proceeds waiver that they were offering wouldn't work.

A    Correct.  I mean that's why this chart works up to the 4,750,000 instead of starting with the 7 million.  But what it shows you is they can say they want it to be equivalent to 7 million.  The purpose of this chart is to test to see if what Connecticut's offering it can deliver.  Because like you say there's an inflection point where there's -- where they run out of cash.  That inflection point happens at the cash equivalent of 4.75 million which is still higher than 3.5 million.

Q    But 4.75 million is not what you interpret their offer to be.  You interpret their offer to be 7.

A    Right, subject to how much cash they actually have.  And that's still more than the cash that they would have gotten under the competing bid.

Q    Let me ask you to look at what has been marked as Cicack, I mean Cicack, First United Exhibit 34.  This is a letter I sent to your lawyer, Mr. Wolfshohl, on December 6th, correct?

A    I can only see the very top of it.  Do you have an extra copy?  I think I know what it says, I just want to see if I recognize it.  Yeah, okay, I've seen this.

Q    All right, and I believe that you told, in response to questions about this, you -- I believe you said you could not force the Connecticut Families to agree that the

additional $500,000 earmarked solely for other unsecured Creditors would go to those other unsecured Creditors.  You couldn't force them to agree to that?

A    Yeah, I can't force them to consent to dis-favorable treatment of similarly situated Creditors.  I can't do that.

Q    But under the bid that you accepted and the bid that you're asking the Court to approve, that's exactly what they did, right, is they voluntarily gave up right to money.

A    Yeah, they did.

MR. CICACK:  Your Honor, I'll pass the witness, thank you.

THE COURT:  Okay, thank you.  Mr. Lemmon.

MR. LEMMON:  Sorry.

THE WITNESS:  No, no.

MR. LEMMON:  Your Honor, I'll be brief.  The Court will recall that we reserved the right to cross-examine regarding evaluation of the lawsuit issues.  The Court will perhaps recall that PQPR is not a party in the Alex Jones case itself.  They are, of course --

THE COURT:  Are you questioning or are you making arguments for like --

MR. LEMMON:  I just want to point out something if I might.  I think -- and I think it goes here.  I'm going to be very brief.

THE COURT:  Okay.

MR. LEMMON: And that is that they are, as we've noted, parties in the litigation with the Trustee. And as much as we would relish the conversation regarding the merits of the lawsuit, we don't find it to be necessary to go through that here --

THE COURT: Okay.

MR. LEMMON: at this time. I will just point out that there was discussion regarding the settlement discussions that were in earlier in the direct examination. Those statements are mostly accurate. I'm happy to answer any questions the Court has if the Court has any.

THE COURT: No questions, thank you.

MR. LEMMON: Thank you.

MR. WOLFSHOHL: May I proceed with redirect? Oh, I don't know if anybody else wants to --

THE COURT: The only question I was going to -- any other questions from any other parties on that side of the table? Okay.

REDIRECT EXAMINATION OF CHRISTOPHER MURRAY

BY MR. WOLFSHOHL:

Q    Mr. Murray, can you turn to Exhibit 19? I thought we'd never get to Exhibit 19. I'm a little scared that I'm going to butcher this. If you go to 19 and you look at the cover of the bid form.

A    Yes.

Q   Mr. or sorry Judge Lopez asked you some questions about the lots and the allocation of price --

A   Yes.

Q   -- and sort of about whether you could combine potentially the bids.  I'm going to ask you a question about that.  So, Group 4, would you agree with me -- is that -- is that everything?

A   Everything.

Q   Okay.  So, Group 5, what does that consist of?

A   It's everything except for Lots 3 and 4 and the inventory.

Q   Okay.  So, let's go to Lots 3 and 4.  What's 3?

A   3 and 4 are the domain names, 4 is the contested ones.

Q   Okay.  And then, is the inventory only -- is that the one that's right above that?

A   Yes.

Q   Is that 2C?

A   Yes.

Q   Okay.  So, just so I'm straight, Group 4 is everything, Group 5 is everything, but those three things?

A   Yes.

Q   So 2C, Lot 3, and Lot 4 are the things that are excluded from Group 5?

A   Yes.

Q   Okay.

THE COURT:  I got to be honest with you, I'm confused.  I thought group, maybe we're saying the -- maybe you're saying the same thing.  I thought Group 3 was Lot 3 and 4, because it has Lots 3 and 4 in parentheses, and Group 4 was lots 1A and 2B.  And Group 6 are Lots 1B and 2A. Maybe you're saying -- maybe we're saying the same thing, but it seems like we're backing into it as opposed to saying what the document says and maybe --

MR. WOLFSHOHL:  That's a fair point.  You want me to do it the way that -- I think I understand what you're saying.

THE COURT:  I just want the record to be clear. But my questions were going to what those words say, and I wasn't trying to like back into what it's not, just saying what it is.

BY MR. WOLFSHOHL:

Q   Okay.  So, then let's start.  So, Group 5, the reference to Lot 1A, what is Lot 1A?

A   Lot 1A is the production IP with equipment.

Q   Okay.  And what's 2B?

A   2B is the e-commerce IP, but without the inventory.

Q   Okay.  If you add those two together, what's left?

A   Add those two together.  Inventory is left out.

Q   And what about the domain names?

A   The domain names weren't in either of those, so yeah,

it's the domain names and the inventory is what is left out of Group 5.

Q   Okay.  And then I want to go to -- so that gets us to where I was trying to go, which is it's Lot 2C, Lot 3, and Lot 4.  Those are the things that are left out of the group -- of a Group 5 bid, right?

A   Yes.

Q   Okay, and I want to go to Exhibit 18.

A   Okay.

Q   So under 2C on 18, what amount was bid on inventory only?

A   They did not submit a bid for inventory only.

Q   What was bid on Lot 3?

A   Group 3?

Q   Lot 3.

A   Lot 3, nothing.

Q   Lot 4?

A   Nothing.

Q   Okay, but if you go to Group 3 --

A   Ah, yeah.

Q   -- is that a combination of Lot 3 and Lot 4?

A   Yes.

Q   How much did they bid on that?

A   $150,000.

Q   Okay.  Is there anything else that they bid on that's

not part of the bid at Exhibit 19?  Maybe I'm not asking that right.  Is Group 3, which consists of Lot 3 and Lot 4, are those the only things reflected on this bid sheet that are not part of the Group 5 bid that Global Tetrahedron made?

A     Yes because there's no bid on the inventory only.

Q     Okay.  So, --

A     That's the Delta.

Q     -- what it leads -- does -- is it -- am I understanding that if you accepted the Group 5 bid in Exhibit 19, what's the best you could do in terms of combining it with Exhibit 18 bid?

A     Oh, I see.  I guess you could add $150,000, and that would be it.

Q     And then, --

A     Because there's nothing on the inventory.

Q     Then there's nothing on the inventory.  So, the best you could do is you could -- you could do, you could accept, instead of accepting the Group 4 bid, you could accept the Group 5 bid, and then maybe you could get another $150,000 out of the First United bid.  Is that right?

A     Yeah if I -- yes.  And that's one of the things we considered.

Q     But it's not like a $5 million number.  Is that right?

A     Yeah, I wasn't -- that's what had confused me before is

I wasn't sure how things were adding up to, you know, a number in the 5 million range.

Q   Okay.

A   And if you did it even this way with this Group 5 and this Group 3, you would add up with a number less than the 350, which is the Group 4 number.  So, I don't know how you would do better by rejiggering it.

Q   There was a -- Mr. Broocks was asking you a question several times about trying to define the purchase price, and he kept asking you, what's the cash amount, what's the cash amount, what's the cash amount, do you remember that?

A   Yes.

Q   Okay.  Have you seen in sale documents, asset purchase agreements, documents like that, have you seen a like quote purchase price, like a defined term quote purchase price, have you seen that to be something other than cash or even including cash plus something else in the past?

A   Yes.

Q   Is that common?

A   Not so much in the Chapter 7 world, but I've seen it.

Q   Okay.

THE COURT:  I see.

BY MR. WOLFSHOHL:

Q   Mr. Cicak asked you a lot of questions, where he was talking about Exhibit 14.  And he was going through a number

of places where he talked about bids being accepted.

A    Okay.

Q    And you, you went with him on it, but I just got a question for you.  If, when you first get a bid, and you decide, I'm going to designate this as a qualified bid, do you consider that accepted in terms of your accepting the bid like you're going to go with it, or do you consider that you're designating, you're qualifying it and you're designating it to be a part of the next process?

A    Yeah, I mean, I guess it could be either.  It's -- it's accepted in the sense that I am accepting it as a qualified bid, and I guess you could use the same word except for designating the successful bidder at the second round.

THE COURT:  It raises a question for me.  So, when you accepted the qualifying bids, did you consider that a round of bidding?  In other words, how many rounds of bids do you think we went through, one or two?

THE WITNESS:  I think we went through two rounds.

THE COURT:  So, the initial round was one round?

THE WITNESS:  Yes.

THE COURT:  And also qualified, and then round two, the best and final?

THE WITNESS:  Yeah, I think of it as being two rounds.

THE COURT:  Okay.

THE WITNESS:  I mean, I didn't know how many rounds there'd be when we started.

THE COURT:  Understood.

BY MR. WOLFSHOHL:

Q   Mr. Cicack, one of the last things he talked about, he showed you his letter to me.

A   Yes.

Q   What number was that, Walt?  Was it --

A   It's his 34.

Q   34, I got it.

A   Cicack 34, or First United 34.

Q   And I think you told him you can't unilaterally decide that 500,000 of this consideration is just going to go to everybody but Connecticut, right?

A   Right.  If money's going to flow through a sale from the estate, it's got to go consistent with the rules.  And that means treat Creditor's the same unless they consent to something else.

Q   So, does that mean that it would have to flow through the same waterfall as the $3.5 million amount?

A   Yes.

Q   Okay.  And so, Mr. Cicack asked you a number of times, why didn't you just ask his client for another bid or an overbid?  Did he ask that?

A   Yeah.

Q    Okay.  So, if all of this money has to go through the same waterfall, what's the real value of this bid?

A    It's the same as the 3.5.

Q    Well, if you add $500,000 to it -- let's pretend that they give it to you and say, we want you to give this to all the non-Connecticut Creditors.  If you got that, would you do that or would you say?

A    And I ignore that, and I say, I'm going to take the 500 and do with it what the code says to do with it.

Q    Right.

A    Then it would be an offer of 4 million.

Q    Okay.  All right.  In any of your analysis that you've done, and we've heard about it all day today, in any of the analysis you've done, is the bid that you're asking or is the transaction that you're asking the Court to approve worth less than $4 million?

A    No, under all those scenarios, they would still be better off than a $4 million cash bid.

Q    I'm going to try to do a quick flyover on the wind-down order.  I'm not going to belabor it, I promise.  First off, Mr. Cicack was asking you questions about the motion versus the order.  What governs, the motion or the order?

A    The order is what matters.

Q    Okay.  The other thing I want to ask you just, and you might have to take a second to thumb through it.  There's a

lot of places in the order that reference just Capital A Auction.

A    Yes.

Q    Okay if you go to Page 5.

A    You've got to remind me which tab this is.

Q    Oh, I'm sorry, it's 8, it's Exhibit 8.

A    I'm there.

Q    In the middle of the page.

A    Which page?

Q    The middle of Page 5.  It's in the chart.

A    All right, I got you the chart.  Okay, yeah.

Q    Okay, so you see where there's a defined term IP assets auction?

A    Yes.

Q    Okay, and down below that you see where there's a defined term remaining assets auction?

A    Yes.

Q    Can you just thumb through the document and tell me if there's any other definition for just auction?

         THE COURT:  There's not, I can tell you.  Let's keep going.

BY MR. WOLFSHOHL:

Q    If -- okay, so I want to if you go to, I'm sorry.  If you go to Paragraph 29.

A    Okay?

Q    I think Mr. Cicack was asking you at the beginning of your discussion with him, you read the beginning of it where it says, "The trustee's right is fully reserved in his reasonable business judgment and in a manner consistent with his duties in applicable law to."  And then it says, "Modify any or waive any procedures or requirements with respect to all bidders, qualified bidders."  And then it says, "Or to announce at an auction, modified or additional procedures for such auction."  But then it also goes on to say, "And in any manner that will best promote the goals of the bidding process or impose before the conclusion of the consideration of bids or an auction if held."  So that's talking about, it includes before the consideration of bids, it doesn't necessarily mean at an auction on the record, does it?

A    Yeah, that phrase refers to a different thing than at the auction, yeah.

Q    And it says you can -- you can implement, or it doesn't say implement, it says impose additional customary terms and conditions on the sale of the IP assets or the remaining assets as applicable, including without limitation.  And then it has a number of things, and it discusses a number of things that can be done in connection with your process, right?

A    Right.

Q    But that's an including without limitation, right?

A     That's what it says, yes, sir.

Q     Mr. Cicack asked you, can you think of any time that non-cash consideration didn't go to the estate as a whole? I think that's -- I wrote it down and quoted it, to the estate as a whole.  Do you remember that?

A     Yes.

Q     Okay.  Whenever a contract gets assumed in bankruptcy, what does the contract counterparty get?

A     They get cured.

Q     Okay.  And if they're owed a whole bunch of money, under the code, does it have to get paid before it gets assumed and assigned?

A     Yes, that's my understanding.  Yeah, you've got to cure defaults before you can assign.

Q     And that's consideration that goes directly to that party, right?

A     Yes.

Q     But it's provided for in the code?

A     Yes.

Q     Okay.  And sometimes in those situations, someone whose contract gets assumed, or assumed and assigned, gets paid in full, and all the other Creditors get nothing, right?

A     That's possible.

Q     Or they get less than 100 cents on the dollar.  Just different scenarios.

A    Yeah.  Yeah, the cure amount doesn't go to the estate. It goes to the contract counterparty.

Q    But that has value to the estate, right?

A    Sure.

Q    But all the value isn't going to the estate because some of it's going to a particular Creditor, right?

A    If I understand what you're asking, yes.

Q    Okay.  The only other thing I want to go to is, I think, that this got designated as an exhibit.

MR. WOLFSHOHL:  It's the new order, Your Honor?

THE COURT:  Yes.  Twice, actually.

MR. WOLFSHOHL:  I'm not going to do it a third time, I promise.  I saw it at least four times.

THE COURT:  It's what, 974.

MR. WOLFSHOHL:  Actually, this one is, I'd like to go to the red line.  I think that was also, I think it was the --

THE COURT:  I don't think the red line was admitted.  I think 974 --

MR. WOLFSHOHL:  I'd like -- I'd like to -- it's 975, can we admit 975 as Trustee Exhibit 31?

MR. CICACK:  No objection.

MR. LEMMON:  No objection.

THE COURT:  Okay, 975 is admitted, Docket Number 975.

MR. WOLFSHOHL:  Docket number 975.

(Exhibit 31 entered into evidence)

MR. WOLFSHOHL:  And then, I'm going to let Ms. Starling get to it.  You there, okay.

BY MR. WOLFSHOHL:

Q    Could you go to Page 17, please?

A    I can't see it.

Q    Sorry, Page 17?  I'm sorry, I wasn't clear.  Okay. What's this language here you're on?

A    Let me read it.  I think I know what this is, but I want to be sure.  Oh, this is the credit to Jones for any amount they would have received for waived.

Q    Well, it's a credit to the estate also, right?  It's a credit on -- or you tell me.  It says to FSS or Jones, right?  I think it's FSS or Jones.

A    Yes.

Q    Okay.  And this wasn't part of the bid, right?

A    No.

Q    Is this just an agreement as to how the estate gets credit?  Is that what that is?

A    Yeah, I mean it's a further concession from the purchasers that benefits the estate.

Q    Does it also benefit Mr. Jones?

A    It does.

Q    Okay.

A     I think it's designed to moot his standing.

Q     Let me ask you.

          MR. WOLFSHOHL:  Nothing further, Your Honor.

          THE COURT:  Yeah.

          MR. PATERSON:  Your Honor, I just have a couple of questions arising out of the (indiscernible).

          THE COURT:  Sure.  I think my questions got clarified, though, but I appreciate it.  I appreciate it the help.

          CROSS EXAMINATION OF CHRISTOPHER MURRAY

BY MR. PATERSON:

Q     Mr. Murray, hello again.  Good evening this time.  If I could ask you just to turn briefly back to trustee Exhibit 18.

A     Okay.

          THE COURT:  Folks, I'm hearing some noise here. If we can just -- I want to make sure the questioning continues.

BY MR. PATERSON:

A     Yeah, this is the backup bid.

Q     And I just wanted to clarify, would it be possible to sell Group 5 and Group 6 together?

A     No.

Q     And would it be possible to sell Group 1 and Group 2 together?

A    No, or would they overlap because you know...

Q    Now, I think you testified that you could have sold the domain names for $150,000 while also proceeding with the sale with the joint bidders.  Is that right?

A    I'm not sure that I could, but that's --

Q    That's Group 3, right?

A    Yeah.

Q    Just assuming for a minute you had attempted to sell the domain names to the backup bidder for 150,000 while proceeding with a joint bidder's bid, how would the costs of closing two sales to two bidders compare with the costs of closing one sale to one bidder?

A    Oh, you're asking if it's worth it to try to grab the $150,000, and I really doubt it would be.

Q    And why is that?

A    We've spent a multiple of that tonight, I think.

MR. PATERSON:  Thank you.  I've no further questions.

THE COURT:  Thank you.  Any further recross?

MR. CICACK:  Your Honor, I'm a little bit unclear about this red line version.  I'm looking at the docket entry now.  I don't -- I see there a public Order 974, but I don't see it.

THE COURT:  975 is the red line?

MR. CICACK:  975 is the redline.

THE COURT:  974 is the clean, 975 is the red.

MR. CICACK:  Your Honor, I just have one question for him.

THE COURT:  Okay.

RECROSS EXAMINATION OF CHRISTOPHER MURRAY

BY MR. CICACK:

Q   All right, sorry about that, Your Honor.  Okay, so I'd like to go real quick to the Trustee's Exhibit 8.

A   The order?

Q   Yeah, the order.

A   Yep.

Q   And I think Mr. Wolfshohl asked you to look at Page 14, Paragraph 29.

A   Yeah.

Q   And you see at the bottom there where it says that you had discretion to basically says as applicable, including without limitation, and it gives A, B, C, D, and E, right?

A   Yes.

Q   None of those happened, right?

A   I think you asked me about all of them before but let me look and let's go through them again.

Q   Well, I didn't.  I asked you in your deposition, but not here.

A   Oh, okay.

Q   I'll tell you what you said in your deposition.

A    Sure.

Q    You said none of this happened.

A    Okay.

Q    Please look at it.

A    Let me see if I was mistaken.  So, extending deadlines, no, I didn't do that.  Adjourning any auction, I didn't adjourn.  Modifying the auction and sale proceedings or adding procedural rules that are reasonable and necessary under the circumstances for conducting an auction.  That one I think we disagreed on because I think I did change the auction procedure, and you said, well, no, no, no, this only means a live auction, and then we learned that Capital A Auction isn't actually defined as a live auction.  So, I think C probably happened.  D, canceling an auction, we disagreed on that.  I don't think I canceled an auction.  You think I did.  And E, rejecting any sealed bid or qualified bids, I did not reject any.  So, yeah, it was C that I think probably happened.

Q    Auctions defined as a live auction.

A    Capital A Auction is not a defined term.

        THE COURT:  Folks, we're not doing this anymore.  I'm not going to go through that.

        MR. CICACK:  All right, thank you, Your Honor.  No further questions.

        THE COURT:  All right.  Mr. Murray, thank you for

your time.

THE WITNESS:  Thank you, sir.

THE COURT:  Okay.  I'm ready to roll.  Why don't you have a seat?  I appreciate everyone.  Appreciate all the briefing.  I appreciate all the arguments.  I'm ready.  I've heard enough.  A note, I appreciate the party staying late for two nights.  There's still about 150 people on the line.  And I appreciate everyone's participation in the hearing.

And for those who are just listening in and listening into Court, I very much appreciate it.  My staff as well and for all the attorneys, for all the briefing, for all the arguments.  I'll note for the record that on September 25th, I entered an order granting the Trustees motion for entry of an order authorizing the wind down.  I'll call it the Wind Down Order at 859.  I authorized the Trustee to do, among other things, auction and sell certain assets, which are defined as the IP assets and the remaining assets.

And the remaining assets are the assets that remain after the IP assets are sold.  And the Trustee, with the assistance of Tranzon 360 and other estate professionals, conducted a process to elicit bids for what I'll call the IP assets.  The first bid form requested seal bids for four lots.  Each lot included assets of Free Speech Systems.  And that's what we're talking about here, assets

of Free Speech Systems.  There were ultimately two qualified bidders.

There was some -- there was one joint bidder, Global Tetrahedron, and the Connecticut Families.  That was one group, and I'll call them the joint bidders or Global Tetrahedron.  The other one was First United American Companies, who I'll just refer to as First United.  Those were the folks, and they submitted sealed bids as contemplated under the order.

The bids submitted by Global Tetrahedron and the Connecticut Families contained consider it cash consideration of about $1 million and non-cash consideration in the form of a waiver, which was essentially a waiver of the Connecticut Families' rights to receive certain cash proceeds from the sale of the IP assets.  And they would ultimately agree to turn it over.

The bid was the initial, what was called the distributable payment waiver, was to make sure that if there was another bidder out there that they could beat the bid by a dollar.  There was another bid, sealed bid, by First United, and that had a bid of about $1.1 million, a little over $1 million as well.  They were overlapping bids, both really bid for Lots 1 and 2.  There was maybe about 50,000, I think, the First United had for Lots 3 and 4 so they were -- the trustee, Christopher Murray, deemed both bids as

qualifying bids, and that's a defined term.  That term actually is defined.

There was a scheduled auction for November 13th, and that auction, which was considered to be a live auction at the time, was cancelled and the Trustee elected to proceed by written submission of highest and best offers.

Based on discussion with parties, as best what the testimony shows me, the parties -- I should say the Trustee sent new bids, forms.  It included a breakdown of lots in different scenarios.  Clearly, I got the lot breakdown wrong.  It was just different than the first lots.  The first lots had pictures and told you what was in it.  And this was kind of a grouping scenario.  Parties were asked to submit their best and final offers, highest and best offers.

So, there was no live auction, no identity of bidders to the other bidders, so no one really knew who was bidding against the others, and no identification of the bids to the other bidders.  So, no one knew who the other bidders were, and no one knew what the other bids were going into the best and the finals.

Court held a hearing today.  There was a motion filed to approve Global Tetrahedron as the winning bidder and it's with the families.  And I would note that their proposed winning bid and their offer designated that or proposed that they could submit or establish a subsidiary or

a new entity to kind of be the "purchaser".  That's not uncommon.  So, the Court held a hearing today.  There were objections filed.

A lot has been made about the process.  The Court expressed some concerns about the process.  But we held an evidentiary hearing, and everyone had the opportunity to raise their concerns.

I will note a couple of things for the record. Today, two witnesses testified -- well, not today, yesterday and today two witnesses testified in support of the motion. Mr. Jeff Tenenbaum, who is the auctioneer authorized to assist the Trustee, he was authorized to do so and the Trustee himself testified.  I've heard over 10 hours of testimony and there's been dozens of exhibits admitted, lots of direct examination, lots of cross examination.

I note that just inherent in this case is, and there's always been from the first day, lots of emotion on all sides in every way possible that you can imagine coming from the Connecticut families, the Texas families, Jones and supporters of Jones.  And I get it.  But while the case by its nature stirs emotions on all sides, my job today is to kind of consider the relief requested and grant or deny it based upon the law and the evidence.

The relief requested is to approve a sale of Lot 4 to Global Tetrahedron, or to the purchaser, and grant it

related relief in a proposed order that has been filed at Docket Number 974.  I have jurisdiction over this matter under 28 U.S.C. 1334.  And this is a core proceeding within the meaning of 28 U.S.C. 157(b)(2).  The Court can enter final orders consistent with Supreme Court precedent.  Venue is proper under 28 U.S.C. 1408.

The basis for requested relief is Section 363 of the Bankruptcy Code, Section 704(a), and numerous rules and local rules of the Court, and Section 105.  I'll note I'm going to cite a little law here for the parties.

Section 704(a) of the Bankruptcy Code authorizes, kind of provides for the duties of a Chapter 7 Trustee, and it actually directs the Trustee to "collect and reduce to money the property of the estate for which the Trustee serves and to close the estate as expeditiously and as is compatible with the best interest of parties in interest."  And that's 704(a)(1).  You know, like Supreme Court cases like Commodity Future Trading v. Weintraub 471 U.S. 343 provides that the Trustee has a duty to maximize the value of the estate.

Section 363(b) of the Bankruptcy Code authorizes the Trustee, after notice and a hearing, which we've had today, to use, sell, other than the ordinary course of business, which this would qualify to sell property of the estate.

Case law in the Fifth Circuit provides that a Trustee must demonstrate that the proposed sale is the highest and best offer.  And that's kind of why people have been talking about highest and best here.

And case law, you could look at cases like In re Moore -- I'll use that for an example, just so people have it -- 608 F.3d 253, a Fifth Circuit 2010 case.  There are many of them.  But it basically comes down to business judgment, the question of Trustee's business judgment.

And I would note case law also provides, and I agree, I'm bound by Fifth Circuit case law.  But business judgment, you go to the deference and you provide deference to the procedures which were approved by this Court, but also the Trustee's business judgment.  And so, you've got to look to see whether there's an articulated business reason here and also look at the process to ensure that the process has been served.

I should note that there were objections filed by Jones individually, First United, who was designated as the backup bidder here and was the other bidder.

The Texas families also filed a statement essentially kind of saying, you know, really kind of reserving rights on the 7525 allocation and how the distributable proceeds waiver kind of actually worked.

"X", formerly known as "Twitter" -- I'm saying

that for the Court Reporter so she knows what letter I used -- also filed an objection to the sale of certain assets. My understanding -- and I take the representations on the record that the "X" objection has been resolved, so long as I kind of approve language in the order, which essentially kind of kicks the issue of ownership down the line and asks me not to make findings on these issues. There's also some language that was filed with the order that purports, at least tries, to try to resolve some of the concerns raised by the Texas families here.

So, got a motion, got a process, and again, I've learned a lot throughout this hearing, and that's why you kind of have evidentiary hearings. And Global Tetrahedron is an affiliate related to an entity called "The Onion", and First United is First United, maybe related -- associated with Jones or not. I don't think there's any evidence in the record one way or the other that really definitively answered that question.

There was a motion to strike an amended kind of response that was filed after the objection deadline by the Jones group. I never read it, so maybe it's moot. I do note that during this hearing there were some -- when Mr. Murray was being examined, there were some paragraphs put up. It was the first time I had seen it, and it was put up by counsel for the Connecticut families. I've got no issues

with that.  I'm just saying I just think that it's been mooted, because I never really -- I've never read it.  I read the objections that were on file and, really, the focus was on business judgment and whether this was the right deal or not the right deal.  So, I'll consider that moot.

There was a question and objections raised to standing, whether Jones had standing here.  Based upon the arguments and the way the motion was drafted, I think Jones had standing.  There was a motion and a revised order at 974 that Mr. Murray even kind of conceded was intended, maybe partially intended, to moot or make it -- to take away his standing.  But I don't think you can file an order at the last day or right before a hearing and say someone didn't have standing.  I think there were questions and serious questions about --

AUTOMATED VOICE:  Our system will end this conference in five minutes.  (indiscernible) to extend this call.  Your conference has been extended for 60 minutes.

THE COURT:  And I don't think -- I think Jones had an had an economic interest in the outcome of this case and had the right to argue that the sale process wasn't fair and shouldn't maximize value because he's got an economic interest in "Free Speech".  He's got personal economic interest because some of the judgments against "Free Speech" that the Connecticut families and the Texas families hold

could ultimately impact the amount of liability that he may be ultimately liable for.

So, I find that he has standing. And there's a recent Supreme Court case that's not entirely on all fours, but it certainly goes to that, where Justice Sotomayor -- and General Trucking is the name of the case. It talks about 1109 and was a party in interest. It gives standing there. So, I find that everyone had the right to come in and argue here for purposes of today.

The real question is -- and we've heard about the process that the -- there's kind of two arguments that have been primarily raised when you kind of boil it down. One is that the process of going to a final and sealed bid did not maximize value. And two, essentially the Trustee's business judgment in what he selected. And you can kind of put aside and you strip down the case and who's involved, and it'd be just, I think, the right thing to do. Forget about who the buyer is and who should buy it.

I think all those considerations are irrelevant in terms of the Trustee's duty to maximize value and whether it should go to Global Tetrahedron or "The Onion" and what they would want to do with it, and whether they want to buy it and shut it down. I think if you buy something you can do whatever you want with it.

I think -- same time, I think someone wants to buy

it and keep it going and hire Jones and do whatever they want, then I think they can do that too.  I don't really think that's relevant for purposes of the analysis.

So, the real question is the Trustee and Mr. Tannenbaum, quite frankly primarily, testified that they thought it was in the best deal to kind of go to a sealed bid.

I've heard a lot of evidence today.  I do find that there was a good faith effort by the Trustee and his professionals to conduct a process to try to maximize value.  I'm going to say from the outset, I know a lot's been talked about with collusion and stuff like that.

I don't find bad faith on behalf of the Trustee, any of the Trustee's professionals, "The Onion", the auctioneer, lawyers, any of Global Tetrahedron's professionals, Seward, Gibson Dunn, any other professionals who worked on this, the Connecticut Families, First United, the Texas Plaintiffs, Jones.  I don't think anyone acted in bad faith here.

I think everybody was trying to buy an asset and put their best foot forward and tried to play within the rules.  And a lot has been said about the distributable proceeds waiver and whether that is something novel.  So what?  Smart lawyers can come up with creative ways and this is a unique case where there's a billion-dollar judgment

subject to appeal.

But the concept of gifting, I accept less to give to others, is not unheard of.  And there's vertical gifting where one group may be entitled to it kind of gives to another group, and there's kind of horizontal gifting where maybe we're both entitled to it and I'll just take less.  And so, those concepts don't concern me.  They're not troublesome.

What does trouble me is that I don't think there was a process that was, while well-intended, simply did not maximize value in any way based upon the record before me.  The Trustee and his professionals thought they could maximize value in the sale, it seemed almost doomed from the minute they decided to go to a sealed bid.  There were new forms going to a best and final.  No one knows what everybody else is bidding.  No one even bid on, really, Lots 3 and 4, $50,000 each.  People don't know if they're actually bidding against themselves.  People don't know what the other parties are bidding.  And then you have a really – – it's a complicated one.

There's a bid form that just says fill out the form.  But the Global Tetrahedron and the joint bidders kind of do a form with a letter, and the letter has to then explain the form initially, and that creates things that even Mr. Tenenbaum, who was the auctioneer who was talking

to parties, couldn't understand.  And he had to get clarification, right?

And so, one party's submitting everything on the form, not going outside the form.  They kind of -- well, they kind of tried to add in some new stuff, but they're not kind of explaining this non-cash component.  And parties could submit non-cash components, but there was this kind of process where now, instead of kind of providing greater clarity, then they go to a final and elect to go to a final where it doesn't even feel like they really understood what they understood in speaking of the Trustee and the auctioneer, and whether they even agreed upon what their understanding was of the Global Tetrahedron bid.

Mr. Tenenbaum testified that he didn't like the bid because it was contingent upon another party receiving -- about another bidder's bid.  And he knew that that really wasn't going to qualify as highest or best because they said instructions and the orders provided that you couldn't have contingencies there.  And so -- and they weren't disclosing who the other was, and Mr. Tenenbaum said he didn't want to disclose that because he didn't want to disclose Global Tetrahedron's strategy.

I'm sure there were other considerations.  I'm just not sure that's really what he should have been doing. I'm not really sure that's a real consideration.  But I

don't think it was done in bad faith.  But this is a unique non-cash component that's complicated.

And you go to best and final, and the best and final bid, Global Tetrahedron goes from $1 million to $1,750,000, and then increases the distributable proceeds waiver, kind of makes sure that the Texas families receive at least $100,000 more than the other bid.  And then there's kind of a future revenues component to it.

First United increases their cash bid from to what I would call -- ah, it's all over the place now, but it's like $3.5 or $3.75 million, depending on how you kind of add up the numbers.  I won't try to do the lots, but I know $3.5 is one of them there.

So, now Trustee essentially has to -- was forced to concede that the words on the paper don't necessarily line up with his understanding of the way the bids worked or what Global Tetrahedron wanted.

But he didn't call them to get an understanding of it.  He just kind of tried to figure out what they under- -- tried to make sense of it, instead of picking up the phone and saying, what does this mean?  You're bidding on Lot 4; are you willing to do 5 and 4, or is it just 4?  How does this thing work?  Is it contingent upon the other bid?

You don't really get that; you don't get the phone call for clarity.  You don't get a live auction where people

can put it on the table and say, identify what this means so that we can have an apples-to-apples bid.  Then I think the Trustee went through an unnecessary kind of mental gymnastics to kind of get to the point where he could get a $7 million bid, although the letter says from Global Tetrahedron that it's up to $7 million.

And he can't get around the fact that Global Tetrahedron put that in their final bid and then drafted the sale order, which his lawyers reviewed, both lawyers reviewed, and it says exactly -- basically tracks, like, 99 percent, to the point -- what the bid letter says.  But he still understands it to be something different than what's in the motion and what's in the bid, which is contingent.

And I don't -- again, the families didn't do anything wrong.  They put a bid together and they articulated their bids.  They didn't know this was going to get cancelled and go to a best and final.  And they tried to articulate it, and they expressed it, but the bid even has a chart that says here's how we compare it to other qualified bids.  We don't know what they are, but this is the way you ought to be thinking about it, this is what we want you to do.

Going to a final with no explanation, in a sealed final where no one knows, I think it's clear the Trustee left a lot of money on the table, or potential for a lot of

money on the table, potential for a lot of negotiation on the table.  No phone calls were picked up to see if somebody wanted to do more.

He talked about the White Oak case.  I presided over that case that he was very proud of, and he should be proud of that.  In that case, there was a live auction, and then somebody showed up at the Courthouse steps and said, I want to put more money on the table, and the Trustee said, well -- same Trustee said, man, Judge, you know, man, they're putting a lot more money on the table.  I said, all right, you want to open it up?  Let's open it back up.  And then somebody wanted to put more money on the table, and I said, hey, at some point we've got to stop, and at some point, somebody's going to have to live by it.  So, there were a lot of rounds there and a lot of transparency.

And I just think this lacked the transparency.  And the final order that's at 974 doesn't say what the Global Tetrahedron final bid says.  Yeah, it's an improvement upon what was said, or maybe it's clarification upon what the parties kind of agreed upon, but that's not what the bid says.  And it's ultimately kind of led me to think this should have been opened back up.

If you're going to open it back up and you're going to start changing terms, then everybody's got to be involved, and everybody gets opened back up.  It was

confusing and it was understandably a little confusing.  The Texas families didn't even understand the way it really worked, according to their own pleadings.  And I'd have to get clarified.

It was based on assumptions of 96.7 and 75.25.  And all the appeals are -- all these judgments are subject to appeal.  I have no idea what a Connecticut Supreme Court is going to do.  I have no idea what a Texas appellate court is going to do.  I had no idea until today that -- I still don't know what stage the Texas process is in.  I know I've authorized in the case for Jones to hire lawyers and go appeal.  (indiscernible) but I've been trying to stay in my lane and not get into this.

I've ruled on non-dischargeability issues, but I've always put even in those orders that whatever those Courts do, if they reduce the judgments, then they're subject.  And the non-dischargeability component that I've ruled upon gets subject to it.  It sounds like it went down a little in the Connecticut -- I don't know if that changes the analysis or not.  I don't fault Mr. Murray for (indiscernible).

Okay.  I don't know whether the record is clear to me that the Trustee and the bidders were not on the same page at the time the Trustee accepted, and how the distributor proceeds worked.  And I don't think Mr. Murray –

- I know he did it, but lack of clarity, Lot 4, Lot 5, how the distributor proceeds, just avoid, not giving any credence to the future revenues component?

The Trustee and the auctioneer both testified that they understood it as a firm $7 million, but that's not what that document says.  And I got it; reasonable minds could disagree.  That's why you've got to put it on the table, try to get more money.  And it's important.

Again, I don't really care who wins, and I got it, there's a lot of emotion, and I'm sure people want "The Onion" to win, and there are some folks who want Jones to win.  I don't really care about that stuff.  But I do care that the Texas families could potentially receive a recovery.  And I think the Trustee has a duty to try to go out there and scratch and claw and get every dollar possible.  And if there's more money on the table or if he thinks there's going to be more money on the table, to try to -- real money, you've got to try.  You've got to try and try to get them everything they can.

And just telling them that they can get an extra $100,000, to me just doesn't cut it.  I don't think -- I don't think it's enough.  I mean, fine, the bid went up from $1 million to $1.750 after a -- we got an extra $750,000.  You know, we've got some other bells and whistles, but that's it.  I don't even think the $3.75 million is enough.

We're talking about a distribution to folks who have -- at least Texas has a $49 million judgment subject to appeal.  Maybe it'll end up being zero.  Maybe Connecticut ends up being zero. Got a secured creditor out there who may take, from what I understand Mr. Murray's telling me, maybe $6 million, maybe more.  I don't know if that deal breaks down.  There's no deals until you -- until I sign them, and no deal is final until it's final in bankruptcy.  And everybody knows.

And not to say that I'll stand in the way of a deal, but you know, stuff breaks down.  It ain't over until it's over.  So, I think you've got to go out and try to get every dollar.  And I don't think -- I think going from an initial round of bid where you qualify to a final, I've never seen that.

And yeah, I think Mr. Murray's lawyers, they're right.  Not every case has cash and understands every aspect of it.  But Murray still can't tell me what the bid is.  But he still can't articulate what the cash -- like, if you're going to put a cash number on it, what it's going to be.  I've never seen that.

Even in gifting scenarios, you have hypothetical ranges as to what you do and where things go.  I think the process fell down.  I don't think the parties did anything wrong.  I think if the parties would have been told we're

going to show up and put your best offer on the record, I think parties -- they were ready to do it.  No one -- they didn't do anything wrong.

And they, I think -- I had no issue with the non-cash component to it.  I just think the other side had a right to know it.  And it's going to change and get tweaked, so that there's -- now it's 750 of value and I think everybody gets to know it when you articulate it.  Even if you wanted to go another round of silent bids or sealed bids and see where things go, I still think you had to kind of tell people here.

And I think -- I got it, you've got to defer to business judgment, but I don't know.  I think the Texas families, the Connecticut families, are involved.  Texas families were not there.  I think you've got to scratch and claw and get everything you can for them, for everyone else. I don't know if -- there may be other parties.  I know that they're the largest but, you know, I don't know.

Maybe the Texas families get something and there's another unsecured creditor out there -- I haven't looked at the claims pool -- that gets less.  I don't know.  I think you've got to scratch and claw for everybody.  We don't even know -- there's not even confirmation two weeks after as to what the auctioneer is going to get.  Are they going to get it based on the $3.5, $7 million bid, $1.75 million?

I very much appreciate Mr. Tenenbaum saying, we'll figure it out on the back end.  Yeah, but that's, I don't know, more money that goes to admin costs, or less money that goes to professionals.  I mean, less money to go to unsecured creditors.  Another round, you get another $750 for all lots?  That's the -- strip it down to its core.  That's -- you know, really, because the distributable proceeds waiver might kind of -- maybe guarantees an extra $100,000 for the Texas families, assuming that all judgments are over, and everything goes.  I don't see it.  I don't think it's enough money.  I don't think First United's bid is enough money.

So, if somebody's going to ask me to award it to someone else, the answer to that is no, too.  We're going to open this up to an auction.  I'll end with that.

I don't -- again, I think these are good faith -- what I would call good faith errors.  I don't find anybody did anything wrong in here that wasn't a level playing field for all bidders and that's important to me.

I don't think there was a meaningful analysis as to how you value as well the risk of other judgments at the time the Texas, Connecticut, what's going to happen at those Courts.  Mr. Murray certainly had a good analysis of PQPR.  Those are based on settlement negotiations, and I take them at his word.

But I don't know, I don't -- I think Tranzon's consideration about doing this lots had one concept.  But then when you threw in the contingent DPW portion of it, I think it kind of stuck to it.  And I think that's where -- I think it lacked a bankruptcy eye on this point once we started getting into the complexities of where things went and where they needed to go.

The process gave Mr. Murray flexibility.  I didn't mean you had to -- I didn't mean we don't have to check, though, whether the process itself was intended.  Well, actually, that process itself (indiscernible) you can cancel an auction.  You know, I didn't mean it was the right thing to do based on these facts.  And again, I'm not second -- I don't like second-guessing trustees.  But there's a lot of evidence that there was not even agreement upon what the deal was.

It's unclear to the Court whether there was even a -- whether the winning bid was an impermissible contingent bid.  It's not even clear about that because we never got clarity.  I think a phone call would have clarified that.  But I get the order provides clarity, but that's not what the winning bid -- when the winning bid was selected, provided.

I think Mr. Murray's assumptions are based on the assumption that it's a $7 million bid, assumption that it's

Lot 4 and 5 were available and not just 4, assumption that the revenue generating didn't -- provided no meaningful portion there, assumption that there's going to be no more money.  It's just a lot of assumptions upon assumptions upon assumptions upon assumptions.  And they're all good faith deals.  Assumption that, you know, this was a strategy by the families, and they needed to keep it secret and not tell the other side, to try to go put folks in a room and see how much money you can get in there.

I think business judgment here -- I think in this case I'm going to not approve the sale to the purchaser.  I think there's a great lack of clarity here.

Based upon the record before me, which is the only issue before me, and the motion before me, I'm going to deny it.  I'm not -- I'm going to say this as well.  It's 10:22 Central Time.  I don't think this makes sense to open it up again for another round of an auction.  I think there's just so much confusion.

I don't think these bids you -- I don't -- Mr. Murray, I think you've got some decisions to make and I'm going to leave them in your hands because you're the Trustee.  There's a motion to disqualify the Trustee I'm deny -- I don't -- we don't want to take that up.  I don't think we're there, anywhere near there, based on this record before me.

I don't want to hold the remaining assets auction. I think I don't want to hold this auction. This auction is not -- what you're telling me and what everybody's telling me is -- it's $3.75, $1.75? No. Not when you've got a $49 million judgment out there, not when you have a $1.4 billion judgment out there, not when Jones is contesting everything, not when PQPR is asserting a lien on everything, a secured creditor.

Sounds like Mr. Murray -- sounds like you've been doing your job in negotiating with the Texas families, the Connecticut families, and PQPR. This case needs to come to a close. This case needs to get back to the point where this Chapter 7 case -- well, it was an 11; they converted it to a 7. This is '20 case -- this was a Chapter -- it's December and this is a 2022 case. This case ends in 2025. It has to. And it's got to get back on track.

So, Mr. Murray, I'm going to make your call. I'm not asking you for your answers today or your decision. You give it some thought. You want to go resolve stuff with PQPR, get a deal done, go do it. You want to go settle with the Texas families, go do it. If not, Texas families, I'm going to be -- end of the month, I'm going to be looking, and I'll be calling to get your adversary proceeding back on track. Either you get something on file or -- same with the Connecticut families. If we're going to go to trial on

this, we're going to go to trial and we're going to schedule it sometime in 2025.  And that's just what we're going to do.

Mr. Murray, if you want to sell, you can sell. You can try to sell the equity if you want.  There's no liens on that.  It's clean.  Cash will be king.  If you want to do it, if you want to abandon this, do what you want. Let the parties go for it.  Let the parties at it if they want to and go pursue their own remedies if you want to do that.  I leave that up to your judgment.

If you want to try to get something together, I'm going to need confirmation that PQPR is out, and I'm going to want confirmation that this is going to go -- I'm going to have to get a lot more comfortable before folks start spending a bunch of money and we have another two-day hearing questioning business judgment.  I don't want to put you through that again.  I don't want to put -- I don't want to put Texas and Connecticut, which has happened again, in my opinion.  They may disagree with that, but I'm tired of that too.

So, whoever the purchasers, the bidders, were, I know you spent a lot of time and money on this and I sincerely thank you for the process.

Trustee, you've got something, just let me know what you want to do.  Today's not the day, but in 30 days

I'm going to want to know where we are with this case.

I thank everyone for their time.  That's my ruling.  We're done.  Thank you

(Proceedings adjourned at 10:27 p.m.)

I'm going to want to know where we are with this case.

INDEX

RULINGS

                                          Page      Line

Motion for Sale, Denied                   374       14

Motion to Disqualify Trustee, Adjourned

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  December 12, 2024