UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

                                   )   CASE NO: 22-33553
    ALEXANDER E. JONES and          )
    OFFICIAL COMMITTEE OF           )   Houston, Texas
    UNSECURED CREDITORS,            )
              Debtor.               )   Monday, December 9, 2024
                                    )
                                    )   1:00 p.m. to 6:44 p.m.
    ------------------------------)


                                  TRIAL

            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE


    APPEARANCES:

    For Debtor:              BEN C. BROOCKS
                             Broocks Law Firm PLLC
                             6207 Bee Cave Road
                             Suite 120
                             Austin, TX 78746

                             SHELBY A. JORDAN
                             Jordan & Ortiz, PC
                             500 North Shoreline Boulevard
                             Suite 804
                             Corpus Christi, TX 78401

    For Chapter 7 Trustee,   JOSHUA W. WOLFSHOHL
    Christopher Murray:      KENESHA L. STARLING
                             Porter Hedges LLP
                             1000 Main Street
                             36th Floor
                             Houston, TX 77002

                             ERIN E. JONES
                             Jones Murray LLP
                             602 Sawyer Street
                             Suite 400
                             Houston, TX 77007

For First United
American Companies:      WALTER CICACK
                        Hawash Cicack & Gaston LLP
                        711 West Alabama Street
                        Houston, TX 77006

For Global Tetrahedron: GREGG J. COSTA
                        JASON Z. GOLDSTEIN
                        Gibson Dunn
                        811 Main Street
                        Suite 3000
                        Houston, TX 77002-6117

For Texas Families:     JARROD B. MARTIN
                        Chamberlain Hrdlicka White Williams
                        & Aughtry PC
                        1200 Smith Street
                        Suite 1400
                        Houston, TX 77002-4310

                        AVI MOSHENBERG
                        NICHOLAS LAWSON
                        Lawson & Moshenberg PLLC
                        801 Travis Street
                        Suite 2101
                        Houston, TX 77002

For Connecticut
Families:               KYLE J. KIMPLER
                        PAUL A. PATERSON
                        VIDA J. ROBINSON
                        Paul Weiss Rifkind Wharton &
                        Garrison
                        1285 Avenue of the Americas
                        New York, NY 10019-6064

                        RYAN E. CHAPPLE
                        Cain & Skarnulis PLLC
                        303 Colorado Street
                        Suite 2850
                        Austin, TX 78701

For U.S. Trustee:       HA MINH NGUYEN
                        Office of the United States Trustee
                        515 Rusk Street
                        Suite 3516
                        Houston, TX 77002

For PQPR Holdings          STEPHEN W. LEMMON
Limited, LLC:              Streusand Landon Ozburn Lemmon LLP
                          1801 South Mopac Expressway
                          Suite 320
                          Austin, TX 78746

For X Corp.:              CAROLINE A. RECKLER
                          CHRISTOPHER HARRIS
                          JONATHAN J. WEICHSELBAUM
                          Latham & Watkins LLP
                          330 North Wabash Avenue
                          Suite 2800
                          Chicago, IL 60611

Court Reporter:           UNKNOWN

Courtroom Deputy:         UNKNOWN

Transcribed by:           Veritext Legal Solutions
                          330 Old Country Road, Suite 300
                          Mineola, NY 11501
                          Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

INDEX

PAGE

OPENING STATEMENT

By Mr. Wolfshohl                                    21

By Mr. Kimpler                                      26

By Mr. Goldstein                                    33

By Mr. Broocks                                      34

By Mr. Cicack                                       46

| TRUSTEE'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jeff Tanenbaum | 54 | 167 | 248 | 250 |
|  |  | 235 |  |  |

| TRUSTEE'S EXHIBITS | RECEIVED |
|---|---|
| Exhibit 6 | 62 |
| Exhibit 7 | 64 |
| Exhibit 8 | 68 |
| Exhibit 14 | 60 |
| Exhibit 15 | 97 |
| Exhibit 16 | 99 |
| Exhibit 17 | 101 |
| Exhibit 18 | 135 |
| Exhibit 19 | 136 |
| Exhibit 21 | 60 |
| Exhibit 22 | 94 |

Exhibit 23                                              105

Exhibit 24                                              141

Exhibit 25                                              113

Exhibit 26                                              114

Exhibit 27                                              120


FIRST UNITED'S EXHIBITS                              RECEIVED

Exhibit 976-15                                          241

Exhibit 976-16                                          245

HOUSTON, TEXAS; MONDAY, DECEMBER 9, 2024; 1:00 PM

(Call to Order)

THE COURT:  Good afternoon, everyone.  This is Judge Lopez.  Today is December 9th.  I'm going to call the 1 p.m. case, the case of Alexander Jones, here in Case 22-33553 in connection with a motion to sell assets.

Why don't I take appearances in the courtroom?  If you're on the line and wish to make an appearance, I'd ask that you please hit 5*.

MR. WOLFSHOHL:  Good afternoon, Your Honor. Joshua Wolfshohl and Kenesha Starling, on behalf of Christopher Murray, the Chapter 7 trustee.

THE COURT:  Okay.  Good afternoon.

MR. BROOCKS:  Your Honor, Ben Broocks and my cocounsel, Shelby Jordan, for Alex Jones.

THE COURT:  Okay.  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Also Erin Jones, on behalf of Christopher Murray, Chapter 7 trustee.

THE COURT:  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack, on behalf of First United American Companies.

THE COURT:  Good afternoon.

MR. COSTA:  Good afternoon, Your Honor.  Gregg Costa, on behalf of Global Tetrahedron, and I'm joined by Jason Goldstein.

THE COURT:  Good afternoon.

MR. MARTIN:  Good afternoon, Your Honor.  Jarrod Martin, as well as Avi Moshenberg and Nick Lawson, for the Texas families.

THE COURT:  Okay.  Good afternoon.

MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen, for the U.S. trustee.

THE COURT:  Good afternoon.

MR. KIMPLER:  Good afternoon, Your Honor.  Kyle Kimpler, from Paul Weiss, on behalf of the Connecticut families.  In the courtroom today is Paul Paterson and Vida Robinson, who you may hear from.  My co-counsel, Ryan Chapple, is on the line.

THE COURT:  Good afternoon.

MR. LEMMON:  Your Honor, Steve Lemmon, on behalf of PQPR.

THE COURT:  Good afternoon. Okay.  Anyone on the line?  I'm just going to go in the order in which I see it. Here's a 312 number.

MS. RECKLER:  Good afternoon, Your Honor. Caroline Reckler, of Latham & Watkins, on behalf of X Corp. I am joined by some of my colleagues, Chris Harris and John Weichselbaum, as well.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance, I'd ask that you please hit 5*.

And just give me one moment.  All righty.  Now we can all --

okay, who do I turn this over to?

Mr. Wolfshohl?

MR. WOLFSHOHL:  Thank you, Your Honor.  We're here today primarily in connection with the trustee's expedited motion for entry of an order in furtherance of the sale of the Free Speech Systems LLC.  A couple of things.  We filed an agenda in an attempt to establish some level of order to what otherwise probably seems like chaos.  I don't know if it helps.  I hope it did.  In terms of the order of things, while we don't have it formally set, we do ask that the court take up motion to strike that we filed.

THE COURT:  I didn't read the corrected motion.  I don't know if that changes anything.

MR. WOLFSHOHL:  The corrected motion to strike or the corrected objection?

THE COURT:  The corrected response, I should say.  I don't know what arguments are going to be raised there.  I didn't read it because it was filed after the time, and sometimes corrected means corrected.  Sometimes corrected means amended, and I figured we'd take the arguments up.  And if somebody tells me that's a new argument that wasn't raised in the original papers and somebody can argue otherwise.

MR. WOLFSHOHL:  Just to be clear, Your Honor, we

do ask that it be stricken for untimeliness, but the primary thrust of our argument is based on standing because we think it's crystal clear.  I don't know if Your Honor has looked at the motion to strike --

THE COURT:  That the trustee -- that Mr. Jones doesn't have standing?

MR. WOLFSHOHL:  Absolutely, Your Honor.

THE COURT:  So if you want to take that up, we can take that up now.  And I'll ask you one question, and I'll let you answer it.

MR. WOLFSHOHL:  Okay.

THE COURT:  What is the evidence going to show with respect to the distributable payment waiver, the DPW?  Is it going to show -- are the Connecticut families waiving any claim that may receive in this case?  In other words, is there going to be an offset of that amount?

MR. WOLFSHOHL:  There is.  There is, Your Honor.

THE COURT:  And is that in the papers?

MR. WOLFSHOHL:  So --

THE COURT:  Hold on a second.  Is that in the papers that they're going to receive --

MR. WOLFSHOHL:  It's in the -- it's in the proposed sale order that we filed that resolves a number of objections.

THE COURT:  Right.  So they get standing.  In

other words, you can't resolve the standing issue by showing up and filing a proposed order like the day before that says this is what's going to happen.  They had standing.  They're objecting to the sale.  They think the 3.75 is a better deal for the estate.

And I get it if the trustee was selling something neutral and they issued it.  But this has a potential $2 million swing that could affect the amount of distribution that Mr. Jones may ultimately be responsible for paying.

I think that gives the debtor standing, and I'll reject that.  So I think he gets to argue don't approve that one, there's a better deal on the table than the trustee didn't exercise his reasonable business judgment because it could reduce my liability by $2 million.

I know this is what you're going to argue, but I can just make the argument there.  Why don't -- why doesn't the debtor have standing in that case to argue to the court that potentially a $2 million swing in judgment if they don't buy the DPW is worth anything?  Why shouldn't I consider that?

MR. WOLFSHOHL:  Only because the credit that's being applied is going to be based on a $7 million sale price.

THE COURT:  Right.

MR. WOLFSHOHL:  And As a result, they're getting a

larger reduction in the judgment under this sale versus --

THE COURT:  But you get to argue that, and they get to argue that it's not.

MR. WOLFSHOHL:  I understand.

THE COURT:  That's my point.  It's not --

MR. WOLFSHOHL:  I understand, Your Honor.

THE COURT:  So I'll --

MR. WOLFSHOHL:  I'd just ask -- we'd ask that the court allow me -- that the court continue to analyze this throughout the hearing because I think one of the problems we have is we think that this hearing is very narrow.  I think that the hearing is about the trustee's business judgment.  And I think -- and Your Honor said that multiple times at the last hearing.  I think that you are going to get a lot of noise around the edges, and it's not going to have anything to do with the trustee's business judgment.

THE COURT:  Okay.

MR. WOLFSHOHL:  And so we're trying to create a scenario where Your Honor gets to hear the evidence that relates to exactly what it is we're in front of you on.  And I just want -- I'd like to at least allow -- the court to allow me, as the hearing progresses, when things are raised that either don't have anything to do with what we're in front of the court on --

THE COURT:  That's fair.

MR. WOLFSHOHL:  -- or that they don't have standing to assert.  For instance, both objectors have said PQPR doesn't -- you know, that you're not taking that into account.  Well, neither of them are PQPR.  PQPR is not objecting to the sale.

THE COURT:  They can't raise the argument that there's a -- that the trustee's business judgment shouldn't be exercised because there's someone alleging $50 million of a secured claim and the bankruptcy code would make those payments go to them?  You're saying they can't raise that because they're not PQPR?

MR. WOLFSHOHL:  I don't think that they can raise PQPR's objection is my point, Your Honor.

THE COURT:  It's not an objection.  They're arguing the bankruptcy code.

MR. WOLFSHOHL:  I understand.  We'll address PQPR. We plan to address it in connection with the hearing, Your Honor.

THE COURT:  Okay.  In other words, I've got to consider it, right?

MR. WOLFSHOHL:  I understand.

THE COURT:  Does this money all go to a secured creditor or does it go to actual unsecured.  Does it go to unsecured creditors or does it go to a secured creditor is something that I raised.  So I think people get to argue the

point as to whether this is a -- this sale is in the best interest of the estate and whether that money is going to go to where the folks really think it's going to go I think is a question I've got to answer as a matter of just Bankruptcy law.  And I think they get to argue that.  I don't think they get to argue, you know, arguments, you know, that -- I don't think they get to prove the merits of PQPR's stuff, right?  But I do think they get to argue that the trustee didn't consider it, in other words, or if he did or if he didn't.

MR. WOLFSHOHL:  Right, Your Honor.  Well, and we'll get to it.  But, you know, the proposed sale, or I will say, because of the credit, I think results in a net neutral effect whether PQPR has a secured claim which will present evidence that discusses exactly what the assessment's based on.  And Mr. Lemmon can discuss with the court where we're at with PQPR, but I think that the net effect relative to the ultimate claims is going to be actually better regardless of how you look --

THE COURT:  And I'm not saying -- I just think they get to argue and I get to consider it all.  But you get to certainly come and tell me this has nothing to do with today's motion at the appropriate time.

MR. WOLFSHOHL:  Understood, Your Honor.

THE COURT:  I think that's right.

MR. WOLFSHOHL:  Okay.  The other -- just a couple of housekeeping matters.  With respect to there was a limited objection filed by X Corp., and Ms. Reckler is on the line.

THE COURT:  Yes.

MR. WOLFSHOHL:  That has been resolved.  The order that was uploaded earlier today resolves it.  There are a couple tweaks because they were waiting on final approval, But I think Ms. Reckler probably doesn't want to spend the entire day in this hearing.  But I just -- whenever it is the appropriate time, we can either walk through that or simply have the court take it under advisement.  But that is a resolution that essentially resolves the limited objection that X Corp. filed, and I wanted to alert the court of that.

THE COURT:  Is that the language that essentially nothing -- there's a sale, but nothing is a finding that anything is property or not property?

MR. WOLFSHOHL:  That's right, Your Honor.  And we're also not assigning the accounts, the X Corp. accounts. There's three of them that are FSS accounts with three separate handles.  We're not assigning those.  The content is being assigned, and we have a protocol under the order that allows for that content to be pulled down, assigned to the winning bidder, and then ultimately it just has a fairly lengthy description of how the X Corp. accounts --

THE COURT:  Got it.  Got it.  So not the handles, but maybe the content then gets sold.

MR. WOLFSHOHL:  That's right.

THE COURT:  Got it.  Okay.

MR. WOLFSHOHL:  That's right, Your Honor.  We've also made modifications, one, to fix an error in the distributable proceeds waiver description, but also account for the reservation of rights language or reservation of rights that was filed by the Texas plaintiffs.  And so there's a provision that also deals with that.  I don't think that the Texas plaintiffs will tell you that --

THE COURT:  What was the -- what was the error?

MR. WOLFSHOHL:  The error was that the --

THE COURT:  (Indiscernible)

MR. WOLFSHOHL:  Yeah.  The error was that the description of the distributable proceeds waiver comes from a definition in the bid letter.  And there was -- prior to filing the motion, there was a disconnect between the trustee and the bidder as to which calculation applied.  Both of them created a better result under both the trustee's analysis.

Before filing the motion, the parties agreed that we would use the higher amount, which is what the trustee had calculated.  And then even since then, in order in part to resolve any objection the Texas plaintiffs would have, we

set a number and said, essentially, this is a floor.  It's the amount that's set forth in Paragraph 43 of the motion. It says the minimum distributable claims waiver will be 750,000, and it's subject to Texas -- if they think it's higher based on some way that the claims might shake out later, they have a right to come in and question that later on once we get to a point where we're actually making distributions.

THE COURT:  I think I understand.  But maybe once we walk through the analysis, I'll understand it better. But I get the gist of it.

MR. WOLFSHOHL:  And then the other change, Your Honor, was the one I just talked about, which was, while this wasn't set forth in the original order, we clarified what the credit against the claims would be.  Obviously, that's important to the estate based on the waiver, and it simply provides that the Connecticut plaintiffs, notwithstanding that they're waiving their distributable proceeds, they are still forgiving what the amount would be if the bid were a $7 million full cash bid, the amount that they would be entitled to.  So it's roughly like a $6 million -- based on our calculations, it's roughly like a $6 million credit against the (indiscernible) --

THE COURT:  (Indiscernible) okay.  Okay.  That's new, right?

MR. WOLFSHOHL:  That's new.  That's right.  No, it's just --

THE COURT:  Okay.

MR. WOLFSHOHL:  You know --

THE COURT:  Got it.

MR. WOLFSHOHL:  The concept of what the credit would be was not developed until, you know, the last several days.

THE COURT:  Okay.  No, no, no.  I appreciate it.  Thank you.

MR. WOLFSHOHL:  We have a lot, I think --

THE COURT:  I studied really hard for this.  That's why I was just trying to make sure that I didn't miss anything.  I appreciate it, though.

MR. WOLFSHOHL:  Well, and in fairness, Your Honor, this was in the order that we -- I mean, we were trying to consolidate all changes to the order.  We did them all.  I think this -- I think we filed it, like, this morning.  So I wouldn't expect Your Honor to have looked at it.

THE COURT:  Yeah.  Got it.

MR. WOLFSHOHL:  And with that, Your Honor, frankly, I think we ought to get into the evidence.  I don't think it's necessary to do openings.  I think closings -- I'd like to reserve for closings, but my preference would be that we get on the clock so that we can actually start

presenting the evidence and move forward.

THE COURT:  Okay.  Let me hear from other parties.

MR. BROOCKS:  Yes, Your Honor.  Well, the reason he didn't want an opening statement is because --

THE COURT:  Can you just get -- just get closer to the mic?

MR. BROOCKS:  Yes.  Ben Broocks, Your Honor.  The reason I think that they don't want an opening statement is the same reason they just filed a corrected order this morning, because we've been doing depositions last week, and we've caught them.  And what I want to do is, I think the opening statement will provide very, very briefly, maybe 15 minutes of an overview so the court will understand precisely what's happening because it's easy to tell a story at 200 or 300 miles an hour where you just miss the details.

But when you get into the details, you will see that there has been misrepresentations to the court.  There has been not a meeting of the minds.  There have been lots of things that have been stated that are accurate.  But I need to give you the full picture so you will see it.  As the evidence unfolds, you'll be able to have a framework to understand that.  So we would strenuously urge just a 15-minute or so opening from both sides so you can see what we're talking about.

THE COURT:  Okay.  Thank you.

Mr. Cicack?

MR. CICACK:  Yes, Your Honor.  I agree that we should have an opening.  We, Mr. Broocks and I, in terms of this motion, we are aligned.  We both objected to it, but we represent different parties, and we come from different viewpoints.  So I agree that we should have an opening statement because I think there's a lot of things that would help Your Honor as we go through.  So I would just ask for maybe 10 minutes of an opening, and I think that'd be sufficient.

THE COURT:  Mr. Costa?

MR. COSTA:  Your Honor, we agree with the trustee that it makes sense.  It's already going to be a long day and evening with the evidence.  There were submissions by all the parties.  You said --

THE COURT:  Don't scare me, Mr. Costa.

MR. COSTA:  The Cowboys are playing tonight.  I wish it weren't so.  But the submissions the parties presented are essentially their opening statements.  You have a good framework based on the filings for what each party's contentions are, and it makes sense, in our view, to get right into this evidence because it's that -- it is a narrow inquiry and the evidence will focus on that.  We would recommend getting right into it.

THE COURT:  I'm going to give everybody, if they

want it, just 15 minutes per side, if that's what you need, but no more.  And the reason I'm doing it as I did hear that there were some tweaks and changes to the proposed order and resolutions.  And I think -- but you don't have to take the whole 15 minutes.  We can just -- I'm just trying to give everyone a framework.  If you want to present, if you want to reserve everything to closing, you can certainly do so as well.

But I do think they're allowed to tell me what I'm going to see and to kind of give me a -- but it doesn't need to be really long.  Again, if you're on the line, I'd ask that you please just keep your phone on mute so we can all hear each other.

So, Mr. Wolfshohl, Global Tetrahedron, the families, if you don't want to go first, you can.

MR. WOLFSHOHL:  Thank you, Your Honor.

MS. RECKLER:  Your Honor, this is --

THE COURT:  Ms. Reckler?

MS. RECKLER:  Your Honor, this is Caroline Reckler.  May I just say something very briefly?  I'm very much the tail wagging the dog (indiscernible) --

THE COURT:  Yeah.  Of course.  Of course, and I should have done so.  I apologize.

MS. RECKLER:  Your Honor, Mr. Wolfshohl is correct.  We have resolved the limited objection that X

Corp. filed.  And I just want to say thank you very, very much to Mr. Wolfshohl and to Mr. Goldstein for working so constructively and practically on some issues, frankly, that are novel to me and I find quite interesting and maybe one day in the future on another case will litigate them in your court, but not for today, and that's the good news.

If Your Honor rules at the end of this hearing or at a later date, that the successful bidder, as identified by the debt of the trustee, is not indeed the successful bidder, then I'd just like to reserve my rights to have the opportunity to recall any witnesses, to cross-examine them before anyone else is declared the successful bidder in the event we are not able to similarly resolve the issues that we were able to resolve with the successful bidder.

And again, just really want to thank the parties for being so professional and collaborative, because it very much could have gone a different direction, and then we would have been here fighting about a whole other set of issues that the court now does not need to address.

THE COURT:  Thank you.

MS. RECKLER:  And Your Honor, may I be excused?

THE COURT:  Absolutely, absolutely.  Absolutely.

MS. RECKLER:  Thank you.

THE COURT:  Okay.  Mr. Wolfshohl?

MR. WOLFSHOHL:  Thank you, Your Honor.  I'm going

to start off.  I just want to kind of level set.  The trustee has a proposed sale that pays significantly more to unsecured creditors than any alternative.  No creditors -- this is important.  No creditors of FSS have objected to the sale.  The limited objection, as Ms. Reckler stated, of X Corp. was resolved.  And as I said, the order that was uploaded included that resolution, and I think there's only minor tweaks left to make.  The largest creditors, as Your Honor knows, the Connecticut creditors, who hold more than 90 percent of the claims pool, overwhelmingly, for obvious reasons, support the sale.

The sale process was conducted in accordance with the wind-down order.  You're going to hear a lot of stuff about everybody on that side of the room telling you that that didn't happen.  But I'm telling Your Honor it did.  The wind-down order was intentional in its flexibility and its ability and the discretion that it gave the court or gave the judge and the court with respect to a sale process related to a very complicated set of assets.  The sale process was extremely successful.  It yielded consideration that more than quadrupled the initial bid amounts.

The only two objections are from the debtor, and as I've stated to the court, I firmly believe the debtor does not have standing to make the objections that he's raising, and an angry losing bidder, who was provided with

the same information as the winning bidder, acknowledged that it understood the process at every step of the way and never objected at any point to the sealed bid process.

First, both objections are fatally flawed because they seek to supplant the trustee's business judgment with their own erroneous judgment.  And second, Your Honor, the vast majority of their complaints are just fantastic and imagined conspiracy theories that have no basis in reality.  And in an attempt to grasp for legitimacy, they misleadingly and selectively quote from portions of the wind-down order in the bid instructions while ignoring the fundamental principles of the wind-down order and bankruptcy law that give the trustee broad discretion to run an inherently complicated sale process.

The objectors assert that the trustee somehow assured the bidders that there would be a live auction and that they'd be entitled to one.  But this falls apart pretty quickly just based on a cursory review of the wind-down order as well as the offering memorandum that all the bidders were provided with.  It also doesn't reconcile with the backup bidder's lack of objection to the process at any point before the trustee actually made his selection of the winning bid.  And to be clear, I don't think we'd be here -- well, take the back.  Even if we had held a live auction, I think we'd be here fighting about essentially the same

stuff.

And in what I think is a generous interpretation of their objections, they suggest that the trustee had to execute a rigid sale process to perfection.  Notwithstanding that the interpretation ignores the fundamental provisions of the wind-down order, this supported standard flies in the face of the mountain of jurisprudence setting forth the criteria for approving a sale process.  It holds the trustee to a standard of not making a single mistake in the process. And that is simply not the law.  And it's not what's set out in the wind-down order, Your Honor.

The second point they make is even less cogent. And you're going to hear a lot about this because they're going to talk a lot about it because it goes directly to the trustee's discretion to select bids that result in the best value to creditors, which is consistent with the wind-down order.  Their argument is that the trustee's assessment of the value of the successful bid didn't precisely align with the successful bidder's intent in the bid.

The trustee analyzed every possible machination of the bid.  They all resulted in a better result for creditors.  The argument falls apart under any level of scrutiny, Your Honor.  First, as I said, either interpretation, they're the high bidder.  Second, as we're going to demonstrate through the evidence today, the

discrepancy was resolved in the estate's favor prior to filing the motion.  And I want to just sort of talk about the way that a sale process and an auction process typically goes.  When you conclude the submission of bids, I don't know if I've ever been in a situation where every single detail of the transaction has been resolved on the day that the selection of a winning bidder occurs.

The notion that that would happen runs contrary to virtually every sale process that I've ever been a part of in any bankruptcy case.  As Your Honor is aware, winning bids rarely have every detail resolved at the time of the auction.  And often there are things like purchase price adjustments, asset purchase agreements that need to be dealt with and negotiated, schedules to asset purchase agreements that discuss what's going to be included in the sale. Numerous matters are often left uncompleted at the time that the actual sale process goes forward, especially when you don't have a stalking horse bidder, which we didn't have here, and nothing's different here, Your Honor.

The purpose of the flexibility that's created is to give the trustee broad discretion so that he can run a process with imperfect facts and the facts that are on the ground so that he can actually assess what is the best situation, what's the best value for creditors.  And Your Honor, as to the trustee's business judgment, the standard

for approval of a sale under 363(b) is that it be reasonable business judgment.  And that's not the backup bidder's judgment.  It's not Mr. Jones' judgment.  It's actually not even the court's business judgment.  The only question the court needs to answer is whether the process constitutes a valid exercise of the trustee's reasonable business judgment.

Any number of people can reach a different conclusion about how to employ a sale process that still qualifies as being within the trustee's business reasonable business judgment.  The trustee's decisions regarding how to conduct this sale process, including the selection of the successful bidder, was squarely within the trustee's reasonable business judgment, and we believe that the sale should be approved, Your Honor, for all the reasons as we've stated in our briefing, and we're going to put on evidence that supports that, Your Honor.

THE COURT:  Thank you.  I meant 10 minutes per side.  I'll give you all a few minutes.

MR. KIMPLER:  Thank you, Your Honor.  I will be very quick.  Kyle Kimpler, for the Connecticut families.

THE COURT:  Maybe I said 15.  I apologize. Whatever I agreed to, we'll live with it.

MR. KIMPLER:  Your Honor, I'd just ask that as you hear the evidence today, you keep three things in mind.

THE COURT:  Okay.

MR. KIMPLER:  First, I want to clarify a little bit of a discussion you had with Mr. Wolfshohl just to make sure it's clear.  I think this goes to the standing.  I think it goes to what is the interest that Mr. Jones has in this hearing.  Now he has claims, we have claims against both FSS and Mr. Jones.  Our claims against Mr. Jones, or a significant portion of them, have been found to be nondischargeable.

In theory, he has an interest in making sure that FSS gets as much money as possible so that his claims, especially the nondischargeable ones, get reduced.  They get a credit for that.  And so it makes total sense to us that he doesn't want us to later say, well, we waived our right to some of the money and so now you owe me the full $1.5 billion, right?  He wants to be able to say, hey, it was your decision to waive that $7 million and you can't now come back to me and try to get it on the back end.  That makes total sense.

That's exactly what we solved for in the revised order.  What the revised order says is that, notwithstanding our waiver, we will give -- we will agree that our claims against both FSS and Jones will be reduced by our pro rata share of $7 million.  In other words, no different than if any other buyer, if Microsoft had come in and paid $7

million cash and we've gotten our fair share of it, that's how we will treat Mr. Jones going forward.  So I would argue that with that consideration solved for, I also don't really understand the interest they have in this auction.  But I'm not going to relitigate that.  I think it's just worth keeping in mind as the day goes on.

MR. BROOCKS:  Okay.

MR. KIMPLER:  The second thing I'd like Your Honor to keep in mind today is that on Friday, the Connecticut appellate court did affirm the judgments.  It did not affirm 100 percent of the judgments.  $1.3 billion of the judgments were affirmed.  All of the compensatory damages, $965 million, affirmed.  All of the common law punitive damages, approximately $330 million, affirmed.

The only part that was not affirmed was the $150 million under the Connecticut unfair trade practices act.  That may have further appeal proceedings going on, and no question Mr. Jones is likely to continue appealing to the next highest court.  This was not a summary affirmance.  It's a 60-page appellate opinion.

So a lot of what you've heard in the briefing so far, and I suspect a lot of what you'll hear today, even though it's, I think, irrelevant to today's hearing, it's about the proposed or supposed infirmity of our claims.  I think the recent affirmance is quite relevant.

THE COURT:  How does that affect what Mr. Murray was thinking about at the time that he made the decision, right?  Does it change the analysis that --

MR. KIMPLER:  Listen, I think if the business judgment is what information did he have on November 11th, it doesn't matter.  I think he'll explain to you that he thought about the claims.  He thought about, you know, had anybody ever objected to them.  He knew they were on appeal. He'll have his reasons for why he thought those claims were valid and while us waiving a portion of them provided real value to the estate.  I think, especially given what we're hearing from the other side, which is wait, wait, wait, the appeals the appeals, the appeals, I think it's quite relevant.

THE COURT:  How do I -- how should I think about the -- what I would call the $7 million, up to $7 million, which seems to have been resolved now, which is what I suspect they're calling lack of meeting of the minds?  How should I keep that in mind, whether --

MR. KIMPLER:  Sure.

THE COURT:  -- you all actually agreed on (indiscernible).

MR. KIMPLER:  There's no conspiracy here.

THE COURT:  No, I'm not saying conspiracy.  I want to be really clear.

MR. KIMPLER:  I know.  I know, Your Honor.  I'll just tell you from my perspective.  My clients, although you'll hear a lot of to the contrary, they care quite a bit about money.  They didn't want to waive amounts that they didn't have to waive.  So yes, we submitted a bid and when we submitted that bid, we thought, hey, we'll try to beat the other bid by $100,000.  But we also very clearly said this bid should be valued at $7 million.  The only way you ever, even under our math, in our letter, you get to $7 million is you waive it all.  That's the only way we could beat a $7 million bid under our math.

Now it turns out our math wasn't exactly the same as the trustee's math.  We didn't take into account there are selling expenses.  There are these costs off the top.  So just from the get-go, there was like a, hey, we've got to reconcile what we're doing.

So after we were announced as the winning bid, I believe I spoke to Mr. Murray or Mr. Wolfshohl, I said, hey, we've got to make sure we -- and this is like the day after, we've got to make sure we understand the amounts.  They said, yeah, we've got some Excel spreadsheets.  Those have been produced.  We'll show you those.  That's how we're going to do it.  I said great.  They sent us a sale motion over that weekend.  It had similar to what the Excel chart -- I think exactly what the Excel charts you'll see today

are, their calculation of the waiver.  I said that's not exactly the way I thought of it.

THE COURT:  I don't want you testifying.  I just want to get --

MR. KIMPLER:  I said that's not exactly the way I thought of it.  But if that's how you look at it, let me talk to my clients and make sure.  And we came back before that motion was filed on November 18th and we said we are fine with that.

And I agree with Mr. Wolfshohl.  This is not different than any bid that I've ever been a part of in an auction process where you have to negotiate some of the remaining items once a winning bid is selected.  And I agree that the most important thing was, whether you took my self-serving interpretation of the bid or whether you took Mr. Murray's interpretation of the bid, both of them were still better than the backup bid.  And that I think is the most crucial part.

THE COURT:  Okay.

MR. KIMPLER:  The last point I want to leave you with to think about today, because you're going to hear a lot about how this is the most novel, unprecedented concept that anyone's ever seen, I don't think that's right.  I think sellers in bankruptcy use non-cash consideration all the time.  And I'd like you to think, Your Honor, today,

about buyers who assume leases.  What does that do?  Do trustees or debtors ascribe value when a buyer assumes and assigns contracts?  Of course they do.  Well, how is that valuable?  Well, there's a liability against the estate that is getting taken out of the estate so that the remaining creditors of that estate can recover more from the sale proceeds.

Now, this is a little bit different.  The liability of my clients is not totally leaving the estate.  But in theory, it is not materially different.  And also, there is no rule that for a liability to count when it is assumed and assigned by a buyer that it has to be a valid liability and it's been appealed up to the Supreme Court.  The bankruptcy code specifically says that you have to cure disputes under contracts.  That's the liability the estate has.  There's no rule that that has to be cured prior to the assumption and assignment.  If you can provide adequate assurance of future performance, those cure disputes can be and oftentimes are resolved later.

So what that means is that it is not atypical at all for a seller in bankruptcy to say, if you assume a liability, I will consider that to be part of the headline value of the transaction.  And sometimes those liabilities may even be in dispute or not fully resolved by the United States Supreme Court.  There are forms of cash consideration

that are valuable, and announcing a rule that trustees can only look to cash consideration is actually contrary to the purpose of maximizing value.  And I'd like Your Honor to just keep that thought in mind as you hear the evidence today.  I'm sorry for taking more than the two minutes I promised.  Thank you.

THE COURT:  I pushed you.  Thank you.

MR. GOLDSTEIN:  For the record, Jason Goldstein, from Gibson Dunn, on behalf of Global Tetrahedron.  I'll be very brief, Your Honor.  I just wanted to make the court aware of the pleading that we filed at Docket Number 973.  I think it's important because we all had not been involved in the actual sale process.  We came in as counsel later.

So as part of our role, we looked very closely at the wind-down order to give it a true four corners read. And we filed a chart for Your Honor that walks through objection by objection from all the objecting parties, compares it against the evidence in the record from the wind-down budget -- sorry, the wind-down order or what you'll hear today and just to make sure that Your Honor knows that everything is covered within the four corners of the document because we're really focused on the process here, and I think that's what you're going to hear from the objectors, that there was some kind of manifest unfairness.

And I would just ask Your Honor to keep in mind

the manifest unfairness to my client who relied on the process, it applied equally to all bidders.  Nobody objected at the time.  It's only like a post hoc objection after they realized they weren't the winning bidder.  No one objected at the time.  It all applied equally to everybody.  It was fair from that perspective.  Now, my clients have really suffered this delay, significant additional costs when they followed everything they were supposed to do.  They submitted a bid, the trustee told them they were the prevailing bidder and they're still, you know, stuck here today without resolution or clarity.

So try to give you an easy roadmap based on the words in the order of how this was compliant.  You'll hear it applied equally to all bidders and, for that reason, that we think the auction was fair and appropriate in the exercise of the trustee's business judgment.  He picked the correct successful bidder, and you should approve the sale for that reason.

THE COURT:  Thank you.

MR. GOLDSTEIN:  Thanks, Your Honor.

MR. BROOCKS:  Your Honor, can you see on the screen anything?

THE COURT:  Are you connected directly there?  Zilde?  Just hold on.  Don't do anything.

MR. BROOCKS:  Your Honor, thank you so much.  This

is, again, Ben Broocks, for Alex Jones, and this was your order that brought us here.  They initiated the sale, and we came here, I guess, 10 days ago or whatever.  And you said there's going to be some discovery and deposition.  We spent Thursday deposing Mr. Murray here in Houston, and then Friday we were in Denver.  And that's why the order got filed this morning, was because we unveiled a lot of bad stuff, and I want to show it to you.

So there's a lot of confusion that needs to be clarified.  This is your order.  The purchase price was supposed to be in U.S. dollars in a specified amount.  Now, that didn't happen, and that's the ultimate crux of the issue here.  Imagine an auction.  You got an auctioneer. Who's going to start the bidding?  And First United says, I bid 350, 3.5 million, and we have 3.5.  Who will bid 3.6? Global Tetrahedron says, I bid 1.75.  Now the Connecticut plaintiffs say, I'm going to gift you -- gift you my part of the 1.75.  The other creditors go, are you asking or telling?  I'm telling you that's whether you want it or not. You're not going to hear any evidence of any agreements today to that effect among the creditors that I'm aware of.

Now, the auctioneer then says sold to the Highest bidder at $1.75 million.  What?  How does a $1.75 million bid be a $3.5 million bid?  How is that 1.75 greater?  Well, it's voodoo economics, to use a phrase.  And it has a name

here.  Distributable proceeds waiver.  Not assumption of liabilities, not forgiveness.  It's a distributable proceeds waiver.

Now, I asked the trustee.  He said he'd never heard the term before.  Never heard it.  He searched Westlaw.  Couldn't find any cases that even discussed a distributable proceeds waiver.  He consulted no outside experts other than his lawyer as to what it meant.  And it is nothing like an assumption of liabilities, like was alluded to today.  It is nothing like that at all, or a transfer of, say, real estate or a property for cash. Nothing like that.

The trustee cannot logically explain why creditors other than the Connecticut plaintiffs getting more of the 1.75 magically increases the auction price.  We believe he did it for one reason.  We believe he was afraid.  Let me tell you why.  This is one of the Connecticut plaintiffs' lawyers.  This is a post on X.  They're threatening to go after everybody that buys Alex Jones' assets if it isn't them.  This is a bid chilling process.  These people got $1.5 million.  And I'm going to tell you, I've read the Connecticut appeals opinion.  There were three sanctionable events, all of which were minor, that caused the sanctions to be entered, and Mr. Jones' liability was done.  It was over.  They overruled 19 different U.S. Supreme Court

precedents.  And if I have to go to the United States Supreme Court to get freedom of the press recognized, we shall go.  But the Connecticut plaintiffs recognized that if a 363 sale goes through, then they get these assets even if their judgment is overturned.  That's what they're looking for here.

Now this is the order that Mr. Wolfshohl was -- it was so interesting to hear him sing and dance and kind of, well, we had some discrepancies.  I was very interested in his euphemisms.  It wasn't a full and final offer.  This is the order that was submitted to Your Honor.  And I'm going to go through it in detail where he says the distributable proceeds waiver amount is $100,000 more than whoever bids higher, 1.7 --

THE COURT:  Is this the -- is this the latest one or is this the one that was --

MR. BROOCKS:  This is the -- we just got the latest one a few minutes ago.

THE COURT:  But I just wanted to make sure.  I wasn't trying to put any spin on it.  I just want to make sure this is the one that was filed originally.

MR. BROOCKS:  The 18th of November.

THE COURT:  Okay.  I just wanted to make sure.

MR. BROOCKS:  Okay.  That Mr. -- the trustee said he did not recognize that it was $100,000 more than whatever

First United bid.  He didn't realize that was in there, so he says, but it's in there.

Now this again, I'm going to walk you through the voodoo economics here.  This is Global Tetrahedron's final bid, $7 million.  It's a lot of money.  Now this is the letter that they gave the court.  It's attached to the original 915 motion that they filed and they have in here cash consideration of $1.75 million.  They got the distributable proceeds waiver as a part of the enticement and we're going to show you.  I don't believe the Connecticut families had ever actually talked to Global Tetrahedron until they were trying to work out a deal with the trustee on the day that it didn't succeed.  And then they -- I think there's big collusion here, but you'll be the judge of that.

But at any rate, it's 1.75 plus a distributable waiver such that the amounts going to the other creditors is what the focal point is and somehow it's going to equal $7 million.  Now here's the chart they give you.  They gave -- this is in their bid.  This is their chart, and this supposedly demonstrates the $100,000 incremental increase, and you've got these proposed cash purchase price of alternate -- well, these are confusing, but here it is in the second page here.  You've got the $100,000 very clearly. $100,000.

Now what I'm going to do is I'm going to take this chart, their chart, and I'm going to change the names.  The First United and Global Tetrahedron.  All I did was change the names.  That's their chart in their letter.  Now they've got a 25/75 assumed liability split.  So if you can see here, for example, that's First United's portion.  Now I'm just going to notice that the First United bid is in the left.  The Tetrahedron bid doesn't ever go up.  Never, never bids more than 1.75.

Now they stay, now what I'm going to do is I'm going to focus on that $2 million just so we get clear on what they're doing.  Now you put -- I'm going to put the First United's first $2 million which would then be split if it's 75/25, 500/1.5 million.  This is their chart.  Now with Global Tetrahedron at 1.75, you can see obviously the non-Connecticuts get $437,000 and the Connecticuts get 1.32.  Now this is their deal.  Now so 500 is obviously more than $437,000.

Now what the Connecticut plaintiffs are going to do, they're going to transfer $62,000 to the non-Connecticut plaintiffs plus $100,000.  And that is going to mean that the non-Connecticut plaintiffs get $600,000.  Where'd it come from?  The Connecticut plaintiffs are getting not their liability, a portion of their recovery from Tetrahedron.  And somehow that magically translates the new Tetrahedron

price to $2.1 million.  That's the new price.

Now this -- let's go 3.5 because that was the actual bid.  This is the division, $875,000, 2.65 Connecticut, non-Connecticut.  The 1.75 doesn't change.  You can still see 875 to 437.  Now what are the Connecticut plaintiffs going to do?  They're going to transfer $437,000 of their portion of the Tetrahedron plus 100.  That's going to give 975.  They're not waiving liabilities.  This thing you heard about is just like waiving liabilities and assuming -- it's not even close to that.  They're not giving up any of their judgment.  They're giving up proceeds they would get from the Connecticut -- from the sale and giving it -- I guess they're giving it to the trustee and instructing him what to do with it.

Now the new Global Tetrahedron price is now magically $3.6 million.  Now how do you get to $7 million?  Well, that's a harder one because if the alternate bid -- First United didn't bid $7 million, but had they bid, you could see the numbers there.  This is the Global Tetrahedron.  Now you can see the discrepancy.  They would have had to give -- the Connecticut plaintiffs would have had to give the entirety of their recovery and that wouldn't put them $100,000 over.  That would put them at even.

Now the new Tetrahedron price, however, if they gave all of their proceeds from 1.7 would now magically

equal $7 million.  Now again this is back to the chart you can see here.  I just wanted to focus on you can see the $100,000 increments.  But this is how -- this is what they put in their final bid that was accepted by the trustee, presented to Your Honor on November 18th.  This is what was in the bid presented to this court for approval.  And you can see that they're putting a $7 million value.  And this is the smoke and mirrors.  That's why I call it voodoo economics.

Now, what I want to do is this gets into another variable because the question becomes, well, is the ratio among the creditors 75/25, or is it 96.73?  They're never clear about this.  That becomes a variable that when Mr. Wolfshohl alluded to that there are all these details.  I've never seen a deal that wasn't fully -- that was fully negotiated.  No, they're haggling about what percentages.  Is it 96.7 or is it 75?  And so the Texas -- I mean, the Connecticut plaintiffs here are being very generous in the offer that they presented to Your Honor and said, we're going to use 75/25.  That's just a makeup number.

Now, this is again their bid, $7 million.  And you can see repeatedly in 915, Docket Number 915, they told this court it was a bid of $7 million.  Now, why did they tell you that?  Because they knew it had to be a final dollar number.  They couldn't have a range.  It's what Your Honor

said. No range, dollar number. They knew that. Now they tell you multiple times, it's $7 million. It's $7 million.

Now, this is the chart that is in their motion. 915. This is the chart. Now I want to focus -- I'm just pulling out -- they've got two, but I'm going to look at both of them. But this is what they've got in 915. You can see on Page 15 of 25. Now, they've got -- I'm going to highlight it there. This is changing the name. This is the First United bid and the Global Tetrahedron Connecticut bid. Now, you can see that they are. Now you can see the ratios. You can see that under the First United, everybody gets more money than the 70 -- that's under the Global Tetrahedron.

But here's the magic now. This is again the Connecticut plaintiffs are going to "gift," whatever that means, $750,000 to the non-Connecticut plaintiffs, again, whether they want it or not, so that other people get a million dollars and the Connecticut plaintiffs get zero. Now, this is their chart. I'm not making anything up. This is it.

Now, you can see that in their math, $750,000 is smaller than a million dollars. Giving the gift. Now, this is called the winning bid, cash equivalent. Now, if the gift class has -- gift class has 25 -- here's how they got it. If the gift class has 25 percent of the recovery and the gift class now gets a million dollars, then 100 percent

of a million dollars is $4 million, plus $750,000 of administrative fees.  And now you've got magically a cash equivalent of the winning bid of 4.7, not $7 million.

Now, this was in the document presented to Your Honor with a lot of fast talk that resulted in depositions, which is the reason they don't want to have opening statements, and they want to go fast because this is something that just can't be explained.

Now, they again told you repeatedly it was $7 million.  It wasn't $7 million.  It's smoke and mirrors.  That's all that it is.  The Connecticut plaintiffs have decided we're going to take whatever we would have gotten from Global Tetrahedron and we're going to gift it to other people.  And that is somehow how it magically becomes the higher bid.

Now, it matters a lot to us who wins this bid.  The Connecticut plaintiffs have made it crystal clear that they intend to not just destroy Alex Jones, but to put him in his grave where he will never work again.  You saw the X account where they said, we will come after anybody that's not a bid, or we accept.  We will come after you.  And that is the threat that the trustee was operating under.  We believe it created a conflict of interest.  And what happened was they come to your court on November 18th, or the Monday after that, shortly after that, asking your

approval.  They hadn't yet finalized the deal.  The trustee is thinking, I'm going to get $7 million.  Well, now, he's not getting $7 million under any scenario.  But the Connecticut plaintiffs are thinking, no, no, no, it's $100,000, plus or minus.

The order that was submitted on November 18th that just got tweaked and changed says $100,000 more than the next highest bidder.  That's what the order says.  Now, the reason it says that is because the Connecticut plaintiffs drafted it and sent it to the trustee, and he put it in there, only realizing after the fact, oh, wait a minute, I said one number.  It has to be a number.  It has to be $7 million, and therein lay the negotiations.

Was there a meeting of the minds?  I asked him in his deposition, yes, the meeting of the minds was not on the price.  It was on 4.6, between 4.6 and $7 million.  So we were new -- we were meeting of the minds that whatever Connecticut plaintiffs gave up was going to be higher than 3.5.  But was there a meeting of the minds on the actual dollar amount?  No, there wasn't.  It was something done after the fact in intense negotiations.  And the reason it was an intense negotiations was because the Connecticut plaintiffs insisted that they have a veto right over whoever the trustee sold it to.

Now the trustee says, well, I'm exercising my

business judgment.  I'm exercising my business judgment.

THE COURT:  I'm giving you the two-minute warning.

MR. BROOCKS:  Two-minute warning.  I'm in the -- thank you.  The business judgment is not all encompassing, all forgiving.  The business judgment that -- because I'm a -- I do a lot of corporate security work.  The business judgment rule is very common in my world.  It has to be rational.  It has to be based on something.  It cannot be something that the trustee says, look, I can do whatever I want, whenever I want, however I want it.  It can't work that way.  That's not the business judgment rule.  The business judgment must be rational.  And under no rational circumstance does this make sense.  Furthermore, there was no meeting of the minds.  Furthermore, there was no final dollar bid.

Now I asked -- in my last minutes, I asked the auctioneer in his deposition, I said, well, why does the amount that non-Connecticut plaintiffs get, why does that cause the price to go up and the value to go up?  What's the correlation?  If Connecticut plaintiffs say we don't want some of our distributable portion of that 1.75, why does that magically make the price go up?  He said, I don't know, it's just the way we thought it was logical.  I said, well, if First United had said, well, hey, we'll give you 3.5 plus we'll give the non-Connecticut plaintiffs $200,000, would

that have made a higher bid?  He said -- he did his math. He said, yeah, about nine -- it would take in $3.5 million up to $9 million.  So I said, wait, so you're telling me that if First United said we'll give you $3.5 million plus we'll give the non-Connecticut plaintiffs $200,000, that would have taken you up to a $9 million dollar bid?  Yeah.

Okay.  Now I don't know how anyone can say that makes sense with a straight face.  It doesn't.  It's not honest and it is not following your bid procedures.  Now what we believe the evidence is going to show is exactly what I said.  We believe, Your Honor, that what you ought to do is disapprove that sale that the trustee has entered into with the Connecticut plaintiffs and approve the sale to First United.

THE COURT:  Thank you.

MR. CICACK:  Thank you, Your Honor.  Walter Cicack, on behalf of First United.  Let me -- I do want to go over some other issues, but let me just start on what Mr. Broocks focused on, and that is the bid by the joint bidders that Mr. Murray accepted and had filed with the court notice of a successful bidder.  What we have learned is -- and the bid, you'll see it, I mean the bid clearly says $100,000 more, whatever we have to give the non-Connecticut families, the unsecured creditors so they get $100,000 more than what they'd get under our bid.  It floated.  It popped, 100

percent clear.  And you know how you know it's 100 percent clear?  Because in the order that was submitted, that's exactly what it says.  Exactly what it says.

Then Mr. Murray says, at some point when I'm getting ready for my depositions, I notice the order doesn't say what I thought the deal was.  I thought the deal was a $7 million value.  In other words, you took a $7 million hypothetical bid, you figured out what the unsecured creditors, other than the families, the Connecticut families would get and that's the bid and then that's the distributable waiver.

So you have it.  And the reason why, and Mr. Broocks is right, the reason why that's so important is because on the bid that was made and accepted, it wasn't the highest and best.  It was based on a contingency and it was based on a formula, all three things the trustee said he wouldn't accept.  All three things.  The trustee said in his bid procedures, and we'll show you, he said we're not going to accept that.  I want your highest and best.  They admit, they admit that if it is $100,000 more, that's not a highest and best.  They admit that if it is $100,000 more, it is a contingency.  They admit if it is $100,000 more, it is a formula.

And you know, Mr. Kimpler got up and testified and he said something about his own self-serving interpretation.

We're not talking about a contract, Your Honor, where two parties got together and drafted it.  We're talking about their bid.  He drafted it.  Who has the best evidence of what they intended than the guy that drafted it?  This is not some sort of agreement.  This was a bid.  They drafted it so it was $100,000 more.

When the trustee said, I misinterpreted your bid, then they said, okay, we'll go with your interpretation.  Why?  Because they knew that their bid did not follow the procedures.  It was not the highest and best.  It was contingent.  It was based on a formula.  They knew that.  So they said, okay, we'll go with yours.

The problem with that is this is done weeks, three months after the notice of successful bidder was filed.  Mr. Murray filed a notice of successful bidder admittedly misunderstanding what the bid was, misunderstanding what it was, and he allowed them to change their bid.  Three weeks after, he allowed them to change their bid, and now he's allowed them to do it again because they've changed it again in this final order that you'll see.

So what we have here is -- and I'll go back and talk a little bit about the process, but what we have here is we have a bid that was accepted, that there was no -- Mr. Murray admittedly misunderstood it.  It was, in fact, not a highest and best, was contingent, was based on a formula.

And after the fact, they allowed it to be revised.

And then when they figured out that even if -- and I'll show Your Honor when I get to cross-examination, even if you put a $7 million value on it, it falls apart. And they realize that because at somewhere around a 17.5 percent, when the credit -- when the other creditors, when you do the allocation, if they end up being more than 17.5 percent, when the final dust settles, they can't perform. They don't have enough distributable proceeds waiver to pay. So they know that under a $7 million bid, they can't even perform. And so they have to change it again. And you'll see that change in the amended order they filed, where now it's $750,000. Magically, it's $750,000.

Nowhere has that concept been talked about. Mr. Murray talked in his deposition about what the deal was. He never said anything about 750. But when they got -- when they realized they had to do a revised order, they realized $7 million doesn't work either because there's a possibility that when the dust settles, the unsecured creditors, who are not the Connecticut families, will have more than 17.5 percent. And when it gets over 17.5 percent, the distributable proceeds waiver cannot work. And they couldn't perform under that agreement. So they had to change it again.

So that in and of itself, they did not have an

agreement.  They did not have a bid.  It was a big misunderstanding.  And they were allowed to change the bid. And my main point about that is, if they're allowed to change the bid, then why aren't we allowed to change our bid?  And we did change our bid.  We revised -- well, we added a $500,000 kicker to the non-Connecticut families.  So we sent Mr. Murray and Mr. Wolfshohl a letter and said, look, we stick by our bid for $3.5 million.  But now that we know that you allowed the Connecticut families to amend their bid, we're now telling you that we'll offer an additional $500,000 that goes earmarked for the Texas families.  We haven't gotten a response yet on that, whether that would be acceptable.

But the point being there is, if you're going to open up the process to allow bids to be amended, you've got to open up the process, allow everybody to amend their bids. So anyway, we'll get into that a little bit more.  I do want to just touch, Your Honor, on the process itself.  What you will --

THE COURT:  I'm putting you on the two-minute clock, too.

MR. CICACK:  I am?  Sorry.  I didn't mean to go so long.

THE COURT:  No worries.

MR. CICACK:  Okay.  So the sale, what you will see

is they moved from a live auction, which is what you ordered, to a secret process.  They did that because they did not want the distributable proceeds waiver to see the light of day.  That's why they did it.

And also, Your Honor, when you see the motion they filed asking for the wind-down order, there's nothing. Every place, the contemplation was there was going to be a live auction.  They sent out in the bid constructions, there was going to be a live auction.  They sent out public statements, there's going to be a live auction.  When they qualified the two bids, they decided, you know what, we're not going to have a live auction.

The procedures in the sale order do not allow them to do anything at that point other than say, okay, we're not going to go forward with the auction if that's what they decided to do.  It did not give them the discretion to go to a secret process.  They had to come back to Your Honor and ask for that permission.  And in fact, your sale order says that if they cancel the live auction they have to file a notice with you within two days.  It actually says that. And so for this idea that somehow they were acting within their discretion, yeah, well, your discretion has to be consistent with sale order, consistent with what you told the court, consistent with the bid procedures, consistent with what you told the public.  And it's not.  One hundred

percent, it's not.  And Your Honor, as we walk through it, I will show you in the exhibits where it's not.  Thank you very much.

THE COURT:  Thank you.  Okay.

MR. WOLFSHOHL:  Your Honor, I'd like to call my first witness.

THE COURT:  Okay.  Well, before you do, dare I ask, while we get the camera ready, if there's any agreement on the admission of documents, or are we just taking it as we go?

MR. WOLFSHOHL:  As we go.  Okay.  Yeah.  We'll just take them up as we go, Your Honor.

THE COURT:  Okay.

MR. WOLFSHOHL:  I'm going to call the trustee's first witness is Jeff Tanenbaum.

THE COURT:  Sir, if you can raise your right hand. Do you swear to tell the truth, the whole truth and nothing but the truth?

MR. TANENBAUM:  I do.

THE COURT:  Okay.  Well, please have a seat. We'll let the record reflect the witness has been properly sworn in.

MR. TANENBAUM:  This one?

THE COURT:  Yeah, that one has to point towards you.  If you can just state your name for the record and

spell your last name.

MR. TANENBAUM:  Yes.  Jeff Tanenbaum.  T-A-N-E-N-B-A-U-M.

THE COURT:  Thank you.  And just going to -- Mr. Tanenbaum, just to let you know, there's at some point the lawyers may object.  I'd just ask that you give me an opportunity to resolve the objection, and I'll let you know if you can answer the question or if someone else has to answer.  And if at any point you need a break, just let me know.

MR. TANENBAUM:  Very good.

THE COURT:  Thank you.

MR. WOLFSHOHL:  Your Honor, may I approach the witness with a witness binder?

THE COURT:  Yes.  As long as the other side has a copy of the binder.

MR. WOLFSHOHL:  Your Honor, I can hand one up to you.  We're also going to have it on the screen, but --

THE COURT:  I'll take one.  Thank you.  And if you're going to have it on the screen, does someone need presenter roles or what do you --

MR. WOLFSHOHL:  That would be Ms. Starling.

THE COURT:  Ms. Starling?  All right.  Hold on a second.  Let me give you the presenter role.  Just give me one moment.  Found you.

Mr. Wolfshohl, I believe Ms. Starling has the presenter role.  Whenever you're ready.

MR. WOLFSHOHL:  Thank you, Your Honor.

DIRECT EXAMINATION OF JEFF TANENBAUM

BY MR. WOLFSHOHL:

Q    Mr. Tanenbaum, could you please tell the court what your professional background is?

A    I'm an auctioneer.

Q    How long have you done that?

A    I'm in my 40th year.

Q    Okay, and explain what you mean when you say auctioneer.

A    Certainly.  Provide services to companies, to trustees, to banks, to anybody that has the need to turn assets into cash.  And I put together strategies to do so using a variety of competitive bidding tools.

Q    And so you said trustees.  How often have you done this work in the context of a bankruptcy case?

A    Probably I'm guessing about 400 bankruptcy cases over the 40 years.

Q    What percentage of your work is bankruptcy versus non-bankruptcy.

A    I mean, that's about, what I'd guess, about a third of my work being bankruptcy.  But there's other insolvency as well.  Article 9 sales, assignments for the benefit of

creditors, state court receiverships.

Q   How many sales processes and auctions have you run, if you just had to kind of estimate in your career?

A   I'd say somewhere in the 1,300 to 1,500.

Q   And what types of assets have you sold?

A   Lots.  Industrial machinery, inventories, real estate, collectibles, rolling stock.  I've sold intellectual property.  I've sold turnkey businesses.

Q   And is that always auctions or are there other types of sales processes that you've employed?

A   There's a variety of sale processes.  A lot of them are auctions, but different variations.  There's live auctions, there's webcast auctions, online auctions, sealed bid auctions.  We do orderly liquidation sales and then sometimes create hybrid processes of any of the above.

Q   Let's start with a live auction.  What do you consider when you say live auction?  What are you talking about?

A   A live auction would be in person and that would be using a, you know, 50, 75, 100, 125, sold.  That method.

Q   Okay, and is that also what you'd refer to as an open cry auction?

A   That is.

Q   Okay.  What's an online auction?

A   Online auctions are -- there's a variety again of online auctions.  One would be a webcast.  One would be a

straight online.  But basically an online auction is where people participate over the Internet.  If it's moderated by an auctioneer over the Internet, it would be a webcast auction.  And if it's not moderated by an auctioneer, but the system automatically advances one item to the next, it would be an online auction.

Q   Okay, and then you also mentioned sealed bid auctions. We're going to talk a lot about that today.

A   Sure.

Q   Explain to the court what that is.

A   A sealed bid auction is a process where we ask bidders to put their bid on a piece of paper and submit it based on a specific set of terms.  The objective in the sealed bid auction is to try to get the buyers to put up their highest and best possible bid so there's no direct competition. They don't know who the competition is, and it's incumbent upon them to scratch their head and decide just how far willing to place their bid.

Q   What typically -- when you're assessing a sales process, what typically dictates the format that you choose?

A   We factor the asset we're selling, the timing of the process, the complexity of the asset, who the buyers are, how many bidders that we anticipate to get into the process and how complicated we anticipate the bidding process itself to be.

Q    Let's take live auctions.  What would you consider to be the advantages of a live auction?

A    Live auctions are great when you have a lot of bidders and you have a lot of individual items.  And I'd say this for live and online.  Really the model for both being very much the same, whether we have a, you know, I'm standing in front of somebody or doing it online.  It's become very similar now.  And really the process is you have a lot of items to sell, you're going to have a lot of buyers, you're going to provide an opportunity for each and every item to be bid on.  And the presumption is you have a sale where there's going to be a lot of interest.  So there'll be a lot of activity on each item and that's what will drive the highest and best value.

Q    So you described kind of a non-in-person scenario just now.

A    Yeah.

Q    When you say live, you said earlier live auctions, typically in person.  But do you use the term live auction when you're referring to things that happen online sometimes?

A    We do.  Sometimes we'll call it a virtual.  We won't use live.  Or maybe we do sometimes, live online auction.  Live virtual online auction.  Because the process itself is happening in real time.  So, you know, the idea of live in

person or live meaning it's happening in real time has become a little bit vague over the years in terms of how that term is used.

Q    Okay.  Describe the sealed bid process with a little bit more detail.  What is it that makes sealed bid process work whenever you're choosing to employ that?

A    Sure.  We use sealed bids a lot for situations where maybe you're selling an asset that has a very different value proposition to the potential buyers, an operating facility.  But it's the land could be worth something and nobody really wants to operate the business, you know, so you might have two people looking at this particular asset through very different eyes.

So the idea of a sealed bid process, if you ran them in a live bid process, you know, you may get one bid at $500,000, one bid at $600,000 and there's your high bid and you're done.  But the reality is that $600,000 bidder might have been willing to spend $3 million.  If you take that live competitive arena out and you put them into a highest and best situation, what you're doing is you're encouraging the bidders to put their Highest and best bid.  And that person, that higher bidder at 600, would scratch their head and say, well, I don't want to lose this.  I'm going to put up $2 million or $2.5 million or $4 million to make sure I don't lose it.  And you have the added benefit of getting

truly the highest and best when you don't have an asset where you can count on multiple competitive bidders.

Q   And when you referred to -- I noticed in the documents that you prepared and sent out, you referred to a sealed bid.  You don't always say sealed bid auction.  What is the correct terminology?

MR. BROOCKS:  I'm going to object.  If he's got a document to ask him about, I'd like to see it.

BY MR. WOLFSHOHL:

Q   Mr. Tanenbaum, could you go to Exhibit 14 for me?

A   Yes.

THE COURT:  I will sustain your objection.  You said docket --

MR. WOLFSHOHL:  It's Exhibit Number 14, Your Honor.

THE COURT:  Okay.

BY MR. WOLFSHOHL:

Q   What is this document, Mr. Tanenbaum?

A   This is our sealed bid offering memorandum and bid form.

Q   Did you prepare this?

A   I did.

Q   When did you prepare it?

A   Let's see, this was this one's date of November 4th.  So this was an updated version that was prepared just

before.  But the original document for that (indiscernible) --

Q      If you go to Exhibit Number 21.

A      There we go.

Q      Can you identify that document?

A      Yeah.  So this one -- yeah, this one was issued October 11th.  So it was worked on in early October and issued in --

Q      Did you prepare this one as well.

A      I did, yes.

        MR. WOLFSHOHL:  Your Honor, I'd move to admit Exhibits 14 and 21.

        MR. BROOCKS:  No objection, Your Honor.

        THE COURT:  Fourteen and 21 are admitted.

        (Trustee's Exhibits 14 and 21 entered into evidence)

BY MR. WOLFSHOHL:

Q      What's the primary difference -- we're going to get back to these.  But let me just ask you, what's the primary difference between 14 and 21?

A      The primary difference was the addition of Lot 4, which were those contested domain names.

Q      Okay.  Would you turn -- if you give me just one second.  Go to Page 12, if you will, on Number 14.  And I'm talking about the 12 up at the top right.

A      Got it.  Yep.

Q    Do you see Number 1 --

A    Yes.

Q    -- where it says sealed bid sale?

A    I do.

Q    And then if you go down to the -- about midway through that paragraph, you see it says, trustee reserves the right to accept or reject bids, evaluate offers compared to other offers received and/or projected revenues from a piecemeal auction and open up a sealed bid for live bidding between competitive bidders.  Did I read that right?

A    Yes.

Q    Okay.  So when I was asking you the question about referring to a sealed bid auction as a sealed bid, I'm asking you, for example, in this provision, you refer to that as a sealed bid.  Is that a sealed bid auction or --

A    Correct.

Q    Is that what -- is that what we're talking about?

A    Yes.

Q    Okay.  Mr. Tanenbaum, what's your role in this case?

A    I was retained by the trustee to act as his sales agent and auctioneer.

Q    And when were you employed?

A    I believe we entered into an agreement in August, and the employment retention, I believe, came in September.  I don't remember the exact dates.

Q   And if you go to Exhibit 6 for me, please.

A   Yes.

Q   Can you identify that document?

A   Yes.  This is the application to employ Tranzon and -- or Tranzon360.

MR. WOLFSHOHL:  Your Honor, I'd move to admit Exhibit 6.

MR. BROOCKS:  It was in the court filing, so okay, no --

MR. CICACK:  No objection.

THE COURT:  Okay.  It --

MR. WOLFSHOHL:  Are you agreeing to the admission of all court filings?

MR. BROOCKS:  No.  I said this one.

MR. WOLFSHOHL:  This one.  Got it.

THE COURT:  Okay.

BY MR. WOLFSHOHL:

Q   Okay.  Mr. Tanenbaum --

THE COURT:  Hold on.  I guess I should say, just for the record, Exhibit 6 is admitted.

(Trustee's Exhibit 6 entered into evidence)

BY MR. WOLFSHOHL:

Q   Mr. Tanenbaum, what is the structure of the employment with the estate?  Or in other words, is it just your firm or is it --

A    Got it.

Q    Yeah.

A    No, we were in partnership.  My firm is ThreeSixty Asset Advisors, and we retained both, ThreeSixty Asset Advisors and Tranzon, who is our partner on the project. We've been referred to throughout as Tranzon360, an amalgamation of both names.

Q    And if you go to the Exhibit C to the application.

A    Yes.

Q    It's going to be the -- do you see where it is?

A    Got it.

Q    Exhibit C is identified as the bankruptcy auction agency agreement.

A    Yes.

Q    And I want to flip to the third page.  I noticed that the -- do you see the signature lines?  I don't see a signature.  Was this ever signed?

A    This was not signed.

Q    Okay.  Why not?

A    Often our agreements when we're on bankruptcy cases are not signed.  They're added as an attachment to an order, and the order is entered and that ends up serving as our engagement as an attachment to the order.

Q    Was an order entered approving this application?

A    Yes.

Q    Okay.  If you'd turn to Exhibit 7.

A    Yes.

Q    Is that the order that you're talking about?

A    This is the order.  The retention order.  Yes.

MR. WOLFSHOHL:  Move to admit Exhibit 7, Your Honor.

THE COURT:  Any objection?  Seven is admitted.

(Trustee's Exhibit 7 entered into evidence)

BY MR. WOLFSHOHL:

Q    Let's go back to Exhibit 6 and Exhibit C to Exhibit 6.

A    Yes.

Q    First, can you go where it says assets and read that to the court?

A    I'm sorry, which page?

Q    Sorry.  The first page.

A    Okay.  Websites, social media accounts, production rights and related items, per Exhibit A1, intellectual property assets.

Q    Okay, and then is there a second item below that?

A    Yes.

Q    What is that?

A    Production facility, equipment and vehicles, per Exhibit A2, personal property assets.

Q    Okay, and if you go down to the couple columns, or sorry, rows down, do you see where it says sale method?

A    Yes.

Q    Can you read that to the court?

A    Yes.  Intellectual property assets to be sealed bid with a round of virtual live bidding amongst competitive bidders, if deemed appropriate and necessary by trustee and agent.  Trustee shall reserve the right to accept or reject any sealed bid submitted.

Q    What does that mean to you, Mr. Tanenbaum?

A    It means, first of all, that we -- that our process was intended to be a sealed bid process and that we would run a sealed bid process that could provide the absolute result. But if we felt it was necessary, we felt it was appropriate, that we could have a round of live overbidding or, as it continues to say, the trustee had the right to accept a bid at the sealed bid from the sealed bid process.

Q    This agreement is dated August 12th.  Is that right?

A    Correct.

Q    At that point in time, did you know what bid process was going to look like?

A    Not entirely.

Q    Why not?

A    Well, we hadn't had the opportunity to interview FSS personnel consultants that we knew were available to discuss the assets in greater detail.  And we were just getting our arms around the case to understand truly what was involved.

And, you know, there were certainly decisions that seem obvious at this point now that we all see this, have seen the sealed bid package where we combined personal property assets into the sealed bid process.  So there's a lot still to be determined that would be in the best interest of the sale and the estate.

Q    And if you'd turn to Page 2.

A    Yes.

Q    What is this?  It's looks like it's numbered 1 through 13.  What is that?

A    Yeah.  This is kind of a -- our agreement format takes a bit of a boilerplate.  We do customize some of those bullets for various sales, but it's our key terms that we have for most sales.

Q    Can you go to Number 2?

A    Yes.

Q    Can you read that for the court?

A    Certainly.  Agents shall conduct the sale in a manner -- sale or sales in a manner intended to maximize recovery in an expedited timeframe and utilizing the methods that agent deems in its professional judgment to be appropriate and in the best interest of trustee and in accordance with the proposal submitted to trustee by agent.

Q    Thank you, and then if you go to Paragraph 5 and read that to the court.

A     Certainly.  Agents shall have the authority to establish appropriate terms of sale consistent with agents' best practices for sales of similar nature subject to trustee's approval.

Q     Are these common types of provisions that you include in your agreements?

A     They are.

Q     Okay, and let's go back to -- well, no, never mind. Let's go to Exhibit 8, please.

A     Eight?

Q     Yeah.  Are you familiar with this document?

A     I am.

Q     What is it?

A     This is the motion that was submitted by the trustee's office to have our sale process authorized.

Q     I'm going to direct your attention to the heading of the document on Page 1.

A     Okay.

D     Do you see -- just read the title of the document, please.

A     Sure.  Order granting trustee's motion for entry of an order authorizing the wind-down of Free Speech Systems.

Q     Okay, and I'm just going to ask you.  You referred to it as a motion?

A     Yeah, this is the order.

Q    Okay.  Did you look at the motion that was filed --

MR. WOLFSHOHL:  Excuse me.  I'd like to move to admit, Your Honor, Exhibit 8.

MR. BROOCKS:  No objection, Your Honor.

BY MR. WOLFSHOHL:

Q    And Mr. Tanenbaum --

MR. WOLFSHOHL:  Is it admitted, Your Honor?

THE COURT:  I do not recall eight being admitted.

MR. BROOCKS:  I said no objection.

MR. WOLFSHOHL:  He said no objection.

THE COURT:  Oh, I'm sorry.  Eight is admitted.

MR. WOLFSHOHL:  Okay.  Thank you, Your Honor.

THE COURT:  I apologize.  Thank you.

(Trustee's Exhibit 8 entered into evidence)

BY MR. WOLFSHOHL:

Q    Mr. Tanenbaum, if it's okay with you, I'm going to refer to this document as the wind-down order.

A    Okay.

Q    You understand whenever I say that, that's what I'm talking about?

A    Yes.

Q    Okay.  Did you look at the motion that was filed to approve this order?

A    I did.

Q    Okay, and did you look at this order before it was

filed?

A     I did.

Q     Did you provide input?

A     I did.

Q     Okay.  At this time -- you see the date of the order, September 25, 2024.  Did you know at that time what the sale process was going to look like?

A     Somewhat better, but not quite crystallized at this point yet either.

Q     Okay, and in the sale motion, at the time the sale motion was entered or filed, what was your expectation as to what type of sale process or auction was going to be run?

A     Still at this point intended a sealed bid process with the optionality for a live overbid or any other process that might have seemed to fit as we got closer to the sale process.

Q     Okay, and what was -- in the input you provided in this order, what was your intent with respect to the provisions that you suggested and added?

A     Really flexibility.

MR. CICACK:  Your Honor, I object.  In terms of his intent, the order says what it says.  His intent is not (indiscernible) --

THE COURT:  I'll allow it.  It's not determinative.  But I'll just take it for what it is.

MR. CICACK:  Thank you.

BY MR. WOLFSHOHL:

Q    Can you give me some examples, Mr. Tanenbaum?

A    Yes.  We wanted to make certain that we had the ability to adjust the process if we needed to.  And so we made sure that was clear and, you know, probably, you know, put most of our, you know, eggs in the basket of Paragraph 29, which your office had incorporated language like this in here and felt we had the flexibility we needed, as needed, to be able to adjust the process based on what we learned as we continued.

Q    Let's go to -- sorry, Page 5, Paragraph 5.

A    Okay.

Q    Do you see that heading?  It says timeline.

A    Yes.

Q    Okay, and if you go down to this chart, can you describe the chart to the court?

A    Sure.  This chart defines some dates that we put as holding dates for a bid process.  And we set a November 8 deadline to receive the sealed bids as part of the IP asset bid deadline at 2:00 p.m., and then we reserved a date of November 13 in the event we needed a live overbid process.  We said the IP assets auction, if any, will be held on November 13.  And then we go on to define the date, if applicable, for a December 10 sale of what we now refer to

as remaining assets for any assets that were not sold during the previous sale process.

Q    So let me go to the next paragraph or section, I guess, that's entitled bidding procedures.

A    Yes.

Q    Do you see the -- read for the court the sentence that leads up to the defined term bid requirements.

A    Oh, I see.  To participate --

Q    Paragraph 6.

A    To participate in the bidding process for the IP assets or otherwise participate in the IP assets auction, a person or entity interested in purchasing the IP assets along with any other remaining assets of FSS in connection with the IP assets auction, each a potential bidder, must deliver or have previously delivered to the trustee the following "the bid" requirements in connection with its sealed bid.

Q    And if you go to the next roughly two pages, are those the bid requirements for the sealed bid?

A    Yes.

Q    Okay, and let me turn you to -- do you see the second bullet point on Page 6?

A    I do.

Q    Okay, and can you read that section to the court, please.

A    Certainly.  Identity of assets and purchase price.

Each sealed bid --

Q    The first -- the first bullet point is what I meant.

A    Oh, first bullet. Okay. Identity. Each bid must fully disclose the identity of each unity -- I'm sorry -- of each entity and each entity's shareholders, partners, investors and ultimate controlling entities that will be bidding for or purchasing the applicable assets or otherwise participating in connection with such sealed bid and the complete terms of any such participation, along with sufficient evidence that the potential bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each sealed bid must also include contact information for the specific person/persons whom Tranzon360, Porter Hedges LLP and Jones Murray LLP should contact regarding such bid.

Q    So just going back to the beginning, do you see where it says each bid.

A    Yes.

Q    And then it refers to each entity and each entity shareholders.

A    Yes.

Q    Do you read that as a restriction on whether joint bids can be submitted?

A    I do not.

Q    Okay, and then I want you to go to the next bullet

point.

A    Yes.

Q    Do you see the second sentence where it says each sealed bid must clearly set forth the purchase price to be paid, including cash and non-cash components --

A    Yes.

Q    -- if any.  And then it says collectively the purchase price and says the purchase price should be in specific amount in U.S. dollars, not a range.

A    Yes.

Q    Okay, and then I want you to go down to the bottom bullet point.

A    Okay.

Q    Do you see where it says contingencies, no financing or diligence outs?

A    Yes.

Q    Okay.  Can you read that provision to the court?

A    Yes.  A sealed bid shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval or on the outcome of or review of due diligence. Each sealed bid must identify with particularity any conditions or material issues that may affect certainty of closing within the proposed timelines.  The potential bidders are expected to have completed all of their due diligence by the IP assets bid deadline, including all

business, legal, accounting, title and other confirmatory diligence.  The extent and nature of any remaining due diligence should be set forth in a specific list attached to each sealed bid.

Q   Now, I'm going to jump ahead and then jump back, but did any qualified bids have any contingencies like what's described here in them?

A   They did not.

Q   Okay.  If you go to Paragraph 7, in the middle of the paragraph, do you see where it says, provided, however, that the trustee's right to modify the foregoing bid requirements, to modify any deadline in Paragraph 4 of this order, to modify any procedures at an IP assets auction, if any, and/or to terminate discussions with any bidders at any time are fully preserved to the extent not materially inconsistent with this order.

A   Yes.

Q   Okay.  Did I read that right?

A   Yes.

Q   Okay, and then you mentioned a second ago Paragraph 29.

A   Yes.

Q   What was Paragraph 29?  What's the significance of that paragraph to you?

A   Twenty-nine is the reservations of rights of the trustee to use in his business judgment when, you know --

assess whatever strategy that we may determine that we need throughout that process, come back to the trustee and say, does this work?  You know, this makes more sense.  This is more beneficial to the estate, and he has the rights and ability to authorize such a change.  So that's an important paragraph to us.

Q    So going back to the timing, at this point, August/September timeframe, why was that important to you?

A    Because, again, there was a lot we did not know yet about how the process would unfold.  And we needed the flexibility to know that we could make adjustments as necessary.

Q    I want to move to your marketing process.

A    Okay.

Q    What did you do to assess what you were selling?

A    So before we marketed to assess it, we obtained some exhibits from the FSS bankruptcy that defined what assets the company had.  And we had a conversation and meeting with the FSS consultants, Bob Schleizer and Jeff Shulse, I believe it is.

MR. BROOCKS:  Your Honor, I'm going to object and move to strike.  He says we.  That's very ambiguous.  I don't know whether he's talking about himself or a group of people.  I think that's very unhelpful.

THE COURT:  I'll allow it.  But I think it's --

perhaps he can clarify.

THE WITNESS: Sure. I mean, you know, many times throughout the process, I had a partner in Tranzon, Kelly Toney. We looked at materials together. At times when I looked at these materials, I had conversations with trustee and trustee's counsel to understand what the materials were. So many of the times, it was more than just my eyes on the document as we were talking through the document. So I do refer often as we and where it is specifically I, I'll try to be more, you know, clear about that.

BY MR. WOLFSHOHL:

Q   When you said documents from the FSS bankruptcy as one of the data points, if you'd go to Exhibit 1, please.

A   Yes.

Q   Have you seen this document?

A   Yes. I don't know if I've seen it all in its entirety, but I was provided some of the exhibits out of this that included some of these, like, domain names, trade names, things of that nature.

Q   What is this document?

A   It --

MR. BROOCKS: (Indiscernible) he said he doesn't know (indiscernible) --

MR. WOLFSHOHL: Your Honor, I'd ask that you admit it. It's the debtor's -- it's the FSS schedules that were

filed in the bankruptcy case.

MR. BROOCKS:  He just said he'd never seen it before (indiscernible) bits and pieces (indiscernible) lay a foundation (indiscernible) --

THE WITNESS:  That's not what I said.

MR. WOLFSHOHL:  I don't need to lay a foundation --

THE COURT:  He said he has seen --

MR. WOLFSHOHL:  -- for schedules that were filed, Your Honor.

THE COURT:  The question is, do you want them admitted?

MR. WOLFSHOHL:  I do want them admitted.

THE COURT:  Okay, and --

MR. BROOCKS:  No foundation.

MR. WOLFSHOHL:  At least for judicial notice purposes.

THE COURT:  I think I can take judicial notice of this.  But if you're asking this witness to authenticate this document, he says he's seen bits and pieces of it and he hasn't seen it in its entirety.  And so I don't think he can talk about the entire document because he kind of admitted he hadn't seen it.  But I can certainly take judicial notice of a publicly filed document on the docket.

BY MR. WOLFSHOHL:

Q    Was this one of the documents that you got information from that you were talking about?

A    Yes.

Q    I lost track of all the things you've said you've done. What else did you do to try to get a handle on what assets (indiscernible) --

A    Oh, sorry.  So, right.  So gathered information, such as excerpts from that document, and then arranged a phone call with the FSS consultant, Bob Schleizer and Jeff Shulse to have some conversation to get a better sense of what the true assets were that comprised this opportunity.

Q    And if we go back to Exhibit 14, which I think is already admitted --

A    I'm sorry.  There was one other thing that I think support we did as well, and that was my colleague Kelly Toney, that visited the site and did a visual inspection of the assets and took photographs and met with the parties onsite.

        MR. BROOCKS:  I'm going to object to that.  He's testifying about what his colleague did, not what he did. It's hearsay.

        THE COURT:  I think he's talking about just the Tranzon process.  So I'll take it not that he did it, but that it's just the process that Tranzon took.  I'll accept it for that purpose.

BY MR. WOLFSHOHL:

Q    And, Mr. Tanenbaum, actually, let's go to Exhibit 21.

A    Yes.

Q    You identified this as the offering memorandum?

A    Yes.

Q    In connection with this sale process.  What's the purpose of this document?

A    This document is provided to parties that had completed an NDA, and we're requesting more information to assess whether or not they would be interested in submitting a bid on the intellectual property portion of the offering.

Q    And I think you previously testified that Exhibit 14 is just an update of 21?

A    That is correct.

Q    What changed under Exhibit 21?

A    Specifically, there may have been some small adjustments to some of the lot descriptions where we may have gotten a little bit more specificity on, say, numbers that we used as a guide.  I'd have to compare the two.  But the most significant change was that we had added Lot 4 in the second package, which had included the contested Alex Jones domain names.

Q    And staying at Exhibit 21 -- I'm sorry.  Actually, let's go to Exhibit 14.

A    Yeah.

Q    First off, if you go to Page 12 -- and I'm sorry, you said you sent this to the parties that actually executed an NDA?

A    That had given us an NDA.  Correct.

THE COURT:  Can I just ask a basic question about Exhibit 21.  Can you remind me what 21 is?

THE WITNESS:  I'm sorry?

THE COURT:  Can you just remind me what Exhibit 21 is.

THE WITNESS:  Oh, yeah.  So Exhibit 21 is the original version of the sealed bid offerings and whereas Exhibit 14 is an updated version.

THE COURT:  So if you flip to Page 10 on the top, there's some writing.  Was that part of the original version?

THE WITNESS:  We're on Exhibit 21?

THE COURT:  Exhibit 21, Page 10 at the top.

THE WITNESS:  Let me see.

THE COURT:  Entirely possible.  I just want to make sure.

THE WITNESS:  Oh, yeah, that looks like it was some rogue data that was in there.  You're talking about the numbers?

THE COURT:  Yeah.  I just want to make sure that I'm -- yeah.

THE WITNESS:  Yep.  That looks like there was some rogue data in whatever version (indiscernible) --

THE COURT:  Okay.

MR. BROOCKS:  I don't have any handwriting on my Page 10 of Exhibit 21.

THE COURT:  I shouldn't say it's handwriting.  That's not the better way of saying it.  I don't want anyone to --

THE WITNESS:  It's not -- yeah, it's not data that was relevant to --

THE COURT:  Okay.

THE WITNESS:  -- anybody's bid or anything other than probably when the form was being --

THE COURT:  I just want the record to be clear because I don't want anyone to look at something that I don't have.  Maybe I ought to give this page back.

MR. BROOCKS:  I don't know what -- I don't know --

MR. WOLFSHOHL:  Yeah.  I don't know what happened, Your Honor.

THE COURT:  Hey, Amber, can you just give that page to Mr. Wolfshohl and just let the parties see.  I'm sure I'm looking at a blank screen, and my page looked different, and I just wanted to make sure that I wasn't -- I didn't have anything different, and I want everything to be clear.  So what got admitted is the blank one.  I don't want

to disturb anything.  I just -- you all were looking at something that looked a little different than what I had, and I just wanted to make sure that I was looking at the right thing or that I had something that everybody else had and nothing different in my record.  But I can -- I think it's -- I don't -- I think the blank one is the one that got admitted because that's what's on the docket.  And I just want to make sure that we're all -- this is inconsequential.  I just want to make sure that I'm -- I have what everybody else has, and so didn't mean to change the flow.  It just looked -- we'll just proceed with -- this is what got admitted into the record, and that's what we'll proceed under.  Thank you.

BY MR. WOLFSHOHL:

Q    If you go to Page 12 for me, Mr. Tanenbaum.

A    On?  I'm sorry, which one are we on now?  Fourteen?

Q    Fourteen.  Yeah.  Fourteen.

A    Yes.

THE COURT:  Lopez kind of ruined that for you there.  Sorry.  Fourteen.  All right.

BY MR. WOLFSHOHL:

Q    What is -- Mr. Tanenbaum, what's this heading, the heading up there that says bid process and terms, what is this section of the offering memorandum meant to be?

A    Yeah.  This is our section that we attempt to reiterate

some of the primary terms.  We try to put them in language that's a little bit more specific to kind of the process that we intend to run.  We certainly point back to the sale order, since that is the governing document, and, I mean, that's what this is (indiscernible) --

MR. BROOCKS:  Your Honor, I'm going to object (indiscernible) he hasn't established the foundation that he actually wrote this thing.

MR. WOLFSHOHL:  He did.  That's how I got the document in earlier.

THE COURT:  Yeah.  He said -- he said he wrote it.

MR. BROOCKS:  He wrote it?

MR. WOLFSHOHL:  Yeah.  He said that.

THE COURT:  Let me just take a look at something here.  Okay.

MR. WOLFSHOHL:  All right.  May I proceed, Your Honor?

THE COURT:  Yes.

MR. WOLFSHOHL:  Okay.

THE COURT:  And just so we're all clear, 14 has writing, too.  Fourteen is an actual bid, not a form.  It's in.

THE WITNESS:  Okay.  Yep.  On Page 11.

MR. WOLFSHOHL:  It's -- it's -- yeah.  Yeah.  It looks like it.  On my version, it does, too, Your Honor.

Honestly, it doesn't matter.  It's just --

THE COURT:  Yeah.  It's in.  I just want to make sure that I'm looking at what everybody else has and we're good.

MR. WOLFSHOHL:  It's already in evidence in another -- or it's part of the other exhibits anyway, so it's not a big issue.

THE COURT:  Okay.

BY MR. WOLFSHOHL:

Q    So if you go to the top of bid process and terms, can you read that first paragraph, before Number 1, the actual --

A    Sure.  The following terms are subject in all respects to the order granting trustee's motion for entry of an order authorizing the wind-down of Free Speech Systems LLC, case number, "the order."  If there is a conflict between these terms and the order, the order controls.

Q    Okay, and when this refers to the order, is that the wind-down order that we previously asked you if I can refer to that as the wind-down order?

A    Yes.  Yes.

Q    And would you read Number 1 where it says sealed bid sale to the court?

A    Yes.  Sealed bid sale.  All property is being offered through a sale process referred to herein as a sealed bid

offering, "sealed bid," wherein interested parties, recipient, buyer, bidder are being asked to submit offers to the sales agent, agent, auctioneer for the right, title and interest in certain intellectual, intangible and/or personal property, "assets," for consideration by the seller, "seller," trustee, estate.  The trustee reserves the right to accept or reject bids, evaluate offers compared to other offers received and/or projected revenues from a piecemeal auction and open up the sealed bid for live bidding between competitive bidders.  The sealed bid and any subsequent auction shall be referred to as the bid process as is further defined herein and all bids submitted to sales agent are subject to the terms and conditions specified below.

THE COURT:  Just if we can kind of -- I want to make sure we're running an efficient process.  I can read this stuff too.  I think --

MR. WOLFSHOHL:  Understood, Your Honor.  I'll try to speed it along.

THE COURT:  No, no, no.  It's not speed it along. I just make sure he can -- I mean we can all read it and you can ask him questions about it, but if you're just asking him to read the sections, I can do that too.

THE WITNESS:  I am an auctioneer.  I can read faster if you want.

THE COURT:  Yeah.  No.

BY MR. WOLFSHOHL:

Q    Mr. Tanenbaum, you wrote this provision, correct?

A    That is correct.

Q    Okay, and was this provision intended to require a live auction?

A    No.  It was intended to describe what our, again, intended process was as of that date.  But we had other provisions within the document that gave us the flexibility to change that process, including the fact that right in that first paragraph we say that we have the right to open it up to a sealed bid process.

Q    And if you go to Paragraph 9.

A    Yes.

Q    You see in the middle it says the sales agent and trustee reserve the right to convert the sealed bid to an auction between qualified bidders.

A    Yes.

Q    Again, is that requiring a live auction?

A    No.  It's reserving the right.

Q    And this was disseminated to all of the bidders or the potential bidders that signed the NDAs, correct?

A    It was.  Yes.

Q    And if you go to Paragraph 25.

A    Yes.

Q    Do you see where it says the bid process and terms,

with any amendments or modifications expressly made by the sales agent constitute all the terms and conditions with respect to the sale of the property.  However, sales agent reserves the right to modify the bid process and terms as they may be necessary and shall notify bidder accordingly.

A     That is correct.

Q     Okay, and in connection with the sale, did you at any point change or modify procedures?

A     We did.

Q     Yeah, and did you notify bidders of that?

A     We did.

Q     So how did you advertise the sales that you were seeking to conduct under the wind-down order?

A     We used a number of different marketing channels.  We utilized trade publications.  We utilized direct mail.  We posted notices on some key websites  We ran some ads in the Wall Street Journal.  And probably one of our most effective marketing methods was -- given the exposure on this sale, was to craft a press release that was picked up by many news outlets around the country and the world.  And all of those things provided traffic to our website.

Q     And going back, if you will, to Exhibit 6, we're going to go back to C of 6, which is your engagement agreement.

A     Yes.

Q     And now I need you to go to B of C.  It's Exhibit B.

It's identified.  Let's see, it's at the end of --

A    Yes, got it.

Q    Okay.  What's that?

A    This is our proposed marketing budget.

Q    Okay, and is that related to the things you just said that you did?

A    Yes, it is.

Q    Okay, and did you in fact incur costs in connection with those things?

A    We did.

Q    So these items were contemplated?

A    Yes.

Q    Let's go to Exhibit 22.  Are you there?

A    Yes.

Q    Can you identify this document?

A    I can.  This is a marketing summary report that I prepared for the trustee on October 31st.

        MR. WOLFSHOHL:  Your Honor, I move to admit Exhibit 22.

        THE COURT:  Any objection?

        MR. BROOCKS:  Yes, Your Honor.  I believe a little bit more foundation is required.

        MR. WOLFSHOHL:  Okay.

        MR. BROOCKS:  I'm not quite sure he's explained that thoroughly.

THE COURT:  I agree.  Why don't you just ask a couple of more clarifying questions?

MR. WOLFSHOHL:  I will.

BY MR. WOLFSHOHL:

Q    Mr. Tanenbaum, you said you prepared this document.

A    I did.

Q    Okay.  Let's start at the top.  Do you see where it says inquiry metrics?

A    Yes.

Q    Okay.  What is the content that's below that?  What does that consist of?

A    So the top one, two, three, the first three rows refer to pages on the ThreeSixty Asset Advisors website.  And this is a summary of the analytics that we downloaded from the Google Analytics page for those three pages.

Q    And then you put them into this report?

A    That I did.

Q    Okay, and then what are the next several items?

A    So of the requests that we received from visitors to the ThreeSixty landing page for NDA request, it's a 723, we actually received requests, we being the ThreeSixty support team website or email account.  And we took those requests and vetted those requests to determine who would receive an NDA.  And that's what that 234 is.

Q    For Mr. Broocks' benefit, when you say we, who are you

talking about?

A     Those are my office.  I have a daughter that works for me part time and a wife that assists me.  And most of this work was done in the ThreeSixty offices as opposed to with Tranzon.  Most of the work on this item here was from we in our office, daughter and wife.

Q     Okay, and then down below that you see where it says top prospects?

A     I do.

Q     What is that?

A     So as of October 31st, I summarized based on the parties that I had conversations with and the activity that those parties had, each one of these had access to the data room.  They had requested access to the data room for more information.  And these seemed at the time to be the top prospects.  They were either asking questions or mostly they were spending time within the data room.  And that was an indication to me that they may be interested parties.

Q     But is this everybody that had access to the data room?

A     This is not.

Q     So you said it's just the people that did it -- that came in the most?

A     Right.  These were what I had determined were the top prospects, people that I felt were, you know, worthy for the attention of the trustee as we started going down the road

and starting with 25,000 people that were inquiring at a top level, this was the top prospects I thought might actually submit a bit.

Q   Understood.  So in the prospects themselves, if you go to that far left column, is that what you're talking about?

A   That is correct.

Q   So those are the actual parties that were looking at this stuff?

A   Correct.

Q   And then company type, what's that mean?

A   Just I tried to categorize them.  First United American Companies, FUAC, I understood that they had an e-commerce interest background, were involved in the e-commerce side. So when we did dissect these assets and market them, we had identified two kind of business units, if you will, of the business that we thought had opportunity for different types of buyers.  One was the production side and one was the e-commerce side.  So what we were trying to do is create more value opportunity as well as more potential competition in identifying those two sides.  So then when we marketed the opportunity, we were trying to identify somewhat who might have been interested in the production or media side versus who might be interested in the e-commerce side.  And that was the distinction between the two.

Q   Okay, and if you -- the middle column says contacts.

What's that mean?

A    Those were the parties, the names that I had that were provided to me.  I think they were all in the data room.  I can't remember if Charlie was given -- I thought he was given access to the data room.  So this might have just been each of the parties that had data room access because it came off of that report of ours that were associated with the companies.

Q    And then the next column where it says last date in the data room.

A    Yeah, this was just trying to provide a little color.  So October 31st, when's the last time any of these parties had actually browsed through the data room.  The system tracks that.  And so I thought it was telling who were the most recent ones that were spending time there.

Q    And then site visit seems explanatory, but what is that exactly?

A    FUAC were the only ones.  Walter had made some arrangements to go out and go onsite and meet with the FSS consultants at the Austin facility.

Q    Okay, and then comments.  Who are those directed to?

A    They were directed to Chris, just sharing some of my, you know, some of my insights of how I was feeling about these parties.  Chris Murray.

Q    When you say Chris, Chris Murray, the trustee?

A    Chris Murray, the trustee.  Yeah.

Q    And then the last column, is that -- like, how did you come up with those answers?

A    I mean, I was really looking for something -- I mean, with FUAC, they had been out to site and Walter may have even asked about deposit at that point or wire instructions. Global Tetrahedron, I'd certainly had plenty of conversations, but I hadn't really spoken to him in the last few days.  And you never really know what a buyer is going to do, even though I thought they were serious.  So I classified them unknown.  The Barbed Wire I put down as a yes because in my previous call with Jeff, he was pretty absolute that they would be putting a bid down.  And then the other three, I wasn't getting contact back.  I had been reaching out by phone call to find out what their interest level was, and I had not gotten any calls back, although I had spoken to them at a -- yeah, some of these notes were updated after the 10/31 date.  So this report is 10/31, but I see -- oh no, those were will follow up.  Okay.  Got it. So, yeah, so as of those eight I had, I hadn't had some of those conversations.  That's why I put unknown.  I didn't know what their status was.

Q    And so that top right has a date.  Is that what you mean by that?

A    10/31.  Yeah.  And I was misreading my notes here.

What I was saying in here was that I will follow up on 11/1 and 11/4 since I hadn't heard from those people.

MR. WOLFSHOHL:  Your Honor, I'd move to admit Exhibit 22.

MR. BROOCKS:  No objection.

THE COURT:  It's admitted.

(Trustee's Exhibit 22 entered into evidence)

BY MR. WOLFSHOHL:

Q   I want to ask you real quick about the NDA.  I'm sorry, the top left where it says actual NDA requests received.

A   Yes.

Q   What does that mean?

A   So we set up a page to try to qualify people that were asking for NDAs.  We noticed very early on that we were getting requests from, we could say odd names, names that didn't sound like they were real names, or we would try to search online and we wouldn't find somebody existing online by name, by phone number, email, things that if you're going to sign an NDA, a legal document, and you're going to be held responsible for sharing information or disclosing information, we felt it was necessary that we could identify those people.

We were primarily looking for businesses and business emails and people that could enter into an NDA that had financial -- you know, seemed to have financial means.  And

anybody that would reach out to us a second time or anybody that we could reach and feel we got some clarification that we could get comfortable with them, would send an NDA to. But we did go through that process, and we did that really to protect the FSS data.  And we didn't want that information out.  We were aware that that FUAC was very likely looking to operate the business, and we weren't wanting to have this information out on the street to anybody that wasn't somebody that could be held accountable for, you know, signing an NDA.

Q   So when you say NDAs received back, is that basically how many NDAs got executed?

A    That was NDA requests received was at 235.  Oh, I see. I'm sorry.  Yes.  The 40 is the NDAs received.  So one of the things when we qualified people, we also found that there were a lot of people that were really just interested in bidding on the equipment if it became an equipment auction.  And those people were easily deferred to the equipment auction site.  And that's where that 52 number is. So you start seeing a shrinking kind of funnel there until we got to 40 actual NDAs that we received back signed by ourselves and signed -- I'm sorry, signed by the bidder, approved by us and countersigned by the trustee.

Q   And you said that this was prepared as of 10/31/2024, as per the note up at the top right?

A    Correct.

Q    So when was the initial sealed bid deadline?

A    November 8.

Q    Okay.  As of this time, how many parties did you expect to bid?

A    At this time, I expected, you know, two per my, you know, sheet here.  Yeah.  As of 10/31, I was expecting FUAC and Barbed Wire.

Q    And did you -- how many bids did you end up receiving?

A    Two.

Q    Okay, and who were they from?

A    They were from FUAC and Global Tetrahedron.

Q    Okay, and when were they received?  Do you remember?

A    They were right around the bid deadline of November 8. I can't recall if one of them might have come in the night before or what the -- you know, but by November 8 for sure.

Q    If you go to Exhibit 15 for me.

A    Yes.

Q    Can you identify that document?

A    Yes.  This is the bid form received from FUAC.

Q    And was it sent to you?

A    It was sent to the list of email parties that are noted in the middle of the bid form, which included myself, my partner, Kelly Toney and Ed Durnil at Tranzon, as well as yourself, Michael Dearman and Erin Jones from Jones Murray.

Q    Do you remember getting it?

A    I do

          MR. WOLFSHOHL:  Your Honor, I'd move to admit Exhibit 15.

          MR. BROOCKS:  No objection.

          THE COURT:  It's admitted.

          (Trustee's Exhibit 15 entered into evidence)

BY MR. WOLFSHOHL:

Q    What lots was this bid for?

A    So they bid for basically everything.  We had a checkbox you can see in the second column there, and that was described to check that off if you wanted to make your bid contingent upon another bid.  And so in this case, all four were checked, implying that they only wanted one if they could get them all.

Q    Okay, and what was the total bid amount?

A    The total bid added up to $1.2 million.

Q    And there's a little asterisk over to the right middle of the page.  You see that?

A    I do.

Q    Okay.  Tell me what that is.

A    Yeah.  So when we set up the assets for sale, because we knew we had this potential remaining assets auction coming up in December, we had carved the vehicles out of this bid package, figuring they really didn't belong in

here.  We also carved out one particular building of assets that it was our understanding nobody necessarily really wanted, that they were going to be excess.  They weren't the production equipment assets.  So the bid package, the bid offering originally did not contemplate that those assets would be included.  But Charlie had reached out and indicated that he wanted those assets and could we make an exception and add those assets in too, could he include those in his bid.  And I said we would.

THE COURT:  Who is Charlie?

THE WITNESS:  I'm sorry, not Charlie.  Walter at FUAC.

THE COURT:  You're referring to Walter Cicack.

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Had reached out and asked if we could make the exception, include those assets.  And I said, certainly.  And I said simply make a note of that, which he noted, along with another addendum.  There was another item that we had discovered that wasn't in the data room that he wanted to make sure would be included.  And we told him he could go ahead and note that as well, and we would consider that as well.

BY MR. WOLFSHOHL:

Q    Okay, and did you qualify that bid?

A    We did.

Q    Did you think that the wind-down order and the bid terms set out in the offering memorandum gave you that ability?

A    I do.

Q    And if you go to Exhibit 16, would you identify that document?

A    Yes.  This is the bid received from Global Tetrahedron.

Q    Is it just from Global Tetrahedron?

A    No.  It is noted under the partner section, it notes the Connecticut families and says as defined in and to the set forth in the accompanying bid letter.

Q    And you see at the bottom left, you see where it's signed?

A    Yes.

Q    Who's that?

A    Ben Collins, CEO of The Onion or Global Tetrahedron.

Q    Okay, and did -- was this sent to you?

A    It was sent to me as well as the other parties, as per instruction on the front of the form.

MR. WOLFSHOHL:  Your Honor, I'd move to admit Exhibit 16.

MR. BROOCKS:  No objection.

THE COURT:  Sixteen is admitted.

(Trustee's Exhibit 16 entered into evidence)

BY MR. WOLFSHOHL:

Q    What's the cash amount of this bid, Mr. Tanenbaum?

A    So really the same story here.  They checked off that they wanted both Lot 1 and 2, in this case, not 3 and 4, but that they were contingent upon one another.  So after allocations, the total bid represented $1 million.

Q    And was this submitted with anything else?

A    It was.  It was submitted with am accompanying bid letter.

Q    If you turn to Exhibit 17, is that what you're referring to?

A    Yes.

Q    Okay.  I think you said you received this with Exhibit 16.

A    That is correct.

          MR. WOLFSHOHL:  Your Honor, I move to admit Exhibit 17.

          THE COURT:  Any objection?

          MR. BROOCKS:  No objection, Your Honor.

          MR. CICACK:  No objection.

          THE COURT:  So the only thing I would ask is, on this Exhibit 17, how does it look on the screen?  I want to see.

          Can you scroll down, Ms. Starling?  Yeah.  Okay.  I just want to make sure that you all are okay with the

names being -- okay.  Thank you.

(Trustee's Exhibit 17 entered into evidence)

BY MR. WOLFSHOHL:

Q    Did you review this when you received it?

A    I did.

Q    Okay, and what did you view this as doing?

A    Well, initially, I wasn't quite sure what it was doing.
And we got on a call together, the trustee and counsel, to
discuss it so I could have a better understanding of what it
was doing.  It was describing some kind of a financial
mechanism to move money, distributable proceeds waiver, from
one creditor group to another.  And it did require some more
education for me to understand what that meant.

Q    Let's start with when you go to Number 2 --

MR. WOLFSHOHL:  Your Honor, did I already move to
admit Exhibit 17?  I think I did-

THE COURT:  Yes.  Yes.  It's in.

BY MR. WOLFSHOHL:

Q    Do you see where it says cash consideration?

A    Yes.

Q    Does that match the bid form that we were at on Exhibit
16?

A    It does.

Q    Okay.  What about this future revenues?  Did you review
that?

A    I did.

Q    And was this anything that you accounted for in assessing the bid?

A    I did not.

Q    Why is that?

A    It's speculative funds and didn't have a value that I felt was appropriate, in my opinion, to attribute. Ultimately, just to be clear, my opinion on the assessment of this bid was something I would be providing to the trustee, but not, you know, determining or thinking I was determining, and my sole opinion would be, you know, the rule of law for the bid.  But when I read future revenues, it did not seem to have any value to attribute to it for this purpose.

Q    What about the next Section C where it says distributable proceeds waiver?

A    So again, I read through the language.  Somewhat understood the language, but again, really needed to understand how that would work.  You know, not being an attorney, understanding the creditor allocations and, you know, why it had the value, you know, what kind of value it had required further conversation.

Q    Okay, and then did you ultimately put to put together an analysis once you had a better understanding?

A    I did.  I mean, there were two steps to an analysis.

The first one was simply taking both of these bids and breaking them out by lot and doing some, you know, estimating of how, you know, those lots broke out, as well as what the attributable value would have been after expenses if we were to have conducted a piecemeal auction for, say, the equipment and inventory.  So I tried to line all that up on a spreadsheet and use that for a comparative tool to discuss with the trustee.

Q    When you say line all of it up based on lots, can you give the court a little bit better understanding as to what you're talking about?

A    Certainly.  We talked about the two different bids. One bid was for Lots 1 through 4, which was one type of intellectual property, another type of intellectual property, equipment and inventory associated with each one. And then Lots 3 and 4, another bid was only interested in Lots 1 and 2, but in their allocation of value to one of those, the amount was zero.  So there was a little uncertainty if they actually wanted that component of the lot.  And then, as mentioned, we knew we had this auction that was presumed for December, and we knew there was a certain amount of value that we would get from a piecemeal auction.  So we put -- I put those numbers in columns with each lot so that I could have a side-by-side comparison of the three types of value that was on the table.

Q    So when you say we were going to have an auction on December 10th, do you mean -- well, when you say we knew there was value, what is that based on?

A    So the production assets, for instance, which were the lion's share of the physical assets at the Austin facility, if they were not purchased during the sealed bid, if somebody bid enough on the intellectual property that stood out from one of the other bids, we could continue to sell the production equipment through this December 10, contemplating remaining assets auction on a piece-by-piece basis.  And we had some estimate of what we felt those assets would bring at that auction based on conducting auctions of similar assets.  So it would not make sense for us to sell that bundle of assets at the intellectual property sale if somebody was attributing less value to it or if it was in a bid with somebody that didn't really want those assets.

Q    Okay.  I want to turn your attention to Exhibit 23. Can you identify that document for the court?

A    Yes.  This first page of this document is that first page that I just -- that lays out what I just described, placing value to each lot.  Now, there was a conversation that took place with each bidder before finalizing this page that helped inform a little bit of how I treated the numbers.

Q    Did you create this document?

A    I did.

Q    Okay.  What was the purpose?

A    The purpose was to analyze the bids that had come in.

MR. WOLFSHOHL:  Okay.  Your Honor, I'd move to admit Exhibit 23.

MR. BROOCKS:  No objection.

THE COURT:  It's admitted.

(Trustee's Exhibit 23 entered into evidence)

BY MR. WOLFSHOHL:

Q    So when I go on that first page where it says at the top -- I know it's very small, and I apologize -- total bids.

THE COURT:  Ms. Starling, I'm going to put on my cheaters.  But I'm going to need your help on this one. Thank you.

MR. WOLFSHOHL:  Do you have them on, Your Honor?

THE COURT:  I've got them on now.  Let's go.

THE WITNESS:  Have you got an extra pair?

BY MR. WOLFSHOHL:

Q    Do you see where it says total bids?

A    Yes.

Q    What does that mean?

A    So this was a total from each of the bidder.  It's a total of the Lot 1, Lot 2, Lot 3, Lot 4, where applicable,

for each of the bidders.  And then at this point and at this stage, I think this was even before conversation with the bidders, I took some liberties on this final row that's in kind of an orange color to just try to make some assumptions of how we might end up combining combinations of bids to get to a high bid that might have been a hybrid between different bidders.

Q    Okay.  When you're selling assets that have multiple lots and situations like this where sometimes somebody's bidding on one and it's contingent on getting another, is it difficult to run a live auction with that type of scenario?

A    It can be.  It can be, especially when you start adding in attributable value for a potential auction and, you know, maybe set it up ourselves a little bit.  But Lot 1 had the equipment component, the inventory component.  You had people that clearly had different idea of what they wanted, even as sublots out of the major lots.  So we were looking at a lot of potential lot permutations.

Q    Why was the attributable value you're talking about relevant when you looked at the first two bids, the two initial bids that you got?  Why was the attributable value that you're talking about, why was it significant to your analysis?

A    Well, so as a for instance, and again, you know, at this point there was assumption, but looking at the Global

Tetrahedron bid and knowing that they had not been out to the site at all to visit with the landlord and have any discussions about ongoing, I thought maybe they only want the intellectual property.  They didn't attribute a lot of value, so maybe that's all they really wanted, but they were taking it either way.

So I kind of looked at that and that's why I say this was just taking a stab and saying, okay, what if we applied intellectual property to Global Tetrahedron of basically a million dollars?  And what if we applied the auction recovery value to the equipment and we blended that together and that ended up to $1.498 million.  Again, I mean, this was not accepting, deciding any bids.  This was just starting a process of analyzing and trying to understand, you know, how we could try to represent a live auction going forward.

Q    Okay.  Thank you.  When you go to the next page of that document, what is it you were doing here?

A    Well, so then came this discussion of the distributable proceeds waiver, which was a waiver, which I became a little bit more understanding of how the waiver worked.  The waiver itself, meaning take money from one group of creditors, apply it to another group of creditors, and that that had a greater value because it would take that much more value to the whole in order for that subgroup of creditors to receive

that much money.  So I understood that concept.  So that was one piece that I was trying to bake into this model.

But I was also trying to.  I was trying to understand they had a mechanism that they described in their bid to place their bid at $1 more to the Texas creditors than they would otherwise get from an alternative bid.  And so what I was trying to do here, I mean, at the point we looked at it, there was nothing disqualifying about it.  It was a topping bid.  It seemed like it's something that could been potentially taken by the trustee.  Again, he had the right to close the bid on the sealed bid.

But there were some missing elements.  It didn't specify how much of a bid they were actually applying, how much distributable waiver.  So we looked at really as a million dollars with this mechanism that could continue to top it and said, okay, what do we do with this in a live auction.  So I started to just try to map out what would happen if we were to try to do some calculations during a live auction on a distributive proceeds waiver.  And as I became more familiar with conversations with trustee and counsel, that there were -- with every bid, that distributive proceeds waiver changes a bit because there's administrative costs, there's fees, auctioneer's fees, things that go in that change each and every time.

So I started with just one scenario of lots and trying

to play with the waiver to see how I could run a live auction with that and offering it up with the trustee having to run calculations on the fly and then started thinking, how do I do this with different lot permutations if somebody wants just these two lots and this lot.

It just started to get to a point -- I'll use the same words I used at the deposition. It made my brain hurt. I got to a point where I said, how am I going to -- how am I going to sit in front of a bidding audience and try to explain the various lots, combine them in different ways, factor in the waiver. I knew that, you know, in conversations with Chris, the trustee, that if we're calculating this on the fly, you know, neither side might have agreed with what those calculations might be. And we were trying to figure out how to make that work and came to determination that there was a better way to run the overbid process.

Q    And what was that better way that you're talking about?

A    That was to use a highest and best process, to expand the sealed bid and simply turn it into a highest and best ask and not run the live process.

Q    And was that your recommendation?

A    And that was my recommendation to the trustee.

Q    And I think you previously said you've done a sealed bid process like this before, right?

A    I'm sorry.  I do want to -- I do want to clarify.  I mean, it was a recommendation and it was vetted out and discussed amongst the trustee, the professionals.  I mean, it was a good, spirited conversation about it being an effective solution.  So I'm sorry.

Q    Okay, and you -- I think you said earlier when you were talking about your prior history with auctions, that you have done sealed bid processes before?

A    Correct.

Q    Okay, and remind the court what you said about the benefits of the sealed bid process.

A    Yeah.  I mean, no doubt, on top of the fact that it cured some of the challenges of how to do the live, one of the key components here is we're down to two bidders, two bidders that may have a very different view of the assets.

On the one hand, we had one bidder that we knew had a collaborative relationship with Alex to continue to operate the business there.  That gave them one very special unique value proposition that only they had.  And then you had another bidder that had this ability to apply this distributable proceeds waiver.  They had their own strategy that made up their own potential value proposition.

And so, you know, sealed bid would work nicely for that because now you're basically saying, who's going to put up your best offer.  Scratch your head and figure out what that

number is going to be.  If it's worth it to you and you have the money in the bank, put that number on the table.  You're not going to get another opportunity to bid again.  And it provided the ability for the trustee to now have the bids, have the waiver and look at it and analyze it, as long as we had some more specificity to calculate it, to analyze it in his time, not in real time, and determine what that value is and whether or not it substantiated.

Q    And did you -- when considering this option, did you consider whether it was authorized under the wind-down order?

A    Yes.

Q    Okay, and if you go to Exhibit 8.

A    Yes.

Q    If you go to Paragraph 29.

A    Yes.

Q    You had reviewed this.  I think we went over it earlier.

A    Yes.

Q    Did you believe that this gave you the flexibility to be able to do --

A    Absolutely.

Q    And do you believe that the bid instructions that you had disseminated through the offering memorandum that we went over earlier, do you think that that gave bidders some

indication that there might not be an actual live auction?

A   I did.

Q   And you were talking about sort of the two unique things that each bidder had that was strategically beneficial to them.

A   Yeah.

Q   I think you said First United had Alex Jones sort of aligning with them and potentially working with them.  And then you said the joint bid had the distributable proceeds waiver, right?

A   Yes.

Q   Okay.  Did you tell either bidder about either of those things?

A   Absolutely not.

Q   Why not?

A   Because, I mean, a sealed bid process.  That's one of the tenants of a sealed bid process.  We're not disclosing bid, and we're not disclosing bid strategy.  You know, that's the secret sauce to a bidder's bid that gives them the power to be competitive and hopefully win their bid.

Q   And so you said that you made this determination, you made the recommendation, but you talked to the trustee and his professionals about it.  Is that right?

A   Correct.

Q   Okay, and if you go to Exhibit 25.

A    Yes.

Q    Can you identify that document for me, please?

A    It's an email that I sent out on November 11th letting bidders know that we were changing the format.

Q    Okay, and did you send this to both of the bidders?

A    That is correct.

Q    Okay.  Did you -- and then let me just --

MR. WOLFSHOHL:  Oh, I'd move to admit Exhibit 25, Your Honor.

MR. BROOCKS:  No objection.

THE COURT:  Okay.  It's admitted.  I don't see anyone's name on this.  I only see.

MR. WOLFSHOHL:  Can you -- can I have the witness explain that to Your Honor?

THE COURT:  Sure.  I'm just saying I don't see Mr. Cicack's name on this email.  I'm sure he got it.  But I just want a record to be clear.

MR. CICACK:  I'll stipulate that we received it, Your Honor.

THE COURT:  Okay.  Thank you.  That's what I needed to know.  Thank you.

(Trustee's Exhibit 25 entered into evidence)

BY MR. WOLFSHOHL:

Q    And would you please turn to Exhibit 26 for me, please?

A    Yes.

Q    And what's this document?

A    So this is the document that we created to support the highest and best portion of the sealed bid.

Q    Was this sent separately from the 25?

A    From the?  What's that?

Q    I'm sorry.  Was this sent separately from Exhibit 25?

A    Yes.  This was sent with another email explaining that the updated bid form or the bid form is attached.

MR. WOLFSHOHL:  Okay, and Your Honor, I'd move to admit this document as well.

THE COURT:  Is 26 admitted, Mr. Cicack?

MR. CICACK:  Your Honor, I'll stipulate that we received it.

THE COURT:  Okay.  I'll admit 26, and I will let the record reflect Mr. Cicack is not listed on here as counsel to FUAC.  But Mr. Cicack has stipulated that he did, in fact, receive the email and the attachment.  Thank you.

(Trustee's Exhibit 26 entered into evidence)

BY MR. WOLFSHOHL:

Q    Just to make the record clear, Mr. Tanenbaum, did 25 and 26 go to both bidders?

A    They did.  We sent it out using a BCC for bidders, just as a normal and customary to make sure all bidders received.  But the professionals were cc'd so they could see that it went out.  So that's why you're not seeing it on this

version.

Q    And so the bidders, when you sent them, didn't see the other bidder?

A    Correct.

Q    But they were sent simultaneously?

A    Correct.

Q    So the exact same thing went to both?

A    That is correct.

Q    The first one is November 11th at 12:18 p.m., right?

A    Yes.

Q    Okay, and then so that's what, a few days after the deadline?

A    Correct.  Yeah.  From November 8 to November 11. Correct.

Q    And then the second one, it looks like was later that afternoon.

A    Yes.

Q    Okay, and --

A    No.  The follow-up one was the next day.  You're referring to the amended --

Q    No, I'm actually talking about --

A    Oh, just the email.  Yes.  Yeah, same day.  I'm sorry.

Q    Okay, and what is this attachment that was sent?

A    The attachment is a set of instructions and how the highest and best portion of the bid process will work on

Page 1 and Page 2 is a form to submit those bids.  And what we did, and you'll notice under the bid packages, is that there's a lot more bid combinations than there were in the first bid package to address the lot issue that we had described.  So we broke out each component of the lots this time, the equipment, the inventory, so forth, individually. Then we also provided them as groups and -- yeah, I'm sorry.

Q    No, no.  Go ahead.

A    Well, I mean, that's really it at that point in terms of what's on the document.

Q    Why did you do it?  Why did you choose to do it that way?

A    To resolve the issues that were on the table about who might bid on what.  And I guess what I was going to say is that, you know, subsequent sending out this form, I had follow-up calls with each of the bidders which resulted even the idea of us extending a couple of those lot categories. So the goal was to give the bidders as much optionality to bid in any way they want so that we could compare the bids, line them up and award them in a most productive way.

Q    Okay, and then if you go after -- the page right before the bid form on the other side --

A    Yes.

Q    -- where it says IP assets auction bid instructions.

A    Yes.

Q     What was the deadline for submitting the highest and best bid?

A     November 13, 10:30 a.m.

Q     Okay, and can you read for the court Numbers 1 and 2 just so the court understands what it was (indiscernible) --

A     Sure, sure.  This will be the final call for highest and best bids wherein the auctioneer and trustee shall evaluate bids submitted and award the bids to the best single or combination of bids received based on the highest financial benefit to the creditors.  In its evaluation of the best combination of bids, the trustee reserves the right to attribute value to lots based on their projected piecemeal auction value.  Any lots awarded on this basis --

Q     Before you go further --

A     Yes.

Q     -- let me just ask you, what do you mean by their projected piecemeal auction value?  Is that what we were talking about earlier?

A     That's what I was talking about early, yeah.  So just as a for instance.

Q     Yes.

A     So as a for instance, had somebody submitted a high bid on Lot 2E, e-commerce, intellectual property with inventory, and somebody had submitted a bid on 1C, production equipment -- I'm sorry, not production equipment only -- to 1B,

production IP without equipment, we would have been left with equipment, right?  And so we would have had an automatic, you know, method to sell that.  However, if somebody had bid for the production equipment with -- production IP with equipment and somebody submitted with a production IP without equipment, we now had a means to compare the two.  If the one with equipment was lower than the one without it, plus the attributed value that we would have given to a future auction sale, then that would have been considered a higher bid.

Q    So in other words, you'd combine the actual offer with a perspective value and say that's the highest.

A    Correct.

Q    Okay.  So -- and I stopped you.  You were at --

A    Yeah.  Any lots awarded on this basis will be sold at the scheduled auction or such other date as may be determined.  Consistent with the wind-down order, any bids that include components of consideration apart from the cash purchase amounts should quantify the amounts of such consideration in specific dollar amounts with as much specificity as possible and avoiding references to any formulas or other contingencies.

Q    And let me ask you this.  Did -- well, first off, let's just flip real quick, so the record's clear, to Exhibit 27.

A    Yes.

Q    What is that document?

A    Twenty-seven is the updated version with three additional group lots.

Q    Well, let's start with what it is on the first page.

A    Oh, I'm sorry.

Q    It's a -- yeah -- is that -- is that an --

A    Oh, the email.

Q    Yeah.  Would it be an email?

A    I'm sorry.  Yeah.

Q    Yeah.

A    So the email is an email to the bidders.  Again, the bidders were Bcc'd on this and it was sent out saying this is a revised bid form as we had omitted several group lot options.

Q    Okay.  So this was sent out the following day?

A    This was sent out the following day.

Q    By you?

A    Correct.

THE COURT:  So the party -- somebody would get something -- are we admitting this?

MR. WOLFSHOHL:  I'm going to ask to admit it, Your Honor.  Yes.

THE COURT:  Any objection?

MR. CICACK:  No objection.  Again, Your Honor, we'll stipulate we received it.

THE COURT:  Thank you.

(Trustee's Exhibit 27 entered into evidence)

THE COURT:  Did someone get something at 2:30 on November 12th and had less than 24 hours to then understand what was happening and submit a bid on best and final?  Am I getting this right?

THE WITNESS:  It was the revised version.

THE COURT:  The first one was sent on Veterans day, right, at 10 -- like on -- at like, I don't know, 4:30 in the afternoon.  And then there's a revised version sent at 2:39 in the afternoon.

THE WITNESS:  Correct.

THE COURT:  And now --

MR. WOLFSHOHL:  Can I ask some questions and give you some context?

THE COURT:  Yeah.  You can.  I just want to make sure that I'm understanding that the deadline was 2:38 and then somebody had to turn around and submit a bid at 10:30 in the morning, a best and final.

MR. WOLFSHOHL:  Your Honor, I'm going to give you a little bit of context.  There's some --

THE COURT:  I just want him to answer if that's a yes or no.

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

BY MR. WOLFSHOHL:

Q   So, Mr. Tanenbaum, after you sent the bid instructions on Monday the 11th --

A   Yes.

Q   -- did you have conversations with the bidders between sending Number 26 and Exhibit Number 27?

A   Yes, I did.

Q   Okay.  Who did you have conversations with?

A   I had -- first, I had a conversation with a representative of FUAC that Walter Cicack authorized me to speak with, a gentleman by the name of Drew Donen, specifically regarding the bid form that he had.

Q   Okay.  Let me just ask you this.  Did the conversations that you had with them affect you sending the second notice?

A   Yes.

Q   Why?

A   The conversations I had with both parties led to the idea that each one of them might have liked to have seen one other bid permutation, just one other group added.  So it was not a change in terms.  It was simply providing one more, well, three more line items of different combination bids that they could bid on.

Q   Okay.  So the first page that says IP assets auction bid instructions, did that -- not the form, but the page that describes the instructions, did that change?

A     It did not change.

Q     So the changes are on the bid form?

A     That is correct.

Q     And those were based on communications with the bidders?

A     Correct.

Q     Okay, and walk the court through what it is you changed.

A     Sure.  So if you look at the bid form page, which is up on screen, and you look down towards the bottom, Group 5, Group 6 and Group 7 were all three new additions to the form.  So one of the bidders had expressed interest in bidding on intellectual property and equipment.  So both intellectual property lots and the equipment, but not the inventory.

      And one of the groups, the other group had expressed interest in bidding on just equipment and inventory without any of the IP.  That was 5 and 7.  I simply added 6 as an additional one just as another variation from Group 5 as long as we were doing it.  So really just expanded the options for the bidders to bid on.

Q     And when you had those conversation with those bidders, at that point you had previously already stated the bid deadline and what the format was going to look like?

A     Correct.

Q   Okay, and so the change was, you said, meant to accommodate what they had asked for in terms of sort of changing the lot so that they could formulate a bid?

A   Correct.  That is correct.

Q   Okay.  I think you were talking about you had had conversations with you said he was the representative of FUAC.

A   Yes.

Q   Okay, and who was that?

A   Drew Donen.

Q   And do you know him?

A   I do know Drew Donen.

Q   You knew him before this?

A   Correct.

Q   Okay.  How did you know him?

A   Drew is an auctioneer that lives in the community that I used to live in, and we had done work together on and off over the years.

Q   Okay.  Well, let me back up a second, because I want to -- I want to address something that I think the court's asking about.  Originally, when this was going to be a live auction, the bid deadline was -- what was it going to be?

A   November 13, 10:30 a.m.

Q   When was the live auction going to be?

A   No, I'm sorry.  I thought that's what you asked me.

Q   When was the bid deadline?  The original bid deadline for the sealed bid, under the --

A   November 8.

Q   November 8.

A   Yep.

Q   Okay.  When was the live auction going to be?

A   It was going to be November 13.

Q   At what time?

A   10:30 a.m.

Q   Okay, and so when you notified the two bidders that it was going to be a sealed bid, highest and best, what was their deadline for submitting that bid?

A   November 13, 10:30 a.m.

Q   So the exact same time that the live auction was going to be?

A   Correct.  Yeah.

Q   Okay, and the modified instructions -- or not modified instructions, the modified bid form was day before that.

A   Correct.

Q   But it was based on you having contracted conversations with them --

A   Correct.

Q   -- about what was in -- like, just changing the lots to accommodate bids that they were going to want to submit.

A   Correct.

Q    Okay, and Mr. -- what was his name?  Donen?

A    Donen.  Yes.

Q    Okay.  How long was your conversation with him?

A    About 25 minutes.

Q    What did you talk about?

A    We talked about a number of things.  We talked about how to use the bid form, number one.  I wanted to make it very clear that they could bid on multiple lots, that one was not -- this was not like the first round where they needed to worry about contingencies.  We wanted to know contingencies.  We wanted a clarification.  We wanted to be comfortable putting a bid on each and every lot on the basis that if that was the only lot they were able to win, that they would be okay with that.

MR. BROOCKS:  This is hearsay, Your Honor.  I'm going to object to this and move to strike.

MR. WOLFSHOHL:  Yeah.  Two things, Your Honor. Well, I can establish by asking him questions about who the person is.

THE COURT:  Just deal with the hearsay objection so we can just deal with it one at a time.  What's your response?

MR. WOLFSHOHL:  My response is that Mr. Donen is an agent of FUAC.  That's how he presented himself to Mr. Tanenbaum, and they had conversations.  So it's a party

admission. And secondly, I'm not doing it for the truth of the matter. I'm trying to establish what Mr. Tanenbaum was doing and what his state of mind was in connection with running the auction. Part of what you're -- well, the biggest thing that you're looking at, Your Honor, today is the trustee's business judgment, and I'm trying to establish what it is that was done in connection with the sale process.

MR. BROOCKS: Your Honor, an agent statement cannot establish a principal agent relationship. It's got to be from the principal himself. An agent can't (indiscernible) --

THE COURT: I don't -- I don't -- I don't -- I don't -- you haven't gotten me there, who this individual is. So I'm going to -- it's hearsay.

BY MR. WOLFSHOHL:

Q    Mr. Tanenbaum, who is this person that we're talking about? Mr. Donen?

A    Who is he in what regard? How did I come to know of him?

Q    How did he -- how was he speaking? Like, tell me -- tell me how you learned that he was affiliated or associated with FUAC.

A    Sure. Initially, he contacted me, said he is working with a potential bidder and is interested on discussing how

the bid -- this goes back prior to the original bid.  And he wanted to know -- he wanted to discuss the bid process.  And I spoke to him like I would any party that inquired prior to an NDA, not sharing information, just on what is about to happen.  And he wanted to get some more information.  But he did not share at that time who he was bidding for or he was investigating for.  I said, look, to have any further conversation with you --

Q    Real quick, when was that conversation, that first conversation?

A    I want to say around November 4.

Q    Okay.

A    And I said, if you would like to discuss in any more detail, then you're going to have to submit an NDA.  So he submitted an NDA.  I shared with him the bid package, and I spoke with him.

Q    When he submitted the NDA, who did he indicate he was?

A    Just -- he did not represent himself as being with anybody, just auctioneer.

Q    Okay.

A    Okay.  He submitted the NDA to me, had it countersigned, and then I went ahead and I spoke with him as I would any other potential bidder about, you know, the process on the NDA, with no dialogue at all about any other bidder, just him trying to understand the bid process

without having the access to that bid document in front of him.  He thanked me.  He said, I don't know if I'm going to be involved or not going to be involved, but if I am, I'll reach back to you.

After the November 8 bid submissions, I received a couple of calls and texts from Drew Donen, which I did not answer and did not respond to.  He was just saying, when can you talk about this?  And at that point I had reached out by email.  Oh, I'm sorry.  I did take one call of his and he explained to me that he is related to the FUAC group and wanted to be able to talk about the bid.  And I said that I can't do that without authorization to do so.  And so I reached out by email to Mr. Cicack and asked him if I may communicate with Drew Donen on behalf of his bid submission. And he sent me an email back saying I was authorized to do so.

Q    Does Mr. Donen -- other than Mr. Cicack confirming that he was operating on behalf of the FUAC bid group, did he -- does he have any other association with that company that you're aware of?

A    I have no idea.

MR. WOLFSHOHL:  Okay, and Your Honor, I'm going to start asking questions.  I'm sure Mr. Broocks is going to get up.  But I think I've established that he is an agent of FUAC.  Mr. Cicack confirmed he was directly to Mr.

Tanenbaum.  And so I'm going to --

THE COURT:  Yeah, why don't you go ahead and ask the questions.

BY MR. WOLFSHOHL:

Q    Okay.  What was -- when you -- once you knew that he was acting as an agent for First United, what did you talk about?  I think we talked a little bit about this.  What did you talk about?  I guess after the notice at Exhibit 25, between the email at Exhibit 25 and the ultimate bid submission, what did you talk to Mr. Donen about?

A    Well, it continued to be about the bid submission, making sure that he understood they could bid multiple ways on the bid form and that that would not -- you know, that that's what we wanted to help make certain that they had all the options, bid options available to them.  He did, you know, try to find out and asked a few times, you know, where are the bids at.  You know, and I said, I can't share that with you.  And he wanted to have an idea how, you know, far they might need to go.  And I said, again, I can't share that with you.  You've really got to put your best foot forward.  And he went on --

Q    Let me stop you.  When you said, you've got to put your best foot forward, you're referring to First United?

A    Correct?

Q    Okay.  Does Mr. Donen have any familial relationship

with Mr. Cicack or --

A    He does --

Q    -- (indiscernible) Cicack.

A    He explained to me that he is Charlie Cicack's father-in-law and that he really wanted to help Charlie to, you know, make this happen as best he could, but he didn't know how much, you know, money they had left, you know, to be able to bid it.  And that he said he was maybe willing to help out, but, you know, would take cashing a CD or something along those lines.

And I said, look, I kind of -- I said, look, it sounds like the sealed bid process helps you a little bit.  You can, you know, figure out your -- what you need to do here and decide and have time to cash it, because you said it takes some time to cash a CD.  So it was a lot of just conversation about that, trying to encourage him to do what he needed to do to, you know, to put their best foot forward.

But that, you know, he kept coming around trying to, I don't want to say ask what the bid was.  It wasn't like he was expecting me to do something that I shouldn't do, but he was trying to get a little bit of a sense to know whether or not it was worth his while.  And I just remember saying to him a couple of times, Drew, it's not a futile effort.  It is not a futile effort.  You know, do what you can.  And,

you know, that was about it, about the bid process, until the end of the conversation, which was, you know, has stuck very well in my head.  He's an auctioneer.  He gets what we do.  And he doesn't run auctions quite this way, but he does more of the piecemeal sales.  But he said to me at the end, Jeff, and I said, yes.  He said, let me ask you a question. I said, what's that?  He said, are you going to call me tomorrow and ask me to bid again?  And I said, absolutely not.  And that was the end of our conversation.

Q    What did you take from that?

A    He was clear.  This is highest and best.  I'm not asking for another bid.  Put your best bid forward.

Q    Okay,  What about the -- what about the other bidder, the Global Tetrahedron --

A    Sure.

Q    -- Connecticut bid.

A    So I talked to Ben Collins is who I called with Global Tetrahedron.

Q    Who's that?

A    That's the CEO of the company.

Q    Okay.

A    And he brought Paula Brillson onto the call.  So it was the two of them.

Q    Who is she?

A    And she's the general counsel for the company and I

went through a similar process.  Similar, but a little different.  We weren't talking about cash and CDs, but we were talking about first putting bids on each and every lot that they were willing to accept.  You know, again, if you lose everything out, but you get Line 2A, you're the high bid and that works out, are you going to be satisfied with that.  If so, then put your bid on that, on that line item.

So we went through that, and then we talked about the distributable proceeds waiver and how they bid the first bid.  And I said look, this is a highest and best bid.  We need a number on the bid sheet.  We are going to base your bid on a number, a value that is, you know, a cash value that you put on the form.  And so that was number one.  And I said and we're not going to consider some kind of a trigger mechanism to increase your bid over somebody else's bid.  And he seemed to get that.  He said, I hear you, no trigger.

And I said -- and I said, and you need to make sure you put as much cash in your bid as possible.  I said you're asking to waive some of that cash towards a creditor pool.  Just understand there's admin fees, there's auctioneer's fees, there's maybe some secure credit or something.  I don't know what, and I don't know the trustee is going to calculate it.  You've got to figure that out yourself.  But just understand you can't put a bid in and say here, you

know, you know, here's how much cash and give it all to unsecured creditors.  There's going to need to be cash in the bid to pay for the other forms of the other components.

Q    With either of those conversations, was it just two conversations, one with --

A    Correct.

Q    One with the First United's representative and one with two people from --

A    Two people from Global Tetrahedron.  They had asked for a follow-up call with attorneys and I talked with counsel and we -- you guys didn't, didn't want to have a conversation and get involved with (indiscernible) said that's the bid process and gave me a clarifying paragraph to send and I sent a paragraph to them and that was it.

Q    Are conversations like this before a sealed bid -- is this a normal thing for you running a sales process?

A    Oh, yeah.  Oh, yeah.

Q    Why is that?

A    Well, my job is to get the highest and best dollar and we're using a sealed bid process.  So my -- you know, as opposed to the competitive bidder, you know, my process is just to encourage people to put their best foot forward.

Q    Did you tell either bidder about anything about the other bidder's bids?

A    Absolutely not.

Q   Okay.  Why not notify First United about the distributable claims proceeds concept?  Why did you not do that?

A   Because that's their bid strategy.  That is -- that's like telling them their bid.

Q   Did you tell -- let me ask this.  Did you tell Global Tetrahedron about any bid strategy that First United was employing?

A   Absolutely not.

Q   Including that it was aligned with Alex Jones and was going to --

A   Correct.  They had no idea who they were bidding against, let alone, you know, whether there was any alliance.

Q   Let's look at Exhibit 18.  Well, first of all, did you get final bids from both bidders?

A   We did.

Q   And did they get in within by the deadline that you had set?

A   Yes.

Q   At 10:30?

A   Yes.

Q   Which was the same time originally scheduled for the live auction?

A   Correct.

Q    Okay.  So they met that deadline?

A    Correct.

Q    If you go to Exhibit 18, what's this document?

A    This is FUA's bid.

MR. WOLFSHOHL:  Your Honor, I move to admit Exhibit 18.

MR. BROOCKS:  No objection.

THE COURT:  It's admitted.

(Trustee's Exhibit 18 entered into evidence)

BY MR. WOLFSHOHL:

Q    Can you walk through this document with me?

A    Yes.  So it's filled out at the top with the FUA name and information.  And then they went ahead and filled in bids on a number of the groups, including one of the groups that I added specifically for them and the, you know, probably most notable one being Group 4, which is kind of the take everything lot for $3,500,000.

Q    And you said you also got a bid from the second bidder, Global Tetrahedron?

A    Yes.

Q    Which we're referring to today as the successful bidder.  Is that at Exhibit 19?

A    Let's see.  Yes.

Q    And just to be clear --

MR. WOLFSHOHL:  Well, Your Honor, I'd like to move

to admit Exhibit 19.

THE COURT:  Nineteen.  Any objection?

MR. BROOCKS:  No, Your Honor.

THE COURT:  It's admitted.

(Trustee's Exhibit 19 entered into evidence)

BY MR. WOLFSHOHL:

Q   Okay.  First of all, this document, the first document, is that just the bid instructions?

A   It is.

Q   Okay, and the second page, would you please go to that -- sorry, the bid form.

A   Yes.

Q   Okay, and what's -- describe this first page to the court.

A   Again, it's got the company information at the top and then it has two bids on it, a bid for Group 4, which is everything, and a bid for Group 5, which is basically everything except for the inventory and the Lot 3 and 4 domains.  But both are bid with the same amount of $7 million.

Q   Okay, and you see that the little asterisk next to the $7 million?

A   I do.

Q   When you go down to the bottom, what does that say?

A   It says not less than $7 million, as set forth in more

detail in the accompanying final bid letter.

Q    Okay.  Just starting with this, based on what you talked to this bidder about prior to the submission, what is the dollar amount set out on the bid form?

A    $7 million.

Q    But it does have this asterisk, right?

A    Mm-hmm.

Q    Okay, and it references -- what does it reference?

A    Well, it references the accompanying bid letter, but it also says not less than $7 million as set forth on that letter.

Q    Okay, and then if you go to the first page of the bid letter, you see Number 1?

A    Yes.

Q    What does that say?

A    Increased consideration of at least $7 million.

Q    And then if you go down to the highlighted and italics part, what does that say?

A    Which part?

Q    It's --

A    Oh, italics and bold.  Yeah, I'm sorry.  Over $7 million of total cash consideration for Group 5 assets. Stop there or keep going?

Q    Yeah, that's all I wanted you to say -- to look at there.  Now I want you to first look at -- well, first, if

you to the third page.

A    Yes.

Q    I'm sorry.  Go to the bottom of that second page.

A    The bottom?  I'm sorry.  Second page of the letter or second page of the package?

Q    I'm talking about the letters.

A    Okay.  Yeah.

Q    I'm bouncing around.  Let's look at the -- you see the bold part where it says as a result?

A    Yes.

Q    Read that to the court, please.

A    As a result, and as set forth below, this final bid is better for other unsecured creditors of FSS, even when compared to other qualified bids that offer up to $7 million of cash consideration for the same Group 5 assets.

Q    And you see the next page where it describes a distributable proceeds waiver amount?

A    In quotes?

Q    Yes.

A    Yes.

Q    Could you read that to the court?

A    Yes.  The distributable proceeds waiver amount is revised under this final bid, so it shall equal an amount necessary for other unsecured creditors of FSS, including the Texas families, to recover $100,000 more and increase

from a dollar amount set forth in the initial bid in the aggregate than they would recover from the sale of the acquired assets to the otherwise highest qualified bidder.

Q    What did you -- when looking at the bid form and the places that we've identified in the letter, as well as that provision, what was your interpretation of this bid?

A    My interpretation of the bid was that it was $7 billion.

Q    How is that, given what you just read about the $100,000 more?

A    Well, I mean, a number of things.  First of all, the offering was a highest and best and a highest and best means what's your highest and best offer.  They put a number on the form saying, our highest and best offer is $7 million. They asterisked it and they said not less than $7 million. And even though -- and cited it to this letter, and while there has some language that tries to back that number down, you know, it still says not less than $7 million.

Now, you know, the concept of saying, you know -- basically what I read it to say is we're bidding $7 million, but to the extent that the other bidder only bids $2 million, we really want to be at $2,000,001 or whatever. And we disregarded that.  That meant that their bid was $2 million to $7 million, and we're accepting $7 million. That's your highest and best.  It's what's on the form.  And

it's what we relied on.  And so we used the distributable waiver concept, which has nothing to do with the calculations they've got there, to use the distributable proceeds waiver concept to run the math on and vet whether that $7 million was truly worth $7 million.

Q   How did you do that?  Tell me how you got a distributable proceeds waiver using that analysis.

A   Sure.  Basically it was to take the difference between the $7 million number and the $1,750,000 number, $5,250,000 and understand after --

Q   Let me back up.  I don't think that I established that.

A   Yeah.

Q   What was the cash portion of what they valued as a $7 million bid?

A   The cash portion was $1,750,000.

Q   Okay.  So what was that relative to the first bid that they submitted?

A   It was half of the -- though the first bid, it was $750,000 more than the first bid they submitted.

Q   Okay.  So go back to your explanation.  I just don't think that I had established the cash portion.

A   Got it.  Okay.  Yeah, yeah, yeah.  Fair enough.  So it was a $1,750,000, which meant $5,250,000 would represent this additional value.  So using the trustee's calculations of the Connecticut families' pool, or what you see, they've

identified on their letter, 96.7, and they've also identified a number of 75 percent, but we use the 96.7 percent number, and we ran the calculation, say how much waiver would make up for $5,250,000 in order to make for a $7 million value bid.  Does that hold water?  And the trustee ran numbers, included allocations for administrative costs and so forth to make sure that that would vet out and that added up to $7 million.

Q    Can you go to Exhibit 24, please?

A    I'm sorry.  Which one?

Q    Twenty-four.

A    Okay.

Q    Are you familiar with this document?

A    I am.

Q    Okay.  What is it?

A    This is a document that the trustee provided to me and that we then kind of worked through together on the phone to kind of vet out the $7 million bid.

Q    Did you participate in the creation of it?

A    I did.

     MR. WOLFSHOHL:  Okay.  Your Honor, I move to admit Exhibit 24.

     MR. BROOCKS:  No objection.

     THE COURT:  24 is admitted.

     (Trustee's Exhibit 24 entered into evidence)

BY MR. WOLFSHOHL:

Q    Mr. Tanenbaum, let's start at the bottom.  Do you see the middle column?  I'm going to divide the -- there's two, basically two charts there, right?

A    Yes.

Q    Okay.

THE COURT:  Mr. Wolfshohl, before you continue, and I want you to finish this exhibit.  At some point we should take a break for everyone and I just want to find a -- I want you to just find a good spot and then we'll take a short break.  But I don't want to -- if you've got a flow of questions, but --

MR. WOLFSHOHL:  It's actually probably not a bad time to take a break, Your Honor.

THE COURT:  Okay.  Why don't we just take a -- just kind of take a ten-minute break.  Why don't we come back at 4:15.

CLERK:  All rise.

THE COURT:  I'll remind you, sir, that you're still under oath and to discuss your testimony with no one. We'll come back in ten minutes.  Thank you.  Let's talk housekeeping, just in terms of timing for --

MR. BROOCKS:  About ten minutes, right?

THE COURT:  Yes, ten minutes and then we'll come back and talk kind of how late we're going to go tonight and

just estimate so we're all clear.  Okay.

MR. WOLFSHOHL:  That sounds good, Your Honor.

THE COURT:  Thank you.

(Recess)

CLERK:  All rise.

THE COURT:  Please be seated.  I think we have everybody here.  Maybe we can just talk -- just back on the record in the Jones case.

MAN 1:  Sorry, Judge.

THE COURT:  No, no worries at all.  Maybe talk a little housekeeping in terms of timing, what the rest of the day looks like.  Maybe I should have asked this question from the beginning.

From your side, Mr. Wolfshohl, who do you expect to put on in addition to this witness?

MR. WOLFSHOHL:  The trustee only.

THE COURT:  The trustee?

MR. WOLFSHOHL:  Yes, Your Honor.

THE COURT:  Will there be any additional witnesses from the -- any anticipated witnesses from the joint bidders?  You don't anticipate putting anyone on?

MR. KIMPLER:  No.

THE COURT:  Okay, and then from --

MR. BROOCKS:  We haven't made that judgment call just yet.  But I wanted to take a more basic -- assuming

Josh has another like 30 minutes with this witness --

THE COURT:  Well, no, I'm going to go there.

MR. BROOCKS:  You're going to go there.  Okay.

THE COURT:  I'm just trying to get a sense of the global picture and then I can zoom in.

MR. BROOCKS:  If they call -- if Mr. Cicack doesn't call Charlie, the primary person behind First United, we might.  But I'm going to -- we're going to have to cross that bridge in a little bit.  We have one witness at most.

THE COURT:  Okay.  So, Mr. Wolfshohl, how much more time do you think you have?  I'm asking for a very good question.  It has to do with allocating air conditioning for the rest of the night.  So it's a very important consideration as it comes in this building and staffing and all that stuff.

Zilde, can we turn that?  Can we push that?  That's where the sun comes through.

MR. WOLFSHOHL:  I'd say --

THE COURT:  I don't want to hold you to it.  Just trying to get a sense of timing.

MR. WOLFSHOHL:  Maybe half an hour to 45 minutes.

THE COURT:  Okay.  So you think you'll be done by 5:00-ish from there.  How much cross do you think you all need?

MR. BROOCKS:  I expect somewhere between an hour and hour and a half.  And then Mr. Cicack's going to have something too.

THE COURT:  Mr. Cicack, how much time do you think you're going to need?

MR. CICACK:  Well, he's -- I don't want to (indiscernible) what he's done.  So I would say if he's going to go an hour, an hour and a half, I probably (indiscernible) not more than a half hour.

THE COURT:  All right.  And I will --

MR. BROOCKS:  (Indiscernible) redirect.

THE COURT:  All that good stuff.  Maybe what makes sense is to finish with this witness today, start up tomorrow.  I think if -- well, at some point somebody's going to want to eat too.  Maybe we just -- let's just push until about 8:00 and let's just see how far we can get.

MR. BROOCKS:  My problem, if I may be heard on this, Your Honor, is two things.  Number one is it becomes difficult for a human mind to concentrate on some of these kind of tedious details.  The later it gets, people get tired, blood sugar.  And so it puts us at a disadvantage in our cross if it's happening later in the day.  And the second thing is that he's talked about Global Tetrahedron in his conversations.  Now, when you adjourned us last time, you said you can talk to the trustee and the auctioneer and

see how -- if it necessitates Global Tetrahedron, we wrote them a letter and they declined our invitation for a depo. Now, in light of his testimony that he called them up and told them specifically things that ended up appearing in their letter, I would suggest that we finish with this guy at a reasonable time and then let me take the deposition of Global Tetrahedron and then come back.

THE COURT:  Yeah, I got it.  We're not doing that. I don't think we've gotten there to cross that bridge yet. I just want to hear from -- let's just finish this witness today.  Let's finish the cross and let's just see where we are.  What I don't want to do, I think, is start with Mr. Murray tonight.  I think it makes sense for a fresh direct, fresh cross on that.  But let's see.  I don't want -- I want to finish with this witness today, and let's just go until we're done.  It sounds like we're going to finish around 7:00, 7:30-ish.  And let's just keep pushing.

MR. WOLFSHOHL:  That sounds good, Your Honor.

THE COURT:  Okay.  Everybody's rights are reserved on additional witnesses and all that stuff.  Go ahead.

MR. WOLFSHOHL:  Your Honor, just for planning purposes, what time would we start tomorrow?

THE COURT:  That's a really good question.  We were thinking like 1:30 p.m.  I've got --

MR. WOLFSHOHL:  So the afternoon.  Okay.

THE COURT:  Yeah.  I will tell you why.  Just looking at my calendar, I've got -- yeah, I've got a hearing at 9:00.  I've got a status conference in Red River at 11:00.  And then I think just have lunch and then kind of come back fresh.  I think that's what makes that it's realistic.  We'll start at 1:30 and then --

MR. WOLFSHOHL:  That'll work for the trustee's side.

THE COURT:  And then go until we're done.

MR. WOLFSHOHL:  Okay.

THE COURT:  Okay.  All right, let's bring the witness on and let's go.  Okay.  All right.  We have the witness back on, and I'll remind you that you're still under oath.

THE WITNESS:  Yes.

THE COURT:  Okay.  Mr. Wolfshohl, whenever you're ready.

MR. WOLFSHOHL:  Thank you, Your Honor.

BY MR. WOLFSHOHL:

Q   Mr. Tanenbaum, I'm going to go back to -- I'm going to go back and then I'm going to come back to Exhibit 24.  But let me ask you a question about your prior testimony.  We were talking about the notices that you sent before the final bid round.

A   Yes.

Q    And those are at Exhibit 25.  That's the first one, right?

A    Correct.

Q    And that was when you first notified the bidders that the 13th was going to be a sealed submission instead of a live auction, right?

A    Correct.

Q    Okay, and then I just want to clarify for the court the changes that were made between Exhibit 26 and 27, I know you talked a little bit about them.  Did they change the assets themselves that were in the picture, or did they just change the groupings?

A    Just the groupings.  We added three groups, but nothing about the assets changed.

Q    Okay.  So, and did anything change from the -- in terms of the -- all the assets available, did anything change from the 8th to these letters?

A    No.

Q    Okay.  So what was happening, kind of like right before the bid deadline, was just a rearranging of groupings as options for the bidders?

A    Correct.  I wouldn't even say rearranging because all of the existing groups remained.  We simply added the ability to bid on a couple of combinations that did not previously exist.

Q    And that was based on feedback from bidders?

A    Based on feedback from bidders.  Correct.

Q    Did between the notification that you first sent on the 25th -- I'm sorry, Exhibit 25 on the 11th, when you notified of the highest and best sealed bid process and the actual submission of the bids, did anybody voice any objection or complaint about how much time there was between?

A    No.

Q    Did anybody express any objection or complaint about it not going to live auction?

A    No.

Q    Did you feel like they understood what the process was going to be?

A    I did.

Q    Let's go back to 24.

        THE COURT:  Mr. Wolfshohl, did you say 24?

        MR. WOLFSHOHL:  Yeah.  Twenty-four, Your Honor.

        THE COURT:  Okay.  Thank you.

        MR. WOLFSHOHL:  It's the chart.

        THE COURT:  Yes.  Okay.  Thank you.

BY MR. WOLFSHOHL:

Q    All right.  I've got to find a way to -- all right.  I want to start with the middle column on the bottom.  You see where it says winning bid cash equivalent?

A    Yes.

Q    What does it mean?  What did that mean, winning bid, cash equivalent?

A    This was just that.  If the bid were in all cash of $7 million, how would the math flow.

Q    Okay, and then if you go to the right, where it says winning bid, where it says purchase cash, what does that represent?

A    That represents the $1,750,000 that was the cash component of Global Tetrahedron's bid.

Q    So what was the purpose of these two columns?  You had one that says $7 million.  That's what you've said that you think the value of the Global Tetrahedron bid was.  And then the one on the right, you said that's what the actual cash was, that was part of their bid.

A    Correct.

Q    So what's the purpose of these two columns?

A    It's to identify the amount of the distributive proceeds waiver and the net benefit to the non-Connecticut creditors.

Q    When you say value the distributable proceeds waiver, what do you mean by that?  Are you talking about what it would be in a $7 million bid or explain that to the court.

A    Correct.  So how much of the $1,750,000 would need to be applied to the -- in this case, as it's called at this point, the gift class, to apply to the gift class, in order

to allow the -- to substantiate the purchase price at $7 million.

Q    And so let's look at that middle column and just go through the math.

A    Sure.

Q    So the middle column, you're trying to figure out what would somebody get in a $7 million cash bid.

A    Correct.

Q    Okay, and what's the second line down from $7 million?

A    The second line down is the administrative costs that the trustee had put in a holding number for that I understood to be secured creditor, admin cost fees, things of that nature.

Q    What kind of things -- well, first of all, did you calculate that?

A    The 650?

Q    Yeah.

A    No, that number was provided.

Q    Okay, and then below that where it says net purchase cash, what does that mean?

A    So that would be how much cash would be left from the $7 million bid after the administrative costs were paid.

Q    And just to be clear, we're talking about what the waterfall would be if there was a full $7 million cash bid, right?

A   Correct.

Q   And that's not what you got, right?

A   Correct.

Q   Okay.  So 6.35, you said that would be the net amount after administrative costs?

A   Correct.

Q   With a $7 million -- if it was a $7 million --

A   If it was a $7 million cash bid.  Correct.

Q   And then what is -- what are the two numbers below that?

A   So then you take that net cash and you apply each creditor group's percentage of the creditor pool.  So the Connecticut family share is showing at 96.7 percent.  So that's $6,350,000 times 96.7 percent gets you $6,140,450.

Q   Let me stop you there.  Did you come up with the 96.7 percent?

A   I did not.

Q   Who did?

A   The trustee.

Q   Okay, and then you go down, you add the two and it's again $6,350,000.  That's the same as up above where it says net purchase cash.  Is that right?

A   Correct.  Because the 209 is when you apply the 3.3 percent to the same $6,350,000.  So yes, you get your balanced at $6,350,000 again.

Q   So what is that $209,550 meant to represent?

A   That's meant to represent how much a $7 million cash bid would put into the pocket of the gift share, the non-Connecticut creditor's pocket.

Q   Okay, and then if you -- so basically if you had a $7 million cash bid, that's how much non-Connecticut creditors would get after you take admins out.

A   Correct.

Q   And if you go to the right where it says winning bid and that cash amount, what does that represent?

A   That's the actual $1,750,000 in cash that's on the Global Tetrahedron bid.

Q   And then what did you do with the next line down?

A   Deducted the same $653,000 in administrative costs.

Q   And then what is the net purchase cash in that scenario?

A   $1,100,000 would remain.

Q   Okay, and what's the purpose of the next two lines below that.

A   So if you dealt with just the cash in this scenario and you apply the same formulas, the 96.7 percent, the 3.3 percent, you'll -- that's how you get to the $1,063,700 Connecticut family share and $36,300 gift class or non-Connecticut family share.

Q   So if you don't look at the very bottom, is that just

representing what the distribution would be if all you had was the $1.75 million number?

A     That is correct.

Q     Okay, and then what did you do down below that?

A     Below that, we then restated the gift classes share of $36,300 and we determine how much waiver would be necessary, how much more cash from the Connecticut families to the gift class share was necessary in order to equal the $209,550 that they would have received from a $7 million cash bid.

Q     Okay, and so that number, that $173,250 if the claims play out to be 96.7 percent Connecticut and then 3.3 percent everyone else, is this saying that $173,250 is what Connecticut has to contribute in the distributable proceeds waiver to make it have the equivalent value of $7 million for the non-Connecticut creditors?

A     Correct.

Q     Okay, and then if you go up top, can you explain to the court what the purpose of this calculation was, just starting with the winning bid cash equivalent?

A     Sure.  Well, the winning big cash equivalent of $4,750,000, this upper section was really what Chris had referred to, the trustee had referred to as a stress test and really just wanted to suss this out by using more conservative assumption numbers.  And so using a 75 percent Connecticut family share and a 25 percent gift class share

and increasing administrative costs of 750, we ran the numbers and what it showed is that even with those numbers the winning bid cash equivalent would be $4,750,000.

Q   So just to get it straight, the bid form said $7 million.

A   Correct.

Q   You said you saw it as a $7 million dollar bid.

A   Correct.

Q   But how is it you could end up -- if these numbers shook out differently, how is it you could end up at a number lower than $7 million?

A   If the share of the creditor pool was different and if the administrative costs went up, that would bring down the value of that bid.

Q   Okay.  So the chart down below, is that meant -- is that meant to reflect what we think the -- what the trustee and you believe the status of things is today?

A   Correct.  Yes.

Q   And the purpose of the part up top, what was that? That was meant to just --

A   It was -- yeah, Chris was trying to be conservative and say, okay, let's see what happens.  If I went totally beyond what I would anticipate to be the case, is it still a higher bid?  You know, he was just trying to be mindful and cautious.

Q    So in other words, he's trying to see, okay, is what they call $7 million really worth $7 million?

A    Well, I think he established that what they called $7 million --

MR. BROOCKS:  (Indiscernible) the witness and mischaracterizes the testimony.

MR. WOLFSHOHL:  Okay.  I'll rephrase the question, Your Honor.

BY MR. WOLFSHOHL:

Q    What's it trying to say?

A    My read is that the table on the bottom establishes the $7 million bid is worth $7 million based on the creditor pool, as it's understood today.  My understanding of the one up above was simply to say that even if you push this thing as hard as one could push it, it still represents a higher bid than the alternative bid.

Q    And using this upper -- this stress test up at the top, with the 75/25 and the increased admin cost, what is the distributable proceeds waiver in that scenario?

A    $750,000.

Q    Okay, and is your interpretation that that's what would be assigned if these scenarios play out with these assumptions?

A    Correct.

Q    Okay.

THE COURT:  Can I ask a question?  What did the winning -- the entity that you designated as the winning bidder, what did they purchase?  What do you think they bought under the auction?  Which lot?

THE WITNESS:  They bought the intellectual property.

THE COURT:  Which lot?

THE WITNESS:  They bought Lot 4, but there was an adjustment out of Lot 4 is my understanding (indiscernible) --

THE COURT:  Can you explain to me -- the reason I'm asking --

THE WITNESS:  Sure.

THE COURT:  This is just a question I've been trying to figure out.

THE WITNESS:  Yeah, yeah, yeah.

THE COURT:  Is if you go to --

THE WITNESS:  If you go to the Exhibit --

THE COURT:  -- go to Exhibit 19.  I hate to go out of turn.  I just want to make sure that I'm understanding and I'm following everything carefully.

THE WITNESS:  Sure.  Which tab?

THE COURT:  Your Exhibit 19, on the bottom of it says that our final bid should be valued of cash consideration for the Group 5 assets.

THE WITNESS:  Well --

THE COURT:  Hold on.  Let me just finish.  So while the Group 5 assets, they're willing to do four on the same terms.  But the best and final was that this final does not allocate any value not included in Group 5.  So if -- and I see Group 5, and I want to make sure I've got this right, as just Lots 1A and B and Lots 1A and B are production equipment.

THE WITNESS:  No.  1A and 2B.

THE COURT:  1A.  I'm looking at Group 1A and 2B.  Right.

THE WITNESS:  Yeah.

THE COURT:  E-commerce, IP without inventory.

THE WITNESS:  So --

THE COURT:  Whatever that means.  And that's -- I'm sure it has a definition.  But they bought Lot 5?

THE WITNESS:  Well, no, they bought Lot 4.

THE COURT:  Well, tell me how you get to buying Lot 4 when this says that we're putting all the value on five, but they're willing to do four.  How did you evaluate that on a best and final?

THE WITNESS:  Because it was still -- their bid didn't change.  Right.  So it's still $7 million whether they bought 4 or 5.

THE COURT:  But they said they're willing to buy

5, but not 4.  So how did you -- how did you determine -- they're saying our value is $7 million for 5, but they're willing to do 4.  But did anyone inquire whether they did agree to do 4?

THE WITNESS:  Yes.

THE COURT:  Maybe I'm just missing it.

THE WITNESS:  So the way I read it and the way I think we all interpreted it was they're willing to buy Group 4 as long as they don't have to apply any more value.  So that same --

THE COURT:  But how do you tell them what they're buying?  Are they buying five or four?  So in other words, they're applying value to five.  But they're willing to do four.  But this makes it -- right, that they're not putting $14 million on the table.

THE WITNESS:  They still -- no, but they -- right.  These weren't one and the other.  They were one or the other.

THE COURT:  Right, but that's what I'm saying.  So this is -- maybe I'm just the one that's confused here, and I'm more than happy to be confused, but this reads to me we should total cash consideration for the Group 5 assets, while this final bid focuses on the five assets.  So that they're admitting that the final bid is on the five, they're willing to acquire the four on the same terms.  Right?

THE WITNESS:  They're basically saying if they don't have to pay any more, they would.

THE COURT:  So then, but then who makes the call about who gets four or five?

THE WITNESS:  So --

THE COURT:  Don't they get the call?

THE WITNESS:  Well, we made the call on the basis that --

THE COURT:  But how do you make the call if they're saying it's five or four?  Who makes the decision about four or five without consulting with them?  The reason I'm asking is that I'm just a little confused about what was purchased because -- and I want to make sure that I am clear that there's agreement that when the winning bid was submitted, that everybody agreed that it was four.  I don't know if Mr. Murray had a conversation (indiscernible) I don't understand how we do a best and final.  So the best and final says, I'm willing to do this, but that ain't best and final, right?  Based upon his definition of best and final, best and final means you put your best foot forward.  Best foot forward means you pick one and you ride the horse.  That was the definition that was provided.  So then, so then, so then what?

THE WITNESS:  May I clarify, Your Honor?

THE COURT:  Yeah.

THE WITNESS:  Okay.  The way that we set this up, if you look at -- if you look, for instance, at the beginning bid submitted by --

THE COURT:  I just want you to tell me what they did.

THE WITNESS:  Well, I guess what I'm trying to point out to you is that these are -- these were bidding scenarios.  Right?  The way we represented it, it was they were allowed to bid on multiple lots on the basis that we would pick which one they were the highest and best at.  So they were giving us the latitude.

THE COURT:  Where's the definition say that?

THE WITNESS:  So we say, note, bids for each package below are noncontingent on winning any other bids.  You may bid on multiple packages.  We will consider your highest and best package option when evaluating bids, which was the conversation that I had with each bidder.

MR. WOLFSHOHL:  Your Honor, may I ask a question to help clarify possibly?

THE COURT:  Yeah.  And I'm not trying to be difficult here.  I'm just trying to make sure that I understand because I had always understood that they bought five, and now I'm learning that they bought four.  And I was just trying to make sure that I understood the difference because I read the letter.

MR. WOLFSHOHL:  And Your Honor, I know you know this, but I want to make sure that the record's clear. We're referring to things as though they were bought, and nothing (indiscernible) --

THE COURT:  Nothing has been bought.  I'm talking about their bid.  I should -- you know, you're right.  I should be a lot more -- I thought the winning bid was for Group 5, which was Lots 1A and 2B, because that's what the letter seemed to indicate to me.  The reason I was asking is I was considering the whole X objection.  And I didn't understand why we were even having a discussion because no one bid on X other than Mr. Cicack's group.  And so I just thought -- I didn't know what resolution there could be with this bidder because they weren't buying any of it because I thought they were just buying Lots 1A and 2B.  And maybe that means e-commerce, I've just learned.  So maybe.  But I thought domain names was something different.  That's where I'm going.  I thought three and four were different than 1A and 2B.

THE WITNESS:  Well, if it helps you out any, the X account is in 1A and 2B.  The X accounts are not under the domain names.  The X accounts are actually in --

THE COURT:  Were they in the original bid under three?

THE WITNESS:  They were at 1A, not in three.

THE COURT:  They were never in a contested?

THE WITNESS:  X were never, no.

THE COURT:  Wow, okay.

THE WITNESS:  Yeah.  We never put the X account under (indiscernible) --

THE COURT:  Got it.  That's helpful.  That's helpful.  Thank you.  That clarified it for me.  Thank you.

THE WITNESS:  You're welcome.

THE COURT:  Maybe that's the question I should have started with.

MR. WOLFSHOHL:  May I proceed, Your Honor?

THE COURT:  Mm-hmm.

BY MR. WOLFSHOHL:

Q   Can you go back -- so let's start with the bottom chart.  Sorry, go back to the bottom chart.

A   Yes.

Q   After I think we went through the sort of analysis of the winning bid, what did you then do in terms of comparing it with the backup bid?

A   We looked at the cash equivalent.  We looked at the $7 million number and compared that with the $3.5 million number.

Q   Okay, and if you look at that on the far left, you've got -- you start with the purchase price, right?

A   Mm-hmm.

Q    What's that amount?

A    Correct.  We looked at the purchase price.  So at this point -- yeah, either one.  Because the way we got to the $7 million, either way, the gross number was higher.  But also key was that the gift class was higher.  The payout to the creditors was higher.

Q    In comparing the FUAC bid to --

A    The backup bid.

Q    I'm sorry.  FUAC is the backup, the backup bid to the winning bid?  Is that what you're saying?

A    Yes.

Q    And then if you go up top, did you do the same exercise?

A    Yes.

Q    Okay, and what's that?

A    Same story.  In both cases, both the cash value of the bid is higher for the Global Tetrahedron, the winning bid versus the backup bid, and the net benefit to the creditors is higher under the winning bid than it is under the backup bidder.

Q    And did you personally speak with Global Tetrahedron after the final bid submission?

A    I did not.

Q    Okay.  What about to the Connecticut families or anybody on their behalf?

A    No.  Nobody.

Q    Have you ever talked to anybody from the Connecticut families?

A    I have not.

Q    Okay.  Tell me -- and why did you -- why did -- or first of all, do you support the trustees designation of the Global Tetrahedron and Connecticut families' bid as the highest and best bid?

A    I do.

Q    Why?

A    Because it provides the highest net benefit to the creditors.

Q    Do you care who wins this bid?

A    I have no care or concern whatsoever.

Q    I shouldn't say -- let me ask that a better way.  Do you care who is designated as the successful bidder?

A    And that's what I mean.  It doesn't matter to me who the successful bidder is from this sale.  I support our process, but I do not care who the bidder is.

Q    Do you care about the process?

A    I care passionately about the process.

Q    Do you believe that the process that you employed created value?

A    Absolutely.

Q    And how's that?

A    For one, if you look at the original bids and you look at the final bids, you'll see a $1.2 million bid became a $3.5 million bid, and a $1 million bid, with some ambiguity in terms of a distributable proceeds waiver, became a $1.75 million bid with a specified distributable proceeds waiver making it a $7 million bid.  So we accomplished exactly what we wanted, is we got the two parties to put their highest and best foot forward.  And whether that ended up being, you know, a $3 million Global Tetrahedron bid and a $3.5 million and it went to FUAC, that would have been fine, but it went the other way.  And so that's what I support.

MR. WOLFSHOHL:  One minute, Your Honor, please.

THE COURT:  Absolutely.

MR. WOLFSHOHL:  I'll pass the witness, Your Honor.

THE COURT:  Let me just ask if there's anyone who supports the relief requested has any questions for this witness before I turn to --

MR. KIMPLER:  Not us, Your Honor.

THE COURT:  Okay.  Thank you.  Then let's start with cross.  We should probably -- let me take back the presenter role just for one moment.

MR. BROOCKS:  Your Honor, I am going to use the ELMO.  Do I -- I don't know who I --

THE COURT:  Well, that makes two of us.

Zilde, they're going to use the --

MR. BROOCKS:  I wanted to orient it where I put it down here.  How do I change the orientation here?  Does anybody know?  Because that'll be really confusing to me.

THE COURT:  Why don't we just take a -- I'll take a one-minute break and you all can -- we can just -- I'll just come back.

Zilde, just let me -- shoot me a text when we're ready.  Thank you.

CLERK:  All rise.

(Recess)

CLERK:  All rise.

THE COURT:  Okay.  We're back on the record in the Jones case.

Mr. Broocks, you may proceed whenever you are ready.

CROSS-EXAMINATION OF JEFF TANENBAUM

BY MR. BROOCKS:

Q   Okay.  So Mr. Tanenbaum, let me get straight on some dates for myself.  And I've got on the screen here -- can you see your screen?  This is November.  Now I want to orient us to, if I can, to the timeframe.  So the 11th of November, which is a Monday, was the date that you received the first initial bids from Global Tetrahedron and First United?

A   No, that was November 8.

Q    I'm sorry.  I said the 11th.  I meant the 8th.  That would have been the -- you're exactly right.  That's Friday, the 8th.  All right.  Now, then you received the final, best and final offer from both those groups on the 13th?

A    Correct.  Yeah.

Q    Okay.  Now, I believe I heard you say that you received Exhibit 17, which was their -- according to (indiscernible) Exhibit 17, which Global Tetrahedron's initial bid on the 8th.  That's a Friday.  And you saw in here the concept of the distributable proceeds waiver.

A    Yes.

Q    And you understood that the way that the offer was worded, it was, you know, million bucks plus $1 over whatever anybody else might have offered at the highest.  In other words, if somebody offered, you know, 1.2, then they would -- Global Tetrahedron said, we'll go $1 more than that.

A    I understood that concept.  Yeah.

Q    Okay, and you understood the concept, but you did not understand what a distributable proceeds waiver was, did you?

A    No.

Q    I just lost my -- in fact, you told the court that you've been through lots and lots and lots of auctions and proceeds, but you've never heard that term before --

A    Correct.

Q    -- for this process.

A    Correct.

Q    All right.  Now I believe you also said that that Friday your team convened a meeting, meaning you, the trustee, Mr. Wolfshohl.  Other people said, what the heck is a distributable proceeds waiver?

A    Correct.

Q    Okay.  Did anybody know?

A    Yeah.

Q    So who had experience with that before?

A    Well, I don't know who had experience, but I was explained what it was.

Q    Who explained it to you?

A    I think Michael Dearman probably was -- Michael or Josh, I don't remember which of the two.  But the counsel for the trustee.

Q    Now you knew the trustee had never heard the term before either.  You knew that, didn't you?

A    I didn't know whether he had ever heard it before.

Q    I'm telling you something you've heard -- you're hearing for the first time?

A    Whether or not he ever heard it before?  No, but in that call, I didn't know if he had heard it before.  I just know that it was explained to me.  He had never made the

statement, I've never heard of it.

Q   Okay.  But you now know that he'd never heard --

A   I've now heard that said from him.  Yes.

Q   Now, so now you -- I believe you said you then had a series of one or more phone calls with Grand (sic) Tetrahedron about this very concept, didn't you?

A   No.

Q   When did you -- you talked to Global Tetrahedron in the week between November the 8th and November the 13th about the distributable proceeds waiver, didn't you?

A   I talked to them, yes, about -- on their new bid.  Correct.

Q   You talked to them about the distributable proceeds waiver.

A   Correct.

Q   Yeah, and you told them that you would not accept any contingent moving up and down bid on their part, right?  You told them that very specifically, didn't you?

A   Those weren't the words I used.

Q   I'm not asking for the words.  The concept of what you conveyed to them was --

A   You just gave me words.  So I'll answer --

Q   Let me rephrase my question, and I don't want (indiscernible) --

THE COURT:  Hold on a second, folks.  Let's just

take one question at a time and one answer at a time.

Go ahead, Mr. Broocks.  Go ahead and ask your questions.

BY MR. BROOCKS:

Q    I don't want to argue.  I want to ask my questions and have you answer them.  If I'm unclear, I'll repeat it.  Did you or did you not between the 8th and the 13th talk to the Global Tetrahedron people about the distributable proceeds waiver, the fact that that would not work, where you had a ratcheting up number, number like $1, $100,000?  Did you talk about that subject to them -- with them?

A    Not the way you've just described it.

Q    Did you -- you're going to want to answer in your own way and I'm going to want you to answer in my way.  So listen, I'm going to try to get it right (indiscernible) --

A    If the words aren't right, I'm not going to (indiscernible) --

Q    You told them --

THE COURT:  Hold on a second.  You only answer the question.  So let's go ahead and ask a question.

BY MR. BROOCKS:

Q    You told them that you would not accept on behalf of the trustee any offer or bid that was tied in any way to what somebody else did.  You told them that expressly, did you not?

A     No.

Q     You're the agent of the trustee, aren't you?

A     Yes.

Q     You explained to them in between November 8th and the 13th in a phone conversation that the mechanics of their original bid that had this bid trigger, that you would not consider that, didn't you?  You told them that, didn't you?

A     I told them that I would not consider a bid trigger that would increase their bid over a higher bid.

Q     And when you read their initial bid with their language that said we want to be $1 higher than the creditor preceding bid, you told them that you would not accept that, didn't you?

A     No, I did not tell them that.

Q     You told them what we cannot do, what we will not consider are calculations that you provide us that have a mechanism that says, hey, if another bidder's higher than we will (indiscernible) you told them you would not consider that, didn't you?

A     I told them I would not consider that on the next bid. Correct.

Q     How's that different than what I said?

A     It is -- do you want me to explain (indiscernible) --

Q     I'm asking you to explain now.  How is that different than what I said, sir?

A     A bid, if a bid is lower and their bid is higher and they're saying they want to be just a bid over, that is a different thing than if somebody comes in with a higher bid than theirs and they're expecting their bid to be triggered to become a higher beating bid.  So there is a difference between the two.

Q     Well, so you told Global Tetrahedron when you got their first initial bid, we will not consider it a bid from you, Global Tetrahedron, that tries to put $1 or $100,000 over what somebody else did.  You told them that very clearly.

A     No.  I did not tell them that after they submitted the first bid.  I told them that in a discussion about how to submit the second bid.

Q     But that occurred after the first bid, didn't it?

A     It did.

Q     Okay.  Okay.  So sometime after the first bid, you had a telephone conversation and you said, hey, guys, your mechanism of topping somebody else ain't going to work.  We're not going to consider it.

A     We're not going to consider it.

Q     Yeah.  Now you got the bid from them, the final bid after the first bid, you actually got that from them and it contained a topping mechanism.  Just instead of it wasn't $1, it was $100,000, wasn't it?

A     Again, it didn't have the mechanism that I told them I

wouldn't consider.

Q   It did not?

A   No.

Q   Now let's take a look at the exhibit, their final bid. We looked at the first briefly, and I'm going to come back to it.  But their final bid, Exhibit 18.  No, I'm sorry, it's 19.

THE COURT:  Mr. Broocks, are you referring to the binder that we've been looking at?

MR. BROOCKS:  Yes, it's the defendant's exhibits.

THE COURT:  Okay.  I just wanted to make sure. Thank you.

THE WITNESS:  I'm sorry.  You're pulling up an exhibit that I already have.

THE COURT:  Yeah.

BY MR. BROOCKS:

Q   Now take a look.  Do you have the hard copies there?

A   Yes.

Q   Take a look at Exhibit 19, and I believe you identified that as the Global Tetrahedron "final bid".

A   Yes.

Q   Okay.  Now I just walk you through this and I believe -- and I'm going to go back to some of this.  You said that you believe, I believe you testified that you saw this where it says not less than $7 million.

A    Correct.

Q    And then you saw over here increased consideration of at least $7 million, right?

A    Correct.

Q    And then you say you saw over $7 million.  I believe you testified you saw that.

A    Yep.

Q    And then I think that you said -- I was talking -- you talking with Mr. Wolfshohl about the distributable proceeds waiver?

A    Yes.

Q    Right, and you understood that they had the concept in here, the same one they had before, except this time it had a $100,000 cap or increase instead of the $1 they had in their initial.  You saw that, too, did you?

A    I did.

Q    And that's the identical concept they had in their first bid, isn't it?  Except it just increased.

A    The concept.  Yes.

Q    Okay, and that's the very concept you say you told them you would not consider.  Is that right?

A    No.  What I told them, he said, I would not consider a bid that put their bid higher than a bid that was higher than theirs.  So in other words, if FUAC's bid was $8 million, we would not take and turn their $7 million into a

bid that topped their $8 million.  We would not do that.
That is what we would not do.

Q    If FUAC bid $3.5 million, does this provision -- did
you read it to say that they would go to $3.6 million?

A    No.  I read it to say that they bid $7 million.

Q    How did you understand this paragraph, this
distributable proceeds waiver, as you've got it here?

A    I understood it as a $7 million bid, that they were
bidding $7 million, but they were asking to be placed just
above a bid that was lower than them so that they didn't
have to bid more, any more than they would have needed to
just to beat that bid.

Q    So Global -- if First United bid $3.5 million, what did
you understand, if anything, to be the effect of their
provision of the distributable proceeds waiver as you see in
this letter?

A    Again, the proceeds -- the distributed proceeds waiver,
I consider separate.  That's how you calculate what money
moves from here to there.

Q    You're right.

A    Where the bid gets positioned was a mechanism they
added there.  And I didn't regard it.  And the reason I
didn't regard it --

Q    I'm not asking what you regarded.  I said how did you
understand it to read.

A    I understood it to read that they were saying, here's our bid of $7 million, but if somebody comes in lower than us, I want our bid to be just above it by $100,000.

Q    Isn't that the very thing you said we won't consider?

A    No.

Q    You didn't tell them that?

A    I understand you're not following me, and I'm happy to explain it again.

Q    Did you tell them that you would not accept a bid that was tied in any way to what somebody else bid, sir?  It's real simple, a yes or no.

A    No, that's not what I said.  That's --

Q    I'm asking you is that true or false.

A    It is false.

Q    Okay.

        MR. WOLFSHOHL:  Your Honor, I'd ask that the witness be allowed to finish his answer.

        THE COURT:  Yeah, I think that --

        THE WITNESS:  He's making speeches.

        THE COURT:  No.  I think he gets to answer the question and then you get to ask another one.  I agree.

BY MR. BROOCKS:

Q    All right.  Now, I want to read this with you.  Now, the distributable proceeds waiver portion says as part of the -- first of all, you understood that it was a $1.75

million cash bid?

A    Correct.  Yes.

Q    First United bid $3.5 million cash simple.

A    Yes.

Q    Okay, and you agree with me, 3.5 is higher than 1.7?

A    In mathematic sense, yes.

Q    Okay.  As part of this final bid, the Connecticut families commit to forego up to 100 percent of their entitlement to the 1.75.  What did that mean to you?

A    That means that they're willing to move up to 100 percent of $1,750,000 from themselves to the non-Connecticut creditors.

Q    You read forgoing 100 -- up to 100 percent of their entitlement to the 1.75 to mean that they would do what?

A    That they would distribute -- that they would authorize a distribution of that money from their creditor pool to the other creditor pool.

Q    So they're saying here, as I understand you, that they would take whatever they would get from the 1.75 and forego some portion of it in favor of other people.

A    Correct.

Q    All right.  Now, so that the amounts can be distributed to the other unsecured creditors.  Who was that going to be?

A    The non-Connecticut creditors.

Q    How many was that going to be?

A    How many?

Q    Yes.

A    I don't know.

Q    Did you have any concept of how many that might be at the time?

A    I did not.

Q    Did you have any understanding as to whether there was any agreement on behalf of the other creditors to accept more money?

A    No.

Q    Do you know what the tax consequences of that would have been to the other creditors?

A    No.  Not within my purview.  I made my recommendations to the trustee.  But those are not pieces of information I was aware of.

Q    Now what did you -- it says as a result as set forth below, this final bid is better for the unsecured creditors of FSS even when compared to other qualified bids that offer up to $7 million of cash.  What did you understand that to mean?

A    Well, I understood that it means that the bid was better even up to a bidder of $7 million.

Q    So what was the purpose of the chart as you understood it that they've got here in this thing?

A    They've got here to illustrate the scenarios so we

could understand how the distributable proceeds waiver worked.

Q    Well, explain to us now how the -- at a $2 million level, how did you understand this chart to work?  What were they telling you?

A    They were telling us that they were using their calculations of 25/75 to take a portion of their bid and apply it to the non-Connecticut creditors and give it increased value based on that 25/75 percent conservative calculation they provided.

Q    Well, if they were bidding $7 million, why did they need to do that?  Why did they need to show a $2 million valuation if they were bidding $7 million?

A    I don't know.  There was more information here than we needed.

Q    Why were they doing it, in your estimation?

A    To illustrate, to try to make an illustration, to show us where their -- how their bid calculates out so that we could understand what it is that they were trying to do.

Q    I'm going to ask you one more time and maybe then I'll move on.

A    Sure.

Q    If they bid a flat $7 million, what difference would it make if somebody else bid two?

A    The distributable proceeds waiver would have -- would

make no sense if they bid seven, flat $7 million.  I don't -- I'm not sure I understand the question.

Q    I'm going to try a third time.

A    Yeah.

Q    If they bid a flat seven, as you've just testified, why would it matter what another creditor -- why would it matter if another creditor bid two or three or four?

A    Because they didn't bid a flat seven.  They bid a seven that included a distributable proceeds waiver.  And they needed to illustrate how that turns into $7 million, how a 1.75 cash combined with a waiver equals $7 million.

Q    Show us how in a $2 million bid by First United, how that would affect the $7 million value bid by Global Tetrahedron.  Looking at the $2 million, how would that work?

A    Again, look, we illustrated the numbers using numbers that I can make sense out of.  They were using 75/25 percent.  I don't have a calculator, a spreadsheet to plug in their numbers.  They were illustrating it one way.  We used the numbers and validated them using the calculations that the trustee had at his disposal, which used and had other information they didn't have here.  They didn't have the information as to what the costs or administrative fees were.  We had to plug those in to make sure we could validate that was truly worth $7 million.

Q    Well, can we at least agree that if the Global Tetrahedron people bid $7 million flat fee, as you say, that it would be a little bit superfluous to put in charts showing what somebody -- what the effects of the transactions might be at $2, $3, $5 and $7 million, those increments?  Would you agree with what?

A    If it was a flat bid, correct.  I agree.

Q    So t's inconsistent for them to have included this from a flat fee again?

A    If it was all 100 percent cash bid, correct.

Q    And you never questioned anybody about, well, why are you giving us this term?  Did you ask anybody about that from the Global Tetrahedron side?

A    Again, it did have a distributable proceeds waiver.

Q    Did you ask anybody?

A    No, we didn't.  I didn't.  I didn't have further conversation.

Q    Now, the chart says, as illustrated above, to the extent that a third party submits an alternate qualified bid for the same assets that consists of cash consideration and a higher amount than the purchase price set forth herein. How could a $2 million purchase price, two, three or five, be higher than seven?

A    Again, I'm not clear on your question.

Q    How could a $2, $3 or $5 million offer from another

bidder, how could that top a $7 million bid?  As they say, to the extent a third party submits an alternative qualified bid for the same assets that consist of cash consideration in a higher amount than the purchase price.  If the purchase price was seven, how could something at two, three or five be higher?

A    They were showing scenarios where, even at a lower amount, they still beat an alternative bid based on using their waiver concept.

Q    But when they say, as illustrated above, that's referring to the chart, isn't it?

A    Yeah.

Q    Right.  That's what you understood?

A    They're still -- they're still beating the -- they're showing they're still beating the price.  It's still a better price.

Q    Well, except -- well, in your way of thinking, $7 million is always better than seven, isn't it?

A    I took the $7 million.

Q    Is $7 million always better than two?

A    I did not look at the other -- at the other criteria.

MR. WOLFSHOHL:  Objection, Your Honor (indiscernible) --

THE COURT:  I agree.  Folks, we're talking over each other and apologize.

MR. BROOCKS:  I apologize, Your Honor.

THE COURT:  Let's just start with a fresh new question.

BY MR. BROOCKS:

Q    Isn't $7 million higher than two?

A    Yeah.

Q    Now, the Connecticut families shall effectuate a distributable proceeds waiver as defined in their initial bid.  So they're taking us back to the initial bid, right, in this letter?

A    The distributable proceeds waiver portion of it, which we all understand has nothing to do with other mechanisms other than the moving of cash from the Connecticut creditors to the non-Connecticut creditors.  That concept has not changed.

Q    And shall forego receipt of the distributable proceeds waiver amount, which shall be assigned to the Chapter 7 trustee for the benefit of unsecured creditors.  Distributable waivers proceeds amount is revised under this bid so that it equals an amount necessary for other unsecured creditors of FSS to recover $100,000 more than the initial bid.  Did I read that correct?

A    Yes.

THE COURT:  Mr. Broocks, can I get you to just either get close to a mic or just turn both mics to you?  I

just want to make sure that we have a good, clean record and that we can hear you just fine.

MR. BROOCKS:  How about this?  I can talk like this.

THE COURT:  Not necessary.

MR. BROOCKS:  Okay.

THE COURT:  Just get one close to you.  Yeah, I think we'll -- I think we'll -- it'll get you good.

BY MR. BROOCKS:

Q   Okay.  Now if the purchase price was $7 million, when would this kick in?  When did you think it would kick in, this concept here that I've got in green.

A   Do you want me to explain it my words?

Q   I asked you a question.  When would it kick in?

A   If they -- it would kick in on the basis -- they were asking for it to kick in to lower their $7 million bid to be just high enough over the existing -- the next highest bid.

Q   So in your estimate, your understanding, they weren't using this to increase their bid, they were using it to decrease their $7 million.

A   The way the bid came out, absolutely.

Q   Read me the language that you say this lowers the $7 million.  What language are you focusing on for me?

A   Well, it's the distributable proceeds waiver revised on this final bid (indiscernible) show equal amount necessary

for other unsecured creditors of FSS to recover $100,000 more in the amount set forth in the initial bid.  They've got a $7 million bid.  They're saying, but we want it to be $100,000 more than the next highest bid.

Q    Okay.  Well, we can all read the language and I appreciate your explanation.  Now let me ask you this.  Was it important that the Connecticut plaintiffs were foregoing money or that other creditors were getting money?  Which was the determinative factor here on this distributable proceeds waiver that gave it value?

A    The fact that the non-Connecticut creditors were receiving more value.

Q    So it didn't matter where the money came from as long as the somebody else got more money than they would have. Is that what you're saying?

A    That is my understanding that is the value to the estate and the way that the trustee determined that that would have higher and better value to the estate.

Q    Now, when you say to the estate, you're talking about all the creditors, right?

A    To the creditors.

Q    All the creditors as a group?

A    Whatever the trustee determined was the group that's entitled to benefit, that they benefit more from this scenario than they would have benefited from the other

scenario.

Q    Well, that's I guess what I'm trying to differentiate is the estate itself versus individual creditors.  You were looking at value from the estate itself, not among individual creditors.  Is that true?

A    You're getting into areas that are beyond my purview in terms of determining what the legal parameters are of the creditor pool.

Q    Fair enough.

A    That's not my -- yeah.

Q    Fair enough.  but I'm asking you your opinion.  You've voiced a lot of opinions.  I'm asking you to give me one now.  Was your understanding that the goal was to maximize the value for the estate or individual creditors that comprise the estate?

          MS. ROBINSON:  Your Honor, we object.  It's been asked and answered and also calls for a legal conclusion.

          MR. BROOCKS:  I don't think it's been answered and I don't think it's a legal conclusion (indiscernible) --

          THE COURT:  I'm just going to take it for what he understood the purpose of the auction was and his role in the auction, not necessarily the legal requirements that are required or just kind of as an auctioneer.  What did you understand the purpose of the auction?

          THE WITNESS:  Sure.  As an auctioneer, my

understanding and my responsibility is to help to generate as much money possible for the parties that are owed money in a bankruptcy.

BY MR. BROOCKS:

Q   Again, and my question simply is, did you understand that to be the estate or individual creditors that comprise the estate?  What was your understanding?

A   Again, I don't -- to whoever -- to the creditors.  To the creditors.  I mean --

Q   As a group?

A   As a group.  Yeah.

Q   Now when you -- now how does -- in your thinking does $1.75 million distributed to creditors, if one person in the Connecticut plaintiffs agrees to forego something, how does that mean that the purchase price has gone up or does it?

A   It means the purchase price value has gone up because another purchase price would have to be higher than that value in order to provide the same net benefit to that group of creditors.

Q   Okay.  Well, maybe this.  Maybe we can agree then that you would agree with me that notwithstanding the inner creditor machinations, the purchase price paid to the estate of the trustee never changed.  $1.75 million cash, right?

A   The cash amount didn't change, just the value of it.

Q   Okay.  Would you say the value of it, you mean -- okay,

now how did you value one group of creditors foregoing
participation in relation to others?  How did you reach a
fair market value of that foregoing or did you?

A    I, with the trustee, we went through and applied the
percentage variance between one group of creditors and the
other group of creditors.

Q    Oh, okay.  We'll come back to that.  But I want to make
sure I'm clear on that.  But you did decide that not just
that the purchase -- you agreed the purchase price didn't
change cash, but the value of that as you assessed it went
up.  That's what you're saying.

A    Correct.

Q    Okay.  Now we saw on the first page of the Global
Tetrahedron's final bid that they say not less than $7
million.  See that there?

A    Yes.

Q    That means more, not less.  Does that mean it could be
higher than that?

A    They placed that on there.  But I wasn't going to give
that any more credence than the $7 million.

Q    So you did -- when it says not less than $7 million,
you just decided to kind of strike through that.  That
didn't mean anything to you or --

A    Well, because that comes back to your language before
that if they wanted their bid to go higher than somebody

else, we wouldn't do that.  They gave us a $7 million bid. That's what we were giving their value to.

Q    And the reason you tell His Honor that they gave you a $7 million bid is because of this number right there.  That $7 million on that first page.  That's what you base that on, right?

A    That, combined with the fact that my conversation that I had with Global Tetrahedron, with Ben Collins was that we are going to value your number based on the number on the bid form.

Q    Okay.  So that's my question.  The number that we see, that His Honor sees right there, that number, nothing in the contents of the letter, but that number right there on the bid form, that first page, that is why you derived a $7 million value for their offer, right?

A    Correct.

Q    Now you saw, as Mr. Wolfshohl pointed out, it references the accompanying final bid letter.  You saw that, didn't you?

A    Mm-hmm.

Q    Did you understand that to mean that the final bid letter that we just looked at was incorporated into the bid? Did you understand it to be that?

A    I understood as an explanation letter trying to explain the basis of their bid.

Q    But you understood they were to be read together?

A    Yes.

Q    Now I believe we said that a minute ago that you had the bid from the Global Tetrahedron initially on November the 8th, Friday, right?

A    Yes.

Q    Let me see if I can pull that back up.  Now, prior to Friday the 8th, you had no understanding at all that the Connecticut plaintiffs were in any way, shape or form involved with Global Tetrahedron?

A    Correct.

Q    The first time you had any inkling that they would have any role at all was when you got this initial bid letter?

A    Correct.

Q    They had not signed -- the Connecticut plaintiffs hadn't signed a NDA, had they?

A    No.

Q    They hadn't visited the data room, had they?

A    They hadn't visited, I'm sorry?

Q    The data room, the online data room.

A    Yeah.  Correct.  Correct.

Q    Did you express any confusion or concern with the trustee or your team, wait, who's this -- what's the Connecticut plaintiffs, what's their role in this?  Having just dealt with Global Tetrahedron prior to that, did you

express any concern or reservation at all?

A    Not reservation, but discussion because it tied with the distributable proceeds waiver.  So had to understand the whole issue.

Q    But did you ask where did they come from?  What are they doing in this, to your team?

A    Once I understood the distributable proceeds waiver, there was no further need for question as long as they were (indiscernible) --

Q    I'll ask my question again.

A    Yeah.

Q    Did you ask anybody what are they doing here, to your team?

A    No.

Q    You didn't ask that?

A    No.

Q    Okay.  Now, I believe you testified with Mr. Wolfshohl that this portion that they have in here about future revenues.  Let me pull that back up.  You saw that where they say future revenues, Global Tetrahedron shall pay a portion of future revenues derived from the acquired assets to the Connecticut families and the Texas families on a pro rata basis by the allowed amount of their claims.  You saw that?

A    Yeah.

Q    What did you understand the inclusion of this was for?

A    Again, just a bidder trying to add more value to their bid.

Q    Did you ascribe any value to this provision?

A    I did not.

Q    Why not?

A    Because it seemed speculative and there was no basis for the value.

Q    Have you seen any documentation between the Connecticut families or the Texas families that discuss this?

A    No.

Q    So if I understand you correctly, the Connecticut families in this letter are going to be giving -- not really families, it's plaintiffs because it includes an FBI agent in there, right?  So it's not really families, it's plaintiffs.  But the plaintiffs --

MS. ROBINSON:  Object.  That's not relevant.

MR. BROOCKS:  It's accurate.

THE COURT:  I didn't hear the --

MR. BROOCKS:  The Connecticut plaintiffs, I --

THE COURT:  No, no, no.  I just didn't hear the question, and I know you said --

MR. BROOCKS:  I said corrected myself.  I said families.  And I said, no, it's the plaintiffs because you have an FBI agent in the midst.  So I'm going to call them

the Connecticut plaintiffs.  That's all I said.

THE COURT:  Yeah.  I'll strike that.  Go ahead and ask another question.

BY MR. BROOCKS:

Q    Okay.  So as to the Connecticut parties, how about that?  You didn't have any understanding or privy -- you weren't privy to any of the agreements between them and the Texas plaintiffs, were you?

A    I was not.

Q    Okay.  Now, do you know what discussions may have taken place between the Texas -- not contracts, just discussions between the Texas and the Connecticut plaintiffs about the assignment of proceeds or the future revenues here?

A    I do not.

Q    Do you have any reason to know one way or the other whether or not the Connecticut plaintiffs were going to make up what they gave to the Texas plaintiffs in this everything (indiscernible) --

A    I do not.

Q    You don't know?

A    Nope.

Q    Who would know that?

A    I don't know.

Q    You didn't ask?

A    No, I did not.

Q    Well, let me ask you this.  Would it cause you any problem as an auctioneer if the Connecticut plaintiffs were going to forego in favor of the Texas plaintiffs their distributable portions of the 1.75, but make it up from the operations of the assets.  Would that cause you problems?

A    That's not a --

MR. WOLFSHOHL:  Objection, relevance.

THE WITNESS:  Yeah.

MR. WOLFSHOHL:  Assumes facts not in evidence.

THE COURT:  I'll overrule.  I think it's here. And he's been testifying.  The question is, as an auctioneer.  I'm just taking it as at face value.

THE WITNESS:  That's fine.  I mean, as an auctioneer, what my role is, is to evaluate what is deemed a higher value and to determine what's a higher value in a case like this that involves the kind of things you're discussing, I need to defer to my client, the trustee, who has the knowledge about that.  And I refer and rely on that and help give my guidance as to what represents a higher and better value based on the facts that I'm given.  But it's those arenas that you're discussing are beyond my purview.

BY MR. BROOCKS:

Q    Well, and I know you're not a lawyer.  But I'm just going to ask it one more time and we'll move on.  Would it have caused you a problem as an auctioneer if the

Connecticut plaintiffs had reached an agreement that they would forego their portion of the 1.75 with the understanding they were going to make it up in the future revenues portion?  Would that have caused you any problem?

A    I don't know.  I would need to understand more about that.

Q    Okay.  Now, you made it very clear to the Global Tetrahedral people that the final offer that they gave was supposed to be a highest and best offer.

A    Correct.

Q    And it had to be a specific number.  You wanted a number, didn't you?

A    Yes.

Q    You didn't want a range.

A    Correct.

Q    And you told them you wouldn't accept a bid that had arrange it, didn't you?

A    I just told them I specifically wanted a number.  I never said anything about a range in my conversation with him.

Q    You don't remember telling them that you would not accept anything other than a number?  You wouldn't accept, for example, a range?

A    I never used the word range on my conversation with Global Tetrahedron.

Q    Let's take a look at Exhibit 27.

A    Sure.

Q    Let me close some of these out real quick so I don't -- okay.  Now, 27, I believe you testified -- well, you tell me.  That was a notification you sent on the 12th to I believe you said you blind copied to all the Global Tetrahedron and First United.

A    Correct.

Q    All right.  And you submitted -- you gave to them the IP assets auction bid instructions.

A    Yes.

Q    All right, and now tell me again why you sent this out on the 12th, the day before.  So you're sending it out at, I believe the time was 2:38 p.m. ahead of a 10:30 next day auction.  Why did you do that?

A    Because we were responding to requests from the bidders to add a couple of groups to the form.  They already had the instructions and the process had been spoken to it about the day prior.  This was simply an edit to give them more flexibility on what they bid on.

Q    Okay, and you said very clearly this will be a final call for the highest and best bid, right?

A    Correct.

Q    Okay, and you said in here, in your auction, your thing, that you would not consider any bids that include

components of consideration apart from the cash amounts. I'm sorry, consistent with the wind-down order, any bids that include components of consideration apart from the cash purchase amounts, should quantify the amounts of such consideration in specific dollar amounts with as much specificity as possible and avoiding any references to formulas or other contingencies, right?

A    Correct.

Q    So that's essentially consistent with what you just told us, that you were not going to consider any moving up and down, ratcheting up and down offer.  You wanted a number, right?

A    That doesn't say that there's no room for that.  Now, were we only going to accept highest and best?  Yes, we were going to only accept highest and best.

Q    But I'm sorry, your words that -- you drafted this, I think you said, right?

A    I drafted this with the attorneys.  Yes.

Q    And you said any bids that include components of consideration apart from the cash purchase amount should quantify the amounts of such consideration in specific dollar amounts.

A    Correct.

Q    With as much specificity as possible.

A    As much specificity as possible.

Q    Without any formulas or other contingencies.

A    Correct.

Q    What did you mean by that, without reference to formulas or contingencies?

A    Well, we weren't accepting any bids with financial contingencies.  You had to have your, you know -- you had to be available, able to close.  We weren't accepting contingencies for due diligence.  So all the usual contingencies.  And as far as formulas, avoiding references to formulas, we did not want to use a formula like the $100,000 overbid, which is why we did not give that credit.  We gave credit to the actual bid amount, the specified bid amount.

Q    So you would agree that the reference to the $100,000 up and down as we've been talking about, that is in your parlance a formula, right?

A    Yeah.  Avoid -- we asked them to avoid it as much as possible.

Q    Right, but I'm simply saying we agree that their $100,000 ratcheting is both a formula and a contingency because it's contingent on what the other side may offer.  It's both, isn't it?

A    I don't consider a contingency.  But I understand it as a formula.

Q    But it's a -- it's contingent on what the other side

offers, isn't it?

A    The formula is based on what the other side offered.  I don't think that's what the term contingency was intended for there.  But that's fine.

Q    Well, what someone else bids, that's a contingency, isn't it?  (indiscernible) somebody else bids, right?

A    There's a lot of ways you can define contingency.  So we'll just have to disagree on that.  That's not what that was intended for there.

Q    Now you say in here bids will not be accepted on any lots that are contingent upon another lot.  Okay.  Now that's what you say.  What does that mean?

A    Meaning that the way we set up this form, you no longer -- there's no longer, as there was in the first lot, first offering, where we said -- where are you going there?

Q    I'm sorry.  I put you ahead.  Go ahead.  I'm sorry.

A    Okay.

Q    Go ahead.  Finish your thought.

A    The original bid form.  No, go back down to the form.

Q    Yeah.

A    Go down to the form.  Go back down to the form.

Q    Okay.

A    One lot being contingent upon the other would be if, say, they said, I'll buy Lot 2A, but only if I get 2C.

Q    Okay.

A    Now the reason we took that out is they didn't need to do that anymore because they were all broken into various groups and combinations.  So what we --

Q    (Indiscernible) that out?  I thought this was the one on the 12th.  The was the day before.  I thought you put it in.  You didn't take that out, did you?

A    No.  I'm talking about from the original bid form from the 8th.

Q    But this is the final bid form that everybody got the day before, right?

A    Correct.  Same form and format is the one they got the day before that.

Q    But you didn't take anything out.  It says bids will not be accepted on any lots that are contingent on another lot.

A    Right.

Q    That wasn't taken out, was it?

A    No.

Q    Okay.  Now if you look back at the Global Tetrahedron offer.

A    Yeah.

Q    Their final, which I believe we said was 19.  Now, I want to focus on the provisions that we alluded to briefly. In fact, I'm tired of hearing me talk.  Let's listen to you. You read right there where it says we have meaningfully

improved.  Read that out loud for us.

A    We have meaningfully improved the consideration provided in our initial bid.  Our final bid should now be valued at over $7 million of total cash consideration for the Group 5 assets.  Do you want me to keep going?

Q    Yeah.  Please.

A    While the final bid focuses on the Group 5 assets, we are also willing to acquire the Group 4 assets on the same terms as set forth herein, provided that this final bid does not allocate value to any assets not included in Group 5.  The aggregate consideration provided by the bidders consists of.

Q    Okay.  Now would you agree with me that the -- we just looked at 28.  I'm sorry, 27, where it says bids will not be accepted that are contingent on another lot, their contingency is between Lots 4 and 5, isn't it?

A    No, there's no contingency there.

Q    While this final bid focuses on Group 5, we're willing to acquire four on the same terms, provided this bid does not allocate any value to any assets not included in five.  You don't understand that as one lot contingent on another?

A    No.  But if you understand the bid process and the bid form, they were given the opportunity to bid on all the lots, and we -- and let us award whichever is the highest and best in any combinations.  So they bid $7 million on

Group 4, and they bid $7 million on Group 5.  And they basically said, hey, we'll take Group 4 at $7 million, but if we can get Group 5 at $7 million without paying any more, we'll take -- or the opposite way.  We'll take it that way.  So they basically bid it both ways, just the same way that FUAC has bids on multiple line items and they wanted it at whichever price was the highest and best.

Q    We're willing to acquire Group 4 on the same terms, but it does not allocate any value to Group 5.  That's what it says.

A    That's why their bid form has the same amount on two different groups.  One has more items in it, one has less items, but it has the same amount.  They're simply clarifying that.

Q    Okay.  Now, the trustee, as you know, filed a motion with the court to seek approval for this transaction.  Did you have any participation in the preparation of that motion?  Did you review it, for example?

A    Yeah.  The motion, I did, yes.

Q    Okay.  Now take a look at Exhibit 12.  I believe this is the right one.  Now, on -- let me pull it up real quick.  Exhibit 12 on page or Paragraph 34.

A    Which one?  Thirty-four or 32?

Q    Let me see if I've got the right one.  I'm sorry.  Yeah.  Now, it says Tranzon360.  Let me.  Before I -- let me

make sure I'm clear.  Tranzon is a company, and that's not your company.  That's a different company.

A     Correct.

Q     Okay.  What's your company?

A     ThreeSixty Asset Advisors.

Q     Okay.  So you did not have any relationship with the trustee before this deal at all, did you?

A     Correct.

Q     You'd never done a deal with him, did you?

A     Correct.

Q     Never met him, never spoken with him.

A     Correct.

Q     Your partner, so to speak, was Tranzon.

A     Yes.

Q     And I believe that you specialized in IP assets and they really didn't.  That's why they brought you in.

A     Amongst other things, yes.

Q     And you're splitting your fee with them?

A     Yes.

Q     Okay.  We'll come back to that in a minute.  So when you say Tranzon360, who's that talking about?

A     It's talking about our collective firms.

Q     So had conversations with FUAC and Global Tetrahedron. Who among the Tranzon360 collective firms talked to Global Tetrahedron?

A    I did.

Q    Anybody else?

A    No.

Q    Okay.  So what you mean is they was you, Jeff Tanenbaum, right?  Talk to Global Tetrahedron?

A    I spoke to him, yes.

Q    Okay.  Now, your firm consists of you, your wife and your daughter.  That's it, right?

A    I've got other contractors and people that work for me.

Q    Contract people that you call in as needed.  But your firm consists of you, your wife and your daughter.

A    Yeah.

Q    In fact, I think you said that when you were going through the NDAs and looking at all the, you know, trying to figure who was real and who wasn't real, you told the court that was just you, your wife and your daughter doing that, wasn't it?

A    Yep.

Q    Okay.  How old is your daughter?

A    She is 26.

Q    Okay.  Now, so it says, had conversations with -- after providing the overall bid form, these conversations were intended to ensure that each bidder understood the form and the bid process.  Okay, and allowed Tranzon360 to answer any questions and ensure that each bidder understood what

highest and best meant.  What did you tell Global Tetrahedron highest and best meant?

A     That I was going to evaluate the bid based on what number was on the form.

Q     Yeah, but what did you tell them highest and best meant?  Did you tell them what it meant?

        MS. ROBINSON:  Objection.  It's been asked and answered.

        THE COURT:  I'll sustain that objection.

BY MR. BROOCKS:

Q     Okay.  Now, did they ask you any questions about highest and best or the distributable waiver portion or anything like that?

A     I mean, we had other conversations.

Q     Did they ask you any questions?

A     Let's see.  Did they ask me any questions?  No, I don't -- I don't know that the answer asked me any questions.

Q     Okay.

A     I think I just walked them through the process.

Q     Okay.  Now we see in the motion that was filed with the court here, we see, and we're going to come back to the chart that you looked at in a minute.  But we see two different charts here, right?

A     Yeah.

Q     On Page 14, we see a chart that shows $7 million as the

winning bid.  $7 million, right?

A    Yep.

Q    Even Though you acknowledge as you have that the cash portion was only 1.75, right?

A    Yes.

Q    Okay  Now, and we see on the second page -- well, I don't know why.  But that's blacked out on my version.  Let me put it on this.

A    I've got the hard copy here.

MR. WOLFSHOHL:  We filed an updated version that corrected that.  That was (indiscernible) --

MR. BROOCKS:  Okay.  I'll put this on the ELMO real quick.

BY MR. BROOCKS:

Q    Okay.  Now, tis is on Page 15.

A    Got it.

Q    Okay.

A    Yes.

Q    Now, and I believe you said this was included as a stress test.

A    Yes.

Q    Okay.  But you put down the winning bid.  It wasn't -- do you see the word stress test anywhere in that document?

A    If I can take the time to read this.  Yeah, Paragraph 43.

Q    Okay.

A    Trustee then stress tested the assumptions in this analysis by evaluating alternative estimates for administrative costs and Connecticut family shares of the claim pool.  This was necessary because the amount of the waiver cannot actually exceed the net proceeds to which the Connecticut families would otherwise be entitled to, creating a natural limit to the implied cash equivalent bid offer.  Under any reasonable assumptions, however, there's more than enough cash available to fund the required waiver.

Q    Okay.  Fair enough.  Now, the first bid at $7 million shows $650,000 of administrative fees, right?

A    Yes.

Q    And it shows a percentage of 96.7 to 3.

A    Correct.

Q    And then the second model runs it at 75/25 with increased administrative costs.

A    Correct.

Q    Why did the administrative costs increase with a lower amount?

A    Again, my understanding from Mr. Murray was that that was just his way of stress testing.  Push the expenses higher and bring the allocation lower and just test it out and see how it worked.

Q    Well, let's hold your finger there and go back to

Exhibit 2.  Your employment agreement.  I believe it's Exhibit 2.  What was your compensation?

A    My compensation was a formula, and it was different for the intellectual property assets versus the personal property assets.

Q    Okay.  So let's go to Exhibit 6.  So let me take it off the ELMO and put it back on this real quick.  I want to flip back and forth here.

A    Yeah.

Q    I'm not working or you're not working.

        MR. BROOCKS:  Ma'am, I need to go to the -- thank you.

BY MR. BROOCKS:

Q    Okay.  Now, your employment or engagement letter is attached to Exhibit 6.  You identified that earlier.

A    Yes.

Q    And so read to us your compensation.

A    Intellectual property assets, 10 percent of the first $500,000 of sale revenues, 7 percent of sale revenues from $500,001 to $2 million, 5 percent of sale revenues in excess of $2 million.

Q    What have you made on this deal?

A    I'm not entirely sure yet.

Q    What do you mean?  Excuse me.  Let me -- let me rephrase the question.  At a $7 million purchase price, why

isn't that very simple?

A   Because our compensation defines percentage of sale revenues.  And I don't know whether or not the distributable proceeds waiver would be considered sale revenues by definition or not.  So I've left that up to the trustee to determine what our fees ought to be.  And we just haven't been focused on that for obvious reasons.

Q   I want to make sure I follow what you said.

A   Sure.

Q   Say it again.  And say it -- because I'm not quite sure I followed you.

MS. ROBINSON:  Objection, asked and answered.

MR. BROOCKS:  I didn't say I followed -- I didn't follow it.

THE COURT:  I didn't hear the question to hear if the question had been asked or answered.

MS. ROBINSON:  He just said say it again.

MR. BROOCKS:  I didn't -- I can tell him what I said.  I said I'm not quite sure I followed what you said.  Could you help me understand?  Can you help me understand and say it again?

THE COURT:  Yeah.  I'll allow it.

THE WITNESS:  I said that our commission is defined on the term sale revenues, and I don't know whether sale revenues will encompass cash or cash value.  And so

that is something that needs to be determined by the client

paying me and his counsel.

BY MR. BROOCKS:

Q    Sale revenue?

A    Mm-hmm.

Q    And you don't know whether or not that encompasses the

distributable proceeds waiver portion, do you?

A    Correct.  Because I never heard of a distributable

proceeds waiver before today.  I mean, before the sale.

Q    So have you had conversations with the trustee or

anybody about what you're entitled to?

A    The only conversation we had is that it ought to be at

least what it would have been under the $3.5 million dollar

bid and that I've left it in the trustee's hands while we

focus on the more important issue, which is closing a sale.

Q    Let me make sure I'm following you.

A    Yeah.

Q    You're saying that you left it with the trustee, that

you ought to get at least what First United paid, offered.

Did I hear you say that?  Is that what you're saying?

A    Yeah, that it would be more than that because we've

added more value than that.

Q    But I think you said --

A    But how much more -- be more than that because we are

entitled to more because we've added value to the sale.  But

how much more we have not discussed.

Q    Okay.  But -- so give us a choice.  What could it be?
I'm just trying to understand your contract in terms of the
sales rep.  I want to understand what it could be.

A    I don't know.  I mean, if it's based on cash value,
then we do the math on $7 million.

Q    Okay.  What else?

A    If it's based on cash, it'd be based on $1.75 million.
If it's based on some cash component, some attributable
value to the increased value, then it might be based on $3.5
million, which was the last cash bid, plus some calculation
of what the distributable proceeds waiver means.  I don't
know.  I trust my client.  Right now the focus is let's get
a sale closed.  I'm not worried about what my fee is.

Q    Okay.  No, no, and I guess now, the last question on
this subject.  What is your understanding of what the
contract, the term sale revenue means in your contract?
What is your understanding of it?

A    Sale revenue is how much money I bring in from a sale.

Q    And how much did you bring in in this sale?

A    I brought in a $7 million cash value bid, which is
comprised of a $1.7 million cash and a distributable
proceeds waiver that makes up the difference.

Q    Now, have you exchanged any emails with the trustee
about your various positions on this?

A    No.

Q    But you've talked to him about it?

A    Only the comment that I just made a moment ago, that it ought to be greater than.

Q    Now, let me go back to the ELMO where I can real quick, please.  Now, on the trustee's motion asking the court to approve the sale, we see 75 percent, 25 percent and 93 percent, 3 percent.  Which is it?  What does the Connecticut plaintiff have?

A    It's 96.7, and 3.3 is what the motion is based on.

Q    So you don't even know what percentage they have, do you?

A    Last discussion, it was 96.7 and 3.3 percent.  That's what was put in the document.

Q    Then why was 75/25 included, if you know?

A    As described before as a stress test, as an arbitrary number used by the trustee to see if even the number was at that level, would it still be the highest bid.  And it still would be.

         MR. BROOCKS:  And I'm so sorry, ma'am.  Let's go back to the thing real quick here.

BY MR. BROOCKS:

Q    So in the offer letter, that Exhibit 19, what percentage did Global Tetrahedron use?  Do you know?  75/25 or 96.7/3.3?

A    If you scroll down a little further on the thing, they reference the 96.7.  They also reference the 75 percent as a conservative number.

Q    As a conservative number.  What does that mean?

A    If the trustee chose to only give them an allocation of 75 percent for whatever reason, they wanted to show that it still had the value that it had.

Q    So would it (indiscernible) that's unsettled, unstated? I mean, whether it's 93 or 75, it's an unstated variable?

A    Yeah.  Beyond my -- beyond my purview.

Q    You don't know whether that's a variable that's still in play?

A    I don't.  I do not.

Q    Now, after the initial bid came in, this exhibit here, there were conversations that the trustee had with the Connecticut plaintiffs discussing this distributable waiver provision, proceeds waiver, and what the Connecticut people's position was versus the trustee's, weren't there?

        MR. WOLFSHOHL:  Objection, to form (indiscernible) referred to it as the initial bid.

        MR. BROOCKS:  I'll rephrase.

        THE COURT:  Okay.

        MR. BROOCKS:  Yeah.  When the --

        MS. ROBINSON:  (indiscernible) sorry, he didn't say (indiscernible) --

THE COURT:  I'm going to let him rephrase his question and see if he lays a foundation for it.

BY MR. BROOCKS:

Q   In the Exhibit 19 final bid, the $7 million bid from Global Tetrahedron and the Connecticut plaintiffs.

A   Yeah.

Q   Were there any conversations that you're aware of or have occurred between the trustee or anybody on your side and Global Tetrahedron and the Connecticut plaintiffs, anybody on their side, about whether or not it was $7 million or something less?

A   I know there have been conversations.  But I was not part of those conversations.

Q   Who do you have believe had those conversations?

A   I don't know.

Q   Why do you know there were conversations?

A   What's that?

Q   Why do you know there were conversations?

A   I have heard from trustee's counsel that there were conversations.  Do I know who had the conversations?  I don't know if it was Erin Jones.  I don't know if it was Chris Murray.  But I know that there were conversations.

Q   And what do you understand those conversations to have been about?

A   I don't know what the conversation was about.

MS. ROBINSON:  Objection, calls for (indiscernible) --

THE COURT:  That's hearsay.

MR. BROOCKS:  Well, he's an agent, Your Honor. He's already admitted he's an agent.  That's agency discussion here.  That's -- I'll move on.  I'll move on.

THE COURT:  I'll sustain.

MR. WOLFSHOHL:  (Indiscernible)

THE COURT:  Go ahead.

BY MR. BROOCKS:

Q   So you weren't a party to those?

A   Correct.

Q   Now, do you have any understanding on any basis as to whether or not the amount of the purchase price was open between Global Tetrahedron and the Connecticut plaintiffs and the trustee after (indiscernible) --

A   I know that they were finalizing what that purchase agreement was and what the allocations were.  That I do know.

Q   And the purchase price was still open.  That's what you understand?

A   I just -- just what I just said to you.

Q   Okay.  Now, so let's take a look at Exhibit 28.  I'm sorry, 24.  Okay.  Now remind me, did you prepare these or did the trustee?

A    The trustee provided to me and then we worked on it together over the phone.

Q    Okay.  So again we've got the variable of the administrative expenses.  We've got the 75/25.  Now this chart shows total class recovery of $900,000.  What that means is that's what the Connecticut plaintiffs were going to give to somebody else, right?

A    No, 650 is what the Connecticut parties --

MR. WOLFSHOHL:  Your Honor, I'm just going to -- for Mr. Broocks' benefit, he's got an exhibit (indiscernible) that was updated (indiscernible) this is just an old version of it (indiscernible) just letting you know (indiscernible) --

THE COURT:  This is not the same?  This is not the same 24 that I admitted.

MR. WOLFSHOHL:  It's not.

MR. BROOCKS:  This is the 24 I've got.

MR. WOLFSHOHL:  We filed an amended witness and exhibit list because there were a couple of corrections, and this was one of them.  And the one that you admitted, the one that I was looking had different numbers on it.

THE COURT:  I'm looking at 968.  I admitted.  Oh, you're looking at 955.  I admitted 968-24.  You can certainly try to get this doc in.  I'm not telling you not to.  I'm just saying the 24 that's in the binder is not the

same 24 that's on the screen.  Maybe that's the -- I think, Mr. Wolfshohl, I believe that's what you were alluding to.

MR. WOLFSHOHL:  Correct.  Yeah.

THE COURT:  Okay.  Thank you.

MR. BROOCKS:  Thank you.  Thank you.

BY MR. BROOCKS:

Q    Now with that clarification, have you ever seen this form here that puts $900,000 in?

A    It's actually on the amended document.  Right?  I'm looking at the right one here in the binder?  It's a million dollars, and that's after a $750,000 distributable proceeds waiver.

Q    No, no, I get that.  Have you ever seen this before? That's my question.

A    The version on screen?

Q    On the screen right here, we're all looking at.

A    I don't know if I've seen that version before.  I know I've seen the 4750 version.

Q    Did you have any, any input in the, in the preparation of variations of this, that, like this $900,000 number we see here?

A    I don't recall.  I mean, I've been looking at this one and so had a lot of different numbers, but it's a $100,000 difference between the two.

Q    Yes, it is.  That's why I was trying to figure out

whether you have any understanding of what the difference is.

A    I believe it was a calculation error on the administrative costs, when the administrative costs were increased and the numbers just weren't carried through.

Q    I missed that.  I don't understand.

A    I think it was just that the administrative costs weren't carried through.  Just looking at it, it's hard for me to run the numbers here without a spreadsheet.  But it looks like --

Q    Okay.  Well, look, I don't want to take a lot of time on that.  You just don't know where it came from.

A    There was an error in a calculation is what it was -- is what I think it was.

Q    It was an error in the calculation.

A    Yeah.  I just don't know.  I don't know.

Q    And then I'm going to go to 28 and I hope I got the right one now, too.  I don't know whether that changed or not.

MR. BROOCKS:  Is this the right one?

MR. WOLFSHOHL:  No.  It's just got a math calculation error.  That's all it is.

MR. BROOCKS:  But is this the right 28?

MR. WOLFSHOHL:  It's not the right 28.  Yeah.  We filed -- yeah.

MR. BROOCKS:  Okay.

MR. WOLFSHOHL:  So it's just -- there's just a math error here (indiscernible) --

MR. BROOCKS:  Now, but the second --

MR. WOLFSHOHL:  Just so you know, it does not match the motion.  That's why (indiscernible).

BY MR. BROOCKS:

Q    Okay.  Well, let me ask you this about the -- let's go back to the motion.

A    Yeah.

Q    If I go back to the ELMO one more time, now on the $7 million cash equivalent winning bid.

A    Yeah.

Q    How much is the -- how much are the Connecticut plaintiffs giving to the other creditors on this chart here on Page 14?

A    $173,250.

Q    So the Connecticut plaintiffs are giving that to the other creditors.  That increases the, in your estimation, the value of this to -- as a -- as a -- just the value of it.

A    Correct.

Q    Okay.  Now if someone else gave -- let's say First United had said we'll give $3.5 million plus we'll give $200,000 to the Texas plaintiffs, would that have made their

bid bigger than the Connecticut plaintiffs and Global Tetrahedron?

A    I've learned more about that since you asked me the question t the deposition the other day.

Q    What did you tell me in your deposition?

A    In my deposition, I said I don't know because I'm not -- I can't speak from a legal sense, but I can tell you from a mathematics sense what it would equal.

Q    And what would (indiscernible) from a mathematical sense?

A    From a mathematic sense, it turned the bid into like a $9 million bid.

Q    Let me just make sure I understand.

A    Yeah.

Q    So you told me in your deposition that if instead of the Connecticut plaintiffs giving 173, if First United said we'll give you 3.5 plus $200,000, you said that would turn a $3.5 million bid into a $9 million bid.  That's what you told me, right?

A    I said it along with the caveat that I don't know if legally that would be a permissible bid.

Q    But mathematically, how did you come up with that $9 million number?

A    Well, mathematically would be on the same basis that if you took the -- if you determine what the cash value of that

$200,000 would be because the non-Connecticut creditors would not have otherwise gotten that money the same way was calculated, I'm looking at the bid from Global Tetrahedron, then it would equate to that.  But I've learned since then that the Connecticut parties would need to --

Q    We'll come to that in a minute.

A    Okay.

Q    So what you told me was that if First United put $3 million in and then gave an extra $200,000 just to the Texas plaintiffs, not to the Connecticut people, okay, so we see that that means it's topping the 173, you told me that would translate into mathematically a $9 million bid.  That's what you told me.

A    Somewhere around there.  Provided it had legal standing.

Q    Yeah.  On Friday night, you told me that, right?

A    Provided it had legal standing.  Yes, that's correct.

Q    Okay.  Good.  Now you're -- if First United had given $200,000, the Connecticut plaintiffs would still keep their money and the Texas plaintiffs would have gotten more money, right?

           MR. WOLFSHOHL:  Objection, calls for speculation.

           THE COURT:  I'll sustain.

BY MR. BROOCKS:

Q    So if the First United had given $200,000 and nothing

else had changed, wouldn't the Connecticut plaintiffs have the same amount?

MR. WOLFSHOHL:  Objection, calls for speculation. It also doesn't have any relevance, Your Honor.

MR. BROOCKS:  Well, it has -- if I can argue the relevance, Your Honor.

THE COURT:  Yeah, yeah.  Go ahead.

MR. BROOCKS:  It has to do with this notion of Connecticut plaintiffs giving to the Texas plaintiffs, and that that giving of the money to the Texas plaintiffs somehow creates value.  Could anybody have given it to him? Could anybody -- excuse me.  Could anybody have given more? That's what he said on Friday.  That's why I'm trying to explore.

MR. WOLFSHOHL:  First of all, they're not giving it to Texas plaintiffs.  They're contributing their distributable proceeds to all creditors.  And secondly, this hypothetical --

THE COURT:  But at least $100,000 extra -- to make sure that at least $100,000 extra goes to Texas, right?

MR. WOLFSHOHL:  Well, Your Honor, our interpretation is not that.  We've laid out the interpretation in the spreadsheet that we went through. It's actually more than $100,000 if you treat it as a $7 million --

THE COURT:  I'm saying at least $100,000, right?  I didn't mean to get into --

MR. WOLFSHOHL:  No, no, if you assume (indiscernible) --

THE COURT:  I didn't want to get into semantics of it.  I apologize.

MR. WOLFSHOHL:  So, but the issue is, Your Honor, he's asking a question that doesn't actually make any sense because the hypothetical doesn't assume that Connecticut is willing to forego the distribution that he's talking about in order to distribute to other --

THE COURT:  Hold on a second.  You all are arguing.  I think he can ask the question and he can just say, I don't know anything about that.

MR. BROOCKS:  Yeah.  My hypothetical doesn't have any -- the Connecticut plan get to keep their part.  They don't -- they're not foregoing anything.

THE COURT:  It's the hypothetical part that we're going to have to then get over.

MR. BROOCKS:  Yeah, the hypothetical --

THE COURT:  The reference.  But why can he answer a hypothetical?

MR. BROOCKS:  Well, because he's an expert.  He's an auctioneer.

THE COURT:  He's an auctioneer.  I'm not sure he

can answer that hypothetical.

MR. BROOCKS:  Well, if I May, Your Honor.

THE COURT:  Yep.

MR. BROOCKS:  But he's expressing value opinions that he went through this whole valuation process and he decided that because the Connecticut plaintiffs were going to give $173,000 to the other creditors that made that -- that magically transformed a $1.75 million into a $7 million bid.  Now my question to him hypothetically is, but if someone else had given $200,000, more than 173, wouldn't that make a bigger value?  He's perfectly qualified to answer that question.

MR. WOLFSHOHL:  Your Honor, if all he's asking is a math question.  But the problem is that presupposes that the trustee can unilaterally decide certain (indiscernible) --

THE COURT:  From his understanding.  If we're just asking a math question, it sounds --

MR. BROOCKS:  Just a math question.

THE WITNESS:  Again, the math works.  However, I am not an expert in the creditor -- the application of that fund, those funds to know whether or not it works legally.

BY MR. BROOCKS:

Q    Yes, but you were involved and were expert enough to decide that the Connecticut plaintiffs giving money created

a bigger value, weren't you?

A    No, I was given counsel as to whether or not --

MR. WOLFSHOHL:  Objection --

MR. BROOCKS:  Why don't you let -- I'm just trying to get his testimony, Your Honor, not Wolfshohl's prompting.

MR. WOLFSHOHL:  I am objecting.  I'm allowed to interpose an objection after the question is asked, Your Honor.  If Mr. Broocks --

THE COURT:  I got that.  But what's the objection?

MR. WOLFSHOHL:  The objection is he's calling for a legal conclusion and it's also misstating his prior testimony.

THE COURT:  What's the legal conclusion that he's being asked to conclude?

MR. WOLFSHOHL:  He's asking him about his opinion about the distribution of proceeds from the estate and the allocation between creditors.  All that he has said is that he got that information from the trustee and helped to assess the value based on (indiscernible) --

THE COURT:  I think they can explore what role he had in the assessment.  I think that's fair.  And I agree with you.  He can't reach legal conclusions.  Some of these questions may ultimately be better from the next witness.

MR. BROOCKS:  Right, and I will take that with the trustee.

BY MR. BROOCKS:

Q    But I'm just saying you -- I think you testified at length that you were involved in the discussions that involved valuations of this, you know, distributable waiver, proceeds waiver.

A    But I was given information to base that off of.

Q    Okay.  But you were involved.

A    I was involved.

Q    Okay.  Based on that and your input that you -- the data you received and input you gave back, if the hypothetical changes just slightly to where the Connecticut plaintiffs don't give anything, keep your money.  $3.5 million, they keep it.  And the other -- excuse me.  And the other creditors, instead of getting $173,000 from the Connecticut plaintiffs, they get it from somebody else.  Wouldn't that be a better deal for everybody?

A    Based on the information that I've received, just like the first time.  Since I've gotten new information since Friday, no, then that (indiscernible) --

Q    What is the new information you got?

A    I inquired with the attorneys to find out whether or not a cash payment direct from the backup bidder direct to a subgroup of creditors would have that same value.  And I was told not unless the Connecticut creditors approved it.

Q    So, again, make sure you understand the hypothetical.

The Connecticut plaintiffs in my hypothetical, they're not being asked to forego or sacrifice anything.  You understand that, right?

MR. WOLFSHOHL:  Objection, the hypothetical is (indiscernible) --

THE COURT:  No, no, no.  Let's just ask another question.  I think we're now in left field.

BY MR. BROOCKS:

Q   Okay.  Now, and you understood that this distribution waiver had nothing to do with waiving liabilities.  You understood that, right?  Nothing was being waived by the Connecticut plaintiffs.

MR. WOLFSHOHL:  Objection, calls for a legal conclusion.

MR. BROOCKS:  His understanding.

THE COURT:  It's just his understanding.  I don't think that's a legal conclusion.

THE WITNESS:  But I don't know we had any discussion about liabilities.  So I don't know.  That's nothing I had any knowledge of.

BY MR. BROOCKS:

Q   Okay.  Let me ask you this.  And then I'm going to land this airplane here.  Now, if you would look at Exhibit 27, I believe.  No, I'm sorry.  Let's try this.  Fourteen.

A   Exhibit 14?

Q`   Yes.

A    Got it.  Yep.

Q    Now, so looking on -- let me pull this up.  Last time, I hope.  Okay.  So we have lots here that are being -- this is the final -- I believe you testified, the final bid package that was showing everybody what they were buying, right?

A    No.  This is --

Q    Fourteen is not?

A    The one you have on screen is not.  Fourteen is.

MR. WOLFSHOHL:  This is -- I filed the corrected, like three or four corrected exhibits.  It's one of the ones that we corrected.  If you want this one -- well, yeah, it was replaced (indiscernible).

MR. BROOCKS:  This is the notebook you gave me when I walked in, I thought, 968.

MR. WOLFSHOHL:  This is the right (indiscernible) --

THE COURT:  Right.

MR. WOLFSHOHL:  That's not the (indiscernible) --

THE COURT:  I think you've (indiscernible) --

MR. BROOCKS:  I'll use -- I'll go back to the ELMO then.

BY MR. BROOCKS:

Q    Now you've got -- you added in Lot 4, which includes

approximately 37 domain names.  And that's actually what the Global Tetrahedral people bid on, right?  Lot Number 4?

A    Correct.

Q    But that was taken out.

A    My understanding is it was taken out.

Q    When was it taken out?

A    I wasn't involved in that.  So I don't know what date it was, but it was after the bid.

Q    After the bid of $7 million, it was taken out.  Do you know whether or not the price got lowered when it got taken out?

A    I was not part of those conversations.

Q    Do you know why the domains in Lot 4 would be included when the judge had said nothing about that pertains to Mr. Jones should be included.  Do you know anything about why that was in there?

A    I know what the discussions were at the time.  At the time, the discussed items that came up in front of the court were X accounts and some other Jones-specific items.  But the domain names that were owned in the FSS bankruptcy case were not explicitly excluded.  And so we included them under instruction with language that said they were contested.

Q    Now, when the court sees, for example, under Lot 1, domain names, social media account, let's talk about social media accounts first.  What does that mean?

A    Social media accounts means accounts like X.  Like there are a number of them in here, and I don't know them offhand, X, Telegram, Gab, Getter.  Those are all social media accounts.

Q    So is your understanding that these are accounts that have libraries associated with them of all of past programming?

A    They may have libraries.  They may just have dialogue and conversations like a Facebook account.

Q    And does it have followers, to your understanding, to your knowledge?

A    Yes.

Q    So is what being sold is people that have subscribed as followers of Mr. Jones are now being auctioned off?

A    No.

Q    Aren't they part of this social media account and domain names in Lot 1?

A    The access to the account is provided.  So somebody then takes over the account.  And those are followers. They're not -- they don't -- you don't get their email addresses.  They're just followers or people that follow that particular business social media account.

Q    That's my point.  So the followers that have subscribed following Mr. Jones --

A    Yes.

Q      -- after this sale, will now be following The Onion.

Is that what I'm understanding to be the effect of this?

A      Whoever.  Whoever controls that account.

Q      Yeah, and so people that have signed up and given their confidential private information to say, I want to follow Alex Jones, are now going to be getting communications from The Onion.  Is that your understanding, sir?

           MR. WOLFSHOHL:  Objections, calls for speculation, also relevance, Your Honor.

           MR. BROOCKS:  I'm asking his understanding.

           THE COURT:  Go ahead.  There are a number of parties standing up.  I just want to make sure that we're all --

           MS. ROBINSON:  Objection.  He said he didn't know (indiscernible) --

           THE COURT:  Mr. Costa?

           MR. COSTA:  Asked and answered, relevance.

           THE COURT:  What is the relevance?

           MR. BROOCKS:  The relevance, Your Honor, is that under the, you know, innocent name, domain names and social media accounts is a -- are libraries of copyrighted materials belong to Mr. Jones and a database of followers that think they are listening to Mr. Jones, when it's going to be The Onion whose determination is to destroy him.  It is very relevant to whether that was fully disclosed to the

court and to the buyers.

MR. WOLFSHOHL:  Your Honor, can I direct you to something?

THE COURT:  No, no, I don't -- I don't -- I just don't -- I think we just have an auction on business judgment, why people buy stuff.  And my understanding is that they were selling whatever interest they had in it, and it is what it is.  And that's what I'm taking it as.  And I got it.  I got it.  And X certainly came in.  I don't think it's relevant for me for purposes of where we are.  I think this clarified for me, actually, the question about what was in one or two.

BY MR. BROOCKS:

Q    Okay.  But your belief, your understand, the last question on this subject that I'm on, your belief is that whoever was a follower under Lots 1 and 2 will now become owned by communicating with the new owners of these assets, right?

MR. WOLFSHOHL:  Same objections, Your Honor.

MR. BROOCKS:  Just your understanding.

THE COURT:  I think he's answered that question, but you can answer it again.

THE WITNESS:  Sorry?

THE COURT:  I think you've answered that question. What your understanding was.

MR. BROOCKS:  Can he answer it again, Your Honor, just to be clear -- make sure I'm clear on it?

THE COURT:  He's answered the question.  He said whoever the owner is will have whatever it has, including potential followers.  I think that was the answer Mr. Tanenbaum said.

MR. BROOCKS:  Okay.  I'll pass the witness, Your Honor.

THE COURT:  Okay.  Mr. Cicack?  Let me just ask the witness.  Are you -- do you want to take a five-minute break or are you --

THE WITNESS:  Are we 30 minutes or are we an hour?

THE COURT:  You've got to add (indiscernible) we're lawyers.  So you're going to have to --

MR. CICACK:  Believe it or not, I think we're closer to 30 minutes.

THE COURT:  Okay.

THE WITNESS:  All right.

THE COURT:  What do you want to do?  You need a break, you need a five-minute break or no?

THE WITNESS:  No.  I'm okay.

THE COURT:  All right.  Let's keep pushing.  Mr. Cicack, in terms of kind of tech, how do you -- how are you going to proceed?  I just want to make sure we're ready for you.

MR. CICACK:  Yeah.  Your Honor, I think I'm going to use as much as possible (indiscernible) trustee's exhibits.

THE COURT:  Okay.

MR. CICACK:  Thee was a lot of overlap.  I do have three exhibits that I thought I had extra copies for, but I can't find them anywhere, which I guess (indiscernible) --

THE COURT:  You want to take five minutes?  Well, let's take the five-minute break and let you get ready. Let's all do that.  Thank you.

CLERK:  All rise.

(Recess)

CLERK:  All rise.

THE COURT:  Back on the record in the Jones case, continuing with cross-examination.

Mr. Cicack, you may begin whenever you're ready.

MR. CICACK:  Thank you, Your Honor.

CROSS-EXAMINATION OF JEFF TANENBAUM

BY MR. CICACK:

Q    All right.  Mr. Tanenbaum, I'd like for you, if you could, to look at -- I think it's in front of you, Exhibit 24, which is the trustee's Exhibit 24.  I think that's the document --

A    The numbers?

Q    Excuse me?

A     The numbers.

Q     Yes, the numbers.

A     Yep.  Got it.

Q     Okay.  Did you prepare this?

A     No.  It was prepared by Mr. Murray, provided to me, and then we worked on it together.

Q     Okay, and did you make any changes to it?

A     I made comments, asked questions, played with the percentage allocations, things like that.

Q     Okay, and I'm interested in the top portion of it where it says winning bidding cash equivalent.

A     Yes.

Q     And it said -- the one I have -- I hope I have the right copy -- says $4,750,000.

A     You have the right copy.

Q     Okay.  Who made the decision to use that number?

A     I think Mr. Murray made that decision to use 75 percent as kind of a stress test.

Q     And this, the top one, assumes that there's a 25 percent, 55 percent -- I mean, sorry, 75 percent difference in the Connecticut family share versus the other creditors, correct?

A     Correct.

Q     All right.  Now, do you know why using that allocation, a $7 million winning bid cash equivalent, wasn't used?

A    Well, once you apply the waiver, it doesn't come up to $7 million.  So you use -- you move the waiver over. There's enough cash to pay -- let's see.  Needed to be enough cash to cover administrative costs.  Yeah.  So once the administrative costs are left, you've got the million dollars, you apply the 75/25.  That's as high as it gets.

Q    So in other words, if you put -- if you used a $7 million number, as opposed to a $4,750,000 number here, then -- and assumed a 25/75 split, the numbers don't work, right?

A    Well, that's just it.  The number that gives is that 7. It becomes 4.75.

Q    No.

A    Yeah.

Q    Assume with a 4.75 is $7 million.  If you used the $7 million.  Just that you did exactly the same that you did underneath.

A    Yeah.

Q    But instead of using -- but now use the 75/25 split.

A    Well, correct.  The numbers don't work.  That's why it comes down to (indiscernible) --

Q    The numbers don't work.  Thank you.  Thank you.  Let me ask you if you would look at the trustee's Exhibit 22.

A    Okay.

          THE COURT:  Mr. Cicack, did you say 22?

          MR. CICACK:  Yes, Your Honor.

THE COURT:  Okay.

MR. CICACK:  Trustee's Exhibit 22.

THE COURT:  Okay.

BY MR. CICACK:

Q     Are you there, sir?

A     Yes.

Q     Okay, and this is -- I believe this is something that you put together, correct?

A     Yes.

Q     Okay, and would it be fair to say that of all the potential bidders, people that were interested in bidding, that First United was the most active?

A     Yeah, I would -- I would say certainly one of the top two or three most active.  Yeah.

Q     Well, was First United more active than Global Tetrahedron?

A     They spent a lot of time in the data room, but, you know, you came out to the site, so I'll give you that and say you were more active.  Yeah.

Q     We also talked to the landlord, right?

A     You talked to the landlord, yeah.

Q     Nobody else did that, right?

A     Correct.

Q     So you understood that First United was a buyer that wanted to continue the business?

A     That was my understanding, yes.

Q     And did you understand that all the other potential bidders were not going to continue the business?

A     I did not.  That wasn't my understanding.  There were some other parties that were interested in other potential operations but never took the next steps.

Q     But Global Tetrahedron, you knew, was not interested in continuing Free Speech Systems' business?

A     Not that I knew of.  But I didn't enter into those conversations to explore what their intention was.

MR. CICACK:  Your Honor, I'd like to switch gears real quick and go to our exhibit list, the First United exhibit list that I think you'll be able to help me with, right?

MS. STARLING:  Of course.

MR. CICACK:  All right.  Exhibit 15.

THE WITNESS:  Is that in a different --

THE COURT:  Hold on a second.  Are you talking -- I'm just going to get to -- Ms. Starling?

MS. STARLING:  Yes, Your Honor.

THE COURT:  Okay.  No, no, no.  I'm just making sure that I'm doing the right thing here, following --

MR. CICACK:  She offered to help.

THE COURT:  You got it?  No, no, no.  Thank you.

MR. CICACK:  And I appreciate it very much.

THE COURT:  All righty.

MR. CICACK:  Is it up on the screen?

THE WITNESS:  Not yet.

THE COURT:  It takes a second to kind of all click in.

MS. STARLING:  Which exhibit?

MR. CICACK:  Exhibit 15.

MS. STARLING:  Okay.

BY MR. CICACK:

Q   All right.  Do you see Exhibit 15 now in front of you?

A   Yes.

Q   Can you explain to the court what that is a copy of?

A   It's a copy of a notice that was published on a website and also distributed to subscribers to that website called the DailyDAC.

Q   Did you prepare Exhibit 15?

A   I did.

Q   Is this a true and correct copy of Exhibit 15?

A   I can't see it all on screen right now.  I'm presuming it is the document.  I expect it to be, but I'm only seeing the headline.

Q   Can we scroll down on it so Mr. Tanenbaum can see the whole thing?  How about --

MR. CICACK:  May I approach?

THE COURT:  Yeah.  Sure.

MR. CICACK:  Do this the old-fashioned way.

THE COURT:  If you have a hard copy?  Yeah.

MR. CICACK:  (Indiscernible) a hard copy.

THE WITNESS:  That helps.  Thank you.

BY MR. CICACK:

Q    And I asked that is a true and correct copy (indiscernible) --

A    Yeah, that looks to be.  Yes.

MR. CICACK:  All right.  Your Honor, I ask that Exhibit 15 be admitted.

THE COURT:  Any objection?  Any objection, counsel?

MR. BROOCKS:  Not from me.

MR. WOLFSHOHL:  No, I don't (indiscernible) --

THE COURT:  All right.  976-15 is admitted.

(First United's Exhibit 976-15 entered into evidence)

BY MR. CICACK:

Q    Now, did you show Exhibit 15 to Mr. Murray before it was published?

A    I don't recall if this one was approved or not.  We had some boilerplate language that was approved.  And then we ran with a few other documents.  So I'd have to look back. I don't recall if he saw this one.

Q    But you would expect that everything that's contained

in Exhibit 15, the factual statements in here, that Mr. Murray had already signed off on?

A    It doesn't mean I might not have made an error.  So I can't speak for what he's seen.  I don't have that information for you right now.

Q    Would it be your normal practice to have your client sign off and review and okay something?

A    Not on every material.  So we do try to on high level, and then some get updated on the fly.  So sorry, I can't answer that.

Q    Okay.  Let me ask you to look at the second full paragraph.

A    Yes.  I need it to scroll down or that hard copy again.

Q    Can we scroll down?  Right, right there where it starts with assets may be bid on individually or as a package by November 8th with an overbid auction scheduled for November 13th.

A    Correct.

Q    That language is accurate, right?

A    Yeah.  At the time it was scheduled, if necessary, which was clarified on our website, but was not verified on that document.

Q    If necessary.  So what is -- what would have made it not necessary?

A    A number of things.

Q    Like?

A    Like had the sealed bids that came in, had one on November 8th, had one been at $5 million and the other been at $1.2 million --

Q    But that didn't happen.

A    It did not.

Q    Right.

A    Right.

Q    What else?

A    If we determined that there was another way to run the overbid process, then it would not have been necessary.

Q    Okay, and so you knew that there was scheduled an online auction on November 13th to occur?

A    We earmarked a date for it if it were to occur. Correct.

Q    It was scheduled, right?

A    It was scheduled, yeah.

Q    And it ended up being canceled?

A    Oh, we did -- I don't know if you want to call it canceled. We never -- we never got to a live -- we never ran a live auction. We didn't cancel it. We had an earmarked date for it, and we did not hold that sale. We ran a (indiscernible) --

Q    So let me understand your testimony. There was a date that was scheduled for it, correct? It's even in the

court's order, right?

A    If necessary.

Q    If necessary.

A    Yeah.

Q    It's scheduled.  And you determined it wasn't necessary?

A    Correct.

Q    So you canceled it.

A    Correct.  We did not hold it.

Q    You're quibbling with my language.  Not holding it isn't the same thing as canceling it?  You had it scheduled.  It didn't happen.  You canceled it.

A    We'll go with cancel.

Q    Thank you.  All right.  Let me ask you to look at what's been marked as my Exhibit 16, please.  All right.  Can you see that, sir?

A    Yes.

Q    Did you prepare this?

A    Yes.

Q    And who was this released to?

A    That went to the media.

Q    The media.

        MR. CICACK:  Okay.  Your Honor, I'd move that exhibit -- that First United's Exhibit 16 be admitted.

        THE COURT:  Any objection?

MR. WOLFSHOHL:  No objection.

THE COURT:  976-16 is admitted.

(First United's Exhibit 976-16 entered into evidence)

BY MR. CICACK:

Q    Okay.  Is this something that you obtained Mr. Murray's approval of before it was published?

A    It is.

Q    And he gave you approval?

A    Yes.

Q    All right.  Thank you.  All right.  All right.  So I want to -- I want to go back and talk a little bit about the conversation that you had with Global Tetrahedron about the final bid that you were seeking.  You remember, I think you spent a lot of time talking about that with the two lawyers that went ahead of me, right.  Do you recall your testimony?

A    Which?  Which conversation?

Q    The one that you had with Mr. Collins in between the initial bid and before the final bid.

A    Yes.

Q    All right.  I think you testified you had one conversation with him.

A    Correct.

Q    Correct?

A    Yes.

Q   Okay, and that's the conversation when you told him that certain types of bids would not be acceptable, right? You wouldn't even consider them?

A   I said they would not be considered -- that certain mechanisms would not be considered.

Q   Okay, and you communicated to him that you wanted or required a highest and best?

A   That it was a highest and best.  Yes.

Q   And if he didn't give you a highest and best, you wouldn't even consider it?

A   Well, putting words in my mouth.  What I told him is we needed a number on the bid form and that that would be the basis for a highest and best.

Q   What is your definition of highest and best?

A   My definition of highest and best is that the bidder provides us their highest bid number, and that is the bid number that we are going to use as their winning -- as their competitive bid.

Q   And it's not dependent on what anybody else bids, correct?

A   Correct.

Q   It stands alone.

A   Correct.

Q   And it's not contingent on anything, correct?

A   Correct.

Q   And that's what you told him?  That's what you told Mr. Collins, right?

A   I told Mr. Collins --

Q   That he had to make a highest and best.

A   He needed to put a bid number on the form, and that's what the basis for the bid would be.  Yes.

Q   All right.  But I just want to make sure that we all understand.  Your definition of highest and best -- and you've been doing this how long?

A   Forty years.

Q   Forty years.  Is it's standalone, not dependent or contingent upon what anybody else bid, correct?

A   Yes.

Q   And if he didn't provide you with a highest and best, you wouldn't consider it?

         MR. WOLFSHOHL:  Objection, misstates testimony.

         THE WITNESS:  Well, you're putting words again in my mouth.  I told him to put a number on the form.  That's what I told him.

BY MR. CICACK:

Q   Okay.  But you were calling for highest and best.

A   Calling for highest and best.  Yes.

Q   And that is what you expected to receive, correct?

A   Correct.

Q   And that's what you told Mr. Collins that you were

expecting from Global Tetrahedron?

A    Correct.

MR. CICACK:  All right.  No further questions, Your Honor.  Thank you.  I'll pass the witness.

THE COURT:  Thank you.  Any redirect?

MR. WOLFSHOHL:  No, Your Honor.

THE COURT:  Okay.  Counsel, do you have any questions?

MS. ROBINSON:  (Indiscernible)

THE COURT:  Okay.  Please go ahead.  And if you can just state your name for the record so we have a good, clean record.

MS. ROBINSON:  This is Vida Robinson, from Paul Weiss, on behalf of the Connecticut families.

REDIRECT EXAMINATION OF JEFF TANENBAUM

BY MS. ROBINSON:

Q    Good evening, Mr. Tanenbaum.

A    Good evening.

Q    (Indiscernible) so you testified just now that you understood that Mr. Jones and FUAC would continue to operate the business if they were (indiscernible), correct?

A    Correct.

Q    Are you aware that Mr. Jones claims to have an agreement with FUAC to continue to be employed and continue to work and develop business of FSS if (indiscernible) --

MR. BROOCKS:  Objection -- finish your sentence.

MS. ROBINSON:  (Indiscernible)

MR. BROOCKS:  No foundation.  She's testifying.

THE COURT:  Counsel?

MS. ROBINSON:  I aske him about (indiscernible)
I'll start again.

BY MS. ROBINSON:

Q    So what was the basis of your understanding that Mr.
Jones and FUAC would continue the business?

A    I knew that there were meetings with First United, with
Walter, when he was down onsite with Alex Jones.  He met
with the attorney, the landlord, about potentially
continuing to operate at the facility.  I don't know about
any details of their relationship other than that knowledge
that they intended to continue to operate there.

Q    So you don't know if it was based on any agreement
between the (indiscernible)?

A    That I don't know.

Q    Do you consider Jones and FUAC (indiscernible) --

MR. BROOCKS:  Objection, legal conclusion and no
foundation.

THE COURT:  No, I think he can answer that.

THE WITNESS:  Well, it's an interesting question.
Because I don't know that there's any agreement, I've
assumed that they're not joint bidders.  I have assumed that

First United was bidding just on their own.  I have no knowledge that they have any financial, you know, vested partner in their bid.

MS. ROBINSON:  (Indiscernible)

THE COURT:  Any other questions?

MR. WOLFSHOHL:  No questions here.

THE COURT:  All righty.

MR. CICACK:  I would like to --

THE COURT:  No, no.  Go ahead.  Come on up.

MR. CICACK:  Just a brief recross.

THE COURT:  Just state your name again for the record.

RECROSS-EXAMINATION OF JEFF TANENBAUM

BY MR. CICACK:

Q    All right.  So, sir.

A    Yes.

Q    I think you just testified that you understood that when I went down to Austin for the site visit, that I met with Alex Jones.

A    That was my understanding.  I thought that you had met with the landlord and with Alex Jones.

Q    Who told you that?

A    My partner.

Q    Will you accept that when I tell you I did not meet with Alex Jones?

A    Sure.  I may have misunderstood.  Yeah.

Q    All right.  You got that information from your partner.

A    Yeah.

Q    All right.  So in terms of Alex Jones and FUAC being joint bidders, do you have any information to lead you to conclude that Mr. Jones has any part in any of the consideration that FUAC has made in its bid?

A    I do not.

Q    In fact, First United has provided proof of its financial wherewithal to close, correct?

A    Correct.

Q    Did you see what they provided last night as well?

A    That you provided some additional financial, yes.

Q    Okay.  So without getting into specifics, you're comfortable that First United, without any help from anybody else, without any help from creditors or anybody else, they have the financial wherewithal to close on a $3 million, $3.5 million deal, a $4 million deal and even more, correct?

        MR. WOLFSHOHL:  Objection, calls for speculation.

BY MR. CICACK:

Q    Based on what you've seen.  You know that, right?

        THE COURT:  Just based on what he's seen, he can answer.

        THE WITNESS:  Based on the -- what's in the bank account, yes.  I don't know what goes beyond that, but yes.

MR. CICACK:  Thank you very much.  No further questions.

THE COURT:  Any further questions?  Thank you very much for your time.

MR. TANENBAUM:  Thank you.

THE COURT:  All right.  What time did I say we were starting?

MR. WOLFSHOHL:  You said 1:30.

THE COURT:  1:30.  1:30.  Thank everyone.  Yes, I thank everyone for their time.  We're adjourned.  You can leave your stuff here.  I'd just ask that you just kind of put it off to the sides.  I have a couple of hearings in the morning.  Everyone is excused.  I'm just going to sit here and organize myself as well.

Mr. Jordan?

MR. JORDAN:  Yeah.

THE COURT:  But before we break, Mr. Jordan?

MR. JORDAN:  Yes.  Thank you.  You had mentioned something about the pleading that was filed yesterday, which was the -- which was called corrected objection.  I wanted just to be sure that -- because I didn't hear what you said about the original filing.  The objection was due last Friday at 5:00, and we were in depositions, but I got that filed.  Well, that's what happened.  I messed up, but I got it filed at 4:45.

THE COURT:  Folks, if we can stop moving.  I'm still conducting court.  Thank you.

MR. JORDAN:  I filed it at 4:45.  I just wanted to be sure you knew that we filed an objection.  I just filed an older version because I was (indiscernible) --

THE COURT:  I wanted to hear arguments on it at the end.  I just said I hadn't read it --

MR. JORDAN:  Oh, okay.

THE COURT:  -- to determine one way or the other, to preserve -- I kind of have read it and then felt like I already kind of heard it and it was in my brain, that kind of stuff.  So I can -- I certainly will listen to arguments in terms of -- I did read the original objection.

MR. JORDAN:  Okay.  Well, it was disjointed at best because it was a -- it was an early draft.  I don't know how I did it.  But it was almost 5:00.  But actually it was 5:00 Texas time when we got it done.

THE COURT:  Okay.  Yeah.  I'll preserve arguments on that.  Okay.

MR. JORDAN:  Thank you, Your Honor.

MR. WOLFSHOHL:  Your Honor, I just want to confirm, Mr. Tanenbaum --

AUTOMATED VOICE:  Our system will end this conference in five minutes.

MR. WOLFSHOHL:  I will be shorter than that.

AUTOMATED VOICE:  To extend this call for one hour --

THE COURT:  Hold on.

AUTOMATED VOICE:  Invalid host code.  Please enter the moderator PIN now.  Invalid host code.

THE COURT:  All right.  That means it's time to go home.

MR. WOLFSHOHL:  I just want to confirm that Mr. Tannenbaum is excused.

AUTOMATED VOICE:  Our system will end this conference in five minutes.

THE COURT:  Yes.  He's released.  He's released. Thank you.

AUTOMATED VOICE:  To extend this call for one hour --

THE COURT:  Have a good night, everyone.

AUTOMATED VOICE:  -- please enter the moderator PIN.

     (Proceedings adjourned at 6:44 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  December 19, 2024