UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
                         HOUSTON DIVISION

ALEXANDER E. JONES AND          )   CASE NO: 22-33553-cml
THE OFFICIAL COMMITTEE OF       )
UNSECURED CREDITORS,            )   Houston, Texas
                                )
          Debtors.              )   Monday, November 25, 2024
                                )
                                )   2:04 PM to 3:23 PM
------------------------------)


                             HEARING

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Alexander E. Jones:    SHELBY JORDAN
                           ANTONIO ORTIZ
                           Jordan & Ortiz, PC
                           500 N. Shoreline Blvd.
                           Corpus Christi, TX 78401

                           BEN C. BROOCKS
                           Broocks Law Firm PLLC
                           6207 Bee Cave Road
                           Austin, TX 78746

For Chapter 7 Trustee:     JOSHUA WOLFSHOHL
                           ERIN JONES
                           Porter Hedges LLP
                           1000 Main Street
                           Houston, TX 77002

For First United          WALTER CICACK
American Companies LLC:    Hawash Cicack & Gaston LLP
                           711 W. Alabama Street
                           Houston, TX 77006

For Global Tetrahedron:    GREGG COSTA
                           JASON GOLDSTEIN
                           Gibson Dunn
                           811 Main Street
                           Houston, TX 77002

For Connecticut          KYLE KIMPLER
Families:                PAUL PATTERSON
                         Paul Weiss Rifkind Wharton &
                         Garrison LLP
                         1285 Avenue of the Americas
                         New York, NY 10019

                         RYAN CHAPPLE (TELEPHONICALLY)
                         Cain & Skarnulis PLLC
                         303 Colorado Street
                         Austin, TX 78701

                         ALINOR STERLING (TELEPHONICALLY)
                         Koskoff, Koskoff and Bieder PC
                         350 Fairfield Avenue
                         Bridgeport, CT 06604

For PQPR:                STEVEN LEMMON (TELEPHONICALLY)
                         Streusand Landon Ozburn Lemmon LLP
                         1801 S. Mopac Expressway
                         Austin, TX 78746

For X Corp:              CAROLINE RECKLER (TELEPHONICALLY)
                         Latham & Watkins LLP
                         330 N. Wabash Avenue
                         Chicago, IL 60611

For Texas Plaintiffs:    AVI MOSHENBERG (TELEPHONICALLY
                         Lawson Moshenberg PLLC
                         801 Travis Street
                         Houston, TX 77002

For United States        HA NGUYEN
Trustee:                 United States Department of Justice
                         515 Rusk Avenue
                         Houston, TX 77002

Court Reporter:          UNKNOWN

Courtroom Deputy:        UNKNOWN

Transcribed by:          Veritext Legal Solutions
                         330 Old Country Road, Suite 300
                         Mineola, NY 11501
                         Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; MONDAY, NOVEMBER 25, 2024; 2:04 PM

(Call to Order)

THE COURT:  Okay.  Good afternoon, everyone.  This is Judge Lopez.  Today is November 25th.  I'm going to call the 2 p.m. case.  I call it the Alex Jones case, but also the adversary case of Wheeler versus Jones.  The Jones case is 22-33553.  Also called for a status conference in 23-03037, which is Wheeler v. Jones.  There's also a TRO hearing and a new adversary proceeding in 24-03238.  I should put on my cheaters to read it better.

Why don't I take appearances in the courtroom and then we'll see if anyone wishes to make an appearance on the line.  If you wish to make an appearance online, I ask that you please hit five star and I will unmute your line.  Why don't I take appearances in the courtroom?

MR. WOLFSHOHL:  Good afternoon, Your Honor.  Joshua Wolfshohl for the Chapter 7 Trustee from Porter Hedges.

THE COURT:  Okay.  Good afternoon.

MS. JONES:  Good afternoon, Your Honor.  Erin Jones for Christopher Murray, Chapter 7 Trustee.

THE COURT:  Good afternoon.

MR. JORDAN:  Your Honor, Shelby Jordan, here with my partner, Antonio Ortiz, as counsel for Alex Jones, along with new counsel, Mr. Ben Broocks here for Alex Jones on all

the matters you mentioned.

THE COURT:  Okay.  Good afternoon.

MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen for the US Trustee.

THE COURT:  Good afternoon.

MR. CICACK:  Your Honor, Walter Cicack, C-I-C-A-C-K, on behalf of First United American Companies LLC.

THE COURT:  Good afternoon.

MR. COSTA:  Good afternoon, Your Honor.  Gregg Costa from Gibson Dunn along with my colleague, Jason Goldstein for Global Tetrahedron, one of the joint successful bidders.

THE COURT:  Good afternoon.

MR. KIMPLER:  Good afternoon, Your Honor.  Kyle Kimpler from Paul Weiss on behalf of Connecticut families. I'm joined in the courtroom by my partner, Mr. Paul Paterson.  On the line, our local counsel, Ryan Chapple as well as Alinor Sterling.

THE COURT:  Okay.  Good afternoon.  Anyone else in the courtroom wish to make an appearance?  Okay.  On the phone line, I'm just going to go in the order in which I see them.  Here's a 512 number.

MR. LEMMON: Your Honor, Steve Lemmon for PQPR.

THE COURT:  Okay.  Good afternoon.  Here's a 312 number.

MS. RECKLER:  Good afternoon, Your Honor. Caroline Reckler of Latham and Watkins on behalf of X Corp.

THE COURT:  Good afternoon.  And here's a 713 number.

MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi Moshenberg on behalf of the Texas plaintiffs.

THE COURT:  Okay.  Good afternoon.  Anyone else wish to make an appearance on the line?  And for parties whose lines I've unmuted, I'd ask that you please just monitor yourselves, keep yourselves on mute.  But obviously, when you need to address the Court, I will keep the line unmuted.

With that said, there's a number of matters that have been filed.  Maybe it makes sense, Mr. Wolfshohl, maybe we can kind of just talk high level status conference.  There's a number of things I think we have to accomplish today.  One is just kind of talk general status conference.  I know that the trustee has filed a motion kind of in furtherance of the sale.  So we should talk about that and timing a hearing on that.  And I know that there's a TRO, which we'll take that up as well.  And then as well, I've got to give an oral ruling on a motion for reconsideration that's been out there for some time in the adversary proceeding regarding non-dischargeability of debt filed by the Connecticut plaintiffs.  Mr. Moshenberg, at some point,

I will turn to you just as general status conference about the Texas plaintiffs one, what I would call the other, just to kind of give me a sense of kind of where you think that's going and is there anything else we need to talk about in that one.

But maybe -- I know that there's a motion to disqualify that's out there.  I'm not sure it's set for today.  And if it is, then let's talk about ordering other stuff.  But maybe, Mr. Wolfshohl, I can kind of turn to you and I don't know if folks had thoughts about how we proceed today.  I'll turn it to you.

MR. WOLFSHOHL:  Thank You, Your Honor.  I think that from the trustee's standpoint, the thing we need to get set is the sale hearing.  I presume that -- I think you did set the motion to disqualify for status conference today.  And so to me, those kind of go hand in hand.  So I think if Your Honor sets a hearing on the sale motion, I think Mr. Cicack is going to ask you to set that for the same time.  I think.

THE COURT:  Okay.

MR. WOLFSHOHL:  As far as the trustee is concerned, we'd like to get to a sale hearing as soon as we possibly can.  We're prepared to engage in expedited discovery.  A lot of allegations have been lodged.  We don't think any of them have merit.  We think that the issues that

are in front of the Court with respect to the sale motion is the trustee's business judgment in how he conducted the auction and how he selected the bid.  And we believe that that should be the subject of the sale hearing.  And we would ask that the Court set that for hearing.

I think that, you know, I'm not 100 percent sure of everything that's being requested in connection with the TRO, but it seems to be mostly asking the Court to stop the sale from happening, which we are not doing until the Court hears the sale hearing.  And so I don't really know why anything needs to be done with that today.

I think that a lot of the other requests and demands that are set out in that document seem to suggest that they're asking the Court to impose on the trustee restrictions that would prevent him from fulfilling his fiduciary duties as the trustee of the estate and of the estate assets.

And so I don't think that there's any immediate harm.  I think that we need to get to a sale hearing.  The trustee would like the Court to set a hearing as soon as possible.  We would propose as early as late next week.  We would be prepared to provide the trustee and anybody else that they need to take a deposition of, you know.  I've spoken to Mr. Cicack, I assured him that I was going to produce the trustee for a deposition prior to any hearing.

The trustee's objective is to try to get to the finish line and the Court makes a decision as to whether proceeding with the sale and whether the trustee's decision as to he picked as the successful bidder is either right or wrong.

So that's what the trustee's position is.  And I think in terms of today, I'm not going to speak to the motion to reconsider.  I think that's something that's not really the trustee's not really involved in.  But as far as the status conference and what the trustee thinks in terms of sequencing is sale hearing.  Motion to disqualify can be set on the same day.  I think that a lot of the same issues arise related to that.

And I think that, you know, honestly, I think that the complaint and the TRO are a side show.  What they're really trying to do is stop the trustee from closing on the sale.  We're not closing on the sale until Your Honor hears the sale hearing and that's the appropriate place to lodge an objection to what the trustee is doing, which is in the context of the motion to sell and the motion in furtherance of the winddown order.  And that's where you lodge objections to that and the Court will hear it all in one hearing.

THE COURT:  Okay.  Thank you.  Let me, yes, sir.

MR. BROOCKS:  Just waiting to be called.

THE COURT:  Oh no, you can come on up.

MR. BROOCKS:  Your Honor, thank you.  Ben Broocks is my name.

THE COURT:  Good afternoon, Mr. Broocks.

MR. BROOCKS:  Yes.

THE COURT:  But before you get started, let me just note.  I think there may have been one or two.  I'm not saying it was you, Mr. Broocks, but it just made me think there may have been one or two pro hacs that have been filed for purposes of today.  For purposes of today, any pro hacs that remain pending, you should -- I will grant them for purposes, you know, everyone should feel free to appear today.  No need to ask me for permission to appear to the extent -- I'm not saying it applies to you, Mr. Broocks -- it's a global statement.  Mr. Broocks.

MR. BROOCKS:  Thank you, Your Honor.  Well I got licensed in June 1980.  So I've been here a while in this Southern District.

So, Your Honor, as far as we're concerned, the sale is something we deeply are concerned about because we think the consideration that is offered is fictitious.  It's Monopoly money.  A $1.75 million offer from Tetrahedron doesn't change.  They've got some shifting of consideration and I'm prepared to demonstrate that fairly quickly.  So we think that discovery needs to be had on that.  But more importantly, the Onion Tetrahedron, the buyer, has been --

its president and his officers have been giving interviews throughout the country.  And so the statements that are being made that nothing has transpired, no employees fired, nothing like that is just simply not what the Tetrahedron people have said.

So what we don't know is what we don't know.  We took a cam shot when we went to -- the day of the announcement, we went to the InfoWars website and we were redirect --we went to Google rather.  It said InfoWars and it redirected us to Tetrahedron.  So I don't doubt for one moment what Mr. Wolfshohl says that he truly believes.  I don't doubt that, but we think there's something else going on.

And what we want to do is stop the sale and stop what we don't know.  We have records or interviews that indicate vitamins have been taken, inventory has been taken.  Lots of things have happened that I am quite sure Mr. Wolfshohl is unaware of or he wouldn't have said nothing's happened.  So we would like the injunction to be entered because we need expedited discovery, not just of the trustee but of Tetrahedron, the buyer.

Now, the flip side of it that you alluded to a minute ago, Your Honor, about the announcement of your judgment on the punitive damages, we are new to the case.  And so we're running catching up a little bit.  But we're in

-- I submitted a three-page outline of issues.  And there's a Connecticut Supreme Court case of 2016 that says there's no collateral estoppel in Connecticut until the appellate process is finished.  There's statutes that say effectively you can't begin to collect on a judgment in Connecticut until the appellate process is finished.  I don't believe those authorities have been presented to you.

Now, I saw something last night that the Connecticut plaintiffs disagreed with us on that.  And that's fine, but we would like the opportunity to present two things to Your Honor before you enter a judgment on that.  Number one is this authority right here.  There is no collateral estoppel yet until the appellate process concludes.  We believe that's what Connecticut law says, a 2016 Supreme Court case.

But more fundamentally, this is a freedom of the press issue.  Now what's been briefed so far is freedom of speech.  Freedom of the press is a different animal.  We have maybe 18 different US Supreme Court dictates that say the US -- for example, a media defendant speaking about a matter of public concern regarding people that have thrust themselves into the controversies has to be shown to have had malice by the plaintiffs by clear and convincing evidence.  Disregard it.  Profit motive of a media defendant is irrelevant.  The New York Times versus Sullivan was an

advertising case.  The US Supreme Court's case says black and white, if profit motive of a media defendant were relevant, then all our case law is worthless.  Disregard it. You cannot hold a media defendant responsible for what third parties say.  This goes back to things from the civil rights era where, you know, fiery speeches were being made by people that were inciting, you know, go kill the white man or something like that.  And then they would -- the Klan would try to pin that if people acted on that on the speaker.  Stokely Carmichael, you know, and the Supreme Court says, no, no, no, no, no, that's incitement.  You can't do that.  But yet that is exactly what happened in Connecticut.

What we have here is a judgment $1.5 billion judgment that has been rendered in a court that is 18 miles from the tragedy with a jury of six people who all live there that is unprecedented in the annals of libel law -- and I've tried several libel cases usually on the plaintiff's side.

But what we're saying, Your Honor, is that in addition to the collateral estoppel, the United States Supreme Court has said, thou shalt not.  And we think that this has not been presented to the Court in a way that you can consider it.  And so that is something we would ask you not to rule on the punitive damages until we have a chance

to file.  I've asked for two weeks because we're going to file a motion to reconsider the compensatory side, which overlaps with the punitive because a lot of the arguments are the same because you can't enter punitive damages under any guise, Business Opportunities Act, Intentional Infliction, the Supreme Court says it's all one big ball of wax.  You have to have first found malice by clear and convincing evidence.  And then, and only then, do you get the punitive damages.

So that's what we would like to -- Mr. Wolfshohl says he wants to have the sale hearing in two weeks.  That's fine for a week; I don't care.  But we would like discovery of the Tetrahedron people to find out what they did.  And we would also like you not to enter your order on the TRO reconsideration until -- I mean on the punitive damage until you've had a chance to see our briefing on it, which will be forthcoming.  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Cicack, good afternoon.

MR. CICACK:  Good afternoon, Your Honor.  I represent --

THE COURT:  Mr. Cicack, can you just make sure the mic just gets a little close?  I just want to make sure everybody can hear each other.

MR. CICACK:  Thank you.  I represent First United

American Companies, who is designated as the backup bidder. And we did file a motion to disqualify what's been designated as successful bidder. I do think that we can do expedited discovery and be back here in two weeks or maybe two weeks, probably the end of next week.

THE COURT: I want folks to consider. Everybody's telling me two weeks. Thanksgiving is like this week and I don't -- fine with me. I don't have to -- I'm not getting deposed, but I just want to make sure that folks feel comfortable that whatever date we pick is realistic in light of in light of the parties. And maybe it is, maybe it's not. I just, I want to just pick the right date.

MR. CICACK: A lot of it's going to depend on -- and I appreciate Your Honor bringing that up, but a lot of it's going to depend on when we can get the depositions.

Chris Murray, I think getting him is going to be easy. The gentleman from Tranzon, who we've already gotten a commitment, can make himself available for deposition pretty quickly via Zoom. I also want to take the deposition of the Global Tetrahedron people. And also I want to take the deposition of somebody who can speak on behalf of the Connecticut families in terms of what their role was in this bid.

Now, there's a couple of very tricky issues in connection with this bid and one just sort of overarching

issue, which is this what they call this distributable proceeds waiver, which is basically -- I don't know if Your Honors had a chance to go through --

THE COURT:  I've read everything.

MR. CICACK:  Okay.  So basically, I think the threshold issue, which if Your Honor decides that this sort of consideration shouldn't even be considered, that seems to me to be a very basic question.  And if the answer to that is no, well, then there's a lot of discovery and a lot of briefing that need not be done because their bid would not be the highest and best bid.

So there's the issue of whether or not as a concept it's appropriate.  But also there's the issue here which is whether or not in the context of this proceeding, it's appropriate, whether there was disclosures and things of that nature that gave us fair notice that this sort of consideration would even be considered or whether this sort of consideration is even highest and best.

But the first issue is, can it even be considered?  Because if it can't be considered, their bid is gone.  And why do we need to go all do a bunch of discovery when their bid is going to be gone?  Now what happens there is going to be up to Your Honor, whether Your Honor says take the other bid or do something else.  But it seems to me that's a pretty discreet issue on whether or not this concept, which,

by the way, I think every lawyer in this room is going to say they've never seen it in a bankruptcy auction process. But whether or not this concept is even something that can be considered by the trustee as consideration, as currency.

So that's a threshold issue. And even if Your Honor says, well, you know, theoretically, I can see how it might work. And if that's the case, that's the case. But then we would have to go to discovery and show Your Honor how it violates the sale order. It violates the instructions that we were given. There was no transparency and, you know, we'll get into all of that. They have their arguments and we have ours.

But the threshold issue may be one of just law, whether or not this is something, this type of currency is something that can even be considered.

And so, I'm not trying to make more work for Your Honor. And Mr. Wolfshohl and I have talked about this as a possibility. I'm not trying to dictate to the Court how it runs its docket.

THE COURT: I understand.

MR. CICACK: That may be a way to go. If we get past that hurdle, if Your Honor says I want to handle it all at the motion stage at the hearing stage, that's fine. The more I think about it, the more I'm thinking maybe we need the next week of the 13th as opposed to the sixth because we

do have a bunch of -- we're going to have at least four depositions.  Somebody might want to take, you know, my client's deposition, which we're more than welcome to give.  So, thank you, Your Honor.

THE COURT:  Thank you.

MR. GOLDSTEIN:  Good afternoon, Your Honor.  For the record, Jason Goldstein from Gibson Dunn on behalf of Global Tetrahedron.  Thanks for having us today and thanks for accommodating us.  We're also new to the case, but we wanted to introduce ourselves and just lay out a couple of things from our client's viewpoint.

So we understand there's a lot of history here, but to us, this is a pretty typical sale process where we had a winning bidder announced.  We're now almost two weeks past the time that the auction closed.  And there's still no sale hearing set.  So we would echo the trustee's request to set that hearing as soon as possible.

We understand there are some things that need to get done in advance.  We think that the issues are extremely limited though.  Really all that should be up, the sale hearing is the trustee's business judgment in designing the process and in selecting the successful bidder.  And I really don't see anything in the motion to disqualify.  That, I think, is highly irregular or the TRO which doesn't seem necessary -- I agree with the trustee there -- that

wouldn't get addressed in a regular sale hearing in the context of a sale objection.

So all the parties would be heard at the sale hearing.  They can put forward the positions that were just articulated by Mr. Cicack, that the consideration doesn't fit within the procedures.  I think we need the evidence from the trustee in front of the Court in order for the Court to hear that.  I don't think it's otherwise an issue for discovery.  The discovery should be limited to what the trustee was considering when exercising his business judgment.  We can do that very quickly.  I don't think that requires a host of depositions.  I don't think that requires discovery from competing bidders.  And I don't think that would be appropriate for a party with no pecuniary interest here, the Jones party, or a competing bidder to take depositions of other bidders.

This is all about business judgment.  If there is grave concern about what's happening in the interim, which I'll just say, some of what we heard from the Jones folks just a kind of iterates what we've seen in the media, statements about what my client is doing that have no basis in fact.  If you went to the InfoWars site right now, it doesn't redirect anywhere.  We think all of that is noise. It's outside of the context here.  What we're looking for is just to get clarity on the process, get the sale approved.

And if there is concern about what's happening in the interim, having the sale hearing as quickly as possible on these limited issues, which I think it will address. Everything that's covered in the motion to disqualify, the TRO, the sale hearing would be the most appropriate way to give all the parties certainty as to the process, certainty of what's happening in the interim. It will alleviate the burden, the cost, the expense on everyone. And I think hopefully streamline this process. Thanks, Your Honor.

THE COURT: Thank you.

MR. PATERSON: Good afternoon, Your Honor, Paul Paterson from Paul Weiss for the Connecticut families. Your Honor, I'd just briefly like to touch upon the sale and the non-dischargeability proceeding. On the sale, I won't belabor the points. We would agree with the points that were just made by Global Tetrahedron's counsel.

I would just say on the discovery point, Your Honor, the central issue here is whether the trustee appropriately exercised his business judgment. We've heard no reason at all why discovery from the Connecticut families would somehow bear upon that. So we would submit that's inappropriate.

Your Honor, on non-dischargeability, we just heard and we saw in the brief that was filed a few days ago, the supposed new legal arguments that were raised. As Your

Honor knows better than anyone, there's a lot of history here. Our case was filed more than 18 months ago. There was extensive briefing before Your Honor, extensive briefing on the motion for leave to appeal. There's been extensive briefing on a motion for reconsideration that was filed more than two months ago. And, Your Honor, we believe now is the time to bring this to a close as Your Honor had suggested. Because if we do need to pursue additional proceedings in this court, we're going to have a lot of work to do, Your Honor, and we want to get on with that sooner rather than later. Likewise, if we have a final decision that can go up on appeal, then the parties might as well get on with that.

Just to briefly respond on the merits on the two supposed new arguments. One is this claim that collateral estoppel somehow doesn't apply until every appeal or one appeal in Connecticut plays out. Your Honor, we set this forth in our submission. That's simply not the law. The case they quote is dealing with a situation where a party has no right of appeal because of mootness. That does not suggest that a decision cannot give rise to collateral estoppel even if it's being appealed.

The Connecticut Supreme Court said it can more than 40 years ago. Collateral estoppel still comes into play even if there's an appeal. We cite the decision in our brief. We heard no response to it this afternoon.

Similarly, on these First Amendment arguments, I really would just refer to what Your Honor said in your non-dischargeability opinion the first time, which is that they're free to raise those in Connecticut. They can raise those on appeal if they want, but that's the place to raise them as the Fifth Circuit made clear in the (indiscernible) case. It's not their prerogative to come into this court and try to collaterally attack the Connecticut judgment on First Amendment grounds. That's all I have. Thank you, Your Honor.

THE COURT: Thank you. So let me kind of just thank you for -- let me just talk generally. And I know that there are some additional parties who may wish to be heard on some matters and certainly as we kind of get into the specifics about the sale hearing, we can talk about it.

A couple of points. In terms of timing for the sale hearing, here's what I would say. I think that the earliest that I could do it legitimately would be Monday, December the 9th at like 1:00 p.m. There's a hearing at one that I could move and maybe parties can look at that. If we can't, then it would have to be probably December 17th at 1:00 p.m. But once we start, we're just going to go and we'll take up the sale hearing, all in one hearing. And that would be taking up the trustee's motion about the sale, to approve the sale. And there, X can raise its objections

and certainly be heard in connection with the sale.  And I know parties are talking from what I've read in the pleadings.  And everybody's rights are preserved.  I don't want to take anything up or talk the substance of kind of what happened there.  But we can take it up on the ninth or the 17th at the sale hearing.

And just to kind of level set because I know there's many parties listening.  And I just think it's important.  We held a hearing a few days ago based on an emergency status conference raised the backup bidder.  At that hearing, I expressed some concerns, two concerns.

One was that the backup bidder didn't know what the winning bid was.  And two, just about -- there were some concerns raised about transparency and process.  There was talk at that hearing that some individuals had been told to not go to work to "preserve the assets" and folks have taken some actions.  And I wanted to make sure at that hearing and even may have said something to the effect that, you know, we're going to hold an evidentiary hearing and we're going to find out exactly what happened and what.

In it I was told, later on in the hearing, that the trustee was going to file a motion to seek approval.  And that gave me comfort that the evidentiary hearing that I wanted to hold could be replaced, quite frankly.  I just wanted to make sure that there was a hearing so there would

be transparency about what happened and the process, everybody can have their day in court.  It's not unusual for a party to object to the sale.  It's not unusual for a party to argue that the debtor can't sell a certain asset that was to be sold under the sale.  I just wanted to make sure that we had a transparent process.  And I was concerned that we weren't going to have that kind of a hearing.  But we are.

I was also thinking about this from the perspective of the backup bidder to make sure that the backup bidder felt there was a fair and transparent process and they come to court and seek relief before a sale occurred.  I also wanted to make sure -- and I had said this at a prior hearing -- I was also thinking about the purchaser.  I didn't want to sign an order saying the purchaser had sold something -- had purchased something free and clear only to get sued in state court later on a host of issues.  If there were concerns about issues relating to the sale, I want to deal with them up front rather than sign an order and have it dealt with in other places.

So I'm happy that the trustee has signed -- has filed the motion.  It sounds like parties can come in pretty quickly.  I'd say, you know, the ninth or the 17th, you all are going to have to figure it out.

In terms of depositions, I think for parties who oppose the sale, what I would say is start with the trustee.

I know that there are some concerns that the trustee may have spoken to parties, you know, after the sale or I should say after the initial bid.  I'm just saying what's alleged.  I don't know what's true or not true and I'm not here to judge and I don't want anyone to read into it.  I'm just dealing with the allegations.

I think you ought to start with the trustee, get a date, and if it turns out the trustee had multiple conversations after, then I think you can turn to a representative of, I think, global Tetrahedron is the purchaser.  So I think that's who you would go to next one party.  I'm not sure anyone needs to bring in any other families.  Global Tetrahedron is the purchaser.

I don't know what -- quite frankly, you know, when you turn on the news, you can't help but see some of it, but I'm making it very clear.  My understanding is that the sale has not been approved, that maybe there were some things that after our initial hearing have kind of gone back to status quo.  Maybe that's the case.  But until I approve that sale, what we have is a notice of a winning bidder and a proposed backup bidder and there's a sale and challenges to that hearing.

So we'll have an evidentiary hearing where parties will be able to put forth their case and we'll see where it goes.  I don't want to prejudge it.  But I do agree a

central issue will be the trustee's business judgment on that date.  I don't want to hide any thoughts that I have as well.  I know PQPR is lurking somewhere there and what considerations the trustee had as it relates to a secured party who has been alleging a lien on all of those assets as well and what considerations went to that.

I'm putting it out there now because I don't like -- I don't want there to be -- me to be surprising anyone with questions that I may have.  I want a fair and transparent process and let's just see where the process goes.

Maybe the trustee -- is that everything right?  And the order complies.  Maybe he didn't.  I don't know.  That's why we have hearings and that's why, well, everybody will have their day in court.  And I don't want to prejudge it and I don't want anyone to read -- I expressed my concerns.  That's why we're going to have an evidentiary hearing and that's what I wanted and that's what we're going to have.

So, I don't know what the best date is.  You know, I'm just going to ask you all to just get with my case manager and go, but we're going to start at one o'clock and we'll just go till we're done.  I'm not inclined, at this point, to hear the motion to disqualify without further evidence.  I want to take up the sale hearing first.  And if

I hear something that gives me grave concern, then we can take it up.  But as of right now, I don't want to take that up.  I want to take up the sale hearing and let's see where that goes.  I think that may drive a lot of what happens or doesn't happen on a go forward.

So, what I would say is I don't want a dual track a motion to disqualify.  I want to take up that on an emergency.  This is going to be taken up on a really quick, what I would call an expedited basis on the ninth or the 17th.  I would abate any discovery or anything related to the motion to disqualify until we know more.  But I want to hear more before we go forward on that.  I want it very focused so we're really on the trustee's business judgment on what happened in connection with the sale, whether the sale should be approved and what findings I can make in support of that, whether -- what assets can be sold, if any, and where we go.

I think there's a lot of questions to answer, a lot to be done on the table there.  I'll stop.  Mr. Wolfshohl, it sounds like you want to tell me something.

MR. WOLFSHOHL:  I just wanted to say the ninth does work for the trustee.  I don't know if you want to talk about that.  You mentioned possibly contacting Ms. Saldana.  So we can do that, but I can tell you right now --

THE COURT:  No.  I want the parties to confirm

because I don't know who can be scheduled on what day and what makes sense.  And I just -- I'd rather you all just -- but when I am asking -- what's today?  The 25th -- by tomorrow, you should have an answer to these questions and I don't know who is showing up, who's arguing what, what needs to get done between now and then, when the trustee is going to be available and, and the deponent -- and the folks who are going to depose him and all that stuff.  We're going to pick a date that makes the most sense and go forward and do that.

And so I'm just telling you two days that work, but someone let my case manager know and if there's disagreement on the date, then you all let me know and then I'll just pick one too.  But we'll proceed there.

As it relates to the oral ruling in Case 23-03037, I would note I can't believe when I went back and looked at it, I had to check it twice.  I entered the memorandum or decision on October 19th of 2023.  That was almost over a year ago.  The matter was appealed to the district court.  It was there hearings were held, came back to this court, let's say around June of 2024.  In September, the Connecticut plaintiffs filed a motion seeking reconsideration.  It's been out there for two months.  I understand that there are other potential motions that could come.  But my job is to rule upon the pleadings that are set

before me.  And if somebody else files something, I'll consider it, but I don't want to wait on what could be coming.  I need to rule on what's been out there since September.

And it's not like we haven't been doing anything. There were a number of matters and parties were asking for extensions of time and I had signed some.  So here's what I would note that there was a motion to reconsider the Court's memorandum decision on a motion for summary judgment against Jones specifically filed by the Connecticut plaintiffs.

In that memorandum decision, the Court considered the motion seeking to determine the extent of dischargeability of a Connecticut judgment for about $1.4 billion against Jones that was rendered by a Connecticut State Court.  The Court considered matters on summary judgment and entered a decision in October of 2023 on that.

There, the Court granted summary judgment on a number of matters, granted summary judgment on 965 million debt for compensatory damages awarded in the Connecticut actions based on defamation and intentional infliction of emotional distress.  I also granted summary judgment on 150 million on what was called CUTPA, C-U-T-P-A, for punitive damages.  I would note that this was a matter for non-dischargeability under Section 523(a)(6) of the bankruptcy code which seeks except from the discharge debts based on

willful and malicious conduct.

I went through the decision, the memorandum decision. And anything I say, I'm referring to the memorandum decision for more specificity. But based on an intentional damage here. And those damages were -- went to the jury. The jury awarded them based on instructions for intent.

The Court denied summary judgment for about 321.65 million in attorney's fees and about 1.5 million in costs awarded as common law punitive damages. And that's what the Connecticut families seek, reconsideration. The basis of the request for reconsideration is that according to the Connecticut families, all of the judgments kind of rise or fall together based upon the evidence that was presented to the jury and based upon the jury's findings. And if I find that the -- they argue that if the underlying debt, the compensatory damages were -- I granted summary judgment on those, and then the damages that flow or the attorney's fees that flow from those damages should also be awarded on summary judgment.

I would note Mr. Jones and his counsel filed opposition to that motion and ask that I not grant reconsideration and let the judgment stand as respect to the, I should say, the common law punitive damages.

I would note that Federal Rule of Civil Procedure

60 applies in bankruptcy cases through Federal Rule of Bankruptcy Procedure 9024 that's a little tricky.  They normally go in line.  But it comes into procedure on the Federal Rule of Bankruptcy Procedure 9024.  Rule 60(b) provides that on a motion and just terms, the court may relieve a party or its legal representative from a final judgment or a proceeding for the following reasons: based on mistake, inadvertent surprise, or inexcusable neglect, newly discovered evidence that with reasonable diligence could not have been discovered in time for a new trial under Rule 59(b), or for fraud, misrepresentation, or misconduct by an opposing party.

And I can also know that there's under six, Rule 60(b)(6), you can also find it for any other reason that justifies relief.  I note that Rule 60(b)(6) is a general catchall phrase.  And if you look at Supreme Court cases like Buck v. Davis, 580 U.S. 100 (2017 case) or Diaz versus Stevens, 731 F3rd 370, a Fifth Circuit 2013 case, they note that the general catchall phrase is reserved for extraordinary circumstances.  And in the Supreme Court case, for example, in the Liljeberg versus Health Services Acquisition, 486 US 847 (1988 case), it provides, you know, United States Supreme Court held that it, you know, provides courts with authority adequate to enable them to vacate judgments whenever it's necessary to accomplish justice.

But also cautioning that should only be applied in extraordinary circumstances.  Motions for reconsideration are generally brought under Rule 60(b).  And I would note that under 59(b), parties can also request motions for a new trial.  But really what they're seeking is consideration of this final piece.  And the parties claim that there's an inconsistency between the Court's ruling on the motion granting -- I should say my order granting summary judgment.  For example, the compensatory damages or the CUTPA damages, but not for the common law damages.

The Court has considered the arguments of the parties and I'm going to deny reconsideration.  I stated the legal standard.  I'm going to stand by every word that I said in the memorandum decision.  I'm going to note a few things.  I did note in here and I stand by that, that there are bankruptcy cases -- I should say, let me back up for a second -- that in Connecticut under state law, common law punitive damages are limited to the expense of the litigation, less taxable costs.  And the jury charge in that case instructed that the common law punitive damages could be awarded if the defendant's actions were willful, wanton, or malicious.

Willful and malicious are based on intent without just cause or excuse, but wanton misconduct was defined as reckless misconduct.  And I certainly recognize that there

are some cases that say that when you look at the primary debt, that that's nondischargeable, then the attorney's fees can flow, including post-judgment interest could also be found as likewise non-dischargeable.  And it was logical. One is logical to presume that a willful and malicious injury based on defamation and intentional infliction of emotional distress were necessary, but unlike the instructions -- and I note this and I'm quoting straight from the decision -- unlike the instructions for defamation, and intentional infliction of emotional distress, the jury in Connecticut, they have the right to award common law punitive damage based on reckless actions or actual intent to cause harm.  And that proved fatal on summary judgment because under the Fifth Circuit law, recklessness does not meet the standard for willful and malicious injury under Section 523(a)(6) and I cited the Miller case, 156 F.3d at 603.

And then also based upon Supreme Court standards, which are cited in the case, there must be intent to cause the injury, not just an act that leads to the injury.  And I found that the record was expressly clear -- was not expressly clear on whether the damages were solely based on willful and maliciousness.  And for that reason, I denied summary judgment on the debt for common law punitive damages.

I also noted, and it was my understanding at the time, that Mr. Jones had appealed the entire judgment. And he had alleged constitutional rights and I noted that nothing in my memorandum order was to prevent the status of those appeals. I had approved counsel, so parties were free to appeal and raise whatever constitutional issues they wish to based upon the Connecticut state court action.

But I'm going to -- the effect of today's ruling is to deny the motion for reconsideration for all bases alleged in the -- requested by the Connecticut family. So the memorandum decision will stand as it is. And that may lead to additional trials. It may lead to other matters. It's not for me to kind of get into that today. There's enough on the Court for us to consider today, but I'm going to deny that motion. I'll enter a short order stating for the reasons stated on the record, the motion is denied.

I would note the Court's ruling is I find pretty standard as it relates to summary judgment based on collateral estoppel from a jury finding in a state court matter. I'm going to limit it to the words that I said and I'm just doing this to help people understand, those who practice in this area and those who are relying on the evidence that was submitted, what the jury found. And I've got to make express findings based on those jury findings.

And when there's ambiguity, I'm going to deny

summary judgment.  That doesn't mean that the debt goes away.  It just means that we need to have a trial on those matters if that's what the parties wish.  But the Court stands on its judgment to date for its, I don't know, 1.1 billion in nondischargeable debt based on summary judgment.  I'll enter a short order on that.

So I think what we need to take up now is, unless someone tells me -- actually, before we take up the TRO, I'd open it up to any party.  I'm looking at Ms. Reckler, for example.  I gave those two dates.  I know that the X's rights are preserved in connection with any sale hearing.  I neglected to open it up to see if anyone wished to be heard in connection with any of those dates.  If they don't work, we'll find one that works.  But everyone's rights are preserved.

Now, if there's anyone who wished to be heard on the sale hearing and timing on that, just get with my case manager, but I want an email with a number of parties, you know, unless there's agreement on it.  And then someone can send out a notice of hearing on it and we'll take it up at that time.

If that's the case, then we should take up the TRO at this time.  Unless there's anything else that we -- oh, Mr. Moshenberg, I needed to ask you in connection with the Texas plaintiffs, I'll grant you there's been a lot of

pleadings that I've read.  I did not see a motion for reconsideration in there.  If there was one, I apologize.  I missed it, but I figured at the status conference, you would tell me one existed or you can tell me kind of where things stand based upon your understanding in the Texas, I should say in the matter with the non-dischargeability claim with respect to the Texas plaintiff.

MR. MOSHENBERG:  Thank you, Judge.  Nothing to apologize for.  We have not filed a motion to reconsider yet.  Candidly, Your Honor, we are making very productive settlement discussions with the Jones side.  We were trying to avoid burdening the Court with additional paperwork and just additional work in general for the lawyers.

We are not making progress quickly enough.  I'm still hopeful.  But I think at this point, what I'd like to do is I'd like to get with the debtor -- or not the debtor, excuse me -- the Jones side and really focus on getting the court of schedule for litigating the adversaries on the dischargeability, action, Your Honor.  And we can file a motion to reconsider in connection with that as well, Your Honor.

THE COURT:  Okay.  So I would just -- just to make sure that I see it and I'd rather see it sooner rather than later, even if it's not set that as quickly -- whatever you all file, I appreciate the update.  I would just ask that if

you, if something gets filed, either a scheduling order or some form of an agreement or if somebody wants a status, just file something so that there's transparency on the docket as to what we're doing.  And then someone can let my case manager know, and we'll pick a date and we'll come back or someone will alert me that something has been filed.

Just the reality, unless something gets filed as an emergency or an expedited, it may take 20, you know, 20 or so days before it hits my radar screen, but in this case, I'd rather see something sooner rather than later.  So I'm thinking about it as we get closer to the end of the year and anything related there.  Okay?

MR. MOSHENBERG:  That sounds like a plan, Judge. Thank you.

THE COURT:  Okay.  Thank you.  Does anyone, before we turn to the TRO, is there anyone else who wishes to be heard in connection with the sale hearing?  And everybody's rights again will be reserved.  I guess we ought to pick an objection deadline if we're going to pick -- I know it's an expedited hearing but, what I would just ask and I'll throw this out for the parties and this is more for me, if we're going to go on the sixth, I would ask that any objections get filed by December 4th by, you know --

MR. MOSHENBERG:  Do you mean the ninth, Your Honor?

THE COURT:  Yes, I say yes.  If I do it by the ninth, then by the sixth at 5 p.m. Central.  And if we're going to do the 17th, then I'll give parties -- if we're going to do the 17th, then let's do the 11th at 5 p.m. Central.  I'm trying to avoid the Sunday night special on the pleadings so that I can actually read it and see where things are and get a good understanding.  But I don't want it so far out that we can take it -- and everybody's rights are to be preserved on that.

Okay.  Let me ask before we turn to the TRO.  Is there anything just case status conference, general update, general issues, does anyone wish to be heard either on the line or...  Okay.  Let me turn to the TRO then.  Who's going forward on that?

MR. JORDAN:  Shelby Jordan.  I'd like to just very briefly lay the background on the TRO and why it was so quickly filed after the announcement on Thursday.

The Court, I think, is aware that on Thursday morning, equivalent to the time that there was a transfer -- I mean there was an announcement of a bidder, the trustee had driven to Austin and had ordered that the show cease, that the website not just play reruns and advertisements, but go dark.  And then shortly after it went dark, a new website popped up which was InfoWars, but claimed to then be owned by Global Tetra.  And that, in fact, you can find that

today.  And how that got redirected from our dark website without passwords and things, we have no idea.

And I only want to give the Court the background with respect to the TRO.  Alex Jones wasn't a quick pistol about coming in and complaining.  It was the fact that everything had been shut down.  Employees were asked to leave.  There's an argument about whether they were fired or not or whether they were told they were fired, but they were asked to leave.  There was concerns about they might be taking things or stealing things.  But there were terms of a bid acceptance that the trustee was performing, that we had never seen anywhere, not in the current motions or otherwise.  Someone instructed the trustee to go shut down the business because up to the point of it's turning off, it was running 50 to $60,000 gross a day.  And, of course, shutting it off dropped it to almost nothing and then switching it back on, which I wanted to report to the Court that it was switched back on about 24 hours, and things have sort of turned to normal.

But the second issue we had was the bid packages that we got access to once the bids were announced, the bid packages showed both the joint bidder, which was Global and the Connecticut  plaintiffs, and the other bid, FUAM was -- they both bid on Lot 4.  And that was critical to us because Lot 4 was all of the IP that included a long list of names

with Alex Jones on it.  And that had been attached with a notation saying that -- and let me get it right by correctly reading it -- when the sale occurred -- when the sale bids were asked for, there was a Lot 4.  We didn't have access, we being counsel, because we weren't bid bidders to all of the documents.  But what we discovered was Lot 4 said the contested domain names are owned by FSS and may be sold. But Alex Jones currently contests FSS ownership and transferability.

So what they did was, at least in our opinion, was to simply ignore the October 6th ruling of the Court and say don't sell something that is in dispute.  Come to me and tell me about it.  And so our reaction wasn't knee jerk. Our action was very concerned.

Now, I'll say this.  Again for the sake of this record, that sale motion, after all the objections had been filed, the sale motion was filed and the document that's marked Lot 4 is now marked "Excluded Assets."  So apparently much of what our temporary restraining order is directed to is being addressed by Mr. Wolfshohl and by the trustee to try to put things back into status quo so that maybe the necessity of evidentiary hearings or the necessity of you entering a TRO.

Because at this point, we are satisfied that operations seem okay, but we're very dissatisfied we don't

know what happened.

And here's a dynamic that I want the Court to just hear. I don't know whether it's something the Court needs to take into consideration or not, but I think you need to hear. And that is that since this case was filed, I'm talking about the original pleadings, during the trial and arguing to the jury --

THE COURT: Which case?

MR. JORDAN: The Connecticut plaintiff's case in Bridgeport, Connecticut.

THE COURT: Oh, okay.

MR. JORDAN: Since that filing -- and I apologize.

THE COURT: No, no, no worries.

MR. JORDAN: I think it's important for the Court to understand that when you look at -- and we have cited the video sections so that you can hear the arguments if it becomes relevant. But from that beginning process, through the jury argument, their argument was to the jury punish Alex Jones such that he can never have a platform and be part of the public discourse again.

Now, we also allege that that's an unconstitutional argument, but that was made to the jury in Connecticut. We have the video for the Court to consider. And here's the only reason I bring that up. What has happened is something I've never seen in a bankruptcy case.

And that doesn't mean a whole lot to a lot of people, but I've been around a long time and I've never been in a case where a creditor comes to you and says I'm objecting to the discharge, Judge.  I want him to pay that money.  He owes it to us for the rest of his life if that's what it takes.  And of course, that's what's going to happen here.  It'll be, if the discharge is denied, it's a tattoo for the rest of his life because he can never pay back a 1 point billion dollars.  But that's not my point.

My point is that all of a sudden your sale process has been converted to something completely different.  This is not a creditor coming in saying we want to buy this asset and reduce our judgment.  This creditor comes in and says, part of the creditor, we want to buy the assets, but we're not going to accept money, so we're not going to credit our judgment.  So Mr. Jones still owes whatever that is.

But what we're going to do is buy the assets so that we can give it to a company that will shut it down, fire the employees and open it and use only those parts they like to pursue their agenda, which means that we want the objection to discharge considered by this Court.  And we want you to also understand we're taking away -- we want you to take away his method of earning an income so he could never pay it.

And the point being that dilemma -- I mean that

dynamic creates a dilemma that is not usually -- I mean the issue of a fresh start versus dischargeability is always before the Court.  I mean that's what you weigh and that's why the standards are as high as you've been discussing and why the criteria is the way it is, what you found in your orders.

But when you then take -- the next thing they ask you to do is sell the property to us so that we can be sure he can never pay us.  And that's what dynamic is new.  Now, I don't know where this goes because I have been searching for a case where a creditor comes in and says I want it nondischargeable and I don't want him to pay it.  I want to punish him for the rest of his life so he cannot pay it.  Now, that leads me to the question about the about the TRO and that is that --

THE COURT:  Your argument, if I understand you, Mr. Shelby, is that the, I guess this is more of a sale hearing argument, but the sliding scale really just pushes off the amount of debt that would have been paid as an unsecured creditor to the nondischargeable.  So someone is essentially foregoing the right to receive a debt in the bankruptcy case because they're standing on a large nondischargeable debt and they can proceed.  So, the debt doesn't go away, but they can't credit it either because they're an unsecure creditor.

MR. JORDAN:  Yes.  And well, not just that.  They don't even have an allowed claim because the issues that were brought earlier --

THE COURT:  I'm not agreeing or disagreeing with you.  I'm just making sure that I understand the argument for purposes of today.  I just want to be clear about that.

MR. JORDAN:  It actually had two elements.  One was the one you just mentioned and then from the standpoint of shutting the business down, if you -- because the dynamic -- and I'm not sure where this goes except I want to be certain the Court understands that we want discovery on what I'm calling motive and motive in the sale because they raise in their response, they say there is a public policy aspect and the --

THE COURT:  Who's the "they" in your --

MR. JORDAN:  I'm sorry.  The Connecticut plaintiffs.

THE COURT:  Okay.

MR. JORDAN:  The Connecticut plaintiffs raise in their pleading that there is a public social responsibility for selling assets and the Court should consider that.  Now they don't say what it is in this case because I think it's a political stance as opposed to a social stance.  But I wanted the Court to hear that with respect to the TRO, notwithstanding the fact that I think the status quo is very

close to being met, and I don't have any reason to think that once we meet with the trustee and Mr. Wolfshohl that if we have some issues on status quo, we'll get them resolved. So that probably a hearing at the same time as the other sale motions is involved will work for us principally because some of these issues are going to bleed over into the sale. Some of these issues are going, in our opinion, going to bleed over into the motion to reconsider that we want the Court to undertake someday. And I think --

THE COURT: The sale is going to come down to what happened, right? What was the process? What was actually sold? What does the purchaser think they purchased? Is it the same thing that was -- is it Lot 4 or something else?

MR. JORDAN: Yes, Lot 4.

THE COURT: And what's in it, right?

MR. JORDAN: Yes.

THE COURT: And then the trustee's business judgment process and is this the highest and otherwise best offer based upon the process that was run and based upon the considerations of, you know, there's a secured creditor out there.

MR. JORDAN: Well, yes. I mean everything you said is correct. And the problem I'm having in making kind of my position, my position of concern made clear is let me use an example that really doesn't apply, but it might, and

that is claims trading.  You can buy and sell claims all you want to.  You can buy a claim and come in and use that claim to oppose a plan or you can use that claim to do various things.  That's perfectly allowed.

But when you buy a claim and you use it for those kind of purposes and they just -- and the system discovers that your motive for the claim was not to reorganize or protect or collect, or improve on the claim.

The motive was to, for instance, I'm a competitor and I bought it for the sake of shutting it down so I could buy it at a depressed price as a competitor.  So I had nothing to do with buying a claim and asserting the claim for the purpose of a legitimate claim.

And that's the concern that I want to express to the Court just because I suspect there will be some issue on discovery that is going to come from our requests of the representative of the plaintiffs, whether it's counsel or whether it's counsel and some of the individual plaintiffs.

And that is that the motive that's involved here is the one that says, I want your claim deemed nondischargeable and I want to cut your legs out from under you so you can never pay it back.  And that makes no sense.  I mean that's, excuse me, that doesn't make any intuitive sense.  If you want a claim dischargeable, so it's going to be paid, you can't walk in and out of bankruptcy and not pay

it, why would you take a position that they have that we are going to destroy the mechanism by which you earn money?

THE COURT:  Mr. Shelby, so today is about a temporary restraining order.  What am I being asked to restrain?

MR. JORDAN:  At this point, I'm not sure anything. I think the only question because you didn't mention discovery.  You mentioned discovery with respect to the sale motion.  I wanted to discuss that issue with you and make sure that I gave you a heads up on the fact that that may be a discovery conflict and I wanted to be sure the Court was --

THE COURT:  Here's what I'd say.  Approving a sale, right, comes under a specific bankruptcy code section and there's case law about what the trustee is going to have to establish to do so.  And the code will have a say in whether that business judgment was exercised or not.  And that's where the business judge is going to come down to, that's coming out of Fifth Circuit case law, but it's also an evidentiary hearing, right?  We're going to have to determine what that is.

I think we need to have an initial hearing to determine what happened and what the trustee's business judgement was.  If the sale, I don't approve the sale -- I'm making something up -- if I don't approve the sale, the

emphasis has got to -- to me, the Connecticut plaintiffs' motives aren't really going to move me as to whether I approved the sale or not.  What's going to move me is what the trustee's business judgment was and whether it made -- and the process and the transparency in the process.  That will then determine whether I approve the sale.

But I got it.  You all feel like they had certain conversations and, you know, there may have been some stuff going on.  Go take a deposition or two and go find out what we have and let me know where we are.  But I want to take things one step at a time.  And I got it may overlap, but I want to make sure that we're doing things one step at a time so that there's a clear record.  Here's a sale.  Here's what's being proposed to be sold.  Was this approved?

I'll grant you, last week, it sounded like there were a bunch of moving pieces, but maybe some statements I've said have kind of put things back in status quo.  And I would note for the record, I think to the extent there's any confusion about where things are, there's a motion to approve a sale.  The trustee remains.

I have heard no -- I know the trustee last week expressed some concerns about once people found out who the proposed purchaser was that there were going to be some -- I haven't seen any evidence of that, nor have I heard of any. No one's going to snatch stuff or take any actions.  If it

ever becomes an action, then people can get me and we're going to have a hearing within 24 hours, but without evidence to the contrary, I think whatever was status quo, preauction remains status quo.  And if I sign an order approving the sale, then then things change and parties will have their rights.  But if not, then either -- there's only a few ways this can go.  I'm either going to approve the sale, I don't know, kind of order a new one if I don't like the way this one went, right, or just deny based upon what I hear and that may then lead to other hearings is what I'm saying.

So I want to just keep the sale hearing on the forefront.  That is what Mr. Cicack's client is saying.  The backup bidder is saying, don't approve it.  Jones is saying, don't approve it.  Let's take this up.  X is saying you can approve it, but you can't buy this.  Let's just take up a hearing, get the evidence in front of us, and let's all be smarter.  I take comfort that the Office of the United States Trustee is here.  And I don't want this playing out based upon statements made before me.  I want to have a hearing where we put people on the stand and see where things go.  Let the evidence prevail.  And let's set a hearing and let's do it in a couple of weeks and see where we go.

So let me just note, I don't see the need to enter

a TRO today, but what I would say is things should be wherever they were before there was even an auction as it relates to the assets. And, in other words, you know, I would say I did express some -- and this is just the bankruptcy judge in me -- that before folks, you know, firing folks, you know, a week before Thanksgiving is just kind of not what we do without real reason.

But it sounds like none of that has occurred and folks are continuing to work whatever jobs they have. Status quo will just remain. And if anyone has an issue with that or wants me to change the status quo, then they're going to have to come in front of me and ask me to change that status quo. So you're kind of getting the order. I just don't think I need to enter it. But I don't think there's anything for me to restrain now. It seems like things have gotten back. But if you find out anything has changed, we're going to have a hearing within 24 hours and that'll be a very quick hearing if things have changed. And whatever was status quo, we'll do.

Let's just have an evidentiary hearing and transparency there will serve us all best. So that's what I'll say.

MR. JORDAN: The only observation I made -- I'm very clear on what you said -- we (indiscernible) won't notice depositions under the adversary. We will participate

in the sale motion and expedite discovery.  But one thing I want to note is there is a continual flow from Global Tetrahedron, from The Onion, that they are the owners, that they have a website that you can find today that says InfoWars Global Tetrahedron.

And so I'm going to explore, Your Honor, based upon your comments.  I think they're helpful.  I'm going to explore that be ceased until we have a chance to --

THE COURT:  It's got to cut both ways and I'm not telling Mr. Jones what to say either.

MR. JORDAN:  I understand.

THE COURT:  I have no idea what he's saying one way or the other and I have no idea what The Onion or other folks are doing as well, but whatever it is, this is going to -- the decisions I make are going to play out in front of me.  Parties have whatever rights they want to say.  I don't want to infringe on anyone's First Amendment rights, but just in terms of what actions the trustee takes or whether anyone tries to assert ownership over assets, what I would say is everyone should be mindful -- and I'll just say this as a general matter -- be mindful of the automatic stay, be mindful of the bankruptcy rules, be mindful of the statutes.

Everyone here has sophisticated counsel.  There are real lawyers in the room and they know what to do.  I'll just leave it there.  Thank you.  Yes, Mr. Broocks.

MR. BROOCKS:  You know, if you're going to enter an order maintaining status quo, we would like, we would request that you include within that if something has been taken from, you know, FSS that it be returned.

THE COURT:  I think embedded in what I've said is I'm going to ask the trustee to just take a hard look without casting any -- whatever status quo looked like the day before the auction in terms of who held what, that's where it should go.  And it's -- that my understanding.

MR. BROOCKS:  So if a mirror image of the hard drive of FSS computers has been taken and given to Tetrahedron, I'm just asking you, Your Honor, we would assume that you saying status quo means give that back.  I would assume.  I don't know.

THE COURT:  Mr. Wolfshohl.  I don't even though if that exists.

MR. WOLFSHOHL:  Absolutely, absolutely not.

THE COURT:  But whatever the world looked like right before, that's what it ought to look like.  And if anything has changed -- and again, everybody can get in front of me really quickly, but I don't want -- let's get quickly -- let's just have a hearing and we'll see where things go.  Mr. Kimpler.

MR. KIMPLER:  Thank you, Your Honor.  Kyle Kimpler from Paul Weiss on behalf of the Connecticut families.  I

just, I'll be very quick.  You'll have a hearing.  You'll see the evidence.  I or my clients did not direct the trustee to go to Austin and do anything last whatever it was, seven or 10 days ago.  I'm just saying that.  You'll hear the evidence.  You don't have to believe me.  But it's a spun conspiracy theory.  Nothing there.

THE COURT:  Okay.

MR. KIMPLER:  I agree with you the motives of my clients are not relevant.  I think the focus of a sale hearing should be the trustee's business judgment.  I think we all agree.  That's what the case law says you should look at and it's the standard on which we will evaluate the sale here.

If we're going to get into motives, I think it opens a trap door to a lot of other things.  For example, what you just heard, how could my clients be wanting nondischargeable judgments but wanting to shut it down?  Well, every day I hear Alex Jones on his show.  He's not advertising or saying buy InfoWar stuff.  He's saying go to my new platform, Alex Jones network.  That's where you can support me.  Not relevant to today, but if we're going to get into motives and we're going to start accusing my clients of having no economic interests, I'm going to say that there's more to that story, that there are other places where there are economic interests, that there are things

that Mr. Jones is doing right now by trying to delay this process so that he has more time on his show to direct his followers to his new platform.  We can put in evidence on all of this if it's necessary.

But I think it makes the hearing a lot more complicated and a lot more cumbersome.  And I think you had it right when you said the question here is pretty simple, it's the business judgment.  Now, obviously, if the evidence comes out different than I'm telling you it is and you see that there's some, you know, instruction we're saying you have to go shut down Alex Jones maybe, that opens up other things, but you're not going to see that, Your Homor.

THE COURT:  Okay.

MR. KIMPLER:  Thank you.

THE COURT:  Let me just note and I'll say this for the record and parties here know this.  I am about as literal as they come when it comes to the code.  It is contextually based as close.  I'm going to follow exactly what the Fifth Circuit has told me to do and I don't read into it.  I don't see this as a case of bringing in the equities to whatever they are.  This is standard case. We're going to have an evidentiary hearing.  We're going to trust they will put their case on and we'll hold a hearing on whether the sale should be approved.  And Section 363 and other related bankruptcy code sections will come into play,

maybe 365, but don't lead with 105 here.  We're going to start with 363, 365 and case law.

It's not to -- I lied.  I think the backup bidder expressed concerns.  The backup bidder asked for a status conference.  Backup bidder wanted an evidentiary hearing.  Backup bidder will have that evidentiary hearing and be able to hear the evidence and the backup bidder will be able to present their case and to oppose it.  And as well as every other party, Global Tetrahedron be able to file statements in support.  Parties of interest will be able to participate.  That's why we'll have it.

What I would ask is if any party at this evidentiary hearing wishes to examine a witness, I want you here in person.  If anyone is going to cross-examine, direct or cross a witness, I want the witnesses here live as well.  It required under the rules, but it also, absent kind of certain circumstances, and I'm asking if you're just going to make an argument, okay.  But if you're going to examine a witness, I want you in the courtroom.  I prefer that you be here one way or the other too.  And it also kind of allows for me to avoid any tech issues with witnesses and things of that nature.  So we'll take the hearing up on that day.

I thank everyone for their time and I wish everyone a happy Thanksgiving.  Thank you.

(Proceedings adjourned at 3:23 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  January 6, 2025