# EXHIBIT 7

## IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE SOUTHERN DISTRICT
## OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **FREE SPEECH SYSTEMS LLC** | § | |
| | § | **Bankruptcy Case No. 22-60043** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **FREE SPEECH SYSTEMS LLC** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 23-03127** |
| | § | |
| **PQPR HOLDINGS LIMITED LLC, JLJR** | § | |
| **HOLDINGS LLC, PLJR HOLDINGS LLC,** | § | |
| **AEJ AUSTIN HOLDINGS LLC, AEJ 2018** | § | |
| **TRUST, CAROL JONES and DAVID JONES** | § | |
| | § | |
| Defendants. | § | |

## PQPR HOLDINGS LIMITED LLC'S, JLJR HOLDINGS LLC'S, AND PLJR HOLDINGS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PQPR Holdings Limited LLC ("PQPR"), JLJR Holdings LLC ("JLJR"), and PLJR Holdings LLC ("PLJR") (collectively, "Defendants") hereby file this PQPR Holdings Limited LLC's, JLJR Holdings LLC's, and PLJR Holdings LLC's Motion For Partial Summary Judgment (the "Motion") in support thereof states the follows:

### I.      OVERVIEW

1.      Since at least 2014, PQPR and FSS have been separate companies, with separate sets of creditors, and separate books and records.  PQPR is an insider, but was controlled by separate management from FSS.  While there is some commonality in the ownership, the companies are not the same.

2. PQPR purchased and paid for product from third parties. That product was marketed by FSS which then owed (and still owes) funds to PQPR. The transactions between PQPR and FSS were recorded contemporaneously. While FSS successfully sold the products, it fell behind in paying PQPR. The debt owed by FSS to PQPR was reviewed by an outside accountant in 2020, and the amount shown as owing by FSS to PQPR (on each entity's books) was affirmed. The debt owing to PQPR was documented in two separate notes, and secured by a grant of a security interest in virtually all property of FSS. At that time, PQPR was virtually the sole supplier to FSS. PQPR was unwilling to continue to advance credit to FSS absent the signing of the notes and security agreement.

3. Subsequent to the grant of the security agreement, FSS continued to incur additional debt to PQPR. PQPR continued to purchase product and to sell such product to FSS only because of the existence of the security agreement.

4. FSS has brought a series of claims against PQPR, claiming that the grant of the security interest, as well as payments made to PQPR were fraudulent transfers and preferences. However, the fact remains that since the time of the grant of the security interest, FSS has incurred additional net debt to PQPR of $6,308,483.16. PQPR therefore seeks a partial summary judgment that, at a minimum, it possesses a first lien security interest in the amount of at least $6,308,483.16.

## II. BACKGROUND FACTS

5. FSS was incorporated in 2007.

6. PQPR was formed and registered with the Texas Secretary of State on October 9, 2013.

7. FSS is and always was wholly owned by Alex Jones.

8.      PQPR is owned by PLJR and JLJR.  PLJR is owned by AEJ Austin Holdings LLC, which owns a 90% membership interest, and Carol Jones, who owns the remaining 10% membership interest. AEJ is owned by Alex Jones.  JLJR is owned by Carol Jones and David Jones.  The net effect of the ownership structure is that Alex Jones indirectly owns 72% of PQPR via his indirect 90% ownership in PLJR.

9.      However, Alex Jones does not and has never acted as a manager or officer of PQPR.  Alex Jones has not ever directed the business operations of PQPR.  Instead, Carol Jones is the manager of JLJR.  David Jones has acted as the person who manages PQPR.  Carol and David Jones are the parents of Alex Jones.

10.     PQPR purchased and paid for product from third parties.  That product was marketed by FSS which then owed (and still owes) funds to PQPR.  The transactions between PQPR and FSS were recorded contemporaneously.  FSS initially paid PQPR timely in full for its purchases of product from PQPR. However, while FSS successfully sold the products, it eventually fell behind in paying PQPR.  PQPR showed the sales to FSS as revenues in the PQPR tax returns.  The debt owed by FSS to PQPR was reviewed by an outside accountant in 2020, and the amount shown as owing by FSS to PQPR (on each entity's books) was affirmed. The debt owing to PQPR was documented in two separate notes. These two notes, the first note dated August 13 2020 and the second note dated November 10, 2021, secured the debt by a grant of a security interest in viritually all property of FSS. *See* Exhibit A, Affidavit of Robert Roe, paras. 9 and 12. At that time, PQPR was virtually the sole supplier to FSS.  PQPR was unwilling to continue to advance credit to FSS absent the signing of the notes and security agreement.

11.     PQPR and FSS executed a security agreement (the "Security Agreement"), which was entered into and made effective as of August 13, 2020 (the "Effective Date") relating to both

antecedent debts as well as later extensions of credit. A UCC 1 Financing Statement was filed on November 18, 2020 reflecting the grant of the Security Agreement.

12.    Subsequent to the grant of the Security Agreement, FSS continued to incur additional debt to PQPR.  PQPR continued to purchase product and to sell such product to FSS only because of the existence of the Security Agreement.  The additional amount of debt incurred by FSS and owing to PQPR after the grant of the security interest is $6,308,483.16.  This is a net number, after taking into account the amount of charges from FSS back to PQPR.  In other words, it is unquestionable that PQPR gave new and additional value to FSS in the amount of at least $6,308,483.16 after the Security Agreement was executed.

13.    FSS was able to run up its debt to PQPR only because FSS was the recipient of credit card payments from the credit card processor.  Because of the reputation of Alex Jones, the sole owner of FSS, who was entangled in a series of high-profile matters which brought him into disrepute, FSS was "de-platformed" by the credit card processor. By this time,  it was also apparent that FSS could not be trusted to timely pay PQPR.  Consequently, a third party was engaged to serve as an intermediary and to collect the credit card receivables. That entity held received funds in trust and disbursed the payments to each of FSS and PQPR.

### III.    SUMMARY JUDGMENT EVIDENCE

14.    In support of the Motion, the following exhibits are incorporated herein for all purposes:

      **Exhibit A**      Affidavit of Robert Roe

      **Exhibit B**      Affidavit of David Jones, DDS

## ARGUMENT

### IV.    SUMMARY JUDGMENT STANDARD

15.    Summary judgment is proper in a case in which there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013).  The burden of the movant is to present the basis for the motion and the elements of the claims that the nonmovant party will be unable to establish a genuine dispute of material fact. *Sevick v. Univ. of Texas Houston Health Sci. Ctr.,* No. CV H-16-2803, 2018 WL 6619748, 1 (S.D. Tex. Jan. 23, 2018).  A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine dispute of material fact by either (1) submitting summary-judgment evidence that negates the existence of a material element of the plaintiff's claim or (2) showing there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322–23.  The Defendants, in this case, can meet this burden, as a matter of law, with respect to $6,308,483.16 of value advanced from Debtor's estate based upon a preexisting security agreement.

### V.    THE SECURITY AGREEMENT COVERS LATER EXTENSIONS OF CREDIT

16.    First, looking to the underlying agreements, the Security Agreement related to all debts then existing or created afterwards.

17.    The Security Agreement created a security interest in the following:

> "[...] performance and payment that certain promissory note of even date herewith in the original principal amount of Twenty Nine Million Five Hundred Eighty Eight Thousand Dollars executed by Debtor in favor of Secured Party as it may be amended or modified (the "Note") and any and all other obligations of Debtor to Secured Party of any kind or character, now owed *or hereafter arising* (collectively, the "Obligations")."

5

(emphasis added).

18. Under the Security Agreement, FSS pledged to PQPR a security interest in the following (hereafter, the "Collateral"):

> (1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
>
> (2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

19. The Security Agreement states that the law governing the secured transaction will be the laws of the State of Texas. Texas allows for security agreements to include future advance clauses where the collateral secures future advances or other value. *In re Guiles*, 580 B.R. 466, 470 (Bankr. W.D. Tex. 2017); *see* also, Tex. Bus. & Com. Code Ann. § 9.204(c) (West 2001).

20. The principal test for determining whether a transaction is to be treated as a security interest is whether "the transaction intended to have effect as security." *In re ProvideRx of Grapevine, LLC*, 507 B.R. 132, 153 (Bankr. N.D. Tex. 2014) (quoting *Looney v. Nuss (In re Looney)*, 545 F.2d 916, 918 (5th Cir.1977)). Here, the Security Agreement expressly and unambiguously creates a security interest in any and all other obligations "now owed or hereafter arising" that applies to future extensions of credit. Any further extension of credit to the debtor by a lender is deemed future indebtedness reasonably contemplated by the parties when they execute a future advance clause. *Kimbell Foods, Inc. v. Republic Nat. Bank of Dallas*, 557 F.2d

491, 495 (5th Cir. 1977), aff'd sub nom. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99
S. Ct. 1448, 59 L. Ed. 2d 711 (1979).

21.     The Security Agreement expressly provides that covered obligations include both
existing and future loans made by the secured party to the Debtor. *In re CTS Truss, Inc.,* No. 7-
85-00172-11, 1986 WL 79426, 1 (W.D. Tex. Oct. 7, 1986)(finding that notes were covered by
security agreements based in part on the inclusion of a clause providing that obligations covered
by it include future as well as existing loans made by the secured party to the debtor).  In fact,
Debtor acknowledges that the Security Agreement was intended to and did apply to future loan
arrangements.  Amend. Compl., at ¶ 33, Dkt. No. 5("[t]he 2021 Secured Note is secured by the
2020 Security Agreement and the 2020 UCC Financing Statement").

22.     The $6,308,483.16 (hereinafter, the "Subsequent Account Balance") advanced
under the existing Security Agreement was reasonably contemplated, as evidenced by the clear
language of the Security Agreement and the pattern of business affairs prior to these transfers.

## VI.     AT THE VERY LEAST, THE SUBSEQUENT ACCOUNT BALANCE IS A SECURED DEBT

23.     PQPR contends that the transfers that Debtor seeks to avoid in this action are not
subject to avoidance under 11 U.S.C. § 548, nor are the transfers voidable under the Texas
Uniform Fraudulent Transfer Act ("TUFTA") as the transfers were in exchange for reasonably
equivalent value provided for under the Security Agreement.[1]

---

[1] As a matter of law, a transfers made to secure a valid antecedent debt is an exchange of reasonably equivalent
value. *First Nat. Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86-87 (Tex. 2003) (a deed of trust lien was
reasonably equivalent value as a matter of law and claims under TUFTA section 24.005 or 24.006 could not be
sustained). This principle is equally applicable to section 548 claims; *See, In re Arabella Petroleum Co., LLC*, 647
B.R. 851 (Bankr. W.D. Tex. 2022) (noting that the TUFTA and section 548 "are for all practical purposes
identical" and that "a transfer made for or on account of an antecedent debt is by definition for a reasonably
equivalent value) and *In re AppliedTheory Corp.*, 323 B.R. 838, 842 (Bankr. S.D.N.Y.), aff'd, 330 B.R. 362
(S.D.N.Y. 2005). The full amount in controversy is secured under the Security Agreement, both then existing
debts and future extensions of credit. The rights of PQPR, as a secured creditor holding a perfected security

24.     Notwithstanding PQPR's view that the full amount owing to PRQPR is secured and not subject to avoidance, this motion seeks to establish that, at a minimum, the Subsequent Account Balance is secured debt and is not avoidable due to the exchange of reasonably equivalent value.  Additionally, even if it is shown that a debtor made a transfer with fraudulent intent, "the transfer is nevertheless not avoidable against a person who received the transfer in good faith and for 'a reasonably equivalent value.'" *First Nat. Bank of Seminole v. Hooper*, 104 S.W.3d 83, 85 (Tex. 2003)(quoting Tex. Bus. & Com. Code Ann. § 24.009).[2]

25.     The Subsequent Account Balance was a later extension of credit contemplated and provided for by the clear language of the Security Agreement.  By granting a security interest in respect to the future extensions of credit, the Debtor necessarily received reasonably equivalent value by virtue of the fact that the Debtor's receipt of the Subsequent Account Balance was exchanged for said security interest.  Stated differently, the security interest did not provide PQPR with a right to anything more than what it provided, and Debtor's liabilities did not increase due to the existing security interest. *In re AppliedTheory Corp.*, 323 B.R. 838, 841 (Bankr. S.D.N.Y.), aff'd, 330 B.R. 362 (S.D.N.Y. 2005) (holding that a debtor receives reasonably equivalent value in exchange for its granting the security interest).

26.     Thus, since the parties, as a matter of law, received a reasonably equivalent value in exchange for the subsequent advances, the Debtor's 11 U.S.C. § 548 and TUFTA claims relating to the Subsequent Account Balance cannot prevail, and summary judgment on these claims is appropriate.

---

interest in Collateral is not subject to avoidance under a theory of constructive fraudulent transfer because, as a matter of law, reasonably equivalent value was provided.

[2] The *First Nat. Bank of Seminole* decision involved an identical TUFTA fraudulent transfer claim to the one brought against PQPR. PQPR contends that the same principle applies to section 548 claims since the TUFTA was modeled on section 548(a)(1). *See Janvey v. Democratic Senatorial Campaign Comm., Inc.,* 712 F.3d 185, 194 (5th Cir. 2013); *see also, In re Arabella Petroleum Co., LLC,* 647 B.R. 851, 868–69 (Bankr. W.D. Tex. 2022)

## VII.   THE SUBSEQUENT ACCOUNT BALANCE IS NOT SUBJECT TO SUBORDINATION UNDER 11 U.S.C. § 510.

27.     Equitable subordination is appropriate when "(1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008).   Additionally, claims should be subordinated only to the extent necessary to offset the harm that the debtor and its creditors suffered on account of the inequitable conduct. *Id.* (citing *Matter of Mobile Steel Co.,* 563 F.2d 692, 706 (5th Cir. 1977)).

28.     Even if the PQPR or David Jones were found to be insiders or acted unfairly, equitable subordination of their claims to those advanced by other creditors still cannot be justified because Debtor cannot make a factual showing that any of the alleged improprieties injured FSS or its other creditors.  *Matter of Mobile Steel Co.,* 563 F.2d 692, 706 (5th Cir. 1977). Equitable subordination is remedial, not penal, and in the absence of actual harm, equitable subordination is inappropriate.  *In re SI Restructuring, Inc.,* 532 F.3d 355, 361 (5th Cir. 2008).

29.     Similar claims were raised in *In re SI Restructuring, Inc.,* 532 F.3d 355 (5th Cir. 2008) in which alleged insiders of the business had engaged in inequitable conduct in the manner in which they presented loans to the board of directors as the only available option at the eleventh hour that granted themselves security for their preexisting, contingent indebtedness on their guarantees of corporate obligations. *Id.* at 359. The Fifth Circuit concluded there was no finding of harm necessary to sustain the claim since the proceeds of the underlying loan were used to pay unsecured creditors and keep the company in operation, which would ultimately benefit the class allegedly harmed by the transaction, even if those unsecured creditors did not

9

receive any payment. So, as a matter of law, there cannot be "harm" under the Fifth Circuit's standard as to the Subsequent Account Balance.

30. Here, even assuming PQPR was deemed to be an insider or that PQPR engaged in inequitable conduct and gained an unfair advantage, the Debtor cannot show actual injury, and the record does not support a finding that the Subsequent Account Balance harmed either the debtor or other creditors. Instead, the record shows that the secured advance of credit did not diminish the estate and was necessary to keep the company in operation. The Debtor's subordination claim should be denied.

### VIII. CONCLUSION AND PRAYER

The Debtor entered into a contract with Defendants in the form of the Security Agreement. Pursuant to the Security Agreement, a security interest was created in any and all obligations thereafter arising. The Security Agreement provides for later extensions of credit to be covered under the agreement and secured thereunder. There is no issue of material fact that would preclude judgment on the determination that the Subsequent Account Balance is secured under the Security Agreement, that Debtor's claim for Equitable Subordination under 11 U.S.C. § 510 be denied, or that Debtor's Recovery of Fraudulent Transfers under 11 U.S.C. §§ 544 and 548 must be denied as a matter of law.

Defendants, therefore, request that the Court enter judgment in favor of the Defendants that the $6,308,483.16 is secured and deny Debtor's TUFTA and 11 U.S.C. claims.

Dated:  April 19, 2024                         Respectfully Submitted,


By: */s/ Stephen W. Lemmon*
       Stephen W. Lemmon
       State Bar No. 12194500
       STREUSAND, LANDON, OZBURN
       & LEMMON LLP
       1801 S. Mopac Expressway, Suite 320
       Austin, Texas 78746
       Telephone: (512) 236-9900
       Facsimile   (512) 236-9904
       Lemmon@slollp.com


**ATTORNEYS FOR DEFENDANTS PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS, LLC, AND PLJR HOLDINGS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing instrument has been served on this 19th day of April 2024, served via this Court's CM/ECF notification system to those parties registered for service upon filing of the same.


/s/ Stephen W. Lemmon
Stephen W. Lemmon

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **FREE SPEECH SYSTEMS LLC** | § | |
| | § | **Bankruptcy Case No. 22-60043** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **FREE SPEECH SYSTEMS LLC** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 23-03127** |
| | § | |
| **PQPR HOLDINGS LIMITED LLC,** | § | |
| **JLJR HOLDINGS LLC, PLJR** | § | |
| **HOLDINGS LLC, AEJ AUSTIN** | § | |
| **HOLDINGS LLC, AEJ 2018 TRUST,** | § | |
| **CAROL JONES and DAVID JONES** | § | |
| | § | |
| Defendants. | | |

## AFFIDAVIT OF ROBERT ROE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

On this day before me, the undersigned Notary Public, personally appeared Robert Roe,

who stated under oath as follows:

    1.    My name is Robert "Bob" Roe. I am above the age of 18 and in all ways competent to make this affidavit. All of the facts contained herein are true and correct and based upon my personal knowledge, unless specified otherwise.

    2.    I am a Certified Public Accountant, licensed in the states of Texas and Wisconsin. I have over 50 years of experience as a licensed public accountant.

1

**EXHIBIT A**

3.     In 2020, I was hired and paid by PQPR Holding Limited LLC ("PQPR") to review the books and records of both Free Speech Systems LLC and PQPR. The initial purpose of the engagement was to determine if the amounts shown on the accounting records of each company for the transactions between FSS and PQPR were accurate.

4.     I reviewed the accounting records of both FSS and PQPR. In particular, I looked to determine if the amounts shown on the records as owing to PQPR by FSS were correct.

5.     As part of my work, I reviewed a representative sample of records related to transactions to determine if the individual entries were accurate. The documents I reviewed included the Quick Books for each of PQPR and FSS, the bank account documents including statements, and debit and credit items like checks and wire transfers, and charges made by FSS to PQPR for administrative functions and advertising. I also reviewed the transactions with consumers who purchased product, and the payments from the credit card companies for those purchases.     I also interviewed FSS employees and reviewed publicly available information regarding advertising, shipping, and handling charges.

6.     With the exception of very minor and routine items, such as the occasional misclassification of some entries, I determined that the Quick Books of each of FSS and PQPR accurately reflected the debt owing from FSS to PQPR[1].

7.     Melinda Flores, an FSS employee, was the bookkeeper with responsibility for recording the transactions. Ms. Flores made the entries on both FSS and PQPR books. The books were maintained separately under different Quick Books licenses. She routinely ran behind on making entries, but the entries were accurate when recorded.

8.     At the time I was reviewing the books and records in 2020, Ms. Flores had only completed the accounting through 12/31/2018. Based upon my review of the books and records, I determined that, as of 12/31/2018, the amount of $29,589,038.98 (which was the amount shown on the books of each of PQPR and FSS) was correctly stated.

9.     In August of 2020, FSS executed a promissory note in favor of PQPR in the amount of $29,589,000 ("Note 1"). A true and correct copy of Note 1 is attached hereto as **Exhibit 1.**

10.     Contemporaneous with the execution of Note 1, FSS also executed a Security Agreement in favor of PQPR (the "Security Agreement"). A true and correct copy of the Security Agreement is attached hereto as **Exhibit 2**. The Security Agreement states that it secures all debts then existing or created afterwards.

11.     PQPR filed a UCC 1 Financing Statement reflecting the grant of the Security Agreement, which was filed with the Texas Secretary of State on November 18, 2020. A true and correct file-stamped copy of the UCC 1 reflecting its filing is attached hereto as **Exhibit 3.**

---

[1] As explained more fully below, the bookkeeper routinely ran behind on making entries. However, the entries when made were accurate. The only corrections necessary were routine classification items not related to the FSS debt to PQPR and were the sort of corrections made in virtually any accounting review of any entity.

2

**EXHIBIT A**

12.     As additional entries were made on the FSS and PQPR Quick Books software for entries for transactions occurring after 12/31/2018, additional debt owing to PQPR from FSS were documented, in the amount of $25,300,000 as of November of 2021. I made a similar review of transactions underlying this additional debt and again determined that the $25,300,000 amount shown on both companies' books was accurate. An additional promissory note in the amount of $25,300,000.00 was executed by FSS in favor of PQPR for such amount ("Note 2"). A true and correct copy of Note 2 is attached hereto as **Exhibit 4**.

13.     I was asked to prepare an accounting of the additional amount owed by FSS to PQPR after the execution of the Security Agreement. I determined, after an additional analysis of the books and records of PQPR and FSS, that the net additional debt incurred by FSS and owed to PQPR after the execution of the Security Agreement was 6,308,483.16. True and correct copies of my analysis, along with the work papers underlying such analysis, are attached hereto as **Exhibit 5**.

14.     My analyses have been provided to counsel for the Plaintiff, but to my knowledge, Plaintiff has never contested my findings regarding the amounts owed to PQPR by FSS, either before or after the grant of the security interest.

15.     Based upon my review of the documentation and my interviews with various parties, I uncovered no information suggesting that FSS and PQPR ever held themselves out to third parties as the same entity.

FURTHER AFFIANT SAYETH NAUGHT.


ROBERT ROE

SUBSCRIBED AND SWORN TO BEFORE ME on this the 19th day of April, 2024.

GLORIA BUENO
Notary Public, State of Texas
My Commission expires
September 18, 2027
ID No. 132170620

Notary Public for the State of Texas

3

**EXHIBIT A**

## PROMISSORY NOTE

$29,588,000.00                 Austin, Texas                 August _13_ , 2020

THIS PROMISSORY NOTE (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (**"Maker"**) and PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (**"Payee"**).

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty Nine Million Five Hundred Eighty-Eight Thousand and 00/100 Dollars ($29,588,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided hereinbelow.

### 1.    **Payment of Principal and Interest.**

**(a)**    Interest, as provided below, is due and payable annually on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) until August 1, 2050 (the **"Maturity Date"**), when the entire amount of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"**), then such payment shall be due on the Business Day next succeeding the payment date.

**(b)**    The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest on amounts advanced under this Note at the lesser of (i) **[one and 75/100 percent (1.75%)]** per annum (**"Contract Rate"**); (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%),** or (ii) the highest rate for which Maker may legally contract under applicable law.

**2.    Maximum Interest Rate.** It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in

**EXHIBIT 1**

the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until payment in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

> **3.   Prepayment.** Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

**4.   Waiver.** Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

**5.   Amendments.** Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

**6.   Events of Default.** The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered

**EXHIBIT 1**

against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

      **7.**    **Remedy.** Upon the occurrence of payment default as provided  paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of  thirty (30) days' notice and opportunity to cure,the entire principal amount and accrued interest  of the Note then outstanding shall become immediately due and payable.

      **8.**    **Governing Law and Venue** . This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

      **9.**    **Attorneys' Fees and Expenses**  In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee, reasonable fees and costs, including attorneys' fees and expenses of colletion.

      EXECUTED to be effective as of the date first above written.

MAKER:

_____

Alexander E. Jones
Managing Member
Free Speech Systems, LLC

**EXHIBIT 1**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the **"Security Agreement"**) is entered into effective as of August 2, 2020 (the **"Effective Date"**) by and between PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (the **"Secured Party"**) and Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (the **"Debtor"** or the **"Company"**).

Section I.     CREATION OF SECURITY INTEREST

The Debtor hereby grants to the Secured Party a security interest in the Collateral described in Section II of this Security Agreement to secure performance and payment that certain promissory note of even date herewith in the original principal amount of Twenty Nine Million Five Hundred Eighty Eight Thousand Dollars executed by Debtor in favor of Secured Party as it may be amended or modified (the **"Note"**) and any and all other obligations of Debtor to Secured Party of any kind or character, now owed or hereafter arising (collectively, the **"Obligations"**). Any capitalized term herein not specifically defined will have the meaning as defined in the limited liability company agreement of the Secured Party.

Section II.     COLLATERAL

In order to secure the payment when due of any and all Obligations, the Debtor hereby pledges to the Secured Party and grants to the Secured Party a security interest in the following collectively, (the **"Collateral"**):

(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and

(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

The Secured Party is hereby granted a first priority lien and security interest in the Collateral to secure the Obligations. Debtor authorizes Secured Party to file a financing statement describing the Collateral in each and every jurisdiction necessary to perfect the

EXHIBIT

5

EXHIBIT 2

security interest and lien granted herein.

Section III.    PAYMENT OBLIGATIONS OF THE DEBTOR

1.    Debtor is not authorized to sell, convey, dispose of encumber or dispose of the Collateral without Secured Party's agreement or until the Obligations are paid in full. The Debtor will account fully and faithfully to the Secured Party for proceeds from disposition of the collateral in any manner and will pay or turn over promptly in cash, negotiable instruments, drafts, assigned accounts or chattel paper, all the proceeds from each sale to be applied to the Debtor's Obligations to the Secured Party, subject if other than cash, to final payment or collection. Application of such proceeds to Obligations of the Debtor will be in the sole discretion of the Secured Party, provided such application of proceeds is made by the Secured Party in a reasonable manner.

2.    The Debtor will pay to the Secured Party on demand all expenses and expenditures, including reasonable attorney's fees and other legal expenses incurred or paid by the Secured Party in exercising or protecting its interests, rights and remedies under this Security Agreement.

3.    The Debtor will pay immediately, without notice, the entire unpaid Obligations of the Debtor to the Secured Party whether created or incurred pursuant to this Security Agreement or otherwise, upon the Debtor's default under Section V of this Security Agreement.

4.    Delivery of the Collateral.

(a)    All certificates and instruments evidencing or representing the Collateral (if any) will be delivered to the Secured Party upon the execution and delivery of this Security Agreement. All other certificates and instruments constituting, evidencing or representing the Collateral from time to time will be delivered to the Secured Party promptly upon the receipt thereof by and/or on behalf of the Debtor. All such certificates and instruments will be held by or on behalf of the Secured Party pursuant hereto, and will be delivered to the Secured Party in suitable form for transfer by delivery or will be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party.

(b)    If the Debtor receives, by virtue of its being or having been an owner of any Collateral, any (i) certificate, promissory note or instrument, (ii) option or right, whether as an addition to, substitution for, or in exchange for the Collateral, or (iii) distributions on dissolution, in total liquidation or from capital, capital surplus or paid-in surplus, the Debtor will receive such certificate, promissory note, instrument, payment or distribution in trust for the benefit of the Secured Party, will segregate it from the Debtor's other assets and will deliver it forthwith to the Secured Party in the exact form received, with any necessary endorsement and assignment duly executed in blank, to be held by the Secured Party as Collateral and as additional collateral security for the Obligations.

Section IV.    DEBTOR'S REPRESENTATION, WARRANTIES AND AGREEMENTS

2

**EXHIBIT 2**

The Debtor makes the following representations, warranties and agreements:

1. The pledge of the Collateral creates a valid and perfected first priority security interest in the pledged Collateral securing payment of the Obligations.

2. The Debtor will, at its own expense,, do, make, procure, execute and deliver all acts, things, writings and assurances as the Secured Party may at any time request to protect, assure or enforce its interests, rights and remedies created by, provided in or emanating from this Security Agreement.

3. The Debtor will sign and execute alone or with the Secured Party a Financing Statement and any and all other documents requested by Secured Party for perfection of the lien on the Collateral.

Section V.    EVENTS OF DEFAULT

The Debtor will be in default under this Security Agreement upon the happening of any condition or event set forth below (herein called an **"Event of Default"**):

1. The Debtor's failure to pay when due any Obligations secured by this Security Agreement;

2. Default by the Debtor in punctual performance of any of the obligations, covenants, terms or provisions contained or referred to in this Security Agreement or the Note;

3. Any warranty, representation or statement contained in this Security Agreement or made or furnished to the Secured Party by or on behalf of the Debtor in connection with this Security Agreement or to induce the Secured Party to make a loan to Debtor proves to have been false in any respect when made or furnished;

4. Loss, theft, sale (except as authorized in this Security Agreement) or encumbrance to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or

5. The Debtor's dissolution, termination of existence, insolvency or business failure; the appointment of a receiver of all or any part of the property of the Debtor; an assignment for the benefit of creditors by the Debtor; the calling of a meeting of creditors of the Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against the Debtor.

6. The Debtor shall have entered against it any judgment, arbitration award, fine or penalty for an amount in excess of $500,000, and such judgment, arbitration award, fine or penalty is not stayed or superseded within 30 days of entry.

Section VI.    SECURED PARTY'S RIGHTS AND REMEDIES

A.    Rights Exclusive of Default.

1. This Security Agreement, the Secured Party's rights hereunder or the Obligations

3

**EXHIBIT 2**

hereby secured may be assigned by Secured Party, and in any such case, the assignee will be entitled to all of the rights, privileges and remedies granted in this Security Agreement to the Secured Party.

2.    Upon the request of the Secured Party at any time, the Debtor will execute, sign, endorse, transfer or deliver in the name of the Debtor any other documents, necessary to perfect the security interest and obligations created by this Security Agreement.

3.    At its option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral. The Debtor agrees to reimburse the Secured Party on demand for any payment made, or expense incurred by the Secured Party pursuant to the foregoing authorization.

4.    Debtor will permit Secured Party, by its representatives and agents (a) to inspect the Collateral, (b) to examine and make copies of the records of Debtor relating to the Collateral, and (c) to discuss the Collateral and the related records of Debtor with, and to be advised as to the same by, Debtor's officers, employees, and accountants, all at such reasonable times and intervals as Secured Party may determine, and all at such Debtor's expense.

5.    Debtor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Secured Party such reasonable reports relating to the Collateral at such intervals as Secured Party shall from time to time request. Debtor will give prompt notice in writing to Secured Party of the occurrence of any Default or Event of Default and of any other development, financial or otherwise, which might materially and adversely affect the Collateral in the aggregate amount of $100,000.00 or more per calendar year.

B.    Rights in Event of Default

1.    Upon the occurrence of an Event of Default, Secured Party, in its sole discretion, may demand that all payments and distributions made to Debtor upon or with respect to the Collateral shall be paid and delivered to Secured Party, and Debtor agrees to take all such action as Secured Party may deem necessary or appropriate to cause all such payments and distributions to be made to Secured Party. Secured Party shall have the right, at any time after the occurrence of any Event of Default, to notify and direct any issuer to thereafter make all payments, dividends, and any other distributions payable in respect thereof directly to Secured Party. Such issuer shall be fully protected in relying on the written statement of Secured Party that it then holds a security interest which entitles it to receive such payments and distributions. Any and all money and other property paid over to or received by Secured Party hereunder shall be retained by Secured Party as additional collateral hereunder and may be applied by Secured Party to payment of the Obligations in such manner and order as Secured Party may elect in its sole discretion.

2.    In addition, Secured Party is entitled to exercise any and all contractual rights provided in this Security Agreement or any other loan document between Debtor and Secured Party, and any and all legal rights and remedies available to a secured party (whether or not the UCC applies to the affected Collateral) or under any other applicable law when a debtor is in default under a security agreement.

3.    Secured Party is also entitled to, without notice, sell, lease, assign, grant an option

4

**EXHIBIT 2**

or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, credit or for future delivery, and upon such terms as Secured Party may deem commercially reasonable. Neither Secured Party's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale. Debtor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Debtor at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made. Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. Subject to the provisions of applicable law, Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Secured Party may further postpone such sale by announcement made at such time and place.

4. Debtor waives (to the extent permitted by law) all rights of redemption, stay, and/ or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereinafter enacted.

5. Further, Secured Party may at any time after the occurrence of an Event of Default require, in its sole discretion and with notice to Debtor, that any receivables, as described in Section II above, be paid directly to Secured Party. In such event, Debtor shall, and shall permit Secured Party to, promptly notify the parties that owe the receivables to Debtor of Secured Party's interest therein and direct such parties to make payment of all amounts then or thereafter due directly to Secured Party. Upon receipt of any such notice from Secured Party, Debtor shall thereafter hold in trust for Secured Party, all amounts and proceeds (as such term is defined in *Section 9.102(a)(65)* of the UCC) received by it with respect to the receivables and immediately and at all times thereafter deliver to Secured Party all such amounts and proceeds in the same form as so received, whether by cash, check, draft or otherwise, with any necessary endorsements. Secured Party shall hold and apply funds so in such manner and order as Secured Party may elect in its sole discretion. If after the occurrence of an Event of Default, any party owing receivables fails or refuses to make payment on any Collateral when due, Secured Party is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Secured Party shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Debtor agrees that Secured Party may at any time and from time to time, if an Event of Default has occurred, compromise with the obligor on any receivable, accept in full payment of any receivable such amount as Secured Party in its sole discretion shall determine or abandon any receivable, and any such action by Secured Party shall be commercially reasonable so long as Secured Party acts in good faith based on information known to it at the time it takes any such action. Regardless of any other provision hereof, however, Secured Party shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone except Debtor to account for funds that it shall actually receive hereunder.

6. Debtor will reimburse Secured Party for all reasonable expenses incurred by Secured Party in taking ownership of the Collateral, including payment of Secured Party's

5

**EXHIBIT 2**

reasonable attorney's fees and legal expenses.

7. The Secured Party may remedy any default and may waive any default without waiving any other prior or subsequent default.

8. Upon request of Secured Party after an Event of Default, Debtor shall execute and deliver to Secured Party irrevocable lockbox agreements in the form provided by or otherwise acceptable to Secured Party, which agreements shall be accompanied by an acknowledgment by the bank where the lockbox is located of the lien of Secured Party granted hereunder and of irrevocable instructions to wire all amounts collected therein to a special collateral account at Secured Party.

9. The remedies of the Secured Party hereunder are cumulative, and the exercise of any one or more of the remedies provided for herein will not be construed as a waiver of any of the other remedies of the Secured Party.

Section VII. ADDITIONAL AGREEMENTS

1. **"Secured Party" and "Debtor,"** as used in this instrument, include the heirs, executors or administrators, successors, representatives, receivers, trustees and assigns of those parties.

2. No delay or omission of Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by Secured Party and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to Secured Party until the Secured Obligations have been paid in full.

3. Should any Collateral come into the possession of Secured Party, Secured Party may use or operate such Collateral for the purpose of preserving it or its value, pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Secured Party in respect of such Collateral. Debtor covenants to promptly reimburse and pay to Secured Party, at Secured Party's request, the amount of all expenses (including the cost of any insurance and payment of taxes or other charges) incurred by Secured Party in connection with its custody and preservation of the Collateral, and all such expenses, costs, taxes, and other charges shall bear interest at the Contract Rate (as defined in the Note) until repaid and, together with such interest, shall be payable by Debtor to Secured Party upon demand and shall become part of the secured Obligations. However, the risk of accidental loss or damage to, or diminution in value of, the Collateral is on Debtor, and Secured Party shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to the Collateral that is in the possession of Secured Party, Secured Party shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are applicable whether or not an Event of Default has occurred.

6

**EXHIBIT 2**

4.     Except to the extent expressly otherwise provided herein and to the fullest extent permitted by applicable law, Debtor waives (a) any right to require Secured Party to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Secured Party may have; (b) with respect to any Collateral that is comprised of obligations, presentment and demand for payment, protest, notice of protest and nonpayment, notice of intent to accelerate, and notice of acceleration; and (c) all rights of marshaling in respect of any and all of the Collateral.

5.     Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

6.     Debtor Remains Liable.  Notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and Obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

7.     NO RELEASE OF DEBTOR.  THE OBLIGATIONS OF DEBTOR UNDER THIS SECURITY AGREEMENT SHALL NOT BE REDUCED, LIMITED OR TERMINATED, NOR SHALL DEBTOR BE DISCHARGED FROM ANY OBLIGATION HEREUNDER, FOR ANY REASON WHATSOEVER (until the Obligations have been indefeasibly paid in full), including:

(a)     (i) any increase in the principal amount of, or interest rate applicable to, (ii) any extension of the time of payment, observance or performance of, (iii) any other amendment or modification of any of the other terms and provisions of, (iv) any release, composition or settlement (whether by way of acceptance of a plan of reorganization or otherwise) of, (v) any subordination (whether present or future or contractual or otherwise) of, or (vi) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Obligations;

(b)     (i) any failure to obtain, (ii) any release, composition or settlement of, (iii) any amendment or modification of any of the terms and provisions of, (iv) any subordination of, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Note or other loan documents between Debtor and Secured Party;

(c)     (i) any failure to obtain or any release of, any failure to protect or preserve, (ii) any

7

**EXHIBIT 2**

release, compromise, settlement or extension of the time of payment of any Obligations constituting, (iii) any failure to perfect or maintain the perfection or priority of any lien upon, (iv) any subordination of any lien upon, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of any lien or intended lien upon, any collateral now or hereafter securing, the Secured Obligations or any other guaranties thereof;

**(d)**     any termination of or change in any relationship between Debtor and Secured Party;

**(e)**     any exercise of, or any failure or election not to exercise, delay in the exercise of, waiver of, or forbearance of or other indulgence with respect to, any right, remedy or power available to Secured Party, including (i) any election not to or failure to exercise any right of setoff, recoupment or counterclaim, (ii) any election of remedies effected by Secured Party, including the foreclosure upon any real estate constituting collateral, whether or not such election affects the right to obtain a deficiency judgment, and (iii) any election by Secured Party in any proceeding under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code; and

**(f)**     ANY OTHER ACT OR FAILURE TO ACT OR ANY OTHER EVENT OR CIRCUMSTANCE THAT (i) VARIES THE RISK OF DEBTOR UNDER THIS SECURITY AGREEMENT OR (ii) BUT FOR THE PROVISIONS HEREOF, WOULD, AS A MATTER OF STATUTE OR RULE OF LAW OR EQUITY, OPERATE TO REDUCE, LIMIT OR TERMINATE THE OBLIGATIONS OF DEBTOR HEREUNDER OR DISCHARGE DEBTOR FROM ANY OBLIGATION HEREUNDER.

**8.**     Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

**9.**     Further, notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the Obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**10.**     The section headings appearing in this instrument have been inserted for convenience only and will be given no substantive meaning or significance whatever in

8

**EXHIBIT 2**

construing the terms and provisions of this instrument. Terms used in this instrument which are defined in the Texas Uniform Commercial Code are used with the meanings as therein defined.

11.   The law governing this secured transaction will be that of the State of Texas in force at the date of this instrument. Venue for any dispute arising out of this Security Agreement will be in the state or federal courts located in Travis County, Texas.

12.   Debtor will not create, incur, or suffer to exist any lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) other liens permitted in writing by the Secured Party.

13.   The unenforceability of any provision of this Security Agreement will not affect the enforceability or validity of any other provision.

14.   This Security Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered will be deemed to be an original and all of which counterparts taken together will constitute but one and the same instrument.

15.   THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED as of the Effective Date.

**DEBTOR:**

Free Speech Systems, LLC

Alexander E. Jones, Managing Member

**SECURED PARTY:**

PQPR Holdings Limited, LLC

David R. Jones, Manager

9

**EXHIBIT 2**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Acuity CxO LLC 5122929690

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Acuity CxO LLC
219 Black Wolf Run
Austin, TX 78738
USA

**FILING NUMBER:** 20-0058072731
**FILING DATE:** 11/18/2020     02:06 PM
**DOCUMENT NUMBER:** 1008390830002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME – Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** | | | | | |
| **Free Speech Systems LLC** | | | | | |
| OR **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **1c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | | COUNTRY |
| **3005 South Lamar Blvd, Suite D109-317** | **Austin** | **TX** | **78704** | | **USA** |

2. DEBTOR'S NAME – Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | | |
| OR **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **2c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| **3a. ORGANIZATION'S NAME** | | | | | |
| **PQPR Holdings Limited LLC** | | | | | |
| OR **3b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| **3c. MAILING ADDRESS** | CITY | STATE | POSTAL CODE | | COUNTRY |
| **100 Congress Avenue, 18th Floor** | **Austin** | **TX** | **78701** | | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:    6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility    ☐ Agricultural Lien  ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

**EXHIBIT 3**

# PROMISSORY NOTE

$25,300,000.00                              Austin, Texas                          November 10, 2021

**THIS PROMISSORY NOTE** (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 **("Maker")** and PQPR Holdings Limited, LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701 **("Payee")**.

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty-Five Million Three Hundred Thousand and 00/100 Dollars ($25,300,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided herein below.

### 1. Payment of Principal and Interest; Security

**(a)** Principal and Interest (as provided below), are due and payable in annual installments of $1,939,644.81 on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) with the final payment being due and payable on November 10, 2036 (the **"Maturity Date"**), when the remaining balance of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"**), then such payment shall be due on the Business Day next succeeding the payment date.

**(b)** The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest at the lesser of (i) [**one and 80/100 percent (1.80%)**] per annum **("Contract Rate")**; (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%),** or (ii) the highest rate for which Maker may legally contract under applicable law.

**(c)** This Note is secured by a Security Agreement executed by Maker dated August 13, 2020 and evidenced by a UCC-1 recorded with the State of Texas on November 18, 2020.

2. **Maximum Interest Rate -** It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be

**EXHIBIT 4**

paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until paid in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

**3. Prepayment** – Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

**4. Waiver** - Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

**5. Amendments** - Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

**6. Events of Default** - The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

**7. Remedy** - Upon the occurrence of payment default as provided paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of thirty (30) days' notice and opportunity to cure, the entire principal amount and accrued interest of the Note then outstanding shall become immediately due and payable.

Page **2** of **3**

**EXHIBIT 4**

**8. Governing Law and Venue** – This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

**9. Attorneys' Fees and Expenses** - In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee reasonable fees and costs, including attorneys' fees and expenses, of collection.

EXECUTED to be effective as of the date first above written.

**MAKER:**

Free Speech Systems, LLC

By _____

Alexander E. Jones, Manager

**ACKNOWLEDGEMENT BY PAYEE:**

PQPR Holdings Limited, LLC

By _____

David R. Jones, Manager

**EXHIBIT 4**

**PQPR Holdings LLC**
**Reconciliation of Current Amount Due from FSS**
**January 1, 2021 to December 31, 2021**

| | | |
|---|---|---:|
| Beginning Balance - January 1, 2021 | | $ (11,843.96) |
| FSS Sales owed to PQPR | | $ 27,687,726.24 |
| Payments from FSS to PQPR | | $ (10,230,277.14) |
| Subtotal | | $ 17,445,605.14 |
| FSS Charges to PQPR | | |
| Administrative | $ (1,903,898.98) | |
| Advertising | $ (5,700,000.00) | |
| Fulfillment | $ (3,533,223.00) | |
| Total Charges to PQPR | | $ (11,137,121.98) |
| Ending Balance - Dedember 31, 2021 | | $ 6,308,483.16 |

**EXHIBIT 5**

Page 1 of 2

3:37 PM
01/17/24
Accrual Basis

## POPR HOLDINGS LIMITED, LLC
### Transactions by Account
### As of December 31, 2021

**Receivable from FSS**

| Type | Date | Num | Adj | Name | Memo | Class | Clr | Split | Debit | Credit |
|------|------|-----|-----|------|------|-------|-----|-------|-------|--------|
| Payment | 01/07/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 01/18/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 01/21/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 01/28/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| General Journal | 01/31/2021 | REV 01_2021 | | Free Speech Systems, LLC. | Record Revenue for January 2021 - Used Stone Edge Reporting | | | Merchandise Sales | 2,875,658.70 | |
| Payment | 02/17/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 02/23/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 02/26/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |
| General Journal | 02/28/2021 | REV 02_2021 | | Free Speech Systems, LLC. | Record Revenue for February 2021 - Used Stone Edge Reporting | | | Merchandise Sales | 1,542,897.98 | |
| Payment | 03/12/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 03/18/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 03/25/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| General Journal | 03/31/2021 | REV 03_2021 | | Free Speech Systems, LLC. | Record Revenue for March 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,847,383.92 | |
| Payment | 04/01/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 50,000.00 |
| Payment | 04/02/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 04/06/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 04/09/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 04/14/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 04/16/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 04/21/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 04/23/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 04/30/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| General Journal | 04/30/2021 | REV 04_2021 | | Free Speech Systems, LLC. | Record Revenue for April 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,317,324.58 | |
| Payment | 05/04/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 05/05/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 05/13/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 225,000.00 |
| Payment | 05/14/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 05/18/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 05/20/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 225,000.00 |
| Payment | 05/26/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 05/28/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| General Journal | 05/31/2021 | REV 05_2021 | | Free Speech Systems, LLC. | Record Revenue for May 2021 - Used Stone Edge Report | | | Merchandise Sales | 3,630,088.44 | |
| Payment | 06/02/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 250,000.00 |
| Payment | 06/03/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 06/09/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 06/10/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 06/17/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 50,000.00 |
| Payment | 06/22/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 50,000.00 |
| Payment | 06/29/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 150,000.00 |
| General Journal | 06/30/2021 | REV 06_2021 | | Free Speech Systems, LLC. | Record Revenue for June 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,547,796.13 | |
| Payment | 07/06/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 07/08/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 07/09/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 07/14/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 07/20/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 07/28/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 07/30/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |
| General Journal | 07/31/2021 | REV 07_2021 | | Free Speech Systems, LLC. | Record Revenue for July 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,550,780.84 | |
| Payment | 08/03/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 08/06/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 08/13/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 08/20/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 08/23/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 08/26/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| General Journal | 08/31/2021 | REV 08_2021 | | Free Speech Systems, LLC. | Record Revenue for August 2021 - Used Stone Edge Report | | | Merchandise Sales | 3,047,638.24 | |
| Payment | 09/02/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 175,000.00 |

**EXHIBIT 5**

3:37 PM
01/17/24
Accrual Basis

**PQPR HOLDINGS LIMITED, LLC**
**Transactions by Account**
As of December 31, 2021

| Type | Date | Num | Adj | Name | Memo | Class | Clr | Split | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|---|
| Payment | 09/10/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 09/17/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 09/20/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 09/21/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 09/28/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 09/29/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| General Journal | 09/30/2021 | REV 09_2021 | | Free Speech Systems, LLC. | Record Revenue for September 2021 – Used Stone Edge Report | | | Merchandise Sales | 2,750,710.48 | |
| Payment | 10/01/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 10/08/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 80,000.00 |
| Payment | 10/12/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 10/13/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 10/15/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 10/18/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 10/18/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 30,000.00 |
| Payment | 10/21/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 10/26/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 10/28/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 10/29/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 53,463.12 |
| General Journal | 10/31/2021 | REV 10_2021 | | Free Speech Systems, LLC. | Record Revenue for October 2021 – Used Stone Edge Report | | | Merchandise Sales | 3,577,446.93 | |
| Payment | 11/02/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 116,814.02 |
| | | | | | | | | | 27,687,726.24 | 10,230,277.14 |

Total Receivable from FSS

**EXHIBIT 5**

11:21 AM
01/18/24
Accrual Basis

**POPR HOLDINGS LIMITED, LLC**
**Transactions by Account**
**As of December 31, 2021**

Page 1 of 1

**EXHIBIT 5**

| Type | Date | Num | Adj | Name | Memo | Class | Clr | Split | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|---|
| **Payable to FSS** | | | | | | | | | | |
| Bill | 01/31/2021 | A-2560 | | Free Speech Systems, LLC | Administrative Services - January 2021 | | | -SPLIT- | | 162,176.83 |
| Bill | 02/28/2021 | A-2561 | | Free Speech Systems, LLC | Administrative Services - February 2021 | | | -SPLIT- | | 115,533.71 |
| Bill | 03/31/2021 | A-2562 | | Free Speech Systems, LLC | Administrative Services - March 2021 | | | -SPLIT- | | 161,190.22 |
| Bill | 04/30/2021 | A-2563 | | Free Speech Systems, LLC | Administrative Services - April 2021 | | | -SPLIT- | | 142,638.14 |
| Bill | 05/31/2021 | A-2564 | | Free Speech Systems, LLC | Administrative Services - May 2021 | | | -SPLIT- | | 188,584.88 |
| Bill | 06/30/2021 | A-2584 | | Free Speech Systems, LLC | Administrative Services - June 2021 | | | -SPLIT- | | 150,704.64 |
| Bill | 07/31/2021 | A-2585 | | Free Speech Systems, LLC | Administrative Services - July 2021 | | | -SPLIT- | | 150,809.11 |
| Bill | 08/31/2021 | A-2586 | | Free Speech Systems, LLC | Administrative Services - August 2021 | | | -SPLIT- | | 168,199.12 |
| Bill | 09/30/2021 | A-2587 | | Free Speech Systems, LLC | Administrative Services - September 2021 | | | -SPLIT- | | 157,806.65 |
| Bill | 10/31/2021 | A-2588 | | Free Speech Systems, LLC | Administrative Services - October 2021 | | | -SPLIT- | | 186,742.42 |
| Bill | 11/30/2021 | A-2589 | | Free Speech Systems, LLC | Administrative Services - November 2021 | | | -SPLIT- | | 165,867.93 |
| Bill | 12/31/2021 | A-2590 | | Free Speech Systems, LLC | Administrative Services - December 2021 | | | -SPLIT- | | 153,642.30 |
| | | | | | | | | | | $ 1,903,898.95 |
| Bill | 01/31/2021 | A-2565 | | Free Speech Systems, LLC | Advertising - January 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 02/28/2021 | A-2566 | | Free Speech Systems, LLC | Advertising - February 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 03/31/2021 | A-2567 | | Free Speech Systems, LLC | Advertising - March 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 04/30/2021 | A-2568 | | Free Speech Systems, LLC | Advertising - April 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 05/31/2021 | A-2569 | | Free Speech Systems, LLC | Advertising - May 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 06/30/2021 | A-2574 | | Free Speech Systems, LLC | Advertising - June 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 07/31/2021 | A-2575 | | Free Speech Systems, LLC | Advertising - July 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 08/31/2021 | A-2576 | | Free Speech Systems, LLC | Advertising - August 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 09/30/2021 | A-2577 | | Free Speech Systems, LLC | Advertising - September 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 10/31/2021 | A-2578 | | Free Speech Systems, LLC | Advertising - October 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 11/30/2021 | A-2579 | | Free Speech Systems, LLC | Advertising - November 2021 | | | Advertising and Promotion | | 475,000.00 |
| Bill | 12/31/2021 | A-2580 | | Free Speech Systems, LLC | Advertising - December 2021 | | | Advertising and Promotion | | 475,000.00 |
| | | | | | | | | | | $ 5,700,000.00 |
| Bill | 01/31/2021 | A-2555 | | Free Speech Systems, LLC | Fulfillment Services - January 2021 | | | Cost of Goods Sold-Distribution | | 342,888.00 |
| Bill | 02/28/2021 | A-2556 | | Free Speech Systems, LLC | Fulfillment Services - February 2021 | | | Cost of Goods Sold-Distribution | | 157,569.00 |
| Bill | 03/31/2021 | A-2557 | | Free Speech Systems, LLC | Fulfillment Services - March 2021 | | | Cost of Goods Sold-Distribution | | 283,872.00 |
| Bill | 04/30/2021 | A-2558 | | Free Speech Systems, LLC | Fulfillment Services - April 2021 | | | Cost of Goods Sold-Distribution | | 223,178.00 |
| Bill | 05/31/2021 | A-2559 | | Free Speech Systems, LLC | Fulfillment Services - May 2021 | | | Cost of Goods Sold-Distribution | | 365,946.00 |
| Bill | 06/30/2021 | A-2570 | | Free Speech Systems, LLC | Fulfillment Services - June 2021 | | | Cost of Goods Sold-Distribution | | 270,009.00 |
| Bill | 07/31/2021 | A-2571 | | Free Speech Systems, LLC | Fulfillment Services - July 2021 | | | Cost of Goods Sold-Distribution | | 321,309.00 |
| Bill | 08/31/2021 | A-2572 | | Free Speech Systems, LLC | Fulfillment Services - August 2021 | | | Cost of Goods Sold-Distribution | | 361,572.00 |
| Bill | 09/30/2021 | A-2573 | | Free Speech Systems, LLC | Fulfillment Services - September 2021 | | | Cost of Goods Sold-Distribution | | 303,060.00 |
| Bill | 10/31/2021 | A-2581 | | Free Speech Systems, LLC | Fulfillment Services - October 2021 | | | Cost of Goods Sold-Distribution | | 355,521.00 |
| Bill | 11/30/2021 | A-2582 | | Free Speech Systems, LLC | Fulfillment Services - November 2021 | | | Cost of Goods Sold-Distribution | | 292,464.00 |
| Bill | 12/31/2021 | A-2583 | | Free Speech Systems, LLC | Fulfillment Services - December 2021 | | | Cost of Goods Sold-Distribution | | 255,834.00 |
| | | | | | | | | | | $ 3,533,223.00 |
| **Total Payable to FSS** | | | | | | | | | 0.00 | 11,137,121.95 |
| **TOTAL** | | | | | | | | | 0.00 | 11,137,121.95 |

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Chapter 11** |
| **FREE SPEECH SYSTEMS LLC** | § | |
| | § | **Bankruptcy Case No. 22-60043** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **FREE SPEECH SYSTEMS LLC** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 23-03127** |
| | § | |
| **PQPR HOLDINGS LIMITED LLC,** | § | |
| **JLJR HOLDINGS LLC, PLJR** | § | |
| **HOLDINGS LLC, AEJ AUSTIN** | § | |
| **HOLDINGS LLC, AEJ 2018** | § | |
| **TRUST, CAROL JONES and** | § | |
| **DAVID JONES** | § | |
| | § | |
| Defendants. | | |

## AFFIDAVIT OF DAVID JONES DDS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

On this day before me, the undersigned Notary Public, personally appeared David Jones,

DDS, who stated under oath as follows:

1.     My name is David Jones. I am above the age of 18 and in all ways competent to make this affidavit. All of the facts contained herein are true and correct and based upon my personal knowledge, unless specified otherwise.

1

**EXHIBIT B**

2.     I am the father of Alex Jones. Alex is the owner of Free Speech Systems LLC ("FSS").

3.     I am the managing member of JLJR Holdings LLC ("JLJR"). JLJR is the manager of PQPR Holdings Limited, LLC ("PQPR"). Thus, I act as manager for PQPR.

4.     PQPR and FSS were founded as separate companies in 2007-2014. They have separate ownership and separate management. Alex Jones, through a series of entities, indirectly owns 72% of PQPR but has no voting rights. PQPR and FSS have separate creditors and have never held themselves out as the same company. Alex has never acted as a manager of PQPR.

5.     PQPR purchased and directly paid for products which FSS advertised.

6.     The products were owned by PQPR and kept in a warehouse. They were sold directly to consumers and FSS received the funds from the consumers for the PQPR sales.

7.     FSS charged PQPR for advertising and overhead.

8.     While FSS initially kept current on its payments to PQPR, as FSS incurred expenses to build out studios etc. as Alex Jones was deplatformed, FSS fell behind in making payments to PQPR and a sizeable debt arose.

9.     The charges from PQPR to FSS and from FSS to PQPR were recorded by a bookkeeper, Melinda Flores. Ms. Flores was an FSS employee and kept the books for both FSS and PQPR. The entries were made in both sets of books. However, while Ms. Flores' entries were accurate, she was continually late in making entries.

10.     In 2020, Bob Roe, a CPA, was hired to examine and document the debt owed by FSS to PQPR. Mr. Roe undertook a review and sampling of the invoices, charges, and all other aspects of the debt. He determined that the FSS and PQPR QuickBooks entries regarding the transactions were materially correct.

11.     PQPR refused to continue to allow FSS to rack up more debt without the execution of notes and a security agreement.

> a. A note in the amount of $29,588,000.00 was executed in 2020 for the debt up through 2018 (at that time, the QuickBooks entries were only current through 2018).
> b. Another note in the amount of $25,300,000.00 was executed in 2021 for the debt arising after 2018 (but before even more debt was incurred by FSS).

12.     In the fall of 2020 FSS executed a security agreement wherein PQPR was granted a security interest in virtually all property of FSS. The security agreement covers the existing debt, as well as future debt. A UCC-1 was filed.

**EXHIBIT B**

13.    In 2021, because of Alex Jones' intemperate comments, credit card processors would not do business with FSS directly. A third party was used to receive the payments and to remit sums to PQPR and to FSS on a formula basis.

14.    Importantly, after the security agreement came into effect, FSS borrowed an additional $6,308,483.16 million in debt to PQPR.

FURTHER AFFIANT SAYETH NAUGHT.

_____
DAVID JONES, DDS

SUBSCRIBED AND SWORN TO BEFORE ME on this the 19th day of April, 2024.

_____
Notary Public for the State of Texas

KELLI J. RANGEL
My Notary ID # 131022169
Expires February 28, 2025

3

**EXHIBIT B**