# EXHIBIT 8

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| | § | Chapter 11 |
| FREE SPEECH SYSTEMS, LLC, | § § | Bankruptcy Case No. 22-60043 |
| Debtor. | § § | |

| | | |
|---|---|---|
| FREE SPEECH SYSTEMS, LLC, | § § | |
| Plaintiff, | § § | |
| v. | § § | Adversary No. 23-03127 |
| PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS, LLC, PLJR HOLDINGS, LLC, AEJ AUSTIN HOLDINGS, LLC, AEJ 2018 TRUST, CAROL JONES and DAVID JONES. | § § § § § § | |
| Defendants. | § § § | |

RESPONSE OF FREE SPEECH SYSTEMS, LLC TO THE MOTION FOR PARTIAL
SUMMARY JUDGEMENT FILED BY DEFENDANTS PQPR HOLDINGS LIMITED
LLC, JLJR HOLDINGS LLC, AND PLJR HOLDINGS LLC
[Relates to ECF # 44]

**Contents**

I.   Issue of Whether the Security Agreement Was a Fraudulent Transfer Precludes Grant of Summary Judgment. .................................................................................................................. 2

A.   Direct Evidence of Fraudulent Intent ................................................................................ 2

B.   Indirect Evidence – Myriad Classic Badges of Fraud ....................................................... 3

II.   Issue of Whether the Security Agreement Should Be Equitably Subordinated Precludes Grant of Summary    Judgment. ........................................................................................ 8

III.   The Issue of How Much Is Actually Owed to PQPR Is a Fact Issue That Precludes Summary Judgment. .................................................................................................................. 8

IV.   The Summary Judgment Evidence is Fatally Defective & Raw Hearsay ......................... 9

V.   Table of Objections to Summary Judgment Evidence ........................................................ 10

1

Free Speech Systems, LLC, respectfully submits:

I. **Issue of Whether the Security Agreement Was a Fraudulent Transfer Precludes Grant of Summary Judgment**.

1. The alleged security agreement that is exhibit A-2 to the motion for partial summary judgment ("MSJ") is the product of a classic, crisis-driven, insider fraudulent transfer. For that reason, the security agreement should be avoided as sought in the complaint.[1][2] If avoided, then PQPR has no security interest. That material fact issue—whether the security agreement itself is the product of a fraudulent transfer -- precludes grant of the MSJ.[3]

   A. **Direct Evidence of Fraudulent Intent**

2. There is, in fact, direct evidence of fraudulent intent insofar as there is a 2013 Memorandum of Understanding signed by FSS, Alex Jones, and Dr. Jones, which provides in

---

[1] Under the Texas Uniform Fraudulent Transfer Act (TUFTA):
  A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made . . . , if the debtor made the transfer . . . : (1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]
Tex. Bus. & Com. Code § 24.005(a)(1). "Thus, the elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors." *Life Partners Holding, Inc.t v. Cowley*, 926 F.3d 103 (5th Cir. 2019).
  The Bankruptcy Code's actual fraudulent transfer provision, set out in 11 U.S.C. § 548, reads:
  The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . , indebted[.]
11 U.S.C. § 548(a)(1)(A). *Life Partners Holding*.
  "The elements of a constructive fraudulent transfer under Texas law are the same as actual fraudulent transfer except instead of pleading fraudulent intent, the plaintiff must plead facts demonstrating: (1) a lack of reasonably equivalent value for the transfer; and (2) the transferor was 'financially vulnerable' or insolvent at the time of the transaction." *Life Partners* citing *Janvey v. Golf Channel, Inc*., 487 S.W.3d 560, 562, 566 & n.21 (Tex. 2016).

[2] The intent to hinder, delay or defraud elements to an intentional fraudulent transfer cause of action are disjunctive, so any one of them can give rise to liability. *Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 263 (Bankr. N.D. Tex. 2003) (so, for example, an intent to delay but ultimately pay the creditor can still cause liability).

[3] A factual dispute is "genuine" and summary judgment would be precluded if the evidence presented in support of and in opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 2511, 91 L.Ed. 2d 202 (1986).

key part: "Best efforts will be made to structure the selling entities to shelter assets and limit liabilities among the parties." [4] According to Dr. Jones, Alex Jones required that language.[5] According to Dr. Jones, Alex Jones "wanted to be sure that PQPR was a separate entity from Free Speech Systems[.]"[6] (See also ¶ 4 herein for how the memorandum's temporal proximity to other events amounts to an independent badge of fraud.)

3.  It bears special note that a single attorney seems to have been assisting more than one party to the above-discussed memorandum during key events in the financial lives of PQPR, Dr. Jones, Alex Jones, and FSS. That is, according to Dr. Jones, the same attorney who created PQPR years ago, years later referred Robert Roe to PQPR in March of 2020 (see note 12 herein).[7] Dr. Jones also testified that same attorney was involved in negotiations of the above-described 2013 Memorandum of Understanding, but, when asked during deposition, Dr. Jones could not say whether Alex Jones and FSS had separate counsel.[8] The same attorney also represented Alex Jones in a January 2020 involuntary bankruptcy filed against Alex Jones by his ex-spouse.[9] According to Robert Roe, during the first quarter of 2020 that same attorney referred Robert Roe to PQPR and "at that point was providing some legal [unspecified] services to PQPR[.]" In other words, at the same time the attorney was representing Alex Jones in an involuntary bankruptcy, see Exhibit 1 hereto (involuntary bankruptcy docket) and at the motion filed February 13, 2020, the attorney was "providing

---

[4]  See the attached Exhibit 2, the deposition transcript of Dr. David Jones, at exhibit 2 thereto.
[5]  *Id.*
[6]  Without prompting, Dr. Jones elected to frame Alex Jones concerns as concerns that FSS would be liable for an injury to one of Dr. Jones' dental patients. Tellingly, this framing followed his alleged lack of recollection regarding what the provision means. "Q: When it states limit liabilities among the parties, does that refer to the parties to this contract, FSS, Alex Jones and yourself? A. I may need to reflect on that. I don't remember." Exhibit 2, Tr. p. 63, lines 6-12.
[7]  *Id.* at p. 18, lines 6-12. Compare Robert Roe's testimony about being referred to PQPR by the same attorney, Eric Taube in note 12 herein.
[8]  Exhibit 2, p. 30, line 2-6.
[9]  See note 7 herein.

3

some legal services to PQPR." (Given the temporal proximity, this Court can fairly infer that the same attorney assisted with the PQPR letter to FSS dated December 29, 2019, found at ECF #350 in the main case, at page 103.)

### B. Indirect Evidence – Myriad Classic Badges of Fraud

4. ***Temporal proximity to divorce***. There is also ample indirect evidence of fraudulent intent insofar as there are present at least ten badges of fraud.[10] For instance, the 2013 Memorandum of Understanding which implemented a strategy to "shelter assets" (see section IA above) was created shortly before Alex Jones' 2013 divorce[11] and around the same time he began broadcasting baseless falsehoods regarding the Sandy Hook tragedies.

5. ***Temporal proximity to involuntary petition against Alex Jones***. If the dates on the documents are true (but see ¶ 12 herein regarding backdating), then the 2020 PQPR note and security agreement were created just days after the dismissal of an involuntary bankruptcy petition filed against Alex Jones by his ex-wife.[12]

---

[10] "Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish the fraudulent intent [under TUFTA]." Roland v. United States, 838 F.2d 1400, 1402-03 (5th Cir. 1988). Not all, or even a majority, of the badges of fraud must exist to find actual fraud. *Id.* When several of these indicia of fraud are found, they can be a proper basis for an inference of fraud. *Roland*, 838 F.2d at 1403.
"Like TUFTA, the Bankruptcy Code also unwinds transfers made 'with actual intent to hinder, delay or defraud' creditors, 11 U.S.C. § 548(a)(1),….[C]ourts have identified various 'badges of fraud' that tend to evidence a transfer made with intent to defraud under § 548 …: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry." *Soza v. Hill (In re Soza)*, 358 B.R. 903 (S.D. Tex. 2006) citing Chastant v. Chastant (In re Chastant), 873 F.2d 89, 91 (5th Cir. 1989)

[11] See Exhibit 3, the December 18, 2013, original petition for divorce filed by Alex Jone's ex-wife in Hays County, Texas.

[12] FSS asks the Court to take judicial notice of the docket in bankruptcy case no. 20-10118 in the Western District of Texas, initiated on January 24, 2020, and dismissed on May 27, 2020. A copy of the docket is attached and marked Exhibit 1.

4

6. ***Temporal proximity to threat of death penalty sanctions.*** The notes and security agreement were created when, during litigation with the Sandy Hook victims' families, FSS and PQPR knew that the interlocutory appeals based upon Texas Citizens Participation Act (TCPA) were failing, and death penalty sanctions (default judgment) were imminent[13], and likely to be followed by significant judgments.[14]

7. ***Insider transactions.*** According to ¶¶ 2-4 of Dr. Jones affidavit at EDCF # 44-2, the transferee, PQPR, is owned by Alex Jones' father and Alex Jones himself. Thus, PQPR is an insider to FSS.[15]

---

The involuntary bankruptcy docket reflects that attorney Eric Taube represented Alex Jones. Robert Roe recently testified that Eric Taube was working for PQPR when Eric Taube referred Robert Roe to PQPR in early 2020.

> Q. So in paragraph three of your affidavit, you state that you were hired and paid by PQPR Holdings Limited LLC to review the books and records of both Free Speech Systems LLC and PQPR.
> A. That's right.
> Q. Did I read that correctly?
> A. You did.
> Q. How did you come to work with PQPR initially?
> A. Over the years I've been in Austin, I've done a number of different projects and worked with an attorney by the name of Eric Taube. Eric Taube, at that point, was providing some legal services to PQPR and at the time, PQPR determined that they needed to have somebody do some work, they asked him for a recommendation and he referred them to me.

See Exhibit 4 hereto, Tr. of the 5/14/24 deposition of Robert Roe. p. 26 at line 10 through p. 27 through 7.

[13] On December 20, 2019, the Travis County Court presiding over the *Heslin v Jones, FSS, et al* matter entered an order that "additional remedies," including "***a default judgment against Defendants on liability***," would be "taken under advisement and may be reconsidered by the Court after remand following the anticipated interlocutory appeal." The same order noted that:" Defendants represented at the December 18 hearing that they would continue to supplement discovery to belatedly comply with the October 18 order. The amount of supplemental discovery is a factor that will be considered if the Motion for Sanctions is reconsidered on remand." See Exhibit 4 hereto.

[14] *SE Prop. Holdings, LLC v. Tammy T. Ctr.*, CIVIL ACTION 15-0033-WS-C, 37 (S.D. Ala. Aug. 8, 2017) ("extremely close temporal proximity is strong evidence of an actual intent to defraud creditors and is a compelling badge of fraud"). *United States ex rel. Bunk v. Gov't Logistics N.V.*, 2016 U.S. App. LEXIS 20481, 842 F.3d 261 (4th Cir. 2016) (Fourth Circuit affirmed successor corporation's liability for a predecessor corporation's liabilities under the False Claims Act "In sum, the temporal proximity of the Gosselin defendants' being advised of the qui tam actions and the GovLog transaction being consummated suggests that the transaction was made to defraud Bunk and the United States out of civil penalties.")

[15] See 11 U.S.C. § 101(31)(B), including at vi.

5

8.  ***All assets transferred.***  The security agreement was a transfer of substantially all of FSS's assets.[16]

9.  ***Transferor's post-transfer continued control.***  Even after the transfer, meanwhile, FSS remained and remains in control of all of its assets.

10.  ***30-year maturity & below market interest rates set by Robert Roe***.  Along the same line, the terms of the two alleged notes effectively further allow FSS to remain in control of all the assets:  That is, the first note is interest only until the note matures in 30 years, or as Dr. Jones puts it, after Dr. Jones has passed.[17]  The second note calls for annual payments of interest and principal of only $$1,939,644.81, see ECF 44-1 at p. 17, and matures after 15 years, id.  The interest rates, in addition, on the two alleged notes -- 1.75% and 1.8%, respectively -- are well below the then 3.5% prime lending market rate.[18]  According to Dr. Jones, Robert Roe (as opposed to the parties to the transactions) decided on the 1.75% interest rate in the first note.[19]

11.  ***Inadequate consideration.***  There was no reason that FSS could not use a supplier other than PQPR.  The consideration received by FSS--- PQPR's purported continued extension of credit --- in exchange for the security agreement was inadequate.[20]

---

[16]  See "Section II" of the purported security agreement at ECF 44-1, p. 7 ("… Debtor hereby pledges … and grants … a security interest in … (1) all fixtures and personal property of every kind and nature, including all accounts… and (2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1)…").

[17]  See Exhibit 2 hereto, p. 141 at lines 7-9.

[18]  See the Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates at https://fred.stlouisfed.org/series/PRIME

[19]  "Q: Who determined that the rate would be 1.75%? A: I believe in this case it was Bob Roe looking at the law as he understood it."  Exhibit 2, Tr. D. Jones, at p. 151, lines 2-4.   This is additionally surprising considering that Rober Roe eventually began providing his services to FSS, not just PQPR.  See note 27 herein.  See also paragraph 15 herein regarding the unlicensed practice of law.

[20]  PQPR strongly implies that no one else would supply FSS. See MSJ at ¶ 10 ("At that time PQPR was virtually the sole supplier to FSS.")   First, FSS's post-petition operations – i.e., its purchase of supplies from parties other than PQPR – demonstrates that the purported value of PQPR's continued business with FSS was illusory.  See Exhibit 6, the unsworn declaration of J. Patrick Magill.  More to the point, Dr. Jones testified that he does not even know whether FSS solicited business from other suppliers or manufacturers.  "Q: My question was from FSS's

12. **Backdating key documents**. The security agreement reflects an August 2020 date. By contrast, the affidavit of Dr. Jones, see ECF # 44-2 at ¶ 12, provides that FSS executed the security agreement "in the fall [not the summer] of 2020[.]"[21] Dr. Jones' "fall" testimony explains the three-month gap between the date on the security agreement and the November 18, 2020, Texas Secretary of State file-mark on the UCC-1. See ECF 44-1. The backdating[22] of the security agreement to August 13, 2020-- *the day immediately preceding a Texas appellate court's August 14, 2020, denial of interlocutory appeal in the Heslin Sandy Hook lawsuit*—is a classic badge of fraud.[23]

13. For telling context, when the Texas Appellate Court denied FSS's interlocutory appeal it also declared the appeal frivolous and remanded the matter back to a Travis County trial court who had already explicitly threatened death penalty (default judgment) sanctions in the event of a remand by the appellate court. See paragraph 6 herein.

14. **Transaction concealed.** Alternatively, the transfer was concealed between August and November 18, 2020, the date file-marked on PQPR's UCC-1 filed in the Texas Secretary of State's Office. [24]

---

perspective, do you know if it ever solicited bids or issued requests from suppliers other than PQPR. A. I don't know. Q. Do you know what percent of the supplements that FSS sells come from PQPR? A. After the bankruptcy, I don't know." 5/15/24 Tr., Dr. Jones, p 33, lines 3-11. He also admitted that pre-bankruptcy, FSS was getting at least 30-35% of its supplies from parties other than PQPR. *Id* at lines 13-14.

[21] FSS asks the Court to take judicial notice that in the Northern Hemisphere the autumnal equinox typically occurs on September 22 or 23 and that the autumnal equinox marks the end of summer and the beginning of fall.

[22] See In re Coppaken, 572 BR 284 (Bankr. D. Kansas 2017) (see number 6 on "Exhibit B" to the opinion, a list of many badges of fraud determined to be present). Also, the IRS considers ´: 9; C<9I=< GJHGKL<9I=< <G;ME=FIK 9F< A<9IGJ G>J9M¨ https://www.irs.gov/irm/part25/irm_25-001-002 See US v. Rozin, 664 F. 3d 1052 (6th Cir. 2012) (affirming district court's holding that "[a]ny evidence of backdating results in a badge of fraud ..[.]")

[23] *Id.*

[24] See the UCC-1 at ECF # 44-1.

15.  ***Unlicensed practice of law***.  The notes and security agreement are, at least to some degree, the product of the <u>un</u>licensed practice of law[25] by Robert Roe (a non-attorney, CPA[26]), who testified that he drafted (and charged for drafting) the second note and that [unlike an attorney constrained by the rules of professional conduct] he represented <u>both</u> FSS and PQPR at the time. [27] [28] See also note 19 herein regarding Mr. Roe setting the interest rate used in the first note based upon his "looking at the law as he understood it[.]"

II.  Issue of Whether the Security Agreement Should Be Equitably Subordinated Precludes Grant of Summary Judgment.

16.  The security agreement is the product of inequitable conduct—i.e., the intentional fraudulent transfer described in section I herein -- to the detriment of the non-insider creditors of FSS.  But for that inequitable conduct, the assets upon which PQPR asserts a lien would be

---

[25] (a) In this chapter the "practice of law" means the preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, <u>such as preparing a will, contract, or other instrument,</u> the legal effect of which under the facts and conclusions involved must be carefully determined.
(b) The definition in this section is not exclusive and does not deprive the judicial branch of the power and authority under both this chapter and the adjudicated cases to determine whether other services and acts not enumerated may constitute the practice of law.

Tex. Govt. Code § 81.101 (underscoring added).

[26] See Exhibit 4, the deposition of Robert Roe, p. 16 at lines 7-16.
[27] "Q: And you got paid for drafting the promissory note in this engagement?  A. No, not specifically. We haven't discussed my fee arrangements, but I just did it as part of the monthly fee they were paying me. I didn't get specifically compensated for it.  Q. It was part of the services that you were paid for, right? A. That is correct. Q. Okay. Were you working for Free Speech Systems when you drafted that note? A. I think I was actually at that time working for both Free Speech and PQPR." Exhibit 4, Tr. R. Roe, page 232, lines 23-25, and p. 233, lines 1-13.

[28] The list of statutory "badges of fraud" is non-exclusive. *Hahn v. Love*, 2009 Tex. App. LEXIS 2109 (Tex. App.—Houston [1st Dist.] Mar. 26, 2009)

8

available to the general unsecured creditors. For that reason, the security agreement and related indebtedness should be equitably subordinated. [29] That fact issue precludes grant of the MSJ.

III. The Issue of How Much Is Actually Owed to PQPR Is a Fact Issue That Precludes Summary Judgment.

17. As to PQPR's bookkeeping, Dr. Jones recently testified: "And my goal originally was to have realtime bookkeeping. …. *We ended up getting a year or two behind and it's hard to predict things when you don't know where the hell you are*."[30]

18. The MSJ evidence offered by PQPR *et al*, taken along, demonstrates that PQPR does not have competent knowledge or record-keeping to know how much it is owed by FSS. See Roe affidavit at ¶ 3 of ECF # 44-1 ("The initial purpose of the engagement was to determine if the amounts shown on the accounting records … were accurate." See id. at ¶ 7 (bookkeeper "routinely ran behind on making entries"). See Dr. Jones affidavit at ¶ 9 of ECF # 44-2 (bookkeeper "continually late in making entries"). This is no surprise to FSS, as PQPR has never transmitted invoices or other records of the transactions that give rise to the alleged indebtedness, despite requests for same, other than an after-the-fact spreadsheet created by Robert Roe.

19. This point is crucial because, for reasons of its own, *PQPR elected against actually attaching the notes and security agreement to the proof of claim*, a document

---

[29] "[T]he court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim" in bankruptcy. 11 U.S.C. § 510(c). In the Fifth Circuit, equitable subordination is appropriate when (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *Life Partners* 926 F.3d at ___ citing *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008).
[30] See Exhibit 2 at p. 77, lines 19-25.

9

executed under penalty of perjury. That means that there is no presumption of the claims validity that wound normally attach.[31]

## IV. The Summary Judgment Evidence is Largely Based on Raw Hearsay

20. The MSJ evidence of the alleged amount owed to PQPR is based upon raw hearsay to which no exception applies. There affidavits reflect zero evidence of compliance with FRE 803(6). The affidavits themselves show that transactions entered the books of PQPR and FSS were badly behind as opposed to entered at or near the time of the event recorded in a manner that lends credibility. See section III herein. And again, Dr. Jones testified that the books were one or two years behind. *Id.* This explains why the affidavits are devoid of any testimony that even approaches compliance with FRE 803(6)'s business record exception to hearsay.

21. Last, Mr. Roe has not been designated as an expert. Movants have not served an expert report. The Roe affidavit does not contain any explanation as to how he is an expert in adding up debt retroactively based upon shaky books, or, for that matter, in the purported sampling his affidavit describes. See the first line of ¶5 of ECF # 44-1. As such, the Court should not treat his opinions (not based upon personal knowledge, see note 32 herein) as probative.

---

[31] Rule 3001(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." *In re Tran*, 369 B.R. 312, 322 (S.D. Tex. 2007) (affirming bankruptcy court dismissal of a creditor's claim because the creditor violated Rule 3001 by not providing supporting documentation with its proof of claim).

V.  Table of Objections to Summary Judgment Evidence

| MSJ Exhibit | Objections |
|---|---|
| A - Affidavit of Robert Roe | FSS objects on hearsay grounds to the portions of the affidavit highlighted in yellow on the attached Exhibit 7.<br><br>FSS objects on the grounds of lack of competency (Mr. Roe had no personal knowledge[32]) to the portions of the affidavit highlighted in yellow on the attached Exhibit 8. |
| A-1 Promissory Note dated 8/13/2020 | This is hearsay to the extent it purports to reflect the amount owed to PQPR based on Mr. Roe's after-the-fact analysis of alleged business records that do not comply with the business records exception to hearsay found in FRE 803(6).[33] |
| A-2 Security Agreement dated 8/13/2020 | This is hearsay to the extent it purports (in "Section I") to reflect the amount owed to PQPR based on Mr. Roe's after-the-fact analysis of alleged business records that do not comply with the business records exception to hearsay found in FRE 803(6), |
| A-3 UCC-1 dated 11/18/2020 | This is hearsay to the extent it is offered to prove the existence of a debt owed to PWRP. |
| A-4 Promissory Note dated 11/10/21 | This is hearsay to the extent it purports to reflect the amount owed to PQPR based on Mr. Roe's after the fact analysis of alleged business records that do not comply with the business records exception to hearsay found in FRE 803(6). |

---

[32]  "Q. Okay. And further, you cannot have -- *it's not possible that you would have personal knowledge -- personal knowledge --of things that you did not see with your own eyes or hear with your own ears. Right? A. That's true.*" Exhibit 4-, p.182, lines 18-24. … what you saw with your own eyes or heard with your own ears? MR. LEMMON: Object to the form.  A. I believe so, but I just -- without -- you asked it that way, without looking at it and reading it again, I can't answer that question.  that question. Q. Okay. I'll be more specific. Like, for instance, you were not engaged by -- and correct me if I'm wrong here -- but you were not engaged by PQPR to conduct the activities described in the affidavit until 2020, right? A. That's correct. Q. And that includes -- and the activities you conducted included reviewing of QuickBooks and other business records, records that were created -- that came into existence before you were – apparently before you were engaged. Right? A. That's true.  Q. And according to you, *they reflect transactions that occurred before you were engaged, right? A. That is true*.  Q. And your belief that those transactions, that those records accurately reflect transactions that occurred before you were engaged is not based on anything you saw, right? A*. I was not there to see the transactions occur, if that's what you're asking. No, of course not.*  Q. Right. And you were not there to see the transactions booked, right? A. That's correct. I wasn't. Q. And you weren't there to hear any of the transactions occur. You weren't there, right? A. That's correct." Id. at pp 185-186 (through line 2).    "Q:  Other than that, other than that metadata search [witness said he checked metadata on only 25 of thousands of files], *you don't really have any -- other than that, you have no knowledge about -- personal knowledge about the entry of the data before you were engag ed. True? A. Yes, true.*") Id. at p 193, lines 16-23.

[33]  Both the affidavit of Mr. Roe and Dr. Jones indicate that the bookkeeper was continuously late in keeping the books up to date, not by days, but by many months.  See section IIII herein.   That is the opposite of a record being "made at or near the time by — or from information transmitted by — someone with knowledge … in the course of a regular activity of a business," as required by FRE 803(6).   f there were ever a case of the source of information or the method or circumstances of preparation indicat[ing] a lack of trustworthiness", see FRE 806(E), this is it.

11

| MSJ Exhibit | Objections |
|---|---|
| A-5 PQPR Holdings LLC "Reconciliation …" | This is raw hearsay, based on Mr. Roe's after-the-fact analysis of alleged business records that do not comply with the business records exception to hearsay found in FRE 803(6). |
| B - Affidavit of David Jones DDS | FSS objects on hearsay grounds to the portions of the affidavit highlighted in yellow on the attached Exhibit 9. |

## Prayer

FSS prays that the Court denies the MSJ.

        O'CONNORWECHSLER PLLC
        By: /s/ Annie Catmull
            Annie Catmull
            State Bar No. 00794932
            aecatmull@o-w-law.com
            Kathleen A. O'Connor
            State Bar No. 00793468
            kaoconnor@o-w-law.com
            4400 Post Oak Parkway, Suite 2360
            Houston, Texas 77027
            T: (281) 814-5977

        ATTORNEYS FOR FREE SPEECH SYSTEMS, LLC

## Certificate of Service

I certify that On May 20, 2024, the attached response was served via the Court's ECF notification system to all registered parties who have made an appearance in this case.

        By: /s/ Annie Catmull
            Annie Catmull

12