# EXHIBIT 10

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| FREE SPEECH SYSTEMS, | Case No. 22-60043 (CML) |
| Debtor. | |
| FREE SPEECH SYSTEMS LLC, | |
| Plaintiff, | |
| v. | |
| PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS LLC, PLJR HOLDINGS LLC, AEJ AUSTIN HOLDINGS LLC, AEJ 2018 TRUST, CAROL JONES and DAVID JONES, | Adversary No. 23-03127 |
| Defendants. | |

## CONNECTICUT FAMILIES' MOTION FOR SUMMARY JUDGMENT

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

The Connecticut Families,[1] as intervenors in the above-captioned adversary proceeding, submit this Motion for Summary Judgment (this "Motion") on Count V of the Complaint (the "Complaint") filed in the above-captioned adversary proceeding by Plaintiff Free Speech Systems, LLC ("FSS") against Defendants PQPR Holdings Limited LLC ("PQPR"), JLJR Holdings LLC, PLJR Holdings LLC, AEJ Austin Holdings, LLC, AEJ 2018 Trust, Carol Jones and David Jones (collectively, "Defendants").

## **Preliminary Statement**[2]

1.      The Connecticut Families bring this Motion to request Defendant PQPR's alleged interest (if any) in FSS to be recognized as what it is:  an equity contribution from one of Alex Jones's companies (PQPR) to another (FSS), which was never expected to be repaid, rather than secured debt negotiated at arms' length.  Indeed, the undisputed facts underlying the PQPR Claim exemplify quintessential characteristics of an equity contribution—not only did FSS fail to "repay" **any** material portion of the millions it supposedly owed for years without **any consequence** to FSS, the PQPR Claim bears an extremely favorable and non-market interest rate, PQPR's manager's (Alex Jones's father, Dr. David Jones) testimony indicates he never expected the "loan" to be repaid, and Defendants have not produced **any** evidence remotely indicating that the terms of the purported debt were negotiated at arms' length.  There are no genuine issues of material fact, and based on the testimony of Defendants' own witnesses, summary judgment is appropriate.

2.      Defendant PQPR has asserted an unsubstantiated $68,154,691.46 secured claim against FSS arising from a transaction between Alex Jones and his father, both acting on behalf of

---

[1]   The "Connecticut Families" are Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash.

[2]   Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms in the remainder of this Motion.

entities wholly or largely owned by Jones, consummated while Jones and FSS were soon to face millions in legal judgments. The PQPR Claim would, by design, take millions of dollars directly from FSS's primary creditors—the Sandy Hook Families—funneling it instead to Jones and his parents. The Subchapter V Trustee already conducted an independent, court-ordered investigation and concluded that PQPR's Claim should be disallowed or subordinated to the claims of unsecured creditors. That conclusion was undoubtedly correct: the undisputed facts underlying the PQPR Claim render it the quintessential case for applying the recharacterization doctrine to recognize the claim as equity, not debt. There are no material facts that could suggest otherwise. The Court should therefore grant summary judgment with respect to Count V of the Complaint brought by FSS in this case, and recharacterize the PQPR Claim as an equity contribution.

3. Several factors, amply supported by deposition testimony elicited from PQPR's own representatives in this case, support recharacterization of the PQPR Claim. *First,* PQPR is undisputedly an insider with respect to FSS—it is majority owned by Alex Jones, who is also the 100% equity owner in FSS, and is managed by Jones's father. Moreover, given Dr. Jones's "pervasive" influence over FSS and their use of shared systems—including shared bank accounts and computer systems—these entities clearly fit the bill for the type of relationship that the Court should more heavily scrutinize in its recharacterization analysis.

4. *Second*, the lack of ***any*** formal lending arrangement or standard loan documentation governing the PQPR Claim for many years militates in favor of recharacterization. Indeed, Defendants have not produced a single document memorializing their lending arrangement prior to execution of the first Promissory Note. By that time, according to Defendants, FSS had racked up over $30 million in debt to PQPR. Of course, it there were any such documentation, Defendants had an obligation to produce it in response to the Connecticut Plaintiffs' discovery requests; it is

therefore undisputed that there was no documented agreement among the parties with respect to any terms of this "loan" until *after* FSS had purportedly already incurred over $30 million in debt to PQPR.

5.      *Third*, even after PQPR and FSS memorialized this supposed $30 million debt, it is uncontroverted that PQPR *continued* to lend money to FSS without any meaningful repayment or other consequences to FSS—purportedly incurring almost $40 million in additional obligations. Critically, Dr. Jones testified that he had only "hope"—rather than an expectation—that PQPR would get this cash infusion back, and that he believed that the Promissory Notes would be renegotiated rather than repaid.

6.      *Fourth*, the indisputable evidence makes clear that PQPR's "repayment" depended heavily upon the success of FSS's business.  Indeed, FSS and PQPR "collectively managed" revenue from InfoWars using a shared cash-management system, with FSS sales being reported as revenues in PQPR's tax returns.  And given FSS's historic failure to pay PQPR, the only way that PQPR could be repaid was if FSS's performance improved dramatically.  Although this factor is not necessary for this Court to grant the Motion, the Connecticut Families submit it is both undisputed and weighs heavily in support of recharacterization.

7.      *Finally*, the way in which the non-market terms of the PQPR Claim were determined leans heavily in favor of recharacterization.  Dr. Jones testified that the interest rate— determined *after* $30 million of "debt" was already incurred—was chosen because it was the "lowest interest rate we could charge" without running afoul of IRS requirements, which is hardly how even the more competitive lenders charge interest.  And the uncontroverted timing of the Promissory Notes and Security Agreement—executed *after* adverse rulings in the state court litigation against FSS, and which contained a provision that any judgment in excess of $100,000

would be an event of default under those agreements—further evidence that this was a belated improper attempt to convert PQPR's equity contributions (to the extent there were any) into a debt instrument with priority in a bankruptcy.

8.     That no genuine dispute of material fact exists with respect to these factors is only further confirmed by the reality that testimony from **_PQPR's_** representatives forms the overwhelming factual support for this Motion seeking summary judgment on recharacterization.

9.     For these reasons, and those that follow, the Connecticut Families respectfully request that the Court grant summary judgment with respect to recharacterizing the PQPR Claim as an equity contribution.

## **Relevant Factual Background**

10.     FSS was formed on November 16, 2007.  Alexander E. Jones ("Jones" or "Alex Jones") is its sole member and 100% equity owner.  Day Ex. 10,[3] 51:22–23.  Jones and members of his family hold interests in several other entities that conducted business with FSS.  One of these entities is defendant PQPR, which is majority owned by Jones, minority owned by Jones's parents, and managed by Jones's father, David Jones ("Dr. Jones").  _Subchapter V Trustee's Initial Findings of Free Speech Systems, LLC Investigation_ [FSS Docket No. 549] (the "Subchapter V Trustee Report") at 11.

11.     The Connecticut Families and the Texas Families[4] (together, the "Sandy Hook Families") filed lawsuits in Connecticut and Texas in 2018 based on false and defamatory statements made by Jones and FSS in the wake of the Sandy Hook Elementary School shooting.

---

[3]     Citations in the form of Day Ex. [  ]  refer to exhibits to the _Declaration of Jonathan Day in Support of the Sandy Hook Families Opposition to PQPR Holdings LLC's, JLJR Holdings LLC's and PLJR Holdings LLC's Motion for Partial Summary Judgment_ [Docket No. 57].

[4]     The "Texas Families" are Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and the Estate of Marcel Fontaine.[5]  _See Heslin_ v. _Free Speech Systems LLC_, Case No. D-1-GN-19-004651 (Tex. Dist. Travis Cnty. Dec. 20, 2019).

Subchapter V Trustee Report at 17. After these lawsuits were pending—and after the Texas court denied Jones's motion to dismiss the case and ordered Jones and FSS to pay $100,000 in attorneys' fees[5]—Jones and PQPR begun documenting "debt" that FSS purportedly owed to PQPR on account of products that PQPR had purchased and paid for from third parties. Subchapter V Trustee Report at 17.

12.     On August 13, 2020, FSS and PQPR executed a promissory note in the principal amount of $29,588,000 made payable to PQPR, ostensibly to memorialize obligations accrued through December 31, 2018 (the "2020 Promissory Note"). *See Affidavit of Robert Roe* [Docket No. 44-1] (the "Roe Affidavit"), Ex. 1. The 2020 Promissory Note bears a 1.75% per annum interest rate and has a maturity date of August 1, 2050. Roe Ex. 1. Contemporaneously, FSS executed a security agreement purportedly granting PQPR a lien on all assets and future income of FSS (the "Security Agreement"). Roe Aff. Ex. 2. The Security Agreement is signed by Jones on behalf of FSS, and his father, Dr. Jones, on behalf of PQPR—again, a company that was both then and now majority-owned by Jones himself. The Security Agreement supposedly secured the 2020 Promissory Note and other obligations "now owed or hereafter arising." Roe Aff. Ex. 2. According to PQPR itself, there are effectively no communications or other documents concerning the negotiation of this almost $30 million promissory note and security agreement.

13.     In late 2021, the Connecticut and Texas state courts entered default judgments against Jones and FSS due to their repeated and serious failures to comply with court orders. Subchapter V Trustee Report at 17. On November 10, 2021—a month and a half after the Texas default judgment and just five days before the Connecticut default judgment—FSS and PQPR entered into a second promissory note in a principal amount of $25,300,000 made payable to

---

[5]     *See Heslin* v. *Free Speech Systems LLC*, Case No. D-1-GN-19-004651 (Tex. Dist. Travis Cnty. Dec. 20, 2019).

PQPR, which allegedly memorialized obligations of FSS to PQPR from January 1, 2019 through December 31, 2020 (the "2021 Promissory Note," together with the 2020 Promissory Note, the "Promissory Notes").   Subchapter V Trustee Report at 17.   The maturity date for the 2021 Promissory Note is November 10, 2036 and it bears an interest rate of 1.8% per annum.  Roe Aff. Ex. 4, § 1.  The 2021 Promissory Note also enumerates certain "events of default," including if "a judgment in excess of $100,000 is entered against [FSS] which is not superseded within ten (10) of the date that it is entered."  Roe Aff. Ex. 4, § 6.

14.     On July 29, 2022 (the "Petition Date"), FSS filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  Case No. 22-60043 (the "FSS Docket"), No. 1, *Chapter 11 Subchapter V Voluntary Petition*.

15.     On October 6, 2022, PQPR filed proof of claim number 11, asserting a secured claim against FSS in a total amount of $68,154,691.46 (the "PQPR Claim").  *See* FSS Claim No. 11-1.  According to PQPR, the "basis" for the PQPR Claim is "Goods sold, unpaid account, resulting in 2 Promissory Notes and subsequent additional unpaid goods sold."  FSS Claim No. 11-1 at 2.  Although PQPR asserts that the PQPR Claim is secured by "all assets of debtor" and attaches a purported UCC-1 financing statement, the proof of claim form does not attach the Security Agreement or Promissory Notes.

16.     Upon the Court's request, the subchapter V trustee appointed in FSS's bankruptcy case (the "Subchapter V Trustee") investigated the validity of the PQPR Claim.  On April 4, 2023, the Subchapter V Trustee issued the Subchapter V Trustee Report.  The Subchapter V Trustee's Report chronicles how there were "numerous instances of financial gymnastics by Alex Jones and Dr. David Jones—presumably to some end"; how "FSS and PQPR did not transact at arm's length"

and "observation of corporate formalities was virtually non-existent"; how their subsequent "sudden enforcement" of alleged intercompany debt "appears to be a preparatory action and an attempt to legitimize the debt"; and how it was even "difficult to view FSS and PQPR as anything but one entity." Subchapter V Trustee's Report at 2, 12, 13, 21. More specifically, among other conclusions and observations, the Subchapter V Trustee's Report:

- Discusses that "FSS and PQPR historically operated using the same cash management system, physical locations, computer systems, and common employee base." Subchapter V Trustee's Report at 11.[6]

- Notes that Ms. Flores—the bookkeeper who "managed the intercompany billings between FSS and PQPR as well as their respective accounts payable and accounts receivable"— "did not personally calculate the PQPR numbers or investigate their accuracy." Subchapter V Trustee's Report at 6, 12.[7]

- Describes FSS and PQPR's "failure to observe corporate formalities," including that they "did not transact at arm's length" and "did not have a contract, price sheet, or formal written agreement governing their relationship, including prices charged." Subchapter V Trustee's Report at 12.[8]

- Observes that the "lack of consequences for the failure of FSS to repay asserted obligations to PQPR is telling" and that the "sudden enforcement of the obligation to pay under those notes, particularly within such close proximity to [the Petition Date] . . . appears to be a preparatory action and an attempt to legitimize the debt." Subchapter V Trustee's Report

---

[6] Many of the conclusions and observations contained within the Subchapter V Trustee's Report have been confirmed through deposition testimony. *See, e.g.*, Day Ex. 9, 139:10–14 (FSS and PQPR operate out of the same physical location); Day Ex. 10, 43:24–44:9, 44:24–45:3 (FSS provided facilities and employees for PQPR); Day Ex. 10, 83:6–8 (FSS and InfoWars "ha[d] use of our [PQPR] money"); Day Ex. 10, 88:25–89:2, 89:25–90:7 (PQPR computer systems kept in the office of FSS employee Lydia Hernandez); Day Ex. 10, 80:7-81:5 (FSS and PQPR shared common wiring platform that allowed transfers between themselves but not to, from, or between any other entities).

[7] Roe's deposition testimony in this case only confirmed this point. *See, e.g.*, Day Ex. 9, 47:24–25 (Ms. Flores is not an accountant); Day Ex. 9, 45:15–25 (Ms. Flores performed services for both FSS and PQPR); Day Ex. 10, 95:25–96:18 (same).

[8] Deposition testimony further illustrates the non-arms'-length nature of these dealings. *See, e.g.*, Day Ex. 9,141:17–142:11 (no formal written agreement between PQPR and FSS); Day Ex. 9, 143:17–20 (no "price sheet per se"); Day Ex. 10, 45:14–46:4 (no "master contract" between FSS and PQPR, but only invoices); Day Ex. 10, 80:7–81:5 (instead of writing checks to pay invoices, PQPR would occasionally direct FSS to make "book adjustments" on a wiring console shared between the two companies that was not accessible to any outside company); Day Ex. 10, 92:16–25 (in conducting PQPR business, Dr. Jones never directed anyone not to use the InfoWars email address that he used for FSS business); Day Ex. 10, 79:10–14 (he only recalled "three emails from 2013 onward about the amounts PQPR was paying for advertising and overhead," and the amounts were "subjective and not reviewed.").

at 13.

- Details Roe's "shifting" narrative around FSS and PQPR's business relationship, and discusses how Roe himself—the same Mr. Roe who submitted an affidavit on behalf of PQPR in this case against FSS—"work[ed] for both PQPR and FSS." Subchapter V Trustee's Report at 5, 13–14.[9]

- Identifies the non-market terms of the debt, including the (a) lack of clear consideration given in exchange for the debt; (b) "certainty" of an imminent default in the Promissory Notes soon after their execution, given the event of default provisions; and (c) low interest rates for the Promissory Notes, indicating FSS and PQPR did not conduct business at arm's length. Subchapter V Trustee's Report at 18–19.

17. Based on these observations and many others, the Subchapter V Trustee concluded that PQPR's claim "should not retain its secured status or payment priority senior or *pari passu* with creditors of FSS," and provides non-exhaustive "grounds and mechanisms" by which PQPR's claim should be subordinated to claims of unsecured creditors. Subchapter V Trustee's Report at 21. As detailed in *supra*, n.8–11, ample deposition testimony elicited from Roe and Dr. Jones—Defendants' own representatives—confirms the Subchapter V Trustee's factual observations detailed above.

18. On July 14, 2023, FSS commenced this adversary proceeding. *Complaint* [Docket No. 1]. On July 31, 2023, FSS filed its amended complaint (the "Complaint"). *Amended Complaint* [Docket No. 5]. The Complaint seeks avoidance of transfers to PQPR, including granting PQPR security interests by the Security Agreement, incurring obligations to PQPR by the Promissory Notes, and additional cash transfers from FSS to PQPR. The Complaint also seeks disallowance of the PQPR Claim under section 502(b) of the Bankruptcy Code. On September 8, 2023, certain Defendants filed their answer to the Complaint. *See PQPR Holdings Limited LLC's, JLJR Holdings LLC's and PLJR Holdings LLC's Answer to Amended Complaint* [Docket No. 17].

---

[9] This is, again, uncontradicted by deposition testimony in this case. *See, e.g.*, Day Ex. 9, 146:6–147:6 (Mr. Roe performed work for both PQPR and FSS and "the lines were blurred" at times); Day Ex. 10, 102:23–103:7 (Dr. Jones and Alex Jones both approved of Mr. Roe providing services on behalf of both PQPR and FSS).

9

19.     On July 21, 2023, the Sandy Hook Families filed the *Joint Motion of the Sandy Hook Families for Entry of an Order Pursuant to Federal Rule 24 and Bankruptcy Rule 7024 Permitting Intervention in PQPR Adversary Proceeding* [Docket No. 2] (the "Intervention Motion"), seeking intervention in this adversary proceeding.

20.     On November 27, 2023, the Court granted the Intervention Motion. *Transcript of November 27, 2023, Hearing*, Case No. 22-60043 (CML) at 55:12–55:15.

21.     On April 19, 2024, certain defendants filed *PQPR Holdings Limited LLC's, JLJR Holdings LLC's, and PLJR Holdings LLC's Motion for Partial Summary Judgment* ("Defendants' Summary Judgment Motion") with respect to a purported $6,308,483.16 claim allegedly secured by the interests granted under the Security Agreement. Defendants' Summary Judgment Motion states that this $6.3 million claim is owed on account of obligations incurred by FSS after Jones and PQPR executed the Security Agreement on August 13, 2020. Defs. Summary Judgment Mot. ¶ 4. In support of Defendants' Summary Judgment Motion, Defendants submitted the *Affidavit of David Jones DDS* (the "Dr. Jones Affidavit") and the Roe Affidavit.

22.     On May 20, 2024, the Sandy Hook Families and FSS both filed oppositions to Defendants' Summary Judgment Motion. *Memorandum of Law of the Sandy Hook Families in Opposition to PQPR Holdings Limited LLC's, JLJR Holdings LLC's and PLJR Holdings LLC's Motion for Partial Summary Judgment* [Docket No. 59]; *Response of Free Speech Systems, LLC to the Motion for Partial Summary Judgment by Defendants PQPR Holdings Limited LLC, JLJR Holdings LLC, and PLJR Holdings LLC* [Docket No. 55].

## Legal Standard

23.     Under Federal Rule of Civil Procedure 56, as made applicable to this case through Federal Rule of Bankruptcy Procedure 7056, summary judgment is appropriate "if the movant

shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." The moving party may satisfy its burden by pointing to the absence of evidence supporting the non-movant's case. *Sossamon* v. *Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009). An issue is only "material" if its resolution could affect the outcome of the action, *Burrell* v. *Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007), and a fact is "genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche*, *Inc.* v. *Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

24.     After the moving party meets its initial burden, the burden shifts to the opposing party to set forth "specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed. R. Civ. P. 56(c); *Little* v. *Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Defendants may not satisfy their burden as the non-movant "with some metaphysical doubt as to the material facts, by conclusory assertions, by unsubstantiated assertions, or by only a scintilla of evidence." *Id.*

25.     The Connecticut Families, as intervenors in this adversary proceeding, are entitled to move for summary judgment with respect to claims alleged in the Complaint. *See, e.g.*, *Iscavo Avocados USA, LLC* v. *Coram Deo Farms, Inc.*, 2018 WL 11612009, at *1 (S.D. Tex. Dec. 17, 2018) (granting intervenor's motion for summary judgment).

## Argument

26.     Based on the undisputed facts, the Court should use its well-established power to recharacterize the PQPR Claim as an equity contribution under section 502(b)(1) of the Bankruptcy Code. *See In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011) (concluding that bankruptcy courts have the power to recharacterize claims under section to 502(b) of the Bankruptcy Code).

27.     This is a textbook case for recharacterization under Texas law.  *See In re Lothian Oil Inc.*, at 543.  Texas courts consider several factors to distinguish between debt and equity.  *Id.* (citing *Arch Petroleum, Inc.* v. *Sharp*, 958 S.W.2d 475, 477 n.3 (Tex. Ct. App. 1997)).  Those factors include the parties' intent, the identity of the parties, the holder's participation in management, the corporation's ability to obtain funding from outside sources, the "thinness" of the corporation's capital structure, the risk involved in the transaction, the formal indicia of the arrangement, and the presence or absence of a fixed interest rate or maturity date.  *In re Am. Hous. Found.*, 499 B.R. 517, 536 (Bankr. N.D. Tex. 2013) (quoting *Fin Hay Realty Co.* v. *U.S.*, 398 F.2d 694, 697 (3d Cir. 1968)).  No single factor is controlling and all factors may be considered.  *In re Lothian*, 650 F.3d at 543 (quoting *Estate of Mixon* v. *U.S.*, 464 F.2d 394, 402 (5th Cir. 1972)).  These factors, however, are "only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship."  *In re Am. Hous. Found.*, 499 B.R. at 536 (quoting *Fin Hay Realty Co.*, 398 F.2d at 697).

28.     Here, the PQPR Claim should be recharacterized as equity, as opposed to "a strict debtor-creditor" relationship, for at least five reasons.  *First*, PQPR is an undisputed insider to FSS that shares common management through Alex Jones and Dr. Jones.  *Second*, it is uncontroverted that until 2020, there was no formal indicia of a lending arrangement between PQPR and FSS, i.e., no fixed interest rate or maturity date.  *Third*, PQPR concededly continued to "lend" tens of millions of dollars to FSS without any meaningful repayment, demonstrating that PQPR did not expect repayment.  *Fourth*, the indisputable shared nature of FSS and PQPR's finances, and the fact that repayment was entirely contingent on FSS improving its performance, demonstrates that PQPR intended to share in the success of FSS's business.  *Fifth*, the non-market terms and the

timing of the Promissory Notes and the Security Agreement also evidence that these documents were merely a last-ditch attempt to legitimize the transactions as debt as FSS and Alex Jones faced pressure from the lawsuits filed by the Sandy Hook Families.

29.     *First*, courts have recharacterized claims in cases where the alleged debtholder was an insider of the debtor, especially where the debtor was also thinly capitalized.  *See In re Mangia Pizza Investments, LP*, 480 B.R. 669, 707–08 (Bankr. W.D. Tex. June 14, 2012); *see also Matter of Herby's Foods, Inc.*, 2 F.3d 128, 132 (5th Cir. 1993) ("[I]f an insider makes a loan to an undercapitalized corporation, the combination of undercapitalization and the insider loan may allow the bankruptcy court to recharacterize the loan as a capital contribution" (citing *Pepper* v. *Litton*, 308 U.S. 295, 309–10 (1939)).  PQPR is unquestionably an insider of FSS, not least because it is majority owned by Alex Jones himself.   In addition, PQPR and FSS share common management because Alex Jones and Dr. Jones had significant influence over both companies at all relevant times.  *See* Subchapter V Trustee's Report at 11–12.[10]  This, too, is undisputed and amply supported by deposition testimony—Dr. Jones, who ostensibly negotiated for PQPR against FSS, testified that his influence at FSS was "pervasive" and that he "was willing and able to do anything that was necessary to further the business" at FSS.  Day Ex. 10, 40:9–10, 40:21–22.  Dr. Jones held positions at FSS from around 2015 through June of 2021 and would advise Alex Jones on financial issues, among other things, at FSS.  Day Ex. 10, 35:23–25, 36:19–37:3.  Moreover, PQPR used the same cash management systems, physical space, and computer systems as FSS and the same bookkeeper kept the books at both FSS and PQPR.  Day Ex. 10, 90:4–7, 95:25–96:4;

---

[10]    The Subchapter V Trustee's Report is admissible for the truth of the statements asserted in that report as it satisfies the "public records" exception to the rule barring hearsay.  *See* Fed. R. Evid. 803(8); *see also United States* v. *Noria*, 945 F.3d 847, 852 (5th Cir. 2019) ("The public-records exception 'is designed to permit the admission into evidence of public records prepared for purposes independent of specific litigation"; "[d]ue to the lack of any motivation on the part of the recording official to do other than mechanically register an unambiguous factual matter . . . such records are [considered] inherently reliable.")

Subchapter V Trustee's Report at 6, 11–12; *see also* Day Ex. 9, 139:10–14 (FSS and PQPR operate out of the same physical location); Day Ex. 10, 43:24–44:9, 44:24–45:3 (FSS provided facilities and employees for PQPR); Day Ex. 10, 83:6–8 (FSS and InfoWars "ha[d] use of our [PQPR] money"); Day Ex. 10, 88:25–89:2, 89:25–90:7 (PQPR computer systems kept in the office of FSS employee Lydia Hernandez); Day Ex. 10, 80:7-81:5 (FSS and PQPR shared common wiring platform that allowed transfers between themselves but not to, from, or between any other entities). FSS and PQPR are undeniably related entities whose transactions should be closely scrutinized for capital contributions disguised as debt.

30.     *Second*, the undisputed lack of ***any*** loan documentation governing FSS and PQPR's historical dealings—let alone evidence that PQPR had agreed upon critical terms like an interest rate or maturity date—until ***after*** $30 million in purported obligations were incurred weighs in favor of recharacterizing PQPR's claim as equity.  *See In re Mangia*, 480 B.R. at 707–08 (recharacterizing a claim where the "sole documentation" consisted "of book entries on the Debtor's QuickBooks system" and there were "no formal documents, no interest rate, and no fixed maturity date"); *see also Curry* v. *U.S.*, 396 F.2d 630, 634 (5th Cir. 1968) ("[O]ne of the normal requisites of a true debt situation is that a sum certain will be paid on a particular day.").  It is uncontroverted that FSS and PQPR did not memorialize their relationship in terms of a contract, price sheet, or written agreement, nor did they establish any indicia of a loan arrangement for any of the transactions predating the Promissory Notes and Security Agreement—a glaring omission if PQPR truly were a lender given that it claims to have provided almost $30 million to FSS by that time.  Subchapter V Trustee's Report at 12; Day Ex. 10, 45:14–20; *see also* Day Ex. 9, 141:17–142:11 (no formal written agreement between PQPR and FSS); Day Ex. 9, 143:17–20 (no "price sheet per se").  Indeed, neither Dr. Jones nor Roe testified that there were ***any*** agreed-upon loan

14

terms—memorialized or otherwise—governing the "loan" prior to execution of the 2020 Promissory Note. Instead, as Dr. Jones testified, FSS employees would determine the amount to charge PQPR for advertising and overhead and then Dr. Jones "approved it by writing big fat checks." Day Ex. 10, 76:2–15. The amounts charged by PQPR to FSS would be modified if Dr. Jones determined the amount on the invoice looked "too much in our favor or too much in Free Speech's favor and we would make adjustments because it looked like we were making too much money or Free Speech Systems was making too much money." Day Ex. 10, 46:8–23; *see also* Day Ex. 10, 80:7–81:5 (instead of writing checks to pay invoices, PQPR would occasionally direct FSS to make "book adjustments" on a wiring console shared between the two companies that was not accessible to any outside company). Prior to 2020, these transactions were recorded as intercompany transfers. Subchapter V Trustee's Report at 15. The informal nature of the transactions between FSS and PQPR—without any negotiation, memorialization, or agreement on the terms of the relationship—weighs in favor of recharacterization.

31.     *Third*, evidence that the claimant did not expect to be repaid weighs in favor of recharacterizing debt as equity. *See In re Mangia*, 480 B.R. at 707–08 (recharacterizing a claim where testimony showed that the claimant "had little expectation that the loans would be repaid"). Here, the undisputed record clearly demonstrates that PQPR did not expect to be repaid for the full amounts allegedly owed by FSS.

32.     From 2014 to 2020, PQPR allegedly lent FSS $54.88 million "with virtually no consequence," further evidencing that the parties "did not transact at arm's length." Subchapter V Trustee's Report at 12. PQPR readily admits it continued to lend to FSS despite FSS's failure to repay the full amounts that PQPR claimed it was owed. Defs. Summary Judgment Mot. ¶¶ 2, 12; Dr. Jones Aff. ¶ 11.

33.     Even Defendants do not contend that they actually expected repayment.  Dr. Jones testified that it was merely his "hope" that FSS would begin paying the principal on the debt allegedly owed to PQPR at the time that he executed the 2020 Promissory Note.  Day Ex. 10, 153:22–25.  That "hope" was apparently founded on "Free Speech's past performance," which by all accounts was defined by a failure to pay PQPR the full amounts allegedly owed.  Day Ex. 10, 154:2–13.  Moreover, despite this "hope," Dr. Jones conceded that he did "not necessarily" think PQPR would be fully repaid during the 30-year term, but rather that Alex Jones "would at least start paying the interest" and that "things can be renegotiated with time."  Day Ex. 10, 143:24–144:3, 156:5–12.  When asked why he would "accept a promissory note in which PQPR would likely not be fully repaid during [his] lifetime," Dr. Jones responded that it was "common business practice and it beats the hell out of nothing."  Day Ex. 10, 144:9–14.  Tellingly, Dr. Jones could provide no explanation for why the alternative to a promissory note was "nothing."  And for the 2021 Promissory Note, Dr. Jones similarly testified that his expectation was that "a renegotiation would be done or a new deal would be done or some arrangement would be rendered that was acceptable to us."  Day Ex. 10, 165:9–15.  When pressed on the interest rates applicable to the Promissory Notes, Dr. Jones testified that low interest rates—indeed, as low as 0%—are "not that uncommon" in "family contracts," further proof that Dr. Jones for some reason believed that the insider relationship somehow warranted a non-market, low interest rate, rather than an interest rate that was a result of an arms'-length negotiation.

34.     *Fourth*, although there are already ample grounds for the Court to grant summary judgment based on the factors outlined above, evidence that repayment depended on the success of the debtor's business also weighs in favor of recharacterization.  *See In re Lothian*, 650 F.3d at 544 (holding that a claim purporting to be a "loan" was an equity interest because it included

payments which "depended on the success of Lothian's business"). To the extent that PQPR actually advanced money to FSS throughout the years (which Defendants have not established), it did so because it expected to share in the success of FSS's business rather than expecting repayment on standard loan terms. During this time, FSS and PQPR "collectively managed revenue generated from product sales on the InfoWars platform" and PQPR "showed the sales to FSS as revenues in the PQPR tax returns." Subchapter V Trustee's Report at 14; Defs. Summary Judgment Mot. ¶ 10. PQPR and FSS had accounts at the same bank during the relevant period and Alex Jones could transfer funds between the accounts. Day Ex. 10, 93:2–12. Although they had no formal arrangement, PQPR apparently claims that it was entitled to 100% of the profits from FSS's sales of its products while FSS "did not appear to have any right to share in any revenue (or gross profit), formally or informally." Subchapter V Trustee's Report at 14, 17. Dr. Jones testified that FSS was PQPR's "primary customer" and that PQPR would be "out of business" if FSS failed. Day Ex. 10, 85:15–86:3. PQPR's expectation to share in the success of FSS's business rather than seek repayment on formal, documented terms weighs in favor of recharacterization. Indeed, because FSS had historically failed to repay PQPR, the **only** way in which PQPR could possibly be repaid is if its performance improved dramatically.

35. *Finally,* although this is again not necessary for this Court to grant summary judgment, here the "formal indicia" of the arrangement between PQPR and FSS further supports recharacterizing the PQPR Claim. *See In re Lothian*, 650 F.3d at 544 (recharacterizing a debt as equity despite language of a "loan" because of the inclusion of a royalty payment); *In re Am. Hous. Found.*, 499 B.R. at 538 (holding that there were no "true debt instruments" in connection with "vague, ambiguous, and suspect" deals despite some formal indicia). The Security Agreement and the Promissory Notes were merely a belated attempt to legitimize the purported transactions as

debt, but do not transform the equity-like substance of the PQPR Claim. For one, the interest rate and terms applicable to the Promissory Notes were negotiated *after* approximately $30 million in debt had allegedly *already been incurred*. Day Ex. 10, 150–160 (the interest rate applicable to the Promissory Notes was determined around the time the Promissory Notes were executed). PQPR admits that the need for funding from PQPR was precipitated by Alex Jones's inability to obtain loans from outside sources. Defs. Summary Judgment Mot. ¶ 13. The Subchapter V Trustee also found that FSS was unable to obtain financing from traditional banks at this time. Subchapter V Trustee's Report at 18. In addition, the terms included in the Promissory Notes are not market. Subchapter V Trustee's Report at 18–19. The maturity dates of 30 years and 15 years on the Promissory Notes were not determined using market references and instead were set at a date "far enough out in the future that it became less of a problem for [Alex Jones]." Day Ex. 10, 147:18–148:3. Similarly, the non-market interest rates on the Promissory Notes were chosen because they were "deemed to be the lowest interest rate we could charge and not get in trouble." Day Ex. 10, 158:21–159:3. The Promissory Notes were "negotiated" between father and son as an attempt to meet a bare minimum threshold to characterize the transactions as debt for tax purposes—if PQPR could have charged a lower interest rate, it would have done so. The relationship between PQPR and FSS is precisely the type of relationship between an insider and a thinly capitalized corporation that may give rise to capital contributions disguised as debt. *See In re Mangia*, 480 B.R. at 708; *Matter of Herby's Foods, Inc.*, 2 F.3d at 132.

36.     The suspicious timing of the documentation of the PQPR Claim is not necessary for the Court to grant summary judgment on recharacterization—given that numerous other undisputed facts justify that relief—but it certainly supports it. *See In re JMV Holdings LLC*, 2022 WL 996372, at *14 (Bankr. E.D. Tex. Mar. 31, 2022) (recharacterizing a purported loan belatedly

documented after the bankruptcy petition date as equity because it was "a fictitious attempt to create a claim and a lien"). Given the long history between the parties, the timing of the Security Agreement demonstrates their intent to disguise PQPR's capital contributions as bona fide debt. PQPR sought to address FSS's alleged "nonpayment" for the first time roughly one week after a Texas judge denied dismissal of one of the lawsuits against Alex Jones and FSS. *See* Subchapter V Trustee's Report at 12. The Promissory Notes were executed right around the time when FSS and Jones were facing multiple lawsuits from the Sandy Hook Families and following significant developments in those lawsuits. *See* Subchapter V Trustee's Report at 17–18 ("It is difficult to accept that the establishment of the two promissory notes with PQPR were merely coincidental."). Indeed, PQPR asserted common interest privilege over conversations with FSS around the time the Promissory Notes were purportedly being negotiated, including conversations with Mr. Pattis, FSS's trial counsel in the Connecticut Families' case. Day Ex. 9, 100:2–101:7. Additionally, the Promissory Notes and the Security Agreement include provisions which establish that a default is triggered in the event that "a judgment in excess of $100,000, is entered against" FSS or there is "any judgement, arbitration award, fine or penalty for an amount in excess of $500,000." Subchapter V Trustee's Report at 19. The Subchapter V Trustee concluded that considering several default judgments had already been entered against Jones in the Sandy Hook Families' cases at the time of the 2021 Promissory Note, these terms made a default "all but a certainty." *Id.*

## Conclusion

37. For the foregoing reasons, the Connecticut Families respectfully request that this Court grant this Motion for summary judgment with respect to Count V of the Complaint and recharacterize the PQPR Claim as equity.

Dated: June 11, 2024

Respectfully submitted,

**CAIN & SKARNULIS PLLC**
By: *Ryan E. Chapple*_____
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, TX 78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011
E-mail:  rchapple@cstrial.com

**KOSKOFF KOSKOFF & BIEDER, PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone:  (203) 336-4421
E-mail:  asterling@koskoff.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Paul Paterson (admitted *pro hac vice*)
Daniel Negless (admitted *pro hac vice*)
Leslie Liberman (admitted *pro hac vice*)
Jonathan Day (admitted *pro hac vice*)
Vida Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Fax:  (212) 757-3990
E-mail:  kkimpler@paulweiss.com
E-mail:  ppaterson@paulweiss.com
E-mail:  dnegless@paulweiss.com
E-mail:  lliberman@paulweiss.com
E-mail:  jday@paulweiss.com
E-mail:  virobinson@paulweiss.com

*Co-Counsel to the Connecticut Families*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion has been served on counsel for the Debtor, the Debtor, and all parties receiving or entitled to notice through CM/ECF on this 11th day of June, 2024.

*Ryan E. Chapple*
Ryan E. Chapple