# EXHIBIT 11

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | § | |
| | § | |
| **FREE SPEECH SYSTEMS,** | § | **Chapter 11** |
| Debtor | § | **Case No. 22-60043 (CML)** |

_____

| | | |
|---|---|---|
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | |
| | § | **Adv. No. 23-03127** |
| **PQPR HOLDINGS LIMITED LLC,** | § | |
| **JLJR HOLDINGS LLC, PLJR** | § | |
| **HOLDINGS LLC, AEJ AUSTIN** | § | |
| **HOLDINGS LLC, AEJ 2018 TRUST,** | § | |
| **CAROL JONES and DAVID JONES,** | § | |
| Defendants. | § | |

## DEFENDANTS' RESPONSE TO
## THE CONNECTICUT FAMILIES' MOTION FOR SUMMARY JUDGMENT

Defendant PQPR Holdings Limited LLC ("PQPR") asks the Court to deny Connecticut

Families' Motion for Summary Judgment (the "Motion") [ECF 61] because of at least two fatal

pleading flaws, and/or, alternatively, because there are genuine issues of material fact that preclude

judgment as a matter of law.

### I.     INTRODUCTION

1.      The Connecticut Families ("Movants") requested this Court grant summary

judgment "with respect to Count V of the *Complaint* and recharacterize the *PQPR Claim* as

equity." Motion at ¶ 37 (emphasis added). The "*PQPR Claim*" is defined as PQPR's Proof of Claim

No. 11 in the amount of $68,154,691.46 filed in the Free Speech Systems LLC ("FSS") bankruptcy

case (the "FSS Bankruptcy"). The "*Complaint*" Movants reference is the Amended Complaint

[ECF 5] (the "FSS Complaint") filed by FSS against PQPR and others in this adversary case (the

"PQPR Adversary").  In Count V of the FSS Complaint, *FSS* requests judgment against PQPR and David Jones disallowing their claims pursuant to section 502(b) of the Bankruptcy Code.[1]  FSS Complaint at ¶¶ 75-81.   Count V does not request that any part of the PQPR Claim be recharacterized.

2.      The first fatal flaw is that the Motion is moot, and the Court has no present jurisdiction to either disallow or recharacterize the PQPR Claim.  The FSS Bankruptcy Case was dismissed on June 21, 2024 [FSS Bankruptcy ECF 956].  Thus, there is no bankruptcy estate and, by definition, no claims against it. The Motion should be denied on this basis alone.

3.      The second fatal flaw is that Movants seek summary judgment on a claim they did not plead.  In fact, Movants have not pled any causes of action – there is no live pleading in which Movants assert claims against PQPR (or others).  Despite being granted leave to intervene, Movants never actually did so.  In other words, Movants never filed a pleading asserting claims against Defendants as is required by the rules.  Movants are not entitled to summary judgment on claims filed by another party.

4.      Based on either of the aforementioned reasons alone, the Court must deny Movants' Motion.  However, even if the Motion was not fatally flawed for those jurisdictional reasons, Movants cannot establish that recharacterization of PQPR's debt is warranted as a matter of law. The very existence of the debt, the Note and Security Agreement creates a fact issue precluding summary judgment. In addition, other facts exist that, at a minimum, establish a genuine issue of material fact sufficient to defeat Movants' Motion for Summary Judgment.

---

[1]     FSS scheduled David Jones as a creditor with an unsecured claim in the amount of $150,000.  The Motion and this Response pertains only to the PQPR Claim.

## II.    MOVANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT

**A.    There is no PQPR Claim to disallow or recharacterize.**

5.    The FSS Bankruptcy Case was dismissed on June 21, 2024 [ECF 956]. Thus, there is no bankruptcy estate and, by definition, no claims against it. Allowance (or disallowance) of claims under Bankruptcy Code § 502 applies only in bankruptcy cases. *See In re Davison*, 186 B.R. 741, 742-43 (Bankr. N.D. Fla. 1995) ("actions that depend upon the existence of the bankruptcy" must be dismissed when the bankruptcy case is dismissed). Any cause of action against PQPR that depends on the existence of the FSS bankruptcy estate cannot survive dismissal of the FSS Bankruptcy.[2] Therefore, the Motion is moot and should be denied on this basis alone.

**B.    Movants have not properly pled a claim for recharacterization against PQPR or others.**

### (i)    Movants do not have live claims pending against PQPR.

6.    On July 21, 2023, the "Sandy Hook Families" ("Intervenors"), defined as Movants together with the Texas Families, filed a joint motion to intervene (the "Intervention Motion") [ECF 2] in the PQPR Adversary with the primary objective to frustrate mediation efforts between PQPR and FSS. The Intervention Motion was not accompanied by a pleading that set out the claim(s) for which intervention was sought as required by Federal Rule of Civil Procedure 24, made applicable by Bankruptcy Rule 7024.[3] Nor did it adopt the claims set forth in the FSS

---

[2]    PQPR is not herein challenging the Court's ability to retain jurisdiction over adversary proceedings that involve claims that do not depend on the existence of the FSS Bankruptcy. In fact, PQPR has consented to the Court's retention of jurisdiction to adjudicate FSS's fraudulent transfer claims in the PQPR Adversary and Intervenors' claims in Adv. No. 22-3331, *Heslin, et al v. Alex Jones, et al.*

[3]    A motion to intervene must "state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c); *In re SBMC Healthcare, LLC*, 519 B.R. 172, 185 (Bankr. S.D. Tex. 2014), aff'd, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017) ("Interpreting this rule, the Fifth Circuit has held that an intervenor must state a 'well-pleaded' claim."). In *In re SBMC*, the court found a motion to intervene was "woefully inadequate" because it failed to attach a proposed complaint and did not allege any causes of action against the defendants. *Id.* at 185. Strict compliance with the requirement to attach a pleading has been excused when the motion to intervene sufficiently puts the parties on notice of the grounds for intervention. *Liberty Surplus Ins. Cos. v. Slick Willies of Am., Inc.*, No. 07-0706, 2007 WL 2330294, at *1 (S.D. Tex. Aug. 15, 2007).

Complaint.[4]  Intervenors simply asserted that intervention was warranted to "properly protect their interests" in "monitoring and ensuring that potential estate causes of action are not released unnecessarily" and "preserving direct claims against [Defendants]."  Intervention Motion at ¶ 1.

7.       The Court granted the Intervention Motion on November 28, 2023 [ECF 22] (the "Intervention Order").  The Intervention Order stated: "The Sandy Hook Families are authorized to intervene in the PQPR Adversary Proceeding, including for the avoidance of doubt, by participating in any mediation proceedings in respect thereof."

8.       An order granting a motion to intervene effectively grants the intervenor leave to file a pleading asserting a claim or defense.  Although courts in the Fifth Circuit have held a failure to comply with Rule 24(c) by attaching a pleading to the motion to intervene is not fatal, once the motion is granted, the party intervening as a plaintiff must assert claims in a pleading or at a minimum adopt claims filed by the original plaintiff.  In the PQPR Adversary, Movants did not even bother to expressly adopt or incorporate the FSS Complaint in the Intervention Motion or subsequently.  While this Court granted the Intervention Motion despite Movant's failure to include a pleading setting out the claims, Movant was not excused from *ever* asserting specific claims for affirmative relief by filing a complaint or otherwise joining in FSS's complaint.  The fact is, Movants do not have any active claims on file in the PQPR Adversary.[5]  Yet, Movants are seeking summary judgment on Count V of the *FSS Complaint* – a cause of action Movants neither filed nor adopted in any way.  Not only is this procedurally insufficient, it is procedurally impossible.  For this reason alone, the Motion should be dismissed.

---

[4]      *See Hill v. Day (In re Today's Destiny, Inc.)*, No. 06-3285, 2007 WL 2028111, at *4 (Bankr. S.D. Tex. July 6, 2007) (finding that strict compliance with Rule 24(c) was not fatal where "the parties objecting to the interventions clearly had notice of the intervening parties' intent and **had notice that the parties were planning on adopting some of the causes of action asserted in the Trustee's Second Amended Complaint**") (emphasis added).

[5]      Movants actually have live fraudulent transfer claims against PQPR in Adv. No. 22-3331, *Heslin, et al v. Alex Jones, et al.*

### (ii) There is no recharacterization claim pending against PQPR.

9.     There is no doubt Movants did not effectively assert affirmative claims against PQPR.  However, even if the Court charitably determines the Movants have effectively adopted the FSS Complaint and, therefore, asserted affirmative claims against PQPR, there is still no basis to recharacterize the PQPR Claim to equity.   Count V of the FSS Complaint does not seek recharacterization, and Movants certainly cannot obtain summary judgment for relief no one has requested.  FSS Complaint at ¶¶ 75-81.

## C.     Fact issues exist that preclude judgment as a matter of law.

### (i)     Relevant Factual Background

10.     Since at least 2014, PQPR and FSS have been separate companies, with separate sets of creditors, and separate books and records.  PQPR is an insider but was controlled by separate management from FSS.  While there is some commonality in the ownership, the companies are not the same.

11.     PQPR purchased and paid for product from third parties.  That product was marketed by FSS which then owed (and still owes) funds to PQPR.  The transactions between PQPR and FSS were recorded contemporaneously.  While FSS successfully sold the products, it fell behind in paying PQPR.  The debt owed by FSS to PQPR was reviewed by an outside accountant in 2020, and the amount shown as owing by FSS to PQPR (on each entity's books) was affirmed.  The debt owing to PQPR was documented in two separate notes (the "Notes")  and secured by a grant of a security interest in virtually all property of FSS (the "Security Agreement").  At that time, PQPR was virtually the sole supplier to FSS.  PQPR was unwilling to continue to advance credit to FSS absent the signing of the Notes and Security Agreement.

5

12.     Subsequent to execution of the Notes and Security Agreement, FSS continued to incur additional debt to PQPR. PQPR continued to purchase product and to sell such product to FSS only because of the existence of the security agreement.

**(ii)     *Movant bears the burden to establish there is no genuine dispute as to any material fact.***

13.     Judge Isgur, in *In re ATP Oil & Gas Corp*., citing Fifth Circuit precedent, summarized a movant's burden when seeking summary judgment on a recharacterization claim:

> A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. … A court views the facts and evidence in the light most favorable to the non-moving party at all times. The Court need consider only the cited materials, but it may consider other materials in the record. The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis.

*In re ATP Oil & Gas Corp*., 497 B.R. 238, 247 (Bankr. S.D. Tex. 2013) (internal citations omitted).

14.     The test for recharacterization "a highly fact-dependent inquiry that will vary in application from case to case." *In re SIAG Aerisyn, LLC*, No. 12-11705, 2014 WL 5595113, at *9 (Bankr. E.D. Tenn. Nov. 3, 2014), quoting *Fairchild Dornier GMBH v. Official Committee of Unsecured Creditors (In re Official Committee of Unsecured Creditors for Dornier Aviation),* 453 F.3d 225, 234 (4th Cir.2006). Recharacterization requires a case-by-case fact-intensive analysis as to the parties' intent. *In re Broadstripe, LLC,* 444 B.R. 51 (Bankr. D. Del. 2010).

**(iii)     *There are genuine issues of fact the preclude summary judgment for recharacterization.***

15.     The affidavits of Robert Roe, attached as <u>Exhibit A,</u> and David Jones, attached as <u>Exhibit B</u>, provides some evidence that the PQPR Claim is debt, not equity, sufficient to defeat the

Motion.[6] The Notes and Security Agreement unambiguously characterize the transactions as debt owed by FSS to PQPR. This is some evidence that the PQPR Claim is debt, not equity. An independent, outside accountant reviewed PQPR's and FSS's books and determined the debt existed and was valid. This is some evidence that the PQPR Claim is debt, not equity. David Jones, the manager of PQPR, expressly contends the PQPR Claim is debt and that was always the intent of PQPR and FSS. This is some evidence that the PQPR Claim is debt, not equity.

16.     PQPR is owned by JLJR Holdings LLC and PLJR Holdings LLC, which are owned by Alex Jones, David Jones, and Carol Jones (wife of Dr. Jones/mother of Alex Jones). Thus, PQPR has not contested the allegation it is an insider of FSS. However, PQPR, JLJR, PLJR, Dr. Jones, and Carol Jones do not own any interests in FSS, and Alex Jones does not own a direct interest in PQPR.

17.     While true that, at times, PQPR officed at FSS and used the same bookkeeper, PQPR paid FSS for these amenities. FSS charged PQPR for advertising, fulfillment, and a monthly administration charge, which was calculated as a pro rata share of FSS's overhead attributable to PQPR. These factors have never been the sole basis for recharacterization. This theory by the Connecticut plaintiffs ignores virtually all aspects of Texas corporate law. The fact is that PQPR and FSS always maintained separate books, separate creditors, and separate ownership structures. The entities never represented themselves to creditors as the same entity. Tellingly, the Connecticut plaintiffs cannot find any creditor who maintains to the contrary. There is absolutely no basis for what is essentially a de facto alter ego claim.

18.     The PQPR-FSS relationship did not start out as a "lending arrangement." PQPR had no intention of FSS accruing debt by failing to turnover sales proceeds it collected on PQPR's

---

[6]     Without specifically referencing the exhibits, the factual statements contained in this section are supported by the Roe Affidavit (Exhibit A) and/or the Jones Affidavits (Exhibit B) and the exhibits attached thereto.

behalf.  The so-called "lending arrangement" only materialized after FSS converted for its benefit the funds collected but not paid to PQPR.  In order to protect itself, PQPR demanded the existing debt be formally documented by the Notes. However, there were indicia of a debt – the debt owed to PQPR by FSS was recorded simultaneously on the books of both entities.  Movants present no evidence to the contrary.

19.      When the Notes were executed, they included all necessary formalities, including an interest rate, maturity date, and repayment terms.  The very existence of the Notes themselves is sufficient to establish a genuine issue of fact sufficient to preclude summary judgment in favor of Movants. *In re SIAG,* 2014 WL 5595113, at *9.  In *SSAB*, the trustee sought summary judgment on its recharacterization claim based on, among other factors, the fact that the note was not created until after the first advances were made to the debtor. The court agreed that several facts raised doubt as to whether the note was truly a note, but held that the existence of the note itself established a fact issue. *Id.*

20.      Movants argue that the fact PQPR continued to "lend" to FSS without meaningful repayment is conclusive evidence PQPR Claim is equity.  Again, PQPR did not intend to lend FSS funds – it intended to receive the sales proceeds as agreed.  PQPR continued to fulfill orders, and FSS continued to collect and wrongfully convert PQPR's funds for its own use.  PQPR continued to supply the goods because that was its business. It continued to expect FSS to perform. Eventually, in accordance with reasonable business practices, it demanded FSS execute the Notes in order to ensure repayment of the unpaid proceeds FSS had collected over the years.

21.      Furthermore, repayment of the PQPR debt was not contingent on the future success of FSS.  The amounts were due to PQPR when the products were sold.  The amounts evidenced

by the Notes were amounts resulting from the sale of PQPR's products and should have been paid immediately. The "success" had already occurred.

### III.   CONCLUSION AND PRAYER

22.     Movants' Motion should be denied.  Movants seek summary judgment only on Count V of the FSS Complaint, which simply requests the PQPR Claim be disallowed under Bankruptcy Code § 502(b) without specifying the basis for disallowance or requesting recharacterization.  At the most basic level, the Court cannot grant summary judgment to disallow a claim against the FSS bankruptcy estate that ceased to exist when the FSS Bankruptcy was dismissed.

23.     Also, as a fundamental procedural failure, Movants did not file a pleading seeking affirmative relief and did not adopt the FSS Complaint.  Therefore, Movants have no live cause of action for recharacterization.  Thus, there is no claim for which summary judgment is an available outcome.

24.     Finally, the Notes and Security Agreement containing material terms, the contemporaneous QuickBooks entries documenting the PQPR debt, the Affidavits of Robert Roe and David Jones, and the existence of other indica of a true debt are sufficient evidence to establish a fact issue sufficient to defeat Movant's Motion.

25.     For the reasons stated herein, Defendants request that the Court deny the Connecticut Families' Motion for Summary Judgment, and grant such other and further relief, both general and special, at law and in equity, to which they may be justly entitled.  Alternatively, if the Court determines above-described jurisdictional and procedural issues are not fatal to the Movants' Motion, PQPR respectfully requests permission to supplement this response to the Motion with further evidence, if needed.

Filed: July 16, 2024

Respectfully submitted,

By: _/s/ Stephen W. Lemmon_____
    Texas Bar No. 12194500
    STREUSAND, LANDON, OZBURN &
    LEMMON, LLP
    1801 S. Mopac Expressway, Ste. 320
    Austin, Texas 78746
    Telephone: (512) 236-9900
    Facsimile: (512) 236-9904
    lemmon@slollp.com

    ATTORNEYS FOR DEFENDANTS PQPR
    HOLDINGS LIMITED LLC, JLJR HOLDINGS,
    LLC, AND PLJR HOLDINGS, LLC

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing instrument has been served on this 16th day of July 2024, on counsel for the Debtor, the Debtor, and all parties registered to receive electronic notification via this Court's CM/ECF system.

                         _/s/ Stephen W. Lemmon_____
                         Stephen W. Lemmon

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| FREE SPEECH SYSTEMS LLC | § | |
| | § | Bankruptcy Case No. 22-60043 |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| FREE SPEECH SYSTEMS LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 23-03127 |
| | § | |
| PQPR HOLDINGS LIMITED LLC, | § | |
| JLJR HOLDINGS LLC, PLJR | § | |
| HOLDINGS LLC, AEJ AUSTIN | § | |
| HOLDINGS LLC, AEJ 2018 TRUST, | § | |
| CAROL JONES and DAVID JONES | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF ROBERT ROE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

On this day before me, the undersigned Notary Public, personally appeared Robert Roe,

who stated under oath as follows:

1.      My name is Robert "Bob" Roe.  I am above the age of 18 and in all ways competent
to make this affidavit.  All of the facts contained herein are true and correct and based upon my
personal knowledge, unless specified otherwise.

2.      I am a Certified Public Accountant, licensed in the states of Texas and Wisconsin.
I have over 50 years of experience as a licensed public accountant.

1

EXHIBIT A

3.     In 2020, I was hired and paid by PQPR Holding Limited LLC ("PQPR") to review the books and records of both Free Speech Systems LLC and PQPR. The initial purpose of the engagement was to determine if the amounts shown on the accounting records of each company for the transactions between FSS and PQPR were accurate.

4.     I reviewed the accounting records of both FSS and PQPR. In particular, I looked to determine if the amounts shown on the records as owing to PQPR by FSS were correct.

5.     As part of my work, I reviewed a representative sample of records related to transactions to determine if the individual entries were accurate. The documents I reviewed included the Quick Books for each of PQPR and FSS, the bank account documents including statements, and debit and credit items like checks and wire transfers, and charges made by FSS to PQPR for administrative functions and advertising. I also reviewed the transactions with consumers who purchased product, and the payments from the credit card companies for those purchases. I also interviewed FSS employees and reviewed publicly available information regarding advertising, shipping, and handling charges.

6.     With the exception of very minor and routine items, such as the occasional misclassification of some entries, I determined that the Quick Books of each of FSS and PQPR accurately reflected the debt owing from FSS to PQPR[1].

7.     Melinda Flores, an FSS employee, was the bookkeeper with responsibility for recording the transactions. Ms. Flores made the entries on both FSS and PQPR books. The books were maintained separately under different Quick Books licenses. She routinely ran behind on making entries, but the entries were accurate when recorded.

8.     At the time I was reviewing the books and records in 2020, Ms. Flores had only completed the accounting through 12/31/2018. Based upon my review of the books and records, I determined that, as of 12/31/2018, the amount of $29,589,038.98 (which was the amount shown on the books of each of PQPR and FSS) was correctly stated.

9.     In August of 2020, FSS executed a promissory note in favor of PQPR in the amount of $29,589,000 ("Note 1"). A true and correct copy of Note 1 is attached hereto as **Exhibit 1.**

10.    Contemporaneous with the execution of Note 1, FSS also executed a Security Agreement in favor of PQPR (the "Security Agreement"). A true and correct copy of the Security Agreement is attached hereto as **Exhibit 2**. The Security Agreement states that it secures all debts then existing or created afterwards.

11.    PQPR filed a UCC 1 Financing Statement reflecting the grant of the Security Agreement, which was filed with the Texas Secretary of State on November 18, 2020. A true and correct file-stamped copy of the UCC 1 reflecting its filing is attached hereto as **Exhibit 3**.

---

[1] As explained more fully below, the bookkeeper routinely ran behind on making entries. However, the entries when made were accurate. The only corrections necessary were routine classification items not related to the FSS debt to PQPR and were the sort of corrections made in virtually any accounting review of any entity.

2

**EXHIBIT A**

12.     As additional entries were made on the FSS and PQPR Quick Books software for entries for transactions occurring after 12/31/2018, additional debt owing to PQPR from FSS were documented, in the amount of $25,300,000 as of November of 2021.  I made a similar review of transactions underlying this additional debt and again determined that the $25,300,000 amount shown on both companies' books was accurate.  An additional promissory note in the amount of $25,300,000.00 was executed by FSS in favor of PQPR for such amount ("Note 2").  A true and correct copy of Note 2 is attached hereto as **Exhibit 4**.

13.     I was asked to prepare an accounting of the additional amount owed by FSS to PQPR after the execution of the Security Agreement.  I determined, after an additional analysis of the books and records of PQPR and FSS, that the net additional debt incurred by FSS and owed to PQPR after the execution of the Security Agreement was 6,308,483.16.  True and correct copies of my analysis, along with the work papers underlying such analysis, are attached hereto as **Exhibit 5**.

14.     My analyses have been provided to counsel for the Plaintiff, but to my knowledge, Plaintiff has never contested my findings regarding the amounts owed to PQPR by FSS, either before or after the grant of the security interest.

15.     Based upon my review of the documentation and my interviews with various parties, I uncovered no information suggesting that FSS and PQPR ever held themselves out to third parties as the same entity.

FURTHER AFFIANT SAYETH NAUGHT.


ROBERT ROE

SUBSCRIBED AND SWORN TO BEFORE ME on this the 19th day of April, 2024.

GLORIA BUENO
Notary Public, State of Texas
My Commission expires
September 18, 2027
ID No. 132170620

Notary Public for the State of Texas

3

**EXHIBIT A**

# PROMISSORY NOTE

$29,588,000.00                    Austin, Texas                    August *13* , 2020

THIS PROMISSORY NOTE (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (**"Maker"**) and PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (**"Payee"**).

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty Nine Million Five Hundred Eighty-Eight Thousand and 00/100 Dollars ($29,588,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided hereinbelow.

## 1.    Payment of Principal and Interest.

**(a)**    Interest, as provided below, is due and payable annually on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) until August 1, 2050 (the **"Maturity Date"**), when the entire amount of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"**), then such payment shall be due on the Business Day next succeeding the payment date.

**(b)**    The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest on amounts advanced under this Note at the lesser of (i) **[one and 75/100 percent (1.75%)]** per annum (**"Contract Rate"**); (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%),** or (ii) the highest rate for which Maker may legally contract under applicable law.

**2.    Maximum Interest Rate.** It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in

**EXHIBIT 1**

the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until payment in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

>    **3. Prepayment.** Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

**4. Waiver.** Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

**5. Amendments.** Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

**6. Events of Default.** The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered

**EXHIBIT 1**

against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

7.   **Remedy.** Upon the occurrence of payment default as provided  paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of  thirty (30) days' notice and opportunity to cure, the entire principal amount and accrued interest  of the Note then outstanding shall become immediately due and payable.

8.   **Governing Law and Venue** . This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

9.   **Attorneys' Fees and Expenses**  In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee, reasonable fees and costs, including attorneys' fees and expenses of colletion.

EXECUTED to be effective as of the date first above written.

MAKER:

Alexander E. Jones
Managing Member
Free Speech Systems, LLC

**EXHIBIT 1**

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the **"Security Agreement"**) is entered into effective as of August 2, 2020 (the **"Effective Date"**) by and between PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (the **"Secured Party"**) and Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (the **"Debtor"** or the "**Company"**).

Section I.     CREATION OF SECURITY INTEREST

The Debtor hereby grants to the Secured Party a security interest in the Collateral described in Section II of this Security Agreement to secure performance and payment that certain promissory note of even date herewith in the original principal amount of Twenty Nine Million Five Hundred Eighty Eight Thousand Dollars executed by Debtor in favor of Secured Party as it may be amended or modified (the "**Note"**) and any and all other obligations of Debtor to Secured Party of any kind or character, now owed or hereafter arising (collectively, the **"Obligations"**). Any capitalized term herein not specifically defined will have the meaning as defined in the limited liability company agreement of the Secured Party.

Section II.     COLLATERAL

In order to secure the payment when due of any and all Obligations, the Debtor hereby pledges to the Secured Party and grants to the Secured Party a security interest in the following collectively, (the **"Collateral"**):

(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and

(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

The Secured Party is hereby granted a first priority lien and security interest in the Collateral to secure the Obligations. Debtor authorizes Secured Party to file a financing statement describing the Collateral in each and every jurisdiction necessary to perfect the

**EXHIBIT**

5

**EXHIBIT 2**

security interest and lien granted herein.

Section III.    PAYMENT OBLIGATIONS OF THE DEBTOR

1.    Debtor is not authorized to sell, convey, dispose of encumber or dispose of the Collateral without Secured Party's agreement or until the Obligations are paid in full. The Debtor will account fully and faithfully to the Secured Party for proceeds from disposition of the collateral in any manner and will pay or turn over promptly in cash, negotiable instruments, drafts, assigned accounts or chattel paper, all the proceeds from each sale to be applied to the Debtor's Obligations to the Secured Party, subject if other than cash, to final payment or collection. Application of such proceeds to Obligations of the Debtor will be in the sole discretion of the Secured Party, provided such application of proceeds is made by the Secured Party in a reasonable manner.

2.    The Debtor will pay to the Secured Party on demand all expenses and expenditures, including reasonable attorney's fees and other legal expenses incurred or paid by the Secured Party in exercising or protecting its interests, rights and remedies under this Security Agreement.

3.    The Debtor will pay immediately, without notice, the entire unpaid Obligations of the Debtor to the Secured Party whether created or incurred pursuant to this Security Agreement or otherwise, upon the Debtor's default under Section V of this Security Agreement.

4.    Delivery of the Collateral.

(a)    All certificates and instruments evidencing or representing the Collateral (if any) will be delivered to the Secured Party upon the execution and delivery of this Security Agreement. All other certificates and instruments constituting, evidencing or representing the Collateral from time to time will be delivered to the Secured Party promptly upon the receipt thereof by and/or on behalf of the Debtor. All such certificates and instruments will be held by or on behalf of the Secured Party pursuant hereto, and will be delivered to the Secured Party in suitable form for transfer by delivery or will be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party.

(b)    If the Debtor receives, by virtue of its being or having been an owner of any Collateral, any (i) certificate, promissory note or instrument, (ii) option or right, whether as an addition to, substitution for, or in exchange for the Collateral, or (iii) distributions on dissolution, in total liquidation or from capital, capital surplus or paid-in surplus, the Debtor will receive such certificate, promissory note, instrument, payment or distribution in trust for the benefit of the Secured Party, will segregate it from the Debtor's other assets and will deliver it forthwith to the Secured Party in the exact form received, with any necessary endorsement and assignment duly executed in blank, to be held by the Secured Party as Collateral and as additional collateral security for the Obligations.

Section IV.    DEBTOR'S REPRESENTATION, WARRANTIES AND AGREEMENTS

2

**EXHIBIT 2**

The Debtor makes the following representations, warranties and agreements:

1.  The pledge of the Collateral creates a valid and perfected first priority security interest in the pledged Collateral securing payment of the Obligations.

2.  The Debtor will, at its own expense,, do, make, procure, execute and deliver all acts, things, writings and assurances as the Secured Party may at any time request to protect, assure or enforce its interests, rights and remedies created by, provided in or emanating from this Security Agreement.

3.  The Debtor will sign and execute alone or with the Secured Party a Financing Statement and any and all other documents requested by Secured Party for perfection of the lien on the Collateral.

Section V.    EVENTS OF DEFAULT

The Debtor will be in default under this Security Agreement upon the happening of any condition or event set forth below (herein called an **"Event of Default"**):

1.  The Debtor's failure to pay when due any Obligations secured by this Security Agreement;

2.  Default by the Debtor in punctual performance of any of the obligations, covenants, terms or provisions contained or referred to in this Security Agreement or the Note;

3.  Any warranty, representation or statement contained in this Security Agreement or made or furnished to the Secured Party by or on behalf of the Debtor in connection with this Security Agreement or to induce the Secured Party to make a loan to Debtor proves to have been false in any respect when made or furnished;

4.  Loss, theft, sale (except as authorized in this Security Agreement) or encumbrance to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or

5.  The Debtor's dissolution, termination of existence, insolvency or business failure; the appointment of a receiver of all or any part of the property of the Debtor; an assignment for the benefit of creditors by the Debtor; the calling of a meeting of creditors of the Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against the Debtor.

6.  The Debtor shall have entered against it any judgment, arbitration award, fine or penalty for an amount in excess of $500,000, and such judgment, arbitration award, fine or penalty is not stayed or superseded within 30 days of entry.

Section VI.    SECURED PARTY'S RIGHTS AND REMEDIES

A.    Rights Exclusive of Default.

1.    This Security Agreement, the Secured Party's rights hereunder or the Obligations

3

**EXHIBIT 2**

hereby secured may be assigned by Secured Party, and in any such case, the assignee will be entitled to all of the rights, privileges and remedies granted in this Security Agreement to the Secured Party.

2.   Upon the request of the Secured Party at any time, the Debtor will execute, sign, endorse, transfer or deliver in the name of the Debtor any other documents, necessary to perfect the security interest and obligations created by this Security Agreement.

3.   At its option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral. The Debtor agrees to reimburse the Secured Party on demand for any payment made, or expense incurred by the Secured Party pursuant to the foregoing authorization.

4.   Debtor will permit Secured Party, by its representatives and agents (a) to inspect the Collateral, (b) to examine and make copies of the records of Debtor relating to the Collateral, and (c) to discuss the Collateral and the related records of Debtor with, and to be advised as to the same by, Debtor's officers, employees, and accountants, all at such reasonable times and intervals as Secured Party may determine, and all at such Debtor's expense.

5.   Debtor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Secured Party such reasonable reports relating to the Collateral at such intervals as Secured Party shall from time to time request. Debtor will give prompt notice in writing to Secured Party of the occurrence of any Default or Event of Default and of any other development, financial or otherwise, which might materially and adversely affect the Collateral in the aggregate amount of $100,000.00 or more per calendar year.

B.   Rights in Event of Default

1.   Upon the occurrence of an Event of Default, Secured Party, in its sole discretion, may demand that all payments and distributions made to Debtor upon or with respect to the Collateral shall be paid and delivered to Secured Party, and Debtor agrees to take all such action as Secured Party may deem necessary or appropriate to cause all such payments and distributions to be made to Secured Party. Secured Party shall have the right, at any time after the occurrence of any Event of Default, to notify and direct any issuer to thereafter make all payments, dividends, and any other distributions payable in respect thereof directly to Secured Party. Such issuer shall be fully protected in relying on the written statement of Secured Party that it then holds a security interest which entitles it to receive such payments and distributions. Any and all money and other property paid over to or received by Secured Party hereunder shall be retained by Secured Party as additional collateral hereunder and may be applied by Secured Party to payment of the Obligations in such manner and order as Secured Party may elect in its sole discretion.

2.   In addition, Secured Party is entitled to exercise any and all contractual rights provided in this Security Agreement or any other loan document between Debtor and Secured Party, and any and all legal rights and remedies available to a secured party (whether or not the UCC applies to the affected Collateral) or under any other applicable law when a debtor is in default under a security agreement.

3.   Secured Party is also entitled to, without notice, sell, lease, assign, grant an option

4

EXHIBIT 2

or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, credit or for future delivery, and upon such terms as Secured Party may deem commercially reasonable. Neither Secured Party's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale. Debtor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Debtor at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made. Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. Subject to the provisions of applicable law, Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Secured Party may further postpone such sale by announcement made at such time and place.

4.      Debtor waives (to the extent permitted by law) all rights of redemption, stay, and/or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereinafter enacted.

5.      Further, Secured Party may at any time after the occurrence of an Event of Default require, in its sole discretion and with notice to Debtor, that any receivables, as described in Section II above, be paid directly to Secured Party. In such event, Debtor shall, and shall permit Secured Party to, promptly notify the parties that owe the receivables to Debtor of Secured Party's interest therein and direct such parties to make payment of all amounts then or thereafter due directly to Secured Party. Upon receipt of any such notice from Secured Party, Debtor shall thereafter hold in trust for Secured Party, all amounts and proceeds (as such term is defined in *Section 9.102(a)(65)* of the UCC) received by it with respect to the receivables and immediately and at all times thereafter deliver to Secured Party all such amounts and proceeds in the same form as so received, whether by cash, check, draft or otherwise, with any necessary endorsements. Secured Party shall hold and apply funds so in such manner and order as Secured Party may elect in its sole discretion. If after the occurrence of an Event of Default, any party owing receivables fails or refuses to make payment on any Collateral when due, Secured Party is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Secured Party shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Debtor agrees that Secured Party may at any time and from time to time, if an Event of Default has occurred, compromise with the obligor on any receivable, accept in full payment of any receivable such amount as Secured Party in its sole discretion shall determine or abandon any receivable, and any such action by Secured Party shall be commercially reasonable so long as Secured Party acts in good faith based on information known to it at the time it takes any such action. Regardless of any other provision hereof, however, Secured Party shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone except Debtor to account for funds that it shall actually receive hereunder.

6.      Debtor will reimburse Secured Party for all reasonable expenses incurred by Secured Party in taking ownership of the Collateral, including payment of Secured Party's

5

**EXHIBIT 2**

reasonable attorney's fees and legal expenses.

7.     The Secured Party may remedy any default and may waive any default without waiving any other prior or subsequent default.

8.     Upon request of Secured Party after an Event of Default, Debtor shall execute and deliver to Secured Party irrevocable lockbox agreements in the form provided by or otherwise acceptable to Secured Party, which agreements shall be accompanied by an acknowledgment by the bank where the lockbox is located of the lien of Secured Party granted hereunder and of irrevocable instructions to wire all amounts collected therein to a special collateral account at Secured Party.

9.     The remedies of the Secured Party hereunder are cumulative, and the exercise of any one or more of the remedies provided for herein will not be construed as a waiver of any of the other remedies of the Secured Party.

Section VII.     ADDITIONAL AGREEMENTS

1.     **"Secured Party" and "Debtor,"** as used in this instrument, include the heirs, executors or administrators, successors, representatives, receivers, trustees and assigns of those parties.

2.     No delay or omission of Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by Secured Party and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to Secured Party until the Secured Obligations have been paid in full.

3.     Should any Collateral come into the possession of Secured Party, Secured Party may use or operate such Collateral for the purpose of preserving it or its value, pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Secured Party in respect of such Collateral. Debtor covenants to promptly reimburse and pay to Secured Party, at Secured Party's request, the amount of all expenses (including the cost of any insurance and payment of taxes or other charges) incurred by Secured Party in connection with its custody and preservation of the Collateral, and all such expenses, costs, taxes, and other charges shall bear interest at the Contract Rate (as defined in the Note) until repaid and, together with such interest, shall be payable by Debtor to Secured Party upon demand and shall become part of the secured Obligations. However, the risk of accidental loss or damage to, or diminution in value of, the Collateral is on Debtor, and Secured Party shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to the Collateral that is in the possession of Secured Party, Secured Party shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are applicable whether or not an Event of Default has occurred.

6

**EXHIBIT 2**

4. Except to the extent expressly otherwise provided herein and to the fullest extent permitted by applicable law, Debtor waives (a) any right to require Secured Party to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Secured Party may have; (b) with respect to any Collateral that is comprised of obligations, presentment and demand for payment, protest, notice of protest and nonpayment, notice of intent to accelerate, and notice of acceleration; and (c) all rights of marshaling in respect of any and all of the Collateral.

5. Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

6. Debtor Remains Liable. Notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and Obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

7. NO RELEASE OF DEBTOR. THE OBLIGATIONS OF DEBTOR UNDER THIS SECURITY AGREEMENT SHALL NOT BE REDUCED, LIMITED OR TERMINATED, NOR SHALL DEBTOR BE DISCHARGED FROM ANY OBLIGATION HEREUNDER, FOR ANY REASON WHATSOEVER (until the Obligations have been indefeasibly paid in full), including:

(a) (i) any increase in the principal amount of, or interest rate applicable to, (ii) any extension of the time of payment, observance or performance of, (iii) any other amendment or modification of any of the other terms and provisions of, (iv) any release, composition or settlement (whether by way of acceptance of a plan of reorganization or otherwise) of, (v) any subordination (whether present or future or contractual or otherwise) of, or (vi) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Obligations;

(b) (i) any failure to obtain, (ii) any release, composition or settlement of, (iii) any amendment or modification of any of the terms and provisions of, (iv) any subordination of, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Note or other loan documents between Debtor and Secured Party;

(c) (i) any failure to obtain or any release of, any failure to protect or preserve, (ii) any

7

**EXHIBIT 2**

release, compromise, settlement or extension of the time of payment of any Obligations constituting, (iii) any failure to perfect or maintain the perfection or priority of any lien upon, (iv) any subordination of any lien upon, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of any lien or intended lien upon, any collateral now or hereafter securing, the Secured Obligations or any other guaranties thereof;

**(d)**    any termination of or change in any relationship between Debtor and Secured Party;

**(e)**    any exercise of, or any failure or election not to exercise, delay in the exercise of, waiver of, or forbearance of or other indulgence with respect to, any right, remedy or power available to Secured Party, including (i) any election not to or failure to exercise any right of setoff, recoupment or counterclaim, (ii) any election of remedies effected by Secured Party, including the foreclosure upon any real estate constituting collateral, whether or not such election affects the right to obtain a deficiency judgment, and (iii) any election by Secured Party in any proceeding under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code; and

**(f)**    ANY OTHER ACT OR FAILURE TO ACT OR ANY OTHER EVENT OR CIRCUMSTANCE THAT (i) VARIES THE RISK OF DEBTOR UNDER THIS SECURITY AGREEMENT OR (ii) BUT FOR THE PROVISIONS HEREOF, WOULD, AS A MATTER OF STATUTE OR RULE OF LAW OR EQUITY, OPERATE TO REDUCE, LIMIT OR TERMINATE THE OBLIGATIONS OF DEBTOR HEREUNDER OR DISCHARGE DEBTOR FROM ANY OBLIGATION HEREUNDER.

**8.**    Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

**9.**    Further, notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the Obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**10.**    The section headings appearing in this instrument have been inserted for convenience only and will be given no substantive meaning or significance whatever in

8

**EXHIBIT 2**

construing the terms and provisions of this instrument. Terms used in this instrument which are defined in the Texas Uniform Commercial Code are used with the meanings as therein defined.

11.  The law governing this secured transaction will be that of the State of Texas in force at the date of this instrument. Venue for any dispute arising out of this Security Agreement will be in the state or federal courts located in Travis County, Texas.

12.  Debtor will not create, incur, or suffer to exist any lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) other liens permitted in writing by the Secured Party.

13.  The unenforceability of any provision of this Security Agreement will not affect the enforceability or validity of any other provision.

14.  This Security Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered will be deemed to be an original and all of which counterparts taken together will constitute but one and the same instrument.

15.  THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED as of the Effective Date.

**DEBTOR:**

Free Speech Systems, LLC

Alexander E. Jones, Managing Member

**SECURED PARTY:**

PQPR Holdings Limited, LLC

David R. Jones, Manager

9

**EXHIBIT 2**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Acuity CxO LLC 5122929690

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Acuity CxO LLC
219 Black Wolf Run
Austin, TX 78738
USA

**FILING NUMBER:** 20-0058072731
**FILING DATE:** 11/18/2020     02:06 PM
**DOCUMENT NUMBER:** 1008390830002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |
|---|
| **Free Speech Systems LLC** |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **3005 South Lamar Blvd, Suite D109-317** | **Austin** | **TX** | **78704** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |
|---|
| |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |
|---|
| **PQPR Holdings Limited LLC** |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **100 Congress Avenue, 18th Floor** | **Austin** | **TX** | **78701** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and
(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

**EXHIBIT 3**

# PROMISSORY NOTE

$25,300,000.00                         Austin, Texas                         November 10, 2021

**THIS PROMISSORY NOTE** (the **"Note"**) is made as of the date first written above by and between Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 **("Maker")** and PQPR Holdings Limited, LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701 **("Payee")**.

Pursuant to the terms set forth herein, Maker, for value received, promises and agrees to pay, as herein provided, to the order of Payee or to such bank account as Payee may direct, in lawful money of the United States of America, the principal sum of Twenty-Five Million Three Hundred Thousand and 00/100 Dollars ($25,300,000.00). This Note memorializes the accrued and current obligations owed by Maker to Payee and provides for the payment of such obligations as provided herein below.

### 1. Payment of Principal and Interest; Security

**(a)** Principal and Interest (as provided below), are due and payable in annual installments of $1,939,644.81 on each anniversary of the Note at the address listed above (unless otherwise directed in writing by Payee) with the final payment being due and payable on November 10, 2036 (the **"Maturity Date"),** when the remaining balance of unpaid principal and accrued, unpaid interest will be payable in full. Pre-payments, if any, will be applied first to accrued interest, then to any costs or expenses due under the Note, and the remainder to reduction of the principal. Notwithstanding the foregoing, if the date on which payment is due is not a day on which banks are open for business in the State of Texas (a **"Business Day"),** then such payment shall be due on the Business Day next succeeding the payment date.

**(b)** The principal balance outstanding from time to time under this Note (after giving effect to all adjustments thereto made pursuant to the terms of this Note) shall bear interest at the lesser of (i) **[one and 80/100 percent (1.80%)]** per annum **("Contract Rate");** (ii) or the maximum rate of nonusurious interest allowed from time to time by applicable law. Interest shall be calculated at a daily rate based on a year of 365 or 366 days, as the case may be, with the daily rate so determined being applied for the actual number of days elapsed. All past due principal and accrued interest on this Note shall bear interest from maturity until paid at the lesser of (i) **five percent (5%),** or (ii) the highest rate for which Maker may legally contract under applicable law.

**(c)** This Note is secured by a Security Agreement executed by Maker dated August 13, 2020 and evidenced by a UCC-1 recorded with the State of Texas on November 18, 2020.

2. **Maximum Interest Rate -** It is the intention of Maker and Payee to conform strictly to applicable usury laws. Accordingly, if the interest payable on this Note would be usurious under applicable law, in that event, notwithstanding anything to the contrary herein, it is agreed that the aggregate of all consideration that constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be canceled automatically and, if theretofore paid, shall be credited on this Note by Payee (or, to the extent that this Note shall have been or would thereby be

**EXHIBIT 4**

paid in full, refunded to Maker). All sums paid or agreed to be paid to Payee for the use, forbearance or detention of sums included in the amounts owing to Payee by Maker shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note until paid in full so that the rate or amount of interest on account of indebtedness does not exceed the applicable usury ceiling, if any. As used in this Note, the term "applicable law" shall mean the law of the State of Texas.

**3. Prepayment** – Borrower reserves the right to prepay, prior to maturity, all or any part of the principal of this Note without penalty. Any prepayments will be solely at Borrower's option and will be applied first to accrued interest, then to fees and expenses due under this Note, and then to principal. Borrower will provide written notice to the holder of this Note of any such prepayment of all or any part of the principal at the time thereof. All payments and prepayments of principal or interest on this Note will be made in lawful money of the United States of America in immediately available funds, at the address of Lender indicated above, or such other place as the holder of this Note may designate in writing to Borrower.

**4. Waiver** - Maker expressly waives demand and presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intent to accelerate the maturity hereof, notice of the acceleration of the maturity hereof, bringing of suit and diligence in taking any action to collect amounts called for hereunder and in the handling of securities at any time existing in connection herewith. Maker also waives any obligation that Payee pursue or exhaust its rights against any security for the Note prior to taking actions to collect the Note.

**5. Amendments** - Any term or provision of this Note and any obligation of Maker hereunder or with respect hereto, may be changed or modified, partially or completely, or noncompliance may be consented to or authorized, by written agreement between Maker and Payee.

**6. Events of Default** - The occurrence and continuance of any of the following events shall be considered an **"Event of Default"** for purposes of this Note: (a) default is made in the payment of principal or interest when due (b) any involuntary case or other proceeding shall be commenced against Maker that seeks liquidation, reorganization or other relief with respect to it or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator or custodian unless dismissed or stayed within 90 days after the institution thereof (provided that upon ineffectiveness of any stays, an Event of Default shall exist); (c) Maker shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official with respect to Maker, or shall consent to any such relief or to the appointment of, or taking possession by, any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors or shall fail generally or shall admit in writing its inability to pay its debts generally as they become due or shall take any corporate action to authorize or effect any of the foregoing; (d) a judgment in excess of $100,000 is entered against Maker which is not superseded within ten (10) of the date that it is entered; Maker shall cease business operations.

**7. Remedy** - Upon the occurrence of payment default as provided paragraph 6 (a) and the expiration of ten (10) days' notice and opportunity to cure, and upon the occurrence of any other Event of Default as provided in paragraph 6(b) -(d) and the expiration of thirty (30) days' notice and opportunity to cure, the entire principal amount and accrued interest of the Note then outstanding shall become immediately due and payable.

Page **2** of 3

**EXHIBIT 4**

**8. Governing Law and Venue** – This Note and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to its principles concerning conflicts of law. Venue for any action brought to collect this Note shall be in Travis County, Texas.

**9. Attorneys' Fees and Expenses** – In the event Payee institutes an action to collect this Note, then in addition to all other amounts due and owing hereunder, Maker shall be liable for and pay to Payee reasonable fees and costs, including attorneys' fees and expenses, of collection.

EXECUTED to be effective as of the date first above written.

**MAKER:**

Free Speech Systems, LLC

By _____

Alexander E. Jones, Manager

**ACKNOWLEDGEMENT BY PAYEE:**

PQPR Holdings Limited, LLC

By _____

David R. Jones, Manager

**EXHIBIT 4**

**PQPR Holdings LLC**
**Reconciliation of Current Amount Due from FSS**
**January 1, 2021 to December 31, 2021**

| | | |
|---|---|---|
| Beginning Balance - January 1, 2021 | | $ (11,843.96) |
| FSS Sales owed to PQPR | | $ 27,687,726.24 |
| Payments from  FSS to PQPR | | $ (10,230,277.14) |
| Subtotal | | $ 17,445,605.14 |
| FSS Charges to PQPR | | |
| Administrative | $ (1,903,898.98) | |
| Advertising | $ (5,700,000.00) | |
| Fulfillment | $ (3,533,223.00) | |
| Total Charges to PQPR | | $ (11,137,121.98) |
| Ending Balance - Dedember 31, 2021 | | $ 6,308,483.16 |

**EXHIBIT 5**

3:37 PM
01/17/24
Accrual Basis

Page 1 of 2

**PQPR HOLDINGS LIMITED, LLC**
**Transactions by Account**
**As of December 31, 2021**

**Receivable from FSS**

| Type | Date | Num | Adj | Name | Memo | Class | Clr | Split | Debit | Credit |
|------|------|-----|-----|------|------|-------|-----|-------|-------|--------|
| Payment | 01/07/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 01/18/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 01/21/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 01/28/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 275,000.00 |
| General Journal | 01/31/2021 | REV 01_2021 | | Free Speech Systems, L.L.C. | Record Revenue for January 2021 - Used Stone Edge Reporting | | | Merchandise Sales | 2,875,658.70 | |
| Payment | 02/17/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 02/23/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 02/26/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |
| General Journal | 02/28/2021 | REV 02_2021 | | Free Speech Systems, L.L.C. | Record Revenue for February 2021 - Used Stone Edge Reporting | | | Merchandise Sales | 1,542,897.98 | |
| Payment | 03/12/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 03/18/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 03/25/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 275,000.00 |
| General Journal | 03/31/2021 | REV 03_2021 | | Free Speech Systems, L.L.C. | Record Revenue for March 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,847,383.92 | |
| Payment | 04/01/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 50,000.00 |
| Payment | 04/02/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 04/06/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 04/09/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 04/14/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 04/16/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 04/21/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 04/23/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 04/30/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 100,000.00 |
| General Journal | 04/30/2021 | REV 04_2021 | | Free Speech Systems, L.L.C. | Record Revenue for April 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,317,324.58 | |
| Payment | 05/04/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 05/05/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 05/13/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 225,000.00 |
| Payment | 05/14/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 05/18/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 05/20/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 225,000.00 |
| Payment | 05/26/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 05/28/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| General Journal | 05/31/2021 | REV 05_2021 | | Free Speech Systems, L.L.C. | Record Revenue for May 2021 - Used Stone Edge Report | | | Merchandise Sales | 3,630,088.44 | |
| Payment | 06/02/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 250,000.00 |
| Payment | 06/03/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 06/09/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 06/10/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 06/17/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 06/18/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 50,000.00 |
| Payment | 06/22/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 50,000.00 |
| Payment | 06/29/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 150,000.00 |
| General Journal | 06/30/2021 | REV 06_2021 | | Free Speech Systems, L.L.C. | Record Revenue for June 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,547,796.13 | |
| Payment | 07/06/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 07/08/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 07/09/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 07/14/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 07/20/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 07/28/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 150,000.00 |
| Payment | 07/30/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |
| General Journal | 07/31/2021 | REV 07_2021 | | Free Speech Systems, L.L.C. | Record Revenue for July 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,550,780.84 | |
| Payment | 08/03/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |
| Payment | 08/06/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 125,000.00 |
| Payment | 08/13/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 08/20/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 08/23/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 08/26/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 75,000.00 |
| General Journal | 08/31/2021 | REV 08_2021 | | Free Speech Systems, L.L.C. | Record Revenue for August 2021 - Used Stone Edge Report | | | Merchandise Sales | 3,047,638.24 | |
| Payment | 09/02/2021 | WIRE | | Free Speech Systems, L.L.C. | | | | Undeposited Funds | | 175,000.00 |

**EXHIBIT 5**

3:37 PM
01/17/24
Accrual Basis

**PQPR HOLDINGS LIMITED, LLC**
**Transaction List by Account**
As of December 31, 2021

| Type | Date | Num | Adj | Name | Memo | Class | Clr | Split | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|---|
| Payment | 09/10/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 09/17/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 300,000.00 |
| Payment | 09/20/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 09/21/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 09/28/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 275,000.00 |
| Payment | 09/29/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| General Journal | 09/30/2021 | REV 09_2021 | | Free Speech Systems, LLC. | Record Revenue for September 2021 - Used Stone Edge Report | | | Merchandise Sales | 2,750,710.48 | |
| Payment | 10/01/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 10/08/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 80,000.00 |
| Payment | 10/12/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 10/13/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 10/15/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 10/18/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 100,000.00 |
| Payment | 10/18/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 30,000.00 |
| Payment | 10/21/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 10/26/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 200,000.00 |
| Payment | 10/28/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 75,000.00 |
| Payment | 10/29/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 53,463.12 |
| General Journal | 10/31/2021 | REV 10_2021 | | Free Speech Systems, LLC. | Record Revenue for October 2021 - Used Stone Edge Report | | | Merchandise Sales | 3,577,446.93 | |
| Payment | 11/02/2021 | WIRE | | Free Speech Systems, LLC. | | | | Undeposited Funds | | 116,814.02 |
| | | | | | | | | | 27,687,726.24 | 10,230,277.14 |

Total Receivable from FSS

**EXHIBIT 5**

11:21 AM
01/18/24
Accrual Basis

**PQPR HOLDINGS LIMITED, LLC**
**Transaction by Account**
**As of December 31, 2021**

Page 1 of 1

**Payable to FSS**

| Type | Date | Num | Adj | Name | Memo | Class | Clr | Split | Debit | Credit | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bill | 01/31/2021 | A-12560 | | Free Speech Systems, LLC | Administrative Services - January 2021 | | | -SPLIT- | | 162,170.83 | |
| Bill | 02/28/2021 | A-12561 | | Free Speech Systems, LLC | Administrative Services - February 2021 | | | -SPLIT- | | 115,533.71 | |
| Bill | 03/31/2021 | A-12562 | | Free Speech Systems, LLC | Administrative Services - March 2021 | | | -SPLIT- | | 161,190.22 | |
| Bill | 04/30/2021 | A-12563 | | Free Speech Systems, LLC | Administrative Services - April 2021 | | | -SPLIT- | | 142,638.14 | |
| Bill | 05/31/2021 | A-12564 | | Free Speech Systems, LLC | Administrative Services - May 2021 | | | -SPLIT- | | 188,584.88 | |
| Bill | 06/30/2021 | A-12584 | | Free Speech Systems, LLC | Administrative Services - June 2021 | | | -SPLIT- | | 150,704.64 | |
| Bill | 07/31/2021 | A-12585 | | Free Speech Systems, LLC | Administrative Services - July 2021 | | | -SPLIT- | | 150,809.11 | |
| Bill | 08/31/2021 | A-12586 | | Free Speech Systems, LLC | Administrative Services - August 2021 | | | -SPLIT- | | 168,199.12 | |
| Bill | 09/30/2021 | A-12587 | | Free Speech Systems, LLC | Administrative Services - September 2021 | | | -SPLIT- | | 157,806.65 | |
| Bill | 10/31/2021 | A-12588 | | Free Speech Systems, LLC | Administrative Services - October 2021 | | | -SPLIT- | | 186,742.42 | |
| Bill | 11/30/2021 | A-12589 | | Free Speech Systems, LLC | Administrative Services - November 2021 | | | -SPLIT- | | 165,867.93 | |
| Bill | 12/31/2021 | A-12590 | | Free Speech Systems, LLC | Administrative Services - December 2021 | | | -SPLIT- | | 153,642.30 | $ 1,903,898.95 |
| Bill | 01/31/2021 | A-12565 | | Free Speech Systems, LLC | Advertising - January 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 02/28/2021 | A-12566 | | Free Speech Systems, LLC | Advertising - February 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 03/31/2021 | A-12567 | | Free Speech Systems, LLC | Advertising - March 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 04/30/2021 | A-12568 | | Free Speech Systems, LLC | Advertising - April 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 05/31/2021 | A-12569 | | Free Speech Systems, LLC | Advertising - May 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 06/30/2021 | A-12574 | | Free Speech Systems, LLC | Advertising - June 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 07/31/2021 | A-12575 | | Free Speech Systems, LLC | Advertising - July 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 08/31/2021 | A-12576 | | Free Speech Systems, LLC | Advertising - August 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 09/30/2021 | A-12577 | | Free Speech Systems, LLC | Advertising - September 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 10/31/2021 | A-12578 | | Free Speech Systems, LLC | Advertising - October 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 11/30/2021 | A-12579 | | Free Speech Systems, LLC | Advertising - November 2021 | | | Advertising and Promotion | | 475,000.00 | |
| Bill | 12/31/2021 | A-12580 | | Free Speech Systems, LLC | Advertising - December 2021 | | | Advertising and Promotion | | 475,000.00 | $ 5,700,000.00 |
| Bill | 01/31/2021 | A-12555 | | Free Speech Systems, LLC | Fulfillment Services - January 2021 | | | Cost of Goods Sold-Distribution | | 342,888.00 | |
| Bill | 02/28/2021 | A-12556 | | Free Speech Systems, LLC | Fulfillment Services - February 2021 | | | Cost of Goods Sold-Distribution | | 157,569.00 | |
| Bill | 03/31/2021 | A-12557 | | Free Speech Systems, LLC | Fulfillment Services - March 2021 | | | Cost of Goods Sold-Distribution | | 283,872.00 | |
| Bill | 04/30/2021 | A-12558 | | Free Speech Systems, LLC | Fulfillment Services - April 2021 | | | Cost of Goods Sold-Distribution | | 223,178.00 | |
| Bill | 05/31/2021 | A-12559 | | Free Speech Systems, LLC | Fulfillment Services - May 2021 | | | Cost of Goods Sold-Distribution | | 365,946.00 | |
| Bill | 06/30/2021 | A-12570 | | Free Speech Systems, LLC | Fulfillment Services - June 2021 | | | Cost of Goods Sold-Distribution | | 270,009.00 | |
| Bill | 07/31/2021 | A-12571 | | Free Speech Systems, LLC | Fulfillment Services - July 2021 | | | Cost of Goods Sold-Distribution | | 321,309.00 | |
| Bill | 08/31/2021 | A-12572 | | Free Speech Systems, LLC | Fulfillment Services - August 2021 | | | Cost of Goods Sold-Distribution | | 361,572.00 | |
| Bill | 09/30/2021 | A-12573 | | Free Speech Systems, LLC | Fulfillment Services - September 2021 | | | Cost of Goods Sold-Distribution | | 303,060.00 | |
| Bill | 10/31/2021 | A-12581 | | Free Speech Systems, LLC | Fulfillment Services - October 2021 | | | Cost of Goods Sold-Distribution | | 355,521.00 | |
| Bill | 11/30/2021 | A-12582 | | Free Speech Systems, LLC | Fulfillment Services - November 2021 | | | Cost of Goods Sold-Distribution | | 292,484.00 | |
| Bill | 12/31/2021 | A-12583 | | Free Speech Systems, LLC | Fulfillment Services - December 2021 | | | Cost of Goods Sold-Distribution | | 255,834.00 | $ 3,533,223.00 |
| **Total Payable to FSS** | | | | | | | | | 0.00 | 11,137,121.95 | $ 11,137,121.95 |
| **TOTAL** | | | | | | | | | 0.00 | 11,137,121.95 | |

**EXHIBIT 5**

IN THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| FREE SPEECH SYSTEMS LLC | § | |
| | § | Bankruptcy Case No. 22-60043 |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| FREE SPEECH SYSTEMS LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 23-03127 |
| | § | |
| PQPR HOLDINGS LIMITED LLC, | § | |
| JLJR HOLDINGS LLC, PLJR | § | |
| HOLDINGS LLC, AEJ AUSTIN | § | |
| HOLDINGS LLC, AEJ 2018 | § | |
| TRUST, CAROL JONES and | § | |
| DAVID JONES | § | |
| | | |
| Defendants. | | |

## AFFIDAVIT OF DAVID JONES DDS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

On this day before me, the undersigned Notary Public, personally appeared David Jones, DDS, who stated under oath as follows:

1.     My name is David Jones. I am above the age of 18 and in all ways competent to make this affidavit. All of the facts contained herein are true and correct and based upon my personal knowledge, unless specified otherwise.

1

**EXHIBIT B**

2.     I am the father of Alex Jones. Alex is the owner of Free Speech Systems LLC ("FSS").

3.     I am the managing member of JLJR Holdings LLC ("JLJR"). JLJR is the manager of PQPR Holdings Limited, LLC ("PQPR"). Thus, I act as manager for PQPR.

4.     PQPR and FSS were founded as separate companies in 2007-2014. They have separate ownership and separate management. Alex Jones, through a series of entities, indirectly owns 72% of PQPR but has no voting rights. PQPR and FSS have separate creditors and have never held themselves out as the same company. Alex has never acted as a manager of PQPR.

5.     PQPR purchased and directly paid for products which FSS advertised.

6.     The products were owned by PQPR and kept in a warehouse. They were sold directly to consumers and FSS received the funds from the consumers for the PQPR sales.

7.     FSS charged PQPR for advertising and overhead.

8.     While FSS initially kept current on its payments to PQPR, as FSS incurred expenses to build out studios etc. as Alex Jones was deplatformed, FSS fell behind in making payments to PQPR and a sizeable debt arose.

9.     The charges from PQPR to FSS and from FSS to PQPR were recorded by a bookkeeper, Melinda Flores. Ms. Flores was an FSS employee and kept the books for both FSS and PQPR. The entries were made in both sets of books. However, while Ms. Flores' entries were accurate, she was continually late in making entries.

10.    In 2020, Bob Roe, a CPA, was hired to examine and document the debt owed by FSS to PQPR. Mr. Roe undertook a review and sampling of the invoices, charges, and all other aspects of the debt. He determined that the FSS and PQPR QuickBooks entries regarding the transactions were materially correct.

11.    PQPR refused to continue to allow FSS to rack up more debt without the execution of notes and a security agreement.

   a. A note in the amount of $29,588,000.00 was executed in 2020 for the debt up through 2018 (at that time, the QuickBooks entries were only current through 2018).
   b. Another note in the amount of $25,300,000.00 was executed in 2021 for the debt arising after 2018 (but before even more debt was incurred by FSS).

12.    In the fall of 2020 FSS executed a security agreement wherein PQPR was granted a security interest in virtually all property of FSS. The security agreement covers the existing debt, as well as future debt. A UCC-1 was filed.

**EXHIBIT B**

13. In 2021, because of Alex Jones' intemperate comments, credit card processors would not do business with FSS directly. A third party was used to receive the payments and to remit sums to PQPR and to FSS on a formula basis.

14. Importantly, after the security agreement came into effect, FSS borrowed an additional $6,308,483.16 million in debt to PQPR.

FURTHER AFFIANT SAYETH NAUGHT.

_____

DAVID JONES, DDS

SUBSCRIBED AND SWORN TO BEFORE ME on this the 19th day of April, 2024.

_____

Notary Public for the State of Texas

KELLI J. RANGEL
My Notary ID # 131022169
Expires February 28, 2025

3

**EXHIBIT B**