# EXHIBIT 9

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

## DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER SUBCHAPTER V OF THE BANKRUPTCY CODE

## INTRODUCTION

Free Speech Systems, LLC**,** the Debtor and Debtor-in-Possession, in the above-captioned Chapter 11 Case, proposes the following Plan of Reorganization. As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority of payments as provided in the Bankruptcy Code, states whether each Class of Claims or interests is impaired or unimpaired and provides the treatment each Class will receive under the Plan.

## SUMMARY OF THE PLAN

The following is a brief description and summary of this Plan.

Under this Plan, the Debtor anticipates paying holders of Allowed Claims 100% of their Allowed Claims. With the exception of the certain holders of Contingent and Unliquidated Unsecured Claims and the Unsecured Deficiency Claim of PQPR, the Plan proposes to pay the holders of all other Allowed Classes of creditors, including Class 3-A "Unsecured Claims of Trade Creditors" 100% of their Allowed Claims. Payments under the Plan to holders of Allowed Claims of Ordinary and Non-Ordinary Course Administrative Expense Claims, Priority Tax Claims, and Class 1, 2 and 3A Claims will be paid by the Reorganized Debtor. Allowed Claims of holders of Class 3B and 3C Claims will be paid from Trust Assets in accordance with the terms of the TDP and Trust Agreement.

Provided that all other applicable requirements of subchapter V of chapter 11 the Bankruptcy Code are met, the Plan may be confirmed even if every class of impaired claims does not accept the Plan. See Bankruptcy Code § 1191(b). However, the Debtor hopes to achieve consensual confirmation under § 1191(a) of the Code.

The Debtor submits that a consensual plan is preferable for at least the following reasons: (a) it will reduce Administrative Expenses, including the fees of the Subchapter V Trustee and the Debtor's Professionals, which should result in an increase in the amounts paid to holders of Allowed Claims; and (b) it should reduce the amount of time required to achieve confirmation of the Plan, thus expediting the date on which distributions under the Plan will commence.

ALL INTERESTED PARTIES SHOULD READ THIS DOCUMENT CAREFULLY AND DISCUSS IT WITH THEIR LEGAL AND FINANCIAL ADVISORS.

THE PLAN MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE PLAN, YOU SHOULD IMMEDIATELY CONTACT THE DEBTOR TO RESOLVE THE DISPUTE. IF YOU AND THE DEBTOR CANNOT AGREE, YOU MUST FILE AND SERVE ANY OBJECTION ON OR BEFORE THE DEADLINE SET BY THE COURT AND INDICATED IN THE NOTICE OR ORDER ACCOMPANYING THIS PLAN. IF YOU DO NOT FILE A TIMELY RESPONSE, THE PLAN MAY BE APPROVED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE PLAN AND HAVE NOT REACHED AN AGREEMENT WITH THE DEBTOR, YOU MUST ATTEND THE CONFIRMATION HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE BANKRUPTCY COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY CONFIRM THE PLAN AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

## ARTICLE 1
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1.    **Definitions.** Applicable definitions contained in the Bankruptcy Code are incorporated into the Plan except as modified in this Article 1. The following definitions shall have the meanings as specified herein, and shall be designated, when such special definitions are applicable, with capital letters, and these definitions shall be enforceable as terms of the Plan in conjunction with the respective matters to which they reference or define:

1.1.1.    "Administrative Expense Claim" or "Administrative Claim" means any right to payment constituting a cost or expense of administration of the Chapter 11 Case pursuant to Bankruptcy Code §§ 503(b) or 507, including, without limitation (a) any fees or charges assessed against the Debtor's Estate under 28 U.S.C. § 1930, and (b) other Administrative Expense Claims as may be ordered and Allowed by the Bankruptcy Court.

1.1.2.    "AEJ" or "Jones" means Alex E. Jones, an individual residing in the State of Texas.

1.1.3.    "Allowed" or "Allowed Claim" means: (a) a Claim that: (i) has been listed by the Debtor in its Schedules as other than disputed, contingent or unliquidated; and (ii) is not otherwise a Disputed Claim; (b) a Claim (i) for which a Proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date, or otherwise has been deemed timely filed under applicable law; and (ii) that is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) in any stipulation executed by the Claim Holder and the Debtor, Reorganized Debtor, or Trustee as applicable; (ii) in a Final Order; or (iii) pursuant to the terms of the Plan.  Except as otherwise specified in the Plan or any Final Order of the Bankruptcy Court, and except for any Claim that is Secured by property of a value more than the principal amount of such claims, the amount of an Allowed Claim shall not include any attorneys' fees, costs, penalties, or interest on such Claim occurring or incurred from and after the Petition Date.

1.1.4.    "Alternative Treatment" means the treatment of Class 3-B Claims afforded to Holders of Class 3-B Claims who affirmatively elect treatment of their Claims as set forth in section 5.5.1 of the Plan.

1.1.5. "Avoidance Actions" means causes of action arising under chapter 5 of the Bankruptcy Code or under related state or federal statutes or common law, including fraudulent conveyance laws, whether litigation has been commenced to prosecute such causes of action which are expressly preserved for the Estate hereunder.

1.1.6. "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan.

1.1.7. "Bankruptcy Estate" means the estate created pursuant to 11 U.S.C. § 541 with respect to the Debtor.

1.1.8. "Bankruptcy Code" or "Code" means Title 11, United States Code, Section 101 *et. seq.*, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

1.1.9. "Bankruptcy Rules" and "Rule" mean collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

1.1.10. "Bar Date" means the applicable bar date by which a Proof of Claim or request for payment of an Administrative Expense Claim must be or must have been filed, as established by (i) the Notice of Chapter 11 Bankruptcy Case [ECF No. 53] (ii) an order establishing a Bar Date for the filing of a Proof of Claim or request for payment of an Administrative Expense Claim; or (iii) the Confirmation Order.

1.1.11. "Business Day" means a day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

1.1.12. "Capital Expenditure Reserves" means funds held by the Reorganized Debtor to acquire, upgrade, and maintain physical assets such as property, plants, buildings, technology, or equipment. Capital Expenditure Reserves shall not exceed seven percent of Reorganized Debtors' gross revenue for the preceding calendar year.

1.1.13. "Cash" means legal tender of the United States of America or its equivalent in immediately available funds.

1.1.14. "Causes of Action" shall mean, without limitation, all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, arising prior to the Petition Date, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions, including but not limited to the Causes of Action set out in the attached Exhibit "A".

1.1.15. "Chapter 11 Case," "Case," or "Bankruptcy Case" means the case under chapter 11 of title 11 of the United States Code pending as *in re Free Speech Systems LLC.*, Case No. 22-60043, commenced on July 29, 2022, in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division, and later transferred to the Houston Division.

1.1.16. "Claim(s)" means a "claim" against the Debtor, as defined in Bankruptcy Code § 101(5).

1.1.17. "Claim Objection Deadline" means the later of (a) sixty (60) days after the Effective Date, (b) sixty (60) days after the Bar Date, and (c) such later date as may be ordered by the Bankruptcy Court pursuant to a motion filed prior to the expiration of such sixty (60) day period.

1.1.18. "Class" or "Classification" means the class designated in the Plan, pursuant to Bankruptcy Code §§ 1122 and 1129, into which the Claims of all Creditors or Equity Interests have been segregated for purposes of voting and distributions.

1.1.19. "Class __ Claim(s)" or "Class __ Interest(s)" means the Class of Claims or Interests described in Section 3.3 of the Plan.

1.1.20. "Collateral" means any Property or interest in Property of the Estate which is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code, disallowance under Bankruptcy Code § 506, or is otherwise invalid under the Bankruptcy Code or applicable state law.

1.1.21. "Confirmation" or "Confirmation of the Plan" means the approval of this Plan by the Bankruptcy Court at the Confirmation Hearing.

1.1.22. "Confirmation Date" means the date on which the clerk dockets a Confirmation Order determining that the Plan meets the requirements of subchapter v of the Bankruptcy Code, which order has been previously entered by the Court.

1.1.23. "Confirmation Hearing" means the hearing(s) which will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of this Plan.

1.1.24. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

1.1.25. "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court on or before the applicable Bar Date, but which:(a) was not filed in a sum certain; or (b) is contingent upon any event or condition which has not occurred and/or is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed by a Final Order.

1.1.26. "Court" or "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, presiding over the Chapter 11 Case, or, if necessary, the United States District Court for the District and Division having original jurisdiction over the Chapter 11 Case.

1.1.27. "Creditor(s)" means all creditors of the Debtor holding Claims for debts, liabilities, demands or Claims of any character whatsoever, as defined in Bankruptcy Code § 101(5).

1.1.28. "Cure Claim" means any Claim based upon the Debtor's default under any Executory Contract to which the Debtor was a party on the Filing Date that has been or will be assumed under Bankruptcy Code § 365 or pursuant to the Plan.

1.1.29. "Debtor" or "Debtor in Possession" means Free Speech Systems, LLC prior to the Effective Date.

1.1.30. "Deficiency Claim" means, with respect to a Secured Claim, the amount by which the Allowed Claim exceeds the sum of (i) any set off rights of the holder of such Claim

against the Debtor under Bankruptcy Code §§ 506 and 553 and (ii) the net proceeds realized from the disposition of the Collateral securing such Claim or, if such Collateral is not liquidated, the value of the interests of the holder of the Claim in the Debtor's interest in the Collateral securing such Claim, as determined by the Bankruptcy Court in accordance with Bankruptcy Code § 506; provided, however, that if the holder of such Claim makes the election provided for in Bankruptcy Code § 1111(b)(2), there shall be no Deficiency Claim in respect of such Claim.

1.1.31.    "Disallowed" means, with respect to a Claim, Interest, Administrative Expense Claim, or portion thereof, that it is determined by a Final Order that the Claim, Interest, Administrative Expense, or portion thereof is not allowed under Bankruptcy Code §§ 502 or 503.

1.1.32.    "Disbursing Agent" means the Reorganized Debtor, provided that in the event that the Plan is confirmed under section 1191(b) of the Code and the Confirmation Order does not provide otherwise.

1.1.33.    "Disbursing Agent Costs" means the Post-Effective Date fees and expenses of the Disbursing Agent arising out of or relating to performance of obligations under this Plan.

1.1.34.    "Disputed Claim" means (a) a Claim, Interest or Administrative Expense that is subject to an objection; or (b) until the Objection Deadline:

- a Claim for which a corresponding Claim has not been listed in the Debtor's Schedules or for which the corresponding Claim is listed in the Debtor's Schedules with a differing amount, with a differing classification, or as a disputed, contingent, or unliquidated Claim;

- a Claim which a Debtor in good faith believes is held by a holder either (i) from which property is recoverable by the applicable Debtor under any of Bankruptcy Code §§ 542, 543, 550 or 553 or (ii) that is a transferee of a transfer avoidable under Bankruptcy Code §§ 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) unless the holder has paid the amount, or turned over any such property for which such holder is liable under the terms of Bankruptcy Code §§ 522(i), 542, 543, 550, or 553; and/or

- an Interest for which a corresponding Interest has not been listed in the Debtor's List of Equity Interests or has been listed in a different number (to the extent of such difference).

1.1.35.    "Disputed Claim Reserve Account" means the Cash bank accounts to be established pursuant to Section 10.4 of the Plan, into which the Reorganized Debtor or the Disbursing Agent, as the case may be, shall deposit the payments attributable to Disputed Non-Ordinary Course Administrative Expense Claims, Priority Tax Claims, and Class 1, 2 and 3A Claims under the Plan pending allowance of the Claim.  The Trust and TDP provide for a separate reserve account of Disputed Class 3-B and Class 3-C Claims.

1.1.36.    "Disputed Lien" shall mean a Lien which is the subject of a pending Avoidance Action or any other type of judicial challenge to the validity, priority or enforceability of the Lien, or allowance of the underlying Claim, whether prosecuted by the Debtor or another party-in-interest and whether filed in the Bankruptcy Court or another court of competent jurisdiction. Independent of and in addition to the foregoing, if the Claim secured by a Lien is a Disputed Claim, the Lien shall be considered a "Disputed Lien" unless and until the Claim is Allowed.

1.1.37.    "Effective Date" means the first Business Day following fourteen (14) days after the Confirmation Date on which all conditions to the effectiveness of this Plan specified in Article 9 have been met or waived.

1.1.38.    "Election Acceptance Letter" means a letter from the IRS notifying the Debtor of the acceptance or nonacceptance of the Debtor's election to be treated as a corporation by filing Form 8832. Receipt of the Election Acceptance Letter should be received within 60 days after Form 8832 has been filed with the IRS.

1.1.39.    "Equity Interest(s)" or "Interest(s)" means all the membership interest in the Debtor.

1.1.40.    "Estate" means the estate created pursuant to Bankruptcy Code §§ 541 and 1186 by the commencement of the Chapter 11 Case.

1.1.41.    "Executory Contract" shall have the meaning assigned in Bankruptcy Code § 365.

1.1.42.    "Filing Date" or "Petition Date" means July 29, 2022, the date upon which the Chapter 11 Case was commenced as a voluntary case under chapter 11 of the Bankruptcy Code.

1.1.43.    "Final Decree" means the order of the Court entered after the Plan is substantially consummated which closes the Chapter 11 Case.

1.1.44.    "Final Trust Contribution Date" shall mean the earlier of (A) the Trust Contribution Date immediately prior to, or substantially contemporaneous with, the filing of notice of substantial consummation pursuant to section 1183(c)(2) of the Bankruptcy Code, or (B) April 15, 2029.

1.1.45.    "Final Order" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to Bankruptcy Code §§ 502(j) or 1144, Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.1.46.    "FSS" means Free Speech Systems, LLC, a Texas limited liability company.

1.1.47.    "General Unsecured Claim" means an Unsecured Claim that is not an Administrative Expense Claim, Priority Tax Claim, or Priority Claim.

1.1.48.    "Impaired Class" and "Unimpaired Class" shall have the meaning described in Bankruptcy Code § 1124.

1.1.49.    "Initial Trust Contribution Date" shall mean April 15, 2025.

1.1.50.    "Initial Trust Funding" means the $500,000, distributed by the Reorganized Debtor to the Plaintiffs Trust within 30 days following receipt of the Election Acceptance Letter affirmatively accepting Debtor's election to be taxed as a C-Corporation.

1.1.51.    "IRS" means the Internal Revenue Service.

1.1.52.    "Lien" has the meaning set forth in Bankruptcy Code § 101(37), *except that* a Lien that has been avoided in accordance with sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

1.1.53.    "Net Disposable Income" shall mean the revenue that is received by the Debtor and that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtor. Expenditures necessary for the continuation, preservation, or operation of the business of the Debtor shall include, but not be limited to the following:

(i)      costs of goods sold;

(ii)     personnel expenses, including salaries, wages, overtime, employee benefits, bonuses, payroll taxes, consulting services and payments to independent contractors;

(iii)    reasonable and necessary operating expenses;

(iv)     Capital Expenditure Reserves;

(v)      Reasonable and necessary legal and accounting fees and expenses, including the Disbursing Agent Costs;

(vi)     Reserve for Federal Income Taxes;

(vii)    Operating Capital Reserve;

(viii)   The Initial Trust Funding; and

(ix)     Payment of Allowed (i) Ordinary and Non-Ordinary Course Administrative Expense Claims, (ii) Priority Tax Claims, and (iii) Class 1, 2 and 3A Claims.

1.1.54.    "Non-Ordinary Course Administrative Expense Claim" means Administrative Expense Claims that are (a) Professional Fee Claims; (b) payment of fees and expenses of the Subchapter V Trustee; and (c) any liability of the Debtor arising for any breach of contract, breach of duty of care, commission of tort, or violation of law or regulation as the by the Debtor, its agents, or any other party for which the Debtor is directly or vicariously liable occurring after the Filing Date and before the Effective Date.

1.1.55.    "Objection Deadline" means the deadline for Reorganized Debtor or the Trustee to file objections to Claims with the Bankruptcy Court established in Article 10 of this Plan.

1.1.56.    "Operating Capital Reserve" means funds held by the Reorganized Debtor to maintain sufficient liquidity to fund reasonable and necessary expenses for the continuing operation of the Reorganized Debtor.  Operating Capital Reserves shall not exceed seven percent of Reorganized Debtors gross revenue for the preceding calendar year.

1.1.57.    "Ordinary Course Administrative Expense Claims" means Administrative Expense Claims that are not Non-Ordinary Course Administrative Expense Claims.

1.1.58.    "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, or entity of whatever nature.

1.1.59.    "Petition Date" shall mean July 29, 2022.

1.1.60.    "Plaintiffs" means the Texas Plaintiffs and the Connecticut Plaintiffs

1.1.61.    "Plan" means the Debtor's Plan of Reorganization in its present form or as it may be amended, modified, or supplemented from time to time, together with all exhibits and Plan Supplements thereto.

1.1.62.    "Plan Filing Date" is the date on which this Plan was filed with the Court, *i.e.*, November 17, 2023.

1.1.63.    "Plan Lien Rate" means a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the Plan Filing Date, or (b) the non-default interest rate expressly provided for under the loan agreement or contract between the Debtor and the applicable holder of the Claim or Lien

1.1.64.    "Plan Period" shall mean the period commencing on the Effective Date and ending on the Final Trust Contribution Date.  If the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the Petition Date and the Effective Date), then the Plan Period shall commence on the applicable date with respect to that Claim or creditor.

1.1.65.    "Plan Supplement" means, including without limitation, the forms of the material documents to implement the provisions of the Plan that are to be filed with the Bankruptcy Court as early as is practicable, but in no event later than five (5) Business Days before the Confirmation Hearing, or on such other date as the Bankruptcy Court may determine. The Plan Supplement is incorporated into the Plan as if fully set forth in the Plan and all references to the Plan refer also to the Plan Supplement.

1.1.66.    "Priority Claim" means any Claim (or portion of such Claim) entitled to priority under Bankruptcy Code § 507 and that is not an Administrative Expense Claim, a Priority Tax Claim, or a Secured Claim.

1.1.67.    "Priority Tax Claim" means a Claim that is entitled to priority pursuant to Bankruptcy Code §§ 502(i) or 507(a)(8) that is not a Secured Claim.

1.1.68.    "Professional" means any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code §§ 327, 328 or 1103 or otherwise, and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Bankruptcy Code § 503(b).

1.1.69.    "Professional Fee Claim" means a Claim of a Professional for compensation for services rendered, and/or reimbursement of costs and expenses incurred, after the Filing Date and prior to and including the Effective Date.

1.1.70.    "Proof of Claim" means any proof of claim filed with the Bankruptcy Court with respect to the Debtor pursuant to Bankruptcy Rules 3001 or 3002.

1.1.71. "Property" or "Property of the Estate" means all assets of the Debtor which are property of the Estate pursuant to Bankruptcy Code § 541.

1.1.72. "Pro Rata Share" means with respect to Claims, the proportion that the amount of an Allowed Claim in a particular Class bear to the aggregate amount of all Claims in such Class, exclusive of Disallowed Claims, but including Disputed Claims.

1.1.73. "PQPR" means PQPR Holdings Limited LLC.

1.1.74. "PQPR Adversary" means adversary proceeding number 23-03127 filed with the Bankruptcy Court. The PQPR Adversary is a Cause of Action.

1.1.75. "PQPR Secured Note" means two promissory notes held by PQPR, the first promissory note in the principal amount of $29,588,000, dated as of August 13, 2020, a second promissory note in the principal amount of $25,300,000.00 made payable to PQPR, dated as of November 10, 2021, the repayment of which is secured by substantially all assets of FSS.

1.1.76. "QSF Law" means Section 468B of the Internal Revenue Code of 1986 and all applicable regulations promulgated thereunder (*e.g.*, 26 C.F.R. §1.468B-1, *et. seq.*).

1.1.77. "Remainder Beneficiary" means the Trust Beneficiary who shall receive any remaining Trust Assets after all possible claims have been paid to Class 3-B and Class 3-C Creditors. The beneficiary of the remaining Trust Assets shall be a 501(c)(3) charitable organization as designated by the Trustee.

1.1.78. "Reorganized Debtor" means the Debtor on and after the Effective Date, surviving after confirmation of the Plan.

1.1.79. "Reorganized Debtor Common Stock" means the common stock of the Reorganized Debtor issued after the Effective Date and upon the filing of Form 8832 with the IRS.

1.1.80. "Sandy Hook Litigation" means all pending civil lawsuits against the Debtor, including, but not limited to, the following:

- *Marcel Fontaine vs. Alex E., Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th Judicial District Court of Travis County, Texas;

- *Neil Heslin vs. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835 in the 261st Judicial District Court of Travis County, Texas;

- *Veronique de la Rosa and Leonard Pozner vs. Alex E. Jones, InfoWars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842 in the 345th Judicial District Court of Travis County, Texas;

- *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, Free Speech Systems, LLC and Owen Shroyer*, Cause No. D-1-GN-18-006623 in the 98th Judicial District Court of Travis County, Texas;

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey*

*T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

1.1.81.    "SBC" means Security Bank of Crawford.

1.1.82.    "Schedules" and "Statements" means the Schedules, Statements and Lists filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time.

1.1.83.    "Secured Claim" means the Claim of any Creditor which is secured by a Lien (whether voluntary or involuntary) on or a security interest in Collateral, or in the event such Claim is a claim of setoff under Bankruptcy Code § 553, to the extent of such setoff.

1.1.84.    "Subchapter V Trustee" means the subchapter V trustee Melissa Haselden appointed in the Bankruptcy Case, or such trustee's successor appointed to serve as trustee pursuant to Bankruptcy Code § 1183.

1.1.85.    "Subordinated Claim" shall mean any Claim that is subordinated in right of payment to Unsecured Claims by reason of either (a) voluntary agreement or consent by the holder of the Claim, or (b) a Final Order of the Court.

1.1.86.    "Tax Expert Memoranda" means the memoranda and any supplemental memoranda and related exhibits of the tax expert regarding the Reorganized Debtor electing to be treated as a corporation for tax purposes, the creation of a qualified settlement fund, and the Trust Documents.

1.1.87.    "TDP" means the Trust Distribution Procedures as may be amended or modified from time to time, in substantially the form attached as Exhibit "B" to this Plan.

1.1.88.    "Timely Filed" with respect to a Claim, Interest or Administrative Expense, means, that a proof of such Claim or Interest or request for payment of such Administrative Expense was filed with the Bankruptcy Court within such applicable period fixed by the Plan, statute, or pursuant to both Bankruptcy rule 3003(c)(3) and a Final Order (e.g., the Bar Date).

1.1.89.    "Trade Creditor" means a vendor that provides goods and services to FSS on credit terms. The amounts owed are stated on the balance sheet of a customer as a current liability, and on the balance sheet of the trade creditor as a current asset.

1.1.90.    "Trust" or "Free Speech Systems Settlement Trust" means the trust established by the Trust Agreement as may be amended or modified from time to time.

1.1.91.    "Trust Agreement" means the Free Speech Systems Settlement Trust Agreement as may be amended or modified from time to time, in substantially the form attached as Exhibit "C" to this Plan.

1.1.92.    "Trust Assets" means the Initial Trust Funding, the Causes of Action and the Trust Contributions.

1.1.93. "Trust Beneficiaries" means the holders of Allowed Class 3-B and Class 3-C Claims.

1.1.94. "Trust Contributions" shall mean the aggregate total of; (i) the Debtor's Net Disposable Income at the end of each calendar year commencing on December 31, 2024, and ending on December 31, 2028.

1.1.95. "Trust Contribution Date" shall mean the fifteenth day of April of each calendar year commencing on the Initial Trust Contribution Date up to and including the Final Trust Contribution Date, or if the fifteenth day of April is not a Business Day, the first Business Day immediately thereafter. For avoidance of doubt, the Trust Contribution Dates are as follows:

| Trust Contribution Date | Trust Contribution for Calendar Year |
|---|---|
| April 15, 2025 | 2024 |
| April 15, 2026 | 2025 |
| April 15, 2027 | 2026 |
| April 15, 2028 | 2027 |
| April 15, 2029 | 2028 |

1.1.96. "Trust Documents" means the Trust Agreement, the TDP and any related agreements, instruments and documents governing the establishment, administration and operation of the Trust.

1.1.97. "Trustee" means Melissa A. Haselden and any successor trustee appointed pursuant to the terms of the Trust Agreement.

1.1.98. "Trust Expenses" means any fees, costs, charged or other expense incurred by the Trust, including any taxes applicable to the Trust.

1.1.99. "Unclaimed Distribution Reserve" has the meaning ascribed to such term in Section 11.2.1. of the Plan.

1.1.100. "Unimpaired Class" has the meaning described in Bankruptcy Code § 1124.

1.1.101. "United States Trustee" or "U.S. Trustee" means the United States Trustee for the Southern District of Texas.

1.1.102. "Unsecured Claim" means any Claim (regardless of whether such Claim is covered by insurance) that is neither secured nor entitled to priority under the Bankruptcy Code, or by a Final Order of the Bankruptcy Court, including, but not limited to: (a) any claim arising from the rejection of an Executory Contract or unexpired lease under Bankruptcy Code § 365, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent

that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Bankruptcy Code § 506(a), and (c) any Deficiency Claim.

    1.1.103.   "Unsecured Trade Creditor" means a Trade Creditor who holds an Unsecured Claim.

    1.1.104.   "Unsecured Creditors" means all holders of Unsecured Claims.

## 1.2.   **Rules of Construction.**

    1.2.1.   <u>Interpretation</u>. Unless otherwise specified herein, all section, article and exhibit references in the Plan are to the respective section in, article of, and exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. All headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

    1.2.2.   <u>Capitalized Terms</u>. Unless otherwise provided, any capitalized terms used in the Plan shall have the meaning set forth in Article 1.

    1.2.3.   <u>References to Documents, Headings or Exhibits</u>. Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions. Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented. Unless otherwise specified in a particular reference, all references in the Plan to articles, sections, subsections and exhibits are references to articles, sections, subsections and exhibits of or to the Plan.

    1.2.4.   <u>Construction and Application of Bankruptcy Code Definitions</u>. Unless otherwise defined herein, words and terms defined in Bankruptcy Code § 101 shall have the same meanings when used in the Plan. Words or terms used but not defined herein shall have the meanings ascribed to such terms or words, if any, in the Bankruptcy Code. The rules of construction contained in Bankruptcy Code § 102 shall apply to the construction of the Plan.

    1.2.5.   <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any article, section, subsection, or clause contained in the Plan.

    1.2.6.   <u>Time</u>. In computing any period prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE 2**
**INFORMATION REGARDING THE DEBTOR,**
<u>**THE CHAPTER 11 CASE, AND THE PLAN**</u>

    THIS ARTICLE 2 PRESENTS ONLY AN OVERVIEW OF CERTAIN KEY INFORMATION RELEVANT TO THE PLAN AND OMITS OTHER DETAILS OF THE PLAN THAT MAY BE IMPORTANT TO YOUR RIGHTS. YOU SHOULD CAREFULLY READ THE ENTIRE PLAN AND SEEK THE ADVICE OF AN ATTORNEY IF YOU ARE UNSURE ABOUT ANY PROVISIONS OF THIS PLAN.

    TO THE EXTENT THAT THERE IS ANY INCONSISTENCY BETWEEN A PROVISION IN THIS ARTICLE 2 AND A PROVISION

CONTAINED ELSEWHERE IN THE PLAN, THE PROVISION ELSEWHERE IN THE PLAN SHALL CONTROL IN ALL RESPECTS.

2.1.    **Background on the Debtor**.

A.    **Business of Free Speech Systems, LLC**

FSS is presently engaged in the business of producing and syndicating Alex Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show ("The Alex Jones Show") from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), such as Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products. FSS periodically adjusts and updates the menu of products available to its listeners and viewers. The website also has available books, t-shirts, and other products ("Non-Supplements") that are advertised during FSS broadcasts.

The vast majority of FSS revenues comes from the sale of Supplements, which have prior to the Petition Date have been supplied by or contracted for by PQPR, an affiliated entity, described below.

FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources.

As of December 31, 2022, FSS employed a workforce of 45 individuals, down from 58 employees on the Petition Date. The majority of whom are involved in production of the Alex Jones Show and other shows produced by FSS and have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production services are provided. The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. On the Petition Date, FSS had a warehouse in a separate location in Austin, Texas where warehousing and product sales fulfillment took place. All of the Debtor's buildings and offices are leased.

B.    **The Relationship Between Alex Jones and FSS**

At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS respectively. Alex and Kelly Jones divorced in 2015. Upon their divorce, Alex Jones became the sole owner of FSS. Since then, Alex Jones has been the Managing Member of FSS.

Alex Jones is also employed by FSS pursuant to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement"). Under the Jones Employment Agreement, Jones agreed to promote products and services agreed to by the FSS.

Since inception, Alex Jones has been a "single talent business." Without Alex Jones, there would neither be any InfoWars nor internet sales. Unfortunately, Mr. Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $60 to $70 million a year enterprise[1]. Alex Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex Jones, as though it was still a family business.

Entry into a durable contract for Alex Jones to continue to provide his services to the Reorganized Debtor is essential to the feasibility of the Plan. FSS (through its Chief Restructuring Officer) and Alex Jones have agreed to the terms of an employment agreement and submitted that agreement to the Court for approval. Success of the Plan depends on Alex Jones being on the air.

### C. The Relationship of FSS and PQPR

*Background Information About PQPR*

PQPR was founded in 2013 and began operations in September 2013. PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. Historically, PQPR advertised its products exclusively through FSS/The Alex Jones Show for which it received a bulk discount. PQPR also sells product outside the FSS/Alex Jones show channels.

PQPR is managed by Dr. David Jones, Alex Jones' father. Alex Jones is not a manager of PQPR but is an indirect owner of PQPR equity. The current owners and their ownership interests in PQPR are as follows:

| | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

Through AEJ Austin Holdings, LLC, Alex Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR"). Mrs. Carol Jones (Alex Jones' Mother) owns an 80.00% interest in JLJR Holdings, LLC ("JLJR") and Dr. David Jones holds the remaining 20.00% membership interest.

---

[1] Gross sales, including sale of PQPR's consigned goods.

Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The nature of the relationship between FSS and PQPR has changed over time. In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. FSS charged PQPR an administrative fee and an advertising fee based on sales volume together with miscellaneous out of pocket expenses. The selection of nutritional supplements to be sold was determined by Alex Jones, David Jones, and the staff of FSS.

In 2021, the relationship with PQPR began to change as FSS wanted to increase its revenue by purchasing products directly and reaping higher margins. While FSS continued to sell PQPR inventory, FSS began placing orders for Supplements with PQPR which then placed the order with the manufacturer. FSS paid PQPR, as its agent, funds required to purchase product, which then paid the manufacturer and managed the delivery and certification of the products. Pricing of the Supplements was done by FSS.

Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise was handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

Over time, FSS failed to fully pay sums due to PQPR derived from the sale of Supplements owned by PQPR. In turn, FSS continued to charge administrative and advertising fees which were not paid. In April 2021, FSS employed Bob Roe, a CPA and Certified Forensic Accountant to reconcile the PQPR accounts. As a result of Roe's work, it was determined that FSS owed significant unpaid amounts to PQPR totaling $29,588,000.00 unpaid purchases. FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

The 2020 Secured Note is secured by a Security Agreement entered as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS. On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

Following the execution of the 2020 Secured Note, FSS payment performance on its PQPR accounts did not change. On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized additional accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8%

and matures on November 10, 2036. The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

PQPR's claims and security interests are under examination by the Subchapter V Trustee and her professionals pursuant to expanded powers granted by the Bankruptcy Court. Other creditor constituencies dispute the debt and liens alleged by PQPR.

On July 14, 2023, the Debtor filed the PQPR Adversary contesting the validity of PQPR's claims and liens and pursuing Avoidance Actions against PQPR and certain related parties.

## 2.2 **Events Leading Up to Bankruptcy**

The Debtor' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtor styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas ( (collectively, as may have been consolidated, the "Texas State Court Litigation").

The Texas Plaintiffs then commenced in 2022 a fraudulent conveyance lawsuit under TUFTA styled *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (the "Plaintiffs' TUFTA Suit").

Two actions: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated before Judge Maya Gamble.

Immediately after the Petition Date, the Debtor sought an order from the Bankruptcy Court to lift the automatic stay to permit the Heslin/Lewis Suit to continue to judgment. The Bankruptcy Court lifted the automatic stay and permitted the suit to trail.

In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division; and

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "Connecticut State Court Litigation" together with the Texas State Court Litigation are hereinafter referred to as the "Sandy Hook Lawsuits").

Trials on the Sandy Hook Lawsuits were set to commence consecutively with significant possibility that they would overlap each other. The Debtor lacked the ability to proceed to trial on that basis. The cost of simultaneous trials, compounded by the scheduling issues, threatened FSS ability to continue as a going concern. Proceeding to trial as scheduled would have required Jones to be absent from his shows, resulting in dramatic drop in revenue at a time when trial costs would skyrocket.

FSS filed its voluntary petition initiating this Chapter 11 Case on July 29, 2022.

### 2.3    Significant Actions in the Chapter 11 Case

During the course of this Case, various pleadings have been filed with the Bankruptcy Court. The following is a description of the more significant pleadings filed during the pendency of this Case affecting operations and the FSS ability to generate Disposable Income. This is not intended as a description of all events which have transpired following the Petition Date. For a comprehensive listing of the pleadings that have been filed in this Chapter 11 Case, the docket should be reviewed, and relevant pleadings may be obtained from the Clerk's Office of the Bankruptcy Court or via the online PACER system at:

https://pacer.login.uscourts.gov/csologin/login.jsf

*Employment of Chief Restructuring Officer*

Initially FSS sought to retain Mark Schwartz as its Chief Restructuring Officer. The Court determined that Mr. Schwartz was not disinterested and denied his application for retention. The Debtor sought a replacement for Mr. Schwartz and determined to hire Patrick Magill. On October 13, 2022, the Court approved Mr. Magill's employment as Chief Restructuring Officer ("CRO").

*Operational Changes*

The CRO has made significant changes to FSS's operations since his employment. The following is a summary of the significant changes which have improved the Debtor's operations and margins.

Changing Credit Card Processors – After 2018, FSS experienced deplatforming from internet access, television and radio and also financial deplatforming. FSS longstanding banking relationship was terminated, and more importantly, FSS was denied access to credit card processing. Without the ability to process credit card transactions, FSS's business could not operate. Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions in 2018.

Initially FSS contracted with Auriam Services, LLC as an intermediary to a credit card processor. FSS' credit card processing cost was in excess of 14.5% of each transaction. While the rate was subsequently renegotiated and reduced to approximately 9%, the CRO sought less expensive options. On November 21, 2022, the Court granted FSS' motion to enter into a new financial services agreement. Under the new agreement, FSS' credit card processing cost declined to approximately 6%.[2]

As of the Petition Date, FSS had started to transition from selling PQPR supplements, which generated only 20% profit margins to purchasing inventory directly, generating substantially greater profit margins for the Debtor's estate. At the same time, FSS transitioned out of its fulfillment operations and entered into an agreement to process and fulfill product sales on behalf of FSS. While elimination of fulfillment was only marginally accretive to earnings, the Debtor reduced employee headcount and allowed it to focus on its core operations.

Notwithstanding the transition to Blue Ascension, the fulfillment costs were still a significant cost and impaired FSS operating profits. At the same time, the CRO negotiated a replacement financial services agreement, the CRO completed the operational changes by entering into a new fulfillment agreement. The counterparty to that fulfillment agreement ("Fulfillment Contractor") provides product sourcing of a menu of supplements which FSS pays

---

[2] The original credit card processor backed out from the arrangement when its identity was discovered, and they were exposed to the threat of doxing. As a result, credit card processing costs have increased 7% with a new credit card processor.

for only after the customer orders and pays for the product. In addition, the Fulfillment Contractor picks, packs and ships each order at a cost to FSS less than half what FSS paid Blue Ascension. FSS relocated all of its remaining inventory to the Fulfillment Contractor's warehouse.

As a result of the changes in operations, FSS (i) reduced its credit card processing costs by 50%, (ii) reduced its reliance on PQPR as a source of product thereby increasing margins, (iii) reduced its cost of fulfillment by more than 50%, and (iv) reduced overhead by rejecting its lease on warehouse space in Austin, Texas. Most importantly, FSS was able to increase inventory availability without additional capital or financing. Since FSS is unable to obtain financing and has limited capital, the ability to source products from the Fulfillment Contractor without the requirement to prepay for the product removes financial limitations on access to certain inventory.

*Mediation*

On October 12, 2022, the Court entered a Stipulation and Agreed Order submitting the disputes between FSS and the Sandy Hook Plaintiff's to mediation before the Honorable Marvin Isgur. That Bankruptcy Court terminated the mediation due to the reported lack of progress in arriving at a settlement. In the event the parties are able to reach a settlement, the terms of this Plan will be modified to incorporate those terms.

## 2.4 **Description Of Assets**

The Debtor filed schedules of all of its assets and liabilities on August 29, 2022. Complete copies of the schedules are available from the Clerk of the Court. The primary assets of the bankruptcy estate and their book values, are shown on the balance sheet attached hereto as Exhibit "D".

## 2.5 **Liquidation Analysis**

Under sections 1191 and 1129(a)(7) a plan can be confirmed without the accepting votes of impaired classes of claims as long as each such class would receive under the plan "not less than" they would receive "if the debtor were liquidated under chapter 7."

If this case were converted to chapter 7 and the assets of the Debtor liquidated, such a liquidation would destroy the going-concern value of this business because it would require the cessation of business operations. Creditors would be forced to look to the liquidation value of the debtor's remaining tangible assets and Causes of Action. Other than intangible assets, the value of which is highly speculative, the Debtor's assets consist of cash, owned inventory, tenant improvements, furniture, fixtures and equipment. The cash balances would likely be consumed by administrative expenses incurred in winding down the Debtor's operations and liquidating its remaining assets. The Debtor's inventory, consisting primarily of supplements, would realize only fraction of its costs if sold on a bulk basis. Tenant improvements are affixed to the Debtor's leased premises and have no value. Similarly, the Debtor's equipment, consisting of installed broadcast equipment, is dated and unlikely to produce any meaningful

return above the cost of removing it from the leased premises.

FSS believes that on a liquidation basis the return to Trade Creditors would be negligible if the Sandy Hook Plaintiffs claims are Allowed. If PQPR's Secured Claim is Allowed, Unsecured Creditors would receive nothing on account of their Allowed Claims. If the Claims of PQPR and the Sandy Hook Plaintiffs Claims are disallowed, liquidation of the Debtor's assets might generate a significant return to Trade Creditors. A liquidation analysis is attached hereto as Exhibit "E".

2.6     **Projection of Disposable Income**

The Debtor's ability to continue in operation and generate revenue is entirely dependent upon Alex Jones' commitment to continue to broadcast for the five year term of the Plan. Mr. Jones and FSS have reached an agreement on the terms of his employment following the Effective Date of the Plan. Jones has agreed to a 5 year contract which is coterminous with the Plan Period. That agreement has not been approved as of the date this Plan was filed and is opposed by the Plaintiffs. Based on the assumption that the Jones employment agreement will be approved by this Court, the Debtor projects that it will generate a continuing stream of revenue in excess of its expenses and capital requirements which will be available to pay its creditors' Allowed Claims. The Debtor's Disposable Income projections for the term of the Plan are attached hereto as Exhibit "F".

The Debtor's business is subject to seasonal fluctuations common to retail operation and is similarly exposed to the vagaries of the global and national economy. Moreover, FSS and its suppliers and contract counterparties are continuously exposed to doxing and deplatforming which adds further unpredictability to the Debtor's operations. Finally, the product mix which the Debtor makes available to customers turns over with regularity. Although the Debtor maintains a stable of products which have a consistent history of sales, some supplements have relatively short sales cycles and sundries such as t-shirts, hats, and bumper stickers change with great regularity.


# ARTICLE 3
## CLASSIFICATION OF CLAIMS AND INTERESTS


3.1.    **Claims and Equity Interests Classified.**

To make the Plan easier to understand, to aid in the Plan balloting process and for all confirmation matters, all Claims (except Administrative Expense Claims and Priority Tax Claims) and Equity Interests shall be classified as set forth in this Article 3 of the Plan. The treatment of unclassified and classified Claims is set out in Articles 4 and 5 of the Plan.

3.2.    **Administrative Claims and Priority Tax Claims.**

Bankruptcy Code § 1123(a)(1) provides that Administrative Claims and Priority Tax Claims shall not be classified for purposes of voting or receiving distributions under the Plan. All such Claims are to be treated separately as unclassified Claims on the terms set forth in Article 4 of the Plan.

3.3.  **Summary of Plan**.

This is a stand-alone Plan wherein the Debtor will be professionally managed and operated post-confirmation for the benefit of its creditors. The Plan contemplates that the Reorganized Debtor will have adequate cash on the Effective Date or sufficient cash flow following the Effective Date to make the necessary payments under the Plan to pay (i) Ordinary and Non-Ordinary Course Administrative Expense Claims, (ii) Priority Tax Claims, and (iii) Class 1, 2 and 3A Claims in full or make appropriate reserve for same by depositing cash into a Disputed Claims Reserve Account, established by the Disbursing Agent to be paid when such claims become Allowed Claims.

The Plan contemplates (a) dedicating to the Trust the Reorganized Debtor's Net Disposable Income for the Plan Period in accordance with Bankruptcy Code § 1191 to satisfy the Allowed Class 3 B and Class 3C claims in accordance the TDP; (b) vesting all Causes of Action in the Trust; (c) paying the Allowed Claims of all other Creditors from the Debtor's available cash on the Effective Date or from income generated by the Reorganized Debtor following the Effective Date.

The following chart summarizes the treatment of the various classes of Claims and Interests under the Plan:

| Class | Description | Treatment of Allowed Claims |
|---|---|---|
| N/A | Administrative Expense Claims (Non-Voting) | Ordinary Course Administrative Expense Claims—Receive, in full satisfaction of such Claim, Cash payment from the Reorganized Debtor in the amount of the Allowed Ordinary Administrative Expense Claim (a) under the existing agreements between the Debtor and the holder of an Ordinary Course Administrative Expense Claim or (b) on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim.<br><br>Non-Ordinary Administrative Expense Claims—Receive, in full satisfaction of such Claim, Cash payment from the Reorganized Debtor in the amount of the Allowed Ordinary Administrative Expense Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. |
| N/A | Priority Tax Claims (Non-Voting) | Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment, each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such Claim, Cash payments from Reorganized Debtor over a period not exceeding five (5) years from the Petition Date. Payments by the Reorganized Debtor provided for herein shall be made in equal monthly installments with the first payment due on the tenth Business Day of the first calendar month following the Effective Date. Interest shall accrue on the Priority Tax Claim in accordance with section 511 of the Bankruptcy Code. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. To the extent the holder of an Allowed Priority Tax Claim has a Lien on the Debtor's property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full. |

| Class1-A | Secured Claim of SBC<br><br>Impaired - Entitled to Vote | Receive, in full satisfaction of such Claim, Cash payments from the Reorganized Debtor in the Allowed amount of such Claim in accordance with the requirements of Bankruptcy Code §1129(b)(2)(A). To the extent the Class 1-A Claim is secured by a Lien on any Collateral, such Lien shall remain in place until such Class 1-A Claim has been paid in full. |
| Class 1-B | Secured Claim of PQPR<br><br>Impaired - Entitled to Vote | Whether PQPR holds a claim against FSS, and whether FSS holds a Lien on any Collateral to secure the repayment of such debt is subject of dispute. PQPR's secured and unsecured claims are disputed. Under the Plan, the Debtor intends to determine under Bankruptcy Code § 506(a) the secured and unsecured portions of PQPR's claim, and, once such amount is determined, PQPR's Allowed Secured Claim will be paid in accordance with Bankruptcy Code § 1129(b)(2)(A)(i)(1) or (iii). Any Deficiency Claims will be treated as a Class 3-C Claim. Pending allowance of PQPR's Class 1-B Secured Claim, the Reorganized Debtor shall pay any disbursements on account of the Class 1-B Claim to the Disbursing Agent. |
| Class 2 | Priority Claims<br><br>Not Impaired - Presumed to Accept | Receive, in full satisfaction of such Claim, Cash payments from Reorganized Debtor in the Allowed amount of such Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such Claim becomes an Allowed Claim. |
| Class 3-A | Unsecured Claims of Trade Creditors<br><br>Not Impaired - Presumed to Accept | Receive, in full satisfaction of such Claim, Cash payments from the Reorganized Debtor in the Allowed amount of such Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such Claim becomes an Allowed Claim. |

| Class 3-B | Unsecured Claims of the Plaintiffs<br><br>Impaired - Entitled to Vote | All liability for Allowed Class 3-B Claims shall be assumed by the Trust and paid in accordance with the TDP, subject in all respects to entry of a Final Order Allowing each Class 3-B Claim.<br><br>Holders of Class 3-B Claims may elect the following alternative treatment of their Claims whether they vote for or against Plan Confirmation:<br><br>**Alternative Treatment:** Holders of Class 3-B Claims that indicate their election for treatment under this option on their Ballot shall receive an Allowed Claim in the amount set forth in Exhibit **"G"** to be paid from the Trust in accordance with the TDP. With respect to any Holder of Class 3-B Claim who elects Alternative Treatment:<br><br>(i)    The Debtor and the Reorganized Debtor will dismiss all pending appeals to the Judgments obtained by the Class 3-B Creditor.<br>(ii)    The Claim of the Class 3-B Claimant who elects Alternative Treatment as set forth in the Plan shall be discharged as provided in Section 13.2 of the Plan and the election shall constitute a waiver of any objection to dischargeability under § 523 of the Code.<br>(iii)    Election to receive Alternative Treatment will result in the Claim 3-B Holders receipt of distributions from the Trust when and if distributions are made pursuant to the Trust Agreement and TDP. The claims of Holders of Disputed Class 3-B Creditors who do not opt into Alternative Treatment will remain contingent upon appeals and potentially retrial. In any event, will not receive distributions from the Trust until their Claims are Allowed by Final Order. |
| --- | --- | --- |
| Class 3-C | Unsecured Claims of Insiders and Unsecured Deficiency Claim of PQPR<br><br>Impaired - Entitled to Vote | All Liability for Class 3-C Claims shall be assumed by the Trust and paid in accordance with the TDP from Trust Assets, subject in all respects to pending appeals and defenses and entry of a Final Order Allowing each Class 3-C Claim and only following payment in full of all Allowed Class 3-B Claims. |
| Class 4 | Interests<br><br>Not Impaired - Presumed to Accept | Interest Holders shall receive the Reorganized Debtor Common Stock. |

3.4. **Impairment Controversies**.

All controversies as to whether a Class of Claims or Equity Interests are impaired under the Plan and whether they are entitled to vote for or against the Plan shall be resolved by the Bankruptcy Court after notice and hearing.

# ARTICLE 4
# TREATMENT OF UNCLASSIFIED CLAIMS

4.1. **Administrative Expense Claims**.

4.1.1. <u>Ordinary Course Administrative Expense Claims</u>. Ordinary Course Administrative Expense Claims shall receive the following treatment:

4.1.1.1. *<u>No Requirement to File Request; Procedure for Disputes</u>*. Holders of Ordinary Course Administrative Expense Claim shall not be required but may file a request for the payment of any Ordinary Course Administrative Expense Claim with the Court. Holders of Ordinary Course Administrative Expense Claims electing not to file requests for payment of Ordinary Course Administrative Expense Claims shall submit invoices or other documents reflecting an asserted Ordinary Course Administrative Expense Claim to the Debtor or Reorganized Debtor, as applicable, in the ordinary course pursuant to any agreement, practices of the parties, and/or applicable law. To the extent that an Ordinary Course Administrative Expense Claim is submitted to the Debtor after the filing of a motion or application for entry of a Final Decree or within sixty (60) days before entry of a Final Decree, the Reorganized Debtor may, in its sole discretion, (a) seek to delay entry of a Final Decree to seek determination by the Bankruptcy Court of the disputed Ordinary Course Administrative Expense Claim, (b) seek to have the case reopened for such determination, or (c) seek determination of its obligation to the holder of the asserted Ordinary Course Administrative Course Administrative Expense Claim before any tribunal with competent jurisdiction or as otherwise provided by applicable non-bankruptcy law.

4.1.1.2. *<u>Objections to Ordinary Course Administrative Expense Claims</u>*. To the extent the Debtor or Reorganized Debtor disputes an asserted Ordinary Course Administrative Expense Claim submitted to the Debtor, the Debtor or Reorganized Debtor shall file a motion with the Bankruptcy Court within sixty (60) days of receipt of such Clam, seeking determination of the disputed Ordinary Course Administrative Expense Request that will be (a) governed by Rule 9013 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 9013-1 and 9013-2, and (b) served on the holder of the disputed Ordinary Course Administrative Expense and the Trustee with no further service required.

4.1.1.3. *<u>Time for Optional Request by Holders of Ordinary Course Administrative Expense Claims</u>*. Any holder of Ordinary Course Administrative Expense Claim electing to file with the Bankruptcy Court a request for payment of such Claims shall file such request within thirty (30) days after the Effective Date. Any such request must be served on the Debtor, its counsel, and the Trustee with no further service required, and must, at a minimum, set forth (i) the name of the holder of the Ordinary Course Administrative Expense Claim; (ii) the amount of the Ordinary Course Administrative Expense Claim; and (iii) the basis for the Ordinary Course Administrative Expense Claim. A failure to file any such request in a timely fashion will not prejudice any holder of an Ordinary Course Administrative Expense Claim from submitting invoices or other documents reflecting an asserted Ordinary Course Administrative Expense Claim

to the Debtor to be determined under the procedures set forth in Sections 4.1.1.1 and 4.1.1.2 of the Plan.

4.1.1.4. *Allowance of Ordinary Course Administrative Expense Claims*. An Ordinary Course Administrative Expense Claim submitted to the Debtor under the procedure set forth in Section 4.1.1.1 of the Plan prior to the Effective Date shall be become an Allowed Ordinary Course Administrative Expense Claim unless the Debtor or Reorganized Debtor files a motion seeking determination of the asserted Ordinary Course Administrative Expense Claim within the time period provided by Section 4.1.1.2 of the Plan. An Ordinary Course Administrative Expense Claim for which a request for payment has been properly filed under the procedure in Section 4.1.1.3 shall become an Allowed Administrative Expense Claim unless an objection is filed by the date that is twenty-one (21) days after a request for payment of such Ordinary Course Administrative Expense Claim is filed. If an objection is timely filed to a request for payment of an Ordinary Course Administrative Expense Claim under the procedure in Section 4.1.1.2 or 4.1.1.3, the Ordinary Course Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

4.1.1.5. *Payment of Ordinary Course Administrative Expense Claims*. Except to the extent that (i) a holder of an Ordinary Course Administrative Expense Claim and the Debtor agree to a different treatment, (ii) such Claim was satisfied while the Chapter 11 Case was pending, or (iii) existing agreements between the Debtor and the holder of an Ordinary Course Administrative Expense Claim provide for payment of such Ordinary Course Administrative Expense Claims on different terms, in which case such Claim shall be satisfied in accordance with those pre-existing agreements or policies, each holder of an Allowed Ordinary Course Administrative Expense Claim shall receive, in full satisfaction of such Claim, Cash payment from the Reorganized Debtor in the amount of the Allowed Ordinary Administrative Expense Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. For the avoidance of doubt, Allowed Ordinary Course Administrative Expenses shall *not* be paid from Trust Contributions.

4.1.2. Non-Ordinary Course Administrative Expense Claims. Non-Ordinary Course Administrative Expense Claims shall receive the following treatment:

4.1.2.1. *Time for Filing Request by Holders of Non-Ordinary Course Administrative Expense Claims*. All holders of Non-Ordinary Course Administrative Expense Claims, other than Professional Persons holding Professional Fee Claims, shall file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Any such request must be served on the Debtor, its counsel, and the Trustee with no further service required, and must, at a minimum, set forth (i) the name of the holder of the Non-Ordinary Course Administrative Expense Claim; (ii) the amount of the Non-Ordinary Course Administrative Expense Claim; and (iii) the basis for the Non-Ordinary Course Administrative Expense Claim. Failure to file any such request in a timely fashion will result in the Administrative Expense Claim in question being discharged and its holder forever barred from asserting such Administrative Expense Claim against the Debtor, its Estate, the Reorganized Debtor, the Trustee, or the Trust Contributions.

4.1.2.2. *Allowance of Non-Ordinary Course Administrative Expense Claims*. A Non-Ordinary Course Administrative Expense Claim for which a request for payment has been

properly filed shall become an Allowed Administrative Expense Claim unless an objection is filed by the date that is twenty-one (21) days after a request for payment of such Non-Ordinary Course Administrative Expense Claim is filed. If an objection is timely filed, the Non-Ordinary Course Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

        4.1.2.3.    *Payment of Non-Ordinary Course Administrative Expense Claims*. Except to the extent that a holder of a Non-Ordinary Course Administrative Expense Claim and the Debtor agree to a different treatment or such Claim was satisfied while the Chapter 11 Case was pending, each holder of an Allowed Ordinary Course Administrative Expense Claim shall receive, in full satisfaction of such Claim, Cash payment from the Reorganized Debtor in the amount of the Allowed Ordinary Administrative Expense Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. For the avoidance of doubt Non-Ordinary Course Administrative Expense Claim shall not be paid from Trust Contributions.

        4.1.3.  <u>Special Provisions for Professional Fee Claims</u>. Notwithstanding anything to the contrary in this Article 4, every Professional Person holding a Professional Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order shall file a final application for payment of fees and reimbursement of expenses no later than the date that is thirty (30) days after the Effective Date; *provided*, *however*, that a Professional Person may supplement its request up to and including the date of the hearing on such request to account for fees and expenses incurred following the Effective Date in connection with, among other things, preparation of the request for allowance of such Professional Fee Claim, attendance at the hearing thereon and any other allowable fees or expenses not previously requested. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. The last date to object to any final fee application shall be the twenty-first (21st) day after such fee application has been filed with the Bankruptcy Court. Allowed Professional Fee Claims, not otherwise paid pursuant to any applicable interim compensation procedures, shall be paid in full in Cash by the Reorganized Debtor on the later of the fifteenth (15th) day after the Effective Date or fifteen (15) days after such Claim becomes an Allowed Claim.

## 4.2.  <u>**Priority Tax Claims**</u>.

        Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment, each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such Claim, Cash payments from Reorganized Debtor over a period not exceeding five (5) years from the Petition Date. Payments by Reorganized Debtor provided for herein shall be made in equal monthly installments with the first payment due on the tenth Business Day of the first month following the Effective Date. Interest shall accrue on the Priority Tax Claim in accordance with section 511 of the Bankruptcy Code. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. To the extent the holder of an Allowed Priority Tax Claim has a Lien on the Debtor's property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full. For the avoidance of doubt Non-Ordinary Course Administrative Expense Claim shall not be paid from Trust Contributions.

## ARTICLE 5
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS UNDER THE PLAN

5.1.  **Class 1-A – Secured Claim of SBC**.

    5.1.1   Impairment and Voting.  This Class is impaired under the Plan. The holder of the Allowed Claim in  Class 1-A shall be entitled to vote to accept or reject the Plan.

    5.1.2   Treatment of SBC's Secured Claim

        5.2.2.1   *Claim Not Allowed*:  The Class 1-A Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

        5.2.2.1   *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 1-A Secured Claim shall be treated and paid as provided below, and the balance of the Class 1-A Claim that is not Secured shall be treated as a General Unsecured Claim in Class 3-A:

        *Potential Bifurcation of Claim.*  If Class 1-A Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (considering all Liens that were senior to the Lien securing the Class 1-A Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

        *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties in interest regarding the claim and amount) shall have the right to object to the Class 1-A Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all  other respects.

        *Interest:* Interest shall accrue on the portion of the Class 1-A Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

        *Payment:*  Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 1-A Claim in equal monthly installments calculated on a five-year amortization.

        *Retention of Lien up to Amount of Allowed Class 1-A Claim:*  Except as otherwise provided in this Section, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 1-A Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 1-A Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral.

5.2. **Class 1-B – Secured Claim of PQPR**.

    5.2.1  <u>Impairment and Voting</u>. This Class is impaired under the Plan. The holder of the Allowed Claim in Class 1-B shall be entitled to vote to accept or reject the Plan.

    5.2.2  <u>Treatment of PQPR's Secured Claim</u>

        5.2.2.1  *Claim Not Allowed*: The Class 1-B Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

        5.2.2.1  *Treatment of Secured Claim*: To the extent it is Allowed and Secured, the Class 1 Secured Claim shall be treated and paid as provided below, and the balance of the Class 1-B Claim that is not Secured shall be treated as a General Unsecured Claim in Class 3-C:

        *Potential Bifurcation of Claim.* If Class 1-B Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (considering all Liens that were senior to the Lien securing the Class 1-B Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

        *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties in interest regarding the claim and amount) shall have the right to object to the Class 1-B Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

        *Interest:* Interest shall accrue on the portion of the Class 1-B Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

        *Payment:* Beginning on the fifteenth day of the month first occurring after the later of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Reorganized Debtor shall pay the Allowed Secured Class 1-B Claim in equal monthly installments calculated on a five-year amortization.

        *Retention of Lien up to Amount of Allowed Class 1-B Claim:* If the holder of the Class 1-B Claim has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 1-B Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 1-B Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Texas, indicating that its Lien has been terminated and released.

5.3.  **Class 2 – Priority Claims**.

Except to the extent that a holder of an Allowed Class 2 Claim and the Debtor or Reorganized Debtor agree to a different treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, each holder of an Allowed Class 2 Claim shall receive, in full satisfaction of such Claim, Cash payments from the Reorganized Debtor in the

Allowed amount of such Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such Claim becomes an Allowed Claim.

5.4. **Class 3-A –Unsecured Claims of Trade Creditors**.

Except to the extent that a holder of an Allowed Class 3-A Claim and the Debtor or Reorganized Debtor agree to a less favorable treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, each holder of an Allowed Class 3-A Claim shall receive, in full satisfaction of such Claim, Cash payments in the amount of the Allowed Claim from the Reorganized Debtor on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such Claim becomes an Allowed Claim.

5.5. **Class 3-B –Plaintiffs' Unsecured Claims**.

On the Effective Date, all of the Debtor's liability for all Plaintiffs' Unsecured Claims shall be assumed by, and channeled to, the Trust without further act or deed and satisfied as set forth herein.

All Plaintiffs' Unsecured Claims against the Debtor or the Reorganized Debtor shall be processed, liquidated, and paid pursuant to the terms and provisions of the TDP and the Trust Agreement. The Trust is described in Article 7 below. The sole recourse of the holder of a Plaintiffs' Unsecured Claims shall be the Trust and the TDP, and such holder shall have no rights whatsoever at any time to assert such holder's Claim against the Debtor or the Reorganized Debtor. Without limiting the foregoing, on the Effective Date, all Persons shall be permanently and forever stayed, restrained, and enjoined from taking any enjoined actions against any Debtor or the Reorganized Debtor (or the property or interest in property of any Debtor or the Reorganized Debtor) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Debtor or the Reorganized Debtor.

The Trust shall be funded, after the receipt of the Election Acceptance Letter affirmatively accepting the Debtor's election, with (1) the Initial Trust Funding; (2) the Trust Contributions; and (3) Causes of Action. The Class 3-B Plaintiffs' Unsecured Claims shall be processed, liquidated, and paid pursuant to the terms and provisions of the TDP and the Trust Agreement.

The Trust and the Reorganized Debtor shall each have standing to assert any rights (including, but not limited to, appeals of judgments and other post judgment contests of any pending judgments, and rights of setoff and recoupment), defenses (including, but not limited to, affirmative defenses), and objections that the Debtor has against or with respect to such Claims. The Reorganized Debtor shall retain standing to object to any proposed settlement by the Trust of any Class 3-B Claim.

5.5.1 **Alternative Treatment** - Holders of Class 3-B Claims may elect to opt in to receive the following treatment of their Claims:

5.5.1.1 *Election* – Holders of Class 3-B Claims may elect to accept Alternative Treatment of their Claims whether they vote to accept or reject the Plan. In order to elect Alternative Treatment, Class 3-B Claimants must affirmatively register their election on their Ballot and return it to the Debtor on or before the deadline established by the Court for the return of Ballots.

   5.5.1.2  *Effect of Election for Alternative Treatment* – The Claims of Class 3-B Creditors who elect to receive Alternative Treatment for their Claims shall receive the following on account of their Claims on the Effective Date:

    (i)  The Claims of electing Class 3-B Claim Holders shall be Allowed Claims in the amount set forth in Exhibit "G" and shall be paid from the Trust in accordance with the TDP.

    (ii)  The Debtor and the Reorganized Debtor will dismiss all pending appeals to the judgments obtained by electing Class 3-B Creditors.

    (iii)  The Claim of each electing Class 3-B Claimant shall be discharged as provided in Section 13.2 of the Plan and the election shall constitute a waiver of any objection to dischargeability under § 523 of the Code.

    (iv)  Election to receive Alternative Treatment will result in the Claim 3-B Holders receipt of distributions from the Trust when and if distributions are made pursuant to the Trust Agreement and TDP. The claims of Holders of Disputed Class 3-B Creditors who do not opt into Alternative Treatment will remain contingent upon appeals and potentially retrial and in any event will not receive distributions from the Trust until their Claims are Allowed by Final Order.

**5.6.** **Class 3-C – Unsecured Claims of Insiders and Unsecured Deficiency Claim of PQPR**.

   Except to the extent that a holder of an Allowed Class 3-C Claim and the Debtor or Reorganized Debtor agree to a less favorable treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, each holder of an Allowed Class 3-C Claim shall receive, in full satisfaction of such Claim, Cash payments in the amount of the Pro Rata Share of the Trust Assets remaining after payment of all Trust Expenses Post and all Allowed Claims in Class 3-B.

**5.7.** **Class 4 – Interests**.

   Allowed Class 4 Interest shall receive the Reorganized Debtor Common Stock on the Effective Date.

**ARTICLE 6**
**ACCEPTANCE OR REJECTION OF THE PLAN**

**6.1.** **Presumed Acceptance of Plan.**

   Any Unimpaired Class under this Plan is conclusively presumed to accept this Plan. Any Class that voted to accept the Plan is presumed to accept this Plan.

**6.2.** **Presumed Rejection of Plan.**

   Any Class that voted to reject the Plan or who will receive or retain no property under the Plan is presumed to reject this Plan.

**ARTICLE 7**
**THE TRUST**

**7.1** **Creation of the Trust**.

   On the Effective Date or such earlier date as the Debtor deems appropriate, the Trust shall be created as provided in the Trust Agreement.

7.2 **Appointment of Trustee**.

Upon approval by the Bankruptcy Court in the Confirmation Order, the Trustee shall be appointed. The Trustee shall have and perform all of the rights, powers, and duties set forth in the Trust Agreement.

7.3 **Purpose of the Trust**.

The purpose of the Trust shall be, among other things, to (a) liquidate, resolve, pay, and satisfy all Claims of Trust Beneficiaries in accordance with this Plan, the Trust Agreement, the TDP, and the Confirmation Order; (b) receive, preserve, hold, manage, and maximize the Trust Assets for use in paying and satisfying Allowed Claims of the Trust Beneficiaries in accordance with the terms of the Trust Agreement; (c) minimize income tax for which the Debtor is liable by ensuring that any such annual amounts Debtor transfers to the Trust will be deductible to the Debtor and/or Debtor's Bankruptcy Estate pursuant to I.R.C. 468B; and (d) take other actions deemed by the Trustee to be in the best interest of the Trust Beneficiaries, who are the sole beneficiaries of the Trust.

7.4 **Transfers, Assignments, and Payments to the Trust**.

Within 30 days of receiving the Election Acceptance Letter affirmatively accepting the Debtor's election, the Debtor (or the Reorganized Debtor, as applicable) shall transfer, assign, and convey, without limitation, to the Trust for the benefit of the Trust Beneficiaries all of the Debtors' rights, title, and interest in the Trust Assets. To the extent certain assets may accrue subsequent to the election of corporate status, such Trust Assets shall be transferred to, vested in, and assumed by the Trust as soon as practicable after such time. Additional transfers by the Reorganized Debtor to the Trust will be made on periodic basis according to the terms of the Plan.

7.5 **Trust Agreement**.

The Trust Agreement, substantially in the form of Exhibit C to this Plan, contains provisions customary to documents utilized in comparable circumstances. The Debtor, the Reorganized Debtor and the Trustee, shall execute the Trust Agreement.

7.6 **Control of the Causes of Action**.

The right to control the Causes of Action, including negotiations relating thereto and settlements thereof, shall be vested in the Trust on and after the Effective Date. Notwithstanding the foregoing, the Reorganized Debtor, and the Subchapter V Trustee shall cooperate with the Trustee in pursuing the Causes of Action and shall provide the representatives of the Trust with reasonable access to personnel and books and records of the Reorganized Debtor relating to the Causes of Action, to enable the Trustee to perform the Trustee's tasks under the Trust Agreement and this Plan.

7.7 **Assumption of Liabilities by the Trust**.

Upon the Effective Date, in exchange for funding in accordance with the Plan, the Trust shall be deemed, without need for further action, to have assumed responsibility and liability for all Claims of the Class 3-B and 3-C Creditors. All Trust Beneficiary Claims shall thereafter automatically and perpetually be transferred and channeled to the Trust, and the Trust shall be solely responsible for any and all such Claims under the terms of the Plan, the Trust Agreement and the TDP.

Except as otherwise expressly provided under this Plan or the Trust Agreement, the Trust shall have no responsibility for any Claims or demands against the Debtor other than the Class 3-B and Class 3-C Creditor Claims.

7.8    **Indemnification and Reimbursement by the Trust.**

The Trust shall indemnify, defend (and, where applicable, pay the defense costs for), and hold harmless the Reorganized Debtor from any and all liabilities associated with a Claim of a Class 3-B or 3-C Creditor that any party seeks to impose upon the Reorganized Debtor, or that are imposed upon the Reorganized Debtor.

7.9    **Tax Treatment of the Trust.**

The Trust shall be treated as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1, and the Trustee shall be the "administrator" of the Trust pursuant to Treasury Regulation section 1.468B-2(k)(3). No election shall be made to treat the Trust as a grantor trust for U.S. federal income tax purposes. Accordingly, the Trust shall be treated as a taxable entity for federal income tax purposes. The Trustee shall cause all taxes imposed on the Trust to be paid using Trust Assets and shall comply with all tax reporting and withholding requirements imposed under applicable tax laws. Any amount so withheld from a distribution or payment by the Trust to a Trust Beneficiary or other payee shall be treated as having been paid to, and received by, such payee for purposes of this Plan and the Plan Documents.

All transfers to the Trust may not revert to the Debtor or Reorganized Debtor. As such, there shall be beneficiaries of the Trust, as well as Remainder Beneficiaries should there be any funds remaining if and when all Class 3-B and Class 3-C Claims are satisfied.

7.10    **Trust Expenses.**

The Trust shall pay all Trust Expenses (including applicable taxes) from the Trust Assets. Neither the Debtor nor the Reorganized Debtor shall have any obligation to pay or reimburse any Trust Expenses.

7.11    **Termination of the Trust.**

The Trust shall automatically dissolve on the date 90 days after the first to occur of the following events:

(a) the date on which the Trustee decides to dissolve the Trust because (1) the Trustee deems it unlikely that new claims will be filed against the Trust; and (2) all Class 3-B and Class 3-C Claims have been liquidated and paid to the extent provided in the Trust Agreement and the TDP or have been disallowed by a Final Order; or

(b) to the extent that any rule against perpetuities shall be deemed applicable to the Trust, the date on which 300 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

7.15    **Termination of the Trustee.**

The duties, responsibilities, rights, and obligations of the Trustee shall terminate in accordance with the terms of the Trust Agreement.

## ARTICLE
## IMPLEMENTATION AND EXECUTION OF THE PLAN

8.1     **Reorganized Debtor**.

8.1.1   <u>Continued Existence</u>. On the Effective Date, the Reorganized Debtor shall file Form 8832 with the IRS and convert from a limited liability company to a C corporation and shall be authorized to take any and all other actions necessary to complete the conversion, including, but not limited to the issuance of the Reorganized Debtor Common Stock in accordance with the Plan. The Debtor shall continue to exist and operate its business as the Reorganized Debtor after the Effective Date. The Reorganized Debtor shall continue in business and shall carry on its business affairs without consultation or approval from the Bankruptcy Court. The Reorganized Debtor shall be free to use or sell its assets, hire, and compensate professionals and otherwise operate free of the restrictions, limitations and constraints existing under the Bankruptcy Code. The Reorganized Debtor shall operate in conformity with the Plan and shall make any required distributions and payments timely and in accordance with the Plan.

8.1.2   <u>Additional Distributions by the Reorganized Debtor</u>. Within 30 days of receiving the Election Acceptance Letter from the IRS affirmatively accepting the Debtor's election, the Reorganized Debtor shall deliver to the Trustee the Initial Trust Funding. The Reorganized Debtor shall deliver the Trust Contributions to the Trustee commencing not less than thirty (30) days before the Initial Trust Contribution Date and each successive Trust Contribution Date thereafter. The Trustee shall make distributions from the funds received in accordance with the terms of the TDP and the Trust Agreement.

8.1.3   <u>Retention of Interests</u>. On the Effective Date, the Interests in the Reorganized Debtor Common Stock shall vest in the Equity Interest as indicated below:

| *Shareholder* | *Number of Shares* | *Percent Ownership* |
|---------------|--------------------|--------------------|
| Alex E. Jones | 100 | 100% |

8.1.4   <u>Directors and Officers of the Reorganized Debtor</u>. The Debtor has engaged the services of an executive search firm to identify candidates to serve as Chief Operating Officer and Chief Financial Officer of Comptroller to take over the duties of the CRO and the current comptroller after the Effective Date. The Debtor will identify the individuals who will serve in those roles in a Plan Supplement. The CRO and current comptroller have indicated an intention to continue to provide services to the Debtor for an appropriate transition period.

8.1.5   <u>Corporate Action</u>. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtor or Reorganized Debtor, as applicable.

8.2     **Subchapter V Trustee**.

8.2.1   <u>Discharge of the Subchapter V Trustee</u>. On the Effective Date, the Subchapter V Trustee shall be discharged.

8.2.2   <u>Disputed Claim Reserve Account</u>. The Disbursing Agent shall hold the Disputed

Claim Reserve Account in trust pending distribution pursuant to the terms of this Plan.

 8.2.3 <u>Standing with Respect to Causes of Action</u>. The Trustee shall have standing to assert or intervene with any objection to a Disputed Claim. The Trustee shall have no obligation to assert or intervene with respect to any Retained Cause of Action. Nothing in the Plan shall affect the Reorganized Debtor's standing to prosecute any defense or appeal of the Sandy Hook Litigation or object to the Claims of Class 3-B and 3-C Claims.

 8.2.4 <u>Compensation and Reimbursement</u>. The Subchapter V Trustee shall be entitled to Post-Confirmation, Pre-Effective Date Subchapter V Trustee Compensation, subject to the approval by the Bankruptcy Court under Bankruptcy Code §§ 330, 331, and/or 503.

 8.2.5 <u>Limitation of Liability</u>. Notwithstanding anything to the contrary in this Plan, the Subchapter V Trustee shall have no liability to any Creditor, Claimant, the Debtor, the Reorganized Debtor, or any other party-in-interest for except upon a finding of the Bankruptcy Court in a Final Order that the Subchapter V Trustee engaged in fraud, intentional misconduct, or gross negligence.

## 8.3 **Vesting of Assets**.

 On the Effective Date, all Property of the Estate, excluding Causes of Action, shall vest in Reorganized Debtor.

## 8.4 **Preservation of the Debtor's Claims**.

 All Causes of Action shall be preserved and shall constitute Property of the Estate and shall be conveyed to Trust on the Effective Date. The Court shall retain jurisdiction to determine all such Causes of Action until the entry of a Final Decree.

## 8.5 **Preservation of Insurance**.

 Nothing in this Plan, including the discharge or release of the Debtor provided in this Plan, shall diminish, or impair the enforceability of any insurance policies that may cover any Claims against the Debtor, the Reorganized Debtor, or any shareholder, officer, director, agent, professional, financial advisor or other Person covered by any insurance policy maintained by the Debtor.

## 8.6 **Release of Liens**.

 Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with the Plan, all mortgages, deeds of trust, Liens or other security interests against the Property of the Estate shall be released on the Effective Date.

## 8.7 **Exemption from Stamp or Similar Taxes**.

 In accordance with Bankruptcy Code § 1146(c): (a) the issuance, distribution, transfer or exchange of Reorganized Debtor's equity interests or other property of the Debtor's Estate; (b) the creation, modification, consolidation or recording of any deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of, or on in connection with, this Plan or the Confirmation Order; (c) the making, assignment, modification or recording of any lease or sublease; or (d) the making, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, the Confirmation Order, or any transaction contemplated by any of the foregoing shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax or

stamp act or real estate transfer or mortgage recording tax, or any governmental assessment. The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

### 8.8    **Recordable Order.**

Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form and shall be accepted by any recording officer for filing and recording purposes without further or additional orders when certified by the Clerk of the Bankruptcy Court.

### 8.9    **Effectuating Documents and Further Transactions.**

The Reorganized Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE 9
## CONDITIONS PRECEDENT

### 9.1    **Conditions to the Effective Date.**

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless, and until, each of the following conditions have been satisfied by the Debtor or, if applicable, waived, in writing by the Debtor and the New Equity:

   a. The Confirmation Order, in a form acceptable to the Debtor, shall have become a Final Order; *provided, however*, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Debtor, unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the option of the Debtor, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order;

   b. The Confirmation Order requires the creation of the Trust in order for the Trust to meet the requirements of I.R.C. 468B to be a Qualified Settlement Fund.

   c. No request for revocation of the Confirmation Order under Bankruptcy Code § 1144 has been made, or, if made, remains pending.

   d. Entry into an employment and non-compete agreement with Jones acceptable to the Debtor and the Subchapter V Trustee

   e. The Debtor has Sufficient Cash on the Effective Date to pay in full the Allowed Non-Ordinary Administrative Expenses, the Priority Tax Claims and the Initial Trust Funding.

   f. The Reorganized Debtor has retained professional management to operate its business during the Plan Period.

### 9.2    **Waiver of Conditions to Effectiveness.**

The Debtor, in its sole discretion, may waive any condition to effectiveness in Section 9.1 of this Plan by filing a notice of such waiver with the clerk of the Bankruptcy Court.

### 9.3    **Non Occurrence of the Effective Date.**

In the event that the Effective Date does not occur, all parties shall be returned to the position they would have held had the Confirmation Order not been entered, and nothing in this Plan, any Plan Document, or any pleading or statement in court shall be deemed to constitute an admission or waiver of any sort or in any way to limit, impair, or alter the rights of any Person.

9.4 **Notice to Bankruptcy Court.**

Promptly after the Effective Date, Reorganized Debtor shall file with the Clerk of the Bankruptcy Court a notice that the Plan has become effective; *provided, however*, that failure to file such notice shall not affect the effectiveness of the Plan or the rights and substantive obligations of any entity hereunder.

**ARTICLE 10**
**PROCEDURES FOR DISPUTED CLAIMS**

10.1 **Generally**.

Except as otherwise provided in the Plan, all Claims against the Debtor that are disputed as of the Effective Date shall be subject to the following procedures in this Article 10:

10.2 **Objections to Claim**.

Except as is otherwise provided for with respect to Administrative Expense Claims, or as otherwise ordered by the Bankruptcy Court, objections to Claims and Equity Interests shall be prosecuted as follows:

10.2.1 Pre-Effective Date Objections. Prior to the Effective Date, any party entitled to do so under the Bankruptcy Code or order of the Court may file and prosecute objections to Claims. The failure of the Debtor prior to Confirmation to object to a Claim for purposes of voting on the Plan shall in no way be deemed to be a waiver of the right of Reorganized Debtor or Subchapter V Trustee to object to such Claim in whole or in part.

10.2.2 Post Effective Date Objections. After the Effective Date, objections to Claims may be made exclusively by the Reorganized Debtor and/or the Trustee. Either the Reorganized Debtor or the Trustee may bring an objection to any Claim and may join in any objection to Claim asserted by the other.

10.3 **Time to File Objections to Claim**.

The Reorganized Debtor or Trustee shall file any Objection to Claim as soon as practicable, but in no event later than the later of (a) sixty (60) days after the later of the Effective Date or the Bar Date or (b) other date set by the Court. The filing, prosecution, settlement, or withdrawal of all objections to Claims after the Effective Date are reserved to the sound discretion of Reorganized Debtor and Trustee; *provided that* (x) any settlement of an objection to Claim shall require the consent of the party that brought the objection, (y) any settlement of an objection to Claim of a Class 1, Class 2, Class 3-A, Class 3-B, Class 3-C, or Class 4 Claim or Interest by the Debtor (other than through this Plan) shall require the consent of the Trustee, and (z) any settlement an Ordinary Course Administrative Expense Claim shall require the consent of the Reorganized Debtor.

10.4 **Disputed Claim Reserve**.

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by a Final Order of the Bankruptcy Court, the Disbursing Agent Trustee shall, consistent with and subject to Bankruptcy Code § 1123(a)(4), with respect to

each applicable class of Claims against the Debtor, retain in the applicable Disputed Claims Reserve for such Class in an aggregate amount equal to the distributions that would have been made to holders of Disputed Claims of such Class as if such Disputed Claims were Allowed Claims against the Debtor, in each case in an amount equal to the least of (i) the filed amount of such Disputed Claims, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claims, and (iii) such other amounts as may be agreed upon by the holders of such Disputed Claims and the Disbursing Agent.

10.5    **Interest on Claims**.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## ARTICLE 11
## PROVISIONS GOVERNING DISTRIBUTIONS

11.1    **Distributions for Allowed Claims and Equity Interests**.

No distributions shall be made upon any Claim or Equity Interest except to Allowed Claims and Equity Interests, whether allowance results from: (i) the provisions of the Code; (ii) the entry of a Final Order on an objection to a Claim or Equity Interest; (iii) the determination of an objection to Claim or Equity Interest contained in an adversary proceeding or other pending litigation which the Court has directed to liquidate the Claim of a Creditor or Equity Interest holder; (iv) through stipulation entered into between Reorganized Debtor, the Trustee and a Creditor or holder of an Equity Interest; (v) through estimation pursuant to Bankruptcy Code § 502(c), or (vi) under the express terms of the Plan. Nothing herein shall preclude the payment of the Debtor's operating expenses without Court order.

11.2    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

11.1.1  Delivery of Distributions in General. Distributions to holders of Allowed Claims shall be made at the addresses set forth in the Proofs of Claim; (ii) the Debtor's Schedules; or (iii) other records of Reorganized Debtor at the time of the distribution.

11.2.1  Undeliverable and Unclaimed Distributions.

11.2.1.1    *Holding and Investment of Undeliverable and Unclaimed Distributions*. If the distribution to any holder of an Allowed Claim is returned to Reorganized Debtor or Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such holder unless and until the Reorganized Debtor or Disbursing Agent is notified in writing of such holder's then-current address. Undeliverable and unclaimed distributions shall be held by the Disbursing Agent as an "Unclaimed Distribution Reserve."

11.2.1.2    *After Distributions Become Deliverable*. The Disbursing Agent shall make all distributions that have become deliverable or have been claimed after a distribution without interest.

11.2.1.3    *Failure to Claim Undeliverable Distributions*. Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent, or the Trust Contributions. In such cases, the Pro Rata Share of any Cash or other property held in the Unclaimed Distribution Reserve for distribution on account of such Claims shall be distributed to the Reorganized Debtor. Nothing contained in the Plan shall require anyone to attempt to locate any holder of an Allowed Claim.

## 11.3    **Withholding and Reporting Requirements**.

In connection with the Plan and all distributions thereunder, Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent shall provide the Reorganized Debtor with a list of all distributions made from Trust Contributions to allow the Reorganized Debtor to comply with such withholding and reporting requirements.

## 11.4    **IRS Form W-9**.

Within 3 business days of the Effective Date, the Reorganized Debtor will mail Internal Revenue Service Form W-9 to each Creditor to whom a Cash distribution is to be made. Notwithstanding anything to the contrary in this Plan, the Disbursing Agent shall withhold any distribution required to be made to a non-governmental Creditor, until that Creditor prepares, executes, and returns to the Disbursing Agent or the Reorganized Debtor, as appropriate, the Internal Revenue Service Form W-9, unless the Reorganized Debtor informs the Disbursing Agent in writing that the Reorganized Debtor has an Internal Revenue Service Form W-9 for the Creditor on file.

## 11.5    **Setoffs**.

The Reorganized Debtor and/or Disbursing Agent may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtor of any such Claim that the Debtor may have against such holder.

## 11.6    **Payments and Distributions with Respect to Disputed Claims**.

No payment or distribution under the Plan shall be made on account of any Claim unless and until such Claim becomes an Allowed Claim by Final Order of the Court.

## ARTICLE 12
## EXECUTORY CONTRACTS

## 12.1    **Executory Contracts Rejected**.

Except all Executory Contracts and unexpired leases assumed by the Confirmation Order or by a separate order of the Bankruptcy Court order, all other Executory Contracts and unexpired leases shall be rejected upon confirmation of this Plan

12.2    **Filing Proofs of Claim for Rejection Damages**.

Any Claims arising from the rejection of an Executory Contract or unexpired lease by this Plan shall be evidenced by a Proof of Claim filed on or before the date that is thirty (30) days after the Effective Date. A failure to file a Proof of Claim for Claims arising from the rejection of an Executory Contract or unexpired lease within such period will result in the Claim in question being discharged and its holder forever barred from asserting such Claim against the Debtor, its Estate, the Reorganized Debtor, or the Trust Contributions.

## ARTICLE 13
## EFFECT OF CONFIRMATION

13.1    **Binding Effect**.

Except as otherwise provided in Bankruptcy Code § 1141(d)(3), and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest the Debtor and inure to the benefit of, and be binding on, any such holder's respective successors and assigns, regardless of whether any Claim or Interest of such holder is impaired under this Plan or whether such Holder has accepted this Plan.

13.2    **Discharge of Claims against and Interests in the Debtor**.

If the Debtor's Plan is confirmed under § 1191(a), upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any successor, assign and affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtor, to the fullest extent permitted by Bankruptcy Code § 1141, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.

If the Debtor's Plan is confirmed under § 1191(b), the Debtor will be discharged as soon as practicable after completion by the Debtor of all payments due within 5 years after the Effective Date. The Court shall grant the Debtor a discharge pursuant to § 1192 of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of the Code and provided for in the Plan.

Except as otherwise provided in this Plan, upon discharge, all such holders of Claims against or Interests in the Debtor, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to Bankruptcy Code § 105, 524 and 1141, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, the Reorganized Debtor.

13.3    **Pre-Confirmation Injunctions, Stays, Stipulations, and Discovery Orders**.

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Case, whether under Bankruptcy Code §§ 105 or 362 or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

13.4    **Injunction against Interference with Plan**.

SUBJECT TO SECTION 17.2 OF THE PLAN REGARDING WITHDRAWAL AND REVOCATION OF THE PLAN, UPON ENTRY OF THE CONFIRMATION ORDER, ALL

HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR, AND OTHER PARTIES IN INTEREST WHO RECEIVED ACTUAL OR CONSTRUCTIVE NOTICE OF THIS PLAN PRIOR TO THE CONFIRMATION HEARING, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

13.5 **Plan Injunction**.

EXCEPT AS OTHERWISE PROVIDED IN THIS PLAN OR IN THE CONFIRMATION ORDER, AS OF THE ENTRY OF THE CONFIRMATION ORDER BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE, WITH RESPECT TO ANY SUCH CLAIM OR INTEREST, PERMANENTLY ENJOINED AFTER THE ENTRY OF THE CONFIRMATION ORDER FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING, DIRECTLY OR INDIRECTLY, THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR THE PROPERTY OF ANY OF THE FOREGOING, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (I) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (II) ENFORCING, LEVYING, ATTACHING (INCLUDING ANY PREJUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING IN ANY MANNER OR BY ANY MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR THEIR PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (II) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (III) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (III) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (IV) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN; AND (V) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY, OR IS INCONSISTENT, WITH THE PROVISIONS OF THIS PLAN; *PROVIDED*, *HOWEVER*, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS THE DEBTOR OR ITS ESTATE FROM EXERCISING THEIR

RIGHTS, OR OBTAINING BENEFITS, PURSUANT TO, AND CONSISTENT WITH, THE TERMS OF THIS PLAN.

13.6 **Third Party Temporary Injunction.**

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ALEX E. JONES SHALL NOT BE DISCHARGED AND RELEASED FROM LIABILITY, IF ANY, FOR CLAIMS AND DEBTS UNDER THIS PLAN. HOWEVER, ABSENT FURTHER COURT ORDER UPON NOTICE AND HEARING, THE EXCLUSIVE REMEDY FOR PAYMENT OF ANY CLASS 3-B OR CLASS 3-C CLAIM OR DEBT ADDRESSED IN THE PLAN, SO LONG AS THE PLAN IS NOT IN UNCURED DEFAULT, SHALL BE THE PLAN. CONSEQUENTLY. UPON CONFIRMATION OF THE PLAN, ALL HOLDERS OF CLASS 3-B OR CLASS 3-C CLAIMS AGAINST THE DEBTOR SHALL BE TEMPORARILY ENJOINED FROM TAKING ANY ACTION TO PROSECUTE OR COLLECT ALL OR ANY PORTION OF THEIR CLAIM AGAINST ALEX JONES SO LONG AS THE PLAN IS NOT IN UNCURED DEFAULT. UNLESS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, AN UNCURED DEFAULT SHALL MEAN A DEFAULT THAT REMAINS UNCURED FOR SIXTY (60) DAYS AFTER RECEIPT BY THE REORGANIZED DEBTOR OF WRITTEN NOTICE FROM ANY CREDITOR AFFECTED BY SUCH DEFAULT.

TO THE EXTENT NECESSARY ANY APPLICABLE STATUTE OF LIMITATIONS AGAINST COLLECTION FROM ALEX JONES IS SPECIFICALLY TOLLED FROM THE PERIOD OF TIME FROM THE PETITION DATE UNTIL THE DATE UPON WHICH THE DEBTOR FAILS TO TIMELY CURE ANY WRITTEN NOTICE OF DEFAULT AS SET FORTH IN THE PLAN. FAILURE BY THE DEBTOR TO CURE ANY WRITTEN NOTICE OF DEFAULT AS SET FORTH IN THE PLAN SHALL RESULT IN THE DISSOLUTION OF THE INJUNCTION GRANTED HEREUNDER AS TO THE AFFECTED CREDITOR WITHOUT FURTHER ORDER OF COURT.

13.6 **Exculpation**.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER THE DEBTOR, REORGANIZED DEBTOR, NOR ANY OF THEIR RESPECTIVE PARTNERS, GENERAL PARTNERS, MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR PROFESSIONALS HAVE OR MAY INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE MEMBERS OR FORMER MEMBERS, AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE CHAPTER 11 CASE, THE NEGOTIATION AND PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN (THE "CHAPTER 11 ACTIVITIES"), EXCEPT FOR THEIR ACTS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION, AND IN ALL RESPECTS ARE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES IN CONNECTION WITH THE CHAPTER 11 ACTIVITIES. NO HOLDER OF A CLAIM OR EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST,

INCLUDING THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES, HAVE ANY RIGHT OF ACTION AGAINST THE DEBTOR, REORGANIZED DEBTOR, OR ANY OF THEIR RESPECTIVE PARTNERS, GENERAL PARTNERS, OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AGENTS, ADVISORS OR PROFESSIONALS FOR ANY ACT OR OMISSION IN CONNECTION WITH THE CHAPTER 11 ACTIVITIES, EXCEPT FOR THEIR ACTS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION.

13.7    **Injunction Related to Exculpation**.

TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CAUSES OF ACTION EXCULPATED PURSUANT TO THIS PLAN.

# ARTICLE 14
# JURISDICTION

14.1    **Retention of Jurisdiction**.

The Bankruptcy Court shall retain and have all the jurisdiction conferred upon it by Bankruptcy Code, including all amendments thereof now existing or hereafter arising, and all amendments made to Title 28 of the United States Code after October 1, 1979. Without limiting the foregoing in any way, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case after the Confirmation Date in respect to the following matters to the fullest extent under applicable law:

    a.    To enable any party in interest (including the Reorganized Debtor) to consummate all proceedings that it may bring prior to the Confirmation Date to set aside Liens, or to recover any preferences, transfers, assets, Claims or damages to which said party may be entitled, or to reject any contracts and recover any property under the provisions of the Bankruptcy Code or other federal or state law;

    b.    To hear and determine all Claims, estimation of claims, and objections to Claims, including Claims arising from the rejection of any Executory Contract and any objections which may be made thereto;

    c.    To liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

    d.    To adjudicate all Claims to any Lien on any Property of the Estate or any proceeds thereof;

    e.    To recover all assets and Property of the Estate, wherever located, to the extent necessary for the consummation of the Plan;

    f.    To Allow, Disallow, or otherwise adjudicate any Claim;

    g.    To resolve any disputes pertaining to the terms and conditions of the sale of any Property of the Estate;

    h.    To resolve any disputes pertaining to the business operations of the Debtor during the pendency of the Chapter 11 Case;

    i.   To enter any orders which may be necessary or appropriate to modify, carry out or enforce the provisions of the Plan, including the injunctions provided for in the Plan;

    j.   To determine any defaults under the Plan, and the consequences of such default;

    k.   To resolve any disputes over the meaning of any provision of the Plan;

    l.   To make such determinations as are specifically provided in the Plan;

    m.  To hear and determine all requests for compensation and/or reimbursement of expenses which may be required under the Code, and not otherwise dispensed with under the Plan;

    n.   To grant the Debtor a discharge pursuant to § 1192 of the Bankruptcy Code; and

    o.   To enter a final decree pursuant to Bankruptcy Code § 350 and Bankruptcy Rule 3022.

**14.2**    **Failure of Bankruptcy Court to Exercise Jurisdiction**.

If the Bankruptcy Court abstains or exercises discretion not to hear any matter within the scope of its jurisdiction, nothing herein shall prohibit or limit the exercise of jurisdiction by any other tribunal having competent jurisdiction over such matter.

## ARTICLE 15
## MODIFICATION OF PLAN

**15.1**    **Pre-Confirmation Modifications**.

The Debtor may propose amendments or modifications to the Plan at any time prior to the Confirmation Date, with leave of the Court and upon notice pursuant to Bankruptcy Code § 1193(a) and Bankruptcy Rule 3019.

**15.2**    **Post-Confirmation Modifications**.

After the Confirmation Date, Modification of the Plan is permitted only upon Court order and only as authorized under Bankruptcy Code § 1193.

## ARTICLE 16
## PLAN DEFAULTS

**16.1**    **Events of Default**.

The occurrence of any of the following shall constitute an event of default (hereinafter referred to as an "Event of Default"):

16.1.1  <u>Failure to Pay</u>.  The failure by the Debtor or the Reorganized Debtor to pay, when due, any payment required to be paid pursuant to the terms of this Plan shall be an Event of Default as to such payments, if the payment is not cured within sixty (60) calendar days after mailing written notice of default from such creditor, the Disbursing Agent or the Trustee to the Reorganized Debtor. Any default notice, inquiry, or other formal communication pursuant to the Plan shall be mailed by certified mail, return receipt requested to the addresses identified in Section 17.10 of the Plan.

16.1.2  <u>Termination of Employment of Alex Jones</u>.  The Reorganized Debtor, at its sole discretion, may declare an Event of Default upon the termination of Alex Jones' employment with the Reorganized Debtor by providing sixty (60) calendar days' notice of such termination to the

Disbursing Agent and the Trustee. An Event of Default shall occur upon the expiration of the notice period, unless waived by the Reorganized Debtor prior to the expiration of the notice period.

16.1.3 <u>Change of Control</u>. Upon the sale or transfer (whether voluntary or involuntary) of all or a majority of the Reorganized Debtor Common Stock after the Effective Date, the Reorganized Debtor may declare an Event of Default, at its sole discretion, by providing sixty (60) calendar days' notice of such termination to the Disbursing Agent and the Trustee. An Event of Default shall occur upon the expiration of the notice period, unless waived by the Reorganized Debtor prior to the expiration of the notice period.

16.1.4 <u>Dischargeability</u>. In the event the Fifth Circuit Court of Appeals determines by Final Order that a corporate (non-individual) debtor filing for relief under subchapter V of Chapter 11 of the Code, is not exempt from exceptions to discharge of debts pursuant to 11 U.S.C. §523(a), the Reorganized Debtor, at its sole discretion, may declare an Event of Default by providing sixty (60) calendar days' notice to the Disbursing Agent and the Trustee. An Event of Default shall occur upon the expiration of the notice period unless all of the Class 3-B Creditors consent to the Discharge of their Claims in accordance with Section 13.2 of the Plan. Such consents shall be in writing, signed by the Claimant, and delivered to the Reorganized Debtor, the Disbursing Agent and the Trustee prior to the expiration of the notice period.

16.2 **Remedies**. Upon the occurrence of an Event of Default which is not timely cured or waived, the Reorganized Debtor shall file a motion with the Court seeking to convert the case to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE 17
## GENERAL PROVISIONS

17.1 **Revocation, Withdrawal or Non-Consummation**.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, or if confirmation or consummation does not occur, then: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any other Person, or (iii) constitute an admission of any sort by the Debtor or any other Person.

17.2 **Severability of Plan Provisions**.

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of

the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

17.3    **Successors and Assigns**.

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

17.4    **Final Decree**.

The Reorganized Debtor or the Disbursing Agent shall file an application for entry of a final decree upon the distribution of all Trust Contributions.

17.5    **Notices**.

Unless otherwise provided herein, all notices or demands required or permitted hereunder shall be deemed to have been duly given and served when made in writing and (a) deposited in the United States Mail in an envelope addressed to the last known address of the noticed party, with postage prepaid or (b) sent by electronic mail to an address indicated on a Proof of Claim or other document filed in the Bankruptcy Case. Any notices to be provided to the Reorganized Debtor shall be addressed as follows:

To the Reorganized Debtor:

> Attn: Patrick Magill
> Chief Restructuring Officer
> 3019 Alvin DeVane Blvd.
> Austin, Texas 78741

With a copy to the attorneys for the Reorganized Debtor:

> Attn: Raymond W. Battaglia
> Law Offices of Raymond W. Battaglia
> 66 Granburg Circle
> San Antonio, Texas 78218
> rbattaglialaw@outlook.com

The Reorganized Debtor may amend the notice parties and addresses at any time by filing a change of address notice with the Court and serving a copy to the Trustee and the Disbursing Agent.

17.6    **Governing Laws**.

The Plan shall be governed by the laws of the State of Texas and the laws of the United States, as may be applicable.

17.7    **Cramdown**.

The Debtor may request Confirmation of the Plan, under Bankruptcy Code § 1129(b).

17.7.1 Subchapter V modifies the rules under which classes of claims can be crammed down. Subchapter V permits a court to disregard Bankruptcy Code § 1129(a)(10) and cram down a plan even if no impaired class of claims accepts the plan. Specifically, Bankruptcy Code § 1191(b) provides that if all the applicable requirements of Bankruptcy Code § 1129(a) are met other than subsections (a)(8), (a)(10), and (a)(15), the Bankruptcy Court can confirm the plan if:

      a.  The plan does not discriminate unfairly against any impaired, non-consenting class.

      b.  Is fair and equitable regarding each class of impaired claims or interests that has rejected the plan.

17.7.2 The Debtor reserves the right to modify the Plan to the extent, if any, required for confirmation pursuant to Bankruptcy Code § 1129(b), as modified by Bankruptcy Code § 1191.

**DATED:**     November 17, 2023.

                  Respectfully submitted,

                  **FREE SPEECH SYSTEMS LLC.**

                  By: Patrick Magill
                  Its: Chief Restructuring Officer

Through its counsel:

                  LAW OFFICES OF RAY BATTAGLIA, PLLC

                  */S/ RAYMOND W. BATTAGLIA*
                  Raymond W. Battaglia
                  State Bar No. 01918055
                  rbattaglialaw@outlook.com
                  66 Granburg Circle
                  San Antonio, Texas 78218
                  Tel. (210) 601-9405

                  *Counsel to the Debtor and Debtor-In-Possession*

# Exhibit A

# Causes of Action

Pursuant to the Amended Plan of Reorganization for Free Speech Systems, LLC, filed on November____, 2023 (as may be amended, the "Plan")[3] , the Debtor and the Trust fully reserve, preserve and retain for all purposes, including, without limitation, for continued or subsequent assertion, prosecution, compromise and/or adjudication following the Effective Date, all Causes of Action, as defined under the Plan (including but not limited to counterclaims, cross claims and affirmative defenses), other than those that are expressly waived, relinquished, released, compromised or settled in the Plan or any prior Final Order, for the benefit of the Trust (collectively, the "Retained Causes of Action"). Therefore, no preclusion doctrine, including but not limited to the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action (or any of them) on or after the Confirmation Date or Effective Date. No person nor entity may rely on any alleged omission from or in the Plan, the Bankruptcy Case or this Exhibit as to the specific identification of any particular Cause of Action or potential defendant(s) as any indication that the Trust will not pursue any and all available Causes of Action against such defendant(s), or for purposes of invoking any of the foregoing doctrines of preclusion, release, waiver, estoppel or laches.

## I.        Pending Causes of Action

The PQPR adversary proceeding number 23-03127 filed with the Bankruptcy Court.

## II.       Causes of Action Related to Avoidance Actions

All Causes of Action in or pursuant to which property is or may be recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, and/or a transfer is avoidable under sections 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code. Such Causes of Action, specifically include, but are not limited to, any and all potential preference claims under 11 U.S.C. § 547 related to transfers made within the 90 days before the Petition Date, or to an insider made between the 90 days and one year before the Petition Date, on account of an antecedent debt owed by the Debtors as identified by the Debtors in its Statement of Financial Affairs, including, but not limited to, Causes of Action against the potential defendants. All Causes of Action to avoid and/or recover the value of any and all alleged fraudulent transfers as may be asserted under either 11 U.S.C. § 548 or 11 U.S.C. § 544 and any state law fraudulent transfer statute applicable thereunder, including but not limited to any and all transfers identified by the Debtor in their Statement of Financial Affairs (specifically including all transfers previously identified in this paragraph) and any transfers made to insiders, including, but not limited to, the PQPR Adversary.  Additionally, Causes of Action include Chapter 5 claims against American Express, Neil Heslin, Scarlet Lewis, Leonard Pozner, Marcel Fontain and Farrar & Ball, LLP. No person nor entity may rely on its omission from the

---

[3] Capitalized terms not otherwise defined herein shall have the definitions ascribed to them in the Plan.

Debtors' respective Statements of Financial Affairs or herein as any indication that the Trust will not pursue any and all available Causes of Action.

## III.    Other Causes of Action

All Causes of Action which the Debtor has based in whole or in part upon and contracts which the Debtor has any rights against and counterparty to a contract with the Debtor for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; or failure to meet other contractual obligations.  Including, but not limited to Claims and Causes of Action against Tim Fruge, Patrick Riles, Melinda Flores, Auriam Services, LLC, CMC Consulting, LLC, Elevated Solutions Group, LLC, and their respective members, shareholders, officers or directors or any of their affiliated entities that engaged in business activities with the Debtor.

Professional malpractice claims against Robert Barnes and Barnes Law, LLP.

**Exhibit B**


**Trust Distribution Procedures**

## FREE SPEECH SYSTEMS SETTLEMENT TRUST
## DISTRIBUTION PROCEDURES

The Free Speech Systems Settlement Trust Distribution Procedures (the "TDP") contained herein provide for satisfying the claims of Trust Beneficiaries ("Beneficiaries"). Payment of Beneficiaries' Allowed Claims are provided in and required by the Free Speech Systems, LLC Amended Plan of Reorganization (the "Plan") and the Free Speech Systems Settlement Trust Agreement (the "Trust Agreement"). The Plan and Trust Agreement establish the Free Speech Systems Settlement Trust (the "Trust"). The Trustee of the Trust (the "Trustee") shall implement and administer this TDP in accordance with the Trust Agreement and the Plan.

## SECTION I

## Introduction

**1.1.    Purpose.**   This TDP has been adopted pursuant to the Trust Agreement and the Plan. It is designed to provide as fair and equitable treatment as possible for the claims of all Beneficiaries.

**1.2.    Interpretation.**    Except as expressly provided below, nothing in this TDP shall be deemed as an admission of any kind by the Debtor or any associates, representatives, successors or assigns of the Debtor. Nothing in this TDP shall confer any legal rights or benefits to claimants beyond the right to receive the equitable portion of funds articulated in the provisions herein. The rights and benefits expressly provided herein to Beneficiaries shall vest in such holders as of the Effective Date.

**1.3.    Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan. The following capitalized terms shall have the meanings set forth below:

1.3.1.  **"Adjusted Claims Payment Ratio"** means the adjustment of the Trust Beneficiaries' Claims Payment Ratio by the Trustee to account for changes to the Pro Rata Share resulting changes to the total Class 3-B Claims reflected on Exhibit G to the Plan.

1.3.2.  **"Claims Payment Ratio"** means the proportion each Allowed Class 3-B Claim bears to the total Class 3-B Claims as set forth in Exhibit G to the Plan, whether such Claims are Allowed or Disputed.

1.3.3.  **"Class 3-B Disputed Claims Reserve"** means the account established by the Trust for distributions that would have been made to holders of Disputed Class 3-B Claims as if such Disputed Claims were Allowed Claims against the Debtor, based on the Claims Payment Ratio.

1.3.4.  **"Distribution Date"** means the date on which the Trustee distributes, transfers, or pays out the Pro Rata Share of the Beneficiaries' Allowed Claims or Resolved Disputed Claims to the respective Beneficiaries, the date of which shall be within a reasonable time period after the Trust receives its annual Trust Contribution from the Debtor, but shall be no more than 90 days after the Trust receives the Trust Contribution.

1.3.5.  **"Distributable Funds"** means Funds Received less Trust Expenses.

1.3.6.  **"Funds Received"** means the aggregate total of:

> (i)  the Initial Trust Funding, as defined by the Plan;
> (ii) the Trust Contributions from the Debtor, as defined by the Plan;
> (ii) Trust income, including interest earned;
> (iii) donations received;
> (iv) future judgments based upon Causes of Action the Trust has the authority to prosecute; and

(v) any other funds transferred to the Trust from any source both foreseen and unforeseen.

**1.3.7.** **"Maximum Annual Payment"** means the maximum annual amount paid out to Trust Beneficiaries from the Funds Received, calculated so that the application of Trust funds over its life shall correspond with the needs created by the Claims of the Beneficiaries.

**1.3.8.** **"Non-Participating Beneficiary"** means a Beneficiary who elects not to receive Alternative Treatment under the Plan.

**1.3.9.** **"Participating Beneficiary"** means a Beneficiary who affirmatively elects Alternative Treatment under the Plan.

**1.3.10.** **"Resolved Disputed Claim"** means a Disputed Claim which converts to an Allowed Claim upon the occurrence of either (a) entry of a Final Order Allowing the Claim in a liquidated amount; or (b) a settlement agreement between the Claimant and the Reorganized Debtor, Allowing the Claim in a liquidated amount which is approved by the Bankruptcy Court by Final Order pursuant to Rule 9019 of the Bankruptcy Rules of the Claim as an Allowed Claim.

## SECTION II

### Overview

**2.1** **Trust Goals**. The goal of the Trust is to make certain funds available to Beneficiaries. This TDP furthers that goal by setting forth proposed procedures for processing and paying funds to Beneficiaries. The Trust is intended to qualify as a Qualified Settlement Fund within the meaning of section 1.468B-1, et seq., of the Treasury Regulations promulgated under section 468B of the IRC. Generally, the TDP calls for annual payments to Participating

Beneficiaries beginning on the Initial Distribution Date, based on the Participating Beneficiaries' Pro Rata Share of then available amounts in the Trust. Distributions on account of Non-Participating Beneficiaries will be held in a reserve account ("Class 3-B Disputed Claims Reserve") pending Allowance of their claim by Final Order. Class 3-C Creditors shall receive payments after all Class 3-B Creditors' claims have been satisfied (both Participating and Non-participating). Payments to individual Beneficiaries shall not exceed their Allowed Claim. The Beneficiary may either be the person who received the judgment claim or a duly appointed representative, successor, or heir.

**2.2    Trust Funding.**    The Trust shall be funded by the Trust Assets as defined in the Plan, plus any Trust income, donations, and future judgments based upon Causes of Action the Trust has the authority to prosecute (collectively "Funds Received"). From the Funds Received, amounts shall be set aside for Trust Expenses. The Funds Received less Trust Expenses shall equal the Distributable Funds ("Distributable Funds"). Distributions to Allowed Class 3-B Claims and to the Class 3-B Disputed Claims Reserve shall be paid from the Distributable Funds.

**2.3    Trust Claim Liquidation Procedures.**    Beneficiary Claims may become Allowed Claims either by (i) electing Alternative Treatment under the Plan; (ii) entry of a Final Order Allowing the Claim in a liquidated amount; or (iii) a settlement agreement between the Claimant, the Reorganized Debtor Allowing the Claim in a liquidated amount which is approved by the Bankruptcy Court by Final Order pursuant to Rule 9019 of the Bankruptcy Rules of the Claim as an Allowed Claim.

**2.3.1    Election.**    Beneficiaries who are eligible and elect to receive Alternative Treatment in accordance with the Plan will participate in receiving initial payments from the Trust. If a Beneficiary affirmatively elects Alternative Treatment under the Plan

("Participating Beneficiary"), the Participating Beneficiary's Claim shall be deemed to be an Allowed Claim in the Amounts set forth in Exhibit G to the Plan.

      **2.3.2**     **Settlement.**  A Non-participating Beneficiary's Claim shall become an Allowed Claim upon an Agreed Settlement between the Claimant and the Reorganized Debtor which has been approved in accordance with Bankruptcy Rule 9019 by Final Order of the Bankruptcy Court after notice and hearing.

      **2.3.3**     **Allowance by Final Order.**  If an eligible Beneficiary does not elect to receive Alternative Treatment ("Non-participating Beneficiary"), the Non-Participating Beneficiary Claim shall become an Allowed Claim upon entry of a Final Order which determines the liquidated amount of the Non-participating Beneficiary's Claim, if any.

## SECTION II

## Distributions from the Trust

      **3.1**     **Trust Determination of Maximum Annual Payment**.    At any given time and based upon the Funds Received, the Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all Class 3-B Beneficiaries as similarly as possible. In each year, the Trust will be empowered to pay out all of the Distributable Funds, calculated so that the application of Trust funds over its life shall correspond with the needs created by the Claims of the Beneficiaries (the "Maximum Annual Payment"). The Trust's distributions to Class 3-B Beneficiaries for that year shall not exceed the Maximum Annual Payment determined for that year**.**

      **3.2**     **Claims Payment Ratio.**    The Trust shall pay a Pro Rata Share of Distributable Funds to Allowed Class 3-B Claims on each Distribution Date.  Pro Rata Share shall be determined based on the proportion each Allowed Class 3-B Claim bears to the total Class 3-B Claims as set

forth in Exhibit G to the Plan. The Trustee shall with respect to Class 3-B Claims, retain in the Class 3-B Disputed Claims Reserve the aggregate amount equal to the distributions that would have been made to holders of Disputed Class 3-B Claims as if such Disputed Claims were Allowed Claims against the Debtor, in each case in an amount equal to the least of (i) the filed amount of such Disputed Claims, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claims, and (iii) such other amounts as may be agreed upon by the holders of such Disputed Claims and the Trustee.

3.3     **Disputed Claims Allowance.**     No distributions shall be paid on account of Disputed Claims. Upon Allowance of a Disputed Claims ("Resolved Disputed Claim") the Trustee shall make a distribution on the first Distribution Date following the date upon which the Disputed Class 3-B Claim becomes an Allowed Claim. The distribution to any Resolved Disputed Claim shall include funds held in the Class 3-B Disputed Claims Reserve on account of the Class 3-B Disputed Claim.

3.4     **Periodic Adjustment of Payment Ratio.**     On each Distribution Date the Trustee shall adjust the Claims Payment Ratio to account for changes to the Pro Rata Share resulting changes to the total Class 3-B Claims reflected on Exhibit G to the Plan (the "Adjusted Claims Payment Ratio"). At each Distribution Date, the Trustee shall also reconcile for prior distributions to Allowed Class 3-B Claims based upon the Adjusted Claims Payment Ratio.

## SECTION IV

## TDP Administration.

**4.1    Payment of Claims.**  The Trust shall only make distributions to Holders of Allowed Claims.

**4.2    Order of Priority.**    No distributions shall be made to Holders of Class 3-C until all Claims of Class 3-C Creditors have been paid in full or disallowed.

**4.3    Delivery of Distributions**. Distributions to Beneficiaries shall be made at the addresses set forth in the Proofs of Claim; (ii) the Debtor's Schedules; or (iii) other records of the Trust at the time of the distribution.

**4.4    Withholding and Reporting Requirements.**    The Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

## SECTION V

## Miscellaneous

**5.1    Amendments.**    Except as otherwise provided herein and in the Plan the Trustee may amend, modify, delete, or add to any provisions of this TDP, provided the Trustee first obtains the consent of the Reorganized Debtor.

**5.2    Severability.** Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP.

Page **7** of **8**

**5.3** **Governing Law.** This TDP shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to Texas conflict of laws principles.

# Exhibit C

# Trust Agreement

# FREE SPEECH SYSTEMS SETTLEMENT TRUST AGREEMENT

This Free Speech Systems Settlement Trust Agreement ("Trust Agreement"), dated and effective as of the _____ day of _____, 2024 is entered into among Free Speech Systems, LLC ("the Debtor") and the Trustee ("Trustee") identified on the signature page thereof and appointed at Confirmation pursuant to the Plan thereby establishing this trust (the "Trust").[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan.

WHEREAS, at the time of the entry of the order for relief in the Chapter 11 Case, the Debtor was named as a defendant in defamation and emotional injury actions related to statements made regarding the Sandy Hook Elementary school shooting in 2012; and

WHEREAS, at the time of creation of this Trust Agreement, there were over $1.4 billion dollars of judgments against the Debtor; and

WHEREAS, the Debtor has reorganized under the provisions of Chapter 11 of the Bankruptcy Code in a case pending in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), styled as *In re Free Speech Systems, LLC, Debtor,* Chapter 11 (Subchapter V) Case No. 22-60043; and

WHEREAS, the Plan, filed by the Debtor, has been confirmed by the Court; and

WHEREAS, the Plan provides, *inter alia,* for the creation of the Free Speech Systems Settlement Trust; and

WHEREAS, pursuant to the Plan, the Trust is to use the Trust Assets to pay the Trust Beneficiaries' ("Beneficiaries") claims; and

WHEREAS, pursuant to the Plan, the Trust is intended to qualify as a Qualified Settlement Fund ("QSF") within the meaning of section 1.468B-1, *et seq.,* of the Treasury Regulations promulgated under section 468B of the IRC; and

WHEREAS, it is the intent of the Debtor, the Trustee, and the other parties that the Trust be administered, maintained, and operated at all times as a QSF through mechanisms that provide reasonable assurance that the Trust will value, and be in a financial position to pay, all Beneficiaries' Claims, in strict compliance with the terms of this Trust Agreement; and

WHEREAS, the Plan provides, among other things, for the complete treatment of all liabilities and obligations of the Debtor with respect to the Beneficiaries' Claims; and

WHEREAS, the Court has determined that the Trust and the Plan satisfy all the

---

[1] This Trust Agreement is being entered into pursuant to the terms of the Plan of Reorganization of Free Speech Systems, LLC filed in the United States Bankruptcy Court for the Southern District of Texas, Case No. 22-60043 [Docket No. _____] (the "Plan").

prerequisites for the injunctions, provided for in the Plan (the "Injunctions"), and such Injunctions have been entered in connection with the Confirmation Order.

NOW, THEREFORE, it is hereby agreed as follows:

## ARTICLE 1

## AGREEMENT OF TRUST

**1.1     Creation and Name.**   The Debtor hereby creates a trust known as the "Free Speech Systems Settlement Trust," which is the Trust provided for and referred to in the Plan.[2] The Trustee of the Trust may transact the business and affairs of the Trust in the name "Free Speech Systems Settlement Trust."

**1.2     Purpose.**   The purpose of the Trust is to (a) liquidate, resolve and pay Beneficiaries' Claims, to the extent possible (b) preserve and maximize the Trust Assets in order to pay as much of the Beneficiaries' Claims as possible; (c) prosecute or settle certain Causes of Action; and (d) aid in the defense and enforcement of the Injunctions. The Trust shall, at all times, remain qualified as a "qualified settlement fund" under the QSF Law and Section 468B of the Internal Revenue Code.

**1.3     Transfer of Assets.**   Pursuant to the Plan, the Debtor has transferred and assigned the Trust Assets to the Trust, free and clear of any liens or other interests of the Debtor or any creditor, shareholder or other entity. The Debtor shall transfer to the Trust any Trust Assets that may, subsequent to the Effective Date, be received by the Debtor or be required to be paid to the Trust pursuant to the terms of the Plan. The Debtor shall execute and deliver such documents as the Trustee reasonably request to transfer and assign any such Trust Assets. All Assets transferred shall be non-reversionary to the Debtor.

**1.4     Acceptance of Assets and Assumption of Liabilities.**

a)     In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly accept the transfer and assignment to the Trust of the Trust Assets in the time and manner as contemplated in the Plan.

b)     In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly assume all liability for all Beneficiaries' Claims.  Except as otherwise provided in the TDP, the Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding the Beneficiaries' Claims that the Debtor has, or would have had, under applicable law.

c)     In furtherance of the purposes of the Trust, and in addition to the indemnification provided for in Section 4.6 of this Trust Agreement, the Trustee, on behalf of the Trust, hereby indemnify the Debtor from personal liability for: any expenses, costs and fees (including attorneys' fees and costs, but excluding any such expenses, costs and fees incurred prior to the Effective Date), judgments, settlements or other liabilities arising from or incurred in connection with, any claim demand or action based upon a Beneficiary's Claim, including, but not

limited to, indemnification or contribution for Beneficiary Claims prosecuted against the Debtor, but such indemnity shall be solely for the benefit of the Debtor and not for the benefit of third-parties.

d)      Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability or effectiveness of the Injunctions issued and affirmed in connection with the Plan or the Trust's assumption of all liability with respect to Beneficiary Claims.

## ARTICLE  2

## POWERS AND TRUST ADMINISTRATION

**2.1     Powers.**

a)      The Trustee are and shall act as fiduciary to the Trust in accordance with the provisions of this Trust Agreement and the Plan.  The Trustee shall, at all times, administer the Trust and the Trust Assets in accordance with Section 1.2 of this Trust Agreement. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Texas.

b)      Except as otherwise specified herein, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder; provided that the Trustee recognize and acknowledge that the Trust is subject to the continuing jurisdiction of the Bankruptcy Court.

c)      Without limiting the generality of Subsection 2.l(a) above, and except as limited below, the Trustee shall have the power to:

(i)      receive and hold the Trust Assets, and exercise all rights with respect to (including sale of) any or all such assets;

(ii)     invest the monies held from time to time by the Trust;

(iii)    sell, transfer or exchange any or all of the Trust Assets, including but not limited to shares of the Debtor, at such prices and upon such terms as they may consider proper, consistent with the other terms of this Trust Agreement;

(iv)    carry out the Trust's obligations and exercise all rights granted to the Trust under the agreements among the Debtor, the Trust, and Beneficiaries;

(v)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Trust to operate;

(vi)    pay liabilities and expenses of the Trust;

(vii)    establish such funds, reserves and accounts within the Trust estate, as deemed by the Trustee to be useful in carrying out the purposes of the Trust;

(viii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding;

(ix)    establish, supervise and administer the Trust in accordance with the TDP and any exhibits, and administer, amend, supplement or modify the TDP, including its exhibits, in accordance with the terms thereof, a copy of which is annexed hereto as Exhibit B;

(x)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing and forecasting and other consultants or alternative dispute resolution panelists and agents as the business of the Trust requires, and to delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in their discretion, deem advisable or necessary in order to carry out the terms of this Trust;

(xi)    pay employees, legal, financial, accounting, investment, auditing and forecasting, and other consultants, advisors and agents reasonable compensation, including without limitation, compensation at rates approved by the Trustee for services rendered prior to the execution hereof;

(xii)    compensate the Trustee and their respective Agents and reimburse them for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder, including without limitation, costs and expenses incurred prior to the execution hereof;

(xiii)    execute and deliver such instruments as the Trustee consider proper in administering the Trust;

(xiv)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)    in accordance with Section 4.6, indemnify (and purchase insurance indemnifying) the Trustee and the Debtor, and the respective agents of the Trust and the Debtor to the fullest extent that a corporation or trust organized under the law of the Trust's situs is from time to time entitled to indemnify and/or insure such agents and/or parties;

(xvi)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4;

(xvii)    consult with the Debtor at such times and with respect to such issues relating to the conduct of the Trust as the Trustee consider desirable;

(xviii)  make, pursue (by litigation or otherwise), collect, compromise or settle, in its own name or the name of the Debtor, any claim, right, action, or cause of action included in the Trust Assets, before any court of competent jurisdiction; provided that settlement of any action requires the approval of the Bankruptcy Court after notice to the Debtor;

(xix)   merge or contract with other claims resolution facilities that are not specifically created by this Trust Agreement or the TDP, provided that such merger or contract shall not (a) subject the Debtor or any successor in interest to any risk of having any Beneficiary Claim asserted against any of them, or (b) otherwise jeopardize the validity or enforceability of the Injunctions;

d)      The Trustee shall not have the power to guarantee any debt of other Persons, provided however, that the Trustee shall have the power to implement the obligations of the Trust, if any, as required under the Plan.

### 2.2     General Administration.

a)      The Trustee shall act in accordance with the Trust Disbursement Procedure ("TDP").  In the event of an inconsistency between later created bylaws or the TDP and this Trust Agreement, this Trust Agreement shall govern.

b)      The Trustee shall timely file such income tax and other returns and statements and comply with all withholding obligations as required under the applicable provisions of the Internal Revenue Code and of any state law and the regulations promulgated thereunder, including without limitation all requirements necessary to qualify and maintain qualification as a QSF, and shall timely pay all taxes required to be paid.

c)      (i) The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within 120 days following the end of each fiscal year, an annual report containing financial statements of the Trust (including, without limitation, a statement of the net claimants' equity of the Trust as of the end of such fiscal year and a statement of changes in net claimants' equity for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustee and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the equity presently available to current and future claimants and as to the conformity of the financial statements with accounting principles generally accepted in the United States, except for the special-purpose accounting methods set forth as follows:

1.      The financial statements shall be prepared using the accrual method of accounting.

2.      The funding received from the Debtor shall be recorded directly to net claimants' equity. These funds shall not represent income of the Trust. Payments for Beneficiaries' Claims shall be reported as deductions in net claimants' equity and shall not represent expenses of the Trust.

3.      Future fixed liabilities and contractual obligations entered into by the Trust shall

be recorded directly against net claimants' equity. Accordingly, the future minimum rental commitments outstanding at period end for non-cancelable operating leases, net of any sublease agreements, shall be recorded as deductions to net claimants' equity.

4.    The liability for unpaid claims reflected in the statements of net claimants' equity shall represent settled but unpaid claims and outstanding settlement offers. A claims liability shall be recorded once a settlement offer is made to the claimant at the amount equal to the expected pro rata payment. Net claimants' equity represents funding available to pay present and future claims on which no fixed liability has been recorded.

5.    Available-for-sale securities shall be recorded at market, excluding any securities issued by the Debtor which shall be recorded at cost, if no market value is available. All interest and dividend income on available-for-sale securities, net of investment expenses, shall be included in investment income on the statement of changes in net claimants' equity. Realized and unrealized gains and losses on available-for-sale securities shall be recorded as separate components on the statements of changes in net claimants' equity.

6.    Realized gains/losses on available-for-sale securities shall be recorded based on the security's original cost. At the time a security is sold, all previously recorded unrealized gains/losses shall be reversed and recorded net, as a component of other unrealized gains/losses in the statement of changes in net claimants' equity.

The Trustee shall provide a copy of such report to the Debtor when such reports are filed with the Bankruptcy Court.

(ii)    Simultaneously with delivery of each set of financial statements referred to in Subsection 2.2(c)(i) above, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements. The Trustee shall provide a copy of such report to the Debtor when such report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this Subsection 2.2(c), other than materials filed under seal, shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee with responsibility for the Southern District of Texas. The Trustee shall file materials under seal which they determine should remain confidential.

d)    The Trustee shall cause to be prepared, as soon as practicable prior to the commencement of each fiscal year, a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years.

**2.3    Claims Administration.**    The Trustee shall promptly proceed to implement the TDP.

# ARTICLE 3

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1    Accounts.**    The Trustee may, from time to time, create such accounts and reserves within the Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses of Beneficiary Claims and may, with respect to any such account or reserve, restrict the use of monies therein. The Trustee shall identify any restricted accounts, and the nature of the restriction, in the reports to be filed with the Bankruptcy Court under Section 2.2(c) above.

**3.2    Investments.**  The Trustee shall invest and manage Trust assets consistent with those standards and provisions of the Uniform Prudent Investor Act expressly set forth herein in this preamble for Section 3.2 and in Sections 3.2(a)-(c), subject to the limitations and provisions set forth below in Section 3.2(d), as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the Trust. In satisfying this standard, the Trustee shall exercise reasonable care, skill, and caution.

a)    The Trustee' investment and management decisions respecting individual assets and courses of action must be evaluated not in isolation, but in the context of the Trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the Trust.

b)    Among circumstances that are appropriate to consider in investing and managing Trust assets are the following, to the extent relevant to the Trust or the Beneficiaries:

(i)    General economic conditions.

(ii)    The possible effect of inflation or deflation.

(iii)    The  expected tax consequences of investment decisions or strategies.

(iv)    The role that each investment or course of action plays within the overall Trust portfolio.

(v)    The expected total return from income and the appreciation of capital.

(vi)    Other resources of the Beneficiaries known to the Trustee as determined from information provided by the Beneficiaries.

(vii)    Needs for liquidity, regularity of income, and preservation or appreciation of capital.

(viii)    An asset's special relationship or special value, if any, to the purposes of the Trust or to one or more of the Beneficiaries.

c)      The Trustee shall make a reasonable effort to ascertain facts relevant to the investment and management of Trust assets.

d)      Notwithstanding the foregoing and/or any other provision of this Trust Agreement, the Trustee shall comply with the following limitations and provisions:

(i)      The Trust shall not acquire, directly or indirectly, equity in any Person (other than the Debtor or any successor to the Debtor on the terms and conditions in the Plan and the Plan Exhibits) or business enterprise if, immediately following such acquisition, the Trust would hold more than five percent of the equity in such Person or business enterprise. The Trust shall not hold, directly or indirectly, more than ten percent of the equity in any Person (other than the Debtor or any successor to the Debtor on the terms and conditions in the Plan and the Plan Exhibits) or business enterprise.

(ii)      The Trust shall not acquire or hold any long-term debt securities (other than those of the Debtor or any successor to the Debtor on the terms and conditions in the Plan and the Plan Exhibits) unless (i) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by S&P's or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (ii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(iii)      The Trust shall not acquire or hold for longer than 90 days any commercial paper unless such commercial paper is rated "Prime- I" or higher by Moody's or "A-l" or higher by S&P or has been given an equivalent rating by another NRSRO.

(iv)      Excluding any securities issued by the Debtor, the Trust shall not acquire or hold, directly or indirectly, any common or preferred stock or convertible securities ("Stock"), REITS, MLPs and Royalty Trusts ("Stocks") unless such stock is included in a diversified and managed portfolio or portfolios.  The Trust shall not acquire, directly or indirectly more than forty percent of the Trust's total assets in such Stock Portfolios, excluding any securities issued by the Debtor, or hold, directly or indirectly, more than forty-five percent of the Trust's total assets in such Stock, excluding any securities issued by the Debtor.

(v)      The Trust shall not acquire any securities or other instruments issued by any person (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof, or other than securities or other instruments of the Debtor or any successor to the Debtor for investments authorized in the Plan) if, following such acquisition, the aggregate market value of all securities and instruments issued by such Person held by the Trust would exceed five percent, excluding any securities issued by the Debtor, of the aggregate value of the Trust estate. The Trust shall not hold any securities or other instruments issued by any Person (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof and other than securities or other instruments of the Debtor or any successor to the Debtor for investments authorized in the Plan) to the extent that the aggregate market value of all securities and instruments issued by such Person held by the Trust would exceed five percent of the aggregate value of the Trust Estate, excluding any securities issued by the Debtor.

(vi)   The Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Subsection 3.2(b).

(vii)   The Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustee, they are adequately collateralized.

(e)  Except as provided in Section 3.2(d) above, the Trust shall not acquire any securities or other instruments issued by any person (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate market value of all securities and instruments issued by such Person held by the Trust would exceed five percent of the aggregate value of the Trust estate, excluding any securities issued by the Debtor. The Trust shall not hold any securities or other instruments issued by any Person (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof and other than securities or other instruments of the Debtor or any successor to the Debtor) to the extent that the aggregate market value of all securities and instruments issued by such Person held by the Trust would exceed five percent of the aggregate value of the Trust Estate.

**3.3**   **Source of Payments.**  All Trust Expenses and all liabilities with respect to Beneficiary Claims shall be payable solely by the Trust out of the Trust Assets.  None of the Debtor, its Affiliates, the Trustee, or any of their Affiliates, subsidiaries, successors in interest, present or former stockholders, directors, officers, employees or agents shall be liable for the payment of any Trust Expense or any other liability of the Trust.

## ARTICLE 4

## TRUSTEE

**4.1**   **Number of Trustees.**

(a)   There shall be one Trustee.

**4.2**   **Term of Service.**

a)   The Trustee named pursuant to Section 4.1 shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Subsection 4.2(c), (iii) his or her removal pursuant to Subsection 4.2(d), or (iv) the termination of the Trust pursuant to Section 7.2.

b)   Each successor Trustee shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Subsection 4.2(c), (iii) his or her removal pursuant to Subsection 4.2(d), or (iv) the termination of the Trust pursuant to Section 7.2.

c)   Any Trustee may resign at any time by written notice to the Court. Such

notice shall specify a date when such resignation shall take effect, which shall not be fewer than 90 days after the date such notice is given, where practicable.

        d)     Any Trustee may be removed in the event that such Trustee becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause. "Good cause" includes, without limitation, any substantial failure to comply with Section 2.2, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings. If there are two Trustees, such removal shall be made upon prompt written notification by the removing Trustee to the Trustee being removed and to the Court of the removal decision specifying the basis for removal and invoking the process for appointment of a Trustee in accordance with the provisions of Section 4.3(a) below.

    **4.3**    **Appointment of Successor Trustee.**

        a)     In the event of a vacancy in the position of Trustee, the vacancy shall be filled by the Court.

        b)     Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.

    **4.4**    **Liability of Trustee.** No Trustee, nor any of their respective Agents, shall be liable to the Trust, to any person holding a Beneficiary Claim, or to any other Person, except for such individual's or entity's own breach of trust committed in bad faith or willful misappropriation. No Trustee shall be liable for any act or omission of any Agent of the Trust, unless the Trustee acted with bad faith in the selection or retention of such Agent.

    **4.5**    **Compensation and Expenses of Trustee.**

(a)    The Trustee shall be compensated as follows:

        (2) (l)  *Hourly Compensation*  The Trustee shall receive compensation from the Trust for his or her services as Trustee for each hour spent on an official trip of the Trustee, or dedicated to Trust Business ("Hourly Compensation"). For the period January 1, 2024 to May 31, 2024, the rate for Hourly Compensation for individual Trustee shall remain the same as each has been paid as of January 1, 2024. *Inflation Adjustment*  The Hourly Compensation and the Annual Compensation shall be adjusted each year in accordance with the Federal Bureau of Labor Statistics' Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) published in January of each year retroactive to the beginning of that year commencing January 1, 2025.

        (3)  *Review of Trustee Compensation*  The structure and amounts of Hourly Compensation and the Annual Compensation payable to the Trustee shall be reviewed when requested, but no less than every three years beginning in April 2025.

     (b)    *Out of Pocket Expenses* The Trust will promptly reimburse the Trustee for all reasonable and necessary out of pocket costs and expenses incurred by the Trustee in connection with the performance of their duties hereunder.

(c)     *Reporting* The Trust will include a description of the amounts paid under this Section 4.5 in the report to be filed pursuant to Subsection 2.2(c)(i) of this Trust Agreement.

### 4.6     Indemnification of Trustee and Additional Indemnitees.

a)     The Trust shall indemnify and defend the Trustee, the Trust's officers, and the Trust's employees to the fullest extent that a corporation or trust organized under the laws of the Trust's situs is from time to time entitled to indemnify and defend its directors, Trustee, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder.  Notwithstanding the foregoing, the Trustee shall not be indemnified or defended in any way for any liability, expense, claim, damage or loss for which they are ultimately liable under Section 4.4.

b)     Additionally, the Debtor, and each of its respective Agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative or arbitrative action, by reason of any act or omission of the Debtor and its respective Agents, with respect to (i) the Chapter 11 Case and any act or omission with respect thereto undertaken by them prior to the commencement thereof, (ii) the liquidation of any Beneficiary Claims, (iii) the administration of the Trust and the implementation of the TDP, or (iv) any and all activities in connection with the Trust Agreement, shall be indemnified and defended by the Trust, to the fullest extent that a corporation or trust organized under the laws of the Trust's situs is from time to time entitled to indemnify and defend its officers, directors, Trustee and employees, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtor, and its respective members, professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, if he or she acted in good faith.

c)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee and their respective Agents in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust pursuant to Subsection 4.6(a), shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the party seeking indemnity to repay such amount in the event that it shall be determined ultimately by Final Order that the party seeking indemnity is not entitled to be indemnified by the Trust.

d)     The Trustee shall have the power, generally or in specific cases, to cause the Trust to indemnify the Agents of the Trust to the same extent as provided in this Section 4.6 with respect to the Trustee.

e)     Any indemnification under Subsection 4.6(d) of this Trust Agreement shall be made by the Trust upon a determination by the Trustee that indemnification of such Person is proper in the circumstances.

f)     The Trustee may purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was a Trustee, an Agent of the Trust, and their respective Agents against liability asserted against or incurred by such individual in that

capacity or arising from his or her status as such.

g)    For avoidance of doubt, former Trustee, Trust officers and employees, and each of their respective Agents entitled to indemnification under this section continue to be so entitled to the same extent with respect to their conduct or status during their past tenure as Trustee, Trust officers and employees, or Agents.

**4.7    Trustee' Lien.**  The Trustee and their respective Agents shall have a first priority lien upon the Trust Assets to secure the payment of any amounts payable to them pursuant to Sections 4.5, 4.6, 4.7, 5.6 and 5.7.

**4.8    Trustee' Employment of Experts.**  The Trustee may, but shall not be required to, retain or consult with counsel, accountants, appraisers, auditors and forecasters, and other parties deemed by the Trustee to be qualified as experts on the matters submitted to them and the opinion of any such parties on any matters submitted to them by the Trustee shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of any such party.

**4.9    Trustee' Independence.**  No Trustee shall, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for the Debtor. No Trustee shall act as an attorney for any person who holds a Beneficiary Claim.

**4.10    Bond.**  The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

# ARTICLE 5

## GENERAL PROVISIONS

**5.1    Irrevocability.**    The Trust is irrevocable.

**5.2    Termination.**

a)    The Trust shall automatically terminate on the date 90 days after the first to occur of the following events:

(i)    the Trustee in their discretion decide to terminate the Trust because all Beneficiary Claims duly filed with the Trust have been resolved and paid to the extent provided in this Trust Agreement and the TDP, to the extent possible based upon the funds available through the Plan, and any remaining funds are dispersed to the Remainder Beneficiaries; or

(ii)    if the Trustee have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Trust in a manner consistent with this Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such other arrangements and such order becomes a Final Order.

(iii)    if the Bankruptcy Court determines that the Trust is no longer economically feasible for the purposes which it was created.

b)    Upon the termination of the Trust, after payment of all the Trust's liabilities have been provided for, all monies remaining in the Trust estate shall be distributed to claimants who are still entitled to receive distributions from the Trust pursuant to Section 2.3 of the TDP.

**5.3    Amendments.**  The Trustee may modify or amend this Trust Agreement or any document annexed to it, including, without limitation, the TDP. Any modification or amendment made pursuant to this Section must be done in writing. Notwithstanding anything contained in this Trust Agreement to the contrary, none of this Trust Agreement, the TDP, any later created bylaws, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair or modify the applicability of sections 1191, 1192 of 1141 of the Bankruptcy Code, the indemnification provisions of this Trust Agreement, the efficacy or enforceability of the Injunctions or the Trust's qualified settlement fund status.

**5.4    Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**5.5    Notices.**  Notices to persons asserting claims shall be given at the address of such person.

**To the Trust through the Trustee:**          **Free Speech Systems**
                                              **Settlement Trust**
                                              **[ADDRESS]**
                                              **[ADDRESS]**
                                              **Telephone:**
                                              **Email:**
                                              **Attention: Melissa Haselden**

**with a copy to:**          **[NAME]**
                            **[FIRM]**
                            **[ADDRESS]**
                            **[ADDRESS]**
                            **Telephone:**
                            **Facsimile:**
                            **Email:**

|                  |                |
|------------------|----------------|
| **To Debtor**    | **[NAME]**     |
|                  | **[FIRM]**     |
|                  | **[ADDRESS]**  |
|                  | **[ADDRESS]**  |
|                  | **Telephone:** |
|                  | **Facsimile:** |
|                  | **Email:**     |
|                  |                |
| **with a copy to** | **[NAME]**   |
|                  | **[FIRM]**     |
|                  | **[ADDRESS]**  |
|                  | **[ADDRESS]**  |
|                  | **Telephone:** |
|                  | **Facsimile:** |
|                  | **Email:**     |

All notices, requests, demands, and other communications required or permitted hereunder shall be in writing and given by (a) personal delivery, or (b) by established express delivery service that maintains delivery records, or (c) by mail, postage prepaid, or (d) by facsimile, e-mail or other electronic methods addressed as follows, or to such other address or addresses as may hereafter be furnished by any party to whom such notice is directed to the other parties listed herein in compliance with terms hereof.

All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return electronic transmission.

**5.6     Successors and Assigns.** The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Debtor, the Trust, and the Trustee and their respective successors and assigns, except that none of the Debtor, or the Trust, nor any Trustee may assign or otherwise transfer any of its, his or her rights or obligations under this Trust Agreement except, in the case of the Trust and the Trustee, as contemplated by Section 2.1.

**5.7     Entire Agreement; No Waiver.** The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**5.8    Headings.**    The headings used in this Trust Agreement are inserted for convenience only and neither constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**5.9    Governing Laws; Submission to Jurisdiction.**  This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas without regard to Texas; conflict of laws principles. The Trust is subject to the continuing jurisdiction of the Bankruptcy Court.

**5.10    Dispute Resolution.**  Any disputes that arise under this Trust Agreement or under the annexes hereto shall be resolved by the Bankruptcy Court pursuant to the Plan, except as otherwise provided herein or in the annexes hereto. Notwithstanding anything else herein contained, to the extent any provision of this Trust Agreement is inconsistent with any provision of the Plan, the Plan shall control.

**5.11    Enforcement and Administration.**  The provisions of this Trust Agreement and the annexes hereto shall be enforced by the Bankruptcy Court pursuant to the Plan.  The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee.

**5.12    Effectiveness.**  This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**5.13    Counterpart Signatures.**  This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of this _____ day of _____, 2024.

**TRUSTEE:**

_____
[NAME]

_____
[NAME]

# Exhibit D

# Balance Sheet

 **FREE SPEECH SYSTEMS**

**FREE SPEECH SYSTEMS, LLC**
Balance Sheet
*As of December 31, 2022 and September 30, 2023*

| | 12/31/2022 | 9/31/2023 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Bank Accounts | | |
| Checking Axos Deposit Acct 8877 | 70,625.79 | 628,476.66 |
| Checking Axos Donations Acct 8885 | 129,398.59 | 63,692.61 |
| Checking Axos Infowars Acct 8893 | 6,125.44 | 396,338.37 |
| Checking Axos Legal Acct 8901 | - | 100,000.00 |
| Checking Axos Operations Acct 8919 | 120,321.47 | 724,763.94 |
| Checking Axos Payroll Acct 8927 | 20,397.80 | 5,000.00 |
| **Total Bank Accounts** | **346,869.09** | **1,918,271.58** |
| | | |
| **Other Current Assets** | | |
| CC Merchant Reserves Account | 500,000.00 | 500,000.00 |
| Deposits / Inventory in Process | - | 1,417,958.93 *(j)* |
| Receivable from PQPR | - | - |
| Inventory | 1,656,736.78 | 492,277.59 |
| Prepaid Expenses | - | 118,336.62 |
| Professional Retainers | 252,235.00 | 302,235.00 |
| **Total Other Current Assets** | **2,408,971.78** | **2,830,808.14** |
| | | |
| **Total Current Assets** | **2,755,840.87** | **4,749,079.72** |
| | | |
| **Fixed Assets** | | |
| Intangibles / Intellectual Property | 2,520.81 *(a)* | 2,520.81 *(a)* |
| Leasehold Improvements | 1,335,971.23 *(a)* | 1,335,971.23 *(a)* |
| Machinery, Equipment and Vehicles | 309,153.00 *(a)* | 351,616.75 *(a)(g)* |
| Office Furniture and Fixtures | 47,539.41 *(a)* | 47,539.41 *(a)* |
| **Total Fixed Assets** | **1,695,184.45** | **1,737,648.20** |
| | | |
| **Due From - PQPR** | **129,500.00** *(b)* | **-** |
| | | |
| **TOTAL ASSETS** | **4,580,525.32** | **6,486,727.92** |
| | | |
| **LIABILITIES AND EQUITY** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable (A/P) | 155,937.91 | 1,105,041.91 |
| Accrued Expenses | 57,772.94 | - *(h)* |
| Unresolved Cash Deposits | - | 439,666.84 *(i)* |
| Note Payable - Allowance | 50,000.00 *(c)* | - |
| Payroll Liabilities | 251,968.15 *(d)* | 7,378.77 |
| SEC Bank - RV Note | 73,000.00 | 73,000.00 |
| Sales Tax Payable | 990.58 | - |
| **Total Current Liabilities** | **589,669.58** | **1,625,087.52** |
| | | |
| **Total Liabilities** | **589,669.58** *(e)* | **1,625,087.52** |
| | | |
| **Equity** | | |
| Opening balance equity | 5,068,000.49 | 5,068,000.49 |
| Retained Earnings | - | (1,077,144.75) |
| Prior Period Adjustment | - | 275,141.87 *(f)* |
| Net Income | (1,077,144.75) | 595,642.79 |
| **Total Equity** | **3,990,855.74** | **4,861,640.40** |
| | | |
| **TOTAL LIABILITIES AND EQUITY** | **4,580,525.32** | **6,486,727.92** |

*(a) Amounts are from the Statement of Financial Affairs and are subject to review.  Depreciation has*
*  not been presented pending a full asset count and review of book value.*
*(b) Over payment of adequate protection payments to PQPR, settled in January of 2023*
*(c) 12/31 Balance due to PQPR for inventory purchases, account was reconciled resulting in overpayment*
*(d) Includes $228,818.31 in payroll tax withholding due from Q4 transition with new payroll vendor,*
*  amount was paid with the 4th Qtr 941*
*(e) Total Liabilities excludes contingent and unliquidated claims of PQPR and Sandy Hook Plaintiffs*
*  in Texas and Connecticut*
*(f) Adjustments related to ongoing review and reconcilaiton of inventory balances and COGS*
*  current month adjustment is related to Q3 2023 analysis*
*(g) Purchased JIB Crane to replace 1 headcount*
*(h) Balance is related to ongoing inventory / COGS reconciliation and true up with supplement vendors.*
*(i) Amounts related to Mountain Way and ESG revenue, held till a final resolution is reached*
*(j) Amounts include timing difference between when product is ordered, manufactured and delivered to our*
*  third party fulfillment vendor*

**We believe this Balance Sheet materially presents the financial condition of Free Speech
Systems, LLC as of 12/31/2022 and 9/30/2023, but management does not represent that
it is in compliance with all requirements of Generally Accepted Accounting Principles (GAAP)
UNAUDITED**

**Exhibit E**


**Liquidation Analysis**



**FREE SPEECH SYSTEMS LLC**
Southern District of Texas
Case #22-60043
*Hypothetical Liquidation Analysis - Exhibit E*
*as of 11/15/2023*

| Notes | | Est. Cost / Book Value | Estimated Recovery %<br>Low | High | Estimated Proceeds $<br>Low | High |
|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | |
| (a) | Cash | 1,918,283.00 | 100.0% | 100.0% | 1,918,283.00 | 1,918,283.00 |
| (a) | Accounts Receivable | 551,181.00 | 100.0% | 100.0% | 551,181.00 | 551,181.00 |
| (b) | Inventory | 2,128,805.00 | 35.0% | 55.0% | 745,081.75 | 1,170,842.75 |
| (c) | Prepaids / Deposits | 500,000.00 | 100.0% | 100.0% | 500,000.00 | 500,000.00 |
| (d) | Intangible Assets | 150,000.00 | 35.0% | 50.0% | 52,500.00 | 75,000.00 |
| (e) | Fixed Assets | | | | | |
| | Computer Equipment | 403,800.00 | 15.0% | 30.0% | 60,570.00 | 121,140.00 |
| | Facilities Equipment | 180,690.00 | 25.0% | 45.0% | 45,172.50 | 81,310.50 |
| | Office Furniture | 138,300.00 | 25.0% | 45.0% | 34,575.00 | 62,235.00 |
| | Production Equipment | 969,019.00 | 15.0% | 30.0% | 145,352.85 | 290,705.70 |
| (e) | Vehicles | 400,000.00 | 35.0% | 55.0% | 140,000.00 | 220,000.00 |
| | **Total Proceeds Available for Distribution** | **7,340,078.00** | | | **4,192,716.10** | **4,990,697.95** |
| | | | | | | |
| | **LIQUIDATION EXPENSES** | | | | | |
| (f) | Trustee Fees | | | | 115,299.69 | 137,244.19 |
| (g) | Trustee Council | | | | 92,239.75 | 109,795.35 |
| (h) | LLC Wind Down Costs | | | | 733,725.32 | 873,372.14 |
| (i) | Liquidation Expenses | | | | 209,635.81 | 374,302.35 |
| (j) | Contingency | | | | 62,890.74 | 74,860.47 |
| | **Total Liquidation Expenses** | | | | **1,213,791.31** | **1,569,574.51** |
| | | | | | | |
| | **NET PROCEEDS AVAILABLE FOR CREDITORS** | | | | **2,978,924.79** | **3,421,123.44** |
| | | | | | | |
| | **ALLOCATION OF PROCEEDS** | | | | | |
| (k) | Secured Creditors | | | | 80,161.04 | 80,161.04 |
| (l) | Estimated Priority Claims | | | | 465,000.00 | 465,000.00 |
| (m) | Legal and Professional Fees | | | | 265,000.00 | 265,000.00 |
| (n) | Unsecured Creditors | | | | 760,626.83 | 760,626.83 |
| | **Total Secured and Unsecured Claims** | | | | **1,570,787.87** | **1,570,787.87** |
| | | | | | | |
| | **NET PROCEEDS AVAILABLE TO SETTLE PLAINTIFF JUDGEMENTS** | | | | **1,408,136.92** | **1,850,335.57** |

**NOTES**

(a) Amount per the 9/30/2023 Monthly Operating Report filed with the Court on 10/20/2023. Accounts receivable is assumed 100% collectible since it is exclusively credit card receivables and are settled in just a few days after the transaction is processed.

(b) Inventory consists of finished products delivered to our fulfillment partner's warehouse and available on the InfoWars website for sale. Recovery percentages take into account the fact that the supplement products are labeled for InfoWars and are often specifically chosen to appeal to our specific audience. Any third party buyer would have the costs and effort to relabel the supplement products. Non-supplement inventory has little to no value as it is very specific to InfoWars. The high and low recovery percentages are the best estimates of management.

(c) Deposit on Credit Card Processing account with Sweetwater Holding Group Inc. Amount assumes there are no material deposits with supplement manufacturers for orders that have not been delivered to our fulfillment partner. Recovery estimates assume that the deposit will be returned to Free Speech Systems in a timely manner.

(d) There are numerous internet domain names owned and registered with Free Speech Systems LLC, the most valuable of which is InfoWars.com Liquidation values are the best estimate of management of the value that these domain names could be sold in a liquidation

(e) Vehicles consist of a 40' RV and a highly modified / armored Ford F450. Neither vehicle is easily marketable and price quotes for comparable sales is not readily available. The realization amounts are managements best estimate of the amounts that would be recovered at auction.

(f) Trustee fees are assumed to be limited to 2.75% of the Total Proceeds Available for Distribution.

(g) Compensation for Trustee's counsel is assumed to be 80% of estimated trustee fees.

(h) Estimates for wind-down costs include operating expenses and other costs considered likely to be incurred during the liquidation period. The liquidation period is assumed to be 8-10 months. Assumes 6 months to conclude the sale of all assets and an additional 2-4 months for administrator and staff to conclude the operations of the company, including resolution of all employee related issues and filing all required tax returns. It contemplates the majority of corporate and all production staff will be terminated immediately and an administrative team of accounting, HR and legal staff will guide the wind-down. The costs associated with the wind-down are estiamted to be 17.5% of Total Proceeds Available for Distribution.

(i) Liquidation expenses include the costs of professional brokers and liquidators to sell all the inventory, vehicles and fixed assets. It is estimated to be between 5% and 7.5% of Total Proceeds Available for Distribution.

(j) There is a 1.5% contingency for expenses that are not known or knowable as of the preparation of this liquidation analysis

(k) As of September 30, 2023 the balance on a note to SEC Bank of Crawford secured by the RV is approximately $80,161.04

(l) Estimated claim amounts from state taxing authorities, lease rejection damages and other known and unknown and disputed priority claims

(m) There are accounts payable to legal, tax and accounting professionals estimated to be $265,000

(n) See attached analysis of Unsecured Claims



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Analysis of Potential Unsecured Claims - Exhibit E*
*as of 11/15/2023*

| | Vendor | Balance | Disputed |
|---|---|---|---|
| | American Express | 199,678.58 | |
| | Randazza Law Firm | 153,826.91 | X |
| | One Party America LLC | 82,619.55 | X |
| | Jacquelyn Blott, Attorney at Law | 58,280.00 | X |
| | DeLage Landen Fiancial Services | 50,537.28 | X |
| | Reeves Law Firm | 36,436.00 | X |
| | Joel Skousen | 35,035.00 | X |
| | Wisconsin Dept of Revenue | 17,567.78 | X |
| | Greenaire, Inc | 12,240.00 | |
| | MRJR Holdings, LLC | 12,000.00 | |
| | Konica Minlota Premier Finance | 1,761.27 | X |
| | American Media / Reality Zone | 404.76 | |
| | Stetson Deese | 239.70 | |
| | | 660,626.83 | |
| *(a)* | Other | 100,000.00 | |
| *(b)* | **Total Estimated Unsecured Claims** | **760,626.83** | |

(a)   Represents a contingency for potential unidentified claims

(b)   Total estimated Unsecured Claims is management's best  estimate of the
       outstanding claims through an analysis of the SFOA schedules filed at 7/29/22,
       the critical vendor schedules, payments made post bankruptcy filing and the
       proof of claims summary as of 10/7/23.  There are several disputed claims
       that total $436,063.79.  In an abundance of caution we have  disclosed them
       as claims that will be paid even though we expect the actual amount to
       be significantly lower.



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 269 | Desktop Generic | Desktop | Computer Equipment | Black box | 1,500.00 |
| 270 | Desktop Generic | Desktop | Computer Equipment | Black box | 2,500.00 |
| 2676 | Desktop Generic | Desktop | Computer Equipment | Black box | 5,000.00 |
| 178 | LG Curved Monitor | Monitor | Computer Equipment | Black box | 500.00 |
| 271 | LG Curved Monitor | Monitor | Computer Equipment | Black box | 1,200.00 |
| 29 | iMac | Desktop | Computer Equipment | E-Commerce office | 500.00 |
| 30 | New iMac | Desktop | Computer Equipment | E-Commerce office | 1,200.00 |
| 256 | iMac | Desktop | Computer Equipment | Production Office | 500.00 |
| 252 | LG Curved Monitor | Monitor | Computer Equipment | Production Office | 600.00 |
| 15 | iMac | Desktop | Computer Equipment | CS Conference room | 500.00 |
| 653 | Server rack | Rack | Computer Equipment | CS server room | 1,200.00 |
| 657 | ProCurve Switch 4208vl | Switch | Computer Equipment | CS server room | 550.00 |
| 7 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Customer Service | 750.00 |
| 241 | Apple Mac Pro | Desktop | Computer Equipment | Production Office | 8,000.00 |
| 242 | LG Curved Monitor | Monitor | Computer Equipment | Production Office | 600.00 |
| 243 | LG Curved Monitor | Monitor | Computer Equipment | Production Office | 600.00 |
| 1 | iMac | Desktop | Computer Equipment | E-Commerce | 500.00 |
| 53 | iMac | Desktop | Computer Equipment | E-Commerce | 500.00 |
| 2 | iMac | Desktop | Computer Equipment | E-Commerce | 1,000.00 |
| 27 | Canon Printer | Large Printer | Computer Equipment | E-Commerce | 1,200.00 |
| 14 | HP DesignJet | Large Printer | Computer Equipment | E-Commerce | 2,600.00 |
| 40 | LG Curved Monitor | Monitor | Computer Equipment | E-Commerce | 1,300.00 |
| 141 | New iMac | Desktop | Computer Equipment | Empty office | 1,500.00 |
| 142 | UniFi switch 48 | Switch | Computer Equipment | Empty office | 950.00 |
| 18 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room | 750.00 |
| 19 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room | 750.00 |
| 20 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room | 750.00 |
| 21 | Lenovo ThinkCentre | All in One pc | Computer Equipment | Facility manager room | 750.00 |
| 26 | Desktop Generic | Desktop | Computer Equipment | Facility manager room | 800.00 |
| 148 | LG Curved Monitor | Monitor | Computer Equipment | Front waiting room / office | 600.00 |
| 152 | LG Curved Monitor | Monitor | Computer Equipment | Front waiting room / office | 600.00 |
| 112 | iPad | Tablet | Computer Equipment | Gym | 600.00 |
| 74 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage | 5,400.00 |
| 75 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage | 5,400.00 |
| 76 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage | 5,400.00 |
| 77 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage | 5,400.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 78 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Gym / storage | 5,400.00 |
| 71 | Server rack | Rack | Computer Equipment | Gym / storage | 1,600.00 |
| 50 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT | 750.00 |
| 52 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT | 750.00 |
| 55 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT | 750.00 |
| 58 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT | 750.00 |
| 59 | Lenovo ThinkCentre | All in One pc | Computer Equipment | IT | 750.00 |
| 41 | iMac | Desktop | Computer Equipment | IT | 500.00 |
| 47 | iMac | Desktop | Computer Equipment | IT | 500.00 |
| 48 | iMac | Desktop | Computer Equipment | IT | 500.00 |
| 56 | iMac | Desktop | Computer Equipment | IT | 500.00 |
| 57 | iMac | Desktop | Computer Equipment | IT | 500.00 |
| 51 | MacBook Pro | Laptop | Computer Equipment | IT | 600.00 |
| 46 | LG Curved Monitor | Monitor | Computer Equipment | IT | 600.00 |
| 10 | Dell Desktop | Desktop | Computer Equipment | Customer Service Office | 750.00 |
| 61 | LG Curved Monitor | Monitor | Computer Equipment | Customer Service Office | 600.00 |
| 153 | Thinksmart hub | Video conference | Computer Equipment | Small conference room | 2,400.00 |
| 309 | iMac | Desktop | Computer Equipment | Producers room | 600.00 |
| 308 | Mac Mini | Desktop | Computer Equipment | Production Break Room | 600.00 |
| 237 | LG Curved Monitor | Monitor | Computer Equipment | Security entrance | 600.00 |
| 238 | LG Curved Monitor | Monitor | Computer Equipment | Security entrance | 600.00 |
| 8 | Dell Desktop | Desktop | Computer Equipment | Customer Service Office | 750.00 |
| 202 | Desktop Generic | Desktop | Computer Equipment | Studio B | 1,200.00 |
| 203 | Desktop Generic | Desktop | Computer Equipment | Studio B | 1,200.00 |
| 161 | Desktop Generic | Desktop | Computer Equipment | Studio B | 1,500.00 |
| 206 | Desktop Generic | Desktop | Computer Equipment | Studio B | 2,500.00 |
| 214 | iMac | Desktop | Computer Equipment | Studio B | 600.00 |
| 204 | iMac | Desktop | Computer Equipment | Studio B | 800.00 |
| 205 | iMac | Desktop | Computer Equipment | Studio B | 1,200.00 |
| 220 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B | 5,400.00 |
| 221 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B | 5,400.00 |
| 222 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B | 5,400.00 |
| 223 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B | 5,400.00 |
| 224 | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio B | 5,400.00 |
| 325 | Desktop Generic | Desktop | Computer Equipment | Studio C | 1,200.00 |
| 315 | Desktop Generic | Desktop | Computer Equipment | Studio C | 1,500.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag *(a)* | Description | Item | Category | Location | Est. Cost *(b)* |
|---|---|---|---|---|---|
| 332 | Desktop Generic | Desktop | Computer Equipment | Studio C | 1,500.00 |
| | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio C | 97,000.00 |
| 801 | Dell Precision T3600 | AUTOCAD | Computer Equipment | Studio C Server Room | 500.00 |
| 814 | Dell Precision T3600 | AUTOCAD | Computer Equipment | Studio C Server Room | 500.00 |
| 812 | Mac Mini | Desktop | Computer Equipment | Studio C Server Room | 500.00 |
| 813 | Mac Mini | Desktop | Computer Equipment | Studio C Server Room | 500.00 |
| 807 | Supermicro SuperServer 1029P-MT SYS-1029P-MT | Rack | Computer Equipment | Studio C Server Room | 1,000.00 |
| 284 | Desktop Generic | Desktop | Computer Equipment | Studio J | 800.00 |
| 285 | Desktop Generic | Desktop | Computer Equipment | Studio J | 800.00 |
| 277 | Desktop Generic | Desktop | Computer Equipment | Studio J | 3,500.00 |
| 278 | Desktop Generic | Desktop | Computer Equipment | Studio J | 3,500.00 |
| 280 | iMac | Desktop | Computer Equipment | Studio J | 600.00 |
| 191 | Pixel Plex | Monitor | Computer Equipment | Studio J | 40,000.00 |
| | PN-V601A LCD Monitor | Monitor | Computer Equipment | Studio J | 130,000.00 |
| 297 | iMac | Desktop | Computer Equipment | Writers Room | 600.00 |
| | | | **Total Computer Equipment Cost** | | **403,800.00** |
| | | | | | |
| 37 | Fridge | Break Room | Facilities | Accounting office | 600.00 |
| 39 | Large TV | TV | Facilities | Accounting office | 500.00 |
| 38 | Vacuum | Vacuum | Facilities | Accounting office | 600.00 |
| 33 | TV | TV | Facilities | E-Commerce office | 600.00 |
| 6 | Fridge | Break Room | Facilities | CS breakroom | 900.00 |
| 4 | Coffee Grinder | Coffee grinder | Facilities | CS breakroom | 900.00 |
| 5 | Coffee Maker | Coffee maker | Facilities | CS breakroom | 1,100.00 |
| 13 | TV | TV | Facilities | CS Conference room | 800.00 |
| 244 | Large TV | TV | Facilities | Producer's Office | 1,200.00 |
| 22 | Zebra RF Gun | RF Gun | Facilities | Facility manager room | 1,300.00 |
| 23 | Zebra RF Gun | RF Gun | Facilities | Facility manager room | 1,300.00 |
| 24 | Zebra RF Gun | RF Gun | Facilities | Facility manager room | 1,300.00 |
| 25 | Zebra RF Gun | RF Gun | Facilities | Facility manager room | 1,300.00 |
| 113 | Air compressor | Air compressor | Facilities | Gym | 5,000.00 |
| 95 | Hoist Bench | Gym equipment | Facilities | Gym | 550.00 |
| 96 | Hoist Bench | Gym equipment | Facilities | Gym | 550.00 |
| 97 | Hoist Bench | Gym equipment | Facilities | Gym | 550.00 |
| 98 | Hoist HD-3700 | Gym equipment | Facilities | Gym | 5,000.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 103 | Keiser Biaxial Chest press | Gym equipment | Facilities | Gym | 5,000.00 |
| 101 | Keiser Infinity series | Gym equipment | Facilities | Gym | 5,000.00 |
| 104 | Keiser Leg press | Gym equipment | Facilities | Gym | 5,000.00 |
| 105 | Keiser seated leg curl | Gym equipment | Facilities | Gym | 5,000.00 |
| 102 | Keiser Upper Back | Gym equipment | Facilities | Gym | 5,000.00 |
| 106 | Massage table | Gym equipment | Facilities | Gym | 670.00 |
|  | Massage table | Gym equipment | Facilities | Gym | 670.00 |
|  | Punching bag | Gym equipment | Facilities | Gym | 200.00 |
|  | Punching bag | Gym equipment | Facilities | Gym | 200.00 |
| 100 | Rouge Echo Bike | Gym equipment | Facilities | Gym | 900.00 |
| 107 | RowERG | Gym equipment | Facilities | Gym | 1,200.00 |
| 93 | Squat Rack | Gym equipment | Facilities | Gym | 1,200.00 |
| 94 | Squat Rack | Gym equipment | Facilities | Gym | 1,200.00 |
| 99 | Teeter | Gym equipment | Facilities | Gym | 500.00 |
| 122 | Teeter | Gym equipment | Facilities | Gym | 500.00 |
| 92 | TF Leg Press | Gym equipment | Facilities | Gym | 1,500.00 |
| 108 | Weight rack with weights 10-60 lbs | Gym equipment | Facilities | Gym | 1,700.00 |
| 109 | Weight rack with weights 65-100lbs | Gym equipment | Facilities | Gym | 3,000.00 |
| 111 | PA System | Speaker | Facilities | Gym | 900.00 |
| 110 | TV | TV | Facilities | Gym | 300.00 |
| 70 | Ac Unit | AC Unit | Facilities | Gym / storage | 9,500.00 |
| 82 | BBQ Pit | BBQ Pit | Facilities | Gym / storage | 3,000.00 |
| 84 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 85 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 86 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 87 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 88 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 89 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 90 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 91 | Philips Selecon Studio light | Lights | Facilities | Gym / storage | 1,800.00 |
| 73 | Electric pallet jack | Pallet jack | Facilities | Gym / storage | 4,000.00 |
| 72 | Pallet jack | Pallet jack | Facilities | Gym / storage | 500.00 |
| 64 | Safe | Safe | Facilities | Gym / storage | 500.00 |
| 67 | Safe | Safe | Facilities | Gym / storage | 500.00 |
| 65 | Safe | Safe | Facilities | Gym / storage | 3,300.00 |
| 66 | Safe | Safe | Facilities | Gym / storage | 3,300.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 69 | Shipping container | Safe | Facilities | Gym / storage | 6,000.00 |
| 79 | Drone storage case | Storage case | Facilities | Gym / storage | 900.00 |
| 144 | Fridge | Break Room | Facilities | Gym Break room | 1,200.00 |
| 145 | Fridge | Break Room | Facilities | Gym Break room | 1,200.00 |
| 146 | Fridge | Break Room | Facilities | Gym Break room | 1,200.00 |
| 147 | Fridge | Break Room | Facilities | Gym Break room | 1,200.00 |
| 143 | Euhomy Ice box | Kitchen | Facilities | Gym Break room | 500.00 |
| 121 | Air tower elite | Gym equipment | Facilities | Gym Cold Room | 1,300.00 |
| 126 | Elliptical | Gym equipment | Facilities | Gym Cold Room | 1,200.00 |
| 118 | Resistance Fitness Bike | Gym equipment | Facilities | Gym Cold Room | 800.00 |
| 119 | Resistance Fitness Bike | Gym equipment | Facilities | Gym Cold Room | 800.00 |
| 120 | Resistance Fitness Bike | Gym equipment | Facilities | Gym Cold Room | 800.00 |
| 125 | Treadmill | Gym equipment | Facilities | Gym Cold Room | 600.00 |
| 123 | Trueform trainer | Gym equipment | Facilities | Gym Cold Room | 7,000.00 |
| 124 | Trueform trainer | Gym equipment | Facilities | Gym Cold Room | 7,000.00 |
| 114 | Joovv red light | Lights | Facilities | Gym Cold Room | 1,300.00 |
| 116 | Joovv red light | Lights | Facilities | Gym Cold Room | 1,300.00 |
| 117 | Joovv red light | Lights | Facilities | Gym Cold Room | 18,000.00 |
| 115 | TV | TV | Facilities | Gym Cold Room | 600.00 |
| 140 | Large TV | TV | Facilities | Morning Host office | 600.00 |
| 42 | Large TV | TV | Facilities | IT | 500.00 |
| 49 | Large TV | TV | Facilities | IT | 500.00 |
| 43 | Large TV | TV | Facilities | IT | 600.00 |
| 60 | TV | TV | Facilities | IT | 800.00 |
| 138 | Large TV | TV | Facilities | Sales office | 600.00 |
| 11 | TV | TV | Facilities | Customer Service Office | 300.00 |
| 62 | TV | TV | Facilities | Customer Service Office | 200.00 |
| 136 | Large TV | TV | Facilities | Afternoon Host office | 600.00 |
| 137 | Large TV | TV | Facilities | Afternoon Host office | 800.00 |
| 157 | Fridge | Break Room | Facilities | Small conference room | 1,200.00 |
| 154 | TV | TV | Facilities | Small conference room | 1,200.00 |
| 303 | Coffee Maker | Coffee maker | Facilities | Podcast studio | 1,200.00 |
| 311 | TV | TV | Facilities | Producers room | 500.00 |
| 307 | Fridge | Break Room | Facilities | Production Break Room | 2,500.00 |
| 305 | Coffee Grinder | Coffee grinder | Facilities | Production Break Room | 1,000.00 |
| 306 | Coffee Maker | Coffee maker | Facilities | Production Break Room | 1,200.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 304 | Large TV | TV | Facilities | Production Break Room | 800.00 |
| 232 | Large TV | TV | Facilities | Production Conference room | 2,300.00 |
| 236 | Safe | Safe | Facilities | Security entrance | 1,600.00 |
| 9 | Large TV | TV | Facilities | Customer Service Office | 500.00 |
| 266 | Safe | Safe | Facilities | Studio J | 5,000.00 |
| 298 | TV | TV | Facilities | Writers Room | 600.00 |
| | | | | **Total Facilities Cost** | **180,690.00** |
| | | | | | |
| 17 | Cabinet | Cabinet | Office Furniture | Customer Service | 500.00 |
| 28 | Cabinet | Cabinet | Office Furniture | Facility manager room | 600.00 |
| 32 | Cabinet | Cabinet | Office Furniture | Purchasing office | 600.00 |
| 35 | Cabinet | Cabinet | Office Furniture | Accounting office | 500.00 |
| 44 | Cabinet | Cabinet | Office Furniture | IT | 600.00 |
| 45 | Cabinet | Cabinet | Office Furniture | IT | 500.00 |
| 134 | Cabinet | Cabinet | Office Furniture | Green screen room | 800.00 |
| 12 | Whiteboard | Whiteboard | Office Furniture | CS Conference room | 600.00 |
| 139 | Whiteboard | Whiteboard | Office Furniture | Sales office | 500.00 |
| 155 | Whiteboard | Whiteboard | Office Furniture | Small conference room | 600.00 |
| 233 | Whiteboard | Whiteboard | Office Furniture | Production Conference room | 600.00 |
| 234 | Whiteboard | Whiteboard | Office Furniture | Production Conference room | 500.00 |
| 3 | Table | Table | Office Furniture | E-Commerce | 500.00 |
| 16 | Conference Table | Table | Office Furniture | CS Conference room | 1,200.00 |
| 83 | Conference Table | Table | Office Furniture | Gym / storage | 1,200.00 |
| 156 | Conference Table | Table | Office Furniture | Small conference room | 2,000.00 |
| 231 | Conference Table | Table | Office Furniture | Production Conference room | 3,000.00 |
| 135 | Cabinet | Cabinet | Office Furniture | Bull pen | 500.00 |
| 208 | Cabinet | Cabinet | Office Furniture | Studio B | 800.00 |
| 209 | Cabinet | Cabinet | Office Furniture | Studio B | 800.00 |
| 239 | Cabinet | Cabinet | Office Furniture | Production Office | 500.00 |
| 312 | Cabinet | Cabinet | Office Furniture | Studio C | 600.00 |
| 636 | Cabinet | Cabinet | Office Furniture | Studio C | 500.00 |
| 31 | Couch | Couch | Office Furniture | E-Commerce office | 500.00 |
| 36 | Couch | Couch | Office Furniture | Accounting office | 500.00 |
| 63 | Couch | Couch | Office Furniture | Customer Service Office | 500.00 |
| 151 | Couch | Couch | Office Furniture | Front waiting room / office | 800.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 299 | Couch | Couch | Office Furniture | Writers Room | 600.00 |
| 34 | Desk | Desk | Office Furniture | Accounting office | 2,000.00 |
| 54 | Big White Desk | Desk | Office Furniture | IT | 500.00 |
| 149 | Big White Desk | Desk | Office Furniture | Front waiting room / office | 600.00 |
| 150 | Big White Desk | Desk | Office Furniture | Front waiting room / office | 600.00 |
| 172 | Studio B Desk | Desk | Office Furniture | Studio B | 10,000.00 |
| 253 | Big White Desk | Desk | Office Furniture | Production Office | 600.00 |
| 254 | Big White Desk | Desk | Office Furniture | Production Office | 600.00 |
| 255 | Big White Desk | Desk | Office Furniture | Production Office | 600.00 |
| 257 | Big White Desk | Desk | Office Furniture | Production Office | 600.00 |
| 258 | Big White Desk | Desk | Office Furniture | Production Office | 600.00 |
| 259 | Big White Desk | Desk | Office Furniture | Production Office | 600.00 |
| 261 | Desk | Desk | Office Furniture | Studio J | 45,000.00 |
| 265 | Desk | Desk | Office Furniture | Studio J | 15,000.00 |
| 286 | Desk | Desk | Office Furniture | Studio J | 5,000.00 |
| 287 | Desk | Desk | Office Furniture | Studio J | 5,000.00 |
| 302 | Desk | Desk | Office Furniture | Podcast studio | 5,000.00 |
| 310 | Desk | Desk | Office Furniture | Producers room | 600.00 |
| 317 | Desk | Desk | Office Furniture | Studio C | 3,000.00 |
| 329 | Desk | Desk | Office Furniture | Studio C | 2,500.00 |
| 334 | Desk | Desk | Office Furniture | Studio C | 2,500.00 |
| 349 | Desk | Desk | Office Furniture | Studio C | 15,000.00 |
| 651 | Big White Desk | Desk | Office Furniture | IT | 500.00 |
| 652 | Big White Desk | Desk | Office Furniture | IT | 500.00 |
| | | | | | 138,300.00 |
| | | | | | |
| 313 | Avcom portable spectrum analyzer | Analyzer | Production Equipment | Studio C | 1,200.00 |
| 185 | Distribution Amplifier Pro Plus | Audio Amplifier | Production Equipment | Studio J | 200.00 |
| 159 | AD 22S Audio Delay | Audio Delay | Production Equipment | Studio B | 579.00 |
| 182 | AD 22S Audio Delay | Audio Delay | Production Equipment | Studio J | 580.00 |
| 291 | AD 22S Audio Delay | Audio Delay | Production Equipment | Studio C | 600.00 |
| 184 | Scarlett 18i20 | Audio Interface | Production Equipment | Studio J | 600.00 |
| 791 | BD600 | Broadcast Delay | Production Equipment | Studio C | 4,000.00 |
| 321 | Airtools 6100 | BroadcastDelay | Production Equipment | Studio C | 900.00 |
| 322 | Airtools 6100 | BroadcastDelay | Production Equipment | Studio C | 900.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 170 | Camera with Tripod | Camera | Production Equipment | Studio B | 6,000.00 |
| 171 | Camera with Tripod | Camera | Production Equipment | Studio B | 7,200.00 |
| 173 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J | 8,000.00 |
| 174 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J | 8,000.00 |
| 175 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J | 8,000.00 |
| 176 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J | 8,000.00 |
| 177 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio J | 8,000.00 |
| 210 | Sony Carl Zeiss | Camera | Production Equipment | Studio B | 700.00 |
| 211 | Panasonic Camera | Camera | Production Equipment | Studio B | 5,000.00 |
| 225 | Camera with Tripod | Camera | Production Equipment | Studio B | 6,000.00 |
| 226 | Camera with Tripod | Camera | Production Equipment | Studio B | 6,500.00 |
| 228 | Sony Carl Zeiss | Camera | Production Equipment | Studio B | 700.00 |
| 283 | Sony Carl Zeiss | Camera | Production Equipment | Studio J | 700.00 |
| 288 | Camera crane with Camera | Camera | Production Equipment | Studio J | 15,000.00 |
| 335 | Sony Carl Zeiss | Camera | Production Equipment | Studio C | 700.00 |
| 351 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C | 8,000.00 |
| 355 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C | 8,000.00 |
| 356 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C | 8,000.00 |
| 357 | Sony camera with tripod | Camera | Production Equipment | Studio C | 1,700.00 |
| 361 | Camera with Tripod and MD-HX | Camera | Production Equipment | Studio C | 8,000.00 |
|  | Sony Carl Zeiss | Camera | Production Equipment | Studio C | 600.00 |
|  | Canon Camera | Camera | Production Equipment | E-Commerce | 2,500.00 |
|  | Sony Carl Zeiss | Camera | Production Equipment | Studio J | 700.00 |
|  | Sony Carl Zeiss | Camera | Production Equipment | Studio J | 700.00 |
| 196 | Sony remote control unit | Camera controller | Production Equipment | Studio B | 1,500.00 |
| 207 | DJI Ronin M | Camera controller | Production Equipment | Studio B | 1,400.00 |
| 260 | Sony remote control unit | Camera controller | Production Equipment | Studio J | 800.00 |
| 276 | NovaStar LED digital video display | Camera controller | Production Equipment | Studio J | 4,500.00 |
| 331 | Sony remote control unit | Camera controller | Production Equipment | Studio C | 1,500.00 |
| 183 | 6200 DAB | Digital Audio Broadcast Processor | Production Equipment | Studio J | 1,700.00 |
| 320 | 6200 DAB | Digital Audio Broadcast Processor | Production Equipment | Studio C | 1,700.00 |
| 811 | Optimod 6200 DAB | Digital Audio Broadcast Processor | Production Equipment | Studio C Server Room | 2,000.00 |
| 68 | Drone | Drone | Production Equipment | Gym / storage | 3,000.00 |
| 187 | NC1 I/O | Input Output Module | Production Equipment | Studio J | 5,400.00 |
| 188 | NC1 I/O | Input Output Module | Production Equipment | Studio J | 5,400.00 |
| 314 | NC1 I/O | Input Output Module | Production Equipment | Studio C | 1,200.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 127 | Socanland Light | Lights | Production Equipment | Green screen room | 1,000.00 |
| 128 | Socanland Light | Lights | Production Equipment | Green screen room | 1,000.00 |
| 131 | Socanland Light | Lights | Production Equipment | Green screen room | 1,000.00 |
| 132 | Socanland Light | Lights | Production Equipment | Green screen room | 1,000.00 |
| 133 | Socanland Light | Lights | Production Equipment | Green screen room | 1,000.00 |
| 212 | Socanland Light | Lights | Production Equipment | Studio B | 500.00 |
| 213 | Socanland Light | Lights | Production Equipment | Studio B | 500.00 |
| 215 | Socanland Light | Lights | Production Equipment | Studio B | 600.00 |
| 229 | Socanland Light | Lights | Production Equipment | Studio B | 600.00 |
| 230 | Socanland Light | Lights | Production Equipment | Studio B | 1,200.00 |
| 235 | Socanland Light | Lights | Production Equipment | Security entrance | 600.00 |
| 240 | Socanland Light | Lights | Production Equipment | Studio B | 500.00 |
| 336 | Socanland Light | Lights | Production Equipment | Studio C | 1,200.00 |
| 337 | Socanland Light | Lights | Production Equipment | Studio C | 1,200.00 |
|  | Socanland Light | Lights | Production Equipment | Studio B | 600.00 |
|  | Socanland Light | Lights | Production Equipment | Studio J | 1,200.00 |
|  | Socanland Light | Lights | Production Equipment | Studio J | 1,200.00 |
|  | Socanland Light | Lights | Production Equipment | Studio J | 1,200.00 |
|  | Socanland Light | Lights | Production Equipment | Studio J | 1,200.00 |
|  | Socanland Light | Lights | Production Equipment | Studio J | 1,200.00 |
|  | Socanland Light | Lights | Production Equipment | Studio C | 1,200.00 |
|  | Light | Lights | Production Equipment | Studio J | 2,000.00 |
|  | Socanland Light | Lights | Production Equipment | Studio C | 600.00 |
|  | Socanland Light | Lights | Production Equipment | Studio B | 1,200.00 |
|  | Socanland Light | Lights | Production Equipment | Studio C | 600.00 |
|  | Socanland Light | Lights | Production Equipment | Studio C | 800.00 |
|  | Socanland Light | Lights | Production Equipment | Studio C | 800.00 |
|  | Socanland Light | Lights | Production Equipment | Studio C | 800.00 |
|  | Socanland Light | Lights | Production Equipment | Studio C | 800.00 |
|  | Socanland Light | Lights | Production Equipment | Studio B | 600.00 |
|  | Socanland Light | Lights | Production Equipment | Studio B | 1,200.00 |
| 169 | The Garnet Microphone | Microphone | Production Equipment | Sound Booth | 3,075.00 |
| 167 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio B | 5,555.00 |
| 168 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio B | 5,555.00 |
| 326 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C | 5,555.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 350 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C | 5,000.00 |
| 784 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C | 4,200.00 |
| 785 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C | 4,200.00 |
| 797 | Blade-3 | Microphone I/O Network Blade | Production Equipment | Studio C | 4,200.00 |
| 786 | Gibraltar Network | Network Rack | Production Equipment | Studio C | 650.00 |
| 323 | Clear-com MS-702 | Rack | Production Equipment | Studio C | 1,600.00 |
| 324 | Clear-com HME DX210 | Rack | Production Equipment | Studio C | 3,000.00 |
| 338 | Evo SNS 16B64TB-2X10C | Rack | Production Equipment | Studio C Server Room | 35,000.00 |
| 339 | Dell 3930 Rack | Rack | Production Equipment | Studio C Server Room | 2,000.00 |
| 340 | HP ProLiant DL360e Gen 8 | Rack | Production Equipment | Studio C Server Room | 1,100.00 |
| 341 | Haivision Encoders | Rack | Production Equipment | Studio C Server Room | 50,000.00 |
| 342 | Evo Server Rack | Rack | Production Equipment | Studio C Server Room | 50,000.00 |
| 343 | Supermicro SuperServer 1029P-MT SYS-1029P-MT | Rack | Production Equipment | Studio C Server Room | 2,100.00 |
| 344 | UC-IRD Receiver Decoder | Rack | Production Equipment | Studio C Server Room | 2,100.00 |
| 345 | Wave Stream Redundancy Controller | Rack | Production Equipment | Studio C Server Room | 15,000.00 |
| 346 | Tanberg E5770 | Rack | Production Equipment | Studio C Server Room | 600.00 |
| 347 | Tandberg EN5990 Digital Encoder | Rack | Production Equipment | Studio C Server Room | 2,500.00 |
| 362 | Creston AV3 | Rack | Production Equipment | Studio C | 2,500.00 |
| 808 | Supermicro SuperServer 1029P-MT SYS-1029P-MT | Rack | Production Equipment | Studio C Server Room | 1,000.00 |
| 274 | Digital radio control | Radio control | Production Equipment | Studio J | 5,100.00 |
| 792 | EW G4 | Radio control | Production Equipment | Studio C | 1,100.00 |
| 794 | True Diversity Receiver 500 | Receiver | Production Equipment | Studio C | 600.00 |
| 795 | True Diversity Receiver 500 | Receiver | Production Equipment | Studio C | 600.00 |
| 796 | True Diversity Receiver 500 | Receiver | Production Equipment | Studio C | 600.00 |
| 166 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio B | 545.00 |
| 181 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio J | 525.00 |
| 289 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio C | 1,200.00 |
| 290 | Teranex Mini - SDI Distribution 12G | SDI Distribution | Production Equipment | Studio C | 700.00 |
| 247 | Tricaster Server | Server | Production Equipment | Studio B | 7,500.00 |
| 248 | Tricaster Server | Server | Production Equipment | Studio B | 7,500.00 |
| 292 | Behringer x32 Rack | Server | Production Equipment | Studio C | 1,600.00 |
| 294 | Tricaster Server | Server | Production Equipment | Studio C | 2,000.00 |
| 295 | Tricaster Server | Server | Production Equipment | Studio C | 10,000.00 |
| 296 | BlackMagic Atem production switcher | Server | Production Equipment | Studio C | 1,000.00 |
| 654 | Server | Server | Production Equipment | CS server room | 600.00 |
| 655 | Server | Server | Production Equipment | CS server room | 700.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 656 | Server | Server | Production Equipment | CS server room | 1,200.00 |
| 781 | IOT/Embedded System | Server | Production Equipment | Studio C | 1,000.00 |
| 798 | Rockford R331 | Server | Production Equipment | Studio C | 11,000.00 |
| 799 | Rockford R331 | Server | Production Equipment | Studio C | 11,000.00 |
| | Server | Server | Production Equipment | CS server room | 2,000.00 |
| 158 | Wheatstone Strata 32 | Soundboard | Production Equipment | Studio B | 75,000.00 |
| 160 | ETC | Soundboard | Production Equipment | Studio B | 4,500.00 |
| 197 | Newtek | Soundboard | Production Equipment | Studio B | 20,000.00 |
| 249 | Newtek | Soundboard | Production Equipment | Studio B | 20,000.00 |
| 273 | Newtek | Soundboard | Production Equipment | Studio J | 20,000.00 |
| 275 | ETC | Soundboard | Production Equipment | Studio J | 3,000.00 |
| 279 | Wheatstone Strata 32 | Soundboard | Production Equipment | Studio J | 75,000.00 |
| 319 | Wheatstone Strata 32 | Soundboard | Production Equipment | Studio C | 75,000.00 |
| 330 | Newtek | Soundboard | Production Equipment | Studio C | 20,000.00 |
| 787 | Access Rack | Stereo | Production Equipment | Studio C | 1,800.00 |
| 788 | Access Rack | Stereo | Production Equipment | Studio C | 1,800.00 |
| 162 | ProSafe GS728TP | Switch | Production Equipment | Studio B | 500.00 |
| 190 | Switch 48 | Switch | Production Equipment | Studio J | 1,200.00 |
| 783 | Catalyst 3650 24 4X1G | Switch | Production Equipment | Studio C | 2,500.00 |
| 800 | Smart Videohub | Switch | Production Equipment | Studio C Server Room | 3,000.00 |
| 809 | ProCurve Switch 4208vl | Switch | Production Equipment | Studio C Server Room | 1,000.00 |
| 810 | DXS-1210-12SC | Switch | Production Equipment | Studio C Server Room | 1,500.00 |
| 129 | Large TV | TV | Production Equipment | Green screen room | 800.00 |
| 130 | Large TV | TV | Production Equipment | Green screen room | 800.00 |
| 198 | Large TV | TV | Production Equipment | Studio B | 2,000.00 |
| 199 | Large TV | TV | Production Equipment | Studio B | 3,000.00 |
| 200 | Large TV | TV | Production Equipment | Studio B | 1,500.00 |
| 201 | TV | TV | Production Equipment | Studio B | 800.00 |
| 216 | TV | TV | Production Equipment | Studio B | 500.00 |
| 217 | Large TV | TV | Production Equipment | Studio B | 500.00 |
| 218 | Large TV | TV | Production Equipment | Studio B | 1,500.00 |
| 219 | Large TV | TV | Production Equipment | Studio B | 1,500.00 |
| 227 | Large TV | TV | Production Equipment | Studio B | 600.00 |
| 250 | Large TV | TV | Production Equipment | Studio C | 600.00 |
| 251 | Large TV | TV | Production Equipment | Studio C | 800.00 |
| 262 | Large TV | TV | Production Equipment | Studio J | 5,500.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 263 | Large TV | TV | Production Equipment | Studio J | 4,500.00 |
| 264 | Large TV | TV | Production Equipment | Studio J | 1,500.00 |
| 267 | TV | TV | Production Equipment | Studio J | 5,400.00 |
| 268 | Large TV | TV | Production Equipment | Studio J | 1,500.00 |
| 272 | Large TV | TV | Production Equipment | Black box | 1,500.00 |
| 281 | Large TV | TV | Production Equipment | Studio J | 2,500.00 |
| 282 | Large TV | TV | Production Equipment | Studio J | 2,000.00 |
| 300 | TV | TV | Production Equipment | Podcast studio | 1,200.00 |
| 301 | TV | TV | Production Equipment | Podcast studio | 2,800.00 |
| 352 | Large TV | TV | Production Equipment | Studio C | 800.00 |
| 353 | Large TV | TV | Production Equipment | Studio C | 600.00 |
| 354 | Large TV | TV | Production Equipment | Studio C | 3,000.00 |
| 358 | TV | TV | Production Equipment | Studio C | 600.00 |
| 359 | TV | TV | Production Equipment | Studio C | 600.00 |
| 360 | TV | TV | Production Equipment | Studio C | 600.00 |
| | Large TV | TV | Production Equipment | Studio J | 1,200.00 |
| | Large TV | TV | Production Equipment | Studio J | 1,200.00 |
| | Large TV | TV | Production Equipment | Studio J | 1,200.00 |
| | Large TV | TV | Production Equipment | Studio J | 1,200.00 |
| | Large TV | TV | Production Equipment | Studio J | 1,200.00 |
| | Large TV | TV | Production Equipment | Studio J | 1,200.00 |
| 348 | SmartOnline UPS | UPS | Production Equipment | Studio C Server Room | 2,000.00 |
| 802 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room | 7,500.00 |
| 803 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room | 7,500.00 |
| 804 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room | 10,500.00 |
| 805 | GXT4 UPS | UPS | Production Equipment | Studio C Server Room | 10,500.00 |
| 806 | SmartOnline UPS | UPS | Production Equipment | Studio C | 2,000.00 |
| 163 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B | 1,500.00 |
| 164 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B | 1,500.00 |
| 165 | Smart Videohub 40x40 | Video Broadcaster | Production Equipment | Studio B | 3,000.00 |
| 179 | ATEM 1 M/E Production Studio 4k | Video Broadcaster | Production Equipment | Studio J | 2,700.00 |
| 180 | Design Video Assist | Video Broadcaster | Production Equipment | Studio J | 1,000.00 |
| 186 | LU2000 | Video Broadcaster | Production Equipment | Studio J | 5,500.00 |
| 189 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio J | 16,000.00 |
| 192 | Ultimatte 12 4k | Video Broadcaster | Production Equipment | Studio C | 2,500.00 |
| 193 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C | 1,000.00 |



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*Fixed Asset & Vehicle Schedule - Exhibit E*

| Asset Tag (a) | Description | Item | Category | Location | Est. Cost (b) |
|---|---|---|---|---|---|
| 194 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C | 1,000.00 |
| 195 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C | 1,000.00 |
| 245 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B | 600.00 |
| 246 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio B | 1,500.00 |
| 293 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio C | 16,000.00 |
| 316 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio C | 5,000.00 |
| 318 | TriCaster TC1 | Video Broadcaster | Production Equipment | Studio B | 5,000.00 |
| 327 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio C | 1,500.00 |
| 328 | TalkShow VS-100 | Video Broadcaster | Production Equipment | Studio C | 1,500.00 |
| 333 | Ultimatte 12 4k | Video Broadcaster | Production Equipment | Studio C | 2,500.00 |
| 782 | KiPro Rack | Video Broadcaster | Production Equipment | Studio C | 3,000.00 |
| 789 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio J | 1,000.00 |
| 790 | HyperDeck Studio Pro | Video Broadcaster | Production Equipment | Studio C | 1,000.00 |
| | | | **Total Production Equipment Cost** | | **969,019.00** |
| | | | | | |
| | | | **TOTAL FIXED ASSETS** | | **1,691,809.00** |
| | | | | | |
| | 2021 Winnenago RV | Vehicle | Vehicles | Alvin Devane Office | 140,000.00 |
| | 2006 Acura MX | Vehicle | Vehicles | Alvin Devane Office | 10,000.00 |
| | 2015 Ford F450 Teradyne Truck | Vehicle | Vehicles | Gym / storage | 250,000.00 |
| | | | **TOTAL VEHICLE COST** | | **400,000.00** |

(a) List is the result of a physical count of items located at the FSS Offices and Studios and does not include anything of nominal value such as small office suplies or personal items. The threshhold of value to be counted and assigned an Asset ID was $500 and higher. Management does not believe there is a material amount of liquidation value in the small items that have under $500 of cost when purchased.

(b) Historical asset values for Free Speech Systems are not complete or reliable. We researched our records to estimate the costs and management believes the amounts are materially correct and consistent with prior tax returns and disclosures in this

**Exhibit F**

**Projections of Net Disposable Income**

**FREE SPEECH SYSTEMS LLC**
Southern District of Texas
Case #22-60043
2024 Profit & Loss Projections - Exhibit F
as of 11/2/2023



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Supplement Sales | 2,257,200 | 2,205,000 | 2,317,500 | 2,353,500 | 2,389,500 | 2,363,400 | 2,314,800 | 2,328,300 | 2,353,500 | 2,367,000 | 2,430,000 | 2,628,000 | 28,307,700 |
| Merchandise | 11,580 | 10,728 | 11,664 | 11,724 | 11,880 | 11,400 | 19,436 | 19,808 | 19,088 | 23,928 | 13,560 | 14,856 | 179,652 |
| Non-Supplement Initiatives | 92,400 | 94,200 | 97,200 | 98,700 | 99,600 | 97,800 | 100,200 | 100,800 | 98,400 | 108,000 | 115,200 | 126,000 | 1,228,500 |
| Advertising / Endorsements | 25,000 | 25,000 | 25,000 | 25,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 50,000 | 395,000 |
| Donations | 5,000 | 5,000 | 5,000 | 100,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 100,000 | 5,000 | 5,000 | 250,000 |
| **Total Income** | 2,391,180 | 2,339,928 | 2,456,364 | 2,588,924 | 2,540,980 | 2,512,600 | 2,474,436 | 2,488,908 | 2,510,988 | 2,633,928 | 2,598,760 | 2,823,856 | 30,360,852 |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| FSS Supplement Costs | 858,060 | 837,221 | 879,944 | 892,683 | 906,475 | 894,627 | 856,800 | 830,484 | 799,497 | 788,211 | 809,190 | 875,124 | 10,228,315 |
| Online Merchandise | 6,948 | 6,437 | 6,998 | 7,034 | 7,128 | 6,840 | 11,662 | 11,885 | 11,453 | 14,357 | 8,136 | 8,914 | 107,791 |
| Non-Supplement Sales Costs | 64,680 | 65,940 | 68,040 | 69,090 | 69,720 | 68,460 | 70,140 | 70,560 | 68,880 | 75,600 | 80,640 | 88,200 | 859,950 |
| **Total Cost of Goods Sold** | 929,688 | 909,597 | 954,982 | 968,807 | 983,323 | 969,927 | 938,602 | 912,929 | 879,830 | 878,168 | 897,966 | 972,238 | 11,196,056 |
| **Gross Margin** | 1,461,492 | 1,430,331 | 1,501,382 | 1,620,117 | 1,557,657 | 1,542,673 | 1,535,834 | 1,575,979 | 1,631,158 | 1,755,760 | 1,700,794 | 1,851,618 | 19,164,796 |
| | 61.1% | 61.1% | 61.1% | 62.6% | 61.3% | 61.4% | 62.1% | 63.3% | 65.0% | 66.7% | 65.4% | 65.6% | 63.1% |
| **Personnel Expenses** | | | | | | | | | | | | | |
| Salaries | 261,984 | 261,984 | 261,984 | 261,984 | 261,984 | 392,976 | 261,984 | 261,984 | 261,984 | 261,984 | 261,984 | 392,976 | 3,405,792 |
| Alex Jones Salary | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 1,500,000 |
| New COO Candidate | 30,769 | 30,769 | 30,769 | 30,769 | 30,769 | 46,155 | 30,769 | 30,769 | 30,769 | 30,769 | 30,769 | 46,155 | 400,000 |
| Hourly Wages & Overtime | 59,950 | 59,950 | 59,950 | 59,950 | 59,950 | 89,925 | 59,950 | 59,950 | 59,950 | 59,950 | 59,950 | 89,925 | 779,350 |
| Payroll Taxes | 35,809 | 35,809 | 35,809 | 35,809 | 35,809 | 53,713 | 35,809 | 35,809 | 35,809 | 35,809 | 35,809 | 53,713 | 465,513 |
| Benefits | 28,085 | 28,085 | 28,085 | 28,085 | 28,085 | 42,128 | 28,085 | 28,085 | 28,085 | 28,085 | 28,085 | 42,128 | 365,109 |
| Executive Incentive Comp | 100,000 | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Employee Bonuses | 48,290 | 48,290 | 48,290 | 48,290 | 48,290 | 72,435 | 48,290 | 48,290 | 48,290 | 48,290 | 48,290 | 72,435 | 627,771 |
| Payroll Tax on Bonus Comp | 3,485 | 1,135 | 1,135 | 1,135 | 1,135 | 1,702 | 1,135 | 1,135 | 1,135 | 1,135 | 1,135 | 1,702 | 17,103 |
| Contract Employees | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 839,400 |
| Consulting Services | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 46,500 |
| **Total Personnel Costs** | 757,457 | 655,107 | 655,107 | 655,107 | 655,107 | 945,809 | 655,357 | 655,357 | 655,357 | 655,357 | 655,357 | 946,059 | 8,546,538 |
| | 31.7% | 28.0% | 26.7% | 25.3% | 25.8% | 37.6% | 26.5% | 26.3% | 26.1% | 24.9% | 25.2% | 33.5% | 28.1% |
| **Production / Facility Expense** | | | | | | | | | | | | | |
| IT Expenses - Production | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 2,432,100 |
| IT Expenses - Online Store | 83,000 | 83,000 | 83,000 | 83,000 | 84,000 | 84,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 1,010,000 |
| Advertising & Promotion | 18,000 | 18,000 | 18,000 | 21,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 219,000 |
| Facilities | 125,700 | 125,700 | 125,700 | 125,200 | 124,700 | 139,700 | 124,700 | 124,700 | 124,700 | 124,700 | 124,700 | 124,700 | 1,514,900 |
| Travel | 6,550 | 6,550 | 38,350 | 6,550 | 6,550 | 73,350 | 71,550 | 6,550 | 38,350 | 6,550 | 36,550 | 38,350 | 335,800 |
| Administrative | 14,600 | 14,600 | 16,600 | 14,600 | 14,600 | 14,600 | 14,600 | 14,600 | 39,600 | 14,600 | 14,600 | 19,600 | 212,200 |
| **Total Production / Facility Expense** | 450,525 | 450,525 | 484,325 | 453,025 | 450,525 | 537,325 | 516,525 | 451,525 | 508,325 | 451,525 | 481,525 | 488,325 | 5,724,000 |
| | 18.8% | 19.3% | 19.7% | 17.5% | 17.7% | 21.4% | 20.9% | 18.1% | 20.2% | 17.1% | 18.5% | 17.3% | 18.9% |
| **Total Operating Exp** | 1,207,982 | 1,105,632 | 1,139,432 | 1,108,132 | 1,105,632 | 1,483,134 | 1,171,882 | 1,106,882 | 1,163,682 | 1,106,882 | 1,136,882 | 1,434,384 | 14,270,538 |
| | 50.5% | 47.3% | 46.4% | 42.8% | 43.5% | 59.0% | 47.4% | 44.5% | 46.3% | 42.0% | 43.7% | 50.8% | 47.0% |
| **Operating Income** | 253,510 | 324,699 | 361,950 | 511,985 | 452,025 | 59,539 | 363,952 | 469,097 | 467,476 | 648,878 | 563,912 | 417,234 | 4,894,258 |
| | 10.6% | 13.9% | 14.7% | 19.8% | 17.8% | 2.4% | 14.7% | 18.8% | 18.6% | 24.6% | 21.7% | 14.8% | 16.1% |
| **Bankruptcy Management Costs** | | | | | | | | | | | | | |
| (a) CRO / Non Employee Mgmt Fees | 50,000 | 50,000 | 50,000 | 50,000 | - | - | - | - | - | - | - | - | 200,000 |
| Trustee Fees | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| FSS Bankruptcy Counsel | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| (b) FSS Appeal Counsel | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Bankruptcy Management Costs** | 80,000 | 80,000 | 80,000 | 80,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 560,000 |
| **Contribution to Plaintiff Trust Account** | | | | | | | | | | | | | |
| (c) Tax Deductible Trust Contributions | 164,835 | 232,464 | 267,853 | 410,385 | 400,924 | 28,062 | 317,255 | 417,142 | 415,602 | 587,934 | 507,216 | 367,872 | 4,117,545 |
| **Income before Taxes** | 8,676 | 12,235 | 14,098 | 21,599 | 21,101 | 1,477 | 16,698 | 21,955 | 21,874 | 30,944 | 26,696 | 19,362 | 216,713 |
| Federal Income Tax Expense (21%) | 1,822 | 2,569 | 2,960 | 4,536 | 4,431 | 310 | 3,507 | 4,611 | 4,594 | 6,498 | 5,606 | 4,066 | 45,510 |
| **Net Income** | 6,854 | 9,666 | 11,137 | 17,063 | 16,670 | 1,167 | 13,191 | 17,344 | 17,280 | 24,446 | 21,090 | 15,296 | 171,203 |
| | 0.3% | 0.4% | 0.5% | 0.7% | 0.7% | 0.0% | 0.5% | 0.7% | 0.7% | 0.9% | 0.8% | 0.5% | 0.6% |
| **Reserves** | | | | | | | | | | | | | |
| (d) Capital Expenditure Reserve | 5,000 | 5,000 | 10,000 | 10,000 | 10,000 | - | 5,000 | 5,000 | 10,000 | 5,000 | 5,000 | 10,000 | 80,000 |
| (e) Operating Capital Reserve | 1,854 | 4,666 | 1,137 | 7,063 | 6,670 | 1,167 | 8,191 | 12,344 | 7,280 | 19,446 | 16,090 | 5,296 | 91,203 |
| | 6,854 | 9,666 | 11,137 | 17,063 | 16,670 | 1,167 | 13,191 | 17,344 | 17,280 | 24,446 | 21,090 | 15,296 | 171,203 |
| Projected Ending Cash Balance | 1,701,854 | 1,706,519 | 1,707,656 | 1,714,720 | 1,721,390 | 1,722,556 | 1,730,748 | 1,743,092 | 1,750,372 | 1,769,818 | 1,785,907 | 1,791,203 | 1,791,203 |
| % of Previous Year Revenue | | | | | | | | | | | | | 6.0% |

(a) CRO will exit Free Speech Systems when the plan is confirmed and effective and a suitable replacement can be found.

(b) Assumes the plan provides for a discharge at the end of the 5-year period and that the current appeals in Connecticut and Texas will be dismissed In the event that there is no discharge available as a result of the plan, the appeals will be continued and the budget will be amended to reflect those costs.

(c) 95% of Operating Income, less Bankruptcy Management Costs will be transferred to the Plaintiff Trust Account on a Quarterly Basis. Unused Capital Expenditure Reserve and excess Operating Capital above 7% of previous years revenue will be contributed to the Plaintiff Trust Account in the first quarter of the following year.

(d) Reserve for Cap Ex to keep the production studio and facilities operating and current.

(e) Working Capital to operate the business. Cap at 7% of prior years revenue

 FREE SPEECH SYSTEMS

FREE SPEECH SYSTEMS LLC
Southern District of Texas
Case #22-60043
2025-2028 Profit & Loss Projections - Exhibit F
as of 11/2/2023

| | Q1 | Q2 | Q3 | Q4 | Total 2025 | Q1 | Q2 | Q3 | Q4 | Total 2026 | Q1 | Q2 | Q3 | Q4 | Total 2027 | Q1 | Q2 | Q3 | Q4 | Total 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | | | | | | |
| Supplement Sales | 7,118,685 | 7,461,720 | 7,346,430 | 7,796,250 | 29,723,085 | 7,439,026 | 7,797,497 | 7,677,019 | 8,147,081 | 31,060,624 | 7,736,587 | 8,109,397 | 7,984,100 | 8,472,965 | 32,303,049 | 8,046,050 | 8,433,773 | 8,303,464 | 8,811,883 | 33,595,171 |
| Merchandise | 35,671 | 36,754 | 61,249 | 54,961 | 188,635 | 37,276 | 38,408 | 64,005 | 57,434 | 197,123 | 38,767 | 39,944 | 66,565 | 59,732 | 205,008 | 40,317 | 41,542 | 69,228 | 62,121 | 213,208 |
| Non-Supplement Initiatives | 297,990 | 310,905 | 314,370 | 366,660 | 1,289,925 | 311,400 | 324,896 | 328,517 | 383,160 | 1,347,972 | 323,856 | 337,892 | 341,657 | 398,486 | 1,401,890 | 336,810 | 351,407 | 355,324 | 414,426 | 1,457,966 |
| Advertising / Endorsements | 300,000 | 300,000 | 320,000 | 127,800 | 1,047,800 | 318,000 | 318,000 | 339,200 | 135,468 | 1,110,668 | 335,490 | 335,490 | 357,856 | 142,919 | 1,171,755 | 353,942 | 353,942 | 377,538 | 150,779 | 1,236,201 |
| Donations | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 |
| **Total Income** | 7,767,346 | 8,219,379 | 8,057,049 | 8,455,671 | 32,499,445 | 8,120,701 | 8,588,801 | 8,423,741 | 8,833,143 | 33,966,387 | 8,449,699 | 8,932,723 | 8,765,178 | 9,184,101 | 35,331,702 | 8,792,120 | 9,290,665 | 9,120,553 | 9,549,209 | 36,752,546 |
| **Cost of Goods Sold** | | | | | | | | | | | | | | | | | | | | |
| FSS Supplement Costs | 2,453,490 | 2,571,719 | 2,531,984 | 2,559,063 | 10,116,257 | 2,539,363 | 2,661,729 | 2,620,603 | 2,648,631 | 10,470,326 | 2,628,240 | 2,754,890 | 2,712,324 | 2,741,333 | 10,836,787 | 2,720,229 | 2,851,311 | 2,807,256 | 2,837,279 | 11,216,075 |
| Online Merchandise | 21,097 | 21,737 | 36,224 | 32,506 | 111,564 | 21,835 | 22,498 | 37,492 | 33,643 | 115,469 | 22,599 | 23,286 | 38,804 | 34,821 | 119,510 | 23,390 | 24,101 | 40,162 | 36,040 | 123,693 |
| Non-Supplement Sales Costs | 208,593 | 217,634 | 220,059 | 256,662 | 902,948 | 217,980 | 227,427 | 229,962 | 268,212 | 943,580 | 226,699 | 236,524 | 239,160 | 278,940 | 981,323 | 235,767 | 245,985 | 248,727 | 290,098 | 1,020,576 |
| **Total Cost of Goods Sold** | 2,683,180 | 2,811,090 | 2,788,267 | 2,848,231 | 11,130,768 | 2,779,177 | 2,911,655 | 2,888,057 | 2,950,486 | 11,529,374 | 2,877,538 | 3,014,700 | 2,990,289 | 3,055,094 | 11,937,620 | 2,979,386 | 3,121,397 | 3,096,145 | 3,163,417 | 12,360,344 |
| **Gross Margin** | 5,084,166 | 5,408,289 | 5,268,782 | 5,607,440 | 21,368,677 | 5,341,524 | 5,677,147 | 5,535,684 | 5,882,658 | 22,437,012 | 5,572,161 | 5,918,024 | 5,774,890 | 6,129,007 | 23,394,082 | 5,812,734 | 6,169,268 | 6,024,409 | 6,385,792 | 24,392,203 |
| | 65.5% | 65.8% | 65.4% | 66.3% | 65.8% | 65.8% | 66.1% | 65.7% | 66.6% | 66.1% | 65.9% | 66.3% | 65.9% | 66.7% | 66.2% | 66.1% | 66.4% | 66.1% | 66.9% | 66.4% |
| **Personnel Expenses** | | | | | | | | | | | | | | | | | | | | |
| Salaries | 825,250 | 962,791 | 825,250 | 962,791 | 3,576,082 | 866,512 | 1,010,931 | 866,512 | 1,010,931 | 3,754,886 | 909,838 | 1,061,477 | 909,838 | 1,061,477 | 3,942,630 | 955,330 | 1,114,551 | 955,330 | 1,114,551 | 4,139,761 |
| Alex Jones Salary | 346,155 | 403,845 | 346,155 | 403,845 | 1,500,000 | 346,155 | 403,845 | 346,155 | 403,845 | 1,500,000 | 346,155 | 403,845 | 346,155 | 403,845 | 1,500,000 | 346,155 | 403,845 | 346,155 | 403,845 | 1,500,000 |
| New COO Candidate | 96,922 | 113,078 | 96,922 | 113,078 | 420,000 | 101,768 | 118,732 | 101,768 | 118,732 | 441,000 | 106,857 | 124,668 | 106,857 | 124,668 | 463,050 | 112,200 | 130,902 | 112,200 | 130,902 | 486,203 |
| Hourly Wages & Overtime | 188,843 | 220,316 | 188,843 | 220,316 | 818,318 | 198,285 | 231,332 | 198,285 | 231,332 | 859,233 | 208,199 | 242,899 | 208,199 | 242,899 | 902,195 | 218,609 | 255,044 | 218,609 | 255,044 | 947,305 |
| Payroll Taxes | 111,473 | 130,052 | 111,473 | 130,052 | 483,052 | 115,723 | 135,010 | 115,723 | 135,010 | 501,467 | 120,185 | 140,216 | 120,185 | 140,216 | 520,802 | 124,870 | 145,682 | 124,870 | 145,682 | 541,105 |
| Benefits | 87,430 | 102,002 | 87,430 | 102,002 | 378,864 | 90,763 | | | 105,890 | 196,654 | 94,263 | 109,973 | 94,263 | 109,973 | 408,473 | 97,938 | 114,260 | 97,938 | 114,260 | 424,396 |
| Executive Incentive Comp | 200,000 | | | | 200,000 | 225,000 | | | | 225,000 | 250,000 | | | | 250,000 | 275,000 | | | | 275,000 |
| Employee Bonuses | 152,114 | 177,466 | 152,114 | 177,466 | 659,160 | 159,720 | 186,339 | 159,720 | 186,339 | 692,118 | 167,705 | 195,656 | 167,705 | 195,656 | 726,724 | 176,091 | 205,439 | 176,091 | 205,439 | 763,060 |
| Payroll Tax on Bonus Comp | 8,275 | 4,170 | 3,575 | 4,170 | 20,190 | 9,041 | 4,379 | 3,753 | 4,379 | 21,552 | 9,816 | 4,598 | 3,941 | 4,598 | 22,953 | 10,601 | 4,828 | 4,138 | 4,828 | 24,394 |
| Contract Employees | 220,343 | 220,343 | 220,343 | 220,343 | 881,370 | 231,360 | 231,360 | 231,360 | 231,360 | 925,439 | 242,928 | 242,928 | 242,928 | 242,928 | 971,710 | 255,074 | 255,074 | 255,074 | 255,074 | 1,020,296 |
| Consulting Services | 12,000 | 12,000 | 12,000 | 12,000 | 48,000 | 15,000 | 15,000 | 15,000 | 15,000 | 60,000 | 18,000 | 18,000 | 18,000 | 18,000 | 72,000 | 21,000 | 21,000 | 21,000 | 21,000 | 84,000 |
| **Total Personnel Costs** | 2,248,804 | 2,346,063 | 2,044,104 | 2,346,063 | 8,985,035 | 2,359,327 | 2,336,928 | 2,038,276 | 2,442,818 | 9,177,348 | 2,473,946 | 2,544,260 | 2,218,071 | 2,544,260 | 9,780,537 | 2,592,866 | 2,650,625 | 2,311,404 | 2,650,625 | 10,205,520 |
| | 29.0% | 28.5% | 25.4% | 27.7% | 27.6% | 29.1% | 27.2% | 24.2% | 27.7% | 27.0% | 29.3% | 28.5% | 25.3% | 27.7% | 27.7% | 29.5% | 28.5% | 25.3% | 27.8% | 27.8% |
| **Production / Facility Expense** | | | | | | | | | | | | | | | | | | | | |
| IT Expenses - Production | 632,346 | 632,346 | 632,346 | 632,346 | 2,529,384 | 657,640 | 657,640 | 657,640 | 657,640 | 2,630,559 | 683,945 | 683,945 | 683,945 | 683,945 | 2,735,782 | 711,303 | 711,303 | 711,303 | 711,303 | 2,845,213 |
| | 258,960 | 261,040 | 265,200 | 265,200 | 1,050,400 | 269,318 | 271,482 | 275,808 | 275,808 | 1,092,416 | 280,091 | 282,341 | 286,840 | 286,840 | 1,136,113 | 291,295 | 293,634 | 298,314 | 298,314 | 1,181,557 |
| Advertising & Promotion | 56,160 | 59,280 | 56,160 | 56,160 | 227,760 | 58,406 | 61,651 | 58,406 | 58,406 | 236,870 | 60,743 | 64,117 | 60,743 | 60,743 | 246,345 | 63,172 | 66,682 | 63,172 | 63,172 | 256,199 |
| Facilities | 392,184 | 405,184 | 389,064 | 389,064 | 1,575,496 | 407,871 | 421,391 | 404,627 | 404,627 | 1,638,516 | 424,186 | 438,247 | 420,812 | 420,812 | 1,704,056 | 441,154 | 455,777 | 437,644 | 437,644 | 1,772,219 |
| Travel | 53,508 | 89,908 | 121,108 | 84,708 | 349,232 | 55,648 | 93,504 | 125,952 | 88,096 | 363,201 | 57,874 | 97,244 | 130,990 | 91,620 | 377,729 | 60,189 | 101,134 | 136,230 | 95,285 | 392,839 |
| Administrative | 47,632 | 50,752 | 71,552 | 50,752 | 220,688 | 49,537 | 52,782 | 74,414 | 52,782 | 229,516 | 51,519 | 54,893 | 77,391 | 54,893 | 238,696 | 53,580 | 57,089 | 80,486 | 57,089 | 248,244 |
| **Total Production / Facility Expense** | 1,440,790 | 1,498,510 | 1,535,430 | 1,478,230 | 5,952,960 | 1,498,422 | 1,558,450 | 1,596,847 | 1,537,359 | 6,191,078 | 1,558,358 | 1,620,788 | 1,660,721 | 1,598,854 | 6,438,722 | 1,620,693 | 1,685,620 | 1,727,150 | 1,662,808 | 6,696,270 |
| | 18.5% | 18.2% | 19.1% | 17.5% | 18.3% | 18.5% | 18.1% | 19.0% | 17.4% | 18.2% | 18.4% | 18.1% | 18.9% | 17.4% | 18.2% | 18.4% | 18.1% | 18.9% | 17.4% | 18.2% |
| **Total Operating Expense** | 3,689,594 | 3,844,573 | 3,579,534 | 3,824,293 | 14,937,995 | 3,857,748 | 3,895,378 | 3,635,123 | 3,980,177 | 15,368,426 | 4,032,304 | 4,165,049 | 3,878,792 | 4,143,114 | 16,219,259 | 4,213,559 | 4,336,245 | 4,038,554 | 4,313,433 | 16,901,791 |
| | 47.5% | 46.8% | 44.4% | 45.2% | 46.0% | 47.5% | 45.4% | 43.2% | 45.1% | 45.2% | 47.7% | 46.6% | 44.3% | 45.1% | 45.9% | 47.9% | 46.7% | 44.3% | 45.2% | 46.0% |
| **Operating Income** | 1,394,572 | 1,563,716 | 1,689,248 | 1,783,147 | 6,430,682 | 1,483,776 | 1,781,769 | 1,900,561 | 1,902,481 | 7,068,586 | 1,539,857 | 1,752,975 | 1,896,098 | 1,985,893 | 7,174,823 | 1,599,175 | 1,833,023 | 1,985,855 | 2,072,360 | 7,490,412 |
| | 18.0% | 19.0% | 21.0% | 21.1% | 19.8% | 18.3% | 20.7% | 22.6% | 21.5% | 20.8% | 18.2% | 19.6% | 21.6% | 21.6% | 20.3% | 18.2% | 19.7% | 21.8% | 21.7% | 20.4% |
| **Bankruptcy Management Costs** | | | | | | | | | | | | | | | | | | | | |
| CRO / Non Employee Mgmt Fees | | | | | | | | | | | | | | | | | | | | |
| Trustee Fees | 45,000 | 45,000 | 45,000 | 45,000 | 180,000 | 30,000 | 30,000 | 30,000 | 30,000 | 120,000 | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 | 25,000 | 35,000 | 35,000 | 35,000 | 130,000 |
| FSS Bankruptcy Counsel | 45,000 | 45,000 | 45,000 | 45,000 | 180,000 | 30,000 | 30,000 | 30,000 | 30,000 | 120,000 | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 | 25,000 | 35,000 | 35,000 | 35,000 | 130,000 |
| (a) FSS Appeal Counsel | | | | | | | | | | | | | | | | | | | | |
| **Total Bankruptcy Management Costs** | 90,000 | 90,000 | 90,000 | 90,000 | 360,000 | 60,000 | 60,000 | 60,000 | 60,000 | 240,000 | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 | 50,000 | 70,000 | 70,000 | 70,000 | 260,000 |
| | 1.2% | 1.1% | 1.1% | 1.1% | 1.1% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.6% | 0.6% | 0.6% | 0.5% | 0.6% | 0.6% | 0.8% | 0.8% | 0.7% | 0.7% |
| **Contribution to Plaintiff Trust Account** | | | | | | | | | | | | | | | | | | | | |
| (b) Tax Deductible Trust Contributions | 1,239,343 | 1,400,030 | 1,519,285 | 1,608,490 | 5,767,148 | 1,352,587 | 1,635,680 | 1,748,533 | 1,750,357 | 6,487,157 | 1,415,364 | 1,617,826 | 1,753,793 | 1,839,099 | 6,626,082 | 1,502,699 | 1,718,947 | 1,867,958 | 1,952,301 | 7,041,906 |
| **Income before Taxes** | 65,229 | 73,686 | 79,962 | 84,657 | 303,534 | 71,189 | 86,088 | 92,028 | 92,124 | 341,429 | 74,493 | 85,149 | 92,305 | 96,795 | 348,741 | 46,475 | 44,076 | 47,896 | 50,059 | 188,506 |
| Federal Income Tax Expense (21%) | 13,698 | 15,474 | 16,792 | 17,778 | 63,742 | (14,950) | (18,079) | (19,326) | (19,346) | (71,700) | (15,643) | (17,881) | (19,384) | (20,327) | (73,236) | (9,760) | (9,256) | (10,058) | (10,512) | (39,586) |
| **Net Income** | 51,531 | 58,212 | 63,170 | 66,879 | 239,792 | 56,138 | 104,167 | 111,354 | 111,470 | 413,129 | 90,136 | 103,030 | 111,689 | 117,122 | 421,977 | 56,235 | 53,331 | 57,955 | 60,571 | 228,092 |
| | 0.7% | 0.7% | 0.8% | 0.8% | 0.7% | 1.1% | 1.2% | 1.3% | 1.3% | 1.2% | 1.1% | 1.2% | 1.3% | 1.3% | 1.2% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| **Reserves** | | | | | | | | | | | | | | | | | | | | |
| (c) Capital Expenditure Reserve | 25,000 | 25,000 | 50,000 | 50,000 | 150,000 | 40,000 | 40,000 | 40,000 | 40,000 | 160,000 | 45,000 | 45,000 | 45,000 | 45,000 | 180,000 | 35,000 | 35,000 | 35,000 | 35,000 | 140,000 |
| (d) Operating Capital Reserve | 26,531 | 33,212 | 13,170 | 16,879 | 89,792 | 46,138 | 64,167 | 71,354 | 71,470 | 253,129 | 45,136 | 58,030 | 66,689 | 72,122 | 241,977 | 21,235 | 18,331 | 22,955 | 25,571 | 88,092 |
| | 51,531 | 58,212 | 63,170 | 66,879 | 239,792 | 86,138 | 104,167 | 111,354 | 111,470 | 413,129 | 90,136 | 103,030 | 111,689 | 117,122 | 421,977 | 56,235 | 53,331 | 57,955 | 60,571 | 228,092 |
| **Projected Ending Cash Balance** | 1,817,734 | 1,850,946 | 1,864,116 | 1,880,995 | 1,880,995 | 1,927,134 | 1,991,301 | 2,062,655 | 2,134,125 | 2,134,125 | 2,179,261 | 2,237,291 | 2,303,980 | 2,376,101 | 2,376,101 | 2,397,336 | 2,415,668 | 2,438,622 | 2,464,194 | 2,464,194 |
| *% of Previous Year Revenue* | | | | | 6.2% | | | | | 6.6% | | | | | 7.0% | | | | | 7.0% |

(a) Assumes the plan provides for a discharge at the end of the 5-year period and that the current appeals in Connecticut and Texas will be dismissed. In the event that there is no discharge awarded as a result of the plan, then the appeals will be continued and the budget will be amended to reflect these costs.

(b) 95% of Operating Income, less Bankruptcy Management Costs will be transferred to the Plaintiff Trust Account on a Quarterly Basis. Unused Capital Expenditure Reserve and excess Operating Capital above 7% of previous years revenue will be contributed to the Plaintiff Trust Account in the first Quarter of the following year.

(c) Reserve for Cap Ex to keep the production studio and facilities operating and current.

(d) Working Capital to operate the business. Cap at 7% of prior years revenue.



**FREE SPEECH SYSTEMS**

FREE SPEECH SYSTEMS LLC
Southern District of Texas
Case #22-60043
*2024 Revenue Projections - Exhibit F*
*as of 11/2/2023*

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Online Supplement Sales - FSS | (a) | 1,620,000 | 1,588,500 | 1,669,500 | 1,701,000 | 1,726,200 | 1,719,000 | 1,800,000 | 1,998,000 | 2,259,000 | 2,367,000 | 2,430,000 | 2,628,000 | 23,506,200 |
| Online Supplement Sales - OTHER | (b) | 637,200 | 616,500 | 648,000 | 652,500 | 663,300 | 644,400 | 514,800 | 330,300 | 94,500 | - | - | - | 4,801,500 |
| Online Merchandise | (c) | 11,580 | 10,728 | 11,664 | 11,724 | 11,880 | 11,400 | 19,436 | 19,808 | 19,088 | 23,928 | 13,560 | 14,856 | 179,652 |
| Non-Supplement Sales Initiatives | (d) | 92,400 | 94,200 | 97,200 - | 98,700 | 99,600 | 97,800 - | 100,200 | 100,800 | 98,400 - | 108,000 | 115,200 | 126,000 | 1,228,500 |
| Advertising / Endorsements | (e) | 25,000 | 25,000 | 25,000 | 25,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 50,000 | 395,000 |
| Donations | (f) | 5,000 | 5,000 | 5,000 | 100,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 100,000 | 5,000 | 5,000 | 250,000 |
| **Total Income** | | 2,391,180 | 2,339,928 | 2,456,364 | 2,588,924 | 2,540,980 | 2,512,600 | 2,474,436 | 2,488,908 | 2,510,988 | 2,633,928 | 2,598,760 | 2,823,856 | 30,360,852 |
| | | | | | | | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| FSS Supplement Costs | (g) | 539,460 | 528,971 | 555,944 | 566,433 | 574,825 | 572,427 | 599,400 | 665,334 | 752,247 | 788,211 | 809,190 | 875,124 | 7,827,565 |
| Other Supplement Pmts | (h) | 318,600 | 308,250 | 324,000 | 326,250 | 331,650 | 322,200 | 257,400 | 165,150 | 47,250 | - | - | - | 2,400,750 |
| Online Merchandise | | 6,948 | 6,437 | 6,998 | 7,034 | 7,128 | 6,840 | 11,662 | 11,885 | 11,453 | 14,357 | 8,136 | 8,914 | 107,791 |
| Non-Supplement Sales Costs | | 64,680 | 65,940 | 68,040 | 69,090 | 69,720 | 68,460 | 70,140 | 70,560 | 68,880 | 75,600 | 80,640 | 88,200 | 859,950 |
| **Total Cost of Goods Sold** | | 929,688 | 909,597 | 954,982 | 968,807 | 983,323 | 969,927 | 938,602 | 912,929 | 879,830 | 878,168 | 897,966 | 972,238 | 11,196,056 |
| | | | | | | | | | | | | | | |
| **Gross Margin** | | 1,461,492 | 1,430,331 | 1,501,382 | 1,620,117 | 1,557,657 | 1,542,673 | 1,535,834 | 1,575,979 | 1,631,158 | 1,755,760 | 1,700,794 | 1,851,618 | 19,164,796 |
| | | 61.1% | 61.1% | 61.1% | 62.6% | 61.3% | 61.4% | 62.1% | 63.3% | 65.0% | 66.7% | 65.4% | 65.6% | 63.1% |

(a)  FSS Sales include product inventory purcahsed by FSS or through our third party fulfillment service
(b)  Includes sales from PQPR and ESG. Sales are at a reduced margin and expected to be phased out in 2024
(c)  Other merchandise sales increase ahead of the 2024 election cycle.
(d)  Includes Pre-packaged meals and Alex Jones branded coffee
(e)  Assumes that advertising and endorsements is a growing product line in 2024 and that AJ is able to secure higher rates
(f)  Includes two donation drives per year
(g)  Supplement margins on FSS inventory are averaging 67% with some individual products higher and some lower
(h)  Current arrangement with ESG is that Platinum inventory is 50% commission after fees and inventory costs

**FREE SPEECH SYSTEMS**

FREE SPEECH SYSTEMS LLC
Southern District of Texas
Case #22-60043
*2025-2028 Revenue Projections - Exhibit F*
*as of 11/2/2023*

| | | 2025 Q1 | Q2 | Q3 | Q4 | 2025 TOTAL | 2026 Q1 | Q2 | Q3 | Q4 | 2026 TOTAL | 2027 Q1 | Q2 | Q3 | Q4 | 2027 TOTAL | 2028 Q1 | Q2 | Q3 | Q4 | 2028 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | | | | | | | | |
| Online Supplement Sales - FSS | (a) | 7,118,685 | 7,461,720 | 7,346,430 | 7,796,250 | 29,723,085 | 7,439,026 | 7,797,497 | 7,677,019 | 8,147,081 | 31,060,624 | 7,736,587 | 8,109,397 | 7,984,100 | 8,472,965 | 32,303,049 | 8,046,050 | 8,433,773 | 8,303,464 | 8,811,883 | 33,595,171 |
| Online Merchandise | (b) | 35,671 | 36,754 | 61,249 | 54,961 | 188,635 | 37,276 | 38,408 | 64,005 | 57,434 | 197,123 | 38,767 | 39,944 | 66,565 | 59,732 | 205,008 | 40,317 | 41,542 | 69,228 | 62,121 | 213,208 |
| Non-Supplement Sales Initiatives | | 297,990 | 310,905 | 314,370 | 366,660 | 1,289,925 | 311,400 | 324,896 | 328,517 | 383,160 | 1,347,972 | 323,856 | 337,892 | 341,657 | 398,486 | 1,401,890 | 336,810 | 351,407 | 355,324 | 414,426 | 1,457,966 |
| Advertising / Endorsements | (c) | 300,000 | 300,000 | 320,000 | 127,800 | 1,047,800 | 318,000 | 318,000 | 339,200 | 135,468 | 1,110,668 | 335,490 | 335,490 | 357,856 | 142,919 | 1,171,755 | 353,942 | 353,942 | 377,538 | 150,779 | 1,236,201 |
| Donations | (d) | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 | 15,000 | 110,000 | 15,000 | 110,000 | 250,000 |
| **Total Income** | | 7,767,346 | 8,219,379 | 8,057,049 | 8,455,671 | 32,499,445 | 8,120,701 | 8,588,801 | 8,423,741 | 8,833,143 | 33,966,387 | 8,449,699 | 8,932,723 | 8,765,178 | 9,184,101 | 35,331,702 | 8,792,120 | 9,290,665 | 9,120,553 | 9,549,209 | 36,752,546 |
| **Cost of Goods Sold** | | | | | | | | | | | | | | | | | | | | | |
| FSS Supplement Costs | (e) | 2,453,490 | 2,571,719 | 2,531,984 | 2,559,063 | 10,116,257 | 2,539,363 | 2,661,729 | 2,620,603 | 2,648,631 | 10,470,326 | 2,628,240 | 2,754,890 | 2,712,324 | 2,741,333 | 10,836,787 | 2,720,229 | 2,851,311 | 2,807,256 | 2,837,279 | 11,216,075 |
| Online Merchandise | | 21,097 | 21,737 | 36,224 | 32,506 | 111,564 | 21,835 | 22,498 | 37,492 | 33,643 | 115,469 | 22,599 | 23,286 | 38,804 | 34,821 | 119,510 | 23,390 | 24,101 | 40,162 | 36,040 | 123,693 |
| Non-Supplement Sales Costs | | 208,593 | 217,634 | 220,059 | 256,662 | 902,948 | 217,980 | 227,427 | 229,962 | 268,212 | 943,580 | 226,699 | 236,524 | 239,160 | 278,940 | 981,323 | 235,767 | 245,985 | 248,727 | 290,098 | 1,020,576 |
| **Total Cost of Goods Sold** | | 2,683,180 | 2,811,090 | 2,788,267 | 2,848,231 | 11,130,768 | 2,779,177 | 2,911,655 | 2,888,057 | 2,950,486 | 11,529,374 | 2,877,538 | 3,014,700 | 2,990,289 | 3,055,094 | 11,937,620 | 2,979,386 | 3,121,397 | 3,096,145 | 3,163,417 | 12,360,344 |
| **Gross Margin** | | 5,084,166 | 5,408,289 | 5,268,782 | 5,607,440 | 21,368,677 | 5,341,524 | 5,677,147 | 5,535,684 | 5,882,658 | 22,437,012 | 5,572,161 | 5,918,024 | 5,774,890 | 6,129,007 | 23,394,082 | 5,812,734 | 6,169,268 | 6,024,409 | 6,385,792 | 24,392,203 |
| | | *65.5%* | *65.8%* | *65.4%* | *66.3%* | *65.8%* | *65.8%* | *66.1%* | *65.7%* | *66.6%* | *66.1%* | *65.9%* | *66.3%* | *65.9%* | *66.7%* | *66.2%* | *66.1%* | *66.4%* | *66.1%* | *66.9%* | *66.4%* |

| | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|
| *Product Revenue Growth Rate* | *5.0%* | *4.5%* | *4.0%* | *4.0%* |
| *Advertising Revenue Growth Rate* | *6.5%* | *6.0%* | *5.5%* | *5.5%* |
| *Expense Growth Rate* | *3.5%* | *3.5%* | *3.5%* | *3.5%* |

(a) FSS Sales include product inventory purchased by FSS or through our third party fulfillment service
(b) Other merchandise sales mirror previous years activity
(c) Assumes that advertising and endorsements is a growing product line and that AJ is able to secure higher rates
(d) Budget includes two donation drives per year
(e) Supplement margins on FSS inventory are averaging 67% with some individual products higher and some lower



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*2024 Op Ex Projections - Exhibit F*
*as of 11/2/2023*

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IT Expenses - Production** | | | | | | | | | | | | | | |
| Internet / Streaming / Bandwidth | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 744,000 | |
| Satellite Service | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 248,100 | |
| Cloud Services | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 1,320,000 | |
| Images / Software / Licenses | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | |
| | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **2,432,100** | |
| **IT Expenses - Online Store** | | | | | | | | | | | | | | |
| Hosting / Cloud Services | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 | |
| Store Infrastructure / Safety | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 516,000 | |
| Store Maintenance / Compliance | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 168,000 | |
| Software Licenses | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 | |
| Customer Service Contract | 13,500 | 13,500 | 13,500 | 13,500 | 14,500 | 14,500 | 15,500 | 15,500 | 15,500 | 15,500 | 15,500 | 15,500 | 176,000 | |
| | **83,000** | **83,000** | **83,000** | **83,000** | **84,000** | **84,000** | **85,000** | **85,000** | **85,000** | **85,000** | **85,000** | **85,000** | **1,010,000** | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Print Media | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 | |
| Radio Media | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 108,000 | |
| Television / Online Media | 7,000 | 7,000 | 7,000 | 10,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 87,000 | |
| | **18,000** | **18,000** | **18,000** | **21,000** | **18,000** | **18,000** | **18,000** | **18,000** | **18,000** | **18,000** | **18,000** | **18,000** | **219,000** | |
| **Facilities** | | | | | | | | | | | | | | |
| Rent | 58,000 | 58,000 | 58,000 | 58,000 | 58,000 | 73,000 | 58,000 | 58,000 | 58,000 | 58,000 | 58,000 | 58,000 | 711,000 | |
| Utilities | 5,500 | 5,500 | 5,500 | 5,000 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 57,500 | |
| Security | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 354,000 | |
| Telecommunication | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 276,000 | |
| Janitorial | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 | |
| Repair and Maintenance | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 | |
| Supplies / Printing / Copy | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 38,400 | |
| Business Meals | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 | |
| | **125,700** | **125,700** | **125,700** | **125,200** | **124,700** | **139,700** | **124,700** | **124,700** | **124,700** | **124,700** | **124,700** | **124,700** | **1,514,900** | |
| **Travel** | | | | | | | | | | | | | | |
| Vehicle Leases | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 10,200 | |
| Fuel / Tolls / Repairs | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 | |
| Airfare / Lodging / Rental Car | 5,000 | 5,000 | 25,000 | 5,000 | 5,000 | 50,000 | 50,000 | 5,000 | 25,000 | 5,000 | 25,000 | 25,000 | 230,000 | (a) |
| Security | - | - | 10,000 | - | - | 20,000 | 20,000 | - | 10,000 | - | 10,000 | 10,000 | 80,000 | |
| Meals | 200 | 200 | 2,000 | 200 | 200 | 2,000 | 200 | 200 | 2,000 | 200 | 200 | 2,000 | 9,600 | |
| | **6,550** | **6,550** | **38,350** | **6,550** | **6,550** | **73,350** | **71,550** | **6,550** | **38,350** | **6,550** | **36,550** | **38,350** | **335,800** | |
| **Administrative** | | | | | | | | | | | | | | |
| Liability / Property Insurance | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 144,000 | |
| Banking Fees | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 | |
| Accounting | - | - | 2,000 | - | - | 5,000 | - | - | 25,000 | - | - | 5,000 | 37,000 | |
| Legal | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 | |
| | **14,600** | **14,600** | **16,600** | **14,600** | **14,600** | **19,600** | **14,600** | **14,600** | **39,600** | **14,600** | **14,600** | **19,600** | **212,200** | |
| **TOTAL OPERATING EXP** | **450,525** | **450,525** | **484,325** | **453,025** | **450,525** | **537,325** | **516,525** | **451,525** | **508,325** | **451,525** | **481,525** | **488,325** | **5,724,000** | |

(a)  Assumes higher than normal travel expenses related to the presidential election cycle



FREE SPEECH SYSTEMS LLC
Southern District of Texas
Case #22-60043
2025-2028 Op Ex Projections - Exhibit F
as of 11/2/2023

| | Q1 | Q2 | Q3 | Q4 | 2025 Total | Q1 | Q2 | Q3 | Q4 | 2026 Total | Q1 | Q2 | Q3 | Q4 | 2027 TOTAL | Q1 | Q2 | Q3 | Q4 | 2028 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IT Expenses - Production** | | | | | | | | | | | | | | | | | | | | |
| Internet / Streaming / Bandwidth | 193,440 | 193,440 | 193,440 | 193,440 | 773,760 | 201,178 | 201,178 | 201,178 | 201,178 | 804,710 | 209,225 | 209,225 | 209,225 | 209,225 | 836,899 | 217,594 | 217,594 | 217,594 | 217,594 | 870,375 |
| Satellite Service | 64,506 | 64,506 | 64,506 | 64,506 | 258,024 | 67,086 | 67,086 | 67,086 | 67,086 | 268,345 | 69,770 | 69,770 | 69,770 | 69,770 | 279,079 | 72,560 | 72,560 | 72,560 | 72,560 | 290,242 |
| Cloud Services | 343,200 | 343,200 | 343,200 | 343,200 | 1,372,800 | 356,928 | 356,928 | 356,928 | 356,928 | 1,427,712 | 371,205 | 371,205 | 371,205 | 371,205 | 1,484,820 | 386,053 | 386,053 | 386,053 | 386,053 | 1,544,213 |
| Images / Software / Licenses | 31,200 | 31,200 | 31,200 | 31,200 | 124,800 | 32,448 | 32,448 | 32,448 | 32,448 | 129,792 | 33,746 | 33,746 | 33,746 | 33,746 | 134,984 | 35,096 | 35,096 | 35,096 | 35,096 | 140,383 |
| | 632,346 | 632,346 | 632,346 | 632,346 | 2,529,384 | 657,640 | 657,640 | 657,640 | 657,640 | 2,630,559 | 683,945 | 683,945 | 683,945 | 683,945 | 2,735,782 | 711,303 | 711,303 | 711,303 | 711,303 | 2,845,213 |
| **IT Expenses - Online Store** | | | | | | | | | | | | | | | | | | | | |
| Hosting / Cloud Services | 31,200 | 31,200 | 31,200 | 31,200 | 124,800 | 32,448 | 32,448 | 32,448 | 32,448 | 129,792 | 33,746 | 33,746 | 33,746 | 33,746 | 134,984 | 35,096 | 35,096 | 35,096 | 35,096 | 140,383 |
| Store Infrastructure / Safety | 134,160 | 134,160 | 134,160 | 134,160 | 536,640 | 139,526 | 139,526 | 139,526 | 139,526 | 558,106 | 145,107 | 145,107 | 145,107 | 145,107 | 580,430 | 150,912 | 150,912 | 150,912 | 150,912 | 603,647 |
| Store Maintenance / Compliance | 43,680 | 43,680 | 43,680 | 43,680 | 174,720 | 45,427 | 45,427 | 45,427 | 45,427 | 181,709 | 47,244 | 47,244 | 47,244 | 47,244 | 188,977 | 49,134 | 49,134 | 49,134 | 49,134 | 196,536 |
| Software Licenses | 7,800 | 7,800 | 7,800 | 7,800 | 31,200 | 8,112 | 8,112 | 8,112 | 8,112 | 32,448 | 8,436 | 8,436 | 8,436 | 8,436 | 33,746 | 8,774 | 8,774 | 8,774 | 8,774 | 35,096 |
| Customer Service Contract | 42,120 | 44,200 | 48,360 | 48,360 | 183,040 | 43,805 | 45,968 | 50,294 | 50,294 | 190,362 | 45,557 | 47,807 | 52,306 | 52,306 | 197,976 | 47,379 | 49,719 | 54,398 | 54,398 | 205,895 |
| | 258,960 | 261,040 | 265,200 | 265,200 | 1,050,400 | 269,318 | 271,482 | 275,808 | 275,808 | 1,092,416 | 280,091 | 282,341 | 286,840 | 286,840 | 1,136,113 | 291,295 | 293,634 | 298,314 | 298,314 | 1,181,557 |
| **Advertising & Promotion** | | | | | | | | | | | | | | | | | | | | |
| Print Media | 6,240 | 6,240 | 6,240 | 6,240 | 24,960 | 6,490 | 6,490 | 6,490 | 6,490 | 25,958 | 6,749 | 6,749 | 6,749 | 6,749 | 26,997 | 7,019 | 7,019 | 7,019 | 7,019 | 28,077 |
| Radio Media | 28,080 | 28,080 | 28,080 | 28,080 | 112,320 | 29,203 | 29,203 | 29,203 | 29,203 | 116,813 | 30,371 | 30,371 | 30,371 | 30,371 | 121,485 | 31,586 | 31,586 | 31,586 | 31,586 | 126,345 |
| Television / Online Media | 21,840 | 24,960 | 21,840 | 21,840 | 90,480 | 22,714 | 25,958 | 22,714 | 22,714 | 94,099 | 23,622 | 26,997 | 23,622 | 23,622 | 97,863 | 24,567 | 28,077 | 24,567 | 24,567 | 101,778 |
| | 56,160 | 59,280 | 56,160 | 56,160 | 227,760 | 58,406 | 61,651 | 58,406 | 58,406 | 236,870 | 60,743 | 64,117 | 60,743 | 60,743 | 246,345 | 63,172 | 66,682 | 63,172 | 63,172 | 256,199 |
| **Facilities** | | | | | | | | | | | | | | | | | | | | |
| Rent | 180,960 | 196,560 | 180,960 | 180,960 | 739,440 | 188,198 | 204,422 | 188,198 | 188,198 | 769,018 | 195,726 | 212,599 | 195,726 | 195,726 | 799,778 | 203,555 | 221,103 | 203,555 | 203,555 | 831,769 |
| Utilities | 17,160 | 14,560 | 14,040 | 14,040 | 59,800 | 17,846 | 15,142 | 14,602 | 14,602 | 62,192 | 18,560 | 15,748 | 15,186 | 15,186 | 64,680 | 19,303 | 16,378 | 15,793 | 15,793 | 67,267 |
| Security | 92,040 | 92,040 | 92,040 | 92,040 | 368,160 | 95,722 | 95,722 | 95,722 | 95,722 | 382,886 | 99,550 | 99,550 | 99,550 | 99,550 | 398,202 | 103,532 | 103,532 | 103,532 | 103,532 | 414,130 |
| Telecommunication | 71,760 | 71,760 | 71,760 | 71,760 | 287,040 | 74,630 | 74,630 | 74,630 | 74,630 | 298,522 | 77,616 | 77,616 | 77,616 | 77,616 | 310,462 | 80,720 | 80,720 | 80,720 | 80,720 | 322,881 |
| Janitorial | 10,920 | 10,920 | 10,920 | 10,920 | 43,680 | 11,357 | 11,357 | 11,357 | 11,357 | 45,427 | 11,811 | 11,811 | 11,811 | 11,811 | 47,244 | 12,284 | 12,284 | 12,284 | 12,284 | 49,134 |
| Repair and Maintenance | 7,800 | 7,800 | 7,800 | 7,800 | 31,200 | 8,112 | 8,112 | 8,112 | 8,112 | 32,448 | 8,436 | 8,436 | 8,436 | 8,436 | 33,746 | 8,774 | 8,774 | 8,774 | 8,774 | 35,096 |
| Supplies / Printing / Copy | 9,984 | 9,984 | 9,984 | 9,984 | 39,936 | 10,383 | 10,383 | 10,383 | 10,383 | 41,533 | 10,799 | 10,799 | 10,799 | 10,799 | 43,195 | 11,231 | 11,231 | 11,231 | 11,231 | 44,923 |
| Business Meals | 1,560 | 1,560 | 1,560 | 1,560 | 6,240 | 1,622 | 1,622 | 1,622 | 1,622 | 6,490 | 1,687 | 1,687 | 1,687 | 1,687 | 6,749 | 1,755 | 1,755 | 1,755 | 1,755 | 7,019 |
| | 392,184 | 405,184 | 389,064 | 389,064 | 1,575,496 | 407,871 | 421,391 | 404,627 | 404,627 | 1,638,516 | 424,186 | 438,247 | 420,812 | 420,812 | 1,704,056 | 441,154 | 455,777 | 437,644 | 437,644 | 1,772,219 |
| **Travel** | | | | | | | | | | | | | | | | | | | | |
| Vehicle Leases | 2,652 | 2,652 | 2,652 | 2,652 | 10,608 | 2,758 | 2,758 | 2,758 | 2,758 | 11,032 | 2,868 | 2,868 | 2,868 | 2,868 | 11,474 | 2,983 | 2,983 | 2,983 | 2,983 | 11,933 |
| Fuel / Tolls / Repairs | 1,560 | 1,560 | 1,560 | 1,560 | 6,240 | 1,622 | 1,622 | 1,622 | 1,622 | 6,490 | 1,687 | 1,687 | 1,687 | 1,687 | 6,749 | 1,755 | 1,755 | 1,755 | 1,755 | 7,019 |
| Airfare / Lodging / Rental Car | 36,400 | 62,400 | 83,200 | 57,200 | 239,200 | 37,856 | 64,896 | 86,528 | 59,488 | 248,768 | 39,370 | 67,492 | 89,989 | 61,868 | 258,719 | 40,945 | 70,192 | 93,589 | 64,342 | 269,067 |
| Security | 10,400 | 20,800 | 31,200 | 20,800 | 83,200 | 10,816 | 21,632 | 32,448 | 21,632 | 86,528 | 11,249 | 22,497 | 33,746 | 22,497 | 89,989 | 11,699 | 23,397 | 35,096 | 23,397 | 93,589 |
| Meals | 2,496 | 2,496 | 2,496 | 2,496 | 9,984 | 2,596 | 2,596 | 2,596 | 2,596 | 10,383 | 2,700 | 2,700 | 2,700 | 2,700 | 10,799 | 2,808 | 2,808 | 2,808 | 2,808 | 11,231 |
| | 53,508 | 89,908 | 121,108 | 84,708 | 349,232 | 55,648 | 93,504 | 125,952 | 88,096 | 363,201 | 57,874 | 97,244 | 130,990 | 91,620 | 377,729 | 60,189 | 101,134 | 136,230 | 95,285 | 392,839 |
| **Administrative** | | | | | | | | | | | | | | | | | | | | |
| Liability / Property Insurance | 37,440 | 37,440 | 37,440 | 37,440 | 149,760 | 38,938 | 38,938 | 38,938 | 38,938 | 155,750 | 40,495 | 40,495 | 40,495 | 40,495 | 161,980 | 42,115 | 42,115 | 42,115 | 42,115 | 168,460 |
| Banking Fees | 312 | 312 | 312 | 312 | 1,248 | 324 | 324 | 324 | 324 | 1,298 | 337 | 337 | 337 | 337 | 1,350 | 351 | 351 | 351 | 351 | 1,404 |
| Accounting | 2,080 | 5,200 | 26,000 | 5,200 | 38,480 | 2,163 | 5,408 | 27,040 | 5,408 | 40,019 | 2,250 | 5,624 | 28,122 | 5,624 | 41,620 | 2,340 | 5,849 | 29,246 | 5,849 | 43,285 |
| Legal | 7,800 | 7,800 | 7,800 | 7,800 | 31,200 | 8,112 | 8,112 | 8,112 | 8,112 | 32,448 | 8,436 | 8,436 | 8,436 | 8,436 | 33,746 | 8,774 | 8,774 | 8,774 | 8,774 | 35,096 |
| | 47,632 | 50,752 | 71,552 | 50,752 | 220,688 | 49,537 | 52,782 | 74,414 | 52,782 | 229,516 | 51,519 | 54,893 | 77,391 | 54,893 | 238,696 | 53,580 | 57,089 | 80,486 | 57,089 | 248,244 |
| **TOTAL OPERATING EXP** | 1,440,790 | 1,498,510 | 1,535,430 | 1,478,230 | 5,952,960 | 1,498,422 | 1,558,450 | 1,596,847 | 1,537,359 | 6,191,078 | 1,558,358 | 1,620,788 | 1,660,721 | 1,598,854 | 6,438,722 | 1,620,693 | 1,685,620 | 1,727,150 | 1,662,808 | 6,696,270 |

***     *Year over Year Expenses increase 4%*     ***



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*2024 Personnel Expense Projections - Exhibit F*
*as of 11/2/2023*

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries | *(a)* | 261,984 | 261,984 | 261,984 | 261,984 | 261,984 | 392,976 | 261,984 | 261,984 | 261,984 | 261,984 | 261,984 | 392,976 | 3,405,792 |
| Alex Jones Salary | *(b)* | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 173,075 | 115,385 | 115,385 | 115,385 | 115,385 | 115,385 | 173,075 | 1,500,000 |
| New COO Candidate | *(a)* | 30,769 | 30,769 | 30,769 | 30,769 | 30,769 | 46,155 | 30,769 | 30,769 | 30,769 | 30,769 | 30,769 | 46,155 | 400,000 |
| Hourly Wages & Overtime | *(a)* | 59,950 | 59,950 | 59,950 | 59,950 | 59,950 | 89,925 | 59,950 | 59,950 | 59,950 | 59,950 | 59,950 | 89,925 | 779,350 |
| Payroll Taxes | | 35,809 | 35,809 | 35,809 | 35,809 | 35,809 | 53,713 | 35,809 | 35,809 | 35,809 | 35,809 | 35,809 | 53,713 | 465,513 |
| Benefits | | 28,085 | 28,085 | 28,085 | 28,085 | 28,085 | 42,128 | 28,085 | 28,085 | 28,085 | 28,085 | 28,085 | 42,128 | 365,109 |
| | | 531,982 | 531,982 | 531,982 | 531,982 | 531,982 | 797,972 | 531,982 | 531,982 | 531,982 | 531,982 | 531,982 | 797,972 | 6,915,764 |
| Executive Incentive Comp | *(c)* | 100,000 | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Employee Bonuses | *(d)* | 48,290 | 48,290 | 48,290 | 48,290 | 48,290 | 72,435 | 48,290 | 48,290 | 48,290 | 48,290 | 48,290 | 72,435 | 627,771 |
| Payroll Tax on Bonus Comp | | 3,485 | 1,135 | 1,135 | 1,135 | 1,135 | 1,702 | 1,135 | 1,135 | 1,135 | 1,135 | 1,135 | 1,702 | 17,103 |
| Contract Employees | *(a) (e)* | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 839,400 |
| Consulting Services | *(f)* | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 46,500 |
| **Total Personnel Expenses** | | 757,457 | 655,107 | 655,107 | 655,107 | 655,107 | 945,809 | 655,357 | 655,357 | 655,357 | 655,357 | 655,357 | 946,059 | 8,546,538 |

*(a)*   *Assumes salaries increase 5% per year*
*(b)*   *Per 5-year Employment contract dated July 1, 2023*
*(c)*   *TBD COO and TBD CFO*
*(d)*   *Assumes bonuses of 15% of Salaries to retain key employees*
*(e)*   *Contract / 1099 production employees*
*(f)*   *Accounting service*



**FREE SPEECH SYSTEMS LLC**
**Southern District of Texas**
**Case #22-60043**
*2025-2028 Personnel Expense Projections - Exhibit F*
*as of 11/2/2023*

| | | Q1 | Q2 | Q3 | Q4 | 2025 Total | Q1 | Q2 | Q3 | Q4 | 2026 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Personnel Expenses** | | | | | | | | | | | |
| Salaries | (a) | 825,250 | 962,791 | 825,250 | 962,791 | **3,576,082** | 866,512 | 1,010,931 | 866,512 | 1,010,931 | **3,754,886** |
| Alex Jones Salary | (b) | 346,155 | 403,845 | 346,155 | 403,845 | **1,500,000** | 346,155 | 403,845 | 346,155 | 403,845 | **1,500,000** |
| New COO Candidate | (a) | 96,922 | 113,078 | 96,922 | 113,078 | **420,000** | 101,768 | 118,732 | 101,768 | 118,732 | **441,000** |
| Hourly Wages & Overtime | (a) | 188,843 | 220,316 | 188,843 | 220,316 | **818,318** | 198,285 | 231,332 | 198,285 | 231,332 | **859,233** |
| Payroll Taxes | | 111,473 | 130,052 | 111,473 | 130,052 | **483,052** | 115,723 | 135,010 | 115,723 | 135,010 | **501,467** |
| Benefits | | 87,430 | 102,002 | 87,430 | 102,002 | **378,864** | 90,763 | - | - | 105,890 | **196,654** |
| | | 1,656,073 | 1,932,084 | 1,656,073 | 1,932,084 | **7,176,315** | 1,719,206 | 1,899,850 | 1,628,443 | 2,005,740 | **7,253,239** |
| | | | | | | | | | | | |
| Executive Incentive Comp | (c) | 200,000 | - | - | - | **200,000** | 225,000 | - | - | - | **225,000** |
| Employee Bonuses | (d) | 152,114 | 177,466 | 152,114 | 177,466 | **659,160** | 159,720 | 186,339 | 159,720 | 186,339 | **692,118** |
| Payroll Tax on Bonus Comp | | 8,275 | 4,170 | 3,575 | 4,170 | **20,190** | 9,041 | 4,379 | 3,753 | 4,379 | **21,552** |
| | | | | | | | | | | | |
| Contract Employees | (e) | 220,343 | 220,343 | 220,343 | 220,343 | **881,370** | 231,360 | 231,360 | 231,360 | 231,360 | **925,439** |
| Consulting Services | (f) | 12,000 | 12,000 | 12,000 | 12,000 | **48,000** | 15,000 | 15,000 | 15,000 | 15,000 | **60,000** |
| | | | | | | | | | | | |
| **Total Personnel Expenses** | | **2,248,804** | **2,346,063** | **2,044,104** | **2,346,063** | **8,985,035** | **2,359,327** | **2,336,928** | **2,038,276** | **2,442,818** | **9,177,348** |

| | | Q1 | Q2 | Q3 | Q4 | 2027 Total | Q1 | Q2 | Q3 | Q4 | 2028 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries | (a) | 909,838 | 1,061,477 | 909,838 | 1,061,477 | **3,942,630** | 955,330 | 1,114,551 | 955,330 | 1,114,551 | **4,139,761** |
| Alex Jones Salary | (b) | 346,155 | 403,845 | 346,155 | 403,845 | **1,500,000** | 346,155 | 403,845 | 346,155 | 403,845 | **1,500,000** |
| New COO Candidate | (a) | 106,857 | 124,668 | 106,857 | 124,668 | **463,050** | 112,200 | 130,902 | 112,200 | 130,902 | **486,203** |
| Hourly Wages & Overtime | (a) | 208,199 | 242,899 | 208,199 | 242,899 | **902,195** | 218,609 | 255,044 | 218,609 | 255,044 | **947,305** |
| Payroll Taxes | | 120,185 | 140,216 | 120,185 | 140,216 | **520,802** | 124,870 | 145,682 | 124,870 | 145,682 | **541,105** |
| Benefits | | 94,263 | 109,973 | 94,263 | 109,973 | **408,473** | 97,938 | 114,260 | 97,938 | 114,260 | **424,396** |
| | | 1,785,497 | 2,083,078 | 1,785,497 | 2,083,078 | **7,737,150** | 1,855,101 | 2,164,284 | 1,855,101 | 2,164,284 | **8,038,770** |
| | | | | | | | | | | | |
| Executive Incentive Comp | (c) | 250,000 | - | - | - | **250,000** | 275,000 | - | - | - | **275,000** |
| Employee Bonuses | (d) | 167,705 | 195,656 | 167,705 | 195,656 | **726,724** | 176,091 | 205,439 | 176,091 | 205,439 | **763,060** |
| Payroll Tax on Bonus Comp | | 9,816 | 4,598 | 3,941 | 4,598 | **22,953** | 10,601 | 4,828 | 4,138 | 4,828 | **24,394** |
| | | | | | | | | | | | |
| Contract Employees | (e) | 242,928 | 242,928 | 242,928 | 242,928 | **971,710** | 255,074 | 255,074 | 255,074 | 255,074 | **1,020,296** |
| Consulting Services | (f) | 18,000 | 18,000 | 18,000 | 18,000 | **72,000** | 21,000 | 21,000 | 21,000 | 21,000 | **84,000** |
| | | | | | | | | | | | |
| **Total Personnel Expenses** | | **2,473,946** | **2,544,260** | **2,218,071** | **2,544,260** | **9,780,537** | **2,592,866** | **2,650,625** | **2,311,404** | **2,650,625** | **10,205,520** |

(a)   *Assumes salaries increase 5% per year*
(b)   *Per 5-year Employment contract dated July 1, 2023*
(c)   *Includes Alex Jones and TBD COO*
(d)   *Assumes bonuses of approximately 15% of Salaries to retain key employees*
(e)   *Contract / 1099 production employees*
(f)   *Accounting service*

# Exhibit G

# Class 3-B Claims

| Claimant | Amount | Pro Rata Pct. |
|---|---:|---:|
| Ian Hockley | $118,899,303.73 | 6.581% |
| Francine Wheeler | $82,099,303.73 | 4.544% |
| David Wheeler | $83,429,303.73 | 4.618% |
| Jacqueline Barden | $48,499,303.73 | 2.684% |
| Erica Lafferty (c/o Richard Coan, Trustee) | | 0.000% |
| William Aldenberg | $130,099,303.73 | 7.201% |
| Carlos M. Soto | $86,899,303.73 | 4.810% |
| Jennifer Hensel | $79,429,303.73 | 4.396% |
| Jillian Soto-Marino | $101,829,303.73 | 5.636% |
| Nicole Hockley | $108,229,303.73 | 5.990% |
| Carlee Soto Parisi | $98,099,304.00 | 5.430% |
| Mark Barden | $86,899,303.73 | 4.810% |
| Veronique De La Rosa | $180,000,000.00 | 9.963% |
| Estate of Marcel Fontaine | $50,000,000.00 | 2.767% |
| Neil Heslin | $27,197,249.90 | 1.505% |
| Scarlett Lewis | $22,847,962.90 | 1.265% |
| Robert Parker | $170,099,303.73 | 9.415% |
| Leonard Pozner | $200,000,000.00 | 11.070% |
| William Sherlach | $58,099,303.73 | 3.216% |
| Donna Soto | $74,099,303.73 | 4.101% |
| | $1,806,755,465.29 | 100.000% |