# EXHIBIT 10

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF TEXAS

4   HOUSTON DIVISION

5   -----------------------------------------x

6   IN RE:

7   ALEXANDER E. JONES,

8                    Debtor.

9                    Case No.

10                   22-22552

11  -----------------------------------------x

12                   3:39 p.m. Eastern time

13                   April 15, 2024

14

15

16       VIRTUAL DEPOSITION of ALEXANDER E. JONES,

17  the Debtor in the above entitled matter, pursuant

18  to Notice, before Stephen J. Moore, a Registered

19  Professional Reporter, Certified Realtime Reporter

20  and Notary Public of the State of New York.

21

22

23

24

25

Page 2

1              ALEXANDER E. JONES

2   A P P E A R A N C E S:

3

4        CROWE & DUNLEAVY PC

5                Attorneys for Debtor

6                2525 McKinnon Street

7                Dallas, Texas 75201

8

9        BY:   VICKIE DRIVER, ESQ.

10

11       PAUL WEISS RIVKIND WHARTON & GARRISON, LLP

12                Attorneys for Connecticut

13                Plaintiffs

14                100 Quentin Roosevelt Boulevard

15                Garden City, New York 11530

16

17       BY:   PAUL A. PATERSON, ESQ.

18                - and -

19                VIDA ROBINSON, ESQ.

20                - and -

21                KYLE KIMPLER, ESQ.

22

23

24

25

```
                                    Page 3

 1                 ALEXANDER E. JONES

 2

 3         STREUSAND LANDON & OZBURN LLP

 4                 Attorneys for Texas Plaintiffs

 5                 811 Barton Springs Road

 6                 Austin, Texas  78704

 7

 8         BY:    STEPHEN W. LEMMON, ESQ.

 9

10   ALSON PRESENT:

11

12         ABDIEL CABALLERO, ESQ.

13         DEANNA DRENGA, ESQ.

14         AMELIA COOKSEY, ESQ.

15         KATHLEEN O'CONNOR, ESQ.

16         CIERA ANN SISCO, ESQ.

17         CRAIG REGENS, ESQ.

18         AVI  MOSHENBERG, ESQ.

19         DANIEL NEGLESS, ESQ.

20         CHRIS MATTEI, ESQ.

21         DAVID LORRY, ESQ.

22         K. PORTER, ESQ.

23         LIZ FREEMAN, ESQ.

24         DAVID PRAGER, ESQ.

25         ALINOR STERLING, ESQ.
```

Page 4

1                        ALEXANDER E. JONES

2      EXAMINATION BY                              PAGE

3      MR. PATERSON                                   9

4

5                       E X H I B I T S

6

7      Exhibit 1  E-mail re: deposition and        24  14

8              production of documents

9

10     Exhibit 2   Copy of Debtor's Plan of        34   5

11             Reorganization

12

13     Exhibit 3  Disclosure Statement             57  14

14

15     Exhibit 4   Projections                     62   9

16

17     Exhibit 5   Monthly operating report for    89  21

18             January

19

20     Exhibit 6 Monthly operating report for      91  24

21             February

22

23     Exhibit 7  TMZ article                     119  23

24

25     Exhibit 8  Declaration of Alex Jones       130  13

Page 5

1                    ALEXANDER E.  JONES

2   Exhibit 9   Exhibit A to Exhibit 8        133   15

3

4   Exhibit 10  Free Speach Systems           152   15

5        employment agreement

6

7   Exhibit 11  Jones income schedule         158   14

8

9   Exhibit 12  Jones September MOR           176    6

10

11  Exhibit 13  Subchapter V Trustee's        191    9

12        initial findings of Free Speach

13        Systems, LLC investigation

14

15

16

17

18

19

20

21

22

23

24

25

```
                                    Page 6
 1              ALEXANDER E.  JONES
 2              THE VIDEOGRAPHER:  Good
 3         afternoon, everybody.  We are going
 4         on the record at 2:39 p.m. central
 5         time on April 15, 2024.
 6              Please note that this
 7         deposition is being conducted
 8         virtually.
 9              Quality of recording depends
10         on the quality of the camera and
11         internet connection of the
12         participants.
13              Audio and video recording
14         will continue to take place unless
15         all parties agree to go off the
16         record.
17              This is media unit number 1
18         of the video recorded deposition of
19         Alexander Jones, taken by counsel
20         for the Plaintiff, in the matter of
21         In re: Alexander E.  Jones, filed in
22         the U.S. Bankruptcy Court for the
23         Southern District of Texas, Houston
24         Division, case number 22-33553
25         (CML).
```

Page 7

```
 1              ALEXANDER E. JONES
 2              This deposition is being
 3         conducted virtually, using virtual
 4         technology.
 5              My name is James Winslow
 6         representing Veritext New York.  I
 7         am the videographer.
 8              The court reporter is Stephen
 9         Moore, also from the firm Veritext.
10              I am not authorized to
11         administer an oath, no are am I
12         related to any party in this action,
13         nor am I financially interested in
14         the outcome.
15              If there are any objections
16         to proceeding, please state them at
17         the time of your appearance.
18              Counsel and all present,
19         including remotely, will now state
20         their appearances and affiliations
21         for the record, beginning with the
22         noticing attorney.
23              MR. PATERSON:  Good
24         afternoon, everyone, Paul Paterson,
25         from Paul Weiss Rifkind Wharton &
```

Page 8

1              ALEXANDER E. JONES

2        Garrison LLP, for the Connecticut

3        Plaintiffs.

4              Wth me in the room here is

5        Kyle Kimpler and some other

6        attorneys for the Connecticut

7        Plaintiffs.

8              MR. MOSHENBERG:  Avi

9        Moshenberg, here on behalf of the

10       Texas plaintiffs.  Along with me is

11       Ciera Sisco.

12             MS. DRIVER:  Vickie Driver.

13       I'm in the room with Alex Jones.

14       Also here in the room with us is

15       Robert Slizer, the financial advisor

16       employed in this matter.

17             I believe on the phone with

18       my office is also Craig Regens.

19             MR. LEMMON:  This is Steve

20       Lemmon, I represent  PQPR.

21             MS. FREEMAN:  This is Liz

22       Freeman, and I represent Melissa

23       Hazelton in the Free Speech case.

24             MS. O'CONNOR:  Kathleen

25       O'Connor ^, for Free Speech

```
                                      Page 9

 1                ALEXANDER E.  JONES

 2        Solutions in the CRO.

 3               THE VIDEOGRAPHER:  Anyone

 4        else?

 5               MS. STERLING:  This is Alinor

 6        Sterling from Koskoff Koskoff &

 7        Bieder.

 8               I also represent the

 9        Connecticut Plaintiffs.

10               THE VIDEOGRAPHER:  Do we have

11        them all?

12               Okay, at this time our court

13        reporter will swear in the witness

14        and counsel may proceed.

15

16   A L E X A N D E R    E.   J O N E S,   called

17        as a witness, having been first duly sworn

18        by the Notary Public, was examined and

19        testified as follows:

20

21   EXAMINATION BY

22   MR. PATERSON:

23

24        Q     Good afternoon, Mr. Jones.

25   My name is Paul Paterson.  We haven't met
```

```
                                          Page 10
 1                  ALEXANDER E. JONES
 2   before, have we?
 3          A       I don't believe so.
 4          Q       You've been deposed a number
 5   of times before, correct?
 6          A       Yes.
 7          Q       And, so do you understand the
 8   basic ground rules for a deposition?
 9          A       Yes.
10          Q       You understand you're under
11   oath and required by law to provide truthful
12   answers today?
13          A       Yes.
14          Q       Just a couple of very quick
15   ground rules.  If you do not understand the
16   question I'm asking, please let me know, I'm
17   happy to try to rephrase.
18                  Otherwise I will assume you
19   understood.
20                  Your counsel may object to
21   certain questions, but unless she directs
22   you otherwise you should still go ahead and
23   answer.
24                  And if at any time today you
25   would like to take a break, please just let
```

```
                                          Page 11

 1                    ALEXANDER E. JONES
 2     me know.
 3                    The only thing I would ask is
 4     that if there is a question pending, that
 5     you answer that question before we take a
 6     break.
 7                    Does that all make sense?
 8          A        Yes, thank you very much.
 9          Q        Where are you located at the
10     moment?
11          A        I am in Austin, Texas at my
12     offices.
13          Q        That's the Free Speech
14     office?
15          A        Yes, sir.
16          Q        Beside your counsel and
17     Mr. Slizer, is anyone else physically in the
18     room with you?
19          A        No.
20          Q        Do you have any documents or
21     papers in front of you?
22          A        No.  But I have a Topo Chico
23     in front of me.
24          Q        Do you have any electronic
25     documents or internet browsers open on your
```

```
                                        Page 12
 1                    ALEXANDER E. JONES
 2   computer other than the deposition software?
 3           A       No.
 4           Q       Do you have any electronic
 5   devices nearby, like a cell phone or tablet?
 6           A       I mean --
 7                   MS. DRIVER:  It's to the
 8           side, but it's face down.
 9           Q       Okay.
10           A       Technically there is a TV
11   right there, computers, I am in a room full
12   of computers, but I'm not looking at
13   anything but you.
14           Q       Excellent.
15                   Mr. Jones, what did you do to
16   prepare for your deposition today?
17           A       I met with Vickie for like
18   two hours yesterday, or an hour and a half.
19           Q       You said that was yesterday?
20           A       Yes.
21           Q       And was anyone besides you
22   and Ms. Driver present?
23           A       No.
24           Q       Were you shown any documents
25   during that session?
```

Page 13

1                    ALEXANDER E. JONES

2          A      Yes, she reminded me of some

3    of the documents I've seen before.

4          Q      And did any of those

5    documents refresh your recollection of

6    events?

7          A      Yes, she was asking me to

8    read them again.

9          Q      And when you read those

10   documents, did your recollection on any

11   issues come back to you?

12         A      It gave -- no, it gave me a

13   headache.  She sat there and made me read

14   them and that was basically the meeting.

15         Q      Have you discussed your

16   deposition today with anyone other than Ms.

17   Driver?

18         A      No.

19         Q      And you received a package of

20   documents or your counsel received a package

21   of documents before the deposition, is that

22   right?

23         A      I don't know that.

24         Q      Okay, we will get to that.

25                Mr. Jones, when did you first

```
                                     Page 14
 1                  ALEXANDER E. JONES
 2   consider filing for bankruptcy?
 3         A      Years ago, a couple of years
 4   ago, I don't remember, it was a couple of
 5   years.  All the dates are a blur.
 6         Q      You filed your bankruptcy
 7   case in late 2022, is that right?
 8         A      I filed -- we filed the
 9   corporate one before and mine later.  I
10   don't remember the days.
11         Q      Why did you file for
12   bankruptcy?
13         A      Because I was out of money.
14   I had sold my main house to pay for the
15   stuff, I had given the Bic loan money to
16   keep it going, and I was hearing I had all
17   this fabulous money everywhere, and I
18   thought A, I was out of money and couldn't
19   pay for another trial.
20                I thought well, if I show
21   these people I don't have all this money and
22   lift my skirts up, maybe they will be
23   reasonable.
24                So I was like, I was out of
25   money, and I wanted to, like I always
```

Page 15

1                    ALEXANDER E. JONES

2     constantly heard in court and stuff with no

3     proof I had hundreds of millions of dollars,

4     which I've never had more than $6, $7, $8

5     million in the bank at the maximum and a few

6     pieces of property.

7                    I wanted to be able to like

8     just show you guys and just move on.

9          Q      And when you said show these

10    people and you guys, are you referring to

11    the Plaintiffs who had judgments against

12    you?

13         A      Well, the whole world, but

14    yeah, I was just seeing all this stuff in

15    the news that wasn't true.

16         Q      And did you hope in the

17    bankruptcy to dispose of the claims that had

18    been asserted against you by various

19    Plaintiffs?

20                    MS. DRIVER:  Objection, form.

21         A      My reason for declaring

22    bankruptcy, I'm not a lawyer, was I was out

23    of money, and there were all these false

24    claims about all this money, so I thought

25    just let it all be investigated and just

```
                                          Page 16
 1                    ALEXANDER E. JONES
 2   show my hand.
 3        Q      And were you hoping in the
 4   process to get rid of the claims that had
 5   been asserted by the Connecticut Plaintiffs?
 6                  MS. DRIVER:  Objection to
 7           form.
 8        A      Again, I'm not a lawyer.  I
 9   was attempting to make a deal with them and
10   show them the money that was there.
11        Q      To your knowledge, what has
12   happened in your bankruptcy case since it
13   was filed?
14        A      I don't know how to answer
15   that.  I mean, it's been a giant
16   investigation to discover I've told the
17   truth.
18                  And so now we are here, it's
19   drawn out for, I think my personal, over a
20   year and a half, I think the M4 is two
21   years.
22                  I'm going from memory, I'm
23   not saying that's exactly accurate, but you
24   have the dates, I don't have them, and it's
25   been a huge waste of money for everybody,
```

Page 17

```
 1                  ALEXANDER E. JONES
 2    because I was trying to say here is the
 3    money I've got, let's make a deal, and
 4    instead, there was this witch hunt to find
 5    money that doesn't exist.
 6                  So to me, it's been pretty
 7    disastrous.
 8         Q       And so, what you just
 9    described was an investigation into your
10    assets.
11                  What else has happened in the
12    bankruptcy since it was filed other than an
13    investigation into your assets?
14         A       I don't know all the terms
15    and all the stuff, I can't speak in any type
16    of competent form to that.
17         Q       Can you identify anything
18    else that's happened specifically in your
19    bankruptcy?
20         A       You've got to stay
21    competitive and always innovative in media
22    to even stay where you're at, so we have not
23    been innovating for almost two years.
24                  So it's -- it's had a major
25    detrimental effect on the operation.  And so
```

1              ALEXANDER E. JONES

2    I can speak to the fact that basically we

3    can't even send reporters most of the time

4    somewhere to cover some big event, and

5    that's our bread and butter, that's what we

6    do.

7                   It's like sending a football

8    team out on the field without pads and

9    helmets.

10                  So, it's been -- basically

11   train wrecked this operation.  It's still

12   operating and continuing to operate, but

13   it's -- I mean, my only thing I can speak to

14   is as a media guy that knows media, that

15   it's been very detrimental to the operation.

16        Q       And so are you hoping when

17   you and Free Speech get out of bankruptcy

18   the business will improve?

19        A       I just hope we can stabilize,

20   because on the trajectory we are on, if this

21   continues, you guys would have killed the

22   golden know goose, which I know several of

23   the lawyers stated was their --

24        Q       What do you mean by the

25   golden goose?

Page 19

```
 1                    ALEXANDER E. JONES
 2               THE WITNESS:  Well, I mean
 3          the Plaintiffs' lawyers in
 4          Connecticut and Texas said don't
 5          support him, don't buy his products,
 6          we don't want money, we want to
 7          silence him.
 8               But then the Plaintiffs
 9          themselves said they want money.
10               So I wonder if the lawyers
11          are working against their clients,
12          or who's being disingenuous, but we
13          have the videos of Connecticut and
14          Texas saying we don't want money,
15          don't support him, don't give him
16          money, we want to shut him down,
17          don't ever let him operate again.
18               And then they are telling me
19          we want you to stay on air and make
20          money, so I don't know what the
21          truth is.
22          Q     But you just said you guys
23     would have killed the golden goose.
24               Who is the golden goose?
25          A     This operation can make --
```

```
                                          Page 20
 1                    ALEXANDER E. JONES
 2   could have made money.  I don't know -- and
 3   that's the point I'm making is the
 4   Plaintiffs' lawyers in Connecticut and
 5   Texas, I can send you the video if you would
 6   like it, got up in the court and in the
 7   courthouse steps and said they don't want
 8   money, they want to silence us.
 9                    And separately, I'm saying
10   that's killing what could pay them.
11        Q      And you referred to the
12   golden goose, Mr. Jones.  Are you the golden
13   goose?
14        A      I mean, clearly I could go
15   other places and make money, but they are
16   trying to destroy this operation, in their
17   own words, and then obsessing over how much
18   money it's making and complaining about it
19   when it isn't making as much money as it
20   could.
21        Q      That's helpful, but that
22   wasn't my question.  My question was you
23   referred to the golden goose.  Are you the
24   golden goose?
25        A      I mean, I would say just in
```

```
                                    Page 21
 1                   ALEXANDER E. JONES
 2   general, if you're trying to silence someone
 3   and a media operation they have yeah, that
 4   in general is the golden goose.
 5           Q       And the someone being
 6   yourself?
 7                   MR. LEMMON:  I object to the
 8           form?
 9           A       Yeah, I'm the main driver
10   around here.  The point is that they said
11   they want to silence me and my operation.
12   That in tandem is the thing that's paying
13   the bills.
14                   And, so it's very -- it's bad
15   faith to sit here and then ask me make more
16   money, how much money you pay us, while out
17   of one side of your mouth you are saying you
18   want to silence us.
19           Q       So, do you consider yourself
20   the golden goose because you think you're
21   paying the bills?
22           A       Well, I don't think.  I mean,
23   I know, yeah, if I left here it would fall
24   apart.
25           Q       During the bankruptcy case,
```

Page 22

```
 1                    ALEXANDER E. JONES
 2   how often have you received updates on it?
 3        A      They try to give me updates
 4   all the time, but it's depressing, and I
 5   look at it, then I just move on.  I don't
 6   understand it all.
 7                  It's basically like
 8   hieroglyphs, and I just -- it's all a big
 9   blur.
10        Q      You understand you have
11   proposed a Plan of Reorganization in this
12   bankruptcy case?
13        A      Again, I'm not a lawyer, this
14   is all hieroglyphs to me, but I think we had
15   one plan, now we have an amended plan, but I
16   can't speak to that.
17                  I'm trying to be helpful, but
18   maybe I'm saying it wrong.
19        Q      Is it true you know nothing
20   about the plan you have proposed other than
21   the fact you've agreed to it?
22                  MS. DRIVER:  Objection, form.
23            I'm also going to instruct the
24            witness to the extent the only way
25            you can answer that question is to
```

```
 1                  ALEXANDER E. JONES
 2          reveal attorney-client privilege,
 3          I'm going to instruct you not to
 4          answer.
 5          A      I mean, I don't even -- I
 6  mean, I think if -- I don't understand the
 7  question.
 8                  What is --
 9          Q      Let's make it a bit more
10  tangible.  If you could, open I believe your
11  counsel has some binders there, and if I
12  could ask you to turn to tab 44.
13                  We are going to mark it as
14  Exhibit 1.
15          A      I don't have any documents.
16                  MS. DRIVER:  It's okay.  So,
17          just for the record, there were two
18          big, very large binders that were
19          delivered to my office.
20                  Thank you very much, Paul.  I
21          have not gone over them with the
22          client, nor did I tell the client
23          that you sent -- sent me documents.
24                  So this is the first time
25          he's seeing this.
```

```
                                          Page 24

 1                  ALEXANDER E.  JONES

 2                  THE WITNESS:  What is this?

 3                  MR. PATERSON:  Thank you,

 4          Vickie.

 5                  MS. DRIVER:  What I

 6          understand this to be is a binder of

 7          documents that Paul may want to ask

 8          you questions about.

 9          A       What page is it?

10                  MS. DRIVER:  I think you said

11          tab 1, is that correct?

12          Q       Tab 44, it's going to be

13     Exhibit 1.

14                  (The above described document was

15          marked Exhibit 1 for identification as of

16          this date.)

17                  MR. LEMMON:  Paul, did you

18          send those documents out to the rest

19          of us?

20          A       We are going to put them in

21     the Exhibit Share software.  The link should

22     have come through.  We are also going to put

23     them up on the screen.

24                  MR. LEMMON:  I haven't seen

25          the link, perhaps I missed it.  Have
```

```
                                       Page 25
 1                  ALEXANDER E. JONES
 2          you already sent it?
 3                  MR. PATERSON:  It should be,
 4          when you went to log into the
 5          deposition program, it should have
 6          given you a link to Exhibit Share,
 7          but we are going to put it up on the
 8          screen as well.
 9          A      I have no idea what this is.
10                  MR. LEMMON:  I would prefer
11          to be able to being assess the
12          documents.
13                  Can you resend the link?
14                  MR. PATERSON:  Let's go off
15          the record for a minute.
16                  THE VIDEOGRAPHER:  The time
17          is 2:55 p.m.  We are off the record.
18                  (At this point in the proceedings
19          there was a recess, after which the
20          deposition continued as follows:)
21                  THE VIDEOGRAPHER:  The time
22          is 3:04 p.m., we are back on the
23          record.
24          Q      So, Mr. Jones, you should
25     have in front of you a document we have
```

```
                                          Page 26
 1                    ALEXANDER E. JONES
 2    marked as Exhibit 1.
 3                    Do you see that's an e-mail
 4    from Ms. Driver, your counsel?
 5          A        Yeah, I can read it, this
 6    works, but I will note that if you need more
 7    than four hours --
 8                    THE WITNESS:  I'll work with
 9            you, then.  That may sound strange,
10            but doesn't have knowledge about the
11            plan other than his agreement to it,
12            unless everyone repeats the same
13            questions.
14          Q        That's all I was going to ask
15    you about, which is, is that a correct
16    statement, that you do not have knowledge
17    about your bankruptcy plan other than the
18    fact that you have agreed to it?
19          A        I mean, I don't -- I trust my
20    counsel.  I have seen the numbers, I think
21    we can probably do that, it's still hard.
22                    I mean, I would say in
23    general I don't understand all this stuff,
24    so I would say yeah, in general, it's a true
25    statement.
```

```
                                        Page 27
 1                    ALEXANDER E. JONES
 2          Q        Have you ever read your
 3    bankruptcy plan?
 4          A        Yes, she made me read it
 5    again yesterday, both the old one and the
 6    amended one, if that's what it's called.
 7          Q        And just focusing on the one
 8    that's been filed, did you read it before it
 9    was filed?
10          A        Yes.
11          Q        And so, do you know what it
12    says?
13          A        Well, I read it, we had like
14    an hour meeting about it months and months
15    ago.
16                   Then there was a new one, and
17    I hadn't seen it in months.  We reviewed it
18    again yesterday, so you know, I mean --
19          Q        And do you consider that to
20    be an important document?
21          A        Yes.
22          Q        Do you consider these
23    bankruptcy proceedings to be important?
24          A        Yes, I do.
25          Q        And do you remember signing
```

```
 1                    ALEXANDER E. JONES
 2   your plan of reorganization?
 3         A      Anything that's signed, I
 4   signed, I mean, I sign a lot of documents,
 5   but I remember signing, yeah.
 6         Q      Have you talked to anyone
 7   other than your lawyer about your bankruptcy
 8   plan?
 9               MS. DRIVER:  I'm just going
10         to object to the extent this calls
11         for any attorney-client privileged
12         information, just making sure that
13         we are -- when you say lawyer, I
14         just want to make sure he remembers.
15               Shelby Jordan is also his
16         lawyer, Christy Stevenson is also
17         his lawyer, David Minton is also his
18         lawyer.
19         Q      Other than that group of
20   people and Ms. Driver, have you spoken with
21   anyone about your bankruptcy plan?
22         A      I have spoken to plenty of
23   people about how I'm in bankruptcy, but not
24   about my plan.
25         Q      In general terms,
```

```
                                    Page 29
 1                 ALEXANDER E.  JONES
 2   financially, what do you understand you
 3   would keep under the plan that's currently
 4   being proposed?
 5           A       My non-exempt -- my exempt
 6   property.
 7           Q       And in terms of your future
 8   income, what would you keep under the plan
 9   you have proposed?
10           A       I don't have it in front of
11   me, but I think like almost all the money
12   out of Free Speech goes to pay the
13   creditors, and I get a percentage of
14   whatever I'm able to bring in outside of
15   that.
16           Q       And what is that percentage?
17           A       I think a third goes to the
18   IRS, a third to the plan and a third to me.
19           Q       And so you effectively get
20   50/50 after tax with creditors for some
21   period of time under your plan, right?
22           A       I'm going from memory, but I
23   believe that's the answer.
24           Q       And in terms of money, how
25   much money would you receive under the plan
```

```
                                           Page 30
 1                   ALEXANDER E. JONES
 2   you have proposed?
 3                MS. DRIVER:  Objection, form.
 4         A       I mean, are you talking about
 5   a salary or are you talking about what I
 6   could potentially make?
 7         Q       Sitting here today, would
 8   your salary and everything else combined,
 9   how much money do you expect to get under
10   the bankruptcy plan you have proposed?
11         A       I don't have it in front of
12   me, I don't know.
13         Q       And without having the
14   document in front of you, do you have any
15   idea how much money you could expect to
16   receive under your bankruptcy plan?
17                MS. DRIVER:  Objection, asked
18         and answered.
19         A       Yeah, I don't know the answer
20   to that.
21         Q       We are going to talk a bit
22   more about the provisions of the plan.
23                You're aware that many of the
24   Sandy Hook Plaintiffs hold non-dischargeable
25   claims, correct?
```

```
                                    Page 31
 1              ALEXANDER E. JONES
 2                   MS. DRIVER:  Objection, calls
 3         for a legal conclusion.
 4         A     So I don't answer that?
 5                   MS. DRIVER:  There are
 6         multiple problems with that
 7         question.
 8                   You can answer to the extent
 9         you understand it.
10         A     I have seen that in the news.
11   I don't know what it means.
12         Q     Do you have any understanding
13   of what it means to hold a non-dischargeable
14   claim?
15         A     Yeah, I guess they can follow
16   me around for the rest of my life.
17         Q     So, notwithstanding your
18   bankruptcy, they can proceed with their
19   claim, right?
20                   MS. DRIVER:  Objection.
21         Q     After you come out of
22   bankruptcy?
23         A     I don't know the details.
24         Q     Are you familiar with the ten
25   year injunction in the plan?
```

```
                                              Page 32
 1                    ALEXANDER E. JONES
 2          A       I can't speak to that with
 3    any competency.
 4          Q       Do you know that for
 5    ten-years, Plaintiffs who do not opt into a
 6    settlement with you will be unable to
 7    enforce their non-dischargeable claims
 8    against you?
 9          A       I really don't know the
10    details of that.
11          Q       So you don't know that if the
12    Connecticut Plaintiffs don't agree to your
13    plan, then under your plan they won't be
14    able to enforce their judgments for ten
15    years?
16                  You don't know that?
17                  MS. DRIVER:  Objection to the
18          form of the question.  I think it
19          might be a little bit misleading to
20          the Connecticut Plaintiffs.
21                  It's the non-electing
22          Plaintiffs, that might be helpful.
23          A       My coping stratgey with this,
24    I don't understand this stuff, and I just --
25    I'm kind of like smiley, caught in a
```

```
 1                    ALEXANDER E. JONES
 2   riptide.
 3                    I don't know where I'm going,
 4   I don't understand all the people, all the
 5   groups.
 6                    I've never talked to you
 7   before, I have no idea what you're talking
 8   about.
 9        Q     Let's go with your counsel's
10   suggestion.  Do you understand that for ten
11   years non-electing Plaintiffs will be unable
12   to enforce the non-dischargeable claims
13   against you?
14        A     I don't know what that means.
15        Q     Is it important?
16        A     What does that mean?
17               MS. DRIVER:  He will have to
18          explain it.
19        Q     Let me ask you again.  Is it
20   important -- different question, sorry.  Is
21   it important to you that creditors not be
22   able to pursue you for ten years?
23               MS. DRIVER:  Objection, form.
24        A     I don't understand.
25        Q     So, let's take a look at your
```

```
                                          Page 34
 1                    ALEXANDER E. JONES
 2   plan, we are going to mark it, it's tab 1 in
 3   the binder you have.  We are going to mark
 4   it as Exhibit 2.
 5                    (The above described document was
 6           marked Exhibit 2 for identification as of
 7           this date.)
 8           A      I don't have enough room
 9   here.
10                    Okay, I've got it.
11           Q      We will bring that up on the
12   screen for everyone.
13                    If you take a look at page 20
14   --
15                    MS. DRIVER:  Are we going
16           with the bottom numbers or the top
17           numbers for the filing?
18                    MR. PATERSON:  We are going
19           with the bottom ones?
20                    MS. DRIVER:  20.
21           Q      You should be hitting 5.06
22   ,general unsecured claims, Class 6.  You see
23   that?
24           A      I am on it.
25           Q      If you look about six lines
```

Page 35

1                    ALEXANDER E. JONES
2    down from the bottom, just under the Y, you
3    will see, "Non-electing Plaintiffs will be
4    enjoined against collecting against the
5    Debtor during the plan term."
6                    Do you see that?
7          A      Y?
8                    MS. DRIVER:  Under Y.
9                    THE WITNESS:  Show me.
10                   MR. PATERSON:  About six
11            lines up from the bottom.
12                   MS. DRIVER:  I am looking for
13            the witness, just for expediency.
14         A      I see it.  "Non-electing
15   Plaintiffs will be enjoined against
16   collecting against the Debtor during the
17   plan term.
18                   "With such non-electing
19   Plaintiffs to the extent such holder and
20   non-dischargeable claim collect against the
21   Debtor non-exempt assets under which claims
22   are otherwise stayed."
23                   I have no idea what that
24   means.
25         Q      So, you understand the plan

```
                                         Page 36
 1                   ALEXANDER E. JONES
 2   term is ten years, correct?  You know your
 3   plan lasts for ten years, right, Mr. Jones?
 4          A      I remember five years and ten
 5   years.
 6          Q      Okay, so you've seen --
 7                 MS. DRIVER:  Somebody in the
 8          middle of the depo telling somebody
 9          they are in the middle of a depo,
10          probably ought to go on mute.  Thank
11          you.
12          Q      So, if you see, this refers
13   to the plan term.  If we go to page 12, you
14   see, "The plan term shall mean the period
15   from the effective date through 120 months
16   from the effective date."
17                 Do you see that?
18          A      1.65?
19          Q      1.65.
20          A      I see that.
21          Q      So your plan term is as
22   defined ten years, right?
23          A      Yes.
24          Q      Unless it's extended?
25          A      I see that.
```

Page 37

1               ALEXANDER E. JONES
2        Q       So under your plan, creditors
3   with non-dischargeable claims who don't
4   support the plan cannot enforce those claims
5   for ten years, right?
6               MS. DRIVER:  Objection, form.
7        A       I'm not a lawyer, I don't
8   know.
9        Q       Why would you want a ten year
10  period during which creditors cannot enforce
11  claims against you?
12              MS. DRIVER:  I'm going to
13              object.  To the extent the witness
14              can answer this without using
15              information that was gained in a
16              conversation with me and is
17              privileged, then I'm going to
18              instruct him not to answer.
19              THE WITNESS:  Vickie, I don't
20              even understand it.  We are doing
21              ten years so I can pay it.  I can't
22              pay that much in five years.
23              That's why we did that,
24              right?
25              MS. DRIVER:  Let him know

Page 38

1                    ALEXANDER E. JONES
2           that.
3           A       We did that because I need
4    ten years to pay that much.  It's still hard
5    to do.
6           Q       And why is it that during the
7    ten years creditors with non-dischargeable
8    claims shouldn't be able to enforce them?
9           A       I don't understand what that
10   means.  But if I've got a plan to try to pay
11   people -- I don't understand what that
12   means.
13          Q       So you don't know that during
14   the ten year plan term if Plaintiffs don't
15   opt in, they won't be able to pursue their
16   claims against you?
17                  MS. DRIVER:  I think where we
18          are going here, Alex --
19          A       Why would they not opt in to
20   get the money?
21                  MS. DRIVER:  Hold on.
22          A       I want to pay them.
23                  MS. DRIVER:  If they are
24          going to enforce your claim, what I
25          think he's trying to say is to

```
 1              ALEXANDER E. JONES
 2         enforce their claim, they would be
 3         suing you and chasing you for money.
 4              So how are you going to pay
 5         this kind of money under this plan
 6         while a bunch of people are
 7         continuing to sue you?
 8              THE WITNESS:  No, but I'm
 9         paying them.
10              MS. DRIVER:  I know.  He's
11         asking you about the document.
12              MR. PATERSON:  I'm happy to
13         ask the questions today.
14              MS. DRIVER:  What I'm going
15         to let you know, Paul, is the way
16         you're asking the questions and
17         where you're going is just getting
18         you to exactly what I said in the
19         e-mail, which is Exhibit 1, which is
20         he doesn't know anything about the
21         details of this plan.
22              And if you would like to have
23         a deposition with him that lasts
24         more than the time today -- please
25         move on to something -- time is
```

```
                                          Page 40

 1                  ALEXANDER E. JONES
 2          getting away.
 3          A       I'm trying to be honest, I
 4   don't know what the hell he's talking about.
 5                  Mr. Jones, is what your
 6   counsel just said accurate?
 7          Q       Is it right to say you don't
 8   know the details of the plan?
 9          A       I mean, I don't have a law
10   degree.  I've read this before, she made me
11   read it yesterday.  But I don't know what it
12   means.
13                  I know I agreed to try to pay
14   a bunch of money to Plaintiffs.  That's all
15   I know.
16          Q       But is it right to say you
17   don't know the details of the plan?
18          A       Yeah, I don't understand all
19   this legalese.  I'm not a bankruptcy lawyer.
20          Q       And so, from your
21   perspective, would you care if creditors
22   could enforce their claims against you the
23   minute you emerge from bankruptcy?
24                  MS. DRIVER:  Objection, form.
25                  To the extent you understand
```

```
                                              Page 41
 1                   ALEXANDER E. JONES
 2          his question you can answer.
 3                   THE WITNESS:  What does that
 4          mean, emerge from bankruptcy?  What
 5          is he talking about?
 6          Q       You understand that at some
 7   point if your plan is confirmed shortly
 8   after you will get out of bankruptcy, you
 9   know that, right?
10          A       I thought I was filing a plan
11   to pay the Plaintiffs, but yeah, okay.
12          Q       So would you care if, for
13   example, later this year, if the Connecticut
14   Plaintiffs don't opt into the plan, they
15   could go and seize your assets, would you
16   care about that?
17          A       Well, I wouldn't do this plan
18   if that was the case.  If I do this thing,
19   they still come after me?
20                   MS. DRIVER:  That's not what
21          he's saying.
22          A       I have no idea what the hell
23   you're talking about.
24          Q       Mr. Jones, are you planning
25   to work forever?
```

Page 42

1                    ALEXANDER E. JONES

2         A       No, I don't live forever,

3    I'll be dead by 75, on average.

4         Q       When do you plan to work

5    until?

6         A       I don't know the answer to

7    that question.  I don't know.

8         Q       In ten years, how old are you

9    going to be?

10        A       60.

11        Q       And what do you expect to be

12   doing in ten years time?

13        A       A million -- I have no idea.

14                MR. PATERSON:  Will FSS be

15           operating in ten years?

16        A       Well, I mean, if I sign onto

17   this plan, I guess it better be.

18        Q       How about 15 years?

19        A       I mean, this is all

20   hypothetical, so I can't really give you

21   answers to hypothetical questions.

22        Q       In the sense you don't know

23   what you're going to be doing in 15 years'

24   time, right?

25                MS. DRIVER:  Objection, form.

```
 1                    ALEXANDER E. JONES
 2         A        These are pretty open-ended
 3    questions.  Yeah, I have no idea.
 4                   MS. DRIVER:  I want to just
 5              point out for the record, you're
 6              asking what he's going to be doing,
 7              not what he intends to be doing,
 8              so --
 9                   MR. PATERSON:  Understood.  I
10              understand what I'm asking.
11         Q        Are you aware that if the
12    Connecticut Plaintiffs do not support your
13    plan, you are still going to owe $1 billion
14    in ten years time?
15                   MR. LEMMON:  I object to the
16              form.
17                   MS. DRIVER:  I object to the
18              form.
19         A        I mean, all that is pie in
20    the sky.  My whole career I've not made $100
21    million.  So it might as well be $50
22    trillion.
23                   I'm trying to bring forward
24    and make an agreement to try to like just
25    move past this, so all this talk about
```

1                   ALEXANDER E. JONES
2    billions of dollars is, to me, I'm not --
3    I'm not Elon Musk or Bill Gates.
4                   So to me, it's -- it's really
5    hypothetical.
6         Q     Because you are never going
7    to pay back $1 billion, is that right?
8                   MS. DRIVER:  Objection, form.
9         A     Well, the idea that you can
10   ask somebody that's never made more than $80
11   million in their whole 30 year career,
12   gross, or take home, to pay billions of
13   dollars, just, it's preposterous.
14                  So the idea that I won't pay
15   my debts, it's like cruel and unusual
16   punishment, and not a lawyer, but it's like
17   saying can I sprout wings and fly to the
18   moon tonight.
19                  Like we won't -- the judge
20   says you have to sprout wings and fly to the
21   moon tonight, I can't sprout wings and fly
22   to the moon tonight, it really enters the
23   comedy zone.
24                  But that's like here is the
25   money I've got, I'll deal with you, and

Page 45

ALEXANDER E. JONES

1     ALEXANDER E. JONES
2  that's what I'm doing is being a real person
3  here.
4        Q     So, sitting here today, what
5  do you plan to do if in ten years time you
6  still owe $1 billion?
7        A     I'll be quite frank with you,
8  and the older I get, the more stuff I have
9  to deal with.  I'm thinking one week ahead,
10 I'm not worried about ten years from now.
11             I have no idea, this is to me
12 just like -- I mean you, ask me questions I
13 can't answer.
14       Q     Do you expect to file for
15 bankruptcy again?
16             MS. DRIVER:  Objection, form.
17       Don't answer that question.
18       A     Yeah, I have never thought
19 about that.
20             MS. DRIVER:  I'm just going
21       to instruct you not to answer.
22       Q     Are you accepting your
23 counsel's instruction?
24             MS. DRIVER:  I never thought
25       about that.  He can say --

```
 1                    ALEXANDER E. JONES
 2          A       I never thought about that.
 3    I'll take my counsel's advice.
 4          Q       And --
 5                  MR. PATERSON:  And Vickie,
 6             what's the basis for that objection?
 7                  MS. DRIVER:  He said that
 8             he's never thought about that, and
 9             you got that answer.
10                  My request for him not to
11             answer was not entered in enough
12             time for him to not say what he
13             said.
14          Q       Okay.
15                  What would the point be of
16    having a bankruptcy plan now, if in ten
17    years' time you are again in the position
18    when you can't pay your debts?
19                  MS. DRIVER:  I'm going to
20             object.  To the extent you cannot
21             answer this question without
22             revealing attorney-client privilege.
23             I'm going to instruct you not to
24             answer.
25                  To the extent you can, you
```

Page 47

ALEXANDER E. JONES

1
2         may answer.

3         A       Yeah, I can't answer that
4   question.  It will violate attorney-client
5   privilege.

6         Q       Do you have any understanding
7   of that yourself or not, other than what you
8   have learned from your lawyer?

9         A       I can't reveal that
10  information without violating
11  attorney-client privilege.

12        Q       And so I guess my question is
13  other than what your lawyers told you, do
14  you have any understanding of why you would
15  emerge from bankruptcy now only to be in the
16  same situation in ten years' time?

17        A       Same answer, attorney-client
18  privilege.

19        Q       Do you know how long the
20  Connecticut Plaintiffs' judgments can be
21  enforced against you?

22        A       For infinity into all known
23  galaxies.

24        Q       You are not aware there is
25  any time limit on that?

Page 48

```
 1                    ALEXANDER E. JONES
 2          A        I just told you, infinity.
 3          Q        So, does that mean you intend
 4   to allow the Connecticut Plaintiffs to
 5   enforce their judgments in perpetuity?
 6                    MS. DRIVER:  Objection, form.
 7          A        Look, whatever they want to
 8   do, they can enjoy themselves.
 9          Q        So, if there is a time limit
10   on how long they can enforce those
11   judgments, is that something you expect to
12   rely upon?
13          A        Again, yeah, I will.  I am
14   not competent to answer your questions.  I
15   have no idea what you're saying.
16          Q        You are familiar with the
17   concept of there being time limits in which
18   people can bring claims, are you familiar
19   with that concept?
20          A        Yes.
21          Q        And if there is a time limit
22   on how long the Connecticut Plaintiffs can
23   enforce their judgments, is that something
24   you intend to rely upon?
25          A        No, I do understand that it's
```

```
                                      Page 49
 1                  ALEXANDER E. JONES
 2   non-dischargeable, according to the federal
 3   court, so that's already a decided thing.
 4                  I'm not debating that with
 5   you.  I'm not going to sit there and discuss
 6   how many angels can dance on the head of the
 7   pin.  At least I know that.
 8        Q        If someone owed you money,
 9   would you want to be paid now or in ten
10   years' time?
11        A        Well, first off, if somebody
12   owed me money, I want to know how much money
13   they had.
14                  If it's money owed me, some
15   crazy amount of money that has just been
16   made up by a kangaroo court, I would go to
17   the person and say how much money do you
18   actually have?
19                  I would actually want the
20   money they had.
21                  But if we are living in
22   fantasy land and people want money that
23   doesn't exist such, as the GDP that exists,
24   that's what the Plaintiffs asked for, $2.7
25   trillion I would laugh at them, because its
```

```
 1                    ALEXANDER E. JONES
 2    Alice in Wonderland tea party stuff.
 3                    Unless you guys have a
 4    crystal ball, am I going to be the King of
 5    the world or something, and you know I'm
 6    about to have trillions of dollars, because
 7    this is cuckoo, this is all cuckoo.
 8           Q       And if someone owed you
 9    money, would you want to know how much money
10    they would have for their entire life or
11    only for a couple of years?
12           A       I mean, that's an academic
13    question.  I can't answer questions like
14    that.
15           Q       So you are not able to answer
16    that question?
17           A       A year is a lifetime in this
18    world now.  So I have no -- I have no -- I
19    have no radar out very far.  It's all just
20    speculative, it's all science fiction;
21    fiction.
22           Q       Going back to my question, I
23    think you gave me a more general answer to
24    it, but if someone owed you money, would you
25    want to be paid now or in ten years' time?
```

1                    ALEXANDER E. JONES

2          A      I would want the capacity

3    they had to pay to get the percentage I

4    could get.

5          Q      Would you prefer to get the

6    money you were owed sooner or later?

7                    MS. DRIVER:  I'm going to

8             object.  This has been asked and

9             answered.  He's answered it to the

10            best of his ability.

11         A      Yeah, this is all like magic,

12   hypothetical, Captain Kangaroo stuff.  I

13   can't answer questions that make no sense.

14         Q      So you think that whether or

15   not you would prefer to get money sooner or

16   later is a magic hypothetical question?

17         A      It all depends on what the

18   deal was or what the amount was.  You can't

19   just speculate.

20         Q      All the other things being

21   aside, putting aside the other terms of the

22   deal, would you want to get paid sooner or

23   later?

24         A      It would depend on the

25   amount.

```
                                        Page 52
 1                ALEXANDER E. JONES
 2        Q      And assuming the amount was
 3   the same, would you want to get paid sooner
 4   or get paid later?
 5                MS. DRIVER:  I'm going to
 6           object, just I'm going to object to
 7           this line of questioning.  It's been
 8           asked and answered.
 9                Move on to something else,
10           please.
11                MR. PATERSON:  It's been
12           asked, it certainly hasn't been
13           answered, so I will repeat the
14           question.
15        A      Maybe they want to defer
16   their taxes maybe later?  Up to the
17   individual.  I can't answer that.
18                MS. DRIVER:  It's also like
19           there is an election to get paid
20           earlier in the plan.
21                If you want to ask if he was
22           a creditor in this plan and whether
23           or not whether he would take the
24           election in this plan, that is
25           relevant for this deposition.
```

ALEXANDER E. JONES

1
2          Vickie, you will be free to ask him
3          questions at the end if you want to.
4                  I am just asking a simple one
5          here.
6          Q      Which is that if there is a
7   set amount of money, would you prefer to
8   receive that amount of money sooner or
9   later?  And if you --
10         A      I don't know.
11         Q      Are you aware that under your
12  plan the Plaintiffs who settle with you get
13  the minimum amount of their proportionate
14  share of $5.5 million, are you aware of
15  that?
16                 MS. DRIVER:  Objection, form.
17         A      I don't know what you're
18  talking about.
19         Q      Do you know that under your
20  plan there is a certain guarantee of $5.5
21  million a year?
22         A      For who, what?
23         Q      Do you know that under your
24  plan there is a certain guarantee you're
25  providing $5.5 million a year?

1                    ALEXANDER E. JONES

2                    MS. DRIVER:  If you would

3           like I'm happy to point him to that

4           part in the plan and he may be able

5           to answer

6           Q       I'm just asking in the

7     abstract to start with?

8           A       I don't remember, what is it?

9                    MS. DRIVER:  I can't help

10          you, if he wants to help you.

11          Q       Do you understand that there

12    is a guarantee in your plan subject to its

13    terms of $5.5 million a year?

14          A       Is that in the free speech

15    plan?

16                   MS. DRIVER:  No.

17          Q       My question, Mr. Jones, you

18    either know or you don't?

19          A       I don't know.

20          Q       Okay.

21                   So, let's take your counsel

22    up on her suggestion of taking a look at the

23    plan, so we will go back to Exhibit 2, which

24    I think is tab 1 in your binder.

25                   If we start on page 10, you

1                  ALEXANDER E. JONES

2    see on page 10 there is a minimum annual

3    distribution and a figure of $5.5 million.

4    Do you see that?

5            A        Yes.

6            Q        And the minimum annual

7    distribution in particular is defined as the

8    Plaintiff's pro rata share for such

9    Plaintiff multiplied by $5.5 million.

10                    Do you see that?

11           A        Yes.

12           Q        And so then we will take a

13   look at page 19.

14                    At the top it says, "The

15   electing Plaintiffs," you see at the bottom

16   of page 18, "Each electing Plaintiff shall

17   receive cash in the amount of," and in

18   number 2, "from the effective date until the

19   year in which the payment trigger occurs,

20   the greater of such electing Plaintiff's

21   minimum annual distribution or," then there

22   is some other text."

23                    Do you see that?

24           A        Yes.

25           Q        And so settling Plaintiffs

```
                                      Page 56
 1                  ALEXANDER E. JONES
 2   get a minimum of their proportionate share
 3   of $5.5 million a year, is that right?
 4          A       Yes, I guess that says that.
 5          Q       And what happens if you make
 6   less than $5.5 million in a particular year?
 7          A       I don't remember the details.
 8          Q       Do you have any plan for how
 9   to satisfy that obligation if you make less
10   than $5.5 million?
11                  MS. DRIVER:  Objection, form.
12          A       I don't remember.
13          Q       Do you think you will always
14   earn more than $5.5 million a year?
15          A       That's like an estimation,
16   that's kind of on the outside, it's on the
17   extreme end.  I would hope we can do it.
18                  No business person a year out
19   knows what's going to happen.  It's a
20   projection in good faith.  We don't know.
21          Q       So, if it's extreme, as you
22   see it, what happens if you can't make the
23   $5.5 million a year?
24                  How are you going to make
25   these distributions?
```

```
                                        Page 57

 1                    ALEXANDER E.  JONES

 2         A       I don't know.

 3         Q       Let's move on to your

 4    Disclosure Statement.

 5                    Are you familiar with the

 6    Disclosure Statement that you filed in this

 7    case?

 8         A       I remember something about

 9    it.

10                    MR.  PATERSON:  Let's mark, we

11            are going to mark Exhibit 3.  It's

12            tab 3 in your binder, which is the

13            Disclosure Statement.

14                    (The above described document was

15            marked Exhibit 3 for identification as of

16            this date.)

17         A       This is?

18                    MS. DRIVER:  Yes.

19         A       All right.

20         Q       And we will put that up on

21    the screen for everyone.

22                    Do you recognize this to be,

23    take a minute to look through it if you

24    want, your Disclosure Statement?

25         A       Yeah, I remember this.
```

Page 58

1                    ALEXANDER E. JONES

2          Q        So I take it you've read this

3    document before?

4          A        A while back, yeah.

5          Q        And did you sign this

6    document?

7          A        I think so, yeah.

8          Q        And what steps did you take

9    to ensure this Disclosure Statement was

10   accurate?

11         A        I just let the accountants

12   and everybody into all my stuff, gave them

13   full access to everything.  I'm not an

14   accountant, I'm not a lawyer.

15         Q        So I understand what you let

16   the accountants do, but what steps did you

17   personally take to make sure the information

18   in here was accurate?

19         A        There were lawyers, CPAs,

20   accountants involved in all of it, so I just

21   went off their professional reputation.  I

22   looked at it.

23         Q        Do you have any understanding

24   of what the purpose of this document is?

25         A        No.

```
                                         Page 59
 1                    ALEXANDER E. JONES
 2          Q        So let's take a look at page
 3     35.
 4                    MS. DRIVER:  I think he's
 5          going to the top of the page.
 6          Q        Just looking at the heading
 7     right before "D, Cramdown" at the top of the
 8     page, just looking at that paragraph above
 9     it, do you see it says starts, do you see
10     the paragraph starting, "The Debtor also
11     believes that the feasibility requirement
12     for confirmation of the plan is satisfied"?
13          A        Yes.
14          Q        Do you see that?
15                   And you see that at the end
16     of that sentence it says, "and all creditors
17     will ultimately be paid in full."
18                   Do you see that?
19          A        Yes.
20          Q        That's not true, is it,
21     Mr. Jones?
22          A        They are welcome to opt into
23     it and they will be paid.  That's their
24     decision.
25          Q        And you were just telling me
```

```
                                         Page 60
 1                    ALEXANDER E. JONES
 2    before how it was pie in the sky to think
 3    that you could ever pay anywhere near $1
 4    billion.
 5                    Do you recall that testimony?
 6         A        Again, I'm not going to argue
 7    this, I don't understand it.  I think it's
 8    what we can pay.
 9                    They can opt into getting
10    paid if they want to, and I would imagine
11    they would, but I don't understand all this,
12    so.
13                    But yeah, it's my intent to
14    try to pay what I can pay.
15         Q        So my question was just
16    whether you recalled your prior testimony
17    about how it was pie in the sky to suggest
18    you could pay $1 billion.
19                    Do you recall that testimony?
20         A        I think it is pie in the sky.
21                    I think this is to pay what
22    the company can produce and pay them, that's
23    my point, but I didn't say that was pie in
24    the sky.
25         Q        Okay.  And when it says, "and
```

```
                                    Page 61
 1                  ALEXANDER E. JONES
 2   all creditors will ultimately be paid in
 3   full," you are not proposing to pay $1
 4   billion, right?
 5           A       I'm proposing to pay what I
 6   can pay, and I would imagine they would opt
 7   in.   That's the sane thing to do.
 8           Q       And that's nowhere near $1
 9   billion, right?
10           A       Or a quadrillion, no.
11           Q       Are you aware that you owe
12   duties to creditors of your estate?
13                  MS. DRIVER:  Objection, form.
14           A       I don't know what that means.
15           Q       I'm going to move on to a
16   different topic now, which is your income
17   and expenses.
18                  Are you familiar with
19   projections that have been given to
20   creditors in this case?
21                  MS. DRIVER:  Objection, form.
22           A       I would have to know what
23   you're talking about.
24           Q       Okay, so let's do that.  If
25   you take a look at tab 4, which is Exhibit
```

```
                                          Page 62
 1                    ALEXANDER E.  JONES
 2      4.
 3                    We will just bring it up on
 4      the screen.
 5                    Do you recognize this
 6      document?
 7                    MS. DRIVER:  I am just
 8          turning to the second page for him.
 9                    (The above described document was
10          marked Exhibit 4 for identification as of
11          this date.)
12          A     No.
13          Q     So, you've never seen this
14      set of projections before?
15          A     I'm saying this all looks the
16      same to me, to be honest, big ass giant
17      stacks of numbers.  They don't look familiar
18      to me.
19          Q     Have you ever seen any
20      forecast of your anticipated earnings and
21      expenses over the next ten years?
22          A     Yes.
23          Q     And what forecast have you
24      seen?
25          A     I don't -- I've seen a bunch
```

Page 63

ALEXANDER E. JONES

1
2    of stuff like this, it all looks the same to
3    me.
4                   I told you, I'm sure I've
5    seen a bunch of stuff like this.  I can't
6    remember.
7         Q       So, did anyone ever sit down
8    with you with a document like this and ask
9    you to review it?
10        A       Yes, I've been in a bunch of
11   meetings looking at stuff like this.
12                   Sorry, I didn't do too good
13   in school.  I mean, it just looks like a
14   bunch of Chinese to me.  I mean, big ass
15   things with numbers all over it.
16        Q       And who were those meetings
17   with that you described?
18        A       Bob Slizer, Vickie Driver.  I
19   mean we have sat there and they make me sit
20   there and read this stuff.
21                   They are the professionals,
22   they know about all this stuff.  It's a
23   bunch of numbers here.
24        Q       And do you know who prepared
25   these projections we are looking at here?

Page 64

ALEXANDER E. JONES

1

2         A       No.

3         Q       And you said you had reviewed

4    certain projections.  Who was it that had

5    prepared the ones you reviewed?

6         A       I don't remember.  I mean --

7         Q       Bob Slizer is the person with

8    the most knowledge of your accounting, is

9    that right?

10        A       And I hear you're deposing

11   him later.  So he can answer your questions

12   then.

13        A       Come on, man, I don't sit

14   here -- I'm not a numbers guy.  This looks

15   like Martian to me.

16                They sat there they tried to

17   make me look at it, they have tried to

18   convince me that I can pay all this money.

19                And I can see that we have

20   made that before so maybe we can in the

21   future.

22                But as for like looking at

23   all this stuff, income invoices, income

24   before expenses, distribution income, I have

25   no idea.  I am not a math guy.

Page 65

ALEXANDER E. JONES

1
2        Q       We will get to that, but my
3    question was just Bob Slizer is the person
4    with the most knowledge of your accounting,
5    right?
6        A       Probably.
7        Q       And so these sets of
8    projections we are looking at here, do you
9    have any reason to believe they are not the
10   best possible estimate of your expected
11   finances over the next ten years?
12       A       In general I can see what we
13   made and hope that we can make as much as we
14   made before.
15               You know, it's a very
16   competitive market, so it's the bottom line
17   that I can think I agree with.
18               As for all the little
19   minutia, I have no idea.  I don't understand
20   like accrual and this tax and state tax and
21   income -- and sales tax and all the -- you
22   look at this stuff.
23               I'm not going to pretend to
24   know what I'm talking about.  Just like
25   what, fly the space shuttle?

```
                                      Page 66
 1                  ALEXANDER E. JONES
 2                  So that's why I'm looking at
 3      it and I'm, like I have no idea what half of
 4      this is, so I'm not going to sit there and
 5      act like I do, but --
 6          Q       When you say it's the bottom
 7      line that I think I can agree with, do you
 8      agree with the bottom line in these
 9      projections?
10          A       I can be shown the bottom
11      line of what we were making profit before
12      and think well, if this is close to that, or
13      even below that, because the market is tough
14      right now, yeah, I think I could probably
15      shoot for that.
16                  Legitimately, if I sign to an
17      agreement I think I can probably try to
18      raise that if the market doesn't totally
19      crash.
20                  So I can be shown what we
21      made before and then be showed this, but as
22      for minutia, I have no idea.
23          Q       So, do you have any basis to
24      dispute the reliability of the numbers that
25      are shown in this document?
```

Page 67

1                    ALEXANDER E. JONES
2          A      As it was presented to me by
3    experts, I believe with the bottom line, I
4    can produce that if I work really hard.
5                    It's still tough.
6                    But I have -- but when it
7    comes to sales tax and accrual and franchise
8    taxes, I have no idea what these numbers
9    mean.
10                   And I'm not going to pretend
11   to even know, because I'm under oath here.
12   I have no idea what this means.
13         Q      Have you reviewed projections
14   that have been provided by FSS?
15         A      No; I believe Bob Slizer has
16   used those projections in these projections,
17   but you have to talk to him.
18                   But I have talked to him a
19   few weeks ago, and he was talking about, I
20   don't want to speak for him, like waiting
21   for projections or something, or something
22   else.
23                   So I know he gets numbers
24   from them.
25                   Is that right, Bob? -- I

Page 68

1                    ALEXANDER E. JONES
2    can't talk to Bob.
3                    Look, listen to this, I don't
4    know, I don't know, because I don't know --
5    I'm trying to help, but I don't know.
6         Q       But you we can possibly
7    shortcut some questions here.  Would you be
8    in a position to speak with me about the
9    details of FSS's projections if I asked you
10   about them?
11        A       No, I know nothing about it.
12   I just know they talk to each other, that's
13   where he gets the numbers.  I know that.
14        Q       So let's talk a little about
15   the economics of your plan.
16                    You understand that under the
17   plan you have currently filed, broadly
18   speaking, you are keeping half of your
19   income until certain payments have been made
20   and then three-quarters of your income after
21   that?
22                    Do you understand that?
23        A       Again, I'm not an accountant,
24   but no.
25                    I generate all this money for

```
                                            Page 69
 1                  ALEXANDER E. JONES
 2    Free Speech, I want to make those numbers,
 3    and then if I bring extra stuff, which you
 4    want to incentivize, then after taxes I get
 5    half, that's a whole different bailiwick.
 6          Q       So, do you know that in the
 7    next few years you would be keeping half of
 8    your personal income under your plan, do you
 9    know that?
10          A       No, I would be keeping a
11    third of it.
12          Q       And that's because a third
13    goes to taxes, a third goes to creditors,
14    and a third goes to you?
15          A       I believe.  I'm not an
16    accountant.
17          Q       And then after certain
18    payments have been made, you would be
19    keeping a greater proportion of your income,
20    right?
21          A       I don't quite understand
22    that, so I can't answer it.
23          Q       You don't understand that
24    after you have paid a certain amount of
25    money to creditors you would be keeping a
```

```
                                        Page 70
 1                   ALEXANDER E. JONES
 2   higher proportion of your income?
 3          A      No.
 4          Q      And so is that something
 5   that's important to you under your plan?
 6          A      Well, obviously I'm not going
 7   to work for free, so if creditors want all
 8   this money, I need to be incentivized to
 9   work.
10                 Slavery was outlawed in the
11   middle of the 1860s.
12          Q      And so is it important to you
13   that at some future time you receive a
14   greater proportion of income under your
15   plan?
16          A      I'm not familiar with that
17   part of it; but I would obviously like to be
18   out from under this at some point.
19          Q      So, let's take a look at --
20   go back to your plan.
21          A      Can I just take five minutes
22   to get some more coffee?
23                 MR. PATERSON:  Sure, let's go
24          off the record.
25                 THE VIDEOGRAPHER:  The time
```

```
                                          Page 71

 1                      ALEXANDER E. JONES

 2           is 3:45 p.m.  We are off the record.

 3                   (At this point in the proceedings

 4           there was a recess, after which the

 5           deposition continued as follows:)

 6                      THE VIDEOGRAPHER:  The time

 7           is 3:56 p.m.  This is the start of

 8           media unit number 2.  We are on the

 9           record.

10           Q      Mr. Jones, we were talking

11    earlier about how you had a ten year plan.

12    Do you remember that?

13           A      Yes.

14           Q      Can you think of any reason

15    why you should get to keep more of your

16    income towards the end of that plan?

17                      MS. DRIVER:  Objection; form.

18           A      I had financial experts look

19    at the precedents, and how everything works,

20    and out in the future.

21                   I have no idea what's going

22    to be happening in the future.  A year or

23    two out is the most I can forecast with

24    accuracy.

25                   So I really -- I've also
```

Page 72

ALEXANDER E. JONES

1

2    impressed upon them that I don't want to be

3    working more than ten years, so I really

4    don't know all the calculus that goes into

5    that.

6          Q      Do you personally think it's

7    fair that you should get to keep a greater

8    proportion of your income in the second part

9    of your plan?

10         A      I don't understand all the

11   numbers that went into it.  I can't speak to

12   that.

13         Q      You don't understand the

14   concept that you are getting a greater

15   proportion of your income in the later part

16   of the plan?

17         A      I don't understand all the

18   calculus that went into it, so I can't speak

19   to it with any competency.

20         Q      I'm going to take a look at

21   Exhibit 4, which are the projections that we

22   marked before the break.  It's tab 4 in your

23   binder.

24         A      We have it right here.

25         Q      And if you look on the third

```
                                            Page 73
 1                    ALEXANDER E. JONES
 2   page of the document --
 3                    MS. DRIVER:  The third page?
 4                    MR. PATERSON:  Third page.
 5          Q        You see it starts 2025 and
 6   goes through to 2034?
 7          A        Yes.
 8          Q        And the first line is Free
 9   Speech payroll, and it says 2025 $1. or
10   $1,681,250.
11                    Do you see that?
12          A        Yes.
13          Q        And then it projects income
14   to you from various other sources.  Do you
15   see that?
16          A        Yes.
17          Q        And then at the end of the --
18   further down in bold it says ''distributable
19   Income."
20                    Do you see that?
21          A        Yes.
22          Q        And a couple of lines lower
23   there is a line shaded in green saying "50
24   percent to creditors."
25                    Do you see that?
```

Page 74

ALEXANDER E. JONES

1

2        A        Yes.

3        Q        And that was what we were

4   talking about before, with after tax,

5   creditors getting half and you getting half,

6   right?

7        A        I'll take your word for it.

8        Q        I'm not testifying today,

9   Mr. Jones.  I'm interested in what your word

10  is.

11       A        I don't know.

12       Q        And do you understand the

13  amount shown here, the 50 percent to

14  creditors that's being paid, to be after

15  taxes?

16       A        Yes.

17       Q        And so you understand that

18  the other part that you are keeping is the

19  equivalent of this 50 percent to creditors

20  shown here?

21       A        Yes.

22       Q        And that's after taxes as

23  well?

24       A        I would imagine we are paying

25  taxes.

```
 1                  ALEXANDER E. JONES
 2          Q        And the taxes come out before
 3   this 50 percent to creditor line, right?
 4          A        I don't know.
 5          Q        Well, if you look up, you can
 6   see lines for taxes withheld and taxes on
 7   other income.
 8                   Do you see those a few lines
 9   up?
10          A        I do see that, yes.
11          Q        And so the amounts reflected
12   in green are net of taxes, right?
13          A        I believe so.
14          Q        And so the amount you're
15   keeping shown here would be $971,567 in
16   2025.  Do you see that?
17          A        Yes.
18          Q        And then it rises to almost
19   $1.4 million in 2033.  Do you see that?
20          A        Yes.
21          Q        And so that's amounts that
22   you are going to keep under your proposed
23   plan, right?
24          A        Yeah, if you would like me to
25   work and pay you money, yeah.
```

Page 76

ALEXANDER E. JONES

1

2          Q        And are you willing to work
3     for less than $1 million a year?
4          A        They have had to convince me
5     to stay in this thing.  So you want to sit
6     here, it will go real fast ^.
7                   This is actually the maximum
8     that I think I could actually pay.  It's on
9     the outside of that in this market, maybe
10    things will change down the road.  That's
11    why there -- the details of this, that's why
12    there is a higher number if we make more.
13                  I'm aware what you can ask
14    for.  There is a thing where it goes up,
15    that's a pretty good deal for you g-u-y-s-
16                  THE VIDEOGRAPHER:  And it's a
17         pretty good deal for you, too,
18         right, because you receive $1
19         million plus a year, correct?
20         A        Well, it's a good deal for
21    you, because I'm going to work, people don't
22    work for free, indentured servitude.  And
23    slavery was banned after the Civil War.
24         Q        And what would you do if you
25    received less than $1 million a year under a

Page 77

```
 1                ALEXANDER E. JONES
 2   Plan of Reorganization?
 3          A       I mean, I don't know.
 4                  MS. DRIVER:  Objection to
 5          form, calls for speculation.
 6          A       Yeah, I don't know.  Still,
 7   I'm not going to do some deal where I don't
 8   get paid.
 9          Q       And are you prepared to get
10   paid less than $1 million a year?
11                  MS. DRIVER:  Objection, form;
12          calls for speculation.
13          A       Quite frankly, I've told my
14   lawyers they need to budget security in here
15   for me.
16                  How am I supposed to go
17   around at public events that will make money
18   without security?  That's not even in here.
19                  So, I agreed to a lot of
20   this, and then I did start looking at it.
21   It's not enough money to operate the level
22   I'm at and what I'm doing.
23                  So, this whole idea that I'm
24   going to go around with no security and no
25   money and all the bills I've got and
```

                     ALEXANDER E. JONES

1
2    separate legal stuff and not have basic
3    money to pay my bills is preposterous.
4                   So, so that's where I'm at.
5    I don't know all the details and all the tax
6    stuff.  That's all handled by them.
7                   I'm not going to pretend to
8    know that stuff.  I just know that this is
9    the bare minimum I can operate on.
10         Q     And so sitting here today,
11   you are not prepared to work for less than
12   $1 million a year?
13                   MS. DRIVER:  Objection, form;
14          that's not -- that is
15          mischaracterizing the document in
16          front of him.
17                   MR. PATERSON:  Vickie, we
18          don't need speaking objections.
19         A     I can't answer your question,
20   it is all speculative.
21         Q     So you think it's speculative
22   work for more than -- less than $1 million?
23         A     I mean, if inflation, if we
24   have deflation and money is worth twice as
25   much I might work for less.

Page 79

1            ALEXANDER E. JONES

2                In an inflationary economy,

3    no.

4                MS. DRIVER:  So the record is

5         clear, there is a settlement offer

6         on the table that is better than

7         this plan.

8                We are testifying about this

9         plan.  So asking whether he would do

10        something else in a settlement

11        agreement, I'm not going to let him

12        testify about.

13        A       That's why I can't answer the

14    questions about -- I know there is another

15    plan that has more money offered.

16                MR. PATERSON:  Vicki, you're

17        not the one testifying today, so

18        theoretically you can not do the

19        interjections.

20        A       That's why I can't speak

21    properly here.  I can't keep heads or tails

22    these two plans.

23                I read them both.  She made

24    me read them again yesterday.  I know there

25    are two plans.

Page 80

1                   ALEXANDER E. JONES
2                   She made me -- I'm quoting
3    the $70 million thing to you, and you're
4    quoting a $55 million deal.  And it's all
5    just a bunch of games.
6         A       So I'm not an accountant, I'm
7    not going to pretend to answer your
8    questions.
9                   If you've got real questions
10   I can answer, I'll do them.
11                  Do I intend to try to make
12   this deal and move on if you guys let me?
13   Damn right I do.
14                  Am I 100 percent sure it's
15   going to work?  No.  That's why this is the
16   outside plan, the maximum I can do.
17        A       What I do know is the markets
18   and all the people coming into broadcasting
19   and AI and everything I know, this is like
20   on the outside.
21                  And if I can't pay it all,
22   then you guys are right back where we were.
23                  So I want to try to make a
24   deal and just move on from this.  But -- I
25   can speak to my beliefs, but I can't speak

```
                                        Page 81
 1                 ALEXANDER E. JONES
 2   to nebulous taxes and, you know, all this.
 3                 I cannot speak with
 4   competency to any of this.
 5        Q     Mr. Jones, do you consider it
 6   a form of enslavement to make less than
 7   $500,000 a year after taxes?
 8                 MS. DRIVER:  Objection to
 9            form.  I'm going to instruct you not
10            to answer.
11        Q     Are you taking your counsel's
12   instruction?
13        A     Yes.
14        Q     So, looking back at the
15   document, and I'll just make clear we will
16   reserve our rights on everything where there
17   have been instructions not to answer and
18   reserve the right to pursue that further.
19                 Looking at the document, if
20   you look at the FSS distributions line, do
21   you see that line?
22        A     Which one is that?
23        Q     It's got a border around it
24   on the document, on the forecast.
25        A     Yes.
```

```
                                    Page 82
 1                 ALEXANDER E. JONES
 2        Q        And you see that shows
 3   distributions from FSS to creditors, right?
 4        A        Yup.
 5        Q        And if you take a look,
 6   you'll see those drop dramatically from 2028
 7   to 2029.
 8                 Do you see that?
 9        A        Yes.
10        Q        Do you know why that is?
11        A        I don't.
12        Q        Are you expecting FSS'
13   business to fall off a cliff in 2029?
14        A        I can't speak to why that was
15   done.
16        Q        Do you know that you're
17   proposing to keep half of FSS' income
18   starting in 2029 in addition to what is
19   shown in the 50 percent to creditors line?
20        A        Where is that?  Show it to
21   me.
22        Q        Are you aware that the
23   difference between these figures, the reason
24   why they drop so much from 2028 to 2029 is
25   that you're keeping more of FSS' income
```

Page 83

```
 1                  ALEXANDER E. JONES
 2    starting in 2029?
 3                  MS. DRIVER:  I'm going to
 4           object.  He just answered the
 5           question he didn't know why.  You
 6           are now telling him why.
 7                  So if you want to testify,
 8           that's fine.  If you would like to
 9           ask him a question, that's fine.
10                  Right now you have testified
11           to something that he said he didn't
12           know, so, he can't answer that
13           question.
14           Q     Okay, so let's be a bit more
15    specific.
16                  So you don't know, Mr. Jones,
17    that in addition to what is shown in the 50
18    percent to creditors line, you are going to
19    be getting millions of dollars a year from
20    FSS beginning around 2029?
21           A     I don't -- I'm not aware of
22    that.
23           Q     So let's just stick with the
24    roughly $1 million to start with.
25                  We spoke before about how you
```

```
                                      Page 84
 1                    ALEXANDER E. JONES
 2    were keeping roughly $1 million to $1.4
 3    million a year.
 4                    What do you intend to use
 5    those amounts for?
 6                    MS. DRIVER:  Objection, form.
 7          A      I have no idea what you're
 8    talking about.
 9          Q      You know you are going to get
10    between $1 million and $1.4 million a year
11    under your plan, at least, right?
12          A      Is that what it says?
13                    MS. DRIVER:  He's referring
14          to this line.
15          A      Yes.
16          Q      Do you know that, Mr. Jones?
17          A      Yeah, that's just a
18    projection, yeah.
19          Q      And what do you plan to use
20    that money for?
21          A      I don't know.
22          Q      Have you spent any time
23    determining what necessary expenses you are
24    going to have in the future?
25          A      I let financial planners do
```

```
                                              Page 85
 1                    ALEXANDER E. JONES
 2    all that.
 3           Q      And so do you personally have
 4    any understanding of what your necessary
 5    expenses are?
 6           A      I mean currently, I have my
 7    ex-wife suing me and a bunch of other stuff
 8    going on, and I'm sure it will continue.
 9                  I have a lot of expenses, and
10    I don't have all those numbers down in front
11    of me.
12           Q      Are you aware of any document
13    where those numbers are recorded?
14           A      No, I don't have it in front
15    of me; but I don't think it's a secret that
16    my ex-wife has been suing me for ten years.
17           Q      Whether or not you have it in
18    front of you, are you aware of any
19    document --
20           A      So I can't give you the
21    specific numbers, because I don't have it.
22           Q      And who would have those
23    numbers?
24           A      I'm sure it's in my
25    accounting and my taxes.  I can find it.
```

Page 86

ALEXANDER E. JONES

1

2      Q        And are you aware of anyone
3  going through all of your expenses
4  methodically and working out which ones are
5  necessary?
6      A        Bob Slizer on just the
7  general, and then for family law, David
8  Minton.
9      Q        That's not something you have
10  done yourself personally?
11      A        No, I haven't done my taxes
12  in 30 years.
13      Q        How much money do you think
14  you need a month to satisfy your reasonable
15  living expenses?
16      A        I don't know.
17      Q        Do you have any idea?
18      A        No.
19      Q        Do you need more than $50,000
20  a month for your living expenses?
21      A        I don't know.
22      Q        Do you think it's possible
23  you could live on less than $50,000 a month
24  in expenses?
25                    MS. DRIVER:  I object, he

```
 1                   ALEXANDER E. JONES
 2           said he did not know.  This is just
 3           the same question over and over
 4           again, harassing the witness.
 5                   He's answered the question,
 6           please move on.
 7                   MR. PATERSON:  There is no
 8           harassing the witness, Vickie, and
 9           there is no need for speeches, but
10           we will move on.
11           Q      So let's talk about some of
12   your expenses in a little more detail.
13                   And specifically I want to
14   talk about your spending during the
15   bankruptcy case.
16                   Have you made any changes to
17   your historic spending since being in
18   bankruptcy?
19           A      I don't have --
20                   MS. DRIVER:  I'm just going
21           to make an objection.  You can use
22           your time in this deposition to ask
23           these questions.
24                   But if you have taken the
25           time to review his deposition
```

```
 1                    ALEXANDER E. JONES
 2            earlier in this case for the 2004
 3            exam, as well as Mr. Slicer's
 4            deposition, you would note that
 5            these questions have been covered in
 6            very excruciating detail.
 7                    If you want to use your time
 8            for this, I'm happy to, but I won't
 9            be adding this to anything that we
10            are doing today.
11                    MR. PATERSON:  Vickie, we
12            understand.  We have read the prior
13            depositions, we do want to talk
14            about this, including things that
15            have happened after the prior
16            depositions.
17                    And we will use our time how
18            we want, and so, to restate my
19            question --
20            Q       Have you made any changes to
21       your historic spending since being in
22       bankruptcy?
23                    MS. DRIVER:  Given his
24            statement before, I would ask that
25            you make sure that you make that
```

```
 1                    ALEXANDER E. JONES

 2          statement from the date of your 2004

 3          forward.

 4                    MR. PATERSON:  In the last

 5          few months have you made any changes

 6          to your typical spending?

 7          A      I can't speak to the details,

 8  because I'm not doing my accounting, but I

 9  know we have cut a lot of expenses since

10  this process began, but I don't have the

11  details in front of me.

12          Q      Do you have an understanding

13  of what expenses you've cut?

14          A      Childcare, house repairs, a

15  whole list of things.

16          Q      Okay, so let's talk about a

17  couple of those.

18                    I'm going to show you a

19  document, it will be Exhibit 5.  It's going

20  to be tab 33 in your binder.

21                    (The above described document was

22          marked Exhibit 5 for identification as of

23          this date.)

24          A      Got it.

25          Q      And we will put it up on the
```

```
                                         Page 90
 1                    ALEXANDER E. JONES
 2   screen.
 3                    Do you recognize this
 4   document?
 5          A        I remember seeing a monthly
 6   operating report, but I don't really
 7   remember it.  I remember seeing that name.
 8          Q        And do you review the monthly
 9   operating reports before they are filed?
10          A        They put them in front of me.
11          Q        And any reason to believe
12   this is not your monthly operating report
13   for January?
14          A        I'm sure it's real.  I don't
15   know that -- they try to make me read all
16   this.
17          Q        And so if you look at page 16
18   of the document, and the numbers on the
19   headers change partway through, so it says
20   page 4 of 7 on the header.
21                    It's near the end.  You can
22   see it up on the screen.
23                    If you look at the second to
24   bottom line, you see it says, "Total meals
25   and entertainment, $2,195."  Do you see
```

Page 91

1                    ALEXANDER E. JONES

2    that?

3         A      Where is that?

4                MS. DRIVER:  Right down here.

5         A      Yes.

6         Q      So you spent $2,195 on meals

7    and entertainment while in bankruptcy in

8    January?

9         A      Yeah, I mean, I don't really

10   keep track of this, but a lot of those are

11   business meetings.

12               I don't even count it as

13   that, but yeah, probably more than that.

14        Q      You think business meetings

15   go in your personal reports?

16        A      I'm not nickel and diming

17   stuff but, I would imagine that sounds like

18   a right number.

19        Q      Now let's look at the one for

20   February, it's going to be tab 34 in your

21   binder.

22               We are going to mark it as

23   Exhibit 6.

24               (The above described document was

25        marked Exhibit 6 for identification as of

```
                                          Page 92
 1                   ALEXANDER E.  JONES
 2          this date.)
 3          A        Okay.
 4          Q        We will bring it up on the
 5    screen as well in a minute.
 6                   Do you recognize this to be
 7    your monthly operating report for February?
 8          A        That's different, that has a
 9    yellow thingie on it.  Is that the same
10    thing?
11                   MS. DRIVER:  There are no
12          exhibit stickers on these.
13          A        I see it.
14          Q        And do you recognize this to
15    be your monthly operating report for
16    February?
17          A        Looks like it.  I'm not
18    disputing it.
19          A        And if we go again near the
20    end of the document, page 4 of 6, do you see
21    the line for meals and entertainment?
22                   It's about ten lines up from
23    the bottom,
24          A        Um-hum.
25          Q        And you see it says $3,441 in
```

```
                                            Page 93
 1                   ALEXANDER E. JONES
 2    bold?
 3                   MS. DRIVER:  Hold on.
 4                   I'm having a hard time
 5          getting to that number.
 6          Q       Do you see total meals and
 7    entertainment, $3,441?
 8          A       Yeah, I see it.
 9          Q       And, so in February you spent
10    $3,441 on meals and entertainment, is that
11    right?
12          A       That's about right.
13          Q       And that's, again, separate
14    from groceries, right?
15                   If you look out there is a
16    separate line item for groceries a few lines
17    up.  Do you see that?
18          A       Yeah, I'm just confused, so.
19                   MS. DRIVER:  That's all
20          right.
21          A       How am I supposed to make you
22    guys all this money if I don't go around and
23    do stuff?
24                   I don't know what you're
25    talking about.
```

```
                                        Page 94

 1                    ALEXANDER E. JONES
 2          Q        You think your meals and
 3   entertainment of $3,441 a month are
 4   necessary to make creditors a lot of money?
 5          A        Absolutely, because I mean, I
 6   guess I need to get better with my
 7   accounting, but a lot of this stuff is
 8   business meetings and things.
 9                    I just don't sit there and
10   think about it and use some company card,
11   because I don't have a company card, I have
12   to pay for everything myself.
13                    Like I paid for airline
14   tickets for business where I went and did
15   major interviews that made this company a
16   lot of money.
17          A        Just because, that's the
18   problem with the bankruptcy.  You asked me
19   earlier, what's your problem with it, and
20   the problem is it's been basically no
21   funding for me to do what I do.
22                    So I've been paying for a lot
23   of it myself.
24          Q        Do you see --
25          Q        If you go to page 5 of 6,
```

Page 95

```
 1                    ALEXANDER E. JONES
 2   second line down there is an item for
 3   business expenses.  Do you see that?
 4          A       Yes.
 5          Q       $2,329, is that right?
 6          A       Yes.
 7          Q       So it's your understanding
 8   that business meals are not included in
 9   business expenses, but instead meals and
10   entertainment?
11          A       No, I'm saying I can do a
12   better job of making sure, but I don't have
13   a company card, so I'm not in the habit of
14   sitting there and thinking about oh, I'm
15   going to a business meeting.
16          A       Well, a lot of that is what
17   that is, or buy the crew food, which I do
18   all the time, because we did it before.
19                  And I bought the whole crew
20   like luncheons multiple times on my credit
21   card.
22                  Then I don't really even
23   think about that, because it's just what I
24   do, but I mean, you know, that's that.
25                  So, I mean, this has been a
```

1                    ALEXANDER E. JONES

2    pretty big company, pretty successful, so I

3    just continue to do business, you know.

4         Q      Can you think of any reason

5    why Mr. Slizer wouldn't have included that

6    business expense in the business expense

7    category?

8         A      Probably because I didn't

9    keep the receipt or even think about it.

10        A      I'm just realizing a lot of

11   that is me handing the credit card to the

12   crew and saying buy the whole office pizza.

13   It's not a lot of money.

14               Sometimes we do all night

15   shows.  I've probably done two of those a

16   month.  That's probably $500 bucks a night

17   buying everybody food.

18               And then the CRO doesn't do

19   that for us, so yeah, a lot of that is me

20   running this operation.

21               I mean, I will do stuff, too,

22   like where -- there is a lot of examples

23   where they will sit there and say, I'll say

24   I just need something right now for this

25   live event or something, and they will say

Page 97

```
 1                 ALEXANDER E.  JONES
 2   no,  we  are  not  going  to  pay  for  it,  and  I
 3   just  pay  for  it.
 4          Q       Do  you  have  an  understanding
 5   of  why  the  CRO  doesn't  incur  those  types  of
 6   expenses?
 7          A       I  mean,  I  think  he's  an
 8   accountant.   I  think  he's  overall  trying  to
 9   do  a  good  job,  but  it's  almost  like  what,
10   you  need  to  send  a  reporter  somewhere?   We
11   don't  do  that  either.
12                 We  are  not  a  reporter  group,
13   we  are  not  a  media  group.   It's  almost  like
14   turn  the  lights  and  camera  off,  you  are  not
15   trying  to  put  something  out  for  the  public.
16                 So  there  are  some  cases  now
17   where  I  sit  there  and  I  say  hey,  we  need
18   this,  and  it's  like  no,  we  are  not  going  to
19   pay  for  that,  so  I  do  it.
20          Q       Other  than  what  you  have
21   mentioned,  what  other  examples  are  there  of
22   that?
23          A       I  would  have  to  --  I  will  so
24   I  don't  really  pay  attention  to  it  when  it
25   happens.
```

Page 98

1                    ALEXANDER E. JONES

2                    When was the last time I'm

3    not really fighting with the CRO.  I just

4    ignore it, I ignore it and move on.

5                    But there are a lot of

6    examples to remember, because I don't really

7    get upset about it, I just move on.

8                    What was the last one?  It

9    was -- I know I complained about it.  Bob,

10   what was the last timing thing I got

11   irritated about?

12                   The studio, I had a huge new

13   York guest on, the studio was $580 an hour,

14   and people ask for that in TV and radio.

15                   And the guy wanted, a Rabbi

16   Chumley, huge, like 20 million viewers,

17   hugely successful.

18                   And I said I want 580 to

19   pay -- he wants to go to a studio, so it

20   looks good for an hour, and they said, "We

21   don't pay for your buddy's studios.

22                   "Well, it's not our buddy's

23   studios, it's our guest."  So I took my

24   credit card and went boom, you'll see it on

25   there, like three weeks ago, and paid for

Page 99

                      ALEXANDER E. JONES

1

2    it.

3            A        I mean, that's just what -- I

4    mean, if they say they are not going to pay

5    for the electricity, I would probably put it

6    on my card too.

7                      That's probably next, it's

8    where we are at, so, it's just ongoing, you

9    know.

10           Q        And so taking, a look back at

11   Exhibit 6, which is the February monthly

12   operating report, if you go to page 9 on the

13   pages on the bottom of the document, do you

14   see in bold underline, "I declare under

15   penalty of perjury that the foregoing

16   monthly operating report and its supporting

17   documentation are true and correct, and that

18   I have been authorized to sign this report

19   on behalf of the estate."

20                    Do you see that?

21           A        Yes.

22           Q        And you see underneath is

23   your signature?

24           A        Yes.

25           Q        And you signed this document,

Page 100

1                 ALEXANDER E. JONES

2    correct?

3         A      Looks like a Verisign, but to

4    the best of my knowledge it's accurate.

5         Q      And what steps did you take

6    to ensure that expenses were properly

7    categorized before authorizing its filing?

8         A      No, I mean, I get your point,

9    I should have brought those things to Bob's

10   attention.

11                I did bring the studio time

12   to him, but I didn't think about when I

13   bought people pizza or Chinese food.

14                So yeah, I guess it's not

15   perfect, but it's not on purpose.  I should

16   have brought those things to his attention.

17   I just am not running around nickel and

18   diming.

19        Q      Looking back at the P&L we

20   were looking at earlier, if you look at page

21   4 of 6 on that document, do you see it lists

22   groceries and the amount is $2,697 a month.

23                Do you see that?

24        A      Um-hum.

25        Q      Is that groceries for the FSS

```
                                      Page 101
 1                    ALEXANDER E. JONES
 2    office as well?
 3           A       No, I think listed groceries,
 4    I don't really buy that much groceries for
 5    here.
 6                   I mean, I buy like my own
 7    Topo Chico and yogurt and food on my card.
 8                   I bring a lot of that from
 9    home, this is from my house, but I think
10    that's a separate deal.
11           Q       So the groceries are for you
12    personally?
13           A       Yes, and my family.
14           Q       And can you think of why
15    that's almost 2,700 a month?
16           A       There is a lot of inflation
17    and I've got a lot of people living with me,
18    so.
19           Q       How many people live with
20    you?  Let's not say the names of any minor
21    children, please.
22                   I'm not asking for names,
23    just number.
24           A       Four full-time.
25           Q       And some people not
```

Page 102

1                     ALEXANDER E. JONES
2   full-time?
3          A       Yeah, I've got some older
4   kids who stay there sometimes.  The family
5   comes through.
6                    My wife's dad was living with
7   us for a few months, but he's been put in a
8   retirement home as of last month.
9                    So he was with us the last
10  six months, he had a heart attack.
11         Q       I'm sorry to hear that.
12         A       No big deal.  He had a heart
13  attack and he moved down here, he's been
14  with us for six months.  Now he's moved out.
15         Q       And the row above is child
16  care, do you see that?  And that's $10,618 a
17  month?
18         A       Yes.
19         Q       I take it that's not child
20  care for other FSS employees?
21         A       No, that's from when I have
22  to go places out of town and do my job, so
23  yeah, it's overnights and all that stuff.
24         Q       And you think it's reasonable
25  to be spending almost $11,000 a month on

```
                                      Page 103
 1                   ALEXANDER E. JONES
 2    child care in bankruptcy?
 3           A      Yeah, when you are grossing
 4    $50, $60 million a year, you guys want a
 5    piece of it, that's what it takes me to do
 6    the job.
 7                   It's like putting gasoline in
 8    the car.
 9           Q      How many hours a day do you
10    typically work?
11           A      Is that a five day week
12    average or a seven day week average?
13           Q      Let's do it per week.  How
14    many hours per week?
15           A      About 70 hours.
16           Q      So your testimony is you work
17    about 70 hours a week?
18           A      Yes.
19           Q      How many hours in the FSS
20    office?
21           A      About 50.
22           Q      About 50 hours a week in the
23    FSS office, and is that all Monday to Friday
24    or the weekends as well?
25           A      No, I work seven days a week.
```

```
                                          Page 104
 1                    ALEXANDER E. JONES
 2          Q      And so your testimony is
 3   you're in the office I guess more than seven
 4   hours a day on average?
 5                    MS. DRIVER:  Objection, form.
 6          A      I would have to go back to
 7   the most recent thing.  I was here about six
 8   hours Sunday, I was here eight hours
 9   Saturday, I was here approximately eight,
10   nine hours every other day.  So do the math.
11                    I don't know, I say 70 hours,
12   that's about -- I've been asked this
13   question before, it's about 70 hours,
14   because I do about 20 hours of prep at the
15   house, at least.
16          Q      And is that typical of the
17   last few months?
18          A      Yeah.  We take my vacation
19   out, it will probably be lower for the
20   aggregate, yes.
21                    So I'm higher when I'm not on
22   vacation.  When I'm working about 70 hours.
23          Q      So we were talking about
24   meals before.  What's the most expensive
25   meal you remember paying for since filing
```

Page 105

```
 1                    ALEXANDER E. JONES
 2    for bankruptcy?
 3                    MR. MOSHENBERG:  I'm going to
 4          object.  To the extent you can.
 5          A       I can't answer that question.
 6          Q       What's your biggest
 7    entertainment expense since filing for
 8    bankruptcy?
 9                    MR. MOSHENBERG:  Objection to
10          form.  You can answer, if you can.
11          A       You know, I'm not big on --
12    I'm not big on concerts and stuff, I'm not
13    really -- there is -- I don't know.
14                    You've got all my documents,
15    you figure it out.  I don't have it.
16          Q       I'm asking you, Mr. Jones.
17          A       I don't know.
18          Q       Do you have any understanding
19    of what you spend money on entertainment on?
20                    MS. DRIVER:  I would like for
21          the record to reflect that since
22          Mr. Jones did not have a very good
23          personal understanding of this, we
24          have given Tonayo, who is the UCC's
25          financial advisor that we pay on a
```

```
                                        Page 106
 1                    ALEXANDER E. JONES
 2           monthly basis, complete access to
 3           his Quickbooks.
 4                   And so, for the record, this
 5           information is absolutely within you
 6           guys' purview.
 7                   So his not knowing about it
 8           we have solved for by overhearing
 9           the information.
10                   So I just want that to be on
11           the record.
12                   MR. PATERSON:  Vickie, if you
13           want to testify about this we are
14           happy to do it on another day, and
15           right now, it's Mr. Jones, and I was
16           asking if he had any
17           understanding --
18                   MS. DRIVER:  I'm not a fact
19           witness here, but I think it's
20           important for the record to reflect
21           the facts.
22           A       I don't know, so that makes
23     it easy.
24                   MR. PATERSON:  Maybe if you
25           are not a fact witness, we can let
```

```
                                       Page 107
 1                   ALEXANDER E.  JONES
 2           the fact witness answer the
 3           questions.
 4                   And so, Mr. -- I think you
 5           just did, so we can move on.
 6           A        Let's take a look at again
 7    the monthly operating report, it's Exhibit
 8    6.
 9                   If you look on page 4, I
10    think it is, you see items for housekeeping.
11    Do you see that?
12           A        Um-hum.
13           Q        So that's $3,900 a month?
14           A        Yes, would you guys rather me
15    not do the show, or would you rather me
16    clean the house, which one is it?
17           Q        Does cleaning the house cost
18    $3,900 a month?
19           A        Yup, sure does.
20           Q        How often do your cleaners
21    come?
22           A        Three times a week.
23           Q        Do you think that's
24    necessary?
25           A        Yeah, I don't like washing
```

```
 1                    ALEXANDER E. JONES
 2    dishes and washing laundry.  It's actually
 3    very relaxing, but if you want me doing
 4    that, there will be no money.
 5            Q       And so your testimony is that
 6    in order to do your job with FSS you need to
 7    spend $3,900 a month on housekeeping?
 8            A       Yeah.
 9                    MS. DRIVER:  Objection to
10            form.
11            A       Yes.
12                    Or wait, my wife should get
13    her ass in there and do it, right?
14            Q       Do you think the average
15    American spends nearly that much on
16    housekeeping, Mr. Jones?
17            A       No, the average American
18    isn't trying to pay you guys $70 million.
19            Q       Do you think you could get by
20    without spending this much on housekeeping?
21            A       Sure, I could go home and
22    probably downsize and stop working and pay
23    you guys nothing, and I can clean the house
24    all day.
25                    Actually sounds fun, I
```

```
                                    Page 109
 1                ALEXANDER E. JONES
 2   actually like cleaning.
 3                I like mopping, I like
 4   washing clothes, I like cooking food more
 5   than I like doing this.
 6                But if I am doing that, I
 7   can't be on air, because you see, I have a
 8   high earning job.
 9                So baseball players and top
10   TV hosts and people, they are not cleaning
11   their houses, not because they don't like
12   to, but because they have time better spent.
13        Q     If the housekeeper only came
14   once a week, why wouldn't you be able to go
15   to work?
16        A     The housekeeper is not just
17   cleaning the house, they are getting
18   everything ready and prepared so that we can
19   deal with the job and not with that, and
20   that's pretty standard.
21                In fact, earners at my level
22   usually have people seven days a week.  We
23   don't have a live in-house keeper.  We have
24   3 days a week.
25        Q     So you think you're doing it
```

```
                                          Page 110
 1                   ALEXANDER E. JONES
 2    tough because you don't have a 7 day a week
 3    housekeeper?
 4                 MS. DRIVER:  Objection.  Do
 5            not answer that question.  It's
 6            harassment.
 7                 MR. PATERSON:  It's not
 8            harassment at all, and we will
 9            reserve our rights.
10                 MS. DRIVER:  I think -- was a
11            judgment.
12                 THE WITNESS:  But I do go to
13            school both ways uphill in the snow.
14            Q      You mentioned vacation
15    before.  Have you been on vacation since
16    filing for bankruptcy?
17            A      Yes, I just went to Hawaii
18    for 12 days.
19            Q      Sounds nice.
20            A      It was really nice.  It was
21    very relaxing.
22            Q      Where in Hawaii?
23            A      Went to Kauai.
24                 MS. DRIVER:  I'm going to
25            object to any further questions
```

```
                                          Page 111
 1                  ALEXANDER E. JONES
 2           about the exact location of where he
 3           was.
 4                   MR. PATERSON:  On what basis?
 5                   MS. DRIVER:  Privacy.
 6                   MR. PATERSON:  He's not there
 7           anymore.  He's in his office.
 8                   MS. DRIVER:  When one of your
 9           associates asked where he was, TMZ
10           reporters showed up there days
11           later, and I don't want to draw a
12           parallel, but I also don't want to
13           have the issue again.
14                   THE WITNESS:  Is that where
15           they got it?
16                   MR. PATERSON:  I just want to
17           say there is absolutely no evidence
18           of that.
19                   He's clearly not in Hawaii
20           anymore, I don't understand.
21                   THE WITNESS:  Nobody stalks
22           me.
23                   MS. DRIVER:  I'm not having
24           it.
25                   MR. PATERSON:  Vickie, I know
```

Page 112

1           ALEXANDER E. JONES

2           why you wouldn't want the record on

3           Hawaii to be developed, but I think

4           we are entitled to your --

5                   MS. DRIVER:  He is answering

6           the questions.  There is no reason

7           why you need to know exactly where

8           he was other than to send reporters

9           there.

10          Q       Were you at a hotel in

11   Hawaii, Mr. Jones?

12          A       I stayed several places.  I

13   stayed at a condo, stayed at different

14   hotels.

15          Q       And I assure you I have no

16   intention of sending reporters to where you

17   were staying on Hawaii.

18          A       Everything else I do at

19   depositions is on HBO and everywhere else.

20                  Your statement implying we

21   are like exaggerating that is preposterous.

22                  We all know, to me, I don't

23   even care.  So just, the point I have travel

24   days, about 13, 14 days to Hawaii, and I

25   went there with my wife and my daughter, so,

```
                                    Page 113
 1                    ALEXANDER E. JONES
 2   and that's it, and we went snorkeling.
 3           Q       Who paid for the trip?
 4           A       Not me.
 5           Q       Who?
 6           A       Not me.
 7           Q       Mr. Jones, I understand it's
 8   not you.  Who paid for the trip?
 9                   MS. DRIVER:  I'm going to
10           object.  There is no reason to
11           understand who -- there is no reason
12           for him to disclose who paid for the
13           trip.
14                   MR. PATERSON:  If there is a
15           source of financing --
16                   MS. DRIVER:  If you want to,
17           you can talk about it off the
18           record, we can talk about it under
19           the protective order for
20           professional eyes only, but I will
21           not let him answer that question on
22           the record.
23                   MR. PATERSON:  Okay, look,
24           you can give whatever instructions
25           you want, Vickie, but I think that's
```

```
                                    Page 114
 1                ALEXANDER E. JONES
 2          totally unjustified and we are going
 3          to be following up on that.
 4                MS. DRIVER:   Perfect.
 5          Q       How much did the trip cost?
 6          A       I don't know, I didn't pay
 7     for it.
 8          Q       How did you get there?  You
 9     flew, right?
10          A       Yes.
11          Q       Did you fly commercial?
12          A       Yes.
13          Q       Was it business class?
14                MR. MOSHENBERG:   I'm going to
15          object.  This is not relevant, it
16          does not -- it did not come -- if
17          there are any expenses from any of
18          this, it will come into his MOR.
19                He's already testified that
20          he didn't pay for it.  I don't
21          understand where we are going with
22          this.
23                This is a deposition that was
24          noticed for the purpose of talking
25          about the contested matter of his
```

1           ALEXANDER E. JONES

2           plan, and any settlement that would

3           be with the Texas Plaintiffs, and

4           this is far outside of those realms.

5           A      If they think in the

6      newspaper, that's nothing, the more they do

7      attacks, the better.

8                MR. PATERSON:  Vickie, I

9           couldn't agree more.  I think this

10          is clearly relevant as to plan

11          confirmation issues as may become

12          apparent.

13               We are going to reserve our

14          rights on this, but those

15          instructions are purely improper.

16          Q      How many other vacations have

17      you been on since filing for bankruptcy?

18          A      I've been on work trips.  I

19      wouldn't state it was vacations.

20               But I think there were some

21      vacations, I guess a year and a half ago, I

22      can't remember.

23               I think I've been on, I've

24      been on a couple of vacations, but most --

25      I've been on quite a few trips for business.

```
                                        Page 116
 1                    ALEXANDER E. JONES
 2     And I really can't keep track of it all.
 3     But --
 4              Q      And, you said?
 5              A      I went to Big Bend and I went
 6     to east Texas and camped out.  Those are
 7     vacations.  Where else did I go?  Where did
 8     I go?
 9                    MS. DRIVER:  I think you went
10              to --
11              A      A year and a half, I think a
12     year and a half ago I went to Cancun, she
13     remembers.  So that's the vacations I
14     remember.
15              Q      How long did you go to Cancun
16     for?
17              A      About a week or something.
18     She remembers it, I don't even remember it.
19     I thought it was like two years ago, but I
20     guess she says last year and a half, Cancun.
21                    MS. DRIVER:  That's to my
22              recollection.
23              A      That's to her recollection.
24              Q      And who paid for the Cancun
25     trip?
```

```
                                          Page 117
 1                   ALEXANDER E. JONES
 2               MS. DRIVER:  If you recall?
 3        A        I don't remember.
 4        Q        Was it your dad?
 5        A        I don't remember.  You guys
 6   have the files.
 7        Q        We don't have all of your
 8   dad's files.
 9                 Has he paid for any of your
10   vacations?
11        A        Not that I remember.  My dad
12   has helped me on some bills.  I don't
13   remember the details.
14        Q        Would you support a Plan of
15   Reorganization where you were unable to have
16   vacations like your Hawaii vacation?
17               MS. DRIVER:  I'll object to
18          the form of that.
19               If you can answer it.
20        A        I mean, obviously I'm going
21   to go on vacation and I'm going to live my
22   life, and if you want guys want to try to
23   block something like that, that's your
24   ballgame.
25                 I'm not miserable, if that's
```

```
                                    Page 118
 1                    ALEXANDER E. JONES
 2   your question, and I'm not going to be
 3   miserable.  And so it is what it is.
 4                    If you want me to go work and
 5   make you money, but you don't want me to do
 6   anything myself.  It's just bizarre, it's
 7   unAmerican.
 8                    And so -- but I really don't
 9   even care.  I'm not even worried about all
10   of this.
11                    So, I'm working hard, been
12   totally transparent, and I'm being asked
13   about a vacation.  It's just --
14        Q      I will show you another
15   document.  We are going to be -- first of
16   all, you said you're being totally
17   transparent.
18                    Just to confirm, you're not
19   saying who paid for your Hawaii vacation,
20   right?
21        A      I didn't really pay
22   attention.
23                    I know my wife booked it.  I
24   think she paid for most of it.
25        Q      Who is she?
```

```
                                               Page 119
 1                    ALEXANDER E.  JONES
 2         A       My wife, you know who she is.
 3         Q       So, we are going to go to
 4    Exhibit 7.
 5         A       You want my life for an HBO
 6    movie.  I can say her name.
 7         Q       It's tab 3 in your binder.
 8         A       TMZ coverage, anyways.
 9                 MS. DRIVER:  I want to make
10            sure we spend time talking about TMZ
11            coverage of his Hawaii trip after
12            Judge Schultz disclosed in his
13            deposition to your associate in
14            response to his questions, where he
15            was on vacation.
16                 Over my objection.
17                 MR. PATERSON:  Vickie, we
18            will spend more time if you keep
19            giving irrelevant and unhelpful and
20            inaccurate speeches.
21                 THE WITNESS:  She doesn't
22            even know where I was.
23                 (The above described document was
24            marked Exhibit 7 for identification as of
25            this date.)
```

```
                                            Page 120
 1                  ALEXANDER E. JONES
 2         Q       Mr. Jones, can you see
 3    Exhibit 7?  We have put that on the screen
 4    as well.
 5         A       Yes.
 6         Q       On the second page, top of
 7    the second page there is a photo of you
 8    sitting in a chair.
 9                  Do you see that?
10         A       Yes.
11                  MS. DRIVER:  What is the
12            relevance to the plan of this?
13                  MR. PATERSON:  Vickie, I'm
14            not going to have a debate about
15            relevance here.
16                  MS. DRIVER:  I'm not going
17            to --
18                  MR. PATERSON:  You can't
19            object.
20                  MS. DRIVER:  Move on.
21         Q       Is this an accurate
22    photograph showing you in Hawaii, Mr. Jones?
23                  MS. DRIVER:  Instruction not
24            to answer.
25         A       I'm going to follow the
```

Page 121

```
1                    ALEXANDER E. JONES
2    instructions of my lawyer.
3                    MS. DRIVER:  This is
4            harassment.  Move on.
5                    MR. PATERSON:  Vickie, just
6            to save some time --
7                    MS. DRIVER:  You have an hour
8            and 40 minutes.  If you want to use
9            it with me instructing him not to
10           answer about trash media reports,
11           then we can use it doing that, or I
12           can just stop the deposition.
13           A      Number one, we have got
14   longer than that.  Number two, if you would
15   let me finish what I was going to say, are
16   you going to instruct him not to answer any
17   question about this article?
18                   MS. DRIVER:  Yes.
19                   MR. PATERSON:  So we will
20           reserve our rights on that as well,
21           and we will move on.
22                   MS. DRIVER:  You take that to
23           Judge Lopez and ask him if you need
24           to ask him about this news article
25           from TMZ about the relevance of this
```

```
                                        Page 122
 1                  ALEXANDER E. JONES
 2        plan.
 3                MR. PATERSON:  Vickie, again,
 4        we can do without the speeches.  I
 5        think this is -- I'll stop it there.
 6                MR. MOSHENBERG:  I might
 7        advise you look back and ask you
 8        where -- there were other exhibits
 9        accidentally attached to -- in the
10        very beginning of the FSS case,
11        where the judge said he was not
12        going to tolerate the family of
13        Jones being drug through the mud in
14        his court.
15                MR. PATERSON:  Vickie, again,
16        we can do without the lengthy
17        objections.
18                They are just going to make
19        this deposition longer.
20                MS. DRIVER:  I don't think
21        you have a clear understanding of
22        this case, and I do feel like you do
23        need to know that.
24                MR. PATERSON:  I appreciate
25        your comments.  I'm going to move
```

1                    ALEXANDER E. JONES

2          on.

3                    THE WITNESS:  Can we take

4          another break?

5                    MR. PATERSON:  Sure.  I'm

6          happy to take a break.

7          A     I'll be here as long as you

8    want.

9                    THE VIDEOGRAPHER:  Going off

10         the record, the time is 4:40 p.m.

11                   (At this point in the proceedings

12         there was a recess, after which the

13         deposition continued as follows:)

14                   THE VIDEOGRAPHER:  The time

15         is 4:50 p.m.  We are back on the

16         record.

17         Q     Mr. Jones, I would like to go

18    back to the document that is Exhibit 3, it's

19    tab 3 in your binder.

20                   That's your Disclosure

21    Statement?

22         A     She's pulling it up.  Got it.

23         Q     And if you go to page 93 of

24    that document --

25         A     93 of the document?

                          ALEXANDER E. JONES

1

2          Q       Yes.

3                  MS. DRIVER:  I think he's

4          looking at the top numbers now.

5                  MR. PATERSON:  It's based on

6          the top numbers, yes.

7          A       Got it.

8          Q       And do you see a list of the

9    claims that have been asserted against you

10   there?

11         A       Yes.

12         Q       And the corresponding amounts

13   are also there?

14         A       Yes.

15         Q       At the top do you see the

16   Connecticut Plaintiffs listed in the first

17   blue box?

18         A       Yes.

19         Q       And then underneath it lists

20   the amount of damages each of them was

21   awarded in Connecticut.

22                 Do you see that?

23         A       Yes.

24         Q       You have appealed those

25   awards, haven't you?

```
                                        Page 125
 1                  ALEXANDER E. JONES
 2          A       Yes.
 3          Q       And you think they are
 4    exorbitant, don't you?
 5          A       Well, I never even knew who
 6    William Aldenberg was, never said his name,
 7    my company never said his name.
 8                  So that's quite a new
 9    precedent you guys have set.  I'll give it
10    to you.
11          A       The FBI's chief counsel in
12    Connecticut goes and creates a lawsuit with
13    Koskov & Koskov, and then creates a lawsuit
14    where I never even knew who he was, and he
15    gets $130 million.
16                  Yeah, I think that's
17    exorbitant.
18          Q       And will you continue to
19    challenge and appeal these claims for
20    non-settling Plaintiffs if your bankruptcy
21    plan is confirmed?
22          A       I haven't really thought
23    about that.  I just know the appeals are
24    going forward.
25          Q       And looking down under Texas
```

```
                                        Page 126
 1                  ALEXANDER E. JONES
 2   Plaintiffs, do you know who Veronica De La
 3   Rosa was?
 4           A      Yes.
 5                  MS. DRIVER:  I believe --
 6           Q      Who was she?
 7                  MS. DRIVER:  Veronique?
 8           Q      Let me -- Veronique?
 9                  MS. DRIVER:  Veronique.
10           Q      Who was she?
11           A      She's one of the mothers of
12   one of the children that died.
13           Q      Okay, so going back to your
14   Disclosure Statement -- well, this document
15   here, let's look, for example, at Kelly Soto
16   Parisi's claim.
17                  Do you see there it's listed
18   there for around $98 million?
19           A      Yes.
20           Q      Do you think that amount is
21   reasonable?
22                  MS. DRIVER:  Objection, form.
23           No foundation he even knows who she
24           is.
25           A      I mean, I don't think $1.5
```

```
                                      Page 127
 1                 ALEXANDER E. JONES
 2    billion -- I never even knew who these
 3    people were, I never said their names.
 4                 So, it's reasonable -- so I'm
 5    trying to settle it, so the question is
 6    academic.
 7         Q     So one of the amounts listed
 8    here under the Connecticut Plaintiffs, would
 9    you say that they were unreasonable amounts
10    that were awarded against you?
11                 MS. DRIVER:  Objection, form.
12         Go ahead.
13         A     I mean, they asked for $2.7
14    trillion, the GDP of India.  This is all
15    kind of La La Land right now.  I don't even
16    know who these people are, I never said the
17    names, I said the name of one person.
18                 So, this is like Cuckoo for
19    Cocoa Puffs for me.  I'm just trying to get
20    past this for the money I have.
21                 But yeah, obviously I never
22    had $93 million or $130 million for
23    Aldenberg.
24                 So I didn't know who is he
25    until he sued me.  Never said his name,
```

Page 128

ALEXANDER E. JONES

1   never published who he is, never put his
2   face up, didn't know who he was.
3   So I'm living in La La Land
4   here, so --
5
6       Q      Do you think the amount of
7   those damages awards is La La Land as well?
8       A      Yeah, I think it's La La
9   Land.
10      Q      And is that true for all of
11  the Connecticut Plaintiffs?
12      A      I said the name of Robbie
13  Parker, there is a big internet story, and I
14  said what I thought about that.
15              I barely ever indicated I
16  said Robbie Parker's name, yes.  So if,
17  questioning someone, the jury wants to say
18  that, you can say something about him.
19              But the other people, I don't
20  know who they are, other than I also said
21  later, the name of, when he sued me, Posner,
22  but that's in Texas.
23              So I guess I said the name of
24  two people, but I mean, I don't even know
25  who these other people are.

Page 129

1                    ALEXANDER E. JONES

2                    So that's basically where I'm

3     at on that.

4          Q     And Robert Parker has the

5     largest award against you of about $170

6     million, right?

7          A     Show it to me.  Yes.

8          Q     Do you think that's La La

9     Land as well?

10         A     Yeah, because I never made

11    half that, so, yeah.

12                I mean, people act like I'm

13    General Motors or something, I'm not.  Or

14    Elon Musk.

15         Q     Do you know what percentage

16    of each of these claims would be paid under

17    your proposed bankruptcy plan?

18         A     I could look it up.  Can you

19    enlighten me?

20         Q     Just sitting here today, do

21    you have any knowledge of what proportion of

22    these amounts creditors are going to get?

23         A     No.

24         Q     So, let's take a look at the

25    Texas Plaintiffs' claims.  Are you aware of

```
                                        Page 130
 1                    ALEXANDER E.  JONES
 2    the settlement you entered into with the
 3    Texas Plaintiffs on their claim amounts?
 4                    MS. DRIVER:  Objection, form.
 5                    MR. LEMMON:  Objection to
 6           form.
 7           A      Can you clarify that?
 8           Q      Yeah, let's make it more
 9    tangible.
10                    We are going to show you what
11    we are going to mark as Exhibit 8, which is
12    tab 16 in your binder.
13                    (The above described document was
14           marked Exhibit 8 for identification as of
15           this date.)
16           A      All right, I'm on it.
17           Q      Great, and we will bring it
18    up on the screen.
19           Q      Do you recognize this
20    document?
21           A      Yes.
22           Q      And it's a declaration you
23    submitted in support of a motion for
24    approval of a settlement relating to the
25    Texas Plaintiffs' claims, is that right?
```

```
                                        Page 131
 1                    ALEXANDER E. JONES
 2          A       Yes.
 3          Q       And do you see in paragraph 2
 4   it says, "I am aware of the proposed
 5   settlement set forth," and it references a
 6   motion.
 7                  Do you see that?
 8          A       Yes.
 9          Q       And 3, you say, "I am aware
10   of and familiar with Exhibit A to the
11   proposed order."  Do you see that?
12          A       Yes, I have seen this several
13   times.
14          Q       And one of the things you say
15   in paragraph 4 is, "I believe the proposed
16   settlement is in the best interest of my
17   bankruptcy estate."
18                  Do you see that?
19          A       Yes.
20          Q       And at the bottom, "I declare
21   under penalty of perjury that the foregoing
22   is true and correct," and that's your
23   signature, right?
24          A       Yes.
25                  MS. DRIVER:  I just want to
```

```
                                          Page 132
 1                    ALEXANDER E. JONES
 2           let the client read all of 4.  Just
 3           part of 4 was referenced.
 4           Q       Okay.  So feel free to take a
 5    minute to read the rest of that.
 6           A       Yes.
 7           Q       And having read that, would
 8    you change any of your prior answers?
 9           A       I mean, I believe my counsel.
10    I don't fully understand all the legalese of
11    it, but I am trying to settle with the
12    Plaintiffs.
13                   I believe the proposed
14    settlement is in the best interests of my
15    bankruptcy estate to delay the additional
16    expense of continued litigation, to allow
17    for some of the largest claims in the
18    bankruptcy to be liquidated through plan
19    voting and distribution while I move towards
20    confirming a plan.
21                   Yeah, I remember we
22    approached Texas, I didn't have the money
23    for a trial, to try to make an agreement
24    with him in hopes that Connecticut would
25    make an agreement, too.
```

Page 133

1                   ALEXANDER E. JONES

2                   I remember that.

3                   And that's what I remember

4    this was for, was to try to get them to push

5    off the trial, so we could try to make an

6    agreement.

7                   MR. PATERSON:  Okay, so let's

8           take a look at Exhibit A referenced

9           in here, and it's tab 17 of your

10          binder.  It's going to be Exhibit 9,

11          I think.

12          A     Okay, I'm on it.

13          Q     And we will just bring it up

14   for everyone else.

15                 (The above described document was

16          marked Exhibit 9 for identification as of

17          this date.)

18          Q     Are you familiar with this

19   document?

20          A     I've seen the document, yes,

21   several times.

22          Q     And this is the Exhibit A

23   referenced in the declaration we were just

24   discussing, right?

25          A     Is that right?

```
                                        Page 134
 1                    ALEXANDER E. JONES
 2          Q       Do you have any reason to
 3    believe it's not, Mr. Jones?
 4          A       Well, you were just showing
 5    me a document, I understand -- yes, it says
 6    Exhibit A.
 7                   MS. DRIVER:  I'll represent
 8              to Mr. Jones that that is the
 9              Exhibit A that we filed under seal.
10          Q       So let's start with
11    Mr. Posner.  What is the amount you have
12    agreed to settle Mr. Posner's claim for?
13          A       $200 million.
14          Q       You think agreeing to this
15    claim amount is in the best interests of
16    your estate?
17          A       Yes.
18          Q       And you thought this was a
19    reasonable amount to settle Mr. Posner's
20    claims for, correct?
21          A       Yes, given that it becomes an
22    average of what's actually available, yes.
23          Q       Isn't it true that no
24    Connecticut Plaintiff has a claim of more
25    than $170 million?
```

```
                                       Page 135
 1                ALEXANDER E. JONES
 2        A      I don't know what that means.
 3        Q      Well, are you aware of any
 4   Connecticut Plaintiff who has a claim of
 5   more than $170 million?
 6        A      I don't know what a
 7   communicable claim is.
 8        Q      We were just looking before,
 9   we can go back to it, at your Disclosure
10   Statement.  It's Exhibit 3, page 93.
11              MS. DRIVER:  I can represent
12          to him that would make it the
13          largest claim in this case.
14        A      Okay, I understand that, so
15   it's the largest claim in the case.  Go
16   ahead.
17        Q      So why is it that you think a
18   $200 million claim from Mr. Posner is
19   reasonable?
20        A      Well, Aldenberg, the chief
21   counsel of the FBI, who never had his name
22   mentioned, was never shown by me, gets $130
23   million.
24              I would imagine someone who
25   lost a child would get $70 million extra.
```

```
                                        Page 136
 1                  ALEXANDER E. JONES
 2    That sounds very fair.
 3           Q       Let's move on to Ms. dela
 4    Rossi.  What's the settled amount of her
 5    claim?
 6           A       $180 million.
 7           Q       And you think that was a
 8    reasonable amount to settle Ms. dela Rossi's
 9    claim for?
10           A       I would imagine that
11    Mr. Aldenberg, who never had his name said
12    by any one of my people, never shown on air,
13    and we never knew who he was, if he gets
14    $130 million, I would imagine a woman who
15    actually lost a child, who I never said her
16    name, and I did show her on TV and talk
17    about her with the CNN host Harry --
18    Anderson Cooper, at least she was shown on
19    my show.
20           A       So I would imagine that,
21    yeah, I think that's very conservative.
22    Someone's name who's never said, they got
23    $130 million.
24                  Someone's name who's actually
25    been said, maybe $17 billion, but we are
```

1                    ALEXANDER E. JONES

2    talking.

3                    So if the name has never been

4    said, $130 million if your name is said, I

5    would think in the trillions, to be serious

6    with you.

7                    But yes, I would think that

8    $180 million, compared to someone whose name

9    has not been said, if you were actually

10   covered, I think that's very reasonable.

11       Q      You are aware Mr. Parker lost

12   a child, right?

13       A      Yes.

14       Q      And you said his claim was La

15   La Land?

16       A      No, I said all the other

17   claims, where I didn't say their names or

18   know who they were, and I never said her

19   name, but I did show her on TV.

20                    So, I said Parker's name, I

21   talked about Posner, and then I did show

22   Della Rossi on TV with Anderson Cooper.

23                    I'm saying the idea that I

24   have $2.7 trillion, that's what they asked

25   for in Connecticut, it's in Bloomberg, they

```
                                      Page 138
 1                  ALEXANDER E. JONES
 2   asked for it, that's La La Land, because I
 3   don't have that much money.
 4                  But if you're going to look
 5   at claims and say well, this FBI gets $130
 6   million, well, someone who actually lost a
 7   child, then I think $180 million or $200
 8   million is reasonable when we are in that
 9   world.
10        A      I mean, you care about Della
11   Rossi and you care about Posner and them, we
12   care about Aldenberg, no one ever showed his
13   name but, he's a huge victim, TERPB, they
14   are as important as him or maybe a little
15   more.
16        Q      But you said you think
17   Mr. Aldenberg's claim is unreasonable,
18   right?
19        A      I didn't even know who he was
20   until he sued me.  Never said his name, none
21   of our reporters did, never talked about
22   him.
23                  I'm saying if his claim of
24   130 is reasonable, then I think Dela Rossi
25   and Leonard Posner have a little bit more.
```

```
                                           Page 139
 1                  ALEXANDER E. JONES
 2                  And you're certainly not
 3   questioning them.  I mean, they are victims.
 4        Q     Do you think Nicole Hockley's
 5   claim is reasonable?
 6        A     I don't know who she is.  You
 7   would have to refresh my memory, I never
 8   said her name.
 9        Q     So let's go back to -- it's
10   still up on the screen, the Disclosure
11   Statement.  You see Mr. Hockley's claim?
12                  MS. DRIVER:  Give him a
13            chance, he asked who she was.
14        Q     You see Mr. Hockley is there
15   for $108 million?  We are on the Disclosure
16   Statement, which is Exhibit 3.
17                  MS. DRIVER:  You can look up
18            there if you want.
19        A     I see that.
20        Q     Do you think that's
21   unreasonable?
22        A     Well, did she lose a child?
23        Q     Did she, do you know?
24        A     People think I killed the
25   kids.  I didn't, but I'm asking you, I don't
```

```
 1                    ALEXANDER E. JONES
 2    know who this woman is.
 3                    I know I owe her all this
 4    money.  If she is in the same category, not
 5    of Aldenberg, but of a child, and I am
 6    responsible, I would like to know, so.  I
 7    don't even know who she is.
 8                    First I heard her name was
 9    from you right now, just,  so --
10                    MS. DRIVER:  If I'm not
11             mistaken, there is no objection by
12             Texas to any of the Connecticut
13             Plaintiffs' claims, so I don't see
14             where we are going here.
15                    MR. PATERSON:  Understood,
16             Vickie.
17             Q      Do you think -- do you
18    distinguish between the Connecticut and the
19    Texas Plaintiffs in your mind?
20                    MS. DRIVER:  Objection, form.
21             The distinction was made when they
22             chose their counsel and filed where
23             they did.
24                    MR. PATERSON:  I'm not asking
25             about how they chose their counsel,
```

ALEXANDER E. JONES

1
2          Vickie, I'm certainly not asking you
3          about it, I'm asking Mr. Jones if he
4          distinguishes between the
5          Connecticut and the Texas Plaintiffs
6          in his mind.
7                  MR. LEMMON:  Real quick, I'm
8          going to object to the form of the
9          question.
10                 MS. DRIVER:  I will object to
11         the form of the question.
12         A      I don't know that I can
13  answer that, I really don't think of that.
14                 The only thing is I know, I
15  think I said Posner's name once, talked
16  about Robbie Parker, showed Dela Rossi on
17  TV, didn't say her name.
18                 Everybody else, I don't know
19  who they are.  So, that's it.
20         Q      Do you think as between those
21  groups, the Connecticut Plaintiffs and the
22  Texas Plaintiffs, that one set of them
23  should receive proportionately more under
24  your bankruptcy plan?
25         A      That's not up to me.  I

```
                                        Page 142
 1                  ALEXANDER E. JONES
 2   didn't have the money for a new trial, and
 3   we made an agreement with them to push the
 4   trial off, and that was the substance of
 5   that.
 6        Q     But it's your bankruptcy
 7   plan, right, Mr. Jones?
 8        A     Well, like I said, these
 9   large numbers are basically just going to be
10   averaged down to what I actually have.
11              So, like I said, I've never
12   had 5 percent of the money being claimed
13   here.
14              So forgive me if I don't
15   really take it at face value.  I'm just here
16   like dealing with something that feels like
17   a hallucination.
18              So -- I don't -- I mean, I
19   think the numbers of Robbie Parker versus de
20   la Rossi and Posner are very close.  They
21   both lost children, so I don't want to
22   question the parents of victims.
23              Whether it's Robbie Parker or
24   Dela Rossi or Posner, I don't think it's
25   right to be questioning victims here.
```

```
                                    Page 143
 1                  ALEXANDER E. JONES
 2         Q      Isn't that precisely what you
 3    did, Mr. Jones, questioning victims?
 4         A      I mean, the ones I know.  I'm
 5    just saying I know these people.  I at least
 6    knew who they were, so.
 7                 But I mean, I'm not the one
 8    questioning who would get what money or
 9    whatever.
10                 I just simply tried to make
11    agreements, tried to move forward with
12    settlement in hopes of getting a full
13    settlement.
14         Q      You said, I believe you said
15    Mr. Parker's claim was reasonable.  If
16    that's the case, why are you appealing it?
17                 MS. DRIVER:  I'm going to
18            object to the extent this is calling
19            for any legal strategy or anything
20            you have discussed with Norm or
21            anyone else.
22                 If you can't answer the
23            question without revealing the
24            conversations with Norm or anyone
25            else on your appeals, I'm going to
```

ALEXANDER E. JONES

1
2       instruct you not to answer.

3           A       Yeah, and what I said is

4  being twisted here.  I said at least I even

5  knew who he was, okay?  And I am trying to

6  like just move on past this.

7                   I see it more reasonable than

8  people I don't even know who they are, like

9  Aldenberg, until he sued me, I don't know

10  who he is, and we never talk about him.

11                  So that's a new system where

12  you don't know who someone is, but you owe

13  him $130 million.

14                  I mean, there is no way for

15  me to respond to this, because it's all at a

16  level of its own reality.

17                  In fact, I'm not even denying

18  the reality is false, it's its own reality

19  its own universe; beautiful.

20          Q       Do you think Mr. Parker's

21  claim is reasonable?

22                  MS. DRIVER:  I'm going to

23          object.  He's answered that question

24          multiple times.

25                  MR. PATERSON:  He hasn't,

```
 1                    ALEXANDER E. JONES
 2           it's yes or no.  He does or he
 3           doesn't.
 4                    MS. DRIVER:  I'm going to
 5           object to the continued questioning
 6           of this exact same question.
 7                    He's answered it multiple
 8           times, please move on.
 9                    And I don't think anything in
10           this contested matter in which this
11           deposition is noticed that it's
12           questioning the amounts of the
13           claims of the Connecticut
14           Plaintiffs.
15                    And if there is in your
16           question, I would like to know.
17           Q      Are you declining to answer
18   that question, Mr. Jones?
19           A      This is all for HBO.  Yeah,
20   I'm declining to answer it.
21           Q      Do you recall the Texas
22   Plaintiffs' claims amounts being negotiated?
23                    MS. DRIVER:  I'm going to
24           object to the extent you cannot
25           answer that question without
```

```
 1                    ALEXANDER E. JONES
 2           revealing attorney-client
 3           communications that you had with me.
 4                    I'm going to instruct you not
 5           to answer.
 6                    THE WITNESS:  Vickie, I don't
 7           even know what you're talking about,
 8           so I have to say I don't know.
 9           Q      We were just looking at some
10    claim amounts of Texas Plaintiffs in Exhibit
11    A, right, do you recall that?
12           A      Yes.
13           Q      Were you involved in
14    negotiating those amounts?
15           A      Six, eight months ago Vickie
16    said, or longer, whatever it was.
17                    MS. DRIVER:  Don't say what
18           Vickie said.  That is
19           attorney-client privilege.
20                    MR. LEMMON:  Sorry,
21           Mr. Jones, I'm also going to object
22           to the form of the question.  Sorry
23           to interrupt you.
24           A      I discussed not having a
25    trial, because I didn't have the money.
```

```
 1                    ALEXANDER E. JONES
 2                    Plus the fiasco of it, to
 3    getting them to push the trial off, that was
 4    what I heard the discussions were.
 5           Q        You said you heard the
 6    discussions were.  My question was were you
 7    personally involved in the negotiation of
 8    the Texas Plaintiffs?
 9           A        No, no.
10           Q        Do you know who was?
11           A        No, I mean, I'm -- I'm not
12    supposed to talk about private stuff.
13                    MS. DRIVER:  You can tell
14           them if you know.
15           A        Yes, they were -- I was like,
16    I don't want to have this trial, I don't
17    have any money.  They said we will try to
18    work with them to push it off.
19                    Those were the discussions.
20           Q        The "they" you just were
21    referencing was your counsel?
22           A        Yes.
23           Q        You recently got an offer
24    from your neighbor to buy your 127 acre
25    ranch for $2.8 million, is that right?
```

Page 148

                        ALEXANDER E. JONES

1

2          A      Yes.

3          Q      Under your plan, do you know

4   who would get the proceeds of that sale?

5          A      I'm not an accountant, but

6   everything that goes into my DIP account,

7   it's basically we are doing Chapter 7, even

8   though we aren't.

9                  It's being put into the

10  account to pay the --

11                 MS. DRIVER:  I'll object to

12          the form of the question.

13         A      I don't know how to answer

14  that.

15                 MS. DRIVER:  It's clear to

16          everyone where that money goes, and

17          it's not into his DIP account.

18         Q      We just heard Mr. Jones say

19  it was and the client --

20                 MS. DRIVER:  And he's not

21          legally aware of where that goes, so

22          let's just not try to confuse it?

23                 MR. PATERSON:  No one is

24          trying to confuse anyone, Vickie.

25         Q      Just to make clear, just to

```
                                          Page 149
 1                ALEXANDER E. JONES
 2   be sure we have a very clear question, are
 3   you aware of who would receive the proceeds
 4   of that ranch sale under your Plan of
 5   Reorganization?
 6                MS. DRIVER:  Objection, form.
 7        Assumes facts not in evidence.
 8        A       Yeah, I really shouldn't
 9   answer these questions, because I don't know
10   the answers.
11                I signed months ago and weeks
12   ago to sell the property, and I believe it
13   was going into the bankruptcy.  However that
14   works, I don't know the details.
15        Q       And look, if you don't know
16   the answer to a question, that's all you
17   need to tell me.
18        A       Yeah, I was trying to be
19   helpful.  It's my belief it was being done
20   to like go into the bankruptcy.
21        Q       Have you entered into a
22   settlement with the Texas Plaintiffs to
23   support your bankruptcy plan?
24        A       I have no connection -- I
25   have not talked to the Texas Plaintiffs.
```

```
                                        Page 150
 1                  ALEXANDER E. JONES
 2          Q       And are you aware of anyone
 3   entering into a settlement on your behalf
 4   with the Texas Plaintiffs to support your
 5   bankruptcy plan?
 6          A       No.
 7                  MR. LEMMON:  Objection, form,
 8          by the way.
 9          Q       Are you aware of the current
10   status of any discussions with the Texas
11   Plaintiffs?
12                  MS. DRIVER:  Objection.  I'm
13          going to instruct the witness, to
14          the extent you cannot answer that
15          without revealing conversations with
16          your counsel, if you can, without
17          revealing discussions with your
18          counsel, please do answer.
19                  THE WITNESS:  I already told
20          him that was the end of the trial.
21          That's the only thing I knew about.
22                  MS. DRIVER:  Then that's all
23          you know about.
24          Q       So, changing topics, am I
25   right in understanding you never had a
```

```
                                    Page 151
 1                  ALEXANDER E. JONES
 2    written employment agreement with FSS before
 3    the bankruptcy?
 4                  MS. DRIVER:  Objection, form.
 5        A       We had one with the previous
 6    CRO Mark Schwartz, but he never executed it,
 7    he was removed by Judge Lopez, this I do
 8    know about, and then they had put Pat McGill
 9    in there, and then he never signed it.
10        Q       What's your personal view of
11    Mr. McGill?
12        A       I think he's an accountant.
13    He did some good things here.
14                  But I also think with this
15    being so political, he was basically
16    paralyzed, where we have, like we have to be
17    competitive just to stay on air, and we have
18    not been competitive for over a year and a
19    half now.
20                  And I'm not even blaming him.
21    People don't know how this stuff works.  But
22    I mean, I think -- I mean, I really don't
23    know what to say about Pat, he's done some
24    good things, he's done some things I
25    disagree with.
```

```
                                            Page 152

 1                    ALEXANDER E. JONES

 2                    And I think with all the

 3    lawyers and everybody involved, everybody

 4    has been frustrated with each other.

 5                    So, I just think because

 6    there are so many cooks in the kitchen,

 7    there has been a lot of frustration and a

 8    lot of issues and a lot of trouble to be

 9    able to basically work with each other.

10                    MR. PATERSON:  So, we are

11              going to mark another document.

12              It's going to be, I think we are up

13              to Exhibit 10, it's tab 7 in your

14              binder.

15                    (The above described document was

16              marked Exhibit 10 for identification as of

17              this date.)

18              A      All right.

19              Q      Do you have that in front of

20    you?

21              A      Yes.

22              Q      Are you familiar with that

23    document?

24              A      Is this the first one or the

25    second one?
```

Page 153

ALEXANDER E. JONES

1    ALEXANDER E. JONES
2        Q        First of all, are you
3    familiar with this document?
4        A        Just the one, this is the
5    original?
6                 MS. DRIVER:  I'm just showing
7            him he signed it.
8                 THE WITNESS:  Is this the one
9            Shelby did or is this the new one?
10       Q        Mr. Jones, we are only
11   interested in your testimony today.
12       A        I don't remember.  I can't
13   answer your question.  There has been a
14   bunch of stuff.  That's why, I'm being
15   honest with you, I don't remember.
16                 There has been like maybe two
17   or three of these, so --
18       Q        Let's go to page 4.  You see
19   you signed this document?
20       A        Yeah, just because I signed
21   it doesn't mean it was agreed to.
22       Q        Do you often sign --
23       A        McGill rejected my first
24   employment agreement, and that's what this
25   is, so I can answer that question.

```
                                    Page 154
 1                ALEXANDER E. JONES
 2         Q       So, going to the first
 3   page -- first of all, why is it that you got
 4   this employment agreement in April 2022?
 5                 MS. DRIVER:  I'm going to
 6            object.  He doesn't remember the
 7            document, and he just said that
 8            Patrick McGill rejected it.
 9                 I want to make sure we don't
10            have the witness guessing about the
11            document.
12         A       Actually, I'm guessing.  I
13   know I had an employment agreement that
14   he -- that Schwartz had done, agreed to
15   that.  He rejected it.
16                 I don't know this is that
17   document, and so I can't answer the
18   question.
19         Q       When is the first employment
20   agreement you remember having with FSS?
21                 MS. DRIVER:  If you can
22            answer.
23         A       When Mark Schwartz first came
24   on, whenever that was, you can check it, we
25   did an employment agreement, he accepted it,
```

Page 155

```
 1                    ALEXANDER E. JONES
 2    if I remember correctly.
 3                    This is all off the top of my
 4    memory.  I think it's accurate.  I am
 5    speculating from memory, and then there have
 6    been like three or four batted around since
 7    then.
 8                    When you interview Bob
 9    Slizer, he's really professional.  He has a
10    full list, he can answer this, but I'm not a
11    business guy, so I'm trying to help you
12    here.
13                    That's just the way I am.  I
14    can't help it.  I just should just say I
15    don't know.
16                    But I remember my first
17    agreement was accepted, but it never got
18    implemented, and I only got paid half or
19    whatever, if memory serves, and I don't know
20    if this is it or what.
21                    And we put in a bunch of
22    others, and it just goes on and on, and I'm
23    upside down, and that's basically what I
24    remember.
25              Q     And before FSS filed for
```

```
                                        Page 156
 1                   ALEXANDER E. JONES
 2   bankruptcy, did you have an employment
 3   agreement with FSS?
 4                   MR. LEMMON:  I object to the
 5          form.
 6          A       I don't know.
 7          Q       On page 4 of this document,
 8   can you say who signed on behalf of FSS?
 9          A       Melinda Flores.
10          Q       She was a bookkeeper,
11   correct?
12          A       Yes.
13          Q       And is there any document you
14   are aware of authorizing her to sign
15   contracts on behalf of FSS?
16                   MS. DRIVER:  Objection, form.
17          A       I don't know.
18          Q       Am I right in understanding
19   that Ms. Flores reported to you?
20                   MS. DRIVER:  Objection, form.
21          A       I don't remember how all this
22   happened.  I thought Mark Schwartz was here
23   when this happened.
24                   MS. DRIVER:  Listen to his
25          question.
```

Page 157

1                    ALEXANDER E. JONES

2          Q        Am I right in understanding

3     that Ms. Flores reported to you, is my

4     question.

5          A        I guess you could say that is

6     correct yeah.

7          Q        And so you were negotiating

8     this employment agreement with your

9     employee, is that right?

10                  MS. DRIVER:  Objection, form.

11         A        It was never implemented, but

12    I don't even know, I don't remember.

13         Q        Do you remember her pushing

14    back against you on behalf of FSS during the

15    negotiations?

16         A        No.

17         Q        And I think you testified you

18    were not paid according to this agreement,

19    is that the best of your understanding?

20         A        You know, I'm trying to be

21    helpful, but I don't remember all this.

22                  I told you there was one

23    employment agreement that we thought was in

24    place but never got implemented, and that's

25    it.

```
                                        Page 158
 1                  ALEXANDER E. JONES
 2                  So -- I don't really know
 3      what else to say.  This might be something
 4      else, I don't know.
 5            Q       And are we right in
 6      understanding that in the last three years,
 7      you never earned a cash salary from FSS more
 8      than $639,000 a year?
 9                  MS. DRIVER:  Objection, form.
10            A       I don't know.
11                  MR. PATERSON:  We will mark
12            Exhibit 11.  It's going to be tab
13            14.
14                  (The above described document was
15            marked Exhibit 11 for identification as of
16            this date.)
17            Q       Do you recognize this
18      document?
19            A       No.
20            Q       I'll represent to you that
21      this is a document that was produced by your
22      lawyers in the litigation, to the best of my
23      understanding.
24                  Do you see it summarizes your
25      income for the past three years?
```

```
 1                    ALEXANDER E. JONES
 2              MS. DRIVER:  I'm going to
 3         object to his characterization of
 4         the document.  I don't think I
 5         produced it in the course of
 6         litigation.
 7              MR. PATERSON:  And Vickie,
 8         I'm just -- to be clear, the only
 9         thing I'm going on is the AEGBR
10         Bates number.
11              MS. DRIVER:  I'm sorry, I
12         guess I wasn't thinking of
13         disclosures to the committee as
14         litigation.
15              MR. PATERSON:  Okay, fair
16         enough.
17              MS. DRIVER:  It was in
18         statements.
19         Q    I understand this document,
20    to the best of my understanding, was
21    provided by your lawyers to the committee, I
22    will put it that way.
23         A    Can I take another break for
24    three minutes?
25              MS. DRIVER:  You have to
```

```
                                  Page 160
 1                  ALEXANDER E. JONES
 2         answer the question.
 3                  Do you want to take a break?
 4         A      Fine.  I'll answer the
 5    question, let's go.
 6                  MS. DRIVER:  I thought there
 7         was a pending question.
 8         A      I need some glasses here.
 9         Q      I think we can break and then
10    we will pick this up.
11                  THE VIDEOGRAPHER:  Let's go
12         off the record, the time is 5:22.
13         This ends media unit number 2.
14                  (At this point in the proceedings
15         there was a recess, after which the
16         deposition continued as follows:)
17                  THE VIDEOGRAPHER:  The time
18         is 5:29.  We are back on the record
19         with the start of media unit number
20         3.
21                  We are back on the record.
22         Q      So, Mr. Jones, do you
23    recognize this document?  We have got
24    Exhibit 11.
25         A      Yes, I've got my magnifying
```

```
                                        Page 161

 1                  ALEXANDER E. JONES

 2   glass out.

 3        Q       And have you seen this

 4   document before?

 5                 MS. DRIVER:  Let me just

 6           clarify the document.  He has the

 7           document in front of him, but I

 8           don't think he recognized it.

 9        A       I don't recognize it, but

10   whatever.

11        Q       And do you have any basis to

12   dispute that this describes your income

13   prior to filing for bankruptcy?

14        A       Okay, if my people filed it

15   I'm sure it's accurate.

16        Q       And you will see, if you look

17   under -- you see the first row where it

18   lists sources of income, you see wages?

19        A       Yes.

20        Q       And under -- from January 1

21   of current year until date you filed for

22   bankruptcy do, you see it lists $331,000?

23        A       Yes.

24        Q       And if you look at the next

25   set of boxes underneath it says last
```

```
                                    Page 162
 1                  ALEXANDER E.  JONES
 2   calendar, 1/1/21 to 12/31/21, do you see
 3   that?
 4          A      Yes.
 5          Q      And you see that lists
 6   $617,000 and change?
 7          A      Yes.
 8          Q      Any reason to think those
 9   were not your wages in 2021 from FSS?
10          A      I think those were my wages.
11   I remember something like that.
12          Q      And I should have asked you
13   the same question for the $331,000 for the
14   current year.
15                 Any reason to believe those
16   were not your wages?
17          A      I don't know about the
18   current year.
19          Q      And then the bottom box has
20   prior year, 1/1/20 to 12/31/20?  Do you see
21   that?
22          A      Which year?
23                 Oh, yes, I see that.
24          Q      Do you see it says wages,
25   $639,118?
```

1                    ALEXANDER E. JONES

2          A      Yes.

3          Q      Any reason to believe those

4    were not your wages from FSS in 2020?

5          A      No.

6          Q      Do you understand that as

7    part of your proposed Plan of Reorganization

8    FSS would pay you a salary of $1.5 million?

9          A      Yes, that's because I get

10   less from the other stuff.

11         Q      What do you mean by the other

12   stuff?

13         A      All the other money I bring

14   in, all the money I was just bringing in.

15         Q      What do you mean by all the

16   other money?

17         A      My percentages of supplement

18   sales, the advertising I was bringing in,

19   all the things I was doing separately, the

20   FSS gross revenue of $31 million.

21         Q      Do you know, did you

22   negotiate the $1.5 million number with FSS?

23         A      I know that's -- I think I

24   put that in the first employment agreement,

25   but I don't really remember, so I can't

```
 1                    ALEXANDER E. JONES
 2   speak to it.
 3          Q       Do you remember who else was
 4   involved in those negotiations?
 5          A       No.
 6          Q       Did you get any advice that
 7   that $1.5 million was reasonable?
 8                  MS. DRIVER:  I'm going to
 9          object.  To the extent he is asking
10          for anything that would be advice
11          from your lawyers, do not answer.
12          A       I can't answer.  It was all
13   lawyer's advice.
14          Q       Did you get any financial
15   advice that the $1.5 million was reasonable?
16          A       I don't remember.
17          Q       Did you do any other analysis
18   to support the $1.5 million figure?
19          A       I don't recall.
20          Q       Do you know whether the $1.5
21   million reflects fair market value for your
22   employment?
23          A       No.  I should be paid a lot
24   more.
25          Q       Why is that?
```

```
                                      Page 165

 1                    ALEXANDER E. JONES
 2          A       Because if I'm not here, it
 3   all shakes and falls apart.
 4          Q       Why is it that FSS couldn't
 5   continue with someone else?
 6          A       I know you guys want me to
 7   think that you don't know that, that you got
 8   such a great deal, as well as my crew and
 9   the operation, but you know damn well, if
10   I'm not here this whole operation will shut
11   down in a matter of weeks.
12                    So, just go ahead, like they
13   say in Tombstone, "Be My Huckleberry,"
14   because if that's what you guys want, you
15   are about to get it.
16          Q       What do you mean by "about to
17   get it"?
18          A       I'm going to leave.
19                    As soon as this negotiation
20   doesn't work, I don't shut down my own
21   company, you guys come in and shut it down,
22   throw me in the briar patch.
23          Q       Mr. Jones, is it your
24   testimony that if you don't get a settlement
25   with all Plaintiffs you are going to shut
```

```
                                        Page 166
 1                  ALEXANDER E. JONES
 2   down FSS?
 3                  MS. DRIVER:  I'm going to
 4          object.  To the extent that calls
 5          for any conversations you have had
 6          with counsel related to negotiations
 7          and the legal advice related to
 8          that, I'm going to instruct you not
 9          to answer.
10          A       Yeah, I can't answer the
11   question.
12          Q       I'm just asking about your
13   present intention.
14                  Is your intention to shut
15   down FSS if you don't get a settlement with
16   all your creditors?
17                  MS. DRIVER:  I'm going to
18          object to the extent that calls
19          form --
20          A       I can't talk about
21   conversations with counsel.
22          Q       I'm not asking about
23   conversations with counsel, I'm asking about
24   your plan, Mr. Jones.
25                  I'm not asking about advice,
```

```
                                      Page 167
 1                  ALEXANDER E.  JONES
 2   I'm asking about what you personally plan to
 3   do.
 4                  Do you plan to shut down FSS
 5   if you don't get a settlement with all your
 6   creditors?
 7                  MS. DRIVER:  If you have a
 8           current plan, or if it's not fully
 9           formed in your mind, then it's not
10           something --
11           A      It not fully formed.  It's
12   just a personal feeling that I understand
13   what's going on with you guys.
14                  Just go ahead and keep
15   trying.
16           Q      When you say it's not fully
17   formed in your mind, you were repeating what
18   your counsel just said, right?
19           A      No, I have not 100 percent
20   made my decision, but, you know, just watch,
21   just watch, just watch.
22           Q      What do you mean by "just
23   watch"?
24           A      I'm just saying it's a
25   beautiful day, watch, watch the sunrise, the
```

1                    ALEXANDER E. JONES

2    sunset.

3         Q        What do you mean, "It's a

4    beautiful day, watch the sunrise, the

5    sunset"?

6         A        I have just said I have --

7    I've not made my decisions yet, but if you

8    think I'm bluffing, you just wait and see.

9         Q        And why shouldn't people

10   think you're bluffing?

11        A        I'm just saying, you want me

12   to stay here, you want me to run this

13   company you, want me to keep it going, you

14   want me to pay you money and all of my crew.

15                 If I could actually make a

16   deal that's reasonable, I'll do it, but

17   let's stop pretending like I'm not supposed

18   to have toilet paper at my house and stuff

19   like that.

20                 So I'm just saying, I know

21   you guys get your orders from on high and

22   all that.

23                 All I'm saying is do whatever

24   you're going to do, and I'm comfortable with

25   it.

Page 169

ALEXANDER E. JONES

1

2          Q          And you said bluffing.  What
3      would you be bluffing?

4          A          No, if I don't get paid to
5      work, I'm going to go bye-bye.

6                      So, hold your breath and see
7      if that doesn't happen.

8          Q          When you said, "don't have
9      toilet paper in your house," who has
10     suggested that you shouldn't have toilet
11     paper in your house?

12         A          It's a metaphor, and like I
13     said, I'm done talking about that.

14                     There is no set ideas.  I'm
15     just telling you that I am aware of what's
16     going on and I'm done.

17         Q          What do you mean by you're
18     done?

19         A          I think that's pretty clear.
20     What I have said is what I have said.  It's
21     done, it's there, and just keep pushing.

22         Q          What do you mean by "keep
23     pushing"?

24         A          Well, just keep pushing, see,
25     you'll see, just keep pushing.

```
                                        Page 170
 1                    ALEXANDER E. JONES
 2          Q        What will we see if we keep
 3   pushing?
 4          A        You will see what you see.
 5          Q        And what is that?
 6          A        Just what you see.
 7                   MS. DRIVER:  I think you guys
 8           have devolved into a very
 9           nonsensical conversation.
10                   Let's try to, Alex, please
11           just answer the question he's
12           asking.
13          A        Nothing.  I'm saying I'm done
14   being harassed, I'm done with all this
15   insanity and all these made up numbers and
16   all this stuff you guys come up with.
17                   I'm just trying to move on
18   from you guys.  But if you guys can't help
19   yourselves, the point is that if you don't
20   think I'm supposed to be paid to work a job
21   to pay you most of my money, then if you
22   don't like that deal, that's your deal, but
23   I'm not going to sit here and debate how
24   many angels can dance on the head of a pin
25   all day long.
```

```
                                      Page 171
 1                 ALEXANDER E. JONES
 2        Q       And you reference made up
 3   numbers.  What numbers do you think are made
 4   up?
 5        A       $130 million to a guy that I
 6   didn't even know who he was until he sued
 7   me, how does that happen in America?
 8        Q       Have you received employment
 9   offers during the bankruptcy from other
10   parties other than FSS?
11              MS. DRIVER:  I'm going to
12         object to the extent this calls for
13         anything that you have discussed
14         with your counsel.
15              And I want to make sure that
16         the client, that you are absolutely
17         clear these are offers.  We are not
18         just talking about socializing
19         concepts.
20        A       Absolutely, no, I don't have
21   any offers.
22        Q       And has anyone socialized the
23   concept of employment with you during the
24   bankruptcy?
25              MS. DRIVER:  I object to the
```

```
                                          Page 172
 1                    ALEXANDER E. JONES
 2           extent that is confidential
 3           information that he has with other
 4           business associates, and I'm not
 5           going to let him testify about that.
 6           A       Yeah, the sky is the limit.
 7    I don't need to have any agreements or
 8    anything with anybody.  If I walk away from
 9    this I can do whatever I want.
10           Q       So, are you accepting your
11    counsel's instruction not to testify about
12    other business discussions you have had?
13           A       I already told you there are
14    no business discussions.  I can get anything
15    I want.
16           Q       Do you think you could make
17    more working somewhere other than FSS?
18           A       Undoubtedly.
19           Q       Where?
20                   MS. DRIVER:  I'm going to
21           object.  I'm not going to let you
22           mention opportunities.
23           A       It's theoretical.  The point
24    is I want to end this chapter and move on.
25                   But if, out of their
```

Page 173

```
 1                    ALEXANDER E. JONES
 2   behavior, they can't do that, that's fine
 3   with me.
 4                    I just have confidence that
 5   I'm going -- I'm a commodity that's going to
 6   be needed.
 7        Q       And would do you think --
 8   what other parties might be interested in
 9   employing you, to your knowledge?
10                    MS. DRIVER:  I am going to
11              object, this is business
12              confidential information, it's
13              proprietary, and I'm going to
14              instruct the witness not to answer.
15        A       On counsel's advice I'm not
16   going to answer.
17                    MS. DRIVER:  Okay, we will
18              reserve our rights on that one and
19              we can move on as well.
20                    MR. PATERSON:  I must admit
21              the confidentiality objection isn't
22              one I have heard in depositions
23              before where there is a
24              confidentiality order, but we will
25              move on, reserving all rights.
```

```
 1                    ALEXANDER E. JONES
 2               MS. DRIVER:  There are
 3          litigation parties who have stated
 4          on the record they are out to
 5          destroy Mr. Jones.
 6                    It is not inconsequential
 7          that someone would approach them and
 8          actually try to hurt his chances to
 9          go to court -- to go to work for
10          them.
11                    So I am actually doing what's
12          in the creditors' best interests
13          here.
14               MR. PATERSON:  Vickie, I
15          don't want to get into a degradation
16          that's about as fanciful as your
17          team's TMZ theory.
18          A     Your TMZ -- nobody is
19     covering me .nobody cares about me you are a
20     conspiracy theorist.
21          Q     Mr. Jones, are you aware of
22     three condos on Clausen Road?
23          A     No.
24          Q     Are you familiar with units
25     3, 4 and 6 at 3504 Clausen Road?
```

Page 175

```
 1                    ALEXANDER E. JONES
 2          A        Yes.
 3          Q        Who owns those condos?
 4          A        Trusts for my children.
 5          Q        The trusts for your children
 6   own all three?
 7          A        Yeah, from best of my
 8   knowledge, those are properties that my
 9   children's trust own.
10          Q        Who lives in them?
11          A        Several of my children.
12          Q        Who pays the carrying costs
13   on them currently?
14          A        I did previously, but to the
15   best of my knowledge, now they pay for that.
16          Q        And "them" being your
17   children or the trusts?
18          A        I don't have the details of
19   it.  I'm not involved, they take care of it.
20          Q        Why did you previously pay
21   those costs?
22          A        Because they were minors,
23   they are now adults.
24          Q        But why did you pay the costs
25   rather than the trusts?
```

Page 176

1                    ALEXANDER E. JONES

2          A       I don't have all the details,

3    I think the trust did pay for some of it.

4          Q       Let's take a look at tab 29,

5    it's going to be Exhibit 12.

6                    (The above described document was

7          marked Exhibit 12 for identification as of

8          this date.)

9          Q       Do you recognize this

10   document?

11         A       No.

12         Q       So, let's go to the next

13   page, a bit further down to where your

14   signature is.

15                  Do you see on page 9 you

16   signed this document?

17         A       Yeah, I just told you I don't

18   recognize it, I don't remember.

19         Q       If you go back to page 1 --

20         A       Yup.

21         Q       Do you see it's a monthly

22   operating report for the period ended

23   September 30, 2023.  Do you see that?

24         A       Yup.

25         Q       Any reason to believe this

```
 1                    ALEXANDER E. JONES
 2   isn't the monthly operating report for
 3   September?
 4          A      No, I have no reason not to
 5   believe it.
 6          Q      And if you look at page -- I
 7   think it's the second to last page of the
 8   document.
 9                 MS. DRIVER:  I'm going to
10             object.  It doesn't appear this is
11             the most recent on the docket, but
12             it was filed at this page, so it may
13             or may not be the most -- the
14             operative document since the
15             amendment.
16          Q      Okay, so we are on page 17.
17   Do you see a few -- about a third of the way
18   down, the page --
19                 MS. DRIVER:  Page 17, I don't
20             see anything.  March 17?
21          Q      So it's on page 5 of 8.  It's
22   on the second to last page of the actual
23   file.
24                 MS. DRIVER:  6th?
25                 MR. PATERSON:  5 of 6,
```

```
 1                  ALEXANDER E. JONES
 2         Vickie.
 3                 MS. DRIVER:  It's here.
 4         Q      Do you see Austin condos
 5   listed about a third of the way down?
 6         A      Yes.
 7         Q      And total, Austin condos,
 8   there is an expense of $917 for that month.
 9   Do you see that?
10                 MS. DRIVER:  I object to the
11             extent this is not the information
12             that is contained in the current
13             document, so I do not want the
14             client testifying that this is true
15             and correct, because it's been
16             amended.
17         Q      I just asked him if he saw
18   it, Vickie.
19         A      I have helped my children out
20   before, but it's been my knowledge for
21   years, it's all been taken care of for
22   years, it's all their deal.
23                 But I mean this isn't some
24   document -- I'm sure at the time it was
25   filed I thought it was accurate, I don't
```

```
1                  ALEXANDER E. JONES
2    know.
3         Q        And to the extent you paid
4    costs for those condos, has your estate been
5    fully repaid for those costs?
6         A        I'm told it's in the process.
7         Q        Do you know where in the
8    process it is?
9         A        No.
10        Q        And do you know if it was in
11   process before the creditors in this case
12   raised this issue?
13        A        I don't know.
14        Q        Let's take a look then -- by
15   the way, where it says Austin condos?
16                 MS. DRIVER:  It's a charge
17           under $1,000.
18        Q        Where it says Austin condos,
19   do you understand that to be referencing the
20   three units on Clausen Road we were just
21   discussing?
22        A        I would guess you're right.
23   I don't know, I have not ever paid attention
24   to this.
25        Q        You said it's in the process
```

```
                                        Page 180
 1                   ALEXANDER E. JONES
 2    of being reimbursed.  Who is in the process
 3    of doing that?
 4           A        Bob Slizer.
 5                    I think that may be the fish
 6    tank, because of a fish tank that I want to
 7    get rid of, or the HOA.  There is a fish
 8    tank that's still mine.
 9                    I never got rid of the fish.
10    I pay for a fish tank over there, I forgot.
11           Q        An actual fish tank?
12           A        It's a salt water fish tank
13    I've had for like 15 years, yes.
14           Q        And how much does that cost?
15           A        It's $100 bucks a week.  They
16    come and feed them, it's a big fish tank.
17           Q        And you've been maintaining
18    that fish tank throughout your bankruptcy?
19           A        It's been there for years.  I
20    actually remembered the fish tank, I'm
21    guessing that could be the fish tank, but it
22    looks like the HOA actually here on the
23    line.
24                    But if you want, we will kill
25    the fish and we will throw them out on the
```

```
                                        Page 181
 1                    ALEXANDER E. JONES
 2    side of the road.
 3         Q      Do you think paying $100 a
 4    week for a fish tank is a prudent use of
 5    creditor funds?
 6                    MS. DRIVER:  I think asking a
 7              question about a $100 charge in a
 8              deposition where people are charging
 9              ten times that an hour is not
10              prudent.
11         A      Maybe it's not the fish tank.
12    Actually it says HOA, I was wrong.  I was
13    trying to think of any bill I was paying in
14    one of those condos.  Maybe it's the fish
15    tank.
16         Q      But to go back to my
17    question, do you think paying $100 a week
18    for a fish tank is a prudent use of creditor
19    funds?
20         A      Well, now that I look at the
21    document closer, I don't think I'm paying
22    for the fish tank, I think it says HOA.
23         Q      Do you have any understanding
24    if you're paying for the fish tank or not?
25         A      It's been amended.
```

```
                                            Page 182
 1                   ALEXANDER E. JONES
 2              MS. DRIVER:  I also want to
 3         note we have been spending all this
 4         time looking at a document that's
 5         been amended.
 6              MR. PATERSON:  I'm not even
 7         asking -- Vickie, I know you want to
 8         make speeches.  I'm not even asking
 9         about the document, I'm asking --
10         Q      Is it your understanding
11    you've been paying $100 a week for a fish
12    tank?
13         A      If the Sandy Hook creditors
14    ask me to, we will execute the fish.
15         Q      I wasn't asking about the
16    execution of fish, Mr. Jones.
17         A      Should we kill them?
18         Q      Is it your understanding
19    you've been paying $100 a week for a fish
20    tank?
21         A      It's a fish sanctuary to save
22    the fish.
23         Q      Fish sanctuary.  And do you
24    think maintaining a fish --
25         A      I'm being sarcastic, dude.  I
```

```
                                        Page 183
 1                   ALEXANDER E. JONES
 2   was actually wrong.  I think somebody else
 3   is paying for the fish.
 4                   I haven't looked at it in
 5   over a year.  It says HOA, once I read the
 6   document.
 7                   So the fish aren't, I believe
 8   they are not paid being paid for by me.
 9                   This will be a great headline
10   when you put it on TMZ.  Like, they wanted
11   my cat, MooShu.
12                   It did not look good for you.
13   Do you know about the cat thing?
14        Q     I'm not here to answer
15   questions, Mr. Jones.
16        A     I have -- now you're after
17   the fish, okay.
18        Q     I just -- we will move on.
19                   Are you aware of any claims
20   that your estate holds against third
21   parties?
22        A     No.
23        Q     And, so are you aware of any
24   claims your estate has against your wife,
25   Erica?
```

```
                                    Page 184
 1                 ALEXANDER E. JONES
 2        A      No.
 3        Q      You have purported to ratify
 4   a prenuptual agreement with her just months
 5   before your bankruptcy, right?
 6             MS. DRIVER:  Objection.  To
 7             the extent this calls for
 8             conversations you had with your
 9             lawyer regarding the prenuptual
10             agreement, I'm going to instruct you
11             not to answer.
12             And to the extent that we are
13             characterizing it as a purported
14             ratification, I'm going to object to
15             the form of the question.
16             If we need to get into all of
17             these issues that are just alleged,
18             I am going to have to just object a
19             whole lot more.
20             MR. PATERSON:  I understand.
21        A      I will follow the advice of
22   my counsel.
23        Q      She didn't instruct you not
24   to answer, actually.
25        A      I don't understand all the
```

Page 185

                    ALEXANDER E. JONES

1

2   prenup stuff, I'm not answering your

3   question.  I don't know.

4        Q      Do you recall ratifying a

5   prenuptual agreement months before your

6   bankruptcy?

7        A      No.

8        Q      Do you recall making payments

9   under that prenuptual agreement?

10        A      Yeah, for eight years; seven

11   years.

12        Q      Do you recall transferring

13   about $1.5 million in cash to your wife in

14   the four years prior to filing for

15   bankruptcy?

16             MS. DRIVER:  I object to

17        form.

18        A      No.

19        Q      Any basis to dispute that you

20   did that?

21             MS. DRIVER:  Objection, form.

22        A      I'm not going to debate that

23   with you.  I don't have all the details in

24   front of me.

25        Q      And any basis to dispute that

1                    ALEXANDER E. JONES
2    you paid more than $800,000 to your wife in
3    the year prior to your bankruptcy filing?
4         A      I'm not arguing those
5    numbers.  I don't have it in front of me.
6         Q      And you purchased an Audi in
7    December 2017 and a Range Rover in November
8    2018, correct?
9         A      I don't remember the dates.
10        Q      But you purchased those
11   vehicles around those times?
12        A      I don't remember.
13        Q      Who owns the Audi?
14               MS. DRIVER:  Objection, form.
15        A      I don't even remember.
16        Q      Who did you purchase these
17   cars for?
18               MS. DRIVER:  Objection, form.
19        He's already said he didn't
20        remember.
21        A      I don't remember any of this.
22        Q      So I just described, I asked
23   you about a series of facts.
24               What efforts have you made to
25   investigate whether those facts give rise to

Page 187

```
 1                    ALEXANDER E. JONES
 2   claims of your estate?
 3                    MS. DRIVER:  I'm going to
 4            object.  To the extent this calls
 5            for conversations that you have had
 6            with counsel, I'm going to instruct
 7            you not to answer.
 8                    THE WITNESS:  I don't know
 9            what he's talking about.  I don't
10            know what it means.
11                    MS. DRIVER:  There is no
12            reason any individual would go
13            through any individual effort other
14            than talking to a lawyer about
15            claims.
16                    So, just, if you did
17            something outside of talking to a
18            lawyer, answer.  If not, I instruct
19            you not to answer.
20            A      No, I didn't.  I don't know
21   what he's talking about.
22            Q      Have you been involved in
23   investigating whether your estate might have
24   claims against any party?
25                    MS. DRIVER:  Objection, same
```

```
                                    Page 188
 1                  ALEXANDER E. JONES
 2          instruction.
 3          A       No.
 4          Q       And are you aware of any
 5   efforts to settle claims against other
 6   parties?
 7                  MS. DRIVER:  If you know.
 8          A       No.
 9          Q       We will change topics.
10                  I want to talk a bit about
11   the property you have claimed as your
12   homestead in this case.
13                  What is your homestead?
14                  You understand what property
15   you have claimed as your homestead?
16                  MS. DRIVER:  I will note for
17          the record that his address has been
18          sealed under the record.
19                  I just prefer it not be
20          stated on the record.
21          A       TMZ, you mean?
22          Q       I'll ignore the reference to
23   TMZ.  I think -- I'm not asking for the
24   address.  Am I right in understanding your
25   homestead is in Austin?
```

1                    ALEXANDER E. JONES

2          A       Yes.

3          Q       And how much did you buy that

4    property for?

5          A       I don't remember.

6          Q       When did you buy it?

7          A       I don't remember the exact

8    date, eight or nine years ago.

9          Q       Have you made improvements to

10   that property since you bought it?

11         A       No, we have just repaired it.

12         Q       What repairs have you made?

13                 MS. DRIVER:  I'm going to

14         object.  In eight years there is

15         absolutely no way anybody in this

16         room could remember how many repairs

17         that they have made.

18                 It's a ridiculous question.

19                 MR. PATERSON:  Vickie, I will

20         appreciate if you avoid commenting

21         on questions as ridiculous.

22         A       We fixed the roof, there was

23   a flood.  There was a big freeze twice,

24   broke a bunch of pipes.

25                 The gutters broke, stuff like

```
 1                    ALEXANDER E. JONES
 2   that.
 3          Q     When was the house built?
 4          A     I don't know.
 5                MS. DRIVER:  It's okay if you
 6          don't know.
 7          A     I don't know.
 8          Q     Any sense --
 9                MS. DRIVER:  Excuse me?
10          Q     I said any sense of when it
11   was built?
12                MS. DRIVER:  He said he
13          didn't know.
14          A     Look it up on Zillow.
15                MS. DRIVER:  It's on the real
16          property record.  There is no reason
17          we have to do this on the record.
18                MR. PATERSON:  Vickie, again
19          we, can do without the commentary.
20                MR. PATERSON:  Let's look at
21          a document.  It's going to be
22          Exhibit 12.  It's tab 15 in your
23          binder.
24                (The above described document was
25          marked Exhibit 12 for identification as of
```

```
                                        Page 191

1                    ALEXANDER E. JONES

2           this date.)

3                    MS. DRIVER:  12?

4                    MR. PATERSON:  12, Exhibit

5           12, tab 15.

6                    MS. DRIVER:  Fine.

7                    MR. PATERSON:  I think it's

8           actually 13, I am told.

9                    (The above described document was

10          marked Exhibit 13 for identification as of

11          this date.)

12                   MS. DRIVER:  It's their hard

13          stop, I will let them call it.  .

14                   That's not the my team.

15          Q       It's Exhibit 13, tab 15, just

16     let me know when you have it.

17          A       We have it, what's the next

18     question?

19          Q       Do you recognize this

20     document?

21          A       No.

22          Q       Have you seen it -- well

23     strike that.

24          Q       We are going to go to page

25     135 of the document, it's near the end?
```

```
                                            Page 192
1                       ALEXANDER E. JONES
2           A          Magnifying glass.
3                       MS. DRIVER:  It's really tiny
4           you might be better off looking up
5           there.
6           A          What is this.
7           Q          A hard copy might be easier
8    for this one but we are trying to zoom it
9    in?
10                      MS. DRIVER:  Actually the one
11          on the screen is better.
12          A          Okay, what's the next
13   question?
14          Q          You see it titled analysis of
15   Jones family FSS equity account
16   transactions?
17          A          Yeah.
18          Q          If you look under home
19   construction, you see there is an amount of
20   about $2.9 million?
21          A          Okay.
22          Q          And that?
23                      MR. LEMMON:  Paul, can you
24          hear me this is Steve Lemmon?
25                      MR. PATERSON:  I can hear
```

1               ALEXANDER E. JONES

2       you.

3               MR. LEMMON:  Paul is this

4       deposition sealed?

5               MR. PATERSON:  We agreed it

6       would be subject to the protective

7       order subject to any parties' right

8       to challenge it under its terms.

9               MS. DRIVER:  This is a sealed

10      document, though that you are using

11      let me almost right this is a sealed

12      document.

13              MR. PATERSON:  Its subject to

14      the protective order.

15              MR. LEMMON:  I object to you

16      using a sealed document in the FSS

17      case to cross-examine Mr. Jones in

18      the Jones case.

19              If you want to pull a

20      specific excerpt from it, then we

21      can discuss whether or not that's

22      appropriate.

23              But attaching this document

24      to this deposition is improper and I

25      object.

Page 194

1              ALEXANDER E. JONES
2              MR. PATERSON:  We disagree, I
3         mean we are only going to talk about
4         this page.
5              MS. DRIVER:  I object to this
6         being attached to the deposition, if
7         we need to take this to the judge we
8         will, but this was sealed and the
9         deposition isn't sealed.
10              MR. PATERSON:  Look, why
11         don't we -- we will table this
12         discussion for now, I'm not going to
13         ask any more questions about the
14         document given the objections, we
15         will take it down and let me just
16         ask.
17              MS. DRIVER:  You can ask
18         questions about it but I don't want
19         it attached to the deposition
20         transcript.
21              MR. PATERSON:  Yeah, look we
22         are happy to work this out off line.
23         Q     Do you have any basis to
24    dispute that you spent $2.9 -- well let me
25    rephrase, do you have any basis to dispute

1                    ALEXANDER E. JONES

2    that between 2010 and 2022 you took draws

3    from FSS of about $2.9 million for home

4    construction?

5                    MS. DRIVER:  Objection, form.

6            A       I can't speak to this, I

7    don't have the details.

8            Q       And do you have any basis to

9    dispute in around the 1,200 days prior to

10   the petition date you withdrew about $2

11   million for home construction?

12           A       I can't confirm these numbers

13   in front of me so I can't speak to it.

14           Q       Prior to 2019, your home

15   construction draws for any year were never

16   over $6,000.

17                   Any basis to dispute that?

18           A       I can't confirm these

19   numbers, I can't speak to it.

20           Q       And do you recall spending

21   something in the order of $2 million or more

22   on home construction?

23           A       No.

24           Q       And is that something you

25   think you would remember if you had done?

1                    ALEXANDER E. JONES

2          A      I'm going to try to

3    investigate it myself.

4          Q      But if you had spent $2

5    million on home construction, do you think

6    you would have a memory of that sitting here

7    today?

8          A      I'm going to have to

9    investigate this myself before I answer your

10   questions.

11         Q      Do you dispute that at the

12   time you did the vast majority of this

13   construction, the Sandy Hook families had

14   commenced litigation against you?

15                   MS. DRIVER:  I'm going to

16           object to the form.

17         A      Basically I can't speak to

18   this, I haven't had time to look into it.

19         Q      Was your home construction a

20   way of estate planning?

21                   MS. DRIVER:  Objection, form,

22           not instruction to answer.

23         A      Yeah, I can't answer your

24   question.

25         Q      You have referenced before, I

```
                                      Page 197
 1                   ALEXANDER E. JONES
 2    think you used the term non-exempt assets
 3    and exempt assets.
 4                   What do you understand that
 5    to mean?
 6          A      All I mean, there are things
 7    like myself, that's ex-tempt exempt, there
 8    are other things that aren't.
 9          Q      Is your interest in FSS
10    exempt?
11          A      I don't know.
12                 MR. PATERSON:  Right, we have
13          come to 7:00, or 6:00 your time, I
14          guess.
15                 Per agreement with counsel,
16          we had agreed to continue the
17          deposition, because would have a
18          hard stop now.
19                 So I think let's go off the
20          record and we will figure out
21          another time to pick it up.
22                 MS. DRIVER:  If we agree to.
23          I said I would work with you on that
24          if we still have relevant questions.
25                 THE VIDEOGRAPHER:  Okay,
```

1                    ALEXANDER E. JONES

2          let's go off the record, the time is

3          6:00 p.m., we are off the record.

4                    (At this point in the proceedings

5          there was recess, after which the

6          deposition continued as follows:)

7                    THE VIDEOGRAPHER:  We are

8          going off the record at 6:01 p.m.

9          This concludes today's testimony

10          given by Alexander Jones.

11                    The total number of media

12          units used is 3, and will be

13          retained by Veritext New York.

14                    Thank you.

15

16

17

18

19

20

21

22

23

24

25

1                ALEXANDER E. JONES

2

3

              I, the undersigned, a

4     Certified Shorthand Reporter of the

State of New York, do hereby

5     certify:

              That the foregoing

6     proceedings were taken before me at

the time and place herein set forth;

7     that any witnesses in the foregoing

proceedings, prior to testifying,

8     were duly sworn; that a record of

the proceedings was made by me using

9     machine shorthand which was

thereafter transcribed under my

10    direction;

              That the foregoing transcript

11    is a true record of the testimony

given.

12               Further, that if the

foregoing pertains to the original

13    transcript of a deposition in a

federal case before completion of

14    the proceedings, review of the

transcript [ ] was [x ] was not

15    requested.

16             I further certify I am

neither financially interested in

17    the action nor a relative or

employee of any attorney or party to

18    this action.

              IN WITNESS WHEREOF, I have

19    this date subscribed my name.

20            Dated: April 17, 2024

21

22

23

           Stephen J. Moore

24          RPR, CRR

25

Page 200

1                    ALEXANDER E. JONES

2          DECLARATION UNDER PENALTY OF PERJURY

3                    Case Name: In Re: ALEXANDER

4          E. JONES

5                    Date of Deposition: April 15,

6          2024

7

8                    I, ALEXANDER E. JONES, hereby

9          certify under penalty of perjury

10         under the laws of the State of New

11         York that the foregoing is true and

12         correct.

13                   Executed this _____ day of

14         _____, 2024, at

15          _____.

16

17

18         _____

19

20                   ALEXANDER E. JONES

21

22

23

24

25

```
 1              ALEXANDER E. JONES
 2            DEPOSITION ERRATA SHEET
 3            Case Name: In Re: ALEXANDER
 4      E. JONES.
 5            Name of Witness: ALEXANDER E>
 6      JONES.
 7            Date of Deposition: April 15,
 8      2024
 9            Reason Codes:  1. To clarify
10      the  record.
11            2. To conform to the facts.
12            3. To correct transcription
13      errors.
14   Page _____ Line _____ Reason _____
     From _____ to _____
15   Page _____ Line _____ Reason _____
     From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18   Page _____ Line _____ Reason _____
     From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21   Page _____ Line _____ Reason _____
     From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24   Page _____ Line _____ Reason _____
     From _____ to _____
25   Page _____ Line _____ Reason _____
     From _____ to _____
```

Page 202

1                    ALEXANDER E. JONES
2                  DEPOSITION ERRATA SHEET
3    Page _____ Line _____ Reason _____
     From _____ to _____
4    Page _____ Line _____ Reason _____
     From _____ to _____
5    Page _____ Line _____ Reason _____
     From _____ to _____
6    Page _____ Line _____ Reason _____
     From _____ to _____
7    Page _____ Line _____ Reason _____
     From _____ to _____
8    Page _____ Line _____ Reason _____
     From _____ to _____
9    Page _____ Line _____ Reason _____
     From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12   Page _____ Line _____ Reason _____
     From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15   Page _____ Line _____ Reason _____
     From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17             _____ Subject to the
18        above changes, I certify that the
19        transcript is true and correct
20             _____  No changes have
21        been made. I certify that the
22        transcript  is true and correct.
23
24        _____
25             ALEXANDER E. JONES

**[& - 2:55]**                                                                     Page 1

| **&** |
| --- |
| **&**   2:4,11 3:3 |
| 7:25 9:6 |
| 125:13 |

| **1** |
| --- |
| **1**   4:7 6:17 |
| 23:14 24:11,13 |
| 24:15 26:2 |
| 34:2 39:19 |
| 43:13 44:7 |
| 45:6 54:24 |
| 60:3,18 61:3,8 |
| 73:9 76:3,18 |
| 76:25 77:10 |
| 78:12,22 83:24 |
| 84:2,10 161:20 |
| 176:19 201:9 |

**1,000**   179:17
**1,200**   195:9
**1,681,250**   73:10
**1.4**   75:19 84:2
84:10
**1.5**   126:25
163:8,22 164:7
164:15,18,20
185:13
**1.65**   36:18
**1.65.**   36:19
**1/1/20**   162:20
**1/1/21**   162:2
**10**   5:4 54:25
55:2 152:13,16
**10,618**   102:16
**100**   2:14 43:20
80:14 167:19

180:15 181:3,7
181:17 182:11
182:19
**108**   139:15
**11**   5:7 158:12
158:15 160:24
**11,000**   102:25
**11530**   2:15
**119**   4:23
**12**   5:9 36:13
110:18 176:5,7
190:22,25
191:3,4,5
**12/31/20**
162:20
**12/31/21**   162:2
**120**   36:15
**127**   147:24
**13**   4:25 5:11
112:24 191:8
191:10,15
**130**   4:25
125:15 127:22
135:22 136:14
136:23 137:4
138:5,24
144:13 171:5
**133**   5:2
**135**   191:25
**14**   4:7,13 5:7
112:24 158:13
**15**   1:13 5:2,4
6:5 42:18,23
180:13 190:22
191:5,15 200:5

201:7
**152**   5:4
**158**   5:7
**16**   90:17
130:12
**17**   133:9
136:25 177:16
177:19,20
199:20
**170**   129:5
134:25 135:5
**176**   5:9
**18**   55:16
**180**   136:6
137:8 138:7
**1860s**   70:11
**19**   55:13
**191**   5:11

| **2** |
| --- |
| **2**   4:10 34:4,6 |
| 54:23 55:18 |
| 71:8 131:3 |
| 160:13 195:10 |
| 195:21 196:4 |
| 201:11 |

**2,195**   90:25
91:6
**2,329**   95:5
**2,697**   100:22
**2,700**   101:15
**2.7**   49:24
127:13 137:24
**2.8**   147:25
**2.9**   192:20
194:24 195:3

**20**   34:13,20
98:16 104:14
**200**   134:13
135:18 138:7
**2004**   88:2 89:2
**2010**   195:2
**2017**   186:7
**2018**   186:8
**2019**   195:14
**2020**   163:4
**2021**   162:9
**2022**   14:7
154:4 195:2
**2023**   176:23
**2024**   1:13 6:5
199:20 200:6
200:14 201:8
**2025**   73:5,9
75:16
**2028**   82:6,24
**2029**   82:7,13,18
82:24 83:2,20
**2033**   75:19
**2034**   73:6
**20932**   199:22
**21**   4:17
**22-22552**   1:10
**22-33553**   6:24
**23**   4:23
**24**   4:7,20
**2525**   2:6
**29**   176:4
**2:39**   6:4
**2:55**   25:17

**[3 - accepting]**
Page 2

| | | | |
|---|---|---|---|
| **3** | **44**  23:12 24:12 | **60**  42:10 103:4 | **91**  4:20 |

**3**

**3**  4:13 57:11,12
  57:15 109:24
  119:7 123:18
  123:19 131:9
  135:10 139:16
  160:20 174:25
  198:12 201:12
**3,441**  92:25
  93:7,10 94:3
**3,900**  107:13,18
  108:7
**30**  44:11 86:12
  176:23
**31**  163:20
**33**  89:20
**331,000**  161:22
  162:13
**34**  4:10 91:20
**35**  59:3
**3504**  174:25
**3:04**  25:22
**3:39**  1:12
**3:45**  71:2
**3:56**  71:7

**4**

**4**  4:15 61:25
  62:2,10 72:21
  72:22 90:20
  92:20 100:21
  107:9 131:15
  132:2,3 153:18
  156:7 174:25
**40**  121:8

**44**  23:12 24:12
**4:40**  123:10
**4:50**  123:15

**5**

**5**  4:10,17 89:19
  89:22 94:25
  142:12 177:21
  177:25
**5.06**  34:21
**5.5**  53:14,20,25
  54:13 55:3,9
  56:3,6,10,14,23
**50**  43:21 73:23
  74:13,19 75:3
  82:19 83:17
  103:4,21,22
**50,000**  86:19,23
**50/50**  29:20
**500**  96:16
**500,000**  81:7
**55**  80:4
**57**  4:13
**580**  98:13,18
**5:22**  160:12
**5:29**  160:18

**6**

**6**  4:20 5:9 15:4
  34:22 91:23,25
  92:20 94:25
  99:11 100:21
  107:8 174:25
  177:25
**6,000**  195:16

**60**  42:10 103:4
**617,000**  162:6
**62**  4:15
**639,000**  158:8
**639,118**  162:25
**6:00**  197:13
  198:3
**6:01**  198:8
**6th**  177:24

**7**

**7**  4:23 15:4
  90:20 110:2
  119:4,24 120:3
  148:7 152:13
**70**  80:3 103:15
  103:17 104:11
  104:13,22
  108:18 135:25
**75**  42:3
**75201**  2:7
**78704**  3:6
**7:00**  197:13

**8**

**8**  4:25 5:2 15:4
  130:11,14
  177:21
**80**  44:10
**800,000**  186:2
**811**  3:5
**89**  4:17

**9**

**9**  4:3,15 5:2,11
  99:12 133:10
  133:16 176:15

**91**  4:20
**917**  178:8
**93**  123:23,25
  127:22 135:10
**971,567**  75:15
**98**  126:18

**a**

**abdiel**  3:12
**ability**  51:10
**able**  15:7 25:11
  29:14 32:14
  33:22 38:8,15
  50:15 54:4
  109:14 152:9
**above**  1:17
  24:14 34:5
  57:14 59:8
  62:9 89:21
  91:24 102:15
  119:23 130:13
  133:15 152:15
  158:14 176:6
  190:24 191:9
  202:18
**absolutely**  94:5
  106:5 111:17
  171:16,20
  189:15
**abstract**  54:7
**academic**  50:12
  127:6
**accepted**
  154:25 155:17
**accepting**
  45:22 172:10

| | | | |
|---|---|---|---|
| **access** 58:13 | 134:22 136:15 | **aggregate** | 135:16 165:12 |
| 106:2 | 136:24 137:9 | 104:20 | 167:14 |
| **accidentally** | 138:6 142:10 | **ago** 14:3,4 | **ai** 80:19 |
| 122:9 | 154:12 168:15 | 27:15 67:19 | **air** 19:19 109:7 |
| **account** 148:6 | 174:8,11 | 98:25 115:21 | 136:12 151:17 |
| 148:10,17 | 180:20,22 | 116:12,19 | **airline** 94:13 |
| 192:15 | 181:12 183:2 | 146:15 149:11 | **aldenberg** |
| **accountant** | 184:24 191:8 | 149:12 189:8 | 125:6 127:23 |
| 58:14 68:23 | 192:10 | **agree** 6:15 | 135:20 136:11 |
| 69:16 80:6 | **adding** 88:9 | 32:12 65:17 | 138:12 140:5 |
| 97:8 148:5 | **addition** 82:18 | 66:7,8 115:9 | 144:9 |
| 151:12 | 83:17 | 197:22 | **aldenberg's** |
| **accountants** | **additional** | **agreed** 22:21 | 138:17 |
| 58:11,16,20 | 132:15 | 26:18 40:13 | **alex** 4:25 8:13 |
| **accounting** | **address** 188:17 | 77:19 134:12 | 38:18 170:10 |
| 64:8 65:4 | 188:24 | 153:21 154:14 | **alexander** 1:7 |
| 85:25 89:8 | **administer** | 193:5 197:16 | 1:16 2:1 3:1 |
| 94:7 | 7:11 | **agreeing** | 4:1 5:1 6:1,19 |
| **accrual** 65:20 | **admit** 173:20 | 134:14 | 6:21 7:1 8:1 |
| 67:7 | **adults** 175:23 | **agreement** 5:5 | 9:1 10:1 11:1 |
| **accuracy** 71:24 | **advertising** | 26:11 43:24 | 12:1 13:1 14:1 |
| **accurate** 16:23 | 163:18 | 66:17 79:11 | 15:1 16:1 17:1 |
| 40:6 58:10,18 | **advice** 46:3 | 132:23,25 | 18:1 19:1 20:1 |
| 100:4 120:21 | 164:6,10,13,15 | 133:6 142:3 | 21:1 22:1 23:1 |
| 155:4 161:15 | 166:7,25 | 151:2 153:24 | 24:1 25:1 26:1 |
| 178:25 | 173:15 184:21 | 154:4,13,20,25 | 27:1 28:1 29:1 |
| **acre** 147:24 | **advise** 122:7 | 155:17 156:3 | 30:1 31:1 32:1 |
| **act** 66:5 129:12 | **advisor** 8:15 | 157:8,18,23 | 33:1 34:1 35:1 |
| **action** 7:12 | 105:25 | 163:24 184:4 | 36:1 37:1 38:1 |
| 199:17,18 | **aegbr** 159:9 | 184:10 185:5,9 | 39:1 40:1 41:1 |
| **actual** 177:22 | **affiliations** | 197:15 | 42:1 43:1 44:1 |
| 180:11 | 7:20 | **agreements** | 45:1 46:1 47:1 |
| **actually** 49:18 | **afternoon** 6:3 | 143:11 172:7 | 48:1 49:1 50:1 |
| 49:19 76:7,8 | 7:24 9:24 | **ahead** 10:22 | 51:1 52:1 53:1 |
| 108:2,25 109:2 | | 45:9 127:12 | 54:1 55:1 56:1 |

| | | | |
|---|---|---|---|
| 57:1 58:1 59:1 | 141:1 142:1 | **alinor** 3:25 9:5 | **ann** 3:16 |
| 60:1 61:1 62:1 | 143:1 144:1 | **alleged** 184:17 | **annual** 55:2,6 |
| 63:1 64:1 65:1 | 145:1 146:1 | **allow** 48:4 | 55:21 |
| 66:1 67:1 68:1 | 147:1 148:1 | 132:16 | **answer** 10:23 |
| 69:1 70:1 71:1 | 149:1 150:1 | **alson** 3:10 | 11:5 16:14 |
| 72:1 73:1 74:1 | 151:1 152:1 | **amelia** 3:14 | 22:25 23:4 |
| 75:1 76:1 77:1 | 153:1 154:1 | **amended** 22:15 | 29:23 30:19 |
| 78:1 79:1 80:1 | 155:1 156:1 | 27:6 178:16 | 31:4,8 37:14 |
| 81:1 82:1 83:1 | 157:1 158:1 | 181:25 182:5 | 37:18 41:2 |
| 84:1 85:1 86:1 | 159:1 160:1 | **amendment** | 42:6 45:13,17 |
| 87:1 88:1 89:1 | 161:1 162:1 | 177:15 | 45:21 46:9,11 |
| 90:1 91:1 92:1 | 163:1 164:1 | **america** 171:7 | 46:21,24 47:2 |
| 93:1 94:1 95:1 | 165:1 166:1 | **american** | 47:3,17 48:14 |
| 96:1 97:1 98:1 | 167:1 168:1 | 108:15,17 | 50:13,15,23 |
| 99:1 100:1 | 169:1 170:1 | **amount** 49:15 | 51:13 52:17 |
| 101:1 102:1 | 171:1 172:1 | 51:18,25 52:2 | 54:5 64:11 |
| 103:1 104:1 | 173:1 174:1 | 53:7,8,13 | 69:22 78:19 |
| 105:1 106:1 | 175:1 176:1 | 55:17 69:24 | 79:13 80:7,10 |
| 107:1 108:1 | 177:1 178:1 | 74:13 75:14 | 81:10,17 83:12 |
| 109:1 110:1 | 179:1 180:1 | 100:22 124:20 | 105:5,10 107:2 |
| 111:1 112:1 | 181:1 182:1 | 126:20 128:6 | 110:5 113:21 |
| 113:1 114:1 | 183:1 184:1 | 134:11,15,19 | 117:19 120:24 |
| 115:1 116:1 | 185:1 186:1 | 136:4,8 192:19 | 121:10,16 |
| 117:1 118:1 | 187:1 188:1 | **amounts** 75:11 | 141:13 143:22 |
| 119:1 120:1 | 189:1 190:1 | 75:21 84:5 | 144:2 145:17 |
| 121:1 122:1 | 191:1 192:1 | 124:12 127:7,9 | 145:20,25 |
| 123:1 124:1 | 193:1 194:1 | 129:22 130:3 | 146:5 148:13 |
| 125:1 126:1 | 195:1 196:1 | 145:12,22 | 149:9,16 |
| 127:1 128:1 | 197:1 198:1,10 | 146:10,14 | 150:14,18 |
| 129:1 130:1 | 199:1 200:1,3 | **analysis** 164:17 | 153:13,25 |
| 131:1 132:1 | 200:8,20 201:1 | 192:14 | 154:17,22 |
| 133:1 134:1 | 201:3,5 202:1 | **anderson** | 155:10 160:2,4 |
| 135:1 136:1 | 202:25 | 136:18 137:22 | 164:11,12 |
| 137:1 138:1 | **alice** 50:2 | **angels** 49:6 | 166:9,10 |
| 139:1 140:1 | | 170:24 | 170:11 173:14 |

173:16 183:14
184:11,24
187:7,18,19
196:9,22,23
**answered**
30:18 51:9,9
52:8,13 83:4
87:5 144:23
145:7
**answering**
112:5 185:2
**answers** 10:12
42:21 132:8
149:10
**anticipated**
62:20
**anybody** 172:8
189:15
**anymore** 111:7
111:20
**anyways** 119:8
**apart** 21:24
165:3
**apparent**
115:12
**appeal** 125:19
**appealed**
124:24
**appealing**
143:16
**appeals** 125:23
143:25
**appear** 177:10
**appearance**
7:17

**appearances**
7:20
**appreciate**
122:24 189:20
**approach**
174:7
**approached**
132:22
**appropriate**
193:22
**approval**
130:24
**approximately**
104:9
**april** 1:13 6:5
154:4 199:20
200:5 201:7
**argue** 60:6
**arguing** 186:4
**article** 4:23
121:17,24
**aside** 51:21,21
**asked** 30:17
49:24 51:8
52:8,12 68:9
94:18 104:12
111:9 118:12
127:13 137:24
138:2 139:13
162:12 178:17
186:22
**asking** 10:16
13:7 39:11,16
43:6,10 53:4
54:6 79:9

101:22 105:16
106:16 139:25
140:24 141:2,3
164:9 166:12
166:22,23,25
167:2 170:12
181:6 182:7,8
182:9,15
188:23
**ass** 62:16 63:14
108:13
**asserted** 15:18
16:5 124:9
**assess** 25:11
**assets** 17:10,13
35:21 41:15
197:2,3
**associate**
119:13
**associates**
111:9 172:4
**assume** 10:18
**assumes** 149:7
**assuming** 52:2
**assure** 112:15
**attached** 122:9
194:6,19
**attaching**
193:23
**attack** 102:10
102:13
**attacks** 115:7
**attempting**
16:9

**attention** 97:24
100:10,16
118:22 179:23
**attorney** 7:22
23:2 28:11
46:22 47:4,11
47:17 146:2,19
199:17
**attorneys** 2:5
2:12 3:4 8:6
**audi** 186:6,13
**audio** 6:13
**austin** 3:6
11:11 178:4,7
179:15,18
188:25
**authorized**
7:10 99:18
**authorizing**
100:7 156:14
**available**
134:22
**average** 42:3
103:12,12
104:4 108:14
108:17 134:22
**averaged**
142:10
**avi** 3:18 8:8
**avoid** 189:20
**award** 129:5
**awarded**
124:21 127:10
**awards** 124:25
128:7

**[aware - binder]**

**aware** 30:23
43:11 47:24
53:11,14 61:11
76:13 82:22
83:21 85:12,18
86:2 129:25
131:4,9 135:3
137:11 148:21
149:3 150:2,9
156:14 169:15
174:21 183:19
183:23 188:4

**b**

**b** 4:5
**back** 13:11
25:22 44:7
50:22 54:23
58:4 70:20
80:22 81:14
99:10 100:19
104:6 122:7
123:15,18
126:13 135:9
139:9 157:14
160:18,21
176:19 181:16
**bad** 21:14
**bailiwick** 69:5
**ball** 50:4
**ballgame**
117:24
**bank** 15:5
**bankruptcy** 1:2
6:22 14:2,6,12
15:17,22 16:12

17:12,19 18:17
21:25 22:12
26:17 27:3,23
28:7,21,23
30:10,16 31:18
31:22 40:19,23
41:4,8 45:15
46:16 47:15
87:15,18 88:22
91:7 94:18
103:2 105:2,8
110:16 115:17
125:20 129:17
131:17 132:15
132:18 141:24
142:6 149:13
149:20,23
150:5 151:3
156:2 161:13
161:22 171:9
171:24 180:18
184:5 185:6,15
186:3
**banned** 76:23
**bare** 78:9
**barely** 128:15
**barton** 3:5
**baseball** 109:9
**based** 124:5
**basic** 10:8 78:2
**basically** 13:14
18:2,10 22:7
94:20 129:2
142:9 148:7
151:15 152:9

155:23 196:17
**basis** 46:6
66:23 106:2
111:4 161:11
185:19,25
194:23,25
195:8,17
**bates** 159:10
**batted** 155:6
**beautiful**
144:19 167:25
168:4
**began** 89:10
**beginning** 7:21
83:20 122:10
**behalf** 8:9
99:19 150:3
156:8,15
157:14
**behavior** 173:2
**belief** 149:19
**beliefs** 80:25
**believe** 8:17
10:3 23:10
29:23 65:9
67:3,15 69:15
75:13 90:11
126:5 131:15
132:9,13 134:3
143:14 149:12
162:15 163:3
176:25 177:5
183:7
**believes** 59:11

**bend** 116:5
**best** 51:10
65:10 100:4
131:16 132:14
134:15 157:19
158:22 159:20
174:12 175:7
175:15
**better** 42:17
79:6 94:6
95:12 109:12
115:7 192:4,11
**bic** 14:15
**bieder** 9:7
**big** 18:4 22:8
23:18 62:16
63:14 96:2
102:12 105:11
105:12 116:5
128:13 180:16
189:23
**biggest** 105:6
**bill** 44:3 181:13
**billion** 43:13
44:7 45:6 60:4
60:18 61:4,9
127:2 136:25
**billions** 44:2,12
**bills** 21:13,21
77:25 78:3
117:12
**binder** 24:6
34:3 54:24
57:12 72:23
89:20 91:21

**[binder - case]**

119:7 123:19
130:12 133:10
152:14 190:23
**binders** 23:11
23:18
**bit** 23:9 30:21
32:19 83:14
138:25 176:13
188:10
**bizarre** 118:6
**blaming** 151:20
**block** 117:23
**bloomberg**
137:25
**blue** 124:17
**bluffing** 168:8
168:10 169:2,3
**blur** 14:5 22:9
**bob** 63:18 64:7
65:3 67:15,25
68:2 86:6 98:9
155:8 180:4
**bob's** 100:9
**bold** 73:18 93:2
99:14
**booked** 118:23
**bookkeeper**
156:10
**boom** 98:24
**border** 81:23
**bottom** 34:16
34:19 35:2,11
55:15 65:16
66:6,8,10 67:3
90:24 92:23

99:13 131:20
162:19
**bought** 95:19
100:13 189:10
**boulevard** 2:14
**box** 124:17
162:19
**boxes** 161:25
**bread** 18:5
**break** 10:25
11:6 72:22
123:4,6 159:23
160:3,9
**breath** 169:6
**briar** 165:22
**bring** 29:14
34:11 43:23
48:18 62:3
69:3 92:4
100:11 101:8
130:17 133:13
163:13
**bringing**
163:14,18
**broadcasting**
80:18
**broadly** 68:17
**broke** 189:24
189:25
**brought** 100:9
100:16
**browsers** 11:25
**bucks** 96:16
180:15

**buddy's** 98:21
98:22
**budget** 77:14
**built** 190:3,11
**bunch** 39:6
40:14 62:25
63:5,10,14,23
80:5 85:7
153:14 155:21
189:24
**business** 18:18
56:18 82:13
91:11,14 94:8
94:14 95:3,8,9
95:15 96:3,6,6
114:13 115:25
155:11 172:4
172:12,14
173:11
**butter** 18:5
**buy** 19:5 95:17
96:12 101:4,6
147:24 189:3,6
**buying** 96:17
**bye** 169:5,5

**c**

**c** 2:2
**caballero** 3:12
**calculus** 72:4
72:18
**calendar** 162:2
**call** 191:13
**called** 9:16 27:6
**calling** 143:18

**calls** 28:10 31:2
77:5,12 166:4
166:18 171:12
184:7 187:4
**camera** 6:10
97:14
**camped** 116:6
**cancun** 116:12
116:15,20,24
**capacity** 51:2
**captain** 51:12
**car** 103:8
**card** 94:10,11
95:13,21 96:11
98:24 99:6
101:7
**care** 40:21
41:12,16
102:16,20
103:2 112:23
118:9 138:10
138:11,12
175:19 178:21
**career** 43:20
44:11
**cares** 174:19
**carrying**
175:12
**cars** 186:17
**case** 1:9 6:24
8:23 14:7
16:12 21:25
22:12 41:18
57:7 61:20
87:15 88:2

**[case - clothes]**

122:10,22
135:13,15
143:16 179:11
188:12 193:17
193:18 199:13
200:3 201:3
**cases** 97:16
**cash** 55:17
158:7 185:13
**cat** 183:11,13
**categorized**
100:7
**category** 96:7
140:4
**caught** 32:25
**cell** 12:5
**central** 6:4
**certain** 10:21
53:20,24 64:4
68:19 69:17,24
**certainly** 52:12
139:2 141:2
**certified** 1:19
199:4
**certify** 199:5,16
200:9 202:18
202:21
**chair** 120:8
**challenge**
125:19 193:8
**chance** 139:13
**chances** 174:8
**change** 76:10
90:19 132:8
162:6 188:9

**changes** 87:16
88:20 89:5
202:18,20
**changing**
150:24
**chapter** 148:7
172:24
**characterizati...**
159:3
**characterizing**
184:13
**charge** 179:16
181:7
**charging** 181:8
**chasing** 39:3
**check** 154:24
**chico** 11:22
101:7
**chief** 125:11
135:20
**child** 102:15,19
103:2 135:25
136:15 137:12
138:7 139:22
140:5
**childcare** 89:14
**children**
101:21 126:12
142:21 175:4,5
175:11,17
178:19
**children's**
175:9
**chinese** 63:14
100:13

**chose** 140:22
140:25
**chris** 3:20
**christy** 28:16
**chumley** 98:16
**ciera** 3:16 8:11
**city** 2:15
**civil** 76:23
**claim** 31:14,19
35:20 38:24
39:2 126:16
130:3 134:12
134:15,24
135:4,7,13,15
135:18 136:5,9
137:14 138:17
138:23 139:5
139:11 143:15
144:21 146:10
**claimed** 142:12
188:11,15
**claims** 15:17,24
16:4 30:25
32:7 33:12
34:22 35:21
37:3,4,11 38:8
38:16 40:22
48:18 124:9
125:19 129:16
129:25 130:25
132:17 134:20
137:17 138:5
140:13 145:13
145:22 183:19
183:24 187:2

187:15,24
188:5
**clarify** 130:7
161:6 201:9
**class** 34:22
114:13
**clausen** 174:22
174:25 179:20
**clean** 107:16
108:23
**cleaners** 107:20
**cleaning**
107:17 109:2
109:10,17
**clear** 79:5
81:15 122:21
148:15,25
149:2 159:8
169:19 171:17
**clearly** 20:14
111:19 115:10
**client** 23:2,22
23:22 28:11
46:22 47:4,11
47:17 132:2
146:2,19
148:19 171:16
178:14
**clients** 19:11
**cliff** 82:13
**close** 66:12
142:20
**closer** 181:21
**clothes** 109:4

**[cml - continued]**

cml   6:25
cnn   136:17
cocoa   127:19
codes   201:9
coffee   70:22
collect   35:20
collecting   35:4
   35:16
combined   30:8
come   13:11
   24:22 31:21
   41:19 64:13
   75:2 107:21
   114:16,18
   165:21 170:16
   180:16 197:13
comedy   44:23
comes   67:7
   102:5
comfortable
   168:24
coming   80:18
commenced
   196:14
commentary
   190:19
commenting
   189:20
comments
   122:25
commercial
   114:11
committee
   159:13,21

commodity
   173:5
communicable
   135:7
communicati...
   146:3
company   60:22
   94:10,11,15
   95:13 96:2
   125:7 165:21
   168:13
compared
   137:8
competency
   32:3 72:19
   81:4
competent
   17:16 48:14
competitive
   17:21 65:16
   151:17,18
complained
   98:9
complaining
   20:18
complete   106:2
completion
   199:13
computer   12:2
computers
   12:11,12
concept   48:17
   48:19 72:14
   171:23

concepts
   171:19
concerts
   105:12
concludes
   198:9
conclusion   31:3
condo   112:13
condos   174:22
   175:3 178:4,7
   179:4,15,18
   181:14
conducted   6:7
   7:3
confidence
   173:4
confidential
   172:2 173:12
confidentiality
   173:21,24
confirm   118:18
   195:12,18
confirmation
   59:12 115:11
confirmed   41:7
   125:21
confirming
   132:20
conform
   201:11
confuse   148:22
   148:24
confused   93:18
connecticut
   2:12 8:2,6 9:9

16:5 19:4,13
   20:4 32:12,20
   41:13 43:12
   47:20 48:4,22
   124:16,21
   125:12 127:8
   128:11 132:24
   134:24 135:4
   137:25 140:12
   140:18 141:5
   141:21 145:13
connection
   6:11 149:24
conservative
   136:21
consider   14:2
   21:19 27:19,22
   81:5
conspiracy
   174:20
constantly   15:2
construction
   192:19 195:4
   195:11,15,22
   196:5,13,19
contained
   178:12
contested
   114:25 145:10
continue   6:14
   85:8 96:3
   125:18 165:5
   197:16
continued
   25:20 71:5

123:13 132:16
145:5 160:16
198:6
**continues**
18:21
**continuing**
18:12 39:7
**contracts**
156:15
**conversation**
37:16 170:9
**conversations**
143:24 150:15
166:5,21,23
184:8 187:5
**convince** 64:18
76:4
**cooking** 109:4
**cooks** 152:6
**cooksey** 3:14
**cooper** 136:18
137:22
**coping** 32:23
**copy** 4:10
192:7
**corporate** 14:9
**correct** 10:5
24:11 26:15
30:25 36:2
76:19 99:17
100:2 131:22
134:20 156:11
157:6 178:15
186:8 200:12
201:12 202:19

202:22
**correctly** 155:2
**corresponding**
124:12
**cost** 107:17
114:5 180:14
**costs** 175:12,21
175:24 179:4,5
**counsel** 6:19
7:18 9:14
10:20 11:16
13:20 23:11
26:4,20 40:6
54:21 125:11
132:9 135:21
140:22,25
147:21 150:16
150:18 166:6
166:21,23
167:18 171:14
184:22 187:6
197:15
**counsel's** 33:9
45:23 46:3
81:11 172:11
173:15
**count** 91:12
**couple** 10:14
14:3,4 50:11
73:22 89:17
115:24
**course** 159:5
**court** 1:2 6:22
7:8 9:12 15:2
20:6 49:3,16

122:14 174:9
**courthouse**
20:7
**cover** 18:4
**coverage** 119:8
119:11
**covered** 88:5
137:10
**covering**
174:19
**cpas** 58:19
**craig** 3:17 8:18
**cramdown**
59:7
**crash** 66:19
**crazy** 49:15
**creates** 125:12
125:13
**credit** 95:20
96:11 98:24
**creditor** 52:22
75:3 181:5,18
**creditors** 29:13
29:20 33:21
37:2,10 38:7
40:21 59:16
61:2,12,20
69:13,25 70:7
73:24 74:5,14
74:19 82:3,19
83:18 94:4
129:22 166:16
167:6 174:12
179:11 182:13

**crew** 95:17,19
96:12 165:8
168:14
**cro** 9:2 96:18
97:5 98:3
151:6
**cross** 193:17
**crowe** 2:4
**crr** 199:24
**cruel** 44:15
**crystal** 50:4
**cuckoo** 50:7,7
127:18
**current** 150:9
161:21 162:14
162:18 167:8
178:12
**currently** 29:3
68:17 85:6
175:13
**cut** 89:9,13

| d |
|---|

**d** 9:16 59:7
**dad** 102:6
117:4,11
**dad's** 117:8
**dallas** 2:7
**damages**
124:20 128:7
**damn** 80:13
165:9
**dance** 49:6
170:24
**daniel** 3:19

**[date - developed]**

**date** 24:16 34:7
36:15,16 55:18
57:16 62:11
89:2,23 92:2
119:25 130:15
133:17 152:17
158:16 161:21
176:8 189:8
191:2,11
195:10 199:19
200:5 201:7
**dated** 199:20
**dates** 14:5
16:24 186:9
**daughter**
112:25
**david** 3:21,24
28:17 86:7
**day** 103:9,11
103:12 104:4
104:10 106:14
108:24 110:2
167:25 168:4
170:25 200:13
**days** 14:10
103:25 109:22
109:24 110:18
111:10 112:24
112:24 195:9
**de** 126:2
142:19
**dead** 42:3
**deal** 16:9 17:3
44:25 45:9
51:18,22 76:15

76:17,20 77:7
80:4,12,24
101:10 102:12
109:19 165:8
168:16 170:22
170:22 178:22
**dealing** 142:16
**deanna** 3:13
**debate** 120:14
170:23 185:22
**debating** 49:4
**debtor** 1:8,17
2:5 35:5,16,21
59:10
**debtor's** 4:10
**debts** 44:15
46:18
**december**
186:7
**decided** 49:3
**decision** 59:24
167:20
**decisions** 168:7
**declaration**
4:25 130:22
133:23 200:2
**declare** 99:14
131:20
**declaring** 15:21
**declining**
145:17,20
**defer** 52:15
**defined** 36:22
55:7

**deflation** 78:24
**degradation**
174:15
**degree** 40:10
**dela** 136:3,8
138:24 141:16
142:24
**delay** 132:15
**delivered** 23:19
**della** 137:22
138:10
**denying** 144:17
**depend** 51:24
**depends** 6:9
51:17
**depo** 36:8,9
**deposed** 10:4
**deposing** 64:10
**deposition** 1:16
4:7 6:7,18 7:2
10:8 12:2,16
13:16,21 25:5
25:20 39:23
52:25 71:5
87:22,25 88:4
114:23 119:13
121:12 122:19
123:13 145:11
160:16 181:8
193:4,24 194:6
194:9,19
197:17 198:6
199:13 200:5
201:2,7 202:2

**depositions**
88:13,16
112:19 173:22
**depressing**
22:4
**described** 17:9
24:14 34:5
57:14 62:9
63:17 89:21
91:24 119:23
130:13 133:15
152:15 158:14
176:6 186:22
190:24 191:9
**describes**
161:12
**destroy** 20:16
174:5
**detail** 87:12
88:6
**details** 31:23
32:10 39:21
40:8,17 56:7
68:9 76:11
78:5 89:7,11
117:13 149:14
175:18 176:2
185:23 195:7
**determining**
84:23
**detrimental**
17:25 18:15
**developed**
112:3

**[devices - drenga]** Page 12

devices 12:5
devolved 170:8
died 126:12
difference
 82:23
different 33:20
 61:16 69:5
 92:8 112:13
diming 91:16
 100:18
dip 148:6,17
direction
 199:10
directs 10:21
disagree
 151:25 194:2
disastrous 17:7
dischargeable
 30:24 31:13
 32:7 33:12
 35:20 37:3
 38:7 49:2
disclose 113:12
disclosed
 119:12
disclosure 4:13
 57:4,6,13,24
 58:9 123:20
 126:14 135:9
 139:10,15
disclosures
 159:13
discover 16:16
discuss 49:5
 193:21

discussed 13:15
 143:20 146:24
 171:13
discussing
 133:24 179:21
discussion
 194:12
discussions
 147:4,6,19
 150:10,17
 172:12,14
dishes 108:2
disingenuous
 19:12
dispose 15:17
dispute 66:24
 161:12 185:19
 185:25 194:24
 194:25 195:9
 195:17 196:11
disputing 92:18
distinction
 140:21
distinguish
 140:18
distinguishes
 141:4
distributable
 73:18
distribution
 55:3,7,21
 64:24 132:19
distributions
 56:25 81:20
 82:3

district 1:3
 6:23
division 1:4
 6:24
docket 177:11
document
 24:14 25:25
 27:20 30:14
 34:5 39:11
 57:14 58:3,6
 58:24 62:6,9
 63:8 66:25
 73:2 78:15
 81:15,19,24
 85:12,19 89:19
 89:21 90:4,18
 91:24 92:20
 99:13,25
 100:21 118:15
 119:23 123:18
 123:24,25
 126:14 130:13
 130:20 133:15
 133:19,20
 134:5 152:11
 152:15,23
 153:3,19 154:7
 154:11,17
 156:7,13
 158:14,18,21
 159:4,19
 160:23 161:4,6
 161:7 176:6,10
 176:16 177:8
 177:14 178:13

178:24 181:21
 182:4,9 183:6
 190:21,24
 191:9,20,25
 193:10,12,16
 193:23 194:14
documentation
 99:17
documents 4:8
 11:20,25 12:24
 13:3,5,10,20,21
 23:15,23 24:7
 24:18 25:12
 28:4 105:14
doing 37:20
 42:12,23 43:6
 43:7 45:2
 77:22 88:10
 89:8 108:3
 109:5,6,25
 121:11 148:7
 163:19 174:11
 180:3
dollars 15:3
 44:2,13 50:6
 83:19
downsize
 108:22
dramatically
 82:6
draw 111:11
drawn 16:19
draws 195:2,15
drenga 3:13

**[driver - e]** Page 13

**driver** 2:9 8:12
8:12 12:7,22
13:17 15:20
16:6 21:9
22:22 23:16
24:5,10 26:4
28:9,20 30:3
30:17 31:2,5
31:20 32:17
33:17,23 34:15
34:20 35:8,12
36:7 37:6,12
37:25 38:17,21
38:23 39:10,14
40:24 41:20
42:25 43:4,17
44:8 45:16,20
45:24 46:7,19
48:6 51:7 52:5
52:18 53:16
54:2,9,16
56:11 57:18
59:4 61:13,21
62:7 63:18
71:17 73:3
77:4,11 78:13
79:4 81:8 83:3
84:6,13 86:25
87:20 88:23
91:4 92:11
93:3,19 104:5
105:20 106:18
108:9 110:4,10
110:24 111:5,8
111:23 112:5

113:9,16 114:4
116:9,21 117:2
117:17 119:9
120:11,16,20
120:23 121:3,7
121:18,22
122:20 124:3
126:5,7,9,22
127:11 130:4
131:25 134:7
135:11 139:12
139:17 140:10
140:20 141:10
143:17 144:22
145:4,23
146:17 147:13
148:11,15,20
149:6 150:12
150:22 151:4
153:6 154:5,21
156:16,20,24
157:10 158:9
159:2,11,17,25
160:6 161:5
164:8 166:3,17
167:7 170:7
171:11,25
172:20 173:10
173:17 174:2
177:9,19,24
178:3,10
179:16 181:6
182:2 184:6
185:16,21
186:14,18

187:3,11,25
188:7,16
189:13 190:5,9
190:12,15
191:3,6,12
192:3,10 193:9
194:5,17 195:5
196:15,21
197:22
**drop** 82:6,24
**drug** 122:13
**dude** 182:25
**duly** 9:17 199:8
**dunleavy** 2:4
**duties** 61:12

**e**

**e** 1:7,16 2:1,2,2
3:1 4:1,5,7 5:1
6:1,21 7:1 8:1
9:1,16,16,16,16
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1,3
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1,19 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1

53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1

**[e - estate]**

| | | | |
|---|---|---|---|
| 138:1 139:1 | **earlier** 52:20 | **electricity** 99:5 | **enslavement** |
| 140:1 141:1 | 71:11 88:2 | **electronic** | 81:6 |
| 142:1 143:1 | 94:19 100:20 | 11:24 12:4 | **ensure** 58:9 |
| 144:1 145:1 | **earn** 56:14 | **elon** 44:3 | 100:6 |
| 146:1 147:1 | **earned** 158:7 | 129:14 | **entered** 46:11 |
| 148:1 149:1 | **earners** 109:21 | **emerge** 40:23 | 130:2 149:21 |
| 150:1 151:1 | **earning** 109:8 | 41:4 47:15 | **entering** 150:3 |
| 152:1 153:1 | **earnings** 62:20 | **employed** 8:16 | **enters** 44:22 |
| 154:1 155:1 | **easier** 192:7 | **employee** 157:9 | **entertainment** |
| 156:1 157:1 | **east** 116:6 | 199:17 | 90:25 91:7 |
| 158:1 159:1 | **eastern** 1:12 | **employees** | 92:21 93:7,10 |
| 160:1 161:1 | **easy** 106:23 | 102:20 | 94:3 95:10 |
| 162:1 163:1 | **economics** | **employing** | 105:7,19 |
| 164:1 165:1 | 68:15 | 173:9 | **entire** 50:10 |
| 166:1 167:1 | **economy** 79:2 | **employment** | **entitled** 1:17 |
| 168:1 169:1 | **effect** 17:25 | 5:5 151:2 | 112:4 |
| 170:1 171:1 | **effective** 36:15 | 153:24 154:4 | **equity** 192:15 |
| 172:1 173:1 | 36:16 55:18 | 154:13,19,25 | **equivalent** |
| 174:1 175:1 | **effectively** | 156:2 157:8,23 | 74:19 |
| 176:1 177:1 | 29:19 | 163:24 164:22 | **erica** 183:25 |
| 178:1 179:1 | **effort** 187:13 | 171:8,23 | **errata** 201:2 |
| 180:1 181:1 | **efforts** 186:24 | **ended** 43:2 | 202:2 |
| 182:1 183:1 | 188:5 | 176:22 | **errors** 201:13 |
| 184:1 185:1 | **eight** 104:8,9 | **ends** 160:13 | **esq** 2:9,17,19 |
| 186:1 187:1 | 146:15 185:10 | **enforce** 32:7,14 | 2:21 3:8,12,13 |
| 188:1 189:1 | 189:8,14 | 33:12 37:4,10 | 3:14,15,16,17 |
| 190:1 191:1 | **either** 54:18 | 38:8,24 39:2 | 3:18,19,20,21 |
| 192:1 193:1 | 97:11 | 40:22 48:5,10 | 3:22,23,24,25 |
| 194:1 195:1 | **electing** 32:21 | 48:23 | **estate** 61:12 |
| 196:1 197:1 | 33:11 35:3,14 | **enforced** 47:21 | 99:19 131:17 |
| 198:1 199:1 | 35:18 55:15,16 | **enjoined** 35:4 | 132:15 134:16 |
| 200:1,4,8,20 | 55:20 | 35:15 | 179:4 183:20 |
| 201:1,4,5 | **election** 52:19 | **enjoy** 48:8 | 183:24 187:2 |
| 202:1,25 | 52:24 | **enlighten** | 187:23 196:20 |
| | | 129:19 | |

**[estimate - families]**

**estimate**  65:10
**estimation**
  56:15
**event**  18:4
  96:25
**events**  13:6
  77:17
**everybody**  6:3
  16:25 58:12
  96:17 141:18
  152:3,3
**evidence**
  111:17 149:7
**ex**  85:7,16
  197:7
**exact**  111:2
  145:6 189:7
**exactly**  16:23
  39:18 112:7
**exaggerating**
  112:21
**exam**  88:3
**examination**
  4:2 9:21
**examine**
  193:17
**examined**  9:18
**example**  41:13
  126:15
**examples**  96:22
  97:21 98:6
**excellent**  12:14
**excerpt**  193:20
**excruciating**
  88:6

**excuse**  190:9
**execute**  182:14
**executed**  151:6
  200:13
**execution**
  182:16
**exempt**  29:5,5
  35:21 197:2,3
  197:7,10
**exhibit**  4:7,10
  4:13,15,17,20
  4:23,25 5:2,2,2
  5:4,7,9,11
  23:14 24:13,15
  24:21 25:6
  26:2 34:4,6
  39:19 54:23
  57:11,15 61:25
  62:10 72:21
  89:19,22 91:23
  91:25 92:12
  99:11 107:7
  119:4,24 120:3
  123:18 130:11
  130:14 131:10
  133:8,10,16,22
  134:6,9 135:10
  139:16 146:10
  152:13,16
  158:12,15
  160:24 176:5,7
  190:22,25
  191:4,10,15
**exhibits**  122:8

**exist**  17:5 49:23
**exists**  49:23
**exorbitant**
  125:4,17
**expect**  30:9,15
  42:11 45:14
  48:11
**expected**  65:10
**expecting**
  82:12
**expediency**
  35:13
**expense**  96:6,6
  105:7 132:16
  178:8
**expenses**  61:17
  62:21 64:24
  84:23 85:5,9
  86:3,15,20,24
  87:12 89:9,13
  95:3,9 97:6
  100:6 114:17
**expensive**
  104:24
**experts**  67:3
  71:18
**explain**  33:18
**extended**  36:24
**extent**  22:24
  28:10 31:8
  35:19 37:13
  40:25 46:20,25
  105:4 143:18
  145:24 150:14
  164:9 166:4,18

  171:12 172:2
  178:11 179:3
  184:7,12 187:4
**extra**  69:3
  135:25
**extreme**  56:17
  56:21
**eyes**  113:20

**f**

**fabulous**  14:17
**face**  12:8 128:3
  142:15
**fact**  18:2 22:21
  26:18 106:18
  106:25 107:2
  109:21 144:17
**facts**  106:21
  149:7 186:23
  186:25 201:11
**fair**  72:7 136:2
  159:15 164:21
**faith**  21:15
  56:20
**fall**  21:23 82:13
**falls**  165:3
**false**  15:23
  144:18
**familiar**  31:24
  48:16,18 57:5
  61:18 62:17
  70:16 131:10
  133:18 152:22
  153:3 174:24
**families**  196:13

**[family - form]**

family 86:7
  101:13 102:4
  122:12 192:15
fanciful 174:16
fantasy 49:22
far 50:19 115:4
fast 76:6
fbi 135:21
  138:5
fbi's 125:11
feasibility
  59:11
february 4:21
  91:20 92:7,16
  93:9 99:11
federal 49:2
  199:13
feed 180:16
feel 122:22
  132:4
feeling 167:12
feels 142:16
fiasco 147:2
fiction 50:20,21
field 18:8
fighting 98:3
figure 55:3
  105:15 164:18
  197:20
figures 82:23
file 14:11 45:14
  177:23
filed 6:21 14:6
  14:8,8 16:13
  17:12 27:8,9

57:6 68:17
  90:9 134:9
  140:22 155:25
  161:14,21
  177:12 178:25
files 117:6,8
filing 14:2
  34:17 41:10
  100:7 104:25
  105:7 110:16
  115:17 161:13
  185:14 186:3
finances 65:11
financial 8:15
  71:18 84:25
  105:25 164:14
financially 7:13
  29:2 199:16
financing
  113:15
find 17:4 85:25
findings 5:12
fine 83:8,9
  160:4 173:2
  191:6
finish 121:15
firm 7:9
first 9:17 13:25
  23:24 49:11
  73:8 118:15
  124:16 140:8
  152:24 153:2
  153:23 154:2,3
  154:19,23
  155:16 161:17

163:24
fish 180:5,6,7,9
  180:10,11,12
  180:16,18,20
  180:21,25
  181:4,11,14,18
  181:22,24
  182:11,14,16
  182:19,21,22
  182:23,24
  183:3,7,17
five 36:4 37:22
  70:21 103:11
fixed 189:22
flew 114:9
flood 189:23
flores 156:9,19
  157:3
fly 44:17,20,21
  65:25 114:11
focusing 27:7
follow 31:15
  120:25 184:21
following 114:3
follows 9:19
  25:20 71:5
  123:13 160:16
  198:6
food 95:17
  96:17 100:13
  101:7 109:4
football 18:7
forecast 62:20
  62:23 71:23
  81:24

foregoing
  99:15 131:21
  199:5,7,10,12
  200:11
forever 41:25
  42:2
forgive 142:14
forgot 180:10
form 15:20
  16:7 17:16
  21:8 22:22
  30:3 32:18
  33:23 37:6
  40:24 42:25
  43:16,18 44:8
  45:16 48:6
  53:16 56:11
  61:13,21 71:17
  77:5,11 78:13
  81:6,9 84:6
  104:5 105:10
  108:10 117:18
  126:22 127:11
  130:4,6 140:20
  141:8,11
  146:22 148:12
  149:6 150:7
  151:4 156:5,16
  156:20 157:10
  158:9 166:19
  184:15 185:17
  185:21 186:14
  186:18 195:5
  196:16,21

**[formed - goes]**                    Page 17

| | | | |
|---|---|---|---|
| **formed** 167:9 167:11,17 | **frustration** 152:7 | 71:20,22 84:24 | **giving** 119:19 |
| | | **g** | **glass** 161:2 |

formed 167:9
167:11,17
forth 131:5
199:6
forward 43:23
89:3 125:24
143:11
foundation
126:23
four 26:7
101:24 155:6
185:14
franchise 67:7
frank 45:7
frankly 77:13
free 5:4,12 8:23
8:25 11:13
18:17 29:12
53:2 54:14
69:2 70:7 73:8
76:22 132:4
freeman 3:23
8:21,22
freeze 189:23
friday 103:23
front 11:21,23
25:25 29:10
30:11,14 78:16
85:10,14,18
89:11 90:10
152:19 161:7
185:24 186:5
195:13
frustrated
152:4

frustration
152:7
fss 42:14 67:14
81:20 82:3,12
82:17,25 83:20
100:25 102:20
103:19,23
108:6 122:10
151:2 154:20
155:25 156:3,8
156:15 157:14
158:7 162:9
163:4,8,20,22
165:4 166:2,15
167:4 171:10
172:17 192:15
193:16 195:3
197:9
fss's 68:9
full 12:11 58:13
59:17 61:3
101:24 102:2
143:12 155:10
fully 132:10
167:8,11,16
179:5
fun 108:25
funding 94:21
funds 181:5,19
further 73:18
81:18 110:25
176:13 199:12
199:16
future 29:7
64:21 70:13

71:20,22 84:24
**g**
g 76:15
gained 37:15
galaxies 47:23
games 80:5
garden 2:15
garrison 2:11
8:2
gasoline 103:7
gates 44:3
gdp 49:23
127:14
general 21:2,4
26:23,24 28:25
34:22 50:23
65:12 86:7
129:13
generate 68:25
getting 39:17
40:2 60:9
72:14 74:5,5
83:19 93:5
109:17 143:12
147:3
giant 16:15
62:16
give 19:15 22:3
42:20 85:20
113:24 125:9
139:12 186:25
given 14:15
25:6 61:19
88:23 105:24
134:21 194:14

198:10 199:11
giving 119:19
glass 161:2
192:2
glasses 160:8
go 6:15 10:22
20:14 25:14
33:9 36:10,13
41:15 49:16
54:23 70:20,23
76:6 77:16,24
91:15 92:19
93:22 94:25
98:19 99:12
102:22 104:6
108:21 109:14
110:12 116:7,8
116:15 117:21
118:4 119:3
123:17,23
127:12 135:9
135:15 139:9
149:20 153:18
160:5,11
165:12 167:14
169:5 174:9,9
176:12,19
181:16 187:12
191:24 197:19
198:2
goes 29:12,17
69:13,13,14
72:4 73:6
76:14 125:12
148:6,16,21

**[goes - half]** Page 18

| | | | |
|---|---|---|---|
| 155:22 | 118:2,15 119:3 | 21:4,20 | 56:4 94:6 |
| **going** 6:3 14:16 | 120:14,16,25 | **good** 6:2 7:23 | 100:14 104:3 |
| 16:22 22:23 | 121:15,16 | 9:24 56:20 | 115:21 116:20 |
| 23:3,13 24:12 | 122:12,18,25 | 63:12 76:15,17 | 128:23 157:5 |
| 24:20,22 25:7 | 123:9 125:24 | 76:20 97:9 | 159:12 179:22 |
| 26:14 28:9 | 126:13 129:22 | 98:20 105:22 | 197:14 |
| 29:22 30:21 | 130:10,11 | 151:13,24 | **guessing** |
| 33:3 34:2,3,15 | 133:10 138:4 | 183:12 | 154:10,12 |
| 34:18 37:12,17 | 140:14 141:8 | **goose** 18:22,25 | 180:21 |
| 38:18,24 39:4 | 142:9 143:17 | 19:23,24 20:12 | **guest** 98:13,23 |
| 39:14,17 42:9 | 143:25 144:22 | 20:13,23,24 | **gutters** 189:25 |
| 42:23 43:6,13 | 145:4,23 146:4 | 21:4,20 | **guy** 18:14 |
| 44:6 45:20 | 146:21 149:13 | **great** 130:17 | 64:14,25 98:15 |
| 46:19,23 49:5 | 150:13 152:11 | 165:8 183:9 | 155:11 171:5 |
| 50:4,22 51:7 | 152:12 154:2,5 | **greater** 55:20 | **guys** 15:8,10 |
| 52:5,6 56:19 | 158:12 159:2,9 | 69:19 70:14 | 18:21 19:22 |
| 56:24 57:11 | 164:8 165:18 | 72:7,14 | 50:3 80:12,22 |
| 59:5 60:6 | 165:25 166:3,8 | **green** 73:23 | 93:22 103:4 |
| 61:15 65:23 | 166:17 167:13 | 75:12 | 106:6 107:14 |
| 66:4 67:10 | 168:13,24 | **groceries** 93:14 | 108:18,23 |
| 70:6 71:21 | 169:5,16 | 93:16 100:22 | 117:5,22 125:9 |
| 72:20 75:22 | 170:23 171:11 | 100:25 101:3,4 | 165:6,14,21 |
| 76:21 77:7,24 | 172:5,20,21 | 101:11 | 167:13 168:21 |
| 78:7 79:11 | 173:5,5,10,13 | **gross** 44:12 | 170:7,16,18,18 |
| 80:7,15 81:9 | 173:16 176:5 | 163:20 | **h** |
| 83:3,18 84:9 | 177:9 184:10 | **grossing** 103:3 | |
| 84:24 85:8 | 184:14,18 | **ground** 10:8,15 | **h** 4:5 |
| 86:3 87:20 | 185:22 187:3,6 | **group** 28:19 | **habit** 95:13 |
| 89:18,19 91:20 | 189:13 190:21 | 97:12,13 | **half** 12:18 |
| 91:22 95:15 | 191:24 194:3 | **groups** 33:5 | 16:20 66:3 |
| 97:2,18 99:4 | 194:12 196:2,8 | 141:21 | 68:18 69:5,7 |
| 105:3 110:24 | 196:15 198:8 | **guarantee** | 74:5,5 82:17 |
| 113:9 114:2,14 | **golden** 18:22 | 53:20,24 54:12 | 115:21 116:11 |
| 114:21 115:13 | 18:25 19:23,24 | **guess** 31:15 | 116:12,20 |
| 117:20,21 | 20:12,12,23,24 | 42:17 47:12 | 129:11 151:19 |
| | | | 155:18 |

hallucination
142:17
**hand** 16:2
**handing** 96:11
**handled** 78:6
**happen** 56:19
169:7 171:7
**happened**
16:12 17:11,18
88:15 156:22
156:23
**happening**
71:22
**happens** 56:5
56:22 97:25
**happy** 10:17
39:12 54:3
88:8 106:14
123:6 194:22
**harassed**
170:14
**harassing** 87:4
87:8
**harassment**
110:6,8 121:4
**hard** 26:21
38:4 67:4 93:4
118:11 191:12
192:7 197:18
**harry** 136:17
**hawaii** 110:17
110:22 111:19
112:3,11,17,24
117:16 118:19
119:11 120:22

**hazelton** 8:23
**hbo** 112:19
119:5 145:19
**head** 49:6
170:24
**headache** 13:13
**header** 90:20
**headers** 90:19
**heading** 59:6
**headline** 183:9
**heads** 79:21
**hear** 64:10
102:11 192:24
192:25
**heard** 15:2
140:8 147:4,5
148:18 173:22
**hearing** 14:16
**heart** 102:10,12
**hell** 40:4 41:22
**helmets** 18:9
**help** 54:9,10
68:5 155:11,14
170:18
**helped** 117:12
178:19
**helpful** 20:21
22:17 32:22
149:19 157:21
**hey** 97:17
**hieroglyphs**
22:8,14
**high** 109:8
168:21

**higher** 70:2
76:12 104:21
**historic** 87:17
88:21
**hitting** 34:21
**hoa** 180:7,22
181:12,22
183:5
**hockley** 139:14
**hockley's** 139:4
139:11
**hold** 30:24
31:13 38:21
93:3 169:6
**holder** 35:19
**holds** 183:20
**home** 44:12
101:9 102:8
108:21 192:18
195:3,11,14,22
196:5,19
**homestead**
188:12,13,15
188:25
**honest** 40:3
62:16 153:15
**hook** 30:24
182:13 196:13
**hope** 15:16
18:19 56:17
65:13
**hopes** 132:24
143:12
**hoping** 16:3
18:16

**host** 136:17
**hosts** 109:10
**hotel** 112:10
**hotels** 112:14
**hour** 12:18
27:14 98:13,20
121:7 181:9
**hours** 12:18
26:7 103:9,14
103:15,17,19
103:22 104:4,8
104:8,10,11,13
104:14,22
**house** 14:14
89:14 101:9
104:15 107:16
107:17 108:23
109:17,23
168:18 169:9
169:11 190:3
**housekeeper**
109:13,16
110:3
**housekeeping**
107:10 108:7
108:16,20
**houses** 109:11
**houston** 1:4
6:23
**huckleberry**
165:13
**huge** 16:25
98:12,16
138:13

**hugely** 98:17
**hum** 92:24
  100:24 107:12
**hundreds** 15:3
**hunt** 17:4
**hurt** 174:8
**hypothetical**
  42:20,21 44:5
  51:12,16

**i**

**idea** 25:9 30:15
  33:7 35:23
  41:22 42:13
  43:3 44:9,14
  45:11 48:15
  64:25 65:19
  66:3,22 67:8
  67:12 71:21
  77:23 84:7
  86:17 137:23
**ideas** 169:14
**identification**
  24:15 34:6
  57:15 62:10
  89:22 91:25
  119:24 130:14
  133:16 152:16
  158:15 176:7
  190:25 191:10
**identify** 17:17
**ignore** 98:4,4
  188:22
**imagine** 60:10
  61:6 74:24
  91:17 135:24

136:10,14,20
**implemented**
  155:18 157:11
  157:24
**implying**
  112:20
**important**
  27:20,23 33:15
  33:20,21 70:5
  70:12 106:20
  138:14
**impressed** 72:2
**improper**
  115:15 193:24
**improve** 18:18
**improvements**
  189:9
**inaccurate**
  119:20
**incentivize**
  69:4
**incentivized**
  70:8
**included** 95:8
  96:5
**including** 7:19
  88:14
**income** 5:7
  29:8 61:16
  64:23,23,24
  65:21 68:19,20
  69:8,19 70:2
  70:14 71:16
  72:8,15 73:13
  73:19 75:7

82:17,25
  158:25 161:12
  161:18
**inconsequent...**
  174:6
**incur** 97:5
**indentured**
  76:22
**india** 127:14
**indicated**
  128:15
**individual**
  52:17 187:12
  187:13
**infinity** 47:22
  48:2
**inflation** 78:23
  101:16
**inflationary**
  79:2
**information**
  28:12 37:15
  47:10 58:17
  106:5,9 172:3
  173:12 178:11
**initial** 5:12
**injunction**
  31:25
**innovating**
  17:23
**innovative**
  17:21
**insanity** 170:15
**instruct** 22:23
  23:3 37:18

45:21 46:23
  81:9 121:16
  144:2 146:4
  150:13 166:8
  173:14 184:10
  184:23 187:6
  187:18
**instructing**
  121:9
**instruction**
  45:23 81:12
  120:23 172:11
  188:2 196:22
**instructions**
  81:17 113:24
  115:15 121:2
**intend** 48:3,24
  80:11 84:4
**intends** 43:7
**intent** 60:13
**intention**
  112:16 166:13
  166:14
**interest** 131:16
  197:9
**interested** 7:13
  74:9 153:11
  173:8 199:16
**interests**
  132:14 134:15
  174:12
**interjections**
  79:19
**internet** 6:11
  11:25 128:13

**interrupt**
146:23
**interview**  155:8
**interviews**
94:15
**investigate**
186:25 196:3,9
**investigated**
15:25
**investigating**
187:23
**investigation**
5:13 16:16
17:9,13
**invoices**  64:23
**involved**  58:20
146:13 147:7
152:3 164:4
175:19 187:22
**irrelevant**
119:19
**irritated**  98:11
**irs**  29:18
**issue**  111:13
179:12
**issues**  13:11
115:11 152:8
184:17
**item**  93:16 95:2
**items**  107:10

**j**

**j**  1:18 9:16
199:23
**james**  7:5

**january**  4:18
90:13 91:8
161:20
**job**  95:12 97:9
102:22 103:6
108:6 109:8,19
170:20
**jones**  1:7,16 2:1
3:1 4:1,25 5:1
5:7,9 6:1,19,21
7:1 8:1,13 9:1
9:24 10:1 11:1
12:1,15 13:1
13:25 14:1
15:1 16:1 17:1
18:1 19:1 20:1
20:12 21:1
22:1 23:1 24:1
25:1,24 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1,3 37:1
38:1 39:1 40:1
40:5 41:1,24
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1,17 55:1
56:1 57:1 58:1
59:1,21 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1

70:1 71:1,10
72:1 73:1 74:1
74:9 75:1 76:1
77:1 78:1 79:1
80:1 81:1,5
82:1 83:1,16
84:1,16 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1,16
105:22 106:1
106:15 107:1
108:1,16 109:1
110:1 111:1
112:1,11 113:1
113:7 114:1
115:1 116:1
117:1 118:1
119:1 120:1,2
120:22 121:1
122:1,13 123:1
123:17 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1,3
134:8 135:1
136:1 137:1
138:1 139:1

140:1 141:1,3
142:1,7 143:1
143:3 144:1
145:1,18 146:1
146:21 147:1
148:1,18 149:1
150:1 151:1
152:1 153:1,10
154:1 155:1
156:1 157:1
158:1 159:1
160:1,22 161:1
162:1 163:1
164:1 165:1,23
166:1,24 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1,5,21
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1,16
183:1,15 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1,15
193:1,17,18
194:1 195:1
196:1 197:1
198:1,10 199:1
200:1,4,8,20
201:1,4,6
202:1,25

**[jordan - koskov]**

| | | | |
|---|---|---|---|
| **jordan** 28:15 | **kids** 102:4 | 54:18,19 56:20 | 147:10,14 |
| **judge** 44:19 | 139:25 | 57:2 61:14,22 | 148:3,13 149:9 |
| 119:12 121:23 | **kill** 180:24 | 63:22,24 65:15 | 149:14,15 |
| 122:11 151:7 | 182:17 | 65:24 67:11,23 | 150:23 151:8 |
| 194:7 | **killed** 18:21 | 68:4,4,4,5,11 | 151:21,23 |
| **judgment** | 19:23 139:24 | 68:12,13 69:6 | 154:13,16 |
| 110:11 | **killing** 20:10 | 69:9 72:4 | 155:15,19 |
| **judgments** | **kimpler** 2:21 | 74:11 75:4 | 156:6,17 |
| 15:11 32:14 | 8:5 | 77:3,6 78:5,8,8 | 157:12,20 |
| 47:20 48:5,11 | **kind** 32:25 39:5 | 79:14,24 80:17 | 158:2,4,10 |
| 48:23 | 56:16 127:15 | 80:19 81:2 | 162:17 163:21 |
| **jury** 128:17 | **king** 50:4 | 82:10,16 83:5 | 163:23 164:20 |
| **k** | **kitchen** 152:6 | 83:12,16 84:9 | 165:6,7,9 |
| | **knew** 125:5,14 | 84:16,21 86:16 | 167:20 168:20 |
| **k** 3:22 | 127:2 136:13 | 86:21 87:2 | 171:6 179:2,7 |
| **kangaroo** | 143:6 144:5 | 89:9 90:15 | 179:10,13,23 |
| 49:16 51:12 | 150:21 | 93:24 95:24 | 182:7 183:13 |
| **kathleen** 3:15 | **know** 10:16 | 96:3 98:9 99:9 | 185:3 187:8,10 |
| 8:24 | 11:2 13:23 | 104:11 105:11 | 187:20 188:7 |
| **kauai** 110:23 | 16:14 17:14 | 105:13,17 | 190:4,6,7,13 |
| **keep** 14:16 29:3 | 18:22,22 19:20 | 106:22 111:25 | 191:16 197:11 |
| 29:8 71:15 | 20:2 21:23 | 112:7,22 114:6 | **knowing** 106:7 |
| 72:7 75:22 | 22:19 27:11,18 | 118:23 119:2 | **knowledge** |
| 79:21 82:17 | 30:12,19 31:11 | 119:22 122:23 | 16:11 26:10,16 |
| 91:10 96:9 | 31:23 32:4,9 | 125:23 126:2 | 64:8 65:4 |
| 116:2 119:18 | 32:11,16 33:3 | 127:16,24 | 100:4 129:21 |
| 167:14 168:13 | 33:14 36:2 | 128:3,20,24 | 173:9 175:8,15 |
| 169:21,22,24 | 37:8,25 38:13 | 129:15 135:2,6 | 178:20 |
| 169:25 170:2 | 39:10,15,20 | 137:18 138:19 | **known** 47:22 |
| **keeper** 109:23 | 40:4,8,11,13,15 | 139:6,23 140:2 | **knows** 18:14 |
| **keeping** 68:18 | 40:17 41:9 | 140:3,6,7 | 56:19 126:23 |
| 69:7,10,19,25 | 42:6,7,22 | 141:12,14,18 | **koskoff** 9:6,6 |
| 74:18 75:15 | 47:19 49:7,12 | 143:4,5 144:8 | **koskov** 125:13 |
| 82:25 84:2 | 50:5,9 53:10 | 144:9,12 | 125:13 |
| **kelly** 126:15 | 53:17,19,23 | 145:16 146:7,8 | |

**[kyle - longer]**

**kyle** 2:21 8:5

**l**

**l** 9:16
**la** 126:2 127:15
  127:15 128:4,4
  128:7,7,8,8
  129:8,8 137:14
  137:15 138:2,2
  142:20
**land** 49:22
  127:15 128:4,7
  128:9 129:9
  137:15 138:2
**landon** 3:3
**large** 23:18
  142:9
**largest** 129:5
  132:17 135:13
  135:15
**lasts** 36:3 39:23
**late** 14:7
**laugh** 49:25
**laundry** 108:2
**law** 10:11 40:9
  86:7
**laws** 200:10
**lawsuit** 125:12
  125:13
**lawyer** 15:22
  16:8 22:13
  28:7,13,16,17
  28:18 37:7
  40:19 44:16
  47:8 58:14
  121:2 184:9

187:14,18
**lawyer's**
  164:13
**lawyers** 18:23
  19:3,10 20:4
  47:13 58:19
  77:14 152:3
  158:22 159:21
  164:11
**learned** 47:8
**leave** 165:18
**left** 21:23
**legal** 31:3 78:2
  143:19 166:7
**legalese** 40:19
  132:10
**legally** 148:21
**legitimately**
  66:16
**lemmon** 3:8
  8:19,20 21:7
  24:17,24 25:10
  43:15 130:5
  141:7 146:20
  150:7 156:4
  192:23,24
  193:3,15
**lengthy** 122:16
**leonard** 138:25
**level** 77:21
  109:21 144:16
**life** 31:16 50:10
  117:22 119:5
**lifetime** 50:17

**lift** 14:22
**lights** 97:14
**limit** 47:25 48:9
  48:21 172:6
**limits** 48:17
**line** 52:7 65:16
  66:7,8,11 67:3
  73:8,23 75:3
  81:20,21 82:19
  83:18 84:14
  90:24 92:21
  93:16 95:2
  180:23 194:22
  201:14,15,16
  201:17,18,19
  201:20,21,22
  201:23,24,25
  202:3,4,5,6,7,8
  202:9,10,11,12
  202:13,14,15
  202:16
**lines** 34:25
  35:11 73:22
  75:6,8 92:22
  93:16
**link** 24:21,25
  25:6,13
**liquidated**
  132:18
**list** 89:15 124:8
  155:10
**listed** 101:3
  124:16 126:17
  127:7 178:5

**listen** 68:3
  156:24
**lists** 100:21
  124:19 161:18
  161:22 162:5
**litigation**
  132:16 158:22
  159:6,14 174:3
  196:14
**little** 32:19
  65:18 68:14
  87:12 138:14
  138:25
**live** 42:2 86:23
  96:25 101:19
  109:23 117:21
**lives** 175:10
**living** 49:21
  86:15,20
  101:17 102:6
  128:4
**liz** 3:23 8:21
**llc** 5:13
**llp** 2:11 3:3 8:2
**loan** 14:15
**located** 11:9
**location** 111:2
**log** 25:4
**long** 47:19
  48:10,22
  116:15 123:7
  170:25
**longer** 121:14
  122:19 146:16

**look** 22:5 33:25
34:13,25 48:7
54:22 55:13
57:23 59:2
61:25 62:17
64:17 65:22
68:3 70:19
71:18 72:20,25
75:5 81:20
82:5 90:17,23
91:19 93:15
99:10 100:20
107:6,9 113:23
122:7 126:15
129:18,24
133:8 138:4
139:17 149:15
161:16,24
176:4 177:6
179:14 181:20
183:12 190:14
190:20 192:18
194:10,21
196:18
**looked** 58:22
183:4
**looking** 12:12
35:12 59:6,8
63:11,25 64:22
65:8 66:2
77:20 81:14,19
100:19,20
124:4 125:25
135:8 146:9
182:4 192:4

**looks** 62:15
63:2,13 64:14
92:17 98:20
100:3 180:22
**lopez** 121:23
151:7
**lorry** 3:21
**lose** 139:22
**lost** 135:25
136:15 137:11
138:6 142:21
**lot** 28:4 77:19
85:9 89:9
91:10 94:4,7
94:16,22 95:16
96:10,13,19,22
98:5 101:8,16
101:17 152:7,8
152:8 164:23
184:19
**lower** 73:22
104:19
**luncheons**
95:20

**m**

**m4** 16:20
**machine** 199:9
**made** 13:13
20:2 27:4
40:10 43:20
44:10 49:16
64:20 65:13,14
66:21 68:19
69:18 79:23
80:2 87:16

88:20 89:5
94:15 129:10
140:21 142:3
167:20 168:7
170:15 171:2,3
186:24 189:9
189:12,17
199:8 202:21
**magic** 51:11,16
**magnifying**
160:25 192:2
**mail** 4:7 26:3
39:19
**main** 14:14
21:9
**maintaining**
180:17 182:24
**major** 17:24
94:15
**majority**
196:12
**make** 11:7 16:9
17:3 19:19,25
20:15 21:15
23:9 28:14
30:6 43:24
51:13 56:5,9
56:22,24 58:17
63:19 64:17
65:13 69:2
76:12 77:17
80:11,23 81:6
81:15 87:21
88:25,25 90:15
93:21 94:4

118:5 119:9
122:18 130:8
132:23,25
133:5 135:12
143:10 148:25
154:9 168:15
171:15 172:16
182:8
**makes** 106:22
**making** 20:3,18
20:19 28:12
66:11 95:12
185:8
**man** 64:13
**march** 177:20
**mark** 23:13
34:2,3 57:10
57:11 91:22
130:11 151:6
152:11 154:23
156:22 158:11
**marked** 24:15
26:2 34:6
57:15 62:10
72:22 89:22
91:25 119:24
130:14 133:16
152:16 158:15
176:7 190:25
191:10
**market** 65:16
66:13,18 76:9
164:21
**markets** 80:17

**[martian - mistaken]**

| | | | |
|---|---|---|---|
| **martian** 64:15 | 100:8 101:6 | 196:6 | 171:5 185:13 |
| **math** 64:25 | 117:20 126:25 | **mention** 172:22 | 192:20 195:3 |
| 104:10 | 127:13 128:24 | **mentioned** | 195:11,21 |
| **mattei** 3:20 | 129:12 132:9 | 97:21 110:14 | 196:5 |
| **matter** 1:17 | 138:10 139:3 | 135:22 | **millions** 15:3 |
| 6:20 8:16 | 142:18 143:4,7 | **met** 9:25 12:17 | 83:19 |
| 114:25 145:10 | 144:14 147:11 | **metaphor** | **mind** 140:19 |
| 165:11 | 151:22,22 | 169:12 | 141:6 167:9,17 |
| **maximum** 15:5 | 153:21 163:11 | **methodically** | **mine** 14:9 |
| 76:7 80:16 | 163:15 165:16 | 86:4 | 180:8 |
| **mcgill** 151:8,11 | 167:22 168:3 | **middle** 36:8,9 | **minimum** |
| 153:23 154:8 | 169:17,22 | 70:11 | 53:13 55:2,6 |
| **mckinnon** 2:6 | 178:23 188:21 | **million** 15:5 | 55:21 56:2 |
| **meal** 104:25 | 194:3 197:5,6 | 42:13 43:21 | 78:9 |
| **meals** 90:24 | **means** 31:11,13 | 44:11 53:14,21 | **minor** 101:20 |
| 91:6 92:21 | 33:14 35:24 | 53:25 54:13 | **minors** 175:22 |
| 93:6,10 94:2 | 38:10,12 40:12 | 55:3,9 56:3,6 | **minton** 28:17 |
| 95:8,9 104:24 | 61:14 67:12 | 56:10,14,23 | 86:8 |
| **mean** 12:6 | 135:2 187:10 | 75:19 76:3,19 | **minute** 25:15 |
| 16:15 18:13,24 | **media** 6:17 | 76:25 77:10 | 40:23 57:23 |
| 19:2 20:14,25 | 17:21 18:14,14 | 78:12,22 80:3 | 92:5 132:5 |
| 21:22 23:5,6 | 21:3 71:8 | 80:4 83:24 | **minutes** 70:21 |
| 26:19,22 27:18 | 97:13 121:10 | 84:2,3,10,10 | 121:8 159:24 |
| 28:4 30:4 | 160:13,19 | 98:16 103:4 | **minutia** 65:19 |
| 33:16 36:14 | 198:11 | 108:18 125:15 | 66:22 |
| 40:9 41:4 | **meeting** 13:14 | 126:18 127:22 | **mischaracteri...** |
| 42:16,19 43:19 | 27:14 95:15 | 127:22 129:6 | 78:15 |
| 45:12 48:3 | **meetings** 63:11 | 134:13,25 | **miserable** |
| 50:12 63:13,14 | 63:16 91:11,14 | 135:5,18,23,25 | 117:25 118:3 |
| 63:19 64:6 | 94:8 | 136:6,14,23 | **misleading** |
| 67:9 77:3 | **melinda** 156:9 | 137:4,8 138:6 | 32:19 |
| 78:23 85:6 | **melissa** 8:22 | 138:7,8 139:15 | **missed** 24:25 |
| 91:9 94:5 | **memory** 16:22 | 144:13 147:25 | **mistaken** |
| 95:24,25 96:21 | 29:22 139:7 | 163:8,20,22 | 140:11 |
| 97:7 99:3,4 | 155:4,5,19 | 164:7,15,18,21 | |

| | | | |
|---|---|---|---|
| **moment** 11:10 | 96:16 100:22 | 52:9 57:3 | 199:19 200:3 |
| **monday** 103:23 | 101:15 102:8 | 61:15 80:12,24 | 201:3,5 |
| **money** 14:13 | 102:17,25 | 87:6,10 98:4,7 | **names** 101:20 |
| 14:15,17,18,21 | 107:13,18 | 107:5 120:20 | 101:22 127:3 |
| 14:25 15:23,24 | 108:7 178:8 | 121:4,21 | 127:17 137:17 |
| 16:10,25 17:3 | **monthly** 4:17 | 122:25 132:19 | **near** 60:3 61:8 |
| 17:5 19:6,9,14 | 4:20 90:5,8,12 | 136:3 143:11 | 90:21 92:19 |
| 19:16,20 20:2 | 92:7,15 99:11 | 144:6 145:8 | 191:25 |
| 20:8,15,18,19 | 99:16 106:2 | 170:17 172:24 | **nearby** 12:5 |
| 21:16,16 29:11 | 107:7 176:21 | 173:19,25 | **nearly** 108:15 |
| 29:24,25 30:9 | 177:2 | 183:18 | **nebulous** 81:2 |
| 30:15 38:20 | **months** 27:14 | **moved** 102:13 | **necessary** |
| 39:3,5 40:14 | 27:14,17 36:15 | 102:14 | 84:23 85:4 |
| 44:25 49:8,12 | 89:5 102:7,10 | **movie** 119:6 | 86:5 94:4 |
| 49:12,14,15,17 | 102:14 104:17 | **mud** 122:13 | 107:24 |
| 49:20,22 50:9 | 146:15 149:11 | **multiple** 31:6 | **need** 26:6 38:3 |
| 50:9,24 51:6 | 184:4 185:5 | 95:20 144:24 | 70:8 77:14 |
| 51:15 53:7,8 | **moon** 44:18,21 | 145:7 | 78:18 86:14,19 |
| 64:18 68:25 | 44:22 | **multiplied** 55:9 | 87:9 94:6 |
| 69:25 70:8 | **moore** 1:18 7:9 | **musk** 44:3 | 96:24 97:10,17 |
| 75:25 77:17,21 | 199:23 | 129:14 | 108:6 112:7 |
| 77:25 78:3,24 | **mooshu** 183:11 | **mute** 36:10 | 121:23 122:23 |
| 79:15 84:20 | **mopping** 109:3 | **n** | 149:17 160:8 |
| 86:13 93:22 | **mor** 5:9 114:18 | **n** 2:2 9:16,16 | 172:7 184:16 |
| 94:4,16 96:13 | **moshenberg** | **name** 7:5 9:25 | 194:7 |
| 105:19 108:4 | 3:18 8:8,9 | 90:7 119:6 | **needed** 173:6 |
| 118:5 127:20 | 105:3,9 114:14 | 125:6,7 127:17 | **negless** 3:19 |
| 132:22 138:3 | 122:6 | 127:25 128:12 | **negotiate** |
| 140:4 142:2,12 | **mothers** 126:11 | 128:16,21,23 | 163:22 |
| 143:8 146:25 | **motion** 130:23 | 135:21 136:11 | **negotiated** |
| 147:17 148:16 | 131:6 | 136:16,22,24 | 145:22 |
| 163:13,14,16 | **motors** 129:13 | 137:3,4,8,19,20 | **negotiating** |
| 168:14 170:21 | **mouth** 21:17 | 138:13,20 | 146:14 157:7 |
| **month** 86:14,20 | **move** 15:8 22:5 | 139:8 140:8 | **negotiation** |
| 86:23 94:3 | 39:25 43:25 | 141:15,17 | 147:7 165:19 |

**negotiations**
157:15 164:4
166:6
**neighbor**
147:24
**neither** 199:16
**net** 75:12
**never** 15:4 33:6
44:6,10 45:18
45:24 46:2,8
62:13 125:5,6
125:7,14 127:2
127:3,16,21,25
128:2,2 129:10
135:21,22
136:11,12,13
136:15,22
137:3,18
138:20,21
139:7 142:11
144:10 150:25
151:6,9 155:17
157:11,24
158:7 180:9
195:15
**new** 1:20 2:15
7:6 27:16
98:12 125:8
142:2 144:11
153:9 198:13
199:4 200:10
**news** 15:15
31:10 121:24
**newspaper**
115:6

**nice** 110:19,20
**nickel** 91:16
100:17
**nicole** 139:4
**night** 96:14,16
**nine** 104:10
189:8
**non** 29:5 30:24
31:13 32:7,21
33:11,12 35:3
35:14,18,20,21
37:3 38:7 49:2
125:20 197:2
**nonsensical**
170:9
**norm** 143:20
143:24
**notary** 1:20
9:18
**note** 6:6 26:6
88:4 182:3
188:16
**notice** 1:18
**noticed** 114:24
145:11
**noticing** 7:22
**notwithstandi...**
31:17
**november**
186:7
**number** 6:17
6:24 10:4
55:18 71:8
76:12 91:18
93:5 101:23

121:13,14
159:10 160:13
160:19 163:22
198:11
**numbers** 26:20
34:16,17 62:17
63:15,23 64:14
66:24 67:8,23
68:13 69:2
72:11 85:10,13
85:21,23 90:18
124:4,6 142:9
142:19 170:15
171:3,3 186:5
195:12,19

**o**

**o** 9:16
**o'connor** 3:15
8:24,25
**oath** 7:11 10:11
67:11
**object** 10:20
21:7 28:10
37:13 43:15,17
46:20 51:8
52:6,6 83:4
86:25 105:4
110:25 113:10
114:15 117:17
120:19 141:8
141:10 143:18
144:23 145:5
145:24 146:21
148:11 154:6
156:4 159:3

164:9 166:4,18
171:12,25
172:21 173:11
177:10 178:10
184:14,18
185:16 187:4
189:14 193:15
193:25 194:5
196:16
**objection** 15:20
16:6 22:22
30:3,17 31:2
31:20 32:17
33:23 37:6
40:24 42:25
44:8 45:16
46:6 48:6
53:16 56:11
61:13,21 71:17
77:4,11 78:13
81:8 84:6
87:21 104:5
105:9 108:9
110:4 119:16
126:22 127:11
130:4,5 140:11
140:20 149:6
150:7,12 151:4
156:16,20
157:10 158:9
173:21 184:6
185:21 186:14
186:18 187:25
195:5 196:21

**[objections - page]**                                          Page 28

**objections** 7:15
  78:18 122:17
  194:14
**obligation** 56:9
**obsessing** 20:17
**obviously** 70:6
  70:17 117:20
  127:21
**occurs** 55:19
**offer** 79:5
  147:23
**offered** 79:15
**offers** 171:9,17
  171:21
**office** 8:18
  11:14 23:19
  96:12 101:2
  103:20,23
  104:3 111:7
**offices** 11:12
**oh** 95:14
  162:23
**okay** 9:12 12:9
  13:24 23:16
  34:10 36:6
  41:11 46:14
  54:20 60:25
  61:24 83:14
  89:16 92:3
  113:23 126:13
  132:4 133:7,12
  135:14 144:5
  159:15 161:14
  173:17 177:16
  183:17 190:5

192:12,21
  197:25
**old** 27:5 42:8
**older** 45:8
  102:3
**once** 109:14
  141:15 183:5
**ones** 34:19 64:5
  86:4 143:4
**ongoing** 99:8
**open** 11:25
  23:10 43:2
**operate** 18:12
  19:17 77:21
  78:9
**operating** 4:17
  4:20 18:12
  42:15 90:6,9
  90:12 92:7,15
  99:12,16 107:7
  176:22 177:2
**operation**
  17:25 18:11,15
  19:25 20:16
  21:3,11 96:20
  165:9,10
**operative**
  177:14
**opportunities**
  172:22
**opt** 32:5 38:15
  38:19 41:14
  59:22 60:9
  61:6

**order** 108:6
  113:19 131:11
  173:24 193:7
  193:14 195:21
**orders** 168:21
**original** 153:5
  199:12
**ought** 36:10
**outcome** 7:14
**outlawed** 70:10
**outside** 29:14
  56:16 76:9
  80:16,20 115:4
  187:17
**overall** 97:8
**overhearing**
  106:8
**overnights**
  102:23
**owe** 43:13 45:6
  61:11 140:3
  144:12
**owed** 49:8,12
  49:14 50:8,24
  51:6
**own** 20:17
  101:6 144:16
  144:18,19
  165:20 175:6,9
**owns** 175:3
  186:13
**ozburn** 3:3

| **p** |
|---|

**p** 2:2,2
**p&l** 100:19
**p.m.** 1:12 6:4
  25:17,22 71:2
  71:7 123:10,15
  198:3,8
**package** 13:19
  13:20
**pads** 18:8
**page** 4:2 24:9
  34:13 36:13
  54:25 55:2,13
  55:16 59:2,5,8
  62:8 73:2,3,4
  90:17,20 92:20
  94:25 99:12
  100:20 107:9
  120:6,7 123:23
  135:10 153:18
  154:3 156:7
  176:13,15,19
  177:6,7,12,16
  177:18,19,21
  177:22 191:24
  194:4 201:14
  201:15,16,17
  201:18,19,20
  201:21,22,23
  201:24,25
  202:3,4,5,6,7,8
  202:9,10,11,12
  202:13,14,15
  202:16

**pages** 99:13
**paid** 49:9 50:25
  51:22 52:3,4
  52:19 59:17,23
  60:10 61:2
  69:24 74:14
  77:8,10 94:13
  98:25 113:3,8
  113:12 116:24
  117:9 118:19
  118:24 129:16
  155:18 157:18
  164:23 169:4
  170:20 179:3
  179:23 183:8,8
  186:2
**paper** 168:18
  169:9,11
**papers** 11:21
**paragraph**
  59:8,10 131:3
  131:15
**parallel** 111:12
**paralyzed**
  151:16
**parents** 142:22
**parisi's** 126:16
**parker** 128:13
  129:4 137:11
  141:16 142:19
  142:23
**parker's**
  128:16 137:20
  143:15 144:20

**part** 54:4 70:17
  72:8,15 74:18
  132:3 163:7
**participants**
  6:12
**particular** 55:7
  56:6
**parties** 6:15
  171:10 173:8
  174:3 183:21
  188:6 193:7
**partway** 90:19
**party** 7:12 50:2
  187:24 199:17
**past** 43:25
  127:20 144:6
  158:25
**pat** 151:8,23
**patch** 165:22
**paterson** 2:17
  4:3 7:23,24
  9:22,25 24:3
  25:3,14 34:18
  35:10 39:12
  42:14 43:9
  46:5 52:11
  57:10 70:23
  73:4 78:17
  79:16 87:7
  88:11 89:4
  106:12,24
  110:7 111:4,6
  111:16,25
  113:14,23
  115:8 119:17

120:13,18
  121:5,19 122:3
  122:15,24
  123:5 124:5
  133:7 140:15
  140:24 144:25
  148:23 152:10
  158:11 159:7
  159:15 173:20
  174:14 177:25
  182:6 184:20
  189:19 190:18
  190:20 191:4,7
  192:25 193:5
  193:13 194:2
  194:10,21
  197:12
**patrick** 154:8
**paul** 2:11,17
  7:24,25 9:25
  23:20 24:7,17
  39:15 192:23
  193:3
**pay** 14:14,19
  20:10 21:16
  29:12 37:21,22
  38:4,10,22
  39:4 40:13
  41:11 44:7,12
  44:14 46:18
  51:3 60:3,8,14
  60:14,18,21,22
  61:3,5,6 64:18
  75:25 76:8
  78:3 80:21

94:12 97:2,3
  97:19,24 98:19
  98:21 99:4
  105:25 108:18
  108:22 114:6
  114:20 118:21
  148:10 163:8
  168:14 170:21
  175:15,20,24
  176:3 180:10
**paying** 21:12
  21:21 39:9
  74:24 94:22
  104:25 181:3
  181:13,17,21
  181:24 182:11
  182:19 183:3
**payment** 55:19
**payments**
  68:19 69:18
  185:8
**payroll** 73:9
**pays** 175:12
**pc** 2:4
**penalty** 99:15
  131:21 200:2,9
**pending** 11:4
  160:7
**people** 14:21
  15:10 28:20,23
  33:4 38:11
  39:6 48:18
  49:22 76:21
  80:18 98:14
  100:13 101:17

101:19,25
109:10,22
127:3,16
128:19,24,25
129:12 136:12
139:24 143:5
144:8 151:21
161:14 168:9
181:8
**percent**  73:24
74:13,19 75:3
80:14 82:19
83:18 142:12
167:19
**percentage**
29:13,16 51:3
129:15
**percentages**
163:17
**perfect**  100:15
114:4
**period**  29:21
36:14 37:10
176:22
**perjury**  99:15
131:21 200:2,9
**perpetuity**  48:5
**person**  45:2
49:17 56:18
64:7 65:3
127:17
**personal**  16:19
69:8 91:15
105:23 151:10
167:12

**personally**
58:17 72:6
85:3 86:10
101:12 147:7
167:2
**perspective**
40:21
**pertains**  199:12
**petition**  195:10
**phone**  8:17
12:5
**photo**  120:7
**photograph**
120:22
**physically**
11:17
**pick**  160:10
197:21
**pie**  43:19 60:2
60:17,20,23
**piece**  103:5
**pieces**  15:6
**pin**  49:7 170:24
**pipes**  189:24
**pizza**  96:12
100:13
**place**  6:14
157:24 199:6
**places**  20:15
102:22 112:12
**plaintiff**  6:20
55:9,16 134:24
135:4
**plaintiff's**  55:8
55:20

**plaintiffs**  2:13
3:4 8:3,7,10
9:9 15:11,19
16:5 19:3,8
20:4 30:24
32:5,12,20,22
33:11 35:3,15
35:19 38:14
40:14 41:11,14
43:12 47:20
48:4,22 49:24
53:12 55:15,25
115:3 124:16
125:20 126:2
127:8 128:11
129:25 130:3
130:25 132:12
140:13,19
141:5,21,22
145:14,22
146:10 147:8
149:22,25
150:4,11
165:25
**plan**  4:10 22:11
22:15,15,20
26:11,17 27:3
28:2,8,21,24
29:3,8,18,21,25
30:10,16,22
31:25 32:13,13
34:2 35:5,17
35:25 36:3,13
36:14,21 37:2
37:4 38:10,14

39:5,21 40:8
40:17 41:7,10
41:14,17 42:4
42:17 43:13
45:5 46:16
52:20,22,24
53:12,20,24
54:4,12,15,23
56:8 59:12
68:15,17 69:8
70:5,15,20
71:11,16 72:9
72:16 75:23
77:2 79:7,9,15
80:16 84:11,19
115:2,10
117:14 120:12
122:2 125:21
129:17 132:18
132:20 141:24
142:7 148:3
149:4,23 150:5
163:7 166:24
167:2,4,8
**planners**  84:25
**planning**  41:24
196:20
**plans**  79:22,25
**players**  109:9
**please**  6:6 7:16
10:16,25 39:24
52:10 87:6
101:21 145:8
150:18 170:10

**plenty** 28:22
**plus** 76:19
  147:2
**point** 20:3
  21:10 25:18
  41:7 43:5
  46:15 54:3
  60:23 70:18
  71:3 100:8
  112:23 123:11
  160:14 170:19
  172:23 198:4
**political** 151:15
**porter** 3:22
**position** 46:17
  68:8
**posner** 128:21
  134:11 135:18
  137:21 138:11
  138:25 142:20
  142:24
**posner's**
  134:12,19
  141:15
**possible** 65:10
  86:22
**possibly** 68:6
**potentially**
  30:6
**pqpr** 8:20
**prager** 3:24
**precedent**
  125:9
**precedents**
  71:19

**precisely** 143:2
**prefer** 25:10
  51:5,15 53:7
  188:19
**prenup** 185:2
**prenuptual**
  184:4,9 185:5
  185:9
**prep** 104:14
**prepare** 12:16
**prepared** 63:24
  64:5 77:9
  78:11 109:18
**preposterous**
  44:13 78:3
  112:21
**present** 3:10
  7:18 12:22
  166:13
**presented** 67:2
**pretend** 65:23
  67:10 78:7
  80:7
**pretending**
  168:17
**pretty** 17:6
  43:2 76:15,17
  96:2,2 109:20
  169:19
**previous** 151:5
**previously**
  175:14,20
**prior** 60:16
  88:12,15 132:8
  161:13 162:20

185:14 186:3
  195:9,14 199:7
**privacy** 111:5
**private** 147:12
**privilege** 23:2
  46:22 47:5,11
  47:18 146:19
**privileged**
  28:11 37:17
**pro** 55:8
**probably** 26:21
  36:10 65:6
  66:14,17 91:13
  96:8,15,16
  99:5,7 104:19
  108:22
**problem** 94:18
  94:19,20
**problems** 31:6
**proceed** 9:14
  31:18
**proceeding**
  7:16
**proceedings**
  25:18 27:23
  71:3 123:11
  160:14 198:4
  199:6,7,8,14
**proceeds** 148:4
  149:3
**process** 16:4
  89:10 179:6,8
  179:11,25
  180:2

**produce** 60:22
  67:4
**produced**
  158:21 159:5
**production** 4:8
**products** 19:5
**professional**
  1:19 58:21
  113:20 155:9
**professionals**
  63:21
**profit** 66:11
**program** 25:5
**projection**
  56:20 84:18
**projections**
  4:15 61:19
  62:14 63:25
  64:4 65:8 66:9
  67:13,16,16,21
  68:9 72:21
**projects** 73:13
**proof** 15:3
**properly** 79:21
  100:6
**properties**
  175:8
**property** 15:6
  29:6 149:12
  188:11,14
  189:4,10
  190:16
**proportion**
  69:19 70:2,14
  72:8,15 129:21

**proportionate**
53:13 56:2
**proportionately**
141:23
**proposed** 22:11
22:20 29:4,9
30:2,10 75:22
129:17 131:4
131:11,15
132:13 163:7
**proposing** 61:3
61:5 82:17
**proprietary**
173:13
**protective**
113:19 193:6
193:14
**provide** 10:11
**provided** 67:14
159:21
**providing**
53:25
**provisions**
30:22
**prudent** 181:4
181:10,18
**public** 1:20
9:18 77:17
97:15
**published**
128:2
**puffs** 127:19
**pull** 193:19
**pulling** 123:22

**punishment**
44:16
**purchase**
186:16
**purchased**
186:6,10
**purely** 115:15
**purported**
184:3,13
**purpose** 58:24
100:15 114:24
**pursuant** 1:17
**pursue** 33:22
38:15 81:18
**purview** 106:6
**push** 133:4
142:3 147:3,18
**pushing** 157:13
169:21,23,24
169:25 170:3
**put** 24:20,22
25:7 57:20
89:25 90:10
97:15 99:5
102:7 120:3
128:2 148:9
151:8 155:21
159:22 163:24
183:10
**putting** 51:21
103:7

**q**

**quadrillion**
61:10

**quality** 6:9,10
**quarters** 68:20
**quentin** 2:14
**question** 10:16
11:4,5 20:22
20:22 22:25
23:7 31:7
32:18 33:20
41:2 42:7
45:17 46:21
47:4,12 50:13
50:16,22 51:16
52:14 54:17
60:15 65:3
78:19 83:5,9
83:13 87:3,5
88:19 104:13
105:5 110:5
113:21 118:2
121:17 127:5
141:9,11
142:22 143:23
144:23 145:6
145:16,18,25
146:22 147:6
148:12 149:2
149:16 153:13
153:25 154:18
156:25 157:4
160:2,5,7
162:13 166:11
170:11 181:7
181:17 184:15
185:3 189:18
191:18 192:13

196:24
**questioning**
52:7 128:17
139:3 142:25
143:3,8 145:5
145:12
**questions** 10:21
24:8 26:13
39:13,16 42:21
43:3 45:12
48:14 50:13
51:13 53:3
64:11 68:7
79:14 80:8,9
87:23 88:5
107:3 110:25
112:6 119:14
149:9 183:15
189:21 194:13
194:18 196:10
197:24
**quick** 10:14
141:7
**quickbooks**
106:3
**quite** 45:7
69:21 77:13
115:25 125:8
**quoting** 80:2,4

**r**

**r** 2:2 9:16
**rabbi** 98:15
**radar** 50:19
**radio** 98:14

**raise** 66:18
**raised** 179:12
**ranch** 147:25
   149:4
**range** 186:7
**rata** 55:8
**rather** 107:14
   107:15 175:25
**ratification**
   184:14
**ratify** 184:3
**ratifying** 185:4
**read** 13:8,9,13
   26:5 27:2,4,8
   27:13 40:10,11
   58:2 63:20
   79:23,24 88:12
   90:15 132:2,5
   132:7 183:5
**ready** 109:18
**real** 45:2 76:6
   80:9 90:14
   141:7 190:15
**reality** 144:16
   144:18,18
**realizing** 96:10
**really** 32:9
   42:20 44:4,22
   67:4 71:25
   72:3 90:6 91:9
   95:22 97:24
   98:3,6 101:4
   105:13 110:20
   116:2 118:8,21
   125:22 141:13

142:15 149:8
151:22 155:9
158:2 163:25
192:3
**realms** 115:4
**realtime** 1:19
**reason** 15:21
   65:9 71:14
   82:23 90:11
   96:4 112:6
   113:10,11
   134:2 162:8,15
   163:3 176:25
   177:4 187:12
   190:16 201:9
   201:14,15,16
   201:17,18,19
   201:20,21,22
   201:23,24,25
   202:3,4,5,6,7,8
   202:9,10,11,12
   202:13,14,15
   202:16
**reasonable**
   14:23 86:14
   102:24 126:21
   127:4 134:19
   135:19 136:8
   137:10 138:8
   138:24 139:5
   143:15 144:7
   144:21 164:7
   164:15 168:16
**recall** 60:5,19
   117:2 145:21

146:11 164:19
185:4,8,12
195:20
**recalled** 60:16
**receipt** 96:9
**receive** 29:25
   30:16 53:8
   55:17 70:13
   76:18 141:23
   149:3
**received** 13:19
   13:20 22:2
   76:25 171:8
**recent** 104:7
   177:11
**recently** 147:23
**recess** 25:19
   71:4 123:12
   160:15 198:5
**recognize**
   57:22 62:5
   90:3 92:6,14
   130:19 158:17
   160:23 161:9
   176:9,18
   191:19
**recognized**
   161:8
**recollection**
   13:5,10 116:22
   116:23
**record** 6:4,16
   7:21 23:17
   25:15,17,23
   43:5 70:24

71:2,9 79:4
105:21 106:4
106:11,20
112:2 113:18
113:22 123:10
123:16 160:12
160:18,21
174:4 188:17
188:18,20
190:16,17
197:20 198:2,3
198:8 199:8,11
201:10
**recorded** 6:18
   85:13
**recording** 6:9
   6:13
**reference** 171:2
   188:22
**referenced**
   132:3 133:8,23
   196:25
**references**
   131:5
**referencing**
   147:21 179:19
**referred** 20:11
   20:23
**referring** 15:10
   84:13
**refers** 36:12
**reflect** 105:21
   106:20
**reflected** 75:11

**[reflects - right]** Page 34

| | | | |
|---|---|---|---|
| **reflects** 164:21 | 116:14,18 | **repeats** 26:12 | 173:18 |
| **refresh** 13:5 | 117:3,5,11,13 | **rephrase** 10:17 | **reserving** |
| 139:7 | 132:21 133:2,3 | 194:25 | 173:25 |
| **regarding** | 153:12,15 | **report** 4:17,20 | **respond** 144:15 |
| 184:9 | 154:6,20 155:2 | 90:6,12 92:7 | **response** |
| **regens** 3:17 | 155:16,24 | 92:15 99:12,16 | 119:14 |
| 8:18 | 156:21 157:12 | 99:18 107:7 | **responsible** |
| **registered** 1:18 | 157:13,21 | 176:22 177:2 | 140:6 |
| **reimbursed** | 162:11 163:25 | **reported** | **rest** 24:18 |
| 180:2 | 164:3,16 | 156:19 157:3 | 31:16 132:5 |
| **rejected** 153:23 | 176:18 186:9 | **reporter** 1:19 | **restate** 88:18 |
| 154:8,15 | 186:12,15,20 | 1:19 7:8 9:13 | **retained** |
| **related** 7:12 | 186:21 189:5,7 | 97:10,12 199:4 | 198:13 |
| 166:6,7 | 189:16 195:25 | **reporters** 18:3 | **retirement** |
| **relating** 130:24 | **remembered** | 111:10 112:8 | 102:8 |
| **relative** 199:17 | 180:20 | 112:16 138:21 | **reveal** 23:2 |
| **relaxing** 108:3 | **remembers** | **reports** 90:9 | 47:9 |
| 110:21 | 28:14 116:13 | 91:15 121:10 | **revealing** 46:22 |
| **relevance** | 116:18 | **represent** 8:20 | 143:23 146:2 |
| 120:12,15 | **reminded** 13:2 | 8:22 9:8 134:7 | 150:15,17 |
| 121:25 | **remotely** 7:19 | 135:11 158:20 | **revenue** 163:20 |
| **relevant** 52:25 | **removed** 151:7 | **representing** | **review** 63:9 |
| 114:15 115:10 | **reorganization** | 7:6 | 87:25 90:8 |
| 197:24 | 4:11 22:11 | **reputation** | 199:14 |
| **reliability** | 28:2 77:2 | 58:21 | **reviewed** 27:17 |
| 66:24 | 117:15 149:5 | **request** 46:10 | 64:3,5 67:13 |
| **rely** 48:12,24 | 163:7 | **requested** | **rid** 16:4 180:7 |
| **remember** 14:4 | **repaid** 179:5 | 199:15 | 180:9 |
| 14:10 27:25 | **repaired** | **required** 10:11 | **ridiculous** |
| 28:5 36:4 54:8 | 189:11 | **requirement** | 189:18,21 |
| 56:7,12 57:8 | **repairs** 89:14 | 59:11 | **rifkind** 7:25 |
| 57:25 63:6 | 189:12,16 | **resend** 25:13 | **right** 12:11 |
| 64:6 71:12 | **repeat** 52:13 | **reserve** 81:16 | 13:22 14:7 |
| 90:5,7,7 98:6 | **repeating** | 81:18 110:9 | 29:21 31:19 |
| 104:25 115:22 | 167:17 | 115:13 121:20 | 36:3,22 37:5 |

| | | | |
|---|---|---|---|
| 37:24 40:7,16 | **riptide** 33:2 | **s** | 168:11,20,23 |
| 41:9 42:24 | **rise** 186:25 | | 170:13 |
| 44:7 56:3 | **rises** 75:18 | **s** 2:2 4:5 9:16 | **says** 27:12 |
| 57:19 59:7 | **rivkind** 2:11 | 76:15 | 44:20 55:14 |
| 61:4,9 64:9 | **road** 3:5 76:10 | **salary** 30:5,8 | 56:4 59:9,16 |
| 65:5 66:14 | 174:22,25 | 158:7 163:8 | 60:25 73:9,18 |
| 67:25 69:20 | 179:20 181:2 | **sale** 148:4 | 84:12 90:19,24 |
| 72:24 74:6 | **robbie** 128:12 | 149:4 | 92:25 116:20 |
| 75:3,12,23 | 128:16 141:16 | **sales** 65:21 | 131:4 134:5 |
| 76:18 80:13,22 | 142:19,23 | 67:7 163:18 | 161:25 162:24 |
| 81:18 82:3 | **robert** 8:15 | **salt** 180:12 | 179:15,18 |
| 83:10 84:11 | 129:4 | **sanctuary** | 181:12,22 |
| 91:4,18 93:11 | **robinson** 2:19 | 182:21,23 | 183:5 |
| 93:12,14,20 | **roof** 189:22 | **sandy** 30:24 | **schedule** 5:7 |
| 95:5 96:24 | **room** 8:4,13,14 | 182:13 196:13 | **school** 63:13 |
| 106:15 108:13 | 11:18 12:11 | **sane** 61:7 | 110:13 |
| 114:9 118:20 | 34:8 189:16 | **sarcastic** | **schultz** 119:12 |
| 127:15 129:6 | **roosevelt** 2:14 | 182:25 | **schwartz** 151:6 |
| 130:16,25 | **rosa** 126:3 | **sat** 13:13 63:19 | 154:14,23 |
| 131:23 133:24 | **rossi** 136:4 | 64:16 | 156:22 |
| 133:25 137:12 | 137:22 138:11 | **satisfied** 59:12 | **science** 50:20 |
| 138:18 140:9 | 138:24 141:16 | **satisfy** 56:9 | **screen** 24:23 |
| 142:7,25 | 142:20,24 | 86:14 | 25:8 34:12 |
| 146:11 147:25 | **rossi's** 136:8 | **saturday** 104:9 | 57:21 62:4 |
| 150:25 152:18 | **roughly** 83:24 | **save** 121:6 | 90:2,22 92:5 |
| 156:18 157:2,9 | 84:2 | 182:21 | 120:3 130:18 |
| 158:5 167:18 | **rover** 186:7 | **saw** 178:17 | 139:10 192:11 |
| 179:22 184:5 | **row** 102:15 | **saying** 16:23 | **seal** 134:9 |
| 188:24 193:7 | 161:17 | 19:14 20:9 | **sealed** 188:18 |
| 193:11 197:12 | **rpr** 199:24 | 21:17 22:18 | 193:4,9,11,16 |
| **rights** 81:16 | **rules** 10:8,15 | 41:21 44:17 | 194:8,9 |
| 110:9 115:14 | **run** 168:12 | 48:15 62:15 | **second** 62:8 |
| 121:20 173:18 | **running** 96:20 | 73:23 95:11 | 72:8 90:23 |
| 173:25 | 100:17 | 96:12 118:19 | 95:2 120:6,7 |
| | | 137:23 138:23 | 152:25 177:7 |
| | | 143:5 167:24 | |

177:22
**secret** 85:15
**security** 77:14
77:18,24
**see** 26:3 34:22
35:3,6,14
36:12,14,17,20
36:25 55:2,4
55:10,15,23
56:22 59:9,9
59:14,15,18
64:19 65:12
73:5,11,15,20
73:25 75:6,8
75:10,16,19
81:21 82:2,6,8
90:22,24,25
92:13,20,25
93:6,8,17
94:24 95:3
98:24 99:14,20
99:22 100:21
100:23 102:16
107:10,11
109:7 120:2,9
124:8,15,22
126:17 131:3,7
131:11,18
139:11,14,19
140:13 144:7
153:18 158:24
161:16,17,18
161:22 162:2,5
162:20,23,24
168:8 169:6,24

169:25 170:2,4
170:4,6 176:15
176:21,23
177:17,20
178:4,9 192:14
192:19
**seeing** 15:14
23:25 90:5,7
**seen** 13:3 24:24
26:20 27:17
31:10 36:6
62:13,19,24,25
63:5 131:12
133:20 161:3
191:22
**seize** 41:15
**sell** 149:12
**send** 18:3 20:5
24:18 97:10
112:8
**sending** 18:7
112:16
**sense** 11:7
42:22 51:13
190:8,10
**sent** 23:23,23
25:2
**sentence** 59:16
**separate** 78:2
93:13,16
101:10
**separately** 20:9
163:19
**september** 5:9
176:23 177:3

**series** 186:23
**serious** 137:5
**serves** 155:19
**servitude** 76:22
**session** 12:25
**set** 53:7 62:14
125:9 131:5
141:22 161:25
169:14 199:6
**sets** 65:7
**settle** 53:12
127:5 132:11
134:12,19
136:8 188:5
**settled** 136:4
**settlement** 32:6
79:5,10 115:2
130:2,24 131:5
131:16 132:14
143:12,13
149:22 150:3
165:24 166:15
167:5
**settling** 55:25
125:20
**seven** 103:12
103:25 104:3
109:22 185:10
**several** 18:22
112:12 131:12
133:21 175:11
**shaded** 73:23
**shakes** 165:3
**share** 24:21
25:6 53:14

55:8 56:2
**sheet** 201:2
202:2
**shelby** 28:15
153:9
**shoot** 66:15
**shortcut** 68:7
**shorthand**
199:4,9
**shortly** 41:7
**show** 14:20
15:8,9 16:2,10
35:9 82:20
89:18 107:15
118:14 129:7
130:10 136:16
136:19 137:19
137:21
**showed** 66:21
111:10 138:12
141:16
**showing** 120:22
134:4 153:6
**shown** 12:24
66:10,20,25
74:13,20 75:15
82:19 83:17
135:22 136:12
136:18
**shows** 82:2
96:15
**shut** 19:16
165:10,20,21
165:25 166:14
167:4

**shuttle** 65:25
**side** 12:8 21:17
  181:2
**sign** 28:4 42:16
  58:5 66:16
  99:18 153:22
  156:14
**signature** 99:23
  131:23 176:14
  199:22
**signed** 28:3,4
  99:25 149:11
  151:9 153:7,19
  153:20 156:8
  176:16
**signing** 27:25
  28:5
**silence** 19:7
  20:8 21:2,11
  21:18
**simple** 53:4
**simply** 143:10
**sir** 11:15
**sisco** 3:16 8:11
**sit** 21:15 49:5
  63:7,19 64:13
  66:4 76:5 94:9
  96:23 97:17
  170:23
**sitting** 30:7
  45:4 78:10
  95:14 120:8
  129:20 196:6
**situation** 47:16

**six** 34:25 35:10
  102:10,14
  104:7 146:15
**skirts** 14:22
**sky** 43:20 60:2
  60:17,20,24
  172:6
**slavery** 70:10
  76:23
**slicer's** 88:3
**slizer** 8:15
  11:17 63:18
  64:7 65:3
  67:15 86:6
  96:5 155:9
  180:4
**smiley** 32:25
**snorkeling**
  113:2
**snow** 110:13
**socialized**
  171:22
**socializing**
  171:18
**software** 12:2
  24:21
**sold** 14:14
**solutions** 9:2
**solved** 106:8
**somebody** 36:7
  36:8 44:10
  49:11 183:2
**someone's**
  136:22,24

**soon** 165:19
**sooner** 51:6,15
  51:22 52:3
  53:8
**sorry** 33:20
  63:12 102:11
  146:20,22
  159:11
**soto** 126:15
**sound** 26:9
**sounds** 91:17
  108:25 110:19
  136:2
**source** 113:15
**sources** 73:14
  161:18
**southern** 1:3
  6:23
**space** 65:25
**speach** 5:4,12
**speak** 17:15
  18:2,13 22:16
  32:2 67:20
  68:8 72:11,18
  79:20 80:25,25
  81:3 82:14
  89:7 164:2
  195:6,13,19
  196:17
**speaking** 68:18
  78:18
**specific** 83:15
  85:21 193:20
**specifically**
  17:18 87:13

**speculate** 51:19
**speculating**
  155:5
**speculation**
  77:5,12
**speculative**
  50:20 78:20,21
**speech** 8:23,25
  11:13 18:17
  29:12 54:14
  69:2 73:9
**speeches** 87:9
  119:20 122:4
  182:8
**spend** 105:19
  108:7 119:10
  119:18
**spending** 87:14
  87:17 88:21
  89:6 102:25
  108:20 182:3
  195:20
**spends** 108:15
**spent** 84:22
  91:6 93:9
  109:12 194:24
  196:4
**spoke** 83:25
**spoken** 28:20
  28:22
**springs** 3:5
**sprout** 44:17
  44:20,21
**stabilize** 18:19

stacks 62:17

stalks 111:21

standard 109:20

start 54:7,25 71:7 77:20 83:24 134:10 160:19

starting 59:10 82:18 83:2

starts 59:9 73:5

state 1:20 7:16 7:19 65:20 115:19 199:4 200:10

stated 18:23 174:3 188:20

statement 4:13 26:16,25 57:4 57:6,13,24 58:9 88:24 89:2 112:20 123:21 126:14 135:10 139:11 139:16

statements 159:18

states 1:2

status 150:10

stay 17:20,22 19:19 76:5 102:4 151:17 168:12

stayed 35:22 112:12,13,13

staying 112:17

stephen 1:18 3:8 7:8 199:23

steps 20:7 58:8 58:16 100:5

sterling 3:25 9:5,6

steve 8:19 192:24

stevenson 28:16

stick 83:23

stickers 92:12

stop 108:22 121:12 122:5 168:17 191:13 197:18

story 128:13

strange 26:9

strategy 143:19

stratgey 32:23

street 2:6

streusand 3:3

strike 191:23

studio 98:12,13 98:19 100:11

studios 98:21 98:23

stuff 14:15 15:2 15:14 17:15 26:23 32:24 45:8 50:2 51:12 58:12 63:2,5,11,20,22 64:23 65:22

69:3 78:2,6,8 85:7 91:17 93:23 94:7 96:21 102:23 105:12 147:12 151:21 153:14 163:10,12 168:18 170:16 185:2 189:25

subchapter 5:11

subject 54:12 193:6,7,13 202:17

submitted 130:23

subscribed 199:19

substance 142:4

successful 96:2 98:17

sue 39:7

sued 127:25 128:21 138:20 144:9 171:6

suggest 60:17

suggested 169:10

suggestion 33:10 54:22

suing 39:3 85:7 85:16

summarizes 158:24

sunday 104:8

sunrise 167:25 168:4

sunset 168:2,5

supplement 163:17

support 19:5 19:15 37:4 43:12 117:14 130:23 149:23 150:4 164:18

supporting 99:16

supposed 77:16 93:21 147:12 168:17 170:20

sure 28:12,14 58:17 63:4 70:23 80:14 85:8,24 88:25 90:14 95:12 107:19 108:21 119:10 123:5 149:2 154:9 161:15 171:15 178:24

swear 9:13

sworn 9:17 199:8

system 144:11

systems 5:4,13

**t**

t 4:5

tab 23:12 24:11 24:12 34:2

54:24 57:12
61:25 72:22
89:20 91:20
119:7 123:19
130:12 133:9
152:13 158:12
176:4 190:22
191:5,15
**table** 79:6
194:11
**tablet** 12:5
**tails** 79:21
**take** 6:14 10:25
11:5 33:25
34:13 44:12
46:3 52:23
54:21 55:12
57:23 58:2,8
58:17 59:2
61:25 70:19,21
72:20 74:7
82:5 100:5
102:19 104:18
107:6 121:22
123:3,6 129:24
132:4 133:8
142:15 159:23
160:3 175:19
176:4 179:14
194:7,15
**taken** 6:19
87:24 178:21
199:6
**takes** 103:5

**talk** 30:21
43:25 67:17
68:2,12,14
87:11,14 88:13
89:16 113:17
113:18 136:16
144:10 147:12
166:20 188:10
194:3
**talked** 28:6
33:6 67:18
137:21 138:21
141:15 149:25
**talking** 30:4,5
33:7 40:4 41:5
41:23 53:18
61:23 65:24
67:19 71:10
74:4 84:8
93:25 104:23
114:24 119:10
137:2 146:7
169:13 171:18
187:9,14,17,21
**tandem** 21:12
**tangible** 23:10
130:9
**tank** 180:6,6,8
180:10,11,12
180:16,18,20
180:21 181:4
181:11,15,18
181:22,24
182:12,20

**tax** 29:20 65:20
65:20,21 67:7
74:4 78:5
**taxes** 52:16
67:8 69:4,13
74:15,22,25
75:2,6,6,12
81:2,7 85:25
86:11
**tea** 50:2
**team** 18:8
191:14
**team's** 174:17
**technically**
12:10
**technology** 7:4
**tell** 23:22
147:13 149:17
**telling** 19:18
36:8 59:25
83:6 169:15
**tempt** 197:7
**ten** 31:24 32:5
32:14 33:10,22
36:2,3,4,22
37:5,9,21 38:4
38:7,14 42:8
42:12,15 43:14
45:5,10 46:16
47:16 49:9
50:25 62:21
65:11 71:11
72:3 85:16
92:22 181:9

**term** 35:5,17
36:2,13,14,21
38:14 197:2
**terms** 17:14
28:25 29:7,24
51:21 54:13
193:8
**terpb** 138:13
**testified** 9:19
83:10 114:19
157:17
**testify** 79:12
83:7 106:13
172:5,11
**testifying** 74:8
79:8,17 178:14
199:7
**testimony** 60:5
60:16,19
103:16 104:2
108:5 153:11
165:24 198:9
199:11
**texas** 1:3 2:7
3:4,6 6:23 8:10
11:11 19:4,14
20:5 115:3
116:6 125:25
128:22 129:25
130:3,25
132:22 140:12
140:19 141:5
141:22 145:21
146:10 147:8
149:22,25

| | | | |
|---|---|---|---|
| 150:4,10 | 60:7,20,21 | 159:4 160:9 | **throw** 165:22 |
| **text** 55:22 | 65:17 66:7,12 | 161:8 162:8,10 | 180:25 |
| **thank** 11:8 | 66:14,17 71:14 | 163:23 165:7 | **tickets** 94:14 |
| 23:20 24:3 | 72:6 76:8 | 168:8,10 | **time** 1:12 6:5 |
| 36:10 198:14 | 78:21 85:15 | 169:19 170:7 | 7:17 9:12 |
| **theoretical** | 86:13,22 91:14 | 170:20 171:3 | 10:24 18:3 |
| 172:23 | 94:2,10 95:23 | 172:16 173:7 | 22:4 23:24 |
| **theoretically** | 96:4,9 97:7,8 | 176:3 177:7 | 25:16,21 29:21 |
| 79:18 | 100:12 101:3,9 | 180:5 181:3,6 | 39:24,25 42:12 |
| **theorist** 174:20 | 101:14 102:24 | 181:13,17,21 | 42:24 43:14 |
| **theory** 174:17 | 106:19 107:4 | 181:22 182:24 | 45:5 46:12,17 |
| **thing** 11:3 | 107:10,23 | 183:2 188:23 | 47:16,25 48:9 |
| 18:13 21:12 | 108:14,19 | 191:7 195:25 | 48:17,21 49:10 |
| 41:18 49:3 | 109:25 110:10 | 196:5 197:2,19 | 50:25 70:13,25 |
| 61:7 76:5,14 | 112:3 113:25 | **thinking** 45:9 | 71:6 84:22 |
| 80:3 92:10 | 115:5,9,20,23 | 95:14 159:12 | 87:22,25 88:7 |
| 98:10 104:7 | 116:9,11 | **third** 29:17,18 | 88:17 93:4 |
| 141:14 150:21 | 118:24 122:5 | 29:18 69:11,12 | 95:18 98:2 |
| 159:9 183:13 | 122:20 124:3 | 69:13,14 72:25 | 100:11 101:24 |
| **thingie** 92:9 | 125:3,16 | 73:3,4 177:17 | 102:2 109:12 |
| **things** 51:20 | 126:20,25 | 178:5 183:20 | 119:10,18 |
| 63:15 76:10 | 128:6,8 129:8 | **thought** 14:18 | 121:6 123:10 |
| 88:14 89:15 | 133:11 134:14 | 14:20 15:24 | 123:14 160:12 |
| 94:8 100:9,16 | 135:17 136:7 | 41:10 45:18,24 | 160:17 178:24 |
| 131:14 151:13 | 136:21 137:5,7 | 46:2,8 116:19 | 182:4 196:12 |
| 151:24,24 | 137:10 138:7 | 125:22 128:14 | 196:18 197:13 |
| 163:19 197:6,8 | 138:16,24 | 134:18 156:22 | 197:21 198:2 |
| **think** 16:19,20 | 139:4,20,24 | 157:23 160:6 | 199:6 |
| 21:20,22 22:14 | 140:17 141:13 | 178:25 | **times** 10:5 |
| 23:6 24:10 | 141:15,20 | **three** 68:20 | 95:20 107:22 |
| 26:20 29:11,17 | 142:19,24 | 98:25 107:22 | 131:13 133:21 |
| 32:18 38:17,25 | 144:20 145:9 | 153:17 155:6 | 144:24 145:8 |
| 50:23 51:14 | 151:12,14,22 | 158:6,25 | 181:9 186:11 |
| 54:24 56:13 | 152:2,5,12 | 159:24 174:22 | **timing** 98:10 |
| 58:7 59:4 60:2 | 155:4 157:17 | 175:6 179:20 | |

**[tiny - two]** Page 41

| | | | |
|---|---|---|---|
| **tiny** 192:3 | **topic** 61:16 | **trash** 121:10 | **truthful** 10:11 |
| **titled** 192:14 | **topics** 150:24 | **travel** 112:23 | **try** 10:17 22:3 |
| **tmz** 4:23 111:9 | 188:9 | **trial** 14:19 | 38:10 40:13 |
| 119:8,10 | **topo** 11:22 | 132:23 133:5 | 43:24 60:14 |
| 121:25 174:17 | 101:7 | 142:2,4 146:25 | 66:17 80:11,23 |
| 174:18 183:10 | **total** 90:24 93:6 | 147:3,16 | 90:15 117:22 |
| 188:21,23 | 178:7 198:11 | 150:20 | 132:23 133:4,5 |
| **today** 10:12,24 | **totally** 66:18 | **tried** 64:16,17 | 147:17 148:22 |
| 12:16 13:16 | 114:2 118:12 | 143:10,11 | 170:10 174:8 |
| 30:7 39:13,24 | 118:16 | **trigger** 55:19 | 196:2 |
| 45:4 74:8 | **tough** 66:13 | **trillion** 43:22 | **trying** 17:2 |
| 78:10 79:17 | 67:5 110:2 | 49:25 127:14 | 20:16 21:2 |
| 88:10 129:20 | **towards** 71:16 | 137:24 | 22:17 38:25 |
| 153:11 196:7 | 132:19 | **trillions** 50:6 | 40:3 43:23 |
| **today's** 198:9 | **town** 102:22 | 137:5 | 68:5 97:8,15 |
| **toilet** 168:18 | **track** 91:10 | **trip** 113:3,8,13 | 108:18 127:5 |
| 169:9,10 | 116:2 | 114:5 116:25 | 127:19 132:11 |
| **told** 16:16 | **train** 18:11 | 119:11 | 144:5 148:24 |
| 47:13 48:2 | **trajectory** | **trips** 115:18,25 | 149:18 155:11 |
| 63:4 77:13 | 18:20 | **trouble** 152:8 | 157:20 167:15 |
| 150:19 157:22 | **transactions** | **true** 15:15 | 170:17 181:13 |
| 172:13 176:17 | 192:16 | 22:19 26:24 | 192:8 |
| 179:6 191:8 | **transcribed** | 59:20 99:17 | **turn** 23:12 |
| **tolerate** 122:12 | 199:9 | 128:10 131:22 | 97:14 |
| **tombstone** | **transcript** | 134:23 178:14 | **turning** 62:8 |
| 165:13 | 194:20 199:10 | 199:11 200:11 | **tv** 12:10 98:14 |
| **tonayo** 105:24 | 199:13,14 | 202:19,22 | 109:10 136:16 |
| **tonight** 44:18 | 202:19,22 | **trust** 26:19 | 137:19,22 |
| 44:21,22 | **transcription** | 175:9 176:3 | 141:17 |
| **took** 98:23 | 201:12 | **trustee's** 5:11 | **twice** 78:24 |
| 195:2 | **transferring** | **trusts** 175:4,5 | 189:23 |
| **top** 34:16 55:14 | 185:12 | 175:17,25 | **twisted** 144:4 |
| 59:5,7 109:9 | **transparent** | **truth** 16:17 | **two** 12:18 |
| 120:6 124:4,6 | 118:12,17 | 19:21 | 16:20 17:23 |
| 124:15 155:3 | | | 23:17 71:23 |

**[two - verisign]**                                                    Page 42

79:22,25 96:15
116:19 121:14
128:24 153:16
**type** 17:15
**types** 97:5
**typical** 89:6
104:16
**typically**
103:10

**u**

**u** 76:15
**u.s.** 6:22
**ucc's** 105:24
**ultimately**
59:17 61:2
**um** 92:24
100:24 107:12
**unable** 32:6
33:11 117:15
**unamerican**
118:7
**under** 10:10
29:3,8,21,25
30:9,16 32:13
35:2,8,21 37:2
39:5 53:11,19
53:23 67:11
68:16 69:8
70:5,14,18
75:22 76:25
84:11 99:14
113:18 125:25
127:8 129:16
131:21 134:9
141:23 148:3

149:4 161:17
161:20 179:17
185:9 188:18
192:18 193:8
199:9 200:2,9
200:10
**underline**
99:14
**underneath**
99:22 124:19
161:25
**undersigned**
199:3
**understand**
10:7,10,15
22:6,10 23:6
24:6 26:23
29:2 31:9
32:24 33:4,10
33:24 35:25
37:20 38:9,11
40:18,25 41:6
43:10 48:25
54:11 58:15
60:7,11 65:19
68:16,22 69:21
69:23 72:10,13
72:17 74:12,17
88:12 111:20
113:7,11
114:21 132:10
134:5 135:14
159:19 163:6
167:12 179:19
184:20,25

188:14 197:4
**understanding**
31:12 47:6,14
58:23 85:4
89:12 95:7
97:4 105:18,23
106:17 122:21
150:25 156:18
157:2,19 158:6
158:23 159:20
181:23 182:10
182:18 188:24
**understood**
10:19 43:9
140:15
**undoubtedly**
172:18
**unhelpful**
119:19
**unit** 6:17 71:8
160:13,19
**united** 1:2
**units** 174:24
179:20 198:12
**universe**
144:19
**unjustified**
114:2
**unreasonable**
127:9 138:17
139:21
**unsecured**
34:22
**unusual** 44:15

**updates** 22:2,3
**uphill** 110:13
**upset** 98:7
**upside** 155:23
**use** 84:4,19
87:21 88:7,17
94:10 121:8,11
181:4,18
**used** 67:16
197:2 198:12
**using** 7:3 37:14
193:10,16
199:8
**usually** 109:22

**v**

**v** 5:11
**vacation**
104:18,22
110:14,15
117:16,21
118:13,19
119:15
**vacations**
115:16,19,21
115:24 116:7
116:13 117:10
117:16
**value** 142:15
164:21
**various** 15:18
73:14
**vast** 196:12
**vehicles** 186:11
**verisign** 100:3

**veritext** 7:6,9
  198:13
**veronica** 126:2
**veronique**
  126:7,8,9
**versus** 142:19
**vicki** 79:16
**vickie** 2:9 8:12
  12:17 24:4
  37:19 46:5
  53:2 63:18
  78:17 87:8
  88:11 106:12
  111:25 113:25
  115:8 119:17
  120:13 121:5
  122:3,15
  140:16 141:2
  146:6,15,18
  148:24 159:7
  174:14 178:2
  178:18 182:7
  189:19 190:18
**victim** 138:13
**victims** 139:3
  142:22,25
  143:3
**vida** 2:19
**video** 6:13,18
  20:5
**videographer**
  6:2 7:7 9:3,10
  25:16,21 70:25
  71:6 76:16
  123:9,14

160:11,17
  197:25 198:7
**videos** 19:13
**view** 151:10
**viewers** 98:16
**violate** 47:4
**violating** 47:10
**virtual** 1:16 7:3
**virtually** 6:8
  7:3
**voting** 132:19

**w**

**w** 3:8
**wages** 161:18
  162:9,10,16,24
  163:4
**wait** 108:12
  168:8
**waiting** 67:20
**walk** 172:8
**want** 19:6,6,9
  19:14,16,19
  20:7,8 21:11
  21:18 24:7
  28:14 37:9
  38:22 43:4
  48:7 49:9,12
  49:19,22 50:9
  50:25 51:2,22
  52:3,15,21
  53:3 57:24
  60:10 67:20
  69:2,4 70:7
  72:2 76:5
  80:23 83:7

87:13 88:7,13
  88:18 98:18
  103:4 106:10
  106:13 108:3
  111:11,12,16
  112:2 113:16
  113:25 117:22
  117:22 118:4,5
  119:5,9 121:8
  123:8 131:25
  139:18 142:21
  147:16 154:9
  160:3 165:6,14
  168:11,12,13
  168:14 171:15
  172:9,15,24
  174:15 178:13
  180:6,24 182:2
  182:7 188:10
  193:19 194:18
**wanted** 14:25
  15:7 98:15
  183:10
**wants** 54:10
  98:19 128:17
**war** 76:23
**washing** 107:25
  108:2 109:4
**waste** 16:25
**watch** 167:20
  167:21,21,23
  167:25,25
  168:4
**water** 180:12

**way** 22:24
  39:15 144:14
  150:8 155:13
  159:22 177:17
  178:5 179:15
  189:15 196:20
**ways** 110:13
**week** 45:9
  103:11,12,13
  103:14,17,22
  103:25 107:22
  109:14,22,24
  110:2 116:17
  180:15 181:4
  181:17 182:11
  182:19
**weekends**
  103:24
**weeks** 67:19
  98:25 149:11
  165:11
**weiss** 2:11 7:25
**welcome** 59:22
**went** 25:4
  58:21 72:11,18
  94:14 98:24
  110:17,23
  112:25 113:2
  116:5,5,9,12
**wharton** 2:11
  7:25
**whereof** 199:18
**wife** 85:7,16
  108:12 112:25
  118:23 119:2

**[wife - years]**                                                      Page 44

183:24 185:13
186:2
**wife's**  102:6
**william**  125:6
**willing**  76:2
**wings**  44:17,20
44:21
**winslow**  7:5
**witch**  17:4
**withdrew**
195:10
**withheld**  75:6
**witness**  9:13,17
19:2 22:24
24:2 26:8 35:9
35:13 37:13,19
39:8 41:3 87:4
87:8 106:19,25
107:2 110:12
111:14,21
119:21 123:3
146:6 150:13
150:19 153:8
154:10 173:14
187:8 199:18
201:5
**witnesses**  199:7
**woman**  136:14
140:2
**wonder**  19:10
**wonderland**
50:2
**word**  74:7,9
**words**  20:17

**work**  26:8
41:25 42:4
67:4 70:7,9
75:25 76:2,21
76:22 78:11,22
78:25 80:15
103:10,16,25
109:15 115:18
118:4 147:18
152:9 165:20
169:5 170:20
174:9 194:22
197:23
**working**  19:11
72:3 86:4
104:22 108:22
118:11 172:17
**works**  26:6
71:19 149:14
151:21
**world**  15:13
50:5,18 138:9
**worried**  45:10
118:9
**worth**  78:24
**wrecked**  18:11
**written**  151:2
**wrong**  22:18
181:12 183:2
**wth**  8:4

**x**

**x**  1:5,11 4:5
9:16 199:14

**y**

**y**  35:2,7,8
76:15
**yeah**  15:14
21:3,9,23 26:5
26:24 28:5
30:19 31:15
40:18 41:11
43:3 45:18
47:3 48:13
51:11 57:25
58:4,7 60:13
66:14 75:24,25
77:6 84:17,18
91:9,13 93:8
93:18 96:19
100:14 102:3
102:23 103:3
104:18 107:25
108:8 125:16
127:21 128:8
129:10,11
130:8 132:21
136:21 144:3
145:19 149:8
149:18 153:20
157:6 166:10
172:6 175:7
176:17 185:10
192:17 194:21
196:23
**year**  16:20
31:25 37:9
38:14 41:13
44:11 50:17

53:21,25 54:13
55:19 56:3,6
56:14,18,23
71:11,22 76:3
76:19,25 77:10
78:12 81:7
83:19 84:3,10
103:4 115:21
116:11,12,20
151:18 158:8
161:21 162:14
162:18,20,22
183:5 186:3
195:15
**years**  14:3,3,5
16:21 17:23
32:5,15 33:11
33:22 36:2,3,4
36:5,22 37:5
37:21,22 38:4
38:7 42:8,12
42:15,18,23
43:14 45:5,10
46:17 47:16
49:10 50:11,25
62:21 65:11
69:7 72:3
85:16 86:12
116:19 158:6
158:25 178:21
178:22 180:13
180:19 185:10
185:11,14
189:8,14

**[yellow - zoom]**                                    Page 45

| |
|---|
| **yellow**   92:9 |
| **yesterday** |
|   12:18,19 27:5 |
|   27:18 40:11 |
|   79:24 |
| **yogurt**   101:7 |
| **york**   1:20 2:15 |
|   7:6 98:13 |
|   198:13 199:4 |
|   200:11 |
| **yup**   82:4 |
|   107:19 176:20 |
|   176:24 |
| **z** |
| **zillow**   190:14 |
| **zone**   44:23 |
| **zoom**   192:8 |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.