# EXHIBIT 18

**Fill in this information to identify the case:**

Debtor 1: Alexander E. Jones

Debtor 2 (Spouse, if filing): _____

United States Bankruptcy Court for the: Southern District of Texas

Case number: 22-33553

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Richard M. Coan c/o Ryan Chapple<br>Name | Richard M. Coan c/o Eric Henzy<br>Name |
| 303 Colorado Street, Suite 2850<br>Number    Street | 10 Middle St, 15th Fl<br>Number    Street |
| Austin           TX        78701<br>City          State      ZIP Code | Bridgeport        CT        06604<br>City          State      ZIP Code |
| Contact phone (512) 477-5000 | Contact phone (203) 368-5495 |
| Contact email rchapple@cstrial.com | Contact email ehenzy@zeislaw.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____  Filed on _____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| 6. | Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |
|---|---|---|

| 7. | How much is the claim? | $_____111,429,303.73_. Does this amount include interest or other charges?<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|

| 8. | What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Connecticut Judgment.  See attached Exhibits A–F |
|---|---|---|

| 9. | Is all or part of the claim secured? | ☑ No<br>☐ Yes.  The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:**  _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**          $_____<br>**Amount of the claim that is secured:**    $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**   $_____<br><br>**Annual Interest Rate (when case was filed)**_____%<br>☐ Fixed<br>☐ Variable |
|---|---|---|

| 10. | Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____ |
|---|---|---|

| 11. | Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |
|---|---|---|

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:**   **Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04 / 03 / 2023
MM / DD / YYYY

_Richard M Coan, Trustee_
Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Richard M. Coan *Trustee* |
| | First name    Middle name    Last name |
| Title | Claimant |
| Company | c/o Ryan E. Chapple, Cain & Skarnulis PLLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 303 Colorado Street, Suite 2850 |
| | Number    Street |
| | Austin      TX    78701 |
| | City      State    ZIP Code |
| Contact phone | (512) 477-5000    Email rchapple@cstrial.com |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | Chapter 11 |
| ALEXANDER E. JONES, | § | |
| | § | Case No. 22-33553 (CML) |
| Debtor | § | |
| | § | |

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| ALEXANDER E. JONES, | ) |
| | ) Case No. 22-33553 (CML) |
| Debtor | ) |
| | ) |

**ATTACHMENT TO PROOF OF CLAIM OF
RICHARD M. COAN, TRUSTEE OF THE BANKRUPTCY ESTATE OF
ERICA GARBATINI AKA ERICA LAFFERTY**

1.      This Attachment, the preceding proof of claim of Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty (Coan), and all associated exhibits are an integral part of, and an integrated set of documents constituting, the proof of claim (Proof of Claim) being filed by Coan in this case.  All of these documents collectively constitute the Proof of Claim for Coan.

2.      On March 10, 2023, Coan and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach and Robert Parker (collectively, the Sandy Hook Families), filed that certain *Adversary Complaint Seeking Judgment That Sandy Hook Judgment Is Non-Dischargeable Under Bankruptcy Code § 523(a)* [Docket No. 212] (the Adversary Complaint), alleging that the Debtor owes non-dischargeable debts arising from a judgment in favor of the Sandy Hook Families in Connecticut state court (the Connecticut Judgment) on account of, among other things, the Debtor's defamatory statements in the aftermath of the shooting at Sandy Hook Elementary School on

December 14, 2012.  The allegations in the Adversary Complaint are incorporated by reference. A true and correct copy of the Adversary Complaint is attached as **Exhibit B**.

3.      The Debtor owes $1,438,139,555.94 under the Connecticut Judgment, which consists of the jury verdict (attached as **Exhibit C**) and the trial court's ruling on punitive damages (attached as **Exhibit D**).  On March 29, 2023, the Sandy Hook Families filed their Motion for Rectification (attached as **Exhibit E**), which was granted on March 31, 2023 (attached as **Exhibit F**).  The Connecticut Judgment comprises 15 separate debts owed to the Sandy Hook Families, as reflected in the table below.

| Sandy Hook Family | Compensatory Damages | Common Law Punitive Damages | CUTPA Punitive Damages | Total |
|---|---|---|---|---|
| Robert Parker | $120,000,000.00 | $40,099,303.73 | $10,000,000.00 | $170,099,303.73 |
| David Wheeler | $55,000,000.00 | $18,429,303.73 | $10,000,000.00 | $83,429,303.73 |
| Francine Wheeler | $54,000,000.00 | $18,099,303.73 | $10,000,000.00 | $82,099,303.73 |
| Jacqueline Barden | $28,800,000.00 | $9,699,303.73 | $10,000,000.00 | $48,499,303.73 |
| Mark Barden | $57,600,000.00 | $19,299,303.73 | $10,000,000.00 | $86,899,303.73 |
| Nicole Hockley | $73,600,000.00 | $24,629,303.73 | $10,000,000.00 | $108,229,303.73 |
| Ian Hockley | $81,600,000.00 | $27,299,303.73 | $10,000,000.00 | $118,899,303.73 |
| Jennifer Hensel | $52,000,000.00 | $17,429,303.73 | $10,000,000.00 | $79,429,303.73 |
| Donna Soto | $48,000,000.00 | $16,099,303.73 | $10,000,000.00 | $74,099,303.73 |
| Carlee Soto Parisi | $66,000,000.00 | $22,099,303.73 | $10,000,000.00 | $98,099,303.73 |
| Carlos M. Soto | $57,600,000.00 | $19,299,303.73 | $10,000,000.00 | $86,899,303.73 |
| Jillian Soto-Marino | $68,800,000.00 | $23,029,303.73 | $10,000,000.00 | $101,829,303.73 |
| William Aldenberg | $90,000,000.00 | $30,099,303.73 | $10,000,000.00 | $130,099,303.73 |
| Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty | $76,000,000.00 | $25,429,303.73 | $10,000,000.00 | $111,429,303.73 |
| William Sherlach | $36,000,000.00 | $12,099,303.73 | $10,000,000.00 | $58,099,303.73 |
| **TOTAL** | $965,000,000.00 | $323,139,555.94 | $150,000,000.00 | **$1,438,139,555.94** |

4.      The Debtor has appealed the Connecticut Judgment with respect to all of the Sandy Hook Families to the Connecticut Appellate Court.  *Lafferty*, Appeal Form [Docket No. 1050] (Dec. 29, 2022).

5.      Coan files this Proof of Claim to preserve all of his claims against the Debtor, which would be potentially lost or negatively affected otherwise.

6.      Coan reserves his right to the liquidation or estimation of his claims for distribution purposes outside of the administration of bankruptcy and respectfully does not consent to a final order within the bankruptcy proceeding.  *See* 28 U.S.C. §§ 157(b)(2)(B) *and* 157(b)(5); *see also Wellness Int'l Network, Ltd.* v. *Sharif*, 135 S. Ct. 1932, 1944-45 (2015); *Stern* v. *Marshall*, 564 U.S. 462, 478-79 (2011).

7.      For the avoidance of doubt, as set forth in the Adversary Complaint, Coan asserts that the Connecticut Judgment is non-dischargeable and reserves all rights accordingly.

8.      Coan does not waive, by filing this Proof of Claim or appearing in this case, and expressly reserves, any rights whether jurisdictional, procedural, or otherwise, including, but not limited to, any rights against the Debtor and any non-debtor affiliates or insiders, including: (a) members of his family; (b) estates of the foregoing individuals; (c) entities owned, controlled or operated by Jones, members of his family, or estates of the foregoing individuals; (d) Free Speech Systems, LLC; (e) Auriam Services; (f) Blue Ascension; or (g) PQPR and/or Free Speech Systems, LLC's prepetition counsel or other professionals.

9.      In filing this Proof of Claim, Coan does not waive any right or rights he may have against any other entities, person or persons liable for all or any part of the claims described herein. This Proof of Claim is filed to protect Coan from any potential forfeiture of his claim by reason of the bar date for claims in this case.  Filing this Proof of Claim is not:

   a.      A waiver or release of Coan's rights or claims against any person, entity, or property, including, but not limited to, any and all applicable insurance related to Coan's claim;

   b.      A waiver or release of any and all of Coan's remedies and rights under applicable state or federal law outside of title 11;

   c.      A waiver or release of Coan's right to trial by jury in any proceeding as to any matters so triable, whether or not the same are designated legal or equitable rights in any case, controversy, or proceeding relating hereto, notwithstanding the designation or not of such matters as "core

proceedings" pursuant to 28 U.S.C. § 157(b)(2)(B), and whether such jury trial right is pursuant to statute or the United States Constitution;

d.    A waiver or release of Coan's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge;

e.    A waiver or release of the right to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceedings commenced with respect thereto, or any other proceeding which may be commenced in this case against or otherwise involving Coan; or

f.    An election of remedy.

Coan reserves his rights to amend, modify, and/or supplement any of the claims set forth in this Proof of Claim, including its exhibits, at any time, including after the claims bar date, in any manner, including, but not limited, to: (a) supplement or amend this Proof of Claim or any related documents and other information, and to describe further the claims asserted herein; (b) assert any and all additional amounts that are due, may be due, or will become due the Debtor including, without limitation, amounts owed both before and after the date of commencement of the Debtor's bankruptcy case that remain outstanding in an undetermined amount, or are otherwise unmatured, unliquidated, and/ or contingent as of the date hereof; and (c) fix and liquidate the amount of unmatured, contingent, and unliquidated claims.  Coan expressly reserves the right to attach, produce, and/or rely upon additional documentation or other evidence that supports his claims, including any additional documents or other evidence that may become available after further investigation or discovery.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE:

ALEXANDER E. JONES,

     Debtor

§
§
§
§
§
§
§

Chapter 11

Case No. 22-33553 (CML)

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re<br><br>Alexander E. Jones,<br><br>Debtor | Case No. 22-33553 (CML)<br><br>Chapter 11 |
| In re<br><br>Free Speech Systems, LLC,<br><br>Debtor | Case No. 22-60043 (CML)<br><br>Chapter 11 |
| David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as chapter 7 trustee for the estate of Erica Lafferty,<br><br>       Plaintiffs<br><br>    v.<br><br>Alexander E. Jones and Free Speech Systems, LLC,<br><br>       Defendants | <br><br><br><br><br><br><br><br><br><br><br>Adv. Pro. No.: ___ |

## ADVERSARY COMPLAINT SEEKING JUDGMENT THAT SANDY HOOK JUDGMENT IS NON-DISCHARGEABLE UNDER BANKRUPTCY CODE § 523(a)

David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as chapter 7 trustee for the estate of Erica Lafferty (collectively, the "Sandy Hook Families" or "Plaintiffs") allege as follows:

## **INTRODUCTION**

1.      Bankruptcy law holds a debtor who has caused willful and malicious injury—as Alex Jones[1] has done—accountable, no matter how many bankruptcies the debtor files.  For years, Alex Jones and his Infowars "contributors" told his audience of millions that the Sandy Hook shooting was "completely fake with actors," a "hologram," an "illusion," "the fakest thing since the three-dollar bill," "staged" to take away their guns, and that the Sandy Hook Families were "paid . . . totally disingenuous" "crisis actors" who faked their loved ones' deaths.  He urged his audience to "investigate," knowing they would respond by cyberstalking, harassing, and threatening the Sandy Hook Families.  After nearly five years of litigation, a disciplinary default for Jones's extreme discovery misconduct, and a trial on damages, the respected trial judge who issued the judgment that forms the debt in this case held that Jones's conduct was "intentional and malicious, and certain to cause harm"; demonstrated "depravity," "cruel[ty]," and "persisten[ce]"; and ultimately reflected "the highest degree of reprehensibility and blameworthiness."  The law cannot repair the harm that Jones has done to the Sandy Hook Families, but it can and must hold Jones fully accountable for the injury he has caused and the resulting judgment against him.

2.      Plaintiffs seek a judgment that the approximately $1.4 billion debt they are owed by defendants Alex Jones and Free Speech Systems, LLC ("FSS") is not dischargeable under section 523(a)(6) of the Bankruptcy Code because it is the result of a willful and malicious injury.  Plaintiffs are immediate family members of the victims of, and an emergency responder to, the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, on December 14, 2012.  The debt comprises compensatory and punitive damages awarded to Plaintiffs in a Connecticut state court action in which Alex Jones and FSS were held liable for defamation,

---

[1]     For purposes of this complaint, all references to Alex Jones shall refer to both Alex Jones in his personal capacity and Free Speech Systems, LLC.

intentional infliction of emotional distress, and other torts arising from their broadcast of lies about Plaintiffs for profit.

3.      There are no issues of fact to be decided here, as all relevant facts were already decided in the Connecticut action.  This case poses the narrow question of whether the closed record from the Connecticut action, which is incorporated by reference, demonstrates that Alex Jones's debt to Plaintiffs is from a willful and malicious injury.  The answer to that question is yes.

4.      Starting the same day as the mass shooting that killed twenty first-grade children and six adults at Sandy Hook Elementary School in 2012, Jones and his wholly-owned companies, including FSS, began broadcasting a campaign of lies to online and radio audiences.  Jones claimed that the Sandy Hook shooting was a government-sponsored hoax in which the grieving Sandy Hook Families participated as actors pretending their loves ones had died.  Alex Jones never actually believed these lies.  Yet for years, he spread and amplified these lies through videos, articles, and radio segments that he published and distributed over numerous internet and social media platforms—during which he repeatedly urged millions of listeners to "investigate" the Sandy Hook Families.

5.      Alex Jones's business is the sale of supplements and other products.  In order to sell these items, he has cultivated customers by holding himself out as a warrior for the truth and a trusted newsman.  The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was a prime narrative for attracting, augmenting, and agitating Jones's audience, and it was a central part of a marketing scheme that has earned Jones and FSS tens of millions of dollars per year.

6.      Alex Jones's lies were certain to—and did—cause catastrophic injuries to the Sandy Hook Families.  Jones's course of conduct traumatized them during a time of devastating

grief. They were harassed, stalked, physically confronted, and threatened, including receiving regular death and rape threats. Some moved houses for their safety and to protect their families, and all suffered a sustained barrage of harassment on social media—including on the memorial and foundation websites they had set up in memory of their loved ones.

7.      Alex Jones's willful and malicious targeting of the Sandy Hook Families has been the subject of nearly five years of court proceedings in Connecticut. When the Sandy Hook Families brought suit in 2018, Alex Jones appeared and defended the case. Rather than follow the rules applicable to all litigants, however, he mocked Plaintiffs' efforts to hold him accountable and transformed the litigation into a new profit center by targeting them and their attorneys. He repeatedly flouted court orders, obstructed the discovery process by denying Plaintiffs the materials necessary to litigate their case, and even broadcast to his listeners that Plaintiffs' counsel were part of a conspiracy of "goddamn rapists" and "fucking child molesters," and he promised a bounty of "one million dollars to put [their] head on a pike." The trial court issued sanctions. The Connecticut Supreme Court granted a rare interlocutory appeal and affirmed.

8.      Neither the sanctions nor subsequent additional warnings from the trial court had any effect, however, as Alex Jones continued his threatening tactics and discovery abuses. This pattern of misconduct ultimately resulted in the entry of a default judgment against Jones, which caused Plaintiffs' allegations to be admitted as a matter of Connecticut law and divested Jones of affirmative defenses.

9.      A trial on compensatory and punitive damages followed. Alex Jones was subpoenaed and testified. Each Plaintiff also testified regarding the nature and severity of their injuries. The jury awarded $965 million in compensatory damages and approved common law punitive damages. In a lengthy decision evaluating the degree of Alex Jones's reprehensible

conduct, the Connecticut trial court expressly found that Jones's conduct was willful and malicious:

> The record clearly supports the plaintiffs' argument that the defendants' conduct was ***intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors."*** The record also establishes that the ***defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.***

The trial court awarded over $470 million in common law and statutory punitive damages, bringing the total amount of damages awarded to Plaintiffs and against Jones and FSS to $1,438,139,555.94 ("the Connecticut Judgment")[2].

10.     Under 11 U.S.C. § 523(a)(6), debts for "willful and malicious injury" may not be discharged in a bankruptcy—this prohibition reflects an express recognition by Congress that certain actions are so inexcusable that a debtor cannot escape liability through the bankruptcy process, but rather must remain accountable for debts arising from such malicious harm for life.

11.     The closed record from the Connecticut action—which includes a default judgment and admitted complaint allegations,[3] extensive trial evidence, a jury award, and numerous court orders (including one assessing substantial punitive damages)—conclusively establishes that Alex Jones caused the Sandy Hook Families willful and malicious injury that will continue to traumatize them for the rest of their lives, such that the resulting $1.4 billion debt cannot be discharged under the Bankruptcy Code.  In fact, Jones is *precluded* from relitigating the issue of whether his conduct caused "willful and malicious injury" because that issue was already decided against him by the

---

[2]     The judgment consists of the jury verdict (Exhibit A) and the trial court's ruling on punitive damages (Exhibit B). Judgment became effective on December 22, 2022, the date the trial court denied the motions by Alex Jones and FSS for a new trial and for remittitur (see Exhibit C).

[3]     Under Connecticut law, an entry of default conclusively establishes the facts alleged in a complaint.

Connecticut trial court. Accordingly, there are no outstanding factual issues to be resolved in this action, and a judgment of nondischargeability should be issued in short order.

12. Even if there were a question as to the preclusive effect of the proceedings in the Connecticut court, which there is not, the Connecticut record confirms that the debt arose from Jones's willful and malicious injury to the Sandy Hook Families. Accordingly, the Sandy Hook Families respectfully request that this Court find that the Connecticut Judgment is nondischargeable under 11 U.S.C. § 523(a)(6).

## JURISDICTION AND VENUE

13. Plaintiffs commence this adversary proceeding pursuant to Rules 4007, 7001(6), and 7001(9) of the Federal Rules of Bankruptcy Procedure. This Court has jurisdiction to determine nondischargeability under Section 523 of Title 11 of the United States Code (the "Bankruptcy Code") and Sections 157 and 1334 of Title 28 of the United States Code. Determination of nondischargeability under Section 523 of the Bankruptcy Code is a "core proceeding" pursuant to Section 157(b)(2)(1) of Title 28 of the United States Code. Pursuant to Rule 7008 of the Federal Rules of Civil Procedure, Plaintiffs consent to entry of final order(s) or judgment by this Court.

14. Venue is proper in this district pursuant to Sections 1408 and 1409 of Title 28 of the United States Code.

## PARTIES

15. Plaintiffs are immediate family members of the victims of, and a first responder to, the December 14, 2012 shootings at Sandy Hook Elementary School in Newtown, Connecticut, and the holders of the Connecticut Judgment.

16. Plaintiffs David Wheeler and Francine Wheeler are the parents of first-grader Benjamin Wheeler, who was killed in the Sandy Hook Elementary School shooting on December

14, 2012.

17.     Plaintiffs Mark and Jacqueline Barden are the parents of first-grader Daniel Barden, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

18.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of first-grader Dylan Hockley, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

19.     Plaintiff Jennifer Hensel is the mother of first-grader Avielle Richman, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

20.     Plaintiff Donna Soto is the mother, and Plaintiffs Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto Marino are the siblings, of first-grade teacher Victoria Leigh Soto, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012, at the age of 27. She died shielding her students.

21.     Plaintiff William Aldenberg was a first responder to the Sandy Hook Elementary School shooting on the morning of the December 14, 2012 and is depicted in iconic photographs and video footage from those events.

22.     Plaintiff William Sherlach was the spouse of school psychologist Mary Sherlach, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

23.     Plaintiff Robert Parker is the father of first-grader Emilie Parker, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

24.     Erica Lafferty is the daughter of elementary school principal Dawn Lafferty Hochsprung, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.  Dawn died trying to save her students.  Due to Erica Lafferty's chapter 7 bankruptcy, Plaintiff Richard M. Coan, chapter 7 trustee for the estate of Erica Lafferty, is substituted for Ms. Lafferty as party-plaintiff in the Connecticut action.

25.     Defendant Alexander E. Jones ("Alex Jones" or "Jones") is the debtor in Case No. 22-33553 (CML) before this Court and a defendant in the three consolidated cases in Connecticut (the "Connecticut Action").[4]  He resides in Austin, Texas and is indebted to Plaintiffs pursuant to the Connecticut Judgment.

26.     Defendant FSS (together with Alex Jones, "Defendants") is a Texas limited liability company wholly-owned by Alex Jones.  FSS is the debtor in Case No. 22-60043 (CML) before this Court, and a defendant in the Connecticut Action.  Its principal offices are located at 3005 South Lamar Boulevard, Austin, Texas.  Jones and FSS control Infowars.com, the primary FSS website, and Infowars LLC (together with Infowars.com, "Infowars") as well as the other associated websites through which Jones and FSS do business.

## RELEVANT CONTENTS OF THE CONNECTICUT RECORD

27.     After Alex Jones engaged in substantial discovery misconduct and bad faith litigation in defiance of repeated court orders, the Connecticut trial court issued sanctions—subsequently affirmed by the Connecticut Supreme Court—and ultimately entered a default judgment against him.  The operative effect of this default judgment under Connecticut law is to conclusively admit and establish the Connecticut Complaint's allegations.  Following the default, the Connecticut Action proceeded to a trial on damages.  The evidence at trial, along with the now-established allegations, plainly proved that Alex Jones willfully and maliciously injured the Sandy Hook Families.  The record leading to the Connecticut Judgment also includes filings by Plaintiffs and Alex Jones, rulings by the Connecticut trial court and Connecticut Supreme Court,

---

[4]     The three consolidated cases are *Lafferty, et al. v. Jones, et al.*, Case No. X06- UWY-CV-18-6046436-S, in the Superior Court of Connecticut, Judicial District of Waterbury; *Sherlach v. Jones, et al.*, Case No. X06-UWY-CV-18-6046437-S, in the Superior Court of Connecticut, Judicial District of Waterbury; and *Sherlach, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-60464386-S, in the Superior Court of Connecticut, Judicial District of Waterbury. The complaints are substantively similar. References to "Conn. Compl." or "Connecticut Complaint" hereafter are to the *Lafferty v. Jones* complaint, the lead complaint on which default was granted. This complaint is attached at Exhibit D.

and a jury verdict following the damages trial.

28.     The Connecticut record, which is incorporated by reference here, provides a closed record of conclusively established facts that are binding in this case.  The following sections of this Complaint draw exclusively from facts established in the Connecticut Action.

### A.     Infowars's Infrastructure at the Time of the Shooting

29.     Alex Jones is a supplement salesman and internet "newsman" who resides in Austin, Texas.[5]  He uses all the paraphernalia and symbology of television and radio journalism to confirm his "newsman" image.[6]  Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes.[7]

30.     Alex Jones owns, operates, and controls the websites Infowars.com and PrisonPlanetTV.com, and other websites.  He is the star of "The Alex Jones Show."  At the time of the Sandy Hook shooting, Alex Jones had built a corporate infrastructure designed to spread his content as far as possible and to activate his audience members to act on it.  Jones was broadcasting via Infowars.com to an audience of "tens of millions of listeners and viewers each month," on 150 nationally syndicated radio stations,[8] and systematically re-posting content to YouTube, Twitter, and Facebook through multiple accounts.[9]

31.     Jones groomed his audience to believe that he and only he would tell them the truth.

---

[5]     *See* Conn. Compl. ¶ 30.

[6]     Among other things, Alex Jones adopts the consciously deepened voice; the news anchor's huge, Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; and the regular references to Infowars "reporters" and "investigations."  Conn. Compl. ¶ 93.

[7]     For example, Alex Jones promotes to his audience "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs, radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed, and firing mechanism of the AR-15 rifle).  Conn. Compl. ¶ 94.

[8]     Pl. Trial Ex. 217 (2016 Media Kit).

[9]     *See, e.g.*, 9/14/22 Trial Tr. (Vol. I) at 55:21–56:6 (Brittney Paz testifying that it was the defendants' practice to upload every clip produced from the Alex Jones show to every online platform they controlled, including Facebook, Twitter, and YouTube); 9/16/22 Trial Tr. (Vol. I) at 76:15–19.  *See also* Conn. Complaint ¶ 40.

Jones's tagline on Infowars was "the frontline of truth journalism," and Infowars was marketed as "the House that Truth Built."[10]  FSS's corporate designee confirmed this at trial.[11]

32.    Jones knows that his customers will act on what he tells them:  "our customers are so loyal to us that they believe in what we're doing to such a degree that if we say something is good for you and is a good value they're going to buy it and buy a lot of it."[12]  His business model is not just to activate customers to buy supplements but to activate them as "infowarriors."  When Jones attacks someone or something, he intends his audience to attack too:  "I am a precision guided heavy munition, coming in on top of you.  I'm here to stand up for the innocents.  I don't like you. I don't like you getting away with what you do.  You make me sick.  So, I hit the barbed wire, and everybody else comes in over me."[13]

**B.    Alex Jones's Campaign of Defamation and Lies about the Sandy Hook Shooting**

33.    On December 14, 2012, a young man shot his way into Sandy Hook Elementary School with a semi-automatic Bushmaster XM15-E2S rifle, and in less than five minutes, he killed twenty first-grade children and six adults while wounding two others.  That terrible day left behind 26 families struggling with grief and senseless loss.

34.    When the shooting occurred, Jones hurried to claim it was a hoax in which the Sandy Hook Families were participating as "actors."[14]  His campaign of lies began the day of the

---

[10]    Pl. Trial Ex. 216 (2014 Media Kit); Pl. Trial Ex. 212 (2013 Web Media Kit).

[11]    9/14/22 Trial Tr. (Vol. II) at 49:11–50:18.

[12]    Pl. Trial Ex. 336a,5/16/19 David Jones Dep. Tr. at 30:21–30:24 (played to the jury on 9/29/22). *See also* Conn. Complaint ¶¶ 93–94.

[13]    Pl. Trial Ex. 37a (video titled  "Alex Jones Warns Megyn Kelly, Exposes Psychological Warfare Operation," dated June 12, 2017); *see also* Pl. Trial Ex. 508 (video dated Sept. 18, 2022); Pl. Trial Ex. 13d (video titled "Super Bowl Police State - Matthew Mills makes a mockery of the Global Mafia," dated Feb. 3, 2014); Pl. Trial Ex. 27 (video titled "Infowars Footage of FOIA Hearing," dated June 3, 2015; Conn. Complaint ¶¶ 41–57.

[14]    *See, e.g.*, Pl. Trial Ex. 105; *see also* Conn. Compl. at ¶ 9 ("Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax – and he never has.").  Of course, he made no attempt to investigate the shooting before publishing his lies to millions.  *See* 9/15/22 Trial Tr. (Vol. III) at 5:19–26.

shooting.   Just hours after the shooting, Jones published headlines stating that, according to "witnesses," the shooting was a false flag.[15]  FSS admitted that this click-bait headline was false—there were no witnesses who said such a thing.[16]

35.    Alex Jones knew at that time and has known since that his statements about the Sandy Hook shooting being a hoax were lies.[17]  Indeed, as Infowars Chief Editor Paul Watson wrote in a December 17, 2015 email, "This Sandy Hook stuff is killing us.  It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway.  Plus it makes us look really bad to align with people who harass the parents of dead kids."[18]

36.    The day after the shooting, Plaintiff Robert Parker made a press statement to thank all those who had reached out to his family, to remember six-year old Emilie, and to express his forgiveness to the shooter's family.   Jones attacked Mr. Parker "pretty immediately" after Mr. Parker issued this statement.[19]  He targeted Mr. Parker again on December 19, 2012, in an article titled "Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear-Jerking Press Conference," which falsely claimed that Mr. Parker read off a card at a press conference the day after his daughter was killed.   The article embedded a video titled "Sandy Hook Shooting Exposed as a Fraud," and included a "Statement from Alex Jones" stating that, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."[20]

---

[15]    *See* Pl. Trial Ex. 1 (video titled "Connecticut School Massacre Looks Like False Flag Says Witnesses," dated Dec. 14, 2012).

[16]    9/14/22 Trial Tr. (Vol. II) at 59:3–11.

[17]    Conn. Compl. at ¶ 9 ("Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax – and he never has.").  Of course, he made no attempt to investigate the shooting before publishing his lies to millions.  *See* 9/15/22 Trial Tr. (Vol. III) at 5:19–26.

[18]    Pl. Trial Ex. 160.

[19]    *See* Pl. Trial Ex. 550 (video titled "Sandy Hook Film Censorship Efforts Backfire," dated Dec. 12, 2014).

[20]    Pl. Trial Ex. 61 (Infowars.com Article, *Father of Sandy Hook Victim Asks 'Read the Card'*, dated Dec. 19, 2012*); see also* Conn. Compl. ¶¶ 102–105.

37. On January 27, 2013, Alex Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." In the video, Jones claimed that "evidence is beginning to come out more and more in the direction" that the shooting "was a staged event" due in part to "what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."[21] Jones then scapegoated Mr. Parker again, playing a video of Mr. Parker's statement the day after the shooting. The video was accompanied by a scrolling chyron stating, "Odd Parent Reaction from SandyHook [sic]." As the video of Mr. Parker played, Alex Jones commented that "I haven't touched this," and that "all I know is they're seizing on it. They staged fast and furious. . . . Our government, to blame the Second Amendment, they'd stage anything." Later in the broadcast, Alex Jones continued: "This needs to be investigated. They're clearly using this to go after our guns. . . . Something though, really, is starting to get suspicious here. . . ."[22]

38. On January 29, 2013, Leonard Pozner—the father of a Sandy Hook shooting victim and a plaintiff in cases brought in Texas—notified Jones about the injuries he was causing and asked him to change his behavior:

> Alex,
> I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown. Accusing us of being actors . . . . Haven't we had our share of pain and suffering? All these accusations of government involvement, false flag terror, new world order etc. I used to enjoy listening to your shows prior to 12-14-12. Now I feel that your type of show created these hateful people and they need to be reeled in![23]

39. Rather than change his behavior or retract his lies, Jones continued to promote the

---

[21] Pl. Trial Ex. 6 (video titled "Why People Think Sandy Hook is A Hox," dated Jan. 27, 2013); *see also* Conn. Compl. ¶¶ 111–112.

[22] Pl. Trial Ex. 6 (video titled "Why People Think Sandy Hook is A Hox," dated Jan. 27, 2013); *see also* Conn. Compl. ¶¶ 113–117.

[23] Pl. Trial Ex. 109.

false narrative that the families were actors. To create more content to continue that narrative, he elevated and amplified prominent Sandy Hook deniers like Steve Pieczenik and Wolfgang Halbig.[24]

40. On April 1, 2013, Jones invited Pieczenik onto his show as a guest caller. During this broadcast, Jones asked him "What is your take on, on Sandy Hook? Is it just all the clear scripting, and how they were ready minute one, and now it's come out that Bloomberg was ready months before, and, and all the people that look and act like actors? What's your take as an expert on this?" Pieczenik responded, "Well, this is a total script," and then continued to discuss Sandy Hook being faked by actors.[25] A few days later, Alex Jones again told his audience that Sandy Hook was staged, stating, "and I'll tell you now, there's—it's open and shut. It's a government operation at the movie theater. No doubt. . . . Sandy Hook, it's got inside job written all over it."[26]

41. On May 13, 2014, Alex Jones broadcast a video on YouTube titled "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert." In the video, Alex Jones interviewed Halbig, who claimed that, "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam." Jones asked Halbig, "What are the big smoking guns? . . . What are the big red flags?" Halbig answered: the "red flags is [sic] that you're

---

[24] *See e.g.,* Pl. Trial Ex. 17 (video titled "Bombshell: Sandy Hook Massacre Was a DHS Illusion Says School Safety Expert," dated May 13, 2014); Pl. Trial Ex. 19 (video titled "FBI Says Nobody Killed at Sandy Hook Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014); Pl. Trial Ex. 25 (video titled "New Bombshell Sandy Hook Information In-Bound," dated Mar. 4, 2015); Pl. Trial Ex. 26 (video titled "Sandy Hook The Lies Keep Growing (Infowars Nightly News)," dated May 29, 2015); Pl. Trial Ex. 27 (video titled "Infowars Footage of FOIA Hearing," dated June 3, 2015); Pl. Trial Ex. 28 (video titled "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP," dated July 7, 2015); Pl. Trial Ex. 68 (Infowars.com Article, *Sandy Hook Investigator: Connecticut PD Had FBI Falsify Crime Statistics*, dated Sept. 26, 2014); Conn. Compl. ¶¶ 129–202. As he did with Pieczenik, Jones brought Halbig on his shows for the purpose of eliciting and publishing false statements claiming that Sandy Hook was a hoax, the Sandy Hook Families were actors and fraudsters, and that children and teachers did not die at Sandy Hook. *See* Conn. Compl. ¶¶ 71–73.

[25] Pl. Trial Ex. 8a (video titled "Crisis Actors Used at Sandy Hook: Special Report," dated Apr. 1, 2013).

[26] Pl. Trial Ex. 9a (video titled "Obama Gun Grab Psyop," dated Apr. 9, 2013).

looking at $29 million . . . and there are other community nonprofit organizations within Newtown that received a lot of funds." Jones interjected, "You're saying a motive for the locals to go along with the fraud is money." Halbig said, "Children did not die, teachers did not die, on December 14, 2012." Jones said, "it's fake . . . it's fake . . . you've got parents acting . . . it is just the fakest thing since the three-dollar bill."[27]

42. In this same "interview" with Halbig, Alex Jones played a video of Plaintiff Robert Parker at the December 15, 2012 press conference, using it to target all the Sandy Hook Families, and others, as actors:

> I mean, it's fake! Blue screens, it's fake! . . . You got parents laughing [mocking laughing], 'Watch this,' and then [mocking crying] method acting [mocking crying and wailing], 'Oh, my child!' I mean, it's just ridiculous! You've got coroners that start laughing—and I don't mean uncomfortably, I mean like laughing—with the State Police when they're giving press conferences. I mean, it just is the fakest thing since the three-dollar bill![28]

43. Pieczenik appeared on Alex Jones's show again on May 27, 2013. During this broadcast, Pieczenik stated that "Sandy Hook was a total false flag." Later in that segment, Jones told Pieczenik, "You coming on and saying 'it's a false flag' is big. When can you come back on this week or next week for a full hour?"[29]

44. A September 24, 2014 article titled "FBI Says No One Killed at Sandy Hook," which described the shooting as a "carefully-scripted false flag event," drove new social media traffic, resulting in massive spikes in visits and pageviews to Infowars.com.[30] FSS was monitoring

---

[27] *See, e.g.*, Pl. Trial Ex. 17e (video titled "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," dated May 13, 2014). *See also* Conn. Compl. ¶¶ 129–141.

[28] Pl. Trial Ex. 17 (video titled "Bombshell: Sandy Hook Massacre Was a DHS Illusion Says School Safety Expert," dated May 13, 2014). *See also* Conn. Compl. ¶¶ 129–141.

[29] Pl. Trial Ex. 7a (video titled "Dr. Steve Pieczenik: Sandy Hook was A Total False Flag," dated Mar. 27, 2013). *See also* Conn. Compl. ¶¶ 123–124.

[30] *See* Pl. Trial Ex. 67; Pl. Trial Ex. 134 (analytics showing spikes in visits and pageviews to Infowars.com due to this article); Pl. Trial Ex. 135; 9/15/22 Trial Tr. (Vol. II) at 26:24–49:14; Pl. Trial Ex. 278a.

audience engagement with this article—as Jones generally did—and identified the massive spikes caused by the article. FSS circulated screenshots of analytics data for Infowars.com in the days after the defendants published "FBI Says No One Killed at Sandy Hook."[31]

45. Jones continued to target the shooting as a hoax and encourage "investigation," [32] including by listeners he knew lived nearby to the Sandy Hook Families. On December 28, 2014, during his radio show, Alex Jones took a call from a listener name Kevin who claimed to live close to Newtown, Connecticut and wanted to talk about the shooting. Jones told Kevin, "I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax." He continued: "The general public doesn't know the school was actually closed the year before . . . They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using." He concluded, "I did deep research—and my gosh, it just pretty much didn't happen."[33]

46. On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Alex Jones proclaimed:

> Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly; but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey-so yeah, or Pakistan. The

---

[31] Pl. Trial Ex. 134. *See also* Conn. Compl. ¶¶ 11, 90, 92–94.

[32] *See e.g.*, Pl. Trial Ex. 19g, (video titled "FBI Says Nobody Killed at Sandy Hook Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014) (Jones: "I do want to send some reporters up there with you as part of an investigation soon. Wolfgang is our guest. Sandyhookjustice.com. Support him. He has a lot of courage and a sterling record, and he's putting it all on the line to expose what we all know is pure bull."); Pl. Trial Ex. 19j (video titled "FBI Says Nobody Killed at Sandy Hook Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014); Pl. Trial Ex. 26b (video titled "Sandy Hook The Lies Keep Growing (Infowars Nightly News)," dated May 29, 2015); Pl. Trial Ex. 28c (video titled "Retired FBI Agent Investigates Sandy Hook MEGA MASSIVE COVER UP," dated Jul. 7, 2015).

[33] Pl. Trial Ex. 22 (video titled "America The False Democracy," dated Dec. 28, 2014); *see also* Conn. Compl. ¶¶ 171–176.

sky is now the limit.[34]

47. On July 7, 2015, the Alex Jones Radio Show broadcast a video posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[35] "[T]he more we look at Sandy Hook," Alex Jones said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened." He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged. . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . he went and investigated, no paperwork, no nothing, it's bull." Later, Jones continued, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . and then they try to hit us with fake copyright deals whenever we show this."[36] Defendants' attacks continued unabated.[37]

48. Jones has repeatedly claimed that Plaintiffs' grief is evidence of their "acting."[38]

---

[34] Pl. Trial Ex. 23a (video titled "Ron Paul – Kurt Haskell," dated Jan. 13, 2016); *see also* Conn. Compl. ¶¶ 185–186.

[35] *See* Pl. Trial Ex. 28 (video titled "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP," dated July 7, 2015). *See also* Conn. Compl. ¶ 36.

[36] *See id. See also* Conn. Compl. ¶¶ 220–224.

[37] *See, e.g.*, Pl. Trial Ex. 35b (video dated Nov. 18, 2016) (Jones: "All I know is, the official story of Sandy Hook has more holes in it than Swiss cheese"); Pl. Trial Ex. 43a (video titled "JFK Assassination Documents to DROP Tonight," dated Oct. 26, 2017) (Jones: "[Sandy Hook is] as phony as the three dollar bill."); *see also* Pl. Trial Ex. 35d (video dated Nov. 18, 2016); Pl. Trial Ex. 35e (video dated Nov. 18, 2016); Pl. Trial Ex. 46 (video titled "SOROS LAWFARE EXPOSED: Phony Sandy Hook Lawsuits Filed By FBI Agent And Families," dated May 23, 2018).

[38] *See, e.g.*, Pl. Trial Ex. 6b (video titled "Why People Think Sandy Hook is A Hoax," dated Jan. 27, 2013) (Jones mocking Robert Parker: "And when you watch the footage, I know grieving parents do strange things but he – it looks like he's saying 'okay do I read off the card' he's laughing, and then he goes over and starts um basically breaking down and crying. So let's show that clip."); Pl. Trial Ex. 17f (video titled "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," dated May 13, 2014) (Jones: "you got parents laughing going 'ha ha ha watch this' and then they're going [imitating fake crying] method acting [imitating fake crying] I mean it's just ridiculous"); Pl. Trial Ex. 19i video titled "FBI Says Nobody Killed at Sandy Hook

49.     Plaintiffs' expert on the internet, social media, and the spread of the defendants' online content, Clint Watts, explained that Jones's infrastructure at the time of the Sandy Hook shooting allowed him to engage a "massive audience" of 49 million users on his website alone.[39]

50.     Alex Jones's conduct was certain to cause Plaintiffs catastrophic harm.  Looking only at the time period 2012–2018, Alex Jones's Sandy Hook lies secured *an absolute minimum of 550 million impressions on social media alone* – that is *not even counting* the massive reach of Infowars.com.[40]  Moreover, the full reach of the Defendants' lies could not be determined because of information that Jones failed to produce.[41]

51.     The record in the Connecticut Action contains numerous additional examples, beyond those recounted here, of Alex Jones's lies that were intentionally broadcast to his massive audience.  Additionally, FSS's corporate designee testified that Jones and FSS failed to produce videos for over 100 more broadcasts of the Alex Jones Show in which Sandy Hook was discussed.[42]

52.     Jones continued to attack Plaintiffs immediately before and during the Connecticut trial.[43]  He did this precisely because those attacks would drive profits and sales.[44]  As recently as September 29, 2022, he told his audience, "now that I've seen the trial's rigged, and how it all looks, I mean—it's definitely—the whole thing's deep state, that's all I can say.  So, I think the

---

Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014); Pl. Trial Ex. 20a (video titled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," dated Dec. 27, 2014); Pl. Trial Ex. 35c (video dated Nov. 18, 2016).

[39]   9/20/22 Trial Tr. (Vol. I) at 100:13–100:24.

[40]   *See* 9/20/22 Trial Tr. (Vol. III) at 16:20–17:2.

[41]   9/20/22 Trial Tr. (Vol. III) at 2:5–8:25 (Clint Watts describing categories of missing data); *see also* DN 1006.

[42]   Pl. Trial Ex. 50 (list of broadcasts in which Jones discussed Sandy Hook, but for which defendants did not produce videos); 9/16/22 Trial. Tr. (Vol. I) at 42:8–43:21.

[43]   *See* Pl. Trial Ex. 552b (video from the Greg Reese Show on Infowars, dated Sept. 23, 2022, showing Plaintiff Robert Parker in footage from livestream of trial and mocking him for "shaking with emotion by the mere presence of Alex Jones"); Pl. Trial Ex. 594.

[44]   *See, e.g.*, Pl. Trial Ex. 513; Pl. Trial Ex. 504; Pl. Trial Ex. 512; Pl. Trial Ex. 552a.

public's original instinct about it was right.  I don't know what really happened there, but it is, it is synthetic as hell."[45]

### C.  Alex Jones's Willful and Malicious Conduct Caused Significant, Irrevocable Harm to the Sandy Hook Families

53.  Jones began attacking Plaintiffs at the lowest and most vulnerable moment of their lives.  Plaintiff David Wheeler—who lost his son Ben—testified that "after the shock of . . . Ben's murder . . . I felt like I was under water and I didn't know—I didn't know which way was up."[46] Plaintiff Mark Barden—whose son Daniel was killed in the shooting—testified that the "lie going on around [him] about [] being an actor[,] about Sandy Hook being a staged event, about Daniel being a fraud and never existed" was "harder beyond what we could ever imagine trying to deal with, trying to deal with the fact that our little boy had just been shot to death in his first grade classroom and how to literally manage one minute to the next, like literally manage from one minute to the next and then also still be parents to [his surviving children] and still be strong for them and still give them some sense of normalcy in what we didn't understand."[47]   Plaintiff Jennifer Hensel described the devastation of losing a child and then being attacked as having faked it:

> I don't think you heal from something like this.  I think you forever hold grief and you rebuild some joy back into your life, and it balances.  And some days, on other days, one takes over the other and the other days the grief is just so awful.  Then you add on the idea that people think that you made all this up for money, or that your child didn't exist—that compounds everything on top of anything you do, and you can't—I couldn't work.  I write for a living, and I couldn't form sentences.[48]

The testimony of Plaintiff William Aldenberg—an FBI agent and first responder on the scene—

---

[45]  Pl. Trial Ex. 594 (video from the Alex Jones Show, dated Sept. 29, 2022).

[46]  9/21/22 Trial Tr. (Vol. I) at 28:22–29:8.

[47]  10/4/22 Trial Tr. (Vol. II) at 21:12–23:7.

[48]  9/21/22 Trial Tr. (Vol. IV) at 30:27–31:10.

epitomized the direct trauma he experienced and provided insight into what the Sandy Hook Families had to bear about their loved ones' last minutes:  "Our senses were—and that is like—it overwhelms your senses.  I don't know.  I don't know what I heard, I just know that what I saw.  It overwhelms your senses.  It's freaking horrible."[49]

54.     As a result of Jones's intentional conduct, the Sandy Hook Families endured, on a regular basis, physical confrontation and harassment, death threats, and a sustained barrage of verbal assault on social media.  Plaintiff Robert Parker described how the harassment he and his family suffered "would come in these waves, and it was almost like I knew when Alex Jones had said something, because we would get a huge wave of stuff."[50]  Plaintiff William Aldenberg was also targeted, as people said he was "not a real FBI agent" and "an actor."[51]

55.     The harassment of the Sandy Hook Families often threatened violence, including death and rape threats.  Erica Lafferty received a letter stating that she "should die, and then be buried next to [her] fake, dead mother," and she received rape threats. [52]  Francine and David Wheeler received death threats at their child's funeral[53] and intruders invaded their home, "opened the door" and "demanded to see" their son Ben, saying, "I know he's here.  I know he's alive."[54]  Plaintiff Mark Barden testified that he was "getting letters in our mailbox and started seeing things on line that were clearly death threats . . . [W]e were sharing things with the FBI.  We were sharing things with Newtown Police Department like what is this and it looked scary and dangerous."[55]

---

[49]   9/13/22 Trial Tr. (Vol. II) at 31:11–19.

[50]   9/29/22 Trial Tr. (Vol. I) at 24:14–25:4.

[51]   9/13/22 Trial Tr. (Vol. II) at 47:21–48:4.

[52]   9/21/22 Trial Tr. (Vol. III) at 17:25–18:15, 21:13–18.

[53]   10/4/22 Trial Tr. (Vol. I) at 26:10–28:17

[54]   9/21/22 Trial Tr. (Vol. III) at 32:11–33:1; *see also* 10/4/22 Trial Tr. (Vol. I) at 24:24–25:4.

[55]   10/4/22 Trial Tr. (Vol. II) at 23:11–24:3.

FBI agent William Aldenberg testified to receiving "violent, threatening messages."[56]  Plaintiff Ian Hockley—father of six-year-old Dylan—testified that someone left on his windshield a card showing Plaintiff Robert Parker purportedly laughing.[57]

56.     Plaintiff Carlee Soto-Parisi—whose sister Victoria, a teacher, was killed in the Sandy Hook shooting trying to protect her students from the shooter—testified about how the hoax penetrated her own community:  "I was hanging out with some friends and one of the girls I was hanging out with said, you know, this girl that we went to school with, she thinks that it was all a hoax, she doesn't believe you—and I went to school with this girl, we went to school from middle school on, together.  And she didn't believe that I had a sister that died.  She thought I was an actress.  And I just couldn't wrap my head around that."[58]

57.     The Sandy Hook Families also experienced massive, constant online harassment. For example, Plaintiff Mark Barden, father of Daniel, described attacks on his music website:

> I started getting this stuff on there . . . like . . . you're a liar, you're a fraud, . . . and I'm like what? It was just completely foreign.  I didn't understand where it was coming from, why it was coming and it was really hurtful because my little music website I've never had a Facebook page in my life.  I had a little YouTube thing, again, to share music and family stuff but not really a social media person . . . and we finally had to let the website go because this hateful stuff threatening stuff, dangerous stuff was coming in so just shut it off.[59]

Plaintiff Francine Wheeler—mother of Ben—explained:

> [T]hey took my videos, and my work of 20 years, and they doctored them, and they made fun of them, and they said, look, see, she's an actor.  And they took—they took my identity.  They took my identity, and then they took my husband's identity, they took my surviving child's identity who was hiding in the gym.  They took it.[60]

---

[56]   9/13/22 Trial Tr. (Vol. II) at 52:7–53:21.

[57]   9/27/22 Trial Tr. (Vol. II) at 6:23–9:3.

[58]   9/13/22 Trial Tr. (Vol III) at 25:15–26.

[59]   10/4/22 Trial Tr. (Vol. II) at 21:12–23:7.

[60]   10/4/22 Trial Tr. (Vol. I) at 37:9–17.

Plaintiff Carlos M. Soto—Victoria Soto's brother—described online comments "saying that I wasn't real. Saying that [Victoria] wasn't real. And that my family wasn't real." He stated that "[a]nytime there's another shooting, or anytime someone says something, our social medias are flooded with another batch of comments."[61]

58.     The harassment poured into online memorials and foundation websites. For example, in connection with his daughter Emilie's memorial page, Plaintiff Robert Parker explained:

> [W]e had eight people that we had allowed to be administrators on the [Emilie memorial] page, who just spent as much free time as they could report-ban-delete, report ban-delete, report-ban-delete—trying to get rid of the stuff, just trying to get it far enough down on the page so that if anybody came to the page, the first thing they would see was something about Emilie and not all of this filth. Then by the middle of January, I finally just turned the page off. I couldn't—I couldn't—I felt like I couldn't protect Emilie's name or her memory anymore. So, I had to get rid of it.[62]

Plaintiff Ian Hockley did the same with memorial videos for his son:

> We put some of the memorials filmed and we put some of those videos on YouTube. Some of just the video of Dylan that had been created but what others were who spoke or sang and Nicole and mine eulogy we also posted that. And that started attracting comments about my behavior because I was called out for smiling . . . I can't remember all the comments that that is what that video started to attract is people saying this must be fake. He's an actor. He's smiling . . . All those things started to appear until we took our video down.[63]

Plaintiff Jennifer Hensel—whose daughter Avielle was killed in the Sandy Hook shooting—described the attack on her family through the Avielle Foundation: "[F]iltering in were people who were attacking our idea and attacking us as actors, and telling us that Avielle didn't exist and that we [were] just trying to get money from the public—and how dare we do something like

---

[61]   9/29/22 Trial Tr. (Vol. II) at 14:8–16:12.

[62]   9/29/22 Trial Tr. (Vol. I) at 12:11–13:25.

[63]   9/27/22 Trial Tr. (Vol. I) at 33:17–34:6.

that."[64]

59.     Jones's campaign of lies has forced the Sandy Hook Families to live in fear for their own safety and for the safety of their surviving loved ones.  For example, Plaintiff Nicole Hockley—whose son Dylan was killed in the Sandy Hook shooting—"took out a really large life insurance policy . . . so that if they got to me [her] surviving son will be okay—financially okay," and bought a house "that is purposefully exposed, so you can't get near my house without someone else in the neighborhood seeing you from any angle.  I have security lights throughout the whole exterior of the house."[65]  Plaintiff Mark Barden explained, "I have developed a layer of constant hypervigilance, and it's exhausting.  It interferes with your sleep, it interferes with your conscious, it interferes with your thinking, your ability to process."[66]  Plaintiff Robert Parker moved away from Newtown, but the move did not protect his family:  "[W]e weren't even halfway through the remodel on this new house, and I see this video on YouTube of all of the county documents about the sale of our house—how much it cost, the address, and the person going through all of that and following—basically, following our steps and the steps of this house and everything.  So, immediately, that sense of security that I thought that we had was totally shattered."[67]

**D.     The Filing of the Connecticut Action**

60.     On May 23, 2018, some of the Sandy Hook Families filed the Connecticut Action in the Judicial District of Fairfield at Bridgeport in Connecticut Superior Court, titled *Lafferty, et al.* v. *Jones, et al.*, UWY-CV-18-6046436-S, before Judge Barbara N. Bellis.  In December 2018 and January 2019 two substantively identical complaints—titled *Sherlach, et al.* v. *Jones, et al.*,

---

[64]   9/21/22 Trial Tr. (Vol. IV) at 28:2–6.

[65]   9/27/22 Trial Tr. (Vol. III) at 23:15–27:15.

[66]   10/4/22 Trial Tr. (Vol. III) at 19:19–20:24.

[67]   9/29/22 Trial Tr. (Vol. I) at 18:20–20:4.

UWY-CV-18-6046437-S and *Sherlach, et al.* v. *Jones, et al.*, UWY-CV-18-6046438-S—were consolidated with the first complaint in the Connecticut Action.[68]

61.     The Connecticut Action was brought against (i) Alex Jones, (ii) FSS; (iii) various additional entities wholly owned and operated by Jones (Infowars, LLC; Infowars Health, LLC; and Prison Planet TV, LLC); and (iv) some additional defendants not relevant here and who were not a party to the case at the time the judgment was entered.

62.     Plaintiffs asserted five causes of action: (i) invasion of privacy by false light, (ii) defamation and defamation *per se*, (iii) intentional infliction of emotional distress, (iv) negligent infliction of emotional distress, and (v) violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), codified at Conn. Gen. Stat. § 42-110a *et seq.*[69]

### E.     Alex Jones's Repeated Discovery Violations and Continuing Harassment While Defending the Connecticut Action

63.     From the filing of the Connecticut Complaint in May 2018 through the end of the damages trial and entry of judgment in late 2022, Alex Jones actively defended the Connecticut Action.

64.     On July 13, 2018, Alex Jones removed the case to the U.S. District Court for the District of Connecticut.  DN 106.[70]  On November 21, 2018—the day after the case was remanded back to the Connecticut Superior Court—Jones filed a special motion to dismiss the case under

---

[68]     The three complaints make substantively similar allegations and advance similar causes of action, and are referred to interchangeably in subsequent briefing by the parties.  As a result, this complaint does not distinguish between them except when citing specific allegations in particular complaints.

[69]     On September 19, 2022, after entry of the default judgment but before the start of trial on damages described below, the Sandy Hook Families filed an amended complaint removing all but Alex Jones and FSS as defendants, and withdrawing the claim for negligent infliction of emotional distress.

[70]     Citations in the form of "DN" refer to the docket number of the *Lafferty.* v. *Jones* docket, which is publicly available at https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=UWYCV186046436S.

Connecticut's anti-SLAPP statute,[71] arguing that the "claims are based on speech on an issue of public concern." DN 112, 113. A month later, the Connecticut court granted limited discovery to respond to the motion as provided by the anti-SLAPP statute. DN 123.10.

65.    Jones resisted discovery, refusing in particular to produce basic analytics data, which would have given Plaintiffs insight into daily traffic flows on Infowars.com and its mirror websites and other significant information.[72] When Alex Jones finally did produce some documents, Plaintiffs discovered that Jones had produced documents that included child pornography. Jones used this as a pretext to target Plaintiffs' counsel by name, and to urge his audience to do the same. On June 14, 2019, he claimed that Plaintiffs' counsel, whose photograph he prominently displayed to his audience, framed him by planting the child pornography in his email so that he would produce it and offered a bounty to his audience for retribution:

> 'Now, I wonder who during discovery would send e-mails out of millions and then know what to search and look at . . . . One million dollars on conviction for who sent the child porn. . . . . We're going to turn you loose, the [internet service providers], the law enforcement. You know who did it. . . . 'You think when you call up on, oh, we'll protect you. We found the child porn. I like women with big giant tits and big asses. *I don't like kids like you goddamn[ed] rapists, f-heads. In fact, you fucks are going to get it, you fucking child molesters. I'll fucking get you in the end, you fucks.* . . . *You're trying to set me up with child porn. I'm going to get your ass.* One million dollars. One million dollars, you little gang members. One million dollars to put your head on a pike. One million dollars, bitch. I'm going to get your ass.
> . . .
> That's why I said, one million. I'm not BSing. One million dollars when they are convicted. The bounty is out, bitches, and you know, you feds, they're going to know you did it. *They're going to get your ass, you little dirt bag. One million, bitch. It's out on your ass*. . . .
> . . .

---

[71]    Connecticut's anti-SLAPP ("Strategic Lawsuit Against Public Participation") statute—Conn. Gen. Stat. § 52-196a, effective January 1, 2018—was enacted to protect parties from frivolous lawsuits aimed at curtailing the exercise of certain federal and state constitutional protected rights, and it authorizes a plaintiff to file a special motion to dismiss when a complaint is "based on the opposing party's exercise of its right of free speech, right to petition the government, or right of association" under the U.S. or Connecticut constitutions. *See, e.g.*, *Elder* v. *Kauffman*, 254 A3d 1001, 1003–04, 1004 n.2 (Conn. App. Ct. 2021).

[72]    *See* DN 450 at 2–3.

*And so, if they want war—you know, it's not a threat. It's like an AC/DC song. If you want blood, you've got it. Blood on the streets, man.* . . . And I'm just asking the Pentagon and the patriots that are left, and 4chan and 8chan, and Anonymous, anybody [who's] a patriot, I am under attack, and if they bring me down, they'll bring you down. I just have faith in you. I'm under attack. And I summon the mean war. I summon all of it against the enemy.

(Emphases added).

66.     On June 18, 2019, the Connecticut trial court entered sanctions based on Jones's

discovery misconduct and on his threatening conduct toward counsel, finding that:

> Putting aside the fact that the documents the Jones defendants did produce contained child pornography, putting aside the fact that the Jones defendants filed with the Court a purported affidavit from Alex Jones that was not in fact signed by Alex Jones, the discovery in this case has been marked with obfuscation and delay on the part of the defendants, who, despite several Court-ordered deadlines as recently as yesterday, they continue in their filings to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several Court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations.[73]

67.     Regarding Jones's threatening conduct, the Connecticut trial court wrote: "Again,

these are just a few examples where Jones either directly harasses or intimidates Attorney Mattei

[counsel for the Sandy Hook Families], repeatedly accuses Plaintiffs' Counsel of requesting the

metadata so they could plant the child pornography, continues to call him a bitch, a sweet little

cupcake, a sack of filth, tells him to go to hell, and the rant or tirade continues with frequent

declarations of war against Plaintiffs' Counsel."[74]  The court recognized its "authority to address

out-of-court bad-faith litigation misconduct where there is a claim that a party harassed or

threatened or sought to intimidate counsel on the other side," and, as a sanction for Alex Jones's

discovery misconduct, denied Jones the opportunity to pursue the special motion under

---

[73] DN 269 at 1.

[74] *Id.* at 7.

Connecticut's anti-SLAPP statute.[75]  The court further cautioned that:

> At this point, I decline to default the Alex Jones defendants, but I will—I don't know how clearly I can say this.  As this case progresses, and we will get today before you leave a trial date in the case now and a scheduling order.  As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the Alex Jones defendants if they from this point forward continue with their behavior with respect to discovery.[76]

68.     Alex Jones then appealed the sanction to the Connecticut Supreme Court, which heard oral argument in August 2019.  On July 23, 2020, the Connecticut Supreme Court issued a decision affirming the lower court's dismissal of the anti-SLAPP motion as a sanction for Alex Jones's repeated discovery violations.[77]  After looking to guidance from the U.S. Supreme Court and sister state appellate courts on the constitutionality of contempt as a sanction for out-of-court statements commenting on judicial proceedings, the Connecticut Supreme Court affirmed the sanctions, finding that Alex Jones's behavior "posed ***an imminent and likely threat*** to the administration of justice" and was "***calculated to interfere with the fairness of the proceedings*** as it directly targeted opposing counsel, accusing him of felonious behavior and threatening him, and reasonably can be expected to influence how the plaintiffs litigate their case."[78]  The Connecticut Supreme Court further noted that, "Because Jones's statements were ***one part of a whole picture of bad faith litigation misconduct***, we conclude that the trial court's reliance on Jones's speech as part of the rationale for the sanctions orders was appropriate in this context."[79]

69.     The case returned to the Connecticut trial court in September 2020.  Over the next

---

[75]   *Id.* at 3.

[76]   *Id.* at 8.

[77]   *See Lafferty* v. *Jones*, 246 A.3d 429 (Conn. July 23, 2020)*, available at* https://jud.ct.gov/external/supapp/Cases/AROcr/CR335/335CR35.pdf.

[78]   *Id.* at 365, 370.

[79]   *Id.* at 370 (emphases added).

two years, Alex Jones continued actively defending the case, and he continued his active discovery misconduct.

70.     For example, in the very first deposition of a plaintiff—and even while that deposition was ongoing—Alex Jones violated the protective order by using testimony designated as "Confidential-Attorneys Eyes Only" as the basis for a frivolous motion to depose former presidential candidate Hillary Clinton.  In forcefully rebuking this violation of the protective order over Jones's objection, the Connecticut court stated in its August 5, 2021 order that Alex Jones:

> [T]ake[s] the absurd position that the court ordered protective order  .  .  .  did not need to be complied with, and should not be enforced by the court.  This argument is frightening.  Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public.  The court will address sanctions at a future hearing.

71.     At the ensuing October 20, 2021 hearing, the Connecticut court imposed sanctions for Alex Jones's violations of the protective order, holding that the arguments by Alex Jones "were baseless, and I think the behavior really is unconscionable.  There is no confusion.  There can be no confusion about a very straight forward protective order that counsel themselves filed and asked the Court to approve.   And I am concerned about a chilling effect on the testimony of other witnesses."  DN 525 at 78.

72.     Similarly, after the court ordered Alex Jones and FSS to produce trial balances for FSS, including subsidiary ledgers, they failed to produce the required discovery.  After the Sandy Hook Families moved for sanctions, the court once more called out the defendants' misconduct in an order dated August 6, 2021:

> There is no excuse for the defendants' disregard of not only their discovery obligations, but the two court orders.  The court finds that the failure to comply with the production request has prejudiced the plaintiffs [and] their ability to both

prosecute their claims and conduct further depositions in a meaningful manner. The Connecticut court further noted that, "Sanctions will be addressed at a future hearing."

73.     In a similar obstructionist vein, Alex Jones and FSS failed to produce Google Analytics data in violation of multiple court orders.  Once more, the Connecticut court found the misconduct sanctionable:

> The Jones defendants, however, seem to take the position that the rules of practice do not apply to them. . . . There is no dispute here that the Jones defendants failed to follow the rules as they relate to discovery.  The actions they took, as they themselves outlined in their objection and surreply, fall far short of meeting their obligations under our rules. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the appropriate sanctions at the next status conference.[80]

74.     While Alex Jones's misconduct in the litigation continued, the court continued to issue a series of warnings that repeated violations might lead to sanctions, including a potential default judgement.  *See, e.g.*, DN 326.10 (May 5, 2021 order noting that noncompliance with a discovery order "may result in sanctions."); DN 336, May 6, 2021 Tr. at 13–16 (noting that "invok[ing] the Rules of Professional Conduct as a procedural weapon" was inappropriate and sanctionable); DN 348.10 (June 2, 2021 order noting that failure to comply with longstanding discovery orders "may result in sanctions including but not limited to a default").

### F.     The Default Judgment Against Alex Jones

75.     Unable to prosecute meaningful discovery, Plaintiffs filed a motion for default judgment on October 6, 2021, which Alex Jones and FSS actively opposed.  At the time that Plaintiffs filed their motion, there were other discovery disputes pending about Alex Jones's misconduct, including regarding the manipulation of financial documents produced in discovery and the improper handling of confidential settlement information in violation of a court order.

---

[80]     DN 450.20, Sept. 30, 2021 order.

76.     In a ruling on November 15, 2021, on the record, which is attached hereto as Exhibit E, the court noted Alex Jones's extensive participation and willful misconduct to date in the litigation.  As to the violations of the protective order, for example, the court noted that Alex Jones and the other defendants "argued unconvincingly that they didn't understand the very protective order that they themselves drafted and asked the Court to approve as a Court order, which the Court did."  DN 574 at 3–4.  The court underscored Alex Jones's long history of extensive appearances in the action—*e.g.*, on June 28, 2018; March 1, 2019; February 24, 2020; July 7, 2020; November 6, 2020; May 14, 2021; and October 20, 2021—and emphasized his history of openly defying repeated court orders and making false representations to the court.

77.     As a result of these violations, the court entered default judgment on all claims against defendants Alex Jones; Infowars, LLC; Free Speech Systems, LLC; Infowars Health, LLC; and Prison Planet TV, LLC.  In concluding that default judgment was appropriate, the court explained:

> Here the Jones defendants were not just careless.  Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a ***pattern of obstructive conduct*** that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.
> . . .
> The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was ***caused by the Jones defendants willful noncompliance***, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims.  For these reasons, the Court is entering a default against the defendants Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC.  The case will proceed as a hearing in damages as to the defendants.  The Court notes ***Mr. Jones is sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly.  And all the defendants have failed to fully and fairly comply*** with their discovery obligations.[81]

---

[81]     DN 579 at 56–57 (emphases added).

78. Following the entry of default judgment, Alex Jones and the other defendants filed a notice of defenses. *See* DN 594. In a December 24, 2021 order, the court struck those defenses, finding that "the Alex Jones defendants are prohibited from contesting liability or raising affirmative defenses in light of the disciplinary default entered against them. Therefore, the notice of defenses is stricken, and the case will proceed as a hearing in damages as to these defendants." *See* DN 620.20 at 1.

79. Under Connecticut law, an entry of default "conclusively establishe[s] the facts alleged in the plaintiffs' complaint." *Smith* v. *Snyder*, 839 A.2d 589, 598 (Conn. 2004); *DeBlasio* v. *Aetna Life & Cas. Co.*, 441 A.2d 838, 839 (Conn. 1982). Thus, as a matter of Connecticut law, Alex Jones has legally admitted to allegations referenced previously, as well as to the following allegations, among others:

- "Jones . . . has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary and with no supporting evidence." (Conn. Complaint ¶ 8);

- "Alex Jones does in fact believe that the Sandy Hook Shooting was a hoax—and he never has." (*Id.* ¶ 9);

- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." (*Id.* ¶ 11);

- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people," including "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media." (*Id.* ¶¶ 13–14);

- "Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting." (*Id.* ¶ 41);

- "The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was . . . a prime narrative for attracting, augmenting, and agitating Jones's audience." (*Id.* ¶ 92);

- "In light of [his] prior experience with similar sorts of reckless and false statements, [Jones] knew that [his] publications could cause the plaintiffs to suffer harassment and potential violence." (*Id.* ¶ 341);

- Jones's acts "resulted in damage to the plaintiffs." (*Id.* ¶ 346);

- "In broadcasting [his] campaign of outrageous and false statements about the plaintiffs, [Jones] intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of [his] conduct." (*Id.* ¶ 361);

- Jones's "conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (*Id.* ¶ 365);

- "Jones's outrageous, cruel and malicious conduct was the cause of the plaintiff's distress." (*Id.* ¶ 377); and

- Jones "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and . . . did so for profit." (*Id.* ¶ 386).

### G.    The Damages Trial Against Alex Jones

80.    On September 13, 2022, following the default judgment, the Connecticut Action proceeded to a trial on damages, in which Alex Jones and his counsel once again fully participated. *See* DN 1026 at 7.

81.    Although he went to Connecticut for much of the trial, Alex Jones spent almost all of the trial outside the courthouse.[82]  On September 22, 2022, the seventh day of trial, Plaintiffs called Alex Jones to the stand.  During his testimony, Jones drew a contempt threat from the court and repeatedly spoke over his own lawyer's objections.[83]  While on the stand, Jones was asked: "[I]f someone were to falsely claim that a group of families who have lost loved ones were actors and had faked the deaths of their loved ones, that would be a horrible thing to say, correct?"  He responded, "In the context, it could be, yes."[84]

82.    As previously described, Plaintiffs testified at the trial regarding their injuries.  Alex

---

[82]    *See* DN 996 (recounting 9/23/22 press conference Jones gave on courthouse steps in which he called for the jury to "go . . . research" the case on their own, in direct contradiction to court's instruction to jury to decide case on evidence presented); 9/27/22 Trial Tr. (Vol. I) at 3; 9/23/22 Trial Tr. (Vol. I) at 1–2; 10/5/22 Trial Tr. (Vol. I) at 5–6.

[83]    *See* 9/22/22 Trial Tr. (Vol. IV) at 22.

[84]    *See* 9/22/22 Trial Tr. (Vol. II) at 38.

Jones's trial counsel was present throughout the trial and had the opportunity to cross-examine each Plaintiff, to cross-examine all other witnesses, and to call witnesses himself.

83.     Following the three-week trial, the court instructed the jury on October 7, 2022 that it was their "duty as jurors to determine the extent of damages," and that they should "award those damages [they] find to have been proven by a preponderance of the evidence[.]"[85]  The court further instructed the jury that, in addition to compensatory damages, common law "[p]unitive damages may be awarded if you find that the defendants' actions in this case were willful[,] wanton or malicious." *Id.*  Punitive damages under CUTPA would be determined by the court.

84.     On October 12, 2022, the jury rendered a verdict assessing damages against Alex Jones and FSS.  This verdict is attached hereto as Exhibit A.  The damages assessment was based on the already-established liability against Jones and FSS for invasion of privacy by false light, defamation, intentional infliction of emotional distress, and violation of CUTPA.  The jury awarded Plaintiffs $965 million in compensatory damages.  The jury also found that Plaintiffs were entitled to common law punitive damages, which in Connecticut consist of attorney's fees and costs.  *See* DN 1010.

85.     On October 21, 2022, Alex Jones and FSS moved to set aside the verdict and for remittitur to reduce the jury's assessment of damages.  That same day, the parties began briefing the issue of CUTPA punitive damages, which are determined by the court under the statute.  On October 21, 2022, Plaintiffs submitted their opening brief, in which they argued that the misconduct by Alex Jones and FSS evidenced the highest possible degree of reprehensibility.  DN 1018.  Under CUTPA, punitive damages are only available where the evidence reveals a "reckless indifference to the rights of others or an intentional and wanton violation of those

---

[85]    Jury Charge, *Lafferty* v. *Jones* Court Ex. II at 12.

rights,"[86] and the "basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive, and violence."[87]  Plaintiffs argued that the evidence before the court established that "it was objectively certain that defendants' conduct would harm the plaintiffs and that the defendants 'actually entertained' the intent to harm the plaintiffs," and "[k]nowing the harm they were causing, the defendants chose to continue inflicting harm on the plaintiffs for ten years, including during this trial." *Id.* at 5.  Plaintiffs advanced several arguments for awarding substantial punitive damages under CUTPA.

86.     *First*, Plaintiffs pointed to evidence that Alex Jones and FSS knew that their actions were certain to cause harm, including because (i) the defendants' infrastructure at the time of the Sandy Hook shooting allowed them to engage a "massive audience" of 49 million users on their website alone, as established by Plaintiffs' trial expert and by FSS's own documents concerning the reach of Infowars content; (ii) Jones groomed his audience to believe that he—and only he— would tell them the truth, as extensively established by the evidence at trial (and the admitted allegations of the Connecticut Complaint); and (iii) Jones's business plan is to activate his audience, and he knows that plan works. *Id.* at 7–9.

87.     *Second*, Plaintiffs pointed to evidence that from shortly after the shooting until recently, Alex Jones and FSS knew they were actually harming Plaintiffs but nevertheless continued attacking them repeatedly.  Plaintiffs noted (i) Alex Jones's repeated attacks on the plaintiffs over a period of years; (ii) that Jones knew his lies were false from the beginning; (iii) that if there were any question whether Jones knew his lies were harming the plaintiffs, that question was completely resolved by the warning from Leonard Pozner barely six weeks after the shooting

---

[86]     *Bridgeport Harbour Place I, LLC* v. *Ganim*, 30 A.3d 703, 732 (Conn. App. Ct. 2011).

[87]     *Id.*

about the "pain and suffering" that Jones was causing and how Jones's show "created these hateful people and they need to be reeled in;" (iv) that Jones chose to keep targeting Plaintiffs after Pozner's warning; (v) that the November 2013 report by the Connecticut State's Attorney regarding the shooting again gave the lie to any notion that the shooting was a hoax, but rather than back off his lies, Jones chose to capitalize on the engaged audience he had developed around the Sandy Hook hoax narrative; (vi) that record evidence showed Jones's focus on the way that the Sandy Hook lies were increasing his website traffic; (vii) that Jones continued his attacks year after year; and (viii) that the trial evidence established Jones's Sandy Hook lies received a minimum of 550,000,000 impressions on social media alone between 2012 and 2018 (this does *not* count radio or impressions from Jones's massive following on Infowars.com and other Jones websites). *Id.* at 9−18.

88.     *Third*, Plaintiffs pointed out the evidence that Jones had continued to attack the Sandy Hook Families during trial in order to push product sales. *Id.* at 18−19.

89.     On October 28, 2022, Alex Jones and FSS opposed the award of punitive damages under CUTPA. DN 1021. They acknowledged that "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 3. They argued, among other things, that (i) the compensatory damages award achieved the purpose of punitive damages, (ii) punitive damages, if imposed, should be limited to common law punitive damages, and (iii) common law damages should be limited to what due process requires. *Id.*

90.     On November 10, 2022, the court issued a 45-page opinion—attached hereto as Exhibit B—regarding common law and CUTPA punitive damages. DN 1026. The court imposed approximately $322 million in common law punitive damages, rejecting Alex Jones's arguments

that full common law punitive damages should not be awarded, and fully compensated Plaintiffs'

attorney's fees and costs (attorney's fees and costs are the measure of common law punitive

damages under Connecticut law). *Id.* at 20.

91.     As to CUTPA punitive damages—determined by the court under Connecticut

law—the Connecticut court stated that it had assessed a number of factors, including (i) the degree

of relative blameworthiness, i.e., whether the defendant's conduct was reckless, intentional, or

malicious; (ii) whether the defendant's action was taken or omitted to augment profit; (iii) whether

the wrongdoing was hard to detect; (iv) whether the injury and compensatory damages was small,

providing a low incentive to bring the action; and (v) whether the award will deter the defendant

and others from similar conduct. *Id.* at 29–30.

92.     In considering the first factor regarding the degree of relative blameworthiness—

which the court found was "the most important consideration"—the court held:

> ***The record clearly supports the plaintiffs' argument that the defendants' conduct
> was intentional and malicious, and certain to cause harm by virtue of their
> infrastructure, ability to spread content, and massive audience including the
> "infowarriors."*** The record also establishes that the defendants repeated the
> conduct and attacks on the plaintiffs for nearly a decade, including during the trial,
> wanton, malicious, and heinous conduct that caused harm to the plaintiffs. This
> depravity, and cruel, persistent course of conduct by the defendants establishes the
> highest degree of reprehensibility and blameworthiness.[88]

93.     In considering the second factor regarding whether Jones's actions were taken in

order to augment profits, the court held:

> [D]espite the defendants' abject failure to meet their obligations to fully and fairly
> comply with discovery—and despite the defendants' failure to produce a
> knowledgeable corporate representative armed with sufficient information—the
> plaintiffs clearly established that the defendants' conduct was motivated by profit,
> by virtue of the convincing evidence including the text messages between Alex
> Jones and Tim Fruge regarding daily sales figures, the business model used by the
> defendants whereby they emulated content including Sandy Hook content to reap
> more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook

---

[88]     *Id.* at 43–44 (emphasis added).

engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.[89]

94.     In considering the third factor regarding the difficulty to detect the wrongdoing, the court held:

> [T]he defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.[90]

95.     In considering the fourth factor regarding the size of the injuries and compensatory damages awards and the low incentive to bring the action, the court held:

> [D]espite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this.  The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court.  Moreover, the trial record establishes that the defendants remain in the unique position of having-and continuing to utilize-an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected.  ***It is, quite simply, unprecedented in American jurisprudence***, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.[91]

96.     In considering the fifth factor regarding the deterrent effect of punitive damages, the court held:

> [T]he court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.[92]

---

[89]   *Id.* at 40–41.

[90]   *Id.* at 41.

[91]   *Id.* at 41–42 (emphasis added).

[92]   *Id.* at 42–43.

97.    Based on its analysis of these factors, the court awarded $10 million in CUTPA punitive damages to each of the 15 plaintiffs in the Connecticut Action, for a total of $150 million.[93]

98.    On December 22, 2022, the court denied the motion by Alex Jones and the other defendants for a new trial and remittitur.  DN 1042.  This decision is attached hereto as Exhibit C. The court found:

> Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support the verdicts rendered by the jury. . . . In reviewing the evidence in a light most favorable to sustaining the verdicts, . . . *the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform to spread lies to a massive audience* clearly supports the verdicts, and that the verdicts are within the limits of a fair and just award of damages.[94]

99.    On December 29, 2022, Alex Jones and other defendants filed an appeal from the judgment.  DN 1050.  That appeal is currently pending.

100.    As a result of the jury's damages verdict, Alex Jones owes debts to the Sandy Hook Families for damages, including common law and statutory punitive damages, in the total amount of $1,438,139,555.94. The Connecticut Judgment comprises 15 separate debts owed to the 15 different Plaintiff creditors, as reflected in the table below.

| Plaintiffs | Compensatory Damages | Common Law Punitive Damages | CUTPA Punitive Damages | Total |
|---|---|---|---|---|
| Robert Parker | $120,000,000 | $40,099,304 | $10,000,000 | $170,099,304 |
| David Wheeler | $55,000,000 | $18,429,304 | $10,000,000 | $83,429,304 |
| Francine Wheeler | $54,000,000 | $18,099,304 | $10,000,000 | $82,099,304 |
| Jacqueline Barden | $28,800,000 | $9,699,304 | $10,000,000 | $48,499,304 |
| Mark Barden | $57,600,000 | $19,299,304 | $10,000,000 | $86,899,304 |
| Nicole Hockley | $73,600,000 | $24,629,304 | $10,000,000 | $108,229,304 |
| Ian Hockley | $81,600,000 | $27,299,304 | $10,000,000 | $118,899,304 |

---

[93]    *Id.* at 44.

[94]    *Id.* at 4–5 (emphasis added).

| | | | | |
|---|---|---|---|---|
| Jennifer Hensel | $52,000,000 | $17,429,304 | $10,000,000 | $79,429,304 |
| Donna Soto | $48,000,000 | $16,099,304 | $10,000,000 | $74,099,304 |
| Carlee Soto-Parisi | $66,000,000 | $22,099,304 | $10,000,000 | $98,099,304 |
| Carlos M. Soto | $57,600,000 | $19,299,304 | $10,000,000 | $86,899,304 |
| Jillian Soto Marino | $68,800,000 | $23,029,304 | $10,000,000 | $101,829,304 |
| William Aldenberg | $90,000,000 | $30,099,304 | $10,000,000 | $130,099,304 |
| Richard M. Coan, chapter 7 trustee for the estate of Erica Lafferty | $76,000,000 | $25,429,304 | $10,000,000 | $111,429,304 |
| William Sherlach | $36,000,000 | $12,099,304 | $10,000,000 | $58,099,304 |
| **TOTAL** | $965,000,000 | $323,139,556 | $150,000,000 | **$1,438,139,556** |

101.     In addition to the litigation proceeding against Alex Jones and other defendants in Connecticut state court, other parents of children killed in the Sandy Hook shooting filed three defamation lawsuits in Texas in 2018 against Alex Jones and FSS based on the same underlying campaign of lies and harassment by Alex Jones. [95]  The cases brought by Sandy Hook parents Neil Heslin and Scarlett Lewis were consolidated, and on August 5, 2022, a jury ordered Alex Jones to pay $45.1 million in punitive damages—in addition to $4.1 million in compensatory damages already awarded.  The third action—brought by Sandy Hook parents Leonard Pozner and Veronique De La Rosa—may proceed to trial this year.

## <u>COUNT ONE</u>

### (Declaratory Judgment That the Connecticut Judgment is<br>Nondischargeable Under Section 523(a)(6))

102.     Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

103.     Section 523(a)(6) of the Bankruptcy Code provides that a "discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."

---

[95]   *See Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *Lewis* v. *Jones*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *Pozner* v. *Jones*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *Fontaine* v. *Jones*, Cause No. D-1-GN-18-001605, in the 459th District Court for Travis County, Texas.

104.     "Willful and malicious injury" under Section 523(a)(6) "requires a showing of either: (1) an objective substantial certainty of injury or (2) a subjective motive to cause harm on the part of the debtor."[96]

105.     The Connecticut trial court has already determined that this debt arises from willful and malicious injury to Plaintiffs by Jones under both the objective and subjective standards.

106.     These determinations were fully litigated and resolved in the Connecticut Action over Jones's active defense and have preclusive effect here.

107.     The closed record of admitted facts, evidence, court orders and jury verdict from the Connecticut Action also confirms that the Connecticut Judgment reflects Jones's willful and malicious injury to Plaintiffs.

108.     The Sandy Hook Families accordingly request a judicial determination by this Court that the approximately $1.4 billion debt owed them is not dischargeable pursuant to section 523(a)(6) of the Bankruptcy Code.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment as follows:

A.     That Debtors, Alex Jones and FSS, are indebted to Plaintiffs in the amount of the Connecticut Judgment;

B.     That  Debtors, Alex Jones and FSS, are indebted to Plaintiffs for attorney's fees, expenses, interest, other costs, and charges from the Connecticut Judgment until paid in full;

C.     That the Connecticut Judgment and other obligations, including any and all other claims, debts, and damages owed by Debtors Alex Jones and FSS to Plaintiffs arising from or relating to the allegations herein are nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code; and

D.     For such other and further relief as the Court may deem proper.

---

[96]     *Miller* v. *J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998).

Respectfully submitted on this 10th day of March, 2023.

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011

*Counsel to the Sandy Hook Families*

**KOSKOFF KOSKOFF & BIEDER PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Telephone: (203) 336-4421

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Daniel S. Sinnreich (admitted *pro hac vice*)
Daniel A. Negless (admitted *pro hac vice*)
Briana P. Sheridan (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990

*Counsel to the Sandy Hook Families other than*
*Richard M. Coan, as chapter 7 trustee for the estate*
*of Erica Lafferty*

**ZEISLER & ZEISLER, PC**
Eric Henzy (*pro hac vice* pending)
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Telephone: (203) 368-5495

*Counsel to Richard M. Coan, as chapter 7 trustee*
*for the estate of Erica Lafferty*

# Exhibit A

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.    COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

**TO PLAINTIFF ROBERT PARKER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                           $ 60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
   (PAST AND FUTURE)                           $ 60,000,000.00

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 120,000,000.00

*JM*

**TO PLAINTIFF DAVID WHEELER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $ 25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
   (PAST AND FUTURE)                          $ 30,000,000.00

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DAVID
   WHEELER AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                                              $ 55,000,000.00

**TO PLAINTIFF FRANCINE WHEELER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $ 24,000,000.00


B.  EMOTIONAL DISTRESS DAMAGES          $ 30,000,000.00
    (PAST AND FUTURE)


**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF FRANCINE
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                        $ 54,000,000.00

4

LM

**TO PLAINTIFF JACQUELINE BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                      $ 10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES            $ 18,800,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JACQUELINE
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                         $ 28,800,000.00

LM

**TO PLAINTIFF MARK BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
   (PAST AND FUTURE)                    $ 32,600,000.00

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF MARK
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                        $ 57,600,000.00

LM

**TO PLAINTIFF NICOLE HOCKLEY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 32,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
   (PAST AND FUTURE)                    $ 41,600,000.00

       **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF NICOLE
   HOCKLEY AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**           $ 73,600,000.00

7

LM

**TO PLAINTIFF IAN HOCKLEY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $38,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $43,600,000.00
   (PAST AND FUTURE)

       **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF IAN
   HOCKLEY AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**           $81,600,000.00

8



**TO PLAINTIFF JENNIFER HENSEL:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                       $ 21,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES             $ 31,000,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF JENNIFER
> HENSEL AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>
> $ 52,000,000.00

9



**TO PLAINTIFF DONNA SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 18,000,000.00


B. EMOTIONAL DISTRESS DAMAGES          $ 30,000,000.00
   (PAST AND FUTURE)


   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DONNA
   SOTO AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**           $ 48,000,000.00

10

**TO PLAINTIFF CARLEE SOTO PARISI:**

A.  DEFAMATION/SLANDER DAMAGES
     (PAST AND FUTURE)                    $30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES           $36,000,000.00
     (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLEE
SOTO PARISI AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                          $66,000,000.00

11

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $18,600,000.00

B.  EMOTIONAL DISTRESS DAMAGES          $39,000,000.00
    (PAST AND FUTURE)

          **TOTAL FAIR, JUST AND REASONABLE
          DAMAGES TO PLAINTIFF CARLOS
          MATHEW SOTO AND AGAINST ALEX JONES
          AND FREE SPEECH SYSTEMS
          (ADD LINE A AND LINE B)**           $57,600,000.00

12

LM

**TO PLAINTIFF JILLIAN SOTO-MARINO:**

A.  DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                          $30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES            $38,800,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$68,800,000.00

13

**TO PLAINTIFF WILLIAM ALDENBERG:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $ 45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES        $ 45,000,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**          $ 90,000,000.00

14

LM

**TO PLAINTIFF ERICA LAFFERTY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 58,000,000.00
   (PAST AND FUTURE)

      **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ERICA
LAFFERTY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**          $ 76,000,000.00

15

**TO PLAINTIFF WILLIAM SHERLACH:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 27,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE**
   **DAMAGES TO PLAINTIFF WILLIAM**
   **SHERLACH AND AGAINST ALEX JONES**
   **AND FREE SPEECH SYSTEMS**
   **(ADD LINE A AND LINE B)**

                                        $ 36,000,000.00

LM

## II.    AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

    If you check YES, the judge will determine the amount due to the plaintiffs for reasonable attorney's fees and costs and will then award the plaintiffs that amount at a later date.

    If you check NO, the judge will award $1 to the plaintiffs for their attorney's fees and costs.

**WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.**

    ☒ **YES**    (reasonable attorney's fees and costs to be awarded by the judge at a later date)

    ☐ **NO**    (judge will award $1)

_____

FOREPERSON SIGNATURE

10|12|2022
DATE

18

LM

# **Exhibit B**

```
NO: X06-UWY-CV18-6046436-S      : SUPERIOR COURT

ERICA LAFFERTY                  : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg. Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought
suit against the defendants, Alex Emric Jones and Free Speech
Systems, LLC.[2]  In the operative complaints,[3] the plaintiffs
allege the following relevant facts against the defendants.
Jones is a radio and internet personality who resides in Austin,
Texas.  He is the host of "The Alex Jones Show" and he owns and
operates the websites Inforwars.com and PrisonPlanet.com.
Infowars, LLC is a Texas limited liability company that produces
and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC
is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the
date of the shooting.  Additionally, the original plaintiff Erica
Lafferty was replaced as a plaintiff by her bankruptcy trustee
Richard Coan on October 20, 2021. In both *Sherlach* v. *Jones* cases,
docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the
named plaintiffs are William Sherlach and Robert Parker.  Sherlach
is the spouse of a school psychologist and Parker is the parent of a
student who were murdered by Adam Lanza during the Sandy Hook
incident.

[2] Although there were many additional defendants when these cases
were originally brought, the only remaining defendants at this
juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the
same facts, they will be discussed simultaneously.

2

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

gain.  In fact, by May, 2013, Jones was alleged to make approximately $10 million annually.  Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ."  In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."  In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card.  Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

throughout the course of the litigation. The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants. The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022.. On October 12, 2022, the jury reached its verdict as to the various plaintiffs. Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice. For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei." *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

### Common Law Punitive Damages

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.  Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim.  Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc*. v. *Canaan Oil & Fuel Co*., supra, 193

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472, 493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . If awarded, [common-law] *punitive damages are limited to the costs of litigation less*

*taxable costs, but, within that limitation, the extent to which*
*they are awarded is in the sole discretion of the trier*. . . .
Limiting punitive damages to litigation expenses, including
attorney's fees, fulfills the salutary purpose of fully
compensating a victim for the harm inflicted . . . while avoiding
the potential for injustice which may result from the exercise
of unfettered discretion by a jury. . . . We have long held that
in a claim for damages, proof of the expenses paid or incurred
affords some evidence of the value of the services . . . . *Label*
*Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d
703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614
A.2d 414 (1992)] (common-law punitive damages, when viewed in
the light of the increasing costs of litigation, also [serve]
to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*,
supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages
for 'wanton or malicious injuries' for more than two hundred
years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

14

and cases cited therein. More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

punitive damages against [the defendant]. The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees. The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

17

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million; as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million; as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million; as to Jennifer Hensel, $17.33 million; as to Donna Soto, $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million; as to Jillian Soto-Marino, $22.93 million; as to William Aldenberg, $30 million; as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million. Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

<u>Punitive Damages Pursuant to the Connecticut Trade Practices
Act (CUTPA), General Statutes § 42-110a et seq.</u>

General Statutes § 42-110g provides in relevant part: "(a)
Any person who suffers any ascertainable loss of money or
property, real or personal, as a result of the use or employment
of a method, act or practice prohibited by section 42-110b, may
bring an action . . . to recover actual damages. . . . *The court
may, in its discretion, award punitive damages* and may provide
such equitable relief as it deems necessary or proper."
(Emphasis added.) "The language is clear and unambiguous; the
awarding of punitive damages is within the discretion of the
trial court." (Internal quotation marks omitted.) *Bridgeport
Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d
703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier. Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. See *State Farm Mutual Automobile Ins. Co*. v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co*. v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration.  Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material."  (Citation omitted; internal quotation marks omitted.)  *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA.  "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co*. observed that several studies

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

outlier cases that call the fairness of the system into question
are above the median . . . . Accordingly, given the need to
protect against the possibility (and the disruptive cost to the
legal system) of awards that are unpredictable and unnecessary,
either for deterrence or for measured retribution, we consider
that a 1:1 ratio, which is above the median award, is a fair
upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich*
v. *Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims
under CUTPA and the punitive damages claims under maritime law
at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined
to adopt the same a one-to-one ratio of punitive damages to
compensatory damages as an upper limit for punitive damages in
CUTPA cases. Id., 453-54. Nevertheless, the court adopted the
factors that were considered by the United States Supreme Court
in *Exxon Shipping Co*. in determining whether the amount of
punitive damages awarded pursuant to CUTPA is excessive. The
court explained that "in determining whether a punitive damages

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co*. discussed.  These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co*. v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454–56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146–47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147–49, the Appellate Court explained that the trial court "found that among the more vexing, competing

considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [defendants'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns. In *Bristol Technology, Inc*. v. *Microsoft Corp*., 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated 'the United States Constitution imposes a substantive

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases.' *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Ins*. *Co*. v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc*. v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)]. The Court further

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

37

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth. On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs. In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident." (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

could have concluded that the bank's reckless and deceptive
conduct, together with the fact that the motive for the conduct
was to increase the profitability of the auction to the bank,
the fact that the bank has a very high net worth and the fact
that there is an established practice in this state of awarding
multiple damages for CUTPA violations, warranted the amount of
the award. Accordingly, [the Supreme Court concluded] that the
size of the trial court's punitive damages award [which was
three times the compensatory award] did not constitute an abuse
of discretion." (Citation omitted; footnote omitted.) Id.,
456-57.

Here, the material allegations of the complaints, which
have been established by virtue of the defaults, entitle the
plaintiffs to an award of CUPTA punitive damages. In support of
their claim for CUTPA punitive damages, the plaintiffs, in their
briefs, support each Ulbrich factor with specific citations to
the record. The defendants, in taking the position that there
should be either no award of CUTPA punitive damages, or only a

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having—and continuing to utilize—an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.

## Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

costs in the total amount of $1,489,555.94, and awards CUTPA punitive damages in the amount of $150,000,000.00.

421277

Barbara N. Bellis

# <u>Exhibit C</u>

| DOC. NO.: X06-UWY-CV-18-6046436-S | : | SUPERIOR COURT |
|---|---|---|
| | : | |
| ERICA LAFFERTY | : | JUDICIAL DISTRICT OF WATERBURY |
| | : | |
| v. | : | COMPLEX LITIGATION DOCKET |
| | : | |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | DECEMBER 22, 2022 |

| DOC. NO.: X06-UWY-CV-18-6046437-S | : | SUPERIOR COURT |
|---|---|---|
| | : | |
| WILLIAM SHERLACH | : | JUDICIAL DISTRICT OF WATERBURY |
| | : | |
| v. | : | COMPLEX LITIGATION DOCKET |
| | : | |
| | : | |
| ALEX JONES, ET AL. | : | DECEMBER 22, 2022 |

| DOC. NO.: X06-UWY-CV-18-6046438-S | : | SUPERIOR COURT |
|---|---|---|
| | : | |
| WILLIAM SHERLACH | : | JUDICIAL DISTRICT OF WATERBURY |
| | : | |
| v. | : | COMPLEX LITIGATION DOCKET |
| | : | |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | DECEMBER 22, 2022 |

MEMORANDUM OF DECISION

The defendants move to set aside the verdict and for remittitur pursuant to General

Statutes § 52-228b and Practice Book § 16-35.[i] Section 52-228b provides in relevant part: "No

verdict in any civil action involving a claim for money damages may be set aside except on

---

[i] Practice Book § 16-35 provides in relevant part: "[M]otions to set aside a verdict, motions for remittitur . . . motions for new trials, unless brought by petition served on the adverse party or parties . . . must be filed with the clerk within ten days after the day the verdict is accepted . . . . Such motions shall state the specific grounds upon which counsel relies."

written motion by a party to the action, stating the reasons relied upon in its support . . . . No such verdict may be set aside solely on the ground that the damages are excessive unless the prevailing party has been given an opportunity to have the amount of the judgment decreased by so much thereof as the court deems excessive. . . ." The defendants also rely on General Statutes § 52-216a, which provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

## MOTION FOR REMITTITUR

"In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Citation omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 281, 32 A.3d 318 (2011).

"We acknowledge that the 'shocks the sense of justice' standard provides vague guidance at best—due, in part, to the uncertain limits of noneconomic damages. The language is intended

to convey the extraordinary departure from reasonableness that is required before a court properly may exercise its authority to set aside the jury's award of damages.  We have in the past stated what will *not* be sufficient to support a trial court's decision to set aside the jury's damages award and order a remittitur: The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . Regarding what *will* be sufficient to support an order of remittitur, we have stated that a trial court should exercise its discretion to order remittitur only in cases where very clear, definite and satisfactory reasons can be given for such interference. . . . For a trial court's remittitur order to be justified . . . we have stated that we must have laid before us a very clear and striking case of indubitable wrong, so clear and striking as to indicate the influence of undue sympathy, prejudice or corruption on the verdict." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 282-83.  "[A] court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances." Id., 280.

"A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power.  Whether the court would have reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict." (Internal quotation marks omitted.) *First American Title Ins. Co.* v. *273 Water Street, LLC*, 157 Conn. App. 23, 52-53, 117 A.3d 857 (2015).

3

The defendants take the position, in a conclusory manner unsupported by any evidence or caselaw, that the verdict was "exorbitant" and the result of "passion and prejudice." [ii],[iii] They argue- again, unsupported by any law- that due process requires that the plaintiffs are responsible for establishing what they think would make them whole--that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice. Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support the verdicts rendered by the jury. The size of the verdicts, while substantial, does not so shock the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; their attention to the evidence and instructions from the court is evident from the specific questions they asked

---

[ii] In contrast, the plaintiffs, in their objection, painstakingly and accurately highlight the evidence submitted in this case, unlike the defendants' conclusory motion.

[iii] "It is well established that [courts] are not obligated to consider issues that are not adequately briefed. . . . Issues are deemed inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion . . . [and] when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Citation omitted; internal quotation marks omitted.) *Handsome, Inc.* v. *Planning & Zoning Commission*, 317 Conn. 515, 534 n.7, 119 A.3d 541 (2015). "[P]ursuit of so large a number of issues forecloses the opportunity for a fully reasoned discussion of pivotal substantive concerns . . . . Multiplicity hints at lack of confidence in any one [issue] . . . ." (Citation omitted; internal quotation marks omitted.). *LaBow* v. *LaBow*, 65 Conn. App. 210, 211, 782 A.2d 200, cert. denied, 258 Conn. 943, 786 A.2d 430 (2001).
Trial courts are not required to decide issues that have been inadequately briefed in post-trial motions. See, e.g., *Myrick* v. *Jack A. Halprin, Inc.*, Superior Court, judicial district of New Haven, Docket No. CV-10-5033401-S (November 16, 2018, *Wilson, J.*) (motion to set aside verdict); *Parrott* v. *Gunn*, Superior Court, judicial district of New Haven, Docket No. CV-09-5030151-S (January 4, 2012, *Wilson, J.*) (motion to set aside verdict and for additur, noting that plaintiff inadequately briefed issues but choosing to reach them based on defendant's brief); *Dreisch* v. *Burkey*, Superior Court, judicial district of Tolland, Docket No. CV-95-004834-S (December 1, 2011, *Shapiro, J.*) (same); *Pierce* v. *Fales*, Superior Court, judicial district of Middlesex, Docket No. CV-99-088423-S (May 3, 2002, *Shapiro, J.*) (motion to set aside verdict).

regarding both the charge and the evidence. In reviewing the evidence in a light most favorable to sustaining the verdicts, the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform to spread lies to a massive audience clearly supports the verdicts, and that the verdicts are within the limits of a fair and just award of damages. The defendants' motion for remittitur is denied.

## MOTION TO SET ASIDE THE VERDICT

"The right to a jury trial is fundamental in our judicial system, and . . . the right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court." (Internal quotation marks omitted.) *Wichers* v. *Hatch*, 252 Conn. 174, 188, 745 A.2d 789 (2000). "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence." (Internal quotation marks omitted.) *Howard* v. *MacDonald*, 270 Conn. 111, 126, 851 A.2d 1142 (2004). "The trial [court] has a broad legal discretion and [its] action will not be disturbed unless there is a clear abuse. . . . A mere doubt of the adequacy of the verdict is an insufficient basis for such action. . . . A conclusion that the jury exercised merely poor judgment is likewise insufficient. . . .." (Internal quotation marks omitted.) *Wichers* v. *Hatch*, supra, 252 Conn. 187. "A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) *Gagliano* v. *Advanced Specialty Care, P.C.*, 329 Conn. 745, 754, 189 A.3d 587 (2018). "If the jury could reasonably have reached its conclusion, the verdict must stand." (Internal quotation marks omitted.) *Id.*

The defendants contend that the cumulative weight of the court's rulings, both prior to and throughout the trial, including rulings related to causation, resulted in a "complete abdication" of the trial court's role in assuring a fair trial. They argue that the amount of the compensatory damages award exceeds any rational relationship to the evidence offered at trial. They take the position that sanctions should have been limited to permissive adverse inferences and that defaults should not enter in civil cases involving speech. The defendants offer ten bases upon which they claim that the verdict should be set aside-- bases which are largely conclusory and not adequately briefed.[iv] They cite no caselaw to support their claim that a default should not enter in a defamation case. The court rejects these arguments, as well as the other arguments put forth by the defendants, who chose to conduct limited cross-examination of the plaintiffs' witnesses and to "boycott" the trial. Finally, with respect to the CUTPA claim, CUTPA serves to deter predatory commercial conduct such as this. This court, in ruling on the defendants' motion to strike, already determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the underlying basis of a CUTPA cause of action." The verdicts rendered by this jury are not against the law or the evidence. The defendants' motion to set aside the verdict is denied.



421277

Hon. Barbara Bellis

---

[iv] One purpose of the motion to set aside the verdict is "it provides the only occasion for counsel to appear in court and to present arguments in support of their positions, which are ordinarily formulated much more clearly and persuasively than at trial . . . ." (Emphasis added; internal quotation marks omitted.) Prishwalko v. Bob Thomas Ford, Inc., 33 Conn. App. 575, 579-80, 636 A.2d 1383 (1994). The defendants waived oral argument of their post-verdict motions and the court is left to their briefs which simply do not adequately address the numerous claims they make.

# **Exhibit D**

| RETURN DATE: JUNE 26, 2018 | : | JUDICIAL DISTRICT |
|---|---|---|
| | : | |
| ERICA LAFFERTY, ET AL, | : | OF FAIRFIELD |
| | : | |
| v. | : | AT BRIDGEPORT |
| | : | |
| ALEX JONES, ET AL. | : | MAY 23, 2018 |

## COMPLAINT

### INTRODUCTION

1.      This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.      Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

10. Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11. Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12. Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13. As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14. On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15. They have confronted strange individuals videotaping them and their children.

16. Some of them have moved to undisclosed locations to avoid this harassment.

17. The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18. Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19. The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiffs are the immediate family of four children and two educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

24.     Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.     Plaintiffs Jennifer Hensel and Jeremy Richman are the parents of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. They reside in Fairfield County, Connecticut.

26.     Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.     Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.     Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

29.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

30.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com

and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

31.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

32.     Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

33.     Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

34.     Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

35.     All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

36.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

37.     Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

38.     Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

39.     Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ;  Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010)  https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

4

## THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

40.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

41.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

42.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

43.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

44.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

45.     His followers have shown themselves ready to comply.

46.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

47.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

48.     Jones's followers came running to his call, as he knew they would.

49.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

50.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

51.    On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

52.    Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

53.    Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

54.    Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

55.    In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

56.    She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

57.    The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

58.    On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

59.    Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

60.    Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

61.    Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

62.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

63.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

64.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

65.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

66.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

67.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

68.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

69.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

70.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

71.     Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

> A.  For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

> B.  Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in

reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive."[6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children.[7]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

72. Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[8] His Facebook page continues to display those publications.

73. Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

74. In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

75. In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[8] See, e.g., https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252. https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

76.     For instance, on May 29, 2015, The Alex Jones Channel published an **In**fowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

77.     The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

78.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

79.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

80.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

81.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired **FB**I Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

82.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

83.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

84.     Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

85.     Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[11] https://www.youtube.com/watch?v=4_2FznkfcBU.
[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[13] https://www.youtube.com/watch?v=jCOe3qIgyFA.
[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

86. Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

87. Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

88. Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

89. Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

90. The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

91. The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[15]

92. The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

93. Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using **In**fowars logos; the regular references to Infowars "reporters" and "investigations."

94. Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. **In** his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas

---

[15] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[16]

95.    According to non-parties **B**ankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

96.    In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[17]

97.    In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

98.    News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

99.    Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[18]

100.    In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[19]

---

[16] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[17] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[18] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term= .yqXeXzdLEZ#.qewdqoN0m2.

[19] Corky Siemaszko, *InfoWars'Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

## THE CAMPAIGN OF ABUSE

101. Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

102. On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[20]

103. That article alleges that Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

104. An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

105. At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

106. On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[21]

107. The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

108. In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

109. The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

110. A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[20] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[21] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

## January 27, 2013

111.   On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[22] Just over a month had passed since the shooting at Sandy Hook.

112.   Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

113.   Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying."

114.   Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

115.   Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

116.   As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

117.   Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

118.   A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

119.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### March 2013

---

[22] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

120. On March 14, 2014, Jones stated, "We've clearly got people where it's actors playing different parts of different people."

121. He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

122. The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

## May 27, 2013

123. On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[23]

124. During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

125. In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

126. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

127. On information and belief, this episode was also broadcast through Jones's radio affiliates.

128. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 13, 2014

129. On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[24]

130. That day, Jones hosted Wolfgang Halbig.

131. During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

---

[23] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

[24] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

132.    Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

133.    Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

134.    Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

135.    Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

136.    Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

137.    He continued, "The whole thing, you've got 'em jumping gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

138.    Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

139.    Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012."

140.    Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

141.    During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake . . . it's fake . . . you've got parents acting . . . it just is the fakest thing since the three-dollar bill."

142.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

143.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

144.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**September 25, 2014**

145. On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[25]

146. This assertion was a complete fabrication: the FBI had made no such statement.

147. During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

148. This was a false statement. FBI crime statistics showed no such thing.

149. Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

150. Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

151. Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

152. Jones asserted that the school was "a cut-out" used as a stage for the event.

153. Jones and Halbig both stated "I wish it was real instead of fake."

154. Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

155. Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

156. Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

157. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

158. On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

---

[25] https://www.youtube.com/watch?v=N1RlzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com /watch?v=eqVqmFy4KW0.

159. The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

160. The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

161. The article quoted Halbig as saying that there was "a 'script' followed during the event."

162. It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

163. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

164. On information and belief, the article has been viewed by hundreds of thousands of persons.

### December 12, 2014

165. On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[26]

166. The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

167. During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

168. Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one

---

[26] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

169.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

170.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

171.    On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[27]

172.    Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

173.    Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

174.    Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

175.    Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

176.    Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

177.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

178.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[27] https://www.youtube.com/watch?v=TGCfi_ot0CU.

179.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### January 2, 2015

180.     On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

181.     The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

182.     "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

183.     The pictures used were images of Noah Pozner.

184.     Upon information and belief, hundreds of thousands of people have viewed this article.

### January 13, 2015

185.     On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[28]

186.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

187.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

188.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[28] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

**March 4, 2015**

189.    On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[29]

190.    Jones hosted Halbig on that episode.

191.    During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

192.    Halbig stated the school was not in operation at the time of the shooting.

193.    Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

194.    Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

195.    Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

196.    Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

197.    Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

198.    Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

199.    Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

200.    A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

201.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

202.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[29] https://www.youtube.com/watch?v=_7ib5WkULBY.

**May 28, 2015**

203.    On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[30]

204.    David Knight hosted Halbig on Infowars Nightly News.

205.    Halbig accused Newtown police chief Mike Kehoe of committing perjury.

206.    Halbig once again appeared, and stated that the school was unsanitary and unsafe.

207.    Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

208.    A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

209.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

210.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

211.    On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[31]

212.    The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

213.    The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

214.    Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

215.    On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

---

[30] https://www.youtube.com/watch?v=Ml3KVj2nVRA.
[31] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

216. Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[32] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

217. During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

218. Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

219. On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**July 7, 2015**

220. On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[33]

221. Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[34]

222. "[T]he more we look at Sandy Hook," he said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

223. He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

224. Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

---

[32] https://www.youtube.com/watch?v=5cll79t7Mrw.

[33] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[34] https://www.youtube.com/watch?v=jCOe3qIgyFA.

225.    Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

226.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

227.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

228.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 17, 2016

229.    On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

230.    These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

231.    Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

232.    Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[35]

233.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

234.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

235.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 18, 2016

236.    On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[36]

---

[35] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.
[36] https://www.youtube.com/watch?v=MwudDfz1yAk.

237.    During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

238.    He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

239.    He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

240.    Jones rehearsed several of his most commonly employed arguments that the Sandy Hook shooting was staged, including that Anderson Cooper was standing in front of "a blue screen or a green screen," that video was "looped," and that "one of the reported fathers of the victims . . . [was] doing classic acting training."

241.    In closing, Jones said, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

242.    The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

243.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

244.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**November 28, 2016**

245.    On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[37]

246.    In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[38]

247.    Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

248.    Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

249.    Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

250.    These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

251.    Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

252.    This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

253.    Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

254.    He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

255.    The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

256.    Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

---

[37] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.
[38] https://www.youtube.com/watch?v=9PdrlrSCLu0.

## March 8, 2017

257.    On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

258.    During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

259.    Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

260.    A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

261.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

262.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## April 22, 2017

263.    On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[39]

264.    During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

265.    Jones told his audience that they should not "believe any of it."

---

[39] https://www.youtube.com/watch?v=rUn1jKhWTXI.

266. As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' deaths.

267. During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

268. In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

269. The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

270. Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

271. The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

272. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

### April 28, 2017

273. On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[40]

274. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[40] https://www.youtube.com/watch?v=StOyqyt0fkY.

## June 13, 2017

275.    On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[41]

276.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

### The Megyn Kelly Interview

#### *The Preview*

277.    On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

278.    NBC released a preview of the interview on the internet on the following day.

279.    In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

280.    Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

281.    In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

282.    Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

283.    Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

284.    The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

285.    These statements were heard by millions of people.

---

[41] https://www.facebook.com/80256732576/videos/10155465593882577/.

### June 15, 2017 – Infowars

286. During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

287. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

288. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming

289. The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

290. Before the interview aired that day, Jones published several pre-show videos on Infowars.

291. During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

 A. In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

 B. Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

 C. He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

 D. He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

 E. While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the

29

plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormal and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

292.    Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

293.    As discussed in paragraphs 123 through 128 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

294.    In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

295.    During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

296.    In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

297.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

298.    These statements were heard by hundreds of thousands, if not millions of people.

### The June 18, 2017 NBC Broadcast

299.    During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

300.    At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 171 through 179 of this complaint.

301.    In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

302.    Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

303.    In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

304. Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

305. In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

306. Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

307. Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real. But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

308. Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

309. Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

310. Jones responded, "Oh, I know—but then they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

311. Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

312. Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

313. In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

314. It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

315. There is no evidence "on the other side."

316. A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

317. More than three million people saw and heard these statements by Jones.

## Alex Jones's June 18, 2017 Counter-Programming

318.    Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

319.    The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

320.    As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged event.

321.    This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

322.    Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

323.    This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

324.    On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

325.    Hundreds of thousands, if not millions, of people heard these statements.

### June 26, 2017

326.    During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

327.    On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[42]

328.    Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

---

[42] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

329.     Shroyer's support for this statement was video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

330.     Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

331.     Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

332.     In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

333.     A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

334.     These statements were heard by at least tens of thousands, if not millions, of people.

335.     On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery.

## COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

336.     All previous allegations in this complaint are incorporated as if fully set forth herein.

337.     The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

338.     The false light in which the defendants' statements placed the plaintiffs would be highly offensive to a reasonable person.

339.     The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs

would be placed.

340.     These false publications have caused the plaintiffs actual and substantial damages.

341.     **In** light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

342.     The plaintiffs are private individuals and are neither public officials nor public figures.

343.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

344.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

345.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

346.     These acts of the defendants resulted in damage to the plaintiffs.

**COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

347.     All previous allegations in this complaint are incorporated as if fully set forth herein.

348.     In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' deaths; the defendants published numerous defamatory statements.

349.     These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' deaths and/or are actors lying about the deaths of their loved ones.

350.     The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

351. The defendants' defamatory publications readily identified the plaintiffs to millions of people.

352. The defendants' defamatory publications were broadcast to millions of people.

353. The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

354. In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

355. The plaintiffs are private individuals and are neither public officials nor public figures.

356. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

357. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

358. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

359. These acts of the defendants resulted in damage to the plaintiffs.

**COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

360. All previous allegations in this complaint are incorporated as if fully set forth herein.

361. In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

362. The defendants' conduct was extreme and outrageous.

363. The defendants' conduct was the cause of the plaintiffs' distress.

364. The emotional distress sustained by the plaintiffs was severe.

365.     The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

366.     In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

367.     The plaintiffs have suffered actual and substantial damages.

368.     The plaintiffs are private individuals and are neither public officials nor public figures.

369.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

370.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

371.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

372.     These acts of the defendants resulted in damage to the plaintiffs.

### COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

373.     All previous allegations in this complaint are incorporated as if fully set forth herein.

374.     The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

375.     The plaintiffs' distress was foreseeable.

376.     The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

377.     The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

378.     The plaintiffs have suffered actual and substantial damages.

36

379. In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

380. The plaintiffs are private individuals and are neither public officials nor public figures.

381. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

382. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

383. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

384. These acts of the defendants resulted in damage to the plaintiffs.

## COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* (Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)

385. All previous allegations in this complaint are incorporated as if fully set forth herein.

386. The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

387. This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

388. The defendants' reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

389. The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

390. The plaintiffs are private individuals and are neither public officials nor public figures.

391. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether

or not they were true.

392.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

393.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

394.    These acts of the defendants resulted in damage to the plaintiffs.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.    Monetary damages;

B.    Punitive damages;

C.    Attorneys' fees;

D.    Costs;

E.    Declarative relief;

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 23rd day of May, 2018.

THE PLAINTIFFS,

By _____

WILLIAM M. BLOSS
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
PHONE: (203) 336-4421
FAX:   (203) 368-3244
wbloss@koskoff.com
mblumenthal@koskoff.com
JURIS #32250

# Exhibit E

```
XO6 UWY CV18-6046436-S    :   SUPERIOR COURT

ERICA LAFFERTY, ET AL     :   JUDICIAL DISTRICT OF WATERBURY

V                         :   AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :   NOVEMBER 15, 2021

-------------------------------------------------------------

XO6 UWY CV18-6046437-S    :   SUPERIOR COURT

WILLIAM SHERLACH, ET AL   :   JUDICIAL DISTRICT OF WATERBURY

V                         :   AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :   NOVEMBER 15, 2021

-------------------------------------------------------------

XO6 UWY CV18-6046438-S    :   SUPERIOR COURT

WILLIAM SHERLACH, ET AL   :   JUDICIAL DISTRICT OF WATERBURY

V                         :   AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :   NOVEMBER 15, 2021
```

## <u>COURT'S RULING</u>

B E F O R E:

        THE HONORABLE BARBARA N. BELLIS, JUDGE


A P P E A R A N C E S:


  Representing the Plaintiffs:

      ATTORNEY CHRISTOPHER MATTEI
      ATTORNEY ALINOR STERLING
      ATTORNEY MATTHEW BLUMENTHAL
      Koskoff Koskoff & Bieder
      350 Fairfield Avenue
      Bridgeport, Connecticut  06604

Representing the Defendants:

    ATTORNEY JAY MARSHALL WOLMAN
    Randazza Legal Group
    100 Pearl Street
    Hartford, Connecticut  06103

    ATTORNEY CAMERON L. ATKINSON
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

    ATTORNEY MARIO CERAME
    Brignole Bush & Lewis
    73 Wadsworth Street
    Hartford, Connecticut  06106

                Recorded and Transcribed By:
                Patricia Sabol
                Court Monitor
                400 Grand Street
                Waterbury, Connecticut  06702

3

THE COURT:  All right.  So I will order a copy of
the transcript of the following ruling, and I will
sign it and I will place it in the court file as my
decision for the purposes of any appeal.

So I'll first address the Clinton deposition
issue and the conduct of July 1, 2021.  In the July
19, 2021 court filing by the defendants Infowars, LLC,
Free Speech Systems, LLC, Infowars Health, LLC and
Prison Planet, LLC, they described how in the motion
to depose Hillary Clinton, testimony designated by the
plaintiffs as highly confidential was filed in the
Clinton deposition motion.  They explained that this
was done because in their opinion, the plaintiffs did
not have a good-faith basis to designate the
deposition as highly confidential before the
deposition had commenced, despite the fact that the
Jones defendants had previously done so themselves.
And it is not lost on the Court that the highly
confidential information was improperly filed in the
middle of the first deposition of a plaintiff.

The July 19, 2021 filing is in sharp contrast to
the Jones defendants' position at the October 20, 2021
sanctions hearing where the Court addressed what, if
any, sanctions should enter.  At the October 20
hearing, the Jones defendants claim they could publish
confidential information as long as they did not
reveal the name of the witness.  That is, they argued

4

```
1       unconvincingly that they didn't understand the very
2       protective order that they themselves drafted and
3       asked the Court to approve as a Court order, which the
4       Court did.
5           The position of the Jones defendants at the
6       October 20, 2021 sanctions hearing did nothing but
7       reinforce the Court's August 5th, 2021 order and
8       findings that the cavalier actions on July 1st, 2021
9       constituted willful misconduct and violated the
10      Court's clear and unambiguous protective order.
11          The history of the attorneys who have appeared
12      for the defendants, Alex Jones, Infowars, LLC, Free
13      Speech Systems, LLC, Infowars Health, LLC and Prison
14      Planet TV, LLC is a convoluted one, even putting aside
15      the motions to withdraw appearance, the claims of
16      conflict of interest and the motions for stay advanced
17      by these five defendants.
18          As the record reflects, on June 28, 2018,
19      Attorney Wolman appeared for all five of the Jones
20      defendants.  Eight months later, on March 1st, 2019,
21      Attorney Wolman is out of the case and Pattis & Smith
22      filed an in-lieu-of appearance for all five
23      defendants.  On February 24, 2020, Attorney Latonica
24      also appeared for all five defendants.  Five months
25      later on July 7, 2020, Attorney Latonica and Pattis &
26      Smith is now out of the case and Attorney Wolman is
27      back in the case for all five defendants.  Then on
```

1    June 28, 2020, Pattis and Smith is back in the case,

2    but now only appears for the four LLC defendants.

3        But what is perhaps more significant is the

4    transparent attempt to cloud the issues by Pattis &

5    Smith, for example, by listing the names of only three

6    of the four clients they represent when filing the

7    motion to take the deposition of Hillary Clinton and

8    then listing all four clients in the July 19, 2021

9    filing relating to the issue.  And by Attorney Wolman

10   who then argued in his October 20, 2021 file that

11   Infowars, LLC had no involvement in the motion for

12   commission because their lawyer did not list their

13   name on the motion.  It is simply improper under our

14   rules of practice for an attorney to do so.

15       Turning to the issue of the subsidiary ledgers.

16   The five Jones defendants on November 6, 2020 filed

17   with the Court their discovery objections relating to

18   the deposition of Free Speech Systems' accounting

19   manager and current employee, Melinda Flores.  In

20   response to the plaintiff's request for subsidiary

21   ledgers, the Jones defendants objected on the basis

22   that the production of the subsidiary ledgers was

23   oppressive, unduly burdensome, disproportionate,

24   harassing and that it will require digging through

25   eight years of accounting.  No objection was raised as

26   to the term "subsidiary ledger", although parties

27   frequently will object to a discovery request if they

1    consider it vague or confusing.

2         On April 29, 2021, the Court overruled the

3    objection.  On May 6, 2021, the Court ordered the

4    deposition of Flores to take place on June 4, 2021 and

5    ordered the documents to be produced by the close of

6    business on May 14, 2021 stating that failure to

7    comply may result in sanctions.

8         On May 14, 2021, the five Jones defendants

9    responded to the document request and Court order and

10   stating that the subsidiary ledgers were incorporated

11   into the trial balances and had been produced.

12        At her June 4, 2021 deposition, Flores, the

13   accounting manager, testified that subsidiary ledgers

14   or detail was easily accessible and available to her.

15   She testified that it would show the sources of

16   advertising income and she testified repeatedly that

17   Free Speech Systems maintained subsidiary ledger

18   information.  Flores did not believe she was obligated

19   to produce the subsidiary ledgers, and it is unclear

20   as to whether they have been produced.

21        It was impossible to reconcile the expert hired

22   by Free Speech Systems with the November 6, 2020

23   objections filed with the Court and with Flores'

24   deposition testimony.  While the Jones defendants in

25   their May 5th, 2021 motion state that Flores would be

26   the best employee to identify and produce the

27   requested documents and further state that Flores

1   would be compelled by Free Speech Systems to produce

2   the requested documents at the deposition, the

3   defendants hired expert, Mr. Roe, said that Flores was

4   wrong and that Free Speech Systems doesn't use or have

5   subsidiary ledgers.

6       The Court, in its August 6, 2021 order, found

7   that the subsidiary ledger information was easily

8   accessible by Flores by clicking on each general

9   account, that, despite the Court orders and although

10  the information exists and is maintained by Free

11  Speech Systems and was required by the Court order to

12  be produced, it had not been produced.  And, again, it

13  is still unclear as to what documents have been

14  produced.

15      The Court rejected Roe's statements in his

16  affidavit as not credible in light of the

17  circumstances.  The Court found that the plaintiffs

18  were prejudiced in their ability to prosecute their

19  claims and conduct further meaningful depositions and

20  that sanctions would be addressed at a future hearing.

21      At the October, 2021 sanctions hearing, the Court

22  addressed whether sanctions should enter.  The Court

23  finds that sanctions are, in fact, appropriate in

24  light of the defendant's failure to fully and fairly

25  comply with the plaintiff's discovery request and the

26  Court's orders of April 29, 2021, May 6, 2021 and

27  August 6, 2021.

8

Turning to the trial balances.  In addition to objecting to the deposition of Flores, the Jones defendants, as I mentioned, filed discovery objections to the request for production directed to Flores.  The Court ruled in favor of the defendants on one production request and ruled in favor of the plaintiffs with respect to others.

In addition to the subsidiary ledgers, the Court ordered production of the trial balances.  Flores had run trial balances in the past unrelated to this action.  Flores testified at her June 4, 2021 deposition that she personally accessed Quick Books and selected the option to generate trial balances for 2012 to 2019.  She testified that she ran the reports and printed them out and believed that the reports were produced.  Her testimony the reports that she ran were produced was left uncorrected by counsel at the deposition.

The reports were not produced by the Court-ordered deadline of May 14, 2021.  They were not produced at her June 4, 2021 deposition, and they have not been produced to date, despite their obligation to do so.

While the Jones defendants, in their May 5, 2021 Court filing, emphasized that Flores would be the best employee to identify and produce the requested documents which would include the trial balances and

1     that Flores would be compelled by Free Speech Systems

2     to produce the documents at her deposition, not only

3     were the reports not produced, but the Jones

4     defendants in their October 7, 2021 filing now claim

5     that Flores, a mere bookkeeper, provided flawed

6     information to the defendants that the defendants,

7     through Roe, had to correct.  And the Court rejects

8     that position.

9         The Jones defendants argue that Roe combined some

10    accounts that were not used consistently and

11    consolidated some general accounts because various

12    transactions all involved the same account and those

13    records created by the Jones defendants' outside

14    accountant were the records that were produced.  But

15    these records that removed accounts and consolidated

16    accounts altered the information in the reports that

17    their own accounting manager had produced, and they

18    contain trial balances that did not balance.  These

19    sanitized, inaccurate records created by Roe were

20    simply not responsive to the plaintiff's request or to

21    the Court's order.

22        Turning to the analytics.  The date for the

23    parties to exchange written discovery has passed after

24    numerous extensions by the Court.  On May 14, 2021,

25    the Court ordered that the defendants were obligated

26    to fully and fairly comply with the plaintiff's

27    earlier request for disclosure and production.

1    On June 1, 2021, the defendants filed an

2    emergency motion for protective order apparently

3    seeking protection from the Court's own order where

4    the defendants again attempted to argue the scope of

5    appropriate discovery.

6    The Court, on June 2, 2021, declined to do so and

7    extended the deadline for final compliance to June 28,

8    2021 ordering the defendants to begin to comply

9    immediately on a rolling basis.  In its June 2nd

10    order, the Court warned that failure to comply would

11    result in sanctions including default.

12    With respect to analytics, including Google

13    Analytics and social media Analytics, the defendants

14    on May 7, 2019 represented that they had provided all

15    the analytics that they had.  They stated with respect

16    to Google Analytics that they had access to Google

17    Analytics reports, but did not regularly use them.  As

18    the Court previously set forth in its September 30,

19    2021 order, the defendants also claim that on June 17,

20    2019, they informally emailed zip files containing

21    Google Analytics reports to the plaintiffs, but not

22    the codefendants, an email the plaintiffs state they

23    did not receive and that the Court found would not

24    have been in compliance with our rules of practice.

25    On June 28, 2021, the Jones defendants filed a

26    notice of compliance stating that complete final

27    supplemental compliance was made by the defendants,

1    Alex Jones and Free Speech Systems, LLC and that

2    Infowars, LLC, Infowars Health, LLC and Prison Planet,

3    LLC, quote:  Had previously produced all documents

4    required to be produced, end quote, representing that

5    with respect to the Google Analytics documents, Free

6    Speech Systems, LLC could not export the dataset and

7    that the only way they could comply was through the

8    sandbox approach.

9        Then on August 8, 2021, the Jones defendants for

10    the first time formally produced Excel spreadsheets

11    limited to Google Analytics apparently for Infowars

12    dot com and not for any of the other websites such as

13    Prison Planet TV or Infowars Health.  Importantly, the

14    Jones defendants to date have still not produced any

15    analytics data from any other platform such as Alexa,

16    Comcast or Criteo.

17        The Jones defendants production of the social

18    media analytics has similarly been insubstantial and

19    similarly has fallen far short both procedurally and

20    substantively, despite prior representations by the

21    Jones defendants that they had produced the social

22    media analytics and despite the May 25, 2021

23    deposition testimony of Louis Certucci, Free Speech

24    Systems social media manager for nearly a decade, that

25    there were no such documents.

26        At the June 28, 2021 deposition of Free Speech

27    Systems corporate designee Zimmerman, Mr. Zimmerman

1    testified that, in fact, he had obtained some

2    responsive documents from Certucci which were then

3    loaded into a deposition chat room by counsel for the

4    Jones defendants.  It appears that these documents

5    were minimal summaries or reports for Facebook and

6    Twitter, but not for other platforms used by the

7    defendants such as You Tube.

8        Any claim of the defendants that the failure to

9    produce these documents was inadvertent falls flat as

10   there was no evidence submitted to the Court that the

11   defendants had a reasonable procedure in place to

12   compile responsive materials within their power,

13   possession or knowledge.

14       Months later, on October 8, 2021, the Jones

15   defendants formally produced six documents for the

16   spring of 2017 for Facebook containing similar

17   information to the Zimmerman chat room documents, but

18   not included in the chat room documents and screen

19   shots of posts by Free Speech Systems to an

20   unidentified social media account with no analytics.

21       The defendants represented that they had produced

22   all the analytics when they had not done so.  They

23   represented in court filings that they did not rely on

24   social media analytics and this, too, is false.

25       I'm going to need to take a thirty second water

26   break, please.

27       (A short break in the proceedings occurred.)

13

        This response was false.  The plaintiffs in
support of their motion for sanctions on the analytics
issue attached as exhibit D, an email dated December
15, 2014 between former Free Speech Systems business
manager Timothy Fruge and current Free Speech Systems
employee Buckley Hamman.  Fruge attaches annotated
charts of detailed analytics concerning Jones' 2014
social media audience including gender demographics
engagement and social media sites that refer people to
Infowars dot com.  As pointed out by the plaintiffs,
Fruge's annotations are even more telling than the
charts themselves and totally contradict the Jones
defendants misrepresentations to the Court that,
quote:  There is no evidence to suggest that Mr. Jones
or Free Speech Systems ever used these analytics to
drive content, end quote.

        The next image on the document shows key
indicators on Twitter.  Those are engagement and
influence.  Again, this is reading from Fruge's notes.
Again, the next image shows the key indicators on
Twitter.  Those are engagement and influence.  Notice
our influence is great and our engagement is low.  I
bring this up -- again these are Fruge's notes --
because we should try and raise our engagement with
our audience.  Engagement is how well we are
communicating and interacting with our audience.  The
higher our engagement, the more valuable our audience

1    will become to our business.  And that is the end of

2    Fruge's notes.                    .

3         I would note that regardless of this reliance on

4    social media analytics, the concept is simple.  The

5    defendants were ordered to produce the documents and

6    our law requires them to produce information within

7    their knowledge, possession or power.  Discovery is

8    not supposed to be a guessing game.  What the Jones

9    defendants have produced by way of analytics is not

10   even remotely full and fair compliance required under

11   our rules.

12        The Court finds that the Jones defendants have

13   withheld analytics and information that is critical to

14   the plaintiff's ability to conduct meaningful

15   discovery and to prosecute their claims.  This callous

16   disregard of their obligations to fully and fairly

17   comply with discovery and Court orders on its own

18   merits a default against the Jones defendants.

19        Neither the Court nor the parties can expect

20   perfection when it comes to the discovery process.

21   What is required, however, and what all parties are

22   entitled to is fundamental fairness that the other

23   side produces that information which is within their

24   knowledge, possession and power and that the other

25   side meet its continuing duty to disclose additional

26   or new material and amend prior compliance when it is

27   incorrect.

1          Here the Jones defendants were not just careless.
2     Their failure to produce critical documents, their
3     disregard for the discovery process and procedure and
4     for Court orders is a pattern of obstructive conduct
5     that interferes with the ability of the plaintiffs to
6     conduct meaningful discovery and prevents the
7     plaintiffs from properly prosecuting their claims.
8          The Court held off on scheduling this sanctions
9     hearing in the hopes that many of these problems would
10    be corrected and that the Jones defendants would
11    ultimately comply with their discovery obligations and
12    numerous Court orders, and they have not.
13         In addressing the sanctions that should enter
14    here, the Court is not punishing the defendants.  The
15    Court also recognizes that a sanction of default is
16    one of last resort.  This Court previously sanctioned
17    the defendants not by entering a default, but by a
18    lesser sanction, the preclusion of the defendant's
19    special motions to dismiss.  At this point entering
20    other lesser sanctions such as monetary sanctions, the
21    preclusion of evidence or the establishment of facts
22    is inadequate given the scope and extent of the
23    discovery material that the defendants have failed to
24    produce.
25         As pointed out by the plaintiffs, they are
26    attempting to conduct discovery on what the defendants
27    publish and the defendants' revenue.  And the failure

of the defendants to produce the analytics impacts the
ability of the plaintiffs to address what is published
and the defendants failure to produce the financial
records such as sub-ledgers and trial balances affects
the ability of the plaintiffs to address the
defendants' revenue.  The prejudice suffered by the
plaintiffs, who had the right to conduct appropriate,
meaningful discovery so they could prosecute their
claims again, was caused by the Jones defendants
willful noncompliance, that is, the Jones defendants
failure to produce critical material information that
the plaintiff needed to prove their claims.

For these reasons, the Court is entering a
default against the defendants Alex Jones, Infowars,
LLC, Free Speech Systems, LLC, Infowars Health, LLC
and Prison Planet TV, LLC.  The case will proceed as a
hearing in damages as to the defendants.  The Court
notes Mr. Jones is sole controlling authority of all
the defendants, and that the defendants filed motions
and signed off on their discovery issues jointly.  And
all the defendants have failed to fully and fairly
comply with their discovery obligations.

As I said, I will order a copy of the transcript.
I will sign it and I will file it in the Court as the
Court's order.

_____
Bellis, J.

```
 1   XO6 UWY CV18-6046436-S    :    SUPERIOR COURT.

 2   ERICA LAFFERTY, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

 3   V                         :    AT WATERBURY, CONNECTICUT

 4   ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

 5   -------------------------------------------------------------

 6   XO6 UWY CV18-6046437-S    :    SUPERIOR COURT

 7   WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

 8   V                         :    AT WATERBURY, CONNECTICUT

 9   ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

10   -------------------------------------------------------------

11   XO6 UWY CV18-6046438-S    :    SUPERIOR COURT

12   WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

13   V                         :    AT WATERBURY, CONNECTICUT

14   ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

15

16              C E R T I F I C A T I O N

17       I hereby certify the foregoing pages are a true and

18   correct transcription of the audio recording of the

19   above-referenced case, heard in the Superior Court, Judicial

20   District of Waterbury, at Waterbury, Connecticut, before the

21   Honorable Barbara N. Bellis, Judge, on the 15th day of

22   November, 2021.

23       Dated this 15th day of November, 2021, in Waterbury,

24   Connecticut.

25                                _____

26                                      Patricia Sabol

27                                      Court Monitor
```

B1040 (FORM 1040) (12/15)

| | |
|---|---|
| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |

| | |
|---|---|
| **PLAINTIFFS** David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as Chapter 7 Trustee for the Estate of Erica Lafferty | **DEFENDANTS**<br>Alexander E. Jones<br>Free Speech Systems, LLC |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>**See below | **ATTORNEYS** (If Known) Law Offices of Ray Battaglia, PLLC<br>66 Granburg Circle<br>San Antonio, TX 78218<br>(210) 601-9405 |
| **PARTY** (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>⊠ Creditor    □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>⊠ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

An action for declaratory judgment that the Connecticut Judgment (as defined in the Complaint) that the Debtor, Alexander E. Jones, owes to Plaintiffs is not dischargeable pursuant to 11 U.S.C. Section 523(a)(6).

---

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| | |
|---|---|
| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
| □ Check if a jury trial is demanded in complaint | Demand $ |
| **Other Relief Sought** | |

---

** Koskoff Koskoff & Bieder PC
350 Fairfield Ave., Ste. 501
Bridgeport, CT 06604
(203) 336-4421

Cain & Skarnulis PLLC
303 Colorado St., Ste. 2850
Austin, TX 78701
(512) 477-5000

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES |||
|---|---|---|
| NAME OF DEBTOR<br>Alexander E. Jones | BANKRUPTCY CASE NO.<br>22-33553 (CML) ||
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Christopher Lopez |

| RELATED ADVERSARY PROCEEDING (IF ANY) |||
|---|---|---|
| PLAINTIFF<br>Same as above | DEFENDANT<br>Free Speech Systems, LLC<br>Alexander E. Jones | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Lopez |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Ryan E. Chapple ||
|---|---|
| DATE<br><br>03/10/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Ryan E. Chapple |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|                          |     |                          |
| ------------------------ | --- | ------------------------ |
| IN RE:                   | §   |                          |
|                          | §   |                          |
|                          | §   | Chapter 11               |
| ALEXANDER E. JONES,      | §   |                          |
|                          | §   | Case No. 22-33553 (CML)  |
| Debtor                   | §   |                          |
|                          | §   |                          |

# EXHIBIT C

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.   COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

**TO PLAINTIFF ROBERT PARKER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 60,000,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**
                                       $ 120,000,000.00

2

JM

**TO PLAINTIFF DAVID WHEELER:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                              $ 25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)                             $ 30,000,000.00


**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DAVID
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 55,000,000.00

3

**TO PLAINTIFF FRANCINE WHEELER:**

A.  DEFAMATION/SLANDER DAMAGES
     (PAST AND FUTURE)                                   $ 24,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                           $ 30,000,000.00
     (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF FRANCINE
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**
                                                         $ 54,000,000.00

4

LM

**TO PLAINTIFF JACQUELINE BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 18,800,000.00
   (PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JACQUELINE
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                   $ 28,800,000.00

LM

**TO PLAINTIFF MARK BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $ 25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                 $ 32,600,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF MARK
   BARDEN AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**
                                              $ 57,600,000.00

LM

**TO PLAINTIFF NICOLE HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                     $ 32,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES
    (PAST AND FUTURE)                     $ 41,600,000.00

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF NICOLE
> HOCKLEY AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>                                          $ 73,600,000.00

7

LM

**TO PLAINTIFF IAN HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                   $ 38,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES      $ 43,600,000.00
(PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF IAN
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                                   $ 81,600,000.00

8



**TO PLAINTIFF JENNIFER HENSEL:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                              $21,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                     $31,000,000.00
    (PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JENNIFER
HENSEL AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                           $52,000,000.00



**TO PLAINTIFF DONNA SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES         $30,000,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$48,000,000.00

10

JM

**TO PLAINTIFF CARLEE SOTO PARISI:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $ 30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $ 36,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLEE
SOTO PARISI AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**
                                               $ 66,000,000.00

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $18,600,000.00

B. EMOTIONAL DISTRESS DAMAGES          $39,000,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLOS
MATHEW SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**             $57,600,000.00

12

LM

**TO PLAINTIFF JILLIAN SOTO-MARINO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $38,800,000.00
   (PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE**
        **DAMAGES TO PLAINTIFF JILLIAN**
        **SOTO-MARINO AND AGAINST ALEX JONES**
        **AND FREE SPEECH SYSTEMS**
        **(ADD LINE A AND LINE B)**
                                       $68,800,000.00

13

**TO PLAINTIFF WILLIAM ALDENBERG:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 45,000,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**              $ 90,000,000.00

14

LM

**TO PLAINTIFF ERICA LAFFERTY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 58,000,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ERICA
LAFFERTY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                        $ 76,000,000.00

15

**TO PLAINTIFF WILLIAM SHERLACH:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 27,000,000.00
   (PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE**
        **DAMAGES TO PLAINTIFF WILLIAM**
        **SHERLACH AND AGAINST ALEX JONES**
        **AND FREE SPEECH SYSTEMS**
        **(ADD LINE A AND LINE B)**

                                $ 36,000,000.00

16

LM

## II.    AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

    If you check YES, the judge will determine the amount due to the plaintiffs for reasonable attorney's fees and costs and will then award the plaintiffs that amount at a later date.

    If you check NO, the judge will award $1 to the plaintiffs for their attorney's fees and costs.

**WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.**

    ☒ **YES**    (reasonable attorney's fees and costs to be awarded by the judge at a later date)

    ☐ **NO**    (judge will award $1)

17

_____

FOREPERSON SIGNATURE

10/12/2022
_____

DATE

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | Chapter 11 |
| ALEXANDER E. JONES, | § | |
| | § | Case No. 22-33553 (CML) |
| Debtor | § | |
| | § | |

# EXHIBIT D

```
NO: X06-UWY-CV18-6046436-S      : SUPERIOR COURT

ERICA LAFFERTY                  : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg.  Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought
suit against the defendants, Alex Emric Jones and Free Speech
Systems, LLC.[2]  In the operative complaints,[3] the plaintiffs
allege the following relevant facts against the defendants.
Jones is a radio and internet personality who resides in Austin,
Texas.  He is the host of "The Alex Jones Show" and he owns and
operates the websites Inforwars.com and PrisonPlanet.com.
Infowars, LLC is a Texas limited liability company that produces
and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC
is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the
date of the shooting.  Additionally, the original plaintiff Erica
Lafferty was replaced as a plaintiff by her bankruptcy trustee
Richard Coan on October 20, 2021. In both *Sherlach* v. *Jones* cases,
docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the
named plaintiffs are William Sherlach and Robert Parker.  Sherlach
is the spouse of a school psychologist and Parker is the parent of a
student who were murdered by Adam Lanza during the Sandy Hook
incident.

[2] Although there were many additional defendants when these cases
were originally brought, the only remaining defendants at this
juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the
same facts, they will be discussed simultaneously.

2

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

gain. In fact, by May, 2013, Jones was alleged to make approximately $10 million annually. Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ." In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors." In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card. Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

6

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

---

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

throughout the course of the litigation. The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants. The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022.. On October 12, 2022, the jury reached its verdict as to the various plaintiffs. Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice. For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei." *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

9

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

<u>Common Law Punitive Damages</u>

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

10

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award. Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim. Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc*. v. *Canaan Oil & Fuel Co.*, supra, 193

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472, 493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . If awarded, [common-law] *punitive damages are limited to the costs of litigation less*

*taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier*. . . . Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614 A.2d 414 (1992)] (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*, supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages for 'wanton or malicious injuries' for more than two hundred years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

14

and cases cited therein. More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

punitive damages against [the defendant]. The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees. The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million;  as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million;  as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million;  as to Jennifer Hensel, $17.33 million;  as  to  Donna  Soto,  $16  million;  as  to  Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million;  as  to  Jillian  Soto-Marino,  $22.93  million;  as  to William Aldenberg, $30 million;  as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million.  Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

<u>Punitive Damages Pursuant to the Connecticut Trade Practices</u>
<u>Act (CUTPA), General Statutes § 42-110a et seq.</u>

General Statutes § 42-110g provides in relevant part: "(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . *The court may, in its discretion, award punitive damages* and may provide such equitable relief as it deems necessary or proper." (Emphasis added.) "The language is clear and unambiguous; the awarding of punitive damages is within the discretion of the trial court." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

awarded for similar CUTPA violations, that it would be less
likely to be swayed by appeals to emotion and prejudice, and,
therefore, it would be less likely to render an award that was
an outlier. Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App.
22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility
of prejudice entering the decision-making process, the award of
attorney's fees [under CUTPA] has been placed in the hands of
the court" instead of jury); see also *MedValUSA Health Programs,
Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423]
(*Zarella, J.*, dissenting) (legislature vested authority to make
punitive damages award under CUTPA in court instead of in jury
to safeguard against risk of excessive awards) [cert. denied
sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546
U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)].
Accordingly, the concerns that underlie the common-law
limitation on punitive damages have far less weight when the
claim is submitted to the trial court instead of the jury."
*Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation.  See *State Farm Mutual Automobile Ins. Co*. v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co*. v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

outlier cases that call the fairness of the system into question are above the median . . . . Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims under CUTPA and the punitive damages claims under maritime law at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined to adopt the same a one-to-one ratio of punitive damages to compensatory damages as an upper limit for punitive damages in CUTPA cases. Id., 453-54. Nevertheless, the court adopted the factors that were considered by the United States Supreme Court in *Exxon Shipping Co.* in determining whether the amount of punitive damages awarded pursuant to CUTPA is excessive. The court explained that "in determining whether a punitive damages

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co*. discussed. These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co*. v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454–56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146-47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49, the Appellate Court explained that the trial court "found that among the more vexing, competing

32

considerations presented to the court in determining the amount
of the punitive award in this case is, on one hand, the issue
of deterrence, particularly in light of the [defendants']
financial net worth, and on the other hand, the issue of the
overall reasonableness and rationality of a high punitive award
in light of the amount of the plaintiff's actual recovery and
the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*,
supra, 554 U.S. 471] . . . [and] note[d] that because neither
compensation nor enrichment is a valid purpose of punitive
damages, an award should not be so large as to constitute a
windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory
factors bearing on its discretion, a broader, threshold
consideration is that high punitive awards may implicate
constitutional concerns. In *Bristol Technology, Inc*. v.
*Microsoft Corp*., 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on
other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court
stated 'the United States Constitution imposes a substantive

limit on the size of punitive damages awards. . . . This is
because [p]unitive damages pose an acute danger of arbitrary
deprivation of property. . . . Still, [i]n our federal system,
States necessarily have considerable flexibility in determining
the level of punitive damages that they will allow in different
classes of cases and in any particular case. . . . Only when an
award [of punitive damages] can fairly be categorized as grossly
excessive in relation to [the State's legitimate interests in
punishment and deterrence] does it enter the zone of
arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States
Supreme Court has 'instructed courts reviewing punitive damages
to consider three guideposts: (1) the degree of reprehensibility
of the defendant's misconduct; (2) the disparity between the
actual or potential harm suffered by the plaintiff and the
punitive damages award; and (3) the difference between the
punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases.' *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Ins*. *Co*. v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)]. The Court further

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth. On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs. In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident." (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

could have concluded that the bank's reckless and deceptive conduct, together with the fact that the motive for the conduct was to increase the profitability of the auction to the bank, the fact that the bank has a very high net worth and the fact that there is an established practice in this state of awarding multiple damages for CUTPA violations, warranted the amount of the award. Accordingly, [the Supreme Court concluded] that the size of the trial court's punitive damages award [which was three times the compensatory award] did not constitute an abuse of discretion."  (Citation omitted; footnote omitted.)  Id., 456-57.

Here, the material allegations of the complaints, which have been established by virtue of the defaults, entitle the plaintiffs to an award of CUPTA punitive damages. In support of their claim for CUTPA punitive damages, the plaintiffs, in their briefs, support each Ulbrich factor with specific citations to the record. The defendants, in taking the position that there should be either no award of CUTPA punitive damages, or only a

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

profit, by virtue of the convincing evidence including the text
messages between Alex Jones and Tim Fruge regarding daily sales
figures, the business model used by the defendants whereby they
emulated content including Sandy Hook content to reap more
profits, the expert testimony of Clint Watts that Jones' use of
Sandy Hook engaged the audience and drove up sales and profit,
the spikes in sales revenue following the article "FBI Says No
One Killed at Sandy Hook," and their use of the plaintiffs even
during the trial to make money.

With respect to whether the wrongdoing was hard to detect,
the defendants' concealment of their conduct and wrongdoing, by
virtue of their stunningly cavalier attitude toward both their
discovery obligations and court orders regarding discovery
throughout the entire pendency of the case, their unprepared
corporate representative, and intentional discovery abuses,
militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory
damages awards, and low incentive to bring the action, the court

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having—and continuing to utilize—an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.

## Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

costs in the total amount of $1,489,555.94, and awards CUTPA punitive damages in the amount of $150,000,000.00.

<u>421277</u>

<u>Barbara N. Bellis</u>

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | Chapter 11 |
| ALEXANDER E. JONES, | § | |
| | § | Case No. 22-33553 (CML) |
| Debtor | § | |
| | § | |

# EXHIBIT E

| AC 46131 | : | STATE OF CONNECTICUT |
|---|---|---|
| **ERICA LAFFERTY, ET AL.** | : | **APPELLATE COURT** |
| **V.** | : | |
| **ALEX EMRIC JONES, ET AL.** | : | **MARCH 29, 2023** |

| AC 46132 | : | STATE OF CONNECTICUT |
|---|---|---|
| **WILLIAM SHERLACH** | : | **APPELLATE COURT** |
| **V.** | : | |
| **ALEX EMRIC JONES, ET AL.** | : | **MARCH 29, 2023** |

| AC 46133 | : | STATE OF CONNECTICUT |
|---|---|---|
| **WILLIAM SHERLACH, ET AL.** | : | **APPELLATE COURT** |
| **V.** | : | |
| **ALEX EMRIC JONES, ET AL.** | : | **MARCH 29, 2023** |

## <u>PLAINTIFFS-APPELLEES' MOTION FOR RECTIFICATION</u>

Pursuant to Rule of Appellate Procedure § 66-5, the plaintiffs-appellees hereby move the trial court to rectify the record in conformity with the verdict and judgment entered thereon.

Throughout the case, by agreement, the parties referred to Erica Lafferty, rather than the trustee of her bankruptcy estate, Richard Coan, as a plaintiff. Judgment entered in the total amount of $111,429,303.73 ($76,000,000.00 in compensatories plus $35,429,303.73 in punitives) in favor of Mr. Coan as Trustee of the Bankruptcy Estate of Ms. Lafferty. However, the verdict form and parts of the punitive damages Memorandum of Decision refer to Ms. Lafferty rather than Mr. Coan. To make the record crystal clear for the

1

reviewing court, plaintiffs seek rectification. The requested relief does not alter the amount or character of the judgment. It simply clarifies the record for a reviewing court.

## I.    BRIEF HISTORY OF THE CASE

The plaintiffs in this case are members of eight families who lost loved ones in the Sandy Hook Elementary School Shooting and one first responder. The plaintiffs brought suit against defendants Alex Jones and Free Speech Systems, LLC (collectively, "the Jones defendants") alleging invasion of privacy by false light; defamation per se; intentional infliction of emotional distress; and violation of the Connecticut Unfair Trade Practices Act. On June 18, 2019, the trial court (Bellis, J.) sanctioned the Jones defendants for discovery non-compliance and because Alex Jones threatened plaintiffs' counsel on his show. Reviewing pursuant to General Statutes § 52-265a, this Supreme Court affirmed. *Lafferty I*, 336 Conn. 332 (2020).

Following the affirmance of the sanction, the Jones defendants continued their obstruction of discovery. The trial court entered a default against the defendants and subsequently struck their notice of defenses. DN 574, 11/15/21 Default Ruling; Ex. B, DN 620.20, 12/24/21 Order Striking Notice of Defenses. The case proceeded as a hearing in damages before a jury, with evidence commencing September 13, 2022. The jury rendered a verdict in favor of the plaintiffs on October 12, 2022, awarding a total of $965,000,000.00 in compensatory damages and determining that common law punitive damages were warranted. The trial court assessed $323,139,555.94 in common law punitive damages and $150,000,000.00 in CUTPA punitive damages, for a total of $473,139,555.94. DN 1026, 11/10/22 Punitives MOD (Ex. A hereto). Final judgment entered on December 22, 2022,

when the defendants' motions for remittitur and to set aside were denied. DN 1043, 12/22/22 MOD Denying New Trial and Remittitur.

Jones appealed that judgment on December 29, 2022: AC 46131, *Erica Lafferty, et al. v. Alex Emric Jones, et al.*; AC 46132, *William Sherlach v. Alex Emric Jones, et al.*; and AC 46133, *William Sherlach, et al. v. Alex Emric Jones, et al*. On December 30, 2022, the three appeals were consolidated. On January 6, 2023, the Jones defendants filed a Corrected Appeal Form, adding FSS to the appeal.[1] On February 23, 2023, the plaintiffs-appellees filed a motion to transfer the consolidated appeals to the Supreme Court. That motion, Mot SC 220201, is pending.

## II.    SPECIFIC FACTS RELIED ON

On October 20, 2021, Erica Lafferty was removed as a party plaintiff and Richard Coan, Chapter 7 Trustee of the Bankruptcy Estate of Erica Garbatini a/k/a Erica Lafferty, was substituted in as a party plaintiff to prosecute the interests of Ms. Lafferty's bankruptcy

---

[1] FSS filed bankruptcy on July 29, 2022 in the United States Bankruptcy Court for the Southern District of Texas. On August 29, 2022, the Bankruptcy Court (Lopez, J.) lifted the automatic stay to allow trial and any subsequent appeal to proceed. See Order Modifying Automatic Stay, *In re Free Speech Systems, LLC*, Case No. 22-60043, (Bankr. S.D. Tex.), ECF No. 117. On December 2, 2022, Alex Jones filed bankruptcy in the same court. On December 19, 2022, the Bankruptcy Court lifted the automatic stay so that this appeal could proceed. See Order Modifying Automatic Stay, *In re Alexander E. Jones*, Case No. 22-33553, (Bankr. S.D. Tex.), ECF No. 58.

3

estate. DN 459.20, Substitution Order.[2] Throughout the proceedings at trial, however, the parties agreed to refer to Erica Lafferty as a plaintiff, rather than referring to Mr. Coan. *E.g.* Ex. B, 10/4/22 Tr. Vol. III at 36:21-37:7. This agreement also applied to the jury interrogatories and verdict, which referred to Ms. Lafferty as a plaintiff, rather than to Mr. Coan. *Id.* The resulting verdict thus reads as an award in favor of Ms. Lafferty of $76,000,000, but is in fact in favor of Mr. Coan, as representative of Ms. Lafferty's bankruptcy estate. *See* DN 1010, Jury Verdict (attached as Ex. C).

In order to make it clear to a reviewing court that the compensatory damages verdict and punitive damages assessment that comprise the total damages award are in favor of Mr. Coan in his capacity as trustee for Ms. Lafferty's bankruptcy estate, the plaintiffs seek rectification of two references to Ms. Lafferty in the Memorandum of Decision on punitive damages, DN 1026 (Ex. B). These requested rectifications are:

(1) <u>Page 9</u>: <u>after</u> "(14) as to Erica Lafferty, $76 million" <u>add</u> "(pursuant to the parties' agreement that references to Ms. Lafferty on the jury verdict and interrogatories are to be treated as references to Mr. Coan in his capacity as trustee of Ms. Lafferty's bankruptcy estate, this verdict amount enters in favor of Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty)"

---

[2] Erica Lafferty has also been known as Erica Garbatini. *See* DN 459, E. Lafferty's Mot. to Substitute Party at ¶1; DN 460, E. Lafferty's Memo. ISO Mot. to Substitute Party at ¶1. On December 5, 2018, Erica Lafferty a/k/a Erica Garbatini filed a voluntary petition under Chapter 7 of the Bankruptcy Code. *See In re Erica L. Garbatini*, Case No. 18-51587, Ch. 7 Petition (Bankr. D. Conn. Dec. 5, 2018) (ECF No. 1). On September 16, 2021, plaintiff Erica Lafferty filed a Motion to Substitute Richard Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, for Individual Plaintiff Erica Lafferty in *Lafferty v. Jones* (DN 459). The court granted Ms. Lafferty's Motion to Substitute on October 20, 2021 (DN 459.20).

(2) Page 20: change "as to Erica Lafferty, $25.33 million;" to "as to Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty, $25.33 million."[3]

Rectification of these references will ensure that the terms of the judgment are crystal clear to a reviewing court.

## III.    LEGAL GROUNDS ON WHICH MOVING PARTY RELIES

The plaintiffs rely on Rule § 66-5, which authorizes clarification of the trial court record via a motion for rectification.

## IV.    CONCLUSION

For these reasons, the plaintiffs request that the relief sought be granted.

**THE PLAINTIFFS-APPELLEES,**

By:    /s/ Alinor C. Sterling
**ALINOR C. STERLING
CHRISTOPHER M. MATTEI
JOSHUA D. KOSKOFF
KOSKOFF KOSKOFF & BIEDER**
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
asterling@koskoff.com
cmattei@koskoff.com
jkoskoff@koskoff.com
Telephone: (203) 336-4421
Fax: (203) 368-3244
JURIS #32250

---

[3] Other references in the Memorandum of Decision require no alteration because they refer to "plaintiffs."

## CERTIFICATION

Pursuant to Rule of Appellate Procedure § 62-7, I hereby certify that on this date, a true and correct copy of the foregoing has been delivered electronically to the last known email addresses of each counsel of record for whom an e-mail has been provided, as indicated below; that the foregoing document has been redacted or does not contain any names or other personal identifying information that is prohibited from disclosure by rule, statute, court order or case law; and that the foregoing document complies with all applicable rules of appellate procedure.

**For Alex Emric Jones & Free Speech Systems, LLC:**
Norman Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT 06511
Telephone: 203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

/s/ *Alinor C. Sterling*
**ALINOR C. STERLING**
**CHRISTOPHER M. MATTEI**
**JOSHUA D. KOSKOFF**

# EXHIBIT A

```
NO: X06-UWY-CV18-6046436-S      : SUPERIOR COURT

ERICA LAFFERTY                  : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg.  Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2] In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas. He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars. Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

_____

Aldenberg is a first responder who responded to the scene on the date of the shooting. Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach* v. *Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker. Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are
also Texas-based companies. All of the above-mentioned Texas
business-entity defendants are owned, controlled, and/or
operated by the defendant Alex Jones and are employed to hold
and generate revenue for him. The Alex Jones Show is syndicated
on more than sixty radio stations and it has an audience of two
million people. Jones and Infowars have an audience of millions
more, including 2.3 million subscribers to Jones' YouTube
channel.

The plaintiffs allege that following the 2012 Sandy Hook
shooting, "Jones and the rest of the Jones defendants acted
together to develop, disseminate and propagate . . . false
statements" regarding the incident. According to the
plaintiffs, Jones made these comments even though he "does not
in fact believe that the Sandy Hook [s]hooting was a hoax—and
he never has." The plaintiffs assert that Jones has developed
a "very lucrative business model" pedaling "conspiracy-minded
falsehoods like those about Sandy Hook" for immense monetary

gain. In fact, by May, 2013, Jones was alleged to make approximately $10 million annually. Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ." In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors." In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card. Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

---

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

throughout the course of the litigation. The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants. The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022.. On October 12, 2022, the jury reached its verdict as to the various plaintiffs. Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice. For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei." *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

Common Law Punitive Damages

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.  Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim.  Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472, 493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . If awarded, [common-law] *punitive damages are limited to the costs of litigation less*

*taxable costs, but, within that limitation, the extent to which*
*they are awarded is in the sole discretion of the trier. . . .*
Limiting punitive damages to litigation expenses, including
attorney's fees, fulfills the salutary purpose of fully
compensating a victim for the harm inflicted . . . while avoiding
the potential for injustice which may result from the exercise
of unfettered discretion by a jury. . . . We have long held that
in a claim for damages, proof of the expenses paid or incurred
affords some evidence of the value of the services . . . . *Label*
*Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d
703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614
A.2d 414 (1992)] (common-law punitive damages, when viewed in
the light of the increasing costs of litigation, also [serve]
to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*,
supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages
for 'wanton or malicious injuries' for more than two hundred
years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

14

and cases cited therein. More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

punitive damages against [the defendant]. The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees. The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150 (1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

17

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million; as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million; as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million; as to Jennifer Hensel, $17.33 million; as to Donna Soto, $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million; as to Jillian Soto-Marino, $22.93 million; as to William Aldenberg, $30 million; as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million. Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

## Punitive Damages Pursuant to the Connecticut Trade Practices
## Act (CUTPA), General Statutes § 42-110a et seq.

General Statutes § 42-110g provides in relevant part: "(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . *The court may, in its discretion, award punitive damages* and may provide such equitable relief as it deems necessary or proper." (Emphasis added.) "The language is clear and unambiguous; the awarding of punitive damages is within the discretion of the trial court." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier. Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

'

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

outlier cases that call the fairness of the system into question are above the median . . . . Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53.

   In light of the differences between punitive damages claims under CUTPA and the punitive damages claims under maritime law at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined to adopt the same a one-to-one ratio of punitive damages to compensatory damages as an upper limit for punitive damages in CUTPA cases. Id., 453-54. Nevertheless, the court adopted the factors that were considered by the United States Supreme Court in *Exxon Shipping Co.* in determining whether the amount of punitive damages awarded pursuant to CUTPA is excessive. The court explained that "in determining whether a punitive damages

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co*. discussed. These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co*. v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454–56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146–47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147–49, the Appellate Court explained that the trial court "found that among the more vexing, competing

considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [defendants'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns. In *Bristol Technology, Inc.* v. *Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated 'the United States Constitution imposes a substantive

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases.' *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.  Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.  In [*Pacific Mutual Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)].  The Court further

35

referenced a long legislative history, dating back over 700
years and going forward to today, providing for sanctions of
double, treble, or quadruple damages to deter and punish. . . .
While these ratios are not binding, they are instructive. They
demonstrate what should be obvious: Single-digit multipliers
are more likely to comport with due process, while still
achieving the State's goals of deterrence and retribution, than
awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that
a punitive damages award may not surpass, ratios greater than
those we have previously upheld may comport with due process
where a particularly egregious act has resulted in only a small
amount of economic damages. . . . The converse is also true,
however.  When compensatory damages are substantial, then a
lesser ratio, perhaps only equal to compensatory damages, can
reach the outermost limit of the due process guarantee.  The
precise award in any case, of course, must be based upon the
fact[s] and circumstances of the defendant's conduct and the

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

37

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth. On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs. In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident." (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

could have concluded that the bank's reckless and deceptive conduct, together with the fact that the motive for the conduct was to increase the profitability of the auction to the bank, the fact that the bank has a very high net worth and the fact that there is an established practice in this state of awarding multiple damages for CUTPA violations, warranted the amount of the award. Accordingly, [the Supreme Court concluded] that the size of the trial court's punitive damages award [which was three times the compensatory award] did not constitute an abuse of discretion."  (Citation omitted; footnote omitted.)  Id., 456-57.

Here, the material allegations of the complaints, which have been established by virtue of the defaults, entitle the plaintiffs to an award of CUPTA punitive damages. In support of their claim for CUTPA punitive damages, the plaintiffs, in their briefs, support each Ulbrich factor with specific citations to the record. The defendants, in taking the position that there should be either no award of CUTPA punitive damages, or only a

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having—and continuing to utilize—an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

plaintiffs.    This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.

## Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

costs in the total amount of $1,489,555.94, and awards CUTPA punitive damages in the amount of $150,000,000.00.

<u>421277</u>

<u>Barbara N. Bellis</u>

# EXHIBIT B

```
DKT NO: X06-UWY-CV186046436-S      :  COMPLEX LITIGATION DKT

ERICA V. LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                   :  OCTOBER 4, 2022


DOCKET NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMERIC JONES
```

**P.M. SESSION**
**VOLUME 3 OF 3**

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
AND A JURY



A P P E A R A N C E S:


   Representing the Plaintiff(s):

       ATTORNEY CHRISTOPHER MATTEI
       ATTORNEY JOSHUA KOSKOFF
       ATTORNEY MATTHEW BLUMENTHAL
       ATTORNEY ALINOR STERLING



   Representing Defendant(s):

       ATTORNEY NORMAN PATTIS



                           Recorded By:
                           Kendyl Henaghan

                           Transcribed By:
                           Kendyl Henaghan
                           Court Recording Monitor
                           Waterbury Superior Court
                           300 Grand Street
                           Waterbury, Connecticut 06702

1    (phonetic) and attorney's fees and costs also go to

2    the Court, but we have an agreement that that – the

3    determination of the amount will be in a later

4    proceeding.

5         That's really the point of this, Your Honor, is

6    to say we're not putting on evidence right now of the

7    amount of attorney's fees and costs, because we have

8    an agreement that that's reserved to a later

9    proceeding.

10        ATTY. PATTIS: And in part, that agreement

11   spawned (phonetic) from the disclosure of – an

12   arguably late disclosure of an expert on the

13   (indiscernible). In the run up to trial, we agreed to

14   defer that and our right to depose that person should

15   that question arise; and I think we did put that on

16   the record, maybe even before evidence began.

17        ATTY. STERLING: I think we put it on –

18   well in any event, it's on the . . .

19        THE COURT: Okay, well the record's nice and

20   clear.

21        ATTY. STERLING: . . . it's very nice and clear

22   right now; and the other issue we had, Your Honor, is

23   that technically, the Plaintiff standing in for Erica

24   Lafferty is Rich Cohen – the bankruptcy trustee.

25        Throughout the proceedings, we have referred to

26   Erica Lafferty as the Plaintiff; we have an agreement

27   that we will refer to Erica Lafferty on the verdict

1         form and any Jury interrogatories; and it will be

2         then, understood, that judgement will enter in favor

3         of the formal plaintiff in the case - but we'll

4         (phonetic) just handle the Jury interrogatories and

5         verdict form that way.

6             ATTY. PATTIS: Agreed.

7             THE COURT: Okay, all right.

8             ATTY. STERLING: Thank you.

9             THE COURT: So, are we ready to go on the

10         proposed charge?

11             ATTY. STERLING: Yes, Your Honor; where did the

12         Court want to begin?

13             THE COURT: Well, I think - just bear with me for

14         one second.

15             ATTY. PATTIS: Did the Court ever get a copy that

16         wasn't all page-tens?

17             THE COURT: I did, I did, and it's actually got

18         colors on it - it's very exciting.

19             One of the things that, I think Attorney

20         Sterling was gonna look at - and you were gonna look

21         at, Attorney Pattis, was the implicit bias charge -

22         whether you thought there was a need for it or not;

23         have you had an opportunity to talk to each other on

24         that - about that?

25             ATTY. STERLING: We have not; so, let's defer

26         that one until tomorrow.

27             THE COURT: Okay. All right, so, on the

```
DKT NO: X06-UWY-CV186046436-S      :  COMPLEX LITIGATION DKT
ERICA V. LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY
v.                                 :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                   :  OCTOBER 4, 2022


DOCKET NO: X06-UWY-CV186046437-S
WILLIAM SHERLACH
v.
ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S
WILLIAM SHERLACH
v.
ALEX EMERIC JONES
```

## C E R T I F I C A T I O N

I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 4th day of October, 2022.

Dated this 5th day of October, 2022, in Waterbury, Connecticut.

*Kendyl Henaghan*
Kendyl Henaghan
Court Recording Monitor

# EXHIBIT C

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.    COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

1

**TO PLAINTIFF ROBERT PARKER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 60,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF ROBERT
   PARKER AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                                       $ 120,000,000.00

2

**TO PLAINTIFF DAVID WHEELER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 30,000,000.00
   (PAST AND FUTURE)


   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DAVID
   WHEELER AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**
                                        $ 55,000,000.00

3

**TO PLAINTIFF FRANCINE WHEELER:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                      $ 24,000,000.00

B. EMOTIONAL DISTRESS DAMAGES            $ 30,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE**
   **DAMAGES TO PLAINTIFF FRANCINE**
   **WHEELER AND AGAINST ALEX JONES**
   **AND FREE SPEECH SYSTEMS**
   **(ADD LINE A AND LINE B)**

                                         $ 54,000,000.00

4

LM

**TO PLAINTIFF JACQUELINE BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                       $ 10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES             $ 18,800,000.00
   (PAST AND FUTURE)


**TOTAL FAIR, JUST AND REASONABLE**
**DAMAGES TO PLAINTIFF JACQUELINE**
**BARDEN AND AGAINST ALEX JONES**
**AND FREE SPEECH SYSTEMS**
**(ADD LINE A AND LINE B)**

                                          $ 28,800,000.00

5

**TO PLAINTIFF MARK BARDEN:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $ 25,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES
    (PAST AND FUTURE)                    $ 32,600,000.00

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF MARK
> BARDEN AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>
> $ 57,600,000.00

LM

**TO PLAINTIFF NICOLE HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                        $ 32,000,000.00


B.  EMOTIONAL DISTRESS DAMAGES              $ 41,600,000.00
    (PAST AND FUTURE)


        **TOTAL FAIR, JUST AND REASONABLE**
        **DAMAGES TO PLAINTIFF NICOLE**
        **HOCKLEY AND AGAINST ALEX JONES**
        **AND FREE SPEECH SYSTEMS**
        **(ADD LINE A AND LINE B)**
                                            $ 73,600,000.00

LM

**TO PLAINTIFF IAN HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                         $ 38,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES              $ 43,600,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF IAN
> HOCKLEY AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>
> $ 81,600,000.00

8

**TO PLAINTIFF JENNIFER HENSEL:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                     $ 21,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES
    (PAST AND FUTURE)                     $ 31,000,000.00

        **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JENNIFER
HENSEL AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                              $ 52,000,000.00



**TO PLAINTIFF DONNA SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 30,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DONNA
   SOTO AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                                       $ 48,000,000.00

**TO PLAINTIFF CARLEE SOTO PARISI:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $ 30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $ 36,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF CARLEE
   SOTO PARISI AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**             $ 66,000,000.00

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                           $ 18,600,000.00

B. EMOTIONAL DISTRESS DAMAGES                  $ 39,000,000.00
   (PAST AND FUTURE)

          **TOTAL FAIR, JUST AND REASONABLE
          DAMAGES TO PLAINTIFF CARLOS
          MATHEW SOTO AND AGAINST ALEX JONES
          AND FREE SPEECH SYSTEMS
          (ADD LINE A AND LINE B)**          $ 57,600,000.00

12

LM

**TO PLAINTIFF JILLIAN SOTO-MARINO:**

A.  DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                 $30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES        $38,800,000.00
   (PAST AND FUTURE)

        **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

        $68,800,000.00

13

**TO PLAINTIFF WILLIAM ALDENBERG:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $ 45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES        $ 45,000,000.00
(PAST AND FUTURE)

       **TOTAL FAIR, JUST AND REASONABLE**
       **DAMAGES TO PLAINTIFF WILLIAM**
       **ALDENBERG AND AGAINST ALEX JONES**
       **AND FREE SPEECH SYSTEMS**
       **(ADD LINE A AND LINE B)**

                             $ 90,000,000.00

LM

**TO PLAINTIFF ERICA LAFFERTY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
   (PAST AND FUTURE)                    $58,000,000.00

       **TOTAL FAIR, JUST AND REASONABLE
       DAMAGES TO PLAINTIFF ERICA
       LAFFERTY AND AGAINST ALEX JONES
       AND FREE SPEECH SYSTEMS
       (ADD LINE A AND LINE B)**        $76,000,000.00

15

**TO PLAINTIFF WILLIAM SHERLACH:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                                  $ 9,000,000.00


B. EMOTIONAL DISTRESS DAMAGES                         $ 27,000,000.00
   (PAST AND FUTURE)


       **TOTAL FAIR, JUST AND REASONABLE**
       **DAMAGES TO PLAINTIFF WILLIAM**
       **SHERLACH AND AGAINST ALEX JONES**
       **AND FREE SPEECH SYSTEMS**
       **(ADD LINE A AND LINE B)**                    $ 36,000,000.00

16

LM

## II. AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

> If you check YES, the judge will determine the amount
> due to the plaintiffs for reasonable attorney's fees
> and costs and will then award the plaintiffs that
> amount at a later date.
>
> If you check NO, the judge will award $1 to the
> plaintiffs for their attorney's fees and costs.

**WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE
ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.**

    ☒ **YES**     (reasonable attorney's fees and costs to be awarded by the judge at
                                   a later date)

    ☐ **NO**     (judge will award $1)

17

_(signature)_

**FOREPERSON SIGNATURE**

10|12|2022

**DATE**

18

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| IN RE: | § § § | Chapter 11 |
| ALEXANDER E. JONES, | § § | Case No. 22-33553 (CML) |
| Debtor | § § § |  |

# EXHIBIT F

ORDER    421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

3/31/2023

ORDER

The following order is entered in the above matter:

ORDER:

The motion for rectification, filed by the plaintiffs on March 29, 2023, is granted, without objection.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____
Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.