# EXHIBIT 40

229 Conn. App. 487 DECEMBER, 2024 487

*Lafferty v. Jones*

We agree with the habeas court that Sturman did not render deficient performance by failing to consult with or hire a crime scene reconstruction expert. At the habeas trial, the crime scene reconstructionist presented a photograph mimicking the conditions under which Carrillo was seeing the shooting—and this would have been his primary, if not sole, contribution to the criminal trial. Although the accuracy of the crime scene reconstructionist's photograph surpassed that of the photographs presented to the jury during the criminal trial, the jury had ample evidence at its disposal to evaluate Carrillo's ability to see the incident from her apartment. Thus, the petitioner has not shown that Sturman performed deficiently by not consulting with or hiring a crime scene reconstruction expert. Accordingly, the petitioner's claim cannot prevail under *Strickland*.

The judgment is affirmed.

In this opinion the other judges concurred.

———————————

ERICA LAFFERTY ET AL. *v.* ALEX EMRIC JONES ET AL.
(AC 46131)

WILLIAM SHERLACH *v.*
ALEX JONES ET AL.
(AC 46132)

WILLIAM SHERLACH ET AL. *v.* ALEX EMRIC JONES ET AL.
(AC 46133)

Moll, Clark and Eveleigh, Js.

*Syllabus*

The defendants, J and his company, F Co., appealed from the judgments of the trial court rendered following jury verdicts for the plaintiffs in three underlying consolidated actions that arose out of the 2012 mass shooting

488          DECEMBER, 2024          229 Conn. App. 487

Lafferty *v.* Jones

at the Sandy Hook Elementary School in Newtown. The court had defaulted the defendants as a sanction for their repeated, wilful failure to fully and fairly comply with the plaintiffs' discovery requests and for violating a protective order. The cases then proceeded to a hearing in damages, after which the plaintiffs were awarded compensatory damages, attorney's fees and costs and, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., punitive damages. On appeal, the defendants claimed, inter alia, that the court incorrectly concluded that the plaintiffs' allegations were sufficient to support a legally viable CUTPA claim. *Held*:

The trial court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and a protective order.

The trial court's default order was a sanction that was proportional to the defendants' wilful noncompliance and misconduct in repeatedly failing to produce critical documents that the plaintiffs needed to prosecute their case and in making highly confidential information about the plaintiffs available on the Internet.

The plaintiffs had no responsibility, as the defendants claimed, to prove the cause of the harm they suffered, as the effect of the trial court's default order was to conclusively establish the defendants' liability, thereby leaving the plaintiffs with only the burden of establishing their damages.

The defendants' inadequately briefed claim that the trial court improperly limited the scope of J's testimony was deemed abandoned.

The trial court did not abuse its discretion in denying the defendants' motion for remittitur, as the evidence was sufficient to support the jury's damages award, which did not shock the sense of justice in light of testimony by all of the plaintiffs about the mental anguish and emotional harm they suffered as a result of death threats and harassment conveyed to them through social media, by mail and in person that stemmed from the defendants' lies that the Sandy Hook massacre was a hoax.

The conduct forming the basis of the plaintiffs' CUTPA claim, namely, the defendants' dissemination of lies about the school shooting, did not constitute the conduct of any trade or commerce within the meaning of CUTPA, as the underlying motivation of the defendants' speech was to generate profit through the sale of products to their audience, and the plaintiffs did not allege that they were harmed by the defendants' advertising, marketing or sale of those products; accordingly, the judgments were reversed as to the plaintiffs' CUTPA claim.

Argued February 8—officially released December 10, 2024

229 Conn. App. 487          DECEMBER, 2024          489

Lafferty *v.* Jones

*Procedural History*

Action, in the first case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the second case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the third case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the cases were consolidated and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, in the first case, Jennifer Hensel, executrix of the estate of Jeremy Richman, was substituted as a plaintiff and withdrew her claims against the named defendant et al.; subsequently, in the first case, Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, was substituted as a plaintiff; thereafter, the court, *Bellis, J.*, defaulted the named defendant et al. in each case for violations of certain discovery orders and a protective order; subsequently, the court denied the motions by the named defendant et al. in each case to set aside the defaults; thereafter, the issue of damages was tried to the jury before *Bellis, J.*; subsequently, in each case, the named plaintiff et al. filed an amended complaint; verdict in each case for the named plaintiff et al.; thereafter, in each case, the court denied the motions filed by the named defendant et al. to set aside the verdict and for remittitur, and rendered judgment in each case for the named plaintiff et al., from which the named defendant et al. in each case filed separate appeals with this court; subsequently, Erica L. Ash was substituted as a party plaintiff for Richard M. Coan, trustee of the bankruptcy estate of Erica L. Garbatini; thereafter, the appeals were consolidated. *Reversed in part*; *judgment directed in part.*

*Norman A. Pattis*, for the appellants in each case (named defendant et al.).

*Alinor C. Sterling*, with whom, on the brief, were *Christopher M. Mattei* and *Joshua D. Koskoff*, for the appellees in each case (named plaintiff et al.).

*Opinion*

MOLL, J. In these consolidated appeals, the defendants Alex Emric Jones and Free Speech Systems, LLC,[1] appeal from the judgments of the trial court rendered following jury verdicts returned in favor of the plaintiffs[2]

---

[1] Several additional defendants were named in the underlying consolidated actions, namely, Infowars, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the judgments rendered following the jury verdicts returned in the underlying consolidated actions. We refer in this opinion to (1) Jones and Free Speech Systems, LLC, collectively, as the defendants, and (2) Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively, as the Jones defendants.

[2] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini [also known as Erica Lafferty], in her place as a plaintiff in this case." (Citations omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court granted a motion to substitute Erica L. Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel,

229 Conn. App. 487          DECEMBER, 2024          491

*Lafferty v. Jones*

in the underlying consolidated tort actions[3] arising out
of the 2012 mass shooting at Sandy Hook Elementary
School in Newtown. On appeal, the defendants claim
that the court improperly (1) defaulted them as a sanc-
tion for violating certain discovery orders and a protec-
tive order, (2) construed the effect of the default to
relieve the plaintiffs of the burden to prove the extent
of their damages, (3) restricted the scope of Jones'
testimony at the hearing in damages, (4) denied their
motion for a remittitur, and (5) concluded that the plain-
tiffs' claim asserting a violation of the Connecticut
Unfair Trade Practices Act (CUTPA), General Statutes
§ 42-110a et seq., was legally sufficient. For the reasons
that follow, we disagree with the defendants' first, sec-
ond, and fourth claims, and deem the defendants' third
claim to be abandoned as inadequately briefed. We
agree, however, with the defendants' fifth claim.
Accordingly, we reverse in part the judgments of the
trial court.

The following facts and procedural history, as set
forth previously by this court or as were undisputed in
the record, are relevant to our resolution of these
appeals. "On December 14, 2012, Adam Lanza entered
Sandy Hook Elementary School (Sandy Hook), and
thereafter shot and killed twenty first-grade children
and six adults, in addition to wounding two other vic-
tims who survived the attack. In the underlying consoli-
dated actions, the plaintiffs, consisting of a first
responder, who was not a victim of the Sandy Hook
shooting but was depicted in the media following the

as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of
the bankruptcy estate of Erica L. Garbatini.

[3] The motions and pleadings filed in each of the underlying consolidated
actions were largely identical, and the jury verdict returned in each action
was the same. In the interest of simplicity, unless otherwise deemed neces-
sary, we refer to the motions, pleadings, and other documents filed in the
controlling action. See *Lafferty* v. *Jones*, Superior Court, judicial district of
Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S.

492           DECEMBER, 2024          229 Conn. App. 487

Lafferty *v.* Jones

shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of [CUTPA]." (Citation omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 859–60, 307 A.3d 923 (2023).

On November 15, 2021, the trial court, *Bellis*, *J.*, defaulted the defendants as a sanction for violating (1) certain discovery orders and (2) a protective order. Thereafter, the issue of damages was tried to a jury. In the midst of the hearing in damages, with the defendants' consent, the plaintiffs filed an amended complaint asserting four counts, each of which was accompanied by a claim of civil conspiracy: (1) invasion of privacy by false light; (2) defamation and defamation per se; (3) intentional infliction of emotional distress; and (4) a violation of CUTPA.[4] On October 12, 2022,

_____

[4] In an accompanying request for leave to amend their complaint, the plaintiffs represented that the amended complaint (1) removed the negligent infliction of emotional distress count previously alleged, (2) removed former defendants, and (3) "simplifie[d] the pleadings by providing a single, uniform

229 Conn. App. 487    DECEMBER, 2024    493

*Lafferty v. Jones*

the jury returned a verdict in favor of the plaintiffs, awarding them a total of $965,000,000 in compensatory damages. The jury further awarded the plaintiffs reasonable attorney's fees and costs, with the amounts to be determined by the court at a later date. On November 10, 2022, the court awarded the plaintiffs a total of (1) $321,650,000 in common-law punitive damages in the form of attorney's fees, (2) $1,489,555.94 in costs, and (3) $150,000,000 in statutory punitive damages pursuant to CUTPA. The defendants filed motions to set aside the verdict and for a remittitur, which the court denied on December 22, 2022. These consolidated appeals followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendants' claims, we note that the plaintiffs argue that "[a]lmost all of [the defendants'] claims of error are so general or so inadequately briefed that they are waived." We iterate that we deem claims on appeal to be abandoned if they are inadequately briefed. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 375 n.30, 246 A.3d 429 (2020) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.)), cert. denied,        U.S.      , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021). As we explain throughout this opinion, we decline to review any

complaint for the hearing in damages of the [underlying] consolidated cases . . . ."

*Lafferty* v. *Jones*

claims that the defendants have abandoned as a result
of inadequate briefing.

I

The defendants first claim that the trial court improp-
erly defaulted them as a sanction for violating certain
discovery orders, as well as a discovery related protec-
tive order. We disagree.

The following additional facts and procedural history
are relevant to our resolution of this claim. Shortly after
the underlying consolidated actions had been com-
menced, the Jones defendants filed special motions to
dismiss the actions pursuant to Connecticut's anti-
SLAPP[5] statute. See General Statutes § 52-196a (b).[6] The
plaintiffs moved for limited discovery vis-à-vis the spe-
cial motions to dismiss; see General Statutes § 52-196a
(d); which the court granted on December 17, 2018.

On January 10, 2019, the court overruled objections
raised by the Jones defendants to the plaintiffs' requests
for production seeking, inter alia, marketing data, sales
analytics, and web analytics that the Jones defendants
"own[ed] and/or control[led]." On May 7, 2019, in an
objection addressing various discovery issues, the
Jones defendants represented that they had "provided
all of the analytics, business and marketing plans that
they have." On May 29, 2019, the plaintiffs moved to
compel compliance with the court's discovery orders,
asserting in part that the Jones defendants had failed
to produce responsive marketing and analytics informa-
tion. The plaintiffs referred, in particular, to marketing

---

[5] "SLAPP is an acronym for 'strategic lawsuit against public participation'
. . . ." *Lafferty* v. *Jones*, supra, 336 Conn. 337 n.4.

[6] Section 52-196a was amended by No. 19-64, § 17, of the 2019 Public Acts,
which made changes to the statute that are not relevant to these appeals.
Accordingly, we refer to the current revision of the statute.

229 Conn. App. 487          DECEMBER, 2024          495

*Lafferty v. Jones*

data generated by Google Analytics[7] in the custody and control of the Jones defendants, and argued that a thirty-five page Google Analytics document provided by the Jones defendants was inadequate.

On June 10, 2019, the court issued an order stating that (1) testimony elicited during certain depositions confirmed that a "Google Analytics account is accessed and utilized by some employees of the [Jones] defendants," (2) the Google Analytics document that the Jones defendants had produced did not constitute full and fair compliance with the court's discovery orders, and (3) the plaintiffs were "entitled to the [Google Analytics] data pursuant to the court's discovery orders." The court further ordered that it would "consider appropriate sanctions for the [Jones] defendants' failure to fully and fairly comply should they not produce the data within one week." Subsequently, the Jones defendants represented that, on June 17, 2019, Google Analytics data purportedly had been emailed to the plaintiffs' counsel; however, the plaintiffs' counsel represented that the email was never received.

On June 17, 2019, the plaintiffs moved for the court to review a June 14, 2019 broadcast of Jones' radio program, during which Jones made threatening comments with respect to one of the plaintiffs' counsel. See *Lafferty* v. *Jones*, supra, 336 Conn. 342–46, 370. On June 18, 2019, after finding that (1) the Jones defendants were noncompliant with the court's discovery orders concerning, inter alia, the Google Analytics data, and (2) Jones had harassed, intimidated, and threatened one of the plaintiffs' counsel during the June 14, 2019

---

[7] In their principal appellate brief, the defendants represent that "Google Analytics is proprietary data made available to subscribers on a server maintained by Google. It is described thus on Google's webpage: 'Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also the mobile app traffic [and] events, currently inside a platform inside the Google Marketing Platform brand.' "

*Lafferty v. Jones*

broadcast, the court sanctioned the Jones defendants by depriving them of the opportunity to pursue their special motions to dismiss. Id., 346–47, 374. At the outset of its decision, the court also stated: "[T]he discovery in this case has been marked with obfuscation and delay on the part of the [Jones] defendants, who, despite several court-ordered deadlines . . . [have] continue[d] . . . to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations. . . . The [court has] entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their discovery and [have] failed to produce that which is within their knowledge, possession, or power to obtain." Later, the court further stated: "At this point, I decline to default the . . . Jones defendants, but I will—I don't know how clearly I can say this. . . . As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the . . . Jones defendants if they, from this point forward, continue with their behavior with respect to discovery." On July 10, 2020, following Chief Justice Richard A. Robinson's grant of the Jones defendants' petition for an expedited public interest appeal pursuant to General Statutes § 52-265a, our Supreme Court affirmed the trial court's sanction orders. *Lafferty* v. *Jones*, supra, 336 n.3, 385.

On November 12, 2020, the plaintiffs moved to again compel compliance with court-ordered discovery.[8] On

---

[8] The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further.

229 Conn. App. 487          DECEMBER, 2024          497

*Lafferty v. Jones*

May 5, 2021, the Jones defendants filed an objection, arguing in part that the plaintiffs' prior discovery requests had been rendered moot as a result of the court's June 18, 2019 sanction orders precluding the Jones defendants from pursuing their special motions to dismiss.[9] On May 14, 2021, the court issued an order stating that "the obligation of the [Jones] defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the [Jones] defendants have been precluded from pursuing special motions to dismiss."

On June 1, 2021, the Jones defendants filed an emergency motion for a protective order requesting that the court (1) extend an upcoming discovery production deadline by forty-five days and (2) narrow the scope of discovery regarding, inter alia, the Google Analytics data, which, they represented, required them to review nearly 300,000 emails for privileged information. On June 2, 2021, the court issued an order stating: "The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the timeframe for compliance, the outstanding discovery responses were due over two years ago. At no point in time following the decision [in *Lafferty* v. *Jones*, supra, 336 Conn. 332] did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs . . . the Jones defendants, in February and March of 2020, while their case was pending before [our] Supreme Court and a court-ordered stay of discovery was in effect, asked the plaintiffs' counsel for a complete set of discovery requests to

─────────────

[9] On November 18, 2020, the Jones defendants filed a notice that the underlying consolidated actions had been removed to the United States District Court for the District of Connecticut. The actions were remanded from the District Court on March 5, 2021.

Lafferty *v.* Jones

date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020, and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021, confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the [Jones] defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that [the Jones defendants'] motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default."

On June 28, 2021, the Jones defendants filed a notice of compliance indicating that (1) the defendants had provided "complete, final supplemental compliance," and (2) Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, previously had satisfied their discovery obligations. With regard to the Google Analytics data, the Jones defendants represented that (1) only Free Speech Systems, LLC, used Google Analytics, (2) Free Speech Systems, LLC, did not possess, control, or have custody of Google Analytics data in a manner allowing the data to be exported,[10] and (3) the only reasonable method of sharing the Google Analytics data would

---

[10] The Jones defendants further represented that, to export the Google Analytics data, Free Speech Systems, LLC, would be required to purchase an upgraded membership account at a cost of $150,000.

229 Conn. App. 487         DECEMBER, 2024         499

Lafferty *v.* Jones

be to permit the plaintiffs' counsel to access it via a
" 'sandbox.' "[11]

On July 1, 2021, Free Speech Systems, LLC, Infowars
Health, LLC, and Prison Planet TV, LLC, through one
of their counsel, Attorney Norman A. Pattis of Pattis &
Smith, LLC,[12] filed a motion for a commission to take
an out-of-state deposition of Hillary Clinton (motion to
depose Clinton).[13] These defendants asserted in rele-
vant part that, (1) during one of the plaintiffs' deposi-
tions, (a) on the advice of counsel, the deponent refused
to answer how the plaintiffs "all ended up represented
by the same [law] firm" in the underlying consolidated
actions and (b) claimed to be unaware of how her
legal fees were being paid, (2) the lead plaintiff in the
underlying consolidated actions was invited to speak
at the Democratic National Convention in 2016, and
thereafter was "praised" by Clinton, and (3) they
"believe[d] that [the underlying consolidated actions
were] filed six years after the shootings at Sandy Hook
as part of a vendetta inspired, orchestrated and directed
in whole or in part by . . . Clinton as part of a vendetta
to silence . . . Jones after . . . Clinton lost the presi-
dential race to Donald J. Trump."

On July 6, 2021, the plaintiffs filed a motion to sanc-
tion the Jones defendants for violating a protective

[11] The Jones defendants defined " '[s]andboxing' " as " 'a computer secu-
rity term referring to when a program is set aside from other programs in
a separate environment so that if errors or security issues occur, those
issues will not spread to other areas on the computer. Programs are enabled
in their own sequestered area, where they can be worked on without posing
any threat to other programs.' "

[12] On July 1, 2021, all of the Jones defendants, except for Jones, were
represented by both Attorney Jay Marshall Wolman and Pattis & Smith,
LLC. At that time, Jones was represented by Wolman only.

[13] Jones did not join the motion to depose Clinton, and Infowars, LLC,
was not listed as one of the movants. In subsequent filings, including an
August 3, 2021 reply brief vis-à-vis the motion to depose Clinton, Infowars,
LLC, was treated as an additional movant.

500                 DECEMBER, 2024          229 Conn. App. 487

*Lafferty v. Jones*

order entered on February 22, 2019, as amended on June 16, 2021 (protective order),[14] which originally had been proposed by the Jones defendants and which, inter alia, protected confidential information produced by the plaintiffs during discovery.[15] The plaintiffs maintained that the motion to depose Clinton, filed by the Jones defendants[16] in the middle of a deposition, (1) was frivolous and (2) improperly published information obtained from the deponent's testimony that was designated as "Highly Confidential-Attorneys Eyes Only" in violation of the protective order. On July 19, 2021, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, filed an objection, and the plaintiffs filed a reply brief the next day.

On August 5, 2021, the court issued an order stating in relevant part: "In the midst of taking the first deposition of a plaintiff . . . Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC (Infowars), filed a motion to depose . . . Clinton, using deposition testimony that had just been designated as '[Highly] Confidential-Attorneys Eyes Only,'

---

[14] The protective order was twice amended further in 2022.

[15] The protective order limited access to materials designated as "Confidential Information" or "Highly Confidential-Attorneys Eyes Only" to certain categories of persons. The protective order further provided in relevant part: "Depositions involving Confidential Information shall be treated, as follows:

"a. Portions of a deposition or depositions in their entirety may be designated Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY by counsel for the deponent or the Designating Party [as defined in the protective order], with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

"b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY where less than all of the testimony in that transcript would fall into those categories, subject to [a procedure detailed in the protective order]. . . . The designations shall remain effective until and unless an objection is made and finally resolved."

[16] The plaintiffs contended that the motion to depose Clinton should be treated as having been filed by all of the Jones defendants. See footnote 13 of this opinion.

229 Conn. App. 487          DECEMBER, 2024          501

Lafferty *v.* Jones

and completely disregarding the court-ordered proce-
dures. At no point prior to filing the Clinton motion did
Infowars profess ignorance of the procedures they had
proposed and which were court-ordered to be followed,
nor have they since taken any steps to correct their
improper filing. If Infowars was of the opinion that the
plaintiffs' designation was unreasonable and not made
in good faith, the solution was to follow the court-
ordered procedure to challenge the designation, not to
blatantly disregard it and make the confidential infor-
mation available on the Internet by filing it in the court
file. The court rejects Infowars' baseless argument that
there was no good cause to issue the protective [order]
. . . . Infowars . . . now takes the absurd position
that the court-ordered protective order circumvents the
good cause requirements of Practice Book § 13-5, did
not need to be complied with, and should not be
enforced by the court. This argument is frightening.
Given the cavalier actions and wilful misconduct of
Infowars in filing protected deposition information dur-
ing the actual deposition, this court has grave concerns
that their actions, in the future, will have a chilling
effect on the testimony of witnesses who would be
rightfully concerned that their confidential information,
including their psychiatric and medical histories, would
be made available to the public. The court will address
sanctions at a future hearing."[17]

On July 6, 2021, the plaintiffs filed a motion to sanc-
tion the Jones defendants for failing to produce certain
accounting documents. The plaintiffs asserted in rele-
vant part that, (1) in connection with a noticed deposi-
tion of Melinda Flores, Free Speech System, LLC's
accounting manager, Flores was directed to produce
documents, including (a) Free Speech System, LLC's
trial balances from 2012 to 2019, and (b) " '[a]ny and

---

[17] On August 4, 2021, the court denied the motion to depose Clinton. That
ruling is not at issue in these consolidated appeals.

all subsidiary ledgers for each account listed in the
[t]rial balances produced,' "[18] (2) the court ordered the
requested records to be produced by the close of busi-
ness on May 14, 2021,[19] (3) on May 14, 2021, the Jones
defendants produced documents that they described to
be trial balances "incorporating the [s]ubsidiary [l]ed-
gers," (4) notwithstanding the Jones defendants' repre-
sentation, they failed to produce any subsidiary ledgers,
and (5) Flores testified during her deposition that (a)
she assisted in assembling the documents produced on
May 14, 2021, (b) Free Speech Systems, LLC, maintained
subsidiary ledger information that was accessible, and
(c) the documents produced did not contain subsidiary
ledgers. (Emphasis omitted.) On July 27, 2021, the Jones
defendants filed an objection, arguing in relevant part
that Free Speech Systems, LLC, did not possess or main-
tain subsidiary ledgers. In support of their objection,
the Jones defendants submitted a personal affidavit of
Robert Roe (Roe affidavit), a certified public accoun-
tant and a certified forensic accountant, who averred

[18] Attached as an exhibit to the July 6, 2021 motion was an affidavit
of Brian W. Merrill, a certified fraud examiner and a certified analytics
professional, who averred in relevant part that "[a] trial balance is a standard
accounting report listing a company's general ledger accounts. A debit or
credit balance is presented for each general ledger account. The purpose
of a trial balance is to prove that the value of all debit balances equals the
value of all credit balances. Subsidiary ledgers ('[s]ubledgers') contain the
transactional detail that support the trial balance details for all general
ledger accounts in an accounting system. Subledgers allow for the interpreta-
tion and analysis of the financial activity that is recorded in the books and
records that ultimately represent the financial statement of the organization."
    On November 6, 2020, the Jones defendants objected to the production
request seeking the trial balances and subsidiary ledgers on the grounds
that the request was, inter alia, overbroad, irrelevant, and unduly burden-
some. The court overruled the objection.
[19] On May 5, 2021, the Jones defendants filed an emergency motion for a
protective order requesting in part that Flores' deposition, scheduled for
May 7, 2021, be rescheduled for medical reasons. On May 6, 2021, the court
ordered Flores' deposition to be rescheduled but further directed that "[t]he
records requested in the request to produce are ordered to be produced by
the close of business on [May 14, 2021]. Failure to comply with this order
may result in sanctions."

229 Conn. App. 487          DECEMBER, 2024          503

*Lafferty* v. *Jones*

that Free Speech Systems, LLC, did not maintain or utilize subsidiary ledgers. On August 3, 2021, the plaintiffs filed a reply brief.

On August 6, 2021, the court issued an order stating in relevant part: "The subsidiary ledger information . . . was easily accessible to Flores . . . . Despite the court orders, and although the information exists, is maintained by [Free Speech Systems, LLC], and could have been produced by Flores as was required by the court orders, the documents were not produced. The court rejects [Roe's] statement . . . that [Free Speech Systems, LLC] does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances. There is no excuse for the [Jones] defendants' disregard of not only their discovery obligations, but the . . . court orders. The court finds that the failure to comply with the production request has prejudiced the plaintiffs [in] their ability to both prosecute their claims and conduct further depositions in a meaningful manner." The court further ordered (1) Flores' deposition to resume, with Flores directed to produce the subsidiary ledger information, and (2) that sanctions would be addressed at a future hearing. During subsequent hearings before the court, the plaintiffs' counsel represented that, on August 24, 2021, the Jones defendants produced alleged subsidiary ledgers; however, the plaintiffs' counsel further represented that "it is not clear whether [the documents produced were], in fact, subsidiary ledgers . . . ."

On August 24, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating the court's discovery orders requiring them to produce, inter alia, the Google Analytics data. The plaintiffs refuted the Jones defendants' contention in their June 28, 2021 notice of compliance that Free Speech Systems, LLC, did not possess, control, or have custody of the Google Analytics data in a manner that could be exported,

*Lafferty v. Jones*

asserting that such "representations were inaccurate and misleading." On September 14, 2021, the Jones defendants filed an objection, arguing, inter alia, that (1) on June 17, 2019, via email, they had produced the Google Analytics data requested by the plaintiffs, and (2) the "sandbox mechanism" previously suggested by them would allow the plaintiffs to access all of the "raw data." On September 23, 2021, the plaintiffs filed a reply brief, and on September 25, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On September 30, 2021 the court issued an order stating in relevant part: "There is no dispute here that the Jones defendants failed to follow the rules [of practice] as they relate to discovery. . . . The purported June 17, 2019 email transmission of zip files . . . containing Google Analytics reports that the plaintiffs' counsel indicates was never received was not sent to [certain other defendants] nor did the purported transmission otherwise comply with the rules of practice. As such, it is not necessary for the court to resolve the issue of whether the purported transmission was actually sent, as it cannot be considered proper compliance under our rules. In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the appropriate sanctions at the next status conference." Subsequently, by way of a notice of compliance dated October 8, 2021, the Jones defendants represented that they had provided supplemental responses to the plaintiffs' discovery requests.

On September 9, 2021, the plaintiffs moved to sanction the Jones defendants for producing "manufactured" documents in discovery. The plaintiffs contended that the trial balances that had been produced

229 Conn. App. 487          DECEMBER, 2024          505

Lafferty *v.* Jones

were not the originals but, rather, constituted altered
trial balances that Roe had manipulated prior to produc-
tion. On October 7, 2021, the Jones defendants filed an
objection. On October 18, 2021, the plaintiffs filed a
reply brief, and on October 20, 2021, with leave of the
court, the Jones defendants filed a surreply brief.

On November 15, 2021, after hearing argument from
the parties over the course of three days between Octo-
ber 20 and November 15, 2021, the court issued an oral
decision defaulting the Jones defendants as a sanction
for violating (1) the protective order and (2) its discov-
ery orders.[20] With regard to the protective order, the
court found in relevant part that (1) the Jones defen-
dants acknowledged that the motion to depose Clinton
contained information obtained from a deposition that
was designated as "Highly Confidential-Attorneys Eyes
Only" pursuant to the protective order, (2) the Jones
defendants argued that the protective order did not
preclude them from publishing such confidential infor-
mation so long as they did not identify the witness from
whom the information was obtained, which position
"did nothing but reinforce the court's August 5, 2021
order and findings that the [Jones defendants'] cavalier
actions constituted wilful misconduct and violated the
court's clear and unambiguous protective order,"[21] and
(3) there was a "transparent attempt to cloud the issues"
by counsel who had filed the motion to depose Clinton,
Pattis, as well as one of the Jones defendants' former

_____

[20] On October 7, 2021, the plaintiffs filed a memorandum of law in favor
of the court defaulting the Jones defendants for their misconduct. On Octo-
ber 20, 2021, the Jones defendants filed a memorandum of law in opposition
to a default order.

[21] The court further observed that the Jones defendants previously had
asserted a different argument, namely, that the inclusion of the "Highly
Confidential-Attorneys Eyes Only" information in the motion to depose
Clinton was justified because the plaintiffs lacked a good faith basis to
designate the deposition at issue as "Highly Confidential-Attorneys Eyes
Only" pursuant to the protective order. The court rejected that argument.

Lafferty *v.* Jones

counsel, Attorney Jay Marshall Wolman, stemming from inconsistent representations as to whether Infowars, LLC, was one of the movants of the motion to depose Clinton.[22]

With respect to the subsidiary ledgers, the court summarized its findings in its August 6, 2021 order regarding the subsidiary ledgers and commented that "it is still unclear as to what documents have been produced." The court then determined that sanctions were "appropriate in light of the [Jones] defendants' failure to fully and fairly comply with the plaintiffs' discovery request and the court's orders . . . ."

Regarding the trial balances, the court determined that the trial balances produced by the Jones defendants did not comply with its discovery orders. The court stated that (1) Flores testified at her deposition that she had generated the trial balances, which she believed had been produced to the plaintiffs, but (2) Roe later altered those trial balances before they had been provided to the plaintiffs. The court rejected an argument asserted by the Jones defendants that Flores had "provided flawed information to the [Jones] defendants that the [Jones] defendants, through Roe, had to correct." The court further stated: "The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by [Roe] were the records that were produced. But these records that removed accounts and consolidated accounts altered

_____

[22] As the court explained, (1) the motion to depose Clinton, filed by Pattis, listed Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, as the movants, (2) in the July 19, 2021 objection to the plaintiffs' July 6, 2021 motion for sanctions, also filed by Pattis, Infowars, LLC, was treated as an additional movant, and (3) during argument, Wolman represented that Infowars, LLC, had no involvement in the motion to depose Clinton because its name was not listed in the motion.

229 Conn. App. 487          DECEMBER, 2024          507

*Lafferty* v. *Jones*

the information in the reports that [Flores] had pro-
duced, and they contain trial balances that did not bal-
ance. These sanitized, inaccurate records created by
Roe were simply not responsive to the plaintiffs' request
or to the court's order."

The court next addressed the Google Analytics data
requested by the plaintiffs, stating: "With respect to
analytics, including Google Analytics . . . the [Jones]
defendants on May 7, 2019, represented that they had
provided all the analytics that they had. They stated
with respect to Google Analytics that they had access
to Google Analytics reports but did not regularly use
them. . . . The [Jones] defendants also claim that, on
June 17, 2019, they informally emailed zip files con-
taining Google Analytics reports to the plaintiffs, but
not [to] the codefendants, an email the plaintiffs state
they did not receive and that the court found would
not have been in compliance with our rules of practice.
On June 28, 2021, the Jones defendants filed a notice
of compliance stating that complete, final supplemental
compliance was made by . . . [Jones] and Free Speech
Systems, LLC, and that Infowars, LLC, Infowars Health,
LLC, and Prison Planet [TV], LLC, quote: 'Had previously
produced all documents required to be produced,' . . .
representing that with respect to the Google Analytics
documents, Free Speech Systems, LLC, could not
export the dataset and that the only way they could
comply was through the sandbox approach. Then on
[October] 8, 2021,[23] the Jones defendants for the first
time formally produced Excel spreadsheets limited to
Google Analytics apparently for [Infowars.com] and not
for any of the other websites such as Prison Planet TV

---

[23] The court referred to August 8, 2021, as the date of the production
of the spreadsheets; however, (1) during argument preceding the court's
sanctions order, the plaintiffs' counsel represented that the spreadsheets
had been produced on October 8, 2021, and (2) the record reflects that the
Jones defendants filed a notice of compliance dated October 8, 2021.

*Lafferty* v. *Jones*

or Infowars Health." (Footnote added.) The court also found that (1) the Jones defendants had failed to produce analytics data for other platforms, such as Alexa and Criteo, and (2) the Jones defendants' production of certain social media analytics data "has . . . been insubstantial and . . . has fallen far short both procedurally and substantively . . . ."[24] As the court summarized, "[t]he court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and court orders on its own merits a default against the Jones defendants."

The court then stated: "Neither the court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to, is fundamental fairness that the other side produces that information which is within [its] knowledge, possession and power, and that the other side meet[s] its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

"Here, the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

---

[24] The defendants make a passing reference to these other analytics in their principal appellate brief. Insofar as the defendants attempt to raise a claim of error specifically as to these other analytics, they have not adequately briefed any such claim. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Thus, we do not set forth additional context vis-à-vis these other analytics.

229 Conn. App. 487    DECEMBER, 2024    509

Lafferty *v.* Jones

"The court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous court orders, and they have not.

"In addressing the sanctions that should enter here, the court is not punishing the [Jones] defendants. The court also recognizes that a sanction of default is one of last resort. This court previously sanctioned the [Jones] defendants not by entering a default, but by a lesser sanction, the preclusion of the [Jones] defendants' special motions to dismiss. At this point, entering other lesser sanctions such as monetary sanctions, the preclusion of evidence, or the establishment of facts is inadequate given the scope and extent of the discovery material that the [Jones] defendants have failed to produce.

"As pointed out by the plaintiffs, they are attempting to conduct discovery on what the [Jones] defendants publish and the [Jones] defendants' revenue. And the failure of the [Jones] defendants to produce the analytics impacts the ability of the plaintiffs to address what is published, and the [Jones] defendants' failure to produce the financial records such as subledgers and trial balances affects the ability of the plaintiffs to address the [Jones] defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims, again was caused by the Jones defendants' wilful noncompliance, that is, the Jones defendants' failure to produce critical material information that the plaintiff[s] needed to prove their claims.

"For these reasons, the court is entering a default against the [Jones] defendants . . . . The case will proceed as a hearing in damages as to the [Jones] defendants. The court notes [that] . . . Jones is [the] sole controlling authority of all the [Jones] defendants, and

that the [Jones] defendants filed motions and signed
off on their discovery issues jointly. And all the [Jones]
defendants have failed to fully and fairly comply with
their discovery obligations.''

On appeal, the defendants assert that (1) the court
incorrectly (a) determined that they had violated the
protective order in filing the motion to depose Clinton
or, in the alternative, (b) attributed the violation of the
protective order to them rather than to their counsel,[25]
(2) the court incorrectly determined that their noncom-
pliance with its discovery orders was wilful, and (3)
the court's sanction order defaulting them was dispro-
portionate.[26] These contentions are unavailing.

_____

[25] As we explained in footnote 13 of this opinion, although Free Speech
Systems, LLC, was one of the movants of the motion to depose Clinton,
Jones did not join the motion. The defendants on appeal do not claim
that Jones was sanctioned improperly vis-à-vis the protective order; on the
contrary, both defendants—Jones and Free Speech Systems, LLC—claim
error as to the court's ruling regarding the violation of the protective order
and assert that the court attributed the violation to them rather than to their
counsel. Accordingly, for purposes of our resolution of the defendants'
claims in part I of this opinion and notwithstanding the convoluted back-
ground concerning the identity of the movants of the motion to depose
Clinton, we do not differentiate between Jones and Free Speech Systems,
LLC, with regard to the motion to depose Clinton and the court's rulings
concerning the protective order.

[26] The defendants raise a number of additional claims, which we decline
to review. First, in their reply brief, the defendants contend for the first
time that that, as a matter of law, "there should be an outer limit on a trial
court's authority to enter a default in civil cases. Failure adequately or
substantially to comply with discovery should never result in a default." We
decline to consider this discrete legal issue raised for the first time in the
defendants' reply brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222,
253 n.24, 301 A.3d 1090 (2023) ("[i]t [is] axiomatic that arguments cannot
be raised for the first time in a reply brief"). Even if some semblance of
this claim can be gleaned from the defendants' principal appellate brief, we
conclude that the defendants have abandoned the claim as a result of their
failure to brief it adequately in their main brief and notwithstanding their
attempt to expound on it in their reply brief. See *Robb* v. *Connecticut Board
of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915 ("[T]he
plaintiff cannot use his reply brief to resurrect a claim that he has abandoned
by failing to adequately brief it in his principal appellate brief. See *Hurley*
v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010) (declining
to consider claim when appellant raised 'vague assertion' of claim in principal

229 Conn. App. 487          DECEMBER, 2024          511

Lafferty *v.* Jones

"A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. . . . [T]his inherent authority permits sanctions for dilatory, bad faith and harassing litigation conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373.

"Additionally, under Practice Book [Rev. to 2021] § 13-14,[27] a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits

---

appellate brief and later 'amplified her discussion of the issue considerably in her reply brief')."), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021). Accordingly, insofar as the defendants claim that the default entered against them was a disproportionate sanction, we limit our analysis to the parameters of the claim adequately briefed by the defendants, namely, that the sanction constituted an abuse of the court's discretion on the basis of the record.

Second, in their principal appellate brief, the defendants claim that "[a] liability default is never appropriate in a case involving speech, given the importance the Connecticut constitution places on speech." The defendants cite article first, § 6, of the Connecticut constitution, which, as they concede, applies only to criminal prosecutions; see *Gray* v. *Mossman*, 91 Conn. 430, 442–43, 99 A. 1062 (1917); and which provides: "In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." Conn. Const., art. I, § 6. The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Third, in their principal appellate brief, the defendants assert that the court, in its August 6, 2021 order addressing the subsidiary ledgers issue, improperly discredited the Roe affidavit without an evidentiary hearing. The defendants contend that "[t]he absence of a meaningful evidentiary record to support this finding as to . . . Roe, a finding that bore such fatal consequences for the defendants, constitutes an abuse of discretion . . . ." The defendants have abandoned this claim by failing to provide any substantive legal analysis to support it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Last, in their principal appellate brief, the defendants assert that "the trial court never set forth just what it thought Google Analytics was. As such, the order [regarding Google Analytics] was not so clear and unambiguous as to warrant a default if, in fact, the order was violated at all." We deem this claim to be inadequately briefed and, therefore, the defendants have abandoned it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

[27] Practice Book (Rev. to 2021) § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or

512            DECEMBER, 2024        229 Conn. App. 487

*Lafferty* v. *Jones*

for a party, such as by rendering a default judgment against a defendant . . . ." (Footnote added.) Id.

We consider three factors in determining whether "a trial court properly exercises its discretion in imposing a sanction for a violation of a court order . . . ." *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 71, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 17–18, 776 A.2d 1115 (2001). "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review.[28] Third, the sanction imposed must be proportional to the violation. This requirement poses a

---

has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply . . . ."

[28] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Fernwood Realty, LLC* v. *AeroCision, LLC*, 166 Conn. App. 345, 356, 141 A.3d 965, cert. denied, 323 Conn. 912, 149 A.3d 981 (2016).

229 Conn. App. 487          DECEMBER, 2024          513

*Lafferty v. Jones*

question of the discretion of the trial court that we will review for abuse of that discretion." (Footnote added; internal quotation marks omitted.) *Lafferty* v. *Jones,* supra, 336 Conn. 373–74.

A

The defendants contend that the court improperly (1) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (2) attributed the violation of the protective order to them, as opposed to their counsel. We are not persuaded.

As to the court's determination that the filing of the motion to depose Clinton violated the protective order, the defendants maintain that, in the motion, they "represented that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. . . . The de minimis recitation of facts in the motion . . . did not violate a court order . . . ." (Citations omitted; footnote omitted.) As the court correctly determined, however, the clear and unambiguous language of the protective order limited access to depositions, or portions thereof, designated as "Highly Confidential-Attorneys Eyes Only." The defendants acknowledge that the motion to depose Clinton contained information drawn from the transcript of one of the plaintiffs' depositions, which, as the court found, was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. Thus, in filing the motion to depose Clinton and making the confidential information set forth therein available to the public, the defendants plainly violated the protective order.

Lafferty *v.* Jones

Moreover, the defendants' position on appeal is further undermined by the fact that, during argument preceding the court's sanctions order, one of the defendants' former counsel, Wolman, conceded that the defendants' actions violated the protective order. The following colloquy occurred between the court and Wolman:

"[Wolman]: . . . We do take the [protective] order very seriously and have endeavored to abide it. There was during a deposition this motion [to depose Clinton] filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the court's order. And you know, it was erroneously believed that that was not subject to the [protective] order. The witness herself was not identified. *And while it may be a technical violation*, and it was not realized to be so at the time—

"The Court: So, do you admit now that it was a violation, whether it's a technical violation or not?

"[Wolman]: *I would say it probably fits within the language of what is protected.* We had concerns as to whether or not it truly was protected. The court has weighed in." (Emphasis added.)

Accordingly, we reject the defendants' assertion that the court incorrectly determined that they violated the protective order in filing the motion to depose Clinton.

The defendants, in the alternative, contend that the court improperly ascribed the violation of the protective order to them rather than to their counsel. The defendants posit that, rather than referring counsel for disciplinary action, the court "attributed counsel's alleged failure to [the defendants], justifying a default on conduct over which the defendants themselves had no control, and about which, the record reflects, they knew

229 Conn. App. 487          DECEMBER, 2024          515

*Lafferty* v. *Jones*

nothing." The defendants fail to cite any portion of the record supporting their assertion that they were unaware of counsel's actions. Without any such evidence, we cannot countenance the defendants' reasoning that they were absolved of any discipline stemming from counsel's conduct. See *MacCalla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 240, 204 A.3d 753 (2019) ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode* v. *Thode*, 190 Conn. 694, 698, 462 A.2d 4 (1983); see *Sousa* v. *Sousa*, 173 Conn. App. 755, 773 n.6, 164 A.3d 702 ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, 327 Conn. 906, 170 A.3d 2 (2017)."); see also *MacCalla* v. *American Medical Response of Connecticut, Inc.*, supra, 239–40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick* v. *Monkey Farm Cafe, LLC*, 163 Conn. App. 45, 52–53, 134 A.3d 643 (2016) (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

B

The defendants next claim that the court erred in finding that they wilfully violated its discovery orders. As to the discovery orders in general, the defendants maintain that "the failure to provide answers was not an example of wilful misconduct. Rather, it was the result of a shocking degree of disorganization. The plaintiffs persuaded the trial judge that the plaintiffs' expectations of how the defendants should operate their business and keep records was the standard the defendants must meet. The default prevented a jury from learning the truth about the defendants' corporate organization—it is a haphazard warren of people drawn

516            DECEMBER, 2024            229 Conn. App. 487

*Lafferty* v. *Jones*

together by . . . Jones' charisma and generosity, but almost altogether devoid of institutional structure or normal corporate governance." We are unpersuaded.

Whether a party wilfully violates a court order "is a factual question committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 222 Conn. App. 867. The court's finding that the defendants' noncompliance with its discovery orders was wilful was supported by its subordinate findings that (1) the subsidiary ledgers requested by the plaintiffs were "easily accessible" and "available" to Flores, (2) Flores generated the trial balances sought by the plaintiffs, but those trial balances later were altered by Roe prior to production to the plaintiffs, and (3) the defendants withheld analytics materials and exhibited a "callous disregard of their obligations to fully and fairly comply with discovery . . . ." Rather than adequately contesting the factual underpinnings of these findings, the defendants propound the argument that their failure to comply with the court's discovery orders stemmed from their purported institutional disorganization. The defendants fail to cite to any portion of the record that supports this assertion. Moreover, the defendants' argument is belied by their own statement in their principal appellate brief that, notwithstanding their purported disorganized corporate structure, they "tendered tens of thousands of documents, sat for scores of depositions, provided answers to requests to admit, and otherwise made efforts to comply with discovery." Thus, the defendants' claim regarding the wilfulness of their noncompliance with the court's discovery orders in general is untenable.

The defendants also assert that the court incorrectly determined that they had wilfully violated its discovery orders specifically concerning the Google Analytics data. The defendants maintain that they (1) made "limited and sporadic use of Google Analytics data," (2)

229 Conn. App. 487          DECEMBER, 2024          517

Lafferty *v.* Jones

"did not keep [any] reports, did not generally or system-
atically rely on them, and consulted Google Analytics
only haphazardly," and (3) did not possess the Google
Analytics data, but, rather, "access[ed] the information
on Google servers," such that they did not wilfully fail
to comply with the court's orders regarding the Google
Analytics data. We reject this assertion. The frequency
of the defendants' use and reliance on the Google Ana-
lytics data has no bearing on their obligation to abide
by the court's discovery orders requiring them to pro-
vide the data to the plaintiffs. Further, whether the
defendants were in possession of the Google Analytics
data is immaterial because the plaintiffs' production
request sought analytics that the defendants "own[ed]
*and/or control*[*led*]." (Emphasis added.) See Practice
Book § 13-9 (a)[29] ("[i]n any civil action, in any probate
appeal, or in any administrative appeal where the judi-
cial authority finds it reasonably probable that evidence
outside the record will be required, any party may serve
. . . upon any other party a request to afford the party
submitting the request the opportunity to inspect, copy,
photograph or otherwise reproduce designated docu-
ments or to inspect and copy, test or sample any tangible
things *in the possession, custody or control* of the party
upon whom the request is served" (emphasis added)).
As the court found, the defendants (1) had access to the
Google Analytics data and (2) produced some Google
Analytics data to the plaintiffs, albeit not in full and
fair compliance with the court's discovery orders.
Accordingly, we conclude that the court properly found
that the defendants wilfully violated the court's discov-
ery orders as to the Google Analytics data.

C

The defendants next claim that the court's order
defaulting them as a sanction for their violations of its

---

[29] An amendment to Practice Book § 13-9, effective January 1, 2022, made
changes to the provision that are not relevant to these appeals. Accordingly,
we refer to the current revision of this provision.

518                DECEMBER, 2024          229 Conn. App. 487

*Lafferty* v. *Jones*

discovery orders and the protective order was dispro-
portionate. The defendants maintain that, although they
"resisted discovery by every lawful means possible in
lengthy proceedings . . . [t]heir compliance was sub-
stantial," and they did not "[fail] to answer the com-
plaint, [fail] to respond to discovery or otherwise [fail]
to participate in the proceedings."[30] We conclude that
the court did not abuse its discretion in defaulting the
defendants.

As we set forth previously in this opinion, whether
the court's sanction defaulting the defendants was pro-
portional to their violations of the court's orders "poses
a question of the discretion of the trial court that we will
review for abuse of that discretion." (Internal quotation
marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 374.
"As with any discretionary action of the trial court,
appellate review requires every reasonable presump-
tion in favor of the action, and the ultimate issue for
us is whether the trial court could have reasonably
concluded as it did. . . . In reviewing a claim that the
court has abused this discretion, great weight is due
to the action of the trial court and every reasonable
presumption should be given in favor of its correctness

---

[30] The defendants also argue that, as a less severe alternative to a default,
the plaintiffs could have asserted a cause of action for intentional spoliation
of evidence or the court could have provided a spoliation charge to the
jury. See *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 243, 905 A.2d
1165 (2006) (recognizing independent cause of action for intentional spolia-
tion of evidence, defined as " 'the intentional destruction, mutilation, or
significant alteration of potential evidence for the purpose of defeating
another person's recovery in a civil action' "). The plaintiffs counter that
the law of spoliation is inapplicable because "there is no question that [the
defendants] had—and simply withheld—financial and analytics compliance.
Moreover, a spoliation charge would not have remedied the prejudice to
the plaintiffs from [the defendants'] misrepresentations regarding the exis-
tence of discovery, prolonged delays in providing the compliance [they] did
provide, and complete refusal to provide other compliance, or from [the
defendants'] wilful violation of the protective order." We agree with the
plaintiffs that the law of spoliation did not provide a reasonable alternative
to the court's default order.

229 Conn. App. 487          DECEMBER, 2024          519

*Lafferty* v. *Jones*

. . . . The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. . . . Under an abuse of discretion standard, a court's decision must be legally sound and [the court] must [have] honest[ly] attempt[ed] . . . to do what is right and equitable under the circumstances of the law, without the dictates of whim or caprice." (Citation omitted; internal quotation marks omitted.) *Gianetti* v. *Neigher*, 214 Conn. App. 394, 437–38, 280 A.3d 555, cert. denied, 345 Conn. 963, 285 A.3d 390 (2022). With regard to discovery orders in particular, "[n]ever will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery. . . . Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Citation omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 374.

"[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself. . . . [A] trial court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be

Lafferty *v.* Jones

imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court. . . . Like a dismissal, a default judgment is also one of the more severe sanctions that a court may impose . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gutierrez* v. *Mosor*, 206 Conn. App. 818, 827–28, 261 A.3d 850, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021).

In determining whether the sanction of default was proportional to the defendants' violations of the court's orders, "we are guided by the factors [our Supreme Court] . . . ha[s] employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to [comply with the orders], that is, whether it [was] due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party . . . and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Gianetti* v. *Neigher*, supra, 214 Conn. App. 439.

Remaining mindful, as the trial court recognized, that a default is a sanction of last resort, we conclude that the court's default order was a proportional sanction under the circumstances presented. As to the wilfulness factor, the court found that the defendants' failure to produce "critical material information" to the plaintiffs, as well as the defendants' "cavalier actions" in filing the motion to depose Clinton, constituted wilful noncompliance and misconduct. The court further found that "the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court

229 Conn. App. 487          DECEMBER, 2024          521

Lafferty *v.* Jones

orders is a pattern of obstructive conduct . . . ."[31] Thus, this factor militates in favor of the court's default order.

With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims." See *Krahel* v. *Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (discussing importance of unproduced discovery and its effect as to plaintiff's case when examining prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018); see also *Lafferty* v. *Jones*, supra, 336 Conn. 378 (citing *Krahel* in analyzing prejudice factor).

Additionally, with regard to the protective order, the court stated in its August 5, 2021 order addressing the filing of the motion to depose Clinton that (1) the defendants, in filing the motion to depose Clinton, made information designated as "Highly Confidential-Attorneys Eyes Only" under the protective order available on the Internet, (2) the defendants took no corrective action thereafter, and (3) it had "grave concerns" that there would be "a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public." The court iterated these concerns during argument preceding its sanction order, stating in relevant

---

[31] As we concluded in part I B of this opinion, we reject the defendants' claim that the court's finding that they wilfully violated the discovery orders was clearly erroneous.

part: "So, I do intend to impose sanctions [for the viola-
tion of the protective order]. . . . I think the [defen-
dants'] behavior really is unconscionable. . . . And I
am concerned about a chilling effect on the testimony
of other witnesses." In light of these concerns, this
factor weighs in favor of the court's default order.

Finally, the court determined that imposing a lesser
sanction would be "inadequate . . . ." In 2019, follow-
ing the defendants' noncompliance with discovery vis-à-
vis the special motions to dismiss and Jones' comments
during his June 14, 2019 radio broadcast, the court
sanctioned the defendants by precluding them from
pursuing the special motions to dismiss; however, the
court cautioned that it would consider defaulting them
in the future if "they, from th[at] point forward, contin-
ue[d] with their behavior with respect to discovery."
Later, the court also warned the defendants that they
risked being defaulted if they failed to comply with its
June 2, 2021 order directing the production of complete,
final supplemental compliance. See *Ridgaway* v. *Mount
Vernon Fire Ins. Co.*, supra, 328 Conn. 74 ("[i]n
instances in which our appellate courts have upheld
the sanction of a nonsuit, a significant factor has been
that the trial court put the plaintiff on notice that non-
compliance would result in a nonsuit"). Nevertheless,
as the court found, the defendants continued to engage
in "a pattern of obstructive conduct" in "callous[ly]"
disregarding their discovery obligations. This conduct
was not isolated; rather, as the various orders entered
by the court demonstrate, notwithstanding being given
ample opportunities to comply, the defendants repeat-
edly failed to produce adequate, responsive materials.
The court reasonably determined that a lesser sanction
would not suffice under such circumstances. See *Guti-
errez* v. *Mosor*, supra, 206 Conn. App. 829 ("[t]he appel-
late courts of this state consistently have upheld non-
suits, defaults or other sanctions imposed for discovery

229 Conn. App. 487          DECEMBER, 2024          523

*Lafferty* v. *Jones*

violations where the noncomplying party has exhibited a pattern of violations or discovery abuse demonstrating a disregard for the court's authority").

Moreover, in the midst of the defendants' ongoing discovery noncompliance, the defendants filed the motion to depose Clinton, which contained information designated as "Highly Confidential-Attorneys Eyes Only" subject to the protective order. As the court determined, the defendants, in a "cavalier" fashion, violated the protective order, which they originally had proposed, by releasing the confidential information to the public, thereby creating a palpable risk of a "chilling effect" on the testimony of witnesses in the future. Against this backdrop, we cannot discern an abuse of discretion by the court in defaulting the defendants as a sanction. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 827 ("dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority" (emphasis omitted; internal quotation marks omitted)).

In sum, we conclude that the court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and the protective order.

II

The defendants next claim that the trial court improperly construed the effect of the defendants' default to relieve the plaintiffs of the burden to establish the extent of their damages. This claim warrants little discussion.

Initially, we observe that the defendants assert that the court "never made a principled and intelligible ruling about causation in this case" but, rather, treated causation as having been established following the

524         DECEMBER, 2024        229 Conn. App. 487

*Lafferty v. Jones*

defendants' default. The defendants do not brief any substantive claims as to any particular rulings of the court[32] but, rather, take issue with the court's rulings as a whole insofar as the court purportedly "eviscerated the concept of causation and relieved the plaintiffs of any responsibility to prove, or even to attempt to prove, a linkage to the various and diffuse harms they suffered and the conduct of the [defendants]."[33] We exercise

_____

[32] The defendants refer to the court's jury charge, wherein the court instructed the jury in relevant part: "I hereby charge you that causation of the plaintiffs' damages is already established. . . . Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case. In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question."

[33] In their principal appellate brief, the defendants make vague references to (1) "a series of bizarre evidentiary rulings" by the court that "eviscerated the requirement that [the] plaintiffs prove the extent of their damages," (2) the court's improper admission of evidence, (3) the court failing to determine which of the plaintiffs' allegations were "material," (4) the court instructing the jury that liability had been " 'established,' " and (5) the court denying a motion in limine filed by the defendants requesting that the transcript of its November 15, 2021 ruling defaulting the defendants be admissible at the hearing in damages. Insofar as the defendants attempt to raise claims of error with respect to these discrete issues, they have failed to brief such claims adequately and, therefore, we deem any such claims to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Additionally, in their principal appellate brief, the defendants repeatedly state that the jury was unaware that liability was established against the defendants as the result of a disciplinary default. In their reply brief, the defendants assert for the first time that the court committed error in failing to notify the jury that the defendants were defaulted as a disciplinary sanction. We decline to review this claim, as it is (1) improperly raised for the first time in the defendants' reply brief or (2) inadequately briefed, even if cognizably raised in the defendants' principal appellate brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023); *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23,

229 Conn. App. 487          DECEMBER, 2024          525

Lafferty *v.* Jones

plenary review over this claim, which presents a question of law. See *Williams* v. *Mansfield*, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022) ("[w]hen . . . a court's decision is challenged on the basis of a question of law, our review is plenary").

It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . If the allegations of the plaintiff's complaint are sufficient on their face to make out a valid claim for the relief requested, the plaintiff, on the entry of a default against the defendant, need not offer evidence to support those allegations. . . . Therefore, the only issue . . . following a default is the determination of damages. . . . A plaintiff ordinarily is entitled to at least nominal damages following an entry of default against a defendant in a legal action. . . .

"In an action at law, the rule is that the entry of a default operates as a confession by the defaulted defendant of the truth of the material facts alleged in the complaint which are essential to entitle the plaintiff to some of the relief prayed. It is not the equivalent of an admission of all of the facts pleaded. The limit of its effect is to preclude the defaulted defendant from making any further defense and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff is entitled to a judgment for the full amount of the relief claimed. The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive."[34] (Emphasis omitted; internal quotation marks

254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d 654 (2021); see also footnote 26 of this opinion.

[34] We note that, "[a]fter a default, a defendant may still contest liability. Practice Book §§ 17-34, 17-35 and 17-37 delineate a defendant's right to contest liability in a hearing in damages after default. Unless the defendant provides the plaintiff written notice of any defenses, the defendant is fore-

*Lafferty* v. *Jones*

omitted.) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 725–26, 916 A.2d 834 (2007).

As these legal principles elucidate, after the court had defaulted the defendants, the plaintiffs were not required to demonstrate that the defendants' conduct caused their harm. Instead, following the defendants' default, the only burden carried by the plaintiffs was to prove the amount of their damages. See *Murray* v. *Taylor*, 65 Conn. App. 300, 335, 782 A.2d 702 (This court, in reversing the trial court's grant of the defaulted defendant's motion to set aside the verdict following the hearing in damages, explained that "[t]he [trial] court determined that there was no evidence from which the jury reasonably could have found that the plaintiff's damages were proximately caused by the conduct alleged and ruled against the plaintiff on that basis. Yet, in an action at law, as here, the liability of a defaulted defendant is established and the plaintiff's burden at a hearing in damages is limited to proving that the amount of damages claimed is derived from the injuries suffered and is properly supported by the evidence. . . . We, therefore, cannot agree with the court's conclusion that the plaintiff's claim must fail because he did not provide evidence that [the defaulted defendant's] negligent conduct proximately caused his injuries . . . ." (Citation omitted.)), cert. denied, 258

closed from contesting liability. . . . If written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint and may challenge the right of the plaintiff to maintain the action or prove any matter of defense. . . . This approximates what the defendant would have been able to do if he had filed an answer and special defenses." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Schwartz* v. *Milazzo*, 84 Conn. App. 175, 178–79, 852 A.2d 847, cert. denied, 271 Conn. 942, 861 A.2d 515 (2004). On November 24, 2021, following the entry of the default against them, the defendants filed a notice of defenses, which was stricken by the court on December 24, 2021. The defendants on appeal do not challenge the propriety of the court's order striking the notice of defenses.

229 Conn. App. 487          DECEMBER, 2024          527

*Lafferty v. Jones*

Conn. 928, 783 A.2d 1029 (2001).[35] Accordingly, the defendants' claim fails.

III

The defendants also claim that the trial court improperly restricted the scope of Jones' testimony at the hearing in damages. We conclude that the defendants have abandoned this claim by failing to brief it adequately.

The following additional procedural history is relevant. On September 6, 2022, the court granted motions in limine filed by the plaintiffs seeking to preclude evidence or argument at the hearing in damages concerning, inter alia, (1) the defendants' "maximum total amount of Sandy Hook coverage or percentage or proportion of Sandy Hook coverage" and (2) the court's ruling defaulting the defendants. Additionally, on September 13, 2022, the court granted a motion for sanctions filed by the plaintiffs on the basis of additional discovery misconduct by the defendants. The court sanctioned the defendants by prohibiting them from presenting evidence or argument "that they did not profit from their Sandy Hook coverage."

On September 22, 2022, during the hearing in damages, the plaintiffs called Jones as a witness. Outside of the jury's presence, the court canvassed Jones with regard to the various topics about which (1) counsel were prohibited from asking him and (2) he was precluded from testifying. Jones indicated that he understood which topics his testimony could not address. During the course of Jones' direct examination, the

[35] The defendants cite the following language in *Murray* to support their claim: " '[E]ven in a hearing in damages . . . a plaintiff must still prove that the damages claimed were caused by the conduct alleged.' " *Murray* v. *Taylor*, supra, 65 Conn. App. 333. The source of that language, however, is the trial court decision that this court reversed on appeal. See id., 332–35, 340. The defendants' reliance on that language, therefore, is untenable.

court and counsel engaged in multiple sidebars, and the jury was excused several times, in order to address whether certain questions asked by the plaintiffs' counsel and testimony by Jones were proper in light of the court's orders. The next day, the defendants' counsel informed the court that, for "strategic" reasons, the defendants were forfeiting the right to cross-examine Jones, intending instead to call him as a witness during their case-in-chief. On October 5, 2022, outside of the jury's presence, the defendants' counsel notified the court that Jones had decided not to testify during the defendants' case-in-chief, explaining that Jones was "boycotting [the] proceedings because he [felt] that [he was] on the horns of a trilemma. If he testifie[d] in accord with the court's orders [restricting his testimony], [he would] be committing perjury; if he violate[d] the court orders, [it would be] criminal contempt; if he [took] the fifth [amendment to the United States constitution], he [would get an] adverse inference."

The defendants claim on appeal that the court committed error in restricting the scope of Jones' testimony. The majority of the defendants' briefing of this claim focuses on reciting and commenting on the relevant procedural history, iterating the "trilemma" that Jones purportedly faced, and detailing how Jones would have testified but for the court's orders limiting his testimony. The defendants, however, provide no substantive legal analysis examining the propriety of the court's orders imposing limits on Jones' testimony, such as the court's September 13, 2022 order sanctioning the defendants for additional discovery violations. Accordingly, we conclude that the defendants have abandoned this claim as a result of their failure to adequately brief it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

IV

The defendants next claim that the trial court improperly denied their motion for a remittitur. We disagree.

229 Conn. App. 487          DECEMBER, 2024          529

*Lafferty v. Jones*

The following additional procedural history is relevant to our resolution of this claim. The evidentiary portion of the hearing in damages transpired over the course of several weeks, commencing on September 13, 2022, and concluding on October 5, 2022. The following witnesses testified during the plaintiffs' case-in-chief: (1) the plaintiffs; (2) Alissa Parker, a spouse of one of the plaintiffs; (3) Brittany Paz, a Connecticut attorney who served as a corporate representative of Free Speech Systems, LLC; (4) Clinton Watts, an expert in the field of "identifying analytics and analysis around social media, the Internet, and how it influences people's behavior"; and (5) Jones. The court admitted in full numerous exhibits offered by the plaintiffs, including video clips of Jones' broadcasts. The defendants rested without calling any witnesses or offering any exhibits, except for one exhibit that was marked for identification only.

In its verdict, the jury awarded the plaintiffs a total of $965,000,000 in compensatory damages, which was split into two categories for each plaintiff: (1) "defamation/slander" damages, past and future; and (2) emotional distress damages, past and future. The jury did not divide the $965,000,000 amount evenly among the plaintiffs; rather, other than two plaintiffs who were each awarded $57,600,000, each plaintiff was awarded a distinct amount of compensatory damages.

In moving for a remittitur, the defendants asserted that the jury's verdict was "exorbitant, shock[ed] the sense of justice and was influenced by partiality and prejudice." The defendants argued that (1) the plaintiffs failed to submit evidence to aid the jury in calculating compensatory damages, such as medical evidence or expert testimony on the extent of their emotional distress, such that the jury's verdict was predicated on speculation and was motivated by prejudice and passion, (2) the jury, in essence, awarded the plaintiffs

530          DECEMBER, 2024          229 Conn. App. 487

*Lafferty* v. *Jones*

punitive damages rather than compensatory damages, and (3) the defendants' right to due process was violated as a result of the plaintiffs' failure to submit evidence estimating their damages. The plaintiffs filed a memorandum of law in opposition to the motion for a remittitur, refuting the defendants' arguments.

In denying the defendants' motion for a remittitur, the court stated: "The defendants take the position, in a conclusory manner unsupported by any evidence or case law, that the verdict was 'exorbitant' and the result of 'passion and prejudice.' They argue—again, unsupported by any law—that due process requires that the plaintiffs are responsible for establishing what they think would make them whole—that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice.[36] Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support[s] the [verdict] rendered by the jury. The size of the [verdict], while substantial, does not so shock the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; [its] attention to the evidence and instructions from the

---

[36] In footnotes, the court (1) observed that, in contrast to the defendants' "conclusory motion," the plaintiffs "in their objection painstakingly and accurately highlight[ed] the evidence submitted" and (2) iterated that it was not obligated to consider inadequately briefed claims.

229 Conn. App. 487          DECEMBER, 2024          531

*Lafferty v. Jones*

court is evident from the specific questions [it] asked regarding both the charge and the evidence.[37] In reviewing the evidence in a light most favorable to sustaining the [verdict], the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform[s] to spread lies to a massive audience clearly supports the [verdict], and that the [verdict was] within the limits of a fair and just award of damages." (Footnotes added; footnotes omitted.)

Before addressing the defendants' claim, we set forth the following applicable legal principles and standard of review. General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

"[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's

---

[37] The jury submitted several notes during its deliberations.

532             DECEMBER, 2024        229 Conn. App. 487

*Lafferty* v. *Jones*

explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 782–83, 208 A.3d 256 (2019). The inquiry into whether a damages award shocks the sense of justice "is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations." *Maldonado* v. *Flannery*, 343 Conn. 150, 166–67, 272 A.3d 1089 (2022).

"[O]ur review of the trial court's decision [to grant or deny remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be given in favor of its correctness. . . . The chief rationale that has been articulated in support of this deferential standard of review is that the trial court, having observed the trial and evaluated the testimony firsthand, is better positioned than a reviewing court to assess both the aptness of the award and whether the jury may have been motivated by improper sympathy,

229 Conn. App. 487          DECEMBER, 2024            533

*Lafferty* v. *Jones*

partiality, or prejudice."[38] (Citations omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 783.

"[A]lthough the trial court has a broad legal discretion in this area, it is not without its limits. . . . Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . Furthermore, [t]he size of the verdict alone does not determine whether it is excessive. . . . Thus, [i]n ruling on the motion for remittitur, the trial court [is] obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned [is] reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . A generous award of noneconomic damages should be sustained if it does not shock the sense of justice. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power. Whether the court would have reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . In determining whether the court abused its discretion, therefore, we must examine the evidential basis of the verdict itself . . . . [T]he court's action cannot

_____

[38] The defendants assert that we should exercise plenary review over their claim because the jury's verdict "shocks the sense of justice" in violation of their due process rights. The defendants provide no legal authority in support of this assertion. We, instead, apply the well settled standard of review and examine the court's decision for an abuse of discretion.

Lafferty *v.* Jones

be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." (Internal quotation marks omitted.) *Gois* v. *Asaro*, 150 Conn. App. 442, 457–58, 91 A.3d 513 (2014).

Moreover, "[p]roper compensation for noneconomic damages cannot be computed by a mathematical formula, and there is no precise rule for the assessment of damages. . . . The plaintiff need not prove damages with mathematical exactitude; rather, the plaintiff must provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) Id., 457; see also *Commission on Human Rights & Opportunities* v. *Cantillon*, 347 Conn. 58, 68–69, 295 A.3d 919 (2023) ("Noneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.)).

The defendants assert that a remittitur of the jury's verdict was necessary because the plaintiffs failed to submit sufficient evidence to establish their damages, such as medical evidence or expert testimony concerning their emotional distress, leaving the jury without a means to determine damages other than relying on passion, prejudice, and speculation. The defendants maintain that, rather than prove their damages, the plaintiffs "focus[ed] . . . on arousing sympathy, directing anger, and anchoring a large number before the jury[39] with the hope that [the] jurors would do what

---

[39] The defendants reference the plaintiffs' closing argument, during which the plaintiffs' counsel, in addressing damages for defamation and slander, proposed that the jury consider (1) picking a number representing a reasonable amount to award to one individual, assuming that a lie about that individual had been told to one person, and (2) multiplying that number first by 550 million, which, according to testimony elicited from Watts, represented the minimum audience that the defendants' lies about Sandy

229 Conn. App. 487        DECEMBER, 2024        535

*Lafferty v. Jones*

they did in this case—award a fortune." (Footnote added.)[40] We disagree.

Our review of the record reveals that there was sufficient evidence to support the $965,000,000 in compensatory damages awarded by the jury. All of the plaintiffs

Hook reached between 2012 and 2018, and then by fifteen, or the number of plaintiffs in the underlying consolidated actions.

[40] The defendants raise two additional assertions that we discuss briefly. First, the defendants contend that, to comport with due process, the plaintiffs were required to present evidence that estimated their damages so as to provide "some notice as to the magnitude of [the] harm" suffered. As before the trial court, the defendants have failed to provide any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Moreover, we iterate our Supreme Court's recent statement that "[n]oneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, [our Supreme Court] has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 347 Conn. 68–69. We also observe that, under Connecticut law, in civil actions seeking the recovery of damages resulting from personal injury, counsel is entitled, but not required, to present argument on the amount of past and future noneconomic damages. See General Statutes § 52-216b (a) ("[i]n any civil action to recover damages resulting from personal injury or wrongful death, counsel for any party to the action shall be entitled to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable"); see also Practice Book § 16-19 ("In any action seeking damages for injury to the person, the amount demanded in the complaint shall not be disclosed to the jury. In the event that the jury shall return a verdict which exceeds the amount demanded, the judicial authority shall reduce the award to, and render judgment in, the amount demanded. Counsel for any party to the action may articulate to the jury during closing argument a lump sum or mathematical formula as to damages claimed to be recoverable.").

Second, the defendants assert that the jury awarded the plaintiffs punitive, rather than compensatory, damages. The record does not support this assertion. Our review of the court's jury charge reflects that the court instructed the jury that its task was to determine compensatory damages, and the court expressly instructed the jury that, "[u]nder the rule [of] compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses." Moreover, the court separately instructed the jury that (1) the plaintiffs were seeking punitive damages in the form

*Lafferty v. Jones*

testified that, in the aftermath of the Sandy Hook massa-
cre, they endured traumatic threats and harassment,
conveyed, inter alia, through social media, by mail, or
in person, stemming from the lies, as propagated by
the defendants, that the Sandy Hook massacre was a
hoax. Examples of such threats and harassment
included death threats, claims that the plaintiffs were
actors, and accusations that the deceased victims of
the Sandy Hook massacre were not real or were still
alive. Additionally, all of the plaintiffs testified to the
mental anguish and emotional harm that they suffered
as a result of the harrowing threats and harassment
they experienced.[41] The extent of the plaintiffs' damages
was established further by the testimony of Watts, the
plaintiffs' social media expert, who testified that, on
the basis of data that he reviewed from three social
media platforms, namely, YouTube, Facebook, and
Twitter, the defendants' lies about the Sandy Hook mas-
sacre reached a minimum audience of 550 million peo-
ple between 2012 and 2018.

In sum, we agree with the court that the evidence
supported the jury's verdict and, although substantial,

of attorney's fees and costs, and (2) the jury was to determine whether
punitive damages were to be awarded, with the court to determine the
amount thereof if awarded. In a section of the verdict form titled "Compensa-
tory Damages," the jury awarded the plaintiffs a total of $965,000,000 in
damages, comprising past and future "defamation/slander" and emotional
distress damages. In a separate section of the verdict form, the jury deter-
mined that the plaintiffs were entitled to attorney's fees and costs. The
defendants do not challenge the propriety of the jury instructions, and, "in
the absence of a showing that the jury failed or declined to follow the court's
instructions, we presume that the jury followed them." *Audibert* v. *Halle*,
198 Conn. App. 472, 482, 233 A.3d 1237 (2020). Thus, we reject the defendants'
contention that the $965,000,000 awarded by the jury to the plaintiffs consti-
tuted punitive, rather than compensatory, damages.

[41] Insofar as the defendants argue that the plaintiffs were required to
produce medical or expert testimony to corroborate their testimony concern-
ing their emotional distress, the defendants provide no legal support for
this assertion. Cf. *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 707 n.25, 41
A.3d 1013 (2012) (rejecting defendant's argument that plaintiff's testimony
regarding emotional distress was insufficient without corroboration by medi-
cal or expert testimony).

229 Conn. App. 487          DECEMBER, 2024          537

Lafferty *v.* Jones

the verdict did not "so [shock] the sense of justice as
to compel the conclusion that the jury [was] influenced
by partiality, prejudice, mistake or corruption." (Inter-
nal quotation marks omitted.) *Ashmore* v. *Hartford
Hospital,* supra, 331 Conn. 782. Accordingly, we con-
clude that the court did not abuse its discretion in
denying the defendants' motion for a remittitur.

V

The defendants' final claim is that the trial court
improperly concluded that the plaintiffs asserted a
legally viable CUTPA claim. For the reasons that follow,
we agree.

We begin with a brief overview of CUTPA. "CUTPA
is, on its face, a remedial statute that broadly prohibits
unfair methods of competition and unfair or deceptive
acts or practices in the conduct of any trade or com-
merce. . . . To give effect to its provisions, [General
Statutes] § 42-110g (a)[42] of [CUTPA] establishes a pri-
vate cause of action, available to [a]ny person who
suffers any ascertainable loss of money or property,
real or personal, as a result of the use or employment
of a method, act or practice prohibited by [General
Statutes §] 42-110b . . . ." (Footnote added; internal
quotation marks omitted.) *Cenatiempo* v. *Bank of
America, N.A.,* 333 Conn. 769, 788, 219 A.3d 767 (2019).
Section 42-110b (a), in turn, provides: "No person shall
engage in unfair methods of competition and unfair or
deceptive acts or practices in the conduct of any trade
or commerce." Section 42-110a (4) defines " '[t]rade'
and 'commerce' " as "the advertising, the sale or rent
or lease, the offering for sale or rent or lease, or the

_____

[42] General Statutes § 42-110g (a) provides in relevant part: "Any person
who suffers any ascertainable loss of money or property, real or personal,
as a result of the use or employment of a method, act or practice prohibited
by section 42-110b, may bring an action in the judicial district in which the
plaintiff or defendant resides or has his principal place of business or is
doing business, to recover actual damages. . . ."

Lafferty *v.* Jones

distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.''[43]

The following additional procedural history is relevant to our resolution of this claim. To support their CUTPA claim in their original complaint, in addition to incorporating the allegations of the other claims that they asserted, the plaintiffs alleged, inter alia, that (1) the defendants ''unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit,''[44] (2) the defendants engaged in a ''campaign of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy,'' (3) the defendants' ''reprehensible conduct caused substantial injury to the plaintiffs and other consumers that [was] not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have

_____

[43] CUTPA ''refers to 'trade or commerce' in the substantive provision, § 42-110b (a), but contains a definition of ' ''trade'' ' and ' ''commerce'' ' in the definitions provision, § 42-110a (4). The definition seems to equate the disjunctive with the conjunctive relationship of the two terms and interpret the two terms as having a single meaning or a combined inclusive meaning.'' R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 n.2.

[44] The plaintiffs further alleged, for instance, that, ''[o]nce he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In [Jones'] [I]nternet based and broadcast radio shows, the . . . defendants hawk 'open currency' precious metals, prepackaged food and dietary supplements, 'male enhancement' elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 'lower receivers' (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle). . . . [T]he . . . defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate[s] those listeners to buy their products.'' (Footnote omitted.)

229 Conn. App. 487        DECEMBER, 2024        539

*Lafferty v. Jones*

reasonably avoided," (4) the defendants' "conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury," and (5) the defendants "broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false and with reckless disregard as to whether or not they were true."[45]

On October 9, 2020, the Jones defendants filed a motion to strike, asserting in relevant part that the plaintiffs' CUTPA claim was insufficiently pleaded. On April 29, 2021, the plaintiffs filed an objection, and, on June 4, 2021, the Jones defendants filed a reply brief. On November 18, 2021, the court denied the motion to strike. With respect to the plaintiffs' CUTPA claim, the court determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful to formulate the underlying basis of a CUTPA cause of action. . . . As the court is not striking the plaintiffs' defamation claim, the plaintiffs' [original] complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action." (Citations omitted.) The court further determined that the plaintiffs had standing to maintain their CUTPA claim, stating that "the plaintiffs allege that the [Jones] defendants 'broadcast . . . outrageous, cruel and malicious lies about the plaintiffs' and that '[t]hese acts of the [Jones] defendants resulted in damage to the plaintiffs.' Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action."

On October 5, 2022, after the plaintiffs had rested their case-in-chief at the hearing in damages, the defendants' counsel orally moved for a directed verdict and/

---

[45] The allegations in support of the plaintiffs' CUTPA claim were substantively identical in the plaintiffs' respective original complaints, as well as in their September, 2022 amended complaint.

Lafferty *v.* Jones

or to dismiss the plaintiffs' CUTPA claim.[46] The defen-
dants' counsel argued in relevant part that the plaintiffs
were asserting a "novel application" of CUTPA because
"there is no representation whatsoever that the plain-
tiffs were harmed in any respect by . . . Jones' com-
mercial activities with respect to the sale of dietary
supplements. . . . There is no evidence that anyone
was harmed by his commercial activity. . . . [N]othing
in [his] speech, or the consequences of that speech,
addresses what CUTPA is intended to address . . . and
that is whether consumers were harmed by . . . the
commercial activity [affecting] trade or commerce.
. . . [W]hat we have here is a novel attempt to use
CUTPA to silence unpopular speech. . . . So, we think
that CUTPA is being used for inappropriate grounds
and that the plaintiffs lack standing to bring the action
because they cannot establish that they were harmed
by . . . Jones' commercial activity. . . . [T]here is no
case . . . that supports what the plaintiffs intend to
do in this case, and that is [to] use . . . a statute that
is designed to protect consumers against unscrupulous
trade and commercial practices to attack speech. . . .
[N]othing in our law supports an application of CUTPA
on the fact[s] as pled and proven in this case." In
response, the plaintiffs' counsel argued in relevant part:
"With regard to the idea that the CUTPA claim is only
about statements, it's not. What it describes is a com-
mercial course of conduct that is built on targeting
and victimizing these families by lying about them. So,
certainly lies are in the mix, but what the court heard
was not just the occasional lie, it's the use of lies to
sell products to fuel a business. . . . There is a busi-
ness plan to hurt these families and to sell things by
hurting them. And that has to be . . . remediable under
CUTPA . . . ." In rebuttal, the defendants' counsel

---

[46] On October 6, 2022, the defendants filed a written version of their
oral motion.

229 Conn. App. 487          DECEMBER, 2024          541

Lafferty *v.* Jones

argued that there was no precedent providing that
CUTPA applies when (1) "a person engages in extreme
comments and relies on the sale of products to produce
that platform" and (2) there is no evidence of harm
stemming from the products sold. The court rejected
the defendants' claims without additional comment.

Subsequently, in their motion to set aside the jury's
verdict, the defendants, in essence, reasserted their
prior contention that the plaintiffs' CUTPA claim was
legally insufficient. In denying that motion, the court
determined in relevant part that "CUTPA serves to deter
predatory commercial conduct such as [the conduct
alleged by the plaintiffs]. This court, in ruling on the
defendants' motion to strike, already determined that
'[a]n allegation of defamatory conduct on the part of a
defendant is sufficiently wrongful conduct to formulate
the basis of a CUTPA cause of action.' The [verdict]
rendered by [the] jury [is] not against the law or the
evidence."[47]

We construe the crux of the defendants' claim on
appeal to be that the conduct at issue alleged by the
plaintiffs and admitted by operation of the defendants'
default, namely, the defendants' dissemination of lies
about the Sandy Hook massacre, was insufficient to
support a viable CUTPA claim because their actions
were not performed "in the conduct of any trade or
commerce." General Statutes § 42-110b (a). The defen-
dants posit that no CUTPA claim arises here when (1)
they did not lie about or unscrupulously advertise the
products that they sold and (2) their actions led to
*indirect* commercial gains through product sales. In
short, the defendants contend that they engaged in non-
commercial speech outside of the scope of CUTPA. The

―――――――――――――
[47] The defendants raised additional claims directed to the plaintiffs' CUTPA
claim, including that the plaintiffs failed to plead the ascertainable loss
element of a CUTPA claim. The court rejected these claims, and the defen-
dants do not pursue these issues on appeal.

542          DECEMBER, 2024          229 Conn. App. 487

*Lafferty* v. *Jones*

plaintiffs respond that, "[w]hen using lies about [the] plaintiffs to sell supplements, [the defendants were] engaged in 'unfair' and 'deceptive' acts and practices 'in the conduct of' [their] 'trade or commerce.' " We conclude that, as a matter of law, the acts in which the defendants engaged were not "in the conduct of any trade or commerce" as required pursuant to CUTPA. See General Statutes § 42-110b (a).

"The interpretation of pleadings is an issue of law. . . . We conduct a plenary review of the pleadings to determine whether they are sufficient to establish a cause of action upon default." (Citation omitted; internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 276, 89 A.3d 373 (2014). Moreover, "[w]hether a defendant is subject to CUTPA is a question of law that is subject to plenary review." *NRT New England, LLC* v. *Longo*, 207 Conn. App. 588, 610–11, 263 A.3d 870, cert. denied, 340 Conn. 906, 263 A.3d 821 (2021).

Before turning to the merits of the defendants' claim, we note that the default entered against the defendants does not limit our review of this claim. "An appellate court . . . may examine the allegations of a complaint to ascertain whether they are sufficient on their face to establish a valid claim for the relief requested. . . . Although the failure of a party to deny the material allegations of a pleading operates so as to impliedly admit the allegations, a default does not automatically trigger judgment for, or the relief requested by, the pleader. The pleader is entitled to an entry of judgment or a grant of relief as a function of the nonresponsive party's default and the attendant implied admission only when the allegations in the well pleaded filing are sufficient on their face to make out a claim for judgment or relief. . . . While an admission carries with it all reasonable implications of fact and legal conclusions . . . the admission cannot traverse beyond the bounds

229 Conn. App. 487          DECEMBER, 2024          543

*Lafferty* v. *Jones*

of the underlying pleading and admit allegations not made by the pleader; the pleading is, unless leave is granted to modify, the ceiling." (Internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, supra, 149 Conn. App. 274–75. "As such, while a default admits the material allegations of the underlying pleading, the question as to whether the default requires judgment in favor of the pleader is to be determined by reference to the sufficiency of the pleading itself." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 737, 830 A.2d 228 (2003). "Put another way, in both equitable and legal actions, the plaintiff must establish his right to relief to the court's satisfaction, even though some issues may have been laid at rest by the default." (Internal quotation marks omitted.) *Moran* v. *Morneau*, 140 Conn. App. 219, 226, 57 A.3d 872 (2013); see also id., 225 ("[a] default may settle many issues, but it does not operate to insulate a mistaken legal proposition from judicial review").

For CUTPA to apply, there must be an unfair or deceptive act or practice committed "in the conduct of any trade or commerce." General Statutes § 42-110b (a); see also *Cenatiempo* v. *Bank of America, N.A.*, supra, 333 Conn. 789 ("[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce"); *Pellet* v. *Keller Williams Realty Corp.*, 177 Conn. App. 42, 62, 172 A.3d 283 (2017) ("[t]he essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or practice; (2) *the act complained of was performed in the conduct of trade or commerce*; and (3) the prohibited act was the proximate cause of harm to the plaintiff" (emphasis added)). CUTPA defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or

*Lafferty v. Jones*

intangible, real, personal or mixed, and any other arti-
cle, commodity, or thing of value in this state." General
Statutes § 42-110a (4).

"Despite th[e] broad language [of § 42-110a (4)], the
definition of trade and commerce is not unlimited and
has been used to restrict the application of CUTPA."
*Stearns & Wheeler, LLC* v. *Kowalsky Bros., Inc.*, 289
Conn. 1, 11 n.13, 955 A.2d 538 (2008); see also R. Langer
et al., 12 Connecticut Practice Series: Connecticut
Unfair Trade Practices, Business Torts and Antitrust
(2024–2025 Ed.) § 3.1, p. 117 ("[b]ecause CUTPA applies
only to acts 'in the conduct of any trade or commerce,'
there is a significant limitation on the reach of [CUTPA]"
(footnote omitted)); see, e.g., *Sempey* v. *Stamford Hos-
pital*, 194 Conn. App. 505, 518, 221 A.3d 839 (2019)
(trial court properly struck CUTPA count predicated
on allegations that former employer made false state-
ments to State of Connecticut Unemployment Commis-
sion regarding former employee's reliability and integ-
rity because, inter alia, employee failed to allege that
employer committed any acts in " 'conduct of any trade
or commerce' ").

Exercising our plenary review, we conclude that the
facts alleged by the plaintiffs and admitted by the defen-
dants are legally insufficient to satisfy the "trade or
commerce" prong of CUTPA. As we have explained,
the conduct forming the basis of the plaintiffs' CUTPA
claim was the defendants' propagation of lies that the
Sandy Hook massacre was a hoax. Applying the statu-
tory definition of " '[t]rade' and 'commerce' " set forth
in § 42-110a (4) (i.e., "the advertising, the sale or rent
or lease, the offering for sale or rent or lease, or the
distribution of any services and any property, tangible
or intangible, real, personal or mixed, and any other
article, commodity, or thing of value in this state"), we
cannot conclude that the defendants violated CUTPA

229 Conn. App. 487          DECEMBER, 2024          545

*Lafferty v. Jones*

in disseminating their lies about the Sandy Hook massacre. That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

In their respective appellate briefs, the plaintiffs and the defendants address our Supreme Court's decision in *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*,          U.S.          , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019). In *Soto*, several plaintiffs, acting as the administrators of the estates of nine of the victims of the Sandy Hook massacre; id., 65, 66 n.2; commenced an action against several defendants who were alleged to have manufactured, distributed, and sold (to Lanza's mother) the weapon used by Lanza at Sandy Hook—a Bushmaster XM15-E2S semiautomatic rifle. Id., 65–66. The plaintiffs asserted a number of legal theories seeking to hold the defendants liable in part for the Sandy Hook massacre, most of which our Supreme Court determined to be precluded by Connecticut law and/or the Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012). Id., 65.

Our Supreme Court concluded, however, that the plaintiffs "offered one narrow legal theory" that was recognized pursuant to Connecticut law and not precluded by PLCAA. Id. Specifically, the plaintiffs alleged that "the defendants violated CUTPA[48] by advertising

_____

[48] The plaintiffs in *Soto* brought their claims pursuant to Connecticut's wrongful death statute, General Statutes § 52-555, predicated in part on alleged CUTPA violations. *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 67.

and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle" and "that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre." (Footnote added.) Id., 86–87. The trial court struck this CUTPA claim, along with a distinct claim by the plaintiffs alleging that the sale of the XM15-E2S to the civilian market, ipso facto, constituted an unfair trade practice, on the ground that the plaintiffs lacked standing stemming from their status as "third-party victims who did not have a direct consumer, commercial, or competitor relationship . . . with the defendants." Id., 88. Our Supreme Court determined that the trial court erred in striking the plaintiffs' CUTPA claims, reasoning: "Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant." Id. Our Supreme Court further clarified that it did not "need [to] decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case." Id., 96. Thus, the court held that the plaintiffs had standing with respect to their "narrow legal theory" under CUTPA because they alleged direct injuries from conduct resulting from wrongful advertising. Id., 65, 99–100.

229 Conn. App. 487 DECEMBER, 2024 547

Lafferty *v.* Jones

The allegations underlying the CUTPA claim deemed viable in *Soto* are, however, materially distinguishable from the allegations in the underlying consolidated actions and do not lend the plaintiffs support with respect to their allegation that the defendants acted "in the conduct of any trade or commerce" for purposes of CUTPA. As in *Soto*, the plaintiffs in this case did not allege that they were consumers, competitors, or otherwise in a business or commercial relationship with the defendants. Unlike the plaintiffs in *Soto*, however, the plaintiffs in this case did not allege that they were "directly injured by conduct resulting from" the defendants' advertising or sale of the defendants' products, such that they could "bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant[s]." *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 88. Thus, notwithstanding *Soto*'s elimination of the commercial relationship test, the plaintiffs did not allege direct injury from the defendants' *advertising* or *sale* of the defendants' products and, thus, did not fall within the expansion of CUTPA liability established in *Soto*. Rather, they alleged injuries from the defendants' *false speech* about the Sandy Hook massacre—speech that itself was silent with regard to the defendants' products. Stated differently, the plaintiffs did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy (in addition to the torts of invasion of privacy by false light, defamation, defamation per se, and intentional infliction of emotional distress) for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far.

In sum, we conclude that the plaintiffs failed to assert a legally viable CUTPA claim. As a result, the judgments rendered with respect to the plaintiffs' CUTPA claim

548            DECEMBER, 2024          229 Conn. App. 487

*Lafferty v. Jones*

must be reversed and the attendant award entered pursuant to CUTPA, namely, the $150,000,000 in punitive damages awarded by the court, must be vacated.

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

STATE OF CONNECTICUT
**APPELLATE COURT**

Date: Hartford, December 10, 2024

*To the Chief Clerk of the Appellate Court.*
The Appellate Court has decided the following case:

ERICA LAFFERTY ET AL.
*v.*                                                                    *Opinion by Moll, J.*
ALEX EMRIC JONES ET AL.

WILLIAM SHERLACH
*v.*
ALEX JONES ET AL.

WILLIAM SHERLACH ET AL.
*v.*
ALEX EMRIC JONES ET AL.

Docket Nos. AC 46131 /AC 46132 /AC 46133
Trial Court Docket Nos. UWYCV186046436S /UWYCV186046437S /UWYCV186046438S

        The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases
are remanded with direction to vacate the court's award of $150,000,000 in punitive damages
pursuant to CUTPA; the judgments are affirmed in all other respects.

Chief Judge

Rescript