# EXHIBIT 43

| DOC. NO.: X06-UWY-CV-18-6046436-S | SUPERIOR COURT |
| ERICA LAFFERTY | JUDICIAL DISTRICT OF WATERBURY |
| v | COMPLEX LITIGATION DOCKET |
| ALEX EMRIC JONES, ET AL. | NOVEMBER 18, 2021 |
| DOC. NO.: X06-UWY-CV-18-6046437-S | SUPERIOR COURT |
| WILLIAM SHERLACH | JUDICIAL DISTRICT OF WATERBURY |
| v | COMPLEX LITIGATION DOCKET |
| ALEX JONES, ET AL. | NOVEMBER 18, 2021 |
| DOC. NO.: X06-UWY-CV-18-6046438-S | SUPERIOR COURT |
| WILLIAM SHERLACH | JUDICIAL DISTRICT OF WATERBURY |
| v | COMPLEX LITIGATION DOCKET |
| ALEX EMRIC JONES, ET AL. | NOVEMBER 18, 2021 |

**MEMORANDUM OF DECISION RE**

In these three consolidated cases, the plaintiffs,[1] various immediate family members of

victims and a first responder to the December 14, 2012 Sandy Hook school shooting, have

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg. The first eleven of these individuals is either a parent of a student or a close relative of school employee who died in the Sandy Hook tragedy. Aldenberg is a first responder who responded to the scene on the date of the shooting. When the *Lafferty* case was originally brought, Jeremy Richman was also named as a plaintiff, but his claims are no longer pending in the case (see docket entries number 346 and 357 in *Lafferty*). Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20,

1

brought suit against the defendants,[2] Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC (collectively, the defendants).[3]  The plaintiffs allege[4] the following relevant facts against the defendants.  Jones is a radio and internet personality who resides in Austin, Texas.   He is the host of "The Alex Jones Show" and he owns and operates the websites Infowars.com and PrisonPlanet.com.  Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.  Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies.  As alleged in the complaint, "[a]ll of the above mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him."  The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people.  Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

2021 (docket entry number 459.20 in *Lafferty*).  In both *Sherlach* v. *Jones* cases, docket numbers X06-UWY-CV-18-6046437-S and X06-UWY-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker.  Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Wolfgang Halbig, Cory T. Sklanka and Midas Resources, Inc. were previously named as defendants in all three cases.  The plaintiffs have since withdrawn their claims as to all of these defendants (see docket entry numbers 301, 317 and 318 in *Lafferty*).

[3] Genesis Communications Network, Inc. is also named as a defendant in all three cases.  Nevertheless, as it is not a party to the motion to strike that is being discussed in this decision, it will not be included in any reference to the "the defendants."  The defendants will both collectively be referred to as "the defendants" and separately by their names when appropriate.

[4] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

Following the 2012 Sandy Hook shooting perpetrated by Adam Lanza, the plaintiffs allege that "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident.   According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has."  The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary gain.  In fact, by May, 2013, Jones was alleged to make approximately $10 million annually.  Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ."  In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs.  For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax."  Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."  In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card.  Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors playing different parts of people.  I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show.  Jones commented: "I mean it's fake . . . it's fake . .

. you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by Jones and his associates where they seemingly questioned if the shooting occurred and whether the plaintiffs' relatives actually died. Accordingly, the plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional

4

infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5)

count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes

§ 42-110a et seq.  Each of the plaintiff's first four causes of action affix the additional label

"civil conspiracy."

On October 9, 2020, the defendants filed a motion to strike all counts of the plaintiffs'

complaint in each of the three cases[5] along with a memorandum of law in support of their

motion.  The plaintiffs filed a memorandum of law in opposition to the motions to strike on April

29, 2021 on April 29, 2021.  On June 4, 2021, the defendants filed their reply memoranda.  The

court conducted a remote oral argument on the defendants' motions to strike on September 23,

2021.  As the arguments raised on the three motions and the opposition thereto are virtually

identical, the court will address the three motions simultaneously.[6]

The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations

of any complaint . . . to state a claim upon which relief can be granted."  (Internal quotation

marks omitted.)  *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 498, 815 A.2d 1188

(2003).  "The role of the trial court in ruling on a motion to strike is to examine the [complaint],

---

[5] The docket numbers for the three cases are listed in the following order: (1): *Lafferty* v. *Jones*,
Docket No. X06-UWY-CV-18-6046436-S; (2) *Sherlach* v. *Jones*, Docket No. X06-UWY-CV-
18-6046437-S and (3) *Sherlach* v. *Jones,* Docket No. X06-UWY-CV-18-6046438-S.

[6] After the present motions to strike were argued, the court entered a default on November 15,
2021 against the defendants due to their repeated discovery violations.  Given that the default has
the effect of establishing liability against the defendants, these motions to strike are arguably
moot.  Nevertheless, the court chooses to address the merits of the motions because it will create
a complete record for appeal and "[c]ourts are in the business of ruling on litigants' contentions,
and they generally operate under the rule essential to the efficient administration of justice, that
where a court is vested with jurisdiction over the subject-matter . . . and . . . obtains jurisdiction
of the person, it becomes its . . . duty to adjudicate the case before it."  (Internal quotation marks
omitted.)  *Drumm* v. *Brown*, 245 Conn. 657, 687, 716 A.2d 50 (1998).

construed in favor of the [plaintiff], to determine whether the [pleading party has] stated a legally sufficient cause of action." (Internal quotation marks omitted.) *Coe* v. *Board of Education*, 301 Conn. 112, 117, 19 A.3d 640 (2011). "If any facts provable under the express and implied allegations in the plaintiff's complaint support a cause of action . . . the complaint is not vulnerable to a motion to strike." *Bouchard* v. *People's Bank*, 219 Conn. 465, 471, 594 A.2d 1 (1991). Nevertheless, "[a] motion to strike admits all *facts* well pleaded; it does not admit *legal conclusions or the truth or accuracy of opinions* stated in the pleadings." (Emphasis in original; internal quotation marks omitted.) *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 588, 693 A.2d 293 (1997). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Internal quotation marks omitted.) *Santorso* v. *Bristol Hospital,* 308 Conn. 338, 349, 63 A.3d 940 (2013).

## CONSTITUTIONAL ARGUMENTS

The defendants first argue that all of the speech alleged in the complaint is entitled to constitutional protections under the first amendment to the United States constitution. The defendants contend that all of the plaintiffs are public figures and/or officials, either of the permanent, limited purpose or involuntary variety, and, therefore, the plaintiffs must allege that the defendants acted with actual malice. According to the defendants, the plaintiffs insufficiently allege facts to meet the actual malice standard, and, as a result, their speech is legally authorized by the first amendment. The defendants additionally argue that their speech is protected under the fair comment privilege. In response, although the plaintiffs argue that they are actually private figures and not public figures, the plaintiffs assert that the court need not decide this issue because they allege actual malice. The plaintiffs also argue that the fair comment privilege does not bar their claims because they sufficiently allege actual malice.

6

Our Supreme Court has cautioned that "[f]irst amendment principles always must remain firmly in mind when a court considers whether legal liability may attach to harm allegedly attributable to a defendant's speech . . . ." *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 409, 223 A.3d 37 (2020). Nevertheless, "[f]rom 1791 to the present . . . the [f]irst [a]mendment has permitted restrictions upon the content of speech in a few limited areas, and has never include[d] a freedom to disregard these traditional limitations. . . . These historic and traditional categories long familiar to the bar . . . [include] defamation . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Stevens*, 559 U.S. 460, 468, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010). "If the plaintiff is a public figure, however, the plaintiff also must prove that the defamatory statement was made with actual malice, such that the statement, when made, [was] made with actual knowledge that it was false or with reckless disregard of whether it was false." (Internal quotation marks omitted.) *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 628, 969 A.2d 736 (2009), citing *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). "[A]ctual malice requires a showing that a statement was made with knowledge that it was false or with reckless disregard for its truth. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth. . . . Further, proof that a defamatory falsehood has been uttered with bad or corrupt motive or with an intent to inflict harm will not be sufficient to support a finding of actual malice . . . although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity." (Internal quotation marks omitted.) *Gleason* v. *Smolinski*, 319 Conn. 394, 447-48, 125 A.3d 920 (2015). "Whether a defendant has knowledge of the falsity of a defamatory statement is a question within the province of the trier of fact." (Internal quotation marks omitted.) Id., 448.

In the present case, the plaintiffs' complaint is replete with examples of Jones making statements on his radio program indicating that the Sandy Hook shooting did not occur and that certain of the plaintiffs participated in faking it.  The plaintiffs also specifically allege that "Alex Jones does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has" and that "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of marketing scheme that has brought him and his business entities tens of millions of dollars per year."  The plaintiffs clearly allege that Jones and his related co-defendant entities made statements with the knowledge that they were false.  Accordingly, the plaintiffs allege actual malice and based on these allegations the defendants are not entitled to invoke the blanket protections of the first amendment.

Nor can the defendants avail themselves of the fair comment privilege.  "The privilege of fair comment, which was one of the most important privileges realized at common law, was a qualified privilege to express an opinion or otherwise comment on matters of public interest. . . . Traditionally, fair comment concerned persons, institutions or groups who voluntarily injected themselves into the public scene or affected the community's welfare, such as public officials, political candidates, community leaders from the private sector of private enterprises which affected public welfare . . . .  The privilege was elevated to constitutional status, however, by a number of United States Supreme Court cases . . . ."  (Citations omitted; internal quotation marks omitted.)  *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 114-15, 448 A.2d 1317 (1982).  "Qualified privileges may be defeated by a showing, by a preponderance of the evidence . . . of actual malice, also known as constitutional malice, or malice in fact."  (Citation omitted.)  *Gleason* v. *Smolinski*, supra, 319 Conn. 432 n.32.  Given that the plaintiffs sufficiently allege actual malice, the fair comment privilege also does not shield the defendants from liability

8

at this stage of the proceedings.  For these reasons, the court rejects both of the defendants'

constitutional arguments as a sufficient basis to grant the motion to strike.[7]

COUNT ONE: FALSE LIGHT INVASION OF PRIVACY

The defendants also make separate arguments that each of the plaintiffs' five causes of

action are legally insufficient.  These contentions will now be addressed by the court.  With

respect to count one, false light invasion of privacy, the defendants move to strike this count for

the following reasons: (1) the group libel doctrine bars the plaintiffs' claims because the majority

of the plaintiffs were not specifically referenced by Jones; (2) the defendants did not have

knowledge or act in reckless disregard as to the falsity of the publicized matter and (3) the

statements attributed to the defendants are matters of opinion.  The plaintiffs respond that none

of these arguments render their false light invasion of privacy claim legally insufficient.  They

note that Connecticut courts have approved of false light invasion of privacy claims with conduct

that is far less egregious than alleged in this matter.

Initially, the court will examine the defendants' assertion that the plaintiffs' false light

invasion of privacy claims are precluded based on the group libel doctrine.  The court's research

failed to reveal any Connecticut state cases that have discussed this concept.  Indeed, there are

relatively few cases nationally that have analyzed the doctrine.  Nevertheless, the Second Circuit

Court of Appeals, applying New York law, has stated that "[u]nder the group libel doctrine,

typically a statement made about an organization is not understood to refer to any of its

individual members unless that person is distinguished from other members of the group. . . .

---

[7] Having made the determination that the plaintiffs sufficiently allege actual malice on the part of
the defendants, the court need not delve into the issue of whether the plaintiffs are properly
characterized as public or private figures.  The court also need not decide whether the statements
at issue were fair comment on a matter of public concern.

9

But where a statement defames all members of a small group, the reference to the individual

plaintiff reasonably follows from the statement. . . . Accordingly, an individual belonging to a

small group may maintain an action for individual injury resulting from a defamatory comment

about the group, by showing that he is a member of the group." (Citations omitted; internal

quotation marks omitted.) *Elias* v. *Rolling Stone, LLC*, 872 F.3d 97, 107-08 (2d Cir. 2017). "To

evaluate a small group defamation claim, a court considers the size of the group, whether the

statement impugns the character of all or only some of the group's members, and the prominence

of the group and its individual members in the community." (Internal quotation marks omitted.)

Id., 108. Generally speaking, the group libel limitation also applies to a cause of action sounding

in false light invasion of privacy. See, e.g., *O'Brien* v. *Williamson Daily News*, 735 F. Supp.

218, 223 (E.D. Ky. 1990), aff'd, 931 F.2d 893 (6th Cir. 1991) (stating that "both the libel claims

and the false light privacy claims require the allegedly defamatory statements to be capable of

reference to an individual").

The defendants contend that all of the plaintiffs cannot maintain claims against them

because the complaint only references comments directly made regarding two of the plaintiffs,

Lafferty and Parker. Nevertheless, when applying the standards from *Elias* to the present case, it

can be seen that the group libel test is satisfied such that all of the plaintiffs have stated a legally

sufficient false light cause of action against the defendants. First, the group of potential plaintiffs

is finite and relatively small. As alleged by the plaintiffs, there were twenty-six victims of the

Sandy Hook shootings and all of the plaintiffs here are either immediate family members (parent,

child, sibling or spouse) of the deceased individuals or a first responder. See *Elias* v. *Rolling

Stone, LLC*, supra, 872 F.3d 108 (concluding that individuals in a fifty-three member fraternity

could maintain a small group defamation claim). Second, when read and understood in totality,

the various comments attributed to Jones could be understood to mean that all the Sandy Hook family members and first responders participated in an elaborate ruse to fake the shootings. Such statements would certainly impugn all of the members of this group. See id., 109 (stating "that [t]aking the allegations in the [a]rticle together, a reader could plausibly conclude that many or all fraternity members participated in alleged [sexual assault] . . . ."). Finally, given the intense media coverage surrounding the Sandy Hook shootings, the plaintiffs here certainly have become well-known figures in the community. For all of these reasons, the court rejects this argument as a sufficient basis to grant the motion to strike.

The second argument offered by the defendants is easily dispatched. "To establish a false light invasion of privacy claim, the claimant must show [inter alia] that . . . the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [she] would be placed." (Internal quotation marks omitted.) *Borg* v. *Cloutier*, 200 Conn. App. 822, 109, 39 A.3d 1249 (2020). As the defendants themselves acknowledge, "this is the same actual malice standard [previously] discussed . . . ." Given that the court has already concluded that the plaintiffs allege actual malice, the court concludes that the plaintiffs sufficiently allege this element of a false light invasion of privacy claim.

Thirdly, the defendants argue that the statements made by Jones are opinions and therefore they cannot formulate the basis of a valid claim. "[T]he defense available in a defamation action that the allegedly defamatory statements are opinions, not assertions of fact, is also available in a false light privacy action." (Internal quotation marks omitted.) *Chernovetz* v. *Harries*, Superior Court, judicial district of New Haven, Docket No. CV-17-6110983-S (April 27, 2021, *Kamp, J.*). "To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion. . . . A statement

11

can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. . . .  In a libel action, such statements of fact usually concern a person's conduct or character. . . .  An opinion, on the other hand, is a personal comment about another's conduct, qualifications or character that has some basis in fact." (Citations omitted; internal quotation marks omitted.)  *NetScout Systems, Inc.* v. *Gartner, Inc.*, supra, 334 Conn. 410-11.  "Context is a vital consideration in any effort to distinguish a nonactionable statement of opinion from an actionable statement of fact.  As [our Supreme Court] previously has recognized, [t]his distinction between fact and opinion cannot be made in a vacuum . . . for although an opinion may appear to be in the form of a factual statement, it remains an opinion if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated. . . .  Thus, while this distinction may be somewhat nebulous . . . [t]he important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact."  (Emphasis omitted; internal quotation marks omitted.)  Id., 412.

The defendants focus the court's attention on Jones' alleged statements that the Sandy Hook shooting was a "fake" or a "hoax" and cite to cases where similar statements were determined to be mere opinion.  Although the court agrees that some of the comments allegedly attributed to Jones may qualify as opinion, it cannot conclude as such for all of the statements. For instance, on March 14, 2014, Jones is alleged to have stated: "We've clearly got people where it's actors playing different parts of people."  The court can reach no other conclusion than Jones meant to tell his audience, as a factual matter, that the Sandy Hook shooting did not happen and certain individuals such as the plaintiffs participated in deceiving the public.

Therefore, at this point in the proceedings, the court determines that at least some of the comments the plaintiffs allege that Jones made are actionable as non-opinion. Accordingly, the court denies the motion to strike count one.

## COUNT TWO: DEFAMATION

Next, the defendants move to strike count two, defamation, for a multitude of reasons. First, the defendants reiterate their argument that the plaintiffs cannot sue them for defamation because of the group libel doctrine. Under Connecticut law, "[t]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Internal quotation marks omitted.) *Simms* v. *Seaman*, 308 Conn. 523, 547-48, 69 A.3d 880 (2013). With respect to the second required element, our Supreme Court has determined that "[w]here the alleged defamatory statements were not made about the . . . plaintiffs, they do not satisfy the 'of and concerning' element crucial to prevailing on a common-law defamation claim. . . . [A] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer . . . ." (Citations omitted; internal quotation marks omitted.) *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, 256 Conn. 343, 355-56, 773 A.2d 906 (2001). "Although defamatory words must refer to an ascertainable person, the plaintiff need not be named if the alleged libel contains matters of description or other references therein, or the extraneous facts and circumstances . . . show that plaintiff was intended to be the object of the alleged libel, and was so understood by others. Thus, for example, a defamation action may lie when the description provided, or extraneous facts establish . . . that a reference to a small group is understood to refer

13

to the plaintiff . . . ." (Internal quotation marks omitted.)  114 Am. Jur. Proof of Facts 3d 513 (2010).  As mentioned in the previous section of this decision, the plaintiffs here are members of a readily identifiable group such that it can be understood that the defendants were allegedly trying to defame them even if they were not specifically mentioned by name.  Accordingly, the court rejects this argument as a reason to strike count two.

The second argument proffered by the defendants is that in order for a statement to be considered defamatory, it must be objectionably false and not one of mere opinion.  According to the defendants, Connecticut has not recognized defamation by implication and for this reason count two must be stricken.  In making these arguments, the defendants are essentially arguing, once again, that their comments are non-actionable opinion.  For the reasons stated in the previous section of this decision, the court again deems this argument to be an insufficient basis to grant the motion to strike.

Finally, the defendants argue that the plaintiffs fail to allege any legally recoverable damages.  The defendants contend that because the plaintiffs do not sufficiently state a defamation per se claim, they have to allege special damages of a pecuniary nature.  It is the defendants' position that such allegations have not been made and this fact renders count two legally insufficient.  In response, the plaintiffs argue that they adequately allege a defamation per se claim and even if the court were to determine otherwise, that they allege the requisite special damages.

In Connecticut, "[d]efamation is comprised of the torts of libel and slander.  Defamation is that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory, or unpleasant feelings or opinions against him. . . .  Slander is oral defamation. . . .  Libel . . . is

14

written defamation. . . .  While all libel was once actionable without proof of special damages, a distinction arose between libel per se and libel per quod. . . .  A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts known by the recipient of the communication. . . .  When a plaintiff brings an action in libel per quod, he must plead and prove actual damages in order to recover." (Internal quotation marks omitted.) *Lowe* v. *Shelton*, 83 Conn. App. 750, 765-66, 851 A.2d 1183, cert. denied, 271 Conn. 915, 859 A.2d 568 (2004). "[W]hen the defamation is actionable per quod . . . injury to the reputation must be alleged and proved as an essential link between the slanderous utterance and the special damage which constitutes the basis of recovery in actions per quod. . . .  The special damage . . . must be of a material and, generally, of a pecuniary nature.  It must result from the conduct of a person other than the defamer or the defamed, and that conduct must be directly caused by the publication of the slander." (Citation omitted.)  *Urban* v. *Hartford Gas Co.*, 139 Conn. 301, 308, 93 A.2d 292 (1952).

"Statements deemed defamatory per se are ones in which the defamatory meaning of the speech is apparent on the face of the statement. . . .  Our state has generally recognized two classes of defamation per se: (1) statements that accuse a party of a crime involving moral turpitude or to which an infamous penalty is attached, and (2) statements that accuse a party of improper conduct or lack of skill or integrity in his or her profession or business and the statement is calculated to cause injury to that party in such profession or business. . . .  Once the plaintiff has established that the words are false and actionable per se, barring any statutory provision to the contrary, she is entitled under Connecticut law to recover general damages without proof of special damages. . . .  This is because the law presumes general damages where the defamatory statements are actionable per se." (Citation omitted; internal quotation marks

omitted.) *Silano* v. *Cooney*, 189 Conn. App. 235, 242, 207 A.3d 84 (2019). "[O]ur courts consistently have used the disjunctive 'or' when listing the two types of criminal accusations that comprise this class of defamation per se under our law. . . . Although some crimes involving moral turpitude may also be subject to an infamous penalty . . . no authority . . . has expressly held that the accusation must allege a crime implicating both categories. . . . [T]he modern view of [the infamous crimes] requirement is that the crime be a chargeable offense which is punishable by imprisonment . . . ." (Citations omitted; internal quotation marks omitted.) Id., 244-45. "Whether words are actionable per se is a question of law for the court . . . . All of the circumstances connected with the publication of defamatory charges should be considered in ascertaining whether a publication was actionable per se. The words used, however, must be accorded their common and ordinary meaning, without enlargement or innuendo." (Internal quotation marks omitted.) *Cohen* v. *Meyers*, 175 Conn. App. 519, 545, 167 A.3d 1157, cert. denied, 327 Conn. 973, 174 A.3d 194 (2017).

As alleged in the complaint, on May 13, 2014, Jones hosted Halbig on his radio program and they discussed the fact that the Sandy Hook shoot was a "scam." Halbig noted: "[t]he red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds." Jones then responded: "You're saying a motive for the locals to go along with the fraud is money." From this statement, a reasonable listener could conclude that Jones was accusing the plaintiffs of fraud. "Moral turpitude, [our Supreme Court has] observed, is a vague and imprecise term to which no hard and fast definition can be given. . . . A general definition . . . is that moral turpitude involves an act of inherent baseness, vileness or depravity in the private and social duties which man does to his fellow man or to society in general, contrary to the accepted rule of right and duty between man

and law." (Internal quotation marks omitted.) *Lega Siciliana Social Club, Inc.* v. *St. Germaine*, 77 Conn. App. 846, 853, 825 A.2d 827, cert. denied, 267 Conn. 901, 838 A.2d 210 (2003). "[I]n common human experience acts of deceit, fraud, cheating, or stealing . . . are universally regarded as conduct which reflects on a man's honesty and integrity . . . ." (Internal quotation marks omitted.) *State* v. *Tarasiuk*, 192 Conn. App. 207, 217, 217 A.3d 11 (2019). For this reason, at least one Superior Court judge has previously determined that allegations "of theft and fraud . . . are crimes of moral turpitude and . . . are defamation per se." *Lodovico* v. *Mihalcik*, Superior Court, judicial district of Hartford, Docket No. CV-07-5013091-S (August 17, 2010, *Rittenband, J.T.R.*). This court concludes similarly and determines that the plaintiffs adequately allege that Jones defamed them by accusing them of a crime of moral turpitude. Moreover, fraud certainly is a serious criminal offense for which prison is a potential punishment. General Statutes § 53a-119 et seq. Accordingly, the court rules that the plaintiffs sufficiently plead defamation per se and, as a result, they adequately allege damages.[8] Therefore, the motion to strike count two is denied.

## COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Next, the defendants move to strike count three sounding in intentional infliction of emotional distress. The defendants move to strike this count on the grounds that: (1) "nothing in the factual background suggests [the] [d]efendants had any intention to harm [the] plaintiffs or had reason to foresee their words would cause harm"; (2) the defendants' speech was not

---

[8] As previously stated, the plaintiffs also argue that they sufficiently allege libel per quod, which requires proof of special pecuniary damages. In their memorandum of law in opposition, the plaintiffs fail to direct the court's attention to any allegations of pecuniary damages. Although the court need not rule on this issue because it has found that the plaintiffs adequately allege defamation per se, the plaintiffs do not appear to have sufficiently allege libel per quod.

sufficiently extreme and outrageous and (3) the plaintiffs do not properly plead that they experienced extreme emotional distress.[9]  The plaintiffs object to this portion of the motion to strike by arguing that they allege that Jones knew he would cause them harm by his actions and that his speech was sufficiently egregious to establish the extreme and outrageous element. Furthermore, the plaintiffs contend they sufficiently set forth that they suffered extreme distress.

The law in Connecticut regarding intentional infliction of emotional distress is well settled.  "In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established.  It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  (Internal quotation marks omitted.)  *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000).  "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society. . . .  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! . . .  Conduct on the part of

---

[9] The defendants also argue that count three, as well as count four sounding in negligent infliction of emotional distress, are legally insufficient because "[t]he [f]irst [a]mendment bars . . . . damages under the generally applicable laws of intentional and negligent infliction of emotional distress where those claims are based on constitutionally protected conduct."  (Internal quotation marks omitted.)  *Gleason* v. *Smolinski*, supra, 319 Conn. 406.  While this is a correct statement of the law, the court need not address this argument because of its prior conclusion that the first amendment does not prohibit the plaintiffs' claims.

the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citations omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 119 (2003). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury." (Citation omitted.) *Appleton* v. *Board of Education*, supra, 210. "[I]n assessing a claim for intentional infliction of emotional distress, the court performs a gatekeeping function. In this capacity, the role of the court is to determine whether the allegations of a complaint . . . set forth behaviors that a reasonable fact finder could find to be extreme or outrageous. In exercising this responsibility, the court is not fact finding, but rather it is making an assessment whether, as a matter of law, the alleged behavior fits the criteria required to establish a claim premised on intentional infliction of emotional distress." (Internal quotation marks omitted.) *Gagnon* v. *Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 847, 888 A.2d 104 (2006).

In count three, the plaintiffs allege that "[i]n broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants . . . knew, or should have known, that emotional distress was the likely result of their conduct." Although this allegation is somewhat conclusory, it has been held to be sufficient to withstand a motion to strike. See, e.g., *Giovanelli* v. *Cantor, Floman, Gross, Kelly & Sacramone*, Superior Court, judicial district of New Haven, Docket No. CV-07-5010641-S (January 30, 2008, *A. Robinson, J.*) (44 Conn. L. Rptr. 802, 805) (where the court denied a motion to strike an intentional infliction of emotional distress count because "[t]he plaintiffs' complaint explicitly alleges that the defendants knew or should have known that emotional distress was likely to result"). Additionally, the plaintiffs explicitly allege

19

that the emotional distress that they suffered was severe. This contention is supported by other

factual allegations found in the complaint that are incorporated by reference into count three,

such as paragraphs thirteen and fourteen where the plaintiffs allege they "have been forced to

endure malicious and cruel abuse at the hands of ruthless and unscrupulous people . . . [and] have

faced physical confrontation and harassment, death threats, and sustained a barrage of

harassment and verbal assault on social media" because of Jones' conduct. All of these

allegations are enough to set forth the fourth element of this tort.

The question then becomes whether the plaintiffs' allegations are sufficient to meet the

second element of an intentional infliction of emotional distress cause of action, which requires

that the defendants' behavior rise to the level of extreme and outrageous conduct. Connecticut's

courts have traditionally construed this requirement very strictly. Nevertheless, under the

specific circumstances of these consolidated cases, the court concludes that the extreme and

outrageous standard has been satisfied. In these matters, the plaintiffs allege, inter alia, that the

defendants accused them of participating in a scheme to fake their own children's deaths. The

Second Circuit Court of Appeals has recently concluded that parents could maintain an

intentional infliction of emotional distress claim against a defendant who allegedly published a

false article regarding their son's death. *Rich* v. *Fox News Network, LLC*, 939 F.3d 112, 123 (2d

Cir. 2019). A similar result is mandated here. Therefore, the court denies the defendants'

motion to strike count three.

COUNT FOUR: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The defendants move to strike count four, negligent infliction of emotional distress,

because they contend that the elements of this cause of action have not been alleged.

Specifically, the defendants argue that: (1) the "[p]laintiffs make insufficient, conclusory

allegations as to their harm, with a pro forma recitation that they suffered emotional distress, caused by [the] [d]efendants . . ." and (2) the plaintiffs do not allege that any harm they suffered was legally foreseeable.  In response, the plaintiffs contend that because they allege a legally cognizable intentional infliction of emotional distress claim, which has a higher burden, then they necessarily have brought a legally supportable negligent infliction of emotional distress cause of action.

"To prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." (Internal quotation marks omitted.) *Grasso* v. *Connecticut Hospice, Inc.*, 138 Conn. App. 759, 771, 54 A.3d 221 (2012).  "In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm." (Internal quotation marks omitted.) *Geiger* v. *Carey*, 170 Conn. App. 459, 498, 154 A.3d 1093 (2017).

In count four, the plaintiffs allege that their "emotional distress was severe enough that it might result in illness or bodily harm."  This contention is further supported by the allegation that "[i]n light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence."  The plaintiffs further allege that "[t]he defendants' campaign of outrageous, cruel and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress." Although these allegations are fairly conclusory, the plaintiffs do set forth the required elements

21

of a negligent infliction of emotional distress cause of action. The plaintiffs allege that the defendants' conduct created an unreasonable risk of emotional distress, this risk was foreseeable, and that as a result, they experienced severe emotional distress that could have led to bodily harm. For this reason, the court denies the motion to strike count four.

COUNT FIVE: CUTPA

The defendants next move to strike count five, CUTPA, on the ground that this count "is insufficiently plead, and impermissibly made up of mere conclusions and a formulaic recitation of the elements of a cause of action." First, the defendants argue that the plaintiffs' allegations of wrongful conduct on the part of the defendants do not satisfy the cigarette rule because they fail to allege the defendants violated the common law or another established concept of unfairness. The defendants further argue that they did not engage in any immoral, unethical, oppressive or unscrupulous conduct. Third, the defendants assert that because "the plaintiffs were not themselves mentioned" any injuries suffered were indirect, remote and derivative. Therefore, the defendants contend the plaintiffs lack standing to state this claim. The plaintiffs object to this portion of the motion to strike by contending that they sufficiently allege underlying common law claims sounding in defamation, false light invasion of privacy as well as intentional and negligent infliction of emotional distress. Additionally, the plaintiffs also assert that their claims are not barred by the first amendment and therefore they allege legally actionable immoral and oppressive conduct. Finally, the plaintiffs argue that they have standing to bring a CUTPA cause of action.

The court will start, as it must, with the parties' arguments regarding standing because standing raises issues of subject matter jurisdiction. *Castle* v. *DiMungo*, 199 Conn. App. 734, 745, n.5 237 A.3d 731 (2020) (stating that "[b]ecause standing implicates the court's subject

22

matter jurisdiction, the court should have addressed the defendant's standing arguments before turning to [other issues raised in motion]").  "[N]otwithstanding the broad language and remedial purpose of CUTPA, [our Supreme Court has] applied traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA."  (Internal quotation marks omitted.)  *Soto* v. *Bushmaster Firearms International, LLC,* 331 Conn. 53, 93-94, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto,* ___ U.S. ___, 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019).  "It is axiomatic that a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. . . .  Our standing jurisprudence consistently has embodied the notion that there must be a colorable claim of a direct injury to the plaintiff, in an individual or representative capacity. . . .  The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. . . .  Thus, to state these basic propositions another way, if the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so.  [When], for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them."  (Internal quotation marks omitted.)  *Connecticut Podiatric Medical Assn.* v. *Health Net of Connecticut, Inc.*, 302 Conn. 464, 469, 28 A.3d 958 (2011).  On the other hand, "[[b]ecause [s]tanding requires no more than a colorable claim of injury . . . a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer].  Similarly,

standing exists to attempt to vindicate arguably protected interests." (Internal quotation marks omitted.) *Fay* v. *Merrill*, 338 Conn. 1, 16, 256 A.3d 622 (2021).

In the present case, the plaintiffs allege that the defendants "broadcast . . . outrageous, cruel and malicious lies about the plaintiffs" and that "[t]hese acts of the defendants resulted in damage to the plaintiffs." Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action. Accordingly, the court rejects this argument as a sufficient basis to strike count five.

With respect to the defendants' other arguments in support of their motion to strike this count, it is well established that Connecticut's courts "have adopted [certain] criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted; footnote omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 790, 219 A.3d 767 (2019).

An allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the underlying basis of a CUTPA cause of action. See, e.g., *Howell* v.

*Howard,* Superior Court, judicial district of Litchfield, Docket No. CV-20-5012819-S (April 16, 2021, *J. Moore, J.*) (holding that the plaintiff's allegations "that the defendant's defamatory written statements have harmed his business or professional reputation" were sufficient to withstand a motion to strike a CUTPA count); *Lodovico* v. *Mihalcik,* supra, Superior Court, Docket No. CV-07-5013091-S (stating that "[t]his [c]ourt finds that the plaintiff has sustained her burden of proving a violation of CUTPA . . in that the defendants violated CUTPA . . [by, inter alia,] [d]efamation . . . ."). As the court is not striking the plaintiffs' defamation claim, the plaintiffs' complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action. Accordingly, the motion to strike count five is denied.

MISCELLANEOUS ARGUMENTS

The defendants also raise a number of additional arguments as to why their motion to strike should be granted.[10] Each of these contentions is easily resolved. First, the defendants assert that the plaintiffs' civil conspiracy claims found in counts one through four lack merit. As noted by the defendants, under Connecticut law, "[t]here is no independent claim of civil conspiracy. Rather, [t]he action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. . . . Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." (Internal quotation marks omitted.) *Larobina* v. *McDonald,* 274 Conn. 394, 408, 876 A.2d 522 (2005). The defendants use this statement of law to argue that because "there are no substantive torts alleged

---

[10] The defendants had also moved to strike "[t]he bulk [of the plaintiffs'] allegations" on statute of limitations grounds. During the September 23, 2021 oral argument, the court denied this portion of the motion to strike on the basis that statute of limitations arguments are inappropriate in the context of a motion to strike and are best addressed via a motion for summary judgment.

25

that survive scrutiny" the plaintiffs' allegations regarding civil conspiracy cannot continue in the case. Given that the court is not striking any of the plaintiffs' underlying tort causes of action, it cannot credit this argument.

Additionally, the defendants note there is no legally sufficient allegation that any of them entered into a conspiracy with Sklanka or Halbig to harm the plaintiffs. Even if that were true, this court has previously ruled that "[m]ost trial courts follow the rule that a single paragraph of a pleading is subject to a motion to strike only when it attempts to set forth all of the essential allegations of a cause of action or defense. . . . Arguably under the present rules, a motion to strike may properly lie with respect to an individual paragraph [or paragraphs] in a count. . . . However, the weight of authority in the Superior Court is that the motion does not lie, except possibly where the subject paragraph [or paragraphs] attempts to state a cause of action." (Internal quotation marks omitted.) *Silano* v. *Cooney*, Superior Court, judicial district of Fairfield, Docket No. CV-14-6045374-S (July 17, 2015, *Bellis, J.*). Given that civil conspiracy is not an independent cause of action, it would be inappropriate for the court to go within counts one through four and surgically strike the allegations that suggest there was a conspiracy among the various defendants. Therefore, the court denies this portion of the defendants' motion to strike.

Similarly, the defendants argue the different defendants are not agents of each other and the plaintiffs insufficiently plead specific liability. The defendants contend that there is no master/servant, agency, employment or joint venture relationship alleged between them. Furthermore, the defendants argue that in the absence of such relationships, there are insufficient allegations as to each of the purported defendants' liability. According to the defendants, the "[p]laintiffs' lumping together of [the] [d]efendants fails to meet the standard necessary to

maintain a claim against any of them." The difficulty with this argument is that it essentially, once again, asks the court to reach into the various counts and strike certain allegations. The court does not read the complaint as an attempt to state causes of action sounding in agency or joint venture. If the defendants had wanted a more precise statement of precisely what the plaintiffs believe that each defendant did, the defendants should have filed a request to revise pursuant to Practice Book § 10-35 (1) in order to "to obtain . . . a more complete or particular statement of the allegations of an adverse party's pleading . . . ." For this reason, the court denies the defendants' motion to strike predicated on this argument.

Finally, the defendants contend that the plaintiffs fail to plead damages or proximate causation sufficiently. The defendants assert that the plaintiffs do not allege the precise injuries that they suffered or how those damages were caused by any of the statements alleged in the complaint. Additionally, the defendants argue that the complaint does not set forth allegations as to what type of harm was experienced by each particular plaintiff. Although the court agrees with the defendants that the plaintiffs' complaint is not specific in this regard, the plaintiffs do allege that the defendants made allegedly defamatory statements and these "defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages." For the purposes of a motion to strike, this allegation is sufficient. Once this matter moves to trial, the plaintiffs will, of course, be required to prove, in accordance with the applicable law, the damages that they claim to have suffered at

the hands of the defendants.  A precise showing is not necessary at this stage of proceedings.[11]

Accordingly, the court rejects this argument as a sufficient basis to grant the motion to strike.

**CONCLUSION**

For all of the reasons stated above, the court denies the defendants' motion to strike in its

entirety

COURT,

421277

Bellis, J.

:eeding under a defamation
ry words are actionable per
tiff's reputation.  [The
ed; internal quotation marks
42, 850, 863 A.2d 735

332                  MARCH, 2021          336 Conn. 332

Lafferty *v.* Jones

ERICA LAFFERTY ET AL. *v.* ALEX
EMRIC JONES ET AL.

WILLIAM SHERLACH *v.*
ALEX JONES ET AL.

WILLIAM SHERLACH ET AL. *v.*
ALEX EMRIC JONES ET AL.
(SC 20327)

Robinson, C. J., Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiffs, a first responder and family members of those killed in the
mass shooting at Sandy Hook Elementary School, commenced separate
actions, which the trial court consolidated, seeking to recover damages

---

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.
  This case originally was scheduled to be argued before a panel of this
court consisting of Chief Justice Robinson and Justices Palmer, McDonald,
D'Auria, Mullins, Kahn and Ecker. Although Justice Palmer was not present

336 Conn. 332          MARCH, 2021                    333

Lafferty *v.* Jones

from the defendants, J and several of his affiliated corporate entities, for, inter alia, invasion of privacy, arising out of statements made by J on his radio show advancing certain conspiracy theories about the shooting. The defendants filed special motions to dismiss the plaintiffs' complaints pursuant to the statute (§ 52-196a (b)) permitting the court to dismiss a complaint that is based on the opposing party's exercise of its constitutional right to free speech in connection with a matter of public concern. The plaintiffs moved for limited discovery pursuant to § 52-196a (d) in order to respond to the special motions to dismiss. The trial court found good cause for limited discovery and ordered the defendants to comply by a certain date, but they failed to meet that deadline. The defendants then filed motions for an extension of time within which to produce the discovery materials. The court granted the motions but warned that, if the defendants continued to ignore deadlines, they would be foreclosed from pursuing their special motions to dismiss. Two days before the new deadline, the defendants again moved for an extension of time, but the court denied the motions, explaining that the defendants had not substantially complied with its discovery orders. On that basis, the plaintiffs moved for sanctions. At the hearing on the sanctions motions, the defendants argued that, by that time, they had responded to almost every discovery request and were in substantial compliance. The court agreed and concluded that their production was sufficient to allow them to pursue their special motions to dismiss. Subsequently, in response to the plaintiffs' request, the trial court ordered the defendants to produce certain marketing data and a complete search of J's cell phone, again warning that it would consider appropriate sanctions if the defendants failed to comply. Shortly thereafter, J and his attorney appeared together on J's radio show to discuss the case, during which J explained that someone had embedded child pornography in e-mails he had turned over to the plaintiffs in discovery. J then went on a long tirade against those whom he believed had planted the child pornography, during which he implicated the plaintiffs' attorney, M, accused M of committing a felony, threatened M, declared war on M, and promoted a $1 million bounty. Shortly after the broadcast, the parties appeared before the court and argued whether the court should order sanctions as a result of the broadcast. After hearing arguments, the court imposed sanctions against the defendants and revoked their opportunity to pursue the merits of their special motions to dismiss, basing its decision on the facts that the defendants had not complied with its discovery orders and that J had harassed, intimidated, and threatened M. Following the court's imposition of sanctions, the defendants appealed pursuant to the statute (§ 52-265a) permitting the Chief Justice to certify an interlocutory appeal involving a matter of substantial public interest. *Held:*

when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

334                    MARCH, 2021                    336 Conn. 332

Lafferty *v.* Jones

1. The trial court did not violate the defendants' first amendment rights
   when it imposed sanctions on the basis of J's broadcast because, consid-
   ering J's role as a party in the litigation and the threatening nature of
   his speech, J's broadcast presented an imminent and likely threat to
   the administration of justice: this court concluded that, if extrajudicial
   speech by a party to litigation poses an imminent and likely threat to
   the administration of judicial proceedings, a court may sanction a party
   for that speech, without violating the first amendment, to the extent
   necessary to protect the fairness of the litigation and taking into consid-
   eration the timing and the nature of the speech; J's status as a party to
   the litigation and the threatening and vituperative nature of his speech
   served to confirm the imminence and likelihood of the threatened harm,
   J, as a party commenting on his own litigation, had a greater opportunity
   and perceived incentive to affect the outcome of the cases than a non-
   party criticizing a judicial action, and J's speech was threatening and
   intimidating, led to additional threats against the trial judge and the
   plaintiffs' counsel, and created a hostile atmosphere that could discour-
   age individuals from participating in the litigation and pose a threat to
   the plaintiffs' ability to litigate their cases; moreover, the court penalized
   the defendants in a restrained manner in order to preserve the judicial
   process, and the sanctions imposed were narrowly tailored to achieving
   the government's substantial interest in ensuring the administration of
   justice, as the court refrained from imposing a more severe sanction,
   such as defaulting the defendants or holding them in contempt, and,
   instead, merely revoked a statutory benefit, namely, the opportunity to
   pursue their special motions to dismiss.

2. The trial court did not abuse its discretion by sanctioning the defendants,
   as it was undisputed that the court's discovery orders were reasonably
   clear and that the defendants violated four of them, and revoking the
   defendants' opportunity to pursue the special motions to dismiss was
   proportional to their discovery violations and in light of the nature of
   J's broadcast: the record supported the trial court's finding that the
   defendants wilfully disregarded the discovery orders and continued to
   challenge the underlying merits of the limited discovery despite the
   court's finding that it was supported by good cause, and the defendants'
   noncompliance was prejudicial to the plaintiffs because the undisclosed
   discovery material could have assisted the plaintiffs in proving probable
   cause that they would succeed on the merits of their complaints; more-
   over, the sanctions imposed were proportional in light of the defendant's
   wilful, repeated violations of deadlines, when considered in combination
   with J's harassment and intimidation of M during the broadcast, and
   measured insofar as the sanctions fell short of a judgment of default or
   dismissal and, instead, merely required the defendants to adjudicate the
   merits of the cases in the ordinary course of litigation rather than through
   their special motions to dismiss; furthermore, the defendants' claim that
   the sanctions were inappropriate because the limited discovery itself
   was overbroad did not excuse their failure to comply with the court's
   orders.

336 Conn. 332          MARCH, 2021                335

*Lafferty v. Jones*

3. The defendants' claim that the trial court denied them their right to due
   process by imposing sanctions without adequate notice and a meaningful
   opportunity to be heard was unavailing: the plaintiffs had filed an earlier
   motion seeking sanctions for the defendants' discovery noncompliance,
   and the court repeatedly discussed the possibility of sanctioning the
   defendants, including warning that it would revoke their opportunity to
   pursue the special motions to dismiss, and issued an order stating that
   it would address J's broadcast at a hearing to be held the following day;
   moreover, the court heard thorough argument on the issue of sanctions
   at the hearing on the broadcast, and at no point did the defendants
   request additional time to prepare.

Argued September 26, 2019—officially released July 23, 2020**

*Procedural History*

Action, in the first case, to recover damages for, inter
alia, invasion of privacy, and for other relief, brought
to the Superior Court in the judicial district of Fairfield,
where the defendant Alex Emric Jones et al. filed a spe-
cial motion to dismiss, action, in the second case, to
recover damages for, inter alia, invasion of privacy, and
for other relief, brought to the Superior Court in the
judicial district of Fairfield, where the court, *Bellis, J.*,
granted the plaintiff William Sherlach's motion to add
Robert Parker as a plaintiff, and the defendant Alex
Jones et al. filed a special motion to dismiss, and action,
in the third case, to recover damages for, inter alia,
invasion of privacy, and for other relief, brought to the
Superior Court in the judicial district of Fairfield, where
the defendant Alex Emric Jones et al. filed a special
motion to dismiss; thereafter, the cases were consoli-
dated and transferred to the Complex Litigation Docket,
judicial district of Waterbury; subsequently, the court,
*Bellis, J.*, granted the motions for sanctions filed by
the plaintiffs in each case, and the defendant Alex Emric
Jones et al., upon certification by the Chief Justice
pursuant to General Statutes § 52-265a that a matter of
substantial public interest was at issue, appealed to this
court. *Affirmed.*

** July 23, 2020, the date that this decision was released as a slip opinion,
is the operative date for all substantive and procedural purposes.

336                    MARCH, 2021                    336 Conn. 332

Lafferty *v.* Jones

*Norman A. Pattis*, with whom was *Kevin Smith*, for the appellants (named defendant et al.).

*Joshua D. Koskoff*, with whom was *Alinor C. Sterling*, for the appellees (plaintiffs).

*Opinion*

ROBINSON, C. J. This public interest appeal presents the opportunity to consider the scope of a trial court's inherent authority to sanction a party to litigation for his or her remarks about the case in light of that party's right to free speech under the first amendment to the United States constitution. The plaintiffs in these cases, a first responder and family members of those killed in the mass shooting at Sandy Hook Elementary School,[1] brought these actions against the defendants, Alex Emric Jones and several of his affiliated corporate entities,[2] claiming that statements made on Jones' radio show advancing certain conspiracy theories about the Sandy Hook shooting were tortious in nature. The defendants appeal[3] from the orders of the trial court sanctioning them by revoking their opportunity to pur-

[1] The plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, and William Aldenberg.

[2] The defendants participating in this appeal are Jones and several of his affiliated corporate entities, namely, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC. We refer to these parties collectively as the defendants and, when necessary, individually by name.

The additional defendants named in the complaint, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., are not parties to this appeal.

[3] The defendants appeal pursuant to the Chief Justice's grant of their petition to file an expedited public interest appeal pursuant to General Statutes § 52-265a. A sanctions order for discovery violations generally is considered interlocutory and is not appealable until a party is held in contempt for noncompliance. *Incardona* v. *Roer*, 309 Conn. 754, 760, 73 A.3d 686 (2013). We have appellate jurisdiction, however, because it is well established that "appeals from interlocutory orders may be taken pursuant to § 52-265a." *Foley* v. *State Elections Enforcement Commission*, 297 Conn. 764, 767 n.2, 2 A.3d 823 (2010).

336 Conn. 332          MARCH, 2021          337

Lafferty *v.* Jones

sue the special motions to dismiss provided by Connecticut's anti-SLAPP[4] statute, General Statutes § 52-196a,[5] issued after the trial court found that the defendants

[4] SLAPP is an acronym for "strategic lawsuit against public participation," the "distinctive elements of [which] are (1) a civil complaint (2) filed against a nongovernment individual (3) because of their communications to government bodies (4) that involves a substantive issue of some public concern. . . . The purpose of a SLAPP suit is to punish and intimidate citizens who petition state agencies and have the ultimate effect of chilling any such action." (Citation omitted; internal quotation marks omitted.) *Field* v. *Kearns*, 43 Conn. App. 265, 275–76, 682 A.2d 148, cert. denied, 239 Conn. 942, 684 A.2d 711 (1996).

[5] General Statutes § 52-196a provides in relevant part: "(b) In any civil action in which a party files a complaint, counterclaim or cross claim against an opposing party that is based on the opposing party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, such opposing party may file a special motion to dismiss the complaint, counterclaim or cross claim.

"(c) Any party filing a special motion to dismiss shall file such motion not later than thirty days after the date of return of the complaint, or the filing of a counterclaim or cross claim described in subsection (b) of this section. The court, upon a showing of good cause by a party seeking to file a special motion to dismiss, may extend the time to file a special motion to dismiss.

"(d) The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof. Notwithstanding the entry of an order to stay discovery, the court, upon motion of a party and a showing of good cause, or upon its own motion, may order specified and limited discovery relevant to the special motion to dismiss.

"(e) (1) The court shall conduct an expedited hearing on a special motion to dismiss. . . . (2) When ruling on a special motion to dismiss, the court shall consider pleadings and supporting and opposing affidavits of the parties attesting to the facts upon which liability or a defense, as the case may be, is based. (3) The court shall grant a special motion to dismiss if the moving party makes an initial showing, by a preponderance of the evidence, that the opposing party's complaint, counterclaim or cross claim is based on the moving party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, unless the party that brought the complaint, counterclaim or cross claim sets forth with particularity the circumstances giving rise to the complaint, counterclaim or cross claim and demonstrates to the court that there is probable cause, considering all valid defenses, that the party will prevail on the merits of the complaint, counterclaim or cross claim. (4) The court shall rule on a special motion to dismiss as soon as practicable.

338                  MARCH, 2021          336 Conn. 332

Lafferty *v.* Jones

had violated numerous discovery orders and that Jones
personally had engaged in harassing and intimidating
behavior directed at the plaintiffs' counsel, Attorney Chris-
topher Mattei. On appeal, the defendants claim, inter alia,
that the trial court (1) improperly sanctioned the defen-
dants because Jones' speech was protected under the
first amendment, and (2) abused its discretion in sanc-
tioning the defendants because the trial court improp-
erly permitted discovery that exceeded the limited
scope contemplated by § 52-196a (d). The defendants
also claim that the trial court violated their due process
rights by failing to afford them sufficient notice and a
meaningful opportunity to be heard before issuing the
sanctions orders. We disagree and, accordingly, affirm
the trial court's sanctions orders.

The record reveals the following relevant facts and
procedural history. On December 14, 2012, Adam Lanza
murdered twenty children and six staff members in a
mass shooting at Sandy Hook Elementary School in
Newtown. Some conspiracy theorists questioned the
circumstances surrounding the shooting and called it
a hoax. In response to statements made by Jones and
other individuals featured on his radio show, the plain-
tiffs brought three separate civil actions against the
defendants in 2018. The complaints alleged counts of
invasion of privacy by false light, defamation and def-
amation per se, intentional infliction of emotional dis-
tress, and negligent infliction of emotional distress, all

"(f) (1) If the court grants a special motion to dismiss under this section,
the court shall award the moving party costs and reasonable attorney's fees,
including such costs and fees incurred in connection with the filing of the
special motion to dismiss. (2) If the court denies a special motion to dismiss
under this section and finds that such special motion to dismiss is frivolous
and solely intended to cause unnecessary delay, the court shall award costs
and reasonable attorney's fees to the party opposing such special motion
to dismiss.

"(g) The findings or determinations made pursuant to subsections (e) and
(f) of this section shall not be admitted into evidence at any later stage of
the proceeding or in any subsequent action. . . ."

336 Conn. 332          MARCH, 2021              339

*Lafferty v. Jones*

of which were accompanied by counts of civil conspir-
acy. In addition, the complaints claimed violations of
the Connecticut Unfair Trade Practices Act, General
Statutes § 42-110a et seq. The trial court consolidated
all three cases.

In November, 2018, the defendants filed special
motions to dismiss the plaintiffs' complaints pursuant
to the anti-SLAPP statute. See General Statutes § 52-196a
(b). In order to respond to the special motions to dis-
miss, the plaintiffs moved for limited discovery pursu-
ant to § 52-196a (d). The plaintiffs argued that they had
demonstrated good cause to entitle them to "specified
and limited discovery relevant to the special motion[s]
to dismiss" pursuant to § 52-196a (d) and asked the trial
court to permit discovery on every issue raised by the
defendants' special motions to dismiss to allow them
to demonstrate probable cause of success on the merits
of their complaints. See General Statutes § 52-196a (e)
(3). The defendants opposed the plaintiffs' motion for
limited discovery, claiming that the plaintiffs' broad dis-
covery requests were contrary to the purpose of the
anti-SLAPP statute and that the plaintiffs had failed to
show good cause.

With respect to the specific discovery requests, the
plaintiffs initially requested five special interrogatories
and twenty-one requests for production from Jones.[6]
At a hearing on December 17, 2018, the trial court found

---

[6] Similar interrogatories and requests for production, with small variations
in number and language, were made to Cory T. Sklanka, Wolfgang Halbig,
Free Speech Systems, LLC, Infowars Health, LLC, Infowars, LLC, Prison
Planet TV, LLC, Midas Resources, Inc., and Genesis Communications Net-
work, Inc. In addition, the plaintiffs noticed the individual depositions of
Jones, Sklanka, Halbig, Kurt Nimmo, the former editor of Infowars, LLC,
and Steve Pieczenik, a guest on Jones' radio show who had expressed that
the Sandy Hook shooting was a hoax, as well as the corporate designees
of Free Speech Systems, LLC, Genesis Communications Network, Inc.,
Infowars Health, LLC, Infowars, LLC, Midas Resources, Inc., and Prison
Planet TV, LLC.

Lafferty *v.* Jones

good cause and granted the plaintiffs' motion for limited
discovery but indicated that it would not grant all of
the plaintiffs' requests and would consider each of the
defendants' objections individually. The trial court then
allowed the parties numerous opportunities to med-
iate disputes and delineate their discovery obligations
at discovery status conferences.

After narrowing the plaintiffs' requests, the trial court
initially ordered the defendants to produce their discov-
ery compliance by February 23, 2019. The defendants
failed to meet that deadline.[7] The defendants then filed
motions for an extension of time, which the trial court
granted, allowing them until March 20, 2019, to produce
their discovery materials. In granting the motions, the
trial court "urge[d] the defendants to honor this court
ordered deadline because the defendants are the ones
[who] want their motion[s] to dismiss adjudicated, but
if they're going to continue to ignore court deadlines,
they're going to lose the ability . . . to pursue their
[special] motion[s] to dismiss."

Two days before the March 20, 2019 discovery dead-
line, the defendants again moved for an extension of
time. This time, the trial court denied the motions, indi-
cating at a hearing with the parties that the defendants
had not substantially complied with its discovery
orders. The trial court explained that the "defendants,
at this point, are coming from a position of weakness.
They've blown past the court's deadlines. There hasn't
been a single piece of paper [produced] or interrogatory
answered." In light of the defendants' noncompliance,
the plaintiffs moved for sanctions on March 20, 2019.
Specifically, the plaintiffs argued that, under Practice
Book § 13-14[8] and the trial court's inherent authority,

---

[7] The defendants filed motions for an extension of time on February 22,
2019, the day before production was due. It does not appear that the trial
court decided those motions.

[8] Practice Book § 13-14 provides in relevant part: "(a) If any party has
failed to answer interrogatories or to answer them fairly, or has intentionally

336 Conn. 332          MARCH, 2021          341

*Lafferty* v. *Jones*

the court should impose sanctions for the defendants'
violations of discovery deadlines.

At a hearing on April 3, 2019, the trial court began to
address the plaintiffs' motions for sanctions but delayed
ruling on them to allow the defendants' counsel time to
resolve an unspecified ethical concern. Subsequently,
on April 10, 2019, the court heard argument on the
motions for sanctions. The defendants argued that they
had responded by that time to almost every discovery
request and that they were in substantial compliance
with the court's discovery orders. The trial court agreed
with the defendants, concluding that, although they had
not complied with every discovery request, the produc-
tion to that point was sufficient to allow them to pursue
the merits of the special motions to dismiss.

Subsequently, in late May, 2019, the plaintiffs brought
additional discovery issues to the trial court's atten-
tion. Specifically, the plaintiffs requested, inter alia,
additional responsive marketing data from Google Ana-
lytics and a complete search of Jones' cell phone. After
another hearing, the trial court ordered the defendants
to produce marketing data responsive to the court
approved production requests. The court warned that
it would "consider appropriate sanctions for the defen-
dants' failure to fully and fairly comply" with its latest
orders.

answered them falsely or in a manner calculated to mislead, or has failed
to respond to requests for production or for disclosure of the existence and
contents of an insurance policy or the limits thereof, or has failed to submit
to a physical or mental examination, or has failed to comply with a discovery
order made pursuant to Section 13-13, or has failed to comply with the
provisions of Section 13-15, or has failed to appear and testify at a deposition
duly noticed pursuant to this chapter, or has failed otherwise substantially
to comply with any other discovery order made pursuant to Sections 13-6
through 13-11, the judicial authority may, on motion, make such order as
the ends of justice require.

"(b) Such orders may include the following: (1) The entry of a nonsuit
or default against the party failing to comply . . . [and] (5) If the party
failing to comply is the plaintiff, the entry of a judgment of dismissal. . . ."

342                    MARCH, 2021                    336 Conn. 332

*Lafferty* v. *Jones*

On Friday, June 14, 2019, Jones and his attorney, Norman A. Pattis, appeared together on Jones' radio broadcast to discuss the pending case. Jones explained to the broadcast audience that someone had embedded child pornography in e-mails turned over to the plaintiffs in discovery. Jones then began a long invective against those whom he believed had planted the child pornography, which we quote in relevant part:[9]

"Jones: I'm here to tell the little pimps, the Senator Murphys and the prosecutor, the Obama appointed prosecutor [who's] doing all this, bitch, I don't need to talk about poor dead kids to have listeners.

\* \* \*

"Jones: They say you're a pedophile. We knew it was coming. And when the Obama appointed [United States] attorney demanded, out of 9.6 million e-mails in the last seven years since Sandy Hook, metadata, which

---

[9] The defendants and the plaintiffs both included transcripts of the June 14, 2019 broadcast in their appendices filed with this court. Their transcripts do not differ materially with respect to the language quoted in this opinion except for one phrase. The defendants' transcript uses the phrase "white shoe boy," whereas the plaintiffs' transcript uses the phrase "white Jew boy . . . ." The trial court, in its oral decision ordering sanctions, relied on the plaintiffs' transcript containing the phrase "white Jew boy . . . ." The defendants subsequently filed a motion to correct the transcript, which the trial court did not decide.

In their appellate briefs, the defendants noted the inconsistencies between the two transcripts and that the trial court had not ruled on their motion to correct, but they do not specifically challenge the accuracy of this phrase on appeal. As the trial court did not decide the motion to correct, we omit the words "Jew" and "shoe" in the quoted transcript.

The transcripts of the broadcast each exceed thirty pages, so we have not reproduced them in their entirety. We include only those portions relied on by the trial court, supplemented when necessary for context. Specifically, we have omitted those portions in which Jones discusses the case's background and the details of the child pornography incident, Jones' introduction of Pattis, Jones' critique of the plaintiffs' case and the Google Analytics reports, discussion of the first amendment ramifications of questioning the veracity of the Sandy Hook shooting, most of Pattis' statements, and other duplicative or irrelevant portions of the broadcast.

336 Conn. 332          MARCH, 2021          343

Lafferty *v.* Jones

meant tracking the e-mails and where they went, well, we fought it in court. The judge ordered for us to release a large number of those e-mails. That's Chris Mattei [who] got that done, a very interesting individual with the firm of Koskoff & Koskoff run by Senator Murphy and Senator Blumenthal that say, for America to survive, quote, I must be taken off the air. . . .

"It was hidden. In Sandy Hook e-mails threatening us, there was child porn. . . . And they get these e-mails a few weeks ago, and they go right to the [Federal Bureau of Investigation (FBI)] and say, '[w]e've got him with child porn.' The FBI says, '[h]e never opened it. He didn't send it.' And then they act like, oh, they're our friends. They're not going to do anything with this. . . .

"Now, I wonder who during discovery would send e-mails out of millions and then know what to search and look at. . . . One million dollars on conviction for who sent the child porn. . . . We're going to turn you loose, the [internet service providers], the law enforcement. You know who did it. . . .

"You think when you call up, oh, we'll protect you. We found the child porn. I like women with big giant tits and big asses. I don't like kids like you goddamn[ed] rapists, f-heads. In fact, you fucks are going to get it, you fucking child molesters. I'll fucking get you in the end, you fucks. . . . You're trying to set me up with child porn. I'm going to get your ass. One million dollars. One million dollars, you little gang members. One million dollars to put your head on a pike. One million dollars, bitch. I'm going to get your ass. You understand me now? You're not going to ever defeat Texas, you sacks of shit. So you get ready for that.

\* \* \*

"Jones: Why does law enforcement say $5000, dead or alive? One million. 'Cause we all know who did it.

344                    MARCH, 2021                    336 Conn. 332

Lafferty *v.* Jones

* * *

"Jones: What a nice group of Democrats. How surprising. What nice people. Chris Mattei, Chris Mattei. Let's zoom in on Chris Mattei. Oh, nice little Chris Mattei. What a good American. What a good boy. You think you'll put on me—anyways, I'm done. Total war. You want it? You got it. I'm not into kids like your Democratic party, you cocksuckers. So get ready. . . .

"Jones: The point is, I'm not putting up  .  .  .  with these guys anymore, man, and their behavior, 'cause I'm not an idiot. They literally went right in there and found this hidden stuff. Oh, my God. Oh, my God. And they're my friends. We want to protect you now, Alex. Oh, you're not going to get in trouble for what we found. F-U man, F-U to hell. I pray God, not anybody else, God visit[s] vengeance upon you in the name of Jesus Christ and all the saints. I pray for divine intervention against the powers of Satan. I literally would never have sex with children. I don't like having sex with children. I would never have sex with children. I am not a Democrat. I am not a liberal. I do not cut children's genitals off like the left does.

* * *

"Jones: I want them to. I want them to track it back to you know who. . . . I wonder who the person of interest is.

"Pattis: Look, are you showing Chris Mattei's photograph on here?[10]

"Jones: Oh, no. That was an accidental cut. He's a nice Obama boy. . . . He's a white . . . boy that thinks he owns America.

---

[10] The defendants' transcript provides: "Look. You're showing Chris Mattei's photograph on the air."

336 Conn. 332        MARCH, 2021              345

Lafferty *v.* Jones

* * *

"Jones: That's why I said, one million. I'm not BS-ing. One million dollars when they are convicted. The bounty is out, bitches, and you know, you feds, they're going to know you did it. They're going to get your ass, you little dirt bag. One million, bitch. It's out on your ass. . . .

"Jones: One million—I pay all debts—one million is on the street for who sent me—and we're going to get the e-mails. We're going to publish them next week. And we're going to make a whole thing. We're not going to show the child porn, but we're going to put the e-mails out, and we're going to show you where they came from. One million on the street. . . .

"Jones: A million dollars is after them. So I bet you'll sleep real good tonight, little jerk. 'Cause your own bud-dies are going to turn you in, and you're going to go to prison, you little white . . . boy jerkoff. Son of a bitch. I mean, I can't handle them. They want war? They're going to get war. I am sick of these people, a bunch of chicken craps [who] have taken this country over [who] want to attack real Americans. . . .

"Jones: We're going to get them. One million. One million dollars is on the street against you. You didn't destroy America on time, bitch. I am pissed, man. I will give everything I have to stop living in this world with these people.

* * *

"Jones: I am sure that [the United States] attorneys appointed by Obama are sweet little cupcakes. Come on. . . .

"Jones: I don't even think errand boy did this. I'm actually not saying that.[11] . . . And so, if they want war—you know, it's not a threat. It's like an AC/DC

---

[11] The defendants' transcript provides: "No, I'm sure—you don't think errand boy did this. I'm actually not saying that."

346                    MARCH, 2021                    336 Conn. 332

Lafferty *v.* Jones

song. If you want blood, you've got it. Blood on the
streets, man. . . .

"Jones: And I'm just asking the Pentagon and the patri-
ots that are left, and 4chan and 8chan, and Anonymous,
anybody [who's] a patriot, I am under attack, and if they
bring me down, they'll bring you down. I just have faith
in you. I'm under attack. And I summon the mean war. I
summon all of it against the enemy. . . .

"Jones: . . . How would you like an Obama
appointed [United States] attorney, man, [who] literally
found a needle in a field of haystacks and tried to go
to the feds and get me indicted? . . . And now I ask my
listeners and everyone, you claimed I sent people. I
never sent anybody. And I want legal and lawful action.
But I pray to God that America awaken[s]. Will Texas be
defeated? You will now decide. This is war." (Footnotes
added.)

The very next Monday, June 17, 2019, the plaintiffs
filed motions asking the trial court to review the broad-
cast. The plaintiffs also asked for "an expedited briefing
schedule concerning what orders must issue in connec-
tion with [Jones'] on-air statements . . . ." In those
motions, the plaintiffs explained that a data firm they
had retained located child pornography in the defen-
dants' metadata and that they "immediately contacted
the FBI." That same day, the trial court issued an order
that "[c]ounsel should be prepared to address the mat-
ter at tomorrow's hearing . . . ."

The next day, June 18, 2019, the parties appeared and
argued whether the trial court should order sanctions
as a result of the broadcast. After hearing argument,
the trial court imposed sanctions against the defendants
and revoked their opportunity to pursue the merits of
their special motions to dismiss pursuant to § 52-196a

336 Conn. 332          MARCH, 2021                    347

*Lafferty v. Jones*

(b).[12] This expedited public interest appeal followed. See footnote 3 of this opinion.

On appeal, the defendants claim that the trial court (1) improperly sanctioned them in violation of their first amendment rights, (2) abused its discretion in fashioning sanctions for discovery noncompliance, and (3) denied them due process by failing to afford them notice and a meaningful opportunity to be heard.

I

We begin with the defendants' challenge to the merits of the sanctions orders, which the trial court based on two grounds. First, the trial court found that the defendants were noncompliant with discovery, with their failure to comply with additional production deadlines viewed in light of their previous noncompliance. Second, the trial court found that, on the June 14, 2019 broadcast, Jones accused Mattei of committing a felony and then harassed, intimidated, and threatened him.[13] Because the trial court provided these two bases for its sanctions orders, we must assess the court's orders both for their propriety as sanctions and their constitutionality. We first conclude that the sanctions did not run afoul of the first amendment because they addressed speech that was an imminent and likely threat to the administration of justice. We also conclude that these two rationales, when considered together, provided sufficient grounds for sanctioning the defendants. Accordingly, it was not an abuse of the trial court's discretion

_____

[12] The trial court also indicated that it would award attorney's fees related to the child pornography issue at a later date, "upon further hearing and the filing of affidavits . . . ."

[13] The trial court also stated: "Now, the transcript doesn't reflect this, but, when I listened to the broadcast, I heard, I'm going to kill. Now, that's not in the transcript, but that is my read and understanding, and what I heard [o]n the broadcast." Because the word "kill" is not mentioned in the transcripts, we do not consider it in our analysis of the trial court's sanctions orders.

348               MARCH, 2021          336 Conn. 332

*Lafferty v. Jones*

to sanction the defendants for their discovery violations
and Jones' vituperative speech.

A

We first consider whether the trial court's sanctions
were permissible under the first amendment's free
speech protections. The defendants argue that the trial
court's ruling is "bereft of any analysis of the first
amendment" and that the court's inherent authority is
not an adequate ground to sanction them on the basis
of Jones' speech. The defendants further contend that,
because Jones' broadcast was not a true threat, did not
incite violence, and did not constitute fighting words,
the trial court's sanction was impermissible under the
first amendment. In response, the plaintiffs first submit
that the sanctions were a constitutionally permissible
exercise of the trial court's authority to sanction bad
faith litigation misconduct, which includes the harass-
ment and intimidation of opposing counsel. Second, the
plaintiffs argue that the broadcast was not protected
speech because it was a true threat. Although we agree
with the defendants that a trial court's inherent author-
ity is subject to constitutional limitations, we never-
theless conclude that Jones' speech during his June 14,
2019 broadcast was not protected by the first amend-
ment because it posed an imminent and likely threat
to the administration of justice.

It is well settled that a trial court "has the inherent
authority to impose sanctions against an attorney and
his client for a course of claimed dilatory, bad faith and
harassing litigation conduct . . . ." (Internal quotation
marks omitted.) *CFM of Connecticut, Inc.* v. *Chowd-
hury*, 239 Conn. 375, 393, 685 A.2d 1108 (1996), over-
ruled in part on other grounds by *State* v. *Salmon*, 250
Conn. 147, 735 A.2d 333 (1999); see also R. Pushaw, "The
Inherent Powers of Federal Courts and the Structural
Constitution," 86 Iowa L. Rev. 735, 764–65 (2001) ("The
inherent authority to administer judicial proceed-

336 Conn. 332          MARCH, 2021                     349

Lafferty *v.* Jones

ings carries with it a corollary power to control those involved in court business—parties, witnesses, jurors, spectators, and lawyers—to maintain order, decorum, and respect. Sanctions have long been deemed imperative to protect against the disruption or abuse of judicial processes and to ensure obedience to a court's orders, thereby preserving its authority and dignity." (Footnote omitted.)).

A long line of decisions makes clear that this inherent authority to sanction a party extends to sanctioning participants to litigation for engaging in threatening and harassing behavior. See *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 188 Conn. App. 21, 22–23, 204 A.3d 71 (dismissing writ of error stemming from sanctions order, issued under court's inherent authority, against nonparty partner in defendant partnership for sending "an inappropriate e-mail" to opposing counsel and telling her to "sit on his fucking head" (internal quotation marks omitted)), cert. denied, 331 Conn. 923, 206 A.3d 765 (2019);[14] see also *Waivio* v. *Board of Trustees of the University of Illinois*, 290 Fed. Appx. 935, 936–37 (7th Cir. 2008) (affirming judgment of dismissal when plaintiff engaged in "delaying and threatening conduct in the course of the litigation," including threatening to kill opposing counsel), cert. denied, 557 U.S. 926, 129 S. Ct. 2842, 174 L. Ed. 2d 563 (2009); *Thomas* v. *Tenneco Packaging Co.*, 293 F.3d 1306, 1308 (11th Cir. 2002) (upholding sanctions against lawyer for filings "directed at opposing counsel" that trial court "deemed abusive and offensive"); *Carroll* v. *Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 291–93 (5th Cir. 1997) (upholding sanction of defendant attorney who engaged in "abusive conduct at his deposition");

---

[14] The defendants incorrectly state that the sanctioned party in *Maurice* v. *Chester Housing Associates Ltd. Partnership*, supra, 188 Conn. App. 21, did not challenge the sanction on first amendment grounds. Instead, the Appellate Court declined to reach the issue, deeming the courthouse a nonpublic forum. Id., 33 n.11.

Lafferty *v.* Jones

*Michael* v. *Boutwell*, 138 F. Supp. 3d 761, 785–87 (N.D. Miss. 2015) (concluding that defendant's threatening of witness warranted sanction of attorney's fees, expenses and $1000 fine but not dispositive sanction of default judgment); *Kalwasinski* v. *Ryan*, Docket No. 96-CV-6475, 2007 WL 2743434, *3 (W.D.N.Y. September 17, 2007) (dismissing self-represented inmate's federal civil rights action because he "deliberately and intentionally participat[ed] in making threats of physical harm against parties and witnesses in his case"); *Fidelity National Title Ins. Co. of New York* v. *Intercounty National Title Ins. Co.*, Docket No. 00 C 5658, 2002 WL 1433717, *12–13 (N.D. Ill. July 2, 2002) (dismissing defendant's counterclaims "[p]ursuant to [the court's] inherent authority to sanction bad faith conduct in litigation" on basis of his "abusive and threatening" letter to opposing counsel).

When acting under its inherent powers, a court should proceed with caution; "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). This cautionary approach requires that any exercise of the inherent power to sanction be limited by constitutional concerns, such as the requirements of due process. See, e.g., *Roadway Express, Inc.* v. *Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980) ("[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record"); R. Pushaw, supra, 86 Iowa L. Rev. 784 ("[t]o be sure, the [c]ourt has recognized that the [c]onstitution limits federal judges' inherent powers"). As a result, a trial court's exercise of its inherent authority to sanction a party for harassing or threatening speech in the context of litigation is limited by the protections of the first amendment.[15] "The [f]irst [a]mendment

_____
[15] These first amendment implications, however, often are not raised or deeply considered. For example, in *Carroll* v. *Jaques Admiralty Law Firm*,

Lafferty *v.* Jones

requires courts to tread warily when restricting liti-
gants' speech. They may do so only when necessary to
protect the fairness or integrity of the particular litiga-
tion before them.'' *Bank of Hope* v. *Chon*, 938 F.3d 389,
397 (3d Cir. 2019); see also *Economy Carpets Manufac-
turers & Distributors, Inc.* v. *Better Business Bureau
of Baton Rouge Area, Inc.*, 330 So. 2d 301, 304 (La. 1976)
 (''the judicial authority, as all powers of government,
is not without limit, and [when] it is asserted an indi-
vidual's right of free speech has been abridged by the
exercise of that power, the burden is [on] us to define its
limitations''). Speech that might otherwise be protected
may be restricted under certain circumstances because
of pending judicial proceedings. See, e.g., *In re Brianna
B.*, 66 Conn. App. 695, 701, 785 A.2d 1189 (2001) (''[t]he
[United States Supreme Court] has . . . emphasized
the vitality of individual rights to free speech during legal
proceedings, such as discovery, but that the right to free
speech is not without limit'').

Fundamental first amendment principles guide our
analysis of the defendants' claims in this appeal. ''The
[f]irst [a]mendment, applicable to the [s]tates through
the [due process clause of the] [f]ourteenth [a]mend-
ment, provides that Congress shall make no law . . .
abridging the freedom of speech. The hallmark of the
protection of free speech is to allow free trade in ideas—
even ideas that the overwhelming majority of people
might find distasteful or discomforting. . . . Thus, the
[f]irst [a]mendment ordinarily denies [the government]
the power to prohibit dissemination of social, economic
and political doctrine [that] a vast majority of its citizens

*P.C.*, supra, 110 F.3d 294, the court succinctly concluded, without substantive
discussion, that the sanction imposed did not violate the affected party's
first amendment rights. But see *In re White*, Docket No. 2:07CV342, 2013
WL 5295652, *38 (E.D. Va. September 13, 2013) (''[w]here government action,
such as an award of sanctions, is directed toward presumptively protected
expression, our system of justice places 'the duty . . . on this [c]ourt to
say where the individual's freedom ends and the [s]tate's power begins' '').

352                   MARCH, 2021              336 Conn. 332

*Lafferty* v. *Jones*

believes to be false and fraught with evil consequence.
. . . The [f]irst [a]mendment affords protection to sym-
bolic or expressive conduct as well as to actual speech.
. . . The protections afforded by the [f]irst [a]mend-
ment, however, are not absolute, and we have long rec-
ognized that the government may regulate certain cate-
gories of expression consistent with the [c]onstitution.''
(Internal quotation marks omitted.) *State* v. *Moulton*,
310 Conn. 337, 348–49, 78 A.3d 55 (2013), quoting *Vir-
ginia* v. *Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155
L. Ed. 2d 535 (2003).

Whether the trial court's sanctions constitute an imper-
missible restriction on the defendants' speech presents
a question of law, over which our review is plenary.
''In certain first amendment contexts . . . appellate
courts are bound to apply a de novo standard of review.
. . . [In such cases], the inquiry into the protected sta-
tus of . . . speech is one of law, not fact. . . . As such,
an appellate court is compelled to examine for [itself]
the . . . statements [at] issue and the circumstances
under which they [were] made to [determine] whether
. . . they . . . are of a character [that] the principles
of the [f]irst [a]mendment . . . protect. . . . [I]n
cases raising [f]irst [a]mendment issues [the United
States Supreme Court has] repeatedly held that an
appellate court has an obligation to make an indepen-
dent examination of the whole record in order to make
sure that the judgment does not constitute a forbidden
intrusion [in] the field of free expression. *New York
Times Co.* v. *Sullivan*, [376 U.S. 254, 284–86, 84 S. Ct.
710, 11 L. Ed. 2d 686 (1964)]. . . . This rule of indepen-
dent review was forged in recognition that a [reviewing]
[c]ourt's duty is not limited to the elaboration of consti-
tutional principles . . . . [Rather, an appellate court]
must also in proper cases review the evidence to make
certain that those principles have been constitutionally
applied. . . . Therefore, even though, ordinarily . . .
[f]indings of fact . . . shall not be set aside unless

336 Conn. 332          MARCH, 2021                353

*Lafferty* v. *Jones*

clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review." (Internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 446–47, 97 A.3d 946 (2014). However, "the heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact." Id., 447.

Whether judicial sanctions imposed for extrajudicial statements made by a party to pending litigation run afoul of the first amendment presents a question of first impression in Connecticut. We find instructive the test that the United States Supreme Court has adopted for considering the constitutionality of contempt as a sanction for out-of-court statements commenting on judicial proceedings.[16] The leading case is *Bridges* v. *California*, 314 U.S. 252, 275–77, 62 S. Ct. 190, 86 L. Ed. 192 (1941), in which the Supreme Court considered whether a union leader could be held in contempt when a newspaper published statements that he had made threatening a strike. The court considered whether the speech presented a "clear and present danger" to the administration of justice. Id., 261–262, 273. Specifically, the court analyzed "the particular utterances . . . in question and the circumstances of their publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment." Id., 271. The court reversed the contempt finding because it concluded that a threat to call an impending strike, which the court observed was a *legal* course of action,[17] had not interfered with the administration of justice. Id., 277–78.

--------

[16] Contempt cases are instructive because the power to sanction and the power to hold an individual in contempt both stem from the court's inherent authority. See, e.g., *Jaconski* v. *AMF, Inc.*, 208 Conn. 230, 232–33, 543 A.2d 728 (1988); 17 Am. Jur. 2d 399, Contempt § 1 (2004).

[17] The importance of the legality of the action at issue is demonstrated by the fact that the United States Supreme Court mentioned it twice. See

Subsequently, in *Craig* v. *Harney*, 331 U.S. 367, 368, 375–78, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947), the court applied *Bridges* to a contempt finding imposed for news articles that criticized a judge's ruling and discussed the community's response. Illuminating further clear and present danger, the court explained: "The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute *an imminent, not merely a likely,* threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." (Emphasis added.) Id., 376. In *Craig*, the court deemed speech critical of an elected judge "appropriate, if not necessary." Id., 377. Because "there was . . . no threat or menace to the integrity of the trial"; id.; the court held that the speech was protected. Id., 378.

The Supreme Court again considered the applicability of *Bridges* in *Wood* v. *Georgia*, 370 U.S. 375, 82 S. Ct. 1364, 8 L. Ed. 2d 569 (1962). In *Wood*, a state court judge convened a grand jury to investigate election law violations, and a local sheriff published a written statement outside of court criticizing the judge and the investigation, which was made available to the grand jury. Id., 376–80, 393. As a result, the state judge held the sheriff in contempt. Id., 380. The Supreme Court concluded that, "in the absence of some other showing of a substantive evil actually designed to impede the course of justice in justification of the exercise of the contempt power to silence the [sheriff], his utterances are entitled to be protected." Id., 389. The court emphasized that *Wood* did not involve a trial or a "judicial proceeding pending" in which such speech could result in prejudice

―――――――――――
*Bridges* v. *California*, supra, 314 U.S. 277 ("[o]n no construction, therefore, can the telegram be taken as a threat either by [the defendant] or the union to follow an illegal course of action"); id., 278 ("[l]et us assume that the telegram could be construed as an announcement of [the defendant's] intention to call a strike, something which, it is admitted, neither the general law of California nor the court's decree prohibited").

Lafferty *v.* Jones

to the other side. (Internal quotation marks omitted.) Id. The court reversed the state court's order of contempt because the sheriff's speech did not pose a clear and present danger to the administration of justice in the absence of evidence of "actual interference"[18] with the grand jury investigation. Id., 393, 395.

But, as first amendment case law has progressed, the clear and present danger standard articulated in *Bridges* has been subject to criticism. For example, Justice William O. Douglas excoriated the use of clear and present danger in his concurrence in *Brandenburg* v. *Ohio*, 395 U.S. 444, 452–54, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969). See also, e.g., T. Emerson, "Toward a General Theory of the First Amendment," 72 Yale L.J. 877, 912 (1963) ("There is still some blood remaining in the doctrine, and it has continued to be used in certain types of situations. But, as a general test of the limits of the first amendment, [clear and present danger] must be regarded as unacceptable." (Footnote omitted.)). One major criticism is the ease with which the test may be manipulated to include protected speech. See *Brandenburg* v. *Ohio*, supra, 454 (Douglas, J., concurring)

---

[18] Actual interference might be construed as an additional factor under the clear and present danger test. See *Wood* v. *Georgia*, supra, 370 U.S. 399 (Harlan, J., dissenting). Read in context, however, *Wood* suggests that the court's search for actual interference likely stems from the facts of *Wood* rather than a substantive alteration to the *Bridges* standard, as the court stated: "[I]n the absence of any showing of an actual interference with the undertakings of the grand jury, *this record lacks persuasion in illustrating the serious degree of harm to the administration of law* . . . ." (Emphasis added.) Id., 393. Indeed, the court specifically observed that the harm that speech could cause to a grand jury investigation is different from that of a trial. See id., 390 ("the limitations on free speech assume a different proportion when expression is directed toward a trial as compared to a grand jury investigation"). Also, earlier cases construing this test required an analysis of imminence and likelihood, which is inconsistent with an actual interference requirement. See *Craig* v. *Harney*, supra, 331 U.S. 373, 376; *Pennekamp* v. *Florida*, 328 U.S. 331, 334, 350, 66 S. Ct. 1029, 90 L. Ed. 1295 (1946); *Bridges* v. *California*, supra, 314 U.S. 263. As a result, we interpret *Wood* in harmony with those cases that came before it and conclude that a showing of actual interference is but one factor in the clear and present danger analysis.

("When one reads the opinions closely and sees when and how the 'clear and present danger' test has been applied, great misgivings are aroused. . . . [T]he threats were often loud but always puny and made serious only by judges so wedded to the status quo that critical analysis made them nervous."); L. Kendrick, "On 'Clear and Present Danger,' " 94 Notre Dame L. Rev. 1653, 1660 (2019) (explaining that clear and present danger test "has been criticized time and again for depending too much on circumstances and thereby giving judges too much discretion and failing to give speakers proper notice of the legality of their activities" (footnotes omitted)).

Although the United States Supreme Court has not directly rejected clear and present danger, the court has alluded to its evolution as a first amendment doctrine. For example, Justice David Souter, in his concurrence in *Denver Area Educational Telecommunications Consortium, Inc.* v. *Federal Communications Commission*, 518 U.S. 727, 778, 116 S. Ct. 2374, 135 L. Ed. 2d 888 (1996), argued that clear and present danger has evolved into the incitement test from *Brandenburg*, under which "constitutional guarantees of free speech and free press do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio*, supra, 395 U.S. 447. The United States Supreme Court also alluded to this divergence in *Landmark Communications, Inc.* v. *Virginia*, 435 U.S. 829, 98 S. Ct. 1535, 56 L. Ed. 2d 1 (1978), stating: "The Supreme Court of Virginia relied on the [clear and present danger] test . . . . We question the relevance of that standard here; moreover we cannot accept the mechanical application of the test which led that court to its conclusion. [The] test was never intended 'to express a technical legal doctrine or

336 Conn. 332        MARCH, 2021              357

*Lafferty* v. *Jones*

to convey a formula for adjudicating cases.' " Id., 842. Nevertheless, the court went on to apply the test and hold that a newspaper article that disclosed confidential information did not meet the test. Id., 844–45.

More recently, the United States Supreme Court considered a similar issue to that presented in this case in the context of attorney speech. See generally *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991). In *Gentile*, the court concluded that a "substantial likelihood of material prejudice" standard was a constitutionally permissible standard to limit extrajudicial attorney speech. (Internal quotation marks omitted.) Id., 1075. In the absence of an express indication from the Supreme Court that a lower standard is permissible, we decline to extend the court's holding in *Gentile* to nonattorneys. This is because the court supported its reasoning by relying on the special status of attorneys, demonstrated through the government's role in attorney regulation and rules already in existence restricting attorney speech. See id., 1066–74. The court specifically declined to state which standard would apply to the speech of nonattorneys. See id., 1072–73 n.5 (noting that rule being interpreted did not apply to nonattorneys or attorneys outside of pending case).

Courts after *Gentile* have continued to apply clear and present danger to extrajudicial speech in certain circumstances. See, e.g., *In re Kendall*, 712 F.3d 814, 826 (3d Cir. 2013) (applying clear and present danger when analyzing whether judge was improperly held in criminal contempt for speech contained in judicial opinion); *Standing Committee on Discipline* v. *Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995) (applying clear and present danger to attorney speech outside of pending judicial proceeding); *United States* v. *Bingham*, 769 F. Supp. 1039, 1045 (N.D. Ill. 1991) (concluding that defense counsel's speech in televised interview on eve

358                    MARCH, 2021                    336 Conn. 332

*Lafferty* v. *Jones*

of jury selection constituted clear and present danger).
For example, the court in *In re White*, Docket No.
2:07CV342, 2013 WL 5295652, *24–26, *68 (E.D. Va. Sep-
tember 13, 2013), considered whether sanctions for
attorney's fees should enter as a result of a nonparty's
allegedly threatening speech. The court analyzed this
request for sanctions in light of different first amend-
ment tests, including clear and present danger.[19] See
id., *70 ("[a]lthough there is some indication that *Bran-
denburg*'s more stringent standard—incitement to
imminent lawlessness—has displaced the 'clear and
present danger' test articulated in . . . earlier cases,
the [c]ourt observes that some post-*Brandenburg* cases
continue to apply the 'clear and present danger' test to
court restrictions of speech threatening the due and
orderly administration of justice" (footnote omitted)).
The court determined that there was "no indication"
that White's online statements had "disrupted or inter-
fered with a [c]ourt proceeding, [or] that his commen-
tary was imminently likely to so interfere," and, as such,
his speech did not pose "a serious and imminent threat
to the administration of justice." (Emphasis omitted;
internal quotation marks omitted.) Id. This lack of clar-
ity surrounding clear and present danger, as noted in
*In re White*, similarly leaves open the question of what
standard applies to the speech of *parties to the litiga-
tion*. See *Wilson* v. *Moore*, 193 F. Supp. 2d 1290, 1293
(S.D. Fla. 2002) (applying clear and present danger test
to speech of criminal defendant made during appeal
process).

"The [United States] Supreme Court has held that
speech otherwise entitled to full constitutional protec-
tion may nonetheless be sanctioned if it obstructs or
prejudices the administration of justice." *Standing
Committee on Discipline* v. *Yagman*, supra, 55 F.3d

---

[19] The District Court also analyzed whether sanctions should enter under
a strict scrutiny analysis. *In re White*, supra, 2013 WL 5295652, *71.

Lafferty *v.* Jones

1442, citing *Gentile* v. *State Bar of Nevada*, supra, 501
U.S. 1074–75, and *Sheppard* v. *Maxwell*, 384 U.S. 333,
363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Importantly,
"[a] rule governing speech, even speech entitled to full
constitutional protection, need not use the words 'clear
and present danger' in order to pass constitutional mus-
ter." *Gentile* v. *State Bar of Nevada*, supra, 1036 (Ken-
nedy, J.). Because the Supreme Court has not yet clearly
supplanted clear and present danger in the area of extra-
judicial speech, we will use it as a guideline in our anal-
ysis. Even still, it is necessary to refine the standard to
our present circumstances to incorporate the require-
ments of *Brandenburg* and the inquiries outlined in
*Gentile*. "Properly applied, the test requires a court to
make its own inquiry into the imminence and magnitude
of the danger said to flow from the particular utterance
and then to balance the character of the evil, as well as
its likelihood, against the need for free and unfettered
expression." *Landmark Communications, Inc.* v. *Vir-
ginia*, supra, 435 U.S. 842–43; see also *Turney* v. *Pugh*,
400 F.3d 1197, 1202 (9th Cir. 2005). We conclude that, if
extrajudicial speech by a party to litigation poses an
imminent and likely threat to the administration of judi-
cial proceedings at issue, a court may sanction a party
for that speech.

It is necessary to outline certain factors that affect
whether extrajudicial speech threatens the administra-
tion of justice. "The [United States Supreme] Court gave
two principal reasons for adopting this lower threshold
[in *Gentile*], one concerned with the identity of the
speaker, the other with the timing of the speech." *Stand-
ing Committee on Discipline* v. *Yagman*, supra, 55 F.3d
1442; see *In re Hinds*, 90 N.J. 604, 609, 449 A.2d 483
(1982) (in using reasonable likelihood standard, "the
determination of whether a particular statement is likely
to interfere with a fair trial involves a careful balancing
of factors, including consideration of the status of the

360                    MARCH, 2021            336 Conn. 332

*Lafferty* v. *Jones*

attorney, the nature and timing of the statement, as well as the context in which it was uttered''); see also *In re Hinds*, supra, 622–23. As a result, we, too, will consider such factors.

If the speaker is a party to litigation, the government's interest in ensuring the fair administration of justice is heightened, especially if the trial involves a criminal defendant. See *Chicago Council of Lawyers* v. *Bauer*, 522 F.2d 242, 248 (7th Cir. 1975) (''[t]hat courts have the duty to ensure fair trials—'the most fundamental of all freedoms'—is beyond question'' (footnote omitted)), cert. denied sub nom. *Cunningham* v. *Chicago Council of Lawyers*, 427 U.S. 912, 96 S. Ct. 3201, 49 L. Ed. 2d 1204 (1976); id., 257–58 (''we require even a greater insularity against the possibility of interference with fairness in criminal cases''). Judicial restrictions on a litigant's speech are more permissible than judicial restrictions on comments made by an outsider to the litigation, such as the press. See *In re Application of Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir.) (''there is a substantial difference between a restraining order directed against the press—a form of censorship which the [f]irst [a]mendment sought to abolish from these shores—and the order here directed solely against trial participants''), cert. denied sub nom. *Dow Jones & Co.* v. *Simon*, 488 U.S. 946, 109 S. Ct. 377, 102 L. Ed. 2d 365 (1988); see also *Standing Committee on Discipline* v. *Yagman*, supra, 55 F.3d 1443 (''[w]hen lawyers speak out on *matters unconnected to a pending case*, there is no direct and immediate impact on the fair trial rights of litigants'' (emphasis added)).

Relying in part on the distinction made in *Gentile* between trial participants and those outside the litigation, the Fifth Circuit declined to apply the stringent clear and present danger standard to a trial participant gag order. *United States* v. *Brown*, 218 F.3d 415, 426–27 (5th Cir. 2000), cert. denied, 531 U.S. 1111, 121 S. Ct. 854, 148 L. Ed. 2d 769 (2001). In *Brown*, the court decided

*Lafferty* v. *Jones*

that the lower standard in *Gentile* may be extended to nonattorney litigation participants, as there was "no reason . . . to distinguish between [attorneys and parties] for the purpose of evaluating a gag order directed at them both." Id., 428; see also *State* v. *Carruthers*, 35 S.W.3d 516, 562–63 (Tenn. 2000) (declining to apply clear and present danger test to trial participants), cert. denied, 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001). We decline to completely extend the reasoning in *Brown* to this case and instead invoke a higher standard reminiscent of clear and present danger that takes into account the speaker's identity. See *Commission for Lawyer Discipline* v. *Benton*, 980 S.W.2d 425, 431 (Tex. 1998) (describing "the *Gentile* standard [as] a constitutional minimum"), cert. denied, 526 U.S. 1146, 119 S. Ct. 2021, 143 L. Ed. 2d 1033 (1999). We recognize that Jones' position, as a civil defendant, presents a different situation than a plaintiff, who affirmatively requests a court's jurisdiction over her case. See *United States* v. *Carmichael*, 326 F. Supp. 2d 1267, 1294 (M.D. Ala. 2004) (declining to apply lower standard in *Gentile* to criminal defendant). Accordingly, we afford Jones the benefit of the doubt and engage in the most rigorous and searching review of any infringement of his first amendment rights.

Courts must have the ability to restrict the rights of participants to the extent necessary to protect the fairness of the litigation. "Although litigants do not surrender their [f]irst [a]mendment rights at the courthouse door . . . those rights may be subordinated to other interests that arise in this setting. For instance, on several occasions [the] [c]ourt has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant. . . . In the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors." (Citations omitted; internal quotation marks omitted.) *Seattle Times Co.* v.

362            MARCH, 2021         336 Conn. 332

Lafferty *v.* Jones

*Rhinehart*, 467 U.S. 20, 32–33 n.18, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). "Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." (Internal quotation marks omitted.) *Gentile* v. *State Bar of Nevada*, supra, 501 U.S. 1072. "[The United States Supreme Court] expressly contemplated that the speech of those participating before the courts could be limited. This distinction between participants in the litigation and strangers to it is brought into sharp relief by [the] holding in *Seattle Times Co.* v. *Rhinehart*, [supra, 20]." (Emphasis omitted; footnote omitted.) *Gentile* v. *State Bar of Nevada*, supra, 1072–73. "The primary danger of extrajudicial speech to the administration of justice must be that the outcome of a judicial proceeding, or the ability of the court to do its work, might be improperly influenced by people who have no legitimate part in the courts' resolution of that matter. Of course, the person making an extrajudicial statement might actually be a party in an ongoing proceeding. Or, an out-of-court statement might not affect any pending matter, but might influence the course of some future proceeding. The point is that an attempt to interfere with the outcome of a case is properly punishable because justice is being affected through means other than those established for the proper disposition of a controversy." L. Raveson, "Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power; Part One: The Conflict Between Advocacy and Contempt," 65 Wash. L. Rev. 477, 499–500 (1990).

A related, but necessary inquiry, considers the timing and the nature of the speech. Speech is more likely to interfere with the administration of justice if it is calculated to intimidate or threaten other participants in the litigation. "It is without question that courts may sanction parties and their attorneys who engage in harassment of their opponents. . . . The [f]irst [a]mend-

336 Conn. 332          MARCH, 2021              363

*Lafferty* v. *Jones*

ment does not shield improper tactics used by litigants
to advance their interests, even if those tactics involve
communication of a message." (Citation omitted.) *B.
Willis*, *C.P.A.*, *Inc.* v. *Goodpaster*, 183 F.3d 1231, 1234
(10th Cir.), cert. denied sub nom. *Willis* v. *Goodpaster*,
528 U.S. 1046, 120 S. Ct. 581, 145 L. Ed. 2d 483 (1999);
see *D'Agostino* v. *Lynch*, 382 Ill. App. 3d 960, 970, 887
N.E.2d 590 ("harassing the court and the litigants
appearing before it" was "calculated to disrupt court
proceedings and bring the administration of law into
disrepute"), appeal denied, 229 Ill. 2d 619, 897 N.E.2d
250 (2008); *Fidelity National Title Ins. Co. of New York*
v. *Intercounty National Title Ins. Co.*, supra, 2002 WL
1433717, *11 ("A party's use of anonymous letters to
opposing counsel to sabotage the litigation is an abuse
of the judicial process. Anonymous, threatening letters
prevent a speedy, open, and just resolution of the dis-
pute on its merits.").

Additionally, "[t]he possibility that other measures
will serve the [s]tate's interests should also be weighed."
*Landmark Communications, Inc.* v. *Virginia*, supra,
435 U.S. 843. We also consider whether the sanction is
narrowly tailored to achieve the government's substan-
tial interest in ensuring the administration of justice.
*Gentile* v. *State Bar of Nevada*, supra, 501 U.S. 1075.

Our analysis also is informed by several cases from
our sister states' appellate courts applying the clear and
present danger standard to uphold contempt findings
arising from statements by litigants.[20] In one recent deci-
sion, the Georgia Court of Appeals upheld the contempt

---

[20] Additionally, courts have applied *Bridges* to extrajudicial speech restric-
tions beyond contempt. For example, it was discussed recently by the Colo-
rado Supreme Court in examining a jury tampering conviction. See *People*
v. *Iannicelli*, 449 P.3d 387, 392–93 (Colo. 2019). Although the case ultimately
was decided on grounds of statutory construction; see id., 394–97; the court
recognized that "[s]peech concerning judicial proceedings is not without
limits . . . because like free speech, a fair trial is one 'of the most cherished
policies of our civilization' and must also be protected." Id., 392; see id.,
396 n.3 ("[W]e acknowledge that defining the precise scope of [Colorado's

conviction of a witness who, while at the courthouse
as a character witness in his son's criminal trial, insulted
the minor victim's mother in the hallway outside the
courtroom and "exclaim[ed] that he hoped God would
make the children and grandchildren of those who lied
about his son suffer in the same way his son was cur-
rently suffering." *Moton* v. *State*, 332 Ga. App. 300, 300,
772 S.E.2d 393 (2015). An Illinois appeals court upheld a
contempt conviction after the contemnor filed a motion
alleging, inter alia, that the opposing parties and their
attorney were part of the Mafia and had bribed the pre-
siding judge. See *D'Agostino* v. *Lynch*, supra, 382 Ill.
App. 3d 961. In that case, the court stated that "[c]om-
ments that are systematically designed to thwart the
judicial process constitute a 'clear and present danger'
to the administration of justice" and concluded that the
"unsubstantiated accusations" against the judge quali-
fied. Id., 970–72; see also *People* v. *Goss*, 10 Ill. 2d 533,
536–37, 141 N.E.2d 385 (1957) (upholding contempt
order under clear and present danger test when non-
party appeared on television show and accused party
to court proceeding of being from "a family with [court
admitted] hoodlum connections" and called witness
"professional sneak and liar" (internal quotation marks
omitted)).

In establishing the constitutional bounds of the
court's authority, we also find instructive those cases
concluding that the litigant's conduct did not present a
clear and present danger to the administration of jus-

jury tampering statute] presents complex questions as to both [f]irst [a]mend-
ment rights and the [s]tate's interest in ensuring the fair and orderly adminis-
tration of justice. The facts of this case, however, do not require us to
attempt to craft an all-encompassing rule applicable in every factual scenario.
Accordingly, we leave that difficult task for another day."); see also *United
States* v. *Heicklen*, 858 F. Supp. 2d 256, 274 (S.D.N.Y. 2012) ("[t]he relevant
cases establish that the [f]irst [a]mendment squarely protects speech con-
cerning judicial proceedings and public debate regarding the functioning of
the judicial system, so long as that speech does not interfere with the fair
and impartial administration of justice").

Lafferty *v.* Jones

tice. See *Pennekamp* v. *Florida*, 328 U.S. 331, 336–39, 348, 66 S. Ct. 1029, 90 L. Ed. 1295 (1946) (publishers of editorials and cartoon critical of judges did not pose clear and present danger); *Garland* v. *State*, 253 Ga. 789, 789, 791, 325 S.E.2d 131 (1985) (reversing contempt conviction of attorney whose remarks criticizing judge for violating judicial ethics and conducting "sham proceeding" were published in newspaper (internal quotation marks omitted)); *Worcester Telegram & Gazette, Inc.* v. *Commonwealth*, 354 Mass. 578, 579–83, 238 N.E.2d 861 (1968) (reversing contempt convictions of publisher and reporter, whose newspaper article inferred that defendant in pending criminal proceeding previously had been "convicted of a serious crime" leading to mistrial, because they did not purposefully try to affect trial's outcome); *In re Contempt of Dudzinski*, 257 Mich. App. 96, 106–107, 667 N.W.2d 68 (reversing contempt conviction of appellant who had worn "Kourts Kops Krooks" shirt in courtroom while quietly observing proceedings (internal quotation marks omitted)), appeal denied, 469 Mich. 988, 673 N.W.2d 756 (2003); *Smith* v. *Pace*, 313 S.W.3d 124, 126–27, 137 (Mo. 2010) (concluding that there was no interference or imminent threat of interference with administration of justice when lawyer defendant used "strong words . . . in petitioning the court . . . for a writ seeking to quash a subpoena" and therein accused judge and prosecutor of "misconduct" and "impropriety" (internal quotation marks omitted)). These cases demonstrate the types of speech that are protected and stand in stark contrast to Jones' speech in this case.

In applying this precedent to the speech at issue in the present case, we first observe that the trial court did not expressly consider whether the speech posed an imminent and likely threat to the administration of justice in ruling on the motions for sanctions.[21] The trial

---

[21] In their argument before the trial court, the defendants contended that the broadcast "did not disrupt the administration of justice."

366                 MARCH, 2021            336 Conn. 332

*Lafferty* v. *Jones*

court instead found its authority to sanction under the
court's inherent authority "to address out-of-court, bad
faith litigation misconduct where there is a claim that
a party harassed or threatened or sought to intimidate
counsel on the other side" and noted its "obligation to
ensure the integrity of the judicial process and [the] func-
tioning of the court." Nevertheless, the findings that led
the trial court to sanction the defendants are consistent
with our aforementioned standard. Specifically, the trial
court found that, on the June 14, 2019 broadcast, Jones
(1) accused opposing counsel of a felony ("planting
child pornography"), (2) used threatening language
toward opposing counsel through violent rhetoric, and
(3) harassed and intimidated opposing counsel, calling
him "a bitch, a sweet little cupcake, a sack of filth,"
and declaring war on him. It is obvious that the central
reason why Jones' speech was censured and why it
ultimately could pose a threat to the administration of
justice is its genuine potential to influence the fairness
of the proceedings. Specifically, Jones' broadcast pro-
duced additional threats to those involved in the case
and created a hostile atmosphere that could discourage
individuals from participating in the litigation.

Balancing the risk of fairness to the proceedings with
"the need for free and unfettered expression," as required
by *Landmark Communications, Inc.* v. *Virginia*, supra,
435 U.S. 843, does not render Jones' speech immune to
sanctions under the first amendment, and we reject the
defendants' assertion that "there is no barrier to a liti-
gant, especially a litigant who is a broadcaster, speaking
freely about pending litigation. [Jones'] decision to air
his grievances over the airwaves and online is hardly
remarkable. These media constitute the new public
square." Although we recognize and reaffirm the impor-
tance of robust public comment about the court system
and the judicial process, and acknowledge that, out-

Case 22-33553   Document 1030-43   Filed in TXSB on 01/21/25   Page 65 of 83

Lafferty *v.* Jones

side of litigation, Jones' speech may be protected,[22] the trial court's duty to ensure a fair trial for those appearing before it permits some restrictions on harassing and threatening speech toward participants in the litigation. Without the ability to place such restrictions, trial courts will be left defenseless to stop both actual interference and perceived threats to just adjudications. " 'Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.' *Pennekamp* v. *Florida*, [supra, 328 U.S. 347]. But it must not be allowed to divert the trial from the 'very purpose of a court system . . . to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.' " *Sheppard* v. *Maxwell*, supra, 384 U.S. 350–51.

Regardless of whether enforcement comes in the form of civil or criminal penalties, speech that interferes with the administration of justice cannot be tolerated. In *State* v. *Taupier*, 330 Conn. 149, 193 A.3d 1 (2018), cert. denied,        U.S.       , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019), this court considered a first amendment challenge to a defendant's conviction of threatening in the first degree for an e-mail communication concerning a Superior Court judge. Id., 153–54. In that case, the defendant had "made it clear that he was extremely angry at the 'court,' over which [the judge] had presided, that he had discovered where [the judge] lived, that he had surveilled [the judge's] residence, that he had thought through a very detailed and specific way to kill [the judge] at that location, and that he had anticipated being punished for his conduct." Id., 191. The court

_____

[22] "Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression. Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment of the rights of free speech and assembly." *Wood* v. *Georgia*, supra, 370 U.S. 389.

368                MARCH, 2021                336 Conn. 332

*Lafferty v. Jones*

concluded that the speech was a true threat and, there-
fore, was unprotected. Id., 199. This conclusion was,
in part, implicitly supported by the effect such speech
had on the administration of justice, i.e., threatening
violence against the judge presiding over the defen-
dant's family court proceedings. See id., 184 (pointing to
judge's reaction, defendant's history with family court
system, and defendant and judge's past history as evi-
dence supporting conviction). Such a threat, at the very
least, could require the judge to recuse herself from
the defendant's cases and, as such, interferes with a fair
adjudication.

There are two important distinctions between *Brid-*
*ges* and its progeny, on the one hand, and the present
case, on the other, that lead us to conclude that Jones'
broadcast posed an imminent and likely threat to the
administration of justice. The first is Jones' role as a
party in the litigation and the second is the unmistakably
threatening and vituperative nature of the speech at
issue. Both of these factors influence the imminence
and likelihood of the threatened harm. In both *Wood*
and *Bridges*, the statements were made by nonparties
criticizing judicial action. In the present case, Jones is
a party commenting on his own litigation and, therefore,
has a greater opportunity and perceived incentive to
affect the outcome of the case.[23] As a party to a judicial

---

[23] The defendants disagree and cite to *In re Sawyer*, 360 U.S. 622, 636, 79
S. Ct. 1376, 3 L. Ed. 2d 1473 (1959), for the proposition that the parties'
speech cannot be "more censurable" than that of nonparties during the
pendency of a court case. We disagree. *In re Sawyer* concerns an attorney,
not a party, and supports the opposite view when quoted in context: "We
can conceive no ground whereby the pendency of litigation might be thought
to make an attorney's out-of-court remarks more censurable, *other than*
*that they might tend to obstruct the administration of justice. Remarks*
*made during the course of a trial might tend to such obstruction where*
*remarks made afterwards would not*. But this distinction is foreign to this
case, because the charges and findings in no way turn on an allegation of
obstruction of justice, or of an attempt to obstruct justice, in a pending
case." (Emphasis added.) Id.

336 Conn. 332          MARCH, 2021          369

*Lafferty* v. *Jones*

proceeding, Jones is participating in a government func-
tion and therefore is under the court's jurisdiction. For
this reason, the trial court may sanction him for speech
that, when made by a stranger to the litigation, may be
acceptable.[24]

The second difference between the present case and
*Bridges* and *Woods* is the nature of the intimidating and
threatening speech, which demonstrates the coercive
influence that might reasonably be expected as a result
of Jones' broadcast. "Since we are committed to a gov-
ernment of laws and not of men, it is of the utmost
importance that the administration of justice be abso-
lutely fair and orderly. [The United States Supreme
Court] has recognized that the unhindered and untram-
meled functioning of our courts is part of the very found-
ation of our constitutional democracy." *Cox* v. *Louisi-
ana*, 379 U.S. 559, 562, 85 S. Ct. 476, 13 L. Ed. 2d 487
(1965). "Courts must have [the] power to protect the
interests of . . . litigants before them from unseemly
efforts to pervert judicial action." *Pennekamp* v. *Flor-
ida*, supra, 328 U.S. 347. The record in this case reflects
additional threats targeting those involved in the case
in connection with Jones' speech.[25] In an order dated

[24] It is important to note that, although Jones is a defendant and therefore
has not been willingly brought into the litigation, that status does not dimin-
ish the need for a fair trial, does not grant him license to harass and intimidate
opposing counsel, and does not lessen the potential impact of his statements
on the trial. However, not all speech by Jones regarding the case is sanc-
tionable—only harassing and threatening speech that presents a likely and
imminent threat to the administration of justice. See, e.g., M. Swartz, Note,
"Trial Participant Speech Restrictions: Gagging First Amendment Rights,"
90 Colum. L. Rev. 1411, 1421–22 (1990) (noting special concerns for criminal
and civil defendants). This fact, along with the nature of civil proceedings
as a whole, supports our use of the most stringent standard to analyze Jones'
speech. See *Chicago Council of Lawyers* v. *Bauer*, supra, 522 F.2d 257–58
(noting how fair trial concerns are lessened in civil litigation).

[25] It is important to note that a judge may still sanction for threatening
or intimidating speech in the absence of actual interference with the adminis-
tration of justice, yet we consider these direct threats as aggravating circum-
stances in this particular case.

370                    MARCH, 2021                    336 Conn. 332

Lafferty *v.* Jones

June 21, 2019, the trial court stated: "In the interest of
full disclosure to all parties, the court was contacted
by the Connecticut State Police, [which was] reportedly
contacted by the FBI regarding threats against the
undersigned [judge] made by individuals on the . . .
Infowars website."[26] In addition, the plaintiffs' counsel
also represented to the trial court that, as a result of
the broadcast, they had "since received threats from
the outside" and even obtained police protection when
attending the court hearing after the broadcast. We take
seriously these statements on the record because "[i]t
long has been the practice that a trial court may rely
[on] certain representations made to it by attorneys,
who are officers of the court and bound to make truthful
statements of fact or law to the court." (Internal quota-
tion marks omitted.) *State* v. *Chambers*, 296 Conn. 397,
419, 994 A.2d 1248 (2010).

Jones' speech further was calculated to interfere with
the fairness of the proceedings as it directly targeted
opposing counsel, accusing him of felonious behavior
and threatening him, and reasonably can be expected
to influence how the plaintiffs litigate their case.[27] On
the broadcast, Jones declared war on those who planted
the child pornography, implicated the plaintiffs' coun-
sel, and promoted a million dollar bounty. Jones stated:
"You're trying to set me up with child porn. I'm going
to get your ass. One million dollars. One million dollars,
you little gang members. One million dollars to put your
head on a pike. One million dollars, bitch. I'm going to
get your ass." A party who places a one million dollar
bounty on the head of opposing counsel, whether liter-
ally or figuratively in the form of his conviction, undeni-
ably interferes with the proceedings. This speech

---

[26] It is unclear whether these threats against the trial judge stemmed from
the original broadcast or a subsequent broadcast by Jones discussing the
sanctions orders.

[27] The trial court specifically considered this when it questioned defense
counsel about how Jones' speech affects the "integrity of the process here
and the functioning of the court and the judicial process . . . ."

clearly " 'is directed to inciting or producing' a threat
to the administration of justice that is both 'imminent'
and 'likely' to materialize.'' *Turney* v. *Pugh*, supra, 400
F.3d 1202. Harassing and intimidating counsel so that
they withdraw from litigating a case is beyond cavil; it
is an unfair and inappropriate litigation strategy that
strikes at the core of our system.[28] See *Harry* v. *Lago-
marsine*, Docket No. 18-CV-1822 (BMC) (LB), 2019 WL
1177718, *3 (E.D.N.Y. March 13, 2019) (explaining how
threats to opposing counsel "effected a permanent
change in [the] defendants' representation"); *Kalwasi-
nski* v. *Ryan*, supra, 2007 WL 2743434, *3 ("[b]y deliber-
ately and intentionally participating in making threats
of physical harm against parties and witnesses in his
case, he has engaged in conduct that he should have
known would threaten a fair decision in this matter").
We recognize that there is a place for strong advocacy
in litigation, but language evoking threats of physical
harm is not tolerable. In light of these reasons, we con-
clude that Jones' speech could pose a threat to the plain-
tiffs' ability to litigate their case, rendering it an immi-
nent and likely threat to the administration of justice.

Finally, we consider whether the state's interests may
be served in another manner and whether the sanctions
imposed are narrowly tailored to the state's interest in
ensuring fair judicial proceedings. See, e.g., *Gentile* v.

---

[28] In fact, the defendants implicitly recognized this interference, as they
argued to the trial court that Attorney Mattei should not participate in the
case if he feels threatened, stating: "[I]f you've got a former federal prosecu-
tor in here who's saying, as a result of this, he can't do his job, then maybe
you should get him off the case because he's not prepared to serve his
clients." The defendants renewed this argument in their brief to this court,
arguing: "If [Mattei] feels sufficiently chilled or impaired, he can, of course,
seek to withdraw as counsel."

The defendants also argue that Jones, in a subsequent broadcast, "made
clear he did not intend to threaten [Mattei]." The trial court interpreted this
later broadcast as a classic nonapology, stating: "[W]hen I watched the
broadcast several times, I wasn't able to see an apology in there. . . . It
doesn't sound like an apology."

372                    MARCH, 2021                    336 Conn. 332

*Lafferty* v. *Jones*

*State Bar of Nevada*, supra, 501 U.S. 1076; *Landmark Communications, Inc.* v. *Virginia*, supra, 435 U.S. 843. The trial court penalized the defendants in a restrained manner in order to preserve the judicial process. In this case, the trial court might have issued a gag order, but such a measure could improperly penalize future speech in the form of a prior restraint. See, e.g., *Kemner* v. *Monsanto Co.*, 112 Ill. 2d 223, 249–50, 492 N.E.2d 1327 (1986) (noting that there are less restrictive means than a gag order "to preserve the integrity of the proceedings before it," such as contempt). Instead, the court appropriately dealt with two issues in a proportional sanction that was more measured than the individual punishments of civil or criminal contempt that have been upheld as a consequence for similar conduct. Indeed, the court refrained from imposing the more severe sanction requested by the plaintiffs, specifically, defaulting the defendant. The court selected a lower penalty, namely, the revocation of special statutory benefit, because the defendants abused the process set out in the statute through their discovery practices. Accordingly, we conclude that the trial court did not violate the first amendment when it imposed sanctions on the basis of Jones' broadcast, which presented an imminent and likely threat to the administration of justice.[29]

[29] The plaintiffs also argue that Jones' speech qualifies as a true threat unprotected by the first amendment. The defendants disagree with this assertion, arguing that the broadcast "was not unequivocal, unconditional, immediate and specific [so] as to convey a gravity of purpose and imminent prospect of execution." Additionally, the defendants argue that the trial court did not allow Jones the opportunity to present evidence to counter a true threat finding, distinguishing this case from *Haughwout* v. *Tordenti*, 332 Conn. 559, 211 A.3d 1 (2019). We initially note that, as the case currently stands, the record is not adequately developed to determine whether Jones' statements qualify as a true threat. But cf. id., 562 n.4 (trial court's decision was supported by facts from disciplinary proceeding and plaintiff's testimony). Because we have determined that Jones' speech constituted an imminent and likely threat to the administration of justice, we need not reach the issue of whether Jones' speech also qualifies under a different category of unprotected speech as a matter of law.

336 Conn. 332          MARCH, 2021          373

Lafferty *v.* Jones

B

We next consider whether the trial court abused its
discretion by sanctioning the defendants for their dis-
covery abuses and Jones' broadcast. A trial court's power
to sanction a litigant or counsel stems from two differ-
ent sources of authority, its inherent powers and the
rules of practice. *Millbrook Owners Assn., Inc.* v. *Ham-*
*ilton Standard*, 257 Conn. 1, 9–10, 776 A.2d 1115 (2001)
("One source of the trial court's authority to impose
sanctions is the court's inherent power. . . . In addi-
tion, our rules of practice, adopted by the judges of the
Superior Court in the exercise of their inherent rule-
making authority . . . also [provide] for specific
instances in which a trial court may impose sanctions."
(Citations omitted; footnote omitted.)); see *Chambers*
v. *NASCO, Inc.*, supra, 501 U.S. 50–51 (discussing rela-
tionship between sanctions under Federal Rules of Civil
Procedure and court's inherent power). As discussed
previously, this inherent authority permits sanctions for
"dilatory, bad faith and harassing litigation conduct
. . . ." (Internal quotation marks omitted.) *CFM of Con-*
*necticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 393. Addi-
tionally, under Practice Book § 13-14, a court may sanc-
tion a party for noncompliance with the court's discovery
orders. Among the permissible sanctions is foreclosing
judgment on the merits for a party, such as by rendering
a default judgment against a defendant or by dismissing
a plaintiff's case. See Practice Book § 13-14 (b). The
anti-SLAPP statute does not limit the court's authority
to impose sanctions. See General Statutes § 52-196a (h)
(2).

In reviewing the portion of the sanctions based on
the violation of discovery orders, we consider three fac-
tors. "First, the order to be complied with must be rea-
sonably clear. In this connection, however, we also state
that even an order that does not meet this standard
may form the basis of a sanction if the record estab-

374                MARCH, 2021          336 Conn. 332

*Lafferty v. Jones*

lishes that, notwithstanding the lack of such clarity, the
party sanctioned in fact understood the trial court's
intended meaning. This requirement poses a legal ques-
tion that we will review de novo. Second, the record
must establish that the order was in fact violated. This
requirement poses a question of fact that we will review
using a clearly erroneous standard of review. Third, the
sanction imposed must be proportional to the violation.
This requirement poses a question of the discretion of
the trial court that we will review for abuse of that dis-
cretion." *Millbrook Owners Assn., Inc.* v. *Hamilton Stand-
ard*, supra, 257 Conn. 17–18. "The determinative ques-
tion for an appellate court is not whether it would have
imposed a similar sanction but whether the trial court
could reasonably conclude as it did given the facts pre-
sented. Never will the case on appeal look as it does
to a [trial court] . . . faced with the need to impose
reasonable bounds and order on discovery." (Internal
quotation marks omitted.) *Usowski* v. *Jacobson*, 267
Conn. 73, 85, 836 A.2d 1167 (2003). "Trial court judges
face great difficulties in controlling discovery proce-
dures which all too often are abused by one side or the
other and this court should support the trial judges' rea-
sonable use of sanctions to control discovery." (Internal
quotation marks omitted.) *Mulrooney* v. *Wambolt*, 215
Conn. 211, 223, 575 A.2d 996 (1990).

In its oral decision granting the motions for sanctions,
the trial court observed that "the discovery in this case
has been marked with obfuscation and delay on the
part of the defendants . . . ." The court cited two spe-
cific examples of discovery noncompliance: (1) the
defendants failed to produce adequate Google Analytics
information with respect to marketing data and to con-
duct a complete search of Jones' cell phone, and (2)
the defendants "disregarded" discovery deadlines on
multiple occasions, "continue[d] to object to . . . dis-
covery, and failed to produce that which is within their
knowledge, possession, or power to obtain."

Lafferty *v.* Jones

It is undisputed that the trial court's discovery orders were reasonably clear and that the defendants violated four of them.[30] The defendants do not raise distinct arguments under the first two prongs of *Millbrook Owner's Assn., Inc.*, but, instead, largely challenge the "harshness" of the sanctions imposed. In considering whether the sanction revoking the defendants' opportunity to pursue the special motions to dismiss was proportional to the defendants' discovery violations, we are guided by "the factors we previously have employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to respond to the posed questions, that is, whether it is due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party, which in turn may depend on the importance of the information requested to that party's case; and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Yeager* v. *Alvarez*, 302 Conn. 772, 787, 31 A.3d 794 (2011). We also consider how Jones' broad-

---

[30] The defendants purport to dispute these issues in their brief by stating, in a heading, that "[t]he court sanctioned [them] for violating the discovery process . . . despite the lack of sufficiently clear orders or actual violations." Despite mentioning this in the heading, there is no clear argument in the brief to support this argument. Instead, the defendants' discovery argument basically contests the merits and breadth of the discovery permitted by the trial court. As a result, we construe the first two prongs of *Millbrook Owners' Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 17–18, as undisputed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016).

Lafferty *v.* Jones

cast impacted the trial court's decision sanctioning the
defendants for bad faith litigation practices. See *Mac-
Calla* v. *American Medical Response of Connecticut,
Inc.*, 188 Conn. App. 228, 230, 239, 204 A.3d 753 (2019)
(upholding sanction of dismissal on basis of plaintiffs'
noncompliance with discovery orders and "the unpro-
fessional and dilatory conduct of the plaintiffs' coun-
sel," who called "a party's corporate representative [who
was] attending a deposition a trespasser," and holding
that this conduct "evinces a disregard for the provisions
of the Practice Book and the authority of the court").

The plaintiffs argue that the sanctions are propor-
tional because the defendants' violations were "deliber-
ate," "wilful," and in "bad faith . . . ." The defendants
counter that their actions were not taken in bad faith.
"[I]n assessing proportionality, a trial court must con-
sider the totality of the circumstances, including, most
importantly, the nature of the conduct itself." *Ridgaway*
v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 76, 176
A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.*
v. *Hamilton Standard*, supra, 257 Conn. 16 ("dismissal
of an action is not an abuse of discretion where a party
shows a deliberate, contumacious or unwarranted dis-
regard for the court's authority" (internal quotation
marks omitted)). In the present case, the trial court did
not expressly find that the defendants' discovery abuses
were performed in bad faith but, in its oral decision,
pointedly characterized their actions as being marked
by a pattern of "obfuscation and delay . . . ." Addition-
ally, the record supports the trial court's finding that
the defendants repeatedly ignored court deadlines and
continued to challenge the underlying merits of discov-
ery, even after the court found the requisite good cause
to allow discovery under § 52-196a (d).[31] See, e.g.,
*National Hockey League* v. *Metropolitan Hockey Club*,

---

[31] For example, even after the trial court ordered the defendants to produce
the Google Analytics materials on June 10, 2019, the defendants continued
to contest whether they should be ordered to produce the data.

Lafferty *v.* Jones

*Inc.*, 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) (upholding dismissal of action in light of "[the] respondents' 'flagrant bad faith' and their counsel's 'callous disregard' of their responsibilities" when respondents failed to answer written interrogatories by deadline). Accordingly, we conclude that the record supports the trial court's finding that the defendants wilfully disregarded the court's discovery orders.

This wilful disregard was exacerbated by Jones' conduct during the June 14, 2019 broadcast. The trial court found that Jones' actions were "indefensible, unconscionable, despicable, and possibly criminal," and that the "deliberate tirade and harassment and intimidation against Attorney Mattei and his firm [were] unacceptable and sanctionable." Because Jones' statements were one part of a whole picture of bad faith litigation misconduct, we conclude that the trial court's reliance on Jones' speech as part of the rationale for the sanctions orders was appropriate in this context.

With respect to the defendants' ability to comply with discovery, one mitigating factor that potentially could have explained the defendants' noncompliance with the discovery deadlines was their change in counsel midway through the discovery process. Although the parties disagree as to whether this change in counsel was a "strategic" tactic, the record indicates that, even under the defendants' original counsel, the documents were still far from ready for production.[32] Moreover, the record supports the trial court's determination that the change in counsel did not by itself affect the defendants' ability to produce the discovery on time.[33]

---

[32] At a March 22, 2019 hearing, Attorney Pattis stated: "I was given those documents on or about March 6. I was also given some interrogatory responses on March 6. Those interrogatory responses were not satisfactory to my way of thinking."

[33] At the March 22, 2019 hearing, the court explained: "I think part of the problem is that your clients are maybe tying their own lawyers' hands by getting other lawyers involved so that nobody knows what anyone else is doing. That would be the most favorable light. . . . The least favorable light would be manipulation."

Turning to the prejudice factor, we consider the importance of the undisclosed discovery material, the effect the information would have on the party requesting it, and whether the information was available through other means. *Yeager* v. *Alvarez*, supra, 302 Conn. 787– 88; see id., 789–90 (defendants were not prejudiced by noncompliance when materials that they sought had been indirectly included in plaintiffs' production). In the present case, the record supports the trial court's implicit finding that the defendants' noncompliance was prejudicial to the plaintiffs[34] because, each time the defendants did not comply with the court ordered discovery, the plaintiffs were unable to access information that could assist them in proving probable cause that they would succeed on the merits of their complaints. For example, access to the defendants' marketing data would be relevant to proving a financial connection between the defendants' actions and the statements made during the broadcast.[35] See *Krahel* v. *Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (considering importance of unproduced discovery and its effect on plaintiff's case when analyzing prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018).

Finally, we consider the proportionality of the specific sanction employed to the violations at issue. Here, the trial court was not just considering one violation of a court deadline but several, and, therefore, the defendants' noncompliance warranted an appropriate sanction by that court. See *Emerick* v. *Glastonbury*,

---

[34] At an April 3, 2019 hearing, the plaintiffs' counsel cited "delay after delay after delay by a party [who] . . . invoked the statute but [who] wasn't prepared to comply with its provisions, [which] is prejudicing my clients."

[35] The plaintiffs' counsel argued that the Google Analytics would show "[s]ales, pricing, web traffic, that is, hits on the website and hits on the Infowars store website." He further argued that "Infowars [LLC] and Free Speech Systems [LLC] [generate] millions and millions and millions of dollars of revenue each year. The content that they broadcast, including the content about Sandy Hook, they use to drive traffic to their website. That's why we're entitled to this stuff."

Lafferty *v.* Jones

177 Conn. App. 701, 736–37, 173 A.3d 701 (2017) ("The plaintiff's conduct, considered in its entirety, satisfied this standard. . . . The court's repeated warnings, suggestions and fines had no impact on the plaintiff, as he ignored the court's admonitions and continued to delay the trial." (Citation omitted.)), cert. denied, 327 Conn. 994, 175 A.3d 1245 (2018). These violations, when considered together, reasonably could be found to make up a pattern of wilfulness on the part of the defendants. But cf. *D'Ascanio* v. *Toyota Industries Corp.*, 309 Conn. 663, 681, 72 A.3d 1019 (2013) (reversing sanction of dismissal because "the objectionable conduct at issue was an isolated event and was not one in a series of actions in disregard of the court's authority"); *Usowski* v. *Jacobson*, supra, 267 Conn. 93 (trial court abused its discretion in sanctioning party by dismissing action on ground that "the record does not establish that the failure to comply with the discovery orders constituted a continuing pattern of violations" because "other factors of a mitigating nature also were present"). The trial court considered this wilfulness along with the defendants' harassing and intimidating speech toward the plaintiffs' counsel, which together created a whole spectrum of bad faith litigation misconduct. "As is often the case in life . . . the whole of abusive action is greater than the sum of the parts of which it is made. Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice . . . ." *Fuery* v. *Chicago*, 900 F.3d 450, 454 (7th Cir. 2018). "[I]t is the [trial] court [that] can evaluate the whole ball of wax and determine whether the small incremental blows to the integrity of the trial add up to something that requires sanctioning. Death by a thousand cuts is no less severe than death by a single powerful blow." Id., 464.

Although the sanctions imposed by the trial court are not the sanctions enumerated within the rules of

380                    MARCH, 2021                    336 Conn. 332

Lafferty *v.* Jones

practice, this does not mean they were disproportionate or impermissible as a matter of law. For example, in *Yeager* v. *Alvarez*, supra, 302 Conn. 772, we concluded that a trial court had the authority to "strike an otherwise valid offer of compromise" as a sanction for a discovery violation; id., 778; because it "falls well within the ambit of judicial power contemplated by both the court's inherent authority and the rules of practice. Significantly, [Practice Book § 13-14 (a)] authorizes a trial court to penalize discovery violations by entering orders 'as the ends of justice require.' In fact, § 13-14 (b) contains sanctions even more severe than those imposed in this matter. These severe sanctions, which may strip a party of all prospect of prevailing, logically encompass a host of lesser penalties. Such milder sanctions may include orders that reduce a party's likelihood of success at trial . . . ." Id., 781.

The sanctions imposed by the trial court in the present case revoked a statutory benefit, namely, the opportunity to pursue the special motions to dismiss under § 52-196a (d), which further penalized the defendants by rescinding a stay of the full discovery process. Nonetheless, as the trial court found, this was a measured sanction for the defendants' noncompliance with limited discovery, which was an abuse of the very benefit they sought to utilize. Moreover, the sanctions imposed were well short of a default or dismissal, insofar as they do not preclude the defendants from having the merits of their cases adjudicated in a conventional manner, such as by summary judgment or trial. See *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 16 ("the court's discretion should be exercised mindful of the 'policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court' "); cf. *Emerick* v. *Glastonbury*, supra, 177 Conn. App. 737 (upholding sanction of dismissal when plaintiff engaged in "continuing and deliberate misconduct . . . [that] demon-

336 Conn. 332          MARCH, 2021          381

Lafferty *v.* Jones

strated . . . deliberate disregard for the court's orders").

In assessing the proportionality of the sanctions, we next turn to the defendants' central argument for excusing their noncompliance, namely, that the discovery in this case was overbroad and that the sanctions, therefore, were not appropriate. According to the defendants, "[w]hen discovery is allowed under § 52-196a, it is allowed as an exception to the statutory rule that discovery is to be stayed pending a decision on the special motion to dismiss, and—when allowed—it must be specific and limited. But, without any clarity from the court as to how the specific and limited discovery should proceed, the plaintiffs exploited the untended frontiers of the judge's order until the specific and limited discovery ordered by the court was indistinguishable from the broad contours of general discovery in all civil cases . . . ." (Emphasis omitted; footnote omitted.)

First, notwithstanding the merits of the defendants' breadth argument, the plaintiffs correctly point out that, despite the defendants' grievances with the scope of discovery, the defendants are still required to comply with the court's orders. "[A] party has a duty to obey a court order even if the order is later held to have been unwarranted." *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 658 n.20, 646 A.2d 133 (1994); see also *Mulholland* v. *Mulholland*, 229 Conn. 643, 649, 643 A.2d 246 (1994). "An order of the court must be obeyed until it has been modified or successfully challenged, and the consequences for noncompliance may be severe indeed." *Fox* v. *First Bank*, 198 Conn. 34, 40 n.3, 501 A.2d 747 (1985).

Second, nothing in the anti-SLAPP statute limits the trial court's discretion to order "specified and limited discovery relevant to the special motion to dismiss" beyond the "good cause" standard set forth in § 52-196a

382                 MARCH, 2021          336 Conn. 332

Lafferty *v.* Jones

(d).[36] We will not fill this legislative silence by imposing broad restrictions on the trial court's discretion to determine good cause, insofar as each case will present different claims and defenses bearing on whether limited discovery should be granted. Cf. *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 57, 459 A.2d 503 (1983) ("[t]he granting or denial of a discovery request rests in the sound discretion of the court"); *Coss* v. *Steward*, 126 Conn. App. 30, 46–47, 10 A.3d 539 (2011) (discussing good cause requirement for protective orders and trial court's discretion in granting them). We conclude, therefore, that the defendants' claims that discovery was improvidently granted under the anti-SLAPP statute does not excuse their failure to comply with the trial court's orders. Accordingly, the trial court did not abuse its discretion in sanctioning the defendants for discovery violations and Jones' June 14, 2019 broadcast.

II

The final issue in this appeal is whether the defendants were afforded adequate notice and a meaningful opportunity to respond before the trial court imposed sanctions. The defendants argue that the court ordered sanctions in an overly summary process because, on

---

[36] Although the legislative history of the anti-SLAPP statute does not further illuminate the meaning of the phrase "good cause," as used in § 52-196a (d), we find the purpose of the statute instructive. Speaking in support of the bill later enacted as § 52-196a, then Representative William Tong explained that it was intended to address "situations in which people have spoken out on matters of public concern including the press and we've seen situations where people file litigation. There appears to be no basis to that litigation but it's designed to chill free speech and the expression of constitutional rights, and so this provides for a special motion to dismiss so that early in the process somebody who's speaking and exercised their constitutional rights can try to dismiss a frivolous or abusive claim that has no merit and short circuit a litigation where it might otherwise cost a great deal of money to continue to prosecute. We think it's an important measure . . . to promote free speech and reporting by our news organizations as well." 60 H.R. Proc., Pt. 16, 2017 Sess., pp. 6879–80; see also footnote 4 of this opinion.

Lafferty *v.* Jones

Monday, June 17, 2019, the plaintiffs filed their motion requesting court review of the broadcast, along with expedited briefing on "what orders must issue in connection with [Jones'] on-air statements," and indicated they would move for "specific relief on an expedited basis," and, the very next day, the court ruled on the merits of the plaintiffs' motion for sanctions without any briefing by the defendants. Additionally, the defendants argue that the court handed their attorney a copy of a recent judicial decision the court considered instructive; see *Maurice* v. *Chester Housing Associates Ltd. Partnership*, supra, 188 Conn. App. 21; and gave the defendants' counsel only the lunch hour to prepare for argument on whether the trial court should order sanctions. The plaintiffs counter that the defendants were afforded sufficient due process because the trial court repeatedly had warned them that it would revoke the opportunity to pursue the special motions to dismiss. They also point out that a June 17, 2019 court order notified counsel that they should be prepared to discuss the broadcast at the hearing scheduled for the following day. Finally, the plaintiffs argue that the defendants did not at any point indicate to the court that they needed additional time to prepare. We agree with the plaintiffs and conclude that the trial court's sanctions did not violate the defendants' due process rights.

"At their core, the due process clauses of the state and federal constitutions require that one subject to a significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard." *Council on Probate Judicial Conduct re James H. Kinsella*, 193 Conn. 180, 207, 476 A.2d 1041 (1984); see *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 393 ("As a procedural matter, before imposing . . . sanctions, the court must afford the sanctioned party or attorney a proper hearing on the . . . motion for sanctions. . . . There must be fair

384                     MARCH, 2021                     336 Conn. 332

Lafferty *v.* Jones

notice and an opportunity for a hearing on the record."
(Citation omitted; internal quotation marks omitted.)).
"Whether the defendant was deprived of his due process
rights is a question of law, to which we grant plenary
review." (Internal quotation marks omitted.) *New Hart-*
*ford* v. *Connecticut Resources Recovery Authority*, 291
Conn. 489, 500, 970 A.2d 570 (2009).

Having reviewed the record, we conclude that the
defendants received adequate notice so as to be apprised
of the possibility of sanctions entering as a result of
their conduct.[37] Specifically, the plaintiffs filed a motion
seeking sanctions several months earlier because of the
defendants' discovery noncompliance. The trial court
discussed the possibility of sanctioning the defendants
on several occasions and had reissued this warning in
its order on June 10, 2019, regarding the outstanding
Google Analytics material. The day before the hearing,
the plaintiffs indicated that they would seek interim
relief, and the court issued an order stating that it would
address the broadcast at the hearing. Because of the

---

[37] The defendants rely on *New Hartford* v. *Connecticut Resources Recovery*
*Authority*, supra, 291 Conn. 489, to support their claim of a due process
violation. In that case, we held that the defendants were not afforded suffi-
cient due process after a trial court found them in contempt. Id., 491. The
present case, however, is distinguishable because, in *New Hartford*, the
defendants indicated at the hearing that they were unprepared to address
the violation of the gag order. Id., 494–95. In addition, "[t]he defendant was
given less than one day to consider a motion for contempt," and "[t]he
defendant's attorney stated that he had not read the full text of the posting,
that he had not been able to speak to the persons responsible for the website
posting or anyone else and that he would like to speak to them about why
they had posted the article." Id., 501. In contrast, unlike the attorney in *New*
*Hartford*, Attorney Pattis was present on the broadcast, witnessed Jones'
allegedly sanctionable conduct, and made representations to the court on
the basis of his observations during the broadcast. Additionally, although
the plaintiffs had filed motions requesting a review of the broadcast the day
before the hearing, the plaintiffs had pending motions for sanctions left
unanswered for several months. Also, the defendants were well aware of
the court's warnings that it might sanction them if discovery noncompliance
continued. As a result, we are not persuaded that *New Hartford* controls
the present case.

336 Conn. 332          MARCH, 2021                    385

*Lafferty* v. *Jones*

trial court's countless warnings that it would sanction the defendants in this specific manner, the defendants cannot reasonably contest that they were not adequately notified of the possibility of such sanctions. Cf. *Fattibene* v. *Kealey*, 18 Conn. App. 344, 350, 353–54, 558 A.2d 677 (1989) (reversing sanctions order when trial court ruled on motion for sanctions without first considering plaintiff's objection). In addition, the trial court held a hearing, at which it heard thorough argument on the issue, and at no point during the argument did the defendants request additional time.[38] This satisfies the due process requirement for a meaningful opportunity to be heard. See, e.g., *Thalheim* v. *Greenwich*, 256 Conn. 628, 650–51, 775 A.2d 947 (2001) (concluding that sanctioned attorney had been afforded "adequate notice and a meaningful opportunity to be heard" when trial court issued order requesting that he "show cause why [he] should not be sanctioned" and attorney received hearing (internal quotation marks omitted)).

The sanctions orders are affirmed.

In this opinion the other justices concurred.

———————————

[38] The defendants did file a motion for a stay the day before the hearing so that Attorney Pattis could address a conflict of interest concern that had arisen. The trial court denied this motion. The defendants do not challenge this ruling on appeal.