# EXHIBIT 48

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO.  03-18-00603-CV

---

**Alex E. Jones; Infowars, LLC; and Free Speech Systems, LLC, Appellants**

**v.**

**Leonard Pozner and Veronique De La Rosa, Appellees**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001842, THE HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

       Appellants Alex E. Jones; Infowars, LLC; and Free Speech Systems, LLC, appeal

from the district court's order denying their motion to dismiss under the Texas Citizens

Participation Act (TCPA).  *See* Tex. Civ. Prac. & Rem. Code § 27.003.[1]  Because we determine

that Appellees Leonard Pozner and Veronique De La Rosa have met their burden of establishing

---

[1]  In this opinion, citations to the TCPA are to the version in effect before the September 2019 amendments became effective.  *See* Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 961–64 (current version at Tex. Civ. Prac. & Rem. Code §§ 27.001–.011), amended by Act of May 24, 2013, 83d Leg., R.S., ch. 1042, §§ 1–3, 5, 2013 Tex. Gen. Laws 2499, 2499–500 (the version at issue in this opinion); *see also* Act of May 20, 2019, 86th Leg., R.S., ch. 378, H.B. 2730, §§ 1–9, 2019 Tex. Gen. Laws __, __ (the 2019 amendments); Act of May 20, 2019, 86th Leg., R.S., ch. 378, H.B. 2730, §§ 11–12, 2019 Tex. Gen. Laws __, __ (providing that a suit filed before the amendments become effective "is governed by the law in effect immediately before that date").

a prima facie case for defamation and that Appellants have not established a valid defense, we affirm the district court's denial of Appellants' motion to dismiss.

## BACKGROUND

Infowars, LLC, operates as the website InfoWars.com, which presents itself as a news media outlet. Free Speech Systems, LLC, owns and operates Infowars, LLC. Jones is the sole member of both entities. Jones publishes the InfoWars website and is the host of its associated shows. Pozner and De La Rosa (the parents) are the parents of Noah Pozner, a child who was killed in the Sandy Hook Elementary School shooting in December 2012. They sued Appellants in April 2018 for defamation and defamation per se based on statements made in three broadcasts that disputed whether the shooting that took their son's life actually occurred and whether, if the children were killed, they were shot as part of a staged event. The broadcasts on which the parents rely aired on April 22, April 28, and June 13, 2017. In addition to asserting a defamation claim, the parents' original petition alleged that Appellants engaged in a conspiracy, that InfoWars and Jones were liable for their employees' actions under the theory of respondeat superior, and that the parents suffered general and special damages.[2] In June 2018, Appellants filed a motion to dismiss under the TCPA (First Motion to Dismiss), and a hearing on that motion was set for August 1.

A flurry of activity filled the week before the hearing. The parents filed a response to the motion to dismiss on July 25. Appellants then filed a "supplement" to their

---

[2] Because civil conspiracy is "derivative," courts do not analyze the trial court's refusal to dismiss plaintiffs' causes of action for conspiracy separately from its refusal to dismiss their other causes of action. *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 797 (Tex. App.—Austin 2017, pet. granted). Similarly, the doctrine of respondeat superior is not a separate "legal action" and is not addressed separately from the underlying cause of action for defamation in a TCPA motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code § 27.001(6).

2

motion on July 27 (the Friday before the hearing date) that included additional argument, exhibits, and supplemental affidavits, and on July 30, they filed another supplemental affidavit in support of their motion.  On July 31, Appellants filed a second "supplement" along with another supplemental affidavit and also filed a seventy-page document objecting to the evidence the parents had filed with their response to the motion to dismiss.[3]  That same day, the parents amended their petition to include a claim for intentional infliction of emotional distress. They also filed objections to the affidavit and supplemental affidavits (and the attached exhibits) filed by David Jones (Appellant Jones's son), and they objected that both supplements to the motion to dismiss were untimely.

After the parties presented their arguments at the hearing on the motion, the district court recessed the hearing to allow the parties to agree on what should be included in the record.  On August 2, the day after the hearing, the court held a conference with counsel for both parties to determine how to conclude the written record and close the TCPA hearing.  On the same day, the parents submitted supplemental declarations further detailing their alleged damages, and Appellants filed a second motion to dismiss under the TCPA (Second Motion to Dismiss) to address the newly added claim for intentional infliction of emotional distress.

---

[3]  In their brief, Appellants have included, in primarily bullet-point form, several pages of objections to various portions of evidence relied on by the parents.  Most of these objections are single words or phrases that contain no analysis or citations to legal authority.  Appellants do not elaborate on these objections in their reply brief.  We review a trial court's evidentiary rulings for an abuse of discretion.  *Southwest Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016).  Assuming that Appellants' objections were adequately briefed, we overrule the objections as we understand them as to the affidavits and supplemental affidavits of the parents. We also determine that the district court did not abuse its discretion in allowing the parents to file supplemental affidavits on August 2, particularly in light of Appellants' two substantial supplements to their motion to dismiss, one filed five days and another filed one day before the hearing and only six and two days before the parents' affidavits were filed.  We do not reach Appellants' other objections and base our conclusions on the pleadings, portions of affidavits, and exhibits that were not subject to the objections listed in Appellants' brief.

The second motion to dismiss was set for a hearing on September 19.  On August 29, the district court signed an order denying the First Motion to Dismiss.  On September 12, Appellants filed a notice of appeal from the August 29 order, which is the basis for this appeal.

## DISCUSSION

"The [TCPA] protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them."  *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding).  The protection comes in the form of a motion to dismiss a suit that would stifle the defendants' exercise of those rights.  *Id.*  "Reviewing a TCPA motion to dismiss requires a three-step analysis."  *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018).  First, the party moving for dismissal must show by a preponderance of the evidence that the TCPA applies to the legal action against it.  Tex. Civ. Prac. & Rem. Code § 27.005(b).  If the movant meets that burden, the nonmovant must establish by clear and specific evidence a prima facie case for each essential element of its claim.  *Id.* § 27.005(c).  "The words 'clear' and 'specific' in the context of this statute have been interpreted respectively to mean, for the former, 'unambiguous,' 'sure,' or 'free from doubt' and, for the latter, 'explicit' or 'relating to a particular named thing.'"  *Hawxhurst v. Austin's Boat Tours*, 550 S.W.3d 220, 230 (Tex. App.—Austin 2018, no pet.) (quoting *In re Lipsky*, 460 S.W.3d at 590).  "In determining whether a legal action should be dismissed under [the TCPA], the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."  Tex. Civ. Prac. & Rem. Code § 27.006(a) ("Evidence").  Collectively, these elements require that the "plaintiff must provide enough detail to show the factual basis for its claim."  *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam).  If the nonmovant satisfies that

4

requirement, the burden shifts back to the movant to prove each essential element of any valid defenses by a preponderance of the evidence.  Tex. Civ. Prac. & Rem. Code § 27.005(d).

The parties do not dispute that the TCPA applies to the defamation action against Appellants.  Therefore, only the second and third steps of the TCPA analysis are at issue here—whether the parents established by clear and specific evidence a prima facie case for each essential element of their defamation claim and, if so, whether Appellants proved each essential element of their statute of limitations defense by a preponderance of the evidence.  We review de novo whether the parties met their respective burdens of proof under section 27.005.  *See Smith Robertson, L.L.P. v. Hamlin*, No. 03-18-00754-CV, 2019 Tex. App. LEXIS 5787 at *5 (Tex. App.—Austin July 11, 2019, pet. filed) (mem. op.); *Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 708 (Tex. App.—Amarillo 2018, pet. denied).

**Prima Facie Case for Defamation**

In the second step of the analysis, the parents must establish by clear and specific evidence a prima facie case for each essential element of their defamation claim.  *See* Tex. Civ. Prac. & Rem. Code § 27.005(c).  "In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss."  *In re Lipsky*, 460 S.W.3d at 591.  The TCPA "does not impose an elevated evidentiary standard or categorically reject circumstantial evidence."  *Id.*  Defamation occurs when "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se)."

*D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). "The status of the person allegedly defamed determines the requisite degree of fault." *In re Lipsky*, 460 S.W.3d at 593. A private individual need prove only negligence, whereas a public figure or official must prove actual malice. *Id.* (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). Finally, the plaintiffs must plead and prove damages, unless the defamatory statements are defamatory per se. *Id.* (citing *Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 162 n.7 (Tex. 2014)). Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *Id.*

In determining whether the parents met their burden to establish a prima facie case for defamation, we are mindful that courts analyze the truth or falsity of a broadcast under the substantial truth doctrine: "if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable." *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013) (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) ("the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements")). "Assessing a broadcast's gist is crucial." *Id.* A broadcast with statements that err in the details but that correctly convey the gist of a story is substantially true. *Id.* at 63-64. "On the other hand, a broadcast 'can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory.'" *Id.* (quoting *Turner*, 38 S.W.3d at 114). Courts determine a broadcast's gist or meaning by examining how a person of ordinary intelligence would view it. *Id.*

6

Both parties acknowledge that Noah Pozner was killed in the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut.  The parents assert that Appellants' broadcasts present false assertions of fact regarding their son's death and that those assertions are defamatory, that they were made with the requisite degree of fault, and that they have harmed the parents.  The three 2017 broadcasts at issue in this case are from different platforms.  The April 22 broadcast is an InfoWars video in which Jones speaks for most of the duration of the hour-long broadcast.  The April 28 broadcast is a press conference at which Jones spoke.  The June 13 broadcast is a video Jones posted to the InfoWars Facebook page.  Because it is dispositive of this interlocutory appeal, we address only the April 22 broadcast.[4]

### *False and Defamatory Broadcast*

"Texas recognizes the common-law rule that defamation is either per se or per quod."  *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018).  "Defamation per se occurs when a statement is so obviously detrimental to one's good name that a jury may presume general damages, such as for loss of reputation or for mental anguish."  *Id.* (citing *Hancock v. Variyam*, 400 S.W.3d 59, 63-64 (Tex. 2013)).  Defamation per quod is simply

---

[4]  The April 28 and June 13 broadcasts are not in the record, although partial transcripts are contained in the record.  The parties agree that these broadcasts republish some of the assertions regarding Sandy Hook made in the April 22 broadcast.  Specifically, in the April 28 broadcast, Jones states that the government has staged "so much stuff," says "[m]aybe the whole thing is fake," and asserts that "They were using blue screens out there."  In the June 13 broadcast, Jones repeats the allegations that the school had been closed before the shooting, that port-a-potties were set up in an hour following the shooting, and that Anderson Cooper's interview with De La Rosa occurred on a green screen.  These factual assertions overlap with the assertions presented in the April 22 broadcast and are alleged to form the basis of the same claim for defamation.  *Cf. Hayes v. Cavin*, No. 03-17-00501-CV, 2018 Tex. App. LEXIS 8343, 2018 WL 4939010, at *3 (Tex. App.—Austin Oct. 12, 2018, pet. denied) (mem. op.) (trial court could have concluded that allegation of additional instance of defamation "did not allege new and distinct injuries and instead clarified their claim of how [defendant] defamed them to other people").

defamation that is not actionable per se.  *Id*.  To determine whether the broadcast was false and capable of a defamatory meaning, we begin by analyzing its "gist."  *D Magazine Partners*, 529 S.W.3d at 434 ("In making the initial determination of whether a publication is capable of a defamatory meaning, we examine its 'gist.'") (citing *Neely*, 418 S.W.3d at 63); *In re Lipsky*, 460 S.W.3d at 594 (noting that the meaning of a publication depends on a reasonable person's perception of the entire "publication and not merely on individual statements" and concluding "the gist" of the statements sufficed to defeat a TCPA motion to dismiss).

The April 22 broadcast contained direct false assertions of facts implying that the parents colluded in what Appellants cast as a hoax relating to the murder of their son, as well as a whirlwind of other statements that, according to Jones, "all tie[] together" and relate to the shooting at Sandy Hook.  Jones begins the broadcast by describing what he believes to be evidence of the government's and media's willingness to deceive people.  Early in the broadcast, Jones explains that Julian Assange (the founder of WikiLeaks) and others are not "leakers" because "you're not a leaker when you're exposing criminal activity in an out of control, rogue government."  He also describes and shows a clip from a segment where he says Madeline Albright is asked whether half a million children dying in Iraq was a reasonable price to pay for the 1991 war in Iraq, and she responds, "I think this is a very hard choice, but the price, we think the price is worth it."  Jones explains that the government involved the nation in a war under false pretenses and also lied in 2003 "about WMDs [weapons of mass destruction].  And we've been lied to over and over again."  Jones states that he is trying "to get to the heart of the matter of what's going on, even though it's painful to try to cover some of these topics."  He critiques the media for taking his comments out of context and states:  "when we've gotten pieces of news that we've discovered have been taken out of context that we were given, we come out and do a

retraction . . . . because we're not fake."  Later in the broadcast, he links the government's alleged dishonesty and willingness to sacrifice children to his theory of what happened at Sandy Hook:

> Most fake mass shootings, they have shooters and then killer patsy. We know that's happened before. They've been caught before.  False flag's a household name.

> I tend to believe that's what happened.  But real mass shootings happen.  I'm not saying real kids didn't die.  We've entertained the idea, because the majority of people online don't believe the official story, because they've been lied to so much and seen our government launch wars that killed millions on lies, so they killed 20-something kids?

> But you watch the blue screens, and you watch the fake stuff. . . .

> The point is, is that everybody knows they lied about WMDs, everybody knows that, that stuff went on, everybody, [it's] in our normal reel about Sandy Hook being fake.  You, you know [why] people question it, okay?

        At several points, he alludes to new information he has uncovered relating to the shooting at Sandy Hook or Newtown (where the school is located), for example:

> Now, what's the new Newtown info, and how does this tie into the tragic event that happened on Obama's watch?  The media, since day one, has said that I said the attacks never happened, when you can go and find myself and Rob [Dew] and everybody else that works around here, in more than seven debates we've done, with both sides, people that think the official story was as exactly as it happened, and former top school security training experts, law enforcement folks like Wolfgang Halbing saying he believes nothing happened.

> Quite frankly, I've said I don't know the truth, but if you've got a government caught lying about WMDs that causes wars that killed millions of people, and hundreds of thousands of children from starvation, that Bill Clinton intensified, and people that launch fraudulent wars against Syria, all based on lies, and they

do this over and over again, I don't want them to sit there and shake their finger at me, like I'm a demon that doesn't care about children being shot in mass shootings.

Jones includes Sandy Hook among a host of items about which he believes the government and media have been deceptive.  In doing so, he also left the impression that Jones believes parents like Pozner and De La Rosa were not truthful in stating that their children were killed, or that if they were, then the children may have been killed as part of what Jones calls a hoax or a "false flag."

Jones presents all of this information as "trustworthy" news.  Throughout the broadcast, Jones repeatedly touts InfoWars as a source of "documented" news based on "in-depth research" that "you can verify yourself" and says "We're so real, they say we're fake."  He then says, "So, here's the new Sandy Hook information. . . . Sandy Hook's so inconclusive. . . . I've said, 'I believe kids died,' but then I've said I've seen Devil's advocate, [we've] done debates that no kids died, and that it's all made up, because the media has been caught making things up."  As the broadcast continues, it includes increasingly specific statements that refer to the role of the parents:

So here are these holier than thou people, when we question CNN, who, supposedly, is at the site of Sandy Hook, and they've got, in one shot, leaves blowing and flowers that are out, and you see the leaves blowing, and they go-they glitch. They're recycling a, a green screen behind them.

Uh, you've got, who's the female lawyer used to be on CNN? Uh, [fake] southern accent or whatever?  She's on there with cars driving in a cul-de-sac in circles and you see, it's the same cars going in circles.

And then we've got Anderson Cooper famously, not just with the flowers blowing in the fake, but when he turns, his nose disappears repeatedly, because the green

screen isn't set right.  And they don't like to do live feeds because somebody
might run up.

CNN did that in the Gulf War and admitted it. They just got caught two weeks
ago doing it in, supposedly, Syria, and then the green screen cuts out and they got,
you know, phones ringing. And all we're saying is, if these are known liars that
lied about WMDS and lied to get us into all of these wars and backed the Arab
Spring, and Libya, and Syria, and Egypt, everywhere else to overthrow
governments and put in radical Islamicists, if they do that and have blood on their
hands, and lied about the Iraq war, and for the sanctions that killed a half million
kids, and let the Islamicists attack Serbia, and lied about Serbia launching the
attack, when it all came out later that Serbia didn't do it, how could you believe
any of it if you have a memory and you're not Dory from Finding Dory, you
know, the Disney movie?

In the clip that Jones asserts was staged on a green screen (which is referenced more than once in

the broadcast), Anderson Cooper is seen interviewing De La Rosa on screen about the loss of her

son.  After further discussion, Jones says "MSN and the corporate media and that whole system

are the ones feeding off the dead children of all these mass shootings and these tragedies, some

of which, the government and other groups have been caught being involved in," then he shows a

"false flag video montage" showing a series of what he asserts are hoaxes perpetrated by the

government or media.  Following that montage, he returns to the screen and mentions "a longer

piece we did with . . . a fake set of cars driving in circles at Sandy Hook."  Toward the very end

of the broadcast, Jones discusses Sandy Hook with a fellow member of the InfoWars staff, Rob

Dew, who mentions that on the day of the shooting, authorities released the wrong name for the

shooter, instead identifying his brother.  Jones responds, "and then the school was closed 'til that

year, and then the videos, it's all rotting and falling apart, and nobody's even in it, and the kids

are going in circles in and out of buildings with their hands up, and then they never called rescue

choppers, ex- I mean exactly."  Dew and Jones go back and forth identifying a series of facts that

they believe demonstrate why the incident at Sandy Hook was not real, ranging from delivery of

port-a-potties to the school within an hour for the subsequent media event to police officers smiling while eating lunch as, according to Dew, "they're supposedly bringing out 20 dead kids."  Dew states, "you know, we've never seen, there's never been any even blurred photos of any bodies or anything.  We've seen every other incident where there's dead bodies," and Jones replies, "They sure showed us the nerve gas kids in Syria, didn't they?"

By asserting, as a matter of fact, that De La Rosa's interview was staged on a green screen and that the school had in fact been closed for years leading up to the shooting, Jones necessarily implies that the parents were untruthful in representing that De La Rosa spoke to Anderson Cooper at the site of her son's death and in representing that they were parents of children who attended Sandy Hook Elementary before and during the shooting.  Overall, the gist of the broadcast is that the shooting at Sandy Hook was staged and, by implication, that the parents were complicit.  Jones references his "normal reel about Sandy Hook being fake" and concludes with an exchange discussing events that Jones believes show the inauthenticity of the Sandy Hook shooting.  Jones references CNN "[getting] caught" using a green screen and claims that the interview with De La Rosa, "supposedly" at "the site of Sandy Hook," also occurred on a green screen based on a "glitch" that occurred when Anderson Cooper's "nose disappears repeatedly."  The broadcast juxtaposes discussion of the Sandy Hook shooting with incidents that, according to Jones, are known to have been staged, leaving the impression that the events of Sandy Hook were among the hoaxes perpetrated by the government, the media, or both.  *See Neely*, 418 S.W.3d at 63 (explaining that juxtaposition of facts can leave a false and defamatory impression).

Immediately following the exchange with Dew, Jones once again affirms that "Anybody can see what we're covering's real here all day."  In other words, the broadcast's gist

is that InfoWars is a serious news organization that has gathered information to show that the shooting that claimed Noah Pozner's life was faked or staged and that Noah's parents participated in the hoax. De La Rosa states in her affidavit that her interview with Anderson Cooper was not conducted on a green screen. Another uncontroverted affidavit addresses several of the factual assertions discussed by Jones and Dew. That affidavit contains photographs showing Noah and his siblings as students at Sandy Hook Elementary and analyzes objects in the photos with them (such as a book published on a particular date) to determine that the students were at the open and functioning Sandy Hook Elementary before the shooting occurred. The affidavit also notes that port-a-potties were delivered four hours after the shooting, contrary to Jones's implicit assertion that they were on standby before the shooting and on scene within an hour. Thus, the parents presented evidence that Appellants' broadcast contains false assertions of fact regarding the events at Sandy Hook and the parents' alleged involvement. Because of the broadcast's overall impression that the shooting at Sandy Hook was faked, a reasonable viewer could conclude that the broadcast mischaracterizes the parents' role, suggesting that they participated in an abhorrent hoax. *See Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App.—Austin 2010, no pet.) ("A statement is defamatory if it tends to injure the person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury, or if it tends to impeach that person's honesty, integrity, or virtue."). Moreover, the parents argue that these defamatory statements charge them with commission of a crime because if they were participating in a hoax, they necessarily provided false statements to law enforcement or colluded with law enforcement to create a false public record. *See* Tex. Penal Code § 37.08 (prohibiting making false entries in government records). The parents therefore assert that Appellants' defamatory statements amounted to defamation per se. *See Texas*

13

*Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 581 (Tex. App.—
Austin 2007, pet. denied) (stating that a statement that charges a person with commission of a
crime will typically be classified as defamation per se); *Express Pub. Co. v. Isensee*, 286 S.W.
926 (Tex. App.—Austin 1926, no writ) ("It is well settled that a publication which falsely
charges one with crime, either in express language or by reasonable implication, is libelous per
se."). We conclude that the parents have produced the minimum quantum of clear and specific
evidence necessary to support a rational inference that the statements were false and defamatory
per se. Thus, they have established a prima facie case for these elements of their defamation per
se claim sufficient to survive TCPA dismissal. *See Serafine v. Blunt*, 466 S.W.3d 352, 357
(Tex. App.—Austin 2015, no pet.) ("A prima facie standard generally 'requires only the
minimum quantum of evidence necessary to support a rational inference that the allegation of
fact is true.'") (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)
(orig. proceeding)).

### *Requisite Degree of Fault*

Whether the parents must prove that the broadcast's statements were made with
negligence or actual malice depends on whether the parents are private individuals or, as
Appellants allege, limited purpose public figures. In support of their assertion that the parents
are limited purpose public figures, Appellants argue that De La Rosa's speaking publicly
regarding gun control and Pozner's creation of a charity that assists victims of mass shootings in
removing false content from the internet has given them "high-profile roles in these
controversies," such that they "voluntarily engaged in activities that necessarily involved the risk
of public criticism." Appellants specifically assert that the parents are public figures for the
purposes of the debate on gun control and whether Jones's statements "should be limited or

14

banned from public platforms."  Shortly after her son's death, De La Rosa was interviewed by CNN's Anderson Cooper, People Magazine, and the Jewish Forward, and she is mentioned and quoted in several other articles regarding the shooting.  In addition to discussing emotional details surrounding her son's death, some of the articles delineate De La Rosa's reasons for favoring gun control.  In January 2013, De La Rosa accepted an invitation that was extended to Sandy Hook parents to testify before a Connecticut legislative panel on gun control, and the following month she spoke at a rally at the Connecticut Capitol.  Appellants assert that De La Rosa's "online profile" evidences that she is no longer a private individual.  That "profile," however, is part of a Jewish Forward online article acknowledging the accomplishments of various Jewish people.  It is not clear that De La Rosa had any input regarding the article, which concludes:

> Before Newtown, [De La Rosa] was a private citizen leading a quiet life as an oncology nurse and mother. On December 14, 2012, she was involuntarily thrust into the limelight. But rather than shy away from the media onslaught, [De La Rosa] made the Herculean effort, as Rabbi Praver said, of communicating her grief to the public.  In so doing, she kept Newtown and gun control on the national agenda.

Appellants assert that Pozner is a limited purpose public figure because he founded HONR, a charity that provides resources, such as cease and desist letters, to combat online harassment of victims of shootings by "hoaxers" or "truthers"—those who believe that tragedies such as the shooting at Sandy Hook were staged.  The record shows that Pozner initially ignored online harassment directed at his and other families whose children were killed at Sandy Hook, but he founded HONR because his family continued to suffer online harassment between 2013 and 2016.  After his family relocated to a different state, they were again harassed

online and also stalked and threatened by a woman who was convinced that the Pozner family, including Noah's sisters, who were in adjacent rooms at Sandy Hook Elementary when Noah was killed, were actors.  Pozner remains concerned that Noah's siblings will continue to suffer harassment if he is not able to protect them from "hoaxers."  In an article submitted as evidence by the Appellants, Pozner states, in reference to his work with HONR, "This is my battle. I didn't pick it.  It picked me."

Public figure status is a question of law for the court.  *McLemore*, 978 S.W.2d at 571.  We use a three-part test to assess whether an individual is a limited purpose public figure:

> (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and

> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Id.*  The alleged controversy at issue in Appellants' broadcast is whether the parents and others somehow participated in staging the shooting at Sandy Hook.  Assuming that De La Rosa speaking to news sources and to Connecticut legislators in 2013 sufficed to make her a public figure for the limited purpose of the debate on gun control and that she remained a public figure in 2017, she nonetheless remained a private individual for purposes of the debate about whether the Sandy Hook shooting was staged.  Nor is Pozner a limited purpose public figure based on his founding of an organization that attempts to allow victims of mass shootings to avoid harassment and maintain their privacy.  Neither De La Rosa's comments on gun control nor Pozner's

16

founding of HONR are germane to their involuntary participation in the debate over whether the event that took their son's life actually happened.  The Texas Supreme Court has recognized that it would be "exceedingly rare" for a person to become an involuntary public figure.  *Neely*, 418 S.W.3d at 71 (noting the U.S. Supreme Court correctly "forecast that it would be 'exceedingly rare' for a person to become a public figure involuntarily" and observing "neither the United States Supreme Court nor this Court has found circumstances in which a person involuntarily became a limited-purpose public figure").  On this record, we cannot say that this is the exceedingly rare case in which the parents have involuntarily become limited purpose public figures.  *See id.* at 71-72.

As a result of the determination that, at this point in the proceeding, the record does not show that the parents are limited purpose public figures, their burden is to establish by clear and specific evidence that Appellants made the statements in the broadcast with negligence.  "For the purposes of defamation liability, a broadcaster is negligent if [he] knew or should have known a defamatory statement was false."  *Id.* at 72.  Appellants contend that the entire broadcast and its constituent statements were not false assertions of fact because they all constituted Jones's opinion and conclusions based on his opinions.  But many of the broadcast's assertions and conclusions are not opinions, but instead are assertions of fact.  For example, Appellants' broadcast contains factual allegations that De La Rosa's interview on CNN was staged on green screen, that the school had been closed before the shooting occurred, and that the victims of the Sandy Hook shooting might not actually have been killed.  Appellants do not argue or provide any support to show that a green screen was actually used in De La Rosa's interview or that any part of Sandy Hook was staged, although Jones states in a supplemental affidavit that he showed the clip with De La Rosa to show why he believed "at the time" that a

17

green screen was used.  The parents' pleadings and affidavits support their claim that the gist of the broadcast is false and Appellants should have known it was false given that the facts and evidence available regarding the shooting at Sandy Hook had been well established in the four years between when the shooting occurred and the April 22 broadcast.  For example, an uncontroverted portion of an affidavit in the record notes that there are over 180 articles in local newspapers that discuss activities occurring at Sandy Hook Elementary during the time Jones asserts it was abandoned.  The affidavit contains a screen shot of metadata from one news source's photo archive that shows a choir practice in progress at the school in 2011, directly contravening Jones's assertion that the school was closed "for years" before the shooting. The affidavit further explains that "the materials necessary to fact-check these claims" all "exist in the public domain" and that the claims repeated in the April 22 broadcast had already been "debunked."  On this record, we conclude the parents have produced the minimum quantum of clear and specific evidence necessary to establish their prima facie case that Appellants' statements were at least negligent.

### *Damages*

"Damages . . . are not always an essential element of defamation."  *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017) (citing *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015)).  "If the statement is defamatory *per se*, then nominal damages may be awarded without proof of actual injury because mental anguish and loss of reputation are presumed."  *Id.* To recover actual damages for loss of reputation or mental anguish or for economic loss, a

18

plaintiff must present evidence of the existence and amount of these damages.[5]  *Id.*  "But this is optional.  The plaintiff can vindicate his name and obtain nominal damages without evidence of actual injury."  *Id.*  Accordingly, having determined that the parents have established a prima facie case that Appellants' statements were defamatory per se, we may presume nominal damages, which are sufficient to defeat Appellants' motion to dismiss.  *See In re Lipsky*, 460 S.W.3d at 596 ("Pleading and proof of particular damage is not required to prevail on a claim of defamation per se, and thus actual damage is not an essential element of the claim to which the TCPA's burden of clear and specific evidence might apply.").

**Statute of Limitations Defense**

In the third step of the TCPA analysis, we address whether Appellants proved each essential element of any valid defenses by a preponderance of the evidence.  The sole defense raised by Appellants is that the statute of limitations bars any claims related to the June 13, 2017 broadcast.  Having determined that the parents have established a prima facie case for defamation per se based on the April 22 broadcast, we do not address the Appellants' statute of limitations claim as it relates to the June 13 broadcast.

---

[5]  Although not essential to their claim for defamation per se, the parents pleaded that they have suffered "general and special damages, including a severe degree of mental distress and anguish which have disrupted their daily routine and caused a high degree of psychological pain."  In affidavits attached to their response to the motion to dismiss, the parents detail their mental anguish and distress as a result of the 2017 broadcasts, which they assert renewed their fears following five years of enduring harassment from hoaxers.  In addition, Pozner submitted a supplemental affidavit detailing expenses for medical treatment and for measures taken to secure his family's privacy and safety at home following the 2017 broadcasts.  De La Rosa details similar expenses in her supplemental affidavit.

**Pending Second TCPA Motion to Dismiss**

In addition to arguing that the district court erred in denying their motion to dismiss the parents' defamation claim, Appellants also argue that the district court erroneously denied by operation of law a subsequent TCPA motion to dismiss the parents' claim for intentional infliction of emotional distress.  However, filing the notice of appeal of the district court's order on the First Motion to Dismiss stayed all proceedings in the trial court pending resolution of this appeal.  Tex. Civ. Prac. & Rem. Code § 51.014(b).  Therefore, we do not reach the parties' arguments related to the parents' claim for intentional infliction of emotional distress and the Second Motion to Dismiss.  *Cf. Jones v. Heslin*, __S.W.3d __, No. 03-18-00650-CV, 2019 Tex. App. LEXIS 7968 at *3-4 (Tex. App.—Austin 2019, no pet. h.).

## CONCLUSION

Having determined that the parents established a prima facie case for defamation per se that was not subject to the defense raised by Appellants, we affirm the district court's order denying Appellants' motion to dismiss.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Kelly

Affirmed

Filed:  November 5, 2019

20