ACCEPTED
03-23-00209-CV
81524500
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/10/2023 3:32 PM
JEFFREY D. KYLE
CLERK

EXHIBIT 3

**NO. 03-23-00209-CV**

---

**IN THE THIRD COURT OF APPEALS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/10/2023 3:32:34 PM
JEFFREY D. KYLE
Clerk

---

**ALEX E. JONES AND FREE SPEECH SYSTEMS, LLC,**
Appellants

**v.**

**NEIL HESLIN AND SCARLETT LEWIS,**
Appellees

---

Appeal from Cause No. D-1-GN-18-001835
In the 459th District Court of Travis County, Texas

*Consolidated with* Cause No. D-1-GN-18-006623
In the 98th Judicial District Court, Travis County

The Honorable Maya Guerra Gamble, Presiding

---

**CORRECTED APPELLANTS' BRIEF**

---

Christopher W. Martin
State Bar No. 13057620
Federal ID No. 13515
*martin@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.
808 Travis Street, Suite 1100
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Federico Andino Reynal
State Bar No. 240604802
*areynal@frlaw.us*
THE REYNAL LAW FIRM, LLP
917 Franklin, Sixth Floor
Houston, Texas 77002
(713)-228-5900 - Telephone
(713)-820-6981 - Facsimile

**ORAL ARGUMENT REQUESTED**

EXHIBIT 3

## IDENTITY OF PARTIES AND COUNSEL

<u>Appellant/Defendant</u>

Alex E. Jones and Free Speech Systems, LLC

<u>Appellant/Defendants' Counsel In This Court</u>

Christopher W. Martin
State Bar No. 13057620
*martin@mdjwlaw.com*
Gus David Oppermann V
State Bar No. 00786148
*oppermann@mdjwlaw.com*
Martin, Disiere, Jefferson & Wisdom, L.L.P.
808 Travis, Suite 1100
Houston, Texas 77002
Telephone:   (713) 632-1750
Facsimile:    (713) 222-0101

Federico Andino Reynal
State Bar No. 240604802
*areynal@frlaw.us*
Joseph C. Magliolo Jr.
jmagliolo@frlaw.us
State Bar No. 12821600
Westley W. Medlin
*wmedlin@frlaw.us*
State Bar No. 24080702
The Reynal Law Firm LLP
917 Franklin, Sixth Floor
Houston, Texas 77002
(713)-228-5900 - Telephone
(713)-820-6981 - Facsimile

EXHIBIT 3

Appellant/Defendants' Counsel In The Trial Court

Mr. Martin
Mr. Reynal
Mr. Magliolo
Mr. Medlin

Appellee/Plaintiff

Neil Heslin (Cause No. D-1-GN-18-001835)
Scarlett Lewis (Cause No. D-1-GN-18-006623)

Appellee/Plaintiffs' Counsel In This Court

Mark D. Bankston
State Bar No. 24071066
mark@fbtrial.com
William R. Ogden
State Bar No. 24073531
bill@fbtrial.com
Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, Texas 77008

Appellee/Plaintiffs' Counsel In The Trial Court

Mr. Bankston
Mr. Ogden
Mr. Ball
Mr. Farrar

# **TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL ........................................................2

TABLE OF CONTENTS.................................................................................4

INDEX OF AUTHORITIES............................................................................7

STATEMENT OF THE CASE......................................................................14

STATEMENT REGARDING ORAL ARGUMENT ...........................................15

ISSUES PRESENTED................................................................................16

STATEMENT OF FACTS ...........................................................................17

ARGUMENT AND AUTHORITIES................................................................21

1.   The Trial Court violated the Texas and U.S. Constitutions by entering
     a disciplinary default judgment. ...................................................21

     A.   The Death Penalty Sanctions were not related to the claimed
          harm, were unnecessarily harsh, and did not consider less severe
          options. ...........................................................................22

     B.   The manner in which the Trial Court construed causation to have
          been "established" by the liability default relieved Plaintiffs of
          their burden of proving the extent of the Defendants' harm and
          led to a runaway verdict. ....................................................26

     C.   The Constitutions of the U.S. and Texas protect speech
          indistinguishable from Appellants' speech and is subject to de
          novo review. .....................................................................28

2.   Plaintiffs' IIED claims were merely repackaged defamation claims and
     fail as a matter of law..................................................................39

     A.   The Trial Court committed reversible error by entering a default
          on Plaintiffs' facially invalid IIED claims. ...........................39

          (1)   Defamatory conduct cannot form the basis of valid IIED
                claims. ...................................................................40

(2)    The Petitions only alleged facts supporting defamation claims. ...................................................................42

B.    The evidence at trial did not support a claim for IIED. .....................43

(1)    The Default Judgment still required Plaintiffs to prove damages in support of their IIED claims. ...............................43

(2)    Plaintiffs improperly repackaged defamation evidence to support their IIED claims. .........................................44

3.    The Trial Court violated the Texas Civil Practice and Remedies Code by failing to bifurcate the trial. ....................................................50

4.    The Trial Court violated Texas law by entering a joint and several punitive damages award. ................................................................57

5.    The Trial Court improperly allowed Plaintiffs to amend their petition to add a "cap buster" claim post-trial and entered judgment thereon. .........59

A.    Plaintiffs' improper amendment secured them a nearly $45,000,000 windfall. .............................................................59

B.    Legal standard for trial amendments. .................................................60

C.    Defendants were surprised and prejudiced by the trial amendment. ......................................................................62

D.    Plaintiffs' amendment was facially prejudicial and should have been denied. ......................................................................66

E.    Plaintiffs failed to secure the necessary jury findings. .......................68

F.    The default judgment does not save Plaintiffs' improper amendment. ......................................................................70

6.    The Trial Court abused its discretion in entering a sanction order based on a deficient declaration of attorneys' fees. ...............................................71

A.    Plaintiffs' fees were not reasonable and necessary. ...........................72

B.    Plaintiffs' evidence to support the hourly rate was insufficient. ........73

EXHIBIT 3

C.      Plaintiffs' evidence to support the time allegedly spent was
        insufficient. .......................................................................................74

CERTIFICATE OF COMPLIANCE ......................................................................78

CERTIFICATE OF SERVICE ...............................................................................78

APPENDIX .............................................................................................................79

EXHIBIT 3

# INDEX OF AUTHORITIES

**Cases**

*Altesse Healthcare Solutions, Inc. v. Wilson,*
544 S.W.3d 570 (Tex. 2018) ....................................................................22, 27

*Andras v. Memorial Hospital,*
888 S.W.2d 567 (Tex. App. 1994) ...................................................................27

*Arizona v. Mayorkas*,
143 S. Ct. 1312 (2023) ....................................................................................37

*Armstrong v. Collin Cty. Bail Bond Bd.*,
233 S.W.3d 57 (Tex. App.—Dallas 2007, no pet.)...........................................24

*Arthur Anderson &  Co. v. Perry Equipment Corp.*,
945 S.W.2d 812 (Tex. 1997) ............................................................................73

*Bentley v. Bunton,*
94 S.W.3d 561 (Tex. 2002) ..............................................................................30

*Blum v. Stenson*,
466 U.S. 886 (1984) ........................................................................................74

*Boos v. Barry*,
485 U.S. 312 (1988) ........................................................................................35

*Bose Corp. v. Consumers Union of U.S., Inc*.,
466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)...............................29, 30

*Brookshire Bros. Ltd. v. Aldridge*,
438 S.W.3d 9 (Tex. 2014)................................................................................26

*Cain v. Hearst Corp*.,
878 S.W.2d 577 (Tex. 1994) ............................................................................29

*Carlton Energy Group, LLC v. Phillips*,
369 S.W.3d 433 (Tex. App.—Houston [1st Dist.] 2012)
*aff'd in part, rev'd in part on other grounds*, 475 S.W.3d 265
(Tex. 2015) .....................................................................................................58

EXHIBIT 3

*Chesser v. Murphy*,
  386 S.W.2d 164 (Tex. Civ. App.—Houston 1965, no writ) ..............................39

*Cire v. Cummings,*
  134 S.W.3d 835 (Tex. 2004) ................................................................23, 27, 71

*Cohen v. California*,
  403 U.S. 15 (1971). ........................................................................................39

*Conely v. Texas Bd. of Crim. Just.*,
  No. 03-11-00094-CV, 2012 WL 1959320 (Tex. App.—Austin
  May 30, 2012, pet. denied) ...............................................................................40

*Creditwatch, Inc. v. Jackson,*
  157 S.W.3d 814 (Tex. 2005) .......................................................................40, 41

*D. Magazine Partners, L.P. v. Rosenthal*,
  529 S.W.3d 429 (Tex. 2017) .......................................................................28, 29

*Davis v. White*,
  No. 02-13-00191-CV, 2016 WL 1163764 (Tex. App.—Fort
  Worth, 2016, no pet.) ........................................................................................68

*Doubleday & Co., v. Rogers,*
  674 S.W.2d 751 (Tex. 1984) .............................................................................30

*Draker v. Schreiber,*
  271 S.W.3d 318 (Tex. App.—San Antonio 2008, no pet.) ................................41

*El Apple I, Ltd. v. Olivas*,
  370 S.W.3d 757 (Tex. 2012) .......................................................................73, 75

*Ex Parte Tucci,*
  859 S.W.2d 1 (Tex. 1993) ...........................................................................31, 32

*Fairfield Ins. v. Stephens Martin Paving, LP,*
  246 S.W.3d 653 (Tex. 2008) .......................................................................57, 58

*Geis v. Colina Del Rio, LP*,
  362 S.W.3d 100 (Tex. App.—San Antonio 2011, pet. denied) .........................61

*Greenhalgh v. Service Lloyds Ins. Co.*,
  787 S.W.2d 938 (Tex. 1990) .............................................................................61

EXHIBIT 3

*Hamill v. Level,*
    917 S.W.2d 15 (Tex.1996) ..................................................................................27

*HCRA of Tex., Inc. v. Johnston,*
    178 S.W.3d 861 (Tex. App.—Fort Worth 2005, no pet.) ....................................69

*Hersh v. Tatum,*
    526 S.W.3d 462 (Tex. 2017) ...............................................................................41

*Hoffmann-La Roche Inc. v. Zeltwanger,*
    144 S.W.3d 438 (Tex. 2004) ..........................................................................40, 41

*Horizon Health Corp. v. Acadia Healthcare Co., Inc.,*
    520 S.W.3d 848 (Tex. 2017); ..........................................................................57, 58

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of
    Boston, Inc.,*
    515 U.S. 557 (1995) ............................................................................................33

*In re Lipsky,*
    460 S.W.3d 579 (Tex. 2015) ...............................................................................42

*JBS Carriers, Inc. v. Washington,*
    564 S.W.3d 830 (Tex. 2018) ...............................................................................52

*Knoderer v. State Farm Lloyds,*
    No. 06-13-00027-CV, 2014 WL 4699136 (Tex. App.—
    Texarkana 2014, no pet.) ....................................................................................27

*Lanfear v. Blackmon,*
    827 S.W.2d 87 (Tex. App.—Corpus Christi 1992, orig.
    proceeding) ..........................................................................................................26

*Low v. Henry,*
    221 S.W.3d 609 (Tex. 2007) ...............................................................................72

*Low v. King,*
    867 S.W.2d 141 (Tex. App.—Beaumont 1993) ..............................................28, 31

*Lowry v. Tarbox,*
    537 S.W.3d 599 (Tex. App.—San Antonio 2017, pet. denied) ............................69

*Madison v. Williamson*,
  241 S.W.3d 145 (Tex. App.—Houston [1st Dist.] 2007, pet.
  denied) ................................................................................................69

*Mission Res., Inc. v. Garza Energy Trust*,
  166 S.W.3d 301 (Tex. App.—Corpus Christi 2005),
  *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008)...........................69

*Missouri v. Biden*,
  No. 23-30445, (5th Cir. 2023) ...........................................................31

*Montelongo v. Abrea*,
  622 S.W.3d 290 (Tex. 2021) ......................................................70, 71

*Morgan v. Compugraphic Corp.*,
  675 S.W.2d 729 (Tex. 1984) ..............................................................43

*Nath v. Texas Children's Hosp.*,
  446 S.W.3d 355 (Tex. 2014) ......................................................71, 72

*New Times, Inc. v. Isaacks*,
  146 S.W.3d 144 (Tex. 2004) ..............................................................30

*Paradigm Oil, Inc. v. Retamco Operating, Inc.*,
  372 S.W.3d 177 (Tex. 2012) ...............................................25, 27, 44

*Paramount Pipe & Supply Co. v. Muhr*,
  749 S.W.2d 491 (Tex. 1988) ..............................................................40

*Penny v. El Patio, LLC*,
  466 S.W.3d 914 (Tex. App.—Austin 2015, pet. denied)..............57, 58

*Reliance Steel & Aluminum Co. v. Sevcik*,
  267 S.W.3d 867 (Tex. 2008) ......................................................52, 56

*Rohrmoos Venture v. UTSW DVA Healthcare, LLP*,
  578 S.W.3d 469 (Tex. 2019) .......................................72, 73, 74, 75

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ................................................................. passim

*Spohn Hosp. v. Mayer*,
  104 S.W.3d 878 (Tex. 2003) ..............................................................23

EXHIBIT 3

*Standard Fruit & Veg. Co. v. Johnson,*
   985 S.W.2d 62 (Tex. 1998) ............................................................40, 41

*Stelly v. Duriso,*
   982 F.3d 403 (5th Cir. 2020) .................................................................50

*Stevenson v. Koutzarov,*
   795 S.W.2d 313 (Tex. App.—Houston [1st Dist.] 1990, writ
   denied) ................................................................................................67

Stoner v. Thompson,
   578 S.W.2d 679 (Tex. 1979) ...............................................39, 70, 71

*Sullivan v. Abraham,*
   488 S.W.3d 294 (Tex. 2016) .................................................................73

*Tanglewood Homes Ass'n v. Feldman,*
   435 S.W.3d 48 (Tex. App.—Houston [14th Dist.] 2014, pet.
   denied) ................................................................................................61

*Tex. Black Iron, Inc. v. Arawak Energy Int'l, Ltd.,*
   566 S.W.3d 801 (Tex. App. 2018) .........................................................67

*Texas Builders v. Keller,*
   928 S.W.2d 479 (Tex.1996) ..................................................................58

*Texas v. Johnson,*
   491 U.S. 397 (1989) ......................................................................28, 32

*TransAmerican Natural Gas Corp. v. Powell,*
   811 S.W.2d 913 (Tex. 1991) ...........................................................24, 27

*Transp. Ins. Co. v. Moriel,*
   879 S.W.2d 10 (1994) ...........................................................................50

*Tullis v. Scott,*
   38 Tex. 537 (Tex. 1873) .......................................................................70

*U.S. v. Alvarez,*
   567 U.S. 709 (2012) ......................................................................28, 29

*Unifund CCR Partners v. Villa,*
   299 S.W.3d 92 (Tex. 2009) ..................................................................71

EXHIBIT 3

*Vaughn v. Drennon,*
   372 S.W.3d 726 (Tex. App.—Tyler 2012, no. pet.) ...........................................41

*Warner Bros. Entm't v. Jones*,
   538 S.W.3d 781 (Tex. App.—Austin 2017),
   *aff'd* 611 S.W.3d 1 (Tex. 2020) ..................................................................41, 46

*Warner Comms. v. Keller*,
   888 S.W.2d 586 (Tex. App.—El Paso 1994) ....................................................58

*Wheeler v. Green*,
   157 S.W.3d 439 (Tex. 2005) ..........................................................................25

*Zarate v. Rodriguez*,
   542 S.W.3d 26 (Tex. App.—Houston [14th Dist.] 2017, pet.
   denied) ...................................................................................................61, 62, 67

*Zorrilla v. Aypco Constr. II, LLC*,
   469 S.W.3d 143 (Tex. 2015) ..........................................................................68

**Statutes**

Tex. Civ. Prac. & Rem. Code §41.006 ............................................................57, 58

Tex. Civ. Prac. & Rem. Code §41.008 ...................................................................59

Tex. Civ. Prac. & Rem. Code §41.008(b)........................................................60, 66

Tex. Civ. Prac. & Rem. Code §41.008(c)...............................................................64

Tex. Civ. Prac. & Rem. Code §41.008(c)(7) .........................................................60

Tex. Civ. Prac. & Rem. Code §41.009 ...................................................................51

Tex. Civ. Prac. & Rem. Code §41.011(a) ..............................................................51

Tex. Civ. Prac. & Rem. Code §41.011(b)..............................................................57

Tex. Civ. Prac. & Rem. Code §73.001 .............................................................42, 45

Tex. Civ. Prac. & Rem. Code §73.054 ...................................................................45

Tex. Civ. Prac. & Rem. Code §73.054(a)...............................................................42

EXHIBIT 3

Tex. Fam. Code §261.001(9) ............................................................................64

Tex. Occ. Code §1101.754 .............................................................................67

Tex. Penal Code §22.04 ....................................................................62, 64, 65

**Rules**

Tex. R. Civ. P. 215.2 (b) ................................................................................22

Tex. R. Civ. P. 63 ...........................................................................................61

**Constitutional Provisions**

Tex. Const. art. 1. Sec.8 ................................................................................29

U.S. Const. Amnd. 1 ......................................................................................29

EXHIBIT 3

## <u>STATEMENT OF THE CASE</u>

| | |
|---|---|
| *Nature of the Case* | This dispute involves claims for intentional infliction of emotional distress ("IIED") and defamation. Plaintiffs are Neil Heslin and Scarlett Lewis. Adam Lanza murdered Heslin and Lewis's son, Jesse, at Sandy Hook Elementary School in 2012. Defendants are Alex Jones and Free Speech Systems, LLC ("FSS"). Jones is a conservative media broadcaster and conspiracy theorist. Jones works for FSS. |
| | Heslin sued Jones and FSS on April 16, 2018. Lewis sued Jones and FSS on October 31, 2018. |
| | On September 27, 2021, the District Court imposed Death Penalty Sanctions against Jones and FSS. |
| | On April 1, 2022, the District Court ordered Jones and FSS to pay Plaintiffs' attorneys fees and costs of discovery to date as an additional sanction. |
| | On July 25, 2022, a trial was held to determine what amount of actual and exemplary damages were caused by Defendants' conduct. |
| *Trial Court* | Travis County 261st District Court<br>Hon. Maya Guerra Gamble |
| *Disposition Below* | The District Court entered a final judgement against Defendants for $50,043,923.80. The District Court also ordered Defendants to pay Plaintiffs' fees and costs for discovery of $966,182.73. Defendants' appeal. |

EXHIBIT 3

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Alex Jones and Free Speech Systems request oral argument. Some of the legal and factual issues presented are very detailed. Alex Jones and Free Speech Systems believe that hearing from the parties' counsel in person would aid the Court's decisional process.

EXHIBIT 3

## <u>ISSUES PRESENTED</u>

1. Whether the Trial Court violated the Texas and United States Constitutions by entering a disciplinary default judgement?

   Yes. The court failed to consider lesser sanctions as required by Texas law and instead imposed "Death Penalty" sanctions precluding Defendants of defending the liability and causation claims against them.

2. Whether the Trial Court violated Texas law by entering a default on Plaintiffs' IIED claims because they are facially invalid?

   Yes. Plaintiffs failed to state a cause of action for IIED because their claims sound in defamation.

3. Whether the Trial Court violated the Texas Civil Practice and Remedies Code by failing to strictly bifurcate the trial?

   Yes. The CPRC mandates full bifurcation.

4. Whether the Trial Court violated Texas law by submitting Plaintiffs' IIED claims to the jury because they failed to prove causation and the evidence Plaintiffs submitted to the jury consisted solely of defamation?

   Yes. Plaintiffs did not establish that Defendants' IIED caused them any damages and, therefore, the issue should not have been submitted to the jury.

5. Whether the Trial Court violated Texas law by entering a joint and several exemplary damages award?

   Yes. Texas law does not recognize joint and several liability for exemplary damages.

6. Whether the Trial Court violated Texas law by allowing Plaintiffs to amend their petition to add "cap buster" allegations for the first-time post-trial and then entering a judgement thereon?

   Yes. Defendants were surprised and prejudiced by Plaintiffs post-trial amendment. Independently, the jury was not instructed on the correct burden of proof.

## STATEMENT OF FACTS

### Plaintiffs' Lawsuits

The mass shooting at the Sandy Hook Elementary School in 2012 sparked a host of conspiracy theories about who was behind the shooting and whether it even occurred. Thereafter, Alex Jones created broadcasts questioning the official narrative of the Sandy Hook school shooting. 25 RR 64

More than 6 years after the shootings at Sandy Hook, in 2018 and 2019, Plaintiffs separately filed three lawsuits against Alex Jones, Free Speech Systems LLC ("FSS"), InfoWars, LLC ("InfoWars") and Owen Shroyer. CR 19-37;CR 13-34. Neil Heslin's first lawsuit was for defamation and his second for IIED. CR 19-37; CR 32 22-3239. Scarlett Lewis' only lawsuit was for IIED. LCR 13-34[1]

Both Plaintiffs' IIED claims were premised on the idea that, because of Jones' broadcasts, unknown third parties harassed them for purportedly lying about their child's death. CR 19-37. Heslin made a separate defamation claim based on two broadcasts in 2017 that disputed whether he had held his dead child in his arms after the mass shooting. CR 19-37

---

[1] Reporters Record will be cited throughout by Volume RR Page (1RR 16); Court Record will be cited CR followed by pages(s); (CR 106-117); Lewis' CR before consolidation LCR followed by page(s) (LCR 1-3).

EXHIBIT 3

## Sanctions

Plaintiffs focused on discovery sanctions early complaining at every possible opportunity that Jones and FSS were not providing adequate information and otherwise engaging in bad faith litigation conduct. CR1425-1441; CR 4394-4400; CR 4394-4400; CR 5442-5971; CR 6203-6234; CR 6455-6664; CR 7071-7079; CR 7881-7912; CR 9423-9560.

On September 27, 2021, the Trial Court entered Death Penalty Sanctions against Defendants and struck their pleadings. CR 5288-5291. The Trial Court's basis for such a severe sanction was discovery abuse, even though Defendants had already produced at least 80,000 pages of documents, provided multiple depositions, and produced dozens of InfoWars broadcasts. CR 4462-4470, CR 7109. Plaintiffs later revealed in connection with their application for attorney's fees that they had spent approximately 1,000 hours reviewing Defendants' discovery production. CR 7109.

Even after the default, Defendants continued to attempt to comply with Plaintiffs' never-ending discovery requests. FSS produced multiple corporate representatives for deposition and even more documents. Nevertheless, the Court continued to sanction Defendants, ordering them to pay more than $1,000,000 in attorney's fees and litigation costs and prohibiting them from designating an expert

on net worth at trial. CR 7109. Plaintiffs, on the other hand, were permitted to use all the evidence they had gathered through discovery which Jones had produced.

**Pre-trial Rulings**

Pre-trial, Defendants timely moved to bifurcate the damages trial pursuant to Chapter 41 of the TRCP. CR 7273-7277. The Court denied Defendants' motion to bifurcate reasoning that in a liability trial, evidence that Defendants acted maliciously would be introduced in phase one to establish Defendants' liability for exemplary damages, so it would be incorrect not to allow the same evidence in a damages trial. *See* 10 RR 58-71. Applying the same reasoning, the District Court allowed net worth evidence to be submitted to the jury in a separate phase after which the jury would award exemplary damages. *Id*.

On April 15, 2022, in an additional pre-trial ruling, the District Court ordered Defendants to pay approximately one million dollars in Plaintiffs' attorney's fees and costs as an additional discovery sanction. CR 7050-7054; CR 7183-7184. Defendants objected to the ruling and to Plaintiffs' deficient fee declarations, which were not detailed or contemporaneous. CR 7119-7123.

## The Damages Trial

In phase one of the trial, Plaintiffs, over objection, introduced voluminous evidence of Defendants' recklessness, maliciousness, and general bad character. 12RR 94-95;12RR 112;12RR 117;12RR 130;12RR 135;12RR 201-202;12RR 206. Plaintiffs introduced no evidence of lost wages, medical expenses or any other type of economic damages and focused their presentation solely on their non-economic damages. 12RR 72. The jurors returned a compensatory damages verdict totaling $4,110,000. 18RR 23-24.

During phase two, Plaintiffs presented expert testimony of Jones' net worth. 19RR 6-46. Jones was barred from testifying. The jury found FSS and Jones jointly and severally liable for exemplary damages totaling $45.2 million. 19 RR 100; CR 9331-9333.

## Post Trial Motions

After trial, Plaintiffs moved for entry of judgment on the entire punitive award and moved to amend their petition to add a "cap-buster" claim for injury to a disabled person under the Texas Penal Code. CR 7913-8003; CR 8009-8051. Defendants moved to reduce the exemplary damages in accordance with the Texas Damages Act and objected to any post-trial amendment. CR 8082-8147. The District Court granted the motion to amend Plaintiffs' petition, inferred that a similar disciplinary default would have occurred, imagined that the damages question would have been

submitted to the jury based on a beyond a reasonable doubt standard of proof, assumed the jury would have answered it the same way, and entered judgment for the full amount of the award. 20 RR 215-225. The District Court also speculated that had she not granted Plaintiffs' motion to amend, she would have found the Texas Damages Act unconstitutional. 20 RR 219-225.

## ARGUMENT AND AUTHORITIES

**1.     The Trial Court violated the Texas and U.S. Constitutions by entering a disciplinary default judgment.**

From the beginning, Plaintiffs sought sanctions for a variety of perceived harms. Beginning with a spoliation motion and continuing through allegations of failures to answer discovery "completely" or "prepare" a corporate representative for deposition, Plaintiffs' discovery complaints have been continuous in the five Texas cases. The Court rewarded them with monetary and death penalty sanctions.

The Sanctions Orders were silent as to how Defendants prevented Plaintiffs from prosecuting their defamation and IIED claims or how the unproduced content could be the proximate cause of their IIED claims that unknown others had harmed them. The Order ignored that Plaintiffs already had in their possession the key evidence to prove their claims. The Order was also silent as to how the preservation of broadcasts posted on third-party forums should lead to sanctions against Defendants if their content was removed by others. CR 7050- 7054

EXHIBIT 3

**A.    The Death Penalty Sanctions were not related to the claimed harm, were unnecessarily harsh, and did not consider less severe options.**

Before imposing sanctions, the District Court must use a two-part test to determine if they are "just": (1) there must be a direct relationship between the offensive conduct and the sanctions and (2) the sanctions should not be excessive. Tex. R. Civ. P. 215.2 (b); *Altesse Healthcare Solutions, Inc. v. Wilson,* 544 S.W.3d 570, 574 (Tex. 2018). The District Court's sanction here had no direct relationship to the claimed harm and was unjustly harsh.

The liability default had no direct relationship to the claimed harm because Defendants' conduct – allegedly failing to produce documents and witnesses – did not impact Plaintiffs' ability to make their asserted claims. Heslin's defamation claim involved two broadcasts: Mr. Shroyer's June 26, 2017 broadcast and Mr. Jones' July 20, 2017 rebroadcast of Mr. Shroyer's June 26, 2017 broadcast. The original petitions of Heslin (CR 19-37) and Lewis (LCR 13-34) contained dozens of hyperlinks to the complained of videos on which claimants relied for evidence of their Defamation and IIED claims.

Similarly, Defendants alleged failure to produce sufficient documents and witnesses did not prejudice their ability to prove up their IIED claims. Before trial, the parties agreed to the use of 42 videos described in Plaintiffs' Exhibit 31. 25 RR 64. In addition to the numerous videos available to Plaintiffs, no explanation was

given as to how Defendants could identify any absent videos that allegedly injured Plaintiffs.

This was not a case in which Defendants failed to answer the complaint, failed to respond to discovery or otherwise failed to participate in the proceedings. In such cases, the harsh remedy of a default may well be warranted. Defendants' discovery compliance was substantial, but perpetually unsatisfactory to Plaintiffs. An appropriate inquiry should have been made by the Court to determine whether any perceived difficulties were material or mere litigation posturing by Plaintiffs anxious to avoid a trial on the merits, but such inquiry never occurred. The harsh remedy of default should be reserved for those parties who fail to participate in, or respond to, judicial proceedings. *Spohn Hosp. v. Mayer*, 104 S.W.3d 878 (Tex. 2003). The court must give a reasoned explanation why lesser sanctions would not have been effective and why the sanction imposed was appropriate. *Cire v. Cummings,* 134 S.W.3d 835, 840-41 (Tex. 2004). That didn't occur here. A trial court's imposition of sanctions is reviewed for an abuse of discretion. *Id*. at 838. Here, there is a claim of substantial non-compliance with discovery obligations but materiality, prejudice, and lesser alternatives were never addressed. It was continuous litigation gamesmanship.

In this case, the Court's Death Penalty sanctions failed to provide the reason Death Penalty sanctions were the only available remedy or why this drastic penalty was appropriate. *Id.* "Sanctions which are so severe as to preclude presentation of

the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex. 1991) (citation omitted).

Here, a case that raised serious Constitutional free speech issues became a game of litigation "gotcha." In the end, Plaintiffs' Counsel persuaded the Trial Court to enter a default on liability and causation, effectively relieving Plaintiffs of proving anything. There was never a showing of discovery bad faith. "Bad faith is not simply bad judgment or negligence, but the conscious doing of a wrong for dishonest, discriminatory or malicious purpose." *Armstrong v. Collin Cty. Bail Bond Bd.*, 233 S.W.3d 57, 63 (Tex. App.—Dallas 2007, no pet.). The result was a windfall to Plaintiffs – they received data they claimed was incomplete and were still free to use everything provided to create a fictitious strawman – an evil company owned by a madman determined to target the parents of grieving children for his own personal profit, and the accused were muted from responding.

A liability default in a case involving the extensive discovery propounded and responded to was both unwarranted and unprecedented. Plaintiffs persuaded the Court that Defendants were non-cooperative because Defendants' documents were not organized to the satisfaction of Plaintiffs' Counsel. Corporate representatives testified at trial and in depositions as to what they knew, observed, and were able to

EXHIBIT 3

recover. 12 RR 6-217; CR 6168-6177; 24 RR 14-26. Plaintiffs scoffed. Defendants'

records were admittedly organized poorly, but their disorganization cost them more

than due process and justice should permit. Mere disorganization should not have

cost Defendants the right to defend themselves or deny them a right to free speech

and due process. Due process prohibits merits-preclusive sanctions for discovery

abuse absent flagrant bad faith or callous disregard for the rules. *Wheeler v. Green*,

157 S.W.3d 439, 443 (Tex. 2005).

The record is clear that Defendants did not fail to participate in the discovery

process. *See* CR 7109. Defendants produced approximately 80,000 pages of

documents in response to Plaintiffs' never-ending discovery requests. CR 7109. A

default might be proportionate when a defendant refuses to meaningfully participate

in any discovery, but one who participates in discovery in a manner that is arguably

imperfect should have the right to a lesser sanction.  The default sanction here

unjustly silenced Defendants altogether regarding the liability and causation

allegations made against them, and the result was an enormous damages verdict.

In assessing proportionality, a trial court must consider the totality of the

circumstances, including, most importantly, the nature of the conduct itself.

*Paradigm Oil, Inc. v. Retamco Operating, Inc.,* 372 S.W.3d 177 (Tex. 2012).

(sanctions under *TRCP 215* (b) cannot be arbitrary, unrelated to the harm caused by

the sanctionable conduct). *Id.* That would have required showing the items

25

EXHIBIT 3

Defendants allegedly failed to produce were at some point in existence, under their control, and that they had been improperly destroyed or intentionally disregarded. *See Brookshire Bros. Ltd. v. Aldridge*, 438 S.W.3d 9, 20 (Tex. 2014). Plaintiffs never made this evidentiary showing.

Defendants' inability to manage their business records to the satisfaction of Plaintiffs was a factor Plaintiffs should have been required to establish as "proof" of whatever claims they thought systemic disorganization would support. *Lanfear v. Blackmon*, 827 S.W.2d 87, 91 (Tex. App.—Corpus Christi 1992, orig. proceeding). Plaintiffs should not have been permitted to transform discovery disorganization or a failure to produce records not in their care, custody, or control into a death penalty default, relieving Plaintiffs from proving anything at all related to liability and causation.

**B.   The manner in which the Trial Court construed causation to have been "established" by the liability default relieved Plaintiffs of their burden of proving the extent of the Defendants' harm and led to a runaway verdict.**

During closing argument, Plaintiffs argued the jury had a historical opportunity to "stop" Alex Jones, presumably by returning a crippling exemplary damages award. 19 RR 70. A necessary prelude to this argument was a record in which causation was eliminated. The Trial Court ruled that because of the liability default, causation had already been "established" for Plaintiffs' IIED claims. 10 RR 109-110. These rulings reduced the damages trial to a farce. Defendants objected

throughout contending that under Texas law, a plaintiff, even one operating under cloak of the luxury of a default judgment, must prove causation as well as the type and extent of their damages.

"For death-penalty sanctions to be appropriate, the party's conduct must justify the presumption that its claims or defense lack merit. *Paradigm Oil,* 372 S.W.3d at 184; *Hamill v. Level,* 917 S.W.2d 15,16 (Tex.1996); *TransAmerican,* 811 S.W.2d at 918; *e.g., Atlesse Healthcare Solutions*, 540 S.W.3d at 572; *Cire,* 134 S.W.3d at 839 (death-penalty sanctions were justified when P deliberately destroyed audiotapes because they were unfavorable to her claims); *Knoderer v. State Farm Lloyds*, No. 06-13-00027-CV, 2014 WL 4699136 (Tex. App.—Texarkana 2014, no pet.) (death-penalty sanctions not justified when Plaintiff destroyed evidence indicating photographs used to impeach Defendant's expert were fabricated because such evidence did not go to the ultimate issues); *see also Andras v. Memorial Hospital,* 888 S.W.2d 567, 573 (Tex. App. 1994).

The effect of the Trial Court's ruling was to allow Plaintiffs to blame Alex Jones for any emotional or mental harms suffered because of harassment by third parties unrelated to Jones or his business. 14 RR 29. The Trial Court transformed the proceeding into an example of existential strict liability, all but handing a blank check to Plaintiffs and their lawyers. 14 RR 38-130. In weeks of testimony, Plaintiffs did not prove by competent evidence that Jones ever sent or influenced anyone to

EXHIBIT 3

harass Plaintiffs or anyone else associated with Sandy Hook, or that anyone who listened to him received any motivation from him to harass Plaintiffs or anyone else associated with Sandy Hook. The jury was erroneously instructed that liability had been "established."

### C. The Constitutions of the U.S. and Texas protect speech indistinguishable from Appellants' speech and is subject to de novo review.

Defendants initially raised numerous questions about the tragic death of children at the hands of a gunman at Sandy Hook Elementary School and stated their personal opinions that the tragedy was a "sham." Jones' public questioning of the circumstances regarding the tragedy was offensive to many.  Both federal and state courts, however, have consistently found offensive speech of this type to be protected. *Texas v. Johnson,* 491 U.S. 397 (1989); *U.S. v. Alvarez*, 567 U.S. 709, 727 (2012); *D. Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429 (Tex. 2017); *Low v. King*, 867 S.W.2d 141 (Tex. App.—Beaumont New York 1993).

 As the US Supreme Court noted in *Alvarez*, "the remedy for speech that is false is speech that is true." The High Court explained:

>        This is the ordinary course in a free society and is an essential element of any trial. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth." The theory of our Constitution is "that the best test of truth is the power of the thought to get itself accepted in the competition of the market".  The First Amendment itself ensures the right to respond to speech we do not like, in public, including the courtroom. Freedom of speech and thought flows not from the beneficence of the state but from

> the inalienable rights of the person. And suppression of speech by the Court can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, and rational discourse particularly when determining a party's Constitutional rights.

*U.S. v. Alvarez*, 567 U.S. 709 (2012).

The Trial Court claimed that Death Penalty sanctions were justified by repeated discovery failures and Jones' professed belief that the District Court's proceedings were a "show trial." CR 5298-5291. The Trial Court offered no explanation as to why an out-of-court statements that the speaker believed to be true were not protected by the Texas and U.S. Constitutions. Tex. Const. art. 1. Sec.8; U.S. Const. Amnd. 1. Rather than the District Court protecting Appellants' freedom of speech, the Court literally took it away for the remainder of these proceedings.

Both the U.S. Constitution and the Texas Constitution "robustly protect freedom of speech," *D. Magazine Partners, L.P. v. Rosenthal,* 529 S.W.3d 429, 431 (Tex. 2017).  Texas law also imposes substantive limits on defamation law. *See Cain v. Hearst Corp*., 878 S.W.2d 577, 584 (Tex. 1994) ("[T]he Texas Constitution [has] independent vitality from the federal constitution, and [it] impose[s] even higher standards on court orders which restrict the right of free speech."). Among these limits, to avoid the threat to free speech that unrestrained defamation liability poses, the U.S. Constitution "imposes a special responsibility on judges whenever it is claimed that a particular communication is [defamatory]." *Bose Corp. v. Consumers Union of U.S., Inc*., 466 U.S. 485, 505, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). For

EXHIBIT 3

appellate judges, one of these responsibilities is to comply with the "requirement of independent appellate review" as a matter of "federal Constitutional Law." *Bose*, 466 U.S. at 510; *see also Doubleday & Co., v. Rogers,* 674 S.W.2d 751, 755 (Tex. 1984) ("[T]he First Amendment requires the appellate court to independently review the evidence.")

The Court's Death Penalty sanctions and subsequent rulings are silent as to the Court's examination of its "special responsibility" in these free speech cases. Indeed, the Court record, Death Penalty order, and other discovery rulings are devoid of the required Constitutional examination of the alleged defamation of Plaintiffs or of Appellants' Constitutionally protected out-of-court broadcasts. *Id*. CR 7050-7054

Even when a statement is verifiable as false, it does not give rise to liability if the "entire context in which it was made" discloses that it is merely an opinion masquerading as a fact. *See Bentley v. Bunton,* 94 S.W.3d 561, 581 (Tex. 2002); *see also New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 156-57 (Tex. 2004). In this case, the entirety of the broadcasts were not played at trial over objection which prevented the factfinder from assessing the context in which the alleged offending statements were made. 13 RR 24-25; *see generally* 13 RR 6-25. This allowed Plaintiffs to paint Defendants as serial offenders rather than political commentators questioning governmental and special interests' activities as well as preventing Defendants from discussing the questions they legitimately possessed.

EXHIBIT 3

All branches of the state and federal government are prohibited from censoring speech. Protected speech includes comments publicly broadcast or on social media. *Missouri v. Biden,* No. 23-30445, (5th Cir. 2023). The Court ordered Death Penalty sanctions, in part, because Defendant claimed outside of the court room that the outcome of his trial was predetermined. CR 7051 FN. Later, the Court's suspension of the Damages Act provided an 8-figure punishment for exercising free speech and created an overwhelming restraint on any future free speech on similar subjects.

This case is not the first in Texas to face the implications of Article 1, Section 8 of the Texas Constitution regarding freedom of speech. *Low v. King,* 867 S.W.2d 141 (Tex.App.1993). Every Texan shall be at liberty to speak, write or publish his opinions on any subject being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or press. *Id.* The Texas Supreme Court has noted:

> In reviewing the validity of the particular sanctions in these orders, we must look first to our Texas Constitution. With its broad command that every person shall be at liberty to speak… opinions on any subject, article one, section eight… provides greater rights of free expression than its federal equivalent. Its language demonstrates Texas' strong and long-standing commitment to free speech.

*Ex Parte Tucci,* 859 S.W.2d 1 (Tex. 1993).

Texas courts recognize that vigorous debate of public issues in our society may produce speech considered obnoxious or offensive by some, but the debate is

EXHIBIT 3

a necessary cost of that freedom. *Id*. Texas courts have consistently maintained a commitment to expression that is strong and uncompromising for friend and foe alike. *Id*.

Speech on matters of public concern is protected by the First Amendment. The determination of whether speech falls into the category of public concern involves evaluating the content, form, and context of the speech. In the case of *Snyder v. Phelps*, the US Supreme Court held that the Westboro Baptist Church's protest, although offensive and hurtful to grieving parents, addressed broader public issues rather than purely private matters. 562 U.S. 443, 451 (2011). The Court there emphasized that even controversial speech should be tolerated to preserve the freedoms protected by the First Amendment. *Id.*

Speech on public issues is granted broad protection under the First Amendment to ensure that courts do not inadvertently act as censors, as open and uninhibited discussion of public matters is essential to self-government. *Id.* at 451-52. The crude or controversial nature of a statement is irrelevant in determining whether it deals with a matter of public concern. *Id.* at 453. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

EXHIBIT 3

To ascertain whether speech is of public or private concern, courts must examine the content, form, and context of the speech by conducting an independent evaluation of the entire record to ensure that the judgment does not infringe on the realm of protected expression. *Snyder*, 562 U.S. at 453-54. No single factor is conclusive, and the circumstances surrounding the speech, including what was said, where it was said, and how it was said, must be evaluated. *Id.* at 454. In doing so, courts must be mindful that "the point of all speech protection" is protecting speech that someone finds disagreeable—universally appealing speech does not require any constitutional safeguarding. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557, 574 (1995).

Under this legal standard, the U.S. Supreme Court, in an 8-1 decision, overturned a state-court judgment for intentional infliction of emotional distress, which awarded substantial compensatory and exemplary damages to the father of a fallen soldier. The judgment arose from a protest conducted by the Westboro Baptist Church during the soldier's funeral. The church members, positioned outside the funeral, held signs with inflammatory messages falsely suggesting that the soldier was a homosexual destined for hell and expressing offensive viewpoints, including "Thank God for Dead Soldiers," "Thank God for 9/11," "Thank God for IEDs," and "You're Going to Hell." Although the father did not see the signs during the funeral

EXHIBIT 3

procession, he witnessed them on a later news broadcast causing him severe emotional distress. *Snyder*, 562 U.S. at 456.

In overturning the judgment, the High Court reasoned that the content of the signs related to broad societal issues rather than matters of purely private concern. Although some signs and online posts were directed at private individuals, the predominant focus of Westboro's demonstration—while crude and inartful—addressed public issues, such as "the political and moral conduct of the United States and its citizens, the fate of our Nation, [and] homosexuality in the military." *Snyder*, 562 U.S. at 454. Nothing suggested a "pre-existing … conflict between [the parties] that might suggest Westboro's speech on public matters was intended to mask an attack on [the father] over a private matter." *Id.* at 455.

The Court further noted that Westboro had engaged in similar forms of speech on numerous occasions, deliberately aiming to reach a wide audience. *Id.* at 454. They did so not only by directly protesting hundreds of funerals, but also exchanging airtime on news shows for cancelling protests at the funeral "of five Amish girls killed by a crazed gunman" and "of a 9–year–old girl killed in the shooting spree in Tucson" where the church members planned to "proclaim[] that she was 'better off dead.'" *Id.* at 468 (Alito, J. dissenting).

The hurtful and offensive nature of the speech, while acknowledged, failed to justify restricting protected speech merely because it causes distress. The Court

34

reasoned that "any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed." *Id.* at 443. Given the undisputedly "outrageous" nature of the speech, a factfinder is "unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression." *Id.* at 458. "Such a risk is unacceptable," as a free society "must tolerate insulting, and even outrageous, speech … to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* at 458 (quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988)).

Under the same standard, the speech here was protected by the First Amendment. Upon evaluating all the circumstances surrounding the speech—its content, form, and context—it becomes evident that the speech was directly related to matters of significant public concern and legitimate news interest, rather than any purely private matters between these particular plaintiffs and these particular defendants.

Regarding the form of the speech, it is crucial to note its medium as speech on a global radio show. In *Snyder*, Justice Samuel Alito, the sole dissenter, provided examples of forms that would not violate the Constitution, such as creating and disseminating video and audio recordings, posting messages on the internet, sending mass emails, or speaking on television and radio shows. 562 U.S. at 463 (Alito, J.

dissenting). Had the Westboro Baptists' speech involved a radio show or internet broadcast rather than an in-person protest at a funeral, the *Snyder* opinion would have been unanimous.

As to context, the speech in question was expressed during a radio show that had been on the air for many years. Throughout these years, the show consistently addressed themes of broad public concern. The program's overall focus revolved around individual liberties, the nation's safety, political and moral decline domestically, and hypervigilance against a government which Defendants believed had been historically deceitful. It built an audience hitting hard at the government and those in power whom Defendants believe historically sought to curtail individual rights and control the population, often referred to as the "deep state."

The show's confrontational style and uncomfortable content often elicited disapproval, disagreement, and scorn. The show blended reporting, opinion, sarcasm, satire, devil's advocacy, and hyperbole. The show's audience knows this, as do those outside the audience. The show often hosts governmental critics seen as outside the mainstream. The show's substantial audience appreciates and engages with the show's content. Over decades of programming, both before and after Sandy Hook, Defendants discussed various government conspiracy theories, such as FBI involvement in the 1999 WTO protests, the 9/11 terrorist attacks, weapons of mass

EXHIBIT 3

destruction in Iraq, the Clinton Foundation, and the origins of COVID-19 and its vaccines.

Defendant's initial suspicions regarding Sandy Hook were no different. When examining its content in context, the free speech target remained the same: the US government and the "deep state." The overall thrust of the content aligned with this consistent focus. It emphasized that when the government seeks to exploit an event to restrict individual liberties, the American people must thoroughly and vigorously question the event. For example, when the government used the 9/11 attacks to justify surveillance on law-abiding citizens, Defendants questioned the official narrative. When the government claimed the existence of weapons of mass destruction in Iraq as a basis for invasion and war, Defendants questioned those claims, just as they questioned the government's justification for other foreign interventions. Similarly, when the government imposed what Justice Gorsuch recently described as "the greatest intrusions on civil liberties in the peacetime history of this country" following the government's use of COVID-19 to lockdown the country and inject every citizen with previously unheard-of substance, Defendants questioned the federal, state, and local governments. *Arizona v. Mayorkas*, 143 S. Ct. 1312, 1314 (2023). And when the government attempted to curtail Second Amendment rights following the Sandy Hook incident, Defendants questioned the event, focusing on government deceit and gun control policies.

It is not the event, the parents or the children that are key to Defendant's broadcast topics, but the government's response to that event itself. The government's responses — be it war, gun control, lockdowns, injections, or foreign wars —are matters of public concern. It can hardly be said that Sandy Hook was not a matter of public concern. The incident sparked a nationwide debate on gun control, which was within the overall theme of the shows and was always presented in its usual style. Understandably, many consider this style both extreme and outrageous. Defendants sincerely believe the moment rigorous critique of any governmental topic becomes off-limits, it will be precisely that topic which totalitarian regimes will exploit. Defendants further believe that "[i]f questioning public events and free speech is banned because it might hurt somebody's feelings, we are not in America anymore." And the U.S. Supreme Court agrees: "[a]s a Nation we have chosen … to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 443.

*Snyder* made clear that courts may not isolate individual statements that infer a private personal attack but must instead determine the overall thrust and dominate theme of the speech from the totality of the circumstances. Plaintiffs imply the totality of the Sandy Hook broadcasts were about them, but that was not the case. Nothing here suggests a pre-existing conflict between Defendants and Plaintiffs that

would indicate the broadcast speech on public matters was ever intended to mask personal attacks.

Some speech will certainly test a court's commitment to the First Amendment. But a court may not act as an "instrument for suppression" or, at best, an "inadvertent censor." The First Amendment does not ask courts to the applaud the message—surely the Supreme Court was not condoning that anyone "F--- the Draft" in *Cohen v. California*, 403 U.S. 15, 16 (1971). Rather, such speech "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458. Overall, when considering the form, context, and content of the speech, the radio show format, the consistent themes of public concern, and Defendant's intention to critique government actions all contribute to the speech's protected nature. The speech was protected and the default juggernaut must be reversed.

**2.    Plaintiffs' IIED claims were merely repackaged defamation claims and fail as a matter of law.**

**A.    The Trial Court committed reversible error by entering a default on Plaintiffs' facially invalid IIED claims.**

The Trial Court erred by entering a default on Plaintiffs' IIED claims because they were not supported by the pleadings. *Stoner v. Thompson*, 578 S.W.2d 679, 682-85 (Tex. 1979) (holding a default judgment is erroneous if the petition discloses the invalidity of a claim); *Chesser v. Murphy*, 386 S.W.2d 164, 169 (Tex. Civ. App.—Houston 1965, no writ) ("A petition must adequately allege a cause of action

before it can support a default judgment"); *Conely v. Texas Bd. of Crim. Just.*, No. 03-11-00094-CV, 2012 WL 1959320, at *4 (Tex. App.—Austin May 30, 2012, pet. denied) ("A default judgment is properly granted only if the facts set out in the petition allege a cause of action for which relief may be granted."); *see also Paramount Pipe & Supply Co. v. Muhr*, 749 S.W.2d 491, 494 (Tex. 1988).

### (1)   Defamatory conduct cannot form the basis of valid IIED claims.

Plaintiffs' Petitions[2] affirmatively disclosed that IIED was not a valid claim because the complained of conduct only supported a claim for defamation. To maintain a claim for IIED, the plaintiff must establish that no alternative cause of action could provide a remedy. *Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005); *Hoffmann-La Roche Inc. v. Zeltwanger,* 144 S.W.3d 438, 447 (Tex. 2004); *Standard Fruit & Veg. Co. v. Johnson,* 985 S.W.2d 62, 68 (Tex. 1998).  If the defendant's conduct could support an alternative cause of action, the plaintiff is barred as a matter of law from pursuing an IIED claim, regardless of whether (1) the plaintiff chooses to bring the alternative claim, (2) the plaintiff succeeds on the

---

[2] At the time of default, the Trial Court entered default judgment against Defendants related to multiple cases filed by different Sandy Hook parents. These cases included a lawsuit filed by Heslin for defamation and two other separate lawsuits filed by Heslin and Lewis for IIED. After the default judgment, these three suits were consolidated and the trial that took place on July 25, 2022.  At the time of default, the operative petition for Lewis' IIED lawsuit was essentially identical to Heslin's IIED petition. *See* LCR 3311-3330 and CR 19-37. The term "Petitions" in this section will refer to both IIED petitions in effect at the time of default.

EXHIBIT 3

alternative claim, or (3) the alternative claim is barred. *Creditwatch,* 157 S.W.3d at 816; *Hoffmann-La Roche Inc.,* 144 S.W.3d at 447-48; *Draker v. Schreiber,* 271 S.W.3d 318, 323 (Tex. App.—San Antonio 2008, no pet.); *see, e.g., Standard Fruit,* 985 S.W.2d at 68 (plaintiff, who witnessed defendant driving truck into parade and killing participant, could not recover for IIED because emotional-distress damages might be recoverable under theory of bystander recovery); *Vaughn v. Drennon,* 372 S.W.3d 726, 732-33 (Tex. App.—Tyler 2012, no. pet.) (plaintiffs could not recover for IIED against defendant, who indirectly damaged plaintiffs' property, polluted it with vehicle exhaust, and threatened plaintiffs with a gun, because plaintiffs' claims were for nuisance and assault).

In this case, Plaintiffs' IIED claims were wholly coextensive with the tort of defamation. CR 7760-7786. A claim for IIED "has four elements: (1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe." *Warner Bros. Entm't v. Jones*, 538 S.W.3d 781, 814 (Tex. App.—Austin 2017), *aff'd* 611 S.W.3d 1 (Tex. 2020) (quoting *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017)). "The Texas Supreme Court has limited the tort of intentional infliction of emotional distress to situations involving an egregious wrong that would otherwise be legally unprotected." *Id*. (citing *Hoffmann-La Roche,* 144 S.W.3d at 447).The elements of defamation include (1) the publication of a false statement of

41

fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (citations omitted). A defamatory statement is one that "tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt, or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation [...]" Tex. Civ. Prac. & Rem. Code §73.001. The Texas Defamation Mitigation Act applies to "a claim for relief, however characterized, from damages arising out of harm to personal reputation caused by the false content of a publication." Tex. Civ. Prac. & Rem. Code §73.054(a).

### (2)    The Petitions only alleged facts supporting defamation claims.

Plaintiffs' Petitions detail the litany of false statements Defendants allegedly made regarding Sandy Hook spanning a five-year period. CR 21-37; LCR 15-29. But the Petitions fail to identify any Defendant conduct, let alone actionable IIED conduct, beyond false statements Jones and others made regarding Sandy Hook on InfoWars broadcasts. Specifically, the Petitions failed to include any allegations that support their conclusory statements that Defendants *coordinated* and *encouraged* "a fringe community of dangerous fanatics who have stalked and endangered" Plaintiffs. CR 20; LCR 14.

42

The Petitions make clear Plaintiffs are complaining about defamatory statements Jones and InfoWars made about them. For example, the *Causes of Action* section specifically references nine InfoWars broadcasts that Plaintiffs allege contained statements Defendants knew were false or were made in reckless disregard for the truth and that Defendants "consistently published false assertions about the circumstances of the death of Plaintiff's child in scores of videos and articles for years." CR 37; LCR 30.  Because Plaintiffs' Petitions failed to adequately allege a cause of action for IIED, as the conduct made the basis of the lawsuit unequivocally sounded in defamation, it was a reversible error for the Trial Court to enter default judgment on these claims.

## B. The evidence at trial did not support a claim for IIED.

### (1) The Default Judgment still required Plaintiffs to prove damages in support of their IIED claims.

At trial, Plaintiffs' burden to prove that Defendants' conduct caused them cognizable injury should have remained unaffected by the default judgment on liability. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex. 1984) (stating it is "incumbent upon a party who obtains a default judgment in a personal injury action to present competent evidence of a casual nexus between the event sued upon and the party's alleged injury"). Indeed, the entire purpose of the trial was to determine what amount of damages, if any, was caused by Defendants' conduct. *See* 11 RR 10-11. A defaulting defendant merely admits facts as to liability but makes

no such admission regarding unliquidated damages. *Paradigm Oil*, 372 S.W.3d at

186.

### (2)   Plaintiffs improperly repackaged defamation evidence to support their IIED claims.

At trial, most of Plaintiffs' evidence focused solely on the emotional injuries

caused by Alex Jones and InfoWars' broadcasts about Plaintiffs. *See* 15 RR 10, 13,

16, 28, 41, 58, 60, 76, 90, 93, 105, 120, 121, 156, 162, 163; 16 RR 40; 16 RR 93.

Plaintiffs failed to present any evidence that the complained of conduct and

subsequent damages could not have been brought as defamation claims.

For example, Heslin testified to the following during direct examination:

Q.   When these things are being said about you, Sandy Hook didn't happen, that you never held your child, that your child never existed, are you having encounters with people in the public about these horrific lies?

A.   I do. I have. Right up to this day. And this morning.

Q.   Talk to us about some of the earliest encounters.

A.   There's so many of them and there's such a variety of them. The encounters or interaction, many of them are on the internet, many of them are anonymous phone calls. Extremely large number are people come up to you in the community or through travels. It's just – it became a way of life, an awful way of life to have to live.

16 RR 17-18. Heslin continued to describe the harassment allegedly caused by Alex

Jones and InfoWars' broadcasts.

Q.   Is it still that way of life today for you, people encountering you in the public and pushing these awful lies and conspiracies that Alex Jones has broadcast?

A.    Yes, it is. Sometimes it's more -- more often than not, sometimes it's -- there's fewer, fewer encounters or interactions. It just -- it varies. There's no rhyme or reason how often or how frequent, but an overall it's -- it's frequent, it's substantial.

Q.    And when it happens, do these encounters often specifically mention Alex Jones and InfoWars?

A.    Often they do. There's a lot of times no one is mentioned in particular.

16 RR 18. When asked about the importance of holding Alex Jones accountable, Heslin said "This trial is the only way I can restore my credibility, reputation. It's been destroyed and damaged by his constant attacks and peddling a conspiracy and a hoax." 16 RR 25.

Later, Heslin said that the harassment encompassed emails, letters, personal interactions, and phone calls from Alex Jones listeners. *See* 16 RR 55-56. Crucially, Heslin never identified a single instance that Alex Jones or any InfoWars employee did anything beyond make false statements on broadcasts. The *conduct* Heslin accused Alex Jones of matches the definition of making a defamatory statement. Tex.Civ.Prac. & Rem.Code §73.001 (one that "tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt, or ridicule"). Moreover, the type of harassment Heslin described receiving is the exact type of *injury* governed by the Defamation Mitigation Act. Tex.Civ.Prac. & Rem.Code §73.054 ("a claim for relief, however characterized, from damages arising out of harm to personal reputation caused by

the false content of a publication"). Heslin's testimony reveals that he only suffered defamation damages. Under the requirements of the Texas Supreme Court, his IIED claim should have been dismissed as a matter of law. *Warner Bros. Entm't*, 538 S.W.3d at 814 (upholding dismissal of IIED claim because "the facts that [plaintiff] bases this claim on are the same facts that he bases his defamation claim on"). The Trial Court abused its discretion first by entering a default and then by allowing Heslin's IIED claim to be submitted to the jury.

Like Heslin, Lewis could not provide a single instance of conduct by Alex Jones or an FSS employee to support damages for IIED. Lewis only provided testimony of damages that would be relevant to a defamation claim. For example:

> Q.     And Miss Lewis, does it continue to cause you emotional distress when you hear this man peddle the thought that you are in some way or another an actor or controlled by other people or like thoughts?
>
> A.     Or that Sandy Hook was a total hoax; that it was a false flag; that it never happened; that there were no children killed. And you know that's not true. You know that's not true. But when you say those things there's a fringe of society that believe you that are actually dangerous.

16 RR 92-93. Lewis testified: "In some way you've impacted every single day of my life negatively since -- almost since Jesse's murder, since 2013, when your videos were going around in my house, in my mom's house, about starting to say that this didn't happen." 16 RR 109.

EXHIBIT 3

Lewis' testimony identified three individuals and their conduct as evidence of the harassment she suffered. However, none of these interactions or individuals provide a legitimate basis for her IIED claim. Lewis described receiving a threatening email from Wolfgang Halbig dated September 9, 2019, well after the initiation of this lawsuit. 16 RR 119. But Lewis was unable to provide any evidence that Halbig was an FSS employee, that his email was sent at the direction or encouragement of FSS or Jones, or that FSS had any foreknowledge that Halbig would be sending such an email. There is no basis for attaching IIED liability to FSS and Jones for the sending of or contents of Halbig's email to Lewis. At most Halbig's email would be evidence that Alex Jones' broadcasts defamed Plaintiff and unrelated third parties independently reacted to cause some damage.

Lewis testified that she heard messages sent by Richards, who was arrested for sending threatening messages to other Sandy Hook parents. 15 RR 76. However, Lewis admitted that Richards never sent her any messages and that she had no evidence Richards ever worked for FSS or Jones. 16 RR 120-121. Like Halbig's email, there is no basis for attaching IIED liability to Defendants for the sending of or contents of Richards' messages to non-parties. The messages are wholly irrelevant and do not save Lewis' IIED claim. At most Richards' voicemail would be evidence that Alex Jones' broadcasts generally and non-specifically defamed Plaintiff.

EXHIBIT 3

Lewis said she feared being the recipient of accusations and threats when she received an email from the mayor of Newtown advising that Dan Bidondi, a free-lance reporter with InfoWars, was going to visit Newtown. 16 RR 74-75. Lewis later acknowledged that she never had any personal contact with Bidondi. 16 RR 121-122. Moreover, Plaintiffs failed to provide any evidence that Bidondi ever confronted, interacted with, or communicated in any way with Lewis or Heslin during his visit. Without any evidence that Bidondi intended any contact with either Plaintiff, Bidondi's trip is irrelevant to either Plaintiff's IIED claim.

Not a single witness for Plaintiffs testified to conduct by Defendants that would substantiate an IIED claim instead of a Defamation claim. For example, Detective Daniel Jewiss, retired police detective and lead investigator of the Sandy Hook shooting for the Connecticut State Police, could not identify the existence of a single record or incident report containing allegations of harassment by any InfoWars employees against either Plaintiff. 11 RR 150.

Michael Crouch is a psychotherapist and testified to the care he provided to Heslin and Lewis following the loss of their son. 15 RR 128. When asked about the type of injuries Plaintiffs suffered from Defendants, Crouch repeatedly identified the harm caused by their publication of false statements. 15 RR 147-148. Later, when asked about the emotional pain caused by Alex Jones, Crouch said: "so, in 2018 when Neil realized that he was being targeted and that the credibility of his son and

48

of Scarlett and Neil was being challenged, that's a new injury." 15 RR 162. At no point did Crouch identify any actions by Alex Jones or FSS that caused emotional harm to either Plaintiff besides the making of false statements.

Plaintiffs' forensic psychologist Dr. Roy Lubitt, continued to reinforce the fact that Plaintiffs' damages were based on alleged defamation, i.e., caused by people believing false statements from Jones and FSS. Lubitt summarized the defamatory nature of Plaintiffs' damages when he said:

> I mean, it's the idea of walking down the street and every fourth person that passes you, and you don't know which one, but out of the every four people, one of them likely believes that you're a liar and fooling the American -- trying to fool the American people and that they -- many of them, you know, shove him, confront him, et cetera.

15 RR 38. Lubitt continued to reiterate that Plaintiffs' damages were solely predicated on the allegedly defamatory statements made by Jones and InfoWars:

> Q.   What fuels the different fears when they're out in the world around other people they don't know?
>
> A.   That -- knowing that roughly one in four people believe they're doing something terrible, that – criminal, immoral, lying et cetera, and trying to take away their second amendment rights, and not even knowing which one of those four people, which one of, you know, you see eight people, you don't know which two are the ones that despise you.

15 RR 40.

In the end, Plaintiffs failed to present any evidence or allegation of any independent intentional conduct by Jones or InfoWars that could possibly serve as a basis for an IIED claim. The record is clear: (1) there is no evidence of any

wrongdoing by any Defendant beyond broadcasting allegedly defamatory statements; and (2) Plaintiffs' own evidence shows that their damages are directly tied to those same statements. When a defendant's false statements expose a plaintiff to *public hatred, contempt, or ridicule*, or impeaches a plaintiff's *honesty, integrity, virtue, or reputation*, that plaintiff must bring a claim for defamation. IIED is not available to them.   The Trial Court committed reversible error when it denied Defendants' attempts to raise this issue. *See* 16 RR 137-138; 22 RR 232-233. The fact that the Trial Court entered a default judgment as to Defendants' liability does not relieve Plaintiffs' burden to assert legally viable claims. *See Stelly v. Duriso,* 982 F.3d 403, 409 (5th Cir. 2020) (finding trial court abused discretion in granting default judgment as to plaintiff's IIED claim because the gravamen of the allegations rested in sexual harassment). At minimum, Plaintiffs' award of IIED damages should be reversed.

**3.      The Trial Court violated the Texas Civil Practice and Remedies Code by failing to bifurcate the trial.**

Texas Courts have bifurcated exemplary damages trials for the past 30 years. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (1994) ("a trial court, if presented with a timely motion, should bifurcate the determination of the amount of punitive damages from the remaining issues."). Texas Civil Practice and Remedies Code Section, Section 41.009 provides:

50

EXHIBIT 3

(a) On motion by a defendant, the court shall provide for a bifurcated trial under this section. A motion under this subsection shall be made prior to voir dire examination of the jury or at a time specified by a pretrial court order issued under Rule 166, Texas Rules of Civil Procedure.

(b)…

(c) In the first phase of a bifurcated trial, the trier of fact shall determine:

    (1) liability for compensatory and exemplary damages; and

    (2) the amount of compensatory damages.

(d) If liability for exemplary damages is established during the first phase of a bifurcated trial, the trier of fact shall, in the second phase of the trial, determine the amount of exemplary damages to be awarded, if any.

Tex. Civ. Prac. & Rem. Code §41.009.  Texas Civil Practice and Remedies Code

Section 41.011(a) lists the evidence that shall be considered in phase two regarding

exemplary damages:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of the defendant.

Tex. Civ. Prac. & Rem. Code §41.011(a).  Section 41.011(b) states unequivocally

that "[e]vidence that is relevant only to the amount of exemplary damages that may

EXHIBIT 3

be awarded is not admissible during the first phase of a bifurcated trial." (Emphasis added)

A judgment must be reversed for erroneously admitting or excluding evidence when that error "probably (though not necessarily) caused rendition of an improper judgment." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008). It is not necessary for the complaining party to prove that "but for" the exclusion (or admission) of evidence, a different judgment would have necessarily resulted. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018). A reviewing court will consider the role the evidence played in the context of the trial and find that it was likely harmful if it was crucial to a key issue. *Sevcik,* 267 S.W.3d at 873.

Defendants timely moved to bifurcate the trial approximately three months before their trial date. CR 7273-7277. The Court granted the motion in part and denied it in part. Specifically, the Court granted the motion to bifurcate as to evidence of net worth, but otherwise denied it. 10 RR 71.

On the first day of trial, the Court gave the jury the following instruction:

You are not here to determine if Mr. Jones and Free Speech Systems, LLC defamed or intentionally inflicted emotional distress on Mr. Heslin or Miss Lewis. The Court has already found that they have committed these acts. The jury's job will be to determine what sum of money, if any, would fairly and reasonably compensate Neil Heslin and Scarlett Lewis for the damages they incurred that were proximately caused by Mr. Jones and Free Speech Systems, LLC's conduct, as well

52

EXHIBIT 3

> as what sum of money, if any, should be assessed against Mr. Jones and Free Speech Systems, LLC, as punishment for their conduct.

> Ordinarily, at this stage of the case the jury would hear all of the evidence on damages. In this case, some of the evidence will be presented after you decide compensatory damages and will be followed by a second Charge of the Court.

11 RR 10-11. At trial, Defendants repeatedly objected to the introduction of exemplary damages evidence in Phase One and moved for mistrial. *See* 11 RR 228 (Defendants ask for mistrial based on improper testimony of lead investigator of Sandy Hook shooting); 13 RR 98 (improper testimony elicited from InfoWars employee regarding internal practices and communications); 15 RR 115 (improper testimony from Plaintiffs' forensic psychiatrist); 16 RR 81 (improper testimony elicited from Mr. Heslin and Ms. Lewis). Multiple witnesses' testimony failed to provide any evidence related to compensatory damages.

Defendants were unquestionably prejudiced by the Trial Court's failure to properly bifurcate.  Phase One tasked the jury with only deciding the amount of Plaintiffs' damages for mental anguish and reputational harm. *See* 17 RR 127. But at trial, the jury was bombarded with both lay and expert testimony regarding: the nature of the wrong; the character of the conduct involved; the degree of culpability of the wrongdoer; the situation and sensibilities of the parties concerned; and the extent to which such conduct offends a public sense of justice and propriety.  TCPRC §41.011(a). For example, the Court permitted Plaintiffs' expert on journalism and

reporting, Fred Zipp, to explain to the jury why he believed InfoWars and Alex Jones were bad actors in the media space. 14 RR 63. Again, this goes to the factors intended for Phase Two of bifurcation and improperly influenced the jury to increase the amount of Plaintiffs' compensatory damages. Mr. Zipp testified in phase one:

- "I think Mr. Jones categorically rejects responsibility for his work . . ." 14 RR 63.

- That InfoWars' Sandy Hook coverage had "[c]ontempt for the parents. Or, you know, sometimes contempt, sometimes just denial that they exist almost, right?" 14 RR 75.

- "Mr. Jones . . . repeatedly published misleading or outright false information." 14 RR 48.

Similarly, the Court permitted Plaintiff's expert on disinformation and conspiracy theories, Becca Lewis, to testify in phase one:

- "Well, InfoWars has an influence on the internet among creators of disinformation that's pretty unparalleled." 14 RR144.

- When asked about academic and scholarly opinion regarding Mr. Jones' responsibility for spreading lies about Sandy Hook, Ms. Lewis says, "There was universal consensus that he was responsible for the spread of these lies." 14 RR 151.

- "And in terms of combining the types of disinformation that Alex Jones promotes and the size and scale of his audience, I can't think of another person working in media who is comparable to him. He's unparalleled in terms of that combination." 14 RR 158.

- When asked about a poll that claims 24 percent of Americans believed that Sandy Hook had been at least partially or fully staged, Ms. Lewis says, "In this case I can say with a great deal of confidence that the 24 percent is directly due to the influence

and amplification provided by Alex Jones and InfoWars." 14 RR 176.

Neither expert testified about the Plaintiffs' mental anguish or Heslin's reputational harm. Plaintiffs cannot factually tie any portion of either expert's testimony to their compensatory damages. The Trial Court consistently and repeatedly prevented Defendants from rebutting such testimony on the grounds that liability and causation had already been determined as a death penalty discovery sanction. 16 RR 200-203.

The Court also admitted extensive testimony from lay witnesses and documentary evidence that further frustrated the jury's task of assessing compensatory damages. For example, Plaintiffs spent considerable time questioning InfoWars employee Daria Karapova about Wolfgang Halbig, a non-party to this lawsuit and someone never employed by InfoWars. Six of the thirteen exhibits Plaintiffs presented to Ms. Karapova were letters sent from Mr. Halbig or mentioning Mr. Halbig. 11 RR 5; 12 RR 5. Plaintiffs focused on Mr. Halbig (a non-party) to highlight Defendants' recklessness for communicating with someone who espoused extreme conspiracy theories, including offensive theories about Sandy Hook. At one point, Plaintiffs admonished Ms. Karapova, "Do you -- do you, sitting here today, do you understand how wrong it was to encourage this man's delusions like this? Do you understand that?" 12 RR 110. Considering the Court had already established Defendants' liability by default, this line of questioning should have been

EXHIBIT 3

limited to the phase two trial on exemplary damages.   It is difficult to see how many of Plaintiffs' questions served any purpose beyond inflaming the jury:

> Q:    What do you think would be happening to those kids, if they were actually being used by the satanic globalists for an occult ritual, where they cart them out for the Superbowl and put them in our face and taunt us with the facts that we actually faked that and here are the real murdered children who are still in the possession of the satanic globalists? At the end of their performance when they leave the Superbowl, do you think they're about to have a good time?

> A:    I can't agree with any of what you just said. My only statement is that I would have much rather think that these children are alive as opposed to have been shot the way they were.

12 RR 111.

Plaintiffs' examination of InfoWars employee, Owen Shroyer, contained many of the same inappropriate topics as those covered with Ms. Karpova. Shroyer answered many questions about recklessly failing to verify stories before broadcasting them. *See* 13 RR 121-125; 13 RR 141-145; 13 RR 148-152; 13 RR 158-159. Plaintiffs again attempted to confuse the jury by arguing Defendants were responsible for the actions of non-party and non-InfoWars employee, Wolfgang Halbig:

> Q.    Wolfgang Halbig, InfoWars was his voice, you were his megaphone; right?

> A.    No.

13 RR 163; *see also* 13 RR 160-162; 13 RR 164-165.

In a harmless-error review, courts have considered the efforts by counsel to erroneously emphasize inadmissible evidence. *Sevcik*, 267 S.W.3d at 874. It is

obvious that Plaintiffs were permitted here, over objection, to focus the vast majority of their Phase One evidence on: the nature of the wrong; the character of the conduct involved; the degree of culpability of the wrongdoer; the situation and sensibilities of the parties concerned; and the extent to which such conduct offends a public sense of justice and propriety. *See* 11 RR 7; 12 RR 75; 13 RR 124; 14 RR 43; 15 RR 63; 16 RR 81; 16 RR 106; *see also* Tex. Civ. Prac. & Rem. Code §41.011(b). The jury was certainly affected by this improper evidence considering their award of over $4 million in compensatory damages despite Plaintiffs failure to produce any medical expenses, lost wages, or any other evidence documenting their alleged damages. *See* 18 RR 23-24.

**4.    The Trial Court violated Texas law by entering a joint and several punitive damages award.**

"In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." Tex. Civ. Prac. & Rem. Code §41.006.  The Final Judgment failed to follow this well-settled issue of law and must be reversed as a matter of law.  Multiple defendants cannot be held jointly and severally liable for exemplary damages. *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848 (Tex. 2017); *Fairfield Ins. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 667 (Tex. 2008); *Penny v. El Patio, LLC*, 466 S.W.3d 914, 926 (Tex. App.—Austin 2015, pet. denied); *Warner Comms. v. Keller*, 888

EXHIBIT 3

S.W.2d 586, 599 (Tex. App.—El. Paso 1994) (interpreting former Tex. Civ. Prac. & Rem. Code §41.005, now §41.006), *rev'd on other grounds sub nom*.; *Texas Builders v. Keller*, 928 S.W.2d 479 (Tex.1996). The factfinder must specify the amount of exemplary damages assessed against each defendant. Tex. Civ. Prac. & Rem. Code §41.006; *Fairfield Ins.*, 246 S.W.3d at 667; *Penny*, 466 S.W.3d at 926.

A defendant cannot be punished for the acts of another. *See Acadia*, 520 S.W.3d at 881. There is no exception to the requirements of section 41.006, even if the defendants are closely related or interrelated companies with common decision makers. *Penny*, 466 S.W.3d AT 926; *Carlton Energy Group, LLC v. Phillips*, 369 S.W.3d 433, 465 (Tex. App.—Houston [1st Dist.] 2012) *aff'd in part, rev'd in part on other grounds*, 475 S.W.3d 265 (Tex. 2015).

Here, the jury charge violated section 41.006 as Plaintiffs failed to secure jury findings that assessed exemplary damages against each specific Defendant. The jury charge included an option of awarding exemplary damages to both Plaintiffs but did not provide for the legally required division of exemplary damages between each Defendant. 18 RR 62-66. The verdict failed to individually award exemplary damages against each defendant. 18 RR 100. This is fatal to Plaintiffs' exemplary damages award. The imposition of joint and several liability to Plaintiffs' exemplary damages award is reversible error as a matter of law.

5.     **The Trial Court improperly allowed Plaintiffs to amend their petition to add a "cap buster" claim post-trial and entered judgment thereon.**

Plaintiffs waited until after the jury returned a verdict before asking the Trial Court to allow them to amend their petition to plead a "cap buster" allegation. This prevented Defendants from litigating these explosive new claims and ignored the requirements that Plaintiffs secure specific jury findings on any cap-buster claim and prove them beyond a reasonable doubt. *See* Tex. Civ. Prac. & Rem. Code §41.008. Proving a violation of Texas Penal Code section 22.04 requires proof of distinct elements not addressed in the pleadings, the trial evidence, the claims previously sought by Plaintiffs at trial, or the jury charge. The amendment allowed Plaintiffs to assert completely new and egregious allegations of outrageous conduct for the first-time post-trial and then assume the Court's granting of Death Penalty sanctions *also* applied to preclude any defense to those never-before asserted allegations.

A.     **Plaintiffs' improper amendment secured them a nearly $45,000,000 windfall.**

Heslin was awarded actual damages of $2,110,000 for defamation and IIED.[3] 18 RR 23-24. Lewis was awarded $2,000,000 in actual damages for her IIED claim. 18 RR 23-24. Heslin was awarded $4,200,000 as exemplary damages for his defamation claim and Heslin and Lewis were each awarded $20,500,000 as

---

[3] $110,000 under defamation and $2,000,000 under IIED

exemplary damages for their respective IIED claims. 19 RR 100. Despite the jury's award, the exemplary damages were limited to an amount equal to the greater of *two times the amount of economic damages; plus an amount equal to any noneconomic damages found by the jury, not to exceed $750,000*; or *$200,000*. Tex. Civ. Prac. & Rem. Code §41.008(b).

Nearly two months after the jury returned its verdict, Plaintiffs requested and were granted leave to file their Fifth Amended Petition to add language to circumvent the statutory cap on exemplary damages. CR 8009-8051. The amendment added a previously unpled provision of the Texas Penal Code sec.22.04.

Plaintiffs used the amendment to claim that their punitive damages were exempted from the damages cap because they were based on a felony under section 22.04 of the Penal Code. *See* Tex. Civ. Prac. & Rem. Code §41.008(c)(7). Because Plaintiffs were not awarded any economic damages, their exemplary damages should have been capped at $750,000 per claim. *See* Tex. Civ. Prac. & Rem. Code §41.008(b). Plaintiffs' total award should have been $6,360,000. Instead, the Trial Court entered final judgment awarding Plaintiffs nearly $50,000,000. *See* CR 9331-9333. Plaintiffs' post-trial petition amendment secured them a nearly $45,000,000 windfall.

## B.   Legal standard for trial amendments.

The decision whether an amendment to a pleading is proper is guided by Rule

EXHIBIT 3

63 which requires a trial court to grant leave to amend "unless there is a showing that such filing will operate as a surprise to the opposite party." Tex. R. Civ. P. 63. The burden to show surprise or prejudice is on the party resisting the amendment. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 939-40 (Tex. 1990).

"Trial amendments that are procedural in nature, such as conforming the pleadings to the evidence introduced during trial, must be allowed." *Zarate v. Rodriguez*, 542 S.W.3d 26, 37 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). But substantive amendments, like ones "asserting a new cause of action may be prejudicial on its face." *Id*. "A trial amendment is prejudicial on its face if (1) the amendment asserts a new substantive matter that reshapes the nature of the trial itself; (2) the new matter is of such a nature that the opposing party could not have anticipated it in light of the development of the case up to the time the amendment was requested; and (3) the opposing party's presentation of its case would be detrimentally affected by the amendment." *Id.* (citing *Tanglewood Homes Ass'n v. Feldman*, 435 S.W.3d 48, 66 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

"A trial court also has discretion to deny a trial amendment adding a new cause of action if the opposing party objects and 'it appears that the new matter was known to the party seeking to file the amendment, or by reasonable diligence it could have been known by the party.'" *Id*. at 37-38 (citing *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 116 (Tex. App.—San Antonio 2011, pet. denied)). A trial court's

EXHIBIT 3

decision to allow or deny a trial amendment will be reversed if the court abused its discretion. *Id*.

### C.      Defendants were surprised and prejudiced by the trial amendment.

To recover punitive damages for defamation or intentional infliction of emotional distress, a plaintiff needs to prove that these torts were committed knowingly or with fraud, malice, or gross negligence by clear and convincing evidence. TCPRC §41.003. The jury charge incorrectly used a *preponderance of the evidence* standard in determining whether Plaintiffs were entitled to *any* exemplary damages. *See* 19 RR 58-66. However, in order to prove that they were excepted from the exemplary damages cap, Plaintiffs would have had to offer the following evidence and prove as a matter of law at trial:

- that a defendant knowingly or intentionally engaged in:
    - (1)      serious bodily injury to a disabled individual;
    - (2)      serious mental deficiency, impairment, or injury to a disabled individual; or
    - (3)      bodily injury to a disabled individual.
- that this individual suffered severe emotional disturbance.
- that this individual suffered from a mental, behavioral, or emotional disorder.
- that this emotional disturbance was of sufficient duration to result in functional impairment that substantially interferes with or limits a person's role or ability to function in family, school, or community activities.[4]

In order to qualify for the cap-busting exception, Plaintiffs needed (and failed)

---

[4] Tex. Penal Code §22.04. The evidence referred to herein to demonstrate an exception to the punitive damages cap shall hereafter be referred to as the "Cap Exception Elements."

EXHIBIT 3

to plead and prove (1) the elements of the exception under TCPRC section 41.008(c)(7); (2) the injury to a *disabled individual* under Texas Penal Code section 22.04; and (3) that Defendants' alleged conduct caused Plaintiffs to suffer *severe emotional disturbance* as defined by section 261.001 under the Family Code.

At a minimum, Plaintiffs' amendment substantively expanded the scope of alleged damages even though such elements were never supported by any of the evidence introduced at trial by Plaintiffs. Plaintiffs' amendment asserted an entirely new claim. The party alleging this new claim must also support it with legally admissible evidence and also obtain affirmative findings from the jury under the proper standard of proof, which Plaintiffs failed to even attempt to timely do. The elements Plaintiffs must prove beyond a reasonable doubt were very different from the elements for the claims and damages sought by Plaintiffs at trial. Pleading and proving a violation of Texas Penal Code section 22.04 is a new cause of action based on distinct facts not encompassed by previously pleaded claims and defenses. Accordingly, Plaintiffs' request amounted to a substantive amendment and should have been denied.

Plaintiffs did not prove any of these Cap Exception Elements (nor prove them beyond a reasonable doubt) through their claims for defamation and intentional infliction of emotional distress. As reflected in the jury charge questions on exemplary damages, Plaintiffs did not prove any of the elements for any exception

to the statutory punitive damages cap at trial.

There are seventeen various Texas Penal Code violations that could theoretically trigger an exception to the cap. Tex. Civ. Prac. & Rem. Code §41.008(c). Additionally, within subsection 7, there are three different ways to find a violation depending on whether it involves an injury to a child, elderly individual, or disabled individual. *Id.* A "disabled individual" may be proved through one of seven different possibilities. Tex. Penal Code §22.04. "Severe emotional disturbance" is defined as "a mental, behavioral, or emotional disorder of sufficient duration to result in functional impairment that substantially interferes with or limits a person's role or ability to function in family, school, or community activities." Tex. Fam. Code §261.001(9).

A defendant doesn't know what to defend at trial unless a plaintiff discloses the specific provisions of 41.008 which the plaintiff believes applies before the start of trial and certainly before the defendant rests its case. A plaintiff must sufficiently allege at least one exception to the punitive damages cap well *before* trial.  The jury instruction for Plaintiffs' claim for intentional infliction of emotional distress included language that "the emotional distress suffered by plaintiff was severe." 17 RR 131. This falls far short of the Cap Exception Elements.

Simply assuming there was *clear and convincing evidence Plaintiffs suffered severe emotional distress* is not the same as the statutory Cap Exception Elements,

which require:

- that a defendant knowingly or intentionally inflicted a serious mental deficiency, impairment, or injury to a disabled individual.
- that this individual suffered severe emotional disturbance.
- that this individual suffered from a mental, behavioral, or emotional disorder.
- that this emotional disturbance was of sufficient duration to result in functional impairment that substantially interferes with or limits a person's role or ability to function in family, school, or community activities.

Tex. Pen. Code Ann. § 22.04.

Defendants were prejudiced and surprised by the new allegation that a specific provision within the punitive damages cap exception applied. Here, Defendants had no reason to put on evidence of any defenses to the Cap Exception Elements. Defendants had no need to defend against unasserted claims and neither party put on any evidence demonstrating that any of the Defendants knowingly or intentionally inflicted a serious mental deficiency, impairment, or injury to a disabled individual who then suffered a severe emotional disturbance which encompassed a mental, behavioral, or emotional disorder. If timely asserted before trial, such allegations would have framed Defendants' cross examination of Plaintiffs and its own direct examination of its witnesses. Defendants had no such opportunities to rebut the "cap busting" allegations at trial.

Moreover, there was no evidence at trial that this emotional disturbance was of sufficient duration to result in functional impairment that substantially interfered

with or limited Plaintiffs' role or ability to function in family, school, or community activities. The failure to timely amend the pleadings deprived Defendants of material cross examination opportunities at trial.

Because Plaintiffs were not awarded any economic damages, their exemplary damages should have been capped at $750,000 per claim. *See* Tex. Civ. Prac. & Rem. Code §41.008(b). Plaintiffs' total award should have been $6,360,000. Instead, the Trial Court entered a judgment awarding Plaintiffs nearly $50,000,000. *See* CR 9331-9333. Plaintiffs' post-trial petition amendment secured them a nearly $45,000,000 windfall. This is facially prejudicial to Defendants. These failures are per se prejudicial because all opportunities to defend against such claims have now been lost, and Defendants have clearly been prejudiced by their inability to defend themselves at trial. It was an abuse of discretion to allow Plaintiffs to amend their pleadings post-trial and base final judgment on such pleadings.

### D. Plaintiffs' amendment was facially prejudicial and should have been denied.

The Trial Court's granting the amendment was an abuse of discretion. The amendment was facially substantive in nature, could not have been anticipated by the Defendants, and detrimentally affected Defendants' ability to prepare and present their defenses. Furthermore, through the exercise of due diligence, Plaintiffs could have discovered the existence of this alternative theory of recovery long before the trial. These failures constitute reversable error.

66

EXHIBIT 3

The court in *Zarate v. Rodriguez* addressed the Trial Court's denial of a party's request to amend the pleadings "to add a cause of action seeking statutory penalties against Rodriguez for acting without a license." 542 S.W.3d at 38 (citing Tex. Occ. Code §1101.754 which authorized a statutory penalty of up to three times commissions paid). This is analogous here because the court in *Zarate* noted that request came after trial. *Id.* The 14th Court held the trial court properly denied the request to amend the pleadings even though the new cause of action was based on the same alleged facts. *Id.* The court also noted that a post-trial request detrimentally affected the presentation of the defendants' case "because it was made after he had rested." *Id*. The 14th Court further noted that "Zarate's new cause of action was a claim that, by exercising reasonable diligence, she could have discovered and asserted much earlier." *Id.*

When making this determination, courts may consider how soon before trial the amendment was made, the addition of new facts, causes of action, defenses, or increased liability, whether new causes of action or defenses are based on recently discovered matters, and whether the opposing parties alleged surprise and that they were not prepared to try new matters. *Tex. Black Iron, Inc. v. Arawak Energy Int'l, Ltd.*, 566 S.W.3d 801, 827 (Tex. App. 2018); *Stevenson v. Koutzarov*, 795 S.W.2d 313, 321 (Tex. App.—Houston [1st Dist.] 1990, writ denied).

Here, Plaintiffs could have asserted these cap-busting claims much earlier, but

they failed to do so. The issue of the requested exception to the punitive damages cap was never raised in the pre-trial pleadings and never addressed at trial. Any argument that Defendants should have anticipated this exception because there was evidence Plaintiffs suffered severe emotional distress is without merit. Defendants did not have fair notice of the facts *and legal theories* Plaintiffs would use to uncap punitive damages. Providing only fair notice of factual allegations does not provide fair notice of claims or causes of action asserted based on those alleged facts.

The punitive damages cap automatically applies as a matter of law to any recovery for punitive damages. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 157 (Tex. 2015). In contrast, "the plaintiff bears the burden of pleading and proving one of the cap busters listed in section 41.008(c) before the cap will not apply." *Davis v. White*, No. 02-13-00191-CV, 2016 WL 1163764, at *2 (Tex. App.—Fort Worth, 2016, no pet.). The only party who could have anticipated Plaintiffs relying on 41.008(c)(7) was Plaintiffs. The amendment detrimentally affected Defendants' presentation of their case because Defendants would have tailored part of their cross examination of Plaintiffs and their experts to address the elements of TCPRC §41.008(c)(7), TPC §22.04, and TFC §261.001(9).

### E.   Plaintiffs failed to secure the necessary jury findings.

Before a court can determine if an exception to the exemplary damages cap applies, a plaintiff <u>must</u> obtain specific jury findings.

68

> Before a court will apply the exception to the statutory damage caps in section 41.008(c), a ***plaintiff must obtain jury findings*** that the defendant violated one of the criminal code provisions listed in the statute, and that the violation was committed knowingly or intentionally. [citations omitted] ***The finding of fraud, malice, or gross negligence necessary to obtain exemplary damages is not sufficient*** to evoke the exception to the statutory damage caps because the application of the exception under these circumstances would be inconsistent with the statutory scheme of limiting exemplary damages even when fraud, malice, or gross negligence has been proven by clear and convincing evidence.

*Madison v. Williamson*, 241 S.W.3d 145, 161 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (emphasis added). Plaintiffs did not do so here.

Not only must a plaintiff obtain a jury finding that a particular Penal Code violation occurred, but they must also find that the violation took place "beyond a reasonable doubt." *Mission Res., Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 315 (Tex. App.—Corpus Christi 2005), *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008); *Lowry v. Tarbox*, 537 S.W.3d 599, 618 (Tex. App.—San Antonio 2017, pet. denied); *Madison,* 241 S.W.3d at 161; *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 874 n.13 (Tex. App.—Fort Worth 2005, no pet.).  No such burden of proof instruction or question was submitted in the charge. *See* 18 RR 23-24. It was an abuse of discretion to enter judgment based on the amended Petition.

EXHIBIT 3

**F.    The default judgment does not save Plaintiffs' improper amendment.**

A default judgment on intentional infliction of emotional distress does not establish the statutory Cap Exception Elements necessary to satisfy the exception under 41.008(c)(7). Plaintiffs' argument that the default judgment relieves them of their burden to properly plead and prove their theories of recovery fails as a matter of law. *Stoner v. Thompson*, 578 S.W.2d at 682 (holding that "[a] judgment must be based upon the pleadings"); *Tullis v. Scott*, 38 Tex. 537, 542 (Tex. 1873) ("[I]t was error in the district court to permit a plaintiff to amend his petition after a default taken, without having that default set aside"); *Montelongo v. Abrea*, 622 S.W.3d 290, 300 (Tex. 2021) ("A pleading must give fair notice not just of alleged facts, but of the claim and the relief sought such that the opposing party can prepare a defense").

"Providing only fair notice of factual allegations does not provide fair notice of claims or causes of action asserted based on those alleged facts." *Abrea*, 622 S.W.3d at 300. "A cause of action involves more than mere facts—it involves facts that give rise to legal relief." *Id*. "When evaluating a cause of action, [courts] consider not just the facts, but whether those facts establish the existence of a legal right or duty and the violation or breach of that right or duty." *Id*.  "And to assert a cause of action, the pleading must be sufficient to enable a court to determine, with reasonable certainty, not just facts, but 'the elements of [the] cause of action and the relief

sought with sufficient information upon which to base a judgment.'" *Id*. at 301 (quoting *Thompson,* 578 S.W.2d at 683). It was an abuse of discretion for the Trial Court to permit Plaintiffs to substantively amend their Petition post-trial and subsequently enter judgment based on the amended Petition.

**6.      The Trial Court abused its discretion in entering a sanction order based on a deficient declaration of attorneys' fees.**

On February 22, 2022, Plaintiffs filed their Motion for Sanctions Regarding Corporate Deposition. CR 6455-6664.  On April 1, 2022, the Trial Court signed its Order on Plaintiffs' Motion. CR 7050-7054. The Sanctions Order required Defendants to pay the expenses of discovery and taxable court costs related to two cases: cause no. D-1-GN-18-001835 and cause no. D-1-GN-18-001842. *See* CR 7050-7054 at 5.  Plaintiffs were ordered to submit evidence "setting forth any court costs, expenses, or attorney's fees relating to discovery or discovery motions, excepting those amounts which were already awarded in any prior order of the Court." *Id*. Defendants had seven days to object. *Id*.  On April 15, 2022, the Trial Court signed its Order on Plaintiffs' Motion. CR 7183-7184

The imposition of Sanctions is reviewed under an abuse of discretion standard. *Nath v. Texas Children's Hosp*., 446 S.W.3d 355, 361 (Tex. 2014); *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Cire*, 134 S.W.3d at 838-39.

Plaintiffs' attorneys' fees submission was facially defective, and it was an

EXHIBIT 3

abuse of discretion for the trial court to accept it. The submission should have been rejected because it failed to establish that the requested attorneys' fees were reasonable and necessary. Plaintiffs provided legally and factually insufficient evidence of its reasonable and necessary attorneys' fees. Because Plaintiffs failed to carry their burden, this Court should reverse the Trial Court's acceptance of them and reject the sufficiency of the proof. Alternatively, this Court should reverse the sanction and remand for an order on attorneys' fees that satisfies the evidentiary requirements that they be shown to be reasonable and necessary.

## A.    Plaintiffs' fees were not reasonable and necessary.

Plaintiffs' submitted declaration of fees did not include sufficient evidence to establish that any of the attorneys' fees were reasonable and necessary. A party seeking attorneys' fees as Sanctions must show that the attorneys' fees were reasonable and necessary. *Nath.*, 576 S.W.3d at 709-10. As the Supreme Court of Texas explained, attorneys' fees sought as a sanction must be reasonable and necessary to match the general requirement that a sanction may not be excessive. *Id.* (citing *Low v. Henry*, 221 S.W.3d 609, 620 (Tex. 2007)). As a result, Plaintiffs' claim for Sanctions here in the form of attorneys' fees must satisfy the evidentiary standard for reasonable and necessary attorneys' fees outlined by the Texas Supreme Court in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019). *See Nath*, 576 S.W. at 710 (citing *Rohrmoos*, 578 S.W.3d at 492).

EXHIBIT 3

*Rohrmoos* confirmed that the reasonableness and necessity of a request for attorneys' fees must be determined by the lodestar method. *Rohrmoos*, 578 S.W.3d at 501. Under the lodestar method, the factfinder must first determine: (1) the reasonable hours counsel spent; and (2) the reasonable hourly rate for such work. *Id*. The factfinder then multiplies the number of reasonable hours by the reasonable hourly rate to reach the lodestar figure. *Id*. The lodestar figure may then be adjusted up or down if relevant factors indicate an adjustment is necessary to reach a reasonable fee. *Id*.

The base lodestar calculation usually includes at least those considerations from *Arthur Anderson & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). *Rohrmoos*, 578 S.W.3d at 500-01. Several other factors govern the determination of a reasonable fee including a fee "that is not excessive or extreme, but rather moderate or fair." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). The factfinder should exclude "[c]harges for duplicative, excessive, or inadequately documented work." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762 (Tex. 2012). Proof of attorneys' fees must be sufficient to permit a court to perform a meaningful review of the fee application. *Sullivan*, 488 S.W.3d at 299.

### B.    Plaintiffs' evidence to support the hourly rate was insufficient.

Plaintiffs' submission failed to satisfy *Rohrmoos* and related standards. First, it did not set forth evidence of any customary rates that would support a base rate of

$550 per hour. CR 7100. A conclusory declaration is insufficient. The fact that the same rates were sought for three lawyers of varying degrees of experience reveals that no meaningful effort was undertaken to determine rates customarily charged by lawyers with similar experience for the type of work performed.

There were no conclusions with respect to rates customarily charged for this type of work, which was insufficient to establish these at market rates. There was a need to examine the range of rates charged for matters similar to the work performed in the *Heslin* and *Lewis* matters before determining that the requested rates were reasonable. The question of whether a rate sought for a particular professional represents a "reasonable hourly rate" for purposes of a requested lodestar fee award against a litigation opponent involves determining the appropriate "hourly rates in the relevant community." *Rohrmoos*, 578 S.W.3d at 493.

A reasonable hourly rate is "a rate shown to be 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Id*. (quoting *Blum v. Stenson*, 466 U.S. 886, 895 n. 11 (1984)). The declaration provided an insufficient basis for the $550 rate.

**C.    Plaintiffs' evidence to support the time allegedly spent was insufficient.**

The submission contained no evidence of any actual contemporaneous time records supporting Bankston's general statements about the time he and others spent and the work performed. Instead, Bankston's declaration contained summary tables

74

identifying broad swaths of time spent on various legal tasks, including one entry of 20 hours spanning a three-week period with a vague description of "Preparation for deposition of Neil Heslin." CR 7090-7115, Bankston Decl. at 8. Moreover, the entry of "document review" covered a period of nearly 11 months and totaled 1000 hours split among three different attorneys. *Id*. at 10. Without contemporaneous timesheets or billing records substantiating these entries, this evidence did not permit a meaningful review of the fee request and could not establish that the attorneys' fees Plaintiffs sought were reasonable and necessary.

The Texas Supreme Court has made clear that "billing records are strongly encouraged to provide the reasonableness and necessity of the requested fees when those elements are contested." *Rohrmoos*, 578 S.W.3d at 502. And while an attorney may testify to these details, "in all but the simplest cases, the attorney would probably have to refer to some type of record or documentation to provide this information." *Id*. (quoting *El Apple*, 370 S.W.3d at 763). An attorney's "hours 'not properly billed to one's client also are not properly billed to one's adversary' under a fee shifting statute." *Id*. (quoting *El Apple*, S.W.3d at 762). Plaintiffs did not provide their fee agreement with Bankston's firm nor any of his contemporaneous billing records that supported the summary tables outlining the fees for which Plaintiffs sought as sanctions. CR 7098-7115. Without billing records that accurately depict lawyer time, Plaintiffs lacked sufficient evidence that the attorneys' fees were

EXHIBIT 3

reasonable and necessary. Plaintiffs' submission failed to establish any properly requested lodestar amount as to work performed by anyone. The generalities associated with the overall request did not allow for the necessary finding that those fees sought as Sanctions were reasonable and necessary.

## CONCLUSION AND PRAYER FOR RELIEF

For these reasons, the Final Judgment must be reversed and remanded to the Trial Court for a retrial on the merits on all liability, causation, and damage issues.

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.

By: /s/Christopher W. Martin
      Christopher W. Martin
      State Bar No. 13057620
      E-mail: martin@mdjwlaw.com
      Gus David Oppermann V
      State Bar No. 00786148
      E-mail: oppermann@mdjwlaw.com
808 Travis Street, Suite 1100
Houston, TX 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

THE REYNAL LAW FIRM LLP
Federico Andino Reynal
State Bar No. 240604802
*areynal@frlaw.us*
Joseph C. Maglio Jr.
State Bar No. 12821600
Westley W. Medlin
*wmedlin@frlaw.us*
State Bar No. 24080702
917 Franklin, Sixth Floor
Houston, Texas 77002
(713) 228-5900 - Telephone
(713) 820-6981 - Facsimile

***ATTORNEYS FOR APPELLANT
ALEX E. JONES AND FREE SPEECH
SYSTEMS, LLC***

EXHIBIT 3

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that this computer-generated Appellant's Brief contains 14,373 words.

*/s/ Gus David Oppermann V*
Gus David Oppermann V
Dated: November 10, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was forwarded to all counsel of record by electronic filing in accordance with the Texas Rules of Appellate Procedure on November 10, 2023.

Mark D. Bankston                     **Via ECF:** mark@fbtrial.com
William R. Ogden                                   bill@fbtrial.com
Kaster Lynch Farrar & Ball LLP
1117 Herkimer
Houston, Texas 77008

*/s/ Gus David Oppermann V*
Gus David Oppermann V

EXHIBIT 3

# **APPENDIX**

A.   ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION

B.   CHARGE OF COURT AUGUST 4

C.   CHARGE OF COURT AUGUST 5

D.   FINAL JUDGMENT

EXHIBIT 3

# APPENDIX A

EXHIBIT 3

Filed in The District Court
of Travis County, Texas

AR   APR 0 1 2022
At _____3:00 P M.
Velva L. Price, District Clerk

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

### ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS
### REGARDING CORPORATE DEPOSTION

---

On this day, the Court considered Plaintiffs' Motion for Sanctions Regarding Corporate Deposition. For the reasons below, the Court finds that the Motion should be granted.

### BACKGROUND

Defendants' pattern egregious discovery abuse is well-detailed in the many prior orders of this Court,[1] but a brief history of Plaintiffs' attempts to take a corporate deposition is as follows:

---

[1] In addition to discovery abuse in these cases, the Court has considered Defendants' consistent pattern of bad faith litigation tactics and discovery abuse in other cases and courts. First, as described

1

7050

EXHIBIT 3

On August 31, 2018, the Court ordered Defendants to appear for depositions in Mr. Heslin's defamation claim (D-1-GN-18-001835). Defendants refused to appear for the depositions or respond to written discovery. After Plaintiff filed a Motion for Sanctions, Defendants initiated an appeal.

On January 25, 2019, this Court ordered Defendants to respond to court-approved discovery requests and appear for depositions in Ms. Lewis' IIED case (D-1-GN-18-006623). Defendants presented Rob Dew as a corporate designee, who was unable to give any testimony. The Court chastised "the failure of the defendants to present an InfoWars corporate representative who has a clue about InfoWars as a corporation," noting that "it was a pretty meaningless deposition." Defendants agreed to stipulate to Plaintiff's petition for the purposes of the TCPA motion and voluntarily pay $8,100 in attorney's fees to avoid sanctions at that time.

Following the events in *Lewis,* the premature appeal in Mr. Heslin's defamation case was dismissed for lack of jurisdiction. Upon remand to this Court in the fall of 2019, InfoWars again refused to respond or appear for deposition. On October 18, 2019, this Court assessed

---

in this Court's prior orders, InfoWars has also committed discovery abuse in *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605). In that case, InfoWars failed to timely answer written discovery. After InfoWars provided untimely and evasive responses, Mr. Fontaine was forced to bring a motion to compel InfoWars' compliance, for which this Court awarded sanctions and attorney's fees on September 15, 2021. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar lawsuit brought after the instant cases by a different set of Sandy Hook parents in the Superior Court of Connecticut, ultimately resulting in a default judgment on liability several weeks after this Court's entry of default judgment. The Court further notes that Defendants have been sanctioned by the Texas Court of Appeals for bringing a frivolous appeal in Mr. Heslin's case. Finally, as noted in the Court's default judgment order, Mr. Jones has publicly declared that he considers these lawsuits to be a "show trial," showing clear signs that Defendants' discovery violations are the result of bad faith. Mr. Jones' recent deposition confirmed these signs, during which Mr. Jones testified about his indifference to his discovery obligations.

2

EXHIBIT 3

sanctions of $25,875, while also ruling that Plaintiff's burdens were taken as established for the purposes of the TCPA motion.

On October 18, 2019, this Court ordered Defendants to appear for deposition in Mr. Heslin's IIED case (D-1-GN-18-004651).[2] Again, Rob Dew was produced as the corporate designee. Again, Mr. Dew had not been prepared and was unable to offer any meaningful testimony. On December 20, 2019, the Court assessed sanctions totaling $100,000 and held the Defendants in contempt for intentionally disobeying the order. At that time, the Court held a default judgment under advisement based on representations by Defendants that discovery would be promptly supplemented during the appellate stay.

All the cases were remanded in June 2021. Defendants had not taken any steps to address the discovery situation during the appeal, and for the next three months following remand, Defendants ignored Plaintiffs' demands for compliance. On September 27, 2021, this Court issued a default judgment on liability and awarded attorney's fees of $45,925.

## THE DECEMBER 3, 2021 CORPORATE DEPOSITION

Following the default judgment, Plaintiffs again sought the Defendants' depositions to secure testimony relevant to the trial on compensatory and punitive damages. Defendants produced Daria Karpova for the deposition. The transcript of Ms. Karpova's deposition shows that she was not prepared to discuss any of the eight topics for which she had been designated. Her testimony as a whole demonstrated profound disrespect for the discovery process. Ms. Karpova's lack of preparation was flagrant and egregious, especially given the repeated refusal to prepare a designee.

_____

[2] Subsequently consolidated with D-1-GN-18-001835.

EXHIBIT 3

On January 14, 2022, the Court heard argument on Plaintiffs' Motion for Sanctions concerning Ms. Karpova's deposition. The Court granted the Motion, awarded costs, and ordered the Defendants to appear one more time. The Court provided detailed instructions for preparing the designee(s).

### THE FEBRUARY 2022 CORPORATE DEPOSITION

On February 14-15, 2022, Defendants presented Brittany Paz as the designee in both the Sandy Hook and Fontaine cases. A review of the deposition transcript shows that Defendants flagrantly disobeyed the Court's order in preparing Ms. Paz. As a result, she was unable to give adequate testimony on any of the topics. Plaintiffs have now faced five non-appearances at corporate depositions on the issues at the heart of their claims despite every remedial action taken the Court, including the severe sanction of default and over $200,000 in cumulative attorney's fees.

### FINDINGS

The Court finds that Defendants have intentionally thwarted the legitimate discovery process in these cases. The egregiousness and repetitiveness of Defendants' obstruction exhibits a disregard for and disrespect of the integrity of this Court and our judicial system. Plaintiffs' discovery of facts necessary to properly present their claim for damages has been irreparably prejudiced in virtually all respects. Absent severe action from this Court, Defendants will ultimately profit from their sabotage of the discovery process.



4

7053

EXHIBIT 3

The Court therefore ORDERS that:

1.    Pursuant to Rule 215(b)(1), the Court disallows any further discovery by Defendants. Any obligation of the Plaintiffs to respond to any pending discovery is terminated.

2.    Pursuant to Rule 215(b)(2), the Court orders that Defendants shall pay all of the expenses of discovery and taxable court costs in these lawsuits. Plaintiffs shall submit evidence setting forth any court costs, expenses, or attorney's fees relating to discovery or discovery motions, excepting those amounts which were already awarded in any prior order of the Court. Defendants may object to the amount within seven days after Plaintiff's filing.

3.    Pursuant to Rule 215(b)(3), the Court orders that designated facts shall be taken to be established for the purposes of the action. Specifically, the jury will be instructed that any factual dispute relating to the following topics shall be taken as established in favor the Plaintiffs:

- Sourcing and research for the videos described in Plaintiffs' petitions.
- Individuals involved in the production of the videos described in Plaintiffs' petitions.
- Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.
- The company's knowledge of the Plaintiffs.
- The audience reach of the videos described in Plaintiffs' petitions.
- The documents produced by the company in response to Plaintiffs' discovery requests.
- Efforts made by the company to preserve potential evidence.
- The company's business structure and relationship with other parties.

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Dated _____ and seal of office , 2021.

On 05/16/2023 07:57:44

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

Dated: April 1, 2021.

Hon. Maya Guerra Gamble

7054

EXHIBIT 3

# APPENDIX B

EXHIBIT 3

**D-1-GN-18-001835**

**ORIGINAL**

| | | |
|---|---|---|
| **NEIL HESLIN and** | § | **IN DISTRICT COURT OF** |
| **SCARLETT LEWIS** | § | |
| | § | |
| **VS.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES and** | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | **261ST DISTRICT COURT** |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. In the case of an emergency, others may contact you through my Judicial Executive Assistant at the number previously provided.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the Judicial Executive Assistant when you leave the Courthouse. We will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, we will collect your notes; when you are released from jury duty, we will promptly destroy your notes so nobody can read what you wrote.

Alternate jurors serve a valuable purpose. Without them, much time and money would be spent in the re-trial of cases. Thank you to my alternate jurors. You will be released from your oath and are free to go about your business, including observing the remainder of the trial if you would like.

**Here are the instructions for answering the questions:**

1. Do not let bias, prejudice, or sympathy play any part in your decision.

Everyone, including me, has feelings, assumptions, perceptions, fears, and stereotypes that we may not be aware of but that can affect what we see and hear, how we remember what we see and hear, and how we make decisions. Because you are making important decisions as the jurors in this case, you must evaluate the evidence carefully, and you must not jump to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases. Techniques to identify and check one's implicit biases include: slowing down and examining your thought processes thoroughly to identify where you may be relying on reflexive, gut reactions or making assumptions that have no basis in the evidence; asking yourself whether you would view the evidence differently if the players were reversed or other types of people were involved; and listening carefully to the opinions of your fellow jurors, each of whom brings a different, valid perspective to the table. Our system of justice is counting on you to render a just verdict based on the evidence, not on biases.

2.  Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.  You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow my instructions.

4.  If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.  All the questions and answers are important. No one should say that any question or answer is not important.

6.  Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

    The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.  Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

EXHIBIT 3

8. Do not answer questions by drawing straws or by any method of chance.

9. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

10. The answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

11. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

12. You are the sole judges of the credibility or believability of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness, you should consider their relationship to the party; their interest, if any, in the outcome of the case; their demeanor or manner of testifying; their opportunity to observe or acquire knowledge concerning the facts about which they have testified; their candor, fairness, and intelligence; and the extent to which they have been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and it would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

## CAUSE OF ACTION NO. 1 – Defamation Committed Against Neil Heslin

You are instructed that Defendants Alex Jones and Free Speech Systems, LLC committed defamation against Neil Heslin.

You are further instructed that Defendants Alex Jones and Free Speech Systems, LLC published statements that were false and defamatory concerning Neil Heslin on June 26, 2017 and July 20, 2017.

> "Publish" means intentionally or negligently to communicate the matter to a person other than Neil Heslin who is capable of understanding its meaning.

> "False" means that a statement is not literally true or not substantially true. A statement is not "substantially true" if, in the mind of the average person, the gist of the statement is more damaging to the person affected by it than a literally true statement would have been.

> "Defamatory" means an ordinary person would interpret the statement in a way that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach the person's honesty, integrity, virtue, or reputation.

You are further instructed that Defendants Alex Jones and Free Speech Systems, LLC knew or should have known, in the exercise of ordinary care, that the statements published on June 26, 2017 and July 20, 2017 were false and had the potential to be defamatory.

> "Ordinary care" concerning the truth of the statement and its potential to be defamatory means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

You are further instructed that at the time Defendants Alex Jones and Free Speech Systems, LLC published the statements on June 26, 2017 and July 20, 2017, Defendants knew the statements were false as it related to Neil Heslin, or that Defendants published the statements with a high degree of awareness that they were probably false, to an extent that Defendants in fact had serious doubts as to the truth of the statements.

Under Texas law, Defendants are responsible for all damages proximately caused by their actions which were reasonably foreseeable; including damages, if any, caused by participating in this litigation.

**QUESTION NO. 1**

What sum of money, if paid now in cash, would fairly and reasonably compensate Neil Heslin for his damages, if any, that were proximately caused by Defendants' defamatory publications on June 26, 2017 and July 20, 2017?

"Proximate cause" means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom. There may be more than one proximate cause of an injury.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Neil Heslin.

Do not include any amount for any condition existing before the defamatory publications, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the defamatory publications.

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for the damages listed below, if any.

a.    Injury to reputation that Neil Heslin sustained in the past.

Answer: $50,000

b.    Injury to reputation that, in reasonable probability, Neil Heslin will sustain in the future.

Answer: $10,000

c.    Mental anguish that Neil Heslin sustained in the past.

Answer: $50,000

d.    Mental anguish that, in reasonable probability, Neil Heslin will sustain in the future.

Answer: $0

## CAUSE OF ACTION NO. 2 – Intentional Infliction of Emotional Distress
## Committed Against Neil Heslin and Scarlett Lewis

You are instructed that Defendants Alex Jones and Free Speech Systems, LLC committed intentional infliction of emotional distress against Neil Heslin and Scarlett Lewis in a continuing course of conduct from 2013 to 2018.

> "Intentional infliction of emotional distress" means the defendant acts intentionally or recklessly with extreme and outrageous conduct to cause the plaintiff emotional distress and the emotional distress suffered by plaintiff was severe.

> "Extreme and outrageous conduct" means the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

Under Texas law, Defendants are responsible for all damages proximately caused by their actions which were reasonably foreseeable; including damages, if any, caused by participating in this litigation.

**QUESTION NO. 2**

What sum of money, if paid now in cash, would fairly and reasonably compensate Neil Heslin for his damages, if any, that were proximately caused by Defendants' intentional infliction of emotional distress from 2013 to 2018?

"Proximate cause" means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom. There may be more than one proximate cause of an injury.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Neil Heslin.

Do not include any amount for any condition existing before the extreme and outrageous conduct, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the extreme and outrageous conduct.

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for each person for the damages listed below, if any.

a.      Mental anguish that Neil Heslin sustained in the past.

Answer: $ 1,500,000

b.      Mental anguish that, in reasonable probability, Neil Heslin will sustain in the future.

Answer: $ 500,000

**QUESTION NO. 3**

What sum of money, if paid now in cash, would fairly and reasonably compensate Scarlett Lewis for her damages, if any, that were proximately caused by Defendants' intentional infliction of emotional distress from 2013 to 2018?

"Proximate cause" means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom. There may be more than one proximate cause of an injury.

"Mental anguish" means the emotional pain, torment, and suffering experienced by Scarlett Lewis.

Do not include any amount for any condition existing before the extreme and outrageous conduct, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the extreme and outrageous conduct.

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for each person for the damages listed below, if any.

a.      Mental anguish that Scarlett Lewis sustained in the past.

Answer: $ 1,500,000

b.      Mental anguish that, in reasonable probability, Scarlett Lewis will sustain in the future.

Answer: $ 500,000

Presiding Juror:

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

>  a   have the complete charge read aloud if it will be helpful to your deliberations;
>
>  b   preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;
>
>  c   give written questions or comments to the Judicial Executive Assistant who will give them to the judge;
>
>  d   write down the answers on which you agree;
>
>  e   get the signatures for a verdict certificate; and
>
>  f   Notify the Judicial Executive Assistant that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instructions for Signing the Verdict Certificate:**

1.     Unless otherwise instructed, you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2.     If ten jurors agree on every answer, those ten jurors sign the verdict. If eleven jurors agree on every answer, those eleven jurors sign the verdict. If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.     All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

Maya Guerra Gamble, Judge Presiding

Submitted on: _____

Returned on: _____

**Verdict Certificate**

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer.
The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have
signed the certificate below.

✓ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have
signed the certificate below.



| | SIGNATURE | NAME PRINTED |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |

EXHIBIT 3

# APPENDIX C

EXHIBIT 3

# ORIGINAL

### D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN and** | § | **IN DISTRICT COURT OF** |
| **SCARLETT LEWIS** | § | |
| | § | |
| **VS.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES and** | § | |
| **FREE SPEECH SYSTEMS, LLC** | § | **261ST DISTRICT COURT** |

Filed in The District Court
of Travis County, Texas

### CHARGE OF THE COURT

AUG 0 5 2022  **JG**

MEMBERS OF THE JURY:

At _____ 12:26 ___ P___ M.
Velva L. Price, District Clerk

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. In the case of an emergency, others may contact you through my Judicial Executive Assistant at the number previously provided.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the Judicial Executive Assistant when you leave the Courthouse. We will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, we will collect your notes; when you are released from jury duty, we will promptly destroy your notes so nobody can read what you wrote.

**Here are the instructions for answering the questions:**

1. Do not let bias, prejudice, or sympathy play any part in your decision.

   Everyone, including me, has feelings, assumptions, perceptions, fears, and stereotypes that we may not be aware of but that can affect what we see and hear, how we remember what we see and hear, and how we make decisions. Because you are making important decisions as the jurors in this case, you must evaluate the evidence carefully, and you must not jump to conclusions based on personal likes or dislikes, generalizations, ...

AUG 0 5 2022 Page 1 of 11
At _____ 4:48 ___ P___ M.
Velva L. Price, District Clerk

feelings, prejudices, sympathies, stereotypes, or biases. Techniques to identify and check one's implicit biases include: slowing down and examining your thought processes thoroughly to identify where you may be relying on reflexive, gut reactions or making assumptions that have no basis in the evidence; asking yourself whether you would view the evidence differently if the players were reversed or other types of people were involved; and listening carefully to the opinions of your fellow jurors, each of whom brings a different, valid perspective to the table. Our system of justice is counting on you to render a just verdict based on the evidence, not on biases.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

10. The answers to the questions must be based on the decision of all twelve jurors.

11. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

12. You are the sole judges of the credibility or believability of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness, you should consider their relationship to the party; their interest, if any, in the outcome of the case; their demeanor or manner of testifying; their opportunity to observe or acquire knowledge concerning the facts about which they have testified; their candor, fairness, and intelligence; and the extent to which they have been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and it would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

## CAUSE OF ACTION NO. 1 – Defamation Committed Against Neil Heslin

You are instructed that Defendants Alex Jones and Free Speech Systems, LLC committed defamation against Neil Heslin.

You are further instructed that Defendants Alex Jones and Free Speech Systems, LLC published statements that were false and defamatory concerning Neil Heslin on June 26, 2017 and July 20, 2017.

> "Publish" means intentionally or negligently to communicate the matter to a person other than Neil Heslin who is capable of understanding its meaning.

> "False" means that a statement is not literally true or not substantially true. A statement is not "substantially true" if, in the mind of the average person, the gist of the statement is more damaging to the person affected by it than a literally true statement would have been.

> "Defamatory" means an ordinary person would interpret the statement in a way that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach the person's honesty, integrity, virtue, or reputation.

You are further instructed that Defendants Alex Jones and Free Speech Systems, LLC knew or should have known, in the exercise of ordinary care, that the statements published on June 26, 2017 and July 20, 2017 were false and had the potential to be defamatory.

> "Ordinary care" concerning the truth of the statement and its potential to be defamatory means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

You are further instructed that at the time Defendants Alex Jones and Free Speech Systems, LLC published the statements on June 26, 2017 and July 20, 2017, Defendants knew the statements were false as it related to Neil Heslin, or that Defendants published the statements with a high degree of awareness that they were probably false, to an extent that Defendants in fact had serious doubts as to the truth of the statements.

**QUESTION NO. 1**

What sum of money, if any, should be assessed against Defendants and awarded to Neil Heslin as exemplary damages for the conduct related to Defendants' defamatory publications on June 26, 2017 and July 20, 2017?

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

> "Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages include punitive damages.

Factors to consider in awarding exemplary damages, if any, are:

1. The nature of the wrong.
2. The character of the conduct involved.
3. The degree of culpability of the wrongdoer.
4. The situation and sensibilities of the parties concerned.
5. The extent to which such conduct offends a public sense of justice and propriety.
6. The net worth of Defendants.

Answer in dollars and cents, if any.

$ 4,200,000.00 ($4.2 M)

## CAUSE OF ACTION NO. 2 – Intentional Infliction of Emotional Distress
## Committed Against Neil Heslin and Scarlett Lewis

You are instructed that Defendants Alex Jones and Free Speech Systems, LLC committed intentional infliction of emotional distress against Neil Heslin and Scarlett Lewis in a continuing course of conduct from 2013 to 2018.

> "Intentional infliction of emotional distress" means the defendant acts intentionally or recklessly with extreme and outrageous conduct to cause the plaintiff emotional distress and the emotional distress suffered by plaintiff was severe.

> "Extreme and outrageous conduct" means the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

**QUESTION NO. 2**

What sum of money, if any, should be assessed against Defendants and awarded to Neil Heslin as exemplary damages for the conduct related to Defendants' intentional infliction of emotional distress from 2013 to 2018?

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

> "Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages include punitive damages.

Factors to consider in awarding exemplary damages, if any, are:

1. The nature of the wrong.
2. The character of the conduct involved.
3. The degree of culpability of the wrongdoer.
4. The situation and sensibilities of the parties concerned.
5. The extent to which such conduct offends a public sense of justice and propriety.
6. The net worth of Defendants.

Answer in dollars and cents, if any.

$ 20,500,000.00 ($20.5M)

**QUESTION NO. 3**

What sum of money, if any, should be assessed against Defendants and awarded to Scarlett Lewis as exemplary damages for the conduct related to Defendants' intentional infliction of emotional distress from 2013 to 2018?

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

> "Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages include punitive damages.

Factors to consider in awarding exemplary damages, if any, are:

1.  The nature of the wrong.
2.  The character of the conduct involved.
3.  The degree of culpability of the wrongdoer.
4.  The situation and sensibilities of the parties concerned.
5.  The extent to which such conduct offends a public sense of justice and propriety.
6.  The net worth of Defendants.

Answer in dollars and cents, if any.

$ 20,500,000.00 ($20.5M)

Presiding Juror:

When you go into the jury room to answer the questions, remember that the presiding juror has these duties:

1. have the complete charge read aloud if it will be helpful to your deliberations;

2. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

3. give written questions or comments to the Judicial Executive Assistant who will give them to the judge;

4. write down the answers on which you agree;

5. get the signatures for a verdict certificate; and

6. Notify the Judicial Executive Assistant that you have reached a verdict.

EXHIBIT 3

**Instructions for Signing the Verdict Certificate:**

MEMBERS OF THE JURY:

In discharging your responsibility on this jury, you will observe all the instructions that have been previously given you.

_____
Maya Guerra Gamble, Judge Presiding

Submitted on: _____

Returned on: _____

EXHIBIT 3

## Verdict Certificate

I certify that the jury was unanimous in answering the preceding questions. All twelve of us agreed to each of the answers. The presiding juror has signed the certificate for all twelve of us.

_____            _____
Signature of Presiding Juror                          Printed Name of Presiding Juror

EXHIBIT 3

# APPENDIX D

EXHIBIT 3

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES and FREE SPEECH | § | 261st DISTRICT COURT |
| SYSTEMS, LLC | § | |

## **FINAL JUDGMENT**

On July 25, 2022, this case came before the Court for trial by jury.[1] Plaintiffs Neil Heslin and Scarlett Lewis appeared personally and through their attorney of record and announced ready for trial. Defendants Alex E. Jones and Free Speech Systems, LLC appeared personally and through their attorney of record and announced ready for trial. After a jury of twelve qualified jurors was duly selected, impaneled, and sworn to try the case, the jury heard the evidence and arguments of counsel. After the evidence was closed, the Court submitted this case to the jury. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record.

Based on the evidence presented during trial, the jury returned a verdict in favor of Plaintiffs and against Defendants. The questions submitted to the jury and

---

[1] Initially, this case was filed as three separate lawsuits by Plaintiffs, which were then consolidated. *See* Cause No.: D-1-GN-18-001835; *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-19-004651; *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-006623; *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 98th Judicial District Court of Travis County, Texas.

9331

EXHIBIT 3

the jury's findings are attached as Exhibits 1 and 2 and are incorporated by reference into this final judgment. The jury's findings, along with the Court's default judgment and resulting admissions, entitle Plaintiffs Neil Heslin and Scarlett Lewis to a judgment against Defendants Alex E. Jones and Free Speech Systems, LLC as set forth in their Fifth Amended Petition. Alternatively, to the extent that a necessary element of their recovery has been omitted, the Court implies a finding to support it.

It is therefore **ORDERED** that Plaintiffs Neil Heslin and Scarlett Lewis shall have and recover of, from, and against Defendants Alex E. Jones and Free Speech Systems, LLC the following:

1. the amounts of $26,810,000 to Plaintiff Neil Heslin and $22,500,000 to Plaintiff Scarlett Lewis; plus

2. Prejudgment interest at the annual rate of 5% from the day this case was filed by Plaintiffs until the day before the date of the judgment in the amounts of $323,150 to Plaintiff Neil Heslin and $284,250 to Plaintiff Scarlett Lewis; plus

3. Costs of court previously assessed by the Court in the amount of $126,523.80; plus

4. All other court costs shall be taxed against Defendants Alex E. Jones and Free Speech Systems, LLC.



-2-

9332

EXHIBIT 3

It is further **ORDERED** that postjudgment interest shall accrue on the amount of $50,043,923.80 at the rate of 5%, compounded annually, from the date the judgment is signed until all amounts are paid in full.

It is further **ORDERED** that all writs and processes as may be necessary in the enforcement and collection of this judgment or the costs of court shall issue as necessary.

Of importance to the Court is that no party sought a judgment addressing the constitutionality, either in general or as specifically applied in this case, of the limitation on the amount of recovery prescribed by Tex. Civ. Prac. & Rem. Code 41.008(b). Instead, Plaintiff's Fifth Amended Petition includes a cause of action referenced in Tex. Civ. Prac. & Rem. Code 41.008(c), which exempts this judgment from the exemplary damages limitation. Upon taking office a Judge swears to uphold both the Constitution of Texas and the Constitution of the United States. I am withholding my own judgment on the question at this time, confident that should the Plaintiffs' Fifth Amended Petition be struck for some reason the constitutionality of Tex. Civ. Prac. & Rem. Code 41.008(b) at least in this case will be raised at that time.

This judgment finally disposes of all claims and all parties and is appealable.

Signed on January 12, 2023.

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 05/16/2023 07:58:21

VELVA L. PRICE
DISTRICT CLERK
By Deputy:

JUDGE PRESIDING
MAYA GUERRA GAMBLE

-3-

9333