**EXHIBIT 8**

                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION

                                    )  CASE NO: 22-33553-CML
                                    )
ALEXANDER E. JONES and              )  Houston, Texas
OFFICIAL COMMITTEE OF               )
UNSECURED CREDITORS,                )  Thursday, June 14, 2024
         Debtors.                   )
                                    )  10:01 a.m. to 4:06 p.m.
--------------------------------)
FREE SPEECH SYSTEMS,                )  CASE NO: 22-60043-CML
         Debtor.                    )
--------------------------------)
HESLIN, et al.,                     )  CASE NO: 22-03331-CML
              Plaintiffs,           )  ADVERSARY
      Vs.                           )
JONES, et al.,                      )
              Defendants.           )
--------------------------------)
HESLIN, et al.,                     )  CASE NO: 23-03034-CML
              Plaintiffs,           )  ADVERSARY
      Vs.                           )
JONES, et al.,                      )
              Defendants.           )
--------------------------------)
WHEELER, et al.,                    )  CASE NO: 23-03036-CML
              Plaintiffs,           )  ADVERSARY
      Vs.                           )
JONES, et al.,                      )
              Defendants.           )
--------------------------------)


                              TRIAL

          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
               UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Free Speech Systems: ANNIE CATMULL
                         O'Connor Wechsler PLLC
                         4400 Post Oak Parkway, Suite 2360
                         Houston, TX 77027

EXHIBIT 8

For Alex E. Jones:        VICKIE DRIVER
                          CHRISSY STEPHENSON
                          SHELBY JORDAN
                          Crowe & Dunlevy PC
                          2525 McKinnon Street, Suite 425
                          Dallas, TX 75201

For PQPR:                 STEVE LEMMON
                          Streusand Landon Ozburn Lemmon LLP
                          1801 S. Mopac Expressway, Suite 320
                          Austin, TX 78746

For Texas Plaintiffs:     AVI MOSHENBERG
                          JARROD MARTIN
                          JENNIFER HARDY
                          Lawson & Moshenberg PLLC
                          801 Travis Street, Suite 2101
                          Houston, TX 77002

For Melissa Haselden      ELIZABETH FREEMAN
Subchapter V Trustee:     Law Office of Elizabeth Freeman
                          P.O. Box 61209
                          Houston, TX 77208

For U.S. Trustee:         HA NGUYEN
                          JAYSON RUFF
                          United States Department of Justice
                          515 Rusk Street, Suite 3516
                          Houston, TX 77002

For Connecticut           KYLE KEMPLER
Plaintiffs:               Paul, Weiss, Rifkind,
                          Wharton & Garrison LLP
                          1285 Avenue of the Americas
                          New York, NY 10019

                          ALINOR STERLING
                          CHRIS MATTEI
                          Koskoff Koskoff & Bieder PC
                          350 Fairfield Avenue, Suite 501
                          Bridgeport, CT 06604

For the Committee:        SARAH BRAUNER
                          Akin Gump Strauss Hauer & Feld LLP
                          2300 N. Field Street, Suite 1800
                          Dallas, TX 75201

EXHIBIT 8

Tax Counsel:          HAROLD "HAP" MAY
                      Harold "Hap" May PC
                      1500 S. Dairy Ashford Road
                      Suite 325
                      Houston, TX 77077

For ESG:              JOHNIE PATTERSON
                      Walker & Patterson PC
                      P.O. Box 61301
                      Houston, TX 77208

For Dr. David Jones:  STEVE ROBERTS
                      Stephen A. Roberts PC
                      1400 Marshall Lane
                      Austin, TX 78703

Court Reporter:       UNKNOWN

Courtroom Deputy:     UNKNOWN

Transcribed by:       Veritext Legal Solutions
                      330 Old Country Road, Suite 300
                      Mineola, NY 11501
                      Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**EXHIBIT 8**

INDEX

PLAINTIFFS' WITNESSES     DIRECT     CROSS     REDIRECT     RECROSS

GOVERNMENT'S WITNESSES     DIRECT     CROSS     REDIRECT     RECROSS

PLAINTIFFS' EXHIBITS                                        RECEIVED

GOVERNMENT'S EXHIBITS                                       RECEIVED

EXHIBIT 8

HOUSTON, TEXAS; FRIDAY, JUNE 14, 2024; 10:01 a.m.

(Call to Order)

THE COURT: Good morning, everyone. This is Judge Lopez. Today is June 14th. I'm going to turn on my camera and I'm going to call the 10:00 a.m. cases, combined cases in Alex Jones and Free Speech Systems.

Why don't I just take appearances to start with and then we'll see where we go.

MS. CATMULL: Good morning, Your Honor. Annie Catmull, C-A-T-M-U-L-L, here on behalf of the Debtor, Free Speech Systems. I'm joined by my partner electronically, Kathleen O'Connor.

THE COURT: Okay. Good morning.

MS. DRIVER: Good morning, Your Honor. Vickie Driver. And I am joined by my partner, Chrissy Stephenson and Mr. Shelby Jordan, my co-counsel, here on behalf of Mr. Jones.

THE COURT: Okay, good morning.

MR. LEMMON: Your Honor, Steve Lemmon for PQPR.

THE COURT: Good morning.

MR. MOSHENBERG: Good morning, Your Honor. Avi Moshenberg, Jarrod Martin, and Jennifer Hardy here on behalf of Texas Plaintiffs.

THE COURT: Okay, good morning.

MS. FREEMAN: Good morning, Your Honor. Elizabeth

**EXHIBIT 8**

Freeman.  I am proposed counsel for Melissa Haselden, the Subchapter V Trustee in Free Speech.  And Ms. Haselden is here as well.

THE COURT:  Okay.  Good morning.

MR. NGUYEN:  Good morning, Your Honor.  Ha Nguyen for the U.S. Trustee.  I also have Jayson Ruff from my office with me.

THE COURT:  Okay.  Good morning.

MR. KEMPLER:  Good morning, Your Honor.  Kyle Kempler from Paul Weiss on behalf of the Connecticut plaintiffs.  This morning you may be hearing from me as well as my partner, Mr. Paterson.  I believe on the line is our co-counsel, Mr. Ryan Chapple.

THE COURT:  Okay.  Good morning.

MS. STERLING:  Good morning, Your Honor.  Alinor Sterling here for the Connecticut plaintiffs as well.  And with us in the courtroom are my law partner, Chris Mattei, and also our client, Robbie Parker.

THE COURT:  Good morning.

MS. BRAUNER:  Good morning, Your Honor.  Sarah Brauner, Akin, on behalf of the Committee in the Jones case.  And with me is my partner, Katherine Porter.

THE COURT:  Okay.  Good morning.

Okay, I'm going to turn to anyone who wishes to make an appearance on the phone line.  If you would hit

EXHIBIT 8

five-star, I will unmute your line. I would just ask if I do unmute your line, that you please just monitor yourselves. There's about 147 people on the line. I guess I can't really say about 147; it looks like there are 147.

Okay, here is a 347 number.

MR. KUMAR: Your Honor, this is (indiscernible) Kumar from (indiscernible). Good morning.

THE COURT: Okay. Good morning.

Here is a 713 number.

MR. MAY: This is Harold Hap May. I am tax counsel for Free Speech.

THE COURT: Good morning, Mr. May.

MR. MAY: Thank you.

THE COURT: 713 number.

MR. PATTERSON: Good morning, Your Honor. Johnie Patterson for ESG.

THE COURT: Good morning. There is a 512 number.

MR. ROBERTS: This is Steve Roberts. I represent Dr. David Jones and (indiscernible).

THE COURT: Okay. I think that is it. I will monitor this to make sure as issues come up. But we'll be able to unmute a few more lines if those parties wish. Okay.

Why don't we start with the Jones case.

Ms. Freeman?

EXHIBIT 8

MS. FREEMAN:  Just very briefly, Your Honor.  I note that there are a number of members of the press that are online and personalities.  And I think it may bear -- hopefully it's not necessary, but it may make sense for the Court to reiterate the policy with regards to recording the proceedings.

THE COURT:  No.  Let's proceed.  Let's go.

MS. DRIVER:  Your Honor, good morning.

THE COURT:  Good morning.

MS. DRIVER:  It's been a long time coming to today in these cases, and I appreciate the Court's time, as always.

Your Honor, I would be a little bit remiss -- we do have set for hearing today in the Jones case our emergency motion to convert his case from 11 to 7.  I believe everything filed of record as of today is in support of that ultimate relief.  And so I think that in my view on behalf of Mr. Jones, the only issue here is the form of order that would be entered today to grant that relief.

I do know that the Committee did want to flip and do FSS first.  They said that to me in advance.  But I told them it would be up to Your Honor.

THE COURT:  I get to choose.

MS. DRIVER:  You do, Your Honor.  Thank you.  I just didn't want to step on anyone's toes.

EXHIBIT 8

THE COURT:  I guess I'm the toe-snapper if that's the case then.  Let's proceed.

MS. DRIVER:  And I will give you that right every day.

Your Honor, we circulated a proposed order to everyone on June 5th when the motion to convert was filed, and it's a fairly simple order.  It is included in our exhibit list.

THE COURT:  And where do I find that?  I want to make sure I'm looking at the right one when you're describing it.

MS. DRIVER:  Yes, Your Honor.  It's going to be Exhibit -- Mr. Jones' Exhibit 4.

THE COURT:  Do you have the --

MS. DRIVER:  And I have books for you if I could hand up, Your Honor.

THE COURT:  Oh no, no.  I just want to know -- if you tell me the docket number, I can pull it up and just look at it.

MS. DRIVER:  That is a great question.

THE COURT:  I think I see it here.  Okay.

MS. DRIVER:  And, Your Honor, this is just what we would consider a very plain vanilla conversion order.  We've run this past all the parties here and we did receive a couple of comments from the U.S. Trustee, which are noted in

EXHIBIT 8

our exhibit.  The U.S. Trustee wanted to make it very clear that the Debtor would appear at the 341 meeting and we have no objection to that language being modified as in Paragraph 4 in the redline that we submitted.

THE COURT:  Okay.

MS. DRIVER:  Your Honor, I think it's just -- since we don't disagree on the ultimate relief requested, and I think there's just clear code language that allows for the conversion of this case and no one is moving for dismissal of this case, I don't think there's any argument there.  I have a lot of issues with the competing order.

THE COURT: Why don't you just tell me about your order and then you can tell me about the competing order and why you think the order works.

MS. DRIVER:  I'm sorry, could you say that one more time?

THE COURT:  No, I was going to ask you to just tell me about -- you think your order works, and now you're going to the other form of order.  Is that -- I just want to make sure I'm following.

MS. DRIVER:  Correct.  We think our order is supported by the U.S. Trustee's Office and that Texas, Connecticut, and the UCC in the Jones case have filed a second order that they considered a competing -- I considered a competing order.  And I'm just going to tell

EXHIBIT 8

Your Honor why I think that order does not work if that's appropriate.

THE COURT:  Okay.

MS. DRIVER:  First of all, some of the provisions that are contained in this order, if you cross-reference the creditor's plan, which I have available here, that's been withdrawn for consideration today.  Essentially we were unable to come to terms on a liquidating plan.  And part of the reason why we could not come to terms with that included some of the terms that they have now included in this competing order.

And I would submit, Your Honor, that it seeks relief far and above what is requested in any motion that's in front of Your Honor today and it also exceeds what could be done in a -- should be done in a normal Chapter 7.  It anticipates that you're going to give advisory opinions and orders related to issues that have not -- cannot and should not be decided until a Chapter 7 trustee is appointed and they've had a chance to weigh in.

They're also asking for things that I just don't believe are allowed in the Code.  For example, they want to keep the UCC in existence past conversion.  And I don't know of anything in the Code or the rules that allows for that.

THE COURT:  I think it's just to get their kind of fees.  Do I understand more than that, or just turning

**EXHIBIT 8**

things over?

MS. DRIVER:  They also want to be advisors to the Chapter 7 trustee.  And I don't think that's appropriate, Your Honor.  Each of the members of the committee have their own counsel.  If Mr. Kempler wants to call the Chapter 7 trustee and set a meeting and advise him of certain things, he certainly has a right to do that, and nothing in this order would prevent that.

Your Honor, there's issues related to turnover of non-exempt property to the Chapter 7 trustee.  I think the Code and the Rules absolutely already address this issue, and imposing additional responsibilities on Mr. Jones simply because he is Mr. Jones, there's just nothing in front of this Court that shows that those are necessary.

It also attempts to restrain a Chapter 7 Trustee before their even appointment from retaining professionals or doing other actions that would require a notice of hearing.  This is unnecessary and clamps the hands of Chapter 7 trustee unnecessarily before they are even appointed.

Your Honor, the two most troubling things that I have is that this would declare that disputed claims are eligible to vote and replace a Chapter 7 trustee at any 341 meeting, which is not the process.  At the 341 meeting they have a chance to vote.  And if there is issues related to

EXHIBIT 8

who can vote, then a briefing schedule should be set.

Your Honor, I have no problem working on an agreed briefing schedule on those issues, but as Your Honor noted, we filed objections to each of the claims yesterday. It is absolutely without question that we dispute these claims.

Your Honor, they also want to declare all orders in the Jones case be binding on a Chapter 7 trustee. I just think a blanket statement like that, there's just no notice and hearing to figure out what that might do to a Chapter 7 trustee.

It demands turnover of property held by trusts that are not in the possession of Mr. Jones. If there is a claim to pull those assets into the estate, the Chapter 7 trustee has all of the powers necessary to do that. The parties that are in charge of those trusts have not been given any notice of this, and it would take away their property rights without due notice and proper process.

They also -- and this is just really my most troubled issue -- is they want to transfer some of Mr. Jones' personal attorney-client privileged information to the trustee without notice and hearing. Attorney-client privilege for an individual is very sacrosanct. I've represented many, many debtors that converted to a Chapter 7 or filed a Chapter 7 that were corporations. Unquestionably that privilege transfers to the Chapter 7 trustee.

**EXHIBIT 8**

THE COURT: Referring to the protective order paragraph?

MS. DRIVER: Yes, Your Honor.

THE COURT: Okay.

MS. DRIVER: And that is just simply, in my opinion contrary to the Texas Rules of Professional Conduct and would require me to do things that I think could put my bar license in jeopardy.

One thing that I find a little bit strange in this order -- and this is just -- I don't think it increases anybody's rights, I don't think it decreases anybody's rights, but it becomes very troubling to me when one party seeks to reserve all rights to assert their Chapter 11 claim, but no one else does. The implication could be that by Akin Gump reserving their right to assert their Chapter 11 claims, that any Chapter 11 professional that didn't get their own separate paragraph might be barred from doing so. Simply deleting that paragraph leaves everybody's rights unadjusted and unaffected.

I just find this to come down to the desire to reserve rights of everybody standing in the courtroom to the detriment of anyone who just simply didn't show up that day.

Again, I reference that this is bootstrapping provisions of a Chapter 11 plan that no party was able to agree on. There was no motion that was filed by any of the

EXHIBIT 8

parties seeking entry of this order to have these types of things adjudicated today.  And to order them today would violate the due process of multiple parties, including a Chapter 7 trustee that hasn't even been appointed.

Your Honor, I think it arguably has you as issuing advisory opinions on things that aren't even ripe to bring in front of this Court, such as the right of certain creditors to vote on the trustee.

I'll also note that we got this order less than 48 hours before this hearing.  And we were never given any comments to our order, which we hoped we could work with the parties to resolve.

Your Honor, there were a lot of things in the Statement of Support filed by Connecticut.  I would not one thing.  The Statement of Support by Connecticut was not joined by the Texas families.  So this was only Connecticut that has these issues.

In our view, there are unfounded assumptions, inaccuracies, and outright misleading statements in that. However, given it was a statement, and I don't believe there's any evidence that's going to be introduced today to support those allegations, I am ready and able to put on a very lengthy evidentiary hearing today to refute them if so necessary.  But in my view, Your Honor, throwing those allegations in the statement was simply just mud.

EXHIBIT 8

And if Your Honor says that those allegations and my refuting them leaves the slate clean, I'm perfectly happy not to bore everyone in this courtroom with an unnecessary evidentiary hearing today.

Mr. Jones is going to be in front of Your Honor in a Chapter 7 case, and he doesn't want unnecessarily to have his ability to be honest and forthright with this Court impugned by not refuting these allegations. And so if we simply say that the slate is clean and we're not going to take evidence on this issue, then the pleadings and the statements that I've said stay where they are and simply leave the slate.

Your Honor, I believe that's my presentation on the motion to convert Mr. Jones' case.

THE COURT: Okay. Thank you. Does anyone else wish to be heard? Mr. Kempler?

MR. KEMPLER: Does either microphone work here, Your Honor?

THE COURT: Yeah.

MR. KEMPLER: Okay. Save a couple steps.

THE COURT: We'll find out.

MR. KEMPLER: So, Your Honor, before I respond to that, just as a matter of procedure, I think all parties here have submitted witness and exhibit lists. We did as well. I think some of the issues we are talking about do

EXHIBIT 8

have an evidentiary basis.  I don't think there needs to be a significant evidentiary hearing on these matters.  I think what we submitted in our exhibit lists are just transcripts of things that Mr. Jones said.  If somebody wants to say we've taken that out of context, they can.  But they speak for themselves.  But I just ask the Court as a point of order before we get into the argument over the form of order, we would at least like to move for the admission of the exhibits on the Connecticut Plaintiff's Exhibit lists.  And other parties have them as well.  I'm also happy to do that in connection with the FSS case arguments and then have them applied to both.  But I don't want to lose -- before we get started I don't want to lose the ability to make sure that we're arguing the whole record here.

Because I think obviously a lot of the stuff we are asking for I'll be the first to admit is a unique provision.  But we think the facts and the circumstances here justify unique provisions.

THE COURT:  Before we talk about -- well, why don't we talk about the exhibits.  Let me just -- why don't we just do some housekeeping there.  Why don't you point out the docket number?

MR. KEMPLER:  Your Honor, if I could -- I have a friend here.

THE COURT:  Sure, absolutely.

EXHIBIT 8

MR. KEMPLER:  I'll have Mr. Paterson handle the evidence.  Thank you.

MR. PATERSON:  Good morning, Your Honor.  Paul Paterson from Paul Weiss for the Connecticut families.

THE COURT:  good morning.

MR. PATERSON:  Your Honor, we filed an updated exhibit list yesterday.  It was Docket Number 950 in the FSS case and 706 in the Jones case.

THE COURT:  I want to keep them separate.  So why don't we just make sure that we're all operating with clean records.  So 706 is the one in this case.

MR. PATERSON:  That's right, Your Honor.

THE COURT:  Okay.  And it looks like there are...

MR. PATERSON:  And, Your Honor, happy to give you a brief overview of what's here if that would be helpful.

THE COURT:  I'm just trying to make sure I've got the right numbers.  There are 14 exhibits.

MR. PATERSON:  That's correct, Your Honor.

THE COURT:  Any objection to the admission of any of the documents at 706?  Which ones?  All of them or none of them or some of them?

MS. DRIVER:  Let me -- I can just go down and tell you the declaration of Ms. Vida Robinson is hearsay.  She is here and can testify if necessary.

THE COURT:  Tell me the ones that you are okay

**EXHIBIT 8**

with and then I'll say no to the others.

MS. DRIVER:  Okay.  I'm fine with Exhibit 1, Exhibit 2, Exhibit 10, Exhibit 11, 12.  And that's it, Your Honor.

THE COURT:  1, 2, 10, 11, and 12.

MS. DRIVER:  Yes, sir.

THE COURT:  Okay.  And since you're standing there, you filed a witness and exhibit list as well.  I think you've got a one through -- let me find...

MS. DRIVER:  I think I have a 1 through 7, Your Honor.

THE COURT:  I was just trying to make sure 7 didn't say anything else.

Any objection to the admission of the exhibits at 696, 1 through 7?

MR. PATERSON:  Not from me, Your Honor.

THE COURT:  Okay, all right.  They are admitted as well.

(Exhibits 1 through 7 admitted into evidence)

THE COURT:  So let's just start with Code.  So 1112(a)(1), which is what we are proceeding under, the debtor may convert a case under this chapter to a case under Chapter 7 unless, (1), the debtor is not the debtor in possession, which doesn't apply; (2), the case was not commenced as an involuntary case under this Chapter, which

EXHIBIT 8

does not apply. Or (3), the case was converted to a case under this chapter other than on the debtor's request. Right? So that doesn't apply.

So we are under (a)(1). And I would note that the motion was filed as an emergency motion. So, Ms. Driver, I'm fine with folks kind of submitting proposed orders two days before. I think this wasn't on full notice, so I think we can consider that.

So the Debtor can convert a case under this chapter unless three exceptions apply, and none of them apply. So we're on kind of a voluntary.

The question is now what should be in that order except the case is converted. Right? Because Bankruptcy Code contemplates conversion and the Bankruptcy Code Section 348 talks about what the effect of that conversion is. You know, how do you count -- how do you treat the date of the petition versus the conversion date and things of that nature.

So I have read the proposed order, both proposed orders. I know what you're asking for. What I'm asking for is the statutory authority to add any of it in there.

MR. PATERSON: Your Honor, I will pass it back to Mr. Kempler if that's okay, if we're talking about the bankruptcy code.

THE COURT: Yeah. I kind of like to start at the

EXHIBIT 8

10,0000-foot level and then dive in.

Mr. Kempler, so point to me statutory authority for what you're asking for.

MR. KEMPLER:  Your Honor, I think the statutory authority here is under 105.  I think the issue here --

THE COURT:  But 105 requires an underlying -- 105 gives further authority to other sections.  So what other section are you relying on?

MR. KEMPLER:  I think we are giving effect to 1112 and 348.  It's perfectly appropriate for the Court in ordering the conversion of the case to take into account particular risks or concerns of that case and to do it in a way that makes the conversion to the Chapter 7 as seamless as possible and as value-preserving as possible.  And in our view, provisions that we placed in the order are all intended to ensure that the value of both the Jones case and then also when we get to the FSS case, because I think there's some overlap there, that there is not any type of gap or loss of -- you know, the Committee here has done a tremendous amount of work.  I think the idea that we're trying to just preserve rights, preserve value, prevent potential value degradation, I think all that is in furtherance of converting the case.

THE COURT:  Okay.  So walk me through

MR. KEMPLER:  So I don't know, Your Honor, if you

EXHIBIT 8

want to come back to any of the disputed exhibits.  But --

THE COURT:  I am more concerned about what this says and where the statutory provision -- in other words...

MR. KEMPLER:  Yeah.  Let me start.  I think the provisions of this order fall in a couple of buckets.  And one of those buckets I'm going to let the Committee counsel handle because I think it's more germane to their concerns.

THE COURT:  Let's talk about the ones that you want to talk about, then, since you're here.

MR. KEMPLER:  So let's start with the trustee election.

THE COURT:  Right.  The Code talks about what to do with a trustee when an interim trustee is appointed and then a permanent.  Why am I getting into that?  How is that 105, right?  Why don't we just let the Code speak for itself, right?

MR. KEMPLER:  We're not asking for anything that the Code doesn't provide, Your Honor.

THE COURT:  Well then why do I need to put it in an order?

MR. KEMPLER:  We're worried about timeline here.  The Code requires --

THE COURT:  But that's a Congress issue right?  Congress put it in.  Congress said when a case is converted, an interim trustee gets appointed.  And then within 30 days

EXHIBIT 8

they'll have another election.  So why can't we just let the Code speak for itself?

MR. KEMPLER:  Because I think if we just go by the defaults here, Your Honor, I think that there is going to be a significant period of time where a trustee -- let's just take one step back.

Here a hundred percent of the creditors of the Jones case are represented by three of the folks on this table.

THE COURT:  Right.

MR. KEMPLER:  We have an agreement as to who we would like to be our trustee.

THE COURT:  Okay.

MR. KEMPLER:  So this is not an issue where you're going to show up at a 341 meeting and have a dispute over who it should be or have some creditor saying I'm not so sure.  There is unanimity in who the trustee should be.  We think that it is important to have a trustee that we have confidence in given the pretty complex issues here.

THE COURT:  Doesn't the Code speak otherwise?  The Code speaks -- you get to have your day at the time of the election.  But at the time of the conversion, the Code speaks and says that an interim trustee gets appointed.  So in other words, what you're asking me to do is add words to what Congress put on this.  And it's not in furtherance of

EXHIBIT 8

it.  You want to have confidence in the person.  But when a case converts, I don't even know who it is.  I find out when everybody else does.  So I'm -- you're asking me to add words to what Congress prescribed.  There's an interim trustee that gets appointed, and I don't know who she or he will be and I don't know what she or he will do within the first -- until the meeting is prescribed where folks can elect.  And I got it, you may have the votes to do it as an election and there could be fights about that.  But I am concerned that I'm being asked to put -- either add words to the statute or to take away or diminish the process that has been set forth in the Bankruptcy Code.  And my job when things get really hard is to hug the rules and the Code.

MR. KEMPLER:  So, Your Honor, a couple of reactions there.  We're not saying there should not be an interim trustee.  We understand.

THE COURT:  But you want to have a hand in who it is.

MR. KEMPLER:  No.  The United States Trustee will appoint an interim trustee.

THE COURT:  You just said you want to have confidence in who it was.

MR. KEMPLER:  Your Honor, we will then elect a permanent trustee.  We're not asking you to say that the U.S. Trustee cannot fulfill its obligations to appoint an

EXHIBIT 8

interim trustee hopefully later today. That's not what we're asking for.

What we are saying is when you look at the Code, it says that the creditors are allowed to then elect a trustee at the 341 meeting. They have to announce their intention to do that. Now, the Code doesn't say how you announce that intention, it doesn't say how that works with a lot of particularity.

So what we are asking you to do to today, Your Honor, is in this order it will be announced so that there is no question to anybody that we intend at the 341 meeting, which is exactly what the Code says, we intend to elect a trustee at that time. There will be an interim trustee between now and then.

Now, Your Honor, we had tried to put in earlier drafts --

THE COURT: Let me give you an example.

MR. KEMPLER: Yeah.

THE COURT: Immediately -- let's just kind of walk through this. Immediately upon appointment of any interim Chapter 7 trustee, Jones has to turn over to the interim trustee all records and property of the estates in his possession, custody, and control provided, however, that the interim trustee shall not be entitled to retain professionals or settle any claims or causes of action or

**EXHIBIT 8**

otherwise to utilize, dispose of any assets before the election of a permanent trustee without the prior written consent of the Connecticut families and the Texas families. Right? You are trying to add...

MR. KEMPLER: We are trying to limit what the interim trustee can do.

THE COURT: And where is that in the Code?

MR. KEMPLER: Your Honor, there's no provision of the Code that allows that. We don't believe there's a provision of the Code that disallows that. And again, what we are contemplating happening here --

THE COURT: I've got what you're contemplating. I'm just trying to make sure that we are all on the same page. Because the duties of the trustee are set forth in 704, right? And so -- and now I'm going to say that the Chapter 7 trustee in Paragraph 3 is going to be elected by 20 percent of the Sandy Hook families. In other words, I'm putting in here who gets to pick. And maybe that's right. But how in the world can I make that determination now in Paragraph 3 today?

MR. KEMPLER: I don't think you are making that determination --

THE COURT: Oh no, I --

MR. KEMPLER: Sorry, you're saying in Paragraph 3 of the order.

EXHIBIT 8

THE COURT:  Yeah.  How in the world can I make that determination now?

MR. KEMPLER:  You do that, Your Honor, as an announcement of our intent to elect a trustee.  I --

THE COURT:  That's not an announcement.  That's me signing a piece of paper saying that this is how I was going to do it.

MR. KEMPLER:  That's fair, Your Honor.  The Bankruptcy Code says what the Bankruptcy Code says.  And it says that 20 percent of creditors can elect a trustee.  Obviously last night they filed claim objections trying to defang us from this.  You know...

THE COURT:  And I don't want to get into that.  I got it.

MR. KEMPLER:  Sure.  When we were voting on a plan, no issue.  But now it's an issue.

But there's -- again, there's only two groups of creditors in this case.  So we think that by saying that the Sandy Hook families are entitled to elect a trustee at the 341 meeting, we don't understand who would be harmed by that provision.  And, Your Honor, we just think that it would make the most sense given the posture of these cases to have certainty that at that 341 meeting, there will be an election, which is exactly what the Code says can happen.

You know, I will concede, Your Honor, there is not

**EXHIBIT 8**

a provision in the Bankruptcy Code that says that you can put this in an order.  But again, we view this as merely implementing what the Code already says.

THE COURT:  Understood.  Talk to me about -- I guess I would ask do the --

MR. KEMPLER:  Sorry.

THE COURT:  The paragraph with the protective order.  Can you just explain to me the -- kind of the -- your position on that?  I know that Ms. Driver expressed that provision, kind of a view about it.  Tell me your view on that.  Because I know that does involve the Connecticut families.

MR. KEMPLER:  It does, Your Honor.  So there's a couple of things going on there.  One, as Your Honor knows, the Creditors' Committee here has really taken the lead on doing a significant investigation and has collected significant amount of documents.  A lot of this is intended to ensure that the trustee, the Chapter 7 trustee, whether it's the interim trustee or the permanent trustee that we would elect, that that work doesn't have to be redone.  So we want to make sure that that information notwithstanding the protective order in this case can be given over to the fiduciary of the estate to do what that fiduciary determines is necessary to do with it.

The second issue is with respect to the privilege.

EXHIBIT 8

I want to be very clear because I think this was left out of the earlier comments. That privilege is only with respect to claims and causes of action of the Chapter 7 estate. It's not just any privilege that Mr. Jones may otherwise have. And I think if you look at the pleadings -- and I don't think there's really any dispute of this -- there's only a handful of causes of action that we believe are worth pursuing. We think those are very important causes of action, but it's not like there are a hundred various claims that we think we should be -- or the Chapter 7 trustee should get the privilege for.

The case law here is very well-settled, especially in the corporate context, that the privilege would go to a Chapter 7 trusted. And again, we think here where there are identified claims that the trustee would be pursuing on behalf of the Jones estate, we think that that provision is wholly appropriate.

There are also provisions in here that would allow the families to use the information that has been received in this case to continue pursuing claims against Mr. Jones, again, assuming the non-dischargeability order is upheld on appeal, there is going to be additional litigation against Mr. Jones. We think it would be just an unnecessary burden to require the families to go out and get the same information that they already obtained. So that is the

EXHIBIT 8

other purpose of these provisions.  That I think covers those, Your Honor.  But if I missed any, please let me know.

THE COURT:  I think Ms. Driver talked about Paragraph 5 too, that all orders entered in the Jones case remain in full force and in effect and survive the conversation.  I think that was the other paragraph that she had mentioned.

MR. KEMPLER:  Yeah.  I'm not sure what the problem with that provision is, Your Honor.  I would think that would be the default anyways.  I don't think anybody here would suggest that everything you've done over the last two years essentially goes up in smoke because there's a conversion.  I think that the case is converted, but Your Honor's rulings remain Your Honor's rulings in this case.  And I can't think of any particular one here that we're trying to game or they're trying to get out of.  So maybe there's a particular example they have in mind.  I honestly do not know.

THE COURT:  Okay.  Okay.  Let me hear from the Committee.

MS. PORTER:  Good morning, Your Honor.  Kathryn Porter from Akin on behalf of the Committee.

THE COURT:  Good morning.

MS. PORTER:  Thank you for giving us the opportunity to speak with you today about the form of the

EXHIBIT 8

order for conversion.  The Committee, together with the Texas and Connecticut families, do support conversion of the case.  But we think that based on our -- we have very real concerns based on our experience over the past year, year-and-a-half actually, that we believe should be addressed appropriate in connection with the conversion order in order to, as Mr. explained, preserve the value of the estate.

As such, we proposed the alternative form of order that is found at Docket Number 698.

If I may, Your Honor, I would like to briefly address some of the context and the history that we went through as the Committee which led us to these conclusions.

THE COURT:  Mm-hmm.

MS. PORTER:  Thank you.  As Your Honor is aware, very early in the case the Committee determined that it was necessary to conduct a full investigation of the claims and causes of action and liabilities that Mr. Jones has.  Together we obtained more than $60,000 documents.  We took several depositions.  We obtained documents from I think more than three dozen parties all tools.  It was an extensive investigation and it revealed that very serious and troubling prepetition transactions were undertaken by this debtor with, from my perspective, the clear intent to hinder, delay, or defraud his creditors.

We have brought these claims and causes of action

EXHIBIT 8

and these facts to the Debtor and the Debtor's counsel many times.  We sent demand letters.  And it was from our perspective these were important, serious issues.

The Debtor asked us do not pursue these causes of action.  The Debtor told us I will not pursue these causes of action and I implore you, Committee, don't pursue these causes of action now.  If you do so, it will completely derail any chance of a consensual resolution in these cases.

Based on the Debtor's request to us not to move forward, we did agree to defer seeking standing and otherwise pursuing these causes of action while we engaged in good faith with the Debtor, tried to see if there was any hope of a consensual resolution.  Unfortunately, as you know, that didn't come to pass, which is why we are here today.

I don't want to go through all of the particular findings that the Committee thinks they found through the course of our investigation.  It's not in the record and that's not the point of the hearing today.  But I will note that some of the more salient and pressing issues were set forth in the disclosure statement the Committee has submitted in connection with its plan, which has now been withdrawn.  And they include backdated documents, they include a flurry of transactions right in advance of the petition date after judgements had been entered against the

EXHIBIT 8

Debtor to his family, close family. And it amounts to more than, you know, several million dollars in value that was diverted in this way.

So this is a very serious point of concern for the Committee and one that we think needs to be protected and transferred to the trustee, the Chapter 7 trustee. We think that actually there is not much value going to the trustee. The claims and causes of action are probably the most valuable thing that will be transferred to the trustee in this case.

Now, that leads me to some of the points that we included in the order to make sure that the claims and causes of action will be transferred and preserved as much as possible for the trustee. One of them is the one that Mr. Kempler touched on and that I think is very important, and that is to ensure that there will be a seamless transition of information that the Committee gathered over the course of this investigation, which was extensive, costly. It should not have to be redone by the Chapter 7 trustee. Some parties produced documents to the Committee with additional restrictions. Some documents were produced under the protective order. We would like comfort to make it crystal clear that information and documents that was obtained by the Committee and during the course if its investigation can be provided to the Chapter 7 trustee so

**EXHIBIT 8**

the Chapter 7 trustee can move forward with that work.

Second, we think it's important that the Committee's work product should be handed over to the Chapter 7 trustee as well.  The Committee has fully drafted complaints, has for quite some time.  And we think that -- as I mentioned, we deferred prosecuting those at the request of the Debtor.  We think that those documents should be -- that work product should be handed over to the Chapter 7 trustee so the Chapter 7 trustee can record them as the Chapter 7 trustee finds to be appropriate.

The next item in the protective order that we -- sorry, not protective order, in the conversion order that we think is important relates to privilege.  This is something that Ms. Jones -- Ms. Driver mentioned as a concern for the Debtor.  It's equally a concern for the Committee.  The claims and causes of action the Committee found have hallmarks of intentional fraud that from my perspective are very clear.  I think the case law is also clear that while it's less common in the individual context, it is permissible in the context of an individual debtor for the privilege to transfer.  We're only asking for privilege to transfer with respect to identified claims, but we think that is critical in order to ensure that those claims can be -- the value of those claims be maximized.

Finally, Ms. Driver mentioned the extent that the

EXHIBIT 8

Committee would continue to be in existence after the conversion.  As Your Honor noted, that relates to the question of fees.  And Ms. Driver mentioned coordination.  It's not that the Committee intends to continue being active, the committee -- and coordinating on an ongoing basis with the Chapter 7 trustee, but we do think it's important that we are able to hand over files and answer questions if they come up solely to ensure that the work product is seamlessly transferred over to the Chapter 7 trustee and that no value is lost in the process.

Finally, I will note that it is -- we included a provision in the order to ensure that the Chapter 7 trustee will have the ability to identify what the trustee determines to be property of the estate and collect it, including value in trusts.  This is a point that's been in contention between the Committee and the Debtor for a very long time.  We have identified real property that is worth hundreds of thousands of dollars that we think very clearly belongs to the Debtor's estate and which the Debtor has disclaimed ownership of.  We can't understand the rationale.

We think that this is not something that we are asking the Court to order today.  Clearly that's not before you to ultimately decide.  But given that it is an identified issue between the parties, we think it makes sense to make clear that the Chapter 7 trustee is not going

EXHIBIT 8

to be constrained by what the Debtor thinks is in the estate and he's turning over.  It should be the Chapter 7 trustee's determination whether or not property belongs to the estate. We think that these are powers the trustee has anyway.  All rights will be preserved.  The debtor can argue and the putative owner can also argue that the property doesn't belong to the debtor's estate, but we think that it is absolutely important given that this is an issue that's been identified between the parties for some time now that the Chapter 7 trustee clearly has the ability to identify and recover assets whether or not this particular debtor agrees they are part of the estate that he's handing over.

I'm happy to answer any questions.

THE COURT:  Thank you very much.

MR. LEMMON:  Your Honor, may I speak briefly?

THE COURT:  Sure.

MR. LEMMON:  Steve Lemmon for PQPR.  My client and its principal, who are represented by Mr. Robbins, produced over 150,000 pages of documents to the Unsecured Creditors' Committee in response to their subpoena.  And we did it on the express promise of the firm representing the Creditors' Committee that they were not going to share those documents with anybody.

We have a big problem with language being included in an order in the Jones case absent somebody filing a

EXHIBIT 8

motion seeking affirmative relief, but just slipping it into the order that changes that promise.

Now, Judge, we'll work with whoever Mr. Jones' trustee is. And, frankly, we're not interested in going through the expense, which was extensive, of producing it all again. But I do have a big problem with changing the terms of that promise that was made by the Unsecured Creditors' Committee here at the last moment in this order. And we would object to that.

THE COURT: Thank you. Mr. Nguyen?

MR. NGUYEN: Thank you, Your Honor. Ha Nguyen for the U.S. Trustee. Your Honor, I just want to give the Court a little bit of comfort, Your Honor, into the order. We will be ready to appoint an interim trustee. It will be within the hour that Your Honor enter. We've cleared conflict, we've did our investigation and due diligence on an interim trustee.

So if anyone else, any creditor has concern about any vacuum period where we don't have an interim trustee, that won't be the case. We are ready to appoint an interim trustee once Your Honor convert. And, Your Honor, I just want to address the two competing orders.

Ms. Driver is correct, we were able to work with Mr. Jones' proposed order in the conversion. And one of the reasons why we were able to do that is because we do have a

EXHIBIT 8

very comprehensive Bankruptcy Code and rules that really addresses many of the issues that the Committee proposed order.

For example, issues with elections. Section 702 really lays out what would happen at an election. There are ways for a party to come in and dispute certain claims, dispute the election. And there is a process that is already in place.

Another concern that we had with the Committee's proposed order is that it restricts our interim trustee or the permanent trustee's duties under 704. Congress clearly lays out those duties under 704. And so we would oppose anything that would hamstring a trustee that hasn't even been appointed yet at the outset. Really the concern is we're kind of front-loading a lot of the issues in a conversion order.

The U.S. Trustee's preference is to always have a clean, simple order that says the case is converted to Chapter 7 and then the Code and the rules actually kick into place. If there's issues with third party holding assets, there is a code provision for a trustee to come in her and ask Your Honor for an order of turnover.

Rule 1019 really sets out Mr. Jones' obligations. Once a case is converted, it requires him to turn over asset, it requires him to do certain reporting. Those are

**EXHIBIT 8**

all in the Code and the rules.  I think it's unnecessary to front load a lot of these issues.  And I've been before Your Honor enough time to know that if one of our panel trustee have an issue, you're just a phone call away and the trustee will be able to have a hearing on that.

And in terms of...

THE COURT:  What are your thoughts about the Committee staying on just in case someone has a question or from a transition perspective?

MR. NGUYEN:  Your Honor, the Committee ceases to exist once the case is converted.  That's just how the Code -- Your Honor can keep them for fees and other issues.  But they are professionals.  The Chapter 7 trustee will always reach out to professionals.  They know how to do it.  Sometimes Committee counsel end up representing Chapter 7 trustee.  It happens all the time.  So there is a process in place.

I know there's issues with the protective orders, but those are your orders.  And once we have a trustee if there's -- I think absolutely there shouldn't be any duplication of work between the Chapter 7 trustee and the UCC.  But Your Honor have protective orders, we have a very well-experienced panel of Chapter 7 trustee.  They know how to come in and ask Your Honor to amend those protective order to allow them access to documents.  I just think it's

EXHIBIT 8

inappropriate for us to handle those situations in a conversion order, which is very unusual. But to give people comfort, our Chapter 7 trustee, they step into complicated cases such as this one all the time. And I'm fairly confident that all of the issues that are brought in the Committee's order will be resolved. I just don't think it's appropriate at this time to resolve it through a conversion order.

So we would simply request that whatever order Your Honor enters, it be simple. And then let the Code and the rules play out as Congress intended. Because we do have a very comprehensive Bankruptcy Code. Thank you, Your Honor.

THE COURT: Thank you.

Ms. Driver, I'll give you the final word if you want one.

MS. DRIVER: I'm going to try to make this short and sweet.

Earlier, Your Honor, when I said that the privilege issue was just as to do with the protective order, I actually missed Paragraph 7. This is the paragraph that says all privileges, including the attorney-client privilege held by Jones related to any property of the estate, including but not limited to claims, causes of action, shall transfer to the interim trustee upon conversion and then to

EXHIBIT 8

the Chapter 7 trustee upon appointment to the fullest extent permitted by applicable law and the interim trustee and the Chapter 7 trustee as applicable shall hold such privilege.

I just want to point the Court to In re Hunt, 133 B.R. 445 (1992). That case was absolutely crystal clear that absent the crime-fraud exception, which has not been alleged here, there is no passing of the privilege from an individual to a trustee.

It does pass in corporate cases. And I understand why lawyers that do corporate cases could get this confused. But it is not confusing to me.

Your Honor, it would be absolutely unprecedented for the waive of attorney-client privilege and transfer to a Chapter 7 trustee to happen on 48 hours' notice.

Your Honor, in Ms. Porter's statement, I was a little bit shocked to hear her say some of the things she said because it invaded what I consider to be 408. So before we start the FSS hearing, I may just want a moment to discuss with the Committee if we're waiving that.

The last thing I'll say -- the last two things I'll say, Your Honor, is that a lot of the claims that Ms. Porter mentioned, I'll represent to Your Honor that the best of my recollection, every single transfer that she is concerned about, that the Committee spent all of these hours investigating, reflected a couple of cars and a boat. Our

EXHIBIT 8

disagreement on whether there is property that was transferred to a trust is reachable by the estate is just one of the disagreement of legal -- a legal disagreement, which will be appropriate to bring in front of Your Honor by a Chapter 7 trustee if they agree with the Committee.

And finally I would say, Your Honor, if you want to say that this Chapter 7 trustee is getting nothing but causes of actions, I would dispute that. I have $2.8 million sitting in my trust account at my office from the sale of the ranch that we will be sending to the trustee as soon as I have a bank account number. So they are going to have plenty of assets on day one. I don't think that's relevant, but that was said and I just wanted to make sure that that record was clear.

Your Honor, do you have any other questions for the Debtor on this?

THE COURT: No.

MS. DRIVER: Thank you.

THE COURT: Thank you. Let me -- go ahead, Ms. Porter.

Not if you're going to talk about the 408 stuff back and forth. I'm not interested in that.

MS. PORTER: I won't. Thank you.

THE COURT: Okay.

MS. PORTER: First I just wanted to say we are not

EXHIBIT 8

suggesting that the only thing that the trustee is getting is causes of action.  We are suggesting that they are a very important asset that the trustee is going to be -- will be handed over.  And I would like to point Your Honor to White v. Williams, which is a case in which an individual debtor's privileges did transfer.

MS. DRIVER:  Could I get the cite on that?

MS. PORTER:  Absolutely.  It is 152 B.R. 123.

MS. DRIVER:  And what district is that out of?

MS. PORTER:  The Northern District of Texas.

THE COURT:  Okay.  Before the Court is an emergency motion filed by the Debtor seeking to convert an individual Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.  Docket Number 684 was filed on June 5th. I'm going to note the Court has jurisdiction under 28 U.S.C. 1334 (indiscernible).  This is a core proceeding under 28 U.S.C. 157, the request on an emergency basis.

The Court has for quite some time indicated that I would make decisions today about the Jones case and in the Free Speech case for quite some time.  So I think emergency consideration of this motion at this time is appropriate and I will grant emergency consideration of the motion.

I would note as well there was a pending confirmation hearing in the Jones case.  The families indicated that they do not intend to proceed with that

EXHIBIT 8

Chapter 11 plan that they had filed and instead will not object to the proposed relief requested in the emergency motion. To the Court's knowledge there has been proper notice and service under the circumstances. And so I will consider a motion now.

The appropriate section that we're looking for when a Debtor seeks to convert individual case here is 1112(a). And it says that the Debtor may convert a case under this chapter to a case under Chapter 7 of the title unless the debtor is not a debtor in possession, the case originally was commenced as an involuntary case, or three, the case was converted to a case under -- was converted to a case under this chapter other than on the Debtor's request. And so those three don't apply. What we are left with is a request.

I would note 1112(f) also says notwithstanding any other provision, a case may not be converted to a case under another chapter unless the debtor may be a debtor under that chapter. And that would not apply in Mr. Jones' case as individual. So, quite frankly, I think the only Chapter 11 debtor who couldn't be a 7 would be a railroad, and we don't have to deal with that today. So certainly 1112(f) has been satisfied.

So really we are dealing with a conversion quite frankly as a matter of right here. So the question is

EXHIBIT 8

what's the proposed form of order.

I would note and I think it's important to note that 1112(b) is another form of a request to convert a case. And that expands it to any party in interest. So not just the Debtor, a party in interest. And really you look to a party in interest as anyone who would have standing in a case could come in and ask. And the standard for that is cause. Right? And that means that there has to be -- and there's a non-exclusive list of what can constitute the cause. It includes but it's not limited to when you look at 1112(b)(4).

So (a) is the debtor has the exclusive right to request it. (b), other parties in interest can come in and ask to convert. And when you look at what cause means, it kind of points to what I would call bad acts or there's no hope for a reorganization and something has to happen and then we're just in Chapter 11. But we're not in (b) land. And I think that's different than a debtor converting under (a). I think under (b) you convert for cause. But depending on what the cause is, you may have to enter language in an order to deal with and preserve the issues that have been -- with the cause for example, if there was gross mismanagement of the estate, you could immediately convert. But you may have to put something in there to kind of deal with whether there was gross mismanagement or

**EXHIBIT 8**

unauthorized use of cash.  That would be a request under a (b).  But we're not in (b).  We're in (a) land.  And that just says that the debtor may convert.  And that's where we are.

And so I think when you're in (a), you just get a clean order converting the case, and because it's the Debtor who is asking for the right to convert.  And I understand that there are a lot of issues here, some of them legal.  Others go outside what I would call legal.  And I think in these instances what makes the most sense is to enter the order.  It allows an interim trustee, whoever that is, and whatever she or he is empowered to do under the Code.  And that's what they get to do.

The Code says once a case is converted, you look to other sections of the Code.  701 says an interim trustee gets appointed.  And the Bankruptcy rules kick in and they say, well, if their case is converted, then the Debtor has to provide some reporting, he's got to turn over records.  What is property of the estate or is not property of the estate is not determined by the Chapter 7 trustee.  It's determined by Section 541 of the Code.  The Code itself will speak to what is property of the estate and the effective conversion on that in a Chapter 11 case is less work to do than if there was a Chapter 13 case.  So the Code itself will speak to those issues.

EXHIBIT 8

I understand the issues and I understand the concerns, but the Code speaks to what must immediately happen. And I think the best answer is to get an interim trustee and let that person get to work right away and do their job. And the Code speaks to when there will be an election, and parties will have their rights under that election. I don't think in a conversion under (a) that we have to address issues of privilege, protective orders. My orders are their orders and they will continue to be -- have whatever effect they have in the Chapter 7 case. If that interim trustee elects to reach out, I'm sure if there's issues and fights about privilege, I'll be here and I'll make the call. But I don't think I need to determine those issues today. What is before me is just a conversion and it's the same conversion order that I've entered in large corporate cases. It's the same conversion that I've entered in ordinary consumer cases, whether large or small the same order. And I think it would be appropriate here.

I think parties know that by entering an order like that and telling everyone that I'm relying on the rules, that everybody ought to encourage everyone to go back and take a hard look at the rules, because I'm going to strictly apply them. And that would go for the Debtor, that would go for the interim trustee, the scope of those duties, what the Debtor's responsibilities are, what the Debtor is,

EXHIBIT 8

property of the estate all of those issues I'm going to strictly enforce because that's what the law requires me to do.

And so I'm hoping that during this period everyone take a hard read of the rules. Because I know I am. And they will be strictly applied and enforced. Sounds like the U.S. Trustee is ready once I enter an order. And we'll see where the process goes. But I don't want -- one thing I don't want to do is to put into an order where an interim trustee then comes in and has to figure out what I did immediately before that person got appointed. I think the interim trustee would have a say in some of these things, and I think it would only out of fairness to a person who would be bound by something to understand and be a part of. So I'm just calling it the way Congress tells me to do it.

So I'm just going to enter a very clean order that says -- although I do think much of what was requested here is already in the Code. I just feel more comfortable not construing my order and then determining how it applies against the Code. I would rather just read the Code and the text very strictly. I think textual is the way to go here. Follow the rules, follow the process. That way everybody is entitled to due process and everybody's rights are preserved for the Texas families, the Connecticut families, Mr. Jones, PQPR, any of the other parties in this case. So I'm going

EXHIBIT 8

to grant the motion.

I think the debtor, you know, noticed that 11(a) is -- says the debtor may do it. 11(b) says they can only do it for cause and if you satisfy these reasons. So I think it's a matter of right the debtor may qualify, would have the right to convert, and I've heard of no facts or anything that would -- or law that would suggest otherwise. And so what I'm doing is afforded under the Bankruptcy Code, and that's what I'll do. So that's that. Let's go to Free Speech.

MR. KIMPLER: Your Honor, Kyle Kimpler from Paul Weiss on behalf of the Connecticut families. I think the motion that's pending in Free Speech is our motion to convert. So if it would make sense to the Court, we're happy to start. I do think there are evidentiary matters in particular here because I think we are proceeding under 1112(b). And so if it would please the Court, we'd like to start with a short evidentiary presentation.

THE COURT: Okay.

MR. KIMPLER: With that, I'll turn it over to Mr. Paterson.

MR. PATERSON: Good morning again, Your Honor.

THE COURT: Good morning.

MR. PATERSON: Your Honor, I think this takes us back to where we were before. Our exhibit list, the updated

EXHIBIT 8

exhibit list, there's 950 in the FSS case, and I believe there was no objection from Ms. Driver to Exhibits 1, 2, 10, 11, and 12.

Your Honor, just to give you a sense of what the remaining exhibits are, many of them are transcripts of Mr. Jones' show, other statements by Mr. Jones, other public documents. We believe there's no -- no one can reasonably argue with their authenticity or admissibility. Specifically, Your Honor, Exhibits 4 to 6 and 14 are either transcripts or transcript excerpts of what Mr. Jones has said.

Exhibits 7 to 9 are screenshots from Dr. Jones' Naturals website of Mr. Jones' father where Mr. Jones has been sending FSS' viewers. Exhibit 3 is a declaration from Ms. Robinson just attaching those screenshots and most of the transcripts, and they were filed to give the Court a record so we didn't need live testimony on that point. 10 and 11 we talked about. They were the schedules filed in the FSS and Jones case. There was no objection.

12 was Mr. Jones' response to FFS' motion to convert. I believe there was no objection as to that either. And 13 is a screenshot of Mr. Jones' Twitter account. So Your Honor, we don't believe that any of these documents should be controversial. We're happy to elicit further testimony laying an evidentiary basis. If Your

EXHIBIT 8

Honor would find that helpful or constructive in some way, we're happy to question Mr. Jones on his statements if that would be constructive to lay a basis. But otherwise, in the interest of efficiency, we'd just propose moving these into evidence.

MS. CATMULL: Your Honor, for FSS, Free Speech Systems has no objection to the admission.

THE COURT: Okay.

MR. LEMMON: Your Honor, Steve Lemmon for PQPR. We have an objection. We have the same objection that Ms. Driver had in the Jones case, but let me preface that if I might, Your Honor, with just 30 seconds of partly why we have the objection. The argument today is essentially between two of the sets of plaintiffs over whether or not to have a conversion, and you'll recall my client moved for conversion, and that's set for today also, and versus whether or not to have a dismissal.

I would suggest to the Court that this evidence is irrelevant to that issue and that the Court can make the determination really on the basis of the argument of counsel, and that that's the most expeditious way to proceed. Now, the Court will proceed the way that the Court decides to proceed, but my suggestion is that all of the major factual issues for the Court to make the determination which way it wants to go are now disputed and before the

**EXHIBIT 8**

Court, and that we do object to getting into the nitty gritty of these exhibits.

We object to those particular exhibits.  We find them to be irrelevant, and we challenge the basis for their admission.  We also point out that many of these things are hearsay, and -- but it is irrelevant, Your Honor, to the issue of whether or not this case should be converted or dismissed.

MR. PATERSON:  Your Honor, if I may be heard briefly, the -- as I understand it, the test that the Court is looking at is what's in the best interests of creditors here.  I think evidence on these points is critical, Your Honor.  I think the evidence -- and it's uncontroverted as Mr. Lemmon said.  That's precisely why it should be admitted.  What this evidence basically shows is that Mr. Jones has been making statements on his show, on his FSS show saying don't buy products from FSS' Infowars store. Buy them from my dad instead.  And we think that's absolutely critical for the Court to consider in terms of what's in the best interest of creditors and whether it's handing the keys back to Mr. Jones or it's a conversion. And we can argue -- we can all argue about weight, Your Honor, but I submit --

THE COURT:  Let me -- I do agree that it probably has some -- if someone is going to argue cause to convert, I

EXHIBIT 8

do have to consider what's in the best interest of creditors and the estate. Isn't the answer I just take what's unobjected to and take judicial notice of what's there and -- in other words, I mean, the question I'm going to have for the -- why don't I just do that? Is there any objection to that?

MS. DRIVER: I'm not sure what you're taking judicial notice of, Your Honor. All the exhibits that we didn't object to, obviously those are admitted --

THE COURT: Right.

MS. DRIVER: -- if Your Honor decides so.

THE COURT: Well, Mr. Lemmon is objecting, but I don't think he can object to the admission of those documents. So that's where we are.

MR. LEMMON: Well, Your Honor, let me refine my objection a little bit or perhaps explain it better, and that is that they are arguing for a conversion versus a dismissal.

THE COURT: You're arguing relevance.

MR. LEMMON: Well, they are arguing -- they're -- what I just heard counsel say is that one of the reasons to have a conversion versus a dismissal is that they believe that Alex Jones in the last two weeks, during which period of time you'll recall we didn't want the company to be functioning, said -- or we -- my client objected to the use

EXHIBIT 8

of cash collateral if the Court will recall. Anyway, they say that Mr. -- that Dr. -- that Alex Jones made certain statements that they believe were detrimental to the estate, okay?

I suggest that that is irrelevant to the issue of whether or not to dismiss the case or convert the case. But I also suggest that -- and I -- it's the only time I've ever watched the show. I watched about half of it I think, and the fact of the matter is that Alex Jones says so many different things on that show that taking almost anything one page at a time is taking it out of context.

And so we believe that for the Court to make the decision whether or not to side with Connecticut to convert or to side with Texas and what others suggest and simply dismiss, that the question of what Alex Jones said on his show in the last two weeks is irrelevant.

THE COURT: I'm going to disagree with that on the context. And I do think if cause is undefined, and I think people get to -- have the right to tell me what they think cause is, so I'm going to -- if there's no objection to it, I'll admit it, but I think it'll go to the weight.

MR. LEMMON: Thank you, Your Honor.

MR. PATERSON: Thank you, Your Honor. So just to clarify, my understanding is that the exhibits on our list are in the record. We can (indiscernible) them for purposes

EXHIBIT 8

of this hearing?

THE COURT:  Ms. Driver?

MS. DRIVER:  Your Honor, I just didn't know if that was a ruling on my objection or if I got a chance to rebut what he had mentioned.

THE COURT:  I thought you mentioned that all the -- well, that's why I was going to ask you for a clarification at this point --

MS. DRIVER:  Okay.

THE COURT:  -- to determine what you objected to and what you don't --

MS. DRIVER:  Your Honor --

THE COURT:  -- for purposes of this hearing.  I think I get to consider -- I don't think I can just say as of right now without anything I shouldn't consider the other exhibits.  That's what I --

MS. DRIVER:  Yeah.

THE COURT:  -- where I was going.  So I cleared that hurdle.  Now we get into the hurdle of what, if anything, your client objects to.

MS. DRIVER:  Your Honor, we just object to the admissibility of the exhibits that we noted.  Your Honor, we believe the best evidence rule provides -- prevents a transcript alone from being admitted because the original is available and could have been provided.

EXHIBIT 8

Your Honor, we also object to the authenticity of these transcripts. If Your Honor looks at the transcripts, you can't tell who transcribed what, how it was transcribed, what their qualifications are. And I'm not talking about Ms. Robinson. I believe that's her name.

THE COURT: It is.

MS. DRIVER: Ms. Robinson, I'm sorry. Ms. -- I've had so many names in my head today and I just saw a Robinson case and I thought maybe I just missed it in my head. It's not Ms. Robinson's ability to tell the truth that I have a problem with. It's not her voracity that I have an issue with. What I don't know is how that transcript was made, who was preparing it, what was used to create it. It's not a certified transcript by a court reporter, and it --

THE COURT: Is Ms. Robinson here?

MS. DRIVER: She is.

MR. PATERSON: She is, Your Honor. And if it would be helpful -- we put in her declaration to try to streamline things, but if it would be helpful, I can give a brief proffer of her testimony or she can get on the stand to lay the basis for that.

THE COURT: What does the dec -- let's see. I'm aware --

MR. PATERSON: The declaration is Exhibit 3, Your Honor.

**EXHIBIT 8**

THE COURT: I'm going to -- well, let's see. What is the transcript? There are screenshots?

MR. PATERSON: There's transcripts 4, 5, and 6, the screenshots at 7 to 9, and then there's another transcript we put in at 14, another screenshot at 13.

MS. DRIVER: These are often done with voice recognition software. And during a lot of the discovery that was done in this case that we did for the committee at their request we did have to produce certain audio recordings of Mr. Jones' voice. And we tried to use a voice recognition software to do that. And when quality-checked by my folks in my office, it was noted that it is very difficult for his voice to be accurately transcribed by AI voice recognition.

THE COURT: Let me ask you. Is there a contract between Mr. Jones and Free Speech saying where he has to promote product?

MS. DRIVER: Generally speaking, there was an --

THE COURT: I mean like specifically. Like --

MS. DRIVER: There was an -- there is an MOU. My understanding is there's an MOU --

THE COURT: I'm not asking for MOUs. I'm asking for a binding contract between -- in other words, as I understand the nature of the business, Mr. Jones has a radio -- has a show. I don't want to -- no, I don't even want to

EXHIBIT 8

call it a show.  It -- I don't know what the --

MS. DRIVER:  He broadcasts.

THE COURT:  Broadcasts.  That's the better word.
That's the more accurate word.  I didn't want to get my
lingo wrong here.  There is a broadcast, and as part of that
broadcast he promotes vitamins and other goods, and people
buy them.  And there was an agreement once the money comes
in how it will be divided, right?  Is there an agreement
where he's bound to promote product using a particular
website or not?

MS. DRIVER:  No, Your Honor.  There is an
understanding about him promoting Dr. Jones' Naturals, and
it is a promotion agreement where it is a $500 fee that FSS
owns every time he promotes Dr. Jones' Naturals.  And that
was an agreement reached with Mr. Magill as the CRO.

MR. PATERSON:  And Your Honor, I understand
there's nothing in that contract that says it's appropriate
for Mr. Jones to tell people not to buy products from FSS'
Infowars stores.  I think that's just a blatant breach of
fiduciary duty among other things, Your Honor.  And there's
evidence.  I mean, it's --

THE COURT:  Why is it a breach of fiduciary duty?

MR. PATERSON:  Because he owes duties to the
estate, Your Honor.  He owes duties to FSS' estate, and what
he's doing is saying don't support FSS, support my dad

EXHIBIT 8

instead.  And Your Honor, all we want to do is just put in the statements that he said.  It's striking how --

THE COURT:  What if he said I don't want to work there anymore?

MR. PATERSON:  That's fine.  He doesn't have to work there.  That's not -- no contract of personal service yet.

THE COURT:  In other words, if he's an employee -- you're saying he's breaching his duty as an employee?

MR. PATERSON:  I think he's breaching his duty as an employee.  He's breaching duties he owes to the estate.

THE COURT:  What fiduciary duties do employees owe?

MR. PATERSON:  I think duties of good faith.

THE COURT:  Okay.

MR. PATERSON:  And he's not just a low-level employee, Your Honor.  He's obviously --

THE COURT:  No, no, no, I got it.

MR. PATERSON:  And --

THE COURT:  I got it.

MR. PATERSON:  -- just on the evidentiary issues, it's striking how much Ms. Driver doesn't want you to hear what her client said.

THE COURT:  In other words, but I think -- can we just get to the point where we're comfortable admitting that

EXHIBIT 8

there's -- that -- on the show he may be telling folks to go to Dr. Jones' Naturals as opposed to some other site?

MS. DRIVER:  We'll stipulate to that if this -- but it's the fact that these transcripts are not reliable, and we have no evidence that they are reliable, and that there is the ability to put the entire show in the record, which would give it full context, which we believe is the only way it should be admissible.

THE COURT:  For what purposes are you seeking to admit this document?

MR. PATERSON:  We're seeking to admit this just to show what Mr. Jones said.  That he --

THE COURT:  But there's a lot of words in there. Like what part of what he said?

MR. PATERSON:  There's a few specific parts, Your Honor, and I could point Mr. Jones to them in testimony.  I could point out there is -- there are parts where he said Infowars is dead, it's not the big thing to support right now.  Go -- we have a separate operation.  It's Dr. Jones' Naturals.  It's my dad.  Go support that instead of Infowars.  We think that's very relevant.  That's all in the excerpts.

And just on the point about foundation, Ms. Robinson is here.  I'm happy to put her on to say, Your Honor, she's looked at the transcripts, she's listened to

EXHIBIT 8

the videos.  They're accurate transcripts.  She's visited the websites.  They're accurate screenshots.

THE COURT:  I mean, if folks -- I'm just going to -- just let's do this.  It's -- you're going to have to prove it up, right?  If she objects to it, you're going to have to prove it up and we're going to have to see where it goes.  So Ms. Driver, you're going to have to figure out how you want -- what you're comfortable stipulating to.

MS. DRIVER:  Your Honor, for harm in this case, and you want to say that we harmed it, it would be far more relevant to talk about what amount of money FSS made during that time period, which if they had bothered to ask was --

THE COURT:  No, but you said --

MS. DRIVER:  -- almost a record week of sales.

THE COURT:  Folks -- you folks are arguing and we're --

MS. DRIVER:  I'm sorry.

THE COURT:  No, no, no, and we're not talking evidence.  We're just talking about it's not admitted, right?  You're objecting to the admission of this document?

MS. DRIVER:  Correct, Your Honor.

THE COURT:  Okay.  Then we -- in other words, it can be agreed upon or you're going to have to lay a foundation.  That's all I mean.  I'm not saying yes or no, and just -- we're just dealing with preliminary

EXHIBIT 8

housekeeping.

MR. PATERSON: Understood, Your Honor. Would you prefer that I proceed with a proffer or with Mr. -- Ms. Robinson's live testimony? I'm happy to do a proffer.

MS. DRIVER: I'm hopeful that we can have -- could we have our opening arguments before we get into evidence? Or we -- I guess we could just crash into evidence.

THE COURT: I don't need opening arguments. I think everybody knows what we're doing today and where we are. The one question I have is where the -- where -- I know where Connecticut is. I don't know where the Texas plaintiffs are and maybe I can just hear from them in terms of what position, if any, they hold. Yeah. Why don't we just get it ready?

MR. KIMPLER: Thank you, Your Honor. Just to be clear, we did file a statement in support of dismissal. And I'll cite to the Document Number 945, Your Honor. Were you looking for general guidance about dismissal versus conversion or in terms of the evidence, Your Honor?

THE COURT: No, I just know that sometimes people file things and then they show up and they tell me other things. And I just like to have a clean record to say that 945 -- that you still support the statement of dismissal and that's where we are. I just -- it's more of just a clarification on the record because someone said on the

EXHIBIT 8

record Connecticut's seeking conversion, Texas is seeking dismissal. And I just -- you're here. I'd like to just get confirmation from you. Sometimes it's just easier for me to ask than to just present.

MR. KIMPLER: That makes total sense, Your Honor. To be clear, we 100 percent stand by our statement to the Court.

THE COURT: Okay. Thank you.

MS. DRIVER: Your Honor, on evidentiary issues, may I have 20 seconds?

THE COURT: Of course.

MS. DRIVER: Local Bankruptcy Rule 9013-1(g) incorporates Bankruptcy Rule 7008.

THE COURT: Mm-hmm.

MS. DRIVER: Bankruptcy Rule 7008 requires that you -- it specifically admit or deny allegations in a complaint. The local rule incorporates it so that that rule also applies to motions filed in bankruptcy court. I think I'm the -- and under Rule 7008, issues that are not specifically denied are deemed admitted. And for that reason, since we're talking about evidence, it may be that people will be -- I wanted to lay that predicate because I think FSS is the only one who filed a response to -- and maybe I'm wrong, but filed an actual response to the motion to convert that admitted or denied a few things and that's

EXHIBIT 8

it.

THE COURT:  I'm not a big fan of that little rule so I waive it in today's purpose --

MS. DRIVER:  If --

THE COURT:  -- for purposes of today.  I -- and I will just generally -- I got it in some time, but it is to admit or deny every particular paragraph of everything is I find it not very helpful.  I know that there are some other judges who find it incredibly helpful.  I am more of a tell-me-what-you-want-or-why or tell-me-why-it's-wrong-and-why. So --

MS. DRIVER:  Yes, Your Honor.  I took the time to talk about it because it may rise to some people's --

THE COURT:  I got it.

MS. DRIVER:  -- objections and deemed admissions. Okay.  Thank you, Your Honor.

THE COURT:  Thank you.  Why don't we just talk generally?  You got a number of docs in.  The court -- 1112 says the court will either convert a case or dismiss it, whichever's in the best interest of creditors or the estate. Tell me why conversion is better than dismissal.

MR. PATERSON:  I'll pass it to Mr. Kimpler if I may.

THE COURT:  Okay.

MR. KIMPLER:  Well, actually, Your Honor, I think

EXHIBIT 8

-- again, there -- a lot of this is evidentiary in nature.

THE COURT: I know, but I just want to know what you -- I want to know why you think that.

MR. KIMPLER: I think it's true for three main reasons. First, I think it's true to preserve equality of distribution. I think it would be absolutely crazy -- with Mr. Magill having corralled $6 million thereabouts in FSS accounts --

THE COURT: Mm-hmm.

MR. KIMPLER: -- I think it would be crazy to dismiss this case and ask the Texas plaintiffs and the Connecticut plaintiffs let's see who can get it first. Maybe one of the families -- we all have judgments that are bigger than that. Maybe one family will get all of it. Maybe another family will get nothing.

THE COURT: So you want me to keep a Subchapter V case open until 2026?

MR. KIMPLER: I want a case converted to a Chapter 7 --

THE COURT: Right.

MR. KIMPLER: -- so that a -- the assets that have been collected can be equitably distributed amongst creditors, and there is lots of case law saying that that is exactly why you should be favoring conversion. So I think equality of distribution is a paramount concern here.

EXHIBIT 8

THE COURT: But we also have another case that I just converted now, right? So there's a Chapter 7 trustee who will be appointed. Don't they have some rights into those estate assets?

MR. KIMPLER: Mr. Jones certainly does not agree with that.

THE COURT: I understand that, but isn't that an argument there?

MR. KIMPLER: It could help if there is a Chapter 7 trustee that has complete control over the distribution of FSS assets and it's all getting distributed through the Jones case, yes, but it's not a complete solution.

THE COURT: No. I agree.

MR. KIMPLER: There's not a stay that would be protecting FSS. Nothing would stop one of the families from going in and collecting a judgment against FSS. You'd be at the same point where you'd be saying does the stay in the Jones Chapter 7 case prevent a collection effort against FSS.

THE COURT: Okay.

MR. KIMPLER: The second reason that we think this is important is because we think it is better to preserve the value of FSS. We think there are very credible allegations of debtor misconduct over the last few weeks. We think there is an abundance of case law that says in the

EXHIBIT 8

face of those allegations that you should be supporting conversion. This attempt to say that it's just Connecticut versus Texas is not the right way to look at it.

THE COURT: What's --

MR. KIMPLER: The Subchapter V trustee's report --

THE COURT: What's the right way to look at it?

MR. KIMPLER: The parties opposing conversion are Mr. Jones. He opposes it. Why does he oppose it?

THE COURT: I know. Well, and Texas, right?

MR. KIMPLER: And Texas. And I'll get to that. But the idea that we would dismiss the case with some uncertainty -- we heard you just now say that there are some issues that can't be decided today, but with some uncertainty about whether as a matter of Texas LLC law, even though Jones does not have economic or beneficial interest in the equity, he still has some sort of managerial control.

THE COURT: Mm-hmm.

MR. KIMPLER: That is destructive to what is left at FSS. That is the position that FSS is taking. That is the position that the Subchapter --

THE COURT: Wouldn't he manage the estate even if it was a Chapter 7? The debtor -- in other words, the Chapter 7 trustee would have to come in and ask for permission for a limited purpose to then manage the estate, and that doesn't just happen automatically.

EXHIBIT 8

MR. KIMPLER:  Well, we think the right answer here is for a Chapter 7 trustee to continue working with Mr. Magill as the CRO to essentially liquidate a -- about $1 million of remaining inventory.  And that's a factual issue I want to come back to.  We do think there's more evidence here that Your Honor needs to hear to understand this.  But we think the idea -- again, I think there's a discrepancy. The concern that I have with Mr. Jones saying go support my family by buying products from my father --

THE COURT:  Mm-hmm.

MR. KIMPLER:  -- is not a concern of sponsorship. There is some deal where he gets paid.  FSS gets $500 every time he says go to Dr. Jones.  What concerns me is when Mr. Jones says stop buying products from FSS.

THE COURT:  What's stopping him from doing that?

MR. KIMPLER:  He is the -- he claims today in this hearing that he is still the sole owner of that business.

THE COURT:  Right.  It's different than the employee part.  That's where I was getting at.

MR. KIMPLER:  Not the employee.

THE COURT:  No, I got it.

MR. KIMPLER:  He's the owner of it.

THE COURT:  No, that's --

MR. KIMPLER:  To say that he has no fiduciary duties to the estate --

EXHIBIT 8

THE COURT:  I was just --

MR. KIMPLER:  -- but yet he should --

THE COURT:  I was just clarifying.

MR. KIMPLER:  -- still have control to me is --

THE COURT:  I was just clarifying that it's not the employee, it's the ownership issue that you really want to know.

MR. KIMPLER:  It's the ownership issue.  He cannot disclaim that he has no fiduciary duties to the FSS estate and then say I still want to control it.

THE COURT:  Right.  So let's just say the case converts.

MR. KIMPLER:  Mm-hmm.

THE COURT:  Then we have to have a non-dischargeability issue.

MR. KIMPLER:  No.  There's no discharge in a Chapter 7.

THE COURT:  Correct.

MR. KIMPLER:  So there's no -- that adversary --

THE COURT:  Right.  No, no.  That --

MR. KIMPLER:  -- proceeding goes away.

THE COURT:  I'm just crossing the lines.

MR. KIMPLER:  Yes.

THE COURT:  We go there.  And then we then wait until I guess the Texas and the Connecticut state court

EXHIBIT 8

appeals play out, right?  Because those matters are still being appealed.

MR. KIMPLER:  Those matters are --

THE COURT:  With respect to --

MR. KIMPLER:  -- being appealed.  I think there's --

THE COURT:  That's why I'm saying we have to wait. I can't make a distribution until we actually know what the final number is, right?  I don't --

MR. KIMPLER:  I think the part --

THE COURT:  I don't think you have an allowed claim that's being subject to anything else.

MR. KIMPLER:  I think the Chapter 7 trustee controls the claim allowance process in a Chapter 7.

THE COURT:  No, I signed the order though, right? So I think --

MR. KIMPLER:  Sure.

THE COURT:  But I think the matters are subject to appeal in terms of what the matters are.  So we would wait then until what?  Until those processes play themselves out.

MR. KIMPLER:  Yes, but if we do dismissal, I'm not sure we're in a different spot.

THE COURT:  Right.  That's my point.

MR. KIMPLER:  You're waiting the same amount.  And then there's the PQPR issues.  But what's important to note

**EXHIBIT 8**

there is that if you look at the Jones and the Texas proposed order, honestly, I'm not sure how this works, but they're proposing that you actually keep the PQPR adversary proceeding even if the FSS case is dismissed.

THE COURT: What happens if Mr. Jones says -- I'm asking you honestly. I -- I'll ask the other side too, if Mr. Jones says, you know what, I don't want to work for FSS anymore, I'm going to go start Info 2. I'm going to start a new company called Info 2. And you may have claims against Jones for the other stuff that people have been talking about, but let's just say I want to start Info 2 and I want you to sell product to -- I want to sell product, same products, and now we're going to call it Info 2. And I'm going to start a new -- I have a new Twitter account called, you know, Info 2. I'm making all this up, but what -- where do we find ourselves there?

MR. KIMPLER: Two sets of disputes or two sets of actions. One, we need to figure out who really owns the IP. Now if he's creating truly new IP and setting it up --

THE COURT: (Indiscernible).

MR. KIMPLER: -- then --

THE COURT: A whole new Info 2 and --

MR. KIMPLER: Okay.

THE COURT: -- because in other words --

MR. KIMPLER: Nobody is saying that Mr. Jones --

EXHIBIT 8

THE COURT: FSS makes money because Alex Jones talks on the show, right?

MR. KIMPLER: Everybody -- at least all of my clients understand that after conversion and hopefully after conversion of both cases Mr. Jones is going to continue to try to make a living. He is free to set up another business.

THE COURT: Mm-hmm.

MR. KIMPLER: He's free to try to go into business with his father. He will continue to have in our view non-dischargeable judgments so we will be able to continue to pursue him for earnings he makes in the future. That won't be an issue thankfully that you'll -- Your Honor's probably thankful you won't be deciding, but that'll be an issue in various state courts' lawsuits.

THE COURT: Mm-hmm.

MR. KIMPLER: And the potential businesses that he goes into business with may face liability too. There may be questions about whether something is a successor entity to FSS. Those will be disputes that will be played out presumably in state court over -- you know, over the coming months or years.

THE COURT: Mm-hmm.

MR. KIMPLER: But nobody is suggesting that the question of conversion or dismissal today affects in any way

EXHIBIT 8

the fact that we all know that Mr. Jones is going to go out and try to continue to make a living, continue his current standard of living doing something.

THE COURT:  Mm-hmm.

MR. KIMPLER:  Our concerns are, is he utilizing estate property to do that?  Is he taking customer lists?  Is he taking IP?  Is he using some sort of period where if you dismiss the case and he had some remaining role at FSS, is he using that time to continue telling his customers don't buy this, go over here and buy that?  When he gets to the point that he is using estate property to try to set up his next venture, I think that is where I would draw the line and say that is inappropriate.

The third issue, Your Honor, for why conversion's appropriate here is the preservation of avoidance claims.  There are -- I think our motion was actually wrong about this.  We said there's 4 million.  I think there's 4 million within the 90-day period.  If you look at insider preference claims for the year period, I think that number goes to 6 or $7 million.  No question that if we dismiss it, those claims go away.  Your Honor, because I'm not sure this may have been my argument, I want to say --

THE COURT:  I just want -- I more kind of just understand the -- I understand their point.  I get their point.  I just wanted to make sure that I crystalized in my

EXHIBIT 8

mind the arguments from the Connecticut plaintiffs just to make sure that I understood it.

MR. KIMPLER:  Your Honor, I think it's -- we don't want to have a race to the courthouse.  We think that's the worst outcome here.  We don't want what's left -- and I think you should hear from Mr. Magill on this.  There is some inventory left that could be sold for real value.

THE COURT:  Mm-hmm.

MR. KIMPLER:  We don't want that to be diminished by having Mr. Jones continue to tell his people not to buy those products.  We want to have a month or so process by which remaining inventory can be sold off.  We think preserving that value is critical.  We think conversion best serves that.  And we don't want to lose what we think are valuable estate causes of action.

THE COURT:  But you're going to require him then to go out there and tell people sell the remaining inventory.

MR. KIMPLER:  No.

THE COURT:  What if he goes out and says I'm --

MR. KIMPLER:  No, no, no.  Our expectation is that Mr. Jones will not work for FSS anymore.  That's what he said he will do.

THE COURT:  No, but my point is how do you -- to require the liquidation of the additional inventory, is the

EXHIBIT 8

estate going to do it, or are you going to require Mr. Jones to do it?

MR. KIMPLER:  The estate is going to do it, and I think you should hear from Mr. Magill on that because I think there is a false assumption in all of the pleadings that a post-conversion, that somehow without Mr. Jones we're just lighting inventory on fire.  I don't think that's true. I think you should hear the evidence on that.

THE COURT:  Mm-hmm.

MR. KIMPLER:  And I think the way this should happen is a case should be converted to a Chapter 7.  Mr. Magill should stay on for another month, whatever he thinks is necessary.  He should continue to be compensated.  He should work directly with the Chapter 7 trustee.  They should liquidate the remaining inventory.  My understanding is that FSS stopped purchasing inventory about a month ago. So it's not like they're sitting on a full -- you know, their normal levels for this time of year.

They should try to collect what they can over a wind-down period.  The trustee at that point should do what a Chapter 7 trustee does and try to pursue claims to the extent there are any and then distribute value to the creditors.  We think that's the most sensible path here, and we think it -- you know, Your Honor, I know you want to keep this to the law today, and we do too.  I think some of the

EXHIBIT 8

facts are important.

THE COURT: Oh, I think so too.

MR. KIMPLER: But I think if you look at all of the pieces of paper you got this week, try to find some cases where a court actually ordered dismissal over conversion.

THE COURT: That don't mean anything to me.

MR. KIMPLER: Well --

THE COURT: It means nothing to me.

MR. KIMPLER: -- the parties have --

THE COURT: In other words, that means nothing to me because a lot of cases get converted, right, just on oral motions -- on oral decisions. And so the fact that there -- I mean, it's -- not it doesn't mean anything to me, and I guess that's the wrong way of saying it. The fact that there isn't a written decision doesn't mean that there aren't tons of oral decisions in other words, right? Because this stuff happens all the time every day in court. And I think that's the real question that I'm asking myself.

This is various facts on the facts of this case, what cause is. Is the case fact-determinative on the facts of this case? And where we go. So the fact that there are other cases out there that do things differently, it's not that -- well, that's the wrong way of saying it. Doesn't -- it means something to me, but it does -- I've got to make a

EXHIBIT 8

decision based on the facts and the circumstances of this case.  That's what I mean.

MR. KIMPLER:  We completely agree, Your Honor.  My point is with one exception where a case was dismissed so that it could be refiled as a Subchapter V case, every case that's been cited in the papers to you this week is a case that supports conversion.  That's not the only point.  I'm saying those cases involve cases where there are concerns about races to the courthouse, where there is a valuable estate that's been collected.

THE COURT:  Mm-hmm.

MR. KIMPLER:  There are cases where there are credible allegations of debtor misconduct.

THE COURT:  Mm-hmm.

MR. KIMPLER:  There are cases where there are preference or avoidance claims that would go away upon dismissal.

THE COURT:  Mm-hmm.

MR. KIMPLER:  In every one of those factual circumstances, and we have all three here --

THE COURT:  Mm-hmm.

MR. KIMPLER:  -- all of the case law that has been cited to you results in courts ordering conversion.  We don't think you should lose sight of that.

THE COURT:  Okay.  No, I appreciate that point.

**EXHIBIT 8**

Why don't we take like a -- I've got a case at 1:30, but it's an oral -- actually a video hearing. I know folks have been here for a while. I don't -- because it makes -- what I'd like to do is just work from 11:45 to 1 and then folks can take a break maybe from 1 to 2 and see if that makes sense and go from there. Does that work for everyone? And then we can just start with the evidence and you can call your first witness. How many witnesses do you have, Mr. Kimpler?

MR. KIMPLER: I think just two. Two. And I don't think we're expecting that they take more than --

THE COURT: And who are they? Who are the witnesses?

MR. PATERSON: Your Honor, they'll be Ms. Robinson and Mr. Magill.

THE COURT: Okay.

MR. PATERSON: And possibly Mr. Jones depending where we get to with the evidence, Your Honor.

THE COURT: Depending on where we go with --

MR. PATERSON: Correct.

THE COURT: Okay. So maybe, Ms. Driver, during the ten-minute break you can talk to them and see if, just with respect to the first part in terms of what you -- there may be some agreement as to kind of the statements that could be there. I'm just -- maybe there's not. I'm just

EXHIBIT 8

asking that you all talk during the ten-minute break.

MS. DRIVER:  Sure.  And I'm -- and I have some thoughts that I'm happy to run by them for the ten minutes.

THE COURT:  We'll come back on at 11:45.  Thank you.

BAILIFF:  All rise.

(Recess)

BAILIFF:  All rise.

THE COURT:  Okay.  Back on the record in the Free Speech case.

MR. LEMMON:  Your Honor?

THE COURT:  Yes, sir.

MR. LEMMON:  Steve Lemmon for PQPR.  If the Court will allow me, I'd like to just spend 30 seconds explaining my client's position regarding its motion to convert and the present motion.

THE COURT:  Yes.

MR. LEMMON:  As the Court knows, we filed a motion to convert.  That motion is still on file.  That motion is set forth today.  We do not intend to put on any evidence in support of our motion to convert.  I want to tell the Court what our position is regarding these motions.

THE COURT:  Okay.

MR. LEMMON:  And that is that our client's overriding interest is in asking the Court to retain

EXHIBIT 8

jurisdiction over the transfer actions that are before the Court right now. And the dismissal order that the Texas plaintiffs have proffered allows the Court to retain jurisdiction over that action. I can explain to the Court why I think that's appropriate if the Court wants to hear from me. But if the Court does not --

THE COURT: You're talking about the adversary proceeding that was filed against PQPR?

MR. LEMMON: Yes, Your Honor.

THE COURT: Okay.

MR. LEMMON: There's also a TUFTA action that's been removed to the court --

THE COURT: Right.

MR. LEMMON: -- in which Mr. Jones is an individual defendant. And we think that that implicates then the Jones estate, which is remaining before the Court. And so we think that there's an appropriate basis for the Court to retain jurisdiction. So if the Court retains jurisdiction over those actions, which are the fraudulent transfer actions against my client I'll call them, then we are fine with either a conversion or a dismissal. We're fine with a dismissal if the Court retains jurisdiction. And that is our position.

THE COURT: Okay.

MR. LEMMON: Thank you.

**EXHIBIT 8**

THE COURT:  Thank you.  And just so I'm clear, maybe -- there are two adversaries, right?  One is the -- maybe we can just identify which are the adversaries that the Texas plaintiffs want me to retain jurisdiction over.  The removed action.

MR. MOSHENBERG:  Just to clarify the record, the Texas plaintiffs have not submitted a proposed order.  That was submitted by, I believe, the Jones side or the FS.  And that was the Jones side.  I -- excuse me.  Whether Texas has any strong -- there's an adversary that FSS filed against PQPR.  There's also TUFTA actions that were filed by Connecticut and Texas plaintiffs together in Austin, Texas that did get removed and ended up in front of this court.

THE COURT:  That's what I'm saying.  Where is that adversary?

MR. MOSHENBERG:  It's cited in the proposed order, Judge.  I don't have it in front of me.

MR. LEMMON:  Your Honor, that is case number 22-3331.

THE COURT:  Ah, yes, yes, yes.  Okay.  Got it.  Got it.  Okay.

MR. LEMMON:  And I misspoke.  I apologize.  I thought that the Texas --

THE COURT:  No, no, no.  I couldn't find it.  I knew that there was another -- I knew that there was a --

**EXHIBIT 8**

one that Free Speech filed against PQPR and then I knew that there was the other litigation that was -- that remained pending.

MR. MOSHENBERG:  Correct, Judge.  And to be clear, that case was by agreement with FSS very early on abated pending settlement talks, planned discussions.  But then, you know, presumably that would resume upon dismissal, Your Honor.

THE COURT:  So if I make sure I've got your position right, PQPR supports conversion, but if I'm inclined to dismiss, you want to keep both of those -- me to retain jurisdiction over both adversary proceedings if I got it right.

MR. LEMMON:  Yes, Your Honor.  PQPR does not oppose dismissal as opposed to conversion if the Court retains jurisdiction over those two cases, those two adversaries.

THE COURT:  Okay.

MR. LEMMON:  Thank you.

THE COURT:  Thank you.

MS. DRIVER:  Your Honor, I think Mr. Paterson and I have an agreement on how to move forward with the exhibits that Mr. Jones objected to.

THE COURT:  Okay.

MS. DRIVER:  And I think it's going to just

EXHIBIT 8

streamline everything a lot. So what they have provided to me just today is what they are telling me are certified transcripts from TransPerfect, which is a third-party transcribing service, and that an individual did go through and confirm that this is accurate from a certified transcribing service.

THE COURT: Okay.

MS. DRIVER: Because of that, and if we are doing the complete transcripts, I do not have any objection to those being admitted into evidence as well as the screengrabs from his Twitter and from the other websites.

THE COURT: So just so we -- I'm clear, do we have -- I don't have a copy of the -- or do I have a copy of the certified --

MR. PATERSON: I'll hand up full copies, Your Honor.

THE COURT: Okay. Perfect. Okay. And Ms. Driver, you're okay with me -- these -- what do we want to call them? If you want, you can give me --

MR. PATERSON: You might want to give them new numbers, Your Honor. I can put them on the record if that helps.

THE COURT: Yeah, that'd be helpful just so we...

MR. PATERSON: So I think just to keep them in the same order, we will call Exhibit 15 the transcript of

EXHIBIT 8

Breaking Deep State Attempted to Shut Down Infowars Headquarters Last Night. We'll call 16 the transcript of Is This Infowars' Last Broadcast? Patriots Rally Behind Alex Jones and Crew. And then we'll call 17 the transcript of Infowars on the Edge, Alex Jones Gives a Bankruptcy Update. And so Your Honor, with that agreement we would ask that those exhibits, which we'll hand up in a minute --

THE COURT: So there'll be a new 15, 16, 17?

MR. PATERSON: 15, 16, 17 along with the screenshots that are included as exhibits --

THE COURT: Are the screenshots the ones -- the same ones before? Do we keep that -- in other words, do we add new numbers for that?

MR. PATERSON: They're the same. No change to the screenshots.

THE COURT: Okay.

MR. PATERSON: So they're Exhibits --

THE COURT: I will ask you then -- this is -- just so we have a clean record, if one is going to admit all the exhibits, just start from the top and then just roll through. And then just numbers.

MR. PATERSON: Right, Your Honor.

THE COURT: Now that we have a new 15, 16, 17 unless you have -- there's agreement.

MR. PATERSON: Then we would move for the

EXHIBIT 8

admission of Exhibits -- the Connecticut Families' Exhibits 1, 2, 7, 8, 9, 10, 11, 12, 13, 15, 16, and 17.

MS. DRIVER:  No objection.

THE COURT:  Okay.  Perfect.  Can I have those copies?  And you can hand them to my law clerk.  I would -- I -- before we start, I know that -- and I had received a report for something, and I know that there's going to be some discussions here.  I will note I don't know what's been going on for the last couple of weeks in discussions about governments trying to shut down.  I don't know if it's what was said or not.  I will -- obviously I'll read what's here.

I'm not sure if that was -- I don't know what that was intended -- or who is the government, but if it was -- someone thought it was me, I'm just stating it for clarity on the record, the government was probably at Kroger's at the time that it was going on.  So I don't know what -- where that's going.  I just -- I say that for the sake of clarity.  There may be a lot of folks listening who were concerned about actions one way or the other, but let's get into the evidence.  So I'm admitting 1, 2, 7, 8, 9, 10, 11, 12, 13, 15, 16, and 17.

MR. PATERSON:  Thank you, Your Honor.

THE COURT:  Okay.  And Ms. Driver, do you have any exhibits that you wish to -- or I should --

MS. DRIVER:  I think we admitted all of my

EXHIBIT 8

evidence. I do have a few --

THE COURT: In this case, if we're going to do it again I want --

MS. DRIVER: Oh, you want them admitted again. Let me --

THE COURT: Yeah, yeah.

MS. DRIVER: -- grab those numbers, Your Honor.

THE COURT: For Free Speech I need there to be just...

MS. DRIVER: And Your Honor, for clarity, we did file this in both cases, so I don't know what the numbers are in Free Speech, but it is still just our Exhibits 1 through 7.

THE COURT: Okay. Any objection to the 1 through 7 there?

MR. PATERSON: No objection, Your Honor.

THE COURT: Okay. Are there any other housekeeping exhibits that anyone wishes to admit before we kind of get into the evidence?

MS. DRIVER: We may have some rebuttal exhibits or impeachment exhibits, but --

THE COURT: No, no, I understand. I'm just talking about --

MS. DRIVER: Okay. Thank you, Your Honor.

THE COURT: -- just straight up at this time.

EXHIBIT 8

MS. CATMULL:  Your Honor, the FSS would offer the Exhibit at 953-1.  Let me make sure I got the number right.  It's the budget that everyone's seen.  Yes, it's 953-1.  It's a proposed wind-down budget.

THE COURT:  953.  Any objection to the admission of 953-1?

MS. DRIVER:  Your Honor, I would like some sort of a prove-up on that budget, but I don't have a --

THE COURT:  It's either a yes or no.  Somebody will have to prove it up.  I'm just trying to see what --

MS. DRIVER:  Okay.

THE COURT:  -- people agree to now more than anything else.

MR. PATERSON:  No objection from me, Your Honor.

THE COURT:  Okay.  Sounds like you -- Ms. Driver, well, I will --

MS. DRIVER:  Yes.  Yes, Your Honor.  I just object to --

THE COURT:  I -- okay.  So you know, someone will have to prove it up.  Okay.

MR. PATERSON:  Your Honor, if it's acceptable, we'd like to call Mr. Magill now.

THE COURT:  Okay.  Mr. Magill, why don't you come on up?  And why don't we turn on the witness cam?  Okay.  Good -- all right.  It's borderline good morning/good

EXHIBIT 8

afternoon, so I'll just say hello.  Please raise your right hand.  Do you swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT:  All right.  We'll let the record reflect that the witness has been properly sworn in.  Mr. Magill, if you can just state your name and spell your last name for the record.

THE WITNESS:  J. Patrick Magill.  Last name is spelled M-A-G-I-L-L.

THE COURT:  Counsel, whenever you're ready.

MR. PATERSON:  Thank you, Your Honor.

DIRECT EXAMINATION OF J. PATRICK MAGILL

BY MR. PATERSON:

Q   Good afternoon I guess it is now, Mr. Magill.  What is your role with FSS?

A   I'm Chief Restructuring Officer.

Q   And how much in cash and cash equivalents does FSS have as of today?

A   Approximately $6 million.

Q   And is that amount available for creditors in a liquidation scenario?

A   Yes.

Q   Just want to talk briefly about inventory.  How much in inventory does FSS have today?

EXHIBIT 8

A    As of today in supplemental -- supplement inventory, the core inventory, 1.2 million.

Q    And how much in inventory sales do you expect FSS could make in an orderly wind-down scenario without Mr. Jones?

A    We forecasted roughly -- I'd have to look at the numbers again, but roughly $1.6 million over a 30-day period, 4-week period.

Q    And what expenses would be included in connection with making those sales?

A    So we calculated that we -- that would cost us roughly $1 million in total costs, which would yield us around 6 point -- $650,000 in net cash.

Q    And that's without Mr. Jones?

A    That is without Mr. Jones.

Q    And do you believe that FSS can make those inventory sales without Mr. Jones being on air?

A    I do.

Q    And why is that?

A    Well, we have other hosts that are on the show.  We also on the show.  We also have the capabilities of doing reruns of programs to fill his time slot.  We also have the -- I believe, the capabilities of having cohosts or substitute hosts.  Mr. Jones does that frequently when he is out of town and when he's on vacation, so I think there is enough information out there on people that would like to

EXHIBIT 8

come and cohost that show. Plus, we have three other hosts on the program. We actually have three shows a day, so this is one of three.

Q    And if Mr. Jones is on the air, do you believe that FSS can make more money from inventory sales?

A    Yes.

Q    And could you quantify that?

A    Well, you know, there's -- I -- it's hard to say how much more, but there's no doubt that when Alex Jones is on the air, that he sells more product. The rate limiting factor in this is, unlike a going concern where we're replenishing inventory, our inventory is shrinking and we're not replacing it, so there'll become a point, no matter who's on the air, where we're going to end up selling from an empty wagon and we won't be able to do that anymore. So, yes. It's hard to quantify, really, but I would admit when Alex is on the show, he does move product.

Q    And if Mr. Jones is on the show, will expenses also be different?

A    Yes. That's where the delta is. That's what happens. The numbers that I just gave you off the top of my head anticipates that we would cut staff significantly and cut other expenses significantly. When Alex is on the air, he likes to have a lot of other people around who are very, you know, good quality people, hard workers, but our expenses

EXHIBIT 8

when he's on the air is significantly higher than when he's not on the air.

Q   So, if Mr. Jones remains on the air, do you expect FSS to make significantly more profit from its remaining inventory sales?

A   No.

Q   Thank you, Mr. Magill.  I have no further questions.

THE COURT:  Thank you very much.  Anyone else who supports the relief requested have any questions?  Okay.

MS. CATMULL:  I do, Your Honor.  I'll be brief.

THE COURT:  No one has to be brief.  I always hear that, I'll be brief, and then -- you don't have to be brief.

MS. CATMULL:  It's a throat clearer, Your Honor.

THE COURT:  I know.

DIRECT EXAMINATION OF J. PATRICK MAGILL

BY MS. CATMULL:

Q   So, Mr. Magill, have you seen a deposit account control agreement for -- to which FSS is a party?

A   No.

Q   And I'm talking about one with PQPR.

A   No.

Q   Do you -- when -- since June 1, other than what you've told the Court in your testimony a few moments ago, have you had any other concerns about Alex Jones being on the air?

A   Yes.

EXHIBIT 8

Q     Have any topics in particular concerned you?

A     Yes.

Q     Okay.  Which?

A     The mentioning of Sandy Hook.

Q     And why does that concern you?

A     Well, this is kind of what got us here in the first place.

          MS. CATMULL:  I pass the witness, Your Honor.

          THE COURT:  Thank you.

          MR. LEMMON:  May I proceed, Your Honor?

          THE COURT:  Please.

             CROSS EXAMINATION OF J. PATRICK MAGILL

BY MR. LEMMON:

Q     Mr. Magill, where is the inventory that FSS owns?

A     In Denver, Colorado.

Q     And does the Debtor have a contract with the entity where -- that it runs the warehouse?

A     Yes.

Q     And is that contract directly with that entity or is it with an intermediary?

A     Intermediary.

Q     Okay.  Have you seen the contract with the warehouse itself?

A     No, I don't believe I have.

Q     Does FSS, to your knowledge, have an agreement to use

EXHIBIT 8

Alex Jones's name and likeness?

A   I have not seen a specific agreement to that, no.

Q   Have you obtained commitments from other employees to stay on after a conversion to liquidate inventory?

A   Not specifically, no.

Q   Have you obtained any commitments from any potential host who would replace Mr. Jones?

A   No.

Q   Has anyone told you that they would not stay on after conversion?

A   No, that -- no.

Q   I want to make -- I want to make certain that I understand your testimony.  Your testimony is that you would not propose for the Debtor to buy any additional product after the time that a conversion would occur; is that correct?

A   That's correct.

Q   I want to ask you very briefly what the agreement is for advertising for Dr. Jones' Naturals.

A   Okay.

Q   Can you tell us whether or not the agreement is that every time Alex Jones mentions Dr. Jones' Naturals that Dr. Jones' Naturals owes Free Speech Systems $500?

A   That's not the way I interpret the agreement.  I interpreted the agreement that Alex Jones, when he makes a

EXHIBIT 8

specific pitch about Dr. Jones products, not Dr. Jones' Naturals, but Dr. Jones products, every time he mentions that, the agreement is we get $500 and that it's tracked by the -- from the producers.

Q    And you're aware -- you were aware of that agreement and approved of that agreement, right?

A    I was, and I did.

Q    And has, in fact, FSS been deducting that, that 500 bucks, however -- whatever it adds up to every time it pays PQPR?

A    Yes.

Q    Finally, Mr. Magill, are you familiar with the term Infowars Life?

A    I am.

Q    And that's a brand that goes on some of the products that are sold by Dr. Jones' Nationals, right?

A    Yes.

Q    And that term is not among the list of terms that you in the amended schedules and statements listed with Court, right?

A    That's incorrect.

Q    You say that Infowars Life is listed in that list?

A    I believe it is, yes.

Q    Okay.  And you swore to that and you're swearing to it now?

EXHIBIT 8

A    My recollection is from the schedule that I signed, yes.

Q    Well, that schedule is before the Court and the Court can observe it, and it has a list of all of the domains that are owned.  Right?

A    Yes.

Q    Has a list of all of the names that -- the trademarks that are owned by the Debtor, right?

A    Yes.

Q    Okay.  Now, have you ever looked at the Texas Secretary of State's website?

A    I've been on it but I don't know what you're talking about.  Yes, I've seen it.

Q    You ever looked for Infowars Life on the Texas Secretary of State's website?

A    No, I personally didn't do that.

Q    So, you're unaware that that name was registered by Dr. Jones in 2014?

        MS. CATMULL:  Objection  Assumes facts not in evidence.

        THE COURT:  I think he's asking if he's aware of it.

BY MR. LEMMON:

Q    I'm asking if you're aware of it.

A    I am not.

EXHIBIT 8

Q   Okay.

THE COURT:  I'm not taking it that that's what happened, just that -- whether he has an understanding if that's the case or not.

BY MR. LEMMON:

Q   So, Mr. Magill, have you made a demand on either Dr. Jones or on any of his companies that they quit using that term on Infowars Life on any of their branding?

A   No.

Q   And are you aware that they have used that branding since 2014?

A   Yes.

MR. LEMMON:  Thank you, Your Honor.  Pass the witness.

THE COURT:  Thank you.

MR. MOSHENBERG:  Judge, may I?

CROSS EXAMINATION OF J. PATRICK MAGILL

BY MR. MOSHENBERG:

Q   Thank you for being here, Mr. Magill.  When you testified earlier, you were talking about how one of the issues, one of the assumptions you made is that there's remaining inventory, that more inventory wouldn't be bought, correct?

A   That's correct.

Q   Okay.  Fair to say that is an assumption.  You don't

EXHIBIT 8

know whether more inventory will be bought if the case were dismissed, correct?

A    No, the assumption was in my analysis, that there would be nothing additionally that would be bought.  Yes, that's correct.

Q    Right.  And I just want to confirm, that's an assumption.  You actually don't know if it gets dismissed and you're no longer the chief restructuring officer, you don't know what's going to happen in future products.

A    Yes, that's correct.

Q    Okay.  You also mentioned that your proposal talks about cutting staff, correct?

A    Yes.

Q    And again, it's an assumption that only your way is going to result in cutting staff?

A    Yes.

Q    Right.  It's very possible -- there's no reason why FSS couldn't continue to cut staff to save their costs if there was a dismissal and you were no longer the chief restructuring officer, correct?

A    That's correct.

Q    And you, in fact, provided a -- you supported a plan in this bankruptcy to pay the Sandy Hook families; isn't that right?

A    Yes.

**EXHIBIT 8**

Q   And you provided that plan because you understood and you acknowledged and you were prepared to testify under oath that a plan was better for the families than a liquidation. In fact, you've done a liquidation analysis and determined it would be better to pay the families money from FSS' revenue over time, correct?

A   That's correct.

Q   And that is still your view today, that it is more money for the families if FSS continues as a business; isn't that right?

A   Yes.

Q   Okay.  And I want to make sure I'm understanding a few things.  First of all, you did file a statement in support of conversion of the FSS case, correct, sir?

A   That is correct.

Q   Okay.  And to be clear, who was all -- I mean, when I say you, I'm assuming it's you, but it was a statement by FSS to support conversion.  Who was the one at FSS that authorized the statement saying that the Debtor supports conversion?

A   Me.

Q   Okay.  So, it wasn't anyone else?

A   No.

Q   Wasn't Alex Jones --

A   No.

EXHIBIT 8

Q    -- who is the owner of the company?

A    No, it wasn't Alex.

Q    Okay.  Did you to him that your -- did you seek his permission to do that?

A    No.

Q    Okay.  Did you in any way ask for his approval or authority to ask that his company be converted to a Chapter 7, sir?

A    No.

Q    Okay.  I looked at your engagement letter.  I also looked at the Court's order authorizing you to become the chief restructuring officer.  I couldn't find anything in there that talked about giving you the authority to recommend that a business be liquidated in conversion, sir.

        MS. CATMULL:  Objection, Your Honor.  That's not a question.

        MR. MOSHENBERG:  It is.

BY MR. MOSHENBERG:

Q    Is there something in there?  Tell me if I'm wrong.

        THE COURT:  That's a question.

        MR. MOSHENBERG:  Thank you, Judge.

        THE WITNESS:  I don't recall anything in there like that, no.

BY MR. MOSHENBERG:

Q    Well, I have it here.  If you'd like, I could refresh

**EXHIBIT 8**

your recollection and you can look through it, but otherwise you can agree with me. There's nothing in your engagement letter or the Court's order that authorizes you to recommend that a business you don't own be converted.

MS. CATMULL: Objection, Your Honor. Now calling for a legal conclusion (indiscernible) orders.

THE COURT: No, I think he can -- the CRO, I'm taking it in the context whether he thought as the CRO he thought he had the authority under my order to do so.

MS. CATMULL: Thank you, Your Honor.

THE WITNESS: Can you ask the question again, so I make sure I get it right?

BY MR. MOSHENBERG:

Q    Sure. Did you think under -- well, let me ask you as the judge guided me on it. Did you see something in the order or in your engagement letter that gave you the impression you had the authority to convert, to ask the Court to convert a business that's not yours to Chapter 7?

A    I believed I had the authority to do that.

Q    Okay. I can look at your engagement letter and your order and you can tell me where it says that. Would that be helpful?

MS. CATMULL: Objection, Your Honor. That's not a question. That's not a question that's seeking --

THE COURT: Would it be helpful, is a question.

EXHIBIT 8

MS. CATMULL:  Yes, but it's not seeking anything probative.  It's irrelevant.  What he --

THE COURT:  Over --

MS. CATMULL:  -- thinks about the --

THE COURT:  Overruled.

MS. CATMULL:  -- Your Honor.

THE COURT:  Overruled.  Overruled.  In other words, I think it is probative to understand where -- if Mr. Magill felt like he had the authority, where he felt he got the authority from.  And I don't want to get into attorney-client communications, but if he thinks it's in the order, then maybe we can look at the order and see where he thinks he has the authority.

THE WITNESS:  I don't believe it's in the order.

THE COURT:  That's what I'm taking it.

THE WITNESS:  I don't believe it's in the order no, no.

BY MR. MOSHENBERG:

Q    Okay.  What about you -- you drafted the engagement letter, correct?

A    That's correct.

Q    There's nothing in the engagement letter, either, that says you have that authority?

A    That's correct.

Q    Okay.  Now, you did recommend, I think, to the Court

**EXHIBIT 8**

this morning.  You filed some sort of winddown procedure, correct?

A    Yes.

Q    Okay.  Do you have any reason to think that that's allowed for you to do, some sort of recommended winddown procedure in a conversion?

A    It was requested that I provide that information, so I did that as a courtesy.

Q    Okay.  And I don't want to learn about conversations with lawyers, but was it -- outside of a lawyer who requested that?

A    Nobody outside of a lawyer.

Q    Okay.  Is it fair to say -- I just want to make sure. Not any lawyer, it's an FSS lawyer that asked you to do that?

A    Yes. Ok

Q    Okay.  And I want to understand.  Your proposal has you continuing on as the chief restructuring officer at FSS, correct?

A    That is not correct.

Q    Okay.  Is there some sort of rule?  I heard earlier today, Connecticut referred to you staying on in some manage -- in some capacity.  Can you tell the Court about that?

A    Someone needs to stay but I had not intended to stay.

Q    Okay.  But you agree with me, someone would stay and

EXHIBIT 8

they would get paid --

A    Yes.

Q    -- that's correct.  Okay.  And the same issue in administrative costs and fees in a Chapter 7, you understand that that would be more costs, like ones paid to yourself, to people other than the creditors, correct?

A    Well, the individuals, some individuals would continue to stay as they are right now that are accounted for in the payroll.  So there may be some staff that would stay and be able to handle the winddown in my absence.

Q    Okay.  Sir, you mentioned that Alex Jones had made statements about Sandy Hook, right?

A    Mm hmm.

Q    He also made statements about yourself; isn't that right?

A    Yes.

Q    Okay.  And I remember in speaking to you about it, you said that you were very troubled by that, you did not care for that.

A    That's true.

Q    Okay.  Are -- is it your testimony that played no part in your recommendation to convert?

A    It played none.

Q    Okay.  The -- it's not nice having someone say that about you, right?

EXHIBIT 8

A    No.  That's right.

Q    Okay, so you -- then you -- I mean, you got a taste of what it's like to have Alex Jones' crosshairs on you, it's fair to say?

A    Yes.

Q    Okay.  And you can --

THE COURT:  Hold on, hold on, folks.  I don't -- I understand the line of questioning.

MR. MOSHENBERG:  Okay.

THE COURT:  No, what I am saying is, there's a lot of folks listening and this is just a -- very much a Lopez thing.  I want to keep the temperature down as much as possible.  So, just -- I got what you meant by crosshairs.  I don't want to get into stuff because there can be a lot of folks listening who could be -- misconstrue what you're saying.  I want you to conduct a thorough examination.  Go as hard as you want.  I'm just really sensitive to certain terms.

MR. MOSHENBERG:  That was a poor choice of words, Your Honor.

THE COURT:  No, no, no, it's not, it's not.  I'm just -- this is very much a Lopez thing.  So, just ask a question again.

MR. MOSHENBERG:  Okay.

BY MR. MOSHENBERG:

EXHIBIT 8

Q   Sir, you under -- you know, firsthand, what it's like to be the target -- or someone that Alex Jones focuses on in his show; is that fair to say?

A   Yes.

Q   Okay.  And so, you got a taste of what it was like for my clients for years to be the target of Alex Jones, to be the focus of Alex Jones show.

A   Yes.

Q   Do you think -- well, the reality is, you knew who Alex Jones was before you became the chief restructuring officer, right?

A   Yes.

Q   Okay.  You knew about the kinds of things he was saying?

A   Yes.

Q   Okay, but you signed up to be the chief restructuring officer, correct?

        MS. CATMULL:  Objection, Your Honor.  I don't see what bearing his knowledge about knowing Alex Jones when he signed up has anything to do with whether this case should convert.

        THE COURT:  I'm --

        MS. CATMULL:  Maybe he can just explain --

        THE COURT:  I'm hoping the next question gets there, but I agree with you, Ms. Catmull.  I'm not sure

EXHIBIT 8

where this is going.

MS. CATMULL:  Thank you, Your Honor.

MR. MOSHENBERG:  I'll move it on, Judge.

THE COURT:  Okay.

BY MR. MOSHENBERG:

Q   And I just want to be clear.  Do you have any basis today for saying -- just a couple more things I want to follow up.  One is, do you know whether or not Alex Jones would stay if the case were converted, stay with FSS, if it was converted to a Chapter 7?

A   I don't know.

Q   Okay.  My impression was, my understanding was that he was going to leave if it converts.  Do you know one way or the other?

A   I'm -- it was my assumption that he would not stay.  He's made statements that led me to believe that.  Yes.

Q   Okay.  So, as far as you know, and that's probably the basis for your assumption, right, he's not going to stick around in a seven?

MS. CATMULL:  Objection.  This has been asked and answered, Your Honor.  He said he doesn't know.  He's made assumptions.  He said what has been told to him.  What else can he say?

THE COURT:  Overruled.

BY MR. MOSHENBERG:

EXHIBIT 8

Q    You can answer, sir.

A    Would you start again, please?

Q    So, as far as you know, you thought he wasn't going to be sticking around in a Chapter 7?

A    That -- yes, correct.

Q    Okay.  Do you know whether he would stick around FSS and continue to work there if the case was dismissed?

A    I don't know.  I didn't look at it that way.  I'm not sure.

Q    And just to tie the bow on all this, you don't know whether FSS would continue as an operating business in a dismissal?

A    I assumed eventually it would get liquidated, so I assumed eventually it would happen, but ---

Q    Okay.  Fair to say that was an assumption, though.  You don't actually know one way or the other.

A    That's correct.

Q    Okay, but one thing we do know is Alex Jones is working at Free Speech Systems, that's more money for the families that would never be paid if you just sold its parts for scraps?

A    Within the limits of that question, the answer is yes.

          MR. MOSHENBERG:  Okay.  I'll pass, Your Honor.

          THE COURT:  Okay.  Anyone else have any questions?

          CROSS EXAMINATION OF J. PATRICK MAGILL

EXHIBIT 8

BY MS. DRIVER:

Q   Mr. Magill, I'm Vickie Driver.  I represent Mr. Jones.
We've met before, correct?

A   We have.

Q   Okay.  The inventory level that FSS is sitting on today
is fair -- is fairly low.  Would that be an accurate
statement?

A   Yes.

Q   Why?

A   Because we have quit purchasing inventory.

Q   When?

A   About a month ago.

Q   And in reaching the conclusion not to continue to --
oh, who decided not to order any more inventory?

A   I did.

Q   And did you speak with Mr. Jones and discuss that
decision before it was made?

A   Not that I recall.

Q   Did you speak with any of his professionals before that
and discuss that particular decision before it was made?

A   I may have spoken to Bob Spicer.  I don't recall.

Q   And did he support that decision if you did talk to
him?

A   I think he -- I think the best way to describe it was
he acknowledged it.

EXHIBIT 8

Q    But he didn't agree with it?

A    I don't recall it ever getting that far.  We -- as you are aware, we have weekly meetings and so, I'm sure it did come up.

Q    Would you have considered it a discussion or was it just informing him?

A    Informing him.  Yeah.

Q    You don't have a deal with your shipping company to ship product after Friday, as we sit here today, do you?

A    I thought I did.  I'm not sure where that comes from. I thought we did.

Q    Do you have anything in writing from the shipping company that says that they will ship after Friday?

A    No.  We don't have a -- we have a contract with the intermediary.

Q    And did that intermediary contact you this week and tell you that they were going to stop shipping if you didn't pay them in advance?

A    That was the original conversation, yes.

Q    And they agreed to continue to ship through Friday, correct?

A    Yes.

Q    And there's no agreement in writing with them to continue to ship after Friday, which is today?

A    Well, we have -- we do not have a cancellation notice

on our -- we have a contract with them so, I assume we still can ship.

Q    Did they give you a cancellation notice before they called you this week and threatened to stop on a dime?

A    Those --

MS. CATMULL:  Objection to lots of facts that are not in evidence, Your Honor.

THE COURT:  I agree.

MS. DRIVER:  I believe that we -- that we have testimony from him that there was a call that said they were going to stop shipping.

THE COURT:  I know.

MS. DRIVER:  Are we okay with that?

THE COURT:  That I'm okay with.  It was the extra.

MS. DRIVER:  Did --

THE COURT:  The extra claws you stuck in there.

MS. DRIVER:  Thank you.

BY MS. DRIVER:

Q    Did you get a written notice from the intermediary prior to their telling you they were going to stop shipping this week?

A    These discussions have been taking place between the lawyers, so I have not had any discussions with the principal on this.

Q    Understood.  So, you and the principal of that entity

EXHIBIT 8

do not have an understanding about shipping past Friday?

A    We don't have an understanding either way.  Right.

Q    Are -- you were sitting in the courtroom when you heard statements from Connecticut lawyers that Mr. Jones' statements on his show in -- early this month have hurt FSS.  Did you hear those statements?

A    Yes.

Q    Do you agree with those statements?

A    Yes, I think I do.

Q    Okay.  Do you have knowledge of the sales that took place between the 3rd of June and the 9th of June?

A    I can give you a rough number, yes.

Q    Let's have that number -- rough number.

A    Slightly over $1 million.

Q    And how does that rate with most weeks of sales for FSS during this case?

A    That's about 400,000 more than normal.

Q    Would it be fair to say that that is the second highest week of sales that you've experienced during this bankruptcy?

A    It's either the second or the highest.

Q    So, the week that the statements were made that everyone is concerned hurt FSS actually resulted in what you would consider record sales?

A    Yeah, I guess that's -- I guess that's true.  I'm not

EXHIBIT 8

quite sure I understand the question, but -- could you say it another way so I'll make sure I get it right?

Q   The week that Mr. Jones was broadcasting that has been characterized by Connecticut's lawyers today as harming the value of FSS actually resulted in record sales.

A   That's an accurate statement.

Q   Is there a concern that his statements may have created new causes of action that could be actionable against FSS?

MS. CATMULL:  Objection, Your Honor, to the extent that invades the attorney-client privilege, I don't think he should answer, (indiscernible).

THE COURT:  He can -- the witness can answer to the extent that it does not violate any attorney client privilege that you may have received.

MS. CATMULL:  Thank you.

THE COURT:  Or that it may lead to a legal conclusion.

THE WITNESS:  I'm not going to answer, then.

BY MS. DRIVER:

Q   So, there -- you can't answer that because of attorney privilege or you're refusing to answer it?

A   Client -- attorney-client privilege.

Q   Thank you.  If Mr. Jones said something last week that gave rise to a cause of action against FSS, it would, in a Chapter 11, be an administrative expense, correct?

EXHIBIT 8

A   It could be, yes.

Q   That would come ahead of the plaintiffs that currently have claims against FSS that are represented here today?

A   Yes.

Q   And if that -- if this case converts to a Chapter 7, it would retain its Chapter 11 administrative priority over those claimants, correct?

A   I think that's right.  You're now getting into a different area for me, but yes, okay.

Q   But if it's dismissed the administrative priority goes away, correct?

        MS. CATMULL:  Calling for a legal conclusions, Your Honor.

        THE COURT:  I'll sustain.

BY MS. DRIVER:

Q   As a -- do you have experience as a person who liquidates companies?

A   Yes.

Q   Would you consider that extensive experience?

A   Well, I probably, over my lifetime, I've probably liquidated six to eight.

Q   And I know you've been involved in more cases than that.  Is that differentiating between liquidation and reorganization?

A   Yes.

**EXHIBIT 8**

Q   Okay.  As a liquidator, are you familiar with the concept of a going out of business or a liquidation sale?

A   Yes.

Q   And is that what you would consider a common marketing tactic to maximize the value of an estate as the company is closing?

A   Well, it's kind of a facts and circumstance issue.  It kind of depends on where you are and how far along you are in the bankruptcy and what you have to sell.  So, it's -- that's kind of a difficult question to answer in a yes or no.

Q   When the total sales during the week where Mr. Jones in the transcripts that have been admitted here have said that he was -- that it was -- that Infowars was shutting down, that FSS was shutting down, had a -- your testimony says, over a $400,000 spike.  Could that possibly be attributed to a going out of business sale mentality in a marketing effort?

A   Yes.

Q   What's the current margin that, FSS realizes on its sale of supplements, just generally speaking?

A   Fifty percent.

Q   And how much is assumed to be the margin in the winddown plan?

A   I would say less than 5 percent.  All of the inventory

EXHIBIT 8

that we have right now is paid for, so on a cash basis that's already amortized in.  So, I mean, if you're talking about a cash on cash question, I would say that for every dollar that we sell, I'm going to guess, 95 percent goes, you know, drops down to the contribution margin.

Q   Pardon me, I'm just looking at some numbers real quick.  So, with the current inventory, if Mr. Jones is on air and broadcasting, you could reasonably expect to get more than a 5 percent gross margin?

A   No, no, that's the cost.  Ninety-five percent gross margin.

Q   Ninety-five percent gross.

A   You said -- I misunderstood.  It's --

Q   My apologies.

A   I may have misspoke.  We have a 50 percent margin.  With a 5 percent cost to goods sold now, we have a 95 percent margin.

Q   If you could give me just one moment to gather my thoughts.  Mr. Magill, you formerly testified in front of this Court that Mr. Jones is responsible for generally most of the revenue of the company, correct?

A   Yes.

Q   And isn't that -- has anything changed today to make that testimony irrelevant or incorrect?

A   No, I don't think in that specific question, that's a

EXHIBIT 8

generally correct statement.  Yeah.

Q    Okay.  And have you spoken with anyone in the production team related to staying on if Mr. Jones leaves?

A    No.

Q    And those -- there are members of that production team that would be required to carry out your liquidation winddown budget, correct?

A    Yes.

Q    Have you -- and I think you testified to this earlier, but I just want to make sure it's clear.  Have you spoken with any of the hosts regarding their intention to stay?

A    No.

Q    And who are those hosts, by the way?

A    Owen Shroyer and Chase Geiser and Harrison Smith.

Q    Would it -- have you seen Chase Geiser here in the courtroom today?

A    No, I don't see him.  Oh, there he is.  He's in the back.  Yes.

Q    Okay.  And would it surprise you if Mr. Geiser got on the stand to testify that he was not staying if Mr. Jones wasn't there?

A    No.

Q    Did you have concerns for the security of the employees at Free Speech during the first and second weeks of June?

A    Yes.

Case 2:23-cv-00553 Document 1021-8 Filed in TXSB on 06/24/25 Page 117 of 208    Page 117

EXHIBIT 8

Q    Were you on site during any of those times?

A    No.

Q    So you haven't been on site for two weeks?

A    That sounds about right.

Q    When was the last time you visited FSS' offices?

MS. CATMULL:  Objection, Your Honor.  I don't understand what this has to do with whether the conversion should occur or not.

THE COURT:  No, no, but I think she's allowed to ask the question whether he's been on site and where we go.

MS. CATMULL:  Thank you, Your Honor.

THE WITNESS:  I think it was the last week in May. I'd have to look at my calendar.  It's been a couple of weeks, at least.  Yeah.

BY MS. DRIVER:

Q    Do you have a schedule or is it just you kind of pop in?

A    I go as needed.  I usually go -- in the early stages, I would go two or three days a week.  In this last couple of months I've gone, you know, maybe every other week for a couple of days.  It just -- I go when I'm needed.

Q    And have there been any meetings with the employees of FSS to discuss what could be happening today in Court, that you've held?

A    No.

EXHIBIT 8

Q   I believe there's an exhibit book up by your side, if you wouldn't mind turning with me to Exhibit 3.

THE COURT:  Ms. Driver, whose Exhibit 3 are you referring to?

MS. DRIVER:  I'm so sorry.  That would be Alex Jones --

THE COURT:  Okay.

MS. DRIVER:  -- Exhibit 3 and it was admitted in the FSS case.

THE COURT:  Okay.  I just want to make sure that I'm pulling up at the -- looking at the right thing, too.

MS. DRIVER:  No problem.

BY MS. DRIVER:

Q   This is your engagement letter that was filed with the Court to support your employment as the CRO; is that correct?

A   Yes.

Q   And you recognize this document?

A   Yes.

Q   And you drafted this document?

A   Yes.

Q   Okay.  On number nine, it says, "Make operational decisions with consultation of current ownership directed at maximizing the value of FSS."  Do you see that statement?

A   I do.

EXHIBIT 8

Q    Did you consult with current ownership before you took
-- made the decision to stop buying product?

A    I don't recall that I did.

Q    Did you know by making -- strike that.  Is it
reasonable to assume when a company like this stops buying
product that it's preparing to liquidate?

A    Yes.

Q    So, in making that decision, you knew you were head --
you were taking FSS towards liquidation?

A    I was preparing for the possibility it would be
liquidated.  Yes.

Q    And in order to prepare for that, instead of taking
money that you could make 50 times the amount you could by
selling product, you chose to keep the money and not buy new
product?

A    I chose not to buy new product.

Q    And you did that without the consultation of current
ownership?

A    Yes.

Q    When you chose to direct your counsel to file a
statement in support of conversion rather than dismissal,
did you consult with current ownership?

A    No.

Q    Sir, the engagement letter and the order in front of
you, if there's anything in those documents that you believe

EXHIBIT 8

gives you the right to make those decisions without consulting with operation, could you please point it out to me?

A    I don't believe there is any in there.

MS. DRIVER:  I pass the witness, Your Honor.

THE COURT:  Thank you.  Any redirect?

MS. CATMULL:  Yes, Your Honor, (indiscernible).

REDIRECT EXAMINATION OF J. PATRICK MAGILL

BY MR. PATERSON:

Q    Hello again, Mr. Magill.  Mr. Magill, Mr. Moshenberg suggested under his questioning that FSS could make more money if it continued operating.  Do you recall that testimony?

A    Yes.

Q    If FSS' assets are seized by the Texas plaintiffs in state court, do you think it will be able to continue being profitable?

A    No.

MR. MOSHENBERG:  Objection (indiscernible).

THE COURT:  Excuse me.  There's an objection.

MR. MOSHENBERG:  Speculation, Your Honor.

MR. PATERSON:  There's not much speculative about it, Your Honor.

THE COURT:  I'll allow it.  He can answer if he knows the answer.

**EXHIBIT 8**

THE WITNESS: Was that -- I assume you're asking my opinion? Yeah.

BY MR. PATERSON:

Q Correct. What's your understanding?

THE COURT: Well --

MR. MOSHENBERG: Now --

THE COURT: Now you're speculating.

BY MR. PATERSON:

Q If FSS' assets are taken away by the Texas plaintiffs and state court, will it be able to continue being profitable?

A No --

MR. MOSHENBERG: Objection.

THE COURT: What's the objection?

MR. MOSHENBERG: I mean, it's the same objection. I'm not really sure I understand the question, but speculation, facts not in evidence.

THE COURT: I'll allow it.

THE WITNESS: Would you restate it again, please, for me?

BY MR. PATERSON:

Q Certainly. If FSS' assets are seized by the Texas plaintiffs in state court, will FSS continue being able to be profitable?

A No.

EXHIBIT 8

Q    Mr. Lemmon asked you some questions about the agreement between FSS and Dr. Jones' Naturals.  Do you recall that?

A    Yes.

Q    To your knowledge, is there anything in that agreement that agreement that allows Mr. Jones to tell listeners not to buy products from FSS?

A    No.

Q    And would you as CRO ever have agreed to such a term?

A    No.

Q    And do you believe that it's in the best interests of FSS' estate for Mr. Jones to tell listeners not to buy products from FSS?

A    No.

Q    Ms. Driver in her questioning suggested that FSS has had record products during a period of time when these statements were made.  Do you recall that?

A    Yes.

Q    Would those record profits have been even higher if Mr. Jones had not been telling people to stop buying products from Infowars?

A    I'm not sure.  I would -- I can't answer that.  I'm not sure.

Q    Mr. Lemmon in his questioning also referred -- questioned whether or not --

            MAN 1:  (indiscernible).

EXHIBIT 8

THE COURT:  Just a moment.

MAN 1:  Yeah, they're make -- yes.

THE COURT:  Yes.  This is Judge Lopez, so can I. I'm asking that you please place your phone on mute, whoever you are.  Thank you.  I apologize.  Thank you.

MAN 1:  Okay?

THE COURT:  Well, sounds like that didn't work. Let's just do this.  Give me a second.

AUTOMATED VOICE:  Conference unmuted.  Conference muted.

THE COURT:  All right, please continue.

MR. PATERSON:  Thank you, Your Honor.

BY MR. PATERSON:

Q    Mr. Lemmon in his questioning, questioned you on whether the Infowars Life brand was reflected in FSS' schedules filed in this case.  Do you recall that?

A    Yes.

Q    And I believe your testimony was you thought it was in the schedules; is that right?

A    That was -- yes.

Q    Like to refer you to Exhibit 10 of the Connecticut plaintiffs, and I can hand up a copy if that's acceptable, Your Honor.

THE COURT:  Please.  You said Exhibit 10?

MR. PATERSON:  Exhibit 10, Your Honor.

EXHIBIT 8

THE COURT:  Okay.

BY MR. PATERSON:

Q    And Mr. Magill, if you turn past the exhibit label, could you just tell me, do you recognize this document?

A    Yes.

Q    And what is it?

A    It's the Statement of Financial Affairs.  It's the schedules.

Q    And if I could just ask you to turn in a few pages, it's hard to read the numbers at the top of the page, but if you turn in three or four pages, you'll see Summary of Assets and Liabilities for Non-Individuals down at the bottom of the page.  Do you see that?

A    Yes.

Q    And if you could go to Page 6, looking at the number on the bottom of the page.

A    Yes.

Q    Do you see Question 59?  "Does the Debtor have any interests in intangibles or intellectual property?"

A    Yes.

Q    And do you see the answer saying yes, and then see attached Exhibit Schedule A/B-60?

A    Yes.

Q    And if you turn over three pages, you see a document with an exhibit label that says Schedule A/B-60?

EXHIBIT 8

A     Yes.

Q     And if you look four lines down, do you see the (indiscernible) Infowars Life that's listed?

A     Yes.

Q     And is that what you were referencing when you said you thought Infowars life was scheduled as an FSS asset?

A     Yes.

Q     Mr. Magill, do you consider yourself a fiduciary of the FSS estate?

A     Yes.

Q     And have you made every decision in this case with that in mind?

A     Yes.

Q     And given that, why is it that you support conversion of this case?

A     Well, I'm concerned about a couple -- well, I support it for a number of reasons.  One of them is, is that I feel as a fiduciary, I have a responsibility to all the creditors equally to be able to deal with them according to what the -- what I believe the rules are, bankruptcy, and not favor one over the other.  So, deal with them in kind of a evenhanded way but no -- giving no advantage to one over the other.  I also am concerned about the causes of action that we would lose in a dismissal.  We have not -- we feel there are several out there and I consider causes of action as a

EXHIBIT 8

potential asset to the estate, and therefore to give it away would be losing value in the estate.  So, I -- you know, those two are the main reasons that I was favoring converting.

Q    Thank you, Mr. Magill.  I have no further questions.

THE COURT:  Thank you.

MS. CATMULL:  Bit of redirect, Your Honor?

THE COURT:  Okay.

REDIRECT EXAMINATION OF J. PATRICK MAGILL

BY MS. CATMULL:

Q    I'll work backwards, Mr. Magill.  I asked you why you supported conversion.  Did the recent statements about Sandy Hook impact that support?

A    No.

Q    Do you have any concerns about -- have you had since June 1 any concerns about employee safety?

A    Yes.

Q    Okay.  Why?

A    Well, there are -- there have been statements by Mr. Jones that I felt might be inflammatory and I am concerned. We have a policy, a written policy that allows employees to carry weapons concealed.  So, I was concerned that some irresponsible employee might do something irresponsible. And also I had some concern about some of Mr. Jones' listeners taking matters in their own hands and maybe coming

**EXHIBIT 8**

up to the office and creating a problem.  So, I had a

general concern about just the temperature at the facility.

Q    Are there guns on the facility?

A    Yes.

Q    Are there employees who carry concealed weapons?

A    Yes.

Q    They're -- as far as, you know, they're licensed to,
true?

A    I presume so, yes.

Q    There have been some questions about why you stopped
buying products.  Have there been -- what impacts your
decision whether or not to by product?

A    Well, the decision that I made and -- the decision came
to me when it was -- became obvious that there was going to
be no possibility that Free Speech would be able to have a
plan confirmed, a reorg plan confirmed.  And one of our
hearings that we had here, I interpreted what was said that
either we needed -- Free Speech needed to have a plan that
could -- a consensual plan by the 14th or that there would
be a dismissal of the case.  When it became clear to me that
I was not going to be able to get a consensual plan with the
families -- and to me that decision has been made.  It was
actually made for me, I really didn't make it -- and I
deemed at that point it would be irresponsible for me to
continue to spend money on product and commit money because

EXHIBIT 8

there's sometimes as much as a 90-day lead time on commitments. That --

Q    Sorry, go ahead.

A    That I wouldn't be able to get the money back in time, so.

Q    Do you purchase -- does FSS purchase product off the shelf?

A    Off the shelf?

Q    Is there -- there's some product -- what's the turnaround on product fulfillment?

A    Well, if we -- when we buy, depending on the product that we buy, but it -- the lead time on a product can be as much as, you know, 60 days. We buy a batch of product. We have it shipped to Denver, put it on the shelf then, and then begin selling it.

Q    Does whether or not Alex Jones is -- in the past, since you've been the CRO has, has Alex Jones always showed up for work?

A    Showed up --

Q    Showed up for work. Has Alex Jones always showed up for work while you've been the CRO there?

A    No, he takes time off.

Q    And during the time off -- the time off, do you wish you had fewer product? Does him being there or not being there impact your decision about whether or not to buy

**EXHIBIT 8**

product or how much.

A    No.

        MS. CATMULL:  Okay.  I pass the witness, Your Honor.

        THE COURT:  Thank you.  Any further questions?

        MR. MOSHENBERG:  (indiscernible).

        THE COURT:  No, no, I'm just -- you -- let's keep going.  Let's go.  Come on.

        RE-CROSS EXAMINATION OF J. PATRICK MAGILL

BY MR. MOSHENBERG:

Q    Mr. Magill, besides selling products, how else does FSS make money?

A    Well, we have sponsorships.  We have people that will come in and want to pitch products on the air, books, gold coins, you know, things like that, and we have contracts with them.  They pay us for the privilege of coming on and pitching to our clients.

Q    My understanding is that's pretty negligible compared to the sale of products?

A    Yes.

Q    Okay.  And so when you're saying, because Alex Jones doesn't come in all the time, you didn't order the main way the company makes money?  Is that what I heard you say?

A    No.  I believe the question was whether he's -- if he doesn't come in for a period of time, does that affect what

EXHIBIT 8

I -- you know, whether I buy product or not, and I said no.

Q   Okay.  Thank you.  I appreciate the clarity on that.  I misunderstood your testimony, though.  I want to go back to the prefs real quick.  Did you do any sort of analysis to see whether the preference payments that you're alleging, the claims for preference payments are also fraudulent transfers?

MS. CATMULL:  (indiscernible) legal conclusion.

MR. MOSHENBERG:  I asked if he did an analysis.  It's a fact, whether he did it or not.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. MOSHENBERG:

Q   So, you don't know offhand whether they are any preference claims that you said you're giving up or also just fraudulent transfer claims that you would still have.  You don't know.

A   No.

MR. MOSHENBERG:  Okay.  Thank you, Judge.

THE COURT:  Thank you.

REDIRECT EXAMINATION OF J. PATRICK MAGILL

BY MS. DRIVER:

Q   Mr. Magill, in your testimony just now, you mentioned that you stopped ordering product because there was no possibility of a plan.  Is that correct?

EXHIBIT 8

A    That was my view, yes.

Q    Okay.  And when did you come to that view?

A    Shortly after the hearing on, I believe it was the 21st or the 23rd of May.

Q    And I thought your testimony earlier was that you stopped ordering products about a month ago?

A    Three weeks ago.  Something like that.  Yeah.

Q    So, shortly after the 21st hearing or before the 21st hearing?

A    No, it was shortly after.

Q    Shortly after.  But you didn't withdraw -- FSS, didn't withdraw its plan until, I think yesterday.

A    Yes, that's correct.

Q    So, you stopped ordering product three weeks before you withdrew your plan, but you knew the plan was not going to happen, right?

A    That's correct.

Q    When did you start considering what the world looked like in the event of a liquidation for FSS?

A    I don't understand your question.

Q    When did you start to consider or analyze what -- let me back up.  Did you have any part in the 30-day winddown budget that was produced to the parties yesterday?

A    Yes.

Q    And that was the first time it was produced to parties,

EXHIBIT 8

correct?

A    Yes.

Q    It was first time Mr. Jones had ever seen it or his professionals?

A    Yes.

Q    So, it was not done in consult with any of those folks?

MR. PATERSON:  Objection, Your Honor.  I think we're fairly far beyond the scope of recross at this point.

THE COURT:  Overruled.

THE WITNESS:  I think the answer is yes.  I -- yeah.

BY MS. DRIVER:

Q    So, when did you start to formulate that plan or think about it?

A    Oh, shortly after it became clear to me that we wouldn't get a plan confirmed.

Q    Do you remember being deposed by Mr. Lemmon on May 30th, 2024?

A    I do.

Q    Do you remember -- and just to be clear, May 30th was more than a week past the May 21st hearing where you said shortly thereafter, you decided that you were -- there was no plan of reorganization, correct?

A    Correct.

Q    Okay, and do you remember testifying that you had not,

**EXHIBIT 8**

as of May 30th, given any thought to a liquidation plan and how that would occur?

A    I don't recall saying that, but that sounds like something I would say.

Q    Okay.  So, if you say that's something you would say, on May 30th, 2024 you had not given any thought to what a liquidation plan looked like?

A    That's what I said, then that's what I said.  I don't recall it but I'm not denying it.

Q    Okay.  And I'm not going to walk through having you testify about that.  I think you're saying if you said it, you said it, you said it.  So, you stopped buying product before you even thought about what a liquidation budget looked like?

A    Yes.

Q    All without consultation with Mr. Jones or any of his team?

A    His professional team, yes.

Q    You said you had security concerns about the employees who were potentially armed on the property, and fans.  Was that something that you testified to?

A    Yes.

Q    What did you do about those concerns?

A    I had a discussion with Tim Enlow who's the head of security.  He was on the ground.  Talked to him about that

EXHIBIT 8

and we -- he keeps me informed if there was an issue.  He'll call me and say, you know, we might have an issue.  We might not.  So, I talk to him every day about security stuff there when I'm up there.

MS. DRIVER:  I'm going to object to the part of that that was, I believe, hearsay.

THE COURT:  Overruled.  Overruled.

BY MS. DRIVER:

Q    Are you aware that during the broadcasts -- well, strike that.  When you said you had security concerns, who did you have security concerns about?  Who did you think would be harmed?

A    Everybody at the studio, the employees.

Q    The employees?

A    Yeah.

Q    Would it surprise you to know that employees showed up voluntarily who were not on the -- who were not on the schedule to work, and came in involuntarily?

MS. CATMULL:  Objection.  Assumes facts not in evidence.  They could put on that evidence if they want to, but there's nothing (indiscernible) and it goes beyond the scope --

THE COURT:  I'll sustain the objection.

BY MS. DRIVER:

Q    Did you direct Mr. Enlow to call in extra security?

EXHIBIT 8

A    I did.

Q    Do you know if that happened?

A    I believe it did, yes.

Q    But do you know that that happened?

MS. CATMULL:  Objection, Your Honor, asked and answered and I don't see what this has to do with whether or not the case should be --

THE COURT:  I think you're testifying, Ms. Catmull.  I think you can just answer -- you can just lodge your objection.

MS. CATMULL:  Yes, Your Honor.

THE COURT:  He can answer the question.

THE WITNESS:  I was told that it had happened.

BY MS. DRIVER:

Q    But you don't have personal knowledge of that?

A    No, I was not in Austin at the time, so I did not see it.

MS. DRIVER:  Okay.  Pass the witness, Your Honor.

THE COURT:  Thank you.  Any further questions for this witness?  Mr. Magill, thank you very much for your time.  Folks, why don't we take a break until -- I've got a 1:30 hearing.  It'll give me an opportunity to read the transcripts that are -- that have been admitted.

Probably going to go -- I would -- I'm going to hang up the line for folks that are there just to kind of

EXHIBIT 8

clear the line. I -- why don't we start at 2:30 p.m. back here -- 1:30 -- no, let's say 2:45 p.m., if we could, 2:45. Give everyone a time. We will -- I will open up the line. I'll just keep the line open from the 1:30, so if you're listening in, you'll be able to listen in to another hearing, but I won't start this hearing until 2:45.

MS. FREEMAN: Very briefly, Your Honor, and to the extent that it assists the Court in understanding the CRO's role and his consultation obligations, I would ask the Court to take judicial notice of the transcript of the hearing from March 11th of 2024 beginning on Page 13 at Line 25 and continuing to Page 14. There is a stipulation with regards to (indiscernible).

(Recess)

CLERK: All rise. Please be seated.

THE COURT: Thank you, and I appreciate everyone's patience. Okay, last we left off, we had just finished with the examination of the CRO, where do we go next?

MR. PATTISON: Your Honor, at this time, the Connecticut Plaintiffs have no additional witnesses or exhibits.

THE COURT: Okay. Thank you.

MS. CATMULL: In our presentation, I will just offer the Court that, I would ask the Court to take judicial notice of the PQPR proof of claim.

EXHIBIT 8

THE COURT:  Okay.

MS. CATMULL:  Thank you, Your Honor.

THE COURT:  Any other evidence to present to the Court?  Any party?  Let me just … are the Movants of the Connecticut party, can I just say that your side is rested with respect to your motion?  Aside from argument, from an evidentiary standpoint?

MR. KEMPLER:  That's fair on behalf of the Connecticut Plaintiffs.  I know there are other parties supporting conversion.  I'll let them speak for themselves.

THE COURT:  Yeah, that's why I was just going to kind of go one by one.  So, any other party who supports conversion?  Any other evidence to present to the Court?  Okay.  Anyone who opposes conversion, any evidence to present to the Court?

MS. DRIVER:  Your Honor, Mr. Jones have evidence to support, and I, if it's appropriate, I'll call Mr. Schleizer to the stand.

THE COURT:  I don't know if it's appropriate, you get to call him, though.

MS. DRIVER:  From a timing perspective, Your Honor.

THE COURT:  Okay.  No, no, no.  I'm here all day.  So, don't worry about me.

THE COURT:  (indiscernible) the witness

EXHIBIT 8

(indiscernible).  Please raise your right hand.  Do you swear to tell the truth, the whole truth and nothing but the truth?

MR. SCHLEIZER:  Yes.

THE COURT:  Okay.  Let the record reflect that the Witness has been properly sworn in.  Sir, if you can state your name for the record and spell your last name.

MR. SCHLEIZER:  My name is Robert Schleizer.  Last name is spelled S-C-H-L-E-I-Z-E-R.

THE COURT:  Thank you very much.  You may proceed whenever you're ready, counsel.

MS. DRIVER:  Thank you, Your Honor.

DIRECT EXAMINATION OF ROBERT SCHLEIZER

BY MS. DRIVER:

Q    Mr. Schleizer, where are you currently employed, or who do you conduct your business through?

A    I have a firm that's called BlackBriar Advisors, LLC.

Q    And what do you do with BlackBriar Advisors?

A    I'm the managing partner and owner.  I manage the professionals in the firm.

Q    And what is BlackBriar Advisors in the business of doing?

A    The vast majority of our work relates to restructuring and bankruptcy and liquidation work.

Q    And in that context, are you familiar with serving as a

EXHIBIT 8

fiduciary for different companies?

A    Yes.

Q    How did you come to meet -- well, strike that.  What is your, what is BlackBriar's current role in Mr. Jones's case?

A    We're currently serving as his financial advisor.

Q    And I probably should say, as immediately prior to the conversion order that was entered while we were all at lunch, what was BlackBriar Advisors' role with Mr. Jones's case.

A    We were financial advisor.

Q    How did you, when did you first meet Alex?

A    On December 6, 2022.  We met him at Shelby Jordan's office, along with you, for the first introductory meeting.

Q    And so, prior to that, you'd done no work for Mr. Jones, his family, his companies, or anything of the sort?

A    No.

Q    In the course of BlackBriar's engagement as financial advisors for Mr. Jones during his chapter 11 case, did you have an opportunity to seek information from Mr. Jones related to his financial documentation and history?

A    Yes, we spent a lot of time with Mr. Jones.  As I testified earlier, the condition of the records were, was not great and it took an extended amount of time to gather information.

Q    How did you characterize the level of Mr. Jones's

EXHIBIT 8

cooperation with your team?

A    He was an open book to us.  Everything we asked him, if he knew the answer, he pointed us in the direction and he gave us access to all of the people he'd been working with, both current and previous, to try to get information pulled together.

Q    And so, in any point, did you get the feeling that he was, the state of the records was probably due more … why would you say the records were in disarray?

A    Because there weren't any.  He had never prepared a financial statement.  He had a number of different people involved over a period of time and a lot of different entities.  And frankly, just no organized approach to keeping financial records.

Q    And has he become, do you think that his financial records through the course of the chapter 11 bankruptcy, have gotten in better shape?

A    Yes, much better.

Q    And do you, has he been cooperative and appreciative of those efforts, in your opinion?

A    He's turned over everything to us and just said just do what you have to do.  And anything he does, any source of revenue, any of its expenses, we've got access to.  And everything's been recorded.

Q    And were there recommendations by your office related

EXHIBIT 8

to containing expenditures during Mr. Jones's case?

A    Yes.  Prior to the bankruptcy filing, he was spending well into six figures a month.  His personal living expenses, excluding the prenuptial agreement, had been averaging less than 50,000 a month over the last year, plus.

Q    Did you have occasion to review a document filed by the Connecticut Plaintiffs that alleged that he had been spending in excess of $83,000 a month?

MR. PATTISON:  Objection, Your Honor.  Relevance.

THE COURT:  What is the relevance, counsel?

MS. DRIVER:  This is just more to go to the allegations that Mr. Jones is not credible to stay in any role with FSS.  I'll move on if you like.

THE COURT:  Please

BY MS. DRIVER:

Q    What is your understanding -- strike that.  You understand that one of the issues that we are deciding here, that the Judge is going to be deciding here this afternoon, is whether the FSS case will be dismissed or converted.

A    Yes.

Q    And what is your understanding of who would have control of FSS's bank accounts if this case is dismissed?

MR. PATTISON:  Objection, Your Honor.  Relevance.

THE COURT:  Overruled.

BY MS. DRIVER:

EXHIBIT 8

A    I've discussed that with Mr. Jones and he has agreed that if --

MS. CATMULL:  Objection, Your Honor.  This is hearsay.  What Mr. Jones did or did not say is not an opposing party.  This is hearsay.  They can call Mr. Jones, he's here.

THE COURT:  Your response?

MS. DRIVER:  Your Honor, it's not for the truth of the matter asserted, it's just what Mr. Schleizer understands from his conversations with Mr. Jones.

MS. CATMULL:  Your Honor, I have a relevance objection.  I don't know why, how probative his understanding is of if it's not being asserted for the truth.

THE COURT:  I agree.

BY MS. DRIVER:

Q    Did you have occasion to work through what would be a hypothetical winddown budget in the event of a dismissal?

A    Mr. Jones and I worked on a potential winddown budget under the scenario that he would continue to work with the chapter 7 trustee in his personal case, to liquidate the assets and maximize the value.  Based on that budget, we projected that revenue over a 60- to 90-day period would somewhere between $4 and $6 million.

Q    And so, with Mr. Jones continuing to work at FSS during

EXHIBIT 8

a period after dismissal -- let me just make sure I understand the realizable revenue from selling the remaining inventory would be between $4 and $6 million?

A    Yes.

Q    Did you have an opportunity to review the liquidation plan that the CRS circulated yesterday?

A    I received it yesterday, yes.

Q    And would the liquidation analysis -- strike that -- would the budget that you were able to put together, exceed the recovery to creditors that is under that liquidation budget that the CRS circulated?

A    Yes.

Q    Does your winddown budget anticipate FSS employees and staff to help?

A    Yes, they did.

Q    And is it your understanding that the crew and staff would actually be available to help?

MS. CATMULL:  Objection, leading, Your Honor.

THE COURT:  Sustained.

BY MS. DRIVER:

Q    Do you have an understanding as to whether the employees and crew at FSS necessary to effectuate that winddown plan would be available to do that?

A    I believe so, yes.

MS. DRIVER:  Your Honor, I'll pass the witness.

EXHIBIT 8

THE COURT:  Thank you.  Anyone have any cross-examination for this witness?

MR. MOSHENBERG:  (indiscernible).

THE COURT:  That works for me too.

DIRECT EXAMINATION OF ROBERT SCHLEIZER

BY MR. MOSHENBERG:

Q    Thank you for being here Mr. Schleizer.  So, I just wanted to follow up on a couple of things that you were saying a moment ago.  Post dismissal, what would your role be at Free Speech Systems?

A    Mr. Jones has asked if I would manage the cash and help liquidate the assets and wind it down on his behalf.

Q    Oka.  Is there any indication to you that Mr. Jones may continue to stay on at Free Speech systems?

A    He's indicated to me that he would if I was willing to work.

MS. DRIVER:  Objection, Your Honor.  Move to strike, that's hearsay.  Mr. Jones is here, he can testify about that.

THE COURT:  It's not an out-of-the-court statement offered for the truth of the matter asserted.  He's expressing his understanding.

MS. DRIVER:  But Your Honor, if I may, based on what -- may I take him on voir dire, Your Honor?

THE COURT:  No.

EXHIBIT 8

MS. DRIVER:  Thank you, Your Honor.

MR. MOSHENBERG:  You can answer, sir.

THE COURT:  In other words, you can express your understanding, but you can't tell me anything that Mr. Jones may have told you, but you can have an understanding about it.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Now, if anyone were to ask you a further question, like and what is that understanding based on, someone is going to raise and objection and I'm not going to let you give me that answer.  Okay?

THE WITNESS:  Would you ask the question again, please.

BY MR. MOSHENBERG:

Q    Yeah.  Okay, so what is your understanding about whether Jones, Alex Jones, will continue to work at Free Speech Systems post dismissal?

A    My understanding is that he is willing to assist in the winddown.

Q    Okay.  And outside of the winddown, would he -- do you have an understanding one way or the other about whether he would continue to operate FS, Free Speech Systems, continue to work at Free Speech Systems?

MS. CATMULL:  Your Honor, same objection about calls for hearsay, but take a running so I don't keep

EXHIBIT 8

disrupting, if the Court will allow a running objection.

MR. MOSHENBERG: Your Honor, I just (indiscernible) based on foundation.

THE COURT: I like foundation. It's not an out-of-the-court statement. He has made no statements. But it is, you could ask more foundation.

MR. MOSHENBERG: Understood.

MS. DRIVER: Thank you, Your Honor.

BY MR. MOSHENBERG:

Q    Based on your involvement with Free Speech Systems, and in your role in the bankruptcy for Alex Jones' estate, do you have any basis, one way or the other, for understanding about Alex Jones's future at Free Speech Systems?

A    I' not sure I understand your question. Please ask it again.

THE COURT: That made two of us.

BY MR. MOSHENBERG:

Q    Well, given your involvement in all of this, do you know, one way or the other -- and don't tell me yet what it is, I'll follow up -- but do you know, one way or the other, about whether Alex Jones may continue to work at Free Speech Systems?

A    If … my understanding is he would to assist, to maximize value.

Q    Okay. And that might include -- do you know, one way

EXHIBIT 8

or the other, whether that includes continuing to work at Free Speech Systems?

A    I guess, to be a little bit more clear, are you talking for a period of time or …?

Q    Yeah, for an extended period of time, or ongoing?

A    If, on a going concern basis, I don't know the answer to that question.

Q    Okay.  Now, I want to better understand what your role would be in a post-Free Speech Systems dismissal.  You were talking about it earlier, about the controls you would have over the company, versus the controls Alex Jones would have.  Can you illuminate that for us?

A    The role I'm playing in his, played in his chapter 11 case, is essentially what he's asked me to do on behalf of FSS, if it does winddown and liquidate, which would be to manage and control he cash, to sell the assets to try to maximize the value, and then to manage the administrative part of the business as it goes through its winddown.

Q    Is there anyone else who is going to be involved in managing the financials of Free Speech Systems, do you know?

A    I have not had discussions with any of the existing employees; that would be the first place we'd look.  And if we were, they were not willing to stay on, then we would bring on additional help.

Q    What about Mr. Jeffrey Schultze?  What's his role at

EXHIBIT 8

Free Speech Systems?

A    I have not talked to Mr. Schultze about it.

Q    Okay.  My understanding was that he would be part of dual signing check writing authority for checks over $25,000.

MS. CATMULL:  Fact not in evidence, calls for hearsay.

THE COURT:  I agree there.

MR. MOSHENBERG:  Okay.

BY MR. MOSHENBERG:

Q    Do you know, one way or the other, about whether he has, going to be part of some sort of dual check signing authority?

A    He currently has check signing authority at the company now.  If he was willing to stay on, he would be an ideal candidate to help.

Q    Understood, okay.

MR. MOSHENBERG:  All right, I'll pass, Your Honor.

THE COURT:  Anyone else who supports the relief have any question?  Any cross-examination?

MR. PATTISON:  I have a couple of questions.

THE COURT:  Okay.  Take your time.

CROSS EXAMINATION OF ROBERT SCHLEIZER

BY MR. PATTISON:

Q    Good afternoon, Mr. Schleizer.  I believe there's a

EXHIBIT 8

binder there, of exhibits that Mr. Jones had introduced. And could I just ask you to take a look at that binder and let me know if you see the budget that you testified about in there?

A    Which specific exhibit are you referring to?

Q    Well, could you let me know if the budget that you referenced to in your testimony has been submitted in this exhibit?

A    It's not submitted.

Q    It is not?  And has that been produced to the Connecticut Plaintiffs?

A    No.

MR. PATTISON:  Your Honor, I'd move to strike all testimony about the budget and financial analysis on that basis.  It's a document that has not been produced to us. The best evidence rule, Your Honor.  He's testifying about a budget.  We don't have the budget itself.

THE COURT:  I'm just listening to the response.

MS. DRIVER:  Your Honor, there is the budget that has been worked on, and it is a work in progress.  There is no budget.  I mean, he has spoke about the things that he believes.

THE COURT:  I'm going to take it as to what he understood, but there is no document.  To the extent somebody's referring to a budget, there is no budget that I

EXHIBIT 8

can review or take confidence in numbers in, if that's what you're looking for.

MR. PATTISON:  And in no document or analysis either, Your Honor, so …

THE COURT:  I agree.

MR. PATTISON:  We'd still move to strike all testimony on the basis that there's some document somewhere that presumably records this, but it hasn't been provided to us, or the Court.

THE COURT:  I'll grant it.

MR. PATTISON:  Thank you, Your Honor.

BY MR. PATTISON:

Q    Mr. Schleizer, you referenced various controls that would be in place in the event of a dismissal, including your control over bank accounts.  Why do you need those controls?

A    I'm not sure I understand your question.

Q    I believe in your testimony you referenced -- well, why not just give bank account authority over to Mr. Jones, in the event that the FSS case is dismissed?

A    Mr. Jones, it's my understanding Mr. Jones would prefer to have me do it.  He does not have control over his bank account other than just being able to charge amounts to a debit card.  So, all disbursements I've done for him, he wanted me to play that same role on FSS.  He does not want

EXHIBIT 8

to have authority on bank accounts.

Q    And you testified about Mr. Jones perhaps being willing to remain on for some period of time.  If there's a chapter 7 trustee in Mr. Jones' case, telling Mr. Jones what he can and cannot do, do you believe he's willing to listen to that?

A    I believe … well, he's been very cooperative throughout this entire process.  If it's to the benefit of, to maximize the value, as well as to help his employees make a transition, I believe he would.

Q    Can you say for sure that Mr. Jones is going to abide by the instructions of a chapter 7 trustee in the Jones case?

A    Yes, I do believe that.

Q    And you're willing to personally vouch for Mr. Jones on that?

A    I just said I, yes, I believe he would do that.

Q    You were the estate-retained professional for Mr. Jones, correct?

A    Excuse me?

Q    You were an estate-retained professional in the Jones case, right?

A    Correct.

Q    You were not separately retained in the FSS case, right?

EXHIBIT 8

A    No.

Q    Are you aware of claims or causes of action between the FSS estates and the Jones estates?

A    I'm aware of them, I don't know the context and I can't express an opinion on them.

Q    And what are you aware of about them?

A    Very little, just to know if there's adversary proceedings and alleged claims.

        MR. PATTISON:  I'll pass the witness, Your Honor.

        THE COURT:  Thank you.  Any further redirect?  Oh, I apologize, Ms. Catmull.

        CROSS-EXAMINATION OF ROBERT SCHLEIZER

BY MS. CATMULL:

Q    You met with Mr. Magill yesterday, right?

A    Yes.

Q    You guys have weekly meetings, right?

A    Yes.

Q    And Mr. Magill showed you the liquidating budget that he discussed here on the stand, right?

A    That's correct.

Q    And during that meeting, you didn't say one thing to disabuse him that that budget didn't make sense, did you?

A    I said I understood his budget.  When I asked him if he had talked to employees, much as he testified today, he indicated that he had not.  And the basis for their sales

EXHIBIT 8

was on the assumption that Alex was not going to be around. I did not challenge his numbers.

Q    Yes or no, you did, yes or no, you did not challenge that budget in any manner during the meeting yesterday?

A    I did not.

Q    So, if Mr. Jones, Alex Jones, tells you what to do with the cash in this -- if the case is dismissed, and you continue on as financial advisor, if Mr. Jones tells you what to do with the FSS cash, do you have the authority to say no?

A    Yes.  I wouldn't do it without that.

Q    Under what circumstances would you say no?

A    If there was a request to do something that was not in the best interest of the estate.

Q    Anything more specific than that?

A    You're asking me to speculate.

Q    Well, there is no estate when the case has been dismissed.  Maybe I understood your testimony.  Are you going to -- did you testify to this Court -- I'm sorry if I got it wrong -- that you're going to be the financial advisor if this case gets dismissed?

A    Yes.

Q    Okay.  Financial advisor to FSS?

A    Yes.

Q    Okay.  And continue on as a financial advisor to Mr.

EXHIBIT 8

Jones?

A    Not in this chapter 7, no.

Q    How about outside the chapter 7, a financial advisor to Mr. Jones?

A    I have no arrangements.  My engagement is limited to what I'm doing within the estate right now.

Q    And Mr. Jones doesn't always do what you say, does he?

A    Can you be specific?

Q    Yes.  Ever, has he ever not done what you said?

A    If you've got a specific instance I'm happy to address it.  He's taken my advice.  He's not done anything that I've told him to do that would have been a problem in the bankruptcy proceeding.

Q    Do you monitor his broadcasts?

A    No, I do not.

Q    Okay, so you have no idea what he's ever saying o his broadcasts?

A    I've listened to a few, but I don't, I don't direct what he does on the production side.

Q    Until today, you had not heard, until today you had heard that he's discussing Sandy Hook as between June 1, 2024 and today, on his broadcast?

A    That's not true.  I was aware of it.

Q    Okay.  Did you tell him to stop?

A    No.

EXHIBIT 8

Q    There were a lot of, there was a lot of testimony based on your understanding about what Mr. Jones will and will not do in the event of a dismissal.  That's based on what Mr. Jones told you, right?

A    We had multiple meetings.  We discussed it, yes.

MS. CATMULL:  Your Honor, I move to strike his testimony about his understandings it was based on what Mr. Jones told him.  That's hearsay.

MS. DRIVER:  His understanding can be based upon lots of different things, Your Honor.  And he's not introducing the statement.

THE COURT:  I'm overruling that.

MS. CATMULL:  Thank you, Your Honor.

BY MS. CATMULL:

Q    So, this budget that you just told the Court about, that's a post-dismissal liquidating budget?

THE COURT:  I've actually struck everything about the budget.

MS. CATMULL:  Sorry, Your Honor, I withdraw my question.

THE COURT:  Okay.

MS. CATMULL:  Sorry, Your Honor.

BY MS. CATMULL:

Q    You have done zero analysis about whether or not PQPR has a deposit account control agreement with Free Speech,

EXHIBIT 8

right?

A    I don't work for Free Speech; I work for Mr. Jones.

Q    That doesn't answer my question, sir.

A    No, I've done no work on that at all.

Q    You've done zero analysis, true?

A    That's correct.

Q    Have you ever heard of a deposit account control agreement?

A    Yes.

Q    In the context of the Free Speech case?

A    No.

Q    So, until today, you were unaware that there's no deposit account control agreement between Free Speech and PQPR.  Is that your testimony to the Court?

        MS. DRIVER:  I'm going to object; facts not in evidence.

        THE COURT:  Overruled.  You can answer.

BY MS. CATMULL:

A    I'm not aware of what the financial arrangement is with Free Speech's bank accounts.

Q    My question is, is today the first day you've heard an allegation that there is no deposit account control agreement between Free Speech and PQPR?

A    Yes.

Q    The Jones teams has full access to the Free Speech

EXHIBIT 8

Systems QuickBooks, right?

A    Yes.

Q    I'll speak up, sorry.  And Blake, over at Free Speech, sends weekly inventory reports, right?

A    We get a weekly sale report.  I don't get a weekly inventory report.  I requested that and I've gotten reports the last few days.

Q    Those are the first reports you ever got from the Free Speech team, is that your testimony?

A    No.  I've gotten reports in the past when I've asked for them.

MS. CATMULL:  I pass the witness, Your Honor.

THE COURT:  Thank you.  Any redirect?

MS. DRIVER:  Your Honor, no redirect.

THE COURT:  Thank you very much for your time.  Any other witnesses, counsel?

MS. DRIVER:  Your Honor, Mr. Jones would close evidence in his case, move to close case, evidence in his case.

THE COURT:  Okay.  Any other party wish to introduce evidence at this time?  PQPR, I guess I … sorry, Mr. Lemmon, I just want … going around the table.

MR. LEMMON:  Thank you, Your Honor.  PQPR is offering no evidence at this point.

THE COURT:  Okay.  Is it fair, can I close the

EXHIBIT 8

evidentiary record?

MR. LEMMON:  Yes, Your Honor.

THE COURT:  Okay, let's proceed to closing argument then.

MR. KEMPLER:  Thank you, Your Honor, Kyle Kempler, Paul Weiss, on behalf of the Connecticut Plaintiffs.  I may not be brief, but I'll do my best.

The question today before the Court, is whether it's conversion or dismissal of the FSS case.  I don't think there's any open dispute today cause exists under Section 1112(b).  The only question is what is the right remedy.  But Congress says, the Bankruptcy Code says, is that the Court is required to make that determination based on what is in the best interests of creditors and the estate.  Given the record that is before the Court today, we submit that conversion is very clearly the best option for the estate.  Conversion is supported by the Debtor itself, Free Speech Systems, who has an independent CRO.  It is supported by the Subchapter 5 Trustee, and the recommendation and report that Ms. Hazelton filed yesterday.  It is supported by creditors holding 95 percent of the liquidated claims against FSS.  It's even supported by PQPR.  It is opposed by Mr. Jones and the Texas Plaintiffs.

I want to start with a couple of points that I think are not in dispute, and that are clear from the

EXHIBIT 8

evidence you've heard today.  First, the Jones case has already been converted to a chapter 7.  Equity interest that he owns in FSS were a non-exempt asset; that's on his own schedules.  And, therefore, Mr. Jones has no continuing economic interest in FSS.

It's also true that Mr. Jones argues that notwithstanding that that asset was a non-exempt asset that belongs to his own chapter 7 estate, he believes he should continue to have managerial control over FSS.  That is the position that he is asserting in his pleadings that you've heard today.

It is also true that Mr. Jones has said that he will not work for either the CRO or a chapter 7 trustee. I'd point, Your Honor, if I could, to Mr. Jones's own pleading, Docket Number 943, paragraph 10, quote, "Jones is unwilling to commit to work for an unknown chapter 7 trustee under hypothetical terms," end quote.

Now, there he's talking about a chapter 7 trustee at the FSS case.  But I ask, what's the difference?  There's a chapter 7 trustee right now that owns the equity in FSS. What Jones is really saying is that he wants to be able to continue to operate FSS without any oversight.  And if there is oversight, if there is, quote, "an unknown chapter 7 trustee," end quote, he will not work there.  This follows public statements that Mr. Jones has made over the last

EXHIBIT 8

couple of weeks, where he said he is getting his company back today.

I'd point Your Honor to Exhibit 15, page 7, quote, "the CRO is about to be removed on the 14th, and I'm about to be back in control of my company, in the interim, for the new assault," end quot.

It is also undisputed that as of today, Free Speech has approximately $6 million of cash and cash equivalence under the control of the CRO, Mr. Magill.  It's also true that the only budget that has been submitted in the evidence, the only evidence before this Court, is that there is about $1.5 million of remaining inventory at Free Speech, which with a thinned down winddown budget of approximately $900,000 over the next four weeks, can generate about $650,000 of excess value for Free Speech. You've heard the CRO testify that he believes that value can be realized without Mr. Jones.  So, if you take those assumptions, the $6 million becomes $6.6 million that could be paid to creditors.

It's also not really in dispute that nobody is here saying that Mr. Jones should have full control of Free Speech Systems.  Nobody is saying hand the entire keys over to him and let him do what he wants.  The Texas Plaintiffs say it's critical that Mr. Schleizer have control over the checkbook.  Jones himself, in his dismissal order, offers

EXHIBIT 8

that as a concession.  Why?  Why is that necessary?  Why is it necessary that only Jeff Schultze can sign checks over $25,000?  I think the answer is in the Subchapter 5 Trustee's initial report a year ago.  Mr. Jones has a long history of cutting deals with his family and his friends, where value leaks away from FSS.

It's also undisputed that Jones has been actively encouraging his listeners to stop buying products from FSS.  Instead, he's been asking them to support Dr. Jones' Naturals, his dad's company, to support his family.

I'd point Your Honor to Exhibit 15, page 24, quote, Mr. Jones says, "I've told listeners, hey, Infowars is not the big thing to support right now.  They're great products, you need them.  I'm saying go to DrJonesNaturals.com.  That's a separate company, a separate operation.  That's what you should be supporting," end quote.

Exhibit 16, page 18, quote -- this is again, a broadcast to his audience, an audience of FSS listeners on an FSS broadcast -- quote, "I'll tell you, Infowars is overrun.  Supporting Infowars stores, it's done.  It's overtaken."

I'd encourage Your Honor to read -- I'm sure you already have -- the Subchapter 5 Trustee's report, at Docket Number 948.  There's additional quotations there.  I'd point

**EXHIBIT 8**

Your Honor to paragraph 17, quote, "There are no assets other than products that are worthless if I don't promote them. Our listeners will never buy those from you if I'm gone. No matter how much they love them, and the rest of the story is I will not sell out or be compromised or stay on air here as a puppet. So, there's that. And I will not work with the CRO. They try and keep him on as the liquidator."

One more, Your Honor. They go on for a very long time. Paragraph 25, quote, "The place to go is DrJonesNatural.com. Ready to ship. They can shut down Infowars Friday or next week, but DrJonesNaturals.com, still standing." There's no dispute about what's been said, and there's no serious dispute about what's intended.

Lastly, Free Speech System made $4 million of payments during the 90-day preference period. They made an additional $3 million of payments during the one-year insider preference period. Mr. Magill said that that was an important consideration, when he consider between dismissal and conversion. There's also no dispute that there's no account control agreement between Free Speech and PQPR, and that's important as well, and I'll come to that.

Your Honor, it is against this backdrop of facts that are not in dispute, that Jones seeks dismissal rather than conversion of a case, in which he has no economic

**EXHIBIT 8**

interest in.  I told you earlier that I think those facts are important, but I think the law is just as important.  I won't repeat myself, but there are no cases that we are aware of, where any one of those facts I just mentioned -- significant remaining value, significant avoidance claims, significant allegations of debtor misconduct -- any one of those three, where a court has ordered dismissal versus conversion, and where you have all three, we submit that the answer here is quite clear.  Again, the only case cited by either Jones or the Texas Plaintiffs in their pleadings, that actually led to dismissal, was In Re Peak Serum, and that's because Court was allowing the debtor to refile the case as a subchapter 5, because the case came up in 2020 as the statute was enacted.

We've cited many cases in our motion that show where there is value to distribute, where there's debtor mis conduct, and where there are viable avoidance claims that courts routinely favor conversion.  Let me address those factors very briefly -- probably not so briefly, Your Honor.

First, equality of distribution.  And I think that's the most important issue today.  I think Mr. Magill has done a pretty terrific job here, under very difficult circumstances.  When Free Speech filed, it filed on fumes. It had less than a $1 million of cash, was burdened by bad contracts that Jones had with his family and friends that

EXHIBIT 8

siphoned money away from the FSS. Under the leadership of Mr. Magill, the ship has been somewhat righted. It now sits on $6 million of cash. What Mr. Jones asks you to do today is to sit at a racetrack with a starter gun, and say, off to the races. Texas Plaintiffs, Connecticut Plaintiffs. Let's see how you do. It could be a winner-take-all contest. The case law could not be clearer, Your Honor, that where there is significant value, equality of distribution is paramount.

I would point Your Honor, in particular, to the Fourth Circuit Court of Appeals decision in the Superior Siding case, at 14 F.3d, where the Court of Appeals said that the risk that one creditor would take all, quote, "Is precisely the kind of unequal access to assets which the bankruptcy laws can tend to forestall."

In the Fifth Circuit, I'd point Your Honor to the Fleetstar case, at 614 B.R. 767, for the very first factor the Court says that courts should look at when making this decision between conversion and dismissal, is, quote, "Whether equality of distribution would be better served by conversion rather than dismissal."

I'd also ask Your Honor to listen to the other side and see what their response is to this. Why is this the fair outcome? Why is it in the best interest of the estate to create a system where one creditor would get more than others?

**EXHIBIT 8**

THE COURT:  How do I know that's the case?

MR. KEMPLER:  That they will get --

THE COURT:  How do I know that Connecticut is not going to have, you know, in other words, you're saying Connecticut versus Texas.  How do I know who ends up first?  There's still a 547 action in front of me here.  There's still multiple appeals that have to work their way through the Connecticut courts and the Texas courts.  How do I know that Connecticut is going to be on the other side of it?

MR. KEMPLER:  You don't know, Your Honor.  What would happen at a dismissal is, I'm going to go home tonight and I'm going to start trying to figure out what can we do to collect first.  They're going to do the same thing.  Nobody knows, sitting here today, who's going to win that race.  I don't know it.  I don't think you can know it.  I think we can take people at their word.  I think if you read the Texas Plaintiffs' opposition, they say that they want to begin enforcing remedies, quote, "Immediately."

I think the only answer that I've heard to this concern is from the Texas Plaintiffs who say, well, everybody here is very well represented.  I don't think that's an answer.  I think that's saying it's a race, but it's a fair race, which is true.  But it's still a race.  We reject, the Connecticut families reject, a winner-take-all mentality.  We think the right answer here is to ensure that

**EXHIBIT 8**

all of the creditors who have waited over a decade for some measure of accountability, that they be treated equally according to their claims.

Let me move onto the second reason that conversion is appropriate, and that's to preserve value and to prevent debtor misconduct. Again, I would urge the Court to look at the Subchapter 5 Trustee's report, which catalogs in fairly good detail, the recent conduct of Jones. It says repeatedly that, quote, "Jones's increasingly toxic …," excuse me, that Jones's conduct has become, quote, "Increasingly toxic and damaging to the FSS estate." Again, that's the conclusion of the Trustee, a Trustee that I have not gotten along with in this case on every issue, Your Honor. Although I've enjoyed working with Ms. Freeman and Ms. Hazelton, we've not always seen eye-to-eye. I think that they are acting as a true, independent fiduciary here, in giving the Court their best recommendation.

I think there's a couple of other things to keep in mind here. I don't think we should dismiss the possibility that if the case is dismissed and Mr. Jones resumes operational control, that he can cause additional damage to Free Speech.

THE COURT: Let me ask you a question. If the case is converted, who do you think manages the day-to-day operations of the debtor?

EXHIBIT 8

MR. KEMPLER: I think it should be a chapter 7 trustee working with --

THE COURT: Under what section of the Code, would the chapter 7 trustee have managerial authority to control the debtors (indiscernible), just day one --

MR. KEMPLER: Well, again --

THE COURT: -- when the trustee is appointed, what section of the code says that the trustee has authority to manage the day-to-day operation of the debtor? In other words, we're assuming facts, and I'm just trying to find out, in law, where those facts are grounded.

MR. KEMPLER: I think …

THE COURT: The trustee would have to come in under Section 721 to ask for authority to manage the day-to-day operations of the debtor, but only in furtherance of liquidation. So, it's not guaranteed that the, that a chapter 7 trustee, if I convert today, would run the estate.

MR. KEMPLER: It's not guaranteed, Your Honor.

THE COURT: In other words, we're assuming that it is, right?

MR. KEMPLER: Well, I'm -- there is evidence in the record today of a winddown budget, that the CRO has testified is feasible.

THE COURT: Right.

MR. KEMPLER: There is a chapter 7 trustee that

EXHIBIT 8

already owns 100 percent of the equity of that business, as of right now.

THE COURT:  Right.  I'm just talking about management.  I think you were talking about who's going to run the day-to-day operations.  I don't think that changes.  In other words, I don't think the CRO ever could really manage the day-to-day operations either; he had to consult with Mr. Jones.  That's what I ordered.  And certainly, he had authority to make decisions in support of reorg, but now I wonder what his authority would be if the case converted, whether he would still even be appointed in a chapter 7 case, indicating, after he indicated, he didn't even want to do it.

MR. KEMPLER:  I think there are individuals at Free Speech who would be reporting to a chapter 7 trustee.  I think the question before you right now, conversion or dismissal -- again, if you dismiss it, I think you have the same open question, and I think the Debtor has filed a motion saying what happens in that situation?

THE COURT:  I know.  I do, I do.

MR. KEMPLER:  Who do they report to?

THE COURT:  No, no, no, I agree, I agree.

MR. KEMPLER:  So, I don't know if there's a perfect answer, and I think it's a … it's, you know, it's a hard question, Your Honor.  I think the practical answer is

EXHIBIT 8

to have a chapter 7 trustee working together with Mr. Magill, if he will stay, or Mr. Schultze; somebody who has a business sense, and with a kind of scaled-down workforce.  I think that is the best of several not-great options.

THE COURT:  Thank you.

MR. KEMPLER:  Again, I think the record here, Your Honor, is pretty clear that Mr. Jones, the person who is asking to regain control, has been less than a good fiduciary over the past few weeks.  And we cited a number of cases in our motion.  I just pointed Your Honor to Judge Rodriguez's decision in the Ozcelebi case; the Gaoming Chow case and the Mazzocone case, all of them are cited in our brief, all of those cases involved debtor misconduct.  In fact, the Mazzocone case, which comes out of Eastern District of Pennsylvania, is up on appeal, where there were allegations made that the debtor had been engaged in misconduct that the Bankruptcy Court didn't consider, and the District Court sent it back to have those further determined.

The third issue, Your Honor, is about preserving avoidance claims.  And I think that this is broader than maybe at first blush you might thing.  So, there's a couple of things going on here.  The Debtor's schedules show that there were $3.8 million; $1.7 of that went to PQPR, $1.1 million of that went to the Texas Plaintiffs two days before

EXHIBIT 8

the case filed, $1 million of it went to American Express, and an additional couple of million went to PQPR in the year leading up to it.

If the case is dismissed, those claims go away. There are no state law preference claims. We've cited numerous cases where, again, the presence of avoidance claim favored conversion not dismissal. There's no case that's been cited to you today that states the opposite. In fact, the cases cited by the Texas Plaintiffs, if you look at Fleetstar or MAR Design, they both actually say that the presence of avoidance claims under chapter 5 support conversion, not dismissal. So, you have that, you know, $3 to $6 million of potential causes of action. You heard Mr. Magill say that that was important to him.

There's another set of issues that I think Your Honor should be mindful of. And that's with PQPR. You heard today on several occasions, I think from both Mr. Macgill and Mr. Schleizer, that there is no deposit account control agreement between Free Speech and PQPR. So, that means that there is an unperfected lien on the cash, that a trustee through 544 can avoid.

Now, if you dismiss the case, yes, the Creditors would still have the right to try to avoid those liens as constructive, fraudulent or actual fraudulent transfers. But this is something different. If we were unsuccessful on

EXHIBIT 8

those theories, and the Court said no, I think these were valid liens, then the fact that they are unperfected does not help us as a matter of state law. It is the power of 544, the strong arm powers of the trustee, that would allow us to avoid those liens as unperfected. And that argument goes away if the case is dismissed. That is a potentially very significant argument. Because upon a dismissal, PQPR is still going to assert that it is owed $60 million as a secured creditor, and they're going to do everything they can to prevent Free Speech from paying out the Plaintiffs.

Let me ask another question about what would happen in dismissal. Now, sure, Mr. Schleizer has his thumb on the bank accounts. Mr. Schultze has his thumb on the checkbook. But who gets to write contracts? Who gets to sign contracts? What stops tomorrow, Saturday, what stops Mr. Jones, if you order a dismissal today, from signing that account control agreement with PQPR? What would stop it? Essentially, elevating these claims into a valid lien, putting the Sandy Hook families even further out of reach. There's a lot of talk about making sure that wires out of accounts are under control. But again, if you go back to the original Subchapter 5 Trustee's report in this case, the modus operandi, when Mr. Jones was in control of this business, was entering into deals that were bad for the company; entering into contracts with friends that let value

**EXHIBIT 8**

leave the estate. Nothing would stop that, Your Honor.

Okay, so that's why we think conversion is appropriate. What do the two opposing parties say? Mr. Jones argues that dismissal is in the best interest of the estate, because only he can sell off the remaining inventory. That's wrong. And as a threshold matter, I think Mr. Jones has very little credibility here to be arguing what's in the best interest of creditors. Given the statements that he's said on FSS broadcasts, I think that that should be taken with a pretty big grain of salt. But even if we take his concerns at face value, it's simply not true, it doesn't hold together. There's about $1.5 million of inventory. Mr. Magill has testified that it could be sold off in an orderly fashion, netting $650,000 for the estate. There is no evidence in the record that suggests that it would do better with Mr. Jones. And in fact, Mr. Magill testified that if you keep Mr. Jones in control, expenses will go significantly up. So, even if you can net the higher margin on product sales, Mr. Magill testified that you'll do no better on a net basis.

The value of this remaining inventory, whether it's $600,000 or $1.5 million, it's one-tenth of the value of the cash that sits there in an account today. It's one-tenth of the amount of the preference price. To suggest that we should favor dismissal to preserve that remaining

Case 22-33553 Document 1051-8 Filed in TXSB on 06/24/25 Page 173 of 208

EXHIBIT 8

inventory value, while ignoring the risk to those other, much larger assets, we suggest makes no sense. It also assumes that Mr. Jones will just work for a winddown. But they have not called him today to say that directly.

You heard Mr. Schleizer speculate about what he may or may not have heard, but I point Your Honor just to what Jones says in his own pleadings. He will not work for a chapter 7 trustee. There already is a chapter 7 trustee. So, I think what's really being asked is that that chapter 7 trustee, who's already been appointed about an hour ago, is not going to have any control over FSS, even though it will be the 100 percent owner. And if it does exercise control, we can expect Mr. Jones to walk out the door.

Now, the Texas Plaintiffs also oppose conversion, Your Honor. They make similar arguments that they would only get scraps in a chapter 7, but somehow get much more outside of a chapter 7. That argument doesn't hold together for the same reason it doesn't hold together for Mr. Jones. But I think it's important to note that you cannot reconcile the statement from the Texas Plaintiffs that they want to begin immediately enforcing remedies against FSS with their desire that FSS continue to operate -- I'm not sure what they're proposing, maybe indefinitely. What they're saying is, FSS, every time you earn a dollar, I'm going to try to take it from you, I'm going to immediately exercise

**EXHIBIT 8**

remedies.  But somehow, the business is going to continue operating.

Those two things do not square if they're going to be enforcing -- I think the Texas Plaintiffs have $50 million of judgments.  And if we're going to be enforcing $1 billion of judgments, it's going to be very difficult for FSS to continue operating.  So, the only way they would do better in a dismissal versus a conversion, is if they can get a higher share of the $6.6 million that's already been wrangled by Mr. Magill.  And again, what else could they mean when they say that they want to exercise remedies immediately?

Now, Your Honor, what's really going on here, is a concern about the preference claim.  Texas Plaintiffs received $1 million from Free Speech system two days before Free Speech filed.  I'd point you to their opposition in paragraph 14, because I think they're being quite candid here.  They say, quote, "Dismissal especially enhances the Texas Plaintiffs' rights," end quote.  And they say that because it would immunize them from preference claims.

In substance, what they are asking you to do, is to give them special treatment to protect them from those claims.  And I don't begrudge them for doing that, Your Honor.  I don't relish the opportunity to be up here having a fight between the Texas and the Connecticut Plaintiffs.  I

EXHIBIT 8

understand that they are motivated to keep the $1 million that they already received.  But Section 1112(b) requires the very opposite analysis.  It doesn't ask what is better for some creditors; it asks, what is better for all creditors?  What is better for the estate?  Case law could not be clearer that where there are preference claims, you don't yield to the desire of a few who got a preference; you yield to the desire of those who did not get a preference. I am confident that if the Texas Plaintiffs stood in my client's shoes, having never received a single penny from Free Speech or from Jones, they would not be supporting dismissal.

Your Honor, conversion, we think, is by far the superior, safer, value maximizing path.  The two parties opposing it have their own agendas.  Conversion is supported by the Debtor, by the Subchapter 5 Trustee, by 95 percent of the creditors, by PQPR.  I know they're eager in their pleadings to say what the Court said on May 21st, and I'm not oblivious to what the Court said.  You've said --

THE COURT:  What did I say?

MR. KEMPLER:  You said -- it's he very first line of the Texas Plaintiffs' opposition.  You said that you're not converting the FSS case on June 14th; it was confirmation or dismissal.

Your Honor, I don't think that you had made a

EXHIBIT 8

decision --

THE COURT:  No, I had not.

MR. KEMPLER:  -- made a sentence on.  I think you said, "People can convince me otherwise."  I hope I've done that.  And I also hope that events that have happened since May 21st -- Jones's conduct, the support of the Creditors, the Debtor and the Trustee, will change how the Court looks at that.

Your Honor, in closing, the Connecticut Plaintiffs never received a penny; have been stayed for two years from collecting.  Mr. Magill has said that in four weeks' time, there can be $6.6 million in an account.  The prospect that Free Speech Systems will be returned to the control of Alex Jones, in light of his recent statements and conduct, simply so that the Sandy Hook families can fight one another in state court and see who has the best ability to et to that $6 million, is the worst possible outcome in these cases.

We urge the Court to please convert the FSS case.

THE COURT:  Thank you.

MR. KEMPLER:  Thank you.

MS. CATMULL:  Thank you, Your Honor.  Just a couple of points.  Today we heard and -- oh, I have a note to myself to remember to say this – thank you so much to the Court and to all the professionals for giving us this time and for making it go as smoothly as it did.

EXHIBIT 8

We heard today, through Mr. Schleizer, that this is the first time he's heard about the DACA, deposit account control agreement issue.  He remembers the manager of FSS.  So, in my mind that's significant.  Why?  For the reasons Mr. Kempler said; there is 544 avoidance for unperfected claims in bankruptcy, and not outside bankruptcy.  I only got here in March of 2024.  I don't know why that hasn't come up sooner, but it didn't, and it's a big issue, because they're asserting a lien against all the cash.

Secondly, I -- I'm always surprised by stuff I shouldn't be surprised by -- but one thing that surprised me in the presentation by folks wanting dismissal -- I was glad to hear it -- was, I think, was they're, they're doing a liquidating budget too.  It's just like a competition of the budgets.  Well, the only person who's going to make that call, if folks supported conversion have their way, is a trustee. I mean it's just math.  But it does, but it does make me think, well, why dual, by bifurcate the proceedings?  If Mr. Jones's case is in a 7, why would we bifurcate a liquidation into state court?  Just in my mind, it would be much more efficient to do it all in the same court.

And then my last comment is, I beg the Court, I beg the Court, to give the chief restructuring officer direction about who to hand bank account control to in the case of a dismissal.  I also beg the Court to indicate

EXHIBIT 8

exactly when Mr. -- the CRO's responsibilities end.  And if they don't end, before they end, the degree to which employees and securities staff, and IT, can rely on the word, the instructions of the CRO, as opposed to Mr. Jones, just to preserve status quo.  I could not emphasize to you how much I think that's important.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. MOSHENBERG:  Thank you, Judge.  I think we're confusing here today, the standard isn't what is the worst possible thing to do to do Alex Jones to make him suffer; the standard is, what is in the best interest of the Creditors.  All the evidence points to one answer, it's to let FSS continue as an ongoing concern, so that the Creditors can collect.

Now, I have to admit, I'm very surprised about all this race to the courthouse stuff that we've been hearing about today, Judge.  It's the first I've ever heard of it.  Let's remember that the Plaintiffs, the Creditors, didn't start this bankruptcy; Free Speech Systems filed it.  There was a supposed race to the courthouse going on, apparently, before the bankruptcy was ever filed.  Although, it was never a race.  The families worked together in tandem to hold Alex Jones responsible.  The Texas Plaintiffs were giving over their discovery and information they learned in litigation, and trying to help Connecticut succeed.  It was

EXHIBIT 8

a point of pride for the Texas Plaintiffs and their counsel when Connecticut got that gigantic judgment in Connecticut, Your Honor.  I'm very proud of that fact.

In fact, when it comes to collections, together we worked to bring the TUFTA case against Alex Jones and Free Speech Systems and PQPR.  We're both intervenors in that case.  In fact, I gave them a Word copy of our petition and they copied and pasted it, when Connecticut intervened in that litigation.  Everything we've done has been together.  And this talk about race to the courthouse, it's surprising to me, because absolutely, we're going to collect and try to do collection efforts.  But we invite Connecticut to be part of that process.

The real race here is a race against time, because the reality is a chapter 7 is a long process.  We know it's going to take years, Judge.  We're in the intermediate levels of appeals in the cases that have been liquidated.  There's a good chance they're going to go up to the Texas Supreme Court, Connecticut Supreme Court, maybe other courts.  And those are just those cases.  We still have the Fontaine case, the Posner and De La Rosa case, Your Honor.  Those need to be liquidated as well.  And we've got to have litigation against PQPR and all the fraudulent transfer litigations that we've been talking about here today, Your Honor.

EXHIBIT 8

This case is so far from over, and every single day of delay is a denial of justice. Because the reality here, the standard that actually matters, is what can we do to get free speech systems to pay the most possible on the judgement it owes to Texas and Connecticut? Because that's how our system works. That's how our justice system works. We make judgment debtors pay their judgment debts. And that's also how bankruptcy works. The analysis isn't what's bad for Alex Jones; the analysis is, what maximizes the value of the estate? What is in the best interest of the Creditors? And that analysis -- and they glossed over it, Judge, it's primarily a financial question; what's going to get more money into the pockets of the creditors?

We're open to working together with Connecticut. I invite them to do so. I was surprised also to hear them say -- we talked about the Posner and the De La Rosa case, and the Fontaine case, that they owned 95 percent of the debt. They're just ready to ignore the whole part, but we're going to have to liquidate and do more trials, and use up more estate assets litigating those cases; assets that don't … really not enough to go around. We're going to have to pay more administrative professionals, trustees, counsel for trustees.

Judge, you know that the case costs so far for administrative professionals, it's been astronomical. And

**EXHIBIT 8**

every single day, I can't help but think about every single person that has gotten paid on this case, except for the ones who are truly wrong: the Connecticut families and the Texas families.

But I think what's not being said here, Judge, is the reality is, it's not a race against, it's not a race against money. It's not a race against collection. It is a fundamental different view of what justice looks like here. And what we believe is that you can't control Alex Jones. Alex Jones will always be Alex Jones. What you can do, what the law allows, what the Bankruptcy Code allows, is to make Alex Jones and Free Speech Systems pay on the judgments that were rendered by juries. That's what we're able to do, and if he starts a new co, Judge, then we can collect against Alex Jones in the chapter 7 bankruptcy. I think he will continue to operate FSS. The history has shown that. And we're going to collect, hopefully in tandem with Connecticut, in a sustainable way, in a way that maximizes the value. And I need to stress that, Judge, because if the true argument here, because Connecticut, I think they've changed their argument over time. If the true argument were economics here, or maximizing in an organized, pro rata way, the value of the estate, Judge, it would be here, confirming plans in the Jones bankruptcy. It would be here confirming plans in the FSS bankruptcy.

EXHIBIT 8

The reality is, not all the creditors were motivated by that economic reality. I think there's a lot of people who wanted to shut down Alex Jones and try to do everything they can. For what it's worth, the Texas side is ready and prepared to broker a deal that was going to give all the families a fair amount of money, and was also going to secure Alex Jones's silence on ever talking about Sandy Hook. That was what we were accomplishing in this bankruptcy. But it wasn't the goal of all the creditors that non-, there were non-economics involved, and we didn't get a plan done. And that's not a criticism. Chapter 11 says creditors don't have to do a deal; they have a plan with the Debtor.

But we're no longer in plan discission. Right now we're in whether to dismiss or convert. And if non-economic reasons are driving why you don't want to do a deal with Alex Jones, I get it. But the analysis now, about whether to dismiss or convert, is entirely economic. What matters is, are you going to get more money for these creditors selling FSS for scraps? Or are you going to get more collecting from an ongoing business, Judge. Mr. Magill will give us the answer to that question. You heard it yourself, Your Honor.

In fact, they talked a lot about their case law, Connecticut. And one case, for instance, is the Texas case,

EXHIBIT 8

the one in Texas, so I looked at it more closely, it's the Ozcelebi case -- I can't pronounce it, but it's 639 B.R. 365.  I want to be clear, Judge Rodriguez started the analysis about whether to dismiss or convert with this statement:  "On Debtor's own admission, dismissal of this case is unlikely to result in recovery or Debtor's unsecured creditors."  That was the issue.  There's been a lot of spin about what drives these cases, but really, the question is, what is going to get the Creditors paid?  And I think that is an important question to answer when it's a judgment creditor, and when you have a judgment debtor, or a jury has said you violated the law, and you need to pay for it.

And going back to the point, Judge, about how there was a race until Free Speech Systems filed for bankruptcy, I don't think it should be lost on anyone what kind of bankruptcy they filed.  Free Speech Systems sought bankruptcy's protection to continue as an ongoing business and restructure in a way that lets it pay millions of dollars to the families and continue to operate.  It didn't' sign up to get shut down and sold for parts, to fire all its workers, to sell, be sold for scraps, against what its owner wants.  I'm not even sure the authority of Mr. Magill to even say FSS wants to convert, I don't know how that's possible.

And I also looked at subchapter 5 again last

EXHIBIT 8

night, Judge.  I'm not sure how the Trustee has any sort of authority under the Code, to weigh in on whether a case should be dismissed.  There's nothing in there about that. I saw a lot of language about procuring consensual plans.

THE COURT:  They can be heard on any matter before the Court.  I think the Trustee can be heard.

MR. MOSHENBERG:  All right, Judge, that's fair.  I don't think it deserves a lot of weight, is my point.  And I'm not saying they're legally barred, but I don't think that part of their opinion really matters much, because really, their job is to procure a consensual plan.  And that didn't happen here, and it didn't happen not because of Texas, Judge.  We were very motivated to try to get a deal done, and to get Jones and FSS to pay a fair amount.

And the reality is, we're going to continue in a post-dismissal world, to try to collect against Jones in a way that we can hopefully buy off his silence; to use our leverage to collect on him, to get him to stop talking about Sandy Hook, Judge.  That is absolutely a goal of mine, it's been a goal throughout this bankruptcy.  Everyone in this room knows that.  That is one on my list.  I want to get Jones and FSS to pay a fair sum, and to get him to agree to never talk about Sandy Hook again, the reason why we're here.  And the reality is chapter 7 doesn't award us that relief.  We tried to accomplish it through chapter 11; it

EXHIBIT 8

didn't happen.  And that's what I'm going to use my abilities under Texas state law to do.

Now, going back to the preference, again, shocks to hear … shocked to hear about the race to the courthouse talk from Connecticut.  Apparently, they viewed it as a race, and apparently, they also think the right thing to do is to sue the Texas families for preference payments.

Now, they haven't really told you about any of these preference payments and how they've been vetted or any of the due diligence required by the Bankruptcy Code to tell you that those are actual preference claims.  They just threw it out there to help bolster their conversion argument.  There's been no due diligence on it.  I'll just tell you right now, as we said in our brief, you know, that's not a preference claim.  In fact, FSS paid that money as a monetary sanction because the judge was not going to let Alex Jones testify at trial on behalf of himself or Free Speech Systems.  That was a requirement in order for him to actually get to try the case.  That was their key man as part of their key defense, to let him come into trial.  The judge was not going to let him until he paid that sanction. That's (indiscernible) value, that's not a preference.

In all this talk about what are the safeguards, well we have safeguards, first of all, in terms of Bob Schleizer, Jeffrey Schultze.  But more important, we have

EXHIBIT 8

the law, we have the Bankruptcy Code. We have Texas state law, Connecticut law, everything that prohibits fraudulent transfers. There's no reason all of a sudden, just because we're out of bankruptcy, that Alex Jones or Free Speech Systems, can begin to fraudulently transfer assets. In fact, we will do everything we can to make sure he doesn't. We have a TUFTA case pending against him. We're happy to do it in front of you, or in Texas, Your Honor, in Austin State Court. The reality is, we're not going to let fraudulent transfers happen on our watch. We are committed to that.

We're here because we have juries and courts render judgments against Alex Jones and Free Speech Systems. Those judgments are just pieces of paper, unless we get them to pay, and a bankruptcy that's going to be a brand-new bankruptcy under chapter 7, that will take years to come to fruition, or meaningless scraps after administrative professional fees, trustee fees and everything else, I think we are deluding what those judgments stand for, Judge. That's precisely why, after two years of waiting, hoping to get Alex Jones to meaningfully pay in this bankruptcy process and seeing it's not going to happen, we're asking for the ability to go put our destiny in our own hands, work with Connecticut and pursue some sort of collections in a dismissal, Judge, and that's precisely why we agree with the Court on that. Thank you.

EXHIBIT 8

THE COURT:  Thank you.

MR. LEMMON:  Your Honor, may I speak, briefly?

THE COURT:  Please.

MR. LEMMON:  PQPR's position remains the same and that is that we're in favor of conversion unless the order provides the Court would retain jurisdiction.  I'm happy to speak to this deposit account issue, but I think that that's a fight for another day.  I would suggest that that is not a reason to convert rather than to dismiss.  But I'm happy to talk about that.  But it's 4;07 on a Friday afternoon and I'll get into it if the Court wants to, but --

THE COURT:  Is it -- is it fair to say that your client still asserts a lien on cash?

MR. LEMMON:  So, Your Honor, my clients have a security interest in everything, but includes all proceeds, right?

THE COURT:  Yeah.

MR. LEMMON:  And we've had a multitude of cash collateral orders and hearings, each one of which granted us a replacement lien.  The Debtor moved -- I believe -- I was just looking for this and I couldn't find it.  I believe the Debtor moved bank accounts during this case when it got cut off by one of its banks.  I'm not sure.  But for the idea that after all these cash collateral hearings now to come in and say, "Ha ha.  (indiscernible), last week we said we were

EXHIBIT 8

going to shut down if you didn't grant us interim use of cash collateral" and now saying, "You don't have an interest in the cash" is --

THE COURT:  Another (indiscernible) for another day.

MR. LEMMON:  Yes, Your Honor.

THE COURT:  I got it.  Thank you.

MS. DRIVER:  If I may, Your Honor.  I want to start by just pointing out a piece of the case that Mr. Kempler cited to that I don't think was highlighted to you, but I'd like to highlight it for you.  It's In Re: Fleetstar, is the case.  And I can give you the cite of 614 B.R. 767 and I'm going to just read a quick quote.  "The phrase 'best interests of the creditors in the estate' is not defined expressly in the Bankruptcy Code.  Although courts generally accommodate parties' choice when they all agree on one course of action over the other, the test for what is in the best interests of the creditors in the estate is not one of majority rule."  And this is quoting cases that say that observing the best interests of the creditors test is not served by merely tallying the votes of creditors and yielding to the majority interest.  Therefore, when parties disagree on conversion or dismissal, as they do here, the court evaluates the alternatives and chooses the alternatives that would be most advantageous to the estate

**EXHIBIT 8**

as a whole.  And I want to point out one part of the estate that just not a lot of people are focused on today because, as a debtors' lawyer, when I represent a company, the thing that's the most important to me is the employees.  There are 44 people at FSS employees in Travis County and Mr. Magill testified that he hasn't alerted one of those people of what could happen to their jobs today, and that's just alarming to me, Your Honor.  Those people deserve -- those people may be living paycheck-to-paycheck, and they have no idea what's happening to their jobs today.

For -- I want to also note that the evidence that you've heard today can really be categorized into two categories and I think those categories are really important, they're economic considerations, and then there are non-economic considerations.  There's been a lot of talk related to alleged statements by Mr. Jones that were -- they want to call that "bad actions of the Debtor".  The problem, Your Honor, is, Mr. Jones is a debtor in his own case and had that converted this morning.  I don't understand how that, somehow, is imparted on FSS.  But even if it is, Your Honor, conversion or dismissal, Mr. Jones still has his First Amendment free speech and can still say whatever he wants, and he will have repercussions for those things that are actionable by law.  But it doesn't stop Mr. Jones from saying what he wants, when he wants on his broadcasts.  So,

**EXHIBIT 8**

the type of statements that were transcribed, and Your Honor probably read over his lunch break, aren't -- there's no -- conversion doesn't stop those. So, if their reasoning is, "We don't want him to say those things on the air", Your Honor, that is not a remedy that is available to them.

Your Honor, when Connecticut talks about their $6 million or $7 million to be had through this estate, it's just really hard for me to understand how they rejected a $55 million minimum plan in the Jones case. And I think dovetailing with what Mr. Moshenberg said, there are some creditors here that you can see want an economic recovery and there are some creditors here that you see simply want destruction.

Your Honor, this conversion, I'm still very confused as to what the timeline is. It seemed, at some point, that Mr. Magill was saying the conversion should be delayed for 30 days. It seemed that they wanted to do this wind down within Subchapter 5, but then he said he wasn't going to stay. It's just very, very murky to me. I don't think the plan that was articulated to this Court today and was admitted into evidence gives us any comfort that there'd be a superior recovery in a Chapter 7. I think the undisputed economic evidence is that, when Mr. Jones was broadcasting during the first week of June, they had record sales of nearly $1.1 million.

EXHIBIT 8

I don't think there's any amount of control over Mr. Jones that would ever satisfy the Connecticut plaintiffs. I think that was clear in the order they wanted in his conversion, and I think it's clear by the arguments and the evidence that they have elicited here today, which frankly, I think the evidence, if looked at from an economic perspective, is clearly in favor of a dismissal.

If you'll give me one moment, Your Honor, I just want to confer with my co-counsel to make sure I didn't miss anything. Your Honor, with that, Mr. Jones would request the dismissal of the FSS case, and would request that the Court deny the Connecticut plaintiffs' motion to convert this case. Thank you.

THE COURT: Thank you. Just one moment. Oh, yeah, of course, Ms. Freeman.

MS. FREEMAN: Just very, very briefly, Judge. The Trustee does not want to belabor any of the points that have been made by the other parties, nor repeat the statements that were made in the investigation report or the report and recommendation that was filed with the Court yesterday. I think it bears saying that this case has been incredibly challenging. And it is deeply disappointing that consensus was not able to be found in the case, and the fact that there wasn't a resolution is, in no way, a comment -- a negative comment on the efforts of those opposing the

EXHIBIT 8

conversion of the case. People worked very, very hard and negotiated in good faith, and unfortunately, we just did not get there.

But I think the fact that FSS will be winding down, no matter what, as Mr. Schleizer testified and as Mr. Jones has indicated, they do believe that a winddown of FSS is inevitable. The Trustee agrees that the best economic recovery, at least with regards to inventory, would be to liquidate as an operating entity, on a reduced staff basis and whatnot. I don't think that there's any true challenge to that fact.

It is a bit surprising to myself after hearing the Court's comments at the prior hearing, where you indicated that you were either going to confirm a consensual plan or dismiss the case, that the Trustee came around and I came around to the conclusion that a conversion is in the best interest of the estate. It is not something that was reached without a great deal of trepidation and understanding the potential negative consequences of a conversion, the consequence of a dismissal, and I think that the Court would have sound basis to either dismiss or to convert. The Trustee is here to answer any questions that you may have. And whichever route the Court chooses to go, there are some considerations that should be discussed with regards to the content of an order of dismissal or an order

EXHIBIT 8

of conversion.  So, if we reach that point, the Trustee would like to address those concerns at that time.

THE COURT:  Thank you.  So, let me just, kind of, first of all, thank each of the parties.  I've heard enough, Mr. Kempler.

MR. KEMPLER:  Of course.

THE COURT:  I know what I'm going to do.  I want to thank all the parties.  You've given me plenty to think about -- the evidence presented to the Court -- let me just start off by noting a couple of things here.  This case started as a Subchapter 5 case in July of 2022.  I don't know if it's in the record, but man, it's got to be one of the longest Subchapter 5 cases that is going on in the United States right now, if not the longest.  I don't pretend to know dates, but Subchapter 5 is different than Chapter 11.  Congress passed it for a very different reason.  It is supposed to be a more expedient and more deliberate Chapter 11 case.  Congress imposed certain requirements within 46 days, the court is to have a status conference.  I should say that, within 46 days, the trustee -- the debtor has to file a report in connection with the status conference.  On Day 60 you have a status conference, Day 90 the debtor is required to file a plan, right?  Day 46 you file, kind of, a, how are things going?  Day 60, we talk about it.  Day 90 there's a plan on file.  You can proceed

**EXHIBIT 8**

consensually, or you can concede non-consensually.  But non-consensually, you just have to prove that you can -- show you're dedicating income for a dedicated period of time, for 3-5 years.  It's meant to come in and get in and get out very quickly.

A prototypical Subchapter 5 case is -- I'll use an example from my days in Queens.  There was a pizza shop by me, Angelo's, and if people were going to come, you needed Angelo to make the pizza, if not, people didn't want to go to Angelo's.  It was just around the corner block.  And so, Subchapter 5 contemplates that you can pay your creditors, but Angelo gets to keep the business.  That's the whole purpose of it.  It's incentivizing the debtor to continue to maximize her or his efforts towards the business and it would generate income, disposable income, to pay creditors.  That's the way it works and only the debtor can file a Subchapter 5 plan.  No-one else can file it different than in Chapter 11.  It is a -- some people call it a "mini-11", I call it a different kind of Chapter 11.  I think it has its own systems, if you will.

This case was, obviously, filed as a Subchapter 5 case, but it came under different circumstances.  There was multiple litigation going on in state courts.  We lifted the stay early on to allow state courts to proceed to judgment, one in Texas, one in Connecticut, both to liquidations to

**EXHIBIT 8**

allow jury trials to reach their conclusions. And after that, we then had to put on pause the adjudication as to whether those judgments would be non-dischargeable in a Subchapter 5 case because that matter was currently on appeal before the United States Fifth Circuit. We had actually gotten to a point where those matters were argued in front of the Fifth Circuit and the Fifth Circuit has ruled -- been here for a while. I counted, Mr. Lemmon, 17 interim cash collateral orders and I think folks just stopped calling it. They didn't want to get to 20, so they just started calling it "extended budgets", but there was a CRO, then there wasn't a CRO, and then Mr. Magill came in as CRO again, a new CRO.

Mr. Magill, I thought -- I thought you did a fantastic job from a business -- I don't want to -- from what I know, and again, bankruptcy judges just, kind of, see what's filed in front of them, in a sense. I thought you did a fantastic job as CRO. Sounds like the relationship broke down towards the end, but in terms of getting things on file, giving me comfort that there was a budget, things that are preceding, I'm talking about bread-and-butter bankruptcy stuff, I very much appreciate your efforts. I very much appreciate Mr. Battaglia who is not here, a number of bankruptcy professionals here. The families have been incredibly involved since Day 1 in this case. They wanted -

EXHIBIT 8

– it's very rare that the automatic stay gets lifted early on in a case and that happened almost instantaneously with support of Mr. Jones towards that. Those matters are being appealed, and so I don't -- it wouldn't be right for me to comment on those. I'll just note that those matters remain pending, and courts will do with them as they will. We did approve attorneys to allow and allow the parties to continue those matters on appeal. They are where they are. I, quite frankly, have no idea what's going on in those cases. But I do know, no-one has told me that those things don't remain on appeal.

There've been numerous reports -- I think I expanded the roles of the Subchapter 5 Trustee in September of, like, 2022. Maybe earlier reports were issued in 2023 and there are a number of reports that have been issued from that. I thank the Subchapter 5 Trustee for her work. I actually called this hearing. I'm the one that said, we're going to, kind of, show up because I think the United States Trustee was right and they were right a long time ago saying, "Judge, this case has been going on for quite some time and don't forget, this is Subchapter 5. We've got to reach a resolution. This is not what Congress may have intended." I think the case went longer because the parties were in mediation, and I didn't want to put my thumb on the scale one way or the other. There were -- you had the Jones

EXHIBIT 8

case going on, you had this case going on and parties were mediating, and I didn't want to put my thumb on the scale one way or the other or be perceived to have put my thumb on the scale. And so, I gave full authority to the mediator to go out there and try to see if a global resolution could be reached. Parties were interested in it, I think Judge Isgur, through all the time that he put in, mediation is non-binding. Parties sometimes reach resolutions, sometimes they don't. And I think that's what took a long time when you, kind of, factor in waiting on what the Fifth Circuit was -- on the ruling on that, waiting on -- see if mediation could be reached.

But it came to a point where I think decisions needed to be made. We were going to have to figure out who had the liens on the cash at some point, advance the PQPR litigation to a point so there was resolution. And the case has been pending now for close to two years. So, (indiscernible) pointed to a lot of different things. I'll tell you what hasn't happened in two years, no-one has filed -- there have been numerous reports filed by the Subchapter 5 Trustee, not one 547 action, not one 548 action, and we're just at about the two year limit to do it, a month away. No actions have been filed in two years. The statute of limitations -- the limitations period put forth in Section 546 likely runs if I don't call a hearing. And I didn't

EXHIBIT 8

even realize that I was doing this within two years.  I picked today as a day that I knew I would be here.  I called this case today to determine whether a case should convert or be dismissed or confirm the plan.  There was still a plan on file at the time.  I'm not sure I'd do it two days before Father's Day, but I wasn't thinking.  But here we are.

So, let's turn to the law and see where we are.  Section 1112 provides for the dismissal or conversion of a Chapter 11 case for cause if it's in the best interest of creditors and the estate.  The Court also has sua sponte authority to dismiss or convert.  1112(B)(4) lists the grounds for constituting cause.  The list is non-exclusive.  Brackets says "includes".  Inquiry is case specific, focusing on the circumstances of each debtor.  But even if I find that cause exists to convert or to dismiss the case, the Court must decide whether one of them is in the best interest of creditors and the estate.  That's just text, right?  There's no bright line rule to determine whether conversion or dismissal is in the best interest of the estate, right?  Let's just look at the Code.  I read, with the Fifth Circuit and In Re: Koerner, K-O-E-R-N-E-R, 800 F.2d 1358 (5th Circuit 1986) case.  That decision is left to the wide discretion of the Court.  There are a number of cases that try to come up with factors.  I like cause.  I would note that the case is to try to determine what cause

EXHIBIT 8

is or really just trying to get to the right answer.  Judges dealing with difficult cases as to where they are and there's no easy or right answer here.

I know that the Connecticut and Texas plaintiffs have been working together for years together and it seems like, at least on this point, they're not -- they're the two main creditor bodies in this case, and what's in the best interest.  Been lots of talk about whether Mr. Jones would, kind of, regain control of the business, but the reality is, he never really lost it.  The CRO was able to make decisions as it related to the restructuring, but to my knowledge, he never controlled the content that was on the show or what was said on it.  I understand I have people bringing up December 14th in a way and people who have had to live through that.  I don't have the words, I don't have -- you know, I grew up in New York, I've been to Danbury Mall, which isn't too far, near Newtown.  So, I don't have the words, I don't.  The analysis I must do is what Congress tells me in terms of what's in the best interest of the estate and creditors.  And I have one group of creditors telling me, convert.  I have another group of creditors telling me, dismiss.  But the reality is, this case would just continue to go on.  There have been lots of talks of causes of action, but no-one brought one.  There are pending matters before me.  Those issues I'll decide.  I've got to

**EXHIBIT 8**

figure out -- there's a lot of talk about access to cash, but I don't know who owns the cash. I don't know if PQPR has the right to all the cash and maybe this issue is all moot. Maybe PQPR liens get undone, and it unlocks cash, but I can still decide that issue. But I don't know who has a right to the distributable value here.

The decision as to whether to -- I'm allowing to allow Free Speech or Infowars to continue or be liquidated, is not the decision that I'm being asked to do today. I think that's a false -- that's a false reality. It's not really what I'm being asked to do. The question is, I don't know, I don't have a copy of Mr. Jones' employment agreement with Free Speech. I don't know what he has the right to do, doesn't have the right to do, what he has a right to say, whether he can put something on a website or tell someone else to go to another website. I don't know any of it. I don't know if people can sell the inventory, not sell the inventory. I don't know if he's the one that people tell me, I don't know if people are going to work, not work. I don't know. That's not what I -- I don't know what a -- I don't know what a Chapter 7 trustee would or wouldn't do either. But I know the Code says they don't manage the operations.

I do know that there is an interim trustee in the Alex Jones case, and I can say this now because I just

EXHIBIT 8

looked at the docket. I know that he knows what authority he has as an interim trustee, and he knows he's going to have to follow the Code with respect to that in an election and we'll see where things go. But -- so, what is in the best interest of creditors and the estate? There are no lawsuits here, there are no 547 exits. Potential actions, plenty of reports, no-one filed any. So, I don't know. I don't know what that means. I know the CRO, Mr. Magill, who I note has done a fine job, tell him he hasn't done it. He's got to understand and say, "I haven't done the analysis." We're only about 30 days away from where that clock runs. Do I have to put that on a Chapter 7 trustee to go figure it out, and honestly say, as the Code says under penalty of perjury, to determine whether you have claims or causes of action? I don't know.

I do know, the current interim trustee will have -- trustees don't own assets either, they're entrusted with assets under property of the estate. So, I think -- I know that this current interim trustee will have the authority to control whatever interest in property the debtor has in the Alex Jones case, which may or may not include the interest in FSS and the trustee will do what the trustee does. It has a job to do and I'm sure the first thing they'll be doing is getting up to speed and getting smart on issues because he is an estate fiduciary. He's going to have to

EXHIBIT 8

exercise his fiduciary duties. But in terms of, kind of, where we are in this case, it's a Subchapter 5 case that has been pending for two years. No causes of actions filed against any party other than a removed action in a case against PQPR that was filed. I can keep that case. That's where we are. I don't know if there's a race to the courthouse or not. I don't know what happens in terms of distributable value. I don't know what happens to value on a go-forward basis. The right cause to dismiss this case. I don't know what I would be leaving a Chapter 7 trustee and the pressures that I would relieve in that that -- that new trustee under -- what 20 days, 20-30 days to make year-long decisions about stuff, what cash to operate, business. The right decision in a case that has been pending for two years with no litigation pending and the ones that I'll keep, is to dismiss the case. There's a Chapter 7 trustee who has an interest in the FSS case and there'll be a permanent trustee at one point and those trustees will make decisions about where things go. I'm not leaving things into the wind here.

I was never asked today to make a decision to shut down a show or not. That was never going to happen today one way or the other. I don't know. That being said, I, again, this case is one of the more difficult cases that I've had. When you look about it, I think creditors are better served by pursuing their state court rights. They

**EXHIBIT 8**

all have them, nothing is being discharged.  Nothing is being affected by the case.  They're all -- there's been no plan here on that.  There was no hope of a plan being confirmed here.  There was nothing here to confirm, and only the debtor can file a plan.  No-one else can file a plan.  So, what do we do two years in?  I think Subchapter 5 is different, requires different treatment and I think remaining assets can be resolved outside of a bankruptcy forum.  I think, even when you look at the factors that courts look at, I don't think anyone loses any rights.  I think you keep everything you've got.  And I would note, in the Jones case, there's like over a billion dollars of potential non-dischargeable debt.  That will work its way through the appeals courts.  I have nothing there to say about that and other courts rule differently.  They'll do that and I'll follow what they do.  You, kind of, look at how creditors will fare inside versus outside of bankruptcy, and that's kind of where we are.  But again, we don't look at this in a vacuum.  There's a Chapter 7 trustee that's been appointed, and I consider what cause is.

There's certain cause to convert, and what's in the best interest of the estate is to stop incurring administrative costs and to allow creditors to pursue their state court remedies.  And for this Court determine the matter that has been removed to this Court.  There's other

EXHIBIT 8

additional -- there are still unresolved plaintiff actions and I intend to turn my attention to those and turn to the PQPR. Those matters, especially the PQPR matter, is well -- that is right within the wheelhouse of a bankruptcy judge to determine -- look at docs, study docs, make rulings on them and I will. I don't think there are any good decisions, only the ones that apply under the facts and circumstances of this case. And I think when you look at where this case is, where this case has started, I think there's no further role for the Subchapter 5 Trustee. I think she's done her job. Mr. Magill, I think you've done a great job. I think your role should be to help transition the bank accounts and that's it. And once that's done, there's still some administrative costs that need to be resolved and I'll retain jurisdiction to you to address those. And I'll maintain jurisdiction to enforce that that -- the work gets done. But this is in the best interest of creditors. This is in the best interest of the estate. (indiscernible) administrative costs of this estate, allow the Chapter 7 Trustee in the Jones case to do his job and now has property over the ownership interest and allow the work to continue. I don't know where this leaves folks. A lot has been made, I think, about First Amendment issues.

I'm limiting my ruling to what's in the best interest of creditors and the estate and who would have

EXHIBIT 8

management over those assets even during a Chapter 7. Again, I called today's hearing. I'll convert the Jones case and I'll dismiss the case. I think it needed to happen. I wish I would have picked a better day, but we are where we are, and the decisions of the Court will be made. I'll enter a short order with where we are. I very much appreciate everyone's time. Ms. Catmull?

MS. CATMULL: Thank you, Your Honor. Thank you very much for the thoughtful ruling. The Court mentioned transitioning the bank accounts. We anticipate, since there's a Chapter 7 trustee in the Jones case, maybe two different parties wanting control of the bank accounts. I laid that out -- but I don't know yet.

THE COURT: Yeah.

MS. CATMULL: I laid that out in Docket 933, which I filed Tuesday.

THE COURT: My understanding of the way this should work and maybe I should have been a little clearer is, I think Mr. Magill's got to find the right place to, kind of, where to, kind of, get it, if the Chapter 7 -- if the interim 7 Trustee wants the bank account. And then I think that's where it goes, right? I think that's what one should do if the interim Chapter 7 trustee, who is right over there, says, "I'd like access to -- transition to me", then I think that's what the answer -- I think that's what

**EXHIBIT 8**

the answer is, because I think that's the way the Code envisions it.  If, for some reason, he says he doesn't want it, then I think find someone else.  But I'm going to ask the interim trustee.  I think, at a minimum, I'd feel awfully comfortable, even for a short period, he'd have control of bank accounts.  We've got to pay some bills here and we'd just ask that he consider that.  Okay.

MS. CATMULL:  Thank you, Your Honor.  And then, to make sure things are crystal clear to remove the cloud about the CRO's role, the cloud that's kind of been murky here, towards the end of this case, his responsibilities other than what the Court told us about the deposits, his responsibilities end now?

THE COURT:  Yeah.

MS. CATMULL:  Thank you, Your Honor.

THE COURT:  Yeah.  Mr. Magill, I think you've done your job, and I don't think you need to do anything else.

MS. CATMULL:  I appreciate it, Your Honor.  Thank you.

THE COURT:  Turn to final applications.  I'd like them on file in two weeks from today.  I'll pick a date to rule on everything.  We'll see where we go.  Anything else we need to take care of today?

MR. KEMPLER:  Your Honor, Kyle Kempler from Paul, Weiss.  I just -- I'm not sure I'm clear.  I heard you say

EXHIBIT 8

that if the interim Chapter 7 Trustee wants control of the accounts, then --

THE COURT:  He's right there.

MR. KEMPLER:  -- then I'd like to talk to him right after.  The order that was submitted by the debtors and the Texas plaintiffs suggest that it would be given to Mr. Schleizer.  I'm just not sure if that's the order you're intending to enter.

THE COURT:  I want -- the interim trustee is there.  I think, for purposes of where we are now until we can take care of administrative expenses and see where things go and all that stuff, I would just ask that Mr. (indiscernible) be the one, if he wants it.  And I think it's well within the authority of the Chapter 7 Trustee (indiscernible).

MR. KEMPLER:  Understood, Your Honor.

THE COURT:  I just -- what I don't want to do is tell someone who just got appointed about 30 minutes ago, what he will or won't be doing.  I guess I could do that, but it probably wouldn't be cool.

MR. KEMPLER:  Understood, Your Honor.  We would support him having control of those --

(Proceedings adjourned at 4:46 p.m.)

EXHIBIT 8

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Sonya M. Ledanski Hyde*

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 24, 2024