**EXHIBIT 28**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE:  ALEX E. JONES | § | |
| | § | **CASE NO. 23-33553 (CML)** |
| | § | |
| Debtor. | § | **Chapter 7** |

---

| | | |
|---|---|---|
| David Wheeler, Francine Wheeler, et. al. | § | |
| Plaintiff | § | |
| vs. | § | **Adversary Pro. 23-03037 (CML)** |
| | § | |
| Alex E. Jones, as debtor and as owner | § | |
| and sole Manager of Free Speed Systems, | § | |
| LLC | § | |
| Defendants | § | |

**ALEX JONES'S MOTION TO RECONSIDER THIS COURT'S ORDER
DETERMINING THAT CONNECTICUT JUDGMENT ON APPEAL BARS
CHALLENGES TO JONES'S DISCHARGEABILIY**

**Page 1 of 619**

**EXHIBIT 28**

**TABLE OF CONTENTS**

I      **JURISDICTION**………………………………………………………………… 3

II     **SUMMARY OF ARGUMENTS WHY RECONSIDERATION IS MANDATORY**……………………………………………………………….. 4

     A     RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE CUTPA REVERSAL (I) MEANS CUTPA PUNITIVES ARE GONE AND (II) REVEALS ILLEGAL MULTIPLE RECOVERY…………………………………………………………. 5

         i     *$150,000,000 IN CUTPA PUNITIVE DAMAGES ARE GONE*……………………. 5

         ii     *CUTPA REVERSAL REVEALS ILLEGAL MULTIPLE DAMAGES*…………………… 6

     B     RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE REVERSAL OF CUTPA ALSO MEANS THE DEATH PENALTY SANCTIONS -- WHICH THIS COURT WRONGLY FELT BOUND BY -- WERE WRONGLY ISSUED……………………………………...……………………………. 7

     C     RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG FEDERAL LAW ON COLLATERAL ESTOPPEL APART FROM CONNECTICUT'S COLLATERAL ESTOPPEL LAW…………………………………… 10

     D     RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG CONNECTICUT LAW ON COLLATERAL ESTOPPEL…………………………………………………………...…………….. 11

     E     RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE FEDERAL LAW REQUIRES AN INDEPENDENT REVIEW OF THE CLAIMS WHICH HAS NOT AND CANNOT OCCUR…………………………………………………………… 12

     F     RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE U.S. CONSTITUTIONAL LAW THAT PREEMPTS CONNECTICUT STATE LAW HAS BEEN IGNORED……………………………………………………………….. 13

     G     ALLOWING AN IRREVOCABLE §363 SALE OF ASSETS IS DEVASTATINGLY INEQUITABLE ……………………………………………………………….. 15

III    **IGNORED WERE THE FACTS THAT (i) SANDY HOOK AND ITS AFTERMATH WERE MATTERS OF PUBLIC CONCERN; (ii) THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES; AND (iii) ALEX JONES WAS A MEDIA DEFENDANT; THERE HAS BEEN NO "LIABIITY TRIAL" IN CONNECTICUT – THERE IS NOTHING TO "COLLATERALLY ESTOP**…………………………………………………………… 17

i

**EXHIBIT 28**

A     THE SANDY HOOK TRAGEDY AND ITS VERY PUBLIC AFTERMATH WERE MATTERS OF PUBLIC CONCERN……………………………………………………………… 17

B     THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES…………………………. 18

C     ALEX JONES IS A MEDIA DEFENDANT ENTITLED TO ALL FIRST AMENDMENT FREEDOM OF THE PRESS PROTECTIONS……………………………………….. 23

D     ALEX JONES GOES ON MEGAN KELLY SHOW IN JUNE 2017 WHICH PROMPTS SUIT…………………………………………………………………………….. 24

E     THE CONNECTICUT PLAINTIFFS SUE MR. JONES AND THE TRIAL COURT ENTERS DEATH PENALTY SANCTIONS CRUSHING JONES'S CONSTITUTIONAL RIGHTS …………………………………………………………………… 24

IV     **FEDERAL COLLATERAL ESTOPPEL LAW REQUIRES THAT BOTH (I) A STATE COURT HAVE USED THE CORRECT STANDARDS AND (II) OVERRIDING PUBLIC POLICY ISSUES TAKE PRECEDENCXE………………………………………………………** 25

A     GROGAN REQUIRES APPLICATION OF A CLEAR AND CONVINCING STANDARD, NOT A PREPONDERANCE OF THE EVIDENCE STANDARD AS THIS COURT INCORRECTLY STATES………………………………………………………………. 25

B     GROGAN REQUIRES THAT CONNECTICUT HAVE USED THE SAME CORRECT STANDARDS IN STATE COURT BEFORE COLLATERAL ESTOPPEL CAN APPLY…………………………………………………………………….. 27

C     GROGAN REQUIRES THAT BEFORE COLLATERAL ESTOPPEL CAN APPLY TO A STATE ACTION, THERE ARE NO "OVERRIDING PUBLIC POLICY GROUNDS THAT WOULD BE VIOLATED OR AFFRONTED………………….. 28

V     **THE COURT HAS BEEN LED TO MISSTATE CONNECTICUT LAW ON COLLATERAL ESTOPPEL………………………………………………** 28

A     THIS COURT HAS BEEN LED TO CONFLATE (I) COLLATERAL ESTOPPEL IN A SUBSEQUENT CASE AFTER FULL TRIAL IN THE FIRST FASE; (II) DEFAULTS WHEN ADDRESSED IN SAME CASE ON DIRECT APPEAL; AND (III) COLLATERAL ESTOPPEL WHERE THERE HAS BEEN A SEPARATE DEFAULT JUDGMENT……………………………........................................................ 29

B     CONNECTICUT LAW ON COLLATERAL ESTOPPEL HAS BEEN MISSTATED; IT MANDATES A FLEXIBLE, NONMECHANICAL APPROACH THAT AVOIDS INJUSTICE AND YIELDS TO PUBLIC POLICY…………………………………………………… 29

**EXHIBIT 28**

| | C | CONNECTICUT LAW ON DEFAULT JUDGMENTS HAS BEEN MISSTATED AND MISAPPLIED…………………………………………………………………….. | 32 |
|---|---|---|---|
| | D | CONNECTICUT LAW ON COLLATERAL ESTOPPEL IN THE CONTEXT OF DEFAULT JUDGMENTS HAS BEEN MISSTATED – THE GENERAL RULE IS THERE IS NO COLLATERAL ESTOPPEL WHERE THERE HAS BEEN A DEFAULT JUDGMENT…………………………………………………………………. | 34 |
| | E | THIS CASE IS NOTHING LIKE SCARBROUGH V. PURSER ……………………… | 37 |
| VI | | **THE CONNECTICUT COURT OF APPEALS REVERSAL OF CUTPA IS OF ENORMOUS SIGNIFICANCE………………………………………………………** | 41 |
| | A | THE CONNECTICUT COURT OF APPEALS HAS DETERMINED CUTPA CLAIMS WERE NOT VALID -- MANDATING CHANGE OF THIS COURT'S DISCHARGEABILITY RULING ON CUTPA PUNITIVE DAMAGES……………………………………………….. | 41 |
| | B | REVERSAL OF CUTPA REQUIRES RECONSIDERATION OF CUTPA COMPENSATORY DAMAGES WHICH IN TURN REVEALS ILLEGAL MULTIPLE DAMAGES……………… | 41 |
| | C | BECAUSE OF THE CUTPA REVERSAL, THE DEATH PENALTY SANCTIONS WERE INVALID AS A MATTER OF LAW………………………………………………… | 44 |
| | i | *This Court Should Review This Issue As Both Federal and Connecticut Collateral Estoppel Requirements Mandate Equity and Fairness Considerations As Part Of Collateral Estoppel Analysis……………………………………………………………………….* | 44 |
| | ii | *The Death Penalty Sanctions Were Not Entered For "Repeated Violation Of Discovery Orders" But For Three Specific And Trivial Reasons……………………………………………………………………….* | 46 |
| | iii | *Two Of The Three Reasons For the Death Penalty Sanction Were Tied To The Now-Reversed CUTPA Cause Of Action, Not Defamation………………………………………………………………….* | 47 |
| | iv | *The Third Basis Of The Death Penalty Sanction Was Noticing Hillary Clinton's Deposition Which Was Not A Reason To Issue Death Penalty Sanctions, And Certainly Not By Itself……………………………………* | 50 |
| | v | *Fairness And Equity Demand This Court's Review Of This Issue……………* | 52 |
| VII | | **THIS COURT HAS AN INDEPENDENT DUTY TO EVALUATE THE EVIDENCE AND NOT BLINDLY ACCEPT THE CONNECTICUT TRIAL** | |

**EXHIBIT 28**

| | | COURT'S DEATH PENALTY…………………………………………………….. | 53 |
|---|---|---|---|
| | A | THE U.S. SUPREME COURT REQUIRES THIS COURT TO MAKE AN INDEPENDENT REVIEW OF THE DEFAMATION FACTS AND ENSUING CONNECTICUT JUDGMENT…………………………………………………………….. | 53 |
| | B | THE DUTY TO CONDUCT AN INDEPENDENT REVIEW OF DEFAMATION FACTS IS CRUCIAL BY ITSELF WHEN CONSTITUTIONAL ISSUES ARE AT STAKE AS HERE………………………………………………………………….. | 55 |
| VIII | | **SOME OF THE IGNORED CONSTITUTIONAL ISSUES THAT SUPERSEDE ALL OTHER LAW INCLUDING COLLATERAL ESTOPPEL LAWS** ………………………………………………………………………… | 58 |
| | A | IT IS FUNDAMENTAL ERROR FOR THIS COURT TO RECOGNIZE CLEAR CONSTITUTIONAL ERRORS MADE IN CONNECTICUT AND BELIEVE IT IS BOUND TO ABIDE BY CLEARLY UNCONSTITUTIONAL HOLDINGS AND FINDINGS …………………………………………………………………. | 58 |
| | B | THE CONNECTICUT PLAINTIFFS WERE NOT REQUIRED TO AND DID NOT PRESENT ANY EVIDENCE OR EVEN PLEADING OF SPECIFIC DEFAMATORY STATEMENTS MADE BY JONES …………………………………………………………………… | 58 |
| | i | *The Connecticut Complaint Does Not Contain Anywhere Near Required Detail And Most Of What Is Referenced Occurred Outside the Statute Of Limitations And Is a Prototected Opinion or Hyperbole*………………………………………………………… | 59 |
| | C | FALSITY-- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED <u>FALSITY</u> OF SPECIFIC STATEMENTS BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE –WHICH DID NOT HAPPEN………………….. | 66 |
| | D | FAULT-- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED <u>FAULT</u> BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE –WHICH DID NOT HAPPEN………………………………………… | 67 |
| | E | INTENTIONAL INFLICTION CLAIMS AND DAMAGES WERE CLEARLY SUBMITTED ON THE WRONG STANDARD AND ARE DISCHARGEABLE……………………………. | 69 |
| | F | DAMAGES CANNOT CONSTITUTIONALLY BE PRESUMED………………………… | 72 |
| | G | IT IS UNCONSTITUTIONAL TO FIND JONES LIABLE FOR ACTS OF THIRD PARTIES……………………………………………………………….. | 74 |

**EXHIBIT 28**

H	PROFIT MOTIVE IS IRRELEVANT IN MEDIA DEFAMATION…………………………………………………………… 78

I	THE AWARD OF PUNITIVE DAMAGES WAS UNCONSTITUTIONAL ………… 78

**CONCLUSION**………………………………………………………………. 78

**Exhibits**

| | |
|---|---|
| **1** | Connecticut Jury Verdict Damages |
| **2** | Lafferty v. Jones, 229 Conn. App. 487, 490 (2024) |
| **3** | Transcript Connecticut Death Penalty Sanctions 11.15.21 |
| **4** | Plaintiffs Motion for Sanctions |
| **5** | Transcript Megan Kelly show |
| **6** | Connecticut Plaintiffs Connecticut Complaint |
| **7** | Protective Order |
| **8** | Notice Depo Clinton |
| **9** | Transcript of Connecticut Hearing 10.20.2021 |
| **10** | Intentionally Omitted |
| **11** | Connecticut Jury Charge |
| **12** | Memorandum of Opinion Judgment |
| **13** | Notice of Defenses Filed After Default |
| **14** | Plaintiffs' Redlined Amended Complaint |
| **15** | Aldenberg testimony pages |
| **16** | Aldenberg testimony pages |

**EXHIBIT 28**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

Alex E. Jones ("Jones") respectfully moves this Court to reconsider its October 19, 2023 Memorandum Decision (the "Order") granting Connecticut Plaintiffs' Motion for Summary Judgment on the nondischargeability of their Connecticut judgment. [Dkt. 76]. Reconsideration is imperative to address significant errors of law and fact that underlie the Order and to ensure the proper administration of justice regarding the nondischargeability of the Connecticut plaintiffs' Connecticut judgment. [Dkt. 76].

1.      As will be specified towards the end of this Motion, many if not most of the errors this Court has been led to, are errors of Constitutional magnitude.  These issues merit a trial alongside the matters the Court has already designated for a dischargeability hearing.

2.      This Court must find dischargeable—or at the very least, identify genuine issues of material fact regarding—the Connecticut judgment's awards of "compensatory damages" and punitive damages under the Connecticut Unfair Trade Practices Act ("CUTPA") reversed by the Connecticut Court of Appeals.  *Lafferty v. Jones,* 229 Conn. App. 487, 537 (2024).  **Ex. 2** hereto.

3.      Critically, this Court's Order rests on several fundamental errors that require correction, many of which deal with the U.S. Constitution. Accurate application of the law is essential to preserve the integrity of the broader judicial system.  This case presents unprecedented and highly significant legal issues not fully or correctly considered in the Order including:

   a. The intersection of state court penalty-based default judgment rules that conflict with constitutional principles as interpreted by the U.S. Supreme Court involving media defendants, public controversies, and public figure plaintiffs;

   b. The intersection of federal bankruptcy law with constitutional principles and conflicting state court penalty-based default judgment rules, all involving media defendants, public controversies, and public figure plaintiffs;

EXHIBIT 28

c.  Errors in the Order's understanding and application of federal and state collateral estoppel doctrines; and

d.  Misstatements concerning state appellate procedures, particularly those that have not corrected previous errors.

To Jones's knowledge, no other case has presented this unique convergence of issues. The Court's decision will inevitably be studied and scrutinized by higher courts, the legal community, the media, and the public at large. It is critical that the Order withstands such scrutiny.

4.      This Court's decision will also reverberate throughout the media world, among broadcasters and commentators who are reporting on cutting edge, controversial issues of the day.

5.      But the Order is crucial to Alex Jones personally.  It imposes an unconscionable and insurmountable burden on Jones.  A judgment exceeding $1,000,000,000, compounded by pre- and post-judgment interest rates as high as 10%, would result in annual interest obligations alone of approximately $100,000,000. This extraordinary liability — one that no human being could bear—constitutes an excessive financial penalty and, effectively, involuntary servitude in violation of the Thirteenth Amendment. It also undermines the fundamental purpose of bankruptcy law: to provide individuals with a meaningful opportunity for a "fresh start." And it has been awarded to plaintiffs who have not experienced any physical harm to themselves or their property – only their feelings.

6.      Furthermore, the Order left unchanged, the Trustee and the Connecticut Plaintiffs are even now attempting to arrange a "settlement" by the sale of Jones's assets based on the assumed validity of the Connecticut Judgment and this Court's prior determination that a majority of that judgment is non-dischargeable – the many errors of which this Motion points out.  As noted hereafter, once that §363 sale is accomplished, even if the Connecticut judgment is reversed and/or

**EXHIBIT 28**

this Court's nondischargeability determinations are changed (whether by reconsideration or reversal), the §363 sale based thereon will place Jones's assets beyond his reach when they should not have been sold to begin with.

7.      This Court's 18-page, single-spaced Order [Dkt. 76] is not only a judgment on Jones, but a precedent for our nation and its First Amendment jurisprudence.  The complexity of the issues and the breadth of errors necessitate a detailed motion. This submission, while lengthy, seeks to assist the Court in revisiting the significant and intertwined legal principles at stake, rather than merely cataloging objections and citing authorities without adequate explanation.

8.      Given the life-altering implications for Jones, the far-reaching effects on constitutional and bankruptcy jurisprudence, and the imminence of an irrevocable §363 sale of assets by the Trustee to people bent on the permanent destruction of Jones, this Court must reconsider its Order.

**I**
**JURISDICTION**

9.      Reconsideration requests are routinely made under either or both FRCP 60(b)(1) and 60(b)(6) as they are here.  As to errors of law, the Supreme Court has stated that a trial court's errors of law can be reconsidered under FRCP 60(b)(1).  *See Kemp v. United States*, 596 U.S. 528, 530, 142 S. Ct. 1856, 1860 (2022) ("We conclude, based on the text, structure, and history of Rule 60(b), that a judge's errors of law are indeed 'mistakes' under Rule 60(b)(1).") (cleaned up).

10.      As to other errors, FRCP 60(b)(6) can and should be invoked "in extraordinary circumstances" which include cases where the order to be reconsidered involves "the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process." *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs.*

**EXHIBIT 28**

*Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)).   Such is the case here.

11.     Particularly where an order is interlocutory, as here, bankruptcy courts have universally recognized their inherent right to reconsider an order.  Moore's Federal Practice, § 59.30[7] (Matthew Bender 3d ed.).  *See also, Anderson Living Tr. v. WPX Energy Prod., LLC*, 308 F.R.D. 410, 433 (D. N.M. 2015); *In re Energy Future Holdings Corp.*, 575 B.R. 616 (Bankr. D. Del. 2017).

**II**
**SUMMARY OF ARGUMENTS WHY RECONSIDERATION IS MANDATORY**

12.     The Connecticut judgment awarded the following unprecedented damages, all of which are dischargeable, or at the very least fact issues as to dischargeability exist:

| Conn. Pls. | Defamation Slander | Emotional Distress | Common law Punitives | CUTPA Punitives | TOTALS |
|---|---|---|---|---|---|
| R. Parker | $60,000,000 | $60,000,000 | $40,000,000 | $10,000,000 | $170,000,000 |
| W. Aldenberg | $45,000,000 | $45,000,000 | $30,000,000 | $10,000,000 | $130,000,000 |
| E. Lafferty | $18,000,000 | $58,000,000 | $25,300,000 | $10,000,000 | $111,300,000 |
| I. Hockley | $38,000,000 | $43,600,000 | $27,200,000 | $10,000,000 | $118,800,000 |
| N. Hockley | $32,000,000 | $41,600,000 | $24,530,000 | $10,000,000 | $108,130,000 |
| J. S. Marionio | $30,000,000 | $38,800,000 | $22,930,000 | $10,000,000 | $101,730,000 |
| C. S. Parisi | $30,000,000 | $36,000,000 | $22,000,000 | $10,000,000 | $98,000,000 |
| M. Barden | $25,000,000 | $32,600,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| C. M. Soto | $18,600,000 | $39,000,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| W. Sherlach | $9,000,000 | $27,000,000 | $12,000,000 | $10,000,000 | $58,000,000 |
| D. Wheeler | $25,000,000 | $30,000,000 | $18,330,000 | $10,000,000 | $83,330,000 |
| F. Wheeler | $24,000,000 | $30,000,000 | $18,000,000 | $10,000,000 | $82,000,000 |
| J. Hensel | $21,000,000 | $31,000,000 | $17,330,000 | $10,000,000 | $79,330,000 |

**EXHIBIT 28**

| | | | | | |
|---|---|---|---|---|---|
| D. Soto | $18,000,000 | $30,000,000 | $16,000,000 | $10,000,000 | $74,000,000 |
| J. Barden | $10,000,000 | $18,800,000 | $9,600,000 | $10,000,000 | $48,400,000 |
| TOTALS | $403,600,000 | $561,400,000 | $321,620,000 | $150,000,000 | $1,436,620,000 |

**Ex. 1** (Conn. Jury Verdict, Conn. Dkt No. 1010] & **Ex. 12** (Memorandum Opinion Judgment). This Court's Order previously denied the Connecticut Plaintiffs' motion for summary judgment that the common law punitive damages were nondischargeable.

A. ***Reconsideration Is Required As A Matter Of Law Because Cutpa Reversal (I) Means Cutpa Punitives Are Gone And (II) Reveals Illegal Multiple Recovery.***

13. This Court stated: "The ultimate amount of this nondischargeable debt could change if Jones succeeds on his state court appeal." [Order, pp.15-16]. This Court is now aware that the Connecticut Appeals Court has reversed the Connecticut trial court's determination that CUTPA was a valid cause of action. This reversal has profound consequences for the damages that were assessed in the Connecticut trial court, referenced in the damages chart above.

i. *$150,000,000 In CUTPA Punitive Damages Are Gone*

14. First and most obviously, the reversal of any CUTPA claims reverses the award of CUTPA punitive damages. *Lafferty v. Jones,* 229 Conn. App. 487, 537 (2024) ("The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. **For the reasons that follow, we agree.**") See **Exhibit 2** hereto (emphasis added). This, in turn, necessitates that this Court revisit its grant of summary judgment and now find dischargeable, the extinguished punitive damages totaling $150,000,000.

15. The CUTPA punitive damage award is invalid and must be held dischargeable for the additional reason that it was not issued based on clear and convincing evidence, as required by

**EXHIBIT 28**

the Constitution, which requirement has been repeatedly reaffirmed by the U.S. Supreme Court. See extensive discussion, *infra*.

### ii.    *CUTPA Reversal Reveals Illegal Multiple Damages*

16.    But CUTPA did not just award punitive damages, it awarded compensatory damages as well, the Charge of the Connecticut Trial Court stating: "Damages due to the defendants' violation of [CUTPA] are included in the other damages measures that I am describing to you and you will not assess them separately." **Ex. 11,** Court Charge, p. 11, p. 24.   Thus, the CUTPA compensatory damage award must be reversed too.   And determining what those reversable CUTPA compensatory damages are shows what can most simply be called a dramatic "multiple recovery."

17.    In a defamation case, the jury may award the plaintiff damages for the injury to a plaintiff's reputation and the mental suffering and emotional distress caused by the defamation. *Chugh v. Kalra*, 342 Conn. 815, 850-51, 271 A.3d 993, 1012-13 (2022) (*citing Battista v. United Illuminating Co.*, 10 Conn. App. 486, 492, 523 A.2d 1356)).

18.    The same reputational injury and emotional distress is compensable as a result of intentional infliction, invasion of privacy and CUTPA.

19.    The jury charge indicated that the damages across all causes of action (defamation, intentional infliction of emotional distress, invasion of privacy/false light, and violation of CUTPA were assessed based on these overlapping concepts of reputational injury and emotional distress. See, e.g. **Ex. 11**, Connecticut Jury Charge, pp. 21-2.   And the grouping of injuries into reputational and emotional distress is conclusively shown when the Charge states that damages under CUTPA are "included in the other damages measures" and "will not be assessed separately."   Again, this confirms that the trial court intended to merge the damage components for all causes of action.

**EXHIBIT 28**

20.     Yet the jury verdict form the jury completed asked the jury for "defamation/slander damages" and "emotional distress damages" as shown by the verdict question for FBI agent William Aldenberg:

21.     The verdict form thus separately stated defamation/slander damages which include emotional distress and then emotional distress again.  At the very minimum this means the damages awarded include multiple recoveries for emotional distress or an unlawful "double award."  *See Duran v. Town of Cicero,* 653 F.3d 632, 640 (7th Cir. 2011) (explaining that plaintiff cannot be compensated twice for same injury, even if multiple theories support damages award or multiple defendants may be held liable).

22.     Further, "emotional distress" damages for intentional infliction as explained *infra*, cannot stand either constitutionally or under 11 U.S.C. § 523(a)(6), as it uses a "knew or should have known" standard, which is negligence, when the Supreme Court has specifically held that for media defendants the *New York Times v. Sullivan* standards apply to claims of intentional infliction. *Snyder v. Phelps,* 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011).

B.  ___RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE REVERSAL OF CUTPA ALSO MEANS THE DEATH PENALTY SANCTIONS -- WHICH THIS COURT WRONGLY FELT BOUND BY -- WERE WRONGLY ISSUED___.

EXHIBIT 28

23. It is unquestioned that this Court did not analyze in any detail the underlying reasons the death penalty sanctions were entered by the Connecticut trial court but rather accepted the characterizations of the Connecticut plaintiffs' lawyers that they were entered for "repeated violations of discovery orders." See e.g., Order p.1. This Court's decision to not examine the underlying factors that precipitated the Death Penalty Sanctions, means this Court felt itself without authority to reject them no matter how unjust; however, the finding of the Court of Appeals that CUTPA was not a viable cause of action as a matter of law means the Death Penalty Sanctions were wrongly assessed as they were largely tied to CUTPA.

24. As will be demonstrated, the transcript of the fateful November 15, 2021, hearing where the Death Penalty Sanctions were imposed [**Ex. 3** hereto] states there were only three reasons – all trivial – for entry of the Death Penalty Sanctions. The first reason was that Jones's lawyers sought to depose Hillary Clinton, which (i) is not a violation of a discovery order, (ii) does not relate to CUTPA and (iii) was unjust, as will be discussed in detail *infra*. The two other reasons for the Death Penalty were tied <u>directly</u> to the now reversed CUTPA claim:

    a. **<u>Analytics</u>**. Jones's lawyers could not retrieve in satisfactory form, never-used Analytics data allegedly showing the number of vitamin supplement sales made during broadcasts when the subject of a media broadcast mentioned Sandy Hook; and

    b. **<u>Sub-journal Entries to Jones's Financials.</u>** Jones's lawyers could not retrieve in a form and format to the liking of the Connecticut Plaintiffs, accounting "subaccounts" from their accounting journal entries, again which the Connecticut Plaintiffs hoped to use to show a profit motive.

25. There are no other court-enumerated bases for the Death Penalty Sanction ordered by the Connecticut trial court.

26. The Connecticut Plaintiffs clearly claimed that these two categories of financial information (i.e., those in ¶25(a) & (b) above) were "critical" to their now-dismissed CUTPA

**EXHIBIT 28**

claims, advising the Connecticut trial court that Jones allegedly employed "false narratives about the Sandy Hook shooting" and that he did so "as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." The Connecticut Plaintiffs elaborated further that Jones stories, including Sandy Hook, "elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money ..." **Ex. 4** hereto, p. 15. The Connecticut Plaintiffs themselves then tied all this to CUTPA plainly so stating:

> "**These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims.** Id. ¶¶ 465–474 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy").

**Ex. 4,** pp. 14-15 (emphasis added).

27.    But these have nothing to do with libel, intentional infliction or invasion of privacy, only CUTPA. The U.S. Supreme Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. See, e.g., *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."). Thus, the claims of need for these scant materials was not to demonstrate libel/defamation, but rather to advance their now-rejected CUTPA claim.

28.    This Court "cleared the runway for Jones to appeal," [Order, p. 12], and Jones did just that appealing, *inter alia*, the inappropriateness of the Death Penalty Sanction and also the fact that CUTPA was not a viable cause of action. The Court of Appeals determined CUTPA was not a valid claim but did not address what the effect of that finding was on the Death Penalty Sanctions

**EXHIBIT 28**

that were tied to the CUTPA claims. Hence, this issue has not been addressed in the appeal process and may never be as appeal to the Connecticut Supreme Court is by discretionary petition for *certiorari* -- thus not assured. That in turn means the impact of CUTPA reversal on the Death Penalty sanctions will not have been reviewed by an appellate court.

29.     Surely the hands of this United States Bankruptcy Court are not tied and the United States Bankruptcy laws rendered impotent in this context. Whether this Court's initial decision to defer to the Connecticut court was valid at the time the Order was entered, given this state of the record at this time, this Court is duty-bound to reconsider its dischargeability order as the Death Penalty Sanctions were clearly not appropriate in light of the vacating of the CUTPA cause of action.

C.  *RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG FEDERAL LAW ON COLLATERAL ESTOPPEL APART FROM CONNECTICUT'S COLLATERAL ESTOPPEL LAW*

30.     Apart from (a) the Constitutional requirements and restrictions referenced below in this summary and fully addressed fully *infra* in the argument section hereof, and (b) Connecticut collateral estoppel, this Court was misled into an erroneous interpretation of federal collateral estoppel law. This Court cited *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (hereafter, "*Grogan*") for the proposition that a "creditor must prove nondischargeability of a debt by a preponderance of the evidence." Order, p. 7. This is an incomplete statement at best, as the Supreme Court in *Grogan* recognized an exception to the "preponderance" standard where a "clear and convincing" standard would apply. That burden-shifting exception occurs where "particularly important individual interests or rights are at stake" which is clearly the case here. *Grogan*, 498 U.S. at 286. Misled by the Connecticut plaintiffs, this

EXHIBIT 28

Court disregarded the "if particularly important individual interests or rights are at stake" caveat, that shifts the dischargeability burden to clear and convincing. This wrong standard necessitates reconsideration.

### D. *RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG CONNECTICUT LAW ON COLLATERAL ESTOPPEL*

31. This Court has been badly misled on Connecticut law of collateral estoppel. For example, this Court has been misled into stating that collateral estoppel applies rigidly, if "[1] the issues … have been fully and fairly litigated in the first action, [2] it must have been actually decided, and [3] the decision must have been necessary to the judgment." Order, p. 8. But this is again incomplete at best.

32. As explained in detail *infra*, in *Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 15 A.3d 601, 613 (Conn. 2011) the Connecticut Supreme Court cautioned that these three points *were not to be applied mechanically* as the Connecticut plaintiffs convinced this Court to do. Rather, the Connecticut Supreme Court held these three points were to be viewed flexibly with equity in mind and are particularly inapplicable when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id*. And Connecticut law's "focus on resulting injustice and other social policies" in deciding collateral estoppel issues, was a reiteration of that holding referenced by the Connecticut Supreme Court in *Cumberland Farms v. Town of Groton*, 262 Conn. 45, 59-60, 808 A.2d 1107, 1117 (2002).

33. Furthermore, the Constitutional issues briefly addressed below in this summary and fully addressed *infra* in the argument section hereof, are not only independent bases for reconsidering the grant of partial summary judgment on the dischargeability issue, the denial to

**EXHIBIT 28**

Jones of his Constitutional rights "works an injustice" and "frustrates other social policies based on values equally or more important than the convenience afforded by finality in legal controversies" which themselves are bases for denying collateral estoppel effect to the catastrophic Death Penalty Sanctions of the default judgment entered against Jones pursuant to Connecticut law.

E. _RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE FEDERAL LAW REQUIRES AN INDEPENDENT REVIEW OF THE CLAIMS WHICH HAS NOT AND CANNOT OCCUR_

34.     The U.S. Supreme Court requires an independent court to have made a separate evaluation and determination on Constitutional issues, which as will be demonstrated, is what this case is about in its entirety:

> In cases raising First Amendment issues we have repeatedly held that **an appellate court has an obligation to make an independent examination of the whole record** in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.

_Bose Corp. v. Consumers Union_, 466 U.S. 485, 499, 104 S. Ct. 1949, 1958-59 (1984) (hereafter, "_Bose_").    Here, however, the Connecticut Court of Appeals refused to make such independent examination, or to even consider the Constitutional issues in light of the Death Penalty Sanctions default, holding briefing on that issue to have been "bereft of any substantive legal analysis" and therefore deemed "abandoned."    **Ex. 2,** _Lafferty v. Jones_, 229 Conn. App. 487, 510 n.26 (2024).

35.     The United States Supreme Court places an unwaivable duty on a federal court such as this one to "review findings of fact by a state court where a federal right has been denied on the basis of a fact without evidence to support it and where a conclusion of law as to a federal right and a finding of fact are so intermingled to require analysis of the facts."    _Bose_, 466 U.S. 485, 506 n.24 (citing _Fiske v. Kansas_, 274 U.S. 380, 385-387 (1927)); _see also Peter Scalamandre & Sons_

**EXHIBIT 28**

*v. Kaufman*, 113 F.3d 556, 560 (5th Cir. 1997) (citing *Bose*) ("Rather, in such cases, we have an obligation to make an independent examination of the entire record to ensure the judgment is supported by clear and convincing evidence of actual malice.").

36.     U.S. Supreme Court thus mandates this Court to evaluate these issues, especially since the Connecticut Court of Appeals has not and there is no assurance the Connecticut Supreme Court will grant cert and if it does, will grant cert on this issue.   This is mandate is particularly important in the context of ensuring the correct application of 11 U.S.C. § 523(a)(6).

37.     And the "independent evaluation" will require evidentiary proceedings since the Death Penalty Sanctions precluded development of an evidentiary record.,

### F. *RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE U.S. CONSTITUTIONAL LAW THAT PREEMPTS CONNECTICUT STATE LAW HAS BEEN IGNORED*

38.     Given the Constitutional importance of the First Amendment, a preemptive body of federal law supersedes all state laws to the contrary, as the Connecticut Supreme Court itself has acknowledged: "Beyond these common-law principles, there are numerous federal constitutional restrictions that govern the proof of the tort of defamation…" *Gleason v. Smolinski*, 319 Conn. 394, 431, 125 A.3d 920, 947 (2015) (hereafter, "*Gleason*").   Among the litany of ignored, preempting "federal constitutional restrictions," were the U.S. Supreme Court's pronouncements in a host of cases, such as *New York Times v. Sullivan,* 376 U.S. 254 (1964) (hereafter, "*Sullivan*"), *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) (hereafter, "*Hustler*") and more recently *Snyder v. Phelps,* 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) (hereafter "*Snyder*").  Ignoring these U.S. Supreme Court preempting mandates robbed the Connecticut trial court's judgment of any collateral estoppel vitality, such that a state court judgment that ignores Constitutional requirements has not employed the correct standard and thus is not to be enforced

EXHIBIT 28

via collateral estoppel.

39. Specifically, and as will be explained more fully *infra*, in *Sullivan*, the Supreme Court commanded that in order to recover, the Connecticut plaintiffs here were required to prove by "clear and convincing evidence" that specific statements Mr. Jones himself made about them were in fact false.

40. Further, *Sullivan* required that the fifteen Connecticut plaintiffs prove also by "clear and convincing evidence" that Jones himself _subjectively_ knew they were false. Only then were compensable defamation damages recoverable: "We previously have noted that, under *New York Times Co. v. Sullivan*, … the plaintiff also must prove that the defamatory statement was made with actual malice, such that the statement, when made, was made with actual knowledge that it was false or with reckless disregard of whether it was false." *Gleason*, 125 A.3d at 948 (citing *Sullivan*) (cleaned up; internal citations and quotations omitted). **None of that happened in the Connecticut trial.**

41. And these Constitutional principles apply to claims of intentional infliction of emotional distress and invasion of privacy. In *Hustler*, the Supreme Court said the *Sullivan* standards applied to the tort of intentional infliction of emotional distress. 485 U.S. at 56-57. This was reaffirmed very recently by the U. S. Supreme Court in *Snyder*, as recognized by the Connecticut Supreme Court: "The first amendment bars damages under the generally applicable laws of intentional and negligent infliction of emotional distress where those claims are based on constitutionally protected conduct." *Gleason*, 125 A.3d at 933 (cleaned up). **Again, this did not happen in the Connecticut trial either**.

42. In fact, as to the Connecticut plaintiffs claim for $561,400,000 for emotional distress, this Court itself quotes language from the Connecticut Court's jury charge, which shows

EXHIBIT 28

that while called *intentional* infliction, that cause of action was submitted based on a negligence standard, this Court stating: "The defendants intended to inflict emotional distress or . . . *knew or should have known* that emotional distress was the likely result of their conduct." Order, p. 13 (emphasis added). See also Order, p. 3 & 14.

43. However, "knew or should have known" is the legal standard of negligence. See *Erickson Prods. v. Kast,* 921 F.3d 822, 833 (9th Cir. 2019) ("A 'should have known' instruction does not fit within this framework because it is a negligence standard."). See also *Mirjavadi v. Vakilzadeh,* 310 Conn. 176, 195, 74 A.3d 1278, 1289 (2013)]. And the negligence "knew of should have known" standard is forbidden by US Supreme Court mandate.

44. Thus, disregarding of preempting Constitutional requirements is not to wait on the Connecticut judiciary but are issues this Court must address now, mandating the reconsideration of its previous grant of summary judgment without addressing these issues.

### G. ALLOWING AN IRREVOCABLE §363 SALE OF ASSETS IS DEVASTATINGLY INEQUITABLE

45. This case has progressed to the point where this Court has erroneously but irrevocably, found a debt non-dischargeable where at a minimum (a) a significant percentage of the debt has now been reversed by the Court of Appeals, (b) another large percentage has been based on a negligence standard and thus is erroneous as a matter of law; and (c) errors of Constitutional significance have not been independently addressed and may or may not get presented to the Connecticut Supreme Court because of the discretionary nature of appeal to that body.

46. Yet because the Order is essentially treated as irrevocable, it allows an irreversible §363 sale of the Defendants' assets – including the all-important "InfoWars" brand and intellectual property -- to fund distributions to creditors whose claims have neither been allowed (nor may ever

EXHIBIT 28

be allowed) and where these crucial issues have yet to be decided.  Upon reversal, for example, Jones has no remedy to recover his assets or obtain relief for the loss of the going concern value of, for instance, InfoWars. [1]   This is unfair and inequitable.

47.     To be even more precise, the sale of assets is being considered to those bent on Jones's destruction, pursuant to a Constitutionally infirm Connecticut judgment.  Apart from whether the Connecticut Supreme Court grants discretionary review, this Court's judgment will be appealed, if necessary, to the District Court, the Fifth Circuit and the U.S. Supreme Court.  Reversal in whole or in part could occur at any of these tribunals.  The irreversible nature of a §363 sale, however, will allow those bent on Jones's destruction to permanently take over Jones's business interests and operate them to destroy his brand by creating at a minimum, customer confusion and at worst wreaking consumer havoc and depriving Jones of his assets and livelihood, based on an invalid judgment which may take significant time to judicially declare. [2]

48.     To have granted the Connecticut plaintiffs' motion for summary judgment on dischargeability, this Court was led into legal and factual error.  To rectify these errors in light of the ensuing irrevocable damage to Jones,  this Court should (a) reconsider the erroneous ruling it was led to make that the Connecticut Judgment is nondischargable; (b) deny the plaintiffs' motion

---

[1]     In contrast, Texas statutes provide that upon a premature judgment sale and later reversal of the judgment, the judgment creditor must return the property or its full value at the time of the sale. This is almost certainly why the Connecticut Plaintiffs do not even attempt to "credit bid" the sale of the Infowars brand.

[2]     *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 22, 107 S. Ct. 1519, 1532 (1987) and *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979).   As reflected by these cases, a section 363 sale does not contain a provision similar to Texas law for liability of the Judgement Creditor for a premature execution on a judgment, that would allow Alex Jones to *recover from the judgment creditor the market value of the property sold at the time of the sale.* Thus, if the joint and several judgments against Jones and FSS are reversed on appeal in any substantial amount Alex Jones may be relegated to collecting nothing, because the Connecticut Plaintiffs, are arranging this purchase in order to such down and destroy the value of the going concern of FSS, and can keep and select property (such as their splitting of the Onion's revenue for a period of time), "as if" they have a valid and enforceable judgment.  The Connecticut Judgment has been stayed on appeal by the Connecticut Statutes.

**EXHIBIT 28**

for summary judgment on dischargeability; (c) set the dischargability issue for an evidentiary trial; and (d) at the conclusion of that trial, find that the damages awarded by the Connecticut trial court are all dischargeable. In the alternative this Court should stay any action on the sale of Jones's assets until these issues are fully and finally resolved whether in Connecticut or in the federal system.

**III.**

**IGNORED WERE THE FACTS THAT (i) SANDY HOOK AND ITS AFTERMATH WERE MATTERS OF PUBLIC CONCERN; (ii) THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES; AND (iii) ALEX JONES WAS A MEDIA DEFENDANT; THERE HAS BEEN NO "LIABIITY TRIAL" IN CONNECTICUT – THERE IS NOTHING TO "COLLATERALLY ESTOP"**

A. THE SANDY HOOK TRAGEDY AND ITS VERY PUBLIC AFTERMATH WERE MATTERS OF PUBLIC CONCERN

49. The tragic Sandy Hook murders took place in December, 2012 in Newtown, Connecticut, a small town with a population of under 30,000 and captivated the entire world. In the United States alone, major news outlets such as The New York Times, The Washington Post, CNN, and NBC News, alongside numerous local papers and online publications, produced extensive coverage immediately following the incident and, in the years, since. Although it is impossible to say with precision, estimates are that at least 10,000 to 20,000 articles were generated within the U.S. about this. International reporting likely produced an additional 5,000 to 10,000 articles initially, with periodic follow-ups and anniversary reports. Globally, Sandy Hook coverage extended to major international news organizations, including BBC, Al Jazeera, The Guardian, Le Monde, and The Sydney Morning Herald, along with other regional publications.

EXHIBIT 28

**B.  THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES**

50.    The Sandy Hook tragedy quickly morphed the Connecticut Plaintiffs into significant public figures as driving forces for gun control.  After 2012, the Connecticut Plaintiffs gave scores of public interviews and/or made statements and/or formed or joined advocacy campaigns, many through organizations or initiatives they founded to prevent similar tragedies via gun control.  Some of the Connecticut Plaintiffs were invited to attend President Barack Obama's 2013 State of the Union address as guests, a gesture that highlighted their very public gun control advocacy.  There President Barack Obama advocated for gun reform following the tragedy, where President Obama after paying tribute to the Connecticut Plaintiffs called for Congress to act on gun violence prevention.

51.    Nicole Hockley and Mark Barden were among the parents who worked closely with the Obama administration on these issues and were publicly recognized in various ways as part of the administration's push for change in gun policy.

52.    Based on public records and media coverage David and Francine Wheeler were even asked to substitute for President Obama himself in his weekly, nationally televised address to publicly advocate these issues:

**EXHIBIT 28**



53.     Francine Wheeler gave widely broadcasted speeches and was involved in Sandy Hook-related gun control advocacy.

54.     Nicole Hockley and Ian Hockley, were active in the media and Mark Barden and Jacqueline Barden frequently gave interviews and public statements.  William Sherlach joined in public advocacy for changes in gun laws and mental health reform.  Mark and Jackie Barden, Nicole Hockley, and William Sherlock co-founded Sandy Hook Promise, which holds itself out on its publicly accessible web site as follows:

**EXHIBIT 28**



https://www.sandyhookpromise.org/who-we-are/about-us/.

55.     Connecticut plaintiff Aldenberg is a law enforcement official with the FBI who was on site at Sandy Hook leading the investigation there. **Ex. 6**, Connecticut Complaint, ¶28.   As a federal law enforcement official, Aldenberg was unquestionably a public figure.   *See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262 (1968) (deputy sheriff); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069-70 (5th Cir. 1987); *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1431 (8th Cir. 1989) (Federal Bureau of Investigation agent); *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir. 1977) (federal narcotics agents); *Simien v. Freeman*, No. 04-cv-701, 2007 U.S. Dist. LEXIS 116972, 2007 WL 9701229, at *5-6 (M.D. La. May 16, 2007) (collecting cases).

56.     At the 2016 Democratic National Convention Erica Lafferty (her maiden name) gave a five-minute speech on gun control and Hillary Clinton, and was shown in close support of Secretary Clinton given her positions on gun control:



57.     The publicity they received from Sandy Hook and their efforts at gun control, were increased when they sued Remington Arms, the manufacturer of the weapon used by the murderer in a highly publicized suit. *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 64, 202 A.3d 262, 271 (2019). That case and its settlement for $73,000,000 was publicized world-wide, referring to the Connecticut Plaintiffs as the "Sandy Hook Families":



**EXHIBIT 28**



58.      Jennifer Hensel and Jeremy Richman were public and vocal advocates for mental health awareness. Jeremy Richman founded the Avielle Foundation, often speaking publicly about the connection between mental health and violence.   Carlee Soto-Parisi and Jillian Soto, sisters of teacher Victoria Soto, became vocal advocates for gun reform and school safety and participated in marches and public forums.

EXHIBIT 28

59.    There is thus no question that the Connecticut Plaintiffs were "public figures," which has Constitutional significance:

> "…a majority of the Court agreed with Mr. Chief Justice Warren's conclusion that the *New York Times* test should apply to criticism of public figures as well as public officials. The Court extended the constitutional privilege announced in that case to protect defamatory criticism of nonpublic persons who are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large."

*Gertz v. Robert Welch*, 418 U.S. 323, 336-37, 94 S. Ct. 2997, 3010 (1974) (internal quotes omitted) (hereafter, "*Gertz*").  As such and as will be discussed in detail *infra*, the U.S. Supreme has continuously reiterated that "the plaintiff in such an action must prove that the defamatory publication 'was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *St. Amant v. Thompson*, 390 U.S. 727, 728, 88 S. Ct. 1323, 1324 (1968) (citing "the rule" of *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964)).  Without question, this "rule" was abandoned in the Connecticut trial and not reviewed by the Connecticut Court of Appeals.

### C. ALEX JONES IS A MEDIA DEFENDANT ENTITLED TO ALL FIRST AMENDMENT FREEDOM OF THE PRESS PROTECTIONS

60.    Jones is a media defendant.  Recognized by both supporters and critics, Jones has been at the forefront of media for nearly three decades, with his career spanning radio, online broadcasting, film, and commentary.

61.    Though some controversies have followed him, Jones has maintained his dedication to free speech, individual rights, and against gun control, positioning himself as a steadfast proponent of questioning mainstream narratives.  The Connecticut Plaintiffs readily admit this. **Ex. 6,** Connecticut Complaint, ¶7, 30-35 & 40.  Currently, he hosts The Alex Jones Show from Austin, Texas, which is the longest-running online news and politics talk show today

EXHIBIT 28

and was previously broadcast by the Genesis Communications Network across the United States via syndicated and internet radio. As such he was entitled to, but denied, all the Constitutional protections afforded media defendants.

### D. ALEX JONES GOES ON MEGAN KELLY SHOW IN JUNE 2017 WHICH PROMPTS SUIT

62. In June 2017, NBC talk show host and political commentator Megyn Kelly hosted Alex Jones on a live broadcast on NBC. The interview covered many subjects and lasted approximately 17.5 minutes in its entirety. Approximately 4.5 minutes of that airtime involved (a) Kelly talking about Sandy Hook, which included her own comments and commentary, (b) Kelly asking question of and making allegations against Jones; and (c) Kelly interviewing Neil Heslin, a parent of one of the murdered children who sued Jones in Texas. A copy of what is believed to be an accurate transcript of relevant portions of the June 2017 Megyn Kelly interview is attached hereto as **Exhibit 5**. [3] Even a casual review shows nothing remotely resembling defamation is found in that interview.

### E. THE CONNECTICUT PLAINTIFFS SUE MR. JONES AND THE TRIAL COURT ENTERS DEATH PENALTY SANCTIONS CRUSHING JONES'S CONSTITUTIONAL RIGHTS

63. Over five years after the Sandy Hook tragedy, on May 23, 2018, the Connecticut Plaintiffs sued Mr. Jones in Waterbury, Connecticut (population approximately 115,000) and their complaint (**Ex. 6** hereto) sets forth causes of action for (i) invasion of privacy, (ii) defamation and defamation per se, (iii) intentional infliction of emotional distress, and (iv) violations of the Connecticut Unfair Business Practices ACT. See Order, p. 2.

---

[3] Plaintiffs' Amended Complaint [**Ex. 14**] cites the youtube version of this interview at ¶391, n. 51. The attached transcript is a true and correct copy of the youtube interview the Connecticut Plaintiffs reference.

64.     The Connecticut statute of limitations is two years for defamation (Sec. Conn. Gen. Stat. 52-597) and three years for intentional infliction (Conn. Gen. Stat. § 52-577).  Almost all of the events complained of occurred well outside of the statute of limitations and yet were the subject of the grossly excessive damage awards.

65.     This Court knows that "Death Penalty Sanctions" were rendered on November 14, 2021.  **Ex. 3**.  But for this Court to state that the case was "thoroughly litigated" for three years before those sanctions [Order, p. 1] is simply wrong.   Upon filing suit, Jones filed a motion to dismiss under the Connecticut anti-Slapp laws, which effectively stayed the case which stay continued when the anti-Slapp denial went to the Connecticut Supreme Court.   As the Court of Appeals itself recently stated: "The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further."  *Lafferty v. Jones*, 229 Conn. App. 487, 496 n.8 (2024).

66.     Thus, the case was not "litigated" for three years as this Court was led to believe and incorrectly stated.

**IV.**
**FEDERAL COLLATERAL ESTOPPEL LAW REQUIRES THAT BOTH (I) A STATE COURT HAVE USED THE CORRECT STANDARDS AND (II) OVERRIDING PUBLIC POLICY ISSUES TAKE PRECEDENCE**

67.     This Court correctly cites *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (hereafter, "*Grogan*") that makes collateral estoppel available in dischargeability cases. [Order, p. 8].  However, this Court makes fatal mistakes in its explanations of the holding and application of the holding of *Grogan*.

**A.  GROGAN REQUIRES APPLICATION OF A CLEAR AND CONVINCING STANDARD, NOT A PREPONDERANCE OF THE EVIDENCE STANDARD AS THIS COURT INCORRECTLY STATES**

**Page 31 of 619**

**EXHIBIT 28**

68.     *Grogan* dealt with the question of whether or not in determining dischargeability, a preponderance of the evidence standard should apply versus a clear and convincing standard. The Court in *Grogan* held it should be a preponderance of the evidence, but with the exception that a clear and convincing standard would apply if "particularly important individual interests or rights are at stake." *Grogan*, 498 U.S. at 286. Induced by the plaintiffs here, the "if particularly important individual interests or rights are at stake" caveat that shifts the dischargeability burden to clear and convincing, was omitted from even discussion; clearly it was not applied. That was error.

69.     The preponderance of the evidence standard is generally applied where there is a monetary dispute between private parties, where society has a minimal concern with the outcome. Therefore, litigants "share the risk of error in roughly equal fashion." *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 1808 (1979).

70.     In bankruptcy proceedings, for example, the preponderance of the evidence standard is used in cases that determine whether debts will be excepted from the debtor's discharge pursuant to Section 523(a). *Grogan*, 498 U.S. at 286. The U.S. Supreme Court has plainly stated, however, that a clear and convincing standard applies in cases where the interests at stake are deemed to be more substantial than mere loss of money:

> The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal" and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." … One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases.

EXHIBIT 28

*Addington*, 441 U.S. at 424.

71.     In *In re Mark*, 336 B.R. 260, 265 (Bankr. D. Md. 2006) the bankruptcy court referenced that clear and convincing evidence is used to overcome the statutory presumption of bad faith in Section 362(c)(3)(A)). This heightened standard of proof necessitates a showing of high probability or reasonable certainty, but short of unequivocal.  See *Kent K. v. Bobby M.,* 210 Ariz. 279, 110 P.3d 1013, 1018-19 (Az. 2005); *Judicial Inquiry and Review Com'n of Virginia v. Peatross*, 269 Va. 428, 611 S.E.2d 392, 400 (Va. 2005).   Additionally, it should apply if that is the standard that was supposed to have been employed in the Connecticut trial court as it was here.

72.     And logic dictates that uses of the clear and convincing standard shows the issue is not whether all the Connecticut plaintiffs needed to show was that Death Penalty Sanctions were entered.  To the contrary, use of that standard underscores that it is the underlying merits that are to be analyzed, not a non-issue related sanction, particularly one that has been shown to be irrelevant given the CUTPA reversal.

## B.  GROGAN REQUIRES THAT CONNECTICUT HAVE USED THE SAME CORRECT STANDARDS IN STATE COURT BEFORE COLLATERAL ESTOPPEL CAN APPLY

73.     First, the Supreme Court does indeed clarify that as suggested in *Brown v. Felsen*, 442 U.S. at 139, n.10, collateral estoppel does apply in bankruptcy proceedings.  But it is not a blanket application.  Rather collateral estoppel only applies if the prior state court proceeding used "standards identical" to the standards of §523, which clearly implies compliance with the Constitution, a fact absent here.  Specifically, if the U.S. Constitution mandates a different standard for defamation actions against media defendants than was used in Connecticut – for example the requirement for falsity and fault to be proved by clear and convincing evidence – a state court

EXHIBIT 28

judgment based on a no fault finding, or even based on negligence, is not an action where the standards are the same. This has happened here in numerous instances.

**C. GROGAN REQUIRES THAT BEFORE COLLATERAL ESTOPPEL CAN APPLY TO A STATE ACTION, THERE ARE NO "OVERRIDING PUBLIC POLICY GROUNDS THAT WOULD BE VIOLATED OR AFFRONTED**

74.     Additionally, collateral estoppel can only apply if there are no overriding public policy grounds, which there are here which were ignored by this Court's Order. *Brown v. Felsen*, 99 S. Ct. 2205, 2213 n. 10. Here, as will be conclusively demonstrated, the Constitutional issues that were completely disregarded, create significant "overriding public policy grounds" that deny collateral estoppel effect to the Connecticut judgment. And this Court should not and indeed cannot disregard its duties and defer to a Connecticut state court tribunal in the face of them.

**V.**
**THE COURT HAS BEEN LED TO MISSTATE CONNECTICUT LAW ON COLLATERAL ESTOPPEL**

75.     First and foremost, the Fifth Circuit has made plain that "collateral estoppel" should be applied by a bankruptcy court in "limited circumstances":

> Because Congress granted bankruptcy courts exclusive jurisdiction to determine whether a debt is dischargeable based on the bankruptcy courts' expertise, *Brown v. Felsen*, 442 U.S. 127, 135-36, 60 L. Ed. 2d 767, 99 S. Ct. 2205 (1979), "in only limited circumstances may bankruptcy courts defer to the doctrine of collateral estoppel and thereby ignore Congress' mandate to provide plenary review of dischargeability issues." *Dennis v. Dennis (In re Dennis)*, 25 F.3d 274, 278 (5th Cir. 1994).

*Schwager v. Fallas (In re Schwager),* 121 F.3d 177, 181 (5th Cir. 1997). And the Fifth Circuit has also made plain that "collateral estoppel" should be strictly construed against creditors:

> "It is a well recognized principle in bankruptcy law that exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor. This is based on the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start.'" In re

**EXHIBIT 28**

*Marvin, 139 Bankr*. 202, 205 (Bankr. W.D. Wis. 1992) (*citing Gleason v. Thaw*, 236 U.S. 558, 35 S. Ct. 287, 59 L. Ed. 717 (1915)).

*Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

**A. THIS COURT HAS BEEN LED TO CONFLATE THREE BODIES OF LAW: (I) COLLATERAL ESTOPPEL IN A SUBSEQUENT CASE AFTER FULL TRIAL IN THE FIRST CASE; (II) DEFAULTS WHEN ADDRESSED IN SAME CASE ON DIRECT APPEAL; AND (III) COLLATERAL ESTOPPEL WHERE THERE HAS BEEN A SEPARATE DEFAULT JUDGMENT**

76.     Bearing these requirements in mind, this Court's Opinion incorrectly states Connecticut law on collateral estoppel. Additionally, it conflates holdings in (a) collateral estoppel cases where there has been a full trial or full evidentiary determination in a prior case, (b) default judgment cases where the default is addressed on direct appeal and (c) collateral estoppel cases when there was a default judgment in the first matter and the subject of the default was sought to be used in a later action by collateral estoppel. The distinctions among these three types of cases are crucial to maintain for proper case analysis and yet their distinctions have been blurred beyond recognition. Jones respectfully submits that this Court has been misled in its interpretation by conflating these three distinct areas and also in its analysis of each of these separate bodies of law. This, in turn, has resulted in erroneous statements of the law and erroneous applications to this case.

**B. CONNECTICUT LAW ON COLLATERAL ESTOPPEL HAS BEEN MISSTATED; IT MANDATES A FLEXIBLE, NONMECHANICAL APPROACH THAT AVOIDS INJUSTICE AND YIELDS TO PUBLIC POLICY**

77.     As stated, this Court's Opinion incorrectly states Connecticut law on collateral estoppel in general apart from default in earlier cases. This Court's Opinion states mechanistic case recitals but omits Connecticut's commands for flexibility in applying collateral estoppel

**EXHIBIT 28**

where public policy issues prevail and where injustices would otherwise occur and disregards the Fifth Circuit's caution of use in only "limited circumstances." *Id*. *In re Schwager*.

78.     This Court correctly quotes a portion of *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 15 A.3d 601, 613 (Conn. 2011) stating that "under Connecticut law, collateral estoppel 'prohibits the re-litigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim.'" But this Court omits the most relevant portion of the holding of *Lighthouse* which appears a few sentences later, where the Connecticut Supreme Court emphasizes these rules are not to be applied mechanically but rather flexibly with equity in mind and particularly not to apply when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." Specifically, *Lighthouse* explains this requirement shortly after the paragraph this Court quotes, which profoundly changes this Court's Opinion:

> Additionally, application of the doctrine of collateral estoppel is neither statutorily nor constitutionally mandated. The doctrine, rather, is a judicially created rule of reason that is enforced on public policy grounds. Accordingly, as we have observed in regard to the doctrine of res judicata, the decision whether to apply the doctrine of collateral estoppel in any particular case should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close and the competing interest of the plaintiff in the vindication of a just claim. These underlying purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." (*Cumberland Farms, Inc. v. Groton,* 262 Conn. 45, 58-59, 808 A.2d 1107 (2002). **We also have explained that courts should be careful that the effect of the doctrine does not work an injustice**. **Thus, the doctrines of preclusion should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies."**

EXHIBIT 28

*Lighthouse Landings,* 15 A.3d at 613-14 (cleaned up; emphasis added). Elaborating on the required flexibility in applying collateral estoppel, the court noted mechanical application of collateral estoppel rules as this Court was led to do, can yield harsh results.

79. And the *Cumberland Farms* case, also cited briefly by this Court but not analyzed, is even clearer that Connecticut's version of collateral estoppel commands the avoidance of the very mechanistic application of collateral estoppel rules this Court here was led to apply, in lieu of flexibly looking at the totality of facts. In the *Cumberland Farms* case, the Connecticut Supreme Court stated:

> We also have recognized, however, that the application of the collateral estoppel doctrine has dramatic consequences for the party against whom the doctrine is applied. **Consequently, courts should be careful that the effect of the doctrine does not work an injustice. Thus, the doctrines of preclusion should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded** by finality in legal controversies. *See also Quinones Candelario v. Postmaster General of the United States*, 906 F.2d 798, 801 (1st Cir. 1990), cert. denied, 499 U.S. 919, 111 S. Ct. 1307, 113 L. Ed. 2d 242 (1991) (eschewing automatic or rigid application of doctrine of res judicata to determinations in administrative proceedings in face of contrary public policy).

*Cumberland Farms,* 808 A.2d at 1117 (cleaned up; internal citations omitted; emphasis added).

80. Also in *Cumberland Farms,* after stating the mandate for flexibility in analysis, the Connecticut Supreme Court went on to note there are several "exceptions" to the general rules of preclusion doctrines, stating

> "In establishing exceptions to the general application of the preclusion doctrines, we have identified several factors to consider, including: (1) whether another public policy interest outweighs the interest of finality served by the preclusion doctrines; (2) whether the incentive to litigate a claim or issue differs as between the two forums; (3) whether the opportunity to litigate the claim or issue differs as between the two forums; and (4) whether the legislature has evinced an intent that the doctrine should not apply.

*Cumberland Farms,* 808 A.2d at 1117 (cleaned up; internal citations omitted).

**EXHIBIT 28**

81.     In fact, in *Cumberland*, the Connecticut Supreme Court rejected the mechanical application of collateral estoppel in that case where "for policy reasons, the doctrine of collateral estoppel does not bar the plaintiff from litigating, in its inverse condemnation action, any and all factual issues relevant to its claim of inverse condemnation regardless of whether those issues were decided…" *Id*. at 1115.  And the reason collateral estoppel was deemed irrelevant for policy reasons was because it involved a "constitutional takings claim" and protecting constitutional issues always is public policy concern. *Id.* at 1118.

82.     The mandate that collateral estoppel does not apply if it would work an injustice is also the law in the Fifth Circuit, which this Court was led to ignore:

> For collateral estoppel to apply, a party must have had a full and fair opportunity to litigate the issue in the prior action and there must be *no undue unfairness* to the party estopped. Caton clearly had a full and fair opportunity to contest the issue in the state proceeding, and we find no injustice in applying the doctrine of collateral estoppel in this case.

*Caton v. Trudeau (In re Caton),* 157 F.3d 1026, 1029 (5th Cir. 1998).

83.     Thus, while these cases were cited by the Connecticut Plaintiffs and this Court itself, the critical aspects of the Connecticut law of collateral estoppel particularly applicable to Jones, were omitted.  To this extent, the legal basis for this Court's Opinion is incorrect and must be reconsidered and corrected.

## C.  CONNECTICUT LAW ON DEFAULT JUDGMENTS HAS BEEN MISSTATED AND MISAPPLIED.

84.     Initially, it must again be stated that there is a distinction in Connecticut law on the law of default judgments in direct appeals versus what collateral estoppel effect is given to a prior default in a different case.  The case of *Smith v. Snyder*, 267 Conn. 456, 458, 839 A.2d 589, 592 (2004) which this Court cites at Order p. 9, is a direct appeal in a default judgment case, and thus is irrelevant here.  In fact, the term "collateral estoppel" is not found in that case.  *Snyder* does,

**EXHIBIT 28**

however, cite *De Blasio v. Aetna Life & Cas. Co., 186* Conn. 398, 401, 441 A.2d 838, 839 (1982) (hereafter, "*DeBlasio*") as does this Court. But this Court has again been led into error in its analysis of Connecticut law even on defaults alone, apart from collateral estoppel. In summary, in Connecticut, Jones was denied the ability to make any defense and the jury instructed that he was deemed liable for defamation, intentional infliction and other causes as a matter of law, all arising from the November 15, 2021, Death Penalty Sanctions. See **Ex. 3**. But that is not Connecticut law according to the Connecticut Supreme Court in *De Blasio.*

85.     In *De Blasio*, a case this Court cites,

> "The entry of the default, however, does not preclude the defendant from raising a defense at the hearing in damages. If timely written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint. The defendant may also challenge the right of the plaintiff to maintain the action or prove any matter of defense. If the defendant appears in the action and furnishes the required notice, the subsequent hearing in damages takes on the nature of a supplemental trial involving the determination of questions of law and fact, and the determination of the damages to be assessed after such trial."

*De Blasio* 441 A.2d at 839 (cleaned up; citations omitted). Yet here, even though Jones filed a notice of defenses [**Exhibit 13**], he was still precluded from raising his defenses both in Connecticut and here as well. If Jones is permitted in Connecticut to raise defenses even after default, unquestionably he should be able to do so here. Further, because he was not permitted to raise his defenses, the issues there were not litigated at all, and certainly not "fully and fairly."

86.     Thus, *Smith v. Snyder* is irrelevant in the collateral estoppel context, and even if it were the holding of *De Blasio* makes clear that a default judgment does not deprive a defaulting party of mounting defenses – rights Jones was denied which are another reason to not find Jones is here collaterally estopped. But more importantly, pure default judgment cases are not relevant to the issue of collateral estoppel.

EXHIBIT 28

**D.** **CONNECTICUT LAW ON COLLATERAL ESTOPPEL IN THE CONTEXT OF DEFAULT JUDGMENTS HAS BEEN MISSTATED – THE GENERAL RULE IS THERE IS NO COLLATERAL ESTOPPEL WHERE THERE HAS BEEN A DEFAULT JUDGMENT**

87.     *De Blasio* leads to the case of *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993), which is the only *authoritative* Connecticut case that Jones is aware of, addressing collateral estoppel when the first case is a default judgment.

88.     This Court references only three cases where collateral estoppel has been applied to a prior default judgment.  The **first** is *Custom Pools v. Underwriters Inc.*, No. CV 940135908, 1996 WL 66264, at *2 (Conn. Super. Ct. 1996), a 1996 district court case that has only been cited by this Court in its Opinion. [4]  The **second** is *Leblanc-Jones v. Massie (In re Massie)*, No. 14-50579, 2018 WL 3218847, at *3 (Bankr. D. Conn. 2018), a Connecticut bankruptcy case that has similarly only been cited once and that is by this Court in its Opinion.  Both cases are based on odd facts not applicable for consideration here and should not be considered authoritative.

89.     The **third** and by far most significant case where collateral estoppel has been applied to a prior default judgment is the Connecticut Supreme Court's decision in *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993) (hereafter "*Whipple*").  While *Whipple* appears to be the leading case on the subject, it was only cursorily cited by this Court, merely referenced for the banal proposition that the phrase "full and fairly litigated" means the party to be estopped, here Jones, "had an adequate opportunity to litigate the matter in the earlier proceeding."  Order pp, 9 & 10.  But this Court has overlooked some of the most important points of *Whipple,* demonstration of which involves examining the facts of that case.

---

[4] *Custom Pools* is a factually confused opinion, in part because it suggests there had been an appellate review of the case when such appears to have not occurred.  That case involved two suits, one by an insurance broker for the premium due and the other by the actual insurance company itself for the premium due. The insured had paid the broker, but for reasons that are never explained, defaulted in the similar suit filed by the insurance company itself.

EXHIBIT 28

90. In the *Whipple* case, Gloria Jackson owned a mobile home situated on the lot that she leased from Whipple trailer park. Whipple won a summary proceeding to evict her from the trailer park, which was appealed, but later dismissed. The trial court order contained an eviction date for some point in the future. While the execution of eviction order was still pending in the first case, Whipple commence a collection action against Ms. Jackson to recover legal fees, incurred in the summary proceeding in which Whipple obtained a pre-judgment attachment of the mobile home itself and removed it from the mobile home park. In the collection action, Whipple obtained a default judgment.

91. Ms. Jackson moved to open the default judgment in the collection action and an evidential hearing was held which she lost. When the mobile home was sold at auction, Ms. Jackson initiated a multi-count complaint against the defendant, alleging improprieties in both the eviction and the collection actions. Whipple filed a motion to strike the abuse of process cause of action, arguing that collateral estoppel applied to the entire original complaint, which the trial court granted but the Connecticut Supreme Court rejected.

92. In rejecting the application of collateral estoppel, the Supreme Court first noted that Connecticut follows the Restatement of Judgments, which it quoted, stating the general rule followed in Connecticut but not referenced by the Order, that default judgments are generally not afforded collateral estoppel effect:

> Whether a prior default judgment has issue preclusive effect in a subsequent action involving a different cause of action has not been settled by this court. The Restatement adopts the position that "presence" of the parties is a necessary condition for a matter to be "actually litigated" for the purpose of issue preclusion. **In the comments to the section on issue preclusion in the Restatement, it is stated that "in the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated**." (Emphasis added.) 1 Restatement (Second), Judgments § 27, comment (e) (1982). Professors James and Hazard, two prominent supporters of the Restatement state "if a defendant over whom jurisdiction has been obtained defaults of appearance or fails to plead or otherwise defend,

EXHIBIT 28

nothing is put in issue save possibly the facts needed to give the court jurisdiction over the subject matter. No other matter or point, then, becomes binding on the parties in later actions upon different claims." *Whipple*, 627 A.2d at 378.

93.     Embracing the flexible, non-mechanical application of the rules that would later be enunciated in general collateral cases discussed above, the Connecticut Supreme Court indicated that the general rule in the context of a default judgment was that the matter was not actually litigated, but that should not be mechanically applied finding that

> "Adherence to this requirement, however, should not demand that in all circumstances a default judgment should mechanically be deprived of any issue preclusive effect. Such a demand would make inflexible the doctrine of issue preclusion, which we have noted must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Whipple*, 627 A.2d at 379

94.     In flushing this out, it reiterated that the critical inquiry was whether Ms. Jackson had a full and fair opportunity to litigate the issues which the trial court later precluded from litigation with respect to the plant claims for abuse of process:

> "Under the circumstances of this case, it is unclear whether the prior collection action afforded the plaintiff a full and fair opportunity to litigate the issues that the trial court later precluded from litigation with respect to the plaintiff's claims of abuse of process." *Whipple*, 627 A.2d at 380.

95.     In even posing that question, the court there makes it clear that a prior entry of a default judgment is not the issue.   Rather, the focus of the Supreme Court was on the ability to litigate the specific issues in question, not litigate in general [5] and notwithstanding the default, held that "…the [trial] court misapplied the doctrine of res judicata and improperly granted the defendants' motion for summary judgment."  *Id*. In so doing, the Connecticut Supreme Court cited

---

[5] *Whipple*, 627 A.2d at 380 ("The defendants maintain that the hearing on the plaintiff's motion to open the default judgment … provided this full and fair opportunity to **contest the issues** in question and that **these issues were actually litigated** and necessarily determined."); *Id.* at 380-81 ("We cannot say, therefore, that she was afforded a full and fair opportunity to explore the factual issues she later sought to litigate in her abuse of process claims. Nor can we conclude that the default judgment in the collection action necessarily determined" all of the issues that were later precluded.")

**EXHIBIT 28**

the Restatements' strong policy considerations ***against*** collateral estoppel where prior defaults were concerned. *Whipple*, 627 A.2d at 379 n. 8.

96.     Hence, Connecticut law on the collateral estoppel effect of a prior default judgment leans strongly against giving a prior default effect, a fact the Opinion ignores and actually goes goes against.

**E.   THIS CASE IS NOTHING LIKE *SCARBROUGH V. PURSER (IN RE SCARBROUGH*).**

97.     No doubt due to the confusion the Connecticut Plaintiffs have created, this Court was led to erroneously conclude that "…this case is like the bankruptcy court decision in *In re Scarbrough*."   Order, pp. 14-15.  This case is nothing like *Scarbrough*.   Reiterating once again, this Court has been led to conflate three separate bodies of law: (a) collateral estoppel cases where there has been a full trial a full evidentiary showing in the prior case; (b) default judgments addressed in direct appeals; and (c) the collateral estoppel effects of prior default judgments in later filed cases (i.e., not in direct appeals).  Adding to the confusion, in each of these three discrete categories, this Court also conflates all of Connecticut, Fifth Circuit and Texas law on these points.

98.     The case of *In re Scarbrough,* 516 B.R. 897 (Bankr. W.D. Tex. 2014) *aff'd sub nom., Scarbrough v. Purser (In Re Scarbrough),* 836 F.3D 447, 456 (5th Cir. 2016) dealt with the collateral estoppel effects of a Texas jury verdict in a later filed case, i.e., a determination of bankruptcy dischargeability.  The phrase "default" appears nowhere in the case.   The *In re Scarbrough* case is based on a horrendous set of facts, involving four general "character groups":

    a.   the first was Mr. Gary Purser, a wealthy, elderly man who was in badly declining mental and physical health;

    b.   The second "character group" consisted of the ailing Mr. Purser's wife and children (the "Family");

EXHIBIT 28

c. the third" character group" consisted of two much younger women (Melissa Deaton and Denise Steele) who sought to financially exploit the ailing Mr. Pursuer and alienate him from his Family; and

d. the fourth "character group" was an unscrupulous lawyer named Jerry W. Scarbrough, who represented the exploiting women, Deaton and Steele, and was the Debtor in his later filed bankruptcy that is the subject of the *In re Scarbrough* case.

99. In short summary, among other things, in the course of a general plot spearheaded by the unscrupulous lawyer, Jerry Scarborough, audio tapes had been made including one made by his exploiting clients (Deaton and Steele) when they were in a hot tub with the ailing Mr. Pursuer first talking in fantasy terms of sexual activity and then telling Mr. Purser he could not trust his Family.

100. Also, under odd circumstances, another audio tape made by Scarborough himself was discovered, where Scarborough "discussed with his wife how each of the Pursers should have to pay one million dollars to him in settlement of Ms. Deaton's claims in the lawsuit." [516 B.R. at 909-10]. This audio tape along with the "hot tube" tape were called the "Secret Recordings."

101. Although all tapes were requested to be produced in discovery, the Secret Recordings were not produced. Chiefly for failure to produce the Secret Recordings, Scarborough himself was personally sanctioned $54,261.50. [516 B.R. at 918.]

102. As attorney for his two exploiting clients (Deaton and Steele), the unscrupulous lawyer, Jerry Scarborough, not only filed a host of suits and motions within those suits, all to embarrass the Family, Scarborough (a) filed a false police report claiming Mr. Purser's wife had threatened to kill Deaton (one of the women exploiting Mr. Purser); (b) urged others to support the appointment of a guardian ad litem for Mr. Purser to "protect" him from his Family; (c) reported to the Texas Department of Adult Protective Services ("APS"), that the Family was

**EXHIBIT 28**

committing "elder abuse" of Mr. Purser, including by "overdosing" Mr. Purser on his prescription medicines, causing APS to initiate an investigation in which they found Scarborough's allegations to be invalid; (d) when Mr. Pursuer later died of pneumonia in the hospital, Scarborough "reported to the funeral home, two local justices of the peace, the Temple Police Department, the Killeen Police Department, and the Texas Rangers that the Purser Family had 'murdered' or 'killed' Gary Purser by overdosing him on prescription drugs because they wanted his money," which the Killeen Police Department determined the accusations were "unfounded"; [516 B.R. at 909] and (e) after Purser's funeral, "cold-called" one of Mr. Purser's cousins where Scarborough "implied" he represented Mr. Purser and discussed Scarborough's theories that some members of the Family used illegal drugs and "that the Family abused and killed Gary Purser by overdosing him on prescription drugs." [516 B.R. at 908-09].

103.  Scarborough's antics also were conducted out of court where he posted You Tube videos claiming bad things against one of the Family members who was running for the Killen School Board, which she lost as a result. [516 B.R. at 913].

104.  While Deaton and Steele (the two exploiting women) represented by Scarborough were the initiating plaintiffs, the Family countersued and added Scarborough as a defendant, the Family claiming they were the victims of defamation and fraud.  After a *full trial*, where all the evidence was presented and witnesses examined and cross examined, the jury returned a verdict against Scarbrough, Deaton and Steele jointly and severally.

105.  Scarborough filed bankruptcy seeking discharge of both the (a) the jury verdict rendered against him and (b) the monetary sanctions award of the trial court entered against him personally for his having hidden the Secret Recordings.

**EXHIBIT 28**

106. The bankruptcy court held collateral estoppel rules of Texas applied to the damages the jury had awarded and then analyzed whether the debts were nondischargeable. As to the dischargeability issue on defamation, the bankruptcy court noted all the evidence that had been presented to the jury, and noted that after weighing the evidence

> "The jury found that Debtor's statements were defamatory per se. Included in the defamation per se jury question was the characterization that the Debtor made statements 'he knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s).'"

107. But the bankruptcy court did not just accept the paper record and assertions of counsel, as the Fifth Circuit observed, the bankruptcy court conducted a "nine-day trial on the merits."

108. Apparently, the only issue resolved by the bankruptcy court by summary judgment was the nondischargeabilithy of the monetary sanction. As to the defamation claims, the Fifth Circuit explained that the evidence presented was what led them to affirm, explaining:

> "Several incidents lead this court to affirm the lower court's judgment. Among them was Scarbrough's (1) false reporting to Adult Protective Services; (2) posting a video of a personal family conflict on YouTube in an attempt to hinder JoAnn Purser's bid for a school board seat; and (3) conspiring to make false statements and reports that JoAnn Purser threatened to kill others and that Appellees consumed illegal drugs. *See, e.g., French v. French*, 385 S.W.3d 61, 72 (Tex. App.—Waco 2012, pet. denied) ("A statement that falsely charges a person with the commission of a crime is defamatory per se." (*citing Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984))). We find no error in the lower court's ruling.

*Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 455-56 (5th Cir. 2016)

109. Here no jury found anything to do with Mr. Jones's underlying liability but rather were repeatedly "instructed" by the Connecticut trial court that "the law" had determined Jones liability and the jury's only task was to assess damages, which will be quoted in detail, *infra*. See **Ex. 1.** And this Court has heard no evidence of the underlying "defamations."

**EXHIBIT 28**

110. Not only did the jury make no factual determinations concerning Mr. Jones, neither did the trial court, which "determined" liability because of three minor issues, referenced herein.

## VI
### THE CONNECTICUT COURT OF APPEALS REVERSAL OF CUTPA IS OF ENORMOUS SIGNIFICANCE

**A. THE CONNECTICUT COURT OF APPEALS HAS DETERMINED CUTPA CLAIMS WERE NOT VALID -- MANDATING CHANGE OF THIS COURT'S DISCHARGEABILITY RULING ON CUTPA PUNITIVE DAMAGES**

111. This Court is now aware that the Connecticut Appeals Court has reversed the award of CUTPA punitive damages which are of $150,000,000. *Lafferty v. Jones,* 229 Conn. App. 487, 537 (2024) ("The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.") See **Ex. 2** hereto. Hence, this Court's determination on the issue of CUTPA punitive damages requires this Court to revisit the issue of dischargeability of the CUTPA punitive damages in the amount of $150,000,000 and find them dischargeable as a matter of law.

112. Additionally, as discussed in detail *infra*, these punitive damage awards were not established by clear and convincing evidence. See, e.g., *Milkovich,* 497 U.S. at 15-16 ("…States [can] not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice.").

**B. REVERSAL OF CUTPA REQUIRES RECONSIDERATION OF CUTPA COMPENSATORY DAMAGES WHICH IN TURN REVEALS ILLEGAL MULTIPLE DAMAGES**

113. The trial court awarded compensatory damages based on CUTPA. "Damages due to the defendants' violation of [CUTPA] are included in the other damages measures that I am describing to you and you will not assess them separately." **Ex. 11,** Court Charge, p. 11, p. 24.

EXHIBIT 28

Thus, the CUTPA compensatory damage award must be reversed too. And examining what those reversable CUTPA compensatory damages are, shows what can most simply be called a dramatic "multiple recovery."

114. A plaintiff is entitled to allege respective theories of liability in separate claims. Here the Connecticut Plaintiffs alleged defamation, intentional infliction of emotional distress, false light, invasion of privacy, and violation of the Connecticut Unfair Trade Practices Act. While the elements of each were different, the Connecticut trial court stated that the damages for each were the same. See, e.,g., **Ex.** 11, Connecticut Jury Charge pp.23 ("Damages due to the defendants' violation of [CUTPA] are included in the other damages measures that I am describing to you and you will not assess them separately."). The "damage measures" the trial court "described" consisted of reputational damage and emotional distress -- the same two measures of damage for each cause of action asserted.

115. As the CUTPA claim was reversed, the compensable damages associated therewith are similarly excluded. But what are they? The jury verdict includes two damage numbers for each plaintiff, consisting of "**defamation/slander damages**" and "**emotional distress**" as the representative portion of the verdict form for Robbie Parker shows:

**EXHIBIT 28**



See Jury Verdict, **Ex 1 & Ex. 12**. Notably the charge does not state reputational damages and emotional distress, but **defamation damages** and **emotional distress**. In a defamation case, the jury may award the plaintiff damages for the injury to his reputation and the mental suffering and emotional distress caused by the defamation. *Chugh v. Kalra*, 342 Conn. 815, 850-51, 271 A.3d 993, 1012-13 (2022) *(citing Battista v. United Illuminating Co.*, 10 Conn. App. 486, 492, 523 A.2d 1356)). The same reputational injury and emotional distress is compensable as a result of intentional infliction, invasion of privacy and CUTPA.

116.    But as **defamation damages** includes both reputation and emotional distress, in awarding both **defamation damages** and **emotional distress**, there has been a "double recovery," revealed by the required removal of CUTPA damages necessitated by CUTPA reversal.

117.    Even though a plaintiff may assert different causes of action, he or she is not entitled to recover twice for harm growing out of the same transaction, occurrence or event. *Jonap v. Silver*, 1 Conn. App. 550, 561-62, 474 A.2d 800 (1984). The rule precluding double recovery is

a "simple and time- honored maxim" that a plaintiff "may be compensated only once for his just damages for the same injury . . . ."  *Rowe v. Goulet,* 89 Conn. App. 836, 849, 875 A.2d 564, 571 (2005) *citing Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 22 n.6, 699 A.2d 964 (1997).

118.     Federal law is the same.  *See Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 332 (Bankr. N.D. Tex. 2011) ("Farooqi has proven the following claims against Inc.: (i) fraudulent inducement, with actual and exemplary damages of $88,500; and (ii) violation of §17.46(b)(12) and §17.46(b)(24) of the DTPA, with actual and exemplary damages of $88,500. Farooqi has also proven that Carroll is personally liable for Farooqi's damages. Because Texas law forbids double recovery, Farooqi can only recover once for his $88,500 of damages.")

119.     The problem here is that the Connecticut Plaintiffs cannot "choose" which damage model they want, as **defamation damages** includes **emotional distress**.   As such the entirety of the damage cannot be determined by summary judgment and thus the previous grant of summary judgment must be reconsidered and denied.

C.  **BECAUSE OF THE CUTPA REVERSAL, THE DEATH PENALTY SANCTIONS WERE INVALID AS A MATTER OF LAW**

120.     While the Court of Appeals reversed the trial court's CUTPA determination, the impact of this reversal should have been felt on the Death Penalty Sanctions which were all based on the CUTPA cause of action.  They were not, as the impact of the CUTPA reversal on the Death Penalty Sanctions was not addressed by the Court of Appeals and thus must be addressed by this Court.

    i.     *This Court Should Review This Issue As Both Federal and Connecticut Collateral Estoppel Requirements Mandate Equity and Fairness Considerations As Part Of Collateral Estoppel Analysis*

**EXHIBIT 28**

121.     As explained in detail *supra*, this Court was led to an incorrect understanding of both federal and Connecticut state collateral estoppel requirements. On the federal level, *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) states that a federal court sitting in diversity on state claims looks to the law of the tribunal that rendered the judgment, here Connecticut, subject to the important caveat that such is the case unless there are overriding policy reasons to not do so, which often results in a "fair and equitable" analysis.

122.     Connecticut collateral estoppel law amplifies this "fair and equitable" requirement in application of the collateral estoppel effects of Connecticut judgments:

> "Thus, the doctrines of preclusion should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies."

*Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 15 A.3d 601, 613-14 (Conn. 2011) (cleaned up; emphasis added).

123.     Based on these requirements, in the appeal to the Connecticut Court of Appeals, Jones's counsel raised the issues that (a) the Death Penalty Sanction of default judgment was not warranted and (b) CUTPA claims were not cognizable. The Court of Appeals disagreed with the first point but agreed with the second. What was not addressed by the Court of Appeals, however, was what the result would be to the Death Penalty Sanctions if the CUTPA claims on which they were principally based were eliminated – which is exactly what happened. Hence the issue here presented, which this Court must address, is precisely that: should this Court in fairness and equity give effect to Death Penalty Sanctions when the primary bases for their issuance was based on issues associated with a cause of action that was legally improper and has been eliminated by the Court of Appeals.

EXHIBIT 28

124. Particularly as appeals from the Court of Appeals to the Connecticut Supreme Court are limited and not a matter of right (as explained elsewhere herein), this issue may never be presented to or ruled on by the Connecticut judicial system. Thus fairness and equity demands that this Court examine this issue. And for the reasons set forth below, this Court will conclude that when the CUTPA cause of action was eliminated, the primary bases for the Death Penalty Sanction was eliminated as well, and as such this Court should not give collateral estoppel effect to that sanction.

ii. *The Death Penalty Sanctions Were Not Entered For "Repeated Violation Of Discovery Orders" But For Three Specific And Trivial Reasons*

125. First, this Court said the Death Penalty Sanctions were entered for "repeated violation of discovery orders" [Order, p. 2]. This is simply wrong.

126. The "Death Penalty" was entered because of three discrete acts plainly stated in the transcript of the hearing that occurred November 15, 2021 [**Ex. 3**] where the Connecticut trial court articulated the three reasons for her order of death to the U.S. Constitution. It is important to note there were only three reasons for the Death Penalty Sanctions, since this Court recites some of the inflammatory and incorrect commentary supplied by the Connecticut Plaintiffs surrounding these three trivial reasons, making is sound as if there were other reasons, this Court stating its apparent misunderstanding:

EXHIBIT 28

> In November 2021, the state court entered a default judgment against the defendants for repeated violation of discovery orders.[5] The court stated on the record that the Jones defendants withheld analytics and information that were "critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims."[6] That the "callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants."[7] And that "the Jones defendants were not just careless" but "their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders" was a "consistent pattern of obstructive conduct.[8]
>
> [5] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ. J. Ex. 74, ECF No. 59-24.
> [6] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ. J. Ex. 74 at 14:12–15, ECF No. 59-24.
> [7] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ J. Ex. 74 at 14:15–18, ECF No. 59-24.
> [8] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ. Ex. 74 at 15:1–4, ECF No. 59-24.

Order p, 2]. These grandiose charges, stated as if they are accurate summaries, are belied by the text of the Death Penalty Order itself which states there were only three reasons.

127. The first of the three reasons for the Death Penalty Sanctions was because Jones's lawyers asked for a commission to take Hillary Clinton's deposition. The other two were Jones's unsatisfactory answers to discovery questions directly related to the Plaintiffs' now-reversed CUTPA claim. We will first address the now-irrelevant CUTPA related requests and conclude with why the trial court's penalties for requesting Clinton's deposition is no impediment to this Court.

iii. *Two Of The Three Reasons For the Death Penalty Sanction Were Tied To The Now-Reversed CUTPA Cause Of Action, Not Defamation*

128. Bearing in mind that the Supreme Court has clearly stated that a "profit motive" has nothing to do with defamation claims against media defendants [*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989)] so financial documents showing "financial motive" are irrelevant to the defamation-related claims.

**EXHIBIT 28**

129.     They may be relevant, however, to the CUTPA-related claims, which were the alleged failure by Jones to (i) submit analytics in the custody and control of third parties, e.g. Google, Twitter and Facebooks and (ii) accounting sub-ledgers showing more detail in sales, all of which was requested to show how many vitamin supplements were sold in relation to the airing of any Sandy Hook - related story.

130.     The "failure" regarding analytics was one of the reasons the trial court there had initially denied Jones's statutory rights to an anti-Slapp motion.   On that issue, the Connecticut Supreme Court analyzed the relevance of the materials the Connecticut Plaintiffs sought, demonstrating its sole relevance was to CUTPA, the Connecticut Supreme Court writing, especially footnote 35:

> In the present case, the record supports the trial court's implicit finding that the defendants' noncompliance was prejudicial to the plaintiffs because, each time the defendants did not comply with the court ordered discovery, the plaintiffs were unable to access information that could assist them in proving probable cause that they would succeed on the merits of their complaints. For example, access to the defendants' marketing data would be relevant to proving a financial connection between the defendants' actions and the statements made during the broadcast.[35]
>
> > FN 35
> > The plaintiffs' counsel argued that the Google Analytics would show "[s]ales, pricing, web traffic, that is, hits on the website and hits on the Infowars store website." He further argued that "Infowars [LLC] and Free Speech Systems [LLC] [generate] millions and millions and millions of dollars of revenue each year. The content that they broadcast, including the content about Sandy Hook, they use to drive traffic to their website. That's why we're entitled to this stuff.

*Lafferty v. Jones,* 336 Conn. 332, 378, 246 A.3d 429, 459 & n. 35 (2020).  This is purely CUTPA-related.

131.     In their Motion for Sanctions filed after the Connecticut Supreme Court returned the case to the trial court, the Connecticut Plaintiffs again explained that the "critical importance" of this was tied to their now-dismissed CUTPA claim:

**EXHIBIT 28**

Moreover, the materials sought here are significant to important aspects of the plaintiffs' case, and their deprivation is prejudicial. The plaintiffs' complaint alleges that "Jones has deliberately employed [] false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." Sherlach Compl. ¶ 11. It alleged that "the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money . . . not because they are eager to educate or even to entertain their audience." Id. ¶ 103. It alleged that "[t]he false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience." Id. ¶ 98. **These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims. Id. ¶¶ 465–474 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy")**. Web-analytics and social media data for the Jones defendants' websites and social media profiles is potentially key for demonstrating these points.

**Ex. 4,** pp. 14-15.

132.    The Connecticut trial court concluded the defendants had failed to provide "full and fair compliance" (i.e., the google analytics and accounting subledgers) with a request for the data, thus willfully withholding information that was of "critical importance" to the plaintiffs in pursuing their CUTPA claims resulting in the Death Penalty Sanctions.  In the Death Penalty Order itself, the Connecticut trial judge explained the CUTPA-related "prejudice":

> "As pointed out by the plaintiffs, they are attempting to conduct discovery on what the defendants publish and the defendants' revenue. And the failure of the defendants to produce the analytics impacts the ability of the plaintiffs to address what is published and the defendants' failure to produce the financial records such as sub-ledgers and trial balances affects the ability of the plaintiffs to address the defendants' revenue."

133.    And this intended use for CUTPA purposes was picked up by the Court of Appeals in its recent opinion when it stated:

> With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the

EXHIBIT 28

plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims."

*Lafferty v. Jones*, 229 Conn. App. 487, 521 (2024).

134. Again, the adequacy of the financial information the Connecticut Plaintiffs were complaining about was related only to CUTPA, not defamation, intentional infliction or false light, as to which the Supreme Court has clearly held that a "profit motive" has nothing to do with Constitutional protected rights involved here. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989). Here, the only possible relevance of these items was to prove a CUTPA case, which the Court of Appeals said was not legally viable.

      *iv.*    *The Third Basis Of The Death Penalty Sanction Was Noticing Hillary Clinton's Deposition Which Was Not A Reason To Issue Death Penalty Sanctions, And Certainly Not By Itself*

135. Turning finally to what the trial court called the "cavalier actions" of Jones's lawyers regarding their motion to depose Hillary Clinton, that amounted, in the trial court's view, to "willful misconduct." By way of background, a protective order had been entered in the case and that is attached hereto as **Exhibit 7**. It provided that information covered could be used for the preparation and trial of this case. **Ex. 7**, p. 4, ¶9. As the deposition of one of the plaintiffs began, it became apparent that plaintiffs' counsel would resist any testimony about how the plaintiffs all happened to find themselves in the same law office six years after the Sandy Hook shootings. It was the collective belief that the prosecution of Jones was orchestrated by those motivated to have their revenge on him for his support of Donald Trump's successful campaign against Hillary Clinton in 2016 – Mr. Trump appeared as a guest on one of Mr. Jones' broadcast during the campaign. To that end, counsel for Mr. Jones sought a commission to take the deposition of Ms. Clinton, then a resident of New York. In the motion for a commission, Mr. Jones's counsel

**EXHIBIT 28**

explained why Clinton's deposition was being sought.  The Death Penalty Sanctions were assessed because of **<u>two sentences</u>** used in that request:

> "On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid."[6] **Exhibit 8** hereto.

136.    Notably, the name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. [7]  Nevertheless, the trial court took grave exception to this, referring to it as "frightening."  *Lafferty v. Jones*, 229 Conn. App. 487, 501 (2024).  The trial judge then denied the request for a commission to take Clinton's deposition [**Ex. 10**], which should have been sanction enough if a violation did in fact occur.   Instead, the Connecticut trial court used this as the only non-CUTPA related ground for the Death Penalty Sanctions.

137.    Importantly the witness refused to answer questions about choice of counsel or who was financing the litigation, so the two offending sentences did not disclose testimony but only a refusal to answer.  Thus, there was nothing of substance revealed.  Even if there was a violation, the decision to rely on that conduct as part of a motion to default the defendants and deny Jones his Constitutional rights is inexplicable.

---

[6] At a hearing on October 20, 2021, Counsel for Connecticut Plaintiffs admitted that these two sentences were the only ones at issue allegedly violating the protective order, stating: "There were no other sentences of their motion for commission that were drawn from the deposition…. But the only two sentences are the ones that were specifically drawn from the deposition itself, are the ones that we cited in our motion."  **Exhibit 9** (Transcript of Connecticut Hearing, Conn. Dkt No. 525.20, p. 72).

[7] At that October 20, 2021, hearing Counsel for Connecticut Plaintiffs himself revealed the unnamed person referenced as Plaintiff Erica Lafferty and stated it was "public knowledge" about Ms. Lafferty's involvement with the failed Clinton campaign, Counsel stating on the record:

> "We do think that including them in a motion for commission for Hillary Clinton's deposition and some of the other statements within the motion, were designed to ostensibly identify who the plaintiff was, because it's public knowledge about Ms. Lafferty's involvement in Ms. Clinton's campaign."  **Exhibit 9** (Transcript of Connecticut Hearing, Conn. Dkt No. 525.20, p. 72).

EXHIBIT 28

138.    The effect of these Death Penalty Sanctions was that the jury of six Connecticut citizens were instructed that Mr. Jones had intentionally and maliciously committed every act that the Connecticut Plaintiffs accused him of – no matter how farfetched and in some cases preposterous, as will be discussed *infra*, and Mr. Jones could literally say nothing in his own defense, an error the Connecticut Court of Appeals refused to consider.  *Lafferty v. Jones*, 229 Conn. App. 487, 491 (2024).  This Court must.

139.    Clearly (a) the deposition of Clinton was unrelated to any of the Connecticut Plaintiffs' claims, and (b) as to the other two, the only possible relevance of this information was related to CUTPA. Thus, virtually all of the Death Penalty Sanctions were wrongly assessed and it would be inequitable and unfair to conclude the finality of the Death Penalty Sanction to the U.S Constitution blindly and without questioning its vitality in light of the CUTPA reversal.

      *v.*    *Fairness And Equity Demand This Court's Review Of This Issue*

140.    Imagine that a prisoner is on death row about to be executed and and evidence exonerating that prisoner was not presented to the fact finder.  No one would dispute that fairness and equity, and certainly the Constitution, would require that that newly discovered evidence be evaluated.  Such is the case here.  The Connecticut Court of Appeals did not review the issue of the effect of the Death Penalty Sanction when the primary bases on which it was issued were removed.  There is no assurance the Connecticut Supreme Court will hear this issue.  So, the independent duty falls to this Court to do so, particularly in connection with its duty to conduct the dischargeability trial.

**EXHIBIT 28**

**VII.**

**THIS COURT HAS AN INDEPENDENT DUTY TO EVALUATE THE EVIDENCE AND NOT BLINDLY ACCEPT THE CONNECTICUT TRIAL COURT'S DEATH PENALTY**

**A. THE U.S. SUPREME COURT REQUIRES THIS COURT TO MAKE AN INDEPENDENT REVIEW OF THE DEFAMATION FACTS AND ENSUING CONNECTICUT JUDGMENT**

141. It is crucial to bear in mind this this case does not just involve First Amendment freedom of speech. Rather it involves (a) a media defendant protected by the freedom of the press and freedom speech provisions of the First Amendment; (b) reporting on matters of public concern; and (c) addressed to public figures who had become such by voluntarily injecting themselves in public controversies. This Court, however, not only does not recognize this, but repeatedly references the Death Penalty Sanction as if it eliminates these issues or renders them irrelevant.

142. It is a though a state court judge's death penalty removes all duties otherwise imposed on this Court. But that is not the law.

143. It is axiomatic that the factual findings underlying the facts of this case, must be independently reviewed by this Court and they have not been:

> In cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free pression. Although such statements have been made most frequently in cases [that]…arose in state courts, respondent argues that the constitutional principle is equally applicable to federal litigation. We quite agree; surely it would pervert the concept of federalism for this Court to lay claim to a broader power of review over state-court judgments than it exercises in reviewing the judgments of intermediate federal courts.

*Bose,* 466 U.S. at 499 (internal citations and quotations omitted). This Court is particularly required to "review findings of fact by a state court where a federal right has been denied on the basis of a fact without evidence to support it and where a conclusion of law as to a federal right and a finding of fact are so intermingled to require analysis of the facts." *Bose*, 466 U.S. 485, 506

**EXHIBIT 28**

n.24 (*citing Fiske v. Kansas*, 274 U.S. 380, 385-387 (1927)).   Particularly as the Connecticut Court

of Appeals did not do so, the burden falls to this Court:

> "Even where a question of fact may have constitutional significance, we normally accord findings of state courts deference in reviewing constitutional claims here. But that deference is **predicated on our belief that at some point in the state proceedings some factfinder has made a conscious determination of the existence or nonexistence of the critical fact. Here the record before us affords no basis for such a conclusion**."

*Time, Inc. v. Firestone*, 424 U.S. 448, 463, 96 S. Ct. 958, 969-70 (1976) (emphasis added) (*citing*

*Lyons v. Oklahoma*, 322 U.S. 596, 602-603 (1944); *Gallegos v. Nebraska*, 342 U.S. 55, 60-61

(1951)).   The key issue in the above quote is that the Supreme Court requires among other things,

the inquiry into whether "critical facts" were resolved and that they were resolved by a fact finder.

Here there is no question that they were not. Rather, they were judicially decreed as a punishment.

144.   The Order this Court entered states

> "[t]his Court cleared the runway for Jones to appeal the Connecticut judgment, including the amount of punitive damages, and nothing in this bankruptcy case affects that appellate right. He may raise … his constitutional arguments with the appropriate state appellate forum. It is not, however, a basis for this Court to ignore the plain language of the state court's default judgment or the damages awards." Order, p. 12.

145.   This is clearly erroneous as first, it is simply not the law.   While federal courts are

bound by a state court's interpretations of state laws, federal constitutional issues are to be resolved

by federal courts. *Mullaney v. Wilbur*, 421 U.S. 684, 690-91 (1975).   It would be unthinkable to

suggest that in a case that involves (a) a media defendant protected by the freedom of the press

and freedom speech provisions of the First Amendment; (b) reporting on matters of public concern;

and (c) addressed to public figures, a federal court plays no role and must rely exclusively on what

a state court system does.   Yet that is the net effect.

EXHIBIT 28

146.    Second, in deferring to the Death Penalty Sanctions, this Court has implicitly held that those Death Penalty Sanctions removed the Supreme Court's review mandate.

147.    Third and perhaps most importantly, the Connecticut Court of Appeals did not review this issue.

148.    In performing its duties, this Court cannot defer the decisions it is required to make here to the Connecticut judicial system.  To the contrary this Court has a Constitutional duty to review the Connecticut judgment and the supporting evidence, particularly since the Connecticut Court of Appeals did not.  While Jones fully intends to attempt to present his issues to the Connecticut Supreme Court, there is no appeal to that body as a matter of right and thus there is no assurance that the "merits" will ever be reviewed by the Connecticut judiciary.

**B.   THE DUTY TO CONDUCT AN INDEPENDENT REVIEW OF DEFAMATION FACTS IS CRUCIAL BY ITSELF WHEN CONSTITUTIONAL ISSUES ARE AT STAKE AS HERE**

149.    The First Amendment to the Constitution clearly distinguishes between freedom of speech and freedom of the press:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the *freedom of speech*, or *of the press*; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S.C.S. Const. Amend. 1 (emphasis added).  While distinct and independent, freedom of speech and press are interrelated, as Justice Brennan said in his concurring opinion in *McDonald v. Smith*:

> It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, . . . and therefore are united in the First Article's assurance."

*McDonald v. Smith*, 472 U.S. 479, 489-90, 105 S. Ct. 2787, 2793 (1985) (J. Brennan concurrence; cleaned up).

EXHIBIT 28

150. Freedom of the press – versus freedom of speech – issues have not been focused on by this Court or the Connecticut judicial system, and yet issues associated with it lie at the bedrock basis of most of the errors the Connecticut trial court, the Connecticut Court of Appeals, and this Court have made. For example, the single fact that Alex Jones is a media defendant implicates Constitutional doctrines and scores of United States Supreme Court cases that distinguish normal garden-variety defamation cases from defamation cases asserted against media defendants, like Jones. *See, e.g., Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 3, 110 S. Ct. 2695, 2697 (1990) (hereafter, "*Milkovich*") ("...the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a ***media defendant*** for speech of public concern…. Foremost, where ***a media defendant*** is involved, a statement on matters of public concern must be provable as false before liability can be assessed…") (emphasis added; internal citations omitted). This, coupled with the fact that (a) the Sandy Hook tragedy and the ensuing efforts to achieve gun control legislation nationwide, were and still are public controversies and matters of public concern and (b) the plaintiffs are public figures who have voluntarily thrust themselves into those public controversies,  transformed the Connecticut case into a case of Constitutional dimensions, subject to Supreme Court mandates and exacting Constitutional requirements that preempt any conflicting state laws – substantive or procedural – as the Supreme Court has repeatedly stated:

- "The First Amendment 'guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker." *Sullivan*, 376 U.S. at 271;

- "In 1964, we decided in *New York Times Co. v. Sullivan*, …that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule…". *Milkovich*, 497 U.S. at 15-17 (citations omitted).

**EXHIBIT 28**

- "The First Amendment limits California's libel law in various respects." *Masson v. New Yorker Magazine*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429 (1991)

151.    Thus, where Constitutional issues are concerned, this Court cannot blindly accept the actions of a Connecticut trial court that simply ignore the Constitution, but must exercise its own independent assessments.    This obligation is neither novel nor new, having been established long ago by the U.S. Supreme Court:

> "Clearly, then, **this Court has an obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments, and in doing so this Court cannot avoid making an independent constitutional judgment on the facts of the case**. The simple fact is that First Amendment questions of constitutional fact compel this Court's de novo review. ….. In these cases **our duty** is not limited to the elaboration of constitutional principles; **we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.** *New York Times Co. v. Sullivan*, …. Our independent analysis of the record leads us to agree with the Court of Appeals that none of the proofs, considered either singly or cumulatively, satisfies the constitutional standard with the convincing clarity necessary to raise a jury question whether the defamatory falsehoods were broadcast with knowledge that they were false or with reckless disregard of whether they were false or not."

*Rosenbloom v. Metromedia*, 403 U.S. 29, 55, 91 S. Ct. 1811, 1825 (1971) (internal cites and quotations omitted; emphasis added).

152.    It is important to stress that this rule of independent review emphasizes that this Court's duty is not limited to making sure the trial court elaborated or espoused constitutional principles.  Rather, the review mandated on this Court requires the examination of the "content, form, and context" of each alleged libel "as revealed by the whole record." *Snyder*, 562 U.S. at 453.   The review is a de novo review where this Court must examine for itself the specific statements at issue and the circumstances under which they were made to determine whether each and every alleged libelous statement is of a character that the principles of the first amendment are protected.  S*ee, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105

EXHIBIT 28

S. Ct. 2939, 86 L. Ed. 2d 593 (1985); *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Bose*, 466 U.S. at 499; *Sullivan* 376 U.S. at 284-286.

153. Here, no fact finder has weighed and determined Constitutional issues. Rather they were deemed "established" by judicial fiat via Death Penalty Sanctions. Thus, this Court not only should not, it also can not accord finality to a wildly excessive compensatory damage award, where no fact finder made any liability findings and there has been no independent review.

## VIII.
## SOME OF THE IGNORED CONSTITUTIONAL ISSUES THAT SUPERSEDE ALL OTHER LAW INCLUDING COLLATERAL ESTOPPEL LAWS

154. The specific Constitutional issues that were not litigated in Connecticut, or litigated with the incorrect standards, are overwhelming. What follows are some of the Constitutional issues that the Connecticut trial court and Connecticut Court of Appeals ignored. As they were ignored, it was error to give collateral estoppel effect to the Connecticut Judgment.

**A. IT IS FUNDAMENTAL ERROR FOR THIS COURT TO RECOGNIZE CLEAR CONSTITUTIONAL ERRORS MADE IN CONNECTICUT AND NEVERTHELESS BELIEVE IT WAS BOUND TO ABIDE BY CLEARLY UNCONSTITUTIONAL HOLDINGS AND FINDINGS**

155. As a preliminary matter, little need be said that when this Court finds Constitutional deficiencies, it cannot ignore them. Indeed, the very purpose of the "**obligation to make an independent examination of the whole record**" is in order to make sure that the judgment does not constitute "a forbidden intrusion on the field of free expression." *Bose,* 466 U.S. at 499.

156. That is not possible here given the Death Penalty Sanctions that not just obviated a fact finding trial – it precluded one.

**B. THE CONNECTICUT PLAINTIFFS WERE NOT REQUIRED TO AND DID NOT PRESENT ANY EVIDENCE OR EVEN PLEADING OF SPECIFIC DEFAMATORY STATEMENTS MADE BY JONES**

EXHIBIT 28

157.    What the trial court did in its Memorandum Opinion [**Ex. 12**], is simply lift quotes from the Plaintiffs' complaint [**Ex. 6**] and repeatedly instruct the jury that that they were to assume those "facts" were actually statements made by Jones, they were defamatory, they were actually made by Jones, were false and they were made with legal malice.  Further, the jury was instructed that Jones was liable for everything third parties said and did.   The Connecticut trial court repeatedly instructed the damages jury:

> "As you will recall, here you are tasked with addressing the issue of damages**, as the court previously determined that the defendants are liable.** As a result this trial focused on damages. **As I previously instructed you, you are not to speculate as to why the court previously determined that the defendants were liable but you are simply to accept it as a given** and focus on the amount of damages to be awarded and the degree of the defendants' wrongdoing."

See also **Ex. 11,** Connecticut Jury Charge p. 2.   See also **Ex. 11**, Connecticut Jury Charge pp.12-13 ("The defendants have been found liable…"); p. 13 ("As I have instructed you, the court has determined that the defendants are liable ….It is established"); p. 14 ("…court has determined that the defendants are liable…");  pp. 14-15 ("The court has determined that the defendants are liable for defamation."); p. 20 ("…the defendants violated the plaintiffs' privacy…"); p. 17 ).

158.    Again, each of the quotes in the Connecticut trial court's Memorandum Opinion [**Ex. 12**] came from the Complaint in the "damages trial" with no fact finder making a determination that the precise words (particularly given their context) were defamatory, false or made with legal malice, or even made by Jones himself.

159.    The U.S. Supreme Court, however, has repeatedly emphasized that it is an absolute Constitutional requirement that each alleged defamatory statement be precisely identified in

**EXHIBIT 28**

context, focusing particularly on "what was said, where it was said, and how it was said" as the

following quote from *Snyder*, particularly the last sentence, plainly states:

> Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community  or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public… The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.  Deciding whether speech is of public or private concern ***requires us to examine the content, form, and context of that speech,*** as revealed by the whole record.  As in other First Amendment cases, the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.  In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate ***all the circumstances of the speech, including what was said, where it was said, and how it was said***.

*Snyder*, 562 U.S. at 453-54 (emphasis added; internal quotes and cites omitted; cleaned up).  This

duty was particularly incumbent on the Connecticut trial court and it did not occur given the Death

Penalty Sanction.  It must occur now and this Court has no record with which to make those

determinations, therefore necessitating a trial on dischargeability.

> i.      *THE CONNECTICUT COMPLAINT DOES NOT CONTAIN ANYWHERE NEAR REQUIRED DETAIL AND MOST OF WHAT IS REFERENCED OCCURRED OUTSIDE THE STATUTE OF LIMITATIONS AND IS A PROTECTED OPINION OR HYPERBOLE*

160.    As a result of the Death Penalty Sanction, the only "what, where and how" of

alleged defamatory statements was in the Connecticut Complaint. See **Ex. 6**.  Even in the face of

a default, a complain must still articulate valid claims, as evidenced by the Court of Appeals

reversal of the CUTPA claims even though a default judgment had been entered on them.

161.    For starters, most of the acts complained of, occurred well outside of the two year

statute of limitations.  (Sec. Conn. Gen. Stat. 52-597).  See, e.g., **Ex. 6** Complaint, complaining of

events that occurred in **2012** (e.g., ¶¶ 102 & n. 20; 139; 167); **2013** (e.g., ¶¶ 96 & n. 17, 106 & n.

21); 111 & n. 22; 120-128); **2014** (e.g., ¶¶ 120; 129 & n. 24; 145-170; 189 -228); 2015 (e.g., ¶¶ 60; 76; 81-82; 180-228).  and **2016** (e.g., ¶¶ 229 – 256).

162.    Additionally, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the defamatory "statement" and more importantly, why it was defamatory.

163.    In other places, statements are made that convey no possible defamatory meaning. As one example of numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when he would move.  See e.g., **Ex. 6,** Connecticut Complaint, ¶¶222; 230; 240; 259; 264.  Was this defamatory?  Was it true?  The jury was told it was maliciously defamatory without explanation.

164.    In another example, the **Ex. 6,** Connecticut Complaint at ¶111-117 states the following about one of the parents laughing and using cue cards.  The following is what the Complaint alleges:

> *111. On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax." Just over a month had passed since the shooting at Sandy Hook.*

> *112. Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event **Unfortunately, evidence is beginning to come out that points more and more in that direction,** and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."*

> *113. Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see*

EXHIBIT 28

*the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,***' he's laughing, and then he goes over, a***nd starts, um, breaking down and crying."*

114. *Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.*

115. *Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."*

116. *As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious .... that killed thousands, our government, to blame the Second Amendment, they'd stage anything."*

117. *Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns .... Something though, really, is starting to get suspicious here ... . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."*

165. What Jones was referring to was Robbie Parker. Here are just a few of the shots

Jones was referring to when he referenced one of the parents laughing at a news conference:

**EXHIBIT 28**

166.    As to the reference to holding "cue cards" Jones was referring to these



**EXHIBIT 28**

167.    These comments are neither false nor defamatory.

168.    Similarly, Jones said:

> "*Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the momen*t."

169.    These are not a defamatory statements of fact, but expressions of constitutionally protected opinion.    Yet for these, Robbie Parker was awarded $120,000,000 in compensatory damage:

**TO PLAINTIFF ROBERT PARKER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                              $ 60,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES
    (PAST AND FUTURE)                              $ 60,000,000.00

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**                          $ 120,000,000.00

See Jury Verdict, **Ex 1 & Ex. 12.** To this, the trial court appended $50,000,000 in punitive damages for a total award of $170,000,000.

170.    Connecticut Plaintiff William Aldenberg, an FBI agent who was listed as a "first responder," testified at the damages trial and made no accusations that Alex Jones ever spoke about him, aired information about him, or directed harassment toward him. When asked, "Did Mr. Jones

**EXHIBIT 28**

direct his audience to Mr. Halbig's website (Halbig being a show-guest)?" Aldenberg responded, "To be honest, certain, I just don't recall that. I don't." (Pg. 54: 22–25). In fact Aldenberg testified he only learned of Jones through his conversations with an FBI counselor. (Pg. 46: 16-17, 20). As to how it affected him, he said: "You can say whatever you want about me. I don't care; just say whatever you want. I'm a big boy, I can take it. But they want to make profits; they want to make millions and millions of dollars." (Pg. 50: 13-17, 23-26). [The referenced pages from Aldenberg's testimony at the damages trial are collectively attached as **Exhibit 16**]. And for this testimony which the trial court instructed the jury was false, defamatory and made with malice, and the jury awarded him $90,000,000 in "compensatory damages"

TO PLAINTIFF WILLIAM ALDENBERG:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $ 45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)                    $ 45,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)              $ 90,000,000.00

To this the trial court appended another $40,000,000 in punitive damages for a total award of $130,000,000.

171.    And Mr. Jones was powerless to refute the any of the allegations given the Death Penalty Sanctions rendered against him.

172.    For these reasons alone, it was error for this Court to give collateral estoppel effect to the Connecticut judgment and find it nondischargeable.

**EXHIBIT 28**

C. **FALSITY -- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED *FALSITY* OF SPECIFIC STATEMENTS BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE – WHICH DID NOT HAPPEN**

173. This point is four-fold: (i) specific statements must be identified that are allegedly defamatory; (ii) there must be a specific adjudication of falsity as to each; (iii) it was the Connecticut plaintiffs' burden to prove the falsity of each; and (iv) the falsity must have been proved and found by a jury by clear and convincing evidence. None of this happened.

174. As to falsity, this Court has been led to erroneously state the elements of a defamation claim in Connecticut at Order p. 13, which mentions neither falsity nor fault:

"A defamatory statement is "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Hopkins v. O'Connor*, 925 A.2d 1030, 1042 (Conn. 2007). To establish a prima facie case of defamation in Connecticut, the plaintiff must show that the defendant published a defamatory statement, which identified the plaintiff to a third person, and that the plaintiff's reputation suffered because of the statement. *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 763–64 (Conn. 2004)."

175. This is neither Connecticut nor federal law. Rather, echoing U.S. Supreme Court requirements, the Connecticut Supreme Court has stated that to establish defamation liability, a plaintiff must also prove falsity and do so by clear and convincing evidence.

176. In approving a jury charge in *Holbrook v. Casazza*, 204 Conn. 336, 358-59, 528 A.2d 774, 785 (1987) the Connecticut Supreme Court stated precisely that:

"First, that the challenged statements are defamatory … in some actionable way and were uttered and published by a defendant. That issue must be proved by her by a preponderance of the evidence. **Second, that any actionable, defamatory statement is false in some material respect. That burden is by clear and convincing evidence**.

177. These are mere repetitions of U.S. Supreme Court mandates and they were ignored:

"Our opinions to date have chiefly treated the necessary showings of fault rather than of falsity. Nonetheless, as one might expect given the language of the Court in *New York Times*, … a public-figure plaintiff must show the falsity of the statements at issue in order

EXHIBIT 28

to prevail in a suit for defamation. … Here, as in *Gertz*, the plaintiff is a private figure and the newspaper articles are of public concern. **In *Gertz*, as in *New York Times*, the common-law rule was superseded by a constitutional rule. We believe that the common law's rule on falsity -- that the defendant must bear the burden of proving truth – must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages**."

*Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76, 106 S. Ct. 1558, 1563 (1986).

178. This was not done. The Connecticut trial court determined these issues by judicial fiat on grounds that had nothing to do with the merits.

### D. FAULT -- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED *FAULT* BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE – WHICH DID NOT HAPPEN

179. Another ignored black-letter Constitutional requirement is that liability of a media defendant cannot be entered without a finding of fault and that fault can not be negligence. *Gertz,* 418 U.S. at 347: "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *See Milkovich,* 497 U.S. at 15-16 ("In other words, [in *Gertz*] the Court fashioned 'a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.'").

180. And fault had to be fault that rose to the level of intentional or recklessness which the Connecticut Plaintiffs had the burden to prove by **clear and convincing evidence** as to each and every alleged libelous statement Jones was accused of making:

> "…under this Court's First Amendment jurisprudence, [the Connecticut Plaintiffs] cannot establish libel without proving by clear and convincing evidence that [Mr. Jones] acted with actual malice—that is with knowledge that the published material was false or with reckless disregard of whether it was false."

*Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021) (explanatory brackets supplied) (*citing Sullivan*, 376 U. S. at 280; *Gertz,* 418 U. S. at 334-335, 342; and *Curtis Publishing Co. v. Butts*, 388 U. S.

**EXHIBIT 28**

130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967). Here there was no finding of fault – only by Death Penalty Sanctions.

181.    Making it abundantly clear that in the ensuing "damages" trial, fault was not at issue, the Connecticut trial court specifically instructed the jury to that effect in many places including the following (emphasis added in each case):[8]

> "As you will recall, here you are tasked with addressing the issue of damages**, as the court previously determined that the defendants are liable.** As a result this trial focused on damages. **As I previously instructed you, you are not to speculate as to why the court previously determined that the defendants were liable but you are simply to accept it as a given** and focus on the amount of damages to be awarded and the degree of the defendants' wrongdoing."

**Ex. 11,** Connecticut Jury Charge p. 2.   See also **Ex. 11**, Connecticut Jury Charge pp.12-13 ("The defendants have been found liable …."; p. 13 ("As I have instructed you, the court has determined that the defendants are liable…"); p. 14 ("…court has determined that the defendants are liable … It is established that by their conduct…."); pp. 14-15 ("The court has determined that the defendants are liable for defamation. …"); p. 20 ("…the defendants violated the plaintiffs' privacy…."); and p. 17 ("… the court has already determined that the defendants are liable to the plaintiffs…").

182.    In fact, as a result of the Death Penalty Sanctions for three seemingly trivial offenses, the Connecticut trial court even instructed the Connecticut jury that it had found Jones conduct extreme and outrageous, instructing the jury: "…you may consider that it is already established that the defendants' conduct was extreme and outrageous."   **Ex. 11,** Connecticut Jury Charge p. 21.

---

[8] The Jury Charge referenced is the one the Connecticut Plaintiffs filed in this Court and this Court's blue ECF page numbering at the top is what is referenced.

EXHIBIT 28

183.     This Court's own Order demonstrates in its analysis of the Connecticut Jury Charge **[Ex. 11]** that the requisite level of fault was not used by the trial court even in the damages trial. This Court's Order not only examined but quoted from the jury charge employed in the "damages only" trial and that charge clearly demonstrates the use of the wrong legal standards when standards are even mentioned at all.  As to defamation there no mention in the Connecticut jury charge about applicable standards and certainly nothing even suggesting the *Sullivan* "clear and convincing" evidentiary standard.   As explained in the immediately following section, as to intentional infliction, the trial court's references to intentional infliction and its use of a "knew or should have known" standard – that of negligence – was clearly erroneous.  Thus, without standards – or with the wrong standards -- these issues were never fully and fairly litigated.

184.     And topping off the improprieties in the subsequent "damages" trial, Jones's testimony was deeply restricted – an issue the Court of Appeals refused to consider.  *Lafferty v. Jones*, 229 Conn. App. 487, 491 (2024).  Again, these issues were never fully and fairly litigated.

185.     There was no trial in Connecticut; there was only an execution.  And the execution was not just of Mr. Jones, it was of the U.S. Constitution itself.

E.  **INTENTIONAL INFLICTION CLAIMS AND DAMAGES WERE CLEARLY SUBMITTED ON THE WRONG STANDARD AND ARE DISCHARGEABLE.**

186.     Another Constitutional error is this Court's holding the emotional distress damages -- which total $561,000,400 – are nondischargeable.   Those damages are well over half of the compensatory damages awarded:

| Conn. Pls. | Defamation Slander | Emotional Distress | Common law Punitives | CUTPA Punitives | TOTALS |
|---|---|---|---|---|---|
| R. Parker | $60,000,000 | $60,000,000 | $40,000,000 | $10,000,000 | $170,000,000 |

**EXHIBIT 28**

| | | | | | |
|---|---|---|---|---|---|
| W. Aldenberg | $45,000,000 | $45,000,000 | $30,000,000 | $10,000,000 | $130,000,000 |
| E. Lafferty | $18,000,000 | $58,000,000 | $25,300,000 | $10,000,000 | $111,300,000 |
| I. Hockley | $38,000,000 | $43,600,000 | $27,200,000 | $10,000,000 | $118,800,000 |
| N. Hockley | $32,000,000 | $41,600,000 | $24,530,000 | $10,000,000 | $108,130,000 |
| J. S.Marionio | $30,000,000 | $38,800,000 | $22,930,000 | $10,000,000 | $101,730,000 |
| C. S. Parisi | $30,000,000 | $36,000,000 | $22,000,000 | $10,000,000 | $98,000,000 |
| M. Barden | $25,000,000 | $32,600,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| C. M. Soto | $18,600,000 | $39,000,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| W. Sherlach | $9,000,000 | $27,000,000 | $12,000,000 | $10,000,000 | $58,000,000 |
| D. Wheeler | $25,000,000 | $30,000,000 | $18,330,000 | $10,000,000 | $83,330,000 |
| F. Wheeler | $24,000,000 | $30,000,000 | $18,000,000 | $10,000,000 | $82,000,000 |
| J. Hensel | $21,000,000 | $31,000,000 | $17,330,000 | $10,000,000 | $79,330,000 |
| D. Soto | $18,000,000 | $30,000,000 | $16,000,000 | $10,000,000 | $74,000,000 |
| J. Barden | $10,000,000 | $18,800,000 | $9,600,000 | $10,000,000 | $48,400,000 |
| **TOTALS** | $403,600,000 | $561,400,000 | $321,620,000 | $150,000,000 | $1,436,620,000 |

**Ex. 1** (Conn. Jury Verdict, Conn. Dkt No. 1010] & **Ex. 12** (Memorandum Opinion Judgment).

187.    In *Hustler*, 485 U.S. at 56-57, the U.S. Supreme Court clearly stated that the "actual malice by clear and convincing evidence" standards articulated in *New York Times Co. v. Sullivan* applies to claims of intentional infliction of emotional distress:

> "We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with actual malice, i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a blind application of the *New York Times* standard, … it reflects our considered judgment that such a standard is necessary to give adequate breathing space to the freedoms protected by the First Amendment."

**EXHIBIT 28**

188.    This has been repeatedly reaffirmed.  *See, e.g., Snyder*, 562 U.S. at 451.

189.    Yet this Court itself quotes from the Connecticut Court's jury charge that uses the wrong standards: "The defendants intended to inflict emotional distress or . . . knew <u>or should have known</u> that emotional distress was the likely result of their conduct."  Order, p. 13 (emphasis added).  See also Order, p. 14 ("The jury was instructed, among other things, that the defendants were liable for intentional infliction of emotional distress: … the defendants … the defendants knew or should have known that emotional distress was the likely result of their conduct."); Order, p. 3.

190.    The standard of "knew or should have known" is the legal standard of negligence. In *Erickson Prods. v. Kast,* 921 F.3d 822, 833 (9th Cir. 2019), the Ninth Circuit succinctly so stated:

> A "should have known" instruction does not fit within this framework because it is a negligence standard. To say that a defendant "should have known" of a risk, but did not know of it, is to say that he or she was "negligent" as to that risk. *See Global-Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 770, 131 S. Ct. 2060, 179 L. Ed. 2d 1167 (2011); *see also BMG Rights Mgmt. (US) LCC v. Cox Commc'ns, Inc*., 881 F.3d 293, 310 (4th Cir. 2018) ("The formulation 'should have known' reflects negligence"); *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001) (noting that "should have known" is a negligence standard).  Negligence is a less culpable mental state than actual knowledge, willful blindness, or recklessness, the three mental states that properly support a finding of willfulness.

*See also Mirjavadi v. Vakilzadeh*, 310 Conn. 176, 195, 74 A.3d 1278, 1289 (2013)  ("As  we have observed, the test for the existence of a legal duty in a negligence action is "whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result . . . .") and *Coppola Constr. Co. v. Hoffman Enters. Ltd. P'ship*, 309 Conn. 342, 351-52, 71 A.3d 480, 487 (2013) ("Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that

**EXHIBIT 28**

the defendant made a misrepresentation of fact (2) that the defendant ***knew or should have known was false***, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." [emphasis added]).

191.    Clearly the negligence "knew of should have known" standard this Court's Order acknowledges was used by the Connecticut trial court as to intentional infliction, is not sufficient to find these claims nondischargeable under 11 U.S.C. § 523(a)(6) and additionally invalidates the cause of action entirely as that standard is forbidden by US Supreme Court mandate.

192.    And, because the wrong standard was used, it is not eligible for collateral estoppel purposes. As noted above, the Fifth Circuit has made clear that for collateral estoppel to apply, the legal standards must be the same:

> As one treatise points out, however, "courts have readily perceived that for purposes of preclusion, "issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same.' " … *See also Brister,* 946 F.2d at 354 n. 1 (5th Cir.1991) (explaining that "not only the facts, but also the legal standard used to assess them, must be identical").

*Recoveredge, L.P. v. Pentecost,* 44 F.3d 1284, 1291 (5th Cir. 1995).

193.    In the jury being instructed that intentional infliction damages can be awarded based on a "knew or should have known," or a negligence, standard, the standards in Connecticut and those required for determination of dischargeability (which certainly assume the correct Constitutional standards were used) are clearly not the same and there is thus no collateral estoppel.

194.    Hence, at the very least, there is no collateral estoppel as regards the intentional infliction of emotional distress claims of $561,000,000 in "compensatory" damages.

**F.  DAMAGES CANNOT CONSTITUTIONALLY BE PRESUMED – BUT THEY WERE**

195.    The Supreme Court has clearly stated that where a media defendant is concerned, damages cannot be presumed but must be proved:

**EXHIBIT 28**

"… we held that the States could not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice. See 418 U.S. at 350 ("Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship . . .").

*Milkovich,* 497 U.S. at 15-16. The Connecticut jury charge, to the contrary, repeatedly instructs

the jury that damages are **presumed** – their task was only to figure out how much those presumed

damages were:

- "The law **presumes** that there is injury to the plaintiffs' reputations. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover, as general damages for injury to his or her reputation and for humiliation and mental suffering." **Ex. 11,** Connecticut Jury Charge, p. 22.

- "The law **conclusively presumes** that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused.… I hereby charge you that causation of the plaintiffs' damages is already established." **Ex. 11,** Connecticut Jury Charge, p. 15.

- "Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law." **Ex. 11,** Connecticut Jury Charge, p. 16.

- "In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question." **Ex. 11,** Connecticut Jury Charge, p. 16.

- "As I have already instructed you here, it has already been established that the defendants' wrongful conduct proximately caused harm to each plaintiff." **Ex. 11,** Connecticut Jury Charge, p. 18.

196. These "presumptions" are both unconstitutional and not subject to collateral

estoppel effect. It was error for this Court to have done so.

EXHIBIT 28

### G. IT IS UNCONSTITUTIONAL TO FIND JONES LIABLE FOR ACTS OF THIRD PARTIES

197. This Court quotes the jury charge that "[D]efendants proximately caused harm to the plaintiffs by …urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly [behind] the Sandy Hook hoax." Order, pp. 3-4. The actual charge itself goes on to state that this "result[ed] in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard the evidence in this case." **Ex. 11,** Connecticut Jury Charge, p. 16.

198. The trial court also instructed the jury that Jones was legally responsible for all statements of its guests: "I instruct you that it is established that the defendants are legally responsible for the statements of these guests on Infowars." **Ex. 11,** Conn. Jury Charge, p. 8.

199. These instructions to the jury were based solely on allegations in the Connecticut Complaint. In one example of many, the Connecticut Plaintiffs identified Defendant Wolfgang Halbig as an independent journalist and investigator who resides in Sorrento, Florida and who was the creator and operator of "the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com." It also identified Defendant Cory T. Sklanka as a journalist who works with Halbig. **Ex. 6,** Connecticut Complaint, ¶¶ 36 & 37. Although Halbig's name is used over 77 times in the Connecticut Compliant, other than a few references to Halbig's appearance as an occasional guest on Mr. Jones' show **[Ex. 6,** Connecticut Complaint, ¶ 68] there are no allegations that would even remotely make Mr. Jones responsible for Halbig's statements and actions other than the completely unverified and conclusory allegation that "Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut." **Ex. 6,** Connecticut Complaint, ¶ 74. The lone exception is the unverified, unsupported, conclusory and inaccurate statement that Halbig was "at all relevant times a servant, agent, apparent agent, employee, and/or

joint venturer of the Jones defendants." **Ex. 6,** Connecticut Complaint, ¶87.  This lone, conclusory allegation is nothing but sheer conjecture and certainly nothing that overcomes Mr. Jones's first amendment rights. Yet the jury was told Mr. Jones was maliciously responsible for everything Halbig did. [9]

200.    Further, the Connecticut Complaint is replete with acts of third parties in allegedly stalking some of the Connecticut Plaintiffs, with no evidentiary tie to Jones.   **Ex. 6,** Connecticut Complaint, ¶¶ 14; 15 ("They have confronted strange individuals videotaping them and their children."); 16; 55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.).  With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

201.    This is blatantly unconstitutional.

202.    Justice Sotomayer in her recent concurrence in *Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) summarized the law forbidding liability for "incitement" of third parties to act:

> Less than two weeks after the Fifth Circuit issued its opinion, this Court decided *Counterman v. Colorado*, 600 U. S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023). In Counterman, the Court made clear that the First Amendment bars the use of an objective standard like negligence for punishing speech, and it read *Claiborne* and other incitement cases as demanding a showing of intent.  The Court explained that the First Amendment precludes punishment for incitement, whether civil or criminal, unless the speaker's words were intended (not just likely) to produce imminent disorder."

---

[9] In fact when in the damages trial Connecticut Plaintiff Aldenberg was asked about Halbig, Aldenberg described Halbig as "an associate of Mr. Jones and Infowars," due to his appearance on Alex Jones' show (Pg. 53: 25-27, Pg. 54: 8-10). During cross-examination, Pattis challenged this reasoning, asking if being a guest on a talk show implies affiliation, to which Aldenberg replied, "To me it does," even agreeing that appearing on CNN would make someone a CNN affiliate (Pg. 73: 8-12). **Ex. 15** hereto.

**EXHIBIT 28**

*Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) (*citing NAACP v. Claiborne Hardware Co.*, 458 U. S. 886, 927-929, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) (internal quotations omitted; cleaned up)).

203.    In *NAACP v. Claiborne Hardware Co.*, 458 U. S. 886, 927-929, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982), cited in *McKesson*, the Supreme Court went so far as to acknowledge that even advocacy of the use of force or violence is protected by the First Amendment when acts of violence are alleged to have been encouraged and committed:

> "This Court has made clear, however, that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment. In *Brandenburg v. Ohio*, 395 U.S. 444, we reversed the conviction of a Ku Klux Klan leader for threatening 'vengeance' if the "suppression" of the white race continued; we relied on the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

204.    Here, telling viewers to "investigate" for themselves, even if true, is purely protected by the Constitution which the Connecticut judgment ignores. [10]  The case of *NAACP v. Claiborne Hardware Co.*, dealt with civil rights activist Medgar Evers, whose urgings to his listeners to employ violence was not actionable even though vastly more inflammatory than Jones's encouragement of his listeners to simply investigate for themselves, the Supreme Court stating

> "[s]trong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore

---

[10] Notwithstanding his Constitutional protections, it must be clearly understood that there was no evidence or even an allegation that Mr. Jones ever one time urged violence; rather, the Connecticut Plaintiffs simply claimed that unrelated third parties harassed them because on a few occasions Jones suggested his listeners investigate matters for themselves. However, this does not even approach the Constitution's boundaries where speakers do actually encourage specific violence against specific people. *See Brandenburg v. Ohio*, 395 U.S. 444 (dealing with KKK threats of vengeance)

**EXHIBIT 28**

the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open."

*See also Watts v. United States*, 394 U.S. 705 (reversing the conviction of a person drafted for Vietnam who said "…if they ever make me carry a rifle the first man I want to get in my sights is L. B. J." dismissing it as "a kind of very crude offensive method of stating a political opposition to the President.). Here, by virtue of the Death Penalty Sanctions, Jones was decreed liable for everything any Connecticut Plaintiff complained happened to them by strangers – a preposterous proposition by itself and certainly unconstitutional in its effect.

### H. PROFIT MOTIVE IS IRRELEVANT IN MEDIA LIBEL

205. As referenced earlier, was noted above that a media defendant's profit motive is Constitutionally irrelevant in a media libel case:

> "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."

*Harte-Hanks Commc'ns v. Connaughton,* 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989).

206. This principle has been repeated by the Fifth Circuit. *See, e.g., Peter Scalamandre & Sons v. Kaufman*, 113 F.3d 556, 561 (5th Cir. 1997), holding that "That a defendant publishes statements anticipating financial gain likewise fails to prove actual malice: a profit motive does not strip communications of constitutional protections. … As long as a defendant does not act knowing his statement is false or with reckless disregard of its truth, actual malice will not be present." (*citing Harte-Hanks*).

207. Notwithstanding this, in the damages trial, particulary in the Connecticut Plaintiffs' closing argument, the Jury was advised of Jones's "profit motive" was repeatedly emphasize by the Connecticut Plaintiffs.

EXHIBIT 28

## I. THE AWARD OF PUNITIVE DAMAGES WAS UNCONSTITUTIONAL

208.    Not only was the failure to follow the requirements of *Sullivan*, *Gertz* and the other unquestioned Supreme Court mandates fatal to the Connecticut judgment, the Connecticut trial court's failures mean there could be no award of punitive damages without compliance with the standards of *New York Times Co. v. Sullivan*, and thus without a finding of malice by clear and convincing evidence, there can be no punitive damages:

> "[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury."

209.    *Gertz v. Robert Welch,* 418 U.S. 323, 350, 94 S. Ct. 2997, 3012 (1974).  In *Herbert v. Lando*, 441 U.S. 153, 161-62, 99 S. Ct. 1635, 1641 (1979), the Supreme Court held that "deeply rooted in the common-law rule, predating the First Amendment, [is the requirement for] a showing of malice on the part of the defendant [by] plaintiffs to recover punitive or enhanced damages."

210.    Yet punitive damages were awarded.  Fortunately, this Court has held common law punitive damages nondischargeable.   But award of punitive damages under CUTPA is unconstitutional and that too will be held no longer relevant in light of the CUTPA reversal.

### CONCLUSION

WHEREFORE, Alex Jones prays that this Court reconsider its decision in granting Plaintiffs' motion for partial summary judgment on the dischargeability of the Connecticut judgment, set the dischargeability issue for trial, and award Jones such other relief to which he may be justly entitled at law and in equity.

**EXHIBIT 28**

Dated: January 13, 2024

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
**Jordan & Ortiz, P.C.**
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
        aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

/s/ Ben Broocks
Ben C. Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

**EXHIBIT 28**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court on January 13, 2025, and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system.

/s/ Shelby A. Jordan
Shelby A. Jordan

**EXHIBIT 28**

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.    COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

1

**EXHIBIT 28**

**TO PLAINTIFF ROBERT PARKER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                         $60,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES              $60,000,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE**
> **DAMAGES TO PLAINTIFF ROBERT**
> **PARKER AND AGAINST ALEX JONES**
> **AND FREE SPEECH SYSTEMS**
> **(ADD LINE A AND LINE B)**
>
> $120,000,000.00

2

JM

EXHIBIT 28

**TO PLAINTIFF DAVID WHEELER:**

A.  DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                                    $ 25,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                        $30,000,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DAVID
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**                            $ 55,000,000.00

3



**EXHIBIT 28**

**TO PLAINTIFF FRANCINE WHEELER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                                    $24,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                           $30,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF FRANCINE
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                                         $54,000,000.00

4



**EXHIBIT 28**

**TO PLAINTIFF JACQUELINE BARDEN:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                       $ 10,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES             $ 18,800,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF JACQUELINE
> BARDEN AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>
> $ 28,800,000.00

5



**EXHIBIT 28**

**TO PLAINTIFF MARK BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                                    $25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                          $32,600,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF MARK
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$57,600,000.00

6

LM

**EXHIBIT 28**

**TO PLAINTIFF NICOLE HOCKLEY:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                     $ 32,000,000.00

B. EMOTIONAL DISTRESS DAMAGES         $ 41,600,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF NICOLE
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 73,600,000.00

7



EXHIBIT 28

**TO PLAINTIFF IAN HOCKLEY:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                           $ 38,000,000.00

B. EMOTIONAL DISTRESS DAMAGES               $ 43,600,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF IAN
HOCKLEY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 81,600,000.00

8

**EXHIBIT 28**

**TO PLAINTIFF JENNIFER HENSEL:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                      $ 21,000,600.00

B.  EMOTIONAL DISTRESS DAMAGES            $ 31,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JENNIFER
HENSEL AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 52,000,000.00

9



**EXHIBIT 28**

**TO PLAINTIFF DONNA SOTO:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                    $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES         $30,000,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$48,000,000.00

10



EXHIBIT 28

**TO PLAINTIFF CARLEE SOTO PARISI:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                     $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES        $36,000,000.00
(PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF CARLEE
   SOTO PARISI AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                     $66,000,000.00

11

**EXHIBIT 28**

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                        $18,600,000.00


B.  EMOTIONAL DISTRESS DAMAGES        $39,000,000.00
    (PAST AND FUTURE)


       **TOTAL FAIR, JUST AND REASONABLE**
       **DAMAGES TO PLAINTIFF CARLOS**
       **MATHEW SOTO AND AGAINST ALEX JONES**
       **AND FREE SPEECH SYSTEMS**
       **(ADD LINE A AND LINE B)**

                           $57,600,000.00

12



**EXHIBIT 28**

**TO PLAINTIFF JILLIAN SOTO-MARINO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                    $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES          $38,800,000.00
   (PAST AND FUTURE)

       **TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**                    $68,800,000.00

13



**EXHIBIT 28**

**TO PLAINTIFF WILLIAM ALDENBERG:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                    $ 45,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES          $ 45,000,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF WILLIAM
> ALDENBERG AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>
> $ 90,000,000.00

14



EXHIBIT 28

**TO PLAINTIFF ERICA LAFFERTY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                 $58,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF ERICA
   LAFFERTY AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

   $76,000,000.00

15

**EXHIBIT 28**

**TO PLAINTIFF WILLIAM SHERLACH:**

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                                    $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES              $ 27,000,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
SHERLACH AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 36,000,000.00

16

**EXHIBIT 28**

## II.   AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

If you check YES, the judge will determine the amount due to the plaintiffs for reasonable attorney's fees and costs and will then award the plaintiffs that amount at a later date.

If you check NO, the judge will award $1 to the plaintiffs for their attorney's fees and costs.

**WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.**

☒ **YES**     (reasonable attorney's fees and costs to be awarded by the judge at a later date)

☐ **NO**     (judge will award $1)

17



**EXHIBIT 28**

_(signature)_

FOREPERSON SIGNATURE

10/12/2022

DATE

18



EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

# *Lafferty v. Jones*

Appellate Court of Connecticut

February 8, 2024, Argued; December 10, 2024, Officially Released

AC 46131, AC 46132, AC 46133

**Counsel:** Norman A. Pattis, for the appellants in each case (named defendant et al.).

Alinor C. Sterling, with whom, on the brief, were Christopher M. Mattei and Joshua D. Koskoff, for the appellees in each case (named plaintiff et al.).

**Judges:** Moll, Clark and Eveleigh, Js. MOLL, J. In this opinion the other judges concurred.

**Opinion by:** MOLL

## Opinion

MOLL, J. In these consolidated appeals, the defendants Alex Emric Jones and Free Speech Systems, LLC,[1] appeal from the judgments of the trial court rendered following jury verdicts returned in favor of the plaintiffs[2] **[\*491]** in the underlying consolidated tort actions[3] arising out of the 2012 mass shooting at Sandy Hook Elementary School in Newtown. On appeal, the defendants claim that the court improperly (1) defaulted them as a sanction for violating certain discovery orders and a protective order, (2) construed the effect of the default to relieve the plaintiffs of the burden to prove the extent of their damages, (3) restricted the scope of Jones' testimony

---

[1] Several additional defendants were named in the underlying consolidated actions, namely, Infowars, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the judgments rendered following the jury verdicts returned in the underlying consolidated actions. We refer in this opinion to (1) Jones and Free Speech Systems, LLC, collectively, as the defendants, and (2) Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively, as the Jones defendants.

[2] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to *Practice Book § 9-5*. William Sherlach is a plaintiff in the second and third cases and Robert Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini [also known as Erica Lafferty], in her place as a plaintiff in this case." (Citations omitted.) *Lafferty v. Jones, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023)*. On December 14, 2023, the court granted a motion to substitute Erica L. Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel, as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini.

[3] The motions and pleadings filed in each of the underlying consolidated actions were largely identical, and the jury verdict returned in each action was the same. In the interest of simplicity, unless otherwise deemed necessary, we refer to the motions, pleadings, and other documents filed in the controlling action. See *Lafferty v. Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S.

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

at the hearing in damages, (4) denied their motion for a remittitur, and (5) concluded that the plaintiffs' claim asserting a violation of the *Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.*, was legally sufficient. For the reasons that follow, we disagree with the defendants' first, second, and fourth claims, and deem the defendants' third claim to **[**6]** be abandoned as inadequately briefed. We agree, however, with the defendants' fifth claim. Accordingly, we reverse in part the judgments of the trial court.

The following facts and procedural history, as set forth previously by this court or as were undisputed in the record, are relevant to our resolution of these appeals. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the **[*492]** shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that **[**7]** [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of [CUTPA]." (Citation omitted.) *Lafferty v. Jones, 222 Conn. App. 855, 859-60, 307 A.3d 923 (2023)*.

On November 15, 2021, the trial court, *Bellis, J.*, defaulted the defendants as a sanction for violating (1) certain discovery orders and (2) a protective order. Thereafter, the issue of damages was tried to a jury. In the midst of the hearing in damages, with the defendants' consent, the plaintiffs filed an amended complaint asserting four counts, each of which was accompanied by a claim of civil conspiracy: (1) invasion of privacy by false light; (2) defamation and defamation per se; (3) **[**8]** intentional infliction of emotional distress; and (4) a violation of CUTPA.[4] On October 12, 2022, **[*493]** the jury returned a verdict in favor of the plaintiffs, awarding them a total of $965,000,000 in compensatory damages. The jury further awarded the plaintiffs reasonable attorney's fees and costs, with the amounts to be determined by the court at a later date. On November 10, 2022, the court awarded the plaintiffs a total of (1) $321,650,000 in common-law punitive damages in the form of attorney's fees, (2) $1,489,555.94 in costs, and (3) $150,000,000 in statutory punitive damages pursuant to CUTPA. The defendants filed motions to set aside the verdict and for a remittitur, which the court denied on December 22, 2022. These consolidated appeals followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendants' claims, we note that the plaintiffs argue that "[a]lmost all of [the defendants'] claims of error are so general or so inadequately briefed that they are waived." We iterate that we deem claims on appeal to be abandoned if they are inadequately briefed. See, e.g., *Lafferty v. Jones, 336 Conn. 332, 375 n.30, 246 A.3d 429 (2020)* ("We repeatedly have stated that [w]e are not required to review issues **[**9]** that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.)), cert. denied, __ *U.S.* __, *141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021)*. As we explain throughout this opinion, we decline to review any **[*494]** claims that the defendants have abandoned as a result of inadequate briefing.

---

[4] In an accompanying request for leave to amend their complaint, the plaintiffs represented that the amended complaint (1) removed the negligent infliction of emotional distress count previously alleged, (2) removed former defendants, and (3) "simplifie[d] the pleadings by providing a single, uniform complaint for the hearing in damages of the [underlying] consolidated cases . . . ."

Lafferty v. Jones, 229 Conn. App. 487

I

The defendants first claim that the trial court improperly defaulted them as a sanction for violating certain discovery orders, as well as a discovery related protective order. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Shortly after the underlying consolidated actions had been commenced, the Jones defendants filed special motions to dismiss the actions pursuant to Connecticut's anti-SLAPP **[\*\*10]** [5] statute. See *General Statutes § 52-196a (b)*.[6] The plaintiffs moved for limited discovery vis-à-vis the special motions to dismiss; see *General Statutes § 52-196a (d)*; which the court granted on December 17, 2018.

On January 10, 2019, the court overruled objections raised by the Jones defendants to the plaintiffs' requests for production seeking, inter alia, marketing data, sales analytics, and web analytics that the Jones defendants "own[ed] and/or control[led]." On May 7, 2019, in an objection addressing various discovery issues, the Jones defendants represented that they had "provided all of the analytics, business and marketing plans that they have." On May 29, 2019, the plaintiffs moved to compel compliance with the court's discovery orders, asserting in part that the Jones defendants had failed to produce responsive marketing and analytics information. The plaintiffs referred, in particular, to marketing **[\*495]** data generated by Google Analytics[7] in the custody and control of the Jones defendants, and argued that a thirty-five page Google Analytics document provided by the Jones defendants was inadequate.

On June 10, 2019, the court issued an order stating that (1) testimony elicited during certain depositions confirmed that a "Google Analytics account **[\*\*11]** is accessed and utilized by some employees of the [Jones] defendants," (2) the Google Analytics document that the Jones defendants had produced did not constitute full and fair compliance with the court's discovery orders, and (3) the plaintiffs were "entitled to the [Google Analytics] data pursuant to the court's discovery orders." The court further ordered that it would "consider appropriate sanctions for the [Jones] defendants' failure to fully and fairly comply should they not produce the data within one week." Subsequently, the Jones defendants represented that, on June 17, 2019, Google Analytics data purportedly had been emailed to the plaintiffs' counsel; however, the plaintiffs' counsel represented that the email was never received.

On June 17, 2019, the plaintiffs moved for the court to review a June 14, 2019 broadcast of Jones' radio program, during which Jones made threatening comments with respect to one of the plaintiffs' counsel. See *Lafferty v. Jones, supra, 336 Conn. 342-46, 370*. On June 18, 2019, after finding that (1) the Jones defendants were noncompliant with the court's discovery orders concerning, inter alia, the Google Analytics data, and (2) Jones had harassed, intimidated, and threatened one of the plaintiffs' **[\*\*12]** counsel during the June 14, 2019 **[\*496]** broadcast, the court sanctioned the Jones defendants by depriving them of the opportunity to pursue their special motions to dismiss. *Id., 346-47, 374*. At the outset of its decision, the court also stated: "[T]he discovery in this case has been marked with obfuscation and delay on the part of the [Jones] defendants, who, despite several court-ordered deadlines . . . [have] continue[d] . . . to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations. . . . The [court has] entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their

---

[5] "SLAPP is an acronym for 'strategic lawsuit against public participation' . . . ." *Lafferty v. Jones, supra, 336 Conn. 337 n.4*.

[6] *Section 52-196a* was amended by *No. 19-64, § 17*, of the 2019 Public Acts, which made changes to the statute that are not relevant to these appeals. Accordingly, we refer to the current revision of the statute.

[7] In their principal appellate brief, the defendants represent that "Google Analytics is proprietary data made available to subscribers on a server maintained by Google. It is described thus on Google's webpage: 'Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also the mobile app traffic [and] events, currently inside a platform inside the Google Marketing Platform brand.' "

**EXHIBIT 28**

Lafferty v. Jones, 229 Conn. App. 487

discovery and [have] failed to produce that which is within their knowledge, possession, or power to obtain." Later, the court further stated: "At this point, I decline to default the . . . Jones defendants, but I will—I don't know how clearly I can say this. . . . **[\*\*13]** As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the . . . Jones defendants if they, from this point forward, continue with their behavior with respect to discovery." On July 10, 2020, following Chief Justice Richard A. Robinson's grant of the Jones defendants' petition for an expedited public interest appeal pursuant to _General Statutes § 52-265a_, our Supreme Court affirmed the trial court's sanction orders. _Lafferty v. Jones, supra, 336 n.3, 38_5.

On November 12, 2020, the plaintiffs moved to again compel compliance with court-ordered discovery.[8] On **[\*497]** May 5, 2021, the Jones defendants filed an objection, arguing in part that the plaintiffs' prior discovery requests had been rendered moot as a result of the court's June 18, 2019 sanction orders precluding the Jones defendants from pursuing their special motions to dismiss.[9] On May 14, 2021, the court issued an order stating that "the obligation of the [Jones] defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the [Jones] defendants have been precluded **[\*\*14]** from pursuing special motions to dismiss."

On June 1, 2021, the Jones defendants filed an emergency motion for a protective order requesting that the court (1) extend an upcoming discovery production deadline by forty-five days and (2) narrow the scope of discovery regarding, inter alia, the Google Analytics data, which, they represented, required them to review nearly 300,000 emails for privileged information. On June 2, 2021, the court issued an order stating: "The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the time frame for compliance, the outstanding discovery responses were due over two years ago. At no point in time following the decision [in _Lafferty v. Jones, supra, 336 Conn. 332, 246 A.3d 429_] did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs . . . the Jones defendants, in February and March of 2020, while their case was pending before [our] Supreme Court and a court ordered stay of discovery was in effect, asked the plaintiffs' counsel **[\*\*15]** for a complete set of discovery requests to **[\*498]** date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020, and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021, confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the [Jones] defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that [the Jones defendants'] motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default."

On June 28, 2021, the Jones defendants filed a **[\*\*16]** notice of compliance indicating that (1) the defendants had provided "complete, final supplemental compliance," and (2) Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, previously had satisfied their discovery obligations. With regard to the Google Analytics data, the Jones defendants represented that (1) only Free Speech Systems, LLC, used Google Analytics, (2) Free Speech Systems, LLC, did not possess, control, or have custody of Google Analytics data in a manner allowing the data to

---

[8] The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further.

[9] On November 18, 2020, the Jones defendants filed a notice that the underlying consolidated actions had been removed to the United States District Court for the District of Connecticut. The actions were remanded from the District Court on March 5, 2021.

be exported,[10] and (3) the only reasonable method of sharing the Google Analytics data would **[\*499]** be to permit the plaintiffs' counsel to access it via a " 'sandbox.' "[11]

On July 1, 2021, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through one of their counsel, Attorney Norman A. Pattis of Pattis & Smith, LLC,[12] filed a motion for a commission to take an out-of-state deposition of Hillary Clinton (motion to depose Clinton).[13] These defendants asserted in relevant part that, (1) during one of the plaintiffs' depositions, (a) on the advice of counsel, the deponent refused to answer how the plaintiffs "all ended up represented by the same [law] firm" in the underlying consolidated **[\*\*17]** actions and (b) claimed to be unaware of how her legal fees were being paid, (2) the lead plaintiff in the underlying consolidated actions was invited to speak at the Democratic National Convention in 2016, and thereafter was "praised" by Clinton, and (3) they "believe[d] that [the underlying consolidated actions were] filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by . . . Clinton as part of a vendetta to silence . . . Jones after . . . Clinton lost the presidential race to Donald J. Trump."

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating a protective **[\*500]** order entered on February 22, 2019, as amended on June 16, 2021 (protective order),[14] which originally had been proposed by the Jones defendants and which, inter alia, protected confidential information produced by the plaintiffs during discovery.[15] The plaintiffs maintained that the motion to depose Clinton, filed by the Jones defendants[16] in the middle of a deposition, (1) was frivolous and (2) improperly published information obtained from the deponent's testimony that was designated as "Highly Confidential-Attorneys **[\*\*18]** Eyes Only" in violation of the protective order. On July 19, 2021, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, filed an objection, and the plaintiffs filed a reply brief the next day.

---

[10] The Jones defendants further represented that, to export the Google Analytics data, Free Speech Systems, LLC, would be required to purchase an upgraded membership account at a cost of $150,000.

[11] The Jones defendants defined " '[s]andboxing' " as " 'a computer security term referring to when a program is set aside from other programs in a separate environment so that if errors or security issues occur, those issues will not spread to other areas on the computer. Programs are enabled in their own sequestered area, where they can be worked on without posing any threat to other programs.' "

[12] On July 1, 2021, all of the Jones defendants, except for Jones, were represented by both Attorney Jay Marshall Wolman and Pattis & Smith, LLC. At that time, Jones was represented by Wolman only.

[13] Jones did not join the motion to depose Clinton, and Infowars, LLC, was not listed as one of the movants. In subsequent filings, including an August 3, 2021 reply brief vis- -vis the motion to depose Clinton, Infowars, LLC, was treated as an additional movant.

[14] The protective order was twice amended further in 2022.

[15] The protective order limited access to materials designated as "Confidential Information" or "Highly Confidential-Attorneys Eyes Only" to certain categories of persons. The protective order further provided in relevant part: "Depositions involving Confidential Information shall be treated, as follows:

"a. Portions of a deposition or depositions in their entirety may be designated Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY by counsel for the deponent or the Designating Party [as defined in the protective order], with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

"b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY where less than all of the testimony in that transcript would fall into those categories, subject to [a procedure detailed in the protective order]. . . . The designations shall remain effective until and unless an objection is made and finally resolved."

[16] The plaintiffs contended that the motion to depose Clinton should be treated as having been filed by all of the Jones defendants. See footnote 13 of this opinion.

On August 5, 2021, the court issued an order stating in relevant part: "In the midst of taking the first deposition of a plaintiff . . . Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC (Infowars), filed a motion to depose . . . Clinton, using deposition testimony that had just been designated as '[Highly] Confidential-Attorneys Eyes Only,' **[*501]** and completely disregarding the court-ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court-ordered to be followed, nor have they since taken any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court-ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the Internet by filing it **[**19]** in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective [order] . . . . Infowars . . . now takes the absurd position that the court-ordered protective order circumvents the good cause requirements of *Practice Book § 13-5*, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and wilful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing."[17]

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for failing to produce certain accounting documents. The plaintiffs asserted in relevant part that, (1) in connection with a noticed deposition of Melinda Flores, Free Speech System, LLC's accounting manager, Flores was directed to produce documents, including (a) Free Speech System, **[**20]** LLC's trial balances from 2012 to 2019, and (b) " '[a]ny and **[*502]** all subsidiary ledgers for each account listed in the [t]rial balances produced,' "[18] (2) the court ordered the requested records to be produced by the close of business on May 14, 2021,[19] (3) on May 14, 2021, the Jones defendants produced documents that they described to be trial balances "incorporating the [s]ubsidiary [l]edgers," (4) notwithstanding the Jones defendants' representation, they failed to produce any subsidiary ledgers, and (5) Flores testified during her deposition that (a) she assisted in assembling the documents produced on May 14, 2021, (b) Free Speech Systems, LLC, maintained subsidiary ledger information that was accessible, and (c) the documents produced did not contain subsidiary ledgers. (Emphasis omitted.) On July 27, 2021, the Jones defendants filed an objection, arguing in relevant part that Free Speech Systems, LLC, did not possess or maintain subsidiary ledgers. In support of their objection, the Jones defendants submitted a personal affidavit of Robert Roe (Roe affidavit), a certified public accountant and a certified forensic accountant, who averred **[*503]** that Free Speech Systems, LLC, did not maintain **[**21]** or utilize subsidiary ledgers. On August 3, 2021, the plaintiffs filed a reply brief.

On August 6, 2021, the court issued an order stating in relevant part: "The subsidiary ledger information . . . was easily accessible to Flores . . . . Despite the court orders, and although the information exists, is maintained by

---

[17] On August 4, 2021, the court denied the motion to depose Clinton. That ruling is not at issue in these consolidated appeals.

[18] Attached as an exhibit to the July 6, 2021 motion was an affidavit of Brian W. Merrill, a certified fraud examiner and a certified analytics professional, who averred in relevant part that "[a] trial balance is a standard accounting report listing a company's general ledger accounts. A debit or credit balance is presented for each general ledger account. The purpose of a trial balance is to prove that the value of all debit balances equals the value of all credit balances. Subsidiary ledgers ('[s]ubledgers') contain the transactional detail that support the trial balance details for all general ledger accounts in an accounting system. Subledgers allow for the interpretation and analysis of the financial activity that is recorded in the books and records that ultimately represent the financial statement of the organization."

On November 6, 2020, the Jones defendants objected to the production request seeking the trial balances and subsidiary ledgers on the grounds that the request was, inter alia, overbroad, irrelevant, and unduly burdensome. The court overruled the objection.

[19] On May 5, 2021, the Jones defendants filed an emergency motion for a protective order requesting in part that Flores' deposition, scheduled for May 7, 2021, be rescheduled for medical reasons. On May 6, 2021, the court ordered Flores' deposition to be rescheduled but further directed that "[t]he records requested in the request to produce are ordered to be produced by the close of business on [May 14, 2021]. Failure to comply with this order may result in sanctions."

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

[Free Speech Systems, LLC], and could have been produced by Flores as was required by the court orders, the documents were not produced. The court rejects [Roe's] statement . . . that [Free Speech Systems, LLC] does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances. There is no excuse for the [Jones] defendants' disregard of not only their discovery obligations, but the . . . court orders. The court finds that the failure to comply with the production request has prejudiced the plaintiffs [in] their ability to both prosecute their claims and conduct further depositions in a meaningful manner." The court further ordered (1) Flores' deposition to resume, with Flores directed to produce the subsidiary ledger information, and (2) that sanctions would be addressed at a future hearing. During subsequent hearings before the court, the plaintiffs' **[\*\*22]** counsel represented that, on August 24, 2021, the Jones defendants produced alleged subsidiary ledgers; however, the plaintiffs' counsel further represented that "it is not clear whether [the documents produced were], in fact, subsidiary ledgers . . . ."

On August 24, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating the court's discovery orders requiring them to produce, inter alia, the Google Analytics data. The plaintiffs refuted the Jones defendants' contention in their June 28, 2021 notice of compliance that Free Speech Systems, LLC, did not possess, control, or have custody of the Google Analytics data in a manner that could be exported, **[\*504]** asserting that such "representations were inaccurate and misleading." On September 14, 2021, the Jones defendants filed an objection, arguing, inter alia, that (1) on June 17, 2019, via email, they had produced the Google Analytics data requested by the plaintiffs, and (2) the "sandbox mechanism" previously suggested by them would allow the plaintiffs to access all of the "raw data." On September 23, 2021, the plaintiffs filed a reply brief, and on September 25, 2021, with leave of the court, the Jones defendants **[\*\*23]** filed a surreply brief.

On September 30, 2021 the court issued an order stating in relevant part: "There is no dispute here that the Jones defendants failed to follow the rules [of practice] as they relate to discovery. . . . The purported June 17, 2019 email transmission of zip files . . . containing Google Analytics reports that the plaintiffs' counsel indicates was never received was not sent to [certain other defendants] nor did the purported transmission otherwise comply with the rules of practice. As such, it is not necessary for the court to resolve the issue of whether the purported transmission was actually sent, as it cannot be considered proper compliance under our rules. In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the appropriate sanctions at the next status conference." Subsequently, by way of a notice of compliance dated October 8, 2021, the Jones defendants **[\*\*24]** represented that they had provided supplemental responses to the plaintiffs' discovery requests.

On September 9, 2021, the plaintiffs moved to sanction the Jones defendants for producing "manufactured" documents in discovery. The plaintiffs contended that the trial balances that had been produced **[\*505]** were not the originals but, rather, constituted altered trial balances that Roe had manipulated prior to production. On October 7, 2021, the Jones defendants filed an objection. On October 18, 2021, the plaintiffs filed a reply brief, and on October 20, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On November 15, 2021, after hearing argument from the parties over the course of three days between October 20 and November 15, 2021, the court issued an oral decision defaulting the Jones defendants as a sanction for violating (1) the protective order and (2) its discovery orders.[20] With regard to the protective order, the court found in relevant part that (1) the Jones defendants acknowledged that the motion to depose Clinton contained information obtained from a deposition that was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order, **[\*\*25]** (2) the Jones defendants argued that the protective order did not preclude them from publishing such confidential information so long as they did not identify the witness from whom the information was obtained, which position "did nothing but reinforce the court's August 5, 2021 order and findings that the [Jones defendants'] cavalier actions constituted wilful misconduct and violated the court's clear and unambiguous

---

[20] On October 7, 2021, the plaintiffs filed a memorandum of law in favor of the court defaulting the Jones defendants for their misconduct. On October 20, 2021, the Jones defendants filed a memorandum of law in opposition to a default order.

protective order,"[21] and (3) there was a "transparent attempt to cloud the issues" by counsel who had filed the motion to depose Clinton, Pattis, as well as one of the Jones defendants' former **[*506]** counsel, Attorney Jay Marshall Wolman, stemming from inconsistent representations as to whether Infowars, LLC, was one of the movants of the motion to depose Clinton.[22]

With respect to the subsidiary ledgers, the court summarized its findings in its August 6, 2021 order regarding the subsidiary ledgers and commented that "it is still unclear as to what documents have been produced." The court then determined that sanctions were "appropriate in light of the [Jones] defendants' failure to fully and fairly comply with the plaintiffs' discovery request and the court's orders . . . ."

Regarding **[**26]** the trial balances, the court determined that the trial balances produced by the Jones defendants did not comply with its discovery orders. The court stated that (1) Flores testified at her deposition that she had generated the trial balances, which she believed had been produced to the plaintiffs, but (2) Roe later altered those trial balances before they had been provided to the plaintiffs. The court rejected an argument asserted by the Jones defendants that Flores had "provided flawed information to the [Jones] defendants that the [Jones] defendants, through Roe, had to correct." The court further stated: "The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by [Roe] were the records that were produced. But these records that removed accounts and consolidated accounts altered **[*507]** the information in the reports that [Flores] had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiffs' request or to the court's order."

The court **[**27]** next addressed the Google Analytics data requested by the plaintiffs, stating: "With respect to analytics, including Google Analytics . . . the [Jones] defendants on May 7, 2019, represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports but did not regularly use them. . . . The [Jones] defendants also claim that, on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not [to] the codefendants, an email the plaintiffs state they did not receive and that the court found would not have been in compliance with our rules of practice. On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete, final supplemental compliance was made by . . . [Jones] and Free Speech Systems, LLC, and that Infowars, LLC, Infowars Health, LLC, and Prison Planet [TV], LLC, quote: 'Had previously produced all documents required to be produced,' . . . representing that with respect to the Google Analytics documents, Free Speech Systems, LLC, could not export the dataset and that the only way they could comply was through the **[**28]** sandbox approach. Then on [October] 8, 2021,[23] the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for [Infowars.com] and not for any of the other websites such as Prison Planet TV **[*508]** or Infowars Health." (Footnote added.) The court also found that (1) the Jones defendants had failed to produce analytics data for other platforms, such as Alexa and Criteo, and (2) the Jones defendants' production of certain social media analytics data "has . . . been insubstantial and . . . has fallen far short

---

[21] The court further observed that the Jones defendants previously had asserted a different argument, namely, that the inclusion of the "Highly Confidential-Attorneys Eyes Only" information in the motion to depose Clinton was justified because the plaintiffs lacked a good faith basis to designate the deposition at issue as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. The court rejected that argument.

[22] As the court explained, (1) the motion to depose Clinton, filed by Pattis, listed Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, as the movants, (2) in the July 19, 2021 objection to the plaintiffs' July 6, 2021 motion for sanctions, also filed by Pattis, Infowars, LLC, was treated as an additional movant, and (3) during argument, Wolman represented that Infowars, LLC, had no involvement in the motion to depose Clinton because its name was not listed in the motion.

[23] The court referred to August 8, 2021, as the date of the production of the spreadsheets; however, (1) during argument preceding the court's sanctions order, the plaintiffs' counsel represented that the spreadsheets had been produced on October 8, 2021, and (2) the record reflects that the Jones defendants filed a notice of compliance dated October 8, 2021.

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

both procedurally and substantively . . . ."[24] As the court summarized, "[t]he court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and court orders on its own merits a default against the Jones defendants."

The court then stated: "Neither the court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to, is fundamental fairness that the other **[\*\*29]** side produces that information which is within [its] knowledge, possession and power, and that the other side meet[s] its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

"Here, the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

 **[\*509]** "The court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous court orders, and they have not.

"In addressing the sanctions that should enter here, the court is not punishing the [Jones] defendants. The court also recognizes that a sanction of default is one of last resort. This court previously sanctioned the [Jones] defendants not by entering a default, but by a lesser sanction, the preclusion of the [Jones] defendants' special motions to dismiss. At this **[\*\*30]** point, entering other lesser sanctions such as monetary sanctions, the preclusion of evidence, or the establishment of facts is inadequate given the scope and extent of the discovery material that the [Jones] defendants have failed to produce.

"As pointed out by the plaintiffs, they are attempting to conduct discovery on what the [Jones] defendants publish and the [Jones] defendants' revenue. And the failure of the [Jones] defendants to produce the analytics impacts the ability of the plaintiffs to address what is published, and the [Jones] defendants' failure to produce the financial records such as subledgers and trial balances affects the ability of the plaintiffs to address the [Jones] defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims, again was caused by the Jones defendants' wilful noncompliance, that is, the Jones defendants' failure to produce critical material information that the plaintiff[s] needed to prove their claims.

"For these reasons, the court is entering a default against the [Jones] defendants . . . . The case will proceed as a hearing in damages as to **[\*\*31]** the [Jones] defendants. The court notes [that] . . . Jones is [the] sole controlling authority of all the [Jones] defendants, and  **[\*510]** that the [Jones] defendants filed motions and signed off on their discovery issues jointly. And all the [Jones] defendants have failed to fully and fairly comply with their discovery obligations."

On appeal, the defendants assert that (1) the court incorrectly (a) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (b) attributed the violation of the protective order to them rather than to their counsel,[25] (2) the court incorrectly determined that their noncompliance with its discovery

---

[24] The defendants make a passing reference to these other analytics in their principal appellate brief. Insofar as the defendants attempt to raise a claim of error specifically as to these other analytics, they have not adequately briefed any such claim. See *Lafferty v. Jones, supra, 336 Conn. 375 n.30*. Thus, we do not set forth additional context vis-a`-vis these other analytics.

[25] As we explained in footnote 13 of this opinion, although Free Speech Systems, LLC, was one of the movants of the motion to depose Clinton, Jones did not join the motion. The defendants on appeal do not claim that Jones was sanctioned improperly vis-a`-vis the protective order; on the contrary, both defendants—Jones and Free Speech Systems, LLC—claim error as to the court's ruling regarding the violation of the protective order and assert that the court attributed the violation to them rather than to their counsel. Accordingly, for purposes of our resolution of the defendants' claims in part I of this opinion and notwithstanding

orders was wilful, and (3) the court's sanction order defaulting them was disproportionate.[26] These contentions are unavailing.

 **[\*511]** "A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. . . . [T]his inherent authority permits sanctions for dilatory, bad faith and harassing litigation conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Lafferty v. Jones, supra, 336 Conn. 373*.

"Additionally, under *Practice Book [Rev. to 2021] § 13-14*,[27] a court may sanction a party for noncompliance **[\*\*32]** with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits  **[\*512]**  for a party, such as by rendering a default judgment against a defendant . . . ." (Footnote added.) Id.

---

the convoluted background concerning the identity of the movants of the motion to depose Clinton, we do not differentiate between Jones and Free Speech Systems, LLC, with regard to the motion to depose Clinton and the court's rulings concerning the protective order.

[26] The defendants raise a number of additional claims, which we decline to review. First, in their reply brief, the defendants contend for the first time that, as a matter of law, "there should be an outer limit on a trial court's authority to enter a default in civil cases. Failure adequately or substantially to comply with discovery should never result in a default." We decline to consider this discrete legal issue raised for the first time in the defendants' reply brief. See *Anderson-Harris v. Harris, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023)* ("[i]t [is] axiomatic that arguments cannot be raised for the first time in a reply brief"). Even if some semblance of this claim can be gleaned from the defendants' principal appellate brief, we conclude that the defendants have abandoned the claim as a result of their failure to brief it adequately in their main brief and notwithstanding their attempt to expound on it in their reply brief. See *Robb v. Connecticut Board of Veterinary Medicine, 204 Conn. App. 595, 613 n.23, 254 A.3d 915* ("[T]he plaintiff cannot use his reply brief to resurrect a claim that he has abandoned by failing to adequately brief it in his principal appellate brief. See *Hurley v. Heart Physicians, P.C., 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010)* (declining to consider claim when appellant raised 'vague assertion' of claim in principal appellate brief and later 'amplified her discussion of the issue considerably in her reply brief')."), cert. denied, **338 Conn. 911, 259 A.3d 654 (2021)**. Accordingly, insofar as the defendants claim that the default entered against them was a disproportionate sanction, we limit our analysis to the parameters of the claim adequately briefed by the defendants, namely, that the sanction constituted an abuse of the court's discretion on the basis of the record.

Second, in their principal appellate brief, the defendants claim that "[a] liability default is never appropriate in a case involving speech, given the importance the Connecticut constitution places on speech." The defendants cite *article first, § 6, of the Connecticut constitution*, which, as they concede, applies only to criminal prosecutions; see *Gray v. Mossman, 91 Conn. 430, 442-43, 99 A. 1062 (1917)*; and which provides: "In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." *Conn. Const., art. I, § 6*. The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty v. Jones, supra, 336 Conn. 375 n.30*.

Third, in their principal appellate brief, the defendants assert that the court, in its August 6, 2021 order addressing the subsidiary ledgers issue, improperly discredited the Roe affidavit without an evidentiary hearing. The defendants contend that "[t]he absence of a meaningful evidentiary record to support this finding as to . . . Roe, a finding that bore such fatal consequences for the defendants, constitutes an abuse of discretion . . . ." The defendants have abandoned this claim by failing to provide any substantive legal analysis to support it. See *Lafferty v. Jones, supra, 336 Conn. 375 n.30*.

Last, in their principal appellate brief, the defendants assert that "the trial court never set forth just what it thought Google Analytics was. As such, the order [regarding Google Analytics] was not so clear and unambiguous as to warrant a default if, in fact, the order was violated at all." We deem this claim to be inadequately briefed and, therefore, the defendants have abandoned it. See *Lafferty v. Jones, supra, 336 Conn. 375 n.30*.

[27] *Practice Book (Rev. to 2021) § 13-14* provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to *Section 13-13*, or has failed to comply with the provisions of *Section 13-15*, or has failed to appear and testify at a deposition duly noticed pursuant

Lafferty v. Jones, 229 Conn. App. 487

We consider three factors in determining whether "a trial court properly exercises its discretion in imposing a sanction for a violation of a court order . . . ." *Ridgaway v. Mount Vernon Fire Ins. Co., 328 Conn. 60, 71, 176 A.3d 1167 (2018)*; see also *Millbrook Owners Assn., Inc. v. Hamilton Standard, 257 Conn. 1, 17-18, 776 A.2d 1115 (2001)*. "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review.[28] Third, the sanction imposed must be proportional to the violation. This requirement poses a **[*513]** question of the discretion of the trial court that we will review for abuse of that discretion." (Footnote added; internal quotation marks **[**33]** omitted.) *Lafferty v. Jones, supra, 336 Conn. 373-74*.

A

The defendants contend that the court improperly (1) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (2) attributed the violation of the protective order to them, as opposed to their counsel. We are not persuaded.

As to the court's determination that the filing of the motion to depose Clinton violated the protective order, the defendants maintain that, in the motion, they "represented that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. . . . The de minimis recitation of facts in the motion . . . did not violate a court order . . . ." (Citations omitted; footnote omitted.) As the court correctly determined, however, the clear and unambiguous language of the protective order limited access to depositions, or portions thereof, designated as "Highly Confidential-Attorneys Eyes Only." The defendants acknowledge that the motion to depose Clinton contained information drawn from the transcript of one of the plaintiffs' depositions, **[**34]** which, as the court found, was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. Thus, in filing the motion to depose Clinton and making the confidential information set forth therein available to the public, the defendants plainly violated the protective order.

**[*514]** Moreover, the defendants' position on appeal is further undermined by the fact that, during argument preceding the court's sanctions order, one of the defendants' former counsel, Wolman, conceded that the defendants' actions violated the protective order. The following colloquy occurred between the court and Wolman:

"[Wolman]: . . . We do take the [protective] order very seriously and have endeavored to abide it. There was during a deposition this motion [to depose Clinton] filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the court's order. And you know, it was erroneously believed that that was not subject to the [protective] order. The witness herself was not identified. *And while it may be a technical violation*, and **[**35]** it was not realized to be so at the time—

"The Court: So, do you admit now that it was a violation, whether it's a technical violation or not?

---

to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to *Sections 13-6 through 13-11*, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply . . . ."

[28] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Fernwood Realty, LLC v. AeroCision, LLC, 166 Conn. App. 345, 356, 141 A.3d 965*, cert. denied, **323 Conn. 912, 149 A.3d 981 (2016)**.

"[Wolman]: *I would say it probably fits within the language of what is protected*. We had concerns as to whether or not it truly was protected. The court has weighed in." (Emphasis added.)

Accordingly, we reject the defendants' assertion that the court incorrectly determined that they violated the protective order in filing the motion to depose Clinton.

The defendants, in the alternative, contend that the court improperly ascribed the violation of the protective order to them rather than to their counsel. The defendants posit that, rather than referring counsel for disciplinary action, the court "attributed counsel's alleged failure to [the defendants], justifying a default on conduct over which the defendants themselves had no control, and about which, the record reflects, they knew **[\*515]** nothing." The defendants fail to cite any portion of the record supporting their assertion that they were unaware of counsel's actions. Without any such evidence, we cannot countenance the defendants' reasoning that they were absolved of any discipline stemming from **[\*\*36]** counsel's conduct. See *MacCalla v. American Medical Response of Connecticut, Inc., 188 Conn. App. 228, 240, 204 A.3d 753 (2019)* ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode v. Thode, 190 Conn. 694, 698, 462 A.2d 4 (1983)*; see *Sousa v. Sousa, 173 Conn. App. 755, 773 n.6, 164 A.3d 702* ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, *327 Conn. 906, 170 A.3d 2 (2017).*"); see also *MacCalla v. American Medical Response of Connecticut, Inc.*, supra, 239-40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick v. Monkey Farm Cafe, LLC, 163 Conn. App. 45, 52-53, 134 A.3d 643 (2016)* (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

B

The defendants next claim that the court erred in finding that they wilfully violated its discovery orders. As to the discovery orders in general, the defendants maintain that "the failure to provide answers was not an example of wilful misconduct. Rather, it was the result of a shocking degree of disorganization. The plaintiffs persuaded the trial judge that the plaintiffs' expectations of how the defendants should operate their business and keep records was the standard the defendants must meet. The default **[\*\*37]** prevented a jury from learning the truth about the defendants' corporate organization—it is a haphazard warren of people drawn **[\*516]** together by . . . Jones' charisma and generosity, but almost altogether devoid of institutional structure or normal corporate governance." We are unpersuaded.

Whether a party wilfully violates a court order "is a factual question committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Lafferty v. Jones, supra, 222 Conn. App. 867*. The court's finding that the defendants' noncompliance with its discovery orders was wilful was supported by its subordinate findings that (1) the subsidiary ledgers requested by the plaintiffs were "easily accessible" and "available" to Flores, (2) Flores generated the trial balances sought by the plaintiffs, but those trial balances later were altered by Roe prior to production to the plaintiffs, and (3) the defendants withheld analytics materials and exhibited a "callous disregard of their obligations to fully and fairly comply with discovery . . . ." Rather than adequately contesting the factual underpinnings of these findings, the defendants propound the argument that their failure to comply with the court's discovery orders stemmed from **[\*\*38]** their purported institutional disorganization. The defendants fail to cite to any portion of the record that supports this assertion. Moreover, the defendants' argument is belied by their own statement in their principal appellate brief that, notwithstanding their purported disorganized corporate structure, they "tendered tens of thousands of documents, sat for scores of depositions, provided answers to requests to admit, and otherwise made efforts to comply with discovery." Thus, the defendants' claim regarding the wilfulness of their noncompliance with the court's discovery orders in general is untenable.

The defendants also assert that the court incorrectly determined that they had wilfully violated its discovery orders specifically concerning the Google Analytics data. The defendants maintain that they (1) made "limited and sporadic use of Google Analytics data," (2) **[\*517]** "did not keep [any] reports, did not generally or systematically rely on them, and consulted Google Analytics only haphazardly," and (3) did not possess the Google Analytics data, but, rather, "access[ed] the information on Google servers," such that they did not wilfully fail to comply with the court's

orders regarding **[\*\*39]** the Google Analytics data. We reject this assertion. The frequency of the defendants' use and reliance on the Google Analytics data has no bearing on their obligation to abide by the court's discovery orders requiring them to provide the data to the plaintiffs. Further, whether the defendants were in possession of the Google Analytics data is immaterial because the plaintiffs' production request sought analytics that the defendants "own[ed] *and/or control*[*led*]." (Emphasis added.) See *Practice Book § 13-9 (a)*[29] ("[i]n any civil action, in any probate appeal, or in any administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required, any party may serve . . . upon any other party a request to afford the party submitting the request the opportunity to inspect, copy, photograph or otherwise reproduce designated documents or to inspect and copy, test or sample any tangible things *in the possession, custody or control* of the party upon whom the request is served" (emphasis added)). As the court found, the defendants (1) had access to the Google Analytics data and (2) produced some Google Analytics data to the plaintiffs, albeit not in full and fair **[\*\*40]** compliance with the court's discovery orders. Accordingly, we conclude that the court properly found that the defendants wilfully violated the court's discovery orders as to the Google Analytics data.

C

The defendants next claim that the court's order defaulting them as a sanction for their violations of its **[\*518]** discovery orders and the protective order was disproportionate. The defendants maintain that, although they "resisted discovery by every lawful means possible in lengthy proceedings . . . [t]heir compliance was substantial," and they did not "[fail] to answer the complaint, [fail] to respond to discovery or otherwise [fail] to participate in the proceedings."[30] We conclude that the court did not abuse its discretion in defaulting the defendants.

As we set forth previously in this opinion, whether the court's sanction defaulting the defendants was proportional to their violations of the court's orders "poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *Lafferty v. Jones, supra, 336 Conn. 374*. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate **[\*\*41]** issue for us is whether the trial court could have reasonably concluded as it did. . . . In reviewing a claim that the court has abused this discretion, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . **[\*519]** The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. . . . Under an abuse of discretion standard, a court's decision must be legally sound and [the court] must [have] honest[ly] attempt[ed] . . . to do what is right and equitable under the circumstances of the law, without the dictates of whim or caprice." (Citation omitted; internal quotation marks omitted.) *Gianetti v. Neigher, 214 Conn. App. 394, 437-38, 280 A.3d 555*, cert. denied, *345 Conn. 963, 285 A.3d 390 (2022)*. With regard to discovery orders in particular, "[n]ever will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery. . . . Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable **[\*\*42]** use of sanctions to control discovery." (Citation omitted; internal quotation marks omitted.) *Lafferty v. Jones*, supra, 374.

---

[29] An amendment to *Practice Book § 13-9*, effective January 1, 2022, made changes to the provision that are not relevant to these appeals. Accordingly, we refer to the current revision of this provision.

[30] The defendants also argue that, as a less severe alternative to a default, the plaintiffs could have asserted a cause of action for intentional spoliation of evidence or the court could have provided a spoliation charge to the jury. See *Rizzuto v. Davidson Ladders, Inc., 280 Conn. 225, 243, 905 A.2d 1165 (2006)* (recognizing independent cause of action for intentional spoliation of evidence, defined as " 'the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action' "). The plaintiffs counter that the law of spoliation is inapplicable because "there is no question that [the defendants] had—and simply withheld—financial and analytics compliance. Moreover, a spoliation charge would not have remedied the prejudice to the plaintiffs from [the defendants'] misrepresentations regarding the existence of discovery, prolonged delays in providing the compliance [they] did provide, and complete refusal to provide other compliance, or from [the defendants'] wilful violation of the protective order." We agree with the plaintiffs that the law of spoliation did not provide a reasonable alternative to the court's default order.

"[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself. . . . [A] trial court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be **[\*520]** imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court. . . . Like a dismissal, a default **[\*\*43]** judgment is also one of the more severe sanctions that a court may impose . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gutierrez v. Mosor, 206 Conn. App. 818, 827-28, 261 A.3d 850*, cert. denied, *340 Conn. 913, 265 A.3d 926 (2021)*.

In determining whether the sanction of default was proportional to the defendants' violations of the court's orders, "we are guided by the factors [our Supreme Court] . . . ha[s] employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to [comply with the orders], that is, whether it [was] due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party . . . and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Gianetti v. Neigher, supra, 214 Conn. App. 439*.

Remaining mindful, as the trial court recognized, that a default is a sanction of last resort, we conclude that the court's default order was a proportional sanction under the circumstances presented. As to the wilfulness factor, the court found that the defendants' failure to produce "critical material information" to the plaintiffs, **[\*\*44]** as well as the defendants' "cavalier actions" in filing the motion to depose Clinton, constituted wilful noncompliance and misconduct. The court further found that "the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court **[\*521]** orders is a pattern of obstructive conduct . . . ."[31] Thus, this factor militates in favor of the court's default order.

With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims." See *Krahel v. Czoch, 186 Conn. App. 22, 35-36, 198 A.3d 103* (discussing importance of unproduced discovery and its effect as to plaintiff's case when examining prejudice), cert. denied, *330 Conn. 958, 198 A.3d 584 (2018)*; see also *Lafferty v. Jones, supra, 336 Conn. 378* (citing *Krahel* in analyzing prejudice factor).

Additionally, with **[\*\*45]** regard to the protective order, the court stated in its August 5, 2021 order addressing the filing of the motion to depose Clinton that (1) the defendants, in filing the motion to depose Clinton, made information designated as "Highly Confidential-Attorneys Eyes Only" under the protective order available on the Internet, (2) the defendants took no corrective action thereafter, and (3) it had "grave concerns" that there would be "a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public." The court iterated these concerns during argument preceding its sanction order, stating in relevant **[\*522]** part: "So, I do intend to impose sanctions [for the violation of the protective order]. . . . I think the [defendants'] behavior really is unconscionable. . . . And I am concerned about a chilling effect on the testimony of other witnesses." In light of these concerns, this factor weighs in favor of the court's default order.

---

[31] As we concluded in part I B of this opinion, we reject the defendants' claim that the court's finding that they wilfully violated the discovery orders was clearly erroneous.

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

Finally, the court determined that imposing a lesser sanction would be "inadequate . . . ." In 2019, following the defendants' noncompliance **[\*\*46]** with discovery vis-à-vis the special motions to dismiss and Jones' comments during his June 14, 2019 radio broadcast, the court sanctioned the defendants by precluding them from pursuing the special motions to dismiss; however, the court cautioned that it would consider defaulting them in the future if "they, from th[at] point forward, continue[ d] with their behavior with respect to discovery." Later, the court also warned the defendants that they risked being defaulted if they failed to comply with its June 2, 2021 order directing the production of complete, final supplemental compliance. See *Ridgaway v. Mount Vernon Fire Ins. Co., supra, 328 Conn. 74* ("[i]n instances in which our appellate courts have upheld the sanction of a nonsuit, a significant factor has been that the trial court put the plaintiff on notice that noncompliance would result in a nonsuit"). Nevertheless, as the court found, the defendants continued to engage in "a pattern of obstructive conduct" in "callous[ly]" disregarding their discovery obligations. This conduct was not isolated; rather, as the various orders entered by the court demonstrate, notwithstanding being given ample opportunities to comply, the defendants repeatedly failed to produce adequate, responsive **[\*\*47]** materials. The court reasonably determined that a lesser sanction would not suffice under such circumstances. See *Gutierrez v. Mosor, supra, 206 Conn. App. 829* ("[t]he appellate courts of this state consistently have upheld nonsuits, defaults or other sanctions imposed for discovery **[\*523]** violations where the noncomplying party has exhibited a pattern of violations or discovery abuse demonstrating a disregard for the court's authority").

Moreover, in the midst of the defendants' ongoing discovery noncompliance, the defendants filed the motion to depose Clinton, which contained information designated as "Highly Confidential-Attorneys Eyes Only" subject to the protective order. As the court determined, the defendants, in a "cavalier" fashion, violated the protective order, which they originally had proposed, by releasing the confidential information to the public, thereby creating a palpable risk of a "chilling effect" on the testimony of witnesses in the future. Against this backdrop, we cannot discern an abuse of discretion by the court in defaulting the defendants as a sanction. See *Gutierrez v. Mosor, supra, 206 Conn. App. 827* ("dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority" **[\*\*48]** (emphasis omitted; internal quotation marks omitted)). In sum, we conclude that the court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and the protective order.

II

The defendants next claim that the trial court improperly construed the effect of the defendants' default to relieve the plaintiffs of the burden to establish the extent of their damages. This claim warrants little discussion.

Initially, we observe that the defendants assert that the court "never made a principled and intelligible ruling about causation in this case" but, rather, treated causation as having been established following the **[\*524]** defendants' default. The defendants do not brief any substantive claims as to any particular rulings of the court[32] but, rather, take issue with the court's rulings as a whole insofar as the court purportedly "eviscerated the concept of causation and relieved the plaintiffs of any responsibility to prove, or even to attempt to prove, a linkage to the various and diffuse harms they suffered and the conduct of the [defendants]."[33] We exercise **[\*525]** plenary review over this

---

[32] The defendants refer to the court's jury charge, wherein the court instructed the jury in relevant part: "I hereby charge you that causation of the plaintiffs' damages is already established. . . . Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case. In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question."

[33] In their principal appellate brief, the defendants make vague references to (1) "a series of bizarre evidentiary rulings" by the court that "eviscerated the requirement that [the] plaintiffs prove the extent of their damages," (2) the court's improper admission

claim, which presents a question of law. See *Williams v. Mansfield, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022)* ("[w]hen **[\*\*49]** . . . a court's decision is challenged on the basis of a question of law, our review is plenary").

It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . If the allegations of the plaintiff's complaint are sufficient on their face to make out a valid claim for the relief requested, the plaintiff, on the entry of a default against the defendant, need not offer evidence to support those allegations. . . . Therefore, the only issue . . . following a default is the determination of damages. . . . A plaintiff ordinarily is entitled to at least nominal damages following an entry of default against a defendant in a legal action. . . .

"In an action at law, the rule is that the entry of a default operates as a confession by the defaulted defendant of the truth of the material facts alleged in the complaint which are essential to entitle the plaintiff to some of the relief prayed. It is not the equivalent of an admission of all of the facts pleaded. The limit of its effect is to preclude the defaulted defendant from making any further defense **[\*\*50]** and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff is entitled to a judgment for the full amount of the relief claimed. The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive."[34] (Emphasis omitted; internal quotation marks **[\*526]** omitted.) *Whitaker v. Taylor, 99 Conn. App. 719, 725-26, 916 A.2d 834 (2007)*.

As these legal principles elucidate, after the court had defaulted the defendants, the plaintiffs were not required to demonstrate that the defendants' conduct caused their harm. Instead, following the defendants' default, the only burden carried by the plaintiffs was to prove the amount of their damages. See *Murray v. Taylor, 65 Conn. App. 300, 335, 782 A.2d 702* (This court, in reversing the trial court's grant of the defaulted defendant's motion to set aside the verdict following the hearing in damages, explained that "[t]he [trial] court determined that there was no evidence from which the jury reasonably could have found that the plaintiff's damages were proximately caused by the conduct alleged and ruled against the plaintiff on that basis. Yet, in an action at law, as here, the liability of a defaulted **[\*\*51]** defendant is established and the plaintiff's burden at a hearing in damages is limited to proving that the amount of damages claimed is derived from the injuries suffered and is properly supported by the evidence. . . . We, therefore, cannot agree with the court's conclusion that the plaintiff's claim must fail because he did not

---

of evidence, (3) the court failing to determine which of the plaintiffs' allegations were "material," (4) the court instructing the jury that liability had been " 'established,' " and (5) the court denying a motion in limine filed by the defendants requesting that the transcript of its November 15, 2021 ruling defaulting the defendants be admissible at the hearing in damages. Insofar as the defendants attempt to raise claims of error with respect to these discrete issues, they have failed to brief such claims adequately and, therefore, we deem any such claims to be abandoned. See *Lafferty v. Jones, supra, 336 Conn. 375 n.30*.

Additionally, in their principal appellate brief, the defendants repeatedly state that the jury was unaware that liability was established against the defendants as the result of a disciplinary default. In their reply brief, the defendants assert for the first time that the court committed error in failing to notify the jury that the defendants were defaulted as a disciplinary sanction. We decline to review this claim, as it is (1) improperly raised for the first time in the defendants' reply brief or (2) inadequately briefed, even if cognizably raised in the defendants' principal appellate brief. See *Anderson-Harris v. Harris, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023)*; *Robb v. Connecticut Board of Veterinary Medicine, 204 Conn. App. 595, 613 n.23, 254 A.3d 915*, cert. denied, **338 Conn. 911, 259 A.3d 654 (2021)**; see also footnote 26 of this opinion.

[34] We note that, "[a]fter a default, a defendant may still contest liability. *Practice Book §§ 17-34*, *17-35* and *17-37* delineate a defendant's right to contest liability in a hearing in damages after default. Unless the defendant provides the plaintiff written notice of any defenses, the defendant is foreclosed from contesting liability. . . . If written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint and may challenge the right of the plaintiff to maintain the action or prove any matter of defense. . . . This approximates what the defendant would have been able to do if he had filed an answer and special defenses." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Schwartz v. Milazzo, 84 Conn. App. 175, 178-79, 852 A.2d 847*, cert. denied, **271 Conn. 942, 861 A.2d 515 (2004)**. On November 24, 2021, following the entry of the default against them, the defendants filed a notice of defenses, which was stricken by the court on December 24, 2021. The defendants on appeal do not challenge the propriety of the court's order striking the notice of defenses.

Page 120 of 125

provide evidence that [the defaulted defendant's] negligent conduct proximately caused his injuries . . . ." (Citation omitted.)), cert. denied, *258 Conn. 928, 783 A.2d 1029 (2001).*[35]  **[\*527]**  Accordingly, the defendants' claim fails.

III

The defendants also claim that the trial court improperly restricted the scope of Jones' testimony at the hearing in damages. We conclude that the defendants have abandoned this claim by failing to brief it adequately.

The following additional procedural history is relevant. On September 6, 2022, the court granted motions in limine filed by the plaintiffs seeking to preclude evidence or argument at the hearing in damages concerning, inter alia, (1) the defendants' "maximum total amount of Sandy Hook coverage or percentage or proportion of Sandy Hook coverage" and (2) the court's ruling defaulting the defendants. Additionally, on September 13, 2022, the court granted **[\*\*52]**  a motion for sanctions filed by the plaintiffs on the basis of additional discovery misconduct by the defendants. The court sanctioned the defendants by prohibiting them from presenting evidence or argument "that they did not profit from their Sandy Hook coverage."

On September 22, 2022, during the hearing in damages, the plaintiffs called Jones as a witness. Outside of the jury's presence, the court canvassed Jones with regard to the various topics about which (1) counsel were prohibited from asking him and (2) he was precluded from testifying. Jones indicated that he understood which topics his testimony could not address. During the course of Jones' direct examination, the  **[\*528]**  court and counsel engaged in multiple sidebars, and the jury was excused several times, in order to address whether certain questions asked by the plaintiffs' counsel and testimony by Jones were proper in light of the court's orders. The next day, the defendants' counsel informed the court that, for "strategic" reasons, the defendants were forfeiting the right to cross-examine Jones, intending instead to call him as a witness during their case-in-chief. On October 5, 2022, outside of the jury's presence, the defendants' **[\*\*53]**  counsel notified the court that Jones had decided not to testify during the defendants' case-in-chief, explaining that Jones was "boycotting [the] proceedings because he [felt] that [he was] on the horns of a trilemma. If he testifie[d] in accord with the court's orders [restricting his testimony], [he would] be committing perjury; if he violate[ d] the court orders, [it would be] criminal contempt; if he [took] the fifth [amendment to the United States constitution], he [would get an] adverse inference."

The defendants claim on appeal that the court committed error in restricting the scope of Jones' testimony. The majority of the defendants' briefing of this claim focuses on reciting and commenting on the relevant procedural history, iterating the "trilemma" that Jones purportedly faced, and detailing how Jones would have testified but for the court's orders limiting his testimony. The defendants, however, provide no substantive legal analysis examining the propriety of the court's orders imposing limits on Jones' testimony, such as the court's September 13, 2022 order sanctioning the defendants for additional discovery violations. Accordingly, we conclude that the defendants have **[\*\*54]**  abandoned this claim as a result of their failure to adequately brief it. See *Lafferty v. Jones, supra, 336 Conn. 375 n.30*.

IV

The defendants next claim that the trial court improperly denied their motion for a remittitur. We disagree.

 **[\*529]**  The following additional procedural history is relevant to our resolution of this claim. The evidentiary portion of the hearing in damages transpired over the course of several weeks, commencing on September 13, 2022, and concluding on October 5, 2022. The following witnesses testified during the plaintiffs' case-in-chief: (1) the plaintiffs; (2) Alissa Parker, a spouse of one of the plaintiffs; (3) Brittany Paz, a Connecticut attorney who served as a corporate representative of Free Speech Systems, LLC; (4) Clinton Watts, an expert in the field of "identifying analytics and analysis around social media, the Internet, and how it influences people's behavior"; and (5) Jones.

---

[35] The defendants cite the following language in *Murray* to support their claim: " '[E]ven in a hearing in damages . . . a plaintiff must still prove that the damages claimed were caused by the conduct alleged.' " *Murray v. Taylor, supra, 65 Conn. App. 333*. The source of that language, however, is the trial court decision that this court reversed on appeal. See *id., 332-35, 340*. The defendants' reliance on that language, therefore, is untenable.

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

The court admitted in full numerous exhibits offered by the plaintiffs, including video clips of Jones' broadcasts. The defendants rested without calling any witnesses or offering any exhibits, except for one exhibit that was marked for identification only.

In its verdict, the jury awarded the plaintiffs a total of $965,000,000 [**55] in compensatory damages, which was split into two categories for each plaintiff: (1) "defamation/ slander" damages, past and future; and (2) emotional distress damages, past and future. The jury did not divide the $965,000,000 amount evenly among the plaintiffs; rather, other than two plaintiffs who were each awarded $57,600,000, each plaintiff was awarded a distinct amount of compensatory damages.

In moving for a remittitur, the defendants asserted that the jury's verdict was "exorbitant, shock[ed] the sense of justice and was influenced by partiality and prejudice." The defendants argued that (1) the plaintiffs failed to submit evidence to aid the jury in calculating compensatory damages, such as medical evidence or expert testimony on the extent of their emotional distress, such that the jury's verdict was predicated on speculation and was motivated by prejudice and passion, (2) the jury, in essence, awarded the plaintiffs [*530] punitive damages rather than compensatory damages, and (3) the defendants' right to due process was violated as a result of the plaintiffs' failure to submit evidence estimating their damages. The plaintiffs filed a memorandum of law in opposition to the motion [**56] for a remittitur, refuting the defendants' arguments.

In denying the defendants' motion for a remittitur, the court stated: "The defendants take the position, in a conclusory manner unsupported by any evidence or case law, that the verdict was 'exorbitant' and the result of 'passion and prejudice.' They argue—again, unsupported by any law—that due process requires that the plaintiffs are responsible for establishing what they think would make them whole—that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice.[36] Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support[s] the [verdict] rendered by the jury. The size of the [verdict], while substantial, does not so shock the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain [**57] limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; [its] attention to the evidence and instructions from the [*531] court is evident from the specific questions [it] asked regarding both the charge and the evidence.[37] In reviewing the evidence in a light most favorable to sustaining the [verdict], the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform[s] to spread lies to a massive audience clearly supports the [verdict], and that the [verdict was] within the limits of a fair and just award of damages." (Footnotes added; footnotes omitted.)

Before addressing the defendants' claim, we set forth the following applicable legal principles and standard of review. *General Statutes § 52-216a* provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall [**58] set aside the verdict and order a new trial. . . ."

"[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of

---

[36] In footnotes, the court (1) observed that, in contrast to the defendants' "conclusory motion," the plaintiffs "in their objection painstakingly and accurately highlight[ed] the evidence submitted" and (2) iterated that it was not obligated to consider inadequately briefed claims.

[37] The jury submitted several notes during its deliberations.

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's **[\*532]** explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory **[\*\*59]** reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) *Ashmore v. Hartford Hospital, 331 Conn. 777, 782-83, 208 A.3d 256 (2019)*. The inquiry into whether a damages award shocks the sense of justice "is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations." *Maldonado v. Flannery, 343 Conn. 150, 166-67, 272 A.3d 1089 (2022)*.

"[O]ur review of the trial court's decision [to grant or deny remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be given in favor of its correctness. . . . The chief rationale that has been articulated **[\*\*60]** in support of this deferential standard of review is that the trial court, having observed the trial and evaluated the testimony firsthand, is better positioned than a reviewing court to assess both the aptness of the award and whether the jury may have been motivated by improper sympathy, **[\*533]** partiality, or prejudice."[38] (Citations omitted; internal quotation marks omitted.) *Ashmore v. Hartford Hospital, supra, 331 Conn. 783*.

"[A]lthough the trial court has a broad legal discretion in this area, it is not without its limits. . . . Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . Furthermore, [t]he size of the verdict alone does not determine whether it is excessive. . . . Thus, [i]n ruling on the motion for remittitur, the trial court [is] obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned [is] reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . A generous **[\*\*61]** award of noneconomic damages should be sustained if it does not shock the sense of justice. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power. Whether the court would have reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . In determining whether the court abused its discretion, therefore, we must examine the evidential basis of the verdict itself . . . . [T]he court's action cannot **[\*534]** be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." (Internal quotation marks omitted.) *Gois v. Asaro, 150 Conn. App. 442, 457-58, 91 A.3d 513 (2014)*.

Moreover, "[p]roper compensation for noneconomic damages cannot be computed by a mathematical formula, and there is no precise rule for the assessment of damages. . . . The plaintiff need not prove damages with mathematical exactitude; rather, the plaintiff must provide sufficient evidence for the trier to make a **[\*\*62]** fair and reasonable estimate." (Internal quotation marks omitted.) *Id., 457*; see also *Commission on Human Rights & Opportunities v. Cantillon, 347 Conn. 58, 68-69, 295 A.3d 919 (2023)* ("Noneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years,

---

[38] The defendants assert that we should exercise plenary review over their claim because the jury's verdict "shocks the sense of justice" in violation of their due process rights. The defendants provide no legal authority in support of this assertion. We, instead, apply the well settled standard of review and examine the court's decision for an abuse of discretion.

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.)).

The defendants assert that a remittitur of the jury's verdict was necessary because the plaintiffs failed to submit sufficient evidence to establish their damages, such as medical evidence or expert testimony concerning their emotional distress, leaving the jury without a means to determine damages other than relying on passion, prejudice, and speculation. The defendants maintain that, rather than prove their damages, the plaintiffs "focus[ed] . . . on arousing sympathy, directing anger, and anchoring a large number before the jury[39] with the hope that [the] jurors would do what **[*535]** they did in this case—award a fortune." (Footnote added.) We disagree.[40]

Our review of the record reveals that there was sufficient **[**63]** evidence to support the $965,000,000 in compensatory damages awarded by the jury. All of the plaintiffs **[*536]** testified that, in the aftermath of the Sandy Hook massacre, they endured traumatic threats and harassment, conveyed, inter alia, through social media, by mail, or in person, stemming from the lies, as propagated by the defendants, that the Sandy Hook massacre was a

---

[39] The defendants reference the plaintiffs' closing argument, during which the plaintiffs' counsel, in addressing damages for defamation and slander, proposed that the jury consider (1) picking a number representing a reasonable amount to award to one individual, assuming that a lie about that individual had been told to one person, and (2) multiplying that number first by 550 million, which, according to testimony elicited from Watts, represented the minimum audience that the defendants' lies about Sandy Hook reached between 2012 and 2018, and then by fifteen, or the number of plaintiffs in the underlying consolidated actions.

[40] The defendants raise two additional assertions that we discuss briefly. First, the defendants contend that, to comport with due process, the plaintiffs were required to present evidence that estimated their damages so as to provide "some notice as to the magnitude of [the] harm" suffered. As before the trial court, the defendants have failed to provide any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty v. Jones, supra, 336 Conn. 375 n.30*. Moreover, we iterate our Supreme Court's recent statement that "[n]oneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, [our Supreme Court] has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities v. Cantillon, supra, 347 Conn. 68-69*. We also observe that, under Connecticut law, in civil actions seeking the recovery of damages resulting from personal injury, counsel is entitled, but not required, to present argument on the amount of past and future noneconomic damages. See *General Statutes § 52-216b (a)* ("[i]n any civil action to recover damages resulting from personal injury or wrongful death, counsel for any party to the action shall be entitled to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable"); see also *Practice Book § 16-19* ("In any action seeking damages for injury to the person, the amount demanded in the complaint shall not be disclosed to the jury. In the event that the jury shall return a verdict which exceeds the amount demanded, the judicial authority shall reduce the award to, and render judgment in, the amount demanded. Counsel for any party to the action may articulate to the jury during closing argument a lump sum or mathematical formula as to damages claimed to be recoverable.").

Second, the defendants assert that the jury awarded the plaintiffs punitive, rather than compensatory, damages. The record does not support this assertion. Our review of the court's jury charge reflects that the court instructed the jury that its task was to determine compensatory damages, and the court expressly instructed the jury that, "[u]nder the rule [of] compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses." Moreover, the court separately instructed the jury that (1) the plaintiffs were seeking punitive damages in the form of attorney's fees and costs, and (2) the jury was to determine whether punitive damages were to be awarded, with the court to determine the amount thereof if awarded. In a section of the verdict form titled "Compensatory Damages," the jury awarded the plaintiffs a total of $965,000,000 in damages, comprising past and future "defamation/slander" and emotional distress damages. In a separate section of the verdict form, the jury determined that the plaintiffs were entitled to attorney's fees and costs. The defendants do not challenge the propriety of the jury instructions, and, "in the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that the jury followed them." *Audibert v. Halle, 198 Conn. App. 472, 482, 233 A.3d 1237 (2020)*. Thus, we reject the defendants' contention that the $965,000,000 awarded by the jury to the plaintiffs constituted punitive, rather than compensatory, damages.

hoax. Examples of such threats and harassment included death threats, claims that the plaintiffs were actors, and accusations that the deceased victims of the Sandy Hook massacre were not real or were still alive. Additionally, all of the plaintiffs testified to the mental anguish and emotional harm that they suffered as a result of the harrowing threats and harassment they experienced.[41] The extent of the plaintiffs' damages was established further by the testimony of Watts, the plaintiffs' social media expert, who testified that, on the basis of data that he reviewed from three social media platforms, namely, YouTube, Facebook, and Twitter, the defendants' lies about the Sandy Hook massacre reached a minimum audience of 550 million people between 2012 and 2018.

In sum, we agree with the court that the evidence supported **[\*\*64]** the jury's verdict and, although substantial, **[\*537]** the verdict did not "so [shock] the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Ashmore v. Hartford Hospital, supra, 331 Conn. 782*. Accordingly, we conclude that the court did not abuse its discretion in denying the defendants' motion for a remittitur.

V

The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.

We begin with a brief overview of CUTPA. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, *[General Statutes] § 42-110g (a)*[42] *of [CUTPA]* establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by *[General Statutes §] 42-110b* . . . ." (Footnote added; internal quotation marks omitted.) *Cenatiempo v. Bank of America, N.A., 333 Conn. 769, 788, 219 A.3d 767 (2019)*. *Section 42-110b (a)*, in turn, provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices **[\*\*65]** in the conduct of any trade or commerce." *Section 42-110a (4)* defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the **[\*538]** distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."[43]

The following additional procedural history is relevant to our resolution of this claim. To support their CUTPA claim in their original complaint, in addition to incorporating the allegations of the other claims that they asserted, the plaintiffs alleged, inter alia, that (1) the defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family

---

[41] Insofar as the defendants argue that the plaintiffs were required to produce medical or expert testimony to corroborate their testimony concerning their emotional distress, the defendants provide no legal support for this assertion. Cf. *Patino v. Birken Mfg. Co., 304 Conn. 679, 707 n.25, 41 A.3d 1013 (2012)* (rejecting defendant's argument that plaintiff's testimony regarding emotional distress was insufficient without corroboration by medical or expert testimony).

[42] *General Statutes § 42-110g (a)* provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by *section 42-110b,* may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ."

[43] *CUTPA* "refers to 'trade or commerce' in the substantive provision, *§ 42-110b (a)*, but contains a definition of ' "trade" ' and ' "commerce" ' in the definitions provision, *§ 42-110a (4)*. The definition seems to equate the disjunctive with the conjunctive relationship of the two terms and interpret the two terms as having a single meaning or a combined inclusive meaning." R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024-2025 Ed.) § 3.1, p. 117 n.2.

EXHIBIT 28

Lafferty v. Jones, 229 Conn. App. 487

members, and they did so for profit,"[44] (2) the defendants engaged in a "campaign of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy," (3) the defendants' "reprehensible conduct caused substantial injury to the plaintiffs and other consumers that [was] not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have **[\*\*66]** **[\*539]** reasonably avoided," (4) the defendants' "conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury," and (5) the defendants "broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false and with reckless disregard as to whether or not they were true."[45]

On October 9, 2020, the Jones defendants filed a motion to strike, asserting in relevant part that the plaintiffs' CUTPA claim was insufficiently pleaded. On April 29, 2021, the plaintiffs filed an objection, and, on June 4, 2021, the Jones defendants filed a reply brief. On November 18, 2021, the court denied the motion to strike. With respect to the plaintiffs' CUTPA claim, the court determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful to formulate the underlying basis of a CUTPA cause of action. . . . As the court is not striking the plaintiffs' defamation claim, the plaintiffs' [original] complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action." **[\*\*67]** (Citations omitted.) The court further determined that the plaintiffs had standing to maintain their CUTPA claim, stating that "the plaintiffs allege that the [Jones] defendants 'broadcast . . . outrageous, cruel and malicious lies about the plaintiffs' and that '[t]hese acts of the [Jones] defendants resulted in damage to the plaintiffs.' Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action."

On October 5, 2022, after the plaintiffs had rested their case-in-chief at the hearing in damages, the defendants' counsel orally moved for a directed verdict and/ **[\*540]** or to dismiss the plaintiffs' CUTPA claim.[46] The defendants' counsel argued in relevant part that the plaintiffs were asserting a "novel application" of CUTPA because "there is no representation whatsoever that the plaintiffs were harmed in any respect by . . . Jones' commercial activities with respect to the sale of dietary supplements. . . . There is no evidence that anyone was harmed by his commercial activity. . . . [N]othing in [his] speech, or the consequences of that speech, addresses what CUTPA is intended to address . . . and that is whether **[\*\*68]** consumers were harmed by . . . the commercial activity [affecting] trade or commerce. . . . [W]hat we have here is a novel attempt to use CUTPA to silence unpopular speech. . . . So, we think that CUTPA is being used for inappropriate grounds and that the plaintiffs lack standing to bring the action because they cannot establish that they were harmed by . . . Jones' commercial activity. . . . [T]here is no case . . . that supports what the plaintiffs intend to do in this case, and that is [to] use . . . a statute that is designed to protect consumers against unscrupulous trade and commercial practices to attack speech. . . . [N]othing in our law supports an application of CUTPA on the fact[s] as pled and proven in this case." In response, the plaintiffs' counsel argued in relevant part: "With regard to the idea that the CUTPA claim is only about statements, it's not. What it describes is a commercial course of conduct that is built on targeting and victimizing these families by lying about them. So, certainly lies are in the mix, but what the court heard was not just the occasional lie, it's the use of lies to sell products to fuel a business. . . . There is a business plan to hurt **[\*\*69]** these families and to sell things by hurting them. And that has to be . . . remediable under CUTPA . . . ." In rebuttal, the defendants' counsel **[\*541]**

---

[44] The plaintiffs further alleged, for instance, that, "[o]nce he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In [Jones'] [I]nternet based and broadcast radio shows, the . . . defendants hawk 'open currency' precious metals, prepackaged food and dietary supplements, 'male enhancement' elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 'lower receivers' (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle). . . . [T]he . . . defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate[s] those listeners to buy their products." (Footnote omitted.)

[45] The allegations in support of the plaintiffs' CUTPA claim were substantively identical in the plaintiffs' respective original complaints, as well as in their September, 2022 amended complaint.

[46] On October 6, 2022, the defendants filed a written version of their oral motion.

EXHIBIT 28

*Lafferty v. Jones*, 229 Conn. App. 487

argued that there was no precedent providing that CUTPA applies when (1) "a person engages in extreme comments and relies on the sale of products to produce that platform" and (2) there is no evidence of harm stemming from the products sold. The court rejected the defendants' claims without additional comment. Subsequently, in their motion to set aside the jury's verdict, the defendants, in essence, reasserted their prior contention that the plaintiffs' CUTPA claim was legally insufficient. In denying that motion, the court determined in relevant part that "CUTPA serves to deter predatory commercial conduct such as [the conduct alleged by the plaintiffs]. This court, in ruling on the defendants' motion to strike, already determined that '[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the basis of a CUTPA cause of action.' The [verdict] rendered by [the] jury [is] not against the law or the evidence."[47]

We construe the crux of the defendants' claim on appeal to be that the conduct **[\*\*70]** at issue alleged by the plaintiffs and admitted by operation of the defendants' default, namely, the defendants' dissemination of lies about the Sandy Hook massacre, was insufficient to support a viable CUTPA claim because their actions were not performed "in the conduct of any trade or commerce." *General Statutes § 42-110b (a)*. The defendants posit that no CUTPA claim arises here when (1) they did not lie about or unscrupulously advertise the products that they sold and (2) their actions led to *indirect* commercial gains through product sales. In short, the defendants contend that they engaged in noncommercial speech outside of the scope of CUTPA. The **[\*542]** plaintiffs respond that, "[w]hen using lies about [the] plaintiffs to sell supplements, [the defendants were] engaged in 'unfair' and 'deceptive' acts and practices 'in the conduct of' [their] 'trade or commerce.' " We conclude that, as a matter of law, the acts in which the defendants engaged were not "in the conduct of any trade or commerce" as required pursuant to CUTPA. See *General Statutes § 42-110b (a)*.

"The interpretation of pleadings is an issue of law. . . . We conduct a plenary review of the pleadings to determine whether they are sufficient to establish a cause of action upon default." **[\*\*71]** (Citation omitted; internal quotation marks omitted.) *Gaynor v. Hi-Tech Homes, 149 Conn. App. 267, 276, 89 A.3d 373 (2014)*. Moreover, "[w]hether a defendant is subject to CUTPA is a question of law that is subject to plenary review." *NRT New England, LLC v. Longo, 207 Conn. App. 588, 610-11, 263 A.3d 870*, cert. denied, *340 Conn. 906, 263 A.3d 821 (2021)*.

Before turning to the merits of the defendants' claim, we note that the default entered against the defendants does not limit our review of this claim. "An appellate court . . . may examine the allegations of a complaint to ascertain whether they are sufficient on their face to establish a valid claim for the relief requested. . . . Although the failure of a party to deny the material allegations of a pleading operates so as to impliedly admit the allegations, a default does not automatically trigger judgment for, or the relief requested by, the pleader. The pleader is entitled to an entry of judgment or a grant of relief as a function of the nonresponsive party's default and the attendant implied admission only when the allegations in the well pleaded filing are sufficient on their face to make out a claim for judgment or relief. . . . While an admission carries with it all reasonable implications of fact and legal conclusions . . . the admission cannot traverse beyond the bounds **[\*543]** of the underlying pleading **[\*\*72]** and admit allegations not made by the pleader; the pleading is, unless leave is granted to modify, the ceiling." (Internal quotation marks omitted.) *Gaynor v. Hi-Tech Homes, supra, 149 Conn. App. 274-75*. "As such, while a default admits the material allegations of the underlying pleading, the question as to whether the default requires judgment in favor of the pleader is to be determined by reference to the sufficiency of the pleading itself." *Comm'r of Soc. Servs. v. Smith, 265 Conn. 723, 737, 830 A.2d 228 (2003)*. "Put another way, in both equitable and legal actions, the plaintiff must establish his right to relief to the court's satisfaction, even though some issues may have been laid at rest by the default." (Internal quotation marks omitted.) *Moran v. Morneau, 140 Conn. App. 219, 226, 57 A.3d 872 (2013)*; see also *id., 225* ("[a] default may settle many issues, but it does not operate to insulate a mistaken legal proposition from judicial review").

---

[47] The defendants raised additional claims directed to the plaintiffs' CUTPA claim, including that the plaintiffs failed to plead the ascertainable loss element of a CUTPA claim. The court rejected these claims, and the defendants do not pursue these issues on appeal.

**EXHIBIT 28**

Lafferty v. Jones, 229 Conn. App. 487

For CUTPA to apply, there must be an unfair or deceptive act or practice committed "in the conduct of any trade or commerce." *General Statutes § 42-110b (a)*; see also *Cenatiempo v. Bank of America, N.A., supra, 333 Conn. 789* ("[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce"); *Pellet v. Keller Williams Realty Corp., 177 Conn. App. 42, 62, 172 A.3d 283 (2017)* ("[t]he essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or **[\*\*73]** practice; (2) *the act complained of was performed in the conduct of trade or commerce*; and (3) the prohibited act was the proximate cause of harm to the plaintiff" (emphasis added)). CUTPA defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or **[\*544]** intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." *General Statutes § 42-110a (4)*.

"Despite th[e] broad language [of *§ 42-110a (4)*], the definition of trade and commerce is not unlimited and has been used to restrict the application of CUTPA." *Stearns & Wheeler, LLC v. Kowalsky Bros., Inc., 289 Conn. 1, 11 n.13, 955 A.2d 538 (2008)*; see also R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024-2025 Ed.) § 3.1, p. 117 ("[b]ecause CUTPA applies only to acts 'in the conduct of any trade or commerce,' there is a significant limitation on the reach of [CUTPA]" (footnote omitted)); see, e.g., *Sempey v. Stamford Hospital, 194 Conn. App. 505, 518, 221 A.3d 839 (2019)* (trial court properly struck CUTPA count predicated on allegations that former employer made false statements to State of Connecticut Unemployment Commission regarding former employee's reliability and integrity because, inter alia, employee failed to allege that employer committed any acts in " 'conduct of any trade or commerce' ").

Exercising our plenary review, we conclude that **[\*\*74]** the facts alleged by the plaintiffs and admitted by the defendants are legally insufficient to satisfy the "trade or commerce" prong of CUTPA. As we have explained, the conduct forming the basis of the plaintiffs' CUTPA claim was the defendants' propagation of lies that the Sandy Hook massacre was a hoax. Applying the statutory definition of " '[t]rade' and 'commerce' " set forth in *§ 42-110a (4)* (i.e., "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state"), we cannot conclude that the defendants violated CUTPA **[\*545]** in disseminating their lies about the Sandy Hook massacre. That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

In their respective appellate briefs, the plaintiffs and the defendants address our Supreme Court's decision in **[\*\*75]** *Soto v. Bushmaster Firearms International, LLC, 331 Conn. 53, 202 A.3d 262*, cert. denied sub nom. *Remington Arms Co., LLC v. Soto, __ U.S. __, 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019)*. In *Soto*, several plaintiffs, acting as the administrators of the estates of nine of the victims of the Sandy Hook massacre; *id., 65, 66 n.2*; commenced an action against several defendants who were alleged to have manufactured, distributed, and sold (to Lanza's mother) the weapon used by Lanza at Sandy Hook—a Bushmaster XM15-E2S semiautomatic rifle. *Id., 65-66*. The plaintiffs asserted a number of legal theories seeking to hold the defendants liable in part for the Sandy Hook massacre, most of which our Supreme Court determined to be precluded by Connecticut law and/or the *Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005)*, codified at *15 U.S.C. §§ 7901 through 7903 (2012)*. *Id., 65*.

Our Supreme Court concluded, however, that the plaintiffs "offered one narrow legal theory" that was recognized pursuant to Connecticut law and not precluded by PLCAA. Id. Specifically, the plaintiffs alleged that "the defendants violated CUTPA[48] by advertising **[\*546]** and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle" and "that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre." (Footnote

---

[48] The plaintiffs in *Soto* brought their claims pursuant to Connecticut's wrongful death statute, *General Statutes § 52-555*, predicated in part on alleged CUTPA violations. *Soto v. Bushmaster Firearms International, LLC, supra, 331 Conn. 67*.

**EXHIBIT 28**

Lafferty v. Jones, 229 Conn. App. 487

added.) *Id., 86-87*. The trial court struck this CUTPA **[**76]** claim, along with a distinct claim by the plaintiffs alleging that the sale of the XM15-E2S to the civilian market, ipso facto, constituted an unfair trade practice, on the ground that the plaintiffs lacked standing stemming from their status as "third-party victims who did not have a direct consumer, commercial, or competitor relationship . . . with the defendants." *Id., 88*. Our Supreme Court determined that the trial court erred in striking the plaintiffs' CUTPA claims, reasoning: "Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant." Id. Our Supreme Court further clarified that it did not "need [to] decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA **[**77]** action. What is clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case." *Id., 96*. Thus, the court held that the plaintiffs had standing with respect to their "narrow legal theory" under CUTPA because they alleged direct injuries from conduct resulting from wrongful advertising. *Id., 65, 99-100*.

 **[*547]** The allegations underlying the CUTPA claim deemed viable in *Soto* are, however, materially distinguishable from the allegations in the underlying consolidated actions and do not lend the plaintiffs support with respect to their allegation that the defendants acted "in the conduct of any trade or commerce" for purposes of CUTPA. As in *Soto*, the plaintiffs in this case did not allege that they were consumers, competitors, or otherwise in a business or commercial relationship with the defendants. Unlike the plaintiffs in *Soto*, however, the plaintiffs in this case did not allege that they were "directly injured by conduct resulting from" the defendants' advertising or sale of the defendants' products, such that they could "bring an action pursuant to CUTPA **[**78]** even in the absence of a business relationship with the defendant[s]." *Soto v. Bushmaster Firearms International, LLC, supra, 331 Conn. 88*. Thus, notwithstanding *Soto*'s elimination of the commercial relationship test, the plaintiffs did not allege direct injury from the defendants' *advertising* or *sale* of the defendants' products and, thus, did not fall within the expansion of CUTPA liability established in *Soto*. Rather, they alleged injuries from the defendants' *false speech* about the Sandy Hook massacre—speech that itself was silent with regard to the defendants' products. Stated differently, the plaintiffs did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy (in addition to the torts of invasion of privacy by false light, defamation, defamation per se, and intentional infliction of emotional distress) for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far.

In sum, we conclude that the plaintiffs failed to assert a legally viable CUTPA claim. As a result, the judgments rendered with respect to the plaintiffs' CUTPA claim **[*548]** must be reversed and the attendant award entered pursuant to CUTPA, **[**79]** namely, the $150,000,000 in punitive damages awarded by the court, must be vacated.

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

---

*End of Document*

**EXHIBIT 28**

XO6 UWY CV18-6046436-S        :        SUPERIOR COURT

ERICA LAFFERTY, ET AL         :        JUDICIAL DISTRICT OF WATERBURY

V                             :        AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL       :        NOVEMBER 15, 2021

----------------------------------------------------------------

XO6 UWY CV18-6046437-S        :        SUPERIOR COURT

WILLIAM SHERLACH, ET AL       :        JUDICIAL DISTRICT OF WATERBURY

V                             :        AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL       :        NOVEMBER 15, 2021

----------------------------------------------------------------

XO6 UWY CV18-6046438-S        :        SUPERIOR COURT

WILLIAM SHERLACH, ET AL       :        JUDICIAL DISTRICT OF WATERBURY

V                             :        AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL       :        NOVEMBER 15, 2021

## COURT'S RULING

B E F O R E:

    THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S:

  Representing the Plaintiffs:

    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY ALINOR STERLING
    ATTORNEY MATTHEW BLUMENTHAL
    Koskoff Koskoff & Bieder
    350 Fairfield Avenue
    Bridgeport, Connecticut  06604

EXHIBIT 28

2

Representing the Defendants:

    ATTORNEY JAY MARSHALL WOLMAN
    Randazza Legal Group
    100 Pearl Street
    Hartford, Connecticut   06103

    ATTORNEY CAMERON L. ATKINSON
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut   06511

    ATTORNEY MARIO CERAME
    Brignole Bush & Lewis
    73 Wadsworth Street
    Hartford, Connecticut   06106


                              Recorded and Transcribed By:
                              Patricia Sabol
                              Court Monitor
                              400 Grand Street
                              Waterbury, Connecticut   06702

EXHIBIT 28

THE COURT: All right. So I will order a copy of the transcript of the following ruling, and I will sign it and I will place it in the court file as my decision for the purposes of any appeal.

So I'll first address the Clinton deposition issue and the conduct of July 1, 2021. In the July 19, 2021 court filing by the defendants Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet, LLC, they described how in the motion to depose Hillary Clinton, testimony designated by the plaintiffs as highly confidential was filed in the Clinton deposition motion. They explained that this was done because in their opinion, the plaintiffs did not have a good-faith basis to designate the deposition as highly confidential before the deposition had commenced, despite the fact that the Jones defendants had previously done so themselves. And it is not lost on the Court that the highly confidential information was improperly filed in the middle of the first deposition of a plaintiff.

The July 19, 2021 filing is in sharp contrast to the Jones defendants' position at the October 20, 2021 sanctions hearing where the Court addressed what, if any, sanctions should enter. At the October 20 hearing, the Jones defendants claim they could publish confidential information as long as they did not reveal the name of the witness. That is, they argued

4

unconvincingly that they didn't understand the very protective order that they themselves drafted and asked the Court to approve as a Court order, which the Court did.

The position of the Jones defendants at the October 20, 2021 sanctions hearing did nothing but reinforce the Court's August 5th, 2021 order and findings that the cavalier actions on July 1st, 2021 constituted willful misconduct and violated the Court's clear and unambiguous protective order.

The history of the attorneys who have appeared for the defendants, Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC is a convoluted one, even putting aside the motions to withdraw appearance, the claims of conflict of interest and the motions for stay advanced by these five defendants.

As the record reflects, on June 28, 2018, Attorney Wolman appeared for all five of the Jones defendants. Eight months later, on March 1st, 2019, Attorney Wolman is out of the case and Pattis & Smith filed an in-lieu-of appearance for all five defendants. On February 24, 2020, Attorney Latonica also appeared for all five defendants. Five months later on July 7, 2020, Attorney Latonica and Pattis & Smith is now out of the case and Attorney Wolman is back in the case for all five defendants. Then on

June 28, 2020, Pattis and Smith is back in the case, but now only appears for the four LLC defendants.

But what is perhaps more significant is the transparent attempt to cloud the issues by Pattis & Smith, for example, by listing the names of only three of the four clients they represent when filing the motion to take the deposition of Hillary Clinton and then listing all four clients in the July 19, 2021 filing relating to the issue. And by Attorney Wolman who then argued in his October 20, 2021 file that Infowars, LLC had no involvement in the motion for commission because their lawyer did not list their name on the motion. It is simply improper under our rules of practice for an attorney to do so.

Turning to the issue of the subsidiary ledgers. The five Jones defendants on November 6, 2020 filed with the Court their discovery objections relating to the deposition of Free Speech Systems' accounting manager and current employee, Melinda Flores. In response to the plaintiff's request for subsidiary ledgers, the Jones defendants objected on the basis that the production of the subsidiary ledgers was oppressive, unduly burdensome, disproportionate, harassing and that it will require digging through eight years of accounting. No objection was raised as to the term "subsidiary ledger", although parties frequently will object to a discovery request if they

EXHIBIT 28

6

consider it vague or confusing.

On April 29, 2021, the Court overruled the objection. On May 6, 2021, the Court ordered the deposition of Flores to take place on June 4, 2021 and ordered the documents to be produced by the close of business on May 14, 2021 stating that failure to comply may result in sanctions.

On May 14, 2021, the five Jones defendants responded to the document request and Court order and stating that the subsidiary ledgers were incorporated into the trial balances and had been produced.

At her June 4, 2021 deposition, Flores, the accounting manager, testified that subsidiary ledgers or detail was easily accessible and available to her. She testified that it would show the sources of advertising income and she testified repeatedly that Free Speech Systems maintained subsidiary ledger information. Flores did not believe she was obligated to produce the subsidiary ledgers, and it is unclear as to whether they have been produced.

It was impossible to reconcile the expert hired by Free Speech Systems with the November 6, 2020 objections filed with the Court and with Flores' deposition testimony. While the Jones defendants in their May 5th, 2021 motion state that Flores would be the best employee to identify and produce the requested documents and further state that Flores

EXHIBIT 28

7

would be compelled by Free Speech Systems to produce the requested documents at the deposition, the defendants hired expert, Mr. Roe, said that Flores was wrong and that Free Speech Systems doesn't use or have subsidiary ledgers.

The Court, in its August 6, 2021 order, found that the subsidiary ledger information was easily accessible by Flores by clicking on each general account, that, despite the Court orders and although the information exists and is maintained by Free Speech Systems and was required by the Court order to be produced, it had not been produced. And, again, it is still unclear as to what documents have been produced.

The Court rejected Roe's statements in his affidavit as not credible in light of the circumstances. The Court found that the plaintiffs were prejudiced in their ability to prosecute their claims and conduct further meaningful depositions and that sanctions would be addressed at a future hearing.

At the October, 2021 sanctions hearing, the Court addressed whether sanctions should enter. The Court finds that sanctions are, in fact, appropriate in light of the defendant's failure to fully and fairly comply with the plaintiff's discovery request and the Court's orders of April 29, 2021, May 6, 2021 and August 6, 2021.

EXHIBIT 28

8

Turning to the trial balances. In addition to objecting to the deposition of Flores, the Jones defendants, as I mentioned, filed discovery objections to the request for production directed to Flores. The Court ruled in favor of the defendants on one production request and ruled in favor of the plaintiffs with respect to others.

In addition to the subsidiary ledgers, the Court ordered production of the trial balances. Flores had run trial balances in the past unrelated to this action. Flores testified at her June 4, 2021 deposition that she personally accessed Quick Books and selected the option to generate trial balances for 2012 to 2019. She testified that she ran the reports and printed them out and believed that the reports were produced. Her testimony the reports that she ran were produced was left uncorrected by counsel at the deposition.

The reports were not produced by the Court-ordered deadline of May 14, 2021. They were not produced at her June 4, 2021 deposition, and they have not been produced to date, despite their obligation to do so.

While the Jones defendants, in their May 5, 2021 Court filing, emphasized that Flores would be the best employee to identify and produce the requested documents which would include the trial balances and

EXHIBIT 28

9

that Flores would be compelled by Free Speech Systems to produce the documents at her deposition, not only were the reports not produced, but the Jones defendants in their October 7, 2021 filing now claim that Flores, a mere bookkeeper, provided flawed information to the defendants that the defendants, through Roe, had to correct. And the Court rejects that position.

The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by the Jones defendants' outside accountant were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that their own accounting manager had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiff's request or to the Court's order.

Turning to the analytics. The date for the parties to exchange written discovery has passed after numerous extensions by the Court. On May 14, 2021, the Court ordered that the defendants were obligated to fully and fairly comply with the plaintiff's earlier request for disclosure and production.

**EXHIBIT 28**

10

On June 1, 2021, the defendants filed an emergency motion for protective order apparently seeking protection from the Court's own order where the defendants again attempted to argue the scope of appropriate discovery.

The Court, on June 2, 2021, declined to do so and extended the deadline for final compliance to June 28, 2021 ordering the defendants to begin to comply immediately on a rolling basis. In its June 2nd order, the Court warned that failure to comply would result in sanctions including default.

With respect to analytics, including Google Analytics and social media Analytics, the defendants on May 7, 2019 represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports, but did not regularly use them. As the Court previously set forth in its September 30, 2021 order, the defendants also claim that on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not the codefendants, an email the plaintiffs state they did not receive and that the Court found would not have been in compliance with our rules of practice.

On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete final supplemental compliance was made by the defendants,

EXHIBIT 28

11

Alex Jones and Free Speech Systems, LLC and that Infowars, **LLC**, Infowars Health, LLC and Prison Planet, LLC, quote: Had previously produced all documents required to be produced, end quote, representing that with respect to the Google Analytics documents, Free Speech Systems, LLC could not export the dataset and that the only way they could comply was through the sandbox approach.

Then on August 8, 2021, the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for Infowars dot com and not for any of the other websites such as Prison Planet TV or Infowars Health. Importantly, the Jones defendants to date have still not produced any analytics data from any other platform such as Alexa, Comcast or Criteo.

The Jones defendants production of the social media analytics has similarly been insubstantial and similarly has fallen far short both procedurally and substantively, despite prior representations by the Jones defendants that they had produced the social media analytics and despite the May 25, 2021 deposition testimony of Louis Certucci, Free Speech Systems social media manager for nearly a decade, that there were no such documents.

At the June 28, 2021 deposition of Free Speech Systems corporate designee Zimmerman, Mr. Zimmerman

testified that, in fact, he had obtained some responsive documents from Certucci which were then loaded into a deposition chat room by counsel for the Jones defendants. It appears that these documents were minimal summaries or reports for Facebook and Twitter, but not for other platforms used by the defendants such as You Tube.

Any claim of the defendants that the failure to produce these documents was inadvertent falls flat as there was no evidence submitted to the Court that the defendants had a reasonable procedure in place to compile responsive materials within their power, possession or knowledge.

Months later, on October 8, 2021, the Jones defendants formally produced six documents for the spring of 2017 for Facebook containing similar information to the Zimmerman chat room documents, but not included in the chat room documents and screen shots of posts by Free Speech Systems to an unidentified social media account with no analytics.

The defendants represented that they had produced all the analytics when they had not done so. They represented in court filings that they did not rely on social media analytics and this, too, is false.

I'm going to need to take a thirty second water break, please.

(A short break in the proceedings occurred.)

EXHIBIT 28

13

This response was false.  The plaintiffs in support of their motion for sanctions on the analytics issue attached as exhibit D, an email dated December 15, 2014 between former Free Speech Systems business manager Timothy Fruge and current Free Speech Systems employee Buckley Hamman.  Fruge attaches annotated charts of detailed analytics concerning Jones' 2014 social media audience including gender demographics engagement and social media sites that refer people to Infowars dot com.  As pointed out by the plaintiffs, Fruge's annotations are even more telling than the charts themselves and totally contradict the Jones defendants misrepresentations to the Court that, quote:  There is no evidence to suggest that Mr. Jones or Free Speech Systems ever used these analytics to drive content, end quote.

The next image on the document shows key indicators on Twitter.  Those are engagement and influence.  Again, this is reading from Fruge's notes.  Again, the next image shows the key indicators on Twitter.  Those are engagement and influence.  Notice our influence is great and our engagement is low.  I bring this up -- again these are Fruge's notes -- because we should try and raise our engagement with our audience.  Engagement is how well we are communicating and interacting with our audience.  The higher our engagement, the more valuable our audience

EXHIBIT 28

14

will become to our business. And that is the end of Fruge's notes.

I would note that regardless of this reliance on social media analytics, the concept is simple. The defendants were ordered to produce the documents and our law requires them to produce information within their knowledge, possession or power. Discovery is not supposed to be a guessing game. What the Jones defendants have produced by way of analytics is not even remotely full and fair compliance required under our rules.

The Court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiff's ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants.

Neither the Court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to is fundamental fairness that the other side produces that information which is within their knowledge, possession and power and that the other side meet its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

EXHIBIT 28

15

Here the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

The Court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous Court orders, and they have not.

In addressing the sanctions that should enter here, the Court is not punishing the defendants. The Court also recognizes that a sanction of default is one of last resort. This Court previously sanctioned the defendants not by entering a default, but by a lesser sanction, the preclusion of the defendant's special motions to dismiss. At this point entering other lesser sanctions such as monetary sanctions, the preclusion of evidence or the establishment of facts is inadequate given the scope and extent of the discovery material that the defendants have failed to produce.

As pointed out by the plaintiffs, they are attempting to conduct discovery on what the defendants publish and the defendants' revenue. And the failure

**EXHIBIT 28**

16

of the defendants to produce the analytics impacts the ability of the plaintiffs to address what is published and the defendants failure to produce the financial records such as sub-ledgers and trial balances affects the ability of the plaintiffs to address the defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was caused by the Jones defendants willful noncompliance, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims.

For these reasons, the Court is entering a default against the defendants Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC. The case will proceed as a hearing in damages as to the defendants. The Court notes Mr. Jones is sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all the defendants have failed to fully and fairly comply with their discovery obligations.

As I said, I will order a copy of the transcript. I will sign it and I will file it in the Court as the Court's order.

Bellis, J.

EXHIBIT 28

17

XO6 UWY CV18-6046436-S      :     SUPERIOR COURT.

ERICA LAFFERTY, ET AL      :     JUDICIAL DISTRICT OF WATERBURY

V      :     AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL      :     NOVEMBER 15, 2021

------------------------------------------------------------

XO6 UWY CV18-6046437-S      :     SUPERIOR COURT

WILLIAM SHERLACH, ET AL      :     JUDICIAL DISTRICT OF WATERBURY

V      :     AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL      :     NOVEMBER 15, 2021

------------------------------------------------------------

XO6 UWY CV18-6046438-S      :     SUPERIOR COURT

WILLIAM SHERLACH, ET AL      :     JUDICIAL DISTRICT OF WATERBURY

V      :     AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL      :     NOVEMBER 15, 2021

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in the Superior Court, Judicial District of Waterbury, at Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 15th day of November, 2021.

Dated this 15th day of November, 2021, in Waterbury, Connecticut.

_____

Patricia Sabol

Court Monitor

**EXHIBIT 28**

| NO. | X06-UWY-CV-18-6046436-S | : | SUPERIOR COURT |
|---|---|---|---|
| ERICA LAFFERTY, ET AL. | | : | COMPLEX LITIGATION DOCKET |
| V. | | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | | : | AUGUST 24, 2021 |

| NO. | X-06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
|---|---|---|---|
| WILLIAM SHERLACH | | : | COMPLEX LITIGATION DOCKET |
| V. | | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | | : | AUGUST 24, 2021 |

| NO. | X06-UWY-CV-18-6046438-S | : | SUPERIOR COURT |
|---|---|---|---|
| WILLIAM SHERLACH, ET AL. | | : | COMPLEX LITIGATION DOCKET |
| V. | | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | | : | AUGUST 24, 2021 |

## MOTION FOR SANCTIONS BASED ON
## THE JONES DEFENDANTS' FAILURE TO PRODUCE
## WEB AND SOCIAL MEDIA DATA AND ANALYTICS

"An order of the court must be obeyed until it has been modified or successfully challenged, and the consequences for noncompliance may be severe indeed." *Lafferty v. Jones*, 336 Conn. 332, 381 (2020) (quoting *Fox v. First Bank*, 198 Conn. 34, 40 n.3 (1985)), *cert. denied*, 2021 WL 1240941 (U.S. Apr. 5, 2021). For two and a half years, the Jones defendants have been under a court order to produce sales, marketing, and web-analytics data, including Google Analytics data. The Court set a "final" deadline for production of the "already overdue supplemental compliance" for June 28, 2021. Order, Dkt. 348.10, June 2, 2021. It expressly warned that "[f]ailure to comply with this order may result in sanctions including but not limited to a default." *Id.* The Jones

**EXHIBIT 28**

defendants violated that order and did so based on inaccurate and incomplete representations concerning the supposed difficulty of producing the requested information.

In addition, for more than two and a half years, the Jones defendants have been under a court order to produce all communications or documents concerning social media marketing and analytics. For years, they represented that they possessed none. The deposition of ███████ ██████████████████████████ came and went. Then, during a ██████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████

This conduct continues the pattern of "continuing misconduct" that "demonstrates a deliberate disregard for the court's orders." *Lafferty*, 336 Conn. at 380–81 (quoting approvingly *Emerick v. Town of Glastonbury*, 177 Conn. App. 701, 737 (2017)'s justification for affirming a sanction of dismissal). The Jones defendants' noncompliance is prejudicial and requires the entry of the most serious possible sanction.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. The Orders Requiring the Jones Defendants to Produce Web and Social Media Marketing and Analytics Data and the Jones Defendants' Previous Refusal to Produce Them

More than two and a half years ago, this Court ordered the Jones defendants to produce materials responsive to the plaintiffs' Requests for Production Nos. 15, 16, and 17, which covered marketing, sales, and web-analytics data. Order, Dkt. 148.00, Jan. 10, 2019; Defs.' Obj. to Plaintiffs' Rev. Disc. Requests, Dkt. 146.00, Jan 9, 2019.

The Court specifically addressed the Jones defendants' nonproduction of Google or other web analytics data on March 22, 2019. Ex. A, 3/22/19 Hrg. Tr. 19. After addressing it repeatedly with no result, it finally held that the "print out produced in response to production requests 15-17

EXHIBIT 28

is simply not full and fair compliance." Order, 255.10, June 10, 2019. It found that court-ordered "depositions confirm[ed] that the Google Analytics account is accessed and utilized by some employees of the defendants." *Id.* It warned that it would "consider appropriate sanctions for the defendants' failure to fully and fairly comply should they not produce the data within one week." *Id.*

They did not produce it. The Court sanctioned the Jones defendants for failure to produce that data, and for "repeatedly ignored court deadlines and continued to challenge the underlying merits of discovery, even after the court found the requisite good cause to allow discovery." *Lafferty*, 336 Conn. at 376. Based on this pattern of "obfuscation and delay," including on the discovery of web analytics, and other litigation misconduct, this Court imposed sanctions. *Id.* Those sanctions were affirmed by the Supreme Court. *Id.*

Even after sanctions were affirmed, the Jones defendants did not produce in response to the Court's orders. After contacting the Jones defendants' counsel requesting compliance with the long-outstanding discovery—and receiving no response—the plaintiffs moved re-compel it yet again. Mot. to Re-Compel Compliance, Dkt. 309.00, Nov. 12, 2020. During a telephonic meet-and-confer three days later, the Jones defendants took the position that they had no obligation to comply with existing discovery. Aff. of Meet & Confer ¶ 15, Dkt. 313.00, Nov. 18, 2020. The next day, the Jones defendants noticed removal for the second time in this case. Not. of Removal, Dkt. 312.00, Nov. 16, 2020.

The federal district court rejected that removal and remanded the case to this Court again on March 5, 2021. Remand, Dkt. 316.00, Mar. 5, 2021. The case was returned to this Court for the third time. The Jones defendants had been under court order to produce sales, marketing, and web-analytics data for more than two years. Rather than do so, they argued that this Court's sanctions

EXHIBIT 28

order—which had been based in large part on their refusal to produce exactly these still-outstanding materials—"necessarily terminated" their production obligations. Defs.' Mem. in Opp. to Mot. 1–2, Dkt. 332.00, May 5, 2021. They also argued, yet again, that the original discovery ordered by this Court was "excessive." *Id.* at 2. On May 14, 2021, the Court rejected their arguments, finding that "[t]he obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished." Order, Dkt. 339.10. Finally, it ordered set a "final" deadline of June 28, 2021 for production of the "already overdue supplemental compliance," including Google and any other web analytics. Dkt. 348.10. It expressly warned the Jones defendants that their failure to produce the analytics by the final deadline of June 28, 2021 "may result in sanctions including but not limited to a default." *Id.*

**B. The Jones Defendants' Continued Refusal to Provide Court-Ordered Information**

**1. Google Analytics**

June 28 was a Monday. On the Thursday afternoon before production was due, counsel for the Jones defendants sent the plaintiffs's counsel a letter representing that the Google Analytics data "cannot be produced as an export," and therefore could not be provided. Ex. B, Letter from Jay Wolman to Christopher Mattei, *et al*., June 24, 2021. Instead, for the first time,[1] the Jones defendants proposed a "sandbox approach," where the plaintiffs would be allowed to access the Jones defendants' Google Analytics accounts and "inspect the dataset" for a limited period of time under the supervision of the Jones defendants. *Id.* The plaintiffs rejected this proposal, noting that they disagreed with the representation that the Analytics "cannot be produced" and that this

---

[1] Although Attorney Wolman's letter represents that he made this proposal at the June 2, 2021 hearing, the transcript of that hearing does not appear to have any reference to it. 6/2/21 Hrg. Tr. Plaintiffs' counsel have no memory of it being mentioned in a prior telephone conversation.

**EXHIBIT 28**

position was "not consistent with the information [the Jones defendants] provided to the Court." Ex. C, Letter from Christopher Mattei, *et al.*, to Jay Wolman, June 25, 2021.

The Jones defendants' counsel responded that "there is no inconsistency," and that "to export the raw data, one must be an Analytics 360 member, i.e. a premium member." Ex. D, Letter from Jay Wolman to Chris Mattei, June 25, 2021. "Free Speech Systems is not an Analytics 360 member," they continued. "[T]herefore it is impossible for it to export the data." *Id.* Defense counsel reiterated his position that, to obtain the discovery, the plaintiffs should pay $150,000 for the Jones defendants to obtain a premium Google Analytics membership. *Id.* In a meet-and-confer telephone call on July 13, 2021, counsel for the Jones defendants reaffirmed this statement. Pls.' Meet & Confer Aff. ¶ 10, Dkt. 426.00, July 26, 2021. He was asked: "So you're telling me that what data you do have access to through their Google Analytics platform, they cannot download or export?" *Id.* He responded: "Yes. Google does not allow it for non-Analytics 360 members, [the Jones defendants] do not have a 360 membership, ergo, it cannot be produced." *Id.*

## 2. Social Media Analytics

In addition to the analytics discussed above, the Court's order of January 10, 2019 ordered the production of:

> All communications and/or documents concerning marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast, either to, from, or concerning:
>
> a. Alphabet Inc., or any subsidiary or property thereof
> b. Facebook, Inc., or any subsidiary or property thereof
> c. Twitter, Inc., or any subsidiary or property thereof
> d. Oath Inc., or any subsidiary or property thereof
> e. Snap Inc., or any subsidiary or property thereof
> f. Apple Inc., or any subsidiary or property thereof

Defs.' Obj. ¶ 17, Dkt. 146.00; Dkt. 148.00. By including subsidiaries, this Request included

documents and communications concerning not only named social-media platforms like Facebook and Twitter, but also Instagram (owned by Facebook), Google (owned by Alphabet), and YouTube (owned by Alphabet).

The Jones defendants never produced any discovery materials regarding their social media data or analytics. The defendants responded to the plaintiffs' interrogatories regarding social media analytics by stating, "All responsive documents have been provided to plaintiff's counsel." Dkt. 218.00–222.00. During a subsequent hearing, the Jones defendants were asked explicitly about marketing and analytics, and responded, "[W]e have provided everything." Ex. E, 5/7/19 Hrg. Tr. 14:26–15:15.

After the sanctions against them were affirmed and the case returned to this Court, the Jones defendants still produced no such documents. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

A month later, ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**EXHIBIT 28**

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████      To this date, the plaintiffs have not received these reports through formal discovery.

## II.     LEGAL STANDARD

Practice Book § 13-14 authorizes the Court to impose sanctions for a party's failure to comply with discovery orders. Pract. Book § 13-14(a). Section 13-14(b) sets forth a non-exhaustive list of potential penalties, including entry of non-suit, the award of fees associated with enforcement of court orders, evidentiary restrictions, etc.  The Court also has inherent power to order sanctions. *Evans v. Gen. Motors Corp.*, 277 Conn. 496, 522–24 (2006); *Millbrook Owners Ass'n, Inc. v. Hamilton Standard*, 257 Conn. 1, 14 (2001).

"[A] court may, either under its inherent power to impose sanctions in order to compel observance of its rules and orders, or under the provisions of [Practice Book] § 13–14, impose sanctions[.]" *Evans*, 277 Conn. at 522-24 (quoting *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 14). The decision "to enter sanctions . . . and, if so, what sanction or sanctions to impose, is a matter within the sound discretion of the trial court." *Evans*, 277 Conn. at 522-24. "[T]he court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court[.]" *Id.* (quoting *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 14). "The design of the rules of practice is both to facilitate business and to advance justice[.]" *Id.* (quoting same).

The standard for imposing and reviewing sanctions for violation of discovery orders requires that (1) "the order to be complied with must be reasonably clear"; (2) "the record must

EXHIBIT 28

establish that the order was in fact violated"; and (3) "the sanction imposed must be proportional to the violation." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18; *Giblen v. Ghogawala*, 111 Conn. App. 493, 497–98 (2008). "In determining the proportionality of a sanction to a violation, we have in the past considered the severity of the sanction imposed and the materiality of the evidence sought . . . whether the violation was inadvertent or wilful . . . and whether the absence of the sanction would result in prejudice to the party seeking the sanction." *Giblen*, 111 Conn. App. at 497–98 (quoting *Forster v. Gianopoulos,* 105 Conn. App. 702, 711 (2008)).

## III.     ARGUMENT

This Court issued multiple applicable orders that were "reasonably clear." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. The record establishes "that the order[s] [were] in fact violated." *Id.* The Jones defendants' noncompliance is prejudicial to the plaintiffs: the relevant discovery is highly material, and the Jones defendants' refusal to produce it has compromised the plaintiffs' ability to use it in the discovery process. This Court warned the Jones defendants that "[f]ailure to comply with this order may result in sanctions including but not limited to a default." Order, Dkt. 348.10. Default is the appropriate sanction.

### A.  The Court's Orders Were Crystal Clear

In order for sanctions to issue, "the order to be complied with must be reasonably clear." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. The orders at issue at issue here were crystal. In its original order two and a half years ago, the Court ordered the Jones defendants to produce materials responsive to the plaintiffs' Requests for Production Nos. 15, 16, and 17, which covered marketing, sales, and web-analytics data. Dkt. 148.00. Request for Production No. 15 asked for "[a]ll marketing data, web analytics, sales analytics, and/or other web traffic data concerning you, Infowars, and/or any website, social-media, or other internet-based profile that you or the Jones

EXHIBIT 28

Defendants own and/or control." Pls.' First Spec. Req. for Prod'n ¶ 15. Request for Production No. 16 demanded "[a]ll marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast." *Id.* ¶ 16. Request for Production No. 17 requested "[a]ll communications and/or documents concerning marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast, either to, from, or concerning" all the major social media platforms. Pls.' First Spec. Req. for Prod'n ¶ 17. The Jones defendants' production obligations regarding social media and web analytics were clear.

On June 16, 2021, this Court sanctioned the defendants in part because of their repeated failure to produce Google Analytics. *Lafferty*, 336 Conn. at 376. In May, after the case's return to Connecticut Superior Court, this Court rejected their arguments against production and of analytics and held "[t]he obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished." Dkt. 339.10. In another follow-on order, the Court set a "final" deadline for production of the "already overdue supplemental compliance," including Google and any other web analytics, for June 28, 2021. Dkt. 348.10. It noted that it "decline[d] the Jones defendants' invitation to address, again, the scope of appropriate discovery" and that "the outstanding discovery responses were due over two years ago." *Id*. This order expressly warned the Jones defendants that their failure to produce the analytics by the final deadline of June 28, 2021 "may result in sanctions including but not limited to a default." *Id*.

**EXHIBIT 28**

## A.  The Jones Defendants Violated the Court's Orders

Another requirement for sanctions is that "the record must establish that the order was in fact violated." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. There is no question that the Court's orders were violated here.

### 1.  The Jones Defendants Violated the Court's Orders to Produce Google Analytics Data

The Jones defendants did not produce the Google Analytics data by June 28, 2021. They still have not produced it. This is an unexcused violation of the Court's order, and it requires the imposition of sanctions.

### 2.  The Jones Defendants Continued Their Pattern of Obfuscation and Delay with this Violation

The Jones defendants did not produce the Google Analytics data as ordered. As the Court has repeatedly said, a court-set deadline must be complied with, or a motion directed to that deadline needs to be filed and adjudicated before the deadline passes. The Jones defendants chose not to file that motion. Rather, they again chose unexcused disobedience of a Court order, forcing the plaintiffs to bring the violation to the Court's attention.

To excuse their noncompliance, moreover, the Jones defendants chose to rely on the notion that production would be very costly, an argument that the Court had already rejected. In support of their excuse, the Jones defendants made inaccurate and incomplete representations concerning the capabilities of their Google Analytics account. This began in argument before the Court on June 2, 2021. During that argument, the Jones defendants represented that utilizing the Google Analytics "export method" required "a premier membership" that "would cost at least $150,000." Ex. H, 6/2/21 Hrg. Tr. 15:10–16. (They maintained "this cost should be borne by [the plaintiffs]." *Id.* at 17:16–17.) They then argued that the data should not be produced at all, contending that "the

EXHIBIT 28

amount of labor . . . required is not proportionate to the needs of the case." *Id.* at 17:19–18:6. This Court rejected these arguments and ordered the Jones defendants to produce the data by June 28, 2021. Order, Dkt. 348.10, June 2, 2021 (noting that it "decline[d] the Jones defendants' invitation to address, again, the scope of appropriate discovery" and that "the outstanding discovery responses were due over two years ago").

Ignoring the fact that the Court had already rejected the argument, the Jones defendants raised this excuse again in their June 25 letter to counsel: "to export the raw data, one must be an Analytics 360 member, i.e. a premium member." Wolman Letter, June 25, 2021. "Free Speech Systems is not an Analytics 360 member," they continued. "[T]herefore it is impossible for it to export the data." *Id.* Free Speech Systems repeated this statement in its Notice of Compliance. It further represented that "Free Speech Systems does not possess, have custody, or control the Google Analytics dataset in a manner that would permit export." Dkt. 377.00 at 2, June 28, 2021.

These representations were inaccurate and misleading. The plaintiffs retained a Google Analytics expert to assess what export capabilities an ordinary Google Analytics account has, and submit his affidavit in support of this Motion. "Like all Google Analytics users, the users of the Infowars.com Google Analytics account have access to the Export function." Ex. I, Affidavit of Jordan Campbell ¶ 9. Indeed, the "EXPORT button is clearly visible on" the very screenshots the Jones defendants provided as an exhibit to their motion for a protective order on May 30, 2021. *Id.* This export function allows the user to export the Google Analytics data in 4 different formats: PDF, Google Sheets, XLSX and CSV." *Id.* ¶ 8. "Exporting in those formats keeps the data organized and allows it to be manipulated by the recipient, as the original user could do." *Id.* Using an expert protocol, the data ordered by the Court could be exported using this basic EXPORT

EXHIBIT 28

function.[2] *Id.* ¶ 10. The Jones defendants' claim that an expensive Google 360 membership is required to comply with the Court's order is inaccurate and misleading: "[I]t is not true that 'to export the dataset, one must be a Google Analytics 360 user.'" *Id.* ¶ 11.

Relying on the Analytics 360 excuse, the Jones defendants refused to produce the required Google Analytics data. Instead, they proposed a "sandbox approach" four days before the deadline. Wolman Letter, June 24, 2021. As the Jones defendants' letter itself admitted, this was not production, but an offer of inspection. *Id.* (noting proposal would allow the plaintiffs to "inspect the data set"). This approach, moreover, "would allow the Jones defendants to observe, surveil, and/or record all the plaintiffs' actions within the Google Analytics account, including any searches or other analysis that the plaintiffs or their experts might perform on the data while they had access to it." Campbell Aff. ¶ 16; Defs.' Notice of Compliance 2 n.3, Dkt. 377.00 (noting that the approach "would necessarily require supervision by Free Speech Systems"). This would be a clear invasion of the work-product doctrine. *See Barksdale v. Harris*, 30 Conn. App. 754, 760 (1993) ("The work product doctrine protects an attorney's . . . 'mental impressions, personal beliefs and countless other tangible and intangible [items].'" (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947))); Conn. Practice Book § 13-3 (codifying work-product privilege).[3]

---

[2] Exporting this data in this manner would require neither technical expertise nor an inordinate amount of labor. "[U]sing the free export function described above, a user of the relevant account could easily export complete, accurate and readily useable data as Excel (xlsx) files." Campbell Aff. ¶ 10. "[E]xporting the data would take a computer literate user following a simple protocol under a week to complete the exports and possibly would require even less time." *Id.* (noting that "a computer literate user" means "someone with simple data entry skills"). "The development of an appropriate export approach" would take "approximately 30 minutes." *Id.* Implementation of such a "step-by-step protocol . . . would be a simple process." *Id.*

[3] When plaintiffs' counsel raised these defects during the parties' meet-and-confer call of July 13, 2021, the Jones defendants acknowledged them but argued they were immaterial to it being sufficient production. Aff. of Attempt to Resolve Discovery Objection ¶ 9, Dkt. 426.00, July 26, 2021.

**EXHIBIT 28**

### 3. The Jones Defendants Violated the Court's Orders Regarding Social Media Data and Analytics

Likewise, for roughly two and a half years, the Jones defendants were under a court order to produce all available analytics for social media accounts under their control. They produced none. Meanwhile, they repeatedly represented that they had made all responsive production. *See* Dkt. 218.00-222.00. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

They still have not been formally produced in discovery. Even if they were, there is no indication that they would constitute complete production under the relevant requests for production. The Jones defendants violated the Court's order in failing to produce these documents for two and a half years—and potentially continuing to improperly withhold others.

### 4. Given the History of the Jones Defendants' Conduct, Default is the Only Appropriate Sanction

"[T]he sanction imposed must be proportional to the violation." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. Default and dismissal are the severest sanctions.[4] In general, Connecticut "practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure." *Millbrook Owners Ass'n, Inc. v. Hamilton Standard*, 257 Conn. 1, 16 (2001). But "'where a party [has] show[n] a deliberate, contumacious or unwarranted disregard for the court's authority,'" dismissal or default "of the entire case may constitute an appropriate sanction." *MacCalla v. Am.*

---

[4] There exist more Connecticut cases addressing sanctions of dismissal than default. However, our courts seem to deal with them interchangeably. There is no indication that a sanction of default must meet a test different from that for one of dismissal. For this reason, while this Motion emphasizes default cases, it refers at times to dismissal cases as well.

EXHIBIT 28

*Med. Response of Connecticut, Inc.*, 188 Conn. App. 228, 239 (2019) (quoting *Emerick v. Glastonbury*, 177 Conn. App. 701, 736 (2017) and affirming sanction of dismissal for attorney's improper behavior in deposition). Under such circumstances, the ultimate sanction "serves not only to penalize those whose conduct warrants such a sanction but also to deter those who might be tempted to such conduct in the absence of such deterrent." *Pavlinko v. Yale-New Haven Hosp.*, 192 Conn. 138, 145 (1984) (citation omitted).

In determining the proportionality of a sanction of default, Connecticut courts have "considered the severity of the sanction imposed and the materiality of the evidence sought . . . whether the violation was inadvertent or wilful . . . and whether the absence of the sanction would result in prejudice to the party seeking the sanction." *Forster v. Gianopoulos*, 105 Conn. App. 702, 711 (2008) (internal citations omitted); *Spatta v. American Classic Cars, LLC*, 150 Conn. App. 20, 27 (2014) (noting the "trial court may consider not only the presence of mistake, accident, inadvertence, misfortune or other reasonable cause . . . factors such as [t]he seriousness of the default, its duration, the reasons for it and the degree of contumacy involved . . . but also, the totality of the circumstances, including whether the delay has caused prejudice to the nondefaulting party").

First, after two and a half years, multiple court orders, a litigation sanction confirmed by our Supreme Court, and express warning that "[f]ailure to comply with this order may result in sanctions including but not limited to a default," Order, Dkt. 348.10, there can be no doubt that the Jones defendants' failure to comply is "deliberate" and "contumacious." *MacCalla*, 188 Conn. App. at 239; *Spatta*, 150 Conn. App. at 27.

Moreover, the materials sought here are significant to important aspects of the plaintiffs' case, and their deprivation is prejudicial. The plaintiffs' complaint alleges that "Jones has

EXHIBIT 28

deliberately employed [] false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." Sherlach Compl. ¶ 11. It alleged that "the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money . . . not because they are eager to educate or even to entertain their audience." *Id.* ¶ 103. It alleged that "[t]he false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience." *Id.* ¶ 98. These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims. *Id.* ¶¶ 465–474 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy"). Web-analytics and social media data for the Jones defendants' websites and social media profiles is potentially key for demonstrating these points.

Additionally, the Jones defendants' motivations for their actions are highly relevant not only for assessing what punitive damages are appropriate, but also in evaluating the intentionality of their actions, and/or whether their broadcasts were done with actual malice. Web and social analytics are relevant and could be material to these claims. Courts have held that "pressure to produce sensationalistic or high-impact stories *with little or no regard for their accuracy* would be probative of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 796-97 (D.C. Cir. 1987) (*en banc*) (emphasis in original). Likewise, "evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful

**EXHIBIT 28**

evidence." *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005). The Jones defendants' analytics are therefore potentially highly relevant to proving how these claims are borne out in the Jones defendants' business practices.

Moreover, the Jones defendants themselves have taken the position that the Google Analytics data is highly material. They claimed that their "records show that, at most, they made $342.55 from article and page referrals that contained the term 'Sandy Hook' out of a total of $10.6 million in overall sales generated from site traffic." Defs.' Emerg. Mot. 3, Dkt. 348.00. They argued that that amount contradicted "*the whole theory of the case*," which according to them, "is that [the Jones defendants] are *somehow motivated to do Sandy Hook stories to get money*." 6/2/21 Hrg. Tr. 17:19–18:6 (emphasis added). They "want[ed] to highlight" the data because, according to them, it "[s]eems like this is a loser of a story in terms of moneymaking." *Id.* In doing so, they were asking the Court simply to take their word that the data does not bear out the plaintiffs' "whole theory of the case"—and decide no one needs to see it at all. Whatever the illogic of this argument, it acknowledges that the data is highly material.[5]

This was not the first time the Jones defendants had argued this information is material. On June 12, 2019, the Jones defendants broadcast an episode of the Alex Jones Show entitled "GOOGLE'S ANALYTICS PROVE INFOWARS HAS NO SANDY HOOK MARKETING: Specialist destroys MSM agenda." Ex. J, Alex Jones Show, *Google's Analytics Prove Infowars Has No Sandy Hook Marketing*, Infowars.com (June 12, 2019). In it, FSS IT manager Michael Zimmerman joined Jones "to show and prove how, contrary to Democrat attorneys and judges,

---

[5] Notably, for these representations to be true, the Jones defendants must have enabled the e-commerce function of Google Analytics back in 2012, and they must have "very significant" e-commerce data that they have failed to provide the plaintiffs. Campbell Aff. ¶ 15. If they did not have this function enabled—and they do not have that data—then their representation cannot establish what it purports to establish, *id.*, and is misleading.

EXHIBIT 28

Infowars has no alleged 'Sandy Hook marketing' and makes no money from Sandy Hook video views, which happen to be less than 1% of all views." *Id.*

Lastly, the refusal to produce this information is prejudicial because it materially impedes discovery. The plaintiffs should have received this information years ago. They should have been able to depose the Jones defendants' ███████████ ██████████ regarding the performance of their social media. They should have been able to plan their approach to discovery based on a thorough analysis of both the withheld Google Analytics data and the late-produced and partial social media analytics.

For all these reasons, the Jones defendants' refusal to produce this information is highly prejudicial.

## IV.  CONCLUSION

For all the foregoing reasons, the plaintiffs' motion should be granted. The plaintiffs ask that the Court find as follows:

1.  The Google Analytics data was not produced;

2.  The non-production was deliberate and unexcused;

3.  In an order to delay or avoid production, the Jones defendants presented misleading, inaccurate and incomplete information concerning the capabilities of their Google Analytics account;

4.  The noncompliance is highly prejudicial;

5.  The late and only partial production of social media analytics is also unexcused and prejudicial.

**EXHIBIT 28**

The plaintiffs request that the Court consider this conduct in combination with the additional sanctionable conduct committed by the Jones defendants to date in determining that the only proportional sanction is default.

THE PLAINTIFFS,

By:  */s/ Christopher M. Mattei*
CHRISTOPHER M. MATTEI
ALINOR C. STERLING
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
Telephone:    (203) 336-4421
Fax:              (203) 368-3244
JURIS #32250

**EXHIBIT 28**

## CERTIFICATION

       This is to certify that a copy of the foregoing has been emailed and/or mailed, this day, postage prepaid, to all counsel and *pro se* appearances as follows:

***For Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC:***
Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103
jmw@randazza.com
P: 702-420-2001

Norman A. Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT 06511
P: 203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

***For Genesis Communications Network, Inc.***
Mario Kenneth Cerame, Esq. (and via USPS)
Brignole & Bush LLC
73 Wadsworth Street
Hartford, CT 06106
mario@brignole.com
mcerame@brignole.com
P: 860-527-9973

                                             */s/ Christopher M. Mattei*
                                             CHRISTOPHER M. MATTEI
                                             ALINOR C. STERLING
                                             MATTHEW S. BLUMENTHAL

**EXHIBIT 28**

# EXHIBIT A

EXHIBIT 28

1

NO: XO6 UWY CV18-6046436-S:   NO: XO6 UWY CV18-6046437-S

ERICA LAFFERTY              :   WILLIAM SHERLACH

V                           :   V

ALEX EMRIC JONES            :   ALEX EMRIC JONES

*  *  *  *  *  *  *  *  *

NO: XO6 UWY CV18-6046438-S:   SUPERIOR COURT

WILLIAM SHERLACH            :   JUDICIAL DISTRICT OF WATERBURY

V                           :   AT WATERBURY

ALEX EMRIC JONES            :   MARCH 22, 2019

*  *  *  *  *  *  *  *  *


B E F O R E:

     THE HONORABLE BARBARA N. BELLIS,

                   Judge

A P P E A R A N C E S:

  Representing the Plaintiffs:

    ATTORNEY ALINOR C. STERLING
    Koskoff Koskoff & Bieder
    350 Fairfield Avenue
    Bridgeport, Connecticut 06604

  Representing the Defendant, Alex Jones:

    ATTORNEY NORMAN A. PATTIS
    ATTORNEY KEVIN M. SMITH
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

  Representing the Defendant, Midas Resources:

    ATTORNEY STEPHEN P. BROWN
    Wilson Elser Moskowitz Edelman & Dicker
    1010 Washington Boulevard
    Stamford, Connecticut  06901

**EXHIBIT 28**

2

Representing the Defendant, Cory Sklanka:

    ATTORNEY KRISTAN JAKIELA
    Regnier Taylor Curran & Eddy
    100 Pearl Street
    Hartford, Connecticut  06103


                Recorded and Transcribed By:
                Patricia Sabol
                Court Monitor
                400 Grand Street
                Waterbury, Connecticut  06702

EXHIBIT 28

3

THE COURT: Good afternoon. Please be seated.

We're here on the Lafferty and related matters. If you could please identify yourselves for the record.

ATTY. STERLING: Yes, your Honor. Alinor Sterling, Koskoff Koskoff & Bieder, for the plaintiffs.

ATTY. BROWN: Good afternoon, your Honor. Stephen Brown from Wilson Elser on behalf of Midas Resources.

ATTY. JAKIELA: Good afternoon, your Honor. Kristan Jakiela on behalf of Cory Sklanka.

ATTY. PATTIS: Good afternoon, Judge. Norm Pattis on behalf of the Jones defendants.

ATTY. SMITH: Kevin Smith, also on behalf of the Jones defendants, your Honor.

THE COURT: All right. Just give me one moment.

So I'm sure plaintiffs' counsel and co-defense counsel has seen the motion for extension of time that was filed yesterday?

ATTY. STERLING: Yes, your Honor.

THE COURT: And there were also some RFA's that the plaintiff filed yesterday.

So I'll hear both sides, but I actually just had a question just to clarify. When I read the March 21st Jones defendant motion, there was a statement on page 3, Attorney Pattis, that said the defendants were

EXHIBIT 28

under the impression that their compliance had been tendered. And I'm wondering if you could explain that. Also, I did have a question for both sides. If memory serves, when I was addressing what limited discovery there would be, I thought we had interrogatories and requests for production.

ATTY. PATTIS: I do have an explanation. It will take a few moments, and I'd ask you to bear with me. I've had -- I have discussed with Mr. Jones and I have his consent to relate the following. And with your permission, I'd also tender several affidavits today. This is the history of -- I will take responsibility for my side of the aisle. I am counsel of record and going forward I will be sole counsel of record. Some of the things that have occurred and for which the Court appears prepared to act I don't think are the fault of either my client or myself. And I'm asking you to reconsider the denial of the motion to extend and here's why. And I will get to the point you raised.

THE COURT: Can we get to it sooner rather than later?

ATTY. PATTIS: I'll get to it right now. Initially, counsel was Mark Randazza and the Rondazza firm. Jay Wolman is the Randazza firm's representative in Connecticut. He was not counsel of choice for Mr. Jones.

EXHIBIT 28

5

THE COURT: Can I just stop you there, Attorney Pattis? Attorney Wolman was the one who filed his appearance.

ATTY. PATTIS: Understood. I'm trying to explain what -- I really am being responsive to your question.

THE COURT: Okay.

ATTY. PATTIS: Mr. Randazza was not permitted to enter. Barnes surfaced. He is a close --

THE COURT: I'm sorry. I didn't hear that. Mr. --

ATTY. PATTIS: Randazza was not permitted to appear pro hac vice. Barnes had Mr. Jones' ear. Apparently they are -- these two knew one another before this case. This is where I've been given permission to waive the attorney-client privilege as to Barnes by Mr. Jones. Barnes persuaded Jones that he had viable privilege claims that Mr. Wolman did not support. In particular, a claim that under Griswold versus Connecticut, you can claim the right to privacy as a privilege with respect to some of these discovery responses. Mr. Wolman wouldn't sign on to that, and there was a breakup.

At that point, Barnes contacted me some time in late February. And I filed an appearance under the representation that I would be moving him in pro hac vice. As I represented to you earlier, I thought I was going to be working under his direction. And he

represented to me that he was going to manage Mr. Jones' legal disputes related to these claims in several jurisdictions.

When I was -- to get to the only question you've asked, Alex Jones was under the impression and had been told by Barnes that full compliance -- he had the material to fully comply in late February. And Jones did not learn until apparently this week that that was not the case.

THE COURT: So let me just -- I apologize because I want to make sure I'm understanding this. So you're telling me that Mr. Jones relied on the advice of counsel who doesn't represent him in this case?

ATTY. PATTIS: I am telling you that Mr. Barnes -- correct. Correct. And so I will take responsibility for that. Okay. I came in and I represented to you last time we were here that I expected Barnes to appear pro hac vice, and I was going to file that motion. I was informed shortly thereafter that he would not be appearing. And at that point I turned up the heat and said, I need discovery compliance. And I received materials from Barnes late on the day of March 20th.

THE COURT: Because when you filed your motion -- one of your motions for extension of time, the one that I denied, the motion had said that you hadn't received or reviewed any documents yet.

EXHIBIT 28

7

ATTY. PATTIS: Not -- if I said none, I overstated it. I had received several inches worth.

THE COURT: I think you said that you had, on March 18th, on that motion for extension of time, that you had not been given any documents to review or produce. That was what you said in your March 18th because I really --

ATTY. PATTIS: I am going to correct that. I was given about two inches of documents, and I didn't seek an order to do rolling discovery because I had -- and I was given those documents on or about March 6th. I was also given some interrogatory responses on March 6th. Those interrogatory responses were not satisfactory to my way of thinking. And I took steps to get them amended. I don't have them at this point. But in terms of the bulk of documents, there are nine point three --

THE COURT: Let me just interrupt you, Attorney Pattis, and I apologize, and I'm going to give you honestly as much time as you need. So I'm just trying to figure out the March 21st motion that you filed that I read very carefully that Mr. Jones was under the impression that full compliance had been tendered, I'm just trying to understand how he could be under that impression if he hadn't signed off under oath on the interrogatory responses. So you wouldn't be mistaken. Regardless of what anyone told you, four

**EXHIBIT 28**

lawyers are involved now. All right. So four different lawyers. If you haven't signed interrogatory answers under oath, how can you believe that full compliance had been tendered? It doesn't seem to be a reasonable belief, if I accept that version.

ATTY. PATTIS: Well, I'm representing, as your officer, the facts as I know them to be.

THE COURT: I am not -- Attorney Pattis, I am not in any way shape or form casting aspersions. I accept your representations as an officer of the Court. But your representation is what his impression was, what he believed. And that's why I started out asking about interrogatory answers. You can't -- how could your client be under the impression that full compliance had been tendered if he had never signed the interrogatories under oath?

ATTY. PATTIS: He had signed the interrogatories, but not the requests for production. I don't know if I shared with you, I shared with co-counsel, that the interrogatories, that responses came with some handwritten material on it, confidential and subject to protective order, which I recognize to be Mr. Jones' handwriting. And then he signed on the last page. That's meaningless to me. I'm not going to tender a document that's meaningless.

THE COURT: So you have in front of you a set of

EXHIBIT 28

9

interrogatory answers that you're not satisfied with that he signed under oath?

ATTY. PATTIS: Right, I do.

THE COURT: On that date.

ATTY. PATTIS: March 6, 2019. That was the day I believe they were due. At that point, I was operating on the assumption, Judge, that I was his -- I was local counsel for someone who had yet to appear. They were prepared over my signature. I wasn't prepared to sign off on them because I had had no opportunity to do any due diligence. And that was the reason for seeking a continuance.

As to the request for production, here's the backdrop on that: The database that must be searched here is composed of somewhere between nine point three and nine point six million emails. The request for individual searches is extremely time-consuming. For example, in one of the --

THE COURT: I accept that. I accept what you're saying that it's time-consuming, but not all of the production requests were for emails. There was marketing information. These were not all an e-mail search. So, for example, there would be, if I looked at them -- I don't have them in front of me -- I'm sure there are some production requests that are not burdensome to respond to and no substantial compliance was made. And I'm not -- you are representing the

EXHIBIT 28

10

Jones defendants, but they are -- it's their obligation to comply. And I'm dealing with Attorney Wolman's original representation with his first motion for extension of time that there was going to be significant document production by the initial deadline, which didn't happen. I think part of the problem --

ATTY. PATTIS: I can explain what happened there.

THE COURT: I think part of the problem is that your clients are maybe tying their own lawyers' hands by getting other lawyers involved so that nobody knows what anyone else is doing. That would be the most favorable light.

ATTY. PATTIS: I understand that, but I don't think --

THE COURT: The least favorable light would be manipulation.

ATTY. PATTIS: I don't think it was willful. With respect to the interrogatory responses, every single answer that I see -- and they prepared this for my signature. I will not tender this. Every single answer was -- and this is, I think, a misapprehension of law which you may recall you went out of your way to correct when last we were here. Every single answer -- this is March 6, 2019 -- all responsive unprivileged documents will be provided. All privileged documents will be logged and provided on a

EXHIBIT 28

11

privilege log. Now, he was operating under the assumption, which you corrected last time we were here, that privilege logs can be tendered after compliance. At that point, Judge, from my perspective, I'm local counsel. I'm going to advise him about the law. I advise him about the law, and I tell him we need compliance. I warned my client's in-house counsel, for lack of a better word, that the Court has made clear on the record that a consequence of noncompliance could be loss of a motion to dismiss. I write a letter urgently to that lawyer late last week saying, look, we've got to (indiscernible) this stuff. I don't know what's going to happen.

I have since spoken with Jones, met with personal representatives and spent more hours this week than I had to spend to try to get to the bottom of what happened. And here is what I am told. And this is based on interviews with my client, this is based on interviews with the IT person who's culling through his emails, this is based on interviews with personal representatives of his, this is based on interviews with Wolman, and this is based -- and I can, if necessary, get an affidavit from Attorney Barnes. This is from conversations and communications with all of them.

Mr. Jones was told by Mr. -- Mr. Jones' IT person -- and I have an affidavit from him -- named

**EXHIBIT 28**

12

Jeff Zimmerman, gave Barnes sixty thousand or so documents in late February. Barnes told my client that this was full compliance and that it would be tendered. No one told Jones until Tuesday of this week -- I don't recall the date, maybe the 19th. The 19th is Tuesday. Nobody told Jones until the 19th of this week that that didn't happen. At that point -- and I have authorization to tell you this -- I was going to withdraw or make a motion to withdraw today unless something else had happened because I cannot defend an empty chair.

Now, Mr. Barnes has been eased out of the picture and will no longer be involved in the case. I have an affidavit from Jones indicating to you that I've been given sole authority and responsibility for the management of discovery in this case. The decision not to tender partial discovery, that is entirely mine because my view was, if I could seek an extension until I could review it all, I would do so. I have not been local counsel enough in cases where I'm going to sign --

THE COURT: I understand that. Can I just interrupt you for one second? And you can sit if you want, whatever you're most comfortable with. Does anybody have either an extra copy or one copy -- and I'll have Mr. Ferraro make a copy of it -- of the interrogatories and production requests so that I can

EXHIBIT 28

13

look at them?

ATTY. STERLING: I have them.

THE COURT: Is that an extra set?

ATTY. STERLING: I don't have, unfortunately, an extra set.

ATTY. PATTIS: Judge, to advance things, I can give you a copy of the signed ones. I brought copies for everybody because I knew that this might come up today. So I'll just tender a copy to everyone to look at.

THE COURT: But these are the ones that you didn't want to submit because you didn't feel they were (indiscernible).

ATTY. PATTIS: I had an opportunity -- when I first got involved in this case, I put a call in to Attorney Sterling, who is known to me for many years as a reasonable person and, frankly, a friend. And it was made clear to me at this point there were some reservations about my client's correspondence. I don't recall if it was with Ms. Sterling or Mr. Mattei, but on March 6th when I received these things, I discussed what the answers were. I told them what they were. And somebody, I don't recall who it was -- and I'm sorry, Alinor -- that one of the answers didn't satisfy them. The question is, name all the business entities and officers. And then the claim is, well, these entities don't exist anymore. I think

the good faith answer is they're not asking at this point who it is, but at the time relevant to the lawsuit.

THE COURT: Here's the thing, Attorney Pattis: I was told, not by you, but by the defendant Jones through his first counsel that there was going to be significant compliance even though they needed an extension. I'm struggling to find any good faith. You're new to the game and I accept what you tell me, truly I do, but any good faith on the part of the defendant. It's the defendant's discovery obligations here. So, for example, I'm just looking at the first few interrogatories. Even if some of the interrogatories had been answered properly under oath and then with the "to be provided", you know, something that was properly responsive to the interrogatories or production requests, not every one of the production requests requires a search through nine million or however many emails.

ATTY. PATTIS: That is my call, and I am solely responsible for that. My view was, I was going to respond once and then be done with it rather than get involved in rolling discovery, which is difficult to manage. I did not consult with my client on that. I made that decision. If there should be sanctions in that regard, they should be directed toward me and not -- me personally and not toward the client because I

EXHIBIT 28

15

made that decision.

Frankly, from my perspective, Judge, my state of mind was, you know, I've learned nine point three million -- for example, one of the search terms was give us every email that you have about the Sandy Hook families or family members. When you identify the plaintiffs, you identify their family members, it comes to over a hundred people. Each search of the nine point three database takes about twelve hours.

THE COURT: So if we just look at these. This is an easy one. So the fifth interrogatory, identify any witnesses you may call at a hearing on a special motion to dismiss. What's the answer to that under oath?

ATTY. PATTIS: The plaintiffs and Alex Jones. That's satisfactory as far as I'm concerned.

THE COURT: What about the first one, business organizations? Is that answered satisfactorily? That's a pretty straightforward one. I'd take about two minutes to figure that.

ATTY. PATTIS: After discussing with -- I don't recall whom, but I tell you I did. The second one, the answer is one that doesn't satisfy my adversaries. No employees are assigned the duties of marketing, data research, analytics concerning Infowars. The only analytics are conducted by a third party Google Analytics and Google Ad Manager. No marketing

EXHIBIT 28

16

analytics were ever done related to Sandy Hook. I discussed that and the question was, well, can you guys get the material from Google? I'm told the letter has been written to Google. I've asked for it. I don't yet have it. So that's the answer, but I've been informed that's an unsatisfactory answer. And, hence, the request for more time.

THE COURT: What about the other interrogatories?

ATTY. PATTIS: As to three, again, it may vary -- I don't think it varies. I'd have to check. There were five sets.

THE COURT: I'm not even looking at the production requests. I'm just looking at the interrogatories.

ATTY. PATTIS: No employees were assigned the duties of investigating any matter concerning Sandy Hook on behalf of the case defendants. That's the answer.

THE COURT: What about the fourth one?

ATTY. PATTIS: This may vary on the entity. Two domain names are used and owned by Free Speech Systems to disseminate content concerning -- it's not a complete sentence. Two domain names are used by Free Speech Systems to disseminate content concerning this matter. And they are Infowars dot com and Prison Planet dot com. That's it.

THE COURT: All right. So when you look at the

EXHIBIT 28

17

production requests, it looks like some of the objections were sustained. I'm not --

ATTY. PATTIS: As to the financial matters and tax returns, yes.

THE COURT: Just roughly, let's say, just roughly, there's probably, say, sixteen that they have to respond to, just roughly. So there have to be some that you don't have the documents on. For example, number eleven -- and I don't have in front of me the rulings.

ATTY. STERLING: Your Honor, the rulings -- those were done after the rulings. So there's a couple notations where an objection was sustained in its entirety, but otherwise the language is the language that the Court approved. So that's fine.

THE COURT: That would have taken around three minutes to comply with.

ATTY. PATTIS: I actually have compliance. There are no documents in my possession. These are Court -- the Court ordered these documents sealed, and they are placed in the lawyer's custody. So that is the answer. And, again, this is a problem that I have about the adequacy of the compliance, whether we need to seek a Court order, but I called and made a phone call because I remember reading something in the press --

THE COURT: It's possession or control, right?

EXHIBIT 28

18

ATTY. PATTIS: Well, but the claim -- and I don't know this as your officer and before I start flashing documents around, I want to know it, but what I'm told is the divorce transcripts were sealed and can only be released with a Court order. Now, what's paradoxical to me about that is the proceedings were nonetheless open to the public because I recall reading about it.

THE COURT: So you're suggesting that even though I've ruled this is the discovery in this case, that Court order doesn't satisfy the ability to get the transcript from his attorney?

ATTY. PATTIS: I'm telling you that when I moved for a continuance on March 6th, it was because precisely of things like this, and I was unwilling to put my name on it. I'm just not. And I don't think that's unreasonable on my part.

THE COURT: So were there any of the production requests at all that you're in a position that you feel that you have proper compliance at this point?

ATTY. PATTIS: As of today, yes. And I am told -- I'd like to bring this -- I appreciate your indulgence. Jeff Zimmerman -- so here's what I have done since -- before you denied my motion for extension. I've reached out to a data analytics firm and described the universe of items that need to be searched. I have --

THE COURT: I read that in your most recent

EXHIBIT 28

19

motion.

ATTY. PATTIS: I didn't know you denied my motion. I came back from an early day in court yesterday, so I had to get something out in a hurry.

THE COURT: (Indiscernible) data analytics.

ATTY. PATTIS: Whether my client will bear that expense or whether the plaintiffs will bear that expense, it's going to cost ninety to a hundred thousand dollars to have that information system by this firm go through the nine point three million emails and sort them. Mr. Zimmerman has done plenty. And he has completed under production request number one -- I have the following notes and I have received documents, Judge, in my office late Wednesday that I've not had a chance to review, but I'm told that 1A through N are completed, 2A through J, 3A through B, 4A through G, 7A through O, 8A through N. 17A through F.

THE COURT: What about 18? That should be pretty easy.

ATTY. PATTIS: I'm told those are completed, but here's what I would like you to know and I have an affidavit if you need it. This young man, Mr. Zimmerman, has been involved in this search for weeks. To do a literal search of every term that the plaintiffs request would not be completed until April 15, 2019. I didn't know that when I made my motion

EXHIBIT 28

20

for April 3rd, but one of the things that's occurred is the Texas -- the same kid is generating data for Texas. And that case has been based on priority because of the expedited schedule down there.

I'm also told, and I confirmed this this morning in a conversation -- forgive me for not recalling his name, the lawyer for Mr. Jones in Florida -- excuse me, in Texas -- that today they've turned over twelve thousand five hundred emails. They are under an order -- and I can get those and turn them over. They are under an order to complete discovery and/or face fairly significant sanctions, and they're hoping to have thousands more on Monday.

THE COURT: Does he have -- Attorney Pattis, does he have a different lawyer in the Texas case than -- it's not Mr. Wolman, it's not Mr. Barnes, it's not Mr. Randazza? It's somebody else?

ATTY. PATTIS: No. Here's what's going on in Texas. And, again, it's awkward to put on the record, but I have authorization to do so. Mr. Barnes has apparently succeeded in being admitted pro hac vice in Texas. And, therefore --

THE COURT: Who's the local counsel there?

ATTY. PATTIS: Mark Enoch (phonetic spelling).

THE COURT: So that's a different lawyer?

ATTY. PATTIS: Right. Enoch is local counsel in Texas to the Jones defendants, and Mr. Barnes is pro

EXHIBIT 28

21

hac vice counsel. And there's been a struggle there. Candidly, Judge, what blew this into crisis mode for me and led me to consider withdrawing is I received a phone call and had my first communication with Texas counsel on Monday. And I had described a certain email I had written to Barnes last week and the failure to get a response to it. And that email I'm not prepared to share, but it warned of dire consequences. Three days passed and I didn't get a response. So I sent another email to Barnes saying, you know, what's up? Did you get my earlier email? And I began to get responses. And then my phone rang off the hook with people in the Jones organization who apparently did not know and then who had not been shown my communication with Barnes. And in those communications, Jones learned for the first time that although he believes that Barnes had a lot of material, perhaps sixty thousand documents or emails or whatnot since at least the end of February, which is why Zimmerman thought he could turn them over and Barnes had not done so.

THE COURT: If I could backtrack a little bit. So how many documents have been produced to date roughly in the Texas action? Just roughly, roughly.

ATTY. PATTIS: I don't think a lot. I think twelve and a half thousand as of this morning. There was a glitch yesterday where Texas thought they sent a

EXHIBIT 28

22

file, but three thousand of the pages were blank and this has led to more recriminations. They intend to send some thirty thousand more over the weekend or so I'm told. I was on a teleconference this morning where arrangements were made to bring in four lawyers over the weekend to produce.

And, Judge, what's more, I have been given assurances that I will be given everything that is tendered in Texas to tender here. The problem is the requests here are broader than the Texas requests.

THE COURT: All right. So if we can, if you don't mind, can you just go through the interrogatories and production requests that you believe you are prepared to comply with at this point?

ATTY. PATTIS: At this point I think I've made a significant error and poorly served the Jones defendants by not doing rolling discovery. If I had it to do again --

THE COURT: Well, if you don't mind, just humor me. Can we just go through them and just identify which ones you believe -- and I'm not holding you to these exactly, but which ones you believe -- because we're going to be together again on Tuesday.

ATTY. PATTIS: I wanted to seek relief on that, but I'm on trial, Mr. Smith and I, on a jury case. We were hoping we could be together to discuss this case on the 2nd. I know you need somebody to cover

EXHIBIT 28

23

Halbig's motions on the --

THE COURT: I do. I cannot go forward on that case without somebody -- I just don't want to put myself in that position.

ATTY. PATTIS: I will have an associate here to be a (indiscernible), but only Mr. Smith and I really understand this issue. So if you need to see us again on discovery issues, we would request the 2nd. One or the other of us can be here. We expect a verdict by then.

THE COURT: If you could just run through which interrogatories first. So there's five interrogatories. You already told me the answer to number five. So what about one, two, three and four in the interrogatories?

ATTY. PATTIS: I will give one --

ATTY. STERLING: I'm sorry to interrupt, your Honor. I just want to see which defendant we're talking about.

ATTY. PATTIS: All five defendants.

ATTY. STERLING: So all five. Okay.

ATTY PATTIS: I will tender all five and then wait for the other side to tell me they think it's insufficient and what I need to do to correct it. That's the error I made. I thought I should get it all done at once. I don't typically engage in motion practice.

EXHIBIT 28

24

THE COURT: Well, you're telling me that you, already looking at them can --

ATTY. PATTIS: I think it's a waste of time to waste the Court's time on discovery disputes. One is sufficient on its face as worded. I think it's worded poorly. Identify all business in which you have ownership and/or control. That speaks to today. I don't really think they asked about today. I think they meant to ask about a reach-back later. So my answer is facially satisfactory, but too cute for words. So I will tender it and let them say, no, we meant later.

As to two, there is no one responsible for marketing data, and we stand by that answer. I'm asking for the information that suggests that they were in touch with Google Analytics. At this point I don't have it. I spoke to a person in personnel this week about that.

Three, as to employees, there are none. I'm prepared to tender that. The domain names or the URL, whatever they are, those are in here and I can tender that and the answer to witnesses is the same for each. So I can offer those today.

THE COURT: All right. And the production requests, out of the sixteen or so, can you just -- you don't have to -- can you just identify which ones that you would be able to make partial compliance to?

EXHIBIT 28

25

ATTY. PATTIS: Yes. May I have a moment, Judge?

THE COURT: Take your time.

Attorney Sterling, do I have your only copy?

ATTY. STERLING: You do. It's --

THE COURT: I'm going to give it back to you. I can have --

ATTY. STERLING: Obviously I have more back at the office, but it's -- I'm managing. It's okay.

ATTY. PATTIS: Judge, we have received this week late in the day on the 20th what I was told were sixty thousand emails. We've had some difficulty downloading them that has crashed our system, but as of this moment, I have thirty-seven thousand of them on a hard drive. There are two issues. One -- well, there are three issues. Whether any serious claims of journalistic privilege are going to be interposed or not. But the pressing issue is the attorney-client privilege. I was on the phone with Texas counsel. They are scrubbing to make sure there's nothing privileged in here. What we're trying to get them to do is give us information from the so-called tip line or confidential informant line. I'm told that's some fifty to sixty thousand emails. And we should be able to get those and produce them quite quickly.

As to the topics in one, Sandy Hook is what crashed our system. However, there are emails that are responsive to Newtown, to Adam Lanza, to crisis

EXHIBIT 28

26

actors. There are about eight -- I guess you won't find it hard to believe. There are about eighty-nine hundred of them or more that relate to Wolfgang Halbig. And so we've got a number of them.

THE COURT: Are there any production requests that you can fully comply with at this point?

ATTY. PATTIS: By --

THE COURT: Except for 18. I think you told me 18 you were all set on, the communications with any other plaintiffs.

ATTY. PATTIS: To be honest with you, Judge, I didn't get what I got from Barnes until Wednesday afternoon. I was in a court trial until midday yesterday. It settled abruptly. And so I have not had a chance to look at what he sent me. But I know that I'm sitting on at least thirty-seven thousand emails. And I discussed an additional ten or twelve thousand more. So I believe that by Monday I can make a showing of thirty to forty thousand emails.

The issue that came up in a conference call this morning is whether there are attorney-client privileges. And because of the exigency in Texas where there's a mandatory timeline, there was a literal discussion about whether to waive the attorney-client privilege so as to comply. And no one is comfortable with that. So a series of lawyers are being brought into the Texas firm to at least scan the

**EXHIBIT 28**

27

documents to make sure they're not turning over privileged material. So I think I'm close, but the downside is, if Mr. Zimmerman --

THE COURT: Attorney Pattis, isn't that usually how it's done in these kind of cases, that there are a team of young associates or young lawyers or whoever on the document production --

ATTY. PATTIS: And there has been. I've spoken to a young man who spent six days at Mr. Jones' facility --

THE COURT: Early on, though, before your involvement.

ATTY. PATTIS: Correct. And so my -- I have two people who are working full time on this matter right now. And I can't work on what I'm not given. So my contention is and my firm belief is, while I'm not happy to be responsible for a file where there is no compliance, but I'm hard-pressed to know what more I could have done. Perhaps I should not have appeared or I should have waited to file an appearance together with the pro hac vice counsel. I didn't. I relied on him. I know who he is. I've seen him around. I've heard about him. He represented and I was told that he had the client's confidence. What more should I have done? I tried to extend a professional courtesy to someone who was apparently less than candid with the client and sandbagged me.

EXHIBIT 28

28

THE COURT:  So besides the search of the emails, what other document search is ongoing?

ATTY. PATTIS:  I called a person who is involved in -- so I'm led to believe that the Jones defendant and related entities employed as many as 75 people, maybe 77.  I've heard two estimates.  So I have asked for organizational charts that would help me understand the difference between one entity and the other and the relationship.  And I'm told they are largely -- it's largely informally managed.

One of the issues that remains in dispute, and I don't know if it's too late to object, they don't want to give a list of all their employees like janitors, this and that and everything else because Mr. Jones is concerned about retaliation against people close to him for political --

THE COURT:  Well, the objections were already dealt with, and there is a process in place for confidentiality issues.  So I suppose with something like janitors' names, I got to think that you and Attorney Sterling could probably reach an agreement as to how not to publicize those names.

ATTY. PATTIS:  So I have spoken to a human resources person to begin to get that data together. I have met with individuals as recently as this morning close to the Jones organization to try to get to the bottom of all this.  I've been invited down to

do what I need to do, if I'm given time and need to go down. I don't know what more I could have done. I genuinely believed that Mr. Barnes had Mr. Jones' confidence. It was represented to me by Barnes and others that he was brought in to manage the litigation in the various courts. And I did what a pro hac vice counsel, or what a person sponsoring counsel does. I stood by and took a subordinate role.

Last week when it was clear that was working to the client's detriment, I'll be candid, I consulted my lawyer, who's Willie Dow. And I described the situation to try to find out what my ethical obligations were. And he basically said that I was in a very precarious situation. So I took the steps that I needed to take to protect myself. And the result is that Mr. Barnes is no longer in the picture, and I am it. And I'm told I have full responsibility.

THE COURT: You had mentioned sanctioning you, which I've never done a sanction in sixteen years and I'm sure not going to start now. But this discovery obligation is not your obligation. It's the defendant's obligation. That is -- it's not what you know, it's not what you don't know. It is the party's obligation to fully and fairly comply with requests for disclosure and production. So any sanctions would be to the party here and not to you.

ATTY. PATTIS: Well, except I did err. I could

EXHIBIT 28

30

have done rolling discovery and I regret it now. That's been the approach in Texas. Of course, it hasn't stopped things from --

THE COURT: Has that motion to dismiss been adjudicated yet?

ATTY. PATTIS: No. My understanding is that a decision -- and Attorney Sterling can correct me if I'm wrong -- a decision has to be tendered by June 2nd, I believe.

THE COURT: Has it been argued?

ATTY. PATTIS: No. It will be argued in May.

ATTY. STERLING: No, your Honor.

THE COURT: So they're still doing their discovery.

ATTY. STERLING: They're doing rolling production. There's a holdup with discovery there, as I understand it. There was a ruling on the reporter's privilege in which the privilege claim was largely rejected. And the plaintiffs in that case chose to go forward with Mr. Jones' deposition and the deposition of the corporate designees without documents, which has now become a basis for a motion for sanctions in that case, with them claiming they're prejudiced by having to go forward, which they had to do because the Texas timeline was so tight.

THE COURT: So, Attorney Sterling, I've given Attorney Pattis the entire floor the whole time and,

of course, I will give you equal time, but I have to just tell you what I'm considering at this point so you can respond to it and Attorney Pattis can respond to it, as well. I would like to -- I don't want to wait until April 2nd. I would like to address the issue of whether your motion should be granted with regard to precluding the motion to dismiss, whether Attorney Pattis' motion for reconsideration on the extension of time, whether the Court should reconsider that. But I would like to see if the landscape is going to change. If we were to come back Monday or Tuesday and you were to tell me, well, I got the twelve thousand five hundred documents today and the other thirty thousand documents that were expected over the weekend, so on Monday I had forty-two thousand five hundred documents and I got the interrogatory answers under oath and I got production 18 and whatever other production requests can be satisfied, that, to me, would change the landscape a little bit, perhaps. So I think I would rather give the defendants an opportunity to do that and then address your motion and address Attorney Pattis' motion. It doesn't make a difference if it's heard today or heard next week.

ATTY. STERLING: Of course, your Honor, if that's the Court's preference, that's what we'll do. I mean, I do have some responses to what's been said here

EXHIBIT 28

32

today. I think that there's been a lot of indications that Attorney Barnes was a bad actor. I think if the Court looks back down the timeline, though, December 10th is the date that the Court determined that discovery would be permitted. January 10th is the date that the Court determined the content of the interrogatories and request for production. After January 10th, we were in court on January 23rd, January 31st, February 14th, and February 21st, and on none of those days did defendant's counsel, who was then Attorney Wolman, say anything about difficulties in meeting a February 25th production date.

THE COURT: Actually, the deadline was the 23rd, right?

ATTY. STERLING: I may be mis --

THE COURT: I think you rounded it off. But that's not a court filing. That's just discovery responses. So as far as I'm concerned it was the 23rd.

ATTY. STERLING: Yes.

THE COURT: Attorney Pattis, I know you're not responsible for that because that was before you were in the case, but you can see how it's troublesome to the Court because nobody in this room wants to be manipulated. But when we have a February 23rd deadline and the Jones defendant's counsel is in the courtroom two days before we address, I believe, the

EXHIBIT 28

33

confidentiality order protective order and whatever other issues were brought to me and I always ask, is there anything else? There was never a mention from the Jones defense counsel that, in fact, there wasn't going to be compliance. So that's the problem. That would have been the time. So can you respond to that? I know that you're answering for somebody else, but that's still what the case -- what's been going on, that's the history.

ATTY. PATTIS: So here's all I know based on the interviews that I conducted this week: Apparently Mr. Zimmerman was not made aware of this data request until sometime well after it was initially tendered. This would have been sometime in January. Zimmerman has told others that he gave Jones what he had late in February so that when Wolman appeared here on February 25th, I believe he knew that Jones was coming into the (indiscernible), that Barnes was coming into the case, but they were having this dispute about what to do about privacy. And Wolman would not sign on to the Griswold claim. And I can't say I blame him.

THE COURT: All right.

ATTY. PATTIS: But I understand what Attorney Sterling says. The thing that floored me this week, I requested an affidavit from Zimmerman, and I was told for the first time this week that strict compliance with everything requested couldn't be done until April

EXHIBIT 28

34

15th. And I had previously requested until April 3rd myself thinking all this was done. Now, it may be that Attorney Sterling and I can work on what she really means by family members and related people because if you do the family members and related people, they've actually searched the web to find out who these are, that's like four hundred people. And if it's going to take twelve hours per search, where are we going to be and when are we going to get there? I can only tell you what I know.

THE COURT: All right. Sorry I interrupted you, Attorney Sterling. I'm sorry.

ATTY. STERLING: Just a few more things. All with the mindset that we're trying to do expedited discovery, and we have pushed hard on our side to be available for expedited discovery. The Court knows how many times we've been back. So this is just turning into not expedited discovery, which means that the discovery stay remains in place indefinitely.

The other -- and I'm really trying -- I have no interest in casting stones at Attorney Pattis. I know the Court doesn't either. So I would like my comments to be understood in that regard. It was on March 7th that the Court warned both orally and in writing that failure to produce on the 20th would potentially result in denial of the anti-SLAPP.

On March 13th, we were back in court and Attorney

EXHIBIT 28

35

Pattis had indicated that he had advised people who need to know of the Court's observations. But not only that, it was a Court order. So it was out there for all to see. So that is just in and of itself extremely problematic and the fact that things were not provided to Attorney Pattis until March 18th.

The other thing that came up in the course of this hearing, and, obviously, I haven't seen any of the documents that have been referenced by Attorney Pattis, is that Mr. Jones apparently signed his affidavit on March 6th. The representation from Attorney Wolman was that compliance could be provided on February 25th, including those interrogatories.

So I'm not in a position to reconcile all these difficulties. What I can do is point to them and say to the Court, I understand Attorney Pattis is casting this in the absolute rosiest light, but the record doesn't look rosy. So I will say one thing about the sanction, and then I understand the Court's preference to proceed on Tuesday, which is that the sanction that we're asking for, which is denial of the anti-SLAPP on a summary basis isn't a sanction on the merits. It just allows the case to proceed to the merits. It allows us to do full discovery. From everything that's been represented, trying to do this discovery on an expedited basis isn't working very well. This is apparently a production of substantial numbers of

EXHIBIT 28

36

documents, if they materialize. But our case law is concerned with making sure that a determination on the merits is what happens, and that denying the anti-SLAPP would actually help us get to that point because at this point we're just stalled.

THE COURT: I'm not going to address that now, but I've said many times now that that special motion to dismiss is in jeopardy, but I wouldn't be denying it. I would be precluding it. I wouldn't address the merits of it.

But I do want to interrupt you because I would like to address this to Attorney Pattis, as well. One of Attorney Pattis' comments, which I accept, that he had originally asked for in his extension of time, I think, for April 1st now, but when you checked with the person who was doing the forensic examination, or whatever you call it, that that wouldn't even be possible. It would be April 15th. So, basically, what the representation is is that it -- it sounds like a solid month to do that forensic audit, or whatever you call it, of the emails. So I guess what I'm saying in a way that that's probably more difficult and more of a burden than was anticipated that was ever mentioned by anyone at any point, Attorney Wolman, and so forth. So it might have been impossible -- if it had been done properly, it might have been impossible for the Jones defendant to have

EXHIBIT 28

37

met that first deadline, given the number of emails and such.

ATTY. STERLING: Possible, although, your Honor, then the question arises, but if they were actually attempting to do this, why didn't we hear about it sooner? It's the first thing I would say if I was under a deadline like that. And also with the focus in this case on how hard we worked to set expedited deadlines.

So I don't really have a response to that at this point, your Honor. It's very difficult from where I sit because I don't have anything to review. I don't have a basis to know what's being produced. I don't -- the representations about what's being searched have shifted over the course of the discovery process. I just -- is there another way to ask that question of me, your Honor? I'm not giving a good answer, but I'm not quite sure what the Court's concern is.

THE COURT: Attorney Pattis, can I ask you, what is the like -- you also mentioned the cost involved of doing it. To be honest, would you like me to be straightforward here?

ATTY. PATTIS: Yes.

THE COURT: The Jones defendants at this point are coming from a position of weakness. They've blown past the Court's deadlines. There hasn't been a

EXHIBIT 28

38

single piece of paper or interrogatory answered. And now they're saying it's too costly. Wouldn't the better approach -- or that who's going to pay the ninety thousand dollars, or whatever it was that you said. Wouldn't a better approach be to turn over immediately the twelve thousand plus documents --

ATTY. PATTIS: Yes, I intend to.

THE COURT: The thirty thousand documents over the weekend, pay the costs of having your forensic examination of the emails instead of suggesting at this point that the plaintiff should bear that cost, answer the interrogatories that you identified the production requests that you can -- and then change the landscape in a way so there's some good faith. This would be the first step.

ATTY. PATTIS: That is entirely on me. And I wanted to comply fully because, candidly, I'm busy and I don't want to be involved on a piecemeal basis. That's my personal preference, but I'm not going to get my way here. So I think you're right.

As to the --

THE COURT: I'm going to interrupt you again. You are getting your way because nothing were to stop me from ruling on that motion and precluding the special motion to dismiss and just moving on with the case. So as far as I'm concerned, you did yeoman's work in --

ATTY. PATTIS: Can I order that piece of the transcript?

Can I just respond to one thing? I think it's important to notice here that it was the plaintiffs who have filed this action, and they sat on their claims for years until it was convenient for them to strike. And then we had thirty days (indiscernible). We had to file our motion in response. There's no case law about the scope of discovery here. But I don't think the Court really expected that there would be nine point three million emails to search and that searching each data firm one at a time was going to take upwards of six to twelve hours. So the Jones defendants contend, not that I've seen it with my own eyes, I'm making representations to you, that they've been at this for weeks. It's my recommendation that they go to the data firm. But here's the problem with the data firm: The data firm can only segregate and locate items. It can't do a privilege analysis. So there were several people in my office today. We were on the phone with people down in "Jonesville", as it were, trying to identify by rule of thumb items in which there could be no conceivable claims of privilege. And those should be things that came in through a so-called tip line or attorney-client privilege because at that point that's all I'm focused on. So I think there are ways to provide it, and I'd

EXHIBIT 28

40

be happy to do so if given permission.

THE COURT: I think it's unfortunate that -- and, again, I'm not laying blame on your feet because you weren't even involved, but I went along with the deadline. The deadline that I ordered was the deadline that Attorney Wolman had requested. So I gave him what he wanted. It sounds like you pretty handily, without much of a struggle, was able to determine that this was going to be an expensive search, and it was going to involve a lot of documents. If Mr. Jones' first attorney had done what you're doing, I would have been back probably with everyone maybe on January 30th, at which point I would have been told this is going to be -- it's going to take longer, it's nine million, or however many emails, but instead what happened -- and I don't want to beat a dead horse -- is that the deadlines were missed and they were like moving targets. This is -- It's just --

ATTY. PATTIS: That may explain why there's been a change in counsel.

THE COURT: True.

ATTY. STERLING: Your Honor, just a few things. Two changes in counsel -- three. But one is, I would ask that with regard to the affidavits that Attorney Pattis mentioned today, could we have those submitted?

ATTY. PATTIS: Yes.

EXHIBIT 28

41

ATTY. STERLING: And with regard to the plaintiffs and the time we chose to file our complaint, I really think this is not the time to try to turn this on us.

ATTY. PATTIS: Well, it bears noting that --

THE COURT: No colloquy. Thank you.

All right. What else? Anything today? So here's what I don't want to do: I want to put these issues to rest one way or the other. And I had intended to do it today. I'm happy -- and since I'm the one that actually wanted that, we can do it next week. But I understand you're not available, Attorney Pattis, on the 26th?

ATTY. PATTIS: Well, here's the story: Mr. Smith and I are trying a case. The jury has been picked. We do not want to be perceived as dogging this file. Attorney Smith indicates tha he'll be here on Tuesday. I would prefer that he not, since --

THE COURT: Are you on trial on Monday?

ATTY. PATTIS: Yes, all week.

THE COURT: Monday, too. Every day?

ATTY. PATTIS: Yes.

THE COURT: Can I ask what town?

ATTY. PATTIS: Yes, Middletown. The case is State vs. Cuson (phonetic spelling). We expect the case, however, to end that week. So the following week is easy for us because it only takes one person

EXHIBIT 28

42

to monitor a jury. I would prefer to have Mr. Smith with me, but he'll be here Tuesday if you need him.

THE COURT: Well, I think I originally intended to just deal with Mr. Halbig's issues, but it would be helpful if we could maybe even do it at nine o'clock first thing and then you can get right on the road and get to Middletown. Quite frankly, I don't know if you want to do it here or in Bridgeport, whatever will be quicker for you. But I just want to be able to address at that point to see if there's some consensus if the landscape has changed at all. For example, forty-three thousand documents were given and interrogatory answers under oath. I don't want to get into a situation -- I don't want to get into ex parte problems.

ATTY. PATTIS: Would you consider calling Judge Suarez in Middletown and ask for an eleven o'clock start date on Tuesday? I'd like to be here myself. I'm the one who's made factual representations to you. And Mr. Smith will do a great job, but I've taken responsibility for this.

THE COURT: Let me just see what time -- so it's nine o'clock on Tuesday.

Ron, is that here or in Bridgeport.

THE CLERK: It's scheduled in Bridgeport.

THE COURT: All right. I will do that, but it's in Bridgeport and here's the problem: I can't really

EXHIBIT 28

43

change the Tuesday date because I'm concerned about notice to Mr. Halbig. And I don't want him going to the wrong court and the notice said Bridgeport. So, you know, I'm an early bird. I can -- well, I can't. I can't get anybody on the record. This has to be on the record, and I can't get a monitor before nine, but --

ATTY. PATTIS: We're happy to go to what we refer to as the devil's backyard or the home court for Koskoff Koskoff & Bieder.

Judge, I have a copy of the affidavits. I think there was a request that they be filed.

THE COURT: Can you just give me one moment, if you don't mind?

ATTY. PATTIS: I'm also handing to counsel the March 6th interrogatory responses, expecting to hear back from them.

THE COURT: Your start time with Judge Suarez would otherwise have been ten, right?

ATTY. PATTIS: That's my understanding, yes.

THE COURT: So I'm sending this to him right now. So just give me a moment.

ATTY. STERLING: Your Honor, counsel has handed me interrogatory responses that have handwritten on them "confidential" and "subject to protective order". Is that -- are you claiming them subject to protective order?

EXHIBIT 28

44

ATTY. PATTIS: No. I'm simply giving -- I'm not making claims as to this document. I'm complying with rolling discovery. There may be issues as to a protective order I'm not up to speed on. What's more, Judge, these are facially defective for two reasons. Mr. Jones signed them, but there's no attestation that he signed them. I'll be happy to correct that, as well. There's a wrong certification date on it. These were prepared for my signature without my reviewing them. But I want to give the other side the information I have and I'll cure these. But I'm simply giving them what I have to try to tilt the playing field.

ATTY. STERLING: But I'm asking just a very specific question, which is, are you claiming they are subject to the protective order because they say confidential and subject to protective order. That affects whether I can file them in court under seal or not.

THE COURT: My client wishes that they be so, so I'm making that claim, yes, on his behalf.

ATTY. STERLING: Okay.

ATTY. PATTIS: But with reservations. I'd prefer to wait until I had a chance to get to the bottom of it myself, but I don't want to (indiscernible).

ATTY. STERLING: So the claim --

THE COURT: These are just the interrogatories

EXHIBIT 28

45

you're talking about.

ATTY. STERLING: Yes, your Honor.

THE COURT: I think what I was anticipating when I saw you on Tuesday was hopefully new answers under oath with proper -- answers that fully and fairly comply with the interrogatories.

ATTY. PATTIS: I'll take care of that.

ATTY. STERLING: So I'm handing them back to counsel. I don't have them now.

THE COURT: All right.

ATTY. PATTIS: I have retrieved them. Thank you for the courtesy, Attorney Sterling.

THE COURT: All right. So I'm sure Judge Suarez will get back to me, unless he's out today. As soon as he does, I will tell Mr. Ferraro and he will let you know, but hopefully we can go that way. I think if it works out, we can start right at nine. We'll make it our business to be done in a half an hour. Mr. Ferraro tells me that Mr. Halbig has indicated to him that he doesn't plan on attending. So I'm still going to go forward with the disqualification conflict issue. So it probably will not take long with respect to Mr. Halbig's motions. So it will probably just be addressing this, but I don't want to get into Mr. Halbig's case at all because I don't want to be getting into any of the substance, just the scheduling.

EXHIBIT 28

46

ATTY. STERLING: Yes. With regard to scheduling, your Honor, since we understand that Mr. Halbig intends not to be present, or at least that's the representation now, would the Court want argument on the plaintiff's side -- I assume not -- with regard to the motion to dismiss and motion for change of venue?

THE COURT: I'm not going to address any of his motions if he's not there. I placed it down for the hearing on the conflict disqualification, and that I need to do for the record. So that's what I plan on doing on that date.

Okay. Anything else today? So I will see you hopefully Tuesday at nine and have a wonderful weekend. And we are adjourned.

(Court was adjourned.)

EXHIBIT 28

47

NO: XO6 UWY CV18-6046436-S:          NO: XO6 UWY CV18-6046437-S

ERICA LAFFERTY                :      WILLIAM SHERLACH

V                             :      V

ALEX EMRIC JONES              :      ALEX EMRIC JONES

*   *   *   *   *   *   *   *   *

NO: XO6 UWY CV18-6046438-S:          SUPERIOR COURT

WILLIAM SHERLACH              :      JUDICIAL DISTRICT OF WATERBURY

V                             :      AT WATERBURY

ALEX EMRIC JONES              :      MARCH 22, 2019

*   *   *   *   *   *   *   *   *

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in the Superior Court, Judicial District of Waterbury, at Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 22nd day of March, 2019.

Dated this 27th day of March, 2019, in Waterbury, Connecticut.

_____

Patricia Sabol

Court Monitor

EXHIBIT 28

# EXHIBIT B

**EXHIBIT 28**



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**24 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

Matthew Blumenthal
<mblumenthal@koskoff.com>

Alinor Sterling
<asterling@koskoff.com>

> *Re:*     *June 28, 2021 | Deadline for Production of Google Analytics*

Dear Counsel,

As discussed today, and as you are aware, the deadline for production of the Google Analytics is on June 28, 2021. The full dataset cannot be produced as an export, which thus means the only method of production is by live access to the dataset for your inspection. And, the Court previously declined to order us to provide you with a log-in. As a result, the only method for your inspection is the sandbox approach referenced during today's deposition. I recall previously making this offer to you, either during a telephone conversation or during the June 2 hearing (the transcript of which we are requesting to verify), but was not memorialized in writing and which Attorney Mattei did not recollect.

This method of inspection is akin to traditional paper discovery, where the requesting party is let into the storeroom of documents organized as kept in the ordinary course of business. You will have full liberty to run whatever searches Google Analytics permits and have full access to inspect the dataset. We envision two possible ways for this sandbox approach--we can provide you with a TeamViewer access to a Free Speech Systems computer connected to the Google Analytics or we can meet you at an agreed-upon location with a clean, new computer, where we will log-in the computer during the period of your inspection.

//

//

//

//

//

---



EXHIBIT 28

Randazza Legal Group
Page 2 of 2

Let us know which approach you prefer so that we can know if we are to meet up with you on or before the 28th.

Thank you for your attention to this matter.

Sincerely,

Jay M. Wolman

**EXHIBIT 28**

# EXHIBIT C

**EXHIBIT 28**

KOSKOFF KOSKOFF & BIEDER PC

June 25, 2021

Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103

Re: **Erica Lafferty, et al. vs. Alex Emric Jones, et al.**

Attorney Wolman:

I write in response to your letter, dated June 24, 2021, concerning data contained in your client's Google Analytics software application.

During yesterday's deposition of Free Speech Systems' corporate designee, you raised for the first time that your client is not prepared to produce its Google Analytics data by June 28 as the Court directed. You had not previously raised this issue with anybody in our office.

As it stands, your client is required to produce that long overdue data by June 28 in accordance with the Court's Order, dated June 2, 2021 (DN 348.10).

We do not agree with your statement that the Google Analytics "cannot be produced as an export." Your position is not consistent with information you provided to the Court on June 2, 2021, nor is it consistent with our understanding of Google Analytics' capability.

Finally, your proposal is not acceptable in any way. You propose to retain sole possession of the data the Court has ordered produced. You propose to permit us to view the data for a limited period of time under conditions you set. You propose to observe us during the period of time we have access to the data in a manner that would allow you to retain a record of our activity.

You proposed this on the evening of Thursday, June 24, and ask that we make ourselves available on or before Monday, June 28.

We expect complete production of the Google Analytics data in compliance with the Court's orders.

Sincerely,

Christopher M. Mattei

350 Fairfield Avenue, Bridgeport, CT 06604 | 203.336.4421 | www.koskoff.com

EXHIBIT 28

# EXHIBIT D

<span style="color:red">**EXHIBIT 28**</span>



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**25 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

> ***Re:*** ***Lafferty v. Jones | Google Analytics***

Dear Attorney Mattei:

To be clear, there is no inconsistency. As set forth on June 2, to export the raw data, one must be an Analytics 360 member, i.e. a premium member. Free Speech Systems is not an Analytics 360 member, therefore it is impossible for it to export the data. As further offered on June 2, if Plaintiffs wish to make Free Speech Systems an Analytics 360 member, they have been welcome to do so. This offer was made on the record. Plaintiffs have declined this manner of production so far.

Sincerely,

Jay M. Wolman

cc:    mblumenthal@koskoff.com, asterling@koskoff.com

---

100 Pearl Street, 14th Floor, Hartford, Connecticut 06103

jmw@randazza.com | 702.420.2001

**EXHIBIT 28**

# EXHIBIT E

**EXHIBIT 28**

```
NO:  UWY-CV18-6046437 S         :  SUPERIOR COURT
SHERLACH, WILLIAM               :  JUDICIAL DISTRICT
                                   OF FAIRFIELD
v.                              :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.             :  MAY 7, 2019
```
```
NO:  UWY-CV18-6046438 S         :  SUPERIOR COURT
LAFFERTY, ERICA, ET AL.         :  JUDICIAL DISTRICT
                                   OF FAIRFIELD
v.                              :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.       :  MAY 7, 2019
```
```
NO:  UWY-CV18-6046436 S         :  SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.       :  JUDICIAL DISTRICT
                                   OF FAIRFIELD
v.                              :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.       :  MAY 7, 2019
```

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S :
     Representing the Plaintiffs:
          ATTORNEY CHRISTOPHER MATTEI
          ATTORNEY ALINOR STERLING
          Koskoff, Koskoff & Bieder, PC
          350 Fairfield Avenue
          Bridgeport, CT  06604

     Representing the Defendants Alex Jones; Infowars, LLC; Free
     Speech Systems, LLC; Infowars Health, LLC; and Prison Planet
     TV, LLC:
          ATTORNEY KEVIN SMITH
          Pattis & Smith, LLC
          383 Orange Street
          1st Floor
          New Haven, CT  06511

     Representing the Defendant Cory Sklanka:
          ATTORNEY KRISTAN JAKIELA
          Regnier, Taylor, Curran & Eddy
          100 Pearl Street
          14th Floor
          Hartford, CT  06103

     Representing the Defendant Midas Resources, Inc.:
          ATTORNEY COLLEEN VELLTURO
          Wilson Elser Moskowitz Edelman & Dicker
          1010 Washington Boulevard
          Stamford, CT  06901


                              Recorded By:
                              Colleen Birney
                              Transcribed By:
                              Colleen Birney
                              Court Recording Monitor
                              1061 Main Street
                              Bridgeport, CT  06604

EXHIBIT 28

THE COURT: Lafferty v Jones.

ATTY. MATTEI: All here, Your Honor.

THE COURT: All right. Just why don't you come on up and identify yourselves for the record, please.

ATTY. STERLING: Good morning, Your Honor; Alinor Sterling, Koskoff, Koskoff & Bieder, for the plaintiffs.

ATTY. MATTEI: Good morning, Your Honor; Chris Mattei for the plaintiffs.

ATTY. JAKIELA: Good morning, Your Honor; Kristan Jakiela, Regnier Taylor, on behalf of Cory Sklanka.

ATTY. SMITH: Good morning, Your Honor; Kevin Smith for the Jones defendants.

ATTY. VELLTURO: Good morning, Your Honor; Colleen Vellturo for Midas Resources.

THE COURT: All right. So tell me what motions need to be adjudicated today. And I do want to just state for the record what is probably clear to everyone at this point. I had said a few times that I thought that there was substantial enough compliance. So in effect I have really extended -- had extended the deadlines for the defendant to comply. So that would be my ruling, just for the record, on the issue of the additional time to comply. I understand it's not necessarily 100 percent complete compliance, but I think I've seen

EXHIBIT 28

enough of it at this point to afford the defendants the opportunity to pursue their special motion to dismiss.

So tell me what needs to be adjudicated today, which filings.

ATTY. MATTEI: Okay. Your Honor, we have docket entry 223. These, I believe, are from the Lafferty docket. 223, that is the Jones defendants' motion to compel compliance, which I think we can deal with pretty quickly. The 227, which is our motion to compel compliance. I believe the Court addressed 234 at the last hearing. We filed 235, which is ready for adjudication. And we also filed 236, which I think given the Court's ruling that you just stated and your ruling on 234, we probably have resolved the issues there.

THE COURT: So why don't we take up first the issue -- 223 and the privilege log issue.

ATTY. SMITH: Yes, Your Honor. Your Honor, we provided a privilege log to the plaintiffs and I believe that Attorney Mattei and Attorney Pattis had a discussion this morning that I was told about on my way here, which I think resolves the issue, if I understand the agreement.

THE COURT: Okay.

ATTY. MATTEI: Yes, Your Honor. Attorney Pattis and I spoke. He agreed, and I hope this is what he

EXHIBIT 28

conveyed to Attorney Smith, that the motion to compel compliance can be -- is now moot. They submitted a privilege log. To the extent the plaintiffs wish to claim a waiver, it would be now on us to file a motion to compel disclosure.

THE COURT: All right. Okay. So I can cross that off the list.

ATTY. SMITH: That's my understanding, Your Honor.

THE COURT: All right. Then what's the next matter that's ready to be adjudicated? 227 is it?

ATTY. MATTEI: That's correct, Your Honor.

THE COURT: And is there a corresponding objection?

ATTY. MATTEI: I believe that was filed last night.

ATTY. SMITH: Yes, Your Honor. Attorney Pattis filed last evening a response to --

THE COURT: That's 239, right?

ATTY. SMITH: Yes.

THE COURT: And plaintiffs have had an opportunity to read that?

ATTY. MATTEI: Yes, Your Honor.

THE COURT: And have you had an opportunity to have any discussions after the filing of Attorney Pattis's objection last night?

ATTY. MATTEI: I spoke with Attorney Pattis in -

EXHIBIT 28 4

- in general about it. My understanding as far as the metadata issue, which I thought we had resolved last week. I defer to Kevin Smith on whether they're renewing the objection to that. But as I understood it, Attorney Pattis said that if the Court is inclined to require them to produce metadata associated with the documents they've already produced, that it would take two weeks to do that. My understanding is that on that issue, we were coming back here today just so they could tell us how long it would take.

THE COURT: I -- that was my understanding as well that today we were going to address how long it would take to produce the metadata because I was of the opinion that the metadata should be produced.

ATTY. SMITH: Understood, Your Honor. And I think that Attorney Pattis in his filing here believes that we have produced what is reasonably usable, which is what the Practice Book calls for. I indicated to Attorney Pattis what the Court's inclination was. And so you will also note that in our response we said if the Court is going to order that, then we would request an additional two weeks to be able to produce that.

THE COURT: So ordered.

All right. Next?

ATTY. MATTEI: Your Honor, in our motion we next

EXHIBIT 28 5

asked that the defendants clarify the source of production for the documents they have produced. You may remember that at an earlier hearing, we raised this issue --

THE COURT: Well, I just want to back up for a minute. You're asking for something more than the Practice Book requires. Practice Book requires, right, the production to be made by the party making the production. You're now asking for more details --

ATTY. MATTEI: No.

THE COURT: -- where the person who's making the production got the information from? No?

ATTY. MATTEI: No, not at all. What we're asking for is clarification as to which defendant has produced the documents, because what they've -- the current state of the record is that they've said all the Jones defendants have produced all the documents. But they've also said that every Jones defendant other than Free Speech Systems is dormant and active and has no function. And so we are left with inconsistent representations about which defendants have produced documents. We believe that the reality is that only Free Speech Systems has produced any documents to us and that the other Jones entities haven't produced any documents. The problem is that they filed responses to our request for production

EXHIBIT 28

saying that they all have.

THE COURT: Well, I think that if the -- if the responses to the request for production are -- if that's the representation, the interrogatories are signed off and the responses to the requests for production have been made by the parties, then I think that's your answer right there. Whether you agree that it was properly done is a different issue. But then you've got to cue that up somehow. But I mean, when -- when it's filed on behalf of a party, if you're now wanting to dig deeper, then you have to dig deeper another way. But you've already given me the answer, which is they've indicated who's filed it. You may disagree with it, but --

ATTY. MATTEI: Except that I think they made different -- other representations in court orally. And so if they want to proceed on that basis, it's going to make the depositions a little bit more difficult. But we were just hoping to have some clarification on that issue.

ATTY. SMITH: Your Honor, I would stand by our filing. That's -- we've taken the same position as the Court.

THE COURT: I think -- I think you stand by the filing. If things were said differently in court, then, you know, you can certainly inquire at the depositions. But I think that what really is -- has

EXHIBIT 28

more value is what was actually produced and signed off on.  So if the indication was that all these defendants have signed off and produced the documents, then that's -- that's what you go on.

ATTY. MATTEI:  Very well, Your Honor.

THE COURT:  Okay.

ATTY. MATTEI:  The next has to do with the manner of production.  And this is I think closely related to the metadata issue.  Just so Your Honor is aware, so we've received tens of thousands of documents, some of which are bate stamped, some of which are not.  The Practice Book requires that materials be produced in a reasonably usable format.

THE COURT:  Right.

ATTY. MATTEI:  The biggest issue we see and the one that may, I think, tease it out most clearly is that they produced emails to us.  The face sheets of those emails clearly show an attachment was associated with the original email, but the attachment has not been produced with the email itself.  And so we don't know whether we've received any attachment.  It may -- an attachment to the email may be part of the production, but if it's -- if it's not conveyed to us in a way where we can associate it with the email, it's completely unusable to us.  And so what we're asking is for a more rational production that we can actually make sense of.

EXHIBIT 28 8

THE COURT: That doesn't seem like an unreasonable request. How can you accommodate that?

ATTY. SMITH: Your Honor, I believe, as Attorney Mattei alluded to, that will probably be resolved by virtue of getting everything in the native format with the metadata.

THE COURT: All right.

ATTY. SMITH: So I think that will fold into that.

THE COURT: Let's -- okay. Let's proceed on that with that hope, okay?

ATTY. MATTEI: Thank you, Your Honor.

THE COURT: Okay.

ATTY. MATTEI: The next issue has to do with Mr. Jones's signed interrogatory responses that Attorney Pattis described for the Court and which have not been produced, because Attorney Pattis at the time said I'm not -- I'm not satisfied with these; I'm going to produce other interrogatory responses, which I believe that they have. But the record as it stands right now is that Mr. Jones, a party to the case, signed interrogatory responses that have not been produced to us.

THE COURT: Okay. So here's -- this is news to me. So here's what I would say on that. I now retract my prior comments that there has been substantial compliance, good-faith, substantial

EXHIBIT 28

compliance because any interrogatory responses -- anything that's been produced without the client's signature is really meaningless. And I say that every day in every case. So the product -- the responses need to be signed off by the party or they're -- so tell me how you're going to solve that problem.

ATTY. SMITH: Well, Your Honor, I think that that's not what Attorney Mattei is representing here. What Attorney Mattei is representing, and Your Honor may recall, when we were in Waterbury --

THE COURT: No, I do. I don't want to -- do you agree or disagree that the responses have not been -- it's just the interrogatory responses that need to be signed, not the production.

ATTY. MATTEI: No. What I'm saying, Your Honor, is that earlier in the discovery process, Mr. Jones apparently completed --

THE COURT: No. I don't want to -- I don't want to revisit that. I'm just trying to figure out if there's consensus or not. So the interrogatory responses, have you received them signed by Mr. Jones?

ATTY. MATTEI: We've received a version of it, yes.

THE COURT: Okay. The current version, the update -- supplemental, current version has -- so I'm

EXHIBIT 28

getting -- Attorney Smith --

ATTY. SMITH: Yes, Your Honor.

THE COURT: -- is saying they have been signed.

ATTY. MATTEI: Correct.

THE COURT: So we have -- so you have signed interrogatories.

ATTY. MATTEI: We do have them, yes, a version of them.

THE COURT: Okay.

ATTY. MATTEI: What we don't have is the version that Mr. Jones previously signed that Attorney Pattis has described for the Court and which were responses to our request for production, they simply declined to produce them.

THE COURT: I don't see why they have to. They don't -- they can -- not have to produce. If they -- if they're working with their client and they have a set of -- first of all, I thought it was just interrogatory responses that got signed, not production.

ATTY. MATTEI: Correct.

THE COURT: Okay.

ATTY. MATTEI: But what we asked for in our request for production and which the Court authorized were statements like those Mr. Jones made in his interrogatories, which he signed. So in essence what we have is we have a party who has made a signed

EXHIBIT 28

statement about matters at issue in this case which are responsive to requests for production that have not been produced.

THE COURT: Well, you're arguing that it's a signed statement, and I actually don't agree with that. I think that people can work with their clients, have signed versions of interrogatory responses, and if they decide not to let it go any further, they don't have to produce it. I don't think that signing interrogatory responses makes it a statement under the Practice Book. So if he decided that he did not think that those were sufficient discovery responses and wants to rip it up and throw it in the garbage, I don't think there's anything wrong with that. I think that's a normal practice if you don't think that this -- just pulling on my own practice, I would get responses back from my client signed, and I would look at them and I would say I'm not going to turn these over because this is insufficient or whatever. So I would start a new version. And then when I was satisfied that the party had met their obligations under the Practice Book and that nothing was misleading or omitted, then I would produce the interrogatory responses.

You're pretty much saying that that's a statement of Mr. Jones and should be produced, and I disagree. So if those were not proper answers, then

EXHIBIT 28

he can rip them out and throw them out as far as I'm concerned.

ATTY. MATTEI:  Thank you, Your Honor.

THE COURT:  Okay.  What else?

ATTY. MATTEI:  The employee chart.  We were provided with an employee chart in response to our request for production that -- and which the Court authorized, required a listing of all employees from December 14th, 2012, to the present.  What we understand is that they provided us with a list of current employees, not a list that covers the required time period.

THE COURT:  Okay.

ATTY. MATTEI:  And so what we're asking for is an update --

THE COURT:  Attorney Smith, do you agree or disagree that that's what was produced?

ATTY. SMITH:  I think, Your Honor, as far as I understand, it is not going back entirely to 2012.  We have taken that back to the clients and said we need the following.  And in our written response here, Attorney Pattis indicates one week.  I believe that might be an error.  I think he probably meant two weeks given that we're trying to get the metadata and all that within that time period.  But whatever the Court orders --

THE COURT:  How long -- how long is the list of

EXHIBIT 28

employees to date?

ATTY. SMITH:  The --

THE COURT:  Roughly.

ATTY. SMITH:  -- the list --

THE COURT:  Just roughly.

ATTY. SMITH:  Right.  So presently the list is like 80 of present employees.  And so I don't know exactly how much there would be in that going back to 2012.  But we expect that that would be produced in the course of doing this data dump for all the metadata.

THE COURT:  Does that make a difference, a week or two?

ATTY. MATTEI:  Well, on this one it does because we have depositions scheduled for next week.

THE COURT:  It's got to be done in advance of the depositions.  That's the problem.  I mean, as you can imagine.

ATTY. SMITH:  I can imagine, Your Honor.

THE COURT:  So what do you suggest?  When is the deposition that you need it for?

ATTY. MATTEI:  The first is scheduled for the 15th.

THE COURT:  So that's next -- a week from tomorrow.

ATTY. SMITH:  Yes.

THE COURT:  So I think you've got to do it in a

EXHIBIT 28

week, at least give them 24 hours beforehand. Okay?

ATTY. SMITH: Yes, Your Honor.

THE COURT: All right.

ATTY. MATTEI: The sixth item I think has been resolved by Attorney Pattis's response.

THE COURT: All right.

ATTY. MATTEI: And I think that that's it with respect to that motion, Your Honor.

THE COURT: All right. What do you have next? Or what do any of the defendants have that needs to be adjudicated?

ATTY. MATTEI: So this is number 5, Your Honor. This has to do with their responses to requests for production relating to marketing a business materials. In their response on file with the court, what they've said is we have no records relating to marketing specific to the Sandy Hook massacre. The request for production is much broader than that. And in their filing today they've clarified that we have no -- you have all the marketing materials of any kind that are responsive to this request.

I guess what we'd ask is that the request for production be updated to reflect that, just as you had them do previously. And the reason that's important is because we've reviewed the --

THE COURT: I agree that it should be updated. I don't think that's burdensome to update it and then

EXHIBIT 28

there can be no confusion.

ATTY. MATTEI: Yeah.

ATTY. SMITH: To -- to update as regards to marketing and the analytics, Your Honor?

THE COURT: Right. Because the --

ATTY. SMITH: If we have some, yes. As a -- to this point, we have provided everything. And then I think that --

THE COURT: Right. But I think that you just need to update the production response to indicate that.

ATTY. MATTEI: That's correct.

THE COURT: That's it. That's not burdensome. Just so there can be no confusion. All right. What else does the plaintiff have?

ATTY. MATTEI: That's it, Your Honor.

THE COURT: Okay. What do the defense have? I did read Attorney Pattis's comments about having regular status conferences. And listen, I'm happy to have them never or as often as you need them to keep you on track. So I defer -- I've deferred to the group of you every time. I will tell you, every time you've come here, we have needed to tackle these issues. So what's the thought now about the next time we have to reconvene?

ATTY. SMITH: I suspect it should be after the depositions. So I would say maybe two weeks, three

EXHIBIT 28

weeks, whatever --

ATTY. MATTEI:  I think that's right, Your Honor.

THE COURT:  Okay.  So I leave it to you.  If, again, if you want to do it in Waterbury where the case is now pending, look for a Monday or Friday. Otherwise, a Tuesday, Wednesday, or Thursday here. And honestly, I don't care where you do it; whatever works for everyone's schedule is fine with me.

All right.  Is that it for today?

ATTY. MATTEI:  Thanks, Judge.

ATTY. SMITH:  Yes, Your Honor.

THE COURT:  All right.  Good luck.


*****

**(END OF TRANSCRIPT)**

**EXHIBIT 28**

```
NO:  UWY-CV18-6046437 S          :  SUPERIOR COURT
SHERLACH, WILLIAM                :  JUDICIAL DISTRICT
                                 :  OF FAIRFIELD
v.                               :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.              :  MAY 7, 2019
-----------------------------------------------------------------
NO:  UWY-CV18-6046438 S          :  SUPERIOR COURT
LAFFERTY, ERICA, ET AL.          :  JUDICIAL DISTRICT
                                 :  OF FAIRFIELD
v.                               :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.        :  MAY 7, 2019
-----------------------------------------------------------------
NO:  UWY-CV18-6046436 S          :  SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.        :  JUDICIAL DISTRICT
                                 :  OF FAIRFIELD
v.                               :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.        :  MAY 7, 2019
```

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Fairfield, at Bridgeport, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 7th day of May, 2019.

Dated this 17th day of May, 2019, in Bridgeport, Connecticut.

Colleen Birney
Court Recording Monitor

EXHIBIT 28

# EXHIBIT F

**EXHIBIT 28**

# Redacted Pursuant to Protective Order

**EXHIBIT 28**

# EXHIBIT G

EXHIBIT 28

# Redacted Pursuant to Protective Order

**EXHIBIT 28**

# EXHIBIT H

EXHIBIT 28

DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  JUNE 2, 2021


DKT NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES



                    STATUS CONFERENCE

       BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE




A P P E A R A N C E S :


   Representing the Plaintiff (s):
     ATTORNEY CHRISTOPHER MATTEI
     ATTORNEY ALINOR STERLING

   Representing the Defendant (s):
     ATTORNEY JAY MARSHALL WOLMAN for the defendant Alex Jones


                              Recorded and Transcribed by:
                              Debbie Ellis
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, CT  06702

EXHIBIT 28

2

THE COURT: Good morning everyone. We're on the record in the Lafferty versus Jones matter. So I'm going to ask counsel for the plaintiffs first to identify themselves for the record.

ATTY. STERLING: Good morning, your Honor. Alinor Sterling from Koskoff Koskoff and Bieder for the plaintiffs. And with me today is my law partner Chris Mattei.

THE COURT: All right. Good morning. And for the Jones defendant.

ATTY. WOLMAN: Good morning, your Honor. This is Jay Wolman of Randazza Legal Group for Alex Jones, Free Speech Systems Infowars, Infowars Health and Prison Planet TV.

THE COURT: Thank you.

And I know we did hear from counsel for Genesis and we informed them that they were not required to participate since the matter today did not involve them and I think they are not participating.

So we are on the record with respect to the RFA for motion for protective order entry number 348. So I did read everything. I have the protective order at 348. I have the plaintiffs June 1st --

ATTY. WOLMAN: You still with us?

THE COURT: I'm still here. The camera is a little shaky.

June 1st objection and then we have June 2nd

EXHIBIT 28

3

objection.  Attorney Ferraro, maybe you can help me.  Thank you.  Attorney Ferraro is the jack of all trades here.  He fixes it all.

And then I have the supplemental objection that was filed today.  So my first question is, Attorney Wolman, have you had an opportunity to review that supplemental objection?

ATTY. WOLMAN:  I did review it this morning, your Honor, and I don't believe that it necessarily means what the plaintiffs imply it means.

THE COURT:  Okay.  I just want to make sure that you reviewed it.  I guess I want to make sure that I didn't miss anything.  Those are the filings.  And I understand you put it down as an emergency motion.

I think I pointed out in the past that when -- and I expect that on occasion we will have very time sensitive things and I appreciate the fact that an RFA was filed, but I think what I had said in the past too if you really have something that's urgent, you're worried about missing a deadline or something, to also e-mail Attorney Ferraro as that e-mail will get right to him and it'll be even more responsive.  Although I do think he was very responsive with this.

So in the future certainly file your RFA but if you are really looking for a quick ruling, also e-mail Attorney Ferraro and copy each other on it obviously.  So I understand that you want a ruling on this.  You're

EXHIBIT 28

4

not looking to file a reply?

ATTY. WOLMAN: Correct, your Honor.

THE COURT: Okay. I don't really need argument on it. It was all pretty self-evident. The only thing that I would ask for argument on is the issue that was just raised today in the supplemental objection with respect to the discussions in February and March of 2020 with Attorney LaTronica.

ATTY. WOLMAN: Yes.

THE COURT: Who I believe is from Attorney Pattis' office and plaintiffs' counsel. If that's something, Attorney Wolman, you want to respond to and then I'll also hear from plaintiffs on that issue as well, if you want to.

ATTY. WOLMAN: Certainly. Your Honor, Mr. Latronica's e-mails were during the appellate stay on this case. There was no obligation to do anything at that point. Certainly, and once this case returned from the courts of appeals, the Supreme Court of Connecticut. The case still as we dealt with the Midas and Sklanka anti-SLAPP motions precluded discovery from our clients and although your Honor did not reach that issue, that was the position, certainly that had been taken. And we also had a large period between certainly mid-November and early April when this case was again in federal court. But during that entire time we had taken the position that if the supreme

EXHIBIT 28

5

court sustained the anti-SLAPP dismissal termination by your Honor, that the discovery request attended to it died with it.

And Mr. LaTronica's e-mails do not countermand that or contradict that in any way but rather, in fact, seem almost hopeful that should there be prevailing, and your Honor's order reversed, then of course we'd be back in the discovery phase of this case regarding the anti-SLAPP motion. So, in that contexts his e-mails make perfect sense.

And so, while your Honor, on May 14th did rule that, allow the motion to re-compel compliance and overrule our argument, this was certainly an issue of first impression and our belief that this was not a requirement that those discovery requests were not outstanding was a reasonable one. And Mr. LaTronica's e-mails, which were not raised I should note, in response to the motion to re-compel were not raised at that time, should not otherwise affect how the court views this.

I should also, because the court asked the parties to essentially meet and confer yesterday, we did do so. And I'd like to certainly report on some of that if I may.

THE COURT: Please.

ATTY. WOLMAN: We proposed removing certain terms which had the largest hit that would potentially, you

**EXHIBIT 28**

6

know, be the most irrelevant as well; sales, marketing and traffic. The plaintiffs were not willing to do that. They did ask if we could be able to sort, for example, by custodian of records to maybe figure that out. We are unable to sort by e-mail box. We can sort by senders of e-mails and the largest person in that respect would be somewhere in the order of 7,500. I don't think that that really gets us anywhere in terms of narrowing.

And on the issue of the Goggle analytics, you know, we finally got a better sense that what they're asking for is to export the entire Google analytics account.

And so I have spoken with IT folks and I can report that that is not a feature that Google analytics has, unless you are a premium member. And my understanding is that to become a premium member of Google analytics, one must pay at least $150,000. If the plaintiffs would like to pay $150,000 for that membership, and I don't know that that's to be baseline costs, we can entertain that.

However, I should note that in terms of the cost benefit relationship of this case as we noted in our motion, we're talking when you look at the amount of sales overall, Sandy Hook did not represent 3 percent of sales. It did not represent three-tenths of a percent --

EXHIBIT 28

7

THE COURT: I don't want to interrupt you, Attorney Wolman, but I wasn't going to have argument on the entire motion since there's no argument of right and I just wanted to get your thoughts on what was just filed today with respect to Attorney LaTronica's continued discovery objections. But as I understand your position he was, during the stay, while the case was on appeal with the Connecticut Supreme Court, he was continuing those discovery objections, although there was a stay in the hopes that he won.

ATTY. WOLMAN: In the event of a win, then we would have been back in the anti-SLAPP discovery phase.

THE COURT: Okay.

ATTY. WOLMAN: Certainly it's appropriate for him and our client to consider what do we need to do to then comply with your Honor's orders.

THE COURT: Okay. Thank you.

Who's arguing for the plaintiffs?

ATTY. STERLING: Your Honor, I am.

THE COURT: Whenever you're ready.

ATTY. STERLING: It's Alinor Sterling for the record.

THE COURT: If you want to just narrow your comments to what Attorney Wolman raised. Okay. So he also talked about the Google analytics and the search and --

ATTY. STERLING: Yes, your Honor.

EXHIBIT 28

8

THE COURT: -- other things. I didn't expect to go that far but certainly.

ATTY. STERLING: Yes. So, your Honor, I don't think that Attorney Wolman's reading of Attorney LaTronica's correspondence with us is a fair read. At that time the only discovery, in effect, was the plaintiffs' first set of interrogatories and request for production.

And Attorney LaTronica is indicating that the Jones defendants understand they have an obligation to respond to those. It does not indicate that that obligation to respond is contingent on the Supreme Court's Ruling. He simply indicates that they understand they need an ESI consultant and that they need to review discovery in files so that they can get their discovery responses in order.

So what your Honor has been presented with is a sort of excuse for not following the court's orders which is that the defendants claim they had interpreted the termination of the anti-SLAPP motion to have necessarily terminated the limited discovery served in connection with that motion. And I'm quoting their filing.

Attorney LaTronica's correspondence with us is simply not consistent with that understanding. And so what I am suggesting the court do is not credit that representation which is a representation concerning the

EXHIBIT 28

9

Jones defendants' subjective state of mind. And really is presenting an excuse for non-compliance, you know, similarly with regard to the claim that this is a question of first impression.

If it's a question of first impression, then and it involves violation of a court order, then the recourse that the Jones defendants had was to make a motion to the court for clarification on what they viewed as a question of first impression.

So I'm not going to go further then that, because the court has asked me to limit my remarks in that regard. But from where we stand, these continued excuses look very similar to the excuses that were made in 2019.

With regard to the meet and confer yesterday, so it appears that although they understood in 2020 that they needed an ESI consultant, the Jones defendants still don't have one. And this came out in a couple different ways. Number one, counsel was indicating or at least indicated yesterday that he did not understand how to produce the Google analytics data.

We have worked with various ESI consultants, data acquisition protocols are available. That can be accomplished, you know, the continued inability to produce that information appears from our perspective to be will. And I would add to that, your Honor, we believe, although we don't know because it's not

identified that what was submitted as Exhibit C to the defendants' motion for protective order, which is a printout based on which Attorney Wolman was arguing, is a Google analytics printout.

What that demonstrates, it's never been produced to us before. What it demonstrates is that his client has the ability to manipulate the data. If he's indicating that he's completely incapable of finding an ESI consultant and working with a protocol, then maybe we need to return to the idea of giving us a login to the account. I know the court didn't want to do that but that would be one way to access the data. The other would be for them to work with an ESI consultant on a limited basis and come up with a protocol.

You know, we were unable to substantively discuss this yesterday because Attorney Wolman didn't have a protocol to provide us with. And by a protocol, I mean a production protocol which is the kind of thing that's used when this kind of information is produced. The lack of an ESI consultant also comes up as a problem, again, when we inquired whether the 300,000 e-mails that Attorney Wolman is referencing were duplicative of anything that's already been produced. That came up in the contexts of considering whether the burden to review might be significantly less because these e-mails may have already been produced.

Attorney Wolman was unable to tell us whether any

EXHIBIT 28

11

of these 300,000 e-mails have been produced.  He just couldn't tell us.  You know, there are other ways to deal with the claim of burden based on privilege.  You know, one way to alleviate a concern about privilege is simply to sort documents for, you know, attorney's e-mail addresses.  That could reduce the burden claimed based on privilege substantially.

But again, there was not a proposal presented to us yesterday for a streamlined approach to handling this that we could consider.  And after two years of waiting for these documents to be produced, we are at a loss as to how to respond.  So I'll suspend my comments there unless the court has questions.

ATTY. WOLMAN:  Your Honor --

THE COURT:  I do not.

ATTY. WOLMAN:  -- may I respond because I believe Attorney Sterling misrepresented what the conference was yesterday.

THE COURT:  Attorney Wolman.  Attorney Wolman, can you wait.

ATTY. WOLMAN:  Yes, your Honor.

THE COURT:  Okay.  Thank you.  I was actually going to tell you that I'll give you an opportunity to respond to Attorney Sterling's arguments but I first would like you to explain to me, if you can, what Exhibit C is.

ATTY. WOLMAN:  Yes, your Honor.

EXHIBIT 28

12

THE COURT: Please.

ATTY. WOLMAN: Thank you.

Only recently did we have our clients run through Google analytics what basically if you do a search on Sandy Hook to find out how many sales are from referral articles. So if there's an article that uses the term Sandy Hook in it and somebody then goes to the store having read that article and then purchases a product, that would be captured as related as a sale that was generated from that. That is only a piece of data that was generated specifically for the purpose of this litigation and was not something that my clients generally had around.

I had asked, can we get this kind of data to find out and then learn as a result, yes, it is three thousands of a percent of all sales are attributable to Sandy Hook as opposed to, for example --

THE COURT: No. No. Attorney Wolman, so that is your explanation to the court as to what Exhibit C is? I just want to make sure I'm understanding it.

ATTY. WOLMAN: Yes, your Honor.

THE COURT: Okay. And then my next question before I will then give you an opportunity to respond to Attorney Sterling's argument is, given the discussions during the stay that Attorney LaTronica had with plaintiffs' counsel and given your statement that this was an issue of first impression, I'm just

EXHIBIT 28

13

wondering why the Jones defendants would wait almost six months to even object to the plaintiffs' November 12th motion asking for the compliance.

ATTY. WOLMAN: Certainly, your Honor. That's -- Attorney Sterling says that it was our obligation to raise it as a motion with the court, well, not necessarily on an issue of first impression. Somebody is going to raise it either as -- they're saying that it's still due and we're saying it's not. They move to re-compel, we object.

You know, we had met and conferred back in November. We addressed this back in November. The reason why it then took afterwards is, later is because we had removed it to federal court depriving this court of jurisdiction, necessarily terminating that even if they were live discovery requests before this court, they certainly would not have been live discovery requests in the federal court where the April 26th conference had not yet occurred under federal rules of civil procedure. So certainly they would have been improper during that time.

Then once this case returned to this court, your Honor sent a briefing schedule and we filed a timely opposition.

THE COURT: I'm just trying to figure out if there was a concern that potentially, right, you had this discovery compliance that the clock was ticking on, I

EXHIBIT 28

14

agree, not when it was in federal court but at least when it was remanded back, I'm just wondering if there was a concern that deadlines had been missed and that you might be overdue with the answers and that you would want direction on that if you were concerned that you had discovery obligations that were overdue.

ATTY. WOLMAN: Well, parties typically, your Honor, do not expend resources when there is not a live discovery issue. So once your Honor issued the order that stated that as a matter of first impression, that, yes, we still had to comply with discovery that was limited to anti-SLAPP motion that it terminated anti-SLAPP motion but that we still necessarily had to continue to produce.

We then, went, we are using a discovery vendor, that's a misrepresentation. Experting Google analytics is not something that is common, your Honor. And it's a misrepresentation to say that we don't have the information because you know what, I asked for was saying how do you want it produced? How? I asked point blank. And she couldn't say how. She said, oh, it's my job to figure it out. No it's not. If you're asking for something, tell me what you're asking for. And then we can follow the instructions. I do this all the time, your Honor. Whenever I ask someone to export their Facebook data, I give them step by step instructions as to how to do that to comply, so that

EXHIBIT 28

15

there's never a question that I'm not getting what I'm asking for. So, you know --

THE COURT: Can you give me one moment, please, and I'll let you continue.

Thank you. On that point, I was just referencing the Practice Book because I thought there were Practice Book provisions that dealt with that issue that you just raised about how, in what form and such, but in any event, go ahead. Continue.

ATTY. WOLMAN: Thank you, your Honor.

And so we asked for that information as to how they wanted it and she would not provide it saying you figure it out. Throwing her hands up. So, you know, I've asked our IT people and they said that there is an export method and that you have to be a premier member. And it would cost at least $150,000 to do so.

As to the inability to deduplicate based on what Attorney Pattis had produced, we have at this time we have an electronic discovery vendor. At the time Attorney Pattis was doing it, one was not being used. So to be able to integrate what he produced into that and figure out and deduplicate that is not something that we are currently able to do because it's not from the same time.

Similarly we cannot simply eliminate and sort for things with attorney's names or domain names on it because it appears often in messages where somebody

EXHIBIT 28

16

will forward an e-mail containing privileged matter or reply or something to an e-mail that has privileged information on it. Each individual e-mail does necessarily have to be reviewed and has to be reviewed for relevance as well.

And I should also note that I disagree with the reading of Mr. LaTronica's e-mails because they also contemplate that of course there would be discovery in this case afterwards. If your Honor's orders sustained they've served two more sets of discovery, of course there would have to be discovery afterwards.

THE COURT: So Attorney Wolman, getting back to the format, did the and I don't have it in front of me, did the request for production specify the form for producing the electronically stored information?

ATTY. WOLMAN: No. All they're asking for now is our Google analytics data. So they're asking for expert --

THE COURT: -- the point that you raised. When I look at 13-9e, right 13-9 subsection e, if information has been electronically stored and if a request for production does not specify a form for producing a type of electronically stored information, the responding party, right, the Jones defendants, shall produce the information in a form in which it is ordinarily maintained or a form that is reasonably usable. A party need not produce the same electronically stored

EXHIBIT 28

information in more than one form.

So I know you were saying you asked in what form and you didn't get an answer but doesn't the Practice Book control on that?

ATTY. WOLMAN:  If it's kept in a form not by us.  It's not under our control.

THE COURT:  The Practice Book doesn't --

ATTY. WOLMAN:  We do not ordinarily maintain it in a form.

THE COURT:  Attorney Wolman, the Practice Book controls here since it wasn't -- it doesn't matter.  You're the producing party and that's what that Practice Book section refers to.  So I would just, you should probably just take a look at that if there are any further issues.  Okay.

ATTY. WOLMAN:  It will cost, my understanding is 150,000 and the cost should be borne by them.

THE COURT:  Okay.  All right.  Anything else, sir?

ATTY. WOLMAN:  Just that the amount of labor otherwise required is not proportionate to the needs of this case and I want to highlight that again.  Three thousands of a percent barely scratches the surface of any justification for the whole theory of the case, is that our clients are somehow motivated to do Sandy Hook stories to get money.  Seems like this is a loser of a story in terms of moneymaking.  It doesn't make money.  There's no evidence of that.  We now have this data and

EXHIBIT 28

18

so the court should look at it from a cost benefit analysis that all this labor, if it's going to take me if I have to do, you know, April to review 1,000 e-mails a day because I've got other cases and I'm the only attorney here admitted in Connecticut, then that's going to take me 300 work days.

THE COURT: Okay. So I will rule on it in writing probably within the hour. Okay. Anything else that we need to deal with today that doesn't involve the other defendant, I don't want to have any discussions that will impact him since he's not here? We are all on the same page as to what other filings, the deadlines are for the other filings?

ATTY. STERLING: We are, your Honor. This is Attorney Sterling for the record. I have one issue. We will be filing a motion to amend the protective order shortly. We'd like to add an attorneys' eyes only designation. When we do file that, your Honor, I think it would be important to set a briefing schedule because we'd like to have that ruling in place before our clients are deposed or we respond with written production. So I just wanted to flag that to the court and inquire whether we should e-mail Attorney Ferraro when we file it or file an RFA.

THE COURT: Can I suggest that you talk to Attorney Wolman first because you definitely don't have any problems agreeing on briefing schedules as far as I

EXHIBIT 28

can see. So why don't you have that discussion off the record with Attorney -- and also Attorney --

ATTY. WOLMAN: Cerame.

THE COURT: Thank you. Since he would be involved in that protective order as well. So have the discussion with all counsel in the case and see if you can come to an agreement. You'll file such and such a motion on this date, the objection on this date, the reply on this date or however you're going to proceed and then you can either jointly e-mail Attorney Ferraro or you can file something with the court laying out the deadlines.

ATTY. WOLMAN: Your Honor, if I may respond briefly. I'm not necessarily adverse to an AEO designation. In fact, this was part of what we originally sought back in February 2019 and was objected to.

THE COURT: Right. The only --

ATTY. WOLMAN: One second. May I --

THE COURT: No. Attorney Wolman, Attorney Wolman here's the problem.

ATTY. WOLMAN: It goes to this issue.

THE COURT: No. No. No. Attorney Wolman, I didn't require Attorney Cerame to participate today and we're now touching upon issues that would affect him and I'm very uncomfortable doing that. So just the general concept of reaching out to him with a briefing schedule

EXHIBIT 28

20

but I don't want to get into the nuts and bolts of attorneys' eyes only because it would affect him in discovery and I just really am uncomfortable doing that today. So I'm going to stop you there and have you reach out jointly and hopefully you can all get on the same page as to a briefing schedule.

ATTY. WOLMAN: Your Honor, it affects the order you're about to issue, though because if there's going to be an attorneys' eyes only provision, we should be entitled to invoke it as well and we'll need to be able to review and mark for that as well.

THE COURT: Okay. So I suggest then when we get off the record here, you immediately -- we'll go off the record. You sure can stay on and if you want to try to invite Attorney Cerame to join you right now and you can get a briefing schedule and if you make it expedited enough, you'll get a ruling on the attorneys' eyes only issue in time to satisfy you I'm sure. Okay. Unless anybody has anything else, we're going to go off the record. I'm going to exit. Attorney Ferraro will exit but you can have at least your discussions if you want since I won't be involved in that and if you want to invite the other attorney to participate and then you can get something filed right away, Attorney Wolman.

ATTY. WOLMAN: I understand. But the order, your Honor's about to issue, if there's going to be

**EXHIBIT 28**

21

attorneys' eyes only, we will need time to as part of this 300,000 e-mail document review to be able to designate those as well as to the extent some are AEO appropriately.

THE COURT:  Okay.  All right.  So I am going to go off the record.  Thank you, counsel.  Stay well.

ATTY. WOLMAN:  Thank you, your Honor.

ATTY. STERLING:  Thank you, your Honor.

\*          \*          \*          \*          \*

EXHIBIT 28

22

DKT NO:  X06-UWY-CV18046436-S    :   COMPLEX LITIGATION

ERICA LAFFERTY                   :   JUDICIAL DISTRICT WATERBURY
v.                               :   AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :   JUNE 2, 2021


DKT NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


                    E L E C T R O N I C
                    C E R T I F I C A T I O N

        I hereby certify the electronic version is a true and

correct transcription of the audio recording of the

above-referenced case, heard in Superior Court, G.A. 4 of

Waterbury, Connecticut before the Honorable Barbara N. Bellis,

Judge, on June 2, 2021.


        Dated this 3rd day of June, 2021 in Waterbury,

Connecticut.




                    _____
                         Debbie A. Ellis
                      Court Recording Monitor

EXHIBIT 28

# EXHIBIT I

**EXHIBIT 28**

| NO.   X06-UWY-CV-18-6046436-S | : | SUPERIOR COURT |
|---|---|---|
| ERICA LAFFERTY, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 23 , 2021 |

| NO.   X-06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 23 , 2021 |

| NO.   X06-UWY-CV-18-6046438-S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 23 , 2021 |

### AFFIDAVIT OF JORDAN CAMPBELL

I, JORDAN CAMPBELL, declare as follows:

1.      I am over eighteen and believe in the obligation of an oath.

2.      I make this affidavit after consideration of the Notice of Compliance dated June 28, 2021 filed by Alex Jones and Free Speech Systems, LLC, and the correspondence between Attorneys Christopher Mattei and Jay Wolman on June 24 and 25, 2021.

3.      I am the owner and operator of Good Soup Media, an online marketing agency, in London, Ontario, Canada.

4.      I am an expert in the use of Google Analytics and have worked extensively with

1

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**

the program for 3+ years. I have spent upwards of $20,000 on online courses and education materials in order to increase my knowledge and expertise in my field. I have been working alongside my clients in their website development, monitoring and advertising efforts including, but not limited to the use of Google Ads, LinkedIn Advertising, Google Analytics, Website Design and Website Maintenance.

5.      In connection with the preparation of this affidavit, I have reviewed what I understand to be the production of the Google Analytics summary reports produced to date by Defendant Free Speech Systems, LLC in this litigation, which include one recently produced 5-page document consisting of screenshots of some Google Analytics information (Exhibit A) and one 35-page set of scanned images of more Google Analytics information (Exhibit B). I have also reviewed the Jones defendants' Emergency Motion for Protective Order, to which the 5 pages of Google Analytics screen shots were attached. I have also reviewed the Notice of Compliance concerning the production of Google Analytics data and correspondence between Jay Wolman and Christopher Mattei dated June 24 and 25, 2021 (Exhibits C and D, respectively).

**What Google Analytics Does**

6.      Google Analytics is a web analytics service offered by Google that is specifically built to collect, track, and report on website traffic and visitor information. Google Analytics collects and stores website visitor data. Some well-known examples of data that Google Analytics collects are: Users (number of website visitors), Sessions (number of times the website has been accessed), Average Time Spent on Site, Bounce Rate (percentage of users who leave after one page visit without interacting), Pages/Session (number of pages a user visits before leaving the site) etc.

2

DocuSign Envelope ID: EE54E1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**

7.      Google Analytics also has an ecommerce tracking function. "Ecommerce tracking is a feature of Google Analytics that tracks shopping activity on your website." https://www.hotjar.com/google-analytics/glossary/ecommerce-tracking/. The sales and payments data collected using the ecommerce function can be used in reports or exported like other Google Analytics data. It appears from the information shown on Exhibit A, in the Revenue column, that a user of the Infowars.com site set up ecommerce tracking within their Google Analytics account, so that ecommerce data is being collected as well.

**How to Export Data Collected by Google Analytics**

8.      Google Analytics data may be exported using the application's built-in function to export data. This export function allows the user to export the Google Analytics data in 4 different formats: PDF, Google Sheets, XLSX and CSV. Exporting in those formats keeps the data organized and allows it to be manipulated by the recipient, as the original user could do. Clicking the EXPORT button enables direct export of the selected data in a format, *e.g.,* as an Excel spreadsheet, suitable for analysis. Data so exported will be the actual data with 100% accuracy. In order to use the export function, the account user uses the report function to define the data to be exported and clicks the EXPORT button located at the top of the page.

9.      Like all Google Analytics users, the users of the Infowars.com Google Analytics account have access to the Export function. The EXPORT button is clearly visible on Exhibit A, as shown through the highlight below:

3

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**



10.     It is my understanding that the Jones defendants have been ordered to produce the data from the relevant Google Analytics accounts for multiple years. While that is a substantial amount of data, by using the free export function described above, a user of the relevant account could easily export complete, accurate and readily useable data as Excel (xlsx) files.  In preparation to make this affidavit I considered and tested the export mechanism, and it is simple to use and functions correctly. I believe exporting the data would take a computer literate user following a simple protocol under a week to complete the exports and possibly would require even less time. (By a computer literate user, I mean someone with simple data entry skills.) The development of

4

**EXHIBIT 28**

an appropriate export approach took me approximately 30 minutes. Following a step-by-step protocol, which could be provided, would be a simple process.

11.     The Jones Defendants state in the Notice of Compliance that "Free Speech Systems understands that, to export the dataset, one must be a Google Analytics 360 user. See https://marketingplatform.google.com/about/analytics/compare/ (noting that "access to raw data" is checked off only for Analytics 360, the non-free solution)." As described above, it is not true that "to export the dataset, one must be a Google Analytics 360 user." There are multiple ways to export the dataset, one of which I have described above.

**The Google Analytics Information that Has Been Produced**

12.     The Google Analytics information that has been produced in this case has not been produced either in the format in which Google Analytics information is usually stored or in another comparably usable format. Exhibit A appears to be screenshots of what appears to be a Google Analytics report. Exhibit B appears to be image copies of PDF reports. These formats deprive the recipient of the ability to access and manipulate the underlying data directly.

13.     The Google Analytics information that has been produced through Exhibits A and B also contain only a tiny fraction of the Google Analytics data that the application collects. For example, the information on Exhibits A and B is not organized day by day, but rather, the information is presented in yearly increments (and in some cases random time intervals). Daily data is available, and provides a far more complete dataset which, if produced in a format, such as Excel files, would be immediately suitable for and ready for analysis. These exhibits also do not provide any data related to Demographics (Age and Gender of website visitors), Location (where in the world the users accessed the website from), Ad Campaign Performance (including keywords used in campaigns and searches used to find the site), Source of the Traffic (where visitors were

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653
EXHIBIT 28

before arriving on the Jones Defendants' website), User Interests, Browser and Operating System Information, or Custom Variables (metrics created by the Jones Defendants to track website specific performance). The reports provide very limited information on Individual Page Performance, Language, New vs. Returning Users, and Ecommerce information (sales performance, time to purchase, etc.).

14. Exhibit A, unlike Exhibit B, contains some revenue data. Revenue data is available through Google Analytics' ecommerce function. In order for the ecommerce function to work, the user must set up ecommerce tracking. Google Analytics instructs:

> To see Ecommerce data in your Analytics reports, you need to:
> Enable Ecommerce for each view in which you want to see data.
> Add code to your site to collect the ecommerce data and send it to Analytics. To complete this task, you need to be comfortable editing HTML and coding in JavaScript, or have help from an experienced web developer.

https://support.google.com/analytics/answer/1009612?hl=en#zippy=%2Cin-this-article. A user with the technical capability to set up ecommerce tracking would certainly have the technical capability to understand that there are multiple means to export Google Analytics data.

15. The Jones defendants state in their Emergency Motion for Protective Order that "In fact, Defendants' records show that, at most, they made $342.55 in sales from article and video page referrals that contained the term "Sandy Hook" out of a total of $10.6 million in overall sales generated from site traffic." In support of this statement, they reference the information that is attached to my affidavit as Exhibit A. (This same information was attached as Exhibit C in support of their Emergency Motion for Protective Order.) For the Google Analytics application to capture e-commerce data – that is, revenue information – for the time period shown on Exhibit A (Dec. 14, 2012 to March 29, 2021), the e-commerce function would have had to be enabled on or before December 14, 2012. If the e-commerce function was enabled throughout that entire period, then there is very significant additional

6

revenue data available that has not been provided to the plaintiffs. If the e-commerce function was not enabled as of December 14, 2012, then Google Analytics data cannot establish revenue for the entire period, and the claim that revenue is $342.55 is not supported by Exhibit A.

16.     Based on the description provided in their correspondence of June 24 and 25, 2021 (Exhibits C and D), the Jones defendants' proposed "sandbox approach" suffers from multiple technical defects. First, it offers the plaintiffs only limited-time access to the data. Second, through mirroring or other methods, it would allow the Jones defendants to observe, surveil, and/or record all the plaintiffs' actions within the Google Analytics account, including any searches or other analysis that the plaintiffs or their experts might perform on the data while they had access to it. Under this arrangement, plaintiffs or their experts would be unable to assure or verify that the Jones defendants did not do so. Having access to this information could give the Jones defendants key insight into plaintiffs' counsel's mental impressions, conclusions, opinions, or legal theories.

17.     I attach a copy of my curriculum vitae as Exhibit E.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DocuSigned by:

*Jordan Campbell*

JORDAN CAMPBELL


Subscribed and sworn to before me this 23 day of August, 2021.


DocuSigned by:

*Kerry McGladdery Dent*

Notary Public


7

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063953

EXHIBIT 28

My commission expires: <u>N/A  LSO# 59685G</u>

This affidavit was sworn by the affiant present in the City of London, in the County of Middlesex, in the Province of Ontario, via videoconferencing technology, before me, a Commissioner of Oaths, present in the City of London, in the County of Middlesex, in the Province of Ontario, pursuant to O. Reg. 431/20: Administering Oath Or Declaration Remotely.

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063963

EXHIBIT 28

This is Exhibit **"A"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS



Page 278 of 619

DocuSign Envelope ID: EE54F1C9-84B2-4A58-B8EE-52A83F063GF3

Case 22-33553 Document 1039-42 Filed in TXSB on 02/03/25 Page 1278 of 1819

EXHIBIT 28



DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063CF3

**EXHIBIT 28**



DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063653

**EXHIBIT 28**



DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063F53

**EXHIBIT 28**



This is Exhibit **"B"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063653

**EXHIBIT 28**



**Page 283 of 619**

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**

## Analytics
http://www.infowars.com
**www.infowars.com**

Go to report ⬈

### Audience Overview

**All Users**
100.00% Users

Jan 1, 2013 - Dec 31, 2013

Overview

● Users

| Users | New Users | Sessions |
|---|---|---|
| 60,896,317 | 58,454,408 | 179,324,958 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.94 | 436,145,187 | 2.43 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:17:02 | 60.25% |

■ New Visitor  ■ Returning Visitor

| Service Provider | Users | % Users |
|---|---|---|
| 1. service provider corporation | 2,376,251 | 10.28% |
| 2. cellco partnership dba verizon wireless | 1,569,696 | 6.79% |
| 3. comcast cable communications inc. | 1,294,506 | 5.60% |
| 4. (not set) | 1,269,750 | 5.50% |
| 5. at&t internet services | 1,021,110 | 4.42% |
| 6. sprint nextel corporation | 905,939 | 3.92% |
| 7. verizon online llc | 881,541 | 3.82% |
| 8. amazon.com inc. | 846,380 | 3.66% |
| 9. time warner cable internet llc | 778,211 | 3.37% |
| 10. road runner holdco llc | 646,535 | 2.80% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

 Analytics
http://www.infowars.com
**www.infowars.com**

<span style="color:red">**EXHIBIT 28**</span>
Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

Overview



● Users

| | |
|---|---|
| 1,500,000 | |
| 1,000,000 | |
| 500,000 | |

March 2014     May 2014     July 2014     September 2014     November 2014

■ New Visitor ■ Returning Visitor



| Users | New Users | Sessions |
|---|---|---|
| 57,506,817 | 55,869,830 | 183,862,383 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.20 | 411,548,207 | 2.24 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:19:31 | 64.73% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 3,446,870 | 11.36% |
| 2. | service provider corporation | 2,385,219 | 7.86% |
| 3. | time warner cable internet llc | 1,961,074 | 6.46% |
| 4. | cellco partnership dba verizon wireless | 1,498,303 | 4.94% |
| 5. | at&t internet services | 1,450,113 | 4.78% |
| 6. | comcast cable communications inc. | 1,402,659 | 4.62% |
| 7. | sprint nextel corporation | 1,311,061 | 4.32% |
| 8. | verizon online llc | 1,158,766 | 3.82% |
| 9. | charter communications | 867,052 | 2.86% |
| 10. | t-mobile usa inc. | 780,604 | 2.57% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653



**EXHIBIT 28**

## Audience Overview

http://www.infowars.com
www.infowars.com

Go to report



All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview



● Users
3,000,000

2,000,000

1,000,000

March 2015     May 2015     July 2015     September 2015     November 2015

■ New Visitor ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 64,126,790 | 62,914,640 | 191,984,644 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.99 | 393,422,524 | 2.05 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:50 | 65.06% |

| Service Provider | Users | % Users |
|---|---|---|
| 1. (not set) | 7,885,701 | 18.74% |
| 2. time warner cable internet llc | 2,246,416 | 5.34% |
| 3. service provider corporation | 2,058,158 | 4.89% |
| 4. at&t mobility llc | 1,707,000 | 4.06% |
| 5. verizon online llc | 1,562,156 | 3.71% |
| 6. cellco partnership dba verizon wireless | 1,420,387 | 3.38% |
| 7. charter communications | 1,174,115 | 2.79% |
| 8. comcast cable communications inc. | 1,131,853 | 2.69% |
| 9. at&t internet services | 1,087,285 | 2.58% |
| 10. cox communications | 795,294 | 1.89% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063CF3

**EXHIBIT 28**

.ıl Analytics http://www.infowars.com
www.infowars.com

Go to report ☑

## Audience Overview

⭘ All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

Overview

● Users

2,000,000

1,000,000

March 2016          May 2016          July 2016          September 2016          November 2016

■ New Visitor  ■ Returning Visitor

| | | |
|---|---|---|
| **Users** | **New Users** | **Sessions** |
| 73,749,848 | 72,118,976 | 218,709,812 |
| **Number of Sessions per User** | **Pageviews** | **Pages / Session** |
| 2.97 | 462,481,331 | 2.11 |
| **Avg. Session Duration** | **Bounce Rate** | |
| 00:03:03 | 60.39% | |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 14,714,613 | 27.85% |
| 2. | time warner cable internet llc | 2,772,965 | 5.25% |
| 3. | at&t mobility llc | 2,717,392 | 5.14% |
| 4. | service provider corporation | 1,999,756 | 3.79% |
| 5. | charter communications | 1,660,629 | 3.14% |
| 6. | cellco partnership dba verizon wireless | 1,159,158 | 2.19% |
| 7. | comcast cable communications inc. | 1,078,205 | 2.04% |
| 8. | mci communications services inc. d/b/a verizon business | 1,039,698 | 1.97% |
| 9. | at&t internet services | 1,022,195 | 1.93% |
| 10. | comcast ip services l.l.c. | 1,010,817 | 1.91% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**

 Analytics http://www.infowars.com www.infowars.com

Go to report

## Audience Overview

**All Users**
100.00% Users

Jan 1, 2017 - Dec 31, 2017

**Overview**



● Users

(Graph showing Users from March 2017 through November 2017, ranging up to 1,500,000)

| Users | New Users | Sessions |
|---|---|---|
| 54,966,386 | 52,108,330 | 178,788,381 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.25 | 388,814,008 | 2.17 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:04 | 57.48% |

■ New Visitor ■ Returning Visitor

(Pie chart: 21.4%, 78.6%)

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 12,491,560 | 34.25% |
| 2. | at&t mobility llc | 1,787,472 | 4.90% |
| 3. | time warner cable internet llc | 1,756,709 | 4.82% |
| 4. | mci communications services inc. d/b/a verizon business | 1,071,697 | 2.94% |
| 5. | charter communications | 1,022,690 | 2.80% |
| 6. | at&t internet services | 680,720 | 1.87% |
| 7. | comcast ip services l.l.c. | 618,121 | 1.69% |
| 8. | cellco partnership dba verizon wireless | 592,009 | 1.62% |
| 9. | comcast cable communications inc. | 580,920 | 1.59% |
| 10. | qwest communications company llc | 568,042 | 1.56% |

© 2019 Google

**Page 288 of 619**

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**



.ıl Analytics
http://www.infowars.com
www.infowars.com

Go to report ⬚

## Audience Overview

**All Users**
100.00% Users

Jan 1, 2018 - Dec 31, 2018

Overview



● Users

600,000

400,000

200,000

| March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

■ New Visitor   ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 35,143,582 | 33,373,209 | 132,867,188 |



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.78 | 322,660,710 | 2.43 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:20 | 53.46% |

| Service Provider | Users | % Users |
|---|---|---|
| 1. (not set) | 4,661,056 | 19.56% |
| 2. cellco partnership dba verizon wireless | 1,562,546 | 6.56% |
| 3. time warner cable internet llc | 1,388,162 | 5.82% |
| 4. comcast cable communications llc | 1,180,283 | 4.95% |
| 5. at&t mobility llc | 815,034 | 3.42% |
| 6. charter communications | 717,740 | 3.01% |
| 7. mci communications services inc. d/b/a verizon business | 707,107 | 2.97% |
| 8. at&amp;t mobility llc | 605,826 | 2.54% |
| 9. t-mobile usa inc. | 568,875 | 2.39% |
| 10. at&amp;t corp. | 393,428 | 1.65% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**

.ıl Analytics  Infowars Store
All Web Site Data

Go to report ☑

## Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview

● Users

30,000

20,000

10,000

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
|-------|-----------|----------|
| 319,533 | 319,533 | 481,817 |

| Number of Sessions per User | Pageviews | Pages / Session |
|-----------------------------|-----------|-----------------|
| 1.51 | 2,014,486 | 4.18 |

| Avg. Session Duration | Bounce Rate |
|-----------------------|-------------|
| 00:03:01 | 54.01% |

| Language | | Users | % Users |
|----------|--|-------|---------|
| | There is no data for this view. | | |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063CF3

**EXHIBIT 28**

.ıl Analytics   Infowars Store
All Web Site Data

Go to report ☑

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

Overview

● Users
150,000

100,000

50,000

| March 2016 | May 2016 | July 2016 | September 2016 | November 2016 |

■ New Visitor   ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 2,653,423 | 2,605,128 | 5,112,772 |

39.7%

60.3%

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.93 | 34,287,444 | 6.71 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:48 | 29.52% |

| Language | Users | % Users |
|---|---|---|
| 1.  en-us | 89,342 | 83.60% |
| 2.  c | 8,158 | 7.63% |
| 3.  en-gb | 3,913 | 3.66% |
| 4.  en-ca | 1,855 | 1.74% |
| 5.  en-au | 792 | 0.74% |
| 6.  nl | 216 | 0.20% |
| 7.  de | 215 | 0.20% |
| 8.  en | 168 | 0.16% |
| 9.  sv-se | 163 | 0.15% |
| 10. fr | 144 | 0.13% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063GF3

**EXHIBIT 28**

.dl Analytics   Infowars Store
All Web Site Data                                    Go to report ⬏

## Audience Overview

◯ All Users
100.00% Users                                        Jan 1, 2017 - Dec 31, 2017

Overview

● Users
40,000

March 2017        May 2017        July 2017        September 2017        November 2017

■ New Visitor   ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 3,132,247 | 3,057,641 | 7,531,369 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.40 | 34,282,728 | 4.55 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:42 | 48.64% |

| Language | Users | % Users | |
|---|---|---|---|
| 1. en-us | 2,780,017 | | 88.50% |
| 2. en-gb | 123,241 | 3.92% | |
| 3. en-ca | 58,528 | 1.86% | |
| 4. en-au | 23,738 | 0.76% | |
| 5. c | 21,569 | 0.69% | |
| 6. es-419 | 10,074 | 0.32% | |
| 7. en | 9,623 | 0.31% | |
| 8. es | 9,140 | 0.29% | |
| 9. de | 8,876 | 0.28% | |
| 10. pt-br | 8,249 | 0.26% | |

© 2019 Google

DocuSign Envelope ID: EE54E1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**

## Analytics
Infowars Store
**All Web Site Data**

Go to report ☑

### Audience Overview

○ All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

**Overview**

● Users
40,000

20,000

| | March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

■ New Visitor   ■ Returning Visitor

| | | |
|---|---|---|
| **Users** 2,319,702 | **New Users** 2,249,348 | **Sessions** 5,887,859 |
| **Number of Sessions per User** 2.54 | **Pageviews** 27,081,597 | **Pages / Session** 4.60 |
| **Avg. Session Duration** 00:03:37 | **Bounce Rate** 46.86% | |

25.5%

74.5%

| Language | Users | % Users |
|---|---|---|
| 1. en-us | 2,100,574 | 90.19% |
| 2. en-gb | 77,136 | 3.31% |
| 3. en-ca | 45,789 | 1.97% |
| 4. en-au | 18,442 | 0.79% |
| 5. de-de | 7,040 | 0.30% |
| 6. en | 6,950 | 0.30% |
| 7. sv-se | 4,642 | 0.20% |
| 8. nl-nl | 4,504 | 0.19% |
| 9. pt-br | 4,120 | 0.18% |
| 10. es-es | 3,912 | 0.17% |

© 2019 Google

**EXHIBIT 28**

.⍳ Analytics  Infowars Shop
All Web Site Data

Go to report ⌕

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

Overview

● Users

|  |
|---|
| 15,000 |
| 10,000 |
| 5,000 |

March 2014 | May 2014 | July 2014 | September 2014 | November 2014

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,402,377 | 1,401,792 | 2,097,803 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.50 | 7,594,153 | 3.62 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:28 | 48.60% |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**

.ıl Analytics  Store.Infowars.com
All Web Site Data

Go to report ☑

**Audience Overview**

⭕ All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

Overview

● Users

20,000

10,000

March 2014 | May 2014 | July 2014 | September 2014 | November 2014

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 638,543 | 633,189 | 1,227,787 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.92 | 8,610,108 | 7.01 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:20 | 14.19% |

| Service Provider | Users | % Users |
|---|---|---|
| There is no data for this view. | | |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063CF3

**EXHIBIT 28**

.ıl Analytics Store.infowars.com
**All Web Site Data**

Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview

● Users

1,000,000

500,000

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 12,427,399 | 12,366,595 | 31,089,027 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.50 | 82,033,098 | 2.64 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:52 | 59.53% |

| Service Provider | Users | % Users |
|---|---|---|
| There is no data for this view. | | |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063653

**EXHIBIT 28**

## Analytics
Store.infowars.com
### All Web Site Data

Go to report ⬈

### Audience Overview

**All Users**
100.00% Users

Jan 1, 2016 - Dec 31, 2016

**Overview**

● Users
15,000

10,000

5,000

| March 2016 | May 2016 | July 2016 | September 2016 | November 2016 |

| Users | New Users | Sessions |
|---|---|---|
| 1,238,750 | 1,186,990 | 2,064,364 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.67 | 15,840,378 | 7.67 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:48 | 0.67% |

■ New Visitor  ■ Returning Visitor

29.2%  70.8%

| Service Provider | Users | % Users |
|---|---|---|
| 1. (not set) | 8,370 | 35.31% |
| 2. time warner cable internet llc | 1,148 | 4.84% |
| 3. at&t mobility llc | 1,118 | 4.72% |
| 4. charter communications | 855 | 3.61% |
| 5. mci communications services inc. d/b/a verizon business | 591 | 2.49% |
| 6. qwest communications company llc | 464 | 1.96% |
| 7. at&t internet services | 453 | 1.91% |
| 8. cellco partnership dba verizon wireless | 389 | 1.64% |
| 9. comcast ip services l.l.c. | 376 | 1.59% |
| 10. service provider corporation | 360 | 1.52% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063GF3

**EXHIBIT 28**



Store.Infowars.com
Analytics  All Web Site Data

Go to report ☒

## Audience Overview

**All Users**
100.00% Users

Jan 1, 2017 - Dec 31, 2017

**Overview**



● Users
10,000

5,000

March 2017          May 2017          July 2017          September 2017          November 2017

■ New Visitor   ▓ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 573,653 | 565,648 | 887,608 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.55 | 6,634,137 | 7.47 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:26 | 0.24% |

17.7%

82.3%

| Service Provider | Users | % Users |
|---|---|---|
| 1. (not set) | 96,570 | 34.01% |
| 2. time warner cable internet llc | 11,541 | 4.07% |
| 3. at&t mobility llc | 9,652 | 3.40% |
| 4. charter communications | 7,875 | 2.77% |
| 5. mci communications services inc. d/b/a verizon business | 6,623 | 2.33% |
| 6. qwest communications company llc | 4,644 | 1.64% |
| 7. comcast ip services l.l.c. | 3,696 | 1.30% |
| 8. at&t internet services | 3,525 | 1.24% |
| 9. comcast cable communications inc. | 3,500 | 1.23% |
| 10. cellco partnership dba verizon wireless | 3,395 | 1.20% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-94B3-4A58-B8EE-52A835063CF3

**EXHIBIT 28**

 Analytics Store.infowars.com
**All Web Site Data**

Go to report ☑

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

Overview



● Users

| | | |
|---|---|---|
| **Users** 219,487 | **New Users** 213,073 | **Sessions** 326,323 |
| **Number of Sessions per User** 1.49 | **Pageviews** 2,161,727 | **Pages / Session** 6.62 |
| **Avg. Session Duration** 00:02:57 | **Bounce Rate** 0.30% | |

■ New Visitor  ■ Returning Visitor

16.4% / 83.6%

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 22,232 | 19.19% |
| 2. | hughes network systems | 4,491 | 3.88% |
| 3. | time warner cable internet llc | 4,443 | 3.84% |
| 4. | cellco partnership dba verizon wireless | 4,288 | 3.70% |
| 5. | comcast cable communications llc | 3,136 | 2.71% |
| 6. | at&t mobility llc | 2,397 | 2.07% |
| 7. | charter communications | 2,357 | 2.03% |
| 8. | t-mobile usa inc. | 2,351 | 2.03% |
| 9. | mci communications services inc. d/b/a verizon business | 2,031 | 1.75% |
| 10. | shaw communications inc. | 1,842 | 1.59% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063653

**Analytics** prisonplanet.tv

**EXHIBIT 28** Go to report ☑

## Audience Overview

○ **All Users**
100.00% Users

Jan 1, 2012 - Dec 31, 2012

**Overview**

● **Users**

March 2012     May 2012     July 2012     September 2012     November 2012

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| **1,764,974** | **1,732,093** | **5,786,016** |

| Number of Sessions per User | Pageviews |
|---|---|
| **3.28** | **9,879,368** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:01:47** | **57.38%** |

*Prison Planet*
*TV Subscriptions*

*now*
*free (Late 2018)*

*- website data*

| Language | | % Users |
|---|---|---|
| | Th | |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063CE3

**EXHIBIT 28**

## Analytics   prisonplanet.tv

Go to report

### Audience Overview

○ All Users
100.00% Users

Jan 1, 2013 - Dec 31, 2013

**Overview**

● Users

| March 2013 | May 2013 | July 2013 | September 2013 | November 2013 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,920,622 | 1,865,236 | 7,064,061 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.68 | 22,317,587 | 3.16 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:30 | 30.19% |

| Language | Users | % Users |
|---|---|---|

There is no data for this view.

© 2019 Google

**EXHIBIT 28**

Analytics  prisonplanet.tv                                    Go to report ☑

**Audience Overview**

○ All Users                                           Jan 1, 2014 - Dec 31, 2014
  100.00% Users

Overview

● Users
20,000

10,000

            March 2014          May 2014          July 2014          September 2014          November 2014

                                                    There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,127,638 | 1,071,115 | 3,569,978 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.17 | 11,021,098 | 3.09 |

| Avg. Session Duration | Bounce Rate | |
|---|---|---|
| 00:03:11 | 30.58% | |

Language                                                                 Users    % Users

                                There is no data for this view.

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063653

**EXHIBIT 28**

## Analytics All Web Site Data

Go to report ☒

### Audience Overview

⬤ All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

⬤ Users

|  | March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 478,463 | 478,244 | 1,533,631 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.21 | 4,642,383 | 3.03 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:44 | 31.90% |

| Language | Users | % Users |
|---|---|---|

There is no data for this view.

© 2019 Google

**Page 303 of 619**

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063CF3

**EXHIBIT 28**

## Analytics All Web Site Data

Go to report ☑

**Audience Overview**

⭕ All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

**Overview**

● Users
15,000

10,000

5,000

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,084,793 | 1,058,039 | 3,570,065 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.29 | 10,779,174 | 3.02 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:36 | 31.81% |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063CF3

**EXHIBIT 28**

**▪▮ Analytics** All Web Site Data

Go to report ☑

## Audience Overview

⭕ All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

Overview



● Users

15,000

10,000

5,000

| March 2016 | May 2016 | July 2016 | September 2016 | November 2016 |

■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 926,919 | 898,954 | 2,944,151 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.18 | 8,423,176 | 2.86 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:18 | 35.69% |

37.5% / 62.5%

| Language | Users | % Users |
|---|---|---|
| 1. en-us | 25,923 | 88.41% |
| 2. en-gb | 1,257 | 4.29% |
| 3. en-ca | 552 | 1.88% |
| 4. en-au | 206 | 0.70% |
| 5. en | 94 | 0.32% |
| 6. de | 89 | 0.30% |
| 7. c | 86 | 0.29% |
| 8. fr | 73 | 0.25% |
| 9. nl-nl | 66 | 0.23% |
| 10. nl | 59 | 0.20% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063CF3

 Analytics  All Web Site Data

**EXHIBIT 28**  Go to report ☑

**Audience Overview**

○ All Users
100.00% Users

Jan 1, 2017 - Dec 31, 2017

**Overview**

● Users
10,000



| March 2017 | May 2017 | July 2017 | September 2017 | November 2017 |

■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 506,221 | 490,104 | 1,651,783 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.26 | 4,764,686 | 2.88 |

20.2%

79.8%

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:24 | 35.25% |

| | Language | Users | % Users |
|---|---|---|---|
| 1. | en-us | 449,908 | 88.66% |
| 2. | en-gb | 21,075 | 4.15% |
| 3. | en-ca | 9,808 | 1.93% |
| 4. | en-au | 3,555 | 0.70% |
| 5. | en | 1,703 | 0.34% |
| 6. | fr | 1,598 | 0.31% |
| 7. | c | 1,523 | 0.30% |
| 8. | zh-cn | 1,291 | 0.25% |
| 9. | de | 1,224 | 0.24% |
| 10. | pt-br | 966 | 0.19% |

© 2019 Google

**Page 306 of 619**

**EXHIBIT 28**

 Analytics  All Web Site Data  Go to report

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

### Overview

● Users



| | March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

■ New Visitor  ■ Returning Visitor



| Users | New Users | Sessions |
|---|---|---|
| 287,199 | 276,141 | 918,042 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.20 | 2,722,174 | 2.97 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:38 | 36.35% |

| | Language | Users | % Users |
|---|---|---|---|
| 1. | en-us | 261,387 | 90.59% |
| 2. | en-gb | 8,739 | 3.03% |
| 3. | en-ca | 5,103 | 1.77% |
| 4. | en-au | 1,996 | 0.69% |
| 5. | c | 1,227 | 0.43% |
| 6. | de-de | 791 | 0.27% |
| 7. | nl-nl | 636 | 0.22% |
| 8. | fr | 635 | 0.22% |
| 9. | pt-br | 620 | 0.21% |
| 10. | zh-cn | 606 | 0.21% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-94B3-4A58-B8EE-52A835063653



© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063CF3

EXHIBIT 28

**Analytics** infowarshealth.com

Go to report

## Audience Overview

⬤ All Users
100.00% Users

Jan 1, 2013 - Dec 31, 2013

**Overview**

⬤ Users

| | | | |
|---|---|---|---|
| March 2013 | May 2013 | July 2013 | September 2013 | November 2013 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 135,193 | 133,084 | 182,012 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.35 | 256,625 | 1.41 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:35 | 75.49% |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063CF3

**EXHIBIT 28**

.ıll Analytics infowarshealth.com

Export report ⍈

## ₁udience Overview

⬤ **All Users**
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

⬤ Users

1,000

500

| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|-------|-----------|----------|
| 57,814 | 55,127 | 75,585 |

| Number of Sessions per User | Pageviews | Pages / Session |
|-----------------------------|-----------|-----------------|
| 1.31 | 105,682 | 1.40 |

| Avg. Session Duration | Bounce Rate |
|-----------------------|-------------|
| 00:01:25 | 75.07% |

| Language | Users | % Users |
|----------|-------|---------|

There is no data for this view.

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063CF3

**.ıl Analytics** infowarshealth.com

**EXHIBIT 28** ⤤ Editor report ⤤

## ıudience Overview

**⬤ All Users**
100.00% Users

Jan 1, 2015 - Dec 31, 2015

**Overview**

● Users

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 44,152 | 42,868 | 58,145 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.32 | 84,199 | 1.45 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:39 | 73.93% |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

**EXHIBIT 28**

# ıl Analytics  infowarshealth.com

Go to report ☑

## ıudience Overview

○ All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

### Overview



● Users

**Users**
25,260

**New Users**
24,727

**Sessions**
33,387

**Number of Sessions per User**
1.32

**Pageviews**
197,181

**Pages / Session**
5.91

**Avg. Session Duration**
00:03:09

**Bounce Rate**
24.73%

■ New Visitor

| Language | Users | % Users | |
|----------|-------|---------|---|
| 1. ru | 13 | | 76.47% |
| 2. ru-ru | 4 | | 23.53% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063CF3

**EXHIBIT 28**

Analytics infowarshealth.com

**ıudience Overview**



O  All Users
100.00% Users

Jan 1, 2017 - Dec 31, 2017

**Overview**

Users

| Language | Users | % Users |
|---|---|---|
| 1. ru | 160 | 72.73% |
| 2. ru-ru | 55 | 25.00% |
| 3. en-us | 3 | 1.36% |
| 4. c | 1 | 0.45% |
| 5. zh-cn | 1 | 0.45% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8FE-52A83F063CF3
**EXHIBIT 28**

## Analytics infowarshealth.com

Audience Overview

All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

Overview



| Users | New Users | Sessions |
| --- | --- | --- |
| 2 | 2 | 2 |

| Number of Sessions per User | Pageviews | Pages / Session |
| --- | --- | --- |
| 1.00 | 3 | 1.50 |

| Avg. Session Duration | Bounce Rate |
| --- | --- |
| 00:00:04 | 50.00% |

New Visitor — 100%

| Language | Users | % Users |
| --- | --- | --- |
| 1. en-us | 2 | 100.00% |

© 2019 Google

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**



August 16, 2018



**VIA FEDEX**

Philipp Schindler
Senior Vice President
Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Schindler:

We represent Free Speech Systems, LLC ("Free Speech") in certain federal court matters. Free Speech has forwarded to us your letter of August 9, 2018 regarding notice of termination of a Content Hosting Services Agreement ("CHSA"), dated December 12, 2013 and as amended on July 24, 2015. In accordance with its obligations in the court cases referenced above (as well as other litigated matters), Free Speech is required to preserve evidence including documents and videos posted pursuant to the CHSA.

It is not clear from your letter the specific grounds upon which Google is relying to terminate the CHSA. It is also not clear what is meant by your statement that "your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain." Please clarify what you mean by this statement and send us a copy of the CHSA, including all amendments, and any other documents that define "Content Owner" as referenced in the statement above.

Further, in light of its preservation obligations, Free Speech asks that Google refrain from deleting, destroying, dissolving, or otherwise rendering inoperable any videos or other documents posted by Free Speech or Alex Jones (or others at their direction) until Free Speech has retrieved all of the materials. We understand that Free Speech is currently unable to access these materials because its account is frozen.

You can email a copy of the CHSA to me at ▓▓▓▓▓▓▓▓▓▓▓. Please do so as soon as possible.



EXHIBIT

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F063GF3

EXHIBIT 28

August 16, 2018
Page 2

Thank you for your attention to this matter and please feel free to contact me if you have any questions or would like to discuss further.

Sincerely,

Partner



August 9, 2018

Via Federal Express and Email

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

**Attn:** Alex Jones and Buckley Hamman
Free Speech Systems, LLC ("Partner")
3019 Alvin DeVane Blvd Suite 350
Austin, Texas 78741
infowarsmain76@gmail.com, buckley@infowars.com

**Attention: Legal Department**
**Re: Termination of Content Agreements**

Dear Sir

We write on behalf of Google LLC f/k/a Google Inc. ("**Google**") to inform you that we are exercising our contractual rights to terminate the Content Hosting Services Agreement ("**CHSA**"), dated December 12, 2013, and as amended on July 24, 2015. This letter serves as written notice that Google is exercising its right to terminate the **CHSA** on 30 days prior written notice under section 11.2.

Accordingly, the **CHSA** will be terminated as of **September 10, 2018**. The Sections that are described as surviving in the **CHSA** will survive termination. Upon termination, your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain.

This notice is not a waiver of any claims or defenses available to Google, including those set forth under the agreements

Signed by an authorized representative of Google:

By:

Name:    Bishop Schneider
         Technical Support

2018.08.10
07:08:00 -07'00'

Date:

CONFIDENTIAL – DMS Template ID: 4673368 (v1.1) – pg. 1



**EXHIBIT 28**

This is Exhibit **"C"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

<span style="color:red">**EXHIBIT 28**</span>



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**24 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

Matthew Blumenthal
<mblumenthal@koskoff.com>

Alinor Sterling
<asterling@koskoff.com>

> *Re:*     *June 28, 2021 | Deadline for Production of Google Analytics*

Dear Counsel,

As discussed today, and as you are aware, the deadline for production of the Google Analytics is on June 28, 2021. The full dataset cannot be produced as an export, which thus means the only method of production is by live access to the dataset for your inspection. And, the Court previously declined to order us to provide you with a log-in. As a result, the only method for your inspection is the sandbox approach referenced during today's deposition. I recall previously making this offer to you, either during a telephone conversation or during the June 2 hearing (the transcript of which we are requesting to verify), but was not memorialized in writing and which Attorney Mattei did not recollect.

This method of inspection is akin to traditional paper discovery, where the requesting party is let into the storeroom of documents organized as kept in the ordinary course of business. You will have full liberty to run whatever searches Google Analytics permits and have full access to inspect the dataset. We envision two possible ways for this sandbox approach--we can provide you with a TeamViewer access to a Free Speech Systems computer connected to the Google Analytics or we can meet you at an agreed-upon location with a clean, new computer, where we will log-in the computer during the period of your inspection.

//

//

//

//

//

---

100 Pearl Street, 14th Floor, Hartford, Connecticut 06103

jmw@randazza.com | 702.420.2001

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83E063053

Randazza Legal Group
Page 2 of 2



EXHIBIT 28

Let us know which approach you prefer so that we can know if we are to meet up with you on or before the 28th.

Thank you for your attention to this matter.

Sincerely,

Jay M. Wolman

EXHIBIT 28

This is Exhibit **"D"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653

**EXHIBIT 28**



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**25 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

> ***Re:    Lafferty v. Jones | Google Analytics***

Dear Attorney Mattei:

To be clear, there is no inconsistency.  As set forth on June 2, to export the raw data, one must be an Analytics 360 member, i.e. a premium member.  Free Speech Systems is not an Analytics 360 member, therefore it is impossible for it to export the data.  As further offered on June 2, if Plaintiffs wish to make Free Speech Systems an Analytics 360 member, they have been welcome to do so.  This offer was made on the record.  Plaintiffs have declined this manner of production so far.

Sincerely,

Jay M. Wolman

cc:     mblumenthal@koskoff.com, asterling@koskoff.com

---

**EXHIBIT 28**

This is Exhibit **"E"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A835063653
EXHIBIT 28

# Jordan Campbell

275 Callaway Road, Unit 80 • London, Ontario CANADA N6G 0N8
Phone: (1) 416-500-2105 • E-Mail: goodsoupmedia@gmail.com

## Experience

**Digital Marketing Consultant**                                         **2017 - Present**
**Good Soup Media – London, Canada**

Development and implementation of online marketing strategies for companies across North America including the use of Google Search and Display Ads, LinkedIn Sponsored Content and Sponsored Messaging Ads, Google Analytics tracking, Facebook Advertising and Email Campaign Planning & Distribution. Providing website design and website analysis services.

- Designing unique and custom-made online marketing strategies for clients
- Set-up and install appropriate website-based tracking tags for Google Analytics and ads purposes
- Detailed weekly reporting on campaign results and impact on website/landing page traffic

## Education

**Digital Social Media Consulting Course (DSMC)**
**Tai Lopez Knowledge Society - Online**                                **2019**

Focus on the latest software developments for streamlining workflows and developing the most up to date advertising strategies. Strategic planning for ad campaign design and metrics reporting.

**Social Media Master Plan Seminar**
**Tai Lopez Knowledge Society - Seminar**                               **2018**
In person intensive course designed to provide the latest and hands on experience in working with all online advertising platforms and data tracking/analysis programs (including Google, Facebook, Instagram, Snapchat, Twitter etc.) Detailed one-on-one coaching from professional online marketers.

**Social Media Marketing Agency (SMMA)**
**Tai Lopez Knowledge Society - Online**                                **2016-2017**

Had the opportunity to learn some of the most cutting-edge sales strategies and online marketing techniques based on the latest cognitive research and software tools available from one of the most successful online marketers of the last decade, Tai Lopez.

## Skills

- Google Analytics
- Google Ads
- LinkedIn Advertising
- Facebook Business Manager
- Website Design
- Email Marketing
- Social Media Content Development

EXHIBIT 28

# EXHIBIT J

EXHIBIT 28



THE
THE ALEX JONES SHOW
LISTEN NOW WAT

# RADIO SHOW NEWS VIDEOS STORE

## BREAKING NEWS CONTACT

WATCH LIVE

BREAKING

STORE

**EXHIBIT 28**

# GOOGLE'S ANALYTICS PROVE INFOWARS HAS NO SANDY HOOK MARKETING
## Specialist destroys MSM agenda

**The Alex Jones Show - JUNE 12, 2019**



IMAGE CREDITS: TSTOKES / PIXABAY.

**Michael Zimmerman joins Alex Jones live in-studio to show and prove how, contrary to Democrat attorneys and judges, Infowars has no alleged 'Sandy Hook marketing' and makes no money from Sandy Hook video views, which happen to be less than 1% of all views.**



EXHIBIT 28



**Don't miss:**

**Fake News Exploits Generational Tech Gap To Smear Alex Jones**

Many of America's governmental representatives are not familiar with how modern social media and Big Tech algorithms actually work. Alex exposes how fake news can be used to smear him and other patriots because of the generational technology gap.

EXHIBIT 28





EXHIBIT 28







# RELATED ARTICLES



THE IMPEACHMENT AND GUN CONFISCATION FANTASY MUST END

EXHIBIT 28

 SPECIAL REPORTS



GUN-GRABBERS UNITE! BETO, BIDEN, KAMALA AND KLOBUCHAR ALL PLEDGE TO GO AFTER YOUR 2ND AMENDMENT

 SPECIAL REPORTS

## THE TYRANNY BEHIND FREE HEALTHCARE

 SPECIAL REPORTS

### DEMS PRAISE BETO'S BIZARRE HANDLING OF EL PASO SHOOTING

 SPECIAL REPORTS

### DAVID KNIGHT SHOW: DEMOCRAT GAME SHOW – POWERBALL & AUCTION

 SPECIAL REPORTS

# SEARCH

Search for articles 🔍



I WANT **YOU** TO SAVE UP TO 75% OFF DOZENS OF PRODUCTS!

» SHOP NOW «

## LISTEN TO THE ALEX JONES SHOW – HERE'S HOW

EXHIBIT 28

Podcast | Listen | On Demand | Archive
WEEKDAYS 11–3PM AND SUNDAY 4–6PM
How To Get The Banned Infowars Podcasts On Your Smartphone - Find out how to subscribe to our shows!

WATCH LIVE NOW



## LATEST STORIES

Watch Live: Democrats Call for Communist Revolution and Civil War During Third Presidential Debate

The Impeachment And Gun Confiscation Fantasy Must End

Come And Take It, Beto: You'll Never Get Our Guns

AOC Labels GOP Ad Slamming Socialism 'Racist'

Researchers Identify Areas of Eye That Change in Mild Alzheimer's Disease

In Show Of "Goodwill," Beijing Exempts US Pork, Soybeans From Trade-War Tariffs

## GET INFORMED

Get the latest breaking news & specials from Alex Jones and the Infowars crew.

First Name

Last Name

**EXHIBIT 28**

Email Address

SUBSCRIBE

VISIT OUR STORE SHOP HERE→

CHILL FORCE

**Your Price: $39.95**

On Sale: $23.97

Life is stressful. Get Chill Force. Support your body's natural systems in the fight against stress & help return to a state of healthy relaxation. The perfect pair with Brain Force or Turbo Force for "calm and clear" energy.



**EXHIBIT 28**



BUY NOW

LEARN MORE

# ILLUSTRATION



# POLLS

Who won the 3rd Democrat debate?

○ Andrew Yang

○ Cory Booker

○ Elizabeth Warren

○ Joe Biden

○ Amy Klobuchar

○ Julian Castro

**EXHIBIT 28**

○ Julián Castro

○ Bernie Sanders

○ Kamala Harris

○ Pete Buttigieg

○ Beto O'Rourke

| Vote | View Results |

# INFOWARS

© 2019 Infowars.com is a Free Speech Systems, LLC Company.

All rights reserved. Digital Millennium Copyright Act Notice.

| Radio | Archive | About Alex Jones Show |
| Video | Watch Alex Jones Show | Subscribe |
| NewsWars | Most Recent | Contact |
| PPTV | D.M.C.A. | |
| Store | Corrections | |
| Infowars Life | | |
| T.O.S. | | |

# INFOWARS

© 2019 Infowars.com is a Free Speech Systems, LLC Company.

All rights reserved. Digital Millennium Copyright Act Notice.

EXHIBIT 28

Megyn Kelly:

First tonight, our report on the incendiary radio host Alex Jones. For years Jones has been spreading conspiracy theories, claiming for instance, that elements of the US government allowed the nine 11 attacks to happen and that the horrific Sandy Hook massacre was a hoax. Some thought we shouldn't broadcast this interview because his baseless allegations aren't just offensive, they're dangerous, but here's the thing. Alex Jones isn't going away. Over the years, his YouTube channel has racked up 1.3 billion views. He has millions of listeners and the ear of our current president. We begin our report with his reaction to the recent terrorist attack in Manchester, England. Alex Jones was nearly 5,000 miles away from Manchester, England when a suicide bomber killed 22 people at a concert less than four weeks ago. Despite the distance and with few facts known Jones did what he often does, jumped mouth first into controversy.

Alex Jones:

A big bomb goes off at a pop stars rock concert bombing a bunch of liberal trendies.

Megyn Kelly:

You said it was a bunch of liberal trendies who were killed, the same people who are promoting open borders bringing Islamists in.

Alex Jones:

Yes.

Megyn Kelly:

In response to which many people looked at the victims, many of whom were 15, 14, there was a little,

Alex Jones:

I'm sorry I didn't blow 'em up. I know, but I did something bad though.

Megyn Kelly:

No, that you would suggest that an 8-year-old right there was Saffy Rose Russo, eight years old that she was a liberal, trendy, because that's what you said about the victims is what has people

Alex Jones:

Upset. Yeah, no, no. The media misrepresenting and clipping that the way you did. I got home at like six o'clock, heard about it. The ages of the victims weren't even known, but they were saying it was jihadi and I said, how crazy is it that liberal trendies are now the victims? And then I start going and looking, of course, if there's kids being killed by Muslims, I'm not saying that it's their fault.

Megyn Kelly:

That pattern, reckless accusation, followed by equivocations and excuses is classic Alex Jones.

Alex Jones:

They can just carte blanc anywhere they want.

**EXHIBIT 28**

Megyn Kelly:

He has spent nearly two decades on the fringe shouting his conspiracy theories into any microphone he could get in front of. Here he is on Austin Community Television in 2001.

Alex Jones:

Tyranny is enveloping the globe.

Megyn Kelly:

He and his company, Infowars have been steadily gaining followers for years, producing radio shows and webcasts, which reach millions a month, but Jones's influence hit new heights when he attracted a very famous fan then presidential candidate Donald Trump.

Donald Trump:

I just want to finish by saying your reputation's amazing.

Megyn Kelly:

In December, 2015, Mr. Trump appeared on Jones' Radio program offering praise and promises.

Donald Trump:

I will not let you down. You'll be very impressed. I hope and I think we'll be speaking a lot better

Megyn Kelly:

Separately. Both men had supported the false statement that Barack Obama was not a natural born citizen.

Alex Jones:

Donald Trump is surging

Megyn Kelly:

And they've had more in common since.

Alex Jones:

I agree with Trump on that. He agrees with me because they've got articles. He's following Alex on coal. He's following Alex on guns. He's following Alex on borders.

Megyn Kelly:

The 2016 campaign was good for infowars. Its YouTube monthly views reached 83 million in November, 2016. More than five times higher than the previous November. And when Mr. Trump won, Alex Jones found himself with access to the seat of power. Infowars got a temporary White House press pass for the first time and Jones says Mr. Trump called him after the election to thank him for his help. You have said that it's surreal to say something on Infowars and then hear it come out of the president of the United States mouth a couple days later.

**EXHIBIT 28**

Alex Jones:

I mean, that has happened, but

Megyn Kelly:

Do you think he's watching?

Alex Jones:

I mean, I know Trump watches and sees the clips and things.

Megyn Kelly:

We did find indications of that on July 22nd, 2015, Infowars put up this video claiming it showed drug trafficking along the US Mexico border. Although we don't know what it actually shows,

Speaker 4:

We actually witnessed a drug smuggling operation from Mexico into the us.

Megyn Kelly:

Three days later, Mr. Trump gave this speech in Iowa

Donald Trump:

Big store. It's all over the place now. Guy swimming across and big bags of stuff str swimming across the river.

Megyn Kelly:

This was Infowars previewing the first presidential debate between Donald Trump and Hillary Clinton.

Alex Jones:

I think she's going to show up and on drugs though

Megyn Kelly:

Alex Jones:

She's going to be whacked up.

Megyn Kelly:

And Mr. Trump's take not long after.

Donald Trump:

We should take a drug test prior because I don't know what's going on with her.

Megyn Kelly:

Donald Trump ally and frequent Infowars guest, Roger Stone underscored the connection between Jones and the Trump campaign. In a tweet last spring, it read "MSM Elites don't see that Alex Jones and Infowars reach millions of Donald Trump's supporters and helped make the Trump revolution."

Alex Jones:

Donald Trump calls me, secretary says, Donald Trump would like to talk to you, Mr. Jones, you'd like to talk to him? Yes. Boom.

Megyn Kelly:

While Jones has boasted of his contact with the president on his radio show, he downplayed it in his interview with us. Claiming the mainstream media or MSM has exaggerated their connection.

Alex Jones:

I think my influence on Trump is way, way lower than what MSM has said.

Megyn Kelly:

Well, what kind of access do you have?

Alex Jones:

He's just called sometimes and talked about politics or thanked me, stuff like that. That's it.

Megyn Kelly:

Would you describe yourself as friends?

Alex Jones:

No.

Megyn Kelly:

Friendly.

Alex Jones:

Sure.

Megyn Kelly:

And how many times has he called you?

Alex Jones:

I don't want to get into all that.

Megyn Kelly:

What is it do you think about Alex Jones that President Trump finds so amazing?

EXHIBIT 28

Charlie Sykes:

That's a scary question.

Megyn Kelly:

Charlie Sykes is a conservative writer and contributor to NBC news. He's been critical of President Trump.

Charlie Sykes:

Obviously there's a conspiratorial turn in the president's thinking in his imagination and those darker impulses are fed into by Alex Jones.

Megyn Kelly:

Jones speaks to his listeners for hours a day, six days a week. His rants can be vulgar and hate-filled like this one directed at a member of Congress.

Alex Jones:

Schiff looks like the archetypal and there's something about this fairy hopping around bossing everybody around, trying to intimidate people like me and you. I want to tell Congressman Schiff and all the rest of them, you want to sit here and say that I'm a Russian. You get in my face with that. I'll beat your ass. You son of a bitch.

Megyn Kelly:

Jones began developing his conspiracy theories as a teenager. He grew up the oldest child of a dentist and a homemaker and went to high school in Austin, Texas.

Alex Jones:

I read a lot of history books when I was a kid, and I also had family that was educated, so I mean, I just knew how things actually worked versus what the news was saying. Sometimes

Megyn Kelly:

After a brief stint in community college, Jones found his calling at Public Access TV in Austin. He went into business for himself founding Infowars in 1999. Many doubted his prospects, but he's now worth millions.

Alex Jones:

I'm Alex Jones, your host.

Megyn Kelly:

Infowars makes most of its money by selling products like male supplements.

Alex Jones:

It has just come off of me and soon there'll be nothing left.

Megyn Kelly:

**EXHIBIT 28**

The main pitch man, Jones himself,

Alex Jones:

I mean it costs 45 $50 million a year to run this.

Megyn Kelly:

How much money's being made?

Alex Jones:

Well, the money that's made is pretty much put back into things.

Megyn Kelly:

Jones uses that money to spread his message, a message that has caused enormous pain.

Charlie Sykes:

What he has done is he has injected this sort of toxic paranoia into the mainstream of conservative thought in a way that would've been inconceivable a couple of decades ago. As we're talking about somebody who traffics in some of the sickest, most offensive types of theories.

Megyn Kelly:

At the top of that list is Jones's outrageous statement that the slaughter of innocent children and teachers at Sandy Hook Elementary School, one of the darkest chapters in American history was a hoax.

Neil Heslin:

I lost my son. I buried my son. I held my son with a bullet hole through his head.

Megyn Kelly:

Neil Hassan's son, Jesse, just six years old, was murdered along with 19 of his classmates and six adults on December 14th, 2012 in Newtown, Connecticut.

Neil Heslin:

I dropped him off at 9 0 4. That's when we dropped him off at school with his book bag hours later. I was picking him up in a body back.

Megyn Kelly:

Alex Jones repeatedly claimed that the shooting never happened. Here he is on Infowars in December, 2014,

Alex Jones:

But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake.

Megyn Kelly:

EXHIBIT 28

You said the whole thing is a giant hoax. How do you deal with the total hoax? It took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I did deep research and my gosh, it just pretty much didn't happen

Alex Jones:

At that point, and I do think there's some cover and some manipulation. That is pretty much what I believe. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again,

Megyn Kelly:

But you're trying to have it always right? No, I'm not. If you wrongly went out there and said it was a hoax, that's wrong.

Alex Jones:

But what I already answered your question was listeners and other people are covering this. I didn't create that story,

Megyn Kelly:

But Alex, the parents, one after the other devastated the dead bodies that the coroner autopsy

Alex Jones:

And they blocked all that. They won't release any of it. That's unprecedented.

Megyn Kelly:

All of the parents even decided to come out and lie about their dead children.
I didn't say that.
What happened to the children?

Alex Jones:

I will sit there on the air and look at every position and play devil's advocate.

Megyn Kelly:

Was that devil's advocate? The whole thing is a giant hoax. The whole thing was fake.

Alex Jones:

Yes, because I remember even that day, I'll go back from memory them saying, but then some of it looks like it's real, but then what do you do when they've got the kids going in circles in and out of the building with their hands up? I've watched the footage and it looks like a drill.

Megyn Kelly:

When you say parents faked their children's death, people get very angry.

**EXHIBIT 28**

Alex Jones:

Well, that's all I know. But they don't get angry about the half million dead Iraqis from the sanctions or they don't get angry about all the illegal's.

Megyn Kelly:

That's a dodge

Alex Jones:

Again, that's a no no, no, it's not a dodge. The media never covers all the evil wars. It's promoted all the big things

Megyn Kelly:

That doesn't excuse what you did and said about Newtown. You know,

Alex Jones:

Here's the difference. Here's the difference. I looked at all the angles of Newtown and I made my statements long before the media even picked up on it.

Megyn Kelly:

In our interview, we asked Jones numerous times what he now believes, and he never completely disavowed his previous statements.

Alex Jones:

I tend to believe that children probably did die there, but then you look at all the other evidence on the other side. I can see how other people believe that nobody died there.

Megyn Kelly:

Of course, there is no evidence on the other side. After President Trump took office, the Newtown Board of Education wrote to him imploring the president to try to stop Jones and other hoaxers like him saying Jones continues to spread hate and lies towards our town. Almost four months later, according to the board chairman, the president has yet to respond. The lies about Sandy Hook have had real world consequences. Just this month, a Florida woman was sentenced to five months in prison for sending death threats to a Sandy Hook parent. Her defense attorney says she was primarily motivated by Infowars. Other victims' family members have been harassed or threatened too. The families say that Jones's words have caused lasting pain and they fear the harassment will continue.

Neil Heslin:

It's disrespectful to me. For in fact, I did lose my son and the 26 other families lost somebody. And I take that very personal.

Megyn Kelly:

You know, this piece is going to air on Father's Day.

Neil Heslin:

Correct.

Megyn Kelly:

What is your message to him?

Neil Heslin:

I think he's blessed to have his children to spend the day with, to speak to. I don't have that

Alex Jones:

Everybody.

Megyn Kelly:

The consequences of Jones's actions are not limited to Sandy Hook.

Alex Jones:

Pizzagate, as it's called, is a rabbit hole that is horrifying to go down. Now,

Megyn Kelly:

In 2016, Jones promoted a conspiracy theory known as Pizzagate. Infowars claimed a child sex ring was being run by Democrats out of a number of businesses and specifically pointed to a Washington DC pizzeria.

Alex Jones:

You got to go to infowars.com and actually see the photos and videos inside these places.

Megyn Kelly:

Jones encouraged his listeners to investigate the case themselves, and one did bringing a semi-automatic rifle to the shop and firing several rounds. No one was hurt and the shooter was arrested. The pizza shop owner wrote a letter asking Jones to apologize facing the possibility of a lawsuit he did

Alex Jones:

That we regret any negative impact our commentaries may have had on Mr. Alefantis, Comet Ping Pong or its employees.

Megyn Kelly:

Another apology came just this spring. Chobani yogurt sued Jones after Infowars fanned the lie that Chobani employees committed a sexual assault in Idaho

Alex Jones:

On behalf of Infowars. I regret that we mischaracterized Chobani,

Megyn Kelly:

EXHIBIT 28

You misstated facts about Chobani and its owner, which you could have found out if you just had a reporter do a little shoe leather reporting, pick up the phone call, check out the facts. You never would've had to retract that or apologize.

Alex Jones:

Well, this is my statement on that. We know that that was basically a PR event, and what happens is you've got a year of reporting on the reported sexual assault,

Megyn Kelly:

All of which has nothing to do with Chobani.

Alex Jones:

Yeah, I know you're not going to let me get it out already.

Megyn Kelly:

I'm going to let you get it. I just want to make sure the record's straight. I don't want to smear the man. You are the one who said that you were wrong about Chobani. You said that.

Alex Jones:

Well, that's because they chose to go after me. And so I simply pointed out that we were reporting other people's reports that were not entirely accurate, and for that we were sorry. It was true.

Megyn Kelly:

You don't sound very sorry.

Alex Jones:

Well, the media said stuff about the settlement that wasn't true.

Megyn Kelly:

But you said things about Chobani and its owner that were not true. Are you? Sorry.

Alex Jones:

I'm going to tell you again. The media really was upset that they said that there was a hoax.

Megyn Kelly:

It's not the media.

Alex Jones:

And so what they did, and so what they did

Megyn Kelly:

Are you sorry?

EXHIBIT 28

Alex Jones:

And so what they did, so what the media did, and we know it was the media and we have the PIs and the law firms, and we're working on it right now. Let's just say Chobani was real happy to get out of that lawsuit,

Megyn Kelly:

But the lawsuit makes clear Infowars was the only media outlet to report the lie that forced Jones to apologize. And with that apology, Chobani considers the matter closed. Do you think of yourself as a journalist?

Alex Jones:

I have some journalists that work for me and I do journalistic work and I've broken a lot of big stories and I understand the basics of it. I need to find the line of London thing

Megyn Kelly:

In the Infowars studio. There's no script. Instead, it's a freewheeling spin through piles of articles straight off the internet.

Alex Jones:

95% of what we cover is looking at a news article and then discussing it.

Megyn Kelly:

Well, if you just look at an article and discuss it, it's garbage in, garbage out. Right? If you haven't ascertained the veracity of that article and it's all BS and then you spend two hours talking about it, then you put out a bunch of misinformation. I'm just trying to figure out what the vetting process is.

Alex Jones:

We all get Hillary with 15 points ahead. Okay. I mean, we all get Mainstream Media has got a big problem.

Megyn Kelly:

The Infowars staffers we met have free reign to cover whatever they like with virtually no oversight. We spoke with some of Jones's employees, including Owen Schroer. How do you, on a day-to-day basis figure out what you're going to do?

Owen Schroer:

I wake up. I look at the news, I pray. I rarely get directives from Alex or my boss. They pretty much just leave it up to me.

Megyn Kelly:

Is that what you consider yourself to be a journalist?

Owen Schroer:

**EXHIBIT 28**

I don't like calling it that. I'm just a human. I'm just a human that's looking for truth, so I'm trying to reach out and be what the people want.

Megyn Kelly:

When you say people, who do you mean?

Owen Schroer:

The deplorables, the flyover country. The forgotten American.

We're going to get to work immediately for the American people.

Megyn Kelly:

With the election of Donald Trump, Alex Jones has plans to expand infowars. More studios, more shows, more employees, more influence.

Alex Jones:

I said the night he won, I said, the war has just begun. So this, we've just got a beach head. And so that's just the start of the war for me.

Megyn Kelly:

And Alex Jones goes into battle with a powerful ally. Just two weeks ago, the Trump Pence campaign emailed this message to supporters. Notice at the bottom, it's a link to Infowars.

Speaker 7:

Hey, NBC News fans. Thanks for checking out our YouTube channel. Subscribe by clicking on that button down here and click on any of the videos over here to watch the latest interviews, show highlights and digital exclusives. Thanks for watching.

EXHIBIT 28

# EXHIBIT 1

**EXHIBIT 28**

| | | |
|---|---|---|
| **RETURN DATE: JUNE 26, 2018** | : | **JUDICIAL DISTRICT** |
| | : | |
| **ERICA LAFFERTY, ET AL,** | : | **OF FAIRFIELD** |
| | : | |
| **v.** | : | **AT BRIDGEPORT** |
| | : | |
| **ALEX JONES, ET AL.** | : | **MAY 23, 2018** |

## COMPLAINT

## INTRODUCTION

1.      This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.      Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

1

EXHIBIT 28

10. Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11. Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12. Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13. As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14. On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15. They have confronted strange individuals videotaping them and their children.

16. Some of them have moved to undisclosed locations to avoid this harassment.

17. The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18. Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19. The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

2

**EXHIBIT 28**

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiffs are the immediate family of four children and two educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

24.     Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.     Plaintiffs Jennifer Hensel and Jeremy Richman are the parents of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. They reside in Fairfield County, Connecticut.

26.     Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.     Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.     Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

29.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

30.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com

3

**EXHIBIT 28**

and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

31. Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

32. Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

33. Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

34. Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

35. All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

36. Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

37. Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

38. Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

39. Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ; Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010) https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

4

EXHIBIT 28

## THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

40. Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

41. Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

42. For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

43. Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

44. Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

45. His followers have shown themselves ready to comply.

46. On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

47. "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

48. Jones's followers came running to his call, as he knew they would.

49. The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

50. The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

**EXHIBIT 28**

51. On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

52. Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

53. Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

54. Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

55. In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

56. She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

57. The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

58. On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

59. Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

60. Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

61. Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

6

EXHIBIT 28

62. Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

63. Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

64. Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

65. Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

66. In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

67. After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

68. Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

69. On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

70. During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

71. Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

  A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

  B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in

7

EXHIBIT 28

reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive."[6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children.[7]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

72. Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[8] His Facebook page continues to display those publications.

73. Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

74. In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

75. In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[8] *See, e.g.*, https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252. https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

8

**EXHIBIT 28**

76. For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

77. The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

78. Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

79. On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

80. Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

81. On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

82. Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

83. Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

84. Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

85. Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.

[11] https://www.youtube.com/watch?v=4_2FznkfcBU.

[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[13] https://www.youtube.com/watch?v=jCOe3qIgyFA.

[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

9

EXHIBIT 28

86. Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

87. Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

88. Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

89. Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

90. The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

91. The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[15]

92. The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

93. Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

94. Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas

---

[15] See generally Richard J. Hofstadler, *The Paranoid Style in American Politics, and Other Essays* (1964).

**EXHIBIT 28**

masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[16]

95. According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

96. In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[17]

97. In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

98. News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

99. Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[18]

100. In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[19]

---

[16] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[17] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[18] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.vqXeXzdLEZ#.qewdqoN0m2.

[19] Corky Siemaszko, *InfoWars'Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

11

**EXHIBIT 28**

## THE CAMPAIGN OF ABUSE

101. Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

102. On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[20]

103. That article alleges that Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

104. An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

105. At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

106. On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[21]

107. The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

108. In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

109. The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

110. A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[20] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[21] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

12

EXHIBIT 28

**January 27, 2013**

111.    On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[22] Just over a month had passed since the shooting at Sandy Hook.

112.    Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

113.    Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying."

114.    Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

115.    Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

116.    As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

117.    Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

118.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

119.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**March 2013**

---

[22] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

EXHIBIT 28

120.    On March 14, 2014, Jones stated, "We've clearly got people where it's actors playing different parts of different people."

121.    He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

122.    The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

## May 27, 2013

123.    On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[23]

124.    During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

125.    In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

126.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

127.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

128.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 13, 2014

129.    On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[24]

130.    That day, Jones hosted Wolfgang Halbig.

131.    During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

---

[23] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

[24] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

14

**EXHIBIT 28**

132. Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

133. Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

134. Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

135. Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

136. Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

137. He continued, "The whole thing, you've got 'em jumping gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

138. Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

139. Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012."

140. Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

141. During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake . . . it's fake . . . you've got parents acting . . . it just is the fakest thing since the three-dollar bill."

142. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

143. On information and belief, this episode was also broadcast through Jones's radio affiliates.

144. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

15

EXHIBIT 28

## September 25, 2014

145.    On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[25]

146.    This assertion was a complete fabrication: the FBI had made no such statement.

147.    During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

148.    This was a false statement. FBI crime statistics showed no such thing.

149.    Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

150.    Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

151.    Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

152.    Jones asserted that the school was "a cut-out" used as a stage for the event.

153.    Jones and Halbig both stated "I wish it was real instead of fake."

154.    Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

155.    Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

156.    Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

157.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

158.    On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

---

[25] https://www.youtube.com/watch?v=N1RIzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

16

EXHIBIT 28

159. The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

160. The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

161. The article quoted Halbig as saying that there was "a 'script' followed during the event."

162. It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

163. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

164. On information and belief, the article has been viewed by hundreds of thousands of persons.

### December 12, 2014

165. On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[26]

166. The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

167. During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

168. Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one

---

[26] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

**EXHIBIT 28**

of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

169. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

170. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

171. On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[27]

172. Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

173. Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

174. Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

175. Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

176. Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

177. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

178. On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[27] https://www.youtube.com/watch?v=TGCfi_ot0CU.

18

**EXHIBIT 28**

179. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### January 2, 2015

180. On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

181. The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

182. "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

183. The pictures used were images of Noah Pozner.

184. Upon information and belief, hundreds of thousands of people have viewed this article.

### January 13, 2015

185. On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[28]

186. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

187. On information and belief, this episode was also broadcast through Jones's radio affiliates.

188. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[28] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

19

**EXHIBIT 28**

## March 4, 2015

189. On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[29]

190. Jones hosted Halbig on that episode.

191. During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

192. Halbig stated the school was not in operation at the time of the shooting.

193. Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

194. Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

195. Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

196. Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

197. Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry . . . used the same actors as different people."

198. Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

199. Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

200. A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

201. On information and belief, this episode was also broadcast through Jones's radio affiliates.

202. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[29] https://www.youtube.com/watch?v=_7ib5WkULBY.

20

**EXHIBIT 28**

**May 28, 2015**

203.    On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[30]

204.    David Knight hosted Halbig on Infowars Nightly News.

205.    Halbig accused Newtown police chief Mike Kehoe of committing perjury.

206.    Halbig once again appeared, and stated that the school was unsanitary and unsafe.

207.    Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

208.    A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

209.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

210.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

211.    On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[31]

212.    The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

213.    The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

214.    Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

215.    On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

---

[30] https://www.youtube.com/watch?v=Ml3KVj2nVRA.

[31] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

21

EXHIBIT 28

216. Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[32] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

217. During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

218. Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

219. On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**July 7, 2015**

220. On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[33]

221. Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[34]

222. "[T]he more we look at Sandy Hook," he said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

223. He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

224. Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

---

[32] https://www.youtube.com/watch?v=5cll79t7Mrw.

[33] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[34] https://www.youtube.com/watch?v=jCOe3qIgyFA.

22

EXHIBIT 28

225. Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

226. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

227. On information and belief, this episode was also broadcast through Jones's radio affiliates.

228. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 17, 2016

229. On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

230. These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

231. Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

232. Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[35]

233. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

234. On information and belief, this episode was also broadcast through Jones's radio affiliates.

235. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 18, 2016

236. On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[36]

---

[35] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.

[36] https://www.youtube.com/watch?v=MwudDfz1yAk.

23

EXHIBIT 28

237. During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

238. He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

239. He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

240. Jones rehearsed several of his most commonly employed arguments that the Sandy Hook shooting was staged, including that Anderson Cooper was standing in front of "a blue screen or a green screen," that video was "looped," and that "one of the reported fathers of the victims . . . [was] doing classic acting training."

241. In closing, Jones said, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

242. The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

243. On information and belief, this episode was also broadcast through Jones's radio affiliates.

244. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

24

EXHIBIT 28

## November 28, 2016

245.    On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[37]

246.    In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[38]

247.    Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

248.    Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

249.    Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

250.    These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

251.    Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

252.    This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

253.    Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

254.    He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

255.    The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

256.    Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

---

[37] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.

[38] https://www.youtube.com/watch?v=9PdrIrSCLu0.

EXHIBIT 28

## March 8, 2017

257. On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

258. During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

259. Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

260. A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

261. On information and belief, this episode was also broadcast through Jones's radio affiliates.

262. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## April 22, 2017

263. On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[39]

264. During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

265. Jones told his audience that they should not "believe any of it."

---

[39] https://www.youtube.com/watch?v=rUn1jKhWTXI.

26

EXHIBIT 28

266. As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' deaths.

267. During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

268. In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

269. The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

270. Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

271. The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

272. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

**April 28, 2017**

273. On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[40]

274. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[40] https://www.youtube.com/watch?v=StOyqyt0fkY.

EXHIBIT 28

## June 13, 2017

275.     On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[41]

276.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

### The Megyn Kelly Interview

#### *The Preview*

277.     On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

278.     NBC released a preview of the interview on the internet on the following day.

279.     In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

280.     Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

281.     In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

282.     Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

283.     Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

284.     The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

285.     These statements were heard by millions of people.

---

[41] https://www.facebook.com/80256732576/videos/10155465593882577/.

EXHIBIT 28

*June 15, 2017 – Infowars*

286. During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

287. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

288. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming

289. The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

290. Before the interview aired that day, Jones published several pre-show videos on Infowars.

291. During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

> A. In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."
>
> B. Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."
>
> C. He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."
>
> D. He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."
>
> E. While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the

29

EXHIBIT 28

plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormal and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

292. Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

293. As discussed in paragraphs 123 through 128 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

294. In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

295. During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

296. In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

297. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

298. These statements were heard by hundreds of thousands, if not millions of people.

### The June 18, 2017 NBC Broadcast

299. During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

300. At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 171 through 179 of this complaint.

301. In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

302. Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

303. In response, Jones said, "But what I already answered your question was— listeners and other people are covering this—I didn't create that story."

30

**EXHIBIT 28**

304. Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

305. In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

306. Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

307. Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real. But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

308. Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

309. Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

310. Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

311. Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

312. Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

313. In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

314. It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

315. There is no evidence "on the other side."

316. A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

317. More than three million people saw and heard these statements by Jones.

31

EXHIBIT 28

### *Alex Jones's June 18, 2017 Counter-Programming*

318.    Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

319.    The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

320.    As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged event.

321.    This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

322.    Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

323.    This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

324.    On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

325.    Hundreds of thousands, if not millions, of people heard these statements.

### *June 26, 2017*

326.    During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

327.    On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[42]

328.    Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

---

[42] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

32

**EXHIBIT 28**

329. Shroyer's support for this statement was video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

330. Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

331. Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

332. In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

333. A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

334. These statements were heard by at least tens of thousands, if not millions, of people.

335. On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery.

### COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

336. All previous allegations in this complaint are incorporated as if fully set forth herein.

337. The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

338. The false light in which the defendants' statements placed the plaintiffs would be highly offensive to a reasonable person.

339. The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs

33

EXHIBIT 28

would be placed.

340. These false publications have caused the plaintiffs actual and substantial damages.

341. In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

342. The plaintiffs are private individuals and are neither public officials nor public figures.

343. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

344. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

345. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

346. These acts of the defendants resulted in damage to the plaintiffs.

### COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

347. All previous allegations in this complaint are incorporated as if fully set forth herein.

348. In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' deaths; the defendants published numerous defamatory statements.

349. These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' deaths and/or are actors lying about the deaths of their loved ones.

350. The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

34

351. The defendants' defamatory publications readily identified the plaintiffs to millions of people.

352. The defendants' defamatory publications were broadcast to millions of people.

353. The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

354. In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

355. The plaintiffs are private individuals and are neither public officials nor public figures.

356. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

357. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

358. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

359. These acts of the defendants resulted in damage to the plaintiffs.

**COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

360. All previous allegations in this complaint are incorporated as if fully set forth herein.

361. In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

362. The defendants' conduct was extreme and outrageous.

363. The defendants' conduct was the cause of the plaintiffs' distress.

364. The emotional distress sustained by the plaintiffs was severe.

35

**EXHIBIT 28**

365. The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

366. In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

367. The plaintiffs have suffered actual and substantial damages.

368. The plaintiffs are private individuals and are neither public officials nor public figures.

369. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

370. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

371. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

372. These acts of the defendants resulted in damage to the plaintiffs.

**COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

373. All previous allegations in this complaint are incorporated as if fully set forth herein.

374. The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

375. The plaintiffs' distress was foreseeable.

376. The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

377. The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

378. The plaintiffs have suffered actual and substantial damages.

36

EXHIBIT 28

379. In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

380. The plaintiffs are private individuals and are neither public officials nor public figures.

381. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

382. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

383. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

384. These acts of the defendants resulted in damage to the plaintiffs.

## COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

385. All previous allegations in this complaint are incorporated as if fully set forth herein.

386. The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

387. This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

388. The defendants' reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

389. The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

390. The plaintiffs are private individuals and are neither public officials nor public figures.

391. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether

37

EXHIBIT 28

or not they were true.

392. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

393. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

394. These acts of the defendants resulted in damage to the plaintiffs.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A. Monetary damages;

B. Punitive damages;

C. Attorneys' fees;

D. Costs;

E. Declarative relief;

This matter is within the jurisdiction of this court.

38

**EXHIBIT 28**

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 23rd day of May, 2018.

**THE PLAINTIFFS,**

By

**WILLIAM M. BLOSS
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
PHONE: (203) 336-4421
FAX:   (203) 368-3244
wbloss@koskoff.com
mblumenthal@koskoff.com
JURIS #32250**

39

**EXHIBIT 28**

| | | |
|---|---|---|
| DOCKET NO: FBT-CV18-6075078-S: | : | SUPERIOR COURT |
| | : | |
| ERICA LAFFERTY, ET AL., | : | J.D. OF FAIRFIELD |
| | : | |
| VS. | : | AT BRIDGEPORT |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | February __, 2019 |

### PROTECTIVE ORDER

The following order ("Protective Order") is entered pursuant to Practice Book Section 13-5(7) for the protection against public disclosure of certain proprietary trade secrets, confidential research, business strategies, and commercial information and other information affecting the privacy interests of non-parties, which are disclosed during discovery in this case. This Protective Order does not protect against public disclosure of information and documents filed with the Court and does not contravene Practice Book Sections 7-4B, 7-4C and 11-20A. The Court finds that good cause exists for entry of this Protective Order.

### Definitions

1. The following definitions apply to this Protective Order:

   a. The term "document" or "documents" has the same meaning as in Practice Book Section 13-1(c)(2).

   b. The term "Confidential Information" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Conn. Gen. Stats. § 35-51(d).

**EXHIBIT 28**

## Confidential Information

2. Information, documents and material in the following categories may be designated as Confidential Information under the terms of this Protective Order:

   a. Personal identifying information as defined in Practice Book Section 4-7, and including party and witness residential addresses;

   b. Proprietary market research conducted by or on behalf of a defendant concerning the product marketplace, product marketing, sales, branding and promotion, and consumer satisfaction and demographics;

   c. Proprietary marketing, branding, promotional, and sales strategies;

   d. Proprietary financial and accounting information;

   e. Written agreements to which a defendant is a party containing non-disclosure or confidentiality provisions; and

   f. Plaintiffs' medical and/or mental health records.

The parties retain the right to move the Court to alter these categories, by adding materials which may be designated confidential or by deleting or narrowing such categories.

## Purpose

3. This Protective Order shall govern the use and dissemination of all information, documents or materials that are produced by the parties in this action and designated as Confidential Information in accordance with the terms of this Protective Order. This Protective Order is not intended to address or govern claims of work product or privilege that may be asserted by any of the parties, except as otherwise provided in this Protective Order.

## Designation and Treatment

4. Any party to this action who produces or supplies information, documents or other materials in this action (hereinafter the "Designating Party") may designate as "Confidential Information" any information, document or material that falls within the categories set forth in paragraph 2 of this Protective Order. The designation of any information, document or material as "Confidential Information" shall represent a good faith determination by counsel so designating to

- 2 -

**EXHIBIT 28**

the Court that there is good cause for the material so designated to receive the protections of this Order. The designation of "Confidential Information" shall be made by affixing on the document or material containing such information, and upon each page so designated if practicable, words that in substance state, "**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER.**" Any material, document or information for which it is impracticable to affix such a legend may be designated by written notice to that effect with a reasonable description of the material in question. Third parties may take advantage of the provisions of this Protective Order by indicating in writing to the requesting party their intent to comply with its procedures or they may seek separate protection from the Court.

5.      At the option of the Designating Party, and to facilitate prompt discovery by allowing inspection or review before formal designation in the manner specified above, all information, material or documents produced in discovery shall be treated as Confidential Information pending inspection and copying. Subject to paragraph 18 of this Protective Order, copies of information, material, and documents selected for copying and reproduced for the inspecting party will lose their status as Confidential Information unless delivered with the necessary legend.

6.      All persons having access to Confidential Information shall maintain it in a safe and secure manner to ensure compliance with this Protective Order. Any summary, extract, paraphrase, quotation, restatement, compilation, notes or copy containing Confidential Information, or any electronic image or database containing Confidential Information, shall be subject to the terms of this Protective Order to the same extent as the material or information from which such summary, extract, paraphrase, quotation, restatement, compilation, notes, copy, electronic image, or database is derived.

7.      A Designating Party may in good faith redact non-responsive and/or irrelevant information from any document or material. However, unredacted copies of such documents shall be maintained by the Designating Party. Designated attorneys for a Discovering Party and, if necessary, qualified Experts under paragraph 10(c) retained by them, shall have access to the unredacted versions of the documents but only for the purpose of ascertaining the appropriateness

**EXHIBIT 28**

of any redactions.

8.      This Protective Order shall not protect from disclosure information, documents or other material that (a) the Designating Party has not made reasonable efforts to keep confidential; (b) has been produced in any other action or proceeding without confidentiality protection, except inadvertently produced documents; (c) has been lawfully obtained by and from another source; or (d) has been denied confidential treatment in any other action or proceeding by a final order as to which all appeals and other opportunities to challenge have been exhausted or for which the time for appealing or otherwise challenging has expired.

### Limitations on Use

9.      Except to the extent expressly authorized by this Protective Order, Confidential Information shall not be used or disclosed for any purpose other than the preparation and trial of this case, all cases consolidated with this case, and in any appeal taken from any order or judgment herein.

### Limitations on Disclosure

10.      Except with the prior written consent of the Designating Party, or as expressly authorized by this Protective Order, no person receiving Confidential Information may disclose it to any other person. Nothing in this Protective Order, however, shall be deemed to restrict in any manner the Designating Party's use of its own Confidential Information or the Court's use of Confidential Information for any appropriate judicial purpose. Each party may disclose its own Confidential Information without regard to this Protective Order, unless otherwise prohibited from doing so. Each party may waive previously asserted designations of Confidential Information with notice to all parties.

11. Access to Confidential Information shall be limited to the following categories of persons ("Qualified Persons") with such status in this case and all cases consolidated with this case:

    a.  All counsel of record, including staff persons employed by such counsel;

    b.  The parties, but only to the extent reasonably necessary to the litigation of this case;

- 4 -

**EXHIBIT 28**

c. Any consultant, investigator or expert (collectively "Expert") who is assisting in the preparation and/or trial of this action, but only to the extent reasonably necessary to enable such Expert to render such assistance;

d. Any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness;

e. Court reporters, videographers and outside vendors performing litigation support services for parties in this case;

f. Counsel who are presently representing clients in a case against any one or more of the Defendants, which arises out of the same or similar set of facts, transactions or occurrences, provided that before disclosing Confidential Information to such counsel, such Defendant (1) must receive notice of the intention to disclose Confidential Information to such counsel; (2) must have the opportunity to move for a protective order in the case in which counsel is involved; and (3) a ruling on the motion for protective order must be issued; and

g. The Court and its personnel.

12. Any person to whom Confidential Information may be disclosed pursuant to this Protective Order, except counsel of record identified in this Protective Order, staff persons employed by such counsel, this Court and its personnel, court reporters and videographers, shall first have an opportunity to read a copy of this Protective Order and shall agree in writing to the non-disclosure terms of the Confidentiality Acknowledgment annexed hereto as Exhibit A ("Confidentiality Acknowledgment") before receiving any Confidential Information. Only counsel of record may disclose Confidential Information to another Qualified Person and they must receive the signed Confidentiality Acknowledgment before disclosing the Confidential Information to any Qualified Person other than other Counsel of Record, staff persons employed by such counsel, this Court and its personnel, court reporters and videographers. Counsel for the party obtaining a person's

**EXHIBIT 28**

signature on the Confidentiality Acknowledgment shall retain the original signed acknowledgment until such time as the identity of the signatory is disclosed or until good cause for earlier disclosure of the acknowledgment is shown. Any non-party witness who is being deposed in this case and who refuses to sign Exhibit A may be shown Confidential Information but only for the time reasonably necessary to question the witness, provided that counsel, in good faith believes, that such disclosure is reasonably necessary to the prosecution or defense of the case.

13. If a party or other person receiving Confidential Information pursuant to this Protective Order, except the Court and its personnel, thereafter receives a subpoena or order to produce such information in any other action or proceeding before any other court or agency, such party or person shall, if there are fewer than ten (10) days to comply, immediately, if possible, or within two (2) days if not, or if there are more than ten (10) days, at least seven (7) court days prior to the due date of compliance, notify the Designating Party of the pendency of the subpoena, public records request or order in writing. To give the Designating Party an opportunity to obtain such relief, the party or person from whom the information is sought shall not make the disclosure before the actual due date of compliance set forth in the subpoena or order.

### Depositions Involving Confidential Information

14. Depositions involving Confidential Information shall be treated, as follows:

    a. Portions of a deposition or depositions in their entirety may be designated Confidential Information by counsel for the deponent or the Designating Party, with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

    b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information where less than all of the testimony in that transcript would fall into those categories, subject to the following procedure:

        i. The court reporter shall include on the cover page a clear indication that the deposition has been so designated.

- 6 -

**EXHIBIT 28**

ii. Within thirty (30) days of receipt of the final, unsigned deposition transcript by counsel for the Designating Party, such counsel shall advise opposing counsel and the court reporter of the pages, lines and exhibits (if such exhibits are not otherwise so designated) in which Confidential Information appears. The court reporter shall supplement the transcript to indicate the designations. Failure to particularize a designation to opposing counsel within the allotted time shall result in the loss of any designation and shall entitle recipients of the deposition to treat the transcript as non-confidential.

iii. If a party objects to a page, line, and exhibit designation made pursuant to paragraph 13(b)(ii) of this Order, the party may make an objection using the procedure provided in paragraph 17 of this Order and the procedures of paragraph 17 shall apply to resolution of the objection. The designations shall remain effective until and unless an objection is made and finally resolved.

15. No one may attend, or review the transcripts of, the portions of any depositions at which Confidential Information is shown or discussed, other than persons authorized to receive access to Confidential Information.

## **<u>Filing or Use of Confidential Information as Evidence</u>**

16. No party shall provide any Confidential Information or information derived therefrom to the Court absent a good faith belief that such information is necessary to the resolution of a contested issue. Confidential Information or information derived therefrom shall be lodged with the Court under Practice Book Sections 7-4B and 7-4C. After Confidential Information is lodged with the Court pursuant to Practice Book Sections 7-4B and 7-4C, the designating party shall promptly file an appropriate motion under Practice Book Section 11-20A requesting that the information be filed under seal. No Confidential Information or information derived therefrom

shall be filed with the Court until such time that the Court has ruled on the designating party's motion under Practice Book Section 11-20A.

### Objections to Designations

17. Any party may, not later than sixty (60) days prior to the trial of this case, object to a designation by notifying the Designating Party in writing of that objection and specifying the designated material to which the objection is made. The parties shall confer within fifteen (15) days of service of any written objection. If the objection is not resolved, the Designating Party shall, within fifteen (15) days of the conference, file and serve a motion to resolve the dispute and shall bear the burden of proof on the issue. If no such motion is filed within the stated time period, the material shall cease to be treated as Confidential. If a motion is filed, information subject to dispute shall be treated consistently with its designation until further order of the Court. With respect to any material which is re-designated or ceases to be subject to the protection of this Protective Order, the Designating Party shall, at its expense, provide to each party which so requests additional copies thereof from which all confidentiality legends affixed hereunder have been adjusted to reflect the re-designation or removed as appropriate.

### Inadvertent Waiver

18. Inadvertent failure to designate any information pursuant to this Protective Order shall not constitute a waiver of any otherwise valid claim for protection, so long as such claim is asserted within thirty (30) days of the discovery of the inadvertent failure. At such time, arrangements shall be made for the Designating Party to substitute properly labeled copies. However, until the receiving party is notified that the information is designated as Confidential Information, the receiving parties shall be entitled to treat the material as non-confidential.

19. In the interest of expediting discovery in these proceedings and avoiding unnecessary costs: (1) inadvertent disclosure in this litigation of privileged information and/or work product shall not constitute a waiver of any otherwise valid claim of privilege, immunity, or other protection; and (2) failure to assert a privilege and/or work product in this litigation as to one document or communication shall not be deemed to constitute a waiver of the privilege, immunity, or protection

- 8 -

**EXHIBIT 28**

as to any other document or communication allegedly so protected, even involving the same subject matter. In the case of inadvertently produced privileged and/or work product documents, upon request of the Producing Party, the documents together with all copies thereof and any notes made therefrom shall be returned forthwith to the party claiming privilege and/or work product immunity. Any party may, within five (5) court days after notification of inadvertent disclosure under this Paragraph, object to the claim of inadvertence by notifying the Designating/Producing Party in writing of that objection and specifying the designated/produced material to which the objection is made. The parties shall confer within fifteen (15) days of service of any written objection. If the objection is not resolved, the Designating Party shall, within fifteen (15) days of the conference, file and serve a motion to resolve the dispute and shall bear the burden of proof on the issue. If a motion is filed, information subject to dispute shall be treated consistently with the Designating/Producing Party's most recent designation until further order of the Court.

## Non-Termination

20. Any information or documents designated as Confidential Information shall continue to be treated as such until such time as (a) the Designating Party expressly agrees in writing that the information, documents, testimony or other materials in question are no longer Confidential or (b) there is a finding by the Court that the information or documents are not the proper subject of protection under this Protective Order. Issues regarding the protection of Confidential Information during trial may be presented to the Court as each party deems appropriate.

21. The obligations and protections imposed by this Protective Order, as to any documents not admitted into evidence at trial unless sealed by the Court, shall continue beyond the conclusion of this action, including any appeals, or until the Court orders otherwise. The Court defers consideration of destruction, return and deletion of Confidential Information at the conclusion of this case.

## Public Health and Safety

22. Nothing in this Order is intended to prevent any party from raising with the Court any

- 9 -

**EXHIBIT 28**

concern that the non-disclosure of Confidential Information may have a possible adverse effect upon the general public health or safety, or the administration or operation of government or public office.

### Continuing Jurisdiction

23. Any party may petition the Court for a modification of the terms of this Protective Order for good cause shown, after notice and opportunity for a hearing. This Court shall have continuing jurisdiction to modify, amend, enforce, interpret or rescind this Protective Order notwithstanding the termination of this action.

Dated: Bridgeport, Connecticut

February _____, 2019

_____
Hon. Barbara Bellis

EXHIBIT 28

EXHIBIT A

**EXHIBIT 28**

| DOCKET NO: FBT-CV18-6075078-S: | : | SUPERIOR COURT |
|---|---|---|
| | : | |
| ERICA LAFFERTY, ET AL., | : | J.D. OF FAIRFIELD |
| | : | |
| VS. | : | AT BRIDGEPORT |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | |

## CONFIDENTIALITY AGREEMENT

The undersigned hereby acknowledges and agrees:

1. I am aware that a Protective Order has been entered in the above-captioned action. I have had the opportunity to read the Protective Order and understand that my willful disclosure of Confidential Information may constitute contempt of court. I consent to the jurisdiction of this Court for enforcement of the terms of this Protective Order.

2. I will not disclose copies of any Confidential Information to any other person, and will not discuss any Confidential Information with any person except those persons described in the Protective Order under the procedures therein specified.

Name: _____

Address: _____

Telephone No.: _____

Dated: _____

- 12 -

**EXHIBIT 28**

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046436 S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046437 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046438 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

## MOTION FOR COMMISSION TO TAKE OUT OF STATE DEPOSITIONS

Pursuant to Conn. Gen. Stat. §52-148c(b) and Connecticut Practice Book §13-28(a), the plaintiffs in the above-captioned consolidated matters respectfully request that this Court grant a Commission to a competent authority, in the form attached hereto as Exhibit A., to issue or cause to issue Subpoena *Duces Tecum,* compelling the testimony and production of documents from Hillary Clinton, 15 Old House Lane, Chappaqua, New York.

**EXHIBIT 28**

## THE WITNESS

Hillary Clinton is a former public official and a former presidential candidate. She has been the target of vitriolic criticism by Alex Jones.

Although Mr. Jones made certain statements about Sandy Hook as early 2012, and largely stopped making claims about Sandy Hook in the years thereafter, the plaintiffs in this action waited until 2018 to bring the instant action. They are all represented by the same firm, Koskoff, Koskoff and Bieder. On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid.

It is clear as a matter of public record, that Erica Lafferty, the lead plaintiff in this case, was invited to speak at the Democratic National Convention in 2016. Ms. Lafferty was also praised thereafter by Hillary Clinton.

The defendants in this case believe that this suit was filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by Hillary Clinton as part of a vendetta to silence Alex Jones after Ms. Clinton lost the presidential race to Donald J. Trump. The litigation is brought and pursued in bad faith as part of a partisan effort to silence Mr. Jones for reasons wholly independent of the merits of the plaintiffs' claims.

Someone directed all of the plaintiffs to the same firm many years after the shooting. The defendants are entitled to know who and why. The defendants intend to ask Ms. Clinton about her endorsement of Ms. Lafferty in 2016, the factors that led Ms. Lafferty to be invited to speak at the Democratic National Convention, and what role, if

EXHIBIT 28

any, Ms. Clinton or those working under her direction had in directing the plaintiffs to the same firm in this case. Ms. Lafferty is clearly a public figure in this case, and has inserted herself on to a public stage in order to advance her vision of what "gun safety" requires. The defendants seek to depose Ms. Clinton to gather further information about how it is that so many plaintiffs found themselves represented by the same firm so long after the events giving rise to the complaint, but shortly after Ms. Clinton suffered a deeply humiliating defeat in her run for the presidency in 2016.

THE DEFENDANTS
FREE SPEECH SYTSEMS, LLC
INFORWARS HEALTH LLC
PRISON PLANET TV LLC

BY: /s/ NORMAN A. PATTIS /s/
PATTIS & SMITH, LLC
Juris NO. 423934
383 Orange Street, First Floor
New Haven, CT 06511
V: 203-393-3017
F: 203-393-9745
npattis@pattisandsmith.com

## CERTIFICATION

This is to certify and a copy of the foregoing has been emailed and/or mailed, this 1st day of July 2021

Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT  06103
jmw@randazza.com

**EXHIBIT 28**

Brignole & Bush, LLC
73 Wadsworth Street
Hartford, CT  06106
Genesis Communications Network, Inc.
 Fax: 860-527-5929

Koskoff Koskoff & Bieder, PC
330 Fairfield Ave.
Bridgeport, CT  06604
asterling@koskoff.com
cmattei@koskoff.com

/s/Norman A. Pattis /s/

**EXHIBIT 28**

# EXHIBIT A

**EXHIBIT 28**

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046436 S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046437 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046438 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

## ORDER OF COMMISSION

The matter comes before the Court on the motion of the defendants in the above-captioned consolidated matters for leave or judicial authority and an issuance of an Order for Commission pursuant to the Connecticut Practice Book §13-28(a) for the taking of the deposition of Wolfgang Halbig.

IT IS HEREBY ORDERED, that the motion for issuance of an Order for Commission be allowed and is hereby granted: and, it is further ordered that any appropriate authority in the State of New York is authorized to issue a subpoena required to compel the attendance of the witness for the taking of said deposition and to produce requested documents:

**EXHIBIT 28**

Dated: this ____ day of July, 2021, at Waterbury, Connecticut

_____
Hon. Barbara N. Bellis
Connecticut Superior Court

**EXHIBIT 28**

| | |
|---|---|
| DKT NO:  X06-UWY-CV186046436-S | :  COMPLEX LITIGATION DKT |
| ERICA LAFFERTY | |
| | :  JUDICIAL DISTRICT WATERBURY |
| v. | |
| | :  AT WATERBURY, CONNECTICUT |
| ALEX EMRIC JONES | :  OCTOBER 20, 2021 |

DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES

DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES

HEARING

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S :


   Representing the Plaintiff(s):

        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        ATTORNEY MATTHEW BLUMENTHAL
        ATTORNEY SARAH STEINFELD


   Representing the Defendant(s):

        ATTORNEY JAY MARSHALL WOLMAN for defendant Alex Jones
        ATTORNEY WESLEY HORTON for Attorney Wolman
        ATTORNEY CAMERON ATKINSON for the LLC defendant's
        ATTORNEY MARIO CERAME for defendant Genesis Comm.

                              Recorded By:
                              Darlene Orsatti

                              Transcribed By:
                              Darlene Orsatti
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, CT 06702

EXHIBIT 28

THE COURT: All right. Good morning. Do you need a minute Attorney Wolman?

ATTY. WOLMAN: No, your Honor. Trying to just change the name on the system and that doesn't seem to be working, so….

THE COURT: I see your name.

ATTY. WOLMAN: I wanted to add Attorney Horton's name.

ATTY. HORTON: Yes.

THE COURT: Okay.

ATTY. HORTON: Good morning, your Honor. My name is Wesley Horton and I'm representing Attorney Wolman on the order to show cause.

THE COURT: Very well. Is there an appearance in the file?

ATTY. HORTON: I filed - I fax/filed an appearance on late - on Monday, but I haven't seen it on the computer, so. But we have filed it and I believe the other counsel has it. Also, your Honor, I would appreciate it -

THE COURT: So -

ATTY. HORTON: I'm sorry.

THE COURT: Why don't we just hold off? Attorney Horton, I will follow through with Attorney Ferraro to see if he can locate your filings. All right. So -

ATTY. HORTON: I have them in front of me. I

**EXHIBIT 28** 2

actually did file them. I also have a problem, your Honor. I'm only on the order to show cause and I have another Court hearing at 11:30. So, I would appreciate it if I could be heard early.

THE COURT: Yeah. I don't think that's going to happen, so why don't we see how we proceed. Maybe we'll be very efficient and get to that point.

Okay. So this is Judge Bellis for the record and we are in the case, the three consolidated cases of Lafferty versus Jones, Docket No. Waterbury Complex Litigation, 186046436. I'm going to just ask counsel of record to identify themselves. I don't have to have Attorney Horton re-identify himself, since we already got him on the record. And once I hear just from counsel of record, I don't need anyone else to identify themselves. Then I will address the media request that was made in the case.

So starting with plaintiff's counsel.

ATTY. MATTEI: Good morning, your Honor. This is Chris Mattei on behalf of the plaintiff's. I'm joined today by my colleagues Alinor Sterling, Sarah Steinfeld and Matthew Blumenthal.

THE COURT: All right. And for the defendant's.

ATTY. WOLMAN: Good morning, your Honor. This is Jay Wolman of Randazza Legal Group representing Alex Jones, Infowars, LLC, Infowars Help, LLC, Free Speech Systems, LLC and Prison Planet T.V., LLC. I'm

**EXHIBIT 28**

joined by my colleague Attorney Cameron Atkinson from Pattis & Smith, who represents the four LLC defendant's that I referenced.

THE COURT: All righty.

ATTY. CERAME: Good morning, your Honor. Mario Cerame for Genesis Communications from Brignole, Bush and Lewis.

THE COURT: Okay. All right. So I'm going to ask - and good morning everyone. I'm going to ask everyone to make sure your devices are muted. I see that some of you are not muted. I'm going to try to do the same so that it's a little easier for our Court Reporter to take down everything without any feedback. And I'm sure that at some point I'll forget to unmute or counsel will forget to unmute, and I'm sure we'll deal with that.

So yesterday there was a request from Connecticut Public Radio to audiotape the proceedings. I know that Mr. Ferraro reached out to counsel of record to see if there was any objection. I think we heard from everyone except for the - except from Attorney Wolman. So did you have an objection, sir?

ATTY. WOLMAN: No objection, your Honor.

THE COURT: All right. So at this point then having no objection, the audiotape proceedings can now begin at this point if they still wish to do so.

**EXHIBIT 28** 4

All right. So what I thought I would do, is I have an agenda of how I planned to proceed. We'll see how far we get today and then I have some items that will be on the next agenda. So I'm going to go through all that first, and just sort of get everyone up to speed as to how we're going to proceed. And then I'm going to do my old standby where I ask counsel if there is anything that they have that's ready to be adjudicated today or needs a briefing schedule, so that we can do the same thing that we do every time.

So I'm going to start with the plaintiff's motion to seal and then we're going to move to the defendant's motion to dismiss with respect to Lafferty and the plaintiff's motion to substitute. I'm then planning on hearing arguments. I'm going to leave out the claim of manufacturer to trial balances in the Flores issue, so that a surreply can be filed. So that will be dealt with at the next hearing. But I will hear argument on the discovery issues, as it relates to the Google analytics. Discovery to social media discovery. The Clinton deposition issue, and the defendant's discovery to date.

And then I was planning on addressing the show cause hearing for Attorney Wolman. So the next time we have our status conference, which I believe is November 17th, in addition to dealing with the

plaintiff's motion regarding the claim of a manufactured trial balances, I'm going to direct Mr. Ferraro to docket the October 12 motion to seal that was filed at entry number 507. Just give me one moment. I don't think it's 507. So I have - just one moment. I know we have two motions to seal that are going to go on the next hearing. So I have entry number 515, which was filed on October 18th that was the plaintiff's motion to seal. And I have the defendant's motion to seal at entry number 510, and that was filed on October 14th. Mr. Ferraro, is there a third motion to seal or are those the only two motions to seal?

THE CLERK: Those are the two new one's your Honor. The third is the one we're going to argue today.

THE COURT: Okay. Very well.

ATTY. WOLMAN: Your Honor, if I may interject. Your Honor has asked us by 5 p.m. to file our surreply. I should note that there may be the case that we will need to file a motion to seal relative to an un-redacted version of that surreply. And I would ask because of the timing, the short timing that while we can lodge a redacted version certainly by 5 p.m. today, I would like to be able to lodge the motion to seal on the un-redacted version by 5 p.m. tomorrow. If that's all right.

**EXHIBIT 28**

THE COURT: I don't have a problem with that. That's fine. All right. So just give me one moment.

THE CLERK: Your Honor, if that gets filed sort of by tomorrow, that other motion to seal, that is enough time to hear that one on the 17th.

THE COURT: All right. So –

THE CLERK: If you chose to do so.

THE COURT: All right. So that motion to seal, if it is in fact filed, I'll instruct you to please docket that for our next hearing date, which is November 17th.

THE CLERK: Yes, your Honor.

THE COURT: Okay. So besides what I've laid out for our agenda to address today, and what I've already mentioned that we're going to address next time, I'm going to ask counsel as we do every time, to identify anything else that counsel believes is ready to be adjudicated today. And then I'll turn to anything that counsel has filed since our last status conference that needs a briefing schedule.

So I'm going to actually start with you Attorney Cerame, since you generally identify yourself last. Let me let you be first this time.. Is there anything sir, that I haven't mentioned that you filed that you feel is ready to be adjudicated today?

ATTY. CERAME: I don't believe so, your Honor.

THE COURT: Thank you. And is there anything

**EXHIBIT 28**

that you filed sir, since our last status conference that needs a briefing schedule?

ATTY. CERAME: No, your Honor.

THE COURT: Thank you. And I'll turn to Attorney Wolman. Same question. Anything that I haven't mentioned that you believe is ready to be adjudicated today?

ATTY. WOLMAN: I don't believe so your Honor. Nor have we filed anything that - anticipating your next question, anything that I believe requires a briefing schedule at this time.

THE COURT: Thank you, sir. And then turning to plaintiff's counsel. Same two questions. Just make sure you unmute, please?

ATTY. MATTEI: Yup. Your Honor, the only motion that you did not mention, but you previously indicated that you were going to be prepared to address sanctions to today, is the motion for sanctions related to the subsidiary ledgers. I understand that you're putting off the trial balance issue. But that issue I think is ready to go as well.

THE COURT: Yeah. .I am going to address the issue on the subsidiary ledgers and the trial balances at the next hearing. I think I was too optimistic as to what we were going to be able to do today. And I have other matters today, so we're

EXHIBIT 28 8

going to just do what's on the agenda for today. But those will both be on the agenda next time.

ATTY. MATTEI: Very well. The only other issue is the one you've already mentioned. Our motion to seal, I supposed that needs a briefing schedule. We indicated in that motion that we don't believe the continued sealing is appropriate. And so I suspect that Attorney Wolman will want to brief that, as will we.

THE COURT: All right. So with respect to motion to seal at number 515, which is dated October 18th. Any objection from any party? How much time would you need?

ATTY. WOLMAN: Our response, your Honor - this is Jay Wolman for the record. I could do two weeks from today is fine.

THE COURT: Okay. So that would be - I don't have a calendar close by. Is that November 3rd, Mr. Ferraro? Do you have a calendar?

THE CLERK: Yes, your Honor. November 3rd.

THE COURT: No reply.

ATTY. WOLMAN: And if I may, your Honor? I should add that if Mr. Mattei or other plaintiff's counsel wanted to respond to my motion with respect to the Jacobson deposition that was filed under seal -

THE COURT: Yeah.

EXHIBIT 28

ATTY. WOLMAN: - and my anticipated motion tomorrow, today, whatever, that they may want some time on that as well.

ATTY. MATTEI: Your Honor, regarding the -

THE COURT: I'm referring to entry number 510, filed on October 14th, the defendant's motion to seal. Is there any reason why we can't use that same date for any objection that might be filed by any party?

ATTY. MATTEI: That's fine, Judge.

THE COURT: Okay. So November 3, 2021. No reply. All right. And if there is a third motion to seal that is filed by Attorney Wolman, we'll follow that same deadline. Okay. Anything else from you Attorney Wolman on anything that either needs a briefing schedule is ready that I haven't mentioned?

ATTY. WOLMAN: No, your Honor, and I apologize for the oversight.

THE COURT: Not a problem. Okay. So we'll first take up the plaintiff's motion for seal - motion to seal at requesting other relief. That's at entry number 455. I have the defendant's objection, at number 503, and I have the plaintiff's reply at 509. So first, let me just find for the record, that the matter was properly docketed and the public was properly notified on the Judicial Branch Website in a timely manner.

EXHIBIT 28

And if anyone is – wishes to address the Court on the motion to seal, would you please identify yourself at this time? All right. Having heard no response. I'll start with the movant whenever you're ready. I'm not sure who's arguing it. Attorney Mattei?

ATTY. MATTEI: Yes, your Honor, I'll take this. Thank you, Judge. As you know, the Court, I believe since our filing of the motion has ordered us to produce certain documents to the defendant's, covered by this motion pursuant to a designation under the protective order as highly confidential, attorney's eyes only. As a result of that ruling, we think it's even more clear now that the defendant's motion in which they publically disclosed contents of documents that they were not entitled to have at that time, be sealed. Because it relates to information and material that this Court has already determined deserves protection under the protective order. So that's number one.

We also want the Court to make clear in its order today, that not only does the designation of those documents as highly confidential attorney's eyes only apply to documents that the defendant's properly received in discovery from us, but applies to any documents that they improperly obtained from Mr. Halbig.

EXHIBIT 28

We presume that those documents are identical, although the defense to date has refused to provide us with the documents that Mr. Halbig provided to them. So we think that the Courts determination that these documents are deserving of protection, should be dispositive on this issue, and that the defendant's public filing, unnecessary public filing in which they described the documents themselves. Which at that time they were not entitled to have. And which we believe they improperly obtained. And in which they described at least to some degree the contents of those documents, that that should be sealed as well.

THE COURT: Thank you. Attorney Wolman.

ATTY. WOLMAN: Sorry, your Honor. Thank you. Plaintiff's confused issues, simply pled. What Mr. Halbig sent is not what – is not produced in discovery. What plaintiff's will produce to us is something that is being produced in discovery and can be protected by the protective order. These are two separate issues. And I of course want to address one quick thing. On the notice itself, they haven't identified a single thing that we disclosed as to the contents of it. May have identified who the parties to a document are. That is not disclosing the contents of anything. So I take issue with any accusation regarding that.

**EXHIBIT 28** 12

Similarly, we did not obtain these improperly. No more so than Woodward and Bernstein obtained information from Deep throat improperly, or the New York Times obtained the Pentagon papers improperly. What a third party - because Mr. Halbig is now a third party to this litigation, because the plaintiff's withdrew their claims against him. A third party to this litigation provided documents to us.

Whether or not he violated an agreement in doing so, that's between him and the parties to the agreement. And if they - plaintiff's want to take action against him, that may be their prerogative. But that does not hamstring us. We cannot be tied down. The media cannot be tied down when a third party, and The Supreme Court is clear on this, a third party provides us information. Because the - and this is even carved out of the protective order that we agreed to.

We would not have agreed to a protective order that did not have this carved out, because these were documents we lawfully obtained. We didn't steal them. We didn't coerce them at the end of a gun. We lawfully obtained them from a third party. We didn't hack into any system. He chose of his own volition to provide them to us. And we gave notice to the Court, because we thought that that

EXHIBIT 28

was – and to plaintiffs because that was appropriate considering the issues about –

THE COURT: I'm going to interrupt you for a second, Attorney Wolman and just – I have a question. I thought I understood that the protective order that you had proposed to the Court and that the Court ultimately adopted dealt with not only discovery from the parties, but it dealt with discovery that was obtained from third parties. And as my recollection serves, this disclosure or the documents were obtained either in connection with or at around the time Mr. Halbig was being deposed. So I understand he was a party and he's no longer a party, but doesn't – you're in the middle of discovery, you were taking his deposition, doesn't your protective order deal with discovery materials that are obtained during discovery?

ATTY. WOLMAN: This was not obtained during discovery, your Honor. In fact, a motion for a commission to take his deposition was either pending or had been adjudicated, but no subpoena had issued to Mr. Halbig at that time. So this cannot be said to come through in discovery when he was not the subject of – of the discovery –

THE COURT: That doesn't answer my question. Doesn't your protective order encompass materials that were obtained in connection with discovery? I

EXHIBIT 28

understand you're saying this was not discovery. He was a former party, it wasn't formally in connection with the deposition. But my question is, doesn't the protective order deal with documents that are obtained during the discovery process?

ATTY. WOLMAN: By that logic, your Honor –

THE COURT: I'm just asking. It's a yes or no. I'm not asking – it's yes or no. You proposed the protective order, you filed one.

ATTY. WOLMAN: It is not in the discovery process. Is says in discovery. That is the issue here. We can look at the language of the protective order, but if Connecticut Public Radio, which is listening in today, if they provided us documents right now, that would not be in discovery. If President Biden provided us with documents right now, that would not be in discovery. Merely because there is a lawsuit, does not mean that anytime a third party to that lawsuit provides a litigant with a document, that it is in discovery.

Mr. Halbig was not the subject of a subpoena. He did not respond to a subpoena in providing us with those documents,.therefore they were not provided in discovery. And your Honor even made clear in her last sanctions order, that to provide something in discovery means it has to be served on all parties. It wasn't served on the plaintiff's. It wasn't

EXHIBIT 28

served on — actually it wasn't served — it was served on Mr. Cerame, I should note. But — and it was emailed to him. It was not a discovery request. This is not in discovery any more so than if President Biden right now gave us some information or if Governor Lamont gave us some information.

THE COURT: When did you file your motion for commission to take Mr. Halbig's deposition?

ATTY. WOLMAN: I do not know that offhand, your Honor.

THE COURT: Take your time.

ATTY. WOLMAN: That was filed July 7th, your Honor. No — wait, that's the plaintiffs' response. Sorry. Looking for it. Might have been June 28th. Yes, it was June 28th, your Honor.

THE COURT: All right. Just give me one moment, please. So I'm just taking a look at that, and it looks like in that motion for commission — so that was filed June 28th, it looks like by Attorney Pattis' office. When did you obtain the materials? Just out of curiosity. I thought you put it in some filing.

ATTY. WOLMAN: It was after that date, your Honor.

THE COURT: All right. So the motion for commission that was filed with the Court on June 28th, and that asked for permission to take the

**EXHIBIT 28**

deposition about the settlement paid, and so forth. So you set – not you, but the defendant's set forth the reason they wanted to take the depositions and that they wanted to ask Mr. Halbig about the settlement, the releases, the payments, and then you – they took the – Attorney Pattis' office took the somewhat unusual step maybe of actually sending a copy of that motion for commission to Mr. Halbig. It looks like it was sent to his email address and that it was to be mailed to his home address.

So you know, that – in my mind when you look at that, that's a motion that's filed with the Court. That's certified, emailed and sent to Mr. Halbig, who was a defendant and so now you've got him involved in the discovery process. So I understand what you're saying that the subpoena had not been served, but that's – and I accept your word on that. I have no reason to doubt it. But I can tell by looking at the motion that Mr. Halbig was served with this discovery request and then you got the material subsequently. So it's a little murky in my mind. It's not as clear cut maybe as you're making it sound. But continue because I did interrupt you. .

ATTY. WOLMAN: And certainly if your Honor is thinking that it's murky, then murkiness should be resolved on the favor of the First Amendment here, not to – and not issue and order a gag order, because

EXHIBIT 28

that's what the plaintiffs are requesting. A gag order in a prior restraint, which is fully un-constitutional and we should not view murkiness as an excuse to violate the First Amendment.

If it's clear that it was produced in response to a subpoena, fine. It was not. No subpoena had been served. Mr. Halbig was given notice of a request for a commission. I think that should be commendable and that actually be practiced. I think we should amend the Practice Book to require that a copy be - of a motion for commission to be mailed upon a punitive deponent.

So that they can respond here rather than later and deal with the subpoena as need be. And a motion to quash and whatever other state that winds up to being. But here he had no obligation to do something. The Court - you know, a subpoena compels somebody to produce documents under penalty of contempt power. This Courts contempt power or whatever, a local Court's contempt power. He had no obligation to produce it. The Court can issue orders sanctioning any litigant who does not produce a discover - a document in discovery when they are compelled in a request for production.

That is a document produced under the aegis of the proper discovery process. Mr. Halbig did not respond to a document request under the Practice

EXHIBIT 28 18

Book. There was none pending. There was no subpoena pending that he chose and thought that maybe this would obviate anything. I don't know. That's his decision. But whatever's lurking in his mind, if he chose to violate the protective order - I'm sorry, the confidentiality order, that confidentiality provision that was up to him as well. You know, one would think that he would have been filed a protective order because it's confidential. He didn't. That is not somebody who is responding in discovery would act. They would file a motion for protective order to make sure. But he did not.

THE COURT: Attorney Wolman, what are we talking about? I had previously designated the releases as highly confidential under the protective order.

ATTY. WOLMAN: Your Honor designated the plaintiff's production of the -

THE COURT: I understand that, but you're not letting me finish my question.

ATTY. WOLMAN: Oh, I heard a pause.

THE COURT: That's all right. Well, I'm just catching my breath. So since the Court had already designated the releases as highly confidential, what are we talking about? I don't want to sit here and waste everybody's time. What are we talking about besides releases? I mean, is this an academic exercise so that we can discuss the First Amendment.

EXHIBIT 28

I'm just trying to understand this because that order is in place, and let's all be clear. All that does is give the documents that obtained during discovery a status that then just requires anyone who wants to use the documents in the file to file a motion. It doesn't mean that the documents can never be filed. It's just a status that one the side or the other can challenge, and which may or may not end up getting filed with the Court.

So my question is, what are you talking about besides releases? In my experience, you have a withdrawal and you have a release. Those are the settlement documents in a case. The withdrawal is a public record, it's in the file, and the releases are already designated. So what is it that we're talking about?

ATTY. WOLMAN: Your Honor, the releases as provided by Mr. Halbig are not designated. That is the issue. The First Amendment is never academic. If your Honor says right now that these are -- that what Mr. Halbig previously gave is attorney --

THE COURT: Mr. Wolman -- Mr. Wolman, I --

ATTY. WOLMAN: May I --

THE COURT: I thought that and I can look up my order. I thought that I actually ruled in your favor on the production on the releases. I believe that I overruled the plaintiff's objections, ruled in your

EXHIBIT 28

favor and said that the releases, I thought for the four former parties, which had include Halbig had to be produced, but they would be designated as highly confidential. If you don't agree with that then we'll pause and I'll go look up. There's a lot of orders in this case, and I can go look up the order. Is that not your understanding?

ATTY. WOLMAN: Your Honor ordered that the plaintiff's produce the releases as AEO. Your Honor did not order that what Mr. Halbig gave us, for all I know —

THE COURT: No, no.

ATTY. WOLMAN: — not going to produce the same documents —

THE COURT: But — Mr. Wolman —

ATTY. WOLMAN: — as they hear them.

THE COURT: Mr. Wolman, this is really not complicated and this is a yes or a no. It doesn't call for any argument. It's a yes or a no or I don't know, your Honor. Okay. Which is a valid response if that's the proper answer. Did I not previously rule in your favor, require the plaintiff's to produce the four — the releases as to the four former parties and then designate them as highly confidential, including the Halbig release? Wasn't the Halbig release — weren't the plaintiff's obligated to produce a copy of that to you? Didn't I

EXHIBIT 28

rule in your favor, yes or no?

ATTY. WOLMAN: As to the plaintiff's producing it, yes.

THE COURT: Okay.

ATTY. WOLMAN: Your Honor did not discuss what Mr. Halbig produced to us.

THE COURT: Okay. So I have already designated that release as highly confidential. The Halbig release. I am not going to change that ruling. That's the ruling that stands. I will not change it and that's the ruling and you'll do what you need to do. What I'm simply trying to find out, is whether there are other documents, because - and I don't know what we're talking about here, in my mind settlement documents are a withdrawal and release and maybe a copy of a check.

So is there anything else that I have to concern myself with here or are we just talking about a release?

ATTY. WOLMAN: I mean, Mr. Halbig sends us lots of emails. There was - you know - I don't know what the plaintiff's would be concerned with. Mr. Halbig sent us some communications with his own counsel, a Mr. Beatty.

ATTY. MATTEI: Your Honor, may I just be heard?

THE COURT: Well, I want - I interrupted Attorney Wolman, so I just want to give him an

**EXHIBIT 28**

opportunity to finish up since I interrupted him, and then I'll give you an opportunity to respond, since it's your motion.

ATTY. WOLMAN:  I mean, arguably Mr. Halbig's email made reference to the nature of the settlement that was being proposed, and his aversion to wanting to enter into it at all.

THE COURT:  Okay.  Anything further before I give the floor back to Attorney Mattei.

ATTY. CERAME:  Your Honor, I should like to be heard before Attorney Mattei, just in response briefly?

THE COURT:  I just want to make sure Attorney Wolman's done, Attorney Cerame.

ATTY. WOLMAN:  Your Honor, treating what a third party provides as AEO is not the same as what the plaintiff's provide.  Under your Honor's order, this is now a brand new order.  And even though there is a process for changing that designation, even three seconds of a gag order is still unconstitutional.  And that's what this does.

THE COURT:  All right.  Attorney Cerame.

ATTY. CERAME:  Just briefly, your Honor.  Just a couple of points.  There was the characterizations made by Attorney Mattei that we have – that there was an improper – the materials were improperly obtained.  As I understand it, these materials were also sent to

EXHIBIT 28

us. I believe personally that they got caught in our Spam filter, and I have not seen these materials.

But nonetheless, ostensibly they were sent to us. I take the issue with the characterization that we improperly obtained them. That may have been a rhetorical flourish, I'm not sure. But to whatever extent there was not a need to make that in the record. And I think that's – it may be relevant as to analysis that we may have received it. And I just wanted to make those points, your Honor. That's all I have to say.

THE COURT: Attorney Mattei.

ATTY. MATTEI: Your Honor, Attorney Wolman is – made the argument that because these were produced by Mr. Halbig, they weren't produced in discovery. The context here is important. A week after the Court ruled that they were not entitled to inquire of Mr. Halbig or obtain documents relating to settlement from him, they then received these documents from Mr. Halbig.

And you point out, Judge, that although we don't know, that very well may have been prompted by them sending Mr. Halbig the motion for commission, and any other communication's they may have had, which we don't know. But what's clear is that they were attempting to obtain these documents from Mr. Halbig in discovery, the Court precluded them from doing

EXHIBIT 28

that, and they then obtained them anyway. So the idea that these were not exchanged or provided in discovery, doesn't make much sense.

And I also want to respond to this claim that Mr. Wolman is a member of the media. And that precluding him from distributing documents obtained in discovery, is a prior restraint. Mr. Wolman is not a member of the media. He is a lawyer representing a litigant before this Court, who is bound by this Courts protective orders. And simply because he's in possession of an identical copy of a document, that this Court has already determined is deserving of protection, does not mean that can - or his client, can disseminate that document, simply because it's a copy, to the media as they've indicated in their pleadings they want to do. For the purpose we claim, of attempting to taint the jury pool.

So from our prospective, this is the Courts entry or protective order and determination that these documents are covered by, and under a highly confidential designation, isn't a prior restraint on anybody. It is an order entered essentially by agreement with the defense to be bound by it. And it doesn't matter whether or not they obtain the document from Mr. Halbig, which we believe was perhaps not pursuant to formal discovery, but

EXHIBIT 28

certainly within the discovery process, or from us. It's the same document, it's deserving of protection, and that should be maintained.

THE COURT: All right. So I am going to deny the motion to seal. I'm also going to deny the plaintiff's request for a Court order designated – designating that all the settlement materials and information be treated as highly confidential.

However, my prior order that the releases are designated as highly confidential remains in effect. So with respect to any releases that the parties obtained they are designated as highly confidential and that order remains in effect. All right. So now I'm going to turn to the defendant's motion to dismiss with respect to the Lafferty claim. That is at entry number 445. I have the plaintiff's objection that is at entry number 462. And I have the defendant's reply that is at number 477. I am also going to take up in conjunction with the motion to dismiss, the plaintiff's motion to substitute, which is at 459 and 460. The defendant's objection, which is at 501. The plaintiff's reply, which is 513.

Ordinarily there is no right to oral argument on a motion to substitute, but in light of the pending motion to dismiss, I am going to allow argument on the motion to substitute, as well as the motion to dismiss. And I think it makes the most sense to

EXHIBIT 28
26

start with the movant on the motion to dismiss. And I think the substitution and the dismissal can be dealt with the same time in the argument, then I will have the plaintiff's response and then the defendant's will have an opportunity to reply.

So I just want to make Attorney Cerame, because I never want to forget you. I didn't see you had any filings with respect to the Lafferty motion to dismiss, and I don't see that you formally joined in it. Did you?

ATTY. CERAME: I did not. Your Honor, I don't think I have anything clever or particularly nuance to add beyond what Attorney Wolman's already said. I have discussed the issue with him, but, truly - I - there are very intelligent people writing here, and I do not have anything particular to add.

THE COURT: All right. And then what about the motion to substitute? Did you want to weigh in on that motion at the appropriate time?

ATTY. CERAME: Nothing beyond what Attorney Wolman has said. I - he's really - he's briefed the issue much more thoroughly than I could have.

THE COURT: All right. So then I will not worry about forgetting you in the argument, with the understanding that you are opting out. And I will start with Attorney Wolman, who will address his motion to dismiss and the plaintiff's motion to

EXHIBIT 28

substitute. Whenever you're ready, sir.

ATTY. WOLMAN: Thank you, your Honor. With respect to Erica Lafferty. We brought this issue to the Courts attention back in May. At the same time we did with respect to Mr. Richmond. The late Mr. Richmond. And at that time the Court in viewing a similar motion to dismiss and motion to substitute, viewed it as — she permitted the substitution for the purpose of withdrawing the claim. There is no functional difference here. Ms. Lafferty has not been a real party and interest since December of 2018. She did not inform the Court. We learned about her bankruptcy by happenstance while doing a pacer search, as I customarily do in discovery of litigants. And at that time we also learned that nominally the claims had sold back to her, committing a fraud in the bankruptcy court, which has since been reversed.

But at all times because that sale was voided, the trustee, Mr. Coan has been the real party and interest continuously through today from December of 2018. And what we have here is — and I should note. There's an argument first raised in the plaintiff's reply on the substitution motion. That I think should come into bearing.

Which is, that because Ms. Lafferty claimed a partial exemption in the matter, under section 522,

EXHIBIT 28

that somehow she remained a real party in interest. While that is an interesting argument to make, she's still then saying that Mr. Coan should be substituted, which then doesn't make sense either way. They can't have it both ways. That was a reply in support of substituting Mr. Coan. She's been saying no, she's really the real party in interest. No. Mr. Coan has been. And while they look to one case, one Superior Court case, I would say that the Court should defer to what the U.S. Bankruptcy Court for the District of Connecticut has stated.

In the matter of In Re: Xiao, X-I-A-O, 2016 Bankruptcy in Lexus 4121. Judge Tancredi noted that when a timely objection, that is to a claim of exemption is lodged, and we have done so, however the assets claimed as exempt remain property of the estate, unless and until the objection is overruled. It could not be more clear that that. And he cites to the Eastern District of New York. He cites to the Tenth Circuit Bankruptcy Appellate Panel, which that decision was affirmed. That is what the Court should look to, a decision of the Bankruptcy Court as to who actually remains the real party in interest.

You know, Ms. Lafferty may prevail in the issue regarding the claimed exemption. The Court has – the Bankruptcy Court has actually deferred action on that case, pending the outcome of this – of that issue,

EXHIBIT 28

pending the outcome of this case. And so what we have is a matter where the assets remain property of the bankruptcy estate even today. They remained property of the bankruptcy estate even when that bill of sale had purportedly issued because that bill of sale of void. The Bankruptcy Court declared that in void, therefore it has zero regal effect. So since that time she is not the real party in interest.

Now sometimes we do substitute the trustee, and that is a motion pending in this court.

THE COURT: Can you address what discretion in your opinion the Court has with respect to the motion to substitute? Is it your position the Courts hands are tied under the law?

ATTY. WOLMAN: I think that just as with the executrix of the Richmond Estate. We're facing a situation here where the trustee has known he is the real party in interest for years. For years. And has chosen not to prosecute. We should not be rewarding his nonfeasance with now all of a sudden letting him into the case well after significant discovery has been taken. That would be prejudicial, your Honor. Just as it was that your Honor felt that Mr. Richmond's claim should be withdrawn because the - presumably the late date at substitution has being sought. This is even later for an even longer period of time. There is no excuse.

**EXHIBIT 28**

Mr. Coan tried to make sure that we did not know what was going on the Bankruptcy Administration. He didn't appear in this case, despite the fact that plaintiff's firm had been hired years ago and retained through an order of the Bankruptcy Court to prosecute the case in the name of Ms. Lafferty. That was the purpose of that order. Ms. Lafferty herself sought that order - and assented to it rather. The trustee is the one who, I should note, moved for it if I recall. But she did not object to that.

THE COURT: Attorney Wolman, what of the fact that the case did not remain dormant during the time that the trustee was not named as a party in this case? What significance under the law is that?

ATTY. WOLMAN: Well, I mean there has been certain amounts of dormancy at least in this court, where months went by when we were in the Supreme Court of Connecticut. There were months that went by when we were in the District Court -

THE COURT: Well, what I meant by dormancy, I don't mean when you removed it to Federal Court, where obviously it would be improper for this Court to do anything, nor do I mean, I believe I had granted your stay. I don't know if you filed it or if Attorney Pattis. So I'm not talking about that as dormancy. In my mind dormancy is when there can be activity on a case and nobody's prosecuting their

EXHIBIT 28

claim.

Given – I can't – I would be hard pressed to find certainly not another case on my docket, but I'd be hard pressed to find another case that's prosecuted and defended as vigorously as this case. So I don't see besides when we were not permitted under the law to have any activity in the case, I don't see that this case was ever dormant for probably a day. And I'm just wondering how significant is that under the law.

ATTY. WOLMAN: Well, I think that we should also look at the fact that discovery was served in May. Months before substitution was sought. Ms. Lafferty, her deposition was taken. And the – you know, some of the issues in terms of how things were characterized, even with respect to the motion for commission regarding Mrs. Clinton, you know, related – is related to that.

We have severe prejudice. We did not get to issue interrogatories. We have not been able to dispose Mr. Coan as a party. In fact he had objected to his – to a subpoena to him. He did not wish to be deposed in this matter. Or I apologize, maybe it's the plaintiffs were seeking to preclude his deposition. I forget who filed that one. Who objected to that subpoena, moved to quash it. I believe that the trustee joined in it, or filed his

**EXHIBIT 28**

own motion. But –

THE COURT: Attorney Wolman, let me just ask you. I know that you're in the middle of depositions, because I'm getting phone calls during the deposition in this case. Where's the prejudice if you weren't able to take the depositions that you say that you weren't able to take? I could see you would be prejudiced if trial started tomorrow and you couldn't do the depositions that you wanted. But clearly you're right in the midst of depositions. So what is the prejudice that attached here, so that I understand it a little better?

ATTY. WOLMAN: Well, I mean, part of the problem is we still haven't even gotten any production from Mr. Coan. Where the plaintiff's asked for time, Mr. Coan has not asked for time, despite the Court essentially ruling on that motion. We've gotten no production from him. We haven't been propertied a new date, we did not get to serve interrogatories on him. That time has elapsed, and we've been litigating against the wrong party for years.

THE COURT: Anything further, sir?

ATTY. WOLMAN: No, your Honor.

THE COURT: Thank you. Attorney Mattei, are you arguing this?

ATTY. MATTEI: Yes, your Honor. Thank you. Taking up the both the motion to substitute and I

**EXHIBIT 28**

think the motion for lack of subject matter jurisdiction at that same time. You started out with the question, Judge, about whether your hands are tied. Our view, and I think the view you have embraces in a couple of prior cases you've handled involving similar cases, is that you do have the authority to resolve a motion to substitute, prior to resolving a motion to dismiss for lack of subject matter jurisdiction.

I believe that you did that in both the Dragonetti case, 2010 Westlaw 4227122, and the Messiah case, which we think is similar to this one. 2012 Westlaw 6634817. And I urge the Court to do that here for a couple of reasons. Number one, it's our view and I think the law supports this that Ms. Lafferty has been and continues to be a proper party in interest, having retained a legal and pecuniary interest in this matter before the Bankruptcy Court, for the duration of the case.

She's retained the maximum exemption that she can under the Bankruptcy Code in an interest in the case, and that confers upon her, both standing and .this Court's subject matter jurisdiction to prosecute the claim in her own name.

With respect to Attorney Wolman's argument that they've objected to that exemption, the objections period for when Ms. Lafferty claimed that exemption

EXHIBIT 28

lapsed in February of 2019, I believe. And it wasn't until the Jones defendant's intervened in Ms. Lafferty's bankruptcy and claiming that she owes them money that they attempted to object to that exemption in August of this year. And I should note, that they have not objected to Ms. Lafferty's claimed exemption of her interest in this lawsuit. What they've objected to, is her claim in the Bankruptcy Court that she does not yet know what the value of the remaining case is.

And as that exemption has existed, essentially throughout the entirety of this case, that property, her interest, had remained within the debtor's possession. That is Ms. Lafferty's possession. And we think that the cases that are most persuasive on this issue are the Fetner case, which I will cite to you as soon as I can pull it up. 218 bankruptcy, 262 In Re: Fetner. And also the *Post versus Latera* case, which we cited to this Court. Where a debtor retains a real legal and pecuniary interest in the litigation that she is bringing, and has advised the Bankruptcy Court of that. That confers upon her standing in this court jurisdiction, and she has had it throughout.

It's simply not part of the bankruptcy estate, and for that principle, I would refer the Court to In Re: Sheets, 69 Bankruptcy, 542. And In Re: Bedouin,

EXHIBIT 28

which is a Connecticut Bankruptcy case, 427 BR30. Explaining that exempt property is not part of the bankruptcy estate. And so she has maintained that interest throughout, and as your Honor points out, she has prosecuted the case diligently.

I do want to address Attorney Wolman's disparagement of Mr. Coan. Mr. Coan has been a, I believe a 35 year veteran of the Bankruptcy Court. And he, as a result of the Bankruptcy Code has discretion as to whether or not to substitute on behalf of the Bankruptcy Estate. It's very clear that he has discretion to do that. Having been made aware of the pendency of the matter. Having been aware of Ms. Lafferty's exemption. Mr. Coan was fully within his rights as the trustee, to continue to let her proceed with it, to pursue it and to prosecute it on his behalf, which he did. And that discretion is undeniably plain with the Bankruptcy Regulations.

I also want to - sorry, Judge.

THE COURT: Take your time.

ATTY. MATTEI: I also want to say that the only remaining question then, is whether or not Mr. .Coan may be substituted at this time. Mr. Wolman criticizes him for now making an effort to substitute. It's not necessary that he do so, but he's doing that at this time, in part because the

EXHIBIT 28

Jones defendants have raised this issue. Not because he's under any mandate to do that. He could continue in his discretion to let Ms. Lafferty continue to prosecute the case on his behalf. But he's opted to seek substitution. Ms. Lafferty has opted for him to seek substitution. And there's no prejudice to the defendant. As you pointed out, your Honor, as a result of this they still can take his deposition if they wish. They still can seek discovery from Mr. Coan, if they wish, but it's not really disputed that the individual who has relevant information to Ms. Lafferty's claim, is Ms. Lafferty herself. She's been deposed. She's prepared records for production. She has submitted interrogatory responses. And the damages that are being claimed in this lawsuit, are those that she personally experienced.

If the Court were to deny its subject matter jurisdiction, deny Mr. Coan's ability to intervene in this case, the injury would be to the Bankruptcy Estate. And the entire purpose of the Bankruptcy Code is to ensure that the assets of a Bankruptcy Estate are maximized. The code is a shield for the debtors' estate to maximize its value. It's not a sword to be used by parties in litigation against the estate.

He's been aware of the claim since the beginning. He's exercised his discretion not to

EXHIBIT 28

substitute. And the clear distinction both between the events surrounding Mr. Richmond's estate, are that Ms. Lafferty has retained an interest throughout. Obviously with Mr. Richmond's passing, he did not retain an interest, was not capable of prosecuting the matter and there was no representative who had discretion to allow him to do that. That's clearly not the case here. The Bankruptcy Code's purpose is to ensure that there is no end run of the bankruptcy process. And that the estate's assets are being maximized. Here, Ms. Lafferty disclosed to the Bankruptcy Court, her interest in this litigation. She maintained an exemption. The case was filed before she ever filed for bankruptcy. And there's no dispute that she was the proper party in interest as of that time.

And so we think that the Court should follow the same rational that it used in Messiah. Conclude that a substitution is appropriate, and allow the case to continue. Indeed, both the Delito case and other cases expanding upon this have held that the rules of standing are not to be applied or construed narrowly, so as to cut off a claim, but rather liberally, particularly in the absence of any prejudice to allow a claim to proceed. So for those reasons we think the motion to substitute should be granted, and we think the motion to dismiss should be denied.

EXHIBIT 28

And I just want to mention one other thing. In the In Re: Xiao case, which Jay recently cited a decision by Judge Tancredi, it was the trustee of the bankruptcy estate that objected to the exemption that the debtor was claiming. Here, neither the trustee nor any legitimate creditor has objected to that exemption. And so we're in a very different posture than they were in the Xiao case. And we're much more closer to Fetner and to the Latera case. Thank you Judge.

ATTY. WOLMAN: May I respond, your Honor.

THE COURT: Certainly.

ATTY. WOLMAN: First, that last point, our clients are legitimate creditors. Ms. Lafferty herself filed amended complaint - amended schedules identifying our clients as creditors. That is why we were then given an opportunity to object to the claimed exemption. For the first time Ms. Lafferty did not give our clients notice, and she cannot capitalize on her own malfeasants in order to then use that as some kind of issue of us sitting on our rights.

No. The only party to sit on his rights is the trustee. Yes. The trustee has discretion to substitute. But simply his - even if he exercises his discretion and doesn't substitute, that does not confer standing on the debtor. That simply means

EXHIBIT 28

that nobody is prosecuting the case if he does not substitute in. It does not mean that the debtor has the right to do so. And it doesn't matter who filed an objection – with respect to the Xiao case I cited, Judge Tancredi stated the principle clearly. And we did file an objection. We filed an objection timely to the claimed exemption. And that has not been adjudicated. And so therefore the owned proper party this entire time has been the trustee and he has sat on his rights and should not now be rewarded for that.

And I should note, that Mr. Mattei misrepresented the record. There is no, so far as I'm aware, notice of compliance with respect to Ms. Lafferty. She has not produced documents it this matter. She is presumably part of this rolling production, but we haven't gotten anything from her. And we haven't gotten anything from Mr. Coan, who is not subject to the rolling production so far as we are aware.

So as a result, I see no reason why he should now having not produced documents, having not had the opportunity to serve.interrogatories on him, that he should now at this late date be permitted to substitute in. Thank you.

ATTY. MATTEI: Your Honor, in response. First of all –

**EXHIBIT 28** 10

THE COURT: I generally don't go back and forth, Attorney Mattei, as you know. But since there was an issue raised with regard to whether there had been compliance, I think you should address that.

ATTY. MATTEI: Yes. Thank you, your Honor. What I said was, that Ms. Lafferty has prepared documents for production, which is accurate. As the defendant's know, because they deposed her, and deposed her on the preparation she had made to produce documents. And I also said that she is served interrogatories, which is true. So I – let me just leave it there.

I also want to say that Ms. Lafferty has not conceded that Mr. Jones is a creditor of hers. She has listed in light of what the Jones defendants have done to muck up her bankruptcy. Him as a contingent creditor, they filed objections as I understand it, to his claim. And Judge Manning has indicated that she will not be addressing that until this matter is resolved. That's all, Judge.

THE COURT: All right. So I am going to deny the motion to dismiss, having granted the motion to substitute, and I will issue something in writing. And I just want to say, that I would consider any appropriate motion to modify from the defendant's or really from any of the parties, if additional time is needed to conduct discovery specific to that

EXHIBIT 28

plaintiff, because certainly there should be no prejudice if sufficient time for the discovery is permitted.

So what I'm going to do now in an effort to accommodate Attorney Horton, because I am not going to get through that hearing today, and the other important matters on our agenda. What I'm going to do Attorney Horton, is sort of give a background, if you would, so that you're on notice and Attorney Wolman is on notice of the Courts concerns. So I will put some background statement on the record so that you know what you're defending against at the next hearing.

I haven't yet decided whether I'm going to possibly, if I find it appropriate, to do a referral to Disciplinary Counsel, or if I'm going to exercise my jurisdiction and discretion and deal with the issue myself at a hearing. I might be leaning towards dealing with the issue myself, with obviously I'm very pleased to see that you're appearing for Attorney Wolman. That's a good thing. So – and I certainly want to give you enough time as well, so that you know what the Court's concerns are.

ATTY. HORTON: Yes.

THE COURT: All right. So – and I don't think once we're done with it, there's not going to be any colloquy, any further discussion, unless you had a

**EXHIBIT 28** 12

specific question. Which I don't think you will. And I'll plan on addressing this issue at our next scheduled status conference. Okay. So on May 6, 2021, the Court having already referred prior defense counsel to the Disciplinary Authorities, and concerned about obstructive and dilatory practices, as well as candor towards the tribunal on the part of the defense, instructed all counsel in the case to review the relevant sections of The Rules of Professional Conduct.

On May 29, 2021, the Court warned Attorney Wolman to refrain from invoking The Rules of Professional Conduct in civil filings in this lawsuit, as it is entirely inappropriate to use the rules as a weapon in a civil lawsuit. The Court warned Attorney Wolman that any further such usage of the rules would result in immediate action by the Court, under Practice Book Section 2-45.

Then on June 26, 2021, Attorney Wolman was warned to refrain from inappropriate commentary and ad hominem criticism of the Court in court filings in this case. These are all very unusual steps for the Court.to take. This brings us to the September 17, 2021 deposition of unrepresented witness Robert Jacobson. The deposition transcript, which has been lodged with the Court at the Courts request, will be marked as a Court Exhibit now, Mr. Ferraro,

**EXHIBIT 28** 3

temporarily under seal. As I see that it contains personal identifying information, and it may contain other information. And Attorney Ferraro, we will put that issue on the agenda as well for our next status conference. That motion – the Courts sua sponte motion to seal parts of the transcript.

I'm also going to instruct Mr. Ferraro to mark the subpoena that was served on Mr. Jacobson as a Court Exhibit. That was filed by plaintiff's counsel, also as a result of the Courts order. And we'll mark that as a Court Exhibit as well. The Court's reviewed the entire deposition transcript of Mr. Jacobson. And had the Court had that information during the September 17 telephone conference that was done on the record, and had the Court had any inkling of the abusive questioning that was being conducted by Attorney Wolman, I would have immediately, immediately stopped the deposition. And if I was going to permit any further questioning of that witness, it would have been done in open court with the Court on the bench and present for any further questioning. But I did not, obviously have the transcript in front of me as the deposition was ongoing.

In response to Attorney Wolman's questioning of Mr. Jacobson, Mr. Jacobson's response would indicate that he had no documents that were responsive to the

EXHIBIT 28

plaintiff's subpoena on either his phone or on the Cloud, except for the subpoena itself. And after the plaintiff objected to the request, Attorney Wolman asked Mr. Jacobson to search the email on his phone for the phrase Sandy Hook. In response, Mr. Jacobson asked Attorney Wolman, quote, am I legally required to do so, end quote.

And rather than refrain from giving legal advice, Attorney Wolman's response was, quote, you're here and you're subpoenaed here, and you brought your documents, your entire email account to the deposition, end quote. Following another objection by plaintiffs' counsel, Attorney Wolman asked Mr. Jacobson, quote, are you refusing my request, end quote. Referring to his request that the unrepresented witness search his phone. At which time Mr. Jacobson stated that he would like to consult with a lawyer.

Attorney Wolman then asked the witness how much time do you need today to consult with a lawyer. At this point on the record with the witness there, plaintiff's counsel with Attorney Wolman's okay, emailed the Court Officer, Mr. Ferraro, to get the Court involved to get a ruling on the issue of whether the unrepresented witness needed to search his phone for the documents.

Nonetheless, Attorney Wolman, after stating

EXHIBIT 28

that the witness had not called counsel immediately, and knowing that the Court had been contacted to intervene in the issue, pressured and barraged the witness by asking, would you like to call a lawyer right now? Mr. Jacobson, are you going to call a lawyer right now?

Attorney Wolman then stated that the witness had a full and fair opportunity to seek counsel. And after the witness stated again that he would await the Courts ruling on the issue, Attorney Wolman again asked the witness, are you refusing to produce documents pursuant to the search I have requested?

The transcript that's been marked as a Court Exhibit, shows that Attorney Wolman continued to pressure and harass the witness, who stated over and over again that he was waiting for the Courts ruling. Attorney Wolman asked the witness several times what the witness was doing himself to seek Court intervention. While Attorney Wolman already knew that Court intervention had been requested by the lawyers, who had access to the Court.

This behavior concerns the Court, and that is part of what Attorney Wolman is answering to. So this witness, like most witnesses, did not have a lawyer on standby. He testified in response to Attorney Wolman's questioning, that he didn't bring a lawyer to the deposition because he could not afford

**EXHIBIT 28**

one. Nor did this unrepresented witness have any method of seeking Court intervention on his own in the middle of the deposition. The Court is also concerned with Attorney Wolman's legally erroneous and response to the witness's question, as to whether the witness was legally required to search his phone.

There was no Court order that the Court had issued, nor does the subpoena that's also been marked as a Court Exhibit, require him to search his phone in the middle of the deposition. And that is simply not normal deposition procedure. It is actually highly irregular.

In the middle of the deposition, the Court did address on the record during the telephone conference, the issue at hand. And I direct the clerk to make a copy of that transcript as a Court Exhibit as well. It's already contained in the file. Attorney Wolman in his comments to the Court during that hearing, justified his continuing to ask the witness to search his phone, because the witness did not himself somehow seek judicial intervention, in addition to the judicial intervention that plaintiffs' counsel had already set in motion, which led to the hearing, and because the witness did not somehow find a lawyer in the middle of the deposition.

The Courts directive on the record at that

EXHIBIT 28

status conference, which took place in the middle of the deposition, was that Attorney Wolman should file a motion on the issue if he felt it was necessary. And that it was not appropriate and not normal deposition procedure to have a witness search a phone for documents in the middle of the deposition. That is what the Courts directive was. File a motion, if you think it's necessary. This is highly inappropriate and it is not normal. It is that simple.

At that point the Court had not seen the subpoena, which now that the Court has seen it, does not show that the witness was required to produce his phone at the deposition, nor had the Court seen the earlier part of that deposition transcript with the questioning that concerns the Court.

It's painfully clear to the Court now, having reviewed the deposition transcript and subpoena that the witness objected to searching his phone. That he wanted time to talk to a lawyer. That he wanted the Courts ruling. And it is also painfully clear that under the law, the witness was under no legal obligation to search his phone.

When Attorney Wolman went back on the record at the deposition, he immediately asked the witness if he was willing to search the phone. At no point did Attorney Wolman make clear to the witness the Courts

**EXHIBIT 28**

directive, that it was inappropriate and not normal to have a witness in the middle of a deposition fumble through a phone and search for records.

The Court is concerned of possible Rules of Professional Conduct violations of 3.43 and 3.44. By disregarding the Court's directive and by misleading the witness to believe that he had a legal obligation to search his phone, email's or the Cloud, when no such legal obligation existed. 3.5(4), by engaging in conduct intended to disrupt a deposition by harassing, barraging, or pressuring the witness. 4.1(1), by making a false statement of material fact to the witness with regard to whether the witness had a legal obligation to search his phone. And with respect to his failure to info the witness of the entirety of the Courts order. 4.3, by giving legal advice to an unrepresented person, by virtue of his response to the witnesses question of whether the witness was legally required to search his phone. And 8.4(3), by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation by virtue of his response to the witness's question of whether the witness was legally required to.search his phone.

So those are the Courts' concerns about possible rules of professional conduct violations. We will take that up at the next hearing, now that everyone

EXHIBIT 28

is on notice of what the Courts specific concerns were, and what specific rules of professional conduct, the Court is concerned might have been violated.  All right.

So Attorney Horton, you are more than welcome to stay for the rest of this hearing.  I see that its 11:16, so we got you out just in the nick of time.  Okay, sir.  So we will see you at the next hearing date.

ATTY. HORTON:  Thank you, your Honor.

THE COURT:  You're welcome.

All right.  So I now want to address the discovery issues.  And I'm going to try to do it in a way that makes sense to me, by sort of breaking it down into different sub-categories.  So let's start with the issue in the motion for the Hillary Clinton deposition.  So the Court in its August 5, 2021 order, found that the defendant's Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC and Prison Planet, LLC, willfully disregarded the Court ordered procedure when filing their motion to depose Hillary Clinton.

The Court further found that the defendant's never took any corrective steps with respect to the improper filing.  And the Court expressed its grave concerns that their actions in the future will have a chilling effect on the testimony of witnesses who

EXHIBIT 28

would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public.

The Court indicated that it would address sanctions at a future hearing, and this is that hearing. So I don't have a particular order. I'm thinking that I will start with the defendant's, then hear from the plaintiff's and then return to the defendants, so that the defendants have an opportunity to respond.

ATTY. WOLMAN: Thank you, your Honor.

We do take the confidentiality order very seriously and have endeavored to abide it. There was during a deposition this motion filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the Courts order. And you know, it was erroneously believed that that was not subject to the confidentiality order. The witness herself was not identified.

And while it may be a technical violation, and it was not realized to be so at the time -

THE COURT: So do you admit now that it was a violation, whether it's a technical violation or not?

ATTY. WOLMAN: I would say it probably fits

EXHIBIT 28

within the language of what is protected. We had concerns as to whether or not it truly was protected. The Court has weighed in.

THE COURT: So let me ask you Attorney Wolman. Do you have any disagreement that the transcript from which that information was taken and filed on the motion in the middle of the deposition apparently, that that transcript had been marked. Whether you agree with the designation or not, that it had been marked as a protected document.

ATTY. WOLMAN: Yes, it had, your Honor. And I would also ask that the Court to - I mean, make sure, you know, that we're disambiguating which defendants are at issue. Not all defendant -

THE COURT: Well I think when I just read my statement, I listed the defendants that were involved in the filing of that motion. So it's not necessary to do that again.

ATTY. WOLMAN: Okay.

THE COURT: So tell me, because subsequent argument with respect to this issue, the argument was that essentially the protective order, there was no basis for granting the protective order, and the designation was not proper, and so be it. I haven't - where do I see a filing anywhere that corrects what happened or that says this was a mistake? Or a technical violation? Or whatever your

EXHIBIT 28

position is?

I'm not saying I agree with it or not. But, what I saw instead, the subsequent filings on this issue was, Court had no basis for granting that protective order, which by the way, you all filed. The defendant's filed. And it was a bad designation. Why was that posture taken?

ATTY. WOLMAN: Certainly I think we're entitled to resist any accusation of a violation of a protective order, as any litigant would be. And that's how we did — we were looking to preserve the issue —

THE COURT: The Court's concern — the Court's concern, Attorney Wolman, is that there were several itineration's of that protective order before the Court granted the protective order in the early days of this case. And I believe you actually were the one that filed it. I understand there were discussions with the plaintiff's. I understand all that. But that was the protective order that you all asked the Court to approve. And that — once the Court enters the order, it's a Court order, correct?

ATTY. WOLMAN: Yes it is, your Honor.

THE COURT: I then get argument from your side, from the defendant's, essentially saying that there shouldn't have been a protective order. There was no good faith basis for it. So I'm at a loss here. Is

EXHIBIT 28

the protective order now something that the defendant's, if they disagree with the designation, don't have to comply with?

ATTY. WOLMAN: No, your Honor. I think the argument is a little more on the designation itself, not being in good faith, and certainly that we didn't appreciate that this kind of statement that doesn't identify any particular witness, would be subsumed within that protective order.

THE COURT: Say that again?

ATTY. WOLMAN: We didn't identify who it was who was being deposed. We gave no explanation –

THE COURT: So, is it your –

ATTY. WOLMAN: – first deposition –

THE COURT: – so was the information contained in that motion not information contained from the deposition?

ATTY. WOLMAN: It was, but that the nature of the disclosure itself was not viewed as a violation of that order. That was – we did not –

THE COURT: So because you didn't list the name, you could take what – so if someone designates a transcript as confidential, or whatever the designation is, anybody in the case can file whatever they want as long as they don't give the name of the deponent?

ATTY. WOLMAN: That as a general – as long as

EXHIBIT 28

you're not saying who it is, what it is, you know, I think that is - makes it readily identifiable.

THE COURT: So -

ATTY. WOLMAN: Who it is -

THE COURT: So you're - so then - Attorney Wolman, say psychiatric records are produced. You can just white-out the name of the plaintiff or the patient, and you can - you can put that out there because it doesn't identify the person?

ATTY. WOLMAN: No, your Honor. But I think we can say that three plaintiff's claim anxiety, seven plaintiff's claim PTSD. Whatever the numbers may wind up being. Six plaintiffs have gone to - or some plaintiffs have gone to this particular out of state doctor, and therefore we need a commission to take his or her deposition.

We're not identifying who the plaintiffs are, but you have to set forth a reason, and we're not saying anybody's particular information. Nobody can say which of the multitude of plaintiffs it is. It's presenting generalized information. And that was not understood as to what we had agreed on. And that the designation - it was not realized that this would - that type of thing would be viewed as a violation of the protective order. If your Honor is saying that it is, we will certainly abide that order from here on out.

**EXHIBIT 28**

THE COURT: Well I'm concerned – it doesn't seem complicated to me, it actually seems extremely basic. But I'm very concerned. So as I understand it, the parties are in the middle of a deposition. Deposition testimony is elicited. In the middle of the deposition, information from that deposition is used, and in the middle of the deposition a motion is filed with information from that deposition.

It's pretty rare in my mind to see. I mean, I'm not sure I've ever seen someone in the middle of a deposition use information from that deposition, while it's still ongoing, and immediately file a motion. So that was a little unusual. But I'm just struggling. I'm not sure that the defendant's understand their obligations under the Court order, that if a deposition transcript is designated by one, two, three; or all the parties, that the information from that deposition cannot be used in the manner that it was used. And I'm hearing things that concern me.

So now your position is we can use, despite the Courts order, we can use information contained – that was elicited in the deposition, as long as we don't identify. So for example, for example, for example and tell me if I'm wrong. So if the plaintiff's – if you designated a deposition of one of the defendant's as confidential until you all figured out what

EXHIBIT 28

portions would be confidential or not, for the purposes of discovery. And the plaintiff's elicited deposition testimony that one of the defendant's, doesn't matter which one, let's say Prison Planet T.V., LLC. It really doesn't matter. But they gross 85 billion dollars a year in advertising revenue. The - or is it your position then that the plaintiff's would then be able to put that in a motion, even though you've designated the transcript as confidential? That one of the defendant's grosses 85 billion dollars a year in advertising revenue, as long as they don't say that it was Prison Plant T.V., LLC because it doesn't identify them? It could be any of the defendant's?

ATTY. WOLMAN: Well, certainly it would be a fact by case by case scenario, because we've certainly represented that none of the defendant's, except for Free Speech Systems, is the revenue generating entity, because that produces Infowars. So certainly if that were to come in, unless of course somehow it's thought up as being Genesis Communications. This - with respect to the issue here, it did not directly identify any identifiable witness, whereas that kind of example might.

We appreciate your Honor's elaboration of how the order is to be interpreted moving forward. And we'll abide that. And we will go forward with that

**EXHIBIT 28**

understanding that this is how things are to be treated. It was not understood that way at the time the commission motion was filed. And because now that your Honor has clarified, this is how we're going to do it going forward, we are certainly –

THE COURT: All right. So Attorney Wolman, let's just step back for a bit, if you would? Let's pull up the protective order that was in effect at the time. The protective order that you filed. And point me to the paragraph's that I need to look at, that you now say that it wasn't clear to you that you could apparently use portions of a deposition transcript where the deposition had been marked confidential by a party. So tell me, the protective order was filed when?

ATTY. WOLMAN: Sorry, what's the entry number, your Honor?

THE COURT: I don't know. You filed –

ATTY. MATTEI: 185.

THE COURT: What is it?

ATTY. MATTEI: 185.

THE COURT: All right. So I'm going to go to the number 185.. That is the proposed order that you actually filed on February 22, 2019, that I granted on that same day. This was your document, not mine. And tell me the provision that you're suggesting now, you needed further clarification from the Court.

EXHIBIT 28

And just before we get to that. Attorney Wolman, just so that we're all on the same page. When - let's say you marked during discovery, let's say that you marked a document as confidential. And let's say that Attorney Mattei for the plaintiff disagreed with your designation. What is the procedure that he would follow to challenge the designation?

ATTY. WOLMAN: That would be following the deposition and opportunity to meet and confer.

THE COURT: And then if you met and conferred, and he - and you stood by your designation that that's confidential, but he wanted to use that information in a court filing. What is he to do then?

ATTY. WOLMAN: He's supposed to file it under seal, or at least seek a sealing. I don't believe the plaintiff's had done that consistently throughout this case, however.

THE COURT: Just - just let's stick to what the question is. What's the procedure? Go ahead.

ATTY. WOLMAN: That one would file that redacted. File an un-redacted under seal conditionally.

THE COURT: And then the Court makes the determination of whether - of what should happen, correct?

EXHIBIT 28

ATTY. WOLMAN: Yes.

THE COURT: Right. We did that, did we not, on record in the – with respect to your clients? I think we spent a good solid hour on the record. I sealed some items. You withdrew some items. And I didn't seal some items. So that was sort of like a challenge, correct, to the designation.

ATTY. WOLMAN: That – well, no, that wasn't a challenge to the designation. That was as to the issue of sealing. But we did not do that, for example, with respect to a reply memorandum that was filed un-redacted.

THE COURT: I just want to make sure that there's no concern. That you have a mechanism and that you understand the mechanism that if – that if a document is designated as confidential or highly confidential, that the procedure that is in place is followed. I just want to make sure that everyone is on the same page with that so we don't have any problems.

So you have a meet and confer. Then if the document is a document that needs to be filed in a court filing, it's filed under seal. It's lodged, and then the Court addresses it. And it either remains – it either can get filed under seal or it's not filed under seal.

ATTY. WOLMAN: Right. It's hard to point to a

EXHIBIT 28

specific portion, and certainly I can't - I was not the filing attorney of that motion. I was busy taking the deposition, your Honor. But, you know, just in the aggregate, it's unclear that it applied to representations regarding an unnamed witness.

THE COURT: Let's direct ourselves back - I'm still on the protective order. I pulled it up and I'm just waiting for you, because I don't want any more problems in the future. So direct me, since I have your document up, direct me to the relevant provision on documents that are designated as confidential. So when a deposition transcript is designated as confidential or highly confidential, what are you permitted or not permitted to do with that transcript?

ATTY. WOLMAN: Well, paragraph 14-A and 14-B talks about designation of the transcript as confidential information. It doesn't say what constitutes the confidential information. It just -

THE COURT: Well, no. Attorney Wolman, listen to me. You're - I want - I'm not asking what constitutes confidential information. This is really not complicated and you're making it more complicated. A party designates a document, rightly or wrongly, they exercise their right under this protective order to designate a document.

We're not addressing as whether anyone agrees or

**EXHIBIT 28**

disagrees with the designation.  But once the designation is made to a deposition transcript, whether you agree with it or not, how is that deposition transcript treated?  And that's what I want you to show me in this protective order.

ATTY. WOLMAN:  Well the transcript is treated for that time period until the designation is challenged as confidential information, your Honor.

THE COURT:  And what paragraph am I looking at, if you can?

ATTY. WOLMAN:  Fourteen A and B, your Honor.

THE COURT:  Just give me one moment, please. And then 15 maybe, no one may attend or review the transcripts of the portions of any depositions, at which confidential information is shown or discussed, other than persons authorized to receive access to confidential information?

ATTY. WOLMAN:  Yes, your Honor.

THE COURT:  All right.  So it seems clear to me that if, again, this is the document that you filed and you asked the Court to approve.  It seems clear to me that re-reviewing those paragraphs, it's a pretty straight forward document that if a party exercises its right to designate a document, or a transcript in whole or in part as confidential, there's a process that is to be followed.  And part of that process does not include taking portions of

**EXHIBIT 28**

the confidential document and doing anything with it, besides the limited things that are allowed in this protective order. So would it not include, for example, posting on a website or filing it on the internet in the court file? Do you agree with that?

ATTY. WOLMAN: I agree. And it looks like the motion was filed where it was attempted to strip away the confidential information part of that where it did not identify a witness, and but appears that the Court is viewing the – what is confidential and how it's treated broader. And so we will abide that going forward certainly.

THE COURT: Just give me one moment. And looking at motion for commission to take Hillary Clinton's deposition that was filed on July 1, 2021, apparently in the middle of the deposition of the lead plaintiff, what portion of – you can just read it to me, because I don't have the transcript of the lead plaintiff. But, read to me right from that motion what portions in your mind were taken from the confidentially designated deposition.

ATTY. WOLMAN: Certainly your Honor. There's one sentence. Everything else is based upon a matter of public record. So, there's only one sentence. The witness claimed not to know her legal fees were being paid.

THE COURT: Okay. Thank you. Anything further?

EXHIBIT 28

ATTY. WOLMAN: When someone says refusing to answer, I don't believe is a statement of confident — it's confidential information itself. So the preceding sentence. So, no, it would just be that one sentence.

THE COURT: So Attorney Wolman, where did the information come from that a plaintiff has refused to answer the questions?

ATTY. WOLMAN: Well, that's information that —

THE COURT: Some of —

ATTY. WOLMAN: — that's saying — I apologize for interjecting. Please?

THE COURT: If it — if it came from a transcript that was marked as confidential, then why isn't that confidential? I don't know. I wasn't at the deposition, and I don't have the deposition transcript. But if at the deposition the witness refused to answer a certain line of inquiry, and that was at a deposition where the transcript was marked highly confidential, how could that information be gleaned anywhere else?

ATTY. WOLMAN: I mean, your Honor, it is a little difficult here because we've also called the Court in the middle of confidential depositions. And the Court has posted transcripts of those colloquies without any form of sealing. This is — it's an unusual circumstance, but we're talking about

EXHIBIT 28

questions and non-responses. I don't think is information that we're dealing with.

THE COURT: So the sentence on advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. That was not information that was gleaned from the deposition that we're talking about.

ATTY. WOLMAN: It's not information gleaned from the deponent. It's an argument of counsel that is not any of the information that it would be subject to the protective order. The questions and non-answers that just — we were talking to the Court about can we make inquiry as to the settlements. Can we ask a witness about that, and we were before the Court and there was no effort made to seal anything.

THE COURT: Attorney Wolman, I apologize because it really might be me not understanding what you're saying. But the sentence that I just recited that refers to how many clients all ended up represented by the same firm. That was not information that was taken from the confidential transcript?

ATTY. WOLMAN: At that point no transcript had been prepared, certainly by the —

THE COURT: Attorney Wolman, you're really splitting hairs here and it concerns me that you don't understand what your obligations are under the protective order. That's why I'm going through this

EXHIBIT 28

exercise.

ATTY. WOLMAN: Okay. It's our understanding –

THE COURT: You know what I can do? I can have, if you can't give me a straight answer, I can have you lodge a copy of the deposition transcript, because I can read. I can read what this motion that was filed by Attorney Pattis says, then I look at the deposition transcript and I could see if that was contained in there. I - this is a straight question, and I expect a straight answer. Unless you don't the answer, which I accept. If you don't know the answer to something, if you do not know whether that question was asked at that deposition, that's okay with me.

Then I will ask someone else if they know, or I'll have the transcript lodged with the Court. And I can read and I can figure it out. This is not – I'm not looking for argument on it. It's just a very simple question that I just can't get a straight answer to. So you represented to me, and I accept your representation because you're a Commissioner of the Court and you have a duty of candor to the Court. I asked this simple question of what in this motion was taken from the deposition. Okay. And you gave me the one sentence.

And now we're talking about this other sentence, and since I wasn't at the deposition and I don't

**EXHIBIT 28**

presently have a copy of the transcript, I'm asking you the question. And the question was, the sentence, the preceding sentence on advice of counsel at least one plaintiff has refused to answer how so many of the client's all ended up represented by the same firm. My question is, at the deposition that we're talking about, was that question asked, the question, how many clients ended up represented by the same firm? It's a yes or a no, or an I don't know.

ATTY. WOLMAN: I believe it was asked. I don't have the transcript in front of me. But again, it's a question as to whether or not the confidential information is what the witness testifies to, rather than the question and non – arguments of counsel and non-responses. Because we haven't treated it that way throughout this case, when we called the Court during depositions designated confidential. So questions and non-responses have not been treated that way.

THE COURT: Anything further?

ATTY. WOLMAN: No, your Honor.

. THE COURT: Thank you. Who's arguing in opposition?

ATTY. MATTEI: I am, your Honor.

THE COURT: When you're ready.

ATTY. MATTEI: Well, I have to say, I am more

EXHIBIT 28

alarmed now than I was before the argument. Because what I've just heard is counsel for Alex Jones say, that prior to the very middle of this hearing, he thought it would have been acceptable to disseminate to the world, personal, highly sensitive information about my client's, so long as he didn't identify them by name.

There is no reading of the protective order that would permit that. Any material, whether it's a document or a deposition transcript that is designated as confidential, and any information derived from that confidential information, is protected, period. The protective order doesn't speak in terms of, well, if you don't identify the person by name, it applies specifically to information.

And what happened here, we're in the very first deposition of the very first plaintiff. In the middle of the deposition after our clients had been made aware that their information was protected by a protective order and that the Court had the authority to do that and enforce it. They disseminate to the public, information that is clearly and unequivocally and undeniably drawn from the deposition testimony itself.

And I sat here during this last colloquy, Judge, where you're trying to get Attorney Wolman to simply

**EXHIBIT 28**

admit that the statement in their motion for a commission, quote, on advice of counsel, at least one plaintiff has refused to answer how many of the clients all ended up represented by the same firm. He refused to admit that that statement was drawn from the deposition, when of course that's the only place it could have been drawn from. It's the first deposition. They're claiming the plaintiff refused to answer. A refusal to answer, I guess in Attorney Wolman's tortured reading isn't actually information. Perhaps it doesn't even count as an answer itself.

When they're asked, as they were, and I'm happy to provide the transcript and Attorney Wolman knows this, although he won't admit it to the Court, they were asked – the plaintiff was asked repeatedly, are you refusing to answer the question?

And the witness responded. I'm refusing to answer that question on the advice of counsel. Precisely what counsel with the Jones defendant's put in their motion. And yet we're told by Attorney Wolman that that does not count as confidential information. And so we are left to wonder what else the Jones defendants may unreasonably later claim was unclear about the protective order.

And I want to go back to the context here, because as troubling as it was that they were essentially laying in weight during the first

**EXHIBIT 28**

deposition, to disclose confidential information. The context here matters. This is the first deposition of the first plaintiff, in which undoubtedly highly sensitive information concerning their lives, their medical history, their mental health history, issues relating to damages; issues relating to their deceased children are going to be discussed. The most highly sensitive and personal of information. And in that first deposition, they choose to go public with information that our clients had every reasonable expectation would be protected.

And it occurred in the midst of a 13 hour deposition. No other deposition has lasted that long. And the reason that they did that, is to send the chilling message that you've already identified to future witnesses and future plaintiff's, that they better be careful about discussing openly their personal information, their personal details of their lives, because there may be a chance that before their lawyers can protect them, Jones' lawyers are going to the court and put it in the pleading.

And we've since received information that other non-party witnesses are concerned about Jones' conduct and his counsels' potential retaliation for providing honest testimony in this case. So it's no accident that this happened there in the first deposition. It's no accident that it happened during

EXHIBIT 28

the context of what we consider to have been an abusively long deposition. And if you ever have a chance to read the entire transcript, I'm sure you would agree. It was designed to set a tone for their conduct for the rest of the case. And that's what they did. And these unconvincing pleas that somehow the protective order was unclear, because number one, we didn't think that it applied to information, we thought it only applied to the identities of the people giving information. That's the first argument we heard today. And then number two, well if it's a non-response, although that may be information, it's unclear whether that's confidential information, because it's a non-response. It is, I think inexcusable that our clients would give information to Mr. Jones and his attorney's, when they have shown such a disregard for the protective order.

And we would ask the Court to make a finding that the conduct here was likely to lead to the chilling effect that the Court has already expressed it had grave concerns about. And even more so now, given counsel's refusal initially to acknowledge that there had even been a violation, and then his tortured answers and responses to the Courts questions.

ATTY. WOLMAN: your Honor, it's my — actually it's my confidential —

**EXHIBIT 28**

ATTY. CERAME: Your Honor –

THE COURT: One moment. One moment. Attorney Cerame.

ATTY. CERAME: Yes, your Honor. I was actually present at this deposition. I just want to correct a couple of representations that were made by Attorney Mattei, that I felt I need to correct the record or just set something straight.

It was a long deposition. It was also one where I participated very actively. I don't always do so. In part because it was the first deposition. I recall that I started asking questions about 5 p.m. The witness was offered repeatedly if she wanted to come back another day. She declined to do so. So I started late, right? So I took a long time too. I had a lot of questions. And I took a long time, and I was very – for a number of reasons. It might be apparent in the transcript. I just wanted to say that.

For one thing in response to what Attorney Mattei said here. There were a number of – it was contentious. There was – it was unusually contentious as someone coming in. And I wanted to say that too. Some of the accusations I hear from Attorney Mattei seem to be Ad hominem's, presuming to derive intent. None of this personal identifying information was really – is what was discussed in any

**EXHIBIT 28**

of the motions. But it was a very contentious deposition, and I just wanted to note that for the record, so the Court had that context of things. That's all.

THE COURT: Thank you.

ATTY. WOLMAN: And I would ask –

THE COURT: One moment. Before I hear from Attorney Wolman, I did want to ask you Attorney Mattei, if there was any other portion of what was designated as confidential. Any other sentences in that motion for commission on the Hillary Clinton deposition that we're taken from the deposition. Since I don't have the transcript.

ATTY. MATTEI: There were no other sentences of their motion for commission that were drawn from the deposition. We do think that including them in a motion for commission for Hillary Clinton's deposition and some of the other statements within the motion, were designed to ostensibly identify who the plaintiff was, because it's public knowledge about Ms. Lafferty's involvement in Ms. Clinton's campaign. And so we think that that was essentially a backdoor way to identify who the plaintiff was.

But the only two sentences are the ones that were specifically drawn from the deposition itself, are the ones that we cited in our motion.

THE COURT: Thank you. Attorney Wolman, you

**EXHIBIT 28**73

have the floor.

ATTY. WOLMAN: Your Honor, I'm not aware of any backdoor way. We could have been deposing any witness. And in fact, the only parties that have disclosed who the witness was, was the plaintiff's. The motion does not say it was the first deposition of the first plaintiff at all - or it's the lead name plaintiff, in any way, shape or form. We haven't said that in any respect, in terms of the - in that motion. That's the plaintiff's disclosure and it's theirs to make. Who says it's my disclosure - mine to make that at least the question itself, not necessarily the answer, or the non-answer is mine.

But what the question is, that's certainly my information to disclose or at least — or other co-counsel, as the case may be. There is no — there's nothing chilling here. This was — I understand the Court has viewed that, but we need to view it in the context. This was not the issue of who saw what doctor, with what condition. And who has done what? What's their income? What's their damages? It's nothing of the sort. It's a motion for commission, where if the Court views it as two sentences, we got the non-answer is an answer. Okay, fine. And we'll understand that again going forward.

This was not - this is the first time that had come up. There have been no other breaches from our

EXHIBIT 28

part since. We've taken many depositions, and that hasn't happened in the slightest. No one has been chilled. This was something designed as a motion to take the commission and to the extent it was misinterpreted as to what could be revealed and what couldn't be. We understand that and we have ever even since the motion for sanctions was filed in the immediate aftermath, we haven't done anything of the sort.

We've been very conservative in our approach here, with the exception of discussions with the Court as to questions and answers at depositions that the Court needs to adjudicate. So, we firmly respect the Court's protective order. We recognize that it's an order we agreed to and it was just misunderstood that -

THE COURT: Attorney Wolman, just to correct what you're saying. It's an order that you filed, that you submitted to the Court. You didn't agree to it. It's not an order of the Court that you agreed to. You actually filed it.

ATTY. WOLMAN: And people -

THE COURT: Your office filed it and drafted it. Maybe you had conversations with the plaintiff's counsel. You asked the Court to approve the order, correct?

ATTY. WOLMAN: I understand. And you know,

EXHIBIT 28

Legislators often draft things that they don't fully comprehend the implications of their own language. So it can happen that an author doesn't really realize that this is what's the full ramifications.

We've got thousands of statutes on the books, where the Legislators didn't realize that they'd be applied in a particular way. But, if we're going to do a textural analysis, it is what it is. And certainly we respect this is how the Court is interpreting the order. We didn't expect it would be that way.

And now we understand that this is how it's being interpreted, and we fully abided it, even once the hint of a violation raised by opposing counsel was made. We've fully gone with that rigorous interpretation.

ATTY. MATTEI: Just a couple of points.

THE COURT: Can I just you Attorney Wolman, what steps when you said as soon as it was filed. I did not see any corrective steps taken by the defendant's once the confidential information was filed in the Hillary Clinton motion. I did see the July 19, 2021 filing, which brought forth other arguments, different arguments that you're making today. So today this is more of a, we were confused, we didn't think that it applied to information contained in the confidential depositions, as long as we didn't give

EXHIBIT 28

the name.  That's a new argument from the July 19 filing.

And the other new argument is, well, if – we didn't realize that it was an objection or non-responsive that we didn't realize that was confidential either.  Those are different argument's that you made in the – from the July 19th filing, which those arguments were more along the lines were, well it was a bad designation, and shouldn't have been designated, and the Court had no good cause to issue a protective order in the first place.  The protective order that you asked the Court to grant that you filed.  So do you want to address that at all?

ATTY. WOLMAN:  Certainly, your Honor.  I believe that the arguments that I've made today are subsumed within the filing.  That – to the extent that there was a violation, you know, this was not an intentional violation.  And that goes to, again, this is not what we expected it to mean.

THE COURT:  And when you say it wasn't intentional, how was it not intentional exactly?

ATTY. WOLMAN:  The witness was not specifically identified.  It was not meant to violate any witnesses' confidentiality, but rather simply to raise a generic issue with the Court as to plaintiffs in general.  Not really revealing any one particular

EXHIBIT 28

witnesses confidential information.

THE COURT: Attorney Cermane, anything further?

ATTY. CERAME: I would note just briefly. I think that what Attorney Wolman is saying is, that there was a difference of opinion about the interpretation of the order. I stay so - I don't want to get anywhere near that I'll say, because it is so contentious. It seems like to me just I can understand how someone might have a different understanding of the order. The parties might have a different understanding of it. That's all I have to say, your Honor.

THE COURT: So I do intend to impose sanctions. I do think that - I reject the arguments that were made in the July 19, 2021 filing by the defendant's. I reject the arguments that were made today by defense counsel. I think that the arguments were baseless, and I think the behavior really is unconscionable. There is no confusion. There can be no confusion about a very straight forward protective order that counsel themselves filed and asked the Court to approve. And I am concerned about a chilling effect on the testimony of other witnesses.

So we are going to leave and I may schedule another court date because there's a lot of ground to cover. The next time we convene, I want to address also the Google analytics documents, the social media

EXHIBIT 28

documents and any other discovery issues. So it may very well – and address what sanctions are going to enter, so it may very well be that we have another hearing before our hearing in November. Because we really have quite a bit of ground to cover.

Because of the concerns that I've voiced, and because of what I've heard from counsel for the Alex Jones defendant's and in part Attorney Cerame, because of your comments, I am very concerned that the defendant's in this case having expressed confusion of a very clear protective order, that there are going to be problems in the future. I suggest strongly for your own interests, as well as your client's interests, that you are err on the side of the caution and seek advice from the Court if you have any concerns about how to proceed.

So rather than just file a motion, where you're concerned whether or not, given what you've said, that you have any concerns that may be confidential information. That you somehow seek the Court's intervention, so that you don't get yourself in a situation where more damage is done.

So with that, we'll adjourn on this matter. Thank you, counsel.

(The matter concluded.)

EXHIBIT 28

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY
                                  :  JUDICIAL DISTRICT WATERBURY
v.
                                  :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  OCTOBER 20, 2021

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #4, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 20th day of October, 2021.

Dated this 21st day of October, 2021 in Waterbury, Connecticut.

Darlene Orsatti

Court Recording Monitor

**EXHIBIT 28**

ORDER 421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
  AT WATERBURY

8/4/2021

ORDER

ORDER REGARDING:
07/01/2021 385.00 MOTION FOR COMMISSION FOR DEPOSITION

The foregoing, having been considered by the Court, is hereby:

ORDER: DENIED

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

UWYCV186046436S  8/4/2021                                     Page 1 of 1

**EXHIBIT 28**

1

# JURY CHARGE



THE COURT: Make yourselves comfortable.

So ladies and gentlemen of the jury, you've listened to the evidence and to the arguments of counsel and it now becomes my duty to instruct you concerning the law of the case. And I apologize but I must read most of this because it becomes somewhat technical in places and it's very important that I not miss anything.

But before I do that, I would like to thank you, ladies and gentlemen, for your attention throughout the trial. I noted that you have all been paying very close attention to everything that has gone on here. You've been unfailingly on time and even early for all the breaks and for each morning and for that, we are all very grateful.

As I instructed you before the start of evidence, generally, a civil trial such as this has two issues, liability and damages. As you will recall, here you are tasked with addressing the issue of damages, as the court previously determined that the defendants are liable. As a result this trial focused on damages. As I previously instructed you, you are not to speculate as to why the court previously determined that the defendants were liable but you are simply to accept it

EXHIBIT 28

as a given and focus on the amount of damages to be awarded and the degree of the defendants' wrongdoing. The plaintiffs' burden at a hearing in damages such as this is to simply prove that the damages claimed is properly supported by the evidence and to prove the extent of the defendants' wrongdoing for purposes of punitive damages.

You as the jury and I as the judge have two separate functions. It is your function to find what the facts are in this hearing in damages; with respect to the facts, you and you alone are charged with that responsibility. My function is to instruct you as to the law to be applied to the facts that you find in order to decide this case.

With respect to the law, what I say to you is binding upon you and you must follow my instructions. I do not have any preference as to the outcome of this case. I have not meant to convey by facial expression or tone of voice or in any other way at any time during the trial any preference or inclination as to how you should decide the facts and you should not make any such interpretations. If in my instructions to you, I refer to one party more than the other or do anything that in your mind suggests a preference for one side or the other, it is not done on purpose.

My task has been to apply the rules of evidence and to instruct you as to the law. It is for you alone

EXHIBIT 28

to decide on the amount of damages in this case. It is your duty to follow my instructions and conscientiously apply the law as I give it to you to the facts as you find them in order to arrive at your ultimate verdict. If you should have a different idea of what the law is or even what you feel it ought to be, you must disregard your own notions and apply the law as I give it to you.

The parties are counting on having their claims decided according to particular legal standards that are the same for everyone and those are the standards I will give you and that you must follow. If what counsel said about the law differs from what I tell you, you will dismiss from your minds what they may have said to you. You must decide this case based only on the law that I furnish to you and on the basis of all the law as I give it to you regardless of the order of my instructions. You must not single out any particular instruction or give it more or less emphasis than any other but rather must apply all of my instructions on the law that apply to the facts as you find them.

You are to determine what the facts are by careful consideration of all the evidence presented and based solely upon the evidence giving to each part of the evidence the weight you consider it deserves in reaching your ultimate conclusion. When I say

EXHIBIT 28

evidence, I include the following; testimony by witnesses in court including what you may have observed in any demonstrations they presented during their testimony, testimony by witnesses by way of the reading of transcripts or the showing of videotapes, exhibits that have been received into evidence as full exhibits, including any pictures or documents that are full exhibits. The testimonial evidence includes both what was said on direct examination and what was said on cross examination without regard to which party called the witness.

The following are not evidence and you must not consider them as evidence in deciding the facts of this case; opening statements and closing arguments by the attorneys, questions and objections of the attorneys, and testimony or exhibits that I instructed you to disregard.

Additionally, testimony or exhibits that I told you was to be used only for a limited purpose is not evidence for any other purpose. Your duty is to decide the case based on the testimony of the witnesses in court along with what has been admitted into evidence in the courtroom only and not on any other information about the issues that was not presented into evidence in this courtroom. It is my right to make comments to you on the evidence but where I do that, such comments are merely to suggest to you what point of law or what

EXHIBIT 28

controversy I'm speaking about. If I refer to certain facts or certain evidence in the case, do not assume that I mean to emphasize those facts or that evidence and do not limit your consideration to the things that I may have mentioned. Likewise, you should attach no importance to it if I should mention one party more than the other. If I should overlook any evidence in the case, you will supply it from your own recollection. If I incorrectly state anything about the evidence in relation to what you remember, you should apply your own recollection and correct my error. In the same way, what any of the lawyers may have said in their respective summaries to you as to the facts or evidence in the case should have weight with you only if their recollection agrees with your own. Otherwise, it is your own recollection of the facts and evidence which should have weight in your deliberations.

Please understand that your decision must not be reached on the basis of sympathy for or prejudice against any party. The parties come to court asking simply for a cool impartial determination of the disputed issues based on the facts and the law. That is what they are entitled to and that is how you should approach the decision of this case.

You have heard that one of the parties in this lawsuit, is the defendant Free Speech Systems, LLC,

EXHIBIT 28

6

which is an entity created by the law. All parties are equal before the law. The mere fact that one of the parties is a natural person and one is a creation of the law, should not play any part in your deliberations. You must treat all parties in an equal and unbiased fashion.

I instruct you that Free Speech Systems, LLC, is owned, controlled and operated by Alex Jones and it is employed to hold and generate revenue for him. I further instruct you that under the law applicable to this case, Alex Jones and Free Speech Systems are legally responsible for each other's wrongful conduct and are each responsible for the entirety of the harm to the plaintiffs in this case.

You will recall the testimony of Brittany Paz the corporate designee of Free Speech Systems. When asked to do so, corporations are required to designate an individual to testify for them. The opposing party has no say in who that person is. The corporation here, Free Speech Systems, LLC is given notice of the topics on which testimony is requested. It then chooses its designee and it is required to provide that designee with all the relevant information necessary to speak for it on that topic. Because it is important that the corporate designee be prepared to testify accurately, a corporation has the right to produce different designees for different topics. The corporation has an

EXHIBIT 28

affirmative obligation to educate its designee as to the matters regarding the corporation. Even if the documents are voluminous and the review of the documents would be burdensome, the corporation is required to have its designee review them in order to testify.

Under Connecticut law, a corporation is generally responsible for the actions of its employees. In this case the court has determined that Free Speech Systems, LLC and Alex Jones both are responsible for the actions and statements of the employees of Free Speech Systems, LLC. Under Connecticut law when a broadcaster invites others on his show whom he expects will make false statements, the broadcaster is responsible for those false statements just as if the broadcaster had said them.

You have heard evidence that the defendants invited guests onto their broadcasts and those broadcasters falsely stated that the plaintiffs are actors and the Sandy Hook shooting was a hoax. These guests included Steve Piecscenik, James Tracy, Wolfgang Halbig, and others. I instruct you that it is established that the defendants are legally responsible for the statements of these guests on Infowars.

There are generally speaking two types of evidence from which a jury can properly find the truth as to the facts of the case. One is direct evidence, such as the

EXHIBIT 28

testimony of an eye witness. The other is indirect or circumstantial evidence, that is, the inferences which may be drawn reasonably and logically from the proven facts. Let me give you an example of what I mean by direct and circumstantial evidence. If you're looking out a third floor window and you see smoke rising outside the window, that's direct evidence that there's smoke outside.

It is also circumstantial evidence that there is a fire of some sort below the window. As a general rule, the law makes no distinction between direct and circumstantial evidence but simply requires that the jury find the facts in accordance with a preponderance of all the evidence in the case, both direct and circumstantial. Thus, both direct and circumstantial evidence are permissible evidence and each type should be treated equally.

In your consideration of the evidence, you are not limited to the bald statements of the witness, that is, the exact words that they use. On the contrary, you are permitted to draw from facts which you find to have been proven such reasonable inferences as seem justified in the light of your experience. While you may make inferences and rely on circumstantial evidence, you should be careful not to resort to guesswork or speculation or conjecture to determine the facts in the case.

EXHIBIT 28

9

While the plaintiffs requested all Sandy Hook videos broadcast by the defendants and all analytics regarding Infowars social media, website and marketing materials and financial data, the defendants did not produce complete information in response and as a result, the plaintiffs had no ability to present the missing information to you.

The credibility of witnesses and the weight to be given to their testimony are matters for you as jurors to determine. However, there are some things to keep in mind. It is the quality and not the quantity of testimony that controls. In weighing the testimony of each witness, you may consider whether the witness has any interest in the outcome of the trial. You should consider a witness's opportunity and ability to observe facts correctly and to remember them truly and accurately, and you should test the evidence each witness gives you by your own knowledge of human nature and the motives that influence and control human actions. You may consider the reasonableness of what the witness says and the consistency or inconsistency of his or her testimony. You may consider his or her testimony in relation to facts that you find to have been otherwise proven. You may believe all of what a witness tells you, some of what a witness tells you or none of what a particular witness tells you. You need not believe any particular number of witnesses and you

Case 2:23-cr-00137 Document 157-21 Filed in TXSB on 05/03/25 Page 497 of 619

EXHIBIT 28

10

may reject uncontradicted testimony if you find it reasonable to do so.

In short, you are to apply the same considerations and use the same sound judgment and common sense that you use for questions of truth and veracity in your own daily lives. While most of the witnesses whose testimony has been presented to you were here to testify in person, the testimony of some witnesses were presented to you by the showing of videotapes of questions asked and answers given by those witnesses under oath at an earlier time. Testimony that is presented in this manner may be accepted or rejected by you in the same way as the testimony of witnesses who have been physically present in court. You should disregard any objections you hear made in those depositions and you may consider the responses.

We have had in this case the testimony of one expert witness Mr. Clint Watts. Expert witnesses such as engineers or doctors are people who, because of their training, education, and experience have knowledge beyond that of the ordinary person. Because of that expertise our law allows expert witnesses to give their opinions. Ordinarily a witness cannot give an opinion about anything but rather is limited to testimony as the facts and that witness's personal knowledge. Here an expert witness has given opinions. However, the fact that a witness may qualify as an

Case 2:23-cv-00037 Document 107-21 Filed in TXSB on 05/01/25 Page 498 of 619
EXHIBIT 28

expert does not mean that you have to accept his opinion. You can accept those opinions or reject them. An expert's testimony is subject to your review like any other witness. In considering an expert's opinion, you should consider the expert's education, training and experience in the particular field, the information available to the expert, including the facts the expert had and the documents available to the expert, the expert's opportunity and ability to examine those things, the expert's ability to recollect the activity and facts that form the basis for the opinion, and the expert's ability to tell you accurately about the facts, activity, and the basis for the opinion. You should ask yourselves about the methods employed by the expert and the reliability of the result.

You should further consider whether the opinion stated by the expert have a rational and reasonable basis in the evidence. Based on all of those things together with your general observation and assessment of the witness, it is then up to you to decide whether or not to accept the opinion. You may believe all, some, or none of the testimony of an expert witness. In other words, an expert witness's testimony is subject to your review like that of any other witness.

The defendants have been found liable for the following violations of each plaintiffs' legal rights. Defamation, intentional infliction of emotional

Case 2:23-cv-05038 Document 1052-11 Filed in TXSB on 05/03/25 Page 492 of 319

EXHIBIT 28

12

distress, false light, invasion of privacy, and violation of the Connecticut Unfair Trade Practices Act. I will define each of these shortly.

It is your duty as jurors to determine the extent of damages. You should award those damages you find to have been proven by a preponderance of the evidence and as I further instruct you. Your award must be fair just and reasonable. The date on which the plaintiffs filed this case and the timing of the lawsuit is irrelevant to your consideration and you should not consider that in any way in determining the damages in this case.

As I have instructed you, the court has determined that the defendants are liable for having intentionally inflicted emotional distress on each plaintiff. Four elements must be shown to establish intentional infliction of emotional distress. These four elements thus have been established. One, the defendants intended to inflict emotional distress or the defendants knew or should have known that emotional distress was the likely result of their conduct. Two, that the conduct was extreme and outrageous. Three, that the conduct was the cause of emotional distress experienced by the plaintiff; and four, that the emotional distress sustained by the plaintiff was severe. It is established that the defendants inflicted such emotional distress on the plaintiffs.

EXHIBIT 28

13

As I have instructed you, the court has determined that the defendants are liable for having invaded the privacy of each plaintiff by placing him or her in a false light before the public by publicizing material about him or her that is false and is such a major misrepresentation of his or her character, history, activities or beliefs that a reasonable person in the plaintiff's position would either be expected to take serious offense or be justified in feeling offended or aggrieved. Thus, these three elements have been established; one, that the defendants' publicized material or information about each plaintiff that was false. Two, that the defendants either knew that the publicized material was false and would place the plaintiff in a false light or acted with reckless disregard as to whether the publicized material was false and would place the plaintiff in a false light; and three, that the material so misrepresented the plaintiff's character, history, activities or beliefs that a reasonable person in the plaintiffs' position would find the material highly offensive. It is established that by their conduct the defendants deprived the plaintiffs of their privacy by casting them in a false light before the public as I have described.

The court has determined that the defendants are liable for defamation. The defendants are liable to

EXHIBIT 28

14

the plaintiffs in this case and it does not matter to their liability whether or not Alex Jones singled them out by their individual names. Defamation is false communication that tends to harm the reputation of another person to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, to deter a third person from associating or dealing with him or her or to provoke adverse, derogatory, or unpleasant feelings or opinions against him or her. Certain defamatory statements whether orally or in writing, are considered to be so harmful in and of themselves that the person to whom they relate is entitled to recover general damages for injury to reputation without proving that any special or actual damages were caused by the statements.

The law conclusively presumes that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused. In this case, the court has determined that the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large.

I hereby charge you that causation of the

EXHIBIT 28

15

plaintiffs' damages is already established. Under Connecticut law, the defendants' conduct is a proximate cause of an injury if it was a substantial factor in bringing the harm about. In other words, if the defendants' conduct contributed materially and not just in a trivial or inconsequential manner to the production of the harm, then the defendants' conduct was a substantial factor. That standard has been met here.

Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case.

In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in

Case 2:23-cv-03037-DC Document 1029-21 Filed in TXSB on 05/03/25 Page 503 of 619
EXHIBIT 28

your verdict.   The cause of the harm is not in question.

Although the court has already determined that the defendants are liable to the plaintiffs, I must still instruct you on the burden of proof in a civil case such as this.   In order for you to award more than nominal damages, a plaintiff must satisfy you that his or her claims of damages are more probable than not. You may have heard in criminal cases that proof must be beyond a reasonable doubt, but I must emphasize to you that this is not a criminal case and you are not deciding criminal guilt or innocence.

In civil cases such as this one, a different standard of proof applies.   The party who asserts a claim has the burden of proving it by a fair preponderance of the evidence, that is, the better or weightier evidence must establish that more probably than not the assertion is true.   In weighing the evidence, keep in mind that it is the quality and not the quantity of evidence that is important.   One piece of believable evidence may weigh so heavily in your mind as to overcome a multitude of less credible evidence.   The weight to be accorded each piece of evidence is for you to decide.   As an example of what I mean, imagine in your mind the scales of justice.   Put all the credible evidence on the scales regardless of which party offered it, separating the evidence

Case 2:23-cv-01037 Document 1529-21 Filed in TXSD on 05/03/25 Page 504 of 619

EXHIBIT 28

17

favoring each side. If the scales remain even or if they tip against the party making the claim, then that party has failed to establish that assertion. Only if the scales incline even slightly in favor of the assertion, may you find the assertion has been proved by a fair preponderance of the evidence.

The rule of damages is as follows; insofar as money can do it, a plaintiff is to receive fair just and reasonable compensation for all harms and losses past and future which are proximately caused by the defendants' wrongful conduct. As I have already instructed you here, it has already been established that the defendants' wrongful conduct proximately caused harm to each plaintiff.

Under the rule compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses. You must attempt to put each plaintiff in the same position as far as money could do it, that they would have been in had the defendants not engaged in the wrongful conduct. Our laws impose certain rules to govern the award of damages in any case where liability is proven. To recover more than nominal damages, a plaintiff has the burden of proving that the amount of damages claimed is derived from the harm suffered and is properly supported by the evidence. You may not guess

EXHIBIT 28

18

or speculate as to the nature or extent of a plaintiffs' losses or harms. Your decision must be based on reasonable probabilities in light of the evidence presented at trial. Harms and losses for which a plaintiff should be compensated, include those they have suffered up to and including the present time and those they are reasonably likely to suffer in the future as a proximate result of the defendants' wrongful conduct.

In your consideration of future damages, you should consider the probable length of the plaintiffs' lives. This may be proven through standardized mortality tables and evidence of a plaintiff's age, health, physical condition, habits, activities, and any other factor that may affect the duration of their life. According to the standardized mortality tables, the plaintiffs' life expectancy is the following number of years from today. Bill Aldenberg 27 years. Jacqueline Barden 28 years. Mark Barden 23 years. Jennifer Hensel 28 years. Ian Hockley 28 years. Nicole Hockley 33 years. Erica Lafferty 46 years. Robert Parker 39 years. William Sherlach 19 years. Carlee Soto Parisi 53 years. Donna Soto 22 years. Jillian Soto Marino 48 years. Matthew Soto 52 years. David Wheeler 21 years. And Francine Wheeler 29 years. Bear in mind these figures are only an estimate of a plaintiff's length of life based upon statistical data

Case 2:23-cv-01037 Document 1-29 Filed in TXSB on 05/03/22 Page 509 of 619
EXHIBIT 28

19

and it is just one element to consider in determining a plaintiff's life expectancy. You may find that a plaintiff will live a longer or shorter period of time based upon your assessment of all the evidence regarding a plaintiff's condition and the circumstances of their life.

Once the plaintiffs have proven the nature and extent of their compensable harms and losses, it becomes your job to determine what is fair just and reasonable compensation for those harms and losses. There's often no mathematical formula in making this determination. Instead, you must use human experience and apply sound common sense in determining the amount of your verdict. The compensatory damages that you are considering here are monies awarded as compensation for non-monetary losses and harms which the plaintiffs have suffered or are reasonably likely to suffer in the future as a result of the defendants' wrongful conduct. They are awarded for such things as mental and emotional pain and suffering, and loss or diminution of the ability to enjoy life's pleasures.

As I have told you, it has been determined that the defendants violated the plaintiffs' privacy by casting them in a false light and also inflicted emotional distress on the plaintiffs by their extreme and outrageous course of conduct. It is your role and your role alone to determine the amount of damages due

EXHIBIT 28

20

to each of the plaintiffs. The plaintiffs are entitled to be compensated for the harm to their privacy interest in being placed before the public in an objectionable false light or false position. They are also entitled to recover for any and all additional emotional distress damages. In assessing the invasion of the plaintiffs' privacy and their emotional distress damages, you may consider that it is already established that the defendants' conduct was extreme and outrageous, indeed, in many cases, the defendant's extreme and outrageous conduct is clear evidence that emotional distress existed the duration of the conduct; the defendants' conduct in spreading the statements and their actual spread; the harassment the plaintiff endured; the plaintiff's fear of harassment, the nature and duration of the invasions of the plaintiff's privacy including future invasions the nature and duration of the plaintiff's emotional distress including future distress; the plaintiffs' testimony concerning their damages.

Invasion of privacy and emotional distress may be inferred from all the circumstances as they are proven to you. The invasion of privacy and emotional distress for which a plaintiff should be compensated include what he or she has suffered up to and including the present time and what he or she is reasonably likely to suffer in the future. You must attempt to put each

Case 2:23-cv-01037 Document 105-21 Filed in TXSB on 05/03/25 Page 508 of 619

EXHIBIT 28

21

plaintiff in the same position as far as money can do it, that he or she would have been in had the defendants not acted wrongfully.

As far as money can compensate the plaintiff for such damages and their consequences, you must award a fair just and reasonable sum. You simply have to use your own good judgment in awarding damages in this category. You must use all your experience, your knowledge of human nature, your knowledge of human events, past and present, your knowledge of the motives which influence and control human action and test the evidence in the case according to such knowledge and render your verdict accordingly. The damages I have described for you in this instruction are called emotional distress damages. You should include both damages for invasion of privacy and damages for other emotional distress suffered in your award of emotional distress damages.

In this case the court has determined that the defendants accused the plaintiffs of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large. The law presumes that there is injury to the plaintiffs' reputations. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover, as general damages for injury to his or her reputation and for humiliation and mental

EXHIBIT 28

22

suffering.

In determining the amount of general damages to award for an injury to a plaintiff's reputation, you should consider what reputation the plaintiff had when the statements were made. You should consider all of the circumstances surrounding the making of the statement. You may also compensate the plaintiff for damages that he or she would likely incur in the future. These damages can include additional damage to his or her reputation that occurs as a result of the bringing of this lawsuit. Each plaintiff has suffered a violation of his or her legal rights entitling him or her to at least to nominal damages.

Nominal damages may be awarded if you find that the defamatory material is of an insignificant character or because you find that a plaintiff had a bad character so that no substantial harm has been done to a plaintiff's reputation or there is no proof that serious harm has been done to the plaintiff's reputation.

If on the other hand, you find that the defamatory material is of significant character or because you find that the plaintiff had a good character, so substantial harm has been done to the plaintiff's reputation or you find there is proof that there is serious harm done to the plaintiff's reputation, then you may award substantial damages. You may award

Case 2:23-cv-01037 Document 1079-21 Filed in TXSB on 05/03/25 Page 529 of 309

EXHIBIT 28

23

punitive damages as a matter of discretion. At a minimum, each plaintiff is entitled to nominal damages of at least one dollar.

The court has determined that the defendants are liable for violating the Connecticut Unfair Trade Practices Act, a Connecticut law commonly known as CUTPA. Therefore, it has been established by the court that the defendants engaged in an unfair trade practice because their business conduct was predicated on damaging the plaintiffs and was immoral, unethical, oppressive, or unscrupulous. Damages due to the defendants' violation of the Connecticut Unfair Trade Practices Act are included in the other damages measures that I am describing to you and you will not assess them separately.

In closing argument, counsel mentioned some formulas or amounts that might figure in your verdict and that is permitted under our law. I caution you that figures suggested by counsel, do not constitute evidence. It is up to you to decide what fair just and reasonable compensation is whatever you find that figure might be, regardless of amounts that may have been suggested by counsel in argument.

In addition to seeking compensatory damages, the plaintiffs seek an award of punitive damages which in Connecticut are limited to attorney's fees and expenses. Punitive damages may be awarded if you find

EXHIBIT 28

that the defendants' actions in this case were wilful wanton or malicious. A wilful and malicious harm is one inflicted intentionally without just cause or excuse. Wilfulness and malice alike import intent. Its characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. The intentional injury aspect may be satisfied if the resultant harm was the direct and natural consequence of the intended act.

Wanton misconduct is reckless misconduct. It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. These damages, however, are not awarded as a matter of right but as a matter of discretion to be determined by you after you consider all the evidence. If you determine that they should be awarded, then I will determine in a separate hearing after this trial ends and based on evidence concerning the plaintiffs' attorney's fees and litigation costs, how much that compensation will be. If you determine they should not be compensated, then I will enter nominal damages of one dollar in this category of damages.

You are to determine whether the plaintiffs should be compensated for attorney's fees and costs by considering the extent to which you find the defendants' conduct is outrageous, the degree to which

EXHIBIT 28

25

you find the defendants were recklessly indifferent to the rights of the plaintiffs or intentionally and wantonly violated their rights. Whether you will award the plaintiffs reasonable attorney's fees and costs in an amount later determined by me or whether you will award the plaintiffs only nominal damages is a matter for your sound discretion.

Now as I told you at the beginning of the trial the notes you may have taken are simply aids to your individual memory. When you deliberate, you should rely on your independent recollection of the evidence you have seen and heard during the trial. You should not give precedence to your own notes or to any other juror's notes over your independent recollection of the evidence because as we all know, notes are not necessarily accurate or complete. Jurors who have not taken notes, should rely on their own recollection of the evidence and should not be influenced in any way by the fact that other jurors have taken notes. Your deliberations should be determined not by what is or is not in your notes but by your independent recollection of the evidence. If you have a question about any particular testimony, you may ask that it be read or played back to you from the official record so there is no need to rely on notes.

Each of you has taken an oath to return a true verdict according to the evidence. No one must be

EXHIBIT 28

false to that oath but you have a duty not only as individuals, but also collectively to express your views to the other jurors and to listen to theirs. That is the strength of the jury system. Each of you takes with you into the jury deliberation room your individual experience and wisdom. Your task is to pool that experience and wisdom in considering the evidence. You do that by giving your views and listening to the views of others. There must necessarily be discussion and give and take within the scope of your oath. That is the way in which agreement is reached.

You must not discuss this case unless all members of the jury are present. We will take the usual breaks and the lunch recess, but you must not discuss the case in twos or threes during those breaks. You can deliberate only when all six of you are together and only in the jury deliberating room and this is important. We have had cases that had to be retried all over again because this rule was violated, so please be very careful not to discuss the case with your fellow jurors except when all of you are together deliberating and you are in the jury deliberating room.

When you have reached a verdict, you will knock on the door and Mr. Ferraro will alert me. When you are told to enter the courtroom, the foreperson should sit in the first seat in the first row. When the jury is asked if it has reached a verdict, the foreperson

Case 2:23-cv-00037 Document 679-21 Filed in TXSB on 05/03/25 Page 524 of 619

EXHIBIT 28

27

should respond. Mr. Ferraro will then hand the verdict form to me and the verdict will be read twice to you. You will each be asked to respond whether it is your verdict as a check that the verdict is in fact unanimous. You should not at that point expect me to make any comment about your verdict. It has been my task to rule on issues of evidence and to instruct you on the law. It is your task to decide the case and I will leave that strictly up to you and make no comment on what you decide. It is of course merely the division of duties and not any lack of appreciation of your efforts, that keeps me from commenting on your decision.

At this time ladies and gentlemen, I will explain the verdict forms to you and then you'll be escorted to the jury deliberation room. You should not begin your deliberations until the exhibits and the verdict forms are delivered to you by Mr. Ferraro. This will occur after the lawyers have had an opportunity to check that all the exhibits are present and to tell me if they think that any different or additional instructions to you are necessary. I will recall you to the courtroom if I conclude that further instructions are needed. When the exhibits are delivered to you, your first task will be to elect a foreperson who will serve as your clerk.

After you have received the exhibits and then

EXHIBIT 28

elected the foreperson, you will begin deliberating. If you have questions during your deliberations, the foreperson should write the jury's question on a sheet of paper, sign and date it and knock on the door. Mr. Ferraro will then bring the question to me and I will respond to it in open court. It may take a few minutes to assemble the staff before you are brought to the courtroom to hear the response. Please try to make any questions very precise. We cannot engage in an informal dialogue and I will respond only to the question on the paper. If you need to have any testimony or any part of my instructions played or read back, you'll follow the same procedure. On a sheet of paper specify what it is that you want to hear as precisely as you can. For example, if you know that you want to hear only the direct examination or only the cross examination of a particular witness, specify that. Otherwise we will have to repeat the whole testimony. Also, if you need to re-watch any video exhibit, please follow the same procedure.

We will now go over the verdict form. Each line must be filled out and the foreperson, when you have reached a verdict, should initial each page of the verdict form and sign and date the last page. Your verdict must be unanimous. There is no such thing as a majority vote of a jury in Connecticut, rather you must all agree on the verdict. No one will hurry you. If

Case 2:23-cv-00037 Document 079-21 Filed in TXSB on 05/03/25 Page 530 of 619

EXHIBIT 28

29

you are not able to reach a verdict today, you will resume your deliberations tomorrow. You may have as much time as you need to reach a verdict. And at this point I will have Mr. Ferraro escort you to the deliberating room.

**EXHIBIT 28**

```
NO: X06-UWY-CV18-6046436-S      : SUPERIOR COURT

ERICA LAFFERTY                  : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S      : SUPERIOR COURT

WILLIAM SHERLACH                : COMPLEX LITIGATION DOCKET

v.                              : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                : November 10, 2022
```

In these three consolidated cases, the plaintiffs,[1] various immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the current named plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto and William Aldenberg. Each of the first eleven of these individuals are either a parent of a student or a close relative of a school employee who died in the Sandy Hook tragedy.

**EXHIBIT 28**

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2] In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas. He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars. Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the date of the shooting. Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach* v. *Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker. Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

2

**EXHIBIT 28**

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

3

gain. In fact, by May, 2013, Jones was alleged to make approximately $10 million annually. Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ." In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors." In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card. Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

4

EXHIBIT 28

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

5

EXHIBIT 28

actually closed the year before. They don't know that they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screens, green screens, they got caught using." On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . . [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV." Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

6

EXHIBIT 28

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants. Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

---

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

7

**EXHIBIT 28**

throughout the course of the litigation. The defendants filed a memorandum of law in opposition, and following a hearing conducted on November 15, 2021, the court entered a default against the defendants, ruling "(T)he case will proceed as a hearing in damages as to the defendants. The court notes Mr. Jones is the sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all of the defendants have failed to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury commenced on September 13, 2022.. On October 12, 2022, the jury reached its verdict as to the various plaintiffs. Specifically, the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct designed to thwart their discovery obligations or otherwise avoid the administration of justice. For example, the Supreme Court previously upheld this court's decision to revoke the defendants' opportunity to file a motion to dismiss under the anti-SLAPP statute, General Statutes § 52-196a, because the defendants "had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei." *Lafferty* v. *Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

8

**EXHIBIT 28**

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

9

**EXHIBIT 28**

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

Common Law Punitive Damages

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

10

EXHIBIT 28

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

11

EXHIBIT 28

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.  Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim.  Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193

12

**EXHIBIT 28**

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472,493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . *If awarded, [common-law] punitive damages are limited to the costs of litigation less*

13

EXHIBIT 28

*taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier. . . .* Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614 A.2d 414 (1992)] (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*, supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages for 'wanton or malicious injuries' for more than two hundred years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

14

**EXHIBIT 28**

and cases cited therein. More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue. As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.' Id. In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded. Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

15

EXHIBIT 28

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

16

**EXHIBIT 28**

punitive damages against [the defendant]. The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees. The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees. [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

17

**EXHIBIT 28**

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

18

EXHIBIT 28

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

19

**EXHIBIT 28**

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million; as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million; as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million; as to Jennifer Hensel, $17.33 million; as to Donna Soto, $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million; as to Jillian Soto-Marino, $22.93 million; as to William Aldenberg, $30 million; as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million. Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

20

**EXHIBIT 28**

<u>Punitive Damages Pursuant to the Connecticut Trade Practices</u>
<u>Act (CUTPA), General Statutes § 42-110a et seq.</u>

General Statutes § 42-110g provides in relevant part: "(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . *The court may, in its discretion, award punitive damages* and may provide such equitable relief as it deems necessary or proper." (Emphasis added.) "The language is clear and unambiguous; the awarding of punitive damages is within the discretion of the trial court." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

21

EXHIBIT 28

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

22

**EXHIBIT 28**

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier. Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

23

**EXHIBIT 28**

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation.  See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

24

EXHIBIT 28

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

25

EXHIBIT 28

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

26

EXHIBIT 28

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

27

EXHIBIT 28

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

28

EXHIBIT 28

outlier cases that call the fairness of the system into question are above the median . . . . Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims under CUTPA and the punitive damages claims under maritime law at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined to adopt the same a one-to-one ratio of punitive damages to compensatory damages as an upper limit for punitive damages in CUTPA cases. Id., 453-54. Nevertheless, the court adopted the factors that were considered by the United States Supreme Court in *Exxon Shipping Co.* in determining whether the amount of punitive damages awarded pursuant to CUTPA is excessive. The court explained that "in determining whether a punitive damages

29

EXHIBIT 28

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co.* discussed. These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

30

EXHIBIT 28

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454-56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

31

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146-47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49, the Appellate Court explained that the trial court "found that among the more vexing, competing

32

EXHIBIT 28

considerations presented to the court in determining the amount of the punitive award in this case is, on one hand, the issue of deterrence, particularly in light of the [defendants'] financial net worth, and on the other hand, the issue of the overall reasonableness and rationality of a high punitive award in light of the amount of the plaintiff's actual recovery and the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*, supra, 554 U.S. 471] . . . [and] note[d] that because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory factors bearing on its discretion, a broader, threshold consideration is that high punitive awards may implicate constitutional concerns. In *Bristol Technology, Inc.* v. *Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court stated 'the United States Constitution imposes a substantive

33

EXHIBIT 28

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

34

**EXHIBIT 28**

authorized or imposed in comparable cases.' *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In [*Pacific Mutual Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)]. The Court further

35

EXHIBIT 28

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. . . . While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . .

"'Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages. . . . The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the fact[s] and circumstances of the defendant's conduct and the

36

EXHIBIT 28

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

37

EXHIBIT 28

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth. On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs. In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident." (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

38

could have concluded that the bank's reckless and deceptive conduct, together with the fact that the motive for the conduct was to increase the profitability of the auction to the bank, the fact that the bank has a very high net worth and the fact that there is an established practice in this state of awarding multiple damages for CUTPA violations, warranted the amount of the award. Accordingly, [the Supreme Court concluded] that the size of the trial court's punitive damages award [which was three times the compensatory award] did not constitute an abuse of discretion."  (Citation omitted; footnote omitted.)  Id., 456-57.

Here, the material allegations of the complaints, which have been established by virtue of the defaults, entitle the plaintiffs to an award of CUPTA punitive damages. In support of their claim for CUTPA punitive damages, the plaintiffs, in their briefs, support each Ulbrich factor with specific citations to the record. The defendants, in taking the position that there should be either no award of CUTPA punitive damages, or only a

39

**EXHIBIT 28**

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

40

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

41

**EXHIBIT 28**

concludes that despite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this. The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court. Moreover, the trial record establishes that the defendants remain in the unique position of having-and continuing to utilize-an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.

With respect to deterrence, the defendants' financial resources, and whether the award would financially destroy the

42

EXHIBIT 28

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

43

**EXHIBIT 28**

plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.

### Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

44

**EXHIBIT 28**

costs in the total amount of $1,489,555.94, and awards CUTPA

punitive damages in the amount of $150,000,000.00.


421277

Barbara N. Bellis

45

**EXHIBIT 28**

| | | |
|---|---|---|
| DOCKET NO: UWY-CV-18-6046436-S : | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL., | : | COMPLEX LITIGATION DOCKET |
| VS. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | NOVEMBER 24, 2021 |

| | | |
|---|---|---|
| DOCKET NO: UWY-CV-18-6046437-S : | : | SUPERIOR COURT |
| WILLIAM SHERLACH, | : | COMPLEX LITIGATION DOCKET |
| VS. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | NOVEMBER 24, 2021 |

| | | |
|---|---|---|
| DOCKET NO: UWY-CV-18-6046438-S : | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL., | : | COMPLEX LITIGATION DOCKET |
| VS. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | NOVEMBER 24, 2021 |

**NOTICE OF DEFENSES**

Pursuant to Practice Book §§ 17-34 & 17-35 Defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, hereby give notice of intent to contradict allegations, the subject matter(s) they intend to contradict, the intention to deny the right of the plaintiffs to maintain their actions, and to prove their matters of defense in any hearing in damages.

As to matters of defense and denial of the right of the plaintiffs to maintain their actions, Defendants incorporate by reference as if fully restated herein the arguments set forth in their Special Motion to Dismiss (*Lafferty* Entry No. 113.00; *Sherlach I* Entry No. 136.00; *Sherlach II* Entry No. 114.00), Memorandum in Support of Special Motion to Dismiss (*Lafferty* Entry No.

**Page 562 of 619**

114.00; *Sherlach I* Entry No. 137.00; *Sherlach II* Entry No. 115.00), Motion to Strike (*Lafferty* Entry No. 297.00; *Sherlach I* Entry No. 229.00; *Sherlach II* Entry No. 200.00), Memorandum in Support of Motion to Strike (*Lafferty* Entry No. 298.00; *Sherlach I* Entry No. 230.00; *Sherlach II* Entry No. 201.00) and Reply in Support of Motion to Strike (*Lafferty* Entry No. 353.00; *Sherlach I* Entry No. 281.00; *Sherlach II* Entry No. 253.00).[1]  These defenses include the following:[2]

1) Plaintiffs' claims are time-barred, in part or in whole;

2) Plaintiffs lack sufficient evidence to demonstrate one or more of the defendants committed defamation *per se*, defamation *per quod*,[3] false light invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of the Connecticut Unfair Trade Practices Act;

3) Plaintiffs lack sufficient evidence to demonstrate that one or more of the defendants conspired with another person to commit defamation *per se*, defamation *per quod*, false light invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of the Connecticut Unfair Trade Practices Act;

4) Plaintiffs' claims are barred by the First Amendment to the U.S. Constitution and Sections 4 & 5 of the Connecticut Declaration of Rights;

5) Plaintiffs are public figures and/or public officials and cannot prove one or more of the defendants made knowingly false statements or made the subject statements in reckless disregard of the truth or falsity thereof;

---

[1] Citations to the entries in the *Lafferty* matter
[2] Defendants further preserve all prior objections to subject matter jurisdiction that the Court has already adjudicated.
[3] The Court already found defamation *per quod* to not have been properly alleged.

EXHIBIT 28

6) Plaintiffs' claims are barred, in whole or in part, by the doctrine of superseding cause because the intentional and criminal actions of Adam Lanza were a superseding cause of Plaintiffs' alleged injuries;

7) Plaintiffs' claims are barred, in whole or in part, by the doctrine of intervening and/or superseding cause because the actions of other individuals, both named and unnamed, identified in the operative complaint, for whom the defendants are not liable, were the intervening and/or superseding cause of Plaintiffs' alleged injuries; and

8) Plaintiffs' claims are barred, in whole or in part, because they received payments from third parties in complete or partial satisfaction of any damages incurred as a result of the occurrence alleged

As to the Complaint in the *Lafferty* matter, Defendants intend to contradict allegations appearing in Paragraphs 6-15, 17-20, 28, 30, 31, 35, 38, 39, 41, 45, 48, 54, 57, 60, 61, 68, 69, 70, 73-80, 83-94, 96-98, 100, 101, 108, 110, 118, 125, 126, 138, 142, 146, 148, 163, 169, 177, 186, 200, 207, 208, 214, 215, 218, 226, 229, 233, 240, 242, 246, 250-252, 260, 266, 267, 269, 271, 272, 274, 276, 281, 284, 286, 287, 290, 291, 291(E), 297, 308, 315, 316, 318, 321, 323, 326, 327, 333, 335, 337-346, 348-359, 361-372, 374-384 & 386-394.[4]

The Amended Complaint in the *Sherlach I* matter and the Complaint in the *Sherlach II* matter bear identical allegations, and Defendants intend to contradict allegations appearing in their respective Paragraphs 6-15, 17-20, 25, 26, 30, 33, 34, 36, 40, 43, 52, 55, 66, 73-75, 78-85, 89-100, 102, 103, 104, 106, 107, 114, 116, 125, 129, 130, 137, 151, 157, 162, 164, 179, 185, 193, 202, 205, 234, 241, 242, 248, 249, 252, 262, 267, 271, 278, 282, 286, 290-292, 300, 306, 307, 309, 311,

[4] Defendants omit reference to the paragraphs incorporating the prior allegations; however, to the extent applicable, those paragraphs are contradicted to the fullest extent the prior allegations are.

**EXHIBIT 28**

312, 314, 316, 321, 324, 326, 327, 330, 331, 331(E), 337, 348, 355, 356, 358, 361, 363, 366, 367, 374, 381, 383-391, 393, 397, 402, 408, 409, 415, 417-426, 428-439, 441-452, 454-464 & 466-474.[5]       .

Defendants intend to contract these allegations regarding the subject matters of a) whether the statements were made with knowing falsity or in reckless disregard of the truth or falsity thereof; b) whether Infowars, LLC, is liable wherever "Infowars" is identified; c) whether the defendants acted jointly, as agents of each other, and/or in a conspiratorial combination; d) whether each of the statements placed Plaintiffs in a false light; e) whether each of the statements are highly offensive to a reasonable person; f) whether each of the statements caused damages to each plaintiff; g) whether each plaintiff is a private figure; h) whether the defendants participated in a scheme to harass and/or abuse any plaintiff; i) whether the statements accuse each plaintiff of faking a loved one's death and/or was an actor lying about the death of a loved one; j) whether the statements injured any plaintiff's reputation or image or exposed them to hatred, contempt, or ridicule; k) whether each defendants' conduct was extreme or outrageous; l) whether any defendant intended to inflict emotional distress on any plaintiff; m) whether any defendant acted with malice or cruelty; n) whether each plaintiff suffered physical illness or bodily injury; o) whether each defendant acted unethically, oppressively, immorally, or unscrupulously; p) whether each defendant could reasonably foresee each plaintiff's injury; q) whether each plaintiff could have avoided injury; and r) whether any injury to any plaintiff is outweighed by the benefit to society of free and fair discourse on broadly publicized, newsworthy events that are used as a catalyst for legislation.

---

[5] Defendants omit reference to the paragraphs incorporating the prior allegations; however, to the extent applicable, those paragraphs are contradicted to the fullest extent the prior allegations are.

**EXHIBIT 28**

Dated: November 24, 2021

Respectfully submitted,
ALEX EMRIC JONES, INFOWARS, LLC,
FREE SPEECH SYSTEMS, LLC,
INFOWARS HEALTH, LLC, PRISON
PLANET TV, LLC

By: /s/ Jay M. Wolman
Jay M. Wolman– Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
P: 702-420-2001
F: 305-437-7662
*Counsel for Defendants Alex E. Jones, Free*
*Speech Systems, LLC, Infowars, LLC,*
*Infowars Health, LLC, and Prison Planet*
*TV, LLC*

And

/s/Norman A. Pattis
Norman A. Pattis
PATTIS & SMITH, LLC
Juris No. 423934
383 Orange Street
New Haven, CT 06511
V: 203-393-3017
F: 203-393-9745
npattis@pattisandsmith.com
*Counsel for Defendants Free Speech*
*Systems, LLC, Infowars, LLC, Infowars*
*Health, LLC, and Prison Planet TV, LLC*
Their Attorneys

**EXHIBIT 28**

## CERTIFICATION

I hereby certify that a copy of the above was mailed or electronically delivered on this 24th day of November, 2021 to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served including:

Alinor C. Sterling
Christopher M. Mattei
Matthew S. Blumenthal
KOSKOFF KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, CT 06604
<asterling@koskoff.com>
<cmattei@koskoff.com>
<mblumenthal@koskoff.com>
*Attorneys for Plaintiffs*

Mario Cerame, Esq.
Brignole, Bush & Lewis
73 Wadsworth Street
Hartford, CT 06106
<mcerame@brignole.com>
*Attorneys for Defendant*
*Genesis Communications Network, Inc.*

Eric Henzy
Zesler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06605
<ehenzy@zeislaw.com>
*Attorney for Plaintiff Richard M. Coan, Trustee*
*of the Bankruptcy Estate of Erica Garbatini*
*a/k/a Erica Lafferty*

/s/ Jay M. Woman 433791
Jay M. Wolman

**EXHIBIT 28**

~~Docket No. FBT~~NO. X06-UWY-CV-18-~~6076475~~6046436-S

~~:   JUDICIAL DISTRICT:~~   SUPERIOR COURT

ERICA LAFFERTY, ET AL.   :   COMPLEX LITIGATION DOCKET

V.   :   AT WATERBURY

~~WILLIAM SHERLACH &~~   :   ~~OF FAIRFIELD~~
~~ROBERT PARKER,~~   :
~~v.~~   :   ~~AT BRIDGEPORT~~
   :
ALEX ~~EMRIC~~ JONES, ET AL.   :   SEPTEMBER 16, 2022

---

NO.   X06-UWY-CV-18-6046437-S   :   SUPERIOR COURT

WILLIAM SHERLACH~~NOVEMBER 14, 2018~~   :   COMPLEX LITIGATION DOCKET

V.   :   AT WATERBURY

ALEX EMRIC JONES, ET AL.   :   SEPTEMBER 16, 2022

---

NO.   X06-UWY-CV-18-6046438-S   :   SUPERIOR COURT

WILLIAM SHERLACH, ET AL.   :   COMPLEX LITIGATION DOCKET

V.   :   AT WATERBURY

ALEX EMRIC JONES, ET AL.   :   SEPTEMBER 16, 2022

## AMENDED COMPLAINT

### INTRODUCTION

1.   This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.   Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

1

**EXHIBIT 28**

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

10.     Nevertheless, time and again, Jones has accused the Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11.     Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12.     Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13.     As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

2

**EXHIBIT 28**

14.     On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15.     They have confronted strange individuals videotaping them and their children.

16.     Some of them have moved to undisclosed locations to avoid this harassment.

17.     The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18.     Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19.     The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

**PARTIES**

21.     The plaintiffs are the immediate family of ~~one child~~five children and ~~one educator~~three educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

---

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

3

**EXHIBIT 28**

24.     Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.     Plaintiff Jennifer Hensel is the mother of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. She resides in Fairfield County, Connecticut.

26.     Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.     Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.     Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

22.29.  Plaintiff Robert "Robbie" Parker is the father of murdered first-grader Emilie Parker, who was six years old at her death on December 14, 2012. He resides in King County, Washington.

23.30.  The plaintiff, William Sherlach, is the spouse of Mary Sherlach, who was a 56-year-old school psychologist killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012. He resides in Fairfield County, Connecticut.

24.31.  The defendants are ~~out of state~~a business ~~entities~~entity and ~~individuals~~individual residing in ~~Connecticut,~~ Texas~~, Florida, and Minnesota~~.

25.32.  Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations. Jones can be served at his place of business, Infowars, at 3019 Alvin Devane Blvd, Suite 300-350, Austin, Texas 78741.

~~26.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.~~

**Formatted:** Normal, Justified, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

4

**EXHIBIT 28**

27.33.  Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.

28.     Defendant Infowars Health LLC is a Texas limited liability company. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.

29.     Defendant Prison Planet TV LLC is a Texas limited liability company. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.

30.     All theThe above-mentioned Texas business-entity defendants are defendant is owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. TheyIt and Jones shall hereinafter be referred to collectively as "the Jones defendants."

31.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

32.     Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

33.     Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

34.     Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

**THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE**

35.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ;  Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010)  https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

5

> **Formatted:** Left, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

EXHIBIT 28

36.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

37.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

38.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

39.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

40.     His followers have shown themselves ready to comply.

41.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

42.     "You have to go investigate it for yourself," he told them.  "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

43.     Jones's followers came running to his call, as he knew they would.

44.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

45.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

46.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

47.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

6

**EXHIBIT 28**

48.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

49.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

50.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

51.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

52.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

53.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

54.     Wolfgang Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

55.     DefendantCory Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

56.     On information and belief, Cory SlankaSklanka actively assisted in operating the websites MonteFrank.com and SandyHookJustice.com through at least September 2016.

57.     Cory Sklanka knew that Wolfgang Halbig's objective in his activities in Connecticut, on his websites, and in his broadcasts, was to publish Halbig's outrageous, hurtful, and defamatory statements about the plaintiffs, and to harass the plaintiffs, as alleged in this Complaint. In fact, he facilitated Halbig's activities, and agreed with Halbig to facilitate Halbig's activities, with the knowing purpose of achieving this objective, as well as the objective of giving Halbig's harassment and publications maximum reach.

58.     Sklanka knew that the websites' purpose was to publish defamatory and otherwise legally actionable false statements about the plaintiffs, including that: (1) the Sandy Hook shooting was a hoax; (2) children or educators did not die in the Sandy Hook shooting; (3) the families of victims in the Sandy Hook shooting are actors or otherwise lying about their loved ones' deaths;

7

**Formatted:** List Paragraph, Indent: First line:  0.5"

**Formatted:** Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Formatted:** List Paragraph, Indent: First line:  0.5", Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Formatted:** Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Formatted:** List Paragraph, Indent: First line:  0.5", Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Formatted:** Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**EXHIBIT 28**

and (4) families of Sandy Hook victims are engaging in fraud to profit from their loved ones' deaths. In fact, that is why he assisted Halbig in his "investigatory," defamatory, and harassing activities.

59. On information and belief, on September 3, 2016, Sklanka posted under a pseudonym, or facilitated the posting of, an article on MonteFrank.com, asserting:

> Avielle Richman is a fabricated identity using the real life person Lenie Urbina of Sandy Hook, CT. Jeremy Richman of The Avielle Foundation continues to commit Fraud against the American public and against the world, collecting donations under false pretenses that his daughter died.[5]

60. The article also asserted:

> Now that "Avielle Richman" and Lenie Urbina have been exposed as being the same person, we know that the "Avielle Foundation" is actively engaging in fraud and theft of donor's [sic] money. The Richman and Urbina families have been caught red-handed and have a lot of explaining to do. This includes Sandy Hook Medical Examiner Dr. H. Wayne Carver who claimed to have performed an autopsy on "Avielle"/Lenie.[6]

61. Sklanka also hosted and published his own podcasts on YouTube about the Sandy Hook shooting under the username "SleightofSin." Based on witness statements, the plaintiffs believe podcasts contain publications by Sklanka within the statute of limitations asserting that the Sandy Hook shooting was a hoax and that the families of victims fabricated their children's deaths.

62. A video already in the plaintiffs' possession indicates that Sklanka participated in and/or co-hosted a podcast published on March 25, 2015 in which he stated that "Sandy Hook . . . was all crappy acting," and that he was "sick of people being destroyed by an event [Sandy Hook] that was fabricated, let alone other people that are possibly being destroyed due to an event that didn't happen."

63. In a video already in the plaintiffs' possession, Sklanka described working closely with Halbig on Sandy-Hook-related activities. The participant speaking immediately after Sklanka noted that Halbig would be appearing on Alex Jones's show the following day, and encouraged the podcast's listeners to listen to that broadcast "on GCN" and "bombard the caller lines . . . and comment sections" to give "encouragement to the Wolf to get this action moving" and for "Alex Jones to investigate." Another participant then argued that they should persuade Alex Jones to send Rob Dew to Connecticut with Halbig "to report." Sklanka stated in response: "I second that."

64. Faced with this lawsuit, Sklanka deleted his YouTube profile and other social media accounts, thus hiding those videos from public view. However, with reasonable discovery, the

---

[5] Barry Miller, *Update: Wolfgang Halbig Threatened & MonteFrank.com Is Not Going Down*, MonteFrank.com (Sept. 3, 2016), https://archive.is/e44tV#selection-203.0-203.284.
[6] *Id.*

8

EXHIBIT 28

plaintiffs believe they would gain access to additional videos containing legally actionable publications by Sklanka and be able to enumerate them in greater detail.

65. The plaintiffs were not aware of Sklanka's activities with Halbig until within the past year. Because Sklanka operated behind the scenes and under a pseudonym, the plaintiffs had no reason to know of his role in the activities related to this complaint.

66. Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[7]

67. Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

68. Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

69. Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

70. Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

71. In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

72. After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

73. Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

74. On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

75. During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

76. Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

---

[7] https://www.facebook.com/mert.melfa/videos/539807396217619/.

9

**EXHIBIT 28**

A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive." [8]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children. [9]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

77. Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor. [10] His Facebook page continues to display those publications.

78. Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

79. In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and

---

[8] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[9] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[10] *See, e.g.*, https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252.
https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

10

EXHIBIT 28

other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

80.     In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

81.     For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[11]

82.     The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

83.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

84.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[12] traveled to and were located in Hartford, Connecticut, for the creation of this video.

85.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[13]

86.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[14]

87.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[15]

88.     Jones continued, "Bidondi did a great job. I just wish I had known about this. I would have gone up there. Halbig tried to get me to go. I just am trying to launch the TV network and the new website and everything else."

89.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other

---

[11] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[12] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[13] https://www.youtube.com/watch?v=4_2FznkfcBU.
[14] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[15] https://www.youtube.com/watch?v=jCOe3qIgyFA.

11

**EXHIBIT 28**

ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[16]

90.     Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

91.     Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

92.     Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

93.     ~~Defendant~~ Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

94.     ~~Defendant~~ Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

~~95.     Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.~~

**THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL**

~~96.~~95.  The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

~~97.~~96.  The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[17]

~~98.~~97.  The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

~~99.~~98.  Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and

---

[16] https://www.youtube.com/watch?v=TGCfi_ot0CU.

[17] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

12

**EXHIBIT 28**



transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

~~100.~~99.      Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[18]

~~101.~~100.      According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

~~102.~~101.      In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[19]

~~103.~~102.      In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

~~104.~~103.      News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

~~105.~~104.      Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[20]

---

[18] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[19] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[20] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.yqXeXzdLEZ#.qewdqoN0m2.

13

EXHIBIT 28

105.     In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[21]

**THE CAMPAIGN OF ABUSE**

106.     Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

107.     On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[22]

108.     That article alleges that plaintiff Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

109.     An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

110.     At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

111.     On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[23]

112.     The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

113.     In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

---

[21] Corky Siemaszko, *InfoWars' Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

[22] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[23] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

14

EXHIBIT 28

114.     The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

115.     A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**January 27, 2013**

116.     On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[24] Just over a month had passed since the shooting at Sandy Hook.

117.     Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

118.     Jones later stated, "I clearly believe from the evidence, children were really killed at Sandy Hook, and it's a real tragedy. But the fact that there having people script things and that answers are being scripted, is incontrovertible."

119.     Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robbie Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, basically breaking down and crying."

120.     Jones then played a video of plaintiff Robert Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

121.     Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

122.     As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

123.     Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious

---

[24] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

15

EXHIBIT 28

here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

125.124.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

126.125.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 27, 2013**

127.126.     On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[25]

128.127.     During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

129.128.     In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

130.129.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

131.130.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

132.131.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**March 14, 2014**

133.132.     On March 14, 2014, The Alex Jones Radio show broadcast an episode advertised on YouTube under the title "Sandy Hook, False Narratives Vs. The Reality."[26] During that episode Jones hosted Wolfgang Halbig.

134.133.     Jones stated, "We've got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts of different people."

---

[25] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.
[26] https://www.youtube.com/watch?v=esIvAO2aIlw; https://www.mediamatters.org/embed/clips/2016/11/29/51283/gcn-alexjones-20140314-shooting.

16

EXHIBIT 28

134. He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

135. Jones stated, "The biggest piece of evidence is that [former New York Mayor Michael] Bloomberg had his social network folks ready two days before."

136. After claiming that he and Infowars had proven that the Boston Marathon bombing was a hoax, Jones later stated, "These people got to be stopped. If they'll stage the Boston bombing and Sandy Hook, they will do anything. The good news is that most people I've seen don't believe Sandy Hook. I think it blew up in their face."

137. Later, in conversation with Halbig, Jones stated, "Obviously I agree with you, something's going on, they're covering up, it's all staged."

138. Later in the conversation, referring to the Sandy Hook shooting, Halbig stated "I think it was a major drill, portrayed as one of the best illusions ever."

139. Jones stated, "We want to send—maybe even I'll go—we want to send reporters up there, Wolfgang, with you, and I understand how dangerous this is so maybe my reporters don't want to go, they probably will want to go, but maybe it's a mission I should go on, there's just so much to run here."

140. The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

### May 13, 2014

141. On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[27]

142. That day, Jones hosted Wolfgang Halbig.

143. During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

144. Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

145. Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

---

[27] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

17

EXHIBIT 28



147.146.    Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

148.147.    Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

149.148.    Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

150.149.    He continued, "The whole thing, you've got 'em jumping the gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

151.150.    Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

152.151.    During that show, Jones stated, in reference to the Sandy Hook shooting, "Kids going in circles, totally staged . . . . I mean clearly, it's a drill, just like the Boston bombing."

153.152.    Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012." As he spoke, video of Robbie Parker at the December 15, 2012 press conference played.

154.153.    Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

155.154.    During Jones's and Halbig's discussion stating that the Sandy Hook shooting was faked, video of plaintiff Robert Parker's press conference played above the chyron "Odd Parent Reaction from SandyHook [sic]," pausing it and playing it in slow motion during parts where it appears Parker is smiling.

156.155.    During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake! Blue screens, it's fake! . . . You got parents laughing [mocking laughing], 'watch this,' and then [mocking crying] method acting, [mocking crying and wailing] 'Oh, my child!' I mean, it's just ridiculous! You've got coroners that start laughing—and I don't mean uncomfortably, I mean like laughing—with the State Police when they're giving press conferences. I mean, it just is the fakest thing since the three-dollar bill!"

157.156.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

158.157.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

18

EXHIBIT 28

159.158.    These statements were also contained in another video posted to YouTube, entitled "Sandy Hook Red Flags Ignored by Newtown School Board."[28]

160.159.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**September 25, 2014**

161.160.    On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[29]

162.161.    This assertion was a complete fabrication: the FBI had made no such statement.

163.162.    During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

164.163.    This was a false statement. FBI crime statistics showed no such thing.

165.164.    Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

166.165.    Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

167.166.    Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

168.167.    Jones asserted that the school was "a cut-out" used as a stage for the event.

169.168.    Jones and Halbig both stated "I wish it was real instead of fake."

170.169.    Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

171.170.    Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

---

[28] https://www.youtube.com/watch?v=YiXpr30oUkA.

[29] https://www.youtube.com/watch?v=N1RlzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

19

EXHIBIT 28

171. Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

172. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### September 26, 2014

173. On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

174. The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

175. The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

176. The article quoted Halbig as saying that there was "a 'script' followed during the event."

177. It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

178. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

179. On information and belief, the article has been viewed by hundreds of thousands of persons.

### December 12, 2014

180. On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[30]

---

[30] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

20

EXHIBIT 28

181.    The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

182.    During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

183.    Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

184.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

185.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**December 28, 2014**

186.    On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[31]

187.    Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

188.    Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

189.    Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

190.    Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished

---

[31] https://www.youtube.com/watch?v=TGCfi_ot0CU.

21

EXHIBIT 28

the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

~~192.~~191.    Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

~~193.~~192.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

~~194.~~193.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

~~195.~~194.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**January 2, 2015**

~~196.~~195.    On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

~~197.~~196.    The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

~~198.~~197.    "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

~~199.~~198.    The pictures used were images of Noah Pozner.

~~200.~~199.    Upon information and belief, hundreds of thousands of people have viewed this article.

**January 13, 2015**

~~201.~~200.    On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[32]

---

[32] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

22

**EXHIBIT 28**

202.201.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

203.202.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

204.203.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**February 12, 2015**

205.204.     On February 12, 2015, during the broadcast of The Alex Jones Radio Show, Jones, David Knight, and Rob Dew discussed the December 12, 2014 "debate" broadcast by Jones and Infowars and discussed in paragraphs 181 through 186 of this Complaint.[33]

206.205.     Jones, Knight, and Dew recounted several purported arguments that the Sandy Hook shooting was faked, including that rescue helicopters weren't called, the investigation was "classified," "ambulances weren't even at the school" and were "stuck at the firehouse," and that former New York Mayor Michael Bloomberg "alert[ed] his people the day before to get ready for a big push."

207.206.     Rob Dew stated "it looks like something went on there."

208.207.     Jones interrupted him saying, "A drill."

209.208.     Dew continued, "It stinks to high heaven. You got the actor father who comes out [and] gets into character. I was a theater major. I worked with actors. I used to watch them get ready before they would go out and cry like that."

210.209.     Jones interjected, "You have a degree in theater!"

211.210.     Dew continued, "I was in the play *Our Town*. I'm sitting there watching these other people about to go out and do the funeral scene and they're pumping themselves up, doing exactly what [Robbie] did [gasping, labored breathing]."

212.211.     Jones interjected, "First he's laughing and smiling, and then . . . ."

213.212.     Dew continued, "And then he's totally sad, crying, and he was cracking jokes right before. That's an actor. That's an actor. I'm sorry [shrugs shoulders demonstratively]."

214.213.     Then, a zoomed-in video of Robbie Parker at the press conference was played as Jones and Dew commented on it.

215.214.     "I mean there it is," Dew said. "He's smiling."

216.215.     Jones said, "Then he huffs and puffs and gets into . . . ."

---

[33] https://www.youtube.com/watch?v=_QKCAo54hPk.

23

**EXHIBIT 28**

217.216.     Dew said, "That is a tell-tale sign of somebody acting right there. Now I don't know for a fact that this guy's an actor. That looks like acting all the way."

218.217.     Later, they discussed the HONR Network, a group associated with Leonard Pozner dedicated to opposing Sandy Hook hoaxing. Jones stated, "Well we'll just start investigating that. And I guess I'm gonna have to probably go up to Newtown. I'm gonna probably go investigate Florida as well."

**March 4, 2015**

219.218.     On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[34]

220.219.     Jones accepted a caller, "Eric from Connecticut," with whom he discussed the Sandy Hook shooting. Eric stated, "One more thing, with my own personal investigation with this, is you find out who Robbie Parker works for, and you really start going down the rabbit hole." They discussed about how Parker was purportedly a "solicitor for the chips [sic] program," a database where "you register your kids," to which Jones responded, "The DNA, the Masons pushed that."

221.220.     As they spoke, a mirrored computer screen played a muted YouTube video (from user "Russianvids") depicting Robbie Parker speaking at the December 15, 2012 press conference.

222.221.     The title of the Youtube video was depicted, as well: "Sandy Hook Shooting Hoax Fraud Robbie Parker Actor Exposed Smiling Laughing then Fake Crying [sic]."

223.222.     As the video played, a mouse cursor selected the words "Robbie Parker" in the title of the video, highlighting them to the viewer. Throughout the episode, Jones could be seen manipulating an Apple-brand cordless mouse. On information and belief, Jones was the person who highlighted the words "Robbie Parker."

224.223.     Jones then hosted Halbig on the episode.

225.224.     During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

226.225.     Halbig stated the school was not in operation at the time of the shooting.

227.226.     Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

228.227.     Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

---

[34] https://www.youtube.com/watch?v=_7ib5WkULBY.

24

EXHIBIT 28

228.     Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

229.     Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

230.     Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

231.     Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

232.     Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

233.     A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

234.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

235.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 28, 2015**

236.     On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[35]

237.     David Knight hosted Halbig on Infowars Nightly News.

238.     Halbig accused Newtown police chief Mike Kehoe of committing perjury.

239.     Halbig once again appeared, and stated that the school was unsanitary and unsafe.

240.     Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

241.     A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[35] https://www.youtube.com/watch?v=Ml3KVj2nVRA.

25

**EXHIBIT 28**

243.242.	On information and belief, this episode was also broadcast through Jones's radio affiliates.

244.243.	The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

245.244.	On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[36]

246.245.	The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

247.246.	The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

248.247.	Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

249.248.	On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

250.249.	Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[37] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

251.250.	During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

252.251.	Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

253.252.	On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**July 7, 2015**

---

[36] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[37] https://www.youtube.com/watch?v=5cll79t7Mrw.

26

254.253.          On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[38]

255.254.          Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[39]

256.255.          Jones rehearsed a number of his favorite arguments that the Sandy Hook shooting was staged. He stated, "It looked like a carnival. It looked like a big PR stunt. It came out that Bloomberg, a day before, sent an email out to his gun control groups, in all 50 states, saying, 'prepare to roll, major operation coming up.' . . . We have videos, that look just incredibly suspicious, people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method, you've got a degree, Rob, in theater. . . . This is something that even laypeople notice."

257.256.          This statement is clearly referring to Robbie Parker, and is most reasonably interpreted to be stating that Robbie was an actor and faked his daughter's death.

258.257.          "[T]he more we look at Sandy Hook," Jones said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

259.258.          He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

260.259.          Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

261.260.          Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

262.261.          A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

263.262.          On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[38] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[39] https://www.youtube.com/watch?v=jCOe3qIgyFA.

27

**EXHIBIT 28**

264.263.	The audience for this broadcast has included hundreds of thousands, if not millions, of people.

265.264.	On that same day, The Alex Jones Show broadcast a longer video entitled "Full Show – Government is Manufacturing Crises."[40] It contained the same statements as the video entitled "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."

266.265.	The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**November 17, 2016**

267.266.	On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

268.267.	These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

269.268.	Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

270.269.	Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[41] Specifically, it seems Jones was referring to plaintiff Robert Parker's statements during a press conference of December 15, 2012, which Jones has frequently described as "classic acting."

271.270.	A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

272.271.	On information and belief, this episode was also broadcast through Jones's radio affiliates.

273.272.	The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[40] https://www.youtube.com/watch?v=O34Oeg6GUIk.
[41] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.

28

EXHIBIT 28

**November 18, 2016**

274.273.　　On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[42]

275.274.　　During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

276.275.　　He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

277.276.　　He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

278.277.　　Jones continued, rehearsing several of his most commonly employed arguments that the Sandy Hook shooting was staged. Referencing Veronique de la Rosa's interview with Anderson Cooper, he stated, "That shows some kind of cover-up happening. And then I saw Anderson Cooper—I've been in TV for twenty-something years, I know a blue-screen or a green-screen—turn and his nose disappeared. Then I saw clearly that they were using footage on the green screen looped, because it would show flowers and other things during other broadcasts that were moving, and then basically cutting to the same piece of footage."

279.278.　　Then he stated: "Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training, where he's laughing and joking and then they go hey 'we're live' and he goes 'Oh,' and [mocking, exaggerated moaning]." Jones was referring to plaintiff Robert Parker's statements during a press conference of December 15, 2012, which he has frequently described as "classic acting." Jones then played the video of Parker at the press conference.

280.279.　　Jones stated, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other

---

[42] https://www.youtube.com/watch?v=MwudDfz1yAk.

29

EXHIBIT 28

rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

281.280.    In closing, Jones stated: "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real. Let's look into Sandy Hook."

282.281.    The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

283.282.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

284.283.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**November 28, 2016**

285.284.    On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[43]

286.285.    In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[44]

287.286.    Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

288.287.    Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

289.288.    Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

290.289.    These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

291.290.    Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

---

[43] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.
[44] https://www.youtube.com/watch?v=9PdrlrSCLu0.

30

**EXHIBIT 28**

291.     This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

292.     Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

293.     He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

294.     The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

295.     Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

**March 8, 2017**

296.     On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

297.     During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

298.     Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

299.     A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

300.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

301.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**April 22, 2017**

302.     On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[45]

---

[45] https://www.youtube.com/watch?v=rUn1jKhWTXI.

31

EXHIBIT 28

304.303.     During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

305.304.     Jones told his audience that they should not "believe any of it."

306.305.     As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' death.

307.306.     During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

308.307.     In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

309.308.     The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

310.309.     Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

311.310.     The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

312.311.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

32

EXHIBIT 28

**April 28, 2017**

313.312.     On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[46]

314.313.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**June 13, 2017**

315.314.     On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[47]

316.315.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**The Megyn Kelly Interview**

*The Preview*

317.316.     On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

318.317.     NBC released a preview of the interview on the internet on the following day.

319.318.     In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

320.319.     Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

---

[46] https://www.youtube.com/watch?v=StOyqyt0fkY.
[47] https://www.facebook.com/80256732576/videos/10155465593882577/.

33

EXHIBIT 28

321. 320. In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

322. 321. Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

323. 322. Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

324. 323. The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

325. 324. These statements were heard by millions of people.

### *June 15, 2017 – Infowars*

326. 325. During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

327. 326. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

328. 327. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### *Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming*

329. 328. The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

330. 329. Before the interview aired that day, Jones published several pre-show videos on Infowars.

331. 330. During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

34

EXHIBIT 28

A. In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

B. Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

C. He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

D. He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

E. While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormally stilted and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

332.331.    Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

333.332.    As discussed in paragraphs 127 through 132 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

334.333.    In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

335.334.    During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

336.335.    In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

337.336.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

338.337.    These statements were heard by hundreds of thousands, if not millions of people.

35

**EXHIBIT 28**

*The June 18, 2017 NBC Broadcast*

339.338.     During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

340.339.     At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 187 through 195 of this complaint.

341.340.     In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

342.341.     Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

343.342.     In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

344.343.     Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

345.344.     In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

346.345.     Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

347.346.     Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real. But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

348.347.     Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

349.348.     Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

350.349.     Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

351.350.     Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

36

**EXHIBIT 28**

352.351.      Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

353.352.      In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

354.353.      It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

355.354.      There is no evidence "on the other side."

356.355.      A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

357.356.      More than three million people saw and heard these statements by Jones.

### *Alex Jones's June 18, 2017 Counter-Programming*

358.357.      Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

359.358.      The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

360.359.      As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged, false event.

361.360.      This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

362.361.      Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

363.362.      This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

364.363.      On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

365.364.      Hundreds of thousands, if not millions, of people heard these statements.

37

EXHIBIT 28



*June 26, 2017*

366.365.　　During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

367.366.　　On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[48]

368.367.　　Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

369.368.　　Shroyer's support for this statement was deceptively edited video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

370.369.　　Shroyer also played as support for his statement a video clip of Sandy Hook parent Lynn McDonnel, which had been deceptively edited to imply that she was never allowed access to her child's body. In the unedited interview, Mrs. McDonnel stated that she was in possession of her child's body.

371.370.　　Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

372.371.　　Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

373.372.　　In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

374.373.　　A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[48] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

38

EXHIBIT 28

374.    These statements were outrageous, recklessly false, and malicious. Along with the original videos, contemporary news accounts stated that the victims' bodies were released to their loved ones, and funerals where the victims' bodies were in the custody of their loved ones were widely reported in the press.[49]

375.    These statements were heard by at least tens of thousands, if not millions, of people.

**July 20, 2017**

376.    On July 20, 2017, Jones re-broadcast the Shroyer segment of June 26, 2017, as part of his Alex Jones Radio Show programming.[50]

377.    During his discussion of the Shroyer segment, Jones said, "Can I prove that New Haven [sic] didn't happen? No. So I've said, for years, we've had debates about it, that I don't know. . . . That was a month ago. He said, 'I wouldn't hold my breath looking for a response. We've not seen a clarification! I'm the one that called him up after I saw the show that night, and I said, 'You know, Owen . . . could be that we need to get clarification on what'—'Oh, I could never find out. The stuff I found was that they never let them see their bodies.' That's kind of what's weird about this." Then he said, in a tone clearly indicating sarcasm, "Maybe they did. So [making incredulous face] I'm sure it's all real! But for some reason, they don't want to let you see those clips together [Shroyer's segment]."

378.    On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**October 26, 2017**

379.    In an October 26, 2017 video entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones claimed that the CIA visited Sandy Hook shooter Adam Lanza and recruited him. He claimed that the truth about Lanza is not known because "they bulldozed the house to get rid of it." Mr. Jones told his audience that Sandy Hook was "as phony as a three-dollar bill, with CNN doing fake newscasts, with blue screens."

380.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**April 20, 2018**

---

[49] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting; http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101; https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100.
[50] https://www.mediamatters.org/blog/2017/07/21/alex-jones-sandy-hook-dad-needs-clarify-whether-he-actually-held-his-son-s-body-and-saw-bullet-hole/217333.

39

EXHIBIT 28

382.381.     Jones has accused the plaintiffs of lying not only about Sandy Hook, but about the pain and torment they have experienced at his hands. In a video on April 20, 2018 entitled, "MSM Continues to Demonize Alex Jones," Jones mocked the plaintiffs, performing a cruel, false, malicious, and outrageous parody of their suffering: "I think they almost do this to mess with us or something. I'm serious, man…They go, 'Oh, my gosh, why are you doing that? You hurt me.' And we're like, 'No, no. We're sorry.' 'You've hurt me.' And like five years later, 'You hurt me. Stop hurting me.' And we're like, 'But we're not bringing you up.'"

383.382.     As shown by the previous allegations (and the statement itself), Jones and the other defendants have for years repeatedly and continually brought the plaintiffs up, and made cruel, outrageous, reckless, and false allegations about them and the tragedy that robbed them of their loved ones. Indeed, Jones made statements accusing the plaintiffs of fabricating the deaths of their loved ones and suggesting that Sandy Hook was a hoax just months before the first lawsuits were filed against him by Sandy Hook families.

384.383.     In the same video, Jones continued to accuse the plaintiffs of lying about his conduct, falsely asserting that he had not discussed Sandy Hook in years. Performing another mocking imitation of the plaintiffs, Jones stated: "'Oh, my gosh. Alex has no heart. He is—nothing is sacred. He brought it up again.' No. You did and lied about it."

385.384.     Jones also falsely claimed he had never attacked the victims, stating, "I have never gone after the Sandy Hook parents . . . Who in the hell would try to go after people's parents who have dead children?"

386.385.     The answer to that question, as shown by the previous allegations, is Jones and the other defendants.

387.386.     In that same broadcast, Jones also made additional recklessly false claims, rehearsing a number of his arguments that the Sandy Hook shooting was faked and the plaintiffs fabricated the deaths of their loved ones. For example, Mr. Jones stated, "You can look it up. They stood down in Sandy Hook. They stood down in Parkland. That's a fact." Later in the  same video, Jones repeated his claim that there was a police "stand down" at Sandy Hook.

388.387.     In the same broadcast, Jones rehearsed his bizarre allegations that Anderson Cooper's interview of Veronique De La Rosa was faked, stating, "It's just a background with the flowers of the town hall and her and Anderson Cooper. And then he turns and his head is shimmery, and his nose disappears, which everybody knows is a chromakey." Mr. Jones also repeated his claim that Anderson Cooper was working for the CIA, and he continued to assert that the interview was shot in front of a blue-screen rather than the result of digital compression.

**Other Statements**

389.388.     On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery. Numerous videos and other broadcasts published by the defendants have recently been removed from the public domain either by the defendants themselves or companies like Twitter,

40

EXHIBIT 28

Facebook, and YouTube. Discovery, including documents and witness testimony, is required for the plaintiffs to present the full scope of the defendants' campaign of outrageous lies and abuse.

### THE BACKPEDALING AND ADMISSIONS

390.389.    The Sandy Hook shooting and its aftermath were exhaustively documented by the local and national press; local, state, and federal law enforcement; other government entities; and other means. It is no exaggeration to say that the true and accepted story of Sandy Hook—that the plaintiffs lost their loved ones in Adam Lanza's murderous rampage—is supported by a mountain of evidence. Most of these records and evidence are publicly available. This in itself is enough to show that the defendants made the outrageous, false, and malicious statements detailed in this complaint with knowledge that the statements were false, or with reckless disregard as to whether or not they were true. Added to this are the defendants' deceptive edits to and contextualization of videos, documents, or other records to purportedly support their statements.

391.390.    Above and beyond this, on numerous occasions, some listed in the allegations above, Jones and the other defendants have admitted either that they never believed the Sandy Hook shooting was faked or that they had serious doubts about the truth of their statements, that they made those statements with knowledge that the statements were false, or with reckless disregard as to whether or not they were true. Those admissions became more frequent after the plaintiffs and other Sandy Hook families filed lawsuits against the defendants related to the defendants' statements about Sandy Hook, the plaintiffs, and the Sandy Hook families.

### April 20, 2018

392.391.    On April 20, 2018, the Alex Jones Show broadcast a video entitled "Watch As Megyn Kelly Opens Old Wounds Of Sandy Hook Victims."[51]

393.392.    In it, Jones made a number of statements indicating that he never actually believed, or else had serious reasons not to believe, his previous statements claiming that the Sandy Hook shooting was a hoax and that the plaintiffs fabricated the deaths of their loved ones.

394.393.    Jones stated, "I can't prove the shooting didn't happen."

395.394.    Jones stated, "It's been years since I even played devil's advocate in debates where I said it all happened like was said, or none of it happened. I could see how people would believe that [the Sandy Hook shooting was faked] because of all the media lying but we've investigated it and we think it happened."

396.395.    Jones acknowledged the power of his platform. "We have our own platform," he said. "Millions are going to see this. Millions are watching."

397.396.    "And here's the deal," he said. "I know the parents know that I've been clear on this for at least four years." While this statement is false—as this Complaint details, Jones repeatedly claimed that the Sandy Hook shooting was false and that the parents were actors during

---

[51] https://www.youtube.com/watch?v=uQkAJykqyeo.

41

**EXHIBIT 28**

that period—it is an admission that by Jones that he believed Sandy Hook really happened and the families lost their loved ones during the time he made nearly all the statements in this complaint.

398.397.     He continued, "I began to say that Sandy Hook happened years before and they took that as weakness."

399.398.     Then, Jones played a video of Neil Heslin's April appearance on Megyn Kelly Today, alternately pausing it and interjecting his own commentary.

400.399.     When, in the video, Heslin said that Jones's lies about Sandy Hook were disrespectful to "the law enforcement, the first responders" who served at Sandy Hook the day of the shooting, Jones interjected, "Who stood down!"

401.400.     Then Jones said, "Hit pause." When the video stopped, Jones screamed into the camera, "You can look it up. They [law enforcement and first responders] stood down in Sandy Hook, they stood down in Parkland. That's a fact!"

402.401.     Then Jones read an email from Leonard Posner, and a responsive email that Jones stated that he himself dictated. In that response, Jones stated: "Thank you for contacting us to share your point of view. Alex has no doubt that this was a real tragedy." According to Jones and the text of the email, this email was sent in January 29, 2013. Then, in real time, Jones remarked, "Paul Watson was like threatening to quit, and I wasn't even saying it didn't happen, I was just devil's advocating." In other words, from the beginning of his campaign of outrageous lies against the plaintiffs, Jones knew and believed that they and the other Sandy Hook families were not actors, had actually lost their loved ones, and that he was lying in making the statements recounted in this Complaint.

403.402.     He continued: "And I'd have these families on right now . . . they don't do it, because they don't want to humanize me. They want to lie." The most reasonable interpretation of this statement is that Jones is accusing the plaintiffs of lying about Jones's statements about them.

**May 23, 2018**

404.403.     On May 23, 2018, The Alex Jones Show broadcast a video entitled, on YouTube, "Alex Jones' Statement On New Sandy Hook Lawsuit."[52] He described "the admitted goal" of lawsuits against him (like this one) as being to create the "Alex Jones statute" to "overturn[] the First Amendment."

405.404.     During the video, Jones made various statements about his state of mind at times relevant in this Complaint.

406.405.     "I kept saying I believe it happened," he stated. Later in the video, he said, "Before, I just questioned it. . . . Once it was personalized, once I saw the players, the people, I said 'I think it's real.' I had the debate that was already going on."

---

[52] https://www.youtube.com/watch?v=AfvhhcXPCps.

42

EXHIBIT 28

407.406.       He also stated: "Three years ago, when the so-called Sandy Hook activists were on my butt saying I was covering it up because I said I thought it happened 'cause I couldn't prove it one way or the other. There were some anomalies. I genuinely was trying to research it. I just said 'I'm done with this. It happened. I'm moving on. Don't blame gun owners for it.'"

408.407.       Jones was admitting that, at the times relevant to most if not all of the publications contained in this Complaint, he believed that the Sandy Hook shooting happened and that the families lost their loved ones.

**June 4, 2018**

409.408.       In 2018, Alex Jones and unidentified Infowars personnel repeatedly accosted former Democratic presidential candidate Sen. Bernie Sanders and several of his staff in Los Angeles International Airport. Jones and Infowars videotaped the series of encounters, and later broadcast them on Infowars on June 4, 2018.

410.409.       Later in the video, an unidentified man in the boarding line stepped between Jones and Sanders. He said to Jones: "You deny Sandy Hook, and you're giving him [Sanders] a hard time?"

411.410.       Jones did not deny that he had denied the Sandy Hook shooting, but instead started asking the unidentified man questions about Hillary Clinton.

412.411.       Later in the conversation, the unidentified man stated to Jones: "You edited videos of Sandy Hook."

413.412.       Jones responded, "Yeah that's right."

414.413.       The unidentified man to Jones said in response, while laughing: "You're an idiot. You win."

415.414.       The unidentified man laughed and made that remark because he realized that Jones had just admitted on camera to deceptively editing videos related to the Sandy Hook shooting that he used as purported evidence to question and deny what happened at Sandy Hook Elementary School on December 14, 2012.

### COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy
**(All Plaintiffs v. All Defendants)**

416.415.       All previous allegations in this complaint are incorporated as if fully set forth herein.

417.416.       The defendants and Halbig and Sklanka, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious

43

**EXHIBIT 28**

offense may reasonably be expected to be taken by a reasonable person in their position.

~~418.~~417.    The false light in which the defendants' and Halbig's and Sklanka's statements placed the plaintiffs would be highly offensive to a reasonable person.

~~419.~~418.    The defendants and Halbig and Sklanka had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs would be placed.

~~420.~~419.    These false publications have caused the plaintiffs actual and substantial damages.

~~421.~~420.    In light of their prior experience with similar sorts of reckless and false statements, the defendants and Halbig and Sklanka knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

~~422.~~421.    The plaintiffs are private individuals and are neither public officials nor public figures.

~~423.~~422.    The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

~~424.~~423.    The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

~~425.~~424.    The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

~~426.~~425.    These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.

### COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
#### (All Plaintiffs v. All Defendants)

~~427.~~426.    All previous allegations in this complaint are incorporated as if fully set forth herein.

~~428.~~427.    In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' death; the defendants and Halbig and Sklanka published numerous defamatory statements.

44

**EXHIBIT 28**



429.428.     These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' death and/or are actors lying about the deaths of their loved ones.

430.429.     The statements contained in the defendants' and Halbig's and Sklanka's campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

431.430.     The defendants' and Halbig's and Sklanka's defamatory publications readily identified the plaintiffs to millions of people.

432.431.     The defendants' and Halbig's and Sklanka's defamatory publications were broadcast to millions of people.

433.432.     The defendants' and Halbig's and Sklanka's defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

434.433.     In light of their prior experience with similar sorts of reckless and false statements, the defendants and Halbig and Sklanka knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

435.434.     The plaintiffs are private individuals and are neither public officials nor public figures.

436.435.     The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

437.436.     The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

438.437.     The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

439.438.     These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.

**COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy**
**(All Plaintiffs v. All Defendants)**

45

**EXHIBIT 28**

440.439.  All previous allegations in this complaint are incorporated as if fully set forth herein.

441.440.  In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants and Halbig and Sklanka intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

442.441.  The defendants' and Halbig's and Sklanka's conduct was extreme and outrageous.

443.442.  The defendants' and Halbig's and Sklanka's conduct was the cause of the plaintiffs' distress.

444.443.  The emotional distress sustained by the plaintiffs was severe.

445.444.  The defendants' and Halbig's and Sklanka's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

446.445.  In light of their prior experience with similar sorts of false and reckless statements, the defendants and Halbig and Sklanka knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

447.446.  The plaintiffs have suffered actual and substantial damages.

448.447.  The plaintiffs are private individuals and are neither public officials nor public figures.

449.448.  The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

450.449.  The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

451.450.  The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

452.451.  These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.

COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy
(All Plaintiffs v. All Defendants)

46

EXHIBIT 28

453. All previous allegations in this complaint are incorporated as if fully set forth herein.

454. The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

455. The plaintiffs' distress was foreseeable.

456.452. The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

457. The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

458. The plaintiffs have suffered actual and substantial damages.

459. In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

460.1. The plaintiffs are private individuals and are neither public officials nor public figures.

461. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

462. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

463. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

464. These acts of the defendants resulted in damage to the plaintiffs.

### COUNT FIVEFOUR: Connecticut Unfair Trade Practices Act,
### Conn. Gen. Stat. § 42-110a *et seq.*; Civil Conspiracy
### (All Plaintiffs v. All Defendants)

465.453. All previous allegations in this complaint are incorporated as if fully set forth herein.

466.454. The defendants and Halbig and Sklanka unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

47

**EXHIBIT 28**

467. 455.     This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

468. 456.     The defendants' and Halbig's and Sklanka's reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

469. 457.     The defendants' and Halbig's and Sklanka's conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

458.     The plaintiffs are private individuals and are neither public officials nor public figures.

470.     The plaintiffs are private individuals and are neither public officials nor public figures.

471. 459.     The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

472. 460.     The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

473. 461.     The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

474. 462.     These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.     Monetary damages;

48

**EXHIBIT 28**

B.      Punitive damages;

C.      Attorneys' fees;

D.      Costs;

E.      Declarative relief;

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this ~~14th~~16th day of ~~November, 2018~~September, 2022.

**THE PLAINTIFFS,**

**By**          /s/          M.
~~WILLIAM~~CHRISTOPHER
~~BLOSS~~MATTEI
**ALINOR C. STERLING**
**MATTHEW S. BLUMENTHAL**
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
PHONE: (203) 336-4421
FAX:   (203) 368-3244
~~wbloss@koskoff.com~~
cmattei@koskoff.com
asterling@koskoff.com
mblumenthal@koskoff.com
JURIS #32250

49

**EXHIBIT 28**

agent. And he ended up -- he talked -- this guy from New London talked to a couple of agents in New Haven who were so concerned about his behavior, they came and saw me. They said, you really have to be careful, this guy sounds like he could do something. And Mr. Santiago -- this guy's name was Shawn Santiago. His Facebook photo -- you know, you have a Facebook account, like, a profile photo was --

ATTY. PATTIS: Objection. Hearsay.

Q Have you seen it?

A Yeah. I've seen it multiple --

ATTY. PATTIS: Objection. Hearsay. Have you seen a document not in evidence? Best evidence.

Q You've personally seen it, haven't you?

A Yes, sir.

Q Okay. Tell the jury what it is?

ATTY. PATTIS: Objection. Hearsay, best evidence.

THE COURT: Overruled.

A It's a photograph. On his Facebook account, there is a photograph of Mr. Wheeler's face and my face next to each other. That's his Facebook profile picture.

Q Do you know whether this gentleman is connected to Wolfgang Halbig?

A Yes.

Q Who's Wolfgang Halbig?

A Wolfgang Halbig is an associate of Mr. Jones and Infowars.

**EXHIBIT 28**

Q  How did you become aware of that?

A  How did I become aware of Halbig or how did --

Q  Halbig.

A  So, Halbig was also one of the people that was writing harassing stuff about me and sending multiple e-mails and phone calls to the FBI saying that I wasn't who they -- the FBI said I was.

Q  And you became aware that you said that Mr. Halbig was associated with Mr. Jones?

A  Yeah.  Mr. Halbig was on Mr. Jones' show.

Q  Do you know whether Mr. Jones supported Halbig's activities up here in Connecticut?

ATTY. PATTIS:  Objection.  Foundation.

THE COURT:  Overruled.

A  Well, I know that Mr. Halbig was on Infowars spewing all of this crap, and Mr. Halbig was in -- I knew that he was in Newtown harassing people.

Q  Did you know that Mr. Jones directed his audience to go to Mr. Halbig's website?

ATTY. PATTIS:  Objection.  Leading.

THE COURT:  Sustained.

Q  Did Mr. Jones direct his audience to Mr. Halbig's website?

A  To be honest, certain, I just don't recall that.  I don't.

Q  Do you know whether this garbage about you and David Wheeler was on --

**EXHIBIT 28**

Q   How many times did Jones call you?

A   He didn't call me, sir.

Q   Did you ever see this photograph, 289, on Infowars?

A   I didn't.  No, sir.

Q   Do you know whether he ever talked about you on Infowars -- Jones?

A   I don't know.

Q   If Halbig appears as a guest on a talk show, does that make him affiliated with a talk show?

A   To me it does.

Q   So, if I appear on CNN tonight, I'm a CNN affiliate?

A   Yes, you are.

ATTY. MATTEI:  Objection, Your Honor.

ATTY. PATTIS:  Okay.

THE COURT:  Sustained.

ATTY. PATTIS:  Okay.

ATTY. MATTEI:  Your Honor, may we have a side bar?

THE COURT:  Certainly.

(SIDEBAR).

ATTY. MATTEI:  The default has established that Halbig and Jones are co-conspirators.

THE COURT: (INDISCERNIBLE).

ATTY. MATTEI:  And it is true, Pattis questioning him on whether or not they are affiliated or whether Jones is responsible for what Halbig did, this is instructable error.