**EXHIBIT 29**

PSC_____   SUPREME COURT
AC 46131, 46132 and 46133

ERICA LAFFERTY, ET AL.   STATE OF CONNECTICUT
v.
ALEX E. JONES, ET AL.   JANUARY 21, 2025

## PETITION FOR CERTIFICATION

TRIAL COURT: *.... I don't think that we need to talk about the Second Amendment, the First - I want to steer - this is a hearing in damages. I don't want to hear about the Second Amendment, First Amendment. President's, elections*. A244-45.

### I.  INTRODUCTION

Pursuant to Practice Book § 84-1 et seq., Defendants Alex Jones and his company, Free Speech Systems, LLC (collectively, "Jones"), respectfully petition the Supreme Court of the State of Connecticut to appeal from the decision of the Appellate Court entered in this case on December 10, 2024, and reported at *Lafferty v. Jones*, 229 Conn. App. 487, 537 (2024), and attached hereto at appendix page A159.

Defendants seek certification of issues relating to protections and rights the U.S. and Connecticut Constitutions' guarantees which, for different reasons, the trial court denied, and the Appellate Court refused to consider.  This resulted in an award against media defendant Jones of $1,436,620,000, believed the largest in Connecticut history.   Although the victims of the Sandy Hook tragedy were 20 young children and 6 adult teachers/administrators, suit was brought by various family members of eight of the victims, including parents, siblings, daughters, and husbands, and one of hundreds of law enforcement officers, none of whom had Constitutional standing.  Although no Plaintiff was identified by name (with two

1

**EXHIBIT 29**

limited exceptions), all claimed to have been defamed by unspecified and/or partially specified opinions of Jones, one of Jones's guests, and actions allegedly taken by unaffiliated third parties about the very public aftermath of Sandy Hook and the gun control efforts it spawned.  The legal validity of those claims was never determined by a fact finder because the trial court entered "Death Penalty Sanctions" that, in violation of the U.S. and Connecticut Constitutions, judicially decreed liability and damage causation for everything pleaded by Plaintiffs, including falsity, fault, malice, damage and responsibility for opinions of a guest and actions of unknown "listeners."  Two of the three specified reasons for sanctions were tied to the CUTPA claim, which the Appellate Court reversed.

## II.    STATEMENT OF THE QUESTIONS PRESENTED FOR REVIEW

1.    In connection with this media case brought by public figure plaintiffs, against a media defendant, regarding matters of public concern, did it violate U.S. and Connecticut Constitutions (collectively, "Constitutions") and/or state policies for the trial court to issue sanctions and associated jury instructions curtailing and/or eliminating what Plaintiffs were Constitutionally required to prove and/or the burdens of proof by which they were to be proved (including a judicial decree that statements were not opinions, their falsity, Jones's fault, Plaintiffs' damages in fact, and punitive damages).

2.    Can this Court, which is Constitutionally required to independently review the entire record to ensure Constitutional facts were proven, do so when the Sanctions and the record do not otherwise provide such support.

3.    Did it violate the Constitutions and/or state policies to allow Plaintiffs to bring defamation and related claims for (i) expressed opinions about

**EXHIBIT 29**

an event for Plaintiffs unnamed in publications; (ii) opinions and statements made by guests; and (iii) actions taken by alleged listeners.

4. Did it violate the Constitutional protections and/or state policies to allow Plaintiffs, who lacked constitutional standing to assert, and be awarded, presumed damages when libel *per se* is not available regarding a media defendant, and Plaintiffs had not validly (i) pleaded and proved libel *per se* or libel *per quod*, or particularized harm of a pecuniary nature, (ii) received "Double Recoveries," (iii) excessive damages and (iv) in the case of intentional infliction, were awarded unconstitutional damages based on a negligence standard.

5. In connection with this media case, did it violate the Constitutions and/or state policies to issue sanctions and associated jury instructions when the sanctions were associated with an improperly asserted CUTPA claim and/or were excessively punitive, especially when lesser sanctions were available and/or the underlying requests were substantially complied with.

## III.   BRIEF HISTORY OF THE CASE

In May 2018, five years after the Sandy Hook tragedy, Plaintiffs filed suit against Jones and others [A1] asserting causes of action for (i) invasion of privacy, (ii) defamation and defamation *per se*, (iii) intentional infliction of emotional distress, and (iv) CUTPA (the "Claims"). *Id.*  At a hearing on November 15, 2021 [A89; hereafter "Sanctions Transcript], the trial court entered "death penalty sanctions" ("Sanctions") judicially decreing Jones liable to all Plaintiffs for all claims.  Jones filed a notice of defenses [A106] which the trial court struck because of the Sanctions.

Plaintiffs admit Jones is a media defendant. [A1, A3, A4, A5].  As such, he was entitled to all protections afforded media defendants by the Constitutions. The Sandy Hook murders garnered global coverage, prompted controversial

**EXHIBIT 29**

public cries for gun control, and resulted in were untold scores of public reports/comments about perceived anomalies and inconsistencies in published accounts of the tragedy and its aftermath.  These, in turn, lead many commentators to express opinions suggesting that some aspects of reporting may have been a "hoax."  These were matters of public concern and controversy.

Plaintiffs became public figures, including by voluntarily interjecting themselves into these public controversies and concerns by (i) filing suits (including against the perpetrator's mother, the school, and the gun manufacturer), (ii) giving scores of public interviews, (iii) making public statements, (iv) forming or joining advocacy campaigns, (v) attending and being recognized at highly public events such as President Barack Obama's 2013 State of the Union address and the 2016 Democratic National Convention; and (vi) being awarded presidential medals.

The jury in the ensuing "damages-only" trial, was repeatedly instructed [A112] that the trial court had previously determined all aspects of liability and causation as pleaded by Plaintiffs, including that all statements attributed to Jones (i) were "lies" [A126], (ii) actually said by Jones, (iii) false, (iv) defamatory, and (v) made with legal malice. The jury was further instructed Jones was legally responsible for guest's statements [A118] and everything any possible "listener" may have perpetrated [A126] and to "…consider that it is already established that the defendants' conduct was extreme and outrageous." A132.  There was no proof establishing these.

The jury was instructed that Plaintiffs were presumed to have been damaged [A113; 123–29; 131; 133] and that causation of those damages had been judicially determined, obviating need of proof.  A126–27; 129.  Those instructions within the Charge are collectively called "Jury Instructions."  The verdict and ensuing judgment was awarded in four groups for all causes: "**defamation/slander damages**" (which included emotional distress) of

**EXHIBIT 29**

$403,600,000; "**emotional distress damages**" of $561,400,000;  **common law punitive damages** of $321,620,000; and **CUTPA punitive damages** of $150,000,000. A142-56.

On appeal, the Appellate Court determined (i) Sanctions were appropriate; (ii) constitutional issues were waived due to inadequate briefing; and (iii) Plaintiffs had no CUTPA cause of action.

The Appellate Court did not specifically decide the questions presented for review in this petition.  Nevertheless, the size and interconnected nature of the Constitutional claims with procedural default rules makes this an important case for this state's jurisprudence.

5

**EXHIBIT 29**

## IV.   ARGUMENT

This case is virtually identical to *Gleason v. Smolinski*, 319 Conn. 394, 396 (2015) in which review was granted for claims pursuant to *State v. Golding*, 213 Conn. 233, 239-40 (1989) and *In re Yasiel R*., 317 Conn. 773, 781 (2015). The record is adequate to review the alleged claim of error as the Complaint [A1], given the Death Penalty Sanctions Transcript [A89] and Jury Charge [A112].  The numerous claims and defenses Jones was denied are all of constitutional magnitude alleging the violation of fundamental rights.  For example, in violation of constitutional rules, Plaintiffs were not required to prove falsity or fault and certainly did not have to prove them by clear and convincing evidence as constitutionally required.  *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76 (1986).  These constitutional violations clearly exist and deprived Jones of a fair trial.  Given U.S. and Connecticut Supreme Court authorities cited hereafter, the errors were not harmless, and Plaintiffs cannot demonstrate their harmlessness beyond a reasonable doubt.  *Gleason* at 402 n. 10.

Review is also warranted under the "plain error review" set forth under Practice Book § 60-5 because the unaddressed issues implicate interests of fundamental justice.  *Lynch v. Granby Holdings,* 230 Conn. 95, 99 (1994).  Also review is requested under this Court's general supervisory authority.

## A. IN A DEFAMATION CASE, SANCTIONS CANNOT BE ENTERED AGAINST A MEDIA DEFENDANT REMOVING PLAINTIFFS' BURDENS

The fact that Jones was a media defendant, the plaintiffs were public figures, and the subject of the alleged defamation was matters of public concern, imposed preempting state and federal constitutional mandates that distinguish

**EXHIBIT 29**

normal garden-variety libel cases from libel cases asserted against media defendants. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 3, (1990).   The First Amendment to the Constitution protects freedom of speech and press.  U.S. Const. Amend. 1.  These freedoms are echoed in the Connecticut Constitution. Art. I., §§ 4-5.  Connecticut constitutional jurisprudence is believed to be in accord with federal. [1]

This Court has summarized the issues the Plaintiffs here were Constitutionally required to prove, and the standards of proof associated with each, all of which the Sanctions improperly eliminated.  *Holbrook v. Casazza*, 204 Conn. 336, 358 (1987) (citing *Gertz v. Robert Welch*, 418 U.S. 323, 342 (1974) and *Rosenbloom v. Metromedia*, 403 U.S. 29, 30 (1971)).   Additionally, defamation requires that the plaintiff have been personally identified, which almost none were.  *Cweklinsky v. Mobil Chem. Co.,* 267 Conn. 210, 216-18 (2004).  These proof requirements are unalterable "**constitutional rules**," superseding all contrary state laws, rules and procedures.  *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76 (1986).

To reiterate, one of these unalterable constitutional rules, for example, required Plaintiffs to prove falsity of every challenged statement and do so by clear and convincing evidence, which requirement the Sanctions eliminated.  *Id*. Another eliminated constitutional requirement forbade a state from finding defamation against a media defendant without showing actual malice by clear and convincing evidence. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). This Court itself has emphasized this constitutional requirement in *Gleason*, 319

---

[1] As stated in *State v. Geisler*, 222 Conn. 672, 684 (1992) federal constitutional law establishes a minimum national standard for the exercise of individual rights. Hence the Connecticut Constitution is at least coextensive with the federal constitution and may be broader

7

**EXHIBIT 29**

Conn. at 432-33. It was not done.  Importantly, the $321,620,000 in common law punitive damages and $150,000,000 in now-reversed CUTPA punitive damages, was awarded without proof of actual malice by clear and convincing evidence, *Gleason* at 432.

The U.S. Supreme Court has repeatedly stated its constitutional requirements preempt any conflicting substantive or procedural state laws.  *N.Y. Times* at 271.  This Court has recognized these Constitutional limits.  *Gleason* at 430-31.  The Supreme Court has stated these restrictions apply beyond defamation, to related claims such as intentional infliction claims [*Snyder v. Phelps,* 562 U.S. 443, 451 (2011)] and all other claims that have as their base defamation-like claims, recognized by this Court.  *Gleason* at 432.

Yet the Sanctions imposed here impermissibly excused Plaintiffs from having to plead and prove, (i) identified specific statements, in context (ii) that identified each Plaintiff, (iii) uttered or published by Jones, (iv) falsity in some material respect to be proved by "clear and convincing evidence"; and (v) legal malice, that Jones published specific statements subjectively knowing them to be false or having subjective serious doubts as to their truth; rather the Sanctions declared all of these to have been affirmatively established.   Thus, all constitutionally required findings were eliminated by the Sanctions.  As a result, the judgment entered against Jones is unconstitutional and must be reversed.

**B.    THIS COURT IS CONSTITUTIONALLY REQUIRED TO INDEPENDENTLY REVIEW THE ENTIRE RECORD TO ENSURE CONSTITUTIONAL FACTS PROVED BY THE REQUIRED STANDARDS – A REVIEW IT CANNOT PERFORM**

The Supreme Court mandates that the facts of this case be independently reviewed by this Court to confirm constitutional conformity.  *Bose Corp. v.*

8

EXHIBIT 29

*Consumers Union*, 466 U.S. 485, 499.   This review is to focus on whether required constitutional ***facts*** have been proved by the required "clear and convincing evidence."   *Rosenbloom*, 403 U.S. at 55.   This Court's focus is particularly required, "where a federal right has been denied on the basis of a fact without evidence to support it …"   *Bose* at 506 n.24; *see also State v. Liebenguth*, 336 Conn. 685, 698-99 (2020).

This Court's duty is not limited to making sure the trial court elaborated or espoused constitutional principles, which it did not as the very opening line of this Motion demonstrates, but to make "….a conscious determination of the existence or nonexistence of the critical facts."   *Time, Inc. v. Firestone*, 424 U.S. 448, 463 (1976).   The "conscious determination" of "critical facts" requires the examination of the "content, form, and context" of each alleged libel "as revealed by the whole record" [*Snyder*, 562 U.S. at 453]  reviewing de novo the specific statements at issue and the circumstances under which they were made to determine whether each alleged libelous statement is of a character that the principles of the First Amendment are protected.   *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749 (1985).   As this Court has said: "Context is a vital consideration…" *Netscout Sys. v. Gartner, Inc.,* 334 Conn. 396, 412 (2020).

Here, a review to confirm that constitutional issues have been properly decided by the fact finder to the requisite "clear and convincing" standard is impossible because no such determinations were made and no adequate record exists, given the Sanctions' decrees.   While the record available does demonstrate massive constitutional issues at stake, the Sanctions and actions of the trial court have improperly precluded the development of a proper record from which this Court could make the review required by the Supreme Court.   At the ensuing damages-only trial, Jones was even forbidden to offer any defense [A112, 117, 122 – 125] even though he had filed a notice of defenses [A106] entitling their

**EXHIBIT 29**

presentation.  *De Blasio v. Aetna Life & Cas. Co.*, 186 Conn. 398, 401 (1982); *see also* PB § 17-34.  This was a constitutional deprivation of Jones's rights as he was precluded from making the very record this Court is charged with reviewing and is being denied.  The inability of this Court to review a full record required to determine that all constitutional issues have been properly proven mandates reversal.

## C.   CONSTITUTIONAL LIMITATIONS REQUIRE PLAINTIFFS PROVE (A) SPECIFIC STATEMENTS, (B) NAMING PLAINTIFFS, (C) MADE BY JONES AND (D) FORBID JONES'S LIABILITY FOR ACTS OF UNRELATED THIRD PARTIES

The Constitution and this Court's precedents require that "[t]he starting point for our analysis is an examination of the statements at issue." *State v. Krijger*, 313 Conn. 434, 452 (2014).  This requires specification of the "content, form, and context" of the alleged defamatory speech, "include[es] what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 453-54.  And "[e]ach statement … requires proof of each of the elements for defamation." *Gleason*, at 431.  Here, nowhere was there any specification of the entirety of what was said, where it was said, and how it was said.

Moreover, phrases such as "hoax" and "fake as a three-dollar-bill," cited out of context in the Complaint, are plainly opinions about events, lacking any specific "what, where, or how" to explain or support them.  They are opinions about events, specific news accounts or news conferences, made in a broader social context. *Montgomery v. Risen*, 875 F.3d 709, 714 (D.C. Cir. 2017) ("hoax" is "loose, figurative, or hyperbolic" and "may not serve as a basis for liability") (citing *Milkovich,* 497 U.S. at 21).  Moreover, it is not even clear what the "hoax" reference pertains too; a press conference? a specific news coverage segment?

The media landscape is rife with groups challenging various events, including Holocaust denial, moon landing skepticism, 9/11 conspiracies, and even flat Earth claims. However, such statements critique or dismiss the events themselves, not the character, conduct, or reputation of those associated with them. Referring to an event as a "hoax" targets the nature of the event, not any specific individual.   *Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966) (alleged libel must be "specifically directed at the plaintiff").  Aside from the fatal constitutional obstacles, from a standpoint of plain error, creating liability to media defendants and conferring standing to claiming damages to extended families and law enforcement officials for opinions about publicly discussed events, creates a nightmare of identifying potential plaintiffs, which implicates interests of fundamental justice.

Further fatal, none of the plaintiffs (with two limited exceptions) were identified, named, singled out, or directly referenced in any way.  "At common law, '[t]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; [and] (2) the defamatory statement identified the plaintiff to a third person…" *Gleason*, at 430-31.  Particularly missing is how any individual Plaintiff was "defamed" by statements directed at generalized events, not at any individual person.  No statement complained of alleged misconduct, dishonesty, or moral failing on the part of any Plaintiff.  No Plaintiff who was not identified in any challenged statement thus has constitutional standing to sue a media defendant for defamation or any defamation-related claim.

Further, the trial court instructed the jury that Jones was legally responsible for all statements/opinions of guests [A118] such as Wolfgang Halbig, an independent journalist who alleged made defamatory statements as a program guest. A4.  However, there were no allegations or proof making Jones responsible for Halbig's statements other than the conclusory allegation that

11

**EXHIBIT 29**

"Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut." A8.[2]   The Charge also stated "[D]efendants proximately caused harm to the plaintiffs by …urging their audience and the public to investigate and look into the plaintiffs …" [A126] "result[ing] in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs…" A126.  However, there was no allegation in the Complaint nor offered proof tying Jones to actions taken by third parties.  Therefore, to make Jones liable for these actions was unconstitutional. *See McKesson v. Doe*, 144 S. Ct. 913, 914 (2024) (Sotomayer, J., concurring) (summarizing the law forbidding liability for "incitement" of third parties to act, echoing the proscriptions of *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)).  It was thus unconstitutional for Jones to be decreed liable for guest comments, certainly absent malice, or acts of strangers.

**D.      DAMAGES AWARDED ARE UNCONSTITUTIONAL WHERE (A) AWARDED ON PRESUMED DAMAGES, (B) LIBEL *PER SE* NOT PRESENT, (C) THEY ARE DOUBLE RECOVERIES AND EXCESSIVE AND (E) WRONG STANDARDS USED**

Damages awarded [A141-58] are unconstitutional and violate Connecticut public policy.  Constitutionally, media defendants cannot be charged with presumed damages without proof of malice [*Milkovich,* 497 U.S. at 15-16] yet the jury was repeatedly instructed damages are presumed.  A126-27, 129, 133. This is

---

[2] In the damages trial, Plaintiff FBI agent Aldenberg said Halbig was "an associate of Mr. Jones and Infowars," solely based on his appearance as a guest on Jones's show. A224.

reversible error.

Defamation *per se* charges a plaintiff with a crime involving moral turpitude punishable by imprisonment or to which an infamous penalty is attached. *Gleason*, at 947. Here, the Complaint asserts defamation *per se* [A34] but only in conclusory fashion states the alleged defamations "implicate…heinous criminal conduct." [*Id*.]. Pleading and proof of libel *per se* allows a plaintiff to recover general damages for reputational injury, humiliation and mental suffering as was done here. *Gleason,* at 947. But there is no libel *per se* present here because (i) nowhere in the pleading did it state what that the "heinous crime" was, (ii) no proof was offered, and (iii) constitutionally there can be no libel *per se* for a media defendant sued by a public figure. *Nunes v. Lizza,* 2023 U.S. Dist. LEXIS 71719, at \*107 (N.D. Iowa 2023). As the damage award was based on libel *per se*, it must be vacated.

That libel *per se* is not present, leaves only libel *per quod*, which requires pleading and proof of actual economic damages of a pecuniary nature, *i.e.*, loss of a business opportunity or position, which no Plaintiff pled or proved. *Urban v. Hartford Gas Co.,* 139 Conn. 301, 308-09 (1952).

CUTPA reversal means the associated compensatory and punitive damage awards must be reversed. In determining that amount, it is apparent CUTPA damages were awarded in the same measures as the other claims, consisting of "**defamation/slander damages**" and "**emotional distress**" [A141-58]. As "defamation damages" encompasses both reputational and emotional distress damages, [*Chugh v. Kalra*, 342 Conn. 815, 850-51 (2022)] reversal of CUTPA reveals the "double recovery" which violates Connecticut law and requires reversal. *Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 22 n.6 (1997).

Additionally, Plaintiffs received $561,400,000 for emotional distress, but that was submitted based on a negligence, "knew or should have known" standard. A123. *See Erickson Prods. v. Kast,* 921 F.3d 822, 833 (9th Cir. 2019).

This is unconstitutional. *Gertz*, 418 U.S. at 334. Additionally, the amounts awarded when no plaintiff has experienced economic damage, bodily harm, or even consulted mental health professionals, is excessive, shocking the conscience requiring reversal.

**E.     SANCTIONS WERE UNCONSTITUTIONALLY EXCESSIVE, PARTICULARLY SINCE THEY WERE PRIMARILY BASED ON NOW-REVERSED CUTPA CLAIM, AND JONES MADE SUBSTANTIAL COMPLIANCE**

This Court has yet to determine whether there is an outer limit to the proportionality analysis reviewing courts engage in to determine whether sanctions awards are appropriate.  Here, the Sanctions were not proportionate to the offenses and as they were tied to now-vacated CUTPA claim should have never been entered.

The Sanctions Transcript states three reasons.  First, Jones's lawyer filed a motion for leave to depose Hillary Clinton [A246] containing the statement: "*On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid,*" claiming they violated a protective order. A53.  The trial court denied the deposition request [*id.*] and later held this as one of three grounds for Sanctions.  It is not a knowing violation of a discovery order and was unjust, as the two offending sentences did not disclose testimony and revealed nothing of substantive testimony. Sanctions based on this were disproportionate to the penalty of denying Jones his Constitutional due process rights.

Second, Jones's lawyers could not retrieve in satisfactory form, never-used Analytics data showing sales ("Analytics Data"), *i.e.*, a subset of the issues presented to this Court earlier. *Lafferty v. Jones*, 336 Conn. 332, 378 & n. 35

EXHIBIT 29

(2020).  Third, Jones's lawyers could not retrieve accounting "subaccounts" from their accounting journal entries also sought for sales information ("Sub-ledger Data").   The Analytics and Subledger Data have nothing to do with defamation, as the U.S. Supreme Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667 (1989).  Thus, both were tied directly to the now reversed CUTPA claim, as Plaintiffs admitted: "**These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims.**"  A239.  As CUTPA was reversed the Sanctions should be as well.

Moreover, the death penalty sanctions were disproportionately punitive. *Ridgeway v. Mount Vernon Dire Ins. Co.*, 238 Conn. 60 (2018) and *Millbrook Owners Assn., Inc. v. Hamilton Standard*, 258 Conn. 1 (2001).   Making sure "the punishment fits the crime" is the key to proportionality.  It is not here.  Jones appeared, substantially complied with discovery, engaged in motion practice, attended endless "status" conferences, sat for dozens of depositions and provided tens of thousands of pages of documents to Plaintiffs.  For Sanctions to stand in the face of Jones's efforts and the vacating of the CUTPA claim, is a denial of Constitutional Due Process and disproportionate.

Upon final resolution of this case, the holdings of the trial court and Appellate Court be reversed and the case sent back for retrial.

## V.   CONCLUSION

For the reasons stated herein, Jones requests that this Petition for Certification be granted.

**EXHIBIT 29**

Dated: January 21, 2025                    DEFENDANTS-APPELLANTS

*/s/ Jay M. Wolman*
Jay M. Wolman, Juris No. 433791 of
**Randazza Legal Group**
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel.: (203) 539-6666
Email: jmw@randazza.com

**COUNSEL FOR ALEX JONES
AND FREE SPEECH SYSTEMS,
LLC**

*/s/ Ben C Broocks*
*Pro Hac Vice*
Ben C Broocks, Juris No. 446537
Texas State Bar No. 03058800
**BROOCKS LAW FIRM PLLC**
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email:
bbroocks@broockslawfirm.com

**COUNSEL FOR ALEX JONES**

**EXHIBIT 29**

# <u>CERTIFICATION</u>

Pursuant to Practice Book §§ 62-7 and 84-5, it is hereby certified that a copy of the foregoing was sent electronically this 21st day of January 2025, to:

Alinor Sterling, Josh Koskoff, and Christopher M. Mattei
**Koskoff, Koskoff & Bieder, P.C.**
350 Fairfield Ave.
Bridgeport, CT 06604
Tel.: (475) 766 – 4989
Email: asterling@koskoff.com
cmattei@koskoff.com
jkoskoff@koskoff.com

It is also certified that this document has been redacted or does not contain any names or other personal identifying information that is prohibited from disclosure by rule, statute, court order, or case law.  It is also certified that this document complies with all applicable rules of appellate procedure.  It is also certified that this petition, exclusive of the case caption, signature block of counsel of record, certifications, and appendix, is 3984 words.

*/s/ Jay M. Wolman*
Jay M. Wolman, Juris No. 433791 of
**Randazza Legal Group**
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel.: (203) 539-6666
Email: jmw@randazza.com

**EXHIBIT 29**

# CERTIFICATION OF INTERESTED ENTITY

Pursuant to Practice Book § 82-3, Plaintiff, Free Speech Systems, LLC is an interested entity, as defined by Practice Book § 60-4. Free Speech Systems, LLC is owned or controlled as follows: Alex E. Jones: 100%.

Alex Jones has also instituted a Chapter 7 bankruptcy proceeding before the Southern District of Texas, Houston Division. *See In re: Free Speech System, LLC*, Case No. 22-60043 and the Chapter 7 Trustee, Christopher R. Murray may claim an interest in the assets and/or ownership of Free Speech Systems, LLC.

The undersigned certifies that the above listed persons or entities have either (1) an ownership interest of 10 percent or more in the party; or (2) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves under Rule 2.11 of the Code of Judicial Conduct.

*/s/ Jay M. Wolman*
Jay M. Wolman, Juris No. 433791 of
**Randazza Legal Group**
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel.: (203) 539-6666
Email: jmw@randazza.com

**EXHIBIT 29**

PSC_____ AC 46131, 46132 and 46133        SUPREME COURT

ERICA LAFFERTY, ET AL.                                        STATE OF CONNECTICUT

v.

ALEX E. JONES, ET AL.                                         JANUARY 21, 2025

### APPENDIX TO PETITION FOR CERTIFICATION

Table of Contents

Plaintiffs' Complaint ................................................................................................A1

Plaintiffs' Amended Complaint (Trial Docket No. 989) .........................................A40

November 15, 2021 Trial Transcript........................................................................A89

Defendants' Notice of Defenses (Trial Docket No. 594) ......................................A106

October 7, 2022 Jury Charge Transcript[1].............................................................A112

Jury Verdict (Trial Docket No. 1010) ....................................................................A141

Appellate Court Decision.......................................................................................A159

List of All Parties to Appeal..................................................................................A221

Portions of September 13, 2022 (Vol. II of III) Trial Transcript...........................A222

Plaintiffs' Motion for Sanctions (Trial Docket No. 450) ......................................A225

Portions of September 21, 2022 (Vol. II of IV) Trial Transcript...........................A244

Defendants' Motion to Take Out of State Deposition (Trial Docket No. 384) ......A246

Order Denying Motion for Commission for Deposition (Trial Docket No. 385.20) .............A253

---

[1] This document was obtained from a filing made in an Adversary Proceeding in the Bankruptcy Court for the Southern District of Texas, Houston Division, *David Wheeler, et al. v. Alex E. Jones, et al.,* Adv. 23-03037, Dkt. 57. The document accordingly bears the court's CM/ECF number.

EXHIBIT 29

| | | |
|---|---|---|
| **RETURN DATE: JUNE 26, 2018** | : | **JUDICIAL DISTRICT** |
| | : | |
| **ERICA LAFFERTY, ET AL,** | : | **OF FAIRFIELD** |
| | : | |
| **v.** | : | **AT BRIDGEPORT** |
| | : | |
| **ALEX JONES, ET AL.** | : | **MAY 23, 2018** |

## COMPLAINT

### INTRODUCTION

1.      This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.      Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

**EXHIBIT 29**

10.     Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11.     Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12.     Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13.     As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14.     On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15.     They have confronted strange individuals videotaping them and their children.

16.     Some of them have moved to undisclosed locations to avoid this harassment.

17.     The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18.     Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19.     The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiffs are the immediate family of four children and two educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

24.     Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.     Plaintiffs Jennifer Hensel and Jeremy Richman are the parents of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. They reside in Fairfield County, Connecticut.

26.     Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.     Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.     Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

29.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

30.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com

3

**EXHIBIT 29**

and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

31.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

32.     Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

33.     Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

34.     Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

35.     All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

36.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

37.     Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

38.     Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

39.     Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ; Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010) https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

4

**EXHIBIT 29**

## THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

40.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

41.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

42.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

43.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

44.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

45.     His followers have shown themselves ready to comply.

46.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

47.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

48.     Jones's followers came running to his call, as he knew they would.

49.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

50.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

5

EXHIBIT 29

51.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

52.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

53.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

54.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

55.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

56.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

57.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

58.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

59.     Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

60.     Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

61.     Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

**EXHIBIT 29**

62.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

63.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

64.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

65.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

66.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

67.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

68.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

69.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

70.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

71.     Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

> A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.
>
> B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in

7

reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive." [6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children.[7]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

72. Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[8] His Facebook page continues to display those publications.

73. Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

74. In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

75. In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[8] *See, e.g.,* https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com /wolfgang.halbig.1/posts/195439914134252. https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

8

76.     For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

77.     The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

78.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

79.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

80.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

81.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

82.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

83.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

84.     Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

85.     Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051. 1391267684&type=3&theater.

[11] https://www.youtube.com/watch?v=4_2FznkfcBU.

[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[13] https://www.youtube.com/watch?v=jCOe3qIgyFA.

[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

9

**EXHIBIT 29**

86.     Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

87.     Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

88.     Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

89.     Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

90.     The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

91.     The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[15]

92.     The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

93.     Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

94.     Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas

---

[15] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

10

A010

masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[16]

95.     According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

96.     In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[17]

97.     In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

98.     News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

99.     Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[18]

100.     In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[19]

---

[16] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[17] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[18] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.yqXeXzdLEZ#.qewdqoN0m2.

[19] Corky Siemaszko, *InfoWars' Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

11

## THE CAMPAIGN OF ABUSE

101.    Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

102.    On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[20]

103.    That article alleges that Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

104.    An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

105.    At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

106.    On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[21]

107.    The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

108.    In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

109.    The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

110.    A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[20] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[21] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

12

**EXHIBIT 29**

**January 27, 2013**

111.    On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[22] Just over a month had passed since the shooting at Sandy Hook.

112.    Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

113.    Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying."

114.    Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

115.    Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

116.    As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

117.    Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

118.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

119.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**March 2013**

---

[22] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

13

**EXHIBIT 29**

120.    On March 14, 2014, Jones stated, "We've clearly got people where it's actors playing different parts of different people."

121.    He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

122.    The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

## May 27, 2013

123.    On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[23]

124.    During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

125.    In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

126.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

127.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

128.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 13, 2014

129.    On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[24]

130.    That day, Jones hosted Wolfgang Halbig.

131.    During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

---

[23] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

[24] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

14

**EXHIBIT 29**

132.    Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

133.    Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

134.    Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

135.    Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

136.    Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

137.    He continued, "The whole thing, you've got 'em jumping gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

138.    Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

139.    Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012."

140.    Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

141.    During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake . . . it's fake . . . you've got parents acting . . . it just is the fakest thing since the three-dollar bill."

142.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

143.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

144.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

15

## September 25, 2014

145.   On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[25]

146.   This assertion was a complete fabrication: the FBI had made no such statement.

147.   During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

148.   This was a false statement. FBI crime statistics showed no such thing.

149.   Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

150.   Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

151.   Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

152.   Jones asserted that the school was "a cut-out" used as a stage for the event.

153.   Jones and Halbig both stated "I wish it was real instead of fake."

154.   Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

155.   Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

156.   Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

157.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

158.   On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

---

[25] https://www.youtube.com/watch?v=N1Rl7XvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

159.     The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

160.     The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

161.     The article quoted Halbig as saying that there was "a 'script' followed during the event."

162.     It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

163.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

164.     On information and belief, the article has been viewed by hundreds of thousands of persons.

### December 12, 2014

165.     On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[26]

166.     The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

167.     During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

168.     Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one

---

[26] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

17

of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

169.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

170.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

171.    On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[27]

172.    Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

173.    Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

174.    Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

175.    Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

176.    Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

177.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

178.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[27] https://www.youtube.com/watch?v=TGCfi_ot0CU.

**EXHIBIT 29**

179. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### January 2, 2015

180. On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

181. The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

182. "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

183. The pictures used were images of Noah Pozner.

184. Upon information and belief, hundreds of thousands of people have viewed this article.

### January 13, 2015

185. On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[28]

186. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

187. On information and belief, this episode was also broadcast through Jones's radio affiliates.

188. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[28] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

## March 4, 2015

189.    On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[29]

190.    Jones hosted Halbig on that episode.

191.    During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

192.    Halbig stated the school was not in operation at the time of the shooting.

193.    Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

194.    Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

195.    Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

196.    Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

197.    Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

198.    Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

199.    Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

200.    A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

201.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

202.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[29] https://www.youtube.com/watch?v=_7ib5WkULBY.

20

A020

EXHIBIT 29

## May 28, 2015

203.    On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[30]

204.    David Knight hosted Halbig on Infowars Nightly News.

205.    Halbig accused Newtown police chief Mike Kehoe of committing perjury.

206.    Halbig once again appeared, and stated that the school was unsanitary and unsafe.

207.    Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

208.    A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

209.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

210.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 29, 2015

211.    On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[31]

212.    The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

213.    The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

214.    Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

215.    On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

---

[30] https://www.youtube.com/watch?v=Ml3KVj2nVRA.
[31] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

21

A021

EXHIBIT 29

216.    Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[32] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

217.    During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

218.    Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

219.    On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

### July 7, 2015

220.    On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[33]

221.    Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[34]

222.    "[T]he more we look at Sandy Hook," he said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

223.    He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

224.    Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

---

[32] https://www.youtube.com/watch?v=5cll79t7Mrw.

[33] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[34] https://www.youtube.com/watch?v=jCOe3qIgyFA.

22

**EXHIBIT 29**

225.   Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

226.   A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

227.   On information and belief, this episode was also broadcast through Jones's radio affiliates.

228.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 17, 2016

229.   On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

230.   These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

231.   Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

232.   Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[35]

233.   A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

234.   On information and belief, this episode was also broadcast through Jones's radio affiliates.

235.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 18, 2016

236.   On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[36]

---

[35] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.
[36] https://www.youtube.com/watch?v=MwudDfz1yAk.

23

**EXHIBIT 29**

237. During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

238. He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

239. He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

240. Jones rehearsed several of his most commonly employed arguments that the Sandy Hook shooting was staged, including that Anderson Cooper was standing in front of "a blue screen or a green screen," that video was "looped," and that "one of the reported fathers of the victims . . . [was] doing classic acting training."

241. In closing, Jones said, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

242. The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

243. On information and belief, this episode was also broadcast through Jones's radio affiliates.

244. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

24

EXHIBIT 29

### November 28, 2016

245.    On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[37]

246.    In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[38]

247.    Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

248.    Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

249.    Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

250.    These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

251.    Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

252.    This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

253.    Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

254.    He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

255.    The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

256.    Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

---

[37] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.

[38] https://www.youtube.com/watch?v=9PdrlrSCLu0.

25

A025

**March 8, 2017**

257.    On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

258.    During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

259.    Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

260.    A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

261.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

262.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**April 22, 2017**

263.    On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[39]

264.    During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

265.    Jones told his audience that they should not "believe any of it."

---

[39] https://www.youtube.com/watch?v=rUn1jKhWTXI.

**EXHIBIT 29**

266.    As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' deaths.

267.    During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

268.    In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

269.    The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

270.    Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

271.    The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

272.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

### April 28, 2017

273.    On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . . Yes, governments stage things."[40]

274.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[40] https://www.youtube.com/watch?v=StOyqyt0fkY.

**June 13, 2017**

275.    On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[41]

276.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

## The Megyn Kelly Interview

### *The Preview*

277.    On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

278.    NBC released a preview of the interview on the internet on the following day.

279.    In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

280.    Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

281.    In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

282.    Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

283.    Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

284.    The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

285.    These statements were heard by millions of people.

---

[41] https://www.facebook.com/80256732576/videos/10155465593882577/.

**EXHIBIT 29**

## *June 15, 2017 – Infowars*

286.   During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

287.   Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

288.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## *Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming*

289.   The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

290.   Before the interview aired that day, Jones published several pre-show videos on Infowars.

291.   During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

   A. In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

   B. Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

   C. He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

   D. He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

   E. While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the

29

**EXHIBIT 29**

plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormal and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

292.   Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

293.   As discussed in paragraphs 123 through 128 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

294.   In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

295.   During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

296.   In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

297.   A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

298.   These statements were heard by hundreds of thousands, if not millions of people.

### The June 18, 2017 NBC Broadcast

299.   During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

300.   At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 171 through 179 of this complaint.

301.   In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

302.   Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

303.   In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

30

304.     Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

305.     In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

306.     Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

307.     Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real.  But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

308.     Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

309.     Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

310.     Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

311.     Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

312.     Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

313.     In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

314.     It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

315.     There is no evidence "on the other side."

316.     A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

317.     More than three million people saw and heard these statements by Jones.

31

**EXHIBIT 29**

### *Alex Jones's June 18, 2017 Counter-Programming*

318.    Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

319.    The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

320.    As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged event.

321.    This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

322.    Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

323.    This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

324.    On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

325.    Hundreds of thousands, if not millions, of people heard these statements.

### *June 26, 2017*

326.    During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

327.    On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[42]

328.    Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

---

[42] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

329.    Shroyer's support for this statement was video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

330.    Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

331.    Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

332.    In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

333.    A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

334.    These statements were heard by at least tens of thousands, if not millions, of people.

335.    On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery.

**COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

336.    All previous allegations in this complaint are incorporated as if fully set forth herein.

337.    The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

338.    The false light in which the defendants' statements placed the plaintiffs would be highly offensive to a reasonable person.

339.    The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs

33

**EXHIBIT 29**

would be placed.

340.   These false publications have caused the plaintiffs actual and substantial damages.

341.   In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

342.   The plaintiffs are private individuals and are neither public officials nor public figures.

343.   The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

344.   The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

345.   The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

346.   These acts of the defendants resulted in damage to the plaintiffs.

### COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

347.   All previous allegations in this complaint are incorporated as if fully set forth herein.

348.   In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' deaths; the defendants published numerous defamatory statements.

349.   These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' deaths and/or are actors lying about the deaths of their loved ones.

350.   The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

34

351.    The defendants' defamatory publications readily identified the plaintiffs to millions of people.

352.    The defendants' defamatory publications were broadcast to millions of people.

353.    The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

354.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

355.    The plaintiffs are private individuals and are neither public officials nor public figures.

356.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

357.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

358.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

359.    These acts of the defendants resulted in damage to the plaintiffs.

**COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

360.    All previous allegations in this complaint are incorporated as if fully set forth herein.

361.    In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

362.    The defendants' conduct was extreme and outrageous.

363.    The defendants' conduct was the cause of the plaintiffs' distress.

364.    The emotional distress sustained by the plaintiffs was severe.

EXHIBIT 29

365.    The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

366.    In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

367.    The plaintiffs have suffered actual and substantial damages.

368.    The plaintiffs are private individuals and are neither public officials nor public figures.

369.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

370.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

371.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

372.    These acts of the defendants resulted in damage to the plaintiffs.

**COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

373.    All previous allegations in this complaint are incorporated as if fully set forth herein.

374.    The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

375.    The plaintiffs' distress was foreseeable.

376.    The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

377.    The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

378.    The plaintiffs have suffered actual and substantial damages.

36

**EXHIBIT 29**

379.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

380.    The plaintiffs are private individuals and are neither public officials nor public figures.

381.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

382.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

383.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

384.    These acts of the defendants resulted in damage to the plaintiffs.

**COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a** *et seq.*
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

385.    All previous allegations in this complaint are incorporated as if fully set forth herein.

386.    The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

387.    This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

388.    The defendants' reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

389.    The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

390.    The plaintiffs are private individuals and are neither public officials nor public figures.

391.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether

37

**EXHIBIT 29**

or not they were true.

392. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

393. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

394. These acts of the defendants resulted in damage to the plaintiffs.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.    Monetary damages;

B.    Punitive damages;

C.    Attorneys' fees;

D.    Costs;

E.    Declarative relief;

This matter is within the jurisdiction of this court.

38

A038

**EXHIBIT 29**

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 23rd day of May, 2018.

                                        THE PLAINTIFFS,


By          _____

                    **WILLIAM M. BLOSS**
                    **MATTHEW S. BLUMENTHAL**
                    KOSKOFF KOSKOFF & BIEDER
                    350 FAIRFIELD AVENUE
                    BRIDGEPORT, CT  06604
                    PHONE: (203) 336-4421
                    FAX:  (203) 368-3244
                    wbloss@koskoff.com
                    mblumenthal@koskoff.com
                    JURIS #32250

EXHIBIT 29

~~Docket No. FBT~~NO.  X06-UWY-CV-18-~~6076475~~6046436-S
~~:~~   ~~JUDICIAL DISTRICT~~:     SUPERIOR COURT

ERICA LAFFERTY, ET AL.          :          COMPLEX LITIGATION DOCKET

V.                    :          AT WATERBURY

~~WILLIAM SHERLACH &~~     :          ~~OF FAIRFIELD~~
~~ROBERT PARKER,~~           :
~~v.~~                    :          ~~AT BRIDGEPORT~~
                       :
ALEX ~~EMRIC~~ JONES, ET AL.       :          SEPTEMBER 16, 2022


NO.    X06-UWY-CV-18-6046437-S      :          SUPERIOR COURT

WILLIAM SHERLACH~~NOVEMBER 14, 2018~~          :          COMPLEX LITIGATION DOCKET

V.                    :          AT WATERBURY

ALEX EMRIC JONES, ET AL.       :          SEPTEMBER 16, 2022


NO.    X06-UWY-CV-18-6046438-S      :          SUPERIOR COURT

WILLIAM SHERLACH, ET AL.       :          COMPLEX LITIGATION DOCKET

V.                    :          AT WATERBURY

ALEX EMRIC JONES, ET AL.       :          SEPTEMBER 16, 2022


<u>**AMENDED COMPLAINT**</u>

**INTRODUCTION**

1.      This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.      Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

1

EXHIBIT 29

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

10.     Nevertheless, time and again, Jones has accused the Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11.     Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12.     Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13.     As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

2

A041

**EXHIBIT 29**

14.     On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15.     They have confronted strange individuals videotaping them and their children.

16.     Some of them have moved to undisclosed locations to avoid this harassment.

17.     The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18.     Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19.     The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

**PARTIES**

21.     The plaintiffs are the immediate family of ~~one child~~five children and ~~one educator~~three educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

---

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

3

A042

**EXHIBIT 29**

24.      Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.      Plaintiff Jennifer Hensel is the mother of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. She resides in Fairfield County, Connecticut.

26.      Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.      Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.      Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

22.29. Plaintiff Robert "Robbie" Parker is the father of murdered first-grader Emilie Parker, who was six years old at her death on December 14, 2012. He resides in King County, Washington.

23.30. The plaintiff, William Sherlach, is the spouse of Mary Sherlach, who was a 56-year-old school psychologist killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012. He resides in Fairfield County, Connecticut.

24.31. The defendants are out of statea business entitiesentity and individualsindividual residing in Connecticut, Texas, Florida, and Minnesota.

25.32. Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations. Jones can be served at his place of business, Infowars, at 3019 Alvin Devane Blvd, Suite 300-350, Austin, Texas 78741.

26.      Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.

> **Formatted:** Normal, Justified, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

A043

**EXHIBIT 29**

27.33.   Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.

28.      Defendant Infowars Health LLC is a Texas limited liability company. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.

29.      Defendant Prison Planet TV LLC is a Texas limited liability company. It may be served through its attorney, Eric Taube, at its principal offices located at 100 Congress Avenue, 18th Floor, Austin, Texas 78701.

30.      All theThe above-mentioned Texas business-entity defendants are defendant is owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. TheyIt and Jones shall hereinafter be referred to collectively as "the Jones defendants."

31.      Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

32.      Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

33.      Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

34.      Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

### THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

35.      Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ;  Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010)  https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

36.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

37.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

38.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

39.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

40.     His followers have shown themselves ready to comply.

41.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

42.     "You have to go investigate it for yourself," he told them.  "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

43.     Jones's followers came running to his call, as he knew they would.

44.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

45.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

46.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

47.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

6

A045

48.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

49.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

50.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

51.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

52.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

53.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

54.     Wolfgang Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

55.     DefendantCory Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

56.     On information and belief, Cory SlankaSklanka actively assisted in operating the websites MonteFrank.com and SandyHookJustice.com through at least September 2016.

57.     Cory Sklanka knew that Wolfgang Halbig's objective in his activities in Connecticut, on his websites, and in his broadcasts, was to publish Halbig's outrageous, hurtful, and defamatory statements about the plaintiffs, and to harass the plaintiffs, as alleged in this Complaint. In fact, he facilitated Halbig's activities, and agreed with Halbig to facilitate Halbig's activities, with the knowing purpose of achieving this objective, as well as the objective of giving Halbig's harassment and publications maximum reach.

58.     Sklanka knew that the websites' purpose was to publish defamatory and otherwise legally actionable false statements about the plaintiffs, including that: (1) the Sandy Hook shooting was a hoax; (2) children or educators did not die in the Sandy Hook shooting; (3) the families of victims in the Sandy Hook shooting are actors or otherwise lying about their loved ones' deaths;

7

and (4) families of Sandy Hook victims are engaging in fraud to profit from their loved ones' deaths. In fact, that is why he assisted Halbig in his "investigatory," defamatory, and harassing activities.

59.     On information and belief, on September 3, 2016, Sklanka posted under a pseudonym, or facilitated the posting of, an article on MonteFrank.com, asserting:

> Avielle Richman is a fabricated identity using the real life person Lenie Urbina of Sandy Hook, CT. Jeremy Richman of The Avielle Foundation continues to commit Fraud against the American public and against the world, collecting donations under false pretenses that his daughter died.[5]

60.     The article also asserted:

> Now that "Avielle Richman" and Lenie Urbina have been exposed as being the same person, we know that the "Avielle Foundation" is actively engaging in fraud and theft of donor's [sic] money. The Richman and Urbina families have been caught red-handed and have a lot of explaining to do. This includes Sandy Hook Medical Examiner Dr. H. Wayne Carver who claimed to have performed an autopsy on "Avielle"/Lenie.[6]

61.     Sklanka also hosted and published his own podcasts on YouTube about the Sandy Hook shooting under the username "SleightofSin." Based on witness statements, the plaintiffs believe podcasts contain publications by Sklanka within the statute of limitations asserting that the Sandy Hook shooting was a hoax and that the families of victims fabricated their children's deaths.

62.     A video already in the plaintiffs' possession indicates that Sklanka participated in and/or co-hosted a podcast published on March 25, 2015 in which he stated that "Sandy Hook . . . was all crappy acting," and that he was "sick of people being destroyed by an event [Sandy Hook] that was fabricated, let alone other people that are possibly being destroyed due to an event that didn't happen."

63.     In a video already in the plaintiffs' possession, Sklanka described working closely with Halbig on Sandy-Hook-related activities. The participant speaking immediately after Sklanka noted that Halbig would be appearing on Alex Jones's show the following day, and encouraged the podcast's listeners to listen to that broadcast "on GCN" and "bombard the caller lines . . . and comment sections" to give "encouragement to the Wolf to get this action moving" and for "Alex Jones to investigate." Another participant then argued that they should persuade Alex Jones to send Rob Dew to Connecticut with Halbig "to report." Sklanka stated in response: "I second that."

64.     Faced with this lawsuit, Sklanka deleted his YouTube profile and other social media accounts, thus hiding those videos from public view. However, with reasonable discovery, the

---

[5] Barry Miller, *Update: Wolfgang Halbig Threatened & MonteFrank.com Is Not Going Down*, MonteFrank.com (Sept. 3, 2016), https://archive.is/e44tV#selection-203.0-203.284.
[6] *Id.*

8

plaintiffs believe they would gain access to additional videos containing legally actionable publications by Sklanka and be able to enumerate them in greater detail.

65.    The plaintiffs were not aware of Sklanka's activities with Halbig until within the past year. Because Sklanka operated behind the scenes and under a pseudonym, the plaintiffs had no reason to know of his role in the activities related to this complaint.

66.    Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[7]

67.    Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

68.    Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

69.    Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

70.    Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

71.    In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

72.    After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

73.    Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

74.    On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

75.    During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

76.    Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

---

[7] https://www.facebook.com/mert.melfa/videos/539807396217619/.

9

**EXHIBIT 29**

A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive." [8]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children. [9]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

77.    Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor. [10] His Facebook page continues to display those publications.

78.    Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

79.    In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and

---

[8] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[9] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[10] *See, e.g.*, https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252.
https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

10

EXHIBIT 29

other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

80.     In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

81.     For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[11]

82.     The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

83.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

84.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[12] traveled to and were located in Hartford, Connecticut, for the creation of this video.

85.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[13]

86.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[14]

87.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[15]

88.     Jones continued, "Bidondi did a great job. I just wish I had known about this. I would have gone up there. Halbig tried to get me to go. I just am trying to launch the TV network and the new website and everything else."

89.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other

---

[11] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[12] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[13] https://www.youtube.com/watch?v=4_2FznkfcBU.
[14] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[15] https://www.youtube.com/watch?v=jCOe3qIgyFA.

11

A050

**EXHIBIT 29**

ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[16]

90.     Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

91.     Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

92.     Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

93.     ~~Defendant~~ Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

94.     ~~Defendant~~ Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

~~95.     Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.~~

**THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL**

~~96.~~ 95.  The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

~~97.~~ 96.  The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[17]

~~98.~~ 97.  The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

~~99.~~ 98.  Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and

---

[16] https://www.youtube.com/watch?v=TGCfi_ot0CU.
[17] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

12

A051

**EXHIBIT 29**



transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

~~100.~~99.        Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[18]

~~101.~~100.        According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

~~102.~~101.        In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[19]

~~103.~~102.        In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

~~104.~~103.        News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

~~105.~~104.        Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[20]

---

[18] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[19] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[20] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.yqXeXzdLEZ#.qewdqoN0m2.

13

EXHIBIT 29



~~106.~~105.      In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[21]

**THE CAMPAIGN OF ABUSE**

~~107.~~106.      Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

~~108.~~107.      On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[22]

~~109.~~108.      That article alleges that plaintiff Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

~~110.~~109.      An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

~~111.~~110.      At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

~~112.~~111.      On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[23]

~~113.~~112.      The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

~~114.~~113.      In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

---

[21] Corky Siemaszko, *InfoWars' Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.
[22] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.
[23] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

14

**EXHIBIT 29**

115.114.      The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

116.115.      A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**January 27, 2013**

117.116.      On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[24] Just over a month had passed since the shooting at Sandy Hook.

118.117.      Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

119.118.      Jones later stated, "I clearly believe from the evidence, children were really killed at Sandy Hook, and it's a real tragedy. But the fact that there having people script things and that answers are being scripted, is incontrovertible."

120.119.      Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robbie Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, basically breaking down and crying."

121.120.      Jones then played a video of plaintiff Robert Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

122.121.      Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

123.122.      As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

124.123.      Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious

---

[24] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

15

here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

125.124.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

126.125.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 27, 2013**

127.126.    On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[25]

128.127.    During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

129.128.    In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

130.129.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

131.130.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

132.131.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**March 14, 2014**

133.132.    On March 14, 2014, The Alex Jones Radio show broadcast an episode advertised on YouTube under the title "Sandy Hook, False Narratives Vs. The Reality."[26] During that episode Jones hosted Wolfgang Halbig.

134.133.    Jones stated, "We've got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts of different people."

---

[25] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.
[26] https://www.youtube.com/watch?v=esIvAO2aIlw; https://www.mediamatters.org/embed/clips/2016/11/29/51283/gcn-alexjones-20140314-shooting.

16

**EXHIBIT 29**

135.134.      He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

136.135.      Jones stated, "The biggest piece of evidence is that [former New York Mayor Michael] Bloomberg had his social network folks ready two days before."

137.136.      After claiming that he and Infowars had proven that the Boston Marathon bombing was a hoax, Jones later stated, "These people got to be stopped. If they'll stage the Boston bombing and Sandy Hook, they will do anything. The good news is that most people I've seen don't believe Sandy Hook. I think it blew up in their face."

138.137.      Later, in conversation with Halbig, Jones stated, "Obviously I agree with you, something's going on, they're covering up, it's all staged."

139.138.      Later in the conversation, referring to the Sandy Hook shooting, Halbig stated "I think it was a major drill, portrayed as one of the best illusions ever."

140.139.      Jones stated, "We want to send—maybe even I'll go—we want to send reporters up there, Wolfgang, with you, and I understand how dangerous this is so maybe my reporters don't want to go, they probably will want to go, but maybe it's a mission I should go on, there's just so much to run here."

141.140.      The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

**May 13, 2014**

142.141.      On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[27]

143.142.      That day, Jones hosted Wolfgang Halbig.

144.143.      During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

145.144.      Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

146.145.      Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

---

[27] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

17

**EXHIBIT 29**

147.146.    Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

148.147.    Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

149.148.    Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

150.149.    He continued, "The whole thing, you've got 'em jumping the gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

151.150.    Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

152.151.    During that show, Jones stated, in reference to the Sandy Hook shooting, "Kids going in circles, totally staged . . . . I mean clearly, it's a drill, just like the Boston bombing."

153.152.    Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012." As he spoke, video of Robbie Parker at the December 15, 2012 press conference played.

154.153.    Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

155.154.    During Jones's and Halbig's discussion stating that the Sandy Hook shooting was faked, video of plaintiff Robert Parker's press conference played above the chyron "Odd Parent Reaction from SandyHook [sic]," pausing it and playing it in slow motion during parts where it appears Parker is smiling.

156.155.    During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake! Blue screens, it's fake! . . . You got parents laughing [mocking laughing], 'watch this,' and then [mocking crying] method acting, [mocking crying and wailing] 'Oh, my child!' I mean, it's just ridiculous! You've got coroners that start laughing—and I don't mean uncomfortably, I mean like laughing—with the State Police when they're giving press conferences. I mean, it just is the fakest thing since the three-dollar bill!"

157.156.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

158.157.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

18

**EXHIBIT 29**

158.     These statements were also contained in another video posted to YouTube, entitled "Sandy Hook Red Flags Ignored by Newtown School Board."[28]

159.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**September 25, 2014**

160.     On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[29]

161.     This assertion was a complete fabrication: the FBI had made no such statement.

162.     During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

163.     This was a false statement. FBI crime statistics showed no such thing.

164.     Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

165.     Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

166.     Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

167.     Jones asserted that the school was "a cut-out" used as a stage for the event.

168.     Jones and Halbig both stated "I wish it was real instead of fake."

169.     Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

170.     Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

---

[28] https://www.youtube.com/watch?v=YiXpr30oUkA.

[29] https://www.youtube.com/watch?v=N1RlzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

19

EXHIBIT 29

171.     Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

172.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## September 26, 2014

173.     On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

174.     The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

175.     The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

176.     The article quoted Halbig as saying that there was "a 'script' followed during the event."

177.     It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

178.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

179.     On information and belief, the article has been viewed by hundreds of thousands of persons.

## December 12, 2014

180.     On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[30]

---

[30] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

20

A059

182.181.    The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

183.182.    During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

184.183.    Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

185.184.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

186.185.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**December 28, 2014**

187.186.    On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[31]

188.187.    Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

189.188.    Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

190.189.    Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

191.190.    Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished

---

[31] https://www.youtube.com/watch?v=TGCfi_ot0CU.

21

**EXHIBIT 29**

the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

192.191.        Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

193.192.        A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

194.193.        On information and belief, this episode was also broadcast through Jones's radio affiliates.

195.194.        The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### January 2, 2015

196.195.        On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

197.196.        The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

198.197.        "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

199.198.        The pictures used were images of Noah Pozner.

200.199.        Upon information and belief, hundreds of thousands of people have viewed this article.

### January 13, 2015

201.200.        On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[32]

---

[32] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

A061

**EXHIBIT 29**

201.  A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

202.  On information and belief, this episode was also broadcast through Jones's radio affiliates.

203.  The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**February 12, 2015**

204.  On February 12, 2015, during the broadcast of The Alex Jones Radio Show, Jones, David Knight, and Rob Dew discussed the December 12, 2014 "debate" broadcast by Jones and Infowars and discussed in paragraphs 181 through 186 of this Complaint.[33]

205.  Jones, Knight, and Dew recounted several purported arguments that the Sandy Hook shooting was faked, including that rescue helicopters weren't called, the investigation was "classified," "ambulances weren't even at the school" and were "stuck at the firehouse," and that former New York Mayor Michael Bloomberg "alert[ed] his people the day before to get ready for a big push."

206.  Rob Dew stated "it looks like something went on there."

207.  Jones interrupted him saying, "A drill."

208.  Dew continued, "It stinks to high heaven. You got the actor father who comes out [and] gets into character. I was a theater major. I worked with actors. I used to watch them get ready before they would go out and cry like that."

209.  Jones interjected, "You have a degree in theater!"

210.  Dew continued, "I was in the play *Our Town*. I'm sitting there watching these other people about to go out and do the funeral scene and they're pumping themselves up, doing exactly what [Robbie] did [gasping, labored breathing]."

211.  Jones interjected, "First he's laughing and smiling, and then . . . ."

212.  Dew continued, "And then he's totally sad, crying, and he was cracking jokes right before. That's an actor. That's an actor. I'm sorry [shrugs shoulders demonstratively]."

213.  Then, a zoomed-in video of Robbie Parker at the press conference was played as Jones and Dew commented on it.

214.  "I mean there it is," Dew said. "He's smiling."

215.  Jones said, "Then he huffs and puffs and gets into . . . ."

---

[33] https://www.youtube.com/watch?v=_QKCAo54hPk.

23

**EXHIBIT 29**

217.216.       Dew said, "That is a tell-tale sign of somebody acting right there. Now I don't know for a fact that this guy's an actor. That looks like acting all the way."

218.217.       Later, they discussed the HONR Network, a group associated with Leonard Pozner dedicated to opposing Sandy Hook hoaxing. Jones stated, "Well we'll just start investigating that. And I guess I'm gonna have to probably go up to Newtown. I'm gonna probably go investigate Florida as well."

**March 4, 2015**

219.218.       On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[34]

220.219.       Jones accepted a caller, "Eric from Connecticut," with whom he discussed the Sandy Hook shooting. Eric stated, "One more thing, with my own personal investigation with this, is you find out who Robbie Parker works for, and you really start going down the rabbit hole." They discussed about how Parker was purportedly a "solicitor for the chips [sic] program," a database where "you register your kids," to which Jones responded, "The DNA, the Masons pushed that."

221.220.       As they spoke, a mirrored computer screen played a muted YouTube video (from user "Russianvids") depicting Robbie Parker speaking at the December 15, 2012 press conference.

222.221.       The title of the Youtube video was depicted, as well: "Sandy Hook Shooting Hoax Fraud Robbie Parker Actor Exposed Smiling Laughing then Fake Crying [sic]."

223.222.       As the video played, a mouse cursor selected the words "Robbie Parker" in the title of the video, highlighting them to the viewer. Throughout the episode, Jones could be seen manipulating an Apple-brand cordless mouse. On information and belief, Jones was the person who highlighted the words "Robbie Parker."

224.223.       Jones then hosted Halbig on the episode.

225.224.       During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

226.225.       Halbig stated the school was not in operation at the time of the shooting.

227.226.       Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

228.227.       Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

---

[34] https://www.youtube.com/watch?v=_7ib5WkULBY.

24

**EXHIBIT 29**

229 228.      Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

230 229.      Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

231 230.      Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

232 231.      Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

233 232.      Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

234 233.      A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

235 234.      On information and belief, this episode was also broadcast through Jones's radio affiliates.

236 235.      The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### May 28, 2015

237 236.      On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[35]

238 237.      David Knight hosted Halbig on Infowars Nightly News.

239 238.      Halbig accused Newtown police chief Mike Kehoe of committing perjury.

240 239.      Halbig once again appeared, and stated that the school was unsanitary and unsafe.

241 240.      Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

242 241.      A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[35] https://www.youtube.com/watch?v=Ml3KVj2nVRA.

25

**EXHIBIT 29**

243 242.        On information and belief, this episode was also broadcast through Jones's radio affiliates.

244 243.        The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

245 244.        On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[36]

246 245.        The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

247 246.        The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

248 247.        Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

249 248.        On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

250 249.        Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[37] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

251 250.        During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

252 251.        Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

253 252.        On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**July 7, 2015**

---

[36] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[37] https://www.youtube.com/watch?v=5cll79t7Mrw.

26



254.253.      On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[38]

255.254.      Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[39]

256.255.      Jones rehearsed a number of his favorite arguments that the Sandy Hook shooting was staged. He stated, "It looked like a carnival. It looked like a big PR stunt. It came out that Bloomberg, a day before, sent an email out to his gun control groups, in all 50 states, saying, 'prepare to roll, major operation coming up.' . . . We have videos, that look just incredibly suspicious, people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method, you've got a degree, Rob, in theater. . . . This is something that even laypeople notice."

257.256.      This statement is clearly referring to Robbie Parker, and is most reasonably interpreted to be stating that Robbie was an actor and faked his daughter's death.

258.257.      "[T]he more we look at Sandy Hook," Jones said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

259.258.      He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

260.259.      Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

261.260.      Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

262.261.      A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

263.262.      On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[38] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting;
https://www.youtube.com/watch?v=8YV1eWq8YSc.
[39] https://www.youtube.com/watch?v=jCOe3qIgyFA.

27

**EXHIBIT 29**

264.263.          The audience for this broadcast has included hundreds of thousands, if not millions, of people.

265.264.          On that same day, The Alex Jones Show broadcast a longer video entitled "Full Show – Government is Manufacturing Crises."[40] It contained the same statements as the video entitled "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."

266.265.          The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**November 17, 2016**

267.266.          On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

268.267.          These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

269.268.          Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

270.269.          Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[41] Specifically, it seems Jones was referring to plaintiff Robert Parker's statements during a press conference of December 15, 2012, which Jones has frequently described as "classic acting."

271.270.          A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

272.271.          On information and belief, this episode was also broadcast through Jones's radio affiliates.

273.272.          The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[40] https://www.youtube.com/watch?v=O34Oeg6GUIk.
[41] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.

28

**EXHIBIT 29**

**November 18, 2016**

274.273.        On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[42]

275.274.        During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

276.275.        He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

277.276.        He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

278.277.        Jones continued, rehearsing several of his most commonly employed arguments that the Sandy Hook shooting was staged. Referencing Veronique de la Rosa's interview with Anderson Cooper, he stated, "That shows some kind of cover-up happening. And then I saw Anderson Cooper—I've been in TV for twenty-something years, I know a blue-screen or a green-screen—turn and his nose disappeared. Then I saw clearly that they were using footage on the green screen looped, because it would show flowers and other things during other broadcasts that were moving, and then basically cutting to the same piece of footage."

279.278.        Then he stated: "Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training, where he's laughing and joking and then they go hey 'we're live' and he goes 'Oh,' and [mocking, exaggerated moaning]." Jones was referring to plaintiff Robert Parker's statements during a press conference of December 15, 2012, which he has frequently described as "classic acting." Jones then played the video of Parker at the press conference.

280.279.        Jones stated, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other

---

[42] https://www.youtube.com/watch?v=MwudDfz1yAk.

29

EXHIBIT 29

rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

281. 280.     In closing, Jones stated: "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real. Let's look into Sandy Hook."

282. 281.     The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

283. 282.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

284. 283.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**November 28, 2016**

285. 284.     On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[43]

286. 285.     In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[44]

287. 286.     Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

288. 287.     Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

289. 288.     Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

290. 289.     These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

291. 290.     Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

---

[43] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.
[44] https://www.youtube.com/watch?v=9PdrlrSCLu0.

A069

**EXHIBIT 29**

292.291.     This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

293.292.     Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

294.293.     He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

295.294.     The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

296.295.     Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

**March 8, 2017**

297.296.     On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

298.297.     During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

299.298.     Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

300.299.     A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

301.300.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

302.301.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**April 22, 2017**

303.302.     On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[45]

---

[45] https://www.youtube.com/watch?v=rUn1jKhWTXI.

31

304.303.     During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

305.304.     Jones told his audience that they should not "believe any of it."

306.305.     As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' death.

307.306.      During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

308.307.     In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

309.308.     The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

310.309.     Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

311.310.     The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

312.311.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

32

**EXHIBIT 29**

**April 28, 2017**

~~313.~~312.      On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[46]

~~314.~~313.      Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**June 13, 2017**

~~315.~~314.      On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[47]

~~316.~~315.      Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**The Megyn Kelly Interview**

*The Preview*

~~317.~~316.      On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

~~318.~~317.      NBC released a preview of the interview on the internet on the following day.

~~319.~~318.      In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

~~320.~~319.      Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

---

[46] https://www.youtube.com/watch?v=StOyqyt0fkY.
[47] https://www.facebook.com/80256732576/videos/10155465593882577/.

33

**EXHIBIT 29**

320.     In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

321.     Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

322.     Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

323.     The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

324.     These statements were heard by millions of people.

### *June 15, 2017 – Infowars*

325.     During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

326.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

327.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### *Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming*

328.     The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

329.     Before the interview aired that day, Jones published several pre-show videos on Infowars.

330.     During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

34

A073

**EXHIBIT 29**

A. In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

B. Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

C. He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

D. He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

E. While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormally stilted and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

~~332.~~331.      Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

~~333.~~332.      As discussed in paragraphs 127 through 132 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

~~334.~~333.      In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

~~335.~~334.      During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

~~336.~~335.      In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

~~337.~~336.      A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

~~338.~~337.      These statements were heard by hundreds of thousands, if not millions of people.

35

A074

**EXHIBIT 29**

***The June 18, 2017 NBC Broadcast***

~~339.~~338.        During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

~~340.~~339.        At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 187 through 195 of this complaint.

~~341.~~340.        In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed.  But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen.  So again—"

~~342.~~341.        Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

~~343.~~342.        In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

~~344.~~343.        Later, Kelly stated, "But Alex, the parents—one after the other—devastated.  The dead bodies that the coroner autopsied."

~~345.~~344.        In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

~~346.~~345.        Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

~~347.~~346.        Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real.  But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

~~348.~~347.        Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

~~349.~~348.         Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

~~350.~~349.        Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

~~351.~~350.        Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

36

**EXHIBIT 29**

351.     Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

352.     In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

353.     It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

354.     There is no evidence "on the other side."

355.     A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

356.     More than three million people saw and heard these statements by Jones.

### *Alex Jones's June 18, 2017 Counter-Programming*

357.     Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

358.     The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

359.     As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged, false event.

360.     This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

361.     Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

362.     This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

363.     On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

364.     Hundreds of thousands, if not millions, of people heard these statements.

**EXHIBIT 29**



*June 26, 2017*

366.365.      During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

367.366.      On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[48]

368.367.      Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

369.368.      Shroyer's support for this statement was deceptively edited video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

370.369.      Shroyer also played as support for his statement a video clip of Sandy Hook parent Lynn McDonnel, which had been deceptively edited to imply that she was never allowed access to her child's body. In the unedited interview, Mrs. McDonnel stated that she was in possession of her child's body.

371.370.      Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

372.371.      Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

373.372.      In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

374.373.      A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[48] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

38

**EXHIBIT 29**

375.374.      These statements were outrageous, recklessly false, and malicious. Along with the original videos, contemporary news accounts stated that the victims' bodies were released to their loved ones, and funerals where the victims' bodies were in the custody of their loved ones were widely reported in the press.[49]

376.375.      These statements were heard by at least tens of thousands, if not millions, of people.

**July 20, 2017**

377.376.      On July 20, 2017, Jones re-broadcast the Shroyer segment of June 26, 2017, as part of his Alex Jones Radio Show programming.[50]

378.377.      During his discussion of the Shroyer segment, Jones said, "Can I prove that New Haven [sic] didn't happen? No. So I've said, for years, we've had debates about it, that I don't know. . . . That was a month ago. He said, 'I wouldn't hold my breath looking for a response. We've not seen a clarification! I'm the one that called him up after I saw the show that night, and I said, 'You know, Owen . . . could be that we need to get clarification on what'—'Oh, I could never find out. The stuff I found was that they never let them see their bodies.' That's kind of what's weird about this." Then he said, in a tone clearly indicating sarcasm, "Maybe they did. So [making incredulous face] I'm sure it's all real! But for some reason, they don't want to let you see those clips together [Shroyer's segment]."

379.378.      On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**October 26, 2017**

380.379.      In an October 26, 2017 video entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones claimed that the CIA visited Sandy Hook shooter Adam Lanza and recruited him. He claimed that the truth about Lanza is not known because "they bulldozed the house to get rid of it." Mr. Jones told his audience that Sandy Hook was "as phony as a three-dollar bill, with CNN doing fake newscasts, with blue screens."

381.380.      A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

**April 20, 2018**

---

[49] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting; http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101; https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100.
[50] https://www.mediamatters.org/blog/2017/07/21/alex-jones-sandy-hook-dad-needs-clarify-whether-he-actually-held-his-son-s-body-and-saw-bullet-hole/217333.

39

A078

**EXHIBIT 29**



382.381.     Jones has accused the plaintiffs of lying not only about Sandy Hook, but about the pain and torment they have experienced at his hands. In a video on April 20, 2018 entitled, "MSM Continues to Demonize Alex Jones," Jones mocked the plaintiffs, performing a cruel, false, malicious, and outrageous parody of their suffering: "I think they almost do this to mess with us or something. I'm serious, man…They go, 'Oh, my gosh, why are you doing that? You hurt me.' And we're like, 'No, no. We're sorry.' 'You've hurt me.' And like five years later, 'You hurt me. Stop hurting me.' And we're like, 'But we're not bringing you up.'"

383.382.     As shown by the previous allegations (and the statement itself), Jones and the other defendants have for years repeatedly and continually brought the plaintiffs up, and made cruel, outrageous, reckless, and false allegations about them and the tragedy that robbed them of their loved ones. Indeed, Jones made statements accusing the plaintiffs of fabricating the deaths of their loved ones and suggesting that Sandy Hook was a hoax just months before the first lawsuits were filed against him by Sandy Hook families.

384.383.     In the same video, Jones continued to accuse the plaintiffs of lying about his conduct, falsely asserting that he had not discussed Sandy Hook in years. Performing another mocking imitation of the plaintiffs, Jones stated: "'Oh, my gosh. Alex has no heart. He is—nothing is sacred. He brought it up again.' No. You did and lied about it."

385.384.     Jones also falsely claimed he had never attacked the victims, stating, "I have never gone after the Sandy Hook parents . . . Who in the hell would try to go after people's parents who have dead children?"

386.385.     The answer to that question, as shown by the previous allegations, is Jones and the other defendants.

387.386.     In that same broadcast, Jones also made additional recklessly false claims, rehearsing a number of his arguments that the Sandy Hook shooting was faked and the plaintiffs fabricated the deaths of their loved ones. For example, Mr. Jones stated, "You can look it up. They stood down in Sandy Hook. They stood down in Parkland. That's a fact." Later in the same video, Jones repeated his claim that there was a police "stand down" at Sandy Hook.

388.387.     In the same broadcast, Jones rehearsed his bizarre allegations that Anderson Cooper's interview of Veronique De La Rosa was faked, stating, "It's just a background with the flowers of the town hall and her and Anderson Cooper. And then he turns and his head is shimmery, and his nose disappears, which everybody knows is a chromakey." Mr. Jones also repeated his claim that Anderson Cooper was working for the CIA, and he continued to assert that the interview was shot in front of a blue-screen rather than the result of digital compression.

**Other Statements**

389.388.     On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery. Numerous videos and other broadcasts published by the defendants have recently been removed from the public domain either by the defendants themselves or companies like Twitter,

40

A079

EXHIBIT 29

Facebook, and YouTube. Discovery, including documents and witness testimony, is required for the plaintiffs to present the full scope of the defendants' campaign of outrageous lies and abuse.

## THE BACKPEDALING AND ADMISSIONS

390.389.    The Sandy Hook shooting and its aftermath were exhaustively documented by the local and national press; local, state, and federal law enforcement; other government entities; and other means. It is no exaggeration to say that the true and accepted story of Sandy Hook—that the plaintiffs lost their loved ones in Adam Lanza's murderous rampage—is supported by a mountain of evidence. Most of these records and evidence are publicly available. This in itself is enough to show that the defendants made the outrageous, false, and malicious statements detailed in this complaint with knowledge that the statements were false, or with reckless disregard as to whether or not they were true. Added to this are the defendants' deceptive edits to and contextualization of videos, documents, or other records to purportedly support their statements.

391.390.    Above and beyond this, on numerous occasions, some listed in the allegations above, Jones and the other defendants have admitted either that they never believed the Sandy Hook shooting was faked or that they had serious doubts about the truth of their statements, that they made those statements with knowledge that the statements were false, or with reckless disregard as to whether or not they were true. Those admissions became more frequent after the plaintiffs and other Sandy Hook families filed lawsuits against the defendants related to the defendants' statements about Sandy Hook, the plaintiffs, and the Sandy Hook families.

### April 20, 2018

392.391.    On April 20, 2018, the Alex Jones Show broadcast a video entitled "Watch As Megyn Kelly Opens Old Wounds Of Sandy Hook Victims."[51]

393.392.    In it, Jones made a number of statements indicating that he never actually believed, or else had serious reasons not to believe, his previous statements claiming that the Sandy Hook shooting was a hoax and that the plaintiffs fabricated the deaths of their loved ones.

394.393.    Jones stated, "I can't prove the shooting didn't happen."

395.394.    Jones stated, "It's been years since I even played devil's advocate in debates where I said it all happened like was said, or none of it happened. I could see how people would believe that [the Sandy Hook shooting was faked] because of all the media lying but we've investigated it and we think it happened."

396.395.    Jones acknowledged the power of his platform. "We have our own platform," he said. "Millions are going to see this. Millions are watching."

397.396.    "And here's the deal," he said. "I know the parents know that I've been clear on this for at least four years." While this statement is false—as this Complaint details, Jones repeatedly claimed that the Sandy Hook shooting was false and that the parents were actors during

---

[51] https://www.youtube.com/watch?v=uQkAJykqyeo.

A080

**EXHIBIT 29**

that period—it is an admission that by Jones that he believed Sandy Hook really happened and the families lost their loved ones during the time he made nearly all the statements in this complaint.

398.397.    He continued, "I began to say that Sandy Hook happened years before and they took that as weakness."

399.398.    Then, Jones played a video of Neil Heslin's April appearance on Megyn Kelly Today, alternately pausing it and interjecting his own commentary.

400.399.    When, in the video, Heslin said that Jones's lies about Sandy Hook were disrespectful to "the law enforcement, the first responders" who served at Sandy Hook the day of the shooting, Jones interjected, "Who stood down!"

401.400.    Then Jones said, "Hit pause." When the video stopped, Jones screamed into the camera, "You can look it up. They [law enforcement and first responders] stood down in Sandy Hook, they stood down in Parkland. That's a fact!"

402.401.    Then Jones read an email from Leonard Posner, and a responsive email that Jones stated that he himself dictated. In that response, Jones stated: "Thank you for contacting us to share your point of view. Alex has no doubt that this was a real tragedy." According to Jones and the text of the email, this email was sent in January 29, 2013. Then, in real time, Jones remarked, "Paul Watson was like threatening to quit, and I wasn't even saying it didn't happen, I was just devil's advocating." In other words, from the beginning of his campaign of outrageous lies against the plaintiffs, Jones knew and believed that they and the other Sandy Hook families were not actors, had actually lost their loved ones, and that he was lying in making the statements recounted in this Complaint.

403.402.    He continued: "And I'd have these families on right now . . . they don't do it, because they don't want to humanize me. They want to lie." The most reasonable interpretation of this statement is that Jones is accusing the plaintiffs of lying about Jones's statements about them.

**May 23, 2018**

404.403.    On May 23, 2018, The Alex Jones Show broadcast a video entitled, on YouTube, "Alex Jones' Statement On New Sandy Hook Lawsuit."[52] He described "the admitted goal" of lawsuits against him (like this one) as being to create the "Alex Jones statute" to "overturn[] the First Amendment."

405.404.    During the video, Jones made various statements about his state of mind at times relevant in this Complaint.

406.405.    "I kept saying I believe it happened," he stated. Later in the video, he said, "Before, I just questioned it. . . . Once it was personalized, once I saw the players, the people, I said 'I think it's real.' I had the debate that was already going on."

---

[52] https://www.youtube.com/watch?v=AfvhhcXPCps.

42

407.406.     He also stated: "Three years ago, when the so-called Sandy Hook activists were on my butt saying I was covering it up because I said I thought it happened 'cause I couldn't prove it one way or the other. There were some anomalies. I genuinely was trying to research it. I just said 'I'm done with this. It happened. I'm moving on. Don't blame gun owners for it.'"

408.407.     Jones was admitting that, at the times relevant to most if not all of the publications contained in this Complaint, he believed that the Sandy Hook shooting happened and that the families lost their loved ones.

**June 4, 2018**

409.408.     In 2018, Alex Jones and unidentified Infowars personnel repeatedly accosted former Democratic presidential candidate Sen. Bernie Sanders and several of his staff in Los Angeles International Airport. Jones and Infowars videotaped the series of encounters, and later broadcast them on Infowars on June 4, 2018.

410.409.     Later in the video, an unidentified man in the boarding line stepped between Jones and Sanders. He said to Jones: "You deny Sandy Hook, and you're giving him [Sanders] a hard time?"

411.410.     Jones did not deny that he had denied the Sandy Hook shooting, but instead started asking the unidentified man questions about Hillary Clinton.

412.411.     Later in the conversation, the unidentified man stated to Jones: "You edited videos of Sandy Hook."

413.412.     Jones responded, "Yeah that's right."

414.413.     The unidentified man to Jones said in response, while laughing: "You're an idiot. You win."

415.414.     The unidentified man laughed and made that remark because he realized that Jones had just admitted on camera to deceptively editing videos related to the Sandy Hook shooting that he used as purported evidence to question and deny what happened at Sandy Hook Elementary School on December 14, 2012.

**COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy**
**(All Plaintiffs v. All Defendants)**

416.415.     All previous allegations in this complaint are incorporated as if fully set forth herein.

417.416.     The defendants and Halbig and Sklanka, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious

43

**EXHIBIT 29**

offense may reasonably be expected to be taken by a reasonable person in their position.

418.417.     The false light in which the defendants' and Halbig's and Sklanka's statements placed the plaintiffs would be highly offensive to a reasonable person.

419.418.     The defendants and Halbig and Sklanka had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs would be placed.

420.419.     These false publications have caused the plaintiffs actual and substantial damages.

421.420.     In light of their prior experience with similar sorts of reckless and false statements, the defendants and Halbig and Sklanka knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

422.421.     The plaintiffs are private individuals and are neither public officials nor public figures.

423.422.     The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

424.423.     The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

425.424.     The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

426.425.     These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.

### COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
### (All Plaintiffs v. All Defendants)

427.426.     All previous allegations in this complaint are incorporated as if fully set forth herein.

428.427.     In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' death; the defendants and Halbig and Sklanka published numerous defamatory statements.

44

**EXHIBIT 29**



429.428.      These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' death and/or are actors lying about the deaths of their loved ones.

430.429.      The statements contained in the defendants' and Halbig's and Sklanka's campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

431.430.      The defendants' and Halbig's and Sklanka's defamatory publications readily identified the plaintiffs to millions of people.

432.431.      The defendants' and Halbig's and Sklanka's defamatory publications were broadcast to millions of people.

433.432.      The defendants' and Halbig's and Sklanka's defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

434.433.      In light of their prior experience with similar sorts of reckless and false statements, the defendants and Halbig and Sklanka knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

435.434.      The plaintiffs are private individuals and are neither public officials nor public figures.

436.435.      The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

437.436.      The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

438.437.      The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

439.438.      These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.

**COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy**
**(All Plaintiffs v. All Defendants)**

45

A084

**EXHIBIT 29**

440.439.      All previous allegations in this complaint are incorporated as if fully set forth herein.

441.440.      In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants and Halbig and Sklanka intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

442.441.      The defendants' and Halbig's and Sklanka's conduct was extreme and outrageous.

443.442.      The defendants' and Halbig's and Sklanka's conduct was the cause of the plaintiffs' distress.

444.443.      The emotional distress sustained by the plaintiffs was severe.

445.444.      The defendants' and Halbig's and Sklanka's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

446.445.      In light of their prior experience with similar sorts of false and reckless statements, the defendants and Halbig and Sklanka knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

447.446.      The plaintiffs have suffered actual and substantial damages.

448.447.      The plaintiffs are private individuals and are neither public officials nor public figures.

449.448.      The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

450.449.      The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

451.450.      The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

452.451.      These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.

**COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy**
**(All Plaintiffs v. All Defendants)**

46

**EXHIBIT 29**

453.   All previous allegations in this complaint are incorporated as if fully set forth herein.

454.   The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

455.   The plaintiffs' distress was foreseeable.

456. 452.   The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

457.   The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

458.   The plaintiffs have suffered actual and substantial damages.

459.   In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

460. 1.   The plaintiffs are private individuals and are neither public officials nor public figures.

461.   The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

462.   The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

463.   The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

464.   These acts of the defendants resulted in damage to the plaintiffs.

**COUNT ~~FIVE~~FOUR: Connecticut Unfair Trade Practices Act,**
**Conn. Gen. Stat. § 42-110a *et seq.*; Civil Conspiracy**
**(All Plaintiffs v. All Defendants)**

465. 453.   All previous allegations in this complaint are incorporated as if fully set forth herein.

466. 454.   The defendants and Halbig and Sklanka unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

47

467.455.     This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

468.456.     The defendants' and Halbig's and Sklanka's reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

469.457.     The defendants' and Halbig's and Sklanka's conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

458.     The plaintiffs are private individuals and are neither public officials nor public figures.

470.     The plaintiffs are private individuals and are neither public officials nor public figures.

471.459.     The defendants and Halbig and Sklanka broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

472.460.     The defendants and Halbig and Sklanka combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

473.461.     The defendants and Halbig and Sklanka combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

474.462.     These acts of the defendants and Halbig and Sklanka resulted in damage to the plaintiffs.


WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN

THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH

BELOW:

Plaintiffs seek relief as follows:

A.     Monetary damages;

48

**EXHIBIT 29**

B.    Punitive damages;

C.    Attorneys' fees;

D.    Costs;

E.    Declarative relief;

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this ~~14th~~16th day of ~~November, 2018~~September, 2022.

**THE PLAINTIFFS,**

**By** _____/s/_____

~~WILLIAM~~CHRISTOPHER       M. ~~BLOSS~~MATTEI

**ALINOR C. STERLING**

**MATTHEW S. BLUMENTHAL**

KOSKOFF KOSKOFF & BIEDER

350 FAIRFIELD AVENUE

BRIDGEPORT, CT  06604

PHONE: (203) 336-4421

FAX:   (203) 368-3244

~~wbloss@koskoff.com~~

cmattei@koskoff.com

asterling@koskoff.com

mblumenthal@koskoff.com

JURIS #32250

49

EXHIBIT 29

1

```
XO6 UWY CV18-6046436-S     :     SUPERIOR COURT

ERICA LAFFERTY, ET AL      :     JUDICIAL DISTRICT OF WATERBURY

V                          :     AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL    :     NOVEMBER 15, 2021
```
-----------------------------------------------------------
```
XO6 UWY CV18-6046437-S     :     SUPERIOR COURT

WILLIAM SHERLACH, ET AL    :     JUDICIAL DISTRICT OF WATERBURY

V                          :     AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL    :     NOVEMBER 15, 2021
```
-----------------------------------------------------------
```
XO6 UWY CV18-6046438-S     :     SUPERIOR COURT

WILLIAM SHERLACH, ET AL    :     JUDICIAL DISTRICT OF WATERBURY

V                          :     AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL    :     NOVEMBER 15, 2021
```

## COURT'S RULING

B E F O R E:

THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S:

Representing the Plaintiffs:

ATTORNEY CHRISTOPHER MATTEI
ATTORNEY ALINOR STERLING
ATTORNEY MATTHEW BLUMENTHAL
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, Connecticut  06604

EXHIBIT 29

2

Representing the Defendants:

    ATTORNEY JAY MARSHALL WOLMAN
    Randazza Legal Group
    100 Pearl Street
    Hartford, Connecticut  06103

    ATTORNEY CAMERON L. ATKINSON
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

    ATTORNEY MARIO CERAME
    Brignole Bush & Lewis
    73 Wadsworth Street
    Hartford, Connecticut  06106

                 Recorded and Transcribed By:
                 Patricia Sabol
                 Court Monitor
                 400 Grand Street
                 Waterbury, Connecticut  06702

A090

EXHIBIT 29

THE COURT: All right. So I will order a copy of the transcript of the following ruling, and I will sign it and I will place it in the court file as my decision for the purposes of any appeal.

So I'll first address the Clinton deposition issue and the conduct of July 1, 2021. In the July 19, 2021 court filing by the defendants Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet, LLC, they described how in the motion to depose Hillary Clinton, testimony designated by the plaintiffs as highly confidential was filed in the Clinton deposition motion. They explained that this was done because in their opinion, the plaintiffs did not have a good-faith basis to designate the deposition as highly confidential before the deposition had commenced, despite the fact that the Jones defendants had previously done so themselves. And it is not lost on the Court that the highly confidential information was improperly filed in the middle of the first deposition of a plaintiff.

The July 19, 2021 filing is in sharp contrast to the Jones defendants' position at the October 20, 2021 sanctions hearing where the Court addressed what, if any, sanctions should enter. At the October 20 hearing, the Jones defendants claim they could publish confidential information as long as they did not reveal the name of the witness. That is, they argued

A091

unconvincingly that they didn't understand the very protective order that they themselves drafted and asked the Court to approve as a Court order, which the Court did.

The position of the Jones defendants at the October 20, 2021 sanctions hearing did nothing but reinforce the Court's August 5th, 2021 order and findings that the cavalier actions on July 1st, 2021 constituted willful misconduct and violated the Court's clear and unambiguous protective order.

The history of the attorneys who have appeared for the defendants, Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC is a convoluted one, even putting aside the motions to withdraw appearance, the claims of conflict of interest and the motions for stay advanced by these five defendants.

As the record reflects, on June 28, 2018, Attorney Wolman appeared for all five of the Jones defendants.  Eight months later, on March 1st, 2019, Attorney Wolman is out of the case and Pattis & Smith filed an in-lieu-of appearance for all five defendants.  On February 24, 2020, Attorney Latonica also appeared for all five defendants.  Five months later on July 7, 2020, Attorney Latonica and Pattis & Smith is now out of the case and Attorney Wolman is back in the case for all five defendants.  Then on

EXHIBIT 29

June 28, 2020, Pattis and Smith is back in the case, but now only appears for the four LLC defendants.

But what is perhaps more significant is the transparent attempt to cloud the issues by Pattis & Smith, for example, by listing the names of only three of the four clients they represent when filing the motion to take the deposition of Hillary Clinton and then listing all four clients in the July 19, 2021 filing relating to the issue. And by Attorney Wolman who then argued in his October 20, 2021 file that Infowars, LLC had no involvement in the motion for commission because their lawyer did not list their name on the motion. It is simply improper under our rules of practice for an attorney to do so.

Turning to the issue of the subsidiary ledgers. The five Jones defendants on November 6, 2020 filed with the Court their discovery objections relating to the deposition of Free Speech Systems' accounting manager and current employee, Melinda Flores. In response to the plaintiff's request for subsidiary ledgers, the Jones defendants objected on the basis that the production of the subsidiary ledgers was oppressive, unduly burdensome, disproportionate, harassing and that it will require digging through eight years of accounting. No objection was raised as to the term "subsidiary ledger", although parties frequently will object to a discovery request if they

A093

consider it vague or confusing.

On April 29, 2021, the Court overruled the objection.  On May 6, 2021, the Court ordered the deposition of Flores to take place on June 4, 2021 and ordered the documents to be produced by the close of business on May 14, 2021 stating that failure to comply may result in sanctions.

On May 14, 2021, the five Jones defendants responded to the document request and Court order and stating that the subsidiary ledgers were incorporated into the trial balances and had been produced.

At her June 4, 2021 deposition, Flores, the accounting manager, testified that subsidiary ledgers or detail was easily accessible and available to her. She testified that it would show the sources of advertising income and she testified repeatedly that Free Speech Systems maintained subsidiary ledger information.  Flores did not believe she was obligated to produce the subsidiary ledgers, and it is unclear as to whether they have been produced.

It was impossible to reconcile the expert hired by Free Speech Systems with the November 6, 2020 objections filed with the Court and with Flores' deposition testimony.  While the Jones defendants in their May 5th, 2021 motion state that Flores would be the best employee to identify and produce the requested documents and further state that Flores

would be compelled by Free Speech Systems to produce the requested documents at the deposition, the defendants hired expert, Mr. Roe, said that Flores was wrong and that Free Speech Systems doesn't use or have subsidiary ledgers.

The Court, in its August 6, 2021 order, found that the subsidiary ledger information was easily accessible by Flores by clicking on each general account, that, despite the Court orders and although the information exists and is maintained by Free Speech Systems and was required by the Court order to be produced, it had not been produced.  And, again, it is still unclear as to what documents have been produced.

The Court rejected Roe's statements in his affidavit as not credible in light of the circumstances.  The Court found that the plaintiffs were prejudiced in their ability to prosecute their claims and conduct further meaningful depositions and that sanctions would be addressed at a future hearing.

At the October, 2021 sanctions hearing, the Court addressed whether sanctions should enter.  The Court finds that sanctions are, in fact, appropriate in light of the defendant's failure to fully and fairly comply with the plaintiff's discovery request and the Court's orders of April 29, 2021, May 6, 2021 and August 6, 2021.

EXHIBIT 29

8

Turning to the trial balances.  In addition to objecting to the deposition of Flores, the Jones defendants, as I mentioned, filed discovery objections to the request for production directed to Flores.  The Court ruled in favor of the defendants on one production request and ruled in favor of the plaintiffs with respect to others.

In addition to the subsidiary ledgers, the Court ordered production of the trial balances.  Flores had run trial balances in the past unrelated to this action.  Flores testified at her June 4, 2021 deposition that she personally accessed Quick Books and selected the option to generate trial balances for 2012 to 2019.  She testified that she ran the reports and printed them out and believed that the reports were produced.  Her testimony the reports that she ran were produced was left uncorrected by counsel at the deposition.

The reports were not produced by the Court-ordered deadline of May 14, 2021.  They were not produced at her June 4, 2021 deposition, and they have not been produced to date, despite their obligation to do so.

While the Jones defendants, in their May 5, 2021 Court filing, emphasized that Flores would be the best employee to identify and produce the requested documents which would include the trial balances and

EXHIBIT 29

9

that Flores would be compelled by Free Speech Systems to produce the documents at her deposition, not only were the reports not produced, but the Jones defendants in their October 7, 2021 filing now claim that Flores, a mere bookkeeper, provided flawed information to the defendants that the defendants, through Roe, had to correct.  And the Court rejects that position.

The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by the Jones defendants' outside accountant were the records that were produced.  But these records that removed accounts and consolidated accounts altered the information in the reports that their own accounting manager had produced, and they contain trial balances that did not balance.  These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiff's request or to the Court's order.

Turning to the analytics.  The date for the parties to exchange written discovery has passed after numerous extensions by the Court.  On May 14, 2021, the Court ordered that the defendants were obligated to fully and fairly comply with the plaintiff's earlier request for disclosure and production.

10

On June 1, 2021, the defendants filed an emergency motion for protective order apparently seeking protection from the Court's own order where the defendants again attempted to argue the scope of appropriate discovery.

The Court, on June 2, 2021, declined to do so and extended the deadline for final compliance to June 28, 2021 ordering the defendants to begin to comply immediately on a rolling basis.  In its June 2nd order, the Court warned that failure to comply would result in sanctions including default.

With respect to analytics, including Google Analytics and social media Analytics, the defendants on May 7, 2019 represented that they had provided all the analytics that they had.  They stated with respect to Google Analytics that they had access to Google Analytics reports, but did not regularly use them.  As the Court previously set forth in its September 30, 2021 order, the defendants also claim that on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not the codefendants, an email the plaintiffs state they did not receive and that the Court found would not have been in compliance with our rules of practice.

On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete final supplemental compliance was made by the defendants,

A098

EXHIBIT 29

11

Alex Jones and Free Speech Systems, LLC and that Infowars, LLC, Infowars Health, LLC and Prison Planet, LLC, quote:  Had previously produced all documents required to be produced, end quote, representing that with respect to the Google Analytics documents, Free Speech Systems, LLC could not export the dataset and that the only way they could comply was through the sandbox approach.

Then on August 8, 2021, the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for Infowars dot com and not for any of the other websites such as Prison Planet TV or Infowars Health.  Importantly, the Jones defendants to date have still not produced any analytics data from any other platform such as Alexa, Comcast or Criteo.

The Jones defendants production of the social media analytics has similarly been insubstantial and similarly has fallen far short both procedurally and substantively, despite prior representations by the Jones defendants that they had produced the social media analytics and despite the May 25, 2021 deposition testimony of Louis Certucci, Free Speech Systems social media manager for nearly a decade, that there were no such documents.

At the June 28, 2021 deposition of Free Speech Systems corporate designee Zimmerman, Mr. Zimmerman

12

testified that, in fact, he had obtained some responsive documents from Certucci which were then loaded into a deposition chat room by counsel for the Jones defendants.  It appears that these documents were minimal summaries or reports for Facebook and Twitter, but not for other platforms used by the defendants such as You Tube.

Any claim of the defendants that the failure to produce these documents was inadvertent falls flat as there was no evidence submitted to the Court that the defendants had a reasonable procedure in place to compile responsive materials within their power, possession or knowledge.

Months later, on October 8, 2021, the Jones defendants formally produced six documents for the spring of 2017 for Facebook containing similar information to the Zimmerman chat room documents, but not included in the chat room documents and screen shots of posts by Free Speech Systems to an unidentified social media account with no analytics.

The defendants represented that they had produced all the analytics when they had not done so.  They represented in court filings that they did not rely on social media analytics and this, too, is false.

I'm going to need to take a thirty second water break, please.

(A short break in the proceedings occurred.)

EXHIBIT 29

13

This response was false.  The plaintiffs in support of their motion for sanctions on the analytics issue attached as exhibit D, an email dated December 15, 2014 between former Free Speech Systems business manager Timothy Fruge and current Free Speech Systems employee Buckley Hamman.  Fruge attaches annotated charts of detailed analytics concerning Jones' 2014 social media audience including gender demographics engagement and social media sites that refer people to Infowars dot com.  As pointed out by the plaintiffs, Fruge's annotations are even more telling than the charts themselves and totally contradict the Jones defendants misrepresentations to the Court that, quote:  There is no evidence to suggest that Mr. Jones or Free Speech Systems ever used these analytics to drive content, end quote.

The next image on the document shows key indicators on Twitter.  Those are engagement and influence.  Again, this is reading from Fruge's notes.  Again, the next image shows the key indicators on Twitter.  Those are engagement and influence.  Notice our influence is great and our engagement is low.  I bring this up -- again these are Fruge's notes -- because we should try and raise our engagement with our audience.  Engagement is how well we are communicating and interacting with our audience.  The higher our engagement, the more valuable our audience

14

will become to our business.  And that is the end of Fruge's notes.

I would note that regardless of this reliance on social media analytics, the concept is simple.  The defendants were ordered to produce the documents and our law requires them to produce information within their knowledge, possession or power.  Discovery is not supposed to be a guessing game.  What the Jones defendants have produced by way of analytics is not even remotely full and fair compliance required under our rules.

The Court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiff's ability to conduct meaningful discovery and to prosecute their claims.  This callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants.

Neither the Court nor the parties can expect perfection when it comes to the discovery process.  What is required, however, and what all parties are entitled to is fundamental fairness that the other side produces that information which is within their knowledge, possession and power and that the other side meet its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

A102

EXHIBIT 29

15

Here the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

The Court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous Court orders, and they have not.

In addressing the sanctions that should enter here, the Court is not punishing the defendants. The Court also recognizes that a sanction of default is one of last resort. This Court previously sanctioned the defendants not by entering a default, but by a lesser sanction, the preclusion of the defendant's special motions to dismiss. At this point entering other lesser sanctions such as monetary sanctions, the preclusion of evidence or the establishment of facts is inadequate given the scope and extent of the discovery material that the defendants have failed to produce.

As pointed out by the plaintiffs, they are attempting to conduct discovery on what the defendants publish and the defendants' revenue. And the failure

A103

EXHIBIT 29

16

of the defendants to produce the analytics impacts the ability of the plaintiffs to address what is published and the defendants failure to produce the financial records such as sub-ledgers and trial balances affects the ability of the plaintiffs to address the defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was caused by the Jones defendants willful noncompliance, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims.

For these reasons, the Court is entering a default against the defendants Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC. The case will proceed as a hearing in damages as to the defendants. The Court notes Mr. Jones is sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all the defendants have failed to fully and fairly comply with their discovery obligations.

As I said, I will order a copy of the transcript. I will sign it and I will file it in the Court as the Court's order.

_____

Bellis, J.

A104

17

XO6 UWY CV18-6046436-S    :    SUPERIOR COURT.

ERICA LAFFERTY, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                         :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

------------------------------------------------------------

XO6 UWY CV18-6046437-S    :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

V                         :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

------------------------------------------------------------

XO6 UWY CV18-6046438-S    :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

V                         :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in the Superior Court, Judicial District of Waterbury, at Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 15th day of November, 2021.

Dated this 15th day of November, 2021, in Waterbury, Connecticut.

_____

Patricia Sabol

Court Monitor

EXHIBIT 29

| DOCKET NO: UWY-CV-18-6046436-S : | : | SUPERIOR COURT |
| | : | |
| ERICA LAFFERTY, ET AL., | : | COMPLEX LITIGATION DOCKET |
| | : | |
| VS. | : | AT WATERBURY |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | NOVEMBER 24, 2021 |

| DOCKET NO: UWY-CV-18-6046437-S : | : | SUPERIOR COURT |
| | : | |
| WILLIAM SHERLACH, | : | COMPLEX LITIGATION DOCKET |
| | : | |
| VS. | : | AT WATERBURY |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | NOVEMBER 24, 2021 |

| DOCKET NO: UWY-CV-18-6046438-S : | : | SUPERIOR COURT |
| | : | |
| WILLIAM SHERLACH, ET AL., | : | COMPLEX LITIGATION DOCKET |
| | : | |
| VS. | : | AT WATERBURY |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | NOVEMBER 24, 2021 |

### NOTICE OF DEFENSES

Pursuant to Practice Book §§ 17-34 & 17-35 Defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, hereby give notice of intent to contradict allegations, the subject matter(s) they intend to contradict, the intention to deny the right of the plaintiffs to maintain their actions, and to prove their matters of defense in any hearing in damages.

As to matters of defense and denial of the right of the plaintiffs to maintain their actions, Defendants incorporate by reference as if fully restated herein the arguments set forth in their Special Motion to Dismiss (*Lafferty* Entry No. 113.00; *Sherlach I* Entry No. 136.00; *Sherlach II* Entry No. 114.00), Memorandum in Support of Special Motion to Dismiss (*Lafferty* Entry No.

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

**EXHIBIT 29**

114.00; *Sherlach I* Entry No. 137.00; *Sherlach II* Entry No. 115.00), Motion to Strike (*Lafferty* Entry No. 297.00; *Sherlach I* Entry No. 229.00; *Sherlach II* Entry No. 200.00), Memorandum in Support of Motion to Strike (*Lafferty* Entry No. 298.00; *Sherlach I* Entry No. 230.00; *Sherlach II* Entry No. 201.00) and Reply in Support of Motion to Strike (*Lafferty* Entry No. 353.00; *Sherlach I* Entry No. 281.00; *Sherlach II* Entry No. 253.00).[1]  These defenses include the following:[2]

1) Plaintiffs' claims are time-barred, in part or in whole;

2) Plaintiffs lack sufficient evidence to demonstrate one or more of the defendants committed defamation *per se*, defamation *per quod*,[3] false light invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of the Connecticut Unfair Trade Practices Act;

3) Plaintiffs lack sufficient evidence to demonstrate that one or more of the defendants conspired with another person to commit defamation *per se*, defamation *per quod*, false light invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of the Connecticut Unfair Trade Practices Act;

4) Plaintiffs' claims are barred by the First Amendment to the U.S. Constitution and Sections 4 & 5 of the Connecticut Declaration of Rights;

5) Plaintiffs are public figures and/or public officials and cannot prove one or more of the defendants made knowingly false statements or made the subject statements in reckless disregard of the truth or falsity thereof;

[1] Citations to the entries in the *Lafferty* matter

[2] Defendants further preserve all prior objections to subject matter jurisdiction that the Court has already adjudicated.

[3] The Court already found defamation *per quod* to not have been properly alleged.

- 2 -

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

**EXHIBIT 29**

6) Plaintiffs' claims are barred, in whole or in part, by the doctrine of superseding cause because the intentional and criminal actions of Adam Lanza were a superseding cause of Plaintiffs' alleged injuries;

7) Plaintiffs' claims are barred, in whole or in part, by the doctrine of intervening and/or superseding cause because the actions of other individuals, both named and unnamed, identified in the operative complaint, for whom the defendants are not liable, were the intervening and/or superseding cause of Plaintiffs' alleged injuries; and

8) Plaintiffs' claims are barred, in whole or in part, because they received payments from third parties in complete or partial satisfaction of any damages incurred as a result of the occurrence alleged

As to the Complaint in the *Lafferty* matter, Defendants intend to contradict allegations appearing in Paragraphs 6-15, 17-20, 28, 30, 31, 35, 38, 39, 41, 45, 48, 54, 57, 60, 61, 68, 69, 70, 73-80, 83-94, 96-98, 100, 101, 108, 110, 118, 125, 126, 138, 142, 146, 148, 163, 169, 177, 186, 200, 207, 208, 214, 215, 218, 226, 229, 233, 240, 242, 246, 250-252, 260, 266, 267, 269, 271, 272, 274, 276, 281, 284, 286, 287, 290, 291, 291(E), 297, 308, 315, 316, 318, 321, 323, 326, 327, 333, 335, 337-346, 348-359, 361-372, 374-384 & 386-394.[4]

The Amended Complaint in the *Sherlach I* matter and the Complaint in the *Sherlach II* matter bear identical allegations, and Defendants intend to contradict allegations appearing in their respective Paragraphs 6-15, 17-20, 25, 26, 30, 33, 34, 36, 40, 43, 52, 55, 66, 73-75, 78-85, 89-100, 102, 103, 104, 106, 107, 114, 116, 125, 129, 130, 137, 151, 157, 162, 164, 179, 185, 193, 202, 205, 234, 241, 242, 248, 249, 252, 262, 267, 271, 278, 282, 286, 290-292, 300, 306, 307, 309, 311,

---

[4] Defendants omit reference to the paragraphs incorporating the prior allegations; however, to the extent applicable, those paragraphs are contradicted to the fullest extent the prior allegations are.

312, 314, 316, 321, 324, 326, 327, 330, 331, 331(E), 337, 348, 355, 356, 358, 361, 363, 366, 367, 374, 381, 383-391, 393, 397, 402, 408, 409, 415, 417-426, 428-439, 441-452, 454-464 & 466-474.[5]     .

Defendants intend to contract these allegations regarding the subject matters of a) whether the statements were made with knowing falsity or in reckless disregard of the truth or falsity thereof; b) whether Infowars, LLC, is liable wherever "Infowars" is identified; c) whether the defendants acted jointly, as agents of each other, and/or in a conspiratorial combination; d) whether each of the statements placed Plaintiffs in a false light; e) whether each of the statements are highly offensive to a reasonable person; f) whether each of the statements caused damages to each plaintiff; g) whether each plaintiff is a private figure; h) whether the defendants participated in a scheme to harass and/or abuse any plaintiff; i) whether the statements accuse each plaintiff of faking a loved one's death and/or was an actor lying about the death of a loved one; j) whether the statements injured any plaintiff's reputation or image or exposed them to hatred, contempt, or ridicule; k) whether each defendants' conduct was extreme or outrageous; l) whether any defendant intended to inflict emotional distress on any plaintiff; m) whether any defendant acted with malice or cruelty; n) whether each plaintiff suffered physical illness or bodily injury; o) whether each defendant acted unethically, oppressively, immorally, or unscrupulously; p) whether each defendant could reasonably foresee each plaintiff's injury; q) whether each plaintiff could have avoided injury; and r) whether any injury to any plaintiff is outweighed by the benefit to society of free and fair discourse on broadly publicized, newsworthy events that are used as a catalyst for legislation.

---

[5] Defendants omit reference to the paragraphs incorporating the prior allegations; however, to the extent applicable, those paragraphs are contradicted to the fullest extent the prior allegations are.

A109

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

EXHIBIT 29

Dated: November 24, 2021

Respectfully submitted,
ALEX EMRIC JONES, INFOWARS, LLC,
FREE SPEECH SYSTEMS, LLC,
INFOWARS HEALTH, LLC, PRISON
PLANET TV, LLC

By: /s/ Jay M. Wolman
Jay M. Wolman– Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
P: 702-420-2001
F: 305-437-7662
*Counsel for Defendants Alex E. Jones, Free
Speech Systems, LLC, Infowars, LLC,
Infowars Health, LLC, and Prison Planet
TV, LLC*

And

/s/Norman A. Pattis
Norman A. Pattis
PATTIS & SMITH, LLC
Juris No. 423934
383 Orange Street
New Haven, CT 06511
V: 203-393-3017
F: 203-393-9745
npattis@pattisandsmith.com
*Counsel for Defendants Free Speech
Systems, LLC, Infowars, LLC, Infowars
Health, LLC, and Prison Planet TV, LLC*
Their Attorneys

- 5 -

A110

**EXHIBIT 29**

**CERTIFICATION**

I hereby certify that a copy of the above was mailed or electronically delivered on this 24th day of November, 2021 to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served including:

Alinor C. Sterling
Christopher M. Mattei
Matthew S. Blumenthal
KOSKOFF KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, CT 06604
<asterling@koskoff.com>
<cmattei@koskoff.com>
<mblumenthal@koskoff.com>
*Attorneys for Plaintiffs*

Mario Cerame, Esq.
Brignole, Bush & Lewis
73 Wadsworth Street
Hartford, CT 06106
<mcerame@brignole.com>
*Attorneys for Defendant*
*Genesis Communications Network, Inc.*

Eric Henzy
Zesler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06605
<ehenzy@zeislaw.com>
*Attorney for Plaintiff Richard M. Coan, Trustee*
*of the Bankruptcy Estate of Erica Garbatini*
*a/k/a Erica Lafferty*

/s/ Jay M. Woman 433791
Jay M. Wolman

*Randazza Legal Group, PLLC*
*100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662*

- 6 -

A111

**EXHIBIT 29**

1

## JURY CHARGE



THE COURT: Make yourselves comfortable.

So ladies and gentlemen of the jury, you've listened to the evidence and to the arguments of counsel and it now becomes my duty to instruct you concerning the law of the case. And I apologize but I must read most of this because it becomes somewhat technical in places and it's very important that I not miss anything.

But before I do that, I would like to thank you, ladies and gentlemen, for your attention throughout the trial. I noted that you have all been paying very close attention to everything that has gone on here. You've been unfailingly on time and even early for all the breaks and for each morning and for that, we are all very grateful.

As I instructed you before the start of evidence, generally, a civil trial such as this has two issues, liability and damages. As you will recall, here you are tasked with addressing the issue of damages, as the court previously determined that the defendants are liable. As a result this trial focused on damages. As I previously instructed you, you are not to speculate as to why the court previously determined that the defendants were liable but you are simply to accept it

A112

as a given and focus on the amount of damages to be awarded and the degree of the defendants' wrongdoing. The plaintiffs' burden at a hearing in damages such as this is to simply prove that the damages claimed is properly supported by the evidence and to prove the extent of the defendants' wrongdoing for purposes of punitive damages.

You as the jury and I as the judge have two separate functions. It is your function to find what the facts are in this hearing in damages; with respect to the facts, you and you alone are charged with that responsibility. My function is to instruct you as to the law to be applied to the facts that you find in order to decide this case.

With respect to the law, what I say to you is binding upon you and you must follow my instructions. I do not have any preference as to the outcome of this case. I have not meant to convey by facial expression or tone of voice or in any other way at any time during the trial any preference or inclination as to how you should decide the facts and you should not make any such interpretations. If in my instructions to you, I refer to one party more than the other or do anything that in your mind suggests a preference for one side or the other, it is not done on purpose.

My task has been to apply the rules of evidence and to instruct you as to the law. It is for you alone

EXHIBIT 29

3

to decide on the amount of damages in this case. It is your duty to follow my instructions and conscientiously apply the law as I give it to you to the facts as you find them in order to arrive at your ultimate verdict. If you should have a different idea of what the law is or even what you feel it ought to be, you must disregard your own notions and apply the law as I give it to you.

The parties are counting on having their claims decided according to particular legal standards that are the same for everyone and those are the standards I will give you and that you must follow. If what counsel said about the law differs from what I tell you, you will dismiss from your minds what they may have said to you. You must decide this case based only on the law that I furnish to you and on the basis of all the law as I give it to you regardless of the order of my instructions. You must not single out any particular instruction or give it more or less emphasis than any other but rather must apply all of my instructions on the law that apply to the facts as you find them.

You are to determine what the facts are by careful consideration of all the evidence presented and based solely upon the evidence giving to each part of the evidence the weight you consider it deserves in reaching your ultimate conclusion. When I say

A114

evidence, I include the following; testimony by witnesses in court including what you may have observed in any demonstrations they presented during their testimony, testimony by witnesses by way of the reading of transcripts or the showing of videotapes, exhibits that have been received into evidence as full exhibits, including any pictures or documents that are full exhibits. The testimonial evidence includes both what was said on direct examination and what was said on cross examination without regard to which party called the witness.

The following are not evidence and you must not consider them as evidence in deciding the facts of this case; opening statements and closing arguments by the attorneys, questions and objections of the attorneys, and testimony or exhibits that I instructed you to disregard.

Additionally, testimony or exhibits that I told you was to be used only for a limited purpose is not evidence for any other purpose. Your duty is to decide the case based on the testimony of the witnesses in court along with what has been admitted into evidence in the courtroom only and not on any other information about the issues that was not presented into evidence in this courtroom. It is my right to make comments to you on the evidence but where I do that, such comments are merely to suggest to you what point of law or what

A115

controversy I'm speaking about. If I refer to certain facts or certain evidence in the case, do not assume that I mean to emphasize those facts or that evidence and do not limit your consideration to the things that I may have mentioned. Likewise, you should attach no importance to it if I should mention one party more than the other. If I should overlook any evidence in the case, you will supply it from your own recollection. If I incorrectly state anything about the evidence in relation to what you remember, you should apply your own recollection and correct my error. In the same way, what any of the lawyers may have said in their respective summaries to you as to the facts or evidence in the case should have weight with you only if their recollection agrees with your own. Otherwise, it is your own recollection of the facts and evidence which should have weight in your deliberations.

Please understand that your decision must not be reached on the basis of sympathy for or prejudice against any party. The parties come to court asking simply for a cool impartial determination of the disputed issues based on the facts and the law. That is what they are entitled to and that is how you should approach the decision of this case.

You have heard that one of the parties in this lawsuit, is the defendant Free Speech Systems, LLC,

A116

EXHIBIT 29

which is an entity created by the law. All parties are equal before the law. The mere fact that one of the parties is a natural person and one is a creation of the law, should not play any part in your deliberations. You must treat all parties in an equal and unbiased fashion.

I instruct you that Free Speech Systems, LLC, is owned, controlled and operated by Alex Jones and it is employed to hold and generate revenue for him. I further instruct you that under the law applicable to this case, Alex Jones and Free Speech Systems are legally responsible for each other's wrongful conduct and are each responsible for the entirety of the harm to the plaintiffs in this case.

You will recall the testimony of Brittany Paz the corporate designee of Free Speech Systems. When asked to do so, corporations are required to designate an individual to testify for them. The opposing party has no say in who that person is. The corporation here, Free Speech Systems, LLC is given notice of the topics on which testimony is requested. It then chooses its designee and it is required to provide that designee with all the relevant information necessary to speak for it on that topic. Because it is important that the corporate designee be prepared to testify accurately, a corporation has the right to produce different designees for different topics. The corporation has an

A117

EXHIBIT 29

affirmative obligation to educate its designee as to the matters regarding the corporation. Even if the documents are voluminous and the review of the documents would be burdensome, the corporation is required to have its designee review them in order to testify.

Under Connecticut law, a corporation is generally responsible for the actions of its employees. In this case the court has determined that Free Speech Systems, LLC and Alex Jones both are responsible for the actions and statements of the employees of Free Speech Systems, LLC. Under Connecticut law when a broadcaster invites others on his show whom he expects will make false statements, the broadcaster is responsible for those false statements just as if the broadcaster had said them.

You have heard evidence that the defendants invited guests onto their broadcasts and those broadcasters falsely stated that the plaintiffs are actors and the Sandy Hook shooting was a hoax. These guests included Steve Piecscenik, James Tracy, Wolfgang Halbig, and others. I instruct you that it is established that the defendants are legally responsible for the statements of these guests on Infowars.

There are generally speaking two types of evidence from which a jury can properly find the truth as to the facts of the case. One is direct evidence, such as the

A118

EXHIBIT 29

8

testimony of an eye witness. The other is indirect or circumstantial evidence, that is, the inferences which may be drawn reasonably and logically from the proven facts. Let me give you an example of what I mean by direct and circumstantial evidence. If you're looking out a third floor window and you see smoke rising outside the window, that's direct evidence that there's smoke outside.

It is also circumstantial evidence that there is a fire of some sort below the window. As a general rule, the law makes no distinction between direct and circumstantial evidence but simply requires that the jury find the facts in accordance with a preponderance of all the evidence in the case, both direct and circumstantial. Thus, both direct and circumstantial evidence are permissible evidence and each type should be treated equally.

In your consideration of the evidence, you are not limited to the bald statements of the witness, that is, the exact words that they use. On the contrary, you are permitted to draw from facts which you find to have been proven such reasonable inferences as seem justified in the light of your experience. While you may make inferences and rely on circumstantial evidence, you should be careful not to resort to guesswork or speculation or conjecture to determine the facts in the case.

**EXHIBIT 29**

9

While the plaintiffs requested all Sandy Hook videos broadcast by the defendants and all analytics regarding Infowars social media, website and marketing materials and financial data, the defendants did not produce complete information in response and as a result, the plaintiffs had no ability to present the missing information to you.

The credibility of witnesses and the weight to be given to their testimony are matters for you as jurors to determine. However, there are some things to keep in mind. It is the quality and not the quantity of testimony that controls. In weighing the testimony of each witness, you may consider whether the witness has any interest in the outcome of the trial. You should consider a witness's opportunity and ability to observe facts correctly and to remember them truly and accurately, and you should test the evidence each witness gives you by your own knowledge of human nature and the motives that influence and control human actions. You may consider the reasonableness of what the witness says and the consistency or inconsistency of his or her testimony. You may consider his or her testimony in relation to facts that you find to have been otherwise proven. You may believe all of what a witness tells you, some of what a witness tells you or none of what a particular witness tells you. You need not believe any particular number of witnesses and you

A120

**EXHIBIT 29**

10

may reject uncontradicted testimony if you find it reasonable to do so.

In short, you are to apply the same considerations and use the same sound judgment and common sense that you use for questions of truth and veracity in your own daily lives. While most of the witnesses whose testimony has been presented to you were here to testify in person, the testimony of some witnesses were presented to you by the showing of videotapes of questions asked and answers given by those witnesses under oath at an earlier time. Testimony that is presented in this manner may be accepted or rejected by you in the same way as the testimony of witnesses who have been physically present in court. You should disregard any objections you hear made in those depositions and you may consider the responses.

We have had in this case the testimony of one expert witness Mr. Clint Watts. Expert witnesses such as engineers or doctors are people who, because of their training, education, and experience have knowledge beyond that of the ordinary person. Because of that expertise our law allows expert witnesses to give their opinions. Ordinarily a witness cannot give an opinion about anything but rather is limited to testimony as the facts and that witness's personal knowledge. Here an expert witness has given opinions. However, the fact that a witness may qualify as an

A121

EXHIBIT 29

11

expert does not mean that you have to accept his opinion. You can accept those opinions or reject them. An expert's testimony is subject to your review like any other witness. In considering an expert's opinion, you should consider the expert's education, training and experience in the particular field, the information available to the expert, including the facts the expert had and the documents available to the expert, the expert's opportunity and ability to examine those things, the expert's ability to recollect the activity and facts that form the basis for the opinion, and the expert's ability to tell you accurately about the facts, activity, and the basis for the opinion. You should ask yourselves about the methods employed by the expert and the reliability of the result.

You should further consider whether the opinion stated by the expert have a rational and reasonable basis in the evidence. Based on all of those things together with your general observation and assessment of the witness, it is then up to you to decide whether or not to accept the opinion. You may believe all, some, or none of the testimony of an expert witness. In other words, an expert witness's testimony is subject to your review like that of any other witness.

The defendants have been found liable for the following violations of each plaintiffs' legal rights. Defamation, intentional infliction of emotional

A122

**EXHIBIT 29**

distress, false light, invasion of privacy, and violation of the Connecticut Unfair Trade Practices Act. I will define each of these shortly.

It is your duty as jurors to determine the extent of damages. You should award those damages you find to have been proven by a preponderance of the evidence and as I further instruct you. Your award must be fair just and reasonable. The date on which the plaintiffs filed this case and the timing of the lawsuit is irrelevant to your consideration and you should not consider that in any way in determining the damages in this case.

As I have instructed you, the court has determined that the defendants are liable for having intentionally inflicted emotional distress on each plaintiff. Four elements must be shown to establish intentional infliction of emotional distress. These four elements thus have been established. One, the defendants intended to inflict emotional distress or the defendants knew or should have known that emotional distress was the likely result of their conduct. Two, that the conduct was extreme and outrageous. Three, that the conduct was the cause of emotional distress experienced by the plaintiff; and four, that the emotional distress sustained by the plaintiff was severe. It is established that the defendants inflicted such emotional distress on the plaintiffs.

A123

**EXHIBIT 29**

13

As I have instructed you, the court has determined that the defendants are liable for having invaded the privacy of each plaintiff by placing him or her in a false light before the public by publicizing material about him or her that is false and is such a major misrepresentation of his or her character, history, activities or beliefs that a reasonable person in the plaintiff's position would either be expected to take serious offense or be justified in feeling offended or aggrieved. Thus, these three elements have been established; one, that the defendants' publicized material or information about each plaintiff that was false. Two, that the defendants either knew that the publicized material was false and would place the plaintiff in a false light or acted with reckless disregard as to whether the publicized material was false and would place the plaintiff in a false light; and three, that the material so misrepresented the plaintiff's character, history, activities or beliefs that a reasonable person in the plaintiffs' position would find the material highly offensive. It is established that by their conduct the defendants deprived the plaintiffs of their privacy by casting them in a false light before the public as I have described.

The court has determined that the defendants are liable for defamation. The defendants are liable to

A124

EXHIBIT 29

the plaintiffs in this case and it does not matter to their liability whether or not Alex Jones singled them out by their individual names. Defamation is false communication that tends to harm the reputation of another person to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, to deter a third person from associating or dealing with him or her or to provoke adverse, derogatory, or unpleasant feelings or opinions against him or her. Certain defamatory statements whether orally or in writing, are considered to be so harmful in and of themselves that the person to whom they relate is entitled to recover general damages for injury to reputation without proving that any special or actual damages were caused by the statements.

The law conclusively presumes that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused. In this case, the court has determined that the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large.

I hereby charge you that causation of the

A125

EXHIBIT 29

15

plaintiffs' damages is already established.  Under Connecticut law, the defendants' conduct is a proximate cause of an injury if it was a substantial factor in bringing the harm about.  In other words, if the defendants' conduct contributed materially and not just in a trivial or inconsequential manner to the production of the harm, then the defendants' conduct was a substantial factor.  That standard has been met here.

Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law.  That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case.

In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described.  The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress.  The extent of the harm is what you will be measuring in

A126

**EXHIBIT 29**

16

your verdict.  The cause of the harm is not in question.

Although the court has already determined that the defendants are liable to the plaintiffs, I must still instruct you on the burden of proof in a civil case such as this.  In order for you to award more than nominal damages, a plaintiff must satisfy you that his or her claims of damages are more probable than not. You may have heard in criminal cases that proof must be beyond a reasonable doubt, but I must emphasize to you that this is not a criminal case and you are not deciding criminal guilt or innocence.

In civil cases such as this one, a different standard of proof applies.  The party who asserts a claim has the burden of proving it by a fair preponderance of the evidence, that is, the better or weightier evidence must establish that more probably than not the assertion is true.  In weighing the evidence, keep in mind that it is the quality and not the quantity of evidence that is important.  One piece of believable evidence may weigh so heavily in your mind as to overcome a multitude of less credible evidence.  The weight to be accorded each piece of evidence is for you to decide.  As an example of what I mean, imagine in your mind the scales of justice.  Put all the credible evidence on the scales regardless of which party offered it, separating the evidence

A127

**EXHIBIT 29**

17

favoring each side. If the scales remain even or if they tip against the party making the claim, then that party has failed to establish that assertion. Only if the scales incline even slightly in favor of the assertion, may you find the assertion has been proved by a fair preponderance of the evidence.

The rule of damages is as follows; insofar as money can do it, a plaintiff is to receive fair just and reasonable compensation for all harms and losses past and future which are proximately caused by the defendants' wrongful conduct. As I have already instructed you here, it has already been established that the defendants' wrongful conduct proximately caused harm to each plaintiff.

Under the rule compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses. You must attempt to put each plaintiff in the same position as far as money could do it, that they would have been in had the defendants not engaged in the wrongful conduct. Our laws impose certain rules to govern the award of damages in any case where liability is proven. To recover more than nominal damages, a plaintiff has the burden of proving that the amount of damages claimed is derived from the harm suffered and is properly supported by the evidence. You may not guess

18

or speculate as to the nature or extent of a plaintiffs' losses or harms. Your decision must be based on reasonable probabilities in light of the evidence presented at trial. Harms and losses for which a plaintiff should be compensated, include those they have suffered up to and including the present time and those they are reasonably likely to suffer in the future as a proximate result of the defendants' wrongful conduct.

In your consideration of future damages, you should consider the probable length of the plaintiffs' lives. This may be proven through standardized mortality tables and evidence of a plaintiff's age, health, physical condition, habits, activities, and any other factor that may affect the duration of their life. According to the standardized mortality tables, the plaintiffs' life expectancy is the following number of years from today. Bill Aldenberg 27 years. Jacqueline Barden 28 years. Mark Barden 23 years. Jennifer Hensel 28 years. Ian Hockley 28 years. Nicole Hockley 33 years. Erica Lafferty 46 years. Robert Parker 39 years. William Sherlach 19 years. Carlee Soto Parisi 53 years. Donna Soto 22 years. Jillian Soto Marino 48 years. Matthew Soto 52 years. David Wheeler 21 years. And Francine Wheeler 29 years. Bear in mind these figures are only an estimate of a plaintiff's length of life based upon statistical data

EXHIBIT 29

19

and it is just one element to consider in determining a plaintiff's life expectancy. You may find that a plaintiff will live a longer or shorter period of time based upon your assessment of all the evidence regarding a plaintiff's condition and the circumstances of their life.

Once the plaintiffs have proven the nature and extent of their compensable harms and losses, it becomes your job to determine what is fair just and reasonable compensation for those harms and losses. There's often no mathematical formula in making this determination. Instead, you must use human experience and apply sound common sense in determining the amount of your verdict. The compensatory damages that you are considering here are monies awarded as compensation for non-monetary losses and harms which the plaintiffs have suffered or are reasonably likely to suffer in the future as a result of the defendants' wrongful conduct. They are awarded for such things as mental and emotional pain and suffering, and loss or diminution of the ability to enjoy life's pleasures.

As I have told you, it has been determined that the defendants violated the plaintiffs' privacy by casting them in a false light and also inflicted emotional distress on the plaintiffs by their extreme and outrageous course of conduct. It is your role and your role alone to determine the amount of damages due

A130

**EXHIBIT 29**

20

to each of the plaintiffs. The plaintiffs are entitled to be compensated for the harm to their privacy interest in being placed before the public in an objectionable false light or false position. They are also entitled to recover for any and all additional emotional distress damages. In assessing the invasion of the plaintiffs' privacy and their emotional distress damages, you may consider that it is already established that the defendants' conduct was extreme and outrageous, indeed, in many cases, the defendant's extreme and outrageous conduct is clear evidence that emotional distress existed the duration of the conduct; the defendants' conduct in spreading the statements and their actual spread; the harassment the plaintiff endured; the plaintiff's fear of harassment, the nature and duration of the invasions of the plaintiff's privacy including future invasions the nature and duration of the plaintiff's emotional distress including future distress; the plaintiffs' testimony concerning their damages.

Invasion of privacy and emotional distress may be inferred from all the circumstances as they are proven to you. The invasion of privacy and emotional distress for which a plaintiff should be compensated include what he or she has suffered up to and including the present time and what he or she is reasonably likely to suffer in the future. You must attempt to put each

A131

EXHIBIT 29

21

plaintiff in the same position as far as money can do it, that he or she would have been in had the defendants not acted wrongfully.

As far as money can compensate the plaintiff for such damages and their consequences, you must award a fair just and reasonable sum. You simply have to use your own good judgment in awarding damages in this category. You must use all your experience, your knowledge of human nature, your knowledge of human events, past and present, your knowledge of the motives which influence and control human action and test the evidence in the case according to such knowledge and render your verdict accordingly. The damages I have described for you in this instruction are called emotional distress damages. You should include both damages for invasion of privacy and damages for other emotional distress suffered in your award of emotional distress damages.

In this case the court has determined that the defendants accused the plaintiffs of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large. The law presumes that there is injury to the plaintiffs' reputations. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover, as general damages for injury to his or her reputation and for humiliation and mental

EXHIBIT 29

22

suffering.

In determining the amount of general damages to award for an injury to a plaintiff's reputation, you should consider what reputation the plaintiff had when the statements were made. You should consider all of the circumstances surrounding the making of the statement. You may also compensate the plaintiff for damages that he or she would likely incur in the future. These damages can include additional damage to his or her reputation that occurs as a result of the bringing of this lawsuit. Each plaintiff has suffered a violation of his or her legal rights entitling him or her to at least to nominal damages.

Nominal damages may be awarded if you find that the defamatory material is of an insignificant character or because you find that a plaintiff had a bad character so that no substantial harm has been done to a plaintiff's reputation or there is no proof that serious harm has been done to the plaintiff's reputation.

If on the other hand, you find that the defamatory material is of significant character or because you find that the plaintiff had a good character, so substantial harm has been done to the plaintiff's reputation or you find there is proof that there is serious harm done to the plaintiff's reputation, then you may award substantial damages. You may award

A133

EXHIBIT 29

23

punitive damages as a matter of discretion. At a minimum, each plaintiff is entitled to nominal damages of at least one dollar.

The court has determined that the defendants are liable for violating the Connecticut Unfair Trade Practices Act, a Connecticut law commonly known as CUTPA. Therefore, it has been established by the court that the defendants engaged in an unfair trade practice because their business conduct was predicated on damaging the plaintiffs and was immoral, unethical, oppressive, or unscrupulous. Damages due to the defendants' violation of the Connecticut Unfair Trade Practices Act are included in the other damages measures that I am describing to you and you will not assess them separately.

In closing argument, counsel mentioned some formulas or amounts that might figure in your verdict and that is permitted under our law. I caution you that figures suggested by counsel, do not constitute evidence. It is up to you to decide what fair just and reasonable compensation is whatever you find that figure might be, regardless of amounts that may have been suggested by counsel in argument.

In addition to seeking compensatory damages, the plaintiffs seek an award of punitive damages which in Connecticut are limited to attorney's fees and expenses. Punitive damages may be awarded if you find

A134

**EXHIBIT 29**

24

that the defendants' actions in this case were wilful wanton or malicious. A wilful and malicious harm is one inflicted intentionally without just cause or excuse. Wilfulness and malice alike import intent. Its characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. The intentional injury aspect may be satisfied if the resultant harm was the direct and natural consequence of the intended act.

Wanton misconduct is reckless misconduct. It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. These damages, however, are not awarded as a matter of right but as a matter of discretion to be determined by you after you consider all the evidence. If you determine that they should be awarded, then I will determine in a separate hearing after this trial ends and based on evidence concerning the plaintiffs' attorney's fees and litigation costs, how much that compensation will be. If you determine they should not be compensated, then I will enter nominal damages of one dollar in this category of damages.

You are to determine whether the plaintiffs should be compensated for attorney's fees and costs by considering the extent to which you find the defendants' conduct is outrageous, the degree to which

A135

**EXHIBIT 29**

25

you find the defendants were recklessly indifferent to the rights of the plaintiffs or intentionally and wantonly violated their rights. Whether you will award the plaintiffs reasonable attorney's fees and costs in an amount later determined by me or whether you will award the plaintiffs only nominal damages is a matter for your sound discretion.

Now as I told you at the beginning of the trial the notes you may have taken are simply aids to your individual memory. When you deliberate, you should rely on your independent recollection of the evidence you have seen and heard during the trial. You should not give precedence to your own notes or to any other juror's notes over your independent recollection of the evidence because as we all know, notes are not necessarily accurate or complete. Jurors who have not taken notes, should rely on their own recollection of the evidence and should not be influenced in any way by the fact that other jurors have taken notes. Your deliberations should be determined not by what is or is not in your notes but by your independent recollection of the evidence. If you have a question about any particular testimony, you may ask that it be read or played back to you from the official record so there is no need to rely on notes.

Each of you has taken an oath to return a true verdict according to the evidence. No one must be

A136

**EXHIBIT 29**

false to that oath but you have a duty not only as individuals, but also collectively to express your views to the other jurors and to listen to theirs. That is the strength of the jury system. Each of you takes with you into the jury deliberation room your individual experience and wisdom. Your task is to pool that experience and wisdom in considering the evidence. You do that by giving your views and listening to the views of others. There must necessarily be discussion and give and take within the scope of your oath. That is the way in which agreement is reached.

You must not discuss this case unless all members of the jury are present. We will take the usual breaks and the lunch recess, but you must not discuss the case in twos or threes during those breaks. You can deliberate only when all six of you are together and only in the jury deliberating room and this is important. We have had cases that had to be retried all over again because this rule was violated, so please be very careful not to discuss the case with your fellow jurors except when all of you are together deliberating and you are in the jury deliberating room.

When you have reached a verdict, you will knock on the door and Mr. Ferraro will alert me. When you are told to enter the courtroom, the foreperson should sit in the first seat in the first row. When the jury is asked if it has reached a verdict, the foreperson

A137

EXHIBIT 29

27

should respond. Mr. Ferraro will then hand the verdict form to me and the verdict will be read twice to you. You will each be asked to respond whether it is your verdict as a check that the verdict is in fact unanimous. You should not at that point expect me to make any comment about your verdict. It has been my task to rule on issues of evidence and to instruct you on the law. It is your task to decide the case and I will leave that strictly up to you and make no comment on what you decide. It is of course merely the division of duties and not any lack of appreciation of your efforts, that keeps me from commenting on your decision.

At this time ladies and gentlemen, I will explain the verdict forms to you and then you'll be escorted to the jury deliberation room. You should not begin your deliberations until the exhibits and the verdict forms are delivered to you by Mr. Ferraro. This will occur after the lawyers have had an opportunity to check that all the exhibits are present and to tell me if they think that any different or additional instructions to you are necessary. I will recall you to the courtroom if I conclude that further instructions are needed. When the exhibits are delivered to you, your first task will be to elect a foreperson who will serve as your clerk.

After you have received the exhibits and then

A138

EXHIBIT 29

28

elected the foreperson, you will begin deliberating.
If you have questions during your deliberations, the
foreperson should write the jury's question on a sheet
of paper, sign and date it and knock on the door.
Mr. Ferraro will then bring the question to me and I
will respond to it in open court. It may take a few
minutes to assemble the staff before you are brought to
the courtroom to hear the response. Please try to make
any questions very precise. We cannot engage in an
informal dialogue and I will respond only to the
question on the paper. If you need to have any
testimony or any part of my instructions played or read
back, you'll follow the same procedure. On a sheet of
paper specify what it is that you want to hear as
precisely as you can. For example, if you know that
you want to hear only the direct examination or only
the cross examination of a particular witness, specify
that. Otherwise we will have to repeat the whole
testimony. Also, if you need to re-watch any video
exhibit, please follow the same procedure.

We will now go over the verdict form. Each line
must be filled out and the foreperson, when you have
reached a verdict, should initial each page of the
verdict form and sign and date the last page. Your
verdict must be unanimous. There is no such thing as a
majority vote of a jury in Connecticut, rather you must
all agree on the verdict. No one will hurry you. If

A139

**EXHIBIT 29**

29

you are not able to reach a verdict today, you will resume your deliberations tomorrow. You may have as much time as you need to reach a verdict. And at this point I will have Mr. Ferraro escort you to the deliberating room.

EXHIBIT 29

# VERDICT

WE THE JURY HAVE REACHED OUR VERDICT AS TO DAMAGES IN THIS CASE.

WE AWARD DAMAGES TO EACH PLAINTIFF AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS, LLC AS FOLLOWS:

## I.   COMPENSATORY DAMAGES

Instructions: Fill in both numbers for each plaintiff. Then go to Section II.

Please enter your damages assessments for each plaintiff on the lines below.

1

A141

EXHIBIT 29

**TO PLAINTIFF ROBERT PARKER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $60,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $60,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$120,000,000.00

2

**EXHIBIT 29**

**TO PLAINTIFF DAVID WHEELER:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                        $ 25,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES              $ 30,000,000.00
    (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF DAVID
   WHEELER AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**
                                            $ 55,000,000.00

3

**EXHIBIT 29**

**TO PLAINTIFF FRANCINE WHEELER:**

A.  DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)                               $24,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                  $30,000,000.00
(PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF FRANCINE
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$54,000,000.00

4



A144

**EXHIBIT 29**

**TO PLAINTIFF JACQUELINE BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                           $ 10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                  $ 18,800,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JACQUELINE
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 28,800,000.00

5



A145

**EXHIBIT 29**

**TO PLAINTIFF MARK BARDEN:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                         $25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES               $32,600,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF MARK
BARDEN AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$57,600,000.00

6



A146

**EXHIBIT 29**

**TO PLAINTIFF NICOLE HOCKLEY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                         $ _32,000,000.00_

B.  EMOTIONAL DISTRESS DAMAGES               $ _41,600,000.00_
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE
> DAMAGES TO PLAINTIFF NICOLE
> HOCKLEY AND AGAINST ALEX JONES
> AND FREE SPEECH SYSTEMS
> (ADD LINE A AND LINE B)**
>
> $ _73,600,000.00_

7



**EXHIBIT 29**

**TO PLAINTIFF IAN HOCKLEY:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $ 38,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                 $ 43,600,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF IAN
HOCKLEYAND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 81,600,000.00

8

A148

**EXHIBIT 29**

**TO PLAINTIFF JENNIFER HENSEL:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                                    $21,000,600.00

B. EMOTIONAL DISTRESS DAMAGES                          $31,000,000.00
   (PAST AND FUTURE)

       **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF JENNIFER
   HENSEL AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                              $52,000,000.00

9

A149

EXHIBIT 29

**TO PLAINTIFF DONNA SOTO:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                           $18,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                  $30,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DONNA
SOTO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**                       $48,000,000.00

10



**EXHIBIT 29**

**TO PLAINTIFF CARLEE SOTO PARISI:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $30,000,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $36,000,000.00
    (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLEE
SOTO PARISI AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

                                               $ 66,000,000.00

11

A151

EXHIBIT 29

**TO PLAINTIFF CARLOS MATHEW SOTO:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST AND FUTURE)                          $18,600,000.00

B.  EMOTIONAL DISTRESS DAMAGES                 $39,000,000.00
    (PAST AND FUTURE)

> **TOTAL FAIR, JUST AND REASONABLE**
> **DAMAGES TO PLAINTIFF CARLOS**
> **MATHEW SOTO AND AGAINST ALEX JONES**
> **AND FREE SPEECH SYSTEMS**
> **(ADD LINE A AND LINE B)**
>
> $57,600,000.00

12

A152

EXHIBIT 29

**TO PLAINTIFF JILLIAN SOTO-MARINO:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                        $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES              $38,800,000.00
   (PAST AND FUTURE)

**TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)**

$ 68,800,000.00

13



A153

**EXHIBIT 29**

**TO PLAINTIFF WILLIAM ALDENBERG:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                                    $ 45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                            $ 45,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE**
   **DAMAGES TO PLAINTIFF WILLIAM**
   **ALDENBERG AND AGAINST ALEX JONES**
   **AND FREE SPEECH SYSTEMS**
   **(ADD LINE A AND LINE B)**                           $ 90,000,000.00

14



A154

**EXHIBIT 29**

**·TO PLAINTIFF ERICA LAFFERTY:**

A.  DEFAMATION/SLANDER DAMAGES
    (PAST·AND FUTURE)                                $18,000,000.00

B.  EMOTIONAL DISTRESS·DAMAGES          $58,000,000.00
    (PAST AND FUTURE)

          **TOTAL FAIR, JUST AND REASONABLE
          DAMAGES TO PLAINTIFF ERICA
          LAFFERTY AND AGAINST ALEX JONES
          AND FREE SPEECH SYSTEMS
          (ADD LINE A AND LINE·B)**      $76,000,000.00

15



A155

EXHIBIT 29

**TO PLAINTIFF WILLIAM SHERLACH:**

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                              $ 9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                    $ 27,000,000.00
   (PAST AND FUTURE)

   **TOTAL FAIR, JUST AND REASONABLE
   DAMAGES TO PLAINTIFF WILLIAM
   SHERLACH AND AGAINST ALEX JONES
   AND FREE SPEECH SYSTEMS
   (ADD LINE A AND LINE B)**

                                                 $ 36,000,000.00

16



A156

**EXHIBIT 29**

## II.     AWARD OF ATTORNEY'S FEES AND COSTS

Instructions: check YES or NO.

> If you check YES, the judge will determine the amount
> due to the plaintiffs for reasonable attorney's fees
> and costs and will then award the plaintiffs that
> amount at a later date.

> If you check NO, the judge will award $1 to the
> plaintiffs for their attorney's fees and costs.

**WE THE JURY FIND THAT THE STANDARD CHARGED FOR THE
ASSESSMENT OF ATTORNEY'S FEES AND COSTS HAS BEEN MET.**

☒  **YES**     (reasonable attorney's fees and costs to be awarded by the judge at
a later date)

☐  **NO**     (judge will award $1)

17

A157

**EXHIBIT 29**

FOREPERSON SIGNATURE

10/12/2022

DATE

18

A158

EXHIBIT 29

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**EXHIBIT 29**

---

Lafferty *v.* Jones

---

## ERICA LAFFERTY ET AL. *v.* ALEX EMRIC JONES ET AL.
### (AC 46131)

## WILLIAM SHERLACH *v.* ALEX JONES ET AL.
### (AC 46132)

## WILLIAM SHERLACH ET AL. *v.* ALEX EMRIC JONES ET AL.
### (AC 46133)

Moll, Clark and Eveleigh, Js.

*Syllabus*

The defendants, J and his company, F Co., appealed from the judgments of the trial court rendered following jury verdicts for the plaintiffs in three underlying consolidated actions that arose out of the 2012 mass shooting at the Sandy Hook Elementary School in Newtown. The court had defaulted the defendants as a sanction for their repeated, wilful failure to fully and fairly comply with the plaintiffs' discovery requests and for violating a protective order. The cases then proceeded to a hearing in damages, after which the plaintiffs were awarded compensatory damages, attorney's fees and costs and, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., punitive damages. On appeal, the defendants claimed, inter alia, that the court incorrectly concluded that the plaintiffs' allegations were sufficient to support a legally viable CUTPA claim. *Held*:

The trial court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and a protective order.

The trial court's default order was a sanction that was proportional to the defendants' wilful noncompliance and misconduct in repeatedly failing to produce critical documents that the plaintiffs needed to prosecute their case and in making highly confidential information about the plaintiffs available on the Internet.

The plaintiffs had no responsibility, as the defendants claimed, to prove the cause of the harm they suffered, as the effect of the trial court's default order was to conclusively establish the defendants' liability, thereby leaving the plaintiffs with only the burden of establishing their damages.

The defendants' inadequately briefed claim that the trial court improperly limited the scope of J's testimony was deemed abandoned.

EXHIBIT 29

---

Lafferty *v.* Jones

---

The trial court did not abuse its discretion in denying the defendants' motion for remittitur, as the evidence was sufficient to support the jury's damages award, which did not shock the sense of justice in light of testimony by all of the plaintiffs about the mental anguish and emotional harm they suffered as a result of death threats and harassment conveyed to them through social media, by mail and in person that stemmed from the defendants' lies that the Sandy Hook massacre was a hoax.

The conduct forming the basis of the plaintiffs' CUTPA claim, namely, the defendants' dissemination of lies about the school shooting, did not constitute the conduct of any trade or commerce within the meaning of CUTPA, as the underlying motivation of the defendants' speech was to generate profit through the sale of products to their audience, and the plaintiffs did not allege that they were harmed by the defendants' advertising, marketing or sale of those products; accordingly, the judgments were reversed as to the plaintiffs' CUTPA claim.

Argued February 8—officially released December 10, 2024

*Procedural History*

Action, in the first case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the second case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, and action, in the third case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the cases were consolidated and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, in the first case, Jennifer Hensel, executrix of the estate of Jeremy Richman, was substituted as a plaintiff and withdrew her claims against the named defendant et al.; subsequently, in the first case, Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini, was substituted as a plaintiff; thereafter, the court, *Bellis, J.*, defaulted the named defendant et al. in each case for violations of certain discovery orders and a protective order; subsequently, the court denied the motions by the named defendant et al. in each case to set aside the defaults; thereafter,

EXHIBIT 29

---

Lafferty *v.* Jones

---

the issue of damages was tried to the jury before *Bellis, J.*; subsequently, in each case, the named plaintiff et al. filed an amended complaint; verdict in each case for the named plaintiff et al.; thereafter, in each case, the court denied the motions filed by the named defendant et al. to set aside the verdict and for remittitur, and rendered judgment in each case for the named plaintiff et al., from which the named defendant et al. in each case filed separate appeals with this court; subsequently, Erica L. Ash was substituted as a party plaintiff for Richard M. Coan, trustee of the bankruptcy estate of Erica L. Garbatini; thereafter, the appeals were consolidated. *Reversed in part; judgment directed in part.*

*Norman A. Pattis*, for the appellants in each case (named defendant et al.).

*Alinor C. Sterling*, with whom, on the brief, were *Christopher M. Mattei* and *Joshua D. Koskoff*, for the appellees in each case (named plaintiff et al.).

*Opinion*

MOLL, J. In these consolidated appeals, the defendants Alex Emric Jones and Free Speech Systems, LLC,[1] appeal from the judgments of the trial court rendered following jury verdicts returned in favor of the plaintiffs[2]

---

[1] Several additional defendants were named in the underlying consolidated actions, namely, Infowars, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc. Jones and Free Speech Systems, LLC, however, were the only remaining defendants at the time of the judgments rendered following the jury verdicts returned in the underlying consolidated actions. We refer in this opinion to (1) Jones and Free Speech Systems, LLC, collectively, as the defendants, and (2) Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, collectively, as the Jones defendants.

[2] "There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases . . . with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert

---

**EXHIBIT 29**

---
Lafferty *v.* Jones
---

in the underlying consolidated tort actions[3] arising out of the 2012 mass shooting at Sandy Hook Elementary School in Newtown. On appeal, the defendants claim that the court improperly (1) defaulted them as a sanction for violating certain discovery orders and a protective order, (2) construed the effect of the default to relieve the plaintiffs of the burden to prove the extent of their damages, (3) restricted the scope of Jones' testimony at the hearing in damages, (4) denied their motion for a remittitur, and (5) concluded that the plaintiffs' claim asserting a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., was legally sufficient. For the reasons that follow, we disagree with the defendants' first, second, and fourth claims, and deem the defendants' third claim to be abandoned as inadequately briefed. We agree, however, with the defendants' fifth claim. Accordingly, we reverse in part the judgments of the trial court.

---

Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of the estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini [also known as Erica Lafferty], in her place as a plaintiff in this case." (Citations omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 858 n.1, 307 A.3d 923 (2023). On December 14, 2023, the court granted a motion to substitute Erica L. Ash, also known as Erica Lafferty, as a plaintiff in place of Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Jeremy Richman, Jennifer Hensel, as executrix of the estate of Jeremy Richman, or Richard Coan, trustee of the bankruptcy estate of Erica L. Garbatini.

[3] The motions and pleadings filed in each of the underlying consolidated actions were largely identical, and the jury verdict returned in each action was the same. In the interest of simplicity, unless otherwise deemed necessary, we refer to the motions, pleadings, and other documents filed in the controlling action. See *Lafferty* v. *Jones*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-18-6046436-S.

**EXHIBIT 29**

---
Lafferty *v.* Jones
---

The following facts and procedural history, as set forth previously by this court or as were undisputed in the record, are relevant to our resolution of these appeals. "On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions . . . .

"In the complaints, the plaintiffs alleged that [Jones] hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold themselves out as news and journalism platforms. The plaintiffs further alleged that [Jones] began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012, and June 26, 2017, [Jones] used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of [CUTPA]." (Citation omitted.) *Lafferty* v. *Jones*, 222 Conn. App. 855, 859–60, 307 A.3d 923 (2023).

On November 15, 2021, the trial court, *Bellis, J.*, defaulted the defendants as a sanction for violating (1) certain discovery orders and (2) a protective order.

---

Lafferty *v.* Jones

---

Thereafter, the issue of damages was tried to a jury. In the midst of the hearing in damages, with the defendants' consent, the plaintiffs filed an amended complaint asserting four counts, each of which was accompanied by a claim of civil conspiracy: (1) invasion of privacy by false light; (2) defamation and defamation per se; (3) intentional infliction of emotional distress; and (4) a violation of CUTPA.[4] On October 12, 2022, the jury returned a verdict in favor of the plaintiffs, awarding them a total of $965,000,000 in compensatory damages. The jury further awarded the plaintiffs reasonable attorney's fees and costs, with the amounts to be determined by the court at a later date. On November 10, 2022, the court awarded the plaintiffs a total of (1) $321,650,000 in common-law punitive damages in the form of attorney's fees, (2) $1,489,555.94 in costs, and (3) $150,000,000 in statutory punitive damages pursuant to CUTPA. The defendants filed motions to set aside the verdict and for a remittitur, which the court denied on December 22, 2022. These consolidated appeals followed. Additional facts and procedural history will be set forth as necessary.

Before turning to the defendants' claims, we note that the plaintiffs argue that "[a]lmost all of [the defendants'] claims of error are so general or so inadequately briefed that they are waived." We iterate that we deem claims on appeal to be abandoned if they are inadequately briefed. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332, 375 n.30, 246 A.3d 429 (2020) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere

---

[4] In an accompanying request for leave to amend their complaint, the plaintiffs represented that the amended complaint (1) removed the negligent infliction of emotional distress count previously alleged, (2) removed former defendants, and (3) "simplifie[d] the pleadings by providing a single, uniform complaint for the hearing in damages of the [underlying] consolidated cases . . . ."

EXHIBIT 29

---
Lafferty *v.* Jones
---

abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.)), cert. denied,       U.S.      , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021). As we explain throughout this opinion, we decline to review any claims that the defendants have abandoned as a result of inadequate briefing.

I

The defendants first claim that the trial court improperly defaulted them as a sanction for violating certain discovery orders, as well as a discovery related protective order. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Shortly after the underlying consolidated actions had been commenced, the Jones defendants filed special motions to dismiss the actions pursuant to Connecticut's anti-SLAPP[5] statute. See General Statutes § 52-196a (b).[6] The plaintiffs moved for limited discovery vis-à-vis the special motions to dismiss; see General Statutes § 52-196a (d); which the court granted on December 17, 2018.

On January 10, 2019, the court overruled objections raised by the Jones defendants to the plaintiffs' requests for production seeking, inter alia, marketing data, sales analytics, and web analytics that the Jones defendants

---

[5] "SLAPP is an acronym for 'strategic lawsuit against public participation' . . . ." *Lafferty* v. *Jones*, supra, 336 Conn. 337 n.4.

[6] Section 52-196a was amended by No. 19-64, § 17, of the 2019 Public Acts, which made changes to the statute that are not relevant to these appeals. Accordingly, we refer to the current revision of the statute.

EXHIBIT 29

---
Lafferty *v.* Jones
---

"own[ed] and/or control[led]." On May 7, 2019, in an objection addressing various discovery issues, the Jones defendants represented that they had "provided all of the analytics, business and marketing plans that they have." On May 29, 2019, the plaintiffs moved to compel compliance with the court's discovery orders, asserting in part that the Jones defendants had failed to produce responsive marketing and analytics information. The plaintiffs referred, in particular, to marketing data generated by Google Analytics[7] in the custody and control of the Jones defendants, and argued that a thirty-five page Google Analytics document provided by the Jones defendants was inadequate.

On June 10, 2019, the court issued an order stating that (1) testimony elicited during certain depositions confirmed that a "Google Analytics account is accessed and utilized by some employees of the [Jones] defendants," (2) the Google Analytics document that the Jones defendants had produced did not constitute full and fair compliance with the court's discovery orders, and (3) the plaintiffs were "entitled to the [Google Analytics] data pursuant to the court's discovery orders." The court further ordered that it would "consider appropriate sanctions for the [Jones] defendants' failure to fully and fairly comply should they not produce the data within one week." Subsequently, the Jones defendants represented that, on June 17, 2019, Google Analytics data purportedly had been emailed to the plaintiffs' counsel; however, the plaintiffs' counsel represented that the email was never received.

On June 17, 2019, the plaintiffs moved for the court to review a June 14, 2019 broadcast of Jones' radio

---

[7] In their principal appellate brief, the defendants represent that "Google Analytics is proprietary data made available to subscribers on a server maintained by Google. It is described thus on Google's webpage: 'Google Analytics is a web analytics service offered by Google that tracks and reports website traffic and also the mobile app traffic [and] events, currently inside a platform inside the Google Marketing Platform brand.'"

Lafferty *v.* Jones

program, during which Jones made threatening comments with respect to one of the plaintiffs' counsel. See *Lafferty* v. *Jones*, supra, 336 Conn. 342–46, 370. On June 18, 2019, after finding that (1) the Jones defendants were noncompliant with the court's discovery orders concerning, inter alia, the Google Analytics data, and (2) Jones had harassed, intimidated, and threatened one of the plaintiffs' counsel during the June 14, 2019 broadcast, the court sanctioned the Jones defendants by depriving them of the opportunity to pursue their special motions to dismiss. Id., 346–47, 374. At the outset of its decision, the court also stated: "[T]he discovery in this case has been marked with obfuscation and delay on the part of the [Jones] defendants, who, despite several court-ordered deadlines . . . [have] continue[d] . . . to object to having to, what they call affirmatively gather and produce documents which might help the plaintiffs make their case. Despite over approximately a dozen discovery status conferences and several court-ordered discovery deadlines, the Jones defendants have still not fully and fairly complied with their discovery obligations. . . . The [court has] entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their discovery and [have] failed to produce that which is within their knowledge, possession, or power to obtain." Later, the court further stated: "At this point, I decline to default the . . . Jones defendants, but I will—I don't know how clearly I can say this. . . . As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the . . . Jones defendants if they, from this point forward, continue with their behavior with respect to discovery." On July 10, 2020, following Chief Justice Richard A. Robinson's grant of the Jones defendants' petition for an expedited public interest appeal

EXHIBIT 29

---
*Lafferty v. Jones*
---

pursuant to General Statutes § 52-265a, our Supreme Court affirmed the trial court's sanction orders. *Lafferty* v. *Jones*, supra, 336 n.3, 385.

On November 12, 2020, the plaintiffs moved to again compel compliance with court-ordered discovery.[8] On May 5, 2021, the Jones defendants filed an objection, arguing in part that the plaintiffs' prior discovery requests had been rendered moot as a result of the court's June 18, 2019 sanction orders precluding the Jones defendants from pursuing their special motions to dismiss.[9] On May 14, 2021, the court issued an order stating that "the obligation of the [Jones] defendants to fully and fairly comply with the discovery requests at issue was not extinguished by the fact that the [Jones] defendants have been precluded from pursuing special motions to dismiss."

On June 1, 2021, the Jones defendants filed an emergency motion for a protective order requesting that the court (1) extend an upcoming discovery production deadline by forty-five days and (2) narrow the scope of discovery regarding, inter alia, the Google Analytics data, which, they represented, required them to review nearly 300,000 emails for privileged information. On June 2, 2021, the court issued an order stating: "The court previously entered numerous orders with respect to this discovery request and the Jones defendants' objections thereto. The court declines the Jones defendants' invitation to address, again, the scope of appropriate discovery. With respect to the timeframe for compliance, the outstanding discovery responses were due

---

[8] The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further.

[9] On November 18, 2020, the Jones defendants filed a notice that the underlying consolidated actions had been removed to the United States District Court for the District of Connecticut. The actions were remanded from the District Court on March 5, 2021.

EXHIBIT 29

---

Lafferty *v.* Jones

---

over two years ago. At no point in time following the decision [in *Lafferty* v. *Jones*, supra, 336 Conn. 332] did the Jones defendants seek clarification from the court as to their discovery obligations. According to emails produced by the plaintiffs . . . the Jones defendants, in February and March of 2020, while their case was pending before [our] Supreme Court and a court-ordered stay of discovery was in effect, asked the plaintiffs' counsel for a complete set of discovery requests to date and continued to discuss the outstanding discovery that was owed by the Jones defendants. Nowhere in the email chain did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal. The plaintiffs filed a motion with the court seeking the overdue compliance on November 12, 2020, and the Jones defendants did not even file an objection until May 5, 2021. The court's ruling of May 14, 2021, confirmed that the outstanding discovery from the Jones defendants was overdue. At this point, the [Jones] defendants are not in compliance with their obligation to produce that discovery which is in their knowledge, possession, or power. To the extent that [the Jones defendants'] motion seeks, at this late date, a further extension of time to produce the already overdue supplemental compliance, it is granted as follows: complete, final supplemental compliance must be made by June 28, 2021, with compliance to begin immediately on a rolling basis. Failure to comply with this order may result in sanctions including but not limited to a default."

On June 28, 2021, the Jones defendants filed a notice of compliance indicating that (1) the defendants had provided "complete, final supplemental compliance," and (2) Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, previously had satisfied their discovery obligations. With regard to the Google Analytics data, the Jones defendants represented that (1) only Free

**EXHIBIT 29**

---

Lafferty *v.* Jones

---

Speech Systems, LLC, used Google Analytics, (2) Free Speech Systems, LLC, did not possess, control, or have custody of Google Analytics data in a manner allowing the data to be exported,[10] and (3) the only reasonable method of sharing the Google Analytics data would be to permit the plaintiffs' counsel to access it via a " 'sandbox.' "[11]

On July 1, 2021, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through one of their counsel, Attorney Norman A. Pattis of Pattis & Smith, LLC,[12] filed a motion for a commission to take an out-of-state deposition of Hillary Clinton (motion to depose Clinton).[13] These defendants asserted in relevant part that, (1) during one of the plaintiffs' depositions, (a) on the advice of counsel, the deponent refused to answer how the plaintiffs "all ended up represented by the same [law] firm" in the underlying consolidated actions and (b) claimed to be unaware of how her legal fees were being paid, (2) the lead plaintiff in the underlying consolidated actions was invited to speak at the Democratic National Convention in 2016, and thereafter was "praised" by Clinton, and (3) they "believe[d] that [the underlying consolidated actions

---

[10] The Jones defendants further represented that, to export the Google Analytics data, Free Speech Systems, LLC, would be required to purchase an upgraded membership account at a cost of $150,000.

[11] The Jones defendants defined " '[s]andboxing' " as " 'a computer security term referring to when a program is set aside from other programs in a separate environment so that if errors or security issues occur, those issues will not spread to other areas on the computer. Programs are enabled in their own sequestered area, where they can be worked on without posing any threat to other programs.' "

[12] On July 1, 2021, all of the Jones defendants, except for Jones, were represented by both Attorney Jay Marshall Wolman and Pattis & Smith, LLC. At that time, Jones was represented by Wolman only.

[13] Jones did not join the motion to depose Clinton, and Infowars, LLC, was not listed as one of the movants. In subsequent filings, including an August 3, 2021 reply brief vis-à-vis the motion to depose Clinton, Infowars, LLC, was treated as an additional movant.

EXHIBIT 29

*Lafferty v. Jones*

were] filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by . . . Clinton as part of a vendetta to silence . . . Jones after . . . Clinton lost the presidential race to Donald J. Trump."

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating a protective order entered on February 22, 2019, as amended on June 16, 2021 (protective order),[14] which originally had been proposed by the Jones defendants and which, inter alia, protected confidential information produced by the plaintiffs during discovery.[15] The plaintiffs maintained that the motion to depose Clinton, filed by the Jones defendants[16] in the middle of a deposition, (1) was frivolous and (2) improperly published information obtained from the deponent's testimony that was designated as "Highly Confidential-Attorneys Eyes Only" in violation of the protective order. On July 19, 2021, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, filed an objection, and the plaintiffs filed a reply brief the next day.

---

[14] The protective order was twice amended further in 2022.

[15] The protective order limited access to materials designated as "Confidential Information" or "Highly Confidential-Attorneys Eyes Only" to certain categories of persons. The protective order further provided in relevant part: "Depositions involving Confidential Information shall be treated, as follows:

"a. Portions of a deposition or depositions in their entirety may be designated Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY by counsel for the deponent or the Designating Party [as defined in the protective order], with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

"b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information or HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY where less than all of the testimony in that transcript would fall into those categories, subject to [a procedure detailed in the protective order]. . . . The designations shall remain effective until and unless an objection is made and finally resolved."

[16] The plaintiffs contended that the motion to depose Clinton should be treated as having been filed by all of the Jones defendants. See footnote 13 of this opinion.

A172

Lafferty *v.* Jones

On August 5, 2021, the court issued an order stating in relevant part: "In the midst of taking the first deposition of a plaintiff . . . Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC (Infowars), filed a motion to depose . . . Clinton, using deposition testimony that had just been designated as '[Highly] Confidential-Attorneys Eyes Only,' and completely disregarding the court-ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court-ordered to be followed, nor have they since taken any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court-ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the Internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective [order] . . . . Infowars . . . now takes the absurd position that the court-ordered protective order circumvents the good cause requirements of Practice Book § 13-5, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and wilful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing."[17]

On July 6, 2021, the plaintiffs filed a motion to sanction the Jones defendants for failing to produce certain

---

[17] On August 4, 2021, the court denied the motion to depose Clinton. That ruling is not at issue in these consolidated appeals.

EXHIBIT 29

Lafferty *v.* Jones

accounting documents. The plaintiffs asserted in relevant part that, (1) in connection with a noticed deposition of Melinda Flores, Free Speech System, LLC's accounting manager, Flores was directed to produce documents, including (a) Free Speech System, LLC's trial balances from 2012 to 2019, and (b) " '[a]ny and all subsidiary ledgers for each account listed in the [t]rial balances produced,' "[18] (2) the court ordered the requested records to be produced by the close of business on May 14, 2021,[19] (3) on May 14, 2021, the Jones defendants produced documents that they described to be trial balances "incorporating the [s]ubsidiary [l]edgers," (4) notwithstanding the Jones defendants' representation, they failed to produce any subsidiary ledgers, and (5) Flores testified during her deposition that (a) she assisted in assembling the documents produced on May 14, 2021, (b) Free Speech Systems, LLC, maintained subsidiary ledger information that was accessible, and (c) the documents produced did not contain subsidiary

[18] Attached as an exhibit to the July 6, 2021 motion was an affidavit of Brian W. Merrill, a certified fraud examiner and a certified analytics professional, who averred in relevant part that "[a] trial balance is a standard accounting report listing a company's general ledger accounts. A debit or credit balance is presented for each general ledger account. The purpose of a trial balance is to prove that the value of all debit balances equals the value of all credit balances. Subsidiary ledgers ('[s]ubledgers') contain the transactional detail that support the trial balance details for all general ledger accounts in an accounting system. Subledgers allow for the interpretation and analysis of the financial activity that is recorded in the books and records that ultimately represent the financial statement of the organization."

On November 6, 2020, the Jones defendants objected to the production request seeking the trial balances and subsidiary ledgers on the grounds that the request was, inter alia, overbroad, irrelevant, and unduly burdensome. The court overruled the objection.

[19] On May 5, 2021, the Jones defendants filed an emergency motion for a protective order requesting in part that Flores' deposition, scheduled for May 7, 2021, be rescheduled for medical reasons. On May 6, 2021, the court ordered Flores' deposition to be rescheduled but further directed that "[t]he records requested in the request to produce are ordered to be produced by the close of business on [May 14, 2021]. Failure to comply with this order may result in sanctions."

EXHIBIT 29

---

Lafferty *v.* Jones

---

ledgers. (Emphasis omitted.) On July 27, 2021, the Jones defendants filed an objection, arguing in relevant part that Free Speech Systems, LLC, did not possess or maintain subsidiary ledgers. In support of their objection, the Jones defendants submitted a personal affidavit of Robert Roe (Roe affidavit), a certified public accountant and a certified forensic accountant, who averred that Free Speech Systems, LLC, did not maintain or utilize subsidiary ledgers. On August 3, 2021, the plaintiffs filed a reply brief.

On August 6, 2021, the court issued an order stating in relevant part: "The subsidiary ledger information . . . was easily accessible to Flores . . . . Despite the court orders, and although the information exists, is maintained by [Free Speech Systems, LLC], and could have been produced by Flores as was required by the court orders, the documents were not produced. The court rejects [Roe's] statement . . . that [Free Speech Systems, LLC] does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances. There is no excuse for the [Jones] defendants' disregard of not only their discovery obligations, but the . . . court orders. The court finds that the failure to comply with the production request has prejudiced the plaintiffs [in] their ability to both prosecute their claims and conduct further depositions in a meaningful manner." The court further ordered (1) Flores' deposition to resume, with Flores directed to produce the subsidiary ledger information, and (2) that sanctions would be addressed at a future hearing. During subsequent hearings before the court, the plaintiffs' counsel represented that, on August 24, 2021, the Jones defendants produced alleged subsidiary ledgers; however, the plaintiffs' counsel further represented that "it is not clear whether [the documents produced were], in fact, subsidiary ledgers . . . ."

EXHIBIT 29

---
Lafferty *v.* Jones
---

On August 24, 2021, the plaintiffs filed a motion to sanction the Jones defendants for violating the court's discovery orders requiring them to produce, inter alia, the Google Analytics data. The plaintiffs refuted the Jones defendants' contention in their June 28, 2021 notice of compliance that Free Speech Systems, LLC, did not possess, control, or have custody of the Google Analytics data in a manner that could be exported, asserting that such "representations were inaccurate and misleading." On September 14, 2021, the Jones defendants filed an objection, arguing, inter alia, that (1) on June 17, 2019, via email, they had produced the Google Analytics data requested by the plaintiffs, and (2) the "sandbox mechanism" previously suggested by them would allow the plaintiffs to access all of the "raw data." On September 23, 2021, the plaintiffs filed a reply brief, and on September 25, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On September 30, 2021 the court issued an order stating in relevant part: "There is no dispute here that the Jones defendants failed to follow the rules [of practice] as they relate to discovery. . . . The purported June 17, 2019 email transmission of zip files . . . containing Google Analytics reports that the plaintiffs' counsel indicates was never received was not sent to [certain other defendants] nor did the purported transmission otherwise comply with the rules of practice. As such, it is not necessary for the court to resolve the issue of whether the purported transmission was actually sent, as it cannot be considered proper compliance under our rules. In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the

**EXHIBIT 29**

Lafferty *v.* Jones

appropriate sanctions at the next status conference." Subsequently, by way of a notice of compliance dated October 8, 2021, the Jones defendants represented that they had provided supplemental responses to the plaintiffs' discovery requests.

On September 9, 2021, the plaintiffs moved to sanction the Jones defendants for producing "manufactured" documents in discovery. The plaintiffs contended that the trial balances that had been produced were not the originals but, rather, constituted altered trial balances that Roe had manipulated prior to production. On October 7, 2021, the Jones defendants filed an objection. On October 18, 2021, the plaintiffs filed a reply brief, and on October 20, 2021, with leave of the court, the Jones defendants filed a surreply brief.

On November 15, 2021, after hearing argument from the parties over the course of three days between October 20 and November 15, 2021, the court issued an oral decision defaulting the Jones defendants as a sanction for violating (1) the protective order and (2) its discovery orders.[20] With regard to the protective order, the court found in relevant part that (1) the Jones defendants acknowledged that the motion to depose Clinton contained information obtained from a deposition that was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order, (2) the Jones defendants argued that the protective order did not preclude them from publishing such confidential information so long as they did not identify the witness from whom the information was obtained, which position "did nothing but reinforce the court's August 5, 2021 order and findings that the [Jones defendants'] cavalier actions constituted wilful misconduct and violated the

[20] On October 7, 2021, the plaintiffs filed a memorandum of law in favor of the court defaulting the Jones defendants for their misconduct. On October 20, 2021, the Jones defendants filed a memorandum of law in opposition to a default order.

A177

---

Lafferty *v.* Jones

---

court's clear and unambiguous protective order,"[21] and (3) there was a "transparent attempt to cloud the issues" by counsel who had filed the motion to depose Clinton, Pattis, as well as one of the Jones defendants' former counsel, Attorney Jay Marshall Wolman, stemming from inconsistent representations as to whether Infowars, LLC, was one of the movants of the motion to depose Clinton.[22]

With respect to the subsidiary ledgers, the court summarized its findings in its August 6, 2021 order regarding the subsidiary ledgers and commented that "it is still unclear as to what documents have been produced." The court then determined that sanctions were "appropriate in light of the [Jones] defendants' failure to fully and fairly comply with the plaintiffs' discovery request and the court's orders . . . ."

Regarding the trial balances, the court determined that the trial balances produced by the Jones defendants did not comply with its discovery orders. The court stated that (1) Flores testified at her deposition that she had generated the trial balances, which she believed had been produced to the plaintiffs, but (2) Roe later altered those trial balances before they had been provided to the plaintiffs. The court rejected an argument asserted by the Jones defendants that Flores had "provided flawed information to the [Jones] defendants that

---

[21] The court further observed that the Jones defendants previously had asserted a different argument, namely, that the inclusion of the "Highly Confidential-Attorneys Eyes Only" information in the motion to depose Clinton was justified because the plaintiffs lacked a good faith basis to designate the deposition at issue as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. The court rejected that argument.

[22] As the court explained, (1) the motion to depose Clinton, filed by Pattis, listed Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, as the movants, (2) in the July 19, 2021 objection to the plaintiffs' July 6, 2021 motion for sanctions, also filed by Pattis, Infowars, LLC, was treated as an additional movant, and (3) during argument, Wolman represented that Infowars, LLC, had no involvement in the motion to depose Clinton because its name was not listed in the motion.

---

*Lafferty v. Jones*

---

the [Jones] defendants, through Roe, had to correct." The court further stated: "The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by [Roe] were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that [Flores] had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiffs' request or to the court's order."

The court next addressed the Google Analytics data requested by the plaintiffs, stating: "With respect to analytics, including Google Analytics . . . the [Jones] defendants on May 7, 2019, represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports but did not regularly use them. . . . The [Jones] defendants also claim that, on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not [to] the codefendants, an email the plaintiffs state they did not receive and that the court found would not have been in compliance with our rules of practice. On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete, final supplemental compliance was made by . . . [Jones] and Free Speech Systems, LLC, and that Infowars, LLC, Infowars Health, LLC, and Prison Planet [TV], LLC, quote: 'Had previously produced all documents required to be produced,' . . . representing that with respect to the Google Analytics documents, Free Speech Systems, LLC, could not export the dataset and that the only way they could comply was through the sandbox approach. Then on

A179

---

Lafferty *v.* Jones

---

[October] 8, 2021,[23] the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for [Infowars.com] and not for any of the other websites such as Prison Planet TV or Infowars Health." (Footnote added.) The court also found that (1) the Jones defendants had failed to produce analytics data for other platforms, such as Alexa and Criteo, and (2) the Jones defendants' production of certain social media analytics data "has . . . been insubstantial and . . . has fallen far short both procedurally and substantively . . . ."[24] As the court summarized, "[t]he court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims. This callous disregard of their obligations to fully and fairly comply with discovery and court orders on its own merits a default against the Jones defendants."

The court then stated: "Neither the court nor the parties can expect perfection when it comes to the discovery process. What is required, however, and what all parties are entitled to, is fundamental fairness that the other side produces that information which is within [its] knowledge, possession and power, and that the other side meet[s] its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

---

[23] The court referred to August 8, 2021, as the date of the production of the spreadsheets; however, (1) during argument preceding the court's sanctions order, the plaintiffs' counsel represented that the spreadsheets had been produced on October 8, 2021, and (2) the record reflects that the Jones defendants filed a notice of compliance dated October 8, 2021.

[24] The defendants make a passing reference to these other analytics in their principal appellate brief. Insofar as the defendants attempt to raise a claim of error specifically as to these other analytics, they have not adequately briefed any such claim. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Thus, we do not set forth additional context vis-à-vis these other analytics.

EXHIBIT 29

---
*Lafferty v. Jones*
---

"Here, the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

"The court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous court orders, and they have not.

"In addressing the sanctions that should enter here, the court is not punishing the [Jones] defendants. The court also recognizes that a sanction of default is one of last resort. This court previously sanctioned the [Jones] defendants not by entering a default, but by a lesser sanction, the preclusion of the [Jones] defendants' special motions to dismiss. At this point, entering other lesser sanctions such as monetary sanctions, the preclusion of evidence, or the establishment of facts is inadequate given the scope and extent of the discovery material that the [Jones] defendants have failed to produce.

"As pointed out by the plaintiffs, they are attempting to conduct discovery on what the [Jones] defendants publish and the [Jones] defendants' revenue. And the failure of the [Jones] defendants to produce the analytics impacts the ability of the plaintiffs to address what is published, and the [Jones] defendants' failure to produce the financial records such as subledgers and trial balances affects the ability of the plaintiffs to address the [Jones] defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims, again was caused by the Jones defendants' wilful noncompliance, that is, the Jones defendants'

EXHIBIT 29

---

Lafferty *v.* Jones

---

failure to produce critical material information that the plaintiff[s] needed to prove their claims.

"For these reasons, the court is entering a default against the [Jones] defendants . . . . The case will proceed as a hearing in damages as to the [Jones] defendants. The court notes [that] . . . Jones is [the] sole controlling authority of all the [Jones] defendants, and that the [Jones] defendants filed motions and signed off on their discovery issues jointly. And all the [Jones] defendants have failed to fully and fairly comply with their discovery obligations."

On appeal, the defendants assert that (1) the court incorrectly (a) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (b) attributed the violation of the protective order to them rather than to their counsel,[25] (2) the court incorrectly determined that their noncompliance with its discovery orders was wilful, and (3) the court's sanction order defaulting them was disproportionate.[26] These contentions are unavailing.

---

[25] As we explained in footnote 13 of this opinion, although Free Speech Systems, LLC, was one of the movants of the motion to depose Clinton, Jones did not join the motion. The defendants on appeal do not claim that Jones was sanctioned improperly vis-à-vis the protective order; on the contrary, both defendants—Jones and Free Speech Systems, LLC—claim error as to the court's ruling regarding the violation of the protective order and assert that the court attributed the violation to them rather than to their counsel. Accordingly, for purposes of our resolution of the defendants' claims in part I of this opinion and notwithstanding the convoluted background concerning the identity of the movants of the motion to depose Clinton, we do not differentiate between Jones and Free Speech Systems, LLC, with regard to the motion to depose Clinton and the court's rulings concerning the protective order.

[26] The defendants raise a number of additional claims, which we decline to review. First, in their reply brief, the defendants contend for the first time that, as a matter of law, "there should be an outer limit on a trial court's authority to enter a default in civil cases. Failure adequately or substantially to comply with discovery should never result in a default." We decline to consider this discrete legal issue raised for the first time in the defendants' reply brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023) ("[i]t [is] axiomatic that arguments cannot be raised for the first time in a reply brief"). Even if some semblance of

---

Lafferty *v.* Jones

---

"A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. . . . [T]his inherent authority permits sanctions for dilatory, bad faith and harassing litigation conduct . . . ." (Citations omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373.

"Additionally, under Practice Book [Rev. to 2021]

this claim can be gleaned from the defendants' principal appellate brief, we conclude that the defendants have abandoned the claim as a result of their failure to brief it adequately in their main brief and notwithstanding their attempt to expound on it in their reply brief. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915 ("[T]he plaintiff cannot use his reply brief to resurrect a claim that he has abandoned by failing to adequately brief it in his principal appellate brief. See *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010) (declining to consider claim when appellant raised 'vague assertion' of claim in principal appellate brief and later 'amplified her discussion of the issue considerably in her reply brief')."), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021). Accordingly, insofar as the defendants claim that the default entered against them was a disproportionate sanction, we limit our analysis to the parameters of the claim adequately briefed by the defendants, namely, that the sanction constituted an abuse of the court's discretion on the basis of the record.

Second, in their principal appellate brief, the defendants claim that "[a] liability default is never appropriate in a case involving speech, given the importance the Connecticut constitution places on speech." The defendants cite article first, § 6, of the Connecticut constitution, which, as they concede, applies only to criminal prosecutions; see *Gray* v. *Mossman*, 91 Conn. 430, 442–43, 99 A. 1062 (1917); and which provides: "In all prosecutions or indictments for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and the facts, under the direction of the court." Conn. Const., art. I, § 6. The defendants' principal appellate brief is bereft of any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Third, in their principal appellate brief, the defendants assert that the court, in its August 6, 2021 order addressing the subsidiary ledgers issue, improperly discredited the Roe affidavit without an evidentiary hearing. The defendants contend that "[t]he absence of a meaningful evidentiary record to support this finding as to . . . Roe, a finding that bore such fatal consequences for the defendants, constitutes an abuse of discretion . . . ." The defendants have abandoned this claim by failing to provide any substantive legal analysis to support it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Last, in their principal appellate brief, the defendants assert that "the trial court never set forth just what it thought Google Analytics was. As such, the order [regarding Google Analytics] was not so clear and unambiguous as to warrant a default if, in fact, the order was violated at all." We deem this claim to be inadequately briefed and, therefore, the defendants have abandoned it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Lafferty *v.* Jones

§ 13-14,[27] a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits for a party, such as by rendering a default judgment against a defendant . . . ." (Footnote added.) Id.

We consider three factors in determining whether "a trial court properly exercises its discretion in imposing a sanction for a violation of a court order . . . ." *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 71, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 17–18, 776 A.2d 1115 (2001). "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review.[28] Third, the sanction imposed must be

---

[27] Practice Book (Rev. to 2021) § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following:

"(1) The entry of a nonsuit or default against the party failing to comply . . . ."

[28] "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

EXHIBIT 29

---

Lafferty *v.* Jones

---

proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Footnote added; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 373–74.

A

The defendants contend that the court improperly (1) determined that they had violated the protective order in filing the motion to depose Clinton or, in the alternative, (2) attributed the violation of the protective order to them, as opposed to their counsel. We are not persuaded.

As to the court's determination that the filing of the motion to depose Clinton violated the protective order, the defendants maintain that, in the motion, they "represented that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. . . . The de minimis recitation of facts in the motion . . . did not violate a court order . . . ." (Citations omitted; footnote omitted.) As the court correctly determined, however, the clear and unambiguous language of the protective order limited access to depositions, or portions thereof, designated as "Highly Confidential-Attorneys Eyes Only." The defendants acknowledge that the motion to depose Clinton contained information drawn from the transcript of one of the plaintiffs' depositions, which, as the court found, was designated as "Highly Confidential-Attorneys Eyes Only" pursuant to the protective order. Thus, in filing the motion to depose Clinton and making the confidential information set forth therein available

conviction that a mistake has been committed." (Internal quotation marks omitted.) *Fernwood Realty, LLC* v. *AeroCision, LLC*, 166 Conn. App. 345, 356, 141 A.3d 965, cert. denied, 323 Conn. 912, 149 A.3d 981 (2016).

EXHIBIT 29

---

Lafferty *v.* Jones

---

to the public, the defendants plainly violated the protective order.

Moreover, the defendants' position on appeal is further undermined by the fact that, during argument preceding the court's sanctions order, one of the defendants' former counsel, Wolman, conceded that the defendants' actions violated the protective order. The following colloquy occurred between the court and Wolman:

"[Wolman]: . . . We do take the [protective] order very seriously and have endeavored to abide it. There was during a deposition this motion [to depose Clinton] filed. And at the end of the day it comes down to simply one sentence. That the witness claims not to know how her legal fees were being paid. That's the only information that I can see in that motion that gives rise to the court's order. And you know, it was erroneously believed that that was not subject to the [protective] order. The witness herself was not identified. *And while it may be a technical violation*, and it was not realized to be so at the time—

"The Court: So, do you admit now that it was a violation, whether it's a technical violation or not?

"[Wolman]: *I would say it probably fits within the language of what is protected.* We had concerns as to whether or not it truly was protected. The court has weighed in." (Emphasis added.)

Accordingly, we reject the defendants' assertion that the court incorrectly determined that they violated the protective order in filing the motion to depose Clinton.

The defendants, in the alternative, contend that the court improperly ascribed the violation of the protective order to them rather than to their counsel. The defendants posit that, rather than referring counsel for disciplinary action, the court "attributed counsel's alleged

Lafferty *v.* Jones

failure to [the defendants], justifying a default on conduct over which the defendants themselves had no control, and about which, the record reflects, they knew nothing." The defendants fail to cite any portion of the record supporting their assertion that they were unaware of counsel's actions. Without any such evidence, we cannot countenance the defendants' reasoning that they were absolved of any discipline stemming from counsel's conduct. See *MacCalla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 240, 204 A.3d 753 (2019) ("Although in some circumstances it may be unduly harsh to impute counsel's transgressions to his client, 'our adversarial system [also] requires that the client be responsible for acts of the attorney-agent whom [he] has freely chosen . . . .' *Thode* v. *Thode*, 190 Conn. 694, 698, 462 A.2d 4 (1983); see *Sousa* v. *Sousa*, 173 Conn. App. 755, 773 n.6, 164 A.3d 702 ('[a]n attorney is the client's agent and his knowledge is imputed to the client' . . .), cert. denied, 327 Conn. 906, 170 A.3d 2 (2017)."); see also *MacCalla* v. *American Medical Response of Connecticut, Inc.*, supra, 239–40 (concluding that court did not abuse its discretion in dismissing claims of certain plaintiffs on basis of counsel's actions); cf. *Herrick* v. *Monkey Farm Cafe, LLC*, 163 Conn. App. 45, 52–53, 134 A.3d 643 (2016) (reversing trial court's judgment of nonsuit rendered on basis of counsel's actions).

B

The defendants next claim that the court erred in finding that they wilfully violated its discovery orders. As to the discovery orders in general, the defendants maintain that "the failure to provide answers was not an example of wilful misconduct. Rather, it was the result of a shocking degree of disorganization. The plaintiffs persuaded the trial judge that the plaintiffs' expectations of how the defendants should operate their business and keep records was the standard the

EXHIBIT 29

---
Lafferty *v.* Jones
---

defendants must meet. The default prevented a jury from learning the truth about the defendants' corporate organization—it is a haphazard warren of people drawn together by . . . Jones' charisma and generosity, but almost altogether devoid of institutional structure or normal corporate governance." We are unpersuaded.

Whether a party wilfully violates a court order "is a factual question committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 222 Conn. App. 867. The court's finding that the defendants' noncompliance with its discovery orders was wilful was supported by its subordinate findings that (1) the subsidiary ledgers requested by the plaintiffs were "easily accessible" and "available" to Flores, (2) Flores generated the trial balances sought by the plaintiffs, but those trial balances later were altered by Roe prior to production to the plaintiffs, and (3) the defendants withheld analytics materials and exhibited a "callous disregard of their obligations to fully and fairly comply with discovery . . . ." Rather than adequately contesting the factual underpinnings of these findings, the defendants propound the argument that their failure to comply with the court's discovery orders stemmed from their purported institutional disorganization. The defendants fail to cite to any portion of the record that supports this assertion. Moreover, the defendants' argument is belied by their own statement in their principal appellate brief that, notwithstanding their purported disorganized corporate structure, they "tendered tens of thousands of documents, sat for scores of depositions, provided answers to requests to admit, and otherwise made efforts to comply with discovery." Thus, the defendants' claim regarding the wilfulness of their noncompliance with the court's discovery orders in general is untenable.

The defendants also assert that the court incorrectly determined that they had wilfully violated its discovery

A188

EXHIBIT 29

Lafferty *v.* Jones

orders specifically concerning the Google Analytics data. The defendants maintain that they (1) made "limited and sporadic use of Google Analytics data," (2) "did not keep [any] reports, did not generally or systematically rely on them, and consulted Google Analytics only haphazardly," and (3) did not possess the Google Analytics data, but, rather, "access[ed] the information on Google servers," such that they did not wilfully fail to comply with the court's orders regarding the Google Analytics data. We reject this assertion. The frequency of the defendants' use and reliance on the Google Analytics data has no bearing on their obligation to abide by the court's discovery orders requiring them to provide the data to the plaintiffs. Further, whether the defendants were in possession of the Google Analytics data is immaterial because the plaintiffs' production request sought analytics that the defendants "own[ed] *and/or control*[*led*]." (Emphasis added.) See Practice Book § 13-9 (a)[29] ("[i]n any civil action, in any probate appeal, or in any administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required, any party may serve . . . upon any other party a request to afford the party submitting the request the opportunity to inspect, copy, photograph or otherwise reproduce designated documents or to inspect and copy, test or sample any tangible things *in the possession, custody or control* of the party upon whom the request is served" (emphasis added)). As the court found, the defendants (1) had access to the Google Analytics data and (2) produced some Google Analytics data to the plaintiffs, albeit not in full and fair compliance with the court's discovery orders. Accordingly, we conclude that the court properly found that the defendants wilfully violated the court's discovery orders as to the Google Analytics data.

---

[29] An amendment to Practice Book § 13-9, effective January 1, 2022, made changes to the provision that are not relevant to these appeals. Accordingly, we refer to the current revision of this provision.

EXHIBIT 29

---
Lafferty *v.* Jones
---

### C

The defendants next claim that the court's order defaulting them as a sanction for their violations of its discovery orders and the protective order was disproportionate. The defendants maintain that, although they "resisted discovery by every lawful means possible in lengthy proceedings . . . [t]heir compliance was substantial," and they did not "[fail] to answer the complaint, [fail] to respond to discovery or otherwise [fail] to participate in the proceedings."[30] We conclude that the court did not abuse its discretion in defaulting the defendants.

As we set forth previously in this opinion, whether the court's sanction defaulting the defendants was proportional to their violations of the court's orders "poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 336 Conn. 374. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably

---

[30] The defendants also argue that, as a less severe alternative to a default, the plaintiffs could have asserted a cause of action for intentional spoliation of evidence or the court could have provided a spoliation charge to the jury. See *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 243, 905 A.2d 1165 (2006) (recognizing independent cause of action for intentional spoliation of evidence, defined as " 'the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action' "). The plaintiffs counter that the law of spoliation is inapplicable because "there is no question that [the defendants] had—and simply withheld—financial and analytics compliance. Moreover, a spoliation charge would not have remedied the prejudice to the plaintiffs from [the defendants'] misrepresentations regarding the existence of discovery, prolonged delays in providing the compliance [they] did provide, and complete refusal to provide other compliance, or from [the defendants'] wilful violation of the protective order." We agree with the plaintiffs that the law of spoliation did not provide a reasonable alternative to the court's default order.

A190

**EXHIBIT 29**

---

Lafferty *v.* Jones

---

concluded as it did. . . . In reviewing a claim that the court has abused this discretion, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. . . . Under an abuse of discretion standard, a court's decision must be legally sound and [the court] must [have] honest[ly] attempt[ed] . . . to do what is right and equitable under the circumstances of the law, without the dictates of whim or caprice." (Citation omitted; internal quotation marks omitted.) *Gianetti* v. *Neigher*, 214 Conn. App. 394, 437–38, 280 A.3d 555, cert. denied, 345 Conn. 963, 285 A.3d 390 (2022). With regard to discovery orders in particular, "[n]ever will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery. . . . Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Citation omitted; internal quotation marks omitted.) *Lafferty* v. *Jones*, supra, 374.

"[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself. . . . [A] trial court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . Therefore, although dismissal of an action is not an abuse of discretion where a party shows

---

Lafferty *v.* Jones

---

deliberate, contumacious or unwarranted disregard for the court's authority . . . the court should be reluctant to employ the sanction of dismissal except as a last resort. . . . [T]he sanction of dismissal should be imposed only as a last resort, and where it would be the only reasonable remedy available to vindicate the legitimate interests of the other party and the court. . . . Like a dismissal, a default judgment is also one of the more severe sanctions that a court may impose . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Gutierrez* v. *Mosor*, 206 Conn. App. 818, 827–28, 261 A.3d 850, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021).

In determining whether the sanction of default was proportional to the defendants' violations of the court's orders, "we are guided by the factors [our Supreme Court] . . . ha[s] employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to [comply with the orders], that is, whether it [was] due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party . . . and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Gianetti* v. *Neigher*, supra, 214 Conn. App. 439.

Remaining mindful, as the trial court recognized, that a default is a sanction of last resort, we conclude that the court's default order was a proportional sanction under the circumstances presented. As to the wilfulness factor, the court found that the defendants' failure to produce "critical material information" to the plaintiffs, as well as the defendants' "cavalier actions" in filing the motion to depose Clinton, constituted wilful noncompliance and misconduct. The court further found that "the Jones defendants were not just careless. Their

EXHIBIT 29

---

Lafferty *v.* Jones

---

failure to produce critical documents, their disregard for the discovery process and procedure and for court orders is a pattern of obstructive conduct . . . ."[31] Thus, this factor militates in favor of the court's default order.

With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims." See *Krahel* v. *Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (discussing importance of unproduced discovery and its effect as to plaintiff's case when examining prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018); see also *Lafferty* v. *Jones*, supra, 336 Conn. 378 (citing *Krahel* in analyzing prejudice factor).

Additionally, with regard to the protective order, the court stated in its August 5, 2021 order addressing the filing of the motion to depose Clinton that (1) the defendants, in filing the motion to depose Clinton, made information designated as "Highly Confidential-Attorneys Eyes Only" under the protective order available on the Internet, (2) the defendants took no corrective action thereafter, and (3) it had "grave concerns" that there would be "a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the

---

[31] As we concluded in part I B of this opinion, we reject the defendants' claim that the court's finding that they wilfully violated the discovery orders was clearly erroneous.

A193

---

*Lafferty v. Jones*

---

public." The court iterated these concerns during argument preceding its sanction order, stating in relevant part: "So, I do intend to impose sanctions [for the violation of the protective order]. . . . I think the [defendants'] behavior really is unconscionable. . . . And I am concerned about a chilling effect on the testimony of other witnesses." In light of these concerns, this factor weighs in favor of the court's default order.

Finally, the court determined that imposing a lesser sanction would be "inadequate . . . ." In 2019, following the defendants' noncompliance with discovery vis-à-vis the special motions to dismiss and Jones' comments during his June 14, 2019 radio broadcast, the court sanctioned the defendants by precluding them from pursuing the special motions to dismiss; however, the court cautioned that it would consider defaulting them in the future if "they, from th[at] point forward, continue[d] with their behavior with respect to discovery." Later, the court also warned the defendants that they risked being defaulted if they failed to comply with its June 2, 2021 order directing the production of complete, final supplemental compliance. See *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, supra, 328 Conn. 74 ("[i]n instances in which our appellate courts have upheld the sanction of a nonsuit, a significant factor has been that the trial court put the plaintiff on notice that noncompliance would result in a nonsuit"). Nevertheless, as the court found, the defendants continued to engage in "a pattern of obstructive conduct" in "callous[ly]" disregarding their discovery obligations. This conduct was not isolated; rather, as the various orders entered by the court demonstrate, notwithstanding being given ample opportunities to comply, the defendants repeatedly failed to produce adequate, responsive materials. The court reasonably determined that a lesser sanction

EXHIBIT 29

---

*Lafferty v. Jones*

---

would not suffice under such circumstances. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 829 ("[t]he appellate courts of this state consistently have upheld nonsuits, defaults or other sanctions imposed for discovery violations where the noncomplying party has exhibited a pattern of violations or discovery abuse demonstrating a disregard for the court's authority").

Moreover, in the midst of the defendants' ongoing discovery noncompliance, the defendants filed the motion to depose Clinton, which contained information designated as "Highly Confidential-Attorneys Eyes Only" subject to the protective order. As the court determined, the defendants, in a "cavalier" fashion, violated the protective order, which they originally had proposed, by releasing the confidential information to the public, thereby creating a palpable risk of a "chilling effect" on the testimony of witnesses in the future. Against this backdrop, we cannot discern an abuse of discretion by the court in defaulting the defendants as a sanction. See *Gutierrez* v. *Mosor*, supra, 206 Conn. App. 827 ("dismissal of an action is not an abuse of discretion where a party shows deliberate, contumacious or unwarranted disregard for the court's authority" (emphasis omitted; internal quotation marks omitted)).

In sum, we conclude that the court properly exercised its discretion in defaulting the defendants as a sanction for their violations of its discovery orders and the protective order.

II

The defendants next claim that the trial court improperly construed the effect of the defendants' default to relieve the plaintiffs of the burden to establish the extent of their damages. This claim warrants little discussion.

Lafferty *v.* Jones

Initially, we observe that the defendants assert that the court "never made a principled and intelligible ruling about causation in this case" but, rather, treated causation as having been established following the defendants' default. The defendants do not brief any substantive claims as to any particular rulings of the court[32] but, rather, take issue with the court's rulings as a whole insofar as the court purportedly "eviscerated the concept of causation and relieved the plaintiffs of any responsibility to prove, or even to attempt to prove, a linkage to the various and diffuse harms they suffered and the conduct of the [defendants]."[33] We exercise

---

[32] The defendants refer to the court's jury charge, wherein the court instructed the jury in relevant part: "I hereby charge you that causation of the plaintiffs' damages is already established. . . . Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law. That is, it has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public by urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly behind the Sandy Hook hoax, resulting in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard in the evidence in this case. In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question."

[33] In their principal appellate brief, the defendants make vague references to (1) "a series of bizarre evidentiary rulings" by the court that "eviscerated the requirement that [the] plaintiffs prove the extent of their damages," (2) the court's improper admission of evidence, (3) the court failing to determine which of the plaintiffs' allegations were "material," (4) the court instructing the jury that liability had been " 'established,' " and (5) the court denying a motion in limine filed by the defendants requesting that the transcript of its November 15, 2021 ruling defaulting the defendants be admissible at the hearing in damages. Insofar as the defendants attempt to raise claims of error with respect to these discrete issues, they have failed to brief such claims adequately and, therefore, we deem any such claims to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

Additionally, in their principal appellate brief, the defendants repeatedly state that the jury was unaware that liability was established against the defendants as the result of a disciplinary default. In their reply brief, the defendants assert for the first time that the court committed error in failing

A196

---

Lafferty *v.* Jones

---

plenary review over this claim, which presents a question of law. See *Williams* v. *Mansfield*, 215 Conn. App. 1, 10, 281 A.3d 1263 (2022) ("[w]hen . . . a court's decision is challenged on the basis of a question of law, our review is plenary").

It is axiomatic that "[a] default admits the material facts that constitute a cause of action . . . and entry of default, when appropriately made, conclusively determines the liability of a defendant. . . . If the allegations of the plaintiff's complaint are sufficient on their face to make out a valid claim for the relief requested, the plaintiff, on the entry of a default against the defendant, need not offer evidence to support those allegations. . . . Therefore, the only issue . . . following a default is the determination of damages. . . . A plaintiff ordinarily is entitled to at least nominal damages following an entry of default against a defendant in a legal action. . . .

"In an action at law, the rule is that the entry of a default operates as a confession by the defaulted defendant of the truth of the material facts alleged in the complaint which are essential to entitle the plaintiff to some of the relief prayed. It is not the equivalent of an admission of all of the facts pleaded. The limit of its effect is to preclude the defaulted defendant from making any further defense and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff

---

to notify the jury that the defendants were defaulted as a disciplinary sanction. We decline to review this claim, as it is (1) improperly raised for the first time in the defendants' reply brief or (2) inadequately briefed, even if cognizably raised in the defendants' principal appellate brief. See *Anderson-Harris* v. *Harris*, 221 Conn. App. 222, 253 n.24, 301 A.3d 1090 (2023); *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 613 n.23, 254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d 654 (2021); see also footnote 26 of this opinion.

A197

EXHIBIT 29

---

Lafferty *v.* Jones

---

is entitled to a judgment for the full amount of the relief claimed. The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive."[34] (Emphasis omitted; internal quotation marks omitted.) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 725–26, 916 A.2d 834 (2007).

As these legal principles elucidate, after the court had defaulted the defendants, the plaintiffs were not required to demonstrate that the defendants' conduct caused their harm. Instead, following the defendants' default, the only burden carried by the plaintiffs was to prove the amount of their damages. See *Murray* v. *Taylor*, 65 Conn. App. 300, 335, 782 A.2d 702 (This court, in reversing the trial court's grant of the defaulted defendant's motion to set aside the verdict following the hearing in damages, explained that "[t]he [trial] court determined that there was no evidence from which the jury reasonably could have found that the plaintiff's damages were proximately caused by the conduct alleged and ruled against the plaintiff on that basis. Yet, in an action at law, as here, the liability of a defaulted defendant is established and the plaintiff's burden at a hearing in damages is limited to proving

---

[34] We note that, "[a]fter a default, a defendant may still contest liability. Practice Book §§ 17-34, 17-35 and 17-37 delineate a defendant's right to contest liability in a hearing in damages after default. Unless the defendant provides the plaintiff written notice of any defenses, the defendant is foreclosed from contesting liability. . . . If written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint and may challenge the right of the plaintiff to maintain the action or prove any matter of defense. . . . This approximates what the defendant would have been able to do if he had filed an answer and special defenses." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Schwartz* v. *Milazzo*, 84 Conn. App. 175, 178–79, 852 A.2d 847, cert. denied, 271 Conn. 942, 861 A.2d 515 (2004). On November 24, 2021, following the entry of the default against them, the defendants filed a notice of defenses, which was stricken by the court on December 24, 2021. The defendants on appeal do not challenge the propriety of the court's order striking the notice of defenses.

---

Lafferty *v.* Jones

---

that the amount of damages claimed is derived from the injuries suffered and is properly supported by the evidence. . . . We, therefore, cannot agree with the court's conclusion that the plaintiff's claim must fail because he did not provide evidence that [the defaulted defendant's] negligent conduct proximately caused his injuries . . . ." (Citation omitted.)), cert. denied, 258 Conn. 928, 783 A.2d 1029 (2001).[35] Accordingly, the defendants' claim fails.

### III

The defendants also claim that the trial court improperly restricted the scope of Jones' testimony at the hearing in damages. We conclude that the defendants have abandoned this claim by failing to brief it adequately.

The following additional procedural history is relevant. On September 6, 2022, the court granted motions in limine filed by the plaintiffs seeking to preclude evidence or argument at the hearing in damages concerning, inter alia, (1) the defendants' "maximum total amount of Sandy Hook coverage or percentage or proportion of Sandy Hook coverage" and (2) the court's ruling defaulting the defendants. Additionally, on September 13, 2022, the court granted a motion for sanctions filed by the plaintiffs on the basis of additional discovery misconduct by the defendants. The court sanctioned the defendants by prohibiting them from presenting evidence or argument "that they did not profit from their Sandy Hook coverage."

On September 22, 2022, during the hearing in damages, the plaintiffs called Jones as a witness. Outside

---

[35] The defendants cite the following language in *Murray* to support their claim: " '[E]ven in a hearing in damages . . . a plaintiff must still prove that the damages claimed were caused by the conduct alleged.' " *Murray* v. *Taylor*, supra, 65 Conn. App. 333. The source of that language, however, is the trial court decision that this court reversed on appeal. See id., 332–35, 340. The defendants' reliance on that language, therefore, is untenable.

**EXHIBIT 29**

---

Lafferty *v.* Jones

---

of the jury's presence, the court canvassed Jones with regard to the various topics about which (1) counsel were prohibited from asking him and (2) he was precluded from testifying. Jones indicated that he understood which topics his testimony could not address. During the course of Jones' direct examination, the court and counsel engaged in multiple sidebars, and the jury was excused several times, in order to address whether certain questions asked by the plaintiffs' counsel and testimony by Jones were proper in light of the court's orders. The next day, the defendants' counsel informed the court that, for "strategic" reasons, the defendants were forfeiting the right to cross-examine Jones, intending instead to call him as a witness during their case-in-chief. On October 5, 2022, outside of the jury's presence, the defendants' counsel notified the court that Jones had decided not to testify during the defendants' case-in-chief, explaining that Jones was "boycotting [the] proceedings because he [felt] that [he was] on the horns of a trilemma. If he testifie[d] in accord with the court's orders [restricting his testimony], [he would] be committing perjury; if he viola[d] the court orders, [it would be] criminal contempt; if he [took] the fifth [amendment to the United States constitution], he [would get an] adverse inference."

The defendants claim on appeal that the court committed error in restricting the scope of Jones' testimony. The majority of the defendants' briefing of this claim focuses on reciting and commenting on the relevant procedural history, iterating the "trilemma" that Jones purportedly faced, and detailing how Jones would have testified but for the court's orders limiting his testimony. The defendants, however, provide no substantive legal analysis examining the propriety of the court's orders imposing limits on Jones' testimony, such as the court's September 13, 2022 order sanctioning the

---

Lafferty *v.* Jones

---

defendants for additional discovery violations. Accordingly, we conclude that the defendants have abandoned this claim as a result of their failure to adequately brief it. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30.

IV

The defendants next claim that the trial court improperly denied their motion for a remittitur. We disagree.

The following additional procedural history is relevant to our resolution of this claim. The evidentiary portion of the hearing in damages transpired over the course of several weeks, commencing on September 13, 2022, and concluding on October 5, 2022. The following witnesses testified during the plaintiffs' case-in-chief: (1) the plaintiffs; (2) Alissa Parker, a spouse of one of the plaintiffs; (3) Brittany Paz, a Connecticut attorney who served as a corporate representative of Free Speech Systems, LLC; (4) Clinton Watts, an expert in the field of "identifying analytics and analysis around social media, the Internet, and how it influences people's behavior"; and (5) Jones. The court admitted in full numerous exhibits offered by the plaintiffs, including video clips of Jones' broadcasts. The defendants rested without calling any witnesses or offering any exhibits, except for one exhibit that was marked for identification only.

In its verdict, the jury awarded the plaintiffs a total of $965,000,000 in compensatory damages, which was split into two categories for each plaintiff: (1) "defamation/slander" damages, past and future; and (2) emotional distress damages, past and future. The jury did not divide the $965,000,000 amount evenly among the plaintiffs; rather, other than two plaintiffs who were each awarded $57,600,000, each plaintiff was awarded a distinct amount of compensatory damages.

In moving for a remittitur, the defendants asserted that the jury's verdict was "exorbitant, shock[ed] the

EXHIBIT 29

---

Lafferty *v.* Jones

---

sense of justice and was influenced by partiality and prejudice." The defendants argued that (1) the plaintiffs failed to submit evidence to aid the jury in calculating compensatory damages, such as medical evidence or expert testimony on the extent of their emotional distress, such that the jury's verdict was predicated on speculation and was motivated by prejudice and passion, (2) the jury, in essence, awarded the plaintiffs punitive damages rather than compensatory damages, and (3) the defendants' right to due process was violated as a result of the plaintiffs' failure to submit evidence estimating their damages. The plaintiffs filed a memorandum of law in opposition to the motion for a remittitur, refuting the defendants' arguments.

In denying the defendants' motion for a remittitur, the court stated: "The defendants take the position, in a conclusory manner unsupported by any evidence or case law, that the verdict was 'exorbitant' and the result of 'passion and prejudice.' They argue—again, unsupported by any law—that due process requires that the plaintiffs are responsible for establishing what they think would make them whole—that is, that the plaintiffs should have been required to offer evidence as to the amount they sought in compensatory damages. As the plaintiffs point out, the defendants cite no transcript, exhibits, or case law to even begin to carry their burden of showing manifest injustice.[36] Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support[s] the [verdict] rendered by the jury. The size of the [verdict], while substantial, does not so shock the sense of justice as to compel the conclusion

---

[36] In footnotes, the court (1) observed that, in contrast to the defendants' "conclusory motion," the plaintiffs "in their objection painstakingly and accurately highlight[ed] the evidence submitted" and (2) iterated that it was not obligated to consider inadequately briefed claims.

**EXHIBIT 29**

---

Lafferty *v.* Jones

that the jury was influenced by partiality, prejudice, mistake or corruption, but instead falls within the necessarily uncertain limits of just damages to be determined by the jury. This jury discharged its obligations conscientiously, dutifully, and according to the court's instructions on the law to be applied. This jury was a careful jury whose behavior was beyond reproach; [its] attention to the evidence and instructions from the court is evident from the specific questions [it] asked regarding both the charge and the evidence.[37] In reviewing the evidence in a light most favorable to sustaining the [verdict], the court finds that the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform[s] to spread lies to a massive audience clearly supports the [verdict], and that the [verdict was] within the limits of a fair and just award of damages." (Footnotes added; footnotes omitted.)

Before addressing the defendants' claim, we set forth the following applicable legal principles and standard of review. General Statutes § 52-216a provides in relevant part: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

"[I]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages

---

[37] The jury submitted several notes during its deliberations.

Lafferty *v.* Jones

or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions. . . . Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, 331 Conn. 777, 782–83, 208 A.3d 256 (2019). The inquiry into whether a damages award shocks the sense of justice "is not intended to detect the kind of shock that arises from a moral outrage but, instead, refers to the distress that may be felt when the requirement of reasonableness has been abandoned in a setting in which reason is a necessary element of any legitimate outcome. If the verdict cannot be explained rationally, then the trial court may presume that it is tainted by improper considerations." *Maldonado* v. *Flannery*, 343 Conn. 150, 166–67, 272 A.3d 1089 (2022).

"[O]ur review of the trial court's decision [to grant or deny remittitur] requires careful balancing. . . . [T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be

EXHIBIT 29

Lafferty *v.* Jones

given in favor of its correctness. . . . The chief ratio-nale that has been articulated in support of this deferen-tial standard of review is that the trial court, having observed the trial and evaluated the testimony first-hand, is better positioned than a reviewing court to assess both the aptness of the award and whether the jury may have been motivated by improper sympathy, partiality, or prejudice."[38] (Citations omitted; internal quotation marks omitted.) *Ashmore* v. *Hartford Hospi-tal*, supra, 331 Conn. 783.

"[A]lthough the trial court has a broad legal discretion in this area, it is not without its limits. . . . Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . Furthermore, [t]he size of the verdict alone does not determine whether it is excessive. . . . Thus, [i]n rul-ing on the motion for remittitur, the trial court [is] obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned [is] reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judg-ment is an insufficient basis for ordering a remittitur. . . . A generous award of noneconomic damages should be sustained if it does not shock the sense of justice. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power. Whether the court would have

[38] The defendants assert that we should exercise plenary review over their claim because the jury's verdict "shocks the sense of justice" in violation of their due process rights. The defendants provide no legal authority in support of this assertion. We, instead, apply the well settled standard of review and examine the court's decision for an abuse of discretion.

Lafferty *v.* Jones

reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . In determining whether the court abused its discretion, therefore, we must examine the evidential basis of the verdict itself . . . . [T]he court's action cannot be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." (Internal quotation marks omitted.) *Gois* v. *Asaro*, 150 Conn. App. 442, 457–58, 91 A.3d 513 (2014).

Moreover, "[p]roper compensation for noneconomic damages cannot be computed by a mathematical formula, and there is no precise rule for the assessment of damages. . . . The plaintiff need not prove damages with mathematical exactitude; rather, the plaintiff must provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) Id., 457; see also *Commission on Human Rights & Opportunities* v. *Cantillon*, 347 Conn. 58, 68–69, 295 A.3d 919 (2023) ("Noneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.)).

The defendants assert that a remittitur of the jury's verdict was necessary because the plaintiffs failed to submit sufficient evidence to establish their damages, such as medical evidence or expert testimony concerning their emotional distress, leaving the jury without a means to determine damages other than relying on passion, prejudice, and speculation. The defendants maintain that, rather than prove their damages, the plaintiffs "focus[ed] . . . on arousing sympathy,

EXHIBIT 29

---

*Lafferty v.* Jones

---

directing anger, and anchoring a large number before the jury[39] with the hope that [the] jurors would do what they did in this case—award a fortune." (Footnote added.) We disagree.[40]

Our review of the record reveals that there was sufficient evidence to support the $965,000,000 in compensatory damages awarded by the jury. All of the plaintiffs

---

[39] The defendants reference the plaintiffs' closing argument, during which the plaintiffs' counsel, in addressing damages for defamation and slander, proposed that the jury consider (1) picking a number representing a reasonable amount to award to one individual, assuming that a lie about that individual had been told to one person, and (2) multiplying that number first by 550 million, which, according to testimony elicited from Watts, represented the minimum audience that the defendants' lies about Sandy Hook reached between 2012 and 2018, and then by fifteen, or the number of plaintiffs in the underlying consolidated actions.

[40] The defendants raise two additional assertions that we discuss briefly. First, the defendants contend that, to comport with due process, the plaintiffs were required to present evidence that estimated their damages so as to provide "some notice as to the magnitude of [the] harm" suffered. As before the trial court, the defendants have failed to provide any substantive legal analysis to support this claim, and, therefore, we deem it to be abandoned. See *Lafferty* v. *Jones*, supra, 336 Conn. 375 n.30. Moreover, we iterate our Supreme Court's recent statement that "[n]oneconomic damages, such as emotional distress, pain and suffering, are, at best, rather indefinite and speculative in nature. . . . For more than fifty years, [our Supreme Court] has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." (Citation omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 347 Conn. 68–69. We also observe that, under Connecticut law, in civil actions seeking the recovery of damages resulting from personal injury, counsel is entitled, but not required, to present argument on the amount of past and future noneconomic damages. See General Statutes § 52-216b (a) ("[i]n any civil action to recover damages resulting from personal injury or wrongful death, counsel for any party to the action shall be entitled to specifically articulate to the trier of fact during closing arguments, in lump sums or by mathematical formulae, the amount of past and future economic and noneconomic damages claimed to be recoverable"); see also Practice Book § 16-19 ("In any action seeking damages for injury to the person, the amount demanded in the complaint shall not be disclosed to the jury. In the event that the jury shall return a verdict which exceeds the amount demanded, the judicial authority shall reduce the award to, and render judgment in, the amount demanded. Counsel for any party to the action may

---

EXHIBIT 29

---

Lafferty *v.* Jones

---

testified that, in the aftermath of the Sandy Hook massacre, they endured traumatic threats and harassment, conveyed, inter alia, through social media, by mail, or in person, stemming from the lies, as propagated by the defendants, that the Sandy Hook massacre was a hoax. Examples of such threats and harassment included death threats, claims that the plaintiffs were actors, and accusations that the deceased victims of the Sandy Hook massacre were not real or were still alive. Additionally, all of the plaintiffs testified to the mental anguish and emotional harm that they suffered as a result of the harrowing threats and harassment they experienced.[41] The extent of the plaintiffs' damages

---

articulate to the jury during closing argument a lump sum or mathematical formula as to damages claimed to be recoverable.").

Second, the defendants assert that the jury awarded the plaintiffs punitive, rather than compensatory, damages. The record does not support this assertion. Our review of the court's jury charge reflects that the court instructed the jury that its task was to determine compensatory damages, and the court expressly instructed the jury that, "[u]nder the rule [of] compensatory damages, the purpose of an award of damages is not to punish or penalize the defendants for their wrongdoing but to compensate the plaintiffs for the resulting harms and losses." Moreover, the court separately instructed the jury that (1) the plaintiffs were seeking punitive damages in the form of attorney's fees and costs, and (2) the jury was to determine whether punitive damages were to be awarded, with the court to determine the amount thereof if awarded. In a section of the verdict form titled "Compensatory Damages," the jury awarded the plaintiffs a total of $965,000,000 in damages, comprising past and future "defamation/slander" and emotional distress damages. In a separate section of the verdict form, the jury determined that the plaintiffs were entitled to attorney's fees and costs. The defendants do not challenge the propriety of the jury instructions, and, "in the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that the jury followed them." *Audibert* v. *Halle*, 198 Conn. App. 472, 482, 233 A.3d 1237 (2020). Thus, we reject the defendants' contention that the $965,000,000 awarded by the jury to the plaintiffs constituted punitive, rather than compensatory, damages.

[41] Insofar as the defendants argue that the plaintiffs were required to produce medical or expert testimony to corroborate their testimony concerning their emotional distress, the defendants provide no legal support for this assertion. Cf. *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 707 n.25, 41 A.3d 1013 (2012) (rejecting defendant's argument that plaintiff's testimony regarding emotional distress was insufficient without corroboration by medical or expert testimony).

EXHIBIT 29

---

Lafferty *v.* Jones

---

was established further by the testimony of Watts, the plaintiffs' social media expert, who testified that, on the basis of data that he reviewed from three social media platforms, namely, YouTube, Facebook, and Twitter, the defendants' lies about the Sandy Hook massacre reached a minimum audience of 550 million people between 2012 and 2018.

In sum, we agree with the court that the evidence supported the jury's verdict and, although substantial, the verdict did not "so [shock] the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Ashmore* v. *Hartford Hospital*, supra, 331 Conn. 782. Accordingly, we conclude that the court did not abuse its discretion in denying the defendants' motion for a remittitur.

V

The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.

We begin with a brief overview of CUTPA. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes] § 42-110g (a)[42] of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment

---

[42] General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ."

**EXHIBIT 29**

---

*Lafferty v. Jones*

---

of a method, act or practice prohibited by [General Statutes §] 42-110b . . . ." (Footnote added; internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 788, 219 A.3d 767 (2019). Section 42-110b (a), in turn, provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42-110a (4) defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."[43]

The following additional procedural history is relevant to our resolution of this claim. To support their CUTPA claim in their original complaint, in addition to incorporating the allegations of the other claims that they asserted, the plaintiffs alleged, inter alia, that (1) the defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit,"[44] (2) the defendants engaged in a "campaign

---

[43] CUTPA "refers to 'trade or commerce' in the substantive provision, § 42-110b (a), but contains a definition of ' "trade" ' and ' "commerce" ' in the definitions provision, § 42-110a (4). The definition seems to equate the disjunctive with the conjunctive relationship of the two terms and interpret the two terms as having a single meaning or a combined inclusive meaning." R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 n.2.

[44] The plaintiffs further alleged, for instance, that, "[o]nce he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In [Jones'] [I]nternet based and broadcast radio shows, the . . . defendants hawk 'open currency' precious metals, prepackaged food and dietary supplements, 'male enhancement' elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 'lower receivers' (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle). . . . [T]he . . . defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager

---

---
Lafferty *v.* Jones
---

of lies, abuse, and harassment, [which constituted] a deceptive practice and offended public policy," (3) the defendants' "reprehensible conduct caused substantial injury to the plaintiffs and other consumers that [was] not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided," (4) the defendants' "conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury," and (5) the defendants "broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false and with reckless disregard as to whether or not they were true."[45]

On October 9, 2020, the Jones defendants filed a motion to strike, asserting in relevant part that the plaintiffs' CUTPA claim was insufficiently pleaded. On April 29, 2021, the plaintiffs filed an objection, and, on June 4, 2021, the Jones defendants filed a reply brief. On November 18, 2021, the court denied the motion to strike. With respect to the plaintiffs' CUTPA claim, the court determined that "[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful to formulate the underlying basis of a CUTPA cause of action. . . . As the court is not striking the plaintiffs' defamation claim, the plaintiffs' [original] complaint sets forth allegations of violations of public policy or otherwise immoral, unethical, oppressive or unscrupulous conduct such that the plaintiffs allege a legally sufficient CUTPA cause of action." (Citations omitted.) The court further determined that the plaintiffs had standing to maintain their CUTPA claim, stating that

---

to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate[s] those listeners to buy their products." (Footnote omitted.)

[45] The allegations in support of the plaintiffs' CUTPA claim were substantively identical in the plaintiffs' respective original complaints, as well as in their September, 2022 amended complaint.

---
Lafferty *v.* Jones
---

"the plaintiffs allege that the [Jones] defendants 'broadcast . . . outrageous, cruel and malicious lies about the plaintiffs' and that '[t]hese acts of the [Jones] defendants resulted in damage to the plaintiffs.' Therefore, the plaintiffs have set forth a colorable claim of direct injury such that they have standing to maintain their CUTPA cause of action."

On October 5, 2022, after the plaintiffs had rested their case-in-chief at the hearing in damages, the defendants' counsel orally moved for a directed verdict and/or to dismiss the plaintiffs' CUTPA claim.[46] The defendants' counsel argued in relevant part that the plaintiffs were asserting a "novel application" of CUTPA because "there is no representation whatsoever that the plaintiffs were harmed in any respect by . . . Jones' commercial activities with respect to the sale of dietary supplements. . . . There is no evidence that anyone was harmed by his commercial activity. . . . [N]othing in [his] speech, or the consequences of that speech, addresses what CUTPA is intended to address . . . and that is whether consumers were harmed by . . . the commercial activity [affecting] trade or commerce. . . . [W]hat we have here is a novel attempt to use CUTPA to silence unpopular speech. . . . So, we think that CUTPA is being used for inappropriate grounds and that the plaintiffs lack standing to bring the action because they cannot establish that they were harmed by . . . Jones' commercial activity. . . . [T]here is no case . . . that supports what the plaintiffs intend to do in this case, and that is [to] use . . . a statute that is designed to protect consumers against unscrupulous trade and commercial practices to attack speech. . . . [N]othing in our law supports an application of CUTPA on the fact[s] as pled and proven in this case." In response, the plaintiffs' counsel argued in relevant part:

---

[46] On October 6, 2022, the defendants filed a written version of their oral motion.

EXHIBIT 29

Lafferty *v.* Jones

"With regard to the idea that the CUTPA claim is only about statements, it's not. What it describes is a commercial course of conduct that is built on targeting and victimizing these families by lying about them. So, certainly lies are in the mix, but what the court heard was not just the occasional lie, it's the use of lies to sell products to fuel a business. . . . There is a business plan to hurt these families and to sell things by hurting them. And that has to be . . . remediable under CUTPA . . . ." In rebuttal, the defendants' counsel argued that there was no precedent providing that CUTPA applies when (1) "a person engages in extreme comments and relies on the sale of products to produce that platform" and (2) there is no evidence of harm stemming from the products sold. The court rejected the defendants' claims without additional comment.

Subsequently, in their motion to set aside the jury's verdict, the defendants, in essence, reasserted their prior contention that the plaintiffs' CUTPA claim was legally insufficient. In denying that motion, the court determined in relevant part that "CUTPA serves to deter predatory commercial conduct such as [the conduct alleged by the plaintiffs]. This court, in ruling on the defendants' motion to strike, already determined that '[a]n allegation of defamatory conduct on the part of a defendant is sufficiently wrongful conduct to formulate the basis of a CUTPA cause of action.' The [verdict] rendered by [the] jury [is] not against the law or the evidence."[47]

We construe the crux of the defendants' claim on appeal to be that the conduct at issue alleged by the plaintiffs and admitted by operation of the defendants' default, namely, the defendants' dissemination of lies

---

[47] The defendants raised additional claims directed to the plaintiffs' CUTPA claim, including that the plaintiffs failed to plead the ascertainable loss element of a CUTPA claim. The court rejected these claims, and the defendants do not pursue these issues on appeal.

A213

EXHIBIT 29

*Lafferty v. Jones*

about the Sandy Hook massacre, was insufficient to support a viable CUTPA claim because their actions were not performed "in the conduct of any trade or commerce." General Statutes § 42-110b (a). The defendants posit that no CUTPA claim arises here when (1) they did not lie about or unscrupulously advertise the products that they sold and (2) their actions led to *indirect* commercial gains through product sales. In short, the defendants contend that they engaged in non-commercial speech outside of the scope of CUTPA. The plaintiffs respond that, "[w]hen using lies about [the] plaintiffs to sell supplements, [the defendants were] engaged in 'unfair' and 'deceptive' acts and practices 'in the conduct of' [their] 'trade or commerce.'" We conclude that, as a matter of law, the acts in which the defendants engaged were not "in the conduct of any trade or commerce" as required pursuant to CUTPA. See General Statutes § 42-110b (a).

"The interpretation of pleadings is an issue of law. . . . We conduct a plenary review of the pleadings to determine whether they are sufficient to establish a cause of action upon default." (Citation omitted; internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, 149 Conn. App. 267, 276, 89 A.3d 373 (2014). Moreover, "[w]hether a defendant is subject to CUTPA is a question of law that is subject to plenary review." *NRT New England, LLC* v. *Longo*, 207 Conn. App. 588, 610–11, 263 A.3d 870, cert. denied, 340 Conn. 906, 263 A.3d 821 (2021).

Before turning to the merits of the defendants' claim, we note that the default entered against the defendants does not limit our review of this claim. "An appellate court . . . may examine the allegations of a complaint to ascertain whether they are sufficient on their face to establish a valid claim for the relief requested. . . . Although the failure of a party to deny the material allegations of a pleading operates so as to impliedly

A214

---
Lafferty *v.* Jones
---

admit the allegations, a default does not automatically trigger judgment for, or the relief requested by, the pleader. The pleader is entitled to an entry of judgment or a grant of relief as a function of the nonresponsive party's default and the attendant implied admission only when the allegations in the well pleaded filing are sufficient on their face to make out a claim for judgment or relief. . . . While an admission carries with it all reasonable implications of fact and legal conclusions . . . the admission cannot traverse beyond the bounds of the underlying pleading and admit allegations not made by the pleader; the pleading is, unless leave is granted to modify, the ceiling." (Internal quotation marks omitted.) *Gaynor* v. *Hi-Tech Homes*, supra, 149 Conn. App. 274–75. "As such, while a default admits the material allegations of the underlying pleading, the question as to whether the default requires judgment in favor of the pleader is to be determined by reference to the sufficiency of the pleading itself." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 737, 830 A.2d 228 (2003). "Put another way, in both equitable and legal actions, the plaintiff must establish his right to relief to the court's satisfaction, even though some issues may have been laid at rest by the default." (Internal quotation marks omitted.) *Moran* v. *Morneau*, 140 Conn. App. 219, 226, 57 A.3d 872 (2013); see also id., 225 ("[a] default may settle many issues, but it does not operate to insulate a mistaken legal proposition from judicial review").

For CUTPA to apply, there must be an unfair or deceptive act or practice committed "in the conduct of any trade or commerce." General Statutes § 42-110b (a); see also *Cenatiempo* v. *Bank of America, N.A.*, supra, 333 Conn. 789 ("[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce"); *Pellet* v. *Keller Williams Realty Corp.*,

EXHIBIT 29

---
Lafferty *v.* Jones
---

177 Conn. App. 42, 62, 172 A.3d 283 (2017) ("[t]he essential elements to pleading a cause of action under CUTPA are: (1) the defendant committed an unfair or deceptive act or practice; (2) *the act complained of was performed in the conduct of trade or commerce*; and (3) the prohibited act was the proximate cause of harm to the plaintiff" (emphasis added)). CUTPA defines " '[t]rade' and 'commerce' " as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

"Despite th[e] broad language [of § 42-110a (4)], the definition of trade and commerce is not unlimited and has been used to restrict the application of CUTPA." *Stearns & Wheeler, LLC* v. *Kowalsky Bros., Inc.*, 289 Conn. 1, 11 n.13, 955 A.2d 538 (2008); see also R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, Business Torts and Antitrust (2024–2025 Ed.) § 3.1, p. 117 ("[b]ecause CUTPA applies only to acts 'in the conduct of any trade or commerce,' there is a significant limitation on the reach of [CUTPA]" (footnote omitted)); see, e.g., *Sempey* v. *Stamford Hospital*, 194 Conn. App. 505, 518, 221 A.3d 839 (2019) (trial court properly struck CUTPA count predicated on allegations that former employer made false statements to State of Connecticut Unemployment Commission regarding former employee's reliability and integrity because, inter alia, employee failed to allege that employer committed any acts in " 'conduct of any trade or commerce' ").

Exercising our plenary review, we conclude that the facts alleged by the plaintiffs and admitted by the defendants are legally insufficient to satisfy the "trade or commerce" prong of CUTPA. As we have explained, the conduct forming the basis of the plaintiffs' CUTPA

**EXHIBIT 29**

---
Lafferty *v.* Jones
---

claim was the defendants' propagation of lies that the Sandy Hook massacre was a hoax. Applying the statutory definition of " '[t]rade' and 'commerce' " set forth in § 42-110a (4) (i.e., "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state"), we cannot conclude that the defendants violated CUTPA in disseminating their lies about the Sandy Hook massacre. That the defendants' speech was motivated by a desire to generate profit through sales of products that the defendants marketed is not adequate to satisfy the "trade or commerce" prong of CUTPA. Indeed, nothing in the defendants' speech, in and of itself, concerning the Sandy Hook massacre made any mention of their products.

In their respective appellate briefs, the plaintiffs and the defendants address our Supreme Court's decision in *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co.*, *LLC* v. *Soto*,       U.S.       , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019). In *Soto*, several plaintiffs, acting as the administrators of the estates of nine of the victims of the Sandy Hook massacre; id., 65, 66 n.2; commenced an action against several defendants who were alleged to have manufactured, distributed, and sold (to Lanza's mother) the weapon used by Lanza at Sandy Hook—a Bushmaster XM15-E2S semiautomatic rifle. Id., 65–66. The plaintiffs asserted a number of legal theories seeking to hold the defendants liable in part for the Sandy Hook massacre, most of which our Supreme Court determined to be precluded by Connecticut law and/or the Protection of Lawful Commerce in Arms Act (PLCAA), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. §§ 7901 through 7903 (2012). Id., 65.

A217

**EXHIBIT 29**

Lafferty *v.* Jones

Our Supreme Court concluded, however, that the plaintiffs "offered one narrow legal theory" that was recognized pursuant to Connecticut law and not precluded by PLCAA. Id. Specifically, the plaintiffs alleged that "the defendants violated CUTPA[48] by advertising and marketing the XM15-E2S in an unethical, oppressive, immoral, and unscrupulous manner that promoted illegal offensive use of the rifle" and "that such promotional tactics were causally related to some or all of the injuries that were inflicted during the Sandy Hook massacre." (Footnote added.) Id., 86–87. The trial court struck this CUTPA claim, along with a distinct claim by the plaintiffs alleging that the sale of the XM15-E2S to the civilian market, ipso facto, constituted an unfair trade practice, on the ground that the plaintiffs lacked standing stemming from their status as "third-party victims who did not have a direct consumer, commercial, or competitor relationship . . . with the defendants." Id., 88. Our Supreme Court determined that the trial court erred in striking the plaintiffs' CUTPA claims, reasoning: "Because the principal evils associated with unscrupulous and illegal advertising are not ones that necessarily arise from or infect the relationship between an advertiser and its customers, competitors, or business associates, we hold that a party directly injured by conduct resulting from such advertising can bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant." Id. Our Supreme Court further clarified that it did not "need [to] decide today whether there are other contexts or situations in which parties who do not share a consumer, commercial, or competitor relationship with an alleged wrongdoer may be barred, for prudential or policy reasons, from bringing a CUTPA action. What is

---

[48] The plaintiffs in *Soto* brought their claims pursuant to Connecticut's wrongful death statute, General Statutes § 52-555, predicated in part on alleged CUTPA violations. *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 67.

A218

---

Lafferty *v.* Jones

---

clear is that none of the rationales that underlie the standing doctrine, either generally or in the specific context of unfair trade practice litigation, supports the denial of standing to the plaintiffs in this case." Id., 96. Thus, the court held that the plaintiffs had standing with respect to their "narrow legal theory" under CUTPA because they alleged direct injuries from conduct resulting from wrongful advertising. Id., 65, 99–100.

The allegations underlying the CUTPA claim deemed viable in *Soto* are, however, materially distinguishable from the allegations in the underlying consolidated actions and do not lend the plaintiffs support with respect to their allegation that the defendants acted "in the conduct of any trade or commerce" for purposes of CUTPA. As in *Soto*, the plaintiffs in this case did not allege that they were consumers, competitors, or otherwise in a business or commercial relationship with the defendants. Unlike the plaintiffs in *Soto*, however, the plaintiffs in this case did not allege that they were "directly injured by conduct resulting from" the defendants' advertising or sale of the defendants' products, such that they could "bring an action pursuant to CUTPA even in the absence of a business relationship with the defendant[s]." *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 88. Thus, notwithstanding *Soto*'s elimination of the commercial relationship test, the plaintiffs did not allege direct injury from the defendants' *advertising* or *sale* of the defendants' products and, thus, did not fall within the expansion of CUTPA liability established in *Soto*. Rather, they alleged injuries from the defendants' *false speech* about the Sandy Hook massacre—speech that itself was silent with regard to the defendants' products. Stated differently, the plaintiffs did not allege direct injury from commercial speech relating to the advertising, marketing, or sale of goods, as in *Soto*. To extend CUTPA's reach to provide a remedy (in addition to the torts of

EXHIBIT 29

A220

---
Lafferty *v.* Jones
---

invasion of privacy by false light, defamation, defamation per se, and intentional infliction of emotional distress) for content of speech unrelated to the advertising, marketing, or sale of products is simply a bridge too far.

In sum, we conclude that the plaintiffs failed to assert a legally viable CUTPA claim. As a result, the judgments rendered with respect to the plaintiffs' CUTPA claim must be reversed and the attendant award entered pursuant to CUTPA, namely, the $150,000,000 in punitive damages awarded by the court, must be vacated.

The judgments are reversed only as to the plaintiffs' CUTPA claim and the cases are remanded with direction to vacate the court's award of $150,000,000 in punitive damages pursuant to CUTPA; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

---

A220

**EXHIBIT 29**

<u>PRACTICE BOOK §84-5(a)(5)(D), LIST OF PARTIES</u>

<u>Defendants, Alex E. Jones and Free Speech Systems, LLC</u>

Jay M. Wolman, Esq.

**Randazza Legal Group**

100 Pearl Street, 14th Floor

Hartford, CT 06103

Tel.: (203) 539 - 6666

Email: jmw@randazza.com

Juris: 433791

Ben C. Broocks, *pro hac vice*

**Broocks Law Firm, PLLC**

248 Addie Roy Rd., Ste. B301

Austin, TX 78746

Tel.: (512) 201 – 2000

Email: bbroocks@broockslawfirm.com

Juris: 446537

<u>Plaintiffs, Carlee Soto-Parisi, Carlos M. Soto, David Wheeler, Donna Soto, Erica Ash a/k/a Erica Lafferty, Francine Wheeler, Ian Hockley, Jacqueline Barden, Jennifer Hensel, Jillian Soto, Mark Marden, Nicole Hockley, Robert Parker, William Aldenberg, William Sherlach, and Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini</u>

Alinor Sterling, Josh Koskoff, and Christopher M. Mattei

**Koskoff, Koskoff & Bieder, P.C.**

350 Fairfield Ave.

Bridgeport, CT 06604

Tel.: (475) 766 – 4989

Email: asterling@koskoff.com

cmattei@koskoff.com

jkoskoff@koskoff.com

Juris No(s): 411754, 410518, 32250

EXHIBIT 29

she ended up transferring.

Q   It continued on?

A   It continued.  It's going to continue after today.
You and I --

        ATTY. PATTIS:  Objection.  Move to strike.
        Speculative.  Nonresponsive.

        THE COURT:  So, I will --

A   It's not speculative.

        ATTY. PATTIS:  Objection.  Move to strike.

        THE COURT:  I am going to sustain the objection
        and strike that answer.

Q   It continued throughout the entire time you were
Chief Division Counsel?

A   It's been going on for ten years.

Q   And during time -- during this whole time, as a
result of your supervision of the FBI's response to this
type of stuff, did you become aware of who Alex Jones was?

A   Yes.

Q   How?

A   Through conversations with the victim's specialist.

Q   And did you have an understanding at that time what
the genesis of this type of behavior was?

        ATTY. PATTIS:  Objection.  Calls for hearsay at
        this point.

        THE COURT:  Overruled.

A   Can you clarify the question, sir?

Q   What was your understanding as to Alex Jones' role in

A222

Q   What was your reaction to this when you were seeing yourself all over the internet?

A   It's -- you can't even describe it.  I don't even know how to describe it.  It's crushing.  It's -- I mean, you are -- basically, you are under attack and you can't even defend yourself.

Q   What about it made you --  I mean, I take it that you weren't a very online person?

A   No.  I would not describe -- I don't have social media or anything like that.  I don't have social media myself, but people create social media accounts with my name and spread this filth.

Q   But when you say that you felt under attack and defenseless, what is it about seeing this stuff online saying that you are an actor, and that your experience at Sandy Hook was fake, what is it that was overwhelming to you?

A   It's -- it's one of the worst things that ever happened if not the worst thing that ever happened here; right?  What happened to them.  And people go on to say this didn't happen.  And then they want to get rich off of it.  That's the worst part.  Like, you know what?  You can say whatever you want about me, I don't care, just say whatever you want.  I'm a big boy, I can take it, but they want to make profits, they want to make millions and millions of dollars.  They want to destroy people's lives.  Their children got slaughtered.  I saw it myself.  And now they

A223

Q   How did you become aware of that?

A   How did I become aware of Halbig or how did --

Q   Halbig.

A   So, Halbig was also one of the people that was writing harassing stuff about me and sending multiple e-mails and phone calls to the FBI saying that I wasn't who they -- the FBI said I was.

Q   And you became aware that you said that Mr. Halbig was associated with Mr. Jones?

A   Yeah.  Mr. Halbig was on Mr. Jones' show.

Q   Do you know whether Mr. Jones supported Halbig's activities up here in Connecticut?

        ATTY. PATTIS:  Objection.  Foundation.

        THE COURT:  Overruled.

A   Well, I know that Mr. Halbig was on Infowars spewing all of this crap, and Mr. Halbig was in -- I knew that he was in Newtown harassing people.

Q   Did you know that Mr. Jones directed his audience to go to Mr. Halbig's website?

        ATTY. PATTIS:  Objection.  Leading.

        THE COURT:  Sustained.

Q   Did Mr. Jones direct his audience to Mr. Halbig's website?

A   To be honest, certain, I just don't recall that.  I don't.

Q   Do you know whether this garbage about you and David Wheeler was on --

NO.    X06-UWY-CV-18-6046436-S    :    SUPERIOR COURT

ERICA LAFFERTY, ET AL.    :    COMPLEX LITIGATION DOCKET

V.    :    AT WATERBURY

ALEX EMRIC JONES, ET AL.    :    AUGUST 24, 2021

---

NO.    X-06-UWY-CV18-6046437-S    :    SUPERIOR COURT

WILLIAM SHERLACH    :    COMPLEX LITIGATION DOCKET

V.    :    AT WATERBURY

ALEX EMRIC JONES, ET AL.    :    AUGUST 24, 2021

---

NO.    X06-UWY-CV-18-6046438-S    :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL.    :    COMPLEX LITIGATION DOCKET

V.    :    AT WATERBURY

ALEX EMRIC JONES, ET AL.    :    AUGUST 24, 2021

## MOTION FOR SANCTIONS BASED ON
## THE JONES DEFENDANTS' FAILURE TO PRODUCE
## WEB AND SOCIAL MEDIA DATA AND ANALYTICS

"An order of the court must be obeyed until it has been modified or successfully challenged, and the consequences for noncompliance may be severe indeed." *Lafferty v. Jones*, 336 Conn. 332, 381 (2020) (quoting *Fox v. First Bank*, 198 Conn. 34, 40 n.3 (1985)), *cert. denied*, 2021 WL 1240941 (U.S. Apr. 5, 2021). For two and a half years, the Jones defendants have been under a court order to produce sales, marketing, and web-analytics data, including Google Analytics data. The Court set a "final" deadline for production of the "already overdue supplemental compliance" for June 28, 2021. Order, Dkt. 348.10, June 2, 2021. It expressly warned that "[f]ailure to comply with this order may result in sanctions including but not limited to a default." *Id.* The Jones

1

defendants violated that order and did so based on inaccurate and incomplete representations concerning the supposed difficulty of producing the requested information.

In addition, for more than two and a half years, the Jones defendants have been under a court order to produce all communications or documents concerning social media marketing and analytics. For years, they represented that they possessed none. The deposition of ███████████ ████████████████████████ came and went. Then, during a ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

This conduct continues the pattern of "continuing misconduct" that "demonstrates a deliberate disregard for the court's orders." *Lafferty*, 336 Conn. at 380–81 (quoting approvingly *Emerick v. Town of Glastonbury*, 177 Conn. App. 701, 737 (2017)'s justification for affirming a sanction of dismissal). The Jones defendants' noncompliance is prejudicial and requires the entry of the most serious possible sanction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Orders Requiring the Jones Defendants to Produce Web and Social Media Marketing and Analytics Data and the Jones Defendants' Previous Refusal to Produce Them

More than two and a half years ago, this Court ordered the Jones defendants to produce materials responsive to the plaintiffs' Requests for Production Nos. 15, 16, and 17, which covered marketing, sales, and web-analytics data. Order, Dkt. 148.00, Jan. 10, 2019; Defs.' Obj. to Plaintiffs' Rev. Disc. Requests, Dkt. 146.00, Jan 9, 2019.

The Court specifically addressed the Jones defendants' nonproduction of Google or other web analytics data on March 22, 2019. Ex. A, 3/22/19 Hrg. Tr. 19. After addressing it repeatedly with no result, it finally held that the "print out produced in response to production requests 15-17

EXHIBIT 29

is simply not full and fair compliance." Order, 255.10, June 10, 2019. It found that court-ordered "depositions confirm[ed] that the Google Analytics account is accessed and utilized by some employees of the defendants." *Id.* It warned that it would "consider appropriate sanctions for the defendants' failure to fully and fairly comply should they not produce the data within one week." *Id.*

They did not produce it. The Court sanctioned the Jones defendants for failure to produce that data, and for "repeatedly ignored court deadlines and continued to challenge the underlying merits of discovery, even after the court found the requisite good cause to allow discovery." *Lafferty*, 336 Conn. at 376. Based on this pattern of "obfuscation and delay," including on the discovery of web analytics, and other litigation misconduct, this Court imposed sanctions. *Id.* Those sanctions were affirmed by the Supreme Court. *Id.*

Even after sanctions were affirmed, the Jones defendants did not produce in response to the Court's orders. After contacting the Jones defendants' counsel requesting compliance with the long-outstanding discovery—and receiving no response—the plaintiffs moved re-compel it yet again. Mot. to Re-Compel Compliance, Dkt. 309.00, Nov. 12, 2020. During a telephonic meet-and-confer three days later, the Jones defendants took the position that they had no obligation to comply with existing discovery. Aff. of Meet & Confer ¶ 15, Dkt. 313.00, Nov. 18, 2020. The next day, the Jones defendants noticed removal for the second time in this case. Not. of Removal, Dkt. 312.00, Nov. 16, 2020.

The federal district court rejected that removal and remanded the case to this Court again on March 5, 2021. Remand, Dkt. 316.00, Mar. 5, 2021. The case was returned to this Court for the third time. The Jones defendants had been under court order to produce sales, marketing, and web-analytics data for more than two years. Rather than do so, they argued that this Court's sanctions

EXHIBIT 29

order—which had been based in large part on their refusal to produce exactly these still-outstanding materials—"necessarily terminated" their production obligations. Defs.' Mem. in Opp. to Mot. 1–2, Dkt. 332.00, May 5, 2021. They also argued, yet again, that the original discovery ordered by this Court was "excessive." *Id.* at 2. On May 14, 2021, the Court rejected their arguments, finding that "[t]he obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished." Order, Dkt. 339.10. Finally, it ordered set a "final" deadline of June 28, 2021 for production of the "already overdue supplemental compliance," including Google and any other web analytics. Dkt. 348.10. It expressly warned the Jones defendants that their failure to produce the analytics by the final deadline of June 28, 2021 "may result in sanctions including but not limited to a default." *Id.*

**B.   The Jones Defendants' Continued Refusal to Provide Court-Ordered Information**

**1.   Google Analytics**

June 28 was a Monday. On the Thursday afternoon before production was due, counsel for the Jones defendants sent the plaintiffs's counsel a letter representing that the Google Analytics data "cannot be produced as an export," and therefore could not be provided. Ex. B, Letter from Jay Wolman to Christopher Mattei, *et al*., June 24, 2021. Instead, for the first time,[1] the Jones defendants proposed a "sandbox approach," where the plaintiffs would be allowed to access the Jones defendants' Google Analytics accounts and "inspect the dataset" for a limited period of time under the supervision of the Jones defendants. *Id.* The plaintiffs rejected this proposal, noting that they disagreed with the representation that the Analytics "cannot be produced" and that this

---

[1] Although Attorney Wolman's letter represents that he made this proposal at the June 2, 2021 hearing, the transcript of that hearing does not appear to have any reference to it. 6/2/21 Hrg. Tr. Plaintiffs' counsel have no memory of it being mentioned in a prior telephone conversation.

**EXHIBIT 29**

position was "not consistent with the information [the Jones defendants] provided to the Court." Ex. C, Letter from Christopher Mattei, *et al.*, to Jay Wolman, June 25, 2021.

The Jones defendants' counsel responded that "there is no inconsistency," and that "to export the raw data, one must be an Analytics 360 member, i.e. a premium member." Ex. D, Letter from Jay Wolman to Chris Mattei, June 25, 2021. "Free Speech Systems is not an Analytics 360 member," they continued. "[T]herefore it is impossible for it to export the data." *Id.* Defense counsel reiterated his position that, to obtain the discovery, the plaintiffs should pay $150,000 for the Jones defendants to obtain a premium Google Analytics membership. *Id.* In a meet-and-confer telephone call on July 13, 2021, counsel for the Jones defendants reaffirmed this statement. Pls.' Meet & Confer Aff. ¶ 10, Dkt. 426.00, July 26, 2021. He was asked: "So you're telling me that what data you do have access to through their Google Analytics platform, they cannot download or export?" *Id.* He responded: "Yes. Google does not allow it for non-Analytics 360 members, [the Jones defendants] do not have a 360 membership, ergo, it cannot be produced." *Id.*

### 2. Social Media Analytics

In addition to the analytics discussed above, the Court's order of January 10, 2019 ordered the production of:

> All communications and/or documents concerning marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast, either to, from, or concerning:
>
> a. Alphabet Inc., or any subsidiary or property thereof
> b. Facebook, Inc., or any subsidiary or property thereof
> c. Twitter, Inc., or any subsidiary or property thereof
> d. Oath Inc., or any subsidiary or property thereof
> e. Snap Inc., or any subsidiary or property thereof
> f. Apple Inc., or any subsidiary or property thereof

Defs.' Obj. ¶ 17, Dkt. 146.00; Dkt. 148.00. By including subsidiaries, this Request included

**EXHIBIT 29**

documents and communications concerning not only named social-media platforms like Facebook and Twitter, but also Instagram (owned by Facebook), Google (owned by Alphabet), and YouTube (owned by Alphabet).

The Jones defendants never produced any discovery materials regarding their social media data or analytics. The defendants responded to the plaintiffs' interrogatories regarding social media analytics by stating, "All responsive documents have been provided to plaintiff's counsel." Dkt. 218.00–222.00. During a subsequent hearing, the Jones defendants were asked explicitly about marketing and analytics, and responded, "[W]e have provided everything." Ex. E, 5/7/19 Hrg. Tr. 14:26–15:15.

After the sanctions against them were affirmed and the case returned to this Court, the Jones defendants still produced no such documents. ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████

A month later, ██████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

6

EXHIBIT 29

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████    To this date, the plaintiffs have not received these reports through formal discovery.

## II.   LEGAL STANDARD

Practice Book § 13-14 authorizes the Court to impose sanctions for a party's failure to comply with discovery orders. Pract. Book § 13-14(a). Section 13-14(b) sets forth a non-exhaustive list of potential penalties, including entry of non-suit, the award of fees associated with enforcement of court orders, evidentiary restrictions, etc.  The Court also has inherent power to order sanctions. *Evans v. Gen. Motors Corp.*, 277 Conn. 496, 522–24 (2006); *Millbrook Owners Ass'n, Inc. v. Hamilton Standard*, 257 Conn. 1, 14 (2001).

"[A] court may, either under its inherent power to impose sanctions in order to compel observance of its rules and orders, or under the provisions of [Practice Book] § 13–14, impose sanctions[.]" *Evans*, 277 Conn. at 522-24 (quoting *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 14). The decision "to enter sanctions . . . and, if so, what sanction or sanctions to impose, is a matter within the sound discretion of the trial court." *Evans*, 277 Conn. at 522-24. "[T]he court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court[.]" *Id.* (quoting *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 14). "The design of the rules of practice is both to facilitate business and to advance justice[.]" *Id.* (quoting same).

The standard for imposing and reviewing sanctions for violation of discovery orders requires that (1) "the order to be complied with must be reasonably clear"; (2) "the record must

establish that the order was in fact violated"; and (3) "the sanction imposed must be proportional to the violation." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18; *Giblen v. Ghogawala*, 111 Conn. App. 493, 497–98 (2008). "In determining the proportionality of a sanction to a violation, we have in the past considered the severity of the sanction imposed and the materiality of the evidence sought . . . whether the violation was inadvertent or wilful . . . and whether the absence of the sanction would result in prejudice to the party seeking the sanction." *Giblen*, 111 Conn. App. at 497–98 (quoting *Forster v. Gianopoulos,* 105 Conn. App. 702, 711 (2008)).

## III.   ARGUMENT

This Court issued multiple applicable orders that were "reasonably clear." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. The record establishes "that the order[s] [were] in fact violated." *Id.* The Jones defendants' noncompliance is prejudicial to the plaintiffs: the relevant discovery is highly material, and the Jones defendants' refusal to produce it has compromised the plaintiffs' ability to use it in the discovery process. This Court warned the Jones defendants that "[f]ailure to comply with this order may result in sanctions including but not limited to a default." Order, Dkt. 348.10. Default is the appropriate sanction.

### A.   The Court's Orders Were Crystal Clear

In order for sanctions to issue, "the order to be complied with must be reasonably clear." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. The orders at issue at issue here were crystal. In its original order two and a half years ago, the Court ordered the Jones defendants to produce materials responsive to the plaintiffs' Requests for Production Nos. 15, 16, and 17, which covered marketing, sales, and web-analytics data. Dkt. 148.00. Request for Production No. 15 asked for "[a]ll marketing data, web analytics, sales analytics, and/or other web traffic data concerning you, Infowars, and/or any website, social-media, or other internet-based profile that you or the Jones

8

**EXHIBIT 29**

Defendants own and/or control." Pls.' First Spec. Req. for Prod'n ¶ 15. Request for Production No. 16 demanded "[a]ll marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast." *Id.* ¶ 16. Request for Production No. 17 requested "[a]ll communications and/or documents concerning marketing data or analytics concerning you, Infowars, or the other Jones Defendants, and/or any other medium, including radio, on which you or the Jones Defendants broadcast, either to, from, or concerning" all the major social media platforms. Pls.' First Spec. Req. for Prod'n ¶ 17. The Jones defendants' production obligations regarding social media and web analytics were clear.

On June 16, 2021, this Court sanctioned the defendants in part because of their repeated failure to produce Google Analytics. *Lafferty*, 336 Conn. at 376. In May, after the case's return to Connecticut Superior Court, this Court rejected their arguments against production and of analytics and held "[t]he obligation of the defendants to fully and fairly comply with the discovery requests at issue was not extinguished." Dkt. 339.10. In another follow-on order, the Court set a "final" deadline for production of the "already overdue supplemental compliance," including Google and any other web analytics, for June 28, 2021. Dkt. 348.10. It noted that it "decline[d] the Jones defendants' invitation to address, again, the scope of appropriate discovery" and that "the outstanding discovery responses were due over two years ago." *Id.* This order expressly warned the Jones defendants that their failure to produce the analytics by the final deadline of June 28, 2021 "may result in sanctions including but not limited to a default." *Id.*

9

### A. The Jones Defendants Violated the Court's Orders

Another requirement for sanctions is that "the record must establish that the order was in fact violated." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. There is no question that the Court's orders were violated here.

### 1. The Jones Defendants Violated the Court's Orders to Produce Google Analytics Data

The Jones defendants did not produce the Google Analytics data by June 28, 2021. They still have not produced it. This is an unexcused violation of the Court's order, and it requires the imposition of sanctions.

### 2. The Jones Defendants Continued Their Pattern of Obfuscation and Delay with this Violation

The Jones defendants did not produce the Google Analytics data as ordered. As the Court has repeatedly said, a court-set deadline must be complied with, or a motion directed to that deadline needs to be filed and adjudicated before the deadline passes. The Jones defendants chose not to file that motion. Rather, they again chose unexcused disobedience of a Court order, forcing the plaintiffs to bring the violation to the Court's attention.

To excuse their noncompliance, moreover, the Jones defendants chose to rely on the notion that production would be very costly, an argument that the Court had already rejected. In support of their excuse, the Jones defendants made inaccurate and incomplete representations concerning the capabilities of their Google Analytics account. This began in argument before the Court on June 2, 2021. During that argument, the Jones defendants represented that utilizing the Google Analytics "export method" required "a premier membership" that "would cost at least $150,000." Ex. H, 6/2/21 Hrg. Tr. 15:10–16. (They maintained "this cost should be borne by [the plaintiffs]." *Id.* at 17:16–17.) They then argued that the data should not be produced at all, contending that "the

10

**EXHIBIT 29**

amount of labor . . . required is not proportionate to the needs of the case." *Id.* at 17:19–18:6. This Court rejected these arguments and ordered the Jones defendants to produce the data by June 28, 2021. Order, Dkt. 348.10, June 2, 2021 (noting that it "decline[d] the Jones defendants' invitation to address, again, the scope of appropriate discovery" and that "the outstanding discovery responses were due over two years ago").

Ignoring the fact that the Court had already rejected the argument, the Jones defendants raised this excuse again in their June 25 letter to counsel: "to export the raw data, one must be an Analytics 360 member, i.e. a premium member." Wolman Letter, June 25, 2021. "Free Speech Systems is not an Analytics 360 member," they continued. "[T]herefore it is impossible for it to export the data." *Id.* Free Speech Systems repeated this statement in its Notice of Compliance. It further represented that "Free Speech Systems does not possess, have custody, or control the Google Analytics dataset in a manner that would permit export." Dkt. 377.00 at 2, June 28, 2021.

These representations were inaccurate and misleading. The plaintiffs retained a Google Analytics expert to assess what export capabilities an ordinary Google Analytics account has, and submit his affidavit in support of this Motion. "Like all Google Analytics users, the users of the Infowars.com Google Analytics account have access to the Export function." Ex. I, Affidavit of Jordan Campbell ¶ 9. Indeed, the "EXPORT button is clearly visible on" the very screenshots the Jones defendants provided as an exhibit to their motion for a protective order on May 30, 2021. *Id.* This export function allows the user to export the Google Analytics data in 4 different formats: PDF, Google Sheets, XLSX and CSV." *Id.* ¶ 8. "Exporting in those formats keeps the data organized and allows it to be manipulated by the recipient, as the original user could do." *Id*. Using an expert protocol, the data ordered by the Court could be exported using this basic EXPORT

function.[2] *Id.* ¶ 10. The Jones defendants' claim that an expensive Google 360 membership is required to comply with the Court's order is inaccurate and misleading: "[I]t is not true that 'to export the dataset, one must be a Google Analytics 360 user.'" *Id.* ¶ 11.

Relying on the Analytics 360 excuse, the Jones defendants refused to produce the required Google Analytics data. Instead, they proposed a "sandbox approach" four days before the deadline. Wolman Letter, June 24, 2021. As the Jones defendants' letter itself admitted, this was not production, but an offer of inspection. *Id.* (noting proposal would allow the plaintiffs to "inspect the data set"). This approach, moreover, "would allow the Jones defendants to observe, surveil, and/or record all the plaintiffs' actions within the Google Analytics account, including any searches or other analysis that the plaintiffs or their experts might perform on the data while they had access to it." Campbell Aff. ¶ 16; Defs.' Notice of Compliance 2 n.3, Dkt. 377.00 (noting that the approach "would necessarily require supervision by Free Speech Systems"). This would be a clear invasion of the work-product doctrine. *See Barksdale v. Harris*, 30 Conn. App. 754, 760 (1993) ("The work product doctrine protects an attorney's . . . 'mental impressions, personal beliefs and countless other tangible and intangible [items].'" (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947))); Conn. Practice Book § 13-3 (codifying work-product privilege).[3]

---

[2] Exporting this data in this manner would require neither technical expertise nor an inordinate amount of labor. "[U]sing the free export function described above, a user of the relevant account could easily export complete, accurate and readily useable data as Excel (xlsx) files." Campbell Aff. ¶ 10. "[E]xporting the data would take a computer literate user following a simple protocol under a week to complete the exports and possibly would require even less time." *Id.* (noting that "a computer literate user" means "someone with simple data entry skills"). "The development of an appropriate export approach" would take "approximately 30 minutes." *Id.* Implementation of such a "step-by-step protocol . . . would be a simple process." *Id.*

[3] When plaintiffs' counsel raised these defects during the parties' meet-and-confer call of July 13, 2021, the Jones defendants acknowledged them but argued they were immaterial to it being sufficient production. Aff. of Attempt to Resolve Discovery Objection ¶ 9, Dkt. 426.00, July 26, 2021.

12

**EXHIBIT 29**

### 3. The Jones Defendants Violated the Court's Orders Regarding Social Media Data and Analytics

Likewise, for roughly two and a half years, the Jones defendants were under a court order to produce all available analytics for social media accounts under their control. They produced none. Meanwhile, they repeatedly represented that they had made all responsive production. *See* Dkt. 218.00-222.00. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

They still have not been formally produced in discovery. Even if they were, there is no indication that they would constitute complete production under the relevant requests for production. The Jones defendants violated the Court's order in failing to produce these documents for two and a half years—and potentially continuing to improperly withhold others.

### 4. Given the History of the Jones Defendants' Conduct, Default is the Only Appropriate Sanction

"[T]he sanction imposed must be proportional to the violation." *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 17–18. Default and dismissal are the severest sanctions.[4] In general, Connecticut "practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure." *Millbrook Owners Ass'n, Inc. v. Hamilton Standard*, 257 Conn. 1, 16 (2001). But "'where a party [has] show[n] a deliberate, contumacious or unwarranted disregard for the court's authority,'" dismissal or default "of the entire case may constitute an appropriate sanction." *MacCalla v. Am.*

---

[4] There exist more Connecticut cases addressing sanctions of dismissal than default. However, our courts seem to deal with them interchangeably. There is no indication that a sanction of default must meet a test different from that for one of dismissal. For this reason, while this Motion emphasizes default cases, it refers at times to dismissal cases as well.

*Med. Response of Connecticut, Inc.*, 188 Conn. App. 228, 239 (2019) (quoting *Emerick v. Glastonbury*, 177 Conn. App. 701, 736 (2017) and affirming sanction of dismissal for attorney's improper behavior in deposition). Under such circumstances, the ultimate sanction "serves not only to penalize those whose conduct warrants such a sanction but also to deter those who might be tempted to such conduct in the absence of such deterrent." *Pavlinko v. Yale-New Haven Hosp.*, 192 Conn. 138, 145 (1984) (citation omitted).

In determining the proportionality of a sanction of default, Connecticut courts have "considered the severity of the sanction imposed and the materiality of the evidence sought . . . whether the violation was inadvertent or wilful . . . and whether the absence of the sanction would result in prejudice to the party seeking the sanction." *Forster v. Gianopoulos*, 105 Conn. App. 702, 711 (2008) (internal citations omitted); *Spatta v. American Classic Cars, LLC*, 150 Conn. App. 20, 27 (2014) (noting the "trial court may consider not only the presence of mistake, accident, inadvertence, misfortune or other reasonable cause . . . factors such as [t]he seriousness of the default, its duration, the reasons for it and the degree of contumacy involved . . . but also, the totality of the circumstances, including whether the delay has caused prejudice to the nondefaulting party").

First, after two and a half years, multiple court orders, a litigation sanction confirmed by our Supreme Court, and express warning that "[f]ailure to comply with this order may result in sanctions including but not limited to a default," Order, Dkt. 348.10, there can be no doubt that the Jones defendants' failure to comply is "deliberate" and "contumacious." *MacCalla*, 188 Conn. App. at 239; *Spatta*, 150 Conn. App. at 27.

Moreover, the materials sought here are significant to important aspects of the plaintiffs' case, and their deprivation is prejudicial. The plaintiffs' complaint alleges that "Jones has

14

**EXHIBIT 29**

deliberately employed [] false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." Sherlach Compl. ¶ 11. It alleged that "the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money . . . not because they are eager to educate or even to entertain their audience." *Id.* ¶ 103. It alleged that "[t]he false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience." *Id.* ¶ 98. These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims. *Id.* ¶¶ 465–474 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy"). Web-analytics and social media data for the Jones defendants' websites and social media profiles is potentially key for demonstrating these points.

Additionally, the Jones defendants' motivations for their actions are highly relevant not only for assessing what punitive damages are appropriate, but also in evaluating the intentionality of their actions, and/or whether their broadcasts were done with actual malice. Web and social analytics are relevant and could be material to these claims. Courts have held that "pressure to produce sensationalistic or high-impact stories *with little or no regard for their accuracy* would be probative of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 796-97 (D.C. Cir. 1987) (*en banc*) (emphasis in original). Likewise, "evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful

15

evidence." *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005). The Jones defendants' analytics are therefore potentially highly relevant to proving how these claims are borne out in the Jones defendants' business practices.

Moreover, the Jones defendants themselves have taken the position that the Google Analytics data is highly material. They claimed that their "records show that, at most, they made $342.55 from article and page referrals that contained the term 'Sandy Hook' out of a total of $10.6 million in overall sales generated from site traffic." Defs.' Emerg. Mot. 3, Dkt. 348.00. They argued that that amount contradicted "*the whole theory of the case*," which according to them, "is that [the Jones defendants] are *somehow motivated to do Sandy Hook stories to get money*." 6/2/21 Hrg. Tr. 17:19–18:6 (emphasis added). They "want[ed] to highlight" the data because, according to them, it "[s]eems like this is a loser of a story in terms of moneymaking." *Id.* In doing so, they were asking the Court simply to take their word that the data does not bear out the plaintiffs' "whole theory of the case"—and decide no one needs to see it at all. Whatever the illogic of this argument, it acknowledges that the data is highly material.[5]

This was not the first time the Jones defendants had argued this information is material. On June 12, 2019, the Jones defendants broadcast an episode of the Alex Jones Show entitled "GOOGLE'S ANALYTICS PROVE INFOWARS HAS NO SANDY HOOK MARKETING: Specialist destroys MSM agenda." Ex. J, Alex Jones Show, *Google's Analytics Prove Infowars Has No Sandy Hook Marketing*, Infowars.com (June 12, 2019). In it, FSS IT manager Michael Zimmerman joined Jones "to show and prove how, contrary to Democrat attorneys and judges,

---

[5] Notably, for these representations to be true, the Jones defendants must have enabled the e-commerce function of Google Analytics back in 2012, and they must have "very significant" e-commerce data that they have failed to provide the plaintiffs. Campbell Aff. ¶ 15. If they did not have this function enabled—and they do not have that data—then their representation cannot establish what it purports to establish, *id.*, and is misleading.

16

Infowars has no alleged 'Sandy Hook marketing' and makes no money from Sandy Hook video views, which happen to be less than 1% of all views." *Id.*

Lastly, the refusal to produce this information is prejudicial because it materially impedes discovery. The plaintiffs should have received this information years ago. They should have been able to depose the Jones defendants' ███████████ ████████ regarding the performance of their social media. They should have been able to plan their approach to discovery based on a thorough analysis of both the withheld Google Analytics data and the late-produced and partial social media analytics.

For all these reasons, the Jones defendants' refusal to produce this information is highly prejudicial.

## IV.   CONCLUSION

For all the foregoing reasons, the plaintiffs' motion should be granted. The plaintiffs ask that the Court find as follows:

1. The Google Analytics data was not produced;

2. The non-production was deliberate and unexcused;

3. In an order to delay or avoid production, the Jones defendants presented misleading, inaccurate and incomplete information concerning the capabilities of their Google Analytics account;

4. The noncompliance is highly prejudicial;

5. The late and only partial production of social media analytics is also unexcused and prejudicial.

17

**EXHIBIT 29**

The plaintiffs request that the Court consider this conduct in combination with the additional sanctionable conduct committed by the Jones defendants to date in determining that the only proportional sanction is default.

THE PLAINTIFFS,

By:    */s/ Christopher M. Mattei*
        CHRISTOPHER M. MATTEI
        ALINOR C. STERLING
        MATTHEW S. BLUMENTHAL
        KOSKOFF KOSKOFF & BIEDER
        350 FAIRFIELD AVENUE
        BRIDGEPORT, CT  06604
        asterling@koskoff.com
        cmattei@koskoff.com
        mblumenthal@koskoff.com
        Telephone:    (203) 336-4421
        Fax:        (203) 368-3244
        JURIS #32250

18

A242

**EXHIBIT 29**

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been emailed and/or mailed, this day, postage prepaid, to all counsel and *pro se* appearances as follows:

***For Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC:***
Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103
jmw@randazza.com
P: 702-420-2001

Norman A. Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT  06511
P:  203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

***For Genesis Communications Network, Inc.***
Mario Kenneth Cerame, Esq. (and via USPS)
Brignole & Bush LLC
73 Wadsworth Street
Hartford, CT  06106
mario@brignole.com
mcerame@brignole.com
P: 860-527-9973

/s/ Christopher M. Mattei
CHRISTOPHER M. MATTEI
ALINOR C. STERLING
MATTHEW S. BLUMENTHAL

19

**EXHIBIT 29**

48

are, he does not then have a basis to say, and then you've done this, and this and this in gun activism, because there's no basis for the jury at this point to say, he must be biased against Mr. Jones because of his gun views, when the testimony is I don't know what his views are.

THE COURT:  Well that's the testimony, but there's also testimony that the witness saw the video.  So, I understand what you're saying.  Is there anything we can do to avoid this problem with each witness?

ATTY. PATTIS:  Yes.

THE COURT:  What I do want to avoid - I don't -

ATTY. PATTIS:  Let me talk to Attorney Mattei. I think Attorney Mattei and I may be closer to agreeing than you perceive.  And I don't mean - that's not a criticism of the Court.  I think it's - it's time for lunch.  But I - let me talk to Attorney Mattei.  I think I understand where he's coming from.

THE COURT:  All right.  It would be nice to work the kinks out so that we don't have to do this every time.  But the other thing is, I want to - I allowed the questions on the positions on gun control.  I don't think that we need to talk about the Second Amendment, the First - I want to steer - this is a hearing in damages.  I don't want to hear about the Second Amendment, the First Amendment.  President' 

A244

elections –

ATTY. PATTIS:  Judge, I played the video, which was the plaintiffs exhibit, which is referring to them, which is referring to Obama, which is referring to the Second Amendment.  They're stuck with the law of the case, as are you.

ATTY. MATTEI:  I assume what you're referring to is Mr. Pattis' last question, which he knew his objection, so he saved it for the last.  Where he basically said, and now you're trying to stop Alex Jones.  Which is exactly what he said in his opening.  Which is exactly what we've been warning about.

ATTY. PATTIS:  No.  It's exactly what they said in the opening.

ATTY. MATTEI:  No, I didn't.

THE COURT:  Well, I –

ATTY. PATTIS:  And after he – they said it –

THE COURT:  Listen.  The opening is not evidence.

ATTY. PATTIS:  No, but Judge –

THE COURT:  I'm not going to say it again.  Take it and put it out of your mind, and we're going – I'm going to rule on the issues in the case based on the evidence that is permissible.  So what was said during the openings that was objected to, not objected to, it doesn't matter.

ATTY. rness to Attorney Mattei  I

**EXHIBIT 29**

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046436 S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046437 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.   X06-UWY-CV-18-6046438 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

### MOTION FOR COMMISSION TO TAKE OUT OF STATE DEPOSITIONS

Pursuant to Conn. Gen. Stat. §52-148c(b) and Connecticut Practice Book §13-28(a), the plaintiffs in the above-captioned consolidated matters respectfully request that this Court grant a Commission to a competent authority, in the form attached hereto as Exhibit A., to issue or cause to issue Subpoena *Duces Tecum,* compelling the testimony and production of documents from Hillary Clinton, 15 Old House Lane, Chappaqua, New York.

EXHIBIT 29

## THE WITNESS

Hillary Clinton is a former public official and a former presidential candidate. She has been the target of vitriolic criticism by Alex Jones.

Although Mr. Jones made certain statements about Sandy Hook as early 2012, and largely stopped making claims about Sandy Hook in the years thereafter, the plaintiffs in this action waited until 2018 to bring the instant action. They are all represented by the same firm, Koskoff, Koskoff and Bieder. On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid.

It is clear as a matter of public record, that Erica Lafferty, the lead plaintiff in this case, was invited to speak at the Democratic National Convention in 2016. Ms. Lafferty was also praised thereafter by Hillary Clinton.

The defendants in this case believe that this suit was filed six years after the shootings at Sandy Hook as part of a vendetta inspired, orchestrated and directed in whole or in part by Hillary Clinton as part of a vendetta to silence Alex Jones after Ms. Clinton lost the presidential race to Donald J. Trump. The litigation is brought and pursued in bad faith as part of a partisan effort to silence Mr. Jones for reasons wholly independent of the merits of the plaintiffs' claims.

Someone directed all of the plaintiffs to the same firm many years after the shooting. The defendants are entitled to know who and why. The defendants intend to ask Ms. Clinton about her endorsement of Ms. Lafferty in 2016, the factors that led Ms. Lafferty to be invited to speak at the Democratic National Convention, and what role, if

**EXHIBIT 29**

any, Ms. Clinton or those working under her direction had in directing the plaintiffs to the same firm in this case. Ms. Lafferty is clearly a public figure in this case, and has inserted herself on to a public stage in order to advance her vision of what "gun safety" requires. The defendants seek to depose Ms. Clinton to gather further information about how it is that so many plaintiffs found themselves represented by the same firm so long after the events giving rise to the complaint, but shortly after Ms. Clinton suffered a deeply humiliating defeat in her run for the presidency in 2016.

THE DEFENDANTS
FREE SPEECH SYTSEMS, LLC
INFORWARS HEALTH LLC
PRISON PLANET TV LLC

BY: /s/ NORMAN A. PATTIS /s/
PATTIS & SMITH, LLC
Juris NO. 423934
383 Orange Street, First Floor
New Haven, CT 06511
V: 203-393-3017
F: 203-393-9745
npattis@pattisandsmith.com

**CERTIFICATION**

This is to certify and a copy of the foregoing has been emailed and/or mailed, this 1st day of July 2021

Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT  06103
jmw@randazza.com

**EXHIBIT 29**

Brignole & Bush, LLC
73 Wadsworth Street
Hartford, CT  06106
Genesis Communications Network, Inc.
 Fax: 860-527-5929

Koskoff Koskoff & Bieder, PC
330 Fairfield Ave.
Bridgeport, CT  06604
asterling@koskoff.com
cmattei@koskoff.com

/s/Norman A. Pattis /s/

A249

**EXHIBIT 29**

A250

# EXHIBIT A

A250

**EXHIBIT 29**

| | | |
|---|---|---|
| NO.  X06-UWY-CV-18-6046436 S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.  X06-UWY-CV-18-6046437 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

| | | |
|---|---|---|
| NO.  X06-UWY-CV-18-6046438 S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL | : | July 1, 2021 |

## ORDER OF COMMISSION

The matter comes before the Court on the motion of the defendants in the above-captioned consolidated matters for leave or judicial authority and an issuance of an Order for Commission pursuant to the Connecticut Practice Book §13-28(a) for the taking of the deposition of Wolfgang Halbig.

IT IS HEREBY ORDERED, that the motion for issuance of an Order for Commission be allowed and is hereby granted: and, it is further ordered that any appropriate authority in the State of New York is authorized to issue a subpoena required to compel the attendance of the witness for the taking of said deposition and to produce requested documents:

**EXHIBIT 29**

Dated: this ____ day of July, 2021, at Waterbury, Connecticut


_____
Hon. Barbara N. Bellis
Connecticut Superior Court

A252

**EXHIBIT 29**

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
  V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

8/4/2021

<u>ORDER</u>

ORDER REGARDING:
07/01/2021 385.00 MOTION FOR COMMISSION FOR DEPOSITION

The foregoing, having been considered by the Court, is hereby:

ORDER: DENIED

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

UWYCV186046436S   8/4/2021

Page 1 of 1

A253