**EXHIBIT 43**

# Index of PFC Cases

| Ex # | | Page |
|---|---|---|
| 1 | *Gleason v. Smolinski*, 319 Conn. 394, 396, 125 A.3d 920, 927 (2015) | 1 |
| 2 | *Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76, 106 S. Ct. 1558, 1563 (1986). | 45 |
| 3 | *Lynch v. Granby Holdings,* 230 Conn. 95, 99, 644 A.2d 325 (1994) | 58 |
| 4 | *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 3, (1990) | 61 |
| 5 | *Holbrook v. Casazza,* 204 Conn. 336, 358, 528 A.2d 774, 785 (1987) | 80 |
| 6 | *Gertz v. Robert Welch,* 418 U.S. 323, 342 (1974) | 92 |
| 7 | *Rosenbloom v. Metromedia*, 403 U.S. 29, 30 (1971) | 129 |
| 8 | *Cweklinsky v. Mobil Chem. Co.,* 837 A.2d 759, 763–64 (Conn. 2004) | 156 |
| 9 | *Berisha v. Lawson,* 141 S. Ct. 2424, 2424 (2021) | 165 |
| 10 | *New York Times v. Sullivan,* 376 U.S. 254, 271 (1964). | 171 |
| 11 | *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) | 196 |
| 12 | *Bose Corp. v Consumers Union,* 466 U.S. 485 (1984) | 214 |
| 13 | *Time, Inc. v. Firestone,* 424 U.S. 448, 463 (1976) | 233 |

**EXHIBIT 43**

| | | |
|---|---|---|
| 14 | *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) | 255 |
| 15 | *Netscout Sys. v. Gartner, Inc.*, 334 Conn. 396, 412, 223 A.3d 37, 48 (2020) | 279 |
| 16 | *De Blasio v. Aetna Life & Cas. Co.,* 186 Conn. 398, 401, 441 A.2d 838, 839 (1982) | 295 |
| 17 | *McKesson v. Doe*, 144 S. Ct. 913, 914 (2024) | 299 |
| 18 | *NAACP v. Claiborne Hardware Co.,* 458 U. S. 886 (1982)) | 301 |
| 19 | *Nunes v. Lizza,* 2023 U.S. Dist. LEXIS 71719, at *107 (N.D. Iowa 2023) | 330 |
| 20 | *Chugh v. Kalra,* 342 Conn. 815, 850-51, 271 A.3d 993, 1012-13 (2022) | 378 |
| 21 | *Haynes v. Yale-New Haven Hospital,* 243 Conn. 17, 22 n.6, 699 A.2d 964 (1997) | 395 |
| 22 | *Erickson Prods. v. Kast*, 921 F.3d 822, 833 (9th Cir. 2019) | 416 |
| 23 | *Harte-Hanks Commc'ns v. Connaughton,* 491 U.S. 657 (1989) | 427 |

**EXHIBIT 43**

<span style="color:red">EXHIBIT 1</span>

Gleason v. Smolinski, 319 Conn. 394

# *Gleason v. Smolinski*

Supreme Court of Connecticut

April 27, 2015, Argued; November 3, 2015, Officially Released

SC 19342

**Reporter**

319 Conn. 394 *; 125 A.3d 920 **; 2015 Conn. LEXIS 341 ***

MADELEINE GLEASON ET AL. v. JANICE SMOLINSKI ET AL.

**Prior History:** [***1] Action to recover damages for, inter alia, intentional infliction of emotional distress, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the court, Wilson, J., granted the defendant John Murray's motion to strike the counts of the complaint against him; thereafter, the court granted the defendant John Murray's motion for summary judgment and rendered judgment thereon in his favor; subsequently, the plaintiff B and B Transportation, Inc., withdrew its claims against the named defendant et al.; thereafter, the matter was tried to the court, Hon. Thomas J. Corradino, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment in part for the named plaintiff, from which the named defendant et al. appealed to the Appellate Court, Alvord, Bear and Sheldon, Js., which affirmed the trial court's judgment, and the named defendant et al., on the granting of certification, appealed to this court.

*Gleason v. Smolinski, 149 Conn. App. 283, 88 A.3d 589, 2014 Conn. App. LEXIS 148 (2014)*

**Disposition:** Reversed; new trial.

## Case Summary

**Overview**

HOLDINGS: [1]-Where plaintiff sued defendants, who had accused her of involvement in her ex-boyfriend's disappearance, for defamation and IIED, the intermediate appellate court erred in rejecting their unpreserved claim that the First Amendment barred the IIED claim to the extent it was based on their protected conduct in putting up missing person posters; even though their purpose was to hound plaintiff into explaining the disappearance, their conduct pertained to a matter of legitimate public concern and they thus established a constitutional violation under State v. Golding; [2]-With respect to the defamation claim, as defendants' statements related to a matter of public concern, the trial court had been required to determine whether plaintiff met her burden to prove the statements were demonstrably false; as it failed to analyze this issue, defendants were entitled to a new trial.

**Outcome**

The judgment of the intermediate appellate court was reversed and the case was remanded for a new trial on both claims.

## Syllabus

The plaintiff G sought to recover damages from the defendants S and P for intentional infliction of emotional distress and defamation in connection with certain conduct related to the disappearance of B. G [***2] and B had met while working as school bus drivers for the same employer and later began dating. Shortly after that relationship ended, B

<span style="color:red">1</span>

**EXHIBIT 43** EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

disappeared. G claimed that the defendants had intentionally inflicted emotional distress by posting copious numbers of missing person flyers in areas where she lived and worked. G further claimed that the defendants had stated to her friends and acquaintances that she was either a murderer or involved in a murder. Following a court trial, the trial court rendered judgment in favor of G and awarded punitive damages, finding that the defendants' conduct constituted intentional infliction of emotional distress and that their statements were defamatory. The defendants subsequently appealed to the Appellate Court claiming, inter alia, that G's intentional infliction of emotional distress claim was barred by the *first amendment to the United States constitution* and that G had failed to introduce sufficient evidence to support the defamation claim. With regard to the defendants' first claim, the Appellate Court concluded that it was unpreserved and the defendants could not establish the existence of a constitutional violation in order to prevail on the claim because the context and placement of the posters **[\*\*\*3]** was designed to harass G, rather than raise a matter of public concern. With regard to the defendants' second claim, the Appellate Court concluded that the trial court's findings of defamation and actual malice were not clearly erroneous. Accordingly, the Appellate Court rendered judgment affirming the trial court's judgment and the defendants, on the granting of certification, appealed to this court. *Held*:

1. The Appellate Court improperly concluded that the *first amendment* did not bar G's claim of intentional infliction of emotional distress on the basis of the defendants' placement of missing person posters: a substantial portion of the defendants conduct was protected by the *first amendment*, the content and location of the posters having been consistent with the overarching public concern of gaining information about B's disappearance by persuading G to be forthcoming with information; although this court could not direct judgment as a matter of law for the defendants on that claim because, in addition to the posters, the defendants had engaged in other confrontational and harassing behavior toward G that could furnish an independent basis for a judgment in her favor, the defendants were entitled to a new trial **[\*\*\*4]** at which the evidence could be considered in light of the governing *first amendment* principles because G did not establish that the constitutional violation was harmless beyond a reasonable doubt.

2. The Appellate Court improperly affirmed the trial court's conclusion that the defendants had committed the tort of defamation: although a trial court's factual findings are reviewed for clear error, appellate courts are required to engage in an independent review of trial court determinations that carry constitutional significance, and, therefore, the Appellate Court here incorrectly applied the clearly erroneous standard of review without tailoring it to the specific trial court determinations at issue such as whether those facts found constituted clear and convincing evidence of actual malice justifying an award of punitive damages; furthermore, the trial court's failure to conduct an analysis of whether the various statements made by the defendants were false required a new trial on G's claim of defamation, this court having concluded that the *first amendment* requires private figure plaintiffs, like G, to bear the burden of proving the falsity of allegedly defamatory statements when, as here, they relate to a matter **[\*\*\*5]** of public concern.

**Counsel:** Steven J. Kelly, pro hac vice, with whom were Christopher P. DeMarco and, on the brief, Anne T. McKenna, pro hac vice, for the appellants (named defendant et al.).

John R. Williams, for the appellee (named plaintiff).

**Judges:** Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js. ROBINSON, J. In this opinion ROGERS, C. J., and PALMER, McDONALD and ESPINOSA, Js., concurred. EVELEIGH, J., with whom ZARELLA, J., joins, dissenting.

**Opinion by:** ROBINSON

# Opinion

EXHIBIT 43 EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

 **[\*\*927]** **[\*396]**   ROBINSON, J. On August 24, 2004, thirty-one year old William Smolinski, Jr. (Bill),[1] disappeared from his home in the city of Waterbury, never to be seen or heard from again. Firmly convinced that the plaintiff Madeleine Gleason,[2] who was Bill's former girlfriend and a fellow school bus driver, either caused or knew more about Bill's disappearance than she would say, and having noticed that the plaintiff and a friend, Fran **[\*397]**  Vrabel, were removing certain missing person flyers, the defendants, Janice Smolinski and Paula Bell,[3] Bill's mother and sister respectively, began to pressure the plaintiff into cooperating with the ongoing investigation. The defendants' tactics included, among other things, saying disparaging things **[\*\*\*6]**  to the plaintiff's friends and acquaintances on several occasions and posting copious numbers of missing person flyers depicting Bill along the plaintiff's school bus route and near her home. These tactics led the plaintiff to bring the civil action that gave rise to this appeal against the defendants, claiming, inter alia, defamation and intentional infliction of emotional distress.

The defendants now appeal, upon our grant of their petition for certification,[4]  **[\*\*928]**  from the judgment of the Appellate Court affirming the trial court's judgment awarding the plaintiff compensatory and punitive damages on her claims of intentional infliction of emotional distress and defamation. *Gleason v. Smolinski, 149 Conn. App. 283, 285-86, 88 A.3d 589 (2014)*. The defendants'  **[\*398]**  first claim on appeal, which relies on, inter alia, *Snyder v. Phelps, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)*, is that the plaintiff's claim of intentional infliction of emotional distress is barred because it arises from speech protected by the *first amendment to the United States constitution*,[5]

---

[1] We note that, although William Smolinski, Jr., was known to his family and friends as Billy; see *Gleason v. Smolinski, 149 Conn. App. 283, 286-87, 88 A.3d 589 (2014)*; both the trial court and the Appellate Court referred to him as Bill. For the sake of consistency with those opinions, we refer to William Smolinski, Jr., as Bill.

[2] We note that B and B Transportation, Inc., was also a plaintiff in the underlying action but subsequently withdrew its claims against the defendants. See *Gleason v. Smolinski, 149 Conn. App. 283, 286 n.2, 88 A.3d 589 (2014)*. For the sake of simplicity, we refer to Gleason as the plaintiff.

[3] As noted by the Appellate Court, the "plaintiff . . . also [filed claims against] John Murray, the owner, publisher and editor of a monthly newspaper, the Waterbury Observer, for invasion of privacy and intentional infliction of emotional distress. Murray filed a motion to strike the claims against him, which the court granted on **[\*\*\*7]**  July 20, 2009. He then moved for summary judgment because all of the counts directed at him had been stricken by the court. The court granted Murray's motion for summary judgment on January 12, 2010. Thus, none of the claims [on] appeal pertain to Murray." (Citation omitted.) *Gleason v. Smolinski, 149 Conn. App. 283, 285 n.1, 88 A.3d 589 (2014)*. For the sake of simplicity, we refer to Janice Smolinski and Bell collectively as the defendants and individually by name.

[4] We granted the defendants' petition for certification to appeal limited to the following issues: "1. Did the Appellate Court properly conclude that the defendants' . . . claim of protected speech [under the *first amendment to the United States constitution*] failed to satisfy the third prong of the test for review of unpreserved claims set forth in *State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989)*?

"2. Did the Appellate Court properly affirm the trial court's determination that the defendants were liable for defamation per se of the . . . plaintiff?" *Gleason v. Smolinski, 312 Conn. 920, 94 A.3d 1201 (2014)*.

[5] "The *first amendment to the United States constitution* provides in relevant part: 'Congress shall make no law . . . abridging the freedom of speech . . . .'

"The *first amendment* prohibition against laws abridging the freedom of speech is made applicable to the states through the *due process clause of the fourteenth amendment to the United States constitution*." *State v. Moulton, 310 Conn. 337, 341 n.3, 78 A.3d 55 (2013)*.

In a footnote, the defendants raise a separate claim **[\*\*\*9]**  under *article first, § 4, of the Connecticut constitution*, arguing that "the state constitutional protection for free speech should be no less protective of the defendants' speech." Because the defendants' state constitutional claim is perfunctorily briefed without an independent analysis consistent with *State v. Geisler, 222 Conn. 672,*

EXHIBIT 43 EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

namely, the act of posting missing person flyers on public roadways. The defendants then claim that the Appellate Court improperly upheld the trial court's determination that they had committed the tort of defamation because, inter alia: (1) the Appellate Court applied an improperly deferential standard [***8] of review; (2) their allegedly defamatory statements were protected opinion; and (3) the plaintiff failed to carry the requisite burden of proof. We conclude that a new trial is required because the trial court's findings on the plaintiff's claims of defamation and intentional infliction of emotional distress did not consider, and are not consistent with, the various limitations placed on these torts by the *first amendment*. Accordingly, we reverse the judgment of the Appellate Court.

The record, including the Appellate Court's opinion and the findings set forth in the trial court's memorandum of decision, reveals the following relevant facts **[*399]** and procedural history. The plaintiff was, at all times relevant to the present case, employed by B and B Transportation, Inc., as a school bus driver. For a period of time, Bill worked at the same company. The two met there and began dating. Soon thereafter, Bill ended his relationship with the plaintiff and his employment at B and B Transportation, Inc. About one year later, Bill and the plaintiff began dating again. During a vacation together in Florida, however, they broke up because of problems in their relationship, including the fact that the plaintiff was much older than Bill, and his belief that she was cheating on him with Chris Sorensen, a local married politician.[6]

 **[**929]** Two days after returning from his trip to Florida with the plaintiff, Bill disappeared without a trace. "The trial testimony revealed that because of the plaintiff's alleged affair with Sorensen . . . the defendants formed the belief [t]hat [the plaintiff] was in a love triangle with **[*400]** [Bill] and . . . another fellow . . . and that [Bill] had gone missing, and that they . . . thought that [the plaintiff] had done something to him . . . ." (Internal quotation marks omitted.) *Gleason v. Smolinski, supra, 149 Conn. App. 287 n.3*. The day before Bill disappeared, Sorensen received a threatening message on his answering machine; both the plaintiff and Bell identified the voice as belonging to Bill.[7]

Shortly after his disappearance, the defendants and William Smolinski, Sr., Bill's father, "started putting up missing [person] posters[8] in various parts of the state. They then noticed some of the posters were being torn down or vandalized and discovered the plaintiff and [Vrabel] were engaged in this activity. The . . . defendants . . . then

---

*684-86, 610 A.2d 1225 (1992)*, we confine our analysis in this opinion to their federal claim. See, e.g., *State v. Johnson, 288 Conn. 236, 244 n.14, 951 A.2d 1257*. *288 Conn. 236, 951 A.2d 1257 (2008)*.

[6] As the Appellate Court **[***10]** noted, "[t]he plaintiff reported to Waterbury police Sergeant Edward Apicella on August 3, 2005, during the course of the police department's investigation of [Bill's] disappearance that . . . 'prior to her relationship with Bill she was having an affair with . . . Sorensen and she is currently continuing to have that affair. She said that she believed Bill suspected [or] knew of her having an affair with [Sorensen] for a time but she didn't actually tell him until she went on a trip to Florida with Bill. [The plaintiff] said that it came to [a head] when they went on a trip to Florida the week prior to August 22, 2004. She said that she was getting phone calls on her cell phone . . . while they were on a beach in Florida. Bill grabbed the cell phone from her and was trying to see who was calling her. [The plaintiff] said that when she tried to get the phone from him he hit her and they had a fight. She began to yell at people on the beach to call the police because Bill was not [returning] her cell phone. She never made a report to the police and she eventually got her phone back. Bill told her that he wanted to end the relationship because he wanted more out of it. . . . She agreed and **[***11]** they returned from Florida [on Sunday, August 22, 2004]. [The plaintiff] went on to say that she had been married three times, she liked Bill but she didn't need to baby-sit a [thirty-one] year old guy who liked to drink and fight. She said that Bill used to . . . get into fights all the time. She also claimed that Bill started to smoke drugs . . . . She said she was already involved with Sorensen as well. It was [Bill's] idea to break up but she agreed.'" *Gleason v. Smolinski, supra, 149 Conn. App. 287 n.3*.

[7] As the Appellate Court noted, Waterbury police Sargent Edward Apicella's police report stated that **[***12]** the plaintiff "said that she got a call from [Sorensen] saying that someone left a message on his answering machine that said: 'You better watch your back at all times.' [The plaintiff] heard the message and she said that it was Bill . . . ." *Gleason v. Smolinski, supra, 149 Conn. App. 287 n.3*.

[8] "The evidence shows that the missing person posters that were hung by the defendants consisted of photographs and **[***13]** physical descriptions of Bill . . . as well as information about his disappearance, an offer of a reward, and contact information to report tips to the police." *Gleason v. Smolinski, supra, 149 Conn. App. 288 n.4*.

EXHIBIT 43   EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

proceeded to follow [the plaintiff] and videotaped her activities in this regard. [The plaintiff] claims the posters were placed along her school bus route and generally where she lived, worked, and conducted some of her life activities. Eventually some of these activities led to the plaintiff going to the . . . police station [in the town of Woodbridge], where the defendants soon followed. A confrontation took place between the parties." (Footnote altered; internal quotation marks omitted.) *Id., 288*.

The plaintiff then brought the present action against the defendants. As the Appellate Court noted, the plaintiff "claims the defendants' activities interfered with **[\*401]** and damaged her monetarily by interfering with her business of operating a school bus for a living. She also says she was defamed by the defendants who had characterized her as a murderer. She also states that her right to privacy was invaded and that generally the defendants intentionally inflicted great emotional stress on her, causing her much anxiety and torment.

"The defendants countered the allegations by saying [that the] alleged actions **[\*\*930]** critical of them were, generally speaking, all lies. They deny entering a bus which [the plaintiff] was driving or going on school property to post a missing [person] poster at a school where [the plaintiff] brought and dropped off students. They deny calling [the plaintiff] a murderer or harassing her on the phone. The plaintiff and the defendants trade mutual accusations about being followed by [each other]." (Internal **[\*\*\*14]** quotation marks omitted.) *Id., 288-89*.

Following a court trial, the trial court, *Hon. Thomas J, Corradino*, judge trial referee, "found that the defendants' conduct constituted intentional infliction of emotional distress and that their statements that the plaintiff was a murderer or was involved in murder constituted defamation. The court awarded the plaintiff compensatory damages of $32,000 on her claim of intentional infliction of emotional distress and $7500 on her claim of defamation, for a total compensatory damages award of $39,500. The court also awarded the plaintiff [$13,166.67 in] punitive damages . . . an amount equal to one third of the plaintiff's total compensatory damages award . . . ." *Id., 289*.

The defendants appealed from the judgment of the trial court to the Appellate Court and claimed, inter alia,[9] **[\*402]** that: (1) the plaintiff's intentional infliction of emotional distress claim was barred by the free speech clause of the *first amendment*, as explicated by the Supreme Court's decision in *Snyder v. Phelps, supra, 562 U.S. 443*, as their conduct was constitutionally protected "speech related to a matter of public concern because the missing person posters were designed to uncover information about [Bill's] disappearance, and to assist with the **[\*\*\*15]** ongoing investigation and potential prosecution of a crime"; and (2) the plaintiff had failed to introduce sufficient evidence to support her defamation claims. See *Gleason v. Smolinski, supra, 149 Conn. App. 286*.

With respect to the defendants' *first amendment* claim, the Appellate Court first determined that it was unpreserved, and considered it under *State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989)*.[10] *Gleason*

---

[9] The defendants also claimed that: (1) "the trial judge exhibited bias and partiality that constituted plain error"; (2) "the [trial] court erred in relying on hearsay statements to determine that the defendants intended to inflict emotional distress upon the plaintiff"; (3) "there was insufficient evidence to support the finding of intentional infliction of emotional distress"; and (4) "the [trial] court erred in awarding compensatory and punitive damages to the plaintiff." *Gleason v. Smolinski, supra, 149 Conn. App. 286*. The Appellate Court rejected these other claims, and we do not address them further because they are not before us in this certified appeal. See footnote 4 of this opinion.

[10] A party "can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever **[\*\*\*17]** condition is most relevant in the particular circumstances." (Emphasis omitted; footnote omitted.) *State v. Golding, supra, 213 Conn. at 239-40*; see *In re Yasiel R., 317 Conn. 773, 780-81, 120 A.3d 1188 (2015)* (modifying third prong). "The test set forth in *Golding* applies in civil as well as criminal cases." *Chatterjee v. Comm'r of Revenue Servs., 277 Conn. 681, 694 n.15, 894 A.2d 919 (2006)*.

EXHIBIT 43 EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

*v.  [\*403] Smolinski, supra,  [\*\*931]  149 Conn. App. 289-90*. The Appellate Court concluded that the defendants could not establish the constitutional violation required by the third prong of *Golding* because, in contrast to the matters of public import that were discussed—albeit crudely and offensively—on the Westboro **[\*\*\*16]** Baptist Church (Westboro) members' protest signs in *Snyder*, it agreed with the trial court's finding that, "[w]hile the content of the posters makes no specific reference to the plaintiff . . . the context and placement of the posters was designed to 'hound' the plaintiff into providing the defendants with information about [Bill's] disappearance . . . rather than to raise a matter of public concern" by seeking further information from the public about his disappearance. *Id., 295*.

With respect to the plaintiff's defamation claims, the Appellate Court reviewed the record and concluded that the trial court properly had found that the defendants had made three defamatory statements regarding the plaintiff, namely, by telling various people that the plaintiff was a "murderer" or otherwise involved in Bill's disappearance. *Id., 310*. In particular, the Appellate Court relied on this court's decision in *Urban v. Hartford Gas Co., 139 Conn. 301, 308, 93 A.2d 292 (1952)*, and concluded **[\*\*\*18]** that the defendants' statements were defamatory per se, thus allowing a presumption that they had harmed the plaintiff's reputation, and relieving her of the burden of proving such harm. *Gleason v. Smolinski, supra, 149 Conn. App. 310-12*. Accordingly, the Appellate Court rendered judgment affirming the judgment of the trial court. *Id., 314*. This certified appeal followed. See footnote 4 of this opinion.

On appeal, the defendants claim that: (1) the *first amendment* bars the plaintiff's claims of intentional **[\*404]** infliction of emotional distress; and (2) the Appellate Court improperly upheld the trial court's conclusion that they had committed the tort of defamation. Additional relevant facts and procedural history will be set forth where appropriate. We address each claim in turn.

I

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

We begin with the defendants' contention that the Appellate Court improperly concluded that the *first amendment* did not bar the plaintiff's claim of intentional infliction of emotional distress, insofar as it arose from their constitutionally protected conduct in putting up missing person posters on public roadways, despite that conduct's design to target the plaintiff. The defendants argue that the Appellate Court, which treated the *first amendment* issue as an unpreserved **[\*\*\*19]** constitutional claim reviewable under *State v. Golding, supra, 213 Conn. at 239-40*,[11] improperly deferred to the trial **[\*\*932]** court's findings of fact, even though the trial court did not address the constitutional issue.[12] The defendants then **[\*405]** contend that the Appellate Court's conclusion that the *first amendment* did not

---

We note that in *In re Yasiel R., supra, 317 Conn. 780-81*, we recently held that "a party satisfies the third prong of *Golding* if he or she makes a showing sufficient to establish a constitutional violation," and that this court's "use of the word 'clearly' in describing the requirements under that prong of the test is unnecessary and misleading." See also *id., 781* (noting that "we have previously employed *Golding* to decide constitutional questions of first impression," and rejecting conclusion that *Golding* required appellant to "reference prior Connecticut precedent to be successful under the third prong").

[11] The defendants also argue that the Appellate Court improperly concluded that the *first amendment* issue was unpreserved. Without providing a citation to the record, the defendants contend that they raised this issue before the trial court—which did not address **[\*\*\*20]** it in its memorandum of decision. Our review of the record indicates that this issue is mentioned for the first time in a postjudgment motion for articulation, which, as the trial court observed, is not a proper way to preserve an issue for appellate review. Cf. *White v. Mazda Motor of America, Inc., 313 Conn. 610, 633-34, 99 A.3d 1079 (2014)* ("[r]aising an issue for the first time in a motion to reargue will not preserve that issue for appellate review").

[12] The defendants further contend that the trial court improperly failed to defer to the rulings of a different judge, *Hon. Robin L. Wilson*, earlier in the case, which, in striking the claims against the defendant John Murray; see footnote 3 of this opinion; concluded that the issues relating to the plaintiff's relationship with Bill, and his ultimate disappearance were matters of legitimate public concern for purposes of tort immunity under the *first amendment*. We disagree. Even if we assume, without deciding, that Judge Wilson's legal conclusions with respect to Murray's motion to strike were directly applicable to the plaintiff's claims against the remaining defendants, under the law of the case doctrine, Judge Corradino, who conducted the court trial in this case, was not

bar the plaintiff's claim of intentional infliction of emotional distress is "directly at odds" with the United States Supreme Court's decision in *Snyder v. Phelps, supra, 562 U.S. 443*. They posit that their poster campaign was constitutionally protected speech that pertained to a matter of legitimate public concern, namely, solving a serious crime and finding a missing person, and that the aspect of their conduct that "target[ed]" the plaintiff did not detract from the campaign's protected status because all of the flyers were posted in public places in a peaceful manner, and none mentioned the plaintiff by name, despite the trial court's finding that they were intended to "hound" her into giving them information about Bill's disappearance.

In response, the plaintiff **[***21]** argues that *Snyder* is factually distinguishable because the conduct at issue therein was not as invasive as the defendants' conduct in the present case, which they had specifically intended to be intimidating.[13] The plaintiff also claims that accepting the defendants' "broad notion that crime always is a legitimate matter of public concern" would encourage false accusations and "lynch mob style activity," and mean that "false accusations of criminal wrongdoing **[*406]** never would be actionable as . . . intentional infliction of emotional distress or defamation, but instead would be protected by the *first amendment*." We agree, however, with the defendants, and conclude that, given our review under *State v. Golding, supra, 213 Conn. at 239-40*, a new trial is required on this count, taking into consideration the governing legal standards under the *first amendment*, because the trial court's findings with respect to intentional infliction of emotional distress **[**933]** are largely supported by conduct that is constitutionally protected and, therefore, not actionable.

"[T]he [f]irst [a]mendment bars . . . damages under the generally applicable laws of intentional and negligent infliction of emotional distress where those claims are based on constitutionally protected conduct."[14] *Cowras v. Hard Copy, 56 F. Supp. 2d 207, 209-10 (D.* **[*407]** *Conn. 1999)*; see, e.g., *Snyder v. Phelps, supra, 562 U.S. 451* ("[t]he [f]ree [s]peech [c]lause of the [f]irst [a]mendment . . . can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress"). "In certain *first amendment* contexts . . . appellate courts are bound to apply a de novo standard of review. . . . [In such cases], the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements @ issue and the circumstances

---

bound to follow them. See, e.g., *Total Recycling Services of Connecticut, Inc. v. Connecticut Oil Recycling Services, LLC, 308 Conn. 312, 322, 63 A.3d 896 (2013)*.

[13] At oral argument before this court, the plaintiff clarified that her statement in her brief that it is "far from clear that [the defendants'] conduct in this case fell within the protections of the *first amendment*," was *not* intended **[***22]** as a restrictive interpretation of the third prong of *State v. Golding, supra, 213 Conn. at 239-40*, which would operate akin to case law arising under *42 U.S.C. § 1983* by focusing the availability of relief on the existence of clearly governing constitutional principles, rather than the clarity of the legal conclusions arising from a review of the facts in the record. We note that this position is consistent with our recent decision in *In re Yasiel R., 317 Conn. 773, 780-81, 120 A.3d 1188 (2015)*. See footnote 10 of this opinion.

[14] By way of background, we note that "[i]n order for the plaintiff to prevail in a case for liability . . . [alleging intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury. . . .

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds **[***25]** of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Internal quotation marks omitted.) *Perez-Dickson v. Bridgeport, 304 Conn. 483, 526-27, 43 A.3d 69 (2012)*; see also *Russo v. Hartford, 184 F. Supp. 2d 169, 188 (D. Conn. 2002)* ("[t]he standard in Connecticut to demonstrate extreme and outrageous conduct is stringent").

EXHIBIT 43                                                                          EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. **[\*\*\*23]** . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review." (Citations omitted; internal quotation marks omitted.) *DiMartino v. Richens, 263 Conn. 639, 661-62, 822 A.2d 205 (2003)*; see also *Brown v. K.N.D. Corp., 205 Conn. 8, 13-14, 529 A.2d 1292 (1987)* ("The function of the procedural scheme created by [the United States Supreme **[\*\*934]** Court] . . . is obviously to require an independent second opinion when free speech is curtailed. These cases place the ultimate constitutional responsibility on **[\*408]** appellate courts to render that second opinion in order **[\*\*\*24]** to safeguard free expression." [Citations omitted.]), overruled in part on other grounds by *DiMartino v. Richens, 263 Conn. 639, 663-64, 822 A.2d 205 (2003)*.

Nevertheless, "the heightened scrutiny that this court applies in *first amendment* cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue [were not protected by the *first amendment*], we accept all subsidiary credibility determinations and findings that are not clearly erroneous." *State v. Krijger, 313 Conn. 434, 447, 97 A.3d 946 (2014)*; see also *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 567, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)* ("[t]he requirement of independent appellate review . . . does not limit our deference to a trial court on matters of witness credibility" [citation omitted; **[\*\*\*26]** internal quotation marks omitted]). Thus, because the certified issues in this case do not embrace a challenge to the trial court's underlying factual findings, which already have been upheld on review by the Appellate Court; see footnotes 4 and 9 of this opinion; our de novo review is limited to determining whether the defendants' conduct, as found by the trial court, was subject to *first amendment* protection.[15] See *State v.* **[\*409]** *Krijger, supra, 448-49* (noting that Appellate Court properly relied on version of facts consistent with jury's verdict finding defendant guilty of threatening in second degree and breach of peace in second degree before engaging in independent review of record to determine whether remarks were not unprotected "true threats").

We begin with a review of *Snyder*, which is the leading United States Supreme Court decision on *first amendment* protection from tort claims of intentional infliction of emotional distress. *Snyder* arose from the protest activities of Westboro, whose small, but vociferous, congregation "believes that God hates and punishes the United States for its tolerance of homosexuality, particularly in America's military," and "frequently communicates its views by picketing, often at military funerals." *Snyder v. Phelps, supra, 562 U.S. 448*. Parishioners from Westboro held protests, replete with a barrage of offensively phrased signs, on "public land adjacent to public streets near the Maryland State House, the United States Naval Academy," and the funeral services for Marine Lance Corporal Matthew **[\*\*935]** Snyder on the day of the service. Id. The protests were lawfully permitted and staged, and took place "approximately **[\*\*\*28]** [1000] feet from the church where the funeral was held. Several buildings separated the picket site from the church. . . . The Westboro picketers displayed their signs for about [thirty] minutes before the funeral

---

[15] Substantial portions of the defendants' brief and oral argument before this court appear to reargue the facts as found by the trial court, in the course of urging us to undertake an "independent" review of the record under *State v. Golding, supra, 213 Conn. at 239-40*. Consistent with the *first amendment* analyses in, for example, *State v. Krijger, supra, 313 Conn. 447-49*, and *DiMartino v. Richens, supra, 263 Conn. 661-62*, our review of the defendants' unpreserved constitutional claims under *Golding* does not permit us to disregard the trial court's findings of historical fact resolving conflicting evidence in favor of our own view **[\*\*\*27]** of the factual record, or to make our own findings when the record reveals conflicting or inconclusive evidence on a factual point. See, e.g., *State v. Lawrence, 282 Conn. 141, 157-58, 920 A.2d 236 (2007)*; *State v. Brunetti, 279 Conn. 39, 55-56, 901 A.2d 1 (2006)*, cert. denied, **549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007)**. Rather—and the dissent's characterization of our analysis notwithstanding—we consider only whether the trial court's factual findings were made in accordance with the principles of the *first amendment*.

EXHIBIT 43     EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

began and sang hymns and recited Bible verses. None of the picketers entered church property or went to the cemetery. They did not yell or use profanity, and there was no violence associated with the picketing. . . .

"The funeral procession passed within 200 to 300 feet of the picket site. Although [Snyder's father] testified **[*410]** that he could see the tops of the picket signs as he drove to the funeral, he did not see what was written on the signs until later that night, while watching a news broadcast covering the event." (Citations omitted.) *Id., 449*. A federal court jury subsequently awarded the Snyder's father several million dollars in damages for his claims, which included intentional infliction of emotional distress, against Westboro and several of its members. *Id., 450*.

Relying on *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50-51, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988)*,[16] **[*411]** the Supreme Court posited that "[w]hether the *[f]irst [a]mendment* prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances **[***29]** of the case. [S]peech **[**936]** on matters of public concern . . . is at the heart of the *[f]irst [a]mendment*'s protection. . . . The *[f]irst [a]mendment* reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. . . . That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. . . . Accordingly, speech on public issues occupies the highest rung of the hierarchy of *[f]irst [a]mendment* values, and is entitled to special protection. . . .

"[N]ot all speech is of equal *[f]irst [a]mendment* importance, however, and where matters of purely private significance are at issue, *[f]irst [a]mendment* protections are often less rigorous. . . . That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: [T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import." (Citations omitted; internal quotation marks omitted.) *Snyder v. Phelps, supra, 562 U.S. 451-52*.

The court then observed that, although "the boundaries of the public concern test are not well defined," **[*412]** it has "articulated some guiding principles, principles that accord **[***32]** broad protection to speech to ensure that courts

---

[16] *Hustler Magazine, Inc. v. Falwell, supra, 485 U.S. 46*, arose from a magazine's publication of a parody cartoon depicting a prominent minister having sexual relations with his mother in an outhouse. In that case, the United States Supreme Court extended *New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*, and concluded that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc. v. Falwell, supra, 56*. The court observed that, although "the law does not regard the intent to inflict **[***30]** emotional distress as one which should receive much solicitude, and it is quite understandable that most if not all jurisdictions have chosen to make it civilly culpable where the conduct in question is sufficiently 'outrageous.' But in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the [f]irst [a]mendment." *Id., 53*. In particular, the court noted that, in *Garrison v. Louisiana, 379 U.S. 64, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964)*, it had held that "even when a speaker or writer is motivated by hatred or ill will his expression was protected by the *[f]irst [a]mendment*." *Hustler Magazine, Inc. v. Falwell, supra, 53*; see also *id., 53-54* (noting that holding to contrary would lead to liability chilling work of political cartoonists and satirists, who often use offensive caricatures in their work).

The Supreme Court rejected the minister's urging to use an "outrageousness" standard to distinguish the cartoon at issue in *Hustler Magazine, Inc.*, from "more traditional political cartoons," stating that the term "outrageousness" does not furnish a "principled standard" for making that distinction, given that "[o]utrageousness in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps **[***31]** on the basis of their dislike of a particular expression. An outrageousness standard thus runs afoul of our [long-standing] refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. See *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910 [102 S. Ct. 3409, 73 L. Ed. 2d 1215] (1982)* ([s]peech does not lose its protected character . . . simply because it may embarrass others or coerce them into action)." (Internal quotation marks omitted.) *Hustler Magazine, Inc. v. Falwell, supra, 485 U.S. 55*.

EXHIBIT 43   EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

themselves do not become inadvertent censors." (Internal quotation marks omitted.) *Id., 452*. It explained that "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public . . . . The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." (Citations omitted; internal quotation marks omitted.) *Id., 453*.

Further, "[d]eciding whether speech is of public or private concern requires us to examine the content, form, and context of that speech, as revealed by the whole record. . . . As in other *[f]irst [a]mendment* cases, the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was **[\*\*\*33]** said, where it was said, and how it was said." (Citations omitted; internal quotation marks omitted.) *Id., 453-54*.

Turning to the record before it, the Supreme Court observed that the "content of Westboro's signs plainly relates to broad issues of interest to society at large, rather than matters of purely private concern," despite the fact that their "messages may fall short of refined social or political commentary, the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy—are matters of public import." (Internal quotation **[\*413]** marks omitted.) *Id., 454*. The court observed that "even if a few of the signs—such as 'You're Going to Hell' and 'God Hates You'—were viewed as containing messages related to . . . Snyder or [his family] specifically, that would not change the fact that the overall thrust and dominant theme of Westboro's demonstration spoke to broader public issues." **[\*\*937]** Id. The Supreme Court noted that the funeral context of Westboro's speech did not "transform [its] nature"; *id., 454*; emphasizing that Westboro "conducted its picketing peacefully on matters of public concern **[\*\*\*34]** at a public place adjacent to a public street.[17] Such space occupies a special position in terms of *[f]irst [a]mendment* protection. . . . [W]e have repeatedly referred to public streets as the archetype of a traditional public forum, noting that [t]ime out of mind public streets and sidewalks have been used for public assembly and debate." (Citations omitted; footnote added; internal quotation marks omitted.) *Id., 454-56*.

The court further rejected the argument that Westboro's conduct was a "personal attack on Snyder and his family," which it had attempted to "immunize . . . by claiming that they were actually protesting the United States' tolerance of homosexuality or the supposed evils of the Catholic [c]hurch." (Internal quotation marks omitted.) *Id., 455*. The court was "not **[\*414]** concerned in this case that Westboro's speech on public matters was in any way contrived to insulate speech on a private matter from liability. Westboro had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of . . . Snyder, and there can be no serious claim that Westboro's picketing did not represent its honestly believed views on public issues. . . . There was no [preexisting] relationship or conflict between Westboro and Snyder that might suggest Westboro's speech on public matters was intended to mask an attack on Snyder over a private matter." (Citation omitted; internal quotation marks omitted.) Id. Thus, the court held that, because "Westboro's speech was at a public place on a matter of public concern, that speech is entitled **[\*\*\*36]** to special protection under the *[f]irst [a]mendment*. Such speech cannot be restricted simply because it is upsetting or arouses contempt." (Internal quotation marks omitted.) *Id., 458*. Accordingly, the Supreme Court directed the lower federal courts to set aside the "jury verdict imposing tort liability on Westboro for intentional infliction of emotional distress . . . ." *Id., 459*.

---

[17] The court observed that, however "hurtful" their conduct, "the church members had the right to be where they were. Westboro alerted local authorities to its funeral protest and fully complied with police guidance on where the picketing could be staged. The picketing was conducted under police supervision some [1000] feet from the church, out of the sight of those at the church. The protest was not unruly; there was no shouting, profanity, or violence." *Snyder v. Phelps, supra, 562 U.S. 457*; see also id. ("[A]ny distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. A group of parishioners standing at the very spot where Westboro stood, holding signs that said 'God Bless America' and 'God Loves You,' would not have been subjected to liability. It **[\*\*\*35]** was what Westboro said that exposed it to tort damages.").

Post-*Snyder* cases make clear the critical import of the threshold inquiry into the nature of the communications at issue in determining whether allegedly tortious speech is subject to *first amendment* protection.[18] Thus, **[\*415]** we begin with **[\*\*938]** an examination of the objective nature of the speech at issue in the count of the complaint alleging intentional infliction of emotional distress, namely, the defendants' extensive campaign of missing person posters. It is well established that "[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without question events of legitimate concern to the public . . . ." *Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 492, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975)*. Indeed, "[p]ublic allegations that someone is involved in crime generally are speech on a matter of public concern." *Obsidian Finance Group, LLC v. Cox, 740 F.3d 1284, 1292 (9th Cir.)*, cert. denied, __ U.S. __, 134 S. Ct. 2680, 189 L. Ed. 2d 223 (2014); see also *id., 1291-92* (allegation that bankruptcy trustee was participant in defrauding **[\*\*\*37]** investors was matter of public concern).[19] This includes matters pertaining to missing persons. **[\*416]** See *Holloway v. American Media, Inc., 947 F. Supp. 2d 1252, 1261 n.10 (N.D. Ala. 2013)* ("[t]here is little question that the disappearance of Natalee Holloway, which dominated news coverage for many weeks, if not years, and which involved the safety of travel abroad and called up the worst fears of parents, was a matter of 'concern to the community'"); but cf. *Sartain v. White, 588 So. 2d 204, 213 (Miss. 1991)* (accusations in letters, pleadings, and oral tirades that plaintiffs were "murderers, robbers and terrorists . . . generally are a matter of public concern," but not in specific context of neighbor dispute). In the present case, the missing person flyers posted by the defendants solely sought information about Bill, without referring to the plaintiff or anyone else potentially implicated in his disappearance, either directly or indirectly. Thus, the content of the communications at issue relates to a matter of public concern.

Our inquiry does not, however, end here, as we also must consider the **[\*\*939]** form and context of the communications at issue. *Snyder v. Phelps, supra, 562 U.S. 454*. We agree with the Alaska Supreme Court's recent rejection of the "sweeping" argument that all "speech involving a matter of public concern is inactionable" under *Snyder*, and emphasize that the *first amendment* is "not an all-purpose tort shield." (Internal quotation marks omitted.) *Greene v. Tinker, 332 P.3d 21, 34-35 (Alaska 2014)*; see also *id., 35* (no *first amendment* absolute privilege to accuse hospital employee of breaching medical **[\*\*\*40]** privacy). Indeed, as the Supreme Court has observed in acknowledging the possibility of "contriv[ance]"; *Snyder v. Phelps, supra, 455*; the *first amendment* cannot be used as a cloak or veil for intentionally tortious conduct that is only tangentially related to the claimed matter of public concern. See *Holloway v. American Media, Inc., supra, 947 F. Supp. 2d 1261-65* (*first amendment* did not, as matter

---

[18] One commentator aptly observes that, "[w]hile public concern in *Snyder* represents a constitutional requirement grafted onto the common law [of intentional infliction of emotional distress] to provide a check on the subjective and equally pliable element of extreme and outrageous conduct, it may well be that **[\*\*\*38]** the two concepts are simply inversely correlated. Specifically, the more the speech in question is about a matter of public concern, the less likely it is for publication of that speech to be deemed extreme and outrageous. . . . In this sense, then, initial judicial resolution of the constitutional public-concern question largely dictates how courts will later resolve the [common-law] question of whether publication of the speech was extreme and outrageous." C. Calvert, "Public Concern and Outrageous Speech: Testing the Inconstant Boundaries of IIED and The *First Amendment* Three Years After *Snyder v. Phelps*," *17 U. Pa. J. Const. L. 437, 475-76 (2014)*.

[19] For additional illustrations of this well established principle, see, for example, *Best v. Berard, 776 F. Supp. 2d 752, 756-58 (N.D. Ill. 2011)* (plaintiff's arrest for driving with suspended license was matter of public concern barring intentional infliction of emotional distress claim arising from her appearance on reality television program); *Hobbs v. Pasdar, 682 F. Supp. 2d 909, 927-28 (E.D. Ark. 2009)* ("West Memphis Three" murder case issue of public concern); *Miles v. Ramsey, 31 F. Supp. 2d 869, 875 (D. Colo. 1998)* (child murder investigation is matter of public concern for purposes of defamation claims arising from tabloid article indicating that plaintiff, who was victim's neighbor, is pedophile); *Shoen v. Shoen, 292 P.3d 1224, 1229-30, 2012 COA 207 (Colo. App. 2012)* (defendant's statement on television that plaintiff was "capable" **[\*\*\*39]** of arranging murder of his brother's wife implicated matter of public concern, triggering higher burden of proof in defamation action); *Wiemer v. Rankin, 117 Idaho 566, 570-71, 790 P.2d 347 (1990)* (article about inadequate investigation related to matter of public concern for purposes of husband's defamation claims arising from shooting death of wife); *Dumas v. Koebel, 2013 WI App 152, 352 Wis. 2d 13, 29-30, 841 N.W.2d 319 (App. 2013)* (*first amendment* barred school bus driver's claims for, inter alia, intentional infliction of emotional distress, which she brought against broadcaster who had confronted her about past misdemeanor prostitution conviction during news story intended to "inform the public that there were bus drivers who had criminal histories . . . and question whether the school district was thoroughly researching the backgrounds of bus drivers"), review denied, ***2014 WI 50, 354 Wis. 2d 863, 848 N.W.2d 859 (2014)***.

of law, shield tabloid **[\*417]** newspaper from intentional infliction of emotional distress claim in light of allegations that it knowingly and maliciously published false information about death and burial of plaintiff's missing daughter, given preexisting animus between parties); cf. *United States v. Sergentakis, United States District Court, Docket No. 15CR33 (NSR), 2015 U.S. Dist. LEXIS 77719 (S.D.N.Y. June 15, 2015)* (defendant's accusations that victim had engaged in child molestation and animal cruelty could be protected under *first amendment* in other contexts, but not in cyberstalking and witness retaliation case wherein they were "thinly veiled" revenge for victim's cooperation with investigation that led to defendant's guilty plea on other charges); *People v. Little, 2014 IL App (4th) 131114-U, 2014 WL 7277785, \*7 (Ill. App. 2014)* (The court rejected the defendant's argument that the state stalking statute was unconstitutionally overbroad under *Snyder* because the "preexisting relationship and conflict **[\*\*\*41]** [between the defendant and his wife] strongly suggest [the] defendant is attempting to mask an attack on [his wife] over a private matter as a protest of a matter of public concern," namely, his claim that he was protesting her decision to get an abortion, and "[n]othing in the evidence suggests that in driving by [the women's shelter], [the] defendant intended to peacefully protest a matter of public concern in a public forum. This is particularly true when, in his own testimony and in statements to police, he denied intentionally driving by [the women's shelter]," and "nothing in the record demonstrates [the] defendant intended to 'convey his position on abortion utilizing a method designed to reach as broad a public audience as possible.'"), appeal denied, *391 Ill. Dec. 796, 31 N.E.3d 771 (Ill. 2015)*.

Nevertheless, although the existence of preexisting animus between parties might indicate circumstantially that a defendant is dressing intentionally tortious conduct in the garb of the *first amendment*, such animus, **[\*418]** including the defendant's motive to harm the plaintiff, "does not necessarily render the messages conveyed . . . matters of purely private rather than public concern." *Spacecon Specialty Contractors, LLC v. Bensinger, 713 F.3d 1028, 1038 (10th Cir. 2013)*. The vehicle, context, and content of the messages remains of paramount **[\*\*\*42]** importance. See *id., 1038-39* (evidence that organizer's motive to harm corporation arising from its labor dispute with union led him to make documentary film did not mean that documentary was not matter of public concern, because it addressed its unfair labor practices with respect to use of foreign laborers, which is matter of public concern); accord *State v. Carpenter, 171 P.3d 41, 58-59 (Alaska 2007)* (radio show host engaged in protected conduct when he ridiculed and **[\*\*940]** humiliated local critic of his show, but crossed line to unprotected intentional infliction of emotional distress when he issued "'call to arms'" to his supporters, broadcast critic's home telephone and fax numbers, and encouraged supporters to use those numbers to harass her).

Turning to the record in the present case, we acknowledge the trial court's finding that "one of the important lines of evidence relied on by the plaintiff to establish this tort [of intentional infliction of emotional distress] was the hanging of posters in areas where the plaintiff lived and worked for the sole purpose of intimidating and harassing the plaintiff. The plaintiff claims posters, showing a picture of . . . Bill . . . with contact information, were hung throughout her bus route, at places where **[\*\*\*43]** she lived and worked and even near, if not on school grounds, where she picked up and dropped off children. This went on for months."[20] **[\*419]** The defendants' preexisting intention to "hound" the

---

[20] The trial court discussed this finding in greater detail, crediting the testimony of Brad Cohen, the plaintiff's supervisor and employer at B and B Transportation, Inc., that "in traveling around several towns the posters were generally 'well spaced out'—'at different poles.' However, on [the plaintiff's] school bus run and at the house where she lived 'there were multiple posters on each and every telephone pole, on guardrails.' He said you could easily do a run (school bus route) by following the posters—'they led down every street, every side street, every nook and cranny of . . . these places.'" The trial court also credited Cohen's testimony that "posters were placed at the entrance to his school bus transportation business on either side of the driveway—a driveway the plaintiff would have to enter and exit at least four times daily." Finally, the trial court credited the testimony of Melissa DePallo, a friend of the plaintiff, that the plaintiff's school bus "run was definitely targeted with flyers. [The plaintiff] lived with [DePallo] for a short time. She lives on a dead end **[\*\*\*45]** street and her house 'was definitely bombarded with flyers.' There were no other flyers on the whole street; the pole in front of her house had twenty posters placed on it. When they were taken down, they went up the next day, it went on not just for the few months [the plaintiff] lived with DePallo, it went on for a year according to her. [The plaintiff] testified that she lived with another friend who testified on her behalf and that person's house was saturated with posters."

The trial court also noted that "no evidence was presented as to why the [defendants] could in fact believe it was a necessary aid to the location of Bill . . . to [hang] posters along [the plaintiff's] bus route. It was understandable to do so along Route 63 which provides a direct connection between the Waterbury area and [the city of] New Haven but saturation of other areas [in the towns]

plaintiff until she "broke" with respect to what she knew about Bill's disappearance did not, however, necessarily transform the protected nature of their speech; see, e.g., *Spacecon Specialty Contractors, LLC v. Bensinger, supra, 713 F.3d 1038*; particularly given that the targeted content and location was consistent with the overarching public concern of gaining information about Bill's disappearance, in **[\*\*941]** particular by persuading the plaintiff **[\*420]** to be forthcoming with her knowledge about the case.[21] **[\*421]** See *State v. Carpenter, supra, 171 P.3d 58* (noting that radio host's constitutionally unprotected words encouraging his listeners to harass critic "were devoid of any express or implicit message that a jury might deem an attempt to persuade [her], except perhaps out of fear of harassment, to withdraw her objections to broadcasting the show"); see also *id., 59* ("[e]ven speech that relates to a matter of public interest loses its protection and can give rise to an [intentional infliction of emotional distress] claim if, in addition to meeting the other requirements for an [intentional infliction of emotional distress] claim, it **[\*\*\*44]** is uttered with an intent merely to harass and with no intent to persuade, inform, or communicate").

---

of Woodbridge and Bethany do not appear to fall in this category. [The plaintiff] lived and worked in the Woodbridge and Bethany area. But apart from a short period of employment at [B and B Transportation, Inc.] and his dating of [the plaintiff] who lived in Woodbridge nothing was presented to [indicate] Bill . . . had **[\*\*\*46]** any other connection to these towns.

"From another perspective it cannot be deduced from the evidence and testimony that the concentration of poster activity where [the plaintiff] lived and worked only commenced in reaction to [the plaintiff's] tearing down posters in that area. The [defendants] ordered thousands of posters and hung many in various areas of Connecticut's western part. But the poster hanging activity in towns where [the plaintiff] worked and lived was apparently done from the beginning of the poster hanging activity. The removal of posters from Woodbridge, Bethany, and [the town of] Ansonia began to be noticed in just a couple of weeks after their being put up by the [defendants]."

[21] The dissent states that "the trial court found that the defendants' targeting of the plaintiff, in the context of their other intimidating activities, was not a bona fide expression to the public of a message that the *first amendment* protects." The dissent also criticizes us for "disregarding" this "crucial finding," namely, that the defendants' sole intent was to "harass . . . ." We respectfully disagree with the dissent's reading of the record and the trial court's findings. Nothing in the trial court's **[\*\*\*47]** memorandum of decision indicates that it considered the *first amendment* in deciding this case. We, of course, do not fault the trial court for this. The *first amendment* claims were not properly preserved and must be reviewed on appeal pursuant to *Golding*.

The dissent also appears to contend that the defendants' *first amendment* claims were properly preserved in the trial court, rendering *Golding* review unnecessary because a "review of the trial court opinion reveals that the trial court did consider free speech issues when deciding this matter." We do not suggest that the trial court was completely unaware that the general subject matter of this case has *first amendment* implications. The dissent's discussion of the trial court's references to the defendants' free speech rights focuses, however, on conduct the propriety and protected nature of which is not at issue in this appeal, namely, the defendants' rights to speak to law enforcement authorities or the public about details surrounding Bill's disappearance. There is nothing in the trial court's opinion indicating that it considered the *first amendment* implications of the defendants' flyer campaign, which were a substantial basis for the plaintiff's intentional infliction of emotional distress claim.

This, **[\*\*\*48]** of course, explains why the Appellate Court considered the defendants' *first amendment* claims under the *Golding* bypass that is available for *unpreserved* constitutional claims. See *Gleason v. Smolinski, supra, 149 Conn. App. 289-90*. It is, of course, this very analysis that formed the basis for the first question that we certified in this appeal, namely: "Did the Appellate Court properly conclude that the defendants' *first amendment* claim of protected speech failed to satisfy the third prong of the test for review of unpreserved claims set forth in *State v. Golding, [supra, 213 Conn. at 239-40*]?" **Gleason v. Smolinski, 312 Conn. 920, 94 A.3d 1201 (2014)**. The dissent's attempt to litigate preservation, with no argument on this point from the parties, is at drastic odds with the well settled procedures that we employ in considering certified appeals from judgments of the Appellate Court, namely, that "the focus of our review is not the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo. The only questions that we need consider are those squarely raised by the petition for certification, and we will ordinarily consider these issues in the form in which they have been framed in the Appellate Court." (Internal quotation marks omitted.) *State v. Saucier, 283 Conn. 207, 221, 926 A.2d 633 (2007)*; see also *id., 222-23* (declining to consider claim that evidence was not hearsay in certified **[\*\*\*49]** appeal because that argument, although properly preserved at trial, was neither raised before Appellate Court nor mentioned in petition for certification). Accordingly, we conclude that the record demonstrates that the trial court's findings on the claims at issue in the present appeal did not consider, and were not guided by, the relevant *first amendment* principles.

EXHIBIT 43                                                                            EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

Moreover, the missing person posters created by the defendants in the present case were entirely content-neutral with respect to the plaintiff; none mentioned her  **[\*\*942]**  by name, and all simply contained photographs and descriptions of Bill, along with reward and tip information. In contrast to the posters in the present case, the signs in *Snyder* referred, at least obliquely, to Snyder, insofar as they stated "You're Going to Hell" and "God Hates You." See *Snyder v. Phelps, supra, 562 U.S. 448*. Second, it is undisputed that all of the posters were placed on or adjacent to public roadways, which are traditional public fora subject to heightened *first amendment* protection—notwithstanding the trial court's finding that many of the particular locations chosen by the defendants were not likely to be particularly fruitful sources of leads as to Bill's whereabouts. See, e.g., *id., 455-56*; see also *Frisby v. Schultz, 487 U.S. 474, 480-81, 108 S. Ct. 2495, 101 L. Ed. 2d 420  [\*422]  (1988)* (emphasizing **[\*\*\*50]**  that "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood" and that "[n]o particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora"); *Lewis v. McCracken, 782 F. Supp. 2d 702, 711-12 (S.D. Ind. 2011)* (following multiple circuits and holding that "privately owned sidewalks bordering public roads qualify as traditional public forums"); *Rodriguez v. Fox News Network, LLC, 356 P.3d 322, 324-28 (Ariz. App. 2015)* (*first amendment* barred intentional and negligent infliction of emotional distress claims arising from news broadcast of driver's suicide at conclusion of high speed chase because law enforcement response to crime is matter of public concern and events happened on public highway).

To this end, we find instructive the New Hampshire Supreme Court's recent decision in *Keene v. Cleaveland,167 N.H. 731, 118 A.3d 253 (2015)*. In *Keene*, a city brought tort claims for damages, alleging tortious interference with contract, civil conspiracy, and negligence, against persons who had engaged in an aggressive protest of the city's parking enforcement policies by following and videotaping parking enforcement officers in the performance of their duties. *Id., 255-56*. Although acknowledging that the content of their speech **[\*\*\*51]**  was constitutionally protected, the city argued that the protesters' behavior, "following closely, chasing, running after, approaching quickly from behind, lurking outside bathrooms, yelling loudly, and filming from close proximity—constitute improper interference with the [officers'] employment duties. The [c]ity contends that this conduct is significantly harassing behavior under the guise of political expression, and, therefore, not constitutionally protected. The [c]ity asserts, therefore, that a jury may impose tort liability  **[\*423]**  without unconstitutionally burdening the [protesters'] right to free speech."[22] (Internal quotation marks omitted.) *Id., 258*.

---

[22] The New Hampshire court noted that the city "employs [officers] to enforce motor vehicle parking laws and regulations . . . . The [officers] patrol . . . on foot and in marked vehicles, monitoring parking meters and issuing parking tickets. In December 2012, the [protesters] began protesting parking enforcement . . . . On an almost daily basis, the [protesters] followed closely behind the [officers], identifying expired parking meters and filling the meter before [an officer] could issue a ticket, a process referred to by the [protesters] as a 'save.' When **[\*\*\*52]**  the [protesters] 'save' a vehicle, they leave a card on the vehicle's windshield that [read]: 'Your meter expired! However, we saved you from the king's tariff!' The [protesters] also: videotaped the [officers] from a close proximity; called the [officers] names such as '[fucking] thief,' 'coward,' 'racist,' and '[bitch]'; criticized the [officers] for issuing tickets; encouraged the [officers] to quit their jobs; and waited for the [officers] during their breaks, including waiting outside restrooms. The [protesters] testified that they engage in these activities to protest parking enforcement because they believe that parking is not a criminal act, and that parking tickets are a 'threat against [the] people.' The [officers] testified that they repeatedly asked the [protesters] to stop their activities, complained to the . . . police . . . and reported the [protesters'] activities to the city attorney." *Keene v. Cleaveland, supra, 118 A.3d 255-56*.

At an evidentiary hearing, the officers "testified that the close proximity of the [protesters]—sometimes only [one] foot away from them—caused [them] anxiety and made them feel harassed. One [officer] testified that he was sometimes followed on his patrols by two or three of the [protesters] **[\*\*\*53]**  at the same time, and that they followed him so closely that if he turned around, they would bump into him. He ultimately resigned because 'the constant harassment and intimidation [had] started to boil over into [his] personal life and [his] time off,' and he felt he was 'backed into a corner.' Another [officer] testified that she is 'tense and uptight all the time' because of the 'awful anticipation' of 'waiting for [the protesters] to show up,' and claimed that she is unable to do her job because she is 'trying to avoid [the protesters].' A third, who complained that the [protesters] waited outside her car and followed her in and out of city buildings on her breaks, testified that she does not feel safe when the [protesters] follow her at work. She also testified that, on one occasion, one of the [protesters] grabbed her wrist when she attempted to remove one of the . . . cards

 **[\*\*943]** **[\*424]** Following *Snyder*, the New Hampshire Supreme Court rejected the city's arguments, concluding that the *first amendment* barred the city's tort claims against the protesters. *Id., 261*. The court disagreed with the city's claim that the form and context of the protesters' seemingly harassing behavior rendered it constitutionally unprotected, noting first that the city did not "challenge the trial court's conclusions that the content of the [protesters'] speech is protected by the *[f]irst [a]mendment* because it relates to a matter of public concern, and that the [contested] activities take place in a traditional public forum—the streets and sidewalks of [the city]." *Id., 260*. The court agreed with the protesters' arguments that "[e]ven those activities that did not involve speech [are] expressive conduct entitled to *[f]irst [a]mendment* protection, and, therefore, are insulated from tort liability," and "absent acts of significant violence, the *[f]irst [a]mendment* protects their nonverbal acts from tort liability." (Internal quotation marks omitted.) Id. Following *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 916-17, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982)*, which rejected a tort claim for damages arising from a boycott of the plaintiff's businesses, the court held that **[\*\*\*55]** the protesters' "challenged conduct, like [their] protected speech, is intended to draw attention to the [c]ity's parking enforcement operations and to persuade the [officers] to leave their positions. There is no allegation that the challenged conduct involves violent conduct. . . . Moreover, conduct does not lose its protected character . . . . simply because it may embarrass others or coerce them into action. . . . We hold, therefore, that the *[f]irst [a]mendment* shields the [protesters] from tort liability for the challenged conduct."[23] (Citations omitted; internal **[\*\*944]** quotation marks omitted.) *Keene v. Cleaveland, supra, 118 A.3d 261*.

 **[\*425]** Guided heavily by this recent New Hampshire decision,[24] which considered similarly targeted and harassing conduct, we conclude that a substantial portion of the defendants' conduct that the trial court found to constitute the intentional infliction of emotional distress was, in fact, protected by the *first amendment*. This is particularly so, given that the trial court's finding that the defendants' conduct was solely intended to harass and "break" the plaintiff did not consider **[\*\*\*57]** whether those actions were intended to persuade her with regard to a matter of public concern as in *Keene*, rather than merely torture her gratuitously with regard **[\*426]** to a purely private matter. See *Snyder v. Phelps, supra, 562 U.S. 458-59*. The defendants have, therefore, established a constitutional violation under the third prong of *State v. Golding, supra, 213 Conn. at 239-40*. See footnote 10 of this opinion.

---

from a car windshield. She has changed her work schedule to avoid the [protesters], and has considered quitting her job. The [c]ity also offered testimony about the risk to public safety: specifically, that the [protesters] distract the [officers] as they drive on city streets, and that the [protesters] '[dart] **[\*\*\*54]** across' the street, which the [c]ity asserted could result in pedestrian injuries or vehicle collisions." *Id., 256-57*.

[23] The New Hampshire Supreme Court remanded the case, however, for consideration of the city's request for injunctive relief, despite the proper dismissal of the tort damages claims, given "the impact of the challenged conduct upon the [c]ity's interests in preserving public safety and protecting the [officers]." *Keene v. Cleaveland, supra, 118 A.3d 261-62*. The court held that the trial court had improperly failed to "consider the factual circumstances of the case prior to making its determination as to whether injunctive relief was warranted," given the allegations that the officers felt intimidated and harassed, and that the protesters had acted "with the purpose and **[\*\*\*56]** intention of preventing the [officers] from doing their jobs." (Internal quotation marks omitted.) *Id., 262*. The court concluded that in "light of the [c]ity's allegations that the challenged conduct threatens the safety of the [officers], pedestrians, and the motoring public, and given the testimony of the [officers] at the hearing . . . the trial court erred when it failed to consider the particular factual circumstances of the case and whether an injunction should issue based upon the governmental and policy interests asserted by the [c]ity." *Id., 263*. It determined that the trial court should consider in the first instance whether a content neutral injunction could be fashioned that would protect the officers and the protesters' constitutional rights. Id.

[24] In its reliance on and attempt to distinguish *Keene v. Cleaveland, supra, 118 A.3d 253*, the dissent again relies on the finding by the trial court in the present case that the defendants intended to "hound" the plaintiff until she "broke," and engaged in the placement of posters "for the sole purpose of intimidating and harassing the plaintiff . . . ." We respectfully disagree. Consistent with the New Hampshire Supreme Court's conclusion that the protesters' harassing activities were constitutionally protected attempts to persuade the officers to quit their jobs, despite the fact that they caused the targeted officers considerable distress; see footnote 22 of this opinion; the record indicates that the defendants' activities in the present case were consistent with their constitutionally protected activity of persuading the plaintiff to share her knowledge with respect to Bill's disappearance. There **[\*\*\*58]** was no finding that the defendants intended to "break" the plaintiff solely out of malice stemming from a purely private dispute; the defendants' persuasive activities more than related to the matter of public concern, namely, solving Bill's disappearance.

Turning to the fourth prong of *Golding*, namely, whether reversal is required, we conclude that the plaintiff, as appellee, has not established that the constitutional violation was harmless beyond a reasonable doubt, given the apparent significance of the flyer campaign to the trial court's finding on her intentional infliction of emotional distress claim. We cannot, however, direct judgment as a matter of law for the defendants because the record demonstrates that, in addition to the posters, which are constitutionally protected if not solely a contrived means for malicious harassment on a matter of private concern; see *Snyder v. Phelps, supra, 562 U.S. 458-59*; the defendants also engaged in other confrontational and harassing behavior, including calling the plaintiff offensive names, following her, and videotaping her activities.[25] Some or **[**945]** all of this conduct might well be held to furnish an independent basis for the judgment in favor of the plaintiff on her intentional **[***59]** infliction of emotional distress claims, but neither the Appellate Court nor the trial court made specific determinations to this effect, instead focusing their analyses primarily on what they deemed to be the defendants' ill-motivated flyer campaign. See *Gleason v. Smolinski, supra, 149 Conn. App. 305-307*. We leave to the trial court, as the finder of fact, to consider in the first instance whether the record supports a finding of intentional infliction of emotional distress independent of **[*427]** any constitutionally protected conduct. But see *Appleton v. Board of Education, 254 Conn. 205, 211, 757 A.2d 1059 (2000)* ("[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress" [internal quotation marks omitted]). Accordingly, we conclude that the defendants are entitled to a new trial, at which the trial court can consider the evidence in light of the governing *first amendment* principles.[26]

II

DEFAMATION CLAIMS

We next turn to the defendants' claim that the Appellate Court improperly upheld the trial court's conclusion **[*428]** that they had committed the tort of defamation. In support of this claim, the defendants contend, inter alia, that: (1) the Appellate Court improperly applied the clearly erroneous standard of review to all of the trial court's conclusions; and (2) the plaintiff improperly was not required to carry the burden of proof constitutionally required insofar as the statements pertained to a **[**946]** matter of public concern.[27]

---

[25] Specifically, we acknowledge that the parties had engaged in a confrontation at the Woodbridge police station, and that the trial court apparently credited the plaintiff's testimony that "every time she saw the defendants they would swear at her and call her names," like "ho" and "slut." See **[***60]** *Gleason v. Smolinski, supra, 149 Conn. App. 294*.

[26] We disagree with the plaintiff's reliance on *Bhatia v. Debek, 287 Conn. 397, 948 A.2d 1009 (2008)*, in support of her argument that our conclusion renders false accusations of criminal wrongdoing protected by the *first amendment*, rather than actionable as claims of defamation or intentional infliction of emotional distress. In our view, the plaintiff's argument sweeps too broadly. First, although an accusation of criminal conduct is topically a matter of public concern, our reading of *Snyder* and contemporary *first amendment* case law establishes that the public concern inquiry is a significant, but not dispositive, factor in determining whether speech or conduct is constitutionally protected for purposes of tort liability. Indeed, should an accusation be false, the *first amendment* does not foreclose liability under a defamation theory in a well pleaded and proven case.

Further, in *Bhatia v. Debek, supra, 287 Conn. 404-405*, we recognized that the law governing the intentional tort of malicious prosecution "seeks to accommodate two competing and ultimately irreconcilable interests. It acknowledges that a person wrongly charged with criminal conduct has an important stake in his bodily freedom and his reputation, but that the community as a whole has an even more important stake in encouraging private citizens to assist public **[***61]** officers in the enforcement of the criminal law." (Internal quotation marks omitted.) Satisfaction of that tort's elements that the defendant acted both without probable cause, and "with malice, primarily for a purpose other than that of bringing an offender to justice"; *id., 404*; would suffice to render such conduct unprotected by the *first amendment* in any event. Cf. *Hustler Magazine, Inc. v. Falwell, supra, 485 U.S. 56* ("public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice'").

[27] The defendants also **[***62]** claimed that the three allegedly defamatory statements were subject to the "fair comment privilege" as statements of opinion on a matter of public concern. For reasons explained subsequently in this opinion, we need not address

EXHIBIT 43 EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

Before turning to the defendants' claims regarding defamation, we note that the Appellate Court's opinion sets forth the following additional relevant facts and procedural history, namely, that the trial court "found three statements made by the defendants to be defamatory. Specifically, it found two sets of statements made to the plaintiff's friends . . . Vrabel and [Melissa] DePallo, to be defamatory: (1) 'Janice Smolinski told [Vrabel] on several occasions that [the plaintiff] "did something to her son" and that "she believes that either [the plaintiff] or someone in her family murdered her son"; and (2) 'Janice Smolinski approached [DePallo] and said you do not know what [the plaintiff] is capable of; she said she does not believe [the plaintiff] killed her son, personally, but she knows [***63] where he is and [Janice] Smolinski thought "she's involved." The court also found the following statement made by the defendants to an unidentified man at the plaintiff's gym to be defamatory: '[The plaintiff] drove to her gym, the defendants were following her, and [the plaintiff] says, "a guy came and said those people (referring to the Smolinskis) just followed you in and said you were a [*429] murderer."'"[28] *Gleason v. Smolinski, supra, 149 Conn. App. 308*.

Citing its decision in *Murphy v. Lord Thompson Manor, Inc., 105 Conn. App. 546, 552, 938 A.2d 1269*, cert. denied, *286 Conn. 914, 945 A.2d 976 (2008)*,[29] for the applicable standard of review, the Appellate Court upheld, as not clearly erroneous, the trial court's conclusion that these statements were not "'mere opinion'" that could not form the basis for a defamation claim, insofar as the plaintiff "'was said to be a murderer or involved in a situation where murder occurred.'" *Gleason v. Smolinski, supra, 149 Conn. App. 310*. The Appellate Court also concluded that the trial court did [***64] not commit clear error in determining that the defendants had acted with actual malice in making these statements in reckless disregard for the truth, thus supporting the plaintiff's claim for punitive damages. *Id., 311*. Finally, the Appellate [**947] Court rejected the defendants' contention that the statements, if defamatory, did not support a claim for damages because the plaintiff [*430] had suffered "no resulting reputational harm," reasoning that injury was presumed because they were defamatory per se under *Urban v. Hartford Gas Co., supra, 139 Conn. 308*. See *Gleason v. Smolinski, supra, 311-12*.

Our consideration of the defendants' specific challenges to the Appellate Court's decision is informed by the following general principles. Although defamation[30] claims are rooted in the state common law, their elements "are heavily influenced by the minimum standards required by the *[f]irst [a]mendment*." *Celle v. Filipino Reporter Enterprises, Inc., 209 F.3d 163, 176 (2d Cir. 2000)*; see also, e.g., *Gertz v. Robert Welch, Inc., 418 U.S. 323, 348-49, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*; *New York Times Co. v. Sullivan, 376 U.S. 254, 283-84, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*; *Flamm v. Am. Ass'n of Univ. Women, 201 F.3d 144, 149-50 (2d Cir. 2000)*. At common law, "[t]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was

---

this claim. See footnote 34 of this opinion. For discussion of additional claims relating to defamation raised by the defendants, see footnotes 28 and 52 of this opinion.

[28] The defendants argue that the statement made at the gym is not supported by credible evidence because there was no evidence that either of the defendants actually made that statement. For purposes of this certified appeal, we assume, without deciding, that the trial court's finding that the defendants made this statement was supported by sufficient evidence.

[29] In *Murphy*, the Appellate Court reviewed a trial court's finding that the defendant had committed the tort of negligent infliction of emotional distress, and quoted this court's decision in *Barbara Weisman, Trustee v. Kaspar, 233 Conn. 531, 541, 661 A.2d 530 (1995)*, for the applicable standard of review, namely: "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give [***65] the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous." (Internal quotation marks omitted.) *Murphy v. Lord Thompson Manor, Inc., supra, 105 Conn. App. 552*.

[30] "Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation." *Skakel v. Grace, 5 F. Supp. 3d 199, 206 (D. Conn. 2014)*.

EXHIBIT 43                                                                 EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."[31] (Internal quotation marks omitted.)  **[\*431]**  *Gambardella v. Apple Health Care, Inc., 291 Conn. 620, 627-28, 969 A.2d 736 (2009)*.

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . ." (Internal quotation marks omitted.) *Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 217, 837 A.2d 759 (2004)*. It is well settled that "for a claim of defamation to be actionable, the statement must be false . . . and under the common law, truth is an affirmative defense to defamation . . . the determination **[\*\*\*67]** of the truthfulness of a statement is a question of fact for the jury." (Citations omitted.) *Id., 228-29*. Each statement furnishes a separate cause of action and requires proof of each of the elements for defamation. See *id., 217*.

Beyond these common-law principles, there are numerous federal constitutional restrictions that govern the proof of the tort of defamation, the applicability of which varies with "(a) the status of the plaintiff as a public or private figure, and (b) whether the subject of the speech **[\*\*948]** is a matter of public or private concern. Thus, there are four possibilities: (1) public person/public matter, (2) private person/public matter, (3) public person/private matter, and (4) private person/private matter." *Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 63 (2d Cir. 1993)*. We previously have noted that, under *New York Times Co. v. Sullivan, supra, 376 U.S. 254*, if "the plaintiff is a public figure . . . the plaintiff also must prove that the defamatory statement was made with actual malice, such that the statement, when made, [was] made with actual knowledge that it was false or with reckless disregard of whether it was false. . . . **[\*432]** Additionally, to recover punitive damages, a plaintiff must prove actual malice, regardless of whether the plaintiff is a public figure." (Citations omitted; internal **[\*\*\*68]** quotation marks omitted.) *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 628*; see also *Gertz v. Robert Welch, Inc., supra, 418 U.S. 350*; *Flamm v. American Assn. of University Women, supra, 201 F.3d at 148-49*. To sustain an award of punitive damages, the plaintiff must prove actual malice by clear and convincing evidence, which "denotes a degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution." (Internal quotation marks omitted.) *Dacey v. Connecticut Bar Asso., 170 Conn. 520, 536-37, 368 A.2d 125 (1976)*. The other elements of defamation, including the subsidiary historical facts, are, however, subject to proof under the preponderance of the evidence standard. *Holbrook v. Casazza, 204 Conn. 336, 358-59, 528 A.2d 774 (1987)*, cert. denied, *484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988)*; *Miles v. Perry, 11 Conn. App. 584, 588-89, 529 A.2d 199 (1987)*.[32]

---

[31] As a variation on the fourth element of reputational harm, "[d]efamation is also actionable per se. . . . Slander is . . . actionable [per se] **[\*\*\*66]** if it charges a crime. . . . To be actionable per se, the [defamation] must be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached. . . . The modern view of this requirement is that the crime be a chargeable offense which is punishable by imprisonment. . . . In the case of a statement that is defamatory per se, injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need neither plead nor prove it. . . . In such case, [t]he individual plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the [defamation] caused him." (Citations omitted; internal quotation marks omitted.) *Skakel v. Grace, 5 F. Supp. 3d 199, 206-207 (D. Conn. 2014)*; see also, e.g., *Urban v. Hartford Gas Co., supra, 139 Conn. 308*; *DeVito v. Schwartz, 66 Conn. App. 228, 234-35, 784 A.2d 376 (2001)*.

[32] The Appellate Court cited *Dacey v. Connecticut Bar Asso., supra, 170 Conn. at 534*, for the proposition that, in contrast to public figures, "if the plaintiff is a private individual . . . she is required to prove actual malice, in order to rebut the defense of privilege and recover general damages, merely by a preponderance of the evidence." *Miles v. Perry, supra, 11 Conn. App. 590*. With respect to common-law privilege defenses, we note by way of background, that "[a] defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege. . . . When considering whether a qualified privilege protects a defendant **[\*\*\*69]** in a defamation case, the court must resolve two inquiries. . . . The first is whether the privilege applies, which is a question of law over which our review is plenary. . . . The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact. . . . In a defamation case brought by an individual who is not a public figure, the factual findings underpinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them. . . . Finally, to the extent that a litigant challenges

18

**EXHIBIT 43**                                                                                          **EXHIBIT 1**

Gleason v. Smolinski, 319 Conn. 394

 [**949]   [*433]  Before turning to the defendants' claims in the present appeal, we observe four touchstones for our analysis. First, the parties do not dispute for purposes of the defamation claim that the oral statements at issue, which pertain to the plaintiff's role in Bill's death or disappearance, implicate a matter of public concern for *first amendment* purposes.[33] See *Holloway  [**950]  v. American  [*434]  Media, Inc., supra, 947 F. Supp. 2d 1261 n.10*; see also,

---

the legal standard that is required to establish that a privilege has been defeated, that issue is a question of law over which our review is plenary." (Citations omitted.) *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 628-29*; see also, e.g., *New York Times Co. v. Sullivan, supra, 376 U.S. 279-80*; *Cweklinsky v. Mobil Chemical Co., supra, 267 Conn. 228-29*; *Woodcock v. Journal Publishing Co., 230 Conn. 525, 535, 646 A.2d 92 (1994)*, cert. denied, **513 U.S. 1149, 115 S. Ct. 1098, 130 L. Ed. 2d 1066 (1995)**.

Qualified privileges may be defeated by a showing, by a preponderance of the evidence; see *Miles v. Perry, supra, 11 Conn. App. 590*; of actual malice, also known as constitutional malice, or malice in fact. See, e.g., *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 634* (common-law intracorporate communications privilege); *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. at 114-15* (fair comment privilege); see also *Konikoff v. Prudential Ins. Co. of America, 234 F.3d 92, 99 (2d Cir. 2000)* ("[t]he critical difference between common-law malice and constitutional malice, then, is that the **[***70]**  former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth").

Thus, we note that the statement of the standard of proof articulated in *Miles v. Perry, supra, 11 Conn. App. 590*, appears accurate with respect to common-law defamation issues lacking *first amendment* significance, such as privilege defenses. We emphasize, however, that given the constitutional implications; see, e.g., *Gertz v. Robert Welch, Inc., supra, 418 U.S. 350*; *Flamm v. American Assn. of University Women, supra, 201 F.3d at 148-49*; the clear and convincing evidence standard furnishes the applicable standard of proving actual malice to sustain an award of punitive damages to a private figure plaintiff. See, e.g., *Lester v. Powers, 596 A.2d 65, 70 (Me. 1991)* ("[w]e do not require clear and convincing evidence, however, to overcome a conditional privilege that arises at common law and not from the [f]irst [a]mendment"); *Reiter v. Manna, 436 Pa. Super. 192, 198-99, 647 A.2d 562 (1994)* ("a private figure plaintiff cannot recover punitive damages unless he or she demonstrates actual malice by clear and convincing evidence"); *Deloach v. Beaufort Gazette, 281 S.C. 474, 480, 316 S.E.2d 139* ("[F]or actual damages in a libel action neither . . . [*New York Times Co.*] nor *Gertz* . . . require the states to adopt a degree of proof more demanding than by 'a preponderance of the evidence' where a private individual is involved. For a private individual to recover punitive damages in a libel action, however, he must prove actual malice **[***71]**  by clear and convincing evidence."), cert. denied, **469 U.S. 981, 105 S. Ct. 384, 83 L. Ed. 2d 319 (1984)**; cf. *Chapadeau v. Utica Observer-Dispatch, Inc., 38 N.Y.2d 196, 199, 341 N.E.2d 569, 379 N.Y.S.2d 61 (1975)* (New York defamation law requires that "where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties").

[33] Notwithstanding the plaintiff's failure to brief this issue, the dissent asserts that the statements at issue did not pertain to a matter of public concern and, therefore, are not subject to protection under the *first amendment*, thus permitting the plaintiff's claims to be governed exclusively under the common law. We respectfully disagree with the dissent's analysis of this point, in particular its reliance on: (1) the **[***73]**  Mississippi Supreme Court's decision in *Sartain v. White, supra, 588 So. 2d 204*; and (2) the fact that the defamatory statements at issue in this case were not directed to the public at large. We address each in turn.

First, we note that the Mississippi Supreme Court's decision in *Sartain* is a jurisprudential odd duck, which arose from a neighborhood dispute wherein defamation allegations arose from one party's accusations in numerous public fora, such as tirades and letters to public officials, that her neighbors were murderers, robbers, and terrorists. *Id., 213*. In holding that this was not a matter of public concern, thus relieving the parties alleging defamation, Lloyd White and Bess White, from having to prove actual malice in order to recover punitive damages, the Mississippi court rendered a particularly narrow decision that appeared to account for the actions of the plaintiff in that case, Josephine Sartain—a prolific self-represented party with apparent mental health problems—noting that the "form of the debate involved various pleadings, letters to city officials, and oral tirades within a neighborhood. The context of the debate involves a dispute between a respectable family as the accused and an accuser with a rather **[***74]**  notorious past. *Though accusations of this nature generally are a matter of public concern, in this context and emanating from this source, we find that they are not in this case*." (Emphasis added.) Id.; see also id. ("Sartain used, misused and played litigation games until she lost the game; yet, it is difficult to say that [Lloyd White and Bess White] won. Surely, they did not win more than they were entitled to, and we may be certain that the courts were patient and careful in hearing . . . Sartain.").

Second, the dissent's emphasis on the relatively private expression of the statements as indicative of the fact that they do not relate to a matter of public concern—as compared to publication through a book, news article, broadcast or other broad medium—

Page 19 of 44                                                                                          **19**

e.g., *Miles v. Ramsey, 31 F. Supp. 2d 869, 875 (D. Colo. 1998)* (child murder investigation matter of public concern for purposes of defamation claims arising from **[\*435]** article in tabloid newspaper indicating that neighbor is pedophile); *Shoen v. Shoen, 292 P.3d 1224, 1229-30, 2012 COA 207 (Colo. App. 2012)* (defendant's statement in television interview that plaintiff was "capable" of arranging murder **[\*\*\*72]** of his brother's wife implicated matter of public concern, triggering state's higher burden of proof in defamation action). Second, with no serious argument to the contrary, we treat the plaintiff as a private figure. Third, we assume, without deciding, that the Appellate Court properly agreed with the plaintiff's characterization of the statements at issue as purported statements of opinion that were, in reality, actionable statements of implied fact under, for example, *Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 448 A.2d 1317 (1982)*, and *Lester v. Powers, 596 A.2d 65 (Me. 1991)*.[34] Finally, there is no dispute that the subject matter of these statements is defamatory per se because they charge crimes punishable by imprisonment **[\*\*951]** and, therefore, the plaintiff is relieved from the burden of pleading and proving damages to her reputation. See, e.g., *Skakel v. Grace, 5 F. Supp. 3d 199, 206-207 (D. Conn. 2014)*; see also footnote 31 of this opinion.

**[\*436]** A

Standard of Appellate Review

Relying on *Woodcock v. Journal Publishing Co., 230 Conn. 525, 646 A.2d 92 (1994)*, cert. denied, *513 U.S. 1149, 115 S. Ct. 1098, 130 L. Ed. 2d 1066 (1995)*, the defendants first contend that the Appellate Court improperly applied the clearly erroneous standard of review, rather than engaging in an independent examination of the entire record to ensure that the judgment did not violate their *first amendment* rights. The plaintiff argues that the proper standard of review is abuse of discretion. We conclude that appellate review of the trial court's conclusions with respect to defamation in this case requires us to review the underlying findings of historical fact for clear error, but also to engage in an independent review of those determinations by the trial court that carry constitutional significance, such as whether those facts constituted clear and convincing evidence of actual malice justifying an award of punitive damages. **[\*\*\*77]**

---

sounds appealing, but is constitutionally unavailing. It is well settled that the "private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern." *Rankin v. McPherson, 483 U.S. 378, 386 n.11, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)*; see also, e.g., *id., 386-87* (derogatory statement by law enforcement employee about unsuccessful attempt on President Ronald Reagan's life pertained to matter of public concern, despite fact that it was made during private conversation **[\*\*\*75]** with another employee); *Dongguk University v. Yale University, 734 F.3d 113, 128-29 (2d Cir. 2013)* (holding that allegedly defamatory statements pertained to matter of public concern under *Snyder* when they related to major scandal in South Korea, despite fact that they were private internal communications); *Cioffi v. Averill Park Central School District Board of Education, 444 F.3d 158, 165 (2d Cir. 2006)* (private letter sent by athletic director to superintendent criticizing football coach's supervision of team was matter of public concern when its subject "was no mere private employment grievance, but assaultive conduct against a minor that, when publicly disclosed, triggered criminal charges as well as public outcry").

[34] Accordingly, we need not address the defendants' claim, based on, inter alia, *Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 795-96, 734 A.2d 112 (1999)*, that all three allegedly defamatory statements were expressions of opinion on a matter of public concern protected by the common-law fair comment privilege because they were statements of their views based on likely known facts, rather than actionable conveyances of objective fact. We note, however, that the bounds of the common-law fair comment privilege largely accord with *first amendment* protections for opinion. See *Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-21, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)*; *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 117-19*; *Lester v. Powers, supra, 596 A.2d 71 n.9*. This is particularly so, insofar as there is no "wholesale defamation exemption for anything that might be labeled 'opinion'" because "expressions of **[\*\*\*76]** 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co., supra, 18*. Put differently, under the *first amendment* after *Milkovich*, the "mere recitation of prefatory phrases such as 'in my opinion' or 'I think' will not render innocent an otherwise defamatory statement." *Flamm v. American Assn. of University Women, supra, 201 F.3d at 152*; see also *Mr. Chow of New York v. Ste. Jour Azur S.A., 759 F.2d 219, 226 (2d Cir. 1985)* (multifactor test for determining whether statement is protected opinion); *Daley v. Aetna Life & Casualty Co., supra, 795-96* (citing *Mr. Chow of New York* for test).

Gleason v. Smolinski, 319 Conn. 394

In *Woodcock v. Journal Publishing Co., supra, 230 Conn. 525-36*, this court followed, inter alia, *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 514, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)*, and *Holbrook v. Casazza, supra, 204 Conn. 343*, in declining to apply the clearly erroneous standard in reviewing a trial court's "determination of actual malice in a case governed by *New York Times Co. v. Sullivan [supra, 376 U.S. 254]*," namely, one implicating defamation claims by a public figure on a matter of public concern. (Internal quotation marks omitted.) *Woodcock v. Journal Publishing Co., supra, 525-36*. Rather, consistent with the analysis applied in other *first amendment* contexts; see part I of this opinion; the court observed that, in "reviewing defamation actions, an appellate court has an obligation to make an independent examination **[*437]** of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . Because freedom of expression occupies the highest rung of the hierarchy of *[f]irst [a]mendment* values, and is entitled to special protection . . . [t]he rule of independent review assigns to appellate courts in *first amendment* freedom of expression cases, a constitutional responsibility that cannot be delegated to the trier of fact, whether the [fact-finding] function be performed in the particular case by a jury or by a trial judge."[35] (Citations omitted; internal quotation marks omitted.) *Id., 536*.

This independent review does not, however, mean that the reviewing court may disregard the facts as found by the trier of fact. This court has acknowledged that the independent review required by *Bose Corp. v. Consumers Union of United States, Inc., supra, 466 U.S. 499-500*, "preserves the due regard that is ordinarily given to the trial judge's **[**952]** opportunity to observe the demeanor of the witnesses. . . . In a footnote, the . . . court [in *Bose Corp.*] clarified that [t]he independent review function is not equivalent to a de novo review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for [the] plaintiff. . . . The court noted that, apart from the finding of actual malice, to which the rule of independent review applies, the other findings of fact in a defamation case are properly tested under the clearly erroneous standard of **[*438]** review."[36] (Citations omitted; emphasis omitted; internal quotation marks **[***79]** omitted.) *Holbrook v. Casazza, supra, 204 Conn. 344*. These other findings of fact include, for example, the falsity of the factual statement that constitutes the alleged defamation. See *Flamm v. American Assn. of University Women, supra, 201 F.3d at 149*.

---

[35] Consistent with this independent review, we note that other determinations **[***78]** related to the *first amendment* in the defamation context present questions of law for the court, such as whether a statement relates to a matter of public concern, whether a plaintiff is a public figure, or whether a statement is defamatory per se. See, e.g., *Celle v. Filipino Reporter Enterprises, Inc., supra, 209 F.3d 176-77*; *Flamm v. American Assn. of University Women, supra, 201 F.3d at 148*; *Skakel v. Grace, supra, 5 F. Supp. 3d 207*.

[36] In *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 628-29*, we cited *Woodcock v. Journal Publishing Co., supra, 230 Conn. 525*, and *Bleich v. Ortiz, 196 Conn. 498, 501, 493 A.2d 236 (1985)*, in describing the standard of review, noting that whether an applicable common-law "privilege nevertheless has been defeated through its abuse, which is a question of fact," and that in "a defamation case brought by an individual who is not a public figure, the factual findings underpinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them." See also footnote 32 of this opinion. Our citation to *Woodcock* was cautionary, noting in the parenthetical reference that it stood for the proposition that, "in [an] appeal of [a] defamation case brought by [a] public figure, [the] clear and convincing evidence standard of review applies, rather than [the] clearly erroneous standard of review." First, we note that our description of *Woodcock* in *Gambardella* contained an apparent misstatement of the law, insofar as it conflated the clear and convincing burden of proof with the clearly erroneous standard of review on appeal, which are **[***80]** two distinct concepts. See, e.g., *Notopoulos v. Statewide Grievance Committee, 277 Conn. 218, 225-27, 890 A.2d 509 (2006)* (attorney ethics violation must be proven by clear and convincing evidence, but court reviews finding of such violation using clearly erroneous standard). Second, the clearly erroneous standard of review was applicable in both *Gambardella* and *Bleich*, because both cases concerned challenges to trial court determinations with respect to common-law privilege defenses in cases wherein no public concern was asserted, rather than constitutionally mandated matters such as the proof of actual malice to sustain a punitive damages award. See *Gambardella v. Apple Health Care, Inc., supra, 639-41* (intracorporate communications privilege for employment decisions); *Bleich v. Ortiz, supra, 503-504* (conditional privilege of protecting ownership interest in personal property).

Thus, although "[w]e have considerable latitude in deciding whether the evidence supports a finding of actual malice," the "constitutionally based rule of independent review does not mean that we disregard credibility determinations of the trier of fact. . . . Deference to factual determinations that turn on credibility **[*439]** assessment is essential because of the fact finder's unique opportunity to observe and weigh witness testimony." (Citations omitted; internal quotation marks omitted.) **[***81]** _Tan v. Le, 177 Wn. 2d 649, 669-70, 300 P.3d 356 (2013)_, cert. denied, __ _U.S._ __, _134 S. Ct. 941, 187 L. Ed. 2d 784 (2014)_; see also _Dacey v. Connecticut Bar Asso., supra, 170 Conn. at 540_ ("[T]he credibility of the witnesses and the weight to be accorded their testimony is a matter for the jury to decide. Further, we refrain from choosing among inferences as this is another jury function."). Thus, we defer to the trier's findings with respect to, for example, a party's actual knowledge of a statement's falsity, or whether he acted in good faith in publishing a statement later deemed defamatory. See _Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 638-39_; **[**953]** see also _Nelson v. Tradewind Aviation, LLC, 155 Conn. App. 519, 540-41, 111 A.3d 887 (2015)_ (upholding actual malice determination because jury reasonably could have concluded that defendant knowingly made false statements about plaintiff's employment history with improper motive); _Tan v. Le, supra, 671-72_ (deferring to jury's finding of actual malice as based on decision not to credit defendants' testimony that they had acted in good faith when publishing defamatory articles). We conclude, therefore, that the Appellate Court; see _Gleason v. Smolinski, supra, 149 Conn. App. 310-11_; improperly applied the clearly erroneous standard of review without tailoring it to the specific trial court determinations at issue, in particular the trial court's actual malice finding, which was of constitutional import given the punitive damages awarded to the plaintiff. See, e.g., _Gertz v. Robert Welch, Inc., supra, 418 U.S. 348-49_; see also footnote 32 of this opinion. **[***82]**

B

Actual Malice and Constitutional Adequacy of Proof

We finally turn to the defendants' burden of proof claim, which relies on _Obsidian Finance Group, LLC_ **[*440]** _v. Cox, supra, 740 F.3d 1284_, for the proposition that when, as in this case, an allegedly defamatory statement relates to a matter of public concern, the _first amendment_ requires the plaintiff, even if _not_ a public figure, to prove by clear and convincing evidence that the defendant acted with actual malice in making it. To this end, the defendants contend that we should engage in an independent review of the record, and conclude that they lacked the requisite actual malice insofar as they were reasonable in believing that the plaintiff was involved in Bill's disappearance because the plaintiff was the last person to see him alive, and refuses to take a polygraph to clear herself as a suspect in his disappearance and, they argue, admits that she continues to withhold information from the police. As the plaintiff acknowledges, the defendants in essence "claim that [she] had the burden of proving that she was innocent of murder in order to prevail on her defamation claim."

In response, the plaintiff relies on _Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 112 and n.6_, and _Atwater v. Morning News Co., 67 Conn. 504, 520, 34 A. 865 (1896)_, for the proposition that, as a private figure, she does not bear the burden of proving **[***83]** the falsity of the defamatory statements, insofar as Connecticut follows the common-law rule that the truth is an affirmative defense in defamation cases involving private citizens. The plaintiff claims that the defendants' arguments to the contrary would cause a radical change in the law of defamation, because it would render any victim of defamation a "limited purpose public figure" under _Gertz v. Robert Welch, Inc., supra, 418 U.S. 323_, resulting solely from the publication of the allegedly tortious statements.[37] The plaintiff **[**954]** then contends that, **[*441]** "[e]ven if this court were to adopt the defendants' radical position . . . it would not alter the result in this case," insofar as the trial court found that the defendants acted in reckless disregard

---

[37] In _Gertz v. Robert Welch, Inc., supra, 418 U.S. 351_, the Supreme Court observed that, an individual's status as a "public figure" for defamation purposes "may rest on either of two alternative bases. In some instances an individual **[***84]** may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." The court held in _Gertz_ that an attorney was not a public figure, despite his active role in community and professional affairs, because he "had achieved no general fame or notoriety in the community," and his role in the facts leading to the case were limited to representing a private client. _Id., 351-52_.

EXHIBIT 43 EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

for the truth in making the statements at issue, given evidence in the record that was sufficient to establish she knew nothing about Bill's disappearance. We agree with the defendants, insofar as they claim that reversal is required because the plaintiff failed to prove the falsity of the allegedly defamatory statements.

We note at the outset that this claim was not preserved in the trial court. Nevertheless, and in the absence of a procedural objection by the plaintiff, we exercise our discretion to review it pursuant to *State v. Golding, supra, 213 Conn. at 239-40*, despite the defendants' failure to ask that we do so, because their main brief otherwise meets the predicates for *Golding* review insofar as it has "present[ed] a record that is [adequate] for review and affirmatively [demonstrates] that [their] claim is indeed a violation of a fundamental constitutional right."[38] (Internal quotation **[***85]** marks omitted.) *State v. Elson, 311 Conn. 726, 754-55, 91 A.3d 862 (2014)*.

 **[*442]**  Our independent research demonstrates that neither of the parties' briefs provides a completely accurate recitation of the law governing the proof of defamation claims like those at issue in the present case, namely, claims made by private figure plaintiffs, but relating to matters of public concern.[39] The defendants rely on the decision of the United States Court of Appeals for the Ninth Circuit in *Obsidian Finance Group, LLC v. Cox, supra, 740 F.3d 1284*, for the proposition that, when an allegedly defamatory statement relates to a matter of public concern, a private plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice in making it. *Obsidian Finance Group, LLC*, does not, however, stand for such a broad proposition. Indeed, the defendants' reading of that case is directly foreclosed, as a matter of federal constitutional law, by the United States Supreme Court's landmark decision in *Gertz v. Robert Welch, Inc., supra, 418 **[**955]** U.S. 346*, which rejected a claim that the actual malice standard adopted in *New York Times Co.* should extend to defamation actions brought by private individuals, even in cases concerning matters of public concern. **[***87]** [40]  **[*443]**  Instead, the Supreme Court held in *Gertz* that

---

[38] Indeed, the Appellate Court's opinion neither addresses, nor indicates that the defendants raised therein, a claim that the plaintiff was constitutionally required to prove that all of the allegedly defamatory statements were made with actual malice. This issue is not squarely presented in the defendants' petition for certification, either. We emphasize that, in a certified appeal, we "ordinarily decline to consider claims that are not raised properly before the Appellate Court or in the petition for certification to appeal to this court. . . . In a certified appeal, the focus of our review is not [on] the actions of the trial court . . . but [on] the actions of the Appellate Court. We do not hear the appeal de novo. The only questions that we need consider are those squarely raised by the petition for certification . . . ." (Citation omitted; internal quotation marks omitted.) *State v. Fauci, 282 Conn. 23, 26 n.1, 917 A.2d 978 (2007)*. We note, however, that in their petition for certification, the defendants claimed that the plaintiff had failed to carry her burden of proving the falsity of the allegedly defamatory statements. Given the legal congruence between these constitutional arguments, and the fact that the plaintiff **[***86]**  does not raise a procedural objection to them, we exercise our discretion to consider these issues on their merits.

[39] The dissent criticizes us for reaching this issue, given what it deems the apparent "failure of any party to request that we do so." Although we ordinarily will decide issues not raised by the parties **[***88]**  only in exceptional circumstances, our discussion of this point is necessary to avoid enshrining in the Connecticut Reports an error of *first amendment* law that would be created by unquestioning adherence to the defendants' overly generous view of *Obsidian Finance Group, LLC v. Cox, supra, 740 F.3d 1284*, particularly given the general unresponsiveness of the plaintiff's brief.

[40] The defendants' argument is not without some support, notwithstanding their failure to cite it. In *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 43-44, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971)*, which preceded *Gertz v. Robert Welch, Inc., supra, 418 U.S. 323*, a plurality of the United States Supreme Court extended the actual malice standard adopted in *New York Times Co.* to defamation actions brought by private individuals in cases concerning matters of public concern, at least insofar as media defendants were concerned. Three years later in *Gertz*, a majority of the United States Supreme Court rejected the approach of the *Rosenbloom* plurality. See *Gertz v. Robert Welch, Inc., supra, 345-46*. We note that a few states have, as a matter of state constitutional or common law, adopted the *Rosenbloom* standard apparently espoused by the defendants in this case, to provide greater protection to the freedom of speech. See, e.g., *Diversified Management, Inc. v. Denver Post, Inc., 653 P.2d 1103, 1106 (Colo. 1982)*; *Journal-Gazette Co. v. Bandido's, Inc., 712 N.E.2d 446, 452 (Ind.)*, cert. denied, **528 U.S. 1005, 120 S. Ct. 499, 145 L. Ed. 2d 385 (1999)**; *Senna v. Florimont, 196 N.J. 469, 488-90, 958 A.2d 427 (2008)*; *Alpine Industrial Computers, Inc. v. Cowles Publishing Co., 114 Wn. App. 371, 393, 57 P.3d 1178 (2002)*. This represents, however, a distinct minority position. See, e.g., *Kennedy v. Sheriff of East Baton Rouge, 935 So. 2d 669, 680-81 (La. 2006)*; *Senna v. Florimont, supra, 485 n.11*. As noted

"the [s]tates should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual"; *id., 345-46*; and that, "so long as they do not impose liability without fault, the [s]tates may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id., 347*; see also *id., 348* (requiring proof of at least negligence "recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation"). The court held, however, that this negligence standard applies only to "compensation for actual injury," and that "[s]tates may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id., 349*.

The defendants' citation to *Obsidian Finance Group, LLC*, does, however, point us indirectly to the proper **[*444]** legal standard with respect to the proof of defamation claims brought by private figures relating to matters of public concern, insofar as it cites the decision of the United States Court of Appeals for the Second Circuit[41] in *Flamm v. American Assn. of  [**956]  University Women, supra, 201 F.3d 144*. See *Obsidian Finance Group, LLC v. Cox, supra, 740 F.3d 1291*. In *Flamm*, the Second Circuit extended the rule of *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986)*, to nonmedia defendants[42] and held that, when an allegedly defamatory statement is made about a plaintiff who is a private figure, but relates to a matter of public concern, those "defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity, at least in cases where the statements were directed towards a public audience with an interest in that concern." *Flamm v. American Assn. of University Women, supra, 149*; see also *Albert v. Loksen, 239 F.3d 256, 268 n.10 (2d Cir. 2001)* (noting that New York common-law rule requiring defendant to plead and prove truth "survives in defamation suits by private-figure plaintiffs concerning statements on purely private matters," but stating that "[f]or constitutional reasons **[***90]** . . . **[*445]** a private-figure plaintiff . . . generally has the burden of proving falsity, at least where the allegedly defamatory statements concern a matter of public interest" [citation omitted]).

In describing this burden shift away from the common-law rule, followed in Connecticut, **[***91]** that falsity is presumed and the truth is an affirmative defense; see, e.g., *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 112*; the United States Supreme Court acknowledged that "requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so. Nonetheless, the [c]ourt's previous decisions on the restrictions that the *[f]irst [a]mendment* places upon the common law of defamation firmly support our conclusion here with respect to the allocation of the burden of proof. In attempting to resolve related issues in the defamation context, the [c]ourt has affirmed that [t]he *[f]irst [a]mendment* requires that we protect some falsehood in order to protect speech that matters. . . . To provide breathing space . . . for true speech on matters of public concern, the [c]ourt has been willing to insulate even demonstrably false speech from liability, and has imposed additional requirements of fault upon the plaintiff in a suit for defamation." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Philadelphia Newspapers, Inc. v. Hepps, supra, 475 U.S. 778*. The court further observed that this burden shift "adds only marginally to the burdens that the plaintiff must already bear as a result of our earlier decisions in the law of defamation. The plaintiff must show fault. A jury is obviously more likely **[***92]** to accept a plaintiff's contention

---

previously; see footnote 5 of this opinion; **[***89]** insofar as the defendants have not provided us with an independently briefed claim, with analysis consistent with *State v. Geisler, 222 Conn. 672, 684-86, 610 A.2d 1225 (1992)*, in support of a claim of greater protection under the Connecticut constitution, we confine our analysis to the *first amendment*.

[41] "[I]t is well settled that decisions of the Second Circuit, while not binding upon this court, nevertheless carry particularly persuasive weight in the resolution of issues of federal law when the United States Supreme Court has not spoken on the point. . . . This is particularly so given the existence of a circuit split, because [d]eparture from Second Circuit precedent on issues of federal law . . . should be constrained in order to prevent the plaintiff's decision to file an action in federal District Court rather than a state court located a few blocks away from having the bizarre consequence of being outcome determinative." (Citations omitted; internal quotation marks omitted.) *Dayner v. Archdiocese of Hartford, 301 Conn. 759, 783-84, 23 A.3d 1192 (2011)*.

[42] The United States Court of Appeals for the Ninth Circuit has observed that "every . . . circuit to consider the issue has held that the *[f]irst [a]mendment* defamation rules in [*New York Times Co. v. Sullivan, supra, 376 U.S. 254*] and its progeny apply equally to the institutional press and individual speakers." *Obsidian Finance Group, LLC v. Cox, supra, 740 F.3d 1291*.

**EXHIBIT 43**                                                          EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

that the defendant was at fault in publishing the statements at issue if convinced that the relevant statements were false. As a practical matter, then, evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published statements **[*446]** will generally encompass evidence of the falsity of the matters asserted."[43] Id.

**[**957]** Our review of the record indicates that neither the trial court nor the Appellate Court ever expressly considered whether the plaintiff proved the falsity of the defamatory statements under any standard of proof.[44] This indicates a violation of the plaintiff's *first amendment* **[*447]** rights under *Philadelphia Newspapers, Inc. v. Hepps, supra, 475 U.S. 778-79*, and *Flamm v. American Assn. of University Women, supra, 201 F.3d at 149*, thus satisfying the third prong of *State v. Golding, supra, 213 Conn. at 239-40*. See footnote 10 of this opinion. Turning to *Golding*'s fourth prong, however, the plaintiff contends that reversal of the defamation judgment is not required insofar as the Appellate Court upheld, as not clearly **[***93]** erroneous, the trial court's conclusion that the defendants made the statements at issue with actual malice by acting with reckless disregard for the truth, thus implying their falsity.[45] To this end, the plaintiff argues that the "defendants simply had no factual basis whatsoever for the accusations they made, yet they made them anyway and did so not only with knowledge that they would injure the plaintiff but for the specific and articulated purpose of 'break[ing] her.'" In support of this argument, she cites her own testimony as sufficient evidence that she "had no knowledge whatsoever concerning [Bill's] disappearance . . . ." Having reviewed the record, we disagree with the plaintiff's argument that it supports the trial court's finding of actual malice.

**[**958]** "As we previously have noted, actual malice requires a showing that a statement was made with knowledge that it was false or with reckless disregard for its truth. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth. . . . Further, proof that a defamatory falsehood has been uttered with bad or corrupt motive or with an intent to inflict harm will not be sufficient to support a finding of

---

[43] Indeed, the plaintiff's reliance on *Goodrich* is belied by footnote 6 of that opinion, wherein we acknowledged that, in light of constitutional decisions in the wake of *New York Times Co. v. Sullivan, supra, 376 U.S. 254*, "as a practical matter the burden of proving the falsity of the publication has been shifted to the plaintiff . . . ." *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 112 n.6*.

[44] The United States Supreme Court has observed that "[t]here is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence." *Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 661 n.2, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)*; see also, e.g., *World Wide Ass'n of Specialty Programs v. Pure, Inc., 450 F.3d 1132, 1140 (10th Cir. 2006)* (discussing split in authorities); *Turner v. KTRK Television, Inc., 38 S.W.3d 103, 117 (Tex. 2000)* (same). Although the Supreme Court's review of the divided authorities in *Harte-Hanks Communications, Inc.*, indicated that the Second Circuit follows the preponderance standard on this point, **[***94]** citing *Goldwater v. Ginzburg, 414 F.2d 324, 341 (2d Cir. 1969)*, cert. denied, *396 U.S. 1049, 90 S. Ct. 701, 24 L. Ed. 2d 695 (1970)*, the Second Circuit has subsequently concluded that *Goldwater* does not reflect the current state of constitutional defamation law, and that this issue remains an open question as a matter of federal law, including within the Second Circuit. See *DiBella v. Hopkins, 403 F.3d 102, 110 (2d Cir.)*, cert. denied, **546 U.S. 939, 126 S. Ct. 428, 163 L. Ed. 2d 326 (2005)**; see also *id., 114-15* (applying clear and convincing standard as matter of New York state law, and noting that majority of state and federal courts apply that standard to falsity element); *Blair v. Inside Edition Productions, 7 F. Supp. 3d 348, 357 (S.D.N.Y. 2014)* ("[n]or has the Second Circuit articulated the appropriate standard of proof"); but see *Rattray v. National City, 51 F.3d 793, 801 (9th Cir. 1994)* (adopting Second Circuit's decision in *Goldwater* in holding that plaintiff need only demonstrate falsity by preponderance of evidence), cert. denied, **516 U.S. 820, 116 S. Ct. 80, 133 L. Ed. 2d 39 (1995)**.

We note that the dissent criticizes us for failing to reach this open question of *first amendment* law and determine the applicable burden of persuasion on remand with respect to the element of falsity. Given the lack of briefing on this point, the fact, as noted by the dissent, that the burden may not necessarily be determinative on remand depending on the trial court's assessment of the level of proof, and our general reluctance to decide constitutional issues unnecessarily; see, e.g., *State v. Torres, 230 Conn. 372, 382, 645 A.2d 529 (1994)*; we deem the dissent's **[***95]** criticism to be unwarranted.

[45] At least one court has acknowledged lodged some intuitive appeal in the plaintiff's argument, which is consistent with much of the discussion in *Philadelphia Newspapers, Inc. v. Hepps, supra, 475 U.S. 778-79*, with respect to implying a finding of falsity from an express finding of actual malice. See *Bentley v. Bunton, 94 S.W.3d 561, 587 (Tex. 2002)*.

actual malice . . . although **[\*448]** such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity. . . .

"Whether a defendant has knowledge of the falsity of a defamatory statement is a question within the province of the trier of fact. . . . The proper inquiry is whether a defendant believes, honestly and in good faith, in the truth of his statements and whether he has grounds for such belief. . . . Notably, however, a trial court is not required **[\*\*\*96]** merely to accept a defendant's self-serving assertion that he published a defamatory statement without knowing that it was false. . . . As the United States Supreme Court aptly stated: The defendant in a defamation action . . . cannot . . . automatically [e]nsure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. . . .

"Although whether a defendant has published a false statement with reckless disregard for its truth is not easily captured in a simple definition, we have held that reckless disregard may be found when an individual publishes defamatory statements with a high degree of awareness of . . . probable falsity . . . or . . . entertained serious doubts as to the truth of [the] publication **[\*\*\*97]** . . . . Moreover, [a] refusal to retract a statement that has been demonstrated to be false and defamatory might be relevant in showing recklessness at the time the statement was published." (Citations omitted; emphasis omitted; internal quotation marks **[\*449]** omitted.) *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 637-39*.

Turning to the record of the present case, we conclude that the plaintiff did not establish actual malice under any standard of proof. See footnote 44 of this opinion. Unlike in our past cases wherein we have upheld findings of actual malice, neither the trial court nor the plaintiff cite any evidence in the record indicating that the defendants' allegations that the plaintiff had some role in, or knowledge about, Bill's disappearance were made, as the trial court found, reckless disregard for the truth. Further, our review of the record does not yield any evidence to support the trial court's determination that "[w]e do not have a case of mere negligent utterances not based on fact but on suspicion and conjecture," particularly given that the plaintiff never challenged at trial the defendants' personal knowledge of the factual basis for their statements. Indeed, the evidence in the record supports the opposite conclusion, notwithstanding **[\*\*\*98]** the fact that there need not be a "single smoking gun proving actual malice," and that even the "clear and convincing evidence standard does not require defendants to admit on the record they entertained serious doubts as to the truth of their allegations." (Internal quotation marks omitted.) *Tan v. Le, supra, 177 Wn. 2d 674*.

 **[\*\*959]** First, the plaintiff and Bill ended their romantic relationship within just a few days of his disappearance, and the morning he disappeared, he was involved in an altercation at DePallo's house, when he put a ladder up to the bedroom where the plaintiff was staying, when he could not reach her by telephone.[46] That night, Bill also left multiple threatening telephone messages for Sorensen, who was his apparent rival for the plaintiff's **[\*450]** affections. Indeed, an affidavit in support of an arrest warrant for Janice Smolinski,[47] and the plaintiff's own testimony,[48] confirms that

---

[46] The plaintiff had told Vrabel that Bill had been "harassing her," shortly before they received a call from his neighbor indicating that he was missing.

[47] The affidavit, which was authored by a Woodbridge police officer, James Sullivan, supports an arrest warrant for Janice Smolinski on charges of trespass in the first degree and disorderly conduct, arising from the placement of posters **[\*\*\*100]** at an elementary school in Woodbridge.

[48] We note that the defendants argue in their brief that the plaintiff "admits she continues to withhold information from the police about [Bill's] disappearance." The defendants support this assertion with a "see" citation to the plaintiff's testimony recorded on page 118 of the November 29, 2011 trial transcript. Having reviewed page 118 and surrounding pages in that transcript, we do not see any support at all for such an admission, which would in essence be the proverbial smoking gun. We caution the defendants

Gleason v. Smolinski, 319 Conn. 394

the Waterbury police have considered the plaintiff as a suspect in Bill's disappearance, and have not yet ruled her out because she has refused, on the advice of counsel, to take a polygraph examination.[49] Moreover, the defendants have searched for the truth into Bill's disappearance, and have retained Todd Lovejoy, a retired Waterbury **[\*\*\*99]** police officer, as a private detective to help them; the plaintiff has not responded to Lovejoy's attempts to speak to her about Bill's disappearance. Finally, the defendants then became aware of the plaintiff's own conduct, along with that of Vrabel, in removing the missing person flyers in the town of Bethany, which, as the trial court found, triggered the defendants' more intense flyer campaign that gave rise to the intentional infliction of emotional distress claim addressed in part I of this opinion. In comparison to the other cases in which we have upheld findings of actual malice,[50] these circumstances indicate **[\*451]** that the defendants did not act **[\*\*960]** with reckless disregard for the truth in stating to other people that the plaintiff, at the very least, knows more than she is saying about Bill's disappearance.[51]

Although it would be probative evidence if there were other evidence of actual malice, the acrimony between the parties, including Janice Smolinski's expressed desire to "break" the plaintiff and have her reveal information about Bill's disappearance, does not suffice by itself to fill this evidentiary void. "[E]vidence of ill will or bad motives will support a finding of actual malice **[\*452]** only when combined with other, more substantial evidence of a defendant's bad faith." (Internal quotation marks omitted.) *Woodcock v. Journal Publishing Co., supra, 230 Conn. 544*; see also, e.g., *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 638* ("proof that a defamatory falsehood has been uttered with bad or corrupt motive or with an intent to inflict harm will not be sufficient **[\*\*\*103]** to support a finding of actual malice" [internal quotation marks omitted]). Accordingly, we conclude that the trial court's failure to conduct the falsity analysis required by the *first amendment* requires a new trial on the defamation claim.[52]

---

that the use of the "see" signal in citations is not absolution from assuring their factual accuracy. Cf. *Rules of Professional Conduct 3.3 (a) (1)*.

[49] We do note, however, that the plaintiff testified that Janice Smolinski had stated to her that she would not leave the plaintiff alone even if the plaintiff passed the polygraph "with flying colors . . . ."

[50] See *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 640* (nursing home supervisor admitted that he was specifically aware that employee had been given resident's property as gift, meaning that "there simply was no basis for a belief that the plaintiff had stolen property from the facility," and plaintiff's violation of gifting policy "did not alter the ownership of the property and **[\*\*\*101]** cannot alter the meaning of theft, a criminal act defined by law"); *Holbrook v. Casazza, supra, 204 Conn. 348-50* (defendants admitted that they did not check veracity of their original accusations, including their factual and legal validity, and continued to publish them after being apprised that investigation had determined that they were invalid); *Nelson v. Tradewind Aviation, LLC, supra, 155 Conn. App. 537-41* (sufficient evidence of actual malice to support defendant's forfeiture of qualified privilege in providing employment references when there was ample evidence of knowing falsity of statements with regard to pilot's alleged termination for reasons related to performance, rather than lack of work); see also *Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 691-92, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)* (sufficient evidence of actual malice held when publisher failed to consult key witness and to listen to readily available tape recording of relevant conversation to verify informant's "highly improbable" allegations, which had already been made doubtful by statements of other witnesses); cf. *Woodcock v. Journal Publishing Co., supra, 230 Conn. 542-44* (There was no clear and convincing evidence of actual malice when, despite evidence that the newspaper had tried to harm the legislative campaign of the plaintiff's husband, the reporter relied on past articles for facts, and the plaintiff did not call the newspaper editor to testify about **[\*\*\*102]** "whether he or she had been aware of the inaccuracy at the time the article was published. In the absence of evidence to the contrary, the most that can be said is that the defendants were negligent in researching and publishing the article.").

[51] Because of our conclusion with respect to the defendants' other claims on appeal, we need not reach their additional argument that, under *DeVito v. Schwartz, 66 Conn. App. 228, 784 A.2d 376 (2001)*, the plaintiff was entitled only to nominal damages because she failed to adduce evidence of reputational or other harm to support her claim to compensatory damages.

[52] Because of our conclusion with respect to the defendants' other claims on appeal, we need not reach their additional argument that, under *DeVito v. Schwartz, 66 Conn. App. 228, 784 A.2d 376 (2001)*, the plaintiff was entitled only to nominal damages because she failed to adduce evidence of reputational or other harm to support her claim to compensatory damages.

**EXHIBIT 43**                                                                                    **EXHIBIT 1**

Gleason v. Smolinski, 319 Conn. 394

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court for a new trial on the claims of intentional infliction of emotional distress and defamation.

In this opinion ROGERS, C. J., and PALMER, McDONALD and ESPINOSA, Js., concurred.

**Dissent by:** EVELEIGH

# Dissent

EVELEIGH, J., with whom ZARELLA, J., joins, dissenting. I respectfully dissent. Free speech may not be invoked as a mere contrivance to shield tortious conduct—directed at a private party on a purely private matter—from liability. See *Snyder v. Phelps, 562 U.S. 443, 455, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)*. In my view, the majority accepts a contrived, post hoc rationalization **[\*\*\*104]** for the harassing conduct by the defendants, **[\*453]** Janice Smolinski and Paula Bell,[1] allowing a hollow invocation of the **[\*\*961]** *first amendment to the United States constitution* in order to protect conduct not deserving of its aegis. I remain dedicated to safeguarding free speech, the hallmark of which "is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting." (Internal quotation marks omitted.) *State v. Krijger, 313 Conn. 434, 448, 97 A.3d 946 (2014)*. As the trial court's findings demonstrate, however, no protected ideas were intended to be expressed by the defendants in continuously bombarding the plaintiff, Madeleine Gleason,[2] with flyers at her residence and place of employment. Instead, the trial court found that "what is unacceptable here and worthy of a finding of outrageous and extreme behavior is the continuing aggravated nature of the [defendants'] activity in hounding [the plaintiff] where she lived and worked and engaged in the ordinary activities of life. . . . Posters of a missing person were placed so as to indicate to [the plaintiff] that the very purpose of the poster campaign was to underline her supposed knowledge of the criminal disappearance of [William Smolinski, Jr. (Bill)]."[3] (Citation omitted.) The trial court **[\*\*\*105]** further concluded: "[T]he [plaintiff's] emotional distress . . . was severe. She, in effect, felt she was being constantly hounded—not as the result of a general effort by the [defendants] to find their son and brother but part of an effort to break her. . . . [T]he defendants would **[\*454]** not be satisfied unless [the plaintiff] admitted to what they were convinced she knew and they pursued their action with these purposes in mind." Respectfully, only by overturning these factual findings—and making a new finding that "the targeted content and location was consistent with the overarching public concern of gaining information about Bill's disappearance"—can the majority justify the conclusion that the defendants' conduct merits the *first amendment's* protections. The majority does so notwithstanding the fact that, at oral argument, the defendants conceded that they were not asking this court to overturn any of the trial court's factual findings. See footnote 4 of this dissenting opinion.

In light of the standard of review we must apply today, which requires this court to search the record to make sure there is no intrusion on *first amendment* rights and to disturb the trial court's factual findings only when they are clearly erroneous, as well as the defendants' concession that they do not ask this court to overturn the trial court's factual findings, respectfully, I cannot agree with the majority's apparent sub silentio disregard of the trial court's crucial factual findings. If it is unable to disregard the trial court's critical factual finding, the majority essentially concedes, through its citation to *State v. Carpenter, 171 P.3d 41 (Alaska 2007)*, that such conduct is not protected speech. See

---

[1] I note that, although John Murray was also named as defendant in the present case, the claims made against him are not at issue in the present appeal. See footnote 3 of the majority opinion. For the sake of simplicity, I refer to Janice **[\*\*\*106]** Smolinski and Bell collectively as the defendants and individually by name.

[2] Although B and B Transportation, Inc., was also a plaintiff in the underlying action, it is not a party to the present appeal. See footnote 2 of the majority opinion. I therefore refer to Gleason as the plaintiff.

[3] For the sake of consistency with the majority opinion, I hereinafter refer to William Smolinski, Jr., as Bill. See footnote 1 of the majority opinion.

*id., 59* ("[e]ven speech that relates to a matter of public interest loses its protection and can give rise to an **[\*\*\*107]** [intentional infliction of emotional distress] claim if . . . it is uttered with an intent merely to harass and with no intent to persuade, inform, or communicate"). Therefore, I would affirm the judgment of the Appellate Court which concluded that, notwithstanding an independent review of the whole record, the trial court's factual **[\*\*962]** findings must stand, as they are amply supported by the record and, therefore, unable to support the legal **[\*455]** conclusion that the defendants' harassing conduct is speech of public concern. See *Gleason v. Smolinski, 149 Conn. App. 283, 293-94, 88 A.3d 589 (2014)*; *id., 306* ("[u]ltimately, the [trial] court credit[ed] the testimony of the plaintiff . . . because although the defendants testified that they did not engage in the conduct of hanging missing person posters in order to harass the plaintiff, other evidence presented . . . [showed] that the defendants had a strong motive to act in the way . . . alleged by the plaintiff" [internal quotation marks omitted]).

The defendants did not intend to convey a protected message through their intentional efforts to "hound" the plaintiff until she "broke." No ideas were expressed through the other harassing conduct that formed the basis for the trial court's judgment. The only message a reasonable person could have **[\*\*\*108]** gleaned from the defendants' conduct, including their targeted placement of posters, is one of harassment. Such tactics included calling the plaintiff and threatening to kill her, calling the plaintiff's employer and the employer's clients to accuse the plaintiff of murder, following the plaintiff and her friends on the street and videotaping her, threatening the plaintiff and her friends in person, swearing at and calling the plaintiff names such as "ho" and "slut" and ignoring admonishments by the police to stop escalating matters before things got out of hand. Shielding this harassing conduct, the sum of which caused the plaintiff "to fear for her safety and that of her child," cannot be tolerated in a decent society and is neither envisioned nor dictated by our *first amendment* jurisprudence. For these reasons, I respectfully dissent.

I

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

I begin by discussing the majority's opinion, first, by noting the cases it cites in setting forth relevant *first amendment* **[\*456]** jurisprudence. I then discuss how, in my view, the majority has overturned a crucial finding of fact in order to conclude that the present case involves a violation of the *first amendment*. Because I respectfully disagree with the **[\*\*\*109]** majority's disregard of this crucial finding, I then conclude that the cases cited by the majority, as well as additional case law, demonstrate that there is no basis for finding a constitutional violation in the present case under the third prong of *State v. Golding, 213 Conn. 233, 239-40, 567 A.2d 823 (1989)*. Specifically, I conclude that the defendants' targeted posters cannot be shielded from forming the basis of liability because it is not speech of public concern.

The majority accurately sets forth the standard of review and substantive law concerning speech of public concern. See *Snyder v. Phelps, supra, 562 U.S. 453-54* ("Deciding whether speech is of public or private concern requires us to examine the content, form, and context of that speech, as revealed by the whole record. . . . As in other *[f]irst [a]mendment* cases, the court is obligated to make an independent **[\*457]** examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." [Citations omitted; internal quotation marks omitted.]); *State v. Krijger, supra, 313 Conn. 447* ("[T]he heightened scrutiny **[\*\*\*110]** that this court applies **[\*\*963]** in *first amendment* cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue [were not protected by the *first amendment*], we accept all subsidiary credibility determinations and findings that are not clearly erroneous."). In undertaking an independent examination of the whole record to determine whether the defendants' targeted placement of posters constitutes speech of public concern, an inquiry concededly made more difficult by the defendants' failure to assert entitlement to the *first amendment's* protections at trial, the majority begins by examining the content, context, and form of the speech at issue.

As to the first of three factors to consider, the content of the speech, the majority examines the "objective nature of the speech at issue in the count of the complaint alleging intentional infliction of emotional distress, namely, the

defendants' extensive campaign of missing person posters." It notes the "well established" principle that "'[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are without [***111] question events of legitimate concern to the public . . . .' *Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 492, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975)*." After noting that the posters seek information about Bill without specifically referencing the plaintiff, the majority concludes that the content of the communications relates to a matter of public concern—namely, "matters pertaining to missing persons." I agree that the content of the posters, without more, ostensibly relates to a matter of public concern.

The majority then discusses case law pertaining to the second and third factors: the context and form of the speech. As to context, the majority concedes that "the existence of preexisting animus between parties might indicate circumstantially that a defendant is dressing intentionally tortious conduct in the garb of the *first amendment*," though it explains that a motive to harm "'does not necessarily render the messages conveyed . . . matters of purely private rather than public concern.' *Spacecon Specialty Contractors, LLC v. Bensinger, 713 F.3d 1028, 1038 (10th Cir. 2013)*." The cases cited by the majority conclude that, if the motive [*458] to harm or harass is the *sole* basis for speech uttered "with no intent to persuade, inform, or communicate" on a protected matter, the *first amendment's* protections do not apply because it is speech on a matter of purely private concern. *State v. Carpenter, supra, 171 P.3d 59*. In my view, [***112] this jurisprudence applies precisely to the present case. However, I acknowledge that, if an improper motive to harm is *not* the sole basis for uttering speech, and there exists a bona fide intent to communicate on a protected matter—which, if condemned, the protected speech will have been improperly chilled— the speech remains protected by the *first amendment*. See *Spacecon Specialty Contractors, LLC v. Bensinger, supra, 1037-39 and 1039 n.4* (documentary inspired by news reports about company's dubious employment practices and alleged abuse of foreign workers "not shown in a purely private context," even though it was product of *some* motivation to harm company's reputation, because "[t]hat the film elucidated those matters of public concern while simultaneously advancing the [u]nion's private interests does not render the matter entirely private"). As acknowledged by the majority, the inquiry into context, form, and motive is fundamental to determining whether speech is of public concern. Without such an inquiry, as the majority notes, the *first amendment* risks becoming an all-purpose tort shield that is [**964] "used as a cloak or veil for intentionally tortious conduct that is only tangentially related to the claimed matter of public concern." See also *Greene v. Tinker, 332 P.3d 21, 34-35 (Alaska 2014)* (rejecting argument that all "speech involving a [***113] matter of public concern is inactionable" [internal quotation marks omitted]).

The majority then turns to the factual findings of the trial court to determine whether the context and form of the targeted placement of posters demonstrates the defendants' bona fide attempt to communicate a message [*459] to the public or, rather, an attempt purely and solely intended to harass the plaintiff. The majority alludes to the trial court's finding that the defendants' targeted posters, were located primarily on, or adjacent to, public roadways, were placed "not as the result of a general effort by the [defendants] to find their son and brother but [rather] part of an effort to break her"—uttered without an attempt to communicate a protected matter to the public—and yet the majority concludes that the targeted placement of posters "was consistent with the overarching public concern of gaining information about Bill's disappearance . . . ." Having apparently disregarded the trial court's crucial factual findings, the majority then concludes that "a substantial portion of the defendants' conduct . . . was, in fact, protected by the *first amendment*."

The majority asserts that "[n]othing in the trial court's memorandum of decision [***114] indicates that it considered the *first amendment* in deciding this case. We, of course, do not fault the trial court for this. The *first amendment* claims were not properly preserved and must be reviewed on appeal pursuant to *Golding*." See footnote 21 of the majority opinion. I disagree. A review of the trial court opinion reveals that the trial court did consider free speech issues when deciding this matter. First, the trial court explained that "the court understands the comments in [*Petyan v. Ellis, 200 Conn. 243, 254, 510 A.2d 1337 (1986)]*, to the effect that certain conduct which would otherwise be considered extreme and outrageous can be privileged. The [defendants] cannot be faulted for bringing their concerns and suspicions to the attention of the police and even the media. Nothing, for example, has been introduced into evidence that the . . . relationship [between Bill and the plaintiff] did not break down under circumstances involving a rival for [the plaintiff's] affection and the [defendants] concede that Bill . . . made a threatening [*460] [tele]phone

EXHIBIT 43

EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

call to the rival the day before [Bill] disappeared. The nature of that person's business—long-haul trucking—and the occupation of [the plaintiff's] now deceased son as a grave digger are not disputed and it would be an *unacceptable [\*\*\*115] restriction on free speech* and even hamper police investigations if people did not have a right to bring such facts to the police's or even [the] public's attention. In fact, the [defendants] are to be admired for their persistent efforts to bring [Bill's] disappearance and their complaints to the highest levels of state government and the federal authorities. One cannot help sympathizing with their pain and frustration." (Emphasis added.) Furthermore, the trial court also reasoned as follows: "The foregoing also leads the court to conclude that the third and fourth element[s] of the tort have been met. [The plaintiff and other witnesses] testified to the emotional distress caused [to the plaintiff] by the activities of the defendants. The enumerated facts and findings made by the court on those facts lead to the conclusion that the actions of the defendants caused [the plaintiff] emotional distress—in fact they were meant to do so. Also, it is not surprising that, given the facts, the emotional distress caused [to the plaintiff] was severe. She, in effect, felt she was being constantly hounded—*not as the result of a  [\*\*965]  general effort by the* [*defendants*] *to find their son and brother but part of [\*\*\*116]  an effort to break her*." (Emphasis added.)

The majority explains that it does "not suggest that the trial court was completely unaware that the general subject matter of this case has *first amendment* implications. The dissent's discussion of the trial court's references to the defendants' free speech rights focuses, however, on conduct whose propriety and protected nature is not at issue in this appeal, namely, the defendants' rights to speak to law enforcement authorities or the public about details surrounding Bill's disappearance. There is nothing in the trial court's opinion indicating  **[\*461]**  that it considered the *first amendment* implications of the defendants' flyer campaign, which were a substantial basis for the plaintiff's intentional infliction of emotional distress claim." See footnote 21 of the majority opinion. I disagree. First, it is not reasonable to assume that the trial court could be aware "that the general subject matter of this case has *first amendment* implications" and consider it in regard to some of the defendants' conduct, but not the conduct involving the posters. Second, the trial court's statement that "it would be an *unacceptable restriction on free speech* and even hamper police investigations if people did [\*\*\*117]  not have a right to bring such facts to the police's *or even* [*the*] *public's attention*" belies the majority's reading of the trial court's memorandum of decision. (Emphasis added.) A reasonable reading of the trial court's reference to the public's attention would include the defendants' placement of posters. Furthermore, contrary to the majority's claim that I am addressing an issue not briefed by the parties— namely, whether the Appellate Court properly applied *Golding* review to these claims—my focus on this language in the trial court's memorandum of decision regarding free speech is in response to the majority's explicit statement that "[n]othing in the trial court's memorandum of decision indicates that it considered the *first amendment* in deciding this case." See footnote 21 of the majority opinion.

I respectfully disagree with the majority's apparent disregard of the factual findings and credibility determinations of the trial court. First and foremost, at oral argument, the defendants conceded that they were not asking this court to overturn the trial court's factual findings as clearly erroneous.[4] Having conceded as  **[\*462]**  such,  **[\*\*966]**  and

---

[4] The following colloquy during oral argument before this court evinces the defendants' concession:

"The Court: Didn't the trial court find that your client had said that the reason that she was putting up these posters was to 'break' [\*\*\*119]  the plaintiff to get her to cooperate? . . .

"[The Defendants' Counsel]: It is a finding, Your Honor, but I don't think it's supported by the record. . . .

"The Court: The trial court found that the defendants were posting the 'murdered' posters on the dead end road where the plaintiff was staying, they were found to have specifically targeted the plaintiff's home and the homes where she stayed. So you're asking us to find that all . . . of those [findings] were clearly erroneous . . .? Did you specifically ask us to do that?

"[The Defendants' Counsel]: Your Honor, I don't think that it matters that they're targeted. . . .

"The Court: I understand . . . but you seem to be saying . . . that the [trial] court was factually incorrect . . . as to where [the posters] were being tacked up and the question about whether [the defendants] was trying to 'break' her.

EXHIBIT 43                                                      EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

despite *Golding* review and an "independent examination" of the whole record, **[\*\*\*118]** I respectfully disagree that the defendants—or the majority—are able to show that the *first amendment's* protections apply in light of these crucial findings. But notwithstanding the defendants' concession, the majority fails to acknowledge, and implicitly overturns, the trial court's finding that the defendants' targeted placement of posters served no purpose beyond harassing the plaintiff and expressed no protected message. Respectfully, disregarding this crucial finding does not square with the standard of review the majority purports to apply, which would require it to overturn as clearly erroneous the trial court's credibility determination that the defendants' contrived justification for their harassing conduct was, in fact, unbelievable. The majority is unable to find clear error and, absent clear error as to this crucial finding, therefore, the majority's conclusion that the defendants' harassing conduct is of public concern **[\*463]** cannot stand in light of our *first amendment* jurisprudence.

Assuming that the majority chooses to overturn—without saying so and notwithstanding the defendants' concession—as clearly erroneous the trial court's factual finding that the defendants' sole purpose in placing posters near the plaintiff's home and work was to harass her, a review of the record is warranted. As noted by the majority, the standard of review requires deference to the factual findings of the trial court, especially credibility determinations regarding disputed issues of fact, unless clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State v. Krijger, supra, 313 Conn. 446*. Only after review of the trial court's subsidiary credibility determinations **[\*\*\*121]** and findings of fact for clear error may this court review, de novo, "whether the defendants' conduct, as found by the trial court, was subject to *first amendment* protection." Id. Even *Golding* review, as the majority notes, "does not permit us to disregard the trial court's findings of historical fact resolving conflicting evidence in favor of our own view of the factual record, or to make our own findings when the record reveals conflicting or inconclusive evidence on a factual point." See footnote 15 of the majority opinion. In my view, however, the majority has done just that.

The majority acknowledges, in a footnote, the following subordinate factual findings undergirding the trial court's critical finding that the defendants' sole purpose in placing posters near the plaintiff's home and work was to intimidate and harass the plaintiff until she broke: that posters placed in other towns were generally well spaced out and yet posters were placed outside **[\*464]** of the plaintiff's place of employment and saturated "every nook and cranny" of her bus route; that there were a large quantity of posters on one pole outside the plaintiff's house, that were replaced when taken down, and yet posters were placed **[\*\*\*122]** nowhere else on the street; that the placement of posters continued for months and followed the plaintiff as she changed residences to avoid them; and that there was no evidence that the placement of posters along the plaintiff's bus route was necessary to aid in locating Bill. See footnote 20 of the majority **[\*\*967]** opinion. The majority also acknowledges other factual findings—though elsewhere in its opinion and, in my view, absent from its analysis regarding the posters—as to additional "confrontational and harassing" conduct by the defendants that formed the basis of the effort to "break" the plaintiff and that very well may justify a judgment for intentional infliction of emotional distress upon remand: a confrontation at a police station in the town of Woodbridge during which the defendants threatend to kill the plaintiff; incidents during which the defendants called the plaintiff offensive names, followed her, videotaped her activities, and told various people that the plaintiff was a "murderer" or otherwise involved in Bill's disappearance. The majority even credits the defendants' representation that it was the actions of the plaintiff in tearing down the posters—in allegedly thwarting **[\*\*\*123]** the defendants' legitimate efforts—that caused the defendants to target her, again, contrary to the trial court's finding that "it cannot be deduced from the evidence and testimony that the concentration of poster activity where [the plaintiff]

---

"[The Defendants' Counsel]: The issue of trying to 'break' her . . . is one of semantics. I think if you look at the total record, the record just doesn't support that my client[s] had any axe to grind against [the plaintiff]. My client[s] [were] trying to replace posters in an effort to find [Bill] . . . . And so . . . whether the trial court's opinion **[\*\*\*120]** is clearly erroneous is irrelevant. . . .

"The Court: Did you ask us to make a finding that all of these findings are clearly erroneous? Or are you saying that, even with these factual findings, you win because targeting shouldn't matter?

"[The Defendants' Counsel]: The latter, Your Honor."

EXHIBIT 43  EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

lived and worked only commenced in reaction to [the plaintiff's] tearing down posters in that area. . . . [T]he poster hanging activity in towns where [the plaintiff] worked and lived was apparently done from the beginning of the poster hanging activity."[5] These **[*465]** subsidiary factual findings in the record provide ample support for the trial court's critical finding that the "sole purpose" of the defendants' placement of posters near the plaintiff's home and work was done for the purpose of "intimidating and harassing the plaintiff." In my view, the majority cannot "acknowledge" these subsidiary factual findings without upholding the crucial finding it has overturned.

Under our standard for clear error and in light of the ample support in the record, therefore, the majority could only have overturned the trial court's critical finding if it had been left with the definite and firm conviction that a mistake had been committed, a conclusion the majority has not made. And if the majority made such a conclusion, it could only have done so by its further disregard of additional relevant facts found by the trial court: that Janice Smolinski *admitted* to "intentionally saturating all the areas where she knows [the plaintiff] frequents 'because she was trying to break her'" so that the plaintiff would admit her involvement in Bill's disappearance; that both defendants admitted to the police, the Waterbury Observer, and other parties their plans to harass the plaintiff and her friend until one of them broke down and gave them information; **[***125]** that Janice Smolinski admitted to the Waterbury Observer that these actions could land her in jail; and that the poster campaign was part of—and not even the exclusive means of—a larger effort to intimidate the plaintiff, intended to, and in fact becoming, the cause of the plaintiff's severe emotional distress. In light of the defendants' admission that the posters were deliberately placed to affect *only the plaintiff*—a person **[*466]** who undeniably already understood that the defendants sought information about Bill's whereabouts—I would uphold the trial court's finding that this conduct did not convey a **[**968]** message to the public or advance legitimate speech.

Most importantly, the trial court, having had the opportunity to view the demeanor of the parties and determine their credibility, clearly resolved the conflict in the parties' testimony to make its crucial factual finding. The trial court characterized the parties' conduct as a "'cat and mouse game'" for which "both sides can be faulted for the antagonistic activity that developed." Additional review of the trial transcript reveals just how deep the acrimony between the parties ran—at one point during the plaintiff's testimony, Janice Smolinski **[***126]** interrupted the plaintiff stating: "Stop it. . . . Stop it. It's not all about you, it's not. Stop." The court took a recess after this outburst, after which the plaintiff's attorney noted that, during the recess, a family member of the defendants "directed an obscenity" at the plaintiff. The trial court then attempted to calm the parties, though it acknowledged that "emotions are boiling . . . ." A fair review of the record cannot, without overturning the trial court's determination as to the defendants' credibility, lead to the definite and firm conviction that a mistake has been committed—instead, the record indicates the turn of a blind eye toward the facts that the majority should have considered. Contrary to its statement that *Golding* review does not permit it to do so, the majority has made several of its own factual "findings when the record reveals conflicting or inconclusive evidence on a factual point." See footnote 15 of the majority opinion.

To the extent the majority might have come to its conclusion by "[performing] a fresh examination of crucial facts under the rule of independent review"; (internal quotation marks omitted) *DiMartino v. Richens,* **[*467]** *263 Conn. 639, 662, 822 A.2d 205 (2003)*; it has not stated how it performed this examination **[***127]** without disregarding credibility determinations made by the trial court, which our *first amendment* jurisprudence does not allow us, and the defendants have not asked us, to do. See *State v. Krijger, supra, 313 Conn. 447*. The majority suggests that a proper application of the rule of independent review would involve a species of "the clearly erroneous standard of review [while] tailoring [the review] to the specific trial court determinations at issue . . . ." But as the Appellate Court noted, it is unclear how that standard permits us to overcome the trial court's finding that the defendants' sole intent was to harass without discounting the trial court's consideration of the parties' credibility as to this crucial issue of fact. See *Gleason v. Smolinski, supra, 149 Conn. App. 306* ("[u]ltimately, the court credit[ed] the testimony of the plaintiff . . .

---

[5] The trial court, instead, noted that an incident during which the plaintiff ripped down posters directly in front of the defendants, leading to a physical confrontation, merely factored in to reducing the amount of damages she could be awarded because the plaintiff played a part in escalating **[***124]** tensions in that specific moment. In addition, the majority also finds that "it is undisputed that all of the posters were placed on or adjacent to public roadways," even though it admits that Janice Smolinski was arrested for trespass and disorderly conduct for placing the posters on private property at the plaintiff's workplace.

because although the defendants testified that they did not engage in the conduct of hanging missing person posters in order to harass the plaintiff, other evidence presented . . . [showed] that the defendants had a strong motive to act in the way . . . alleged by the plaintiff" [internal quotation marks omitted]). This crucial finding must stand.

If, therefore, the majority could not have overturned as clearly erroneous the factual finding that the defendants' **[***128]** *sole* intent in targeting posters at the plaintiff was to harass her until she broke, given its citation to relevant case law, the majority essentially concedes that its conclusion cannot stand. See *State v. Carpenter, supra, 171 P.3d 59* ("[e]ven speech that relates to a matter of public interest loses its protection and can give rise to an [intentional infliction of emotional distress] claim if . . . it is uttered with an intent merely to harass and with no intent to persuade, inform, or communicate"). No other cases cited by the majority support the conclusion that the defendants' conduct in **[*468]** the present case is speech of public concern. Indeed, no case has afforded the **[**969]** *first amendment's* protections to speech of facially acceptable content expressed in a traditional public forum, where the speech: (1) is uttered in a context that consists of the *sole and exclusive* desire to harm the plaintiff and, concomitantly, no intent to convey a protected idea or message to the public; (2) is inextricably linked to intimidating conduct that borders on harassment of a private party on a purely private matter; and (3) if condemned, does not chill protected speech or pose a risk of self-censorship. To conclude as it has, the majority has, in effect, applied **[***129]** the *first amendment* as an all-purpose tort shield "used as a cloak or veil for intentionally tortious conduct that is only tangentially related to the claimed matter of public concern." See *Greene v. Tinker, supra, 332 P.3d 34-35*. In my view, the majority's citation to *Spacecon Specialty Contractors, LLC v. Bensinger, supra, 713 F.3d 1039*, and *State v. Carpenter, supra, 171 P.3d 59*, as discussed previously in this opinion, are sufficient to establish that the defendants' speech is not of public concern.

My review of additional *first amendment* case law also supports my conclusion. *Keene v. Cleaveland, 167 N.H. 731, 118 A.3d 253 (2015)*, is instructive, containing facts most similar to those in the present case and differing only by factual findings regarding the legitimacy of the actors' intent to express protected speech to the public and the extent to which protected speech would be chilled if the conduct were condemned. In *Keene*, the Supreme Court of New Hampshire confronted a claim that the *first amendment* protects conduct intended to harass parking enforcement officers issuing parking tickets. *Id., 255*. The facts of *Keene* are set forth in the majority opinion and, therefore, need not be repeated here. See footnote 22 of the majority opinion. I emphasize, however, that in conceding that **[*469]** the content and locational context favored protection, the plaintiff in that case, the city of Keene, argued that certain other facts indicated that **[***130]** the conduct at issue constituted "'significantly harassing behavior under the guise of political expression,' and, therefore, [rendered the conduct] not constitutionally protected." *Keene v. Cleaveland, supra, 258*. Specifically, the plaintiff in that case argued that aspects of the defendants' conduct, namely "following closely, chasing, running after, approaching quickly from behind, lurking outside bathrooms, yelling loudly, and filming from close proximity" had a tortious impact on the parking enforcement officers. (Internal quotation marks omitted.) *Id., 260*. The New Hampshire Supreme Court disagreed that this impact rendered the speech a matter of private concern, highlighting the fact that the defendants "*intended* [this conduct] to draw attention to the [c]ity's parking enforcement operations and to persuade the [parking enforcement officers] to leave their positions." (Emphasis added.) *Id., 261*. Because the challenged conduct was the vehicle for the defendants' bona fide political protest, imposing liability for the conduct would infringe upon the defendants' right to free speech, undermine the free and robust debate of public issues, and pose the risk of a reaction of self-censorship on matters of public import. Id.; see also **[***131]** *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982)* (*first amendment* protects rights of individuals to engage in public protest, even if protest activity causes economic harm, for purpose of influencing societal or governmental change, because speech "does not lose its protected character . . . simply because it may embarrass others or coerce them into action").

The defendants' use of posters touches on the same *first amendment* concerns as the defendants' conduct in *Keene*. Specifically, the content of the speech related **[*470]** to a matter of public concern, the activities **[**970]** generally occurred in traditional public fora, and the context of the speech involved types of harassment. But the critical difference between the two cases, as mentioned previously, is the factual finding regarding the actors' intent to express a message or idea traditionally protected by the *first amendment* to the public.

In *Keene*, the defendants engaged in harassing activity that, as a matter of fact, was inextricably linked to, and intended to advance, their protected message to the public—a message protesting the government. Such speech is worthy of the strongest *first amendment* protections. See *State v. Krijger, supra, 313 Conn. 450* (reiterating the "'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, **[\*\*\*132]** and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials'"), quoting *New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*; see also *State v. Peter, 798 N.W.2d 552, 553 (Minn. App. 2011)* (reversing conviction for disorderly conduct for protesters outside fur store because "their statements and conduct did not rise to the level of 'fighting words,' and their loud chanting and yelling were 'inextricably intertwined' with their political protest, which was protected by the *[f]irst [a]mendment*").

By stark contrast, in the present case, the trial court found that the defendants' targeting of the plaintiff, in the context of their other intimidating activities, was not a bona fide expression to the public of a message that the *first amendment* protects. Specifically, the trial court found that "the poster campaign in areas where [the plaintiff] lived and worked [was] part of a larger effort to intimidate her. . . . [The plaintiff] was being constantly hounded—not as the result of a general effort by the [defendants] to find their son and brother **[\*471]** but part of an effort to break [the plaintiff]. . . . [The defendants] pursued their action with these purposes in mind." See *Connick v. Myers, 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)* ("[A] questionnaire not otherwise of public concern does not attain that status because its **[\*\*\*133]** subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. [W]hether [the utterances] . . . could be matters of public concern is beside the point—it does not answer whether *this* [utterance] is such speech." [Emphasis in original.]). The defendants' conduct might have tangentially involved protected speech, but the other actions of the defendants, made transparent by their own admissions as to their purpose to harass, formed the basis of the trial court's credibility determination that this conduct was merely and solely tortious conduct directed at a private party in an antagonistic, private dispute. See *People v. Little, 2014 IL App (4th) 131114-U, 2014 WL 7277785, \*7 (Ill. App. 2014)* (conviction for stalking affirmed, statute not unconstitutionally overbroad and properly applied to defendant's conduct because "preexisting relationship and conflict [between the defendant and his wife] strongly suggest [the] defendant is attempting to mask an attack on [his wife] over a private matter as a protest of a matter of public concern" and because "nothing in the evidence suggests that in driving by [the women's shelter], [the] defendant intended to peacefully protest **[\*\*\*134]** a matter of public concern in a public forum . . . [or] 'convey his position on abortion utilizing a method designed to reach as broad a public audience as possible'"). As the trial court found, nothing in the evidence suggests that, in hounding the plaintiff and placing posters near every place she frequented, the defendants intended to advance a message—a message **[\*\*971]** that was found to have been protected in the defendants' other actions in other contexts—to the public. **[\*472]** Rather, this conduct was "*not* as the result of a general effort by the [defendants] to find their son and brother, but [rather], part of an effort to break [the plaintiff]."[6] (Emphasis added.)

---

[6] The majority asserts that it "find[s] instructive the New Hampshire Supreme Court's recent decision in *Keene*" and that "[g]uided heavily by this . . . decision, which considered similarly targeted and harassing conduct, we conclude that a substantial portion of the defendants' conduct that the trial court found to constitute the intentional infliction of emotional distress was, in fact, protected by the *first amendment*. This is particularly so, given that the trial court's finding that it was solely intended to harass and 'break' the plaintiff did not consider **[\*\*\*135]** whether those actions were intended to persuade the plaintiff with regard to a matter of public concern as in *Keene*, rather than merely torture her gratuitously with regard to a purely private matter." (Footnote omitted.) I disagree. First, as I have explained previously in this opinion, the trial court did consider whether the defendants' conduct was intended to persuade her with regard to a matter of public concern, and in fact, concluded that the defendants' conduct was "not as the result of a general effort by the [defendants] to find their son and brother but part of an effort to break her." As the trial court determined, the defendants' conduct was not part of a public concern regarding missing persons, but it was about forcing a confession out of a private individual. In contrast, the conduct in *Keene* was intended to convince government actors to quit their job because the protestors believed that parking enforcement was not a legitimate role for government. As the trial court in the present case concluded "it would be an unacceptable restriction on free speech and even hamper police investigations if people did not have a right to bring [facts relevant to persons of interest **[\*\*\*136]** in an investigation] to the police's or even [the] public's attention," but harassing a private individual to hound a confession from the private individual is not a matter of public concern and free speech is not implicated.

EXHIBIT 43                                                                              EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

The comparison between the protected speech in *Keene* and the unprotected speech in the present case is reinforced when one examines whether a judgment for money damages would run the risk of chilling protected speech. In *Keene*, a judgment against the defendants would mean that the defendants, believing as they did that the government's actions in issuing parking tickets should not be tolerated and hoping to broadcast this belief to the public, would be penalized for expressing this message. It would also mean that future protesters of governmental action in New Hampshire would **[\*473]** think twice and potentially self-censor before launching an unpleasantly sharp attack on their government or its officials. By contrast, the judgment against the defendants in the present case does not pose these risks: the judgment does not penalize the defendants for searching for Bill or bringing their grievances about the authorities' lack of diligence to public light, undeniably protected **[\*\*\*137]** conduct. The trial court concluded that these bona fide efforts—the efforts in publicizing the case on television and in the Waterbury Observer, the efforts to hang posters in multiple states in a manner actually intended to yield tips as to Bill's whereabouts and to advance their cause—merited admiration and encouragement. The trial court stated that "it would be an unacceptable restriction on free speech and even hamper police investigations if people did not have a right to bring such facts to the police's or even [the] public's attention." The trial court further concluded that "the defendants [cannot] be held accountable [for] . . . [t]he publicity about the case . . . [and] had a right to voice what they felt were valid criticisms of the way law enforcement authorities handled the investigation and their pleas for help in order to try to ensure that the intensity of the investigation would be increased and relevant areas of inquiry **[\*\*972]** would be pursued. This is a commonly exercised right of citizens in dealing with what they consider to be unresponsive authorities and a crucial aspect of preserving a functioning democracy."

As the trial court found and the Appellate Court affirmed, however, **[\*\*\*138]** expressing criticism of the police or engaging in the public search for Bill was not the defendants' intent when they targeted the plaintiff with posters. See *Gleason v. Smolinski, supra, 149 Conn. App. 306*. Affirming the judgment against the defendants would penalize them only for going "beyond the acceptable parameters" of a decent society and engaging in **[\*474]** opprobrious behavior wholly divorced from any protected message. Instead of chilling speech or posing any risk of self-censorship, the judgment prevents the actions of these defendants—and thereby future individuals—from targeting, intimidating, harassing, and *intentionally* inflicting emotional distress upon any person they believe to have previously engaged in the commission of a crime. Affirming the judgment would not require the defendants to take down all of their posters or cease their search for Bill; it is consistent with the protections afforded by the *first amendment* while vindicating our state's "legitimate interest in redressing wrongful injury"; *Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*; by reaching "no farther than is necessary to protect the legitimate interest involved." *Id., 349*.

Affirming the judgment of the trial court is also consistent with *Snyder*, from which the majority quotes extensively and upon which the majority **[\*\*\*139]** appears to rely. In my view, reliance on *Snyder* is not apt. As in the present case, the content of the speech in *Snyder* related to a matter of public concern—a viewpoint critical of the government. But contrary to the present case, the context of the speech revealed that the defendants actually intended to convey this viewpoint to the public by way of its picketing. In *Snyder*, the United States Supreme Court concluded that the defendants "had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of [Marine Lance Corporal] Matthew Snyder, and there can be no serious claim that [the defendants'] picketing did not represent its 'honestly believed' views on public issues." *Snyder v. Phelps, supra, 562 U.S. 455*. "There was no [preexisting] relationship or conflict between [the defendants] and [the plaintiff] that might suggest [the defendants'] speech on public matters was intended to mask an attack on [him] over a private **[\*475]** matter." Id. Moreover, the plaintiff's distress in *Snyder* was not caused by harassing conduct; instead, "any distress occasioned by [the defendants'] picketing turned on the content and viewpoint of the message conveyed, rather than any interference with **[\*\*\*140]** the funeral itself." *Id., 457*. In other words, it was the content of the speech—the honestly believed, protected message that the defendants in *Snyder* wished to communicate to the public—that caused the distress, not the context in which the speech occurred.[7]

---

[7] That the context of the speech so clearly demonstrated its bona fide attempt to convey a protected message to the public has led commentators to wonder why the United States Supreme Court granted certiorari in the first instance. E.g., A. Brownstein &

EXHIBIT 43                                                    EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

 **[\*\*973]**  By contrast, the distress experienced by the plaintiff in the present case resulted solely from the context in which the speech occurred—the relentless hounding of the plaintiff where she lived and worked—not the content of the posters. See *Watts v. Chittenden, 301 Conn. 575, 605, 22 A.3d 1214 (2011)* ("it is the repetition of the misconduct that makes it extreme and outrageous"); see also A. Caplan, Free Speech and Civil Harassment Orders," *64 Hastings L.J. 781, 838 (2013)* ("[T]hroughout much civil harassment litigation . . . the petitioner's emotional state is often a reaction to the  **[\*476]**  content of [the] respondent's speech. The constitutional evil of content discrimination can often be avoided in practice by recasting allegations about content as allegations about unwanted contact. Ending unconsented contact [regardless of the content that may be conveyed during the contact] is a permissible exercise of the government's power to regulate, on a content neutral basis, **[\*\*\*142]**  the noncommunicative aspects of expressive activity."). The acrimonious, preexisting relationship between the parties from the very start, the abundance of other harassing conduct, and especially the defendants' admissions that their actions were meant to hound the plaintiff until she broke, indicate no honestly believed, protected message intended to be conveyed to the public, but rather a relentless, private attack on the plaintiff to vindicate a perceived wrong.

In addressing the possibility that speech could be chilled by affirming the judgment for intentional infliction for emotional distress in *Snyder*, the United States Supreme Court recognized that, by condemning the defendants' speech, the jury could have imposed liability on the basis of their "tastes or views, or perhaps . . . their dislike of a particular expression . . . [which would pose] a real danger of becoming an instrument for the suppression of . . . vehement, caustic, and sometimes [unpleasant] expression." (Citation omitted; internal quotation marks omitted.) *Snyder v. Phelps, supra, 562 U.S. 458*. By contrast, condemnation of the defendants' harassing conduct in the present case does not pose any risk of having resulted from differing tastes or views **[\*\*\*143]**  on what the posters conveyed or the ideas they espoused, nor does it pose a risk of suppressing unpleasant expression. It merely imposes liability for the "continued, aggravated nature of the defendants' activity in hounding [the plaintiff] where she lived and worked" for the sole purpose of intimidating  **[\*477]**  and harassing the plaintiff and "not as the result of a general effort by the [defendants] to find [Bill]"

In light of the foregoing, I would uphold the critical factual findings of the trial court which, in the absence of any case law to the contrary[8] and as essentially conceded  **[\*\*974]**  by the majority by its citation to *State v. Carpenter, supra,*

---

V. Amar, "Afterthoughts on *Snyder v. Phelps*," *2011 Cardozo L. Rev. De Novo 43, 43-44* ("From a scholarly and professional perspective . . . [*Snyder*] added little to the development of free speech doctrine. . . . [O]ne can only wonder why the [c]ourt thought it appropriate to grant review in this matter in the first place. . . . [W]e think the [c]ourt may have spent more ink than was necessary on the question of whether the content of [the defendant's] speech constituted a matter of public or private concern. Other factors really did the lion's share of the analytic work in this case. . . . The protest was directed to the public at large. This was public discourse, not speech exclusively, or at least primarily, directed at a target audience. If all of **[\*\*\*141]**  these conditions are satisfied, it is not clear to us that classifying speech as a matter of public or private concern is terribly important." [Footnotes omitted.]); A. Caplan, "Free Speech and Civil Harassment Orders," *64 Hastings L.J. 781, 823 (2013)* ("[the court's] focus [on the content of the speech] was largely irrelevant to the outcome of the case").

[8] I briefly note that no other cases cited by the majority support its conclusion. With respect to the cases offered for the proposition that the reporting of crime is a matter of public concern, some are inapposite to the present case because the speakers were members of the media fulfilling their role as the press in reporting the existence of truthful facts. See *Cox Broadcasting Corp. v. Cohn, supra, 420 U.S. 492* (broadcast company's broadcast of truthful facts surrounding crime in light of "a society in which each individual has but limited time and resources with which to observe at [firsthand] the operations of his government, [and therefore] he relies necessarily upon the press to bring to him in convenient form the facts of those operations"); *Best v. Berard, 776 F. Supp. 2d 752, 757-58 (N.D. Ill. 2011)* (broadcast company's broadcast of plaintiff's arrest **[\*\*\*145]** analogous to "police blotter"); *Dumas v. Koebel, 2013 WI App 152, 352 Wis. 2d 13, 29-30, 841 N.W.2d 319 (App. 2013)* (news broadcast intended to inform public about bus drivers' criminal histories and criticize school district's hiring practices). Others are inapposite because the statements at issue criticized public officials in the conduct of their public business. See *Shoen v. Shoen, 292 P.3d 1224, 1230, 2012 COA 207 (Colo. App. 2012)* (statements "related to a matter of public concern because they addressed [the speaker's] views about the adequacy of the investigation by public law enforcement officers when unanswered questions remained"); *Wiemer v. Rankin, 117 Idaho 566, 571, 790 P.2d 347 (1990)* ("[t]he article addressed the performance of the prosecutor"). Others predicated the *first amendment's* protections on bases not relevant to the present case; see *Hobbs v. Pasdar, 682 F. Supp. 2d 909, 927-28 (E.D. Ark. 2009)* (plaintiff was limited purpose public figure); *Miles v. Ramsey, 31 F. Supp. 2d 869, 875 (D. Colo. 1998)* (article was matter of public concern

EXHIBIT 43

EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

*171 P.3d 58-59*, cannot reasonably render the defendants' conduct to be speech of public concern. See *id., 56-57* ("We distinguish between speech, however crude . . . directed at persuading the ultimate target to change her mind about a matter of public concern, and speech intended merely to harass or cause others **[\*478]** to harass the target. Speech of the latter sort is not entitled to *[f]irst [a]mendment* protection."). To the extent the majority would conclude that the defendants could properly harass the plaintiff to persuade her to divulge information about her involvement in Bill's disappearance, the content of this "communication" **[\*\*\*144]** ceases to be of public concern because it no longer advances any interest in informing the public about the commission of crime; see *Cox Broadcasting Corp. v. Cohn, supra, 420 U.S. 492*; but rather amounts to drawing out a confession from a private citizen by way of tortious conduct. I would affirm the judgment of the Appellate Court, which concluded that the defendants have not satisfied the third prong of *Golding* review because they have not established any constitutional violation. See *Gleason v. Smolinski, supra, 149 Conn. App. 293-95*.

But even assuming, arguendo, that the defendants' targeted posters represented speech of public concern and that the defendants established a constitutional violation under the third prong of *Golding*, I respectfully disagree with the majority's conclusion that the fourth prong of *Golding* requires **[\*\*\*146]** a remand because of the "apparent significance of the flyer campaign to the trial court's finding on her intentional infliction of emotional distress claim." In my view, the constitutional violation, if any, is harmless beyond a reasonable doubt. The majority has conceded the existence of extensive and continuous "confrontational and harassing behavior, including calling the plaintiff offensive names, following her, and videotaping her activities" that, as detailed previously in this dissenting opinion, is a sound, independent basis for the judgment. Including the other relevant facts that, in my view, the majority should have considered—such as the fact that the plaintiff received threatening telephone calls from Bell, causing the plaintiff to fear for her safety and that of her child—any **[\*479]** constitutional **[\*\*975]** violation is harmless beyond a reasonable doubt.[9]

Like the Appellate Court, I would conclude that the defendants did not satisfy the third prong of *Golding* because they have not established **[\*\*\*147]** a violation of their *first amendment* rights. See *Gleason v. Smolinski, supra, 149 Conn. App. 293-95*.

II

DEFAMATION

I next turn to the majority's discussion of the plaintiff's claim of defamation. I agree with the majority's analysis and conclusion that the three statements at issue—private accusations to private individuals that the plaintiff was a "murderer"—were defamatory statements of fact, not of opinion. I respectfully disagree, however, with the remainder of the majority's analysis, in particular, its conclusion that the statements at issue constitute speech of public concern meriting the protections of the *first amendment*. In my view, a proper inquiry into the content, **[\*480]** context, and form of these private accusations leads to the conclusion that the *first amendment's* protections are unwarranted. Without analysis, the majority concludes that "the parties do not dispute for purposes of the defamation claim that the oral statements at issue, which pertain to the plaintiff's role in Bill's death or disappearance, implicate a matter of public concern for *first amendment* purposes." I respectfully disagree.

Contrary to the precedent to which it cites,[10] the majority fails to conduct *any* analysis of the content, context, and form of the defamatory utterances at issue, affording them the *first amendment's* protections **[\*\*\*148]** without inquiry.

---

because murder was national "media spectacle"); *Holloway v. American Media, Inc., 947 F. Supp. 2d 1252, 1261 n.8 (N.D. Ala. 2013)* (plaintiff was public figure); or performed incomplete analyses. See *Obsidian Finance Group, LLC v. Cox, 740 F.3d 1284, 1292 (9th Cir.)* (no discussion of content, context, and form), cert. denied, __ **U.S. __, 134 S. Ct. 2680, 189 L. Ed. 2d 223 (2014)**.

[9] Nevertheless, because the majority remands the case, I am convinced that the trial court will have no trouble in finding the intentional infliction of emotional distress by a preponderance of the evidence.

[10] The majority concedes that "an accusation of criminal conduct [may be] topically [on] a matter of public concern . . . [which] is a significant, but not dispositive, factor in determining whether speech or conduct **[\*\*\*149]** is constitutionally protected for purposes

**EXHIBIT 43**                                                                                       EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

See *Snyder v. Phelps, supra, 562 U.S. 453* ("[d]eciding whether speech is of public or private concern *requires us to examine the content, form, and context of that speech*" [emphasis added; internal quotation marks omitted]). Failure to make this inquiry is inconsistent with a de novo standard of review, notwithstanding that the present case comes to us on *Golding* review or with less than clear briefing. See *State v. Krijger, supra, 313 Conn. 446* ("[A]n appellate court is compelled to examine for [itself] the . . . statements @ issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the *[f]irst [a]mendment* . . . protect. . . . This rule of independent review was forged in recognition that a[n] [appellate] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied." **[**976]** [Citation omitted; internal quotation marks omitted.]).

Instead of performing its own independent review of the whole record, the majority merely cites to three cases to support its position that the statements are of public concern because they "pertain to the plaintiff's role in Bill's death or disappearance . . . ." None of the three cases created a per se rule that *any* accusation **[*481]** of crime garners the *first amendment's* protections. Instead of creating per se rules, the court in each of those cases engaged in its own requisite inquiry into content, **[***150]** context, and form of the defamatory statements to come to a legal conclusion that the statements merited the *first amendment's* protections. As for their ultimate legal conclusions, all of the cases predicated the *first amendment's* protections on bases not applicable to the present case; see footnote 8 of this dissenting opinion; *Holloway v. American Media, Inc., 947 F. Supp. 2d 1252, 1261 n.8 (N.D. Ala. 2013)* (article published involved public figure); *Miles v. Ramsey, 31 F. Supp. 2d 869, 875 (D. Colo. 1998)* (article published was matter of public concern because murder was national "media spectacle"); *Shoen v. Shoen, 292 P.3d 1224, 1229-30, 2012 COA 207 (Colo. App. 2012)* (statements were made on television program "during a two-hour interview, in which—among other things—[the speaker] criticized the quality and completeness of the [s]heriff's investigation" and therefore "related to a matter of public concern because they addressed [the speaker's] views about the adequacy of the investigation by public law enforcement officers when unanswered questions remained"). Though the content of the speech in those cases might have touched on a matter of public concern, the context of the speech involved attempts to convey a message *to the public*, vastly differing from the intended audience—private individuals—in the present case.

I would conclude, instead, that *Sartain v. White, 588 So. 2d 204 (Miss. 1991)*, is instructive. In *Sartain*, neighbors were embroiled in a terrible conflict **[***151]** over a period of years. *Id., 205*. The defendants alleged that the plaintiff, a woman with arguable mental capacity, accused them, verbally in public and in letters to third parties, of various criminal acts including murder. *Id., 206*. After the defendants prevailed on their claim for defamation, the plaintiff appealed, citing to *Gertz* and claiming the **[*482]** protections of the *first amendment* in accusing the defendants of various crimes. *Id., 213*. The Supreme Court of Mississippi concluded that only if the plaintiff's accusations amounted to speech of public concern would the *first amendment* have been applicable. Id. After detailing the plaintiff's borderline delusional behavior, the court discussed the content, context, and form of the accusations, concluding as follows: "The content of the debate in question involves whether the [defendants] are murderers, robbers and terrorists. The form of the debate involved various pleadings, letters to city officials, and oral tirades within a neighborhood. The context of the debate involves a dispute between a respectable family as the accused and an accuser with a rather notorious past. Though accusations of this nature generally are a matter of public concern, in this context and emanating from this **[***152]** source, we find that they are not in this case."[11] Id.

---

of tort liability. Indeed, should an accusation be false, the *first amendment* does not foreclose liability under a defamation theory in a well pleaded and proven case." See footnote 26 of the majority opinion. The majority also cites to a Mississippi case that, with facts largely identical to the facts of the present case, evinces the requirement that reviewing courts must undertake the relevant *first amendment* inquiry before affording accusations of criminal conduct the protections of the *first amendment*. See *Sartain v. White, 588 So. 2d 204, 213 (Miss. 1991)* (conducting content, context, and form inquiry to conclude that defamatory accusations of various crimes are generally matter of public concern but not in specific context of acrimonious neighbor dispute).

[11] The majority asserts that "the Mississippi Supreme Court's decision in *Sartain* is a jurisprudential odd duck, which arose from a neighborhood dispute wherein defamation allegations arose from one party's accusations in numerous public fora, such as tirades and letters to public officials, that her neighbors were murderers, robbers, and terrorists." See footnote 33 of the majority opinion.

EXHIBIT 43   EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

**[\*\*977]** Assuming, arguendo, that the defendants' accusations in the present case touched on a matter of public concern, which is far from a settled proposition; see footnote 8 of this dissenting opinion; the facts surrounding this case, like those in *Sartain*, reveal **[\*\*\*153]** that the defendants' utterances were merely part and parcel of harassing conduct. As the record amply demonstrates, the parties have been embroiled in an emotionally-charged and very private dispute in which, as the **[\*483]** trial court put it, "[t]wo sets of basically decent people found themselves in conflict and involved in a series of mutually antagonistic events because of a tragic event . . . ." These accusations occurred during confrontations with the plaintiff's friends, and to a stranger during the course of following the plaintiff—conduct the majority concedes is not subject to the *first amendment's* protections. Indeed, unlike in the three cases cited by the majority, the fact that the utterances in the present case were *not* directed to the public at large belies the claim that this speech is of public concern. See *Obsidian Finance Group, LLC v. Cox, 740 F.3d 1284, 1292 (9th Cir.)* (public nature of allegation against appointed bankruptcy trustee militated in favor of conclusion that allegation was of public concern), cert. denied, __ U.S. __ 134 S. Ct. 2680, 189 L. Ed. 2d 223 (2014); *Flamm v. Am. Ass'n of Univ. Women, 201 F.3d 144, 150 (2d Cir. 2000)* ("[that the challenged utterance] was also distributed to a public audience with an interest in issues of gender discrimination . . . [and] mailed, at a minimum, to hundreds of [the plaintiff's] peers and fellow professionals nationwide . **[\*\*\*154]** . . [makes it more likely that the utterance was] clearly intended to, and can reasonably be viewed as an attempt to, influence public discourse and affect the public response to incidents of gender discrimination"); *Johnson v. Ryan, 186 Wash. App. 562, 575, 346 P.3d 789 (2015)* ("there should be some degree of closeness between the challenged statements and the asserted public interest" [internal quotation marks omitted]).

I would conclude that the defendants' private accusations of murder were "solely in the individual interest of the speaker . . . [and therefore warrant] no special protection . . . ." (Citation omitted.) *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 762, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985)* (plurality opinion). It is worth stressing that these private accusations **[\*484]** forming the basis of the judgment lie in stark contrast to the defendants' *other*, protected speech *not* forming the basis of the judgment: namely, the defendants' speech that brings to the public's attention in the Waterbury Observer and on television the authorities' lack of diligence in pursuing the case in light of allegations that the plaintiff was involved in a love triangle. But far from the context of the defendants' legitimate attempts to exercise their free speech rights, and, instead, just as in *Sartain*, the context of the statements forming **[\*\*\*155]** the basis of the judgment evinces a purely private conflict that simply cannot be attributed to any exposition on a public matter. See also *Connick v. Myers, supra, 461 U.S. 148 n.8* ("[A] questionnaire not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. [W]hether [the utterances] . . . could be matters of public concern is beside the point—it does not answer whether *this* **[\*\*978]** [utterance] is such speech." [Emphasis in original.]).

The majority's extension of the *first amendment's* protections to the defendants' defamatory statements has serious consequences, namely, a shift in the burden of proof as to the truth or falsity of the alleged defamatory statement from the defendants to the plaintiff. The burden of proof is often dispositive of actions for defamation, especially in cases involving defamatory statements difficult to prove or disprove, often the same cases in which the parties present scant evidence. See *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776-78, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986)* ("the burden of proof is the deciding factor only when the evidence is ambiguous" and although "requiring the plaintiff to show falsity will insulate from liability some speech that is false, **[\*\*\*156]** but unprovably so . . . [this rule is justified in order] to protect speech that matters" **[\*485]** [internal quotation marks omitted]). Without a reasoned legal conclusion that the defendants' speech is of public concern, affording the defendants protection under the *first amendment* serves only to shield false criminal accusations made by one private party against another private party. Such a result is inconsistent with *first amendment* jurisprudence. Cf. *Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 168-69, 99 S. Ct. 2701, 61 L. Ed. 2d 450 (1979)* (rejecting contention that "any person who engages in criminal

---

I disagree that *Sartain* is a "jurisprudential odd duck" and, instead, assert that it properly applied the law to allegations made in a personal dispute between families in a neighborhood. Similarly, the present case arose from a personal dispute between two families that knew each other. Like the dispute in *Sartain*, the accusations involved in the present case did not relate to the actions of government officials, but were personal attacks designed to elicit a response from a private individual.

conduct automatically becomes a public figure" because "[t]o hold otherwise would create an 'open season' for all who sought to defame persons convicted of a crime"); see *Gertz v. Robert Welch, Inc., supra, 418 U.S. 341* ("[w]e would not lightly require the [s]tate to abandon [the underlying state interest in compensating individuals for harm inflicted on them by defamatory falsehoods]"). This result is also inconsistent with our classification of such statements as defamatory per se, which operates to *lighten* the burden on a plaintiff by presuming injury to a plaintiff's reputation. See *Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 551, 733 A.2d 197 (1999)*.

An inquiry into the content, context, and form of the defamatory statements at issue, the harassing context of which is discussed at length previously in this dissenting opinion, leads **[***157]** me to conclude that the defamatory statements at issue in the present case are not speech of public concern and, therefore, are not entitled to protection under the *first amendment*. The defendants intended to convey no protected message on any matter of concern to the public and, therefore, affirming the judgment in the present case chills no protected speech. The constitutional guarantees of the *first amendment* "'can tolerate sanctions against calculated falsehood without significant impairment of their essential function.' [*Time, Inc. v. Hill, 385 U.S. 374, 389-90, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967)]*. Indeed, *[f]irst [a]mendment* **[*486]** protections must function in balance with competing interests protected by state tort law, among which the sanctity of reputation . . . [is] seminal to our jurisprudence." *Krajewski v. Gusoff, 2012 PA Super 166, 53 A.3d 793, 808 (Pa. Super. 2012)*, appeal granted, *621 Pa. 117, 74 A.3d 119*, appeal dismissed, *624 Pa. 224, 84 A.3d 1057 (2014)*.

Because I would conclude that the plaintiff's defamation claim does not implicate the *first amendment*—because it involves a private plaintiff, private defendants, and a matter of purely private concern—I would apply the common law of defamation in the present case and, accordingly, I would not have shifted the burden of proving falsity to the plaintiff. Without this shift, I would conclude that the plaintiff met her burden of proving a common-law defamation claim by a preponderance of **[***158]** the evidence. I **[**979]** would then conclude that the defendants neither pleaded nor proved the common-law affirmative defense of truth by a preponderance of the evidence. See *Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 228-29, 837 A.2d 759 (2004)* ("under the common law, truth is an affirmative defense to defamation . . . the determination of the truthfulness of a statement is a question of fact for the jury" [citation omitted]). Finally, I would conclude that the plaintiff established entitlement to punitive damages in the present case.

I begin with the trial court's decision, which correctly set forth the common law of defamation, and review the record to determine whether the plaintiff proved a prima facie case. The majority appears to concede, and I agree, that the plaintiff proved a common-law prima facie case for defamation, not disputing that the defendants' statements are properly classified as defamatory per se because they charge crimes punishable by imprisonment. But the inquiry into whether the defendants proved the truth of the defamatory statements as an **[*487]** affirmative defense is rendered more difficult because the defendants neither pleaded nor proved this defense. Indeed, at trial, the defendants decided to deny calling the plaintiff a murderer, instead **[***159]** of *justifying* having made those utterances by pleading and proving their truth. The defendants' failure to proffer evidence that the plaintiff murdered Bill is therefore unsurprising, as that issue was raised for the first time on appeal. Even if the defendants had properly pleaded, and subsequently attempted to prove, the truth of their defamatory utterances, the defendants would have needed to show that the plaintiff was a murderer by a preponderance of the evidence, meaning that "the evidence, considered fairly and impartially, induce[s] in the mind of the trier a reasonable belief that it [is] more probable than otherwise that the facts involved in that element [are] true." (Internal quotation marks omitted.) *Gaudio v. Griffin Health Services Corp., supra, 249 Conn. 535 n.8*. On appeal of "a defamation case brought by an individual who is not a public figure, the factual findings underpinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them." *Gambardella v. Apple Health Care, Inc., 291 Conn. 620, 628-29, 969 A.2d 736 (2009)*.

A review of the memorandum of decision demonstrates that the defendants failed to prove that the plaintiff murdered Bill by a preponderance of the evidence and that the trial court implicitly found as such. By **[***160]** repeatedly referring to the statements as "defamatory," the trial court was implicitly finding that the defendants had not proven the statements to be true. Our case law, however imprecisely, has at times used the term "defamatory" as a synonym for "false" in defamation actions, as it represents the legal conclusion that a prima facie case has been presented.

EXHIBIT 43   EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

See, e.g., *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 639*; **[\*488]** *Woodcock v. Journal Publishing Co., 230 Conn. 525, 534, 543, 646 A.2d 92 (1994)*, cert. denied, *513 U.S. 1149, 115 S. Ct. 1098, 130 L. Ed. 2d 1066 (1995)*; *Cweklinsky v. Mobil Chemical Co., supra, 267 Conn. 228*. Even our model jury instructions define a "defamatory statement" as "a false communication . . . ." Connecticut Civil Jury Instructions (4th Ed. 2008) § 3.11-1, available at *http://www.jud.ct.gov/JI/civil/part3/3.11-1.htm* (last visited October 19, 2015). The trial court reinforced this implicit finding in its discussion of actual malice, in which it stated that the defendants presented absolutely no evidence that the plaintiff murdered Bill: "We do not have a case of mere **[\*\*980]** negligent utterances not based on fact but on suspicion and conjecture."

Because I read the trial court's thorough memorandum of decision as setting forth a finding that the defendants did *not* prove truth of their assertion that the plaintiff was a murderer, I now review the record to determine whether that factual finding is clearly erroneous. The defendants never alleged, either **[\*\*\*161]** in their pleadings or at trial, that the plaintiff murdered Bill. They neither attempted to, nor succeeded in, presenting *any* evidence that could have led the trial court to conclude that it was more probable than not that the plaintiff murdered Bill. My own review confirms that the record is, in fact, devoid of any such evidence; there is no body, no weapon, and no evidence of foul play. The plaintiff, her friends, and all of the other witnesses at trial made no statements accusing the plaintiff of Bill's murder. Even after having hired a private detective, the defendants offered nothing other than conjecture to support their claim. That the plaintiff declines to speak to the police on advice of counsel does not inject clear error into the trial court's findings, nor does it establish that it is more probable than not that the plaintiff murdered Bill. At most, this evidence might suggest that, according to the majority, "the plaintiff, at the very **[\*489]** least, knows more than she is saying about Bill's disappearance." But that is a far cry from establishing that the plaintiff is a "murderer," which is the actual defamatory statement forming the basis of the judgment in the present case. **[\*\*\*162]** Because there is no competent evidence in the record to contradict the trial court's implicit finding that the defendants failed to prove that the plaintiff murdered Bill, the trial court's finding that the defendants failed to prove the truth of the defamatory statements is not clearly erroneous. Accordingly, I would affirm the judgment of the trial court on this count.

This does not end the inquiry, however, because the plaintiff sought and was awarded punitive damages. Because, in my view, this case lacks *first amendment* significance, and in light of the standard of review, I would conclude that the plaintiff proved her entitlement to common-law punitive damages. The trial court and the Appellate Court appropriately concluded that, to be awarded punitive damages in a defamation case lacking *first amendment* significance, the common law of damages applies. See *Gleason v. Smolinski, supra, 149 Conn. App. 312-14*, citing *DeVito v. Schwartz, 66 Conn. App. 228, 236, 784 A.2d 376 (2001)*; see also *Johnson v. Johnson, 654 A.2d 1212, 1215-16 (R.I. 1995)*.

Common-law "[p]unitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Vandersluis v. Weil, 176 Conn. 353, 358, 407 A.2d 982 (1978)*. "If the evidence discloses that a defendant was recklessly indifferent to the rights of a plaintiff, an actual intention to do harm to the plaintiff is not necessary." *Berry v. Loiseau, 223 Conn. 786, 811, 614 A.2d 414 (1992)*. "[T]he **[\*\*\*163]** trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Internal quotation marks **[\*490]** omitted.) *Bhatia v. Debek, 287 Conn. 397, 420, 948 A.2d 1009 (2008)*. In the present case, the trial court concluded "when all is said and done, [the plaintiff] was subject to intentional infliction of emotional distress." Moreover, having chosen a trial strategy of denying having made the defamatory statements instead of *justifying* having made them, the defendants even offered no self-serving testimony to the effect that they actually believed the plaintiff murdered Bill, testimony the trial court could have easily utilized in assessing whether punitive damages were warranted. **[\*\*981]** Cf. *St. Amant v. Thompson, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)* ("[i]t may be said that [the test for actual malice] . . . permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity"); see also *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 641-42* ("The fact that the defendants continued to assert that they believed that the plaintiff had [committed a crime] was not dispositive of the issue of whether they had known that their statements were false or recklessly disregarded their truth. A trial court must evaluate a defendant's testimony, including whether there are grounds to support it, and is not constrained simply to accept a defendant's assertion that he did not know that his statement was false."). In

EXHIBIT 43                                                                           EXHIBIT 1

Gleason v. Smolinski, 319 Conn. 394

light of the exhaustive evidence of the defendants' hostility and spite, I would conclude that the trial court's decision to award punitive damages was not an abuse of discretion and, therefore, affirm the judgment of the trial court in full.

Although I would conclude that the *first amendment* does not protect the defendants' accusations of murder, because the majority has applied the *first amendment* to the present case, I briefly address several concerns I have with the majority's analysis.

 **[*491]**  First, I am not convinced that the majority should **[***164]**  even have reached the issue of whether the plaintiff proved falsity as part of a prima facie case for defamation concerning speech of public concern. The majority acknowledges that neither party asked us to reach this issue, stating that "this claim was not preserved in the trial court" and "we exercise our discretion to review it . . . despite the defendants' failure to ask that we do so . . . ." (Citation omitted.) The defendants only asked that we review whether the plaintiff proved actual malice so that we would reverse the award of punitive damages. See *Cox v. Galazin, 460 F. Supp. 2d 380, 388 (D. Conn. 2006)* ("If the plaintiff were a private individual and the statements concerned a purely private matter, the plaintiff would not need to show actual malice in order to establish liability. Further, in such a situation, if the statements constituted defamation per se, the plaintiff would also not need to prove actual injury and could recover presumed general damages."); *Gleason v. Smolinski, supra, 149 Conn. App. 312-14* (affirming award of punitive damages).

Second, having reached the issue of falsity despite the failure of any party to request that we do so, and even assuming arguendo that the defendants' defamatory statements were speech of public concern, thereby shifting the burden **[***165]**  to the plaintiff to prove that she did not murder Bill, the majority does not explain by what burden of persuasion the plaintiff must prove her innocence on remand. Though the majority concludes that a new trial is warranted because, in its view, the trial court failed to conduct a falsity analysis, the majority does no more than note that there is a "debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence." *Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 661 n.2, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)*. Because the proper burden  **[*492]** of persuasion is likely to arise on remand; see *Weaver v. McKnight, 313 Conn. 393, 417-18, 97 A.3d 920 (2014)*; in my view, the majority should have set forth the burden of persuasion a private plaintiff must meet in proving the falsity of a defamatory statement of public concern.[12]

 **[**982]**  Lastly, I respectfully disagree with the majority's conclusion that the plaintiff failed to prove by clear and convincing evidence that the defendants uttered their defamatory statements with actual malice. At the outset, I note that the defamatory statement for which the majority appears to test the record is the statement "to other people that the plaintiff, at the very least, knows more than she is saying about Bill's disappearance." I respectfully disagree. The majority's characterization of the defamatory statement at issue is a far cry from the *actual* defamatory statement at issue in the present case—"murderer"—forming the basis of the judgment. In my view, to properly address the issues in the present case, the majority *must* test the record to determine whether the defendants acted with actual malice in accusing the plaintiff of murdering Bill. As the trial court noted, "[e]specially in a case like this, where the pain and emotions are so apparent and understandable, it is important that things be gotten right so as not to add to the pain and suffering of what to the court at least are sympathetic parties caught in a difficult maelstrom."

Assuming **[***167]**   that the majority's analysis nevertheless addresses whether the plaintiff proved that the defendants acted in reckless disregard for the truth of  **[*493]** whether she murdered Bill, I turn now to the majority's analysis. The majority accurately sets forth the substantive law and standard of review for actual malice in a defamation case. The majority agrees that "[t]he proper inquiry is whether a defendant believes, honestly and in good faith, in the truth of his statements . . . ." *Gambardella v. Apple Health Care, Inc., supra, 291 Conn. 638*. It also agrees

---

[12] Though I would not reach the issue, I would also conclude that, had she retained the burden of persuasion to prove that she did not murder Bill ab initio, the plaintiff met this burden under any standard. In my view, the plaintiff's testimony that she was unaware of Bill's disappearance until three days after it happened, as well as the trial court's crediting her testimony in other contexts and the lack of any competent evidence to the contrary, is sufficient **[***166]**  to establish that she did not murder Bill.

Gleason v. Smolinski, 319 Conn. 394

that "we defer to the trier's findings with respect to, for example . . . whether [a party] acted in good faith in publishing a statement later deemed defamatory."

In the present case, the trial court found as follows: "The statements referenced . . . to [Melissa] DePallo and [Fran] Vrabel and the man at the gym, in the court's opinion meet the requirements of defamation as set forth in [*Cweklinsky v. Mobil Chemical Co., supra, 267 Conn. 217*].

"The statements to DePallo and Vrabel say directly [that the plaintiff] was a murderer or involved in the murder of Bill . . . . The statements made to DePallo and Vrabel were obviously 'published' to them. The statement made to the man at the gym was published to him. In all these situations [the plaintiff] was identified **[***168]** to the listener and since [the plaintiff] was being accused of murder or involved with murder the defamations are per se accusations since murder clearly involves a crime of 'moral turpitude' or 'infamous penalty.' We do not have here mere opinion— [the plaintiff] was said to be a murderer or involved in a situation where murder occurred.

"The statements if made were made with actual malice under the law as the court interprets it. There was reckless disregard of whether the statements that were alleged to have been made were truthful. We do not have a case of mere negligent utterances not based on fact but on suspicion and conjecture." I agree with the **[*494]** trial court. In light of the ample evidence demonstrating the defendants' hostility and spite, which has been discussed **[**983]** at length previously in this opinion, I would conclude that the plaintiff established by clear and convincing evidence that the defendants recklessly disregarded whether their statements were truthful. Therefore, I would affirm the award of punitive damages.

For the reasons set forth previously in this opinion, I do not view the present case as one implicating the *first amendment*. Consequently, I would affirm the judgment of the Appellate **[***169]** Court in all respects. Therefore, I respectfully dissent.

---

**End of Document**

EXHIBIT 43

EXHIBIT 2

## *Phila. Newspapers v. Hepps*

Supreme Court of the United States

December 3, 1985, Argued ; April 21, 1986, Decided

No. 84-1491

**Reporter**

475 U.S. 767 *; 106 S. Ct. 1558 **; 89 L. Ed. 2d 783 ***; 1986 U.S. LEXIS 97 ****; 54 U.S.L.W. 4373; 12 Media L. Rep. 1977

PHILADELPHIA NEWSPAPERS, INC., ET AL. v. HEPPS ET AL.

**Prior History:  [****1]**  APPEAL FROM THE SUPREME COURT OF PENNSYLVANIA.

**Disposition:**  *506 Pa. 304, 485 A. 2d 374*, reversed and remanded.

## Case Summary

**Procedural Posture**
Appellant sought review of a judgment from the Supreme Court of Pennsylvania finding that, in an action for libel, a showing of fault did not require a showing of falsity and held that to place the burden of showing truth on appellant did not unconstitutionally inhibit free debate.

**Overview**

Appellee brought suit for libel and defamation in connection with newspaper stories run by appellant. Appellee challenged the ruling that he had the burden of proving the falsity of the statements, and the Pennsylvania Supreme Court reversed, holding the appellant had the burden of proving the statements were true. On review the Supreme Court found that in order to avoid a chilling effect on *U.S. Const. amend. I*'s protection of true speech, a private figure plaintiff must bear the burden of showing that the speech at issue was false before recovering damages for defamation from a media defendant. Therefore the court reversed the judgment and remanded the case holding that the appellee had to prove the statements of the appellant were false in order to recover damages.

**Outcome**
The judgment of the lower court, imposing the burden of proving falsity on appellant, was reversed because the burden of showing falsity fell on the appellee in an action to prove defamation involving speech of public concern.

## Syllabus

 Appellee Hepps is the principal stockholder of appellee corporation that franchises a chain of stores selling beer, soft drinks, and snacks.  Appellant owner published a series of articles in its Philadelphia newspaper whose general theme was that Hepps, the franchisor corporation, and its franchisees (also appellees) had links to organized crime and used some of those links to influence the State's governmental processes.  Appellees then brought a defamation suit in a Pennsylvania state court against the newspaper owner and the authors (also appellants) of the articles in question.  Concluding that the Pennsylvania statute giving the defendant the burden of proving the truth of allegedly defamatory statements violated the Federal Constitution, the trial court instructed **[****2]**  the jury that the plaintiff bore the burden of proving falsity. The jury ruled for appellants and therefore awarded no damages to appellees.  The Pennsylvania Supreme Court, concluding that a showing of fault did not require a showing of falsity, held that to place the burden of showing truth on the defendant did not unconstitutionally inhibit free debate, and remanded the case for a new trial.

EXHIBIT 43

EXHIBIT 2

*Held*: In a case such as this one, where a newspaper publishes speech of public concern about a private figure, the private-figure plaintiff cannot recover damages without also showing that the statements at issue are false. Because in such a case the scales are in an uncertain balance as to whether the statements are true or false, the Constitution requires that the scales be tipped in favor of protecting true speech. To ensure that true speech on matters of public concern is not deterred, the common-law presumption that defamatory speech is false cannot stand. While Pennsylvania's "shield law," which allows employees of the media to refuse to divulge their sources, places a heavier burden on appellees, the precise scope of that law is unclear and, under these circumstances, it does **[****3]** not appear that such law requires a different constitutional standard than would prevail in the absence of such law. Pp. 771-779.

**Counsel:** David H. Marion argued the cause for appellants. With him on the briefs were Samuel E. Klein and Kerry L. Adams.

Ronald H. Surkin argued the cause for appellees. With him on the brief was Edwin P. Rome. *

 **[****4]**

**Judges:** O'CONNOR, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. BRENNAN, J., filed a concurring opinion, in which BLACKMUN, J., joined, post, p. 779. STEVENS, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE and REHNQUIST, JJ., joined, post, p. 780.

**Opinion by:** O'CONNOR

# Opinion

 **[*768]  [***787]  [**1559]**    JUSTICE O'CONNOR delivered the opinion of the Court.

 [1A]This case requires us once more to "[struggle] . . . to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the *First Amendment*." *Gertz v. Robert Welch, Inc., 418 U.S. 323, 325 (1974)*. In *Gertz*, the Court held that a private figure who brings a suit for defamation cannot recover without some showing that the media defendant was at fault in publishing the statements at issue. *Id., at 347*. Here, we hold that, at least where a newspaper publishes speech of public **[*769]** concern, a private-figure plaintiff cannot recover damages without also showing that the statements at issue are false.

I

Maurice S. Hepps is the principal **[****5]** stockholder of General Programming, Inc. (GPI), a corporation that franchises a chain of stores -- known at the relevant time as "Thrifty" stores -- selling beer, soft drinks, and snacks.

---

* Briefs of amici curiae urging reversal were filed for the American Civil Liberties Union et al. by John G. Koeltl, James C. Goodale, Burt Neuborne, Jack D. Novick, Stefan Presser, Bruce W. Sanford, W. Terry Maguire, R. Bruce Rich, Robert D. Sack, and Alice Neff Lucan; for the American Federation of Labor and Congress of Industrial Organizations by David M. Silberman and Laurence Gold; for Capital Cities Communications, Inc., et al. by Bernard G. Segal, Jerome J. Shestack, Carl A. Solano, Elihu A. Greenhouse, and Lawrence Gunnels; and for Print and Broadcast Media et al. by E. Barrett Prettyman, Jr., Dan Paul, Franklin G. Burt, Steven M. Kamp, John H. McElhaney, Richard M. Schmidt, Jr., Peter G. Banta, Stuart F. Pierson, Neil L. Shapiro, Wilford W. Kirton, Jr., David M. Olive, Theodore Sherbow, Robert Haydock, Jr., Peter Michael Meloy, W. Joel Blass, William W. Ogden, Eric D. Lanphere, Michael A. Gross, Conrad M. Shumadine, William A. Niese, Norton L. Armour, H. Hugh Stevens, Jr., Thomas T. Cobb, Michael Minnis, James L. Koley, J. Laurent Scharff, Alexander Wellford, Donald B. Holbrook, Edward P. Davis, Jr., P. Cameron DeVore, Gregg D. Thomas, Jack M. Weiss, Rutledge C. Clement, Jr., and George K. Rahdert.

Daniel J. Popeo filed a brief for the American Legal Foundation as amicus curiae urging affirmance.

EXHIBIT 43                                                                                          EXHIBIT 2

Mr. Hepps, GPI, and a number of its franchisees are the appellees **[\*\*1560]** here. [1] Appellant Philadelphia Newspapers, Inc., owns the Philadelphia Inquirer (Inquirer). The Inquirer published a series of articles, authored by appellants William Ecenbarger and William Lambert, containing the statements at issue **[\*\*\*788]** here. The general theme of the five articles, which appeared in the Inquirer between May 1975 and May 1976, was that appellees had links to organized crime and used some of those links to influence the State's governmental processes, both legislative and administrative. The articles discussed a state legislator, described as "a Pittsburgh Democrat and convicted felon," App. A60, whose actions displayed "a clear pattern of interference in state government by [the legislator] on behalf of Hepps and Thrifty," *id.*, at A62-A63. The stories reported that federal "investigators have found connections between Thrifty and underworld figures," *id.*, at A65; that "the Thrifty **[\*\*\*\*6]** Beverage beer chain . . . had connections . . . with organized crime," *id.*, at A80; and that Thrifty had "won a series of competitive advantages through rulings by the State Liquor Control Board," *id.*, at A65. A grand jury was said to be investigating the "alleged relationship between the Thrifty chain and known Mafia figures," and "[whether] the chain received special treatment from the [state Governor's] administration and the Liquor Control Board." *Id.*, at A68.

 **[\*770]** Appellees brought suit for defamation against appellants in a Pennsylvania state court. Consistent with *Gertz, supra*, Pennsylvania requires a private figure who brings a suit for defamation to **[\*\*\*\*7]** bear the burden of proving negligence or malice by the defendant in publishing the statements at issue. *42 Pa. Cons. Stat. § 8344* (1982). As to falsity, Pennsylvania follows the common law's presumption that an individual's reputation is a good one. Statements defaming that person are therefore presumptively false, although a publisher who bears the burden of proving the truth of the statements has an absolute defense. See *506 Pa. 304, 313-314, 485 A. 2d 374, 379 (1984)*. See also *42 Pa. Cons. Stat.  § 8343(b)(1)* (1982) (defendant has the burden of proving the truth of a defamatory statement). Cf. *Gertz, supra, at 349* (common law presumes injury to reputation from publication of defamatory statements). See generally Eaton, The American Law of Defamation Through *Gertz* v. *Robert Welch, Inc.*, and Beyond: An Analytical Primer, 61 Va. L. Rev. 1349, 1352-1357 (1975) (describing common-law scheme of defamation law).

The parties first raised the issue of burden of proof as to falsity before trial, but the trial court reserved its ruling on the matter. Appellee Hepps testified **[\*\*\*\*8]** at length that the statements at issue were false, Tr. 2221-2290, and he extensively cross-examined the author of the stories as to the veracity of the statements at issue. After all the evidence had been presented by both sides, the trial court concluded that Pennsylvania's statute giving the defendant the burden of proving the truth of the statements violated the Federal Constitution. *Id.*, at 3589. The trial court therefore instructed the jury that the plaintiffs bore the burden of proving falsity. *Id.*, at 3848.

During the trial, appellants took advantage of Pennsylvania's "shield law" on a number of occasions. That law allows employees of the media to refuse to divulge their sources. See *42 Pa. Cons. Stat. § 5942(a)* (1982) ("No person . . . employed by any newspaper of general circulation . . . or any **[\*771]** radio or television station, or any magazine of general circulation, . . . shall be required to **[\*\*\*789]** disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit"). See also *506 Pa., at 327, 485 A. 2d, at 387* ("This statute **[\*\*\*\*9]** has been interpreted **[\*\*1561]** broadly"). Appellees requested an instruction stating that the jury could draw a negative inference from appellants' assertions of the shield law; appellants requested an instruction that the jury could not draw any inferences from those exercises of the shield law's privilege. The trial judge declined to give either instruction. Tr. 3806-3808. The jury ruled for appellants and therefore awarded no damages to appellees.

Pursuant to Pennsylvania statute, *42 Pa. Cons. Stat. § 722(7)* (1982), the appellees here brought an appeal directly to the Pennsylvania Supreme Court. That court viewed *Gertz* as simply requiring the plaintiff to show fault in actions for defamation. It concluded that a showing of fault did not require a showing of falsity, held that to place the burden

---

[1] Appellants list nine entities as appellees in the proceedings in this Court: Maurice S. Hepps; General Programming, Inc.; A. David Fried, Inc.; Brookhaven Beverage Distributors, Inc.; Busy Bee Beverage Co.; ALMIK, Inc.; Lackawanna Beverage Distributors; N.F.O., Inc.; and Elemar, Inc. Brief for Appellants ii.

EXHIBIT 43   EXHIBIT 2

of showing truth on the defendant did not unconstitutionally inhibit free debate, and remanded the case for a new trial. [2] *506 Pa., at 318-329, 485 A. 2d, at 382-387*. We noted probable jurisdiction, *472 U.S. 1025 (1985)*, and now reverse.

**[****10]**  II

In *New York Times Co.* v. *Sullivan, 376 U.S. 254 (1964)*, the Court "[determined] for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a **[*772]** public official against critics of his official conduct." *Id., at 256*. The State's trial court in that case believed the statements tended to injure the plaintiff's reputation or bring him into public contempt, *id., at 267*, and were therefore libelous *per se, id., at 262*. The trial court therefore instructed the jury that it could presume falsity, malice, and some damage to reputation, as long as it found that the defendant had published the statements and that the statements concerned the plaintiff.  *Ibid*.  The trial court also instructed the jury that an award of punitive damages required "malice" or "actual malice." *Id., at 262, 267*. The jury found for the plaintiff and made an award of damages that did not distinguish between compensatory and punitive damages. *Id., at 262*. The Alabama Supreme Court upheld the judgment **[****11]** of the trial court in all respects.  *Id., at 263*.

This Court reversed, holding that  **[***790]**  "libel can claim no talismanic immunity from constitutional limitations." *Id., at 269*. Against the "background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks," the Court noted that "[authoritative] interpretations of the *First Amendment* guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker." *Id., at 270-271*. Freedoms of expression require "'breathing space,'" *id., at 272* (quoting *NAACP v. Button, 371 U.S. 415, 433 (1963))*:

"A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions -- and to do so on pain of libel judgments virtually unlimited in amount -- leads to . . . 'self-censorship.' . . .  Under such a **[****12]** rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is  **[**1562]**  in fact true, because of doubt  **[*773]**  whether it can be proved in court or fear of the expense of having to do so." *376 U.S., at 279*.

The Court therefore held that the Constitution

"prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id., at 279-280*.

That showing must be made with "convincing clarity," *id., at 285-286*, or, in a later formulation, by "clear and convincing proof," *Gertz, 418 U.S., at 342*. The standards of *New York Times* apply not only when a public official sues a newspaper, but also when a "public figure" sues a magazine or news service.  See *Curtis Publishing Co.* v.

---

[2] The state courts that have considered this issue since *Gertz* have reached differing conclusions.  Compare, *e. g., Denny v. Mertz, 106 Wis. 2d 636, 654-658, 318 N. W. 2d 141, 150-151* (defendant must bear burden of showing truth), cert. denied, **459 U.S. 883 (1982)**, and *Memphis Publishing Co.* v. *Nichols, 569 S. W. 2d 412 (Tenn. 1978)* (same), with *Gazette, Inc.* v. *Harris, 229 Va. 1, 15-16, 325 S. E. 2d 713, 725* (plaintiff must bear burden of showing falsity), cert. denied, **473 U.S. 905 (1985)**, and *Madison v. Yunker, 180 Mont. 54, 67, 589 P. 2d 126, 133 (1978)* (same).

48

**EXHIBIT 43**                                                   EXHIBIT 2

*Butts, 388 U.S. 130, 162-165 (1967)* (Warren, C. J., concurring in result); *id., at 170* (opinion [****13] of Black, J.); *id., at 172* (opinion of BRENNAN, J.).  See also *Wolston v. Reader's Digest Assn., Inc., 443 U.S. 157, 163-169 (1979)*.

A decade after *New York Times*, the Court examined the constitutional limits on defamation suits by private-figure plaintiffs against media defendants.   *Gertz, supra.* The Court concluded that the danger of self-censorship was a valid, but not the exclusive, concern in suits for defamation: "The need to avoid self-censorship by the news media is . . . , not the only societal value at issue . . . [or] this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation." **[***791]** *Gertz, supra, at 341*. See also *Rosenblatt v. Baer, 383 U.S. 75, 92 (1966)* (Stewart, J., concurring).  Any analysis must also take into account the "legitimate state interest underlying the law of libel [in] the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz, supra, at 341*. See also *Time, Inc*. v. *Firestone, 424 U.S. 448, 456 (1976)* **[****14]**  (discussing  **[*774]**  the "appropriate accommodation between the public's interest in an uninhibited press and its equally compelling need for judicial redress of libelous utterances").  In light of that interest, and in light of the fact that private figures have lesser access to media channels useful for counteracting false statements and have not voluntarily placed themselves in the public eye, *Gertz, supra, at 344-345*, the Court held that the Constitution "allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*," *418 U.S., at 348*: "[So] long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id., at 347*. Nonetheless, even when private figures are involved, the constitutional requirement of fault supersedes the common law's presumptions as to fault and damages.  In addition, the Court in *Gertz* expressly held that, although a showing of simple fault sufficed to **[****15]** allow recovery for actual damages, even a private-figure plaintiff was required to show actual malice in order to recover presumed or punitive damages. *Id., at 348-350*.

The Court most recently considered the constitutional limits on suits for defamation in *Dun & Bradstreet, Inc*. v. *Greenmoss Builders, Inc., 472 U.S. 749 (1985)*. In sharp contrast to *New York Times, Dun & Bradstreet* involved not only a private-figure plaintiff, but also speech of purely private concern.  *472 U.S., at 751-752*. A plurality of the Court in *Dun & Bradstreet* **[**1563]**  was convinced that, in a case with such a configuration of speech and plaintiff, the showing of actual malice needed to recover punitive damages under either *New York Times* or *Gertz* was unnecessary:

"In light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest [in preserving private reputation] adequately supports awards of presumed and punitive **[*775]** damages -- even absent a showing of 'actual malice.'" *472 U.S., at 761* (opinion of POWELL, J.) (footnote omitted).

See also **[****16]**  *id., at 764* (BURGER, C. J., concurring in judgment); *id., at 774* (WHITE, J., concurring in judgment).

 [2]One can discern in these decisions two forces that may reshape the common-law landscape to conform to the *First Amendment*. The first is whether the plaintiff is a  **[***792]**  public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law.  When the speech is of public concern but the plaintiff is a private figure, as in *Gertz*, the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in *Dun & Bradstreet*, the constitutional requirements do not **[****17]**  necessarily force any change in at least some of the features of the common-law landscape.

[3]Our opinions to date have chiefly treated the necessary showings of fault rather than of falsity. Nonetheless, as one might expect given the language of the Court in *New York Times*, see *supra, at 772-773*, a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation. See *Garrison v. Louisiana, 379 U.S. 64, 74 (1964)* (reading *New York Times* for the proposition that "a public official [is] allowed the civil [defamation] remedy only if he establishes that the utterance was false").  See also *Herbert v. Lando, 441 U.S. 153, 176 (1979)* ("[The] plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability").

 **[\*776]**   [1B]Here, as in *Gertz*, the plaintiff is a private figure and the newspaper articles are of public concern. In *Gertz*, as in *New York Times*, the common-law rule was superseded by a constitutional rule.  We believe that the common law's rule on falsity -- that the defendant must bear the **[\*\*\*\*18]**  burden of proving truth -- mustsimilarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.

There will always be instances when the factfinding process will be unable to resolve conclusively whether the speech is true or false; it is in those cases that the burden of proof is dispositive.  Under a rule forcing the plaintiff to bear the burden of showing falsity, there will be some cases in which plaintiffs cannot meet their burden despite the fact that the speech is in fact false.  The plaintiff's suit will fail despite the fact that, in some abstract sense, the suit is meritorious.  Similarly, under an alternative rule placing the burden of showing truth on defendants, there would be some cases in which defendants could not bear their burden despite the fact that the speech is in fact true.  Those suits would succeed despite the fact that, in some abstract sense, those suits are unmeritorious.  Under either rule, then, the outcome of the suit will sometimes be at variance with the outcome that we would desire if all speech were either demonstrably true or demonstrably false.

 **[\*\*1564] [\*\*\*\*19]**    [1C]This dilemma stems from the fact thatthe allocation of the burden of proof will determine liability for some speech that is true and some that is false, but *all* of such  **[\*\*\*793]**  speech is *unknowably* true or false.  Because the burden of proof is the deciding factor only when the evidence is ambiguous, we cannot know how much of the speech affected by the allocation of the burden of proof is true and how much is false.  In a case presenting a configuration of speech and plaintiff like the one we face here, and where the scales are in such an uncertain balance, we believe that the Constitution requires us to tip them in favor of protecting true speech.  To ensure that true speech on matters of public concern is not deterred,  **[\*777]**  we hold that the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern.

 [1D]In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the *First Amendment* without bearing the burden of showing that its restriction is justified.  **[\*\*\*\*20]**  See *Consolidated Edison Co*. v. *Public Service Comm'n of N. Y., 447 U.S. 530, 540 (1980)* (content-based restriction); *First National Bank of Boston v. Bellotti, 435 U.S. 765, 786 (1978)* (speaker-based restriction); *Renton* v. *Playtime Theatres, Inc., ante*, at 47-54 (secondary-effects restriction).  See also *Speiser v. Randall, 357 U.S. 513 (1958)* (striking down the precondition that a taxpayer sign a loyalty oath before receiving certain tax benefits).  It is not immediately apparent from the text of the *First Amendment*, which by its terms applies only to governmental action, that a similar result should obtain here: a suit by a private party is obviously quite different from the government's direct enforcement of its own laws.  Nonetheless, the need to encourage debate on public issues that concerned the Court in the governmental-restriction cases is of concern in a similar manner in this case involving a private suit for damages: placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably **[\*\*\*\*21]**  result.  See *New York Times*, 376 U.S., at 279; *Garrison, supra, at 74* ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned").  Because such a "chilling" effect would be antithetical to the *First Amendment's* protection of true speech on matters of public concern, we believe that a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant.  To do otherwise could "only result in a deterrence of speech which the Constitution makes free." *Speiser, supra, at 526*.

EXHIBIT 43                                                                          EXHIBIT 2

[*778]  We recognize that requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so.  Nonetheless, the Court's previous decisions on the restrictions that the *First Amendment* places upon the common law of defamation firmly support our conclusion here with respect to the allocation of the burden of proof. In attempting to resolve **[***794]** related issues in the defamation context, the Court has affirmed that "[the] *First Amendment* requires that we protect some **[****22]** falsehood in order to protect speech that matters." *Gertz, 418 U.S., at 341*. Here the speech concerns the legitimacy of the political process, and therefore clearly "matters." See *Dun & Bradstreet*, 472 U.S., at 758-759 (speech of public concern is at the core of the *First Amendment's* protections).  To provide "'breathing space,'" *New York Times, supra*, at 272 (quoting *NAACP v. Button, 371 U.S., at 433*), for true speech on matters of public concern, the Court has **[**1565]** been willing to insulate even *demonstrably* false speech from liability, and has imposed additional requirements of fault upon the plaintiff in a suit for defamation. See, *e. g., Garrison, 379 U.S., at 75*; *Gertz, supra, at 347*. We therefore do not break new ground here in insulating speech that is not even demonstrably false.

We note that our decision adds only marginally to the burdens that the plaintiff must already bear as a result of our earlier decisions in the law of defamation. The plaintiff must show fault. A jury is obviously more likely to accept a plaintiff's contention that the defendant was **[****23]** at fault in publishing the statements at issue if convinced that the relevant statements were false.  As a practical matter, then, evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published statements will generally encompass evidence of the falsity of the matters asserted.  See *Keeton, Defamation and Freedom of the Press*, 54 Texas L. Rev. 1221, 1236 (1976). See also Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, *25 Wm. & Mary L. Rev. 825, 856-857 (1984)*.

 [*779]   [1E]We recognize that the plaintiff's burden in this case is weightier because of Pennsylvania's "shield" law, which allows employees of the media to refuse to divulge their sources.  See *supra, at 770-771*. [3] But we do not have before us the question of the permissible reach of such laws.  Indeed, we do not even know the precise reach of Pennsylvania's statute.  The trial judge refused to give any instructions to the jury as to whether it could, or should, draw an inference adverse to the defendant from the defendant's decision to use the shield law rather than to present affirmative **[****24]** evidence of the truthfulness of some of the sources.  See *supra, at 771*.  That decision of the trialjudge was not addressed by Pennsylvania's highest court, nor was it appealed to this Court. [4] In the situation before us, we are unconvinced that the **[***795]** State's shield law requires a different constitutional standard than would prevail in the absence of such a law.

 [****25]  For the reasons stated above, the judgment of the Pennsylvania Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered*.

**Concur by:** BRENNAN

# Concur

JUSTICE BRENNAN, with whom JUSTICE BLACKMUN joins, concurring.

---

[3] Pennsylvania is not alone in this choice.  See, *e. g., Ala. Code § 12-21-142* (1977); *Cal. Const., Art. I, § 2(b)*; *N. Y. Civ. Rights Law § 79-h* (McKinney 1976).

[4] We also have no occasion to consider the quantity of proof of falsity that a private-figure plaintiff must present to recover damages. Nor need we consider what standards would apply if the plaintiff sues a nonmedia defendant, see *Hutchinson v. Proxmire, 443 U.S. 111, 133, n. 16 (1979)*, or if a State were to provide a plaintiff with the opportunity to obtain a judgment that declared the speech at issue to be false but did not give rise to liability for damages.

EXHIBIT 43   EXHIBIT 2

I believe that where allegedly defamatory speech is of public concern, the *First Amendment* requires that the plaintiff, **[\*780]** whether public official, public figure, or private individual, prove the statements at issue to be false, and thus join the Court's opinion. Cf. *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*. I write separately only to note that, while the Court reserves the question whether the rule it announces applies to nonmedia defendants, *ante*, at 779, n. 4, I adhere to my view that such a distinction is "irreconcilable with the fundamental *First Amendment* principle that "[the] inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of the source, whether corporation, association, union, or individual.'" *Dun & Bradstreet, Inc*. v. *Greenmoss Builders, Inc., 472 U.S. 749, 781 (1985)* **[\*\*\*\*26]**  (BRENNAN, J., dissenting) (quoting *First National Bank of Boston v. Bellotti, 435 U.S. 765, 777  [\*\*1566]  (1978))*.

**Dissent by:** STEVENS

# Dissent

JUSTICE STEVENS, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE **REHNQUIST** join, dissenting.

The issue the Court resolves today will make a difference in only one category of cases -- those in which a private individual can prove that he was libeled by a defendant who was at least negligent.  For unless such a plaintiff can overcome the burden imposed by *Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974)*, he cannot recover regardless of how the burden of proof on the issue of truth or falsity is allocated.  By definition, therefore, the only litigants -- and the only publishers -- who will benefit from today's decision are those who act negligently or maliciously.

The Court, after acknowledging the need to "'[accommodate] . . . the law of defamation and the freedoms of speech and press protected by the *First Amendment*,'" *ante*, at 768 (quoting *Gertz v. Robert Welch, Inc., 418 U.S., at 325*), decides to override "the common-law presumption" retained by several States **[\*\*\*\*27]**  [1]  that "defamatory speech is false" because of  **[\*781]**  the need  **[\*\*\*796]**  "[to] ensure that true speech on matters of public concern is not deterred." *Ante*, at 776-777.  I do not agree that our precedents require a private individual to bear the risk that a defamatory statement -- uttered either with a mind toward assassinating his good name or with careless indifference to that possibility -- cannot be proven false.  By attaching no weight to the State's interest in protecting the private individual's good name, the Court has reached a pernicious result.

 **[\*\*\*\*28]**  The state interest in preventing and redressing injuries to reputation is obviously important.  As Justice Stewart eloquently reminded us in his concurrence in *Rosenblatt v. Baer, 383 U.S. 75, 92-94 (1966)*:

"The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty.  The protection of private personality, like the protection of life itself, is left primarily to the individual States under the *Ninth* and *Tenth Amendments*.  But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.

. . . .

---

[1] See, *e. g., Elliott v. Roach, 409 N. E. 2d 661, 681 (Ind. App. 1980)*; *Trahan v. Ritterman, 368 So. 2d 181, 184 (La. App. 1979)*; **Parsons v. Gulf & South American S.S. Co., 194 So. 2d 456, 460** (La. App.), cert. denied, **389 U.S. 896 (1967)**; *Madison v. Yunker, 180 Mont. 54, 61, 589 P. 2d 126, 129-130 (1978)*; *Rogozinski v. Airstream by Angell, 152 N. J. Super. 133, 146-147, 377 A. 2d 807, 814 (1977)*, modified, *164 N. J. Super. 465, 397 A. 2d 334 (1979)*; **Martin v. Griffin Television, Inc., 549 P. 2d 85, 87, 94 (Okla. 1976)**; *Corabi v. Curtis Publishing Co., 441 Pa. 432, 447-451, 468, 273 A. 2d 899, 907-909, 917 (1971)*; *Memphis Publishing Co.* v. *Nichols, 569 S. W. 2d 412, 420 (Tenn. 1978)*; *Frank B. Hall & Co., Inc*. v. *Buck, 678 S. W. 2d 612, 623-625 (Tex. App. 1984)*, cert. denied, **472 U.S. 1009 (1985)**; *Denny v. Mertz, 106 Wis. 2d 636, 654-655, 318 N. W. 2d 141, 150*, cert. denied, **459 U.S. 883 (1982)**.

". . . The *First* and *Fourteenth Amendments* have not stripped private citizens of all means of redress for injuries **[*782]** inflicted upon them by careless liars.  The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem.  Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose **[****29]** reputation has been falsely dishonored.

"Moreover, the preventive effect of liability for defamation serves an important public purpose.  For the rights and values of private personality far transcend mere personal interests.  Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the **[**1567]** easy lie can infect and degrade a whole society." [2]

 **[****30]**  While deliberate or inadvertent libels vilify private personages, they contribute little to the marketplace of ideas.  In assaying the *First Amendment* side of the balance, it helps to remember that the perpetrator of the libel suffers from its **[***797]** failure to demonstrate the truth of its accusation only if the "private-figure" plaintiff first establishes that the publisher is at "fault," *418 U.S., at 347* -- *i. e.*, either that it published its libel with "actual malice" in the *New York Times* sense ("with knowledge that it was false or with reckless disregard of whether it was false or not," *New York Times Co.* v. *Sullivan, 376 U.S. 254, 279-280 (1964))*, or that it published with that degree of careless indifference characteristic of negligence.  Far from being totally in the dark about "how much **[*783]** of the speech affected by the allocation of the burden of proof is true and how much is false," *ante*, at 776, the antecedent fault determination makes irresistible the inference that a significant portion of this speech is beyond the constitutional pale. [3] **[****32]**  This observation is almost tautologically true with regard to libels published **[****31]** with "actual malice."  For that standard to be met, the publisher must come close to willfully blinding itself to the falsity of its utterance. [4] **[****33]**  The observation is also valid, albeit to a lesser extent, with respect to **[*784]** defamations

---

[2] "There is no doubt about the historical fact that the interest in one's good name was considered an important interest requiring legal protection more than a thousand years ago; and that so far as Anglo-Saxon history is concerned this interest became a legally protected interest comparatively soon after the interest in bodily integrity was given legal protection." L. Eldridge, The Law of Defamation § 53, pp. 293-294 (1978).

See *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc., 472 U.S. 749, 757-758 (1985)* (opinion of POWELL, J.); *id., at 767-769* (WHITE, J., concurring in judgment); *id., at 793, n. 16* (BRENNAN, J., dissenting) ("[The] individual's interest in reputation is certainly at the core of notions of human dignity"); *Gertz v. Robert Welch, Inc., 418 U.S. 323, 341 (1974)*.

[3] "But there is no constitutional value in false statements of fact.  Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues.  *New York Times Co.* v. *Sullivan*, 376 U.S. [254,] 270 [(1964)].  They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)*." *Gertz v. Robert Welch, Inc., 418 U.S., at 340*.

But cf. *New York Times Co.* v. *Sullivan, 376 U.S., at 279, n. 19*.

[4] "Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication.  In *New York Times, supra*, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information.  In *Garrison v. State of Louisiana, 379 U.S. 64 (1964)*, . . . the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of . . . probable falsity.' *379 U.S., at 74*. Mr. Justice Harlan's opinion in *Curtis Publishing Co.* v. *Butts, 388 U.S. 130, 153 (1967)*, stated that evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' was essential to recovery by public officials in defamation actions.  These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson, 390 U.S. 727, 731 (1968)*.

See *Rosenblatt v. Baer, 383 U.S. 75, 92 (1966)* (Stewart, J., concurring) ("What the *New York Times* rule ultimately protects is defamatory falsehood").

EXHIBIT 43                                                                         EXHIBIT 2

uttered with "fault." [5] **[**1568]** Thus, **[***798]** while the public's interest in an uninhibited press is at its nadir when the publisher is at fault or worse, society's "equally compelling" need **[*785]** for judicial redress of libelous utterances is at its zenith. *Time, Inc*. v. *Firestone, 424 U.S. 448, 456 (1976)*.

 **[****34]** To appreciate the thrust of the Court's holding, we must assume that a private-figure libel plaintiff can prove that a story about him was published with "actual malice" -- that is, without the publisher caring in the slightest whether it was false or not. Indeed, in order to comprehend the full ramifications of today's decision, we should assume that the publisher knew that it would be impossible for a court to verify or discredit the story and that it was published for no other purpose than to destroy the reputation of the plaintiff. Even if the plaintiff has overwhelming proof of malice -- in both the common-law sense and as the term was used in *New York Times Co*. v. *Sullivan* -- the Court today seems to believe that the character assassin has a constitutional license to defame. [6]

 **[****35]** In my opinion deliberate, malicious character assassination is not protected by the *First Amendment to the United States Constitution*. That Amendment does require the target of a defamatory statement to prove that his assailant was at fault, and I agree that it provides a constitutional shield for truthful statements. I simply do not understand, however, why a character assassin should be given an absolute license to defame by means of statements **[***799]** that can be neither verified nor disproved. The danger of deliberate defamation by reference to unprovable facts is not a merely speculative or hypothetical concern. Lack of knowledge about third parties, the loss of critical records, an uncertain recollection about events that occurred long ago, perhaps during a period of special stress, the absence of eyewitnesses -- a host of factors -- may **[*786]** make it impossible for an honorable person to disprove malicious **[**1569]** gossip about his past conduct, his relatives, his friends, or his business associates.

The danger of which I speak can be illustrated within the confines of this very case. Appellants published a series of five articles proclaiming that "Federal **[****36]** authorities . . . have found connections between Thrifty and underworld

---

[5] It is presumably for this reason that the Court believes that its "decision adds only marginally to the burdens that the plaintiff must already bear as a result of our earlier decisions in the law of defamation." *Ante*, at 778. See *ibid*. ("As a practical matter, then, evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published statements will generally encompass evidence of the falsity of the matters asserted" (citations omitted)).

Although I am inclined to agree with the preceding observation, I do not agree that it supports the result reached by the Court today. That allocation of the burden of proof is inconsequential in many cases provides no answer to cases in which it is determinative. See *infra*, at 785-787. Moreover, the Court's belief, however sincere, that its decision will not significantly impair the state interest in redressing injury to reputation is not itself sufficient to justify overriding state law. See *Gertz v. Robert Welch, Inc., 418 U.S., at 349*.

I note that the Court makes no claim that its decision to impose on private-figure libel plaintiffs the burden of proving falsity is necessary to prevent jury confusion. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 116, pp. 839-840 (5th ed. 1984) ("[There] is no inconsistency in assuming falsity until defendant publisher proves otherwise and requiring the plaintiff to prove negligence or recklessness with respect to the truth or falsity of the imputation"). See also *506 Pa. 304, 325, n. 13*, *485 A. 2d 374, 385, n. 13 (1984)* ("In a rather circuitous argument, [appellants] contend that falsity is inextricably bound up with proof of fault. [Appellants] assert that to prove fault the plaintiff in fact must demonstrate the falsity of the matter. While in some instances the plaintiff may elect to establish the patent error in the material to demonstrate the lack of due care in ascertaining its truth, it does not necessarily follow that negligence of the defendant can only be shown by proving that the material is false. A plaintiff can demonstrate negligence in the manner in which the material was gathered, regardless of its truth or falsity. In such instance the presumption of falsity will prevail unless the defendant elects to establish the truth of the material and thereby insulate itself from liability. Where it is necessary to prove falsity to establish the negligence of the defendant, it is then the burden of the plaintiff to do so. . . . That proposition will not, of course, hold true in all cases. Where negligence can be established without a demonstration of the falsity of the material, there is no additional obligation upon the plaintiff to prove the falsity of the material").

[6] This license would gain immeasurable strength if courts take up the suggestion of commentators in the Court's camp that the nonfalsifiable nature of a libel should entitle the defendant to summary judgment. See Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, *25 Wm. & Mary L. Rev. 825, 865 (1984)* ("If the plaintiff's suit is based upon a statement that is not susceptible to being proved false, for example, the court should deny any discovery and dismiss the complaint").

EXHIBIT 43 EXHIBIT 2

figures," App. A65; that "Federal agents have evidence of direct financial involvement in Thrifty by [Joseph] Scalleat," a "leader of organized crime in northeastern Pennsylvania," *id*., at A72; and that "the Thrifty Beverage beer chain . . . had connections itself with organized crime," *id*., at A80. [7] The defamatory character of these statements is undisputed.  Yet the factual basis for the one specific allegation contained in them is based on an admitted relationship between appellees and a third party.  The truth or falsity of that statement depends on the character and conduct of that third party -- a matter which the jury may well have resolved against the plaintiffs on the ground that they could not disprove the allegation on which they bore the burden of proof. [8]

 **[****37]**  Despite the obvious blueprint for character assassination provided by the decision today, the Court's analytical approach -- by attaching little or no weight to the strong state interest in redressing injury to private reputation -- provides a wholly unwarranted protection for malicious gossip.  As I understand the Court's opinion, its counterintuitive result is derived from a straightforward syllogism.  The major premise seems to be that "the *First Amendment's* protection of true speech on matters of public concern," *ante*, at 777, is **[\*787]** tantamount to a command that no rule of law can stand if it will exclude any true speech from the public domain.  The minor premise is that although "we cannot know how much of the speech affected by the allocation of the burden of proof is true and how much is false," *ante*, at 776, at least some unverifiable gossip is true.  From these premises it necessarily follows that a rule burdening the dissemination of such speech would contravene the *First Amendment*.  Accordingly, "a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant." **[****38]** *Ante*, at 777.

The Court's result is plausible however, only because it grossly undervalues the strong state interest in redressing injuries to private reputations.  **[\*\*\*800]**  The error lies in its initial premise, with its mistaken belief that doubt regarding the veracity of a defamatory statement must invariably be resolved in favor of constitutional protection of the statement and against vindication of the reputation of the private individual.  To support its premise, the Court relies exclusively on our precedents requiring the government to bear the burden of proving that a restriction of speech is justified.  See *ante*, at 777-778.  Whether such restrictions appear in the form of legislation burdening the speech of particular speakers or of particular points of view, or of common-law actions punishing seditious libel, the Court is doubtlessly correct that the government or its agents must at a minimum shoulder the burden of proving that the speech is false and must do so with sufficient reliability that we can be confident that true speech is not suppressed.  It was to achieve this reliability that the Court, in *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)*, **[****39]** incorporated into the *First Amendment* the then-emergent common-law "privilege for [good-faith] criticism of official conduct." *Id., at 282*. See *id., at 282, n. 21*. Because "erroneous **[\*\*1570]** statement is inevitable in free debate, and [because] it must be protected if the freedoms of expression **[\*788]** are to have the 'breathing space' that they 'need . . . to survive, *N.A.A.C.P*. v. *Button, 371 U.S. 415, 433* [1963],'" *id., at 271-272*, this privilege is defeasible only if the defamatory statement "was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *id., at 279-280*.  "Allowance of the defense of truth, with the burden of proving it on the defendant," was found wanting because it did not "mean that only false speech [would] be deterred" -- doubts regarding whether truth "can be proved in court or fear of the expense of having to do so" would force good-faith critics of official conduct to "'steer far wider of the unlawful zone,'" *id., at 279* (quoting *Speiser v. Randall, 357 U.S. 513, 526 (1958))*. [9] **[****40]**

---

[7] The parties agree that "the thrust of the challenged publications was that the Thrifty chain was connected with underworld figures and organized crime. It was that proposition that was required to be proven false." Brief for Appellants 36.

[8] At trial, the individual plaintiff simply denied knowledge of Joseph Scalleat's employment with Beer Sales Consultants and of BSC's employment by three Thrifty stores.  See Testimony of Maurice Hepps, Tr. 2185-2186, 2200.

[9] The *New York Times Co*. v. *Sullivan* privilege was subsequently extended to "public figures." See *Curtis Publishing Co*. v. *Butts, 388 U.S. 130, 164 (1967)* (Warren, C. J., concurring in result).

EXHIBIT 43 EXHIBIT 2

Even assuming that attacks on the reputation of a public figure should be presumed to be true, however, a different calculus is appropriate when a defamatory statement disparages the reputation of a private individual. [10] In that case, the overriding concern for reliable protection of truthful statements must make **[***801]** room for "[the] legitimate state interest underlying the law of libel" -- "'the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz v. Robert Welch, Inc., 418 U.S., at 341*. A public official, of course, has no "less interest in protecting his reputation than an individual in private life." *Rosenbloom v. Metromedia, 403 U.S. 29, 46 (1971)* (opinion of **[*789]** BRENNAN, J.). But private **[****41]** persons are "more vulnerable to injury" and "more deserving of recovery" -- more vulnerable because they lack "access to the channels of effective communication . . . to counteract false statements"; more deserving because they have "relinquished no part of [their] good [names]" by "[thrusting] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc., 418 U.S., at 344-345*.

**[****42]** Recognition of the "strong and legitimate [state] interest in compensating private individuals for injury to reputation," *id., at 348-349*, exposes the untenability of the Court's methodology: the burden of proof in "private-figure" libel suits simply cannot be determined by reference to our precedents having the reputations of "public figures" in mind. In libel cases brought by the latter category of plaintiffs,

"we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement . . . but the possibility of such error . . . would create a strong impetus toward self-censorship, which the *First Amendment* cannot tolerate." *Rosenbloom v. Metromedia, 403 U.S., at 50* (opinion of BRENNAN, J.).

In libel suits brought by private individuals, in contrast, "the state interest in compensating injury to the reputation of private individuals requires that a different **[**1571]** rule should obtain." *Gertz v. Robert Welch, Inc., 418 U.S., at 343*. To be sure, both categories of cases involve "speech that matters." *Id., at 341*. But "[the] extension of the **[****43]** *New York Times* test" to every item of public interest "would abridge this legitimate state interest to a degree that we find unacceptable." *Id., at 346*. [11] Accordingly, in *Gertz* v. *Robert Welch, Inc*., this **[*790]** Court rejected the *Rosenbloom* plurality's assumption that the risk of error must invariably be borne by the libel plaintiff, regardless of his or her status, as long as the defamatory statement touches "matters of public or general concern." *Rosenbloom v. Metromedia, 403 U.S., at 44*. *Gertz* thus forecloses the Court's unacknowledged reliance on the discredited analysis of the *Rosenbloom* plurality; where private-figure libel plaintiffs are involved, the *First Amendment* does *not* "[require] us to tip [the scales] in favor of protecting true speech" merely because that speech addresses "matters of public concern." *Ante*, at 776. See *418 U.S., at 345-346*. **[***802]** See also *Time, Inc*. v. *Firestone, 424 U.S., at 454-456* (refusing to "reinstate the doctrine advanced in the plurality opinion in *Rosenbloom*" in the guise of protection for inaccurate reporting on "public **[****44]** controversies" or on judicial proceedings).

In my view, as long as publishers are protected by the requirement that the plaintiff has the burden of proving fault, there can be little, if any, basis for a concern that a significant amount of true speech will be deterred unless the private person victimized by a malicious libel can also carry the burden of proving falsity. The Court's decision trades on the good names of private individuals with little *First Amendment* coin to show for it.

---

[10] If the issue were properly before us, I would be inclined to the view that public figures should not bear the burden of disproving the veracity of accusations made against them with "actual malice," as the *New York Times* Court used that term. The contrary remarks in cases such as *Garrison v. Louisiana, 379 U.S. 64, 74 (1964)*, were not necessary to the decisions in those cases, and they do not persuade me that the constitutional value in truthful statements requires any more protection of defamatory utterances whose truth may not be ascertained than is provided by the *New York Times* test.

[11] See *418 U.S., at 342* ("Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test").

**EXHIBIT 43**   <span style="color:red">EXHIBIT 2</span>

I respectfully dissent.

## References

*50 Am Jur 2d, Libel and Slander 464*

16 Am Jur Pl & Pr Forms **[****45]**  (Rev), Libel and Slander, Forms 1, 4, 11, 24, 27, 29, 31, 35, 231, 281-284

14 Am Jur Proof of Facts 2d 49, Defamation With Actual Malice

19 Am Jur Trials 499, Defamation

USCS, *Constitution, 1st Amendment*

US L Ed Digest, Constitutional Law 947, 948; Evidence 192

Index to Annotations, Freedom of Sppech and Press; Libel and Slander; New York Times Rule; Presumptions and Burden of Proof

Annotation References:

 Progeny of New York Times v Sullivan in the Supreme Court. *61 L Ed 2d 975*.

Constitutional aspects of libel and slander.  *28 L Ed 2d 885*.

The Supreme Court and the right of free speech and the press.  *93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976*.

Necessity and sufficiency of plaintiff's allegations as to falsity in defamation action.  *85 ALR2d 460*.

**End of Document**

**EXHIBIT 43**  EXHIBIT  3

Lynch v. Granby Holdings, 230 Conn. 95

# *Lynch v. Granby Holdings*

Supreme Court of Connecticut

June 8, 1994, Argued ; June 23, 1994, [*] Released

14868

**Reporter**

230 Conn. 95 *; 644 A.2d 325 **; 1994 Conn. LEXIS 207 ***

JOSEPH L. LYNCH ET AL. v. GRANBY HOLDINGS, INC.

**Prior History: [***1]**    Action to recover damages for, inter alia, breach of a lease agreement, brought to the Superior Court in the judicial district of Hartford-New Britain at Hartford and tried to the jury before Hon. Robert Satter, state trial referee, who, exercising the powers of the Superior Court, rendered judgment in part for the plaintiffs in accordance with the jury's verdict, from which the plaintiff Daniel Lynch appealed and the defendant cross appealed to the Appellate Court, O'Connell, Landau and Freedman, Js., which reversed in part the trial court's judgment and remanded the case for a new trial on the breach of lease count brought by the plaintiff Daniel Lynch, and the defendant, on the granting of certification, appealed to this court.

**Disposition:** Reversed; further proceedings.

# Case Summary

**Procedural Posture**
Defendant lessor sought review of a decision from the Court of Appeals (Connecticut), which reversed the trial court's judgment in favor of the tenant that had awarded the tenant zero damages in the tenant's action for breach of the lease.

**Overview**
The appellate court reversed the trial court's judgment in favor of the tenant, which had awarded him zero damages because it found that the jury's award was improper. On appeal, the court stated that it was abuse of discretion for the appellate court to order a new trial on the ground of plain error because: (1) the appellate court's opinion did not discuss the plain error rule and articulated no reason why plain error review was appropriate; (2) the issue was addressed sua sponte, rather than at the behest of one of the parties which deprived the parties of the opportunity to brief the issue, and (3) in light of the related issues that concerned the tenant's duties under the lease the possibility of juror confusion did not warrant plain error review because such a claim of error did not implicate interests of public welfare or fundamental justice between the parties.

**Outcome**
The court reversed and remanded the appellate court judgment, which had reversed the trial court's judgment in favor of the tenant in the tenant's action for breach of the lease.

**Counsel:** Andrea A. Hewitt, with whom was Eliot B. Gersten, for the appellant (defendant).

Timothy Brignole, for the appellee (plaintiff Daniel Lynch).

---

[*] June 23, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

**EXHIBIT 43**                                                                          **EXHIBIT 3**

Lynch v. Granby Holdings, 230 Conn. 95

**Judges:** PETERS, C. J., CALLAHAN, BORDEN, BERDON and PALMER, Js.

## Opinion

 [*96] [**325]    PER CURIAM. In this civil action concerning a disputed lease agreement, the dispositive issue before us is the scope of appellate review of issues that were raised neither [***2]  at trial nor on appeal. Two actions arising under a single lease were consolidated at trial. In the first action, the tenant, Daniel Lynch (tenant), and his subtenants, Joseph Lynch and Joan Lynch (subtenants), [1] [***3]  filed a four count complaint charging the lessor, Granby Holdings, Inc. (lessor), with breach of the lease, with breach of an oral agreement and with negligent misrepresentation. [2] In the second action, the lessor sued the tenant to recover unpaid rent. A jury returned verdicts in favor of the subtenants against the lessor on their claims of breach of an oral agreement [**326]  and for negligent misrepresentation, and awarded them damages in the amount of $ 12,409. The jury also found in favor of the tenant on his claim of breach of the lease but awarded him zero damages. In the second action,  [*97]  the jury found the tenant liable for unpaid rent in the amount of $ 35,911.30. The trial court rendered judgments in accordance with the jury verdicts.

The tenant appealed and the lessor cross appealed to the Appellate Court, which affirmed the judgments in favor of the subtenants and the lessor. The Appellate Court concluded, however, that the jury's zero damages verdict on the tenant's claim for breach of contract manifested such juror confusion that a new trial on that claim was required. Lynch v. *Granby Holdings, Inc., 32 Conn. App. 574, 578-79, 630 A.2d 609 (1993)*. We granted the lessor's petition for certification [3] and now reverse.

 [***4]  In the tenant's appeal to the Appellate Court, he challenged the validity of the zero damages award on the theory that the trial court had misinstructed the jury on mitigation of damages. Neither at trial nor in his brief or oral argument in the Appellate Court did the tenant contend that the damages award was improper for any other reason. The Appellate Court did not address the merits of the trial court's charge on mitigation. Instead, the Appellate Court concluded that the jury's award should be set aside because the award manifested confusion "about liability, about damages about the mitigation [of] damages, or all three. Therefore, the jury's award of zero damages is improper . . . ." *Lynch v. Granby Holdings, Inc., supra, 32 Conn. App. 579*.

In the absence of a question relating to subject matter jurisdiction, the Appellate Court had only limited authority to reach the issue of possible confusion in the  [*98]  jury's verdict. In civil jury cases seeking money damages, a litigant is not entitled to plenary appellate review of a claim of error that was not presented to the trial court by way of a timely motion to set aside a jury verdict. *General Statutes § 52-228b*;  [***5]  Practice Book § 4185; *Falby v. Zarembski, 221 Conn. 14, 22, 602 A.2d 1 (1992)*; *Pietrorazio v. Santopietro, 185 Conn. 510, 512-15, 441 A.2d 163 (1981)*. In the absence of an appropriate motion to set aside the verdict, appellate review of such a claim is limited to plain error review.  *Falby v. Zarembski, supra, 22*; *Pietrorazio v. Santopietro, 185 Conn. 510, 512-15*. In civil cases, "plain error is properly reserved for those extraordinary situations where the error is so obvious that the fairness and integrity of and public confidence in the judicial process would be impaired were we to fail to address

---

[1] The initial complaint listed only Joseph Lynch as a plaintiff subtenant. On January 22, 1992, however, the trial court granted a motion to add Joan Lynch as a plaintiff subtenant.

[2] A fifth count in the first action was a claim between the subtenants and S. Michael Lassman for breach of contract and negligence. The jury's award to the subtenants of $ 2128 on that count was not at issue in the appeal to the Appellate Court and is, therefore, not at issue in this court.

[3] We granted certification to appeal, limited to the following issue: "Whether the Appellate Court was correct under the circumstance[s] of this case in holding that a jury finding for the plaintiff Daniel Lynch, together with an award of zero damages, was required to be set aside and remanded for a new trial?" **Lynch v. Granby Holdings, Inc., 228 Conn. 913, 635 A.2d 1230 (1993)**.

EXHIBIT 43                                                                EXHIBIT  3

Lynch v. Granby Holdings, 230 Conn. 95

an issue that was not raised or preserved at trial." *Commissioner of Health Services v. Youth Challenge of Greater Hartford, Inc., 219 Conn. 657, 671, 594 A.2d 958 (1991)*; *Skrzypiec v. Noonan, 228 Conn. 1, 14-15, 633 A.2d 716 (1993)*; *Dubois v. General Dynamics Corp., 222 Conn. 62, 68-69, 607 A.2d 431 (1992)*. In this case, therefore, the Appellate Court could consider an infirmity in the jury verdict on the basis of the jury's manifest confusion only if the Appellate Court concluded that it had been plain error for the trial court **[\*\*\*6]** to accept the jury's verdict.

As a general matter, the Appellate Court has discretion to decide that a ruling by the trial court warrants plain error review. Before us, the question is whether the Appellate Court abused its discretion in coming to such a conclusion. *Finley v. Aetna Life & Casualty Co., 202 Conn. 190, 195-96, 520 A.2d 208 (1987)*.

In the circumstances of this case, we conclude, for three reasons, that it was an abuse of discretion for the Appellate Court to order a new trial on the ground **[\*99]** of plain error. First, unlike the Appellate Court's opinion in *Finley v. Aetna Life & Casualty Co., 5 Conn. App. 394, 402-403, 499 A.2d 64 (1985)*, rev'd on other grounds, *202 Conn. 190, 195-96, 520 A.2d 208 (1987)*, the Appellate Court's opinion **[\*\*327]** in this case does not discuss the plain error rule and articulates no reason why plain error review was appropriate. Second, the Appellate Court addressed this issue sua sponte, rather than at the behest of one of the parties, thereby depriving the parties of an opportunity to brief the issue. Finally, in light of the related issues concerning the tenant's duties under the lease in this case, the possibility **[\*\*\*7]** of juror confusion does not warrant plain error review because such a claim of error does not implicate interests of public welfare or of fundamental justice between the parties. See *Skrzypiec v. Noonan, supra, 228 Conn. 15*; *Dubois v. General Dynamics Corp., supra, 222 Conn. 68-69*. [4]

Having decided that a new trial was required on the ground of jury confusion, the Appellate Court did not consider the tenant's claim that the jury's verdict was improper because of misinstruction on the issue of mitigation of damages. We therefore remand this case to the Appellate Court for consideration of that issue and any other issues that properly were raised in that court by the tenant's appeal.

The judgment of the Appellate Court is reversed and the case **[\*\*\*8]** is remanded to that court for further proceedings in accordance with this opinion.

---

**End of Document**

---

[4]  In view of our resolution of this appeal, we need not decide whether the rule of *Malmberg v. Lopez, 208 Conn. 675, 679-80, 546 A.2d 264 (1988)*, on which the Appellate Court relied, applies to claims for breach of contract as well as to tort claims.

60

EXHIBIT 43

EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

# *Milkovich v. Lorain Journal Co.*

Supreme Court of the United States

April 24, 1990, Argued ; June 21, 1990, Decided

No. 89-645

### Reporter

497 U.S. 1 *; 110 S. Ct. 2695 **; 111 L. Ed. 2d 1 ***; 1990 U.S. LEXIS 3296 ****; 58 U.S.L.W. 4846; 17 Media L. Rep. 2009

MILKOVICH v. LORAIN JOURNAL CO. ET AL.

**Prior History:  [****1]**  CERTIORARI TO THE COURT OF APPEALS OF OHIO, LAKE COUNTY.

**Disposition:** *46 Ohio App. 3d 20, 545 N. E. 2d 1320*, reversed and remanded.

## Case Summary

### Procedural Posture
Petitioner coach challenged a decision of the Court of Appeals of Ohio, Lake County, which affirmed an order granting summary judgment to respondents, an author and a newspaper, in a suit for damages for defamation.

### Overview

Petitioner coach sued respondents, an author and a newspaper, for defamation after respondents printed an article implying that petitioner had lied under oath. The trial court granted summary judgment for respondents and the appellate court affirmed, holding that the article was an opinion and was protected by *U.S. Const. amend. I*. The United States Supreme Court reversed, holding that the *U.S. Const. amend. I*, did not prohibit the application of Ohio's libel laws to the alleged defamation. The Court said that there was no absolute privilege protecting opinion from the application of defamation laws. It said that the dispositive question was whether a reasonable factfinder could conclude that respondents' statements implied that petitioner had perjured himself. The Court said that the connotation that petitioner perjured himself was sufficiently factual to be susceptible of being proved true or false. It said that petitioner had to show that the connotations were false and made with some level of fault.

### Outcome
The Court reversed the judgment.

## Syllabus

While petitioner Milkovich was a high school wrestling coach, his team was involved in an altercation at a match with another high school's team. Both he and School Superintendent Scott testified at an investigatory hearing before the Ohio High School Athletic Association (OHSAA), which placed the team on probation. They testified again during a suit by several parents, in which a county court overturned OHSAA's ruling. The day after the court's decision, respondent Lorain Journal Company's newspaper published a column authored by respondent Diadiun, which implied that Milkovich lied under oath in the judicial proceeding. Milkovich commenced a defamation action against respondents in the county court, alleging that the column accused him of committing the crime of perjury, damaged him in his occupation of teacher and coach, and constituted libel *per se*. Ultimately, the trial court granted summary judgment for  **[****2]**  respondents. The Ohio Court of Appeals affirmed, considering itself bound by the State Supreme

**EXHIBIT 43**                                                                                    EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

Court's determination in Superintendent Scott's separate action against respondents that, as a matter of law, the article was constitutionally protected opinion.

*Held:*

1. The *First Amendment* does not require a separate "opinion" privilege limiting the application of state defamation laws. While the Amendment does limit such application, *New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710*, the breathing space that freedoms of expression require to survive is adequately secured by existing constitutional doctrine. Foremost, where a media defendant is involved, a statement on matters of public concern must be provable as false before liability can be assessed, *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 89 L. Ed. 2d 783, 106 S. Ct. 1558*, thus ensuring full constitutional protection for a statement of opinion having no provably false factual connotation. Next, statements that cannot reasonably be interpreted as stating actual facts about an individual are protected, see, *e. g., Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537,* **[****3]** thus assuring that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of this Nation. The reference to "opinion" in dictum in *Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-340, 41 L. Ed. 2d 789, 94 S. Ct. 2997*, was not intended to create a wholesale defamation exemption for "opinion." Read in context, the *Gertz* dictum is merely a reiteration of Justice Holmes' "marketplace of ideas" concept, see *Abrams v. United States, 250 U.S. 616, 630, 63 L. Ed. 1173, 40 S. Ct. 17*. Simply couching a statement -- "Jones is a liar" -- in terms of opinion -- "In my opinion Jones is a liar" -- does not dispel the factual implications contained in the statement. Pp. 11-21.

2. A reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that Milkovich perjured himself in a judicial proceeding. The article did not use the sort of loose, figurative, or hyperbolic language that would negate the impression that Diadiun was seriously maintaining Milkovich committed perjury. Nor does the article's general tenor negate this impression. In addition, the connotation **[****4]** that Milkovich committed perjury is sufficiently factual that it is susceptible of being proved true or false by comparing, *inter alia*, his testimony before the OHSAA board with his subsequent testimony before the trial court. Pp. 21-22.

3. This decision balances the *First Amendment's* vital guarantee of free and uninhibited discussion of public issues with the important social values that underlie defamation law and society's pervasive and strong interest in preventing and redressing attacks upon reputation. Pp. 22-23.

**Counsel:** Brent L. English argued the cause for petitioner. With him on the brief was John D. Brown.

Richard D. Panza argued the cause for respondents. With him on the brief were William G. Wickens, David L. Herzer, Richard A. Naegele, P. Cameron DeVore, and Marshall J. Nelson. *

**Judges:** **[****5]** REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, post, p. 23.

**Opinion by:** REHNQUIST

# Opinion

---

* Briefs of amici curiae urging affirmance were filed for Dow Jones & Co. et al. by Robert D. Sack, Richard J. Tofel, Richard M. Schmidt, Jr., Devereux Chatillon, Douglas P. Jacobs, Barbara L. Wartelle, Harvey L. Lipton, Laura R. Handman, Slade R. Metcalf, Richard J. Ovelmen, Deborah R. Linfield, Jane E. Kirtley, and Bruce W. Sanford; and for the American Civil Liberties Union et al. by Henry R. Kaufman.

Louis A. Colombo and David L. Marburger filed a brief for the Ohio Newspaper Association et al. as amici curiae.

                                                                                                                        62

**EXHIBIT 43**                                                                                                 EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

**[\*3]   [\*\*\*8]   [\*\*2697]**  CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

[1A]Respondent J. Theodore Diadiun authored an article in an Ohio newspaper implying that petitioner Michael Milkovich, a local high school wrestling coach, lied under oath **[\*\*2698]**  in a judicial proceeding about an incident involving petitioner and his team which occurred at a wrestling match. Petitioner sued Diadiun and the newspaper for libel, and the Ohio Court of Appeals affirmed a lower court entry of summary judgment against petitioner. This judgment was based in part on the grounds that the article constituted an "opinion" protected from the reach of state defamation law by the *First Amendment to the United States Constitution*. We hold that the *First Amendment* does not prohibit the application of Ohio's libel laws to the alleged defamations contained in the article.

This lawsuit is before us for the third time in an odyssey of litigation spanning nearly 15 years. [1] Petitioner Milkovich, now **[\*\*\*\*6]**  retired, was the wrestling coach at Maple Heights High **[\*4]**  School in Maple Heights, Ohio. In 1974, his team was involved in an altercation at a home wrestling match with a team from Mentor High School. Several people were injured. In response to the incident, the Ohio High School Athletic Association (OHSAA) held a hearing at which Milkovich and H. Don Scott, the Superintendent of Maple Heights Public Schools, testified. Following the hearing, OHSAA placed the Maple Heights team on probation for a year and declared the team ineligible for the 1975 state tournament. OHSAA also censured Milkovich for his actions during the altercation. Thereafter, several parents and wrestlers sued OHSAA in the Court of Common Pleas of Franklin County, Ohio, seeking a restraining order against OHSAA's ruling on the grounds that they had been denied due process in the OHSAA proceeding. Both Milkovich and Scott testified in that proceeding. The court overturned OHSAA's probation and ineligibility orders on due process grounds.

**[\*\*\*\*7]**  The day after the court rendered its decision, respondent Diadiun's column appeared in the News-Herald, a newspaper which circulates in Lake County, Ohio, and is owned by respondent Lorain Journal Co. The column bore the heading "Maple beat the law with the 'big lie,'" beneath which appeared Diadiun's photograph and the words "TD Says." The carryover page headline announced ". . . Diadiun says Maple told a lie." The column contained the following passages:

"'. . . [A] lesson was learned (or relearned) yesterday by the student body of Maple Heights High **[\*\*\*9]**  School, and by anyone who attended the Maple-Mentor wrestling meet of last Feb. 8.
"'A lesson which, sadly, in view of the events of the past year, is well they learned early.
"'It is simply this: If you get in a jam, lie your way out.

 **[\*5]**  "'If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.
"'The teachers responsible were mainly head Maple wrestling coach, Mike Milkovich, and former superintendent of schools H. Donald Scott.
. . . .

"'Anyone who attended the meet, whether he be from Maple Heights, Mentor,  **[\*\*\*\*8]**  or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.
"'But they got away with it.
"'Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

"'I think not.'" *Milkovich v. News-Herald, 46 Ohio App. 3d 20, 21, 545 N.E.2d 1320, 1321-1322 (1989)*. [2]

---

[1] The Court has previously denied certiorari twice in this litigation on various judgments rendered by the Ohio courts. See **Lorain Journal Co. v. Milkovich, 474 U.S. 953, 88 L. Ed. 2d 305, 106 S. Ct. 322 (1985)**; *Lorain Journal Co. v. Milkovich, 449 U.S. 966, 66 L. Ed. 2d 232, 101 S. Ct. 380 (1980)*.

[2] In its entirety, the article reads as follows:

EXHIBIT 43    EXHIBIT 4

Milkovich v. Lorain Journal Co., 497 U.S. 1

"Yesterday in the Franklin County Common Pleas Court, judge Paul Martin overturned an Ohio High School Athletic Assn. decision to suspend the Maple Heights wrestling team from this year's state tournament.

"It's not final yet -- the judge granted Maple only a temporary injunction against the ruling -- but unless the judge acts much more quickly than he did in this decision (he has been deliberating since a Nov. 8 hearing) the temporary injunction will allow Maple to compete in the tournament and make any further discussion meaningless.

"But there is something much more important involved here than whether Maple was denied due process by the OHSAA, the basis of the temporary injunction.

"When a person takes on a job in a school, whether it be as a teacher, coach, administrator or even maintenance worker, it is well to remember that his primary job is that of educator.

"There is scarcely a person concerned with school who doesn't leave his mark in some way on the young people who pass his way -- many are the lessons taken away from school by students which weren't learned from a lesson plan or out of a book. They come from personal experiences with and observations of their superiors and peers, from watching actions and reactions.

"Such a lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple-Mentor wrestling meet of last Feb. 8.

"A lesson which, sadly, in view of the events of the past year, is well they learned early.

"It is simply this: If you get in a jam, lie your way out.

"If you're successful enough, and powerful enough, and can sound sincere enough, you stand an excellent chance of making the lie stand up, regardless of what really happened.

"The teachers responsible were mainly head Maple wrestling coach, Mike Milkovich, and former superintendent of schools H. Donald Scott.

"Last winter they were faced with a difficult situation. Milkovich's ranting from the side of the mat and egging the crowd on against the meet official and the opposing team backfired during a meet with Greater Cleveland Conference rival Metor *[sic]*, and resulted in first the Maple Heights team, then many of the partisan crowd attacking the Mentor squad in a brawl which sent four Mentor wrestlers to the hospital.

"Naturally, when Mentor protested to the governing body of high school sports, the OHSAA, the two men were called on the carpet to account for the incident.

"But they declined to walk into the hearing and face up to their responsibilities, as one would hope a coach of Milkovich's accomplishments and reputation would do, and one would certainly expect from a man with the responsible poisition *[sic]* of superintendent of schools.

"Instead they chose to come to the hearing and misrepresent the things that happened to the OHSAA Board of Control, attempting not only to convince the board of their own innocence, but, incredibly, shift the blame of the affair to Mentor.

"I was among the 2,000-plus witnesses of the meet at which the trouble broke out, and I also attended the hearing before the OHSAA, so I was in a unique position of being the only non-involved party to observe both the meet itself and the Milkovich-Scott version presented to the board.

"Any resemblance between the two occurrances *[sic]* is purely coincidental.

"To anyone who was at the meet, it need only be said that the Maple coach's wild gestures during the events leading up to the brawl were passed off by the two as 'shrugs,' and that Milkovich claimed he was 'Powerless to control the crowd' before the melee.

"Fortunately, it seemed at the time, the Milkovich-Scott version of the incident presented to the board of control had enough contradictions and obvious untruths so that the six board members were able to see through it.

"Probably as much in distasteful reaction to the chicanery of the two officials as in displeasure over the actual incident, the board then voted to suspend Maple from this year's tournament and to put Maple Heights, and both Milkovich and his son, Mike Jr. (the Maple Jaycee coach), on two-year probation.

"But unfortunately, by the time the hearing before Judge Martin rolled around, Milkovich and Scott apparently had their version of the incident polished and reconstructed, and the judge apparently believed them.

EXHIBIT 43   EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

**[\*6]  [\*\*\*\*9]  [\*\*\*10]  [\*\*2699]** Petitioner commenced a defamation action against respondents in the Court of Common Pleas of Lake County, Ohio, alleging that the headline of Diadiun's article and the **[\*7]** nine passages quoted above "accused plaintiff of committing the crime of perjury, an indictable offense in the State of Ohio, and damaged plaintiff directly in his life-time occupation **[\*\*2700]** of coach and teacher, and constituted libel per se." App. 12. The action proceeded to trial, and the court granted a directed verdict to respondents on the ground that the evidence failed to establish the article was published with "actual malice" as required by *New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)*. See App. 21-22. The Ohio Court of Appeals for the Eleventh Appellate District reversed and remanded, holding that there was sufficient evidence of actual malice to go to the jury. See *Milkovich v. Lorain Journal, 65 Ohio App. 2d 143, 416 N.E.2d 662 (1979)*. The Ohio **[\*8]** Supreme Court dismissed the ensuing appeal for want of a substantial constitutional question, and this Court denied certiorari. *449 U.S. 966, 101 S. Ct. 380, 66 L. Ed. 2d 232 (1980)*.

**[\*\*\*\*10]** On remand, relying in part on our decision in *Gertz v. Robert Welch, Inc., 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)*, the trial court granted summary judgment to respondents on the grounds that the article was an opinion protected from a libel action by "constitutional law," App. 55, and alternatively, as a public figure, petitioner had failed to **[\*\*\*11]** make out a prima facie case of actual malice. *Id., at 55-59*. The Ohio Court of Appeals affirmed both determinations. *Id., at 62-70*. On appeal, the Supreme Court of Ohio reversed and remanded. The court first decided that petitioner was neither a public figure nor a public official under the relevant decisions of this Court. See *Milkovich v. News-Herald, 15 Ohio St. 3d 292, 294-299, 473 N.E.2d 1191, 1193-1196 (1984)*. The court then found that "the statements in issue are factual assertions as a matter of law, and are not constitutionally protected as the opinions of the writer. . . . The plain import of the author's assertions is that Milkovich, *inter alia*, committed the crime of perjury in a court of law." *Id., at 298-299, 473 N.E.2d at 1196-1197*. **[\*\*\*\*11]** This Court again denied certiorari. *474 U.S. 953 (1985)*.

Meanwhile, Superintendent Scott had been pursuing a separate defamation action through the Ohio courts. Two years after its *Milkovich* decision, in considering Scott's appeal, the Ohio Supreme Court reversed its position on Diadiun's article, concluding that the column was "constitutionally protected opinion." *Scott v. News-Herald, 25 Ohio St. 3d 243, 254, 496 N.E.2d 699, 709 (1986)*. Consequently, the court upheld a lower court's grant of summary judgment against Scott.

The *Scott* court decided that the proper analysis for determining whether utterances are fact or opinion was set forth in the decision of the United States Court of Appeals for the District of Columbia Circuit in *Ollman v. Evans, 242 U.S. App. D.C. 301, 750 F.2d 970 (1984)*, cert. denied, *471 U.S. 1127,* **[\*9]** *86 L. Ed. 2d 278, 105 S. Ct. 2662 (1985)*. See *Scott, 25 Ohio St. 3d at 250, 496 N.E.2d at 706*. Under that analysis, four factors are considered to ascertain whether, under **[\*\*\*\*12]** the "totality of circumstances," a statement is fact or opinion. These factors are: (1) "the specific language used"; (2) "whether the statement is verifiable"; (3) "the general context of the statement"; and (4) "the broader context in which the statement appeared." *Ibid.* The court found that application of the first two factors to the column militated in favor of deeming the challenged passages actionable assertions of fact. *Id., at 250-252, 496 N.E.2d at 706-707*. That potential outcome was trumped, however, by the court's consideration of the third and fourth factors. With respect to the third factor, the general context, the court explained that "the large caption 'TD Says' . . . would indicate to even the most gullible reader that the article was, in fact, opinion." *Id., at 252, 496 N.E.2d*

---

"'I can say that some of the stories told to the judge sounded pretty darned unfamiliar,' said Dr. Harold Meyer, commissioner of the OHSAA, who attended the hearing. 'It certainly sounded different from what they told us.'

"Nevertheless, the judge bought their story, and ruled in their favor.

"Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth.

"But they got away with it.

"Is that the kind of lesson we want our young people learning from their high school administrators and coaches?

"I think not." App. to Pet. for Cert. A138-A139.

**EXHIBIT 43**                                                                    **EXHIBIT 4**

Milkovich v. Lorain Journal Co., 497 U.S. 1

*at 707*. [3] As for the fourth factor, the "broader context," the court reasoned that because the **[\*\*2701]** article appeared on a sports page -- "a **[\*\*\*12]** traditional haven for cajoling, invective, and hyperbole" -- the article would probably be construed as opinion. *Id., at 253-254, 496 N.E.2d at 708*. [4]

 **[\*10]**   **[\*\*\*\*13]**   **[\*\*\*\*14]**   [1B][2A][3A][4A]Subsequently, considering itself bound by the Ohio Supreme Court's decision in *Scott*, the Ohio Court of Appeals in the instant proceedings affirmed a trial court's grant of summary judgment in favor of respondents, concluding that "it has been decided, as a matter of law, that the article in question was constitutionally protected opinion." *46 Ohio App. 3d at 23, 545 N.E.2d at 1324*.The Supreme Court of Ohio dismissed petitioner's ensuing appeal for want of a substantial constitutional question. App. 119. We granted certiorari, *493 U.S. 1055 (1990)*, to consider the important questions raised by the Ohio courts' recognition of a constitutionally required "opinion" exception to the application of its defamation laws. We now reverse. [5]

---

[3] The court continued:

"This position is borne out by the second headline on the continuation of the article which states: '. . . *Diadiun says* Maple told a lie.' . . . The issue, in context, was not the statement that there was a legal hearing and Milkovich and Scott lied. Rather, based upon Diadiun's having witnessed the original altercation and OHSAA hearing, it was his view that any position represented by Milkovich and Scott less than a full admission of culpability was, in his view, a lie. . . . A review of the context of the statements in question demonstrates that Diadiun is not making an attempt to be impartial and no secret is made of his bias. . . . While Diadiun's mind is certainly made up, the average reader viewing the words in their internal context would be hard pressed to accept Diadiun's statements as an impartial reporting of perjury." *Scott, 25 Ohio St. 3d at 252-253, 496 N.E.2d at 707-708* (emphasis in original).

[4] Specifically, the court reasoned as follows:

"It is important to recognize that Diadiun's article appeared on the sports page -- a traditional haven for cajoling, invective, and hyperbole. . . . In this broader context we doubt that a reader would assign the same weight to Diadiun's statement as if it had appeared under the byline 'Law Correspondent' on page one of the newspaper. . . . On balance . . . a reader would not expect a sports writer on the sports page to be particularly knowledgeable about procedural due process and perjury. It is our belief that 'legal conclusions' in such a context would probably be construed as the writer's opinion." *Id., at 253-254, 496 N.E.2d at 708*.

[5]  [2B]

Preliminarily, respondents contend that our review of the "opinion" question in this case is precluded by the Ohio Supreme Court's decision in *Scott v. News-Herald, 25 Ohio St. 3d 243, 496 N.E.2d 699 (1986)*. First, respondents claim that the determination by the Ohio Supreme Court in *Milkovich v. News-Herald, 15 Ohio St. 3d 292, 298, 473 N.E.2d 1191, 1196 (1984)*, that petitioner is not a public official or figure was overruled in *Scott*. Thus, since petitioner has failed to establish actual malice, his action is precluded under *New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)*, and *Curtis Publishing Co. v. Butts, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967)*. This contention is meritless. Respondents rely on the following statements made by the Ohio Supreme Court in its discussion of Scott's status as a public official: "'To say that Milkovich nevertheless was not a public figure for purposes of discussion about the controversy is simply nonsense,'" *25 Ohio St. 3d at 247, 496 N.E.2d at 704* (quoting **Milkovich v. Lorain Journal Co., 474 U.S. 953, 964, 88 L. Ed. 2d 305, 106 S. Ct. 322 (1985)** (BRENNAN, J., dissenting from denial of certiorari)), and "we overrule *Milkovich* in its restrictive view of public officials and hold a public school superintendent is a public official for purposes of defamation law." *25 Ohio St. 3d at 248, 496 N.E.2d at 704*. However, it is clear from the context in which these statements were made that the court was simply supporting its determination that Scott was a public official, and that as relates to petitioner Milkovich, these statements were pure dicta. But more importantly, petitioner Milkovich was not a party to the proceedings in *Scott* and thus would not be bound by anything in that ruling under Ohio law. See *Hainbuchner v. Miner, 31 Ohio St. 3d 133, 137, 509 N.E.2d 424, 427 (1987)* ("It is universally recognized that a former judgment, in order to be *res judicata* in a subsequent action, must have been rendered in an action in which the parties to the subsequent action were adverse parties") (quotation omitted). Since the Ohio Court of Appeals did not address the public-private figure question on remand from the Ohio Supreme Court in *Milkovich* (because it decided against petitioner on the basis of the opinion ruling in *Scott*), the ruling of the Ohio Supreme Court in *Milkovich* presumably continues to be law of the case on that issue. See

**EXHIBIT 43**                                                              **EXHIBIT  4**

Milkovich v. Lorain Journal Co., 497 U.S. 1

 **[\*11]   [\*\*\*\*15]   [\*\*\*13]   [\*\*2702]**  Since the latter half of the 16th century, the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements. See L. Eldredge, Law of Defamation 5 (1978).

 **[\*12]**  In Shakespeare's Othello, Iago says to Othello:

"Good name in man and woman, dear my lord,

Is the immediate jewel of their souls.

Who steals my purse steals trash;

'Tis something, nothing;

'Twas mine, 'tis his, and has been slave to thousands;

But he that filches from me my good name

Robs me of that which not enriches him,

And makes me poor indeed." Act III, scene 3.

Defamation law developed not only as a means of allowing an individual to vindicate his good name, but also for the purpose of obtaining redress for harm caused by such statements. Eldredge, *supra*, at 5. As the common law developed in this country, apart from the issue of damages, one usually needed only allege an unprivileged publication of false and defamatory matter to state a cause of action for defamation. See, *e. g.*, *Restatement  **[\*\*\*14]** of Torts § 558* (1938); *Gertz  **[\*13]**  v. Robert Welch, Inc., 418 U.S. at 370* (WHITE,  **[\*\*\*\*16]**  J., dissenting) ("Under typical state defamation law, the defamed private citizen had to prove only a false publication that would subject him to hatred, contempt, or ridicule"). The common law generally did not place any additional restrictions on the type of statement that could be actionable. Indeed, defamatory communications were deemed actionable regardless of whether they

---

*Hawley v. Ritley, 35 Ohio St. 3d 157, 160, 519 N.E.2d 390, 393 (1988)* ("The decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels").

 [3B]

Nor is there any merit to respondents' contention that the Court of Appeals below alternatively decided there was no negligence in this case even if petitioner were regarded as a private figure, and thus the action is precluded by our decision in *Gertz v. Robert Welch, Inc., 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)*. Although the appellate court noted that "the instant cause does not present any material issue of fact as to negligence or 'actual malice,'" *Milkovich v. News-Herald, 46 Ohio App. 3d 20, 24, 545 N.E.2d 1320, 1325 (1989)*, this statement was immediately explained by the court's following statement that the *Scott* ruling on the opinion issue had accorded respondents absolute immunity from liability. See *46 Ohio App. 3d at 24, 545 N.E.2d at 1325*. The court never made an evidentiary determination on the issue of respondents' negligence.

 [2C] [3C] [4B]

Next, respondents concede that the *Scott* court relied on the United States Constitution as well as the Ohio Constitution in its recognition of an opinion privilege, Brief for Respondents 18, but argue that certain statements made by the court evidenced an intent to independently rest the decision on state-law grounds, see *25 Ohio St. 3d at 244, 496 N.E.2d at 701* ("We find the article to be an opinion, protected by *Section 11, Article I of the Ohio Constitution . . .*"); *id., at 245, 496 N.E.2d at 702* ("These ideals are not only an integral part of *First Amendment* freedoms under the federal Constitution but are independently reinforced in *Section 11, Article I of the Ohio Constitution . . .*"), thereby precluding federal review under *Michigan v. Long, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983)*. We similarly reject this contention. In the *Milkovich* proceedings below, the Court of Appeals relied completely on *Scott* in concluding that Diadiun's article was privileged opinion. See *46 Ohio App. 3d at 23-25, 545 N.E.2d at 1324-1325*. *Scott* relied heavily on federal decisions interpreting the scope of *First Amendment* protection accorded defamation defendants, see, *e. g.*, *25 Ohio St. 3d at 244, 496 N.E.2d at 701* ("The federal Constitution has been construed to protect published opinions ever since the United States Supreme Court's opinion in *Gertz* v. *Robert Welch, Inc. . . .*"), and concluded that "based upon the totality of circumstances it is our view that Diadiun's article was constitutionally protected opinion both with respect to the federal Constitution and under our state Constitution." *Id., at 254, 496 N.E.2d at 709*. Thus, the *Scott* decision was at least "interwoven with the federal law," and was not clear on its face as to the court's intent to rely on independent state grounds, yet failed to make a "plain statement . . . that the federal cases . . . [did] not themselves compel the result that the court . . . reached." *Long, 463 U.S. at 1040-1041*. Under *Long*, then, federal review is not barred in this case. We note that the Ohio Supreme Court remains free, of course, to address all of the foregoing issues on remand.

Page 7 of 19

67

EXHIBIT 43 EXHIBIT 4

Milkovich v. Lorain Journal Co., 497 U.S. 1

were deemed to be statements of fact or opinion. See, *e. g.*, Restatement of Torts, *supra*, §§ 565-567. As noted in the 1977 *Restatement (Second) of Torts § 566, Comment a:*

"Under the law of defamation, an expression of opinion could be defamatory if the **[\*\*2703]** expression was sufficiently derogatory of another as to cause harm to his reputation, so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. . . . The expression of opinion was also actionable in a suit for defamation, despite the normal requirement that the communication be false as well as defamatory. . . . This position was maintained even though the truth or falsity of an opinion -- as distinguished from a statement of fact -- is not a matter that can be objectively determined **[\*\*\*\*17]** and truth is a complete defense to a suit for defamation."

However, due to concerns that unduly burdensome defamation laws could stifle valuable public debate, the privilege of "fair comment" was incorporated into the common law as an affirmative defense to an action for defamation. "The principle of 'fair comment' afforded legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact." 1 F. Harper & F. James, Law of Torts § 5.28, p. 456 (1956) (footnote omitted). As this statement implies, comment was generally privileged when it concerned a matter of public concern, was upon true or privileged facts, represented the actual opinion of the speaker, and was not made **[\*14]** solely for the purpose of causing harm. See Restatement of Torts, *supra*, § 606. "According to the majority rule, the privilege of fair comment applied only to an expression of opinion and not to a false statement of fact, whether it was expressly stated or implied from an expression of opinion." *Restatement (Second) of Torts, supra, § 566, Comment a*. Thus under the common law, the privilege of "fair comment" **[\*\*\*\*18]** was the device employed to strike the appropriate balance between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech.

[1C]In 1964, we decided in *New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710*, that the *First Amendment to the United States Constitution* placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id., at 279-280*. **[\*\*\*15]** This rule was prompted by a concern that, with respect to the criticism of public officials in their conduct of governmental affairs, a state-law "'rule compelling the critic of official conduct to guarantee the truth of all his factual assertions' would deter protected speech." *Gertz v. Robert Welch, Inc., supra, at 334* (quoting *New York* **[\*\*\*\*19]** *Times, supra, at 279*).

Three years later, in *Curtis Publishing Co. v. Butts, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967)*, a majority of the Court determined "that the *New York Times* test should apply to criticism of 'public figures' as well as 'public officials.' The Court extended the constitutional privilege announced in that case to protect defamatory criticism of nonpublic persons 'who are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.'" *Gertz, 418 U.S. at 336-337* **[\*15]** (quoting *Butts, 388 U.S. at 164* (Warren, C. J., concurring in result)). As Chief Justice Warren noted in concurrence, "our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.'" *Butts, supra, at 164*. The Court has also determined that both for public officials and public figures, a showing of **[\*\*\*\*20]** *New York Times* malice is subject to a clear and convincing standard **[\*\*2704]** of proof. *Gertz, 418 U.S. at 342*.

The next step in this constitutional evolution was the Court's consideration of a private individual's defamation actions involving statements of public concern. Although the issue was intially in doubt, see *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971)*, the Court ultimately concluded that the *New York Times* malice standard was inappropriate for a private person attempting to prove he was defamed on matters of public interest. *Gertz v. Robert Welch, Inc., supra.* As we explained:

**EXHIBIT 43**                                                                      EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

"Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.

. . . .

"[More important,] public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual." *418 U.S. at 344-345*  **[****21]**  (footnote omitted).

Nonetheless, the Court believed that certain significant constitutional protections were warranted in this area. First, we held that the States could not impose liability without requiring some showing of fault. See *id., at 347-348* ("This approach . . . recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury  **[*16]**  to reputation,  **[***16]**  yet shields the press and broadcast media from the rigors of strict liability for defamation"). Second, we held that the States could not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice. See *418 U.S. at 350* ("Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship . . .").

Still later, in *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986)*, we held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." *Id., at 777*.  **[****22]**  In other words, the Court fashioned "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id., at 776*. Although recognizing that "requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so," the Court believed that this result was justified on the grounds that "placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result." *Id., at 777-778*.

We have also recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions. In *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970)*, a real estate developer had engaged in negotiations with a local city council for a zoning variance on certain of his land, while simultaneously negotiating with the city on other land the city wished to purchase from him. A local newspaper published certain articles stating that some  **[****23]**  people had characterized the developer's negotiating position as "blackmail," and the developer sued for libel. Rejecting a contention that liability could be premised on the notion that the word "blackmail" implied the developer had committed the actual crime of blackmail, we held that "the imposition of  **[*17]**  liability on such a basis was constitutionally impermissible -- that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review." *Id., at 13*.  **[**2705]**  Noting that the published reports "were accurate and full," the Court reasoned that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id., at 13-14*. See also *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988)* (*First Amendment* precluded recovery under state emotional distress action for ad parody which "could not reasonably have been interpreted as stating actual  **[****24]**  facts about the public figure involved"); *Letter Carriers v. Austin, 418 U.S. 264, 284-286, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974)* (use of the word "traitor" in literary definition of a union "scab" not basis for a defamation  **[***17]**  action under federal labor law since used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").

 [1D][5]The Court has also determined that "in cases raising *First Amendment* issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)* (quoting *New York Times, 376 U.S. at 284-286*)."The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is

a question of law." *Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685, 105 L. Ed. 2d 562, 109 S. Ct. 2678 (1989)*.

[1E]Respondents would have us recognize, in **[****25]** addition to the established safeguards discussed above, still another First-Amendment-based protection for defamatory statements which are categorized as "opinion" as opposed to "fact." For **[*18]** this proposition they rely principally on the following dictum from our opinion in *Gertz:*

"Under the *First Amendment* there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *418 U.S. at 339-340* (footnote omitted).

Judge Friendly appropriately observed that this passage "has become the opening salvo in all arguments for protection from defamation actions on the ground of opinion, even though the case did not remotely concern the question." *Cianci v. New Times Publishing Co., 639 F.2d 54, 61 (CA2 1980)*. Read in context, though, the fair meaning of the passage is to equate the word "opinion" in the second sentence with the word "idea" in the first sentence. Under this view, the language was merely a reiteration of Justice **[****26]** Holmes' classic "marketplace of ideas" concept. See *Abrams v. United States, 250 U.S. 616, 630, 63 L. Ed. 1173, 40 S. Ct. 17 (1919)* (dissenting opinion) ("The ultimate good desired is better reached by free trade in ideas -- . . . the best test of truth is the power of the thought to get itself accepted in the competition of the market").

Thus, we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled "opinion." See *Cianci, supra, at 62, n.10* (The "marketplace of ideas" origin of this passage "points strongly to the view that the 'opinions' held to be constitutionally protected were the sort of thing that could be corrected by discussion"). Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of "opinion" may often imply an assertion of objective fact.

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of **[**2706]** facts which lead to the **[***18]** conclusion that Jones told an untruth. Even if the speaker states the facts **[*19]** upon which he bases his opinion, **[****27]** if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" See *Cianci, supra, at 64*. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." *Restatement (Second) of Torts, § 566, Comment a* (1977).

Apart from their reliance on the *Gertz* dictum, respondents do not really contend that a statement such as, "In my opinion John Jones is a liar," should be protected by a separate privilege for "opinion" under the *First Amendment*. But they do contend that in every defamation case the *First Amendment* **[****28]** mandates an inquiry into whether a statement is "opinion" or "fact," and that only the latter statements may be actionable. They propose that a number of factors developed by the lower courts (in what we hold was a mistaken reliance on the *Gertz* dictum) be considered in deciding which is which. But we think the "'breathing space'" which "'freedoms of expression require in order to survive,'" *Hepps, 475 U.S. at 772* (quoting *New York Times, 376 U.S. at 272*), is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between "opinion" and fact.

[1F][6][7A]Foremost, we think *Hepps* stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present,

**EXHIBIT 43**                                                                 **EXHIBIT  4**

Milkovich v. Lorain Journal Co., 497 U.S. 1

where a media defendant **[\*20]** is involved. [6] Thus, unlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public **[\*\*\*\*29]** concern which does not contain a provably false factual connotation will receive full constitutional protection. [7]

 **[\*\*\*\*30]   [\*\*\*19]**   [1G]Next, the *Bresler-Letter Carriers-Falwell* line of cases provides protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual. *Falwell, 485 U.S. at 50*. This provides assurance that public debate will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our Nation. See *id., at 53-55*.

 [1H]The *New York Times-Butts-Gertz* culpability requirements further ensure that debate on public issues remains "uninhibited, robust, and wide-open." *New York Times, 376 U.S. at 270*.Thus, where a statement of "opinion" on a matter **[\*\*2707]** of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth. Similarly, where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault **[\*21]** as required by **[\*\*\*\*31]** *Gertz*. [8] Finally, the enhanced appellate review required by *Bose Corp.* provides assurance that the foregoing determinations will be made in a manner so as not to "constitute a forbidden intrusion of the field of free expression." *Bose Corp., 466 U.S. at 499* (quotation omitted).

We are not persuaded that, in addition to these protections, an additional separate constitutional privilege for "opinion" is required to ensure the freedom of expression guaranteed by the *First Amendment*. The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. We think this question must be answered in the affirmative. As the Ohio Supreme Court itself observed: "The **[\*\*\*\*32]** clear impact in some nine sentences and a caption is that [Milkovich] 'lied at the hearing after . . . having given his solemn oath to tell the truth.'" *Scott, 25 Ohio St. 3d at 251, 496 N.E.2d at 707*. This is not the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression.

We also think the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false. A determination whether petitioner lied in this instance can be made on a core of objective evidence by comparing, *inter alia*, petitioner's testimony before the OHSAA board with his subsequent testimony before the trial court. As the *Scott* court noted regarding the plaintiff in that case: "Whether or not H. Don Scott did indeed perjure

---

[6] In *Hepps* the Court reserved judgment on cases involving nonmedia defendants, see *475 U.S. at 779, n.4*, and accordingly we do the same. Prior to *Hepps*, of course, where public-official or public-figure plaintiffs were involved, the *New York Times* rule already required a showing of falsity before liability could result. *475 U.S. at 775*.

[7]  [7B]

We note that the issue of falsity relates to the *defamatory* facts implied by a statement. For instance, the statement, "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery.

[8]  [1I]

Of course, the limitations on presumed or punitive damages established by *New York Times* and *Gertz* also apply to the type of statements at issue here.

EXHIBIT 43    EXHIBIT 4

Milkovich v. Lorain Journal Co., 497 U.S. 1

himself is certainly verifiable by a perjury action with evidence adduced from the transcripts and witnesses present at **[\*22]** the **[\*\*\*20]** hearing. Unlike a subjective assertion the averred defamatory language **[\*\*\*\*33]** is an articulation of an objectively verifiable event." *Id., at 252, 496 N.E.2d at 707*. So too with petitioner Milkovich. [9]

 **[\*\*\*\*34]** The numerous decisions discussed above establishing *First Amendment* protection for defendants in defamation actions surely demonstrate the Court's recognition of the Amendment's vital guarantee of free and uninhibited discussion of public issues. But there is also another side to the equation; we have regularly acknowledged the "important social values which underlie the law of defamation," and recognized that "society has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer, 383 U.S. 75, 86, 15 L. Ed. 2d 597, 86 S. Ct. 669  [\*\*2708]  (1966)*. Justice Stewart in that case put it with his customary clarity:

> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty.
>
> . . . .

> "The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem.  **[\*23]**  Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been **[\*\*\*\*35]**  falsely dishonored." *383 U.S. at 92-93* (concurring opinion).

[1J]We believe our decision in the present case holds the balance true. The judgment of the Ohio Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*Reversed*.

**Dissent by:** BRENNAN

# Dissent

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Since this Court first hinted that the *First Amendment* provides some manner of protection for statements of opinion, [1] notwithstanding any common-law protection, courts and commentators have struggled with **[\*\*\*21]** the contours of this protection and its relationship to other doctrines within our *First Amendment* jurisprudence. Today, for the first

---

[9] In their brief, *amici* Dow Jones et al. urge us to view the disputed statements "against the background of a high profile controversy in a small community," and says that "they related to a matter of pressing public concern in a small town." Brief for Dow Jones et al. as *Amici Curiae* 27. We do not have the same certainty as do *amici* that people in a "small town" view statements such as these differently from people in a large city. Be that as it may, however, *amici* err in their factual assumption. Maple Heights is located in Cuyahoga County, Ohio, and in the 1980 census had a population of 29,735. Mentor is located in Lake County, Ohio, and in the 1980 census had a population of 42,065. Lake County adjoins Cuyahoga County on the east, and in the 1980 census had a population of 212,801. Both Maple Heights and Mentor are included in the Cleveland standard consolidated statistical area, which in 1980 had a population of 2,834,062. The high schools of both Mentor and Maple Heights played in the Greater Cleveland Conference.

[1] See, *e. g., New York Times Co. v. Sullivan, 376 U.S. 254, 292, n.30, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)* ("Since the *Fourteenth Amendment* requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact"); *Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-340, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)* ("Under the *First Amendment* there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas").

EXHIBIT 43   EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

time, the Court addresses this question directly and, to my mind, does so cogently and almost entirely correctly. I agree with the Court that under our line of cases culminating in *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986)*, only defamatory statements that are capable of being proved false are subject to liability under state libel law. See 497 U.S. at 16. [2] I also agree with the Court that the "statement" **[*24]** **[****36]** that the plaintiff must prove false under *Hepps* is not invariably the literal phrase published but rather what a reasonable reader would have understood the author to have said. See 497 U.S. at 16-17 (discussing *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970)*; *Letter Carriers v. Austin, 418 U.S. 264, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974)*; *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988))*.

 **[****37]**  In other words, while the Court today dispels any misimpression that there is a so-called opinion privilege *wholly in addition* to the protections we have already found to be guaranteed by the *First Amendment*, it determines that a protection for statements of pure opinion is dictated by *existing First Amendment* doctrine. As the Court explains, "full constitutional protection" extends to any statement relating **[****38]** to matters of public concern "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." **[**2709]**  497 U.S. at 20. Among the circumstances to be scrutinized by a court in ascertaining whether a statement purports to state or imply "actual facts about an individual," as shown by the Court's analysis of the statements at issue here, see *ante*, at 22, and n.9, are the same indicia that lower courts have been relying on for the past decade or so to distinguish between statements of fact and statements of opinion: the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made. See, *e. g., Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d 1280 (CA4 1987)*; *Janklow v. Newsweek, Inc., 788 F.2d 1300 (CA8 1986)*; *Ollman v. Evans, 242 U.S. App. D.C. 301, 750 F.2d 970 (1984)*, cert. denied, *471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662* **[***22]** *(1985)*.

 **[*25]**  With all of the above, I am essentially in agreement. I part company with the **[****39]** Court at the point where it applies these general rules to the statements at issue in this case because I find that the challenged statements cannot reasonably be interpreted as either stating or implying defamatory facts about petitioner. Under the rule articulated in the majority opinion, therefore, the statements are due "full constitutional protection." I respectfully dissent.

I

As the majority recognizes, the kind of language used and the context in which it is used may signal readers that an author is not purporting to state or imply actual, known facts. In such cases, this Court has rejected claims to the contrary and found that liability may not attach "as a matter of constitutional law." 497 U.S. at 17. See, *e. g., Bresler, supra* (metaphor); *Letter Carriers, supra* (hyperbole); *Falwell, supra* (parody). In *Bresler*, for example, we found that Bresler could not recover for being accused of "blackmail" because the readers of the article would have understood the author to mean only that Bresler was manipulative and extremely unreasonable. See *ante*, at 16-17. In *Letter* **[****40]** *Carriers*, we found that plaintiffs could not recover for being accused of being "traitor[s]" because the newsletter's readers would have understood that the author meant that plaintiffs' accurately reported actions were reprehensible and destructive to the social fabric, not that plaintiffs committed treason. See *ante*, at 17.

Statements of belief or opinion are like hyperbole, as the majority agrees, in that they are not understood as actual assertions of fact about an individual, but they may be actionable if they *imply* the existence of false and defamatory facts. See *ante*, at 18-19. The majority provides some general guidance for identifying when statements of opinion imply assertions of fact. But it is a matter worthy of further attention **[*26]** in order "to confine the perimeters of [an]

---

[2] The defendant in the *Hepps* case was a major daily newspaper and, as the majority notes, see 497 U.S. at 16, the Court declined to decide whether the rule it applied to the newspaper would also apply to a nonmedia defendant. See *475 U.S. at 779, n.4*. I continue to believe that "such a distinction is 'irreconcilable with the fundamental *First Amendment* principle that "the inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of the source, whether corporation, association, union, or individual."'" *Id., at 780* (BRENNAN, J., concurring) (citations omitted).

EXHIBIT 43 EXHIBIT 4

Milkovich v. Lorain Journal Co., 497 U.S. 1

unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 505, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)*. Although statements of opinion *may* imply an assertion of a false and defamatory fact, they do not *invariably* do so. Distinguishing **[****41]** which statements do imply an assertion of a false and defamatory fact requires the same solicitous and thorough evaluation that this Court has engaged in when determining whether particular exaggerated or satirical statements could reasonably be understood to have asserted such facts. See *Bresler, supra; Letter Carriers, supra; Falwell, supra.* As Justice Holmes observed long ago: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner, 245 U.S. 418, 425, 62 L. Ed. 372, 38 S. Ct. 158 (1918)*.

For instance, the statement that "Jones is a liar," or the example **[***23]** given by the majority, "In my opinion John Jones is a liar" -- standing **[**2710]** alone -- can reasonably be interpreted as implying that there are facts known to the speaker to cause him to form such an opinion. See 497 U.S. at 18-19. But a different result must obtain if the speaker's comments had instead been as follows: "Jones' brother once lied to me; Jones just told me he was 25; I've **[****42]** never met Jones before and I don't actually know how old he is or anything else about him, but he looks 16; I think Jones lied about his age just now." In the latter case, there are at least six statements, two of which may arguably be actionable. The first such statement is factual and defamatory and may support a defamation action by Jones' brother. The second statement, however, that "I think Jones lied about his age just now," can be reasonably interpreted in context only as a statement that the speaker infers, from the facts stated, that Jones told a particular lie. It is clear to the listener that the speaker does **[*27]** not actually know whether Jones lied and does not have any other reasons for thinking he did. [3] Thus, the only fact implied by the second statement is that the speaker drew this inference. If the inference is sincere or nondefamatory, the speaker is not liable for damages. [4]

**[*28]**  **[****43]**  **[****44]**  II

The majority does not rest its decision today on any finding that the statements at issue explicitly state a false and defamatory fact. Nor could it. Diadiun's assumption that Milkovich must have lied at the court **[***24]** hearing is

---

[3] The **Restatement (Second) of Torts § 566, Comment c** (1977), makes a similar observation. It explains that a statement that "I think C must be an alcoholic" is potentially libelous because a jury might find that it implies the speaker knew undisclosed facts to justify the statement. In contrast, it finds that the following statement could not be found to imply any defamatory facts:

"A writes to B about his neighbor C: 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.'"

Yet even though clear disclosure of a comment's factual predicate precludes a finding that the comment implies other defamatory facts, this does not signify that a statement, preceded by only a partial factual predicate or none at all, necessarily implies other facts. The operative question remains whether reasonable readers would have actually interpreted the statement as implying defamatory facts. See *ante*, at 20, n.7; see generally Note, 13 Wm. Mitchell L. Rev. 545 (1987); Comment, *74 Calif. L. Rev. 1001 (1986)*; Zimmerman, Curbing the High Price of Loose Talk, 18 U. C. D. L. Rev. 359 (1985).

[4] See 497 U.S. at 20, n.7 (noting that under *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986)*, "the issue of falsity relates to the defamatory facts *implied* by a statement" (emphasis changed)). *Hepps* mandates protection for speech that does not actually state or imply false and defamatory facts -- independently of the *Bresler-Letter Carriers-Falwell* line of cases. Implicit in the constitutional rule that a plaintiff must prove a statement false to recover damages is a requirement to determine first what statement was actually made. The proof that *Hepps* requires from the plaintiff hinges on what the statement can reasonably be interpreted to mean. For instance, if Riley tells his friends that Smith cheats at cards and Smith then proves that he did not rob a convenience store, Smith cannot recover damages for libel on that basis because he has proved the wrong assertion false. Likewise, in the example in text, Jones cannot recover for defamation for the statement "I think Jones lied about his age just now" by producing proof that he did not lie about his age because, like Smith, he would have proved the wrong assertion false. The assertion Jones must prove false is that the speaker had, in fact, drawn the inference that Jones lied.

EXHIBIT 43                                                              EXHIBIT 4

Milkovich v. Lorain Journal Co., 497 U.S. 1

patently conjecture. [5] The majority finds Diadiun's statements actionable, however, because it concludes that these statements imply a factual assertion that Milkovich perjured himself at the judicial proceeding. **[**2711]** I disagree. Diadiun not only reveals the facts upon which he is relying but he makes it clear at which point he runs out of facts and is simply guessing. Read in context, the statements cannot reasonably be interpreted as implying such an assertion as fact. See 497 U.S. at 5-7, n.2 (reproducing the column).

**[****45]** Diadiun begins the column by noting that, on the day before, a Court of Common Pleas had overturned the decision by the Ohio High School Athletic Association (OHSAA) to suspend the Maple Heights wrestling team from that year's state tournament. He adds that the reversal was based on due process grounds. Diadiun emphasizes to the audience that he was present at the wrestling meet where the brawl that led to the team's suspension took place and that he was present at the hearing before the OHSAA. He attributes the brawl to Maple Heights coach Milkovich's wild gestures, ranting and egging the crowd on against the competing team from Mentor. He then describes Milkovich's testimony before the OHSAA, characterizing it as deliberate misrepresentation **[*29]** "attempting not only to convince the board of [his] own innocence, but, incredibly, shift the blame of the affair to Mentor." *Ante*, at 6, n.2. Diadiun then quotes statements allegedly made by Milkovich to the commissioners to the effect that his wrestlers had not been involved in the fight and his gestures had been mere shrugs.

At that point in the article, the author openly begins to surmise. Diadiun says that it "*seemed* **[****46]** " that Milkovich's and another official's story contained enough contradictions and obvious untruths that the OHSAA board was able to see through it and that "*probably*" the OHSAA's suspension of the Maple Heights team reflected displeasure as much at the testimony as at the melee. *Ante*, at 7, n.2 (emphasis added). Then Diadiun guesses that by the time of the court hearing, the two officials "*apparently* had their version of the incident polished and reconstructed, and the judge *apparently* believed them." *Ibid.* (emphasis added). For the first time, the column quotes a third party's version of events. The source, an OHSAA commissioner, is described -- in evident contrast to Diadiun -- as having attended the proceeding. The column does not quote any testimony from the court proceeding, nor does it describe what Milkovich said in court. There is only a vague statement from the OHSAA commissioner that the testimony "sounded pretty darned unfamiliar." [6] For the first time, Diadiun **[***25]** fails **[*30]** to claim any firsthand knowledge, after stressing that he had personally attended both the meet and the OHSAA hearing. After noting again that the judge ruled in Milkovich's **[****47]** and Maple Heights' favor, Diadiun proclaims: "Anyone who attended the meet, whether he be from Maple Heights, Mentor, or impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth." *Ibid.*

**[****48]** No reasonable reader could understand Diadiun to be impliedly asserting -- as fact -- that Milkovich had perjured himself. Nor could such a reader infer that Diadiun had further information about Milkovich's court testimony on which his belief was based. It is plain from the column that Diadiun did not attend the court hearing. Diadiun also clearly had no detailed secondhand information about what Milkovich had said in court. Instead, **[**2712]** what suffices for "detail" and "color" are quotations from the OHSAA hearing -- old news compared to the court decision

---

[5] Conjecture, when recognizable as such, alerts the audience that the statement is one of belief, not fact. The audience understands that the speaker is merely putting forward a hypothesis. Although the hypothesis involves a factual question, it is understood as the author's "best guess." Of course, if the speculative conclusion is preceded by stated factual premises, and one or more of them is false and defamatory, an action for libel may lie *as to them*. But the speculative conclusion itself is actionable only if it implies the existence of another false and defamatory fact.

[6] The commissioner is quoted as having said: "'I can say that some of the stories told to the judge sounded pretty darned unfamiliar . . . . It certainly sounded different from what they told us.'" *Ante*, at 7, n.2. This quotation might also be regarded as a stated factual premise on which Diadiun's speculation is based. However, Milkovich did not complain of the quotation in his pleadings. In any event, it is unlikely that it would be found defamatory. Diadiun had already characterized the testimony of the two officials before the OHSAA as "obvious untruths." Thus, the commissioner's alleged assertion that the testimony in court was different is quite nebulous. It might indicate that the officials told the truth in court, in contrast to the version given to the commissioners, or that the officials discussed entirely different issues, rather than that they told a new lie.

EXHIBIT 43                                                                              EXHIBIT 4

Milkovich v. Lorain Journal Co., 497 U.S. 1

which prompted the column -- and a vague quotation from an OHSAA commissioner. Readers could see that Diadiun was focused on the court's reversal of the OHSAA's decision and was angrily supposing what must have led to it. [7]

 **[*31]   [****49]**  Even the insinuation that Milkovich had repeated, in court, a more plausible version of the misrepresentations **[***26]** he had made at the OHSAA hearing is preceded by the cautionary term "apparently" -- an unmistakable sign that Diadiun did not know what Milkovich had actually said in court. "Cautionary language or interrogatories of this type put the reader on notice that what is being read is opinion and thus weaken any inference that the author possesses knowledge of damaging, undisclosed facts. . . . In a word, when the reasonable reader encounters cautionary language, he tends to 'discount that which follows.'" *Ollman v. Evans, 242 U.S. App. D.C. at 314, 750 F.2d at 983*, quoting *Burns v. McGraw-Hill Broadcasting Co., 659 P.2d 1351, 1360 (Colo. 1983)*. See also B. Sanford, Libel and Privacy: The Prevention and Defense of Litigation 145 (1987) (explaining that many courts have found that words like "apparent" reveal "that the assertion is qualified or speculative and is not to be understood as a declaration of fact"); *Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (CA9 1980)* **[****50]**  (explaining that a statement phrased in language of apparency "is less likely to be understood as a statement of **[*32]** fact rather than as a statement of opinion"); *Gregory v. McDonnell Douglas Corp., 17 Cal. 3d 596, 603, 552 P.2d 425, 429, 131 Cal. Rptr. 641 (1976)* (finding a letter "cautiously phrased in terms of apparency" did not imply factual assertions); *Stewart v. Chicago Title Ins. Co., 151 Ill. App. 3d 888, 894, 503 N.E.2d 580, 583, 104 Ill. Dec. 865 (1987)* (finding a letter "couched in language of opinion rather than firsthand knowledge" did not imply factual assertions). Thus, it is evident from what Diadiun actually wrote that he had no unstated reasons for concluding that Milkovich perjured himself.

Furthermore, the tone and format of the piece notify readers to expect speculation and personal judgment. The tone is pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage. Diadiun never says, for instance, that Milkovich committed perjury. He says that "anyone who **[**2713]** attended the meet . . . knows in his heart" that Milkovich lied -- obvious hyperbole as Diadiun does not purport **[****51]** to have researched what everyone who attended the meet knows in his heart.

The format of the piece is a signed editorial column with a photograph of the columnist and the logo "TD Says." Even the headline on the page where the column is continued -- "Diadiun says Maple told a lie," 497 U.S. at 4 -- reminds readers that they are reading one man's commentary. While signed columns may certainly include statements of fact, they are also the "well recognized home of opinion and comment." *Mr. Chow of New York v. Ste. Jour Azur S. A., 759 F.2d 219, 227 (CA2 1985)*. Certain formats -- editorials, reviews, political cartoons, letters to the editor -- signal the reader to anticipate a departure from what is actually known by the author as fact. See *Ollman v. Evans, supra,*

---

[7] Both state and federal courts have found that audiences can recognize conjecture that neither states nor implies any assertions of fact, just as they can recognize hyperbole. For example, in *Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1290 (CA4 1987)*, the court found that a disparaging statement about a product test in an industry newsletter, set forth following a list of seven observations about the test's methodology, "readily appears to be nothing more than the author's personal inference from the test results. The premises are explicit, and the reader is by no means required to share [the author's] conclusion." For the same reason, the court in *Dunlap v. Wayne, 105 Wash. 2d 529, 540, 716 P.2d 842, 849 (1986)*, concluded: "Arguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves." See also *National Assn. of Government Employees, Inc. v. Central Broadcasting Corp., 379 Mass. 220, 226, 396 N.E.2d 996, 1000 (1979)* (finding that, as listeners were told the facts upon which a radio talk show host based her conclusion, they "could make up their own minds and generate their own opinions or ideas which might or might not accord with [the host's]").

The common-law doctrine of fair comment was also premised on such an observation. Where the reader knew or was told the factual foundation for a comment and could therefore independently judge whether the comment was reasonable, a defendant's unreasonable comment was held to defame "'himself rather than the subject of his remarks.'" Hill, Defamation and Privacy Under the *First Amendment*, 76 Colum. L. Rev. 1205, 1229 (1976) (quoting *Popham* v. *Pickburn*, 7 H. & N. 891, 898, 158 Eng. Rep. 730, 733 (Ex. 1862) (Wilde, B.)). "As Thomas Jefferson observed in his first Inaugural Address . . . error of opinion need not and ought not be corrected by the courts 'where reason is left free to combat it.'" *Potomac, 829 F.2d at 1288-1289*, quoting Thomas Jefferson's first Inaugural Address (The Complete Jefferson 385 (S. Padover ed. 1943)).

**EXHIBIT 43**                                                              **EXHIBIT  4**

Milkovich v. Lorain Journal Co., 497 U.S. 1

*at 317, 750 F.2d at 986* ("The reasonable reader who peruses [a] column on the editorial or Op-Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper"); R. Smolla, Law of Defamation § 6.12(4), n.252 (1990) (collecting **[*33]** **[****52]** cases); Zimmerman, Curbing the High Price of Loose Talk, 18 U. C. D. L. Rev. 359, 442 (1985) (stressing the need to take into account "the cultural common **[***27]** sense of the ordinary listener or reader"). [8]

 **[****53]** III

Although I agree with the majority that statements must be scrutinized for implicit factual assertions, the majority's scrutiny in this case does not "hold the balance true," 497 U.S. at 23, between protection of individual reputation and freedom of speech. The statements complained of neither state nor imply a false assertion of fact, and, under the rule the Court reconfirms today, they should be found not libel "'as a matter of constitutional law.'" *Ante*, at 17, quoting *Bresler, 398 U.S. at 13*. Readers of Diadiun's column are signaled repeatedly that the author does not actually know what Milkovich said at the court hearing and that the author is surmising, from factual premises made explicit in the column, that Milkovich must have lied in court. [9]

 **[*34]** **[****54]** **[**2714]** Like the "imaginative expression" and the "rhetorical hyperbole" which the Court finds have "traditionally added much to the discourse of our Nation," 497 U.S. at 18, conjecture is intrinsic to "the free flow of ideas and opinions on matters of public interest and concern" that is at "the heart of the **[***28]** *First Amendment*." *Falwell, 485 U.S. at 50*. The public and press regularly examine the activities of those who affect our lives. "One of the prerogatives of American citizenship is the right to criticize men and measures." *Id., at 51* (quoting *Baumgartner v. United States, 322 U.S. 665, 673-674, 88 L. Ed. 1525, 64 S. Ct. 1240 (1944))*. But often only some of the facts are known, and solely through insistent prodding -- through conjecture as well as research -- can important public questions be subjected to the "uninhibited, robust, and wide-open" debate to which this country is profoundly committed. *New York Times Co. v. Sullivan, 376 U.S. 254, 270, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)*.

---

[8] The readers of Diadiun's column would also have been alerted to regard any implicit claim of impartiality by Diadiun with skepticism because Diadiun's newspaper is published in the county in which Mentor High School -- home to the team that was allegedly mauled at the wrestling meet -- is located. Where readers know that an author represents one side in a controversy, they are properly warned to expect that the opinions expressed may rest on passion rather than factual foundation. See, *e. g., Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d at 1290* (explaining that the contents of a company's newsletter would be understood as reflecting the professional interests of the company rather than as "a dispassionate and impartial assessment" of a test of a competitor's product); *Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (CA9 1980)* (recognizing that statements in the early weeks of litigation by one side about the other were likely to include unsubstantiated charges, but that these "are highly unlikely to be understood by their audience as statements of fact").

[9] Milkovich does not challenge the accuracy of any of Diadiun's stated premises. Nor does he complain or proffer proof that Diadiun had not, in fact, concluded from the stated premises that Milkovich must have lied in court. There is, therefore, no call to consider under what circumstances an insincere speculation would constitute a false and defamatory statement under *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986)*. However, I would think that documentary or eyewitness testimony that the speaker did not believe his own professed opinion would be required before a court would be permitted to decide that there was sufficient evidence to find that the statement was false and submit the question to a jury. Without such objective evidence, a jury's judgment might be too influenced by its view of what was said. As we have long recognized, a jury "is unlikely to be neutral with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' . . . which must be protected if the guarantees of the *First* and *Fourteenth Amendments* are to prevail." *Monitor Patriot Co. v. Roy, 401 U.S. 265, 277, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971)* (quoting *New York Times, 376 U.S. at 270*). See also *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 510-511, 80 L. Ed. 2d 502, 104 S. Ct. 1949, and n.29 (1984)* (discussing the risks of submitting various questions to juries where freedom of speech is at stake); *Gertz, 418 U.S. at 349* (expressing concern about juries punishing unpopular opinion rather than compensating individuals for injuries sustained by the publication of a false fact); R. Smolla, Law of Defamation §§ 6.05(3)(a)-(c) (1990); Zimmerman, 18 U. C. D. L. Rev., at 430.

**EXHIBIT 43**                                                                    EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

Did NASA officials ignore sound warnings that the Challenger Space Shuttle would explode? Did Cuban-American **[\*35]** **[\*\*\*\*55]** leaders arrange for John Fitzgerald Kennedy's assassination? Was Kurt Waldheim a Nazi officer? Such questions are matters of public concern long before all the facts are unearthed, if they ever are. Conjecture is a means of fueling a national discourse on such questions and stimulating public pressure for answers from those who know more. "'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.'" *Id., at 269* (quoting *Stromberg v. California, 283 U.S. 359, 369, 75 L. Ed. 1117, 51 S. Ct. 532 (1931))*.

What may be more disturbing to some about Diadiun's conjecture than, say, an editorial in 1960 speculating that Francis Gary Powers was in fact a spy, despite the Government's initial assurances that he was not, is the naivete of Diadiun's conclusion. The basis of the court decision that is the subject of Diadiun's column was that Maple Heights had been denied its right to due process by the OHSAA. Diadiun, **[\*\*\*\*56]** as it happens, not only knew this but included it in his column. But to anyone who knows what "due process" means, it does not follow that the court must have believed some lie about what happened at the wrestling meet, because what happened at the meet would not have been germane to the questions at issue. There may have been testimony about what happened, and that testimony may have been perjured, but to anyone who understands the patois of the legal profession there is no reason to assume -- from the court's decision -- that such testimony must have been given.

Diadiun, therefore, *is* guilty. He is guilty of jumping to conclusions, of benightedly assuming that court decisions are always based on the merits, and of looking foolish to lawyers. He is not, however, liable for defamation. Ignorance, without more, has never served to defeat freedom of speech. "The constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are **[\*36]** offered.'" *New York Times, supra, at 271* (quoting *NAACP v. Button, 371 U.S. 415, 445, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963))*.

 **[\*\*\*29]** I appreciate this Court's **[\*\*\*\*57]** concern with redressing injuries to an individual's reputation. But as long as it is clear to the reader that he is being offered conjecture and not solid information, the danger to reputation is **[\*\*2715]** one we have chosen to tolerate in pursuit of "'individual liberty [and] the common quest for truth and the vitality of society as a whole.'" *Falwell, supra, at 50-51* (quoting *Bose Corp., 466 U.S. at 503-504*). Readers are as capable of independently evaluating the merits of such speculative conclusions as they are of evaluating the merits of pure opprobrium. Punishing such conjecture protects reputation only at the cost of expunging a genuinely useful mechanism for public debate. "In a society which takes seriously the principle that government rests upon the consent of the governed, freedom of the press must be the most cherished tenet." *Edwards v. National Audubon Society, Inc., 556 F.2d 113, 115* (CA2), cert. denied *sub nom. Edwards v. New York Times Co., 434 U.S. 1002, 54 L. Ed. 2d 498, 98 S. Ct. 647 (1977)*.

It is, therefore, imperative that we take the most particular care where freedom **[\*\*\*\*58]** of speech is at risk, not only in articulating the rules mandated by the *First Amendment*, but also in applying them. "'Whatever is added to the field of libel is taken from the field of free debate.'" *New York Times, 376 U.S. at 272* (quoting *Sweeney v. Patterson, 76 U.S. App. D.C. 23, 24, 128 F.2d 457, 458*, cert. denied, *317 U.S. 678, 87 L. Ed. 544, 63 S. Ct. 160 (1942))*. Because I would affirm the Ohio Court of Appeals' grant of summary judgment to respondents, albeit on somewhat different reasoning, I respectfully dissent.

# References

*50 Am Jur 2d, Libel and Slander 14*

USCS, *Constitution, Amendment 1*

US L Ed Digest, Constitutional Law 947

Index to Annotations, *First Amendment*; Libel and Slander; Newspapers and Periodicals; New York Times Rule; Perjury

**EXHIBIT 43**                                                                        EXHIBIT  4

Milkovich v. Lorain Journal Co., 497 U.S. 1

Annotation References:

Free speech and press clauses of *Federal Constitution's First Amendment* as affecting damages recoverable for defamation-- Supreme Court cases. *86 L Ed 2d 816*.

 Progeny of New York Times v Sullivan in the Supreme Court. *61 L Ed 2d 975*.

Constitutional aspects of libel and slander-- Supreme Court cases.  **[****59]**  *28 L Ed 2d 885*.

Libel and slander: necessity of expert testimony to establish negligence of media defendant in defamation action by private individual.  *37 ALR4th 987*.

Libel by newspaper headlines.  *95 ALR3d 660*.

Libel and slander: who is a "public figure" in the light of *Gertz v Robert Welch, Inc. (1974) 418 US 323, 41 L Ed 2d 789, 94 S Ct 2997*. *75 ALR3d 616*.

Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice.  *20 ALR3d 988*.

Libel and slander: who is a public official or otherwise within the federal constitutional rule requiring public officials to show actual malice.  *19 ALR3d 1361*.

---

**End of Document**

EXHIBIT 43

EXHIBIT 5

Holbrook v. Casazza, 204 Conn. 336

# *Holbrook v. Casazza*

Supreme Court of Connecticut

April 8, 1987, Argued ; July 7, 1987, Decided

Nos. 12863, 12864

**Reporter**

204 Conn. 336 *; 528 A.2d 774 **; 1987 Conn. LEXIS 923 ***

Joan O. Holbrook v. Titus J. Casazza; Joan O. Holbrook v. Gala H. Nordquist

**Prior History:  [***1]**   Action, in each case, to recover damages for allegedly defamatory statements made by the defendants, brought to the Superior Court in the judicial district of Middlesex, where the cases were consolidated and tried to the jury before *Barry, J.*; verdicts and judgments for the plaintiff, from which the defendants filed separate appeals.

The appellants filed a motion for reargument which was denied.

**Disposition:** *No error*.

## Case Summary

**Procedural Posture**

Defendants, members of the town board of tax assessors, sought review of the decision from the Superior Court in the judicial district of Middlesex (Connecticut), which denied their motions to set aside the jury verdicts against them in plaintiff tax assessor's defamation action. The board members contended that the evidence was insufficient to show falsity and malice, that the charges were inadequate, and that the damage award was excessive.

**Overview**

The board members accused the tax assessor of numerous improprieties in performing her duties. The board members refused to retract their defamatory statements even after the Connecticut Association of Assessing Officers and the Office of Policy and Management both exonerated the tax assessor of any wrongdoing. The court determined that the board members' failure to investigate the facts, to seek advice from other knowledgeable persons, or to publish a retraction, together with the ill will that seemingly spurred the publication of their defamatory statements, evidenced a high degree of awareness that their accusations were probably false and supported the jury's findings. The court found that the trial court's jury instructions conformed to the board members' requested jury charges, they were sufficiently correct in law, and they furnished adequate guidance for the jury. The court found that the award of damages fell somewhere within the necessarily uncertain limits of fair and reasonable compensation that could be seen as reasonably related to the evidence adduced at trial. The court concluded that the trial court did not err in refusing to set aside the jury's verdict.

**Outcome**

The court affirmed the trial court's judgment.

**Counsel:** *William F. Gallagher*, with whom were *Evelyn A. Barnum* and, on the brief, *Steven J. Errante* and *David J. Peska*, for the appellants (defendants).

*Roger Sullivan,* for the appellee (plaintiff).

**EXHIBIT 43**                                                                    <span style="color:red">EXHIBIT  5</span>

Holbrook v. Casazza, 204 Conn. 336

**Judges:** Peters, C. J., Healey, Shea, Callahan and Moraghan, Js.

**Opinion by:** SHEA

# Opinion

 **[\*337] [\*\*775]**   The principal issue in these appeals is whether the statements of the defendants accusing the plaintiff of numerous improprieties in performing her duties as tax assessor in the town of Westbrook were made with actual malice. The plaintiff brought separate defamation actions against the defendants, members **[\*338]** of the board of tax assessors for the town, seeking compensatory and exemplary damages for harm to her reputation, mental **[\*\*\*2]** anguish, pain and suffering, public humiliation, and pecuniary loss alleged to have resulted from defamatory statements of the defendants.  Following a trial in which the cases were consolidated, the jury returned verdicts against both defendants for an aggregate amount of $ 28,000 in general damages, $ 181,000 in special damages, and $ 77,477 in exemplary damages. While ordering remittiturs amounting to $ 3828 with respect to the awards of exemplary damages, the trial court denied the defendants' motions to set aside the verdicts against them, from which denials the defendants have appealed.  We find no error.

From the evidence the jury could reasonably have found the following facts.  In January, 1982, the defendant, Titus J. Casazza, obtained from an appraisal firm a reduction of $ 2300 in the appraised value of property belonging to him.  Upon learning of this, the plaintiff, Joan O. Holbrook, then chairman of the board of assessors for the town, questioned Casazza about the use of his position as a member of the board of assessors in obtaining the reduction, and mentioned that Casazza's neighbors had not been accorded comparable treatment.  Casazza responded angrily to a statement **[\*\*\*3]  [\*\*776]**  made by the plaintiff during that conversation "that it was quite unethical of him to use his office to further personal gain." Following this incident, Casazza remained away from the assessor's office for approximately one month.  After his return on February 23, 1982, he spent "a good part of [the] time" investigating the office records with a view toward discovering any misconduct on the part of the plaintiff in her work as an assessor.

It was also on February 23, 1982, that an abstract compiling the 1981 decennial revaluations of real property **[\*339]** in Westbrook was completed.  The plaintiff, the most experienced member of the board of assessors, had performed most of the revaluation work.  Because the board was comprised of three persons, the plaintiff, the defendant Casazza, and the defendant Gala H. Nordquist, the signing of the abstract by the plaintiff and Nordquist, a majority of the board, validated it as the grand list for the town.  Casazza, who refused to sign, subsequently persuaded Nordquist that she had endorsed a list that had been wrongfully altered by the plaintiff.  Concerned about this criticism, Nordquist "stayed home for a day or two" until **[\*\*\*4]** asked by the plaintiff to return.  Upon returning, an argument occurred during which the plaintiff told Nordquist that she "had no business being an assessor." Nordquist became angry, was "reduced to tears," and immediately went to the office of Donald Morrison, first selectman for the town, and told him of Casazza's criticisms.

During a series of meetings in March, 1982, the defendants complained to Morrison, other selectmen, and the town council of misconduct on the part of the plaintiff.  Among the accusations were allegations of improper field card erasures and unauthorized reductions in property values for relatives and friends.  Morrison, with the consent of the parties, requested an investigation of the complaint by the Connecticut Association of Assessing Officers, which appointed a committee to conduct the investigation.  After examining the records in the assessors' office and inspecting several of the relevant properties, the committee, on April 27, 1982, issued its report finding "no wrongdoing on the part of" the plaintiff.

On the following day the defendants submitted a further complaint to the office of policy and management (OPM), the state agency charged with the **[\*\*\*5]** supervision of municipal assessors. See _General Statutes § 12-1c_.  In summary, the defendants accused the plaintiff of: **[\*340]** (1) unilaterally changing assessed values in violation of _General_

<span style="color:red">81</span>

EXHIBIT 43                                                              EXHIBIT  5

Holbrook v. Casazza, 204 Conn. 336

*Statutes § 12-62*; [1] **[\*\*\*6]** (2) making unauthorized substantive changes in the 1981 grand list in violation of *General Statutes § 12-60*; [2] (3) illegally erasing several hundred property assessments; (4) reducing the assessments upon properties owned by friends and family members; and (5) increasing the assessments upon properties owned by people who were in her disfavor.  With respect to several of their accusations, the defendants, before filing their complaint, did not seek an explanation from the plaintiff of the reasons for her actions.  Additionally, with respect to their allegations of favoritism, the defendants did not "go back and consult the 1971 book to see what if any reductions were given in 1971." The defendants, furthermore, neither consulted an attorney nor sought the advice of any other assessors.

 **[\*\*777]**  On June 22, 1982, the OPM released a committee report finding that all of the contested changes made by the plaintiff had been "appropriate," that no evidence existed of "partiality or bias," and therefore that the defendants' accusations were "invalid." At first selectman Morrison's request, however, the report included a comment that erasing, the method used by  **[\*341]**  the plaintiff to correct field cards, while not illegal, was not the preferred method, which is "to draw a line through the value to be changed and enter the new value."

Casazza nevertheless filed another complaint with the supervisor of the OPM in which he repeated his previous accusations. The OPM declined to reopen its investigation.  On September 22, 1982, the plaintiff mailed to the defendants **[\*\*\*7]**  a demand for retraction of their accusations, but the defendants refused to comply.

During the spring and summer of 1982, the news media provided extensive coverage of the controversy between the parties.  The media detailed the charges of misconduct underlying the investigations of the plaintiff, and numerous articles featured quotations from Casazza.  The impact of the defendants' accusations upon the plaintiff's reputation resulted in the plaintiff being dropped from consideration for the newly created position of single assessor for the town.  Additionally, after having applied for assessor positions in fifty-two towns within a one hundred mile radius of Westbrook, at least three of which were actively seeking an assessor, the plaintiff received only one interview, which did not result in a job offer.  The plaintiff, furthermore, felt compelled to move from Westbrook to an adjoining community.

The plaintiff brought the present actions in November, 1982.  In these appeals from the judgments rendered by the trial court in accordance with verdicts for the plaintiff, the defendants claim: (1) that the evidence was insufficient to support findings of falsity and malice; (2) that the **[\*\*\*8]**  trial court erred in various aspects of its jury charge; (3) that the allusion by the plaintiff's counsel during trial to an indemnification of the defendants by the town warranted a mistrial; (4) that the court  **[\*342]**  erred in excluding evidence of the sale price of property owned by the plaintiff's husband; and (5) that the damage awards are excessive.

I

The rule set forth by the United States Supreme Court in *New York Times Co.* v. *Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964),* prohibits a public official from recovering damages for a defamatory falsehood unless he proves that the false "statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." See also *St. Amant v. Thompson, 390 U.S. 727, 730-31, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968).* Further, those who "are properly classed as public figures and those who hold

---

[1] "*General Statutes Sec. 12-62*.  Periodic revaluation of real estate.  (a) Commencing October 1, 1978, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the last preceding revaluation of all real property and every ten years after each such revaluation, view all of the real estate of their respective municipalities, and shall revalue the same for assessment and, in the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors. . . ."

[2] "General Statutes Sec. 12-260.  Correction of clerical error in assessment.  Any clerical omission or mistake in the assessment of taxes may be at any time corrected according to the fact by the assessors or board of tax review, and the tax shall be levied and collected according to such corrected assessment."

EXHIBIT 43

EXHIBIT  5

Holbrook v. Casazza, 204 Conn. 336

governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with" such actual malice. *Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. [\*\*\*9] Ed. 2d 789 (1974)*. In this appeal the plaintiff concedes that, as a tax assessor, she "had substantial responsibility for the conduct of her office in establishing property values and therefore was a public official according to standards set by federal law." Cf. *New York Times Co*. v. *Sullivan, supra* (elected commissioner as public official); *Moriarty v. Lippe, 162 Conn. 371, 294 A.2d 326 (1972)* (patrolman); *Ryan v. Dionne, 28 Conn. Sup. 35, 248 A.2d 583 (1968)* (tax collector).

The jury affirmatively answered special interrogatories submitted by the court, expressly finding that (1) the defendants uttered and published defamatory statements about the plaintiff, and that, by clear and convincing evidence, such statements (2) were false and (3) were made with actual malice. The defendants first claim that the trial court erred in denying their motions  **[\*343]**  to set aside the verdict and render judgment notwithstanding the verdict because the verdict is not supported by the evidence.

 **[\*\*778]**  A

We must preliminarily determine the proper standard of appellate review.  Appellate courts ordinarily do not disturb the facts as found by a jury unless **[\*\*\*10]**  it appears that the evidence furnished no reasonable basis for the jury's conclusions.  *Moriarty v. Lippe, supra, 374*; *Petrizzo v. Commercial Contractors Corporation, 152 Conn. 491, 499, 208 A.2d 748 (1965)*. The evidence is given the most favorable construction to which it is reasonably entitled in support of the verdict. *Wochek v. Foley, 193 Conn. 582, 587, 477 A.2d 1015 (1984)*; *Petrillo v. Bess, 149 Conn. 166, 167, 179 A.2d 600 (1961)*; *Kerrigan v. Detroit Steel Corporation, 146 Conn. 658, 660, 154 A.2d 517 (1959)*.

Where a defamation action has successfully been brought by a public official, however, the issues involve the demarcation between speech that is unconditionally guaranteed and speech that may legitimately be regulated.  Cf. *Speiser v. Randall, 357 U.S. 513, 525, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958)*. "In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' **[\*\*\*11]**  *Pennekamp v. Florida, 328 U.S. 331, 335 [66 S. Ct. 1029, 90 L. Ed. 1295 (1946)]*. . . .   We must 'make an independent examination of the whole record,' *Edwards v. South Carolina, 372 U.S. 229, 235 [83 S. Ct. 680, 9 L. Ed. 2d 697 (1963)]*, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York*  **[\*344]** *Times Co*. v. *Sullivan, supra, 285*; cf.  *New York v. Ferber, 458 U.S. 747, 774 n.28, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)*; *Hess v. Indiana, 414 U.S. 105, 108-109, 94 S. Ct. 326, 38 L. Ed. 2d 303 (1973)*; *Miller v. California, 413 U.S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419*, reh. denied, *414 U.S. 881, 94 S. Ct. 26, 38 L. Ed. 2d 128 (1973)*; *Street v. New York, 394 U.S. 576, 592, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969)*.

In *Bose Corporation v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502*, reh. denied, *467 U.S. 1267, 104 S. Ct. 3561, 82 L. Ed. 2d 863 (1984)*, the United States Supreme Court elaborated upon the "constitutionally based rule" of independent review.  The court maintained that the **[\*\*\*12]**  rule preserves the "due regard" that is ordinarily given to the trial judge's opportunity to observe the demeanor of the witnesses.  *Id., 499-500*. In a footnote, the *Bose* court clarified that "[t]he independent review function is not equivalent to a '*de novo*' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff." *Id., 514 n.31*. The court noted that, apart from the finding of actual malice, to which the rule of independent review applies, the other findings of fact in a defamation case are properly tested under the clearly erroneous standard of review.  Id.; see also *Time, Inc*. v. *Pape, 401 U.S. 279, 284, 91 S. Ct. 633, 28 L. Ed. 2d 45*, reh. denied, *401 U.S. 1015, 91 S. Ct. 1248, 28 L. Ed. 2d 552 (1971)*; cf. *Tavoulareas v. Piro, 817 F.2d 762 (D.C. Cir. 1987)*. As we have stated, it is the finding of actual malice by clear and convincing proof that impels a defamatory falsehood uttered against a public official across the constitutional threshold and into the limited category of "unprotected" speech.

 **[\*345] [\*\*\*13]**  B

**EXHIBIT 43**                                                                                    **EXHIBIT  5**

Holbrook v. Casazza, 204 Conn. 336

We initially dispose of the defendants' claim that the evidence was insufficient to support the findings by the jury in their respective cases that the defamatory statements were false.  We note that in these appeals the defendants challenge such findings only in respect to their statements that the plaintiff improperly changed assessments in the 1981 grand list in violation of *General Statutes §§ 12-62* and *12-60*.  Moreover, the defendants conceded at oral argument that there had been no evidence  **[**779]**  underlying their accusations that the plaintiff had increased assessments upon properties owned by persons who were in her disfavor.

The jury returned a general verdict for the plaintiff while answering affirmatively the special interrogatory whether "the plaintiff proved by clear and convincing evidence the falsity of *any* of the defamatory statements." (Emphasis added.)  This court has recognized that a general verdict for one party raises a presumption that the jury found every issue in favor of "'the prevailing party.'" *Alfano v. Insurance Center of Torrington, 203 Conn. 607, 613, 525 A.2d 1338 (1987)*; *Finley v. Aetna Life & Casualty Co., 202 Conn. 190,  [***14] 202, 520 A.2d 208 (1987)*; *Colucci v. Pinette, 185 Conn. 483, 489-90, 441 A.2d 575 (1981)*. Thus, we must uphold the jury's findings of falsity if the evidence is sufficient in respect to any of the defamatory statements made by the defendants.  Applying the ordinary standard of appellate review, we conclude that testimony regarding the April 27, 1982 determination of the Association of Assessing Officers and the June 22, 1982 OPM committee report, both of which declared the defamatory accusations untrue, furnished a reasonable basis for the jury's findings of falsity. The general verdict rule makes it unnecessary for us to undertake a separate  **[*346]**  analysis concerning the defendants' particular accusations that the plaintiff violated *§§ 12-62* and *12-60*. [3]

 **[***15]**  We next "independently review" the record to determine whether sufficient evidence supports the jury's findings of actual malice. A statement made with actual malice, under the rule of *New York Times Co.*, is made with knowledge of its falsity or with reckless disregard of whether it is false.  See *Beckley Newspapers Corporation v. Hanks, 389 U.S. 81, 82-83, 88 S. Ct. 197, 19 L. Ed. 2d 248 (1967)*. A merely negligent misstatement of fact about a public official retains the constitutional protection afforded free expression.  See *Rosenbloom v. Metromedia, 403 U.S. 29, 50, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971)*; *Rosenblatt v. Baer, 383 U.S. 75, 83-84, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966)*. Further, proof that a defamatory falsehood has been uttered  **[*347]**  "with bad or corrupt motive" or with an intent to inflict harm will not be sufficient to support a finding of actual malice; *Beckley Newspapers Corporation v. Hanks, supra*; *Henry v. Collins, 380 U.S. 356, 357, 85 S. Ct. 992, 13 L. Ed. 2d 892 (1965)*; although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity. 3 *Restatement (Second),  [***16]  Torts § 580A, comment d*.

Applying these principles, we are persuaded that the proof presented to show actual malice does possess the convincing clarity that the constitutional standard demands.  With respect to Nordquist, the record indicates that, in making several accusations, she relied entirely upon Casazza's advice to her and made no effort independently  **[**780]**  to verify facts.  The following transcript portion, for example, records the examination of

---

[3] In these appeals the defendants, in their joint brief, have inserted a claim that the trial court erred in refusing to submit to the jury a series of interrogatories that had been proposed by the defendant Casazza.  See Practice Book § 312.  It is within the reasonable discretion of the trial court whether to submit pertinent interrogatories to the jury.  *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole, 189 Conn. 518, 527, 457 A.2d 656 (1983)*; *Freedman v. New York, N.H. & H. R. Co., 81 Conn. 601, 612, 71 A. 901 (1909)*. We have recognized, however, that a party has the right to avoid the implication of a general verdict by seeking from the jury answers to appropriate interrogatories. *Ubysz v. DiPietro, 185 Conn. 47, 61-62, 440 A.2d 830 (1981)*; *Callahan v. Jursek, 100 Conn. 490, 493, 124 A. 31 (1924)*. The interrogatories proposed by the defendant Casazza would not have involved consideration of each of the accusations that had been made by the defendants.  Most notably, no interrogatory sought a jury finding with respect to the accusation that the plaintiff had been responsible for several hundred illegal erasures on the field card records.  Therefore, even if the jury's answers to all of the proposed interrogatories had favored the defendants, such results would not necessarily have been in contradiction to a verdict for the plaintiff.  Moreover, the failure on the part of Casazza to take exception to the court's refusal, or to the three special interrogatories prepared and submitted to the jury by the court, indicates Casazza's satisfaction at the time that the three interrogatories were adequate to protect his interests.  Thus, we conclude that the trial court did not abuse its discretion in refusing to submit the proposed interrogatories to the jury.

**EXHIBIT 43**                                                                                              EXHIBIT  5

Holbrook v. Casazza, 204 Conn. 336

Nordquist by counsel for the plaintiff regarding the letter of complaint submitted to the OPM following the April 27, 1982 exoneration of the plaintiff by the Association of Assessing Officers:

"Q.  And in that letter, you accused Joan Holbrook of violating two Statutes having to do with assessing?

"A.  Yes.

"Q.  Statute 12-62 and Statute 12-60, is that correct?

"A.  Yes.

"Q.  Had you ever read either one of those statutes before you signed that letter?

"A.  The first one where it says the changes were made unilaterally, I didn't read the Statute, because I figured this was what it was all about.

"Q.  Isn't it true that you never read either one of those Statutes before you made those charges?

"A.  Yes sir.

 [*348]  [***17]   "Q.  And isn't it also true that you have never read those Statutes?

"A.  Yes.

"Q.  Not since the charges were made, you've never resorted to the Statutes?

"A.  No.

"Q.  And before you sent that charge against Joan Holbrook to O.P.M., you didn't consult a lawyer, did you, and ask his advice about the meaning of the Statutes?

"A.  No.

"Q.  And you didn't consult any other assessor?

"A.  No.

"Q.  The only person you consulted with was Titus Casazza?

"A.  There were other people that were involved.

"Q.  The only person you consulted with in making the charges was Titus Casazza, isn't that true?

"A.  Yes sir."

The jury could properly have concluded that a reasonably prudent person in the position of Nordquist, upon learning of the initial exoneration of the plaintiff, would have sought evidence corroborative of Casazza's perspective prior to publishing the subsequent accusations of misconduct in the complaint to the OPM.  Viewed in the light of the following additional factors, Nordquist's disregard of the probable falsity of her accusations crosses the threshold from negligence to recklessness.  First, the circumstances under which Nordquist embarked upon publishing her claims [***18] of wrongdoing suggest the presence of animus.  Upon being told by the plaintiff that she "had no business [*349] being an assessor," Nordquist, angered and "reduced to tears," immediately published her accusations to Morrison, the town's first selectman. Second, Nordquist refused to retract her statements after learning of a second official exoneration of the plaintiff, this time by the OPM. [4] A refusal to retract a statement that has been

---

[4] The transcript indicates that the examination of Nordquist soon turned to the subject of the plaintiff's demand for retraction:

demonstrated to be false and defamatory "might be relevant in showing recklessness at the time the statement was published." 3 *Restatement (Second), Torts* § 580A, comment d; *Golden Bear Distributing Systems of Texas, Inc.* v. *Chase Revel, Inc., 708 F.2d 944, 950 (5th Cir. 1983)*. We conclude that the failure of Nordquist to investigate the facts, seek advice from other knowledgeable persons, or publish a retraction after learning of the June 22, 1982 OPM committee **[\*\*781]** report, together with the ill will that seemingly spurred the initial publication of her defamatory statements, evidenced "the high degree of awareness of their probable falsity demanded by *New York Times. . . .*" *Garrison v. Louisiana, 379 U.S. 64,* **[\*\*\*19]** *74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964)*.

The record similarly supports the finding of actual malice with respect to Casazza.  Ill will clearly developed when the plaintiff challenged Casazza about the propriety of using his official position as an assessor in obtaining a reduction in the value of his own property.  Like Nordquist, Casazza did not check the available **[\*350]**  **[\*\*\*20]** records of the 1971 decennial revaluation, consult an attorney, or seek the advice of other assessors about the validity of his accusations. Following the June 22, 1982 OPM committee report determining that the accusations against the plaintiff were invalid, Casazza not only refused to publish a retraction, but republished his statements in a further complaint filed with the supervisor of the OPM, and also at an interview with a reporter for the Middletown Press, which resulted in an article that elaborated upon the claimed misconduct of the plaintiff.  Such evidence supports the conclusion that Casazza recklessly disregarded the probable falsity of his publications.  See *Rosenbloom v. Metromedia, supra, 56*; *St. Amant v. Thompson, supra, 731*.

Because we determine that the evidence was sufficient to support the jury's findings of falsity and malice, we hold that the trial court did not err in denying the defendants' motions to set aside the verdict and render judgment notwithstanding the verdict.

II

The defendants next claim that the trial court erred in its charge to the jury because the instructions (1) failed adequately to relate the legal element of malice **[\*\*\*21]** to the particular facts of this case, and (2) did not ask the jury independently to determine whether the plaintiff had made illegal unilateral or substantive changes in the grand list. We disagree.

A

The court devoted a substantial portion of its jury instructions to the issue of malice. The following excerpts are illustrative.  "To recover even for a false, defamatory statement, a public official such as the plaintiff must establish that the statement was made with actual malice; that is, with knowledge that the statement was false or with a reckless disregard for **[\*351]** its truth or falsity. . . .  You are by now familiar with the facts in this case.  Mrs. Holbrook has several claims she has sought to prove.  That the defendants have uttered and published a variety of statements as are outlined in the pleadings that I have referred you to read and to the testimony that you have heard.  Let me state these issues again.  To establish her claims against a defendant, Mrs. Holbrook must prove three essential elements. . . .  Third, that a defendant published an actionable and false, defamatory statement with actual malice; that is, knowing it was false or seriously doubting **[\*\*\*22]** its truth.  And that element requires proof again by the plaintiff by clear and convincing evidence. . . .  Actual malice is a legal term which you must not confuse with more common

---

"Q. Now, after spending a month or a month and a half on their investigation, the [OPM] issued a report in which they exonerated Mrs. Holbrook of the charges that you had made, isn't that true?

"A. Yes.

"Q. And did you thereafter receive a letter from Mrs. Holbrook's attorney . . . in which he called upon you to make a public retraction of the charges that you had published against Mrs. Holbrook?

"A. Yes, I did. . . .

"Q. And you refused to retract your accusation, isn't that also true?

"A. Yes."

EXHIBIT 43 EXHIBIT 5

Holbrook v. Casazza, 204 Conn. 336

definitions of malice; such as, ill will or hatred.  The plaintiff cannot prevail merely by proving that the defendant was motivated by ill will, prejudice, hostility, hatred, contempt or even a desire to injure."

Upon receiving a request from the jury for an explanation of the term "malice" "as applied to this case in writing as clearly as possible in lay terms," the court responded: "In this case for a defendant, for the defendant to have acted with malice means that he must've uttered and published a defamatory statement with knowledge that the statement was false or with a reckless disregard of any evidence or circumstances of its probable falsity." The record indicates that the jury foreman appeared satisfied with this definition, to which the defendants took an exception only on the ground that the court had not restated the burden of proof.

 [**782]  We have stated that the test of a court's charge "is not whether it is as accurate upon legal principles as the opinions of a court of last resort [***23]  but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules  [*352]  of law." *Atlantic Richfield Co.* v. *Canaan Oil Co., 202 Conn. 234, 240, 520 A.2d 1008 (1987)*; *Borsoi v. Sparico, 141 Conn. 366, 371, 106 A.2d 170 (1954)*. Because the charge was correct in law and ample for the guidance of the jury, it met the required test.  See *State v. Marra, 195 Conn. 421, 443, 489 A.2d 350 (1985)*; *DeCarufel v. Colonial Trust Co., 143 Conn. 18, 20-21, 118 A.2d 798 (1955)*.

We note that the charge requested by the defendants in respect to malice was no more fact-specific than the charge actually given on that issue, to which the defendants took no exception.  The defendants requested the following language: "Even if you have found on the basis of the evidence that the plaintiff has proven by clear and convincing evidence, that is, to a high probability, that the statements made about her were false, she is not entitled to prevail in this action unless you also find that the plaintiff has proven to you by clear and convincing evidence that at the time the defendant made any or each such [***24]  false statement, he either knew that the statement was not true, or made the statement with reckless disregard for whether it was true or not. . . .  By reckless disregard for the truth or falsity of a defamatory statement, I mean that in order to find for the plaintiff on this basis, you must be convinced that when the defendant made the statements in question, he possessed a high degree of awareness of their probable falsity." Because the charge requested was in substance given, the defendants cannot prevail in their attack upon the generality of the language used therein.  *Atlantic Richfield Co*. v. *Canaan Oil Co., supra, 241*; *Lowell v. Daly, 148 Conn. 266, 269, 169 A.2d 888 (1961)*.

B

We are similarly unpersuaded by the defendants' claim that the court erred in failing to instruct the jury  [*353]  that evidence of the administrative determinations exonerating the plaintiff "was incompetent to establish that the plaintiff had not violated [*General Statutes §§ 12-62* and *12-60*]." The defendants took no exception to this omission from the charge, but rely upon the failure of the court to charge in accordance with their request.  We note that the defendants have [***25]  not claimed error in the admission of testimony regarding those administrative rulings.

Section six of the defendants' requests to charge consisted of four paragraphs dealing with the defendants' accusations that the plaintiff had made changes in the grand list that were unilateral, in violation of *§ 12-62*, and that were substantive, in violation of *§ 12-60*.  The request stated, in respect to each alleged statutory violation, that, if the plaintiff has not proved falsity by clear and convincing evidence, "you must return a verdict for the defendant."

Ordinarily there can be no error in a court's rejection of a request to charge that clearly does not meet the requirements of Practice Book § 318.  See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole, 189 Conn. 518, 527 n.2, 457 A.2d 656 (1983)*. That rule, which is entitled "Form and Contents of Requests," provides in part that requests to charge the jury "shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based. . . ." Practice Book § 318; see generally *Colucci v. Pinette, 185 Conn. 483, 486-87 [***26]  n.2, 441 A.2d 574 (1981)*. This request does not meet these criteria.  We have stated that a request containing more than one principle of law violates the rule and was properly refused.  See, e.g., *Terminal Taxi Co.* v. *Flynn, 156 Conn. 313, 320, 240 A.2d 881 (1968)*; W. Maltbie, Connecticut Appellate Procedure §§ 109, 110.

EXHIBIT 43

EXHIBIT 5

Holbrook v. Casazza, 204 Conn. 336

**[\*354]**  Additionally, the request to charge included the instruction that, unless the  **[\*\*783]**  plaintiff has proved the falsity of either alleged statutory violation, "you must return a verdict for the defendant." A verdict for the plaintiff would have been proper, however, had she prevailed in respect to any one of the several claimed defamatory accusations. Because the request was therefore an inaccurate statement of the applicable law, the court was not in error in denying the request to charge.  See *State v. Chetcuti, 173 Conn. 165, 171, 377 A.2d 263 (1977)*; *State v. Green, 172 Conn. 22, 25, 372 A.2d 133 (1976)*.

In any event, we note that, while the defendants claim error in the court's failure to instruct the jury that evidence of the administrative determinations "was incompetent to establish that the plaintiff had not violated **[\*\*\*27]** *[§§ 12-62* and *12-60*]," their request did not include such an instruction.  Because the defendants took no exception on the point, this claim was "not distinctly raised at trial"; *State v. Rogers, 199 Conn. 453, 461, 508 A.2d 11 (1986)*; and we are relieved of any obligation to consider it further.  Practice Book § 4185; *Atlantic Richfield Co*. v. *Canaan Oil Co., supra, 241*; *Kosko v. Kohler, 176 Conn. 383, 389, 407 A.2d 1009 (1978)*.

III

A further contention of the defendants is that the trial court erred in refusing to declare a mistrial when the plaintiff's counsel asked Morrison, first selectman of the town, whether he had agreed to pay the defendants' counsel fees. The defendants' objection at trial, renewed on appeal, was that the question "has the effect of leading the jury to believe that [the defendants] are protected by the Town, that their Attorneys' fees are being paid by the Town, and the inference that's going to be drawn by the jury is that the Town  **[\*355]**  will in effect pay any judgments in this case. . . ." Counsel for the plaintiff responded that the purpose of his question was "to show that the witness is not a neutral and detached **[\*\*\*28]**  person with whom I cannot ask leading questions, but that he is in fact a hostile witness and that his interests are aligned with [the defendants]." While denying the motion for mistrial, the court sustained the objection, and then instructed the jury to disregard the question.

The defendants argue that "[t]he inference that defendants would be indemnified by the Town may be likened to placing information regarding a defendant's insurance coverage before a jury." We have stated that the rule excluding evidence that a defendant carries liability insurance is not without exception.  See *Magnon v. Glickman, 185 Conn. 234, 242, 440 A.2d 909 (1981)*; *Gigliotti v. United Illuminating Co., 151 Conn. 114, 122, 193 A.2d 718 (1963)*. "'It is usually held that it is permissible for plaintiff's counsel, when acting in good faith, to show the relationship between a witness and defendant's insurance company where such evidence tends to show the interest or bias of the witness and affects the weight to be accorded his testimony.'" *Magnon v. Glickman, supra*; annot., *4 A.L.R.2d 761, 779*.

The trial court has great latitude in ruling on motions for mistrial. *State [\*\*\*29]  v. Nowakowski , 188 Conn. 620, 624, 452 A.2d 938 (1982)*; *State v. Perez, 181 Conn. 299, 310, 435 A.2d 334 (1980)*. The question before us on appeal is not primarily whether the question posed to Morrison was proper, but whether the trial court, in refusing to grant a mistrial on account of an unanswered question that the jury was instructed to disregard, so far exceeded or abused the discretion committed to it as to warrant our granting a new trial.  *State v. Couture, 194 Conn. 530, 562, 482 A.2d 300 (1984)*, cert. denied, *469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d* **[\*356]**  *971 (1985)*; *State v. Laudano, 74 Conn. 638, 646, 51 A. 860 (1902)*. The general rule is that a mistrial is granted only where it is apparent to the court that, as a result of some occurrence during trial, a party has been deprived of the opportunity for a fair trial.  *State v. Gaston, 198 Conn. 490, 495, 503 A.2d 1157 (1986)*; *State v. DeMatteo, 186 Conn. 696, 703, 443 A.2d 915 (1982)*.

Even assuming that the question posed to Morrison was improper, we are not convinced by the defendants' bare assertions  **[\*\*784]**  that "the court's cautionary instruction was an **[\*\*\*30]**  inadequate cure," and that "the suggestion of indemnification [was] so harmful that a fair trial could not be had." Accordingly, we hold that the court did not abuse its discretion in denying the defendants' motion for a mistrial.

IV

The defendants next claim that the court erred in excluding evidence regarding the sale price of property owned by the plaintiff's husband.  The defendants argue that the knowledge they possessed about the sale of the "Patchoug

**EXHIBIT 43**                                                                                          EXHIBIT 5

Holbrook v. Casazza, 204 Conn. 336

Marina," which occurred some time after the assessment date at a price "substantially higher than the assessed value placed on it by the plaintiff in the 1981 revaluation," was crucial on the issue of actual malice.

It is true that the trial court sustained the plaintiff's objection to "any inquiry of this witness [viz., the defendant Casazza] about the sale and the sales price [as] irrelevant to the issues at hand. . . ." It is clear, however, that the defendants sought to introduce such evidence on the issue of falsity, and not on the issue of malice. The plaintiff's counsel argued at trial that the evidence was inadmissible to show lack of malice on the part of Casazza because he "did not have this information in his **[\*\*\*31]** possession at the time that he made **[\*357]** the accusations." Counsel for Casazza subsequently stated to the court that the evidence of the sale price of the marina "really goes to the truth of the matter," and that "it should be admissible because the fact that something is true, even if that doesn't come to light until after the statement is made, is still very pertinent." We agree with the defendants' claim at trial that evidence of the sale was relevant to the issue of whether there had been an underassessment of the property by the plaintiff, as the defendants had charged.  We agree with the plaintiff, however, that, in the absence of a showing that the defendants were aware of this sale when they made their remarks concerning the plaintiff's exercise of favoritism, the evidence was irrelevant for the purpose of proving the lack of malice.

The defendants have abandoned on appeal the valid ground for the admissibility of the proffered evidence relied upon at trial probably because they recognize that ultimately they suffered no harm from the erroneous ruling.  The record indicates that evidence of the sale price was indeed introduced by the defendants during the direct examination **[\*\*\*32]** of Anthony Viagrande, an officer of the appraisal firm that had assisted in the 1981 revaluation. Viagrande testified several times that the plaintiff had informed him that her husband had sold the marina for $ 1,200,000.  Because the evidence claimed to have been improperly excluded was in fact later admitted, any error resulting from the court's initial ruling was rendered harmless.  See *Allen v. Nissley, 184 Conn. 539, 545-46, 440 A.2d 231 (1981)*.

V

The defendants' final claim is that the court erred in refusing to set aside the damage awards as excessive. The defendants submit that these excessive awards resulted from the court's failure adequately to instruct the jury on the standard of proof to be borne **[\*358]** by the plaintiff with respect to the elements of falsity and actual malice. We are not persuaded that the awards were excessive.

We find no deficiency in the charge given to the jury by the trial court in regard to the plaintiff's burden of proof. The court instructed that the plaintiff "has a more demanding and different burden of proof than preponderance of the evidence on two elements of her claim.  She must demonstrate one, that any defamatory **[\*\*\*33]** statement was false, and two, a defendant acted with actual malice, and both of those claims must be proved by what we call clear and convincing evidence. Clear and convincing evidence is a more exacting standard than proof by a preponderance of the evidence.  Clear and convincing proof leaves no substantial doubt in your mind.  It is proof that establishes in your mind not only that the proposition at issue is probable, but also that it is highly probable. . . .  On the **[\*\*785]** other hand, clear and convincing evidence is not as high a standard as the burden of proof applied in criminal cases, which is proof beyond a reasonable doubt.  It is enough that the plaintiff in this case establishes falsity or actual malice beyond any substantial doubt.  She does not have to dispel every reasonable doubt. . . .

"To establish her claims against a defendant, Mrs. Holbrook must prove three essential elements.  First, that the challenged statements are defamatory of her in some actionable way and were uttered and published by a defendant. That issue must be proved by her by a preponderance of the evidence.  Second, that any actionable, defamatory statement is false in some material respect. **[\*\*\*34]** That burden is by clear and convincing evidence. Third, that a defendant published an actionable and false, defamatory statement with actual malice; that is, knowing it was false or seriously doubting its truth.  And that element requires proof again by the plaintiff by clear and convincing evidence."

**EXHIBIT 43**                                                                                    EXHIBIT  5

Holbrook v. Casazza, 204 Conn. 336

[*359]  These jury instructions conformed to the defendants' requests to charge, are sufficiently correct in law; [5] see *Gertz v. Robert Welch, Inc., supra, 342*; *Rosenbloom v. Metromedia, supra, 30*; *Dacey v. Connecticut Bar Assn., 170 Conn. 520, 534-38, 368 A.2d 125 (1976)*; and furnished adequate guidance for the jury.  See generally *Atlantic Richfield Co*. v. *Canaan Oil Co., supra, 240*. Therefore, we cannot agree with the defendants that such instructions misled the jury into awarding excessive damages.

 [***35]  We next examine the damage awards returned by the jury.  The jury returned a verdict against Casazza for $ 21,000 in general damages, $ 135,750 in special damages, and $ 58,111 in exemplary damages. Against the defendant Nordquist the jury returned a verdict for $ 7000 in general damages, $ 45,250 in special damages, and $ 19,366 in exemplary damages. The court ordered remittiturs on the exemplary damages awards in the amounts of $ 2874 and $ 954 in regard to Casazza and Nordquist, respectively.  Thus, the defendant Casazza was responsible for 75 percent, and the defendant Nordquist for 25 percent, of the aggregate damages awarded to the plaintiff.

"Assessment of damages is peculiarly within the province of the jury and their determination should be  [*360]  set aside only when the verdict is plainly excessive and exorbitant." *Wochek v. Foley, 193 Conn. 582, 586, 477 A.2d 1015 (1984)*; *Szivos v. Leonard, 113 Conn. 522, 525, 155 A. 637 (1931)*. "The only practical test to apply to a verdict is whether the award of damages falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict [***36]  so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption.  *Briggs v. Becker, 101 Conn. 62, 66, 124 A. 826* [1924]." *Slabinski v. Dix, 138 Conn. 625, 629, 88 A.2d 115 (1952)*. Evidence offered at trial relevant to damages must be reviewed in the light most favorable to sustaining the verdict.  See *Wochek v. Foley, supra, 587*; *Gorczyca v. New York, N.H. & H.R. Co., 141 Conn. 701, 703-704, 109 A.2d 589 (1954)*.

The exemplary damages awards in the present cases were properly limited to attorney's fees, which were based on a one  [**786]  third contingency fee agreement and costs.  See *Kenny v. Civil Service Commission, 197 Conn. 270, 277, 496 A.2d 956 (1985)*; *Alaimo v. Royer, 188 Conn. 36, 42, 448 A.2d 207 (1982)*; see also *Gertz v. Robert Welch, Inc., supra, 348-50*. Apart from these awards, the plaintiff received a verdict for an aggregate amount of $ 28,000 in general damages and $ 181,000 in special damages. There was testimony at trial from Gary Crakes, an economist, that the plaintiff had sustained a "total net discounted loss" of $ 181,571.  [***37]  The plaintiff sought damages based not only upon pecuniary loss, but also public humiliation, mental anguish, and pain and suffering.  An award of such general damages cannot have been the product of precise calculations and is given considerable deference by a reviewing court.  See *Campbell v. Gould, 194 Conn. 35, 42, 478 A.2d 596 (1984)*.

It is clear that, under these circumstances, the awards of damages fall "somewhere within the necessarily  [*361]  uncertain limits of fair and reasonable compensation," and may be seen as reasonably related to the evidence adduced at trial.  "The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness." *Katsetos v. Nolan, 170 Conn. 637, 656, 368 A.2d 172 (1976)*; see *Herb v. Kerr, 190 Conn. 136, 139, 459 A.2d 521 (1983)*. Accordingly, we find no error in the refusal of the trial court to set aside the damage awards as excessive.

There is no error.

---

[5] We note that the propriety of that portion of the jury charge placing the burden of providing falsity upon the plaintiff by clear and convincing evidence is not at issue in this appeal.  "At common law, prior to the application of constitutional standards in the area of libel and slander, the truth of the defamatory statement was an affirmative defense for the defendant to prove. **Restatement of Torts §§ 518**, 613 (2) (1938).  Although falsity was an element of a cause of action for defamation, id. at § 558, once a statement was shown to be defamatory, falsity was presumed.  Prosser, Torts § 116 (4th Ed. 1971). . . .  The language of *New York Times Co*. v. *Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*, and later cases makes clear that the burden of demonstrating the falsity of the defamatory statement rests on the plaintiff when the malice standard applies." **Wilson v. Scripps-Howard Broadcasting Co., 642 F.2d 371, 374-75 (6th Cir. 1981)**.

**EXHIBIT 43**

EXHIBIT  5

Holbrook v. Casazza, 204 Conn. 336

**End of Document**

91

**EXHIBIT 43**                                                    <span style="color:red">EXHIBIT 6</span>

Gertz v. Robert Welch, 418 U.S. 323

# *Gertz v. Robert Welch*

Supreme Court of the United States

November 14, 1973, Argued ; June 25, 1974, Decided

No. 72-617

**Reporter**

418 U.S. 323 *; 94 S. Ct. 2997 **; 41 L. Ed. 2d 789 ***; 1974 U.S. LEXIS 88 ****; 1 Media L. Rep. 1633

GERTZ v. ROBERT WELCH, INC.

**Prior History: [****1]** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

**Disposition:** *471 F.2d 801*, reversed and remanded.

# Case Summary

**Procedural Posture**

Petitioner attorney challenged the decision of the United States Court of Appeals for the Seventh Circuit, which held that petitioner was a public figure and that the New York Times standard applied in his defamation action. Accordingly, the court of appeals affirmed the district court's grant of a judgment notwithstanding the verdict in favor of respondent publisher.

**Overview**

After a policeman killed a youth, the youth's family retained petitioner to represent them in a civil action. During the trial, respondent published an article about petitioner that labeled him as a "Communist" and a member of a Marxist organization. Because the statements contained serious inaccuracies, petitioner filed a libel action against respondent. The district court held that the New York Times standard applied, which meant that respondent escaped liability unless petitioner proved that a defamatory falsehood was published with actual malice. The district court entered judgment for respondent and the court of appeals affirmed. The Supreme Court reversed and remanded, holding that petitioner was not a public figure. The state's interest in compensating injury to the reputation of a private individual required a different rule. The Court held that the states could define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injuries to a private individual. The states could not permit recovery of presumed or punitive damages absent a showing of knowledge of falsity or reckless disregard for the truth.

**Outcome**

The Court reversed the court of appeals' decision and held that the facts showed petitioner was a private figure. The Court held that the state interest in compensating a private figure required a different rule and held that the states could define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injuries to a private individual. The case was remanded for a new trial.

# Syllabus

 A Chicago policeman named Nuccio was convicted of murder.  The victim's family retained petitioner, a reputable attorney, to represent them in civil litigation against Nuccio.  An article appearing in respondent's magazine alleged

EXHIBIT 43                                                                                          EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

that Nuccio's murder trial was part of a Communist conspiracy to discredit the local police, and it falsely stated that petitioner had arranged Nuccio's "frame-up," implied that petitioner had a criminal record, and labeled him a "Communist-fronter." Petitioner brought this diversity libel action against respondent.  After the jury returned a verdict for petitioner, the District Court decided that the standard enunciated in *New York Times Co. v. Sullivan, 376 U.S. 254*, which bars media liability for defamation of a public official absent proof that the defamatory statements were published with knowledge of their falsity or in reckless disregard of the truth, **[****2]** should apply to this suit.  The court concluded that that standard protects media discussion of a public issue without regard to whether the person defamed is a public official as in *New York Times Co. v. Sullivan, supra*, or a public figure, as in *Curtis Publishing Co. v. Butts, 388 U.S. 130*. The court found that petitioner had failed to prove knowledge of falsity or reckless disregard for the truth and therefore entered judgment *n. o. v.* for respondent.  The Court of Appeals affirmed.  *Held*:

1. A publisher or broadcaster of defamatory falsehoods about an individual who is neither a public official nor a public figure may not claim the *New York Times* protection against liability for defamation on the ground that the defamatory statements concern an issue of public or general interest. Pp. 339-348.

(a) Because private individuals characteristically have less effective opportunities for rebuttal than do public officials and public figures, they are more vulnerable to injury from defamation. Because they have not voluntarily exposed themselves to increased risk of injury from defamatory falsehoods, they are also more deserving **[****3]** of recovery. The state interest in compensating injury to the reputation of private individuals is therefore greater than for public officials and public figures.  Pp. 343-345.

(b) To extend the *New York Times* standard to media defamation of private persons whenever an issue of general or public interest is involved would abridge to an unacceptable degree the legitimate state interest in compensating private individuals for injury to reputation and would occasion the additional difficulty of forcing courts to decide on an *ad hoc* basis which publications and broadcasts address issues of general or public interest and which do not.  Pp. 345-346.

(c) So long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood which injures a private individual and whose substance makes substantial danger to reputation apparent.  Pp. 347-348.

2. The States, however, may not permit recovery of presumed or punitive damages when liability is not based on knowledge of falsity or reckless disregard for the truth, and the private defamation plaintiff who establishes liability **[****4]** under a less demanding standard than the *New York Times* test may recover compensation only for actual injury. Pp. 348-350.

3. Petitioner was neither a public official nor a public figure. Pp. 351-352.

(a) Neither petitioner's past service on certain city committees nor his appearance as an attorney at the coroner's inquest into the death of the murder victim made him a public official. P. 351.

(b) Petitioner was also not a public figure. Absent clear evidence of general fame or notoriety in the community and pervasive involvement in ordering the affairs of society, an individual should not be deemed a public figure for all aspects of his life.  Rather, the public-figure question should be determined by reference to the individual's participation in the particular controversy giving rise to the defamation. Petitioner's role in the Nuccio affair did not make him a public figure. Pp. 351-352.

**Counsel:** Wayne B. Giampietro argued the cause and filed briefs for petitioner.

Clyde J. Watts argued the cause and filed a brief for respondent.

**Judges:** POWELL, J., delivered the opinion of the Court, in which STEWART, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined.  BLACKMUN, J., filed a **[****5]** concurring opinion, post, p. 353.  BURGER, C. J., post, p. 354, DOUGLAS, J., post, p. 355, BRENNAN, J., post, p. 361, and WHITE, J., post, p. 369, filed dissenting opinions.

Gertz v. Robert Welch, 418 U.S. 323

**Opinion by:**  POWELL

# Opinion

[*325]  [***797]  [**3000]    MR. JUSTICE POWELL delivered the opinion of the Court.

[1]This Court has struggled for nearly a decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the *First Amendment*. With this decision we return to that effort. We granted certiorari to reconsider the extent of a publisher's constitutional privilege against liability for defamation of a private citizen. *410 U.S. 925 (1973)*.

I

In 1968 a Chicago policeman named Nuccio shot and killed a youth named Nelson.  The state authorities prosecuted Nuccio for the homicide and ultimately obtained a conviction for murder in the second degree.  The Nelson family retained petitioner Elmer Gertz, a reputable attorney, to represent them in civil litigation against Nuccio.

Respondent publishes American Opinion, a monthly outlet for the views of the John [****6]  Birch Society.  Early in the 1960's the magazine began to warn of a nationwide conspiracy to discredit local law enforcement agencies and create in their stead a national police force capable of supporting a Communist dictatorship.  As part of the continuing effort to alert the public to this assumed danger, the managing editor of American Opinion commissioned an article on the murder trial of Officer Nuccio.  For this purpose he engaged a regular contributor to the magazine.  In March 1969 respondent published the resulting article under the title "FRAME-UP: Richard  [*326]  Nuccio And The War On Police." The article purports to demonstrate that the testimony against Nuccio at his criminal trial was false and that his prosecution was part of the Communist campaign against the police.

In his capacity as counsel for the Nelson family in the civil litigation, petitioner attended the coroner's inquest into the boy's death and initiated actions for damages, but the neither discussed Officer Nuccio with the press nor played any part in the criminal proceeding.  Notwithstanding petitioner's remote connection with the prosecution of Nuccio, respondent's magazine portrayed him as an architect [****7]  of the "frame-up." According to the article, the police file on petitioner took "a big, Irish cop to lift." The article stated that petitioner had been an official of the "Marxist League for Industrial Democracy, originally known as the Intercollegiate Socialist Society, which has advocated the violent seizure of our government." It labeled Gertz a "Leninist" and a "Communist-fronter." It also stated that Gertz had been an officer of the National Lawyers Guild, described as a Communist organization that "probably did more than any other outfit to plan the Communist attack on the Chicago police during the 1968 Democratic Convention."

These statements contained serious inaccuracies.  The implication that petitioner had a criminal record was false.  Petitioner had been a member and officer of the National Lawyers Guild some 15 years earlier, but there was no evidence that he or that organization had taken any part in planning the 1968 demonstrations in Chicago.  There was also no basis for the charge that  [***798]  petitioner was a "Leninist" or a "Communist-fronter." And he had never been a member of the "Marxist League for Industrial Democracy" or the "Intercollegiate Socialist Society.  [****8]  "

[*327]  The managing editor of American Opinion made no effort to verify or substantiate the charges against petitioner.  Instead, he appended an editorial introduction  [**3001]  stating that the author had "conducted extensive research into the Richard Nuccio Case." And he included in the article a photograph of petitioner and wrote the caption that appeared under it: "Elmer Gertz of Red Guild harrasses Nuccio." Respondent placed the issue of American Opinion containing the article on sale at newsstands throughout the country and distributed reprints of the article on the streets of Chicago.

Petitioner filed a diversity action for libel in the United States District Court for the Northern District of Illinois.  He claimed that the falsehoods published by respondent injured his reputation as a lawyer and a citizen. Before filing an answer, respondent moved to dismiss the complaint for failure to state a claim upon which relief could be granted,

apparently on the ground that petitioner failed to allege special damages.  But the court ruled that statements contained in the article constituted libel *per se* under Illinois law and that consequently petitioner need not plead **[****9]** special damages.  *306 F.Supp. 310 (1969)*.

After answering the complaint, respondent filed a pretrial motion for summary judgment, claiming a constitutional privilege against liability for defamation. [1] It asserted that petitioner was a public official or a public figure and that the article concerned an issue of public interest and concern.  For these reasons, respondent argued, it was entitled to invoke the privilege enunciated in *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*. Under this rule respondent would escape liability unless  **[*328]**  petitioner could prove publication of defamatory falsehood "with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id., at 280*.  Respondent claimed that petitioner could not make such a showing and submitted a supporting affidavit by the magazine's managing editor.  The editor denied any knowledge of the falsity of the statements concerning petitioner and stated that he had relied on the author's reputation and on his prior experience with the accuracy and authenticity of the author's contributions to American **[****10]**  Opinion.

The District Court denied respondent's motion for summary judgment in a memorandum opinion of September 16, 1970.  The court did not dispute respondent's claim to the protection of the *New York Times* standard.  Rather, it concluded that petitioner might overcome the constitutional privilege by making a factual showing sufficient to prove publication of defamatory falsehood in reckless disregard of the truth.  During the course of the trial, however, it became clear that the trial court had not accepted all of respondent's asserted grounds for applying the *New York Times* **[***799]**  rule to this case.  It thought that respondent's claim to the protection of the constitutional privilege depended on the contention that petitioner was either a public official under the *New York Times* decision **[****11]**  or a public figure under *Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967)*, apparently discounting the argument that a privilege would arise from the presence of a public issue.  After all the evidence had been presented but before submission of the case to the jury, the court ruled in effect that petitioner was neither a public official nor a public figure. It added that, if he were, the resulting application of the *New York Times* standard would require a directed verdict for respondent.  Because some statements in the article constituted libel *per se*  **[*329]**  under Illinois law, the court submitted the case to the jury under instructions that withdrew from its consideration all issues save the measure of damages.  The jury awarded $ 50,000 to petitioner.

 **[**3002]**  [2]Following the jury verdict and on further reflection, the District Court concluded that the *New York Times* standard should govern this case even though petitioner was not a public official or public figure. It accepted respondent's contention that that privilege protected discussion of any public **[****12]**  issue without regard to the status of a person defamed therein.  Accordingly, the court entered judgment for respondent notwithstanding the jury's verdict. [2] This conclusion anticipated the reasoning **[*330]** of a plurality of this Court in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*.

---

[1] Petitioner filed a cross-motion for summary judgment on grounds not specified in the record.  The court denied petitioner's cross-motion without discussion in a memorandum opinion of September 16, 1970.

[2] *322 F.Supp. 997 (1970)*. Petitioner asserts that the entry of judgment *n. o. v.* on the basis of his failure to show knowledge of falsity or reckless disregard for the truth constituted unfair surprise and deprived him of a full and fair opportunity to prove "actual malice" on the part of respondent.  This contention is not supported by the record.  It is clear that the trial court gave petitioner no reason to assume that the *New York Times* privilege would not be available to respondent.  The court's memorandum opinion denying respondent's pretrial motion for summary judgment does not state that the *New York Times* standard was inapplicable to this case.  Rather, it reveals that the trial judge thought it possible for petitioner to make a factual showing sufficient to overcome respondent's claim of constitutional privilege. It states in part:

"When there is a factual dispute as to the existence of actual malice, summary judgment is improper.

. . . .

"In the instant case a jury might infer from the evidence that [respondent's] failure to investigate the truth of the allegations, coupled with its receipt of communications challenging the factual accuracy of this author in the past, amounted to actual malice, that is,

 **[****13]**  [3] [4]Petitioner appealed to contest the applicability of the *New* **[***800]**  *York Times* standard to this case. Although the Court of Appeals for the Seventh Circuit doubted the correctness of the District Court's determination that petitioner was not a public figure, it did not overturn that finding. [3] **[****15]**  It agreed with the District Court that respondent could assert the constitutional privilege because the article concerned a matter of public interest, citing this Court's intervening decision in *Rosenbloom v. Metromedia, Inc., supra.* The Court of Appeals read *Rosenbloom* to require application of the *New York Times* standard to any publication or broadcast about an issue of significant public interest, without regard to the position, fame, or anonymity of the person defamed, and it concluded that respondent's statements **[*331]**  concerned such an issue. [4] After reviewing the record, the Court of Appeals

---

'reckless disregard' of whether the allegations were true or not.  *New York Times [Co.]* v. *Sullivan, [376 U.S. 254,] 279-280 [(1964)].*" Mem. Op., Sept. 16, 1970.

Thus, petitioner knew or should have known that the outcome of the trial might hinge on his ability to show by clear and convincing evidence that respondent acted with reckless disregard for the truth.  And this question remained open throughout the trial.  Although the court initially concluded that the applicability of the *New York Times* rule depended on petitioner's status as a public figure, the court did not decide that petitioner was not a public figure until all the evidence had been presented.  Thus petitioner had every opportunity, indeed incentive, to prove "reckless disregard" if he could, and he in fact attempted to do so.  The record supports the observation by the Court of Appeals that petitioner "did present evidence of malice (both the 'constitutional' and the 'ill will' type) to support his damage claim and no such evidence was excluded . . . ." *471 F.2d 801, 807 n. 15 (1972).*

[3] The court stated:

"[Petitioner's] considerable stature as a lawyer, author, lecturer, and participant in matters of public import [undermines] the validity of the assumption that he is not a 'public figure' as that term has been used by the progeny of *New York Times*.  Nevertheless, for purposes of decision we make that assumption and test the availability of the claim of privilege by the subject matter of the article." *Id., at 805*.

[4] In the Court of Appeals petitioner made an ingenious but unavailing attempt to show that respondent's defamatory charge against him concerned no issue of public or general interest. He asserted that the subject matter of the article was the murder trial of Officer Nuccio and that he did not participate in that proceeding.  Therefore, he argued, even if the subject matter of the article generally were protected by the *New York Times* privilege, under the opinion of the *Rosenbloom* plurality, the defamatory statements about him were not.  The Court of Appeals rejected this argument.  It noted that the accusations against petitioner played an integral part in respondent's general thesis of a nationwide conspiracy to harass the police:

"[We] may also assume that the article's basic thesis is false.  Nevertheless, under the reasoning of *New York Times Co.* v. *Sullivan*, even a false statement of fact made in support of a false thesis is protected unless made with knowledge of its falsity or with reckless disregard of its truth or falsity. It would undermine the rule of that case to permit the actual falsity of a statement to determine whether or not its publisher is entitled to the benefit of the rule.

"If, therefore, we put to one side the false character of the article and treat it as though its contents were entirely true, it cannot be denied that the comments about [petitioner] were integral to its central thesis.  They must be tested under the *New York Times* standard." *471 F.2d, at 806*.

We think that the Court of Appeals correctly rejected petitioner's argument.  Its acceptance might lead to arbitrary imposition of liability on the basis of an unwise differentiation among kinds of factual misstatements.  The present case illustrates the point.  Respondent falsely portrayed petitioner as an architect of the criminal prosecution against Nuccio.  On its face this inaccuracy does not appear defamatory. Respondent also falsely labeled petitioner a "Leninist" and a "Communist-fronter." These accusations are generally considered defamatory. Under petitioner's interpretation of the "public or general interest" test, respondent would have enjoyed a constitutional privilege to publish defamatory falsehood if petitioner had in fact been associated with the criminal prosecution.  But this would mean that the seemingly innocuous mistake of confusing petitioner's role in the litigation against Officer Nuccio would destroy the privilege otherwise available for calling petitioner a Communist-fronter.  Thus respondent's privilege to publish statements whose content should have alerted it to the danger of injury to reputation would hinge on the accuracy of statements that carried with them no such warning.  Assuming that none of these statements was published with knowledge of falsity or with reckless disregard for the truth, we see no reason to distinguish among the inaccuracies.

EXHIBIT 43                                                                EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

endorsed **[\*\*3003]** the District Court's conclusion that petitioner had failed to show by **[\*\*\*\*14]** clear and **[\*332]** convincing evidence that respondent had acted with "actual malice" as defined by *New York Times*. There was no evidence that **[\*\*\*801]** the managing editor of American Opinion knew of the falsity of the accusations made in the article.  In fact, he knew nothing about petitioner except what he learned from the article.  The court correctly noted that mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a "'high degree of awareness of . . . probable falsity.'" *St. Amant v. Thompson, 390 U.S. 727, 731 (1968)*; accord, *Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 84-85 (1967)*; *Garrison v. Louisiana, 379 U.S. 64, 75-76 (1964)*. The evidence in this case did not reveal that respondent had cause for such an awareness.  The Court of Appeals therefore affirmed, *471 F.2d 801 (1972)*. For the reasons stated below, we reverse.

 **[\*\*\*\*16]**  II

 [5A]The principal issue in this case is whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements.  The Court considered this question on the rather different set of facts presented in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*. Rosenbloom, a distributor of nudist magazines, was arrested for selling allegedly obscene material while making **[\*333]** a delivery to a retail dealer.  The police obtained a warrant and seized his entire inventory of 3,000 books and magazines.  He sought and obtained an injunction prohibiting further police interference with his business.  He then sued a local radio station for failing to note in two of its newscasts that the 3,000 items seized were only "reportedly" or "allegedly" obscene and **[\*\*3004]** for broadcasting references to "the smut literature racket" and to "girlie-book peddlers" in its coverage of the court proceeding for injunctive relief.  He **[\*\*\*\*17]** obtained a judgment against the radio station, but the Court of Appeals for the Third Circuit held the *New York Times* privilege applicable to the broadcast and reversed.  *415 F.2d 892 (1969)*.

This Court affirmed the decision below, but no majority could agree on a controlling rationale.  The eight Justices [5] who participated in *Rosenbloom* announced their views in five separate opinions, none of which commanded more than three votes.  The several statements not only reveal disagreement about the appropriate result in that case, they also reflect divergent traditions of thought about the general problem of reconciling the law of defamation with the *First Amendment*. One approach has been to extend the *New York Times* test to an expanding variety of situations. Another has been to vary the level of constitutional privilege for defamatory falsehood with the status of the person defamed.  And a third view would grant to the press and broadcast media absolute immunity from liability for defamation. To place our holding in the proper context, we preface our discussion of this case with a review of the several *Rosenbloom* opinions and their antecedents.

 **[\*\*\*\*18]**  In **[\*\*\*802]** affirming the trial court's judgment in the instant case, the Court of Appeals relied on MR. JUSTICE BRENNAN's **[\*334]** conclusion for the *Rosenbloom* plurality that "all discussion and communication involving matters of public or general concern," *403 U.S., at 44*, warrant the protection from liability for defamation accorded by the rule originally enunciated in *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*. There this Court defined a constitutional privilege intended to free criticism of public officials from the restraints imposed by the common law of defamation. The Times ran a political advertisement endorsing civil rights demonstrations by black students in Alabama and impliedly condemning the performance of local law-enforcement officials.  A police commissioner established in state court that certain misstatements in the advertisement referred to him and that they constituted libel *per se* under Alabama law.  This showing left the Times with the single defense of truth, for under Alabama law neither good faith nor reasonable care would protect the newspaper from liability.  This Court concluded that a "rule **[\*\*\*\*19]** compelling the critic of official conduct to guarantee the truth of all his factual assertions" would deter protected speech, *id., at 279*, and announced the constitutional privilege designed to counter that effect:

---

[5] MR. JUSTICE DOUGLAS did not participate in the consideration or decision of *Rosenbloom*.

**EXHIBIT 43**                                                                                    **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id., at 279-280*. [6]

 [****20]   [*335]   [**3005]  Three  [***803]  years after *New York Times*, a majority of the Court agreed to extend the constitutional privilege to defamatory criticism of "public figures." This extension  [*336]  was announced in *Curtis Publishing Co*. v. *Butts* and its companion, *Associated Press v. Walker, 388 U.S. 130, 162 (1967)*. The first case involved the Saturday Evening Post's charge that Coach Wally Butts of the University of Georgia had conspired with Coach "Bear" Bryant of the University of Alabama to fix a football game between their respective schools. *Walker* involved an erroneous Associated Press account of former Major General Edwin Walker's participation in a University of Mississippi campus riot. Because Butts was paid by a private alumni association and Walker had resigned from the Army, neither could be classified as a "public official" under *New York Times*. Although Mr. Justice Harlan announced the result in both cases, a majority of the Court agreed with Mr. Chief Justice Warren's conclusion that the *New York Times* test should apply to criticism of "public figures" as well as "public officials." [7] The Court extended [****21]  the constitutional  [*337]  privilege announced in that case to protect defamatory criticism of nonpublic persons who "are nevertheless intimately involved in the resolution of important public questions or, by

---

[6] *New York Times* and later cases explicated the meaning of the new standard. In *New York Times* the Court held that under the circumstances the newspaper's failure to check the accuracy of the advertisement against news stories in its own files did not establish reckless disregard for the truth. *376 U.S., at 287-288*. In *St. Amant v. Thompson, 390 U.S. 727, 731 (1968)*, the Court equated reckless disregard of the truth with subjective awareness of probable falsity: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." In *Beckley Newspapers Corp. v. Hanks, 389 U.S. 81 (1967)*, the Court emphasized the distinction between the *New York Times* test of knowledge of falsity or reckless disregard of the truth and "actual malice" in the traditional sense of ill-will. *Garrison v. Louisiana, 379 U.S. 64 (1964)*, made plain that the new standard applied to criminal libel laws as well as to civil actions and that it governed criticism directed at "anything which might touch on an official's fitness for office." *Id., at 77*. Finally, in *Rosenblatt v. Baer, 383 U.S. 75, 85 (1966)*, the Court stated that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."

In *Time, Inc. v. Hill, 385 U.S. 374 (1967)*, the Court applied the *New York Times* standard to actions under an unusual state statute. The statute did not create a cause of action for libel. Rather, it provided a remedy for unwanted publicity. Although the law allowed recovery of damages for harm caused by exposure to public attention rather than by factual inaccuracies, it recognized truth as a complete defense. Thus, nondefamatory factual errors could render a publisher liable for something akin to invasion of privacy. The Court ruled that the defendant in such an action could invoke the *New York Times* privilege regardless of the fame or anonymity of the plaintiff. Speaking for the Court, MR. JUSTICE BRENNAN declared that this holding was not an extension of *New York Times* but rather a parallel line of reasoning applying that standard to this discrete context:

"This is neither a libel action by a private individual nor a statutory action by a public official. Therefore, although the *First Amendment* principles pronounced in *New York Times* guide our conclusion, we reach that conclusion only by applying these principles in this discrete context. It therefore serves no purpose to distinguish the facts here from those in *New York Times*. Were this a libel action, the distinction which has been suggested between the relative opportunities of the public official and the private individual to rebut defamatory charges might be germane. And the additional state interest in the protection of the individual against damage to his reputation would be involved. Cf. *Rosenblatt v. Baer, 383 U.S. 75, 91* (STEWART, J., concurring)." *385 U.S., at 390-391*.

[7] Professor Kalven once introduced a discussion of these cases with the apt heading, "You Can't Tell the Players without a Score Card." Kalven, The Reasonable Man and the *First Amendment*: Hill, Butts, and Walker, 1967 Sup. Ct. Rev. 267, 275. Only three other Justices joined Mr. Justice Harlan's analysis of the issues involved. In his concurring opinion, Mr. Chief Justice Warren stated the principle for which these cases stand -- that the *New York Times* test reaches both public figures and public officials. MR. JUSTICE BRENNAN and MR. JUSTICE WHITE agreed with the Chief Justice on that question. Mr. Justice Black and MR. JUSTICE DOUGLAS reiterated their view that publishers should have an absolute immunity from liability for defamation, but they acquiesced in the Chief Justice's reasoning in order to enable a majority of the Justices to agree on the question of the appropriate constitutional privilege for defamation of public figures.

EXHIBIT 43 EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

reason of their fame, shape events in areas of concern to society at large." *Id., at 164* (Warren, C. J., concurring in result).

 [****22]  In his opinion for the plurality in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 [**3006] (1971)*, MR. JUSTICE BRENNAN took the *New York Times* privilege one step further.  He concluded that its protection should extend to defamatory falsehoods relating to private persons if the statements **[***804]** concerned matters of general or public interest. He abjured the suggested distinction between public officials and public figures on the one hand and private individuals on the other.  He focused instead on society's interest in learning about certain issues: "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved." *Id., at 43*. Thus, under the plurality opinion, a private citizen involuntarily associated with a matter of general interest has no recourse for injury to his reputation unless he can satisfy the demanding requirements of the *New York Times* test.

Two Members of the Court concurred in the result in *Rosenbloom* but departed from the reasoning of the plurality. **[****23]**  Mr. Justice Black restated his view, long shared by MR. JUSTICE DOUGLAS, that the *First Amendment* cloaks the news media with an absolute and indefeasible immunity from liability for defamation. *Id., at 57*. MR. JUSTICE WHITE concurred on a narrower ground.  *Ibid*.  He concluded that "the *First Amendment* gives the press and the broadcast media a privilege to report and comment upon the official actions of public **[*338]** servants in full detail, with no requirement that the reputation or the privacy of an individual involved in or affected by the official action be spared from public view." *Id., at 62*. He therefore declined to reach the broader questions addressed by the other Justices.

Mr. Justice Harlan dissented.  Although he had joined the opinion of the Court in *New York Times*, in *Curtis Publishing Co.* he had contested the extension of the privilege to public figures.  There he had argued that a public figure who held no governmental office should be allowed to recover damages for defamation "on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily **[****24]**  adhered to by responsible publishers." *388 U.S., at 155*. In his *Curtis Publishing Co.* opinion Mr. Justice Harlan had distinguished *New York Times* primarily on the ground that defamation actions by public officials "lay close to seditious libel . . . ." *Id., at 153*. Recovery of damages by one who held no public office, however, could not "be viewed as a vindication of governmental policy." *Id., at 154*. Additionally, he had intimated that, because most public officials enjoyed absolute immunity from liability for their own defamatory utterances under *Barr v. Matteo, 360 U.S. 564 (1959)*, they lacked a strong claim to the protection of the courts.

In *Rosenbloom* Mr. Justice Harlan modified these views.  He acquiesced in the application of the privilege to defamation of public figures but argued that a different rule should obtain where defamatory falsehood harmed a private individual.  He noted that a private person has less likelihood "of securing access to channels of communication sufficient to rebut falsehoods concerning him" than do public officials and public figures, *403 U.S., at 70.* **[****25]**  and has not voluntarily placed himself in the **[*339]** public spotlight.  Mr. Justice Harlan concluded that the States could constitutionally allow private individuals to recover damages **[***805]**  for defamation on the basis of any standard of care except liability without fault.

MR. JUSTICE MARSHALL dissented in *Rosenbloom* in an opinion joined by MR. JUSTICE STEWART.  *Id*., at 78. He thought that the plurality's "public or general interest" test for determining the applicability of the *New York Times* privilege would involve the courts in the dangerous business of deciding "what information is relevant to **[**3007]** self-government." *Id., at 79*. He also contended that the plurality's position inadequately served "society's interest in protecting private individuals from being thrust into the public eye by the distorting light of defamation." *Ibid*.  MR. JUSTICE MARSHALL therefore reached the conclusion, also reached by Mr. Justice Harlan, that the States should be "essentially free to continue the evolution of the common law of defamation and to articulate whatever fault standard best suits the State's need," so long as the States **[****26]**  did not impose liability without fault. *Id., at 86*. The principal point of disagreement among the three dissenters concerned punitive damages. Whereas Mr. Justice Harlan thought that the States could allow punitive damages in amounts bearing "a reasonable and purposeful relationship to the actual harm done . . . ," *id., at 75*, MR. JUSTICE MARSHALL concluded that the size and

**EXHIBIT 43**                                                                          **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

unpredictability of jury awards of exemplary damages unnecessarily exacerbated the problems of media self-censorship and that such damages should therefore be forbidden.

III

[6] [7]We begin with the common ground. Under the *First Amendment* there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but **[*340]** on the competition of other ideas. [8] But there is no constitutional value in false statements of fact. Neither the intentional lie **[****27]** nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues. *New York Times Co. v. Sullivan, 376 U.S., at 270*. They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)*.

[8] **[****28]** Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate. As James Madison pointed out in the Report on the Virginia Resolutions of 1798: "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." 4 J. Elliot, Debates on the Federal Constitution of 1787, p. 571 (1876). And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable **[***806]** self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to *First Amendment* liberties. As the Court stated in *New York Times Co. v. Sullivan, supra, at 279*: "Allowance of the defense of truth, **[*341]** with the burden of proving it **[****29]** on the defendant, does not mean that only false speech will be deterred." The *First Amendment* requires that we protect some falsehood in order to protect speech that matters.

The need to avoid self-censorship by the news media is, however, not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation. See *New York Times Co. v. Sullivan, supra, at 293* (Black, J., concurring); *Garrison v. Louisiana, 379 U.S., at 80* (DOUGLAS, J., concurring); *Curtis Publishing Co. v. Butts, 388 U.S., at 170* **[**3008]** (opinion of Black, J.). Such a rule would, indeed, obviate the fear that the prospect of civil liability for injurious falsehood might dissuade a timorous press from the effective exercise of *First Amendment* freedoms. Yet absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation.

[9] **[****30]** The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as MR. JUSTICE STEWART has reminded us, the individual's right to the protection of his own good name

"reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the *Ninth* and *Tenth Amendments*. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt v. Baer, 383 U.S. 75, 92 (1966)* (concurring opinion).

---

[8] As Thomas Jefferson made the point in his first Inaugural Address: "If there be any among us who would wish to dissolve this Union or change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it."

**100**

EXHIBIT 43                                                                    EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

 **[\*342]**  [10]Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury.  As Mr. Justice Harlan stated, "some antithesis between freedom of speech and press and libel **[\*\*\*\*31]**  actions persists, for libel remains premised on the content of speech and limits the freedom of the publisher to express certain sentiments, at least without guaranteeing legal proof of their substantial accuracy." *Curtis Publishing Co. v. Butts, supra, at 152*. In our continuing effort to define the proper accommodation between these competing concerns, we have been especially anxious to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise.  *NAACP v. Button, 371 U.S. 415, 433 (1963)*. To that end this Court has extended a measure of strategic protection to defamatory falsehood.

 [11]The *New York Times* standard  **[\*\*\*807]**  defines the level of constitutional protection appropriate to the context of defamation of a public person.  Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental **[\*\*\*\*32]**  office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.  This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test.  Despite this  **[\*343]**  substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures. *New York Times Co. v. Sullivan, supra; Curtis Publishing Co. v. Butts, supra.* We think that these decisions are correct, but we do not find their holdings justified solely by reference to the interest of the press and broadcast media **[\*\*\*\*33]**  in immunity from liability.  Rather, we believe that the *New York Times* rule states an accommodation between this concern and the limited state interest present in the context of libel actions brought by public persons. For the reasons stated below, we conclude that the state interest in  **[\*\*3009]**  compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them.

Theoretically, of course, the balance between the needs of the press and the individual's claim to compensation for wrongful injury might be struck on a case-by-case basis.  As Mr. Justice Harlan hypothesized, "it might seem, purely as an abstract matter, that the most utilitarian approach would be to scrutinize carefully every jury verdict in every libel case, in order to ascertain whether the final judgment leaves fully protected whatever *First Amendment* values transcend the legitimate state interest in protecting the particular plaintiff who prevailed." *Rosenbloom v. Metromedia, Inc., 403 U.S., at 63* (footnote omitted).  But this approach **[\*\*\*\*34]**  would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable.  Because an *ad hoc* resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general  **[\*344]**  application.  Such rules necessarily treat alike various cases involving differences as well as similarities.  Thus it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority.

 [12]With that caveat we have no difficulty in distinguishing among defamation plaintiffs.  The first remedy of any victim of defamation is self-help -- using available opportunities to contradict the lie or correct  **[\*\*\*808]**  the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity **[\*\*\*\*35]**  to counteract false statements than private individuals normally enjoy. [9] Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs.  An

---

[9] Of course, an opportunity for rebuttal seldom suffices to undo harm of defamatory falsehood. Indeed, the law of defamation is rooted in our experience that the truth rarely catches up with a lie.  But the fact that the self-help remedy of rebuttal, standing alone, is inadequate to its task does not mean that it is irrelevant to our inquiry.

**EXHIBIT 43**                                                                                                    **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs.  He runs the risk of closer public scrutiny than might otherwise be the case.  And society's interest in [****36] the officers of government is not strictly limited to the formal discharge of official duties.  As the Court pointed out in *Garrison v. Louisiana, 379 U.S., at 77*, the public's interest extends to "anything  **[\*345]**  which might touch on an official's fitness for office . . . .  Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character."

Those classed as public figures stand in a similar position.  Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare.  For the most part those who attain this status have assumed roles of special prominence in the affairs of society.  Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.  More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.  In either event, they [****37] invite attention and comment.

 **[\*\*3010]**  Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.  No such assumption is justified with respect to a private individual.  He has not accepted public office or assumed an "influential role in ordering society." *Curtis Publishing Co. v. Butts, 388 U.S., at 164* (Warren, C. J., concurring in result).  He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.

 **[\*\*\*809]**  For these reasons we conclude that the States should retain substantial latitude in their efforts to enforce a  **[\*346]**  legal remedy for defamatory [****38] falsehood injurious to the reputation of a private individual.  The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable.  And it would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of "general or public interest" and which do not -- to determine, in the words of MR. JUSTICE MARSHALL, "what information is relevant to self-government." *Rosenbloom v. Metromedia, Inc., 403 U.S., at 79*. We doubt the wisdom of committing this task to the conscience of judges.  Nor does the Constitution require us to draw so thin a line between the drastic alternatives of the *New York Times* privilege and the common law of strict liability for defamatory error.  The "public or general interest" test for determining the applicability of the *New York Times* standard to private defamation actions inadequately serves both of the competing values at stake.  On the one hand, a private individual whose reputation is injured by defamatory falsehood that does concern an issue of public [****39] or general interest has no recourse unless he can meet the rigorous requirements of *New York Times*.  This is true despite the factors that distinguish the state interest in compensating private individuals from the analogous interest involved in the context of public persons.  On the other hand, a publisher or broadcaster of a defamatory error which a court deems unrelated to an issue of public or general interest may be held liable in damages even if it took every reasonable precaution to ensure the accuracy of its assertions.  And liability may far exceed compensation for any actual injury to the plaintiff, for the jury may be permitted to presume damages without proof of loss and even to award punitive damages.

 **[\*347]**   [13]We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. [10] [****41]  This approach provides a  **[\*\*\*810]**   **[\*\*3011]**   **[\*\*\*\*40]**  more equitable  **[\*348]**  boundary

---

[10] Our caveat against strict liability is the prime target of MR. JUSTICE WHITE's dissent.  He would hold that a publisher or broadcaster may be required to prove the truth of a defamatory statement concerning a private individual and, failing such proof,

**EXHIBIT 43**                                                                                      **EXHIBIT  6**

Gertz v. Robert Welch, 418 U.S. 323

between the competing concerns involved here.  It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. At least this conclusion obtains where, as here, the substance of the defamatory statement "makes substantial danger to reputation apparent." [11] This phrase places in perspective the conclusion we announce today.  Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential.  Cf. *Time, Inc. v. Hill, 385 U.S. 374 (1967)*. Such a case is not now before us, and we intimate no view as to its proper resolution.

IV

 [14]Our accommodation of the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*.  This conclusion is not based on a belief that the considerations which prompted the adoption of the *New York Times* privilege for defamation of public officials and its extension to public figures are wholly inapplicable to the context of private individuals.  Rather, we endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputation.  **[*349]**  But this countervailing state interest extends no further than compensation for actual injury. For the reasons stated below,  **[****42]** we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.

 [15]The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss.  Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication.  Juries may award substantial sums as compensation for supposed damage  **[***811]**  to reputation without any proof that such harm actually occurred.  The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any  **[**3012]**  system of liability for defamatory falsehood to inhibit the vigorous exercise of *First Amendment* freedoms.  Additionally, the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact.  More to the **[****43]**  point, the States

---

that the publisher or broadcaster may be held liable for defamation even though he took every conceivable precaution to ensure the accuracy of the offending statement prior to its dissemination.  *Post*, at 388-392.  In MR. JUSTICE WHITE's view, one who publishes a statement that later turns out to be inaccurate can never be "without fault" in any meaningful sense, for "[it] is he who circulated a falsehood *that he was not required to publish." Post*, at 392 (emphasis added).

MR. JUSTICE WHITE characterizes *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, as simply a case of seditious libel. *Post*, at 387.  But that rationale is certainly inapplicable to *Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967)*, where MR. JUSTICE WHITE joined four other Members of the Court to extend the knowing-or-reckless-falsity standard to media defamation of persons identified as public figures but not connected with the Government.  MR. JUSTICE WHITE now suggests that he would abide by that vote, *post*, at 398, but the full thrust of his dissent -- as we read it -- contradicts that suggestion.  Finally, in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 57 (1971)*, MR. JUSTICE WHITE voted to apply the *New York Times* privilege to media defamation of an individual who was neither a public official nor a public figure. His opinion states that the knowing-or-reckless-falsity standard should apply to media "comment upon the official actions of public servants," *id., at 62*, including defamatory falsehood about a person arrested by the police.  If adopted by the Court, this conclusion would significantly extend the *New York Times* privilege.

MR. JUSTICE WHITE asserts that our decision today "trivializes and denigrates the interest in reputation," *Miami Herald Publishing Co.* v. *Tornillo, ante*, at 262 (concurring opinion), that it "[scuttles] the libel laws of the States in . . . wholesale fashion" and renders ordinary citizens "powerless to protect themselves." *Post*, at 370.  In light of the progressive extension of the knowing-or-reckless-falsity requirement detailed in the preceding paragraph, one might have viewed today's decision allowing recovery under any standard save strict liability as a more generous accommodation of the state interest in comprehensive reputational injury to private individuals than the law presently affords.

[11] *Curtis Publishing Co. v. Butts, supra, at 155*.

**103**

EXHIBIT 43                                                                                    EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury.

[16] [17]We would not, of course, invalidate state law simply because we doubt its wisdom, but here we are attempting to reconcile state law with a competing interest grounded in the constitutional command of the *First Amendment*. It is therefore appropriate to require that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved.  It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We **[*350]** need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions.  Suffice it to say that actual injury is not limited to out-of-pocket loss.  Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of **[****44]** reputation and standing in the community, personal humiliation, and mental anguish and suffering.  Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

[18]We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation. In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive.  Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused.  And they remain free to use their discretion selectively to punish expressions of unpopular views.  Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship, but, unlike **[****45]** the former rule, punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions.  They are not compensation for injury.  Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.  In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury.

**[*351]**  V

[19]Notwithstanding our refusal to extend the *New York Times* privilege to defamation of private individuals, respondent contends that we should affirm the judgment below on the ground that petitioner is **[***812]** either a public official or a public figure. There is little basis for the former assertion.  Several years prior to the present incident, petitioner had served briefly on housing committees appointed by the mayor of Chicago, but at the time of publication he had never held any remunerative governmental position.  Respondent admits this but argues **[****46]** that petitioner's appearance at the coroner's inquest rendered him a "de facto public official." Our cases recognize no such concept.  Respondent's suggestion would sweep all lawyers under the *New York Times* rule as officers of the court and distort the plain meaning of the "public official" category beyond all recognition.  We decline to follow it.

[20]Respondent's characterization of petitioner as a public figure raises a different question.   That designation **[**3013]** may rest on either of two alternative bases.  In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.  More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.  In either case such persons assume special prominence in the resolution of public questions.

[21] **[****47]**  [22]Petitioner has long been active in community and professional affairs.  He has served as an officer of local civic groups and of various professional organizations, and he has published several books and articles on legal subjects.  Although petitioner was consequently well known in some circles, he had achieved no general fame **[*352]** or notoriety in the community.  None of the prospective jurors called at the trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population. We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes.  Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.

**EXHIBIT 43**                                                                      **EXHIBIT  6**

Gertz v. Robert Welch, 418 U.S. 323

It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to **[****48]** the defamation.

 [23]In this context it is plain that petitioner was not a public figure. He played a minimal role at the coroner's inquest, and his participation related solely to his representation of a private client.  He took no part in the criminal prosecution of Officer Nuccio.  Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so.  He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome.  We are persuaded that the trial court did not err in refusing to characterize petitioner as a public figure for the purpose of this litigation.

 [5B] [24]We therefore conclude that the *New York Times* standard is inapplicable to this case and that the trial court erred in entering judgment for respondent.  Because the jury was allowed to impose liability without fault and was permitted  **[***813]**   **[****49]**  to presume damages without proof of injury, a new trial is necessary.  We reverse and remand for further proceedings in accord with this opinion.

*It is so ordered*.

**Concur by:** BLACKMUN

## Concur

 **[*353]**  MR. JUSTICE BLACKMUN, concurring.

I joined MR. JUSTICE BRENNAN'S opinion for the plurality in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*. I did so because I concluded that, given *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, and its progeny (noted by the Court, *ante*, at 334-336, n. 6), as well as *Curtis Publishing Co*. v. *Butts and Associated Press v. Walker, 388 U.S. 130 (1967)*, the step taken in *Rosenbloom*, extending the *New York Times* doctrine to an event of public or general interest, was logical and inevitable.  A majority of the Court evidently thought otherwise, as is particularly evidenced by MR. JUSTICE WHITE'S separate concurring opinion there and by the respective dissenting opinions of Mr. Justice Harlan and of MR. JUSTICE MARSHALL joined by MR. JUSTICE STEWART.

The Court today refuses to apply *New York Times* to the private individual, as contrasted with the public **[****50]** official and the public figure. It thus withdraws to the factual limits of the *pre-Rosenbloom* cases.  It thereby fixes the outer boundary of the *New York Times* doctrine and  **[**3014]**  says that beyond that boundary, a State is free to define for itself the appropriate standard of media liability so long as it does not impose liability without fault. As my joinder in *Rosenbloom's* plurality opinion would intimate, I sense some illogic in this.

The Court, however, seeks today to strike a balance between competing values where necessarily uncertain assumptions about human behavior color the result.  Although the Court's opinion in the present case departs from the rationale of the *Rosenbloom* plurality, in that the Court now conditions a libel action by a private person upon a showing of negligence, as contrasted with a showing of willful or reckless disregard, I am willing to  **[*354]**  join, and do join, the Court's opinion and its judgment for two reasons:

1. By removing the specters of presumed and punitive damages in the absence of *New York Times* malice, the Court eliminates significant and powerful motives for self-censorship that otherwise are present in **[****51]** the traditional libel action.  By so doing, the Court leaves what should prove to be sufficient and adequate breathing space for a vigorous press.  What the Court has done, I believe, will have little, if any, practical effect on the functioning of responsible journalism.

2. The Court was sadly fractionated in *Rosenbloom*. A result of that kind inevitably leads to uncertainty.  I feel that it is of profound importance for the Court to come to rest in the defamation area and to have a clearly defined majority position that eliminates the unsureness engendered by *Rosenbloom's* diversity.  If my vote were not needed to create

EXHIBIT 43                                                      EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

a majority, I would adhere to my prior view.  A definitive ruling, however, is paramount.  See *Curtis Publishing Co. v. Butts, 388 U.S., at 170* (Black, J., concurring); *Time,  [***814]  Inc. v. Hill, 385 U.S. 374, 398 (1967)* (Black, J., concurring); *United States v. Vuitch, 402 U.S. 62, 97 (1971)* (separate statement).

For these reasons, I join the opinion and the judgment of the Court.

**Dissent by:** BURGER; DOUGLAS; BRENNAN; WHITE

# Dissent

MR. CHIEF JUSTICE BURGER, dissenting.

The doctrines **[****52]**  of the law of defamation have had a gradual evolution primarily in the state courts.  In *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, and its progeny this Court entered this field.

Agreement or disagreement with the law as it has evolved to this time does not alter the fact that it has been orderly development with a consistent basic rationale.  In today's opinion the Court abandons the traditional  **[*355]**  thread so far as the ordinary private citizen is concerned and introduces the concept that the media will be liable for negligence in publishing defamatory statements with respect to such persons.  Although I agree with much of what MR. JUSTICE WHITE states, I do not read the Court's new doctrinal approach in quite the way he does.  I am frank to say I do not know the parameters of a "negligence" doctrine as applied to the news media. Conceivably this new doctrine could inhibit some editors, as the dissents of MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN suggest.  But I would prefer to allow this area of law to continue to evolve as it has up to now with respect to private citizens rather than embark on a new doctrinal theory which has no jurisprudential **[****53]**  ancestry.

The petitioner here was performing a professional representative role as an advocate in the highest tradition of the law, and under that tradition the advocate is not to be invidiously identified with his client.  The important public policy which underlies this tradition -- the right to counsel -- would be gravely jeopardized if every lawyer who takes an "unpopular" case, civil or criminal,  **[**3015]**  would automatically become fair game for irresponsible reporters and editors who might, for example, describe the lawyer as a "mob mouthpiece" for representing a client with a serious prior criminal record, or as an "ambulance chaser" for representing a claimant in a personal injury action.

I would reverse the judgment of the Court of Appeals and remand for reinstatement of the verdict of the jury and the entry of an appropriate judgment on that verdict.

MR. JUSTICE DOUGLAS, dissenting.

The Court describes this case as a return to the struggle of "[defining] the proper accommodation between the law of defamation and the freedoms of speech and press protected by the *First Amendment*." It is indeed a struggle, once described by Mr. Justice Black as "the same  **[*356]   [****54]**  quagmire" in which the Court "is now helplessly struggling in the field of obscenity." *Curtis Publishing Co. v. Butts, 388 U.S. 130, 171* (concurring opinion).  I would suggest that the struggle is a quite hopeless one, for, in light of the command of the *First Amendment*, no "accommodation" of its freedoms can be "proper" except those made by the Framers themselves.

Unlike the right of privacy which, by the terms of the *Fourth Amendment*, must be accommodated with reasonable searches and seizures  **[***815]**  and warrants issued by magistrates, the rights of free speech and of a free press were protected by the Framers in verbiage whose proscription seems clear.  I have stated before my view that the *First Amendment* would bar Congress from passing any libel law. [1] This was the view held by Thomas Jefferson [2]

---

[1] See, *e. g., Rosenblatt v. Baer, 383 U.S. 75, 90* (concurring).

[2] In 1798 Jefferson stated:

**EXHIBIT 43**                                                                              **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

and it is one Congress has never challenged through enactment of a civil libel statute.  The sole congressional attempt at this variety of *First Amendment* muzzle was in the Sedition Act of 1798 -- a criminal libel act never tested in this Court and one which expired by its terms three years after enactment.  As President, Thomas Jefferson pardoned those who **[****55]** were convicted under the Act, and fines levied in its prosecution were repaid by Act of Congress. [3] The general **[*357]** consensus was that the Act constituted a regrettable legislative exercise plainly in violation of the *First Amendment*. [4]

 **[****56]**  With the *First Amendment* made applicable to the States through the Fourteenth, [5] I do not see how States have any more ability to "accommodate" freedoms of speech or of the press than does Congress.  This is true whether the form of the accommodation is civil or criminal since "[what] a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel." *New York Times Co. v. Sullivan, 376 U.S. 254, 277*. Like Congress, States are without power "to use a civil libel law or any other law to impose damages for merely **[**3016]** discussing public affairs." *Id., at 295* (Black, J., concurring).[6]

 **[****57]**   **[*358]** Continued **[***816]** recognition of the possibility of state libel suits for public discussion of public issues leaves the freedom of speech honored by the *Fourteenth Amendment* a diluted version of *First Amendment* protection.  This view is only possible if one accepts the position that the *First Amendment* is applicable to the States only through the Due Process Clause of the Fourteenth, due process freedom of speech being only that freedom

---

"[The *First Amendment*] thereby [guards] in the same sentence, and under the same words, the freedom of religion, of speech, and of the press: insomuch, that whatever violates either, throws down the sanctuary which covers the others, *and that libels, falsehood, and defamation, equally with heresy and false religion, are withheld from the cognizance of federal tribunals. . . .*" 8 The Works of Thomas Jefferson 464-465 (Ford ed. 1904) (emphasis added).

[3] See, *e. g.*, Act of July 4, 1840, c. 45, 6 Stat. 802, accompanied by H. R. Rep. No. 86, 26th Cong., 1st Sess. (1840).

[4] Senator Calhoun in reporting to Congress assumed the invalidity of the Act to be a matter "which no one now doubts." Report with Senate Bill No. 122, S. Doc. No. 118, 24th Cong., 1st Sess., 3 (1836).

[5] See *Stromberg v. California, 283 U.S. 359, 368-369*.

[6] Since this case involves a discussion of public affairs, I need not decide at this point whether the *First Amendment* prohibits all libel actions.  "An unconditional right to say what one pleases about public affairs is what I consider to be the *minimum* guarantee of the *First Amendment*." *New York Times Co. v. Sullivan, 376 U.S. 254, 297* (Black, J., concurring) (emphasis added).  But "public affairs" includes a great deal more than merely political affairs.  Matters of science, economics, business, art, literature, etc., are all matters of interest to the general public.  Indeed, any matter of sufficient general interest to prompt media coverage may be said to be a public affair.  Certainly police killings, "Communist conspiracies," and the like qualify.

A more regressive view of free speech has surfaced but it has thus far gained no judicial acceptance.  Solicitor General Bork has stated:

"Constitutional protection should be accorded only to speech that is explicitly political.  There is no basis for judicial intervention to protect any other form of expression, be it scientific, literary or that variety of expression we call obscene or pornographic.  Moreover, within that category of speech we ordinarily call political, there should be no constitutional obstruction to laws making criminal any speech that advocates forcible overthrow of the government or the violation of any law." Bork, Neutral Principles and Some *First Amendment* Problems, 47 Ind. L. J. 1, 20 (1971).

According to this view, Congress, upon finding a painting aesthetically displeasing or a novel poorly written or a revolutionary new scientific theory unsound could constitutionally prohibit exhibition of the painting, distribution of the book or discussion of the theory.  Congress might also proscribe the advocacy of the violation of any law, apparently without regard to the law's constitutionality.  Thus, were Congress to pass a blatantly invalid law such as one prohibiting newspaper editorials critical of the Government, a publisher might be punished for advocating its violation.  Similarly, the late Dr. Martin Luther King, Jr., could have been punished for advising blacks to peacefully sit in the front of buses or to ask for service in restaurants segregated by law.

EXHIBIT 43          EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

which this Court might deem to be "implicit in the concept of ordered liberty." [7] But the Court frequently has rested **[\*359]** state free speech and free press decisions on the *Fourteenth Amendment* generally [8] rather than on the Due Process Clause alone.  The *Fourteenth Amendment* speaks not only of due process but also of "privileges and immunities" of United States citizenship.  I can conceive of no privilege or immunity with a higher claim to recognition **[\*\*3017]** against state abridgment than the freedoms of speech and of the press.  In our federal system we are all subject to two governmental regimes, and freedoms of speech and of the press protected against the infringement of only one are quite illusory.  The identity **[\*\*\*\*58]** of the oppressor is, I would think, a matter of relative indifference to the oppressed.

**[\*\*\*\*59]** There can be no doubt that a State impinges upon free and open discussion when it sanctions the imposition of damages for such discussion through its civil libel laws.  Discussion of public affairs is often marked by highly charged emotions, and jurymen, not unlike us all, are **[\*\*\*817]** subject to those emotions.  It is indeed this very type of speech which is the reason for the *First Amendment* since speech which arouses little emotion is little in need of protection.  The vehicle for publication in this case was the American Opinion, a most controversial periodical which disseminates the views of the John Birch Society, an organization which many deem to be **[\*360]** quite offensive.  The subject matter involved "Communist plots," "conspiracies against law enforcement agencies," and the killing of a private citizen by the police.  With any such amalgam of controversial elements pressing upon the jury, a jury determination, unpredictable in the most neutral circumstances, becomes for those who venture to discuss heated issues, a virtual roll of the dice separating them from liability for often massive claims of damage.

It is only the hardy publisher who will engage in discussion **[\*\*\*\*60]** in the face of such risk, and the Court's preoccupation with proliferating standards in the area of libel increases the risks.  It matters little whether the standard be articulated as "malice" or "reckless disregard of the truth" or "negligence," for jury determinations by any of those criteria are virtually unreviewable.  This Court, in its continuing delineation of variegated mantles of *First Amendment* protection, is, like the potential publisher, left with only speculation on how jury findings were influenced by the effect the subject matter of the publication had upon the minds and viscera of the jury.  The standard announced today leaves the States free to "define for themselves the appropriate standard of liability for a publisher or broadcaster" in the circumstances of this case.  This of course leaves the simple negligence standard as an option, with the jury free to impose damages upon a finding that the publisher failed to act as "a reasonable man." With such continued erosion of *First Amendment* protection, I fear that it may well be the reasonable man who refrains from speaking.

Since in my view the *First* and *Fourteenth Amendments* prohibit the imposition of damages upon **[\*\*\*\*61]** respondent for this discussion of public affairs, I would affirm the judgment below.

**[\*361]** MR. JUSTICE BRENNAN, dissenting.

I agree with the conclusion, expressed in Part V of the Court's opinion, that, at the time of publication of respondent's article, petitioner could not properly have been viewed as either a "public official" or "public figure"; instead, respondent's article, dealing with an alleged conspiracy to discredit local police forces, concerned petitioner's purported involvement in "an event of public or general interest." *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 31-*

---

[7] See *Palko v. Connecticut, 302 U.S. 319, 325*.  As Mr. Justice Black has noted, by this view the test becomes "whether the government has an interest in abridging the right involved and, if so, whether that interest is of sufficient importance, *in the opinion of a majority of the Supreme Court*, to justify the government's action in doing so.  Such a doctrine can be used to justify almost any government suppression of *First Amendment* freedoms.  As I have stated many times before, I cannot subscribe to this doctrine because I believe that the *First Amendment's* unequivocal command that there shall be no abridgement of the rights of free speech shows that the men who drafted our *Bill of Rights* did all the 'balancing' that was to be done in this field." H. Black, A Constitutional Faith 52 (1969).

[8] See, *e. g., Bridges v. California, 314 U.S. 252, 263 n. 6 (Black, J.)*; *Murdock v. Pennsylvania, 319 U.S. 105, 108 (DOUGLAS, J.)*; *Saia v. New York, 334 U.S. 558, 560 (DOUGLAS, J.)*; *Talley v. California, 362 U.S. 60, 62 (Black, J.)*; *DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 828 (DOUGLAS, J.)*; *Elfbrandt v. Russell, 384 U.S. 11, 18 (DOUGLAS, J.)*; *Mills v. Alabama, 384 U.S. 214, 218 (Black, J.)*; **Mine Workers v. Illinois Bar Assn., 389 U.S. 217, 221-222, and n. 4 (Black, J.)**.

EXHIBIT 43                                                                                    EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

*32 (1971)*; see *ante*, at 331-332, n. 4.  I cannot agree, however, that free and robust debate -- so essential to the proper functioning of our system of government -- is permitted adequate "breathing space," *NAACP v. Button, 371 U.S. 415, 433 (1963)*, when, as the Court holds, the States may impose all but strict liability for defamation if the defamed party is a private person and "the substance of the defamatory statement 'makes substantial danger to reputation apparent.'" *Ante*, at 348. [1] [***818] I adhere to my view expressed [**3018] [****62] in *Rosenbloom v. Metromedia, Inc., supra*, that we strike the proper accommodation between avoidance of media self-censorship and protection of individual reputations only when we require States to apply the *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, knowing-or-reckless-falsity standard in civil libel actions concerning media reports of the involvement of private individuals in events of public or general interest.

The Court does not hold that *First Amendment* guarantees do not extend to speech concerning private persons' involvement in events of public or general interest. It recognizes that self-governance in this country perseveres because of our "profound national commitment [*362] to the principle that debate on *public issues* should be uninhibited, robust, and wide-open. [****63] " *Id., at 270* (emphasis added).  Thus, guarantees of free speech and press necessarily reach "far more than knowledge and debate about the strictly official activities of various levels of government," *Rosenbloom v. Metromedia, Inc., supra, at 41*; for "[freedom] of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama, 310 U.S. 88, 102 (1940)*.

The teaching to be distilled from our prior cases is that, while public interest in events may at times be influenced by the notoriety of the individuals involved, "[the] public's primary interest is in the event[,] . . . the conduct of the participant and the content, effect, and significance of the conduct…." *Rosenbloom, supra, at 43*. Matters of public or general interest do not "suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved." *Ibid*.  See *Time, Inc [****64] . v. Hill, 385 U.S. 374, 388 (1967)*.

Although acknowledging that *First Amendment* values are of no less significance when media reports concern private persons' involvement in matters of public concern, the Court refuses to provide, in such cases, the same level of constitutional protection that has been afforded the media in the context of defamation of public persons.  The accommodation that this Court has established between free speech and libel laws in cases involving public officials and public figures -- that defamatory falsehood be shown by clear and convincing evidence to have been published with knowledge of falsity or with reckless disregard of truth -- is not apt, the Court holds, because [*363] the private individual does not have the same degree of access to the media to rebut defamatory comments as does the public person and he has not voluntarily exposed himself to public scrutiny.

While these arguments are forcefully and eloquently presented, I [***819] cannot accept them, for the reasons I stated in *Rosenbloom*:

"The *New York Times* standard was applied to libel of a public official or public figure to give effect to the [First] [****65] Amendment's function to encourage ventilation of public issues, not because the public official has any less interest in protecting his reputation than an individual in private life.  While the argument that public figures need less protection because they can command media attention to counter criticism may be true for some very prominent people, even then it is the rare case where the denial overtakes the original charge.  Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story.  When the public official or public figure is a minor functionary, or has left the position that put him in the public [**3019] eye . . . , the argument loses all of its force.  In the vast majority of libels involving public officials or public figures, the ability to respond through the media will depend on the same complex factor on which the ability of a private individual depends: the unpredictable event of the media's continuing interest in the story.  Thus the unproved, and highly improbable, generalization that an as yet [not fully defined] class of 'public figures' involved in matters of public concern will be

---

[1] A *fortiori* I disagree with my Brother WHITE's view that the States should have free rein to impose strict liability for defamation in cases not involving public persons.

EXHIBIT 43                                                                   EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

better able to respond [****66]  through the media than private individuals also involved in such matters seems too insubstantial  [*364]  a reed on which to rest a constitutional distinction." *403 U.S., at 46-47*.

Moreover, the argument that private persons should not be required to prove *New York Times* knowing-or-reckless falsity because they do not assume the risk of defamation by freely entering the public arena "bears little relationship either to the values protected by the *First Amendment* or to the nature of our society." *Id., at 47*. Social interaction exposes all of us to some degree of public view.  This Court has observed that "[the] risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press." *Time, Inc. v. Hill, 385 U.S., at 388*. Therefore,

"[voluntarily] or not, we are all 'public' men to some degree.  Conversely, some aspects of the lives of even the most public men fall outside the area of matters of public or general concern.  See . . .  *Griswold v. Connecticut, 381 U.S. 479 (1965)*. Thus, the idea that certain 'public' figures have [****67]  voluntarily exposed their entire lives to public inspection, while private individuals have kept theirs carefully shrouded from public view is, at best, a legal fiction.  In any event, such a distinction could easily produce the paradoxical result of dampening discussion of issues of public or general concern because they happen to involve private citizens while extending constitutional encouragement to discussion of aspects of the lives of 'public figures' that are not in the area of public or general concern." *Rosenbloom, supra, at 48* (footnote omitted).

To be sure, no one commends publications which defame the good name and reputation of any person: "In an ideal world, the responsibility of the press would match the freedom  [***820]  and public trust given it." *Id., at  [*365]  51*. [2] Rather, as the Court agrees, some abuse of *First Amendment* freedoms is tolerated only to insure that would-be commentators on events of public or general interest are not "deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense [****68]  of having to do  [**3020]  so." *New York Times Co. v. Sullivan, 376 U.S., at 279*. The Court's holding and *a fortiori* my Brother WHITE's views, see n. 1, *supra*, simply deny free expression its needed "breathing space." Today's decision will exacerbate the rule of self-censorship of legitimate utterance as publishers "steer far wider of the unlawful zone," *Speiser v. Randall, 357 U.S. 513, 526 (1958)*.

 [****69]  We recognized in *New York Times Co. v. Sullivan, supra, at 279*, that a rule requiring a critic of official conduct to guarantee the truth of all of his factual contentions would inevitably lead to self-censorship when  [*366]  publishers, fearful of being unable to prove truth or unable to bear the expense of attempting to do so, simply eschewed printing controversial articles.  Adoption, by many States, of a reasonable-care standard in cases where private individuals are involved in matters of public interest -- the probable result of today's decision -- will likewise lead to self-censorship since publishers will be required carefully to weigh a myriad of uncertain factors before publication.  The reasonable-care standard is "elusive," *Time, Inc. v. Hill, supra, at 389*; it saddles the press with "the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait." *Ibid*.  Under a reasonable-care regime, publishers and broadcasters will have to make pre-publication judgments about juror assessment of such diverse considerations [****70]  as the size, operating procedures, and financial condition of the newsgathering system, as well as the relative costs and

---

[2] A respected commentator has observed that factors other than purely legal constraints operate to control the press:

"Traditions, attitudes, and general rules of political conduct are far more important controls.  The fear of opening a credibility gap, and thereby lessening one's influence, holds some participants in check.  Institutional pressures in large organizations, including some of the press, have a similar effect; it is difficult for an organization to have an open policy of making intentionally false accusations." T. Emerson, The System of Freedom of Expression 538 (1970).

Typical of the press' own ongoing self-evaluation is a proposal to establish a national news council, composed of members drawn from the public and the journalism profession, to examine and report on complaints concerning the accuracy and fairness of news reporting by the largest newsgathering sources.  Twentieth Century Fund Task Force Report for a National News Council, A Free and Responsive Press (1973).  See also Comment, The Expanding Constitutional Protection for the News Media from Liability for Defamation: Predictability and the New Synthesis, 70 Mich. L. Rev. 1547, 1569-1570 (1972).

**EXHIBIT 43**                                                                                      EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

benefits of instituting less frequent and more costly reporting at a higher level of accuracy.  See The Supreme Court, 1970 Term, 85 Harv. L. Rev. 3, 228 (1971).  Moreover, in contrast to proof by clear and convincing evidence required under the *New York Times* test, the burden of proof for reasonable care will doubtless be the preponderance of the evidence.

 [***821]  "In the normal civil suit where [the preponderance of the evidence] standard is employed, 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' *In re Winship, 397 U.S. 358, 371 (1970)* (HARLAN, J., concurring).  In libel cases, however, we view an erroneous verdict for the plaintiff as most serious.  Not only does it mulct the defendant for an innocent misstatement . . . but the  **[*367]**  possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the *First Amendment* **[****71]**  cannot tolerate." *Rosenbloom, 403 U.S., at 50*.

And, most hazardous, the flexibility which inheres in the reasonable-care standard will create the danger that a jury will convert it into "an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' . . . which must be protected if the guarantees of the *First* and *Fourteenth Amendments* are to prevail." *Monitor Patriot Co. v. Roy, 401 U.S. 265, 277 (1971)*.

The Court does not discount altogether the danger that jurors will punish for the expression of unpopular opinions. This probability accounts for the Court's limitation that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Ante*, at 349.  But plainly a jury's latitude to impose liability for want of due care poses a far greater threat of suppressing unpopular views than does a possible recovery of presumed or punitive damages. Moreover, the Court's **[**3021]**  broad-ranging examples of "actual injury," including impairment of reputation and standing in the community, **[****72]**  as well as personal humiliation, and mental anguish and suffering, inevitably allow a jury bent on punishing expression of unpopular views a formidable weapon for doing so.  Finally, even a limitation of recovery to "actual injury" -- however much it reduces the size or frequency of recoveries -- will not provide the necessary elbowroom for *First Amendment* expression.

"It is not simply the possibility of a judgment for damages that results in self-censorship. The very  **[*368]**  possibility of having to engage in litigation, an expensive and protracted process, is threat enough to cause discussion and debate to 'steer far wider of the unlawful zone' thereby keeping protected discussion from public cognizance. . . . Too, a small newspaper suffers equally from a substantial damage award, whether the label of the award be 'actual' or 'punitive.'" *Rosenbloom, supra, at 52-53*.

On the other hand, the uncertainties which the media face under today's decision are largely avoided by the *New York Times* standard.  I reject the argument that my *Rosenbloom* view improperly commits to judges the task of determining what is and what is not an issue of "general **[****73]**  or public interest." [3]  I noted in

---

[3] The Court, taking a novel step, would not limit application of *First Amendment* protection to private libels involving issues of general or public interest, but would forbid the States from imposing liability without fault in any case where the substance of the defamatory statement made substantial danger to reputation apparent.  As in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 44 n. 12, 48-49, n. 17 (1971)*, I would leave open the question of what constitutional standard, if any, applies when defamatory falsehoods are published or broadcast concerning either a private or public person's activities not within the scope of the general or public interest.

Parenthetically, my Brother WHITE argues that the Court's view and mine will prevent a plaintiff -- unable to demonstrate some degree of fault -- from vindicating his reputation by securing a judgment that the publication was false.  This argument overlooks

EXHIBIT 43                                                                          EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

*Rosenbloom* **[\*369]**  **[\*\*\*822]** that performance of this task would not always be easy.  *Id., at 49 n. 17*. But surely the courts, the ultimate arbiters of all disputes concerning clashes of constitutional values, would only be performing one of their traditional functions in undertaking this duty.  Also, the difficulty of this task has been substantially lessened by that "sizable body of cases, decided both before and after *Rosenbloom*, that have employed the concept of a matter of public concern to reach decisions in . . . cases dealing with an alleged libel of a private individual that employed a public interest standard . . . and . . . cases that applied *Butts* to the alleged libel of a public figure." Comment, The Expanding Constitutional Protection for the News Media from Liability for Defamation: Predictability and the New Synthesis, 70 Mich. L. Rev. 1547, 1560 (1972). The public interest is necessarily broad; any residual self-censorship that may result from the uncertain contours of the "general or public interest" concept should be of far less concern to publishers and broadcasters than that occasioned **[\*\*\*\*74]**  by state laws imposing liability for negligent falsehood.

 **[\*\*\*\*75]**  Since petitioner failed, after having been given a full and fair opportunity, to prove that respondent published the  **[\*\*3022]**  disputed article with knowledge of its falsity or with reckless disregard of the truth, see *ante*, at 329-330, n. 2, I would affirm the judgment of the Court of Appeals.

MR. JUSTICE WHITE, dissenting.

For some 200 years -- from the very founding of the Nation -- the law of defamation and right of the ordinary citizen to recover for false publication injurious to his reputation have been almost exclusively the business of  **[\*370]**  state courts and legislatures.  Under typical state defamation law, the defamed private citizen had to prove only a false publication that would subject him to hatred, contempt, or ridicule.  Given such publication, general damage to reputation was presumed, while punitive damages required proof of additional facts.  The law governing the defamation of private citizens remained untouched by the *First Amendment* because until relatively recently, the consistent view of the Court was that libelous words constitute a class of speech wholly unprotected by the *First Amendment*,  **[\*\*\*823]**  subject only to limited exceptions carved **[\*\*\*\*76]**  out since 1964.

But now, using that Amendment as the chosen instrument, the Court, in a few printed pages, has federalized major aspects of libel law by declaring unconstitutional in important respects the prevailing defamation law in all or most of the 50 States.  That result is accomplished by requiring the plaintiff in each and every defamation action to prove not only the defendant's culpability beyond his act of publishing defamatory material but also actual damage to reputation resulting from the publication.  Moreover, punitive damages may not be recovered by showing malice in the traditional sense of ill will; knowing falsehood or reckless disregard of the truth will now be required.

I assume these sweeping changes will be popular with the press, but this is not the road to salvation for a court of law.  As I see it, there are wholly insufficient grounds for scuttling the libel laws of the States in such wholesale fashion, to say nothing of deprecating the reputation interest of ordinary citizens and rendering them powerless to protect themselves.  I do not suggest that the decision is illegitimate or beyond the bounds of judicial review, but it is an ill-considered exercise **[\*\*\*\*77]**  of the power entrusted to this Court, particularly when the  **[\*371]**  Court has not had the benefit of briefs and argument addressed to most of the major issues which the Court now decides.  I respectfully dissent.

I

Lest there be any mistake about it, the changes wrought by the Court's decision cut very deeply.  In 1938, the Restatement of Torts reflected the historic rule that publication in written form of defamatory material -- material

---

the possible enactment of statutes, not requiring proof of fault, which provide for an action for retraction or for publication of a court's determination of falsity if the plaintiff is able to demonstrate that false statements have been published concerning his activities. Cf. Note, Vindication of the Reputation of a Public Official, 80 Harv. L. Rev. 1730, 1739-1747 (1967). Although it may be that questions could be raised concerning the constitutionality of such statutes, certainly nothing I have said today (and, as I read the Court's opinion, nothing said there) should be read to imply that a private plaintiff, unable to prove fault, must inevitably be denied the opportunity to secure a judgment upon the truth or falsity of statements published about him. Cf. *Rosenbloom v. Metromedia, Inc., supra, at 47*, and n. 15.

**EXHIBIT 43**                                                                           EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

tending "so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" [1] -- subjected the publisher to liability although no special harm to reputation was actually proved. [2] **[****79]** *Restatement [\*372] of Torts [\*\*3023] § 569* (1938). [3] **[\*\*\*824]** Truth was a defense, and some libels were privileged; but, given a false circulation, general damage to reputation was presumed and damages could be awarded by the jury, along with any special damages such as pecuniary loss and emotional distress.  At the very least, the rule allowed the recovery of nominal damages for any defamatory publication actionable *per se* and thus performed

"a vindicatory **[\*\*\*\*78]** function by enabling the plaintiff publicly to brand the defamatory publication as false.  The salutary social value of this rule is preventive in character since it often permits a defamed person to expose the groundless character of a defamatory rumor before harm to the reputation has resulted therefrom." *Id*., § 569, comment b, p. 166.

If the defamation was not libel but slander, it was actionable *per se* only if it imputed a criminal offense; a venereal or loathsome and communicable disease; improper conduct of a lawful business; or unchastity by a woman.  *Id*., § 570. To be actionable, all other types of slanderous statements required proof of special damage other than actual loss of reputation or emotional distress, that special damage almost always being in the form of material or pecuniary loss of some kind.  *Id*., § 575 and comment b, pp. 185-187.

Damages for libel or slander *per se* included "harm caused thereby to the reputation of the person defamed or in the absence of proof of such harm, for the harm which normally results from such a defamation." *Id*., § 621.  At the heart of the libel-and-slander-*per-se* **[\*373]** damage scheme lay the award of general damages for loss **[\*\*\*\*80]** of reputation. They were granted without special proof because the judgment of history was that the content of the publication itself was so likely to cause injury and because "in many cases the effect of defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed." *Id*., § 621, comment a, p. 314. [4] **[\*\*\*\*81]** Proof of actual injury to reputation was itself insufficient proof of that special damage necessary to support liability for slander not actionable *per se*.  But if special damage in the form of material or pecuniary loss were proved, general damages for injury to reputation could be had without further proof.  "The plaintiff

---

[1] ***Restatement of Torts § 559*** (1938); see also W. Prosser, Law of Torts § 111, p. 739 (4th ed. 1971); 1 A. Hanson, Libel and Related Torts para. 14, pp. 21-22 (1969); 1 F. Harper & F. James, The Law of Torts § 5.1, pp. 349-350 (1956).

[2] The observations in Part I of this opinion as to the current state of the law of defamation in the various States are partially based upon the Restatement of Torts, first published in 1938, and Tentative Drafts Nos. **11** and **12 of Restatement of Torts (Second)**, released in 1965 and 1966, respectively.  The recent transmittal of Tentative Draft No. 20, dated April 25, 1974, to the American Law Institute for its consideration has resulted in the elimination of much of the discussion of the prevailing defamation rules and the suggested changes in many of the rules themselves previously found in the earlier Tentative Drafts.  This development appears to have been largely influenced by the draftsmen's "sense for where the law of this important subject should be thought to stand." Restatement (Second) of Torts, p. vii (Tent. Draft No. 20, Apr. 25, 1974).  It is evident that, to a large extent, these latest views are colored by the plurality opinion in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*. See, *e. g*., Restatement (Second) of Torts, *supra*, at xiii, §§ 569, 580, 581A, 581B, 621.  There is no indication in the latest draft, however, that the conclusions reached in Tentative Drafts Nos. 11 and 12 are not an accurate reflection of the case law in the States in the mid-1960's prior to the developments occasioned by the plurality opinion in *Rosenbloom*.  See *infra*, at 374-375.

[3] See also W. Prosser, *supra*, n. 1, § 112, p. 752 and n. 85; Murnaghan, From Figment to Fiction to Philosophy -- The Requirement of Proof of Damages in Libel Actions, 22 Cath. U. L. Rev. 1, 11-13 (1972).

[4] Proof of the defamation itself established the fact of injury and the existence of some damage to the right of reputation, and the jury was permitted, even without any other evidence, to assess damages that were considered to be the natural or probable consequences of the defamatory words. ***Restatement of Torts § 621, comment a***, p. 314 (1938); see also C. Gatley, Libel and Slander 1004 (6th ed. 1967); M. Newell, Slander and Libel § 721, p. 810 (4th ed. 1924); see generally C. McCormick, Law of Damages § 116, pp. 422-430 (1935).  In this respect, therefore, the damages were presumed because of the impossibility of affixing an exact monetary amount for present and future injury to the plaintiff's reputation, wounded feelings and humiliation, loss of business, and any consequential physical illness or pain.  *Ibid.*

EXHIBIT 43   EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

may recover not only for the special harm so caused, but also for general loss of reputation." *Id.*, § 575, comment a, p. 185. [5] The right to recover for **[**3024]** emotional distress depended upon the defendant's otherwise being liable for either libel or slander. *Id.*, § 623.  Punitive damages were recoverable upon proof of special facts amounting to express malice.  *Id.*, § 908 and comment b, p. 555.

 **[*374]**  Preparations in the mid-1960's for Restatement (Second) of Torts reflected what were deemed to be substantial changes in the law of defamation, primarily a trend toward limiting *per se* libels to those where the defamatory nature of the publication is apparent on its face, *i. e.*, where the "defamatory innuendo is apparent from the publication itself without reference to extrinsic facts by way of inducement." *Restatement (Second) of Torts § 569*, p. 29 (Tent. Draft No. 12, Apr. 27, 1966).  Libels of this sort and slanders *per se* continued to be recognized as actionable without proof of special damage **[***825]** or injury to reputation. [6] All other defamations would require proof of special injury in the form of material or pecuniary loss.  Whether this asserted change reflected the prevailing law was heavily debated, [7] but it was unquestioned at the time that there are **[****82]** recurring situations in which libel and slander are and should be actionable *per se*.

In surveying the current state of the law, the proposed Restatement (Second) observed that "[all] courts except Virginia agree that any libel which is defamatory upon its face is actionable without proof of damage . . . ." *Restatement (Second) of Torts § 569*, p. 84 (Tent. Draft No. 11, Apr. 15, 1965).  Ten jurisdictions continued to support the old rule that libel not defamatory on its face and whose innuendo depends on extrinsic facts is actionable without proof of damage although slander would not be.  Twenty-four jurisdictions were said to hold that libel not defamatory on its face is to be treated like **[****83]** slander and thus not actionable without proof of damage where **[*375]** slander would not be.  *Id.*, § 569, p. 86.  The law in six jurisdictions was found to be in an unsettled state but most likely consistent with the Restatement (Second).  *Id.*, § 569, p. 88.  The law in Virginia was thought to consider libel actionable without proof of special damage only where slander would be, regardless of whether the libel is defamatory on its face.  *Id.*, § 569, p. 89.  All States, therefore, were at that time thought to recognize important categories of defamation that were actionable *per se*. [8] Nor was any question apparently raised at that time that upon proof of special damage in the form of material or pecuniary loss, general damages to reputation could be recovered without further proof.

Unquestionably, state law continued **[****84]** to recognize some absolute, as well as some conditional, privileges to publish defamatory materials, including the privilege of fair comment in defined situations.  But it remained true that in a wide range of situations, the ordinary citizen could make out a prima facie case without proving more than a defamatory publication and could recover general damages for injury to his **[***826]** reputation unless defeated by the defense of truth. [9]

The impact of today's decision on the traditional law of libel is immediately obvious and indisputable.  No longer **[**3025]** will the plaintiff be able to rest his case with proof of a libel defamatory **[****85]** on its face or proof of a slander historically actionable *per se*.  In addition, he must prove some further degree of culpable conduct on the

---

[5] See also Prosser, *supra*, n. 1, § 112, p. 761; Harper & James, *supra*, n. 1, § 5.14, p. 388; Note, Developments in the Law -- Defamation, 69 Harv. L. Rev. 875, 939-940 (1956).

[6] Also actionable *per se* were those libels where the imputation, although not apparent from the material itself, would have been slander *per se* if spoken rather than written.

[7] **Restatement (Second) of Torts § 569**, pp. 29-45, 47-48 (Tent. Draft No. 12, Apr. 27, 1966); see also Murnaghan, *supra*, n. 3.

[8] Applying settled Illinois law, the District Court in this case held that it is libel *per se* to label someone a *Communist.  306 F.Supp. 310 (ND Ill. 1969)*.

[9] This appears to have been the law in Illinois at the time Gertz brought his libel suit.  See, *e. g., Brewer v. Hearst Publishing Co., 185 F.2d 846 (CA7 1950)*; *Hotz v. Alton Telegraph Printing Co., 324 Ill. App. 1, 57 N. E. 2d 137 (1944)*; *Cooper v. Illinois Publishing & Printing Co., 218 Ill. App. 95 (1920)*.

**EXHIBIT 43**                                                                    **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

part of the  **[*376]**  publisher, such as intentional or reckless falsehood or negligence.  And if he succeeds in this respect, he faces still another obstacle: recovery for loss of reputation will be conditioned upon "competent" proof of actual injury to his standing in the community.  This will be true regardless of the nature of the defamation and even though it is one of those particularly reprehensible statements that have traditionally made slanderous words actionable without proof of fault by the publisher or of the damaging impact of his publication.  The Court rejects the judgment of experience that some publications are so inherently capable of injury, and actual injury so difficult to prove, that the risk of falsehood should be borne by the publisher, not the victim.  Plainly, with the additional burden on the plaintiff of proving negligence or other fault, it will be exceedingly difficult, perhaps impossible, for him to vindicate his reputation interest by securing a judgment for nominal damages, the practical effect of such a **[****86]** judgment being a judicial declaration that the publication was indeed false.  Under the new rule the plaintiff can lose, not because the statement is true, but because it was not negligently made.

So too, the requirement of proving special injury to reputation before general damages may be awarded will clearly eliminate the prevailing rule, worked out over a very long period of time, that, in the case of defamations not actionable *per se*, the recovery of general damages for injury to reputation may also be had if some form of material or pecuniary loss is proved.  Finally, an inflexible federal standard is imposed for the award of punitive damages. No longer will it be enough to prove ill will and an attempt to injure.

These are radical changes in the law and severe invasions of the prerogatives of the States.  They should **[*377]**  at least be shown to be required by the *First Amendment* or necessitated by our present circumstances.  Neither has been demonstrated.

Of course, *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*; *Rosenblatt v. Baer, 383 U.S. 75 (1966)*, and *Curtis Publishing Co*. v. *Butts and Associated Press v. Walker, 388 U.S. 130 (1967),* **[****87]**  have themselves worked major changes in defamation law.  Public officials and public figures, if they are to recover general damages for injury to reputation, must prove knowing falsehood or reckless disregard for the truth.  The States were required to conform to these decisions.   Thereafter in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*, three Members of the  **[***827]**  Court urged that the same standard be applied whenever the publication concerned an event of public or general concern.  But none of these cases purported to foreclose in all circumstances recovery by the ordinary citizen on traditional standards of liability, and until today, a majority of the Court had not supported the proposition that, given liability, a court or jury may not award general damages in a reasonable amount without further proof of injury.

In the brief period since *Rosenbloom* was decided, at least 17 States and several federal courts of appeals have felt obliged to consider the *New York Times* constitutional privilege for liability as extending to, in the words of the *Rosenbloom* plurality, "all discussion and communication involving matters of public or general **[****88]** concern." *Id., at 44*. [10] Apparently, however,  **[**3027]**  general  **[*378]   [***828]**  damages still remain recoverable once that

---

[10] See, *e. g., West v. Northern Publishing Co., 487 P. 2d 1304, 1305-1306 (Alaska 1971)* (article linking owners of taxicab companies to illegal liquor sales to minors); *Gallman v. Carnes, 254 Ark. 987, 992, 497 S. W. 2d 47, 50 (1973)* (matter concerning state law school professor and assistant dean); *Belli v. Curtis Publishing Co., 25 Cal. App. 3d 384, 102 Cal. Rptr. 122 (1972)* (article concerning attorney with national reputation); *Moriarty v. Lippe, 162 Conn. 371, 378-379, 294 A. 2d 326, 330-331 (1972)* (publication about certain police officers); *Firestone v. Time, Inc., 271 So. 2d 745, 750-751 (Fla. 1972)* (divorce of prominent citizen not a matter of legitimate public concern); *State v. Snyder, 277 So. 2d 660, 666-668 (La. 1973)* (criminal defamation prosecution of a defeated mayoral candidate for statements made about another candidate); *Twohig v. Boston Herald-Traveler Corp.,    Mass.   ,   , 291 N. E. 2d 398, 400-401 (1973)* (article concerning a candidate's votes in the legislature); *Priestley v. Hastings & Sons Publishing Co. of Lynn, 360 Mass. 118, 271 N. E. 2d 628 (1971)* (article about an architect commissioned by a town to build a school); *Harnish v. Herald-Mail Co., Inc., 264 Md. 326, 334-336, 286 A. 2d 146, 151 (1972)* (article concerning substandard rental property owned by a member of a city housing authority); *Standke v. B. E. Darby & Sons, Inc., 291 Minn. 468, 476-477, 193 N. W. 2d 139, 145 (1971)* (newspaper editorial concerning performance of grand jurors); *Whitmore v. Kansas City Star Co., 499 S. W. 2d 45, 49 (Mo. Ct. App. 1973)* (article concerning a juvenile officer, the operation of a detention home, and a grand jury investigation); *Trails West, Inc. v. Wolff, 32 N. Y. 2d 207, 214-218, 298 N. E. 2d 52, 55-58 (1973)* (suit against a

EXHIBIT 43   EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

standard of liability is satisfied.  Except where public officials and public figures are concerned, the Court now repudiates  **[\*379]**  the plurality opinion in *Rosenbloom* and appears to espouse the liability standard set forth by three other Justices in that case.  The States must now struggle to  **[\*380]**  discern the meaning of such ill-defined concepts as "liability without fault" and to fashion novel rules for the recovery of damages.  These matters have not been briefed or argued by the parties and their workability has not been seriously explored.  Nevertheless, yielding to the apparently irresistible impulse to announce a new and different interpretation of the *First Amendment*, the Court discards history and precedent in its rush to refashion defamation law in accordance with the inclinations of a perhaps evanescent majority of the Justices.

 **[\*\*\*\*89]**  II

The Court does not contend, and it could hardly do so, that those who wrote the *First Amendment* intended to prohibit the Federal Government, within its sphere of influence in the Territories and the District of Columbia, from providing the private citizen a peaceful remedy for damaging falsehood. At the time of the adoption of the *First Amendment*, many of the consequences of libel law already described had developed, particularly the rule that libels and some slanders were so inherently injurious that they were actionable without special proof of damage to reputation. As the Court pointed out in *Roth v. United States, 354 U.S. 476, 482 (1957), 10* of the 14 States that had ratified the Constitution by 1792 had themselves provided constitutional guarantees for free  **[\*381]**  expression, and 13 of the 14 nevertheless provided for the prosecution of libels. Prior to the Revolution, the American Colonies had adopted

---

Congressman for an investigation into the death of schoolchildren in a bus accident); *Twenty-five East 40th Street Restaurant Corp. v. Forbes, Inc., 30 N. Y. 2d 595, 282 N. E. 2d 118 (1972)* (magazine article concerning a restaurant's food); *Kent v. City of Buffalo, 29 N. Y. 2d 818, 277 N. E. 2d 669 (1971)* (television station film of plaintiff as a captured robber); *Frink v. McEldowney, 29 N. Y. 2d 720, 275 N. E. 2d 337 (1971)* (article concerning an attorney representing a town); *Mead* v. *Horvitz Publishing Co.* (9th Dist. Ohio Ct. App. June 13, 1973) (unpublished), cert. denied, **416 U.S. 985 (1974)** (financial condition of participants in the development of a large apartment complex involving numerous local contractors); *Washington v. World Publishing Co., 506 P. 2d 913 (Okla. 1973)* (article about contract dispute between a candidate for United States Senate and his party's county chairman); *Matus v. Triangle Publications, Inc., 445 Pa. 384, 395-399, 286 A. 2d 357, 363-365 (1971)* (radio "talk show" host's discussion of gross overcharging for snowplowing a driveway not considered an event of public or general concern); *Autobuses Internacionales S. De R.L., Ltd. v. El Continental Publishing Co., 483 S. W. 2d 506 (Tex. Ct. Civ. App. 1972)* (newspaper article concerning a bus company's raising of fares without notice and in violation of law); *Sanders v. Harris, 213 Va. 369, 372-373, 192 S. E. 2d 754, 757-758 (1972)* (article concerning English professor at a community college); *Old Dominion Branch No. 496 v. Austin, 213 Va. 377, 192 S. E. 2d 737 (1972)*, rev'd, *ante*, p. 264 (plaintiff's failure to join a labor union considered not an issue of public or general concern); *Chase v. Daily Record, Inc., 83 Wash. 2d 37, 41, 515 P. 2d 154, 156 (1973)* (article concerning port district commissioner); *Miller v. Argus Publishing Co., 79 Wash. 2d 816, 827, 490 P. 2d 101, 109 (1971)* (article concerning the backer of political candidates); *Polzin v. Helmbrecht, 54 Wis. 2d 578, 586, 196 N. W. 2d 685, 690 (1972)* (letter to editor of newspaper concerning a reporter and the financing of pollution control measures).

The following United States Courts of Appeals have adopted the plurality opinion in *Rosenbloom: Cantrell v. Forest City Publishing Co., 484 F.2d 150 (CA6 1973)*, cert. pending, No. 73-5520 (article concerning family members of the victim of a highly publicized bridge disaster not actionable absent proof of actual malice); *Porter v. Guam Publications, Inc., 475 F.2d 744, 745 (CA9 1973)* (article concerning citizen's arrest for theft of a cash box considered an event of general or public interest); *Cervantes v. Time, Inc., 464 F.2d 986, 991 (CA8 1972)* (article concerning mayor and alleged organized crime connections conceded to be a matter of public or general concern); *Firestone v. Time, Inc., 460 F.2d 712 (CA5 1972)* (magazine article concerning prominent citizen's use of detectives and electronic surveillance in connection with a divorce); **Davis v. National Broadcasting Co., 447 F.2d 981 (CA5 1971)**, aff'g *320 F.Supp. 1070 (ED La. 1970)* (television report about a person caught up in the events surrounding the assassination of President Kennedy considered a matter of public interest).  However, at least one Court of Appeals, faced with an appeal from summary judgment in favor of a publisher in a diversity libel suit brought by a Philadelphia retailer, has expressed "discomfort in accepting the *Rosenbloom* plurality opinion as a definitive statement of the appropriate law . . . ." *Gordon v. Random House, Inc., 486 F.2d 1356, 1359 (CA3 1973)*.

As previously discussed in n. 2, *supra*, the latest proposed draft of Restatement (Second) of Torts substantially reflects the views of the *Rosenbloom* plurality. It also anticipates "that the Supreme Court will hold that strict liability for defamation is inconsistent with the free-speech provision of the *First Amendment* . . . ," **Restatement (Second) of Torts § 569**, p. 59 (Tent. Draft No. 20, Apr. 25, 1974), as well as the demise of *pre-Rosenbloom* damages rules.  See *id*., § 621, pp. 285-288.

**EXHIBIT 43**                                                                **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

the common law of libel. [11] **[\*\*\*829]** Contrary to some popular notions, freedom of the press was sharply curtailed in colonial America. [12] Seditious libel was punished as a contempt by the colonial legislatures and as a criminal offense in the **[\*\*\*\*90]** colonial courts. [13]

Scant, if any, evidence exists that the *First Amendment* was intended to abolish the common law of libel, at least to the extent of depriving ordinary citizens of meaningful redress against their defamers.  On the contrary,

"[it] is conceded on all sides that the common-law rules that subjected the libeler to responsibility for the private injury, or the public scandal or disorder occasioned by his conduct, are not abolished by the protection extended to the press in our constitutions." 2 T. Cooley, Constitutional Limitations 883 (8th ed. 1927).

Moreover, consistent with the Blackstone formula, [14] these **[\*382]** common-law actions did not abridge freedom **[\*\*\*\*91]** of the press.  See generally L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 247-248 (1960); Merin, Libel and the Supreme Court, 11 Wm. & Mary L. Rev. 371, 376 (1969); Hallen, Fair Comment, **[\*\*3028]** 8 Tex. L. Rev. 41, 56 (1929). Alexander Meiklejohn, who accorded generous reach to the *First Amendment*, nevertheless acknowledged:

"No one can doubt that, in any well-governed society, the legislature has both the right and the duty to prohibit certain forms of speech.  Libelous assertions may be, and must be, forbidden and punished.  So too must slander. . . .  All these necessities that speech be limited are recognized and provided for under the Constitution.  They were not unknown to the writers of the *First Amendment*. That amendment, then, we may take it for granted, *does not forbid the abridging of speech*.  But, at the same time, *it does forbid the abridging of the freedom of speech*.  It is to the solving of that paradox, that apparent self-contradiction, that we are summoned if, as free men, we wish to know what the right of freedom of speech is." Political Freedom, The Constitutional Powers of the **[\*\*\*\*92]** People 21 (1965).

See also Leflar, The Free-ness of Free Speech, 15 Vand. L. Rev. 1073, 1080-1081 (1962).

Professor Zechariah Chafee, a noted *First Amendment* scholar, has persuasively argued that conditions in 1791 "do not arbitrarily fix the division between lawful and unlawful speech **[\*\*\*\*93]** for all time." Free Speech in the United States 14 (1954). [15] **[\*\*\*\*94]** At the same time, however, **[\*383]** **[\*\*\*830]** he notes that while the Framers may have

---

[11] Merin, Libel and the Supreme Court, 11 Wm. & Mary L. Rev. 371, 373 (1969).

[12] A. Sutherland, Constitutionalism in America: Origin and Evolution of Its Fundamental Ideas 118-119 (1965).

[13] See generally L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History (1960).

[14] The men who wrote and adopted the *First Amendment* were steeped in the common-law tradition of England.  They read Blackstone, "a classic tradition of the bar in the United States" and "the oracle of the common law in the minds of the American Framers . . . ." J. Hurst, The Growth of American Law: The Law Makers 257 (1950); Levy, *supra*, n. 13, at 13; see also Sutherland, *supra*, n. 12, at 124-125; *Schick v. United States, 195 U.S. 65, 69 (1904)*. From him they learned that the major means of accomplishing free speech and press was to prevent prior restraints, the publisher later being subject to legal action if his publication was injurious.  4 W. Blackstone, Commentaries \*150-153.

[15] See also Meiklejohn, The *First Amendment* Is An Absolute, 1961 Sup. Ct. Rev. 245, 264:

"First, the Framers initiated a political revolution whose development is still in process throughout the world.  Second, like most revolutionaries, the Framers could not foresee the specific issues which would arise as their 'novel idea' exercised its domination over the governing activities of a rapidly developing nation in a rapidly and fundamentally changing world.  In that sense, the Framers did not know what they were doing.  And in the same sense, it is still true that, after two centuries of experience, we do not know what they were doing, or what we ourselves are now doing.

EXHIBIT 43

EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

intended to abolish seditious libels and to prevent any prosecutions by the Federal Government for criticism of the Government, [16] "the free speech clauses do not wipe out the common law as to obscenity, profanity, and defamation of individuals." [17]

The debates in Congress and the States over the *Bill of Rights* are unclear and inconclusive on any articulated intention of the Framers as to the free press guarantee. [18] We know that Benjamin Franklin, John Adams, and William Cushing favored limiting freedom of the press to truthful statements, while others such as James Wilson suggested a restatement of the Blackstone standard. [19]  **[*384]**  Jefferson endorsed Madison's formula that "Congress shall make no law . . . abridging the freedom of speech or the press" only after he suggested:

"The people shall not be deprived of their right to speak, to write, or *otherwise* to publish anything but false facts affecting injuriously the life, liberty,  **[****95]**  or reputation of others . . . ." F. Mott, Jefferson and the Press 14 (1943). [20]

 **[**3029]**  Doubt has been expressed that the Members of Congress envisioned the *First Amendment* as reaching even this far.  Merin, Libel and the Supreme Court, 11 Wm. & Mary L. Rev. 371, § 379-380 (1969).

 **[****96]**  This Court in bygone years has repeatedly dealt with libel and slander actions from the District of Columbia and from the Territories.  Although in these cases *First Amendment* considerations were not expressly discussed, the opinions of the Court unmistakably revealed that the classic law of libel was firmly in place in those areas where federal  **[***831]**  law controlled.  See, *e. g., Washington Post Co. v. Chaloner, 250 U.S. 290 (1919)*; *Baker v. Warner, 231 U.S. 588 (1913)*; *Nalle v. Oyster, 230 U.S. 165 (1913)*; *Dorr v. United States, 195 U.S. 138 (1904)*; *Pollard v. Lyon, 91 U.S. 225 (1876)*; *White v. Nicholls, 3 How. 266 (1845)*.

The Court's consistent view prior to *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, was that defamatory  **[*385]**  utterances were wholly unprotected by the *First Amendment*.  In *Patterson v. Colorado ex rel. Attorney General, 205 U.S. 454, 462 (1907)*, for example, the Court said that although freedom of speech and press is protected from abridgment by the Constitution, these  **[****97]**  provisions "do not prevent the subsequent

---

"In a more abstract and more significant sense, however, both they and we have been aware that the adoption of the principle of self-government by 'The People' of this nation set loose upon us and upon the world at large an idea which is still transforming men's conceptions of what they are and how they may best be governed."

[16] See *Beauharnais v. Illinois, 343 U.S. 250, 272 (1952)* (Black, J., dissenting).  Brant, who interprets the Framers' intention more liberally than Chafee, nevertheless saw the free speech protection as bearing upon criticism of government and other political speech.  I. Brant, The *Bill of Rights* 236 (1965).

[17] Z. Chafee, Free Speech in the United States 14 (1954).

[18] See 1 Annals of Cong. 729-789 (1789).  See also Brant, *supra*, n. 16, at 224; Levy, *supra*, n. 13, at 214, 224.

[19] Merin, *supra*, n. 11, at 377.  Franklin, for example, observed:

"If by the *Liberty of the Press* were understood merely the Liberty of discussing the Propriety of Public Measures and political opinions, let us have as much of it as you please: But if it means the Liberty of affronting, calumniating, and defaming one another, I, for my part, own myself willing to part with my Share of it when our Legislators shall please so to alter the Law, and shall cheerfully consent to exchange my *Liberty* of Abusing others for the *Privilege* of not being abused myself." 10 B. Franklin, Writings 38 (Smyth ed. 1907).

[20] Jefferson's noted opposition to public prosecutions for libel of government figures did not extend to depriving them of private libel actions.  Mott, *supra*, at 43.  There is even a strong suggestion that he favored state prosecutions.  E. Hudon, Freedom of Speech and Press in America 47-48 (1963).

**EXHIBIT 43**                                                                    **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

punishment of such as may be deemed contrary to the public welfare." This statement was repeated in _Near v. Minnesota ex rel. Olson, 283 U.S. 697, 714 (1931)_, the Court adding:


"But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common law rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our constitutions." _Id., at 715_.

_Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572 (1942)_ (footnotes omitted), reflected the same view:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.  These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words -- those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.  It has been well observed that such utterances are no essential part **[****98]** of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

 _Beauharnais v. Illinois, 343 U.S. 250, 254-257 (1952)_ (footnotes omitted), repeated the _Chaplinsky_ statement, noting also that nowhere at the time of the adoption of  **[*386]** the Constitution "was there any suggestion that the crime of libel be abolished." And in _Roth v. United States, 354 U.S., at 483_ (footnote omitted), the Court further examined the meaning of the _First Amendment_:

"In light of this history, it is apparent that the unconditional phrasing of  **[**3030]**  the _First Amendment_ was not intended to protect every utterance.  This phrasing did not prevent this Court from concluding that libelous utterances are not within the area of constitutionally protected speech.  _Beauharnais v. Illinois, 343 U.S. 250, 266_. At the time of the adoption of the _First Amendment_, obscenity law was not as fully developed as libel law, but there is sufficiently contemporaneous  **[***832]**  evidence to show that obscenity,  **[****99]**  too, was outside the protection intended for speech and press." [21]

The Court could not accept the generality of this historic view in _New York Times Co. v. Sullivan, supra._ There the Court held that the _First Amendment_ was intended to forbid actions for seditious libel and that defamation actions by public officials were therefore not subject to the traditional law of libel and slander. If these officials (and, later, public figures occupying semi-official or influential,  **[****100]**  although private, positions) were to recover, they were required to prove not only that the publication was false but also that it was knowingly false or published with reckless disregard for its truth or falsity. This view that the _First Amendment_ was written to forbid **[*387]** seditious libel reflected one side of the dispute that raged at the turn of the nineteenth century [22] and also mirrored the views of some later scholars. [23]

The central meaning of _New York Times_, and for me the _First Amendment_ as it relates to libel laws, is that seditious libel -- criticism of government and public officials -- falls beyond the police power of the State.  376 U.S., at 273-276.

---

[21] For further expressions of the general proposition that libels are not protected by the _First Amendment_, see _Konigsberg v. State Bar of California, 366 U.S. 36, 49-50 and n. 10 (1961)_; _Times Film Corp. v. City of Chicago, 365 U.S. 43, 48 (1961)_; _Pennekamp v. Florida, 328 U.S. 331, 348-349 (1946)_; cf.  _Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67 (1973)_; _Stanley v. Georgia, 394 U.S. 557, 561 n. 5 (1969)_.

[22] See Levy, _supra_, n. 13, at 247-248.

[23] See, _e. g.,_ _Abrams v. United States, 250 U.S. 616, 630 (1919)_ (Holmes, J., dissenting).

**119**

EXHIBIT 43                                                                                    EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

24 In a democratic society such as ours, the citizen has the privilege of criticizing his government and its officials.  But neither *New York Times* nor its **[****101]**  progeny suggest that the *First Amendment* intended in all circumstances to deprive the private citizen of his historic recourse to redress published falsehoods damaging to reputation or that, contrary to history and precedent, the Amendment should now be so interpreted.  Simply put, the *First Amendment* did not confer a "license to defame the citizen." W. Douglas, The Right of the People 36 (1958).

I do not labor the foregoing matters to contend that the Court is foreclosed from reconsidering prior interpretations of the *First Amendment*. 25 But the Court apparently finds a clean slate where in fact we have instructive historical experience dating from long before  **[*388]**  the first settlers, with their notions of democratic government and human freedom, journeyed to this land.  Given this rich background of history and precedent and because we deal with fundamentals when **[****102]**  we construe the *First Amendment*, we should proceed with  **[**3031]**  care and be presented with more compelling reasons before we jettison the settled law of the States to an even more radical extent. 26

 **[****103]**  III

 **[***833]**  The Court concedes that the dangers of self-censorship are insufficient to override the state interest in protecting the reputation of private individuals who are both more helpless and more deserving of state concern than public persons with more access to the media to defend themselves.  It therefore refuses to condition the private plaintiff's recovery on a showing of intentional or reckless falsehood as required by *New York Times*.  But the Court nevertheless extends the reach of the *First Amendment* to all defamation actions by requiring that the ordinary  **[*389]**  citizen, when libeled by a publication defamatory on its face, must prove some degree of culpability on the part of the publisher beyond the circulation to the public of a damaging falsehood. A rule at least as strict would be called for where the defamatory character of the publication is not apparent from its face.  *Ante*, at 348. 27  Furthermore, if this major hurdle to establish liability is surmounted, the Court requires proof of actual injury to reputation before any damages for such injury may be awarded.

 **[****104]**  The Court proceeds as though it were writing on *tabula rasa* and suggests that it must mediate between two unacceptable choices -- on the one hand, the rigors of the *New York Times* rule which the Court thinks would

---

24 Kalven, The New York Times Case: A Note on "The Central Meaning of the *First Amendment*," 1964 Sup. Ct. Rev. 191, 208-209.

25 "The language of the *First Amendment* is to be read not as barren words found in a dictionary but as symbols of historic experience illumined by the presuppositions of those who employed them. . . .  As in the case of every other provision of the Constitution that is not crystallized by the nature of its technical concepts, the fact that the *First Amendment* is not self-defining and self-enforcing neither impairs its usefulness nor compels its paralysis as a living instrument." *Dennis v. United States, 341 U.S. 494, 523 (1951)* (Frankfurter, J., concurring).

26 "[The] law of defamation has been an integral part of the laws of England, the colonies and the states since time immemorial. So many actions have been maintained and judgments recovered under the various laws of libel that the Constitutional validity of libel actions could be denied only by a Court willing to hold all of its predecessors were wrong in their interpretation of the *First Amendment* and that two hundred years of precedents should be overruled." Rutledge, The Law of Defamation: Recent Developments, 32 Alabama Lawyer 409, 410 (1971).

The prevailing common-law libel rules in this country have remained in England and the Commonwealth nations.  Pedrick, Freedom of the Press and the Law of Libel: The Modern Revised Translation, 49 Cornell L. Q. 581, 583-584 (1964). After many years of reviewing the English law of defamation, the Porter Committee concluded that "though the law as to defamation requires some modification, the basic principles upon which it is founded are not amiss." Report of the Committee on the Law of Defamation, Cmd. No. 7536, para. 222, p. 48 (1948).

27 If I read the Court correctly, it clearly implies that for those publications that do not make "substantial danger to reputation apparent," the *New York Times* actual-malice standard will apply.  Apparently, this would be true even where the imputation concerned conduct or a condition that would be *per se* slander.

EXHIBIT 43                                                                EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

give insufficient recognition to the interest of the private plaintiff, and, on the other hand, the prospect of imposing "liability without fault" on the press and others who are charged with defamatory utterances.  Totally ignoring history and settled *First Amendment* law, the Court purports to arrive at an "equitable compromise," rejecting both what it considers faultless liability and *New York Times* malice, but insisting on some intermediate degree of fault. Of course, the Court necessarily discards the contrary judgment arrived at in the 50 States that the reputation interest of the private citizen is deserving of considerably more protection.

The Court evinces a deep-seated antipathy to "liability without fault." But this catch-phrase has no talismanic significance and is almost meaningless in this context where the Court appears to be addressing those libels and slanders that are defamatory on their face and where **[*390]** the publisher is no doubt **[****105]** aware from the nature of the material that it would be inherently damaging to reputation. He publishes **[***834]** notwithstanding, knowing that he will inflict injury.  With this knowledge, he must intend to inflict that injury, his excuse being that he is privileged to do so -- that he has published the truth.   But as it turns out, what he has circulated to the public **[**3032]** is a very damaging falsehood. Is he nevertheless "faultless"? Perhaps it can be said that the mistake about his defense was made in good faith, but the fact remains that it is he who launched the publication knowing that it could ruin a reputation.

In these circumstances, the law has heretofore put the risk of falsehood on the publisher where the victim is a private citizen and no grounds of special privilege are invoked.  The Court would now shift this risk to the victim, even though he has done nothing to invite the calumny, is wholly innocent of fault, and is helpless to avoid his injury.  I doubt that jurisprudential resistance to liability without fault is sufficient ground for employing the *First Amendment* to revolutionize the law of libel, and in my view, that body of legal rules poses no realistic **[****106]** threat to the press and its service to the public.  The press today is vigorous and robust.  To me, it is quite incredible to suggest that threats of libel suits from private citizens are causing the press to refrain from publishing the truth.  I know of no hard facts to support that proposition, and the Court furnishes none.

The communications industry has increasingly become concentrated in a few powerful hands operating very lucrative businesses reaching across the Nation and into almost every home. [28] Neither the industry as a whole nor **[*391]** its individual components are easily intimidated, and we are fortunate that they are not.  Requiring them to pay for the occasional damage they do to private reputation will play no substantial part in their future performance or their existence.

---

[28] A recent study has comprehensively detailed the role and impact of mass communications in this Nation.  See Note, Media and the *First Amendment* in a Free Society, 60 Geo. L. J. 867 (1972). For example, 99% of the American households have a radio, and 77% hear at least one radio newscast daily.  In 1970, the yearly average home television viewing time was almost six hours per day. *Id*., at 883 n. 53.

"Sixty years ago, 2,442 newspapers were published daily nationwide, and 689 cities had competing dailies.  Today, in only 42 of the cities served by one of the 1,748 American daily papers is there a competing newspaper under separate ownership.  Total daily circulation has passed 62 million copies, but over 40 percent of this circulation is controlled by only 25 ownership groups.

"Newspaper owners have profited greatly from the consolidation of the journalism industry.  Several of them report yearly profits in the tens of millions of dollars, with after tax profits ranging from seven to 14 percent of gross revenues.  Unfortunately, the owners have made their profits at the expense of the public interest in free expression.  As the broad base of newspaper ownership narrows, the variation of facts and opinions received by the public from antagonistic sources is increasingly limited.  Newspaper publication is indeed a leading American industry.  Through its evolution in this direction, the press has come to be dominated by a select group whose prime interest is economic.

"The effect of consolidation within the newspaper industry is magnified by the degree of intermedia ownership.  Sixty-eight cities have a radio station owned by the only local daily newspaper, and 160 television stations have newspaper affiliations.  In 11 cities diversity of ownership is completely lacking with the only television station and newspaper under the same control." *Id*., at 892-893 (footnotes omitted).

See also Congress, FCC Consider Newspaper Control of Local TV, 32 Cong. Q. 659-663 (1974).

121

EXHIBIT 43 EXHIBIT 6

Gertz v. Robert Welch, 418 U.S. 323

 **[****107]**  In  **[***835]**  any event, if the Court's principal concern is to protect the communications industry from large libel judgments, it would appear that its new requirements with respect to general and punitive damages would be ample protection.   Why it also feels compelled to escalate the threshold standard of liability I cannot fathom,  **[*392]**  particularly when this will eliminate in many instances the plaintiff's possibility of securing a judicial determination that the damaging publication was indeed false, whether or not he is entitled to recover money damages.  Under the Court's new rules, the plaintiff must prove not only the defamatory statement but also some degree of fault accompanying it.  The publication may be wholly false and the wrong to him  **[**3033]**  unjustified, but his case will nevertheless be dismissed for failure to prove negligence or other fault on the part of the publisher. I find it unacceptable to distribute the risk in this manner and force the wholly innocent victim to bear the injury; for, as between the two, the defamer is the only culpable party.  It is he who circulated a falsehood that he was not required to publish.

It is difficult for me to **[****108]**  understand why the ordinary citizen should himself carry the risk of damage and suffer the injury in order to vindicate *First Amendment* values by protecting the press and others from liability for circulating false information.  This is particularly true because such statements serve no purpose whatsoever in furthering the public interest or the search for truth but, on the contrary, may frustrate that search and at the same time inflict great injury on the defenseless individual.  The owners of the press and the stockholders of the communications enterprises can much better bear the burden.  And if they cannot, the public at large should somehow pay for what is essentially a public benefit derived at private expense.

IV

A

Not content with escalating the threshold requirements of establishing liability, the Court abolishes the ordinary damages rule, undisturbed by *New York Times*  **[*393]**  and later cases, that, as to libels or slanders defamatory on their face, injury to reputation is presumed and general damages may be awarded along with whatever special damages may be sought.  Apparently because the Court feels that in some unspecified and unknown number of cases, plaintiffs **[****109]**  recover where they have suffered no injury or recover more than they deserve, it dismisses this rule as an "oddity of tort law." The Court thereby refuses in *any* case to accept the fact of wide dissemination of a *per se* libel as prima facie proof of injury sufficient to survive a motion to dismiss at the close of plaintiff's case.

I have said before, but it bears repeating, that even if the plaintiff should recover no monetary damages, he should be able to prevail and have a judgment that the publication is false.  But beyond that, courts and legislatures literally for centuries have thought that in the generality of cases, libeled plaintiffs will be seriously shortchanged if they must prove the extent of the injury to their reputations. Even where libels or slanders are not on their face defamatory and special damage must be shown, when that showing is made, general damages  **[***836]**  for reputation injury are recoverable without specific proof. [29]

 **[****110] [*394]**   The Court is clearly right when at one point it states that "the law of defamation is rooted in our experience that the truth rarely catches up with a lie." *Ante*, at 344 n. 9.  But it ignores what that experience teaches,

---

[29] Having held that the defamation plaintiff is limited to recovering for "actual injury," the Court hastens to add:

"Suffice it to say that actual injury is not limited to out-of-pocket loss.  Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Ante*, at 350.

It should be pointed out that under the prevailing law, where the defamation is not actionable *per se* and proof of "special damage" is required, a showing of actual injury to reputation is insufficient; but if pecuniary loss is shown, general reputation damages are recoverable.  The Court changes the latter, but not the former, rule.  Also under present law, pain and suffering, although shown, do not warrant damages in any defamation action unless the plaintiff is otherwise entitled to at least nominal damages.  By imposing a more difficult standard of liability and requiring proof of actual damage to reputation, recovery for pain and suffering, though real, becomes a much more remote possibility.

**EXHIBIT 43**                                                                                EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

*viz.*, that damage to reputation is recurringly difficult to prove and that requiring actual proof would repeatedly destroy any chance for  **[\*\*3034]**  adequate compensation.  Eminent authority has warned that

"it is clear that proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted in fact." W. Prosser, Law of Torts § 112, p. 765 (4th ed. 1971). [30]

 **[\*\*\*\*111]**  The Court fears uncontrolled awards of damages by juries, but that not only denigrates the good sense of most jurors -- it fails to consider the role of trial and appellate courts in limiting excessive jury verdicts where no reasonable relationship exists between the amount awarded and the injury sustained. [31] **[\*\*\*\*112]**  Available information  **[\*395]**  tends to confirm that American courts have ably discharged this responsibility. [32]

The new rule with respect to general damages appears to apply to all  **[\*\*\*837]**  libels or slanders, whether defamatory on their face or not, except, I gather, when the plaintiff proves intentional falsehood or reckless disregard. Although the impact of the publication on the victim is the same, in such circumstances the injury to reputation may apparently be presumed in accordance with the traditional rule.  Why a defamatory statement is more apt to cause injury if the lie is intentional than when it is only negligent, I fail to understand.  I suggest that judges and juries who must live by these rules will find them equally incomprehensible.

B

With a flourish of the pen, the Court also discards the prevailing rule in libel and slander actions that punitive damages may be awarded on the classic grounds of common-law malice, that is, "'[actual] malice' in the sense of ill will or fraud or reckless indifference to consequences."  **[\*396]**  C. McCormick, Law of Damages § 118, p. 431 (1935); see also W. Prosser, *supra*, § 113, p. 772;  **[\*\*\*\*113]**  1 A. Hanson, Libel and Related Torts para. 163, p. 133 (1969); Note, Developments in the Law -- Defamation, 69 Harv. L. Rev. 875, 938 (1956); *Cal. Civ. Code § 48a (4)(d)* (1954).  In its stead, the Court requires defamation plaintiffs to show intentional falsehood or reckless disregard for the truth or falsity of the publication.  The Court again complains about substantial verdicts and the possibility of press self-censorship, saying that punitive damages are merely "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Ante*, at 350.  But I see no constitutional difference between publishing with reckless disregard for the truth, where punitive damages will be permitted, and negligent publication where they will not be allowed.  It is difficult to understand what is constitutionally  **[\*\*3035]**  wrong with assessing punitive damages to deter a publisher from departing from those standards of care ordinarily followed in the publishing industry, particularly if common-law malice is also shown.

---

[30] "The harm resulting from an injury to reputation is difficult to demonstrate both because it may involve subtle differences in the conduct of the recipients toward the plaintiff and because the recipients, the only witnesses able to establish the necessary causal connection, may be reluctant to testify that the publication affected their relationships with the plaintiff.  Thus some presumptions are necessary if the plaintiff is to be adequately compensated." Note, Developments in the Law -- Defamation, 69 Harv. L. Rev. 875, 891-892 (1956).

[31] "On questions of damages, the judge plays an important role.  It is, of course, for him to determine and instruct the jury as to what matters may be taken into consideration by them in arriving at a verdict since such questions are clearly matters of substantive law.  But the judge also may and frequently does exercise a judgment as to the amount of damages the plaintiff may recover.  His function here is primarily to keep the jury within bounds of reason and common sense, to guard against excessive verdicts dictated by passion and prejudice and to see to it that the amount of the verdict has some reasonable relation to the plaintiff's evidence as to his loss or the probability of loss.  Thus, the trial judge may grant a new trial or the appellate court may reverse and remand the case for a new trial because of excessive damages or, as is more frequently the case, a remittitur may be ordered, the effect of which is that the plaintiff must accept a specified reduction of his damages or submit to a new trial on the issue of liability as well as damages." 1 F. Harper & F. James, The Law of Torts § 5.29, p. 467 (1956) (footnote omitted).

[32] See Pedrick, *supra*, n. 26, at 587 n. 23.

**EXHIBIT 43**                                                               **EXHIBIT 6**

Gertz v. Robert Welch, 418 U.S. 323

I note also the questionable premise that "juries assess punitive damages in wholly unpredictable amounts bearing no necessary **[****114]** relation to the actual harm caused." *Ibid*.  This represents an inaccurate view of established practice, "another of those situations in which judges, largely unfamiliar with the relatively rare actions for defamation, rely on words without really going behind them . . . ." [33] While a jury award in any type of civil case may certainly be unpredictable, trial and appellate courts have been increasingly vigilant in ensuring that the jury's result is "based upon a rational consideration of the evidence and the proper application of the  **[*397]**  law." *Reynolds v. Pegler, 123 F.Supp. 36, 39 (SDNY 1954)*, aff'd, *223 F.2d 429 (CA2)*, cert. denied, *350 U.S. 846 (1955)*. See *supra*, nn. 31-32. Moreover, some courts require that punitive damages bear a reasonable relation to the compensatory damages award. [34] Still others bar common-law punitive damages or condition their award on a refusal to print a retraction. [35]

"The danger . . . of immoderate  **[***838]**  verdicts, is certainly a real one, and the criterion to be applied by the judge in setting or reducing the amount is concededly a vague and subjective one.  Nevertheless **[****115]** the verdict may be twice submitted by the complaining defendant to the common sense of trained judicial minds, once on motion for new trial and again on appeal, and it must be a rare instance when an unjustifiable award escapes correction." C. McCormick, *supra*, § 77, p. 278.

The Court points to absolutely no empirical evidence to substantiate its premise.  For my part, I would require something more substantial than an undifferentiated fear of unduly burdensome punitive damages awards before retooling the established common-law rule and depriving the States of the opportunity to experiment with different methods for guarding against abuses.

Even assuming the possibility that some verdicts will be "excessive," I cannot subscribe to the Court's remedy.  On its face it is a classic **[****116]**  example of judicial overkill.  Apparently abandoning the salutary *New York Times* policy of case-by-case "'independent examination of the whole record' . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on  **[*398]**  the field of free expression," [36] **[****117]**  the Court substitutes an inflexible rule barring recovery of punitive damages absent proof of constitutional malice.  The *First Amendment* is a majestic statement of a free people's dedication to "uninhibited, robust, and wide-open" debate on public issues, [37] but we do it a grave disservice when we needlessly spend its force. [38] For almost 200 years, punitive damages and the *First Amendment* have peacefully coexisted.  There has been no demonstration that state libel laws as they relate to punitive damages necessitate the majority's extreme response.  I fear that those who read the Court's decision will find its words inaudible, for the Court speaks "only [with] a voice of power, not of reason.  **[**3036]**  " *Mapp v. Ohio, 367 U.S. 643, 686 (1961)* (Harlan, J., dissenting).

V

In disagreeing with the Court on the *First Amendment's* reach in the area of state libel laws protecting nonpublic persons, I do not repudiate the principle that the *First Amendment* "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Associated Press v. United States, 326 U.S. 1, 20 (1945)*; see also *Miami Herald Publishing Co*. v. *Tornillo, ante*, at 260 (WHITE, J., concurring).  I continue to subscribe to the *New York Times*

---

[33] Murnaghan, *supra*, n. 3, at 29.

[34] Note, Developments in the Law -- Defamation, 69 Harv. L. Rev., *supra*, at 875, 938 and n. 443.

[35] **Id., at 939, 941-942**.  See, *e. g*., *Cal. Civ. Code § 48a (2)* (1954).

[36] *376 U.S., at 285*.

[37] *Id., at 270*.

[38] Judicial review of jury libel awards for excessiveness should be influenced by *First Amendment* considerations, but it makes little sense to discard an otherwise useful and time-tested rule because it might be misapplied in a few cases.

**124**

EXHIBIT 43   EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

decision and those decisions extending its protection to defamatory falsehoods about public persons.  My quarrel with the Court stems **[\*399]** from its willingness "to sacrifice good sense to a syllogism" **[\*\*\*\*118]** [39] -- to find in the *New York Times* doctrine an **[\*\*\*839]** infinite elasticity.  Unfortunately, this expansion is the latest manifestation of the destructive potential of any good idea carried out to its logical extreme.

Recovery under common-law standards for defamatory falsehoods about a private individual, who enjoys no "general fame or notoriety in the community," who is not "[pervasively] [involved] in the affairs of society," and who does not "thrust himself into the vortex of [a given] public issue . . . in an attempt to influence its outcome," [40] is simply not forbidden by the *First Amendment*. A distinguished private study group put it this way:

"Accountability, like subjection to law, is not necessarily a net subtraction from liberty." "The *First Amendment* was intended to guarantee free expression, not to create a privileged industry." Commission on Freedom of the Press, A Free and Responsible Press 130, 81 (1947).

**[\*\*\*\*119]** I fail to see how the quality or quantity of public debate will be promoted by further emasculation of state libel laws for the benefit of the news media. [41] If anything, **[\*400]** this trend may provoke a new and radical imbalance in the communications process.  Cf. Barron, Access to the Press -- A New *First Amendment* Right, 80 Harv. L. Rev. 1641, 1657 (1967). It is not at all inconceivable that virtually unrestrained defamatory remarks about private citizens will discourage them from speaking out and concerning themselves with social problems.  This would turn the *First Amendment* on its head.  Note, The Scope of *First Amendment* Protection for Good-Faith Defamatory Error, 75 Yale L. J. 642, 649 (1966); Merin, 11 Wm. & Mary L. Rev., at 418. David Riesman, writing in the midst of World War II on the fascists' effective use of defamatory attacks on their opponents, commented: "Thus it is that the law of libel, with its ecclesiastic background and domestic character, its aura of heart-balm suits and crusading nineteenth-century editors, becomes suddenly important for modern democratic survival." Democracy and Defamation: **[\*\*3037]** Fair **[\*\*\*\*120]** Game and Fair Comment I, 42 Col. L. Rev. 1085, 1088 (1942).

This case ultimately comes down to the importance the Court attaches to society's "pervasive and strong **[\*\*\*\*121]** interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer, 383 U.S., at 86*. From all that I have seen, the Court has miscalculated and denigrates that interest at a time when escalating assaults on individuality and personal dignity counsel otherwise. [42] **[\*\*\*\*122]**   **[\*401]** At the very least, the issue is highly

---

[39] O. Holmes, The Common Law 36 (1881).

[40] *Ante*, at 351, 352.

[41] Cf. Pedrick, *supra*, n. 26, at 601-602:

"A great many forces in our society operate to determine the extent to which men are free in fact to express their ideas.  Whether there is a privilege for good faith defamatory misstatements on matters of public concern or whether there is strict liability for such statements may not greatly affect the course of public discussion.  How different has life been in those states which heretofore followed the majority rule imposing strict liability for misstatements of fact defaming public figures from life in the minority states where the good faith privilege held sway?"

See also T. Emerson, The System of Freedom of Expression 519 (1970) (footnote omitted): "[On] the whole the role of libel law in the system of freedom of expression has been relatively minor and essentially erratic."

[42] "The man who is compelled to live every minute of his life among others and whose every need, thought, desire, fancy or gratification is subject to public scrutiny, has been deprived of his individuality and human dignity.  Such an individual merges with the mass.  His opinions, being public, tend never to be different; his aspirations, being known, tend always to be conventionally accepted ones; his feelings, being openly exhibited, tend to lose their quality of unique personal warmth and to become the feelings of every man.  Such a being, although sentient, is fungible; he is not an individual." Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N. Y. U. L. Rev. 962, 1003 (1964).

**EXHIBIT 43**                                                            **EXHIBIT  6**

Gertz v. Robert Welch, 418 U.S. 323

debatable,  **[\*\*\*840]**  and the Court has not carried its heavy burden of proof to justify tampering with state libel laws. [43]

 **[\*\*\*\*123]**   **[\*402]**  While some risk of exposure "is a concomitant of life in a civilized community," *Time, Inc. v. Hill, 385 U.S. 374, 388 (1967)*, the private citizen does not bargain for defamatory falsehoods. Nor is society powerless to vindicate unfair injury to his reputation.

"It is a fallacy . . . to assume that the *First Amendment* is the only guidepost in the area of state defamation laws.  It is not. . . .

"The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty.  The protection of private personality, like the protection of life itself, is left primarily to the  **[\*\*3038]**  individual States under the *Ninth* and *Tenth Amendments*.  But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt v. Baer, supra, at 92* (STEWART, J., concurring).

The case against razing state libel laws is compelling when considered in light of the increasingly prominent role **[\*\*\*\*124]**  of mass media in our society and the awesome power it has placed in the hands of a select few. [44] Surely, our political "system cannot flourish if regimentation takes hold." *Public Utilities  [\*\*\*841]  Comm'n v. Pollak, 343 U.S. 451, 469 (1952)* (DOUGLAS, J., dissenting).  Nor can it survive if our people are deprived of an effective method  **[\*403]**  of vindicating their legitimate interest in their good names. [45]

Freedom and human dignity and decency are not antithetical.  Indeed, they cannot survive **[\*\*\*\*125]**  without each other.  Both exist side-by-side in precarious balance, one always threatening to overwhelm the other.  Our experience

---

[43] With the evisceration of the common-law libel remedy for the private citizen, the Court removes from his legal arsenal the most effective weapon to combat assault on personal reputation by the press establishment.  The David and Goliath nature of this relationship is all the more accentuated by the Court's holding today in *Miami Herald Publishing Co.* v. *Tornillo, ante*, p. 241, which I have joined, that an individual criticized by a newspaper's editorial is precluded by the *First Amendment* from requiring that newspaper to print his reply to that attack.  While that case involves an announced candidate for public office, the Court's finding of a *First Amendment* barrier to government "intrusion into the function of editors," *ante*, at 258, does not rest on any distinction between private citizens or public officials.  In fact, the Court observes that the *First Amendment* clearly protects from governmental restraint "the exercise of editorial control and judgment," *i. e.*, "[the] choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of *public issues and public officials* -- whether fair or unfair . . . ." *Ibid*.  (Emphasis added.)

We must, therefore, assume that the hapless ordinary citizen libeled by the press (a) may not enjoin in advance of publication a story about him, regardless of how libelous it may be, *Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931)*; (b) may not compel the newspaper to print his reply; and (c) may not force the newspaper to print a retraction, because a judicially compelled retraction, like a "remedy such as an enforceable right of access," entails "governmental coercion" as to content, which "at once brings about a confrontation with the express provisions of the *First Amendment* and the judicial gloss on that Amendment developed over the years." *Miami Herald Publishing Co.* v. *Tornillo, ante*, at 254; but cf. this case, *ante*, at 368 n. 3 (BRENNAN, J., dissenting).

My Brother BRENNAN also suggests that there may constitutionally be room for "the possible enactment of statutes, not requiring proof of fault, which provide . . . for publication of a court's determination of falsity if the plaintiff is able to demonstrate that false statements have been published concerning his activities." *Ibid*.  The Court, however, does not even consider this less drastic alternative to its new "some fault" libel standards.

[44] See n. 28, *supra*.

[45] "No democracy, . . . certainly not the American democracy, will indefinitely tolerate concentrations of private power irresponsible and strong enough to thwart the aspirations of the people.  Eventually governmental power will be used to break up private power, or governmental power will be used to regulate private power -- if private power is at once great and irresponsible." Commission on Freedom of the Press, A Free and Responsible Press 80 (1947).

**EXHIBIT 43**                                                                    **EXHIBIT  6**

Gertz v. Robert Welch, 418 U.S. 323

as a Nation testifies to the ability of our democratic institutions to harness this dynamic tension.  One of the mechanisms seized upon by the common law to accommodate these forces was the civil libel action tried before a jury of average citizens.  And it has essentially fulfilled its role.  Not because it is necessarily the best or only answer, but because

"the juristic philosophy of the common law is at bottom the philosophy of pragmatism.  Its truth is relative, not absolute. The rule that functions well produces a title deed to recognition." B. Cardozo, Selected Writings 149 (Hall ed. 1947).

In our federal system, there must be room for allowing the States to take diverse approaches to these vexing questions.  We should "continue to forbear from fettering the States with an adamant rule which may embarrass them in coping with their own peculiar problems . . . ." *Mapp v. Ohio, 367 U.S., at 681* (Harlan, J., dissenting); see also Murnaghan, From Figment to Fiction to Philosophy -- The Requirement of Proof of Damages in **[****126]**  Libel Actions, 22 Cath. U. L. Rev. 1, 38 (1972).  **[*404]**  Cf.  *Younger v. Harris, 401 U.S. 37, 44-45 (1971)*. Whether or not the course followed by the majority is wise, and I have indicated my doubts that it is, our constitutional scheme compels a proper respect for the role of the States in acquitting their duty to obey the Constitution.  Finding no evidence that they have shirked this responsibility, particularly when the law of defamation is even now in transition, I would await some demonstration of the diminution of freedom of expression before acting.

For the foregoing reasons, I would reverse the judgment of the Court of Appeals and reinstate the jury's verdict.

# References

*50 Am Jur 2d, Libel and Slander 125, 297, 299, 302*

16 Am Jur Pl & Pr Forms (rev ed), Libel and Slander Forms 1-4, 24

17 Am Jur Trials 223, Libel Actions by Public Officials

US L Ed Digest, Constitutional Law 927.5, 930

ALR Digests, Constitutional Law 794; Libel and Slander 65, 127

L Ed Index to Annos, Libel and Slander

ALR Quick Index, Libel and Slander; New York Times Rule

Federal Quick Index,  **[****127]**  Libel and Slander

            Annotation References:

Constitutional aspects of libel and slander.  *28 L Ed 2d 885*.

Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice.  *20 ALR3d 988*.

Libel and slander: who is a public official or otherwise within the federal constitutional rule requiring public officials to show actual malice.  *19 ALR3d 1361*.

Effect of alleged misstatements or misrepresentations in campaign literature, material, or leaflets on validity of representation election.  *3 ALR 3d 889*.

Constitutional aspects of libel or slander of public officials.  *95 ALR2d 1450*.

Necessity and sufficiency of plaintiff's allegations as to falsity in defamation action.  *85 ALR2d 460*.

Sufficiency of plaintiff's allegations in defamation action as to defendant's malice.  *76 ALR2d 696*.

**EXHIBIT 43**                                                                    EXHIBIT  6

Gertz v. Robert Welch, 418 U.S. 323

Libel and slander: actionability of statement imputing incapacity, inefficiency, misconduct, fraud, dishonesty, or the like to public employee.  *53 ALR2d 8*.

 **[****128]**  Excessiveness or inadequacy of damages for defamation.  *35 ALR2d 218*.

---

**End of Document**

**EXHIBIT 43**

**EXHIBIT  7**

Rosenbloom v. Metromedia, 403 U.S. 29

## *Rosenbloom v. Metromedia*

Supreme Court of the United States

December 7-8, 1970, Argued ; June 7, 1971, Decided

No. 66

### Reporter

403 U.S. 29 *; 91 S. Ct. 1811 **; 29 L. Ed. 2d 296 ***; 1971 U.S. LEXIS 124 ****; 1 Media L. Rep. 1597

ROSENBLOOM v. METROMEDIA, INC.

**Prior History:  [****1]**  CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.

**Disposition:**  *415 F.2d 892*, affirmed.

## Case Summary

### Procedural Posture
Petitioner sought review of the judgment of the United States Court of Appeals for the Third Circuit holding in favor of respondent in petitioner's suit against respondent for libel.

### Overview
Petitioner distributed nudist magazines and was arrested on charges of possession of obscene literature. Following petitioner's arrest, respondent broadcast reports of the arrest over the radio. A jury acquitted petitioner of the criminal obscenity charges and petitioner filed suit against respondent, alleging that respondent's unqualified characterization of materials seized from petitioner as obscene in respondent's broadcasts constituted libel per se and was proved false by petitioner's acquittal. Petitioner's defenses were truth and privilege. The district court held in favor of petitioner and the appellate court reversed, concluding that petitioner's evidence did not meet the requisite clear and convincing proof that the statements alleged as libel were uttered with knowledge that such were false or with reckless disregard of whether they were false. Petitioner sought the Court's review. The Court held the appellate court had correctly stated the standard of proof necessary in order for petitioner to prevail, and because petitioner failed to meet that standard with the requisite convincing clarity in order to create jury issue, the judgment of the appellate court was affirmed.

### Outcome
The judgment in favor of respondent was affirmed because petitioner did not meet the requisite standard of proof necessary to create a jury issue on the issue of respondent's defamatory statements.

## Syllabus

 Respondent's radio station, which broadcast news reports every half hour, broadcast news stories of petitioner's arrest for possession of obscene literature and the police seizure of "obscene books," and stories concerning petitioner's lawsuit against certain officials alleging that the magazines he distributed were not obscene and seeking injunctive relief from police interference with his business.  These latter stories did not mention petitioner's name, but used the terms "smut literature racket" and "girlie-book peddlers." Following petitioner's acquittal of criminal obscenity charges, he filed this diversity action in District Court seeking damages under Pennsylvania's libel law.  The jury found for petitioner and awarded $ 25,000 in general damages; and $ 725,000 in punitive damages, which was reduced by

129

EXHIBIT 43   EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

the court on remittitur to $ 250,000.  The Court of Appeals reversed, holding that the *New York Times Co [****2] . v. Sullivan, 376 U.S. 254*, standard applied, and "the fact that plaintiff was not a public figure cannot be accorded decisive significance." *Held*: The judgment is affirmed.  Pp. 40-62.

MR. JUSTICE BRENNAN, joined by THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN, concluded that the *New York Times* standard of knowing or reckless falsity applies in a state civil libel action brought by a private individual for a defamatory falsehood uttered in a radio news broadcast about the individual's involvement in an event of public or general interest. Pp. 40-57.

MR. JUSTICE BLACK concluded that the *First Amendment* protects the news media from libel judgments even when statements are made with knowledge that they are false.  P. 57.

MR. JUSTICE WHITE concluded that, in the absence of actual malice as defined in *New York Times, supra*, the *First Amendment* gives the news media a privilege to report and comment upon the official actions of public servants in full detail, without sparing from public view the reputation or privacy of an individual involved in or affected by any official action.  Pp. 59-62.

**Counsel:** Ramsey Clark argued the cause for petitioner.  **[****3]**  With him on the brief was Benjamin Paul.

Bernard G. Segal argued the cause for respondent.  With him on the brief were Irving R. Segal, Samuel D. Slade, and Carleton G. Eldridge, Jr.

**Judges:** Brennan, J., announced the Court's judgment and delivered an opinion in which Burger, C. J., and Blackmun, J., joined.  Black, J., post, p. 57, and White, J., post, p. 57, filed opinions concurring in the judgment. Harlan, J., filed a dissenting opinion, post, p. 62.  Marshall, J., filed a dissenting opinion in which Stewart, J., joined, post, p. 78.  Douglas, J., took no part in the consideration or decision of this case.

**Opinion by:** BRENNAN

# Opinion

 **[*30]**   **[***304]**   **[**1813]**  MR. JUSTICE BRENNAN announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join.

 [1A] [2]In a series of cases beginning with *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, the Court has considered the limitations upon state libel laws imposed by the constitutional guarantees of freedom of speech **[****4]**  and of the press.  *New York Times* held that in a civil libel action by a public official against a newspaper those guarantees required clear and convincing proof that a defamatory falsehood alleged as libel was uttered with "knowledge that it was false or with reckless disregard of whether it was false or not." *Id., at 280*. The same requirement was later held to apply to "public figures" who sued in libel on the basis of alleged defamatory falsehoods. The several cases considered since *New York Times* involved actions of "public officials" or "public figures," usually, but not always, against newspapers or magazines. [1] **[****6]**  **[***305]** Common  **[**1814]**  to all the

---

[1] See, *e. g., Associated Press v. Walker, 388 U.S. 130 (1967)* (retired Army general against a wire service); *Curtis Publishing Co.* v. *Butts, 388 U.S. 130 (1967)* (former football coach against publisher of magazine); *Beckley Newspapers Corp.* v. *Hanks, 389 U.S. 81 (1967)* (court clerk against newspaper); *Greenbelt Publishing Assn.* v. *Bresler, 398 U.S. 6 (1970)* (state representative and real estate developer against publisher of newspaper); *Ocala Star-Banner Co.* v. *Damron, 401 U.S. 295 (1971)* (defeated candidate for tax assessor against publisher of newspaper); *Monitor Patriot Co.* v. *Roy, 401 U.S. 265 (1971)* (candidate for United States Senate against publisher of newspaper); *Time, Inc.* v. *Pape, 401 U.S. 279 (1971)* (police official against publisher of magazine).  However, *Rosenblatt v. Baer, 383 U.S. 75 (1966)*, involved an action against a newspaper columnist by a former county recreation area supervisor; *St. Amant v. Thompson, 390 U.S. 727 (1968)*, involved an action of a deputy sheriff against a

EXHIBIT 43                                                                    EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

cases was a **[\*31]** defamatory falsehood in the report of an event of "public or general interest." [2] The instant case presents the question whether the *New York Times'* knowing-or-reckless-falsity standard applies in a state civil libel action brought not by a "public official" or a "public figure" but by a private individual for a defamatory falsehood uttered in a news broadcast by a radio station about the individual's involvement in an event of public or general **[\*32]** interest. [3] The **[\*\*\*\*5]** District Court for the Eastern District of Pennsylvania held that the *New York Times* standard did not apply and that Pennsylvania law determined respondent's liability in this diversity case, *289 F.Supp. 737 (1968)*. The Court of Appeals for the Third Circuit held that the *New York Times* standard did apply and reversed the judgment for damages awarded to petitioner by the jury. *415 F.2d 892 (1969)*. We granted certiorari, *397 U.S. 904 (1970)*. We agree with the Court of Appeals and affirm that court's judgment.

I

In 1963, petitioner was a distributor of nudist magazines in the Philadelphia metropolitan area. During the fall of that year, in response to citizen complaints, the Special Investigations Squad of the Philadelphia Police Department initiated a series of enforcement actions under the city's obscenity laws. The police, under the command of Captain Ferguson, purchased various magazines from more than 20 newsstands throughout the city. Based upon Captain Ferguson's determination that the magazines were obscene, [4] police on October 1, 1963, arrested most of the newsstand operators [5] on charges of selling obscene material. While the police were making an **[\*\*\*306]** arrest at one newsstand, petitioner arrived to deliver some of **[\*\*\*\*7]** his nudist magazines and was immediately arrested **[\*33]** along with the newsboy. [6] Three days later, on October 4, the police obtained a warrant to search petitioner's home and the rented barn he used as a warehouse, and seized the inventory of magazines and books found at these locations. Upon learning of the seizures, petitioner, who had been released on bail after his first arrest, surrendered to the police and was arrested for a second time.

Following the second arrest, Captain Ferguson **[\*\*\*\*8]** telephoned respondent's radio station WIP and another local radio station, a wire service, and a local newspaper to inform them of the raid on petitioner's home and of his arrest. WIP broadcast news reports every half hour to the Philadelphia metropolitan area. These news programs ran either five or ten minutes and generally contained from six to twenty different items that averaged **[\*\*1815]** about thirty seconds each. WIP's 6 p. m. broadcast on October 4, 1963, included the following item:

"City Cracks Down on Smut Merchants

---

defeated candidate for the United States Senate; and *Linn v. Plant Guard Workers, 383 U.S. 53 (1966)*, involved an action by an official of an employer against a labor union.

 *Garrison v. Louisiana, 379 U.S. 64 (1964)*, held that the *New York Times* standard measured also the constitutional restriction upon state power to impose criminal sanctions for criticism of the official conduct of public officials. The *Times* standard of proof has also been required to support the dismissal of a public school teacher based on false statements made by the teacher in discussing issues of public importance. *Pickering v. Board of Education, 391 U.S. 563 (1968)*. The same test was applied to suits for invasion of privacy based on false statements where, again, a matter of public interest was involved. *Time, Inc.* v. *Hill, 385 U.S. 374 (1967)*. The opinion in that case expressly reserved the question presented here whether the test applied in a libel action brought by a private individual. *Id., at 391*.

[2] This term is from Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 214 (1890). Our discussion of matters of "public or general interest" appears in Part IV, *infra*, of this opinion.

[3] Petitioner does not question that the *First Amendment* guarantees of freedom of speech and freedom of the press apply to respondent's newscasts.

[4] At trial, Captain Ferguson testified that his definition of obscenity was "anytime the private parts is showing of the female or the private parts is shown of males."

[5] Several more newsstand operators were arrested between October 1 and October 4.

[6] The record neither confirms nor refutes petitioner's contention that his arrest was fortuitous. Nor does the record reflect whether or not petitioner's magazines were the subject either of the original citizens' complaints or of the initial police purchases.

EXHIBIT 43                                                                              EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

"The Special Investigations Squad raided the home of George Rosenbloom in the 1800 block of Vesta Street this afternoon.  Police confiscated 1,000 allegedly obscene books at Rosenbloom's home and arrested him on charges of possession of obscene literature.  The Special Investigations Squad also raided a barn in the 20 Hundred block of Welsh Road near Bustleton Avenue and confiscated 3,000 obscene books.  Capt. Ferguson says he believes they have hit the supply of a main distributor of obscene material in Philadelphia."

 **[\*34]**  This report was rebroadcast in substantially the same form at 6:30 p. m., but at 8 p. m. when the item was broadcast **[\*\*\*\*9]**  for the third time, WIP corrected the third sentence to read "reportedly obscene." News of petitioner's arrest was broadcast five more times in the following twelve hours, but each report described the seized books as "allegedly" or "reportedly" obscene. From October 5 to October 21, WIP broadcast no further reports relating to petitioner.

On October 16 petitioner brought an action in Federal District Court against various city and police officials and against several local news media. [7] The suit alleged that the magazines petitioner distributed were not obscene and sought injunctive relief prohibiting further police interference with his business as well as further publicity of the earlier arrests. The second series of allegedly defamatory broadcasts related to WIP's news reports of the lawsuit.  There were ten broadcasts on October 21, two on October 25, and one on November 1.  None mentioned petitioner by name.  The first at 6:30 a. m. on October 21 was pretty much like those that followed:

" **[\*\*\*307]**  Federal District Judge Lord, will hear arguments today from two publishers and a distributor all seeking an injunction against Philadelphia Police Commissioner Howard Leary **[\*\*\*\*10]**  . . . District Attorney James C. Crumlish . . . a local television station and a newspaper . . . ordering them to lay off the smut literature racket.

"The girlie-book peddlers say the police crackdown  **[\*35]**  and continued reference to their borderline literature as smut or filth is hurting their business.  Judge Lord refused to issue a temporary injunction when he was first approached.  Today he'll decide the issue.  It will set a precedent . . . and if the injunction is not granted . . . it could signal an even more intense effort to rid the city of pornography."

On October 27, petitioner went to WIP's studios after hearing from a friend that the station had broadcast news **[\*\*\*\*11]**  about his lawsuit.  Using a lobby telephone to talk with a part-time newscaster, petitioner inquired what stories WIP had broadcast about him.  The newscaster asked him to be more specific about dates and times. Petitioner then asked for the noon news broadcast on October 21, 1963, which the newscaster read to him over the phone; it was similar to the above 6:30 a. m. broadcast. According to petitioner, the ensuing interchange was brief. Petitioner told the newscaster that his magazines were "found to be completely legal and legitimate by the United States Supreme Court." When the newscaster replied the district attorney had said the magazines were obscene, petitioner countered that he had a public statement of the district attorney declaring the magazines legal.  At that point, petitioner testified, "the telephone conversation was terminated . . .  **[\*\*1816]**  He just hung up." Petitioner apparently made no request for a retraction or correction, and none was forthcoming.  WIP's final report on petitioner's lawsuit -- the only one after petitioner's unsatisfactory conversation at the station -- occurred on November 1 after the station had checked the story with the judge involved.  **[\*\*\*\*12]**  [8]

 **[\*36]**  II

---

[7] The complaint named as defendants the publishers of two newspapers, a television station, the city of Philadelphia, and the district attorney, but not respondent WIP.  The plaintiffs were petitioner, the partnership of himself and his wife which carried on the business, and the publisher of the nudist magazines that he distributed.

[8] The text of the final broadcast read as follows:

"U.S. District Judge John Lord told WIP News just before airtime that it may be another week before he will be able to render a decision as to whether he has jurisdiction in the case of two publishers and a distributor who wish to restrain the D. A.'s office, the police chief, a TV station and the Bulletin for either making alleged raids of their publications, considered smut and immoral literature by the defendants named, or publicizing that they are in that category.  Judge Lord then will be in a position to rule on injunction proceedings asked by the publishers and distributor claiming the loss of business in their operations."

**EXHIBIT 43**                                                      **EXHIBIT 7**

Rosenbloom v. Metromedia, 403 U.S. 29

In May 1964 a jury acquitted petitioner in state court of the criminal obscenity charges under instructions of the trial judge that, as a matter of law, the nudist magazines distributed by petitioner were not obscene. Following his acquittal, petitioner filed this diversity action in District Court seeking damages **[****13]** under Pennsylvania's libel law. Petitioner alleged that WIP's unqualified characterization of the books seized as "obscene" in the 6 and 6:30 p. m. broadcasts of October 4, describing his arrest, constituted libel *per se* and was proved false by petitioner's subsequent acquittal.  In addition, he alleged that the broadcasts in the second series describing his court suit for injunctive relief were also false and defamatory in that WIP **[***308]** characterized petitioner and his business associates as "smut distributors" and "girlie-book peddlers" and, further, falsely characterized the suit as an attempt to force the defendants "to lay off the smut literature racket."

At the trial WIP's defenses were truth and privilege.  WIP's news director testified that his eight-man staff of reporters prepared their own newscasts and broadcast their material themselves, and that material for the news programs usually came either from the wire services or from telephone tips.  None of the writers or broadcasters involved in preparing the broadcasts in this case testified.  The news director's recollection was that the primary source of information for the first series of broadcasts **[*37]** **[****14]** about petitioner's arrest was Captain Ferguson, but that, to the director's knowledge, the station did not have any further verification.  Captain Ferguson testified that he had informed WIP and other media of the police action and that WIP had accurately broadcast what he told the station. The evidence regarding WIP's investigation of petitioner's lawsuit in the second series of broadcasts was even more sparse.  The news director testified that he was "sure we would check with the District Attorney's office also and with the Police Department," but "it would be difficult for me to specifically state what additional corroboration we had." In general, he testified that WIP's half-hour deadlines required it to rely on wire-service copy and oral reports from previously reliable sources subject to the general policy that "we will contact as many sources as we possibly can on any kind of a story."

III

Pennsylvania's libel law tracks almost precisely the Restatement (First) of Torts provisions on the subject. Pennsylvania holds actionable any unprivileged "malicious" [9] publication of matter which **[****15]** tends to harm a person's reputation and expose him to public hatred, contempt, or ridicule.  *Schnabel v. Meredith, 378 Pa. 609, 107 A. 2d 860 (1954)*; *Restatement of Torts §§ 558*, 559 (1938).  **[**1817]** Pennsylvania law recognizes truth as a complete defense to a libel action.  *Schonek v. WJAC, Inc., 436 Pa. 78, 84, 258 A. 2d 504, 507 (1969)*; *Restatement of Torts § 582*.  It recognizes an absolute immunity for defamatory statements made by high state officials, even if published with an improper motive, actual malice, or knowing falsity. *Montgomery v. Philadelphia, 392 Pa. 178, 140 A. 2d 100 (1958)*; *Restatement of Torts § 591*, **[*38]** and it recognizes a conditional privilege for news media to report judicial, administrative, or legislative proceedings if the account is fair and accurate, and not published solely for the purpose of causing harm to the person defamed, even though the official information is false or inaccurate. *Sciandra v. Lynett, 409 Pa. 595, 600-601, 187 A. 2d 586, 588-589 (1963)*; *Restatement of Torts § 611*.  The conditional privilege of the news media may be defeated, **[****16]** however, by "'want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication.' The failure to employ such 'reasonable care and diligence' can destroy a privilege which otherwise would protect the utterer of the communication." *Purcell v. Westinghouse Broadcasting Co., 411 Pa. 167, 179, [***309] 191 A. 2d 662, 668 (1963)*. Pennsylvania has also enacted verbatim the Restatement's provisions on burden of proof, which place the burden of proof for the affirmative defenses of truth and privilege upon the defendant. [10]

---

[9] The reference here, of course, is to common-law "malice," not to the constitutional standard of *New York Times Co*. v. *Sullivan, supra.* See n. 18, *infra*.

[10] Pa. Stat. Ann., Tit. 12, § 1584a (Supp. 1971) provides:

"(1) In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

"(a) The defamatory character of the communication;

"(b) Its publication by the defendant;

**133**

 **[****17]   [*39]**  At the close of the evidence, the District Court denied respondent's motion for a directed verdict and charged the jury, in conformity with Pennsylvania law, that four findings were necessary to return a verdict for petitioner: (1) that one or more of the broadcasts were defamatory; (2) that a reasonable listener would conclude that the defamatory statement referred to petitioner; (3) that WIP had forfeited its privilege to report official proceedings fairly and accurately, either because it intended to injure the plaintiff personally or because it exercised the privilege unreasonably and without reasonable care; and (4) that the reporting was false.  The jury was instructed that petitioner had the burden of proof on the first three issues, but that respondent had the burden of proving that the reporting was true.  The jury was further instructed that "as a matter of law" petitioner was not entitled to actual damages claimed for loss of business "not because it wouldn't ordinarily be but because there has been evidence that this same subject matter was the subject" of broadcasts over other television and radio stations and of newspaper reports, "so if there was any business **[****18]** lost . . . we have no proof . . . that [it] resulted directly from the broadcasts by WIP . . . ." App. 331a.  On the question of punitive damages, the judge gave the following instruction:

"If you find that this publication arose from a bad motive or malice toward the plaintiff, or if you find that it was published with reckless indifference to the truth, if you find that it was not true, you would be entitled to award punitive damages, and punitive  **[**1818]**  damages are awarded as a deterrent from future conduct of the same sort.

"They really are awarded only for outrageous conduct, as I have said, with a bad motive or with reckless disregard of the interests of others, and before  **[*40]**  you would award punitive damages you must find that these broadcasts were published with a bad motive or with reckless disregard of the rights of others, or reckless indifference to the rights of others . . . ."

The jury returned a verdict for petitioner and awarded $ 25,000 in general damages, and $ 725,000 in punitive damages. The District Court reduced the punitive damages  **[***310]**  award to $ 250,000 on remittitur, but denied respondent's motion for judgment *n. o. v.*  In **[****19]**  reversing, the Court of Appeals emphasized that the broadcasts concerned matters of public interest and that they involved "hot news" prepared under deadline pressure.  The Court of Appeals concluded that "the fact that plaintiff was not a public figure cannot be accorded decisive importance if the recognized important guarantees of the *First Amendment* are to be adequately implemented." *415 F.2d, at 896*. For that reason, the court held that the *New York Times* standard applied and, further, directed that judgment be entered for respondent, holding that, as a matter of law, petitioner's evidence did not meet that standard.

IV

 [3A]Petitioner concedes that the police campaign to enforce the obscenity laws was an issue of public interest, and, therefore, that the constitutional guarantees for freedom of speech and press imposed limits upon Pennsylvania's power to apply its libel laws to compel respondent to compensate him in damages for the alleged defamatory falsehoods broadcast about his involvement.  As noted, the narrow question he raises is whether, because he is not

---

"(c) Its application to the plaintiff;

"(d) The recipient's understanding of its defamatory meaning;

"(e) The recipient's understanding of it as intended to be applied to the plaintiff;

"(f) Special harm resulting to the plaintiff from its publication;

"(g) Abuse of a conditionally privileged occasion.

"(2) In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:

"(a) The truth of the defamatory communication;

"(b) The privileged character of the occasion on which it was published;

"(c) The character of the subject matter of defamatory comment as of public concern."

See *Restatement of Torts § 613*.

EXHIBIT 43

EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

a "public official" [****20] or a "public figure" but a private individual, those limits required that he prove that the falsehoods resulted from a failure of respondent to exercise reasonable care, or required that he prove that [*41] the falsehoods were broadcast with knowledge of their falsity or with reckless disregard of whether they were false or not. That question must be answered against the background of the functions of the constitutional guarantees for freedom of expression. *Rosenblatt v. Baer, 383 U.S. 75, at 84-85, n. 10 (1966)*.

[4]Self-governance in the United States presupposes far more than knowledge and debate about the strictly official activities of various levels of government. The commitment of the country to the institution of private property, protected by the Due Process and *Just Compensation Clauses* in the Constitution, places in private hands vast areas of economic and social power that vitally affect the nature and quality of life in the Nation. Our efforts to live and work together in a free society not completely dominated by governmental regulation necessarily encompass far [****21] more than politics in a narrow sense. "The guarantees for speech and press are not the preserve of political expression or comment upon public affairs." *Time, Inc* . v. *Hill, 385 U.S. 374, 388 (1967)*. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama, 310 U.S. 88, 102 (1940)*.

Although the limitations upon civil libel actions, first held in *New York Times* to be required by the *First Amendment*, were applied in that case in the context of defamatory falsehoods about the official conduct of a public official, later decisions have disclosed the artificiality, in terms of the public's interest, of a simple distinction between "public" and "private" individuals or institutions:

"Increasingly in this country, the distinctions between governmental [***311] and [**1819] private sectors are blurred. . . . In many situations, policy determinations [*42] which traditionally were channeled through formal political institutions [****22] are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government. This blending of positions and power has also occurred in the case of individuals so that many who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions . . . .

". . . Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.'" *Curtis Publishing Co*. v. *Butts, 388 U.S. 130, 163-164 (1967)* (Warren, C. J., concurring in result).

[5][6]Moreover, the constitutional protection was not intended to be limited to matters bearing broadly on issues of responsible government. "The Founders . . . felt that a free press would advance 'truth, science, morality, and arts in general' as well [****23] as responsible government." *Id., at 147* (opinion of HARLAN, J.). Comments in other cases reiterate this judgment that the *First Amendment* extends to myriad matters of public interest. In *Time, Inc*. v. *Hill, supra*, we had "no doubt that the . . . opening of a new play linked to an actual incident, is a matter of public interest," *385 U.S., at 388*, which was entitled to constitutional protection. *Butts* held that an alleged "fix" of a college football game was a public issue. *Associated Press v. Walker, 388 U.S. 130 (1967)*, a companion case to *Butts*, established that the public had a similar interest in the events and personalities involved in federal efforts to enforce a court decree ordering the enrollment of a Negro student in the University of Mississippi. Thus, these cases underscore the vitality, as [*43] well as the scope, of the "profound national commitment to the principle that debate on *public issues* should be uninhibited, robust, and wide-open." *New York Times Co*. v. *Sullivan, 376 U.S., at 270-271* (emphasis added).

[7A] [****24] If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the

content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety. [11] The present **[***312]** case illustrates the point.  The community has a vital interest in the proper enforcement of its criminal laws, particularly in an area such as obscenity where a number of highly important values are potentially in conflict: the public has an interest both in seeing that the criminal law is adequately enforced and in assuring that the law is not used unconstitutionally to suppress free expression.  Whether the person involved is a famous large-scale magazine distributor or a "private" businessman running a corner newsstand has no relevance **[**1820]** in ascertaining whether the public has an interest in the issue.  We honor the commitment to robust debate on public issues, which is embodied in the *First Amendment*, **[*44]** **[****25]** by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous. [12]

**[****26]** [8]Our Brother WHITE agrees that the protection afforded by the *First Amendment* depends upon whether the issue involved in the publication is an issue of public or general concern.  He would, however, confine our holding to the situation raised by the facts in this case, that is, limit it to issues involving "official actions of public servants." In our view that might be misleading.  It is clear that there has emerged from our cases decided since *New York Times* the concept that the *First Amendment's* impact upon state libel laws derives not so much from whether the plaintiff is a "public official," "public figure," or "private individual," as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest. See T. Emerson, The System of Freedom of Expression 531-532, 540 (1970).  In that circumstance we think the time has come forthrightly to announce that the determinant whether the *First Amendment* applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the **[*45]** delineation **[****27]** of the reach of that term to future cases.  As our Brother WHITE observes, that is not a problem in this case, since police arrest of a person for distributing allegedly obscene magazines clearly constitutes an issue of public or general interest. [13]

V

**[***313]** We turn then to the question to be decided.  Petitioner's argument that the Constitution should be held to require that the private individual prove only that the publisher failed to exercise "reasonable care" in publishing defamatory falsehoods proceeds along two lines.  First, he argues that the private individual, **[****28]** unlike the public figure, does not have access to the media to counter the defamatory material and that the private individual, unlike the public figure, has not assumed the risk of defamation by thrusting himself into the public arena.  Second,

---

[11] For example, the public's interest in the provocative speech that was made during the tense episode on the campus of the University of Mississippi would certainly have been the same in *Associated Press v. Walker, n. 1, supra*, if the speaker had been an anonymous student and not a well-known retired Army general.  *Walker* also illustrates another anomaly of focusing analysis on the public "figure" or public "official" status of the individual involved.  General Walker's fame stemmed from events completely unconnected with the episode in Mississippi.  It seems particularly unsatisfactory to determine the extent of *First Amendment* protection on the basis of factors completely unrelated to the newsworthy events being reported.  See also *Greenbelt Publishing Assn*. v. *Bresler, 398 U.S. 6 (1970)*.

[12] We are not to be understood as implying that no area of a person's activities falls outside the area of public or general interest.  We expressly leave open the question of what constitutional standard of proof, if any, controls the enforcement of state libel laws for defamatory falsehoods published or broadcast by news media about a person's activities not within the area of public or general interest.

We also intimate no view on the extent of constitutional protection, if any, for purely commercial communications made in the course of business.  See *Valentine v. Chrestensen, 316 U.S. 52 (1942)*. Compare *Breard v. Alexandria, 341 U.S. 622 (1951)*, with *Martin v. Struthers, 319 U.S. 141 (1943)*. But see *New York Times Co*. v. *Sullivan, 376 U.S., at 265-266*; *Linn v. Plant Guard Workers, 383 U.S. 53 (1966)*.

[13] Our Brother WHITE states in his opinion: "The *First Amendment* gives . . . a privilege to report . . . the official actions of public servants in full detail, with no requirement that . . . the privacy of an individual involved in . . . the official action be spared from public view." *Post*, at 62.  This seems very broad.  It implies a privilege to report, for example, such confidential records as those of juvenile court proceedings.

EXHIBIT 43                                                              EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

petitioner focuses on the important values served by the law of defamation in preventing and redressing attacks upon reputation.

We have recognized the force of petitioner's arguments, *Time, Inc.* v. *Hill, supra, at 391*, and we adhere to the caution expressed in that case against "blind application" of the *New York Times* standard. *Id., at 390*. Analysis **[\*\*1821]** of the particular factors involved, however, convinces us that petitioner's arguments cannot be reconciled with the purposes of the *First Amendment*, with our cases, and with the traditional doctrines of libel law itself.  Drawing a distinction between "public" **[\*46]** and "private" figures makes no sense in terms of the *First Amendment* guarantees. [14] **[\*\*\*\*31]**  The *New York Times* standard was applied to libel of a public official or public figure to give effect to the Amendment's function to encourage ventilation of public issues, not because **[\*\*\*\*29]** the public official has any less interest in protecting his reputation than an individual in private life.  While the argument that public figures need less protection because they can command media attention to counter criticism may be true for some very prominent people, even then it is the rare case where the denial overtakes the original charge.  Denials, retractions, and corrections are not "hot" news, and rarely receive the prominence of the original story.  When the public official or public figure is a minor functionary, or has left the position that put him in the public eye, see *Rosenblatt v. Baer, supra*, the argument loses all of its force.  In the vast majority of libels involving public officials or public figures, the ability to respond through the media will depend on the same complex factor on which the ability of a private individual depends: the unpredictable event of the media's continuing interest in the story.  Thus the unproved, and highly improbable, generalization that an as yet undefined class of "public figures" involved in matters of public concern will be better able to respond **[\*47]** through the media than private individuals also **[\*\*\*\*30]** involved in such matters seems too insubstantial a reed on which to rest a constitutional distinction.  Furthermore, **[\*\*\*314]** in *First Amendment* terms, the cure seems far worse than the disease.  If the States fear that private citizens will not be able to respond adequately to publicity involving them, the solution lies in the direction of ensuring their ability to respond, rather than in stifling public discussion of matters of public concern. [15]

 **[\*\*\*\*32]**  Further reflection over the years since *New York Times* was decided persuades **[\*\*1822]** us that the view of the "public official" or "public figure" as assuming the risk of defamation by voluntarily thrusting himself into the public eye bears little relationship either to the values protected by the *First Amendment* or to the nature of our society.  We have recognized that "exposure of the self to others in varying degrees is a concomitant of life in a civilized community." *Time, Inc.* v. *Hill,* **[\*48]** *supra, at 388*.  Voluntarily or not, we are all "public" men to some degree.  Conversely, some aspects of the lives of even the most public men fall outside the area of matters of public or general

---

[14] See *United Medical Laboratories, Inc.* v. *Columbia Broadcasting System, Inc., 404 F.2d 706 (CA9 1968)*, cert. denied, **394 U.S. 921 (1969)**; *Time, Inc.* v. *McLaney, 406 F.2d 565* (CA5), cert. denied, **395 U.S. 922 (1969)**; *Bon Air Hotel, Inc.* v. *Time, Inc., 426 F.2d 858, 861 n. 4*, and cases cited therein (CA5 1970).  See generally Cohen, A New Niche for the Fault Principle: A Forthcoming Newsworthiness Privilege in Libel Cases?, *18 U. C. L. A. L. Rev. 371 (1970)*; Kalven, The Reasonable Man and the *First Amendment*: Hill, Butts, and Walker, 1967 Sup. Ct. Rev. 267; Note, Public Official and Actual Malice Standards: The evolution of *New York Times Co.* v. *Sullivan*, 56 Iowa L. Rev. 393, 398-400 (1970); Note, The Scope of *First Amendment* Protection for Good-Faith Defamatory Error, 75 Yale L. J. 642 (1966).

[15] Some States have adopted retraction statutes or right-of-reply statutes.  See Donnelly, The Right of Reply: An Alternative to an Action for Libel, 34 Va. L. Rev. 867 (1948); Note, Vindication of the Reputation of a Public Official, 80 Harv. L. Rev. 1730 (1967).  Cf. *Red Lion Broadcasting Co.* v. *FCC, 395 U.S. 367 (1969)*.

One writer, in arguing that the *First Amendment* itself should be read to guarantee a right of access to the media not limited to a right to respond to defamatory falsehoods, has suggested several ways the law might encourage public discussion.  Barron, Access to the Press -- A New *First Amendment* Right, 80 Harv. L. Rev. 1641, 1666-1678 (1967). It is important to recognize that the private individual often desires press exposure either for himself, his ideas, or his causes.  Constitutional adjudication must take into account the individual's interest in access to the press as well as the individual's interest in preserving his reputation, even though libel actions by their nature encourage a narrow view of the individual's interest since they focus only on situations where the individual has been harmed by undesired press attention.  A constitutional rule that deters the press from covering the ideas or activities of the private individual thus conceives the individual's interest too narrowly.

EXHIBIT 43   EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

concern.  See n. 12, *supra; Griswold v. Connecticut, 381 U.S. 479 (1965)*. [16] Thus, the idea that certain "public" figures have voluntarily exposed their entire lives to public inspection, while private individuals have kept theirs carefully shrouded from public view is, at best, a legal fiction.  In any event, such a distinction could easily produce the paradoxical result of dampening discussion of issues of public or general concern because **[****33]** they happen to involve private citizens while extending constitutional encouragement to discussion of aspects of the lives of "public figures" that are not in the area of public or general concern.

 [9]General references to the values protected by the law of libel conceal important distinctions.  Traditional arguments suggest that libel law protects two separate interests of the individual: first, his desire to preserve a certain privacy around his personality from unwarranted intrusion, and, second, a desire to preserve his public good name and reputation. See *Rosenblatt v. Baer, 383 U.S., at 92* (STEWART, J., concurring).  The individual's interest in privacy -- **[***315]** in preventing **[****34]** unwarranted intrusion upon the private aspects of his life -- is not involved in this case, or even in the class of cases under consideration, since, by hypothesis, the individual is involved in matters of public or general concern. [17] In **[*49]** the present case, however, petitioner's business reputation is involved, and thus the relevant interests protected by state libel law are petitioner's public reputation and good name.

 **[****35]** These are important interests.  Consonant with the libel laws of most of the States, however, Pennsylvania's libel law subordinates these interests of the individual in a number of circumstances.  Thus, high government officials are immune from liability -- absolutely privileged -- even if they publish defamatory material from an improper motive, with actual malice, and with knowledge of its falsity. *Montgomery v. Philadelphia, 392 Pa. 178, 140 A. 2d 100 (1958)*. This absolute privilege attaches to judges, attorneys at law in connection with a judicial proceeding, parties and witnesses to judicial proceedings, Congressmen and state legislators, and high national **[**1823]** and state executive officials.  *Restatement of Torts §§ 585-592*.  Moreover, a conditional privilege allows newspapers to report the false defamatory material originally published under the absolute privileges listed above, if done accurately.  *Sciandra v. Lynett, 409 Pa. 595, 187 A. 2d 586 (1963)*.

 [10A] **[****36]**  Even without the presence of a specific constitutional command, therefore, Pennsylvania libel law recognizes that society's interest in protecting individual reputation **[*50]** often yields to other important social goals. In this case, the vital needs of freedom of the press and freedom of speech persuade us that allowing private citizens to obtain damage judgments on the basis of a jury determination that a publisher probably failed to use reasonable care would not provide adequate "breathing space" for these great freedoms.  Reasonable care is an "elusive standard" that "would place on the press the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait." *Time, Inc*. v. *Hill, 385 U.S., at 389*. Fear of guessing wrong must inevitably cause self-censorship and thus create the danger that the legitimate utterance will be deterred.  Cf.  *Speiser v. Randall, 357 U.S. 513, 526 (1958)*.

---

[16] This is not the less true because the area of public concern in the cases of candidates for public office and of elected public officials is broad.  See *Monitor Patriot Co.* v. *Roy, 401 U.S. 265 (1971)*.

[17] Our Brothers HARLAN and MARSHALL would not limit the application of the *First Amendment* to private libels involving issues of general or public interest. They would hold that the Amendment covers all private libels at least where state law permits the defense of truth.  The Court has not yet had occasion to consider the impact of the *First Amendment* on the application of state libel laws to libels where no issue of general or public interest is involved.  See n. 1, *supra*.  However, *Griswold v. Connecticut, 381 U.S. 479 (1965)*, recognized a constitutional right to privacy and at least one commentator has discussed the relation of that right to the *First Amendment*. Emerson, *supra*, at 544-562.  Since all agree that this case involves an issue of public or general interest, we have no occasion to discuss that relationship.  See n. 12, *supra*.  We do not, however, share the doubts of our Brothers HARLAN and MARSHALL that courts would be unable to identify interests in privacy and dignity.  The task may be difficult but not more so than other tasks in this field.

EXHIBIT 43   EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

Moreover, we ordinarily decide civil litigation by **[****37]** the preponderance of the evidence.  Indeed, the judge instructed the jury to decide the present case by that standard.  In the normal civil suit where this **[***316]** standard is employed, "we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor." *In re Winship, 397 U.S. 358, 371 (1970)* (HARLAN, J., concurring).  In libel cases, however, we view an erroneous verdict for the plaintiff as most serious.  Not only does it mulct the defendant for an innocent misstatement -- the three-quarter-million-dollar jury verdict in this case could rest on such an error -- but the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the *First Amendment* cannot tolerate.  These dangers for freedom of speech and press led us to reject the reasonable-man standard of liability as "simply inconsistent" with our national commitment under the *First Amendment* when sought to be applied to the **[*51]** conduct of a political campaign. *Monitor Patriot Co.* v. *Roy, 401 U.S. 265, 276 (1971)*. **[****38]** The same considerations lead us to reject that standard here.

We are aware that the press has, on occasion, grossly abused the freedom it is given by the Constitution.  All must deplore such excesses.  In an ideal world, the responsibility of the press would match the freedom and public trust given it.  But from the earliest days of our history, this free society, dependent as it is for its survival upon a vigorous free press, has tolerated some abuse.  In 1799, James Madison made the point in quoting (and adopting) John Marshall's answer to Talleyrand's complaints about American newspapers, American State Papers, 2 Foreign Relations 196 (U.S. Cong. 1832):

"'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press.  That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness*, is seen and lamented, *but the remedy has not yet been discovered.* **[****39]** *Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn.  However  desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.'"* 6 Writings of **[**1824]** James Madison, 1790-1802, p. 336 (G. Hunt ed. 1906) (emphasis in original).


 [3B][11][12A]This Court has recognized this imperative: "To insure the ascertainment and publication of the truth about public affairs, it is essential that the *First Amendment* **[*52]** protect some erroneous publications as well as true ones." *St. Amant v. Thompson, 390 U.S. 727, 732 (1968)*.We thus hold that a libel **[****40]** action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether **[***317]** it was false or not. [18] Calculated falsehood, of course, falls outside "the fruitful exercise of the right of free speech." *Garrison v. Louisiana, 379 U.S. 64, 75 (1964)*.

 **[****41]** [10B]Our Brothers HARLAN and MARSHALL reject the knowing-or-reckless-falsehood standard in favor of a test that would require, at least, that the person defamed establish that the publisher negligently failed to ascertain the truth of his story; they would also limit any recovery to "actual" damages.  For the reasons we have stated, the negligence standard gives insufficient breathing space to *First Amendment* values.  Limiting recovery to actual damages has the same defects.  In the first instance, that standard, too, leaves the *First Amendment* insufficient

---

[18] [12B]At oral argument petitioner argued that "the little man can't show actual malice. How can George Rosenbloom show that there was actual malice in Metromedia?  They never heard of him before." Tr. of Oral Arg., Dec. 8, 1970, p. 39.  But ill will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.  That standard requires only that the plaintiff prove knowing or reckless falsity. That burden, and no more, is the plaintiff's whether "public official," "public figure," or "little man." It may be that jury instructions that are couched only in terms of knowing or reckless falsity, and omit reference to "actual malice," would further a proper application of the *New York Times* standard to the evidence.

EXHIBIT 43     EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

elbow room within which to function.  It is not simply the possibility of a judgment for damages that results in self-censorship. The very possibility of having to engage in litigation, an expensive and protracted process,  **[*53]**  is threat enough to cause discussion and debate to "steer far wider of the unlawful zone" thereby keeping protected discussion from public cognizance.  _Speiser v. Randall, 357 U.S., at 526_. Cf. _Blonder-Tongue Laboratories, Inc._ v. _University of Illinois Foundation, 402 U.S. 313, 334-339 (1971)_.  **[****42]**  Too, a small newspaper suffers equally from a substantial damage award, whether the label of the award be "actual" or "punitive."

The real thrust of Brothers HARLAN'S and MARSHALL'S position, however, is their assertion that their proposal will not "constitutionalize" the factfinding process.  But this clearly is not the way their test would work in practice.  Their approach means only that factfinding will shift from an inquiry into whether the defamatory statements were knowingly or recklessly uttered to the inquiry whether they were negligently uttered, and if so, to an inquiry whether plaintiff suffered "actual" damages.  This latter inquiry will involve judges even more deeply in factfinding.  Would the mere announcement by a state legislature that embarrassment and pain and suffering are measurable actual losses mean that such damages may be awarded in libel actions? No matter how the problem is approached, this Court would ultimately have to fashion constitutional definitions of "negligence" and of "actual damages."


 [13]Aside from these particularized considerations, we have repeatedly recognized **[****43]**  that courts may not avoid an excursion  **[**1825]**  into factfinding in this area simply because it is time consuming or difficult.  We stated in _Pennekamp v. Florida, 328 U.S.  331, 335 (1946)_, that:

"The Constitution has imposed upon this Court final authority to determine the meaning and application **[***318]**  of those words of that instrument which require interpretation to resolve judicial issues.  With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances  **[*54]**  under which they were made to see whether or not they . . . are of a character which the principles of the _First Amendment_, as adopted by the _Due Process Clause of the Fourteenth Amendment_, protect." (Footnote omitted.)


Clearly, then, this Court has an "obligation to test challenged judgments against the guarantees of the _First_ and _Fourteenth Amendments_," and in doing so "this Court cannot avoid making an independent constitutional judgment on the facts of the case." _Jacobellis v. Ohio, 378 U.S. 184, 190 (1964)_. The **[****44]**  simple fact is that _First Amendment_ questions of "constitutional fact" compel this Court's _de novo_ review.  See _Edwards v. South Carolina, 372 U.S. 229, 235 (1963)_; _Blackburn v. Alabama, 361 U.S. 199, 205 n. 5 (1960)_.

VI


 [14][15]Petitioner argues that the instructions on punitive damages either cured or rendered harmless the instructions permitting an award of general damages based on a finding of failure of WIP to exercise reasonable care. We have doubts of the merits of the premise, [19] but even  **[*55]**  assuming that instructions were given satisfying the standard of knowing or reckless falsity, the evidence was insufficient to sustain an award for the petitioner under that standard. In these cases our "duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied." _New York Times Co._ v.

---

[19] The instructions authorized an award of punitive damages upon a finding that a falsehood "arose from a bad motive or . . . that it was published with reckless indifference to the truth . . . punitive damages are awarded as a deterrent from future conduct of the same sort." App. 333a.  The summation of petitioner's counsel conceded that respondent harbored no ill-will toward petitioner, but, following the suggestion of the instructions that punitive damages are "'smart' money," App. 313a, argued that they should be assessed because "[respondent] must be careful the way they impart news information and you can punish them if they weren't because you could say that was malicious." _Ibid_.  This was an obvious invitation based on the instructions to award punitive damages for carelessness.  Thus the jury was allowed, and even encouraged, to find malice and award punitive damages merely on the basis of negligence and bad motive.

EXHIBIT 43                                                   EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

*Sullivan, 376 U.S., at 285*. Our independent **[****45]** analysis of the record leads us to agree with the Court of Appeals that none of the proofs, considered either singly or cumulatively, satisfies the constitutional standard with the convincing clarity necessary to raise a jury question whether the defamatory falsehoods were broadcast with knowledge that they were false or with reckless disregard of whether they were false or not.

 **[****46]**  The evidence most strongly supporting petitioner is that concerning his visit to WIP's studio where a part-time newscaster hung up the telephone when petitioner disputed the newscaster's statement that the District Attorney had characterized petitioner's magazines as obscene. This contact occurred, however, after all but one of the second series of broadcasts had been aired.  The incident has no probative value insofar  **[***319]**  as it bears on petitioner's case as to the first series of broadcasts. That portion of petitioner's case was based upon the omission from the first two broadcasts  **[**1826]**  at 6 and 6:30 p. m. on October 4 of the word "alleged" preceding a characterization of the magazines distributed by petitioner.  But that omission was corrected with the 8 p. m. broadcast and was not repeated in the five broadcasts that followed.  And we agree with the analysis of the Court of Appeals that led that court, and leads us, to conclude that the episode failed to provide evidence satisfying the *New York Times* standard insofar as it bore on petitioner's  **[*56]**  case based upon the broadcasts on and after October 21 concerning petitioner's lawsuit:

"Only one **[****47]**  broadcast took place after this conversation.  It is attacked on the ground that it contains an inaccurate statement concerning plaintiff's injunction action in that it stated that the district attorney considered plaintiff's publications to be smut and immoral literature.  The transcript of the testimony shows that plaintiff's own attorney, when questioning defendant's representative concerning the allegedly defamatory portion of the last broadcast, said that he was not questioning its 'accuracy'.  Furthermore, his examination of the same witness brought out that defendant's representative confirmed the story with the judge involved before the broadcast was made.  We think that the episode described failed to provide evidence of actual malice with the requisite convincing clarity to create a jury issue under federal standards." *415 F.2d, at 897*.


 [16][17]Petitioner argues finally that WIP's failure to communicate with him to learn his side of the case and to obtain a copy of the magazine for examination, sufficed to **[****48]**  support a verdict under the *New York Times* standard.  But our "cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson, 390 U.S., at 731*. Respondent here relied on information supplied by police officials.  Following petitioner's complaint about the accuracy of the broadcasts, WIP checked its last report with the judge who presided in the case.  While we may assume that the District Court correctly held to be defamatory  **[*57]**  respondent's characterizations of petitioner's business as "the smut literature racket," and of those engaged in it as "girlie-book peddlers," there is no evidence in the record to support a conclusion that respondent "in fact entertained serious doubts as to the truth" of its reports.

*Affirmed*.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of **[****49]**  this case.

**Concur by:** BLACK; WHITE

# Concur


MR. JUSTICE BLACK, concurring in the judgment.

 [1B] [7B] [18]I concur in the judgment of the Court for the reasons stated in my concurring opinion in *New York Times Co. v. Sullivan, 376 U.S. 254, 293 (1964)*, in my concurring and dissenting opinion in *Curtis Publishing Co. v. Butts, 388 U.S. 130, 170 (1967)*, and in MR. JUSTICE  **[***320]**  DOUGLAS' concurring opinion in *Garrison v. Louisiana, 379 U.S. 64, 80 (1964)*.  I agree of course that *First Amendment* protection extends to "all discussion and

EXHIBIT 43          EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *Ante*, at 44.  However, in my view, the *First Amendment* does not permit the recovery of libel judgments against the news media even when statements are broadcast with knowledge they are false.  As I stated in *Curtis Publishing Co [****50] . v. Butts, supra*, "It is time for this Court to abandon *New York Times Co*. v. *Sullivan* and adopt the rule to the effect that the *First Amendment* was intended to leave the press free from the **[**1827]** harassment of libel judgments." *Id., at 172*.

MR. JUSTICE WHITE, concurring in the judgment.

I

Under existing law the *First Amendment* is deemed to permit recoveries for damaging falsehoods published **[*58]** about public officials or public figures only if the defamation is knowingly or recklessly false.  But until today the *First Amendment* has not been thought to prevent citizens who are neither public officials nor public figures from recovering damages for defamation upon proving publication of a false statement injurious to their reputation. There has been no necessity to show deliberate falsehood, recklessness, or even negligence.

The Court has now decided that the *First Amendment* requires further restrictions on state defamation laws.  MR. JUSTICE BRENNAN and two other members of the Court would require proof of knowing or reckless misrepresentation of the facts whenever the publication concerns a subject of legitimate public interest, **[****51]** even though the target is a "private" citizen.  Only residual areas would remain in which a lower degree of proof would obtain.

Three other members of the Court also agree that private reputation has enjoyed too much protection and the media too little.  But in the interest of protecting reputation, they would not roll back state laws so far.  They would interpret the *First Amendment* as proscribing liability without fault and would equate non-negligent falsehood with faultless conduct.  The burden of the damaging lie would be shifted from the media to the private citizen unless the latter could prove negligence or some higher degree of fault.  They would also drastically limit the authority of the States to award compensatory and punitive damages for injury to reputation.

MR. JUSTICE BLACK, consistently with the views that he and MR. JUSTICE DOUGLAS have long held, finds no room in the *First Amendment* for any defamation recovery whatsoever.

Given this spectrum of proposed restrictions on state defamation laws and assuming that MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS will continue in future cases **[*59]** to support the severest of the restrictions, it would seem that at least **[****52]** five members of the Court would support each of the following rules:

For public officers and public figures to recover for damage to their reputations for libelous falsehoods, **[***321]** they must prove either knowing or reckless disregard of the truth.  All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error.  In all actions for libel or slander, actual damages must be proved, and awards of punitive damages will be strictly limited.

II

For myself, I cannot join any of the opinions filed in this case.  Each of them decides broader constitutional issues and displaces more state libel law than is necessary for the decision in this case.  As I have said, MR. JUSTICE BRENNAN would extend the privilege enunciated in *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)*, to publications upon any "subject of public or general interest." See *ante*, at 43.  He would thereby extend the constitutional protection to false and damaging, but nonmalicious, publications about such matters as the health and environmental hazards of widely **[****53]** used manufactured products, the mental and emotional stability of executives of business establishments, and the racial and religious prejudices of many groups and individuals.  All of these are, of course, subjects of real concern, and arguments for placing them within the scope of **[**1828]** *New York Times* are by no means frivolous.

**EXHIBIT 43**                                                                                                                    <span style="color:red">EXHIBIT  7</span>

Rosenbloom v. Metromedia, 403 U.S. 29

For MR. JUSTICE MARSHALL and MR. JUSTICE HARLAN, MR. JUSTICE BRENNAN's opinion is both too severe and too limited.  They would make more sweeping incursions into state tort law but purportedly with less destructive weapons.  They would permit suit by some plaintiffs **[*60]** barred under MR. JUSTICE BRENNAN's opinion, but would require all plaintiffs to prove at least negligence before any recovery would be allowed.

I prefer at this juncture not to proceed on such a broad front.  I am quite sure that *New York Times Co.* v. *Sullivan* was the wiser course, but I am unaware that state libel laws with respect to private citizens have proved a hazard to the existence or operations of the communications industry in this country.  Some members of the Court seem haunted by fears of self-censorship by the press and of damage judgments that will **[****54]** threaten its financial health.  But technology has immeasurably increased the power of the press to do both good and evil.  Vast communication combines have been built into profitable ventures.  My interest is not in protecting the treasuries of communicators but in implementing the *First Amendment* by insuring that effective communication which is essential to the continued functioning of our free society.  I am not aware that self-censorship has caused the press to tread too gingerly in reporting "news" concerning private citizens and private affairs or that the reputation of private citizens has received inordinate protection from falsehood. I am not convinced that we must fashion a constitutional rule protecting a whole range of damaging falsehoods and so shift the burden from those who publish to those who are injured.

I say this with considerable deference since all my Brethren have contrary views.  But I would not nullify a major part of state libel law until we have given the matter the most thorough consideration and can articulate some solid *First Amendment* **[***322]**  grounds based on experience and our present condition.  As it is, today's experiment rests almost entirely **[****55]**  on theoretical grounds and represents a purely intellectual derivation from what are thought to be important principles of tort  **[*61]**  law as viewed in the light of the primacy of the written and spoken word.

 [19]This case lends itself to more limited adjudication.  *New York Times Co.* v. *Sullivan* itself made clear that discussion of the official actions of public servants such as the police is constitutionally privileged.  "The right of free public discussion of the stewardship of public officials" is, in the language of that case, "a fundamental principle of the American form of government." *376 U.S., at 275*.Discussion of the conduct of public officials cannot, however, be subjected to artificial limitations designed to protect others involved in an episode with officials from unfavorable publicity.  Such limitations would deprive the public of full information about the official action that took place.  In the present case, for example, the public would learn nothing if publication only of the fact that the police made an arrest were permitted; it is also necessary that the **[****56]**  grounds for the arrest and, in many circumstances, the identity of the person arrested be stated.  In short, it is rarely informative for a newspaper or broadcaster to state merely that officials acted unless he also states the reasons for their action and the persons whom their action affected.

 [20]Nor can *New York Times* be read as permitting publications that invade the privacy or injure the reputations of officials, but forbidding those that invade the privacy or injure the reputations of private citizens against whom official action is directed.  *New York Times* gives the broadcasting media and the press the right not only to censure and criticize officials but also to praise them and the concomitant right to censure and criticize their adversaries.  To extend constitutional protection to criticism only of officials would be to authorize precisely **[**1829]**  that sort of thought control that the *First Amendment* forbids government to exercise.

 **[*62]**   [1C] [21]  **[****57]**  I would accordingly hold that in defamation actions, absent actual malice as defined in *New York Times Co.* v. *Sullivan*, the *First Amendment* gives the press and the broadcast media a privilege to report and comment upon the official actions of public servants in full detail, with no requirement that the reputation or the privacy of an individual involved in or affected by the official action be spared from public view.  Since respondent Metromedia did nothing more in the instant case, I join in holding its broadcasts privileged.  I would not, however, adjudicate cases not now before the Court.

**Dissent by:** HARLAN; MARSHALL

EXHIBIT 43

EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

# Dissent

MR. JUSTICE HARLAN, dissenting.

The very facts of this case demonstrate that uncritical acceptance of the Pennsylvania libel law here involved would be inconsistent with those important *First* and *Fourteenth Amendment* values we first treated with in an analogous context in *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)*. However, as the plurality opinion implicitly recognizes, only an undiscriminating assessment of those values would lead us to extend the **[***323]** *New York Times* rule in full force to all purely private libels. **[****58]** My Brother BRENNAN's opinion would resolve the dilemma by distinguishing those private libels that arise out of events found to be of "public or general concern" from those that do not, and subjecting the former to full-scale application of the *New York Times* rule.

For the reasons set forth in Part I of my Brother MARSHALL's dissent, I cannot agree to such a solution. As he so well demonstrates, the principal failing of the plurality opinion is its inadequate appreciation of the limitations imposed by the legal process in accommodating the tension between state libel laws and the federal constitutional protection given to freedom of speech and press.

 **[*63]** [22]Once the evident need to balance the values underlying each is perceived, it might seem, purely as an abstract matter, that the most utilitarian approach would be to scrutinize carefully every jury verdict in every libel case, in order to ascertain whether the final judgment leaves fully protected whatever *First Amendment* values [1] transcend the legitimate state interest in protecting the particular plaintiff who prevailed. This seems **[****59]** to be what is done in the plurality opinion. But we did not embrace this technique in *New York Times, supra.* Instead, as my Brother MARSHALL observes, we there announced a rule of general application, not ordinarily dependent for its implementation upon a case-by-case examination of trial court verdicts. See also my dissent in *Time, Inc*. v. *Pape, 401 U.S. 279, 293 (1971)*. Nor do I perceive any developments in the seven years since we decided *New York Times, supra*, that suggest our original method should now be abandoned. At least where we can discern generally applicable rules that should balance with fair precision the competing interests at stake, such rules should be preferred to the plurality's approach both in order to preserve a measure of order and predictability in the law that must govern the daily conduct of affairs and to avoid subjecting the press to judicial second-guessing of the newsworthiness of each item they print. Consequently, I fully concur in Part I of MR. JUSTICE MARSHALL's dissent.

 **[****60]** **[*64]** Further, I largely agree with the alternative proposals of that dissent. I, **[**1830]** too, think that, when dealing with private libel, the States should be free to define for themselves the applicable standard of care so long as they do not impose liability without fault; that a showing of actual damage should be a requisite to recovery for libel; and that it is impermissible, given the substantial constitutional values involved, to fail to confine the amount of jury verdicts in such cases within any ascertainable limits. However, my reasons for so concluding are somewhat different than his, and I therefore reach a different result than he does with respect to the tolerable limits of punitive damages.

I

 [23]I think we all agree on certain **[***324]** core propositions. First, as a general matter, the States have a perfectly legitimate interest, exercised in a variety of ways, in redressing and preventing careless conduct, no matter who is responsible for it, that inflicts actual, measurable injury upon individual citizens. Secondly, there is no identifiable

---

[1] Of course, for me, this case presents a Fourteenth, not a purely *First, Amendment* issue, for the question is one of the constitutionality of the applicable Pennsylvania libel laws. However, I have found it convenient, in the course of this opinion, occasionally to speak directly of the *First Amendment* as a shorthand phrase for identifying those constitutional values of freedom of expression guaranteed to individuals by the *Due Process Clause of the Fourteenth Amendment*.

144

value worthy of constitutional **[****61]** protection in the publication of falsehoods. Third, although libel law provides that truth is a complete defense, that principle, standing alone, is insufficient to satisfy the constitutional interest in freedom of speech and press. For we have recognized that it is inevitable that there will be "some error in the situation presented in free debate," *Time, Inc*. v. *Hill, 385 U.S. 374, 406 (1967)* (opinion of this writer), a process that needs "breathing space," *NAACP v. Button, 371 U.S. 415, 433 (1963)*, to flourish, and that "putting to the pre-existing prejudices of a jury the determination of what is 'true' may effectively institute a system of censorship." *Time, Inc*. v. *Hill, supra, at 406*.

 [24][25]Moreover, any system that punishes certain speech is likely to induce self-censorship by those who would otherwise **[*65]** exercise their constitutional freedom. Given the constitutionally protected interest in unfettered speech, it requires an identifiable, countervailing **[****62]** state interest, consistent with *First Amendment* values, to justify a regulatory scheme that produces such results. And, because the presence of such values dictates closer scrutiny of this aspect of state tort law than the *Fourteenth Amendment* would otherwise command, it may well be that certain rules, impervious to constitutional attack when applied to ordinary human conduct, may have to be altered or abandoned where used to regulate speech. Finally, as determined in *New York Times*, the constitutional interest in tolerance of falsehood as well as the need to adjust competing societal interests, prohibits, at a minimum, the imposition of liability without fault.

The precise standard of care necessary to achieve these goals is, however, a matter of dispute as is the range of penalties a State may prescribe for a breach of that standard. In analyzing these problems it is necessary to begin with a general analytical framework that defines those competing interests that must be reconciled. My Brother MARSHALL's opinion, I think, dwells too lightly upon the nature of the legitimate countervailing interests promoted by the State's libel law and, as a result, overstates the case **[****63]** against punitive damages. Because we deal with a set of legal rules that treat truth as a complete defense it strikes, I think, somewhat wide of the mark to treat the State's interest as one of protecting reputations from "unjustified invasion." *Post*, at 78. By hypothesis, the respondent here was free to reveal any true facts about petitioner's "obscure private life." [2]

 **[*66]** [26]Given **[**1831]** the defense of truth, it is my judgment that, in order to assure that it promotes purposes consistent with *First Amendment* **[***325]** values, the legitimate function of libel law must be understood as that of compensating **[****64]** individuals for actual, measurable harm caused by the conduct of others. This can best be demonstrated by postulating a law that subjects publishers to jury verdicts for falsehoods that have done the plaintiff no harm. In my view, such a rule can only serve a purpose antithetical to those of the *First Amendment*. It penalizes speech, not to redress or avoid the infliction of harm, but only to deter the press from publishing material regarding private behavior that turns out to be false simply because of its falsity. This the *First Amendment* will not tolerate. Where the State cannot point to any tangible danger, even knowingly erroneous publication is entitled to constitutional protection because of the interest in avoiding an inquiry into the mere truth or falsity of speech. Moreover, such a scheme would impose a burden on speaking not generally placed upon constitutionally unprotected conduct -- the payment of private fines for conduct which, although not conformed to established limits of care, causes no harm in fact.

 [27][28] **[****65]** Conversely, I think that where the purpose and effect of the law are to redress actual and measurable injury to private individuals that was reasonably foreseeable as a result of the publication, there is no necessary conflict with the values of freedom of speech. Just as an automobile negligently driven can cost a person his physical and mental well-being and the fruits of his labor, so can a printing press negligently set. While the *First Amendment* protects the press from the imposition of special liabilities upon it, "to exempt a publisher, because of the nature of his calling, from an imposition generally exacted from other members of the community, would be to extend

---

[2] I would expressly reserve, for a case properly presenting it, the issue whether the *New York Times* rule should have any effect on "privacy" litigation. The problem is briefly touched upon in *Time, Inc*. v. *Hill, 385 U.S. 374, 404-405 (1967)* (HARLAN, J., concurring and dissenting).

EXHIBIT 43    EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

a protection not required by the constitutional  **[\*67]**  guarantee." *Curtis Publishing Co*. v. *Butts, 388 U.S. 130, 160 (1967)* (opinion of this writer).  A business "is not immune from regulation because it is an agency of the press.  The publisher of a newspaper has no special immunity from the application of general laws.  He has no special privilege to invade the rights and liberties of others." *Associated Press v. NLRB, 301 U.S. 103, 132-133 (1937)*.  That the damage **[\*\*\*\*66]** has been inflicted by words rather than other instrumentalities cannot insulate it from liability.  States may legitimately be required to use finer regulatory tools where dealing with "speech," but they are not wholly disabled from exacting compensation for its measurable adverse consequences.  If this is not so, it is difficult to understand why governments may, for example, proscribe "misleading" advertising practices or specify what is "true" in the dissemination of consumer credit advertisements.

Nor does this interest in compensating victims of harmful conduct somehow disappear when the damages inflicted are great.  So long as the effect of the law of libel is simply to make publishers pay for the harm they cause, and the standard of care required is appropriately adjusted to take account of the special countervailing interests in an open exchange of ideas, the fact that this may involve the payment of substantial sums cannot plausibly be said to raise serious *First Amendment* problems.  If a newspaper refused to pay its bills because to do so would put it out of business, would the *First Amendment* dictate that this **[\*\*\*326]** be treated as a partial or complete defense?  If **[\*\*\*\*67]** an automobile carrying a newsman to the scene of a history-making event ran over a pedestrian, would the size of the verdict, if based upon generally applicable tort law principles, have to be assessed against the probability that it would deter broadcasters from news gathering before it could pass muster under the *First Amendment*?

 **[\*68]**   [29] [30]However, without foreclosing the possibility that other limiting principles may be surfaced by subsequent experience,  **[\*\*1832]**  I do think that since we are dealing, by hypothesis, with infliction of harm through the exercise of freedom of speech and the press to which the Constitution gives explicit protection, recoverable damages must be limited to those consequences of the publication which are reasonably foreseeable.  The usual tort rule seems to be that once some foreseeable injury has been inflicted, the negligent defendant must compensate for all damages he proximately caused in fact, no matter how peculiar were the circumstances of the particular plaintiff involved.  W.  **[\*\*\*\*68]**  Prosser, The Law of Torts § 50 (3d ed. 1964).  However, our cases establish, I think, that, unless he has knowledge to the contrary, a speaker is entitled to presume that he is addressing an audience that is not especially susceptible to distress at the specter of open, uninhibited, robust speech.  *Cohen* v. *California, ante*, p. 15.  See also *Brandenburg v. Ohio, 395 U.S. 444 (1969)*; *Butler v. Michigan, 352 U.S. 380 (1957)*. Thus, I think the speaker should be free from a duty to compensate for actual harm inflicted by his falsehoods where the defamation would not have caused such harm to a person of average sensibilities unless, of course, the speaker knew that his statements were made concerning an unusually sensitive person.  In short, I think the *First Amendment* does protect generally against the possibility of self-censorship in order to avoid unwitting affronts to the frail and the queasy.

II

Of course, it does not follow that so long as libel law performs the same compensatory function as civil law generally it is necessarily legitimate in all its various applications.  The presence of *First Amendment* values means that the **[\*\*\*\*69]** State can be compelled to utilize finer,  **[\*69]**  more discriminating instruments of regulation where necessary to give more careful protection to these countervailing interests.  *New York Times, supra*, and *Curtis Publishing Co., supra*, established that where the injured party is a "public figure" or a "public official," the interest in freedom of speech dictates that the States forgo their interest in compensating for actual harm, even upon a basis generally applicable to all members of society, unless the plaintiff can show that the injurious publication was false and was made "with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times, supra, at 280*.  Tacitly recognizing that it would unduly sacrifice the operative legitimate state interests to extend this rule to all cases where the injured party is simply a private individual, the plurality opinion would nevertheless apply it where the publication concerned such a person's "involvement in an event of public or general concern." *Ante*, at 52.  I **[\*\*\*327]** would not overrule *New York Times* or *Curtis Publishing* **[\*\*\*\*70]** *Co*. and I do agree, as indicated above, that making liability turn on simple falsity in the purely

**EXHIBIT 43**   **EXHIBIT 7**

Rosenbloom v. Metromedia, 403 U.S. 29

private libel area is not constitutionally permissible.  But I would not construe the Federal Constitution to require that the States adhere to a standard other than that of reasonable care where the plaintiff is an ordinary citizen.

My principal concern with the plurality's view, of course, is that voiced by my Brother MARSHALL.  However, even if this objection were not tenable, unlike the plurality, I do think there is a difference, relevant to the interests here involved, between the public and the private plaintiff, as our cases have defined these categories, and that maintaining a constitutional distinction between them is at least as likely to protect true *First Amendment* concerns as one that eradicates such a line and substitutes for it a distinction between matters we think are of true social significance and those we think are not.

 **[*70]**   [31]To begin, it does no violence, in my judgment, to the value of freedom of speech and press to impose a duty of reasonable care upon those who would **[****71]   [**1833]**  exercise these freedoms.  I do not think it can be gainsaid that the States have a substantial interest in encouraging speakers to carefully seek the truth before they communicate, as well as in compensating persons actually harmed by false descriptions of their personal behavior.  Additionally, the burden of acting reasonably in taking action that may produce adverse consequences for others is one generally placed upon all in our society.  Thus, history itself belies the argument that a speaker must somehow be freed of the ordinary constraints of acting with reasonable care in order to contribute to the public good while, for example, doctors, accountants, and architects have constantly performed within such bounds.

This does not mean that I do not agree with the rule of *New York Times, supra*, but only that I deem it inapplicable here.  That rule was not, I think, born solely of a desire to free speech that would otherwise have been stifled by overly restrictive rules, but also rested upon a determination that the countervailing state interests, described above, were not fully applicable where the subject of the falsehood was a public official or a **[****72]**  public figure. For me, it does seem quite clear that the public person has a greater likelihood of securing access to channels of communication sufficient to rebut falsehoods concerning him than do private individuals in this country who do not toil in the public spotlight.  Similarly, our willingness to assume that public personalities are more impervious to criticism, and may be held to have run the risk of publicly circulated falsehoods concerning them, does not rest solely upon an empirical assertion of fact, but also upon a belief that, in our political system, the individual speaker is entitled to act upon such an assumption if our institutions are to be held  **[*71]**  up, as they should be, to constant scrutiny.  And, at least as to the "public official," it seems to be universally the case that he is entitled to an absolute immunity for what he may utter in response to the charges of others.  Where such factors are present the need to provide monetary compensation for defamation appears a good deal more attenuated.  Finally, in light of the plurality opinion's somewhat extravagant **[***328]**  delineation of the public interest involved in the dissemination of information about **[****73]**  nonpublic persons, it bears emphasizing that a primary rationale for extending the *New York Times* rule to public figures was the desire to reflect, in the constitutional balance, the fact that "in this country, the distinctions between governmental and private sectors are blurred," *Curtis Publishing Co., supra, at 163* (opinion of Warren, C. J.), and to treat constitutional values as specially implicated where important, albeit nonofficial, policy and behavior were the subjects of discussion.  At the very least, this tends to diminish the force of any contention that libelous depictions of nonpublic persons are often likely to involve matters of abiding public significance.

I cannot agree that the *First Amendment* gives special protection to the press from "the very possibility of having to engage in litigation," *ante*, at 52 (opinion of BRENNAN, J.).  Were this assertion tenable, I do not see why the States could ever enforce their libel laws.  Cf. my Brother BLACK's opinion, *ante*, at 57.  Further, it would certainly cast very grave doubts upon the constitutionality of so-called "right-of-reply statutes" advocated by the plurality, *ante*, at 47 n. 15,  **[****74]**  and ultimately treat the application of any general law to a publisher or broadcaster as an important *First Amendment* issue.  The notion that such an interest, in the context of a purely private libel, is a significant independent constitutional value is an unfortunate consequence of the plurality's  **[*72]**  single-minded devotion to the task of preventing self-censorship, regardless of the purposes for which such restraint is induced or the evils its exercise tends to avoid.

 [32]It is, then, my judgment that the reasonable care standard adequately serves those *First Amendment* values that must inform the definition of actionable libel  **[**1834]**  and that those special considerations that made even this

**EXHIBIT 43**                                                                   **EXHIBIT 7**

Rosenbloom v. Metromedia, 403 U.S. 29

standard an insufficiently precise technique when applied to plaintiffs who are "public officials" or "public figures" do not obtain where the litigant is a purely private individual.

III

There remains the problem of punitive damages. [3] No doubt my Brother MARSHALL is correct in asserting that the specter of being forced to pay out substantial punitive damage awards is likely to induce self-censorship. **[****75]** This would probably also be the case where the harm actually caused is likely to be great. But, as I indicated above, this fact in itself would not justify construing the *First Amendment* to impose an arbitrary limitation on the amount of actual damages recoverable. Thus, as my Brother MARSHALL would apparently agree -- since he, too, proposes no limitation on actual damages -- one cannot jump from the proposition that fear of **[***329]** substantial punitive damage awards may be an important factor in **[*73]** inducing self-censorship directly to the result that punitive damages cannot be assessed in all private libel cases. A more particularized inquiry into the nature of the competing interests involved is necessary in order to ascertain whether awarding punitive damages must inevitably, in private libel cases, serve only interests that are incompatible with the *First Amendment*.

 **[****76]**   [33]At a minimum, even in the purely private libel area, I think the *First Amendment* should be construed to limit the imposition of punitive damages to those situations where actual malice is proved. This is the typical standard employed in assessing anyone's liability for punitive damages where the underlying aim of the law is to compensate for harm actually caused, see, *e. g.*, 3 L. Frumer et al., Personal Injury § 2.02 (1965); H. Oleck, Damages to Persons and Property § 30 (1955), and no conceivable state interest could justify imposing a harsher standard on the exercise of those freedoms that are given explicit protection by the *First Amendment*.

The question then arises whether further limitations on this general state power must be imposed in order to serve the particularized goals of the *First Amendment*. The most compelling rationale for providing punitive damages where actual malice is shown is that such damages assure that deterrent force is added to the jury's verdict. If the speaker's conduct was quite likely to produce substantial harm, but fortuitously did not, simple assessment of **[****77]** actual damages will not fully reflect the social interest in deterring that conduct generally. Further, even if the harm done was great the defendant may have unusually substantial resources that make the award of actual damages a trivial inconvenience of no actual deterrent value. And even where neither of these factors obtains, the State always retains an interest in punishing more severely conduct that, although it causes the same effect, is more morally blameworthy. For example, consider **[*74]** the distinction between manslaughter and first-degree murder.

I find it impossible to say, at least without further judicial experience in this area, that the *First Amendment* interest in avoiding self-censorship will always outweigh the state interest in vindicating these policies. It seems that a legislative choice is permissible which, for example, seeks to induce, through a reasonable monetary assessment, repression of false material, published with **[**1835]** actual malice, that was demonstrably harmful and reasonably thought capable of causing substantial harm, but, in fact, was not so fully injurious to the individual attacked. Similarly, the State surely has a legitimate **[****78]** interest in seeking to assure that its system of compensating victims of negligent behavior also operates upon all as an inducement to avoidance of such conduct. And, these are burdens that are placed on all members of society, thus permitting the press to escape them only if its interest is somehow different in this regard.

However, from the standpoint of the individual plaintiff such damage awards are windfalls. They are, in essence, private fines levied for purposes that may be wholly unrelated to the circumstances of the actual litigant. That fact alone is not, I think, enough to condemn them. The State may, as it often **[***330]** does, use the vehicle of a private

---

[3] The conclusions I reach in Part III of this opinion are somewhat different from those I embraced four Terms ago in *Curtis Publishing Co., supra, at 159-161*. Where matters are in flux, however, it is more important to re-think past conclusions than to adhere to them without question and the problem under consideration remains in a state of evolution, as is attested to by all the opinions filed today. Reflection has convinced me that my earlier opinion painted with somewhat too broad a brush and that a more precise balancing of the conflicting interests involved is called for in this delicate area.

148

**EXHIBIT 43**                                                                 **EXHIBIT  7**

Rosenbloom v. Metromedia, 403 U.S. 29

lawsuit to serve broader public purposes.  It is noteworthy that my Brother MARSHALL does not rest his objection to punitive damages upon these grounds.  He fears, instead, the self-censorship that may flow from the unbridled discretion of juries to set the amount of such damages.  I agree that where these amounts bear no relationship to the actual harm caused, they then serve essentially as springboards to jury assessment, without reference to the primary legitimating compensatory function of the system, of an **[****79]** infinitely wide range of penalties wholly unpredictable in amount at the time of the publication **[*75]** and that this must be a substantial factor in inducing self-censorship.  Further, I find it difficult to fathom why it may be necessary, in order to achieve its justifiable deterrence goals, for the States to permit punitive damages that bear no discernible relationship to the actual harm caused by the publication at issue.  A rational determination of the injury a publication might potentially have inflicted should typically proceed from the harm done in fact.  And where the compensatory scheme seeks to achieve deterrence as a subsidiary by-product, the desired deterrence, if not precisely measured by actual damages, should be informed by that touchstone if deterrence of falsehood is not to replace compensation for harm as the paramount goal.  Finally, while our legal system does often mete out harsher punishment for more culpable acts, it typically begins with a gradation of offenses defined in terms of effects.  Compare, for example, larceny with murder.  It is not surprising, then, that most States apparently require that punitive damages in most private civil actions bear **[****80]** some reasonable relation to the actual damages awarded, Oleck, at § 275, Pennsylvania included, *Weider v. Hoffman, 238 F.Supp. 437, 444-447 (MD Pa. 1965)*.

However, where the amount of punitive damages awarded bears a reasonable and purposeful relationship to the actual harm done, I cannot agree that the Constitution must be read to prohibit such an award.  Indeed, as I understand it, my Brother MARSHALL's objection to my position [4] **[****82]** is not that the interest in freedom of speech dictates eliminating such judgments, but that this result **[*76]** is compelled by the need to avoid involving courts in an "ad hoc balancing" of "the content of the speech and the surrounding circumstances," *post*, at 86, 85, much like that undertaken today in Part VI of the plurality opinion, the same technique criticized in my dissent in *Time, Inc*. v. *Pape, supra.* I find this argument unpersuasive.  First, I do not see why my proposed rule would necessarily require frequent judicial reweighing of the facts underlying each jury verdict.  A carefully and properly instructed jury should ordinarily be able to arrive at damage awards that are self-validating.  **[****81]**   **[**1836]** It is others, not I, who have placed upon the federal courts the general duty of reweighing jury verdicts regarding the degree of fault demonstrated in libel actions.  Further, to the extent that supervision of jury verdicts would be required **[***331]** it would entail a different process from that undertaken where judges redetermine the degree of fault.  The defendant's resources, the actual harm suffered by the plaintiff, and the publication's potential for actual harm are all susceptible of more or less objective measurement.  And the overriding principle that deterrence is not to be made a substitute for compensation should serve as a useful mechanism for adjusting the equation.  Finally, even if some marginal "ad hoc balancing" becomes necessary, I should think it the duty of this Court at least to attempt to implement such a process before pre-empting, for itself, all state power in this regard. [5]

---

[4] Of course, I do not envision that, consistently with my views, the States could only exact some predetermined multiple of the actual damages found.  I should think a jury could simply be instructed, along the lines set out in my opinion, on the legitimate uses of the punitive damage award and the necessity for relating any such judgment to the harm actually done.

[5] The plurality opinion states that the "real thrust" of my position is that it "will not 'constitutionalize' the factfinding process." *Ante*, at 53.  In fact, I have attempted to demonstrate throughout this opinion that I believe the positions of my Brothers BRENNAN, BLACK, and MARSHALL all, in varying degrees, overstate the extent to which libel law is incompatible with the constitutional guarantee of freedom of expression, and have pointed out that I think my views have merit "even if [the objection noted in my Brother MARSHALL's opinion] were not tenable." *Supra, at 69*.  Moreover, the assertion that an inquiry into whether actual damages were suffered "will involve judges even more deeply in factfinding," *ante*, at 53, than ascertaining whether "the defendant in fact entertained serious doubts as to the truth of his publication," *ante*, at 56, or whether the publication involved "an event of public or general concern," *ante*, at 52, seems to me to carry its own refutation.  The former focuses on measurable, objective fact; the latter upon subjective, personal belief.  Finally, I cannot see why juries may not typically be entrusted responsibly to determine whether a publisher was negligent, a function they perform in judging the harmful conduct of most other members of society; or why it should be materially more difficult for judges to oversee such decisions where a speaker, rather than any other actor, is a defendant.

**EXHIBIT 43**                                                                                    **EXHIBIT 7**

Rosenbloom v. Metromedia, 403 U.S. 29

**[****83]**

**[*77]**    [34]In sum, given the fact that it seems to reflect the majority rule, that most of our jurisprudence proceeds upon the premise that legislative purposes can be achieved by fitting the punishment to the crime, and since we deal here with a precise constitutional interest that may legitimately require the States to resort to more discriminating regulation within a more circumscribed area of permissible concern, I would hold unconstitutional, in a private libel case, jury authority to award punitive damages which is unconfined by the requirement that these awards bear a reasonable and purposeful relationship to the actual harm done.  Conversely, where the jury authority has been exercised within such constraints, and the plaintiff has proved that the speaker acted out of express malice, given the present state of judicial experience, I think it would be an unwarranted intrusion into the legitimate legislative processes of the States and an impermissibly broad construction of the *First Amendment* to nullify that state action.

Because the Court of Appeals adjudicated this case upon principles **[****84]**  wholly unlike those suggested here, I  **[*78]**  would vacate the judgment below and remand the case for further proceedings consistent with the views expressed herein.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE STEWART joins, dissenting.

Here, unlike the other cases involving the *New York Times* [1] doctrine, we are dealing with an individual who held no public office, who had not taken part in any public  **[***332]**  controversy, and who lived an obscure private life. [2] George Rosenbloom,  **[**1837]**  before the events and reports of the events involved here, was just one of the millions of Americans who live their lives in obscurity.

 **[****85]**  The protection of the reputation of such anonymous persons "from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer, 383 U.S. 75, 92 (1966)* (STEWART, J., concurring). But the concept of a citizenry informed by a free and unfettered press is also basic to our system of ordered liberty. Here these two essential and fundamental values conflict.

I

The plurality has attempted to resolve the conflict by creating a conditional constitutional privilege for defamation published in connection with an event that is found to be of "public or general concern." The condition for the privilege is that the defamation must not be published "with knowledge that it was false or with reckless  **[*79]**  disregard of whether it was false or not." I believe that this approach offers inadequate protection for both of the basic values that are at stake.

In order for particular defamation to come within the privilege there must be a determination that the event was of legitimate public interest. That determination **[****86]**  will have to be made by courts generally and, in the last analysis, by this Court in particular.  Courts, including this one, are not anointed with any extraordinary prescience. But, assuming that under the rule announced by MR. JUSTICE BRENNAN for the plurality, courts are not simply to take a poll to determine whether a substantial portion of the population is interested or concerned in a subject, courts will be required to somehow pass on the legitimacy of interest in a particular event or subject; what information is relevant to self-government.  See *Whitney v. California, 274 U.S. 357, 375 (1927)* (Brandeis, J., concurring).  The danger such a doctrine portends for freedom of the press seems apparent.

---

[1] *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)*.

[2] See, *e. g., Associated Press v. Walker, 388 U.S. 130 (1967)*; *Curtis Publishing Co.* v. *Butts, 388 U.S. 130 (1967)*; *Beckley Newspapers Corp.* v. *Hanks, 389 U.S. 81 (1967)*; *Greenbelt Publishing Assn.* v. *Bresler, 398 U.S. 6 (1970)*; *Rosenblatt v. Baer, 383 U.S. 75 (1966)*.

                                                                                    150

**EXHIBIT 43**                                                              EXHIBIT  7

Rosenbloom v. Metromedia, 403 U.S. 29

The plurality's doctrine also threatens society's interest in protecting private individuals from being thrust into the public eye by the distorting light of defamation. This danger exists since all human events are arguably within the area of "public or general concern." My Brother BRENNAN does not try to provide guidelines or standards by which courts are to decide the scope of public concern.  He does, however, indicate that areas exist that are not the **[****87]** proper focus of public concern, and cites *Griswold v. Connecticut, 381 U.S. 479 (1965)*. But it is apparent that in an era of a dramatic threat of overpopulation and one in which previously accepted standards of conduct are widely heralded as outdated, even the intimate and personal concerns with which the Court dealt in that **[***333]** case cannot be said to be outside the area of "public or general concern."

 **[*80]**  The threats and inadequacies of using the plurality's conditional privilege to resolve the conflict between the two basic values involved here have been illustrated by the experience courts have had in trying to deal with the right of privacy. See Cohen, A New Niche for the Fault Principle: A Forthcoming Newsworthiness Privilege in Libel Cases?, *18 U. C. L. A. L. Rev. 371, 379-381 (1970)*; Kalven, Privacy in Tort Law -- Were Warren and Brandeis Wrong?, 31 Law & Contemp. Prob. 326, 336 (1966). The authors of the most famous of all law review articles recommended that no protection be given to privacy interests when the publication dealt with a "matter which is of public or general interest." Warren & Brandeis, The Right **[****88]** to Privacy, 4 Harv.  **[**1838]**  L. Rev. 193, 214 (1890). Yet cases dealing with this caveat raise serious questions whether it has substantially destroyed the right of privacy as Warren and Brandeis envisioned it. [3] For example, the publication of a picture of the body of plaintiff's daughter immediately after her death in an automobile accident was held to be protected.  *Kelley v. Post Publishing Co., 327 Mass. 275, 98 N. E. 2d 286 (1951)*. And the publication of the details of the somewhat peculiar behavior of a former child prodigy, who had a passion for obscurity, was found to involve a matter of public concern.  *Sidis v. F-R Pub. Corp., 113 F.2d 806 (CA2 1940)*.

In *New York Times* **[****89]** the Court chose to balance the competing interests by seeming to announce a generally applicable rule.  Here it is apparent that the general rule announced cannot have general applicability.  The plurality's conditional privilege approach, when coupled **[*81]** with constitutionalizing of the factfinding process, [4] see Part VI of MR. JUSTICE BRENNAN's opinion, results in the adoption of an ad hoc balancing of the two interests involved. The Court is required to weigh the nuances of each particular circumstance on its scale of values regarding the relative importance of society's interest in protecting individuals from defamation against the importance of a free press.  This scale may arguably be a more finely tuned instrument in a particular case.  But whatever precision the ad hoc method supplies is achieved at a substantial cost in predictability and certainty.  Moreover, such an approach will require this Court to engage in a constant and continuing supervision of defamation litigation throughout the country.  See *Time, Inc.* v. *Pape, 401 U.S. 279, 293 (1971)* (HARLAN, J., dissenting); *Curtis Publishing Co.* v. *Butts, 388 U.S. 130, 171 (1967)* **[****90]**  (opinion of BLACK, J.).

Undoubtedly, ad hoc balancing may be appropriate in some circumstances that involve *First Amendment* problems. See, *e. g., Bates v. Little Rock, 361 U.S. 516 (1960)*; *Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503 (1969)*. But in view of the shortcomings of my Brother BRENNAN's test, defamation of a private individual by the **[***334]** mass media is not one of the occasions for unfettered ad hoc balancing.  A generally applicable resolution is available that promises to provide an adequate balance between the interest in protecting individuals from defamation and the equally basic interest in protecting freedom of the press.

II

As the plurality recognizes here and as was recognized as the basic premise of the *New York Times* principle, the threat that defamation law presents for the values **[*82]** encompassed in the concept of freedom of the

---

[3] For cases in which the courts have protected the privacy of persons involved in dramatic public events see *Mau v. Rio Grande Oil, Inc., 28 F.Supp. 845 (ND Cal. 1939)*, and *Melvin v. Reid, 112 Cal. App. 285, 297 P. 91 (1931)*.

[4] See *Time, Inc*. v. *Pape, 401 U.S. 279 (1971)*.

EXHIBIT 43
EXHIBIT 7

Rosenbloom v. Metromedia, 403 U.S. 29

press **[****91]** is that of self-censorship. [5] Our notions of liberty require a free and vigorous press that presents what it believes to be information of interest or importance; not timorous, afraid of an error that leaves it open to liability for hundreds of thousands of dollars.  The size of the potential judgment that may be rendered against the press must be the most significant factor in producing self-censorship -- a judgment like the one rendered against Metromedia would be fatal to many smaller publishers. [6]

 [35] [36]The  **[**1839]**  judgments that may be entered in defamation cases are unlike those that may be entered **[****92]**  in most litigation since the bulk of the award is given to punish the defendant or to compensate for presumed damages.  Here the jury awarded Mr. Rosenbloom $ 725,000 in punitive damages. [7] This huge sum was given not to compensate him for any injury but to punish Metromedia.  The concept of punitive or exemplary damages was first articulated in *Huckle* v. *Money*, 2 Wils. 205, 95 Eng. Rep. 768 (K. B. 1763) -- one of the general warrant cases.  There Lord Camden found that the power to award such damages was inherent in the jury's exercise of uncontrolled discretion in the awarding of damages.  See 1 T. Sedgwick, Damages §§ 347-350 (9th ed. 1912).  Today these damages are rationalized as a way to punish the wrongdoer and to admonish others not to err.  See Morris, Punitive Damages in Tort Cases, 44 Harv. L. Rev. 1172 (1931). Thus they serve the same function as criminal penalties and are in effect private fines.  Unlike criminal penalties, however, punitive damages are not awarded within discernible limits but can be awarded  **[*83]**  in almost any amount.  Since there is not even an attempt to offset any palpable loss and since these damages are **[****93]**  the direct product of the ancient theory of unlimited jury discretion, the only limit placed on the jury in awarding punitive damages is that the damages not be "excessive," and in some jurisdictions, that they bear some relationship to the amount of compensatory damages awarded. [8] See H. Oleck, Damages to Persons and Property § 275, pp. 557-560 (1955).  The manner in which unlimited discretion may be exercised is plainly unpredictable.   And fear of the extensive awards that may be given under the doctrine  **[***335]**  must necessarily produce the impingement on freedom of the press recognized in *New York Times*.

In addition to the huge awards **[****94]**  that may be given under the label of punitive or exemplary damages, other doctrines in the law of defamation allow substantial damages without even an offer of evidence that there was actually injury.  See *Montgomery v. Dennison, 363 Pa. 255, 69 A. 2d 520 (1949)*; *Restatement of Torts § 621* (1938).  These doctrines create a legal presumption that substantial injuries "normally flow" from defamation. There is no requirement that there be even an offer of proof that there was in fact financial loss, physical or emotional suffering, or that the plaintiff's standing in the community was diminished.  The effect is to give the jury essentially unlimited discretion and thus to give it much the same power it exercises under the labels of punitive or exemplary damages.  The impingement upon free speech is the same no matter what label is attached.

 **[*84]**  The unlimited discretion exercised by juries in awarding punitive and presumed damages compounds the problem of self-censorship that necessarily results from the awarding of huge judgments.  This discretion allows juries to penalize heavily the unorthodox and the unpopular and exact little from others.  Such free **[****95]**  wheeling discretion presents obvious and basic threats to society's interest in freedom of the press.  And the utility of the discretion in fostering society's interest in protecting individuals from defamation is at best vague and uncertain.  These awards are not to compensate victims; they are only windfalls.   Certainly, the large judgments that can  **[**1840]**  be awarded admonish the particular defendant affected as well as other potential transgressors not to publish defamation. The degree of admonition -- the amount of the judgment in relation to the defamer's means -- is not, however, tied to any concept of what is necessary to deter future conduct nor is there even any way to determine

---

[5] *New York Times Co.* v. *Sullivan, 376 U.S., at 279*.

[6] The jury awarded Mr. Rosenbloom $ 25,000 in general damages and $ 725,000 in punitive damages. The District Court reduced the punitive damages to $ 250,000 on remittitur.

[7] See n. 6, *supra*.

[8] Most jurisdictions in this country recognize the concept of punitive or exemplary damages.  Four States -- Illinois, Massachusetts, Nebraska, and Washington -- apparently do not recognize the doctrine.  In Louisiana and Indiana the doctrine has limited applicability.  See H. Oleck, Damages to Persons and Property § 269, p. 541 (1955).

**EXHIBIT 43**                                                                                    EXHIBIT  7

Rosenbloom v. Metromedia, 403 U.S. 29

that the jury has considered the culpability of the conduct involved in the particular case.  Thus the essence of the discretion is unpredictability and uncertainty.

The threats to society's interest in freedom of the press that are involved in punitive and presumed damages can largely be eliminated by restricting the award of damages to proved, actual injuries.  The jury's wide-ranging discretion will largely be eliminated since the award will be based on essentially objective, discernible **[****96]** factors.  And the self-censorship that results from the uncertainty created by the discretion as well as the self-censorship resulting from the fear of large judgments themselves would be reduced.  At the same time, society's interest in protecting individuals from defamation will still be fostered.  The victims of the defamation will be compensated for their real injuries.  They will not be, however, assuaged far beyond their wounds.  And, there **[*85]** will be a substantial although imprecise and imperfect admonition to avoid future defamation by imposing the requirement that there be compensation for actual damages.

My Brother HARLAN argues that it is unnecessary to go so far.  Although he recognizes the dangers involved in failing "to confine the amount of jury verdicts . . . within any ascertainable limits," MR. JUSTICE HARLAN suggests that on a finding of actual malice punitive damages **[***336]** may be awarded if they "bear a reasonable and purposeful relationship to the actual harm done." My Brother HARLAN envisions jurors being instructed [9] to consider the deterrent function of punitive damages and to try to gear the punitive damages awarded in some undetermined way **[****97]** to actual injury.  Apparently, the jury under the supervision of the court would weigh the content of the speech and the surrounding circumstances -- *inter alia*, the position of the plaintiff, the wealth of the defendant, and the nature of the instrument of publication -- on the scale of their values and determine what amount is necessary in light of the various interests involved.  Since there would be no objective standard by which to measure the jury's decision there would be no predetermined limit of jury discretion and all of the threats to freedom of the press involved in such discretion would remain.  The chant of some new incantation will, of course, provide clear authority for a court to substitute its values for the jury's and remake the decision.  If this is what my Brother **[*86]** HARLAN envisions, he is merely moving the ad hoc balancing from the question of fault to the question of damages.

 **[****98]**   [37]I believe that the appropriate resolution of the clash of societal values here is to restrict damages to actual losses.  See Hill, The *Bill of Rights* and the Supervisory Power, 69 Col. L. Rev. 181, 191 n. 62 (1969). Of course, damages can be awarded for more than direct pecuniary loss but they must be related to some proved harm. See Wright, Defamation, Privacy, and the Public's Right to Know: A National Problem and a New Approach, 46 Tex. L. Rev. 630, 648 **[**1841]** (1968).If awards are so limited in cases involving private individuals -- persons first brought to public attention by the defamation that is the subject of the lawsuit -- it will be unnecessary to rely, as both the plurality and to some extent MR. JUSTICE HARLAN do, on somewhat elusive concepts [10] **[****99]** of the degree of fault, and unnecessary, for constitutional purposes, to engage in ad hoc balancing of the competing interests involved.

---

[9] "[A] jury instruction is not abracadabra.  It is not a magical incantation, the slightest deviation from which will break the spell.  Only its poorer examples are formalistic codes recited by a trial judge to please appellate masters.  At its best, it is simple, rugged communication from a trial judge to a jury of ordinary people, entitled to be appraised in terms of its net effect." *Time, Inc*. v. *Hill, 385 U.S. 374, 418 (1967)* (Fortas, J., dissenting).

[10] See n. 9, *supra*.

**EXHIBIT 43**                                              **EXHIBIT 7**

Rosenbloom v. Metromedia, 403 U.S. 29

[11] States would be essentially free to continue the evolution of the common law of defamation and to articulate whatever fault standard best suits the State's need. [12]

The only constitutional caveat should be that absolute or strict liability, like uncontrolled damages and private **[*87]** fines, cannot be used. [13] **[***337]** The effect of imposing liability without fault is to place "the printed, written or spoken word in the same class with the use of explosives or the keeping of dangerous animals." W. Prosser, The Law of Torts § 108, p. 792 (3d ed. 1964).  Clearly, this **[****100]** is inconsistent with the concepts of freedom of the press.

Thus in this case I would reverse the judgment of the **[****101]** Court of Appeals for the Third Circuit and remand the case for a determination of whether Mr. Rosenbloom can show any actual loss.

## References

*16 Am Jur 2d, Constitutional Law 341- 350*; *50 Am Jur 2d, Libel and Slander 174*, *175*, *251*, *252*, *349*

13 Am Jur Pl & Pr Forms, Libel and Slander, Forms 13:1 et seq.

17 Am Jur Trials 223, Libel Actions by Public Officials

US L Ed Digest, Constitutional Law 927.5, 930

ALR Digests, Constitutional Law 792(1), 795

L Ed Index to Anno, Constitutional Law; Libel and Slander; Radio or Television

ALR Quick Index, Freedom of Speech and Press; Libel and Slander; New York Times Rule; Radio and Television

Federal Quick Index, Freedom of Speech and Press; Libel and Slander; Radio and Television

    Annotation References:

The Supreme Court and the right of free speech and press. *93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976*.

Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice.  *20 ALR3d 988*.

**[****102]**  Libel and slander: who is a public official or otherwise within the federal constitutional rule requiring public officials to show actual malice.  *19 ALR3d 1361*.

---

[11] Of course, reliance on limiting awards to compensation for actual loss will require some review of the facts of particular cases. But that review will be limited to essentially objectively determinable issues; the contents of the publication will not have to be considered.

[12] Leaving States free to impose liability when defamation is found to be the result of negligent conduct, should make it somewhat more likely that a private person will have a meaningful forum in which to vindicate his reputation. If the standard of care is higher, it would seem that publishers will be more likely to assert the defense of truth than simply contend that they did not breach the standard.

[13] Strict liability for defamation was first clearly established in *Jones* v. *E. Hulton & Co.*, [1909] 2 K. B. 444, aff'd, [1910] A. C. 20. See Smith, Jones v. Hulton: Three Conflicting Judicial Views As to a Question of Defamation, 60 U. Pa. L. Rev. 365 and 461 (1912). The standard has been applied in many jurisdictions in this country.  See, *e. g., Upton v. Times-Democrat Publishing Co., 104 La. 141, 28 So. 970 (1900)*; *Laudati v. Stea, 44 R. I. 303, 117 A. 422 (1922)*; *Taylor v. Hearst, 107 Cal. 262, 40 P. 392 (1895)*. See also **Restatement of Torts § 582, comment g** (1938).  Liability without fault has not been applied, however, in Pennsylvania. See *Summit Hotel Co.* v. *National Broadcasting Co., 336 Pa. 182, 8 A. 2d 302 (1939)*, Pa. Stat. Ann., Tit. 12, § 1583 (1953).

**EXHIBIT 43**                                                              EXHIBIT  7

Rosenbloom v. Metromedia, 403 U.S. 29

Constitutional aspects of libel and slander of public officials.  *95 ALR 2d 1450*.

Validity, construction, and application of statute limiting damages recoverable for defamation.  *13 ALR 2d 277*.

Legal aspects of radio communication and broadcasting.  40 ALR 1513, 66 ALR 1361, 76 ALR 1272, 82 ALR 1106, 89 ALR 420, 104 ALR 872, 124 ALR 982, 171 ALR 765.

---

**End of Document**

EXHIBIT 43  Cweklinsky v. Mobil Chem. Co., 267 Conn. 210  EXHIBIT  8

## *Cweklinsky v. Mobil Chem. Co.*

Supreme Court of Connecticut

September 11, 2003, Argued ; January 6, 2004, Officially Released

(SC 16846)

**Reporter**
267 Conn. 210 *; 837 A.2d 759 **; 2004 Conn. LEXIS 2 ***; 20 I.E.R. Cas. (BNA) 1281

VICTOR CWEKLINSKY v. MOBIL CHEMICAL COMPANY

**Prior History:  [***1]**  Action to recover damages for, inter alia, the defendant's alleged violation of the *Fair Labor Standards Act*, wrongful termination of the plaintiff's employment and defamation, and for other relief, brought to the United States District Court for the District of Connecticut, and tried to the jury before Squatrito, J.; verdict and judgment in part for the plaintiff; thereafter, the court granted the plaintiff's motion to set the amount of punitive damages and prejudgment and postjudgment interest and rendered a supplemental judgment for the plaintiff, from which the defendant appealed and the plaintiff cross appealed to the United States Court of Appeals for the Second Circuit, McLaughlin, Jacobs and Sack, Js., which certified to this court three questions of law concerning the viability and scope of an employee's action against an employer for compelled self- publication defamation.

*Cweklinsky v. Mobil Chem. Co., 297 F.3d 154, 2002 U.S. App. LEXIS 14824 (2d Cir. Conn., 2002)*

**Disposition:** Certified questions answered.

## Case Summary

**Procedural Posture**
Plaintiff employee sued defendant employer in the United States District Court for the District of Connecticut, asserting various claims arising out of the termination of his employment. After a jury verdict, the employee appealed from the judgment to the United States Court of Appeals for the Second Circuit. The Court of Appeals then certified to the supreme court three questions of law, which were accepted.

**Overview**
The question addressed was whether Connecticut recognized a cause of action for compelled self-publication defamation based on a former employee's compelled self-publication of an employer's defamatory statements made only to the former employee. The supreme court concluded that Connecticut did not recognize such a cause of action, as the public policy considerations that favored the rejection of the doctrine of compelled self-publication defamation outweighed the considerations supporting its recognition. The most compelling public policy consideration against recognition of the doctrine was that acceptance of the doctrine would have a chilling effect on communication in the workplace, thereby contradicting society's fundamental interest in encouraging the free flow of information. The doctrine of compelled self-publication defamation also countered the duty to mitigate damages, compliance with applicable statutes of limitations, and the doctrine of employment at will. The employee's claim that equity and fairness supported recognition of the cause of action was far outweighed by the concerns that weighed against the recognition of the cause of action.

**Outcome**
The first certified question was answered in the negative. The remaining certified questions were not addressed.

EXHIBIT 43                                                              EXHIBIT 8

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

**Counsel:** Jeffrey J. Tinley, with whom was Robert Nastri, Jr., for the appellant (defendant).

Victoria de Toledo, with whom, on the brief, was Rhonna W. Rogol, for the appellee (plaintiff). Allison M. Bogosian and Robert B. Mitchell filed a brief for the Connecticut Business and Industry Association, Inc. **[\*\*\*2]** , as amicus curiae.

**Judges:** Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js. In this opinion the other justices concurred.

**Opinion by:** VERTEFEUILLE

# Opinion

 **[\*212] [\*\*761]**   VERTEFEUILLE, J. The dispositive issue in this case, which comes to us upon acceptance of three certified questions from the United States Court of Appeals for the Second Circuit pursuant to *General Statutes § 51-199b (d)*, [1] **[\*\*\*3]** is whether Connecticut recognizes a cause of action for defamation based on a former employee's compelled self- publication of a former employer's defamatory statements made by the employer to only **[\*213]** the employee. [2] We conclude that Connecticut does not recognize such a cause of action.

The plaintiff, Victor Cweklinsky, brought a multicount complaint against the defendant, Mobil **[\*\*\*4]** Chemical Company, in the United States District Court for the District of Connecticut, asserting various claims arising out of the termination of his employment by the defendant. [3] The plaintiff's common-law claims for defamation and breach of implied contract, and statutory claims for state and federal retaliatory discharge were tried to a jury, which found for the plaintiff and awarded damages on his defamation and breach of contract claims, but found for the defendant **[\*\*762]** on both of the retaliation claims. [4] The defendant subsequently appealed from the judgment of the District Court to the United States Court of Appeals for the Second Circuit. [5] The Court of Appeals then certified to this court three questions of law, which we accepted. See footnote 2 of this opinion.

 **[\*\*\*5] [\*214]**   The following facts, certified by the Court of Appeals, are relevant to our resolution of the certified questions. [6] "This case arises out of [the plaintiff's] termination from [the defendant]. [The plaintiff], who had worked as a machinist at [the defendant] for twenty-five years, was given approximately six weeks of paid medical leave in

---

[1] *General Statutes § 51-199b*, the Uniform Certification of Questions of Law Act, provides in relevant part: "(d) The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state. . . ."

[2] The Court of Appeals for the Second Circuit asked this court to answer the following three questions: "(1) Does Connecticut recognize a cause of action for defamation based on a plaintiff employee's or former employee's compelled self-publication of a defendant employer's or former employer's defamatory statements made by the employer or former employer only to the employee or former employee? (2) If so, does the assertion that [the plaintiff Victor] Cweklinsky was forced to repeat [the defendant Mobil Chemical Company's] defamatory statements 'over and over' present a triable jury issue as to whether any self-publications have occurred? (3) If no self-publications have occurred as a matter of law, may [the plaintiff Victor] Cweklinsky recover for self-publications that may occur in the future?" *Cweklinsky v. Mobil Chemical Co., 297 F.3d 154, 161 (2d Cir. 2002)*. Because we answer the first question in the negative, we need not reach the second and third certified questions.

[3] The plaintiff's third amended complaint alleged ten counts against the defendant, four of which ultimately were tried to the jury.

[4] See *Cweklinsky* v. *Mobil Chemical Co.*, United States District Court, Docket No. 399CV0698 (DJS) (February 16, 2001).

[5] The plaintiff filed a cross appeal that is not implicated in the questions certified to us.

[6] *General Statutes § 51-199b (f)* provides in relevant part: "A certification order must contain . . . (2) The facts relevant to the question, showing fully the nature of the controversy out of which the question arose . . . ."

EXHIBIT 43                                                       EXHIBIT 8

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

November [of] 1998 to undergo carpal tunnel syndrome surgery on his wrist. In December [of 1998], [the plaintiff's] treating physician, Dr. Gerald F. Cambria, gave [the plaintiff] a return-to- work letter that cleared him to return to full-time, full-duty work on Friday, December 11. On December 11, however, [the plaintiff] did not report to work. Instead, he went back to Dr. Cambria's office, and met with Carol Giacondino, Dr. Cambria's office manager. [The plaintiff] requested that Giacondino extend his return-to-work [date] from December 11 to December 14. [He] did not tell Giacondino that he already had been scheduled to work on Saturday, December 12 and Sunday, December 13.

 [***6]  "To accommodate [the plaintiff], Giacondino altered [the plaintiff's] copy of Dr. Cambria's December 8 return-to-work letter to reflect that [the plaintiff] could resume working on December 14. Significantly, Giacondino did not amend the office copy of Dr. Cambria's December 8 letter, nor indicate the change in [the plaintiff's] file.

"When [the plaintiff] reported to work on December 14, he gave his (amended) copy of Dr. Cambria's December 8 return-to-work letter to his supervisor, Gerry Smerka. Smerka then consulted with [the defendant's] human resources manager, Therese Haberman, about the discrepancy in [the plaintiff's] return-to-work date. As part of her investigation of the issue, Haberman  [*215]  called Dr. Cambria's office and got access to Dr. Cambria's December 8 return-to-work letter from [the plaintiff's] medical file. The letters were identical with one salient exception: the return-to-work date on [the plaintiff's] copy was December 14, while Dr. Cambria's office copy had a December 11 return-to-work date.

"Confused by this discrepancy, Haberman made two more phone calls to Dr. Cambria's office, speaking with a different person each time. On both occasions,  [***7]  Dr. Cambria's people assured Haberman that [the plaintiff's] return-to-work date was December 11. Haberman also contacted . . . the administrator of [the defendant's] short-term disability plan, [which] confirmed that [it] was not aware of any change in [the plaintiff's] return-to-work date from December 11 to December 14. Concluding that [the plaintiff] himself must have altered Dr. Cambria's December 8 letter, [the defendant decided] to fire [the plaintiff].

"On January 5, 1999, Smerka and Haberman met with [the plaintiff]. They told him that he was being terminated because  [**763]  of the obvious discrepancy between Dr. Cambria's office copy and the altered letter that [the plaintiff] gave [the defendant]. [The plaintiff] denied altering Dr. Cambria's letter, but did not inform Smerka or Haberman that it was actually Giacondino who had changed the note at [the plaintiff's] request." *Cweklinsky v. Mobil Chemical Co., 297 F.3d 154, 156-57 (2d Cir. 2002)*.

After the plaintiff's denial, the defendant investigated further and determined that it was Giacondino, and not the plaintiff, who had altered the letter. Despite this finding, however, the [***8] defendant issued a final termination letter, concluding that although the plaintiff had not falsified his return-to-work letter, his employment should nonetheless be terminated because he had taken paid medical leave without a medical basis. *Id., 157-58*.

 [*216]  During the trial, the plaintiff provided evidence that the statements made by the defendant were defamatory. With regard to publication, counsel for the plaintiff asked him whether he had published the defamatory statements to prospective employers, and if so, whether he had felt "compelled" to do so. The plaintiff responded: "Over and over. And they asked why I was terminated. I told them. That's what they asked."

The question that we must answer is whether Connecticut recognizes a cause of action for defamation based on a former employee's compelled self-publication of a former employer's defamatory statement made only to the employee. [7] We are mindful that the issue of whether to recognize a common-law cause of action in defamation "is

---

[7] The plaintiff contends that this question does not present an issue of first impression, claiming that this court, in *Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 544-45 n.23, 733 A.2d 197 (1999)*, recognized the doctrine of compelled self-publication defamation when it characterized the doctrine as "emerging." We disagree with the plaintiff's characterization of our statement. We did not recognize such a cause of action but merely referred to an article in which the *author* described the doctrine as emerging. *Id., 544 n.23*; see J. Acevedo, "The Emerging Cause of Action for Compelled Self-Publication Defamation in the Employment Context: Should Connecticut Follow Suit?," 72 Conn. B.J. 297 (1998).

EXHIBIT 43   EXHIBIT 8

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

a matter of policy for the court to determine" based upon competing concerns in society. *Craig v. Driscoll, 262 Conn. 312, 339, 813 A.2d 1003 (2003)*. In making **[\*\*\*9]** such a determination, we acknowledge that the law of torts generally, and the tort of defamation especially, involves competing public policy considerations that must be thoroughly evaluated. After completing our evaluation as set forth herein, we conclude that the public policy considerations that favor the rejection of the doctrine of compelled self-publication defamation outweigh the considerations supporting its recognition. Accordingly, we decline to recognize the doctrine of compelled self-publication defamation.

**[\*\*\*10] [\*217]**   We begin our analysis with a brief review of the common-law tort of defamation. A defamatory statement is defined as a communication that tends to "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . ." (Internal quotation marks omitted.) *QSP, Inc. v. Aetna Casualty & Surety Co., 256 Conn. 343, 356, 773 A.2d 906 (2001)*, quoting 3 *Restatement (Second), Torts § 559*, p. 156 (1977). To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published **[\*\*764]** to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. See *QSP, Inc. v. Aetna Casualty & Surety Co., supra, 356*; 3 *Restatement (Second), supra, §§ 558*, *580B*, pp. 155, 221-22; W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 113, p. 802. With each publication by the defendant, a new cause of action arises. See W. Prosser & W. Keeton, supra, § **[\*\*\*11]** 113, pp. 799-800. As a general rule, however, no action for defamation exists if the defendant publishes the defamatory statements to only the plaintiff, and the plaintiff subsequently disseminates the statements to a third person. See 3 *Restatement (Second), supra, § 577, comment (m)*, p. 206; W. Prosser & W. Keeton, supra, § 113, p. 802.

Several courts in other states, however, have carved out an exception to that rule in the context of employment. [8] These courts have concluded that publication to **[\*218]** the third party by the defamed former employee, or "self-publication," may satisfy the publication requirement because the person effectively is "compelled" to publish the defamatory statement to prospective employers when the person is asked why he or she left his or her former employment. See, e.g., *Lewis v. Equitable Life Assurance Society of the United States, 389 N.W.2d 876, 886-87 (Minn. 1986)*. These courts reason that it is fair to hold an employer liable for compelled self-publication because it is reasonably foreseeable that the employee, in seeking new employment, will inevitably be asked why he or she left his or her former employment. See id.

**[\*\*\*12]**   The parties in the present case disagree on whether a majority of jurisdictions recognize the doctrine of compelled self-publication defamation. Our own jurisdictional survey leads us to agree with the Court of Appeals' assessment that "most jurisdictions have yet to recognize compelled self-publication defamation or have expressly rejected it." [9] **[\*\*\*13]** *Cweklinsky v. Mobil* **[\*\*765]** *Chemical* **[\*219]** *Co., supra, 297 F.3d 159*. Furthermore, although

---

[8] See *McKinney v. County of Santa Clara, 110 Cal. App. 3d 787, 795-97, 168 Cal.Rptr. 89 (1980)*; *Churchey v. Adolph Coors Co., 759 P.2d 1336, 1344-45 (Colo. 1988)*; *Munsell v. Ideal Food Stores, 208 Kan. 909, 919-20, 494 P.2d 1063 (1972)*; *Grist v. Upjohn Co., 16 Mich. App. 452, 484, 168 N.W.2d 389 (1969)*; *Lewis v. Equitable Life Assurance Society of the United States, 389 N.W.2d 876, 886-87 (Minn. 1986)*; **Neighbors v. Kirksville College of Osteopathic Medicine, 694 S.W.2d 822, 824 (Mo. App. 1985)**; *Downs v. Waremart, Inc., 137 Or. App. 119, 130-31, 903 P.2d 888 (1995)*.

[9] A cause of action for compelled self-publication defamation expressly was rejected in the following cases: *Gore v. Health-Tex, Inc., 567 So. 2d 1307, 1308 (Ala. 1990)*; *Atkins v. Industrial Telecommunications Ass'n, 660 A.2d 885, 894-95 (D.C. App. 1995)*; *Brantley v. Heller, 101 Ga. App. 16, 18-19, 112 S.E.2d 685 (1960)*; *Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., 100 Haw. 149, 170-72, 58 P.3d 1196 (2002)*; *Layne v. Builders Plumbing Supply Co., 210 Ill. App. 3d 966, 975-76, 569 N.E.2d 1104, 155 Ill. Dec. 493 (1991)*; *Wieder v. Chemical Bank, 202 App. Div. 2d 168, 170, 608 N.Y.S.2d 195 (1994)*; *Yetter v. Ward Trucking Corp., 401 Pa. Super. 467, 472, 585 A.2d 1022 (1991)*; *Sullivan v. Baptist Memorial Hospital, 995 S.W.2d 569, 574 (Tenn. 1999)*.

Many federal courts, applying state law, also have rejected a cause of action for compelled self-publication defamation. See, e.g., *Olivieri v. Rodriguez, 122 F.3d 406, 408-409 (7th Cir. 1997)* (stating that doctrine of self-publication has been "largely discredited"); *De Leon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1237 (4th Cir.)* (applying Maryland law not recognizing self-publication), cert.

EXHIBIT 43                                                           EXHIBIT  8

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

as many as seven state appellate courts have adopted the doctrine; see footnote 8 of this opinion; the highest appellate courts of only two states, Colorado and Minnesota, have adopted it. [10] Moreover, in both those states, the legislatures responded by eliminating or restricting the doctrine's application. [11] After a thorough review of all of the applicable case law, we are persuaded by the majority of other states, which have concluded that public policy concerns favor the rejection of the doctrine of compelled self-publication defamation. See, e.g., _Sullivan v. Baptist Memorial Hospital, 995 S.W.2d 569, 574 (Tenn. 1999)_.

The most compelling public policy consideration against recognition of the doctrine is that acceptance of the doctrine would have a chilling effect on communication in the workplace, thereby contradicting society's fundamental interest in encouraging the free flow of information. See, e.g., _Layne v. Builders Plumbing Supply Co., 210 Ill. App. 3d 966, 976, 569 N.E.2d 1104, 155 Ill. Dec. 493 (1991)_. Open and honest communication in the workplace is a laudable public policy, in that "an employer who communicates **[*220]** specific feedback, gives reasons for actions, and communicates those reasons to other employees will [foster] a happier . . . and [more] efficient [working environment]." R. Prentice & B. Winslett, **[***14]** "Employee References: Will a 'No Comment' Policy Protect Employers Against Liability for Defamation?," 25 Am. Bus. L.J. 207, 234 (1987). Recognition of compelled self-publication defamation, however, would encourage employers to curtail communications with employees, and the employees' prospective employers, for fear of liability. As one commentator noted, recognition of the doctrine could create a perpetual "culture of silence," negatively affecting not only employers, but employees in numerous ways. See J. Acevedo, "The Emerging Cause of Action for Compelled Self-Publication Defamation in the Employment Context: Should Connecticut Follow Suit?," 72 Conn. B.J. 297, 316 (1998) (stating that "adoption of self-publication defamation might deter employers from communicating [with] the employee . . . thereby fostering an unhealthy 'culture of silence' in the workplace").

Many states that have rejected the doctrine of compelled self- publication defamation have concluded that this "culture of silence" may actually harm employees by depriving them of the benefit of constructive criticism because of an employer's fear that the comments may be used against it in **[***15]** the future. See, e.g., _Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., 100 Haw. 149, 172, 58 P.3d 1196 (2002)_; _Sullivan v. Baptist Memorial Hospital, supra,_ **[**766]** _995 S.W.2d 574_. As the Supreme Court of Hawaii noted, "employees who may be able to improve substandard job performances may fail to do so because needed feedback is withheld." (Internal quotation marks omitted.) _Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., supra, 172_. These states have reasoned further that a working environment fueled by "no comment" could result in the elimination of formal termination **[*221]** procedures, causing employees to be discharged prematurely without the opportunity to rebut an employer's accusations. See id.; _Sullivan v. Baptist Memorial Hospital, supra, 573_.

---

denied, _493 U.S. 825, 110 S. Ct. 87, 107 L. Ed. 2d 52 (1989)_; _Spratt v. Northern Automotive Corp., 958 F. Supp. 456, 465 (D. Ariz. 1996)_ (stating that Arizona courts do not recognize compelled self- publication); _Hensley v. Armstrong World Industries, Inc., 798 F. Supp. 653, 657 (W.D. Okla. 1992)_ (asserting that Oklahoma would follow "vast majority of states" rejecting theory of compelled self-publication). In other federal jurisdictions, the issue has not been decided. See, e.g., _Golem v. Village of Put-in-Bay, 222 F. Supp. 2d 924, 934 (N.D. Ohio 2002)_ (stating that Ohio has not yet recognized doctrine of self- publication); _Monroe v. Host Marriot Service Corp., 999 F. Supp. 599, 604 (D.N.J. 1998)_ (asserting that cause of action for defamation could not be maintained when plaintiff publishes defamatory statement, but decided case upon statute of limitations grounds); _Bickling v. Kent General Hospital, Inc., 872 F. Supp. 1299, 1310-11 (D. Del. 1994)_ (asserting that Delaware was undecided on issue of self-publication); _Sarratore v. Longview Van Corp., 666 F. Supp. 1257, 1263 (N.D. Ind. 1987)_ (finding that compelled self-publication was not yet law of Indiana). For an overview of cases considering the self-publication doctrine, see generally annot., D. Chapus, "Publication of Allegedly Defamatory Matter by Plaintiff ('Self-Publication') as Sufficient to Support Defamation Action," _62 A.L.R.4th 616_ (1988 & Sup. 2003).

[10] See _Churchey v. Adolph Coors Co., 759 P.2d 1336, 1347 (Colo. 1988)_; _Lewis v. Equitable Life Assurance Society of the United States, supra, 389 N.W.2d 876_.

[11] See _Colo. Rev. Stat. Ann. § 13-25-125.5_ (Lexis Nexis 2003); _Minn. Stat. Ann. § 181.933 (2)_ (West 1993).

EXHIBIT 43                                                                              EXHIBIT  8

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

The majority of the states rejecting the doctrine also have determined that employer silence could frustrate an employee's right to redress a wrongful termination in violation of state and federal antidiscrimination statutes. [12] In a discrimination case, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. See, e.g., *Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 55-56, 448 A.2d 801 (1982).* [***16] The burden then shifts to the employer to show that the employee was discharged for nondiscriminatory reasons. *Id.* "Normally, a factfinder would be justifiably suspicious if an employer fired an employee in a protected group and refused to explain the reason for the termination at the time of discharge." (Internal quotation marks omitted.) *Sullivan v. Baptist Memorial Hospital, supra, 995 S.W.2d 574*. As the Tennessee Supreme Court noted, however, in a case wherein there is potential liability for compelled self-publication defamation "an employer's silence could justifiably be viewed as savvy rather than suspicious," thereby providing an extra obstacle that a plaintiff claiming discriminatory discharge must overcome. Id.

 [***17]  Moreover, as several commentators have observed, this fear of chilling communications is not simply hypothetical.  [*222]  In states where courts have recognized a cause of action for compelled self- publication defamation, "human resources, legal and other employment advisors admonish employers to provide limited or no information when terminating employees" in order to prevent potential liability. M. Cooper, "Between A Rock And A Hard Case: Time For A New Doctrine Of Compelled Self-Publication," *72 Notre Dame L. Rev. 373, 432 (1997)*. In response, many employers have adopted a policy of releasing only nominal information to terminated employees. See id.; see also A. Langvardt, "Defamation in the Business Setting: Basics and Practical Perspectives," 33 Bus. Horizons 66, 73 (September-October 1990) (estimating that, as of 1990, 40 percent of employers adhere to silence policy to avoid liability); M. Middleton, "Employers Face Upsurge in Suits Over Defamation," National L.J. 1, 30-31 (May 4, 1987) (stating that statistics show that employers are giving out less information about employees). We are persuaded that undermining open and honest communication in the workplace, to the [***18] detriment of both employers and employees, is a substantial public policy reason that weighs heavily against recognizing a cause [**767] of action for compelled self-publication defamation.

We further agree with those states that have refused to adopt the doctrine of compelled self-publication defamation because it counters several well established principles of law, including the duty to mitigate damages, compliance with applicable statutes of limitations, and the doctrine of employment at will. See, e.g., *Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., supra, 100 Haw. 172*; *Layne v. Builders Plumbing Supply Co., supra, 210 Ill. App. 3d 976*; *Sullivan v. Baptist Memorial Hospital, supra, 995 S.W.2d 574*. We address each of these principles individually.

First, the recognition of compelled self-publication defamation can discourage plaintiffs from mitigating [*223] damages by providing them with too much control over the cause of action. See, e.g., *Layne v. Builders Plumbing Supply Co., supra, 210 Ill. App. 3d 976*. It is axiomatic that the plaintiff has a duty to mitigate damages. See, e.g., *Ann Howard's Apricots Restaurant v.Commission on Human Rights & Opportunities, 237 Conn. 209, 229, 676 A.2d 844 (1996)* [***19] ("[this court has] often said in the contracts and torts contexts that the party receiving a damage award has a duty to make reasonable efforts to mitigate damages"). As the United States Supreme Court noted in the context of defamation claims by public officials, "the first remedy of any victim of defamation is self-help--using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation." *Gertz v. Robert Welch, Inc., 418 U.S. 323, 344, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*.

---

[12] See, e.g., *General Statutes § 46a-60 (a)*, which provides in relevant part: "It shall be a discriminatory practice . . .

"(1) For an employer . . . except in the case of a bona fide occupational qualification or need, to . . . discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability, including, but not limited to, blindness . . . ." See also *42 U.S.C. § 2000e-2 (a) (1)*.

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

In the case of compelled self-publication defamation, however, the duty to mitigate potentially is corrupted because publication occurs as a result of the *plaintiff's* repetition of the defamatory statement. The plaintiff, as the party repeating the publication, therefore, essentially controls the cause of action, having the ability to increase damages by continually repeating the defamatory statement to different prospective employers. As the Illinois Appellate Court observed, such control would then "encourage [repeated] publication of [the] defamatory statement by a plaintiff who reasonably could have avoided such **[***20]**  republication or could have tried to explain to a prospective employer the true nature of the situation and to contradict the defamatory statement." *Layne v. Builders Plumbing Supply Co., supra, 210 Ill. App. 3d 976*. Consequently, the unbridled control that the doctrine of compelled self-publication allows is inconsistent with the "fundamental principle of mitigation of damages." *Olivieri v. Rodriguez, 122 F.3d 406, 408 (7th Cir. 1997)*.

 **[\*224]**  Second, a cause of action for compelled self-publication defamation permits a former employee potentially to circumvent or manipulate the applicable statute of limitations. See, e.g., *Sullivan v. Baptist Memorial Hospital, supra, 995 S.W.2d 574*. The statute of limitations for a defamation claim begins on the date of publication; see 3 *Restatement (Second), supra, §§ 577, 577A*; and because a new cause of action arises with each publication; see W. Prosser & W. Keeton, supra, § 113, pp. 799-800; an employee relying on the doctrine of compelled self-publication has the ability to circumvent the statute of limitations by continually repeating the publication of the defamatory statement. After **[***21]**  the statute of limitations expires with regard to one publication, an employee need only fill out a new job application, or go to another interview,  **[\*\*768]**  in order to give rise to a new cause of action with a new publication. This capability would obviate the public policy underlying the statute of limitations itself, i.e., "to promote finality in the litigation process"; *Skibeck v. Avon, 24 Conn. App. 239, 243, 587 A.2d 166*, cert. denied, *219 Conn. 912, 593 A.2d 138 (1991)*; and give a defendant the peace of mind that comes with knowing that its potential liability has been extinguished. *Daily v. New Britain Machine Co., 200 Conn. 562, 582, 512 A.2d 893 (1986)*.

We reject the plaintiff's contention that a former employee's control over the duty to mitigate damages and the relevant statute of limitations are tempered, if not eliminated, by the requirement that the self-publication be "compelled." "Compulsion," as used by the proponents of self-publication, refers to the obligation to respond truthfully to questions in any job interview. See, e.g., *Lewis v. Equitable Life Assurance Society of the United States, supra, 389 N.W.2d 886-87.* **[***22]**  Advocates of compelled self-publication defamation liability argue that a plaintiff is compelled to publish the defamatory statement when asked why he or she left his or her  **[\*225]**  former employment because "fabrication . . . is an unacceptable alternative." *Id., 888*. While it cannot be disputed seriously that encouraging truthful discourse during job interviews is desirable, it does not necessarily follow that the need for honesty negates the concerns entrenched in the plaintiff's control over a self-publication claim. In fact, compulsion, as defined by the need to be truthful in a job interview, exists in every case in which a terminated employee has a job interview, and therefore provides little temperance at all. Even if a plaintiff must prove, as some courts require, that a prospective employer *actually* inquired about the reason that the employee had left his or her former employment, the frequency of this line of questioning during a job interview essentially neutralizes its tempering effect. Consequently, the fact that the self-publication needs to be compelled does little to lessen the plaintiff's control over the cause of action.

Lastly, recognizing a cause of action **[***23]**  for compelled self- defamation would significantly undermine the well established doctrine of employment at will. See *Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., supra, 100 Haw. 172*; *Sullivan v. Baptist Memorial Hospital, supra, 995 S.W.2d 574*. "In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary. Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." (Internal quotation marks omitted.) *Thibodeau v. Design Group One Architects, LLC, 260 Conn. 691, 697-98, 802 A.2d 731 (2002)*; see also *Boucher v. Godfrey, 119 Conn. 622, 627, 178 A. 655 (1935)* (Connecticut expressly adopts doctrine of employment at will). Consequently, in the absence of an employment contract, or an illegal discriminatory motive, an employer has the right to terminate an  **[\*226]**  employee at any time without liability. [13] Adoption of a cause of

---

[13] This court has recognized an exception to the at-will employment doctrine. See, e.g., *Thibodeau v. Design Group One Architects, LLC, supra, 260 Conn. 694* ("at common law, an employer may terminate an at-will employee for any reason unless that reason

Page 7 of 9

**EXHIBIT 43**                                                                 **EXHIBIT  8**

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

action in defamation based on compelled self-publication, however, could **[\*\*769]** impose an obligation on an employer to conduct a sometimes **[\*\*\*24]** costly and time-consuming investigation for *every* termination, no matter how irrefutable the evidence against the employee may be, so as to avoid potential liability for stating false grounds for termination. As the Supreme Court of Hawaii concluded, such an obligation "would significantly compromise [the] well-settled principles encompassed by the at-will employment doctrine." (Internal quotation marks omitted.) *Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., supra, 172*.

 **[\*\*\*25]**  Our rejection of the doctrine of compelled self-publication defamation is reinforced by the Restatement (Second) of Torts. Although the Restatement (Second) recognizes a cause of action for self-publication defamation, it does not recognize the doctrine of *compelled* self-publication in factual circumstances such as those in the present case. See 3 *Restatement (Second), supra, § 577 (1)*. *Section 577 (1) of the Restatement (Second)* defines publication as a "communication intentionally or by a negligent act to one other than the person defamed." Id. A commentary to *§ 577* specifically addresses self-publication, providing that recovery for self- publication is allowed if a defamed person repeats the defamatory statement *without awareness of its defamatory nature*, and circumstances indicate repetition **[\*227]** is likely. Id., *comment (m)*. [14] The illustrations to comment (m) confirm that ignorance of the defamatory nature of the published statement is crucial to the exception permitting recovery. [15] Thus, according to the Restatement (Second), because the plaintiff in the present case necessarily was aware of the defamatory nature of the defendant's statement, a cause of action **[\*\*\*26]** in compelled self-publication defamation would be unavailable.

 **[\*\*\*27]**  The plaintiff in the present case contends that adoption of the doctrine of compelled self-publication defamation would further the policies of equity and fairness. Specifically, the plaintiff argues that the doctrine should be adopted because "[it] . . . justly holds defendants accountable for the foreseeable consequences of their actions . . . [and] protects an employee from an injury for which his employer is responsible and the employee is powerless to prevent." (Internal quotation marks omitted.) We disagree.

We have set forth herein the significant public policy concerns that lead us to conclude that we should reject a cause of action for compelled self-publication defamation. **[\*228]**  These considerations, in our view, outweigh those concerns that favor recognition of the doctrine, such as the one **[\*\*770]**  cited by the plaintiff. Furthermore, merely because a potential harm may be foreseeable does not require that a defendant should be held liable. In *Perodeau v. Hartford, 259 Conn. 729, 756, 792 A.2d 752 (2002)*, we determined that "[a] simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty **[\*\*\*28]** exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed." (Internal quotation marks omitted.)

The plaintiff further argues that equity compels the recognition of the doctrine of compelled self-publication defamation because employers are sufficiently protected from the aforementioned concerns by the traditional defamation defense of "truth." The plaintiff maintains that, "when faced with an employee suspected of having engaged in misconduct, an employer can always adequately protect itself by conducting a thorough investigation and making an informed and factually supported decision." The plaintiff seems to suggest that conducting a thorough investigation would allow the employer to feel confident in the truth of its assertion, thereby relieving it of liability for communicating a defamatory

---

violates some important public policy"); *Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 476-77, 427 A.2d 385 (1980)* (recognizing public policy exception to doctrine of employment at will). Employment at will, however, remains the general rule.

[14] The ***Restatement (Second), supra, § 577, comment (m)***, provides: "One who communicates defamatory matter directly to the defamed person, who himself communicates it to a third person, has not published the matter to the third person if there are no other circumstances. If the defamed person's transmission of the communication to the third person was made, however, without an awareness of the defamatory nature of the matter and if the circumstances indicated that communication to a third party would be likely, a publication may properly be held to have occurred."

[15] One illustration to ***§ 577 of the Restatement (Second)*** provides: "A writes a defamatory letter about B and sends it to him through the mail in a sealed envelope. B indignantly shows the letter to his son. B, not A, has published a libel." 3 ***Restatement (Second), supra, § 577, illustration (9)***. In contrast, another illustration to the same section of the Restatement (Second) provides: "A writes a defamatory letter about B and sends it to him through the mail in a sealed envelope. A knows that B is blind and that a member of his family will probably read the letter to him. B receives the letter and his wife reads it to him. A has published a libel." Id., ***illustration (10)***.

Page 8 of 9                                                                         163

**EXHIBIT 43**                                                    EXHIBIT  8

Cweklinsky v. Mobil Chem. Co., 267 Conn. 210

statement. In other words, the plaintiff argues that since "truth [is] an absolute defense" to compelled self-publication defamation, there is no reason for an employer to be apprehensive about honest communications with its employees. We disagree.

Although it is true that for a claim of defamation to be actionable, the statement must be false;  **[\*\*\*29]**  see *Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 112, 448 A.2d 1317 (1982)*; and under the common law, truth is an affirmative defense to defamation; see *Holbrook v. Casazza, 204 Conn. 336, 361, 528 A.2d 774 [\*229]  (1987)*, cert. denied, *484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988)*; the determination of the truthfulness of a statement is a question of fact for the jury. As a defense, truth provides protection against liability, but not against the expense and inconvenience of being sued. A successful defense is small comfort to an employer that must pay attorney's fees to defend a defamation claim and have the employer's attention diverted from its business to the defense of the suit. We are persuaded that most employers will likely choose a "culture of silence"; see J. Acevedo, supra, 72 Conn. B.J. 316; rather than rely on truth as a defense to a defamation claim.

The answer to the first certified question is: No. Because the answer to the first certified question is in the negative, we do not reach the remaining two questions that were certified.

No costs shall be taxed in this court to either party.

In **[\*\*\*30]**  this opinion the other justices concurred.

---

**End of Document**

**EXHIBIT 43**

EXHIBIT 9

Berisha v. Lawson, 141 S. Ct. 2424

# *Berisha v. Lawson*

Supreme Court of the United States

July 2, 2021, Decided

No. 20-1063.

**Reporter**

141 S. Ct. 2424 *; 210 L. Ed. 2d 991 **; 2021 U.S. LEXIS 3588 ***; 89 U.S.L.W. 3444; 29 Fla. L. Weekly Fed. S 9; 2021 WL 2742816

SHKELZEN BERISHA v. GUY LAWSON, ET AL.

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Subsequent History:** As Revised July 29, 2021.

**Prior History:** **[***1]** ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

*Berisha v. Lawson, 973 F.3d 1304, 2020 U.S. App. LEXIS 27940, 2020 WL 5228847 (11th Cir. Fla., Sept. 2, 2020)*

**Judges:** Roberts, Thomas, Breyer, Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh, Barrett.

# Opinion

**[*2424]** **[**991]** Petition for writ of certiorari to the United States Court of Appeals for the Eleventh Circuit denied. Justice Thomas, dissenting from denial of certiorari. Justice Gorsuch, dissenting from denial of certiorari.

**Dissent by:** THOMAS; GORSUCH

# Dissent

Justice Thomas, dissenting from the denial of certiorari.

In 2015, Guy Lawson published a book detailing the "true story" of how three Miami youngsters became international arms dealers. *973 F. 3d 1304, 1306 (CA11 2020)*. A central plot point involves the protagonists' travels to Albania and subsequent run-ins with the "Albanian mafia," a key figure of which, the book claims, is petitioner Shkelzen Berisha. The book performed well, and Lawson eventually sold the movie rights to Warner Bros., which made the feature film War Dogs.

Unhappy with his portrayal, Berisha sued Lawson for defamation under Florida law. According to Berisha, he is not associated with the Albanian mafia—or any dangerous group—and Lawson recklessly relied on flimsy sources to contend that he was.

The District Court granted summary judgment in favor of Lawson. Setting aside questions of truth or falsity, the court simply asked whether Berisha is a "public figure." Why? Because under this Court's *First Amendment* jurisprudence, public **[***2]** figures cannot establish libel without proving by clear and convincing evidence that the defendant acted

**EXHIBIT 43**                                                                                   EXHIBIT  9

Berisha v. Lawson, 141 S. Ct. 2424

with "'actual malice'"—that is with knowledge that the published material "was false or with reckless disregard of whether it was false." *New York Times Co. v. Sullivan, 376 U. S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*; accord, *Gertz v. Robert Welch, Inc., 418 U. S. 323, 334-335, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*; *Curtis Publishing Co. v. Butts, 388 U. S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967)*. After concluding that Berisha is a public figure (or at least is one for purposes of Albanian weapons-trafficking stories), the court found that he had not satisfied this high standard. The Eleventh Circuit affirmed.

Berisha now asks this Court to reconsider the "actual malice" requirement as it applies to public figures. As I explained recently, we should. See *McKee v. Cosby, 586 U. S. ___, ___, 139 S. Ct. 675, [\*2425] 203 L. Ed. 2d 247, 248 (2019)* (opinion concurring in denial of certiorari).

This Court's pronouncement that the *First Amendment* requires public figures **[\*\*992]** to establish actual malice bears "no relation to the text, history, or structure of the Constitution." *Tah v. Global Witness Publishing, Inc., 991 F. 3d 231, 251 (CADC 2021)* (Silberman, J., dissenting) (emphasis deleted). In fact, the opposite rule historically prevailed: "[T]he common law deemed libels against public figures to be . . . *more* serious and injurious than ordinary libels." *McKee, 586 U. S., at ___, 139 S. Ct. 675, 203 L. Ed. 2d 247, at 251* (opinion of Thomas, J.).

The Court provided scant explanation for the decision to erect a new hurdle for public-figure **[\*\*\*3]** plaintiffs so long after the *First Amendment's* ratification. In *Gertz*, for example, the Court reasoned that public figures are fair targets because "they invite attention and comment." *418 U. S., at 345, 94 S. Ct. 2997, 41 L. Ed. 2d 789*. That is, "public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood." *Ibid.* But it is unclear why exposing oneself to an increased risk of becoming a victim necessarily means forfeiting the remedies legislatures put in place for such victims. And, even assuming that it is sometimes fair to blame the victim, it is less clear why the rule still applies when the public figure "has not voluntarily sought attention." *378 F. Supp. 3d 1145, 1158 (SD Fla. 2018)*; see also *Rosanova v. Playboy Enterprises, Inc., 580 F. 2d 859, 861 (CA5 1978)* ("It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be").

The lack of historical support for this Court's actual-malice requirement is reason enough to take a second look at the Court's doctrine. Our reconsideration is all the more needed because of the doctrine's real-world effects. Public figure or private, lies impose real harm. Take, for instance, the shooting at a pizza shop rumored to be "the home of a Satanic child sex abuse ring involving top Democrats such as Hillary **[\*\*\*4]** Clinton," Kennedy, 'Pizzagate' Gunman Sentenced to 4 Years in Prison, NPR (June 22, 2017), www.npr.org / section / thetwo-way / 2017 / 06 / 22 / 533941689/ pizzagate-gunman-sentenced-to-4-years-in-prison. Or consider how online posts falsely labeling someone as "a thief, a fraudster, and a pedophile" can spark the need to set up a home-security system. Hill, A Vast Web of Vengeance, N. Y. Times (Jan. 30, 2021), www.nytimes.com/2021/01/30/ technology/change-my-google-results.html. Or think of those who have had job opportunities withdrawn over false accusations of racism or anti-Semitism. See, *e.g.,* Wemple, Bloomberg Law Tried To Suppress Its Erroneous Labor Dept. Story, Washington Post (Sept. 6, 2019), www. washingtonpost.com / opinions / 2019 / 09 / 06 / bloomberg-law-tried-suppress-its-erroneous-labor-dept-story. Or read about Kathrine McKee—surely this Court should not remove a woman's right to defend her reputation in court simply because she accuses a powerful man of rape. See *McKee, 586 U. S., at ___-___, 139 S. Ct. 675, 203 L. Ed. 2d 247* (opinion of Thomas, J.) (slip op., at 1-2).

The proliferation of falsehoods is, and always has been, a serious matter. Instead of continuing to insulate those who perpetrate lies from traditional remedies **[\*\*\*5]** like libel suits, we should give them only the protection the *First Amendment* requires. I would grant certiorari.

Justice Gorsuch, dissenting from the denial of certiorari.

The *Bill of Rights* protects the freedom of the press not as a favor to a particular industry, but because democracy cannot function without the free exchange of ideas. To govern themselves wisely, the **[\*2426]** framers knew, people must be able to speak and write, question old assumptions, and offer new insights. "If a nation expects to be ignorant and free . . . it expects what never was and never will be. . . . There is no safe deposit for [liberty] but with the people

166

**EXHIBIT 43**                                                                               EXHIBIT 9

Berisha v. Lawson, 141 S. Ct. 2424

. . . [w]here the press is free, and every man able to read." **[\*\*993]** Letter from T. Jefferson to C. Yancey (Jan. 6, 1816), in 10 The Writings of Thomas Jefferson 4 (P. Ford ed. 1899).

Like most rights, this one comes with corresponding duties. The right to due process in court entails the duty to abide the results that process produces. The right to speak freely includes the duty to allow others to have their say. From the outset, the right to publish was no different. At the founding, the freedom of the press generally meant the government could not impose prior restraints preventing individuals **[\*\*\*6]** from publishing what they wished. But none of that meant publishers could defame people, ruining careers or lives, without consequence. Rather, those exercising the freedom of the press had a responsibility to try to get the facts right—or, like anyone else, answer in tort for the injuries they caused.

This principle extended far back in the common law and far forward into our Nation's history. As Blackstone put it, "[e]very freeman has an undoubted right to lay what sentiments he pleases before the public," but if he publishes falsehoods "he must take the consequence of his own temerity." 4 W. Blackstone, Commentaries on the Laws of England 151-152 (1769). Or as Justice Story later explained, "the liberty of the press do[es] not authorize malicious and injurious defamation." *Dexter v. Spear, 7 F. Cas. 624, F. Cas. No. 3867 (No. 3,867)* (CC RI 1825).

This was "[t]he accepted view" in this Nation for more than two centuries. *Herbert v. Lando, 441 U. S. 153, 158-159, 99 S. Ct. 1635, 60 L. Ed. 2d 115, and n. 4 (1979)*. Accordingly, "from the very founding" the law of defamation was "almost exclusively the business of state courts and legislatures." *Gertz v. Robert Welch, Inc., 418 U. S. 323, 369-370, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)* (White, J., dissenting). As a rule, that meant all persons could recover damages for injuries caused by false publications about them. See Kurland, The Original Understanding of the Freedom **[\*\*\*7]** of the Press Provision of the First Amendment, 55 Miss. L. J. 225, 234-237 (1985); J. Baker, An Introduction to English Legal History 474-475 (5th ed. 2019); Epstein, Was *New York Times* v. *Sullivan* Wrong? *53 U. Chi. L. Rev. 782, 801-802 (1986)*; *Peck v. Tribune Co., 214 U. S. 185, 189, 29 S. Ct. 554, 53 L. Ed. 960, 7 Ohio L. Rep. 96 (1909)*.

This changed only in 1964. In *New York Times Co. v. Sullivan, 376 U. S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*, this Court declared that public officials could no longer recover for defamation as everyone had for centuries. Now, public officials could prevail only by showing that an injurious falsehood was published with "'actual malice.'" *Id., at 279-280, 84 S. Ct. 710, 11 L. Ed. 2d 686*. Three years later, the Court extended its actual malice standard from "public officials" in government to "public figures" outside government. See generally *Curtis Publishing Co. v. Butts, 388 U. S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967)*. Later still, the Court cast the net even wider, applying its new standard to those who have achieved "pervasive fame or notoriety" and those "limited" public figures who "voluntarily injec[t]" themselves or are "drawn into a particular public controversy." *Gertz, 418 U. S., at 351, 94 S. Ct. 2997, 41 L. Ed. 2d 789*. The Court viewed these innovations "overturning 200 years of libel law" as "necessary to implement the *First Amendment* interest in 'uninhibited, robust, and wide-open' **[\*2427]** debate on public issues." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U. S. 749, 766, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985)* (White, J., concurring in judgment).

Since 1964, however, our Nation's media landscape has shifted in ways few could have foreseen. Back then, building printing presses **[\*\*\*8]** and amassing newspaper distribution networks demanded significant investment and expertise. See *Logan, Rescuing Our Democracy by Rethinking New York Times Co. v. Sullivan, 81 Ohio St. L. J. 759, 794 (2020)* (Logan). Broadcasting **[\*\*994]** required licenses for limited airwaves and access to highly specialized equipment. See *ibid.* Comparatively large companies dominated the press, often employing legions of investigative reporters, editors, and fact-checkers. See *id., at 794-795*. But "[t]he liberty of the press" has never been "confined to newspapers and periodicals"; it has always "comprehend[ed] every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin, 303 U. S. 444, 452, 58 S. Ct. 666, 82 L. Ed. 949 (1938)*; see also Sentelle, Freedom of the Press: A Liberty for All or a Privilege for a Few? 2013 Cato S. Ct. Rev. 15, 30-34. And thanks to revolutions in technology, today virtually anyone in this country can publish virtually anything for immediate consumption virtually anywhere in the world. *Logan 803* (noting there are 4 billion active social media users worldwide).

Page 3 of 6                                                                               **167**

EXHIBIT 43 EXHIBIT 9

Berisha v. Lawson, 141 S. Ct. 2424

The effect of these technological changes on our Nation's media may be hard to overstate. Large numbers of newspapers and periodicals have failed. See Grieco, Pew Research Center, Fast Facts About the Newspaper Industry's Financial Struggles as McClatchy Files for Bankruptcy (Feb. 14, 2020), [***9] http://www.pewresearch.org/fact -tank/2020/02/14/fast-facts-about-the-newspaper-industrys -financial-struggles/. Network news has lost most of its viewers. Pew Research Center, Network Evening News Ratings (Mar. 13, 2006), https://www.journalism.org/ numbers/network-evening-news-ratings/. With their fall has come the rise of 24-hour cable news and online media platforms that "monetize anything that garners clicks." *Logan 800*. No doubt, this new media world has many virtues—not least the access it affords those who seek information about and the opportunity to debate public affairs. At the same time, some reports suggest that our new media environment also facilitates the spread of disinformation. *Id., at 804*. A study of one social network reportedly found that "falsehood and rumor dominated truth by every metric, reaching more people, penetrating deeper . . . and doing so more quickly than accurate statements." *Id., at 804, n. 302*; see Vosoughi, Roy, & Aral, The Spread of True and False News Online, Science Magazine, Mar. 9, 2018, pp. 1146-1151. All of which means that "the distribution of disinformation"—which "costs almost nothing to generate"—has become a "profitable" business while [***10]  "the economic model that supported reporters, fact-checking, and editorial oversight" has "deeply erod[ed]." *Logan 800*.

It's hard not to wonder what these changes mean for the law. In 1964, the Court may have seen the actual malice standard as necessary "to ensure that dissenting or critical voices are not crowded out of public debate." Brief in Opposition 22. But if that justification had force in a world with comparatively few platforms for speech, it's less obvious what force it has in a world in which everyone carries a soapbox in their hands. Surely, too, the Court in 1964 may have thought the actual malice standard justified in part because other safeguards existed to deter the dissemination of defamatory falsehoods and misinformation. *Logan 794-795*. In that  [*2428]  era, many major media outlets employed fact-checkers and editors, *id., at 795*, and one could argue that most strived to report true stories because, as "the public gain[ed] greater confidence that what they read [wa]s true," they would be willing to "pay more for the information so provided," Epstein, *53 U. Chi. L. Rev., at 812*. Less clear is what sway these justifications hold in a new era where the old economic model that supported reporters, fact-checking, [***11]  and editorial oversight is disappearing.

These questions lead to other even more fundamental ones. When the Court originally adopted the actual malice standard, it took the view that tolerating the publication of *some* false information was a necessary and acceptable cost to pay to ensure truthful statements vital to democratic self-government were not inadvertently suppressed. See *Sullivan, 376 U. S.,  [**995]  at 270-272*. But over time the actual malice standard has evolved from a high bar to recovery into an effective immunity from liability. Statistics show that the number of trials involving defamation, privacy, and related claims based on media publications has declined dramatically over the past few decades: In the 1980s there were on average 27 per year; in 2017 there were 3. Logan 808-810 (surveying data from the Media Law Resource Center). For those rare plaintiffs able to secure a favorable jury verdict, nearly one out of five today will have their awards eliminated in post-trial motions practice. *Id., at 809*. And any verdict that manages to make it past all that is still likely to be reversed on appeal. Perhaps in part because this Court's jurisprudence has been understood to invite appellate courts to engage in the unusual practice of revisiting a jury's factual determinations [***12]  *de novo*, it appears just 1 of every 3 jury awards now survives appeal. *Id., at 809-810*.

The bottom line? It seems that publishing *without* investigation, fact-checking, or editing has become the optimal legal strategy. See *id., at 778-779*. Under the actual malice regime as it has evolved, "ignorance is bliss." *Id., at 778*. Combine this legal incentive with the business incentives fostered by our new media world and the deck seems stacked against those with traditional (and expensive) journalistic standards—and in favor of those who can disseminate the most sensational information as efficiently as possible without any particular concern for truth. See *ibid.* What started in 1964 with a decision to tolerate the occasional falsehood to ensure robust reporting by a comparative handful of print and broadcast outlets has evolved into an ironclad subsidy for the publication of falsehoods by means and on a scale previously unimaginable. *Id., at 804*. As *Sullivan*'s actual malice standard has come to apply in our new world, it's hard not to ask whether it now even "cut[s] against the very values underlying the decision." Kagan, A Libel Story: *Sullivan* Then and Now, 18 L. & Soc. Inquiry 197, 207 (1993) (reviewing A. Lewis, Make No Law: The *Sullivan* Case and the *First Amendment* (1991)). If ensuring [***13]  an informed democratic

**EXHIBIT 43**

EXHIBIT 9

Berisha v. Lawson, 141 S. Ct. 2424

debate is the goal, how well do we serve that interest with rules that no longer merely tolerate but encourage falsehoods in quantities no one could have envisioned almost 60 years ago?

Other developments raise still more questions. In 1964, the Court may have thought the actual malice standard would apply only to a small number of prominent governmental officials whose names were always in the news and whose actions involved the administration of public affairs. Here again, the Court may have thought that allowing some falsehoods about these persons and topics was an acceptable price to pay to ensure truthful statements vital to democratic self-government were not **[*2429]** inadvertently suppressed. Perhaps the Court weighed the costs and benefits similarly when it extended the actual malice standard to the "pervasively famous" and "limited purpose public figures."

 But today's world casts a new light on these judgments as well. Now, private citizens can become "public figures" on social media overnight. Individuals can be deemed "famous" because of their notoriety in certain channels of our now-highly segmented media even as they remain unknown in most. See, *e.g.*, *Hibdon v. Grabowski, 195 S. W. 3d 48, 59, 62 (Tenn. App. 2005)* (holding **[***14]** that an individual was a limited-purpose public figure in part because he "entered into the jet ski business and voluntarily advertised on the news group *rec.sport.jetski*, an Internet site that is accessible worldwide"). Lower courts have even said that an individual can become a limited purpose public figure simply by *defending* himself from a defamatory statement. See *Berisha v. Lawson, 973 F. 3d 1304, 1311 (CA11 2020)*. Other persons, such as victims of sexual assault seeking to confront their assailants, might choose to enter the public square only reluctantly and yet wind **[**996]** up treated as limited purpose public figures too. See *McKee v. Cosby, 586 U. S. ___, ___, 139 S. Ct. 675, 203 L. Ed. 2d 247 (2019)* (Thomas, J., concurring in denial of certiorari) (slip op., at 1). In many ways, it seems we have arrived in a world that dissenters proposed but majorities rejected in the *Sullivan* line of cases—one in which, "voluntarily or not, we are all public [figures] to some degree." *Gertz, 418 U. S., at 364, 94 S. Ct. 2997, 41 L. Ed. 2d 789* (Brennan, J., dissenting) (brackets and internal quotation marks omitted).

Again, it's unclear how well these modern developments serve *Sullivan*'s original purposes. Not only has the doctrine evolved into a subsidy for published falsehoods on a scale no one could have foreseen, it has come to leave far more people without redress than anyone **[***15]** could have predicted. And the very categories and tests this Court invented and instructed lower courts to use in this area—"pervasively famous," "limited purpose public figure"—seem increasingly malleable and even archaic when almost anyone can attract some degree of public notoriety in some media segment. Rules intended to ensure a robust debate over actions taken by high public officials carrying out the public's business increasingly seem to leave even ordinary Americans without recourse for grievous defamation. At least as they are applied today, it's far from obvious whether *Sullivan*'s rules do more to encourage people of goodwill to engage in democratic self-governance or discourage them from risking even the slightest step toward public life.

"In a country like ours, where the people . . . govern themselves through their elected representatives, adequate information about their government is of transcendent importance." *Dun & Bradstreet, 472 U. S., at 767, 105 S. Ct. 2939, 86 L. Ed. 2d 593* (White, J., concurring in judgment). Without doubt, *Sullivan* sought to promote that goal as the Court saw the world in 1964. Departures from the Constitution's original public meaning are usually the product of good intentions. But less clear is how well *Sullivan* **[***16]** and all its various extensions serve its intended goals in today's changed world. Many Members of this Court have raised questions about various aspects of *Sullivan*. See, *e.g.*, *McKee, 586 U. S., at ___, 139 S. Ct. 675, 203 L. Ed. 2d 247* (opinion of Thomas, J.); *Coughlin v. Westinghouse Broadcasting & Cable, Inc., 476 U. S. 1187, 106 S. Ct. 2927, 91 L. Ed. 2d 554 (1986)* (Burger, C. J., joined by Rehnquist, J., dissenting from denial of certiorari); *Gertz, 418 U. S., at 370, 94 S. Ct. 2997, 41 L. Ed. 2d 789* (White, J., dissenting); *Rosenbloom v. Metromedia, Inc., 403 U. S. 29, 62, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971)* **[*2430]** (Harlan, J., dissenting); *id., at 78, 91 S. Ct. 1811, 29 L. Ed. 2d 296* (Marshall, J., dissenting); *Rosenblatt v. Baer, 383 U. S. 75, 92-93, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966)* (Stewart, J., concurring); see also Kagan, 18 L. & Soc. Inquiry*, at 205, 209; Lewis & Ottley, *New York Times* v. *Sullivan* at 50, *64 De Paul L. Rev. 1, 35-36 (2014)* (collecting statements from Justice Scalia). Justice Thomas does so again today. In adding my voice to theirs, I do not profess any sure answers. I am not even certain of all the questions we should be asking. But given the momentous changes in the Nation's media landscape since 1964, I cannot help but think the Court would profit from returning its attention, whether in this case or another, to a field so vital to the "safe deposit" of our liberties.

**End of Document**

EXHIBIT 43

EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

# *New York Times Co. v. Sullivan*

Supreme Court of the United States

January 6, 1964, Argued ; March 9, 1964, Decided [*]

No. 39

**Reporter**

376 U.S. 254 *; 84 S. Ct. 710 **; 11 L. Ed. 2d 686 ***; 1964 U.S. LEXIS 1655 ****; 95 A.L.R.2d 1412; 1 Media L. Rep. 1527

NEW YORK TIMES CO. v. SULLIVAN

**Prior History:  [****1]**  CERTIORARI TO THE SUPREME COURT OF ALABAMA.

**Disposition:**  *273 Ala. 656, 144 So. 2d 25*, reversed and remanded.

# Case Summary

**Procedural Posture**
Petitioner newspaper sought review of a decision by the Supreme Court of Alabama upholding a judgment awarding respondent damages in a civil libel action.

**Overview**

Petitioner newspaper sought review of a decision upholding a judgment awarding respondent damages in a civil libel action. The Court held that the rule of law applied by the Alabama courts was constitutionally deficient for failure to provide petitioner the safeguards for freedom of speech and of the press that were guaranteed by the *First* and *Fourteenth Amendments* in a libel action brought by a public official against critics of his official conduct. The Court held that petitioner's constitutional guarantees required a rule that prohibited a public official from recovering damages for a defamatory falsehood relating to the public official's official conduct unless the official proved that the statement was made with actual malice. The Court defined actual malice as knowledge that the defamatory statement was false or made with reckless disregard of whether it was false or not. Further, the Court held that under the proper safeguards, the evidence presented against petitioner was constitutionally insufficient to support the judgment for respondent. Respondent presented no evidence to show petitioner was aware of erroneous statements or was in any way reckless in that regard.

**Outcome**
The Court reversed the judgment and remanded the case.

# Syllabus

 Respondent, an elected official in Montgomery, Alabama, brought suit in a state court alleging that he had been libeled by an advertisement in corporate petitioner's newspaper, the text of which appeared over the names of the four individual petitioners and many others.  The advertisement included statements, some of which were false, about police action allegedly directed against students who participated in a civil rights demonstration and against a leader of the civil rights movement; respondent claimed the statements referred to him because his duties included

---

[*] Together with No. 40, Abernathy et al. v. Sullivan, also on certiorari to the same court, argued January 7, 1964.

171

EXHIBIT 43                                                                        EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

supervision of the police department. The trial judge instructed the jury that such statements were "libelous per se," legal injury being implied without proof of actual damages, and that for the purpose of compensatory damages malice was presumed, so that such damages could be awarded against petitioners if the statements were found **[****2]** to have been published by them and to have related to respondent.  As to punitive damages, the judge instructed that mere negligence was not evidence of actual malice and would not justify an award of punitive damages; he refused to instruct that actual intent to harm or recklessness had to be found before punitive damages could be awarded, or that a verdict for respondent should differentiate between compensatory and punitive damages. The jury found for respondent and the State Supreme Court affirmed.  *Held*: A State cannot under the *First* and *Fourteenth Amendments* award damages to a public official for defamatory falsehood relating to his official conduct unless he proves "actual malice" -- that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false.  Pp. 265-292.

(a) Application by state courts of a rule of law, whether statutory or not, to award a judgment in a civil action, is "state action" under the *Fourteenth Amendment*. P. 265.

(b) Expression does not lose constitutional protection to which it would otherwise be entitled because it appears in the form of a paid advertisement. Pp. 265-266.

(c) Factual error, content **[****3]**  defamatory of official reputation, or both, are insufficient to warrant an award of damages for false statements unless "actual malice" -- knowledge that statements are false or in reckless disregard of the truth -- is alleged and proved.  Pp. 279-283.

(d) State court judgment entered upon a general verdict which does not differentiate between punitive damages, as to which under state law actual malice must be proved, and general damages, as to which it is "presumed," precludes any determination as to the basis of the verdict and requires reversal, where presumption of malice is inconsistent with federal constitutional requirements.  P. 284.

(e) The evidence was constitutionally insufficient to support the judgment for respondent, since it failed to support a finding that the statements were made with actual malice or that they related to respondent.  Pp. 285-292.

**Counsel:** Herbert Wechsler argued the cause for petitioner in No. 39.  With him on the brief were Herbert Brownell, Thomas F. Daly, Louis M. Loeb, T. Eric Embry, Marvin E. Frankel, Ronald S. Diana and Doris Wechsler.

William P. Rogers and Samuel R. Pierce, Jr. argued the cause for petitioners in No. 40.  With Mr. Pierce **[****4]**  on the brief were I. H. Wachtel, Charles S. Conley, Benjamin Spiegel, Raymond S. Harris, Harry H.  Wachtel, Joseph B. Russell, David N. Brainin, Stephen J. Jelin and Charles B. Markham.

M. Roland Nachman, Jr. argued the cause for respondent in both cases.  With him on the brief were Sam Rice Baker and Calvin Whitesell.

Briefs of amici curiae, urging reversal, were filed in No. 39 by William P. Rogers, Gerald W. Siegel and Stanley Godofsky for the Washington Post Company, and by Howard Ellis, Keith Masters and Don H. Reuben for the Tribune Company.  Brief of amici curiae, urging reversal, was filed in both cases by Edward S. Greenbaum, Harriet F. Pilpel, Melvin L. Wulf, Nanette Dembitz and Nancy F. Wechsler for the American Civil Liberties Union et al.

**Judges:** Warren, Black, Douglas, Clark, Harlan, Brennan, Stewart, White, Goldberg

**Opinion by:** BRENNAN

# Opinion

 **[*256]**   **[***692]**   **[**713]**  MR. JUSTICE BRENNAN delivered the opinion of the Court.

172

EXHIBIT 43                                                                    EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

We are required in this case to determine for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his **[****5]** official conduct.

Respondent L. B. Sullivan is one of the three elected Commissioners of the City of Montgomery, Alabama.  He testified that he was "Commissioner of Public Affairs and the duties are supervision of the Police Department, Fire Department, Department of Cemetery and Department of Scales." He brought this civil libel action against the four individual petitioners, who are Negroes and Alabama clergymen, and against petitioner the New York Times Company, a New York corporation which publishes the New York Times, a daily newspaper. A jury in the Circuit Court of Montgomery County awarded him damages of $ 500,000, the full amount claimed, against all the petitioners, and the Supreme Court of Alabama affirmed.  _273 Ala. 656, 144 So. 2d 25_.

Respondent's complaint alleged that he had been libeled by statements in a full-page advertisement that was carried in the New York Times on March 29, 1960. [1] Entitled "Heed Their Rising Voices," the advertisement began by stating that "As the whole world knows by now, thousands of Southern Negro students are engaged in widespread non-violent demonstrations in positive affirmation of the right to live in human dignity as **[****6]** guaranteed by the U.S. Constitution and the _Bill of Rights_." It went on to charge that "in their efforts to uphold these guarantees, they are being met by  **[***693]**  an unprecedented wave of terror by those who would deny and negate that document which the whole world looks upon as setting the pattern for modern freedom. . . ." Succeeding  **[*257]**  paragraphs purported to illustrate the "wave of terror" by describing certain alleged events.  The text concluded with an appeal for funds for three purposes: support of the student movement, "the struggle for the right-to-vote," and the legal defense of Dr. Martin Luther King, Jr., leader of the movement, against a perjury indictment then pending in Montgomery.

The text appeared over the names of 64 persons, many widely known for their  **[**714]**  activities in public affairs, religion, trade unions, and the performing arts.  Below these names, and under a line reading "We in the south who are struggling **[****7]** daily for dignity and freedom warmly endorse this appeal," appeared the names of the four individual petitioners and of 16 other persons, all but two of whom were identified as clergymen in various Southern cities.  The advertisement was signed at the bottom of the page by the "Committee to Defend Martin Luther King and the Struggle for Freedom in the South," and the officers of the Committee were listed.

Of the 10 paragraphs of text in the advertisement, the third and a portion of the sixth were the basis of respondent's claim of libel. They read as follows:

Third paragraph:

"In Montgomery, Alabama, after students sang 'My Country, 'Tis of Thee' on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission."

Sixth paragraph:

"Again and again the Southern violators have answered Dr. King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child.  They **[****8]** have **[*258]** assaulted his person.  They have arrested him seven times -- for 'speeding,' 'loitering' and similar 'offenses.' And now they have charged him with 'perjury' -- a _felony_ under which they could imprison him for _ten years. . . ._"

Although neither of these statements mentions respondent by name, he contended that the word "police" in the third paragraph referred to him as the Montgomery Commissioner who supervised the Police Department, so that he was being accused of "ringing" the campus with police.  He further claimed that the paragraph would be read as imputing

---

[1] A copy of the advertisement is printed in the Appendix.

173

EXHIBIT 43                                                                       EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

to the police, and hence to him, the padlocking of the dining hall in order to starve the students into submission. [2] As to the sixth paragraph, he contended that since arrests are ordinarily made by the police, the statement "They have arrested [Dr. King] seven times" would be read as referring to him; he further contended that the "They" who did the arresting would be equated with the "They" who committed the other described acts and with the "Southern violators." Thus, he argued, the paragraph would be read as accusing the Montgomery police, and hence him, of answering Dr. King's protests with **[****9]** **[***694]** "intimidation and violence," bombing his home, assaulting his person, and charging him with perjury.  Respondent and six other Montgomery residents testified that they read some or all of the statements as referring to him in his capacity as Commissioner.

It is uncontroverted that some of the statements contained in the two paragraphs were not accurate descriptions of events which occurred in Montgomery.  Although Negro students staged a demonstration on the State Capitol steps, they sang the National Anthem and not "My **[*259]** Country, 'Tis of Thee." Although nine students were expelled by the State Board of Education, this was not for leading the demonstration at the Capitol, but for demanding service at a lunch counter in the Montgomery County Courthouse on another day.  Not the entire student body, but most of it, had protested **[****10]** the expulsion, not by refusing to register, but by boycotting classes on **[**715]** a single day; virtually all the students did register for the ensuing semester.  The campus dining hall was not padlocked on any occasion, and the only students who may have been barred from eating there were the few who had neither signed a preregistration application nor requested temporary meal tickets.  Although the police were deployed near the campus in large numbers on three occasions, they did not at any time "ring" the campus, and they were not called to the campus in connection with the demonstration on the State Capitol steps, as the third paragraph implied.  Dr. King had not been arrested seven times, but only four; and although he claimed to have been assaulted some years earlier in connection with his arrest for loitering outside a courtroom, one of the officers who made the arrest denied that there was such an assault.

On the premise that the charges in the sixth paragraph could be read as referring to him, respondent was allowed to prove that he had not participated in the events described.  Although Dr. King's home had in fact been bombed twice when his wife and child were there, **[****11]** both of these occasions antedated respondent's tenure as Commissioner, and the police were not only not implicated in the bombings, but had made every effort to apprehend those who were.  Three of Dr. King's four arrests took place before respondent became Commissioner.  Although Dr. King had in fact been indicted (he was subsequently acquitted) on two counts of perjury, each of which carried a possible five-year sentence, respondent had nothing to do with procuring the indictment.

**[*260]**  Respondent made no effort to prove that he suffered actual pecuniary loss as a result of the alleged libel. [3] One of his witnesses, a former employer, testified that if he had believed the statements, he doubted whether he "would want to be associated with anybody who would be a party to such things that are stated in that ad," and that he would not re-employ respondent if he believed "that he allowed the Police Department to do the things that the paper say he did." But neither this witness nor any of the others testified that he had actually believed the statements in their supposed reference to respondent.

**[****12]**  The cost of the advertisement was approximately $ 4800, and it was **[***695]** published by the Times upon an order from a New York advertising agency acting for the signatory Committee.  The agency submitted the advertisement with a letter from A. Philip Randolph, Chairman of the Committee, certifying that the persons whose names appeared on the advertisement had given their permission.  Mr. Randolph was known to the Times' Advertising Acceptability Department as a responsible person, and in accepting the letter as sufficient proof of authorization it followed its established practice.  There was testimony that the copy of the advertisement which accompanied the letter listed only the 64 names appearing under the text, and that the statement, "We in the south . . . warmly endorse

---

[2] Respondent did not consider the charge of expelling the students to be applicable to him, since "that responsibility rests with the State Department of Education."

[3] Approximately 394 copies of the edition of the Times containing the advertisement were circulated in Alabama.  Of these, about 35 copies were distributed in Montgomery County.  The total circulation of the Times for that day was approximately 650,000 copies.

EXHIBIT 43                                                    EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

this appeal," and the list of names thereunder, which included those of the individual petitioners, were subsequently added when the first proof of the advertisement was received.  Each of the individual petitioners testified that he had not authorized the use of his name, and that he had been unaware of its use until receipt of respondent's demand for a retraction. The manager of the Advertising Acceptability **[****13]**  **[\*261]**  Department testified that he had approved the advertisement for publication because he knew nothing to cause him to believe that anything in it was false, and because it  **[\*\*716]**  bore the endorsement of "a number of people who are well known and whose reputation" he "had no reason to question." Neither he nor anyone else at the Times made an effort to confirm the accuracy of the advertisement, either by checking it against recent Times news stories relating to some of the described events or by any other means.

Alabama law denies a public officer recovery of punitive damages in a libel action brought on account of a publication concerning his official conduct unless he first makes a written demand for a public retraction and the defendant fails or refuses to comply.  Alabama Code, Tit. 7, § 914.  Respondent served such a demand upon each of the petitioners. None of the individual petitioners responded to the demand, primarily because each took the position that he had not authorized the use of his name on the advertisement and therefore had not published the statements that **[****14]**  respondent alleged had libeled him.  The Times did not publish a retraction in response to the demand, but wrote respondent a letter stating, among other things, that "we . . . are somewhat puzzled as to how you think the statements in any way reflect on you," and "you might, if you desire, let us know in what respect you claim that the statements in the advertisement reflect on you." Respondent filed this suit a few days later without answering the letter.  The Times did, however, subsequently publish a retraction of the advertisement upon the demand of Governor John Patterson of Alabama, who asserted that the publication charged him with "grave misconduct and . . . improper actions and omissions as Governor of Alabama and Ex-Officio Chairman of the State Board of Education of Alabama." When asked to explain why there had been a retraction for the Governor but not for respondent, the  **[\*262]**  Secretary of the Times testified: "We did that because we didn't want anything that was published by The Times to be a reflection on the State of Alabama and the Governor was, as far as we could see, the embodiment of the State of Alabama and the proper representative of the State and, furthermore,  **[****15]**  we had by that time learned more of the actual facts which the ad purported to recite and,  **[\*\*\*696]**  finally, the ad did refer to the action of the State authorities and the Board of Education presumably of which the Governor is the ex-officio chairman . . . ." On the other hand, he testified that he did not think that "any of the language in there referred to Mr. Sullivan."

The trial judge submitted the case to the jury under instructions that the statements in the advertisement were "libelous per se" and were not privileged, so that petitioners might be held liable if the jury found that they had published the advertisement and that the statements were made "of and concerning" respondent.  The jury was instructed that, because the statements were libelous *per se*, "the law . . . implies legal injury from the bare fact of publication itself," "falsity and malice are presumed," "general damages need not be alleged or proved but are presumed," and "punitive damages may be awarded by the jury even though the amount of actual damages is neither found nor shown." An award of punitive damages -- as distinguished from "general" damages, which are compensatory in nature -- apparently **[****16]**  requires proof of actual malice under Alabama law, and the judge charged that "mere negligence or carelessness is not evidence of actual malice or malice in fact, and does not justify an award of exemplary or punitive damages." He refused to charge, however, that the jury must be "convinced" of malice, in the sense of "actual intent" to harm or "gross negligence and recklessness," to make such an award, and he also refused to require that a verdict for respondent differentiate between compensatory and punitive damages. The judge rejected petitioners' contention  **[\*263]**  that his rulings abridged the freedoms of speech and of the press that are guaranteed by the *First* and *Fourteenth Amendments*.

 **[\*\*717]**  In affirming the judgment, the Supreme Court of Alabama sustained the trial judge's rulings and instructions in all respects.  *273 Ala. 656, 144 So. 2d 25*. It held that "where the words published tend to injure a person libeled by them in his reputation, profession, trade or business, or charge him with an indictable offense, or tend to bring the individual into public contempt," they are "libelous per se"; that "the matter complained of is, under the above doctrine,  **[****17]**  libelous per se, if it was published of and concerning the plaintiff"; and that it was actionable without "proof of pecuniary injury . . . , such injury being implied." *Id., at 673, 676, 144 So. 2d at 37, 41*. It approved the trial court's ruling that the jury could find the statements to have been made "of and concerning" respondent, stating: "We

EXHIBIT 43                                                                                    EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

think it common knowledge that the average person knows that municipal agents, such as police and firemen, and others, are under the control and direction of the city governing body, and more particularly under the direction and control of a single commissioner.  In measuring the performance or deficiencies of such groups, praise or criticism is usually attached to the official in complete control of the body." *Id., at 674-675, 144 So. 2d at 39*. In sustaining the trial court's determination that the verdict was not excessive, the court said that malice could be inferred from the Times' "irresponsibility" in printing the advertisement while "the Times in its own files had articles already published which would have demonstrated the falsity of the allegations in the advertisement"; from the Times' failure **[****18]** to retract for respondent while retracting for the Governor, whereas the falsity of some of the allegations was then **[***697]** known to the Times and "the matter contained in the advertisement was equally false as to both parties"; and from the testimony of the Times' Secretary that, **[*264]** apart from the statement that the dining hall was padlocked, he thought the two paragraphs were "substantially correct." *Id., at 686-687, 144 So. 2d at 50-51*. The court reaffirmed a statement in an earlier opinion that "There is no legal measure of damages in cases of this character." *Id., at 686, 144 So. 2d at 50*. It rejected petitioners' constitutional contentions with the brief statements that "The *First Amendment of the U.S. Constitution* does not protect libelous publications" and "The *Fourteenth Amendment* is directed against State action and not private action." *Id., at 676, 144 So. 2d at 40*.


 [1]Because of the importance of the constitutional issues involved, we granted the separate petitions for certiorari of the individual petitioners and of the *Times.* **[****19]** *371 U.S. 946*.We reverse the judgment.  We hold that the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the *First* and *Fourteenth Amendments* in a libel action brought by a public official against critics of his official conduct. [4] **[**718]** **[*265]** We further hold that under the proper safeguards the evidence presented in this case is constitutionally insufficient to support the judgment for respondent.


 **[****20]** I.

 [3] [4]We may dispose at the outset of two grounds asserted to insulate the judgment of the Alabama courts from constitutional scrutiny.  The first is the proposition relied on by the State Supreme Court -- that "The *Fourteenth Amendment* is directed against State action and not private action." That proposition has no application to this case. Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press.  It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute.  See, *e. g.*, Alabama Code, Tit. 7, §§ 908-917.  The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.  See *Ex parte Virginia, 100 U.S. 339, 346-347*; **[***698]** **[****21]** *American Federation of Labor v. Swing, 312 U.S. 321*.

The second contention is that the constitutional guarantees of freedom of speech and of the press are inapplicable here, at least so far as the Times is concerned, because the allegedly libelous statements were published as part of a paid, "commercial" advertisement. The argument relies on *Valentine v. Chrestensen, 316 U.S. 52*, where the Court

---

[4] [2]

Since we sustain the contentions of all the petitioners under the *First Amendment's* guarantees of freedom of speech and of the press as applied to the States by the *Fourteenth Amendment*, we do not decide the questions presented by the other claims of violation of the *Fourteenth Amendment*. The individual petitioners contend that the judgment against them offends the Due Process Clause because there was no evidence to show that they had published or authorized the publication of the alleged libel, and that the Due Process and *Equal Protection Clauses* were violated by racial segregation and racial bias in the courtroom.  The Times contends that the assumption of jurisdiction over its corporate person by the Alabama courts overreaches the territorial limits of the Due Process Clause.  The latter claim is foreclosed from our review by the ruling of the Alabama courts that the Times entered a general appearance in the action and thus waived its jurisdictional objection; we cannot say that this ruling lacks "fair or substantial support" in prior Alabama decisions.  See *Thompson v. Wilson, 224 Ala. 299, 140 So. 439 (1932)*; compare *N. A. A. C. P.* v. *Alabama, 357 U.S. 449, 454-458*.

**EXHIBIT 43**                                                                                    EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

held that a city ordinance forbidding street distribution of commercial and business advertising matter did not abridge the *First Amendment* freedoms, even as applied to a handbill having a commercial message on one side but a protest against certain official action on the other.  The reliance is wholly misplaced.  The Court in *Chrestensen* reaffirmed the constitutional protection for "the freedom of communicating  **[*266]**  information and disseminating opinion"; its holding was based upon the factual conclusions that the handbill was "purely commercial advertising" and that the protest against official action had been added only to evade the ordinance.


 [5] **[***HR6]** [6] **[****22]**  The publication here was not a "commercial" advertisement in the sense in which the word was used in *Chrestensen*.  It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern.  See *N. A. A. C. P.* v. *Button, 371 U.S. 415, 435*. That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold. *Smith v. California, 361 U.S. 147, 150*; cf.  *Bantam Books, Inc., v. Sullivan, 372 U.S. 58, 64, n. 6*. Any other conclusion would discourage newspapers from carrying "editorial advertisements" of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities -- who wish to exercise their freedom of speech even though they are not members of the press.  Cf.  *Lovell v. Griffin, 303 U.S. 444, 452*; **[****23]**   *Schneider v. State, 308 U.S. 147, 164*. The effect would be to shackle the *First Amendment* in its attempt to secure "the widest possible dissemination of information from diverse and antagonistic sources."  *Associated Press v. United States, 326 U.S. 1, 20*.  **[**719]**  To avoid placing such a handicap upon the freedoms of expression, we hold that if the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement. [5]


 **[*267]**  II.

Under Alabama law as applied in this case, a publication is "libelous per se" if the words "tend to injure a person . . . in his reputation" **[****24]**  or to "bring [him] into public contempt"; the trial court stated that the standard was met if the words are such as to "injure him in his public office, or impute misconduct to him in his office, or want of official integrity, or want of fidelity to a public trust . . . ." The jury  **[***699]**  must find that the words were published "of and concerning" the plaintiff, but where the plaintiff is a public official his place in the governmental hierarchy is sufficient evidence to support a finding that his reputation has been affected by statements that reflect upon the agency of which he is in charge.  Once "libel per se" has been established, the defendant has no defense as to stated facts unless he can persuade the jury that they were true in all their particulars.  *Alabama Ride Co.* v.  *Vance, 235 Ala. 263, 178 So. 438 (1938)*; *Johnson Publishing Co.* v.  *Davis, 271 Ala. 474, 494-495, 124 So. 2d 441, 457-458 (1960)*. His privilege of "fair comment" for expressions of opinion depends on the truth of the facts upon which the comment is based.  *Parsons v. Age-Herald Publishing Co., 181 Ala. 439, 450, 61 So. 345, 350 (1913)*. **[****25]**  Unless he can discharge the burden of proving truth, general damages are presumed, and may be awarded without proof of pecuniary injury.  A showing of actual malice is apparently a prerequisite to recovery of punitive damages, and the defendant may in any event forestall a punitive award by a retraction meeting the statutory requirements.  Good motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight.  *Johnson Publishing Co.* v.  *Davis, supra, 271 Ala., at 495, 124 So. 2d, at 458*.

 **[*268]**  The question before us is whether this rule of liability, as applied to an action brought by a public official against critics of his official conduct, abridges the freedom of speech and of the press that is guaranteed by the *First* and *Fourteenth Amendments*.

---

[5] See American Law Institute, **Restatement of Torts, § 593, Comment b** (1938).

**EXHIBIT 43**                                                           **EXHIBIT 10**

New York Times Co. v. Sullivan, 376 U.S. 254

[7][8]Respondent relies heavily, as did the Alabama courts, on statements of this Court to the effect that **[****26]** the Constitution does not protect libelous publications. [6] **[****28]**  Those statements do not foreclose our inquiry here. None of the cases sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public officials.  The dictum in *Pennekamp v. Florida, 328 U.S. 331, 348-349*, that "when the statements amount to defamation, a judge has such remedy in damages for libel as do other public servants," implied no view as to what remedy might constitutionally be afforded to public officials.  In *Beauharnais v. Illinois, 343 U.S. 250*, the Court sustained an Illinois criminal libel statute as applied to a publication held to be both defamatory of a racial group and "liable to cause violence and disorder." But the Court was careful to note that it "retains and **[**720]** exercises authority to nullify action which encroaches on freedom of utterance under the guise of punishing libel"; for "public men, are, as it were, public property,  **[****27]** " and "discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled." *Id., at 263-264*, and n. 18. In the only previous case that did present the question of constitutional limitations upon the power to award damages for libel of a public official, the **[***700]** Court was equally divided and the question was not decided.  *Schenectady Union Pub. Co*. v.  *Sweeney, 316 U.S. 642.* **[*269]** In deciding the question now, we are compelled by neither precedent nor policy to give any more weight to the epithet "libel" than we have to other "mere labels" of state law. *N. A. A. C. P.* v. *Button, 371 U.S. 415, 429*. Like insurrection, [7] contempt, [8] advocacy of unlawful acts, [9] breach of the peace, [10] obscenity, [11] solicitation of legal business, [12] and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations.  It must be measured by standards that satisfy the *First Amendment*.

[9][10][11]The general proposition that freedom of expression upon public questions is secured by the *First Amendment* has long been settled by our decisions.  The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the **[****29]** people." *Roth v. United States, 354 U.S. 476, 484*. "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California, 283 U.S. 359, 369*. "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions," *Bridges v. California, 314 U.S. 252, 270*, and this opportunity is to be afforded for "vigorous advocacy" no less than "abstract discussion." *N. A. A. C. P.* v. *Button, 371 U.S. 415, 429*. **[*270]** The *First Amendment*, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.  **[****30]** To many this is, and always will be, folly; but we have staked upon it our all." *United States v.*

---

[6] *Konigsberg v. State Bar of California, 366 U.S. 36, 49*, and n. 10; *Times Film Corp*. v. *City of Chicago, 365 U.S. 43, 48*; *Roth v. United States, 354 U.S. 476, 486-487*; *Beauharnais v. Illinois, 343 U.S. 250, 266*; *Pennekamp v. Florida, 328 U.S. 331, 348-349*; *Chaplinsky v. New Hampshire, 315 U.S. 568, 572*; *Near v. Minnesota, 283 U.S. 697, 715*.

[7] *Herndon v. Lowry, 301 U.S. 242*.

[8] *Bridges v. California, 314 U.S. 252*; *Pennekamp v. Florida, 328 U.S. 331*.

[9] *De Jonge v. Oregon, 299 U.S. 353*.

[10] *Edwards v. South Carolina, 372 U.S. 229*.

[11] *Roth v. United States, 354 U.S. 476*.

[12] *N. A. A. C. P.* v. *Button, 371 U.S. 415*.

**EXHIBIT 43**                                                                                    EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

*Associated Press, 52 F. Supp. 362, 372 (D. C. S. D. N. Y. 1943)*. Mr. Justice Brandeis, in his concurring opinion in *Whitney v. California, 274 U.S. 357, 375-376*, gave the principle its classic formulation:

"Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government.  They recognized the risks to which all human institutions are subject.  But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, **[\*\*721]** hope and imagination; that fear breeds repression; that repression **[\*\*\*701]** breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones.  Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law -- the argument of force in its worst form.  Recognizing **[\*\*\*\*31]** the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

 [12][13]Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.  See *Terminiello v. Chicago, 337 U.S. 1, 4*; *De Jonge v. Oregon, 299 U.S. 353, 365*. **[\*271]** The present advertisement, as an expression of grievance and protest on one of the major public issues of our time, would seem clearly to qualify for the constitutional protection. The question is whether it forfeits that protection by the falsity of some of its factual statements and by its alleged defamation of respondent.

 [14] **[\*\*\*\*32]** Authoritative interpretations of the *First Amendment* guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker.  Cf.  *Speiser v. Randall, 357 U.S. 513, 525-526*.The constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered." *N. A. A. C. P.* v. *Button, 371 U.S. 415, 445*. As Madison said, "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." 4 Elliot's Debates on the Federal Constitution (1876), p. 571.  In *Cantwell v. Connecticut, 310 U.S. 296, 310*, the Court declared:

"In the realm of religious faith, and in **[\*\*\*\*33]** that of political belief, sharp differences arise.  In both fields the tenets of one man may seem the rankest error to his neighbor.  To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.  But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression **[\*272]** are to have the "breathing space" that they "need . . . to survive," *N. A. A. C. P.* v. *Button, 371 U.S. 415, 433*, was also recognized by the Court of Appeals for the District of Columbia Circuit in *Sweeney v. Patterson, 76 U.S. App. D. C. 23, 24, 128 F.2d 457, 458 (1942)*, cert. denied,  *317 U.S. 678*. Judge **[\*\*\*\*34]** Edgerton spoke for a unanimous court which affirmed the dismissal of a Congressman's libel suit based upon a newspaper **[\*\*\*702]** article charging him with anti-Semitism in opposing a judicial appointment.  He said:

"Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. . . .   The interest of the public here outweighs the interest of appellant **[\*\*722]** or any other individual.  The protection of the public requires not merely discussion, but information. Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to

EXHIBIT 43   EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

Congressmen.  Errors of fact, particularly in regard to a man's mental states and processes, are inevitable. . . .  Whatever is added to the field of libel is taken from the field of free debate." [13]

 [****35]  [15]Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error.  Where judicial officers are involved, this Court has held that concern for the dignity and  [*273]  reputation of the courts does not justify the punishment as criminal contempt of criticism of the judge or his decision.  *Bridges v. California, 314 U.S. 252*. This is true even though the utterance contains "half-truths" and "misinformation."  *Pennekamp v. Florida, 328 U.S. 331, 342, 343, n. 5, 345*. Such repression can be justified, if at all, only by a clear and present danger of the obstruction of justice.  See also  *Craig v. Harney, 331 U.S. 367*;  *Wood v. Georgia, 370 U.S. 375*. If judges are to be treated as "men of fortitude, able to thrive in a hardy climate,"  *Craig v. Harney, supra, 331 U.S., at 376*, surely the same must be true of other government officials, such **[****36]**  as elected city commissioners. [14] Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations.

 [16]If neither factual **[****37]**  error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct, the combination of the two elements is no less inadequate.  This is the lesson to be drawn from the great controversy over the Sedition Act of 1798, 1 Stat. 596, which first crystallized a national awareness of the central meaning of the *First Amendment*. See Levy, Legacy of Suppression (1960), at 258 *et seq.*; Smith, Freedom's Fetters (1956), at 426, 431,  **[***703]**  and *passim.*  That statute made it a crime, punishable by a $ 5,000 fine and five years in prison, "if any person shall write, print, utter or publish . . . any false, scandalous and malicious  **[*274]**  writing or writings against the government of the United States, or either house of the Congress . . . , or the President . . . , with intent to defame . . . or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States." The Act allowed the defendant the defense of truth, and provided that the jury were  **[**723]**  to be judges both of the law and the facts.  Despite these qualifications, the Act was **[****38]**  vigorously condemned as unconstitutional in an attack joined in by Jefferson and Madison.  In the famous Virginia Resolutions of 1798, the General Assembly of Virginia resolved that it

"doth particularly protest against the palpable and alarming infractions of the Constitution, in the two late cases of the 'Alien and Sedition Acts,' passed at the last session of Congress . . . .  [The Sedition Act] exercises . . . a power not delegated by the Constitution, but, on the contrary, expressly and positively forbidden by one of the amendments thereto -- a power which, more than any other, ought to produce universal alarm, because it is levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right." 4 Elliot's Debates, *supra*, pp. 553-554.

---

[13] See also Mill, On Liberty (Oxford: Blackwell, 1947), at 47:

". . . To argue sophistically, to suppress facts or arguments, to misstate the elements of the case, or misrepresent the opposite opinion . . . all this, even to the most aggravated degree, is so continually done in perfect good faith, by persons who are not considered, and in many other respects may not deserve to be considered, ignorant or incompetent, that it is rarely possible, on adequate grounds, conscientiously to stamp the misrepresentation as morally culpable; and still less could law presume to interfere with this kind of controversial misconduct."

[14] The climate in which public officials operate, especially during a political campaign, has been described by one commentator in the following terms: "Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent." Noel, Defamation of Public Officers and Candidates,  49 Col. L. Rev. 875 (1949).

For a similar description written 60 years earlier, see Chase, Criticism of Public Officers and Candidates for Office,  23 Am. L. Rev. 346 (1889).

**EXHIBIT 43**                                                                                   EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

Madison prepared the Report in support of the protest. His premise was that the Constitution created a form of government under which "The people, not the government, possess the absolute sovereignty." The structure of the government dispersed power in reflection of the people's distrust **[\*\*\*\*39]** of concentrated power, and of power itself at all levels.  This form of government was "altogether different" from the British form, under which the Crown was sovereign and the people were subjects.   "Is  **[\*275]**  it  not  natural  and  necessary,  under  such  different circumstances," he asked, "that a different degree of freedom in the use of the press should be contemplated?" _Id., pp. 569-570_.   Earlier, in a debate in the House of Representatives, Madison had said: "If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people." 4 Annals of Congress, p. 934 (1794).  Of the exercise of that power by the press, his Report said: "In every state, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men, of every description, which has not been confined to the strict limits of the common law.  On this footing the freedom of the press has stood; on this foundation it yet stands . . . ." 4 Elliot's Debates, _supra_, p. 570.  The right of free public discussion of the stewardship of public officials was thus, in Madison's view,  **[\*\*\*\*40]**  a fundamental principle of the American form of government. [15]

 **[\*\*\*\*41]**   **[\*276]**  Although  **[\*\*\*704]**  the Sedition Act was never tested in this Court, [16] the attack upon its validity has carried the day in the court of history.  Fines levied in its prosecution were repaid by Act of Congress on the ground that it was unconstitutional.  See, _e. g._, Act of July 4, 1840, c. 45, 6  **[\*\*724]**  Stat. 802, accompanied by H. R. Rep. No. 86, 26th Cong., 1st Sess. (1840).  Calhoun, reporting to the Senate on February 4, 1836, assumed that its invalidity was a matter "which no one now doubts." Report with Senate bill No. 122, 24th Cong., 1st Sess., p. 3. Jefferson, as President, pardoned those who had been convicted and sentenced under the Act and remitted their fines, stating: "I discharged every person under punishment or prosecution under the sedition law, because I considered, and now consider, that law to be a nullity, as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image." Letter to Mrs. Adams, July 22, 1804, 4 Jefferson's Works (Washington ed.), pp. 555, 556.  The invalidity of the Act has also been assumed by Justices of this Court.  See Holmes, J., dissenting and joined by Brandeis, J., in  _Abrams v. United States, 250 U.S.  616, 630_;  **[\*\*\*\*42]**  Jackson, J., dissenting in _Beauharnais v. Illinois, 343 U.S. 250, 288-289_;  Douglas, The Right of the People (1958), p. 47.  See also Cooley, Constitutional Limitations (8th ed., Carrington, 1927), pp. 899-900; Chafee, Free Speech in the United States (1942), pp. 27-28.  These views reflect a broad consensus that the Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the _First Amendment_.

 [17]There is no force in respondent's argument that the constitutional limitations implicit in the history of the Sedition Act apply only to Congress and not to the States.  It is true that the _First Amendment_ was originally addressed only to action by the Federal Government, and  **[\*277]**  that Jefferson, for one, while denying  **[\*\*\*\*43]**  the power of Congress "to controul the freedom of the press," recognized such a power in the States.  See the 1804 Letter to

---

[15] The Report on the Virginia Resolutions further stated:

"It is manifestly impossible to punish the intent to bring those who administer the government into disrepute or contempt, without striking at the right of freely discussing public characters and measures; . . . which, again, is equivalent to a protection of those who administer the government, if they should at any time deserve the contempt or hatred of the people, against being exposed to it, by free animadversions on their characters and conduct.  Nor can there be a doubt . . . that a government thus intrenched in penal statutes against the just and natural effects of a culpable administration, will easily evade the responsibility which is essential to a faithful discharge of its duty.

"Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government.  The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 Elliot's Debates, _supra_, p. 575.

[16] The Act expired by its terms in 1801.

**EXHIBIT 43**                                                                                    **EXHIBIT  10**

New York Times Co. v. Sullivan, 376 U.S. 254

Abigail Adams quoted in *Dennis v. United States, 341 U.S.  494, 522, n. 4* (concurring opinion).  But this distinction was eliminated with the adoption of the *Fourteenth Amendment* and the application to the States of the *First Amendment's* restrictions.  See, *e. g.,* *Gitlow v. New York, 268 U.S. 652, 666*; *Schneider v. State, 308 U.S. 147, 160*; *Bridges v. California, 314 U.S. 252, 268*; *Edwards v. South Carolina, 372 U.S. 229, 235*.

 **[***705]**   [18]What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. [17]  The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute.  See *City of Chicago v. Tribune Co., 307 Ill. 595, 607, 139 N. E. 86, 90 (1923)*.  **[****44]**  Alabama, for example, has a criminal libel law which subjects to prosecution "any person who speaks, writes, or prints of and concerning another any accusation falsely and maliciously importing the commission by such person of a felony, or any other indictable offense involving moral turpitude," and which allows as punishment upon conviction a fine not exceeding $ 500 and a prison sentence of six months.  Alabama Code, Tit. 14, § 350.  Presumably a person charged with violation of this statute enjoys ordinary criminal-law safeguards such as the requirements of an indictment and of proof beyond a reasonable doubt.  These safeguards are not available to the defendant in a civil action.  The judgment awarded in this case -- without the need for any proof of actual pecuniary loss -- was one thousand times greater than the maximum fine provided by the Alabama criminal statute, and one hundred times greater than that provided by the Sedition Act.  **[*278]**  And since there is no double-jeopardy limitation **[****45]**  applicable to civil  **[**725]**  lawsuits, this is not the only judgment that may be awarded against petitioners for the same publication. [18] Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the *First Amendment* freedoms cannot survive.  Plainly the Alabama law of civil libel is "a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law."  *Bantam Books, Inc., v. Sullivan, 372 U.S. 58, 70*.

 **[****46]**   [19]The state rule of law is not saved by its allowance of the defense of truth.  A defense for erroneous statements honestly made is no less essential here than was the requirement of proof of guilty knowledge which, in *Smith v. California, 361 U.S. 147*, we held indispensable to a valid conviction of a bookseller for possessing obscene writings for sale.  We said:

"For if the bookseller is criminally liable without knowledge of the contents, . . . he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature. . . .  And the bookseller's burden would become the public's burden, for by restricting him the public's access to reading matter would be restricted. . . .  [His] timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word  **[***706]**  which the State could not constitutionally  **[*279]**  suppress directly.  The bookseller's self-censorship, compelled by **[****47]**  the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered.  Through it, the distribution of all books, both obscene and not obscene, would be impeded." (*361 U.S. 147, 153-154*.)

---

[17] Cf.  *Farmers Union v. WDAY, 360 U.S. 525, 535*.

[18] The Times states that four other libel suits based on the advertisement have been filed against it by others who have served as Montgomery City Commissioners and by the Governor of Alabama; that another $ 500,000 verdict has been awarded in the only one of these cases that has yet gone to trial; and that the damages sought in the other three total $ 2,000,000.

**EXHIBIT 43**                                                                                    **EXHIBIT  10**

New York Times Co. v. Sullivan, 376 U.S. 254

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions -- and to do so on pain of libel judgments virtually unlimited in amount -- leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. [19] Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.  See, *e. g., Post Publishing Co*. v. *Hallam, 59 F. 530, 540 (C. A. 6th Cir. 1893)*; see also Noel, Defamation of Public Officers and Candidates,  49 Col. L. Rev. 875, 892 (1949). Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt **[****48]**  whether it can be proved in court or fear of the expense of having to do so.  They tend to make only statements which "steer far wider of the unlawful zone."  *Speiser v. Randall, supra, 357 U.S., at 526*. The rule thus dampens the vigor and limits the variety of public debate.  It is  **[**726]**  inconsistent with the *First* and *Fourteenth Amendments*.

 [20]The constitutional guarantees require,  **[****49]**  we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made  **[*280]**  with "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.  An oft-cited statement of a like rule, which has been adopted by a number of state courts, [20] is found in the  **[***707]**  Kansas case of  *Coleman v. MacLennan, 78 Kan. 711, 98 P. 281 (1908)*. The State Attorney General, a candidate for re-election and a member of the commission charged with the management and control of the state school fund, sued a newspaper publisher for alleged libel in an article purporting to state facts relating to his official conduct in connection with a school-fund transaction.  The defendant pleaded privilege and the trial judge, over the plaintiff's objection, instructed the jury that

"where an article is published and circulated among voters for the sole purpose of giving what the defendant  **[*281]**  believes to be truthful information concerning a candidate for public office and for the purpose of enabling **[****50]**  such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principal matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in such a case the burden is on the plaintiff to show actual malice in the publication of the article."

---

[19] Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about "the clearer perception and livelier impression of truth, produced by its collision with error." Mill, On Liberty (Oxford: Blackwell, 1947), at 15; see also Milton, Areopagitica, in Prose Works (Yale, 1959), Vol. II, at 561.

[20]  *E. g., Ponder v. Cobb, 257 N. C. 281, 299, 126 S.E.2d 67, 80 (1962)*; *Lawrence v. Fox, 357 Mich. 134, 146, 97 N.W.2d 719, 725 (1959)*; *Stice v. Beacon Newspaper Corp., 185 Kan. 61, 65-67, 340 P.2d 396, 400-401 (1959)*; *Bailey v. Charleston Mail Assn., 126 W. Va. 292, 307, 27 S.E.2d 837, 844 (1943)*; *Salinger v. Cowles, 195 Iowa 873, 889, 191 N. W. 167, 174 (1922)*; *Snively v. Record Publishing Co., 185 Cal. 565, 571-576, 198 P. 1 (1921)*; *McLean v. Merriman, 42 S. D. 394, 175 N. W. 878 (1920)*. Applying the same rule to candidates for public office, see, *e. g.,  Phoenix Newspapers v. Choisser, 82 Ariz. 271, 276-277, 312 P. 2d 150, 154 (1957)*; *Friedell v. Blakely Printing Co., 163 Minn. 226, 230, 203 N. W. 974, 975 (1925)*. And see *Chagnon v. Union-Leader Corp., 103 N. H. 426, 438, 174 A. 2d 825, 833 (1961)*, cert. denied,  **369 U.S. 830**.

The consensus of scholarly opinion apparently favors the rule that is here adopted.  *E. g*., 1 Harper and James, Torts, § 5.26, at 449-450 (1956); Noel, Defamation of Public Officers and Candidates,  49 Col. L. Rev. 875, 891-895, 897, 903 (1949); Hallen, Fair Comment,  8 Tex. L. Rev. 41, 61 (1929); Smith, Charges Against Candidates,  18 Mich. L. Rev. 1, 115 (1919); Chase, Criticism of Public Officers and Candidates for Office,  23 Am. L. Rev. 346, 367-371 (1889); Cooley, Constitutional Limitations (7th ed., Lane, 1903), at 604, 616-628.  But see, *e. g*., American Law Institute, **Restatement of Torts, § 598, Comment a** (1938) (reversing the position taken in Tentative Draft 13, § 1041 (2) (1936)); Veeder, Freedom of Public Discussion,  23 Harv. L. Rev. 413, 419 (1910).

EXHIBIT 43
EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

In answer to a special question, the jury found that the plaintiff had not proved actual malice, and a general verdict was returned for the defendant.  On appeal the Supreme Court of Kansas, in an opinion by Justice Burch, reasoned as follows  (*78 Kan., at 724, 98 P., at 286*):

"It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages.  The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the **[****51]** public welfare, although at times such injury may be great.  The **[**727]** public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged."

The court thus sustained the trial court's instruction as a correct statement of the law, saying:

"In such a case the occasion gives rise to a privilege, qualified to this extent: any one claiming to be defamed by the communication must show actual malice or go remediless.  This privilege extends to a great variety of subjects, and includes matters of **[*282]** public concern, public men, and candidates for office."  *78 Kan., at 723, 98 P., at 285*.

 **[****52]** Such a privilege for criticism of official conduct [21] is appropriately analogous to the protection accorded a public official when *he* is sued for libel by a private citizen.  In *Barr v. Matteo, 360 U.S. 564, 575*, this Court held the utterance of a federal official to be absolutely privileged if made "within the outer perimeter" of his duties. The States accord the same immunity to statements of their highest officers, although some differentiate their lesser officials and qualify the privilege they enjoy. [22] But all hold that all officials are protected unless actual malice **[***708]** can be proved.  The reason for the official privilege is said to be that the threat of damage suits would otherwise "inhibit the fearless, vigorous, and effective administration of policies of government" and "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."  *Barr v. Matteo, supra, 360 U.S., at 571*. Analogous considerations support the privilege for the citizen-critic of government.  It is as much his duty to criticize as it is the official's duty to administer.  See *Whitney v. California, 274 U.S. 357, 375* **[****53]** (concurring opinion of Mr. Justice Brandeis), quoted *supra, p. 270*.  As Madison said, see *supra, p. 275*, "the censorial power is in the people over the Government, and not in the Government over the people." It would give public servants an unjustified preference over the public they serve, if critics of official conduct **[*283]** did not have a fair equivalent of the immunity granted to the officials themselves.

We conclude that such a privilege is required by the *First* and *Fourteenth Amendments*.

III.

---

[21] The privilege immunizing honest misstatements of fact is often referred to as a "conditional" privilege to distinguish it from the "absolute" privilege recognized in judicial, legislative, administrative and executive proceedings.  See, *e. g.*, Prosser, Torts (2d ed., 1955), § 95.

[22] See 1 Harper and James, Torts, § 5.23, at 429-430 (1956); Prosser, Torts (2d ed., 1955), at 612-613; American Law Institute, Restatement of Torts (1938), § 591.

EXHIBIT 43                                              EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

 [21] **[\*\*\*\*54]** [22][23]We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct.  Since this is such an action, [23] **[\*\*\*\*56]**  the rule requiring proof of actual malice is applicable.  While  **[\*\*728]**  Alabama law apparently requires proof of actual malice for an award of punitive damages, [24] **[\*\*\*\*57]**  where general damages are concerned malice is "presumed." Such a presumption is inconsistent  **[\*284]**  with the  **[\*\*\*709]**  federal rule.  "The power to create presumptions is not a means of escape from constitutional restrictions," _Bailey v. Alabama, 219 U.S. 219, 239_; "the showing of malice required for the forfeiture of the privilege is not presumed but is a matter for proof by the plaintiff . . . ." _Lawrence v. Fox, 357 Mich. 134, 146, 97 N.W.2d 719, 725 (1959)_.  **[\*\*\*\*55]** [25] Since the trial judge did not instruct the jury to differentiate between general and punitive damages, it may be that the verdict was wholly an award of one or the other.  But it is impossible to know, in view of the general verdict returned.  Because of this uncertainty, the judgment must be reversed and the case remanded.  _Stromberg v. California, 283 U.S. 359, 367-368_; _Williams v. North Carolina, 317 U.S. 287, 291-292_; see _Yates v. United States, 354 U.S. 298, 311-312_; _Cramer v. United States, 325 U.S. 1, 36, n. 45_.

 [24][25][26]Since respondent may seek a new trial, we deem that considerations of effective judicial administration require us to review the evidence in the present record to determine  **[\*285]**  whether it could constitutionally support a judgment for respondent.  This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.  This is such a case, particularly since the question is one of alleged trespass across "the line between speech

---

[23] We have no occasion here to determine how far down into the lower ranks of government employees the "public official" designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included. Cf.  _Barr v. Matteo, 360 U.S. 564, 573-575_. Nor need we here determine the boundaries of the "official conduct" concept. It is enough for the present case that respondent's position as an elected city commissioner clearly made him a public official, and that the allegations in the advertisement concerned what was allegedly his official conduct as Commissioner in charge of the Police Department. As to the statements alleging the assaulting of Dr. King and the bombing of his home, it is immaterial that they might not be considered to involve respondent's official conduct if he himself had been accused of perpetrating the assault and the bombing.  Respondent does not claim that the statements charged him personally with these acts; his contention is that the advertisement connects him with them only in his official capacity as the Commissioner supervising the police, on the theory that the police might be equated with the "They" who did the bombing and assaulting.  Thus, if these allegations can be read as referring to respondent at all, they must be read as describing his performance of his official duties.

[24] _Johnson Publishing Co_. v.  _Davis, 271 Ala. 474, 487, 124 So. 2d 441, 450 (1960)_. Thus, the trial judge here instructed the jury that "mere negligence or carelessness is not evidence of actual malice or malice in fact, and does not justify an award of exemplary or punitive damages in an action for libel."

The court refused, however, to give the following instruction which had been requested by the Times:

"I charge you . . . that punitive damages, as the name indicates, are designed to punish the defendant, the New York Times Company, a corporation, and the other defendants in this case, . . . and I further charge you that such punitive damages may be awarded only in the event that you, the jury, are convinced by a fair preponderance of the evidence that the defendant . . . was motivated by personal ill will, that is actual intent to do the plaintiff harm, or that the defendant . . . was guilty of gross negligence and recklessness and not of just ordinary negligence or carelessness in publishing the matter complained of so as to indicate a wanton disregard of plaintiff's rights."

The trial court's error in failing to require any finding of actual malice for an award of general damages makes it unnecessary for us to consider the sufficiency under the federal standard of the instructions regarding actual malice that were given as to punitive damages.

[25] Accord,  _Coleman v. MacLennan, supra, 78 Kan., at 741, 98 P., at 292_;  _Gough v. Tribune-Journal Co., 75 Idaho 502, 510, 275 P.2d 663, 668 (1954)_.

Page 15 of 25

unconditionally **[****58]** guaranteed and speech which may legitimately be regulated." *Speiser v. Randall, 357 U.S. 513, 525*. In cases where that line must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of **[**729]** the *First Amendment*, as adopted by the *Due Process Clause of the Fourteenth Amendment*, protect." *Pennekamp v. Florida, 328 U.S. 331, 335*; see also *One, Inc., v. Olesen, 355 U.S. 371*; *Sunshine Book Co.* v. *Summerfield, 355 U.S. 372*. We must "make an independent examination of the whole record," *Edwards v. South Carolina, 372 U.S. 229, 235*, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. [26]

 [27] [28] [29]

 **[****59]**   [30]Applying  **[***710]**  these standards, we consider that the proof presented to show actual malice lacks the convincing  **[*286]**  clarity which the constitutional standard demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law.  The case of the individual petitioners requires little discussion.  Even assuming that they could constitutionally be found to have authorized the use of their names on the advertisement, there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard.  The judgment against them is thus without constitutional support.

 [31] [32]As to the Times, we similarly conclude that the facts do not support a finding of actual malice. The statement by the Times' Secretary that, apart from the padlocking allegation, he thought the advertisement was "substantially correct," affords no constitutional warrant for the **[****60]** Alabama Supreme Court's conclusion that it was a "cavalier ignoring of the falsity of the advertisement [from which] the jury could not have but been impressed with the bad faith of The Times, and its maliciousness inferable therefrom." The statement does not indicate malice at the time of the publication; even if the advertisement was not "substantially correct" -- although respondent's own proofs tend to show that it was -- that opinion was at least a reasonable one, and there was no evidence to impeach the witness' good faith in holding it.  The Times' failure to retract upon respondent's demand, although it later retracted upon the demand of Governor Patterson, is likewise not adequate evidence of malice for constitutional purposes.  Whether or not a failure to retract may ever constitute such evidence, there are two reasons why it does not here.  *First*, the letter written by the Times reflected a reasonable doubt on its part as to whether the advertisement could reasonably be taken to refer to respondent at all.  *Second*, it was not a final refusal, since it asked for an explanation on this point -- a request that respondent chose to ignore.  Nor does the retraction upon **[****61]** the demand of the Governor supply the  **[*287]**  necessary proof.  It may be doubted that a failure to retract which is not itself evidence of malice can retroactively become such by virtue of a retraction subsequently made to another party.  But in any event that did not happen here, since the  **[**730]**  explanation given by the Times' Secretary for the distinction drawn between respondent and the Governor was a reasonable one, the good faith of which was not impeached.

 [33]Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files.  The mere presence of the stories in the files does not, of course, establish that the Times "knew" the advertisement was false, since the state of mind required for  **[***711]**  actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement. With respect to the failure of those persons to make the check, the record shows that they relied upon their knowledge of the good reputation of many of those **[****62]** whose names were listed as sponsors of the advertisement, and upon the letter from A. Philip Randolph, known to them as a responsible individual, certifying that

---

[26] The *Seventh Amendment* does not, as respondent contends, preclude such an examination by this Court.  That Amendment, providing that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law," is applicable to state cases coming here. *Chicago, B. & Q. R. Co.* v. *Chicago, 166 U.S. 226, 242-243*; cf. *The Justices v. Murray, 9 Wall. 274*. But its ban on re-examination of facts does not preclude us from determining whether governing rules of federal law have been properly applied to the facts.  "This Court will review the finding of facts by a State court . . . where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts." *Fiske v. Kansas, 274 U.S. 380, 385-386*. See also *Haynes v. Washington, 373 U.S. 503, 515-516*.

EXHIBIT 43                                                    EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

the use of the names was authorized.  There was testimony that the persons handling the advertisement saw nothing in it that would render it unacceptable under the Times' policy of rejecting advertisements containing "attacks of a personal character"; [27] their failure to reject it on this ground was not unreasonable.  We think **[\*288]** the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice. Cf. *Charles Parker Co*. v. *Silver City Crystal Co., 142 Conn. 605, 618, 116 A.2d 440, 446 (1955)*; *Phoenix Newspapers, Inc., v. Choisser, 82 Ariz. 271, 277-278, 312 P.2d 150, 154-155 (1957)*.

 **[\*\*\*\*63]**    [34]We also think the evidence was constitutionally defective in another respect: it was incapable of supporting the jury's finding that the allegedly libelous statements were made "of and concerning" respondent.  Respondent relies on the words of the advertisement and the testimony of six witnesses to establish a connection between it and himself.  Thus, in his brief to this Court, he states:

"The reference to respondent as police commissioner is clear from the ad.  In addition, the jury heard the testimony of a newspaper editor . . . ; a real estate and insurance man . . . ; the sales manager of a men's clothing store . . . ; a food equipment man . . . ; a service station operator . . . ; and the operator of a truck line for whom respondent had formerly worked . . . .  Each of these witnesses stated that he associated the statements with respondent . . . ." (Citations to record omitted.)

There was no reference to respondent in the advertisement, either by name or official position.  A number of the allegedly libelous statements -- the charges that the dining hall was padlocked and that Dr. **[\*\*\*\*64]** King's home was bombed, his person assaulted, and a perjury prosecution instituted against him -- did not even concern the police; despite the ingenuity of the arguments which would attach this significance to the word "They," it is plain that these statements could not reasonably be read as accusing respondent of personal involvement in the acts **[\*289]** in question.  The statements upon which respondent **[\*\*731]** principally relies as referring to him are the two allegations that did concern the police or police functions: that "truckloads of police . . . ringed the Alabama **[\*\*\*712]** State College Campus" after the demonstration on the State Capitol steps, and that Dr. King had been "arrested . . . seven times." These statements were false only in that the police had been "deployed near" the campus but had not actually "ringed" it and had not gone there in connection with the State Capitol demonstration, and in that Dr. King had been arrested only four times.  The ruling that these discrepancies between what was true and what was asserted were sufficient to injure respondent's reputation may itself raise constitutional problems, but we need not consider them here.  Although **[\*\*\*\*65]** the statements may be taken as referring to the police, they did not on their face make even an oblique reference to respondent as an individual.  Support for the asserted reference must, therefore, be sought in the testimony of respondent's witnesses.  But none of them suggested any basis for the belief that respondent himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department and thus bore official responsibility for police conduct; to the extent that some of the witnesses thought respondent to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they based this notion not on any statements in the advertisement, and not on any evidence that he had in fact been so involved, but solely on the unsupported assumption that, because of his official position, he must have been. [28] **[\*\*\*\*67]**  This

---

[27] The Times has set forth in a booklet its "Advertising Acceptability Standards." Listed among the classes of advertising that the newspaper does not accept are advertisements that are "fraudulent or deceptive," that are "ambiguous in wording and . . . may mislead," and that contain "attacks of a personal character." In replying to respondent's interrogatories before the trial, the Secretary of the Times stated that "as the advertisement made no attacks of a personal character upon any individual and otherwise met the advertising acceptability standards promulgated," it had been approved for publication.

[28] Respondent's own testimony was that "as Commissioner of Public Affairs it is part of my duty to supervise the Police Department and I certainly feel like it [a statement] is associated with me when it describes police activities." He thought that "by virtue of being Police Commissioner and Commissioner of Public Affairs," he was charged with "any activity on the part of the Police Department." "When it describes police action, certainly I feel it reflects on me as an individual." He added that "It is my feeling that it reflects not only on me but on the other Commissioners and the community."

Grover C. Hall testified that to him the third paragraph of the advertisement called to mind "the City government -- the Commissioners," and that "now that you ask it I would naturally think a little more about the police Commissioner because his

**EXHIBIT 43**                                                              EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

reliance on the bare **[\*290]**   **[\*\*\*713]**  fact of respondent's **[\*\*732]** official position [29] was made explicit by the Supreme Court of Alabama.  That court, in holding that the trial court "did not err in overruling the demurrer [of the Times] in the aspect that the libelous **[\*291]**   **[\*\*\*\*66]**  matter was not of and concerning the [plaintiff,]" based its ruling on the proposition that:

"We think it common knowledge that the average person knows that municipal agents, such as police and firemen, and others, are under the control and direction of the city governing body, and more particularly under the direction and control of a single commissioner.  In measuring the performance or deficiencies of such groups, praise or criticism is usually attached to the official in complete control of the body." *273 Ala., at 674-675, 144 So.2d, at 39*.

 [35][38]This proposition has disquieting implications for criticism of governmental conduct.  For good reason, "no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence." *City of Chicago v. Tribune Co., 307 Ill. 595, 601, 139 N. E.  86, 88  [\*292]  (1923)*.  The present proposition would sidestep this obstacle by transmuting criticism of government, however impersonal it may seem on its face, into personal criticism, and hence potential libel, of the officials of whom the government is composed.  There is no legal alchemy by which a State may thus create the cause of action that would otherwise be denied for a publication which,  **[\*\*\*\*68]**  as respondent himself said of the advertisement, "reflects not only on me but on the other Commissioners and the community." Raising as it does the possibility that a good-faith critic of government will be penalized for his criticism, the proposition relied on by the Alabama courts strikes at

---

responsibility is exclusively with the constabulary." It was "the phrase about starvation" that led to the association; "the other didn't hit me with any particular force."

Arnold D. Blackwell testified that the third paragraph was associated in his mind with "the Police Commissioner and the police force.  The people on the police force." If he had believed the statement about the padlocking of the dining hall, he would have thought "that the people on our police force or the heads of our police force were acting without their jurisdiction and would not be competent for the position." "I would assume that the Commissioner had ordered the police force to do that and therefore it would be his responsibility."

Harry W. Kaminsky associated the statement about "truckloads of police" with respondent "because he is the Police Commissioner." He thought that the reference to arrests in the sixth paragraph "implicates the Police Department, I think, or the authorities that would do that -- arrest folks for speeding and loitering and such as that." Asked whether he would associate with respondent a newspaper report that the police had "beat somebody up or assaulted them on the streets of Montgomery," he replied: "I still say he is the Police Commissioner and those men are working directly under him and therefore I would think that he would have something to do with it." In general, he said, "I look at Mr. Sullivan when I see the Police Department."

H. M. Price, Sr., testified that he associated the first sentence of the third paragraph with respondent because: "I would just automatically consider that the Police Commissioner in Montgomery would have to put his approval on those kind of things as an individual."

William M. Parker, Jr., testified that he associated the statements in the two paragraphs with "the Commissioners of the City of Montgomery," and since respondent "was the Police Commissioner," he "thought of him first." He told the examining counsel: "I think if you were the Police Commissioner I would have thought it was speaking of you."

Horace W. White, respondent's former employer, testified that the statement about "truck-loads of police" made him think of respondent "as being the head of the Police Department." Asked whether he read the statement as charging respondent himself with ringing the campus or having shotguns and tear-gas, he replied: "Well, I thought of his department being charged with it, yes, sir.  He is the head of the Police Department as I understand it." He further said that the reason he would have been unwilling to re-employ respondent if he had believed the advertisement was "the fact that he allowed the Police Department to do the things that the paper say he did."

[29] Compare *Ponder v. Cobb, 257 N. C. 281, 126 S.E.2d 67 (1962)*.

188

**EXHIBIT 43**                                                                                                    **EXHIBIT 10**

New York Times Co. v. Sullivan, 376 U.S. 254

the very center of the constitutionally protected area of free expression. [30] We hold that such a proposition may not constitutionally be utilized to establish that an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations.   Since it was relied on exclusively here, and there was no other  **[\*\*\*714]**  evidence to connect the statements with respondent, the evidence was constitutionally insufficient to support a finding that the statements referred to respondent.

 [36] [37]

 **[\*\*\*\*69]**  The  **[\*\*733]**  judgment of the Supreme Court of Alabama is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed and remanded*.

 **[\*\*\*715]**  [APPENDIX]

 **[\*\*\*716]**  [SEE ILLUSTRATION IN ORIGINAL.]

**Concur by:** BLACK; GOLDBERG

# Concur

 **[\*293]**  MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring.

I concur in reversing this half-million-dollar judgment against the New York Times Company and the four individual defendants.  In reversing the Court holds that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." *Ante*, p. 283.  I base my vote to reverse on the belief that the *First* and *Fourteenth Amendments* not merely "delimit" a State's power to award damages to "public officials against critics of their official conduct" but completely prohibit a State from exercising such a power.  The Court goes on to hold that a State can subject such critics to damages if "actual malice" can be proved against them. "Malice," even as defined by the Court, is an elusive, abstract concept, hard to prove and hard to  **[\*\*\*\*70]**  disprove. The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs and certainly does not measure up to the sturdy safeguard embodied in the *First Amendment*.  Unlike the Court, therefore, I vote to reverse exclusively on the ground that the Times and the individual defendants had an absolute, unconditional constitutional right to publish in the Times advertisement their criticisms of the Montgomery agencies and officials.  I do not base my vote to reverse on any failure to prove that these individual defendants signed the advertisement or that their criticism of the Police Department was aimed at the plaintiff Sullivan, who was then the Montgomery City Commissioner having supervision of the city's police; for present purposes I assume these things were proved.  Nor is my reason for reversal the size of the half-million-dollar judgment, large as it is.  If Alabama has constitutional power to use its civil libel law to impose damages on the press for criticizing the way public officials perform or fail  **[\*294]**  to perform their duties, I know of no provision in the Federal Constitution which either expressly  **[\*\*\*\*71]**  or impliedly bars the State from fixing the amount of damages.

The half-million-dollar verdict does give dramatic proof, however, that state libel laws threaten the very existence of an American press virile enough to publish unpopular views on public affairs and bold enough to criticize the conduct

---

[30] Insofar as the proposition means only that the statements about police conduct libeled respondent by implicitly criticizing his ability to run the Police Department, recovery is also precluded in this case by the doctrine of fair comment.  See American Law Institute, Restatement of Torts (1938), § 607.  Since the *Fourteenth Amendment* requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact.  Both defenses are of course defeasible if the public official proves actual malice, as was not done here.

EXHIBIT 43                                                                                    EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

of public officials.  The factual background of this case emphasizes the imminence and enormity of that threat.  One of the acute and highly emotional issues in this country arises out of efforts of many people, even including some public officials, to continue state-commanded segregation of races in the public schools and other public places, despite our several holdings that such a state practice is forbidden by the *Fourteenth Amendment*. Montgomery is one of the localities in which widespread hostility to desegregation has been manifested.  This hostility has sometimes extended itself to persons who favor desegregation, particularly to so-called "outside agitators," a term which can be made to fit papers like the Times, which is published in New York.   The scarcity of testimony to show that Commissioner Sullivan suffered any actual damages at all suggests that these feelings of hostility **[****72]**  had at least as much to do with rendition of this half-million-dollar  **[***717]**  verdict as did an appraisal of damages.  Viewed realistically, this record lends support to an inference that instead of being damaged Commissioner Sullivan's political, social, and financial prestige has likely been enhanced by the Times' publication.  Moreover, a second half-million-dollar libel verdict against the Times based on the same advertisement has already been  **[**734]**  awarded to another Commissioner.  There a jury again gave the full amount claimed.  There is no reason to believe that there are not more such huge verdicts lurking just around the corner for the Times or any other newspaper or broadcaster which  **[*295]**  might dare to criticize public officials.  In fact, briefs before us show that in Alabama there are now pending eleven libel suits by local and state officials against the Times seeking $ 5,600,000, and five such suits against the Columbia Broadcasting System seeking $ 1,700,000.   Moreover, this technique for harassing and punishing a free press -- now that it has been shown to be possible -- is by no means limited to cases with racial overtones; it can be used in other **[****73]**  fields where public feelings may make local as well as out-of-state newspapers easy prey for libel verdict seekers.

In my opinion the Federal Constitution has dealt with this deadly danger to the press in the only way possible without leaving the free press open to destruction -- by granting the press an absolute immunity for criticism of the way public officials do their public duty. Compare  *Barr v. Matteo, 360 U.S. 564*. Stopgap measures like those the Court adopts are in my judgment not enough.  This record certainly does not indicate that any different verdict would have been rendered here whatever the Court had charged the jury about "malice," "truth," "good motives," "justifiable ends," or any other legal formulas which in theory would protect the press.  Nor does the record indicate that any of these legalistic words would have caused the courts below to set aside or to reduce the half-million-dollar verdict in any amount.

I agree with the Court that the *Fourteenth Amendment* made the First applicable to the States. [1] This means to me that since the adoption of the *Fourteenth Amendment* a State has no more power than the Federal Government to use a civil **[****74]**  libel law or any other law to impose damages for merely discussing public affairs and criticizing public officials.  The power of the United  **[*296]**  States to do that is, in my judgment, precisely nil.  Such was the general view held when the *First Amendment* was adopted and ever since. [2] **[****75]**  Congress never has sought to challenge this viewpoint by passing any civil libel law.  It did pass the Sedition Act in 1798, [3] which made it a crime -- "seditious libel" -- to criticize federal officials or the Federal Government.  As the Court's opinion correctly points out, however, *ante*, pp. 273-276, that Act came to an ignominious end and by common consent has generally been treated as having been a wholly unjustifiable and much to be regretted violation of  **[***718]**  the *First Amendment*. Since the *First Amendment* is now made applicable to the States by the Fourteenth, it no more permits the States to impose damages for libel than it does the Federal Government.

We would, I think, more faithfully interpret the *First Amendment* by holding that at the very least it leaves the people and the press free to criticize officials and discuss public affairs with impunity.  This Nation of ours elects many of its

---

[1] See cases collected in  *Speiser v. Randall, 357 U.S. 513, 530* (concurring opinion).

[2] See, *e. g.*, 1 Tucker, Blackstone's Commentaries (1803), 297-299 (editor's appendix).  St. George Tucker, a distinguished Virginia jurist, took part in the Annapolis Convention of 1786, sat on both state and federal courts, and was widely known for his writings on judicial and constitutional subjects.

[3] Act of July 14, 1798, 1 Stat. 596.

EXHIBIT 43                                                    EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

important officials; so do the States, the municipalities, the counties, and even many precincts.  These officials are responsible to the people for the way they perform their duties. While our Court has held that some kinds of speech and writings, such as "obscenity," *Roth [\*\*735] v. United States, 354 U.S. 476*, and "fighting words," *Chaplinsky v. New Hampshire, 315 U.S. 568*, are not expression within the protection of the *First Amendment*, [4] freedom to discuss public affairs and public officials  **[\*297]**  is unquestionably, as the Court today holds, the kind of speech the *First Amendment* was primarily designed to keep within the area of free discussion.  To punish the exercise of this right to discuss public affairs or to penalize it through libel judgments is to abridge **[\*\*\*\*76]**  or shut off discussion of the very kind most needed.  This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials.  But I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials.  "For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it." [5] **[\*\*\*\*77]**  An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the *First Amendment*. [6]

I regret that the Court has stopped short of this holding indispensable to preserve our free press from destruction.

MR. JUSTICE GOLDBERG, with whom MR. JUSTICE DOUGLAS joins, concurring in the result.

The Court today announces a constitutional standard which prohibits "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with  **[\*298]**  'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Ante*, at 279-280.  The Court thus rules that the Constitution gives citizens and newspapers a "conditional privilege" immunizing nonmalicious misstatements of fact regarding the official conduct of a government officer.  The impressive array of history [1] and precedent marshaled by the Court,  **[\*\*\*719]** however, confirms my belief that the Constitution affords greater protection than that provided by the Court's standard to citizen and press in exercising the right **[\*\*\*\*78]**  of public criticism.

In my view, the *First* and *Fourteenth Amendments to the Constitution* afford to the citizen and to the press an absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excesses and abuses.  The prized American right "to speak one's  **[\*\*736]**  mind, **[\*\*\*\*79]** " cf.  *Bridges v. California, 314 U.S. 252, 270*, about public officials and affairs needs "breathing space to survive," *N. A. A. C. P.* v.  *Button, 371 U.S. 415, 433*. The right should not depend upon a probing by the jury of the motivation [2] of the citizen or press.  The theory  **[\*299]** of our

---

[4] But see  *Smith v. California, 361 U.S. 147, 155* (concurring opinion);  *Roth v. United States, 354 U.S. 476, 508* (dissenting opinion).

[5] 1 Tucker, Blackstone's Commentaries (1803), 297 (editor's appendix); cf. Brant, Seditious Libel: Myth and Reality,  39 N. Y. U. L. Rev. 1.

[6] Cf. Meiklejohn, Free Speech and Its Relation to Self-Government (1948).

[1] I fully agree with the Court that the attack upon the validity of the Sedition Act of 1798, 1 Stat. 596, "has carried the day in the court of history," *ante*, at 276, and that the Act would today be declared unconstitutional.  It should be pointed out, however, that the Sedition Act proscribed writings which were "false, scandalous *and malicious*." (Emphasis added.) For prosecutions under the Sedition Act charging malice, see, *e. g.*, Trial of Matthew Lyon (1798), in Wharton, State Trials of the United States (1849), p. 333; Trial of Thomas Cooper (1800), in *id., at 659*; Trial of Anthony Haswell (1800), in *id., at 684*; Trial of James Thompson Callender (1800), in *id., at 688*.

[2] The requirement of proving actual malice or reckless disregard may, in the mind of the jury, add little to the requirement of proving falsity, a requirement which the Court recognizes not to be an adequate safeguard. The thought suggested by Mr. Justice Jackson in  *United States v. Ballard, 322 U.S. 78, 92-93*, is relevant here: "As a matter of either practice or philosophy I do not see how we can separate an issue as to what is believed from considerations as to what is believable.  The most convincing proof that one

191

EXHIBIT 43   EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

Constitution is that every citizen may speak his mind and every newspaper express its view on matters of public concern and may not be barred from speaking or publishing because those in control of government think that what is said or written is unwise, unfair, false, or malicious.  In a democratic society, one who assumes to act for the citizens in an executive, legislative, or judicial capacity must expect that his official acts will be commented upon and criticized. Such criticism cannot, in my opinion, be muzzled or deterred by the courts at the instance of public officials under the label of libel.

 [****80]  It has been recognized that "prosecutions for libel on government have [no] place in the American system of jurisprudence." _City of Chicago v. Tribune Co., 307 Ill. 595, 601, 139 N. E. 86, 88_. I fully agree.  Government, however, is not an abstraction; it is made up of individuals -- of governors responsible to the governed.  In a democratic society where men are free by ballots to remove those in power, any statement critical of governmental action is necessarily "of and concerning" the governors and any statement critical of the governors' official conduct is necessarily "of and concerning" the government.  If the rule that libel on government has no place in our Constitution is to have real meaning, then libel on the official conduct of the governors likewise can have no place in our Constitution.

We must recognize that we are writing upon a clean slate. [3] As the  [***720]  Court notes, although there have been  [*300]  "statements of this Court to the effect that the Constitution does not protect libelous publications . . . none of the cases sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public  [****81]  officials." _Ante_, at 268.  We should be particularly careful, therefore, adequately to protect the liberties which are embodied in the _First_ and _Fourteenth Amendments_. It may be urged that deliberately and maliciously false statements have no  [**737]  conceivable value as free speech.  That argument, however, is not responsive to the real issue presented by this case, which is whether that freedom of speech which all agree is constitutionally protected can be effectively safeguarded by a rule allowing the imposition of liability upon a jury's evaluation of the speaker's state of mind.  If individual citizens may be held liable in damages for strong words, which a jury finds false and maliciously motivated, there can be little doubt that public debate and advocacy will be constrained.  And if newspapers, publishing advertisements dealing with public issues, thereby risk liability, there can also be little doubt that the ability of minority groups to secure publication of their views on public affairs and to seek support for their causes will be greatly diminished.  Cf.  _Farmers Educational & Coop. Union v. WDAY, Inc., 360 U.S. 525, 530_. The opinion of the  [****82]  Court conclusively demonstrates the chilling effect of the Alabama libel laws on _First Amendment_ freedoms  [*301]  in the area of race relations.  The American Colonists were not willing, nor should we be, to take the risk that "men who injure and oppress the people under their administration [and] provoke them to cry out and complain" will also be empowered to "make that very complaint the foundation for new oppressions and prosecutions." _The Trial of John Peter Zenger_, 17 Howell's St. Tr. 675, 721-722 (1735) (argument of counsel to the jury).  To impose liability for critical, albeit erroneous or even malicious, comments on official conduct would effectively resurrect "the obsolete doctrine that the governed must not criticize their governors." Cf.  _Sweeney v. Patterson, 76 U.S. App. D.C. 23, 24, 128 F.2d 457, 458_.

 [****83]  Our national experience teaches that repressions breed hate and "that hate menaces stable government." _Whitney v. California, 274 U.S. 357, 375_ (Brandeis, J., concurring).  We should be ever mindful of the wise counsel of Chief Justice Hughes:

---

believes his statements is to show that they have been true in his experience.  Likewise, that one knowingly falsified is best proved by showing that what he said happened never did happen." See note 4, _infra_.

[3] It was not until  _Gitlow v. New York, 268 U.S. 652_, decided in 1925, that it was intimated that the freedom of speech guaranteed by the _First Amendment_ was applicable to the States by reason of the _Fourteenth Amendment_. Other intimations followed.  See _Whitney v. California, 274 U.S. 357_;  _Fiske v. Kansas, 274 U.S. 380_. In 1931 Chief Justice Hughes speaking for the Court in _Stromberg v. California, 283 U.S. 359, 368_, declared: "It has been determined that the conception of liberty under the _due process clause of the Fourteenth Amendment_ embraces the right of free speech." Thus we deal with a constitutional principle enunciated less than four decades ago, and consider for the first time the application of that principle to issues arising in libel cases brought by state officials.

EXHIBIT 43   EXHIBIT 10

New York Times Co. v. Sullivan, 376 U.S. 254

"Imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if **[\*\*\*721]** desired, may be obtained by peaceful means.  Therein lies the security of the Republic, the very foundation of constitutional government." *De Jonge v. Oregon, 299 U.S. 353, 365*.

This is not to say that the Constitution protects defamatory statements directed against the private conduct of a public official or private citizen.  Freedom of press and of speech insures that government will respond to the will of the people and that changes may be obtained by peaceful means.  Purely private defamation has little to do with the political ends of a self-governing society.   The imposition of liability for private **[\*\*\*\*84]** defamation does not  **[\*302]** abridge the freedom of public speech or any other freedom protected by the *First Amendment*. [4] This, of course, cannot be said "where  **[\*\*738]** public officials are concerned or where public matters are involved. . . .   One main function of the *First Amendment* is to ensure ample opportunity for the people to determine and resolve public issues.  Where public matters are involved, the doubts should be resolved in favor of freedom of expression rather than against it." Douglas, The Right of the People (1958), p. 41.

 **[\*\*\*\*85]**  In many jurisdictions, legislators, judges and executive officers are clothed with absolute immunity against liability for defamatory words uttered in the discharge of their public duties. See, *e. g.,  Barr v. Matteo, 360 U.S. 564*; *City of Chicago v. Tribune Co., 307 Ill., at 610, 139 N. E., at 91*. Judge Learned Hand ably summarized the policies underlying the rule:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery.  The justification for doing so is that it is impossible to know whether the claim is well founded until the  **[\*303]**  case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.  **[\*\*\*\*86]**  Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith.  There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors.  As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative.  In  **[\*\*\*722]**  this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds.  A moment's reflection shows, however, that **[\*\*\*\*87]**  that cannot be the meaning of the limitation without defeating the whole doctrine.  What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . ." *Gregoire v. Biddle, 177 F.2d 579, 581*.

---

[4] In most cases, as in the case at bar, there will be little difficulty in distinguishing defamatory speech relating to private conduct from that relating to official conduct.  I recognize, of course, that there will be a gray area.  The difficulties of applying a public-private standard are, however, certainly of a different genre from those attending the differentiation between a malicious and nonmalicious state of mind.  If the constitutional standard is to be shaped by a concept of malice, the speaker takes the risk not only that the jury will inaccurately determine his state of mind but also that the jury will fail properly to apply the constitutional standard set by the elusive concept of malice. See note 2, *supra*.

Page 23 of 25

EXHIBIT 43                                                                    EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

 **[*304]**  If the government official should be immune from libel actions so that his ardor to serve the public will not be dampened and "fearless, vigorous, and effective administration of policies of government" not be inhibited, _Barr v. Matteo, supra, at 571_, then the citizen and the press should likewise be immune from libel actions for their criticism of official conduct.  Their ardor as citizens will thus not be dampened and they will  **[**739]**  be free "to applaud or to criticize the way public employees do their jobs, from the least to the most important." [5] If liability can attach to political criticism because it damages the reputation of a public official as a public official, then no critical citizen can safely utter anything but faint praise about  **[****88]**  the government or its officials.  The vigorous criticism by press and citizen of the conduct of the government of the day by the officials of the day will soon yield to silence if officials in control of government agencies, instead of answering criticisms, can resort to friendly juries to forestall criticism of their official conduct. [6]

The conclusion that the Constitution affords the citizen and the press an absolute **[****89]**  privilege for criticism of official conduct does not leave the public official without defenses against unsubstantiated opinions or deliberate misstatements.  "Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment . . . of free speech . . . ." _Wood v. Georgia, 370 U.S. 375, 389_. The public  **[*305]**  official certainly has equal if not greater access than most private citizens to media of communication.  In any event, despite the possibility that some excesses and abuses may go unremedied, we must recognize that "the people of this nation have ordained in the light of history, that, in spite of the probability of excesses  **[***723]**  and abuses, [certain] liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." _Cantwell v. Connecticut, 310 U.S. 296, 310_. As Mr. Justice Brandeis correctly observed, "sunlight is the most powerful of all disinfectants." [7]

 **[****90]**  For these reasons, I strongly believe that the Constitution accords citizens and press an unconditional freedom to criticize official conduct.  It necessarily follows that in a case such as this, where all agree that the allegedly defamatory statements related to official conduct, the judgments for libel cannot constitutionally be sustained.

# References

The Supreme Court and the right of free speech and press

      Annotation References:

1. The Supreme Court and the right of free speech and press. 93 L ed 1151, 2 L ed 2d 1706.

2. Libel and slander: actionability of statement imputing incapacity, inefficiency, misconduct, fraud, dishonesty, or the like to public employee.  _53 ALR2d 8_.

3. Doctrine of privilege or fair comment as applicable to misstatements of fact in publication relating to public officer or candidate for office.  110 ALR 412, 150 ALR 358.

4. Constitutionality of statutes or ordinances making one fact presumptive evidence of another.  51 ALR 1139, 86 ALR 179, 162 ALR 495.

5. Retraction as affecting right of action or amount of damages for libel **[****91]**  or slander.  13 ALR 794.

---

[5] MR. JUSTICE BLACK concurring in  _Barr v. Matteo, 360 U.S. 564, 577_, observed that: "The effective functioning of a free government like ours depends largely on the force of an informed public opinion.  This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees.  Such an informed understanding depends, of course, on the freedom people have to applaud or to criticize the way public employees do their jobs, from the least to the most important."

[6] See notes 2, 4, _supra_.

[7] See Freund, The Supreme Court of the United States (1949), p. 61.

**EXHIBIT 43**                                                           EXHIBIT  10

New York Times Co. v. Sullivan, 376 U.S. 254

6. Sufficiency of identification of plaintiff by publication or statement complained of as libelous or slanderous.  91 ALR 1161.

7. Libel and slander: publication or statement as defamatory, by reason of extrinsic facts, of person not referred to nor intended to be referred to.  69 ALR 734.

8. What evidence is admissible to identify plaintiff as person defamed.  *95 ALR 2d 227*.

---

**End of Document**

195

**EXHIBIT 43**

EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

# *Snyder v. Phelps*

Supreme Court of the United States

October 6, 2010, Argued; March 2, 2011, Decided

No. 09-751

**Reporter**

562 U.S. 443 \*; 131 S. Ct. 1207 \*\*; 179 L. Ed. 2d 172 \*\*\*; 2011 U.S. LEXIS 1903 \*\*\*\*; 79 U.S.L.W. 4135; 39 Media L. Rep. 1353; 22 Fla. L. Weekly Fed. S 836

ALBERT SNYDER, Petitioner v. FRED W. PHELPS, SR., et al.

**Prior History:  [\*\*\*\*1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT.

*Snyder v. Phelps, 580 F.3d 206, 2009 U.S. App. LEXIS 21173 (4th Cir. Md., 2009)*

**Disposition:** Affirmed.

## Case Summary

**Procedural Posture**

Petitioner, father of a marine who was killed in the line of duty, won a jury verdict from defendant protestors, who picketed for about 30 minutes before the funeral began on public land approximately 1,000 feet from the church where the funeral was held. The United States Court of Appeals for the Fourth Circuit reversed the verdict, concluding that the protestors' statements were entitled to *First Amendment* protection. Certiorari was granted.

**Overview**

The content of the protestors' signs plainly related to broad issues of interest to society at large, rather than matters of purely private concern. While the messages may have fallen short of refined social or political commentary, the issues they highlighted--the political and moral conduct of the United States and its citizens, the fate of the nation, homosexuality in the military, and scandals involving the Catholic clergy--were matters of public import. The context of the speech and its connection with the funeral did not make the speech a matter of private rather than public concern. Simply put, the protestors had the right to be where they were. They alerted local authorities to their funeral protest and fully complied with police guidance on where the picketing could be staged. The picketing was conducted under police supervision some 1,000 feet from the church, out of the sight of those at the church. The protest was not unruly; there was no shouting, profanity, or violence. Any distress occasioned by the picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself.

**Outcome**

The judgment of the United States Court of Appeals for the Fourth Circuit was affirmed. 8-1 Decision; one concurrence; one dissent.

## Syllabus

**EXHIBIT 43**                                                                    <span style="color:red">EXHIBIT  11</span>

Snyder v. Phelps, 562 U.S. 443

**[\*443] [\*\*\*175] [\*\*1210]**   For the past 20 years, the congregation of the Westboro Baptist Church has picketed military funerals to communicate its belief that God hates the United States for its tolerance of homosexuality, particularly in America's military. The church's picketing has also condemned the Catholic Church for scandals involving its clergy. Fred Phelps, who founded the church, and six Westboro Baptist parishioners (all relatives of Phelps) traveled to Maryland to picket the funeral of Marine Lance Corporal Matthew Snyder, who was killed in Iraq in the line of duty. The picketing took place on public land approximately 1,000 feet from the church where the funeral was held, in accordance with guidance from local law enforcement officers. The picketers peacefully displayed their signs--stating, *e.g.,* "Thank God for Dead Soldiers," "Fags Doom Nations," "America is Doomed," "Priests Rape Boys," and "You're Going to Hell"--for about 30 minutes before the funeral began. Matthew Snyder's father (Snyder), petitioner here, saw the tops of the picketers' signs when driving to the funeral, but did **[\*\*\*\*2]** not learn what was written on the signs until watching a news broadcast later that night.

Snyder filed a diversity action against Phelps, his daughters--who participated in the picketing--and the church (collectively Westboro) alleging, as relevant here, state tort claims of intentional infliction of emotional distress, intrusion upon seclusion **[\*\*\*176]** , and civil conspiracy. A jury held Westboro liable for millions of dollars in compensatory and punitive damages. Westboro challenged the verdict as grossly excessive and sought judgment as a matter of law on the ground that the *First Amendment* fully protected its speech. The District Court reduced the punitive damages award, but left the verdict otherwise intact. The Fourth Circuit reversed, concluding that Westboro's statements were entitled to *First Amendment* protection because those statements were on matters of public concern, were not provably false, and were expressed solely through hyperbolic rhetoric.

*Held:* The *First Amendment* shields Westboro from tort liability for its picketing in this case. *Pp. ___ - ___, 179 L. Ed. 2d, at 180-186*.

 **[\*\*1211]** (a) The Free Speech Clause of the *First Amendment* can serve as a defense in state tort suits, including suits for intentional infliction **[\*\*\*\*3]** of **[\*444]** emotional distress. *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50-51, 108 S. Ct. 876, 99 L. Ed. 2d 41*. Whether the *First Amendment* prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. "[S]peech on public issues occupies the ' "highest rung of the hierarchy of *First Amendment* values" ' and is entitled to special protection." *Connick v. Myers, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708*. Although the boundaries of what constitutes speech on matters of public concern are not well defined, this Court has said that speech is of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *id., at 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708*, or when it "is a subject of general interest and of value and concern to the public," *San Diego v. Roe, 543 U.S. 77, 83-84, 125 S. Ct. 521, 160 L. Ed. 2d 410*. A statement's arguably "inappropriate or controversial character . . . is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson, 483 U.S. 378, 387, 107 S. Ct. 2891, 97 L. Ed. 2d 315*. *Pp. ___ - ___, 179 L. Ed. 2d, at 180-182*.

To determine whether speech is of public or private concern, this Court must independently examine the " 'content, form, and **[\*\*\*\*4]** context' " of the speech " 'as revealed by the whole record.' *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761, 105 S. Ct. 2939, 86 L. Ed. 2d 593*. In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all aspects of the speech. *Pp. ___ - ___, 179 L. Ed. 2d, at 181-182*.

The "content" of Westboro's signs plainly relates to public, rather than private, matters. The placards highlighted issues of public import--the political and moral conduct of the United States and its citizens, the fate of the Nation, homosexuality in the military, and scandals involving the Catholic clergy--and Westboro conveyed its views on those issues in a manner designed to reach as broad a public audience as possible. Even if a few of the signs were viewed as containing messages related to a particular individual, that would not change the fact that the dominant theme of Westboro's demonstration spoke to broader public issues. *P. ___ , 179 L. Ed. 2d, at 182*.

**EXHIBIT 43**                                                                      EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

The "context" of the speech--its connection with Matthew Snyder's funeral--cannot by itself transform the nature of Westboro's speech. The **[\*\*\*177]** signs reflected Westboro's condemnation of much in modern society, and it cannot be argued that Westboro's use of speech on public issues **[\*\*\*\*5]** was in any way contrived to insulate a personal attack on Snyder from liability. Westboro had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of Matthew Snyder, and there can be no serious claim that the picketing did not represent Westboro's honestly held beliefs on public issues. Westboro may have chosen the picket location to increase publicity for its views, and its speech may have been particularly hurtful to Snyder. That does **[\*445]** not mean that its speech should be afforded less than full *First Amendment* protection under the circumstances of this case. *Pp. ____ - ____, 179 L. Ed. 2d, at 182-183*.

That said, " '[e]ven protected speech is not equally permissible in all places and at all times.' *Frisby v. Schultz, 487 U.S. 474, 479, 108 S. Ct. 2495, 101 L. Ed. 2d 420*. Westboro's choice of where and when to conduct its picketing is not beyond the Government's regulatory reach--it is "subject to reasonable time, place, or manner restrictions." *Clark v. Community for [\*\*1212] Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221*. The facts here are quite different, however, both with respect to the activity being regulated and the means of restricting those activities, from the few limited situations where the Court has **[\*\*\*\*6]** concluded that the location of targeted picketing can be properly regulated under provisions deemed content neutral. *Frisby, supra, at 477, 108 S. Ct. 2495, 101 L. Ed. 2d 420*; *Madsen v. Women's Health Center, Inc., 512 U.S. 753, 768, 114 S. Ct. 2516, 129 L. Ed. 2d 593*, distinguished. Maryland now has a law restricting funeral picketing, but that law was not in effect at the time of these events, so this Court has no occasion to consider whether that law is a "reasonable time, place, or manner restrictio[n]" under the standards announced by this Court. *Clark, supra, at 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221*. *Pp. ____ - ____, 179 L. Ed. 2d, at 183-184*.

The "special protection" afforded to what Westboro said, in the whole context of how and where it chose to say it, cannot be overcome by a jury finding that the picketing was "outrageous" for purposes of applying the state law tort of intentional infliction of emotional distress. That would pose too great a danger that the jury would punish Westboro for its views on matters of public concern. For all these reasons, the jury verdict imposing tort liability on Westboro for intentional infliction of emotional distress must be set aside. *Pp. ____ - ____, 179 L. Ed. 2d, at 184-185*.

(b) Snyder also may not recover for the tort of intrusion upon seclusion. He argues that he was a member of a captive audience at his **[\*\*\*\*7]** son's funeral, but the captive audience doctrine--which has been applied sparingly, see *Rowan v. Post Office Dept., 397 U.S. 728, 736-738, 90 S. Ct. 1484, 25 L. Ed. 2d 736*; *Frisby, supra, at 484-485, 108 S. Ct. 2495, 101 L. Ed. 2d 420* --should not be expanded to the circumstances here. Westboro stayed well away from the memorial service, Snyder could see no more than the tops of the picketers' signs, and there is no indication that the picketing interfered with the funeral service itself. *Pp. ____ - ____, 179 L. Ed. 2d, at 185-186*.

(c) Because the *First Amendment* bars Snyder from recovery for intentional infliction of emotional distress **[\*\*\*178]** or intrusion upon seclusion--the allegedly unlawful activity Westboro conspired to accomplish--Snyder also cannot recover for civil conspiracy based on those torts. *P. ____, 179 L. Ed. 2d, at 186*.

(d) Westboro addressed matters of public import on public property, in a peaceful manner, in full compliance with the guidance of local officials. It did not disrupt Matthew Snyder's funeral, and its choice to picket at that time and place did not alter the nature of its speech. **[\*446]** Because this Nation has chosen to protect even hurtful speech on public issues to ensure that public debate is not stifled, Westboro must be shielded from tort liability for its picketing in this case. **[\*\*\*\*8]** Pp. ____ - ____, *179 L. Ed. 2d, at 186*.

*580 F.3d 206*, affirmed.

**Counsel: Sean E. Summers** argued the cause for petitioner.


**Margie J. Phelps** argued the cause for respondents.

**EXHIBIT 43** EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

**Judges:** Roberts, C. J., delivered the opinion of the Court, in which Scalia, Kennedy, Thomas, Ginsburg, Breyer, Sotomayor, and Kagan, JJ., joined. Breyer, J., filed a concurring opinion. Alito, J., filed a dissenting opinion, post, p. ___.

**Opinion by:** ROBERTS

# Opinion

 **[\*447]**  Chief Justice **Roberts** delivered the opinion of the Court.

 **[\*\*1213]** A jury held members of the Westboro Baptist Church liable for millions of dollars in damages for picketing near a soldier's funeral service. The picket signs reflected the church's view that the United States is overly tolerant of sin and that God kills American soldiers as punishment. The question presented is whether the *First Amendment* shields the church members from tort liability for their speech in this case.

 **[\*448]**  I

A

Fred Phelps founded the Westboro Baptist Church in Topeka, Kansas, in 1955. The church's congregation believes that God hates and punishes the United States for its tolerance of homosexuality, particularly in America's military. The church frequently communicates its views by picketing, often at military funerals. In the more than 20 years that the members of Westboro Baptist have publicized their message, they have picketed nearly 600 funerals. Brief for Rutherford  **[\*\*\*\*9]** Institute as *Amicus Curiae* 7, n. 14.

Marine Lance Corporal Matthew Snyder was killed in Iraq in the line of duty. Lance Corporal Snyder's father selected the Catholic church in the Snyders' hometown of Westminster, Maryland, as the site for his son's funeral. Local newspapers provided notice of the time and location of the service.

Phelps became aware of Matthew Snyder's funeral and decided to travel to Maryland with six other Westboro Baptist parishioners (two of his daughters and four of his grandchildren) to picket. On the day of the memorial service, the Westboro congregation members picketed on public land adjacent to public streets near the Maryland State House, the United States Naval Academy, and Matthew Snyder's funeral. The Westboro picketers carried signs that were largely the same at all three locations. They stated, for instance: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You."

The church had notified the authorities **[\*\*\*179]**  in advance of its intent to picket at the time of the funeral, and the  **[\*\*\*\*10]** picketers complied with police instructions in staging their demonstration. The picketing took place within a 10- by 25-foot plot of public land adjacent to a public street, behind a temporary  **[\*449]** fence. App. to Brief for Appellants in No. 08-1026 (CA4), pp. 2282-2285 (hereinafter App.). That plot was approximately 1,000 feet from the church where the funeral was held. Several buildings separated the picket site from the church. *Id.*, at 3758. The Westboro picketers displayed their signs for about 30 minutes before the funeral began and sang hymns and recited Bible verses. None of the picketers entered church property or went to the cemetery. They did not yell or use profanity, and there was no violence associated with the picketing. *Id.*, at 2168, 2371, 2286, 2293.

EXHIBIT 43                                                    EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

The funeral procession passed within 200 to 300 feet of the picket site. Although Snyder testified that he could see the tops of the picket signs as he drove to the funeral, he did not see what was written on the signs until later that night, **[\*\*1214]** while watching a news broadcast covering the event. *Id.*, at 2084-2086.[1]

B

Snyder filed suit against Phelps, Phelps's daughters, and the Westboro Baptist Church (collectively Westboro or the **[\*450]** church) in the United States District Court for the District of Maryland under that court's diversity jurisdiction. Snyder alleged five state tort law claims: defamation, publicity given to private life, intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy. Westboro moved for summary judgment contending, in part, that the church's speech was insulated from liability by the *First Amendment*. See *533 F. Supp. 2d 567, 570 (2008)*.

The District Court awarded Westboro summary judgment on Snyder's claims for defamation and publicity given to private life, concluding that Snyder could not prove the necessary elements of those torts. *Id., at 572-573*. A trial was held on the remaining claims. At trial, Snyder described the severity of his emotional injuries. He testified that he is unable to separate the thought of his dead son from his thoughts of Westboro's picketing, and that he often becomes tearful, angry, and physically ill when he thinks about it. *Id., at 588-589*. **[\*\*\*\*13]** Expert witnesses testified that Snyder's emotional **[\*\*\*180]** anguish had resulted in severe depression and had exacerbated pre-existing health conditions.

A jury found for Snyder on the intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy claims, and held Westboro liable for $2.9 million in compensatory damages and $8 million in punitive damages. Westboro filed several post-trial motions, including a motion contending that the jury verdict was grossly excessive and a motion seeking judgment as a matter of law on all claims on *First Amendment* grounds. The District Court remitted the punitive damages award to $2.1 million, but left the jury verdict otherwise intact. *Id., at 597*.

In the Court of Appeals, Westboro's primary argument was that the church was entitled to judgment as a matter of law because the *First Amendment* fully protected Westboro's speech. The Court of Appeals agreed. *580 F.3d 206, 221 (CA4 2009)*. The court reviewed the picket signs and concluded that Westboro's statements were entitled to *First Amendment* **[\*451]** protection because those statements were on matters of public concern, were not provably false, and were expressed solely through hyperbolic **[\*\*\*\*14]** rhetoric. *Id., at 222-224*.[2]

**[\*\*1215]** We granted certiorari. *559 U.S. 990, 130 S. Ct. 1737, 176 L. Ed. 2d 211 (2010)*.

---

[1] A few weeks after the funeral, one of the picketers posted a message on Westboro's Web site discussing the picketing **[\*\*\*\*11]** and containing religiously oriented denunciations of the Snyders, interspersed among lengthy Bible quotations. Snyder discovered the posting, referred to by the parties as the "epic," during an Internet search for his son's name. The epic is not properly before us and does not factor in our analysis. Although the epic was submitted to the jury and discussed in the courts below, Snyder never mentioned it in his petition for certiorari. See Pet. for Cert. *i* ("Snyder's claim arose out of Phelps' intentional acts *at Snyder's son's funeral*" (emphasis added)); this Court's *Rule 14.1(g)* ([1] petition must contain statement "setting out the facts material to consideration of the question presented"). Nor did Snyder respond to the statement in the opposition to certiorari that "[t]hough the epic was asserted as a basis for the claims at trial, the petition . . . appears to be addressing only claims based on the picketing." Brief in Opposition 9. Snyder devoted only one paragraph in the argument section of his opening merits brief to the epic. Given the foregoing and the fact that an Internet posting may raise distinct issues in this context, we decline to consider the epic in deciding this case. **[\*\*\*\*12]** See *City of Ontario v. Quon, 560 U.S. 746, 759-760, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010)* .

[2] One judge concurred in the judgment on the ground that Snyder had failed to introduce sufficient evidence at trial to support a jury verdict on any of his tort claims. *580 F.3d, at 227* (opinion of Shedd, J.). The Court of Appeals majority determined that the picketers had "voluntarily waived" any such contention on appeal. *Id., at 216*. Like the court below, we proceed on the unexamined premise that respondents' speech was tortious.

EXHIBIT 43

EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

II

[2] To succeed on a claim for intentional infliction of emotional distress in Maryland, a plaintiff must demonstrate that the defendant intentionally or recklessly engaged in extreme and outrageous conduct that caused the plaintiff to suffer severe emotional distress. See *Harris v. Jones, 281 Md. 560, 565-566, 380 A.2d 611, 614 (1977)*. [3] The Free Speech Clause of the *First Amendment* --"Congress shall make no law . . . abridging the freedom of speech"--can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress. See, *e.g., Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50-51, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988)*.[3]

Whether the *First Amendment* prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. [4] "[S]peech on 'matters of public concern' . . . is 'at the heart of the *First Amendment's* **[*452]** protection.' *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758-759, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985)* (opinion of Powell, J.) (quoting *First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 776, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978))*. The *First Amendment* reflects "a profound national commitment to the principle that debate **[***181]** on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*. That is because "speech concerning public affairs is more than self-expression; **[****16]** it is the essence of self-government." *Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964)*. Accordingly, "speech on public issues occupies the highest rung of the hierarchy of *First Amendment* values, and is entitled to special protection." *Connick v. Myers, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)* (internal quotation marks omitted).

" '[N]ot all speech is of equal *First Amendment* importance,' " however, and where matters of purely private significance are at issue, *First Amendment* protections are often less rigorous. *Hustler, supra, at 56, 108 S. Ct. 876, 99 L. Ed. 2d 41* (quoting *Dun & Bradstreet, supra, at 758, 105 S. Ct. 2939, 86 L. Ed. 2d 593*); see *Connick, supra, at 145-147, 103 S. Ct. 1684, 75 L. Ed. 2d 708*. That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: "[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas"; and the "threat of liability" does not pose the risk of "a reaction of self-censorship" on matters of public **[**1216]** import. *Dun & Bradstreet, supra, at 760, 105 S. Ct. 2939, 86 L. Ed. 2d 593* (internal quotation marks omitted).

We noted a short time ago, in considering whether public employee speech addressed a matter of public concern, that **[****17]** "the boundaries of the public concern test are not well defined." *San Diego v. Roe, 543 U.S. 77, 83, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)* (*per curiam*). Although that remains true today, we have articulated some guiding principles, principles that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors.

[5] **[*453]** Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *Connick, supra, at 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708*, or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public," *San Diego, supra, at 83-84, 125 S. Ct. 521, 160 L. Ed. 2d 410*. See *Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 492-494, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975)*; *Time, Inc. v. Hill, 385 U.S. 374, 387-388, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967)*. The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson, 483 U.S. 378, 387, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)*.

---

[3] The dissent attempts to draw parallels between this **[****15]** case and hypothetical cases involving defamation or fighting words. *Post, at ___ - ___, 179 L. Ed. 2d, at 193* (opinion of Alito, J.). But, as the court below noted, there is "no suggestion that the speech at issue falls within one of the categorical exclusions from *First Amendment* protection, such as those for obscenity or 'fighting words.' *580 F.3d, at 218, n. 12*; see *United States v. Stevens, 559 U.S. 460, 468-469, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010)*).

EXHIBIT 43                                                                    EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

Our opinion in *Dun & Bradstreet*, on the other hand, provides an example of speech of only private concern. In that case we held, as a general matter, that information about a particular individual's credit report "concerns **[****18]** no public issue." *472 U.S., at 762, 105 S. Ct. 2939, 86 L. Ed. 2d 593*. The content of the report, we explained, "was speech solely in the individual interest of the speaker and its specific business audience." *Ibid.* That was confirmed by the fact that the particular report was sent to only five subscribers to the reporting service, who were bound not to disseminate it further. *Ibid.* To cite another **[***182]** example, we concluded in *San Diego* v. *Roe* that, in the context of a government employer regulating the speech of its employees, videos of an employee engaging in sexually explicit acts did not address a public concern; the videos "did nothing to inform the public about any aspect of the [employing agency's] functioning or operation." *543 U.S., at 84, 125 S. Ct. 521, 160 L. Ed. 2d 410*.

[6] Deciding whether speech is of public or private concern requires us to examine the " 'content, form, and context' " of that speech, " 'as revealed by the whole record.' *Dun & Bradstreet, supra, at 761, 105 S. Ct. 2939, 86 L. Ed. 2d 593* (quoting *Connick, supra, at 147-148, 103 S. Ct. 1684, 75 L. Ed. 2d 708*). As in other *First Amendment* cases, the court is obligated "to 'make [an independent examination of the whole record'] in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' *Bose Corp. v. Consumers Union of United States, [*454] Inc., 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)* **[****19]** (quoting *New York Times, supra, at 284-286, 84 S. Ct. 710, 11 L. Ed. 2d 686*). In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said.

The "content" of Westboro's signs plainly relates to broad issues of interest to society at large, rather than matters of "purely private concern." *Dun & Bradstreet, supra, at 759, 105 S. Ct. 2939, 86 L. Ed. 2d 593*. The placards read "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Fag Troops," "Semper Fi Fags," "God Hates Fags," "Maryland Taliban," "Fags Doom Nations," "Not Blessed Just **[**1217]** Cursed," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "You're Going to Hell," and "God Hates You." App. 3781-3787. While these messages may fall short of refined social or political commentary, the issues they highlight--the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy--are matters of public import. The signs certainly convey Westboro's position on those issues, in a manner designed, unlike **[****20]** the private speech in *Dun & Bradstreet*, to reach as broad a public audience as possible. And even if a few of the signs--such as "You're Going to Hell" and "God Hates You"--were viewed as containing messages related to Matthew Snyder or the Snyders specifically, that would not change the fact that the overall thrust and dominant theme of Westboro's demonstration spoke to broader public issues.

Apart from the content of Westboro's signs, Snyder contends that the "context" of the speech--its connection with his son's funeral--makes the speech a matter of private rather than public concern. The fact that Westboro spoke in connection with a funeral, however, cannot by itself transform the nature of Westboro's speech. Westboro's signs, displayed on public land next to a public street, reflect the fact that the church finds much to condemn in modern **[*455]** society. Its speech is "fairly characterized as constituting speech on a matter of public concern," *Connick, 461 U.S., at 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708*, and the funeral setting does not alter that conclusion.

Snyder argues that the church **[***183]** members in fact mounted a personal attack on Snyder and his family, and then attempted to "immunize their conduct by claiming **[****21]** that they were actually protesting the United States' tolerance of homosexuality or the supposed evils of the Catholic Church." Reply Brief for Petitioner 10. We are not concerned in this case that Westboro's speech on public matters was in any way contrived to insulate speech on a private matter from liability. Westboro had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of Matthew Snyder, and there can be no serious claim that Westboro's picketing did not represent its "honestly believed" views on public issues. *Garrison, 379 U.S., at 73, 85 S. Ct. 209, 13 L. Ed. 2d 125*. There was no pre-existing relationship or conflict between Westboro and Snyder that might suggest Westboro's speech on public matters was intended to mask an attack on Snyder over a private matter. Contrast *Connick, 461 U.S. at 153, 103 S. Ct. 1684, 75 L. Ed. 2d 708* (finding public employee speech a matter of private concern when it was "no coincidence that [the speech] followed upon the heels of [a] transfer notice" affecting the employee).

EXHIBIT 43

EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

Snyder goes on to argue that Westboro's speech should be afforded less than full *First Amendment* protection "not only because of the words" but also because the church members exploited the **[****22]** funeral "as a platform to bring their message to a broader audience." Brief for Petitioner 44, 40. There is no doubt that Westboro chose to stage its picketing at the Naval Academy, the Maryland State House, and Matthew Snyder's funeral to increase publicity for its views and because of the relation between those sites and its views--in the case of the military funeral, because Westboro believes that God is killing American soldiers as punishment for the Nation's sinful policies.

 **[*456]**  Westboro's choice to convey its views in conjunction with Matthew Snyder's funeral made the expression of those views particularly hurtful to many, especially to Matthew's father. The record **[**1218]**  makes clear that the applicable legal term--"emotional distress"--fails to capture fully the anguish Westboro's choice added to Mr. Snyder's already incalculable grief. But Westboro conducted its picketing peacefully on matters of public concern at a [7] public place adjacent to a public street. Such space occupies a "special position in terms of *First Amendment* protection." *United States v. Grace, 461 U.S. 171, 180, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983)*. "[W]e **[****23]** have repeatedly referred to public streets as the archetype of a traditional public forum," noting that " '[t]ime out of mind' public streets and sidewalks have been used for public assembly and debate." *Frisby v. Schultz, 487 U.S. 474, 480, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988)*.[4]

That said, [8] "[e]ven protected speech is not equally permissible in all places and at all times." *Id., at 479, 108 S. Ct. 2495, 101 L. Ed. 2d 420* (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 799,  [***184] 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985))*. Westboro's choice of where and when to conduct its picketing is not beyond the Government's regulatory reach--it is "subject to reasonable time, place, or manner restrictions" that are consistent with  **[****24]** the standards announced in this Court's precedents. *Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)*. Maryland now has a law imposing restrictions on funeral picketing, *Md. Crim. Law Code Ann. § 10-205* (Lexis Supp. 2010), as do 43 other States and the Federal Government. See Brief for American Legion as *Amicus Curiae* 18-19, n. 2 **[*457]** (listing statutes). To the extent these laws are content neutral, they raise very different questions from the tort verdict at issue in this case. Maryland's law, however, was not in effect at the time of the events at issue here, so we have no occasion to consider how it might apply to facts such as those before us, or whether it or other similar regulations are constitutional.[5]

We have identified a few limited situations where the location of targeted picketing can be regulated under provisions that the Court has determined to be content neutral. In *Frisby*, for example, we upheld a ban on such picketing "before or about" a particular residence, *487 U.S., at 477, 108 S. Ct. 2495, 101 L. Ed. 2d 420*. In *Madsen* v.  **[****25]** *Women's Health Center, Inc.*, we approved an injunction requiring a buffer zone between protesters and an abortion clinic entrance. *512 U.S. 753, 768, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994)*. The facts here are obviously quite different, both with respect to the activity being regulated and the means of restricting those activities.

Simply put, the church members had the right to be where they were. Westboro alerted local authorities to its funeral protest and fully complied with police guidance on where the picketing could be staged. The picketing was conducted under police supervision some 1,000 feet from the church, out of the sight of those at the church. The protest was not unruly; **[**1219]**  there was no shouting, profanity, or violence.

The record confirms that any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. A group of parishioners standing at the very

---

[4] The dissent is wrong to suggest that the Court considers a public street "a free-fire zone in which otherwise actionable verbal attacks are shielded from liability." *Post, at ___ - ___, 179 L. Ed. 2d, at 193*. The fact that Westboro conducted its picketing adjacent to a public street does not insulate the speech from liability, but instead heightens concerns that what is at issue is an effort to communicate to the public the church's views on matters of public concern. That is why our precedents so clearly recognize the special significance of this traditional public forum.

[5] The Maryland law prohibits picketing within 100 feet of a funeral service or funeral procession; Westboro's picketing would have complied with that restriction.

EXHIBIT 43                                                                                EXHIBIT  11

Snyder v. Phelps, 562 U.S. 443

spot where Westboro stood, holding signs that said "God Bless America" and "God Loves You," would not have been subjected to liability. It was what Westboro said that exposed it to tort damages.

 **[\*458]**  Given that Westboro's speech was at a public place on a matter of public  **[\*\*\*\*26]** concern, that speech is entitled to "special protection" under the *First Amendment*. Such speech cannot be restricted simply because it is upsetting or arouses contempt. "If there is a bedrock principle underlying the *First Amendment*, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)*. Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American* **[\*\*\*185]**  *Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 574, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)*.

The jury here was instructed that it could hold Westboro liable for intentional infliction of emotional distress based on a finding that Westboro's picketing was "outrageous." "Outrageousness," however, is a highly malleable standard with "an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." *Hustler, 485 U.S., at 55, 108 S. Ct. 876, 99 L. Ed. 2d 41* (internal quotation marks omitted). In a case such as this, a jury is "unlikely  **[\*\*\*\*27]** to be neutral with respect to the content of [the] speech," posing "a real danger of becoming an instrument for the suppression of . . . 'vehement, caustic, and sometimes unpleasan[t]' " expression. *Bose Corp., 466 U.S., at 510, 104 S. Ct. 1949, 80 L. Ed. 2d 502* (quoting *New York Times, 376 U.S., at 270, 84 S. Ct. 710, 111 L. Ed. 2d 686*). Such a risk is unacceptable; "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the *First Amendment*." *Boos v. Barry, 485 U.S. 312, 322, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988)* (some internal quotation marks omitted). What Westboro said, in the whole context of how and where it chose to say it, is entitled to "special protection" under the *First Amendment*, and that protection cannot be overcome by a jury finding that the picketing was outrageous.

 **[\*459]**  For all these reasons, the jury verdict imposing tort liability on Westboro for intentional infliction of emotional distress must be set aside.

III

The jury also found Westboro liable for the state law torts of intrusion upon seclusion and civil conspiracy. The Court of Appeals did not examine these torts independently of the intentional infliction of emotional distress tort. Instead, the Court of Appeals reversed  **[\*\*\*\*28]** the District Court wholesale, holding that the judgment wrongly "attache[d] tort liability to constitutionally protected speech." *580 F.3d, at 226*.

Snyder argues that even assuming Westboro's speech is entitled to *First Amendment* protection generally, the church is not immunized from liability for intrusion upon seclusion because Snyder was a member of a captive audience at his **[\*\*1220]**  son's funeral. Brief for Petitioner 45-46. We do not agree. [9] In most circumstances, "the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes." *Erznoznik v. Jacksonville, 422 U.S. 205, 210-211, 95 S. Ct. 2268, 45 L. Ed. 2d 125 (1975)* (internal quotation marks omitted). As a result, "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen v. California, 403 U.S. 15, 21, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971)*.

As a general  **[\*\*\*\*29]** matter, we have applied the captive audience doctrine only sparingly to protect unwilling  **[\*\*\*186]** listeners from protected speech. For example, we have upheld a statute allowing a homeowner to restrict the delivery of offensive mail to his home, see *Rowan v. Post Office Dept., 397 U.S. 728, 736-738, 90 S. Ct. 1484, 25 L. Ed. 2d 736 (1970)*, and an ordinance prohibiting picketing **[\*460]** "before or about" any individual's residence, *Frisby, 487 U.S., at 477, 484-485, 108 S. Ct. 2495, 101 L. Ed. 2d 420*.

204

EXHIBIT 43                                                                    EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

Here, Westboro stayed well away from the memorial service. Snyder could see no more than the tops of the signs when driving to the funeral. And there is no indication that the picketing in any way interfered with the funeral service itself. We decline to expand the captive audience doctrine to the circumstances presented here.

Because we find that the *First Amendment* bars Snyder from recovery for intentional infliction of emotional distress or intrusion upon seclusion--the alleged unlawful activity Westboro conspired to accomplish--we must likewise hold that Snyder cannot recover for civil conspiracy based on those torts.

IV

Our holding today is narrow. We are required in *First Amendment* cases to carefully review the record, and the reach of our opinion here is limited by the **[****30]** particular facts before us. As we have noted, "the sensitivity and significance of the interests presented in clashes between *First Amendment* and [state law] rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Florida Star v. B. J. F., 491 U.S. 524, 533, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (1989)*.

Westboro believes that America is morally flawed; many Americans might feel the same about Westboro. Westboro's funeral picketing is certainly hurtful and its contribution to public discourse may be negligible. But Westboro addressed matters of public import on public property, in a peaceful manner, in full compliance with the guidance of local officials. The speech was indeed planned to coincide with Matthew Snyder's funeral, but did not itself disrupt that funeral, and Westboro's choice to conduct its picketing at that time and place did not alter the nature of its speech.

Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and--as it did here-- **[*461]** inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course--to protect even hurtful **[****31]** speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.

 **[**1221]** The judgment of the United States Court of Appeals for the Fourth Circuit is affirmed.

It is so ordered.

**Concur by:** BREYER

## Concur

Justice **Breyer**, concurring.

I agree with the Court and join its opinion. That opinion restricts its analysis here to the matter raised in the petition for certiorari, namely, Westboro's picketing activity. The opinion does not examine in depth the effect of television broadcasting. Nor does it say anything about Internet postings. The Court holds that the **[***187]** *First Amendment* protects the picketing that occurred here, primarily because the picketing addressed matters of "public concern."

While I agree with the Court's conclusion that the picketing addressed matters of public concern, I do not believe that our *First Amendment* analysis can stop at that point. A State can sometimes regulate picketing, even picketing on matters of public concern. See *Frisby v. Schultz, 487 U.S. 474, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988)*. Moreover, suppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity **[****32]** to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means. And in some circumstances the use of certain words as means would be similarly unprotected. See *Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)* ("fighting words").

EXHIBIT 43                                                                    EXHIBIT  11

Snyder v. Phelps, 562 U.S. 443

The dissent recognizes that the means used here consist of speech. But it points out that the speech, like an assault, seriously harmed a private individual. Indeed, the state **[\*462]** tort of "intentional infliction of emotional distress" forbids only conduct that produces distress "so severe that no reasonable man could be expected to endure it," and which itself is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Post, at        -     , 179 L. Ed. 2d, at 188-189* (opinion of Alito, J.) (quoting *Harris v. Jones, 281 Md. 560, 567, 571, 380 A.2d 611, 614, 616 (1977)*; internal quotation marks omitted)*.* The dissent requires us to ask whether our holding unreasonably limits liability for intentional infliction of emotional distress--to the point where A (in order **[\*\*\*\*33]** to draw attention to his views on a public matter) might launch a verbal assault upon B, a private person, publicly revealing the most intimate details of B's private life, while knowing that the revelation will cause B severe emotional harm. Does our decision leave the State powerless to protect the individual against invasions of, *e.g.*, personal privacy, even in the most horrendous of such circumstances?

As I understand the Court's opinion, it does not hold or imply that the State is always powerless to provide private individuals with necessary protection. Rather, the Court has reviewed the underlying facts in detail, as will sometimes prove necessary where *First Amendment* values and state-protected (say, privacy-related) interests seriously conflict. Cf. *Florida Star v. B. J. F., 491 U.S. 524, 533, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (1989)*; *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)*. That review makes clear that Westboro's means of communicating its views consisted of picketing in a place where picketing was lawful and in compliance with all police directions. The picketing could not be seen or heard from the funeral ceremony itself. And Snyder testified that he saw no more than **[\*\*\*\*34]** the tops of the picketers' signs as he drove to the **[\*\*1222]** funeral. To uphold the application of state law in these circumstances would punish Westboro for seeking to communicate its views on matters of public **[\*463]** concern without proportionately advancing the State's interest in protecting its citizens against severe **[\*\*\*188]** emotional harm. Consequently, the *First Amendment* protects Westboro. As I read the Court's opinion, it holds no more.

**Dissent by:** ALITO

# Dissent

Justice **Alito**, dissenting.

Our profound national commitment to free and open debate is not a license for the vicious verbal assault that occurred in this case.

Petitioner Albert Snyder is not a public figure. He is simply a parent whose son, Marine Lance Corporal Matthew Snyder, was killed in Iraq. Mr. Snyder wanted what is surely the right of any parent who experiences such an incalculable loss: to bury his son in peace. But respondents, members of the Westboro Baptist Church, deprived him of that elementary right. They first issued a press release and thus turned Matthew's funeral into a tumultuous media event. They then appeared at the church, approached as closely as they could without trespassing, and launched a malevolent verbal attack on Matthew and his family **[\*\*\*\*35]** at a time of acute emotional vulnerability. As a result, Albert Snyder suffered severe and lasting emotional injury.[1] The Court now holds that the *First Amendment* protected respondents' right to brutalize Mr. Snyder. I cannot agree.

I

Respondents and other members of their church have strong opinions on certain moral, religious, and political issues, and the *First Amendment* ensures that they have almost limitless opportunities to express their views. They may write

---

[1] See *580 F.3d 206, 213-214, 216 (CA4 2009)*.

**EXHIBIT 43**                                                                 EXHIBIT  11

Snyder v. Phelps, 562 U.S. 443

and distribute books, articles, and other texts; they may create and disseminate video and audio recordings; they may circulate petitions; they may speak to individuals and groups in public forums and in any private venue that **[\*464]** wishes to accommodate them; they may picket peacefully in countless locations; they may appear on television and speak on the radio; they may post messages on the Internet and send out e-mails. And they may express their views in terms that are "uninhibited," "vehement," and "caustic." *New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*.

It does not follow, however, that they may intentionally inflict severe emotional injury on private persons at a time **[\*\*\*\*36]** of intense emotional sensitivity by launching vicious verbal attacks that make no contribution to public debate. To protect against such injury, "most if not all jurisdictions" permit recovery in tort for the intentional infliction of emotional distress (or IIED). *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 53, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988)*.

This is a very narrow tort with requirements that "are rigorous, and difficult to satisfy." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 12, p. 61 (5th ed. 1984). To recover, a plaintiff must show that the conduct at issue caused harm that was truly severe. See *Figueiredo-Torres v. Nickel, 321 Md. 642, 653, 584 A.2d 69, 75 (1991)* ("[R]ecovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves" (internal quotation marks omitted)); *Harris v. Jones, 281 Md. 560, 571, 380 A.2d 611, 616 (1977)* (the distress must be " 'so severe that no reasonable man could be expected to endure it' " **[\*\*1223]** (quoting **[\*\*\*189]** *Restatement (Second) of Torts § 46, Comment j* (1963-1964))).

A plaintiff must also establish that the defendant's conduct was " 'so outrageous in character, and so extreme in degree, **[\*\*\*\*37]** as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' *Harris, supra, at 567, 380 A. 2d, at 614* (quoting *Restatement (Second) of Torts § 46, Comment d*).

Although the elements of the IIED tort are difficult to meet, respondents long ago abandoned any effort to show **[\*465]** that those tough standards were not satisfied here. On appeal, they chose not to contest the sufficiency of the evidence. See *580 F.3d 206, 216 (CA4 2009)*. They did not dispute that Mr. Snyder suffered " 'wounds that are truly severe and incapable of healing themselves.' *Figueiredo-Torres, supra, at 653, 584 A. 2d, at 75*. Nor did they dispute that their speech was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' *Harris, supra, at 567, 380 A. 2d, at 614*. Instead, they maintained that the *First Amendment* gave them a license to engage in such conduct. They are wrong.

II

It is well established that a claim for the intentional infliction of emotional distress can be satisfied by speech. Indeed, what has been described as "[t]he **[\*\*\*\*38]** leading case" recognizing this tort involved speech. Prosser and Keeton, *supra,* § 12, at 60 (citing *Wilkinson* v. *Downton*, [1897] 2 Q. B. 57); see also *Restatement (Second) of Torts § 46, Illustration 1*. And although this Court has not decided the question, I think it is clear that the *First Amendment* does not entirely preclude liability for the intentional infliction of emotional distress by means of speech.

This Court has recognized that words may "by their very utterance inflict injury" and that the *First Amendment* does not shield utterances that form "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)*; see also *Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S. Ct. 900, 84 L. Ed. 1213 (1940)* ("[P]ersonal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution"). When grave injury is intentionally inflicted by **[\*466]** means of an attack like the one at issue here, the *First Amendment* should not interfere with recovery.

III

**EXHIBIT 43**                                                                   **EXHIBIT  11**

Snyder v. Phelps, 562 U.S. 443

In this case, respondents brutally  [****39] attacked Matthew Snyder, and this attack, which was almost certain to inflict injury, was central to respondents' well-practiced strategy for attracting public attention.

On the morning of Matthew Snyder's funeral, respondents could have chosen to stage their protest at countless locations. They could have picketed the United States Capitol, the White House, the Supreme Court, the Pentagon, or any of the more than 5,600 military recruiting stations in this country. They could have returned to the Maryland State House  [***190] or the United States Naval Academy, where they had been the day before. They could have selected any public road where pedestrians are allowed. (There are more than 4,000,000 miles of public roads in the [**1224]  United States.[2] ) They could have staged their protest in a public park. (There are more than 20,000 public parks in this country.[3] ) They could have chosen any Catholic church where no funeral was taking place. (There are nearly 19,000 Catholic churches in the United States.[4] ) But of course, a small group picketing at any of these locations would have probably gone unnoticed.

The Westboro Baptist Church, however, has devised a strategy that remedies this problem. As the Court notes, church members have protested at nearly 600 military funerals. *Ante, at ___, 179 L. Ed. 2d, at 178*. They have also picketed the funerals of  [*467]  police officers,[5] firefighters,[6] and the victims of natural disasters,[7] accidents,[8] and shocking crimes.[9] And in advance of these protests, they issue press releases to ensure that their protests will attract public attention.[10]

This strategy works because it is expected that respondents' verbal assaults will wound the family and friends of the deceased and because the media is irresistibly drawn to the sight of persons who are visibly in grief. The more outrageous the funeral protest, the more publicity the Westboro Baptist Church is able to obtain. Thus, when the church recently announced its intention to picket the funeral of a 9-year-old girl killed in the shooting spree in Tucson--proclaiming that she was "better off dead"[11] --their announcement was national news,[12] and the church was able to

---

[2] See Dept. of Transp., Federal Highway Administration, Highway Statistics 2008, Table HM-12M,  [****40] http://www.fhwa.dot.gov/policyinformation/statistics/2008/hm12m.cfm (all Internet materials as visited Feb. 25, 2011, and available in Clerk of Court's case file).

[3] See Trust for Public Land, 2010 City Park Facts, http://www.tpl.org/content_documents/CityParkFacts_2010.pdf.

[4] See United States Conference of Catholic Bishops, Catholic Information Project, http://www.usccb.org/comm/cip.shtml#toc4.

[5] See http://www.godhatesfags.com/fliers/20110124_St-Petersburg-FL-Dead-Police.pdf.

[6] See http: //www.godhatesfags.com/fliers/20110120_Dead-Volunteer-Firefighter-Connecting_the_Dots-Baltimore-MD.pdf.

[7] See http://www.godhatesfags.com/fliers/20110104_Newburg-and-Rolla-MO-Tornado-Connecting-the-Dots.pdf.

[8] See http://www.godhatesfags.com/fliers/20101218_Wichita-KS-Two-Dead-Wichita-Bikers.pdf.

[9] See  [****41] http://www.godhatesfags.com/fliers/20110129_Tampa-FL-God-Sent-Military-Mom-Shooter-to-Kill-Kids.pdf.

[10] See nn. 5-9, *supra*.

[11] See http://www.godhatesfags.com/fliers/20110109_AZ-Shooter-Connecting-the-Dots-Day-2.pdf.

[12] See, *e.g.,* Stanglin, Anti-Gay Church Group Plans To Picket Tucson Funerals, USA Today, Jan. 10, 2011, http://content.usatoday.com/communities/ondeadline/post/2011/01/anti-gay-church-group-plans-to-picket-tucston-funerals/1;  [****42] Mohanani, Group To Picket 9-Year-Old Tucson Victim's Funeral, Palm Beach Post, Jan. 11, 2011, http://www.palmbeachpost.com/news/nation/group-to-picket-9-year-old-tucson-victims-1177921.html; Mehta & Santa Cruz, Tucson Rallies To Protect Girl's Family From Protesters, L. A. Times, Jan. 11, 2011, http://articles.latimes.com/2011/jan/11/nation/la-na-funeral-protest-20110112; Medrano, Funeral Protest: Arizona Rallies To Foil Westboro Baptist Church, Christian Science Monitor, Jan. 11, 2011, http://www.csmonitor.com/USA/2011/0111/Funeral-protest-Arizona-rallies-to-foil-Westboro-Baptist-Church.

Snyder v. Phelps, 562 U.S. 443

obtain **[*468]** free air time on the radio in exchange for canceling its **[***191]** protest.[13] Similarly, **[**1225]** in 2006, the church got air time on a talk radio show in exchange for canceling its threatened protest at the funeral of five Amish girls killed by a crazed gunman.[14]

In this case, respondents implemented the Westboro Baptist Church's publicity-seeking strategy. Their press release stated that they were going "to picket the funeral of Lance Cpl. Matthew A. Snyder" because "God **[****43]** Almighty killed Lance Cpl. Snyder. He died in shame, not honor--for a fag nation cursed by God . . . . Now in Hell--sine die." Supp. App. in No. 08-1026 (CA4), p. 158a. This announcement guaranteed that Matthew's funeral would be transformed into a raucous media event and began the wounding process. It is well known that anticipation may heighten the effect of a painful event.

On the day of the funeral, respondents, true to their word, displayed placards that conveyed the message promised in their press release. Signs stating "God Hates You" and "Thank God for Dead Soldiers" reiterated the message that God had caused Matthew's death in retribution for his sins. App. to Brief for Appellants in No. 08-1026 (CA4), pp. 3787, 3788 (hereinafter App.). Others, stating "You're Going to Hell" and "Not Blessed Just Cursed," conveyed the message that Matthew was "in Hell--sine die." *Id.,* at 3783.

Even if those who attended the funeral were not alerted in advance about respondents' intentions, the meaning of these signs would not have been missed. Since respondents chose to stage their protest at Matthew Snyder's funeral and not **[*469]** at any of the other countless available venues, a reasonable **[****44]** person would have assumed that there was a connection between the messages on the placards and the deceased. Moreover, since a church funeral is an event that naturally brings to mind thoughts about the afterlife, some of respondents' signs--*e.g.*, "God Hates You," "Not Blessed Just Cursed," and "You're Going to Hell"--would have likely been interpreted as referring to God's judgment of the deceased.

Other signs would most naturally have been understood as suggesting--falsely--that Matthew was gay. Homosexuality was the theme of many of the signs. There were signs reading "God Hates Fags," "Semper Fi Fags," "Fags Doom Nations," and "Fag Troops." *Id.*, at 3781-3787. Another placard depicted two men engaging in anal intercourse. A reasonable bystander seeing those signs would have likely concluded that they were meant to suggest that the deceased was a homosexual.

After the funeral, the Westboro picketers reaffirmed the meaning of their protest. They posted an online account entitled "The Burden of Marine Lance Cpl. Matthew A. Snyder. The Visit of Westboro Baptist Church to Help the Inhabitants of Maryland **[***192]** Connect the Dots!" *Id.,* at 3788.[15] Belying any suggestion that **[**1226]** they had simply **[****45]** made general comments about homosexuality, the Catholic Church, and the **[*470]** United States military, the "epic" addressed the Snyder family directly:

---

[13] See Santa Cruz & Mehta, Westboro Church Agrees Not To Take Protest to Shooting Victims' Funerals, L. A. Times, Jan. 13, 2011,                                          http://articles.latimes.com/2011/jan/13/nation/la-na-funeral-protest-20110113; http://www.godhatesfags.com/fliers/20110112_AZ-Shooter-Mike-Gallagher-Radio-Exchange.pdf.

[14] See Steinberg, Air Time Instead of Funeral Protest, N. Y. Times, Oct. 6, 2006, p. A14.

[15] The Court refuses to consider the epic because it was not discussed in Snyder's petition for certiorari. *Ante, at ___, n. 1, 179 L. Ed. 2d, at 179*. The epic, however, is not a distinct claim but a piece of evidence that the jury considered in imposing liability for the claims now before this Court. The protest and the epic are parts of a single course of conduct that the jury found to constitute intentional infliction of emotional distress. See *580 F.3d, at 225* ("[T]he Epic cannot be divorced from the general context of the funeral protest"). The Court's strange insistence that the epic "is not properly before us," *ante, at ___, n. 1, 179 L. Ed. 2d, at 179*, means that the Court has not actually made "an independent examination of the whole record," *ante, at ___, 179 L. Ed. 2d, at 182* (internal quotation marks omitted). And the Court's refusal to consider the epic contrasts sharply with its willingness to take notice of Westboro's protest activities at other times and locations. See *ante, at ___, 179 L. Ed. 2d, at 182*.

**EXHIBIT 43**                                                                              EXHIBIT  11

Snyder v. Phelps, 562 U.S. 443

"God blessed you, Mr. and Mrs. Snyder, with a resource and his name was Matthew. He was an arrow in your quiver! In thanks to God for the comfort the child could bring you, you had a DUTY to prepare that child to serve the LORD his GOD--PERIOD! You did JUST THE OPPOSITE--you raised him for the devil.

. . . . .

"Albert and Julie RIPPED that body apart and taught Matthew to defy his Creator, to divorce, and to commit adultery. They taught him how to support the largest pedophile machine in the history of the entire world, the Roman Catholic monstrosity. Every dime they gave the Roman Catholic monster they condemned their own souls. They also, in supporting satanic Catholicism, taught Matthew to be an idolater.

. . . . .

"Then after all that they sent him to fight for the United States of Sodom, a filthy country that is in lock step with his evil, wicked, and sinful manner of life, putting him in the cross hairs of a God that is so mad He has smoke coming from his nostrils and fire from his mouth! How dumb was that?" *Id.,* at 3791.

 **[****46]** In light of this evidence, it is abundantly clear that respondents, going far beyond commentary on matters of public concern, specifically attacked Matthew Snyder because (1) he was a Catholic and (2) he was a member of the United States military. Both Matthew and petitioner were private  **[****47]** figures,[16] and this attack was not speech on a matter of public concern. While commentary on the Catholic Church or the United States military constitutes speech on matters of public concern, speech regarding Matthew Snyder's purely private conduct does not.

 **[*471]**  Justice Breyer provides an apt analogy to a case in which the *First Amendment* would permit recovery in tort for a verbal attack:

   "[S]uppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means. And in some circumstances the use of certain words as means would be similarly **[***193]**  unprotected." *Ante, at ___, 179 L. Ed. 2d, at 187* (concurring opinion).

This captures what respondents did in this case. Indeed, this is the strategy that they have routinely employed--and that they will now continue to employ--inflicting severe and lasting emotional injury on an ever growing list of innocent victims.

IV

The Court concludes that respondents' speech was protected by the *First Amendment* for essentially  **[****48]** three reasons, but none is sound.

First--and most important--the Court finds that "the overall thrust and dominant theme of [their] demonstration spoke to" broad public issues. *Ante, at ___, 179 L. Ed. 2d, at 182*. As I have attempted to show, this portrayal is quite inaccurate; respondents' attack on **[**1227]**  Matthew was of central importance. But in any event, I fail to see why actionable speech should be immunized simply because it is interspersed with speech that is protected. The *First Amendment* allows recovery for defamatory statements that are interspersed with nondefamatory statements on matters of public concern, and there is no good reason why respondents' attack on Matthew Snyder and his family should be treated differently.

Second, the Court suggests that respondents' personal attack on Matthew Snyder is entitled to *First Amendment* protection because it was not motivated by a private grudge,  **[*472]**  see *ante, at ___, 179 L. Ed. 2d, at 182*, but I see no basis for the strange distinction that the Court appears to draw. Respondents' motivation--"to increase publicity

[16] See *533 F. Supp. 2d 567, 577 (Md. 2008)*.

EXHIBIT 43                                          EXHIBIT 11

Snyder v. Phelps, 562 U.S. 443

for its views," *ibid.*--did not transform their statements attacking the character of a private figure into statements that made a contribution to debate on matters of public **[****49]** concern. Nor did their publicity-seeking motivation soften the sting of their attack. And as far as culpability is concerned, one might well think that wounding statements uttered in the heat of a private feud are less, not more, blameworthy than similar statements made as part of a cold and calculated strategy to slash a stranger as a means of attracting public attention.

Third, the Court finds it significant that respondents' protest occurred on a public street, but this fact alone should not be enough to preclude IIED liability. To be sure, statements made on a public street may be less likely to satisfy the elements of the IIED tort than statements made on private property, but there is no reason why a public street in close proximity to the scene of a funeral should be regarded as a free-fire zone in which otherwise actionable verbal attacks are shielded from liability. If the *First Amendment* permits the States to protect their residents from the harm inflicted by such attacks--and the Court does not hold otherwise--then the location of the tort should not be dispositive. A physical assault may occur without trespassing; it is no defense that the perpetrator had "the right **[****50]** to be where [he was]." See *ante, at ____, 179 L. Ed. 2d, at 184*. And the same should be true with respect to unprotected speech. Neither classic "fighting words" nor defamatory statements are immunized when they occur in a public place, and there is no good reason to treat a verbal assault based on the conduct or character of a private figure like Matthew Snyder any differently.

One final comment about the opinion **[***194]** of the Court is in order. The Court suggests that the wounds inflicted by vicious verbal assaults at funerals will be prevented or at least mitigated in the future by new laws that restrict picketing **[*473]** within a specified distance of a funeral. See *ante, at     -     , 179 L. Ed. 2d, at 183-184*. It is apparent, however, that the enactment of these laws is no substitute for the protection provided by the established IIED tort; according to the Court, the verbal attacks that severely wounded petitioner in this case complied with the new Maryland law regulating funeral picketing. See *ante, at ____, 179 L. Ed. 2d, at 184, n. 5*. And there is absolutely nothing to suggest that Congress and the state legislatures, in enacting these laws, intended them to displace the protection provided by the well-established IIED tort.

The real significance of these new laws is **[****51]** not that they obviate the need for IIED protection. Rather, their enactment dramatically illustrates the fundamental point that funerals are unique events at which special protection against emotional assaults is in order. At funerals, the emotional well-being of bereaved relatives is particularly vulnerable. See *National Archives and Records Admin. v. Favish, 541 U.S. 157, 168, 124 S. Ct. 1570, 158 L. Ed. 2d [**1228] 319 (2004)*. Exploitation of a funeral for the purpose of attracting public attention "intrud[es] upon their . . . grief," *ibid.*, and may permanently stain their memories of the final moments before a loved one is laid to rest. Allowing family members to have a few hours of peace without harassment does not undermine public debate. I would therefore hold that, in this setting, the *First Amendment* permits a private figure to recover for the intentional infliction of emotional distress caused by speech on a matter of private concern.

V

In reversing the District Court judgment in favor of petitioner, the Court of Appeals relied on several grounds not discussed in the opinion of this Court or in the separate opinion supporting affirmance. I now turn briefly to those issues.

First, the Court of Appeals held that the District **[****52]** Court erred by allowing the jury to decide whether respondents' speech was " 'directed specifically at the Snyder family.' **[*474]** *580 F.3d, at 221*. It is not clear whether the Court of Appeals thought that this was a question for the trial judge alone or a question on which the judge had to make a preliminary ruling before sending it to the jury. In either event, however, the submission of this question to the jury was not reversible error because, as explained above, it is clear that respondents' statements targeted the Snyders.

Second, the Court of Appeals held that the trial judge went astray in allowing the jury to decide whether respondents' speech was so " 'offensive and shocking as to not be entitled to *First Amendment* protection.' " *Ibid.* This instruction also did respondents no harm. Because their speech did not relate to a matter of public concern, it was not protected

from liability by the *First Amendment*, and the only question for the jury was whether the elements of the IIED tort were met.

Third, the Court of Appeals appears to have concluded that the *First Amendment* does not permit an IIED **[***195]** plaintiff to recover for speech that cannot reasonably be interpreted as stating actual facts **[****53]** about an individual. See *id., at 222*. In reaching this conclusion, the Court of Appeals relied on two of our cases--*Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)*, and *Hustler, 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41* --but neither supports the broad proposition that the Court of Appeals adopted.

*Milkovich* was a defamation case, and falsity is an element of defamation. Nothing in *Milkovich* even hints that the *First Amendment* requires that this defamation element be engrafted onto the IIED tort.

*Hustler* did involve an IIED claim, but the plaintiff there was a public figure, and the Court did not suggest that its holding would also apply in a case involving a private figure. Nor did the Court suggest that its holding applied across the board to all types of IIED claims. Instead, the holding was limited to "publications such as the one here at issue," namely, a caricature in a magazine. *485 U.S., at 56, 108 S. Ct. 876, 99 L. Ed. 2d 41*. Unless a caricature of a public figure can reasonably be interpreted **[*475]** as stating facts that may be proved to be wrong, the caricature does not have the same potential to wound as a personal verbal assault on a vulnerable private figure.

Because I cannot agree either with the holding of this Court or the other grounds **[****54]** on which the Court of Appeals relied, I would reverse the decision below and remand for further proceedings.[17]

 **[**1229]** VI

Respondents' outrageous conduct caused petitioner great injury, and the Court now compounds that injury by depriving petitioner of a judgment that acknowledges the wrong he suffered.

In order to have a society in which public issues can be openly and vigorously debated, it is not necessary to allow the brutalization of innocent victims like petitioner. I therefore respectfully dissent.

# References

U.S.C.S., *Constitution, Amendment 1*

15 *Moore's Federal Practice § 101.61* (Matthew Bender 3d Ed.)

L Ed Digest, Constitutional Law §§934, 937, 938, 964

L Ed Index, Picketing

Supreme Court's Construction And Application Of *Supreme Court Rule 14* (And Similar Predecessor Provisions), Prescribing Requirements **[****55]**  Of Petition For Certiorari. *118 L. Ed. 2d 665*.

Governmental Regulation Of Nonlabor Picketing As Violating Freedom Of Speech Or Press Under *Federal Constitution's First Amendment*--Supreme Court Cases. *101 L. Ed. 2d 1052*.

Progeny Of New York Times V. Sullivan In The Supreme Court. *61 L. Ed. 2d 975*.

Supreme Court's Views As To The Federal Legal Aspects Of The Right Of Privacy. *43 L. Ed. 2d 871*.

---

[17] The Court affirms the decision of the Fourth Circuit with respect to petitioner's claim of intrusion upon seclusion on a ground not addressed by the Fourth Circuit. I would not reach out to decide that issue but would instead leave it for the Fourth Circuit to decide on remand. I would likewise allow the Fourth Circuit on remand to decide whether the judgment on the claim of civil conspiracy can survive in light of the ultimate disposition of the IIED and intrusion upon seclusion claims.

**EXHIBIT 43**   EXHIBIT  11

Snyder v. Phelps, 562 U.S. 443

The Supreme Court And The Right Of Free Speech And Press. *93 L. Ed. 1151*, *2 L. Ed. 2d 1706*, *11 L. Ed. 2d 1116*, *16 L. Ed. 2d 1053*, *21 L. Ed. 2d 976*.

---

**End of Document**

**EXHIBIT 43**                                                                      EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

## *Bose Corp. v. Consumers Union*

Supreme Court of the United States

November 8, 1983, Argued ; April 30, 1984, Decided

No. 82-1246

**Reporter**

466 U.S. 485 *; 104 S. Ct. 1949 **; 80 L. Ed. 2d 502 ***; 1984 U.S. LEXIS 73 ****; 52 U.S.L.W. 4513; 38 Fed. R. Serv. 2d (Callaghan) 1421; 10 Media L. Rep. 1625

BOSE CORP. v. CONSUMERS UNION OF UNITED STATES, INC.

**Subsequent History:  [****1]**  Petition For Rehearing Denied June 25, 1984.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT.

**Disposition:**  *692 F.2d 189*, affirmed.

## Case Summary

**Procedural Posture**

Petitioner sought review of the judgment of the United States Court of Appeals for the First Circuit which had reversed the district court's judgment in petitioner's favor. The court of appeals held that it was not bound to apply the clearly erroneous standard of *Fed. R. Civ. P. 52(a)* and concluded that actual malice had not been proven in the defamation action.

**Overview**

Petitioner sought recovery for defamatory statements made by respondent magazine about petitioner's product. The district court found that petitioner's claims of product disparagement succeeded based upon clear and convincing evidence. The court of appeals determined that it was not bound by the clearly erroneous standard set forth in *Fed. R. Civ. P. 52(a)* and applied de novo review, concluding that actual malice had not been demonstrated, as required of public figures in defamation actions, and reversed the judgment. On the Supreme Court's grant of certiorari, the judgment was affirmed, ruling that the appellate court was bound to make an independent examination of the record to be certain that *U.S. Const. amend. I* had not been infringed upon and that such an examination was consistent with the aims of *Rule 52(a)*. Furthermore, the presumption of correctness attending factual findings was stronger in some cases and such a presumption was substantially lessened in cases where the appellate court must conduct an independent review, as in this instance. Lastly, the court held that appellate judges could determine whether the record established actual malice with convincing clarity.

**Outcome**

The judgment in favor of respondent was affirmed. The appellate court was bound to make an independent examination of the record to be certain that the *First Amendment* had not been infringed upon. Hence, its reassessment of whether actual malice accompanied respondent's disparaging statements about petitioner's product was not improper and the appellate court was not bound to apply the clearly erroneous standard to its determination.

## Syllabus

214

EXHIBIT 43                                                              EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

Respondent published an article in its magazine evaluating the quality of numerous brands of loudspeaker systems, including one marketed by petitioner.  Petitioner objected to statements in the article about its system, including one to the effect that the sound of individual musical instruments tended to wander "about the room." When respondent refused to publish a retraction, petitioner filed a product disparagement action in Federal District Court.  The court ruled that petitioner was a "public figure" and that therefore, pursuant to the *First Amendment* as interpreted in *New York Times Co. v. Sullivan, 376 U.S. 254*, to recover petitioner must prove by clear and convincing evidence that respondent made a false disparaging statement with "actual malice." **[****2]**  Entering judgment for petitioner, the court found, based primarily on the testimony of the article's author (respondent's employee), that the article contained a false statement of "fact," because the sound of instruments heard through the speakers tended to wander "along the wall" between the speakers, rather than "about the room" as reported by respondent; that the author's testimony that the challenged statement was intended to mean "along the wall" was not credible; and that the statement was disparaging. On the basis of what it considered to be clear and convincing proof, the court concluded that petitioner had sustained its burden of proving that respondent had published the false statement with knowledge that it was false or with reckless disregard of its truth or falsity. The Court of Appeals reversed, holding that its review of the "actual malice" determination was not limited to the "clearly erroneous" standard of *Federal Rule of Civil Procedure 52(a)* -- which provides that "[findings] of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" -- and that it **[****3]**  must perform a *de novo* review, independently examining the record to ensure that the District Court had applied properly the governing constitutional rule.  Based on its review of the record, the Court of Appeals concluded that petitioner had not sustained its burden of proof.

*Held*:

1. The clearly-erroneous standard of *Rule 52(a)* does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times Co.* v. *Sullivan*.  Appellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.  Pp. 498-511.

(a) In cases raising *First Amendment* issues, an appellate court has an obligation to make an independent examination of the whole record to ensure that the judgment does not constitute a forbidden intrusion on the field of free expression.  However, the standard of review must be faithful to both *Rule 52(a)* and the *New York Times* rule of independent review, the conflict between the two rules being in some respects more apparent than real.  For instance, *Rule 52(a)* does not forbid an examination of the entire record, and **[****4]**  the constitutionally based rule of independent review permits giving "due regard" to the trial judge's opportunity to judge witnesses' credibility, as provided by *Rule 52(a)*.  Pp. 498-501.

(b) *Rule 52(a)* applies to findings of fact, but does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact.  In a consideration of the possible application of *Rule 52(a)*'s distinction between questions of law and fact to the issue of "actual malice," three characteristics of the *New York Times* rule are relevant: (1) the common-law heritage of the rule, (2) the fact that its content is given meaning through case-by-case adjudication, and (3) the fact that the constitutional values protected by it make it imperative that judges make sure that it is correctly applied.  Pp. 501-503.

(c) The requirement of independent appellate review enunciated in *New York Times* reflects a deeply held conviction that judges -- particularly Members of this Court -- must exercise such review in order to preserve precious constitutional liberties.   Under *New York Times*, the question whether the evidence in the record in a **[****5]**  defamation case is of the convincing clarity required to strip the utterance of *First Amendment* protection is ultimately a question of federal constitutional law.  Pp. 503-511.

2. The Court of Appeals correctly concluded that there is a significant difference between proof of actual malice and mere proof of falsity, and that the requisite additional proof was lacking in this case.  The testimony of the article's

Page 2 of 19                                                              215

EXHIBIT 43

EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

author did not constitute clear and convincing evidence of actual malice. The fact that he attempted to rationalize the mistake as to the article's use of the phrase "about the room" does not establish that he realized the inaccuracy at the time of publication.  The choice of the language used, though reflecting a misconception, did not place the speech beyond the outer limits of the *First Amendment's* broad protective umbrella.  Even accepting all of the District Court's purely factual findings, nevertheless, as a matter of law, the record does not contain clear and convincing evidence that respondent or its employee prepared the article with knowledge that it contained a false statement, or with reckless disregard of the truth.  Pp. 511-513.

**Counsel:** Charles Hieken argued **[****6]**  the cause for petitioner.  With him on the briefs was Blair L. Perry.

Michael N. Pollet argued the cause for respondent.  With him on the brief were Marshall Beil and Carol A. Schrager. *

**Judges:** STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined.  BURGER, C. J., concurred in the judgment.  WHITE, J., filed a dissenting opinion, post, p. 515.  REHNQUIST, J., filed a dissenting opinion, in which O'CONNOR, J., joined, post, p. 515.

**Opinion by:** STEVENS

# Opinion

 **[*487]**   **[***508]**   **[**1952]**   JUSTICE STEVENS delivered the opinion of the Court.

 [1A]An unusual metaphor in a critical review of an unusual loudspeaker system gave  **[**1953]**  rise to product disparagement **[****7]**  litigation that presents us with a procedural question of first impression: Does *Rule 52(a) of the Federal Rules of Civil Procedure* prescribe the standard to be applied by the Court of Appeals in its review of a District Court's determination that a false statement was made with the kind of "actual malice" described in *New York Times Co.* v. *Sullivan, 376 U.S. 254, 279-280 (1964)*?

In the May 1970 issue of its magazine, Consumer Reports, respondent published a seven-page article evaluating the quality of numerous brands of medium-priced loudspeakers. In a boxed-off section occupying most of two pages, respondent commented on "some loudspeakers of special interest,"  **[*488]**  one of which was the Bose 901 -- an admittedly "unique and unconventional" system that had recently been placed on the market by petitioner. [1] After describing the system and some of its virtues, and after noting that a listener "could pinpoint the location of various instruments much more easily with a standard speaker than with the *Bose* system," respondent's article made the following statements:

"Worse, individual instruments  **[***509]**  heard through the *Bose* system seemed **[****8]**  to grow to gigantic proportions and tended to wander about the room.  For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall.  With orchestral music, such effects seemed inconsequential.  But we think they might become annoying when listening to soloists." Plaintiff's Exhibit 2, p. 274.

---

[*] Briefs of amici curiae urging affirmance were filed for the American Civil Liberties Union et al. by James F. McHugh, Charles S. Sims, and John Reinstein; and for New York Times Co. et al. by Floyd Abrams, Dean Ringel, Devereux Chatillon, Robert Sack, Alice Neff Lucan, Corydon B. Dunham, David Otis Fuller, Jr., W. Terry Maguire, Richard M. Schmidt, Jr., R. Bruce Rich, and Peter C. Gould.

[1] In introducing the loudspeaker system to the marketplace, petitioner emphasized the unconventional nature of the system and actively solicited reviews in numerous publications thereby inviting critical evaluation and comment on the unique qualities of the system. *508 F.Supp. 1249, 1273 (Mass. 1981)*.

**EXHIBIT 43**                                                                **EXHIBIT 12**

Bose Corp. v. Consumers Union, 466 U.S. 485

After stating opinions concerning the overall sound quality, the article concluded: "We think the *Bose* system is so unusual that a prospective buyer must listen to it and judge it for himself.  We would suggest delaying so big an investment until you were sure the system would please you after the novelty value had worn off." *Id., at 275*.

[2A]  **[****9]**  Petitioner took exception to numerous statements made in the article, and when respondent refused to publish a retraction, petitioner commenced this product disparagement action in the United States District Court for the District of Massachusetts. [2]  After a protracted period of pretrial  **[*489]**  discovery, the District Court denied respondent's motion for summary judgment, *84 F.R.D. 682 (1980)*, and conducted a 19-day bench trial on the issue of liability.  In its lengthy, detailed opinion on the merits of the case, *508 F.Supp. 1249 (1981)*, the District Court ruled in respondent's favor on most issues. [3]  Most significantly, the  **[**1954]**  District Court ruled that the petitioner is a  **[***510]**  "public figure" as that term is defined in *Gertz  [*490] v. Robert Welch, Inc., 418 U.S. 323, 342, 345, 351-352 (1974)*, for purposes of this case and therefore the *First Amendment*, as interpreted in *New York Times Co.* v. *Sullivan, 376 U.S., at 279-280*, precludes recovery in this product disparagement action unless the petitioner proved by clear and **[****10]**  convincing evidence that respondent made a false disparaging statement with "actual malice."

**[****11]**  On three critical points, however, the District Court agreed with petitioner.  First, it found that one sentence in the article contained a "false" statement of "fact" concerning the tendency of the instruments to wander. [4] **[****12]**  Based primarily on testimony by the author of the article, the District Court found that instruments heard through the speakers tended to wander "along the wall," rather than "about the room" as reported by respondent.

---

[2]  [2B]

Federal jurisdiction over the product disparagement claim was based on diversity of citizenship, *28 U. S. C. § 1332(a)(1)*.  The law of New York and Massachusetts, viewed by the parties as in accord in this area, governed the product disparagement claim.  *508 F.Supp., at 1259, n. 17*.  The District Court held that under the applicable state law, plaintiff had the burden of proving, by a preponderance of the evidence, that the statements in issue were false and disparaging, and also had the burden of establishing actual damages in order to recover.  *Id., at 1259-1260*.  In addition to the product disparagement claim, petitioner alleged claims for unfair competition and a violation of the Lanham Act, *15 U. S. C. § 1121*.  The District Court held that neither of those claims had been proved.  *508 F.Supp., at 1277*.

[3] Petitioner's attack on the article included contentions that it was misleading in referring to two persons as a "panel" and in creating the impression that evaluations of loudspeaker quality are objective rather than subjective judgments.  While the District Court agreed with petitioner on these points, it ruled that they did not entitle petitioner to relief.  *Id., at 1260-1262*. Petitioner also argued that the overall sound quality of the Bose 901 should have been rated higher by the reviewers.  The District Court rejected this claim, observing that all of the testimony, including that of Dr. Bose, revealed that the evaluation of a speaker's "sound quality" or "accuracy" is a "subjective matter," and hence in the final analysis is "nothing more than an opinion and, as such, it cannot be proved to be true or false." *Id., at 1262*. The court also found that petitioner had failed to prove false a statement recommending use of an amplifier of 50 watts per channel to achieve the "deepest" bass response with the speakers, observing that the parties had conceded that the power requirements of the speakers were readily and objectively ascertainable.  *Id., at 1263-1264*. The court also found that petitioner had failed to prove that the person primarily responsible for the article was biased by reason of his financial interest in eventually marketing a speaker on which he had obtained a patent.  On the other hand, the District Court rejected respondent's argument that there could be no actual malice because respondent had no motive to distort the facts; the District Court identified two possible reasons for the disparagement, first, the "scant proof" that respondent had a "built in bias" against "higher priced products" and second, a suggestion in the testimony that respondent resorted to "sarcasm" to boost circulation.  *Id., at 1275-1276*. The District Court did not, however, rely upon these possible motivations as affirmative proof of actual malice. See *id., at 1276-1277*.

[4] In its ruling on respondent's motion for summary judgment, the District Court had held that the question whether respondent's panelists "actually heard instruments grow to gigantic proportions or wander about the room is a question of fact, not opinion. . . ." *84 F.R.D. 682, 684 (1980)*. In support of the motion for summary judgment, respondent had submitted an affidavit by one of the panelists, Arnold Seligson, stating that the article accurately reported what was heard in the tests and "I know what I heard," while petitioner had submitted an affidavit by Dr. Bose, who designed the Bose 901, stating in substance that "the phenomenon of widened and wandering instruments . . . is a scientific impossibility." *Ibid*.

Page 4 of 19

**217**

EXHIBIT 43   EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

[5] [****13]  Second, it found that  [*491]  the statement was disparaging. Third, it concluded "on the basis of proof which it considers clear and convincing, that the plaintiff has sustained its burden of proving that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity." *508 F.Supp., at 1277*. [6] [****14]  [***511]  Judgment was [**1955]  entered for petitioner on the product disparagement claim. [7]

 [3A]The United States Court of Appeals for the First Circuit reversed.  *692 F.2d 189 (1982)*. The court accepted the finding that the comment about wandering instruments was  [*492]  disparaging. It assumed, without deciding, that the statement was one of fact, rather than opinion, and that it was false, observing that "stemming at least in part from the uncertain nature of the statement as one of fact or opinion, it is difficult to determine with confidence whether it is true or false." *Id., at 194*. After noting [****15]  that petitioner did not contest the conclusion that it was a public figure, or the applicability of the *New York Times* standard, the Court of Appeals held that its review of the "actual malice" determination was not "limited" to the clearly-erroneous standard of *Rule 52(a)*; instead, it stated that it "must perform a de novo review, independently examining the record to ensure that the district court has applied properly the governing constitutional law and that the plaintiff has indeed satisfied its burden of proof." *Id., at 195*. It added, however, that it "[was] in no position to consider the credibility of witnesses and must leave questions of demeanor to the trier of fact." *Ibid*.  Based on its own review of the record, the Court of Appeals concluded:

"[We] are unable to find clear and convincing evidence that CU published the statement that individual instruments tended to wander about the room with knowledge that it was false or with reckless disregard of whether it was false or not.  The evidence presented merely shows that the words in the article may not have described precisely what

---

[5] Although at one point the District Court seemed to suggest that the instruments, *i. e.*, the sound, did not wander at all, relying on a review in another publication stating that "*each instrument has its prescribed space -- and it stays there*," *508 F.Supp., at 1268* (emphasis supplied by the District Court) (citation omitted), the District Court had previously stated that some degree of "movement" of sound between loudspeakers is common to all systems and its discussion of liability indicates that respondent could have truthfully reported that the sound tended to wander "along the wall," or at least "seemed" to wander along the wall.  It is not entirely clear that the District Court made a finding of fact as such regarding where the sound tended to wander. Indeed, it is not entirely clear that he found as a *fact* that the sound did not wander about the room.  Rather, as discussed more extensively *infra*, at 493-497, the finding seemed to be that the "panel" conducting the test did not subjectively perceive the sound to be wandering "about the room," but rather perceived it to be wandering "across the room." Just where the sound did "wander," in reality, did not appear to be the focus of the decision, though there was conflicting testimony concerning whether it was "scientifically impossible" for sound to wander "about" the room, or to "seem" to wander "about" the room.  See *508 F.Supp., at 1267-1269, 1276-1277*.

[6] In its ruling on the motion for summary judgment, the District Court assumed, without deciding, that the actual-malice standard would be applicable in the case and expressly recognized that falsity alone does not prove that statements were made with actual malice, observing that additional facts are required, and that there must be clear and convincing evidence on this question.  *84 F.R.D., at 684-685*. In holding that there was a material issue of "fact" (a label we use advisedly) on actual malice, the District Court recounted petitioner's argument that the panelists must have *known* the statements concerning enlarged and wandering instruments were false because they *were* false, *ibid*. ("[According] to the plaintiff, the panel could not have heard these phenomena and the statement that they did hear them was false.  The plaintiff further contends that because Seligson was a member of the listening panel . . . he must have known that the statement was false . . ."). The court also noted petitioner's evidence concerning Seligson's patent on a speaker system, and indulging in all reasonable inferences favorable to the plaintiff, concluded that a genuine issue of material fact existed on the question of actual malice. *Id., at 686*.

[7] A separate trial before a different judge on the issue of damages resulted in a finding that the false disparaging statement resulted in a sales loss of 824 units, each of which would have produced a net profit of $ 129, causing petitioner damages of $ 106,296. Petitioner also was awarded $ 9,000 for expenses incurred in an attempt to mitigate damages.  Judgment for the total amount, plus interest, was entered by the District Court.  *529 F.Supp. 357 (1981)*.

the two panelists heard during the listening test.  CU **[****16]** was guilty of using imprecise language in the article -- perhaps resulting from an attempt to produce a readable article for its mass audience.  Certainly this does not support an inference of actual malice." *Id., at 197*. [8]

 **[\*493]** We granted certiorari to consider **[****17]** whether the Court of Appeals erred when it refused to apply the clearly-erroneous standard of *Rule 52(a)* to the District Court's "finding" of actual  **[***512]**  malice. *461 U.S. 904 (1983)*.

I

To place the issue in focus, it is necessary to state in somewhat greater detail (a) the evidence on the "actual malice" issue; and (b) the basis for the District Court's determination.

*Evidence of Actual Malice*.

At trial petitioner endeavored to prove that the key sentence embodied three distinct  **[\*\*1956]**  falsehoods about instruments heard through the Bose system: (1) that their size seemed grossly enlarged; (2) that they seemed to move; and (3) that their movement was "about the room."

Although a great deal of the evidence concerned the first two points, the District Court found that neither was false. It concluded that the average reader would understand that the reference to enlarged instruments was intended to describe the size of the area from which the sound seemed to emanate rather than to any perception about the actual size of the musical instruments being played, rejecting as "absurd" the notion that readers would interpret the figurative language literally.  **[****18]** *508 F.Supp., at 1266*. [9] After referring to testimony explaining that "a certain degree of movement **[\*494]** of the location of the apparent sound source is to be expected with all stereo loudspeaker systems," the District Court recognized that the statement was accurate insofar as it reported that "instruments . . . tended to wander. . . ." *Id., at 1267*. Thus, neither the reference to the apparent size of the instruments, nor the reference to the fact that instruments appeared to move, was false. [10]

 **[****19]**  The statement that instruments tended to wander "about the room" was found false because what the listeners in the test actually perceived was an apparent movement back and forth along the wall in front of them and between the two speakers. Because an apparent movement "about the room" -- rather than back and forth -- would be so different from what the average listener has learned to expect, the District Court concluded that "the location of the movement of the apparent sound source is just as critical to a reader as the fact that movement occurred." *Ibid*.

The evidence concerning respondent's knowledge of this falsity focused on Arnold Seligson, an engineer employed by respondent.  Seligson supervised the test of the Bose 901 and prepared the written report upon which the

---

[8] Judge Campbell concurred specially to emphasize the fact that the Court of Appeals had not passed on the merits of the District Court's holding that petitioner was a public figure.  We, of course, also do not pass on that question.

 [3B]

We observe that respondent's publication of Consumer Reports plainly would qualify it as a "media" defendant in this action under any conceivable definition of that term.  Hence, the answer to the question presented in *Dun & Bradstreet, Inc*. v. *Greenmoss Builders, Inc*., cert. granted, **464 U.S. 959 (1983)**, could not affect this case and we naturally express no view at this time on that question.

[9] "Therefore, the plaintiff did not present any evidence to contradict the defendant's evidence which tended to show that when listening to the Bose 901 a listener could and does perceive that the apparent sound source is very large.  Thus, the court concludes that the plaintiff has not sustained its burden of proof by a preponderance of the evidence that the defendant's statement -- 'instruments . . . seemed to grow to gigantic proportions' -- was false." *508 F.Supp., at 1267*.

[10] Thus, respondent prevailed on both of the issues of fact that had been identified at the summary judgment stage of the proceedings.  See n. 4, *supra*.

EXHIBIT 43    EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

published article was based.  His initial in-house report contained this sentence: "'Instruments not only could not be placed with precision but appeared to suffer from giganticism and a tendency to wander around the room; a violin seemed about 10 ft. wide, a piano stretched from wall to wall,  **[\*\*\*513]**  etc.'" *Id., at 1264, n. 28*. Since the editorial revision from "around the room" to "about **[\*\*\*\*20]**  the room" did not change the meaning of the false statement, and since there was no evidence that the editors were aware of the inaccuracy in the original report, the actual-malice determination rests entirely on an evaluation of Seligson's state of mind when he wrote his initial report, or when he checked the article against that report.

 **[\*495]**  Seligson was deposed before trial and testified for almost six days at the trial itself.  At one point in his direct examination, he responded at length to technical testimony by Dr. Bose, explaining the scientific explanation for the apparent movement of the source of sound back and forth across a wall.  App. 117-122.  The trial judge then questioned Seligson, and that questioning revealed that the movement which Seligson had heard during the tests was confined to the wall. [11] **[\*\*\*\*22]**  During his **[\*\*1957]**  cross-examination, at counsel's request he drew a rough sketch of the movement of the sound source that he intended to describe with the words "tended to wander about the room"; that sketch revealed a back and forth movement along the wall between the speakers. He was then asked:

"Q.  Mr. Seligson, why did you use the words 'tended to **[\*\*\*\*21]**  wander about the room' to describe what you have drawn on the board?

"A.   Well, I don't know what made me pick that particular choice of words.  Would you have been more satisfied **[\*496]**  if we said 'across,' -- I think not -- instead of before.  I have the feeling you would have objected in either event.  The word 'about' meant just as I drew it on the board.  Now, I so testified in my deposition." *Id.*, at 169. [12]

---

[11] The following questions were asked and answered:

"[Q.] Does that explain, in your opinion, the lateral movement of the instrument?

"[A.] Yes.

"[Q.] I think your statement in the article which says they moved into the room, just as if they came forward, as well --

"[A.] The example given for the movement into the room refers only to a widened violin and a widened piano and was meant to imply only that the widening and movement was across the rear wall from the two speakers.

 . . . . .

"[Q.] 'It tended to wander about the room.' It didn't say from side to side or against the walls alone, but it says --

"[A.] I believe the next sentence is meant to explain that.  It then says, 'For instance,' as an example of the effect. . . .

"[Q.] The word 'about' means around, doesn't it?

"[A.] It was, your Honor, it was meant to mean about the rear wall, between the speakers.

"[Q.] That isn't what it says, though.

"[A.] I understand." App. 122-124.

[12] These additional questions were then asked and answered:

"Q.  Would it have been more accurate in your judgment to say that the instruments tended to move back and forth between the two speakers?

"A.  No, I don't think so, taken in context of the way it's described.  Remember, the effect is carefully described in a few sentences later.  It's hard to mistake.

"Q.  Is there anything in the article which you think conveys to the reader the idea that the instruments stayed down at one end of the room and didn't come out and wander about, like you wandered about, where you have drawn the orange line?

"A.  Yes.

"Q.  What is that?

EXHIBIT 43                                                                      EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

*The* **[\*\*\*514]** *District Court's Actual-Malice Determination*.

The District Court's reasons for finding falsity in the description of the location of the movement of the wandering instruments provided the background for its **[\*\*\*\*23]** ruling on actual malice. The court concluded that "no reasonable reader" would understand the sentence as describing lateral movement along the wall.  Because the "average reader" would interpret the word "about" according to its "plain ordinary meaning," the District Court unequivocally rejected Seligson's testimony -- and respondent's argument -- that the sentence, when read in context, could be understood to refer to lateral movement. [13]

**[\*\*\*\*24]**  **[\*497]**  On similar reasoning the District Court found Seligson's above-quoted explanation of the intended meaning of the sentence incredible.  The District Court reasoned:

"Thus, according to Seligson, the words used in the Article -- 'About the room' -- mean something different to him than they do to the populace in general.  If Seligson is to be believed, at the time of publication of the Article he interpreted, and he still interprets today, the words 'about the room' to mean 'along the wall.' After careful consideration of Seligson's testimony and of his demeanor at trial, the Court finds that Seligson's testimony on this point is not credible.  Seligson is an intelligent person whose **[\*\*1958]** knowledge of the English language cannot be questioned.  It is simply impossible for the Court to believe that he interprets a commonplace word such as 'about' to mean anything other than its plain ordinary meaning.

"Based on the above finding that Seligson's testimony to the contrary is not credible, the Court further finds that at the time of the Article's publication Seligson knew that the words 'individual instruments . . . tended to wander about the room' did not accurately **[\*\*\*\*25]** describe the effects that he and Lefkow had heard during the 'special listening test.' Consequently, the Court concludes, on the basis of proof which it considers clear and convincing, that the plaintiff has sustained its burden of proving that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity." *508 F.Supp., at 1276-1277*.

**[\*498]**  Notably, the District Court's ultimate determination of actual malice was framed as a conclusion and was stated in the disjunctive.  Even though the District Court found it impossible to believe that Seligson -- at the time of trial -- was truthfully maintaining that the words "about the room" could fairly be read, in context, to describe lateral movement **[\*\*\*515]** rather than irregular movement throughout the room, the District Court did not identify any independent evidence that Seligson realized the inaccuracy of the statement, or entertained serious doubts about its truthfulness, at the time of publication. [14]

**[\*\*\*\*26]**  II

[4]This is a case in which two well-settled and respected rules of law point in opposite directions.

Petitioner correctly reminds us that *Rule 52(a)* provides:

_____

"A.  I would think that the reader would get that from reading that a violin appeared to be ten feet wide and a piano stretched from wall to wall.  This is no hint of depth or whatever, entering into the room." *Id.*, at 169-170.

[13] The District Court buttressed this conclusion by pointing out that petitioner had received no complaints from purchasers about any wandering instruments, and that no other reviews of the Bose 901 had referred to wandering instruments.  On the contrary, a review quoted by the District Court commented that "each instrument has its prescribed space -- and it stays there." See n. 5, *supra*.  This evidence, however, was more probative of falsity in ascribing any movement at all to the sound source than of falsity in describing the location of the movement.  As we have pointed out, the District Court found that the article was truthful insofar as it stated that apparent movement occurred.

[14] The District Court expressly rejected petitioner's exhaustive attempt to prove that Seligson had a continuing interest in marketing his own speaker and therefore deliberately distorted the review. *508 F.Supp., at 1275*.

EXHIBIT 43                                                                    EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

We have repeatedly held that the Rule means what it says.  *Inwood Laboratories, Inc*. v. *Ives Laboratories, Inc., 456 U.S. 844, 855-856 (1982)*; *Pullman-Standard v. Swint, 456 U.S. 273, 287 (1982)*; *United States v. United States Gypsum Co., 333 U.S. 364, 394-396 (1948)*. It surely does not stretch the language of the Rule to characterize an inquiry into what a person knew at a given point in time as a question of "fact." [15] In this case, since the trial judge expressly commented on Seligson's credibility, petitioner argues that the **[*499]** Court of Appeals plainly erred when it refused to uphold **[****27]** the District Court's actual-malice "finding" under the clearly-erroneous standard of *Rule 52(a)*.

 [5]On the other hand, respondent correctly reminds us that in cases raising *First Amendment* issues we have repeatedly held that an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co*. v. *Sullivan, 376 U.S., at 284-286*. See also *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 933-934 (1982)*; *Greenbelt Cooperative Publishing Assn*. v. *Bresler, 398 U.S. 6, 11 (1970)*; *St. Amant v. Thompson, 390 U.S. 727, 732-733 (1968)*. **[****28]** Although such statements have been made most frequently in cases to which *Rule 52(a)* does **[**1959]** not apply because they arose in state courts, respondent argues that the constitutional principle is equally applicable to federal litigation.  We quite agree; surely it would pervert the concept of federalism for this Court to lay claim to a broader power of review over state-court judgments than it exercises in reviewing the judgments of intermediate federal courts.

Our standard of review must be faithful to both *Rule 52(a)* and the rule of independent review applied in *New York Times Co*. v. *Sullivan*.  The conflict between the two rules is in **[***516]** some respects more apparent than real. The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record; *Rule 52(a)* never forbids such an examination, and indeed our seminal decision on the Rule expressly contemplated a review of the entire record, stating that a "finding is 'clearly **[****29]** erroneous' when although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co., supra, at 395* (emphasis supplied). Moreover, *Rule 52(a)* commands that "due regard" shall be given to the trial judge's opportunity to **[*500]** observe the demeanor of the witnesses; the constitutionally based rule of independent review permits this opportunity to be given its due.  Indeed, as we previously observed, the Court of Appeals in this case expressly declined to second-guess the District Judge on the credibility of the witnesses.

 [6] [7] [8A]The requirement that special deference be given to a trial judge's credibility **[****30]** determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others.  The same "clearly erroneous" standard applies to findings based on documentary evidence as to those based entirely on oral testimony, see *United States Gypsum Co., supra, at 394*, but the presumption has lesser force in the former situation than in the latter.  Similarly, the standard does not change as the trial becomes longer and more complex, but the likelihood that the appellate court will rely on the presumption tends to increase when trial judges have lived with the controversy for weeks or months instead of just a few hours. [16]  One might therefore assume that the cases in which the appellate courts have a duty to

---

[15] Indeed, in *Herbert v. Lando, 441 U.S. 153, 170 (1979)*, we referred in passing to actual malice as "ultimate fact."

[16] [8B]

"The conclusiveness of a 'finding of fact' depends on the nature of the materials on which the finding is based.  The finding even of a so-called 'subsidiary fact' may be a more or less difficult process varying according to the simplicity or subtlety of the type of 'fact' in controversy.  Finding so-called ultimate 'facts' more clearly implies the application of standards of law.  And so the 'finding

EXHIBIT 43   EXHIBIT  12

Bose Corp. v. Consumers Union, 466 U.S. 485

exercise **[\*501]** independent review are merely those in which the presumption that the trial court's ruling is correct is particularly weak.  The difference between the two rules, however, is much more than a mere matter of degree.  For **[\*\*\*\*31]** the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed **[\*\*\*517]** in the particular case by a jury or by a trial judge.

**[\*\*\*\*32]**   [9] [10A]*Rule 52(a)* applies to findings of fact, including those described as "ultimate **[\*\*1960]** facts" because they may determine the outcome of litigation.  See *Pullman-Standard v. Swint, 456 U.S., at 287*.  But *Rule 52(a)* does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.  See *ibid.; Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc., 456 U.S., at 855, n. 15*.  Nor does *Rule 52(a)* "furnish particular guidance with respect to distinguishing law from fact." *Pullman Standard* v. *Swint*, 456 U.S., at 288.  What we have characterized as "the vexing nature" of that distinction, *ibid.*, does not, however, diminish its importance, or the importance of the principles that require the distinction **[\*\*\*\*33]** to be drawn in certain cases. [17]

In a consideration of the possible application of the distinction to the issue of "actual malice," at least three characteristics of the rule enunciated in the *New York Times* case **[\*\*\*\*34]** are **[\*502]** relevant.  First, the common-law heritage of the rule itself assigns an especially broad role to the judge in applying it to specific factual situations.  Second, the content of the rule is not revealed simply by its literal text, but rather is given meaning through the evolutionary process of common-law adjudication; though the source of the rule is found in the Constitution, it is nevertheless largely a judge-made rule of law.  Finally, the constitutional values protected by the rule make it imperative that judges -- and in some cases judges of this Court -- make sure that it is correctly applied.  A few words about each of these aspects of the rule are appropriate.

The federal rule that prohibits a public official from recovering damages for a defamatory falsehood unless he proves that the false "statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *New York Times, 376 U.S., at 279-280*, has its counterpart in rules previously adopted by a number of state courts **[\*\*\*\*35]** and extensively reviewed by scholars for generations. [18]  The earlier defamation cases, in turn, have a kinship to English cases considering the kind of motivation that must be proved to support **[\*\*\*518]** a commonlaw action for deceit. [19]  It has long been recognized that the formulation of a rule of this kind "allows  the  judge  the  maximum  of  power  in  passing  judgment  in  the  particular  case."

---

of fact' even if made by two courts may go beyond the determination that should not be set aside here.  Though labeled 'finding of fact,' it may involve the very basis on which judgment of fallible evidence is to be made.  Thus, the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes consideration by this Court.  See, *e. g., Beyer v. LeFevre, 186 U.S. 114*.  Particularly is this so where a decision here for review cannot escape broadly social judgments -- judgments lying close to opinion regarding the whole nature of our Government and the duties and immunities of citizenship." *Baumgartner v. United States, 322 U.S. 665, 670-671 (1944)*.  See generally *Pullman-Standard v. Swint, 456 U.S. 273, 286-287, n. 16 (1982)*.

[17] [10B]

A finding of fact in some cases is inseparable from the principles through which it was deduced.  At some point, the reasoning by which a fact is "found" crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment.  Where the line is drawn varies according to the nature of the substantive law at issue.  Regarding certain largely factual questions in some areas of the law, the stakes -- in terms of impact on future cases and future conduct -- are too great to entrust them finally to the judgment of the trier of fact.

[18] A representative list of such cases and comments is found in footnote 20 of the Court's opinion in *New York Times, 376 U.S., at 280*.

[19] Under what has been characterized as the "honest liar" formula, fraud could be proved "when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false." *Derry* v. *Peek*, 14 App. Cas. 337, 374 (1889).

EXHIBIT 43     EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

[20] **[****37]**  **[*503]**  Moreover, the exercise of this power is the process through which the rule itself evolves and its integrity is maintained. [21] **[**1961]**  As we have explained, the meaning of some concepts cannot be adequately expressed in a simple statement:

"These considerations fall short of proving St. Amant's reckless disregard for the accuracy of his statements about Thompson.  'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition.  Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law.  Our cases, however, have furnished meaningful guidance for the further definition of a reckless **[****36]**  publication." *St. Amant v. Thompson, 390 U.S., at 730-731*.

When the standard governing the decision of a particular case is provided by the Constitution, this Court's role in marking out the limits of the standard through the process of case-by-case adjudication is of special importance.  This process has been vitally important in cases involving restrictions on the freedom of speech protected by the *First Amendment*, **[****38]**  particularly in those cases in which it is contended that the communication in issue is within one of the few classes of "unprotected" speech.

 [11]The *First Amendment* presupposes that the freedom to speak one's mind is not only an aspect of individual liberty -- and thus a good unto itself -- but also is essential to the common quest for truth and the vitality of society as a **[*504]**  whole.  Under our Constitution "there is no such thing as a false idea.  However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc., 418 U.S., at 339-340* (footnote omitted).  Nevertheless, **[***519]**  there are categories of communication and certain special utterances to which the majestic protection of the *First Amendment* does not extend because they "are no essential part of any exposition **[****39]**  of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)*.

Libelous speech has been held to constitute one such category, see *Beauharnais v. Illinois, 343 U.S. 250 (1952)*; others that have been held to be outside the scope of the freedom of speech are fighting words, *Chaplinsky v. New Hampshire, supra*, incitement to riot, *Brandenburg v. Ohio, 395 U.S. 444 (1969)*, obscenity, *Roth v. United States, 354 U.S. 476 (1957)*, and child pornography, *New York v. Ferber, 458 U.S. 747 (1982)*. [22] **[****41]**  In each of

---

[20] "Probably the formula is less definite than it seems.  Its limitations are perhaps largely a matter of language color.  As do most English formulas, it allows the judge the maximum of power in passing judgment in the particular case.  It restricts the jury as neatly as can be done to the function of evaluating the evidence.  But judgment under this formula can be turned either way with equal facility on any close case." L. Green, Judge and Jury 286 (1930) (Chapter 10 of this work by Professor Green, cited herein, is also published in 16 Va. L. Rev. 749 (1930)).

[21] "And it must be kept in mind that the judge has another distinct function in dealing with these elements, which though not frequently called into play, is of the utmost importance.  It involves the determination of the *scope* of the general formula, or some one of its elements.  It comes into play in the marginal cases.  It requires the judge to say what sort of conduct can be considered as condemned under the rules which are employed in such cases.  It is the function through which the formulas and rules themselves were evolved, through which their integrity is maintained and their availability determined." Green, *supra*, at 304.

[22] Commercial speech was once regarded as unprotected by the *First Amendment*, see *Valentine v. Chrestensen, 316 U.S. 52 (1942)*, but in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976)*, we rejected that broad conclusion.  Though false and misleading commercial speech could be deemed to represent a category of unprotected speech, see *ibid*., the rationale for doing so would be essentially the same as that involved in the libel area, viz., "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974)*. Moreover, since a commercial advertiser usually "seeks to disseminate information about a specific product or service he himself provides and presumably knows more about than anyone else," *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S., at 772, n. 24*, there is a minimal "danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression." *Id., at 777* (Stewart, J., concurring).

EXHIBIT 43                                                                      EXHIBIT  12

Bose Corp. v. Consumers Union, 466 U.S. 485

these **[\*505]** **[\*\*1962]** areas, the limits of the unprotected category, as well as the unprotected character of particular communications, have been determined by the judicial evaluation of special facts that have been deemed to have constitutional significance.  In such cases, the Court has regularly conducted an independent review of the record both to be sure that the speech in **[\*\*\*\*40]** question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited.  Providing triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit the expression of protected **[\*\*\*520]** ideas. [23] The principle of viewpoint neutrality that underlies the *First Amendment* itself, see *Police Department of Chicago v. Mosley, 408 U.S. 92, 95-96 (1972)*, also imposes a special responsibility on judges whenever it is claimed that a particular communication is unprotected. See generally *Terminiello v. Chicago, 337 U.S. 1, 4 (1949)*.

We have exercised independent judgment on the question whether particular remarks "were so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provoke the average person to retaliation, and thereby cause a breach of the peace,'" *Street v. New York, 394 U.S. 576, 592 (1969)*, and on the analogous question whether advocacy is directed to inciting or producing **[\*506]** imminent lawless action, *Hess v. Indiana, 414 U.S. 105, 108-109 (1973)* *(per curiam)*; compare *id., at 111* (REHNQUIST, J., dissenting) ("The **[\*\*\*\*42]** simple explanation for the result in this case is that the majority has interpreted the evidence differently from the courts below"); *Edwards v. South Carolina, 372 U.S. 229, 235 (1963)* (recognizing duty "to make an independent examination of the whole record"); *Pennekamp v. Florida, 328 U.S. 331, 335 (1946)* ("[We] are compelled to examine for ourselves the statements in issue . . . to see whether or not they do carry a threat of clear and present danger . . . or whether they are of a character which the principles of the *First Amendment* . . . protect"). [24]

 **[\*\*\*\*43]** **[\*\*1963]** Similarly, although under *Miller v. California, 413 U.S. 15 (1973)*, the questions of what appeals to "prurient interest" and what is "patently offensive" under the community standard obscenity test are "essentially questions of fact," *Id., at 30*, we expressly recognized the "ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary," *id., at 25*. [25] **[\*\*\*\*45]** We **[\*\*\*521]** have

---

Statements made by public employees in their employment capacity and not touching on matters of public concern may be considered unprotected in the sense that employment-related sanctions may be imposed on the basis of such statements.  See *Connick v. Myers, 461 U.S. 138 (1983)*; *Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979)*; *Pickering v. Board of Education, 391 U.S. 563 (1968)*.

[23] The risk of broadening a category of unprotected speech may explain why one Member of this Court preferred a candid statement -- "I know it when I see it" -- of his concept of the judicial function to a premature attempt to fashion an all encompassing "shorthand description" of obscenity. See *Jacobellis v. Ohio, 378 U.S. 184, 197 (1964)* (Stewart, J., concurring).

[24] See also *Fiske v. Kansas, 274 U.S. 380, 385-387 (1927)* (explaining that this Court will review findings of fact by a state court where a federal right has been denied on the basis of a fact without evidence to support it and where a conclusion of law as to a federal right and a finding of fact are so intermingled to require analysis of the facts); *Gitlow v. New York, 268 U.S. 652, 665-666 (1925)*; *Schaefer v. United States, 251 U.S. 466, 483 (1920)* (Brandeis, J., dissenting); see generally *Broadrick v. Oklahoma, 413 U.S. 601, 613-614 (1973)* (explaining *Edwards v. South Carolina, 372 U.S. 229 (1963)*; *Cox v. Louisiana, 379 U.S. 536 (1965)*; and *Cantwell v. Connecticut, 310 U.S. 296, 311 (1940))*.

[25] In support of this statement, we cited Justice Harlan's opinion in *Roth v. United States, 354 U.S. 476, 497-498 (1957)*, where he observed:

"The Court seems to assume that 'obscenity' is a peculiar *genus* of 'speech and press,' which is as distinct, recognizable, and classifiable as poison ivy is among other plants.  On this basis the *constitutional* question before us simply becomes, as the Court says, whether 'obscenity,' as an abstraction, is protected by the *First* and *Fourteenth Amendments*, and the question whether a *particular* book may be suppressed becomes a mere matter of classification, of 'fact,' to be entrusted to a factfinder and insulated from independent constitutional judgment.  But surely the problem cannot be solved in such a generalized fashion.  Every communication has an individuality and 'value' of its own.  The suppression of a particular writing or other tangible form of

EXHIBIT 43                                                                    EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

therefore **[*507]** rejected the contention that a jury finding of obscenity *vel non* is insulated from review so long as the jury was properly instructed and there is some evidence to support its findings, holding that substantive constitutional limitations govern.  In *Jenkins v. Georgia, 418 U.S. 153, 159-161 (1974)*, based on an independent examination of the evidence -- the exhibition of a motion picture -- the Court held that the film in question "could not, as a matter of constitutional law, be found to depict sexual conduct in a patently offensive way. . . ." *Id., at 161*. **[****44]** [26] And in its recent opinion identifying a new category of unprotected expression -- child pornography -- the Court expressly anticipated that an "independent **[*508]** examination" of the allegedly unprotected material may be necessary "to assure ourselves that the judgment . . . 'does not constitute a forbidden intrusion on the field of free expression.'" *New York v. Ferber, 458 U.S., at 774, n. 28* (quoting *New York Times Co*. v. *Sullivan, 376 U.S., at 285*).

[12A] [13A] [14A]Hence, in *New York Times Co*. v. *Sullivan*, after announcing the constitutional requirement for a finding of "actual malice" in certain types of defamation actions, it was only natural that we should conduct **[****46]** an independent review of the evidence on the dispositive constitutional issue.  We explained our action as follows:

"This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.  This is such a case, particularly since the **[**1964]** question is one of alleged trespass **[***522]** across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated.' *Speiser v. Randall, 357 U.S. 513, 525*. In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the *First Amendment*, as adopted by the *Due Process Clause of the Fourteenth Amendment*, protect.' *Pennekamp v. Florida, 328 U.S. 331, 335*; see also *One, Inc*. v. *Olesen, 355 U.S. 371*; *Sunshine Book Co*. v. *Summerfield, 355 U.S. 372*. **[****47]**  We must 'make an independent examination of the whole record,' *Edwards v. South Carolina, 372 U.S. 229, 235*, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *376 U.S., at 285* (footnote omitted). [27]

---

expression is, therefore, an individual matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is [suppressible] within constitutional standards.  Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

"I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as 'obscene,' for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind."

[26] Cf.  *Hamling v. United States, 418 U.S. 87, 100, 124 (1974)* (holding that jury determination of obscenity was supported by the evidence and consistent with the applicable constitutional standard while reviewing petitioner's sufficiency of the evidence arguments regarding other issues under the test of *Glasser v. United States, 315 U.S. 60 (1942))*. See generally *Jacobellis v. Ohio, 378 U.S., at 187-190* (opinion of BRENNAN, J.) (*de novo* review required in obscenity cases); *id., at 202-203* (Warren, C. J., dissenting) (intermediate standard of review).

[27]  [12B] [13B]

This Court "has an 'obligation to test challenged judgments against the guarantees of the *First* and *Fourteenth Amendments*,' and in doing so 'this Court cannot avoid making an independent constitutional judgment on the facts of the case.' *Jacobellis v. Ohio, 378 U.S. 184, 190 (1964)* [opinion of BRENNAN, J.].  The simple fact is that *First Amendment* questions of 'constitutional fact' compel this Court's *de novo* review.  See *Edwards v. South Carolina, 372 U.S. 229, 235 (1963)*; *Blackburn v. Alabama, 361 U.S. 199, 205 n. 5 (1960)*." *Rosenbloom v. Metromedia, 403 U.S. 29, 54 (1971)* (opinion of BRENNAN, J., joined by BURGER, C. J., and BLACKMUN, J.).  See generally *Adams v. Tanner, 244 U.S. 590, 600 (1917)* (Brandeis, J., dissenting) ("*Ex facto jus oritur*. That ancient rule must prevail in order that we may have a system of living law").

EXHIBIT 43 EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

**[****48]   [*509]**  In *Time, Inc.* v. *Pape, 401 U.S. 279 (1971)*, a case in which the Federal District Court had entered a directed verdict, we again conducted an independent examination of the evidence on the question of actual malice, labeling our definition of "actual malice" as a "constitutional rule" and stating that the question before us was whether that rule had been correctly applied to the facts of the case, *id., at 284*.  **[***523]**  Again we stated that independent inquiries "of this kind are familiar under the settled principle that '[in] cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will reexamine  **[*510]**  the evidentiary basis on which those conclusions are founded,'" noting that "in cases involving the area of tension between the *First* and *Fourteenth Amendments* on the one hand and state defamation laws on the other, we have frequently had occasion to review 'the evidence in the . . . record to determine whether  **[**1965]**  it could constitutionally  **[****49]**  support a judgment' for the plaintiff." *Ibid.* (citations omitted). [28]

In *Monitor Patriot Co.* v. *Roy, 401 U.S. 265, 277 (1971)* the Court held "as a matter of constitutional law" that the jury could not be allowed to determine the relevance of a defamatory statement to the plaintiff's status as a public figure. We explained that the jury's application of such a standard "is unlikely to be neutral **[****50]**  with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' *New York Times, supra, at 270*, which must be protected if the guarantees of the *First* and *Fourteenth Amendments* are to prevail." *Ibid.* [29]

[15]The requirement of independent appellate review reiterated in *New York Times Co.* v. *Sullivan* is a rule of federal constitutional **[****51]**  law.  It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage.  It reflects a deeply held conviction that judges -- and particularly Members of this Court -- must  **[*511]**  exercise such review in order to preserve the precious liberties established and ordained by the Constitution.  The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of *First Amendment* protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

III

---

In *New York Times Co.* v. *Sullivan*, we were reviewing a state-court judgment entered on a jury verdict.  Respondent had contended that the *Seventh Amendment* precluded an independent review. Recognizing that the *Seventh Amendment's* ban on reexamination of facts tried by a jury applied to a case coming from the state courts, *Chicago, B. & Q. R. Co.* v. *Chicago, 166 U.S. 226, 243-246 (1897)*; *The Justices v. Murray, 9 Wall. 274 (1870)*; see generally *Parsons v. Bedford, 3 Pet. 433 (1830)*, we found the argument without merit, relying on our statement in *Fiske v. Kansas, 274 U.S., at 385-386*, that review of findings of fact is appropriate "where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts."

[14B]The intermingling of law and fact in the actual-malice determination is no greater in state or federal jury trials than in federal bench trials.  See *supra, at 499-500*, and *infra*, at 512-513.  And, of course, the limitation on appellate review of factual determinations under *Rule 52(a)* is no more stringent than the limitation on federal appellate review of a jury's factual determinations under the *Seventh Amendment*, which commands that "no fact tried by jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

[28] Justice Harlan, the lone dissenter in *Time, Inc.* v. *Pape*, observed that the Court had merely refound the facts in the case, but agreed that the Court was free to examine for itself the evidentiary bases upon which the decision below rested.  He argued that this power need not be exercised in every case, but rather independent review of the evidence should be limited to cases in which certain "unusual factors" exist, such as "allegations of harassment." *401 U.S., at 294*.

[29] A similar concern with the need to "preserve the right of free speech both from suppression by tyrannous, well-meaning majorities and from abuse by irresponsible, fanatical minorities," *Schaefer v. United States, 251 U.S., at 482* (dissenting opinion), was identified by Justice Brandeis in explaining the special risk in allowing jurors to evaluate the character of the "clear and present danger" presented by arguably seditious speech.

**EXHIBIT 43**                                                                        **EXHIBIT  12**

Bose Corp. v. Consumers Union, 466 U.S. 485

[16A]The Court of Appeals was correct in its conclusions (1) that there is a significant difference between **[\*\*\*524]** proof of actual malice [30] and mere proof of falsity, and (2) that such additional **[\*\*\*\*52]** proof is lacking in this case.

The factual portion of the District Court's opinion may fairly be read as including the following findings: (1) Seligson's actual perception of the apparent movement of the sound source at the time the Bose 901 was tested was "along the wall" rather **[\*\*\*\*53]** than "about the room"; (2) even when the words in the disputed sentence are read in the context of the entire article, neither the "average reader," nor any other intelligent person, would interpret the word "about" to mean "across"; (3) Seligson is an intelligent, well-educated person; (4) the words "about the room" have the same meaning for Seligson as they do for the populace in general; and (5) although he was otherwise a credible witness, Seligson's testimony that (a) he did not "know what made me pick that **[\*512]** particular choice of words" and (b) that the word "about" meant what he had drawn on the board, is not credible.

 **[\*\*1966]**   [17]When the testimony of a witness is not believed, the trier of fact may simply disregard it.  Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.  See _Moore v. Chesapeake & Ohio R. Co., 340 U.S. 573, 575 (1951)_. In this case the trial judge found it impossible to believe that Seligson continued to maintain that the word "about" meant "across." Seligson's testimony does not rebut **[\*\*\*\*54]**  any inference of actual malice that the record otherwise supports, but it is equally clear that it does not constitute clear and convincing evidence of actual malice. Seligson displayed a capacity for rationalization.  He had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made -- that the inaccurate was accurate.  That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication.

 [18]Aside from Seligson's vain attempt to defend his statement as a precise description of the nature of the sound movement, the only evidence of actual malice on which the District Court relied was the fact that the statement was an inaccurate description of what Seligson had actually perceived.  Seligson of course had insisted "I know what I heard." The trial court took him at his word, and reasoned that since he did know what he had heard, and he knew that the meaning of the language employed did not accurately reflect what he heard, he must have realized the statement was **[\*\*\*\*55]**  inaccurate at the time he wrote it.  "Analysis of this kind may be adequate when the alleged libel purports to be an eyewitness or other direct account _of events that speak for themselves." Time, Inc_. v. _Pape, 401 U.S., at 285_.  **[\*\*\*525]**  See generally _The Santissima Trinidad, 7 Wheat. 283, 338-339 (1822)_. Here, however, adoption of the language chosen was "one of a number of possible rational interpretations" of an event "that bristled with ambiguities" and descriptive challenges for the writer.  **[\*513]**  _Time, Inc_. v. _Pape, supra, at 290_. The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the _First Amendment's_ broad protective umbrella.  Under the District Court's analysis, any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time.

 [19]The statement in this case represents the sort of inaccuracy that is commonplace in the forum of **[\*\*\*\*56]**  robust debate to which the _New York Times_ rule applies.  _401 U.S., at 292_. "Realistically, . . . some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in _New York Times, Butts, Gertz_, and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." _Herbert v. Lando, 441 U.S. 153, 171-172 (1979)_. "[Erroneous] statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the

---

[30]  [16B]

The burden of proving "actual malice" requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.  See, _e. g., New York Times Co_. v. _Sullivan, 376 U.S., at 280_; see also _Gertz v. Robert Welch, Inc., 418 U.S., at 342_; _St. Amant v. Thompson, 390 U.S. 727, 731 (1968)_; see generally W. Prosser, Law of Torts 771-772, 821 (4th ed. 1971).

EXHIBIT 43                                                              EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

'breathing space' that they 'need . . . to survive.'" *New York Times Co*. v. *Sullivan, 376 U.S., at 271-272* (citation omitted).

[20]The Court of Appeals entertained some doubt concerning the ruling that the *New York Times* rule should be applied to a claim of product disparagement based on a critical review of a loudspeaker system.  We express no view on that ruling, but having accepted it for purposes of deciding this case, we agree with the Court **[****57]** of Appeals that the difference between hearing violin sounds move around the room and hearing them wander back and forth fits easily within the breathing space that gives life to the *First Amendment*. We may accept all of the purely factual findings of the District Court and nevertheless hold as  **[**1967]** a matter of law that the record does not contain clear and convincing evidence that Seligson or his employer prepared the loudspeaker article with knowledge that it contained a false statement, or with reckless disregard of the truth.

 **[*514]**   [1B] [21A]It may well be that in this case, the "finding" of the District Court on the actual-malice question could have been set aside under the clearly-erroneous standard of review, and we share the concern of the Court of Appeals that the statements at issue tread the line between fact and opinion.  Moreover, the analysis of the central legal question before us may seem out of place in a case involving a dispute about the sound quality of a loudspeaker. But though the question presented **[****58]** reaches us on a somewhat peculiar wavelength, we reaffirm the principle of independent appellate review that we have applied uncounted times before.  We hold that the clearly-erroneous standard of *Rule 52(a) of the Federal Rules of  [***526]  Civil Procedure* does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times Co*. v. *Sullivan*. [31] Appellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.

 **[****59]**  The judgment of the Court of Appeals is affirmed.

*It is so ordered*.

 **[*515]**  THE CHIEF JUSTICE concurs in the judgment.

**Dissent by:** WHITE; REHNQUIST

# Dissent

JUSTICE WHITE, dissenting.

Although I do not believe that the "reckless disregard" component of the *New York Times* malice standard is a question of historical fact, I agree with JUSTICE REHNQUIST that the actual-knowledge component surely is.  Here, the District Court found that the defamatory statement was written with actual knowledge of falsity. The Court of

---

[31] [21B]

There are, of course, many findings of fact in a defamation case that are irrelevant to the constitutional standard of *New York Times Co*. v. *Sullivan* and to which the clearly-erroneous standard of *Rule 52(a)* is fully applicable.  Indeed, it is not actually necessary to review the "entire" record to fulfill the function of independent appellate review on the actual-malice question; rather, only those portions of the record which relate to the actual-malice determination must be independently assessed.  The independent review function is not equivalent to a "*de novo*" review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff.  If the reviewing Court determines that actual malice has been established with convincing clarity, the judgment of the trial court may only be reversed on the ground of some other error of law or clearly erroneous finding of fact.  Although the Court of Appeals stated that it must perform a *de novo* review, it is plain that the Court of Appeals did not overturn any factual finding to which *Rule 52(a)* would be applicable, but instead engaged in an independent assessment only of the evidence germane to the actual-malice determination.

EXHIBIT 43                                                          EXHIBIT 12

Bose Corp. v. Consumers Union, 466 U.S. 485

Appeals thus erred in basing its disagreement with the District Court on its *de novo* review of the record.  The majority is today equally in error.  I would remand to the Court of Appeals so that it may perform its task under the proper standard.

JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, dissenting.

There is more than one irony in this "Case of the Wandering Instruments," which subject matter makes it sound more like a candidate for inclusion in the "Adventures of Sherlock Holmes" than in a casebook on constitutional law.  It is ironic in the first place that a constitutional principle which originated in *New York Times Co.* v. *Sullivan, 376 U.S. 254 (1964)*, **[****60]** because of the need for freedom to criticize the conduct of public officials is applied here to a magazine's false statements about a commercial loudspeaker system.

It is also ironic that, in the interest of protecting the *First Amendment*, the Court rejects the "clearly erroneous" standard of review mandated by *Federal Rule of Civil Procedure 52(a)* in favor of a "*de novo*" standard of review for the "constitutional **[**1968]** facts" surrounding the "actual malice" determination.  But the facts **[***527]** dispositive of that determination -- actual knowledge or subjective reckless disregard for truth -- involve no more than findings about the *mens rea* of an author, findings which appellate courts are simply ill-prepared to make in any context, including the *First Amendment* context.  Unless "actual malice" now means something different from the definition given to the term 20 years ago by this **[*516]** Court in *New York Times*, I do not think that the constitutional requirement of "actual malice" properly can bring into play any standard of factual review other than the "clearly erroneous" standard.

In this case the District Court concluded by what it found to be clear **[****61]** and convincing evidence that respondent's engineer Arnold Seligson had written the defamatory statement about Bose's product with actual knowledge that it was false.  It reached that conclusion expressly relying on its determination about the credibility of Seligson's testimony.  *508 F.Supp. 1249, 1276-1277 (1981)*. On appeal there was no issue as to whether the District Court had properly understood what findings were legally sufficient to establish "actual malice" nor was there any issue as to the necessary quantum of proof nor the proper allocation of the burden of proof of "actual malice." The issue on appeal thus was only the propriety of the District Court's factual conclusion that Bose had actually proved "actual malice" in this case.  Yet the Court of Appeals never rebutted the District Court's conclusion that Seligson had actual knowledge that what he printed was false.  Instead it concluded after *de novo* review that Seligson's language was merely "imprecise" and that as such, it would not "support an inference of actual malice." *692 F.2d 189, 197 (1982)*.

It is unclear to me just what that determination by the Court of Appeals has to do with **[****62]** the *mens rea* conclusion necessary to the finding of "actual malice" and with the District Court's finding of actual knowledge here.  In approving the Court of Appeals' *de novo* judgment on the "actual malice" question, for all the factual detail and rehearsal of testimony with which the majority's opinion is adorned, the Court never quite comes to grips with what factual finding it must focus on.  At one point we are told that "[the] statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies," *ante*, at 513, suggesting that the disparaging **[*517]** statement was perhaps not even false, or at any rate not false *enough*. One paragraph later, we are told that "as a matter of law . . . the record does not contain clear and convincing evidence that Seligson or his employer prepared the loudspeaker article with knowledge that it contained a false statement, or with reckless disregard of the truth." *Ante*, at 513.  The Court remarks that the question presented "reaches us on a somewhat peculiar wavelength," *ante*, at 514, but that is scarcely a reason for transmitting the answer **[****63]** on an equally peculiar wavelength.

In my view the problem results from the Court's attempt to treat what is here, and in other contexts always has been, a pure question of fact, as something more than a fact -- a so-called "constitutional fact." The Court correctly points out that independent appellate review of **[***528]** facts underlying constitutional claims has been sanctioned by previous decisions of this Court where "a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts." *Fiske v. Kansas, 274 U.S. 380, 385-386 (1927)*. But in other contexts we have always felt perfectly at ease leaving state-of-

Bose Corp. v. Consumers Union, 466 U.S. 485

mind determinations, such as the actual knowledge and recklessness determinations involved here, to triers of fact with only deferential appellate review -- for example, in criminal cases where the burden of proving those facts is even greater than the "clear and **[\*\*1969]** convincing" standard applicable under *New York Times*. [1]

**[\*\*\*\*64]** **[\*518]** Presumably any doctrine of "independent review" of facts exists, not so that an appellate court may inexorably place its thumb on the scales in favor of the party claiming the constitutional right, but so that perceived shortcomings of the trier of fact by way of bias or some other factor may be compensated for. [2] But **[\*\*\*529]** to me, the only shortcoming here is an **[\*519]** appellate court's inability to make the determination which the Court mandates today -- the *de novo* determination about the state of mind of a particular author at a particular time. Although there well may be cases where the "actual malice" determination can be made on the basis of objectively reviewable facts in the record, it seems to me that just as often it is made, as here, on the basis of an evaluation of the credibility of the testimony of the author of the defamatory statement. I am at a loss to see how appellate courts can even begin to make such determinations. In any event, surely such determinations are best left to the trial judge.

**[\*\*\*\*65]** It is of course true as the Court recognizes that "where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding -- inherent in all litigation -- will create the danger that the legitimate utterance will be penalized." *Speiser v. Randall, 357 U.S. 513, 526 (1958)*. But the *New York Times* rule adequately addresses the need to shield protected speech from the risk of erroneous factfinding by placing the **[\*\*1970]** burden of proving "actual malice" on the party seeking to penalize expression. I agree with Justice Harlan who, in commenting on the inappropriateness of *de novo* fact review of the "actual malice" determination, concluded that he could not

---

[1] In attempting to justify independent appellate review of the "actual malice" determination, the majority draws an analogy to other cases which have attempted to define categories of unprotected speech, such as obscenity and child pornography cases, *New York v. Ferber, 458 U.S. 747, 774, n. 28 (1982)*; *Miller v. California, 413 U.S. 15 (1973)*; *Roth v. United States, 354 U.S. 476 (1957)*, and cases involving words inciting anger or violence, *Hess v. Indiana, 414 U.S. 105 (1973) (per curiam)*; *Street v. New York, 394 U.S. 576 (1969)*; *Chaplinsky v. New Hampshire, 315 U.S. 568 (1942)*. To my mind, however, those cases more clearly involve the kind of mixed questions of fact and law which call for *de novo* appellate review than do the *New York Times* "actual malice" cases, which simply involve questions of pure historical fact.

For example, with respect to the obscenity cases, appellate courts perhaps are just as competent as are triers of fact to make determinations about whether material appeals to "prurient interests," whether it depicts sexual conduct in a "patently offensive" way, and whether the material lacks serious artistic value, *Miller v. California, supra, at 24*. In the words-inciting-violence cases, the necessary determinations, equally capable of *de novo* appellate review, are whether words are "'likely to provoke the *average* person to retaliation,'" *Street v. New York, supra, at 592* (emphasis added) (quoting *Chaplinsky v. New Hampshire, supra, at 574*), or whether the "rational inference from the import of the language" is that it is "likely to produce *imminent* disorder." *Hess v. Indiana, supra, at 109*. None of those cases requires the kind of pure historical factual determination that the *New York Times* cases require: a determination as to the actual subjective state of mind of a *particular* person at a *particular* time.

[2] The Court correctly points out that in *New York Times Co*. v. *Sullivan*, we conducted independent appellate review of the facts underlying the "actual malice" determination. It is notable, however, that *New York Times* came to this Court from a state court after a jury trial, and thus presented the strongest case for independent factfinding by this Court. The factfinding process engaged in by a jury rendering a general verdict is much less evident to the naked eye and thus more suspect than the factfinding process engaged in by a trial judge who makes written findings as here. Justifying independent review of facts found by a jury is easier because of the absence of a distinct "yes" or "no" in a general jury verdict as to a particular factual inquiry and because of the extremely narrow latitude allowed appellate courts to review facts found by a jury at common law. Thus it is not surprising to me that early cases espousing the notion of independent appellate review of "constitutional facts," such as *Fiske v. Kansas, 274 U.S. 380 (1927)*, and *New York Times*, should have arisen out of the context of jury verdicts and that they then were perhaps only reflexively applied in other quite different contexts without further analysis. See *Time, Inc*. v. *Pape, 401 U.S. 279 (1971)* (involving appellate review of a District Court's directed verdict).

**EXHIBIT 43**                                                            EXHIBIT  12

Bose Corp. v. Consumers Union, 466 U.S. 485

"discern in those *First Amendment* considerations that led us to restrict the States' powers to regulate defamation of public officials any additional interest that is not served by the actual-malice rule of *New York Times, supra*, but is substantially promoted by utilizing [an appellate court] as the ultimate arbiter of factual disputes in those libel cases where no unusual factors, such as allegations of harassment **[****66]** or the existence of a jury verdict resting on erroneous instructions . . . are present." *Time, Inc*. v. *Pape, 401 U.S. 279, 294 (1971)* (dissenting opinion).

I think that the issues of "falsity" and "actual malice" in this case may be close questions, but I am convinced that the **[*520]** District Court, which heard the principal witness for the respondent testify for almost six days during the trial, fully understood both the applicable law and its role as a finder of fact.  Because it is not clear to me that the *de novo* findings of appellate courts, with only bare records before them, are likely to be any more reliable than the findings reached by trial judges, I cannot join the majority's sanctioning of factual second-guessing by appellate courts.  I believe that the primary result of the Court's holding today will not be greater protection for *First Amendment* values, but rather only lessened confidence in the judgments of lower courts and more entirely factbound appeals.

I continue to adhere to the view expressed in *Pullman-Standard v. Swint, 456 U.S. 273, 287 (1982)*, that *Rule 52(a)* "does not make exceptions or purport to exclude **[****67]** certain categories of factual findings from the obligation **[***530]** of a court of appeals to accept a district court's findings unless clearly erroneous." There is no reason to depart from that rule here, and I would therefore reverse and remand this case to the Court of Appeals so that it may apply the "clearly erroneous" standard of review to the factual findings of the District Court.

## References

5 Am Jur 2d, Appeal and Error 831; 32 Am Jur 2d, Federal Practice and Procedure 363

2 Federal Procedure, L Ed, Appeal, Certiorari, and Review 3:649

USCS, Court Rules, *Federal Rules of Civil Procedure, Rule 52*

US L Ed Digest, Appeal and Error 1477

L Ed Index to Annos, Appeal and Error

ALR Quick Index, Appeal and Error

Federal Quick Index, Appeal and Error

   Annotation References:

Application of "purely erroneous" test of *Rule 52(a) of Federal Rules of Civil Procedure* to trial court's findings of fact based on documentary evidence.  **[****68]** *11 ALR Fed 212*.

---

**End of Document**

EXHIBIT 43                                                   EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

# *Time, Inc. v. Firestone*

Supreme Court of the United States

Argued October 14, 1975 ; March 2, 1976

No. 74-944.

**Reporter**

424 U.S. 448 *; 96 S. Ct. 958 **; 47 L. Ed. 2d 154 ***; 1976 U.S. LEXIS 26 ****; 1 Media L. Rep. 1665

TIME, INC. v. FIRESTONE

**Prior History:  [****1]**  CERTIORARI TO THE SUPREME COURT OF FLORIDA

## Case Summary

**Procedural Posture**

Petitioner news publisher appealed a judgment from the Supreme Court of Florida that held petitioner libeled respondent divorcee by publishing defamatory news of her divorce in its magazine and assessed damages for the publication.

**Overview**

Based on a published order of a court hearing respondent's divorce, petitioner news publisher wrote an article in its national magazine reporting the divorce, inaccurately reporting that the divorce resulted from respondent's extramarital affairs that would "make Dr. Freud's hair curl." Petitioner appealed an adverse judgment that the report was actionable and that damages were appropriate because respondent was a public figure and that petitioner had not maliciously published the report. The court found that respondent was not a public figure because she had merely resorted to judicial process to obtain a divorce and had not interjected herself into a matter of public controversy. The fact that her divorce was a "cause celebre" did not make her a public figure in the constitutional sense. The court noted that constitutional limitations required a showing of fault on the part of a defendant charged with publishing defamatory material, but that the lower courts had not made any finding as to petitioner's fault in the record. Without this finding, the court could not support the award of damages even though there was evidence that petitioner's publication was inaccurate.

**Outcome**

The judgment holding petitioner publisher liable for defamatory statements it printed about respondent and assessing damages for the libel was vacated. The court found that although respondent was not a public figure and there was evidence that petitioner's publication was inaccurate, the lower court did not make a finding of petitioner's fault, which was constitutionally required. The court remanded for proceedings consistent with its decision.

## Syllabus

After respondent had sought separate maintenance, her husband, the scion of a wealthy industrial family, filed a counterclaim for divorce on grounds of extreme cruelty and adultery. The court granted the counterclaim, stating that "neither party is domesticated, within the meaning of that term as used by the Supreme Court of Florida," and that "the marriage should be dissolved." On the basis of newspaper and wire service reports and information from a bureau chief and a "stringer," petitioner published in its magazine an item reporting that the divorce was granted "on grounds of extreme cruelty and adultery." After petitioner had declined to retract, respondent brought this libel action

**EXHIBIT 43**                                                                    **EXHIBIT  13**

Time, Inc. v. Firestone, 424 U.S. 448

in the state court.  A jury verdict for damages against petitioner was ultimately affirmed by the Florida Supreme Court. Petitioner claims that the judgment violates its rights under the *First* and *Fourteenth Amendments*.  Held:

1.  The standard enunciated in *New York Times Co. v. Sullivan, 376 U.S. 254*, as later extended,  **[****2]**  which bars media liability for defamation of a public figure absent proof that the defamatory statements were published with knowledge of their falsity or in reckless disregard of the truth, is inapplicable to the facts of this case.  Pp. 452-457.

 (a) Respondent was not a "public figure," since she did not occupy "[a role] of especial prominence in the affairs of society," and had not been "thrust . . . to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc., 418 U.S. 323, 345*. Pp. 453-455.

 (b) The New York Times rule does not automatically extend to all reports of judicial proceedings regardless of whether the party plaintiff in such proceedings is a public figure who might be assumed to "have voluntarily exposed [himself] to increased risk of injury from defamatory falsehood." *Gertz, supra, at 345*. There is no substantial reason why one involved in litigation should forfeit that degree of protection afforded by the law of defamation simply by virtue of being drawn into a courtroom.  Pp. 455-457.

2.  No finding was ever made by the divorce court that respondent **[****3]**  was guilty of adultery as petitioner had reported, and though petitioner contends that it faithfully reproduced the precise meaning of the divorce judgment, the jury's verdict, upheld on appeal, rejected petitioner's contention that the report was accurate.  Pp. 457-459.

3.  In a case such as this, *Gertz, supra*, imposes the constitutional limitations that (1) compensatory awards "be supported by competent evidence concerning the injury" and (2) liability cannot be imposed without fault. Since Florida permits damages awards in defamation actions based on elements other than injury to reputation, and there was competent evidence here to permit the jury to assess the amount of such injury, the first of these conditions was satisfied.  Pp. 459-461.

4.  Since, however, there was no finding of fault on the part of the petitioner in its publication of the defamatory material, the second constitutional limitation imposed by Gertz was not met.  Though the trial court's failure to submit the question of fault to the jury does not of itself establish noncompliance with the constitutional requirement, none of the Florida courts that considered this case determined that petitioner **[****4]**  was at fault. Pp. 461-464.

 *305 So.2d 172*, vacated and remanded.

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined.  POWELL, J., filed a concurring opinion, in which STEWART, J., joined, post, p. 464. BRENNAN, J., post, p. 471, WHITE, J., post, p. 481, and MARSHALL, J., post, p. 484, filed dissenting opinions. STEVENS, J., took no part in the consideration or decision of the case.

**Counsel:** John H. Pickering argued the cause for petitioner.  With him on the briefs were Harold R. Medina, Jr., and William S. Frates.

Edna L. Caruso argued the cause and filed a brief for respondent.

**Opinion by:** REHNQUIST

# Opinion

 **[*449]**  **[***160]**  **[**963]**  MR. JUSTICE REHNQUIST, delivered the opinion of the Court.

Petitioner is the publisher of Time, a weekly news magazine.  The Supreme Court of Florida affirmed a  **[*450]**  $100,000 libel judgment against petitioner which was based on an item appearing in Time that purported

EXHIBIT 43  Time, Inc. v. Firestone, 424 U.S. 448  EXHIBIT  13

to describe the result of domestic relations litigation between respondent and her husband.  We granted certiorari, *421 U.S. 909 (1975)*, to review petitioner's claim **[****5]** that the judgment violates its rights under the *First* and *Fourteenth Amendments to the United States Constitution*.

I

Respondent, Mary Alice Firestone, married Russell Firestone, the scion of one of America's wealthier industrial families, in 1961.  In 1964, they separated, and respondent filed a complaint for separate maintenance in the Circuit Court of Palm Beach  **[***161]**  County, Fla.  Her husband counterclaimed for divorce on grounds of extreme cruelty and adultery. After a lengthy trial the Circuit Court issued a judgment granting the divorce requested by respondent's husband.  In relevant part the court's final judgment read: S

"This cause came on for final hearing before the court upon the plaintiff wife's second amended complaint for separate maintenance (alimony unconnected with the causes of divorce), the defendant husband's answer and counterclaim for divorce on grounds of extreme cruelty and adultery, and the wife's answer thereto setting up certain affirmative defenses.

 . . . . .

"According to certain testimony in behalf of the defendant, extramarital escapades of the plaintiff were bizarre and of an amatory nature which would have made Dr. Freud's hair curl.  **[****6]**  Other testimony, in plaintiff's behalf, would indicate that defendant was guilty of bounding from one bed partner to another  **[*451]**  with the erotic zest of a satyr. The court is inclined to discount much of this testimony as unreliable.  Nevertheless, it is the conclusion and finding of the court that neither party is domesticated, within the  **[**964]**  meaning of that term as used by the Supreme Court of Florida.

 . . . . .

"In the present case, it is abundantly clear from the evidence of marital discord that neither of the parties has shown the least susceptibility to domestication, and that the marriage should be dissolved.

 . . . . . $

"The premises considered, it is thereupon

"ORDERED AND ADJUDGED as follows:

"1.  That the equities in this cause are with the defendant; that defendant's counterclaim for divorce be and the same is hereby granted, and the bonds of matrimony which have heretofore existed between the parties are hereby forever dissolved.

 . . .

"4.  That the defendant shall pay unto the plaintiff the sum of $ 3,000 per month as alimony beginning January 1, 1968, and a like sum on the first day of each and every month thereafter until the death **[****7]**  or remarriage of the plaintiff." App. 523-525, 528.

Time's editorial staff, headquartered in New York, was alerted by a wire service report and an account in a New York newspaper to the fact that a judgment had been rendered in the Firestone divorce proceeding.  The staff subsequently received further information regarding the Florida decision from Time's Miami bureau chief and from a "stringer" working on a special assignment basis in the Palm Beach area.  On the basis of these four sources, Time's staff composed the following item,  **[*452]**  which appeared in the magazine's "Milestones" section the following week: S

"DIVORCED.  By Russell A. Firestone Jr., 41, heir to the tire fortune: Mary Alice Sullivan Firestone, 32, his third wife; a  onetime  Palm  Beach  schoolteacher;  on  grounds  of  extreme  cruelty  and  adultery;  after  six  years  of

EXHIBIT 43                                                        EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

marriage, **[\*\*\*162]** one son; in West Palm Beach, Fla.  The 17-month intermittent trial produced enough testimony of extramarital adventures on both sides, said the judge, 'to make Dr. Freud's hair curl.'"I

Within a few weeks of the publication of this article respondent demanded in writing a retraction from petitioner, alleging that a portion **[\*\*\*\*8]** of the article was "false, malicious and defamatory." Petitioner declined to issue the requested retraction.  [1]

Respondent then filed this libel action against petitioner in the Florida Circuit Court.  Based on a jury verdict for respondent, that court entered judgment against petitioner for $100,000, and after review in both the Florida District Court of Appeal and the Supreme Court of Florida the judgment was ultimately affirmed.  *305 So. 2d 172 (1974)*. Petitioner advances several contentions as to why the judgment is contrary to decisions of this Court holding that the *First* and *Fourteenth Amendments of the United States Constitution* limit the authority of state courts to impose liability for damages based on defamation.

II

 [1A] **[\*\*\*\*9]** Petitioner initially contends that it cannot be liable for publishing any falsehood defaming respondent unless **[\*453]** it is established that the publication was made "with actual malice," as that term is defined in *New York Times Co.  v. Sullivan, 376 U.S. 254 (1964)*. [2] Petitioner advances two arguments in support of this contention: that **[\*\*965]** respondent is a "public figure" within this Court's decisions extending New York Times to defamation suits brought by such individuals, see, e.g., *Curtis Publishing Co.  v. Butts, 388 U.S. 130 (1967)*; and that the Time item constituted a report of a judicial proceeding, a class of subject matter which petitioner claims deserves the protection of the "actual malice" standard even if the story is proved to be defamatorily false or inaccurate.  We reject both arguments.

 **[\*\*\*\*10]**  [2] [3]In *Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974)*, we have recently further defined the meaning of "public figure" for the purposes of the *First* and *Fourteenth Amendments*: S

"For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."I

Respondent did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust **[\*\*\*163]** herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it.

 **[\*454]** Petitioner contends that because **[\*\*\*\*11]** the Firestone divorce was characterized by the Florida Supreme Court as a "cause celebre," it must have been a public controversy and respondent must be considered a public figure. But in so doing petitioner seeks to equate "public controversy" with all controversies of interest to the public. Were we to accept this reasoning, we would reinstate the doctrine advanced in the plurality opinion in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*, which concluded that the New York Times privilege should be extended to falsehoods defamatory of private persons whenever the statements concern matters of general or public interest.  In Gertz, however, the Court repudiated this position, stating that "extension of the New York Times test proposed by

---

[1] Under Florida law the demand for retraction was a prerequisite for filing a libel action, and permits defendants to limit their potential liability to actual damages by complying with the demand. *Fla. Stat. Ann.  §§ 770.01-770.02* (1963).

[2]  [1B]

 The "actual malice" test requires that a plaintiff prove that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *376 U.S., at 280*.

**EXHIBIT 43**                                                                    **EXHIBIT  13**

Time, Inc. v. Firestone, 424 U.S. 448

the Rosenbloom plurality would abridge [a] legitimate state interest to a degree that we find unacceptable." *418 U.S., at 346*.

 [4A]Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in Gertz, **[****12]** even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public.  Nor did respondent freely choose to publicize issues as to the propriety of her married life.  She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony.  We have said that in such an instance "[r]esort to the judicial process… is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court." *Boddie v. Connecticut, 401 U.S. 371, 376-377 (1971)*. Her actions, both in instituting the litigation and in its conduct, were quite different from those of General Walker in *Curtis Publishing Co., supra.* [3] She assumed no "special prominence  **[*455]**  in the resolution of public questions." *Gertz, supra, at 351*.  We hold respondent was not a "public figure" for the purpose of determining the constitutional protection  **[**966]**  afforded petitioner's report of the factual and legal basis for her divorce.

 [5]For similar reasons we likewise reject petitioner's claim for automatic extension of the New York Times privilege to all reports of judicial proceedings.  It is argued that information concerning proceedings in our Nation's courts may have such importance **[****14]**  to all citizens as to justify extending special *First Amendment* protection to the press when reporting on such events.   We have recently accepted a significantly more confined version of this  **[***164]**  argument by holding that the Constitution precludes States from imposing civil liability based upon the publication of truthful information contained in official court records open to public inspection.  *Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975)*.

Petitioner would have us extend the reasoning of Cox Broadcasting to safeguard even inaccurate and false statements, at least where "actual malice" has not been established.  But its argument proves too much.  It may be that all reports of judicial proceedings contain some informational value implicating the *First Amendment*, but recognizing this is little different from labeling all judicial proceedings matters of "public or general interest," as that phrase was used by the plurality  **[*456]**  in Rosenbloom.  Whatever their general validity, use of such subject-matter classifications to determine the extent of constitutional **[****15]**  protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area.  It was our recognition and rejection of this weakness in the Rosenbloom test which led us in Gertz to eschew a subject-matter test for one focusing upon the character of the defamation plaintiff.  See *418 U.S., at 344-346*. By confining inquiry to whether a plaintiff is a public officer or a public figure who might be assumed to "have voluntarily exposed [himself] to increased risk of injury from defamatory falsehood," we sought a more appropriate accommodation between the public's interest in an uninhibited press and its equally compelling need for judicial redress of libelous utterances.  Cf.  *Chaplinsky v. New Hampshire, 315 U.S. 568 (1942)*.

Presumptively erecting the New York Times barrier against all plaintiffs seeking to recover for injuries from defamatory falsehoods published in what are alleged to be reports of judicial proceedings would effect substantial depreciation of the individual's interest in protection from such **[****16]**  harm, without any convincing assurance that such a sacrifice is required under the *First Amendment*. And in some instances such an undiscriminating approach might achieve results directly at odds with the constitutional balance intended.  Indeed, the article upon which the Gertz libel action was based purported to be a report on the murder trial of a Chicago police officer See *418 U.S., at 325-*

---

[3] **[****13]**   [4B]

 Nor do we think the fact that respondent may have held a few press conferences during the divorce proceedings in an attempt to satisfy inquiring reporters converts her into a "public figure." Such interviews should have had no effect upon the merits of the legal dispute between respondent and her husband or the outcome of that trial, and we do not think it can be assumed that any such purpose was intended.  Moreover, there is no indication that she sought to use the press conferences as a vehicle by which to thrust herself to the forefront of some unrelated controversy in order to influence its resolution.  See *Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974)*.

**237**

*326*. Our decision in that case should make it clear that no such blanket privilege for reports of judicial proceedings is to be found in the Constitution.

[6] [7]It may be argued that there is still room for application of the New York Times protections to more narrowly **[*457]** focused reports of what actually transpires in the courtroom. But even so narrowed, the suggested privilege is simply too broad. Imposing upon the law of private defamation the rather drastic limitations worked by New York Times cannot be justified by generalized **[****17]** references to the public interest in reports of judicial proceedings. The details of many, if not most, courtroom battles would add almost nothing toward advancing the uninhibited debate on public issues thought to provide principal support for the decision in New York Times. See *376 U.S., at 270*; **[***165]** cf. *Rosenblatt v. Baer, 383 U.S. 75, 86 (1966)*. And while participants in some litigation may be legitimate "public figures," either generally or for the limited purpose of that litigation, **[**967]** the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom. The public interest in accurate reports of judicial proceedings is substantially protected by *Cox Broadcasting Co., supra.* **[****18]** As to inaccurate and defamatory reports of facts, matters deserving no *First Amendment* protection, see *418 U.S., at 340*, we think Gertz provides an adequate safeguard for the constitutionally protected interests of the press and affords it a tolerable margin for error by requiring some type of fault.

III

[8]Petitioner has urged throughout this litigation that it could not be held liable for publication of the "Milestones" item because its report of respondent's divorce **[*458]** was factually correct. In its view the Time article faithfully reproduced the precise meaning of the divorce judgment. But this issue was submitted to the jury under an instruction intended to implement Florida's limited privilege for accurate reports of judicial proceedings. App. 509; see *305 So. 2d, at 177*. By returning a verdict for respondent the jury necessarily found that the identity of meaning which petitioner claims does not exist even for laymen. The Supreme Court of Florida upheld this finding on appeal, rejecting petitioner's contention that its report was accurate as a matter of law. **[****19]** Because demonstration that an article was true would seem to preclude finding the publisher at fault, see *Cox Broadcasting Co., 420 U.S., at 498-500* (POWELL, J., concurring), we have examined the predicate for petitioner's contention. We believe the Florida courts properly could have found the "Milestones" item to be false.

For petitioner's report to have been accurate, the divorce granted Russell Firestone must have been based on a finding by the divorce court that his wife had committed extreme cruelty toward him and that she had been guilty of adultery. This is indisputably what petitioner reported in its "Milestones" item, but it is equally indisputable that these were not the facts. Russell Firestone alleged in his counterclaim that respondent had been guilty of adultery, but the divorce court never made any such finding. Its judgment provided that Russell Firestone's "counterclaim for divorce be and the same is hereby granted," but did not specify that the basis for the judgment was either of the two grounds alleged in the counterclaim. The Supreme Court of Florida **[****20]** on appeal concluded that the ground actually relied upon by the divorce court was "lack of domestication of the parties," a ground not theretofore recognized by Florida law. The Supreme Court nonetheless affirmed the judgment dissolving the bonds of **[***166]** matrimony **[*459]** because the record contained sufficient evidence to establish the ground of extreme cruelty. *Firestone v. Firestone, 263 So. 2d 223, 225 (1972)*.

[9A] [10]Petitioner may well argue that the meaning of the trial court's decree was unclear, [4] but this does not license it to choose from among several conceivable interpretations the one most damaging to respondent. Having chosen

---

[4] [9B]

Petitioner is incorrect in arguing that a rational interpretation of an ambiguous document is constitutionally protected under our decision in *Time, Inc. v. Pape, 401 U.S. 279 (1971)*. There we were applying the New York Times standard to test whether the

EXHIBIT 43   EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

to follow this tack, [5] petitioner **[\*\*968]** must be able to establish not merely that the item reported was a conceivable or plausible interpretation of the decree, but that the item was factually correct.  We believe there is ample support for the jury's conclusion, affirmed by the Supreme Court of Florida, that this was not the case.  There was, therefore, sufficient **[\*\*\*\*21]** basis for imposing liability upon petitioner if the constitutional limitations we announced in Gertz have been satisfied.  These are a prohibition against imposing liability without fault, *418 U.S., at 347*, and the requirement that compensatory awards "be supported by competent evidence concerning the injury." *Id., at 350*.

**[\*\*\*\*22]** **[\*460]**  [11] [12]As to the latter requirement little difficulty appears.  Petitioner has argued that because respondent withdrew her claim for damages to reputation on the eve of trial, there could be no recovery consistent with Gertz.  Petitioner's theory seems to be that the only compensable injury in a defamation action is that which may be done to one's reputation, and that claims not predicated upon such injury are by definition not actions for defamation. But Florida has obviously decided to permit recovery for other injuries without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation. This does not transform the action into something other than an action for defamation as that term is meant in Gertz.  In that opinion we made it clear that States could base awards on elements other than injury to reputation, specifically listing "personal humiliation, and mental anguish and suffering" as examples of injuries which might be compensated consistently with the Constitution upon a showing **[\*\*\*\*23]** of fault. Because respondent has decided to forgo recovery for injury to her reputation, she is not prevented from obtaining compensation for such other damages that a defamatory falsehood may have caused her.

 [13]The trial court charged, consistently with Gertz, that the jury should award respondent compensatory damages in "an amount of **[\*\*\*167]** money that will fairly and adequately compensate her for such damages," and further cautioned that "[i]t is only damages which are a direct and natural result of the alleged libel which may be recovered." App. 509.  There was competent evidence introduced to permit the jury to assess the amount of injury.  Several witnesses [6] testified to the extent of respondent's **[\*461]** anxiety and concern over Time's inaccurately reporting that she had been found guilty of adultery, and she herself took the stand to elaborate on her fears that her young son would be adversely affected by this falsehood when he grew older.  The jury decided these injuries should be compensated by an award of $100,000.  We have no warrant for re-examining this determination. Cf. **[\*\*\*\*24]** *Lincoln v. Power, 151 U.S. 436 (1894)*.

IV

 [14A]Gertz established, however, that not only must there be evidence to support an award of compensatory damages, there must also be evidence of some fault on the part of a defendant charged with publishing defamatory material.  No question of fault was submitted to the jury in this case, because under Florida law the only findings required for determination of liability were whether the article was defamatory, whether **[\*\*969]** it was true, and whether the defamation, if any, caused respondent harm.

 [15] [16] **[\*\*\*\*25]** The failure to submit the question of fault to the jury does not of itself establish noncompliance with the constitutional requirements established in Gertz, however.  Nothing in the Constitution requires that assessment of fault in a civil case tried in a state court be made by a jury, nor is there any prohibition against such a finding being made in the first instance by an appellate, rather than a trial, court.  The *First* and *Fourteenth*

---

defendant had acted in reckless disregard of the truth.  *Id., at 292*. But as we have concluded that the publication in this case need not be tested against the "actual malice" standard, Pape is of no assistance to petitioner.

[5]  In fact, it appears that none of petitioner's employees actually saw the decree prior to publication of the "Milestones" article.  But we do not think this can affect the extent of constitutional protection afforded the statement.  Moreover, petitioner has maintained throughout that it would have published an identical statement if its editorial staff had had an opportunity to peruse the judgment prior to their publication deadline, and has consistently contended that its article was true when compared to the words of that judgment.

[6] These included respondent's minister, her attorney in the divorce proceedings, plus several friends and neighbors, one of whom was a physician who testified to having to administer a sedative to respondent in an attempt to reduce discomfort wrought by her worrying about the article.

Case 22-33553   Document 1059-17   Filed in TXSB on 02/03/25   Page 242 of 452

EXHIBIT 43                                                           EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

*Amendments* do not impose upon the States any limitations as to how, within their own judicial systems, factfinding tasks shall be allocated.  If we were satisfied that one of the Florida courts which considered this case had supportably ascertained petitioner  **[*462]**  was at fault, we would be required to affirm the judgment below.

But the only alternative source of such a finding, given that the issue was not submitted to the jury, is the opinion of the Supreme Court of Florida.  That opinion appears to proceed generally on the assumption that a showing of fault was not required, [7] but then in the penultimate paragraph it recites:

 **[***168]**  "Furthermore, this erroneous reporting **[****26]**  is clear and convincing evidence of the negligence in certain segments of the news media in gathering the news.  *Gertz v. Welch, Inc., supra.* Pursuant to Florida law in effect at the time of the divorce judgment ( *Section 61.08, Florida Statutes*), a wife found guilty of adultery could not be awarded alimony.  Since petitioner had been awarded alimony, she had not been found guilty of adultery nor had the  **[*463]**  divorce been granted on the ground of adultery.  A careful examination of the final decree prior to publication would have clearly demonstrated that the divorce had been granted on the grounds of extreme cruelty, and thus the wife would have been saved the humiliation of being accused of adultery in a nationwide magazine.  This is a flagrant example of 'journalistic negligence.'" *305 So. 2d, at 178*.l

 **[****27]**  [17]It may be argued that this is sufficient indication the court found petitioner at fault within the meaning of Gertz.  Nothing in that decision or in the *First* or *Fourteenth Amendment* requires that in a libel action an appellate court treat in detail by written opinion all contentions of the parties, and if the jury or trial judge had found fault in fact, we would be quite willing to read the quoted passage as affirming that conclusion.  But without some finding of fault by the judge or jury in the Circuit Court, we would have to attribute to the Supreme Court of Florida from the quoted language not merely an intention to affirm the finding of the lower court, but an intention to find such a fact in the first instance.

 [18]Even where a question of fact may have constitutional significance, we normally accord findings of state courts deference in reviewing constitutional claims here.   See, e.g., *Lyons v. Oklahoma, 322 U.S. 596, 602-603 (1944)*; **[****28]** *Gallegos v. Nebraska, 342 U.S. 55, 60-61 [**970] (1951)* (opinion of Reed, J.).  But that deference is predicated on our belief that at some point in the state proceedings some factfinder has made a conscious determination of the existence or nonexistence of the critical fact.  Here the record before us affords no basis for such a conclusion.

 [14B]It may well be that petitioner's account in its "Milestones" section was the product of some fault on its part,  **[*464]**  and that the libel judgment against it was, therefore, entirely consistent with Gertz.  But in the absence of a finding in some element of the state-court system that there was fault, we are not inclined to canvass the record to make such a determination in the first instance.  Cf.  *Rosenblatt v. Baer, 383 U.S., at 87-88*.  Accordingly, the judgment of the Supreme Court of Florida is vacated and the case remanded for further proceedings not inconsistent with this opinion.

---

[7] After reiterating its conclusion that the article was false, the Florida court noted that falsely accusing a woman of adultery is libelous per se and normally actionable without proof of damages.  The court then recognized that our opinion in Gertz necessarily displaced this presumption of damages but ruled that the trial court's instruction was consistent with Gertz and that there was evidence to support the jury's verdict -- conclusions with which we have agreed.  The court went on to reject a claim of privilege under state law, pointing out that the privilege shielded only "fair and accurate" reports and the jury had resolved these issues against petitioner.  The court appears to have concluded its analysis of petitioner's legal claims with this statement, which immediately precedes the paragraph set out in the text:

"Careful examination and consideration of the record discloses that the judgment of the trial court is correct and should have been affirmed on appeal to the District Court." *305 So. 2d, at 177-178*.

There is nothing in the court's opinion which appears to make any reference to the relevance of some concept of fault in determining petitioner's liability.

240

**EXHIBIT 43**                                                                    **EXHIBIT 13**

Time, Inc. v. Firestone, 424 U.S. 448

So ordered.

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

**Concur by:** POWELL

# Concur

[***169]  MR. JUSTICE [****29]  POWELL, with whom MR. JUSTICE STEWART joins, concurring.

A clear majority of the Court adheres to the principles of *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*. But it is evident from the variety of views expressed that perceptions differ as to the proper application of such principles to this bizarre case.  In order to avoid the appearance of fragmentation of the Court on the basic principles involved, I join the opinion of the Court.  I add this concurrence to state my reaction to the record presented for our review.

In Gertz we held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id., at 347*. Thus, while a State may elect to hold a publisher to a lesser duty of care, [1] there is no *First Amendment* constraint against  [*465]  allowing recovery upon proof of negligence.  The applicability of such a fault standard was expressly limited to circumstances where, as here, "the substance of the defamatory statement 'makes substantial danger to reputation apparent.'" [2] [****30]  *Id., at 348*, quoting *Curtis Publishing Co.  v. Butts, 388 U.S. 130, 155 (1967)*. By requiring a showing of fault the Court in Gertz sought to shield the press and broadcast media from a rule of strict liability that could lead to intolerable self-censorship and at the same time recognize the legitimate state interest in compensating private individuals for wrongful injury from defamatory falsehoods.

[****31]  In one paragraph near the end of its opinion, the Supreme Court of Florida cited Gertz in concluding that Time was guilty of "journalistic negligence." But, as the opinion of the Court recognizes, ante, at 462 n. 7, and 463, it is not evident from this single paragraph that any type of fault standard was in fact applied.  Assuming that Florida now will apply a negligence standard in cases of this kind, the ultimate question here is whether Time exercised due care under the circumstances: Did Time exercise the reasonably prudent care that a State  [**971]  may constitutionally demand of a publisher or broadcaster prior to a publication whose content reveals its defamatory potential?

The answer to this question depends upon a careful consideration of all the relevant evidence concerning Time's actions prior to the publication of the  [*466]  "Milestones" article.  But in its conclusory paragraph finding negligence, the Supreme Court of Florida mentioned only the provision  [***170]  of Florida law that proscribed an award of alimony to a wife found guilty of adultery, arguing that the award of alimony to respondent clearly demonstrated that the divorce was granted on other  [****32]  grounds.  There is no recognition in the opinion of the ambiguity of the divorce decree and no discussion of any of the efforts made by Time to verify the accuracy of its news report.  Nor was there any weighing of the evidence to determine whether there was actionable negligence by Time under the Gertz standard. [3]

---

[1] A State, if it elected to do so, could require proof of gross negligence before holding a publisher or broadcaster liable for defamation. In Gertz, we concluded "that the State should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." *418 U.S., at 345-346*.

[2]  In amplification of this limitation, we referred to the type of "factual misstatement whose content [does] not warn a reasonably prudent editor or broadcaster of its defamatory potential." *id., at 348*.

[3] The absence of any assessment of fault under the Gertz standard by the Supreme Court of Florida is fatal here because there was no such finding at any other level of judgment in this proceeding.  Ante, at 461-463, and n. 7.

EXHIBIT 43                                                      EXHIBIT  13

Time, Inc. v. Firestone, 424 U.S. 448

There was substantial evidence, much of it uncontradicted, that the editors of Time exercised considerable care in checking the accuracy of the story prior to its publication.  The "Milestones" item appeared in the December 22, 1967, issue of Time.  This issue went to press on Saturday, December 16, the day after the Circuit Court rendered its decision at about 4:30 in the afternoon.  The evening of the 15th the Time editorial staff in New York received an Associated Press [****33] dispatch stating that Russell A. Firestone, Jr., had been granted a divorce from his third wife, whom "he had accused of adultery and extreme cruelty." Later that same evening, Time received the New York Daily News edition for December 16, which carried a special bulletin substantially to the same effect as the AP dispatch.

On the morning of December 16, in response to an inquiry sent to its Miami bureau, Time's New York office received a dispatch from the head of that bureau quoting excerpts from the Circuit Court's opinion that [*467] strongly suggested adultery on the part of both parties.  [4] Later that day the editorial staff received a message from Time's Palm Beach "stringer" that read, in part: "The technical grounds for divorce according to Joseph Farrish [sic], Jr., attorney for Mary Alice Firestone, were given as extreme cruelty and adultry [sic]." App. 532.  The stringer's dispatch also included several quotations from the Circuit Court opinion.  [5] At trial the senior editor testified that although no member of the New York editorial staff had read the Circuit Court's opinion, he had believed that both the stringer and the chief of Time's Miami bureau had read [****34] it.

The opaqueness of the Circuit Court's decree is also a factor to be considered in assessing whether Time was guilty of actionable fault under the Gertz standard.  Although it appears that neither the head of the Miami bureau nor the stringer personally read the [****35] opinion or order,  [***171] the stringer testified at trial that respondent's attorney Farish and others read him portions of the decree over the telephone before he filed his dispatch with Time.  [6] The  [**972]  record does not reveal whether  [*468] the limited portions of the decree that shed light on the grounds for the granting of the divorce were read to the stringer.  [7] But the ambiguity of the divorce decree may well have contributed to the stringer's view, and hence the Time editorial staff's conclusion, that a ground for the divorce was adultery by respondent.

However one may characterize it, the Circuit Court decision was hardly a model of clarity.  Its opening sentence was as follows: S

"This cause came on for final hearing before the court upon the plaintiff wife's second amended complaint for separate maintenance (alimony unconnected with the causes of divorce), the defendant husband's answer and counterclaim for divorce on grounds of extreme cruelty and adultery, and the wife's answer thereto setting up certain affirmative defenses." App. 523.I

---

[4] The excerpts included: "'According to certain testimony in behalf of the defendant [husband], extra marital escapades of the plaintiff [wife] were bizarre and of an amatory nature which would have made Dr. Freud's hair curl.  Other testimony, in the plaintiff's behalf, would indicate that the defendant was guilty of bounding from one bed partner to another with the erotic zest of a satyr.'" App. 544.

[5]  Based on these news items and dispatches, the Time editorial team, consisting of a researcher, writer, and senior editor in charge of the "Milestones" section of the magazine, wrote, edited, and checked the article for accuracy.  At trial they testified as to their complete belief in the truth of the news item at the time of publication.

[6] Several hours after filing his dispatch, the stringer spoke with the divorce judge by telephone.  According to testimony of the stringer at trial the divorce judge read him portions of the decree, and none of this information was inconsistent with that contained in his dispatch to Time; otherwise, he would have alerted Time's New York office immediately.

[7] Time did not consider the stringer to be an employee.  He worked for Time part time and was compensated at an hourly rate, although he was guaranteed a minimum amount of work each year.  In this case, he was contacted by the chief of the Miami bureau [****36] and requested to investigate the Firestone divorce decree. There is thus a question whether the fault, if any, of the stringer in not personally reading the entire opinion and order, is even a factor that may be considered in assessing whether there was actionable fault by Time under Gertz.  Cf. *Cantrell v. Forest City Publishing Co., 419 U.S. 245, 253-254 (1974)*.

**EXHIBIT 43**                                                                **EXHIBIT  13**

Time, Inc. v. Firestone, 424 U.S. 448

After commenting on the conflicting testimony as to respondent's "extra marital escapades" and her husband's "bounding from one bed partner to another," the opinion states that "it is the conclusion and finding of the court that neither **[****37]** party is domesticated…." Finally, the Circuit Court "ORDERED AND ADJUDGED":

"That the equities in this cause are with the  **[\*469]**  defendant; that defendant's counterclaim for divorce be and the same is hereby granted, and the bonds of matrimony which have heretofore existed between the parties are hereby forever dissolved." App. 528.

The remaining paragraphs in the order portion of the decision relate to child custody and support, disposition of certain property, attorney's fees, and the award of $3,000 per month to the wife (respondent) as alimony. There is no reference whatever in the "order" portion of the decision either to "extreme cruelty" or "adultery," the only grounds relied upon by the husband.  But the divorce was granted to him following an express finding "that the equities… are with the defendant [the husband]."

Thus, on the face of the opinion itself, the husband had counterclaimed for divorce on the grounds of extreme cruelty and adultery, and the court had found the equities to be with him and had granted his counterclaim **[\*\*\*172]** for divorce. Apart from the awarding of alimony to the wife there is no indication, either in the opinion or accompanying **[****38]**  order, that the husband's counterclaim was not granted on both of the grounds asserted. This may be a redundant reading, as either ground would have sufficed.  But the opinion that preceded the order was full of talk of adultery and made no explicit reference to any other type of cruelty.  In these circumstances, the decision of the Circuit Court may have been sufficiently ambiguous to have caused reasonably prudent newsmen to read it as granting divorce on the ground of adultery.

As I join the opinion of the Court remanding this case, it is unnecessary to decide whether the foregoing establishes as a matter of law that Time exercised the requisite care under the circumstances.  Nor have I undertaken to identify all of the evidence that may be relevant or to  **[\*470]**  point out conflicts that arguably have been resolved against Time by the jury.  My point in writing is to emphasize that, against the background of a notorious divorce case, see *Curtis Publishing Co., 388 U.S., at 158-159*, [8]  **[\*\*973]**  and a decree that invited misunderstanding, there was substantial evidence supportive of Time's defense that it was not guilty of actionable negligence.   At the very **[****39]**  least the jury or court assessing liability in this case should have weighed these factors and this evidence before reaching a judgment. [9]  There is no indication in the record before us that this was done in accordance with Gertz. [10]

 **[****40]**

**Dissent by:** BRENNAN; WHITE; MARSHALL **[\*471]**

---

[8] In its first opinion remanding the case to the District Court of Appeal, after referring to the general prominence of the Firestones, the Supreme Court of Florida indicated that "their marital difficulties were equally well known; and the charges and countercharges of meretriciousness, flowing from both sides of the controversy, made their divorce action a veritable cause celebre in social circles across the country." *271 So. 2d 745, 751 (1972)*. The District Court of Appeal similarly observed that in part due to the sensational and colorful testimony the 17-month divorce trial had been the object of national news coverage.  *254 So. 2d 386, 389 (1971)*. The reports Time received that the decree was granted on the ground of adultery therefore were consistent with the well-publicized trial revelations.

[9] Indeed, I agree with the view expressed by MR. JUSTICE MARSHALL in his dissenting opinion: Unless there exists some basis for a finding of fault other than that given by the Supreme Court of Florida there can be no liability.

[10] The Florida District Court of Appeal, on the second appeal to it, reversed a judgment for respondent.  In doing so, it applied the New York Times "actual malice" standard, but added: "Nowhere was there proof Time was even negligent, much less intentionally false or in reckless disregard of the truth." *254 So. 2d, at 390*. A problem infecting the various decisions in the Florida courts is the understandable uncertainty as to exactly what standard should be applied.  This case was in litigation several years before Gertz was decided.

**EXHIBIT 43**                                                                                          EXHIBIT  13

Time, Inc. v. Firestone, 424 U.S. 448

# Dissent

MR. JUSTICE BRENNAN, dissenting.

In my view, the question presented by this case is the degree of protection commanded by the *First Amendment's* free expression guarantee where it is sought to hold a publisher liable under state defamation laws for erroneously reporting the results of a public judicial proceeding.

I

In a series of cases beginning with *New York Times Co.  v. Sullivan, 376 U.S. 254 (1964)*, this Court **[\*\*\*173]** has held that the laws of libel and defamation, no less than other legal modes of restraint on the freedoms of speech and press, are subject to constitutional scrutiny under the *First Amendment*. The Court has emphasized that the central meaning of the free expression guarantee is that the body politic of this Nation shall be entitled to the communications necessary for self-governance, and that to place restraints on the exercise of expression is to deny the instrumental means required in order that the citizenry exercise that ultimate sovereignty reposed in its collective judgment by the Constitution.    [1]    Accordingly, we have held that laws governing harm incurred by individuals through defamation **[\*\*\*\*41]** or invasion of privacy, although directed to the worthy objective of ensuring the "essential dignity and worth of every human being" necessary to a civilized society, *Rosenblatt v. Baer, 383 U.S. 75, 92 (1966)* (STEWART, J., concurring), must be measured and limited by constitutional constraints **[\*472]** assuring the maintenance and well-being of the system of free expression.  Although "calculated falsehood" is no part of the expression protected by the central meaning of the *First Amendment*, *Garrison v. Louisiana, 379 U.S. 64, 75 (1964)*, error and misstatement is recognized as inevitable in any scheme of truly free expression and debate.  *New York Times, supra, at 271-272*. Therefore, in order to avoid the self-censorship that **[\*\*974]** would necessarily accompany strict or simple fault liability for erroneous statements, rules governing liability for injury to reputation are required to allow an adequate margin for error -- protecting some misstatements so that the "freedoms of expression… have the 'breathing space' that they 'need… to survive.'" Ibid.  "[T]o insure the ascertainment and publication of the truth about public affairs,  **[\*\*\*\*42]**  it is essential that the *First Amendment* protect some erroneous publications as well as true ones." *St. Amant v. Thompson, 390 U.S. 727, 732 (1968)*. For this reason, New York Times held that liability for

---

[1] See Kalven, The New York Times Case: A Note on "The Central Meaning of the *First Amendment*," 1964 Sup. Ct. Rev. 191; Meiklejohn, The *First Amendment* Is An Absolute, 1961 Sup. Ct. Rev. 245. See also Bloustein, The *First Amendment* and Privacy: The Supreme Court Justice and the Philosopher, 28 Rutgers L. Rev. 41 (1974); Meiklejohn, Public Speech in the Supreme Court Since New York Times v. Sullivan, 26 Syracuse L. Rev. 819 (1975).

[2] The protection of the actual-malice test extends to erroneous statements that in any way "might touch on… [the] fitness for office" of a public official, *Garrison v. Louisiana, 379 U.S. 64, 77 (1964)*, or a candidate for public office, *Monitor Patriot Co.  v. Roy, 401 U.S. 265, 274 (1971)*. The actual-malice standard has been applied "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs," *Rosenblatt v. Baer, 383 U.S. 75, 85 (1966)*, and further to "public figures" who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Curtis Publishing Co. v. Butts, 388 U.S. 130, 164 (1967)* (Warren, C.J., concurring in result).

As an erroneous judgment of liability is, in view of the *First Amendment* values at stake, of more serious concern than an erroneous judgment in the opposite direction, *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 50 (1971)*, the Court has held that actual malice must be demonstrated with "convincing clarity." *New York Times, 376 U.S., at 285-286*. The actual-malice standard requires a showing that the erroneous statements were made in knowing or reckless disregard of their falsity, *id., at 280*, and has been otherwise defined as requiring a showing that the statements were made by a person who in fact was entertaining "serious doubts" as to their truth. *St. Amant v. Thompson, 390 U.S. 727, 731 (1968)*.

EXHIBIT 43                                                                         EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

defamation of a public official may not be imposed in the absence of proof of actual malice on the part of the person making the erroneous statement.  *376 U.S., at 279-280*. [2]

 **[****43]**  **[*473]**  Identical  **[***174]**  considerations led the Court last Term in *Cox Broadcasting Corp.  v. Cohn, 420 U.S. 469 (1975)*, to hold that the *First Amendment* commands an absolute privilege to truthfully report the contents of public records reflecting the subject matter of judicial proceedings.  Recognizing the possibility of injury to legitimate privacy interests of persons affected by such proceedings, the Court was nevertheless constrained in light of the strong *First Amendment* values involved to conclude that no liability whatever could be imposed by the State for reports damaging to those concerns.  Following the reasoning of New York Times and its progeny, the Court in Cox Broadcasting noted: S

"[In] a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations.  Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations.  **[****44]**  Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government  **[*474]**  generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice….

 . . . . .

"… Public records by their very nature are of interest to those concerned  **[**975]**  with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business." *420 U.S., at 491-492, 495*.I

Crucial to the holding in Cox Broadcasting was the determination that a "reasonable man" standard for imposing liability for invasion of privacy interests is simply inadequate to the task of safeguarding against "timidity and self-censorship" in reporting judicial proceedings.  **[****45]**  *Id., at 496*. Clearly, the inadequacy of any such standard is no less in the related area of liability for defamation  **[***175]**  resulting from inadvertent error in reporting such proceedings.

II

It is true, of course, that the Court in *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, cut back on the scope of application of the New York Times privilege as it had evolved through the plurality opinion in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*. Rosenbloom had held the New York Times privilege applicable to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *403 U.S., at 44*. But in light of the Court's perception  **[*475]**  of an altered balance between the conflicting values at stake where the person defamed is in some sense a "private individual," *Gertz, supra, at 347, 349-350*, held *First Amendment* interests adequately protected in such circumstances so long

---

[2] The Court places heavy emphasis on the degree to which Mrs. Firestone attempted to "influence the resolution of" a particular controversy.  In response to the observation that Mrs. Firestone held press conferences, for example, the Court notes that those conferences were not intended to influence the outcome of the trial or any other controversy.Ante, at 454-455, n. 3.  Gertz did, of course, refer to the fact that persons often become public figures by attempting to influence the resolution of public questions.  *418 U.S., at 345*. But the reference must be viewed as but an example of how one becomes a public figure. Surely Gertz did not intend to establish a requirement that an individual attempt to influence the resolution of a particular controversy before he can be termed a public figure. If that were the rule, Athletic Director Butts in *Curtis Publishing Co.  v. Butts, 388 U.S. 130 (1967)*, would not be a public figure. We held that Butts was a public figure, and in Gertz we specifically noted that that decision was "correct." *418 U.S., at 343*.

as defamation liability is restricted to a requirement of "fault" and proof of "actual injury" resulting from the claimed defamation. [3] **[****46]** *418 U.S., [\*476] at 349-350*. However, the extension of the relaxed standard of Gertz to news reporting of events transpiring in and decisions arising out of public judicial proceedings is unwarranted by the terms of Gertz itself, is contrary to other well-established precedents of this Court and, most importantly, savages the cherished values encased in the *First Amendment*.

 **[****47]**   There is no indication in Gertz of any intention to overrule the Rosenbloom decision  **[\*\*976]**  on its facts. Confined to those facts, Rosenbloom holds that in instances of erroneous reporting of the public actions of public officials, the New York Times actual-malice standard must be met before liability for defamation may be imposed in favor of persons affected by those actions.   Although  **[\*\*\*176]**  Gertz clearly altered the broader rationale of Rosenbloom, until the Court's decision today it could not have been supposed that Rosenbloom did not remain the law roughly to the extent of my Brother WHITE'S concurring statement therein:

"[I]n defamation actions, absent actual malice as defined in New York Times Co.  v. Sullivan, the *First Amendment* gives the press and the broadcast media a privilege to report and comment upon the official actions of public servants in full detail, with no requirement that the reputation or the privacy of an individual involved in or affected by the official action be spared from public view." *403 U.S., at 62*. [4]I

 **[****48]**  At stake in the present case is the ability of the press to report to the citizenry the events transpiring in the Nation's judicial systems.   There is simply no meaningful  **[\*477]**  or constitutionally adequate way to report such events without reference to those persons and transactions that form the subject matter in controversy.  [5] This Court has long held:

"A trial is a public event.  What transpires in the court room is public property…. Those who see and hear what transpired can report it with impunity.  There is no special perquisite of the judiciary which enables it, as distinguished

---

[3] In this case, the $100,000 damage award was premised entirely on the injury of mental pain and anguish.  All claims as to injury to reputation were withdrawn prior to trial, and no evidence concerning damage to reputation was presented at trial.  (Indeed, it appears that petitioner was affirmatively precluded from offering evidence to refute any possible jury assumption in this regard by a pretrial order granting "Plaintiff's Motion to Limit Testimony," App. 77.) It seems clear that by allowing this type of recovery the State has subverted whatever protective influence the "actual injury" stricture may possess.  Gertz would, of course, allow for an award of damages for such injury after proof of injury to reputation. *418 U.S., at 349-350*. But to allow such damages without proof "by competent evidence" of any other "actual injury" is to do nothing less than return to the old rule of presumed damages supposedly outlawed by Gertz in instances where the New York Times standard is not met.  *418 U.S., at 349*. See Anderson, Libel and Press Self-Censorship, 53 Tex. L. Rev. 422, 472-473 (1975); Eaton, The American Law of Defamation through Gertz v. Robert Welch, Inc.  and Beyond: An Analytical Primer, 61 Va. L. Rev. 1349, 1436-1437 (1975). The result is clearly to invite "gratuitous awards of money damages far in excess of any actual injury" and jury punishment of "unpopular opinion rather than [compensation to] individuals for injury sustained by the publication of a false fact." *Gertz, supra, at 349*.

Furthermore, the allowance of damages for mental suffering alone will completely abrogate the use of summary judgment procedures in defamation litigation.  Cf. Anderson, supra, at 469 n. 218.  The use of such summary procedures may be a critical factor enabling publishers to avoid large litigation expenses in marginal and frivolous defamation suits.  The specter of such expenses may be as potent a force for self-censorship as any threat of an ultimate damages award.  See generally ibid.

[4] Cf. Anderson, supra, n. 3, at 450-451, concluding that the Gertz opinion suggests a "category of involuntary public figures" roughly equivalent to "[individuals] involved in or affected by… official action" as defined by my Brother WHITE in *Rosenbloom, 403 U.S., at 62*.

[5] Cf.  *Rosenbloom v. Metromedia, Inc., supra, at 61* (WHITE, J., concurring):

"Discussion of the conduct of public officials cannot… be subjected to artificial limitations designed to protect others involved in an episode with officials from unfavorable publicity.  Such limitations would deprive the public of full information about the official action that took place."

**EXHIBIT 43**                                                                                    **EXHIBIT 13**

Time, Inc. v. Firestone, 424 U.S. 448

from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." _Craig v. Harney, 331 U.S. 367, 374 (1947)_. [6]

The Court has recognized that with regard to the judiciary, no less than other areas of government, the press performs an indispensable role by "subjecting the… judicial processes to extensive public scrutiny and criticism." _Sheppard v. Maxwell, 384 U.S. 333, 350 (1966)_. And it is critical that the judicial processes be open to such scrutiny and criticism, for, as the Court has noted **[****49]** in the specific context of labor disputes, the more acute public controversies are, "the more likely it is that in some aspect they will get into court." _Bridges v. California, 314 U.S. 252, 268-269 (1941)_. [7] Indeed, slight **[*478]** reflection is **[***177]** needed to observe the insistent and complex interaction between controversial **[**977]** judicial proceedings and popular impressions thereof and fundamental legal and political changes in the Nation throughout the 200 years of evolution of our political system.  With the judiciary as with all other aspects of government, the _First Amendment_ guarantees to the people of this Nation that they shall retain the necessary means of control over their institutions that might in the alternative grow remote, insensitive, and finally acquisitive of those attributes of sovereignty not delegated by the Constitution. [8]

**[****50]**  Also no less true than in other areas of government, error in reporting and debate concerning the judicial process is inevitable.   Indeed, in view of the complexities of that process and its unfamiliarity to the laymen **[*479]** who report it, the probability of inadvertent error may be substantially greater.[9]

---

[6] Craig also refutes any contention that private civil litigation is somehow different in this respect.  _331 U.S., at 378_.

[7] An early and sympathetic observer of our Nation's political system commented:

"The judicial organization of the United States is the institution which a stranger has the greatest difficulty in understanding.  He hears the authority of a judge invoked in the political occurrences of every day, and he naturally concludes that in the United States the judges are important political functionaries; nevertheless, when he examines the nature of the tribunals, they offer at the first glance nothing that is contrary to the usual habits and privileges of those bodies; and the magistrates seem to him to interfere in public affairs only by chance, but by a chance that recurs every day.

. . . . . .

"Scarcely any political question arises in the United States that is not resolved, sooner or later, into a judicial question." 1 A. de Tocqueville, Democracy in America 98, 280 (P. Bradley ed. 1948).

[8] Even those who would narrowly confine the central meaning of the _First Amendment_ to "explicitly political speech" recognize that this must extend to all speech "concerned with governmental behavior, policy or personnel, whether the governmental unit involved is executive, legislative, judicial or administrative." Bork, Neutral Principles and Some _First Amendment_ Problems, 47 Ind. L.J. 1, 27-28 (1971).

[9] The difficulties encountered by laymen attempting to report in summarized form the results of judicial proceedings are surely illustrated in the instant case.  Respondent's husband in counterclaiming for divorce had alleged grounds of "extreme cruelty and adultery," a fact reported in the subsequent judicial opinion.  That opinion went on to state:

"According to certain testimony in behalf of the defendant, extra marital escapades of the plaintiff were bizarre and of an amatory nature which would have made Dr. Freud's hair curl.  Other testimony, in plaintiff's behalf, would indicate that defendant was guilty of bounding from one bed partner to another with the erotic zest of a satyr.  The court is inclined to discount much of this testimony as unreliable.  Nevertheless, it is the conclusion and finding of the court that neither party is domesticated, within the meaning of that term as used by the Supreme Court of Florida in the case of _Chesnut v. Chesnut, 33 So. 2d 730_, where the court, in holding that a divorce rather than separate maintenance should be granted, said:

"'The big trouble was total incapacity on the part of either for domestication. Seventy-five per cent of successful marriage depends on tact to cushion and bypass domestic frictions.  It is much better than meeting them head on and bearing the scars they leave.  When the bride and the groom are both devoid of a yen for domestication, the marital bark puts out to sea with its jib pointed to the rocks….  We think the record reveals a complete allergy to the give and take essential to successful marriage.'

. . . . .

**247**

EXHIBIT 43                                                                          EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

**[****51]   [***178]   [**978]**  "There is perhaps no area of news more inaccurately reported factually, on the whole, though with some notable exceptions, than legal news.

 **[*480]**  "Some part of this is due to carelessness…. But a great deal of it must be attributed, in candor, to ignorance which frequently is not at all blameworthy.  For newspapers are conducted by men who are laymen to the law.  With too rare exceptions their capacity for misunderstanding the significance of legal events and procedures, not to speak of opinions, is great.  But this is neither remarkable nor peculiar to newsmen.  For the law, as lawyers best know, is full of perplexities.

"In view of these facts any standard which would require strict accuracy in reporting legal events factually or in commenting upon them in the press would be an impossible one.  Unless the courts and judges are to be put above criticism, no such rule **[*481]** can obtain.  There must be some room for misstatement of fact, as well as for misjudgment, if the press and others are to function as critical agencies in our democracy concerning courts as for all other instruments of government." *Pennekamp v. Florida, 328 U.S. 331, 371-372 (1946)* **[****52]** (Rutledge, J., concurring).  [10]

For precisely such reasons, we have held that the contempt power may not be used to punish the reporting of judicial proceedings merely because a reporter "missed the essential point in a trial or failed to summarize the issues to accord with the views of the judge who sat on the case." *Craig v. Harney, 331 U.S., at 375*. See also *Pennekamp v. Florida, supra.* And "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel." *New York Times, 376 U.S., at 277*. The *First Amendment* insulates from defamation liability a margin for error sufficient to ensure the avoidance of crippling press self-censorship in the field of reporting public judicial affairs.  To be adequate, that margin must be both of **[****53]** sufficient breadth and predictable in its application.  In my view, therefore, the actual-malice standard of New York Times must be met in order to justify the imposition of liability in these circumstances.

MR. JUSTICE WHITE, dissenting

---

"In the present case, it is abundantly clear from the evidence of marital discord that neither of the parties has shown the least susceptibility to domestication, and that the marriage should be dissolved.

 . . . . .

"The premises considered, it is thereupon

"ORDERED AND ADJUDGED as follows:

"1.  That the equities in this cause are with the defendant; that defendant's counterclaim for divorce be and the same is hereby granted, and the bonds of matrimony which have heretofore existed between the parties are hereby forever dissolved." App. 523-529.

The Florida Supreme Court in the instant action found the fault required by *Gertz, 418 U.S., at 347*, to be present in the record by virtue of the fact that

"[p]ursuant to Florida law in effect at the time of the divorce judgment… a wife found guilty of adultery could not be awarded alimony. Since petitioner had been awarded alimony, she had not been found guilty of adultery nor had the divorce been granted on the ground of adultery. A careful examination of the final decree prior to publication would have clearly demonstrated that the divorce had been granted on the grounds of extreme cruelty…." *305 So. 2d 172, 178 (1974)*.

Surely the threat of press self-censorship in reporting judicial proceedings is obvious if liability is to be imposed on the basis of such "fault." Indeed, the impossibility of assuring against such errors in reporting is manifested by the fact that the same Florida Supreme Court, in reviewing the judgment of divorce some two and one-half years previous to the above-quoted statement, had found the divorce to have been granted by the trial judge on the erroneous grounds of "lack of domestication" rather than for either extreme cruelty or adultery. *Firstone v. Firstone, 263 So. 2d 223 (1972)*.

[10] Judge Frank's opinion of the phenomenon and its cause appears to have been roughly comparable.  J. Frank, Courts On Trial 1-3 (Atheneum ed. 1963).

 **[\*\*\*179]**  I would affirm the judgment of the Florida Supreme Court because *First Amendment* values will not be furthered in any way by application to this case of the fault standards newly drafted and imposed by *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, upon which my  **[\*482]**  Brother REHNQUIST relies, or the fault standards required by *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*, upon which my Brother BRENNAN relies; and because, in any event, any requisite fault was properly found below.

The jury found on ample evidence that the article published by petitioner Time, Inc., about respondent Firestone was false and defamatory. This Court has held, and no one seriously disputes, that, regardless of fault, "there is no constitutional value in false statements of fact." "They belong to that category of utterances which '… are of such slight social value as'" to be worthy of no *First Amendment* protection.  **[\*\*\*\*54]**  *Gertz v. Robert Welch, Inc., supra, at 340*, quoting *Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)*. This Court's decisions from *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, through *Gertz v. Robert Welch, Inc., supra*, holding that the Constitution requires a finding of some degree of fault as a precondition to a defamation award, have done so for one reason and one reason alone: unless  **[\*\*979]**  innocent falsehood is allowed as a defense, some true speech will also be deterred. Thus "[t]he *First Amendment* requires that we protect some falsehood in order to protect speech that matters," *Gertz v. Robert Welch, Inc., supra, at 341* (emphasis supplied), e.g., true fact statements.  In light of these decisions, the threshold question in the instant case should be whether requiring proof of fault on the part of Time, Inc., as a precondition to recovery in this case -- and thereby possibly interfering with the State's desire to compensate respondent Firestone -- will contribute in any way to the goal of protecting "speech that matters." I think it would not.

At the time of the defamatory publication **[\*\*\*\*55]**  in this case -- December 1967 -- the law clearly authorized liability  **[\*483]**  without fault in defamation cases of the sort involved here. \* Whatever the chilling effect of that rule of law on publication of "speech that matters" in 1967 might have been, it has already occurred and is now irremediable. The goal of protecting "speech that matters" by announcing rules, as this Court did in  **[\*\*\*180]**  *Gertz v. Robert Welch, Inc., supra*, and *Rosenbloom v. Metromedia, Inc., supra*, requiring fault as a precondition to a defamation recovery under circumstances such as are involved here, is fully achieved so long as fault is required for cases in which the publication occurred after the dates of those decisions.  This is not such a case.

 **[\*\*\*\*56]**  Therefore, to require proof of fault in this case -- or in any other case predating Gertz and Rosenbloom in which a private figure is defamed -- is to interfere with the State's otherwise legitimate policy of compen sating defamation victims without furthering *First Amendment* goals in any way at all.  In other areas in which the Court has developed a rule designed not to achieve justice in the case before it but designed to induce socially desirable conduct by some group in the future, the Court has declined to apply the rule to fact situations predating its announcement, e.g., *Williams v.  [\*484]  United States, 401 U.S. 646, 653 (1971)* (plurality opinion).  The Court should follow a similar path here.

In any event, the judgment of the court below should be affirmed.  My Brother REHNQUIST concludes that negligence is sufficient fault, under Gertz, to justify the judgment below, and that a finding of negligence may constitutionally be supplied by the Florida Supreme Court.  I agree.  Furthermore, the state court referred to Gertz v. Robert Welch, Inc., by name; noted the "convincing evidence of… negligence" in the case; pointed out that a careful examination **[\*\*\*\*57]**  of the divorce decree would have "clearly demonstrated" that the divorce was not grounded on adultery, as reported by Time, Inc.; and stated flatly: "This is a flagrant example of 'journalistic negligence.'" *305 So. 2d 172, 178 (1974)*.  It appears to me that the Florida Supreme Court has made a sufficiently "conscious

---

\* *Konigsberg v. State Bar of California, 366 U.S. 36, 49, and n. 10 (1961)*; *Times Film Corp.  v. Chicago, 365 U.S. 43, 48 (1961)*; *Roth v. United States, 354 U.S. 476, 486-487 (1957)*; *Beauharnais v. Illinois, 343 U.S. 250, 266 (1952)*; *Pennekamp v. Florida, 328 U.S. 331, 348-349 (1946)*; *Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)*; *Near v. Minnesota ex rel. Olson, 283 U.S. 697, 715 (1931)*. The majority concludes that respondent Firestone was neither a "public official" nor a "public figure," *New York Times Co.  v. Sullivan, 376 U.S. 254 (1964)*; *Curtis Publishing Co.  v. Butts, 388 U.S. 130 (1967)*, and therefore that this case does not fall within any exception, then announced, to the Court's statements that common-law defamation rules do not violate the *First Amendment*. In this respect I agree with the majority.

**EXHIBIT 43**                                                                    **EXHIBIT  13**

Time, Inc. v. Firestone, 424 U.S. 448

determination," ante, at 463, of the fact of negligence.  If it is Gertz that controls this case and if that decision is to be applied retroactively, I would affirm the judgment.

 **[\*\*980]**  MR. JUSTICE MARSHALL, dissenting.

The Court agrees with the Supreme Court of Florida that the "actual malice" standard of _New York Times Co.  v. Sullivan, 376 U.S. 254 (1964)_, does not apply to this case.  Because I consider the respondent, Mary Alice Firestone, to be a "public figure" within the meaning of our prior decisions, _Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)_; _Curtis Publishing Co.  v. Butts, 388 U.S. 130 (1967)_, I respectfully dissent.

I

Mary Alice Firestone was not a person "first brought to public attention by the defamation that is the subject of the lawsuit." _Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 78, 86 (1971)_ **[\*\*\*\*58]**  (MARSHALL, J., dissenting).  On the contrary, she was "prominent among the '400' of  **[\*485]**  Palm Beach society," and an "active [member] of the sporting set," _271 So. 2d 745, 751 (Fla. 1972)_, whose activities predictably attracted the attention of a sizable portion of the public.  Indeed, Mrs. Firestone's appearances in the press were evidently frequent enough to warrant  **[\*\*\*181]**  her subscribing to a press-clipping service.

Mrs. Firestone brought suit for separate maintenance, with reason to know of the likely public interest in the proceedings.  As the Supreme Court of Florida noted, Mr. and Mrs. Firestone's "marital difficulties were… well-known," and the lawsuit became "a veritable cause celebre in social circles across the country." Ibid.  The 17-month trial and related events attracted national news coverage, and elicited no fewer than 43 articles in the Miami Herald and 45 articles in the Palm Beach Post and Palm Beach Times.  Far from shunning the publicity, Mrs. Firestone held several press conferences in the course of the proceedings.

These facts are sufficient to warrant the conclusion that Mary Alice Firestone was a "public figure" for purposes **[\*\*\*\*59]**  of reports on the judicial proceedings she initiated.  In _Gertz v. Robert Welch, Inc., supra, at 352_, we noted that an individual can be a public figure for some purposes and a private figure for others.  And we found two distinguishing features between public figures and private figures.  First, we recognized that public figures have less need for judicial protection because of their greater ability to resort to self-help: "public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." _418 U.S., at 344_.

As the above recital of the facts makes clear, Mrs. Firestone is hardly in a position to suggest that she lacked access to the media for purposes relating to her lawsuit.  **[\*486]**  It may well be that she would have had greater difficulty countering alleged falsehoods in the national press than in the Miami and Palm Beach papers that covered the proceedings so thoroughly.  But presumably the audience Mrs. Firestone would have been most interested in reaching could have been reached through the local **[\*\*\*\*60]**  media. In any event, difficulty in reaching all those who may have read the alleged falsehood surely ought not preclude a finding that Mrs. Firestone was a public figure under Gertz. Gertz set no absolute requirement that an individual be able fully to counter falsehoods through self-help in order to be a public figure. We viewed the availability of the self-help remedy as a relative matter in Gertz, and set it forth as a minor consideration in determining whether an individual is a public figure.

The second, "more important," consideration in Gertz was a normative notion that public figures are less deserving of protection than private figures: That although "it may be possible for someone to become a public figure through no purposeful action of his own," generally those classed as public figures have "thrust themselves to the forefront of particular public controversies"  **[\*\*981]**  and thereby "[invited] attention and comment." _Id., at 344-345_. And even if they have not, "the communications media are entitled to act on the assumption that… public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.  **[\*\*\*\*61]**  " _Id., at 345_.

 **[\*\*\*182]**  We must assume that it was by choice that Mrs. Firestone became an active member of the "sporting set" -- a social group with "especial prominence in the affairs of society," ibid., whose lives receive constant media

EXHIBIT 43                                                          EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

attention.  Certainly there is nothing in the record to indicate otherwise, and Mrs. Firestone's subscription to a press-clipping service suggests that she was not altogether uninterested **[*487]** in the publicity she received.  Having placed herself in a position in which her activities were of interest to a significant segment of the public, Mrs. Firestone chose to initiate a lawsuit for separate maintenance, and most significantly, held several press conferences in the course of that lawsuit. If these actions for some reason fail to establish as a certainty that Mrs. Firestone "voluntarily exposed [herself] to increased risk of injury from defamatory falsehood," surely they are sufficient to entitle the press to act on the assumption that she did.  Accordingly, Mrs. Firestone would appear to be a public figure under Gertz.

The Court resists this result by concluding that the subject matter of the alleged defamation was **[****62]** not a "public controversy" as that term was used in Gertz.  In part, the Court's conclusion rests on what I view as an understatement of the degree to which Mrs. Firestone can be said to have voluntarily acted in a manner that invited public attention.  But more fundamentally its conclusion rests on a reading of Gertz that differs from mine.  The meaning that the Court attributes to the term "public controversy" used in Gertz resurrects the precise difficulties that I thought Gertz was designed to avoid.

It is not enough for the Court that, because of Mrs. Firestone's acquired prominence within a segment of society, her lawsuit had already attracted significant public attention and comment when the Time report was published.  According to the Court, the controversy, already of interest to the public, was "not the sort of 'public controversy' referred to in Gertz." Ante, at 454.  The only explanation I can discern from the Court's opinion is that the controversy was not of the sort deemed relevant to the "affairs of society," ante, at 453, and the public's interest not of the sort deemed "legitimate" or worthy of judicial recognition.

 **[*488]**  If there is one thing that is **[****63]** clear from Gertz, it is that we explicitly rejected the position of the plurality in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*, that the applicability of the New York Times standard depends upon whether the subject matter of a report is a matter of "public or general concern." We explained in Gertz that the test advanced by the Rosenbloom plurality S%"would occasion the… difficulty of forcing state and federal judges to decide on an ad hoc basis which publications address issues of 'general or public interest' and which do not -- to determine, in the words of MR. JUSTICE MARSHALL, 'what information is relevant to self-government.' *Rosenbloom v. Metromedia, Inc., 403 U.S., at 79*. We doubt the wisdom of committing this task to the conscience of judges." *418 U.S., at 346*.

 **[***183]**  Having thus rejected the appropriateness of judicial inquiry into "the legitimacy of interest in a particular event or subject," *Rosenbloom, supra, at 78, 79* (MARSHALL, J., dissenting), Gertz obviously did not intend to sanction any such inquiry by its use of the term "public controversy." Yet that is precisely how I understand **[****64]** the Court's opinion to interpret Gertz. [1]

---

[1] The Supreme Court of Florida's explanation of why the New York Times standard is inapplicable is equally inconsistent with Gertz.  After referring to Mrs. Firestone's prominence in Palm Beach society, the widespread attention her lawsuit received, and her granting of interviews to the news media, the court reasoned as follows:

"That the public was curious, titillated or intrigued with the scandal in the Firestone divorce is beyond doubt.  But we again emphasize the distinction we make between that genre of public interest and real public or general concern.

. . . . .

"… [We] cannot find here any aspect of real public concern, and none has been shown to us, which would be furthered or enhanced by 'free discussion' and 'robust debate' about the divorce of Russell and Mary Alice Firestone.

"Nor did [Mrs. Firestone's] quoted interviews with the press raise the untidy affair to the dignity of true public concern.  Unlike an actress who might grant interviews relating to the opening of her new play, [Mrs. Firestone] was not seeking public patronage. Publicity, or sympathy, perhaps, but not patronage.  Irrespective of her subjective motives, objectively she was merely satiating the appetites of a curious press.

EXHIBIT 43                                                                                   EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

**[****65]   [*489]   [**982]**  If Gertz is to have any meaning at all, the focus of analysis must be on the actions of the individual, and the degree of public attention that had already developed, or that could have been anticipated, before the report in question.  Under this approach, the class of public figures must include an individual like Mrs. Firestone, who acquired a social prominence that could be expected to attract public attention, initiated a lawsuit that predictably attracted more public attention, and held press conferences in the course of and in regard to the lawsuit. [2] I would hold that, for purposes of this  **[*490]**  case, Mrs. Firestone is a public figure, who must demonstrate that the report in question was published with "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

**[****66]**  II

**[***184]**  While the foregoing discussion is sufficient to dispose of the case under my reading of the law, two other aspects of the Court's opinion warrant comment.  First, the Court appears to reject the contention that a rational interpretation of an ambiguous document is always entitled to some constitutional protection.  The Court reads *Time, Inc. v. Pape, 401 U.S. 279 (1971)*, as providing such protection only under the rubric of the New York Times "actual malice" standard.  Ante, at 459 n. 4.  I disagree.  While the precise holding in Pape was that the choice of one of several rational interpretations of an ambiguous document is not enough to create a jury issue of "actual malice," the Court's reasoning suggests that its holding ought not be so confined.  In introducing its discussion, the Court noted:

"[A] vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody said rather than of what anybody did.  Indeed, perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports,  **[**983]**  speeches, press conferences, and the like.  The question of the **[****67]** 'truth' of  **[*491]**  such an indirect newspaper report presents rather complicated problems." *401 U.S., at 285-286* (emphasis in original).

And in discussing the need for some protection for the publisher attempting to report the gist of a lengthy government document, the Court observed:

"Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of 'truth' that would not put the publisher virtually at the mercy of the unguided discretion of a jury." *Id., at 291*.

Surely the Court's evident concern that publishers be accorded the leeway to offer rational interpretations of ambiguous documents was not restricted to cases in which the New York Times standard is applicable.  That concern requires that protection for rational interpretations be accorded under the fault standard contemplated in Gertz.  Thus my Brothers POWELL and STEWART, while joining the opinion of the Court, recognize that the rationality of an interpretation of an ambiguous document must figure as a crucial element in any assessment of fault under Gertz.  Ante, at 467-469. I agree.  The choice of one of several rational interpretations of an ambiguous **[****68]** document, without more, is insufficient to support a finding of fault under Gertz.

Finally, assuming that the Court is correct in its assessment of the law in this case, I find the Court's disposition baffling.  The Court quotes that portion of the Florida Supreme Court's opinion which, citing Gertz, states in no uncertain terms that Time's report was a "flagrant example of 'journalistic negligence.'" *305 So. 2d 172, 178 (1974)*.  But the Court is unwilling to read that statement as a "conscious determination" of fault, and accordingly the Court remands the case for an assessment of fault.

---

"In sum, the Firestone divorce action was unquestionably newsworthy, but reports thereof were not constitutionally protected as being matters of real public or general concern." *271 So. 2d, at 752*.

This language is from an opinion that issued before Gertz was decided, but the reasoning was reaffirmed in the Supreme Court of Florida's final opinion in the case, *305 So. 2d 172, 174-175 (1974)*, which issued after our decision in Gertz.

EXHIBIT 43     Time, Inc. v. Firestone, 424 U.S. 448     EXHIBIT 13

[*492]  Surely the Court cannot be suggesting  [***185]  that the quoted portion of the Supreme Court of Florida's opinion, which contained a citation to Gertz, had no meaning at all.  And if it did have meaning, it must have reflected either an intention to find fault or an intention to affirm a finding of fault. It is quite clear that the opinion was not intended to affirm any finding of fault, for as the Court observes there was no finding of fault to affirm.  The question of fault had not been submitted to the jury, and the District Court of Appeal had explicitly noted the [****69]  absence of any proof that Time had been negligent. _254 So. 2d 386, 390 (1971)_. The absence of any prior finding of fault only reinforces what the Florida Supreme Court's language itself makes clear -- that the court was not simply affirming a finding of fault, but making such a finding in the first instance.

I therefore agree with my Brother WHITE that the Supreme Court of Florida made a conscious determination of fault. I would add, however, that it is a determination that is wholly unsupportable.  The sole basis for that court's determination of fault was that under Florida law a wife found guilty of adultery cannot be, as Mrs. Firestone was, awarded alimony. Time, the court reasoned, should have realized that a divorce decree containing an award of alimony could not, consistent with Florida law, have been based on adultery. But that reasoning assumes that judicial decisions can always be squared with the prior state of the law.  If we need be reminded that courts occasionally err in their assessment of the law, we need only refer to the subsequent history of the divorce decree involved in this case: When the divorce case reached the Supreme Court of Florida, that [****70]  court found that the divorce had been granted for lack of "domestication" and pointed out that that was not one of the statutory grounds for [*493]  divorce. _Firestone v. Firestone, 263 So. 2d 223 (1972)_. Time's responsibility was to report accurately what the trial court did, not what it could or should [**984]  have done.  If the trial court awarded alimony while basing the divorce on a finding of adultery by the wife, Time cannot be faulted for reporting that fact.  Unless there is some basis for a finding of fault other than that given by the Supreme Court of Florida, I think it clear that there can be no liability.

## References

_50 Am Jur 2d, Libel and Slander 84_, 302, 310, 470

16 Am Jur Pl & Pr Forms (Rev ed), Libel and Slander Forms 1, 25

19 Am Jur Trials 499, Defamation

USCS, _Constitution, 1st_ and _14th Amendments_

US L Ed Digest, Constitutional Law 927.5; 930

ALR Digests, Constitutional Law 792(1)

L Ed Index to Annos, Libel and Slander

ALR Quick Index, Libel and Slander; New York Times Rule

Federal Quick Index, Libel and Slander

[****71]   Annotation References:

Constitutional aspects of libel and slander. _28 L Ed 2d 885_.

The Supreme Court and the right of free speech and press. _93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976_.

Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice. _20 ALR3d 988_.

Libel and slander: who is a public official or otherwise within the federal constitutional rule requiring public officials to show actual malice. _19 ALR3d 1361_.

Constitutional aspects of libel or slander of public officials. _95 ALR2d 1450_.

EXHIBIT 43 EXHIBIT 13

Time, Inc. v. Firestone, 424 U.S. 448

Libel and slander: false news reports as to births, betrothals, marriages, divorces, or similar marital matters. *9 ALR3d 559*.

---

**End of Document**

EXHIBIT 43                                                                                    EXHIBIT  14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

# *Dun & Bradstreet v. Greenmoss Builders*

Supreme Court of the United States

March 21, 1984, Argued ; June 26, 1985, Decided

No. 83-18

**Reporter**

472 U.S. 749 *; 105 S. Ct. 2939 **; 86 L. Ed. 2d 593 ***; 1985 U.S. LEXIS 103 ****; 53 U.S.L.W. 4866; 11 Media L. Rep. 2417

DUN & BRADSTREET, INC. v. GREENMOSS BUILDERS, INC.

**Subsequent History:  [****1]**  October 3, 1984, Reargued.

**Prior History:** CERTIORARI TO THE SUPREME COURT OF VERMONT.

**Disposition:**  *143 Vt. 66, 461 A. 2d 414*, affirmed.

# Case Summary

**Procedural Posture**
On certiorari from the Supreme Court of Vermont, petitioner challenged a ruling that that respondent did not need to show actual malice to recover presumed and punitive damages for petitioner's false and defamatory statements as petitioner was a nonmedia defendant and its alleged defamatory speech was not of public concern.

**Overview**
Petitioner, who was in the business of composing and selling financial reports about businesses, mistakenly reported that respondent had filed for bankruptcy. The report was sent to several of petitioner's subscribers. Petitioner issued a corrective statement, but refused to divulge the names of those that received the report. Respondent brought a defamation suit and the jury awarded respondent presumed and punitive damages. However, a new trial was ordered because the court was dissatisfied with its jury instructions regarding petitioner's knowledge of falsity or reckless disregard for the truth. The Supreme Court of Vermont reversed, holding that respondent was not required to show actual malice to recover presumed and punitive damages because petitioner was a nonmedia entity. On certiorari the Court affirmed, holding that respondent was not required to show actual malice to recover presumed and punitive damages because petitioner's false and defamatory speech was not a matter of public concern.

**Outcome**
Affirmed; because respondent was a private party, and because petitioner's false and defamatory statements against respondent did not involve matters of public concern, respondent was not required to show petitioner acted with actual malice when making the defamatory statements to recover presumed and punitive damages.

# Syllabus

 Petitioner credit reporting agency sent a report to five subscribers indicating that respondent construction contractor had filed a voluntary petition for bankruptcy.  The report was false and grossly misrepresented respondent's assets and liabilities.  Thereafter, petitioner issued a corrective notice, but respondent was dissatisfied with this notice and brought a defamation action in Vermont state court, alleging that the false report had injured its reputation and seeking damages.  After trial, the jury returned a verdict in respondent's favor and awarded both compensatory or presumed damages and punitive damages. But the trial court believed that *Gertz v. Robert Welch, Inc., 418 U.S. 323*, controlled,

**EXHIBIT 43**                                                                    EXHIBIT  14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

and granted petitioner's motion for a new trial on the ground that the instructions to the jury permitted it to award damages on a lesser showing than "actual malice." The Vermont Supreme Court reversed, holding that *Gertz* was inapplicable to nonmedia defamation actions.

*Held*: The judgment is affirmed.

**Counsel:** Gordon Lee **[****2]**  Garrett, Jr., reargued the cause for petitioner.  With him on the briefs were Hugh M. Dorsey, Jr., David J. Bailey, William B. B. Smith, Peter J. Monte, and A. Buffum Lovell.

Thomas F. Heilmann reargued the cause and filed briefs for respondent. [*]

**Judges:** JUSTICE POWELL, joined by JUSTICE REHNQUIST and JUSTICE O'CONNOR, concluded that: 1. The fact that the jury instructions in question referred to "malice," "lack of good faith," and "actual malice," did not require the jury to find "actual malice," as respondent contends, where the instructions failed to define any of these terms. Consequently, the trial court correctly concluded that the instructions did **[****3]**  not satisfy Gertz.  Pp. 753-755. 2. Permitting recovery of presumed and punitive damages in defamation cases absent a showing of "actual malice" does not violate the First Amendment when the defamatory statements do not involve matters of public concern. Pp. 755-763. (a) In light of the reduced constitutional value of speech on matters of purely private concern, as opposed to speech on matters of public concern, the state interest in compensating private individuals for injury to their reputation adequately supports awards of presumed and punitive damages -- even absent a showing of "actual malice." Cf. Gertz. Pp. 755-761. (b) Gertz, supra, does not apply to this case.  Petitioner's credit report concerned no public issue but was speech solely in the individual interest of the speaker and its specific business audience.  This particular interest warranted no special protection when it was wholly false and damaging to the victim's business reputation.  Moreover, since the credit report was made available to only five subscribers, who, under the subscription agreement, could not disseminate it further, it cannot be said that the report involved any strong interest  **[****4]**  in the free flow of commercial information.  And the speech here, like advertising, being solely motivated by a desire for profit, is hardy and unlikely to be deterred by incidental state regulation.  In any event, the market provides a powerful incentive to a credit reporting agency to be accurate, since false reporting is of no use to creditors.  Pp. 761-763. THE CHIEF JUSTICE concluded that Gertz is inapplicable to this case, because the allegedly defamatory expression involved did not relate to a matter of public concern, and that no other reason was needed to dispose of the case.  Pp. 763-764. JUSTICE WHITE concluded that Gertz should not be applied to this case either because Gertz should be overruled or because the defamatory publication in question did not deal with a matter of public importance.  P. 774. POWELL, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST and O'CONNOR, JJ., joined.  BURGER, C. J., post, p. 763, and WHITE, J., post, p. 765, filed opinions concurring in the judgment.  BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, post, p. 774.

**Opinion by:** POWELL

# Opinion

 **[*751]**   **[***597]**   **[**2941]**  JUSTICE POWELL  **[****5]**  announced the judgment of the Court and delivered an opinion, in which JUSTICE REHNQUIST and JUSTICE O'CONNOR joined.

---

[*]Briefs of amici curiae urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by Robert M. Weinberg, George Kaufmann, and Laurence Gold; for Dow Jones & Co., Inc., by Robert D. Sack and Frederick T. Davis; for the Information Industry Association by Richard E. Wiley, Lawrence W. Secrest III, Michael Yourshaw, and Patricia M. Reilly; and for the Washington Post by David E. Kendall and Kevin T. Baine.

William E. Murane filed briefs for Sunward Corp. as amicus curiae urging affirmance.

**EXHIBIT 43**                                                                                   **EXHIBIT 14**

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

In *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, we held that the *First Amendment* restricted the damages that a private individual could obtain from a publisher for a libel that involved a matter of public concern. More specifically, we held that in these circumstances the *First Amendment* prohibited awards of presumed and punitive damages for false and defamatory statements unless the plaintiff shows "actual malice," that is, knowledge of falsity or reckless disregard for the truth. The question presented in this case is whether this rule of *Gertz* applies when the false and defamatory statements do not involve matters of public concern.

I

Petitioner Dun & Bradstreet, a credit reporting agency, provides subscribers with financial and related information about businesses. All the information is confidential; under the terms of the subscription agreement the subscribers may not reveal it to anyone else. On July 26, 1976, petitioner sent a report to five subscribers indicating that respondent, a construction contractor, had filed a voluntary **[****6]** petition for bankruptcy. This report was false and grossly misrepresented respondent's assets and liabilities. That same day, while discussing the possibility of future financing with its bank, respondent's president was told that the bank had received the defamatory report. He immediately called petitioner's regional office, explained the error, and asked for a correction. In addition, he requested the names **[***598]** of the firms that had received the false report in order to assure them that the company was solvent. Petitioner promised to look into the matter but refused to divulge the names of those who had received the report.

After determining that its report was indeed false, petitioner issued a corrective notice on or about August 3, 1976, **[*752]** to the five subscribers who had received the initial report. The notice stated that one of respondent's former employees, not respondent itself, had filed for bankruptcy and that respondent "continued in business as usual." Respondent told petitioner that it was dissatisfied with the notice, and it again asked for a list of subscribers who had seen the initial report. Again petitioner refused to divulge their names.

Respondent **[****7]** then brought this defamation action in Vermont state court. It alleged that the false report had injured its reputation and sought both compensatory and punitive damages. The trial established that the error in petitioner's report had been caused when one of its employees, a 17-year-old high school student paid to review Vermont bankruptcy pleadings, had inadvertently attributed to respondent a bankruptcy petition filed by one of respondent's former employees. Although petitioner's representative testified that it was routine practice to check the accuracy of such reports with the businesses themselves, it did not try to verify the information about respondent before reporting it.

After trial, the jury returned a verdict in favor of respondent and awarded $ 50,000 in compensatory or presumed damages and $ 300,000 in punitive damages. Petitioner moved for a new trial. It argued that in *Gertz v. Robert Welch, Inc., supra, at 349*, this Court had ruled broadly that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless **[**2942]** disregard for the truth," and it argued **[****8]** that the judge's instructions in this case permitted the jury to award such damages on a lesser showing. The trial court indicated some doubt as to whether *Gertz* applied to "non-media cases," but granted a new trial "[because] of . . . dissatisfaction with its charge and . . . conviction that the interests of justice [required]" it. App. 26.

The Vermont Supreme Court reversed. *143 Vt. 66, 461 A. 2d 414 (1983)*. Although recognizing that "in certain instances the distinction between media and nonmedia defendants **[*753]** may be difficult to draw," the court stated that "no such difficulty is presented with credit reporting agencies, which are in the business of selling financial information to a limited number of subscribers who have paid substantial fees for their services." *Id., at 73, 461 A. 2d, at 417*. Relying on this distinguishing characteristic of credit reporting firms, the court concluded that such firms are not "the type of media worthy of *First Amendment* protection as contemplated by *New York Times* [*Co.* v. *Sullivan, 376 U.S. 254 (1964),*] and its progeny." *Id., at 73-74, [****9] 461 A. 2d, at 417-418*. It held that the balance between a private plaintiff's right to recover presumed and punitive damages without a showing of special fault and the *First Amendment* rights of "nonmedia" **[***599]** speakers "must be struck in favor of the private plaintiff defamed by a

**EXHIBIT 43**                                                        **EXHIBIT  14**

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

nonmedia defendant." *Id., at 75, 461 A. 2d, at 418*.   Accordingly, the court held "that as a matter of federal constitutional law, the media protections outlined in *Gertz* are inapplicable to nonmedia defamation actions." *Ibid*.

Recognizing disagreement among the lower courts about when the protections of *Gertz* apply, [1] we granted certiorari. *464 U.S. 959 (1983)*. We now affirm, although for reasons different from those relied upon by the Vermont Supreme Court.

**[****10]**  II

As an initial matter, respondent contends that we need not determine whether *Gertz* applies in this case because the instructions, taken as a whole, required the jury to find "actual  **[*754]**  malice" before awarding presumed or punitive damages. [2] The trial court instructed the jury that because the report was libelous *per se*, respondent was not required "to prove actual damages . . . since damage and loss [are] conclusively presumed." App. 17; accord, *id*., at 19.   It also instructed the jury that it could award punitive damages only if it found "actual malice." *Id*., at 20.   Its only other relevant instruction was that liability could not be established unless respondent showed "malice or lack of good faith on the part of the Defendant." *Id*., at 18.   Respondent contends that these references to "malice," "lack of good faith," and "actual malice" required the jury to find knowledge of falsity or reckless disregard for the truth -- the "actual malice" of *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)* -- before it awarded presumed or punitive damages.

**[****11]**  We reject this claim because the trial court failed to define any of these terms adequately.   It did not, for example, provide the jury with any definition of the term "actual malice." In fact, the only  **[**2943]**  relevant term it defined was simple "malice." [3] And its definitions of this term included not only the *New York Times* formulation but also other concepts such as  **[*755]**  "bad faith" and "reckless disregard of the [statement's] possible consequences." App. 19.   The  **[***600]**  instructions thus permitted the jury to award presumed and punitive damages on a lesser showing than "actual malice." Consequently, the trial court's conclusion that the instructions did not satisfy *Gertz* was correct, and the Vermont Supreme Court's determination that *Gertz* was inapplicable was necessary to its decision that the trial court erred in granting the motion for a new trial.   We therefore must consider whether *Gertz* applies to the case before us.

**[****12]**  III

In *New York Times Co*. v. *Sullivan, supra*, the Court for the first time held that the *First Amendment* limits the reach of state defamation laws.   That case concerned a public official's recovery of damages for the publication of an advertisement criticizing police conduct in a civil rights demonstration.   As the Court noted, the advertisement concerned "one of the major public issues of our time." *Id., at 271*. Noting that "freedom of expression *upon public questions* is secured by the *First Amendment*," *id., at 269* (emphasis added), and that "debate *on public issues* should

---

[1] Compare *Denny v. Mertz, 106 Wis. 2d 636, 318 N. W. 2d 141*, cert. denied, **459 U.S. 883 (1982)** (*Gertz* inapplicable to private figure suits against nonmedia defendants); *Stuempges v. Parke, Davis & Co., 297 N. W. 2d 252 (Minn. 1980)* (same); *Rowe v. Metz, 195 Colo. 424, 579 P. 2d 83 (1978)* (same); and *Harley-Davidson Motorsports, Inc*. v. *Markley, 279 Ore. 361, 568 P. 2d 1359 (1977)* (same), with *Antwerp Diamond Exchange, Inc*. v. *Better Business Bureau, 130 Ariz. 523, 637 P. 2d 733 (1981)* (*Gertz* applicable in such situations); and *Jacron Sales Co*. v. *Sindorf, 276 Md. 580, 350 A. 2d 688 (1976)* (same).

[2] Respondent also argues that petitioner did not seek the protections outlined in *Gertz* before the jury instructions were given and that the issue therefore was not preserved for review.   Since the Vermont Supreme Court considered the federal constitutional issue properly presented and decided it, there is no bar to our review.  See *Orr v. Orr, 440 U.S. 268, 274-275 (1979)*.

[3] The full instruction on malice reads as follows:

"If you find that the Defendant acted in a bad faith towards the Plaintiff in publishing the Erroneous Report, *or* that Defendant intended to injure the Plaintiff in its business, *or* that it acted in a willful, wanton or reckless disregard of the rights and interests of the Plaintiff, the Defendant has acted maliciously and the privilege is destroyed.  *Further*, if the Report was made with reckless disregard of the possible consequences, *or* if it was made with the knowledge that it was false *or* with reckless disregard of its truth or falsity, it was made with malice." App. 18-19 (emphasis added).

EXHIBIT 43                                                              EXHIBIT  14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

be uninhibited, robust, and wide-open," *id., at 270* (emphasis added), the Court held that a public official cannot recover damages for defamatory falsehood unless he proves that the false statement was made with "'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *id., at 280*. In later cases, all involving public issues, the Court extended this same constitutional protection to libels of public figures, *e. g., Curtis Publishing* **[****13]** *Co.* v. *Butts, 388 U.S. 130 (1967)*, and in one case suggested in a plurality opinion that this constitutional rule should extend to libels of any individual so long as the defamatory statements involved a "matter of public or general interest," *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 44 (1971)* (opinion of BRENNAN, J.).

 **[*756]**  In *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, we held that the protections of *New York Times* did not extend as far as *Rosenbloom* suggested.  *Gertz* concerned a libelous article appearing in a magazine called American Opinion, the monthly outlet of the John Birch Society.  The article in question discussed whether the prosecution of a policeman in Chicago was part of a Communist campaign to discredit local law enforcement agencies.  The plaintiff, Gertz, neither a public official nor a public figure, was a lawyer tangentially involved in the prosecution.  The magazine alleged that he was the chief architect of the "frame-up" of the police officer and linked him to Communist activity.  Like every other case in which this Court has found constitutional limits to state **[****14]** defamation laws, *Gertz* involved expression on a matter of undoubted public concern.

In *Gertz*, we held that the fact that expression concerned a public issue did not by itself entitle the libel defendant to the constitutional protections of *New York Times*.  These protections, we found, were not "justified solely by reference to the interest of the press and broadcast media in immunity **[**2944]** from liability." *418 U.S., at 343*.  **[***601]**  Rather, they represented "an accommodation between [*First Amendment*] [concerns] and the limited state interest present in the context of libel actions brought by public persons." *Ibid*.  In libel actions brought by private persons we found the competing interests different.  Largely because private persons have not voluntarily exposed themselves to increased risk of injury from defamatory statements and because they generally lack effective opportunities for rebutting such statements, *id., at 345*, we found that the State possessed a "strong and legitimate . . . interest in compensating private individuals for injury to reputation." *Id., at 348-349*. Balancing this stronger state interest **[****15]** against the same *First Amendment* interest at stake in *New York Times*, we held that a State could not allow recovery of presumed and punitive damages absent a showing of "actual malice." Nothing in our opinion,  **[*757]** however, indicated that this same balance would be struck regardless of the type of speech involved. 4

 **[****16]**  IV

We have never considered whether the *Gertz* balance obtains when the defamatory statements involve no issue of public concern.  To make this determination, we must employ the approach approved in *Gertz* and balance the State's interest in compensating private individuals for injury to their reputation against the *First Amendment* interest in

---

4 The dissent states that "[at] several points the Court in *Gertz* makes perfectly clear [that] the restrictions of presumed and punitive damages were to apply in all cases." *Post*, at 785, n. 11.  Given the context of *Gertz*, however, the Court could have made "perfectly clear" only that these restrictions applied in cases involving *public speech*.  In fact, the dissent itself concedes that "*Gertz* . . . focused largely on defining the circumstances under which protection of the central *First Amendment* value of robust debate of *public issues* should mandate plaintiffs to show actual malice to obtain a judgment and actual damages . . . ." *Post*, at 777 (original emphasis).

The dissent also incorrectly states that *Gertz* "specifically held," *post*, at 779, 793, both "that the award of presumed and punitive damages on less than a showing of actual malice is not a narrowly tailored means to achieve the legitimate state purpose of protecting the reputation of private persons . . . ," *post*, at 779, and that "unrestrained presumed and punitive damages were 'unnecessarily' broad . . . in relation to the legitimate state interests," *post*, at 793-794.  Although the Court made both statements, it did so only within the context of public speech.  Neither statement controls here.  What was "not . . . narrowly tailored" or was "'unnecessarily' broad" with respect to public speech is not necessarily so with respect to the speech now at issue.  Properly understood, *Gertz* is consistent with the result we reach today.

EXHIBIT 43  EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

protecting this type of expression.  This state interest is identical to the one weighed in *Gertz*.  There we found that it was "strong and legitimate." *418 U.S., at 348*. A State should not lightly be required to abandon it,

"for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name **[*758]** 'reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty.  The protection of private personality, like the protection of life itself, is left primarily to the individual States under the *Ninth* and *Tenth Amendments*. . . .' *Rosenblatt v. Baer, 383 U.S. 75, 92 [***602] (1966)* (concurring opinion)." *Id., at 341*.

The *First Amendment* interest, on the **[****17]** other hand, is less important than the one weighed in *Gertz*.  We have long recognized that not all speech is of equal *First Amendment* importance. [5] **[****20]** It is speech on **[**2945]** "'matters of public concern'" **[*759]** that is "at the heart of the *First Amendment's* protection." *First National Bank of Boston v. Bellotti, 435 U.S. 765, 776 (1978)*, citing *Thornhill v. Alabama, 310 U.S. 88, 101 (1940)*. As we stated in *Connick v. Myers, 461 U.S. 138, 145 (1983)*, this "special concern [for speech on public issues] is no mystery":

"The *First Amendment* 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth v. United States, 354 U.S. 476, 484 (1957)*; *New York Times Co*. v. *Sullivan, 376 U.S. 254, 269 (1964)*. '[Speech] concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964)*. Accordingly, the Court has frequently reaffirmed **[***603]** that speech on public issues occupies the "'highest **[****18]** rung of the hierarchy of *First Amendment* values,'" and is entitled to special protection. *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982)*; *Carey v. Brown, 447 U.S. 455, 467 (1980)*."

---

[5] This Court on many occasions has recognized that certain kinds of speech are less central to the interests of the *First Amendment* than others.  Obscene speech and "fighting words" long have been accorded no protection.  *Roth v. United States, 354 U.S. 476, 483 (1957)*; *Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572 (1942)*; cf. *Harisiades v. Shaughnessy, 342 U.S. 580, 591-592 (1952)* (advocating violent overthrow of the Government is unprotected speech); *Near v. Minnesota ex rel. Olson, 283 U.S. 697, 716 (1931)* (publication of troopship sailings during wartime may be enjoined).  In the area of protected speech, the most prominent example of reduced protection for certain kinds of speech concerns commercial speech. Such speech, we have noted, occupies a "subordinate position in the scale of *First Amendment* values." *Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 456 (1978)*. It also is more easily verifiable and less likely to be deterred by proper regulation.  *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-772 (1976)*. Accordingly, it may be regulated in ways that might be impermissible in the realm of noncommercial expression.  *Ohralik, supra, at 456*; *Central Hudson Gas & Elec. Corp*. v. *Public Service Comm'n of New York, 447 U.S. 557, 562-563 (1980)*.

Other areas of the law provide further examples.  In *Ohralik* we noted that there are "[numerous] examples . . . of communications that are regulated without offending the *First Amendment*, such as the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees." *436 U.S., at 456* (citations omitted).  Yet similar regulation of political speech is subject to the most rigorous scrutiny.  See *Brown v. Hartlage, 456 U.S. 45, 52-53 (1982)*; *New York Times Co*. v. *Sullivan, 376 U.S. 254, 279, n. 19 (1964)*; *Buckley v. Valeo, 424 U.S. 1, 14 (1976)*. Likewise, while the power of the State to license lawyers, psychiatrists, and public school teachers -- all of whom speak for a living -- is unquestioned, this Court has held that a law requiring licensing of union organizers is unconstitutional under the *First Amendment*. *Thomas v. Collins, 323 U.S. 516 (1945)*; see also *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 44 (1971)* (opinion of BRENNAN, J.) ("the determinant whether the *First Amendment* applies to state libel actions is whether the utterance involved concerns an issue of public or general concern").

**EXHIBIT 43**                                                                                    **EXHIBIT  14**

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

In contrast, speech on matters of purely private concern is of less *First Amendment* concern.  *Id., at 146-147*.  As a number of state courts, including the court below, have recognized, the role of the Constitution in regulating state libel law is far more limited when the concerns that activated *New York Times* and *Gertz* are absent. [6] In such a case,

 **[\*760]**  "[there] is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government;  **[\*\*2946]**  and there is no threat of liability causing a reaction of self-censorship by the press.  The facts of the present case are wholly without the *First Amendment* concerns with which the Supreme Court of the United States has been struggling." *Harley-Davidson Motorsports, Inc.* v. *Markley, 279 Ore. 361, 366, 568 P. 2d 1359, 1363 (1977)*.

Accord, *Rowe v. Metz, 195 Colo. 424, 426, 579 P. 2d 83, 84 (1978)*;  **[\*\*\*\*19]**  *Denny v. Mertz, 106 Wis. 2d 636, 661, 318 N. W. 2d 141, 153*, cert. denied, *459 U.S. 883 (1982)*.

While such speech is not totally unprotected by the *First Amendment*, see *Connick v. Myers, supra, at 147*, its protections are less stringent.  In *Gertz*, we found that the state interest in awarding presumed and punitive damages was not "substantial" in view of their effect on speech at the core of *First Amendment* concern.  *418 U.S., at 349*. This interest, however, *is* "substantial" relative to the incidental effect these remedies may have on speech of significantly less constitutional interest.   The rationale of the common-law rules has been the experience and judgment of  **[\*\*\*\*21]**  history that "proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted in fact." W. Prosser, Law of Torts § 112, p. 765 (4th ed. 1971); accord, *Rowe v. Metz, supra, at 425-426, 579 P. 2d, at 84*; Note, Developments in the Law -- Defamation, 69 Harv. L. Rev. 875, 891-892 (1956). As a result, courts for centuries have allowed juries to presume that some damage occurred from many defamatory utterances  **[\*761]**  and publications.  *Restatement of Torts § 568, Comment b*, p.  162 (1938) (noting that Hale announced that damages were to be presumed for libel as early as 1670).  This rule furthers the state interest in providing remedies for defamation by ensuring that those remedies are effective.  In light of the  **[\*\*\*604]**  reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages -- even absent a showing of "actual malice." [7]

---

[6] As one commentator has remarked with respect to "the case of a commercial supplier of credit information that defames a person applying for credit" -- the case before us today -- "If the *first amendment* requirements outlined in *Gertz* apply, there is something clearly wrong with the *first amendment* or with *Gertz*." Shiffrin, The *First Amendment* and Economic Regulation: Away From a General Theory of the *First Amendment*, 78 Nw. U. L. Rev. 1212, 1268 (1983).

[7] The dissent, purporting to apply the same balancing test that we do today, concludes that even speech on purely private matters is entitled to the protections of *Gertz. Post*, at 786.  Its "balance," however, rests on a misinterpretation.  In particular, the dissent finds language in *Gertz* that, it believes, shows the State's interest to be "irrelevant." See *post*, at 794.  It is then an easy step for the dissent to say that the State's interest is outweighed by even the reduced *First Amendment* interest in private speech.  *Gertz*, however, did not say that the state interest was "irrelevant" in absolute terms.  Indeed, such a statement is belied by *Gertz* itself, for it held that presumed and punitive damages were available under some circumstances.  *418 U.S., at 349*. Rather, what the *Gertz* language indicates is that the State's interest is not substantial relative to the *First Amendment* interest in *public speech*. This language is thus irrelevant to today's decision.

The dissent's "balance," moreover, would lead to the protection of all libels -- no matter how attenuated their constitutional interest. If the dissent were the law, a woman of impeccable character who was branded a "whore" by a jealous neighbor would have no effective recourse unless she could prove "actual malice" by clear and convincing evidence.  This is not malice in the ordinary sense, but in the more demanding sense of *New York Times*.  The dissent would, in effect, constitutionalize the entire common law of libel.

EXHIBIT 43     EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

**[****22]**  V

The only remaining issue is whether petitioner's credit report involved a matter of public concern. In a related context, we have held that "[whether] . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record." *Connick v. Myers, supra, at 147-148*.  **[*762]**  These factors indicate that petitioner's credit report concerns no public issue. [8] It  **[**2947]**  was speech solely in the individual interest of the speaker and its specific business audience.  Cf. *Central Hudson Gas & Elec. Corp*. v. *Public Service Comm'n of New York, 447 U.S. 557, 561 (1980)*. This particular interest warrants no special protection when -- as in this case -- the speech is wholly false and clearly damaging to the victim's business reputation. Cf.  *id., at 566*; *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-772 (1976)*. Moreover, since the credit report was made available to only five subscribers, who, under the terms of the subscription agreement, could not disseminate it further, it cannot be **[****23]** said that the report involves any "strong interest in the free flow of commercial information." *Id., at 764*. There is simply no credible argument that this type of credit reporting requires special protection to ensure that "debate on public issues [will] be uninhibited, robust, and wide-open." *New York Times*  **[***605]**  *Co*. v. *Sullivan, 376 U.S., at 270*.

**[****24]**  In addition, the speech here, like advertising, is hardy and unlikely to be deterred by incidental state regulation.  See *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., 425 U.S., at 771-772*. It is solely motivated by the desire for profit, which, we have noted, is a force less likely to be deterred than others.  *Ibid*. Arguably, the reporting here was also more objectively verifiable than speech deserving of greater protection.  See *ibid*.  In any case, the market provides a powerful incentive to a credit reporting  **[*763]**  agency to be accurate, since false credit reporting is of no use to creditors.  Thus, any incremental "chilling" effect of libel suits would be of decreased significance. [9]

**[****25]**  VI

 [1A]We conclude that permitting recovery of presumed and punitive damages in defamation cases absent a showing of "actual malice" does not violate the *First Amendment* when the defamatory statements do not involve matters of public concern. Accordingly, we affirm the judgment of the Vermont Supreme Court.

*It is so ordered*.

**Concur by:** BURGER; WHITE

## Concur

---

CHIEF JUSTICE BURGER, concurring in the judgment.

---

[8] The dissent suggests that our holding today leaves all credit reporting subject to reduced *First Amendment* protection.  This is incorrect.  The protection to be accorded a particular credit report depends on whether the report's "content, form, and context" indicate that it concerns a public matter.  We also do not hold, as the dissent suggests we do, *post*, at 787, that the report is subject to reduced constitutional protection because it constitutes economic or commercial speech. We discuss such speech, along with advertising, only to show how many of the same concerns that argue in favor of reduced constitutional protection in those areas apply here as well.

[9] The Court of Appeals for the Fifth Circuit has noted that, while most States provide a qualified privilege against libel suits for commercial credit reporting agencies, in those States that do not there is a thriving credit reporting business and commercial credit transactions are not inhibited.  ***Hood v. Dun & Bradstreet, Inc., 486 F.2d 25, 32 (1973)***, cert. denied, ***415 U.S. 985 (1974)***. The court cited an empirical study comparing credit transactions in Boise, Idaho, where there is no privilege, with those in Spokane, Washington, where there is one.  ***486 F.2d, at 32***, and n. 18.

EXHIBIT 43                                                                EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

In *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, contrary to well-established common law prevailing in the states, a divided Court held that a private plaintiff in a defamation action cannot recover for a published falsehood unless he proves that the defendant was at least negligent in publishing the falsehood. The Court further held that there can be no "presumed" damages in such an action and that the private plaintiff cannot receive "punitive" damages unless it is established that the publication was made with "actual malice," as defined in *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)*.

I dissented in *Gertz* because I believed that, insofar as the "ordinary private citizen" was concerned, *418 U.S., at 355*, the Court's **[****26]** opinion "[abandoned] the traditional thread," *id., at 354-355*, **[**2948]** that had been the theme of the law in this country **[*764]** up to that time. I preferred "to allow this area of law to continue to evolve as it [had] up to [then] with respect to private citizens rather than embark on a new doctrinal theory which [had] no jurisprudential ancestry." *Ibid.* *Gertz*, however, is now the law of the land, and until it is overruled, it must, **[***606]** under the principle of *stare decisis*, be applied by this Court.

 [1B]The single question before the Court today is whether *Gertz* applies to this case. The plurality opinion holds that *Gertz* does not apply because, unlike the challenged expression in *Gertz*, the alleged defamatory expression in this case does not relate to a matter of public concern. I agree that *Gertz* is limited to circumstances in which the alleged defamatory expression concerns a matter of general public importance, and that the expression in question here relates to a matter of essentially private concern. I therefore agree with the plurality opinion to the extent that it holds that *Gertz* is inapplicable in this case for the two **[****27]** reasons indicated. No more is needed to dispose of the present case.

I continue to believe, however, that *Gertz* was ill-conceived, and therefore agree with JUSTICE WHITE that *Gertz* should be overruled. I also agree generally with JUSTICE WHITE's observations concerning *New York Times Co*. v. *Sullivan*. *New York Times*, however, equates "reckless disregard of the truth" with malice; this should permit a jury instruction that malice may be found if the defendant is shown to have published defamatory material which, in the exercise of reasonable care, would have been revealed as untrue. But since the Court has not applied the literal language of *New York Times* in this way, I agree with JUSTICE WHITE that it should be reexamined. The great rights guaranteed by the *First Amendment* carry with them certain responsibilities as well.

Consideration of these issues inevitably recalls an aphorism of journalism that "too much checking on the facts has ruined many a good news story."

 **[*765]** JUSTICE WHITE, concurring in the judgment.

Until *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)*, the law of defamation was almost exclusively the business **[****28]** of state courts and legislatures. Under the then prevailing state libel law, the defamed individual had only to prove a false written publication that subjected him to hatred, contempt, or ridicule. Truth was a defense; but given a defamatory false circulation, general injury to reputation was presumed; special damages, such as pecuniary loss and emotional distress, could be recovered; and punitive damages were available if common-law malice were shown. General damages for injury to reputation were presumed and awarded because the judgment of history was that "in many cases the effect of defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed." *Restatement of Torts § 621, Comment a*, p. 314 (1938). The defendant was permitted to show that there was no reputational injury; but at the very least, the prevailing rule was that at least nominal damages were to be awarded for any defamatory publication actionable *per se*. This rule performed

"a vindicatory function by enabling the plaintiff publicly to brand the defamatory publication as false. The salutary social value of this rule is preventive **[****29]** in character since it often permits a defamed person to expose the groundless character of a defamatory rumor before harm to the reputation has resulted therefrom." *Id*. § 569, Comment *b*, p. 166.

263

EXHIBIT 43                                                                  EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

**[\*\*\*607]**  Similar rules applied to slanderous statements that were actionable *per se*. [1]

**[\*766]**  **[\*\*2949]**  *New York Times Co*. v. *Sullivan* was the first major step in what proved to be a seemingly irreversible process of constitutionalizing **[\*\*\*\*30]** the entire law of libel and slander.  Under the rule announced in that case, a public official suing for libel could no longer make out his case by proving a false and damaging publication.  He could not establish liability and recover any damages, whether presumed or actually proved, unless he proved "malice," which was defined as a knowing falsehood or a reckless disregard for the truth. *376 U.S., at 280*. Given that proof, however, the usual damages were available, including presumed and punitive damages. This judgment overturning 200 years of libel law was deemed necessary to implement the *First Amendment* interest in "uninhibited, robust, and wide-open" debate on public issues. *Id., at 270*. Three years later, the same rule was applied to plaintiffs who were not public officials, but who were termed public figures.  *Curtis Publishing Co*. v. *Butts, 388 U.S. 130, 155 (1967)*.

In 1971, four Justices took the view that the *New York Times* rules should apply wherever a publication concerned any manner of general or public interest, even though the plaintiff was a private person. *Rosenbloom v. Metromedia, Inc., 403 U.S. 29*. **[\*\*\*\*31]**  That view did not command a majority.  But in *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, the Court again dealt with defamation actions by private individuals, for the first time holding that such plaintiffs could no longer recover by proving a false statement, no matter how damaging it might be to reputation. They must, in addition, prove some "fault," at least negligence. *Id., at 347, 350*. Even with that proof, damages were not presumed but had to be proved. *Id., at 349*. Furthermore, no punitive damages were available without proof of *New York Times* malice.  **[\*767]**  *418 U.S., at 350*. This decision, which again purported to implement *First Amendment* values, seemingly left no defamation actions free from federal constitutional limitations.

I joined the judgment and opinion in *New York Times*.  I also joined later decisions extending the *New York Times* standard to other situations.  But I came to have increasing doubts about the soundness of the Court's approach and about some of the assumptions underlying it.   I could not join the plurality opinion in *Rosenbloom*, and I dissented **[\*\*\*\*32]** in *Gertz*, asserting that the common-law **[\*\*\*608]** remedies should be retained for private plaintiffs.  I remain convinced that *Gertz* was erroneously decided.  I have also become convinced that the Court struck an improvident balance in the *New York Times* case between the public's interest in being fully informed about public officials and public affairs and the competing interest of those who have been defamed in vindicating their reputation.

In a country like ours, where the people purport to be able to govern themselves through their elected representatives, adequate information about their government is of transcendent importance.  That flow of intelligence deserves full *First Amendment* protection.  Criticism and assessment of the performance of public officials and of government in general are not subject to penalties imposed by law.  But these *First Amendment* values are not at all served by circulating false statements of fact about public officials.  On the contrary, erroneous information frustrates these values.  They are even more disserved when the statements falsely impugn the honesty of those men and women and hence lessen the confidence in government. As **[\*\*\*\*33]** the Court said in *Gertz*: "[There] is no constitutional value in false statements of fact.  Neither **[\*\*2950]** the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *418 U.S., at 340*. Yet in *New York Times* cases, the public official's complaint will be dismissed unless he alleges and makes out a jury case of a knowing or reckless falsehood. Absent such proof, there will be no **[\*768]** jury verdict or judgment of any kind in his favor, even if the challenged publication is admittedly false.  The lie will stand, and the public continue to be misinformed about public matters.  This will recurringly happen because the putative plaintiff's burden is so exceedingly difficult to satisfy and can be discharged only by expensive litigation.  Even if the plaintiff sues, he frequently loses on summary

---

[1] At the common law, slander, unlike libel, was actionable *per se* only when it dealt with a narrow range of statements: those imputing a criminal offense, a venereal or loathsome and communicable disease, improper conduct of a lawful business, or unchastity of a woman. **Restatement of Torts § 570** (1938).  To be actionable, all other slanderous statements required additional proof of special damages other than an injury to reputation or emotional distress.  The special damages most often took the form of material or pecuniary loss. *Id*. § 575 and Comment *b*, pp. 185-187.

EXHIBIT 43 EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

judgment or never gets to the jury because of insufficient proof of malice. If he wins before the jury, verdicts are often overturned by appellate courts for failure to prove malice. Furthermore, when the plaintiff loses, the jury will likely return a general verdict and there will be no **[****34]** judgment that the publication was false, even though it was without foundation in reality. [2] The public is **[***609]** left to conclude that the challenged statement was true after all. Their only chance of being accurately informed is measured by the public official's ability himself to counter the lie, unaided by the courts.   That is a decidedly weak reed to depend on for the vindication of *First Amendment* **[*769]** interests -- "it is the rare case where the denial overtakes the original charge.   Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story." *Rosenbloom, 403 U.S., at 46-47* (opinion of BRENNAN, J.); *Gertz, supra, at 363-364* (BRENNAN, J., dissenting).

 **[****35]**  Also, by leaving the lie uncorrected, the *New York Times* rule plainly leaves the public official without a remedy for the damage to his reputation. Yet the Court has observed that the individual's right to the protection of his own good name is a basic consideration of our constitutional system, reflecting "'our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty.'" *Gertz, supra, at 341*, quoting *Rosenblatt v. Baer, 383 U.S. 75, 92 (1966)* (Stewart, J., concurring).  The upshot is that the public official must suffer the injury, often cannot get a judgment identifying the lie for what it is, and has very little, if any, chance of countering that lie in the public press.

The *New York Times* rule thus countenances two evils: first, the stream of information about public officials and public affairs is polluted and often remains polluted by false information; and second, the reputation and professional life of the defeated plaintiff may be destroyed by falsehoods that might have been avoided with a reasonable effort to investigate the facts.  In terms **[****36]** of the *First Amendment* and reputational **[**2951]** interests at stake, these seem grossly perverse results.

Of course, the Court in *New York Times* could not have been unaware of these realities.  Despite our ringing endorsement of "wide-open" and "uninhibited" debate, which taken literally would protect falsehoods of all kinds, we cannot fairly be accused of giving constitutional protection to false information as such, for we went on to find competing and overriding constitutional justification for our decision.  The constitutional interest in the flow of information about **[*770]** public affairs was thought to be very strong, and discovering the truth in this area very difficult, even with the best of efforts.  These considerations weighed so heavily that those who write and speak about public affairs were thought to require some breathing room -- that is, they should be permitted to err and misinform the public as long as they act unknowingly and without recklessness.  If the press could be faced with possibly sizable damages for every mistaken publication injurious to reputation, the result would be an unacceptable degree of self-censorship, which might prevent the occasional mistaken **[****37]** libel, but would also often prevent the timely flow of information that is thought to be true but cannot be readily verified.  The press must therefore be privileged to spread false information, even **[***610]** though that information has negative *First Amendment* value and is severely damaging to reputation, in order to encourage the full flow of the truth, which otherwise might be withheld.

---

[2] If the plaintiff succeeds in proving a jury case of malice, it may be that the jury will be asked to bring in separate verdicts on falsity and malice. In that event, there could be a verdict in favor of the plaintiff on falsity, but against him on malice. There would be no judgment in his favor, but the verdict on falsity would be a public one and would tend to set the record right and clear the plaintiff's name.

It might be suggested that courts, as organs of the government, cannot be trusted to discern what the truth is.  But the logical consequence of that view is that the *First Amendment* forbids all libel and slander suits, for in each such suit, there will be no recovery unless the court finds the publication at issue to be factually false.  Of course, no forum is perfect, but that is not a justification for leaving whole classes of defamed individuals without redress or a realistic opportunity to clear their names.  We entrust to juries and the courts the responsibility of decisions affecting the life and liberty of persons.  It is perverse indeed to say that these bodies are incompetent to inquire into the truth of a statement of fact in a defamation case.  I can therefore discern nothing in the Constitution which forbids a plaintiff to obtain a judicial decree that a statement is false -- a decree he can then use in the community to clear his name and to prevent further damage from a defamation already published.

EXHIBIT 43   EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

*Gertz* is subject to similar observations.  Although rejecting the *New York Times* malice standard where the plaintiff is neither a public official nor a public figure, there the Court nevertheless deprived the private plaintiff of his common-law remedies, making recovery more difficult in order to provide a margin for error.  In doing so, the Court ruled that without proof of at least negligence, a plaintiff damaged by the most outrageous falsehoods would be remediless, and the lie very likely would go uncorrected.  And even if fault were proved, actual damage to reputation would have to be shown, a burden traditional libel law considered difficult, if not impossible, to discharge.  For this reason JUSTICE POWELL would not impose on the plaintiff the burden of proving damages in the case **[****38]**  now before us.

Although there was much talk in *Gertz* about liability without fault and the unfairness of presuming damages, all of this, as was the case in *New York Times*, was done in the name of the *First Amendment*, purportedly to shield the press and others writing about public affairs from possibly intimidating  **[*771]**  damages liability.  But if protecting the press from intimidating damages liability that might lead to excessive timidity was the driving force behind *New York Times* and *Gertz*, it is evident that the Court engaged in severe overkill in both cases.

In *New York Times*, instead of escalating the plaintiff's burden of proof to an almost impossible level, we could have achieved our stated goal by limiting the recoverable damages to a level that would not unduly threaten the press.  Punitive damages might have been scrutinized as Justice Harlan suggested in *Rosenbloom, supra, at 77*, or perhaps even entirely forbidden.  Presumed damages to reputation might have been prohibited, or limited, as in *Gertz*.  Had that course been taken and the common-law standard of liability been retained, the defamed public official, upon proving **[****39]**  falsity, could at least have had a judgment to that effect.  His reputation would then be vindicated; and to the extent possible, the misinformation circulated would have been countered.  He might have also recovered a modest amount, enough perhaps to pay his litigation expenses.  At the very least, the public official should not have been required to satisfy the actual malice standard where he sought no damages but only to clear his name.  In this way, both *First Amendment* and reputational interests would have been far better served.

 **[**2952]**  We are not talking in these cases about mere criticism or opinion, but about misstatements of fact that seriously harm the reputation of another, by lowering him in the estimation of the community or to deter third persons from associating or dealing with him.  *Restatement of Torts § 559* (1938).  The necessary breathing room for speakers can be ensured by limitations on recoverable damages; it does not also require depriving many public figures of any room to vindicate their reputations sullied by false statements of  **[***611]**  fact.  It could be suggested that even without the threat of large presumed and punitive damages awards, press defendants' communication **[****40]**   **[*772]**  will be unduly chilled by having to pay for the actual damages caused to those they defame.  But other commercial enterprises in this country not in the business of disseminating information must pay for the damage they cause as a cost of doing business, and it is difficult to argue that the United States did not have a free and vigorous press before the rule in *New York Times* was announced.  In any event, the *New York Times* standard was formulated to protect the press from the chilling danger of numerous large damages awards.  Nothing in the central rationale behind *New York Times* demands an absolute immunity from suits to establish the falsity of a defamatory misstatement about a public figure where the plaintiff cannot make out a jury case of actual malice.

I still believe the common-law rules should have been retained where the plaintiff is not a public official or public figure.  As I see it, the Court undervalued the reputational interest at stake in such cases.  I have also come to doubt the easy assumption that the common-law rules would muzzle the press.  But even accepting the *Gertz* premise that the press also needed protection in suits by private **[****41]**  parties, there was no need to modify the common-law requirements for establishing liability and to increase the burden of proof that must be satisfied to secure a judgment authorizing at least nominal damages and the recovery of additional sums within the limitations that the Court might have set. [3]

---

[3] The Court was unresponsive to my suggestion in dissent, *418 U.S., at 391-392*, that the plaintiff should be able to prove and obtain a judgment of falsehood without having to establish any kind of fault.

EXHIBIT 43                                                     EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

[2A]It is interesting that JUSTICE POWELL declines to follow the *Gertz* approach in this case.  I had thought that the decision in *Gertz* was intended to reach cases that involve any false statements of fact injurious to reputation, whether the statement is made privately or publicly and whether or not it implicates a matter of public importance.  JUSTICE POWELL, however, distinguishes *Gertz* as a case that involved a matter  **[\*773]** of public concern, an element absent here.  Wisely, in my view,  **[\*\*\*\*42]**  JUSTICE POWELL does not rest his application of a different rule here on a distinction drawn between media and nonmedia defendants.  On that issue, I agree with JUSTICE BRENNAN that the *First Amendment* gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech.  None of our cases affords such a distinction; to the contrary, the Court has rejected it at every turn. [4] It  **[\*\*2953]**  should be  **[\*\*\*612]**  rejected again, particularly in this context, since it makes no sense to give the most protection to those publishers who reach the most readers and therefore pollute the channels of communication with the most misinformation and do the most damage to private reputation. If *Gertz* is to be distinguished from this case, on the ground that it applies only where the allegedly false publication deals with a matter of general or public importance, then where the false publication does not deal with such a matter, the common-law rules would apply whether the defendant is a member of the media or other public disseminator or a nonmedia individual publishing privately.  Although JUSTICE POWELL speaks only of the inapplicability of the *Gertz* **[\*\*\*\*43]**  rule with respect to presumed and  **[\*774]**  punitive damages, it must be that the *Gertz* requirement of some kind of fault on the part of the defendant is also inapplicable in cases such as this.

 **[\*\*\*\*44]**  As I have said, I dissented in *Gertz*, and I doubt that the decision in that case has made any measurable contribution to *First Amendment* or reputational values since its announcement.  Nor am I sure that it has saved the press a great deal of money.  Like the *New York Times* decision, the burden that plaintiffs must meet invites long and complicated discovery involving detailed investigation of the workings of the press, how a news story is developed, and the state of mind of the reporter and publisher.  See *Herbert v. Lando, 441 U.S. 153 (1979)*. That kind of litigation is very expensive.  I suspect that the press would be no worse off financially if the common-law rules were to apply and if the judiciary was careful to insist that damages awards be kept within bounds.  A legislative solution to the damages problem would also be appropriate.  Moreover, since libel plaintiffs are very likely more interested in clearing their names than in damages, I doubt that limiting recoveries would deter or be unfair to them.  In any event, I cannot assume that the press, as successful and powerful as it is, will be intimidated into withholding news that by decent **[\*\*\*\*45]**  journalistic standards it believes to be true.

 [1C]The question before us is whether *Gertz* is to be applied in this case.  For either of two reasons, I believe that it should not.  First, I am unreconciled to the *Gertz* holding and believe that it should be overruled.  Second, as JUSTICE POWELL indicates, the defamatory publication in this case does not deal with a matter of public importance.  Consequently, I concur in the Court's judgment.

**Dissent by:** BRENNAN

# Dissent

---

[4] We explained in *Branzburg v. Hayes, 408 U.S. 665 (1972)* that "the informative function asserted by representatives of the organized press" to justify greater privileges under the *First Amendment* was also "performed by lecturers, political pollsters, novelists, academic researchers, and dramatists." *Id., at 705*. From its inception, without discussing the issue, we have applied the rule of *New York Times* to nonmedia defendants.  See *New York Times*, 376 U.S., at 254, n., 286; *Henry v. Collins, 380 U.S. 356 (1965)*; *Garrison v. Louisiana, 379 U.S. 64 (1964)*. And this Court has made plain that the organized press has a monopoly neither on the *First Amendment* nor on the ability to enlighten.  *First National Bank of Boston v. Bellotti, 435 U.S. 765, 782 (1978)*. See also *Pell v. Procunier, 417 U.S. 817 (1974)* (press has no independent *First Amendment* right of access to prisons).  Cf. *Buckley v. Valeo, 424 U.S. 1, 48-49 (1976)* (the idea that government can restrict the speech of some elements of society to enhance the relative voice of others is "wholly foreign" to the *First Amendment*).

**EXHIBIT 43**                                                                          EXHIBIT  14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

This case involves a difficult question of the proper application of *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, to credit reporting -- a type of  **[\*\*\*613]**  speech at some remove from that  **[\*775]**  which first gave rise to explicit *First Amendment* restrictions on state defamation law -- and has produced a diversity of considered opinions, none of which speaks for the Court.  JUSTICE POWELL's plurality opinion affirming the judgment below would not apply the *Gertz* limitations on presumed and punitive damages to this case; rather, the three Justices joining that opinion would hold that the *First Amendment* **[\*\*\*\*46]**  requirement of actual malice -- a clear and convincing showing of knowing falsehood or reckless disregard for the truth -- should have no application in this defamation action because the speech involved a subject of purely private concern and was circulated to an extremely limited audience.  Establishing this exception, the opinion reaffirms *Gertz* for cases involving matters of public concern, *ante*, at 756-757, and reaffirms *New York Times Co*. v. *Sullivan, 376 U.S. 254 (1964)*, for cases in which the challenged speech allegedly libels a public official or a public figure.  *Ante*, at 755.  JUSTICE WHITE also would affirm;  **[\*\*2954]**  he would not apply *Gertz* to this case on the ground that the subject matter of the publication does not deal with a matter of general or public importance.  *Ante*, at 774 (concurring in judgment). [1] THE CHIEF JUSTICE apparently agrees with JUSTICE WHITE.  *Ante*, at 764 (concurring in judgment).  The four who join this opinion would reverse the judgment of the Vermont Supreme Court.  We believe that, although protection of the type of expression at issue is admittedly not the "central meaning of the *First Amendment*," *376 U.S., at 273*,  **[\*\*\*\*47]**  *Gertz* makes clear that the *First Amendment* nonetheless requires restraints on presumed and punitive damages awards for this  **[\*776]**  expression.  The lack of consensus in approach to these idiosyncratic facts should not, however, obscure the solid allegiance the principles of *New York Times Co*. v. *Sullivan* continue to command in the jurisprudence of this Court.  See also *Bose Corp*. v. *Consumer's Union of the United States, Inc., 466 U.S. 485 (1984)*.


I

In *New York Times Co*. v. *Sullivan* the Court held **[\*\*\*\*48]**  that the *First Amendment* shields all who speak in good faith from the threat of unrestrained libel judgments for unintentionally false criticism of a public official. Recognizing that libel law, like all other governmental regulation of the content of speech, "can claim no talismanic immunity from constitutional limitations [and] must be measured by standards that satisfy the *First Amendment*," *376 U.S., at 269*, the Court drew from salutary common-law developments, *id., at 280*, and n. 20, [2]  **[\*\*\*614]**  and unquestioned *First Amendment* principles, *id., at 273-274*, to formulate the now-familiar actual malice test.  Because the "erroneous statement is inevitable in free debate . . . [it] must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *New York Times Co*. v. *Sullivan, supra,  [\*777]  at 271-272*, quoting *NAACP v. Button, 371 U.S. 415, 433 (1963)*; see *Bose Corp., supra*, at 513.  These solidly accepted principles are not at issue today.

---

[1] JUSTICE WHITE also ventures some modest proposals for restructuring the *First Amendment* protections currently afforded defendants in defamation actions.  JUSTICE WHITE agrees with *New York Times Co*. v. *Sullivan*, however, that the breathing space needed to ensure the robust debate of public issues essential to our democratic society is impermissibly threatened by unrestrained damages awards for defamatory remarks.  *Ante*, at 770-772 (opinion concurring in judgment).

[2] The principles were expressed as early as 1788 in an opinion of the Pennsylvania Supreme Court:

"What then is the meaning of *the bill of rights*, and *Constitution of Pennsylvania*, when they declare, 'That the freedom of the press shall not be restrained,' and 'that the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature or any part of the government?' . . .  [They] give to every citizen a right of investigating the conduct of those who are entrusted with the public business . . . .  The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society to enquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame.  To the latter description, it is impossible that any good government should afford protection and impunity." *Respublica* v. *Oswald*, 1 Dall. 319, 325 (footnotes omitted).

**EXHIBIT 43**                                                                                    **EXHIBIT  14**

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

 **[****49]**  Our *First Amendment* libel decisions in the last two decades have in large measure been an effort to explore the full ramifications of the *New York Times Co*. v. *Sullivan* principles.  Building on the extension of actual malice to "public figure" plaintiffs in *Curtis Publishing Co*. v. *Butts, 388 U.S. 130 (1967)*, the Court in *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*, and *Gertz v. Robert Welch, Inc., supra*, focused largely on defining the circumstances under which protection of the central *First Amendment* value of robust debate of *public issues* should mandate plaintiffs to show actual malice to obtain a judgment and actual damages; the Court settled on a rule requiring actual malice as a prerequisite to recovery only in suits brought by public officials or public  **[**2955]**  figures.  *418 U.S., at 344-346*. [3] We have also recognized, however, that the *First Amendment* requires significant protection from defamation law's chill for a range of expression far broader than simply speech about pure political issues.  See *Time, Inc*. v. *Hill, 385 U.S. 374, 388 (1967)* ("The **[****50]**  guarantees for free speech and press are not the preserve  **[***615]**  of political expression or comment upon public affairs, essential as those are to healthy government"); cf.  *Abood v. Detroit Board of Education, 431 U.S. 209, 231 (1977)*.

 **[****51]**   **[*778]**  Our cases since *New York Times Co*. v. *Sullivan* have proceeded from the general premise that all libel law implicates *First Amendment* values to the extent it deters true speech that would otherwise be protected by the *First Amendment*.  *376 U.S., at 269*.  In this sense defamation law does not differ from state efforts to control obscenity, see *Miller v. California, 413 U.S. 15, 23-24 (1973)*, ensure loyalty, see *Speiser v. Randall, 357 U.S. 513 (1958)*, protect consumers, see *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976)*, oversee professions, see *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626 (1985)*, or pursue other public welfare goals through content-based regulation of speech.  "When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied." *Speiser v. Randall, supra, at 520*.  **[****52]**  This general proscription against unnecessarily broad content-based regulation permeates *First Amendment* jurisprudence.

In libel law, no less than any other governmental effort to regulate speech, States must therefore use finer instruments to ensure adequate space for protected expression.  Cf. *Central Hudson Gas & Electric Corp*. v. *Public Service Comm'n of New York, 447 U.S. 557, 565 (1980)* (restriction "may extend only so far as the interest it serves"); *Lowe* v. *SEC, ante*, at 234 (WHITE, J., concurring in judgment) ("[The] *First Amendment* permits restraints on speech only when they are narrowly tailored to advance a legitimate governmental interest").  The ready availability and unconstrained application of presumed and punitive damages in libel actions is too blunt a regulatory instrument to satisfy this *First Amendment* principle, even when the alleged libel does not implicate directly the type of speech at issue in *New York Times Co*. v.  **[*779]**  *Sullivan*.  Justice Harlan made precisely this point in *Rosenbloom*:

"At a minimum, *even in the purely private libel area*, I think the *First Amendment* should be construed to limit the  **[****53]**  imposition of punitive damages to those situations where actual malice is proved.  This is the typical standard employed in assessing anyone's liability for punitive damages where the underlying aim of the law is to compensate for harm actually caused, . . . and no conceivable state interest could justify imposing a harsher standard on the exercise of *those freedoms that are given explicit protection* **[**2956]**  *by the First Amendment*." *403 U.S., at 73* (dissenting opinion) (emphasis added).

See also *id., at 65*;  **[***616]**  *New York Times Co*. v. *Sullivan, 376 U.S., at 269*.

---

[3] A plurality in *Rosenbloom* would have applied the actual malice standard of liability when the alleged libel concerned matters of "public or general interest," irrespective of the status of the plaintiff.  *403 U.S., at 43* (opinion of BRENNAN, J.).  In *Gertz* the Court rejected the *Rosenbloom* plurality's "public or general interest" approach.  That approach was thought unacceptably to impair the reputational interests of private individuals, who, unlike public officials or public figures, neither assume the risk of rough treatment by entering the public arena nor have ready access to the media to rebut false charges.  *418 U.S., at 344-345*. It was also thought to "occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest.'" *Id., at 346* (citation omitted).

**EXHIBIT 43**                                                                    EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749



Justice Harlan's perception formed the cornerstone of the Court's analysis in *Gertz*.  Requiring "that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved," the Court found it "necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury." *418 U.S., at 349*. The Court explained that state rules authorizing presumed and punitive damages conferred on juries "largely uncontrolled discretion"  **[****54]**  to assess damages "in wholly unpredictable amounts bearing no necessary relation to the actual harm caused." *Id., at 349-350*. Punitive damages in particular were found to be "*wholly irrelevant* to the state interest" because "[they] are not compensation for injury." *Id., at 350* (emphasis added).  For these reasons, the Court in *Gertz* specifically held that the award of presumed and punitive damages on less than a showing of actual malice is not a narrowly tailored means to achieve the legitimate state purpose of protecting the reputation of private persons: the common-law approach, said the Court, "*unnecessarily* compounds the  **[*780]**  potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of *First Amendment* freedoms." *Id., at 349* (emphasis added). [4]

 **[****55]**  Thus, when an alleged libel involves criticism of a public official or a public figure, the need to nurture robust debate of public issues and the requirement that all state regulation of speech be narrowly tailored coalesce to require actual malice as a prerequisite to any recovery.  When the alleged libel involves speech that falls outside these especially important categories, we have held that the Constitution permits States significant leeway to compensate for actual damage to reputation. [5] The  **[***617]**  requirement of narrowly tailored  **[*781]**  regulatory measures, however, always mandates at least a showing of fault and proscribes the award of presumed and punitive damages on less than a showing of actual malice. It has remained the judgment of the Court since *Gertz* that this comprehensive two-tiered structure best accommodates the values of the constitutional free speech guarantee  **[**2957]**  and the States' interest in protecting reputation.

 **[****56]**  II

The question presented here is narrow.  Neither the parties nor the courts below have suggested that respondent Greenmoss Builders should be required to show actual malice to obtain a judgment and actual compensatory damages.  Nor do the parties question the requirement of *Gertz* that respondent must show fault to obtain a judgment and actual damages.  The only question presented is whether a jury award of presumed and punitive damages based on less than a showing of actual malice is constitutionally permissible.  *Gertz* provides a forthright negative answer. To preserve the jury verdict in this case, therefore, the opinions of JUSTICE POWELL and JUSTICE WHITE have cut away the protective mantle of *Gertz*.

---

[4] Since the decision in *Gertz*, we have applied its reasoning with respect to damages in excess of compensation for actual harm in other areas of the law.  See, *e. g., Electrical Workers v. Foust, 442 U.S. 42, 48-52 (1979)*; *Newport v. Fact Concerts, Inc., 453 U.S. 247, 270-271 (1981)*. These cases, like *Gertz*, recognize that "the alleged deterrence achieved by punitive damages awards is likely outweighed by the costs -- such as the encouragement of unnecessary litigation and the chilling of desirable conduct -- flowing from the rule, at least when the standards on which the awards are based are ill-defined." *Smith v. Wade, 461 U.S. 30, 59 (1983)* (REHNQUIST, J., dissenting).  See *id., at 46-47* (Court opinion) (noting prevailing view that punitive damages may only be awarded for "'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others,'" quoting **Restatement (Second) of Torts § 908(2)** (1979) (emphasis deleted)); *461 U.S., at 93-94* (O'CONNOR, J., dissenting); *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 244-245 (1984)*; *id., at 260-261* (BLACKMUN, J., dissenting); *id., at 276* (POWELL, J., dissenting).

[5] Such speech might at times involve issues of public or general interest within the meaning of *Rosenbloom* and thus implicate important *First Amendment* interests.  To justify this cost, the Court in *Gertz* held that the State had an enhanced interest in protecting private reputation and cited the independent *First Amendment* difficulties inherent in case-by-case judicial determination of whether speech concerns a matter of public interest.  *418 U.S., at 344-346*. See n. 3, *supra*.  The decision in *Gertz* is also susceptible of an alternative justification.  Speech allegedly defaming a private person will generally be far less likely to implicate matters of public importance than will speech allegedly defaming public officials or public figures.  In light of the problems inherent in case-by-case judicial determination of what is in the public interest, the Court's result could be explained as a decision that the cost of case-by-case evaluation could be avoided without significant chilling of speech involving matters of public importance.

EXHIBIT 43                                                                          EXHIBIT  14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

A

Relying on the analysis of the Vermont Supreme Court, respondent urged that this pruning be accomplished by restricting the applicability of *Gertz* to cases in which the defendant is a "media" entity.  Such a distinction is irreconcilable with the fundamental *First Amendment* principle that "[the] inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union,  **[****57]**  or individual." *First National Bank of Boston v. Bellotti, 435 U.S. 765, 777 (1978)*.  **[*782]**  *First Amendment* difficulties lurk in the definitional questions such an approach would generate. [6] **[****58]**  And the distinction would  **[***618]**  likely be born an anachronism. [7]  **[*783]**  Perhaps most importantly, the argument that *Gertz* should be limited to the media misapprehends our cases.  We protect the press to ensure the vitality of *First Amendment* guarantees. [8] This solicitude  **[**2958]**  implies no endorsement of the principle that speakers other than the press deserve lesser *First Amendment* protection.  "In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue." *First National Bank of Boston v. Bellotti, supra, at 784-785*. See *Bridges v. California, 314 U.S. 252, 277-278 (1941)*.

---

[6] An attempt to characterize petitioner Dun & Bradstreet illustrates the point.  Like an account of judicial proceedings in a newspaper, magazine, or news broadcast, a statement in petitioner's reports that a particular company has filed for bankruptcy is a report of a timely news event conveyed to members of the public by a business organized to collect and disseminate such information.  Thus it is not obvious why petitioner should find less protection in the *First Amendment* than do established print or electronic media. The Vermont Supreme Court nonetheless characterized petitioner as a nonmedia defendant entitled to less protection because it is "in the business of selling financial information to a limited number of subscribers who have paid substantial fees for [its] services." *143 Vt. 66, 73, 461 A. 2d 414, 417 (1983)*. The court added that "[there] is a clear distinction between a publication which disseminates news for public consumption and one which provides specialized information to a selective, finite audience." *Ibid*.

No clear line consistent with *First Amendment* principles can be drawn on the basis of these criteria.  That petitioner's information is "specialized" or that its subscribers pay "substantial fees" hardly distinguishes these reports from articles in many publications that would surely fall on the "media" side of the line the Vermont Supreme Court seeks to draw.  Few published statements are of universal interest, and few publications are distributed without charge.  Much fare of any metropolitan daily is specialized information for which a selective, finite audience pays a fee.  Nor is there any reason to treat petitioner differently than a more widely circulated publication because it has "a limited number of subscribers." Indeed, it would be paradoxical to increase protection to statements injurious to reputation as the size of their audience, and hence their potential to injure, grows.  Cf. *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 (1984)*.

[7] Owing to transformations in the technological and economic structure of the communications industry, there has been an increasing convergence of what might be labeled "media" and "nonmedia." Pool, The New Technologies: Promise of Abundant Channels at Lower Cost, in What's News: The Media in American Society 81, 87 (1981).  See also I. Pool, Technologies of Freedom (1983); U.S. Federal Trade Commission, Media Policy Session: Technology and Legal Change (1979); Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, Telecommunications in Transition: The Status of Competition in the Telecommunications Industry, 97th Cong., 1st Sess. (Comm. Print 1981).

[8] See, *e. g., Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue, 460 U.S. 575, 585 (1983)*; *Columbia Broadcasting System, Inc.* v. *FCC, 453 U.S. 367, 395 (1981)*; *Miami Herald Publishing Co.* v. *Tornillo, 418 U.S. 241 (1974)*; *Branzburg v. Hayes, 408 U.S. 665, 707 (1972)*; *New York Times Co.* v. *United States, 403 U.S. 713 (1971)*; *Mills v. Alabama, 384 U.S. 214, 218-219 (1966)*; *Grosjean v. American Press Co., Inc., 297 U.S. 233, 250 (1936)*. See also *Herbert v. Lando, 441 U.S. 153, 180-199 (1979)* (BRENNAN, J., dissenting in part); *Saxbe v. Washington Post Co., 417 U.S. 843, 850 (1974)* (POWELL, J., dissenting); *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 393 (1973)* (BURGER, C. J., dissenting); *Red Lion Broadcasting Co.* v. *FCC, 395 U.S. 367, 390 (1969)*; *Time, Inc.* v. *Hill, 385 U.S. 374, 389 (1967)*; Stewart, "Or of the Press," 26 Hastings L. J. 631 (1975).

**EXHIBIT 43**                                                                   **EXHIBIT  14**

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

 **[****59]**   [2B]The free speech guarantee gives each citizen an equal right to self-expression and to participation in self-government.  See, *e. g., Carey v. Brown, 447 U.S. 455, 459-463 (1980);Police Department of Chicago v. Mosley, 408 U.S. 92 (1972);Cohen v. California, 403 U.S. 15, 24 (1971);Whitney v. California, 274 U.S. 357, 375-377 (1927)* (Brandeis, J., concurring).  This guarantee also protects the rights of listeners to "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States, 326 U.S. 1, 20 (1945).*[9] **[****60]**  Accordingly, at least six  **[*784]**  Members of this  **[***619]**  Court (the four who join this opinion and JUSTICE WHITE and THE CHIEF JUSTICE) agree today that, in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities.  See *ante*, at 773 (opinion concurring in judgment). [10]

B

Eschewing the media/nonmedia distinction, the opinions of both JUSTICE WHITE and JUSTICE POWELL focus primarily on the content of the credit report as a reason for restricting the applicability of *Gertz*.  Arguing that at most *Gertz* should protect speech that "deals with a matter of public or general importance," *ante*, at 773, JUSTICE WHITE, without analysis or explanation, decides that the credit report at issue here falls outside this protected category.  The plurality opinion of JUSTICE POWELL offers virtually the same conclusion with at least a garnish of substantive analysis.

Purporting to "employ the approach approved in *Gertz*," *ante*, at 757, JUSTICE POWELL balances the state interest in protecting private reputation against the *First Amendment* interest in protecting expression on matters not of public concern.  The state interest is found to be identical to that at stake in *Gertz*.  The *First Amendment* interest **[****61]** is, however, found to be significantly weaker because speech on public issues, such as that involved in *Gertz*, receives greater constitutional protection than speech that is not a matter of public concern.  See *ante*, at 759-760, citing  **[*785]**  *Connick v. Myers, 461 U.S. 138 (1983)*.  JUSTICE POWELL is willing to concede that such  **[**2959]**  speech receives some *First Amendment* protection, but on balance finds that such protection does not reach so far as to restrain the state interest in protecting reputation through presumed and punitive damages awards in state defamation actions.  *Ante*, at 760-761.  Without explaining what *is* a "matter of public concern," the plurality opinion proceeds to serve up a smorgasbord of reasons why the speech at issue here is not, *ante*, at 761-762, and on this basis affirms the Vermont courts' award of presumed and punitive damages.

In professing allegiance to *Gertz*, the plurality opinion protests too much.  As JUSTICE WHITE correctly observes, JUSTICE POWELL departs completely from the analytic framework and result of that case: "*Gertz* was intended to reach cases that involve any false statements . . . whether **[****62]** or not [they] [implicate] a matter of public importance." *Ante*, at 772 (concurring **[***620]** in judgment). [11] Even accepting the notion that a distinction can and

---

[9] In light of the "increasingly prominent role of mass media in our society, and the awesome power it has placed in the hands of a select few," *Gertz, 418 U.S., at 402* (WHITE, J., dissenting), protection for the speech of nonmedia defendants is essential to ensure a diversity of perspectives.  See J. Barron, Freedom of the Press for Whom? (1973).  "[Uninhibited], robust and wide-open" debate, *New York Times Co.* v. *Sullivan, 376 U.S., at 270*, among nonmedia speakers is as essential to the fostering and development of an individual's political thought as is such debate in the mass media. See J. Klapper, The Effects of Mass Communications (1960).

[10] JUSTICE POWELL's opinion does not expressly reject the media/nonmedia distinction, but does expressly decline to apply that distinction to resolve this case.

[11] One searches *Gertz* in vain for a single word to support the proposition that limits on presumed and punitive damages obtained only when speech involved matters of public concern. *Gertz* could not have been grounded in such a premise.  Distrust of placing in the courts the power to decide what speech was of public concern was precisely the rationale *Gertz* offered for rejecting the *Rosenbloom* plurality approach.   *418 U.S., at 346*.  It would have been incongruous for the Court to go on to circumscribe the protection against presumed and punitive damages by reference to a judicial judgment as to whether the speech at issue involved matters of public concern. At several points the Court in *Gertz* makes perfectly clear the restrictions of presumed and punitive damages were to apply in all cases.  *Id., at 346, 349-350*.

Page 18 of 24                                                                    **272**

should be drawn between matters  **[*786]**  of public concern and matters of purely private concern, however, the analyses presented by both JUSTICE POWELL and JUSTICE WHITE fail on their own terms.  Both, by virtue of what they hold in this case, propose an impoverished definition of "matters of public concern" that is irreconcilable with *First Amendment* principles.  The credit reporting at issue here surely involves a subject matter of sufficient public concern to require the comprehensive protections of *Gertz*.  Were this speech appropriately characterized as a matter of only private concern, moreover, the elimination of the *Gertz* restrictions on presumed and punitive damages would still violate basic *First Amendment* requirements.

 **[****63]**  (1)

The five Members of the Court voting to affirm the damages award in this case have provided almost no guidance as to what constitutes a protected "matter of public concern." JUSTICE WHITE offers nothing at all, but his opinion does indicate that the distinction turns on solely the subject matter of the expression and not on the extent or conditions of dissemination of that expression.  *Ante*, at 773.  JUSTICE POWELL adumbrates a rationale that would appear to focus primarily on subject matter. [12] The opinion relies on the fact that the speech at issue was "solely in the individual interest of the speaker and its specific *business* audience," *ante*, at 762 (emphasis added).  Analogizing explicitly to advertising,  **[*787]**  the opinion also states that credit reporting is "hardy" and "solely motivated by the desire for profit." *Ibid*.   **[**2960]**  These two strains of analysis suggest  **[***621]**  that JUSTICE POWELL is excluding the subject matter of credit reports from "matters of public concern" because the speech is predominantly in the realm of matters of economic concern.

 **[****64]**  In evaluating the subject matter of expression, this Court has consistently rejected the argument that speech is entitled to diminished *First Amendment* protection simply because it concerns economic matters or is in the economic interest of the speaker or the audience.  See, *e. g., Joseph Burstyn, Inc*. v. *Wilson, 343 U.S. 495, 501-502 (1952)*; *American Federation of Labor v. Swing, 312 U.S. 321, 325-326 (1941)*; *Thornhill v. Alabama, 310 U.S. 88, 101-103 (1940)*; see also *Abood v. Detroit Board of Education, 431 U.S., at 231-232*, and n. 28. "[Our] cases have never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters -- to take a nonexhaustive list of labels -- is not entitled to full *First Amendment* protection." *Id., at 231*. The breadth of this protection evinces recognition that freedom of expression is not only essential to check tyranny and foster self-government but also intrinsic to individual liberty and dignity and instrumental in society's search for truth.  See *Bose Corp*. v. *Consumers Union of United States, Inc., 466 U.S., at 503-504*;  **[****65]**  *Whitney v. California, 274 U.S., at 375* (Brandeis, J., concurring).

Speech about commercial or economic matters, even if not directly implicating "the central meaning of the *First Amendment*," *376 U.S., at 273*, is an important part of our public discourse.  The Court made clear in the context of discussing labor relations speech in *Thornhill v. Alabama, supra*:

"It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in the business or

---

Indeed, JUSTICE POWELL's opinion today is fairly read as embracing the approach of the *Rosenbloom* plurality to deciding when the Constitution should limit state defamation law.  The limits imposed, however, are less stringent than those suggest by the *Rosenbloom* plurality.  Under the approach of today's plurality, speech about matters of public or general interest receives only the *Gertz* protections against unrestrained presumed and punitive damages, not the full *New York Times Co*. v. *Sullivan* protections against any recovery absent a showing of actual malice.

[12] JUSTICE POWELL also appears to rely in part on the fact that communication was limited and confidential.  *Ante*, at 762.  Given that his analysis also relies on the subject matter of the credit report, *ante*, at 761-762, it is difficult to decipher exactly what role the nature and extent of dissemination plays in JUSTICE POWELL's analysis.  But because the subject matter of the expression at issue is properly understood as a matter of public concern, see *infra*, at 791-793, it may well be that this element of confidentiality is crucial to the outcome as far as JUSTICE POWELL's opinion is concerned.  In other words, it may be that JUSTICE POWELL thinks this particular expression could not contribute to public welfare because the public generally does not receive it.  This factor does not suffice to save the analysis.  See n. 18, *infra*.

EXHIBIT 43EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

industry directly concerned.  The health of the  **[\*788]**  present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing.  The merest glance at state and federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern.  Free discussion concerning the conditions in industry and the causes of labor disputes appears to **[\*\*\*\*66]**  us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society." *310 U.S., at 102-103*.


As *Thornhill* suggests, the choices we make when we step into the voting booth may well be the products of what we have learned from the myriad of daily economic and social phenomenon that surround us.  See *id., at 102* ("Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members  **[\*\*\*622]**  of society to cope with the exigencies of their period"). [13]


 **[\*\*\*\*67]**   **[\*789]**   **[\*\*2961]**  The credit reporting of Dun & Bradstreet falls within any reasonable definition of "public concern" consistent with our precedents.  JUSTICE POWELL's reliance on the fact that Dun & Bradstreet publishes credit reports "for profit," *ante*, at 762, is wholly unwarranted.  Time and again we have made clear that speech loses none of its constitutional protection "even though it is carried in a form that is 'sold' for profit." *Virginia Pharmacy Bd*., 425 U.S., at 761. See also *Smith v. California, 361 U.S. 147, 150 (1959)*; *Joseph Burstyn, Inc*. v. *Wilson, supra, at 501*. More importantly, an announcement of the bankruptcy of a local company is information of potentially great concern to residents of the community where the company is located; like the labor dispute at issue in *Thornhill*, such a bankruptcy "in a single factory may have economic repercussions upon a whole region." And knowledge about solvency and the effect and prevalence of bankruptcy certainly would inform citizen opinions about questions of economic regulation.  It is difficult to suggest that a bankruptcy is not a subject matter of public **[\*\*\*\*68]**  concern when federal law requires invocation of judicial mechanisms to effectuate it and makes the fact of the bankruptcy a matter of public record.  See *Cox Broadcasting Corp*. v. *Cohn, 420 U.S. 469 (1975)*.


Given that the subject matter of credit reporting directly implicates matters of public concern, the balancing analysis the Court today employs should properly lead to the conclusion that the type of expression here at issue should receive *First Amendment* protection from the chilling potential of unrestrained presumed and punitive damages in defamation actions. [14]


 **[\*\*\*\*69]**   **[\*790]**  (2)

---

[13] Similarly, we have rejected the arguments for denying or restricting *First Amendment* protection of advertising on the ground that advertising is not a matter of public concern. Recognizing that even pure advertising may well be affected with a public interest, we have stated that "the free flow of commercial information is indispensable . . . to the formation of intelligent opinions as to how [our economic] system ought to be regulated or altered." *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 765 (1976)*. See also *Bigelow v. Virginia, 421 U.S. 809, 822 (1975)* ("Viewed in its entirety the [abortion] advertisement conveyed information of potential interest and value to a diverse audience -- not only to readers possibly in need of the services offered").  The potential political aspect of attempts to influence consumer preferences has also been recognized.  See *Metromedia, Inc*. v. *San Diego, 453 U.S. 490, 538-539 (1981)* (BRENNAN, J., concurring in judgment) ("May the city decide that a United Automobile Workers billboard with the message 'Be a patriot -- do not buy Japanese-manufactured cars' is 'commercial' and therefore forbid it?").  The greater state latitude for regulating commercial advertising is instead a function of "greater objectivity and hardiness." *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., supra, at 772, n. 24*.

[14] JUSTICE POWELL purports to draw from *Connick v. Myers, 461 U.S. 138 (1983)*, a test for distinguishing matters of public concern from matters of private concern.  This reliance perpetuates a definition of "public concern" wholly out of accord with our consistent precedents and with the common-law understanding of the concept.  See *id., at 165, n. 5* (BRENNAN, J., dissenting).  Moreover, *Connick* explicitly limited its distinction between public and private concern to the "context" of a government employment situation.  *Id., at 148*, and n. 8.

EXHIBIT 43  EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

**[\*\*\*623]**  Even if the subject matter of credit reporting were properly considered -- in the terms of JUSTICE WHITE and JUSTICE POWELL -- as purely a matter of private discourse, this speech would fall well within the range of valuable expression for which the *First Amendment* demands protection.  Much expression that does not directly involve public issues receives significant protection.  Our cases do permit some diminution in the degree of protection afforded one category of speech about economic or commercial matters.  "Commercial speech" -- defined as advertisements that "[do] no more than propose a commercial transaction," *Pittsburgh Press Co*. v. *Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 385 (1973)* -- may be more closely regulated than other types of speech.  Even commercial speech, however, receives substantial *First Amendment* protection.  *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626 (1985)*; *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., supra, at 765* ("So long as we preserve a predominantly free enterprise economy, the allocation **[\*\*\*\*70]** of our resources in large measure will be made through numerous private economic decisions. . . . To this end, the free flow of commercial information is indispensable").  Credit reporting is not "commercial speech" as this Court has defined the term.  Even if credit reporting were so considered, it would still be entitled to the substantial protections the *First Amendment* affords that category.  See *Zauderer, 471 U.S., at 637*; *id., at 657-658* (BRENNAN, J., concurring in part and dissenting in part).  Under either view, the **[\*\*2962]** expression at issue in this case should receive protection from the chilling potential of unrestrained presumed and punitive damages awards in defamation actions.

**[\*791]**  Our economic system is predicated on the assumption that human welfare will be improved through informed decisionmaking.  In this respect, ensuring broad distribution of accurate financial information comports with the fundamental *First Amendment* premise that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States, 326 U.S., at 20*. **[\*\*\*\*71]**  The economic information Dun & Bradstreet disseminates in its credit reports makes an undoubted contribution to this private discourse essential to our well-being.  Justice Douglas made precisely this point:

"The language of the *First Amendment* does not except speech directed at private economic decisionmaking. Certainly such speech could not be regarded as less important than political expression.  When immersed in a free flow of commercial information, private sector decisionmaking is at least as effective an institution as are our various governments in furthering the social interest in obtaining the best general **[\*\*\*624]** allocation of resources. . . .

"The financial data circulated by Dun & Bradstreet, Inc., are part of the fabric of national commercial communication." *Dun & Bradstreet, Inc*. v. *Grove, 404 U.S. 898, 905-906 (1971)* (Douglas, J., dissenting from denial of certiorari).

Justice Douglas further noted that "[presumably] the credit reports published by the petitioner facilitate through the price system the improvement of human welfare at least as much as did the underlying disagreement in our most recent libel opinion, *Rosenbloom v. Metromedia, Inc., 403 U.S. 29 (1971)*, **[\*\*\*\*72]** arising out of a squabble over whether a vendor had sold obscene magazines." *Id., at 905, n. 9*.

The credit reports of Dun & Bradstreet bear few of the earmarks of commercial speech that might be entitled to somewhat less rigorous protection.  In *every* case in which we have permitted more extensive state regulation on the basis of a commercial speech rationale the speech being regulated **[\*792]** was pure advertising -- an offer to buy or sell goods and services or encouraging such buying and selling. [15]  Credit reports are not commercial advertisements for a good or service or a proposal to buy or sell such a product.  We have been extremely chary about extending the "commercial speech" doctrine beyond this narrowly circumscribed category of advertising because often vitally

---

[15] See, *e. g., Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626 (1985)*; *Bolger v. Young Products Corp., 463 U.S. 60 (1983)* (contraceptive advertising); *In re R. M. J., 455 U.S. 191 (1982)* (lawyer advertising); *Metromedia, Inc*. v. *San Diego, 453 U.S. 490 (1981)* (commercial billboard advertising); *Central Hudson Gas & Electric Corp*. v. *Public Service Comm'n of New York, 447 U.S. 557 (1980)* (advertising of electricity); *Friedman v. Rogers, 440 U.S. 1 (1979)* (optometrist advertising); *Ohralik v. Ohio State Bar Assn., 436 U.S. 447 (1978)* (lawyer's solicitation of business); *Bates v. State Bar of Arizona, 433 U.S. 350 (1977)* (lawyer advertising).

**EXHIBIT 43**                                                          **EXHIBIT  14**

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

important speech will be uttered to advance economic interests and because the profit motive making such speech hardy dissipates rapidly when the speech is not advertising. Compare *Central Hudson Gas & Electric Corp*. v. *Public Service Comm'n of New York, 447 U.S. 557 (1980)*, with *Consolidated Edison Co*. v. *Public Service Comm'n of New York, 447 U.S. 530 (1980)*.  **[****73]**

It is worth noting in this regard that the common law of most States, although apparently not of *Vermont, 143 Vt. 66, 76, 461 A. 2d 414, 419 (1983)*,  **[****74]**  recognizes a qualified privilege for reports like that at issue here.  See Maurer, Common Law Defamation and the Fair Credit Reporting Act, *72 Geo. L. J. 95, 99-105 (1983)*. The privilege typically precludes recovery for false and defamatory credit information without  **[**2963]**  a showing of bad faith or malice, a standard of proof which is often defined according to the *New York Times* formulation.  See, *e. g., Datacon, Inc.* v. *Dun & Bradstreet, Inc., 465 F.Supp. 706, 708 (ND Tex. 1979)*. The common law thus recognizes that credit reporting is quite susceptible to libel's chill; this accumulated learning is worthy of respect.

 **[*793]**  Even if JUSTICE POWELL's characterization of the credit reporting at  **[***625]**  issue here were accepted in its entirety, his opinion would have done no more than demonstrate that this speech is the equivalent of commercial speech. The opinion, after all, relies on analogy to advertising. Credit reporting is said to be hardy, motivated by desire for profit, and relatively verifiable.  *Ante*, at 762.  But this does not justify the elimination of restrictions on presumed and punitive damages. State efforts to regulate  **[****75]**  commercial speech in the form of advertising must abide by the requirement that the regulatory means chosen be narrowly tailored so as to avoid any unnecessary chilling of protected expression.  See *Zauderer, supra*; *Virginia Pharmacy Bd*. v. *Virginia Citizens Consumer Council, Inc., supra*; *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York, supra.* [16]

 **[****76]**  The Court in *Gertz* specifically held that unrestrained presumed and punitive damages were "unnecessarily" broad,  **[*794]**  *418 U.S., at 350*, in relation to the legitimate state interests.  Indeed, *Gertz* held that in a defamation action punitive damages, designed to chill and not to compensate, were *"wholly irrelevant"* to furtherance of any valid state interest. *Ibid*.  The Court did not reach these conclusions by weighing the strength of the state interest against the strength of the *First Amendment* interest.  Rather, the Court recognized and applied the principle that regulatory measures that chill protected speech be no broader than necessary to serve the legitimate state interest asserted. The plurality opinion today recognizes, as it must, that the state interest at issue here is identical to that at issue in *Gertz*.  What was "irrelevant" in *Gertz* must still be irrelevant, and the requirement that the regulatory means be no broader than necessary is no less applicable even if the speech is simply the equivalent of commercial speech. Thus, unrestrained presumed and punitive damages for this type of speech must run afoul of *First Amendment* **[****77]**  guarantees. [17]

---

[16] Indeed JUSTICE POWELL has chosen a particularly inapt set of facts as a basis for urging a return to the common law.  Though the individual's interest in reputation is certainly at the core of notions of human dignity, *ante*, at 757-758, citing *Rosenblatt v. Baer, 383 U.S. 75, 92 (1966)* (Stewart, J., concurring); see *Paul v. Davis, 424 U.S. 693, 714 (1976)* (BRENNAN, J., dissenting), the reputational interest at stake here is that of a corporation.  Similarly, that this speech is solely commercial in nature undercuts the argument that presumed damages should be unrestrained in actions like this one because actual harm will be difficult to prove.  If the credit report is viewed as commercial expression, proving that actual damages occurred is relatively easy.  For instance, an alleged libel concerning a bank's customer may cause the bank to lower the credit limit or raise the interest rate charged that customer.  The commercial context does not increase the need for presumed damages, but if anything reduces the need to presume harm.  At worst the commercial damages caused by such action should be no more difficult to ascertain than many other traditional elements of tort damages.  See, *e. g., Russell v. City of Wildwood, 428 F.2d 1176, 1181 (CA3 1970)* (future earnings); *Seffert v. Los Angeles Transit Lines, 56 Cal. 2d 498, 509, 364 P. 2d 337, 344 (1961)* (Traynor, J., dissenting) (pain and suffering).

[17] JUSTICE POWELL's analysis fails to apply the requirement that regulation be narrowly tailored.  At one point the opinion reads: "This particular interest [in credit reporting] warrants no special protection when . . . the speech is wholly false and clearly damaging to the victim's business reputation." *Ante*, at 762.  The point, of course, is not that false speech intrinsically deserves protection, see *Gertz, 418 U.S., at 340*, but that the burdening of unintentional false speech potentially chills truthful speech.  Thus, the state interest in compensating injury resulting from false speech must be vindicated by means that are narrowly tailored to avoid this deleterious result.

EXHIBIT 43                                                                      EXHIBIT 14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

(3)

 **[\*\*\*626]**  Even if not at "the essence of self-government," *Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964)*, the expression at issue in this  **[\*\*2964]**  case is important to both our public discourse and our private welfare.  That its motivation might be the economic interest of the speaker **[\*\*\*\*78]** or listeners does not diminish its *First Amendment* value.  See *Consolidated Edison Co.*  **[\*795]**  v. *Public Service Comm'n of New York, 447 U.S. 530 (1980)*.  Whether or not such speech is sufficiently central to *First Amendment* values to require actual malice as a standard of liability, this speech certainly falls within the range of speech that *Gertz* sought to protect from the chill of unrestrained presumed and punitive damages awards. [18]

 **[\*\*\*\*79]**  Of course, the commercial context of Dun & Bradstreet's reports is relevant to the constitutional analysis insofar as it implicates the strong state interest "in protecting consumers and regulating commercial transactions," *Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 460 (1978)*.  Cf. *Bolger v. Young Drug Products Corp., 463 U.S. 60, 81 (1983)* (STEVENS, J., concurring in judgment).  The special harms caused by inaccurate credit reports, the lack of public sophistication about or access to such reports, and the fact that such reports by and large contain statements that are fairly readily susceptible of verification, all may justify appropriate  **[\*796]**  regulation designed to prevent the social losses caused by false credit reports. [19]  And in the libel context, the  **[\*\*\*627]**  States' regulatory interest in protecting reputation is served by rules permitting recovery for actual compensatory damages upon a showing of fault. Any further interest in deterring potential defamation through case-by-case judicial imposition of presumed and punitive damages awards on less than a showing of actual malice simply exacts too high a toll on *First [\*\*\*\*80] Amendment* values.  Accordingly, Greenmoss Builders should be permitted to recover for any actual damage it can show resulted from Dun & Bradstreet's negligently false credit report, but should be required to show actual malice to receive presumed or punitive damages. Because the jury was not instructed in accordance with these principles, we would reverse and remand for further proceedings not inconsistent with this opinion.

 **[\*\*\*\*81]**

---

[18] JUSTICE POWELL also relies in part on the fact that the expression had a limited circulation and was expressly kept confidential by those who received it.  Because the subject matter of the expression at issue in this case would clearly receive the comprehensive protections of *Gertz* were the speech publicly disseminated, this factor of confidential circulation to a limited number of subscribers is perhaps properly understood as the linchpin of JUSTICE POWELL's analysis.  See *ante*, at 762 (because of confidentiality "it cannot be said that the report involves any 'strong interest in the free flow of commercial information'") (plurality opinion) (citation omitted).  See also n. 12, *supra*.

This argument does not save the analysis.  The assertion that the limited and confidential circulation might make the expression less a matter of public concern is dubious on its own terms and flatly inconsistent with our decision in *Givhan v. Western Line Consolidated School Dist., 439 U.S. 410 (1979)*.  Perhaps more importantly, Dun & Bradstreet doubtless provides thousands of credit reports to thousands of subscribers who receive the information pursuant to the same strictures imposed on the recipients in this case.  As a systemic matter, therefore, today's decision diminishes the free flow of information because Dun & Bradstreet will generally be made more reticent in providing information to all its subscribers.

[19] See Maurer, Common Law Defamation and the Fair Credit Reporting Act, *72 Geo. L. J. 95, 126 (1983)*:

"Under *Gertz*, plaintiffs may be compensated for actual damages upon establishing the fault of the defendant; to obtain punitive damages, a plaintiff must demonstrate malice. Sections 1681o and 1681n [of the Fair Credit Reporting Act] are consistent with these constitutional principles.  Section 1681o provides for recovery of actual damages upon a showing of negligence, which presumably satisfies the *Gertz* requirement of fault. Section 1681n authorizes punitive damages for willful violation of the Act.  Whether section 1681n is equivalent to *Gertz*'s malice standard depends on whether a court would consider it to be possible to fail willfully to follow reasonable procedures and yet not manifest reckless disregard for the truth.  Such a fine distinction appears unworkable as a categorical test, so that section 1681n would likely be regarded as harmonious with the principles of *Gertz*.  Thus, the Act appears to provide the degree of protection for commercial speech currently required under *first amendment* doctrine" (footnotes omitted).

277

**EXHIBIT 43**                                                                 EXHIBIT  14

Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749

# References

Free speech and press clauses of *Federal Constitution's First Amendment* as affecting damages recoverable for defamation--Supreme Court cases

*50 Am Jur 2d, Libel and Slander 96*, *97*, *102*, *298-302*, *350*, *352*, *353*

16 Am Jur Pl & Pr Forms (Rev), Libel and Slander Forms 1-4, 24, 111, 251, 283, 294, 311-314

14 Am Jur Proof of Facts 2d 49, Defamation with Actual Malice

19 Am Jur Trials 499, Defamation

USCS *Constitution, 1st Amendment*

US L Ed Digest, Constitutional Law 927, 947

L Ed Index to Annos, Freedom of Speech, Press, Religion, and Assembly; Libel and Slander

ALR Quick Index, Commercial Defamation; Freedom of Speech and Press; Libel and Slander; New York Times Rule

Federal Quick Index, Freedom of Speech and Press; Libel and Slander; New York Times Rule

Annotation References:

Progeny of New York Times v Sullivan in the Supreme Court. *61 L Ed 2d 975.*

Constitutional aspects of libel and slander.  *28 L Ed 2d 885*.

Who is a "public figure" in light of *Gertz v Robert Welch, Inc. (1974) 418 US 323, 41 L Ed 2d 789, 94 S Ct 2997*. *75 ALR3d 616*.

Binding effect **[****82]**  upon state courts of opinion of United States Supreme Court supported by less than a majority of all its members.  *65 ALR3d 504*.

Sufficiency of showing of malice or lack of reasonable care to support credit agency's liability for circulating inaccurate credit report.  *40 ALR3d 1049*.

Libel and slander: Who is a public official or otherwise within the federal constitutional rule requiring public officials to show actual malice.  *19 ALR3d 1361*.

---

**End of Document**

EXHIBIT 43   EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

## *Netscout Sys. v. Gartner, Inc.*

Supreme Court of Connecticut

January 14, 2019, Argued; January 21, 2020, Officially Released

SC 20079

**Reporter**

334 Conn. 396 *; 223 A.3d 37 **; 2020 Conn. LEXIS 18 ***

NETSCOUT SYSTEMS, INC. v. GARTNER, INC.

**Prior History:  [***1]** Action to recover damages for, inter alia, violations of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, Lee, J., granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed. Affirmed.

*NetScout Sys. v. Gartner, Inc., 2017 Conn. Super. LEXIS 4444 (Conn. Super. Ct., Sept. 11, 2017)*

**Disposition:** Affirmed.

## Case Summary

### Overview

HOLDINGS: [1]-Although the trial court incorrectly determined that the 2014 report contained certain statements about the technology developer that a reasonable juror could have found to be defamatory, summary judgment was properly granted because all of the statements the research publisher made about the developer were expressions of nonactionable opinion. The terms "limited" and "limits" used to describe the developer's abilities were subjective, vague, unquantifiable, relative, and unverifiable, and, although "reach" and "mind share" could have been terms of art, those qualities were subjective and unverifiable; [2]-Because the publisher's statements about the developer in the 2014 report were nonactionable expressions of opinion, the developer failed to establish a viable claim under the Connecticut Unfair Trade Practices Act, *Conn. Gen. Stat. § 42-110a et seq.*

### Outcome
The judgment is affirmed.

## Syllabus

The plaintiff, which develops and sells information technology products, sought to recover damages for the defendant's alleged violation of the *Connecticut Unfair Trade Practices Act* (CUTPA) (*§ 42-110a et seq.*) and for defamation in connection with certain allegedly false statements that the defendant had published in a market research report. The defendant provides consulting services to vendors of information technology and publishes market research reports in which it rates vendors, including those that purchase its services. The defendant claims in its marketing materials that the opinions expressed in its reports are objective and impartial. The defendant published a report in which it rated vendors, including the plaintiff, in the network performance monitoring and diagnostics market, and, although the plaintiff previously had accepted the **[***2]**  defendant's invitation to participate in the report's evaluation process, the plaintiff had declined to purchase any consulting services from the defendant.

EXHIBIT 43                                                   EXHIBIT  15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

The report included a graphical ranking of vendors, which was presented in the form of a square divided into four quadrants, and vendors were plotted along the axes of the graph on the basis of the defendant's application of certain weighted criteria, including the subjective evaluations of the vendors' customers. On the basis of its placement in the upper left quadrant of the graph, the plaintiff was designated a "challenger," whereas vendors placed in the upper right quadrant received the more desirable designation of "leader." The report defined the term "challenger" in relevant part as a vendor that is currently struggling to deal with new technical demands and rising expectations, whereas a "leader" is defined in relevant part as having comprehensive portfolios and the ability to handle multiple application and technology types. The report also included three specific "cautions" about the plaintiff and its limitations in its market. The plaintiff alleged that the statements in the report were false and defamatory, and that **[***3]** the defendant had engaged in a pay to play scheme, pursuant to which it rated vendors in a biased manner, on the basis of the amount of consulting services each vendor purchased from the defendant. The defendant moved for summary judgment, claiming that, because the statements in the report constituted protected speech, the plaintiff's claims were barred by the *first amendment to the United States constitution*. Although the trial court concluded that the defendant's designation of the plaintiff as a challenger rather than as a leader constituted nonactionable opinion, it also determined that certain statements contained in the definition of the term "challenger" and in the cautions specific to the defendant either were factual or implied, undisclosed facts. With respect to those statements, the court nevertheless concluded that the plaintiff's claims were barred by the *first amendment* because the defendant was a limited purpose public figure, the defendant's statements were on a matter of public concern, and the plaintiff failed to prove by clear and convincing evidence that the defendant had made the statements with actual malice. The court also found that there was no evidence that the defendant's placement of the various vendors in the quadrants **[***4]** on the graph was correlated to the amount of consulting services the vendors had purchased from the defendant. Accordingly, the trial court granted the defendant's motion for summary judgment on both the defamation count and the CUTPA count and rendered judgment thereon, from which the plaintiff appealed. *Held* that the trial court properly granted the defendant's motion for summary judgment, this court having concluded that all of the defendant's statements were nonactionable expressions of opinion, there was insufficient evidence to create a genuine issue of material fact regarding the truth of the defendant's claims of objectivity and impartiality, and the plaintiff failed to present sufficient evidence to support its pay to play claim: a reasonable person could construe the defendant's designation of the plaintiff as a challenger only to be an expression of opinion, as ratings of products and services are inherently subjective and the criteria used by the defendant in ranking the vendors, including the subjective evaluations of the vendors' own customers, and the weight assigned to those criteria could not be proven true or false; moreover, contrary to the conclusion of the trial **[***5]** court, this court concluded that, in light of the context in which they were made, the statements contained in the definition of the term "challenger" and in the cautions about the plaintiff were neither factual nor implied, defamatory statements of fact, as the parties were operating in a sophisticated market and their customers understood that the rating of products and services is based on inherently subjective evaluations, the report expressly stated that it consisted of the defendant's own opinions that should not be construed as statements of fact, and the language used in the definitions and cautions, which was highly technical and employed terms of art specific to the plaintiff's specific market, was abstract, unquantifiable, and comparative, such that the statements were insusceptible of being verified; furthermore, the fact that the defendant had claimed in its marketing materials that the opinions presented in its research reports are objective and impartial, in the absence of evidence establishing that those claims of objectivity were false, did not transform the nonactionable statements of opinion contained in the report into express or implied, defamatory factual statements, **[***6]** as such claims of objectivity, like puffery, are insusceptible of being proven true or false and are unlikely to induce reliance in a reasonable person viewing such statements.

**Counsel:** Jason D. Frank, pro hac vice, with whom were Emily E. Renshaw, pro hac vice, and, on the brief, James A. Budinetz, Michael T. Ryan, Elizabeth G. Hays, pro hac vice, and Michael D. Blanchard, for the appellant (plaintiff).

Derek L. Shaffer, pro hac vice, with whom were Andrew M. Zeitlin and, on the brief, Diane C. Polletta, John J. DiMarco, Robert L. Wyld, Patrick M. Fahey, Michael D. Bonanno, pro hac vice, Kathleen M. Sullivan, pro hac vice, and Robert L. Raskopf, pro hac vice, for the appellee (defendant).

Michelle M. Seery and Eugene Volokh, pro hac vice, filed a brief for the Reporters Committee for Freedom of the Press as amicus curiae.

EXHIBIT 43 EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

Jennifer M. DelMonico and Proloy K. Das filed a brief for the Connecticut Business and Industry Association as amicus curiae.

**Judges:** Robinson, C. J., and Palmer, McDonald, Mullins, Kahn and Ecker, Js. ECKER, J. In this opinion the other justices concurred.

**Opinion by:** ECKER

# Opinion

 **[\*\*41] [\*398]**   ECKER, J. The plaintiff, NetScout Systems, Inc., is in the business of developing and selling information technology products **[\*\*\*7]** that allow its customers to manage, monitor, diagnose and service their computer networks. The defendant, Gartner, Inc., publishes research reports in which it rates vendors, such as the plaintiff, that sell and service various forms of information technology. The defendant also sells consulting services **[\*399]** to some of the vendors that it rates. In 2014, the defendant issued a research report (2014 report), in which it ranked the plaintiff lower than some of its competitors and made critical comments about the plaintiff. Thereafter, the plaintiff brought this action alleging that the defendant had engaged in a "pay to play" scheme, in which it rewarded vendors that purchased consulting services from the defendant by giving them high ratings in its research reports. The plaintiff claimed that the alleged pay to play scheme constituted a false and deceptive business practice under the Connecticut Unfair Trade Practices Act (CUTPA), _General Statutes § 42-110a et seq._, and that the 2014 report contained false and defamatory statements about the plaintiff. The defendant, in response, raised a defense premised on the theory that its rankings and commentary were protected speech under the _first amendment to the United States constitution_.[1]

The trial court agreed with the defendant. **[\*\*\*8]** The court concluded that the defendant's 2014 report was constitutionally protected speech, and the plaintiff, as a limited purpose public figure, was required to present evidence that the defendant had acted with actual malice. The court found that the plaintiff had failed to do so and, accordingly, rendered summary judgment for the defendant with respect to both claims on that ground. The court also determined that the CUTPA claim failed because the plaintiff had not presented evidence to support the factual predicate for **[\*\*42]** its pay to play allegation due to its own expert witness' inability to conclude that the defendant's ratings were correlated to the dollar volume of consulting services that the **[\*400]** vendors had purchased from the defendant. The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to _General Statutes § 51-199 (c)_ and _Practice Book § 65-1_.

We affirm the trial court's judgment on the alternative ground that all of the defendant's statements regarding the plaintiff were nonactionable expressions of opinion.

I

The record, viewed in the light most favorable to the plaintiff, reveals the following relevant facts and procedural history. The plaintiff, a Delaware corporation with its **[\*\*\*9]** principal place of business in the town of Westford, Massachusetts, is a prominent provider of computer network performance monitoring products and services. Its customers include numerous businesses around the world, including commercial banks, airlines, financial service providers, and telecommunication service providers, as well as governmental agencies and five branches of the United States military. In 2014, the plaintiff had revenues of approximately $400 million.

---

[1] The _first amendment to the United States constitution_ provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ." This prohibition is made applicable to the states through the _due process clause of the fourteenth amendment to the United States constitution_. See, e.g., _44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996)_.

EXHIBIT 43                                                      EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

The defendant, a Delaware corporation with its principal place of business in the city of Stamford, describes itself as " 'the world's leading information technology research and advisory company.' " Among the defendant's research publications are its "Magic Quadrant" research reports, which are marketed to buyers of various information technology products to assist them in selecting a vendor. The centerpiece of each report is a graphic rating of vendors called "the Magic Quadrant," presented in the form of a square divided into quadrants. The horizontal axis of the square depicts the vendors' "Completeness of Vision," and the vertical axis depicts their "Ability to Execute." As illustrated by the graphic, vendors with **[\*\*\*10]** high ratings for both completeness of vision and ability to execute are placed in the upper **[\*401]** right quadrant and are designated as "Leaders"; those with a high rating for ability to execute and a low rating for completeness of vision are placed in the upper left quadrant and are designated as "Challengers"; those with a high rating for completeness of vision and a low rating for ability to execute are placed in the lower right quadrant and are designated as "Visionaries"; and those with low ratings for both completeness of vision and ability to execute are placed in the lower left quadrant and are designated as "Niche Players."

In addition to its research activities and associated publications, the defendant provides consulting services, which it calls "Strategic Advisory Services," to some vendors of information technology products.[2] The analysts who market and provide these consulting services also are part of the team that determines the placement of vendors on the Magic Quadrant graphic. An analyst's job performance is evaluated in part based on the amount of revenue he or she generates, including revenue from the sale of consulting services. The plaintiff's pay to play allegations **[\*\*\*11]** rest substantially on the claim that the defendant's vendor ratings were influenced by the vendors' willingness to use and pay for the defendant's consulting services.

In early 2013, Julie Dempster, an account executive with the defendant assigned to the plaintiff's account, and Jonah **[\*\*43]** Kowall, the defendant's research vice president for information technology operations management, exchanged a number of e-mails regarding the plaintiff. In an e-mail to Dempster dated January 4, 2013, Kowall wrote, "I don't understand why we don't speak to other people at [the plaintiff], nor do I understand why [the plaintiff does not] attend shows, or do any [strategic advisory services]. With [the plaintiff] in lots **[\*402]** of research and potentially a [Magic Quadrant report] in 2013 I'm not quite understanding the relationship at all. I normally go out of my way to make things happen, and that's not how it should be. [The plaintiff] ha[s] potentially the worst [analyst relations/public relations] and poor[est] marketing out of all the vendors I deal with." In a subsequent e-mail dated April 5, 2013, Kowall wrote that the plaintiff did not "work with us like [its] competitors do . . . and [it does not] engage **[\*\*\*12]** us for [strategic advisory services], which I think could help [it] a lot more strategically." In an e-mail to Kowall dated July 8, 2013, Dempster wrote that "[t]he [strategic advisory services] day is so key for us to gain exposure and further licensing and engagements at [the plaintiff]!"

On July 29, 2013, the defendant publicly announced that it would be publishing a new Magic Quadrant report—that is, the 2014 report—for the network performance monitoring and diagnostics (NPMD) market. By e-mail dated September 2, 2013, the defendant invited the plaintiff to participate in the evaluation process for inclusion in the 2014 report. The defendant included in the e-mail a definition of the NPMD market, the criteria for inclusion in the report, the evaluation criteria, a research and process timeline, and a vendor survey. The plaintiff accepted the invitation and returned the completed survey to the defendant on October 1, 2013.

On December 2, 2013, Kowall sent an e-mail to his coworkers containing a draft of the Magic Quadrant graphic to be included in the 2014 report, in which the plaintiff was placed in the leaders quadrant. On December 3, 2013, Rebecca Noriega, a senior analyst and **[\*\*\*13]** public relations manager with the plaintiff, sent an e-mail to Dempster indicating that the plaintiff was not going to participate in the "strategic advisory services day" that Dempster had suggested. The next day, Kowall circulated another e-mail containing a revised draft of **[\*403]** the Magic Quadrant graphic, in which the plaintiff was placed directly on the line between the leaders quadrant and the challengers quadrant. Kowall noted in the e-mail that he "still think[s] [that one of the other vendors placed in the challengers quadrant] and [the plaintiff] should technically be leaders here, or at least on the line (as [the plaintiff] is)" and observed that the plaintiff

---

[2] The precise nature of these consulting services is unclear from the record, but that has no bearing on our analysis or the disposition of this appeal.

and the other vendor may be ranked "too low" in their ability to execute. On December 5, 2013, Kowall circulated yet another e-mail with a second revised draft of the Magic Quadrant graphic. Kowall indicated that he had "tweaked some of the weightings to give us better control." As a result, the plaintiff was placed higher on the vertical ability to execute axis but farther to the left on the horizontal completeness of vision axis, thereby situating the plaintiff deeper into the challengers quadrant. During the defendant's **[\*\*\*14]** internal peer review of the draft 2014 report, several reviewers questioned why the plaintiff was placed in the challengers quadrant instead of in the leaders quadrant.

On January 9, 2014, the defendant provided the plaintiff with a draft of the 2014 report, in which the plaintiff was placed in the challengers quadrant of the Magic Quadrant graphic. The draft 2014 report also contained narrative evaluations of the plaintiff's "[s]trengths" and three "[c]autions" concerning the plaintiff. On January **[\*\*44]** 14, 2014, Noriega and the plaintiff's vice president of marketing, Steven Shalita, participated in a conference call with Dempster and two other employees of the defendant, Vivek Bhalla and Colin Fletcher. Shalita indicated that the plaintiff was "struggling with the assessment and some of the language" the draft 2014 report contained. Bhalla and Fletcher attempted to explain the reasons for the plaintiff's placement and requested written feedback from the plaintiff. On January 17, 2014, Shalita sent an e-mail to Kowall, Fletcher, Bhalla and Michele Severance, another employee of the defendant, **[\*404]** attaching a response to the draft 2014 report and explaining in detail why the plaintiff believed **[\*\*\*15]** that it had been ranked too low on its completeness of vision. In an e-mail to Shalita dated January 20, 2014, Kowall indicated that the defendant needed "specific changes to the text [of the draft 2014 report] BEFORE the call today"; (emphasis omitted); which would be the last opportunity to discuss the plaintiff's positioning in the Magic Quadrant graphic and the report's narrative providing certain cautions concerning the plaintiff. The plaintiff did not suggest any specific changes to the draft report, and the conference call never took place.

On January 22, 2014, the plaintiff's president and chief executive officer, Anil Singhal, sent a letter to the defendant's chief executive officer, Eugene A. Hall, in which he wrote that he did not find it "amusing that [the defendant] had the temerity to place [the plaintiff] in the '[c]hallengers' quadrant . . . ." Singhal also indicated that, if the defendant published the 2014 report, he would "vigorously contest [that] action through whatever means available." Over the next several days, Singhal had a number of telephone conversations with Nancy Erskine, the defendant's ombudsman, in which he reiterated that the plaintiff believed that **[\*\*\*16]** the challengers ranking was unfair and discriminatory and that the plaintiff wanted to be designated as the leading vendor in the NPMD market or, in the alternative, removed entirely from the 2014 report. Singhal also indicated that, if the defendant refused to redesignate the plaintiff as a leader or to remove it from the report, the plaintiff would take legal action.

On March 6, 2014, the defendant published the final 2014 report. The plaintiff was placed in the challengers quadrant. The report defined "[c]hallengers" as "those with high market reach and large deployments. Once leaders in the network performance monitoring market, they are currently struggling to deal with new technical **[\*405]** demands and rising expectations. These established NPMD vendors bring a substantial installed base, but also architectures, feature sets and pricing structures that require modernization (often in progress) to better compete with those in the [l]eaders quadrant." The report also provided the following three "[c]autions" regarding the plaintiff: (1) "[the plaintiff] has a limited ability to expand beyond its network management heritage, which would be the next logical step (for example, into [application **[\*\*\*17]** performance monitoring] or [information technology] operations analytics)"; (2) "[o]ffering only a hardware-based deployment model limits [the plaintiff's] ability to address growing software and [software as a service] solution demand"; and (3) "[the plaintiff] is perceived as a conservative stalwart in the NPMD space, and lacks the reach and mind share that many smaller competitors have." In separate marketing publications directed at purchasers of the defendant's research products, the defendant represented that the opinions expressed in its reports were "impartial," "independent," "objectiv[e]," and "unbiased."

**[\*\*45]** The 2014 report was made available to 40,000 subscribers to the defendant's research services, more than 4000 of whom viewed the report. Vendors purchased online reprints of the report that were viewed approximately 18,700 times, as well as 2000 paper reprints.

After the 2014 report was published, the plaintiff filed this lawsuit. The two count complaint alleged, in the first count, that the defendant had violated CUTPA by engaging in a pay to play scheme in which vendors purchase consulting services from the defendant in exchange for high ratings in the defendant's Magic **[\*\*\*18]** Quadrant report. In the

EXHIBIT 43     EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

second count, the plaintiff alleged that the defendant had published false and defamatory statements about the plaintiff in the 2014 report.

 [*406]  The defendant moved for summary judgment, claiming that the *first amendment* barred both the defamation claim and the CUTPA claim. It contended that, because the 2014 report was on a matter of public concern and the plaintiff is a limited purpose public figure, the plaintiff was required to present evidence that the defendant had acted with actual malice, such that its statements about the plaintiff were "made with actual knowledge that [they were] false or with reckless disregard of whether [they were] false." (Internal quotation marks omitted.) *Gleason v. Smolinski, 319 Conn. 394, 431, 125 A.3d 920 (2015)*. The plaintiff's failure to produce any evidence of actual malice, the defendant claimed, required the court to render summary judgment in its favor. The defendant also argued that the statements in the 2014 report were not factual assertions but statements of opinion protected by the *first amendment*. In addition, the defendant contended that the CUTPA claim was barred because (1) there was no evidence that the defendant's business model departed from standard business norms, (2) there was no evidence that the **[***19]**  plaintiff's placement in the Magic Quadrant graphic was related to vendor payments to the defendant for consulting services, (3) professional malpractice is nonactionable under CUTPA, and (4) there was no evidence that the plaintiff suffered an ascertainable loss as a result of the 2014 report.

The trial court rendered summary judgment in the defendant's favor on both counts of the complaint. It concluded that the defendant's designation of the plaintiff as a challenger rather than a leader was nonactionable opinion. Although the court determined that certain statements in the defendant's definition of a challenger and in the three cautions regarding the plaintiff either were factual or implied undisclosed facts, it agreed with the defendant that the plaintiff was a limited purpose public figure and that the defendant's statements **[*407]**  were on a matter of public concern, which meant that the plaintiff, to overcome the defendant's *first amendment* protections, was required to present clear and convincing evidence that the defendant had made its statements with actual malice. After concluding that the plaintiff had not done so, the court held that both the defamation claim and the CUTPA claim were barred **[***20]**  by the *first amendment*. In addition, with respect to the CUTPA claim, the court concluded that the plaintiff had presented no credible evidence that it was damaged by the defendant's statements or that the placement of vendors in the Magic Quadrant graphic was correlated to the amount of consulting services that the respective vendors had purchased from the defendant.

This appeal followed. [3] The plaintiff contends that the trial court erroneously concluded  **[**46]**  that the plaintiff was required to prove actual malice on the basis of its incorrect determination that the plaintiff was a limited purpose public figure and that the defendant's statements about the plaintiff in the 2014 report were on a matter of public concern. The plaintiff also contends that, even if the trial court correctly determined that the actual malice standard applies, the court incorrectly determined that the plaintiff had not presented evidence sufficient to create a genuine issue of material fact as to that issue. Finally, the plaintiff contends with respect to the CUTPA claim that the trial court incorrectly determined that the plaintiff had not presented evidence sufficient to create a genuine issue of material fact as to whether **[***21]**  it had been damaged or whether the Magic  **[*408]**  Quadrant vendor rankings were correlated to the purchase of consulting services.

The defendant disputes these claims of error. It also contends that the trial court's decision may be affirmed on the alternative grounds that (1) the defendant's statements about the plaintiff were in all respects statements of opinion, not fact, and (2) even if the statements were factual, the plaintiff presented no evidence that they were false. We agree with the defendant that its statements about the plaintiff were expressions of opinion and, therefore, cannot provide the basis for a defamation claim. With respect to the plaintiff's claims resting on the alleged falsity of the

---

[3] We subsequently granted the application of the Reporters Committee for Freedom of the Press to file an amicus curiae brief in support of the defendant's contention that its statements about the plaintiff were nonactionable opinion and the application of the Connecticut Business and Industry Association to file an amicus curiae brief on the issue of whether this court should stop applying the so-called "cigarette rule" in CUTPA cases and, instead, apply the "substantial unjustified injury" test.

EXHIBIT 43                                                                                        EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

defendant's representations of independence and objectivity in rendering its opinions, we reject those claims as well on this record. Accordingly, we affirm the judgment of the trial court.[4]

II

The standard of review on summary judgment is well established. "Summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . **[***22]** . The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"In deciding a motion for summary judgment, the trial court must view the evidence in the light most **[*409]** favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Internal quotation marks omitted.) *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., 311 Conn. 282, 289-90, 87 A.3d 534 (2014)*.

 **[**47]** *First amendment* principles always must remain firmly in mind when a court considers whether legal liability may attach to harm allegedly attributable to a defendant's speech,[5] and both the parties and the trial court in the present case understandably have framed much of their respective analyses under the rubric of the *first amendment*. The operative **[***23]** principles of substantive **[*410]** law governing this appeal, however, primarily involve the common law of defamation. We make reference to constitutional doctrine when necessary, but, in our view, the issues presented here are largely resolved by the straightforward application of defamation law.

"At common law, [t]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. . . .

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . ." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Gleason v. Smolinski, supra, 319 Conn. 430-31*. But it is not enough that the statement inflicts reputational harm. "To be actionable, the statement in question must convey

---

[4] Because we affirm the trial court's judgment on the basis of our conclusions that the defendant's statements regarding the plaintiff were expressions of nonactionable opinion and that the plaintiff failed to present evidence of a pay to play scheme, we need not address the other claims raised by the plaintiff on appeal.

[5] See *Gertz v. Robert Welch, Inc., 418 U.S. 323, 325, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)* ("[t]his [c]ourt has struggled for nearly a decade [since *New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)]* to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the [f]irst [a]mendment"); *Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 114-15, 448 A.2d 1317 (1982)* (observing that common-law "privilege of 'fair comment' " was "elevated to constitutional status" in *New York Times Co. v. Sullivan, supra, 376 U.S. 254*). The distinction between fact and opinion at the center of the present case figures prominently in *first amendment* law, as well. See, e.g., *Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)* ("a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection"); see also 3 **Restatement (Second), Torts § 566, comment (c)**, pp. 172-73 (1977) (entitled "Effect of the Constitution"). Under *Milkovich*, the characterization of the subject matter at issue as a matter of "public" or "private" concern may affect the *first amendment* analysis. See *Milkovich v. Lorain Journal Co., supra, 19* ("a statement on matters of *public concern* must be provable as false before there can be liability" under *first amendment* [emphasis added]). *Milkovich* appears to have left open the issue of whether a statement of opinion that involves a matter of private concern could be actionable under state law consistent with the *first amendment*. See *id., 20*. There is no need to address the issue here because the plaintiff's claims fail.

EXHIBIT 43                                                EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

an objective fact, as generally, a defendant cannot be held liable for expressing **[\*\*\*24]** a mere opinion. See *Mr. Chow of New York v. Ste. Jour Azur S.A., 759 F.2d 219, [229-30] (2d Cir. 1985)* (no liability where restaurant review conveyed author's opinion rather than literal fact); *Hotchner v. Castillo-Puche, 551 F.2d 910, 913 [2d Cir.]* ([a] writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be) [cert. denied sub nom. *Hotchner v. Doubleday & Co., 434 U.S. 834, 98 S. Ct. 120, 54 L. Ed. 2d 95 (1977)]*." (Internal quotation marks omitted.) *Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 795-96, 734 A.2d 112 (1999)*; see also *Milkovich* **[\*\*48]** *v. Lorain Journal Co., 497 U.S. 1, 13, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)* (noting that, at early common law, defamatory opinion was actionable, but, **[\*411]** "due to concerns that unduly burdensome defamation laws could stifle valuable public debate, the privilege of fair comment was incorporated into the common law as an affirmative defense to an action for defamation" [internal quotation marks omitted]). "A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known. . . . In a libel action, such statements of fact usually concern a person's conduct or character. . . . An opinion, on the other hand, is a personal *comment* about another's conduct, qualifications or character that has some basis in fact." (Citations omitted; emphasis in original.) *Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 111, 448 A.2d 1317 (1982)*.

It should surprise no one that the distinction between actionable statements of fact and nonactionable **[\*\*\*25]** statements of opinion is not always easily articulated or discerned. See *id., 112 n.5* ("the difficulty in distinguishing fact from opinion has been recognized by a number of writers; see, e.g., [H.] Titus, 'Statement of Fact versus Statement of Opinion—A Spurious Dispute in Fair Comment, '15 Vand. L. Rev. 1203 [1962]; [D.] Noel, 'Defamation of Public Officers and Candidates,' 49 [Colum.] L. Rev. 875, 878 [1949]; [N]ote, 'Fair Comment', 62 Harv. L. Rev. 1207 [1949]"); see also *Biro v. Condé Nast, 883 F. Supp. 2d 441, 460 (S.D.N.Y. 2012)* ("the seemingly simple proposition that expressions of opinion are protected belies an often complicated task of distinguishing between potentially actionable statements of fact and nonactionable expressions of opinion" [internal quotation marks omitted]). See generally J. Kirchmeier, Note, "The Illusion of the Fact-Opinion Distinction in Defamation Law," *39 Case W. Res. L. Rev. 867 (1988-1989)*. The difficulty arises primarily because the expression of an opinion may, under certain circumstances, reasonably be understood to imply the existence of an underlying **[\*412]** basis in an unstated fact or set of facts. See *Gleason v. Smolinski, supra, 319 Conn. 435* (citing *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 117-19*, for proposition that statements of opinion may be actionable statements of implied fact); 3 *Restatement (Second), Torts § 566*, p. 170 (1977) ("[a] defamatory communication may consist of a statement in the form of an opinion, but a statement **[\*\*\*26]** of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion"); see also *Milkovich v. Lorain Journal Co., supra, 497 U.S. 19* (under common law, privilege of fair comment "did not extend to a false statement of fact, whether it was expressly stated or implied from an expression of opinion" [internal quotation marks omitted]).

Context is a vital consideration in any effort to distinguish a nonactionable statement of opinion from an actionable statement of fact. As this court previously has recognized, "[t]his distinction between fact and opinion cannot be made in a vacuum . . . for although an opinion may appear to be in the form of a factual statement, it remains an opinion if it is clear from the *context* that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated. . . . Thus, while this distinction may be somewhat nebulous . . . [t]he important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of **[\*\*49]** existing fact." (Citation omitted; emphasis in original; internal quotation marks **[\*\*\*27]** omitted.) *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 111-12*. A central feature of the analysis undertaken by virtually every court called on to distinguish opinion from fact involves a careful examination of the overall context in which the statement is made.

**[\*413]** Courts will examine a variety of factors as part of this contextualized analysis, and, although no uniform test exists, the relevant case law focuses on a common set of considerations. One prevalent approach, first articulated by the United States Court of Appeals for the Ninth Circuit, uses a three part test to determine whether a reasonable fact finder could conclude that an expression of opinion implies an actionable assertion of fact: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether

EXHIBIT 43 EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Partington v. Bugliosi, 56 F.3d 1147, 1153 (9th Cir. 1995)*; see also *Piccone v. Bartels, 785 F.3d 766, 772 (1st Cir. 2015)* (distinguishing statement of fact from expression of opinion requires "an examination of the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation **[\*\*\*28]** and any cautionary terms used by the person publishing the statement"); *Mr. Chow of New York v. Ste. Jour Azur S.A., supra, 759 F.2d 226* (court considers [1] context in which statements were made and circumstances surrounding statements, [2] whether language was "precise" and "literal" or, instead, was "loose, figurative or hyperbolic," [3] whether statements were "objectively capable of being proved true or false," and [4] whether statements imply "undisclosed defamatory facts as the basis for the opinion"); *Ollman v. Evans, 750 F.2d 970, 979, 242 U.S. App. D.C. 301 (D.C. Cir. 1984)* (in determining whether average person understands speech at issue to be factual or expression of opinion, court considers [1] "the common usage or meaning of the specific language of the challenged statement itself," [2] "the statement's verifiability—is the statement capable of being objectively characterized as **[\*414]** true or false," [3] "the full context of the statement—the entire article or column, for example," and [4] "the broader context or setting in which the statement appears"), cert. denied, *471 U.S. 1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985)*; *Belly Basics, Inc. v. Mothers Work, Inc., 95 F. Supp. 2d 144, 145 (S.D.N.Y. 2000)* ("New York law dictates a three factor test to distinguish statements of fact from statements of opinion: [1] whether the challenged statements have a precise and readily understood meaning; [2] whether the statements are susceptible of being **[\*\*\*29]** proved false; and [3] whether the context signals to the reader that the statements are more likely to be expressions of opinion rather than fact" [internal quotation marks omitted]); *K Corp. v. Stewart, 247 Neb. 290, 296, 526 N.W.2d 429 (1995)* ("a court looks at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed, considering the specificity of the statement, its verifiability, the literary context, and the broader setting in which the statement appears"). Without stripping these formulations of their nuance, they can be summarized as requiring analysis of three basic, overlapping considerations: (1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective **[\*\*50]** meaning; (2) whether the nature and tenor of the actual language used by the declarant suggests a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification.

In light of the context in which the present case arises, we also find helpful the extensive case law from other jurisdictions involving speech that rates or reviews products, services or businesses. Some of these cases involve **[\*\*\*30]** defamation or other claims against defendants in the business of rating the quality of sophisticated financial instruments of one kind or another; others are brought against defendants that rate or **[\*415]** review more garden variety consumer products and services such as restaurants, hotels, and the like. See footnotes 6 through 8 of this opinion. Within the broader analytic framework described in the preceding paragraph, courts in these "ratings" cases resolve the issue of whether a reasonable person could conclude that the rating or review implies a statement of objective fact by considering whether (1) the speaker has exercised discretion when weighing the underlying data,[6] (2) the defendant's rating system uses abstract terms, such as a number between one and ten or "fuzzy descriptive phrases like 'superb,' 'good,' and 'strong caution' "; *Browne v. Avvo, Inc., 525 F. Supp. 2d 1249, 1252 (W.D. Wn.*

---

[6] See *Compuware Corp. v. Moody's Investors Services, Inc., 499 F.3d 520, 529 (6th Cir. 2007)* (credit rating based on "subjective and discretionary weighing of complex factors" was nonactionable opinion); *Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864, 871 (8th Cir. 2005)* ("subjective interpretation of multiple objective data points" constitutes opinion); *ZL Technologies, Inc. v. Gartner, Inc., 709 F. Supp. 2d 789, 798 (N.D. Cal. 2010)* (when defendant weighed importance of certain facts differently based on relative value that it assigned to different criteria, rating was nonactionable opinion), aff'd, *433 Fed. Appx. 547 (9th Cir.)*, cert. denied, ***565 U.S. 963, 132 S. Ct. 455, 181 L. Ed. 2d 295 (2011)***; *Browne v. Avvo, Inc., supra, 525 F. Supp. 2d 1252* (when underlying data were weighted based on defendant's subjective opinions regarding relative importance of various attributes, comparative rating of plaintiff attorney was nonactionable opinion); ***Castle Rock Remodeling, LLC v. Better Business Bureau of Greater St. Louis, Inc., 354 S.W.3d 234, 242-43 (Mo. App. 2011)*** (when defendant's rating system weighted objective data, consumer rating was nonactionable opinion).

EXHIBIT 43                                                                                          EXHIBIT  15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

*2007)*; [7] and (3) the publication containing  **[\*416]**  the ratings defined the terms that it used. See *Smith v. Humane Society of the United States, 519 S.W.3d 789, 800-801 (Mo. 2017)* (defendant's use of term "puppy mill" to describe plaintiff's kennel was nonactionable when defendant did not define term).

Courts generally have held that "claims for defamation based upon ratings or grades fail because [ratings or grades] cannot be objectively verified **[\*\*\*31]** as true or  **[\*\*51]**  false and thus, are opinion . . . ."[8] *Castle Rock Remodeling, LLC v. Better Business Bureau of Greater St. Louis, Inc., 354 S.W.3d 234, 241 (Mo. App. 2011)*; see also id., n.3 (citing cases). "Liability for [defamation] may attach, however, when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader. If an author represents that he has private, [firsthand] knowledge which substantiates the opinions he expresses, the expression of  **[\*417]**  opinion becomes as damaging as an assertion of fact." (Internal quotation marks omitted.) *Mr. Chow of New York v. Ste. Jour Azur S.A., supra, 759 F.2d 225*; cf. *Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 185 (4th Cir. 1998)* (opinion based on fully disclosed facts is not actionable); *Partington v. Bugliosi, supra, 56 F.3d 1156-57* (same). The case law in this area also makes it clear that an opinion that is based on the opinions of others does not imply defamatory facts and, therefore, is not actionable. See *Seaton v. TripAdvisor, LLC, 728 F.3d 592, 599-601 (6th Cir. 2013)* (when defendant's inclusion of plaintiff's hotel on " 'Dirtiest Hotels' " list was based on opinions of hotel customers, it did not imply false facts but constituted nonactionable opinion); *ZL Technologies, Inc. v. Gartner, Inc., 709 F. Supp. 2d 789, 798 (N.D. Cal. 2010)* ("[t]he use of a rigorous mathematical model to generate a ranking . . . based upon [subjective evaluations by vendors and their customers] does not transform [the defendant's] opinion into a statement of fact that can be **[\*\*\*32]** proved or disproved"), aff'd, *433 Fed. Appx. 547 (9th Cir.)*, cert. denied, *565 U.S. 963, 132 S. Ct. 455, 181 L. Ed. 2d 295 (2011)*.

"[T]he determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court." *Mr. Chow of New York v. Ste. Jour Azur S.A., supra, 759 F.2d 224*; see also *Smith v. Humane Society of the United States, supra, 519 S.W.3d 798* ("[w]hether an alleged statement is capable of being treated as an opinion or as an assertion of fact is a question of law" [internal quotation marks omitted]). "Where the court cannot reasonably characterize the allegedly libelous words as either fact or opinion because, for example,

---

[7] See also *Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864, 867, 870-71 (8th Cir. 2005)* (when defendant assigned ratings of "Does Not Qualify," "Silver," "Gold" and "Platinum," rating of plaintiff as "Does Not Qualify" was not sufficiently factual to be susceptible of being proved true or false); *Jefferson County School District No. R-1 v. Moody's Investor's Services, Inc., 175 F.3d 848, 856 (10th Cir. 1999)* (defendant's use of vague phrases such as "negative outlook" and "ongoing financial pressures" to describe plaintiff's financial condition constituted nonactionable opinion [internal quotation marks omitted]); **Castle Rock Remodeling, LLC v. Better Business Bureau of Greater St. Louis, Inc., 354 S.W.3d 234, 242-43 (Mo. App. 2011)** (defendant's "C" rating of plaintiff was not "sufficiently factual to be susceptible of being proved true or false" [internal quotation marks omitted]); *K Corp. v. Stewart, supra, 247 Neb. 296-97* (defendant's use of subjective terms such as "minimum standards," "unacceptable level of deterioration," "acceptable quality," and "first class condition" constituted expression of opinion).

[8] See, e.g., *Seaton v. TripAdvisor, LLC, 728 F.3d 592, 600-601 (6th Cir. 2013)* (defendant's placement of plaintiff's hotel on " 'Dirtiest Hotels' " list constituted nonactionable opinion); *ZL Technologies, Inc. v. Gartner Group, Inc., 433 Fed. Appx. 547, 548 (9th Cir.)* (defendant's placement of plaintiff in Magic Quadrant graphic constituted nonactionable opinion), cert. denied, **565 U.S. 963, 132 S. Ct. 455, 181 L. Ed. 2d 295 (2011)**; *Compuware Corp. v. Moody's Investors Services, Inc., 499 F.3d 520, 529 (6th Cir. 2007)* (defendant's credit rating of plaintiff constituted nonactionable opinion); *Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864, 870-71 (8th Cir. 2005)* (defendant's safety rating of plaintiff air charter services provider constituted nonactionable opinion); *Jefferson County School District No. R-1 v. Moody's Investor's Services, Inc., 175 F.3d 848, 856 (10th Cir. 1999)* (defendant's credit rating of plaintiff school district constituted nonactionable opinion); *Mr. Chow of New York v. Ste. Jour Azur S.A., supra, 759 F.2d 229* (with exception of statement that plaintiff restaurant served Peking duck in one dish instead of traditional three dishes, which was susceptible of being proved true or false, defendant's review of plaintiff's restaurant constituted nonactionable opinion); *Browne v. Avvo, Inc., supra, 525 F. Supp. 2d 1251* (defendant's comparative rating of attorneys constituted nonactionable opinion); *Smith v. Humane Society of the United States, supra, 519 S.W.3d 800-801* (defendant's inclusion of plaintiff's kennel in report listing worst puppy mills in state constituted nonactionable opinion); **Castle Rock Remodeling, LLC v. Better Business Bureau of Greater St. Louis, Inc., 354 S.W.3d 234, 242-43 (Mo. App. 2011)** (defendant's rating of plaintiff's business constituted nonactionable opinion).

288

innuendo is present,  **[\*\*52]**  this becomes an issue of fact for the jury, which would preclude a directed verdict. This is similar to the rule which requires the jury to decide  **[\*418]**  whether an ambiguous assertion is reasonably capable of a defamatory meaning."[9] *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 112 n.5*.

With these principles in mind, we turn to the plaintiff's argument that the defendant's statements concerning the plaintiff in the 2014 report reasonably could be construed as defamatory statements of fact. The plaintiff's first claim of error is that the trial court incorrectly determined that the defendant's placement of the plaintiff in the challengers quadrant of the Magic Quadrant graphic was an expression of nonactionable opinion. We agree with  **[\*\*\*33]**  the trial court that this speech was not factual and did not imply defamatory facts. Vendor ratings of this nature, in our view, typically are inherently subjective, and no reasonable person would consider a vendor's placement in the Magic Quadrant graphic to be anything other than the expression of the rater's opinion. This very issue was addressed in *ZL Technologies, Inc. v. Gartner, Inc., supra, 709 F. Supp. 2d 800*, in which the United States District Court for the Northern District of California observed that the defendant determined the placement of vendors in a Magic Quadrant graphic by "looking to a number of factors, [and] applying differing weights based on its subjective assessment of a company's ability to execute and completeness of vision." The relative weight assigned to the criteria and the criteria themselves "are not facts  **[\*419]**  that can be proved true or false but a reflection of a subjective valuation . . . ." Id. The court in *ZL Technologies, Inc.*, also observed that the defendant made the placement determination in part by considering the subjective evaluations of the vendors' customers, which were merely opinions once removed. *Id., 797, 800*. Likewise, in the present case, the defendant assigned the plaintiff a place in the Magic Quadrant graphic  **[\*\*\*34]**  on the basis of the defendant's subjective evaluation of a variety of factors that were, in turn, assigned relative importance or "weigh[t]" in accordance with the subjective preferences embedded in its evaluative process, and by considering the subjective evaluations of the vendors' customers. The trial court correctly determined that the placement of the plaintiff in the challengers section of the Magic Quadrant graphic was nonactionable opinion.

This brings us to our single area of disagreement with the trial court. Although the trial court found that the defendant's designation of the plaintiff as a challenger was nonactionable, it agreed with the plaintiff that the generic description of the term "[c]hallengers," as used in the 2014 report, and the three particularized "[c]autions" explaining the plaintiff's placement as a challenger contained actionable statements of fact. With respect to  **[\*\*53]**  the generic description of the challengers category, the trial court agreed with the plaintiff's contention that the defendant's rating impliedly conveyed a factual assertion that the plaintiff, having been designated by the defendant as a challenger rather than a leader, lacked "comprehensive  **[\*\*\*35]**  portfolios and the ability to handle multiple application and technology types" and was "currently struggling to deal with new technical demands and rising expectations." [10] We disagree.

 **[\*420]**  To begin with, we return to the starting point of our analysis, which requires consideration of the context in which the challenged statement is made. The 2014 report set forth views regarding the relative strengths and weaknesses of vendors operating within a particular commercial market. Whether expressed using colorful jargon, numerical or letter grades, stars, or the standard terminology of "good, better, best," such ratings appear virtually any place a potential customer might look—in magazines and newsletters, television advertisements, billboards, waiting rooms, websites, and every other conceivable physical or electronic surface. Reasonable viewers, and certainly those consumers operating in the sophisticated market involved here, understand that these ratings normally rest, at

---

[9] See *Burns v. Telegram Publishing Co., 89 Conn. 549, 552, 94 A. 917 (1915)* ("[i]t is only when the court can say that the publication is not reasonably capable of any defamatory sense, that the court can rule, as [a] matter of law, that the publication is not libelous, or withdraw the case from the jury, or order a verdict for the defendant" [internal quotation marks omitted]); 3 **Restatement (Second), supra, § 614**, p. 311 ("[t]he court determines . . . whether a communication is capable of bearing a [defamatory] meaning, and . . . [t]he jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient"); 3 **Restatement (Second), supra, § 614, comment (d)**, p. 312 ("if, in the opinion of the court, the question [of whether a statement is capable of bearing a defamatory meaning] is one on which reasonable men might differ, it is for the jury to determine which of the two permissible views they will take").

[10] The trial court did not expressly address the former statement, which was included in the defendant's definition of "[l]eader" in the 2014 report, but concluded that a reasonable juror could find that the latter statement was factual in nature, or at least that it implied undisclosed defamatory facts.

EXHIBIT 43                                                    EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

bottom, on inherently and irreducibly subjective evaluations of value, quality and performance. This assumption does not mean that the speaker is at liberty to make false statements of fact merely by labelling them "opinions," **[\*\*\*36]** [11] but it does lead us to believe that the audience ordinarily recognizes that the context bespeaks caution, in the sense that most ratings of goods and services reflect an expression of evaluative opinion rather than verifiable fact.

Indeed, consistent with the nature and context of its undertaking, the defendant expressly states in the 2014 report that "[t]his publication consists of the opinions of [the defendant's] research organization and should not be construed as statements of fact." Although this statement does not automatically immunize the speaker against claims of defamation; see footnote 11 of this opinion; we conclude that the abstract, unquantifiable, **[\*421]** and comparative nature of the defendant's descriptions of the challenger and leader categories, using terms such as "comprehensive portfolios," "multiple application and technology types," and "struggling to deal with new technical demands and rising expectations," renders the statements irreducibly vague and insusceptible of being proved true or false. The statements, moreover, were not specific to the plaintiff but applied generally to *all* vendors placed in the referenced quadrants. A reasonable reader would understand that **[\*\*\*37]** all aspects of the challengers description did not necessarily apply equally to all vendors. [12]

 **[\*\*54]** We reach a similar conclusion with respect to the statements contained in the 2014 report's cautions about the plaintiff, namely, that the plaintiff "has a limited ability to expand beyond its network management heritage, which would be the next logical step (for example, into [application performance monitoring] or [information technology] operations analytics)," that "[o]ffering only a hardware-based deployment model limits [the plaintiff's] ability to address growing software and [software as a service] solution demand," and that the plaintiff "is perceived as a conservative stalwart in the NPMD space, and lacks the reach and mind share that many smaller competitors have." The terms "limited" and "limits" used to describe the plaintiff's abilities are subjective, vague, unquantifiable, relative and unverifiable, and, although "reach" and "mind share" may be terms of art that have particular meanings in the **[\*422]** relevant marketing field, [13] these qualities are subjective and unverifiable. We also consider it significant that the 2014 report explained that, like the defendant's decision about where **[\*\*\*38]** to place the plaintiff in the Magic Quadrant graphic, these additional statements were based in part on the subjective evaluations of the plaintiff's customers. Accordingly, we conclude that the trial court incorrectly determined that these statements were factual or implied defamatory statements of fact.

The plaintiff contends that, even if these statements were not actionable as defamatory statements of fact in and of themselves, the defendant's speech was still actionable because the defendant falsely claimed that its opinions were objective and impartial. Again, we disagree. Demonstrably false claims of objectivity, under certain circumstances, conceivably might supply sufficiently suggestive innuendo to transform otherwise nonactionable statements into defamatory speech, but this is not such a case. A false claim of objectivity, without more, cannot be defamatory of the plaintiff because the statement refers to the speaker rather than the vendor. We detect no obvious or even implied correspondence between the putative "objectivity" of the speaker and the perception of the speaker's statement as fact or opinion. "Objective" speakers may publish subjective opinions, whereas biased **[\*\*\*39]** or self-interested speakers may publish statements of fact. In the defamation context, the speaker's claim to objectivity, whether true

---

[11] See *Milkovich v. Lorain Journal Co., supra, 497 U.S. 18* (observing that statement couched as opinion will be actionable if it implies assertion of objective fact); *Gleason v. Smolinski, supra, 319 Conn. 435 n.34* ("the 'mere recitation of prefatory phrases such as "in my opinion" or "I think" will not render innocent an otherwise defamatory statement' ").

[12] The trial court also concluded that an assertion of fact is conveyed in the defendant's statement that challengers had "architectures, feature sets and pricing structures that require modernization (often in progress) to better compete with those in the [l]eaders quadrant." The plaintiff does not address or defend this particular finding on appeal. In any event, we would conclude that this statement is an expression of opinion for the same reasons the other statements in the challengers and leaders descriptions are expressions of opinion.

[13] See, e.g., T. Marabella, Note, "Elemental Copyright: The Complexity of Ideas and the Alchemy of Mind-Share," 90 B.U. L. Rev, 2149, 2161 (2010) ("[mind share] is a term used in the marketing and advertising world, defined as the likelihood that a consumer will think of a particular brand when a type of product is mentioned").

EXHIBIT 43  EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

or not, does not turn that speaker's negative statement of opinion about the plaintiff into an actionable statement of fact. That the defendant claimed a measure of objectivity in its marketing materials did not convert its vaguely worded, comparative and evaluative statements **[*423]** into express or implied defamatory factual statements. See *Seaton v. TripAdvisor, LLC, supra, 728 F.3d 600* (defendant's claim that it was most trusted advisor and that it provided " 'the whole truth' " about rated hotels did not render defendant's opinion about plaintiff's hotel actionable); *ZL Technologies, Inc. v. Gartner, Inc., supra, 709 F. Supp. 2d 797-98* (defendant's statements that its analysis was "fact-based and knowledge-centric, built on objectivity, and founded on a methodology it says ensures the ultimate objectivity" were "insufficient to transform the tenor of the **[**55]** rankings in the [Magic Quadrant] [r]eport from opinion to fact" [internal quotation marks omitted]). [14]

 **[*424]**  The concept of "puffery," although typically applied outside the defamation context, usefully illuminates the basic point. [15] A claim of objectivity, like claims of integrity, **[***40]** credibility, high ethical norms and the like, is often considered nonactionable puffery because it is unlikely to induce reliance and is insusceptible to being proved true or false. See *Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019)* ("general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are **[**56]** too general to cause a reasonable investor to rely upon them" [internal quotation marks omitted]); *Intermountain Stroke Center, Inc. v. Intermountain Health Care, Inc., 638 Fed. Appx. 778, 788 (10th Cir. 2016)* (advertising that speaks generically to caliber of defendant's product is "classic puffery" and incapable of being proved true or false); *Boca Raton Firefighters*

---

[14] **Section 566 of the Restatement (Second) of Torts** makes the same point with respect to the closely related concept of the speaker's honesty or sincerity when expressing an opinion. See 3 **Restatement (Second), supra, § 566, comment (c)**, p. 175 ("Should it be a significant issue whether the expression of opinion was the actual opinion of the defendant? Though an asserted factual statement that it is the actual opinion of the defendant may be held to be implied, its truth or falsity would apparently have no effect on the defamatory character of the communication."). But see *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 123* ("[a] comment is fair when [inter alia] it . . . is an *honest expression* of the writer's real opinion or belief" [emphasis in original; internal quotation marks omitted]). The court in *Goodrich* quoted the decision of the New York Court of Appeals in *Briarcliff Lodge Hotel, Inc. v. Citizen-Sentinel Publishers, Inc., 260 N.Y. 106, 118-19, 183 N.E.193 (1932)*, which cited no authority to support the statement. *Goodrich v. Waterbury Republican-American, Inc., supra, 123-24*.

It has been held in cases involving claims of financial fraud that a false claim of objectivity may render a statement actionable. See, e.g., *In re International Business Machines Corporate Securities Litigation, 163 F.3d 102, 109 (2d Cir. 1998)* ("an opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact"); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 651 F. Supp. 2d 155, 176 (S.D.N.Y. 2009)* (same); *State v. Moody's Corp., Superior Court, judicial district of Hartford, Docket No. X04-HHD-CV-10-6008836-S (May 10, 2012) (54 Conn. L. Rptr. 116, 121, 2012 Conn. Super. LEXIS 1268)* (when defendant claimed that it had employed "specific policies and procedures . . . to protect its independence and objectivity," statement was actionable under theory of misrepresentation because it was susceptible to being proved false). In our view, there would seem to be a significant difference between the business of rating securities, which is predictive and widely perceived as employing standardized econometric methodologies requiring a high degree of mathematical and technical skill, and the business of rating products and services, which involves commentary on an existing state of affairs and is generally understood to be inherently subjective in nature. In light of this difference, as well as the differences between the elements of a fraud claim and a defamation claim; see F. Harper & M. McNeely, "A Syntheses of the Law of Misrepresentation," 22 Minn. L. Rev. 939, 947 (1938) ("[I]n misrepresentation, the defendant has misled the plaintiff himself, whereas in defamation he has misled a third person to the plaintiff's loss. Thus, in the case of misrepresentation, the plaintiff complains because he himself has been induced to enter into some commercial transaction by his reliance upon the misstatements which the defendant has made. In defamation, however, he complains because some third person has believed or is presumed to have believed the defendant's misstatements about him, and has been induced or is presumed to have been induced to act in reliance thereon to the plaintiff's loss." [Footnote omitted.]); it is far from clear to us that the same rule should apply in the context of a defamation claim brought in the ratings context by the subject of the purportedly defamatory opinion.

[15] "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." **Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993)**; see also *Newcal Industries, Inc. v. IKON Office Solution, 513 F.3d 1038, 1053 (9th Cir. 2008)* ("[u]ltimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim"), cert. denied, **557 U.S. 903, 129 S. Ct. 2788, 174 L. Ed. 2d 290 (2009)**.

*& Police Pension Fund v. Bahash, 506 Fed. Appx. 32, 37 (2d Cir. 2012)* ("[t]he statements alleged in the [plaintiff's] complaint regarding [the] integrity and credibility [of the company whose stock was being sold] and the objectivity of [the defendant security rating provider's] credit ratings are the  **[\*425]**  type of mere puffery that we have previously held to be not actionable" because "no reasonable purchaser of [the stock] would view statements such as these as meaningfully altering the mix of available information about the company [whose stock was being sold]" [internal quotation marks omitted]); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009)* (defendant's statements regarding its good reputation for integrity were "no more than 'puffery' "); **[\*\*\*41]**  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., supra, 206* ("[the] [p]laintiffs conflate the importance of a . . . reputation for integrity with the materiality of [the defendant's own] statements regarding its reputation," and "[n]o investor would take [the defendant bank's statement that it set the standard for best practices] seriously . . . for the simple fact that almost every investment bank makes these statements").

Putting aside our conceptual problems with the plaintiff's theory of defamation premised on the allegedly false claims of objectivity, we also agree with the trial court that the plaintiff failed to present any credible evidence that the Magic Quadrant rankings in the 2014 report were based on the amount of consulting services that each vendor purchased from the plaintiff. Specifically, the court noted that the two vendors who spent the most on consulting services were ranked comparably to or lower than the plaintiff in the Magic Quadrant graphic—which the plaintiff's expert had disregarded when he found a correlation between expenditures and rankings. Although the plaintiff's expert attempted to salvage his pay to play correlation by reference to these two vendors' higher rankings in other Magic Quadrant reports, and the **[\*\*\*42]**  plaintiff claims on appeal that, at the very least, this broader historical point created a genuine issue of material fact, we remain unpersuaded. The unavoidable reality is that, with respect to the publication **[\*426]**  at issue, the plaintiff's own expert was unable to provide an opinion supporting the plaintiff's fundamental theory of wrongdoing without entirely disregarding the data pertaining to the two highest paying vendors in the rankings. [16] We agree with the trial court's conclusion that "[s]uch manipulation of evidence does  **[\*\*57]**  not create a genuine issue of material fact or support a question for the jury" as to whether a correlation between expenditures and rankings existed.

The plaintiff also contends that, even if the trial court properly rejected its expert's conclusions correlating expenditures and rankings, there was other evidence that would allow a jury to infer that the defendant's claims of objectivity and impartiality were false. The plaintiff points in particular to evidence that the defendant had told the plaintiff that the defendant "need[ed] to fix things with [the plaintiff] considering the focus our research agenda has on [the plaintiff's] market in 2013" and that "market **[\*\*\*43]**  leaders need to be represented properly." Singhal, the plaintiff's president and chief executive officer, testified at his deposition that one of the defendant's analysts had told him that the plaintiff should spend more money on marketing, which Singhal interpreted as "code . . . for spending more money on [the defendant's] services." The evidence also established that the plaintiff was placed in the leaders quadrant in early drafts of the 2014 report, but, after Kowall  **[\*427]**  "tweaked" the underlying weightings, the plaintiff ended up in the challengers quadrant. The plaintiff additionally points to evidence that the defendant repeatedly referred to the plaintiff as a leader in various documents, thereby effectively admitting that the plaintiff should have been placed in the leaders quadrant.

We agree with the trial court's findings that this evidence was insufficient to create a genuine issue of material fact regarding the truth of the defendant's claims of objectivity and impartiality. With respect to the defendant's references to the plaintiff as a leader, the trial court correctly observed that all but one of these references were made solely in

---

[16] The plaintiff contends that the trial court prematurely concluded that there was no correlation between expenditures and placement in the Magic Quadrant graphic because the trial court barred the plaintiff "from taking discovery related to [the defendant's] relationship with, payments from, and treatment of companies other than [the plaintiff] . . . ." The plaintiff, however, has neither challenged the correctness of the court's discovery ruling on appeal nor explained what additional information it would require to determine whether there was a correlation between expenditures and placement in the Magic Quadrant graphic. Indeed, the plaintiff acknowledges that it had information concerning the total amounts that other vendors had paid the defendant for consulting services and the placement of the two vendors who paid most in other Magic Quadrant reports for markets other than NPMD.

EXHIBIT 43   EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

connection with the plaintiff's market **[\*\*\*44]** share, which was consistent with its placement in the challengers quadrant. With respect to the earlier draft placing the plaintiff in the leaders quadrant, it is indisputable that the defendant's analysts engaged in a lengthy process of repositioning various vendors based on a variety of criteria. Although Kowall at one point wrote that he believed that the plaintiff "technically" should be placed in the leaders quadrant, or that it at least should be placed on the line between the leaders quadrant and the challengers quadrant, and other analysts questioned the plaintiff's ranking as a challenger, these exchanges took place at a time when the analysts were openly debating the position of vendors, including the plaintiff, in the graphic. The evidence showed that the positions of almost all of the vendors in the Magic Quadrant graphic worsened over time as the analysts "tweaked" the data, and the plaintiff's position relative to the other vendors remained relatively constant. There is no suggestion in any of these communications that the adjustments were made on the basis of the vendors' expenditure levels. We likewise conclude that the statement made by the defendant's analysts to **[\*\*\*45]** the plaintiff that the defendant needed to "fix things" with the plaintiff and that the plaintiff should spend more on marketing reflect nothing more than a **[\*428]** recommendation for curative action and cannot reasonably support an actionable inference that the plaintiff's ranking was dependent on pay to play expenditures. The availability of the defendant's consulting services was no secret to anyone; the defendant publicly disclosed the fact that some of the vendors that it ranked in its Magic Quadrant reports purchased consulting services from it, enabling readers to consider the defendant's claims of objectivity and impartiality in their proper context.

 **[\*\*58]** The plaintiff contends that any ambiguity in the foregoing evidence must, at the summary judgment stage, be construed in its favor because a reasonable fact finder could resolve the ambiguity and conclude that the defendant's claims of objectivity and impartiality were false. The flaw in this argument is that it misapprehends the particular nature of the ambiguity at issue. The plaintiff is correct that, generally speaking, summary judgment will not be rendered if there is an ambiguity in the evidence such that a reasonable person might **[\*\*\*46]** decide a disputed issue of material fact in favor of either the plaintiff or the defendant. See, e.g., *H.O.R.S.E. of Connecticut, Inc. v. Washington, 258 Conn. 553, 565, 783 A.2d 993 (2001)* (ambiguous meaning of critical deposition testimony precluded summary judgment). It also is true that, in defamation cases, a jury issue can arise when an expression of opinion contains an ambiguity that reasonably can be understood to convey by implication an actionable factual assertion. [17] See *Goodrich v. Waterbury Republican-American, Inc., supra, 188 Conn. 112 n.5* (referring to **[\*429]** "the rule which requires the jury to decide whether an ambiguous assertion is reasonably capable of a defamatory meaning"). But the ambiguity at work in the present case is of a different kind. When we say that certain statements in the 2014 report are properly characterized as vague and ambiguous, we mean that the statements could *not* be understood by a reasonable juror to imply a factual statement; their ambiguity does not invite the listener to infer a latent factual assertion but, rather, suggests an imprecise and irreducibly subjective meaning that cannot be understood to convey a statement of fact. Thus, the statements are expressions of opinion as a matter of law. See, e.g., *Mr. Chow of New York v. Ste. Jour Azur S.A., supra, 759 F.2d 224* (whether statement is factual or expression of opinion is question of law). This conclusion does **[\*\*\*47]** not preclude summary judgment in the present context but, instead, compels it. Accordingly, we conclude that the trial court correctly determined as a matter of law that no reasonable juror could find by a preponderance of the evidence [18] that the defendant's claims of objectivity and impartiality were defamatory.

---

[17] For example, this court found that an "ambiguous" statement appearing in a newspaper article that the plaintiff had charged the city of Bridgeport for 8000 gallons of gasoline but, when measured, the volume had "shrunk [1000] gallons," was actionable because it was "susceptible of a libelous meaning [i.e., overcharging], and capable of being injurious to the plaintiff. It might have been understood by one reading it as implying that the plaintiff was guilty of some dishonest action in connection with the loss of the gasoline. So understood, the article was libelous. It being capable of such a meaning, it was proper for the plaintiff in his complaint, by way of innuendo, to allege that it conveyed such a meaning to its readers." (Internal quotation marks omitted.) *Burns v. Telegram Publishing Co., 89 Conn. 549, 551-52, 94 A. 917 (1915)*.

[18] The defendant argues that the plaintiff is required to prove falsity by clear and convincing evidence because the plaintiff is a limited purpose public figure and that the 2014 report constituted speech on a matter of public concern. See *Gleason v. Smolinski, supra, 319 Conn. 432*. We need not address this issue because we have concluded that the plaintiff's claims fail even under the preponderance standard.

**EXHIBIT 43**                                                                                    EXHIBIT 15

Netscout Sys. v. Gartner, Inc., 334 Conn. 396

[19] Any evidence presented by the **[\*\*59]** plaintiff **[\*430]** that might arguably support an inference that the defendant had a conflict of interest would not render its statements actionable in a defamation action. See *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 651 F. Supp. 2d 155, 179 (S.D.N.Y. 2009)* ("[t]he existence of conflicts of interest alone typically is not sufficient to establish that [the] defendants 'knowingly' made a false and misleading statement"). Indeed, as we have explained, a reasonable purchaser of the defendant's research reports would understand that comparative ratings of products and services cannot be strictly objective. See *Browne v. Avvo, Inc., supra, 525 F. Supp. 2d 1253 n.1* ("[c]omparisons and comparative ratings are often based as much on the biases of the reviewer as on the merits of the reviewed: they should, therefore, be relied upon with caution"); *id., 1253* (stating, with respect to defendant's comparative ratings, that "that and $1.50 will get you a ride on Seattle's new South Lake Union Streetcar" **[\*\*\*48]** [internal quotation marks omitted]); *Castle Rock Remodeling, LLC v. Better Business Bureau of Greater St. Louis, Inc., supra, 354 S.W.3d 241* (ratings and grades "cannot be objectively verified as true or false").

Our conclusion that the trial court properly rendered summary judgment for the defendant on the defamation claim is also dispositive of the plaintiff's claim that the trial court improperly rendered summary judgment for the defendant on the CUTPA claim. Because the defendant's statements about the plaintiff in the 2014 report were nonactionable expressions of opinion, and because the plaintiff failed to present sufficient evidence to support its pay to play claim, we are compelled to conclude that the plaintiff has failed to establish a viable claim within the purview of CUTPA.

In summary, we conclude that the trial court incorrectly determined that the 2014 report contained certain statements about the plaintiff that a reasonable juror could find to be defamatory and either to be factual or **[\*431]** to imply undisclosed defamatory facts. In our view, all of the statements that the defendant made about the plaintiff were expressions of nonactionable opinion. We further conclude that, at least in the absence of any credible evidence tending to establish that the defendant's claims of objectivity **[\*\*\*49]** and impartiality were provably false and that it was engaged in a pay to play scheme, such speech cannot support either the plaintiff's defamation claim or its CUTPA claim. Accordingly, we affirm the trial court's judgment on the alternative ground that all of the challenged statements by the defendant were nonactionable expressions of opinion.

The judgment is affirmed.

In this opinion the other justices concurred.

---

**End of Document**

---

[19] This conclusion is reached in the context of a defamation claim, and the plaintiff is a vendor alleging harm arising from statements made as part of the defendant's rating and review of the plaintiff's information technology products and services. Different claims in a different context brought by a differently situated plaintiff may fare differently. Compare *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 651 F. Supp. 2d 155, 176, 179 (S.D.N.Y. 2009)* (when defendant rating agencies, which held themselves out as being unbiased and independent from companies that they rated, knew that "the ratings process was flawed . . . that the portfolio was not a safe, stable investment, and . . . that [they] could not issue an objective rating because of the effect it would have on their compensation, it may be plausibly inferred that [they] knew they were disseminating false and misleading ratings"); see also footnote 14 of this opinion.

**EXHIBIT 43**                                                                    EXHIBIT 16

De Blasio v. Aetna Life & Casualty Co., 186 Conn. 398

## *De Blasio v. Aetna Life & Casualty Co.*

Supreme Court of Connecticut

November 12, 1981, Argued ; March 9, 1982, Decided

No Number in Original

**Reporter**

186 Conn. 398 *; 441 A.2d 838 **; 1982 Conn. LEXIS 464 ***

Pasquale DeBlasio v. Aetna Life and Casualty Company

**Prior History: [***1]**   Action for specific performance of an automobile insurance contract, and for other relief, brought to the Superior Court in the judicial district of Waterbury and tried to the court, *Lexton, J.;* judgment for the plaintiff to recover nominal damages only, from which the plaintiff appealed to this court.

**Disposition:** *No error*.

## Case Summary

**Procedural Posture**

Plaintiff insured filed an action for specific performance against defendant insurer in the Superior Court in the Judicial District of Waterbury (Connecticut), claiming indemnification under an automobile insurance policy that it had issued him. After granting the insured a default judgment, the trial court held a hearing on the damages to impose, and awarded the insured $ 1 in nominal damages. The insured appealed.

**Overview**

At the damages hearing, the insurer presented evidence on its claim that the insured's policy did not cover the accident for which he sought indemnification. The insurer argued that the policy specified the insured vehicle and included coverage for a temporary substitute vehicle, but the latter was only operative if the insured was not the title owner thereof. Because the accident was caused by a secondary car that the insured held title to, the trial court ruled that it was not covered by the temporary substitute vehicle clause, and awarded only nominal damages. On appeal, the insured argued that the trial court erred in accepting evidence on the policy, claiming such was precluded by the default, and that the ruling on the temporary substitute vehicle provision was erroneous. Finding no error, the court declared that Conn. Gen. Prac. Book § 367 allowed the insurer to prove any matter of defense at a default damages hearing if proper notice was given to the insured. Because such notice was given by the insurer, there was no error in considering its defense at the damages hearing. Because ample evidence supported the trial court's ruling on coverage, it was not disturbed.

**Outcome**

The court found no error in the trial court's judgment.

**Counsel:** *Eugene L. DeFronzo,* for the appellant (plaintiff).

*Joseph A. Mengacci,* for the appellee (defendant).

**Judges:** Speziale, C. J., Healey, Parskey, F. Hennessy and Covello, Js.

**Opinion by:** COVELLO

EXHIBIT 43                                                    EXHIBIT 16

De Blasio v. Aetna Life & Casualty Co., 186 Conn. 398

## Opinion

 **[\*399]  [\*\*838]**   The plaintiff in this action seeks specific performance of an automobile insurance contract.  He claims indemnification under the policy's provisions for damages which he paid as the result of an automobile accident for which he had been found liable.

On May 1, 1979, the plaintiff filed an amended complaint seeking the relief claimed above.  On May 21, 1979, he filed a motion for default for the defendant's failure to enter an appearance in the action.  On June 11, 1979, the court, *Kulawicz, J.,* granted the default as requested.

On July 12, 1979, the defendant, having filed its appearance, moved to set aside the  **[\*\*\*2]   [\*\*839]**  default pursuant to Practice Book § 376. [1]  On October 2, 1979, the court, *Pickett, J.,* denied the motion to set aside the default concluding that the defendant had not shown good cause for its failure to enter a timely appearance.

 **[\*400]**  On October 9, 1979, the defendant filed a notice of defenses pursuant to Practice Book § 367. [2]  In it, the defendant denied the essential allegations of the complaint and claimed "[t]here was no coverage for this loss under the policy set forth in the complaint."

 **[\*\*\*3]**  At the subsequent hearing in damages, the court, *Lexton, J.,* allowed the introduction of evidence concerning the applicability of the policy's provisions to the circumstances in question.  The court concluded that there was indeed no coverage under the policy, and rendered judgment in favor of the defendant.  Thereafter, the court opened the judgment and, by agreement of the parties, rendered judgment for the plaintiff to recover nominal damages of $ 1. The plaintiff has appealed.

I

The plaintiff contends that the court erred in admitting into evidence the insurance policy in question and in allowing the defendant to present a defense on the issue of liability. He claims that the entry of the default for failure to appear precluded the introduction of evidence concerning liability.  We do not agree.

The entry of a default constitutes an admission by the defendant of the truth of the facts alleged in the complaint. *Kawasaki Kisen Kaisha, Ltd. v.  [\*401]  Indomar, Ltd., 173 Conn. 269, 272, 377 A.2d 316 (1977)*; *Went v. Schmidt, 117 Conn. 257, 258, 167 A. 721 (1933)*. "The plaintiff must still prove [at a hearing in damages] how much of the judgment prayed **[\*\*\*4]**  for in the complaint he is entitled to receive." *United National Indemnity Co. v. Zullo, 143 Conn. 124, 130, 120 A.2d 73 (1956)*. He is, at the very least, entitled to nominal damages. *Cardona v. Valentin, 160 Conn. 18, 26, 273 A.2d 697 (1971)*.

The entry of the default, however, does not preclude the defendant from raising a defense at the hearing in damages. If timely written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint.  The defendant may also challenge the right of the plaintiff to maintain the action or prove any matter

---

[1] Practice Book § 376 provides: "[A] motion to set aside a default where no judgment has been rendered may be granted by the court *for good cause shown* upon such terms as it may impose.  As part of its order the court may extend the time for filing pleadings or disclosure in favor of a party who has not been negligent." (Emphasis added.)

[2] Practice Book § 367 provides: "In any hearing in damages upon default suffered or after a denial of a motion to strike, the defendant shall not be permitted to offer evidence to contradict any allegations in the plaintiff's complaint, except such as relate to the amount of damages, unless he has given notice to the plaintiff of his intention to contradict such allegations and of the subject matter which he intends to contradict, nor shall the defendant be permitted to deny the right of the plaintiff to maintain such action, nor shall he be permitted to prove any matter of defense, unless he has given written notice to the plaintiff of his intention to deny such right or to prove such matter of defense."

296

EXHIBIT 43  EXHIBIT 16

De Blasio v. Aetna Life & Casualty Co., 186 Conn. 398

of defense.  Practice Book § 367; see also *General Statutes § 52-221*; *Bonner v. American Financial Marketing Corporation, 181 Conn. 57, 58, 434 A.2d 323 (1980)*; *Upton v. Windham, 75 Conn. 288, 289-90, 53 A. 660 (1902)*.

If the defendant appears in the action and furnishes the required notice, the subsequent hearing in damages takes on "the nature of a supplemental trial involving the determination of questions of law and fact, and the determination of the damages to be assessed after such trial." *New York, N.H. & H. R. Co. v. Hungerford, 75 Conn.  [***5]  76, 78-79, 52 A. 487 (1902)*.

At such a proceeding the burden of proof is on the defendant to disprove those allegations of the complaint which he contests.  *Hourigan v. Norwich, 77 Conn. 358, 367-68, 59 A. 487 (1904)*. If the defendant simply claims that he is not liable, he assumes the burden of proving that fact.  *Bernhard v.  [*402]   [**840]  Curtis, 75 Conn. 476, 481, 54 A. 213 (1903)*. If the defendant sustains his burden, the plaintiff is entitled to nominal damages only.  *Cardona v. Valentin, supra, 26*.

In the present case, the defendant's notice of defenses met the requirements of Practice Book § 367.  This being so, the court was correct in allowing the introduction of evidence concerning the issue of liability, despite the earlier entry of a default.

II

The plaintiff further contends that the court erred in concluding that the policy in issue did not provide coverage under the circumstances evident here.  So to hold would require a significant distortion of the essentially agreed upon facts.

At the time this action arose, the plaintiff owned two automobiles.  A 1969 Pontiac was insured with the Fireman's Fund Insurance Company.  A [***6]  1972 Toyota was insured with the defendant, Aetna Life and Casualty Company.  The principal driver of the Toyota was the plaintiff's minor daughter. Because of her age, the plaintiff paid a higher premium on the Toyota through assignment out of the so-called "risk pool."

On May 3, 1973, the plaintiff's daughter was unable to start the Toyota and borrowed her father's Pontiac to go to work.  On the way home she was involved in an accident which injured a passenger in the car.

The passenger thereafter instituted suit against the plaintiff and his daughter. Fireman's Fund Insurance Company, the carrier insuring the Pontiac, defended the action and ultimately paid their policy limits of $ 25,000 on a $ 33,000 judgment.  In  [*403]  the interim, the plaintiff made demand upon the defendant to appear for him in the action and to defend him with respect to any exposure above the $ 25,000 Fireman's Fund policy limits.  This the defendant declined to do.

The plaintiff contends that the Pontiac is covered under the provisions of the Aetna policy as a "temporary substitute automobile." This policy does contain such a provision.  The terms are very explicit, however, that a "temporary [***7]  substitute automobile" does *not* include a vehicle owned by the named insured. The plaintiff responds that his daughter had physical possession of the Toyota; that it was maintained for her use; that an extra insurance premium was paid in consideration of her use of the car; and, therefore, that she was the "owner." Since the Pontiac which was used in place of the Toyota was not owned by the daughter, the plaintiff argues that it was, therefore, a "temporary substitute automobile" within the meaning of the Aetna policy, and, thus, that it was entitled to coverage.

The plaintiff testified that he was the owner of both automobiles.  The Aetna policy listed the plaintiff as the "Named Insured" and the 1972 Toyota as the "Owned Automobile." The trial court concluded in its memorandum of decision that the plaintiff was the registered owner of the 1972 Toyota.  Ownership of this vehicle was a factual consideration to be determined by the trier.  It is evident that the court's conclusion on this matter is amply supported by the evidence, and is legally and logically consistent with the facts found.  The judgment must therefore stand.  *Lewis v. Lewis, 162 Conn. 476, 480, 294 [***8]  A.2d 637 (1972)*.

**EXHIBIT 43**                                                                                          EXHIBIT 16

De Blasio v. Aetna Life & Casualty Co., 186 Conn. 398

 **[\*404]**  Since the 1972 Toyota was owned by the plaintiff, the substitution of his 1969 Pontiac did not cause the Pontiac to become a "temporary substitute automobile" within the meaning of the Aetna policy as it also was owned by the plaintiff.  This being the case, the court correctly concluded that the policy did not cover the circumstance which has arisen here.

There is no error.

In this opinion the other judges concurred.

---

**End of Document**

298

EXHIBIT 43

EXHIBIT 17

Mckesson v. Doe, 144 S. Ct. 913

# *Mckesson v. Doe*

Supreme Court of the United States

April 15, 2024, Decided

No. 23-373.

**Reporter**

144 S. Ct. 913 *; 218 L. Ed. 2d 442 **; 2024 U.S. LEXIS 1582 ***; 92 U.S.L.W. 3268; 30 Fla. L. Weekly Fed. S 102

DeRay Mckesson, Petitioner v. John Doe.

**Notice:** The pagination of this document is subject to change pending release of the final published version.

**Prior History:  [***1]** ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

*Doe v. McKesson, 71 F.4th 278, 2023 U.S. App. LEXIS 15113, 2023 WL 4044558 (5th Cir. La., June 16, 2023)*

**Judges:** Roberts, Thomas, Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh, Barrett, Jackson.

# Opinion

 **[**442]  [*913]**   Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

**Concur by:** Sotomayor

# Concur

Statement of JUSTICE SOTOMAYOR respecting the denial of certiorari.

Earlier in this case, the Fifth Circuit held that petitioner DeRay Mckesson, the leader of a Black Lives Matter protest in Baton Rouge, Louisiana, could be liable under a negligence theory for serious injuries sustained by a police officer when an unidentified individual attending that protest threw a hard object that hit the officer in the face. *945 F. 3d 818, 828-829 (2019)*. In so holding, the Fifth Circuit rejected Mckesson's argument that the *First Amendment* barred his liability in these circumstances absent a showing of intent to incite violence. *Id., at 832*. Judge Willett dissented, explaining that the majority's theory of "'[n]egligent protest' liability against a protest leader for the violent act of a rogue assailant . . . clash[ed] head-on with constitutional fundamentals." *Id., at 846* (opinion concurring in part and dissenting in part).

This Court vacated the Fifth Circuit's judgment and remanded for certification of the underlying state-law questions to **[***2]** the Louisiana Supreme Court, recognizing that there would be no need to reach the constitutional  **[*914]**  question on which the panel had divided if Louisiana law did not provide for negligence liability in these circumstances. See *Mckesson v. Doe, 592 U. S. 1, 4-6, 141 S. Ct. 48, 208 L. Ed. 2d 158 (2020)* (*per curiam*). The Court explained that "certification would ensure that any conflict in this case between state law and the *First Amendment* is not purely hypothetical." *Id., at 6, 141 S. Ct. 48, 208 L. Ed. 2d 158*.

Page 1 of 2

**EXHIBIT 43**                                                    EXHIBIT 17

Mckesson v. Doe, 144 S. Ct. 913

When the Louisiana Supreme Court took up the question and concluded that state law did allow the claim, the Fifth Circuit once again had to answer the constitutional question. See *71 F. 4th 278, 282 (2023)*. The same divided panel then reaffirmed its prior holding that Mckesson could be liable in negligence to the officer, again rejecting Mckesson's argument that the *First Amendment* precluded the imposition of negligence liability in these circumstances. See *id., at 295-297*. Judge Willett again dissented on this point, arguing that, under this Court's decision in *NAACP v. Claiborne Hardware Co., 458 U. S. 886, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982)*, "a protest leader's simple negligence is far too low a threshold for imposing liability for a third party's violence." *71 F. 4th, at 306* (opinion concurring in part and dissenting in part). A negligence theory of liability for protest leaders, the dissent pointed out, "would have enfeebled America's street-blocking **[***3]** civil rights movement, imposing ruinous financial liability against citizens for exercising core *First Amendment* freedoms." *Id., at 313*.

Less than two weeks after the Fifth Circuit issued its opinion, this Court decided *Counterman v. Colorado, 600 U. S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023)*. In *Counterman*, the Court made clear that the *First Amendment* bars the use of "an objective standard" like negligence for punishing speech, *id., at 78, 79, n. 5, 143 S. Ct. 2106, 216 L. Ed. 2d 775*, **[**443]** and it read *Claiborne* and other incitement cases as "demand[ing] a showing of intent," *600 U. S., at 81, 143 S. Ct. 2106, 216 L. Ed. 2d 775*. The Court explained that "the *First Amendment* precludes punishment [for incitement], whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id., at 76, 143 S. Ct. 2106, 216 L. Ed. 2d 775* (citing *Claiborne, 458 U. S., at 927-929, 102 S. Ct. 3409, 73 L. Ed. 2d 1215*, among other cases). Although the Court determined that a less-demanding recklessness standard was sufficient to punish speech as a "true threat," it emphasized that an objective standard like negligence would violate the *First Amendment*. See *600 U. S., at 82, 143 S. Ct. 2106, 216 L. Ed. 2d 775*.

Mckesson now asks this Court to "grant certiorari and confirm that *Claiborne* forecloses negligent-protest liability." Pet. for Cert. 15. Because this Court may deny certiorari for many reasons, including that the law is not in need of further clarification, its denial today expresses no view about the merits of Mckesson's claim. Although the Fifth Circuit did not have the benefit of this **[***4]** Court's recent decision in *Counterman* when it issued its opinion, the lower courts now do. I expect them to give full and fair consideration to arguments regarding *Counterman*'s impact in any future proceedings in this case.

---

End of Document

300

**EXHIBIT 43**    **EXHIBIT 18**

NAACP v. Claiborne Hardware Co., 458 U.S. 886

# *NAACP v. Claiborne Hardware Co.*

Supreme Court of the United States

March 3, 1982, Argued ; July 2, 1982, Decided

No. 81-202

**Reporter**
458 U.S. 886 *; 102 S. Ct. 3409 **; 73 L. Ed. 2d 1215 ***; 1982 U.S. LEXIS 49 ****; 50 U.S.L.W. 5122

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ET AL. v. CLAIBORNE HARDWARE CO. ET AL.

**Prior History:  [****1]**  CERTIORARI TO THE SUPREME COURT OF MISSISSIPPI.

**Disposition:**  *393 So. 2d 1290*, reversed and remanded.

## Case Summary

**Procedural Posture**
Petitioners, who were participants, organizers, and supporters of a boycott of white merchants in a southern city, which had been organized to demand racial equality and integration, sought review of a judgment of the Supreme Court of Mississippi, which held petitioners liable for damages that arose from the boycott because certain participants had engaged in unlawful conduct.

**Overview**

The appeal arose after 92 petitioners were found liable for all of the economic consequences of a boycott of the businesses of respondents, white merchants in a southern city. The boycott was organized to demand racial equality and integration. Petitioners, participants and supporters of the boycott, were found liable for damages caused by the boycott by the highest court of the state under a common-law tort theory because certain participants in the boycott had engaged in physical force, violence, and intimidation to achieve the desired results. In light of those factors, the state court held the entire boycott unlawful. The United States Supreme Court reversed the judgment on appeal because the majority of petitioners' activities were nonviolent and entitled to the protection of the *First Amendment*. Therefore, only those who took part in the unlawful activity could be held liable and only those losses proximately caused by the unlawful conduct could be recovered. The Court noted that absent a specific intent to further such unlawful conduct, mere association by petitioners with the boycotting group was insufficient to predicate liability.

**Outcome**
The judgment was reversed and remanded because the majority of petitioners and their activities had been nonviolent and entitled to constitutional protection. The Court held that only those who took part in the unlawful activity could be held liable and only those losses proximately caused by the unlawful conduct could be recovered.

## Syllabus

In 1966, a boycott of white merchants in Claiborne County, Miss., was launched at a meeting of a local branch of the National Association for the Advancement of Colored People (NAACP) attended by several hundred black persons. The purpose of the boycott was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice.  The boycott was largely supported by speeches encouraging nonparticipants to join

**EXHIBIT 43**                                                          **EXHIBIT  18**

NAACP v. Claiborne Hardware Co., 458 U.S. 886

the common cause and by nonviolent picketing, but some acts and threats of violence did occur.  In 1969, respondent white merchants filed suit in Mississippi Chancery Court for injunctive relief and damages against petitioners (the NAACP, the Mississippi Action for Progress, and **[****2]**  a number of individuals who had participated in the boycott, including Charles Evers, the field secretary of the NAACP in Mississippi and a principal organizer of the boycott). Holding petitioners jointly and severally liable for all of respondents' lost earnings during a 7-year period from 1966 to the end of 1972 on three separate conspiracy theories, including the tort of malicious interference with respondents' businesses, the Chancery Court imposed damages liability and issued a permanent injunction. The Mississippi Supreme Court rejected two theories of liability but upheld the imposition of liability on the basis of the common-law tort theory.  Based on evidence that fear of reprisals caused some black citizens to withhold their patronage from respondents' businesses, the court held that the entire boycott was unlawful and affirmed petitioners' liability for all damages "resulting from the boycott" on the ground that petitioners had *agreed* to use force, violence, and "threats" to effectuate the boycott.

*Held*:

1. The nonviolent elements of petitioners' activities are entitled to the protection of the *First Amendment*. Pp. 907-915.

(a) Through exercise of their *First [****3]  Amendment* rights of speech, assembly, association, and petition, rather than through riot or revolution, petitioners sought to bring about political, social, and economic change.  Pp. 907-912.

(b) While States have broad power to regulate economic activities, there is no comparable right to prohibit peaceful political activity such as that found in the boycott in this case.  Pp. 912-915.

2. Petitioners are not liable in damages for the consequences of their nonviolent, protected activity.  Pp. 915-920.

(a) While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity; only those losses proximately caused by the unlawful conduct may be recovered.  Pp. 915-918.

(b) Similarly, the *First Amendment* restricts the ability of the State to impose liability on an individual solely because of his association with another.  Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful **[****4]**  goals and that the individual held a specific intent to further those illegal aims.  Pp. 918-920.

3. The award for all damages "resulting from the boycott" cannot be sustained, where the record discloses that all of the respondents' business losses were not proximately caused by violence or threats of violence. Pp. 920-932.

(a) To the extent that the Mississippi Supreme Court's judgment rests on the ground that "many" black citizens were "intimidated" by "threats" of "social ostracism, vilification, and traduction," it is flatly inconsistent with the *First Amendment*. The court's ambiguous findings are inadequate to assure the "precision of regulation" demanded by that Amendment.  Pp. 920-924.

(b) Regular attendance and participation at the meetings of the Claiborne County Branch of the NAACP is an insufficient predicate on which to impose liability on the individual petitioners.  Nor can liability be imposed on such individuals simply because they were either "store watchers" who stood outside the boycotted merchants' stores to record the names of black citizens who patronized the stores or members of a special group of boycott "enforcers." Pp. 924-926.

(c) For similar reasons,  **[****5]**  the judgment against Evers cannot be separately justified, nor can liability be imposed upon him on the basis of speeches that he made, because those speeches did not incite violence or specifically authorize the use of violence. His acts, being insufficient to impose liability on him, may not be used to impose liability on the NAACP, his principal.  Moreover, there is no finding that Evers or any other NAACP member had either actual

**302**

EXHIBIT 43                                                                           EXHIBIT  18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

or apparent authority from the NAACP to commit acts of violence or to threaten violent conduct or that the NAACP ratified unlawful conduct. To impose liability on the NAACP without such a finding would impermissibly burden the rights of political association that are protected by the *First Amendment*. Pp. 926-932.

**Counsel:** Lloyd N. Cutler argued the cause for petitioners.  With him on the briefs were James Robertson, Edward Tynes Hand, William R. Richardson, Jr., John Payton, Thomas I. Atkins, Charles E. Carter, William L. Robinson, and Frank R. Parker.

Grover Rees III argued the cause for respondents.  With him on the briefs were Crane D. Kipp, Christopher J. Walker, and Dixon L. Pyles.  *

 **[****6]**

**Judges:** STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined.  REHNQUIST, J., concurred in the result.  MARSHALL, J., took no part in the consideration or decision of the case.

**Opinion by:** STEVENS

# Opinion

 **[*888]  [***1220]  [**3413]**     JUSTICE STEVENS delivered the opinion of the Court.

The term "concerted action" encompasses unlawful conspiracies and constitutionally protected assemblies. The "looseness and pliability" of legal doctrine applicable to concerted action led Justice Jackson to note that certain joint activities **[***1221]** have a "chameleon-like" character. [1] The boycott of white merchants in Claiborne County, Miss., that gave rise to this litigation had such a character; it included elements of criminality and elements of majesty. Evidence that fear of reprisals caused some black citizens to withhold their patronage from respondents' businesses convinced the Supreme Court of Mississippi that the entire boycott was unlawful and that each of the 92 petitioners was liable for all of its economic consequences.  Evidence that persuasive rhetoric, determination to remedy past injustices,  **[****7]**  and a host of voluntary decisions by free citizens were the critical  **[*889]**  factors in the boycott's success presents us with the question whether the state court's judgment is consistent with the Constitution of the United States.

I

In March 1966, black citizens of Port Gibson, Miss., and other areas of Claiborne County presented white elected officials with a list of particularized demands for racial equality and integration. [2] The complainants did not receive a satisfactory response and, at a local National Association for the Advancement of Colored People (NAACP) meeting at the First Baptist Church, several hundred black persons voted to place a boycott on white merchants in the area. On October 31, 1969, several of the merchants filed suit in state court to recover losses caused by the boycott and

---

* Briefs of amici curiae urging reversal were filed by John Vanderstar, Charles S. Sims, and Phyllis N. Segal for the American Civil Liberties Union et al.; by J. Albert Woll, Laurence Gold, and George Kaufmann for the American Federation of Labor and Congress of Industrial Organizations; and by Paul S. Berger, David Bonderman, Leonard B. Simon, and Nathan Z. Dershowitz for the American Jewish Congress.

[1] See *Krulewitch v. United States, 336 U.S. 440, 447-449* (concurring opinion).

[2] Port Gibson is the county seat and largest municipality in Claiborne County.

EXHIBIT 43     EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

to enjoin future boycott activity.  We recount first the course of that litigation and then consider **[****8]** in more detail the events that gave rise to the merchants' claim for damages.

A

The complaint was filed in the Chancery Court of Hinds County by 17 white merchants. [3] **[****9]** The merchants named two corporations and 146 individuals as defendants: the NAACP, a New York membership corporation; Mississippi Action for Progress (MAP), a Mississippi corporation that implemented **[*890]** the federal "Head Start" program; Aaron Henry, the President of the Mississippi State Conference of the NAACP; Charles Evers, the Field Secretary of the NAACP in Mississippi; and 144 other individuals who had participated in the boycott. [4] The complaint sought injunctive relief and an attachment of property, as well as damages.  Although it alleged that the plaintiffs were suffering irreparable injury from an ongoing conspiracy, no preliminary relief was sought.

**[**3414]** Trial **[***1222]** began before a chancellor in equity on June 11, 1973. [5] **[****11]** The court heard the testimony of 144 witnesses during an 8-month trial.  In August 1976, the chancellor issued an opinion and decree finding that "an overwhelming preponderance of the evidence" established the joint and several liability of **[*891]** 130 of the defendants on three separate conspiracy theories. [6] First, the court held that the defendants were liable for the tort of malicious interference with the plaintiffs' businesses, which did not necessarily require the presence of a conspiracy. [7] **[****12]** Second, the chancellor **[***1223]** found a violation of a state **[*892]** statutory prohibition

---

[3] The affected businesses represented by the merchants included four grocery stores, two hardware stores, a pharmacy, two general variety stores, a laundry, a liquor store, two car dealers, two auto parts stores, and a gas station.  Many of the owners of these boycotted stores were civic leaders in Port Gibson and Claiborne County.  Respondents Allen and Al Batten were aldermen in Port Gibson, Record 15111; Robert Vaughan, part owner and operator of one of the boycotted stores, represented Claiborne County in the Mississippi House of Representatives, *id*., at 15160; respondents Abraham and Hay had served on the school board, *id*., at 14906, 14678; respondent Hudson served on the Claiborne County Democratic Committee, *id*., at 840.

[4] The complaint also named 52 banks as "attachment defendants." The banks answered that the NAACP had $ 16,800 on deposit in Mississippi.

[5] As a result of the plaintiffs' prayer for an attachment in equity, jurisdiction existed in Chancery Court.  The trial judge ruled: "It was incumbent upon this court to hear the case in full once jurisdiction was assumed.  To have heard the portions of this matter sounding in equity, only, and to have transferred the questions of tort liability and damages to the circuit court would have been contrary to the maxim 'equity delights to do complete justice, and not by halves.'" App. to Pet. for Cert. 56b.  The defendants thus were denied a jury trial on the liability issues.  Although the court recognized that it had power to empanel a jury, it declined to exercise its discretion to do so.  *Ibid*.  The Mississippi nonresident attachment statute that provided the basis for equitable jurisdiction has since been declared unconstitutional by both Federal District Courts in Mississippi.  *MPI, Inc.* v. *McCullough, 463 F.Supp. 887 (ND Miss. 1978)*; *Mississippi Chem. Corp*. v. **Chemical Constr. Corp., 444 F.Supp. 925 (SD Miss. 1977)**.

Commencement of trial was delayed by collateral proceedings in federal court.  See *Henry v. First National Bank of Clarksdale, 50 F.R.D. 251 (ND Miss. 1970)*, rev'd, *444 F.2d 1300 (CA5 1971)*, cert. denied, **405 U.S. 1019**.  The District Court entered a preliminary injunction restraining the state proceedings on the theory that the merchants sought to infringe the defendants' *First Amendment* rights.  The Court of Appeals reversed, holding that the mere commencement of a private tort suit did not itself involve "state action" for purposes of *28 U. S. C. § 1343(3)*.

[6] App. to Pet. for Cert. 2g.  Of the original 148 named defendants, 16 were dismissed by stipulation of counsel (12 had died, 2 were minors, 1 was *non compos mentis*, and 1 -- the Reverend Dominic Cangemi -- was dismissed by agreement without explanation).  One defendant was dismissed because he had been misidentified in the complaint.  The chancellor dismissed one defendant -- state NAACP leader Aaron Henry -- because "the complainants failed to meet the burden of proof as to [his] wrongdoing." *Id*., at 28b.  Thus, except for the defendants dismissed by stipulation or because of misidentification, the plaintiffs prevailed on the merits in the trial court against all but one of the defendants.

[7] Although the bulk of the court's discussion of the defendants' commonlaw tort liability focused on the presence of a civil conspiracy, the chancellor did not appear to hold that a concerted refusal to deal -- without more -- was actionable under the common law of Mississippi.  The court apparently based its first theory of liability on the ground that the "malicious interference by

**EXHIBIT 43**                                                                                    **EXHIBIT 18**

NAACP v. Claiborne Hardware Co., 458 U.S. 886

against secondary boycotts, on the theory that the defendants' primary dispute was with the governing authorities of Port Gibson and Claiborne County and not with the white merchants at whom the boycott was **[**3415]** directed. [8] Third, the court found a violation of **[****10]** Mississippi's antitrust statute, on the ground that the boycott had diverted black patronage from the white merchants to black merchants and to other merchants located out of Claiborne County and thus had unreasonably limited competition between black and white merchants that had traditionally existed. [9] The chancellor specifically rejected the defendants' claim that their conduct was protected by the *First Amendment*. [10]

**[****13] [*893]**    Five of the merchants offered no evidence of business losses. The chancellor found that the remaining 12 had suffered lost business earnings and lost goodwill during a 7-year period from 1966 to 1972 amounting to $ 944,699.  That amount, plus statutory antitrust penalties of $ 6,000 and a $ 300,000 award of attorney's fees, produced a final judgment of $ 1,250,699, plus interest from the date of judgment and costs.  As noted, the chancellor found all but 18 of the original 148 defendants jointly and severally liable for the entire judgment.  The court justified imposing full liability on the national organization of the NAACP on the ground that it had failed to "repudiate" the actions of Charles Evers, its Field Secretary in Mississippi.

**[***1224]**    In addition to imposing damages liability, the chancellor entered a broad permanent injunction. He permanently enjoined petitioners from stationing "store watchers" at the respondents' business premises; from

---

the defendants with the businesses of the complainants as shown by the evidence in this case is tortious *per se*, and this would be true even without the element of conspiracy." *Id*., at 42b (footnote omitted).  In Mississippi, "[either] an individual or a corporation, whether acting in conjunction with others, or not," may be liable in an action for "malicious interference with a trade or calling." *Memphis Laundry-Cleaners v. Lindsey, 192 Miss. 224, 239, 5 So. 2d 227, 232 (1941)*. The chancellor in this case stated that the necessary element of malice is established by proof of "the intentional performance of an act harmful to another without just or lawful cause or excuse." App. to Pet. for Cert. 42b, n. 8.

The repeated references to the presence of a conspiracy might be explained by the court's finding that each of the defendants -- with the exception of Aaron Henry -- was jointly and severally liable for the plaintiffs' losses.  As noted, an element of the plaintiffs' common-law action was the defendants' intentional performance of an "unprivileged" act harmful to another.  The chancellor stated that the evidence clearly established that "certain defendants" had committed "overt acts which were injurious to the trade and business of complainants." *Id*., at 39b.  The court continued: "Where two or more persons conspire together, the conspiracy makes the wrongful act of each person the joint acts of them all," *id*., at 41b; "[it] follows that each act done in pursuance of the conspiracy by one of several conspirators is, in contemplation of the law, an act for which each is jointly and severally liable." *Ibid*.  Thus, the presence of a conspiracy rendered all of the "conspirators" liable for the wrongful acts of any member of that conspiracy.

[8] See *Miss. Code Ann. § 97-23-85* (1972).  The chancellor found: "The testimony in the case at bar clearly shows that the principal objective of the boycott was to force the white merchants of Port Gibson and Claiborne County to bring pressure upon governing authorities to grant defendants' demands or, in the alternative, to suffer economic ruin." App. to Pet. for Cert. 51b.  As noted, however, many of the merchants themselves were civic leaders. See n. 3, *supra*.

[9] See *Miss. Code Ann. § 75-21-9* (1972).  The court made clear that under this theory intentional participation in the concerted action rendered each defendant directly liable for all resulting damages.  "As a legal principle, it is sufficient to show that the concert of action on the part of the defendants was deliberately invited, and that the defendants gave their adherence to the scheme and participated in it." App. to Pet. for Cert. 54b.  The same was true of the court's secondary boycott theory; "since an illegal boycott is an invasion of a property right, the members of the boycotting combination are liable for the resulting damages." *Id*., at 53b.

[10] In its discussion of the secondary boycott statute, the court rejected an argument that the statute was unconstitutional under the *First* and *Fourteenth Amendments*.  Noting as a "basic premise" that "secondary boycotts are unlawful under both United States and Mississippi law," the court stated that "conduct and communication which are illegal are not protected by the constitutional provisions relating to freedom of speech." *Id*., at 46b.  In imposing liability under the state restraint of trade statute, the chancellor added: "After a careful consideration of the constitutional claims of defendants, the Court finds that none of the acts or conduct of defendants was shielded or protected by the Constitution of the United States or the Constitution of the State of Mississippi." *Id*., at 55b-56b.  Finally, in assessing damages, the court stated: "Defendants base their defense on the concept that the right to boycott and inflict losses on complainants was a legally protected right afforded them under the laws and Constitution of the United States.  This Court has hereinbefore found that the conduct of the defendants was unlawful and unprotected." *Id*., at 62b.

EXHIBIT 43                                                          EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

"persuading" any person to withhold his patronage from respondents; from "using demeaning and obscene language to or about any person" because that person continued to patronize the respondents; from "picketing or patrolling" **[****14]** the premises of any of the respondents; and from using violence against any person or inflicting damage to any real or personal property. [11]

 **[*894]**  In December 1980, the Mississippi Supreme Court reversed significant portions of the trial court's judgment. *393 So. 2d 1290*. It held that the secondary boycott statute was inapplicable because it had not been enacted until "the boycott had been in **[**3416]** operation for upward of two years." [12] The court declined to rely on the restraint of trade statute, noting that **[****15]** the "United States Supreme Court has seen fit to hold boycotts to achieve political ends are not a violation of the Sherman Act, *15 U. S. C. § 1 (1970)*, after which our statute is patterned." [13] Thus, the court rejected two theories of liability that were consistent with a totally voluntary and nonviolent withholding of patronage from the white merchants.

The Mississippi Supreme Court upheld the imposition of liability, however, on the basis of the chancellor's common-law tort theory.  After reviewing the chancellor's recitation of the facts, the court quoted the following finding made by the trial court:

"In carrying out the agreement and design, certain of the defendants, acting for all others, engaged in acts of physical force and violence against the persons and property of certain customers and prospective customers.  **[****16]** Intimidation, threats, social ostracism, vilification, and traduction were some of the devices used by the defendants to achieve the desired results.  Most effective, also, was the stationing of guards ('enforcers,' 'deacons,' or 'black hats') in the vicinity of white-owned businesses.  Unquestionably, the evidence shows that the volition of many black persons was overcome out of sheer fear, and they were forced and compelled against their personal wills to withhold their trade and business intercourse **[*895]** from the complainants." App. to Pet. for Cert. 39b (quoted *393 So. 2d, at 1300*).

On the basis of this finding, the court concluded that the entire boycott was unlawful.  "If any of these factors -- force, violence, or threats -- is present, then the boycott is illegal regardless of whether it is primary, secondary, economical, political, social or other." [14] In a brief passage, **[***1225]** the court rejected petitioners' reliance on the *First Amendment*:

"The agreed use of illegal force, violence, and threats against the peace to achieve a goal makes the present state of facts a conspiracy. We know of no instance, and our attention has been drawn **[****17]** to no decision, wherein it has been adjudicated that free speech guaranteed by the *First Amendment* includes in its protection the right to commit crime." *Id., at 1301*.

---

[11] *Id.*, at 19g.  Following the entry of judgment, the defendants moved for relief from Mississippi's 125-percent supersedeas bonding requirement.  Although the Mississippi Supreme Court denied the motion, a federal court enjoined execution of the Chancery Court judgment pending appeal. *Henry v. First National Bank of Clarksdale, 424 F.Supp. 633 (ND Miss. 1976)*, aff'd, *595 F.2d 291 (CA5 1979)*, cert. denied, **444 U.S. 1074**.

[12] *393 So. 2d, at 1300*.

[13] *Id., at 1301*.

[14] *Ibid*.

**EXHIBIT 43**                                                                                    EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

The theory of the Mississippi Supreme Court, then, was that petitioners had *agreed* to use force, violence, and "threats" to effectuate the boycott. [15] To the trial court, such a finding had not been necessary. [16]

 **[****18]** Although the Mississippi Supreme Court affirmed the chancellor's basic finding of liability, the court held that respondents **[*896]** "did not establish their case" with respect to 38 of the defendants. [17] The court found that MAP was a victim, rather than a willing participant, in the conspiracy and dismissed -- without further explanation -- 37 individual defendants for lack of proof.  Finally, the court ruled that certain damages had been improperly awarded and that other damages had been inadequately proved.  **[**3417]** The court remanded for further proceedings on the computation of damages. [18]

 **[****19]** We granted a petition for certiorari.  *454 U.S. 1030*. At oral argument, a question arose concerning the factual basis for the judgment of the Mississippi Supreme Court.  As noted, that court affirmed petitioners' liability for damages on the ground that each of the petitioners had agreed to effectuate the boycott through force, violence, and threats.  Such a finding was not necessary to the trial court's imposition of liability and neither state court had identified the evidence actually linking the petitioners to such an agreement.  In response to a request from this Court, respondents filed a supplemental brief "specifying the acts committed by each of the petitioners giving rise to liability for damages." Supplemental Brief for Respondents 1.  That brief helpfully places the petitioners in different categories; we accept respondents' framework for analysis and identify these classes as a preface to our review of the relevant incidents that occurred **[***1226]** during the 7-year period for which damages were assessed.  [19]

 **[****20] [*897]**   First, respondents contend that liability is justified by evidence of participation in the "management" of the boycott. [20] **[****21]** Respondents identify two groups of persons who may be found liable as "managers": 79 individuals who regularly attended Tuesday night meetings of the NAACP at the First Baptist Church; and 11 persons who took "leadership roles" at those meetings. [21]

---

[15] The court did not specifically identify the evidence linking any of the defendants to such an agreement.

[16] As noted, liability under the secondary boycott and restraint of trade statutes could be found on the basis of an entirely voluntary and nonviolent agreement to withhold patronage.  See n. 9, *supra*.  It is not clear whether -- in its imposition of tort liability -- the trial court rested on a theory similar to that ultimately advanced by the Mississippi Supreme Court.  In finding an unlawful civil conspiracy -- which rendered each conspirator liable for the actions of others, see n. 7, *supra* -- the chancellor arguably believed that it was necessary to connect all defendants to an agreement to use force or violence to effectuate the conspiracy. See App. to Pet. for Cert. 40b-41b.  The chancellor made no factual finding, however, that such an agreement existed.

[17] *393 So. 2d, at 1302*.

[18] Concerning the permanent injunction entered by the chancellor, the court stated: "Although the granting of injunction has been assigned as error, the error has not been argued, and NAACP, et al. say, at the conclusion of their brief '. . . the injunctive aspects of the case are now moot. . . .'" *Id., at 1293*. Despite this finding, the court did not vacate the injunction.

[19] Respondents acknowledge that "[the] basis on which the Mississippi Supreme Court held that petitioners were liable for damages was 'the agreed use of illegal force, violence and threats.'" Supplemental Brief for Respondents 1-2.

[20] Respondents argue that anyone "who participates in the decisionmaking functions of an enterprise, with full knowledge of the tactics by which the enterprise is being conducted, manifests his assent to those tactics. . . ." *Id*., at 2.  Respondents thus would impose liability for the managers' *failure* to act; respondents argue that, despite evidence that boycott "enforcers" caused fear of injury to persons and property, "they were not taken from their posts and replaced by a system of voluntary compliance; there is no evidence that any of the petitioners even admonished them for their enforcement methods; the successful system of paramilitary enforcers on the streets and 'rhetorical' threats of violence by boycott leaders was left in place for the duration." *Id*., at 5.

[21] These groups are not meant to be exclusive.

**EXHIBIT 43**                                                                 EXHIBIT  18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

Second, respondents contend that liability is justified by evidence that an individual acted as a boycott "enforcer." [22] In this category, respondents identify 22 persons as members of the "Black Hats" -- a special group organized during the boycott -- and 19 individuals who were simply "store watchers."

Third, respondents argue that those petitioners "who themselves engaged in violent acts **[****22]** or who threatened violence have provided the best possible evidence that they wanted the boycott to succeed by coercion whenever it could not succeed by persuasion." *Id*., at 10.  They identify 16 individuals  **[*898]** for whom there is direct evidence of participation in what respondents characterize as violent acts or threats of violence.

Fourth, respondents contend that Charles Evers may be held liable because he "threatened violence on a number of occasions against boycott breakers." *Id*., at 13.  Like the chancellor, respondents would impose liability on the national NAACP because Evers "was acting in his capacity as Field Secretary of the NAACP when he committed these tortious and constitutionally unprotected acts." *Ibid*.

 **[**3418]**  Finally, respondents state that they are "unable to determine on what record evidence the state courts relied in finding liability on the part of seven of the petitioners." *Id*., at 16.  With these allegations of wrongdoing in mind, we turn to consider the factual events that gave rise to this controversy.

B

The chancellor held petitioners liable  **[***1227]**  for all of respondents' lost earnings during a 7-year period from 1966 **[****23]** to December 31, 1972.  We first review chronologically the principal events that occurred during that period, describe some features of the boycott that are not in dispute, and then identify the most significant evidence of violent activity.

In late 1965 or early 1966, Charles Evers, the Field Secretary of the NAACP, helped organize the Claiborne County Branch of the NAACP.  The pastor of the First Baptist Church, James Dorsey, was elected president of the Branch; regular meetings were conducted each Tuesday evening at the church.  At about the same time, a group of black citizens formed a Human Relations Committee and presented a petition for redress of grievances to civic and business leaders of the white community.  In response, a biracial committee -- including five of the petitioners and several of the respondents -- was organized and held a series of unproductive meetings.

The black members of the committee then prepared a further petition entitled "Demands for Racial Justice." This petition  **[*899]** was presented for approval at the local NAACP meeting conducted on the first Tuesday evening in March.  As described by the chancellor, "the approximately 500 people present **[****24]** voted their approval unanimously." [23]  On March 14, 1966, the petition was presented to public officials of Port Gibson and Claiborne County.

The petition included 19 specific demands.  It called for the desegregation of all public schools and public facilities, the hiring of black policemen, public improvements in black residential areas, selection of blacks for jury duty, integration of bus stations so that blacks could use all facilities, and an end to verbal abuse by law enforcement officers.  It stated that "Negroes are not to be addressed by terms as 'boy,' 'girl,' 'shine,' 'uncle,' or any other offensive term, but as 'Mr.,' 'Mrs.,' or 'Miss,' as is the case with other citizens." [24]  As described by the chancellor, the purpose

---

[22] "Once the pattern had been established -- warnings to prospective customers, destruction of goods purchased at boycotted stores, public displays of weapons and of military discipline, denunciation of names gathered by the store-watchers, and subsequent violence against the persons and property of boycott breakers -- store-watching in Port Gibson became the sort of activity from which a court could reasonably infer an intention to frighten people away from the stores." *Id*., at 8.

[23] App. to Pet. for Cert. 15b.

[24] *Id*., at 10b.

EXHIBIT 43                                                                EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

of the demands "was to gain equal rights and opportunities for Negro citizens." [25] The petition further provided that black leaders hoped it would not be necessary to resort to the "selective buying campaigns" that had been used in other communities. [****25] [26] [****26] On March 23, two demands that had been omitted [*900] from the original petition were added, one of which provided: "All [***1228] stores must employ Negro clerks and cashiers." [27] This supplemental petition stated that a response was expected by April 1.

A favorable response was not received. On April 1, 1966, the Claiborne County [**3419] NAACP conducted another meeting at the First Baptist Church. As described by the chancellor:

"Several hundred black people attended the meeting, and the purpose was to decide what action should be taken relative to the twenty-one demands. Speeches were made by Evers and others, and a vote was taken. It was the unanimous vote of those present, without dissent, to place a boycott on the white merchants of Port Gibson and Claiborne County." App. to Pet. for Cert. 15b.

The boycott was underway. [28]

 [****27] In September 1966, Mississippi Action for Progress, Inc. (MAP), was organized to develop community action programs in 20 counties of Mississippi. One of MAP's programs -- known as Head Start -- involved the use of federal funds to provide food for young children. Originally, food purchases in Claiborne County were made alternately from white-owned and black-owned stores, but in February 1967 the directors [*901] of MAP authorized their Claiborne County representatives to purchase food only from black-owned stores. Since MAP bought substantial quantities of food, the consequences of this decision were significant. A large portion of the trial was devoted to the question whether MAP participated in the boycott voluntarily and -- under the chancellor's theories of liability -- could be held liable for the resulting damages. The chancellor found MAP a willing participant, noting that "during the course of the trial, the only Head Start cooks called to the witness stand testified that they refused to go into white-owned stores to purchase groceries for the children in the program *for the reason that they were in favor of the boycott and wanted to honor it*." [29]

---

[25] *Id*., at 12b.

[26] The petition stated:

"We hope it will not be necessary to resort to the kind of peaceful demonstrations and selective buying campaigns which have had to be used in other communities. It takes manpower, time and energy which could be better directed at solving these problems which exist in Port Gibson and Claiborne County by mutual cooperation and efforts at tolerant understanding.

"No one likes to have to resort to picketing and other kinds of demonstration -- just as no one likes to be the target of this kind of demonstration. But this sort of thing is inevitable unless there can be real progress toward giving all citizens their equal rights. There seems sometimes to be no other alternative.

"Objectives of Negro citizens of Port Gibson and Claiborne County are, simply put, to have equality of opportunity, in every aspect of life, and to end the white supremacy which has pervaded community life. This implies many long-range objectives such as participation in decision-making at every level of community, civic, business and political affairs." *Id*., at 9b.

[27] *Id*., at 13b.

[28] Although Evers' speech on April 1, 1966, was not recorded, the chancellor found: "Evers told his audience that they would be watched and that blacks who traded with white merchants would be *answerable to him*. According to Sheriff Dan McKay, who was present during the speech, Evers told the assembled black people that any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people. Evers' remarks were directed to all 8,000-plus black residents of Claiborne County, and not merely the relatively few members of the Claiborne NAACP." *Id*., at 17b-18b (footnote omitted).

[29] *Id*., at 22b (emphasis in original). The chancellor also noted that MAP's Board of Directors "did not seek help from local law-enforcement officers, nor did they complain to United States authorities for protection of their cooks from possible reprisals arising from trade with the white merchants"; and that "MAP employees in Claiborne County continued to take an active part in the NAACP

NAACP v. Claiborne Hardware Co., 458 U.S. 886

**[****28]** Several events occurred during the boycott that had a strong effect on boycott activity.  On February 1, 1967, Port Gibson employed its first black policeman.  During that month, the boycott was lifted on a number of merchants. On April 4, 1968, Dr. Martin Luther King, Jr., was assassinated in Memphis.  The chancellor found that this tragic event had a  **[***1229]**  depressing effect on the black community and, as a result, the boycott "tightened." [30]

**[****29] [*902]**   One event that occurred during the boycott is of particular significance.  On April 18, 1969, a young black man named Roosevelt Jackson was shot and killed during an encounter with two Port Gibson police officers. [31] Large crowds immediately gathered, first at the hospital and later at the church.  Tension in the community neared a breaking point.  The local police requested  **[**3420]**  reinforcements from the State Highway Patrol and sporadic acts of violence ensued.  The Mayor and Board of Aldermen placed a dawn-to-dusk curfew into effect.

On April 19, Charles Evers spoke to a group assembled at the First Baptist Church and led a march to the courthouse where he demanded the discharge of the entire Port Gibson Police Force.  When this demand was refused, the boycott was reimposed on all white merchants. One of Evers' speeches on this **[****30]**  date was recorded by the police.  In that speech -- significant portions of which are reproduced in an Appendix to this opinion -- Evers stated that boycott violators would be "disciplined" by their own people and warned that the Sheriff could not sleep with boycott violators at night.

On April 20, Aaron Henry came to Port Gibson, spoke to a large gathering, urged moderation, and joined local leaders in a protest march and a telegram sent to the Attorney General of the United States.  On April 21, Evers gave another speech to several hundred people, in which he again called for a discharge of the police force and for a total boycott of all white-owned businesses in Claiborne County.  Although this speech was not recorded, the chancellor found that Evers stated: "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." [32]

As noted, this lawsuit was filed in October 1969.  No significant events concerning the boycott occurred after that **[*903] [****31]** time.  The chancellor identified no incident of violence that occurred after the suit was brought.  He did identify, however, several significant incidents of boycott-related violence that occurred some years earlier.

Before describing that evidence, it is appropriate to note that certain practices generally used to encourage support for the boycott were uniformly peaceful and orderly.  The few marches associated with the boycott were carefully controlled by black leaders. Pickets used to advertise the boycott were often small children.  The police made no arrests -- and no complaints are recorded -- in connection with the picketing and occasional demonstrations supporting **[***1230]**  the boycott. Such activity was fairly irregular, occurred primarily on weekends, and apparently was largely discontinued around the time the lawsuit was filed. [33]

---

activities and to support the boycott by picketing and marching." *Id*., at 23b.  The Mississippi Supreme Court rejected the chancellor's findings and concluded that MAP was not a willing participant in the boycott, thus absolving it from liability.

[30] *Id*., at 25b.  One of the respondents awarded the most in damages, Barbara Ellis -- a partner in Ellis Variety Store -- testified that the store was boycotted from April 1, 1966, until January 27, 1967.  On the latter date, the store agreed -- apparently at the urging of a biracial committee -- to hire a black cashier.  Record 1183.  The boycott was reimposed on April 17, 1968, after the death of Martin Luther King, Jr., but again was lifted on May 1, 1968.  *Id*., at 1184.  The boycott finally was reimposed on April 19, 1969, the day following the shooting of Roosevelt Jackson.  *Ibid*.

[31] The officers had gone to Jackson's home to arrest him.  A scuffle ensued and Jackson was shot by a white officer allegedly while being held by a black officer.

[32] App. to Pet. for Cert. 27b.

[33] Record 1146.  The Sheriff of Claiborne County testified: "There were pickets off and on from April, 1966 to 1970." ***Id., at 1060***.  When asked to describe "how they conducted themselves, what they did, what they went about doing," he stated: "Most of them carried or either had signs on their shoulders and they walked up and down the streets in front of the stores.  They wouldn't always picket the same stores at the same time.  At different times they might picket M&M then they would move up and picket Claiborne Hardware down Market Street to other businesses.  Most of the time it was teenagers and at the last it was little bitty fellows, as

EXHIBIT 43                                                                    EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

 [****32]  One form of "discipline" of black persons who violated the boycott appears to have been employed with some regularity.  Individuals stood outside of boycotted stores and identified those who traded with the merchants.  Some of these "store watchers" were members of a group known as the "Black Hats" or the "Deacons." [34] [****33]  The names of persons who violated  [*904]  the boycott were read at meetings of the Claiborne County NAACP and published in a mimeographed  [**3421]  paper entitled the "Black Times." As stated by the chancellor, those persons "were branded as traitors to the black cause, called demeaning names, and socially ostracized for merely trading with whites." [35]

The chancellor also concluded that a quite different form of discipline had been used against certain violators of the boycott. He specifically identified 10 incidents that "strikingly" revealed the "atmosphere of fear that prevailed among blacks from 1966 until 1970." [36]  The testimony concerning four incidents convincingly demonstrates that they occurred because the victims were ignoring the boycott. In two cases, shots were fired at a house; in a third, a brick was thrown through a windshield; in the fourth, a flower garden was damaged.  None of these four victims, however, ceased trading with white merchants. [37]

 [****34]  [*905]   The  [***1231]  evidence concerning four other incidents is less clear, but again it indicates that an unlawful form of discipline was applied to certain boycott violators.  In April 1966, a black couple named Cox asked for a police escort to go into a white-owned dry cleaner and, a week later, shots were fired into their home.  In another incident, an NAACP member took a bottle of whiskey from a black man who had purchased it in a white-owned store.  The third incident involved a fight between a commercial fisherman who did not observe the boycott and four men

---

young as about six years old.  That was '69 and '70." *Ibid*.  The Sheriff also testified that the boycott was "tight" in April 1966, April 1968, and April 1969.  *Id., at 1152*.

[34] Evidence concerning the aims and practices of the "Black Hats" is contradictory.  Respondents describe them as a "paramilitary organization." Petitioner Elmo Scott, a member of the group, testified concerning instructions that were given to him: "It was given to the Deacons to give respect to the people that was on the street and, regardless of what they say back to you, for you not to use bad language to them or not to curse them or no kind of way, just talk to them in the right manner of way." *Id*., at 2985.  It is undisputed that the "Black Hats" were formed during the boycott, that members of the organization engaged in "store watching" and other "enforcement" activities, and that some individuals who belonged to the group committed acts of violence.

[35] App. to Pet. for Cert. 19b.

[36] *Id*., at 35b.

[37] On August 22, 1966, birdshot was fired into the home of James Gilmore, a black man who ignored the boycott. He immediately grabbed a shotgun, leapt into his car, pursued the vehicle from which he believed the shots had come, forced it to the side of the road, and apprehended three young black men who were active supporters of the boycott. They were indicted, tried, and convicted, but the convictions were set aside on appeal. *Whitney v. State, 205 So. 2d 284 (Miss. 1967)*. Gilmore continued to patronize white merchants after the incident.

In June 1966, while Murriel Cullens was having a beer in Wolf's Store, a brick was thrown through the windshield of his parked car.  He had been patronizing white merchants and continued to do so thereafter.  Record 14049.  In November 1966, shotgun pellets were fired into the wall of his mother's home.  She had received a number of threatening telephone calls criticizing her for patronizing white stores.  She continued to do so after the incident.  *Id*., at 14003.  At trial, Laura Cullens testified, in response to a question whether she had been scared: "No indeed.  I haven't had a bone in me scared in my life from nobody.  And I have always told them, they say, 'You're just an uncle tom.' And I say, 'Well, uncle tom can be blue, black, green or purple or white.  If I feel I am in the right, I stand in that right and nobody tells me what to do.'" *Id*., at 14017.

James Bailey, who was a teenager at the time of the incident, testified that he had noticed that an elderly black lady named Willie Butler traded with a white merchant and had groceries delivered to her home.  He testified that he destroyed flowers in her garden to punish her for violating the boycott.  *Id*., at 3656.  He stated that he acted on his own initiative and that Mrs. Butler continued to trade with the merchant.  *Id*., at 3660, 3741.

311

EXHIBIT 43                                                    EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

who "grabbed me and beat me up and took a gun off me." [38] In a fourth incident, described only in hearsay testimony, a group of young blacks apparently pulled down the overalls of an elderly brick mason known as "Preacher White" and spanked him for not observing the boycott. [39]

[****35]  Two other incidents discussed by the chancellor are of less certain significance.  Jasper Coleman testified that he participated  [*906]  in an all-night poker game at a friend's house on Christmas Eve 1966.  The following morning he discovered that all four tires of his pickup truck had been slashed  [**3422]  with a knife.  Coleman testified that he did not participate in the boycott but was never threatened for refusing to do so.  Record 13791.  Finally, Willie Myles testified that he and his wife received a threatening phone call and that a boy on a barge told him that he would be whipped for buying his gas at the wrong place.

Five of these incidents occurred in 1966.  The other five are not dated.  The chancellor thus did not find that any act of violence occurred after 1966. [40] [****36]  In particular, he made no reference to any act of violence or threat of violence -- with the exception,  [***1232]  of course, of Charles Evers' speeches -- after the shootings of Martin Luther King, Jr., in 1968 or Roosevelt Jackson in 1969.  The chancellor did not find that any of the incidents of violence was discussed at the Tuesday evening meetings of the NAACP. [41]

II

[1][2A]This Court's jurisdiction to review the judgment of the Mississippi Supreme Court is, of course, limited to the federal  [*907]  questions necessarily decided by that court. [42]  We consider first whether petitioners' activities are protected in any respect by the Federal Constitution and, if they are, what effect such protection has on a lawsuit of this nature.

[2B]

[****37]  A

---

[38] *Id*., at 13868.  One of his assailants testified that the incident resulted from an automobile accident, rather than the boycott. *Id*., at 3656.

[39] "Preacher White" had died by the time of trial.  No witness admitted being present at what respondents' counsel characterized as "the spanking of Preacher White." *Id*., at 3696.  The Port Gibson Chief of Police testified, however, that White had come in and complained that a group of young blacks had pulled his overalls down and whipped him.  *Id*., at 2176.  In describing this incident, the chancellor stated that Preacher White "was stripped of his clothing and whipped by a group of young blacks because he refused to honor the boycott." App. to Pet. for Cert. 37b.

[40] In describing the "atmosphere of fear" existing during the boycott, the chancellor emphasized the participation of petitioner Rudy Shields.  He stated:

"Defendant Rudolph J. (Rudy) Shields, formerly of Chicago, was the principal figure in several altercations.  He boasted that he was 'the most jailed person in the Claiborne County boycott.' This man was the acknowledged leader of the 'Deacons.'" *Id*., at 35b.

See also Supplemental Brief for Respondents 10-13.  The record indicates that Shields was in Port Gibson for approximately eight months during 1966.  Record 4993.

[41] The chancellor did find -- and apparently believed this fact to be significant -- that the NAACP provided attorneys to black persons arrested in connection with acts arising from the boycott. App. to Pet. for Cert. 38b.  The NAACP provided legal representation to the three black persons arrested in August 1966 following the Gilmore shooting.

[42] Although the Mississippi Supreme Court remanded for a recomputation of damages, its judgment is final for purposes of our jurisdiction.  See *Cox Broadcasting Corp.* v. *Cohn, 420 U.S. 469, 480*.

EXHIBIT 43                                                            EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

The boycott of white merchants at issue in this case took many forms.  The boycott was launched at a meeting of a local branch of the NAACP attended by several hundred persons.  Its acknowledged purpose was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice.  The boycott was supported by speeches and nonviolent picketing. Participants repeatedly encouraged others to join in its cause.

 [3A]Each of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the *First* and *Fourteenth Amendments*. [43] The black citizens named as defendants in this action banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect.  As we so recently acknowledged in *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 294*, "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." We recognized [****38]  that "by collective effort individuals can make their views known, when, individually, their voices would be faint [*908] or lost." *Ibid*.  In emphasizing [**3423] "the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues," *id., at 295*, we noted the words of Justice Harlan, writing for the Court in *NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460*:

"Effective advocacy of both public and private points of view, particularly controversial ones, is [***1233] undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly."

THE CHIEF JUSTICE stated for the Court in *Citizens Against Rent Control*: "There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." *454 U.S., at 296*.

 [3B]

 [****39]  [4]The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.  In *De Jonge v. Oregon, 299 U.S. 353*, the Court unanimously held that an individual could not be penalized simply for assisting in the conduct of an otherwise lawful meeting held under the auspices of the Communist Party, an organization that advocated "criminal syndicalism." After reviewing the rights of citizens "to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances," *id., at 364*, Chief Justice Hughes, writing for the Court, stated:

"It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime.  The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded [****40] as criminals on that score.  The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices [*909]  under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects.  If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against

---

[43] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *U.S. Const., Amdt. 1*.  *First Amendment* freedoms are protected by the *Fourteenth Amendment* from invasion by the States.  *Edwards v. South Carolina, 372 U.S. 229, 235*.

EXHIBIT 43   EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge." *Id., at 365*.

Of course, the petitioners in this case did more than assemble peaceably and discuss among themselves their grievances against governmental and business policy. Other elements of the boycott, however, also involved activities ordinarily safeguarded by the *First Amendment*. In *Thornhill v. Alabama, 310 U.S. 88*, the Court held that **[****41]** peaceful picketing was entitled to constitutional protection, even though, in that case, the purpose of the picketing "was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." *Id., at 99*. Cf. *Chauffeurs v. Newell, 356 U.S. 341*. In *Edwards v. South Carolina, 372 U.S. 229*, we held that a peaceful march and demonstration was protected by the rights of free **[***1234]** speech, free assembly, and freedom to petition for a redress of grievances.

 [5]Speech itself also was used to further the aims of the boycott. Nonparticipants repeatedly were urged to join the common cause, both through public address and through personal solicitation. These elements of the boycott involve speech in its most direct form. In addition, **[**3424]** names of boycott violators were read aloud **[****42]** at meetings at the First Baptist Church and published in a local black newspaper. Petitioners admittedly sought to persuade others to join the boycott **[*910]** through social pressure and the "threat" of social ostracism. Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action. As Justice Rutledge, in describing the protection afforded by the *First Amendment*, explained:

"It extends to more than abstract discussion, unrelated to action. The *First Amendment* is a charter for government, not for an institution of learning. 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas v. Collins, 323 U.S. 516, 537*.

In *Organization for a Better Austin v. Keefe, 402 U.S. 415*, the Court considered the validity of a prior restraint on speech that invaded the "privacy" of the respondent. Petitioner, a racially integrated community organization, charged that respondent, a real estate broker, had engaged in tactics known as **[****43]** "blockbusting" or "panic peddling." [44] **[****45]** Petitioner asked respondent to sign an agreement that he would not solicit property in their community. When he refused, petitioner distributed leaflets near respondent's home that were critical of his business practices. [45] A state court enjoined petitioner from distributing the leaflets; an appellate court affirmed on the ground that the alleged activities were coercive and intimidating, rather than informative, and therefore not entitled to *First Amendment* protection. *Id., at 418*. This Court reversed. THE CHIEF JUSTICE explained:

"This Court has often recognized that the activity of peaceful pamphleteering is a form of communication protected **[*911]** by the *First Amendment*. E. g., *Martin v. City of Struthers, 319 U.S. 141 (1943)*; *Schneider v. State, 308 U.S. 147 (1939)*; *Lovell v. Griffin, 303 U.S. 444 (1938)*. In sustaining the injunction, however, the Appellate Court was apparently of the view that petitioners' purpose in distributing their literature was **[****44]** not to inform the public, but to 'force' respondent to sign a no-solicitation agreement. The claim that the expressions **[***1235]** were intended to exercise a coercive impact on respondent does not remove them from the reach of the *First Amendment*.

---

[44] Specifically, petitioner contended that respondent "aroused the fears of the local white residents that Negroes were coming into the area and then, exploiting the reactions and emotions so aroused, was able to secure listings and sell homes to Negroes." *402 U.S., at 416*.

[45] One of petitioner's officers testified at trial that he had hoped that respondent would be induced to sign the no-solicitation agreement by letting "his neighbors know what he was doing to us." *Id., at 417*.

Page 14 of 29

EXHIBIT 43  EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. See *Schneider v. State, supra; Thornhill v. Alabama, 310 U.S. 88 (1940)*. Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability." *Id., at 419*.

In dissolving the prior restraint, the Court recognized that "offensive" and "coercive" speech was nevertheless protected by the *First Amendment*. [46]

 [**3425]  In sum, the boycott clearly involved constitutionally protected activity.  The established elements of speech, assembly, association, and petition, "though not identical, are inseparable." *Thomas v. Collins, supra, at 530*. Through exercise of these *First Amendment* rights, petitioners sought to bring about political, social, and economic change.  [*912]  Through speech, assembly, [****46]  and petition -- rather than through riot or revolution -- petitioners sought to change a social order that had consistently treated them as second-class citizens.

 [6]The presence of protected activity, however, does not end the relevant constitutional inquiry.  Governmental regulation that has an incidental effect on *First Amendment* freedoms may be justified in certain narrowly defined instances.  See *United States v. O'Brien, 391 U.S. 367*. [47] A nonviolent and totally voluntary boycott may have a disruptive effect on local economic conditions.  This Court has recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association.  See *Giboney v. Empire Storage & Ice Co., 336 U.S. 490*; *NLRB v. Retail Store Employees, 447 U.S. 607*. The right of business entities to "associate" to suppress competition may be curtailed.  *National Society of Professional Engineers v. United States, 435 U.S. 679*.  [***1236]  Unfair [****47]  trade practices may be restricted. Secondary boycotts and picketing by labor unions may be prohibited, as part of "Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *NLRB v. Retail Store Employees, supra, at 617-618* (BLACKMUN, J., concurring in part).  See *Longshoremen v. Allied International, Inc., 456 U.S. 212, 222-223*, and n. 20.

 [****48]

 [*913]   [7]While States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case.  This Court has recognized that expression on public issues "has always rested on the highest rung of the hierarchy of *First Amendment* values." *Carey v. Brown, 447 U.S. 455, 467*.  "[Speech] concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana, 379 U.S. 64, 74-75*. There is a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan, 376 U.S. 254, 270*.

---

[46] See *Watts v. United States, 394 U.S. 705, 708* ("The language of the political arena, like the language used in labor disputes, see *Linn v. United Plant Guard Workers of America, 383 U.S. 53, 58 (1966)*, is often vituperative, abusive, and inexact").  See also *Cohen v. California, 403 U.S. 15*; Farber, Commercial Speech and *First Amendment* Theory, 74 Nw. U. L. Rev. 372 (1979).

[47] "To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong.  Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged *First Amendment* freedoms is no greater than is essential to the furtherance of that interest." *391 U.S., at 376-377* (footnotes omitted).

EXHIBIT 43                                                        EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127*, the Court considered whether the Sherman Act prohibited a publicity campaign waged by railroads against the trucking industry that was designed to foster the adoption of laws destructive of the trucking business, to create an atmosphere **[****49]** of distaste for truckers among the general public, and to impair the relationships existing between truckers and **[**3426]** their customers.  Noting that the "right of petition is one of the freedoms protected by the *Bill of Rights*, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms," the Court held that the Sherman Act did not proscribe the publicity campaign. *Id., at 137-138*. The Court stated that it could not see how an intent to influence legislation to destroy the truckers as competitors "could transform conduct otherwise lawful into a violation of the Sherman Act." *Id., at 138-139*. Noting that the right of the people to petition their representatives in government "cannot properly be made to depend on their intent in doing so," the Court held that "at least insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Id., at 139-140*. This conclusion was not changed by the fact that the railroads' anticompetitive *purpose* produced an anticompetitive **[*914]** *effect* **[****50]** ; the Court rejected the truckers' Sherman Act claim despite the fact that "the truckers sustained some direct injury as an incidental effect of the railroads' campaign to influence governmental action." *Id., at 143*.


 [8]It is not disputed that a major purpose of the boycott in this case was to influence governmental action.  Like the railroads in *Noerr*, the **[***1237]** petitioners certainly foresaw -- and directly intended -- that the merchants would sustain economic injury as a result of their campaign. Unlike the railroads in that case, however, the purpose of petitioners' campaign was not to destroy legitimate competition.  Petitioners sought to vindicate rights of equality and of freedom that lie at the heart of the *Fourteenth Amendment* itself.  The right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution **[****51]** itself. [48]

In upholding an injunction against the state supersedeas **[****52]** bonding requirement in this case, Judge Ainsworth of the Court of Appeals for the Fifth Circuit cogently stated:

"At the heart of the Chancery Court's opinion lies the belief that the mere organization of the boycott and every activity undertaken in support thereof could be subject to judicial prohibition under state law.  This **[*915]** view accords insufficient weight to the *First Amendment's* protection of political speech and association.  There is no suggestion that the NAACP, MAP or the individual defendants were in competition with the white businesses or that the boycott arose from parochial economic interests.  On the contrary, the boycott grew out of a racial dispute with the white merchants and city government of Port Gibson and all of the picketing, speeches, and other communication associated with the boycott were directed to the elimination of racial discrimination in the town.  This differentiates this case from a boycott organized for economic ends, for speech to protest racial discrimination is essential political speech lying at the core of the *First Amendment*." *Henry v. First National Bank of Clarksdale, 595 F.2d 291, 303 (1979)* (footnote **[****53]** omitted).

---

[48] In *NAACP v. Alabama ex rel. Flowers, 377 U.S. 288*, the Court unanimously rejected Alabama's effort to oust the NAACP from that State.  The State claimed, in part, that the NAACP was "'engaged in organizing, supporting and financing an illegal boycott'" of Montgomery's bus system.  *Id., at 302*. Writing for the Court, Justice Harlan described as "doubtful" the "assumption that an organized refusal to ride on Montgomery's buses in protest against a policy of racial segregation might, without more, in some circumstances violate a valid state law." *Id., at 307*. In *Missouri v. National Organization for Women, Inc., 620 F.2d 1301, 1317 (CA8 1980)*, cert. denied, **449 U.S. 842**, Judge Stephenson stated that "the right to petition is of such importance that it is not an improper interference [under state tort law] even when exercised by way of a boycott."

EXHIBIT 43                                                                      EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

**[\*\*3427]**   [9]We hold that the nonviolent elements of petitioners' activities are entitled to the protection of the *First Amendment*. [49]

B

 [10A]The Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory **[\*\*\*1238]** that state law prohibited a nonviolent, politically motivated boycott. The fact that such activity is constitutionally protected, however, **[\*\*\*\*54]** imposes a special obligation on this Court to examine critically the basis on which liability was imposed. [50] In particular, we **[\*916]** consider here the effect of our holding that much of petitioners' conduct was constitutionally protected on the ability of the State to impose liability for elements of the boycott that were not so protected. [51]

 **[\*\*\*\*55]**   [10B]

 [11][12][13]The *First Amendment* does not protect violence. "Certainly violence has no sanctuary in the *First Amendment*, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of 'advocacy.'" *Samuels v. Mackell, 401 U.S. 66, 75* (Douglas, J., concurring).  Although the extent and significance of the violence in this **[\*\*\*\*56]** case are vigorously disputed by the parties, there is no question that acts of violence occurred.  No federal rule of law restricts a State from imposing tort liability for business losses that are caused by violence and by threats of violence. When such conduct occurs in the context of constitutionally protected activity, however, "precision of regulation" is demanded. *NAACP v. Button, 371 U.S. 415, 438*. [52] Specifically, the presence of activity protected by the *First Amendment* imposes restraints on the grounds that may give rise to **[\*917]** damages liability and on the persons who may be held accountable for those damages.

In *Mine Workers v. Gibbs, 383 U.S. 715*, the Court considered a case in many respects similar **[\*\*\*\*57]** to the one before us.  The case grew out of the rivalry between the United Mine Workers (UMW) and the Southern Labor Union (SLU) over representation of workers in the southern Appalachian coal fields.  A coal company laid off 100 miners of UMW's Local 5881 when it closed one of its mines.  That same year, a subsidiary of the coal company hired Gibbs

---

[49] We need not decide in this case the extent to which a narrowly tailored statute designed to prohibit certain forms of anticompetitive conduct or certain types of secondary pressure may restrict protected *First Amendment* activity.  No such statute is involved in this case.  Nor are we presented with a boycott designed to secure aims that are themselves prohibited by a valid state law.  See *Hughes v. Superior Court, 339 U.S. 460*.

[50] "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.  This is such a case, particularly since the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated.' *Speiser v. Randall, 357 U.S. 513, 525*. In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the *First Amendment*, as adopted by the *Due Process Clause of the Fourteenth Amendment*, protect.' *Pennekamp v. Florida, 328 U.S. 331, 335*; see also *One, Inc*. v. *Olesen, 355 U.S. 371*; *Sunshine Book Co*. v. *Summerfield, 355 U.S. 372*. We must 'make an independent examination of the whole record,' *Edwards v. South Carolina, 372 U.S. 229, 235*, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co*. v. *Sullivan, 376 U.S. 254, 285*.

[51] Although this is a civil lawsuit between private parties, the application of state rules of law by the Mississippi state courts in a manner alleged to restrict *First Amendment* freedoms constitutes "state action" under the *Fourteenth Amendment*.  *New York Times Co*. v. *Sullivan, supra, at 265*.

[52] See also *Carroll v. Princess Anne, 393 U.S. 175, 184*; *Keyishian v. Board of Regents, 385 U.S. 589, 604*.

EXHIBIT 43                                                        EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

as **[\*\*\*1239]** mine superintendent to attempt to open a new mine on nearby property through use of members **[\*\*3428]** of the SLU. Gibbs also received a contract to haul the mine's coal to the nearest railroad loading point. When he attempted to open the mine, however, he was met by armed members of Local 5881 who threatened Gibbs and beat an SLU organizer. These incidents occurred on August 15 and 16. Thereafter, there was no further violence at the mine site and UMW members maintained a peaceful picket line for nine months. No attempts to open the mine were made during that period.

Gibbs lost his job as superintendent and never began performance of the haulage contract. Claiming to have suffered losses as a result of the union's concerted plan against him, Gibbs filed suit in federal court against the international UMW. He alleged **[\*\*\*\*58]** an unlawful secondary boycott under the federal labor laws and, as a pendent state-law claim, "an unlawful conspiracy and an unlawful boycott aimed at him . . . to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." _Id., at 720_. The federal claim was dismissed on the ground that the dispute was "primary" and therefore not cognizable under the federal prohibition of secondary labor boycotts. Damages were awarded against the UMW, however, on the state claim of interference with an employment relationship.

This Court reversed. The Court found that the pleadings, arguments of counsel, and jury instructions had not adequately **[\*918]** defined the compass within which damages could be awarded under state law. The Court noted that it had "consistently recognized the right of States to deal with violence and threats of violence appearing in labor disputes" and had sustained "a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation." _Id., at 729_. To accommodate federal labor policy, however, the Court in _Gibbs_ held: **[\*\*\*\*59]** "the permissible scope of state remedies in this area is strictly confined to the direct consequences of such [violent] conduct, and does not include consequences resulting from associated peaceful picketing or other union activity." _Ibid_. The Court noted that in _Construction Workers v. Laburnum Construction Corp., 347 U.S. 656_, damages were restricted to those directly and proximately caused by wrongful conduct chargeable to the defendants. "'Thus there [was] nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct.'" _383 U.S., at 730_ (quoting _San Diego Building Trades Council v. Garmon, 359 U.S. 236, 249, n. 6_).

[14]The careful limitation on damages liability imposed in _Gibbs_ resulted from the need to accommodate state law with federal labor policy. That limitation is no less applicable, however, to the important _First Amendment_ interests at issue in this case. Petitioners withheld their patronage from the white establishment of **[\*\*\*\*60]** Claiborne County to challenge a political and economic **[\*\*\*1240]** system that had denied them the basic rights of dignity and equality that this country had fought a Civil War to secure. While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered.

The _First Amendment_ similarly restricts the ability of the State to impose liability on an individual solely because of his **[\*919]** association with another. In _Scales v. United States, 367 U.S. 203, 229_, the Court noted that a "blanket prohibition of association with a group having both legal and illegal aims" would present "a real danger that legitimate political expression or association would be impaired." The Court suggested that to punish association with such a group, there must be "clear proof that a **[\*\*3429]** defendant 'specifically [intends] to accomplish [the aims of the organization] by resort to violence.'" _Ibid_. (quoting _Noto v. United States, 367 U.S. 290, 299)_. [53] Moreover, **[\*\*\*\*61]** in _Noto_ v. _United States_ the Court emphasized that this intent must be judged "according to the strictest law," [54] for "otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally

---

[53] See _United States v. Robel, 389 U.S. 258_; _Elfbrandt v. Russell, 384 U.S. 11_; _Aptheker v. Secretary of State, 378 U.S. 500_.

[54] _"Strictissimi juris." 367 U.S., at 299_.

318

**EXHIBIT 43**                                                                **EXHIBIT  18**

NAACP v. Claiborne Hardware Co., 458 U.S. 886

protected purposes, because of other and unprotected purposes which he does not necessarily share." *Id., at 299-300*.

In *Healy v. James, 408 U.S. 169*, the Court applied these principles in a noncriminal context.  In that case the Court held that a student group could not be denied recognition at a state-supported college merely because of its affiliation **[****62]**  with a national organization associated with disruptive and violent campus activity.  It noted that "the Court has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization." *Id., at 185-186*. The Court stated that "it has been established that 'guilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government,' is an impermissible basis upon which to deny *First Amendment* rights." *Id., at 186* (quoting *United States v. Robel, 389 U.S. 258, 265)*. "The government has the burden  **[*920]** of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." *408 U.S., at 186* (footnote omitted). [55]

**[****63]**

**[***1241]**   [15A]The principles announced in *Scales, Noto*, and *Healy* are relevant to this case.  Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims. [56] "In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' *Shelton v. Tucker, 364 U.S. 479, 488 (1960)*." *Carroll v. Princess Anne, 393 U.S. 175, 183-184*.

**[****64]**  III

[16]The chancellor awarded respondents damages for all business losses that were sustained during a 7-year period beginning in 1966 and ending December 31, 1972. [57] **[****65]**  With the exception **[*921]** of Aaron Henry,  **[**3430]** all defendants were held jointly and severally liable for these losses.  The chancellor's findings were consistent with his view that voluntary participation in the boycott was a sufficient basis on which to impose liability. The Mississippi Supreme Court properly rejected that theory; it nevertheless held that petitioners were liable for all damages "resulting from the boycott." [58]  In light of the principles set forth above, it is evident that such a damages award may not be sustained in this case.

---

[55] In *Rizzo v. Goode, 423 U.S. 362*, the Court vacated an injunction, directed against an entire police department, that had resulted from 20 specific incidents of police misconduct.  The Court held that such collective responsibility should be limited to instances in which a concerted design existed to accomplish a wrongful objective.  *Id., at 373-376*.

[56] Of course, the question whether an individual may be held liable for damages merely by reason of his association with others who committed unlawful acts is quite different from the question whether an individual may be held liable for unlawful conduct that he himself authorized or incited.  See *infra*, at 925-926.

[57] It is noteworthy that the portion of the chancellor's opinion discussing damages begins by referring expressly to the two theories of liability that the Mississippi Supreme Court rejected:

"The complainants proved, in this record, that they suffered injury to their respective businesses as the direct and proximate result of the unlawful secondary boycott and the defendants' actions in restraining trade, all of which was accomplished by defendants through a conspiracy." App. to Pet. for Cert. 57b (footnote omitted).

In a footnote, the chancellor added that "any kind of boycott is unlawful if executed with force or violence or threats." *Id., . . . at 57*b, n. 21.

[58] *393 So. 2d, at 1307*.

EXHIBIT 43 EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

The opinion of the Mississippi Supreme Court itself demonstrates that all business losses were not proximately caused by the violence and threats of violence found to be present.  The court stated that "coercion, intimidation, and threats" formed *"part* of the boycott activity" and *"contributed* to its almost complete success." [59] The court broadly asserted -- without differentiation -- that "'[intimidation,] threats, social ostracism, vilification, and traduction'" were devices used by the defendants to effectuate the boycott. [60] The court repeated the chancellor's finding that "the volition of *many* black persons was overcome out of sheer fear." [61] These findings are inconsistent with the court's imposition of all damages "resulting from the boycott."  [***1242] To the extent that the court's judgment rests on the ground that "many" black citizens were "intimidated" by "threats" of "social ostracism, vilification, and traduction," it is flatly inconsistent with the *First Amendment*. The ambiguous findings of the Mississippi Supreme Court [****66] are inadequate to assure the "precision of regulation" demanded by that constitutional provision.

 [*922]  The record in this case demonstrates that all of respondents' losses were not proximately caused by violence or threats of violence. As respondents themselves stated at page 12 of their brief in the Mississippi Supreme Court:

"Most of the witnesses testified that they voluntarily went along with the NAACP and their fellow black citizens in honoring and observing the boycott because they wanted the boycott."

This assessment is amply supported by the record. [62] [****68]  It is indeed inconceivable that a boycott launched by the unanimous vote of several hundred persons succeeded solely through fear and intimidation.  Moreover, the fact that the boycott "intensified" following the shootings of [****67] Martin Luther King, Jr., and Roosevelt Jackson demonstrates that factors other than force and violence (by the petitioners) figured  [*923]  prominently in the boycott's success.  The chancellor made no finding that any act of  [**3431]  violence occurred after 1966.  While the timing of

---

[59] *Id., at 1302* (emphasis added).

[60] *Id., at 1300* (quoting trial court; see App. to Pet. for Cert. 39b).

[61] *393 So. 2d, at 1300* (emphasis added).

[62] The testimony of Julia Johnson -- although itself only a small portion of a massive record -- perhaps best illustrates this point:

"Q.  How did you observe the boycott?

"A.  I just stayed out of the stores, because I had my own personal reasons to stay out of the stores.  There were some things I really wanted, and the things I wanted were the right to vote, the right to have a title -- Mrs. or Mr. or whatever I am, and not uncle or aunt, boy or girl.  So that's what I wanted.  And if I wanted a job -- a qualified job, I wanted to have the opportunity to be hired. Not hired because I'm black or white, but just hired.

"Q.  And this was your reason for observing the boycott?

"A.  Yes, it was.

"Q.  And you were in favor of the boycott?

"A.  Yes, I was in favor of the boycott.

"Q.  And it wasn't because somebody threatened you?

"A.  No, it wasn't because nobody threatened me.

"Q.  You weren't afraid?

"A.  Was I afraid?

"Q.  Yes.

"A.  No, I was not afraid." Record 15476.

It is clear that losses were sustained because persons like Julia Johnson "wanted justice and equal opportunity." *Id*., at 6864 (testimony of Margaret Liggins).  See *id*., at 6737, 12419, 13543-13544.

**EXHIBIT 43**  EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

the acts of violence was not important to the chancellor's imposition of liability, it is a critical factor under the narrower rationale of the Mississippi Supreme Court.  That court has completely failed to demonstrate that business losses suffered in 1972 -- three years after this lawsuit was filed -- were proximately caused by the isolated acts of violence found in 1966. [63] It is impossible to conclude that state power has not been exerted to compensate respondents for the direct consequences of nonviolent, constitutionally protected activity.

This case is not like *Milk Wagon Drivers v. Meadowmoor Dairies, Inc., 312 U.S. 287*, in which the Court held that the presence of violence justified an injunction against both violent and  **[\*\*\*1243]**  nonviolent activity. [64] The violent conduct present in that case was pervasive. [65] **[\*\*\*\*70]**  The Court in *Meadowmoor* stated that "utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force." *Id., at 293*. The Court emphasized, however:

 **[\*924]**  "Still it is of prime importance that no constitutional freedom, least of all the guarantees of the *Bill of Rights*, be defeated by insubstantial findings of fact screening reality.  That is why this Court has the ultimate power to search the records in the state courts where a claim of constitutionality is effectively made.   And so the right of free **[\*\*\*\*69]**  speech cannot be denied by drawing from a trivial rough incident or a moment of animal exuberance the conclusion that otherwise peaceful picketing has the taint of force." *Ibid*.

Such "insubstantial findings" were not present in *Meadowmoor*.  But in this case, the Mississippi Supreme Court has relied on isolated acts of violence during a limited period to uphold respondents' recovery of *all* business losses sustained over a 7-year span.  No losses are attributed to the voluntary participation of individuals determined to secure "justice and equal opportunity." [66] The court's judgment "screens reality" and cannot stand. [67]

 [17A] [18A] [19A]Respondents' supplemental brief also demonstrates that on the present record no judgment may be sustained against most of the petitioners.  Regular attendance and participation at the Tuesday meetings of the Claiborne County Branch of the NAACP is an insufficient predicate on which to impose liability. The chancellor's findings do not suggest that  **[\*\*3432]**  any illegal conduct was authorized, ratified, or even discussed at any of **[\*\*\*\*71]**  the meetings.  The Sheriff testified that he was kept **[\*925]**  informed of what transpired at the meetings;

---

[63] It is also noteworthy that virtually every victim of the acts of violence found by the chancellor testified that he or she continued to patronize the white merchants. See *supra, at 904*, and n. 37.

[64] In *Mine Workers v. Gibbs, 383 U.S. 715*, the Court stated that if "special facts" such as those presented in *Meadowmoor* "appeared in an action for damages after picketing marred by violence had occurred," they might "support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered." *383 U.S., at 731-732*.

[65] As described by the Court: "Witnesses testified to more than fifty instances of windowsmashing; explosive bombs caused substantial injury to the plants of Meadowmoor and another dairy using the vendor system and to five stors; stench bombs were dropped in five stores; three trucks of vendors were wrecked, seriously injuring one driver, and another was driven into a river; a store was set on fire and in large measure ruined; two trucks of vendors were burned; a storekeeper and a truck driver were severely beaten; workers at a dairy which, like Meadowmoor, used the vendor system were held with guns and severely beaten about the head while being told 'to join the union'; carloads of men followed vendors' trucks, threatening the drivers, and in one instance shot at the truck and driver." *312 U.S., at 291-292*.

[66] See n. 62, *supra*.

[67] For the same reasons, the permanent injunction entered by the chancellor must be dissolved.  Since the boycott apparently has ended, the Mississippi Supreme Court may wish to vacate the entire injunction on the ground that it is no longer necessary; alternatively, the injunction must be modified to restrain only unlawful conduct and the persons responsible for conduct of that character.

EXHIBIT 43                                                                    EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

he made no reference to any discussion of unlawful activity. [68] [***1244] To impose liability for presence at weekly meetings of the NAACP would -- ironically -- not even constitute "guilt by association," since there is no evidence that the association possessed unlawful aims. Rather, liability could only be imposed on a "guilt *for* association" theory. Neither is permissible under the *First Amendment*. [69]

[17B]

[****72] [15B] [18B] [19B]

[20A]Respondents also argue that [****73] liability may be imposed on individuals who were either "store watchers" or members of the "Black Hats." There is nothing unlawful in standing outside a store and recording names. Similarly, there is nothing unlawful in wearing black hats, although such apparel may cause apprehension in others. As established above, mere association with either group -- absent a specific intent to further an unlawful aim embraced by that group -- is [*926] an insufficient predicate for liability. At the same time, the evidence does support the conclusion that some members of each of these groups engaged in violence or threats of violence. Unquestionably, these individuals may be held responsible for the injuries that they caused; a judgment tailored to the consequences of their unlawful conduct may be sustained.

Respondents have sought separately to justify the judgment entered against Charles Evers and the national NAACP. As set forth by the chancellor, Evers was specially connected with the boycott in four respects. First, Evers signed the March 23 supplemental demand letter and unquestionably played the primary leadership role in the organization of the boycott. Second, Evers participated [****74] in negotiations with MAP and successfully convinced MAP to abandon its practice of purchasing food alternately from white-owned and black-owned stores. Third, he apparently presided at the April 1, 1966, meeting at which the vote to begin the boycott was taken; he delivered a speech to the large audience that was gathered on that occasion. See n. 28, *supra*. Fourth, Evers delivered the speeches on April 19 and 21, 1969, which we have discussed previously. See *supra, at 902*; Appendix to this opinion.

[21]For the reasons set forth above, liability may not be imposed on Evers for his presence at NAACP [***1245] meetings or his active participation in the boycott itself. To the extent that Evers caused respondents to suffer business losses through his organization of the boycott, his emotional and persuasive appeals for unity in the joint effort, or his "threats" of vilification [**3433] or social ostracism, Evers' conduct is constitutionally protected and beyond the reach of a damages award. Respondents point to Evers' speeches, however, as justification for the chancellor's damages award. [****75] Since respondents would impose liability on the basis of a public address -- which predominantly contained highly charged political rhetoric [*927] lying at the core of the *First Amendment* -- we approach this suggested basis of liability with extreme care.

---

[68] See Record 1172. The strongest evidence of wrongdoing at the meetings was presented by petitioner Marjorie Brandon, who served at times as the local NAACP secretary. She testified that "in the meetings there were statements saying that you would be dealt with" if found trading in boycotted stores. *Id*., at 5637. She stated that she understood "dealt with" to mean "they would take care of you, do something to you, if you were caught going in." *Ibid*. Her testimony does not disclose who made the statements, how often they were made, or that they were in any way endorsed by others at the meetings. A massive damages judgment may not be sustained on the basis of this testimony; the fact that certain anonymous persons made such statements at some point during a 7-year period is insufficient to establish that the Association itself possessed unlawful aims or that any petitioner specifically intended to further an unlawful goal.

[69] A legal duty to "repudiate" -- to disassociate oneself from the acts of another -- cannot arise unless, absent the repudiation, an individual could be found liable for those acts. As our decisions in *Scales, Noto*, and *Healy* make clear, see *supra, at 920*, civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. The chancellor in this case made no finding that the individuals who committed those acts of violence were "agents" or "servants" of those who attended the NAACP meetings; certainly such a relationship cannot be found simply because both shared certain goals. Cf. *General Building Contractors Assn*. v. *Pennsylvania, ante*, at 391-395.

EXHIBIT 43                                                                    EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

[22]There are three separate theories that might justify holding Evers liable for the unlawful conduct of others.  First, a finding that he authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity.  Second, a finding that his public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period.  Third, the speeches might be taken as evidence that Evers gave other specific instructions to carry out violent acts or threats.

While many of the comments in Evers' speeches might have contemplated "discipline" in the permissible form of social ostracism, it cannot be denied that references to [****76]  the possibility that necks would be broken and to the fact that the Sheriff could not sleep with boycott violators at night implicitly conveyed a sterner message.  In the passionate atmosphere in which the speeches were delivered, they might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence whether or not improper discipline was specifically intended.

[23][24]It is clear that "fighting words" -- those that provoke immediate violence -- are not protected by the *First Amendment*. *Chaplinsky v. New Hampshire, 315 U.S. 568, 572*. Similarly, words that create an immediate panic are not entitled to constitutional protection.  *Schenck v. United States, 249 U.S. 47*. [70] This Court has made clear, however, that mere *advocacy* of the use of force or violence does not remove speech from the protection of the *First Amendment*. In *Brandenburg v. Ohio, 395 U.S. 444*, [****77]  we reversed the conviction of a Ku Klux Klan leader for threatening "revengeance" if the "suppression" of the white race continued; we relied on  [*928]  "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id., at 447*. See *Noto v. United States, 367 U.S., at 297-298* (" [***1246]  the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action").  See also *Whitney v. California, 274 U.S. 357, 372* (Brandeis, J., concurring).

[****78]  The emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg*.  The lengthy addresses generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them.  In the course of those pleas, strong language was used.  If that language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that unlawful conduct. In this case, however -- with the possible exception of the Cox incident -- the acts of violence identified in 1966 occurred weeks or months after the April 1, 1966, speech; the chancellor made no finding of any violence after the challenged 1969 speech.  [**3434]  Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases.  An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause.  When such appeals do not incite [****79]  lawless action, they must be regarded as protected speech.  To rule otherwise would ignore the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan, 376 U.S., at 270*. [71]

---

[70] "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *249 U.S., at 52*.

[71] In *Watts v. United States, 394 U.S. 705*, the petitioner was convicted of willfully making a threat to take the life of the President. During a public rally at the Washington Monument, petitioner stated in a small discussion group:

"'They always holler at us to get an education.  And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going.  If they ever make me carry a rifle the first man I want to get in my sights is L. B. J.'" *Id., at 706*.

This Court summarily reversed.  The Court agreed with the petitioner that the statement, taken in context, was "a kind of very crude offensive method of stating a political opposition to the President." *Id., at 708*.

EXHIBIT 43 EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

[****80]

[*929]   [25]For these reasons, we conclude that Evers' addresses did not exceed the bounds of protected speech. If there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence.  But any such theory fails for the simple reason that there is no evidence -- apart from the speeches themselves -- that Evers authorized, ratified, or directly threatened acts of violence. [72] The chancellor's findings are not sufficient to establish that Evers had a duty to "repudiate" the acts of violence that occurred. [73] The findings are constitutionally inadequate to support the damages judgment against him.

[26]  [****81]  The liability of the NAACP derived solely from the liability of  [***1247]  Charles Evers. [74] The chancellor found:

"The national NAACP was well-advised of Evers' actions, and it had the option of repudiating his acts or ratifying them.  It never repudiated those acts, and therefore, it is deemed by this Court to have affirmed them." App. to Pet. for Cert. 42b-43b.

[*930]  Of course, to the extent that Charles Evers' acts are insufficient to impose liability upon him, they may not be used to impose liability on his principal.  On the present record, however, the judgment against the NAACP could not stand in any event.

[27] [****82]  The associational rights of the NAACP and its members have been recognized repeatedly by this Court. [75] The NAACP -- like any other organization -- of course may be held responsible for the acts of its agents throughout the country that are undertaken within the scope of their actual or apparent authority. [76] Cf. *American Society of Mechanical Engineers*, *Inc.* v. *Hydrolevel Corp., 456 U.S. 556*. Moreover, the NAACP may be found liable for other conduct of which it had knowledge and specifically ratified.

[****83]

[**3435]  [28A]The chancellor made no finding that Charles Evers or any other NAACP member had either actual or apparent authority to commit acts of violence or to threaten violent conduct. The evidence in the record suggests the contrary.  Aaron Henry, President of the Mississippi State Conference of the NAACP and a member of the Board of Directors of the national organization, testified that the statements attributed to Evers were directly contrary to NAACP policy.  Record 4930. [77] Similarly, there is no evidence that the NAACP ratified  [*931]  -- or even had specific

---

[72] There is evidence that Evers occasionally served as a "store watcher," but there is no suggestion that anything improper occurred on those occasions.

[73] See n. 69, *supra*.

[74] Indeed it is noteworthy that Aaron Henry -- who was president of the Mississippi State Conference of the NAACP, president of the Coahoma County Branch of the NAACP, and a member of the Board of Directors of the national NAACP -- was the only defendant dismissed by the chancellor on the merits.

[75] Cf.  *NAACP v. Alabama ex rel. Patterson, 357 U.S. 449*; *Bates v. Little Rock, 361 U.S. 516*; *Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293*; *NAACP v. Button, 371 U.S. 415*; *Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539*; *NAACP v. Alabama ex rel. Flowers, 377 U.S. 288*.

[76] There is no question that Charles Evers -- as its only paid representative in Mississippi -- was an agent of the NAACP.

[77] In a footnote to his discussion of the NAACP's liability, the chancellor wrote:

"Aaron E. Henry, a prominent black leader in the State of Mississippi, who was president of the Mississippi State Conference of the NAACP, president of the Coahoma County Branch of the NAACP, and a member of the Board of Directors of the national

knowledge of -- any of the acts of **[\*\*\*1248]** violence or threats of discipline associated with the boycott. Henry testified that the NAACP never authorized, and never considered taking, any official action with respect to the boycott. *Id*., at 4896.  The NAACP supplied no financial aid to the boycott. *Id*., at 4940.  The chancellor made no finding that the national organization was involved in any way in the boycott. [78]

 **[\*\*\*\*84]**   [28B]

 [29]To impose liability without a finding that the NAACP authorized -- either actually or apparently -- or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the *First Amendment*. As Justice Douglas noted in *NAACP v. Overstreet, 384 U.S. 118*, dissenting from a dismissal of a writ of certiorari found to have been improvidently granted:

"To equate the liability of the national organization with that of the Branch in the absence of any proof that **[\*\*\*\*85]** the national authorized or ratified the misconduct in question could ultimately destroy it.  The rights of political association are fragile enough without adding the **[\*932]** additional threat of destruction by lawsuit.  We have not been slow to recognize that the protection of the *First Amendment* bars subtle as well as obvious devices by which political association might be stifled.  See *Bates v. Little Rock, 361 U.S. 516, 523*. Thus we have held that forced disclosure of one's political associations is, at least in the absence of a compelling state interest, inconsistent with the *First Amendment's* guaranty of associational privacy. *E. g., DeGregory v. New Hampshire, 383 U.S. 825*; *Gibson v. Florida Legislative Comm., 372 U.S. 539, 543-546*; *Shelton v. Tucker, 364 U.S. 479*; *N. A. A. C. P.* v. *Alabama, 357 U.S. 449, 462-463*. Recognizing that guilt by association is a philosophy alien to the traditions of a free society (see *Schware v. Board of Bar Examiners, 353 U.S. 232, 245-246*, **[\*\*\*\*86]**  and the *First Amendment* itself, we have held that civil or criminal disabilities may not be imposed on one **[\*\*3436]**  who joins an organization which has among its purposes the violent overthrow of the Government, unless the individual joins knowing of the organization's illegal purposes ( *Wieman v. Updegraff, 344 U.S. 183*) and with the specific intention to further those purposes.  See *Elfbrandt* v. *Russell*, [384 U.S., at] 11; *Aptheker v. Secretary of State, 378 U.S. 500*." *Id., at 122*.

 [30]The chancellor's findings are not adequate to support the judgment against the NAACP.

IV

---

NAACP, testified that the NAACP 'absolutely did not approve of the way the boycott was being conducted in Port Gibson.' There is also evidence in the record tending to show that Evers was called to account by the national NAACP because of the manner in which the boycott was conducted.  However, the NAACP took no action whatever to curb Evers' activities in this connection." App. to Pet. for Cert. 42b, n. 9.

Henry's testimony concerning Evers' having been "called to account by the National NAACP" concerned Evers' failure to make proper reports and Henry's understanding that there was a personality clash between Evers and an executive of the NAACP. Record 4905, 4907.  We have found no evidence in the record that any representative of the national NAACP was advised of any facts concerning the manner in which the Port Gibson boycott was conducted.

[78] The chancellor did find that the NAACP had posted bond and provided legal representation for arrested boycott violators.  Since the NAACP regularly provides such assistance to indigent black persons throughout the country, this finding cannot support a determination that the national organization was aware of, and ratified, unauthorized violent conduct. Counsel for respondents does not contend otherwise.

EXHIBIT 43                                                                    EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

In litigation of this kind the stakes **[\*\*\*1249]** are high.  Concerted action is a powerful weapon.  History teaches that special dangers are associated with conspiratorial activity. [79] **[\*\*\*\*87]** And **[\*933]** yet one of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means. [80]

[31]At times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose.  In this case, however, petitioners' ultimate objectives were unquestionably legitimate.  The charge of illegality -- like the claim of constitutional protection -- derives from the means employed by the participants to achieve those goals.  The use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award.  But violent conduct is beyond the pale of constitutional protection.

[20B] **[\*\*\*\*88]**  [32]The taint of violence colored the conduct of some of the petitioners.  They, of course, may be held liable for the consequences of their violent deeds.  The burden of demonstrating that it colored the entire collective effort, however, is not satisfied by evidence that violence occurred or even that violence contributed to the success of the boycott. A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts.  Such a characterization must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use unlawful means, that carefully **[\*934]** identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity.  The burden of demonstrating that fear rather than protected conduct was the dominant force in the movement is heavy.  A court must be wary of a claim that the true color **[\*\*\*\*89]** of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees.  The findings of the chancellor, framed largely in the light of two legal theories rejected by the Mississippi Supreme Court, are constitutionally insufficient to support the judgment that all petitioners are liable for all losses resulting from the boycott.

The judgment is reversed.  The case is remanded for further proceedings not inconsistent with this opinion.

**[\*\*\*1250]** *It is so ordered*.

**[\*\*3437]**  JUSTICE REHNQUIST concurs in the result.

JUSTICE MARSHALL took no part in the consideration or decision of this case.

APPENDIX TO OPINION OF THE COURT

Portions of speech delivered by Charles Evers on April 19, 1969 (Record 1092-1108):

"Thank you very much.  We want our white friends here to know what we tell them happens to be so.  Thank you for having the courage to walk down those streets with us.  We thank you for letting our white brethren know that guns and bullets ain't gonna stop us.  (No) (No) We thank you for letting our white brothers know that Port Gibson ain't none of their town.  (Amen) (Applause) That Port Gibson is all of our town.  (Applause) **[\*\*\*\*90]** That black folks, red folks, Chinese and Japanese alike (Yeah) (That's right.), that we are going to have our share.  (Yeah, we are.)

---

[79] In discussing the doctrine of criminal conspiracy, Justice Jackson noted:

"The crime comes down to us wrapped in vague but unpleasant connotations.  It sounds historical undertones of treachery, secret plotting and violence on a scale that menaces social stability and the security of the state itself.  'Privy conspiracy' ranks with sedition and rebellion in the Litany's prayer for deliverance.  Conspiratorial movements do indeed lie back of the political assassination, the *coup d'etat*, the *putsch*, the revolution, and seizures of power in modern times, as they have in all history." *Krulewitch v. United States, 336 U.S., at 448* (concurring opinion).

[80] "The most natural privilege of man, next to the right of acting for himself, is that of combining his exertions with those of his fellow creatures and of acting in common with them.  The right of association therefore appears to me almost as inalienable in its nature as the right of personal liberty.  No legislator can attack it without impairing the foundations of society." 1 A. de Tocqueville, Democracy in America 203 (P. Bradley ed. 1954).

**EXHIBIT 43**                                                    EXHIBIT  18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

[*935]  "We are going to beat you because we know you can't trick us no more.  (yea) You are not going to be able to fool us by getting somebody to give us a drink of whiskey no more.  (Applause) You ain't gonna be able to fool us by somebody giving us a few dollars no more.  (Applause) We are gonna take your money and drink with you and then we're gonna (Applause) vote against you.  Then we are going to elect a sheriff in this county and a sheriff that is responsible, that won't have to run and grab the telephone and call up the blood-thirsty highway patrol when he gets ready (Yeah) to come in and beat innocent folks down to the ground for no cause.  (That's right) (Applause) (Boo) We are going to elect a sheriff that can call his deputies and represent black leaders in the community and stop whatever problem there is.  (Yeah) (That's right.)

"Then we are going to do more than that.  The white merchants of this town are so wrapped up in the power structure here, since you love your Police Department so well, since you support them so well (Yeah),  [****91]  we are going to let them buy your dirty clothes and your filthy, rotten groceries.

"Oh, no, white folks, we ain't going to shoot you with no bullet.  (That's right.) We are going to shoot you with our ballots and with our bucks.  (Yea) (That's right.) We are going to take away from you the thing that you have had over us all these years.  (Yeah) Political power and economic power.  While you kill our brothers and our sisters and rape our wives and our friends.  (Yeah) You're guilty.  You're guilty because you don't care a thing about anybody.  (Yes.) And when you go and let a big, black burly nigger like you get on the police force (Yea) go down and grab another black brother's arm and hold it while a white racist stole him from us, and he's a liar if he says he didn't hold him.

. . . .

"We mean what we are saying.  We are not playing.  (Right) We better not even think one of us is black.  You better not even be caught near one of these stores.  (Applause)

 [*936]  "We don't want you caught in Piggly-Wiggly.  You remember how he grinned at us four years ago?  (Yeah) You know how when he took office he grinned at us?  (Yeah) He ain't hired nobody yet.  (That's right) (No) And [****92]  you know old Jitney Jungle  [***1251]  down there with those funny letters down on the end?  (That's right) (Applause) He haven't hired nobody in there yet.  (No) Do you know poor ole M & M or whatever it stands for, mud and mush, I guess.  (Applause) They're out here on the highway and they haven't hired none of us yet.

"Do you know Ellis who had a part-time boy all his life?  He ain't hired nobody, is he, yet?  (No) Then we got ole Stampley, and ninety-nine and three-fourths of his sales are black folks business.  He got the nerve to tell me he ain't gonna put no nigger ringing his cash register.  I got news for you, Brother Stampley.  You can  [**3438]  ring it your damn self.  (Extra loud applause.) I want some of you fat cats after this meeting who wants three of our young boys who ain't a'scar'd of white folks (Applause) (Me) and we want you that's willing to follow the rules now to go down by Brother Stampley's and serve notice on him with our placards that we ain't coming no more.

"Then we are going to tell all the young men that drive Piggly-Wiggly trucks now (Yeah) (Be careful, Son.) because the soul brothers and the spirit is watching you.  (Extra loud applause.)

 [****93]  "All right, Brother Wolf, you're next.  (Applause) We got a couple of 'em to come down by Brother Wolf's. We mean business, white folks. We ain't gonna shoot you all, we are going to hit you where it hurts most.  (In the pocketbook) (Applause) In the pocketbook and in the ballot box.  (Applause) We may as well tell our friends at Alcorn to stay away from up here.  (Yea) Now, you say, 'What's wrong with you niggers?' I'll tell you what is wrong with us niggers; We are tired of you white folks, you racists and you bigots mistreating us.  (Yeah) We are tired of paying you to  [*937]  deny us the right to even exist.  (Tell'em about it.) And we ain't coming back, white folks. (We ain't.)

"You all put a curfew on us at eight o'clock tonight.  We are going to do you better than that.  We are going to leave at one-thirty.  (Loud applause) We are going to leave at one-thirty and we ain't coming back, white folks.

. . . .

EXHIBIT 43                                                    EXHIBIT 18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

"We are going to have Brother McCay; we are going to have our newly elected mayor who we elected, we are going to have him around here, too.  Come on back, my dear friend.  He say, 'Naw, brother, we ain't coming.' 'Have you got rid of all those bigots you got on your **[\*\*\*\*94]** police force?' 'No.' 'Have you hired Negroes in all them stores?' 'No.' 'Well, we ain't coming back.' (Right) That's all we gonna do.  You know, what they don't realize is you put on this curfew, that is all we needed.  Let me just give them some instructions.  We are going to buy gas only from the Negro-owned service stations.  We agreed on it, remember?  Now, don't back upon your agreement.  (Yea) I don't care how many Negroes working on it, that's too bad.  We are going only to Negro-owned service stations.  And we are going only -- the only time you will see us around on this street, now listen good, you are going to Lee's Grocery and other stores on this end.  Is that clear?  (Yeah) (Applause)

"We don't want to go to none of them drugstores.  They get us confused.  Now, who am I going to get my medicine from?  Let us know in  **[\*\*\*1252]**  time and we will be glad to furnish a car free to carry you anywhere you have to go to get a prescription filled.  You can't beat this.  (No) It won't cost you a dime.  You go to any of the local black businessmen and tell them you have got to go to Vicksburg to get your stuff.  And then if they don't carry you, let us know.  We'll take care **[\*\*\*\*95]** of them later.  (Applause) Now, you know, we have got a little song that says, 'This is your thing, do what you want to do.' (Applause) This is our thing, let's do what we want to do with it.  Let's make sure now -- if you be disobedient  **[\*938]**  now you are going to be in trouble.  Remember that, now, listen.  Listen good.  They are going to start saying, 'You know what, Evers is down there with his goon squad, . . .' Now, we know Claiborne County, -- 'with his goon squad harassing poor ole niggers.'

"Well, good white folks you have been harassing us all our lives.  (Applause) And if we decided to harass you that's our business.  (That's right) They are our children and we are going to discipline them the way we want to.  Now, be sure you get all this right on all these tape recorders.  Whatever I say on this trip I will say it in Jackson.  (Amen) (Glory) And I will say it in Washington and New York.  White folks ain't gonna never control us no more.  (Applause)

. . . .

 **[\*\*3439]**  "Now, my dear friends, the white folks have got the message.  I hope you have got the message and tell every one of our black brothers until all these people are gone, you voted on this in the church,  **[\*\*\*\*96]**  don't let me down, and don't let yourself down.  We agreed in the church that we would vacate this town until they have met those requests, the white folks don't demand nothing out of us.  All right, white folks, we are just saying until you decide when you want to do these little things we beg of you, we are not coming back.  (No way)

"None of us better not be caught up here.  (Yea) I don't care how old you are, I don't care how sick you are, I don't care how crazy you are, you better not be caught on these streets shopping in these stores until these demands are met.  (Applause)

"Now, let's get together.  Are you for this or against it?  (Applause) (For it.) Remember you voted this.  We intend to enforce it.  You needn't go calling the chief of police, he can't help you none.  You needn't go calling the sheriff, he can't help you none.  (That's right.) He ain't going to offer  **[\*939]**  to sleep with none of us men, I can tell you that.  (Applause) Let's don't break our little rules that you agreed upon here.

. . . .

"Let's go to the funeral of our young son whenever the funeral is.  I don't want you to come with hate because that is not going to solve our problems.  (No hate.  **[\*\*\*\*97]**  ) We don't want you to hate the white folks here in Port Gibson.  That is not going to solve it.  If you hate what they have done, I hate to get personal, I hate what they did so much to Medgar, (I know.) I ain't going to ever stop hating them for that.  But I am going to chase them in the way what I know is right and just.  I am not going to lay out in the bushes and shoot no white folks. That's wrong.  I am not gonna go out here and bomb none of them's home.  (No)  **[\*\*\*1253]**  That's not right.  But I am going to do everything in my power to take away all the power, political power, legal power that they possess anywhere I live.  We are going to compete against them.  When we blacks learn to support and respect each other, then and not until then, will white folks respect us.  (Applause)

**EXHIBIT 43**                                                          EXHIBIT  18

NAACP v. Claiborne Hardware Co., 458 U.S. 886

"Now, you know I trust white folks and I mean every word I say.  But it comes a time when we got to make up in our mind individually, are we going to make those persons worthwhile.  We done talked and raised all kind of sand all day here, now, what is really going to prove it, are we going to live up to what we have said?  (Applause) Now if there is any one of us breaks what we agreed upon, you are **[****98]** just as guilty as that little trigger-happy, blood-thirsty rascal.  (Tell 'em about it.)

. . . .

"I go all over this country, and I ought not to tell you white folks this, and I tell other white folks that some day we are going to get together in Mississippi, black and white, and work out our problems.  And we are ready to start whenever you are.  If you are ready to start, we are.  We ain't  **[*940]**  going to let you push us, not one inch.  (That's right.) If you come on beating us, we are going to fight back.  (Right) We got our understanding.  We are all God's children.  The same man that brought you all here brought us.  You could have been black just like we are.  We could have been white and baldheaded just like you are.  (Laughter) (Inaudible) We are going to work hard at this, Dan.  We are going to be organized this time.  We ain't going to be bought off and talked off.  We are going to elect the county sheriff here this next time that don't need the highway patrol.  Now, you see, Dan had a good chance to set himself up right, but he goofed it.  He goofed.  (Yeah) He blew it.  (Laughter) Don't forget that, heah.  (Right) It brings back memories like you know you remember **[****99]**  things we do.

"Now, if you don't think it is necessary, we don't have to go back to the church.  If you want to go back there, we can.  I want you to make sure here that we are going to leave this town to our white brothers and  **[**3440]**  we ain't coming back no more until all our requests have been met.  Is that the common consent of all of you here? (Applause) (Let's go back to the church.) All right.  Are we willing to make sure that everyone of us will be sure that none of the rest of our black brothers violate our . . . (Yea) We are all saying it now.  Let's not say it now so much on my part.  You know, I'm just sort of leading, you know, how these lawyers are, leading our folks on to say what has to be said.  And that's the case.  Let's make us a white town.  We would like for you to start it.  Be courteous now.  Don't mistreat nobody.  Tell them, in a nice forceful way, the curfew is going to be on until they do what we ask them."

## References

*16 Am Jur 2d, Conspiracy 61*

USCS, *Constitution, First Amendment*

US L Ed Digest, Constitutional Law 926, 960

L Ed Index to Annos, Boycott

ALR Quick Index, Boycott

Federal **[****100]**  Quick Index, Boycott

> Annotation References:

The Supreme Court and the *First Amendment* right of association.  *33 L Ed 2d 865*.

The Supreme Court and the right of free speech and press.  *93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976*.

**End of Document**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

# *Nunes v. Lizza*

United States District Court for the Northern District of Iowa, Western Division

April 25, 2023, Decided; April 25, 2023, Filed

No. 19-CV-4064 CJW-MAR; No. 20-CV-4003 CJW-MAR

**Reporter**

2023 U.S. Dist. LEXIS 71719 *; 2023 WL 3079996

DEVIN G. NUNES, Plaintiff, vs. RYAN LIZZA, HEARST MAGAZINES, INC., and HEARST MAGAZINE MEDIA, INC., Defendants.ANTHONY NUNES, JR., ANTHONY NUNES, III and NUSTAR FARMS, LLC, Plaintiffs, vs. RYAN LIZZA and HEARST MAGAZINE MEDIA, INC., Defendants.

**Subsequent History:** Affirmed by *Nunes v. Lizza, 2025 U.S. App. LEXIS 1664 (8th Cir. Iowa, Jan. 27, 2025)*

**Prior History:** *Nustar Farms v. Ryan Lizza & Hearst Magazine Media, 613 F. Supp. 3d 1124, 2020 U.S. Dist. LEXIS 88104, 2020 WL 2465263 (N.D. Iowa, May 12, 2020)*

**Counsel:** [*1] Eugene Volokh, Interested Party (5:19-cv-04064-CJW-MAR), Pro se, Los Angeles, CA.

For Devin G Nunes, NuStar Farms, LLC, Anthony Nunes, Jr, Anthony Nunes, III, Plaintiffs (5:19-cv-04064-CJW-MAR): William F McGinn, LEAD ATTORNEY, McGinn Springer & Noethe PLC, Council Bluffs, IA; Steven Scott Biss, PRO HAC VICE, Law Office of Steven S Biss, Charlottesville, VA.

For Ryan Lizza, Defendant (5:19-cv-04064-CJW-MAR): Michael A Giudicessi, Nicholas A Klinefeldt, Susan Patricia Elgin, LEAD ATTORNEYS, Faegre Drinker Biddle & Reath LLP, Des Moines, IA; Jonathan R Donnellan, Kristen Hauser, Nathaniel S Boyer, Ravi V Sitwala, PRO HAC VICE, Hearst, New York, NY; Nina N Shah, Sarah Park, PRO HAC VICE, The Hearst Corporation, New York, NY; Scott W Wright, PRO HAC VICE, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN.

For Hearst Magazines, Inc, Defendant (5:19-cv-04064-CJW-MAR): Nicholas A Klinefeldt, Susan Patricia Elgin, Michael A Giudicessi, LEAD ATTORNEYS, Faegre Drinker Biddle & Reath LLP, Des Moines, IA; Jonathan R Donnellan, Nathaniel S Boyer, Ravi V Sitwala, PRO HAC VICE, Hearst, New York, NY.

For Hearst Magazine Media, Inc, Defendant (5:19-cv-04064-CJW-MAR): Nicholas A Klinefeldt, Susan Patricia [*2] Elgin, Michael A Giudicessi, LEAD ATTORNEYS, Faegre Drinker Biddle & Reath LLP, Des Moines, IA; Jonathan R Donnellan, Kristen Hauser, Nathaniel S Boyer, Ravi V Sitwala, PRO HAC VICE, Hearst, New York, NY; Nina N Shah, Sarah Park, PRO HAC VICE, The Hearst Corporation, New York, NY; Scott W Wright, PRO HAC VICE, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN.

For United States of America, Interested Party (5:20-cv-04003-CJW-MAR): Melissa Ammann Carrington, LEAD ATTORNEY, US Attorney's Office, Northern District of Iowa, Cedar Rapids, IA.

For Brown, Winick, Graves, Gross and Baskerville, P.L.C., Interested Party (5:20-cv-04003-CJW-MAR): Sean Patrick Moore, LEAD ATTORNEY, Brown Winick Graves Gross Baskerville Schoenebaum, Des Moines, IA.

Eugene Volokh, Interested Party, Pro se, Los Angeles, CA.

For Anthony Nunes, Jr, Anthony Nunes, III, NuStar Farms, LLC, Plaintiffs (5:20-cv-04003-CJW-MAR): Steven Scott Biss, PRO HAC VICE, Law Office of Steven S Biss, Charlottesville, VA; William F McGinn, McGinn Springer & Noethe PLC, Council Bluffs, IA.

For Ryan Lizza, Hearst Magazine Media, Inc, Defendants (5:20-cv-04003-CJW-MAR): Jonathan R Donnellan, Kristen Hauser, Ravi V Sitwala, LEAD ATTORNEYS, PRO [*3] HAC VICE, Nathaniel S Boyer, Hearst, New York, NY; Michael A Giudicessi, LEAD ATTORNEY, Nicholas A Klinefeldt, Susan Patricia Elgin, Faegre Drinker Biddle &

**EXHIBIT 43**                                                                 **EXHIBIT  19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Reath LLP, Des Moines, IA; Scott W Wright, LEAD ATTORNEY, PRO HAC VICE, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; Nina N Shah, PRO HAC VICE, Sarah Park, The Hearst Corporation, New York, NY.

**Judges:** C.J. Williams, United States District Judge.

**Opinion by:** C.J. Williams

# Opinion

**MEMORANDUM OPINION AND ORDER**

**TABLE OF CONTENTS**

    I. BACKGROUND

    A. Procedural History

    1. The Nunes Case, 19-CV-4064

    2. The NuStar Case, 20-CV-4003

    3. Post-Consolidation

    B. Factual History: The Parties

    1. The Nunes Family and NuStar Farms

    2. Esquire and Ryan Lizza

    C. Factual History: The Article

    1. Content and Investigation

    2. Editing Process

    3. Publication

    4. Retraction

    5. The Tweet

    6. Public Mention of the Sibley Farm

EXHIBIT 43                                              EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

7. Allegations of Federal Immigration Violations

a. NuStar Farms' Onboarding Process

b. NuStar Farms' History of No-Match Issues

c. NuStar Farms' Employees with Problematic Documents

d. NuStar Farms Employees' Invocation of the *Fifth Amendment*

e. Congressman Devin Nunes' Alleged Knowledge of NuStar Farms' Practices

f. Congressman Devin Nunes' Family Relationships

g. Congressman Devin Nunes' Time in **[*4]** Congress, Sponsorship, and Donations

8. The Nunes' Reaction Post-Publication

9. Damages

II. SUMMARY JUDGMENT STANDARD

III. DISCUSSION

A. NuStar Plaintiffs' Claim of Defamation

1. Applicable Law

2. Elements

a. Publication

b. Defamatory Statement

c. Of and Concerning Plaintiff

d. Injury to Plaintiff

**EXHIBIT 43**                                                                **EXHIBIT 19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

e. Falsity

f. Negligence

B. Defamation by Implication

1. Applicable Law

2. NuStar Plaintiffs' Claim

a. Juxtaposition of Facts

b. Republication Under Iowa Law

c. Of and Concerning Plaintiff

d. Injury

e. Falsity of the Implication

f. Negligence

C. Nunes' Claim

1. Juxtaposition of Facts

2. Republication Under California Law

3. Of and Concerning Plaintiff

4. Injury

5. Falsity of the Implication

6. Defendants' Intent to Convey Defamatory Impression

7. Actual Malice

IV. CONCLUSION

**333**

**EXHIBIT 43**                                                                                        **EXHIBIT  19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

This matter[1] is before the Court on defendants' motion for summary judgment[2] on plaintiffs Anthony Nunes, Jr., Anthony Nunes, III, and NuStar Farms, LLC's (collectively "NuStar plaintiffs") complaint[3] alleging defamation (Count I) and defamation by implication (Count II) and on plaintiff Devin Nunes' ("Nunes") complaint[4] alleging defamation by implication (Count I). (Docs. 118; 121; 103; Case No. 20-CV-4003-CJW-MAR, Doc. 188). Plaintiffs timely filed a resistance. **[*5]**  (Doc. 130). Defendants timely replied. (Doc. 138). For the following reasons, the Court **grants** the motion as to NuStar plaintiffs' claim for defamation (Count I), **grants** the motion as to NuStar plaintiffs' claim for defamation by implication (Count II), and **grants** the motion as to Nunes' claim for defamation by implication (Count I).

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. The Court will consider additional facts as they become relevant to its analysis.

### A. Procedural History

The procedural life of this case is extensive, and as such, the Court discusses only that portion of which is relevant to the motion for summary judgment.

### 1. The Nunes Case, 19-CV-4064

On September 30, 2019, Nunes filed a two-count complaint in this Court. (Doc. 1). Nunes brought Count I for defamation alleging defendants published an article ("the Article") in *Esquire* containing false statements of fact concerning Nunes, knowing the statements were defamatory and would be republished and acting with actual malice, harming Nunes. (*Id.*, at 19-22). Count II asserted common-law conspiracy, alleging defendants and others conspired through concerted action to publish a "hit piece"—that is, **[*6]**  the Article—that would defame and thus harm Nunes through its lies. (*Id.*, at 22-24). On January 21, 2020, defendants filed a motion to dismiss or strike portions of the complaint citing the California Code of Civil Procedure and also filed to stay discovery and for protective order. (Docs. 15; 17). Then, on February 3, 2020, Nunes filed an amended complaint again alleging defamation and common-law conspiracy. (Doc. 23). That same day, the Court dismissed the January 21, 2020 motion as moot as a result of the amended complaint and allowed leave to refile. (Doc. 24). On February 4, 2020, the Court granted the motion to stay and granted defendants the ability to file a renewed motion to dismiss so long as it was filed by February 18, 2020. (Doc. 26). On February 18, 2020, defendants filed a motion to dismiss the amended complaint and to strike. (Doc. 34). On March 31, 2020, the Court extended the stay of discovery by 30 days. (Doc. 45). On August 5, 2020, the Court granted the motion to dismiss with prejudice and entered judgment in favor of defendants. (Doc. 53). Nunes maintained that there were 12 defamatory statements, including several related to his family's move to Iowa. (Docs. **[*7]**  38; 53, at 22-34). Further, Nunes alleged the statements within the Article together created a false implication—that he, his family, and others including former Representative Steve King, conspired to hide the family's move to Iowa because the farm employs undocumented laborers. (Docs. 38; 53, at 35). In Count II of his complaint,

---

[1] All references to the docket are to Case No. 19-CV-4064-CJW-MAR, unless otherwise stated. On February 1, 2022, the Court consolidated plaintiffs' separate cases, Case No. 19-CV-4064-CJW-MAR and Case No. 20-CV-4003-CJW-MAR, making the former the lead case with further filings to be entered in the lead case. (Doc. 83).

[2] Defendants also filed a redacted version of their motion for summary judgment, including all attachments (Doc. 121), and the resistance and reply were both filed in redacted forms (Docs. 139, 141). The Court will refer to the original, sealed documents filed at Docs. 118, 130, and 138.

[3] NuStar plaintiffs filed a third amended complaint, which the Court references here. (Case No. 20-CV-4003-CJW-MAR, Doc. 188).

[4] Nunes filed a third amended complaint, which the Court references here. (Doc. 103).

**334**

EXHIBIT 43                                                                    EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Nunes asserted Lizza and others conspired to defame him by promoting, publishing, and republishing the Article. (Docs. 38; 53, at 47). The Court addressed defendants' motion to dismiss as to the claims in Counts I and II of Nunes' complaint and granted defendants' motion to dismiss on Counts I and II. (Doc. 53). Nunes appealed the Court's August 5 order. (Doc. 55).

The Eighth Circuit Court of Appeals affirmed in part and reversed in part, remanding the case to this Court. (Docs. 60; 61). The Court of Appeals agreed Nunes' complaint failed to sufficiently allege express defamation. (Doc. 60, at 2). Adopting this Court's conclusions, the Court of Appeals held Nunes' complaint did not identify an allegedly defamatory statement, and he could not so raise a statement for the first time on appeal. (*Id.*, at 6). The Court of Appeals reversed and remanded, however, **[*8]** on the issue of defamation by implication, finding the complaint stated a claim based on an alleged republication of the Article through a November 20, 2019 tweet ("the Tweet") defendant Lizza published on his Twitter. (*Id.*, at 2, 14-15). It is plausible, the Court held, that the presentation of facts within the Article are juxtaposed in a way that the implication—that Nunes and his relatives had a politically explosive secret and thus conspired to hide the family's move to Iowa—could be conveyed to the reasonable reader. (*Id.*, at 7-8). What is more, the Court of Appeals found Nunes sufficiently, plausibly alleged each element of a defamation by implication claim under Iowa law[5] so as to survive a motion to dismiss. (*Id.*, at 7-15). The Court of Appeals later denied Nunes' motion for reconsideration and petition for rehearing en banc. (Docs. 67; 68).

On January 18, 2022, defendants filed an answer to the amended complaint. (Doc. 73).

### 2. The NuStar Case, 20-CV-4003

On January 16, 2020, NuStar plaintiffs filed a complaint in this Court alleging defamation. (Case No. 20-CV-4003-CJW-MAR, Doc. 1). On March 23, 2020, defendants filed a motion to dismiss under *Federal Rules of Civil Procedure 12(b)(6)* and *12(e)*. (*Id.*, Doc. 15). NuStar plaintiffs **[*9]** timely resisted (*Id.*, Doc. 20), and defendants timely replied (*Id.*, Doc. 21). On May 12, 2020, this Court granted the *Rule 12(b)(e)* motion for a more definite statement and denied with leave to refile the *Rule 12(b)(6)* motion to dismiss for failure to state a claim. (*Id.*, Doc. 27). On May 24, 2020, plaintiffs filed an amended complaint alleging a single count of defamation with a more definite statement. (*Id.*, Doc. 28). Then, on June 22, 2020, defendants filed a motion to dismiss the amended complaint under *Rule 12(b)(6)*. (*Id.*, Doc. 33). Plaintiffs timely resisted (*Id.*, Doc. 41), and defendants timely replied (*Id.*, Doc. 43). Defendants also moved to stay discovery and for a protective order. (*Id.*, Doc. 35). Again, plaintiffs timely resisted (*Id.*, Doc. 42), and defendants timely replied (*Id.*, Doc. 44). The Court granted the order to stay discovery pending the motion to dismiss. (*Id.*, Doc. 45). On September 11, 2020, this Court granted the motion to dismiss to the extent defendants sought dismissal of all defamation claims except as to a claim related to surveillance[6] of Lizza. (*Id.*, Doc. 50, at 24-26). This Court directed plaintiffs to amend their complaint and limit the defamation claim to the claim regarding knowing employment **[*10]** of undocumented laborers. (*Id.*, Doc. 50).

On September 17, 2020, plaintiffs filed a second amended complaint. (*Id.*, Doc. 51). Defendants filed a timely answer. (*Id.*, Doc. 52). Then, on November 18, 2020, plaintiffs filed a motion to compel discovery (*Id.*, Doc. 53), which was denied as moot with leave to refile if needed (*Id.*, Doc. 62). Defendants then filed a resisted motion to compel certain

---

[5] The Court analyzed the motion to dismiss using Iowa law, having found no conflict between California and Iowa law. The parties did not challenge this finding on appeal. (Doc. 60, at 4-5).

[6] The claim related to the following statement:

> There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor. One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs . . . asserting that the farm was aware of their status . . .. A second source, who claimed to be an undocumented immigrant, also claimed to have worked at NuStar for several years, only recently leaving the dairy, which this source estimated employed about fifteen people.

(Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 24).

EXHIBIT 43   EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

records from the Social Security Administration (*Id.*, Doc. 79), which on March 15, 2021, this Court granted, (*Id.*, Doc. 80). Defendants later filed two motions to compel regarding NuStar employee depositions (*Id.*, Docs. **[*11]** 103; 106), and plaintiffs timely resisted both (*Id.*, Docs. 107; 108). Defendants timely replied to both resistances. (*Id.*, Docs. 111; 112). From these motions to compel, the Court granted witness compliance with document production and provision of materials to new counsel. (*Id.*, Doc. 119). The Court later ordered CJA appointment for the six employees who the parties sought to depose. (*Id.*, Doc. 122). On July 26, 2021, defendants filed a motion to compel testimony of a specific attorney and related documents. (*Id.*, Doc. 126). Plaintiffs timely resisted (*Id.*, Doc. 133), and defendants timely replied (*Id.*, Doc. 140). On August 13, 2021, plaintiffs filed their own motion to compel discovery (*Id.*, Doc. 138). Defendants filed a timely resistance (*Id.*, Doc. 143). On August 23, 2021, defendants filed a motion to compel responses to third party litigation funding discovery requests (*Id.*, Doc. 147). Plaintiffs timely resisted (*Id.*, Doc. 153), and defendants timely replied (*Id.*, Doc. 158). On September 14, 2021, the Court denied plaintiffs' motion to compel filed at Doc. 138 (*Id.*, Doc. 161) and later granted defendants' motion to compel specific attorney testimony and related documents, filed **[*12]** at Doc. 126,[7] (*Id.*, Doc. 177). On October 26, 2021, the Court granted defendants' motion to compel responses to third party litigation funding discovery requests, filed at Doc. 147. (*Id.*, Doc. 180).

On October 8, 2021, plaintiffs moved to amend their complaint a third time (*Id.*, Doc. 173). Defendants timely resisted, (*Id.*, Doc. 176), and plaintiffs timely replied. (*Id.*, Doc. 181). On December 16, 2021, the Court granted the motion as to adding actual malice and defamation by implication claims but denied the motion as to adding claims of false light invasion of privacy and common-law conspiracy. (*Id.*, Doc. 187). On January 4, 2022, plaintiffs filed their third amended complaint. (*Id.*, Doc. 188). Defendants filed a timely answer. (*Id.*, Doc. 193).

Then, on January 25, 2022, defendants moved to consolidate the NuStar case with the Nunes case (*Id.*, Doc. 195), which NuStar plaintiffs resisted (*Id.*, Doc. 196).

### 3. Post-Consolidation

As mentioned, on February 1, 2022, the Court consolidated Nunes' and NuStar plaintiffs' cases. (Doc. 83; Case No. 20-CV-4003-CJW-MAR, Doc. 197). After the Court consolidated plaintiffs' cases, Nunes moved for leave to file his second amended complaint (Doc. 86), **[*13]** which defendants timely resisted (Doc. 87). The Court granted Nunes' motion as to adding defamation by implication and common-law conspiracy claims but denied the motion as to adding a false light invasion of privacy claim. (Doc. 90). After Nunes filed his second amended complaint (Doc. 92), defendants moved to strike immaterial and impertinent matter from the complaint (Doc. 99). After plaintiffs' timely resistance (Doc. 100) and defendants' timely reply (Doc. 101), the Court granted the motion but denied any relief through sanctions (Doc. 102).

On August 6, 2022, Nunes filed his third amended complaint. (Doc. 104). On August 22, 2022, defendants filed a timely answer. (Doc. 107).

On October 7, 2022, plaintiffs filed a motion to compel discovery (Doc. 112), and defendants moved to preclude plaintiffs from relying on belatedly disclosed witnesses, (Doc. 113). Both parties filed respective resistances (Docs. 116; 117) and replies (Docs. 119; 120). On November 18, 2022, the Court granted defendants' motion to preclude reliance on belatedly disclosed witnesses both at trial and in their resistance to summary judgment. (Doc. 128). On December 2, 2022, the Court granted plaintiffs' motion **[*14]** to compel but denied a request therein for attorneys' fees. (Doc. 136).

On October 25, 2022, defendants moved for summary judgment against all plaintiffs. (Doc. 118). Having filed both sealed and redacted versions of the motion, defendants then moved to unseal certain documents filed in support of summary judgment. (Doc. 124). Plaintiffs resisted the motion to unseal (Doc. 129) and timely resisted defendants'

---

[7] On October 26, 2021, the Court terminated as duplicative the unsealed version of defendants' motion to compel. (*See* Case No. 20-CV-4003-CJW-MAR (terming Doc. 127)).

EXHIBIT 43
EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

motion for summary judgment (Doc. 130). Defendants timely replied to plaintiffs' resistance to the motion to unseal (Doc. 133) and the motion for summary judgment (Doc. 139). Defendants then filed a proposed less-redacted version of their reply statement of undisputed facts. (Doc. 142). On January 6, 2023, the Court heard argument on the motion for summary judgment and the motion to unseal. (Doc. 144).

### B. Factual History: The Parties

#### 1. The Nunes Family and NuStar Farms

Plaintiffs Anthony Nunes Jr., Anthony Nunes III, and Devin Nunes are, respectively, father and sons.[8] (Docs. 118-2, at 2; 130-1, at 4-5; 138-1, at 5-6). Anthony Jr.'s family has owned and operated a dairy farm in Tulare, California for more than a century. (Docs. 118-2, at 3; 130-1, at 2; 138-1, at 4-5). All three men **[*15]** worked on the Tulare farm starting at a young age. (Docs. 118-2, at 3-4; 130-1, at 2-5; 138-1, at 4-5). Later, after purchasing and opening a different farm, Anthony Jr. and Anthony III worked closely together, and all family members, including Devin, performed various assigned tasks on the new California farm, though Devin ceased farming upon election to Congress. (Docs. 118-2, at 4; 130-1, at 5-6; 138-1, at 6-7). Devin, whose educational background is in farming, also operated his own farming business in addition to a farming operation with Anthony III until he was elected to Congress. (Docs. 118-2, at 4-5; 130-1, at 6-7; 138-1, at 7-9). In 1996, Devin began managing his family's Tulare dairy farm, as his family, including his uncle and part-owner of the Tulare dairy, Gerald Nunes, often worked and managed their farms together. (Docs. 118-2, at 5; 130-1, at 7-8; 138-1, at 8-10).

In 2001, after Devin's appointment to the position of California Director of Rural Development in the Department of Agriculture, he ceased work at the Tulare dairy. (Docs. 118-2, at 5-6; 130-1, at 8-9; 138-1, at 10-11). Thereafter, from 2003-2022, Devin represented various districts of California in Congress, **[*16]** attempting all the while to stay on top of issues facing dairy farmers despite his absence from the family's various farms. (Docs. 118-2, at 6; 130-1, at 9; 138-1, at 11). Devin has remained a California resident, even after his parents sold their California property and moved to Iowa along with Anthony III, who was interested in a farm in Sibley, Iowa, which would later become NuStar Farms. (Docs. 118-2, at 6; 130-1, at 10; 138-1, at 12-13). Devin's brother and father asked Devin to visit the Sibley farm before purchasing the farm, which Devin agreed to do, spending two nights there to evaluate the farm, facilities, and livestock. (Docs. 118-2, at 7; 130-1, at 10-11; 138-1, at 13-14). Devin claims that at no point did he discuss the labor used at the Sibley farm. (Docs. 118-2, at 7; 130-1, at 11; 138-1, at 14). Devin's parents, Dian and Anthony Jr., formed NuStar Farms in 2006 as co-owners, though Anthony Jr. became 100 percent owner in 2011, then transferred five percent to Anthony III and 5 percent to Anthony III's wife, Lori, in 2019 or 2020 with the thought Anthony III—who previously agreed to be responsible for labor—and Lori would eventually become full owners of the dairy. **[*17]** (Docs. 118-2, at 7-8; 130-1, at 10, 11; 138-1, at 13, 14).

#### 2. Esquire and Ryan Lizza

Hearst Media and Hearst Magazines (collectively, "Hearst") publish a magazine called *Esquire* as well as an online version, *Esquire*.com. (Docs. 118-2, at 8; 130-1, at 12; 138-1, at 14-15). The online publication covers various news categories, publishing content daily, while the print version publishes six times annually. (Docs. 118-2, at 8; 130-1, at 12-13; 138-1, at 15-16). Written in the style of New Journalism, *Esquire* articles are often written using first-person observations. (Docs. 118-2, at 8; 130-1, at 13; 138-1, at 16). *Esquire* utilizes a group of senior editors to create, edit, and write articles and requires both employees and freelancers to adhere to ethical practices, including accuracy, fairness, transparency, and complete reporting. (Docs. 118-2, at 8; 130-1, at 13-14; 138-1, at 17-18). Each story is

---

[8] Given the number of plaintiffs bearing the last name "Nunes," for purposes of clarity, the Court will refer to each by their first name in the factual history.

EXHIBIT 43                                                                    EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

sent through an editorial process that includes writer selection, fact-checking, art design, copy editing, and a check on accuracy. (Docs. 118-2, at 9; 130-1, at 14-15; 138-1, at 18-19).

Ryan Lizza, an experienced political reporter who has published hundreds of times in respected publications **[*18]** over 25 years,[9] worked for *Esquire* under an independent contractor agreement from June 1, 2018-June 1, 2019. (Docs. 118-2, at 9; 130-1, at 15-17; 138-1, at 19-21). As a political journalist, Lizza has covered many political issues and scandals both on television and in print, such as President Bill Clinton's impeachment, the 2000 United States election recount, presidential campaigns, and international politics, has lectured at respected universities on topics including politics and journalism, and has worked on award-winning reports, receiving recognition in 2009 as a Top 50 journalist by *The Washingtonian* and other awards since. (Docs. 118-2, at 9-12; 130-1, at 17-20; 138-1, at 21-24). Never before the instant case, defendants claim, has Lizza been accused of defamation or reporting falsehoods, or found liable for either. (Docs. 118-2, at 12; 130-1, at 21; 138-1, at 24-25).

### C. Factual History: The Article

In the summer of 2018, defendants claim, *Esquire* editors assigned Lizza to investigate and report on Devin Nunes' family's farm, NuStar Farms, as Devin was one of the most high-profile and powerful members of Congress at the time. (Docs. 118-2, at 12; 130-1, at 21-22; 138-1, at 25-26). **[*19]** Lizza and his editors claim that they believed Devin Nunes' relatives and family's dairy farm moved to Iowa over ten years earlier, where they believed dairies often use undocumented labor; plaintiffs disagree. (Docs. 118-2, at 12; 130-1, at 22-23; 138-1, at 26-28). On September 30, 2018, *Esquire*.com published the Article detailing Lizza's investigation and report on NuStar Farms, which was later printed in the November 2018 print copy of *Esquire*. (Docs. 118-2, at 13; 130-1, at 23-24; 138-1, at 28). Then, on September 30, 2018, and again on November 20, 2019, Lizza tweeted a link to the Article on his personal Twitter account. (Docs. 118-2, at 13; 130-1, at 24-25; 138-1, at 28-30).

### 1. Content and Investigation

The Article's headline reads, "Devin Nunes's Family Farm is Hiding a Politically Explosive Secret." (*See* Docs. 130-1, at 25; 130-1, at 30). The Article itself begins by stating "Devin Nunes has a secret." (*See* Docs. 118-2, at 13; 130-1, at 25; 130-1, at 30). The Article later states, "So here's the secret: The Nunes family dairy of political lore—the one where his brother and parents work—isn't in California." (*See* Docs. 118-2, at 13; 130-1, at 25; 138-1, at 30). Further, the Article **[*20]** provides that, "[a]s far as [Lizza] could tell . . . neither [Devin] Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare." (Docs. 118-2, at 13; 130-1, at 25-27; 138-1, at 31-33). The content of the Article, defendants state, came from Lizza's investigation in Sibley, where he sought to learn about the local labor market, NuStar Farms, and the tension between agriculture and certain political views Lizza believed common among many Iowa farmers, as much of Sibley's population voted for President Donald Trump in 2016 and was represented by Representative Steve King, who is opposed to undocumented immigration. (Docs. 118-2, at 13-14; 130-1, at 27-28; 138-1, at 33-34).

Lizza worked on the Article for longer than two months, which included: (1) researching use of immigrant labor on dairy farms in Minnesota and Iowa from various sources, including Congressional records and studies; (2) spending three days in Sibley, Iowa, and Worthington, Minnesota, where he interviewed a total of 24 sources; (3) and taking over five hours of interview recordings, 60 pages of written notes and audio notes for himself, over an hour of **[*21]** video footage and research totaling over 1,120 pages. (Docs. 118-2, at 14; 130-1, at 28-32; 138-1, at 34-42). Defendants state that some people Lizza interviewed, despite supporting President Trump, were uneasy on Trump's immigration views, which Lizza suspected might be because of dairies' reliance on undocumented labor.

---

[9] Plaintiffs claim Lizza harbors extreme bias toward Devin and published statements and stories in accord with that sentiment, in addition to claimed libelous stories before employment with Hearst, leading to the events of this case. (Docs. 118-2, at 9; 130-1, at 15-18).

EXHIBIT 43

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

EXHIBIT 19

(Docs. 118-2, at 14-15; 130-1, at 32; 138-1, at 42-43). In fact, according to defendants, several sources confirmed that undocumented labor use occurs on Midwestern dairy farms and that its prevalence is well-known, as did files from a _Title 8, United States Code, Section 1324, Immigration Reform and Control Act ("IRCA")_ prosecution and a 2017 letter from dairy farmers to the Chairman of the Judiciary Committee. (Docs. 118-2, at 15-16; 130-1, at 33; 138-1, at 43-44). As a result of this labor use paired with the farmers' alleged political views, Lizza noted in the Article that there is political hypocrisy when the dairy farmers employ undocumented laborers despite supporting Trump, King, and their views against undocumented immigration. (Docs. 118-2, at 16; 130-1, at 33; 138-1, at 44).

Further, the Article detailed interviews in which two sources having first-hand knowledge, which plaintiffs dispute, informed Lizza that NuStar Farms relies on undocumented **[*22]** labor and that one source had taken "illegal people" to NuStar Farms and "assert[ed] that the farm was aware of [each undocumented laborer's] status." (Docs. 118-2, at 16; 130-1, at 34; 138-1, at 44-45). According to defendants, Source 1 informed Lizza a NuStar Farms worker Flavio,[10] informed the source to be careful with what they told Lizza, leading Lizza to infer he was being followed because the worker knew not only who Lizza was interviewing but where those interviews would take place. (Docs. 118-2, at 16-17; 130-1, at 34-35; 138-1, at 46-48). Plaintiffs add "Source 1 then informed Lizza that she told Flavio that Lizza 'just wanted help. He just want [sic] to make an article, and that's it'"; plaintiffs also state that Lizza misrepresented being followed. (Docs. 130-1, at 34-35; 138-1, at 46-48). Source 1 also informed Lizza that he would have better luck speaking with workers at a dairy 25 minutes away because Flavio informed Source 1 that NuStar Farms' workers were scared to help Lizza in case he was "looking for something else," and that NuStar Farms was "so scared." (Docs. 118-2, at 17-18; 130-1, at 35-36; 138-1, at 48).

Lizza's second source, Source 2, who previously worked **[*23]** for NuStar Farms, informed Lizza he is "illegal," which plaintiffs deny. (Docs. 118-2, at 18; 130-1, at 36; 138-1, at 49). Defendants claim the Social Security Administration ("SSA") has no record of someone with Source 2's name and Social Security Number ("SSN"), which plaintiffs deny and dispute because Source 2 signed his Form I-9 and supplied his social security card, and NuStar Farms never received a no-match letter when it withheld taxes from Source 2's pay. (Docs. 118-2, at 18; 130-1, at 36; 138-1, at 49-50). Defendants state, and plaintiffs dispute, that a third source said nearly all employees on dairy farms in the area are undocumented laborers. (Docs. 118-2, at 18; 130-1, at 37; 138-1, at 50-51).

To explain why it is "nearly impossible for a dairy in the area or the size of NuStar [Farms] to not use undocumented labor," the Article featured two area dairy farmers commenting on the matter. (Docs. 118-2, at 18; 130-1, at 37; 138-1, at 51). One of these sources was featured in a January 2016 _Des Moines Register_ article, which informed Lizza's view that Midwestern dairies rely on undocumented labor, though plaintiffs deny and dispute Lizza ever reviewed the article. (Docs. 118-2, **[*24]** at 19; 130-1, at 37, 37 n.13 (citing Lizza's affidavit); 138-1, at 51-52). One source, who stated that they "sent" people "over there" stated people with documentation are going to go to a good company with benefits, not work in a dairy making $14 an hour without vacation and benefits. (Docs. 118-2, at 19; 130-1, at 37-38; 138-1, at 52).

The Article goes on to state, "Is it possible the Nuneses have nothing to be seriously concerned about? Of course . . . ," and, defendants claim to plaintiffs' denial, Lizza did not intend to convey a formal conspiracy to hide the family's move to Iowa or that the secret involved anything other than the move. (Docs. 118-2, at 19; 130-1, at 38; 138-1, at 52-53). The Article states that Devin Nunes "has no financial interest in his parents' Iowa dairy operation," and defendants claim to plaintiffs' denial, that no facts within the Article allege that Devin is involved in the farm's operations or knows about hiring practices. (Docs. 118-2, at 19-20; 130-1, at 38; 138-1, at 53-54). Plaintiffs dispute that the Article details that Devin has no ownership or operational interest in the farm, to which defendants reply that the Article states Devin has no financial **[*25]** interest in the farm, which includes not having an operational interest, and that it is true Devin and his wife filed a document with the Securities and Exchange Commission ("SEC") listing their address as the NuStar Farms post-office box because Lizza retrieved the document from the SEC website. (Docs. 118-2, at 19-20, 62; 130-1, at 39, 118; 138-1, at 53-54, 165).

---

[10] Source 1 was deposed and confirmed Flavio worked at NuStar Farms. (Docs. 118-2, at 18; 130-1, at 36; 138-1, at 49).

**EXHIBIT 43**                                                        EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

The Article goes on to name the aforementioned secret, which plaintiffs state conveys a defamatory implication and not the farm's location as the secret. (Docs. 118-2, at 20; 130-1, at 39-40; 138-1, at 54-56). The Article then asks, "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?" (Docs. 118-2, at 20; 130-1, at 39-40; 138-1, at 54-56). Defendants claim, to plaintiffs' denial, "conspire" here means to act in harmony, not to commit a formal, actionable conspiracy. (Docs. 118-2, at 20; 130-1, at 39-40; 138-1, at 54-56).

Defendants state that while in Sibley, Lizza tried to interview Devin Nunes and the NuStar plaintiffs on multiple occasions. (Docs. 118-2, at 20; 130-1, at 40-41; 138-1, at 56-57). Defendants claim, **[*26]** and plaintiffs deny, that Lizza called NuStar Farms multiple times without response and that he was rebuffed and ignored when he attempted to interview Anthony Jr. (Docs. 118-2, at 21; 130-1, at 41; 138-1, at 57). Devin Nunes also did not respond to requests for comment and advised his father to not speak to Lizza. (Docs. 118-2, at 21; 130-1, at 41; 138-1, at 57-58).

### 2. Editing Process

According to defendants, a thorough editing process occurred to ensure the accuracy of the statements in the Article and the clarity of the narrative, all while consulting Lizza. (Docs. 118-2, at 21; 138-1, at 58-61). Defendants assert the Article was checked by multiple fact-checkers, but plaintiffs dispute this, adding their conclusion that defendants were negligent in not keeping Lizza's notes, tapes, and records despite suit being filed a year after the Article's creation and Hearst's policy of retaining such materials for 60 days only. (Docs. 118-2, at 9, 21; 130-1, at 14-15, 41-44; 138-1, at 18-19, 58-61). Then, *Esquire* performed several rounds of editing using multiple senior editors, including the story editor, the Executive Director of Editorial, and the Editor-in-Chief, in addition to contributions **[*27]** from the Art Department and a copy-editing process performed by the Assistant Copy Editor, with the Article receiving final approval by the Editor-in-Chief; plaintiffs dispute these facts. (Docs. 118-2, at 21; 130-1, at 41-44; 138-1, at 58-61).

Instead, plaintiffs state that though the Article went through multiple drafts, yet after listening to the tapes, Lizza knowingly included falsities in the Article. (Docs. 130-1, at 41-44). In support of this claimed fact, plaintiffs list three versions of a paragraph from the Article:

(1) There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely on undocumented labor. One source, who was deeply connected in the local Hispanic community, *told me that the source has personally sent undocumented workers to Anthony Nunes' farm for jobs.* 'I've been there and bring illegal people,' the source said. "*And he knows that.*" The source added, "People come here and ask [sic] work so I send them over there."

(2) There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely on undocumented labor. One source, who was deeply connected **[*28]** in the local Hispanic community, *has personally sent undocumented workers to Anthony Nunes' farm for jobs.* 'I've been there and bring illegal people,' the source said. "*And he knows that.*" The source added, "People come here and ask work so I send them over there."

(3) "There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, *as* [sic] *least in part*, on undocumented labor. One source, who was deeply connected in the local Hispanic community, *had personally sent undocumented workers to Anthony Nunes, Jr.'s farm for jobs.* 'I've been there and bring illegal people,' the source said, *asserting that the farm was aware of their status.* "People come here and ask work so I send them over there."

(*Id.*) (emphasis added). Defendants acknowledge these changes were made but call them non-substantive and state the changes do not suggest carelessness or that defendants acknowledged the statements' falsity. (Doc. 138-1, at 60-61).

EXHIBIT 43   EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

### 3. Publication

Again, the Article was published on September 30, 2018, on *Esquire*.com and later printed in the November 2018 print copy of *Esquire*. (Docs. 118-2, at 13; 130-1, at 23-24; 138-1, at 28). On November **[*29]** 20, 2019, Lizza tweeted a link to the Article—the Tweet—on his personal Twitter. (Docs. 118-2, at 13; 130-1, at 24-25; 138-1, at 28-30). Defendants state Lizza believed when the Article was published and the Tweet was published, and still believes today, that NuStar plaintiffs knowingly employed undocumented workers, which plaintiffs state is false because they believe Lizza never spoke to one of their workers or anyone with firsthand knowledge, though defendants say this is not true. (Docs. 118-2, at 21; 130-1, at 44-45; 138-1, at 61-63). Also, defendants assert that Lizza believed at the time of the Article and Tweet publications, and still believes today, that dairy farms often use undocumented labor, which led him to believe NuStar Farms knowingly hired undocumented laborers, as he thought it unlikely NuStar plaintiffs could remain ignorant of their workers' statuses. (Docs. 118-2, at 21-22; 138-1, at 63-64). Plaintiffs deny this and call the Article a conjured "October Surprise" that intentionally ignored Lizza's tapes and notes and did not acknowledge that NuStar plaintiffs did not own the farm when Source 1 brought labor to the Sibley farm. (Doc. 130-1, at 45).

Defendants also **[*30]** state Lizza's research uncovered many facts showing reliance on undocumented labor is common and widely known, including the aforementioned IRCA prosecution and statements from dairy industry groups. (Docs. 118-2, at 22; 138-1, at 64-66). According to defendants, one source informed Lizza that Anthony Jr. called the source expressing fear that the Article would put a target on the Nunes' Sibley dairy and lead to an ICE raid, which the source stated led the source to believe NuStar plaintiffs would only be in fear of an ICE raid if they have undocumented workers. (Docs. 118-2, at 22-23; 138-1, at 64-66). Plaintiffs state neither this phone call nor expression of fear that an ICE raid would occur ever happened. (Doc. 130-1, at 45-46).

Also, defendants state that when Lizza published the Tweet, Lizza believed Devin Nunes was aware that NuStar Farms hires and uses undocumented labor, which he believed was one reason Devin had been "reticent" about his family's move. (Doc. 118-2, at 23). NuStar plaintiffs deny this, stating their family has never been reticent about their move to Iowa or the operation of NuStar Farm, the move has been a matter of public record since 2006, and there is no **[*31]** evidence showing Devin—who spoke publicly about NuStar Farms—was ever aware that NuStar hires unauthorized workers. (Doc. 130-1, at 46-47). Defendants reply to this proffer that plaintiffs cite to no evidence in support of their asserted facts. (Doc. 138-1, at 66-67). Further, defendants state Lizza was familiar with Devin's farming background, education, work experience, and family's farming history, which led Lizza to believe Devin would know dairy farms, including NuStar Farms, rely on undocumented labor. (Docs. 118-2, at 23-24; 138-1, at 67-68). Lizza believed this was another reason Devin was not open about the family's move, given his immigration stances and his purported conversations about the farm with his family, and that Devin would have talked about the dairy's labor pool because he used its address on an SEC filing. (Docs. 118-2, at 23-24; 138-1, at 67-68). Plaintiffs state Devin never discussed labor or farm operations as to the Sibley farm with his father, and Devin had no experience that would lead him to believe his family employed undocumented laborers there. (Doc. 130-1, at 47-48).

### 4. Retraction

Defendants received no complaint or demand for correction or retraction **[*32]** until a year after the Article's publication, and Lizza did not find the Molly Hemingway article in *The Federalist* to have refuted[11] any of the Article's reporting on undocumented labor use. (Docs. 118-2, at 24; 130-1, at 48-49; 138-1, at 69-70). On September 25, 2019, however, Devin Nunes sent a retraction demand letter to defendants. (Docs. 118-2, at 24; 130-1, at 49-50; 138-1, at 70). Five days later, Devin Nunes filed this suit. (Docs. 118-2, at 25; 130-1, at 50; 138-1, at 70).

---

[11] Plaintiffs state the Hemingway article was not a rebuttal but an article pointing out falsehoods in the Article to show that the Sibley farm was mentioned at a town hall in 2010. (Docs. 118-2, at 24; 130-1, at 48-49; 138-1, at 69-70).

EXHIBIT 43                                                                           EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Lizza read the retraction demand and complaint around the time of delivery in September 2019. (Docs. 118-2, at 25; 130-1, at 50; 138-1, at 70-71). Lizza believed the complaint challenged eight or nine statements as false but did not read the complaint as challenging any implication that Nunes was aware of any undocumented workforce, though plaintiffs state they expressly asked for retraction of the implication. (Docs. 118-2, at 25; 130-1, at 50; 138-1, at 70-71). Also, Lizza did not take the retraction demand or complaint to challenge the statements that NuStar Farms uses undocumented labor—though plaintiffs state the retraction did challenge knowing use and employment of undocumented labor—which surprised **[*33]** him and led him to tweet that Devin rebutted the Article but not its core findings on undocumented labor. (Docs. 118-2, at 25-26; 130-1, at 51-52; 138-1, at 71-73). Further, defendants state that the retraction demand and complaint do not allege what "criminal wrongdoing" the Article, through its defamatory gist and false implication, purportedly alleged that Devin knew about or conspired to conceal, because the conspiracy makes no mention of Devin's knowledge of NuStar Farm's use of undocumented labor. (Docs. 118-2, at 26; 138-1, at 73-74). In response, plaintiffs point to the Eighth Circuit Court of Appeals' finding that a reasonable reader could find the complaint plausibly alleges an implication that there was a conspiracy to hide NuStar plaintiffs' move, among other pieces of the implication. (Doc. 130-1, at 52-53). After receiving the complaint and retraction demand, Lizza still believed Devin knew NuStar Farms hires undocumented laborers, and no facts in the complaint changed Lizza's belief or caused him to doubt it, though plaintiffs maintain Lizza's belief is baseless. (Docs. 118-2, at 26-27; 130-1, at 53-54; 138-1, at 74-76).

Defendants assert, to plaintiffs' denial, that **[*34]** the original complaint contains numerous false statements, such as: (1) Lizza and his fiancée, Olivia Nuzzi, coordinated a smear campaign of tweeting the Article; (2) Lizza and Nuzzi had a joint scheme to retaliate against Devin for exposing corruption including the Hilary Clinton Steele dossier; and (3) a joint scheme among Lizza, the Editor-in-Chief of *Esquire*, Nuzzi, and CNN to publish the Article. (Docs. 118-2, at 27; 130-1, at 54-55; 138-1, at 76-78).

### 5. The Tweet

On November 20, 2019, Lizza tweeted a link to the Article via his personal Twitter account, having no doubt about the accuracy of the Article or that Devin Nunes was aware that NuStar Farms knowingly hires undocumented laborers; plaintiffs contest this fact, asserting Lizza knew the Article contained falsehoods on these topics. (Docs. 118-2, at 27; 130-1, at 55-56; 138-1, at 78-79). Defendants add no one at Hearst directed Lizza, who left their employment months before, to share the link; plaintiffs contest Hearst's liability nonetheless, arguing Hearst is liable because Lizza has apparent authority to publish the Article again through the Tweet. (Docs. 118-2, at 27-28; 130-1, at 55-56; 138-1, at 78-79).

### 6. Public Mention [*35]  of the Sibley Farm

According to plaintiffs, Devin has mentioned his family's move to Iowa, in part because the Hemingway article documents King saying to people that Devin's family are among his constituents; as defendants point out, however, Devin himself is not documented in the record discussing his family's move to Iowa. (Docs. 118-2, at 28; 130-1, at 56; 138-1, at 79-80). When asked to produce documents relating to any statement Devin made about his family's move to Iowa or mentioning NuStar Farms, Devin responded that there were none, though plaintiffs state that is because Devin was never involved in the business of NuStar Farms. (Docs. 118-2, at 28; 130-1, at 57; 138-1, at 80). In fact, Devin did not recall any statements or communications he made about NuStar Farms, his family's move to Iowa, the purchase of NuStar Farms, or the family's role in managing or operating NuStar Farms. (Docs. 118-2, at 28; 130-1, at 56-57; 138-1, at 80-81). Devin has been in Iowa since the Nunes' move, however, and states he made mention of his family being in Iowa at a 2010 townhall in Le Mars, Iowa, though the press release for the event did not mention his family's Sibley farm—King's office, **[*36]** not Nunes'—created the press release. (Docs. 118-2, at 28-29; 130-1, at 57-58; 138-1, at 81). Devin holds not the Iowa farm, but the Tulare, California farm as the family dairy that is central to his identity and has taken guests, ambassadors, diplomats, media members, and government officials to the Tulare farm for tours. (Docs. 118-2, at 29; 130-1, at 58; 138-1, at 82).

EXHIBIT 43                                                                    EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

In August 2018, however, a petition was brought in California state court claiming it was misleading for Devin to be called "U.S. Representative/Farmer" on the November 2018 election ballot, given that he had not farmed in 11 years; it was later found that no error was made in accepting Nunes' ballot with that title. (Docs. 118-2, at 29; 130-1, at 58-60; 138-1, at 82-83). Devin responded to the petition by detailing his connection to farming including through his relatives, though he mentioned neither NuStar Farms nor that his family operated a farm in Sibley. (Docs. 118-2, at 29; 130-1, at 60; 138-1, at 83-84). Here, NuStar plaintiffs produced no discovery related to any public statement by them about Devin, stated there were no documents, and did not answer an interrogatory to identify every public statement or communication **[*37]** NuStar plaintiffs made relating to Devin, because they objected to the interrogatory. (Docs. 118-2, at 30; 130-1, at 60-61; 138-1, at 84-85). In 2009, a regional dairy publication wrote an article about NuStar plaintiffs; NuStar plaintiffs conditioned their participation in the article on the agreement that there would be no mention of Devin, as he had nothing to do with the Sibley dairy. (Docs. 118-2, at 30-31; 130-1, at 61-62; 138-1, at 85). Later, NuStar plaintiffs asked the publication to remove the article out of concern for Devin and because they did not want publicity for the dairy and regretted the interview. (Docs. 118-2, at 30-31; 130-1, at 61-62; 138-1, at 85-86).

### 7. Allegations of Federal Immigration Violations

Defendants state that their expert, Philip Martin, explained that United States agricultural workers are primarily Hispanic and foreign-born, and 70 percent of foreign-born workers are unauthorized; plaintiffs dispute defendants' statement. (Docs. 118-2, at 42; 130-1, at 85; 138-1, at 117-18). When asked, "What do you think of people here—who are here illegally, just putting in work and making money for their family? Do you think there's anything wrong with that?" **[*38]** Anthony Jr. expressed a positive opinion of those people and stated positive sentiment toward the Bracero program[12] or one like it in which the government would legalize immigrants working in agriculture. (Docs. 118-2, at 42-43; 130-1, at 85-86; 138-1, at 118-19).

Under federal law, employers must use a Form I-9 to verify the identity and employment authorization of individuals hired by employers in the United States. (Docs. 118-2, at 31; 130-1, at 62; 138-1, at 86). Section 2 of the Form I-9 requires the employer's signature and date attesting that they (1) "have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of [the employer's] knowledge the employee is authorized to work in the United States." (Docs. 118-2, at 31; 130-1, at 62; 138-1, at 86). For at least 289 Form I-9s—based on the 309 NuStar plaintiffs provided in discovery—NuStar Farms did not complete Section 2 on time, which is a substantive IRCA violation. (Docs. 118-2, at 31; 130-1, at 62-69; 138-1, at 86-96).

In October 2018, NuStar Farms was advised by its immigration attorney, Amanda Bahena, **[*39]** who was performing an internal I-9 compliance audit, that Section 2 must be filled out for all employees and that NuStar Farms could accept a document that "looks correct on its face" without further inquiry. (Docs. 118-2, at 31-32; 130-1, at 69-70; 138-1, at 96-98). On at least 208 Form I-9s, NuStar Farms never signed and dated Section 2, which is, as plaintiffs' expert testified, a substantive IRCA violation. (Docs. 118-2, at 32-33; 130-1, at 71; 138-1, at 99-100). Defendants state that for at least 68 Form I-9s, NuStar Farms did not fill out any portion of the forms on time—another substantive violation—and waited months or years to do so despite the law requiring the forms be filled out in within three days of the hire. (Docs. 118-2, at 32-33; 138-1, at 100-02). Plaintiffs dispute this, saying they completed all documentation at the commencement of each employee's work. (Doc. 130-1, at 72-73).

### a. NuStar Farms' Onboarding Process

---

[12] On August 4, 1942, the Bracero program commenced with the goal of easing labor shortages by allowing millions of Mexican nationals to legally enter the United States to work on short-term contracts, often in the field of agriculture, though the program ended on December 31, 1964. LIBRARY OF CONGRESS, *1942: Bracero Program*, https://guides.loc.gov/latinx-civil-rights/bracero-program; (Docs. 118-2, at 69; 130-1, at 125; 138-1, at 177).

EXHIBIT 43                                                                          EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Dian Nunes, who trained the current bookkeeper, Lori Nunes, testified at her deposition that "it is 'a known fact' that it is 'against the law' to inspect employee documents." (Docs. 118-2, at 33; 130-1, at 73; 138-1, at 102). During Anthony III's deposition, **[*40]** he testified he believes he is not legally allowed to ask about expirations or question document validity and that he thought asking would constitute discrimination. (Docs. 118-2, at 33-34; 130-1, at 73-74; 138-1, at 102-103). Anthony Jr. testified "it might be illegal for me to ask [workers] about their [SSNs]" submitted with the I-9 even when the SSA has alerted NuStar Farms of a no-match. (Docs. 118-2, at 33; 130-1, at 74; 138-1, at 103). Defendants state, to plaintiffs' denial, that Dian never verified employee documentation at NuStar Farms[13] because she thought it was against the law to try, which plaintiffs say is false because she verified documentation, just not immigration status. (Docs. 118-2, at 34; 130-1, at 74; 138-1, at 104).

Upon moving to Iowa, Anthony Jr., who has never taken responsibility for verifying documents at the Sibley farm, informed Anthony III that Anthony III was in charge of "the labor" and "the problems" because Anthony Jr. did not want to deal with labor or related problems. (Docs. 118-2, at 34; 130-1, at 74-75; 138-1, at 104).

Anthony III's wife, Lori, enters the onboarding paperwork and is tasked with ensuring all the entries are correct by checking the **[*41]** Form I-9s, which she has done at NuStar Farms since 2010. (Docs. 118-2, at 34; 130-1, at 75; 138-1, at 104-105). Lori has never reviewed a NuStar Farms' employee's identification for correctness, however, and does not believe it is her responsibility to look at Form I-9s and check them for correctness after an employee returns the Form I-9—though she has before. (Docs. 118-2, at 35; 130-1, at 75; 138-1, at 105). In Lori's deposition testimony, she stated the October 2018 self-audit was how she learned the dairy had to complete Section 2 of the Form I-9. (Docs. 118-2, at 35; 130-1, at 76; 138-1, at 106). Lori's practice, which she learned from Dian, is to enter the name and submitted SSN into QuickBooks to process payroll. (Docs. 118-2, at 35; 130-1, at 76; 138-1, at 106). Having learned all her bookkeeping skills from Dian, Lori followed Dian, Anthony Jr., and Anthony III's direction relating to employment documents because she believed they knew and followed those laws. (Docs. 118-2, at 35; 130-1, at 76; 138-1, at 107).

Though Dian knew a Form I-9 was required for each employee and read the instructions, she never discussed the Form I-9 requirements with Lori or others at NuStar Farms; **[*42]** instead, she told Lori to make copies of the papers, attach them to the other paperwork, and file the documents. (Docs. 118-2, at 35-36; 130-1, at 77; 138-1, at 107-108). When Lori was asked during her deposition whether she wanted to know of her employees' statuses, Lori stated she did not know and has a lot of feelings on the matter. (Docs. 118-2, at 36; 130-1, at 75; 138-1, at 108-09). Plaintiffs' expert, Clete Samson, testified in his deposition that an employer "generally has the duty to confirm that their employees are authorized for work." (Docs. 118-2, at 36; 130-1, at 78; 138-1, at 109). Claude Arnold, defendants' expert, and Samson agree that at a minimum, the number and type of substantive Form I-9 violations is indicia of NuStar plaintiffs' constructive knowledge of hiring undocumented persons. (Docs. 118-2, at 36-37; 130-1, at 78; 138-1, at 109). Defendants expand this conclusion, however, and say, which plaintiffs deny, the number and type of violations are sufficient to conclude NuStar plaintiffs had constructive knowledge but were in willful disregard of laborers' eligibility to work in the United States. (Docs. 118-2, at 33-37; 130-1, at 78; 138-1, at 109).

On April **[*43]** 1, 2021, NuStar plaintiffs provided a document listing all its employees and former employees, which included their names, proffered SSNs, dates of birth, and dates of employment. (Docs. 118-2, at 37; 130-1, at 78; 138-1, at 109). This Court ordered the SSA to verify the SSNs of all disclosed NuStar Farms employees by populating a chart containing all NuStar Farms' current and former employees' names, proffered dates of birth, and SSNs in the rows and including a "Match?" column to state "Yes" if the name and SSN in that row matched the SSA records and "No" if not; on April 16, 2021, the SSA produced such a chart ("the Chart"). (Docs. 118-2, at 37; 130-1, at 78-79; 138-1, at 109-10). Of those employees who NuStar plaintiffs employed on or before September 30, 2018, 243 of 319 employees' names, dates of birth, and SSNs did not match SSA records. (Docs. 118-2, at 37; 130-1, at 79; 138-1, at 110).

---

[13] Defendants' claimed fact uses the label "Nunes Farms," not "NuStar Farms." (Doc. 118-2, at 34). Neither party comments on this distinction. Given that this is the only mention of "Nunes Farms," the Court interprets this as a typographical error and that defendants intended to say NuStar Farms.

**EXHIBIT 43**                                                           **EXHIBIT 19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

### b. NuStar Farms' History of No-Match Issues

In October 2019, NuStar Farms received a letter from the SSA ("2018 No-Match Letter") stating that 20 of 27 W-2s submitted to the Internal Revenue Service ("IRS") for 2018 reported SSNs that did not match the SSA's records. (Docs. 118-2, at 38; 130-1, **[\*44]** at 79; 138-1, at 111). Lori thought the 2018 No-Match Letter was a joke but still informed Anthony III and Anthony Jr., who said to do nothing but file it. (Docs. 118-2, at 38; 130-1, at 80; 138-1, at 111). In December 2020, NuStar Farms received another letter from the SSA ("2019 No-Match Letter") stating that 14 of 19 W-2s for tax year 2019 provided SSNs that did not match SSA records, which Lori believed was "bogus." (Docs. 118-2, at 38; 130-1, at 80; 138-1, at 111-12).

The no-match letters are what the SSA calls "EDCOR" letters or "Educational Correspondence," which the SSA began to send in 2019 after a decade-long hiatus from the practice. (Docs. 118-2, at 39; 130-1, at 80-81; 138-1, at 112). Both no-match letters state that NuStar plaintiffs could log into a government portal to find out which employees' information did not match, so as to ensure there were no errors with their identification documents. (Docs. 118-2, at 39; 130-1, at 81; 138-1, at 112-13). Both letters informed NuStar plaintiffs that when information does not match, the SSA cannot credit the earnings to the employee's Social Security records, which impacts whether the employee is "entitled to Social Security retirement, **[\*45]** disability, and survivors' benefits, and how much he or she can receive." (Docs. 118-2, at 39; 130-1, at 81; 138-1, at 113). Both letters provided information about free online wage reporting tools and how to view and correct name and SSN mismatches, in addition to indication that mismatches can be the result of bookkeeping errors, which NuStar plaintiffs ruled out. (Docs. 118-2, at 39-40; 130-1, at 82; 138-1, at 113).

On the SSA website, there is information about what employers can do should they have questions about their EDCOR letters. (Docs. 118-2, at 40; 130-1, at 82; 138-1, at 114). That website states that an employer is responsible for investigating a name and SSN mismatch error. (Docs. 118-2, at 40; 130-1, at 82; 138-1, at 114). After receiving the letters, Lori, Anthony III, and Anthony Jr. did not visit the SSA website to determine which of their employees had records that did not match. (Docs. 118-2, at 40; 130-1, at 82; 138-1, at 113-14). After receiving the 2018 No-Match Letter, none of NuStar Farms' owners or managers advised employees to contact the SSA to correct the discrepancy, nor did the owners or managers seek legal advice. (Docs. 118-2, at 40; 130-1, at 82-83; **[\*46]** 138-1, at 115). When NuStar plaintiffs received the 2019 No-Match Letter, Anthony III, Anthony Jr., and Lori did not visit the SSA website to determine which employees had information that did not match. (Docs. 118-2, at 41; 130-1, at 83; 138-1, at 115). In response, none of NuStar Farms' owners or managers asked any employees to check the accuracy of their SSNs, nor did they advise their employees to contact the SSA to correct the issues. (Docs. 118-2, at 41; 130-1, at 83; 138-1, at 115). Further, none of the owners or managers sought legal advice upon receiving the 2019 No-Match Letter. (Docs. 118-2, at 41; 130-1, at 83; 138-1, at 116).

Defendants state, and plaintiffs deny and dispute based on Arnold's methodology and conclusions, that Arnold concluded 239 of the 319 persons NuStar employed on or before September 30, 2018, had provided "counterfeit Resident Alien, state identification or Social Security card documents or did not provide documentation that satisfies employee verification requirements." (Docs. 118-2, at 41-42; 130-1, at 84; 138-1, at 116). Defendants state, and plaintiffs again deny and dispute based on Arnold's methodology and conclusions, that when Arnold produced **[\*47]** his July 30, 2021 report, NuStar Farms still employed nine of the aforementioned undocumented workers. (Docs. 118-2, at 42; 130-1, at 84; 138-1, at 116-17). Samson testified that some of the NuStar Farms' employees' documents contained "indicia" that they were "fake," including that the documents used different fonts than genuine cards and some SSNs started with the number 9 despite the SSA not assigning SSNs starting with that number. (Docs. 118-2, at 42; 130-1, at 84-85; 138-1, at 117). Plaintiffs add, to defendants' protest, that Samson also agreed with Arnold that other indicia existed, such as misspellings. (Docs. 118-2, at 45; 130-1, at 91; 138-1, at 126).

### c. NuStar Farms' Employees with Problematic Documents

On December 11, 2006, NuStar Farms hired R.G. who presented a Resident Alien card that had expired June 3, 2006, and the SSA confirmed R.G.'s name and SSN did not match records. (Docs. 118-2, at 43; 130-1, at 86; 138-1,

EXHIBIT 43　　　　　　　　　　　　　　　　　　　　　　　　　　　　EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

at 119-20). On February 21, 2007, NuStar Farms hired I.C.V. who presented a Resident Alien card that expired on December 30, 2005, and whose name and SSN did not match SSA records. (Docs. 118-2, at 43; 130-1, at 86-87; 138-1, at 120). On July 4, 2007, NuStar **[*48]** Farms hired F.C.V., whose Form I-9 is dated July 20, 2007, and who presented a Resident Alien card expiring November 30, 2006; F.C.V.'s name and SSN did not match SSA records. (Docs. 118-2, at 43; 130-1, at 87; 138-1, at 120-21). On May 18, 2011, NuStar Farms hired A.H. who presented a Resident Alien card bearing an expiration date of December 5, 2009. (Docs. 118-2, at 43-44; 130-1, at 87-88; 138-1, at 121). On May 23, 2011, Lori signed the Section 2 employer verification on A.H.'s Form I-9; A.H.'s name and SSN did not match SSA records. (Docs. 118-2, at 43-44; 130-1, at 87-88; 138-1, at 121).

Samson stated that accepting expired work authorization documents violates the IRCA and opined that, having viewed F.C.V.'s Form I-9, F.C.V. must not have been instructed in any way how to fill out his Form I-9. (Docs. 118-2, at 43; 130-1, at 88-90; 138-1, at 122-23). Samson further testified that verifying and recording the expiration date is an important record-keeping obligation of the employer. (Docs. 118-2, at 44; 130-1, at 89-90; 138-1, at 123-24). Lori testified that she did not see expiration dates on documents because she did not check them, while Anthony III did not know work authorizations had **[*49]** expiration dates. (Docs. 118-2, at 44; 130-1, at 90; 138-1, at 124). Having been advised by Bahena, Lori now knows that she cannot accept expired documents and how to correctly complete forms. (Docs. 118-2, at 45; 130-1, at 90; 138-1, at 124).

On May 10, 2012, NuStar Farms hired J.N. who presented NuStar Farms with a state identification card that expired April 22, 2012. (Docs. 118-2, at 45; 130-1, at 90; 138-1, at 124-25). On July 7, 2017, NuStar Farms hired A.G.M. who provided a state identification card that had expired on January 18, 2016. (Docs. 118-2, at 45; 130-1, at 91; 138-1, at 125). Bahena acknowledged the fact NuStar Farms should not accept expired state identification documents. (Docs. 118-2, at 45; 130-1, at 91; 138-1, at 126).

In February 2018, NuStar Farms hired M.M.O. whose original Form I-9 identified him as a citizen of the United States; his name and SSN, however, did not match SSA records. (Docs. 118-2, at 46; 130-1, at 91-92; 138-1, at 126-27). In May 2021, after subpoenaing M.M.O., defendants were told M.M.O. no longer worked for NuStar plaintiffs, and he could not be produced for deposition. (Docs. 118-2, at 46; 130-1, at 92; 138-1, at 127). In May 2022, NuStar **[*50]** Farms re-hired M.M.O., and accepted the same identification document as in February 2018, though it had expired in May 2021, and NuStar plaintiffs did not complete Section 2 of M.M.O.'s Form I-9. (Docs. 118-2, at 46; 130-1, at 92-93; 138-1, at 127-28 (citing Doc. 118-115)). The May 2022 Form I-9, however, did not list M.M.O. as a citizen but rather a lawful permanent resident, and M.M.O.'s Alien Registration number was not on the Form. (Docs. 118-2, at 46; 130-1, at 93; 138-1, at 129). Defendants state Samson acknowledges that it is a red flag for an employer when a potential employee presents the employer with a name and SSN that the employer has already been told by the SSA does not match; plaintiffs dispute this, saying the Chart showing the mismatch would not show constructive knowledge, and instead only "indicia of a potential issue with fraudulent documents being used." (Docs. 118-2, at 46; 130-1, at 93-94; 138-1, at 129-30).

The Form I-9's instructions state that a Social Security card is not valid to establish employment authorization if it states, "VALID FOR WORK ONLY WITH [DHS OR INS] AUTHORIZATION." (Docs. 118-2, at 47; 130-1, at 94; 138-1, at 130). But NuStar Farms hired **[*51]** two known employees who presented Social Security cards bearing "VALID FOR WORK ONLY WITH [DHS OR INS] AUTHORIZATION," and one employee, H.F., presented a name and SSN that did not match SSA records. (Docs. 118-2, at 47; 130-1, at 94; 138-1, at 130-31). When Lori was asked about the notation as to one employee's card, she stated she did not recall the specific card but that there is most likely an authorization form that goes with the card, as is required. (Docs. 118-2, at 47; 130-1, at 95; 138-1, at 131-32).

In October 2018, Bahena informed Lori that when NuStar Farms reviews Form I-9s, identification documents, and work authorization documents, NuStar Farms should inspect the documents for discrepancies and inconsistencies. (Docs. 118-2, at 47-48; 130-1, at 95-96; 138-1, at 132). On August 20, 2007, NuStar Farms hired R.V.B. whose date of birth on his Form I-9 was "10-12-1975," though it was listed as "12/10/75" on his permanent resident card. (Docs. 118-2, at 49; 130-1, at 98-99; 138-1, at 135-36). Further, the SSA had no match to someone with his name, SSN, or either date in combination. (Docs. 118-2, at 49; 130-1, at 98-99; 138-1, at 135-36). On June 19, 2013, NuStar Farms hired **[*52]** someone listed on their Form I-9—which a translator helped him with—as "Criserio P.V.," as "Cricerio"

EXHIBIT 43                                                          EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

on his W-4, and "Criceiro" on his identification document. (Docs. 118-2, at 48; 130-1, at 97; 138-1, at 133-34). The W-4 lists this employee as having been born "11-12-86," but on his permanent resident card, his date of birth is "01/12/1986." (Docs. 118-2, at 48; 130-1, at 97; 138-1, at 133-34). On September 24, 2013, NuStar Farms hired A.V.G., whose Form I-9 lists his date of birth as "10-08-1990," though his permanent resident card states he was born on "10/18/90." (Docs. 118-2, at 49; 130-1, at 99; 138-1, at 136). The SSA had no match to an individual by his name, SSN, and either date of birth in combination. (Docs. 118-2, at 49; 130-1, at 99; 138-1, at 136). On January 1, 2016, NuStar Farms hired D.T.M., who, according to his Form I-9, was born on "10-6-1996." (Docs. 118-2, at 48-49; 130-1, at 98; 138-1, at 134-35). But D.T.M.'s permanent resident card—which was submitted with his Form I-9—lists his date of birth as "10 Jan. 1996," and there was no match within SSA records for someone with his name, SSN, and birthdate combination using either date. (Docs. 118-2, at 48-49; 130-1, **[\*53]** at 98; 138-1, at 134-35).

Plaintiffs also hired C.L., whose identification card misspelled his last name as "Lpez." (Docs. 118-2, at 49; 130-1, at 99-100; 138-1, at 136-37). Plaintiffs hired J.A.G., the back of whose identification card defendants assert misspelled his middle name as "Afuirre." (Docs. 118-2, at 49; 130-1, at 99-100; 138-1, at 136-37). Also, Samson admits NuStar plaintiffs committed a substantive violation when they hired I.C.V., whose identification and social security cards both misspelled his first name as "Irael," because his identification card was expired. (Docs. 118-2, at 49-50; 130-1, at 100-01; 138-1, at 137-38). NuStar Farms also hired I.S., who presented identification and social security cards in which his first name was misspelled as "Israel." (Docs. 118-2, at 50; 130-1, at 101; 138-1, at 138-39). Bahena testified at her deposition that had NuStar plaintiffs "noticed the mismatch of the name, it would raise questions that [she] would advise them to follow up on." (Docs. 118-2, at 50; 130-1, at 101-02; 138-1, at 139). NuStar Farms hired T.F., who plaintiffs refer to as "J.F.," whose name is written as "T.F." in both Sections 1 and 2 of the Form I-9, but as **[\*54]** "J.F.F." in the Section 1 signature block and on his identification card. (Docs. 118-2, at 50; 130-1, at 102; 138-1, at 139-40). Had T.F. been a current employee when Bahena began her representation, Bahena stated she would have advised NuStar plaintiffs to follow up and terminate the worker if he was undocumented. (Docs. 118-2, at 50; 130-1, at 102-03; 138-1, at 140).

Last, NuStar Farms hired P.C.M., who presented an identification document purportedly issued by the Texas Department of Public Safety, though the document misspelled the word "Safety" as "Safery."[14] (Docs. 118-2, at 50; 130-1, at 103; 138-1, at 140-41). Bahena advised NuStar plaintiffs to question employees about their documents if they noticed obvious typos in the identification cards. (Docs. 118-2, at 51; 130-1, at 103; 138-1, at 141).

### d. NuStar Farms Employees' Invocation of the *Fifth Amendment*

Defendants served deposition subpoenas on six of NuStar Farms' current employees who have worked for NuStar Farms for 5-14 years and were all hired before the Article's publication; each employee was asked to produce their original identification and authorization documents. (Docs. 118-2, at 51; 130-1, at 104; 138-1, at 141-42). F.S.D., J.T.G., and L.P.P. **[\*55]** are paid significantly higher salaries than other workers and sometimes more than Anthony III. (Docs. 118-2, at 51; 130-1, at 104; 138-1, at 142). J.T.G. served in a supervisory position, according to Source 1's testimony. (Docs. 118-2, at 51; 130-1, at 104; 138-1, at 142). When F.S.D. sat for his March 12, 2021 deposition, his counsel—who NuStar Farms retained—stated he advised his client to "plead the Fifth" concerning his Form I-9 and associated documents. (Docs. 118-2, at 51-52; 130-1, at 104; 138-1, at 142-43). Further, when F.S.D.'s counsel so advised him to assert his *Fifth Amendment* rights, NuStar Farms' counsel interrupted to speak to F.S.D.'s counsel, after which F.S.D.'s counsel withdrew representation, and NuStar Farms' counsel said none of their employees were invoking their *Fifth Amendment* rights. (Docs. 118-2, at 52; 130-1, at 104-105; 138-1, at 143-44).

After counsel withdrew, the Court appointed new counsel for the employees who, thereafter, each invoked their *Fifth Amendment* rights and did not testify as to: (1) their proffered identification documents; (2) whether they are legally in the United States; (3) whether they are authorized to work in the United States; (4) whether they have been issued a valid social **[\*56]** security card; (5) whether the United States has given them permission to live or work here; and

---

[14] Though not referenced by the parties, the word "department" is also misspelled "deparment." (Doc. 118-41, at 2).

EXHIBIT 43                                                                      EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

(6) whether the federal or a state government has ever issued them identification cards. (Docs. 118-2, at 52-53; 130-1, at 105; 138-1, at 144-45). Also, none of the six workers produced the documents defendants subpoenaed, instead invoking the *Fifth Amendment*. (Docs. 118-2, at 53; 130-1, at 105; 138-1, at 145). All six workers invoked the *Fifth Amendment* and refused to answer when asked whether NuStar plaintiffs ever asked the employees for identification cards or documents and when asked whether they had spoken to NuStar plaintiffs about their authorization to work or reside in the United States and whether NuStar plaintiffs knew of the employees' respective authorization status. (Docs. 118-2, at 53; 130-1, at 105-06; 138-1, at 145-46). The six workers also invoked the *Fifth Amendment* and refused to answer when asked whether they filled out any forms or provided NuStar plaintiffs with documents regarding their authorization to work in the United States. (Docs. 118-2, at 54; 130-1, at 106; 138-1, at 146-47). When plaintiffs' counsel asked whether they had ever seen anyone bring workers to the Sibley dairy, both N.A.C. and A.K.S. invoked **[*57]**  the *Fifth Amendment*, as did J.T.G. when asked whether NuStar Farms ever provided him housing, whether he lived in NuStar Farms-owned or Nunes-owned housing, or if he ever recruited workers for the dairy. (Docs. 118-2, at 54; 130-1, at 106-107; 138-1, at 147-48).

Also, all six subpoenaed employees had incomplete Form I-9s, as each Section 2 was incomplete, and the documents supplied to establish their identity and authorization to work were not listed on the Forms. (Docs. 118-2, at 54-55; 130-1, at 107; 138-1, at 148-49). The SSA confirmed none of the six subpoenaed employees' names, SSNs, and dates of birth in combination matched their records. (Docs. 118-2, at 55; 130-1, at 107-108; 138-1, at 149). Arnold testified, and Samson agreed—in defendants' telling—that to the extent there were paperwork and font issues and certain indicia of fraudulent documents, all six employees presented NuStar plaintiffs counterfeit documents containing the wrong fonts and various irregularities. (Docs. 118-2, at 55; 130-1, at 108-109; 138-1, at 149-51). According to defendants but contested by plaintiffs, there is no record of L.P.P. ever presenting NuStar plaintiffs with identification documents. (Docs. 118-2, at 55-56; **[*58]**  130-1, at 109; 138-1, at 151).

In October 2018, Bahena informed NuStar plaintiffs that at least some of its then-employed workers required follow-ups and "hard conversations" regarding their proffered work authorization documents, and she attached notes to at least one worker's documents and Form I-9, testifying that NuStar plaintiffs would have needed a valid work authorization document beyond his Social Security Card to maintain employment after Bahena's review. (Docs. 118-2, at 56; 130-1, at 109-10; 138-1, at 151-52). Plaintiffs deny and dispute defendants' assertion that Anthony III testified J.T.G.'s son, M.M., was hired despite not presenting valid work authorization, working on and off for fourand-a-half years. (Docs. 118-2, at 56; 130-1, at 110; 138-1, at 152). Defendants also state, to plaintiffs' denial, that Samson testified that A.K.S.—one of the six employees who pled the *Fifth Amendment*—presented a Social Security card that was discombobulated on its face and that, viewed with the Form I-9 that listed an "A Number" different from that of his permanent resident card, a reasonable employer should have asked questions about the documents. (Docs. 118-2, at 56; 130-1, at 110-11; 138-1, at **[*59]**  153).

L.P.P., one of the six subpoenaed employees, has been convicted four times for failure to present a valid license. (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 153-54). In 2018, another of the six subpoenaed employees, J.T.G., presented an updated California driver's license with a nonexistent address, despite living in Sibley since 2008 and in free, NuStar Farms-provided housing since 2015; plaintiffs deny these facts. (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 154). F.S.D. also lives in rent-free, NuStar Farms-provided housing, which plaintiffs deny. (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 154). Also, Samson stated J.T.G.'s documents would "cause a reasonable employer to have a duty of care to investigate." (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 154-55). Further, Samson testified that NuStar Farms committed substantive IRCA violations upon hiring several of the six subpoenaed employees. (Docs. 118-2, at 57; 130-1, at 111-12; 138-1, at 155). On August 26, 2022, NuStar plaintiffs confirmed that they continue to employ all six employees. (Docs. 118-2, at 57-58; 130-1, at 112; 138-1, at 156). NuStar plaintiffs have not supplied additional or supplemental work authorization, **[*60]**  identification, or Form I-9 documents for the six subpoenaed employees, though they state that is because they have already provided the documents they could find. (Docs. 118-2, at 58; 130-1, at 112; 138-1, at 156).

Further, as part of the employees' pay, NuStar Farms houses several of its employees, including J.T.G., F.S.D., and N.A.C., in homes owned by the Nunes family. (Docs. 118-2, at 58; 130-1, at 112; 138-1, at 156-57). According to Arnold, free housing is common among agricultural employees who might struggle to secure housing, should those

EXHIBIT 43  EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

employees be undocumented. (Docs. 118-2, at 58; 130-1, at 112-13; 138-1, at 157-58). Also, NuStar Farms provides health insurance to Nunes' family members in its employ, but it provides only worker's compensation insurance—not health insurance—to non-Nunes' family employees; Arnold states, and plaintiffs deny, this is common for employers who know their employees are undocumented. (Docs. 118-2, at 58; 130-1, at 113; 138-1, at 158).

### e. Congressman Devin Nunes' Alleged Knowledge of NuStar Farms' Practices

Devin stated that because of his time at the Tulare farm, he understands how hiring was done at the Tulare farm, and he cannot believe the **[*61]** practices would have changed when his family moved to Iowa. (Docs. 118-2, at 59; 130-1, at 113-14; 138-1, at 159). Devin also stated his belief that NuStar plaintiffs would not have hired anyone undocumented and that because of his familiarity with the hiring process in Tulare, he is sure NuStar plaintiffs are following the same procedure and regulations so as to not hire undocumented persons in Iowa. (Docs. 118-2, at 59; 130-1, at 114; 138-1, at 159-60). Specifically, Devin stated that NuStar plaintiffs' hiring practices "wouldn't have changed from the way that my grandmother did it and the way that we did it in the past." (Docs. 118-2, at 59; 130-1, at 114; 138-1, at 160). In stating he lacked knowledge about NuStar Farms' employment practices, Devin reiterated that he cannot imagine the practices have changed since when he worked with his family in California. (Docs. 118-2, at 59; 130-1, at 114; 138-1, at 160). Dian, Devin's mother, stated that the hiring procedure at the Sibley farm is "pretty much the same" as what the family did in California, and they "did not change their requirements" for Form I-9s when they moved to Iowa. (Docs. 118-2, at 60; 130-1, at 115; 138-1, at 160-61). **[*62]**

Dian's mother—Devin's grandmother—trained Devin how to hire. (Docs. 118-2, at 60; 130-1, at 115; 138-1, at 161). When Devin worked with family on their farms in California, the employee would fill out the Form I-9, and Devin would "get usually a social security . . . card, and a form or two of photo I.D." (Docs. 118-2, at 60; 130-1, at 115; 138-1, at 161). Devin was asked whether he would review these cards to see whether they were genuine and responded:

> Yeah, I mean you had to—well, not if they're genuine, you have to accept them. I mean, I guess if you looked at a card and it had a picture of Ryan Lizza on it, and it wasn't of whoever's applying for the job, then—then, you know, you could challenge it at that point.
> But I don't know, I don't ever remember that happening. Somebody gives you a card, and it's their picture, you have to accept that as—as real, 'cause it's what they're giving you. And it would be illegal otherwise, discriminate against those people. Anybody that you're hiring, you can't challenge their—their identification that they give you.

(Docs. 118-2, at 60; 130-1, at 115; 138-1, at 161-62). Devin added that if an employer wanted to verify the documents, it would be **[*63]** impossible because it is impermissible to ask an applicant, so "nobody knows who's in this country illegally or not, and . . . you have no way to find out." (Docs. 118-2, at 60-61; 130-1, at 116; 138-1, at 162). Also, Devin stated that as someone who hires people "all the time," an employer must "accept their documentation as real, whatever they provide you." (Docs. 118-2, at 61; 130-1, at 116; 138-1, at 162). Last, when asked how one would enforce immigration laws if one cannot question an individual on the matter, Devin stated, "Well, they can't be questioned by the employer, that's for sure," and that accepting the provided documentation is "the way that I've always operated." (Docs. 118-2, at 61; 130-1, at 116; 138-1, at 162).

### f. Congressman Devin Nunes' Family Relationships

Before his election to the House of Representatives in 2002, Devin worked closely with his family on various farm ventures. (Docs. 118-2, at 61; 130-1, at 116; 138-1, at 163). Upon Devin's venture into politics, in support of her son on a volunteer basis, Dian became treasurer of the Devin Nunes Campaign Committee ("Devin's Campaign Committee"), a role she held at the time of her deposition along with being treasurer **[*64]** of three of Devin's political action committees. (Docs. 118-2, at 61-62; 130-1, at 116-17; 138-1, at 163). Devin is also involved with some of Anthony Jr.'s investment wineries in California. (Docs. 118-2, at 62; 130-1, at 117; 138-1, at 163). What is more, Devin often communicates with Anthony Jr. and Anthony III—to the tune of 860 calls, some calling one another back moments later after needing to hang up, over 18 months. (Docs. 118-2, at 62; 130-1, at 117; 138-1, at 163-64). Many

EXHIBIT 43                                                                EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

conversations were about farming and how things were going at NuStar Farms, including water issues at the farm. (Docs. 118-2, at 62; 130-1, at 117-18; 138-1, at 163-64).

Devin has, in the past, arranged for his family to visit the White House and meet President George W. Bush. (Docs. 118-2, at 62; 130-1, at 118; 138-1, at 165). Anthony Jr., through Devin, met Senator John Hoeven when Hoeven was Governor of North Dakota, and they spoke about NuStar Farms. (Docs. 118-2, at 62-63; 130-1, at 118; 138-1, at 165-66). Anthony III and Anthony Jr., through Devin, have also met former Representative George Holding and met separately with Representative Billy Long, speaking with Long about farming. (Docs. 118-2, at **[\*65]**  63; 130-1, at 118; 138-1, at 165-66).

Devin reported knowing that one NuStar Farms' employee is somehow related to Lori and knowing or knowing of—the parties contest which—some former NuStar Farms' employees. (Docs. 118-2, at 63; 130-1, at 118-19; 138-1, at 166). Devin and Anthony Jr. discussed NuStar Farms' employment records at some point—plaintiffs state during the litigation—because Devin was aware, he testified, that NuStar plaintiffs had to produce records going back "for the whole time" and learned from the conversation that "everybody was documented." (Docs. 118-2, at 63; 130-1, at 119; 138-1, at 166-67). In the Second Amended Complaint, Devin alleged that NuStar Farms' records show how NuStar plaintiffs documented workers. (Docs. 118-2, at 63; 130-1, at 119; 138-1, at 167). In the Third Amended Complaint—the complaint at issue here, Devin alleges that "documents establishing both employment authorization and ID as well as Forms I-9-Employment Eligibility Verifications, are kept and maintained by NuStar [Farms] in the ordinary course of its business." (Docs. 118-2, at 63; 130-1, at 119; 138-1, at 167).

When Lizza arrived in Sibley for reporting but prior to the Nunes' awareness **[\*66]**  of which reporter was there, Anthony Jr. called Devin multiple times, and at least three times over two days once he learned it was Lizza, to inform Devin of a car driving around. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 167). Lizza sent Devin messages explaining he was writing an article about the "the dairy industry and immigration" a few days after Anthony Jr. informed Devin of Lizza's presence in Sibley. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 167-68). Devin never responded to Lizza and told his father not to either. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 168). The resulting Article was "exactly what [plaintiffs] thought" it would be. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 168).


### g. Congressman Devin Nunes' Time in Congress, Sponsorship, and Donations

Devin testified in his deposition that were there a mechanism for employers to "find out whether somebody's here illegally," it would be discriminatory and illegal. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 168). The federal government, however, offers a free online system called "E-Verify" that allows enrolled employers to verify their employees' ability to work in the United States. (Docs. 118-2, at 64; **[\*67]**  130-1, at 121; 138-1, at 168). Employers can verify their employees' employment eligibility and identities by matching the Employment Eligibility Verification information on the Form I-9s against SSA and Department of Homeland Security ("DHS") records; the site has been used by millions in the United States since it became available in 1997. (Docs. 118-2, at 64-65; 130-1, at 121; 138-1, at 168-69). When Devin was asked about E-Verify and whether it may be used lawfully, he stated he believed it is unlawful to use it to target people, and the program is a failed program, does not work, and is discriminatory. (Docs. 118-2, at 65; 130-1, at 121; 138-1, at 169). NuStar Farms does not and has never used E-Verify. (Docs. 118-2, at 65; 130-1, at 121-22; 138-1, at 169-70). An employer establishes a rebuttable presumption that it has not knowingly hired unauthorized employees when it confirms the identity and eligibility of a worker using E-Verify, giving legal protection and a definitive answer as to authorization. (Docs. 118-2, at 65-66; 130-1, at 122; 138-1, at 170). Lori and Anthony III stated NuStar plaintiffs do not use EVerify because it is not legally required. (Docs. 118-2, at 66; **[\*68]**  130-1, at 122 (citing Doc. 118-17, at 73); 138-1, at 170).

Having stated there is no way for someone to know another person's work authorization status, Devin also stated he has never known an undocumented worker because "no one person ever came up to him and said, oh, I'm illegal. Not one." (Docs. 118-2, at 66; 130-1, at 122; 138-1, at 170-71). Devin also testified that it is "practically impossible" to hire unauthorized workers, and "nobody's hiring unauthorized workers." (Docs. 118-2, at 66; 130-1, at 122; 138-1, at 171). In 2014, however, a Texas A&M survey found more than 70 percent of dairy respondents had low to medium

EXHIBIT 43

EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

confidence in workers' documents, and 58 percent of respondents stated they had high concern about enforcement of immigration laws. (Docs. 118-2, at 73; 130-1, at 131; 138-1, at 188).

On June 23, 2019, while on *Sunday Morning Futures*, host Maria Bartiromo, asked Devin about issues regarding undocumented or illegal immigration to which he responded:

> So, the easiest way, in my opinion, to fix all of this is that you put in a permit system. So you put in a system where, if somebody is employing you, you have to—you have to actually file with the government what's called **[*69]**  E-Verify.
> It's a voluntary program now. It's worked really, really well. And that means, if everybody was certified by the government that everybody working for you is, in fact, here on a legal permit, that in the long run is great.
> Now, you can't is have [sic] that without a permit system, because everyone knows that, in this country, we have got millions of people that are here on either expired permits, or they never had a permit in the first place. . . . we have already proven that this E-Verify system works with people who have voluntarily been taking part in it.

(Docs. 118-2, at 66-67; 130-1, at 123; 138-1, at 171-72). On a similar note, Devin co-sponsored four versions of the Agricultural Job Opportunity, Benefits, and Security Act ("AgJOBS bill") in 2003, 2005, 2007, and 2009. (Docs. 118-2, at 67; 130-1, at 123; 138-1, at 172). All four versions of the AgJOBS bill would have extended the H-2A program to agricultural workers, giving them a path to permanent residency and allowing their employ upon certification that "there are not sufficient workers who are able, willing, and qualified" to work in the United States. (Docs. 118-2, at 67; 130-1, at 123-24; 138-1, at 172-73). All **[*70]**  four versions of the AgJOBS bill would have: (1) allowed workers to correct SSA records and voided penalties for using counterfeit numbers; (2) required employers to provide free housing and transportation; and (3) required employers to ensure that anyone driving workers has a valid driver's license. (Docs. 118-2, at 67; 130-1, at 123-24; 138-1, at 172-73). The 2007 and 2009 AgJOBS bills also included a provision that would grant dairy workers legal residence for up to three years and a path toward permanent citizenship. (Docs. 118-2, at 68; 130-1, at 124; 138-1, at 174).

In 2008 and 2009, Devin also co-sponsored versions of the Dairy and Sheep H-2A Visa Enhancement Act, which both included provisions to provide dairy workers legal residency for three years with extensions and provisions on housing. (Docs. 118-2, at 68; 130-1, at 124; 138-1, at 174-75). In the 2008 bill's opening remarks, Representative John McHugh stated the bill's purpose was "to ensure that American dairy farmers . . . can legally hire the employees they need," because "increasingly, the U.S. dairy workforce is relying upon those born outside of the United States, with some estimates indicating that at least 50 percent **[*71]**  of all current labor is now foreign-born."[15] (Docs. 118-2, at 68; 130-1, at 125; 138-1, at 175-76). In 2016, when asked whether a wall at the United States' southern border could be built while the United States maintains a Bracero program, Devin responded, "Yeah. I mean, it's always been the solution. It's security along with a permit system of some kind, and then a verification system." (Docs. 118-2, at 69; 130-1, at 125; 138-1, at 176-77).

In July 2018, Devin co-sponsored a bill, the Agricultural Guestworker and Legal Workforce Act ("AG Act") that would create a new H-2C visa for agricultural workers. (Docs. 118-2, at 69; 130-1, at 126; 138-1, at 177-78). The AG Act's new H-2C would require employers to attest that they were "unsuccessful in locating sufficient members of willing and qualified United States workers for the job." (Docs. 118-2, at 69; 130-1, at 126; 138-1, at 178-79). The AG Act would create a mandatory verification system modeled after E-Verify and include provisions to verify SSNs suspected of fraudulent use and to provide free housing to H-2C workers. (Docs. 118-2, at 69; 130-1, at 126; 138-1, at 179-80).

In 2019, Devin was an original co-sponsor of the Farm Workforce Modernization Act ("FWMA") **[*72]** , which provided a permanent residence path for unauthorized agricultural workers already in the United States. (Docs. 118-2, at 70; 130-1, at 126-27; 138-1, at 180). FWMA included provisions to eliminate penalties for workers using fake SSNs, verified SSNs suspected of fraudulent usage, expanded the H-2A with 50 percent reserved for dairy and agricultural workers, appropriated funds for housing farm workers and amended housing laws, created a mandatory verification

---

[15] Martin found similarly, estimating 51 percent of the dairy workforce is undocumented, though plaintiffs deny and dispute this finding. (Docs. 118-2, at 69; 130-1, at 125; 138-1, at 176).

EXHIBIT 43                                                                EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

system modeled after E-Verify, and required employers to provide free transport between jobs for workers. (Docs. 118-2, at 70; 130-1, at 127; 138-1, at 181). On March 18, 2021, Devin voted to pass the 2021 version of the FWMA, which contained similar provisions to the 2019 FWMA. (Docs. 118-2, at 70; 130-1, at 128; 138-1, at 182).

During the deposition, Devin could not recall any of the aforementioned bills that he either voted for or co-sponsored, stating that he did not recall the 2021 FWMA or his vote on it, nor the 2019 FWMA. (Docs. 118-2, at 70-71; 130-1, at 128; 138-1, at 183). When asked whether he supported the verification system within the FWMA, Devin did not say, as he has "voted on a **[*73]** lot of different immigration issues over the years," which he testified is a complex issue. (Docs. 118-2, at 71; 130-1, at 129; 138-1, at 183-84). Then, when asked if unauthorized workers were being hired because of labor shortages, Devin stated he does not know anyone "who is employing illegals," but also that no one "knows who's illegal or legal" in the United States. (Docs. 118-2, at 71; 130-1, at 129; 138-1, at 184).

Devin's Campaign Committee has received various donations from agriculture-related companies and food producers. For example, Blue Diamond Growers donated $41,000 to Devin's Campaign Committee, and has spent more than $1,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 129; 138-1, at 184). Western Growers donated $30,000 to Devin's Campaign Committee and has spent over $2,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 129; 138-1, at 185). Dairy Farmers of America donated $38,000 to Devin's Campaign Committee and has spent over $6,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 130; 138-1, at 185-86). National Milk Producers Federation donated $23,000 **[*74]** to Devin's Campaign Committee and has spent over $4,500,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 130; 138-1, at 186). Land O'Lakes, Inc. donated $54,000 to Devin's Campaign Committee and has spent $2,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 73; 130-1, at 130; 138-1, at 186-87). Last, Western Union Dairymen donated $34,500 to Devin's Campaign Committee and has spent over $130,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 73; 130-1, at 131; 138-1, at 187-88).

### 8. The Nunes' Reaction Post-Publication

The day after the Article's publication, Devin spoke to his family, having many conversations that day and continued discussions thereafter. (Docs. 118-2, at 73; 130-1, at 131; 138-1, at 188-89). At his deposition, Anthony Jr. stated his reaction to the Article was "fear" and that his employees are "scared of the government." (Docs. 118-2, at 74; 130-1, at 131-32; 138-1, at 189). Devin believes that, based on discussions with undisclosed persons, he knows the identity of one of Lizza's sources for the Article; but Devin could not recall the alleged source's name. (Docs. 118-2, at 74; 130-1, **[*75]** at 132; 138-1, at 189-90). Devin also believes Lizza went to Sibley looking for any "brown Spanish-speaking person" he could find. (Docs. 118-2, at 74-75; 130-1, at 132; 138-1, at 190).

Defendants state that in October 2018—shortly after the Article was published, Lori contacted Bahena for a self-audit of NuStar plaintiffs' hiring protocol, which led to NuStar plaintiffs' discovery that their hiring protocol included errors; plaintiffs state the audit only showed NuStar plaintiffs that there were paperwork issues requiring correction. (Docs. 118-2, at 75; 130-1, at 133; 138-1, at 190-91). NuStar plaintiffs also claim they learned they must complete Section 2 on all Form I-9s or sign and attach the verification documents; defendants claim what NuStar plaintiffs actually learned was that one of their errors was lacking an employer signature in Section 2. (Docs. 118-2, at 75; 130-1, at 133; 138-1, at 191-92). Defendants state that NuStar plaintiffs learned they had been accepting facially defective documents, including expired cards; plaintiffs deny this and state the audit instead taught them they should not accept expired cards. (Docs. 118-2, at 75-76; 130-1, at 133; 138-1, at 192). **[*76]** Defendants state that after the audit, Anthony III retroactively signed Section 2 on the Form I-9s of 59 employees; plaintiffs dispute this, stating Anthony III instead corrected unintended paperwork omissions and signed Section 2 on certain Form I-9s. (Docs. 118-2, at 76; 130-1, at 133-34; 138-1, at 192). Defendants further claim, to plaintiffs' denial, that when Anthony III retroactively signed Section 2 on the 59 employees' Form I-9s, he had not reviewed the original employee identification documents. (Docs. 118-2, at 76; 130-1, at 134; 138-1, at 192-93).

EXHIBIT 43 EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

On September 30, 2019, Devin filed suit against defendants seeking $77,500,000 in damages but seeking no injunctive relief. (Docs. 118-2, at 76, 77; 130-1, at 134-35; 138-1, at 193, 195). Devin and Anthony Jr. discussed Anthony Jr.'s goal to get the Article retracted, and Devin sought counsel. (Docs. 118-2, at 76-77; 130-1, at 134; 138-1, at 193-94). On October 2, 2018, *The Federalist* published a counter-piece to the Article using Lori, who stated she talked to a reporter claiming to be associated with Breitbart, as a source. (Docs. 118-2, at 77; 130-1, at 134-35; 138-1, at 194). Then, on November 14, 2019, NuStar plaintiffs sent **[*77]** Hearst a retraction demand. (Docs. 118-2, at 77; 130-1, at 135; 138-1, at 194). On January 16, 2020, NuStar plaintiffs filed suit seeking $25,000,000 in damages but seeking no injunctive relief. (Docs. 118-2, at 77; 130-1, at 135; 138-1, at 195).

On February 3, 2020, Devin filed his First Amended Complaint containing allegations related to the Tweet and social media. (Docs. 118-2, at 78; 130-1, at 135-36; 138-1, at 195-96). Since filing suit, Devin and Anthony Jr. have had multiple conversations to discuss the suits, and Devin has spoken with an expert witness, Chris Buskirk, about working for both NuStar plaintiffs and himself. (Docs. 118-2, at 78; 130-1, at 136; 138-1, at 196). Despite engagement by plaintiffs, Buskirk later withdrew during the discovery process. (Docs. 118-2, at 78; 130-1, at 136; 138-1, at 196-97).

### 9. Damages

Various people in and around the Sibley community became aware of the Article; defendants state that none are identified as having thought less of NuStar plaintiffs after the Article, though plaintiffs state many did. (Docs. 118-2, at 78-79; 130-1, at 136-37; 138-1, at 197-99). Despite this, NuStar plaintiffs also received support from people in the community **[*78]** after the Article's publication. (Docs. 118-2, at 79; 130-1, at 137; 138-1, at 199).

It is unclear whether, before the Article, people believed NuStar Farms did not employ undocumented persons but now, after the Article, believe NuStar Farms employs undocumented persons. Source 1 testified that agricultural employers commonly have difficulty hiring because authorized people are less willing to work on farms, so farm employees are often undocumented persons. (Docs. 118-2, at 79; 130-1, at 137; 138-1, at 199-200). Another source, Father James Callahan, stated his belief, based on the composition of his parish and experience in his community in Minnesota, that dairy farms would be "screwed" absent undocumented and immigrant workers because these workers staff local farms. (Docs. 118-2, at 79; 130-1, at 137; 138-1, at 200-201). Fr. Callahan testified he does not think less of those who use undocumented labor because it is commonly known that local farms rely on undocumented workers who have invalid documentation. (Docs. 118-2, at 79; 130-1, at 137-38; 138-1, at 201-022). Source 1 also testified that the Sibley economy is commonly known to use undocumented labor, though plaintiffs deny and **[*79]** dispute this fact. (Docs. 118-2, at 79; 130-1, at 138; 138-1, at 202-03).

Defendants say NuStar Farms lost no business from the Article; plaintiffs state this is false, as evidenced by the fact Jesse Van de Stroet[16] and others would no longer do business with NuStar Farms after the Article, among other reasons. (Docs. 118-2, at 80; 130-1, at 138; 138-1, at 203-204). Although the parties agree NuStar Farms' revenue has increased since publication of the Article, plaintiffs state that is only because of increased prices on the Chicago Mercantile Exchange. (Docs. 118-2, at 80; 130-1, at 138; 138-1, at 204-205). NuStar Farms makes nearly all its revenue by selling milk to a local creamery, and the creamery's owner called to offer support to NuStar plaintiffs after the Article was published. (Docs. 118-2, at 80; 130-1, at 139; 138-1, at 205). Defendants claim and plaintiffs deny that NuStar plaintiffs have not identified any economic injuries caused by the Article. (Docs. 118-2, at 80; 130-1, at 139; 138-1, at 205).

Defendants' expert, Mark J. Hosfield, examined NuStar plaintiffs' business and accounting records, which suggested to him that NuStar Farms has not suffered quantifiable damages **[*80]** through lost profits or loss in business value. (Docs. 118-2, at 80; 130-1, at 139; 138-1, at 206). When asked what he would like a jury to award, Anthony III stated

---

[16] Plaintiffs have not stated who Mr. Van de Stroet is or what his business with NuStar Farms was, despite relying on Mr. Van de Stroet's severance of their business relationship as an actual injury caused by defendants. (Docs. 130-1, at 138; 132, at 21; 132-11, at 3 (plaintiffs' disclosures)).

EXHIBIT 43                                                                    EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

he does not care about money because "[i]t's principal [sic]," and NuStar Farms' corporate representative did not make an effort to calculate NuStar Farms' damages by the date of its deposition. (Docs. 118-2, at 81; 130-1, at 140; 138-1, at 206-207). Nor did Anthony Jr. make efforts to calculate his damages by the date of the corporate deposition. (Docs. 118-2, at 81; 130-1, at 140; 138-1, at 207). Finally, Anthony Jr. has not required any medical or mental health care, including medications, as a result of the Article. (Docs. 118-2, at 81; 130-1, at 140; 138-1, at 208).

In 2020, Devin was re-elected to the United States House of Representatives; to date, he has never lost an election. (Docs. 118-2, at 81; 130-1, at 140-41; 138-1, at 208). Having been elected to Congress ten times, Devin has served on many congressional committees, and chaired the House Permanent Select Committee on Intelligence ("Intelligence Committee") from 2015 until January 2019 as its ranking Republican until his resignation from the Intelligence **[*81]**  Committee. (Docs. 118-2, at 81-82; 130-1, at 141; 138-1, at 208-209). Devin's position on the Intelligence Committee showed he had a stellar reputation and the support of his colleagues, though plaintiffs qualify that Devin's reputation and support suffered as he faced scrutiny after the Article's publication. (Docs. 118-2, at 82; 130-1, at 141-42; 138-1, at 209-10). In addition to his prestigious assignment on the Intelligence Committee, Devin also had a prestigious position on the House Ways and Means Committee from 2015 until his resignation and was the ranking Republican on its Subcommittee on Health from 2019 until he resigned. (Docs. 118-2, at 82; 130-1, at 141; 138-1, at 209). Devin did not lose any congressional committee positions since the Article or Tweet and, in January 2021, was awarded the Presidential Medal of Freedom by President Trump—one of the highest civilian honors in the United States. (Docs. 118-2, at 82; 130-1, at 142-43; 138-1, at 210). Devin stated he was awarded the Presidential Medal of Freedom partially because of the "attacks" Lizza and Hearst performed on Devin and the Nunes family. (Docs. 118-2, at 83; 130-1, at 143; 138-1, at 211).

From 2018-2020, Devin's **[*82]**  congressional salary was effectively unchanged after the Article and the Tweet, according to his tax returns; Devin earned $213,945 in 2018, $216,833 in 2019, and $220,048 in 2020. (Docs. 118-2, at 83; 130-1, at 143; 138-1, at 211). For information about campaign fundraising, defense counsel was directed to view Devin's Federal Election Commission filings. (Docs. 118-2, at 83; 130-1, at 143-44; 138-1, at 211-12). For the two years ending December 31, 2016, Nunes' campaign received $2,460,000 in donations; $12,690,000 for the two years ending December 31, 2018—one of the top five Congressional campaign fundraising amounts; and $26,800,000 for the two years ending December 31, 2020, ranking in the top four in Congressional campaign fundraising dollars. (Docs. 118-2, at 83-84; 130-1, at 144-45; 138-1, at 212-14). Nevertheless, plaintiffs qualify that "probably three dozen companies" stopped supporting Devin after the Article and the Tweet; defendants, however, deny plaintiffs have proven this. (Docs. 130-1, at 144-45; 138-1, at 212-14).

In December 2021, Devin announced he was resigning[17] from Congress to serve as Chief Executive Officer of Trump Media & Technology Group, Inc. ("Trump Media"), **[*83]**  the principal product of which is a social media platform called Truth Social. (Docs. 118-2, at 84; 130-1, at 145; 138-1, at 214). Devin was offered the position of CEO by the Chairman of Trump Media's Board, President Trump, based on Devin's reputation; Devin never had to apply or submit a résumé or negotiate a salary before being offered the position and was offered a salary of $750,000 annually to increase to $1,000,000 annually after two years. (Docs. 118-2, at 84-85; 130-1, at 145-46; 138-1, at 215). Devin also is entitled to 145,000 restricted shares in Trump Media to vest within the first two years of his employment there, and he receives an annual bonus determined by the Board. (Docs. 118-2, at 85; 130-1, at 146; 138-1, at 215-16). Devin stated that he accepted the job to give the American people their voices back via Truth Social and to fight defamation, end censorship, allow freedom of ideas and expression, and "provide a platform that encouraged global conversation without any discrimination." (Docs. 118-2, at 85; 130-1, at 146-47; 138-1, at 216).

According to defendants and denied by plaintiffs, Hosfield testified Devin has not suffered economic damages as a result of defendants' **[*84]**  actions. (Docs. 118-2, at 85; 130-1, at 147; 138-1, at 216-17). Devin's September 30, 2019 complaint claimed defamation based on the Article and sought $75,000,000 in compensatory damages and $2,500,000 in punitive damages. (Docs. 118-2, at 86; 130-1, at 147; 138-1, at 217). These damages were computed, according to defendants, by the aggregate damages from all the statements in the initial complaint concerning the

---

[17] Devin resigned effective January 1, 2022. (Docs. 118-2, at 84; 130-1, at 145; 138-1, at 215).

**EXHIBIT 43**                                                                 EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Article as published on September 30, 2018; plaintiffs state these damages were instead calculated by the harm caused by defendants' continuing publication with intent and actual malice after Devin's retraction demand. (Docs. 118-2, at 86; 130-1, at 147; 138-1, at 217-18). Regarding Devin's case, defendants claim that the Eighth Circuit determined the publication at issue is the Tweet, and the case concerns only defamatory implication—not defamation; plaintiffs dispute and deny this. (Docs. 118-2, at 86; 130-1, at 147-48; 138-1, at 218). Devin's Third Amended Complaint also seeks $75,000,000 in compensatory damages and $2,500,000 in punitive damages attributed to the Tweet, though the attribution and computations have changed. (Docs. 118-2, at 86; 130-1, at 148; 138-1, at [*85] 218-19). Devin testified that his damages are based on "how much information's out there" and the "number of views," though plaintiffs qualify these are some factors the jury can consider. (Docs. 118-2, at 86; 130-1, at 148; 138-1, at 219). Further, Devin testified his damages increase daily and that the number of views have "ballooned beyond belief"; defendants assert Devin estimated the number of views as between 10 and 20 million. (Docs. 118-2, at 86-87; 130-1, at 148-49; 138-1, at 220-21). Discussing how he calculated the post's value in damages, Devin asked what a view or post is worth: "[Y]ou know, dollar, two dollars, three dollars? I don't know." (Docs. 118-2, at 87; 130-1, at 149; 138-1, at 221-22).

In March 2019, Devin sued Elizabeth Mair, Twitter, and two Twitter aliases for defamation, seeking $250,000,000 in compensatory damages, which he testified can be calculated by counting "all the tweets that went out." (Docs. 118-2, at 87; 130-1, at 149-50; 138-1, at 222). According to Fox News, Devin stated the lawsuit against Mair and Twitter was the "first of many," as he would be challenging "all these fake new stories" about "this [Russia hoax] investigation." (Docs. 118-2, [*86] at 87-88; 130-1, at 150; 138-1, at 223) (alteration in original). Devin's personal policy as of 2019 is that he will take you to court "if you defame and slander" him, and the Article was "one of the big ones" that caused him to create this policy. (Docs. 118-2, at 88; 130-1, at 150; 138-1, at 223).

In April 2019, Devin also sued McClatchy—the parent company of *The Fresno Bee*—Mair, and Mair Strategies for defamation based on a story accusing Devin of crimes, dishonesty, unethical acts, lack of fitness for office or employment for profit, and lack of integrity. (Docs. 118-2, at 88; 130-1, at 150; 138-1, at 223). Alleging harm to reputation, insult, pain, embarrassment, humiliation, and mental suffering, Devin sought $150,000,000 in damages for the McClatchy article. (Docs. 118-2, at 88; 130-1, at 151; 138-1, at 223). Devin testified this damage calculation was computed by evaluating the number of times the article was published or "used," and that the article there was very similar to the Article accessible through the Tweet in that it accused him of crimes and that it was published before an election. (Docs. 118-2, at 88-89; 130-1, at 151; 138-1, at 223-24).

In December 2019, Devin sued [*87] Cable News Network ("CNN") for defamation related to a report involving a Ukrainian former-prosecutor and himself. (Docs. 118-2, at 90; 130-1, at 152-53; 138-1, at 226). Devin sought $435,000,000 in damages arising from allegations imputing onto Devin "commission of felonies and crimes involving moral turpitude," "an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of duties of such office or employment, including dishonesty, lack of candor, fraud and concealment, lack of ethics, self-dealing and conflicts of interest." (Docs. 118-2, at 90; 130-1, at 153; 138-1, at 226). During Devin's deposition, he stated damages were calculated in a similar way there as here. (Docs. 118-2, at 90; 130-1, at 153; 138-1, at 226).

In March 2020, Devin sued *The Washington Post* over allegations that he had informed President Trump that an intelligence official was giving a briefing to Adam Schiff; Devin sought $250,000,000 in damages for defamation causing him insult, pain, embarrassment, humiliation, mental suffering, reputational injury, and special damages. (Docs. 118-2, at 89; 130-1, at 151; 138-1, at 224). Devin alleged the article's [*88] gist was that he lied to President Trump, causing Trump to become angry with the Acting Director of National Intelligence, and that such criminal conduct, dishonesty, deceit, and "sharp and unethical practices" made Devin unfit to perform duties of office or employment for profit, all of which Devin alleged harmed his reputation. (Docs. 118-2, at 89; 130-1, at 152; 138-1, at 225). Defendants assert that in November 2020, Devin again sued *The Washington Post* over statements in an article

EXHIBIT 43                                          EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

based on the so-called midnight run to the White House;[18] plaintiffs dispute and deny this fact. (Docs. 118-2, at 89; 130-1, at 152; 138-1, at 225). In the second *Washington Post* suit, Devin seeks $125,000,000 in compensatory damages and $50,000,000 in presumed damages, which he calculated in part by looking at the number of republications. (Docs. 118-2, at 89-90; 130-1, at 152; 138-1, at 225-26).

Then, in August 2021, Devin sued NBC Universal for defamation based on a Rachel Maddow segment on MSNBC alleging that there are published statements that accuse Devin of obstruction of justice and treason, severe breaches of the Code of Conduct and protocols in handling information from foreign sources in the **[*89]** Intelligence Committee, concealment, lack of integrity, and ethical impropriety. (Docs. 118-2, at 90; 130-1, at 153; 138-1, at 226-27). In this suit, Devin seeks $200,000,000 or more in damages; yet again, damages were calculated in a method similar to the method here and in every other defamation suit described. (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 226-27).

In his deposition testimony, Devin states he has not tried to distinguish between damages caused by the various publications at issue in these lawsuits and has not compared them; plaintiffs add that Devin's suit here is based on its own facts, publications and republications, and damages. (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 227). On Devin's website, he has publicized his lawsuits against various media outlets and personalities on a page called "Media Attacks and Lawsuits." (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 227-28). The website discusses the instant suit, describing Hearst as a target of the lawsuit for the Article "falsely claiming that [Devin] conspired to hide a business venture operated by his family members in Iowa." (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 228). Devin has received much "negative **[*90]** and false press" during recent years, even being called a "Putin stooge" and being asked whether he is a Russian agent. (Docs. 118-2, at 91; 130-1, at 155; 138-1, at 228-29). According to Devin, McClatchy published several negative stories accusing him of various improprieties, and large, corporate-owned media companies have launched large, full-scale attacks to ruin his reputation, with Democrat politicians defaming him by recounting claims within those stories. (Docs. 118-2, at 91-92; 130-1, at 155; 138-1, at 229-30). The mainstream media, "leftwing activist groups," and research operatives have all vehemently attacked Devin. (Docs. 118-2, at 92; 130-1, at 155; 138-1, at 230).

Devin has testified about his emotional distress in the hours after publication of the Article and of the humiliation he has experienced having to tell people he was being deposed for this case and, plaintiffs add, the humiliation he experienced interacting with people he worked with in Congress after the Article was published. (Docs. 118-2, at 92; 130-1, at 156; 138-1, at 230-31). Devin also testified as to his embarrassment at being unable to give tours on the Tulare farm after the Article, given his uncle's **[*91]** perceived need to distance himself from Devin. (Docs. 118-2, at 92; 130-1, at 156-57; 138-1, at 231-32). Further, Devin testified he has experienced anxiety when learning Lizza went to Sibley before defendants published the Article, though he never sought treatment for the mental anguish or distress he claims resulted from the Article and Tweet. (Docs. 118-2, at 92; 130-1, at 157; 138-1, at 232). Last, Devin states he has no medical conditions that resulted from publication of the Article or Tweet. (Docs. 118-2, at 93; 130-1, at 157; 138-1, at 233).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." *Fed. R. Civ. P. 56(c)(1)(A)*; *see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Alternatively, a party can show that "the materials cited do not establish the absence or presence of **[*92]** a genuine dispute, or that an adverse party cannot produce

---

[18] Plaintiffs deny that this was about the alleged midnight run. (Docs. 118-2, at 89 (citing Doc. 118-22), 130-1 at 152; 138-1, at 225). But Devin's testimony directly refers to that article as the one about the so-called midnight run. (Doc. 118-22, at 53).

**EXHIBIT 43**   **EXHIBIT 19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

admissible evidence to support the fact." *Fed. R. Civ. P. 56(c)(1)(B)*. More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Fed. R. Civ. P. 56(c)(2)*.

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992)*. It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question." *Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005)* (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*, or evidence that is "merely colorable" or "not significantly probative," *Anderson, 477 U.S. at 249-50*, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id., at 249* (internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record **[*93]** which show a lack of a genuine issue." *Hartnagel, 953 F.2d at 395*. A plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of "specific facts creating a triable controversy." *See Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999)* (quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." *Fed. R. Civ. P. 56(c)(3)*. Even so, the moving party does not meet its burden by "[s]imply providing a massive record," and the Court "will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004)*.

The moving party's burden of production turns on its burden of persuasion at trial. If the moving party bears the burden of persuasion on the relevant issue at trial, it must support its motion with credible evidence available under *Rule 56(c)* that would entitle it to a directed verdict if not challenged at trial. *Celotex Corp., 477 U.S. at 331* (Brennan, J., dissenting); *Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993)*. But, if the moving party does not bear the burden of persuasion at trial, it has two options to satisfy its *Rule 56* burden of production. First, it may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Celotex Corp., 477 U.S. at 331* (Brennan, J., dissenting); **[*94]** *Bedford v. Doe, 880 F.3d 993, 996 (8th Cir. 2018)*. Second, it may show that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Celotex Corp., 477 at U.S. at 331* (Brennan, J., dissenting); *Bedford, 880 F.3d at 996*.

Once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and show by depositions, affidavits, or other evidence "specific facts which create a genuine issue for trial." *See Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005)* (quotation marks omitted). In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton, 572 U.S. 650, 651, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)*; *Matsushita, 475 U.S. at 587-88*; *Reed v. City of St. Charles, 561 F.3d 788, 790 (8th Cir. 2009)*. A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004)*. Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., 90 F.3d 1372, 1377 (8th Cir. 1996)*.

### III. DISCUSSION

Plaintiffs sued defendants in two separate complaints. (Doc. 103; Case No. 20-CV-4003-CJW-MAR, Doc. 188). In Count I, NuStar plaintiffs allege that defendants committed defamation because defendants published false and defamatory statements to third parties about NuStar plaintiffs that defendants knew or should have known would **[*95]** cause NuStar plaintiffs injury. (Case No. 20-CV-4003-CJW-MAR, Doc. 188, at 26-28). In Count II, NuStar

**EXHIBIT 43**                                                    **EXHIBIT 19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

plaintiffs allege defamation by implication because the Article defendants allegedly republished implies, by use of juxtaposed facts, that NuStar plaintiffs, Nunes, and Steve King conspired to conceal a "politically explosive secret," namely alleged knowing-employment of undocumented laborers. (*Id.*, at 28-30).

In Count I of Nunes' complaint, he alleges defamation by implication. (Doc. 103, at 19-21). More specifically, plaintiff Nunes alleges that the Article defendants allegedly republished, through use of juxtaposed facts, implies that Nunes conspired with Steve King and NuStar plaintiffs to conceal plaintiffs' alleged knowing-employment of undocumented laborers—a "politically explosive secret." (*Id.*).

For the following reasons, the Court **grants** defendants' motion for summary judgment on Count I of NuStar plaintiffs' complaint, **grants** summary judgment on Count II of NuStar plaintiffs' complaint, and **grants** defendants' motion for summary judgment on Count I of Nunes' complaint. NuStar plaintiffs have not shown a genuine dispute of material fact on multiple elements of Count I, nor **[*96]** have they shown genuine disputes of material fact on several elements of Count II. As for Count I of Nunes' complaint, Nunes has failed to show a genuine dispute of material fact on multiple elements of his defamation by implication claim. The Court will address defendants' arguments for summary judgment on each count.

The parties' arguments in support and in resistance to defendants' motion, both in their written briefing and at oral argument, are fact-intensive. The Court's discussion of facts in this section is not intended to be exhaustive. The Court analyzes the undisputed facts or disputed facts, as appropriate, to determine the claims on which a reasonable jury could find in favor of Nunes or NuStar plaintiffs. As such, the Court does not discuss or reach all of plaintiffs' arguments or evidence in support thereof.

### A. NuStar Plaintiffs' Claim of Defamation

NuStar plaintiffs allege that defendants are liable for defamation because of their alleged publication of false statements of fact concerning NuStar plaintiffs. (Case No. 20-CV-4003, Doc. 188, at 26-28). Defendants argue NuStar plaintiffs' defamation claim fails because NuStar plaintiffs have not shown that it is false to state **[*97]** that NuStar plaintiffs knowingly employed undocumented laborers. (Doc. 118-1, at 39-51). Further, defendants assert that NuStar plaintiffs—all of whom are private figures in this matter of public concern[19]—cannot prove requisite fault of negligence or actual malice. (*Id.*, at 51-54). Finally, defendants argue that NuStar plaintiffs have not been harmed in any way by the alleged publication and have produced no evidence of damages to them, such as economic or reputational injury. (*Id.*, at 55-56).

NuStar plaintiffs assert defendants defamed them by publishing false statements about NuStar plaintiffs, causing them harm, and are thus liable in defamation. (Doc. 130). They argue defendants published the Article about plaintiffs, which contained alleged falsehoods, such as the narrative that any plaintiff attempted to hide NuStar plaintiffs' move to Iowa. (*Id.*, at 11-13). NuStar plaintiffs also argue defendants published the defamatory Article negligently, citing many reasons including republication after the lawsuit commenced and the use of "fabricated statements" in the Article. (*Id.*, at 13-18). Further, NuStar plaintiffs argue they have suffered injury because of the Article, particularly **[*98]** to their reputation within their local farming community. (*Id.*, at 18-33).

For the following reasons, the Court finds that NuStar plaintiffs have not shown genuine issues of material fact on all elements of defamation, making a grant of summary judgment appropriate on their claim of defamation (Count I).

---

[19] This Court previously found NuStar plaintiffs, unlike Nunes, are neither public figures nor involuntary or limited-purpose public figures. (Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 32-36). The parties did not challenge this finding on appeal to the Eighth Circuit Court of Appeals, and thus, the finding that NuStar plaintiffs are private figures remains the law of the case. *See Nunes v. Lizza, 12 F.4th 890 (8th Cir. 2021)*; *CRST Expedited, Inc. v. TransAm Trucking, Inc., 505 F. Supp. 3d 832, 837-38 (N.D. Iowa 2020)* (discussing law of the case doctrine). This Court has, however, previously referred to the matter as one of public concern. (Doc. 53, at 9 n.3).

EXHIBIT 43                                                    EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

As a preliminary matter, defendants challenge this Court's previous finding that NuStar plaintiffs are private figures. Defendants assert discovery has brought to light facts indicating NuStar plaintiffs are limited-purpose public figures deserving of less protection than private persons. (Doc. 118-1, at 54). Plaintiffs assert the Court's finding that NuStar plaintiffs are private figures is correct because defendants failed to carry their burden of providing facts or evidence showing plaintiffs are limited-purpose public figures. (Doc. 130, at 13 n.7). The Court's finding that NuStar plaintiffs are private figures remains accurate, and it adopts its previous findings and analysis on this matter. The Court briefly addresses defendants' additional facts.

Defendants have not alleged any facts that change the outcome of the Court's analysis here. This Court previously found NuStar plaintiffs, **[*99]** unlike Nunes, are neither public figures, nor involuntary or limited-purpose public figures. (Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 32-36). The parties did not challenge this finding on appeal. *See Nunes v. Lizza, 12 F.4th 890 (8th Cir. 2021)*.

Here, defendants offer no additional material, relevant facts related to whether NuStar plaintiffs "voluntarily injected" themselves or were "drawn into" the public controversy. In arguing that NuStar plaintiffs are limited-purpose public figures, defendants cite various other sections of their brief, which themselves cite to various facts in the appendices. (Doc. 118-1, at 53-54 & 53 n.17 (citing Doc. 118-1, at 29-31, 34-37)). These cited pages discuss many facts defendants claim "show[ ] far greater voluntariness" in NuStar plaintiffs' coordination with Nunes, including that: Nunes' mother, Dian, was his volunteer campaign treasurer; Nunes talks to his family often about many things including farming and how general things are going; Nunes arranged a family meeting with President Trump at the White House; Nunes knew a handful of former NuStar employees and an employee's relation to his brother's wife; Nunes believed workers were documented, having talked to his father; Nunes and his **[*100]** father discussed not talking to Lizza who was writing about the dairy industry and immigration and that Nunes ignored Lizza's direct messages; and Nunes believes checking the status of an immigrant is illegal. (*Id.*, at 53-54 & n.17, 29-31).

In further support, defendants cite to facts (Doc. 118-1, at 53-54 & n.17 (citing Doc. 118-1, at 29-31, 34-37)), relating to: Anthony Nunes Jr.'s belief his employees fear the government; Nunes' recollection of a member in a certain family being a source; that an immigration attorney internally audited NuStar Farms in attempts to follow proper employment procedures; that defendants believe NuStar Farms still does not fill out a section of the proper forms; defendants' allegation that NuStar Farms never investigated flagged employees; that Nunes had discussions with his brother about getting the Article retracted; that Nunes had discussions with his father about the lawsuits; and that Nunes recommended his attorney to his family and talked to an expert for all plaintiffs.

None of these facts, even aggregated, voluntarily place NuStar plaintiffs into the public controversy, and the Court does not find NuStar plaintiffs were drawn into the controversy **[*101]** as required by the test for limited-purpose public figures nor the reasoning behind the test. A visit to the White House arranged by a relative or working a volunteer, out-of-sight position on a campaign does not cast one into the position of a limited-purpose public figure. Nor does sharing the same attorney; if an individual employs the same attorney as a public-figure employs in a case where both are sued, that does not render the individual a public personality. The choice to share an attorney as civil plaintiffs in a case based on similar facts and claims is a reasonable approach for purposes of efficiency and cost-savings by eliminating duplicative work. Further, NuStar plaintiffs are entitled to defend themselves against claims they believe are defamatory; their choice of attorneys to represent them in such a lawsuit does not voluntarily thrust them into the spotlight or drag them into it. The question of why one plaintiff spoke to an expert for several plaintiffs on the same facts and issues could be answered similarly. If anything, some of these facts indicate NuStar plaintiffs' inability to personally reach the press or lack of understanding how to deal with the press; they **[*102]** asked Nunes what to do when a reporter asked questions that would impact Nunes, who has dealt with the press because NuStar plaintiffs have not.

Finally, defendants argue NuStar plaintiffs are limited-purpose public figures because one family member was quoted in a response article. (Doc. 118-1, at 53). That the family member, Lori Nunes—who is not individually a plaintiff to this litigation—was sought out by another reporter, after the family was initially sought out by Lizza, does not mean plaintiffs had ready access to the media generally, could have sought the media out independently of Nunes, or would have even been approached or acknowledged absent the Article that involved their public figure family member. (*Id.*;

EXHIBIT 43                                                                              EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

118-2, at 77). The fact that one news source approached one family member who is involved with NuStar Farms does not mean NuStar plaintiffs have ready access or are transformed into public figures here.

Here, a public figure has himself been dragged into a matter by two media defendants' decision to investigate the public figure's private life and the lives of his family members, dragging the non-public family members into the issue and exposing private facts the public **[*103]** normally has no right to. Even were all allegations in the Article true as to the NuStar plaintiffs, these parties would likely never have received this disruption absent their relation to a public figure. A finding that NuStar plaintiffs, or other private persons on these specific facts, are public figures of any caliber would open the floodgates and unleash destruction on the lives of those whose loved ones have chosen a public life, simply because of familial relation. This could expose numerous people to reduced protection when they are allegedly defamed just because they are related to a public figure. For these reasons, the Court finds NuStar plaintiffs are private individuals, and a negligence standard applies. Alleged tortfeasors must take their alleged victims how they find them; whether greater protections apply is of no consequence.

### 1. Applicable Law

Under Iowa law,[20] a claim of defamation may be brought for certain written statements—libel—tarnishing the name or reputation of the plaintiff. _Johnson v. Nickerson, 542 N.W.2d 506, 510 (Iowa 1996)_. Statements that cannot reasonably be interpreted as stating actual facts about a particular person are not actionable in defamation, though whether a statement is capable of having a defamatory **[*104]** meaning is a question for the court to determine. _Bauer v. Brinkman, 958 N.W.2d 194, 198 (Iowa 2021)_. To establish a prima facie case of defamation for libel as a public figure or limited-purpose public figure, a plaintiff suing a media defendant must show that the defendant "(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff," but if plaintiff is a public figure, he must also show (5) the statement is false and (6) "was made with actual malice." _Nunes, 12 F.4th at 895_; _Cockram v. Genesco, Inc., 680 F.3d 1046, 1050-52 (8th Cir. 2012)_[21]; _Nickerson, 542 N.W.2d at 510-11 & n.3_; _New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 282, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)_. When the plaintiff is a private figure, however, alleged defamation related to matters of public concern require the plaintiff to prove (1) falsity and (2) a negligent breach of the professional standard of care. _Bierman v. Weier, 826 N.W.2d 436, 447 (Iowa 2013)_; _Cockram, 680 F.3d at 1053_; _Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 770, 777, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986)_.

Speech involves matters of public concern when "it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" _Snyder v. Phelps, 562 U.S. 443, 453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)_ (citing _City of San Diego v. Roe, 543 U.S. 77, 83-84, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)_) (internal citation omitted). In other words, a public concern or controversy is one whose ramifications will affect "persons who are not direct participants" in the controversy. _Stepnes v. Ritschel, 663 F.3d 952, 963 (8th Cir. 2011)_ (quotation **[*105]** omitted).

As the prima facie elements show, courts must determine whether an individual is a public figure, limited-purpose public figure, or private figure to apply the correct analysis to a defamation claim. A person is a public figure "for all purposes and in all contexts" when the person achieves "pervasive fame or notoriety." _Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)_. A person is a limited-purpose public figure when the person voluntarily injects themself or is drawn into a particular public controversy, becoming a public figure "for a limited range of issues." _Id._; _Stepnes, 663 F.3d at 963_. Limited-purpose public figures are more common than public

---

[20] This Court previously found that Iowa and California laws on defamation are not in conflict, and thus, it applied Iowa substantive law to NuStar's defamation claim, which the parties did not challenge. _See Nunes, 12 F.4th at 895_.

[21] For purposes of applicable law, the Court references several cases interpreting defamation law in other states, such as Missouri, as none conflict with Iowa's defamation laws.

EXHIBIT 43    EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

figures. *Gertz, 418 U.S. at 351*. Regardless of whether a figure is public for all purposes or a limited purpose, all public figures "assume special prominence in the resolution of public questions." *Id.* Absent a finding that a person is a public figure or limited-purpose public figure, the person is a private figure. *See id.*

To establish publication, a plaintiff must show that the allegedly defamatory statement was communicated to one or more third persons and understood to be defamatory. *Bierman, 826 N.W.2d at 464*; *Huegerich v. IBP, Inc., 547 N.W.2d 216, 221-22 (Iowa 1996)*. That a defamatory statement is communicated to the defamed person alone is insufficient. *Huegerich, 547 N.W.2d at 221*. It is equally insufficient to establish **[*106]** publication when the defamed person alone is the disseminator of the statement unless the defamed is "under a strong compulsion to communicate the defamatory statement[ ]." *Id. at 221-22*.

To establish that a statement is defamatory, a plaintiff must show "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Accent Media, Inc. v. Young, 12-CV-07-LRR, 2013 U.S. Dist. LEXIS 201938, 2013 WL 12140468, at *9 (N.D. Iowa Sept. 11, 2013)* (quoting RESTATEMENT (SECOND) OF TORTS § 559 (AM. L. INST. 1997)) (applying Iowa law). In evaluating whether a statement was understood to be defamatory, the statement is viewed within the context of the circumstances surrounding the statement and the entire communication. *See Bandstra v. Covenant Reformed Church, 913 N.W.2d 19, 47 (Iowa 2018)*; *Huegerich, 547 N.W.2d at 221*. A court can determine as a matter of law whether a challenged statement is capable of a defamatory meaning. *See Stevens v. Iowa Newspapers, Inc., 728 N.W.2d 823, 830 (Iowa 2007)*. Courts examine the entire communication and the totality of the circumstances to determine whether an average and reasonable reader could understand the statement as having the purported defamatory meaning. *Yates v. Iowa W. Racing Ass'n, 721 N.W.2d 762, 769, 772 (Iowa 2006)* (citation omitted).

Though a court can find a statement is defamatory by looking at the larger context, a statement can be defamatory in its very nature, meaning it is defamatory per se. A court can properly find a statement defamatory **[*107]** per se because the statement is so naturally likely to expose the defamed to "public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." *Bandstra, 913 N.W.2d at 46* (quotation omitted). The Iowa Supreme Court has found defamation per se in several instances, such as when the defamed is accused of being a liar or of committing an indictable crime that would subject the defamed to a sentence of incarceration, including illegal drug possession.[22] *See Huegerich, 547 N.W.2d at 221*. Statements requiring extrinsic evidence to show their defamatory meaning are not defamatory per se. *Vinson v. Linn-Mar Cmty. Sch. Dist., 360 N.W.2d 108, 116 (Iowa 1984)*. If a statement is defamatory per se, the defamed plaintiff need not prove the statement was false or made with malice or show damages. *Roskens v. Graham, 435 F.Supp.3d 955, 988 (N.D. Iowa 2020)* (applying Iowa law); *Huegerich, 547 N.W.2d at 221*; *Vinson, 360 N.W.2d at 115*. But when, as here, defendants are members of the media, there is no presumption that the allegedly libelous statements are false or caused injury. In other words, libel per se is not available against members of the media. *See Bierman, 826 N.W.2d at 448* ("[L]ibel per se is available only when a private figure plaintiff sues a nonmedia defendant for certain kinds of defamatory statements that do not concern a matter of public importance[.]").

To establish that a statement is **[*108]** "of and concerning" a plaintiff, a plaintiff need only "establish a connection between [the statement] and himself [or herself]" so as to show the statement refers to plaintiff. *New York Times, 376 U.S. at 289-92*.

To establish that a statement injured a plaintiff, the plaintiff must show injury resulting directly from the statement, whether in the form of "lost wages, emotional and mental anguish, humiliation, embarrassment," reputational, loss of enjoyment of life, or another cognizable injury. *Goodman v. Performance Contractors, Inc., 308 F. Supp. 3d 1002, 1010 (N.D. Iowa 2018)*; *Schaetzel v. Mercy Health Services-Iowa, Corp., No. 17-CV-1007-LRR, 2018 U.S. Dist. LEXIS 106483, 2018 WL 3132610, at *5 (N.D. Iowa June 26, 2018)*.

---

[22] The Court notes here it is alleged plaintiffs have engaged in repeat violations of laws regulating employment of undocumented laborers, which can result in imprisonment. *See 8 U.S.C. § 1324a*.

**EXHIBIT 43**                                                          **EXHIBIT  19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

To establish that a statement is false, a public-figure plaintiff—or a plaintiff in a matter of public concern—must show that "the alleged defamatory statement can reasonably be interpreted as stating actual facts" and "those facts are capable of being proven true or false." *Yates, 721 N.W.2d at 771*. A plaintiff need not prove the literal falsity of every detail of a statement; rather, a plaintiff must prove that the "gist" or "sting" of the challenged statements are substantially false. *See Doe v. Hagar, 765 F.3d 855, 863 (8th Cir. 2014)* (applying Iowa law). "The gist or sting of a defamatory charge is the heart of the matter in question—the hurtfulness of the utterance." *Id.* (internal quotation marks omitted). Under this framing, opinions might be actionable "if they imply a provable false **[\*109]** fact, or rely upon stated facts that are provably false," though the statement to be proven false is "not the literal wording of the statement but what a reasonable reader . . . would have understood" the defaming defendant to have said. *Yates, 721 N.W.2d at 771*. Further, statements "that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution." *Id.* Whether a statement implies a provably false factual assertion is an issue of law for the court to decide. *Jones v. Palmer Commc'ns, Inc., 440 N.W.2d 884, 891 (Iowa 1989)*, *overruled on other grounds by Schlegel v. Ottumwa Courier, 585 N.W.2d 217, 224 (1998)*.

The Iowa Supreme Court adopted the following four-factor test to assess whether a statement is false:

> The first factor is whether the alleged defamatory statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous. The second factor is the degree to which the alleged defamatory statements are objectively capable of proof or disproof. The third factor is the context in which the alleged defamatory statement occurs. The final factor . . . is the broader social context into which the alleged defamatory **[\*110]**  statement fits.

*Bandstra, 913 N.W.2d at 47* (cleaned up). In construing the context of the statement, Iowa courts consider whether the author disclosed the factual basis for the statement and whether the statement implies the existence of other, undisclosed defamatory facts. *See Yates, 721 N.W.2d at 771* ("[S]tatements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false.") (quoting *Moldea v. N.Y. Times Co., 22 F.3d 310, 313, 306 U.S. App. D.C. 1 (D.C. Cir. 1994)*). Thus, Iowa courts consider the language of the challenged statement in the context of the entire communication to determine if it implies a statement of fact. *See id. at 770* (discussing *Bandstra* factors). If a statement does not imply the existence of an objectively provable fact, then the statement is not actionable in defamation. *Bandstra, 913 N.W.2d at 47, 49*.

Last, to establish actual malice, a public-figure plaintiff must show the defendant acted with "knowing or reckless disregard of the truth of the statement." *Barreca v. Nickolas, 683 N.W.2d 111, 121 (Iowa 2004)*. In other words, actual malice is shown when the defamer knows the statement to be false or makes the statement with reckless disregard of whether it was false. *New York Times, 376 U.S. at 279-80*.

### *2. Elements*

### *a. Publication*

Defendants make no argument as to the element of publication for defamation purposes and, thus, do not meet their initial burden as to this **[\*111]**  element. (*See generally* Doc. 118-1, at 39-56); *see Hartnagel, 953 F.2d at 395*.

### *b. Defamatory Statement*

Next, defendants make no argument regarding whether the Article contained statements considered defamatory as to NuStar plaintiffs, and thus, do not meet their initial burden as to this element. (*See generally* Doc. 118-1, at 39-56); *see Hartnagel, 953 F.2d at 395*.

EXHIBIT 43  EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

### c. Of and Concerning Plaintiff

Defendants make no argument as to whether the publication was of and concerning NuStar plaintiffs and, thus, do not meet their initial burden as to this element. (*See generally* Doc. 118-1, at 39-56); *see Hartnagel, 953 F.2d at 395*.

### d. Injury to Plaintiff

Next, the Court finds a genuine issue of material fact as to whether NuStar plaintiffs were injured by the alleged defamatory statements in the Article.

Defendants assert there is no genuine issue as to injury, and thus, plaintiffs' claim for defamation should be dismissed. (Doc. 118-1, at 55-56). In support of this assertion, defendants state plaintiffs have not provided any evidence of damages. (*Id.*, at 55). Under Iowa law, they argue, plaintiffs must show reputational harm, such as economic loss, before they can recover any parasitic damages, such as mental anguish. (*Id.*). Here, defendants argue, the evidence actually shows **[*112]** plaintiffs were supported by their community after publication of the Article. (*Id.*, at 55-56). For instance, in defendants' telling, NuStar Farms' main customer stated post-publication of the Article that it backed NuStar Farms, a witness stated the Sibley community would think no less of NuStar plaintiffs post-publication due to local reliance on undocumented laborers, and NuStar plaintiffs saw a profit increase post-publication instead of profit loss. (*Id.*). Thus, defendants state the defamation claim must be dismissed for lack of damages. (*Id.*, at 56).

NuStar plaintiffs argue that the alleged defamation led to much suffering, including, "public shame, ridicule, insult, humiliation, embarrassment, emotional distress and mental anguish, anxiety, insecurity, fear for safety," fear about who heard the implication, fear of additional defamation from other actors based on information in the Article, "permanent loss of standing and credibility in the community," fear their names will not be cleared, and reputational injury. (Doc. 130, at 19-20). In support, NuStar plaintiffs state a local farmer read the Article then, upset and in disbelief, contacted them to ask: "[W]hat's going on here? **[*113]** This is crazy." (Docs. 118-8, at 16; 130, at 20; 130-1, at 136-37). This fact does not, however, aid NuStar plaintiffs in meeting their burden, as it does not show damage but rather support from a local individual. NuStar plaintiffs also state that multiple people called and threatened NuStar plaintiffs, including a phone call by a "Carrie" who threatened to call ICE and commented negatively on her perception of plaintiffs, using expletives. (Doc. 130, at 20; 131-4, at 7-8). Other people called NuStar plaintiffs to relay their negative beliefs about them after the Article—some of whom threatened the family—and multiple people attempted to get into the dairy building after the Article. (Docs. 118-8, at 16-18; 130, at 20; 130-1, at 136-37). NuStar plaintiffs cite to many other facts, including negative Facebook ratings of their business in response to the Article (Docs. 118-8, at 18-19; 131-4, at 8), that Lizza interviewed a priest—after the interview but before the Article was published—who was left with the belief NuStar plaintiffs were involved in corruption (Docs. 118-4, at 12; 130, at 20; 130-1, at 137-38),[23] and that a customer, Jesse Van de Stroet,[24] stopped doing business with plaintiffs **[*114]** because of the Article (Docs. 130, at 21; 130-1, at 138; 132-11, at 3).

The Court finds plaintiffs have shown a genuine issue of material fact as to the question of damages. First, people began leaving negative reviews of NuStar Farms after the Article was published, called expressing negative opinions of NuStar plaintiffs referencing allegations in the Article, and some people even showed up on farm property (though

---

[23] The Court finds the fact that Fr. Callahan formed this opinion of NuStar plaintiffs is irrelevant to the question of damages caused by the publication of defamatory statements within the Article, as he formed that opinion independently of the Article or statements therein. (*See* Docs. 118-2, at 79 (citing Doc. 118-4, at 20-23); 130-1, at 138; 138, at 12-13). The statements made or published to Fr. Callahan might overlap with those in the Article but are not statements he learned as a result of the Article's publication. Fr. Callahan's opinion as to plaintiffs' reputation is not relevant as to whether plaintiffs were injured as a result of the Article's publication.

[24] *Supra* note 16.

Case 22-33553   Document 1059-17   Filed in TXSB on 02/03/25   Page 366 of 452

**EXHIBIT 43**                                                                    EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

whether they went to the dairy farm to voice negative opinions is unclear). Also, there is evidence that brings into question the accuracy of defendants' statement that plaintiffs' profits increased after the Article because of increased business or transactions. Plaintiffs cite to market changes on the Chicago Mercantile Exchange as the reason for increased profits, (Doc. 130-1, at 138); defendants provide no evidence to the contrary or to show increased clientele, transactions, or anything that indicates that increased economic performance occurred. This change in profits could realistically, as plaintiffs claim, be caused by the agriculture market, which itself could be impacted by factors like inflation, labor, or shortages, not just better performance or increased **[*115]** business. Further, defendants' offered fact that NuStar plaintiffs' profits increased does not show what factors, if any, could have also impacted profits, which is necessary to show that no genuine issue exists as to economic harm. The Court notes, however, that the fact Van de Stroet stopped buying from NuStar plaintiffs is insufficient under the circumstances. The Court has seen no evidence in support of the claim Van de Stroet ended his business relationship with NuStar plaintiffs, nor that one existed prior to the Article. *See Matsushita, 475 U.S. at 586*; *Anderson, 477 U.S. at 249-50*. Thus, the Court does not consider this fact in its analysis.

The facts here create a genuine question as to whether NuStar plaintiffs faced economic and reputational harms because of the Article, so as to satisfy the element of damages. Also, there are additional facts indicating plaintiffs might have suffered anxiety and other parasitic damages after being threatened and having unknown persons enter their property after having received such threats.

In sum, there is a genuine issue of material fact as to whether NuStar plaintiffs suffered damages. *See Mosley, 415 F.3d at 910*. Thus, a reasonable jury could find for plaintiffs on this element.

### e. Falsity

The Court finds no genuine **[*116]**  issue of material fact as to whether the alleged defamatory statements were false.

Defendants assert that the statements in the Article are objectively, provably true and, thus, that summary judgment is appropriate. (Doc. 118-1, at 39-51). The statements at issue in NuStar plaintiffs' defamation claim are statements in the Article asserting that NuStar plaintiffs knowingly hired undocumented laborers. (*See* Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 25-26). Defendants argue these statements are supported by NuStar Farms' acceptance of facially invalid documents from workers, such as expired documents. (*Id.*, at 42-47). Further, defendants argue NuStar plaintiffs are not protected because they did not read or understand certain documents, or their limits or expirations. (*Id.*, at 43). Instead, defendants argue NuStar plaintiffs might have constructive knowledge because employers must check documents with objectively reasonable care. (*Id.*, at 43); *see United States v. Cobo-Cobo, 873 F.3d 613, 615 (8th Cir. 2017)* ("Federal law requires employers to verify the identity of their employees by checking certain documents to ensure [a worker] is eligible to work in the United States, which the employer, in an I-9 form, must attest to having done."); *Split Rail Fence Co. v. United States, 852 F.3d 1228, 1243 (10th Cir. 2017)* (stating **[*117]**  that "deliberate failure to investigate suspicious circumstances imputes knowledge" and deliberate ignorance or avoiding acquiring knowledge triggers constructive knowledge). Defendants next point to the fact that NuStar plaintiffs failed to complete Section 2 of the required I-9 Form at least 289 times and failed to sign and date the Form at least 208 times, despite attestation and completion of that section being required. (Doc. 118-1, at 44). In at least 68 instances, NuStar plaintiffs did not timely fill out the I-9s. (Doc. 118-1, at 44; 130-1, at 62-69). Defendants also point to the fact that NuStar plaintiffs have been notified that a majority of their workers' SSNs do not match to those individuals, including persons hired before the Article was created. (Doc. 118-1, at 45; 130-1, at 78-82). Finally, defendants point to NuStar employees' exercise of their *Fifth Amendment* rights, stating that rather than solely serving as protection against feared immigration proceedings, the workers are invoking the right so as to insulate their employer, who provides many of them housing and livable wages. (Doc. 118-1, at 47-49). In their reply, defendants argue none of the facts plaintiffs cite create a **[*118]**  genuine issue, particularly because the statements from their expert do not explain why or how NuStar plaintiffs did not knowingly hire unauthorized laborers but instead, the statements conclude that NuStar plaintiffs did not violate the law. (Doc. 138, at 6-9).

EXHIBIT 43                                                                      EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Plaintiffs assert the statement that NuStar plaintiffs knowingly employed undocumented laborers is false. Relevant here, NuStar plaintiffs cite to the fact that the sources Lizza used had no firsthand knowledge of whether NuStar Farms relied on undocumented labor. (Doc. 130, at 12). NuStar plaintiffs also reference that those sources never made the exact statements the Article states they made, such as the statement that NuStar knowingly employed undocumented persons, and Source 2 was fully documented despite the Article saying otherwise. (*Id.*, at 13). Finally, they cite to 65 of their undisputed facts, including their expert's statements, to support their assertion that NuStar Farms did not knowingly employ undocumented laborers. (*Id.*) (citing Doc. 130-1, at ¶¶ 116, 117, 118, 119, 120, 121, 122, 140, 146, 150, 155, 170, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 185, 186, 188, 190, 192, 193, 194, 196, 197, 198, **[\*119]**  199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 231, 232, 234, 235, 237, 238, 239, 240, 241, 242, 243, 246, 283, 327, 328, 329, 330, and 331). After reading all 65 of these cited paragraphs, few of them provide facts addressing the question of falsity and whether a genuine issue of material fact exists on the element. Rather, many of them only provide plaintiffs' expert's legal conclusions without giving the Court any facts with which to evaluate whether NuStar plaintiffs have met their burden of showing a genuine issue as to falsity of defendants' statements accusing plaintiffs of knowing-hire violations under any part of the IRCA. *See 8 U.S.C. § 1324a*. Plaintiffs do cite, however, to some facts related to their failure to complete I-9s, which plaintiffs assert is simply a "paperwork issue[ ]" that does not include knowledge. (Doc. 130-1, at 71); *see also Split Rail, 852 F.3d at 1233*. They also cite to facts in some cases confirming and, in some cases, refuting defendants' assertions that NuStar plaintiffs did not question expired documents or were unaware of expiration at times before the Article was created. (Doc. 130-1, at 74, 90-92). Further, many facts refer to instances where employees presented **[\*120]**  documents for work authorization that contained different birth dates from one another, contained misspellings of agencies, contained incorrect name spellings, incorrect names in total, or names that were spelled inconsistently from one another. (Doc. 130-1, at 93-103, 110, 111).

The Court finds plaintiffs have not met their burden of showing a genuine issue exists. Despite the fact that NuStar plaintiffs legally needed to obtain verification from prospective employees through unexpired documents, they accepted expired cards, at least some of which explicitly stated when they expired.[25] For instance, the state identification card one worker presented to them had an expiration date on it, as did some of the resident cards and permanent resident cards. Further, there were numerous problems and inconsistencies within documents provided by certain NuStar Farms' employees, such as documents referring to one employee by different names and the document provided by another employee which was purportedly issued by a government office whose name was spelled incorrectly. These facts support defendants' position, not plaintiffs'—the facts plaintiffs cite simply reference the fact NuStar plaintiffs **[\*121]**  could not or did not question documents that appeared genuine as opposed to showing that NuStar plaintiffs can prove they lacked knowledge of their employees' documentation status. In all, NuStar plaintiffs reference no evidence showing statements that they knowingly hired undocumented laborers were false; accordingly, plaintiffs fail to show a genuine issue of material fact as to falsity.

In sum, NuStar plaintiffs do not show a genuine issue of material fact as to falsity. The assertion that NuStar knowingly used undocumented labor is substantially, objectively true. Thus, a reasonable jury could not find in favor of plaintiffs on this element. *See Mosley, 415 F.3d at 910*.

### f. Negligence

Last, the Court finds no genuine issue of material fact as to negligence.

---

[25] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Replace Your Green Card: When to Replace Your Green Card*, https://www.uscis.gov/green-card/after-we-grant-your-green-card/replace-your-green-card (discussing expiration of permanent resident cards, also called green cards); U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Redesigned Green Card 2023*, https://www.uscis.gov/sites/default/files/document/guides/GreenCard_Comparison_EN.PDF.p df (showing expiration dates on permanent resident cards both before and after a 2023 card redesign).

**EXHIBIT 43**                                                                      **EXHIBIT  19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Defendants argue Lizza's reporting and Hearst's publishing were far from negligent. (Doc. 118-1, at 51; 138, at 10-11). In support, defendants established that Lizza went to Sibley, performed dozens of interviews, gathered hundreds of pages of research before writing the Article, and made reasonable efforts to interview the relevant Nunes' family members who did not wish **[*122]**  to speak to Lizza. (Doc. 118-1, at 51). Further, defendants conducted multiple rounds of editing on the Article, including fact-checking, over a two-week period. (*Id.*). Finally, plaintiffs cannot point to any other actions defendants could have taken in reporting and publishing to perform within the professional standard of care; defendants argue the evidence supporting the level of professional care taken in creating the Article is overwhelming, and evidence of negligence does not exist. (*Id.*, at 52-53). Defendants do not cite to any expert deposition, opinion, or other evidence stating what the professional standard is for the Court to apply at this stage, but at this stage in the litigation it is not defendants' burden unless and until plaintiffs point to a professional standard and indicate how defendants violated that standard. *See Jauregui, 173 F.3d at 1085*. Defendants cite *Crescenz v. Penguin Group (USA), Inc., 561 F. App'x 173 (3d Cir. 2014)*, discussing the court's decision affirming a grant of summary judgment on the element of negligence in a defamation suit against an author and publisher. (Doc. 118-1, at 52). In that discussion, defendants still do not point to a standard the Court might use to evaluate negligence, only to "overwhelming" evidence that defendants were **[*123]**  not negligent, similar to the defendants in *Crescenz*. (*Id.*).

Plaintiffs assert defendants negligently created and published the Article's defamatory statements based on numerous facts. First, they point to Hearst's code of ethics, saying defendants violated the code. (Docs. 130, at 16; 130-1, at 13-14). NuStar plaintiffs do not, however, say how this code was violated. They provide no evidence as to what the professional standard is or how defendants' conduct breached the professional standard of care. Plaintiffs do, however, claim defendants "destroyed notes, emails, text messages and transcripts." (Doc. 130, at 16). In support, they cite to facts related to defendants' singular fact-checker who did not recall whether he listened to full recordings of interviews, and though he stated he reviewed all transcripts to fact-check the Article, defendants never produced the transcript of Lizza's interview with a woman who ran a grocery store. (Doc. 130-1, at 14-15). They also point to facts surrounding Lizza's research and interview process, including alleged lies Lizza told to interviewees, such as: NuStar relied 100 percent on undocumented labor; the Nunes family's move to Iowa was a secret; the **[*124]**  Nunes family told a reporter to use Devin Nunes' middle name so no one would connect him to the story; Anthony Nunes Jr. did not want sources speaking to Lizza because of his son's connections to President Trump; and facts involving destruction or disappearance of various communications and notes Lizza used to write the Article but never produced. (Docs. 130, at 16; 130-1, at 25-32, 34-35). Further, NuStar plaintiffs state Lizza lied about what the Article was about because he told people he interviewed that the Article was about immigration, NuStar Farms, and the dairy industry. (Docs. 130, at 16; 130-1, at 27-28). None of these facts create a genuine issue of material fact on this element. Plaintiffs have failed to show that the failure to retain notes or transcripts was intentional or violated a standard of care. The alleged misstatements made by Lizza during interviews are more opinions or hunches than false assertions of fact. Last, the Article was, in large part, about immigration, dairy farming, and NuStar Farms, so that was not a material misstatement.

Plaintiffs also cite, however, to facts that indicate information provided by various sources was not fact-checked, including **[*125]**  a statement that a woman sent "illegal" workers to NuStar Farms during 2003-2004—years before NuStar plaintiffs purchased the farm in 2007. (Docs. 130, at 17; 130-1, at 28-32). That source also was unsure whether the workers were "legal," but Lizza wrote the plaintiffs were aware of the "illegal" workers' undocumented status based on the source's statements and did not include the source's lack of knowledge as to worker status in the Article. (Docs. 130, at 17; 130-1, at 28-32). Lizza also did not ask the source when the workers were sent to what is now NuStar Farms or who had requested the workers. (Docs. 130, at 17; 130-1, at 28-32). Further, plaintiffs state because the Article was subject to several edits using the audiotapes and transcripts, defendants would have known some statements, such as those from the source who sent labor to the farm before plaintiffs owned it, were not accurate or misrepresented the interviewee's statements. (Docs. 130, at 17; 130-1, at 41-44).

The Court finds that the facts here do not create a genuine issue of material fact as to negligence. Defendants cite facts showing they sought to investigate what they believed to be an important story involving **[*126]**  NuStar plaintiffs and Nunes, their farm, and immigration. The facts support that defendants sought to discover the true facts through an investigation. Despite arguing negligence under a professional standard, neither party cited any facts, evidence,

Case 22-33553   Document 1059-17   Filed in TXSB on 02/03/25   Page 369 of 452

EXHIBIT 43                                                           EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

or cases that tell the Court the exact standard that is applied in evaluating negligence of a professional journalist. Once defendants have put on facts in support of its claimed lack of negligence, it is for plaintiffs to respond by arguing negligence, stating and describing the standard for the Court to apply, and then show how the professional standard was violated so as to constitute professional negligence. Alas, NuStar plaintiffs have not done this. NuStar plaintiffs have only stated negligence occurred and cited a handful of facts without any reference to what those facts mean in relation to a standard of care. At most, plaintiffs have shown defendants may have made some mistakes, but like every other profession, journalism is not held to a standard of perfection. Pointing to isolated instances of errors does not satisfy plaintiffs' burden of showing a genuine issue of material fact as to negligence. Again, if presented with the **[*127]** actual standard, the Court might have found differently; but that standard is not available here. Thus, there is no genuine issue of material fact, and no reasonable jury could find for plaintiffs on this element.

In total, the Court finds that because two elements of NuStar plaintiffs' defamation claim do not present genuine issues of material fact, a reasonable jury could not find in their favor. Thus, the Court grants defendants' motion for summary judgment as to Count I of NuStar plaintiffs' third amended complaint.


### B. Defamation by Implication

As to NuStar plaintiffs, defendants argue NuStar plaintiffs cannot show a genuine issue of material fact on several elements of their implication claim, and NuStar plaintiffs failed to identify a gist or sting different from that of Count I, and thus, Count II must be dismissed. In support, defendants argue NuStar plaintiffs cannot show a genuine issue of material fact as to falsity because the implication that NuStar plaintiffs conspired to hide their employment and use of undocumented labor is substantially, objectively true. (Doc. 118-1, at 49-51). Also, defendants argue NuStar plaintiffs cannot show defendants were negligent in their reporting **[*128]** and publication because defendants adhered to the professional standards of journalism. (*Id.*, at 51-52). Finally, defendants assert NuStar plaintiffs have not been damaged by the implication because there is no evidence of reputational harm. (*Id.*, at 55-56).

NuStar plaintiffs assert they have shown a genuine issue on all elements of defamation by implication. They assert defendants published the Article again on November 20, 2019, via the Tweet.[26] (*See generally* Doc. 130). Also, NuStar plaintiffs argue defendants negligently published the Tweet for many reasons, including the use of "fabricated statements" in the Article. (*Id.*, at 13-18). Further, NuStar plaintiffs argue they have suffered actual injury, particularly to their reputation within their local farming community. (*Id.*, at 18-33). Finally, NuStar plaintiffs argue the implication is false, as Nunes was not connected to the business operations or benefits of the Iowa farm, and NuStar plaintiffs never concealed their move to Iowa. (*Id.*, at 11-13).

Next, as to Nunes, defendants assert Nunes cannot prove five essential elements of his defamation by implication claim. First, defendants state Nunes cannot show republication of the Article, **[*129]** which is necessary for Nunes to prove publication, given the Twitter post of the Article is at issue, not the original Article. (Doc. 181-1, at 56-58). Further, even if the Article were republished via the Twitter post, defendants argue Hearst is not liable because Hearst no longer employed Lizza at the time of the Twitter post; accordingly, defendants assert Hearst is an improper defendant to the implication claim. (*Id.*, at 58). Second, defendants argue Nunes cannot show the implication is false, and substantial evidence refutes Nunes' claim that he did not conspire with his family to cover the alleged hiring practices and their move to Iowa because Nunes allegedly knew nothing of the hiring practices. (*Id.*, at 58-63). Third, defendants argue Nunes cannot prove actual malice, as required of a public figure, because no evidence exists to show Lizza knew the implication was false. (*Id.*, at 63-66). Fourth, defendants assert Nunes cannot show Lizza intended the implication, which they claim is logically required in implication cases on the element of actual malice. (*Id.*, at 66-70). Finally, defendants claim that Nunes cannot show actual injury because he did not properly follow California's **[*130]** retraction laws, does not plead special or pecuniary or economic losses suffered, and does not present evidence of special damages. (*Id.*, at 70-72).

---

[26] On appeal, the Eighth Circuit limited Nunes' claim of defamation by implication to the alleged republication of the Article through the Tweet. *Nunes, 12 F.4th at 900-01*.

EXHIBIT 43 EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Nunes argues there exist genuine issues of material fact on every element of his defamation claim. He asserts defendants republished the Article through the Tweet. (*See generally* Doc. 130). Also, Nunes argues he was injured because of the implication's impact on his reputation among other members of Congress, companies, and donors, impacting his ability to raise campaign funds. (*Id.*, 18-22). Further, Nunes argues the implication is false, as Nunes was not connected to the business operations or benefits of the Iowa farm, and he never conspired or acted to conceal his family members' move. (*Id.*, at 11-12). Finally, Nunes asserts there is a genuine issue as to actual malice, particularly in view of the Tweet after Nunes demanded retraction. (*Id.*, at 16-18).

For the following reasons, because the Court does not find a genuine issue of material fact as to each element of NuStar plaintiffs' defamation by implication claim, the Court finds that a reasonable jury could not find in NuStar plaintiffs' favor on Count II. Thus, the Court grants defendants' **[\*131]** motion for summary judgment as to NuStar plaintiffs' claim of defamation by implication.

Likewise, because the Court does not find a genuine issue of material fact as to each element of Nunes' defamation by implication claim, the Court finds that a reasonable jury could not find in Nunes' favor on Count I. Thus, the Court grants defendants' motion for summary judgment as to Nunes' claim of defamation by implication.

### 1. Applicable Law

Both Iowa and California laws[27] allow a plaintiff—public figure or otherwise—to bring a claim of defamation by implication when they believe that defamation has occurred not because of what the defamer explicitly states but from what the defamer implies. *Stevens, 728 N.W.2d at 829*; *Price v. Stossel, 620 F.3d 992, 1003 (9th Cir. 2010)* (applying California law); *In re Hunter, 610 B.R. 479, 498 (M.D.N.C. 2019)* (examining California law); *Manzari v. Associated Newspapers Ltd., 830 F.3d 881, 889 (9th Cir. 2016)* (applying California law).

There is a threshold element of defamation by implication that is dependent upon the way the alleged implication presents in the written piece. Defamation by implication occurs when the defamer "(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts[.]" *Stevens, 728 N.W.2d at 827* (quotation omitted); *see Price, 620 F.3d at 1003*. Even if the facts stated are true, the implication **[\*132]** is a form of defamation unless the implication qualifies as an opinion. *Stevens, 728 N.W.2d at 827*; *Price, 620 F.3d at 1003*; *Weller v. Am. Broad. Cos., Inc., 232 Cal. App. 3d 991, 283 Cal. Rptr. 644, 652 n.10 (Cal. Ct. App. 1991)*. Defamation by implication claims must be evaluated by considering the entire written article or document, as the implication can arise from various facts and phrases scattered throughout the piece or placed consecutively. *Manzari, 830 F.3d at 890*; *Stevens, 728 N.W.2d at 827-28*; *see also Toney v. WCCO Television, Midwest Cable and Satellite, Inc., 85 F.3d 383, 396 (8th Cir. 1996)*.[28] "[T]he touchstone of implied defamation claims is an artificial juxtaposition of two true statements or the material omission of facts that would render the challenged statement(s) non-defamatory." *Toney, 85 F.3d at 387*; *see Price, 620 F.3d at 1003*; *Stevens, 728 N.W.2d at 827*. Thus, a defendant must "defend the juxtaposition of two statements or the omission of certain facts." *Toney, 85 F.3d at 387*. "When a reader, 'connecting the dots,' could reasonably arrive at the implication, the author may be accountable." *Nunes, 12 F.4th at 897* (quoting *Elias v. Rolling Stone LLC, 872 F.3d 97, 109 (2d Cir. 2017)*); *Manzari, 830 F.3d at 889-91*. Thus, the court must determine that a reasonable person could understand the communication as bearing the allegedly

---

[27] Magistrate Judge Mark A. Roberts previously found a conflict between Iowa and California law on the issue of republication. (Doc. 90, at 14-15). The Court adopts Judge Roberts' analysis and findings on choice of law and finds California law applies to Nunes' claimed republication. Therefore, unlike NuStar plaintiffs' defamation and defamation by implication claims where no conflict of laws exists and thus the Court applies Iowa law, any discussion of defamation by implication as to Nunes will apply California law. (*See id.*, at 16-22).

[28] For purposes of applicable law, the Court references several cases interpreting defamation by implication laws in other states, such as Minnesota when no conflict exists between it and the applicable law here.

EXHIBIT 43  EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

defamatory implication. *Bertrand v. Mullin, 846 N.W.2d 884, 896 n.3 (Iowa 2014)*; *GetFugu, Inc. v. Patton Boggs LLP, 220 Cal. App. 4th 141, 162 Cal. Rptr. 3d 831, 842 (Cal. Ct. App. 2013)*.

Once a court finds this threshold element satisfied, it must evaluate whether the juxtaposed, truthful statements or omitted facts satisfy other elements typical of traditional defamation claims. "A claim asserting defamation by implication requires proof of similar elements [as a claim asserting defamation], **[\*133]** except that a plaintiff need not show that individual statements are defamatory." *Nunes, 12 F.4th at 895*. Thus, a plaintiff must show that the defendant (1) published statements—that is the statements or omissions within the document in its entirety—(2) of and concerning the plaintiff, which (3) resulted in injury to the plaintiff. *Id.* Further, though the facts and phrases presented in the statement might be true, "[t]he court must determine whether an objectively reasonable reader could draw the alleged false implication from the article as a whole," meaning the implication itself must be false. *Id. at 896*; *Manzari, 830 F.3d at 889-90*; *Stephens, 728 N.W.2d at 827-28*; *Toney, 85 F.3d at 394-96*. As discussed previously, a plaintiff need not prove the literal falsity of every detail of a statement; rather, a plaintiff must prove that the "gist" or "sting" of the challenged statements are substantially false. *See Doe, 765 F.3d at 863* (applying Iowa law). Further, statements "that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution." *Id.* Courts applying California law, but not Iowa law, have held that a plaintiff must also prove "that the defendant 'intended to convey the defamatory **[\*134]** impression.'" *De Havilland v. FX Networks, LLC, 21 Cal. App. 5th 845, 230 Cal. Rptr. 3d 625, 646 (2018)* (quoting *Dodds v. Am. Broad. Co., 145 F.3d 1053, 1063-64 (9th Cir. 1998)*).

When the plaintiff alleging defamation by implication is a public figure or limited-purpose public figure, they must also prove by clear and convincing evidence that the implication was made with actual malice, just as a plaintiff claiming defamation. *Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511-12, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)*; *Nunes, 12 F.4th at 899*; *Nelson Auto Center, Inc. v. Multimedia Holdings Corp., 951 F.3d 952, 958 (8th Cir. 2020)*; *Manzari, 830 F.3d at 883-84*. A defendant displays actual malice when an implication is made with knowledge of its falsity or reckless disregard as to the implication's truth. *See Stevens, 728 N.W.2d 830-831* (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)*); *Manzari, 830 F.3d at 891*. "[T]he defendant must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication." *Harte-Hanks Commc'ns, 491 U.S. at 688* (internal citation and quotations omitted); *see Manzari, 830 F.3d at 889*. In the case of republication, actual malice can be shown when the defendant republishes the defamatory statement or implication after being notified that it is defamatory and false. *RESTATEMENT (SECOND) OF TORTS § 580A cmt.-d 2022*; *see also, e.g., Stevens, 728 N.W.2d at 828, 830* (relying on Restatement (Second) of Torts when discussing defamation liability); *Kahn v. Bower, 232 Cal. App. 3d 1599, 284 Cal. Rptr. 244, 248 (Cal. Ct. App. 1991)* (same). Whether evidence in the record supports a finding of actual malice by clear and convincing evidence is a question of law for the court to decide. *Harte-Hanks Commc'ns, 491 U.S. at 685-86*.

Under California and Iowa law,[29] when a defamatory statement or implication is republished on social media, **[\*135]** under some instances, the republication can constitute an additional instance of defamation or defamation by implication that resets the statute-of-limitation. "Republication occurs when the original defamer repeats or recirculates his or her original remarks to a new audience." *Penrose Hill, Ltd. v. Mabray, 479 F.Supp.3d 840, 850 (N.D. Cal. 2020)* (quoting *Shively v. Bozanich, 31 Cal. 4th 1230, 7 Cal. Rptr. 3d 576, 80 P.3d 676, 683 (Cal. 2003)*); *Nunes, 12 F.4th at 899-900*. Under California law, whether the statute-of-limitation is reset through a republication depends on whether the second or later publication is made via an "aggregate communication that reaches a large number of persons at the same time" and whether that publication is part of the same single integrated publication as the original publication. *Penrose, 479 F.Supp.3d at 850-51*. General reference to or linking to a defamatory article alone is not republication. *Id. at 851*. When a second or later publication steps beyond simply

---

[29] Again, as to the issue of republication, NuStar plaintiffs' claims are subject to Iowa law, but Nunes' claim is subject to California law because of the conflict of law regarding republication, (*See* Doc. 90, at 14-15); accordingly, the Court references the law of both jurisdictions in its statement of applicable law.

   

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

hyperlinking the defamatory material and adds to or alters the original substance, there might be republication. *Id. at 852*. Republication might occur when the text of a social media post linking to the defamatory piece contains statements about the plaintiff, repeats the contents of the defamatory statements, or realleges the original substance by providing additional information. *Id. at 852-53*. Under Iowa law, however, a plaintiff need **[*136]** only show repetition of the original statement that was reasonably foreseeable. *Huegerich, 547 N.W.2d at 222* ("Every repetition of a defamatory statement 'constitutes a claim which is separate and independent from any claims arising out of the original publication.'") (quoting *Kiner v. Reliance Ins. Co., 463 N.W.2d 9, 14 (Iowa 1990)*).

### 2. NuStar Plaintiffs' Claim[30]

#### a. Juxtaposition of Facts

Defendants make no argument as to whether a juxtaposition exists. (*See* Doc. 118-1, at 59-60). Thus, defendants fail to meet their initial burden as to whether statements throughout the Article are sufficiently juxtaposed so as to produce the implication. *See Hartnagel, 953 F.2d at 395*.

#### b. Republication Under Iowa Law

The Court finds no genuine issue of material fact as to republication for purposes of the implication as to Hearst, though it finds a genuine issue of material fact as to Lizza under Iowa law. In relation to the Tweet's publication—the Article's republication—under Iowa publication laws, defendants make no argument. Applicable to both plaintiff groups, however, is defendants' argument that Hearst is an improper defendant to any claims arising from the Tweet because it no longer employed Lizza when he shared the Tweet. (Doc. 118-1, at 58).

In response, NuStar plaintiffs state only, throughout their **[*137]** briefing, that publication of the Article occurred for an additional time on November 20, 2019, when Lizza published the Tweet. (*See generally* Doc. 130). They do not state any factual or legal support for their conclusion, and they incorrectly state that the Eighth Circuit Court of Appeals held explicitly the Tweet was a republication of the Article. (Doc 130, at 7). The Eighth Circuit never said this; instead, it held that "the complaint sufficiently alleges that Lizza republished the article," *Nunes, 12 F.4th at 901*, meaning Nunes sufficiently alleged republication of the Article in his individual complaint—not that republication was shown or substantiated definitively. *See Fed. R. Civ. P. 12(b)(6)*. Importantly, the Eighth Circuit Court of Appeals said nothing about whether Lizza's publication of the Tweet constituted republication by Hearst when Lizza no longer worked for Hearst at the time. NuStar plaintiffs do not address defendants' argument that Hearst is an improper defendant on the implication claims. (Doc. 118-1, at 58). The two responses to defendants' two undisputed facts showing Lizza no longer worked for Hearst in November 2019 do not in any way controvert that Lizza no longer worked for Hearst when he posted the **[*138]** Tweet—plaintiffs instead use their response to discuss a prior conflict with Lizza from 2017 and to assert that Lizza had apparent authority to publish the Tweet for Hearst, though plaintiffs do not say how there would still be apparent authority under agency law. (Doc. 130-1, at 15-17, 55-56). Nor do plaintiffs cite any evidence or argue that the republication through the Tweet was foreseeable, as required under Iowa law.

The Court finds no genuine issue of material fact as to Hearst. Defendants have provided evidence showing Hearst was no longer affiliated with Lizza at the time of the Tweet. Plaintiffs have put on no evidence to rebut defendants' evidence, and they have cited no evidence or argument in support of their assertion that Lizza was acting with apparent authority when posting the Tweet. Thus, plaintiffs have not shown a genuine issue of material fact on this element as to Hearst.

---

[30] NuStar plaintiffs allege defamation by implication under Iowa law as private figures and so must show, in sum: (1) juxtaposition or omission of facts thereby creating a defamatory implication; that defendant (2) published a statement(s); (3) of and concerning the plaintiff; (4) which resulted in injury to the plaintiff; (5) falsity of the implication; and (6) negligence.

**EXHIBIT 43**     **EXHIBIT  19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Defendants make no argument as to whether, under Iowa law, Lizza republished the Article via the Tweet. Thus, defendants fail to meet their initial burden on this element as to Lizza. *See Hartnagel, 953 F.2d at 395*.

In sum, the Court finds no genuine issue of material fact exists on publication as to Hearst but that a genuine **[*139]** issue of material fact exists on the element as to Lizza. *See Mosley, 415 F.3d at 910*. Thus, the Court finds no reasonable jury could find for NuStar plaintiffs on this element in relation to Hearst. *See Mosley, 415 F.3d at 910*.


### c. Of and Concerning Plaintiff

Next, defendants make no argument as to whether the Article was of and concerning NuStar plaintiffs. (*See generally* Doc. 118-1, at 39-56). Thus, defendants fail to meet their initial burden on this element. *See Hartnagel, 953 F.2d at 395*.


### d. Injury

Here, defendants' injury argument is the same for both Counts I and II of NuStar plaintiffs' complaint, given the similarity in the claimed defamatory statement and claimed implication. Accordingly, the Court adopts its findings and analysis of injury under NuStar plaintiffs' defamation claim. Thus, the Court finds a genuine issue of material fact exists as to injury such that a reasonable jury could find for NuStar plaintiffs on this element. *See Mosley, 415 F.3d at 910*.


### e. Falsity of the Implication

The Court finds there exists no genuine issue of material fact on the issue of falsity of the implication. Defendants argue that the defamatory gist plaintiffs allege is the same as that alleged in Count I—that all plaintiffs conspired with others to hide and conceal the "politically **[*140]** explosive secret" that NuStar plaintiffs knowingly employ undocumented laborers on their farm, which defendants say is no different than the alleged defamatory statement that NuStar plaintiffs knowingly hire undocumented laborers. (Docs. 118-1, at 49; 138, at 9). Defendants assert that the test on summary judgment for this element is whether NuStar plaintiffs "would have been exposed to any more opprobrium had the publication been free of error." (Doc. 118-1, at 50). Referencing Count I, defendants state the defamatory sting on both counts, being the same, could not possibly create more opprobrium. (*Id.*). Defendants also state that the alleged defamatory statements and implication are substantially true. (*Id.*). They argue further there is no additional sting by stating plaintiffs conspired because conspiracy by itself is not wrong or defamatory—it is only defamatory when one conspires to commit a wrongful or illegal act, which differs from conspiring to hide an illegal act. (*Id.*). Further, even if defendants accused plaintiffs of actionable conspiracy, defendants assert that the underlying act resulting in the sting or gist was the knowing hiring of undocumented persons, which defendants **[*141]** argue is substantially true. (*Id.*, at 50-51). Finally, defendants argue none of the juxtaposed facts connected with the statement that plaintiffs used undocumented labor add to the sting of the Article. (*Id.*, at 51).

NuStar plaintiffs assert they did not knowingly employ undocumented laborers and conspire to cover it up. (*See generally* Doc. 130). They argue the farm in Sibley, Iowa is not the family farm—that farm has remained in Tulare, California. (*Id.*, at 12). Further, NuStar plaintiffs point to the fact plaintiffs never acted to conceal their move to Iowa in 2006. (Docs. 130, at 12; 130-1, at 22-23, 25-27, 39, 46-47). NuStar plaintiffs assert they opened a new dairy in Iowa, but the family farm in California is currently run by other family members, and there is no political secret about the farm as implied in the entire Article or from the individual fact that NuStar plaintiffs moved. (Docs. 130, at 12; 130-1, at 22-23, 25-27). Also, despite the Article implying that Devin Nunes had some interest in the Iowa farm, in NuStar plaintiffs' telling, he was never involved in the farm, its management, employment or hiring, never discussed labor issues with Anthony Jr., Anthony III, or **[*142]** Lori Nunes, and Devin Nunes and his wife never used the Iowa farm's

EXHIBIT 43

EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

address on any SEC filings and challenge the authenticity of the alleged filing produced in discovery. (Docs. 130, at 12; 130-1, at 39, 47-48, 118). Finally, they dispute that either Source 1 or 2 had any personal knowledge of NuStar Farms' labor practices, and state that (1) Sources 1 and 2 did not make the statements attributed to them in the Article given Lizza's notes, (2) Source 2 was not undocumented as claimed in the Article, and (3) at no time did NuStar Farms knowingly employ undocumented laborers, as supported by their purported expert's opinions. (Docs. 130, at 12-13; 130-1, at 28-32, 34, 36).

The Court finds no genuine issue of material fact exists as to falsity. NuStar plaintiffs argue the alleged implication as to them is false. As to the juxtaposed fact that the family conspired to hide the farm's move, they cite facts supporting that they never concealed the move and that the family's farm did not move—instead, they claim, the family purchased a separate and additional farm unaffiliated with the family farm in California. NuStar plaintiffs also cite to facts rebutting the allegation Devin Nunes had any [*143] interest or affiliation with—and thus that he could conspire with—the Iowa farm or knew anything about their current, active hiring practices or history at the Iowa farm at the time of the Article or had any knowledge of undocumented labor usage. But, as discussed in NuStar plaintiffs' defamation claim, NuStar plaintiffs do not, however, cite to facts that properly rebut defendants' argument as to whether NuStar plaintiffs knowingly used undocumented labor. This is because NuStar plaintiffs cite mostly to conclusions by their expert, which the Court cannot evaluate as facts. NuStar plaintiffs also cite to many facts indicating that they accepted insufficient documents because they believed it was invidiously discriminatory to question the documents. But none of these facts support that NuStar plaintiffs did not knowingly use undocumented labor. In all, NuStar plaintiffs have not presented facts creating a genuine issue of material fact as to falsity of the implication. Each of the juxtaposed facts identified lend to the larger implication, and defendants need only show the sting or gist of the implication is substantially true. The fact of knowing employment of undocumented laborers [*144] is essential and central to the implication being defamatory—there would be no "politically explosive secret" absent knowing employment of undocumented workers. The scandal comes from the allegation that a politician who votes for laws in furtherance of his belief that illegal immigration is wrong turns his head away when his family employs undocumented immigrants; the hypocrisy of knowing employment is the politically explosive secret. Here, the Court finds there is no genuine question as to whether the implication itself is substantially true or false; thus, the level of opprobrium is the only issue. *See Olson v. City of North Liberty, 451 F.Supp.3d 1010, 1026 (S.D. Iowa 2020)* (stating that the Court can only determine substantial truth as a matter of law when the only issue regarding falsity is the level of opprobrium, not when the truth of what was implied or said is also in issue). Plaintiffs have not met their burden to show a genuine issue of material fact as to falsity of the implication, despite defendants' recitation of facts which paint the implication as substantially true.

In sum, the Court finds no genuine issue of material fact exists on this element. *See Mosley, 415 F.3d at 910*. Thus, the Court finds no reasonable jury could find for NuStar plaintiffs as to falsity [*145] of implication.

### *f. Negligence*

Defendants' argument about negligence under Count II of NuStar plaintiffs' complaint does not differ from their negligence argument under Count I. NuStar plaintiffs' argument and cited facts in support also do not differ. Accordingly, the Court adopts its analysis and findings on negligence under Count I. In sum, the Court finds no genuine issue of material fact exists on this element. Thus, the Court finds no reasonable jury could find for NuStar plaintiffs on negligence.

In total, the Court finds that because not all elements of NuStar plaintiffs' defamation by implication claim present genuine issues of material fact, a reasonable jury could not find in their favor. Thus, the Court grants defendants' motion for summary judgment as to Count II of NuStar plaintiffs' third amended complaint.

**EXHIBIT 43**                                                                      **EXHIBIT  19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

*C. Nunes' Claim*[31]

*1. Juxtaposition of Facts*

Defendants make no argument as to whether a juxtaposition exists. (*See* Doc. 118-1, at 59-60). Thus, defendants do not meet their initial burden as to this element. *See Hartnagel, 953 F.2d at 395*.

*2. Republication Under California Law*

The Court finds no genuine issue of material fact as to republication. Defendants assert that the Tweet was not an actionable **[*146]** republication. (Doc. 118-1, at 57). In support, they cite California law establishing that hyperlinks alone are not republication. (*Id.*). Even if the Court were to find republication, defendants argue, Hearst is not a proper defendant because Lizza no longer worked for Hearst when he created the Tweet. (*Id.*, at 58).

Plaintiff Nunes does not show a genuine issue of material fact on this element. Rather than arguing and citing facts to support the question of republication within the caselaw, Nunes states only, throughout his briefing, that republication of the Article occurred on November 20, 2019, when Lizza published the Tweet. (*See generally* Doc. 130). He states no factual or legal support for the conclusion that the Tweet constitutes a republication of the Article under California law and incorrectly states the Eighth Circuit Court of Appeals held that the Tweet was a republication of the Article. (*Id.*, at 7). Again, the Eighth Circuit never said this; instead, it held that "the complaint sufficiently alleges that Lizza republished the article," *Nunes, 12 F.4th at 901*, meaning the complaint *sufficiently alleged* republication for purposes of a motion to dismiss, not that republication was shown or substantiated **[*147]** definitively. *See Fed. R. Civ. P. 12(b)(6)*. Here, Nunes makes no showing as to whether, beyond simply pleading republication in the complaint, there is a genuine issue as to republication. Further, Nunes makes no argument that Hearst is a proper defendant.

In sum, the Court finds no genuine issue of material fact exists on this element. *See Mosley, 415 F.3d at 910*. Thus, the Court finds no reasonable jury could find for Nunes on republication.

*3. Of and Concerning Plaintiff*

Defendants make no argument as to this element. (*See generally* Doc. 118-1, at 56-72). Thus, defendants fail to meet their initial burden as to whether statements throughout the Article were of and concerning Nunes. *See Hartnagel, 953 F.2d at 395*.

*4. Injury*

The Court finds no genuine issue of material fact as to injury. Defendants argue Nunes can recover only special damages because he did not properly follow the California retraction statute. (Doc. 118-1, at 70-71 (citing Doc. 90, at 15 and *Anschutz Ent. Grp., Inc. v. Snepp, 171 Cal. App. 4th 598, 640-41, 90 Cal. Rptr. 3d 133 (2009)*)). In support, defendants cite the statute which requires retraction demands be made three weeks before filing a lawsuit based on

---

[31] Nunes alleges defamation by implication under California law as a public figure based on the alleged republication of the Article on Twitter, and thus must show: (1) a juxtaposition or omission of facts thereby creating a defamatory implication; (2) that the defendant published a statement(s); (3) the statement(s) was of and concerning the plaintiff; (4) the statement(s) resulted in injury to the plaintiff; (5) the implication was false; (6) the defendant intended to convey the defamatory impression; and (7) the defendant acted with actual malice.

Case 22-33553   Document 1059-17   Filed in TXSB on 02/03/25   Page 376 of 452

EXHIBIT 43                                                      EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

the same statements, assert Nunes failed to do, and state that Nunes did not request the Tweet be retracted, only the unspecified "publication." (*Id.*, at 71). Defendants also **[*148]** argue Nunes produces no evidence of his special damages, or pecuniary or economic losses. (*Id.*). Defendants point to his salary staying the same while he served in Congress and tripling when he began employment with Truth Social, and to his fundraising increasing substantially after the Article was published. (*Id.*).

Plaintiff Nunes argues he has suffered injury as a result of the Tweet. He cites the retweets, quotes, replies, and likes of the alleged republication as injury. (Doc. 130, at 20). He additionally cites to reputational harm suffered in Congress because he was confronted by several other members of Congress and the House Intelligence Committee attorney about what was going on, some of whom were concerned he would be expelled from Congress due to accusations of federal crimes—that is, employing undocumented laborers—and some of whom wanted to know whether he had an undisclosed interest in NuStar Farms. (*Id.*, at 21). Further, Nunes states that many companies stopped donating to him as a result of the Article and its republication, that he experienced public shame and embarrassment because he was no longer able to give farm tours in California, and that at least one family member **[*149]** cut off—at least in part—his relationship with Nunes because of the Article and Tweet and not for any act by Nunes. (*Id.*, at 21-22).

The Court finds no genuine issue as to damages. As a preliminary matter, Nunes can recover only special damages because he did not properly follow the California retraction statute. *See Anschutz Ent. Grp., 171 Cal. App. 4th at 640-41* (discussing *California Civil Code Section 48a(1)*). Under *California Civil Code Section 48a(d)(2)*, special damages under *Section 48a* are limited to evidenced damages suffered to a plaintiff's "property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel, and no other." Nunes makes no accounting and provides no formula on which to base his damages. He does not show being confronted by various persons at work negatively impacted his occupation or ability to work, or that changes in campaign fundraising damaged his campaign and thus his occupation.

In sum, the Court finds no genuine issue of material fact exists as to recoverable damages and thus, injury. *See Mosley, 415 F.3d at 910*. Thus, the Court finds no reasonable jury could find for Nunes on this element.

### *5. Falsity of the Implication*

Next, the Court finds a genuine issue of material fact exists on the issue of falsity **[*150]** as to Nunes. Defendants argue their reporting is substantially true, making summary judgment appropriate. They argue that Nunes never made public disclosures of his family's move, and he attended a Steve King rally in 2010, which shows he knows King—with whom defendants say Nunes conspired to hide the family move. (Doc. 118-1, at 59). Defendants point also to evidence Nunes told his family they should not speak to Lizza and his family's insistence that Nunes be left out of the *Dairy Star* article, in addition to the family hiring Nunes' lawyer and speaking with Nunes about retraction. (*Id.*, at 59-60). Further, defendants argue Nunes knows his family employs undocumented laborers—a verifiable fact—based on his statements about knowing what the hiring looks like from the California farm, his belief that employers cannot question the authenticity of worker documentation, and his conversations with his father and brother. (*Id.*, at 60-63). Defendants argue each of these facts show Nunes knew of the use or potential use of undocumented labor because of his family's refusal to question authorizing documents. (*Id.*, at 61).

Nunes asserts he did not cover up any politically explosive secret or **[*151]** conspire to do so, and he had no knowledge of NuStar Farms' business or its practices. He argues the farm in Sibley, Iowa is not the family farm—that farm has remained in Tulare, California. (Doc. 130, at 12). Further, Nunes points to the fact neither he nor NuStar plaintiffs ever acted to conceal NuStar plaintiffs' move to Iowa in 2006. (Doc. 130, at 12; 130-1, at 22-23, 25-27, 39, 46-47, 56). He asserts his relatives opened a new dairy in Iowa, but the family farm in California is currently run by other family members, and there is no political secret about the farm as implied in the entire Article or from the individual fact that NuStar plaintiffs moved. (Docs. 130, at 12; 130-1, at 22-23, 25-27, 39, 46-47, 56). To this point, Nunes once more states NuStar Farms has never been the family farm because that farm has remained in California. (Doc. 130, at 12). Importantly, despite the Article implying that Nunes had some interest in the Iowa farm, in Nunes' telling, he was never involved in the farm, its management, employment, or hiring, never discussed labor issues with

**EXHIBIT 43**                                                    **EXHIBIT 19**

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Anthony Jr., Anthony III, or Lori Nunes, and he and his wife never used the Iowa farm's address on any SEC filings **[*152]** and challenge the authenticity of the alleged filing produced in discovery. (Doc. 130, at 12; 130-1, at 48-49). He has no ownership or interest, disclosed or undisclosed, in the farm, he states. (Doc. 130, at 12; 130-1, at 48-49). Last, Nunes points to the fact that the family does not knowingly employ undocumented persons. (Doc. 130, at 12-13).

The Court finds that a reasonable jury could find for Nunes here. There are disputes on essential facts, including whether Nunes was aware of his family's alleged hiring practices. There is, however, no evidence to which Nunes cites that rebuts the allegation that his family farm employs undocumented persons. At the same time, defendants do not show evidence Nunes knew of any employment practices in California so that he would have reason to know of current employment practices in Iowa, assuming they are the same practices. Defendants do not show that Nunes knew of the employment practices in Iowa. They do not show that the employment practices are the same at the Iowa farm now as when Nunes worked at the California farm but instead assume so. Further, no facts suggest Nunes acted to conceal his family's move, and his association with King alone **[*153]** does not show conspiracy. Central to the implication as to Nunes is the fact that he was involved at all, and the evidence presented creates a question as to whether Nunes had knowledge or involvement in the (1) alleged knowing employment of undocumented laborers or (2) covering it up through a conspiracy. Whether Nunes' family employed undocumented persons has no bearing here if he is not connected to those actions. Though defendants might have shown substantial truth of the implication as to NuStar plaintiffs, an implication cannot be said to be substantially true as to someone who has not been shown to have acted in the scheme at all.

In sum, the Court finds a genuine issue of material fact exists as to falsity of the implication. *See Mosley, 415 F.3d at 910*. Thus, a reasonable jury could find in favor of Nunes on this element.

### 6. Defendants' Intent to Convey Defamatory Impression

Next, the Court finds no genuine issue of material fact as to intent to convey the defamatory impression. Defendants argue Lizza intended no implication and has not been shown to intend the implication. (Doc. 118-1, at 66-67). Defendants point to the Article's content, which includes the statement that Nunes has no financial interest **[*154]** in the Iowa farm and does not say he is involved with the farm. (Doc. 118-1, at 66). Defendants state Lizza never meant "conspire" in the formal, legal sense—which is shown, in defendants' telling, by "precise facts" Lizza includes and how they are "precisely laid out in the Article." (*Id.*, at 67).

Nunes does not argue on this element. He simply states in his brief, "[t]he intended and endorsed defamatory implication" once when outlining the implication, (Doc. 130, at 3), and discusses the Eighth Circuit Court of Appeals' mention that plaintiff plausibly pled that defendants intended the implication, not that Nunes had proven such intent. (*Id.*, at 7). This is insufficient to raise any material fact on which a genuine issue could exist.

In sum, the Court finds no genuine issue of material fact exists on defendants' intent to convey a defamatory statement. *See Mosley, 415 F.3d at 910*. Thus, the Court finds no reasonable jury could find for Nunes on this element.

### 7. Actual Malice

Last, the Court finds a genuine issue of material fact as to actual malice. Defendants argue no actual malice exists because Lizza did not knowingly or recklessly disregard the truth of the implication—an implication he did not know or **[*155]** intend to make. (Doc. 118-1, at 66-67). Further, defendants argue Nunes cannot show actual malice by clear and convincing evidence, as the law requires. (*Id.*, at 64-66).

Nunes argues Lizza harbors extreme bias toward Nunes and has previously made other false accusations regarding Nunes. (Doc. 130, at 16). Nunes also states Lizza lied about what he was reporting, Lizza made many misrepresentations to interviewees including the sources, and defendants fabricated statements including assertions

Case 22-33553   Document 1059-17   Filed in TXSB on 02/03/25   Page 378 of 452

EXHIBIT 43                                                          EXHIBIT 19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

that sources sent undocumented labor to NuStar Farms and that one source was undocumented. (*Id.*, at 17). He points out that Lizza did not ask important follow up questions such as when people were brought to the farm. (*Id.*). He cites further to publication via Twitter after the retraction demand and lawsuit filing, and what he believes was an October Surprise—the timing of the Article being tweeted evidences, in Nunes' telling, an intent to inflict harm on his career, as defendants knew he was a prominent member of Congress. (*Id.*, at 17-18). Also, Nunes states that Lizza knew the Article contained falsehoods when he made the Tweet because he had audiotapes of source interviews that did not contain **[*156]** what he claimed they did. (*Id.*, at 17).

Here, the Court finds by clear and convincing evidence that there is a question as to whether actual malice existed. It is insufficient for Nunes to say defendants desired to inflict damage on Nunes and his career without proper evidence to support such a blanket statement. It also is insufficient for Nunes to claim Lizza knew he was publishing falsehoods because of the content of the interview tapes when nothing Nunes cites evidences contradiction between what Lizza wrote and what interviewees stated, including interview tapes. Conversely, though Nunes did not argue republication as required, the Article was at least re-posted and a request for retraction—whether sufficient—occurred. In other words, Lizza was informed of its alleged falsity and then spoke the allegedly defamatory implication again—regardless of whether that additional recitation of the implication legally qualifies as a republication for purposes of the statute-of-limitation. As discussed, there is a question as to the substantial truth of the implication as to Nunes, which Nunes demanded defendants retract because he alleges the implication is false as to him. Lizza renewed **[*157]** or ratified his previous statements when he shared the Tweet, despite being told the implication as to Nunes was false before tweeting. *See Dickinson v. Cosby, 37 Cal. App. 5th 1138, 1159, 250 Cal. Rptr. 3d 350 (Cal. Ct. App. 2019)* (discussing failure to retract a statement upon which doubt is cast after publication and ratification through that same failure to retract). Thus, the Court finds the evidence of the Tweet's publication after an attempted retraction demand creates a genuine issue as to Lizza's actual malice.

As to Hearst, defendants make no argument and put on no evidence in support of the assertion that Hearst did not act with actual malice. Under a clear and convincing evidence standard, the Court finds defendants have not met their initial burden as to Hearst's alleged actual malice. *Hartnagel, 953 F.2d at 395*.

In sum, the Court finds a genuine issue of material fact exists as to actual malice. *See Mosley, 415 F.3d at 910*.

In total, however, because Nunes does not show a genuine issue of material fact on all elements of his claim, a reasonable jury could not find in his favor. Thus, the Court grants defendants' motion for summary judgment as to Count I of Nunes' third amended complaint.

### IV. CONCLUSION

For these reasons, defendants' motion for summary judgment (Docs. 118; 121) is **granted** as to NuStar plaintiffs' **[*158]** claim of defamation (Count I), **granted** as to NuStar plaintiffs' claim of defamation by implication (Count II), and **granted** as to Nunes' claim of defamation by implication (Count I).

Still pending before this Court is the disposition of the motion to unseal certain documents supporting the motion for summary judgment. (Docs. 124; 125; 142). The Court orders the motion to unseal be held in abeyance. The Court directs the Clerk of Court to delay filing its judgment closing this matter until the Court issues its order on the motion to unseal.

**IT IS SO ORDERED** this 25th day of April, 2023.

/s/ C.J. Williams

C.J. Williams

United States District Judge

**EXHIBIT 43**

EXHIBIT  19

Nunes v. Lizza, 2023 U.S. Dist. LEXIS 71719

Northern District of Iowa

---

**End of Document**

**EXHIBIT 43**                                                                    EXHIBIT  20

Chugh v. Kalra, 342 Conn. 815

# *Chugh v. Kalra*

Supreme Court of Connecticut

October 13, 2021, Argued; April 12, 2022, Decided

SC 20562

**Reporter**
342 Conn. 815 *; 271 A.3d 993 **; 2022 Conn. LEXIS 82 ***

RAKSHITT CHUGH v. AASHISH KALRA ET AL.

**Prior History:  [***1]** Action to recover damages for, inter alia, breach of a partnership agreement, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket, where ARC Capital, LLC, and Peak XV Capital, LLC, were added as plaintiffs; thereafter, the court, Schuman, J., granted the defendants' motion to dismiss certain counts of the complaint; subsequently, the plaintiffs withdrew the complaint in part; thereafter, the court, Schuman, J., granted in part the defendants' motion for summary judgment and rendered judgment thereon; subsequently, the court, Schuman, J., denied in part the defendants' motion to preclude certain evidence; thereafter, the case was tried to the jury before Schuman, J.; verdict for the named plaintiff; subsequently, the court, Schuman, J., denied the named defendant's motion to set aside the verdict and for judgment notwithstanding the verdict, and rendered judgment for the named plaintiff, from which the named defendant appealed.

*Chugh v. Kalra, 2020 Conn. Super. LEXIS 331, 2020 WL 1488606 (Conn. Super. Ct., Feb. 28, 2020)*

**Disposition:** Reversed in part; further proceedings.

## Case Summary

### Overview

HOLDINGS: [1]-*Fed. R. Civ. P. 13(a)(1)* did not bar a director's claims on the ground that they were compulsory counterclaims in a federal action because the district court determined that a limited liability company was collaterally estopped from pursuing the claims in the federal action;  [2]-The director's evidence of partnership was sufficient to support the jury's finding of an oral agreement between the director and the partner to carry on, as co-owners, a business for profit and that they carried on that business. There was no evidence the director and partner intended to adopt the corporate form in place of their partnership;  [3]- Because the jury was instructed to award special damages only if it found that the director had proven lost profits, and because there was no evidence to support the lost profits award, the damages award could not stand.

### Outcome
Judgment reversed with respect to libel per se claim and punitive damages award, and case remanded for new trial on that claim and for hearing in damages. Judgment affirmed in all other respects.

## Syllabus

The plaintiff C sought to recover compensatory and punative damages from the defendants, K and T Co., for, inter alia, breach of a partnership **[***2]**  agreement in connection with a failed business venture. In 2004, C and K had

EXHIBIT 43 EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

agreed to form a partnership to pursue investment opportunities. In furtherance of that agreement, they established numerous companies, including and principally T Co., an investment advisory company incorporated in the Cayman Islands. C and K each held a 50 percent equity interest in T Co. through entities controlled by C and K. The shares of stock representing C's interest were owned by A Co. and H Co., and the shares of stock representing K's interest were owned by P Co. Over time, C and K's relationship deteriorated, and, in 2012, with no notice to C, T Co.'s board of directors voted to remove C as a director, which left K exclusively in charge of T Co. Thereafter, K proceeded to treat T Co. and its assets as his own, and C was excluded from any involvement in T Co.'s affairs. A Co. and H Co. subsequently filed a petition in the Grand Court of the Cayman Islands to wind up T Co. and to liquidate and divide its assets between K and C. P Co. opposed the petition by asserting as an affirmative defense that C had breached his fiduciary duty to T Co. in numerous ways. The Cayman Islands court granted the petition **[\*\*\*3]** and rejected P Co.'s affirmative defense, concluding that there was no merit to any of the allegations against C. Meanwhile, K, through P Co., brought an action in federal court against C, A Co., and other related entities. T Co. was thereafter substituted as the plaintiff in the federal action and claimed that C had breached his fiduciary duty to T Co. in numerous ways. T Co.'s specific allegations against C substantially reprised the allegations P Co. had asserted in the winding up proceeding. Following the decision of the Cayman Islands court, the District Court granted the motion for summary judgment filed by the defendants in the federal action on the ground that T Co. was collaterally estopped from pursuing its claims. While the federal action was still pending, C filed the present action against K and T Co., alleging, breach of partnership agreement, breach of fiduciary duty, and libel per se. The libel claim was predicated on a 2013 press release K had issued following the decision of the Cayman Islands court, in which K accused C of stealing T Co.'s customer database and misappropriating its business opportunities, and of paying Cayman Islands liquidators to interfere in the **[\*\*\*4]** federal action. Following a trial, at which C's expert witness on damages, S, testified that the press release had cost C more than $20 million in lost profit, the jury returned a verdict in favor of C, awarded him $9.4 million in damages, and authorized the imposition of punitive damages, which the trial awarded in the amount of approximately $3 million. K filed a motion to set aside the verdict, arguing, with respect to the verdict on the libel claim, that the record was devoid of evidence supporting S's testimony regarding lost profit because his testimony was predicated on the false assumption that C's hedge fund and private equity fund had $250 million under management in 2012 when it was undisputed that C and his companies had no money under management at that time. The trial court denied K's motion to set aside the verdict, concluding that any error involving the admission of S's testimony was harmless because it was clear that the jury, having awarded C only $4 million in compensatory damages in connection with the libel claim, did not fully accept S's testimony and because, although the jury was instructed that it could award C compensatory damages only if he proved that he **[\*\*\*5]** lost profits as a result of the harm to his reputation from the press release, that instruction was an incorrect statement of the law, as C was not required to prove actual damages or lost profits in a libel per se case. Thereafter, the trial court rendered judgment for C, from which K appealed. *Held*:

1. K could not prevail on his claim that C's claims in the present action were barred by the federal compulsory counterclaim rule (*Fed. R. Civ. P. 13 (a) (1)*) on the ground that they were compulsory counterclaims in the federal action, as that rule was inapplicable because there had been no decision on the merits of the claims T Co. asserted in the federal action; in light of the equitable principles of res judicata, estoppel, and waiver underlying *rule 13 (a) (1)*, a court need not apply the rule when to do so would be unjust, such as when a decision on the merits was not rendered in the prior action, and, therefore, regardless of whether K had been a party to the federal action, *rule 13 (a) (1)* would not bar C's claims in the present action because the District Court determined that T Co. was collaterally estopped from pursuing it claims in the federal action, and it would be anomalous for this court to conclude that C's claims were barred **[\*\*\*6]** by principles of res judicata, estoppel, or waiver due to C's failure to assert them as counterclaims in an action that itself was barred by those principles.

2. There was no merit to K's claims that C's breach of partnership agreement and breach of fiduciary duty claims failed as a matter of law under *Karanian v. Maulucci (185 Conn. 320, 440 A.2d 959)*, in which the court indicated that, if partners adopt the corporate form to insulate against personal liability, they cease to be partners, and that any partnership C and K created ceased to exist when they incorporated T Co., among other entities, in 2006: *Karanian* did not control C's claims because, unlike the partners in that case, who intended to and did reorganize their partnership into a corporation, there was no evidence in the present case that C and K ever intended to adopt the

**EXHIBIT 43**                                                                **EXHIBIT 20**

Chugh v. Kalra, 342 Conn. 815

corporate form in place of their partnership, but, rather, the evidence indicated that C and K's partnership was an overarching entity comprised of numerous companies owned by C, K, and their families, acting in concert to further the remunerative goals of the partnership, and K cited no authority holding that a partnership cannot operate in such a manner; moreover, insofar as K claimed that the evidence did **[***7]** not support a finding that he and C were ever partners, although the evidence of a partnership was not overwhelming, it was sufficient to support the jury's finding of an oral agreement between C and K to carry on, as co-owners, a business for profit and that they carried on that business from 2004 until at least 2013.

3. The trial court abused its discretion in admitting S's testimony on damages with respect to C's libel per se claim: it was undisputed that S's testimony that C sustained more than $20 million in lost profit as the result of K's 2013 press release had no basis in fact; moreover, the trial court improperly instructed the jury that it could award special damages only if it found that C had proven lost profit and that instructional error was not harmless, as this court could not conclude that the jury would have awarded C $4 million in general damages in connection with C's libel claim but for that error, there was no other evidence to support the award for lost profit, and, therefore, the damages award could not stand; furthermore, because the record revealed that a component of the trial court's punitive damages award was a success fee for C's counsel in the amount of **[***8]** 25 percent of the total compensatory damages award, which included the $4 million award for C's libel claim, the punitive damages award also could not stand; accordingly, the judgment was reversed as to C's libel claim and the case was remanded for a new trial on that claim and for a hearing in damages.

**Counsel:** John W. Cerreta, with whom was Joseph T. Nawrocki, for the appellant (named defendant).

John G. Balestriere, pro hac vice, with whom were Stefan Savic and, on the brief, Matthew W. Schmidt, pro hac vice, for the appellee (named plaintiff).

**Judges:** Robinson, C. J., and McDonald, D'Auria, Mullins, Kahn and Keller, Js. KELLER, J. In this opinion the other justices concurred.

**Opinion by:** KELLER

# Opinion

 **[*818] [**995]**   KELLER, J. This case is the latest in a series of cases arising out of a failed business venture between the named plaintiff, Rakshitt Chugh, [1] and the named defendant, Aashish Kalra. [2] Chugh commenced the present action seeking compensatory and punitive damages for,  **[*819]** inter alia, breach of partnership agreement, breach of fiduciary duty, and libel per se. A jury found in favor of Chugh on those three counts, awarding him damages in the amount of $9,400,000 [3] and authorizing the imposition of punitive damages, which the trial **[***9]** court awarded in the amount of $2,965,488.29. On appeal, [4] Kalra claims that the trial court improperly denied his motions to set aside the verdict and for judgment notwithstanding the verdict because (1) Chugh's claims are barred by the

---

[1] Two companies controlled by Chugh, Peak XV Capital, LLC (Peak XV), and ARC Capital, LLC (ARC Capital), were also added as plaintiffs in this action. The trial court granted the defendants' motion to dismiss ARC Capital from the case for lack of standing and to dismiss Peak XV from the case with respect to every claim except the libel claim. For the sake of clarity, we refer in this opinion to Chugh, Peak XV, and ARC Capital by name.

[2] Trikona Advisers Limited (TAL) was also named as a defendant in this case. For the sake of clarity, we refer in this opinion to Kalra and TAL collectively as the defendants and individually by name when appropriate.

[3] The trial court later ordered a remittitur in the amount of $451,171.24.

[4] Kalra appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to *General Statutes § 51-199 (c)* and *Practice Book § 65-2*.

**380**

EXHIBIT 43                                                                        EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

compulsory counterclaim rule set forth in *rule 13 (a) (1) of the Federal Rules of Civil Procedure*, [5] (2) as a matter of law, no partnership **[\*\*996]** existed between the parties during the relevant time frame, and (3) with respect to the libel claim, the trial court improperly admitted the testimony of Chugh's expert witness on damages because there was no evidence to support the testimony. We agree with Kalra's third claim and, accordingly, reverse in part the judgment of the trial court.

Because issues related to the underlying action have been litigated on prior occasions in numerous other forums, [6] when appropriate, we quote directly from the **[\*820]** decisions in those cases in setting forth the relevant facts and procedural history. Chugh and Kalra, both of whom are naturalized citizens of the United States, were born in India but immigrated to the United States to pursue postsecondary educational and employment opportunities. In 2002, Chugh's brother, who had attended high school with Kalra in India, introduced **[\*\*\*10]** them in New York City. The two men became friends, and, between 2002 and 2004, Kalra worked as a consultant for Byte Consulting, Inc., a company founded by Chugh in 2000. By 2004, they were meeting nearly every day for lunch. It was during one of their lunch meetings, in early 2004, that they agreed to form a partnership to pursue investment opportunities in India. At the time, India had just announced that it would open its doors to foreign investment in real estate and infrastructure projects in early 2005, an opportunity that they saw themselves as uniquely positioned to exploit. They agreed that theirs would be a 50/50 partnership and that all strategic decisions relating to the business, including where to set up offices and whom to hire, would have to be unanimous.

In furtherance of the partnership agreement, Chugh and Kalra established numerous companies around the world. [7] Principal among them was Trikona Advisors Limited (TAL), an investment advisory company incorporated in the Cayman Islands. "Each man held a [50] percent equity stake in TAL through entities controlled by them. Chugh's shares were owned by ARC Capital, LLC (ARC Capital), and Haida Investments [Limited **[\*821]** (Haida)], **[\*\*\*11]** and Kalra's shares were owned by Asia Pacific [Ventures Limited (Asia Pacific)]. At the same time, the two men formed Trinity Capital [PLC (Trinity)], a closed-end fund listed on the London Stock Exchange, through which they solicited investments. Kalra and Chugh managed Trinity through TAL. Trinity paid TAL a fee for its management services, calculated at [2] percent of Trinity's net asset value plus a performance fee.

 **[\*\*997]** "The 2008 economic crisis took its toll on TAL and soured the relationship between Chugh and Kalra. Trinity's shareholders began pressuring the Trinity board [of directors (board)] to sell the company's assets and [to] distribute capital which, while it might benefit the shareholders, would reduce TAL's management fees by lowering Trinity's net asset value. Chugh and Kalra differed on how to respond to the Trinity board's proposed asset sale: Kalra opposed the move, while Chugh wanted to be more conciliatory to the shareholders. TAL tried to prevent the sell-off by acquiring the shares of [QVT Financial LP (QVT)], one of Trinity's main shareholders, but the deal collapsed when TAL could not secure the necessary financing. Frustrated, Kalra advocated taking legal action **[\*\*\*12]** against QVT

---

[5] *Rule 13 (a) of the Federal Rules of Civil Procedure* provides in relevant part: "(1) *In General*. A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim:

(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and

*(B)* does not require adding another party over whom the court cannot acquire jurisdiction. . . ."

[6] In *Trikona Advisers Ltd. v. Haida Investments Ltd., 318 Conn. 476, 479 n.5, 122 A.3d 242 (2015)*, this court observed that "[t]hese parties have filed several actions in multiple domestic and international courts. For example, other than the present action, the parties have filed actions in the United States District Court for the District of Connecticut, the New York Supreme Court, the Grand Court of the Cayman Islands, India, and Mauritius."

[7] Evidence adduced at trial reveals that, as of September 27, 2012, twelve companies comprised what the parties referred to as the "Trikona Group": TAL in the Cayman Islands, Trikona Capital Advisers, LLC, in Delaware, Trinity Capital Limited, TSF Advisers Mauritius Limited, Trikona Advisers Mauritius Limited, Trikona Capital Limited in the Cayman Islands, Trikona Capital Advisers Limited in the United Kingdom, Sankalp Buildwell PVT Limited in India, Trikona Capital Mauritius Limited, Trikona Investments Limited in Mauritius, Trikona Asset Holdings Limited in Mauritius, and TCK Advisers PVT Limited in India.

for breach of contract, but was ultimately dissuaded from that course by Chugh and outside legal counsel." *Trikona Advisers Ltd. v. Chugh, 846 F.3d 22, 26-27 (2d Cir. 2017)*.

"The souring of Kalra and Chugh's relationship culminated on January 11, 2012, when, with no notice to Chugh, TAL's board of directors voted to remove him as a director. This left Kalra exclusively in charge of TAL. Thereafter, Kalra proceeded to treat TAL and its assets as his own and Chugh was excluded from further involvement in the business." Id., 27. "TAL's collapse spawned a number of legal proceedings in the United States and abroad, [including] a [winding up] proceeding  **[*822]**  in the Cayman Islands and [a] federal civil [action] in Connecticut . . . ." Id.

"On February 13, 2012, ARC [Capital] and Haida, which held Chugh's TAL shares and were controlled by Chugh, filed a petition in the Grand Court of the Cayman Islands (Cayman court), seeking to 'wind up' TAL, a Cayman corporation. The [petition] sought to liquidate the business and [to] divide its assets between Chugh and Kalra. Asia Pacific, which held Kalra's TAL shares and was controlled by Kalra, opposed [the] petition. Under Cayman Islands law, a court may order a company to be wound up if it is 'of [the] **[***13]**  opinion that it is just and equitable' to do so. . . . [ARC Capital and Haida] argued to the Cayman court that it would be just and equitable to liquidate the company because: (1) TAL had experienced a 'loss of substratum,' i.e., a loss of its ability to 'carry on the business for which it was established,' due to its dire financial condition and the complete breakdown in trust between Kalra and Chugh; (2) Kalra had wrongfully caused Chugh to be removed from TAL's board and thereby deprived Chugh of his 'legitimate expectation of being involved in [TAL's] management'; and (3) after he had removed Chugh from the board, Kalra proceeded to misuse TAL's assets for his sole benefit.

"[Asia Pacific] opposed the [winding up of TAL] by asserting the affirmative defense that Chugh had breached his fiduciary duty to TAL in several ways, and that his removal from the board was therefore justified. Specifically, [it] argued that: (1) Chugh intentionally sabotaged TAL's attempt to acquire [QVT's] shares in Trinity and had 'caused' TAL to pay QVT £2 million for covenants of 'extremely limited value'; (2) Chugh had later 'prevented' TAL from bringing suit against QVT for breach of contract, over **[***14]**  Kalra's objections; (3) Chugh 'forced' Kalra to agree to an unfavorable settlement with Trinity in the breach of contract arbitration arising  **[*823]**  out of [a] failed [business] deal; and (4) Chugh 'stole' TAL's assets and customer information for use in establishing Peak XV [Capital, LLC (Peak XV) and other entities] and interfered in the distribution of payments due to Kalra. [Asia Pacific] framed these arguments as jurisdictional defenses, arguing that if any one of these allegations were true, Chugh would be precluded  **[**998]**  from invoking the Cayman court's equitable jurisdiction under the doctrine of unclean hands.

"The Cayman court tried the [winding up] proceeding over seven days in January of 2013. At the trial's conclusion, the court granted [the] petition. It found that 'each of' [ARC Capital and Haida's] allegations was supported by evidence, and that these allegations 'taken together' supported a finding that it was just and equitable to wind up TAL. [8] It also rejected each of [Asia Pacific's] affirmative defenses, concluding that there was 'no merit whatsoever [to] the allegations made against . . . Chugh.' " (Citation omitted.) *Id., 27-28*. Indeed, the Cayman court found that Asia Pacific's allegations **[***15]**  against Chugh, including its claim that Chugh had stolen TAL's assets and destroyed its business, were "completely at odds with the evidence of what actually happened . . . ." *In re Trikona Advisers Ltd.*, Grand Court of the Cayman Islands, Docket No. FSD 18 of 2012 (AJJ) (January 31, 2013). The court concluded that, in fact, it was Kalra who had engaged in "blatantly improper self-dealing," calling Kalra's testimony to the contrary "disingenuous" and his evidence "wholly unreliable." Id. The court further stated that, after listening to Kalra testify over the course of several days, it had come to the conclusion that there was nothing he would not do, "no matter how dishonest, to ensure that . . . Chugh . . . [is] excluded from any share in [TAL's] remaining [net asset value]." Id. It further stated that Kalra had  **[*824]**  commenced an action in the United States District Court for the District of Connecticut against Chugh in which he had asserted all of the baseless allegations against Chugh that he had asserted in the winding up proceeding. See id. The court described Kalra's action in the District Court as "a thoroughly dishonest abuse of process." Id. On May 15, 2013, the Cayman **[***16]**  court issued a "Default Costs Certificate,"

---

[8] A copy of the Cayman court's memorandum of decision was entered into evidence at the trial in the present case.

EXHIBIT 43                                                                 EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

ordering Asia Pacific to pay ARC Capital's and Haida's litigation expenses in the winding up proceeding in the amount of $760,067.65. [9]

As the Cayman court indicated, "[o]n December 28, 2011, two months before the commencement of the [winding up] proceeding . . . Kalra, through Asia Pacific, sued . . . [Chugh, ARC Capital, and other related entities (Chugh defendants)] in the [D]istrict [C]ourt in Connecticut. After TAL's board removed Chugh, TAL was substituted as [the] plaintiff. TAL's . . . operative complaint . . . assert[ed] eleven causes of action against the Chugh [d]efendants sounding in breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unfair competition, theft of trade secrets, civil conspiracy, conversion, statutory theft, unjust enrichment, and abuse of process. TAL alleged that Chugh breached his fiduciary duty by: (1) undermining TAL's negotiating positions in the QVT [deal] and [another business deal]; (2) causing TAL to enter into an unfavorable settlement of its claims against **[*825]** Trinity; **[**999]** (3) interfering with payments due to Kalra; and (4) misappropriating TAL's customer information and assets in the course **[***17]** of founding Peak XV to unfairly compete with TAL. These claims substantially reprised the allegations [Asia Pacific] asserted as affirmative defenses to [the winding up] petition in the [Cayman court]."

"Following the ruling of the Cayman court in the [winding up] proceeding . . . the Chugh [d]efendants moved for summary judgment in the [D]istrict [C]ourt based on collateral estoppel. They argued that in deciding the petition the Cayman court had already made findings of fact in Chugh's favor on all of [the] assertions regarding TAL's collapse, and that [TAL] was therefore collaterally estopped from relitigating those factual disputes. The [D]istrict [C]ourt agreed, and . . . granted [the] motion for summary judgment." *Trikona Advisers Ltd. v. Chugh, supra, 846 F.3d 28-29*. The United States Court of Appeals for the Second Circuit affirmed the District Court's judgment. *Id., 35*.

On January 8, 2014, while the federal action was still pending, Chugh filed the underlying action against the defendants, alleging, inter alia, breach of partnership agreement, breach of fiduciary duty, and libel per se. [10] The libel claim was predicated on a March 13, 2013 press release Kalra had issued, following the Cayman court's ruling, in which Kalra accused Chugh **[***18]** of stealing TAL's customer database and misappropriating its business opportunities. He also accused Chugh of paying the Cayman Island liquidators "$500,000 to interfere in the Connecticut litigation [then pending in the District Court] against [Chugh]." The trial court subsequently stayed the state court proceeding pending the outcome **[*826]** of TAL's postjudgment motions and appeal in the federal action. Following the lifting of the stay, the defendants filed a motion for summary judgment in which they argued, inter alia, that Chugh's claims [11] were barred by *rule 13 (a) (1) of the Federal Rules of Civil Procedure* because all of the claims were compulsory counterclaims in the federal action. They further argued that Chugh's breach of partnership agreement and breach of fiduciary duty claims failed as a matter of law because Chugh and Kalra never entered into a partnership agreement and that, even if they had, the agreement ended as a matter of law in 2006 when TAL incorporated in the Cayman Islands because, under *Karanian v. Maulucci, 185 Conn. 320, 323-24, 440 A.2d 959 (1981)*, a company cannot be both a partnership and a corporation at the same time. Finally, the defendants argued that the libel claim also failed as a matter of law because the 2013 press release addressed a matter of public concern, and, **[***19]** therefore, any statement contained therein was constitutionally protected speech. They further argued

---

[9] ARC Capital brought an action in the trial court against Asia Pacific and Kalra, seeking to domesticate and enforce the Cayman court's costs order. The trial court later consolidated that case and the present case for trial. "In count three of the domestication complaint, [ARC Capital] sought to pierce the corporate veil of Asia Pacific and to hold Kalra liable for the full amount of the costs judgment." The jury found in favor of ARC Capital on count three, but the trial court granted Kalra's motion to set aside the verdict on the ground that the evidence was insufficient to support the jury's finding that Kalra had used his control of Asia Pacific to commit a fraud or wrong that proximately caused ARC Capital's inability to collect what Asia Pacific owed it under the costs order. ARC Capital did not appeal from that ruling.

[10] The operative complaint alleged three additional claims that were dismissed or withdrawn before trial: breach of an ancillary settlement agreement, breach of an implied contract to form a joint venture, and breach of the implied covenant of good faith and fair dealing.

[11] See footnote 1 of this opinion.

383

that they were entitled to summary judgment on the libel claim because truth is a complete defense to libel, and the press release was an "essentially true" recitation of the federal complaint.

The trial court denied in part the defendants' motion for summary judgment. With respect to their contention that Chugh's claims were compulsory counterclaims in the federal action, the court concluded that Chugh was not required to assert them in the federal action because Kalra was not a party to that action "and there is no authority squarely holding that **[\*\*1000]** a party must cite in a nonparty to assert compulsory counterclaims against the nonparty." In light of the court's determination that *rule 13 (a) (1) of the Federal Rules of Civil Procedure* was inapplicable because Kalra was not an opposing party in the federal action, it did not address Chugh's **[\*827]** assertion that the rule also was inapplicable because Chugh's claims in the present case did not arise out of the same transaction or occurrence that was the subject matter of the federal complaint.

The trial court also denied the motion for summary judgment with respect to the defendants' contention **[\*\*\*20]** that, under *Karanian*, any partnership between the parties ended with TAL's incorporation. Citing *Bartomeli v. Bartomeli, 65 Conn. App. 408, 783 A.2d 1050 (2001)*, the court concluded that merely because a company cannot be both a corporation and a partnership does not mean that the partnership between Chugh and Kalra ended with TAL's incorporation. Whether the partner-ship continued to exist after 2006, the court concluded, was a genuine issue of material fact for the jury to decide. The court also noted that, pursuant to Chugh's theory of the case, the partnership was not congruent with TAL but, rather, consisted of all of the companies comprising the Trikona Group, such that TAL's incorporation could not have been a superseding event for the partnership. Finally, the court rejected the defendants' argument that they were entitled to summary judgment on the libel claim because the statements contained in the 2013 press release involved a matter of public concern, and, as such, they were protected by the first amendment to the federal constitution. The court explained that the *first amendment* "does not absolutely bar defamation claims against public figures or claims involving matters of public concern but, rather, merely affects the standard of proof" and whether the **[\*\*\*21]** standard was met in this case was a question of fact for the jury. The court similarly rejected the defendants' contention that they were entitled to summary judgment because the statements contained in the press release were factually true, explaining that whether the statements were true was also a question of fact properly reserved for the jury.

**[\*828]** After the jury returned a verdict in favor of Chugh on the breach of partnership agreement, breach of fiduciary duty, and libel claims, Kalra filed a motion to set aside the verdict on the same grounds asserted in the motion for summary judgment. Additionally, Kalra argued that the court should set aside the verdict as to the libel claim on the ground that the record was devoid of evidence supporting the testimony of Chugh's expert witness on damages, Professor Fabio Savoldelli, that the 2013 press release cost Chugh between $20.2 and $27.7 million in lost profits. Kalra argued that Savoldelli's testimony was predicated on the false assumption that Chugh's hedge fund and private equity fund had $250 million under management in 2012 when, in fact, it was undisputed that Chugh and his companies had no money under management in 2012. He further **[\*\*\*22]** argued that "Savoldelli calculated damages based on an assumption that Chugh raised capital through 2012 and then invested that money thereafter." Given that assumption, Kalra argued, "the 2013 press release could not conceivably have affected Chugh's ability to raise capital through 2012."

The trial court denied Kalra's motion to set aside the verdict. Although the court acknowledged that Kalra's argument for setting aside the verdict as to the libel claim had "strong logical appeal," it concluded that any error involving the admission of Savoldelli's testimony was harmless because it was clear that the jury, having awarded Chugh only $4 million in compensatory **[\*\*1001]** damages, "did not fully accept Savoldelli's testimony . . . ." The trial court further concluded that Savodelli's testimony was harmless because, although the jury was instructed that it could award Chugh compensatory damages only if Chugh proved " 'that he lost profits as a result of the harm that the statement in question did to his reputation,' " that instruction was an incorrect statement of the law, and, in fact, Chugh "was not required **[\*829]** to prove actual damages or lost profits in a libel per se case."

On appeal, **[\*\*\*23]** Kalra renews his claims before the trial court that (1) Chugh's entire action is barred by the federal compulsory counterclaim rule, (2) Chugh's breach of partnership agreement and breach of fiduciary duty claims fail as a matter of law under *Karanian*, and (3) there was no evidence to support the testimony of Chugh's expert witness

EXHIBIT 43                                                                    EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

on damages relative to the libel claim, and, therefore, the trial court abused its discretion in admitting that testimony. We address each claim in turn.

I

We begin with Kalra's claim that the trial court incorrectly concluded that Chugh's claims were not compulsory counterclaims in the federal action because Kalra was not a party to that action. *Rule 13 (a) (1) of the Federal Rules of Civil Procedure* provides in relevant part that "[a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against *an opposing party* if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." (Emphasis added.) Kalra argues that, in applying this rule, federal courts have held that the phrase "opposing party" should be construed liberally **[***24]** to include not only parties who were formally named in the prior action but any party who was in privity with the named party or had control over the action. See *Metropolitan Life Ins. Co. v. Kubichek, 83 Fed. Appx. 425, 431 (3d Cir. 2003)* ("the rationales supporting a liberal reading of 'transaction or occurrence' in *[rule] 13 (a)* should also apply to 'opposing party,' such that the potential counterclaimant is obligated to assert his or her counterclaim against even an **[\*830]** unnamed party if it arises out of the same transaction or occurrence and if the unnamed party is the functional equivalent of the named party, is controlling the litigation, or is an alter ego of the named party"). But see 6 C. Wright et al., Federal Practice and Procedure (3d Ed. 2010) § 1404, pp. 13-14 ("The first sentence of *[r]ule 13 (a)* requires . . . a pleading to state a counterclaim that the pleader has against an 'opposing party' at the time of its service. The federal courts have not given a definitive answer to the question of who is an opposing party for purposes of a counterclaim, but the point has caused relatively few difficulties." (Footnote omitted.)). Chugh responds that the trial court correctly determined that *rule 13 (a) (1)* did not bar his claims in the present case because Kalra was not a party to the federal **[***25]** action. He further contends that *rule 13 (a) (1)* is inapplicable for the additional reason that his claims in the present case do not arise out of the same transaction or occurrence that was the subject matter of the federal complaint. We conclude that *rule 13 (a) (1)* is inapplicable because there was no decision on the merits in the federal action. Accordingly, we need not decide whether Kalra was an "opposing party" under a liberal reading of *rule 13 (a) (1)*, or whether Chugh's claims in the present case arose out of the same transaction or occurrence as the complaint in the federal action.

**[\*\*1002]** We begin our analysis by noting that Connecticut is not a compulsory counterclaim state. "In Connecticut, the fact that a defendant in a prior action did not assert a related cause of action in that prior action does not foreclose the defendant from asserting those claims in a new action filed in the future. As explained in the commentary to the Restatement (Second) of judgments: 'The justification for the existence of such an option is that the defendant should not be required to assert his claim in the forum or the proceeding chosen by the plaintiff but should be allowed to bring suit at a time **[\*831]** and place of his own selection.' 1 *Restatement (Second), [Judgments] § 22, comment (a)*, pp. **[***26]** 186-87 [1982]." (Footnote omitted.) *State v. Bacon Construction Co., 160 Conn. App. 75, 88, 124 A.3d 941*, cert. denied, *319 Conn. 953, 125 A.3d 532 (2015)*; see also *Lowndes v. City National Bank, 79 Conn. 693, 696, 66 A. 514 (1907)* ("[w]hile the law encourages, it does not compel, the settlement of all controversies between the same parties by a single action"); *Hansted v. Safeco Ins. Co. of America, 19 Conn. App. 515, 520 n.4, 562 A.2d 1148* ("[b]ecause Connecticut does not have a compulsory counterclaim rule . . . [the plaintiff] cannot be precluded from bringing the present claim on the ground that he failed to bring [it as] a counterclaim in [the prior action]" (citation omitted)), cert. denied, *212 Conn. 819, 565 A.2d 540 (1989)*.

Remarkably, this is the first time that this court has been asked to consider the applicability of *rule 13 (a)* to, and its preclusive effect on, a state court proceeding. Other state appellate courts that have considered this issue, however, generally have held that the rule ought to be applied in the same manner that it is applied by the federal courts. See, e.g., *Nottingham v. Weld, 237 Va. 416, 420, 377 S.E.2d 621, 5 Va. Law Rep. 1978 (1989)* ("It has been held that a state court must give a federal court order, dismissing a diversity case for failure to prosecute, the same preclusive effect it would have been given in the federal courts, even though state law would have permitted the maintenance of a subsequent action following a dismissal by that state's courts. . . . Although courts have disagreed, the majority, **[***27]** and we think the better view is that the forum court must look to the original court's construction of

385

its compulsory counterclaim rule, and accord it full faith and credit." (Citation omitted; footnote omitted.)). But see *Van Pembrook v. Zero Mfg. Co., 146 Mich. App. 87, 105, 380 N.W.2d 60 (1985)* (rejecting claim that principles of comity or full **[*832]** faith and credit required Michigan Court of Appeals to give effect to Missouri compulsory counterclaim rule: "[i]n recognizing and enforcing the laws of another state, this [c]ourt is disinclined to overrule the positive law of this forum to give foreign law effect especially when it would contravene the fixed policy of the law of this state"); 6 C. Wright et al., supra, § 1417, p. 161 (questioning the applicability of *rule 13 (a)* to states that do not have compulsory counterclaim rule: "The rule itself and the [a]dvisory [c]ommittee [n]ote accompanying it are silent on whether *[r]ule 13 (a)* was intended to be a rule of administration for the federal courts or was expected to have wider application. Indeed, it is doubtful whether the rulemakers are given the power by the *Rules Enabling Act* [*28 U.S.C. § 2072 (2018)*] to decide that question or to extend the effect of the federal rules to the state courts." (Footnote omitted.)).

Rooted in principles of res judicata, **[***28]** estoppel, and waiver; see *Tyler v. DH Capital Management, Inc., 736 F.3d 455, 460 (6th Cir. 2013)*; the purpose of *rule 13 (a) of the Federal Rules of Civil Procedure* is "to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." **[**1003]** *Southern Construction Co. v. Pickard, 371 U.S. 57, 60, 83 S. Ct. 108, 9 L. Ed. 2d 31 (1962)*; see also *Super Natural Distributors, Inc. v. MuscleTech Research & Development, 140 F. Supp. 2d 970, 978-79 (E.D. Wis. 2001)* ("*[r]ule 13 (a)* was designed to balance the interest of the counterclaimant in prosecuting the counterclaim in a forum of its own choosing against the [court's] interest in conserving judicial resources" (internal quotation marks omitted)). In light of the equitable principles underlying the rule, it is apparent that a court need not apply it when to do so would work an injustice; see *Carnation Co. v. T.U. Parks Construction Co., 816 F.2d 1099, 1103 (6th Cir. 1987)* ("the waiver or **[*833]** estoppel theory [underlying *rule 13 (a)*] allows more discretion not to hold [that a] claim is barred [when] to do so is manifestly unjust"); such as when a decision on the merits was not rendered in the prior action because it was dismissed on grounds of res judicata or for failure to state a claim on which relief could be granted. See, e.g., *Tyler v. DH Capital Management, Inc., supra, 460* (plaintiff's failure to plead compulsory counterclaims in prior action was not bar to later action because "the principles of res judicata . . . apply [only] to adjudications on the merits"); *id., 459* ("a party is not required to assert a counterclaim [when] it successfully files a **[***29]** [preanswer] motion to dismiss"); *Martino v. McDonald's System, Inc., 598 F.2d 1079, 1083 (7th Cir.)* ("[t]he principle of res judicata at issue . . . treats a judgment *on the merits* as an absolute bar to relitigation between the parties and those in privity with them" (emphasis added)), cert. denied, *444 U.S. 966, 100 S. Ct. 455, 62 L. Ed. 2d 379 (1979)*; see also *National Union Fire Ins. Co. of Pittsburgh v. Jett, 118 F.R.D. 336, 338 (S.D.N.Y. 1988)* ("*Rule 13 [(a)]* requires that a compulsory counterclaim be raised only when it is related to the 'subject matter of the opposing party's claim.' Dismissal of an action is a judicial determination that the plaintiff has no claim. Therefore, compulsory counterclaims that were not raised prior to dismissal are not barred in future proceedings."); *Horn & Hardart Co. v. National Railroad Passenger Corp., 659 F. Supp. 1258, 1264 (D.D.C. 1987)* ("In this case, the policy driving *rule 13 (a)* must give way to a more important concern. When [the defendant] filed a *rule 12 (b)* motion in response to [the plaintiff's] complaint in [the prior action], [the defendant] was in effect arguing that [the plaintiff] had not proffered a valid claim. In holding for [the defendant], the [c]ourt confirmed the [defendant's] contention. The so-called claim did not require a pleading in response. . . . In such a case, the party opposing **[*834]** an invalid claim should not be required to fully litigate any claims of its own . . . ." (Citation omitted.)), aff'd, *843 F.2d 546, 269 U.S. App. D.C. 53 (D.C. Cir.)*, cert. denied, *488 U.S. 849, 109 S. Ct. 129, 102 L. Ed. 2d 102 (1988)*; 6 C. Wright et al., **[***30]** supra, § 1417, pp. 154-55 ("courts have avoided the application of [claim preclusion] rules when no decision on the merits was rendered in the first action").

Accordingly, even if Kalra had been a party to the federal action, *rule 13 (a) of the Federal Rules of Civil Procedure* would not bar Chugh's claims in the present case in light of the District Court's determination that TAL was collaterally estopped from pursuing the claims in the federal action. As we indicated, after the Cayman court issued its ruling in the winding up proceeding, the District Court granted the Chugh defendants' motion for summary judgment, stating that "Asia Pacific . . . attempted to defend against the winding up of TAL on the ground of unclean hands, arguing that [ARC Capital and Haida] . . . were barred from invoking the court's equitable jurisdiction because of Chugh's breaches of fiduciary duty, which were attributable to [them]. As evidence **[**1004]** of Chugh's misconduct, Asia Pacific put on evidence relating to each of TAL's claims in this litigation." *Trikona Advisers, Ltd. v. Chugh, United States District Court, Docket No. 3:11-cv-2015 (SRU), 2015 U.S. Dist. LEXIS 73391 (D. Conn. June 5, 2015)*, aff'd,

EXHIBIT 43                                           EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

*846 F.3d 22 (2d Cir. 2017)*. The court further stated: "The unclean hands defense was a dispositive issue in **[\*\*\*31]** the Cayman [court] proceeding, and the bulk of the winding up proceeding was devoted to the parties' attempts to prove or disprove Chugh's alleged misconduct." Id. "Having chosen to fight [through Asia Pacific] the winding up petition by advancing as a defense all of the substantive claims raised in this litigation, [TAL] cannot now avoid the consequences of its actions. Even under the . . . restrictive approach [of the Restatement (Second) of Judgments], [its] claims are barred by the doctrine of issue preclusion." Id.

 **[\*835]**  It would be anomalous, to say the least, were we to conclude that Chugh's claims in the present case are barred by principles of res judicata, estoppel, or waiver due to his failure to assert them as counterclaims in a case that itself was barred by those principles. We do not read *rule 13 (a) of the Federal Rules of Civil Procedure* or the case law interpreting it as requiring such a result, and, therefore, we will not impose it. [12] As the United States Court of Appeals for the Fifth Circuit stated in a similar context, "[i]f one hauled into [c]ourt as a defendant has a claim but the adversary plaintiff has not, the nominal defendant ought to be allowed to name the time and place to assert it. . . . It is one thing **[\*\*\*32]** to concentrate related litigation once it is properly precipitated. It is quite another thing for the [Federal  **[\*836]**  Rules of Civil Procedure] to compel the institution of litigation." *Lawhorn v. Atlantic Refining Co., 299 F.2d 353, 357 (5th Cir. 1962)*. In light of the foregoing, we reject Kalra's claim that *rule 13 (a) (1)* bars Chugh's claims in the present case on the ground that all of them were compulsory counterclaims in the federal action. [13]

 **[\*\*1005]**  II

---

[12] Kalra contends, nonetheless, that, because the Chugh defendants filed an answer in the federal action several months before filing their motion for summary judgment, Chugh's claims in the present case were compulsory counterclaims in that action. Kalra argues that *rule 13 (a) of the Federal Rules of Civil Procedure* requires a compulsory counterclaim to be filed at the time of the defendant's responsive "pleading," regardless of the final disposition of the case, and that only in the absence of such a pleading is the defendant relieved of the obligation to file such a counterclaim. See, e.g., *Bluegrass Hosiery, Inc. v. Speizman Industries, Inc., 214 F.3d 770, 772 (6th Cir. 2000)* ("*Rule 13 (a)* . . . only requires a compulsory counterclaim if the party who desires to assert a claim has served a pleading. . . . In other words, *[r]ule 13 (a)* does not apply unless there has been some form of pleading." (Citation omitted.)) Under Kalra's reading of *rule 13 (a)*, therefore, if the Chugh defendants had moved for summary judgment prior to filing their answer, Chugh's claims in the present case would not be barred because a motion for summary judgment is not a pleading under the Federal Rules of Civil Procedure. See *National Union Fire Ins. Co. of Pittsburgh v. Jett, supra, 118 F.R.D. 337-38* ("[The plaintiff] never filed a pleading in the [prior] action. Its motion to dismiss or for summary judgment was not a pleading as defined in [*rule 7 of the Federal Rules of Civil Procedure*]. Therefore, its claims were not required to be raised in the [prior] action.") For the reasons previously set forth, we conclude that Kalra's interpretation of *rule 13 (a)* is not only inconsistent with the equitable principles underlying that rule but is in no way compelled by the case law interpreting it. Indeed, if Chugh *had* asserted his claims as counterclaims in the federal action, there is no reason to think that the District Court would not have allowed him to withdraw them without prejudice once that court determined that all of TAL's claims were barred by collateral estoppel.

[13] We note, moreover, that it is not at all clear that *rule 13 (a) of the Rules of Civil Procedure* has any applicability to a state court action that was commenced while the federal court action was still pending, which occurred here. "Although it is well established [in the federal courts] that a party is barred from suing on a claim that should have been pleaded as a compulsory counterclaim in a prior action, one closely related question remains unsettled. What would prevent a defendant who does not want to assert a claim as a compulsory counterclaim in the opposing party's suit from bringing an independent action on that claim while the first action still is pending? Neither claim preclusion nor waiver or estoppel [is an] appropriate [theory] for barring a second suit of this type. Preclusion becomes operative only upon the termination of an action and therefore can have no bearing on the second action in the situation under discussion since the first suit still is pending." (Footnote omitted.) 6 C. Wright et al., supra, § 1418, p. 164 "Clearly the language of *[r]ule 13 (a)* cannot be construed as empowering the federal court to restrain [state court] proceedings. Thus, if a party asserts a claim in a state court that should be a compulsory counterclaim in an already pending federal action, the federal court cannot enjoin the prosecution of the state proceeding. In this situation the general objective underlying *[r]ule 13 (a)* of avoiding multiple suits is outweighed by the express statutory policy prohibiting federal interference with the functioning of state judicial systems. The result is that in the absence of voluntary restraint by one of the courts, both the federal and the state actions will proceed toward judgment and the first to reach that point will serve as the basis for asserting a defense of claim or issue preclusion in the action that still is being adjudicated." (Footnote omitted.) Id., pp. 174-75.

EXHIBIT 43                                                        EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

We next address Kalra's claim that Chugh's breach of partnership agreement and breach of fiduciary duty claims fail as a matter of law under *Karanian v. Maulucci, supra, 185 Conn. 320, 440 A.2d 959*, in light of language in that case that, "[i]f [partners] adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders. **[\*837]** They cannot be partners inter sese and a corporation as to the rest of the world." (Internal quotation marks omitted.) *Id., 324*, quoting *Jackson v. Hooper, 76 N.J. Eq. 592, 599, 75 A. 568 (1910)*. Kalra argues that "*Karanian* is fatal to Chugh's claim of an enduring partnership agreement that survived corporate formation . . . . Any oral partnership created over lunch in 2004 . . . definitively ceased to exist when Chugh and Kalra incorporated TAL, Trinity, and the subsidiary corporate entities **[\*\*\*33]** in 2006." Chugh responds that *Karanian* is irrelevant to the outcome of this case for the simple reason that "there is no evidence . . . that Chugh and Kalra intended to adopt the corporate form and [to] replace their partnership with a corporation, as opposed to simply choosing to own corporations within the Trikona Group partnership." (Internal quotation marks omitted.) Chugh further contends that, under Connecticut law, a partnership can own any type of assets, including corporations, and that the jury reasonably found, on the basis of the evidence presented, that Chugh and Kalra's partnership consisted of owning and running a series of companies comprising the Trikona Group, but the partnership was not itself subsumed within any one of those companies. We agree with Chugh.

*General Statutes § 34-301 (12)* defines "partnership" as "an association of two or more persons to carry on as co-owners a business for profit . . . ." *Section 34-301 (13)* defines "partnership agreement" as "[an] agreement, whether written, oral or implied, among the partners concerning the partnership, including amendments to the partnership agreement." This court previously has recognized that "general and limited partners are bound in a fiduciary relationship **[\*\*\*34]** and, as such, must act as trustees and represent the interests of each other." (Internal **[\*\*1006]** quotation marks omitted.) *Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 39, 761 A.2d 1268* **[\*838]** *(2000)*; see also *Iacurci v. Sax, 313 Conn. 786, 800, 99 A.3d 1145 (2014)* (partners "are per se fiduciaries"). Whether Chugh and Kalra entered into an oral partnership agreement in 2004 was a question of fact for the jury. See, e.g., *Bender v. Bender, 292 Conn. 696, 728, 975 A.2d 636 (2009)* ("[i]t is well settled that the existence of a contract is a question of fact"). Whether, under *Karanian*, that agreement ended as a matter of law in 2006 is a question of law subject to this court's plenary review. See, e.g., *Fish v. Fish, 285 Conn. 24, 37, 939 A.2d 1040 (2008)* (trial court's determination of proper legal standard is question of law subject to plenary review).

We agree with Chugh that *Karanian* is not controlling of his breach of partnership agreement and breach of fiduciary duty claims. To understand why, we must revisit the facts of that case. In *Karanian*, the trial court found that the plaintiff's father, Charles Karanian, and the defendant, Richard Maulucci, Sr., "agreed (1) to enter into a joint enterprise to open and operate a roller-skating rink in Wallingford . . . (2) to a 50 percent share for each of them in the business; (3) to change eventually the joint enterprise into a corporation and (4) to contribute [$20,000] each to the business as a **[\*\*\*35]** capital investment. Karanian made his contribution and named the plaintiff as the holder of the beneficial interest of his investment. Maulucci . . . never fulfilled his promise to make a similar contribution of cash.

"In September, 1977, Maulucci . . . filed with the [O]ffice of the [S]ecretary of the [S]tate a certificate of incorporation, an appointment of statutory agent for service, and an organizational and first annual report.

* * *

"In the latter part of March, 1978, Maulucci . . . barred Karanian from the business premises and took over complete control of the business operation. The **[\*839]** dispute between the parties had escalated to the point where it was no longer feasible for them to operate the business as equal owners. As a result, the plaintiff commenced [an] action, claiming an accounting, damages, the appointment of a receiver and other relief.

"On the basis of these facts, [the trial court concluded] that [a]s a consequence of the neglect to implement the agreement to operate as a corporation, the corporate entity may be a shield for Karanian and Maulucci against the outside world so as to protect them from personal liability for corporate activities, but as between themselves, **[\*\*\*36]** they, in essence and in reality, have only a partnership, with each having a [50] percent interest therein." (Emphasis omitted; internal quotation marks omitted.) *Karanian v. Maulucci, supra, 185 Conn. 322-23*.

EXHIBIT 43                                          EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

On appeal, both parties claimed that the trial court erred in concluding that, as between themselves, Karanian and Maulucci were partners, despite having incorporated their business by filing the necessary paperwork with the Secretary of the State. See *id., 323*. This court agreed and, in doing so, quoted *Jackson v. Hooper, supra, 76 N.J. Eq. 599*, for the proposition that, when partners in a business venture " 'adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders. They cannot be partners inter sese and a corporation as to the rest of the world.' " *Karanian v. Maulucci, supra, 185 Conn. 324*.

Unlike in the present case, however, the trier of fact in *Karanian* found not only **[\*\*1007]** that the parties intended to reorganize their joint venture into a corporation but that they did, in fact, complete such a reorganization. See *id., 322*. On appeal, the sole issue before this court was whether, in light of these findings, the trial court **[\*840]** properly could find, over the parties' objections, that **[\*\*\*37]** their business was *both* "a corporation and a partnership at the same time." *Id., 324*. On the basis of the record and the undisputed facts, which included a certified copy of the certificate of incorporation endorsed by the Secretary of the State, this court concluded that "the roller-skating business conducted by [the parties] operated as a corporation and not as a partnership." *Id., 324-25*. Because the parties in *Karanian* did not claim that their partnership survived the incorporation of the roller-skating rink—indeed, both sides maintained that there was no partnership—this court had no reason to consider whether a partnership could survive incorporation and, if so, under what circumstances.

Courts that have considered this issue, however, as Kalra acknowledges in his appellate brief, consistently have held that a partnership can operate through a corporation, so long as it is the intent of the partners to do so and the rights of third parties, such as creditors or shareholders, are not adversely affected. As the Second Circuit Court of Appeals has explained: "When the parties intend to merge their entire joint venture agree-ment, including their rights inter sese and the conduct of the business enterprise **[\*\*\*38]** planned or conducted under the agreement, into the form of a corporation, they are bound by the result and are relegated to their rights as corporate stockholders. . . .

"[However] when the parties to a joint venture agreement, in forming a corporation to carry out one or more of its objectives, intend to reserve certain rights inter sese under their agreement, which do not interfere with or restrict the management of the affairs of the corporation, its exercise of corporate powers, or the rights of third parties doing business with it, these rights being extrinsic to the corporate entity and its operations, such joint venture agreement may be enforced." (Citations omitted.) *Sagamore Corp. v. Diamond West Energy* **[\*841]** *Corp., 806 F.2d 373, 378 (2d Cir. 1986)*; see *id., 378-79* (citing cases); see also *Arditi v. Dubitzky, 354 F.2d 483, 486-87 (2d Cir. 1965)* ("There is little logical reason why individuals cannot be partners inter sese and a corporation as to the rest of the world, so long as the rights of the third parties such as creditors are not involved. . . . The courts of New York and New Jersey have come to recognize this . . . at least to the extent of permitting suit [on] joint venture obligations if it is apparent that the intention of the parties was that the corporation should be only a means of carrying out the joint **[\*\*\*39]** venture . . . or a way of organizing different branches of a wide-reaching joint enterprise . . . ." (Citations omitted; internal quotation marks omitted.)); *Paretti v. Cavalier Label Co., 702 F. Supp. 81, 83-84 (S.D.N.Y. 1988)* ("[i]n New York, entrepreneurs may consider themselves to be partners even though their business is organized as a corporation, so long as the partnership agreement does not interfere with the rights of third parties such as creditors"); *Eng v. Brown, 21 Cal. App. 5th 675, 696, 230 Cal. Rptr. 3d 771 (2018)* ("Partners may, by agreement, continue their relations as copartners in conjunction with their relationship as stockholders of a corporation, and the law would take cognizance of such dual relationship and deal with the parties in the light of their [agreements between themselves], independently of their incorporation . . . . [C]ourts will **[\*\*1008]** enforce preincorporation agreements among partners or joint venturers who have incorporated in order to carry out the agreement between or among the partners or joint venturers." (Citations omitted; internal quotation marks omitted.)), review denied, *California Supreme Court, Docket No. S248552, 2018 Cal. LEXIS 5138 (July 11, 2018)*; *Gruber v. Wilner, 213 Ga. App. 31, 34, 443 S.E.2d 673 (1994)* ("[i]t is generally held that a joint venture agreement continues in effect following the formation of a corporation created to implement it **[\*\*\*40]** if the intention of **[\*842]** the parties to this effect is clear" (emphasis omitted; internal quotation marks omitted)); *Koestner v. Wease & Koestner Jewelers, Inc., 63 Ill. App. 3d 1047, 1050, 381 N.E.2d 11, 21 Ill. Dec. 76 (1978)* ("[a]n emphasis on substance over form has led numerous courts to conclude that . . . [t]here is little logical reason why individuals cannot be partners inter sese and a corporation as to the rest of

Page 12 of 17                                                                    389

EXHIBIT 43                                                                                    EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

the world, so long as the rights of third parties such as creditors are not involved" (internal quotation marks omitted)); *Blank v. Blank, 222 App. Div. 2d 851, 853, 634 N.Y.S.2d 886 (1995)* ("[l]acking a compelling reason to preclude individuals from acting as partners between themselves and as a corporation to the rest of the world . . . courts have sanctioned such an arrangement as long as the rights of third parties, like creditors, are not involved and the parties' rights under the partnership agreement are not in conflict with the corporation's functioning"); *Schuster v. Largman, 308 Pa. 520, 531, 162 A. 305 (1932)* (principle that business cannot be partnership and corporation at same time "does not mean that a partnership may not organize corporations to handle a portion of its business and own all of the stock in them"); *Jolin v. Oster, 44 Wis. 2d 623, 630, 172 N.W.2d 12 (1969)* (citing cases and noting that "a preincorporation joint adventure or partnership agreement providing for the use of a corporation as a medium for the venture survives **[***41]** the corporation").

In the present case, there is simply no evidence that Chugh and Kalra ever intended to adopt the corporate form in place of their partnership. To the contrary, as the trial court stated in denying Kalra's motion to set aside the verdict, the partnership, as presented to the jury, was an "overarching entity" comprised of numerous companies owned by Chugh, Kalra, and their respective families, acting in concert to further the remunerative goals of the partnership. Kalra cites no authority, and we are aware of none, holding that a partnership **[*843]** cannot operate in this manner. [14] Nor did Kalra argue at trial that a **[**1009]** partnership cannot operate in this manner or take exception to the trial court's instruction to the jury that it could. [15] His sole contention, rather, was that the evidence did not support a finding that he and Chugh were ever partners. [16] The jury evidently disagreed.

**[*844]** Chugh's and Kalra's testimony in this regard could not have been more diametrically opposed. Whereas Chugh testified that the two men were introduced in 2002, that they were eating lunch with one another nearly every day by 2004, and that they decided to form a partnership to pursue investment opportunities **[***42]** in India at the

---

[14] Although acknowledging the substantial body of law holding that the intent of the parties controls whether a partnership survives incorporation of the partnership business, Kalra argues that there are numerous courts, such as the New York Court of Appeals, that have "never abrogated" the so-called "categorical rule" set forth in *Jackson v. Hooper, supra, 76 N.J. Eq. 599*, the 1910 New Jersey case cited in *Karanian*, that a partnership cannot be both a partnership and a corporation at the same time. Kalra cites just one case, *D'Orazio v. Mainetti, 24 App. Div. 3d 915, 805 N.Y.S.2d 455 (2005)*, as an example of a court that "enforce[d] the categorical . . . rule and recognize[d] no exceptions [to it]." We disagree that the court in *D'Orazio* applied a different standard from any of the other New York cases cited in this opinion. Although the court in *D'Orazio* recognized the general rule that, "[w]hen parties adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders"; (internal quotation marks omitted) *id., 916*; the court "agree[d] that the record as a whole contain[ed] sufficient proof to raise a question of fact as to whether the firm operated as a partnership despite its legal incorporation, [but it did] not find such proof sufficient to establish, as a matter of law, that [the parties] indeed continued to operate as a de facto partnership following the firm's incorporation . . . ." *Id., 917*. Thus, the court reversed the trial court's summary judgment and remanded the case for a trial to determine the "factual issue" of whether the parties intended for their partnership to survive the incorporation of their business. Id.

[15] The trial court instructed the jury that, "[a]lthough one company cannot be both a corporation and a partnership, it is possible that there can be a partnership separate and apart from a corporate entity or group of corporate entities. . . . Ultimately, the existence of a partnership is a question of the intention of the parties to be determined by you from all the facts and circumstances."

[16] During closing arguments, Kalra's counsel argued: "As further evidence [that the partnership] didn't exist, [Chugh] testified that he never registered the partnership here in Connecticut where he and . . . Kalra lived, that, when he filed tax returns, he never disclosed the partnership to the Internal Revenue Service. Remember, partnerships are about profits, and profits are taxable. He never disclosed the partnership to any department of the [United States] Treasury. He never disclosed the partnership to any regulator like the Securities and Exchange Commission here in the United States. . . . Why is this important? It is important because it is clear evidence that the partnership did not exist." Counsel further argued: "Ladies and gentlemen, there is either a partnership or there is not. . . . And we know certainly, it was never written. As a matter of fact, there isn't even a memorandum or a note, nothing, [no] writing of any kind that was submitted by [Chugh] that you could say, here's proof, here's proof there was a partnership."

390

EXHIBIT 43                                                              EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

beginning of 2004, [17] Kalra testified that he did not know Chugh in 2004, that the two men "never ever discussed a partnership agreement," and that it was "completely unthinkable" that he would have entered into such an agreement with Chugh, in 2004 or any other time. During cross-examination, however, Kalra acknowledged that he repeatedly referred to Chugh as his "partner" during the Cayman winding up proceeding in 2013—and elsewhere over the years—and that he testified during that proceeding that he "did not want [a] winding down [of TAL]," but, rather, he just "did not want to be partners with . . . Chugh anymore." He also acknowledged that he and Chugh "associate[d] for a profit in business" under the umbrella of the Trikona Group and that "a substantial benefit of [*845] working in the Trikona Group was to make . . . money for [themselves and their respective families]." Although Chugh's evidence of a partnership [**1010] was not overwhelming, we agree with the trial court that it was sufficient to support the jury's finding of an oral agreement between Chugh and Kalra to carry on, as coowners, a business for profit—to wit, the Trikona Group—and that the two men carried [***43] on that business from 2004 until at least 2013.

III

We turn, therefore, to Kalra's claim that the trial court abused its discretion in admitting the testimony of Chugh's expert witness on damages, Savoldelli, because there was insufficient evidence to support his testimony. Chugh responds that the trial court correctly determined that any error in the admission of Savoldelli's testimony was harmless because the jury obviously did not "fully accept" his testimony and the trial court incorrectly instructed the jury that Chugh was required to prove damages relative to the libel per se claim when, in fact, he was not required to prove damages. We agree with Kalra.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, Kalra filed a motion in limine to preclude Savoldelli's testimony on the ground that it had no basis in scientific fact but was wholly speculative and conjectural. Kalra argued that Savoldelli had testified, during his deposition, that his damages estimate assumed that Chugh could have raised $250 million for his investment fund, Peak XV, but for Kalra's defamatory statements, because "Chugh was one of two partners [***44] at [Trinity] and that fund had raised on the order of $500 million . . . ." Savoldelli stated that "[he] conservatively just assumed that each of the two [partners]" had raised one half of Trinity's funds and, therefore, that Chugh would have [*846] been able to raise that same amount for his own investment fund. In his motion in limine, Kalra argued that Savoldelli's expert testimony was inadmissible under *State v. Porter, 241 Conn. 57, 698 A.2d 739 (1997)*, cert. denied, *523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)*, which requires that "proposed scientific testimony . . . be demonstrably relevant to the facts of the particular case in which it is offered, and not simply . . . valid in the abstract." *Id., 65*. Kalra argued that, under this standard, Savodelli's testimony must be excluded because it was undisputed that Chugh and Peak XV failed to raise any funds between 2009 and 2015.

In its ruling on the motion in limine, the trial court noted that it had "heard the parties in chambers" with respect to the issues raised in the motion and that it had decided to "allow [their] experts to testify about the market conditions during the time in question and the qualities or conditions necessary to raise funds . . . ." The court further stated that it would "allow the experts to render [***45] a damages opinion or analysis that focuses on the amount that the market would yield assuming a particular base amount, provided there is evidence to support that assumption."

At trial, Savoldelli testified that the 2013 press release, which accused Chugh of bribery, would have been "fatal" to Chugh's two investment funds. He further testified that his damages estimate "assum[ed]" that the two funds "had 250 million [dollars] under management as of 2012" and that, by applying a "cash flow analysis begin[ning] effectively

---

[17] Specifically, Chugh testified that, "in early 2004, we were having . . . lunch at a Chinese restaurant, and, at that time, I proposed that [we] partner up for this Indian real estate opportunity. We agreed that it was going to be a 50/50 partnership. In my mind at [the] time, you know, it was a pretty simple relationship. We trusted each other. We said everything is going to be equal . . . . And we're going to make decisions . . . completely equally on every single thing. . . . So, it was a 50/50 partnership in that every single decision that we made, whether it was any spending that we did, any employees that we hired, any offices that we opened, any strategic decisions that we made, any investments that we made, every single decision was unanimous, both of [us] checked with each other, and we agreed on it. If there was some disagreement between us, one of us convinced the other person . . . to go ahead or not to go ahead with [a] decision. But pretty much everything was unanimously decided between the two of us."

391

EXHIBIT 43
EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

midway through the year in 2012," he was able to determine that the companies would have earned $20.2 to $27.7 million between 2012 and 2026, but for the 2013 press release. At the conclusion of the evidence, the trial court instructed the jury in relevant part: "[If] you reject the defendant's affirmative defense [with respect to the libel claim], then you **[*847]** should consider what damages, if any, to award the plaintiff for libel. Ordinarily, the plaintiff would have to **[**1011]** prove that a libelous statement caused harm to his reputation. However, certain written defamatory statements are so harmful in and of themselves that the plaintiff is entitled to recover at least **[***46]** nominal damages for injury to reputation without proving that the publication actually caused harm to the plaintiff. I have determined that the statement in question falls into this category; therefore, if you find that the plaintiff has proven the first two elements of libel and that the defendant has not proven his affirmative defense, then you must award the plaintiff at least $1 in nominal damages.

"Nominal damages should be awarded if you find that the defamatory material is of an insignificant character, or because you find that the plaintiff ha[s] bad character, so that no substantial harm has been done to the plaintiff's reputation, or because there is no proof that serious harm has been done to the plaintiff's reputation.

"It is up to you to decide whether to award . . . Chugh only nominal damages or, instead, to award him compensatory damages for any proven injury to his reputation and economic loss; thus, on this count, if you reach the issue of damages in accordance with these instructions, and if [Chugh] proves that he lost profits as a result of the harm that the statement in question did to his reputation, you should award compensatory damages instead of nominal damages." **[***47]**

During deliberations, the jury sent a note to the judge inquiring whether there was "a cap" on what it could award in nominal damages. In response, the trial court instructed the jury: "No, but here is some additional guidance on the meaning of nominal damages. Nominal damages are a trivial sum of money awarded to a litigant **[*848]** who has established a cause of action but has not established that he is entitled to compensatory damages."

Following the jury's verdict, Kalra filed a motion to set aside the verdict as to the libel claim on a variety of grounds, but primarily because there was no evidence to support Savoldelli's testimony that Chugh had lost more than $20 million as a result of the 2013 press release. Kalra argued that the trial court should have recognized that Savoldelli's testimony was irrelevant and, therefore, inadmissible under *Porter* given that his damages estimate assumed that Chugh's investment funds had $250 million under management in 2012 when, in fact, according to Chugh's own testimony, they had no money under management in 2012. The trial court denied the motion, reasoning that any error relating to Savoldelli's testimony was harmless. Specifically, the court reasoned: **[***48]** "[Kalra's] argument, which he presented to the jury, has strong logical appeal. Unfortunately, [Chugh's] brief does not respond to it. . . . The court is left with little guidance as to how to handle this newly raised issue.

"The court concludes that any error involving the admission of Savoldelli's testimony was harmless. To begin with, the jury did not fully accept Savoldelli's testimony of damages exceeding $20 million. Instead, the jury awarded $4 million in lost profits on the libel [claim] . . . .

"Further, [Chugh], under our law, was not required to prove actual damages or lost profits in a libel per se case. The court charged that, because the [2013] press release was libelous per se, the jury should award [Chugh] at least nominal damages and then decide to award him compensatory damages 'if [he] proves that he lost profits as a result of the harm that the statement in question did to his reputation . . . .' In contrast, [Chugh] requested the following charge: 'If you find that . . . **[*849]** Kalra's statements were libelous per se, you must award . . . Chugh general damages for injury to reputation regardless of **[**1012]** whether he demonstrated special damages. In determining the amount of **[***49]** general damages to award for the injury to [Chugh's] reputation, you should consider what reputation [Chugh] had in the community when the writing was made and all of the circumstances surrounding the making of the writing. You may also compensate [Chugh] for damages that he will likely incur in the future. . . . General and special damages together comprise what are called compensatory damages, or damages that compensate . . . Chugh for his loss.' . . . [Chugh's] request to charge . . . was a correct statement of the law. . . . Although [Chugh] does not raise the jury charge issue in his own postverdict briefs, the fact remains that the charge as given was more

EXHIBIT 43                                                                                        EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

favorable to [Kalra] than that to which he was entitled. . . . Therefore, [Kalra] cannot prevail on his challenge to the damages award on libel." (Citations omitted; footnotes omitted.)

It is well established that, "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Citation omitted; internal quotation **[\*\*\*50]** marks omitted.) *Klein v. Norwalk Hospital, 299 Conn. 241, 254, 9 A.3d 364 (2010)*. The same standard applies to claims of instructional error. That is, "not every improper jury instruction requires a new trial because not every improper instruction is harmful. [W]e have often stated that before a party is entitled to a new trial . . . he or she has the burden of demonstrating the error was harmful. . . . An instructional impropriety is harmful if it is likely that it affected the verdict." (Internal quotation marks omitted.) *Burke v. Mesniaeff, 334 Conn. 100, 121, 220 A.3d 777 (2019)*.

 **[\*850]**  It is true, as the trial court stated, that Chugh was not required to prove lost profits to recover compensatory damages. In a libel per se case, the jury may award the plaintiff general damages in an amount it deems sufficient to compensate him for the injury to his reputation and the mental suffering caused by the defamatory statement. See, e.g., *Battista v. United Illuminating Co., 10 Conn. App. 486, 492, 523 A.2d 1356* ("When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it. . . . The individual plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering [that] the libel caused him." (Citation **[\*\*\*51]** omitted; internal quotation marks omitted.)), cert. denied, *204 Conn. 802, 525 A.2d 1352 (1987)*, and cert. denied, *204 Conn. 803, 525 A.2d 1352 (1987)*; see also *Gleason v. Smolinski, 319 Conn. 394, 435, 125 A.3d 920 (2015)* ("there is no dispute that the subject matter of these statements is defamatory per se because they charge crimes punishable by imprisonment and, therefore, the plaintiff is relieved from the burden of pleading and proving damages to her reputation"); *Proto v. Bridgeport Herald Corp., 136 Conn. 557, 572-73, 72 A.2d 820 (1950)* (upholding general damages award of $5150 in libel per se case and concluding that, "[i]n view of the seriousness of the calumny published by the defendant and of the widespread publication given to it throughout the community in which the plaintiff had been brought up, had attended school and had engaged in business, we cannot say that the amount is excessive"); *Miles v. Perry, 11 Conn. App. 584, 587, 594, 529 A.2d 199 (1987)* (upholding general damages award of $25,000 in libel per se case).

In order to recover *lost profits*, however, "[a] plaintiff must present sufficiently accurate and complete evidence **[\*851]  [\*\*1013]**  for the trier of fact to be able to estimate those profits with reasonable certainty." *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 70, 717 A.2d 724 (1998)*; see also *Simone Corp. v. Connecticut Light & Power Co., 187 Conn. 487, 495, 446 A.2d 1071 (1982)* ("[d]amages for losses of profits are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty" (internal quotation marks **[\*\*\*52]** omitted)). This applies equally to a case of libel per se. See, e.g., *DeVito v. Schwartz, 66 Conn. App. 228, 235, 784 A.2d 376 (2001)* ("The . . . plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the [defamation] caused him. . . . To recover special damages, however, the plaintiff must prove that he suffered economic loss that was legally caused by the defendant's defamatory statements, even [when] the defamation is per se. See 3 *Restatement (Second), Torts § 622* (1977). General and special damages together comprise compensatory damages. See 4 *Restatement (Second), Torts, § 904* (1979)." (Citation omitted; internal quotation marks omitted.)).

In the present case, it is undisputed that Savoldelli's testimony that Chugh sustained lost profits in excess of $20 million had no basis in fact. Because the jury was instructed to award special damages *only* if it found that Chugh had proven lost profits, and because there was no other evidence to support the lost profits award, the damages award cannot stand.

In reaching a contrary conclusion, the trial court cited *State v. Gradzik, 193 Conn. 35, 475 A.2d 269 (1984)*, for the proposition that any evidentiary insufficiency occasioned by that court's instructional error was harmless. *Gradzik*, however, does not support the trial court's ruling. **[\*\*\*53]** In that case, the defendant was convicted of burglary in the third degree. *Id., 36*. At the close of  **[\*852]**  evidence, the trial court instructed the jury that it could find the defendant

**EXHIBIT 43**   EXHIBIT 20

Chugh v. Kalra, 342 Conn. 815

guilty only if it found that "the defendant had unlawfully entered the building by entering the cellar." *Id., 37-38*. On appeal, the defendant claimed "that the court erred in denying his motion [for a judgment of acquittal] because there was insufficient evidence from which the jury could conclude that he had entered the cellar. The state counter[ed] that the motion was properly denied because there was sufficient evidence that the defendant had entered the cellar and, in the alternative, that the defendant had unlawfully entered the hatchway which is part of the building. Because [this court] agree[d] that the defendant's presence in the hatchway constituted an unlawful entry into the building, we [concluded that we did not need to] decide whether there was sufficient evidence that the defendant had entered the cellar" because it was "beyond cavil that the hatchway is part of the building in question" and the defendant had "concede[d] that he was in the hatchway . . . ." *Id., 38*.

Thus, we concluded in *Gradzik* that, even if the evidence **[***54]** was insufficient to support a finding that the defendant had entered the cellar, the error was harmless because the evidence was undeniably sufficient to support a conviction under the correct standard. *Id., 38-39*. In the present case, however, there is simply no evidence that Chugh sustained lost profits in the amount of $4 million—or in any other amount—as a result of the 2013 press release. Nor are we able to conclude that the jury would have awarded him $4 million in general damages but for the instructional impropriety. [18] **[*853]** A properly instructed jury might **[**1014]** have awarded him more or less; we simply have no way of knowing. In light of the foregoing, we cannot conclude that the instructional error in this case was harmless. Accordingly, the verdict must be set aside as to the libel claim, and the case remanded for a new trial on that claim. [19] In addition, we agree with Kalra that a new hearing on punitive damages is also required because the record reveals that a component of the punitive damages award was a "success fee" for Chugh's attorney in the amount of 25 percent of the total compensatory damages award, which included the $4 million libel award.

The judgment is reversed with respect **[***55]** to the libel per se claim and the punitive damages award, and the case is remanded for a new trial on that claim and for a hearing in damages consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

---

**End of Document**

[18] We do not doubt that a properly instructed jury would have awarded Chugh general damages given the jury's finding that Kalra acted with malice in publishing the 2013 press release and its award of punitive damages in connection with the libel claim. Indeed, it is clear that the jury struggled with the limitations imposed on it by the trial court's instructions with respect to the damages award, i.e., that special damages could be awarded *only* if the jury found that Chugh had proven lost profits—which he clearly had not proven—but, otherwise, the jury could award only nominal damages. This is evident in the jury's question asking the court whether there was an upper limit on the amount of nominal damages it could award. What we cannot determine, however, without resort to conjecture, is the *amount* of general damages that the jury would have awarded but for the trial court's error. It is for this reason that a new trial on the libel claim is required.

[19] We note that Kalra also sought plain error review of the trial court's instruction to the jury, in accordance with Kalra's request to charge, that Kalra bore the burden of proving the truth of the matter asserted in the 2013 press release. Because we conclude that Kalra is entitled to a new trial due to the court's error relative to the damages instruction, we need not decide whether he is entitled to plain error review of this additional instructional error claim.

**EXHIBIT 43**                                                    EXHIBIT  21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

## *Haynes v. Yale-New Haven Hosp.*

Supreme Court of Connecticut

February 20, 1997, Argued ; August 26, 1997, officially released

(SC 15470)

**Reporter**
243 Conn. 17 *; 699 A.2d 964 **; 1997 Conn. LEXIS 323 ***

SUSAN M. HAYNES, ADMINISTRATRIX (ESTATE OF BARBARA S. FREEMAN) v. YALE-NEW HAVEN HOSPITAL ET AL.

**Prior History:  [***1]**  Action, in four counts, to recover damages for, inter alia, the wrongful death of the plaintiff's decedent, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the court, Gordon, J., granted the defendants' motion for summary judgment as to the first count; thereafter, the court granted the defendants' motion to dismiss the remaining counts of the complaint and rendered judgment thereon; subsequently, the court vacated its order granting the defendants' motion for summary judgment and opened the judgment of dismissal, and thereafter granted the defendants' renewed motion for summary judgment on all four counts of the complaint and rendered judgment thereon, from which the plaintiff appealed.

**Disposition:** Affirmed.

## Case Summary

**Procedural Posture**
Plaintiff decedent's daughter sought review of the decision of the Superior Court in the judicial district of New Haven (Connecticut), which granted defendant hospital's motion for summary judgment in decedent's daughter's medical malpractice action.

**Overview**
After plaintiff's decedent was killed in a vehicle accident, plaintiff, decedent's daughter, was fully compensated by the driver's liability carrier and under the decedent's underinsured motorist benefit. Decedent's daughter filed claims for medical malpractice under the Connecticut Unfair Trade Practices Act (CUTPA) against defendant hospital. The trial court precluded decedent's daughter from pursuing the medical malpractice claim on the basis of the common law rule barring double recovery for the same injury. The court affirmed the trial court's decision, agreeing with the trial court that negligence was not a proper basis for a CUTPA claim because malpractice did not fall under CUTPA.

**Outcome**
The court affirmed the trial court's grant of summary judgment in favor of hospital in decedent's daughter's malpractice claim.

**Counsel:** James E. Swaine, for the appellant (plaintiff).

Mark R. Kravitz, with whom were Jeffrey R. Babbin and, on the brief, Penny Q. Seaman and Thomas J. Witt, for the appellees (defendants). Philip J. O'Connor filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

EXHIBIT 43 EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

**Judges:** Callahan, C. J., and Borden, Berdon, Katz, Palmer, McDonald and Peters, Js. [1] In this opinion CALLAHAN, C. J., and PALMER and PETERS, Js., concurred. **[***2]** BERDON, J., with whom KATZ and MCDONALD, Js., join, concurring and dissenting.

**Opinion by:** BORDEN

# Opinion

 **[*19] [**965]**   BORDEN, J. The dispositive issues in this appeal are whether: (1) underinsured motorist benefits fall within the common law collateral source rule; and (2) the medical malpractice allegations in the complaint are sufficient to state a claim for a violation of the Connecticut Unfair Trade Practices Act (CUTPA), *General Statutes § 42-110a et seq.* The plaintiff, Susan M. Haynes, as administratrix of the estate of her mother, the decedent Barbara S. Freeman, brought an action against the defendants, Yale-New Haven Hospital (Yale-New Haven) and Charles F. McKhann, a surgeon, alleging medical malpractice and CUTPA violations. [2] The trial court granted the defendants' motion for summary judgment and the plaintiff appealed from the judgment rendered thereon. [3] The plaintiff **[**966]**  claims that the trial court improperly concluded that: **[***3]** (1) on the first count, the plaintiff could not prevail because of the common law bar against double recovery for the same loss; and (2) **[*20]** on the second count, the plaintiff's allegations were legally insufficient to state a CUTPA violation. We affirm the judgment of the trial court.

 **[***4]**  The record reveals the following facts. The plaintiff's decedent was employed as a rural letter carrier for the United States postal service. On May 14, 1986, while in the course of her duties as a postal worker, the decedent was seriously injured when her vehicle was struck head-on by a vehicle driven by Alan G. Perrier. An ambulance transported the decedent to Yale-New Haven for emergency medical treatment. She was admitted to Yale-New Haven's emergency department at approximately 12:40 p.m. and began receiving emergency medical care for a fractured left leg and a fractured pelvis. At approximately 2:15 p.m., after being in the care of the hospital for approximately one and one-half hours, the emergency room doctors noticed that the decedent was experiencing "'an expanding abdominal girth.'" Upon this discovery, the decedent was transported to the operating room for emergency exploratory surgery. At approximately 2:30 p.m., McKhann began the surgery and, upon opening her abdomen, he discovered large amounts of blood as a result of the laceration of her spleen, which he then removed. During the surgery, however, the decedent's circulation failed and she went into cardiac arrest. **[***5]** McKhann was unable to resuscitate her heart and the decedent was pronounced dead at 3:41 p.m.

The plaintiff first brought an action against Perrier, the driver of the vehicle that had struck the decedent's vehicle, for wrongful death and other compensatory damages. The plaintiff received $ 20,000 from Perrier's insurer, an amount that represented the limit of his automobile liability insurance policy. After exhausting Perrier's policy coverage, the plaintiff then pursued a claim against Covenant Insurance Company (Covenant), the decedent's automobile insurance

---

[1] This case first was argued to this court before Chief Justice Callahan and Justices Borden, Berdon, Katz and McDonald on September 26, 1996. The panel was then expanded to include Justices Palmer and Peters, and the matter was reargued before the court .

[2] The plaintiff also brought claims for wrongful retention of moneys paid for medical services rendered on behalf of the decedent by a federal agency, and for breach of an implied contract, both of which were subsequently withdrawn.

[3] The plaintiff appealed from the trial court's granting of the motion for summary judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and *General Statutes § 51-199 (c)*. After oral argument, this court ordered reargument en banc, and the filing of supplemental briefs limited to the following issue: "Under the circumstances of this case, should the $ 650,000 received by the plaintiff for her decedent's death be treated as: (1) a payment by a collateral source that does not bar the plaintiff's suit against the defendant Yale-New Haven Hospital; or (2) full compensation for the loss of the decedent's life that does bar the plaintiff's suit against the defendant Yale-New Haven Hospital?"

EXHIBIT 43                                                        EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

carrier, **[\*21]** which provided uninsured and underinsured motorist coverage (underinsured motorist coverage) [4] in the amount of $ 900,000. Unable to settle the matter, the parties submitted the plaintiff's underinsured motorist claim to arbitration under the provisions of the decedent's insurance policy. Covenant conceded Perrier's liability, and the parties stipulated that the only issue before the arbitration panel was the amount of damages for the decedent's wrongful death. A panel of three arbitrators determined the damages to be $ 650,000. [5] Covenant paid the plaintiff $ 630,000, after deducting the $ 20,000 that the plaintiff **[\*\*\*6]** had recovered from Perrier's liability carrier.

The plaintiff then commenced this action against the defendants. In the medical malpractice count, the plaintiff sought damages against both defendants on the grounds that they allegedly had failed to meet the requisite standard **[\*\*\*7]** of care in applying emergency room care to the decedent, that the emergency department was inadequately staffed, and that the existing staff was inadequately trained and supported. In the CUTPA count, against Yale-New Haven only, the plaintiff alleged that Yale-New Haven had engaged in unfair and deceptive trade practices because, although the hospital was certified as a major trauma center, it had failed to meet the requisite standards of care for such a center for essentially the same reasons stated in the medical malpractice count. The defendants filed a special **[\*22]** defense to the medical malpractice count, alleging that the plaintiff had already received full compensation for the harm suffered by the plaintiff's decedent. Yale-New Haven essentially denied the allegations of the CUTPA count.

The trial court granted the defendants' motion for summary judgment on the medical **[\*\*967]** malpractice count because it concluded that as a result of the plaintiff's having been fully compensated for the death of her decedent, she was precluded from pursuing this claim against the defendants by the common law rule barring a double recovery for the same injury. In addition, the trial court rendered summary **[\*\*\*8]** judgment on the CUTPA count, based upon the reasoning that a malpractice claim cannot be recast as a CUTPA claim. This appeal followed.

I

We first address the plaintiff's argument that underinsured motorist benefits, because of their contractual nature, are not within the ambit of the common law rule precluding double recovery for the same harm, [6] **[\*\*\*9]** but, rather, come within the common law collateral source rule. [7] Accordingly, the plaintiff argues that the trial **[\*23]** court improperly

---

[4] Throughout this discussion, all references to "underinsured" motorist coverage encompass uninsured motorist coverage as well.

[5] Accordingly, because the plaintiff and Covenant stipulated before the arbitration panel that "the only issue is just damages for [the decedent's] death, the loss of earning capacity, conscious pain and suffering, [and] loss of enjoyment of life's activities," for purposes of this case the $ 650,000 award must be considered the full legal value of the damages. The plaintiff does not dispute this fact. Moreover, as a rule, the decision of an arbitration panel is binding as res judicata in a subsequent judicial proceeding. See, e.g., *Fink v. Golenbock, 238 Conn. 183, 195, 680 A.2d 1243 (1996)*.

[6] The rule precluding double recovery is a "simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury. . . . Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint tortfeasors. . . . The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once. . . . Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." (Citations omitted; internal quotation marks omitted.) *Gionfriddo v. Gartenhaus Cafe, 211 Conn. 67, 71-73, 557 A.2d 540 (1989)*.

[7] "The collateral source rule provides that a defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him. . . . The basis of [this] rule is that a wrongdoer shall not benefit from a windfall from an outside source. That rule is applicable . . . in any tort case." (Citations omitted; internal quotation marks omitted.) *Gurliacci v. Mayer, 218 Conn. 531, 556-57, 590 A.2d 914 (1991)*.

EXHIBIT 43                                                                    EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

rendered summary judgment on the malpractice count. The defendants argue that the trial court properly found the rule barring double recovery for a single harm to be controlling. We agree with the defendants. [8]

 [***10]  This case forces us to confront the tension between two competing principles. The first is that a tortfeasor should not be rewarded by collateral sources that have benefited an injured party. This principle recognizes the social value in making the tortfeasor pay the injured party even for already "compensated" losses in order to prevent a windfall to the tortfeasor; 2 S. Speiser, C. Krause & A. Gans, American Law of Torts (1985 & Sup. 1997) § 8.16, p. 526; and to fulfill the general tort policy of deterring similar tortfeasors from wrongful conduct. W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 4, pp. 25-26. The second, competing principle is that a litigant may recover just damages for the same loss only once. The social policy behind this concept is that it is a  [*24]  waste of society's economic resources to do *more* than compensate an injured party for a loss and, therefore, that the judicial machinery should not be engaged in shifting a loss in order to create such an economic waste. See, e.g., 4 G. Palmer, Law of Restitution (1978 & Sup. 1997) § 23.15, p. 437. The question we must decide is which of these two policies should control in the present case.

The plaintiff contends [***11]  that this conflict is resolved by the contractual basis of underinsured motorist payments. She argues that,  [**968]  because Covenant's liability was based entirely upon its contract with the decedent, all payments made pursuant to the underinsured motorist insurance policy should be viewed as purely contractual in nature. Thus, according to the plaintiff, the collateral source rule should apply.

We are not persuaded that payments made pursuant to an underinsured motorist contract can be so easily classified. In our view, underinsured motorist benefits are sui generis. They are contractual, but they depend on principles of tort liability and damages. Whether in any particular case underinsured motorist benefits should be treated as are other types of insurance must depend on a case-by-case analysis of the underlying purpose and the principles that apply to such benefits.

It is true that Covenant would have had no liability to the plaintiff's decedent but for the existence of the insurance contract, and that, generally speaking, an action by an insured against an underinsured motorist carrier is in form "an action in contract." *Dodd v. Middlesex Mutual Assurance Co., 242 Conn. 375, 384, 698 A.2d 859 (1997)*.  [***12]  We do not dispute, moreover, that the collateral source rule would apply to various other contractual insurance payments, such as life, disability, or medical insurance. Underinsured motorist insurance, however, is unlike those traditional types of insurance, all of which pay upon proof of the occurrence of the  [*25]  particular loss insured against, irrespective of the legal liability of others for causing that loss. Although in form first party insurance, underinsured motorist insurance operates in part as a surrogate for a third party who lacks sufficient liability insurance. It provides benefits only upon proof that a third party, namely, an underinsured motorist for whose liability it acts as a surrogate, was a tortfeasor who injured the insured. Moreover, the amount of an underinsured motorist payment is determined, within contractual limits, by the measure of tort damages. See *Williams v. State Farm Mutual Automobile Ins. Co., 229 Conn. 359, 368, 641 A.2d 783 (1994)* (in order to recover under underinsured motorist policy, insured must prove amount of damages and that other motorist was underinsured and legally liable).

---

[8] We acknowledge that many jurisdictions agree with the plaintiff that underinsured motorist benefits should be treated as a collateral source that does not affect the insured's right of recovery against a different tortfeasor. See, e.g., *International Sales-Rentals Leasing Co. v. Nearhoof, 263 So. 2d 569, 571 (Fla. 1972)* (joint tortfeasor not entitled to setoff equal to amount of recovery injured plaintiff received from his uninsured motorist coverage carrier); *Respess v. Carter, 585 So. 2d 987, 988-90 (Fla. App. 1991)* (same); *State Farm Mutual Automobile Ins. Co. v. Board of Regents of the University System of Georgia, 226 Ga. 310, 311-12, 174 S.E.2d 920 (1970)* (same). For the reasons expressed herein, however, we agree with those cases, though fewer in number, that hold to the contrary. See, e.g., *Petrella v. Kashlan, 826 F.2d 1340, 1344 (3d Cir. 1987)* (under New Jersey law, recovery on underinsured motorist coverage should be regarded as same as recovery from tortfeasor, because both dependent on there being underlying tort); *Cooper v. Aplin, 523 So. 2d 339 (Ala. 1988)* (satisfaction of litigated judgment against uninsured motorist carrier prevents subsequent action against other tortfeasors); *Waite v. Godfrey, 106 Cal. App. 3d 760, 773, 163 Cal. Rptr. 881 (1980)* (uninsured motorist benefits not collateral source).

398

EXHIBIT 43                                                                           EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

Thus, underinsured motorist **[\*\*\*13]**  benefits, although contractual in nature, operate in part as a liability insurance surrogate for the underinsured motorist third party tortfeasor. We recognize that an underinsured motorist carrier "is not the alter ego of the tortfeasor and . . . they do not share the same legal [status]." *Mazziotti v. Allstate Ins. Co., 240 Conn. 799, 817, 695 A.2d 1010 (1997)*. *Mazziotti*, however, dealt with the question of whether an insured's underinsured motorist insurance carrier and a third party tortfeasor should be deemed in privity with each other for purposes of the doctrine of collateral estoppel. *Id., 810-19*. The fact that the carrier and the tortfeasor do not share a *complete* legal identity, and thus are not in privity with each other, does not automatically resolve the narrower question of how payments made pursuant to an underinsured motorist policy should be treated.

We do not mean to imply that claims for underinsured motorist payments must be viewed solely as sounding in tort, and not in contract. Neither classification is  **[\*26]**  appropriate for all cases. [9] **[\*\*\*15]**  Because underinsured motorist claims are sui generis, we need to go beyond labels in resolving the question posed **[\*\*\*14]**  by this case. [10] **[\*\*\*16]**  Put another  **[\*\*969]**  way, the question is not whether underinsured motorist  **[\*27]**  benefits *are* a collateral source; the question is whether they *should be treated* as a collateral source, in the present factual context. We must, therefore, examine the purpose that underinsured motorist coverage is meant to serve, and decide how, as a matter of policy, including consistency with related legal principles, that specific type of insurance should be treated. We conclude that, for the particular purpose of characterizing underinsured motorist payments, the relationship in the present case between the underinsured carrier and the defendant may be viewed as analogous to that of joint tortfeasors, [11] and thus that the general tort rule precluding double recovery from joint tortfeasors should apply.

---

[9] The plaintiff relies upon *Pecker v. Aetna Casualty & Surety Co., 171 Conn. 443, 370 A.2d 1006 (1976)*, to support her argument that underinsured motorist payments are purely contractual in nature, and thus that the collateral source rule should apply. In *Pecker*, we held that "an insurer making payment under the underinsured motorist coverage provisions of its policy makes that payment 'on behalf of' the insured, not the uninsured motorist." *Id., 452*; see also *Regs., Conn. State Agencies § 38a-334-6 (a)*. We do not dispute that, because they are based on the insured's contract with her underinsured carrier, the benefits are paid on her behalf. This fact, however, in and of itself, is not dispositive of the manner in which we should treat such payments in the context of the present case. Even if they are made *"on behalf of"* the insured, underinsured motorist payments are still exclusively *premised upon* a third party's tort liability. *Pecker*, therefore, does not resolve the fundamental tension caused by the hybrid nature of underinsured motorist coverage.

[10] Indeed, the peculiar hybrid nature of underinsured motorist insurance limits the utility of broad statements of policy, such as those found in the Restatement of Judgments and the Restatement of Torts. For example, the Restatement of Judgments notes that, with regard to the tension between the collateral source rule and the principle against double recovery for the same loss, "which one of those concepts governs depends on whether the person providing the payments in question is assimilated to a co-obligor of the judgment debtor or to a *casualty insurer* of the injured party." (Emphasis added.) 2 **Restatement (Second), Judgments § 50, comment (e)** (1982). As previously observed, however, underinsured motorist coverage is unlike casualty insurance, which pays for the loss irrespective of who is legally liable for the loss.

Similarly, the Restatement of Torts directs that "payments made by one who is not himself liable as a joint tortfeasor will go to diminish the claim of the injured person against others responsible for the same harm *if they are made in compensation of that claim*, as distinguished from payments from collateral sources such as *insurance*, sick benefits, donated medical or nursing services, voluntary continuance of wages by an employer, and the like." (Emphasis added.) 4 **Restatement (Second), Torts § 885 (3)**, comment (f) (1979). The reference to "insurance," however, does not provide real guidance for the question before us. Although life and medical insurance, for example, are likely contemplated by this reference, they are types of insurance that, unlike underinsured motorist coverage, do not depend on proof of an underlying tort and do not act as a surrogate for the tortfeasor's liability coverage. Indeed, because underinsured motorist payments *do* act as a surrogate for tort liability, they *can* reasonably be seen as being made "in compensation of" the underlying tort injury. Accordingly, this passage can be read both as supporting and precluding the plaintiff's recovery against the defendants in the present case, depending on which portion of the passage one emphasizes.

[11] Under the plaintiff's allegations against the defendants in the present case, it is clear that the underinsured motorist tortfeasor himself and the defendants were joint tortfeasors because the decedent did not die solely from her injuries from the accident, but also because of the hospital's negligence. Analytically, in terms of basic tort principles, the underinsured motorist's conduct was a proximate cause of the death, and another, concurrent proximate cause was the defendants' alleged negligence. The underinsured

EXHIBIT 43 EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

We begin with the fundamental principle that the purpose of underinsured motorist insurance is to place the insured in the *same* position as, but *no better* position than, the insured would have been had the underinsured tortfeasor been fully **[\*\*\*17]** insured. "The public policy established by the underinsured motorist statute is that every insured is entitled to recover for the damages he or she would have been able to recover if the underinsured motorist had maintained [an adequate] policy of liability insurance." (Internal quotation marks omitted.) **[\*28]** *Rydingsword v. Liberty Mutual Ins. Co., 224 Conn. 8, 18, 615 A.2d 1032 (1992)*; see also *Williams v. State Farm Mutual Automobile Ins. Co., supra, 229 Conn. 366-67*; *Smith v. Safeco Ins. Co. of America, 225 Conn. 566, 573, 624 A.2d 892 (1993)*. The plaintiff's argument, however, would have her recover *more* than her full damages -- indeed, that is the whole point of her action against the defendants -- *solely* because of her decedent's underinsured motorist coverage. For example, had the tortfeasor motorist *not* been underinsured, but instead had had adequate liability insurance, the plaintiff would have been required to bring an action against both that tortfeasor and the defendant in order to recover $ 650,000 for her decedent's death, [12] which would be assessable against either or both the defendants' and the motorist's liability carrier. In that **[\*\*\*18]** scenario, the plaintiff could have recovered, from either or both the tortfeasor and these defendants, a *total* of $ 650,000 *and no more*. As the plaintiff conceded in this court, she could not have proceeded **[\*\*970]** against her decedent's underinsured motorist carrier at that point. Under the plaintiff's argument, however, she is in a *better* position because her decedent had been struck by an underinsured driver than she would have been had the same driver been fully insured. Pursuant to the plaintiff's argument, she can recover $ 650,000 against her decedent's underinsured motorist insurance carrier, and then recover additional compensation from the defendants. This increase in compensation is contrary to the fundamental purpose of underinsured motorist coverage. [13] **[\*\*\*20]** See *Gionfriddo v. Gartenhaus Cafe, 211 Conn. 67, 71-72,  [\*29]  557 A.2d 540 (1989)* (applying no double recovery principle to bar action under Dram Shop Act where plaintiff had already recovered full measure of damages from other, unrelated tortfeasor). [14]

---

motorist carrier was liable for the entire wrongful death damages of $ 650,000, reduced by the $ 20,000 collected from the tortfeasor's liability carrier, only because the defendants' subsequent negligence was not, under the plaintiff's allegations, an independent, intervening cause that cut off the underinsured motorist's negligence.

[12] For convenience, we carry the damages for the decedent's death in this case over into our hypothetical.

[13] At oral argument, the plaintiff attempted to avoid this double recovery problem by reference to *§ 38a-334-6 (e) of the Regulations of Connecticut State Agencies*, which provides: "Recovery over. The insurer may require the insured to hold in trust all rights against third parties or to exercise such rights after the insurer has paid any claim, provided that the insurer shall not acquire by assignment, prior to settlement or judgment, its insured's right of action to recover for bodily injury from any third party." The plaintiff argues that this regulation would allow Covenant to seek reimbursement or restitution from the plaintiff, should the plaintiff prevail in its case against the defendants subsequent to receiving payment from Covenant, and, moreover, that barring the plaintiff from pursuing its claim against the defendants would effectively nullify the regulation. **[\*\*\*19]**

The problem with the plaintiff's position is that, as the plaintiff acknowledged at oral argument, this court has never decided whether this regulation permits an underinsured motorist carrier that has paid benefits to its insured, in a case such as this, to create in its policy a right over, not only against the underinsured motorist whose conduct was the risk that was insured against, but against a different, joint tortfeasor. Cf. *Westchester Fire Ins. Co. v. Allstate Ins. Co., 236 Conn. 362, 672 A.2d 939 (1996)*. We need not decide that question until a case presents it, which the present case does not. The plaintiff has nowhere alleged, nor is there any indication in the record, that such a subrogation or reimbursement clause was contained in the decedent's contract with Covenant. Accordingly, whether the existence of such a clause *could have* obviated the present double recovery problem is not before the court in this case. Our conclusion, however, that, in the *absence* of such a clause, there *is* a double recovery problem does not bear on the effect of the regulation when such a clause is present. If there *were* such a clause, however, and if it did operate against the defendants in this case as the plaintiff suggests, the net effect would still be that the plaintiff would recover nothing further, because she would be required to hold the proceeds of her action against the defendants "in trust" for Covenant.

[14] In *Gionfriddo v. Gartenhaus Cafe, supra, 211 Conn. 71-72*, we relied on the principle, recognized since at least 1863, that "the possible rendition of multiple judgments does not . . . defeat the proposition that a litigant may recover just damages only once." Indeed, in *Gionfriddo* we recognized that the principle against double recovery for the same loss applies in both tort and contract law. See *id., 74 n.9*. To the extent, therefore, that the present case involves both contract law -the contract of underinsured motorist coverage -- and tort law -the action against the hospital -- the same principle against double recovery should apply.

EXHIBIT 43 EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

[***21]  Furthermore, the plaintiff's putative right to recover against the defendants in the present case, for the loss that her decedent's underinsured motorist carrier has already paid depends solely on the order of litigation in this case. This point can be illustrated by a simple  [*30]  hypothetical. Suppose that after the accident in this case, the tortfeasor motorist's insurance company had refused to pay the last dollar of the motorist's $ 20,000 coverage. In order to satisfy the exhaustion doctrine; see *Ciarelli v. Commercial Union Ins. Cos., 234 Conn. 807, 811, 663 A.2d 377 (1995)*; the plaintiff would have been required to bring an action against the underinsured motorist. Undoubtedly, at the same time she would have brought an action against these defendants as well, as joint tortfeasors. Under the damages in this case, the plaintiff would have been awarded a total judgment of $ 650,000. That judgment would have been satisfied by these defendants, or their insurers, paying $ 630,000 and the underinsured's motorist's liability carrier paying $ 20,000. In that situation, as the plaintiff acknowledged in oral argument, the plaintiff would not then have been able to make an additional claim for underinsured motorist benefits under her own policy. Thus, under that scenario, the plaintiff would recover a total of $ 650,000, and no more.

[**971]  The only difference between the actual facts and the aforementioned hypothetical situation is the order of litigation -that is, whether the plaintiff brings an action against the defendant, before or after she recovers pursuant to her decedent's underinsured motorist policy. Under the plaintiff's argument, however, when she pursues her underinsured motorist policy *first*, as she in fact did, she can recover, not only the $ 650,000 that she received from her decedent's underinsured motorist carrier, but an *additional* amount for the same damages when she then brings an action against the defendants. Had the exact same claims been presented in a different order, however -- namely, an action against the defendants *first*, rather than *second* -- she agrees that she could recover only a total of $ 650,000. Stating the plaintiff's position in this manner demonstrates why it must fail, for it would be bizarre to say that the law permits  [*31]  a double recovery depending on the order of litigation of the plaintiff's claims. Cf. *Hall v. Gilbert & Bennett Mfg. Co., 241 Conn. 282, 302, 695 A.2d 1051 (1997)*. Put another way, it cannot be the law that underinsured motorist benefits [***22]  are, or are not, a "collateral source" depending solely on *when* they are sought. 15

Finally, the equities do not weigh substantially in favor of the plaintiff's position. Precluding the plaintiff from obtaining double recovery does not deprive the decedent of the benefit for which she paid her underinsured motorist premium, namely, a guaranteed recovery of her wrongful death damages, subject to contractual limits, despite the fact that she was hit by an underinsured motorist, and whether there was a joint tortfeasor [***23]  who could also be held liable. The only thing she is deprived of is the opportunity to recover *more* than she paid for. Moreover, although we acknowledge the general notion that a defendant, if indeed negligent, should be held accountable, our conclusion does not create an inappropriate windfall for the defendants. It is no more of a windfall to the defendants in this case to bar recovery against them than it was a windfall to the nightclub in *Gionfriddo* to bar recovery against it. *Whenever* the principle against double recovery is applied as between various tortfeasors, or tortfeasor surrogates, one of the parties escapes at least some degree of liability. In such cases, however, the policy behind the fundamental principle barring double recovery; see footnote 6; simply is deemed to outweigh the policy behind the collateral source rule. See footnote 7. Such a consequence is,  [*32]  therefore, not a windfall under the law, but rather a necessary consequence of a fundamental policy choice. See *RK Constructors, Inc*. v. *Fusco Corp., 231 Conn. 381, 386, 650 A.2d 153 (1994)*.

II

---

15 Of course, one could also resolve the order of litigation problem by, instead of *precluding* double recovery whatever the order of litigation, as we choose to do, *allowing* the plaintiff to maintain her additional claim against the underinsured motorist carrier even after receiving full compensation from the two tortfeasors. The plaintiff does not, however, argue for such a rule. In any event, we believe that that would be an even more bizarre result than what the plaintiff *is* seeking.

EXHIBIT 43                                                                    EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

We next address the issue of whether the plaintiff's CUTPA count against Yale-New Haven sufficiently **[\*\*\*24]** stated a claim pursuant to *§ 42-110a et seq.* [16] **[\*\*\*25]**  The trial court rendered summary judgment on this count because it concluded that the second count of the plaintiff's complaint was merely a negligence claim recast as a CUTPA claim and that it was therefore legally insufficient. [17]  The plaintiff argues that her allegations of negligence **[\*\*972]** can support a CUTPA claim because Yale-New Haven held itself out to be a major trauma center even though it allegedly did not meet those standards. We disagree.

We previously have concluded "that the provision of medical services falls within CUTPA's definition of trade or commerce as 'the distribution of any services . . . .' *General Statutes § 42-110a (4)*." *Fink v. Golenbock, 238 Conn. 183, 213, 680 A.2d 1243 (1996)*. *Fink*, **[\*33]** however, was based upon the entrepreneurial or business aspects of providing medical services. *Id., 185-88*. In *Fink*, the dispute that gave rise to a violation of CUTPA involved a situation in which "the defendant took certain actions designed to usurp the business and clientele of one [professional] corporation in favor of another . . . [that] placed him in direct competition with the interests of the [professional] corporation." (Citations omitted; internal quotation marks omitted.)  **[\*\*\*26]** *Id., 212-13*.

The trial court in the present case, relying on *A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 217, 579 A.2d 69 (1990)*, held that negligence could not be a basis for a CUTPA claim. The trial court then determined that the allegations were based solely on negligence and rendered summary judgment. We agree with the trial court that the plaintiff's CUTPA count does not allege a sufficient cause of action, but for different reasons.

In *A-G Foods, Inc.*, we held that "the first prong [of the 'cigarette rule'], standing alone, is insufficient to support a CUTPA violation, at least when the underlying claim is grounded solely in negligence." Id. [18] **[\*\*\*28]**  We agreed  **[\*34]**  with the defendant in *A-G Foods, Inc.*, that "its negligence was not an unfair or deceptive trade practice within the meaning of *General Statutes § 42-110b (a)*." *Id., 215*. We also stated that "clearly [the defendant's] negligence did not constitute an 'immoral, unethical, oppressive or unscrupulous' practice." *Id., 216-17*. Subsequently, this court stated that *A-G Foods, Inc.*, stands for the proposition "that there is no CUTPA violation when the sole basis

---

[16] *General Statutes § 42-110b (a)* provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

*General Statutes § 42-110g (a)* provides: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by *section 42-110b*, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."

[17] We review this issue, as the plaintiff and the defendants did in their arguments before this court, as if the motion for summary judgment were a motion to strike testing the legal sufficiency of the allegations of the CUTPA claim. Accordingly, we decide the issue raised by the parties as if the allegations of fact were true.

[18] "In determining whether certain acts constitute a violation of [CUTPA], we have adopted the criteria set out in the *cigarette rule* by the federal trade commission . . . (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise -whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." (Emphasis added; internal quotation marks omitted.) *Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 591, 657 A.2d 212 (1995)*.

We have previously noted that "all three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Internal quotation marks omitted.) *Associated Investment Co. Ltd. Partnership v. Williams Associates IV, 230 Conn. 148, 155-56, 645 A.2d 505 (1994)*.d

Page 8 of 21

EXHIBIT 43                                                    EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

of the claim is the defendant's **[\*\*\*27]** negligence and the jury determines that the plaintiff was contributorily negligent." *Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 591, 657 A.2d 212 (1995)*. In *Williams Ford, Inc.*, however, we made clear that we did not decide "whether negligence of the defendant alone, unaccompanied by contributory negligence of the plaintiff, [could] establish a CUTPA violation" because the plaintiffs in *Williams Ford, Inc.* were found to have been contributorily negligent. [19] *Id., 591 n.25*. Indeed, we specifically left that issue open for another day. Id. Likewise, in the present case we do not decide whether negligence alone is sufficient to support a CUTPA violation.

We conclude that professional negligence -- that is, malpractice -- does not fall under CUTPA. Although physicians and other health care providers are subject to CUTPA, only the entrepreneurial or commercial aspects of the profession are covered, just as only the entrepreneurial aspects of the practice of law are covered by CUTPA. "Although **[\*\*973]** an attorney is not exempt from CUTPA; *Heslin v. Connecticut Law Clinic of Trantolo & Trantolo, 190 Conn. 510, 461 A.2d 938 (1983)*; we made it clear in *Heslin* that we were not deciding **[\*35]** 'whether every provision of CUTPA permits regulation of every aspect of the practice of law . . . .' *Id., 520*. We have held that it is important not to 'interfere with the attorney's primary duty of robust representation of the interests of his or her client.' *Mozzochi v. Beck, [204 Conn. 490, 497, 529 A.2d 171 (1987)]*. This public policy **[\*\*\*29]** consideration requires us to hold that CUTPA covers only the entrepreneurial or commercial aspects of the profession of law. The noncommercial aspects of lawyering -- that is, the representation of the client in a legal capacity -- should be excluded for public policy reasons. See *Krawczyk v. Stingle, 208 Conn. 239, 246, 543 A.2d 733 (1988)*." *Jackson v. R. G. Whipple, Inc., 225 Conn. 705, 730-31, 627 A.2d 374 (1993)* (*Berdon, J.*, concurring).

Other jurisdictions have reached a similar result with respect to the medical profession. The Washington Court of Appeals has held that although the entrepreneurial or commercial aspects of the practice of medicine are covered as "trade or commerce" under that state's consumer protection act, violations predicated on negligence or malpractice, whether legal or medical, are not covered because those claims address only competence. See *Quimby v. Fine, 45 Wash. App. 175, 180, 724 P.2d 403 (1986)* (holding that claims that relate to "actual competence of the medical practitioner" are not recognized under state's consumer protection act, but claims implicating entrepreneurial aspects of practice of medicine may be sufficient), **[\*\*\*30]** rev. denied, *107 Wash. 2d 1032 (1987)*; see also *Ikuno v. Yip, 912 F.2d 306, 312 (9th Cir. 1990)* (applying Washington law, Court of Appeals concluded that "Washington has recognized that both the practice of law and medicine may give rise to [consumer protection act] claims. . . . These may arise, however, only when the actions at issue are chiefly concerned with 'entrepreneurial' aspects of practice, such as the solicitation of business and billing **[\*36]** practices, as opposed to claims directed at the 'competence of and strategy' employed by the . . . [defendant]." [Citations omitted.]); *Eriks v. Denver, 118 Wash. 2d 451, 465, 824 P.2d 1207 (1992)* (adopting "entrepreneurial" test from *Quimby* and applying it in legal malpractice setting); *Jaramillo v. Morris, 50 Wash. App. 822, 827, 750 P.2d 1301* (relying on *Quimby* and holding that negligence claims against hospital were not cognizable under state's consumer protection act because "the entrepreneurial aspects of the hospital's business, such as billing, were not implicated"), rev. denied, *110 Wash. 2d 1040 (1988)*; *Burnet v. Spokane Ambulance, 54 Wash. App. 162, 166-67, 772 P.2d 1027* (relying on **[\*\*\*31]** *Quimby* and *Jaramillo* in holding that negligence claims asserted against hospital did not include entrepreneurial aspect of hospital's operations, so that claims fell outside reach of state's consumer protection act), rev. denied, *113 Wash. 2d 1005, 777 P.2d 1050 (1989)*.

Just recently, the Michigan Court of Appeals addressed this same issue in *Nelson v. Ho, 222 Mich. App. 74, 564 N.W.2d 482 (1997)*. In *Nelson*, the court held that "it would be improper to view the practice of medicine as interchangeable with other commercial endeavors, and apply to it concepts that originated in other areas. . . . [20]

---

[19] In *Williams Ford, Inc. v. Hartford Courant Co., supra, 232 Conn. 590, 593*, the underlying claim was negligent misrepresentation and the plaintiffs were found to have been 10 percent contributorily negligent.

[20] In *Nelson*, the Michigan Court of Appeals relied on statements made by the United States Supreme Court in *Goldfarb v. Virginia State Bar, 421 U.S. 773, 786 n.15, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975)*. Specifically, the Court of Appeals stated: "This theoretical distinction [between learned professions and the practice of a trade] was specifically addressed in *Goldfarb* . . . where the United States Supreme Court considered the issue of whether a minimum-fee schedule for lawyers enforced by the Virginia

EXHIBIT 43 EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

Therefore, a **[\*\*974]** blanket inclusion in the **[\*37]** [state consumer protection act] for physicians would also be improper. Consequently, we . . . hold that only allegations of unfair, unconscionable, or deceptive methods, acts or practices in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice may be brought under the [consumer protection act]. Allegations that concern misconduct in the actual performance of medical services or the actual practice of medicine would be improper. We do not consider the legislature's use of 'trade or commerce' in defining **[\*\*\*32]** the application of the act to exhibit an intent to include the actual performance of medical services or the actual practice of medicine. If we were to interpret the act as such, the legislative enactments and well-developed body of law concerning medical malpractice could become obsolete. . . . Only when physicians are engaging in the entrepreneurial, commercial, or business aspect of the practice of medicine are they engaged in 'trade or commerce' within the purview of the [consumer protection act]." (Citation omitted.) *Id., 486*; see also *Gadson v. Newman, 807 F. Supp. 1412, 1416 (C.D. Ill. 1992)* (applying Illinois law, District Court determined that in order to bring claim against health care provider under consumer fraud act, "the distinction between the business aspects [of] medicine and the 'actual practice of medicine' or the non-business aspects of medicine is crucial").

 **[\*\*\*33]** We find these decisions persuasive, and conclude that their reasoning is equally applicable to CUTPA claims. We appreciate, however, that "it would be a **[\*38]** dangerous form of elitism, indeed, to dole out exemptions to our [consumer protection] laws merely on the basis of the educational level needed to practice a given profession, or for that matter, the impact which the profession has on society's health and welfare." *United States v. National Society of Professional Engineers, 389 F. Supp. 1193, 1198 (D.D.C. 1974)*. A blanket exemption for the medical profession would therefore be improper. *Nelson v. Ho, supra, 564 N.W.2d at 486*. We thus conclude that the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services aside from medical competence is implicated, or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation. To hold otherwise would transform every claim for medical malpractice into a CUTPA claim. Accordingly, within **[\*\*\*34]** this framework, we must review the plaintiff's allegations of CUTPA violations and look to the underlying nature of the claim to determine whether it is really a medical malpractice claim recast as a CUTPA claim.

The plaintiff alleged that Yale-New Haven was certified as a major trauma center and held itself out as such, but failed to staff the emergency department adequately, and that it failed to train and support adequately its existing staff to meet the applicable standards for a major trauma center. The plaintiff further alleged that Yale-New Haven also failed, with respect to emergency room procedures, to meet the standards for a major trauma center. [21] It is undisputed that Yale-New Haven **[\*39]** was certified as a major trauma center. Therefore, it was not a misrepresentation when it held itself out as certified. By holding itself out as a major trauma center, however, it was representing to the public that it would meet the applicable standards of competency for a major trauma center. We conclude that this representation is simply what all physicians and health care providers represent to the public -- that they are licensed and impliedly that they will meet **[\*\*975]** the applicable standards **[\*\*\*35]** of care. If they fail to meet the standard of

---

State Bar constituted price-fixing in violation of the Sherman Act . . . . The state bar argued that it was exempt from the Sherman Act because the practice of law was a 'learned profession,' not 'trade or commerce.' The . . . Court stated that while 'it would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas'; [*id., 788 n.17*] . . . 'it is no disparagement of the practice of law as a profession to acknowledge that it has this business aspect.' [*Id., 788*] . . . ." (Citations omitted.) *Nelson v. Ho, supra, 564 N.W.2d at 484-85*. As the Court of Appeals in *Nelson* noted, "subsequently, in *Arizona v. Maricopa County Medical Society, 457 U.S. 332, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982)*, the United States Supreme Court, relying in part on *Goldfarb*, struck down . . . the defendant's maximum-price schedule for fees charged by doctors for services provided" as price fixing in violation of the Sherman Act. *Nelson v. Ho, supra, 564 N.W.2d at 485 n.3*.

[21] The crux of the plaintiff's allegations in the CUTPA count are as follows: "In order best to qualify to treat such emergency and trauma patients and to draw and receive them, defendant Hospital has sought classification and holds and held itself out as a major trauma center. Nevertheless, by virtue of the inadequate, inadequately trained, and inadequately supported, staffing, and the other failures in respect of emergency and trauma patients alleged in [the medical malpractice count regarding emergency room care] . . . defendant Hospital did not duly meet the standards of such a major trauma center."

EXHIBIT 43                                                                                            EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

care and harm results, the remedy is not one based upon CUTPA, but upon malpractice. The trial court properly rendered summary judgment on the CUTPA count because no unfair or deceptive practices were alleged.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and PALMER and PETERS, Js., concurred.

BERDON, J., with whom KATZ and MCDONALD, Js., join, concurring **[***36]** and dissenting.

**Concur by:** BERDON (In Part)

**Dissent by:** BERDON (In Part)

# Dissent

BERDON, J., with whom KATZ and MCDONALD, Js., join, concurring [1] and dissenting. We have recognized two fundamental rules with respect to recovery of damages in tort cases. The first is the single recovery rule -- that is, a tort victim can obtain but one full recovery from joint tortfeasors for the damages he or she has sustained. The second is the collateral source rule -- that is, the tortfeasor is not entitled to take advantage of the benefits received by the tort victim as a result of his or her injuries when the benefits come from a source independent of the tortfeasor. Part I of the majority's decision disregards this latter rule by shielding the defendants Yale-New Haven Hospital and Charles F. McKhann, a surgeon at the hospital, from liability and the payment of damages for their alleged **[*40]** negligence in allowing the plaintiff's decedent, Barbara S. Freeman, to bleed to death after an automobile accident. The majority insulates the defendants from liability because Freeman had obtained and paid for a policy of insurance that provided for underinsured motorist protection [2] in the amount of $ 900,000, of which **[***37]** her estate received $ 630,000 for her wrongful death. [3] The basis for the majority's unusual decision is that the $ 630,000 was not a true collateral source. In the words of the majority, "underinsured motorist benefits . . . operate in part as a liability insurance surrogate for the underinsured motorist third party tortfeasor." Because the majority improperly concludes that payment by the decedent's underinsured motorist carrier was made on behalf of the underinsured motorist tortfeasor in a "surrogate" capacity, thereby treating the underinsured motorist carrier as a joint tortfeasor, it then concludes that the defendants can take advantage of the insurance payment because of the single recovery rule. This blurring of the collateral source and single recovery rules, by labeling the payment received from a tort victim's own insurance carrier as a payment on behalf of the underinsured motorist tortfeasor, is not only contrary to our long-standing precedent, but also flies in the face of two recent decisions of this court; see *Mazziotti v. Allstate Ins. Co., 240 Conn. 799, 817, 695 A.2d 1010* **[*41]** *(1997)*, and *Dodd v. Middlesex Mutual Assurance Co., 242 Conn. 375, 698 A.2d 859 (1997)*; both **[***38]** of which I will discuss later in this opinion.

The collateral source rule is a rule that is firmly rooted in the law of Connecticut. It "provides that a defendant is not entitled to be relieved **[***39]** from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him. . . .

---

[1] I concur in the result with respect to part II of the majority opinion.

[2] Throughout this opinion, as in the majority opinion, references to "underinsured" motorist coverage are intended to encompass uninsured motorist coverage as well. Therefore, I refer only to underinsured motorist benefits, except in places where I cite to case law and authorities specifically dealing with uninsured motorist benefits.

[3] In the arbitration proceedings against the decedent's underinsured motorist insurance carrier, Covenant Insurance Company (Covenant), the decedent's estate was awarded $ 650,000 as the full value of the decedent's life. Because the decedent's estate was paid $ 20,000 by the underinsured motorist tortfeasor (through his liability insurance), Covenant paid the balance of $ 630,000. I concede that, under the single recovery rule, the $ 20,000 paid on behalf of the underinsured motorist tortfeasor should be deducted from any recovery obtained against the defendants in this case.

The basis of our well-established collateral source rule is that a wrongdoer shall not benefit from a windfall from an outside source. That rule is applicable . . . in any tort case." (Citations omitted; internal quotation marks omitted.) *Gurliacci v. Mayer, 218 Conn. 531, 556-57, 590 A.2d 914 (1991)*; see also *Gorham v. Farmington Motor Inn, Inc., 159 Conn. 576, 580, 271 A.2d 94 [**976] (1970)*; [4] *Todd v. Malafronte, 3 Conn. App. 16, 23, 484 A.2d 463 (1984)*. [5]

 **[***40]** "Simply stated, the collateral source rule will not allow a tortfeasor to reduce his damage liability resulting from harm caused to another by benefits the injured person received from sources other than the tortfeasor himself or one acting on the tortfeasor's behalf. In essence, the collateral source rule is both a rule of damages and a rule of evidence. Its operation prevents a tort defendant from introducing evidence to prove that the plaintiff incurred no medical expenses **[*42]** because the plaintiff's insurer paid them, or no wage loss because a kind employer continued wages during the disability. "The end result of the operation of the collateral source rule is that in some cases the tort plaintiff may recover twice or more for some elements of damages -- one from the tortfeasor who caused the harm and again from any source of benefits collateral to the tortfeasor. Such multiple recovery, however, is the by-product of the rule and not a principle of the rule itself nor a policy at the foundation of the rule." J. Kircher, "Insurer Subrogation in Wisconsin: The Good Hands (Or A Neighbor) in Another's Shoes," 71 Marq. L. Reversed 33, 51-52 (1987). "The types of payments that typically **[***41]** come within the collateral source rule include insurance proceeds, medical benefits, and payments made by an employer pursuant to a statutory compensation scheme." (Emphasis added.) *Rametta v. Stella, 214 Conn. 484, 490, 572 A.2d 978 (1990)*; see also *Apuzzo v. Seneco, 178 Conn. 230, 233, 423 A.2d 866 (1979)* (holding that unemployment compensation benefits received by plaintiff are collateral source and that defendant could not reduce personal injury damages because of such benefits); *Healy v. White, 173 Conn. 438, 448, 378 A.2d 540 (1977)* (holding that free special education services provided by state to plaintiff's child, in order to cope with needs caused by personal injuries, are collateral source and that defendants could not reduce personal injury damages because of such benefits); *Gorham v. Farmington Motor Inn, Inc., supra, 159 Conn. 579-80* (holding that medical expenses and wages paid pursuant to employment contract were collateral sources and that defendant could not reduce personal injury damages because of such benefits); *Roth v. Chatlos, 97 Conn. 282, 287-88, 116 A. 332 (1922)* ("The authorities, both numerically and in weight, agree that a defendant **[*43]** owes to the injured **[***42]** compensation for injuries the proximate cause of which was his own negligence, and that their payment by third parties cannot relieve him of this obligation; and that whether the motive impelling their payment be affection, philanthropy, or contract, the injured is the beneficiary of their bounty and not him who caused the injury. In short, the defendant has no equitable or legal claim to share in the amount paid for the plaintiff."); *Regan v. New York & New England R. Co., 60 Conn. 124, 130, 22 A. 503 (1891)* (holding that, where plaintiff brought claim for fire loss after allegedly being compensated by its insurer, defendant could not claim benefit from insurance because proceeds "came to the plaintiff from a collateral source, wholly independent of the defendant, and which as to him was 'res inter alios acta'"). [6]

---

[4] "The reason for the [collateral source] rule given by a majority of the jurisdictions which have adopted it is that a 'windfall' ought not to be granted to a defendant. . . . If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer [being] relieved of his full responsibility for his wrongdoing." (Citation omitted; internal quotation marks omitted.) *Gorham v. Farmington Motor Inn, Inc., supra, 159 Conn. 580*.

[5] The collateral source rule "provides that benefits received by a plaintiff from a source wholly collateral to and independent of the tortfeasor will not diminish the damages otherwise recoverable." (Internal quotation marks omitted.) *Todd v. Malafronte, supra, 3 Conn. App. 23*.

[6] I am aware that there is a school of thought that the collateral source rule should be abandoned or restricted. Those who advocate the elimination of the collateral source rule, to the extent that a tortfeasor is relieved of all liability, however, lose sight of an important aspect of the law of torts. "The 'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 4, p. 25. In other words, with respect to the alleged facts of this case, the policy

 [***43] [**977]   The collateral source rule was embraced by the United States Supreme Court in 1854; see *Propeller Monticello v. Mollison, 58 U.S. (17 How.) 152, 15 L. Ed. 68 (1854)*; [7] and has been faithfully applied in this state  [*44]  since 1891.  *Regan v. New York & New England R. Co., supra, 60 Conn. 124*. Nevertheless, I recognize that we also have the rule that as between joint tortfeasors, a plaintiff can only recover his or her full damages once. In *Gionfriddo v. Gartenhaus Cafe, 211 Conn. 67, 71, 557 A.2d 540 (1989)*, we explained the single recovery principle to be a "simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury." (Internal quotation marks omitted.) We further elaborated that this rule applies with respect to recovery from joint tortfeasors: "Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint tortfeasors. . . . This rule is based on the sound policy that seeks to ensure that parties will recover for their damages. . . . The possible rendition of multiple judgments does not,  [***44]  however, defeat the proposition that a litigant may recover just damages only once. . . . Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." (Citations omitted; emphasis added; internal quotation marks omitted.) *Id., 71-72*; see also 2 *Restatement (Second), Judgments § 50* (1982). That rule, as will be discussed later, is inapposite to the facts of this case.

 [***45]  In my view, underinsured motorist benefits fall squarely within the purview of the collateral source rule. The majority, however, holds that the payment by the decedent's underinsured motorist carrier, Covenant Insurance Company (Covenant), of the underinsured  [*45]  motorist benefits to the plaintiff was made on behalf of the underinsured motorist tortfeasor and, therefore, subject to the single recovery rule. The majority's reasoning stands underinsured motorist law on its head by transforming the decedent's insurance, for which she paid the premiums for coverage substantially in excess of that required by law, into the underinsured motorist tortfeasor's insurance. Before addressing the majority's reasoning, I first analyze why underinsured motorist benefits fit within the definition of a collateral source. I The Restatement of Torts and the Restatement of Judgments both define the areas occupied by the concepts of collateral sources and single recovery. The Restatement (Second) of Torts sets forth the distinction between the two concepts: "Effect of Payments Made to Injured Party[.] (1) A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited  [***46]  against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability. (2) Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." (Emphasis added.) 4 *Restatement (Second), Torts § 920A* (1979). [8]

---

of the law must also be concerned with discouraging further conduct of hospital emergency room personnel from negligently allowing patients to bleed to death.

[7]  The United States Supreme Court first embraced what subsequently came to be known as the collateral source rule in Propeller Monticello v. Mollison, supra, 58 U.S. (17 How.) 68. In Mollison, the owner of a schooner, which sank after colliding with a steamship, received insurance proceeds from his own insurer and also brought a negligence action against the steamship for damages to the schooner and its cargo. The court held that "the defense set up in the answer, that the [owner of the schooner has] received satisfaction from the insurers, cannot avail the [steamship]. The contract with the insurer is in the nature of a wager between third parties, with which the [steamship] has no concern. The insurer does not stand in the relation of a joint [tortfeasor], so that satisfaction accepted from [it] shall be a release of others. This is a doctrine well established at common law and received in courts of equity." *Id., 70*.

[8]  **Section 920A, comments (a)** and *(b), of the Restatement (Second) of Torts* (1979), highlight the distinction found in **§ 920A (1)** and *(2)*, providing in relevant part: "a. Payments by or for defendant. If a tort defendant makes a payment toward his tort liability, it of course has the effect of reducing that liability. This is also true of payments made under an insurance policy that is maintained by the defendant, whether made under a liability provision or without regard to liability, as under a medical-payments clause. This is true also of a payment by another tortfeasor of an amount for which he is liable jointly with the defendant or even by one who is not actually liable to the plaintiff if he is seeking to extinguish or reduce the obligation. . . . "b. Benefits from collateral sources. Payments made to or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury.

EXHIBIT 43   EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

**[\*\*\*47] [\*\*978] [\*46]**    Comment (b) to *§ 920A* further underscores the clearly defined nature of collateral source payments. Specifically, "if the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives. . . ." (Emphasis added.) Id., *§ 920A, comment (b)*. Likewise, the Restatement (Second) of Judgments sets forth the clearly defined areas that those two concepts occupy: "One [concept] is that the injured party is entitled to be recompensed only once by persons chargeable with injuring him; the other is that the liability of a wrongdoer should not be diminished by the fact that provision against the loss **[\*\*\*48]** had been made on behalf of the injured person. Which one of those concepts governs depends on whether the person providing the payments in question is assimilated to a co-obligor of the judgment debtor or to a casualty insurer of the injured party. The choice is clearly in favor of treating them as co-obligors when, for example, one was guilty of an intentional tort and the other only of negligence. The choice is clear, for the opposite conclusion, when **[\*47]** the injured party himself purchased accident insurance covering the loss. Such insurance is universally held to be a 'collateral source.' In other cases, the choice involves selecting a beneficiary for a windfall." 2 *Restatement (Second), Judgments § 50, comment (e)* (1979). Underinsured motorist benefits clearly fall within the collateral source rule, and do not come within the single recovery rule, because, among other reasons, they are paid as a result of a contract between the tort victim and the underinsured motorist carrier. This is so even though the damages caused by an underinsured motorist, who is legally liable for the injury to a plaintiff, provide the measuring rod for the benefits to be paid to a plaintiff. [9] I arrive **[\*\*\*49]** at this conclusion based upon an insurance regulation of this state, our own precedent, and the overwhelming weight of authority from other jurisdictions that have addressed the issue.

The payment made under an underinsured motorist policy is clearly contractual in nature and made on behalf of the insured and not the tortfeasor. *Section 38a-334-6 (a) of the Regulations of Connecticut State Agencies* [10] requires the underinsured motorist carrier "to pay **[\*48]** on behalf of the insured," **[\*\*979]** and not on behalf of the tortfeasor, "all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an [underinsured] motor vehicle . . . ."

**[\*\*\*50]** Although addressed in a different context, we recently decided two cases clearly designating payments made by the underinsured/uninsured motorist carrier to its insured as contractual in nature, and, therefore, concluding in both cases that those benefits were independent of the underinsured/uninsured motorist tortfeasor. In *Mazziotti v. Allstate Ins. Co., supra, 240 Conn. 817*, we held that payment to the insured under an underinsured motorist policy was contractual. In that case, we made clear that underinsured motorist benefits were made, not on behalf of the uninsured tortfeasor, but, rather, on behalf of the insured. We stated the following: "The obligation of [an] insurance carrier providing uninsured motorist coverage as a part of its liability insurance coverage on the automobile of the insured person is a contractual obligation arising under the policy of insurance. . . . Payments made pursuant to an

---

But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. . . ." (Emphasis added.)

[9]  The harm caused by the tortfeasor is the measuring rod in most instances for the amount of damages due from a collateral source. For example, the injury caused by the tortfeasor is determinative of the number of weeks that an injured victim is unable to work. Therefore, the number of weeks of unemployment compensation, a collateral source under *Apuzzo v. Seneco, supra, 178 Conn. 230*, is also measured by the tortfeasor's harm.

[10]  *Section 38a-334-6 of the Regulations of Connecticut State Agencies* provides in pertinent part: "Minimum provision for protection against uninsured motorists "(a) Coverage. The insurer shall undertake to pay on behalf of the insured all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by the insured caused by an accident involving the uninsured motor vehicle. This coverage shall insure the occupants of every motor vehicle to which the bodily injury liability coverage applies. 'Uninsured motor vehicle' includes a motor vehicle insured against liability by an insurer that is or becomes insolvent. . . ." (Emphasis added.)

EXHIBIT 43
EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

uninsured motorist policy are paid on behalf of the insured, and not on behalf of the financially irresponsible motorist who has caused the insured's injuries. . . . The insurer is not the alter ego of the tortfeasor and, although its contractual liability is premised in part **[\*\*\*51]** on the contingency of the tortfeasor's liability, they do not share the same legal right. The commonality of interest in proving or disproving the same facts is not enough to establish privity." (Citations omitted; internal quotation marks omitted.) Id. This proposition from Mazziotti was later reaffirmed in *Dodd v. Middlesex Mutual Assurance Co., supra, 242 Conn. 384-85*, where the court held that an employer could not be reimbursed for workers' compensation payments made to an employee from the proceeds of **[\*49]** uninsured motorist benefits received by, and payable to, that employee. Furthermore, the overwhelming weight of authority of the jurisdictions that have considered whether underinsured/uninsured motorist benefits are a collateral source have concluded that those benefits fall squarely within that rule. See, e.g., *International Sales-Rentals Leasing Co. v. Nearhoof, 263 So. 2d 569, 571 (Fla. 1972)* (holding that joint tortfeasor defendant does not get setoff equal to amount of recovery injured plaintiff receives from carrier of his uninsured motorist coverage); *Respess v. Carter, 585 So. 2d 987, 988-90 (Fla. App. 1991)* ("The broad issue presented is whether a tortfeasor should gain **[\*\*\*52]** the benefit of proceeds from [uninsured motorist] coverage of an insurance policy, the premium for which was paid by the injured party. . . . We believe that the collateral source rule is dispositive of this case. . . . In the instant case, the general rule -- recognized but not followed by the trial court in order to prevent a windfall from flowing to the plaintiffs -- is that a joint tortfeasor is not entitled to setoff for amounts paid by [an uninsured motorist] carrier to the injured party. . . . We interpret the . . . trial court's order as adopting the premise that . . . the [uninsured motorist] carrier stands in the place of the driver/tortfeasor and his carrier just as though it were that driver who had secured the insurance and paid the premium. This is incorrect. . . . [An uninsured motorist] carrier is neither a tortfeasor nor an insurer thereof. . . . The general principle stated . . . is that the collateral source rule precludes a setoff of [uninsured motorist] benefits." [Citations omitted; internal quotation marks omitted.]); *State Farm Mutual Automobile Ins. Co. v. Board of Regents of the University System of Georgia, supra, 226 Ga. 310* (uninsured motorist **[\*\*\*53]** benefits "do not discharge . . . the liability of the uninsured motorist and cannot be pleaded **[\*50]** in defense of an action by the injured party against the uninsured motorist"); *Beaird v. Brown, 58 Ill. App. 3d 18, 21, 373 N.E.2d 1055, 15 Ill. Dec. 583 (1978)* ("We find that payments received by the plaintiffs pursuant to their uninsured motorist coverage were received from a collateral source. . . . Were the plaintiffs to seek recovery from their insurer, such a recovery would be based on contract law and would be made possible by the insured's payment of premiums. On the other hand, a recovery against the uninsured motorist would be founded in tort law. . . . To allow the defendant **[\*\*980]** to reduce his liability because the plaintiffs exercised a contract right of recovery against their insurer [for uninsured motorist benefits], a right for which the plaintiffs paid consideration in the form of premiums, would be an unjust enrichment of the defendant." [Citations omitted; internal quotation marks omitted.]); *Southard v. Lira, 212 Kan. 763, 770, 512 P.2d 409 (1973)* ("A tort-feasor cannot diminish the amount of his liability by pleading payments made to the plaintiff under the terms of a contract between the **[\*\*\*54]** plaintiff and a third party who was not a joint tort-feasor. . . . Nor are payments made by an insurance carrier under uninsured motorist coverage, payments which a tort-feasor can utilize to diminish the amount of his liability to the injured party."); *Jones v. Smith, 1 Kan. App. 2d 331, 334, 564 P.2d 574 (1977)* (finding that rule in Southard was controlling and holding that "the mere fact that [the plaintiff] obtained uninsured benefits from her own insurance company does not prevent her from maintaining a cause of action against the tort-feasor. . . . The only drawback is that, in the event [that the plaintiff] recovers from the lawsuit, she must subrogate her insurance company from the proceeds."); *Hagedorn v. Adams, 854 S.W.2d 470, 479 (Mo. App. 1993)* ("The collateral source rule is applicable to uninsured motorist payments made under a policy of insurance by the insured's own insurance company **[\*51]** to the insured for which the insured has paid a premium. . . . Payment of the uninsured motorist coverage is from a source collateral of the wrongdoer." [Citation omitted.]); *Weatherly v. Flournoy, 929 P.2d 296, 299 (Okla. App. 1996)* ("We find that a tortfeasor may not set-off any **[\*\*\*55]** amount he is found to owe the injured party by any amount the injured party may have received from his own uninsured/underinsured motorist policy. The tortfeasor should not benefit from a policy held and paid for by the injured party."); *Estate of Rattenni v. Grainger, 298 S.C. 276, 278, 379 S.E.2d 890 (1989)* ("we find no persuasive reason to distinguish underinsurance proceeds from other insurance proceeds that are subject to the collateral source rule"); *Bradley v. H.A. Manosh Corp., 157 Vt. 477, 484-85, 601 A.2d 978 (1991)* ("It might seem that a tortfeasor, such as [the] defendant, ought to be allowed to subtract from a damages award any settlement the plaintiff receives from an insurer standing jointly liable with an uninsured motorist. Such a result cannot be justified, however. . . . The [uninsured motorist] carrier has a status different from that of insurance carriers who represent other tortfeasors. Their contractual obligation is to persons allegedly at fault,

EXHIBIT 43                                                                                    EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

whereas the contractual obligation of the [uninsured motorist] carrier is to the injured party." [Citations omitted; internal quotation marks omitted.]); *Johnson v. General Motors Corp., 190 W. Va. 236, 244, [\*\*\*56] 438 S.E.2d 28 (1993)* ("In the case before us, it would be unfair for [the defendant] to minimize its damages by offsetting the underinsurance settlement the [plaintiffs] received as a result of their own contractual arrangements. Accordingly, we hold that the collateral source rule operates to preclude the offsetting of uninsured or underinsured benefits since the benefits are the result of a contractual arrangement which is independent of the tortfeasor . . . ."); see also *Peele v. Gillespie, 658 N.E.2d 954, 957-58 (Ind. App. 1995)* [\*52] (same, but collateral source rule is based on statute rather than common law). [11]

 [\*\*\*57] [\*\*981]   Indeed, the precise issue presented in this case has arisen in the context of several factual situations in which plaintiffs have sought damages from defendants even though the plaintiff already had recovered his or her damages in underinsured/uninsured motorist benefits. See, e.g., *Respess v. Carter, supra, 585 So. 2d 988-90* (with facts similar to present case, where deceased insured's survivors settled with [uninsured motorist] carrier for $ 405,000 in uninsured motorist benefits, and then brought action against uninsured motorist's doctor and hospital for negligently treating and releasing uninsured motorist when he had complained of heart attack symptoms shortly before automobile accident in dispute; court held that defendants were not entitled to have setoff for benefits paid by deceased insured's uninsured motorist carrier because benefits fell within collateral source rule); *Bradley v. H.A. Manosh Corp., [\*53] supra, 157 Vt. 483-85* (jury awarded $ 250,000 in damages and defendant, employer of uninsured motorist, argued that trial court should have reduced award by $ 200,000 that plaintiff had received from her father's uninsured motorist policy; court held that defendant was not [\*\*\*58] entitled to setoff for amount of timely payment by uninsured motorist carrier because of collateral source rule, and because through uninsured motorist statute, and most policies, "any potential windfall to the plaintiff will instead pass through to the [uninsured motorist] carrier as reimbursement for payments already made"); *Johnson v. General Motors Corp., supra, 190 W. Va. 240 n.1, 243-44* (plaintiffs received approximately $ 300,000 underinsured motorist settlement for automobile collision with underinsured motorist and subsequently litigated products liability claim against defendant for injuries in same accident caused by allegedly inadequate seat belt restraint system; court held that defendant could not minimize its damages by offsetting them by underinsured motorist benefits that plaintiffs received); *Hagedorn v. Adams, supra, 854 S.W.2d 478-79* (plaintiff received uninsured motorist benefits in amount of $ 20,000 from his insurer due to collision with police vehicle while he was passenger on motorcycle driven by uninsured motorist; court held that defendant city could not obtain credit for uninsured motorist benefits paid to plaintiff because of collateral source rule).   [\*\*\*59] A widely recognized treatise on underinsured/uninsured motorist insurance makes clear that those benefits are wholly independent of the tortfeasor(s): "[An] uninsured [or underinsured] motorist [payment] is not for the benefit of the tortfeasor. The disposition of an uninsured [or underinsured] motorist claim generally has no relation to or effect on the liability of the uninsured motorist (or other joint tortfeasors). One reason for this is that in most states the insurer is entitled to  [\*54] be subrogated to the insured's tort claim against the uninsured [or underinsured] motorist. Thus, courts have repeatedly concluded that ordinarily . . . the insurance payment does not diminish the damages that may be recovered from an uninsured [or underinsured] tortfeasor or a joint tortfeasor who is insured." 2 A. Widiss, Uninsured and Underinsured Motorist Insurance (2d Ed. 1992) § 19.11, pp. 138-39, citing *Erickson v.*

---

[11] I recognize that other courts have come to different conclusions. See, e.g., *Petrella v. Kashlan, 826 F.2d 1340, 1344 (3d Cir. 1987)* (applying New Jersey law); *Cooper v. Aplin, 523 So. 2d 339, 340-41 (Ala. 1988)*; *Waite v. Godfrey, 106 Cal. App. 3d 760, 769-75, 163 Cal. Rptr. 881 (1980)*. Nonetheless, I am unpersuaded by these decisions. Indeed, Waite has been criticized by another California Court of Appeals case, albeit from another district, and this criticism underscores the key weakness in those cases that hold that underinsured motorist benefits are not collateral sources. In *Pacific Gas & Electric Co. v. Superior Court, 28 Cal. App. 4th 174, 181-82, 33 Cal. Rptr. 2d 522 (1994)*, a case involving a collateral source but not underinsured motorist benefits, the court discussed the decision in Waite, stating: "Waite, using suspect analysis and ill-considered dicta . . . concluded the collateral source rule did not apply. . . . By comparing its case to one where a potential defendant's insurance would compensate the plaintiff, Waite changed the focus from who paid for the insurance to whose acts triggered coverage by the policy. The court concluded the settlement [claim] 'represented only a payment made on the occasion of damage inflicted by another joint tortfeasor, i.e., another wrongdoer besides [the] defendants, regardless of what carrier was the source of the payment.' . . . Waite failed to satisfactorily explain how it could suddenly disregard whose carrier was the source of the payments, the key point in determining if the source was collateral." (Citations omitted.)

EXHIBIT 43                                                                                 EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

*Hinckley Municipal Liquor Store, 373 N.W.2d 318, 326 (Minn. App. 1985)* ("An uninsured motorist policy is a private contract between the insured and the insurer. As such, it does not run to the benefit of [the defendant]. The policy was not purchased to protect [the **[\*\*\*60]** defendant], it was purchased to protect . . . the insured. [The defendant] does not become a third party beneficiary to the uninsured motorist policy. . . . It is the general rule that co-tortfeasors are jointly and severally liable to injured plaintiffs."). My conclusion that underinsured motorist benefits is a collateral source is further buttressed by *General Statutes §§ 52-225a* [12] **[\*\*\*62]** and *52-225b*, [13] which provide that **[\*55]** an award of **[\*\*982]** economic damages, based on personal injury or wrongful death, shall be reduced by the trial court, after liability is determined and damages are awarded, by certain enumerated payments of "collateral sources" (statutory collateral source credits) to the plaintiff. Notwithstanding this limited abrogation of the collateral source rule by statute, the legislature has, up to this point in time, chosen not to include underinsured motorist benefits in *§ 52-225b*. This is so in spite of the fact that uninsured motorist law has existed in Connecticut since 1967, [14] underinsured motorist coverage since 1979, [15] and statutory collateral source credits were enacted in 1985. [16] Indeed, the legislature has revisited *§ 52-225b* and its related statutes twice, [17] **[\*\*\*61]** but has never included underinsured motorist benefits as a statutory **[\*56]** collateral source credit. Surely the legislature has the power to further abrogate the common law collateral source rule. *Warner v. Leslie-Elliott Constructors, Inc., 194 Conn. 129, 133, 479 A.2d 231 (1984)*. The legislature, however, has gone no further than the present version of *§ 52-225b*, which demonstrates an intent on its part to limit the encroachment on the collateral source rule. [18]

---

[12] *General Statutes § 52-225a* provides: "Reduction in economic damages in personal injury and wrongful death actions for collateral source payments. (a) In any civil action, whether in tort or in contract, wherein the claimant seeks to recover damages resulting from (1) personal injury or wrongful death occurring on or after October 1, 1987, or (2) personal injury or wrongful death, arising out of the rendition of professional services by a health care provider, occurring on or after October 1, 1985, and prior to October 1, 1986, if the action was filed on or after October 1, 1987, and wherein liability is admitted or is determined by the trier of fact and damages are awarded to compensate the claimant, the court shall reduce the amount of such award which represents economic damages, as defined in subdivision (1) of subsection (a) of *section 52-572h*, by an amount equal to the total of amounts determined to have been paid under subsection (b) of this section less the total of amounts determined to have been paid under subsection (c) of this section, except that there shall be no reduction for (1) a collateral source for which a right of subrogation exists and (2) that amount of collateral sources equal to the reduction in the claimant's economic damages attributable to his percentage of negligence pursuant to *section 52-572h*. "(b) Upon a finding of liability and an awarding of damages by the trier of fact and before the court enters judgment, the court shall receive evidence from the claimant and other appropriate persons concerning the total amount of collateral sources which have been paid for the benefit of the claimant as of the date the court enters judgment. "(c) The court shall receive evidence from the claimant and any other appropriate person concerning any amount which has been paid, contributed, or forfeited, as of the date the court enters judgment, by, or on behalf of, the claimant or members of his immediate family to secure his right to any collateral source benefit which he has received as a result of such injury or death."

[13] *General Statutes § 52-225b* provides: "'Collateral sources' means any payments made to the claimant, or on his behalf, by or pursuant to: (1) Any health or sickness insurance, automobile accident insurance that provides health benefits, and any other similar insurance benefits, except life insurance benefits available to the claimant, whether purchased by him or provided by others; or (2) any contract or agreement of any group, organization, partnership or corporation to provide, pay for or reimburse the costs of hospital, medical, dental or other health care services. 'Collateral sources' do not include amounts received by a claimant as a settlement." (Emphasis added.)

[14] See Public Acts 1967, No. 510, § 4.

[15] See Public Acts 1979, No. 79-235.

[16] See Public Acts 1985, No. 85-574, § 1.

[17] "Number 86-338 of the 1986 Public Acts is commonly known as 'Tort Reform I,' and was codified at General Statutes (Reversed to 1987) *§§ 52-225a through 52-225d*, *52-251c* and *52-572h*. Number 87-227 of the 1987 Public Acts, commonly known as 'Tort Reform II,' revised those sections." *Childs v. Bainer, 235 Conn. 107, 120 n.9, 663 A.2d 398 (1995)*.

[18] In partially abrogating the common law rule for certain specified collateral sources, the legislature was careful to limit these credits to provide merely a reduction against the economic damages awarded to the plaintiff by the trier of fact; see *General Statutes § 52-225a (a)* and *(b)*; and subject to reducing the collateral source credit for any amount that has been paid by, or on

EXHIBIT 43                                                                          EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

 **[\*\*\*63]**  In this case, the decedent was required by law to purchase underinsured motorist coverage in the amount of only $ 20,000; see _General Statutes §§ 38a-336_ [19] **[\*\*\*65]**  and  **[\*\*983]**  _14-112_; [20] but opted to pay additional premiums for $ 880,000 in additional coverage. If she had carried the mandated amount of only $ 20,000, this case would surely not be here. To allow a defendant to receive the benefit of these underinsured motorist benefits flies in the face of the core principle behind the collateral  **[\*57]**  source rule -- the public policy favoring avoidance of unjust enrichment on the part of a tortfeasor. _Gurliacci v. Mayer, supra, 218 Conn. 556-57_ (basis of our collateral source rule is that wrongdoer shall not benefit from windfall from source wholly independent of tortfeasor and paid to plaintiff); _Gorham v. Farmington Motor Inn, Inc., supra, 159 Conn. 580_ (it is more just that injured person, rather than wrongdoer, shall profit from windfall). Furthermore, although one of the bases to justify the collateral source rule is that if there should be a windfall it should go to the tort victim, there was no windfall in the present case. The plaintiff's decedent paid insurance premiums for the $ 900,000 coverage **[\*\*\*64]**  year after year to protect her (or her estate) from the contingency that unfortunately occurred. In essence, the underinsured motorist insurance coverage in this case was no different than a life insurance policy, except that the amount of the payment for the death was not fixed but, rather, based upon the value of the decedent's life. Finally, "the collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. . . . If [a court] were to permit a tortfeasor to mitigate damages with payments from [a] plaintiff's insurance, [the] plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit." (Emphasis added.) _Helfend v. Southern California Rapid Transit District, 2 Cal. 3d 1, 10, 465 P.2d 61, 84 Cal. Rptr. 173 (1970)_.

II I now turn to the rationales that the majority advances in order to justify its decision. The overarching flaw in the majority's reasoning is that it concludes that "underinsured motorist benefits, although contractual  **[\*58]**  in nature, operate in part as a liability insurance surrogate for the underinsured motorist third party tortfeasor." The simple answer to this unfounded conclusion, as I have previously pointed out and will do so again in this part of my opinion, is that this state's insurance regulation and our established case law have rejected this "surrogate" argument. By improperly concluding that underinsured motorist benefits operate as a liability insurance surrogate for the underinsured motorist, the majority unjustifiably paves the way for its application of the common-law rule precluding double recovery for the same harm as articulated in _Gionfriddo v. Gartenhaus Cafe, supra, 211 Conn. 67_. Once the majority made the leap that underinsured motorist benefits are a "liability **[\*\*\*66]**  insurance surrogate" for the underinsured tortfeasor motorist, it was able to treat the underinsured motorist carrier as a joint tortfeasor, alongside the defendants, in which case the general tort rule precluding double recovery from joint tortfeasors would apply. I have no quarrel with the single recovery rule being applied faithfully to actual joint tortfeasors. But underinsured motorist carriers are not joint tortfeasors, and should not be viewed as such. Gionfriddo is distinguishable on its facts from the present case because, as a result of its sale of alcoholic liquor to the intoxicated driver who caused the fatal accident, the defendant was actually a joint tortfeasor. _Id., 70_. That is simply not the case here, and that underscores the fundamental flaw in the majority's opinion. [21]

---

behalf of, the plaintiff or his or her family in securing the right to the collateral source benefit -- i.e., insurance premiums paid by the insured are used to offset the collateral source credit. See _General Statutes § 52-225a (c)_. In this case, the majority does not even allow a credit for the premiums that the plaintiff's decedent was obligated to pay for the underinsured motorist coverage.

[19] _General Statutes § 38a-336_ provides in pertinent part: "Uninsured and underinsured motorist coverage. (a) (1) Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to _section 38a-334_, with limits for bodily injury or death not less than those specified in subsection (a) of _section 14-112_, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom. . . ."

[20] Pursuant to _General Statutes § 14-112_, the minimum coverage requirement "for damages by reason of personal injury to, or the death of, any one person, [is] twenty thousand dollars . . . ."

[21] In addition, the majority considers underinsured motorist benefits "sui generis," making much of the fact that those benefits are measured by the tort damages caused by the underinsured motorist tortfeasor. The majority uses this fact to justify treating that

EXHIBIT 43                                                      EXHIBIT 21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

 **[\*\*\*67] [\*\*984] [\*59]**    The majority, by concluding that the decedent's underinsured motorist carrier is a surrogate for the underinsured motorist tortfeasor, dismisses the plain language of § 38a-334-6 (a) of the regulations, [22] which provides that the underinsured motorist carrier "shall undertake to pay on behalf of the insured all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an [underinsured] motor vehicle . . . ." [23] **[\*\*\*68]** (Emphasis added.) In other words, payment of benefits made by the underinsured motorist carrier are made, not on behalf of the tortfeasor, but, rather, on behalf of the insured. This is bolstered by the fact that it is the insured that pays the **[\*60]** premiums for the underinsured motorist coverage and not the underinsured motorist tortfeasor. [24]

Indeed, we so interpreted this regulation in _Pecker v. Aetna Casualty & Surety Co., 171 Conn. 443, 449-52, 370 A.2d 1006 (1976)_. In Pecker, we stated, in discussing whether "other insurance" clauses were valid under another provision in the regulations, that " § 38-175a-6 (a) [of the Regulations of Connecticut State Agencies, now § 38a-334-6 (a)] clearly indicates that an insurer making payment under the uninsured motorist coverage provisions of its **[\*\*\*69]** policy makes that payment 'on behalf of' the insured, not the uninsured motorist." (Emphasis added.) _Id., 452_. We reinforced this proposition, as I previously pointed out, in _Mazziotti v. Allstate Ins. Co., supra, 240 Conn. 817_, and _Dodd v. Middlesex Mutual Assurance Co., supra, 242 Conn. 384_. The majority also reasons that the plaintiff's right to pursue her claim must fail because of what it asserts as the "fundamental principle" behind underinsured motorist insurance, namely, that the insured should not be placed in a better position than she would be in had the underinsured tortfeasor been fully insured. Simply put, the public policy behind underinsured motorist insurance does not embody this enunciated principle and the majority's assertion appears to be an overly broad generalization from our previous case law. I agree that our case law provides that "the public policy established by the uninsured motorist statute is that **[\*61]** every insured is entitled to recover for the **[\*\*985]** damages he or she would have been able to recover if the uninsured motorist had maintained [an adequate] policy of liability insurance." (Internal quotation marks

---

insurance differently from more traditional types of insurance. What this approach ignores is that, although underinsured motorist insurance is prompted by statute, the relationship between insurer and insured is contractual. To show the weakness in the majority's reliance on the underinsured motorist label, I pose the following hypothetical. What if the decedent had the minimal amounts under her underinsured motorist endorsement to her automobile liability insurance policy and she also bargained separately for a second policy that would provide up to $ 880,000 in insurance benefits, and this insurance functioned just like underinsured motorist insurance (i.e., the measuring rod for the required payment under the policy is the damages caused by the tortfeasor). Would the majority say that this is not a collateral source because the insured and the insurer contracted for the measuring rod of the damages to be the damages caused by the tortfeasor? I think the answer is no. The fact that the insurance in this case falls under the rubric of underinsured motorist insurance should not cause it to be reclassified as a noncollateral source -- in other words, a surrogate for the tortfeasor's inability to pay. The simple fact is that underinsured motorist insurance, is not really any different than any other insurance that has historically been classified as collateral sources -- i.e., fire insurance, commercial loss insurance, life insurance -- because it is still based upon an insurance contract where the insured pays the premiums.

[22]  See footnote 10 of this opinion.

[23] Section 38a-334-6 (a) of the regulations was adopted pursuant to the authority of _General Statutes §§ 38a-336 (a) (1)_ and _38a-334_. "Not only is the [insurance] commissioner obligated to adopt regulations with respect to the minimum provisions to be included in the policy of insurance issued in this state; see _General Statutes § 38a-334_; we presume that these regulations are 'an accurate reflection of the legislative intent articulated in the statute's more general language.' _AFSCME v. New Britain, 206 Conn. 465, 470, 538 A.2d 1022 (1988)_. This presumption is further underscored by the Uniform Administrative Procedure Act, _General Statutes § 4-166 et seq._, which provides for legislative oversight through the legislative regulation review committee prior to approval of the regulations. _General Statutes § 4-170_." _General Accident Ins. Co. v. Wheeler, 221 Conn. 206, 211, 603 A.2d 385 (1992)_.

[24] Moreover, the fact that underinsured motorist benefits are mandated by statute does not take them out of the definition of a collateral source. First, only $ 20,000 of coverage is required by statute. Second, we have held that statutorily mandated benefits in the form of unemployment compensation benefits are a collateral source and should not be considered by the trier of fact in awarding damages. See _Apuzzo v. Seneco, supra, 178 Conn. 233_; see also 4 **Restatement (Second), Torts § 920A, comment (c)** (1979) (payments within collateral source rule are "benefits arising by statute, as in worker[s'] compensation acts" or through "social legislation benefits . . . [such as] social security benefits [or] welfare payments").

omitted.) *Rydingsword v. Liberty Mutual Ins. Co., [\*\*\*70] 224 Conn. 8, 18, 615 A.2d 1032 (1992)*; see also *Williams v. State Farm Mutual Automobile Ins. Co., 229 Conn. 359, 366-67, 641 A.2d 783 (1994)*; *Smith v. Safeco Ins. Co. of America, 225 Conn. 566, 573, 624 A.2d 892 (1993)*; *Bodner v. United Services Automobile Assn., 222 Conn. 480, 499, 610 A.2d 1212 (1992)*. For example, we have previously held that an insured cannot recover punitive damages against its own uninsured motorist carrier, because had the uninsured motorist maintained a policy of liability insurance, the insured would not have been able to recover punitive damages from the tortfeasor's insurer; *Bodner v. United Services Automobile Assn., supra, 499-500*; that the statutory collateral source credits mandated by *§ 52-225a* limits the amount of benefits that a claimant may recover through underinsured motorist insurance, the same way that the underinsured motorist would be allowed to reduce the damages for which he or she is liable; *Smith v. Safeco Ins. Co. of America, supra, 573*; and that "whether the uninsured motorist was legally liable must be determined in light of any substantive defenses that would have been available to the uninsured motorist." *Williams v. State Farm Mutual [\*\*\*71] Automobile Ins. Co., supra, 368*. Those cases merely indicate that the insured is entitled to no greater recovery from his or her underinsured motorist carrier than he or she would have been able to recover from the underinsured motorist. See *Smith v. Safeco Ins. Co. of America, supra, 225 Conn. 573* ("underinsured motorist protection is not intended to provide a greater recovery than would have been available from the tortfeasor"). The plaintiff in this case is not seeking an enhanced right of recovery from her [\*62] decedent's underinsured motorist carrier beyond that which she would have been entitled to recover from the underinsured tortfeasor. Instead, she has received insurance proceeds for which the decedent contracted with Covenant in consideration for premiums she paid. The other side of the coin, however, is that the majority's decision places the defendants in a better position, indeed, it gives them a windfall, just because the decedent had the foresight to purchase $ 880,000 more underinsured motorist insurance than the minimal $ 20,000 amount required by statute. In what it finds as further support for its position, the majority asserts that the plaintiff's right to recover depends [\*\*\*72] solely on the order of litigation. The thrust of the majority's reasoning is that if the plaintiff had first brought an action against the defendants, she would not be entitled to recover the underinsured motorist benefits. As I see it, the answer to that reasoning is that the contractual relationship between insurer and insured allows the insured to promptly seek benefits from its insured. The underinsured motorist carrier is required to make prompt payment of a claim that it finds to be clearly payable. [25] Indeed, the public policy requiring prompt payment of just claims demands no less. See generally *General Statutes § 38a-815 et seq.* (Connecticut Unfair Insurance Practices Act); *General Statutes § 42-110a et seq.* (Connecticut Unfair Trade Practices Act). The fact that the plaintiff, as administratrix of the decedent's estate, was able to recover a prompt payment, based upon the decedent's contractual arrangement with her insurer, before the plaintiff brought an action against the defendants in this case [\*63] should not be used to create a windfall for the defendants. The Vermont Supreme Court has aptly stated that "it would be inequitable to allow a tortfeasor to escape liability [\*\*\*73] whenever a plaintiff receives timely payment from [his or] her [uninsured motorist] carrier." (Emphasis added; internal quotation marks omitted.) *Bradley v. H.A. Manosh Corp., supra, 157 Vt. 485*.

With respect to the order of litigation, allowing the plaintiff to recover in this case makes sense for another reason. The conclusion that underinsured motorist benefits [\*\*986] are not a collateral source jeopardizes the subrogation rights of underinsured motorist carriers and also impermissibly interferes with the contractual relationship of the insurer and insured. An underinsured motorist carrier, based on the insurance contract or a settlement agreement, after fulfilling its duty of making prompt payment, would surely seek reimbursement of all or part of a payment if the insured later recovers from the tortfeasor. This is common practice in the world of underinsured [\*\*\*74] motorist benefits. "Uninsured [or underinsured] motorist coverages usually include a provision that states the insurer has a right to be reimbursed to the extent of any payment the insurer has made." 2 A. Widiss, supra, § 19.2, p. 110. [26] In

---

[25] I recognize, of course, that an underinsured motorist carrier is only obligated to make payment "after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements . . . ." *General Statutes § 38a-336 (b)*.

[26] For example, Connecticut has *§ 38a-334-6 (e) of the Regulations of Connecticut State Agencies*, which provides: "Recovery over. The insurer may require the insured to hold in trust all rights against third parties or to exercise such rights after the insurer has paid any claim, provided that the insurer shall not acquire by assignment, prior to settlement or judgment, its insured's right of

**EXHIBIT 43**                                                                                         EXHIBIT  21

Haynes v. Yale-New Haven Hosp., 243 Conn. 17

addition, "[an uninsured or underinsured motorist carrier] will often require a claimant to sign an agreement, prior to receiving any payment, which acknowledges the receipt of the insurance payment and reiterates the **[*64]** terms of the [insurance contract with respect to reimbursement] . . . ." Id., § 19.6, pp. 129-30. Nothing prevents underinsured motorist carriers from doing this. See, e.g., *Bradley v. H.A. Manosh Corp., supra, 157 Vt. 483* ("in a pretrial settlement agreement, the [uninsured motorist] carrier agreed to pay [the] plaintiff $ 200,000, provided it would receive reimbursement up to $ 200,000 out of any recovery from the defendant, whom it agreed to sue jointly with [the] plaintiff"); *International Sales-Rentals Leasing Co. v. Nearhoof, supra, 263 So. 2d 570* (in order to settle uninsured motorist claim, uninsured motorist carrier required plaintiffs to sign a trust agreement wherein plaintiffs agreed to "hold in trust" all **[***75]** rights, claims, and causes of action against any party responsible for plaintiffs' injuries and, based upon this, uninsured motorist carrier intervened in plaintiffs' action against defendant.) As the Vermont Supreme Court has pointed out, in the context of an action against an uninsured motorist's employer brought after uninsured motorist benefits were collected, "tortfeasors jointly liable with an uninsured motorist may not reduce their liability by the amount of payments made under [uninsured motorist] coverage because any potential windfall to the plaintiff will instead pass through to the [uninsured motorist] carrier as reimbursement for payments already made." *Bradley v. H.A. Manosh Corp., supra, 485*.

**[***76]** The underinsured motorist carrier's assertion of its rights to reimbursement for payments made to an insured greatly reduces the prospects of double recovery. [27] Whether there is a double recovery on the part **[*65]** of the plaintiff obviously depends upon the insurance contract between the tort victim (the insured) and the underinsured motorist carrier. That, however, is a matter between the insured and the insurer. Nevertheless, the tort victim is benefited, as are insureds in general, by placing the ultimate financial responsibility upon the defendants in a case such as this one, and by allowing the tort victim's underinsured motorist carrier to be reimbursed from any recovery that the victim receives from any third party that is liable for the injuries, because the end result **[**987]** will be that the costs of insurance premiums for such protection will be driven down.

**[***77]** In sum, I conclude that the underinsured motorist benefits paid to the plaintiff as a result of the decedent's death constitute a collateral source that cannot be taken advantage of by the defendants in order to mitigate the damages for which they may be found liable. Therefore, I find that the trial court improperly rendered summary judgment on the medical malpractice count. Accordingly, I dissent.

---

**End of Document**

---

action to recover for bodily injury from any third party." (Emphasis added.) Although we have never decided whether this regulation would apply to nonmotorists, as the defendants are in this case, I believe that the regulation still applies because it is applicable to recovery from "any third party."

[27] Professor Tait has noted that "odd as it may seem, to reap the fruits of subrogation requires a continued recognition of the Collateral Source Rule. This is so because if the tortfeasor's liability to the plaintiff is reduced by the amount of the collateral benefits, the plaintiff will have no cause of action for that amount to which the collateral source can be subrogated." C. Tait, "Connecticut's Collateral Source Rule: Stepchild of the Law of Damages," 1 Conn. L. Reversed 93, 116 (1968). As Professor Tait aptly stated, subrogation creates a middle ground between abolishing the collateral source rule and allowing absolute double recovery: "[Subrogation] offers a recognized alternative to [double recovery, a solution] that would further the basic tort principles of compensation and indemnity within the concept of fault liability. As long as . . . fault remains the keystone of our tort law, it is subrogation that merits the attention of our courts and legislature, and its adoption in appropriate new areas should help legitimize the Collateral Source Rule within the law of damages." *Id., 123*. I cannot agree more.

**EXHIBIT 43**                                                          **EXHIBIT 22**

Erickson Prods. v. Kast, 921 F.3d 822

# *Erickson Prods. v. Kast*

United States Court of Appeals for the Ninth Circuit

March 25, 2019, Argued and Submitted, San Francisco, California; April 16, 2019, Filed

No. 15-16801

**Reporter**

921 F.3d 822 *; 2019 U.S. App. LEXIS 11037 **; Copy. L. Rep. (CCH) P31,443

ERICKSON PRODUCTIONS, INC.; JIM ERICKSON, Plaintiffs-Appellees, v. KRAIG RUDINGER KAST, Defendant-Appellant.

**Prior History:  [**1]** Appeal from the United States District Court for the Northern District of California. D.C. No. 5:13-cv-05472-HRL. Howard R. Lloyd, Magistrate Judge, Presiding.

*Erickson Prods. v. Kast, 2014 U.S. Dist. LEXIS 56711 (N.D. Cal., Apr. 23, 2014)*

**Disposition:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED. EACH PARTY TO BEAR ITS OWN COSTS.

## Case Summary

### Overview

HOLDINGS: [1]-On appeal of a jury verdict finding that defendant vicariously and contributorily infringed plaintiffs' copyrighted images by displaying them on his website, and did so willfully, the jury's vicarious liability verdict was vacated because defendants presented no evidence that could constitute a direct financial benefit to plaintiff as a matter of law; [2]-A vicarious infringer's avoidance of licensing fees could not constitute a direct financial benefit as a matter of law because the direct infringer's avoidance of fees alone could not satisfy the requirement of a direct financial benefit to the vicarious infringer; [3]-Remand was required because the trial court's erroneous willfulness instruction was likely prejudicial to the defendant. The jury's willfulness finding was relevant to its award of § 450,000 in statutory damages pursuant to *17 U.S.C.S. § 504(c)(2)*.

### Outcome

The court vacated the jury's finding of vicarious liability. The court affirmed the jury's finding of contributory liability and therefore affirmed the judgment. The court reversed the jury's finding of willfulness and remanded the issue of statutory damages to the trial court.

**Summary:**

SUMMARY[*]

### Copyright

The panel affirmed in part and reversed in part the district court's judgment finding that the defendant vicariously and contributorily infringed plaintiffs' copyrighted images by displaying them on his website and did so willfully.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**EXHIBIT 43**                                                            **EXHIBIT  22**

Erickson Prods. v. Kast, 921 F.3d 822

Defendant hired a website developer to redevelop the website of his business. Three photos, taken by plaintiffs and licensed to Wells Fargo Private Bank through plaintiff's company, were incorporated into defendant's website.

The panel vacated the jury's vicarious liability verdict, which found that defendant vicariously infringed plaintiff's copyright through his employment of the website developer, the direct infringer. The panel held that to prevail on a vicarious liability claim, the plaintiff must prove that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity. The panel held that plaintiffs presented no evidence **[\*\*2]** that could constitute a direct financial benefit as a matter of law. Specifically, the website developer's avoidance of licensing fees for the photos did not confer a direct financial benefit on defendant.

The panel affirmed the jury's contributory liability verdict and therefore affirmed the judgment. A party engages in contributory copyright infringement when it (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement. Reviewing for plain error, the panel held that the district court did not plainly err in instructing the jury that "knowledge" for contributory infringement purposes includes having a "reason to know" of the infringement.

The panel vacated the jury's willfulness finding and remanded for a determination of whether defendant's infringement was willful on the existing record. A finding of willfulness requires a showing of recklessness, willful blindness, or actual knowledge, and merely negligent conduct is not willful. The panel held that the district court therefore erred when it instructed the jury that it could find that defendant's infringement was willful if he "should have known" that his acts infringed **[\*\*3]** plaintiffs' copyright.

**Counsel:** Christopher J. Cariello (argued), Margaret Wheeler-Frothingham, and Paul M. Fakler, Orrick Herrington & Sutcliffe LLP, New York, New York, for Defendant-Appellant.

Kevin P. McCulloch (argued) and Nathaniel A. Kleinman, New York, New York, for Plaintiffs-Appellees.

**Judges:** Before: Sidney R. Thomas, Chief Judge, and Michael Daly Hawkins and M. Margaret McKeown, Circuit Judges. Opinion by Judge Hawkins.

**Opinion by:** Michael Daly Hawkins

# Opinion

 **[\*826]**  HAWKINS, Senior Circuit Judge:

Defendant-Appellant Kraig Kast ("Kast") appeals a jury verdict finding that he vicariously and contributorily infringed Plaintiffs-Appellees Erickson Productions, Inc. and Jim Erickson's (collectively, "Erickson") copyrighted images by displaying them on his website and did so willfully. We vacate the jury's vicarious liability verdict but affirm its contributory liability verdict, so we uphold the judgment against Kast. We vacate the jury's willfulness finding and remand for a determination of whether Kast's infringement was willful on the existing record.

This opinion addresses Kast's appeal of the judgment against him, Case No. 15-16801. The panel will address Kast's related appeal of the district court's amendment of the judgment **[\*\*4]** against him, Case No. 17-17157, in a separate memorandum disposition.

**FACTS AND PROCEEDINGS BELOW**

**I. Factual Background**

417

**EXHIBIT 43**                                                                 **EXHIBIT  22**

Erickson Prods. v. Kast, 921 F.3d 822

Kast is a California resident who owns and operates various business entities and websites. One such business is Atherton Trust, a real estate wealth management company. In 2010, an opportunity arose for Atherton Trust to be appointed by the State of California to manage the estates of disabled persons. Kast thought a revamped website would enhance Atherton Trust's prospects; so, he hired a website developer, Only Websites, to redevelop the site. Among other things, Kast "agree[d] to provide content and other material . . . throughout the development process." Kast's approval would be required on all work, "including the design, development and finalization of the website."

To facilitate development, Kast completed a questionnaire outlining his goals for the revamped website. Kast identified Wells Fargo Private Bank ("Wells Fargo") as one of Atherton Trust's competitors and highlighted certain features of Wells Fargo's website he found appealing. Kast also stated in emails that he wanted to mimic Wells Fargo's website. Further, Kast noted that he "need[ed] to choose photos **[\*\*5]** from options" provided by Only Websites.

Kast closely managed the development process. For instance, after reviewing an early draft of the developmental website, Kast stated that he "like[d] what [Only Websites did] with the home page layout."  **[\*827]**  On the other hand, Kast wanted the logo "to be warmer like" Wells Fargo's and the photos "to be more casual like" Wells Fargo's. Likewise, Kast later requested that Only Websites move the placement of Atherton Trust's logo and company name.

Eventually, three photos from Wells Fargo's website—which were taken by Jim Erickson and licensed to Wells Fargo through his company, Erickson Productions, Inc.—were incorporated into Atherton Trust's developmental website.[1] Neither Atherton Trust, Kast, nor Only Websites licensed the photos. Erickson discovered the infringement via Picscout, a "software that tracks imagery online" by running nightly internet-wide searches. In July 2011, Erickson demanded that Atherton Trust "cease and desist infringing its copyright" and pay damages. Kast promptly directed Only Websites to remove the photos, which was done the next morning, but refused to pay.

## II. Procedural Background

*a. The trial and the jury's verdict against [\*\*6]  Kast*

Erickson filed suit in the Central District of California, alleging direct, vicarious, and contributory copyright infringement.[2] Erickson contended that the infringement was willful, and therefore subject to enhanced damages under *17 U.S.C. § 504(c)(2)*.

The case was transferred to the Northern District of California, where it proceeded to trial by consent before a magistrate judge.

Two divergent narratives emerged at trial. Erickson portrayed Kast as an opportunistic, cost-cutting businessperson who rushed completion of Atherton Trust's developmental website in an effort to generate additional income through state-appointed estate management. Erickson's counsel elicited testimony from Kast at trial that he first became aware that the photos in question were on Atherton Trust's website in January 2011, and the photos remained there until Kast received the July 2011 demand letter. Erickson claimed that including the unlicensed photos not only allowed Kast to continue pursuing the business opportunity he so desired, but also avoided the required developmental licensing fee.

---

[1] Neither the record nor the trial transcript reveals whether Kast directed Only Websites to include the photos or whether Only Websites did so unilaterally.

[2] Erickson initially sued Kast in the Southern District of New York, but his complaint was dismissed for lack of personal jurisdiction. *See Erickson Prods., Inc. v. Atherton Trust, No. 12 Civ. 1693 (PGG), 2013 U.S. Dist. LEXIS 39576, 2013 WL 1163346 (S.D.N.Y. March 20, 2013)*. Erickson obtained a default judgment against Only Websites. Order of Default, *Erickson Prods.*, No. 1:12-cv-01693-PGG-KNF (S.D.N.Y. Nov. 28, 2012).

EXHIBIT 43                                                                    EXHIBIT 22

Erickson Prods. v. Kast, 921 F.3d 822

Kast painted a different picture. He agreed "the Atherton Trust website included unauthorized copies of [Erickson's] **[\*\*7]** photos that were copied from" Wells Fargo's website. But, according to Kast, Only Websites copied the photos without his consent. Kast also pointed to a provision in his contract with Only Websites, which stated that "Client [Kast] is responsible for obtaining copyright releases and licenses on all photographs it sends to Provider. Limit of 2 photographs provided by Provider for every page except the home page." Kast testified he understood this provision to mean that "[a]nything that I sent to them had to be licensed," but that "if they provided the photos, [they] had to provide licensed photos." Similarly, Kast asserted that had he known he needed to license photos for the developmental site, he **[\*828]** would have done just that; in fact, he later and on his own licensed two stock photos for the site's "live" version. Separately, Kast argued he lacked control over Only Websites: Only Websites published the website without his consent and ignored multiple requests to replace the infringing photos. Finally, Kast contended that he did not reap a financial benefit from the infringing photos because "[h]e made no money off the website" and "avoid[ing] a license fee" is not a direct financial **[\*\*8]** benefit.

At the charging conference, the parties wrangled over the wording of the willfulness jury instruction. Erickson sought an instruction that Kast acted willfully if he knew he infringed Erickson's copyrights, acted with reckless disregard for Erickson's copyrights, or "should have known" his actions infringed Erickson's copyrights. Kast objected to the "should have known" prong, arguing that it set the standard "much lower than recklessness." The district court agreed with Erickson and included the "should have known" prong.

The jury found by special verdict that Kast vicariously and contributorily (but not directly) infringed Erickson's copyright on each of the photos and did so willfully. Pursuant to *17 U.S.C. § 504(c)(2)*, the jury awarded Erickson $150,000 in damages per photograph, for total damages of $450,000.

*b. The instant appeal*

Kast timely appealed the district court's judgment against him. Kast initially briefed his case without the assistance of counsel. We appointed pro bono counsel to assist Kast with two of the issues he raised in his opening brief: (1) whether the avoidance of licensing fees constitutes a direct financial benefit for purposes of imposing vicarious copyright liability; **[\*\*9]** and (2) whether a "should have known" willfulness instruction is proper under *17 U.S.C. § 504(c)*. The parties submitted supplemental briefing on these issues, the former an issue of first impression in this circuit. We now consider whether to affirm (1) the jury's vicarious liability verdict, (2) the jury's contributory liability verdict, and (3) the jury's willfulness finding. We also address (4) some additional evidentiary and procedural matters.

### STANDARDS OF REVIEW

"We review the district court's denial of a motion for directed verdict de novo." *Allstate Ins. Co. v. Herron, 634 F.3d 1101, 1109 (9th Cir. 2011)*. Legal questions are reviewed de novo so long as they are "raise[d] . . . at some point before the judge submitted the case to the jury[.]" *F.B.T. Prods., LLC v. Aftermath Records, 621 F.3d 958, 962-63 (9th Cir. 2010)*.

Jury instructions "must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *Gantt v. City of Los Angeles, 717 F.3d 702, 706 (9th Cir. 2013)* (quotation marks and citation omitted). If a jury instruction is incorrect, reversal is appropriate "unless the error is more probably than not harmless." *Chuman v. Wright, 76 F.3d 292, 294 (9th Cir. 1996)*. If a party fails to object to a jury instruction in the district court, it can still be reviewed on appeal for plain error. *See Hoard v. Hartman, 904 F.3d 780, 786 (9th Cir. 2018)*. "We may exercise our discretion to correct a district court on plain error review when the following factors **[\*\*10]** are met: (1) the district court erred; (2) the error was obvious or plain; (3) the error affected substantial rights; and (4) the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *Id. at 787* (quotation marks and citation omitted).

**EXHIBIT 43**                                                                                          <span style="color:red">EXHIBIT 22</span>

Erickson Prods. v. Kast, 921 F.3d 822

**[\*829]**  "We review the district court's rulings concerning discovery and evidentiary issues for an abuse of discretion and reverse only if the district court's ruling more likely than not affected the verdict." *Kulas v. Flores, 255 F.3d 780, 783 (9th Cir. 2001)* (citations omitted).

**DISCUSSION**

### I. The Vicarious Liability Verdict

The jury found that Kast vicariously infringed Erickson's copyright through his employment of Only Websites, the direct infringer. "To prevail on a vicarious liability claim, [plaintiff] must prove [defendant] has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *VHT, Inc. v. Zillow Group, Inc., 918 F.3d 723, 745 (9th Cir. 2019)* (citing *Perfect 10, Inc. v. Giganews, Inc., 847 F.3d 657, 673 (9th Cir. 2017)* (internal quotation marks omitted).

Kast argues the judge erred in denying his motion for a directed verdict on vicarious liability because Erickson presented no evidence that could constitute a direct financial benefit as a matter of law.[3] We agree and vacate the jury's vicarious liability verdict.

"The essential **[\*\*11]**  aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . ." *Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004)*. Erickson claims Kast received three "direct financial benefits" from Only Websites' infringement: (1) the photographs drew customers to purchase his services; (2) he avoided paying licensing fees to Erickson; and (3) he was able to "rush" the launch of his website. Each one fails.

#### a. Enhanced attractiveness of Kast's website

A website owner can receive a direct financial benefit from the presence of infringing material on his or her website, but only "where the availability of infringing material acts as a draw for customers." *Ellison, 357 F.3d at 1078* (internal quotation marks and citation omitted). If the infringing material is "just an added benefit," rather than a draw, it does not confer a direct financial benefit on the website owner. *See id. at 1078-79*.

Erickson claims the photographs enhanced the general attractiveness of Kast's website to customers, and thereby "drew" visitors to purchase his services. Erickson argues that, because the whole purpose of the website was to advertise Kast's wealth management company, Kast had a direct financial **[\*\*12]**  interest in everything on the website that enhanced its appeal to potential customers. However, a financial benefit is not "direct" unless there is a "causal relationship between the infringing activity and [the] financial benefit." **[\*830]** *Ellison, 357 F.3d at 1079*. Erickson does not contend that anyone visited Kast's website in order to view his photographs or purchased his services because they saw the photographs. The parties agree that no one visited the website or purchased anything after doing so. If Kast had a direct financial interest in every piece of content on this website that arguably made the website

---

[3] Kast also argues that the jury's vicarious liability verdict was not supported by sufficient evidence. Kast failed to renew his motion for a directed verdict in the trial court, so his sufficiency of the evidence argument is forfeited. *See Nitco Holding Corp. v. Boujikian, 491 F.3d 1086, 1089 (9th Cir. 2007)* ("[A] post-verdict motion under *Rule 50(b)* is an absolute prerequisite to any appeal based on insufficiency of the evidence.") (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 126 S. Ct. 980, 163 L. Ed. 2d 974 (2006))*. Insofar as Kast's arguments address whether certain alleged benefits were "direct financial benefits" as a matter of law, rather than whether the evidence established that Kast received those benefits, they are unaffected by this rule. *See Cochran v. City of Los Angeles, 222 F.3d 1195, 1200 (9th Cir. 2000)* (failure to renew post-verdict a motion for judgment as a matter of law made at the close of evidence does not prevent our review of an "issue [that] does not concern the sufficiency of the evidence presented to the jury.").

Erickson Prods. v. Kast, 921 F.3d 822

marginally more attractive or presentable, then the requirement of a causal link would be erased. Erickson does not argue the photographs were anything more, at best, than an "added benefit" to visitors of Kast's website, so the infringement did not confer a direct financial benefit on Kast as a matter of law. *See id.*

*b. Avoidance of licensing fees*

Erickson claims "Kast enjoyed a direct [financial] benefit from the illegal copying of Erickson's works by avoiding the license fees he would have otherwise been required to pay[.]" Whether a vicarious infringer's avoidance of licensing fees constitutes a direct **[\*\*13]** financial benefit as a matter of law is a question of first impression in this circuit. No other circuit appears to have addressed it, either.[4] We hold that it does not.

As an initial matter, Erickson's avoidance of fees claim cannot be premised on any unlicensed use by Kast of Erickson's copyrighted photographs. That would result in direct liability, a theory the jury rejected. *See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001)* ("[Direct] infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106."). Additionally, to the extent Erickson suggests Kast owed licensing fees as a result of his vicarious infringement, his argument is plainly circular.

Instead, Erickson's argument must be that Kast received a direct financial benefit when Only Websites avoided Erickson's licensing fee. Only Websites surely owed Erickson a licensing fee, and saved money by failing to pay it, but the direct infringer's avoidance of fees alone cannot satisfy the requirement of a direct financial benefit to the vicarious infringer. Otherwise, the requirement of a direct financial benefit **[\*\*14]** would be rendered meaningless, since—at least where, as here, licenses are for sale—a direct infringer necessarily saves money by failing to obtain a license. *See Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1114 (9th Cir. 2000)* ("The existence of a license creates an affirmative defense to a claim of copyright infringement.").

Nor did Kast receive any other direct financial benefit as a result of Only Websites' failure to pay. In some circumstances, a direct infringer's avoidance of fees may prove financially advantageous to a vicarious infringer. For instance, Kast would have benefitted if Only Websites turned its lower costs from fee avoidance into lower prices for its website design services. *See In re Aimster Copyright Litig., 334 F.3d 643, 654 (7th Cir. 2003)*. But **[\*831]** this benefit would not be "direct," since it would reach Kast only incidentally, via Only Websites' intervening decision to cut prices. *See id.* (noting in dicta that a dance hall operator benefitted only indirectly from an orchestra's avoidance of licensing fees). In any event, Erickson never claimed that Only Websites and Kast were able to offer services more cheaply or quickly *because* Only Websites infringed Erickson's copyright.

Erickson's alternative theory that Only Websites avoided the licensing fee in its capacity as Kast's agent, such that **[\*\*15]** Kast himself is liable for its failure to pay, is also unpersuasive. Kast employed Only Websites to develop the website, but the latter's decision to infringe Erickson's copyright would have exceeded the scope of any agency relationship that may have existed between them. *See Restatement (Third) of Agency § 2.02 cmt. h* (illegal or tortious acts exceed the scope of an agency relationship).

Thus, Only Websites' avoidance of licensing fees did not confer a direct financial benefit on Kast as a matter of law.[5]

---

[4] There is no consensus among district courts on this issue. *Compare Oppenheimer v. Allvoices, Inc., No. C 14-00499 LB, 2014 U.S. Dist. LEXIS 80320, 2014 WL 2604033, at \*9 (N.D. Cal. June 10, 2014); Klein & Heuchan, Inc. v. CoStar Realty Info., Inc., No. 8:08-cv-1227-T-30EAJ, 2009 U.S. Dist. LEXIS 136688, 2009 WL 10670735, at \*3 (M.D. Fla. Nov. 25, 2009))* with *Vander Music v. Azteca Int'l Corp.*, No. 2:08-cv-08184-JHN-RCx, 2011 WL 13177301, at \*7 (C.D. Cal. Jan. 21, 2011) (Nguyen, J.); *Thomson v. HMC Grp., No. CV 13-03273 DMG (VBKx), 2014 U.S. Dist. LEXIS 200111, 2014 WL 12589313, at \*4 (C.D. Cal. July 25, 2014); BroadVision Inc. v. Gen. Elec. Co., No. 08 Civ. 1478(WHP), 2009 U.S. Dist. LEXIS 45862, 2009 WL 1392059, at \*4 (S.D.N.Y. May 5, 2009); F. E. L. Publ'ns, Ltd. v. Nat'l Conference of Catholic Bishops, 466 F. Supp. 1034, 1042 (N.D. Ill. 1978)*.

[5] We find the parties' attempts to fit Kast's alleged avoidance of licensing fees into *Ellison*'s "draw" inquiry unmoving. The "draw" inquiry assumes that the financial benefit in question is an increase in potential customers on the vicarious infringer's website or

**EXHIBIT 43**

EXHIBIT 22

Erickson Prods. v. Kast, 921 F.3d 822

*c. The "rush" completion of the website*

Finally, Erickson contends Kast received a direct financial benefit because the photographs enabled Kast to "rush" the launch of his website. Indeed, Kast conceded that he "rushed" the site out before it was finished in order to seek appointment to manage certain estates. But Kast received no money, clients, business inquiries, or website visitors by rushing the website's completion before removing Erickson's photos. Erickson never explained how using the photos allowed Kast to launch the website more quickly, or how the rushed launch enabled him to realize any profits at all. Thus, the alleged rush conferred no financial benefit on Kast at all and fails as a matter of law. *See* **[\*\*16]** *Ellison, 357 F.3d at 1079*.

## II. The Contributory Liability Verdict

The jury also found that Kast contributorily infringed Erickson's copyright. A party engages in contributory copyright infringement when it "(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *VHT, 918 F.3d at 745* (citing *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n, 494 F.3d 788, 795 (9th Cir. 2007))*. On appeal, Kast challenges the jury instructions on the contributory liability claim.[6] We find his argument unpersuasive and affirm the contributory liability verdict.

Kast claims the trial judge erred by instructing the jury that "knowledge" for contributory infringement purposes includes having a "reason to know" of the infringement. According to Kast, only "actual knowledge" or "willful blindness" are sufficient.

Preliminarily, we note that Kast raised this issue for the first time in his supplemental opening brief, with the assistance of pro bono counsel. This argument exceeds the scope of the issues pro bono counsel was instructed to brief and argue.  **[\*832]**  Kast himself did not object to this element of the jury instructions, so we ordinarily would not address it. *See Galvan v. Alaska Dep't of Corr., 397 F.3d 1198, 1204 (9th Cir. 2005)* ("Courts generally do not decide issues not raised by the parties.").

However, even if we were to reach this **[\*\*17]**  issue, we would still uphold the contributory liability verdict. Kast did not raise this objection at trial, so it is reviewed for plain error.[7] "[I]n the civil context . . . plain errors should 'encompass only those errors that reach the pinnacle of fault envisioned by [the plain error standard].'" *C.B. v. City of Sonora, 769 F.3d 1005, 1018 (9th Cir. 2014)* (quoting *Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1193 (9th Cir. 2002)* (internal alterations omitted)).

Here, even if the "should have known" instruction was erroneous, the error was not plain. Inconsistency in our case law on the "knowledge" element of contributory liability precludes a finding of plain error. For instance, in *Luvdarts, LLC v. AT & T Mobility, LLC, 710 F.3d 1068, 1072-73 (9th Cir. 2013)*, we held that "actual knowledge of specific acts of infringement" and "[w]illful blindness of specific facts" are the only two mental states that satisfy the "knowledge" element of contributory infringement. *Id.* But in *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., 658 F.3d 936,*

---

[6] Kast also claims insufficient evidence supports the contributory liability verdict. As with all his other sufficiency of the evidence challenges, this argument is waived. *See Nitco, 491 F.3d at 1089*.

[7] Erickson's claim that Kast waived even plain error review of this jury instruction is incorrect. Erickson is right that both parties stipulated to the relevant instruction. However, merely submitting an erroneous instruction does not waive a later challenge, so long as there is no evidence that the appellant considered and rejected a correct instruction "for some tactical or other reason." *See United States v. Perez, 116 F.3d 840, 845-46 (9th Cir. 1997)*; *see also Crowley v. Epicept Corp., 883 F.3d 739, 748 (9th Cir. 2018)*. Here, there is no such evidence.

in his place of business. By contrast, the supposed benefit of avoiding a licensing fee does not depend on how many people visit the website or buy anything when they are there.

EXHIBIT 43                                                                     EXHIBIT 22

Erickson Prods. v. Kast, 921 F.3d 822

*943 (9th Cir. 2011)*, we cited with approval a "know or have reason to know" instruction for contributory liability. *Id.* (citing *Napster, 239 F.3d at 1020*). Neither case is close to Kast's on the facts.[8] While *Luvdarts* was decided after *Louis Vuitton*, it did not explicitly overrule it. And both cases were decided several years after *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005)*, the case in which Kast claims the Supreme Court settled the matter in favor of an "actual knowledge" requirement. **[**18]** Without resolving the apparent tension between *Luvdarts* and *Louis Vuitton*, we hold that Kast has not demonstrated that the jury instructions were plainly erroneous.

Nor are we persuaded by Kast's other arguments against the contributory liability jury instructions. Kast challenges the instruction requiring the jury to find that "Only Websites did not have permission to copy or publish copies of [Erickson's] Photos and thus infringed [Erickson's] copyrights by doing so[.]" He insists this instruction "ask[ed] the jury to make a finding not in evidence." Kast failed to object to this instruction below, and, in any case, he is wrong on the merits. The parties stipulated that Only Websites designed the infringing website, which "included unauthorized copies of [Erickson's] Photos" copied from Wells Fargo's website. And Erickson elicited unrefuted testimony that neither Only Websites nor Kast had permission to use the photos. Thus, these facts were in evidence.

### [*833]  III. The Willfulness Finding

The jury also found Kast's vicarious and contributory infringement were willful. Kast claims the district court erred when it instructed the jury that it could find that Kast's **[**19]** infringement was willful if Kast "should have known that [his] acts infringed plaintiffs' copyright." We agree and remand the issue of willfulness to the district court on the existing record.

#### a. Whether the willfulness instruction was erroneous

The jury's willfulness finding is relevant to its award of statutory damages. Absent a finding of willfulness, the jury may award statutory damages "in a sum of not less than $750 or more than $30,000" per work infringed. *17 U.S.C. § 504(c)(1)*. However, if the copyright owner proves that the infringement was "willful," the court may increase the statutory damage award to $150,000 per work infringed. *Id. § 504(c)(2)*.

At Kast's trial, the judge instructed the jury: "Infringement is considered willful when . . . (1) the defendant knew that those acts infringed plaintiffs' copyrights; or, (2) the defendant *should have known* that those acts infringed plaintiffs' copyright; or, (3) the defendant engaged in conduct that was reckless or demonstrated a reckless disregard for plaintiffs' copyrights." The jury found that Kast's contributory and vicarious infringement was willful and awarded Erickson $450,000 in statutory damages. Had the jury not made this finding, Erickson's statutory **[**20]** damages could not have exceeded $90,000.

"A determination of willfulness requires an assessment of a defendant's state of mind." *Friedman v. Live Nation Merch., Inc., 833 F.3d 1180, 1186 (9th Cir. 2016)*. "[T]o prove willfulness under the *Copyright Act*, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *Unicolors, Inc. v. Urban Outfitters, Inc., 853 F.3d 980, 991 (9th Cir. 2017)* (quoting *Wash. Shoe Co. v. A-Z Sporting Goods, Inc., 704 F.3d 668, 674 (9th Cir. 2012))* (alteration in original).

A "should have known" instruction does not fit within this framework because it is a negligence standard. To say that a defendant "should have known" of a risk, but did not know of it, is to say that he or she was "negligent" as to that

---

[8] In *Luvdarts*, the alleged contributory infringer was a wireless carrier whose network was used to send infringing multimedia content, *see 710 F.3d at 1070*, while in *Louis Vuitton*, it was a company that hosted websites that sold infringing goods, *see 658 F.3d at 940*.

EXHIBIT 43                                                                                                    EXHIBIT 22

Erickson Prods. v. Kast, 921 F.3d 822

risk. *See Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 770, 131 S. Ct. 2060, 179 L. Ed. 2d 1167 (2011)*; *see also BMG Rights Mgmt. (US) LCC v. Cox Commc'ns, Inc., 881 F.3d 293, 310 (4th Cir. 2018)* ("The formulation 'should have known' reflects negligence"); *Swinton v. Potomac Corp., 270 F.3d 794, 803 (9th Cir. 2001)* (noting that "should have known" is a negligence standard).

Negligence is a less culpable mental state than actual knowledge, willful blindness, or recklessness, the three mental states that properly support a finding of willfulness. *See Global-Tech Appliances, 563 U.S. at 770; Unicolors, 853 F.3d at 992*. "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. By **[\*\*21]** contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, and a negligent defendant is one who should have known of a similar risk but, in fact, did not." *Global-Tech Appliances, 563 U.S. at 769-70* (citations omitted). Thus, Kast is correct that the judge permitted the jury to find willfulness on the **[\*834]** basis of a lesser mental state than our cases demand.[9]

Erickson's alternative interpretation of the jury instructions is unpersuasive. Erickson claims that an infringer who "should have known" of the infringing activity has "constructive knowledge" of the infringement, and that constructive knowledge is sufficient for willfulness.

Erickson is correct that a "should have known" instruction conveys the concept of "constructive knowledge." *See Knowledge*, Black's Law Dictionary (10th ed. 2014) ("Constructive knowledge" is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person."). The problem for Erickson is that "constructive knowledge" is distinct from, and less culpable than, any of the mental states that support a finding of willfulness. Erickson cites extensively from non-binding, out-of-circuit, and **[\*\*22]** district court authorities indicating that constructive knowledge can support a willfulness finding, but all are incompatible with our repeated requirement of actual knowledge, willful blindness, or recklessness.[10] We have never held merely negligent conduct to be willful, and we decline to do so now.

*b. Whether the error requires reversal*

The erroneous willfulness instruction was likely prejudicial to Kast, so remand is required. *See Chuman, 76 F.3d at 294*. While the evidence may have established that Kast was negligent, it is much less clear that it established recklessness, willful blindness, or actual knowledge. Kast presented evidence that he did not know Only Websites was or might be infringing. Kast's contract with Only Websites suggests that Kast reasonably believed it was Only Websites' responsibility to obtain licenses for Erickson's photos. *See VHT, 918 F.3d at 748* ("[C]ontinued use of a

---

[9] The jury instruction was phrased in the disjunctive, that is, the jury was asked whether Kast "knew" of, should have known of, *or* was reckless with regard to Only Websites' infringement. Thus, implicit in a finding under the "should have known" prong would be a conclusion that Kast did not, in fact, know of the risk or fact of infringement. *See Global-Tech Appliances, 563 U.S. at 770* (explaining that a negligent defendant, by definition, does not know of a risk).

[10] Erickson relies heavily on our "see also" citation, in *Washington Shoe*, to a statement by a New York district court: "[t]o prove willfulness, plaintiffs must show that the infringer had actual *or constructive knowledge* that it was infringing the plaintiffs' copyrights or else acted in reckless disregard of the high probability that it was infringing plaintiffs' copyrights." *See Wash. Shoe, 704 F.3d at 674* (citing *Arclightz & Films Pvt. Ltd. v. Video Palace Inc., 303 F. Supp. 2d 356, 361-62 (S.D.N.Y. 2003)* (emphasis added)). This oblique citation does not state the law of this circuit. It is dicta. *Washington Shoe* analyzed the infringer's willfulness in the context of determining whether the infringer "expressly aimed . . . an intentional act" at the State of Washington, for purposes of personal jurisdiction. *See Wash. Shoe, 704 F.3d at 673-74* (citing *Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1228 (9th Cir. 2011))*. The question of statutory damages was not before the court. It is doubly dicta because the *Washington Shoe* defendant's willful infringement was based on actual, not constructive, knowledge of infringing activity. *See 704 F.3d at 675*. In fact, in the sentence to which the citation to *Arclightz* is appended, we stated a requirement that the defendant be "actually aware" of the infringement or have acted with reckless disregard for or willful blindness to the copyright holder's rights. *See id. at 674* (citing *Louis Vuitton, 658 F.3d at 944*).

EXHIBIT 43 EXHIBIT 22

Erickson Prods. v. Kast, 921 F.3d 822

work even after one has been notified of his or her alleged infringement does not constitute willfulness so long as one believes reasonably, and in good faith, that he or she is not infringing." (citing *Evergreen Safety Council v. RSA Network Inc., 697 F.3d 1221, 1228 (9th Cir. 2012))*. Several of Kast's other actions also **[\*\*23]** suggest **[\*835]** that he was not reckless with respect to Erickson's rights: he obtained licenses for the photos that he supplied to Only Websites, and promptly removed the infringing photos when Erickson asked. If the jury had been properly instructed, it might well have refused to find Kast willful on this record.

We are unpersuaded by Erickson's contention that the jury's contributory infringement verdict indicates that the jury would have found willfulness even without the "should have known" instruction. Erickson claims that a contributory infringer has "knowledge" of the direct infringer's conduct if he "know[s] or ha[s] reason to know" of the direct infringement. *See Louis Vuitton, 658 F.3d at 943* (citing *Napster, 239 F.3d at 1020*). Erickson contends that, if Kast had "knowledge" for purposes of contributory infringement, then he had "knowledge" for purposes of the willfulness inquiry. However, a "knew or had reason to know" instruction could be satisfied by a negligence finding via its second prong, so the contributory infringement finding does not necessarily mean the jury would have found that Kast was actually aware of, or willfully blind or reckless with respect to, Only Websites' infringement. In any case, *Louis Vuitton* is inapposite **[\*\*24]** because it addressed a contributory infringer with actual, rather than constructive, knowledge. *See id. at 944*.

Accordingly, we remand the issue of willfulness to the district court. We disagree with Kast's claim that "the record permits only one resolution of the factual issue" of willfulness, *see Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S. Ct. 1781, 72 L. Ed. 2d 66 (1982)*, and decline his invitation to enter judgment in his favor.

## IV. Kast's Remaining Evidentiary and Procedural Arguments

Kast makes several additional evidentiary and procedural arguments, primarily in his pro se briefs. We summarize these below. None are persuasive.

Kast claims he was an improper defendant because "Erickson should have sued Atherton, not Kast." Even if Atherton Trust is also liable for the infringement, Kast would be jointly and severally liable, so he is a proper defendant. *See Range Road Music, Inc. v. E. Coast Foods, Inc., 668 F.3d 1148, 1151, 1155 (9th Cir. 2012)* (imposing joint and several liability in copyright infringement case on corporate entity and its sole officer and director).

Kast also argues that the district court made numerous discovery and evidentiary errors, including that it should have excluded information about Kast's finances, it permitted Erickson to withhold evidence relating to his finances, and it permitted Erickson to introduce improper character **[\*\*25]** evidence. None of these alleged errors call for reversal. For instance, Erickson's questions regarding Kast's finances explored the ownership of various businesses and trusts, not his personal wealth. Because such questions arguably related to both vicarious liability and willfulness, *see Amazon, 508 F.3d at 1173* (requiring control for vicarious liability); *Castle Rock Entm't v. Carol Publ'g Grp., Inc., 955 F. Supp. 260, 267 (S.D.N.Y. 1997)* (considering whether "the defendants are sophisticated" in determining willfulness), allowing it was not an abuse of discretion. Likewise, although Kast points to billing line items to suggest that Erickson withheld evidence, nothing suggests any documents resulted from those communications. Finally, even assuming Erickson's prior-relationship questioning was improper, Kast fails to show that this error—or, in fact, any of the **[\*836]** other alleged evidentiary errors—was prejudicial. *Kulas, 255 F.3d at 783*.

### CONCLUSION

We vacate the jury's finding of vicarious liability. We affirm the jury's finding of contributory liability and therefore affirm the judgment. *See Hopkins v. Dow Corning Corp., 33 F.3d 1116, 1119, 1126, 1128 (9th Cir. 1994)* (affirming judgment because jury's verdict on at least one theory of liability was upheld); *DeWitt v. W. Pac. R.R. Co., 719 F.2d 1448, 1451*

**EXHIBIT 43**

EXHIBIT 22

Erickson Prods. v. Kast, 921 F.3d 822

*(9th Cir. 1983)* (same). We reverse the jury's finding of willfulness and remand the issue of statutory damages to the trial court.

**AFFIRMED IN PART, [\*\*26]  REVERSED IN PART, AND REMANDED. EACH PARTY TO BEAR ITS OWN COSTS**.

---

**End of Document**

EXHIBIT 43                                                    EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

# *Harte-Hanks Communications v. Connaughton*

Supreme Court of the United States

March 20, 1989, Argued ; June 22, 1989, Decided

No. 88-10

**Reporter**

491 U.S. 657 *; 109 S. Ct. 2678 **; 105 L. Ed. 2d 562 ***; 1989 U.S. LEXIS 3133 ****; 57 U.S.L.W. 4846; 16 Media L. Rep. 1881

HARTE-HANKS COMMUNICATIONS, INC. v. CONNAUGHTON

**Prior History:** **[****1]** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

**Disposition:** *842 F. 2d 825*, affirmed.

## Case Summary

**Procedural Posture**
Following a jury verdict in the district court in favor of respondent judicial candidate in his action for libel against petitioner newspaper, the United States Court of Appeals for the Sixth Circuit affirmed. The newspaper petitioned for review.

**Overview**
A judicial candidate won a judgment against a newspaper for libel after the paper published a story alleging that he acted unethically, lied, and extorted witnesses. The appellate court affirmed. On final appeal, the Supreme Court affirmed, holding that the appellate court applied the correct substantive legal standard in reviewing the action because its opinion ultimately rested on a finding of the paper's reckless disregard for the truth and actual malice. The appellate court properly conducted its review independently of the jury's verdict, and determined that the record supported the finding of actual malice where testimony proved that the paper purposely avoided the truth when it published the story based on the allegations of a single source without verifying her claims against the taped interview of another key source, and that it intentionally ignored the contrary assertions of other witnesses and the candidate's denials. Further, a conclusion of actual malice logically followed the jury's rejection of testimony by the paper's witnesses as to their reasons for failing to corroborate the allegations.

**Outcome**
The Supreme Court affirmed the appellate court's decision, which upheld the judgment against the newspaper for libel.

## Syllabus

Respondent was the unsuccessful challenger for the position of Municipal Judge of Hamilton, Ohio, in an election conducted on November 8, 1983.  A local newspaper, the Journal News, published by petitioner supported the reelection of the incumbent. A little over a month before the election, the incumbent's Director of Court Services resigned and was arrested on bribery charges, and a grand jury investigation of those charges was in progress on November 1, 1983.  On that day, the Journal News ran a front-page story quoting a grand jury witness (Thompson) as stating that respondent had used "dirty tricks" and offered her and her sister jobs and a trip to Florida "in appreciation" for their help in the investigation.  Respondent filed a diversity action against petitioner for libel in Federal

EXHIBIT 43                                                          EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

District Court, alleging that the story was false, had damaged his personal and professional reputation, and had been published with actual malice. After listening to six days of testimony and three taped interviews -- one conducted by respondent and two by Journal News reporters **[****2]** -- and reviewing the contents of 56 exhibits, the jury was given instructions defining the elements of public figure libel and directed to answer three special verdicts. It found by a preponderance of the evidence that the story in question was defamatory and false, and by clear and convincing proof that the story was published with actual malice, and awarded respondent $ 5,000 in compensatory damages and $ 195,000 in punitive damages. The Court of Appeals affirmed. It separately considered the evidence supporting each of the jury's special verdicts, concluding that neither the finding that the story was defamatory nor the finding that it was false was clearly erroneous. In considering the actual malice issue, but without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice, the court identified 11 subsidiary facts that the jury "could have" found and held that such findings would not have been clearly erroneous, and, based on its independent review, that when considered cumulatively they provided clear and convincing evidence of actual malice.

*Held:*

 **[****3]** 1. A showing of "'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers'" cannot alone support a verdict in favor of a public figure plaintiff in a libel action. Rather, such a plaintiff must prove by clear and convincing evidence that the defendant published the false and defamatory material with actual malice, *i. e.*, with knowledge of falsity or with a reckless disregard for the truth. Although there is language in the Court of Appeals' opinion suggesting that it applied the less severe professional standards rule, when read as a whole, it is clear that this language is merely supportive of the court's ultimate conclusion that the Journal News acted with actual malice. Pp. 663-668.

2. A reviewing court in a public figure libel case must "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity" to ensure that the verdict is consistent with the constitutional standard set out in *New York Times Co. v. Sullivan, 376 U.S. 254*, and subsequent decisions. See *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485.* **[****4]** Based on this Court's review of the entire record, the Court of Appeals properly held that the evidence did in fact support a finding of actual malice, but it should have taken a somewhat different approach in reaching that result. While the jury *may* have found each of the 11 subsidiary facts, the case should have been decided on a less speculative ground. Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Thompson's sister, the most important witness to the bribery charges against the Director of Court Services, was not contacted simply because respondent failed to place her in touch with the newspaper; (2) the testimony of the editorial director of the Journal News that he did not listen to the taped interviews simply because he thought that they would provide him with no new information; and (3) the testimony of Journal News employees who asserted that they believed Thompson's allegations were substantially true. When those findings are considered alongside the undisputed evidence, **[****5]** the conclusion that the newspaper acted with actual malice inexorably follows. The evidence in the record in this case, when reviewed in its entirety, is "unmistakably" sufficient to support a finding of actual malice. Pp. 685-693.

**Counsel:** Lee Levine argued the cause for petitioner. With him on the briefs were Richard L. Creighton, Jr., Kevin E. Irwin, Michael D. Sullivan, and James E. Grossberg.

John A. Lloyd, Jr., argued the cause for respondent. With him on the brief were Sallie Conley Lux and Jeanette H. Rost. *

---

*A brief of *amici curiae* urging reversal was filed for the Associated Press et al. by *P. Cameron DeVore, Daniel M. Waggoner, Douglas P. Jacobs, Alice N. Lucan, Mark L. Tuft, Harvey L. Lipton, Jeffrey N. Paule, Lois J. Schiffer, Robert D. Sack, E. Susan Garsh, William A. Niese, Deborah R. Linfield, Samuel E. Klein, W. Terry Maguire, Rene P. Milam, Richard M. Schmidt, Roslyn A. Mazer, Lawrence Gunnels, Steven R. Shapiro, Robert J. Brinkmann, J. Laurent Scharff, Jane Kirtley*, and *Bruce W. Sanford*.

EXHIBIT 43

EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

**Judges:** Stevens, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Brennan, White, Marshall, Blackmun, O'Connor, and Kennedy, JJ., joined.  White, J.,  **[****6]**  filed a concurring opinion, in which Rehnquist, C. J., joined, post, p. 694.  Blackmun, J., post, p. 694, and Kennedy, J., post, p. 696, filed concurring opinions. Scalia, J., filed an opinion concurring in the judgment, post, p. 696.

**Opinion by:** STEVENS

# Opinion

 **[\*659]   [\*\*\*571]   [\*\*2681]**  JUSTICE STEVENS delivered the opinion of the Court.

 [1A] [2A]A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false "statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964)*. See *Curtis Publishing Co. v. Butts, 388 U.S. 130, 162 (1967)* (opinion of Warren, C. J.).  In *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485 (1984)*, we held that judges in such cases have a constitutional duty to "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Id.,  [\*\*2682]  at 514*. In this case the Court of Appeals affirmed a libel judgment **[****7]**  against a newspaper without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice. We  **[\*\*\*572]**  granted certiorari to consider whether the Court of Appeals' analysis was consistent with our holding in *Bose.  488 U.S. 907 (1988)*.

 **[\*660]**  I

Respondent, Daniel Connaughton, was the unsuccessful candidate for the office of Municipal Judge of Hamilton, Ohio, in an election conducted on November 8, 1983.  Petitioner is the publisher of the Journal News, a local newspaper that supported the reelection of the incumbent, James Dolan.  A little over a month before the election, the incumbent's Director of Court Services resigned and was arrested on bribery charges.  A grand jury investigation of those charges was in progress on November 1, 1983.  On that date, the Journal News ran a front-page story quoting Alice Thompson, a grand jury witness, as stating that Connaughton had used "dirty tricks" and offered her and her sister jobs and a trip to Florida "in appreciation" for their help in the investigation.

 [3A]Invoking the federal court's diversity **[****8]**  jurisdiction, Connaughton filed an action for damages, alleging that the article was false, that it had damaged his personal and professional reputation, and that it had been published with actual malice. After discovery, petitioner filed a motion for summary judgment relying in part on an argument that even if Thompson's statements were false, the *First Amendment* protects the accurate and disinterested reporting of serious charges against a public figure. The District Court denied the motion, noting that the evidence raised an issue of fact as to the newspaper's interest in objective reporting and that the "neutral reportage doctrine" did not apply to Thompson's statements. [1] The case accordingly proceeded to trial.

 [3B]

---

[1] The District Court explained that the neutral reportage doctrine, as defined by the Ohio Court of Appeals, see *J. V. Peters & Co. v. Knight Ridder Co., 10 Media L. Rptr. 1576 (1984)*, and the United States Court of Appeals for the Second Circuit, see *Edwards v. National Audubon Society, Inc., 556 F. 2d 113*, cert. denied, **434 U.S. 1002 (1977)**, "immunizes from liability the accurate and disinterested reporting of serious charges made against a public figure by a responsible, prominent organization." App. to Pet. for Cert. 78a.  Because the court was convinced that Thompson did not qualify as "a responsible, prominent organization on a par with the State Attorney General's Office in *J. V. Peters* or the National Audubon Society in *Edwards,*" it concluded that the defense was unavailable.  *Ibid.*

Petitioner did not argue in its petition for a writ of certiorari, and does not now argue, that the neutral reportage doctrine immunized its coverage of Thompson's allegations.  Accordingly, we do not review this aspect of the District Court's judgment.

EXHIBIT 43                                                                    EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

 **[****9]**  **[*661]**  After listening to six days of testimony and three taped interviews -- one conducted by Connaughton and two by Journal News reporters -- and reviewing the contents of 56 exhibits, the jury was given succinct instructions accurately defining the elements of public figure libel and directed to answer three special verdicts. [2] It **[**2683]** unanimously found by a **[***573]** preponderance of the evidence that the November 1 story was defamatory and that it was false.  It also found by clear and convincing proof that the story was published with actual malice. After a separate hearing on damages, the jury awarded Connaughton $ 5,000 in compensatory damages and $ 195,000 in punitive damages.  Thereafter, the District Court denied a motion for judgment notwithstanding the verdict, App. to Pet. for Cert. 83a, and petitioner appealed.

 **[****10]**  **[*662]**  The Court of Appeals affirmed.  *842 F. 2d 825 (CA6 1988)*. In a lengthy opinion, the majority detailed why its "independent examination of the entire record" had demonstrated that "the judgment does not pose a forbidden intrusion into the *First Amendment* rights of free expression." *Id., at 828*. The opinion identified the "core issue" as "simply one of credibility to be attached to the witnesses appearing on behalf of the respective parties and the reasonableness and probability assigned to their testimony." *Id., at 839-840*. It separately considered the evidence supporting each of the jury's special verdicts, concluding that neither the finding that the article was defamatory [3] **[****11]**  nor the finding that it was false [4] was clearly erroneous.

 **[****12]**  The Court of Appeals' review of the actual malice determination involved four steps.  It first noted the wide disparity between the respective parties' versions of the critical evidence, pointing out that if the jury had credited petitioner's evidence it "could have easily concluded that Thompson's **[*663]** charges were true and/or that the *Journal*'s conduct in determining Thompson's credibility was not a highly unreasonable departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers." *Id., at 840*. Second, it **[***574]** inferred

---

[2] The jury was asked:

1. "Do you unanimously find by a preponderance of the evidence that the publication in question was defamatory toward the plaintiff?"

2. "Do you unanimously find by a preponderance of the evidence that the publication in question was false?"

3. "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?" App. 201.

There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence.  Compare *Firestone v. Time, Inc., 460 F. 2d 712, 722-723* (CA5) (Bell, J., specially concurring), cert. denied, **409 U.S. 875 (1972)**, with *Goldwater v. Ginzburg, 414 F. 2d 324, 341 (CA2 1969)*, cert. denied, *396 U.S. 1049 (1970)*. See also *Tavoulareas v. Piro, 260 U. S. App. D. C. 39, 63-64, n. 33, 817 F. 2d 762, 786, n. 33* (en banc), cert. denied, **484 U.S. 870 (1987)**; Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, *25 Wm. & Mary L. Rev. 825, 863-865 (1984)*. We express no view on this issue.

[3] The Court of Appeals observed that "the article was defamatory in its implication that Connaughton was an unethical lawyer and an undesirable candidate for the Hamilton Municipal judgeship who was capable of extortion, who was a liar and an opportunist not fit to hold public office, particularly a judgeship." *842 F. 2d, at 840-841*.

[4] As to the finding of falsity, the Court of Appeals wrote:

"Equally apparent from the jury's answer to the second special interrogatory is that it considered the published Thompson charges to be false.  Its finding is understandable in light of the plaintiff's proof which disclosed that the *Journal*'s effort to verify her credibility ended in an avalanche of denials by knowledgeable individuals; [and] its inability to produce a single person who supported Thompson's accusations.  . . .

"Moreover, the jury obviously refused to credit the *Journal*'s construction of Connaughton's interview of October 31.  It accepted Connaughton's express denials of each Thompson charge and considered the significant language interpreted by the *Journal* to constitute his admissions of those charges, when read in context, as nothing more than conjecture elicited by structured questions calculated to evoke speculation.  Thus, upon reviewing the record in its entirety, this court concludes that the jury's determinations of the operational facts bearing upon the falsity of the article in issue were not clearly erroneous." *Id., at 841*.

EXHIBIT 43                                                    EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

from the jury's answers to the three special interrogatories that "it obviously elected to assign greater credibility to the plaintiff's witnesses and proof [and that] the jury simply did not believe the defendants' witnesses, its evidentiary presentations or its arguments." *Ibid.* Third, having considered what it regarded as the "subsidiary or operative facts" that constituted the plaintiff's theory of the case, it concluded that the jury's findings concerning those operative facts were not clearly erroneous. *Id., at 843-844*. Fourth, "in **[****13]** the exercise of its independent judgment" based on its evaluation of the "cumulative impact of the subsidiary facts," the court concluded that "Connaughton proved, by clear and convincing evidence, that the *Journal* demonstrated its actual malice when it published the November 1, 1983, article despite the existence of serious doubt which attached to Thompson's veracity and the accuracy of her reports." *Id., at 846*.

Judge Guy dissented.  In his opinion the admissions made by Connaughton in his **[**2684]** interview with Journal News reporters the day before the story was published sufficiently corroborated Thompson's charges to preclude a finding of actual malice. *Id., at 853-854*. He was satisfied, as a matter of law, that respondent had failed to prove actual malice by clear and convincing evidence, regardless of whether determinations of credibility made by the jury are subject to a *de novo* standard of review. *Id., at 855*.

II

Petitioner contends that the Court of Appeals made two basic errors.  First, while correctly stating the actual malice standard announced in *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, **[****14]** the court actually applied a less severe **[*664]** standard that merely required a showing of "'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'" *842 F. 2d, at 845* (quoting *Curtis Publishing Co. v. Butts, 388 U.S., at 155* (opinion of Harlan, J.)).  Second, the court failed to make an independent *de novo* review of the entire record and therefore incorrectly relied on subsidiary facts implicitly established by the jury's verdict instead of drawing its own inferences from the evidence.

There is language in the Court of Appeals' opinion that supports petitioner's first contention.  For example, the Court of Appeals did expressly state that the Journal News' decision to publish Alice Thompson's allegations constituted an extreme departure from professional standards. [5] **[****16]** Moreover, the opinion attributes **[***575]** considerable weight to the evidence that the Journal News was motivated by its interest in the reelection of the candidate it supported and its economic interest in gaining a competitive advantage over **[****15]** the Cincinnati **[*665]** Enquirer, its bitter rival in the local market. [6] **[**2685]** Petitioner is plainly correct in recognizing that a public figure plaintiff

---

[5] The Court of Appeals wrote:

"In *Curtis Publishing Co.* v. *Butts*, the Supreme Court accorded public figures as well as public officials recovery of damages for the publication of 'defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' *388 U.S. at 155*." *Id., at 845*.

At another point, the court wrote:

"Accordingly, this court concludes that the *Journal*'s decision to rely on Thompson's highly questionable and condemning allegations without first verifying those accusations through her sister, [Stephens], and without independent supporting evidence constituted *an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers* which demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. *Butts, 388 U.S. at 153*." *Id., at 847* (emphasis supplied).

See also *id., at 840*.

[6] As to the newspaper's motives, the Court of Appeals asserted:

"A review of the entire record of the instant case discloses substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of [the incumbent] and prejudiced against Connaughton as evidenced by the

EXHIBIT 43                                                                     EXHIBIT  23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

must prove more than an extreme departure from professional standards and that a newspaper's motive in publishing a story -- whether to promote an opponent's candidacy or to increase its circulation -- cannot provide a sufficient basis for finding actual malice.

 [****17]   [1B]The language in the Court of Appeals' opinion discussing professional standards is taken from Justice Harlan's plurality opinion in *Curtis Publishing Co. v. Butts, supra, at 155*.In that case, Justice Harlan had opined that the *New York Times* actual malice standard should be reserved for cases brought by public officials.  The *New York Times* decision, in his view, was primarily driven by the repugnance of seditious libel and a concern that public official libel "lay close" to  **[*666]**  this universally renounced, and long-defunct, doctrine.  *388 U.S., at 153*. In place of the actual malice standard, Justice Harlan suggested that a public figure need only make "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Id., at 155*. This proposed standard, however, was emphatically rejected by a majority of the Court in favor of the stricter *New York Times* actual malice rule.  See *388 U.S., at 162* (opinion of Warren, C. J.); *id., at 170* **[****18]**  (Black, J., dissenting); *id., at 172* (Brennan, J., dissenting).  Moreover,  **[***576]**  just four years later, Justice Harlan acquiesced in application of the actual malice standard in public figure cases, see *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 69-70 (1971)* (dissenting opinion), and by the time of the Court's decision in *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)*, the Court was apparently unanimously of this view.  Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court.

 [4A]It also is worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. [7] See *Beckley  [*667]  Newspapers Corp. v. Hanks, 389 U.S. 81 (1967)**(per curiam); Henry v. Collins, 380 U.S. 356 (1965)**(per curiam)*.  Indeed, just last Term we unanimously held that a public figure "may not recover for the tort **[****19]**  of intentional infliction of emotional distress . . . without showing . . . that the publication contains a false statement of fact which was made . . . with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 56 (1988)*.

---

confidential personal relationship that existed between [the incumbent] and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by [the incumbent] from the *Journal* as compared with the equally consistent unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer*'s initial expose of the questionable operation of the [incumbent's] court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the . . . campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area." *Id., at 843*.

Later in the opinion, the court again stressed that "the evidence adduced at trial demonstrated that the *Journal* was motivated to publicize Thompson's allegations, not only by a desire to establish its preeminence in the reporting of Hamilton political news, but also by a desire to aid the [incumbent's] campaign." *Id., at 846*.

[7] The trial judge correctly instructed the jury that "[a]ctual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure on the part of the writer." App. 199.

The phrase "actual malice" is unfortunately confusing in that it has nothing to do with bad motive or ill will.  See *Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52, n. 18 (1971)* (opinion of Brennan, J.).  By instructing the jury "in plain English" at appropriate times during the course of the trial concerning the not-so-plain meaning of this phrase, the trial judge can help ensure that the *New York Times* standard is properly applied.  *Tavoulareas, 260 U. S. App. D. C., at 84, 817 F. 2d, at 807* (R. B. Ginsburg, J., concurring).  See also **Westmoreland v. CBS Inc., 596 F. Supp. 1170, 1172-1173, n. 1 (SDNY 1984)** (suggesting that jury confusion can be minimized if a less confusing phrase, such as "state-of-mind," "deliberate or reckless falsity," or "constitutional limitation" is used in the jury's presence).

**EXHIBIT 43**                       **EXHIBIT 23**

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice. The allegedly defamatory statements at issue in the *New York Times* case were themselves published as part of a paid advertisement. **[\*\*2686]** *376 U.S., at 265-266*. If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels. Actual malice, instead, requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," *St. Amant v. Thompson, 390 U.S. 727, 730 (1968)*, we have **[\*\*\*\*20]** made clear that the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity," *Garrison v. Louisiana, 379 U.S. 64, 74 (1964)*, or must have "entertained serious doubts as to the truth of his publication," *St. Amant, supra, at 731*.

[4B]

**[\*\*\*\*21]** [5][6]Certain statements in the **[\*\*\*577]** Court of Appeals' opinion, when read in isolation, appear to indicate that the court at times substituted the professional standards rule for the actual malice requirement and at other times inferred actual malice from the newspaper's motive in publishing Thompson's story. Nevertheless, when the opinion is read as a whole, it is clear that the conclusion concerning the newspaper's departure **[\*668]** from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury." *842 F. 2d, at 847*. Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, see *Herbert v. Lando, 441 U.S. 153, 160 (1979)*;*Tavoulareas v. Piro, 260 U. S. App. D. C. 39, 66, 817 F. 2d 762, 789* (en banc), cert. denied, *484 U.S. 870 (1987)*, **[\*\*\*\*22]** and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry. Thus, we are satisfied that the Court of Appeals judged the case by the correct substantive standard.

The question whether the Court of Appeals gave undue weight to the jury's findings -- whether it failed to conduct the kind of independent review mandated by our opinion in *Bose* -- requires more careful consideration. A proper answer to that question must be prefaced by additional comment on some of the important conflicts in the evidence.

III

The most important witness to the bribery charges against the Director of Court Services was Patsy Stephens, Alice Thompson's older sister. In a tape-recorded interview conducted in Connaughton's home between 12:30 and 4:30 a.m. on September 17, 1983, Stephens explained how, on 40 or 50 occasions, she had visited with the Court Administrator, Billy Joe New, in his office and made cash payments to dispose of "DUI" and other minor criminal charges against her former husband and various other relatives and acquaintances. [8] On September 22, pursuant to an arrangement **[\*669]** made by Connaughton at the suggestion of the county **[\*\*\*\*23]** prosecutor, Stephens took a lie detector test. After learning that she **[\*\*2687]** had passed the test, Connaughton filed a written complaint against New. In due course, New was arrested, indicted, and convicted.

---

[8] Early in September Connaughton's wife Martha was advised that Patsy Stephens was willing to disclose important information about the special treatment her former husband had received in the Hamilton Municipal Court. The source of this advice was the president of the local chapter of Mothers Against Drunk Driving. Martha Connaughton and her brother then visited with Patsy Stephens in her mother's home for about 30 minutes and arranged for a later interview with Connaughton. Alice Thompson was present at a part of that meeting, as well as at the subsequent interview. Shortly before midnight on September 16, after Patsy Stephens and Alice Thompson had returned home from work, two of Connaughton's supporters (Berry and Cox) picked the two sisters up and drove them to Connaughton's home where they remained until about 4:30 a.m. on September 17.

EXHIBIT 43                                                                                    EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

[****24]   Alice Thompson was one of the eight persons present at the tape-recorded interview on September [***578]  17. [9]  One of the cases Patsy Stephens described was a shoplifting charge against her sister. Thompson volunteered some comments about the incident, but otherwise had little to say during the long interview with Stephens.  Thompson was also present on the 22d, when Stephens took the polygraph test, but Thompson declined to submit to such a test.  App. 301.  On that day, the two sisters spent several hours in the company of Connaughton, his wife, and two of his supporters.  They discussed a number of subjects, including the fact that Billy Joe New had just resigned, the question whether there was reason to be concerned about the safety of the two sisters, the fact that Martha Connaughton might open an ice cream parlor sometime in the future, the possibility that the two sisters might be employed there as waitresses, and a vacation in Florida planned by the Connaughtons for after the election.

[****25]   [*670]   Late in October, New's lawyer, Henry Masana, met with Jim Blount, the editorial director of the Journal News, and Joe Cocozzo, the newspaper's publisher, to arrange a meeting with Alice Thompson.  Masana explained that Thompson wanted to be interviewed about the "dirty tricks" Connaughton was using in his campaign. Thereafter, on October 27, Blount and Pam Long, a Journal News reporter, met with Thompson in the lawyer's office and tape-recorded the first of the two interviews that provided the basis for the story that Long wrote and the Journal News published on November 1.

The tape of Alice Thompson's interview is 1 hour and 20 minutes long.  Significant portions of it are inaudible or incoherent.  It is clear, however, that Thompson made these specific charges:

-- that Connaughton had stated that his purpose in taping the interview with Patsy Stephens was to get evidence with which he could confront New and Judge Dolan and "scare them into resigning" without making any public use of the tapes; [10] [****27]

[*671]  -- that he would pay the expenses for a 3-week vacation in Florida for the two sisters; [11]

---

[9] The other seven were: Patsy Stephens, Dan and Martha Connaughton, Martha Connaughton's brother Dave Berry, Connaughton's campaign manager, Joe Cox, and two of Connaughton's neighbors, Jeanette and Ernest Barnes.

[10] "A. They started asking me a bunch of questions so I asked Dan Connaughton. . . .  I said why are you doing this. . . .  And of course, he turned off the tape recorder.  And he said, I'll tell you the truth.  He said, all I want is to get enough evidence on Billy, he said, and have Billy resign.  And he said, of course, if Billy resigns, Dolan will resign, and he said, then I can just step up on the bench. . . .  But he said right out of his own mouth, all I want to do is to get a story in evidence on them, to meet them face to face, and show them what evidence he had against him, or whatever, to get them to resign, and no more would be said about it.

. . .

"Q. Okay.  So in other words, based on what he said to you, you believed him?

"A. Blackmail.  I mean, you know, the way he phrased it, the way he said it, you know.  He said all he wanted to do was get enough evidence on Billy, and he also used Dolan's name, which I don't know what he was going to get on Dolan -- to scare them into resigning.  I said what happens when they resign?  Nothing more will be said about anything.  He said when I take the bench nothing will be said." App. 291-292.

[11] "A. . . .  I asked them what I was going to get out of it.

"Q. What did they promise you? Or what did they say when you asked them?

"A. They said my help would be deeply appreciated.  And they went on to talk about the three weeks vacation they was planning on taking when the election was . . .

"Q. He was planning to take three weeks vacation?

"A. Yes, the family -- Dave Berry and Martha, and Dan.

"MR. BLOUNT: They wanted you to go along?

"A. Me and my sister would be welcome to go along with Dave . . .

EXHIBIT 43   EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

-- **[\*\*\*579]**  **[\*\*2688]**  that he would buy a restaurant for the two sisters' parents **[\*\*\*\*26]**  to operate; [12] **[\*\*\*\*28]**

 **[\*672]**  -- that he would provide jobs for both Patsy Stephens and Alice Thompson; [13] **[\*\*\*\*29]**

---

"(By Mrs. Long)

"Q. Did they say they would pay your expenses?

"A. Yeah.  I made it clear to them that I couldn't afford a trip to Florida.

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no.

"(By Mrs. Long)

"Q. Now where were they going to go?

"A. Three weeks in Florida.

"Q. And they added Disneyworld?

"A. (Inaudible) a three weeks trip to Florida.  And they had a friend in Florida that wouldn't be home at the time, that we could stay at their condominium." *Id., at 293-294*.

[12] "A. . . . [Connaughton] said he was thinking about putting a restaurant in there, and he was wanting to know if my mother and father [Zella and Brownie Breedlove] would run it for him.  And I said oh yeah, my mother would love to get back into the restaurant business.  He said good, when the lease is up, he said, we'll tear the inside out and put a restaurant in there, and he said, your mother and father can run it, and he said that way, he said you girls can help run it too, and put your sisters in there working too; he said just . . . he even made up a name -- Breedlove's Lunch or something like that.  Ma Breedlove's Cooking, you know.  He had the names figured out and everything.  He offered to buy us a restaurant, you know, and put us in that building.

"Q. Okay.  So it would just be your parents being a manager, they wouldn't have to buy -- did you understand him that they wouldn't have to . . .

"A. Oh, they was going to do everything, you know.  They was just going to put us in there to work, or to run it.  They wanted my mother to run the business for them." *Id., at 307*.

[13] "Q. Did he promise you to find a job?

"A. Yeah.

"Q. Why did he offer to find you a job?

"A. Because the day at the house, going back to the first time I met them, Martha was asking me did I work, or anything, and I was telling her I was looking for work.  I had been out of a job.  Evidently she must have talked to her husband about it, and that night over at his home, he said are you employed now, you know, . . . and I said no.  So he said, we'll see if we can't do something about that.  I told him I wanted away from bartending and stuff; he said we'll see if we can't do something about it.  You know, a decent job." *Id., at 295-296*.

"MR. MASANA: I'm going to interject.  What about the job you were promised?

"A. Oh, when they promised me, you know, the secure job and everything, they also promised -- they promised Patsy a job too.

(By Mrs. Long)

"Q. That she would be in with Breedlove's Lunch, or cafe?

"A. No, they promised Patsy a decent job, you know.

"Q. That she would be (inaudible).

"A. That she would be good up in Court.  That come out of his own mouth.  That come out of Dan's mouth; he said we need somebody like you up at the courthouse.  Municipal Court." *Id., at 309*.

**EXHIBIT 43**                                                                 **EXHIBIT 23**

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

-- that he would take them out to a victory dinner at an expensive French restaurant after the election; [14] and

-- that Connaughton would not allow knowledge of the sisters' involvement to become public. [15]

 **[\*673]   [\*\*\*580]**  During the course of the interview, Thompson indicated that she had told her story to the Cincinnati Enquirer, which declined to print it, *id., at 284*, and that the local police, likewise, were not interested, *id., at 310*. [16] Thompson indicated that she was "against" Connaughton becoming a judge. *Id., at 311*.  She also asserted that since Connaughton had made public that she and her sister had provided evidence against New, friends had accused her "of being a snitch and a rat" -- epithets **[\*\*\*\*30]** to **[\*\*2689]** which she took great offense -- and that one reason she came to the Journal News was "to get that cleared up." [17] **[\*\*\*\*31]** In her description of the interview in Connaughton's home on September 17, Thompson stated that Connaughton had frequently turned off the tape recorder, [18] that his voice would not be heard **[\*674]** on the tape, [19] and, somewhat inconsistently (and in response

---

[14] "A. . . . And he said he wanted me and Pat to definitely be there, and for a victory dinner he wanted to take me and Patsy to dinner at the Maisonette.

"Q. This would be after he wins the election?

"A. Ummm-hmmm." *Id., at 306*.

[15] "A. . . . But as far as anybody else, the public, or anything like that -- or it going to Court, we wouldn't have to worry about it; we wouldn't have to go to Court and our names wouldn't be on there." *Id., at 296*.

"A. [T]hey had already promised that our names wouldn't be mentioned that nobody would know about us . . . ." *Id., at 302*.

[16] The transcript of the interview quotes Thompson as saying: "I explained to them the whole story, how it got off to this, or that, you know.  They was embarrassed evidently." *Id., at 310*.  However, the tape recording of the interview, which the jury heard, makes clear that Thompson actually stated: "I explained to them the whole story, how I got offered this and that, you know.  They wasn't interested in this evidently." Defendant's Exh. J.

[17] "A. . . .  Can't get any worse than what Dan (inaudible).  Makes it sound like I'm the bad guy.

"Q. Have you had any repercussions from this?

"A. I've been under a lot of (inaudible) strain.  I guess.

"Q. Other people calling you besides the Enquirer?

"A. Yeah.  I've had people that I thought were my friends call me and accuse me of being a snitch and a rat.  I don't like to carry that name, and that's what a lot of people is thinking.  That knows me.

"MR. BLOUNT: They were just mad, they didn't threaten you?

"A. (inaudible) a snitch.  You name it, and I'm that.  I just want to get that cleared up." App. 320.

[18] "A. . . .  I said, what's the whole deal?  And of course, he turned off the tape recorder.  . . .

. . .

"MR. BLOUNT: Was being questioned by the Connaughtons tougher than going to Court?

"A. Ummm-hmmm.  They turned that tape recorder on and off so many times, you know, left out what they wanted to.

. . .

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no." *Id., at 291-293*.

[19] "MR. BLOUNT: They had it on when you were talking and off when they were talking?

"A. I don't think Dan Connaughton's voice is on it." *Id., at 293*.

**EXHIBIT 43**                                                                        **EXHIBIT 23**

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

to a leading question), that most of her comments had been made in response to leading questions by Connaughton. 20

 **[****32]   [***581]**  Toward the end of the interview, Blount made two significant comments.  He announced that "Pam will, of course, write the story," *id., at 314*, and he asked "[w]hat would happen if we called your sister," *id., at 316*.  In response to the first comment, Thompson volunteered a somewhat improbable explanation for her motivation in seeking the interview, 21 **[****33]   [*675]**  and in response to the second she gave an equivocal answer, 22 even though she had previously assured Blount that Stephens would  **[**2690]**  confirm everything she had said. 23

---

"MR. BLOUNT: Was it Dan Connaughton himself who talked about the trip?

"A. Yeah.  He did most of the talking in the living room.  Like I said though the tape recorde[r] was off when Dan spoke." *Id., at 295*.

20 "MR. MASANA: Off the record -- you were saying something about Dan was encouraging you to say things in a certain way?

"A. Oh, yeah.  He was leading me in questions, you know.

(By Mrs. Long)

"Q. Can you give us an example?

"A. Well, he kept on trying to get me to say that Dolan had something to do with this, you know?

"Q. Would he phrase it in a question? Like, did Judge Dolan have anything to do with it?

"MR. BLOUNT: Wasn't it true that Judge Dolan did this, or something?

"A. Yeah, you know, and so on.  But like I say, if you listen to the tapes you're not going to hear it, because his voice ain't on the tape. . . .

. . .

"Q. Sure.  So it was a yes, no, situation for you in that he'd phrase it a certain way and all you had to do was yes or no?

"A. Ummm-hmmm.  And then, you know, he'd say to repeat that." *Id., at 296-298*.

21 "A. I just want people to know.  Because they shouldn't vote for a man that is this dirty, you know, because I call it blackmail, what he was trying to do." *Id., at 314*.

There is some tension between this civic interest in fair procedure and Thompson's reluctant participation in the exposure of the corrupt procedures at the Municipal Court, her assertion that although she realized that Connaughton's offers were improper, she would have accepted them if her name had never been mentioned because "that's the way [the system] works," *id., at 315*, and her displeasure at being called a "snitch and a rat," *id., at 320*.

22 "A. I think she's scared right now to talk to anyone, because the Cincinnati Enquirer has been trying to get her to talk to them.  She's getting scared now since this is all reality.  My sister is . . . she's kind of weakminded when it comes to anything like that.  She won't do nothing for nobody unless she thinks she's benefiting from it.  And she honestly thought she was a getting a job out of this, and would make something of herself out of this.  And the Connaughtons just used her all the way.  And now since she's seeing that it's coming down to where she ain't going to get nothing out of it, she's brought up in the middle of all this and everything, she's scared." *Id., at 316*.

23 "MR. BLOUNT: Obviously, we can't quote your sister from you (inaudible).  What's your sister's position in this, would she support you or would she support him?  In other words, if somebody said to her, who's telling the truth here?

"A. She'll tell you about the trips, the dinner at the Maisonette, the jobs and everything.  She'll tell you that's the truth, because they was offered to her too." *Id., at 313*.

                                                                                              437

**EXHIBIT 43**                                                                          EXHIBIT  23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

 **[****34]**  On Sunday, October 30, an editorial appeared in the Journal News under the headline "Municipal Court Race will have More than One Loser." [24] App. to Pet. for Cert. 45a.  In the column, Blount observed that the campaign "battle has been all it was expected to be and more," and predicted that "[a] lot could still happen in the next eight to nine days." *Ibid.* He went on to discuss the charges pending against New, stating that the "array of charges and counter charges probably has taken some votes from Dolan." *Ibid.* He cautioned, however, that the race was still wide open and quoted an unidentified voter as saying, "I resent voting for a person who I later find has been deceitful or dishonest  **[*676]**  in campaigning." *Id., at 46*a.  Significantly, this unidentified person did not express indignation at dishonesty in the administration of the Municipal Court -- a concern one would think the arrest of New might have prompted -- but rather, a distaste for dishonesty *in campaigning* -- a concern that the then-uninvestigated and unwritten November 1 story would soon engender.  After questioning the Cincinnati Enquirer's coverage of a story critical of Dolan and suggesting that **[****35]**  "the Connaughton forces have a wealthy, influential link to *Enquirer* decisionmakers," the column indicated that the Journal News had not yet decided  **[***582]**  which candidate it favored, but implied that an endorsement was forthcoming.  *Id., at 48*a.

On October 31, a reporter for the Journal News telephoned Connaughton and asked him to attend a meeting with Jim Blount, stating "that the endorsement may hang in the balance." Tr. 457 (Aug. 9, 1985).  Connaughton met with the reporter, Blount, and Cocozzo that afternoon and discussed a variety of subjects.  One of the subjects was the rumor that Connaughton had an influential link to the Cincinnati Enquirer.  Connaughton asserted that he had "no extraordinary pull or any inside track to anybody down there," and that any rumor to the contrary was "a lie." *Id.*, at 458.  Another subject was Connaughton's participation **[****36]**  in the investigation of Billy Joe New.  Connaughton provided a chronology of the events that led to his filing of the complaint against New and explained that he believed that he had an obligation "as an attorney and officer of the court to report [New's] crimes." *Id.*, at 458-459.  No mention was made of Thompson's interview or her charges against Connaughton.  *Id.*, at 460.  After about an hour, Jim Blount received a telephone call and then told Connaughton that a reporter wanted to interview him.  *Id.*, at 462.

Connaughton then went to another office where Blount and Long advised him that they had interviewed Alice Thompson  **[*677]**  and were "trying to find out . . . how much of her statement was true." App. 256.  The ensuing tape-recorded interview lasted 55 minutes.  Connaughton acknowledged that the meetings that Thompson described had taken place and that there had been some speculative discussion about each of the subjects that Thompson mentioned.  He stated, however, that Thompson's account of their meetings was "obviously shaded and bizarre," *id., at 276*, and that there was "absolutely" no "*quid pro quo* for information." [25]

 **[****37]   [**2691]**  Thus, while categorically denying that he intended to confront New and Judge Dolan with the tape of the Stephens interview to scare them into resigning, Connaughton admitted that he might well have speculated about what they would say or do if they heard the tapes. [26]  Similarly, while denying  **[*678]**  that he had promised

---

[24] The full text of this editorial is reprinted as Appendix A to the Court of Appeals' opinion.  *842 F. 2d, at 848-849*.

[25] The transcript of the Connaughton interview states:

"MR. CONNAUGHTON: No, and it had nothing to do with (inaudible) for information or something, i[f] that's what the point of this question is.  That's absolutely no, if that's that question.  Well, the tape will speak for itself." App. 265.

The tape recording of this interview makes clear that Connaughton said, "No, and it had nothing to do with a *quid pro quo* for information.  . . ." Defendant's Exh. I.

[26] "A. . . . I think it would be fair to say, sometime during those three or four hours that they were there, that I probably made a remark along the lines that I just can't believe what I'm hearing, and, you know, I would think if they could hear what we're hearing, they would probably resign.  I mean, I thought the allegation was that serious.  But to tell her that -- to answer that -- and if she's saying that was my announced purpose of what I had them there for and what we were going to do with the information, my answer would be no.

"MR. BLOUNT: You didn't tell her you were going to take the tapes to him?  And play them for them?

438

EXHIBIT 43                                                         EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

Stephens and Thompson anonymity, he agreed that he had **[\*\*\*583]** told them that he had hoped that they could remain anonymous. [27] **[\*\*\*\*39]** He also categorically denied that he had promised Thompson a job as a waitress, promised Stephens a job at the Municipal Court, or promised to set their parents up in a restaurant, although he did acknowledge a general conversation in which his wife had discussed the possibility that if her dream of opening "a gourmet ice cream shop" should materialize, the sisters might work there. [28] **[\*\*\*\*40]** There were similar acknowledgments of references **[\*679]** to a possible Florida trip and postelection victory dinner, but denials of any promises. [29] **[\*\*\*\*41]** At the end **[\*\*\*584]** of **[\*\*2692]** the interview, Long went back -- stressing that Thompson's

---

"A. No. No. What I might have said is, boy, I'd sure like to let them hear these tapes and see what they've got to say for themselves, you know, in a fashion such as that.

"MR. BLOUNT: In an expression of shock.

"MR. CONNAUGHTON: Yeah. Yeah, as I almost fell off of the fireplace. Right." App. 262-263.

[27] "Q. Did you ever promise Alice Thompson anonymity?

"A. That question was discussed, and I was hoping to her, and I told her it would be my intention and hope that she could remain anonymous, yes. But did I promise her anonymity, the answer would be no. Did we discuss it, we sure did, and I expressed to her my desire as well as her desire that she could remain anonymous." *Id., at 264*.

[28] "Q. Did you ever talk to Alice about getting a job for her in appreciation for her help with your investigation of New and Dolan?

"A. No.

"Q. Not a waitress job?

"A. No.

"Q. Did you promise a Municipal Court job for her sister Patsy Stephens?

"A. No.

"Q. Did you offer to have 'the sisters go on a post election trip to Florida with you and your family to stay in a condominium?'

"A. No.

"Q. Did you offer to set up Thompson's parents, the Breedloves, in what is now Walt's Chambers, which you own and lease?

"A. Absolutely not.

"Q. Why would she say this to us?

"A. What was discussed in an off-handed way, the people who own that bar, who we're not very pleased with, their lease expires next September. My wife has the idea that she wants to open an ice cream type shop like Graeters, or some such thing as that, and I heard her discussing with them that maybe, since Patty had run this Homette Restaurant or something of that nature, that maybe she would help out and participate in the operation of this -- whatever you want to call it -- deli shop or gourmet ice cream shop. Yes, and I was present when that took place.

"Q. And when was that?

"A. Well, I don't think it was that night. As I recall, this was a later time that we had seen them.

"Q. But that would only be for Patty (unclear)?

"A. I guess Alice was there, and the offer may have been extended to her in that fashion, that she could work there or something -- I wouldn't be surprised if that was said." *Id., at 264-265*.

[29] "Q. What about this post election trip to Florida? . . .

"MR. BLOUNT: Did you talk about anything like that?

"A. Ummm-hmmm. After getting over the initial shock it became a little clearer to me of -- kind of how scary this thing was with the information they gave to us, as far as, if their personal safety was at stake. . . . I do remember in an off-handed way it being

EXHIBIT 43   EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

charge was a "hefty"  **[*680]**  one -- and asked for a second time whether Connaughton had promised Stephens a job at  **[****38]**  the Municipal Court if he was elected.  He once again unequivocally denied the allegation. [30]

The following day the lead story in the Journal News -- under the headline "Bribery case witness claims jobs, trip offered" -- reported that "[a] woman called to testify before the . . . Grand Jury in the Billy Joe New bribery case claims Dan Connaughton, candidate for Hamilton Municipal Judge, offered her and her sister jobs and a trip to Florida 'in appreciation' for their help." [31] *Id., at 329*.  The article, which carried Pam Long's byline, stated that Thompson accused Connaughton of using "'dirty tricks'" to gain her cooperation in **[****42]** investigating New and that Connaughton, although admitting that he did meet with Thompson, "denied any wrongdoing." *Ibid.* Each of Thompson's allegations was accurately reported, including her claims that Connaughton had promised to "protect her anonymity," *id., at 330*, that he had promised Stephens "a municipal court job" and Thompson some other sort of work, that he had invited both sisters on "a post-election trip to Florida," and that he had offered "to set up Thompson's parents . . . in the restaurant business," *id., at 333*.  The article conveyed Thompson's allegation that "the tapes were turned off and on during a session [that] lasted until 5:30 a.m.," and that these promises were  **[*681]**  made "[w]hen the tape was turned off." *Ibid.* In addition, Long wrote, "Thompson claimed Connaughton had told her the tapes he made of her . . . statement . . . were to be presented to Dolan" with the hope that Dolan might resign, thereby allowing Connaughton to assume the municipal judgeship.   *Id., at 335*.  Connaughton's contrary version of the events was also accurately reported.

---

discussed . . . they could go down to Hilton Head or Florida, or something like that, or maybe hide out or something like that, I don't know.  But I own no property and have nothing to offer them.

"Q. But there was talk about a friend that had a condominium that would be vacant and it was in terms of a full blown trip, you know, you, the Berrys, the whole group going down to Florida and they were welcome to go along.  . . .

"A. No.  The only conversation I remember along those lines was in connection with, if their personal safety might be in question because of going out on the line and making these serious allegations. . . ." *Id., at 266*.

"Q. One last statement.  At lunch Thompson said that you promised to take her and her sister out to a post election victory dinner at the Maisonette?

"A. I promised to take them to the Maisonette?  Hell, I haven't been to the Maisonette for years.

"MR. BLOUNT: Was it discussed?  . . .

"A. It may have been.  It may have been.  I won't deny that some loose discussion in a kidding way was . . .

. . .

"A. . . . If she says that I made a firm statement that we were going to definitely plan a party at the Maisonette, that's not true. . . ." *Id., at 272-273*.

[30] "Q. So her sister Patty, again getting back and going over the promises -- pardon me for going back to them but that seems to be a hefty charge against you.

"A. That's alright.

"Q. Her sister Patty is not going to get a job in the Municipal Court if you're elected?

"A. Not that I know of.

"Q. And she's not going to be disappointed to find that out, right?

"[A. She's not going to be disappointed at that.  Right.]" *Id., at 277*.

The bracketed response does not appear in the written transcript, but can be heard on the tape recording.  Defendant's Exh. I.

[31] The full text of this article is reprinted as Appendix B to Judge Guy's dissenting opinion.  *842 F. 2d, at 858-859*.

EXHIBIT 43
EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

[****43]  As the Court of Appeals correctly noted, there was evidence in the record -- both in the Thompson tape and in the Connaughton tape -- that would have supported the conclusion that Thompson was telling the truth and that Connaughton was dissembling.  See *842 F. 2d, at 840*.  On the other hand, notwithstanding the partial confirmation of Thompson's charges in the Connaughton tape, there remained a sharp conflict between their respective versions of the critical events.  There was unquestionably ample evidence in the record to support a finding that Thompson's principal charges were false, either because she misinterpreted remarks by Connaughton and his wife, or because Thompson was deliberately lying.

[7] [8A]The jury listened to the tape recordings of the two conflicting  [***585]  interviews and also observed the demeanor of the two witnesses as they testified in open court.  They found that Connaughton was telling the truth and that Thompson's charges  [**2693]  were false.  The fact that an impartial jury unanimously reached that conclusion does not, however, demonstrate that the Journal News acted with actual malice. Unlike a newspaper, a jury is often required to decide  [****44]  which of two plausible stories is correct.  Difference of opinion as to the truth of a matter -- even a difference of 11 to 1 -- does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a "high degree of awareness of . . . probable falsity," *Garrison, 379 U.S., at 74*.  The jury's verdict in this case, however, derived additional support from several critical pieces of information that strongly support the inference that the Journal  [*682]  News acted with actual malice in printing Thompson's false and defamatory statements.

IV

[8B]On October 27, after the interview with Alice Thompson, the managing editor of the Journal News assembled a group of reporters and instructed them to interview all of the witnesses to the conversation between Connaughton and Thompson with one exception -- Patsy Stephens.  No one was asked to interview her and no one made any attempt to do so.  See App. 56-57, 61, 83-85.  This omission is hard to explain in light of Blount's and Long's repeated questions during the Connaughton and Thompson interviews concerning whether Stephens would confirm Thompson's allegations.  See  [****45]  *id., at 277, 313, 316*.  It is utterly bewildering in light of the fact that the Journal News committed substantial resources to investigating Thompson's claims, yet chose not to interview the one witness who was most likely to confirm Thompson's account of the events.  However, if the Journal News had serious doubts concerning the truth of Thompson's remarks, but was committed to running the story, there was good reason not to interview Stephens -- while denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, a denial coming from Stephens would quickly put an end to the story.

The remaining six witnesses, including Connaughton, were all interviewed separately on October 31.  Each of them denied Alice Thompson's charges and corroborated Connaughton's version of the events.  Thus, one Journal News reporter testified at trial that Jeanette and Ernest Barnes denied that any promises, offers, or inducements were made and that he had known the Barneses for several years and considered them both credible.  *Id., at 89-90*.  Another reporter testified that she interviewed Dave Berry and that Berry stated that absolutely no promises  [****46]  or offers were made.  *Id., at 91-92*.  By the time the November 1 story appeared,  [*683]  six witnesses had consistently and categorically denied Thompson's allegations, yet the newspaper chose not to interview the one witness that both Thompson and Connaughton claimed would verify their conflicting accounts of the relevant events.

The newspaper's decision not to listen to the tapes of the Stephens interview in Connaughton's home  [***586]  also supports the finding of actual malice. During the Connaughton interview, Long and Blount asked if they could hear the tapes. *Id., at 259*.  Connaughton agreed, *ibid.*, and later made the tapes available, *id., at 48, 142*.  Much of what Thompson had said about the interview could easily have been verified or disproved by listening to the tapes. Listening to the tapes, for example, would have revealed whether Thompson accurately reported that the tape recorders were selectively turned on and off and that Connaughton was careful not to speak while the recorders were running.  Similarly, the tapes presented a simple means of determining whether Stephens and Thompson had been asked leading questions, as Thompson claimed.  Furthermore,  [****47]  if Blount was truly in equipoise about the question whether to endorse the incumbent judge for reelection -- as he indicated in the column that he published on Sunday, October 30 -- it is difficult to understand his lack of interest in a detailed description of the  [**2694]  corrupt disposition of 40 to 50 cases in Judge Dolan's court.  Even though he may have correctly assumed that the account

EXHIBIT 43   EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

did not reflect on the integrity of the judge himself, surely the question whether administrative shortcomings might be revealed by the tapes would be a matter in which an editor in the process of determining which candidate to endorse would normally have an interest. [32] Although simply one piece of **[*684]** evidence in a much larger picture, one might reasonably infer in light of this broader context that the decision not to listen to the tapes was motivated by a concern that they would raise additional doubts concerning Thompson's veracity.

**[****48]** Moreover, although also just a small part of the larger picture, Blount's October 30 editorial can be read to set the stage for the November 1 article.  Significantly, this editorial appeared before Connaughton or any of the other witnesses were interviewed.  Its prediction that further information concerning the integrity of the candidates might surface in the last few days of the campaign can be taken to indicate that Blount had already decided to publish Thompson's allegations, regardless of how the evidence developed and regardless of whether or not Thompson's story was credible upon ultimate reflection.

Finally, discrepancies in the testimony **[***587]** of Journal News witnesses may have given the jury the impression that the **[*685]** failure to conduct a complete investigation involved a deliberate effort to avoid the truth.  Thus, for example, Blount's superiors testified that they understood that Blount had directed reporter Tom Grant to ask the police whether Thompson had repeated her charges against Connaughton to them and whether they considered her a credible witness.  *Id., at 86-87 (Walker), 95 (Cocozzo)*.  Blount also so testified.  *Id., at 37-38*.  Grant, however, **[****49]** denied that he had been given such an assignment.  *Id., at 88*.  Similarly, at the early stages of the proceeding, there was testimony that on October 31 Pam Long had tried to arrange a meeting with Patsy Stephens over the telephone, *id., at 94*, that Blount was standing at her desk during the conversation and overheard Long talking to Stephens, *id.*, at 36-37, and that Connaughton had volunteered that he would have Stephens get in touch with them, *id., at 57*.  Connaughton categorically denied that the issue of getting in touch with Stephens was even discussed, *id., at 142*, and ultimately Blount and Long agreed that there was no contact -- and no attempt to make contact -- with Stephens on the 31st or at any other time before the story was published, *id., at 48-49 (Blount), 56-57 (Long)*.

V

---

[32] Blount testified at trial as follows:

"Q. . . . Did you listen to any of the tapes of the interview conducted by Dan Connaughton with Miss Stephens and Miss Thompson on the 17th of September?  Did you listen to any of those tapes before you approved and published the article about Dan Connaughton on the figures of November 18, 1983?

"A. No, because we had from several sources what was on the tape, there was several sources including Mr. Connaughton, that there was no mention of things we were exploring at this time[.]

. . .

"Q. You were, I presume, concerned that you were dealing with a credible person in Alice Thompson, were you not?

"A. Correct.

"Q. Wouldn't one of the simplest ways to determine her credibility be to play the tape to see whether her statement that Dan's voice is not on it is true?

"A. No, because we had been told from other sources that this matter, as I previously said, saying it was not on the tape. This was not discussed on the tape. We had been told by other persons that the tape was junk as far as evidence.

"Q. The tape was what?

"A. Junk." App. 30-31.

Blount further testified that by the time of trial, almost two years after he received the tapes, he had only listened to 15 minutes of the 2 1/2 hours of tape. *Id., at 33*.

**EXHIBIT 43**                                                                                          **EXHIBIT 23**

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

[9][10]The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.  *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S., at 510-511*.This rule is not simply premised on common-law **[**2695]** tradition, [33] but on the **[*686]** unique character of the interest protected **[****50]** by the actual malice standard.  Our profound national commitment to the free exchange of ideas, as enshrined in the *First Amendment*, demands that the law of libel carve out an area of "'breathing space'" so that protected speech is not discouraged.  *Gertz, 418 U.S., at 342* (quoting *NAACP v. Button, 371 U.S. 415, 433 (1963))*; *New York Times Co., 376 U.S., at 272* (same).  The meaning of terms such as "actual malice" -- and, more particularly, "reckless disregard" -- however, is not readily captured in "one infallible definition." *St. Amant v. Thompson, 390 U.S., at 730*. Rather, only **[***588]** through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards.  *Bose, supra, at 503*. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary.  Uncertainty as to the scope of the constitutional protection can only dissuade protected speech -- the more elusive the standard, **[****51]** the less protection it affords.  Most fundamentally, the rule is premised on the recognition that "[j]udges, as expositors of the Constitution," have a duty to "independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose, supra, at 511*.

**[****52]**   [11][12A]There is little doubt that "public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule," *Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 300 (1971)*, and the strongest possible case for independent **[*687]** review.  As Madison observed in 1800, just nine years after ratification of the *First Amendment*:

> "Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government.  The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 J. Elliot, Debates on the Federal Constitution 575 (1861).

This value must be protected with special vigilance.  When a candidate enters the political arena, he or she "must expect that the debate will sometimes be rough and personal," *Ollman v. Evans, 242 U. S. App. D. C. 301, 333, 750 F. 2d 970, 1002 (1984)* **[****53]** (en banc) (Bork, J., concurring), cert. denied, *471 U.S. 1127 (1985)*, and cannot "'cry Foul!' when an opponent or an industrious reporter attempts to demonstrate" that he or she lacks the "sterling integrity" trumpeted in campaign literature and speeches, *Monitor Patriot Co. v. Roy, 401 U.S. 265, 274 [**2696] (1971)*. Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty. [34]

---

[33] The following cases are illustrative of this tradition: *Bose, 466 U.S., at 510-511* (actual malice); *Jenkins v. Georgia, 418 U.S. 153, 161 (1974)* (obscenity); *Hess v. Indiana, 414 U.S. 105, 108-109 (1973)* *(per curiam)* (incitement); *Miller v. California, 413 U.S. 15, 25 (1973)* (obscenity); *Time, Inc. v. Pape, 401 U.S. 279, 284 (1971)* (actual malice); *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 11 (1970)* (defamation); *Street v. New York, 394 U.S. 576, 589, 592 (1969)* (fighting words); *Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83 (1967)* *(per curiam)* (actual malice); *New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)* (actual malice); *Edwards v. South Carolina, 372 U.S. 229, 235 (1963)* (peaceful assembly); *Niemotko v. Maryland, 340 U.S. 268, 271 (1951)* (failure to issue license for religious meeting in public park); *Pennekamp v. Florida, 328 U.S. 331, 335 (1946)* (clear and present danger to integrity of court).

[34] Of course, the protection of "calculated falsehoods" does not promote self-determination.  As we observed in *Garrison v. Louisiana, 379 U.S. 64 (1964)*:

"At the time the *First Amendment* was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration.  Cf.

EXHIBIT 43   EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

[12B]

[****54]

 [*688]  [1C][13]We have not gone so far,  [***589]  however, as to accord the press absolute immunity in its coverage of public figures or elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail.  See *Curtis Publishing Co. v. Butts, 388 U.S., at 162* (opinion of Warren, C. J.).  A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct.  "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant, 390 U.S., at 731*. The standard is a subjective one -- there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity." *Garrison v. Louisiana, 379 U.S., at 74*. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. See *St. Amant, supra, at 731, 733*.  [****55]  See also *Hunt v. Liberty Lobby, 720 F. 2d 631, 642 (CA11 1983)*; *Schultz v. Newsweek, Inc., 668 F. 2d 911, 918 (CA6 1982)*. In a case such as this involving the reporting of a third party's allegations, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant, supra, at 732*.

 [2B][14]In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full.  Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," *Bose, 466 U.S., at 499-500*, the reviewing court must "'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the *First Amendment* . . . protect,'" *New York Times Co., 376 U.S., at 285* (quoting *Pennekamp v. Florida, 328 U.S. 331, 335  [*689]  (1946))*. [****56] [35] Based on our review of the entire record, we agree with the Court of Appeals that the evidence did in fact support a finding of actual malice. Our approach, however, differs somewhat from that taken by the Court of Appeals.

 [****57]     [2C]In considering the actual malice  [***590]  issue, the Court of Appeals identified 11 subsidiary  [**2697]  facts that the jury "could have" found. [36]*842 F. 2d, at 843-844*. The court held that

---

Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 Col. L. Rev. 1085, 1088-1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution.  For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Id., at 75*.

[35] Petitioner concedes that "when conducting the independent review mandated by *New York Times* and *Bose*, a reviewing court should properly hesitate to disregard a jury's opportunity to observe live testimony and assess witness credibility." Brief for Petitioner 36, n. 45.  It contends, however, that this Court did reject the trial court's credibility determination in *Bose*.  We disagree with this reading of *Bose*.  In *Bose* we accepted the trial court's determination that the author of the report at issue did not provide credible testimony concerning the reason for his choice of words and his understanding of the meaning of the word "about." *466 U.S., at 511-512*. Unlike the District Court, however, we were unwilling to infer actual malice from the finding that the witness "refused to admit [his mistake] and steadfastly attempted to maintain that no mistake had been made -- that the inaccurate was accurate." *Id., at 512*.

[36] The Court of Appeals asserted:

"A review of the entire record of the instant case disclosed substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of Dolan and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between Dolan and Blount, the *Journal* Editorial Director, and the unqualified, consistently

EXHIBIT 43                                                              EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

such  **[\*690]**  findings would not have been not clearly erroneous, *id., at 844*, and, based on its independent review, that when considered cumulatively they provide clear and convincing evidence of actual malice, *id., at 847*. We agree that the jury *may* have found each of those facts, but conclude that the case should be decided on a less speculative ground.   Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper; (2) the testimony of Blount that he did not listen to the tapes simply because he thought they would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that  **[\*\*\*\*58]**  they believed Thompson's allegations were substantially true.   When these findings are considered alongside the undisputed  **[\*691]**  evidence, the conclusion that the newspaper acted with actual malice inexorably follows.

 **[\*\*\*\*59]**   [8C] [15A] [16A]There is no dispute that Thompson's charges had been denied not only by Connaughton, but also by five other witnesses before the story was published.   Thompson's most serious charge -- that Connaughton  **[\*\*\*591]**  intended to confront the incumbent judge with the tapes to scare him into resigning and otherwise not to disclose the existence of the tapes -- was not only highly improbable, but inconsistent with the fact that Connaughton had actually arranged a lie detector test for Stephens and then delivered the tapes to the police. These facts were well known to the Journal News before the story was published.   Moreover, because the newspaper's interviews of Thompson and Connaughton were captured on tape, there can be no dispute as to what was communicated, nor how it was said.   The hesitant, inaudible, and sometimes unresponsive and improbable tone of Thompson's answers to various leading questions raise obvious doubts about her veracity.   Moreover, contrary to petitioner's contention  **[\*\*2698]**  that the prepublication interview with Connaughton confirmed the factual basis of Thompson's statements, Brief for Petitioner 47, review of the tapes makes clear that Connaughton unambiguously denied  **[\*\*\*\*60]**  each allegation of wrongful conduct.   Connaughton's acknowledgment, for instance, that his wife may have discussed with Stephens and Thompson the possibility of working at an ice cream store that she might someday open, hardly confirms the allegations that Connaughton had promised to buy a restaurant for the sister's parents to operate, that he would provide Stephens with a job at the Municipal Court, or even that he would provide Thompson with suitable work. [37] It is extraordinarily unlikely that the  **[\*692]**  reporters missed Connaughton's denials simply because he confirmed certain aspects of Thompson's story.

---

favorable editorial and daily news coverage received by Dolan from the *Journal* as compared with the equally consistently unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer*'s initial expose of the questionable operation of the Dolan court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the Connaughton-Dolan campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area; (5) that Thompson's emotional instability coupled with her obviously vindictive and antagonistic attitudes toward Connaughton as displayed during an interview on October 27, 1983, arranged by Billy New's defense attorney, afforded the *Journal* an ideal vehicle to accomplish its objectives; (6) that the *Journal* was aware of Thompson's prior criminal convictions and reported psychological infirmities and the treatment she had received for her mental condition; (7) that every witness interviewed by *Journal* reporters discredited Thompson's accusations; (8) that the *Journal* intentionally avoided interviewing Stephens between October 27, 1983, the date of its initial meeting with Thompson, and November 1, 1983 when it printed its first story even though it knew that Stephens could either credit or discredit Thompson's statements; (9) that the *Journal* knew that publication of Thompson's allegations charging Connaughton with unethical conduct and criminal extortion and her other equally damaging statements would completely discredit and irreparably damage Connaughton personally, professionally and politically; (10) that its prepublication legal review was a sham; (11) that the *Journal* timed the release of the initial story so as to accommodate follow-up stories and editorial comments in a manner calculated to peak immediately before the election in an effort to maximize the effect of its campaign to discredit Connaughton and the *Enquirer*." *842 F. 2d, at 843-844*.

[37] Nor can petitioner claim immunity from suit because portions of Thompson's account of the relevant events were confirmed by Connaughton.  "[T]he defamer may be [all] the more successful when he baits the hook with truth." *Afro-American Publishing Co. v. Jaffe, 125 U. S. App. D. C. 70, 76, 366 F. 2d 649, 655 (1966)* (en banc).  See also *Tavoulareas, 260 U. S. App. D. C., at 64, 817 F. 2d, at 787*. Of course, the press need not accept "denials, however vehement; such denials are so commonplace in the

**EXHIBIT 43**                                                                                    EXHIBIT  23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

[15B] [16B]

 **[****61]**   [8D]It is also undisputed that Connaughton made the tapes of the Stephens interview available to the Journal News and that no one at the newspaper took the time to listen to them.  Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her.  Accepting the jury's determination that petitioner's explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges.  Although failure to investigate will not alone support a finding of actual malice, see *St. Amant, 390 U.S., at 731, 733*, the purposeful avoidance of the truth is in a different category.

There is a remarkable similarity between this case -- and in particular, the newspaper's failure to interview Stephens and failure to listen to the tape recording of the September 17 interview at Connaughton's home -- and the facts that supported the Court's judgment in *Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967)*.  **[****62]**  In  **[***592]** *Butts* the evidence showed that the Saturday Evening Post had published an accurate account of an unreliable informant's false description of the Georgia athletic director's purported agreement to "fix" a college football game.  Although there was reason to question the informant's veracity, just as there was reason to doubt Thompson's story, the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually happened  **[*693]**  at the game in question. [38] **[****63]**  This evidence of an intent to avoid the truth was not only sufficient to convince the plurality that there had been an extreme departure from professional publishing standards, but it was also sufficient to satisfy the more demanding *New York Times* standard applied by Chief Justice  **[**2699]**  Warren, [39] Justice Brennan, and Justice White. [40]

 [2D] [8E]As in *Butts*, the evidence in the record in this case, when reviewed **[****64]**  in its entirety, is "unmistakably" sufficient to support a finding of actual malice. The judgment of the Court of Appeals is accordingly

*Affirmed*.

---

world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. National Audubon Society, Inc., 556 F. 2d, at 121*.

[38] As Justice Harlan observed in *Butts:*

"Burnett's notes were not even viewed by any of the magazine's personnel prior to publication.  John Carmichael who was supposed to have been with Burnett when the phone call was overheard was not interviewed.  No attempt was made to screen the films of the game to see if Burnett's information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information." *388 U.S., at 157*.

In this passage, "Stephens" might easily be substituted for "Carmichael," "Thompson" for "Burnett," and "the tapes" for "Burnett's notes" and "the films of the game."

[39] Chief Justice Warren wrote:

"The slipshod and sketchy investigatory techniques employed to check the veracity of the source and the inferences to be drawn from the few facts believed to be true are detailed at length in the opinion of Mr. Justice Harlan.  Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue.  Instead, the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article." *Id., at 169-170*.

[40] Although concluding that the case should be remanded for a new trial, Justice Brennan, joined by Justice White, agreed with Chief Justice Warren that the evidence presented at the original trial "unmistakably would support a judgment for Butts under the *New York Times* standard." *Id., at 172*.

**EXHIBIT 43**                                                                                                    **EXHIBIT  23**

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

**Concur by:** WHITE; BLACKMUN; KENNEDY; SCALIA

# Concur

 **[\*694]**  JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, concurring.

In my view, in cases like this the historical facts -- *e. g.*, who did what to whom and when -- are reviewable only under the clearly-erroneous standard mandated by *Federal Rule of Civil Procedure 52*.  Credibility determinations fall in this category, as does the issue of knowledge of falsity. But as I observed in dissent in *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 515 (1984)*, the reckless disregard component of the *New York Times Co.* v. *Sullivan* "actual malice" standard is not a question of historical fact.  A trial court's determination of that issue therefore is to be reviewed independently by the appellate court.

 **[\*\*\*593]**  As I read it, the Court's opinion is consistent with these views, and -- as Justice Kennedy observes -- is consistent with the views expressed by Justice Scalia in his concurrence.  Based on these premises, I join the Court's opinion.

 **[\*\*\*\*65]**  JUSTICE BLACKMUN, concurring.

I agree with the majority's analysis and with the result it reaches.  I write separately, however, to stress two points.

First, the case reaches us in an odd posture, one which stands in the way of giving full consideration to aspects of the content of the article under attack that perhaps are of constitutional significance.  Petitioner has abandoned the defense of truth, see *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986)*, despite the fact that there might be some support for that defense.  We therefore must presume that the jury correctly found that the article was false, see *ante*, at 681, and decide whether petitioner acted with knowledge or reckless disregard of its falsity. In addition, petitioner has eschewed any reliance on the "neutral reportage" defense.  Cf. *Edwards v. National Audubon Society, Inc., 556 F. 2d 113, 120* (CA2), cert. denied, *434 U.S. 1002 (1977)*. This strategic decision appears to have been unwise in light of the facts of this case.  The article accurately reported  **[\*695]**  newsworthy allegations that Daniel Connaughton,  **[\*\*\*\*66]**  a political candidate, had used "dirty tricks" to elicit information from Alice Thompson and her sister, information that had become central to the political campaign, and also accurately reported Connaughton's response, which confirmed the existence of discussions with Thompson that touched upon the subject matter of her allegations but claimed that Thompson's version of these discussions was incorrect.  Were this Court to adopt the neutral reportage theory, the facts of this case arguably might fit within it.  That question, however, has also not been squarely presented.

Second, I wish to emphasize that the form and content of the story are relevant not only to the falsity and neutral reportage questions, but also to the question of actual malice. In the past, this Court's  **[\*\*2700]**  decisions dealing with actual malice have placed considerable emphasis on the manner in which the allegedly false content was presented by the publisher. See *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 12-13 (1970)* (truthful and accurate reporting of what was said at public meeting on issues of public importance not actionable); *Time, Inc. v. Pape, 401 U.S. 279, 290-292 (1971)*  **[\*\*\*\*67]**  (erroneous interpretation of Government report not "actual malice").  Under our precedents, I find significant the fact that the article in this case accurately portrayed Thompson's allegations *as* allegations, and also printed Connaughton's partial denial of their truth.  The form of the story in this case is markedly different from the form of the story in *Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967)*, where the informant's description of the events was presented as truth rather than as contested allegations.  These differences in presentation are relevant to the question whether the publisher acted in reckless disregard  **[\*\*\*594]**  of the truth: presenting the content of Thompson's allegations as though they were established fact would have shown markedly less regard of their possible falsity.

 **[\*696]**  Several aspects of the majority's opinion in this case might be interpreted as breaking with our practice of considering the form and content of the article in making malice determinations.  The majority notes the form of the

story, see *ante*, at 680-681, but its account of the evidence it finds probative of actual malice, *ante*, at **[****68]** 682-685, deals exclusively with evidence extrinsic to the story itself.  The absence of any discussion of *Pape* and *Bresler* also might be understood as a suggestion that the manner in which the contested statements are presented is irrelevant to the malice inquiry.  Finally, the majority relies upon *Butts* in the course of its discussion of petitioner's purposefully incomplete investigation of its story, *ante*, at 692-693, in a manner that suggests it might not have accorded significance to the difference between the forms of the respective stories in *Butts* and in this case.

I am confident, however, that these aspects of the majority's opinion are omissions in explanation rather than in analysis, and that the majority's opinion cannot fairly be read to hold that the content of the article is irrelevant to the actual malice inquiry.  Because I am convinced that the majority has considered the article's content and form in the course of its painstaking "review of the entire record," see *ante*, at 689, and because I conclude that the result the majority reaches is proper even when the contents of the story are given due weight, I concur.

JUSTICE KENNEDY, concurring.

 **[****69]**  I join the opinion of the Court, for in my view it is not inconsistent with the analysis set out in Justice Scalia's separate concurrence.

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court's disposition of this case, and with its resolution of the second legal issue on which we granted certiorari, namely whether "highly unreasonable conduct constituting an extreme departure from ordinary standards of investigation and reporting" is alone enough to establish **[*697]** (rather than merely evidence of) the malice necessary to assess liability in public figure libel cases.

I disagree, however, with the Court's approach to resolving the first and most significant question upon which certiorari was granted, which was the following:

> "Whether, in a defamation action instituted by a candidate for public office, the *First* and *Fourteenth Amendments* obligate an appellate court to conduct an independent review of the entire factual basis for a jury's finding of actual malice -- a review that examines both the subsidiary facts underlying the jury's finding of actual malice and the jury's ultimate finding of actual malice itself."

 **[**2701]**  That question squarely raised the conflict **[****70]**  that the Sixth Circuit perceived it had created with an earlier decision of the District of Columbia Circuit, en banc, concerning the requirement we set forth in *Bose Corp. v.  [***595] Consumers Union of United States, Inc., 466 U.S. 485 (1984)*, that judges "exercise independent judgment" on the question "whether the record establishes actual malice with convincing clarity," *id., at 514*. The nub of the conflict, which is of overwhelming importance in libel actions by public figures, is whether this means, as the Sixth Circuit understood the District of Columbia Circuit to have held in *Tavoulareas v. Piro, 260 U. S. App. D. C. 39, 817 F. 2d 762 (1987)* (en banc), that the trial judge and reviewing courts must make their own "independent" assessment of the facts allegedly establishing malice; or rather, as the Sixth Circuit held here (explicitly rejecting *Tavoulareas*), that they must merely make their own "independent" assessment that, *assuming all of the facts that could reasonably be found in favor of the plaintiff were found in favor of the plaintiff*, clear **[****71]**  and convincing proof of malice was established.

Today's opinion resolves this issue in what seems to me a peculiar manner.  The Court finds it sufficient to decide the present case to accept, not all the favorable facts that the  **[*698]**  jury *could reasonably* have found, but rather only the adequately supported favorable facts that the jury *did* find.  Exercising its independent judgment just on the basis of those facts (and the uncontroverted evidence), it concludes that malice was clearly and convincingly proved. The crucial passage of the Court's opinion is the following:

> "Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper;

448

EXHIBIT 43                                    EXHIBIT 23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

(2) the testimony of Blount that he did not listen to the tapes simply because he thought they would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that they believed Thompson's allegations were substantially **[****72]** true.  When these findings are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inextricably follows." *Ante*, at 690-691 (emphasis in original).

This analysis adopts the most significant element of the Sixth Circuit's approach, since it accepts the jury's determination of at least the necessarily found controverted facts, rather than making an independent resolution of that conflicting testimony.  Of course the Court examines the evidence pertinent to the jury determination -- as a reviewing court always must -- to determine that the jury *could reasonably* have reached that conclusion.  But the Court does not purport to be exercising its own independent judgment as to whether Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper, whether Blount did not listen to the tapes because he thought they would provide no new information, or whether the Journal News employees believed Thompson's allegations to be substantially true.

 **[*699]**  While I entirely agree with this  **[***596]**  central portion of the Court's analysis, I do not understand the Court's approach in conducting **[****73]**  that analysis only on the basis of the three factual determinations the Court selects.  To begin with, I am dubious of the Court's conclusion that the jury *must* have made all three of those findings in order to bring in the verdict that it did under the judge's instructions, and in order to answer as it did the only relevant "special interrogatory," which was "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?" It seems to me, for example, that even if one believed Blount's explanation of why he did not listen to the tapes, it would still be reasonable to find  **[**2702]**  (and I would find) clear and convincing proof of malice from the utterly inexplicable failure to interview Stephens plus the uncontroverted evidence.

More important, however, even if each of these factual findings happened to be *necessary* to the verdict and interrogatory response, I see no reason to make them the exclusive focus of our analysis, instead of consulting (as the Sixth Circuit did, and as courts invariably do when reviewing jury verdicts) all the reasonably supported findings that the jury could have made.  It may well be true that "we  **[****74]**  need only consider those factual findings that were essential to the jury verdict" in the sense that referring to those alone is enough to decide the case -- *i. e.*, those alone establish clear and convincing proof of malice. But one could pick out any number of categories of permissible jury findings that would meet that test.  For example, it might be true that we could find the requisite proof of malice by considering, not all the evidence in its light most favorable to the plaintiff, but only that evidence produced by a particular witness.  We could then say "we need only consider the findings the jury might have made based on the testimony of Mr. Smith to decide this case." I see no more logic in limiting the inquiry the way the Court has done than in limiting it in this latter fashion.

 **[*700]**  That can be made plain by applying the Court's approach to a situation in which the facts essential to the jury verdict happen *not* to establish clear and convincing proof of malice. Assume a case in which there are innumerable controverted allegations, dozens of which, if the plaintiff's version is credited, would suffice to establish malice; but in which only *one* controverted **[****75]**  allegation -- the defendant's allegation that he knew firsthand the truth of the libelous charges -- could not *possibly* have been found against the plaintiff if the jury was to come in with the verdict that it did.  If we applied today's analysis to that situation, we would then proceed to ask whether the fact that the defendant did not know firsthand the truth of the charges, and that he lied about that, is alone enough to establish clear and convincing proof of malice. It clearly would not be.  Surely, however, we would not reverse the judgment for the plaintiff, when dozens of other disputed contentions which the jury might have resolved in the plaintiff's favor *would* establish clear and convincing proof. We would, as the Sixth Circuit did, assume that all those disputes were resolved in the plaintiff's favor -- unless, of course, we again devised some nonfunctional category of the remaining disputes that we could look to, perhaps  **[***597]**  those pertaining to testimony by Mr. Smith.

In sum, while the Court's opinion is correct insofar as the critical point of deference to jury findings is concerned, I see no basis for consulting only a limited number of the permissible **[****76]**  findings.  I would have adopted the Sixth Circuit's analysis in its entirety, making our independent assessment of whether malice was clearly and convincingly

**EXHIBIT 43**                                                                              EXHIBIT  23

Harte-Hanks Communications v. Connaughton, 491 U.S. 657

proved on the assumption that the jury made all the supportive findings it reasonably could have made.  That is what common-law courts have always done, and there is ultimately no alternative to it.

## References

32 Am Jur 2d, Federal Practice and Procedure 363; *50 Am Jur 2d, Libel and Slander 135, 296-303, 462*

2 Federal Procedure, L Ed, Appeal, Certiorari, and Review 3:649; 33 Federal Procedure, L Ed, Trial 77:243-77:246

16 Am Jur Pl & Pr Forms (Rev), Libel and Slander, Forms 29, 184, 297

14 Am Jur Proof of Facts 2d 49, Defamation with Actual Malice

17 Am Jur Trials 223, Libel Actions by Public Officials

USCS, *Constitution, Amendment 1*

US L Ed Digest, Appeal 1673; Constitutional Law 948; Evidence 918

Index to Annotations, Findings of Fact; Libel and Slander; New York Times Rule

　　**[****77]**　　　Annotation References:

Supreme Court's views as to what constitutes factual issue under "clearly erroneous" standard of *Federal Rule of Civil Procedure 52(a)*, providing that findings of fact shall not be set aside unless clearly erroneous.  *72 L Ed 2d 890*.

 Progeny of New York Times v Sullivan in the Supreme Court. *61 L Ed 2d 975*.

The Supreme Court and the right of free speech and press.  *93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976*.

Criticism or disparagement of character, competence, or conduct of candidate for office as defamation.  *37 ALR4th 1088*.

What constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice.  *20 ALR3d 988*.

Constitutional aspects of libel or slander of public officials.  *95 ALR2d 1450*.

**End of Document**