EXHIBIT 44

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**(AUSTIN DIVISION)**

| | | |
|---|---|---|
| **ERICA LAFFERTY, *et al.*,** | § | |
| **Plaintiffs (Judgment Creditors)** | § | |
| | § | |
| **vs.** | § | **Civil Action 1:24-cv-1198** |
| | § | |
| **ALEXANDER E. JONES, et al.,** | § | **Jury Trial Demanded** |

**ALEX JONES'S FIRST AMENDED ANSWER, AFFIRMATIVE**
**DEFENSES SUBJECT THERETO, AND COUNTERCLAIMS**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

In response to Plaintiffs'[1] Application for Domestication of the Connecticut Judgment and for Post-Judgment Turnover and Appointment of Receiver as to Judgment Debtor Alexander E. Jones (the "Removed State Court Suit"), Alex Jones ("Jones") timely files this First Amended Answer, Affirmative Defenses, and Counterclaims, and in support thereof would show as follows:

**I.**
**JONES' ANSWER**

1. Jones denies generally the multiple allegations and conclusions set out in ¶1 of the Removed State Court Suit including that Jones is now obligated to the Connecticut Plaintiffs on the non-final Connecticut Judgment.

2. Jones denies that the Connecticut Judgment is enforceable against the discharge in bankruptcy of Jones, including because of the fact that the Connecticut Judgment was rendered by fiat of a state judge and not a "clear and convincing" jury finding as to any of the elements of the

---

[1] Plaintiffs are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (collectively the "Connecticut Plaintiffs")

**EXHIBIT 44**

causes of action asserted.  Also, damages were awarded on a preponderance standard instead of a clear and convincing standard.

3.      Jones denies that the Connecticut Judgment is enforceable as it is against the First and Fourteenth Amendments to the Constitution and as such violates Jones's rights of free speech particularly as media defendants, as regards, public figures and as regards matters of public concern and the judiciary's fiat declarations that judicially declared Jones to be liable for the acts complained of in the Connecticut Complaint, thus violates the Due Process Clause of the Fourteenth Amendment.

4.      Jones denies that the Connecticut Judgment is enforceable as it is against Texas public policy.

5.      Jones denies that the Connecticut Judgment has been properly domesticated and alleges that such purported domestication was concealed from Jones, was obtained without due process of law or in strict compliance with Texas Domestication Statutes, and accordingly is void.

6.      Jones denies that on October 19, 2023, the Bankruptcy Court entered a "final order" determining that $1,115,000,000 of the Connecticut Judgment was non-dischargeable in bankruptcy and, therefore, unaffected by the bankruptcy proceedings (the "Purported Non-Dischargeable Connecticut Judgment").  In fact, Jones sought an interlocutory appeal of this interlocutory partial summary judgment, findings and conclusions, but such interlocutory appeal was denied and accordingly, the summary judgment remains partial, interlocutory and subject to bankruptcy court reconsiderations, and such claim by the Connecticut Plaintiffs that the judgment is "final" is false.

7.      No final judgment on dischargeability of the Connecticut Judgment is final in Connecticut, and accordingly cannot have been domesticated in Texas and cannot support any

**EXHIBIT 44**

claims of a right to execution on any purported assets of Jones or support the extraordinary remedy of a receiver on a non-final appealed judgment.

8.      Although Jones admits the allegations of ¶2 of the Removed State Court Suit that the United States Bankruptcy Court for the Southern District of Texas issued an Order vesting authority in the trustee appointed for Judgment Debtor Alex Jones' bankruptcy to take control of Judgment Debtor Free Speech Systems, LLC ("FSS") cash assets, including its bank accounts, and entered an order permitting the Trustee to dispose of those assets for the benefit of Alex Jones' creditors,[2] Jones (and now Jones' Chapter 7 Trustee) owns 100% of the equity interests in FSS and 100% of the non-exempt assets of Jones, including this equity.

9.      Jones denies in ¶ 2:

   a.  that the bankruptcy court has determined the rights to any assets of FSS or Jones *viz-a-viz* creditors competing interests, nor has the bankruptcy court rendered any "final" "appealable" judgment or order allowing or disallowing either exemptions or determining dischargeability of the Connecticut Judgment. Accordingly, any action, no matter how intricately described by Plaintiffs, can access any property or personal and persona interest of Jones until the bankruptcy court enters such final orders.   No receiver could be appointed to take control of assets in the jurisdiction of the bankruptcy court; and

   b.  that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, *non-appealable*, properly domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

10.      Jones denies generally the allegations and conclusions of Plaintiffs in ¶3 of the Removed State Court case regarding liquidated or unliquidated claims against Jones.  Jones alleges that no such determination may be made until (i) all claims are reduced to a judgment that is final and appealable and non-stayed; (ii) all claims are found to be non-dischargeable by final order that is non-appealable; and (iii) all claims to exemptions of Jones have been determined by final order

---

[2]      See Dkt. 956 (June 21, 2024), No. 22-60043 (Bankr. S.D. Tex.).

**EXHIBIT 44**

non-appealable or non-stayed.  Important to this denial is that neither the Connecticut Judgment or the Texas Judgment are final on appeal, and both are stayed pending appeal either by statute[3] or by agreement or alternatively, both judgments are subject to supersedeas rights of Jones, under both Connecticut law and Texas law.  [*See*, *also*, AMENDED Notice of Removal, Dkt. 7].

11.     Jones also denies the Connecticut Plaintiffs may change the law and statutes to allow proceeds available to satisfy a judgment to be applied is some manner agreed among judgment holders other than as specified by statute and law;  that is, Plaintiffs cannot, as suggested in ¶ 3, overcome the first claim by Texas Plaintiffs to priority over the funds, and at the same time compel payments to judgment creditors to be applied other than in strict compliance with Texas law.

12.     Jones denies that such agreed relief set out in ¶ 3 is allowable at law.  In this regard, Jones would show that the Texas Plaintiffs have already tried to execute on assets of FSS and such efforts were removed to the bankruptcy court where they remain subject to the determination of the bankruptcy court to entitlement of the pending sale and resulting proceeds, just as this removal should be handled, and such collection action has not been remanded by the bankruptcy court.

13.     As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

14.      Jones denies the Plaintiffs' allegations and conclusions in ¶ 4 that:

---

3       *See*, Connecticut Judgment is Stayed Until a Final Judgment.  The following is from the Connecticut Practice Book – Rules of Court:

Sec. 61-11. Stay of Execution in Noncriminal Cases (a) Automatic stay of execution Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to [take] file an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. If the case goes to judgment on appeal, any stay thereafter shall be in accordance with Section 71-6 (motions for reconsideration), Section 84-3 (petitions for certification by the Connecticut supreme court), and Section 71-7 (petitions for certiorari by the United States supreme court).

**EXHIBIT 44**

a. Connecticut Plaintiffs are not seeking relief that violates the automatic stay. In fact, the Connecticut Plaintiffs have violated the automatic stay by setting the hearing on Turnover and Receivership without notice to the Bankruptcy Court and seeking lifting of the automatic stay; and

b. that it is the Connecticut Plaintiffs that are permitted by law to determine whether or not "… any assets acquired by Judgment Debtor Alex Jones after his case was converted to a Chapter 7 on June 14, 2024, *(does) not constitute property of the Chapter 7 bankruptcy Estate* and are thus available to satisfy the Judgment." That determination is in the exclusive jurisdiction of the bankruptcy court, and includes assets paid by the Chapter 7 estate after that date to Jones for his continued maintenance and broadcast of "The Alex Jones Show" to facilitate the sale and income of FSS pending this sale which salary to Jones is, as an example, exempt.

15. As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

16. Jones denies the allegations and conclusions of the Connecticut Plaintiffs set out in ¶ 5 of the Removed State Court Suit that the Connecticut Plaintiffs are entitled to any of the relief listed in ¶ 5. As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

17. Jones agrees with the judicial admission of the Connecticut Plaintiffs in ¶ 6 that the only rights of Plaintiffs "… to execute on the Judgment (shall be only) in accordance with any prospective developments in any bankruptcy proceeding pertaining to the Judgment Debtor (Jones)." [*See*, ¶ 6, pg. 4, Removed State Court Suit]. Jones denies all other statements. As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

18. Jones is not required to admit or deny the statements in ¶7.

**EXHIBIT 44**

19.     Jones denies the Plaintiffs' suggestion and/or conclusion in ¶ 8 of the application of TEX. CIV. PRAC. & REM. CODE § 31.002(a) as justifying or authoring a receivership over Jones interests or rights in and to property in the custody of the bankruptcy court, or as a result of the improper and void attempt to domesticate the Connecticut Judgment.

20.     Jones denies the Plaintiffs' suggestion and conclusion in ¶ 9 that the application of TEX. CIV. PRAC. & REM. CODE § 31.002(b) justifies or authorizes a receivership over Jones interests or rights in and to property in the custody of the bankruptcy court, or as a result of the improper and void attempt to domesticate the Connecticut Judgment.

21.     Jones denies the allegations and conclusions in ¶ 10 that there is non-exempt property disclosed in discovery responses of Jones Exhibit "1". As suggested in the Declaration of Alinor C. Sterling, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

22.     Jones denies the allegations and conclusions in ¶ 11 that the Receiver is entitled to "turn over all non-exempt, non-bankruptcy estate property" of Jones and alleges that the facts of jurisdiction and the Texas or federal statutes do not authorize such an order and Connecticut does not have a domesticated judgment to support such relief. As set out above, Jones denies that the Connecticut Plaintiffs have any judgment, including the Connecticut Judgment, that is final, non-appealable, domesticated, and recognized as enforceable to support an execution, attachment or the drastic remedy of a receiver.

23.     Jones is not required to admit or deny the legal conclusions set out in ¶ 12 of the Motion.

**EXHIBIT 44**

24.     Jones is not required to admit or deny the legal conclusions set out in ¶ 13 of the Motion.

**II.**
**JONES'S AFFIRMATIVE DEFENSES**

25.     **Illegality** – the Domestication of the Judgment was obtained by Connecticut Plaintiffs' denial of Jones Constitutional and due process rights and is void.

26.     **Fraud** – the domestication of the Connecticut Judgment was obtained by misstatement of fact, misleading statements regarding "final" non-dischargeable orders, and false certificates of service that purport to represent that the domestication statute had been timely and properly served.

27.     **Lack of Standing** – no final judgment entitled to enforcement.  The Connecticut Plaintiffs have no standing to seek either the Domestication of the Connecticut Judgment or the Turnover order or the Receivership.

28.     **Void Judgment** – the Domestication of the Connecticut Judgment was procured by the denial of due process notice to Jones and is void.   Without limiting the generality of the foregoing, Jones alleges that the Connecticut Judgment is void as it is against the First and Fourteenth Amendments to the Constitution and as such violates Jones's rights of free speech particularly as media defendants, as regards, public figures and as regards matters of public concern and the judiciary's fiat declarations that judicially declared Jones to be liable for the acts complained of in the Connecticut Complaint, violates the Due Process Clause of the Fourteenth Amendment.

29.     **Violations of Jones's Constitutional Rights** – for the reasons set forth in the Counterclaim that follows (which is incorporated herein by reference), the Connecticut Judgment has been procured by numerous violations of Jones's rights guaranteed under the Constitution and

Page 7 of 44
**Page 7 of 73**

is therefore void and/or unenforceable.

30.     **Unconstitutional and Unlawful Emotional Distress Damages** – the amounts awarded as defamation damages and emotional distress damages are improper and unconstitutional as they are not tied to any established guidelines and were assessed absent substantial physical manifestation of emotional distress.  Further, the awards are grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.

31.     **Unconstitutional and Unlawful Double Counting of Emotional** – the amounts awarded as defamation damages and emotional distress damages are improper as they are duplicative of one another.

32.     **Unconstitutional Punishment Damages** – the outrageous and absurd one-half a billion dollars in punitive damages is unconstitutional and resulted from the denial of due process of Jones's rights.  They are grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork even if tied to the inappropriate alleged "compensatory damages."

33.     **Unconstitutional Taking** – the damages awarded by the Connecticut Judgment are unconstitutional in that they result in an unconstitutional taking of Jones property, sanctioned by state law.

34.     **Failure Conditions Precedent – Estoppel** – the Connecticut Plaintiffs are estopped from Domesticating their non-final Connecticut Judgment that is stayed by operation of Connecticut law.

35.     **Failure Conditions Precedent – Estoppel** – the Connecticut Plaintiffs are estopped from receiving a turnover of Jones' assets or the appointment of a receiver by: (i) the

**EXHIBIT 44**

automatic statutory supersedeas laws of Connecticut; (ii) the statutory supersedeas laws of the State of Texas; and (iii) the automatic stay of the bankruptcy code § 362.

36.    **Offset** – Jones is entitled to offset all damages arising from the actions of the Connecticut Plaintiffs on void orders or judgments entered upon and as a direct result of the denial of due process rights of Alex Jones or as found to be due in the Jones Counterclaims set out herein below.

37.    **Violations of Texas Public Policy** – Jones asserts the Connecticut Judgment is enforceable as it is against Texas public policy.

WHEREFORE, Alex E. Jones prays of for an order and judgment of this Court that the Connecticut Plaintiffs take nothing in their Removed State Court Case, and for such other and further relief to which Alex E. Jones may be entitled, at law or in equity.

EXHIBIT 44

## FIRST AMENDED COUNTERCLAIMS
## OF ALEX E. JONES

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

38.     Defendant and Counterclaim Plaintiff Alexander E. Jones (herein "Alex Jones"), files these first amended counterclaims pursuant to 42 U.S.C.S. §1983 and the United States Constitution as to the various plaintiffs/counterclaim defendants, identified below as the "Connecticut Plaintiffs," seeking among other things, (a) various declarations that the judgment obtained by the Connecticut Plaintiffs against Mr. Jones in Connecticut is invalid and unenforceable as a matter of law as it was knowingly procured in violation of the United States Constitution, (b) injunctive relief precluding the enforcement the Connecticut judgment obtained by the Connecticut Plaintiffs against Mr. Jones as it was procured in knowingly violation of the United States Constitution, and (c) damages for the numerous violations of the civil rights of Mr. Jones, as hereafter set forth.

39.     The Connecticut Plaintiffs filed a Complaint in Connecticut state court (the "Connecticut Complaint") in 2018, nearly 6 years after the Sandy Hook murders had taken place. That resulted in an unconstitutional judgment against Mr. Jones in the amount of almost **$1,500,000,000** as among the 15 Connecticut Plaintiffs, many of whom were related to one another, such awards breaking down as follows:

EXHIBIT 44

**Compensatory Damages Erica Lafferty:**

TO PLAINTIFF ERICA LAFFERTY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $58,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ERICA
LAFFERTY AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $76,000,000.00

**Punitive Damages Erica Lafferty:**     $40,000,000.00

**Total Award for Erica Lafferty:**     **$116,000,000.00**

**Compensatory Damages William Sherlach:**

TO PLAINTIFF WILLIAM SHERLACH:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $9,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $27,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
SHERLACH AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $36,000,000.00

**Punitive Damages William Sherlach:**     $40,000,000.00

**Total Award for William Sherlach:**     **$76,000,000.00**

**Compensatory Damages Robert Parker:**

TO PLAINTIFF ROBERT PARKER:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $60,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF ROBERT
PARKER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $120,000,000.00

**Punitive Damages Robert Parker:**     $40,000,000.00

**Total Award for Robert Parker:**     **$160,000,000.00**

**Compensatory Damages Jennifer Hensel:**

TO PLAINTIFF JENNIFER HENSEL:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $21,000,600.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $31,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JENNIFER
HENSEL AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $52,000,000.00

**Punitive Damages Jennifer Hensel:**     $17,330,000.00

**Total Award for Jennifer Hensel:**     **$69,330,000.00**

**Compensatory Damages David Wheeler:**

TO PLAINTIFF DAVID WHEELER:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $30,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF DAVID
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $55,000,000.00

**Punitive Damages David Wheeler:**     $18,330,000.00

**Total Award for David Wheeler:**     **$73,330,000.00**

**Compensatory Damages Francine Wheeler:**

TO PLAINTIFF FRANCINE WHEELER:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $24,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $30,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF FRANCINE
WHEELER AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $54,000,000.00

**Punitive Damages Francine Wheeler:**     $18,000,000.00

**Total Award for Francine Wheeler:**     **$72,000,000.00**

**EXHIBIT 44**

**Compensatory Damages Mark Barden:**

TO PLAINTIFF MARK BARDEN:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) — $25,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) — $32,600,000.00

TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF MARK BARDEN AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) — $57,600,000.00

**Punitive Damages Mark Barden:** $19,200,000.00

**Total Award for Mark Barden:** $76,800,000.00

**Compensatory Damages Jacqueline Barden:**

TO PLAINTIFF JACQUELINE BARDEN:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) — $10,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) — $18,800,000.00

TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF JACQUELINE BARDEN AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) — $28,800,000.00

**Punitive Damages Jacqueline Barden:** $9,600,000.00

**Total Award for Jacqueline Barden:** $38,400,000.00

**Compensatory Damages Ian Hockley:**

TO PLAINTIFF IAN HOCKLEY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) — $38,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) — $43,600,000.00

TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF IAN HOCKLEY AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) — $81,600,000.00

**Punitive Damages Ian Hockley:** $27,200,000.00

**Total Award for Ian Hockley:** $108,800,000.00

**Compensatory Damages Nicole Hockley:**

TO PLAINTIFF NICOLE HOCKLEY:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) — $32,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) — $41,600,000.00

TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF NICOLE HOCKLEY AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) — $73,600,000.00

**Punitive Damages Nicole Hockley:** $24,530,000.00

**Total Award for Nicole Hockley:** $98,130,000.00

**Compensatory Damages Carlos Mathew Soto:**

TO PLAINTIFF CARLOS MATHEW SOTO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) — $18,600,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) — $39,000,000.00

TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF CARLOS MATHEW SOTO AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) — $57,600,000.00

**Punitive Damages Carlos Mathew Soto:** $19,200,000.00

**Total Award for Carlos Mathew Soto:** $76,800,000.00

**Compensatory Damages Donna Soto:**

TO PLAINTIFF DONNA SOTO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE) — $18,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE) — $30,000,000.00

TOTAL FAIR, JUST AND REASONABLE DAMAGES TO PLAINTIFF DONNA SOTO AND AGAINST ALEX JONES AND FREE SPEECH SYSTEMS (ADD LINE A AND LINE B) — $48,000,000.00

**Punitive Damages Donna Soto:** $16,000,000.00

**Total Award for Donna Soto:** $64,000,000.00

**EXHIBIT 44**

---

**Compensatory Damages Carlee Soto Parisi:**

TO PLAINTIFF CARLEE SOTO PARISI:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $30,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $36,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF CARLEE
SOTO PARISI AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $66,000,000.00

**Punitive Damages for Carlee Soto Parisi:** $22,000,000.00

**Total Award for Carlee Soto Parisi:**     $88,000,000.00

---

**Compensatory Damages Jillian Soto-Marinio:**

TO PLAINTIFF JILLIAN SOTO-MARINO:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $30,000,600.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $38,800,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF JILLIAN
SOTO-MARINO AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $68,800,000.00

**Punitive Damages Jillian Soto-Marinio:** $22,930,000.00

**Total Award for Jillian Soto-Marinio:**     $91,730,000.00

---

**Compensatory Damages William Aldenberg:**

TO PLAINTIFF WILLIAM ALDENBERG:

A. DEFAMATION/SLANDER DAMAGES
(PAST AND FUTURE)     $45,000,000.00

B. EMOTIONAL DISTRESS DAMAGES
(PAST AND FUTURE)     $45,000,000.00

TOTAL FAIR, JUST AND REASONABLE
DAMAGES TO PLAINTIFF WILLIAM
ALDENBERG AND AGAINST ALEX JONES
AND FREE SPEECH SYSTEMS
(ADD LINE A AND LINE B)     $90,000,000.00

**Punitive Damages William Aldenberg:** $30,000,000.00

**Total Award for William Aldenberg:**     $120,000,000.00

---

A near identical complaint has been filed initiating an adversary proceeding in Texas to collect that judgment (the "Adversary Complaint"). The Connecticut Complaint (and its ensuing judgment) and the Adversary Complaint filed in Texas to collect on that judgment effectively put Mr. Jones out of business and attempted to silence him – forever.

40. However, the Connecticut Complaint and ensuing judgment the Adversary Complaint seeks to enforce, are unconstitutional. Further, their procurement and enforcement violates 42 U.S.C.S. §1983 and the United States Constitution. In brief summary, which the trial of this Counterclaim will demonstrate, under black-letter ironclad United States Supreme Court mandates, certain Constitutional requirements were to be afforded Mr. Jones but which the

**EXHIBIT 44**

Connecticut Plaintiffs worked together with the state judiciary to deny Mr. Jones. These protections include the following impregnable and unassailable requirements:

a.  The Connecticut Plaintiffs, were required to prove to a jury by clear and convincing evidence, that Mr. Jones acted with actual malice as to each and every alleged libelous statement he was accused of making, whereas the Connecticut Plaintiffs procured the abrogation of that right.

- "…under this Court's First Amendment jurisprudence, [the Connecticut Plaintiffs] cannot establish libel without proving by clear and convincing evidence that [Mr. Jones] acted with actual malice—that is with knowledge that the published material was false or with reckless disregard of whether it was false." *Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021) (*citing New York Times Co. v. Sullivan*, 376 U. S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 334-335, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); and *Curtis Publishing Co. v. Butts*, 388 U. S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967).

- "The First Amendment limits California's libel law in various respects. When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i. e., with knowledge that it was false or with reckless disregard of whether it was false or not. Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication." *Masson v. New Yorker Magazine*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429 (1991) (*citing New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)).

b.  A Constitutionally required finding of "malice" is not an objective one, but a *subjective* one focusing on what Mr. Jones himself believed, which the Connecticut Plaintiffs convinced the Connecticut court to ignore in violation of those Constitutional rights.

- Under this rule, absent knowing falsehood, liability requires proof of reckless disregard for truth, that is, that the defendant in fact entertained serious doubts as to the truth of his publication. Such subjective awareness of probable falsity, may be found if there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Herbert v. Lando,*

441 U.S. 153, 156-57, 99 S. Ct. 1635, 1639 (1979) (internal citations and quotations omitted) (*citing St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 n. 6 (1974)).

c.  A fact finder must have actually made the determination of malicious libel; it cannot

be presumed which the Connecticut Plaintiffs convinced the Connecticut court to

ignore and presume malice.

- Even where a question of fact may have constitutional significance, we normally accord findings of state courts deference in reviewing constitutional claims here. But that deference is predicated on our belief that at some point in the state proceedings some factfinder has made a conscious determination of the existence or nonexistence of the critical fact. Here the record before us affords no basis for such a conclusion." *Time, Inc. v. Firestone*, 424 U.S. 448, 463, 96 S. Ct. 958, 969-70 (1976) (*citing Lyons v. Oklahoma*, 322 U.S. 596, 602-603 (1944); *Gallegos v. Nebraska*, 342 U.S. 55, 60-61 (1951)).

d.  Punitive damages can only be awarded after complying with the standards of *New*

*York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710

(1964) which the Connecticut Plaintiffs convinced the Connecticut court to ignore:

- They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury." *Gertz v. Robert Welch*, 418 U.S. 323, 350, 94 S. Ct. 2997, 3012 (1974)

e.  Constitutional libel limitations apply to state law claims of intentional infliction of

emotional distress which the Connecticut Plaintiffs convinced the Connecticut

court to ignore:

- "We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with actual malice, i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a blind

Case 23-3553, Document 105-18, Filed 11/12/24, Page 16 of 44 / Case 22-33553 Document 1059-18 Filed in TXSB on 12/03/25 Page 16 of 73

**EXHIBIT 44**

application of the New York Times standard, … it reflects our considered judgment that such a standard is necessary to give adequate breathing space to the freedoms protected by the First Amendment." *Hustler Magazine v. Falwell*, 485 U.S. 46, 56-57, 108 S. Ct. 876, 882 (1988)

    f. An alleged libeler cannot be liable for the violent acts of others that the libeler did not specifically and subjectively intend to incite with his libelous speech which the Connecticut Plaintiffs convinced the Connecticut court to ignore judicially holding him responsible for the damages, if any, caused by completely unrelated third parties:[4]

- "This Court has made clear, however, that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment. In Brandenburg v. Ohio, 395 U.S. 444, we reversed the conviction of a Ku Klux Klan leader for threatening "vengeance" if the "suppression" of the white race continued; we relied on the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927-28, 102 S. Ct. 3409, 3433 (1982) (*citing Brandenburg v. Ohio*, 395 U.S. 444, 444, 89 S. Ct. 1827, 1828 (1969) *and Noto v. United States*, 367 U.S. 290, 297, 81 S. Ct. 1517, 1520 (1961) [( the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action"]).

41. And there are other Constitutional protections the Connecticut Plaintiffs succeeded in convincing a Connecticut state court judge to trample when they convinced her to punish Alex

---

[4] Although it must be clearly understood that there was no evidence or even an allegation that Mr. Jones ever one-time urged violence; rather, the Connecticut Plaintiffs simply claimed that unrelated third parties harassed them. As will be discussed *infra*, this does not even approach the Constitution's protections where speakers do actually encourage violence. *See Brandenburg v. Ohio,* 395 U.S. 444 (dealing with KKK threats of vengeance); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 928, 102 S. Ct. 3409, 3434 (1982) (stating with reference to civil rights activist Medgar Evers, "[s]trong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open."); *Watts v. United States*, 394 U.S. 705 (reversing the conviction of a person drafted for Vietnam who said "…if they ever make me carry a rifle the first man I want to get in my sights is L. B. J." dismissing it as "a kind of very crude offensive method of stating a political opposition to the President."

**EXHIBIT 44**

Jones and judicially decree with no proof required, including that a jury of six Connecticut citizens would be instructed, among other things, that Alex Jones acted with actual subjective malice and the Connecticut Plaintiffs need offer no proof of such, let alone by "clear and convincing evidence" and that Alex Jones was personally responsible for everything any third party said or did including harassment of any of the Connecticut Plaintiffs by third parties completely unaffiliated with Alex Jones.

42.     The United States Supreme Court has stated the First Amendment "guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271, 84 S. Ct. 710, 721 (1964). But the Connecticut Plaintiffs convinced the Connecticut judge to toss this on the garbage heap and replace it with a judicial fiat declaring complete liability, leaving only the determination of damages -- which the Connecticut Plaintiffs urged an unhinged and unguided jury to assess for essentially "mental anguish" at over $1,500,000,000.

43.     Specifically, among the penalties imposed, the Connecticut trial judge: (A) struck Mr. Jones's answer and all his constitutional defenses, making it procedurally as if Mr. Jones had simply not shown up; (B) held Mr. Jones legally and factually liable for everything the Connecticut Plaintiffs claimed in their pleadings, whether true or not, including actions and statements by unrelated third parties – all without plaintiffs having to offer any proof at all; (C) judicially decreed that Mr. Jones had subjective knowledge of the falsity of everything the Connecticut Plaintiffs claimed he and third parties said or did -- whether true or not -- without plaintiffs having to offer any proof at all; (D) judicially decreed that all that was left was a trial on plaintiffs' damages, which were presumed and which the Connecticut Plaintiffs needed only to demonstrate by a

Case 23-3553, Document 105-18, Filed 11/12/23, Page 18 of 184
Case 22-33553 Document 1059-18 Filed in KSB 10/02/25 Page 18 of 73

**EXHIBIT 44**

preponderance of the evidence; and (E) ordered Mr. Jones to effectively remain silent during the damages trial, forbidding Mr. Jones from defending himself or challenging anything the Connecticut Plaintiffs claimed.

44.     Doing so constituted an unfair, excessive and unconstitutional penalty, which predictably resulted in an unconstitutional taking of Mr. Jones property

45.     And there were three reasons the Connecticut Plaintiffs urged, and the Connecticut judge accepted, for these unprecedented unconstitutional acts:

- The first reason was that Jones's lawyers had asked the Connecticut court for permission to depose Hillary Clinton, who was a friend of one or more of the Connecticut Plaintiffs and whom Mr. Jones believed was directly or indirectly involved in the case either as part of the gun control agenda or as revenge on Jones since Mr. Trump appeared as a guest on one of Mr. Jones' broadcast during Trump's 2016 campaign against Hillary Clinton.  A protective order had been entered in the case that clearly provided that information covered in depositions could be used for the preparation and trial of the case.   In the motion for leave, Jones's lawyers explained that at a deposition of an unnamed witness (whose name and gender was not used), the witness refused to answer questions about their collective choice of counsel, or who was financing the litigation.  Believing it was Clinton, leave was sought for her deposition.   Because the Plaintiffs had designated the entire deposition as "confidential," the trial court not only denied the request for a deposition commission but felt the lawyers' request violated the protective order.

- The second reason was that Alex Jones's lawyers could not retrieve irrelevant and never-used "Google Analytics" data that Plaintiffs thought would show "s*ales, pricing, web traffic, that is, hits on the website and hits on the Infowars store website." Lafferty v. Jones,* 336 Conn. 332, 336, 246 A.3d 429, 435 n. 35 (2020). However, when the subject is a media broadcast, from a Constitutional standpoint, as the Supreme Court has repeatedly said a "profit motive" is irrelevant in libel cases. *Harte-Hanks,* 109 S. Ct. at 2686.

- Alex Jones's lawyers could not retrieve in a form and format to the liking of the Plaintiffs, any accounting "subaccounts" from their accounting journal entries, again which the Plaintiffs presumably hoped to use to show a profit motive, which is irrelevant to whether a media defendant has been proven to have committed malicious libel.

**EXHIBIT 44**

46.    That these are the three – and only three – reasons such judicial "death penalty" was rendered is not in dispute as evidenced by the transcript of the November 15, 2021, hearing where this death penalty was judicially levelled.  See **Exhibit A** hereto. [5]  But it resulted in one of the most unprecedented and knowing acts of constitutional defiance in the annals of modern constitutional jurisprudence.

47.    As direct result of these violations of Mr. Jones's civil rights, his business has been decimated resulting in significant financial losses due to the acts of the Connecticut Plaintiffs for which they must now be held accountable.

## I.
## PARTIES

48.    The Counterclaim Plaintiffs who are Defendants in this counterclaim are David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, Williams Aldenberg, William Sherlach, Robert Parker, and Erica Ash (formerly Erica Lafferty) (previously defined collectively the "Connecticut Plaintiffs").

## II.
## JURISDICTION AND VENUE

49.    Jurisdiction exists pursuant to §§ 28 U.S.C. 1332, 1334, §1441(a), (b)(2), 1442, and 1452(a).  Additionally, jurisdiction exists because the Connecticut Plaintiffs initiated an Adversary Proceeding in the bankruptcy court requesting that the Bankruptcy Court find that the Connecticut Judgment be determined non-dischargeable.  Specifically, the Connecticut Plaintiffs filed a 40 page complaint (the "Complaint") attached to which are either specifically attached or incorporated by

---

[5] And not only were these death penalty sanctions judicially rendered, the Connecticut Plaintiffs successfully urged the Connecticut court to not allow Mr. Jones to defend that he did not profit in any material way from any Sandy Hook related-broadcast.  This amounted to putting a bullet in the brain pan of an already dead defense.

reference, "[t]he record leading to the Connecticut Judgment ,… filings by Plaintiffs and Alex Jones, rulings by the Connecticut trial court and Connecticut Supreme Court and a jury verdict following the damages trial."  They then filed a motion for summary judgment.

### III.
### BACKGROUND FACTS

A.    **ALEX JONES IS A MEDIA DEFENDANT ENTITLED TO ALL FIRST AMENDMENT PROTECTIONS**

50.    Alex Jones is a media defendant.  Recognized by both supporters and critics, Jones has been at the forefront of media for nearly three decades, with his career spanning radio, online broadcasting, film, and commentary. Though some controversies have followed him, Jones has maintained his dedication to free speech and individual rights, positioning himself as a steadfast proponent of questioning mainstream narratives.  The Connecticut Plaintiffs readily admit this. As such he is entitled to, but was denied, all the Constitutional protections afforded media defendants. While it may come as a surprise to some, until sued by the Connecticut Plaintiffs and their associates in Texas based on the Sandy Hook tragedy, Jones had never been in any significant lawsuits.

51.    Currently, he hosts The Alex Jones Show from Austin, Texas, which is the longest-running online news and politics talk show today and was previously broadcast by the Genesis Communications Network across the United States via syndicated and internet radio.

*Early life and influences*

52.    Alex Jones was born on February 11, 1974, in Dallas, Texas, and was raised in Rockwall, 25 miles east of Dallas.  His family moved to Austin in Jones's sophomore year of high school. He attended Anderson High School, and briefly attended Austin Community College.

**EXHIBIT 44**

Jones's formative years in Texas—along with the state's emphasis on personal liberty—helped shape his views on individual rights, government, and media freedom

*Early broadcasting career*

53.      Jones began his career in Austin working on a live, call-in format public-access cable television program, focusing on issues such as property rights, personal freedoms, and Second Amendment advocacy. His approach resonated with a Texan audience sensitive to libertarian values and government accountability.

54.      In 1996, Jones transitioned to radio, hosting a show named The Final Edition on KJFK (98.9 FM).   Influenced by Congressman Ron Paul and Rush Limbaugh, Jones began to broadcast about the New World Order conspiracy theory at this time. In 1999, Jones tied with Shannon Burke for that year's poll of "Best Austin Talk Radio Host", as voted by readers of The Austin Chronicle.  Within a few years, by 1998 a syndicator put all of Jone's shows throughout the country.   Jones has a huge following of viewers espousing mainly a Libertarian, individual perspective that leans more towards younger listeners.

55.      In about 1999, Jones founded the website InfoWars, initially as a news site for the sale of their videos and documentary films.  Over time, InfoWars, with Jones as its publisher and director, became a prominent website centered on promoting conspiracy theories.  By 2000 he was on over 100-150 radio stations nation-wide interviewing people and becoming the pioneer of talk radio and what is now podcasting.

56.      In 2010, the show attracted around two million listeners each week.  By 2011 Jones had a larger on-line audience than Glenn Beck and Rush Limbaugh combined.

57.     On 2013, Jones appeared as a guest on the BBC's Sunday Politics, discussing conspiracy theories about the Bilderberg Group, with presenter Andrew Neil and journalist David Aaronovitch and was invited to speak on Piers Morgan's CNN.

58.     In November 2016, the InfoWars website received approximately 10 million visits a week, making its reach more extensive than mainstream news websites such as The Economist and Newsweek. Another of Jones's websites is PrisonPlanet.com and his radio show, then syndicated to 129 stations, had a daily audience of five million listeners and his video streams had topped 80 million viewers in a single month.

59.     In 2020, The Alex Jones Show was syndicated nationally by the Genesis Communications Network to more than 100 AM and FM radio stations in the United States.

## *Guests Interviewed*

60.     Jones's guest list continues to expand into the realms of politics, alternative medicine, and global policy. Each interview tends to add another layer to his often-controversial discussions.  These guests span different political, social, and alternative perspectives, fitting the variety of topics Jones discusses.  A non-exclusive list of guests are:

- Donald Trump
- Elon Musk
- Daniel Ellsberg
- Tucker Carlson
- Ray McGovern former CIA officer
- Many US Senators and Congressmen
- Joe Rogan – Podcast host and commentator known for The Joe Rogan Experience
- David Icke – Conspiracy theorist and author known for his theories on global elites and reptilian beings
- Ron Paul – Former Congressman and presidential candidate known for his libertarian views
- Andrew Napolitano – Former judge and Fox News analyst
- Steve Bannon – Former White House Chief Strategist and executive chairman of Breitbart News
- Paul Joseph Watson – British commentator and writer known for his work with Infowars

**EXHIBIT 44**

- Dr. Stella Immanuel – Physician who became widely known for her views on COVID-19 and hydroxychloroquine
- Robert F. Kennedy Jr. – Environmental attorney and activist, also known for his views on vaccines
- Milo Yiannopoulos – Political commentator known for his controversial views and association with the alt-right
- Charlie Sheen – Actor who appeared to discuss conspiracy theories, including those about 9/11
- Jesse Ventura – Former Governor of Minnesota and conspiracy theorist
- Edward Griffin – Author of The Creature from Jekyll Island, known for his views on the Federal Reserve
- Matt Drudge – Founder of The Drudge Report, who rarely gives interviews
- Jordan Maxwell – Researcher known for his theories on religion, secret societies, and the occult
- Roseanne Barr – Comedian and actress who has discussed her own views on the entertainment industry and politics
- Gavin McInnes – Co-founder of Vice and founder of the Proud Boys
- Anthony Cumia – Radio personality known from the Opie and Anthony show
- William Binney – Former NSA official and whistleblower who spoke about government surveillance
- Jerome Corsi – Political commentator and author involved in various conspiracy theories
- James O'Keefe – Founder of Project Veritas, known for undercover journalism
- Mike Cernovich – Social media personality and author with a focus on political activism
- Roger Stone – Political consultant and former advisor to Donald Trump, frequently interviewed about politics and his legal battles
- Nigel Farage – British politician known for his role in Brexit and leadership of the UK Independence Party (UKIP)
- Dr. Andrew Wakefield – Disgraced British doctor known for his controversial study linking vaccines and autism
- Alexandra Bruce – Writer and researcher known for her work on alternative science and conspiracy theories
- Robert David Steele – Former CIA officer and advocate of open-source intelligence and various conspiracy theories
- Larry Elder – Conservative talk radio host and former California gubernatorial candidate
- David Knight – Former Infowars host who frequently discussed constitutional issues and civil liberties
- Rand Paul – U.S. Senator from Kentucky and prominent libertarian-leaning politician
- Michael Savage – Conservative radio host and author
- Pat Buchanan – Political commentator, author, and former presidential candidate
- Lord Christopher Monckton – British politician and climate change skeptic

**EXHIBIT 44**

- Tommy Robinson – British far-right activist and former leader of the English Defence League (EDL)
- George Galloway – British politician and broadcaster, known for his outspoken views on international issues
- Ann Coulter – Conservative commentator and author
- Alan Watt – Researcher known for his commentary on social engineering and globalist agendas
- Marjorie Taylor Greene – U.S. Congresswoman known for her outspoken views on several conspiracy theories
- Louis Farrakhan – Leader of the Nation of Islam, who has shared alternative perspectives on history and society
- Stefan Molyneux – Philosopher and commentator known for controversial views on race, gender, and culture
- Jon Rappoport – Investigative journalist known for his writings on medical freedom and alternative health
- Tom Fitton – President of Judicial Watch, often discusses government transparency and accountability
- Adam Kokesh – Libertarian activist and former Marine
- Jim Marrs – Journalist and author known for his work on 9/11, UFOs, and the JFK assassination
- Richard Gage – Architect and founder of Architects & Engineers for 9/11 Truth
- Peter Schiff – Economist and financial commentator
- Sargon of Akkad (Carl Benjamin) – British YouTuber and political commentator
- Randall Carlson – Geologist and researcher known for his theories on ancient civilizations and catastrophism
- Cynthia McKinney – Former U.S. Congresswoman with outspoken views on government transparency and military issues
- Clif High – Internet entrepreneur and writer known for his "web bot" predictions
- Neal Fox – Musician and filmmaker known for his libertarian and anti-establishment views
- Dr. Russell Blaylock – Retired neurosurgeon who has discussed the effects of vaccines and processed foods on health
- Richard Belzer – Actor and conspiracy theorist, known for his interest in the JFK assassination and other topics
- Vani Hari (Food Babe) – Activist focused on food ingredients and safety
- Ed Asner – Actor and political activist, who discussed his views on government and corporate power
- Rob Dew – Journalist and producer at Infowars, frequently joining for news segments and commentary
- Michael Scheuer – Former CIA officer and analyst known for his views on U.S. foreign policy and counter-terrorism
- Dr. Sherri Tenpenny – Osteopathic physician who discusses vaccine skepticism
- Larry Nichols – Political consultant and former Clinton advisor who shared various conspiracy theories about the Clintons

**EXHIBIT 44**

- Ames Wesley Rawles – Survivalist and author known for his work on preparedness and self-sufficiency
- Dr. Judy Mikovits – Research scientist who became prominent in the anti-vaccine movement
- Mark Dice – Media analyst and YouTuber known for his satirical and conservative commentary
- Pat Riley – Financial analyst and commentator on economics and government policy
- John B. Wells – Radio host and conspiracy theorist, formerly of Coast to Coast AM
- Lyn Ulbricht – Mother of Ross Ulbricht, founder of the Silk Road marketplace, who advocates for criminal justice reform
- Dr. Rima Laibow – Psychiatrist and medical doctor who discusses natural health and regulatory issues
- Texe Marrs – Pastor and author known for his conspiracy theories and religious beliefs
- Max Keiser – Financial commentator and Bitcoin advocate

## *Interview Topics*

61. Jones has covered major issues of the day including issues associated with 911 which he predicted. Jones covered the falsification of weapons of mass destruction that prompted the Iraq invasion. Interviews occur on controversial subjects like government surveillance, privacy medical freedom and vaccination (Covid mandates), globalism in the New World order, 911 conspiracy theories, UFOs, climate change, secret societies in the tech industry, free speech.

62. Alex Jones's Infowars has covered a vast array of subjects over the years, often with a focus on controversial or alternative perspectives. Here's a rundown of some of the major subjects frequently discussed on the show:

- Government Surveillance and Privacy, covering topics like the NSA's data collection, Big Tech's role in monitoring citizens, and alleged government tracking methods.
- Medical Freedom and Vaccine Skepticism where Jones and guests often discuss issues around mandatory vaccinations, alternative health treatments, and concerns about pharmaceutical industry practices.
- Globalism and the New World Order, covering claims around secret plans by global elites to form a one-world government, often labeled the "New World Order."
- 9/11 Conspiracy Theories, covering claims around the idea that the 9/11 attacks were an "inside job," focusing on perceived inconsistencies in the official narrative.
- UFOs and Extraterrestrial Life covering discussions about alien life, government cover-ups of UFO sightings, and Area 51 conspiracies.

**EXHIBIT 44**

- Financial System and Federal Reserve Criticism covering issues and critiques about the Federal Reserve, fiat currency, and what he views as manipulation of the financial system by elites.
- COVID-19, Health Mandates, and Medical Tyranny addressing theories around the origins of COVID-19, opposition to lockdowns, and skepticism about government and pharmaceutical responses to the pandemic.
- The Deep State addressing the idea that there is a shadow government (the "Deep State") operating independently of elected officials to push certain agendas.
- Climate Change Skepticism frequently challenges mainstream scientific consensus on climate change, with claims it's exaggerated to control populations or promote globalist agendas.
- Secret Societies and Occult Influence addressing claims about the influence of groups like the Illuminati, Freemasons, and Skull & Bones on world events and cultural direction.
- Big Tech Censorship and Free Speech addressing how social media companies and Big Tech allegedly censor conservative and alternative voices.
- Second Amendment Rights and Gun Control addressing strong advocacy for the right to bear arms, with critiques of gun control measures as threats to personal freedom.
- Cultural and Political "Wokeness" discussing what guests see as the dangers of "woke culture" and political correctness, especially in media and education.
- Ancient Civilizations and Hidden History addressing theories and speculation on advanced ancient civilizations and lost knowledge, as well as the suppression of alternative historical narratives
- Transhumanism and Technological Control Addressing concerns about artificial intelligence, human enhancement technology, and the potential for elites to use technology for control.
- Psychological Operations and Media Manipulation addressing discussions around how governments and corporations use media and psychological operations (or "psy-ops") to control public perception and influence behavior.
- Mind Control and MK-Ultra, addressing theories around historical CIA mind control experiments and the possibility of ongoing psychological manipulation techniques.
- Social Engineering and Population Control addressing claims that powerful entities engage in social engineering, manipulating society's structure, norms, and values, sometimes tied to eugenics or population reduction theories.
- Suppression of Alternative Medicine and Natural Health addressing issues associated with arguments that natural and alternative treatments are suppressed to benefit the pharmaceutical industry.
- Space Programs and Secret Technology, addressing theories and speculation on secret government space programs, including alleged advanced technologies kept hidden from the public.
- Weather Modification and Geoengineering, addressing theories around deliberate climate and weather manipulation through geoengineering, such as "chemtrails" and HAARP.

- Child Trafficking and Elite Networks addressing allegations of child trafficking networks involving powerful individuals, often framed as part of broader political scandals.
- Cryptocurrency and Financial Independence which include discussions around Bitcoin, alternative currencies, and their potential as tools for freedom from traditional banking systems.
- Artificial Intelligence and the Rise of the Machines addressing concerns about AI potentially surpassing human intelligence and the ethical and existential risks of robotics and automation.
- Hollywood and Entertainment Industry Influence. Addressing theories that Hollywood and the music industry promote certain agendas, often involving occult symbolism or social engineering
- Pedogate and Alleged Cover-ups of High-Level Abuse addressing speculation that certain political or entertainment elites are involved in abusive practices covered up by networks of power.
- False Flag Operations, discussing events believed to be "false flags," or staged incidents designed to justify government actions or manipulate public opinion.
- Cultural Marxism and Ideological Subversion addressing the theory that cultural institutions are infiltrated to shift society toward Marxist or socialist ideals, allegedly to destabilize Western countries.
- Human-Animal Hybrids and Genetic Experimentation, addressing theories about alleged experiments blending human and animal DNA or genetically modifying humans, typically discussed as bioethics concerns.
- Agenda 21 and Sustainable Development, addressing claims that UN's Agenda 21 is a plan to centralize control over land and resources under the guise of environmental sustainability.

63. These subjects are often discussed from a skeptical, libertarian, or populist perspective, with emphasis on questioning mainstream narratives.

## *Deep State*

64. Jones frequently analyzes the "Deep State," referring to an alleged network of powerful, unelected individuals within government agencies who, according to him, exert control over policy and public perception independently of elected officials. This concept remains central to his discourse, resonating with audiences wary of centralized power.

## *Donald Trump*

65. On December 2, 2015, Donald Trump, then a presidential candidate, appeared on The Alex Jones Show, with Trump stating to Jones at the end: "your reputation is amazing. I will

**EXHIBIT 44**

not let you down. You'll be very, very impressed, I hope."  Jones and Trump both said the appearance was arranged by Roger Stone, who made multiple appearances on Jones' program during the 2016 presidential campaign.  During his 2016 presidential campaign, via his Twitter account, Trump linked to InfoWars articles.  In one of her own speeches and video ads, Clinton criticized Trump for his ties to Jones.  Trump called Jones on the day after the election to thank him for his help in the campaign.

## *Second Amendment Rights*

66.     Jones has been a staunch supporter of the Second Amendment, emphasizing the importance of individual rights in public debates about gun ownership and regulation. His views align with those of his libertarian audience, underscoring his belief in the right to personal freedom and self-defense

## *Other Media-Based Activities*

67.     Aside from being a news casting media personality, Mr. Jones has appeared in movies. Including some produced by Richard Linkletter, the filmmaker, who put Mr. Jones in movies with some notable actors like Keanu Reeves and Woody Harrelson.  He has also produced his own films, including the Jones film Endgame: Blueprint for Global Enslavement.

**B.     SANDY HOOK TRAGEDY**

68.     Just before 9:30 AM on December 14, 2012, Adam Lanza shot his way into a locked school in Newtown Connecticut at Sandy Hook elementary school, with a Bushmaster XM15-E2S.  He thereupon shot and killed 20 first-grade children and 6 adults, wounding two others.  The tragedy left behind not only several devastated families but an entire nation.  In the ensuring chaos and fog of devastation, several elements of society including the press sought to rush in, some to render help and others to use this tragedy as an opportunity to push for gun control.  While the

**EXHIBIT 44**

deaths of the victims were clear, in the ensuing chaos many things happened and/or were reported, that created confusion in the eyes of certain members of the public. Particularly given the presence of some members of a "political" press, events which may have been innocent or easily explained were not explained and this gave rise to a significant number of people across the country who began to ask questions. Many of those questions were treated as acts of disrespect, not worthy of answers, which in turn led to a growing concern that the entire story of the Sandy Hook massacre had not been told. Some went so far as to claim that the entire event had been staged, which was particularly sensitive to a large segment of the population who had seen the US government present "overwhelming evidence" that Iraq was manufacturing weapons of mass destruction for use against the world, only to find out the entire story that cost our beloved nation trillions of dollars and countless lives, was fabricated. Others did not go so far but continued to ask questions. Suffice it to say, stories all across the spectrum were circulated and news reporters and news sources continually pounded the story, many seeing it as an opportune time for advancement of the gun control agenda vehemently resisted by other portions of our nation. Alex Jones was among those who initially merely asked questions, such why CNN reporter Anderson Cooper who was allegedly on site was operating behind a greenscreen such that his nose would disappear when he would move? Or why did one of the victim's family members seem to be reading from prepared prompt cards? Unlike others, Mr. Jones was never skeptical that people had been killed; his initial skepticism rather was focused on secondary aspects that were to him confusingly inconsistent with a mass murder scene. Ultimately Mr. Jones acknowledged the tragic deaths and abandoned his questions of the ancillary aspects of the tragedy.

       **C.     AFTERMATH OF SANDY HOOK TRAGEDY – THE CONNECTICUT PLAINTIFFS BECOME PUBLIC FIGURES**

**EXHIBIT 44**

69.     Suffice it to say, the Sandy Hook tragic murders captivated the entire world. In the United States alone, major news outlets such as The New York Times, The Washington Post, CNN, and NBC News, alongside numerous local papers and online publications, produced extensive coverage immediately following the incident and, in the years, since.  Although it is impossible to say with precision, estimates are that at least 10,000 to 20,000 articles were generated within the U.S. about this. Globally, Sandy Hook coverage extended to major international news organizations, including BBC, Al Jazeera, The Guardian, Le Monde, and The Sydney Morning Herald, along with other regional publications.  International reporting likely produced an additional 5,000 to 10,000 articles initially, with periodic follow-ups and anniversary reports.

70.     The Sandy Hook tragedy quickly morphed into the signature driving force for gun control.  This perhaps initially started with most of the Connecticut Plaintiffs suing Remington Arms, the manufacturer of the weapon used by the murderer.  It was a highly publicized suit in which case many of the Connecticut Plaintiffs who joined that suit received $73,000,000 in settlement in part for their "pain and suffering" and "destruction of the ability to enjoy life's activities."

71.     Since 2012 and prior to the suit herein filed, the Connecticut Plaintiffs have given scores of public interviews and/or made statements and/or formed or joined advocacy campaigns, many through organizations or initiatives they founded to prevent similar tragedies.  Some of the Connecticut Plaintiffs were invited to attend President Barack Obama's 2013 State of the Union address as guests, a gesture that highlighted their gun control advocacy.   There President Barack Obama advocated for gun reform following the tragedy, where President Obama after paying tribute to the Connecticut Plaintiffs called for Congress to act on gun violence prevention.

EXHIBIT 44

72.    Nicole Hockley and Mark Barden were among the parents who worked closely with the Obama administration on these issues and were publicly recognized in various ways as part of the administration's push for change in gun policy.

73.    Based on public records and media coverage David and Francine Wheeler were asked to substitute for President Obama himself in his weekly, nationally televised address:



74.    At the 2016 Democratic National Convention Erica Lafferty (her maiden name) gave a five-minute speech on gun control and Hillary Clinton, and was shown in close support of Secretary Clinton given her positions on gun control:

EXHIBIT 44



75.     Nicole Hockley and Ian Hockley, were active in the media and co-founded Sandy Hook Promise, speaking widely about gun reform.  Mark Barden and Jacqueline Barden frequently gave interviews and public statements; Mark Barden is also a prominent figure in Sandy Hook Promise.  Jennifer Hensel and Jeremy Richman were vocal advocates for mental health awareness. Jeremy Richman founded the Avielle Foundation, often speaking publicly about the connection between mental health and violence.  William Sherlach joined in advocacy for changes in gun laws and mental health reform.  Francine Wheeler gave a widely broadcasted speech and is involved in advocacy.  Carlee Soto-Parisi and Jillian Soto, Sisters of teacher Victoria Soto, who became vocal advocates for gun reform and school safety, participated in marches and public forums.

76.     The Connecticut Plaintiffs decided to continue to draw attention to the tragedy using Alex Jones as the human pinata to advance their two-fold agenda.  One aspect of their agenda, on information and belief, was the concerted action with significant political opponents of Mr. Jones, to embark on a plan to silence him and remove him from the airwaves.  Thus, in 2018,

EXHIBIT 44

Jones was on information and belief, due to the efforts of the Connecticut Plaintiffs, removed from YouTube; Facebook suspended his profile; Stitcher Radio removed all of his podcasts; Facebook, Apple, YouTube and Spotify removed all content by Jones and InfoWars. YouTube removed channels associated with InfoWars, including The Alex Jones Channel. He was also removed from Pinterest, Mailchimp, and LinkedIn. He was also permanently banned from Twitter and Periscope. The InfoWars app was removed from the Apple App Store for "objectionable content." He was banned from using PayPal for business transactions. In 2019, YouTube terminated other news sources for reuploading of live streams from InfoWars. In March 2020, the InfoWars app was removed from the Google Play store. After Elon Musk's purchase of Twitter, several previously banned accounts were reinstated including Mr. Jones.

77.     The second prong of their attack on Mr. Jones, was filing suit 18 miles from the small community where the tragedy had occurred and where local sensitivities were still raw. That their goal was to remove Alex Jones from the airwaves was repeated by the lawyers for the Connecticut Plaintiffs in their opening and closing statements and throughout the trial. But the trial was an unfair, partisan attack not just on Alex Jones but on the Constitution of the United States by both the Connecticut Plaintiffs and an aligned judicial system.

### D.     UNCONSTITUTIONAL DEATH PENALTY SANCTIONS ENTERED

78.     This desecration of Mr. Jones rights occurred when the Connecticut Plaintiffs urged, and the Connecticut trial court agreed that Mr. Jones would not be able to defend himself or even explain himself. The Connecticut Plaintiffs urged, and the Connecticut trial court agreed that the jury of six Connecticut citizens would be instructed that Mr. Jones had intentionally and maliciously committed every act that the Connecticut Plaintiffs accused him of – no matter how

**EXHIBIT 44**

farfetched and in some cases preposterous, as will be discussed infra, and Mr. Jones could literally say nothing in his own defense.

79. Why the Court did this is not a matter of speculation or "conspiracy theory," and one need not guess or speculate as to why the Connecticut Court removed all of Mr. Jones's Constitutional rights. **The Connecticut Court held a hearing on November 15, 2021 (the transcript is attached as Exhibit A hereto) and articulated the reasons for her order of death to the US Constitution**. The transcript recites that there were only three reasons, each of which was either a mischaracterization of the record, clearly erroneous or an outright abuse of discretion.

*Reason Number 1: Alex Jones's Lawyers Asked For Permission To Depose Hillary Clinton*

80. First, the Court referred to Mr. Jones's counsel's "cavalier actions" regarding their motion to depose Hillary Clinton, that amounted, in the Court's view, to "willful misconduct." A protective order had been entered in the case and that is attached hereto as **Exhibit B.** It clearly provides that information covered could be used for the preparation and trial of this case. As the plaintiffs' depositions began, it became apparent that plaintiffs' counsel would resist any testimony about how the plaintiffs all happened to find themselves in the same law office six years after the Sandy Hook shootings. It was Mr. Jones' belief that the prosecution of him was orchestrated by those motivated to have their revenge on him for his support of Donald Trump's successful campaign – Mr. Trump appeared as a guest on one of Mr. Jones' broadcast during the campaign-- against Hillary Clinton in 2016. To that end, counsel for Mr. Jones sought a commission to take the deposition of Ms. Clinton, then a resident of New York. In the motion for a commission, Mr. Jones's counsel explained why Clinton's deposition was being sought explaining that at a deposition a witness was instructed by counsel not to answer questions about choice of counsel or who was financing the litigation. The name and gender of the deponent were not mentioned; the

**EXHIBIT 44**

deposition was characterized, not quoted. The trial court took grave exception to this, referring to it as "frightening." The judge not only denied the request, but she found the conduct involving the pleading so significant it was the first of the three errors that lead to the death penalty. It makes no sense to render a death penalty killing Jones's Constitutional rights for conduct over which Mr. Jones had no control, and about which, the record reflects, he knew nothing. If the Court genuinely believed counsel erred in the treatment of the deposition material in counsel's motion for a commission to depose Ms. Clinton, the remedy was against counsel, not the client. The de minimis recitation of facts in the motion for a commission did not violate a court order and any suggestion that it was is demonstrably false. Even if there was a violation, the decision to rely on that conduct as part of a motion to default the defendants and deny Jones his Constitutional rights is inexplicable.

*Reason Number Two: Alex Jones Lawyers Could Not Provide Trivial Analytics Profits Data*

81.     Second, there was a claimed failure to submit analytics in the custody and control of third parties, e.g. Google, Twitter and Facebooks that may show how many vitamin supplements were sold in relation to the airing of any Sandy Hook- related story. The Court concluded the defendants had failed to provide "full and fair compliance" with a request for the data, thus willfully withholding information that was of "critical importance" to the plaintiffs, although no one ever explained why it was of "critical importance" to the plaintiffs. The Court declined to consider monetary sanctions or preclusion of evidence as sanctions as inadequate finding only a default was appropriate. The Connecticut Plaintiffs urged, and the Court concluded, the Connecticut Plaintiffs were prejudiced in some inexplicable way by the failure to produce limited financial and analytics data on the timing of product sales. Despite the alleged "importance" of the issue, neither the Connecticut Plaintiffs nor the trial Court ever set forth just what it thought

EXHIBIT 44

Google Analytics was or what it was to be used for. But it is self-evident. The Connecticut Plaintiffs wanted to see if sales of product correlated to any Sandy Hook broadcast. But the Supreme Court is clear that a "profit motive" has nothing to do with Constitutional protections. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."). At most, the plaintiffs might have been entitled to an adverse inference of some sort at trial, although just what the inference should be is difficult to fathom given the complete lack of evidence to support the theory so dear to the hearts of plaintiffs' counsel – a belief that the defendants target marketed what topics they discussed solely to increase social media exposure as part of a plan to sell nutraceutical products. The truth is that Sandy Hook was a minuscule portion of what Mr. Jones commented on in the years since 2012, however much the plaintiffs may wish it were otherwise.

> *Reason Number Three: The Court Refused To Accept Alex Jones's Accountant's Explanation of Minor Financial "Subaccount" Data Accepting The Explanations of a Non-CPA Instead*

82. The final of the three "death penalty" grounds were the alleged infirmities in attempts to correct and/or supplement disclosures in a financial affidavit called a "subsidiary ledger" by an expert retained by the defendants, Robert Roe. The Court found Mr. Roe's affidavit "not credible in light of the circumstances," asserting that Mr. Roe had submitted a "sanitized, inaccurate" set of records. Here is the background. The Connecticut Plaintiffs sought financial information again intended to determine how much money the defendants made in connection with Sandy Hook related publications. Connecticut Plaintiffs took the deposition of Melinda Flores, a bookkeeper at FSS. She was ordered to produce certain financial records, including "trial

balances." The documents she produced did not satisfy the plaintiffs. The defendants retained an expert, a CPA named Robert Roe, to attempt to locate and to provide to the plaintiffs' data in a form acceptable to them. His efforts failed to satisfy the plaintiffs, who filed yet another in a series of motions for sanctions. A sworn statement by Mr. Roe stated that FSS did not maintain records in the form requested by the plaintiffs, going so far as to state that the term "subsidiary ledgers" they used in their request was not a term with an accepted meaning among accounts. The Connecticut Plaintiffs tendered a counter affidavit from their own expert, a forensic fraud examiner but not a CPA, who opined the "subsidiary ledgers" was, in fact, a well understood and generally accepted term. The Court sided with the plaintiff's papers and rejected Mr. Roe's opinion on the papers. "The court rejected the statement of accountant retained by FSS that FSS does not 'maintain or utilize' subsidiary ledgers as not credible in light of the circumstances." The absence of a meaningful evidentiary record to support this finding as to Mr. Roe, is itself beyond questionable, but the Supreme Court has been crystal clear that financial or profit motives have nothing to do with Constitutional rights and it was incomprehensible that Mr. Jones Constitutional rights would be forfeited because the Connecticut Plaintiffs may have been hindered in some way showing how much money Mr. Jones made

### E.    CONNECTICUT COMPLAINT

83.    Turning to the Complaint, the Connecticut jury was instructed that the court had determined Alex Jones had committed with malice each and every act the Connecticut Plaintiffs stated. Here, however, that Complaint must be reviewed in detail as the United States Supreme Court places an unwaivable duty on a federal court to "review findings of fact by a state court where a federal right has been denied on the basis of a fact without evidence to support it and where a conclusion of law as to a federal right and a finding of fact are so intermingled to require

analysis of the facts." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 506 n.24, 104 S. Ct. 1949, 1962 (1984). The rule that the court <u>*must*</u> "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment" was established in *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S. Ct. 710, 728-29 (1964).

84.     Thus, it is Constitutionally impermissible for this Court to simply accept the inexplicable death penalty sanction that extinguished all of Mr. Jones Constitutional rights simply because the Connecticut Plaintiffs convinced a Connecticut trial court to extinguish those rights for the three trivial reasons just referenced. And even if a Court incorrectly refuses to look behind to the allegations in the Connecticut Complaint itself, it absolutely then at least looks at the death penalty order. In short, it must examine <u>***something***</u> to fulfill its duty. Looking at just a few things in the Connecticut Complaint make the unconstitutional travesty clear.

85.     First, the Complaint identifies no "express statements" that were allegedly made by Mr. Jones that are libelous. In a traditional libel complaint, precise statements are quoted so that the court and parties can review and assess the words and context. The Connecticut Complaint, although prolix, nowhere clearly highlights the precise allegedly libelous statements Mr. Jones was accused of making.

86.     Second, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the libelous "statement" and more importantly, why it was libelous. As one example of numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would

disappear when he would move.  See e.g., Connecticut Complaint, ¶¶222; 230; 240; 259; 264. Was this libelous?  Was it true?  The jury was told it was maliciously libelous without explanation. Or another example is the repeated reference to one of the Connecticut Plaintiffs asking about cue cards while being interviewed on TV. See e.g., Connecticut Complaint, ¶¶ 102; 103; 105; 112; 113 ("ok, do I read off the card?"). Was this libelous?  Was it true?  It did not matter.  The jury was told it was maliciously libelous without explanation.

87.    Second, it is clear that the Connecticut Plaintiffs sought to hold Mr. Jones responsible for what independent third parties said and did.  In one example of many, the Connecticut Plaintiffs identified Defendant Wolfgang Halbig as an independent journalist and investigator who resides in Sorrento, Florida and who was the creator and operator of "the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com."  It also identified Defendant Cory T. Sklanka as a journalist who works with Halbig.  Connecticut Complaint, ¶¶ 36 & 37.  Although Halbig's name is used over 77 times in the Connecticut Compliant, other than a few references to Halbig's appearance as an occasional guest on Mr. Jones' show [Connecticut Complaint, ¶ 68] there are no allegations that would even remotely make Mr. Jones responsible for Halbig's statements and actions other than the completely unverified and conclusory allegation that "Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut."  Connecticut Complaint, ¶ 74.  The lone exception is the unverified, unsupported, conclusory and inaccurate statement that Halbig was "at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants." Connecticut Complaint, ¶87.  This lone, conclusory allegation is nothing but sheer conjecture and certainly nothing that overcomes Mr. Jones's first amendment rights. Yet the jury was told Mr. Jones was maliciously responsible for everything Halbig did.

**EXHIBIT 44**

88.     Third, the Connecticut Complaint is replete with acts of third parties in allegedly stalking some of the Connecticut Plaintiffs.   Connecticut Complaint, ¶¶ 14; 15 ("They have confronted strange individuals videotaping them and their children."); 16; 55 (" In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.). With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

89.     And Mr. Jones was powerless to refute them given the death penalty sanctions rendered against him.  This of course, leads to the question of what Alex Jones did that was so serious a threat to the Connecticut judicial system that his Constitutional rights were forfeited.  Read Exhibit A.

**F.     CONNECTICUT TRIAL AND UNCONSTITUTIONAL VERDICT AND JUDGMENT**

90.     As stated, the six-person jury and Court that was untethered by the Constitution went wild in its award giving the following amounts to the following persons:

| | | | |
|---|---|---|---|
| Total Award for Erica Lafferty: | $116,000,000.00 | Total Award for William Sherlach: | $76,000,000.00 |
| Total Award for David Wheeler: | $73,330,000.00 | Total Award for Francine Wheeler: | $72,000,000.00 |
| Total Award for Mark Barden: | $76,800,000.00 | Total Award for Jacqueline Barden: | $38,400,000.00 |
| Total Award for Ian Hockley: | $108,800,000.00 | Total Award for Nicole Hockley: | $98,130,000.00 |
| Total Award for Carlos Mathew Soto: | $76,800,000.00 | Total Award for Donna Soto: | $64,000,000.00 |
| Total Award for Carlee Soto Parisi: | $88,000,000.00 | Total Award for Jillian Soto-Marinio: | $91,730,000.00 |
| Total Award for William Aldenberg: | $120,000,000.00 | | |

**IV.**
**CAUSES OF ACTION**

91.     Alex Jones incorporates by reference each and every fact herein above set forth.

**EXHIBIT 44**

92.     By the acts hereinabove complained of, and others which will be demonstrated at trial, the Connecticut Plaintiffs have violated Alex Jones's rights under the First and Fourteenth Amendments of the Constitution of the United States.   These acts include, without limitation,

a.      the denial of Mr. Jones substantive and procedural due process rights;

b.      the striking of all Mr. Jones defenses, and forbidding him to speak while imposing strict liability on him for all acts of which the Connecticut Plaintiffs complain thereby depriving him of the ability to fully and fairly litigate the claims asserted against him;

c.      holding Mr. Jones responsible for acts and statements of others over which he neither had nor exercised control;

d.      holding Mr. Jones responsible for acts of stalking and harassment by unknown persons with whom he was not affiliated and over which he neither had nor exercised control;

e.      working alone or jointly with others, procuring the expulsion of Mr. Jones from airwaves seeking to deprive him of a platform for the exercise of his First Amendment rights of speech;

f.      working directly and indirectly with the Connecticut judiciary to achieve excessive, inordinate and punitive emotional distress and punitive damages, in violation of the Eight and Fourteenth Amendments;

g.      working directly and indirectly with the Connecticut judiciary to achieve unconstitutional takings of his property in violation of the Constitution, including the taking of his rights to use the airwaves for exercise of his First Amendment rights;

**EXHIBIT 44**

h. working directly and indirectly with the Connecticut judiciary to achieve these violations of Mr. Jones's Constitutional rights.

93. All of the acts herein above addressed occurred under color of state law as the Connecticut Plaintiffs instigated the acts of the Connecticut state court about which complaint is made.

94. As a direct and proximate result of these acts and wrongful conduct, Mr. Jones has experienced loss of property, anguish, embarrassment, humiliation, stress and will continue to suffer such damages, all of which have been proximately caused by the Connecticut Plaintiffs.

## DEMAND FOR JURY TRIAL

95. Mr. Jones asserts his rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with FED. R. CIV. P. 38, a trial by jury on all issues.

## PRAYER FOR RELIEF

96. Based on the forgoing, Mr. Jones asks this Court to

 a. preliminarily and permanently enjoin the enforcement of the Connecticut Judgment;

 b. issue appropriate declarations that the acts herein complained of and others that shall be proved at trial are unconstitutional and hence void;

 c. award Mr. Jones all legal damages to which he shall show himself justly entitled;

 d. award Mr. Jones pre and post judgment interest;

 e. award Mr. Jones his attorney's fees and costs;

 f. award Mr. Jones such other relief, legal and equitable, to which he shall be justly entitled.

**EXHIBIT 44**

Dated: November 12, 2024

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
**Jordan & Ortiz, P.C.**
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
           aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

Ben C. Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

**EXHIBIT 44**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 12, 2024, a true and correct copy of the foregoing document was served via e-file/e-mail in accordance with the Texas Rules of Civil Procedure:

Ryan E. Chapple
rchapple@cstrial.com
Benjamin D. Evans
bevans@cstrial.com
Bethany G. Gingras
bgingras@cstrial.com
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701

Crissie Stephenson
Vickie Driver
Elliott, Thomason & Gibson, LLP
511 N. Akard, Ste. 202
Dallas, Texas 75201
crissie@etglaw.com
vickie@etglaw.com

Joshua W. Wolfshohl
Michael B. Dearman
Jordan T. Stevens
Kenesha L. Starling
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
jwolfshohl@porterhedges.com
mdearman@porterhedges.com
jstevens@porterhedges.com
kstarling@porterhedges.com

Erin E. Jones
**JONES MURRAY LLP**
602 Sawyer Street, Suite 400
Houston, Texas 77007
erin@jonesmurray.com

Kell C. Mercer
Kell.mercer@mercer-law-pc.com

*/s/ Shelby A. Jordan*
Shelby A. Jordan

EXHIBIT 44

```
XO6 UWY CV18-6046436-S    :    SUPERIOR COURT

ERICA LAFFERTY, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                         :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

----------------------------------------------------------------

XO6 UWY CV18-6046437-S    :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

V                         :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

----------------------------------------------------------------

XO6 UWY CV18-6046438-S    :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

V                         :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021
```

## COURT'S RULING

B E F O R E:

      THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S:

  Representing the Plaintiffs:

     ATTORNEY CHRISTOPHER MATTEI
     ATTORNEY ALINOR STERLING
     ATTORNEY MATTHEW BLUMENTHAL
     Koskoff Koskoff & Bieder
     350 Fairfield Avenue
     Bridgeport, Connecticut  06604

EXHIBIT 44

2

Representing the Defendants:

    ATTORNEY JAY MARSHALL WOLMAN
    Randazza Legal Group
    100 Pearl Street
    Hartford, Connecticut  06103

    ATTORNEY CAMERON L. ATKINSON
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

    ATTORNEY MARIO CERAME
    Brignole Bush & Lewis
    73 Wadsworth Street
    Hartford, Connecticut  06106

                        Recorded and Transcribed By:
                        Patricia Sabol
                        Court Monitor
                        400 Grand Street
                        Waterbury, Connecticut  06702

THE COURT: All right. So I will order a copy of the transcript of the following ruling, and I will sign it and I will place it in the court file as my decision for the purposes of any appeal.

So I'll first address the Clinton deposition issue and the conduct of July 1, 2021. In the July 19, 2021 court filing by the defendants Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet, LLC, they described how in the motion to depose Hillary Clinton, testimony designated by the plaintiffs as highly confidential was filed in the Clinton deposition motion. They explained that this was done because in their opinion, the plaintiffs did not have a good-faith basis to designate the deposition as highly confidential before the deposition had commenced, despite the fact that the Jones defendants had previously done so themselves. And it is not lost on the Court that the highly confidential information was improperly filed in the middle of the first deposition of a plaintiff.

The July 19, 2021 filing is in sharp contrast to the Jones defendants' position at the October 20, 2021 sanctions hearing where the Court addressed what, if any, sanctions should enter. At the October 20 hearing, the Jones defendants claim they could publish confidential information as long as they did not reveal the name of the witness. That is, they argued

4

unconvincingly that they didn't understand the very protective order that they themselves drafted and asked the Court to approve as a Court order, which the Court did.

The position of the Jones defendants at the October 20, 2021 sanctions hearing did nothing but reinforce the Court's August 5th, 2021 order and findings that the cavalier actions on July 1st, 2021 constituted willful misconduct and violated the Court's clear and unambiguous protective order.

The history of the attorneys who have appeared for the defendants, Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC is a convoluted one, even putting aside the motions to withdraw appearance, the claims of conflict of interest and the motions for stay advanced by these five defendants.

As the record reflects, on June 28, 2018, Attorney Wolman appeared for all five of the Jones defendants. Eight months later, on March 1st, 2019, Attorney Wolman is out of the case and Pattis & Smith filed an in-lieu-of appearance for all five defendants. On February 24, 2020, Attorney Latonica also appeared for all five defendants. Five months later on July 7, 2020, Attorney Latonica and Pattis & Smith is now out of the case and Attorney Wolman is back in the case for all five defendants. Then on

EXHIBIT 4

5

June 28, 2020, Pattis and Smith is back in the case, but now only appears for the four LLC defendants.

But what is perhaps more significant is the transparent attempt to cloud the issues by Pattis & Smith, for example, by listing the names of only three of the four clients they represent when filing the motion to take the deposition of Hillary Clinton and then listing all four clients in the July 19, 2021 filing relating to the issue. And by Attorney Wolman who then argued in his October 20, 2021 file that Infowars, LLC had no involvement in the motion for commission because their lawyer did not list their name on the motion. It is simply improper under our rules of practice for an attorney to do so.

Turning to the issue of the subsidiary ledgers. The five Jones defendants on November 6, 2020 filed with the Court their discovery objections relating to the deposition of Free Speech Systems' accounting manager and current employee, Melinda Flores. In response to the plaintiff's request for subsidiary ledgers, the Jones defendants objected on the basis that the production of the subsidiary ledgers was oppressive, unduly burdensome, disproportionate, harassing and that it will require digging through eight years of accounting. No objection was raised as to the term "subsidiary ledger", although parties frequently will object to a discovery request if they

consider it vague or confusing.

On April 29, 2021, the Court overruled the objection. On May 6, 2021, the Court ordered the deposition of Flores to take place on June 4, 2021 and ordered the documents to be produced by the close of business on May 14, 2021 stating that failure to comply may result in sanctions.

On May 14, 2021, the five Jones defendants responded to the document request and Court order and stating that the subsidiary ledgers were incorporated into the trial balances and had been produced.

At her June 4, 2021 deposition, Flores, the accounting manager, testified that subsidiary ledgers or detail was easily accessible and available to her. She testified that it would show the sources of advertising income and she testified repeatedly that Free Speech Systems maintained subsidiary ledger information. Flores did not believe she was obligated to produce the subsidiary ledgers, and it is unclear as to whether they have been produced.

It was impossible to reconcile the expert hired by Free Speech Systems with the November 6, 2020 objections filed with the Court and with Flores' deposition testimony. While the Jones defendants in their May 5th, 2021 motion state that Flores would be the best employee to identify and produce the requested documents and further state that Flores

EXHIBIT 44

7

would be compelled by Free Speech Systems to produce the requested documents at the deposition, the defendants hired expert, Mr. Roe, said that Flores was wrong and that Free Speech Systems doesn't use or have subsidiary ledgers.

The Court, in its August 6, 2021 order, found that the subsidiary ledger information was easily accessible by Flores by clicking on each general account, that, despite the Court orders and although the information exists and is maintained by Free Speech Systems and was required by the Court order to be produced, it had not been produced. And, again, it is still unclear as to what documents have been produced.

The Court rejected Roe's statements in his affidavit as not credible in light of the circumstances. The Court found that the plaintiffs were prejudiced in their ability to prosecute their claims and conduct further meaningful depositions and that sanctions would be addressed at a future hearing.

At the October, 2021 sanctions hearing, the Court addressed whether sanctions should enter. The Court finds that sanctions are, in fact, appropriate in light of the defendant's failure to fully and fairly comply with the plaintiff's discovery request and the Court's orders of April 29, 2021, May 6, 2021 and August 6, 2021.

8

Turning to the trial balances. In addition to objecting to the deposition of Flores, the Jones defendants, as I mentioned, filed discovery objections to the request for production directed to Flores. The Court ruled in favor of the defendants on one production request and ruled in favor of the plaintiffs with respect to others.

In addition to the subsidiary ledgers, the Court ordered production of the trial balances. Flores had run trial balances in the past unrelated to this action. Flores testified at her June 4, 2021 deposition that she personally accessed Quick Books and selected the option to generate trial balances for 2012 to 2019. She testified that she ran the reports and printed them out and believed that the reports were produced. Her testimony the reports that she ran were produced was left uncorrected by counsel at the deposition.

The reports were not produced by the Court-ordered deadline of May 14, 2021. They were not produced at her June 4, 2021 deposition, and they have not been produced to date, despite their obligation to do so.

While the Jones defendants, in their May 5, 2021 Court filing, emphasized that Flores would be the best employee to identify and produce the requested documents which would include the trial balances and

9

that Flores would be compelled by Free Speech Systems to produce the documents at her deposition, not only were the reports not produced, but the Jones defendants in their October 7, 2021 filing now claim that Flores, a mere bookkeeper, provided flawed information to the defendants that the defendants, through Roe, had to correct. And the Court rejects that position.

The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by the Jones defendants' outside accountant were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that their own accounting manager had produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiff's request or to the Court's order.

Turning to the analytics. The date for the parties to exchange written discovery has passed after numerous extensions by the Court. On May 14, 2021, the Court ordered that the defendants were obligated to fully and fairly comply with the plaintiff's earlier request for disclosure and production.

EXHIBIT 44

10

On June 1, 2021, the defendants filed an emergency motion for protective order apparently seeking protection from the Court's own order where the defendants again attempted to argue the scope of appropriate discovery.

The Court, on June 2, 2021, declined to do so and extended the deadline for final compliance to June 28, 2021 ordering the defendants to begin to comply immediately on a rolling basis. In its June 2nd order, the Court warned that failure to comply would result in sanctions including default.

With respect to analytics, including Google Analytics and social media Analytics, the defendants on May 7, 2019 represented that they had provided all the analytics that they had. They stated with respect to Google Analytics that they had access to Google Analytics reports, but did not regularly use them. As the Court previously set forth in its September 30, 2021 order, the defendants also claim that on June 17, 2019, they informally emailed zip files containing Google Analytics reports to the plaintiffs, but not the codefendants, an email the plaintiffs state they did not receive and that the Court found would not have been in compliance with our rules of practice.

On June 28, 2021, the Jones defendants filed a notice of compliance stating that complete final supplemental compliance was made by the defendants,

EXHIBIT 44

11

Alex Jones and Free Speech Systems, LLC and that Infowars, LLC, Infowars Health, LLC and Prison Planet, LLC, quote: Had previously produced all documents required to be produced, end quote, representing that with respect to the Google Analytics documents, Free Speech Systems, LLC could not export the dataset and that the only way they could comply was through the sandbox approach.

Then on August 8, 2021, the Jones defendants for the first time formally produced Excel spreadsheets limited to Google Analytics apparently for Infowars dot com and not for any of the other websites such as Prison Planet TV or Infowars Health. Importantly, the Jones defendants to date have still not produced any analytics data from any other platform such as Alexa, Comcast or Criteo.

The Jones defendants production of the social media analytics has similarly been insubstantial and similarly has fallen far short both procedurally and substantively, despite prior representations by the Jones defendants that they had produced the social media analytics and despite the May 25, 2021 deposition testimony of Louis Certucci, Free Speech Systems social media manager for nearly a decade, that there were no such documents.

At the June 28, 2021 deposition of Free Speech Systems corporate designee Zimmerman, Mr. Zimmerman

12

testified that, in fact, he had obtained some responsive documents from Certucci which were then loaded into a deposition chat room by counsel for the Jones defendants. It appears that these documents were minimal summaries or reports for Facebook and Twitter, but not for other platforms used by the defendants such as You Tube.

Any claim of the defendants that the failure to produce these documents was inadvertent falls flat as there was no evidence submitted to the Court that the defendants had a reasonable procedure in place to compile responsive materials within their power, possession or knowledge.

Months later, on October 8, 2021, the Jones defendants formally produced six documents for the spring of 2017 for Facebook containing similar information to the Zimmerman chat room documents, but not included in the chat room documents and screen shots of posts by Free Speech Systems to an unidentified social media account with no analytics.

The defendants represented that they had produced all the analytics when they had not done so. They represented in court filings that they did not rely on social media analytics and this, too, is false.

I'm going to need to take a thirty second water break, please.

(A short break in the proceedings occurred.)

EXHIBIT 44

13

This response was false.  The plaintiffs in support of their motion for sanctions on the analytics issue attached as exhibit D, an email dated December 15, 2014 between former Free Speech Systems business manager Timothy Fruge and current Free Speech Systems employee Buckley Hamman.  Fruge attaches annotated charts of detailed analytics concerning Jones' 2014 social media audience including gender demographics engagement and social media sites that refer people to Infowars dot com.  As pointed out by the plaintiffs, Fruge's annotations are even more telling than the charts themselves and totally contradict the Jones defendants misrepresentations to the Court that, quote:  There is no evidence to suggest that Mr. Jones or Free Speech Systems ever used these analytics to drive content, end quote.

The next image on the document shows key indicators on Twitter.  Those are engagement and influence.  Again, this is reading from Fruge's notes. Again, the next image shows the key indicators on Twitter.  Those are engagement and influence.  Notice our influence is great and our engagement is low.  I bring this up -- again these are Fruge's notes -- because we should try and raise our engagement with our audience.  Engagement is how well we are communicating and interacting with our audience.  The higher our engagement, the more valuable our audience

EXHIBIT 44

14

will become to our business.  And that is the end of Fruge's notes.

I would note that regardless of this reliance on social media analytics, the concept is simple.  The defendants were ordered to produce the documents and our law requires them to produce information within their knowledge, possession or power.  Discovery is not supposed to be a guessing game.  What the Jones defendants have produced by way of analytics is not even remotely full and fair compliance required under our rules.

The Court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiff's ability to conduct meaningful discovery and to prosecute their claims.  This callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants.

Neither the Court nor the parties can expect perfection when it comes to the discovery process.  What is required, however, and what all parties are entitled to is fundamental fairness that the other side produces that information which is within their knowledge, possession and power and that the other side meet its continuing duty to disclose additional or new material and amend prior compliance when it is incorrect.

Here the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.

The Court held off on scheduling this sanctions hearing in the hopes that many of these problems would be corrected and that the Jones defendants would ultimately comply with their discovery obligations and numerous Court orders, and they have not.

In addressing the sanctions that should enter here, the Court is not punishing the defendants. The Court also recognizes that a sanction of default is one of last resort. This Court previously sanctioned the defendants not by entering a default, but by a lesser sanction, the preclusion of the defendant's special motions to dismiss. At this point entering other lesser sanctions such as monetary sanctions, the preclusion of evidence or the establishment of facts is inadequate given the scope and extent of the discovery material that the defendants have failed to produce.

As pointed out by the plaintiffs, they are attempting to conduct discovery on what the defendants publish and the defendants' revenue. And the failure

EXHIBIT 44

16

of the defendants to produce the analytics impacts the ability of the plaintiffs to address what is published and the defendants failure to produce the financial records such as sub-ledgers and trial balances affects the ability of the plaintiffs to address the defendants' revenue. The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was caused by the Jones defendants willful noncompliance, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims.

For these reasons, the Court is entering a default against the defendants Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC. The case will proceed as a hearing in damages as to the defendants. The Court notes Mr. Jones is sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly. And all the defendants have failed to fully and fairly comply with their discovery obligations.

As I said, I will order a copy of the transcript. I will sign it and I will file it in the Court as the Court's order.

_____

Bellis, J.

Case 22-33553 Document 1059-18 Filed in TXSB on 11/02/28/25 Page 61 of 73

EXHIBIT 44

17

XO6 UWY CV18-6046436-S      :      SUPERIOR COURT.

ERICA LAFFERTY, ET AL      :      JUDICIAL DISTRICT OF WATERBURY

V      :      AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL      :      NOVEMBER 15, 2021

-------------------------------------------------------------------

XO6 UWY CV18-6046437-S      :      SUPERIOR COURT

WILLIAM SHERLACH, ET AL      :      JUDICIAL DISTRICT OF WATERBURY

V      :      AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL      :      NOVEMBER 15, 2021

-------------------------------------------------------------------

XO6 UWY CV18-6046438-S      :      SUPERIOR COURT

WILLIAM SHERLACH, ET AL      :      JUDICIAL DISTRICT OF WATERBURY

V      :      AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL      :      NOVEMBER 15, 2021

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in the Superior Court, Judicial District of Waterbury, at Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 15th day of November, 2021.

Dated this 15th day of November, 2021, in Waterbury, Connecticut.

_____

Patricia Sabol

Court Monitor

**EXHIBIT 42**

| DOCKET NO: FBT-CV18-6075078-S: | : | SUPERIOR COURT |
| --- | --- | --- |
| | : | |
| ERICA LAFFERTY, ET AL., | : | J.D. OF FAIRFIELD |
| | : | |
| VS. | : | AT BRIDGEPORT |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | February __, 2019 |

### PROTECTIVE ORDER

The following order ("Protective Order") is entered pursuant to Practice Book Section 13-5(7) for the protection against public disclosure of certain proprietary trade secrets, confidential research, business strategies, and commercial information and other information affecting the privacy interests of non-parties, which are disclosed during discovery in this case. This Protective Order does not protect against public disclosure of information and documents filed with the Court and does not contravene Practice Book Sections 7-4B, 7-4C and 11-20A. The Court finds that good cause exists for entry of this Protective Order.

### Definitions

1. The following definitions apply to this Protective Order:

    a. The term "document" or "documents" has the same meaning as in Practice Book Section 13-1(c)(2).

    b. The term "Confidential Information" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Conn. Gen. Stats. § 35-51(d).

**Confidential Information**

2.   Information, documents and material in the following categories may be designated as Confidential Information under the terms of this Protective Order:

   a.   Personal identifying information as defined in Practice Book Section 4-7, and including party and witness residential addresses;

   b.   Proprietary market research conducted by or on behalf of a defendant concerning the product marketplace, product marketing, sales, branding and promotion, and consumer satisfaction and demographics;

   c.   Proprietary marketing, branding, promotional, and sales strategies;

   d.   Proprietary financial and accounting information;

   e.   Written agreements to which a defendant is a party containing non-disclosure or confidentiality provisions; and

   f.   Plaintiffs' medical and/or mental health records.

The parties retain the right to move the Court to alter these categories, by adding materials which may be designated confidential or by deleting or narrowing such categories.

**Purpose**

3.   This Protective Order shall govern the use and dissemination of all information, documents or materials that are produced by the parties in this action and designated as Confidential Information in accordance with the terms of this Protective Order. This Protective Order is not intended to address or govern claims of work product or privilege that may be asserted by any of the parties, except as otherwise provided in this Protective Order.

**Designation and Treatment**

4.   Any party to this action who produces or supplies information, documents or other materials in this action (hereinafter the "Designating Party") may designate as "Confidential Information" any information, document or material that falls within the categories set forth in paragraph 2 of this Protective Order. The designation of any information, document or material as "Confidential Information" shall represent a good faith determination by counsel so designating to

- 2 -

**Page 63 of 73**

the Court that there is good cause for the material so designated to receive the protections of this Order. The designation of "Confidential Information" shall be made by affixing on the document or material containing such information, and upon each page so designated if practicable, words that in substance state, "**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER.**" Any material, document or information for which it is impracticable to affix such a legend may be designated by written notice to that effect with a reasonable description of the material in question. Third parties may take advantage of the provisions of this Protective Order by indicating in writing to the requesting party their intent to comply with its procedures or they may seek separate protection from the Court.

5.     At the option of the Designating Party, and to facilitate prompt discovery by allowing inspection or review before formal designation in the manner specified above, all information, material or documents produced in discovery shall be treated as Confidential Information pending inspection and copying. Subject to paragraph 18 of this Protective Order, copies of information, material, and documents selected for copying and reproduced for the inspecting party will lose their status as Confidential Information unless delivered with the necessary legend.

6.     All persons having access to Confidential Information shall maintain it in a safe and secure manner to ensure compliance with this Protective Order. Any summary, extract, paraphrase, quotation, restatement, compilation, notes or copy containing Confidential Information, or any electronic image or database containing Confidential Information, shall be subject to the terms of this Protective Order to the same extent as the material or information from which such summary, extract, paraphrase, quotation, restatement, compilation, notes, copy, electronic image, or database is derived.

7.     A Designating Party may in good faith redact non-responsive and/or irrelevant information from any document or material. However, unredacted copies of such documents shall be maintained by the Designating Party. Designated attorneys for a Discovering Party and, if necessary, qualified Experts under paragraph 10(c) retained by them, shall have access to the unredacted versions of the documents but only for the purpose of ascertaining the appropriateness

- 3 -

of any redactions.

8.  This Protective Order shall not protect from disclosure information, documents or other material that (a) the Designating Party has not made reasonable efforts to keep confidential; (b) has been produced in any other action or proceeding without confidentiality protection, except inadvertently produced documents; (c) has been lawfully obtained by and from another source; or (d) has been denied confidential treatment in any other action or proceeding by a final order as to which all appeals and other opportunities to challenge have been exhausted or for which the time for appealing or otherwise challenging has expired.

### Limitations on Use

9.  Except to the extent expressly authorized by this Protective Order, Confidential Information shall not be used or disclosed for any purpose other than the preparation and trial of this case, all cases consolidated with this case, and in any appeal taken from any order or judgment herein.

### Limitations on Disclosure

10.  Except with the prior written consent of the Designating Party, or as expressly authorized by this Protective Order, no person receiving Confidential Information may disclose it to any other person. Nothing in this Protective Order, however, shall be deemed to restrict in any manner the Designating Party's use of its own Confidential Information or the Court's use of Confidential Information for any appropriate judicial purpose. Each party may disclose its own Confidential Information without regard to this Protective Order, unless otherwise prohibited from doing so. Each party may waive previously asserted designations of Confidential Information with notice to all parties.

11. Access to Confidential Information shall be limited to the following categories of persons ("Qualified Persons") with such status in this case and all cases consolidated with this case:

   a.  All counsel of record, including staff persons employed by such counsel;

   b.  The parties, but only to the extent reasonably necessary to the litigation of this case;

- 4 -

EXHIBIT 42

c. Any consultant, investigator or expert (collectively "Expert") who is assisting in the preparation and/or trial of this action, but only to the extent reasonably necessary to enable such Expert to render such assistance;

d. Any deponent or witness who is reasonably believed to have been eligible to have access to Confidential Information by virtue of his or her employment or other affiliation with the Designating Party, and other non-party witnesses deposed in this case but only for the time reasonably necessary to question the witness;

e. Court reporters, videographers and outside vendors performing litigation support services for parties in this case;

f. Counsel who are presently representing clients in a case against any one or more of the Defendants, which arises out of the same or similar set of facts, transactions or occurrences, provided that before disclosing Confidential Information to such counsel, such Defendant (1) must receive notice of the intention to disclose Confidential Information to such counsel; (2) must have the opportunity to move for a protective order in the case in which counsel is involved; and (3) a ruling on the motion for protective order must be issued; and

g. The Court and its personnel.

12. Any person to whom Confidential Information may be disclosed pursuant to this Protective Order, except counsel of record identified in this Protective Order, staff persons employed by such counsel, this Court and its personnel, court reporters and videographers, shall first have an opportunity to read a copy of this Protective Order and shall agree in writing to the non-disclosure terms of the Confidentiality Acknowledgment annexed hereto as Exhibit A ("Confidentiality Acknowledgment") before receiving any Confidential Information. Only counsel of record may disclose Confidential Information to another Qualified Person and they must receive the signed Confidentiality Acknowledgment before disclosing the Confidential Information to any Qualified Person other than other Counsel of Record, staff persons employed by such counsel, this Court and its personnel, court reporters and videographers. Counsel for the party obtaining a person's

- 5 -

**Page 66 of 73**

signature on the Confidentiality Acknowledgment shall retain the original signed acknowledgment until such time as the identity of the signatory is disclosed or until good cause for earlier disclosure of the acknowledgment is shown. Any non-party witness who is being deposed in this case and who refuses to sign Exhibit A may be shown Confidential Information but only for the time reasonably necessary to question the witness, provided that counsel, in good faith believes, that such disclosure is reasonably necessary to the prosecution or defense of the case.

13. If a party or other person receiving Confidential Information pursuant to this Protective Order, except the Court and its personnel, thereafter receives a subpoena or order to produce such information in any other action or proceeding before any other court or agency, such party or person shall, if there are fewer than ten (10) days to comply, immediately, if possible, or within two (2) days if not, or if there are more than ten (10) days, at least seven (7) court days prior to the due date of compliance, notify the Designating Party of the pendency of the subpoena, public records request or order in writing. To give the Designating Party an opportunity to obtain such relief, the party or person from whom the information is sought shall not make the disclosure before the actual due date of compliance set forth in the subpoena or order.

### **Depositions Involving Confidential Information**

14. Depositions involving Confidential Information shall be treated, as follows:

    a. Portions of a deposition or depositions in their entirety may be designated Confidential Information by counsel for the deponent or the Designating Party, with respect to documents or information that it has produced, by requesting such treatment on the record at the deposition or in writing no later than thirty (30) days after the date of the deposition.

    b. This Protective Order shall permit temporary designation of an entire transcript as Confidential Information where less than all of the testimony in that transcript would fall into those categories, subject to the following procedure:

        i. The court reporter shall include on the cover page a clear indication that the deposition has been so designated.

ii. Within thirty (30) days of receipt of the final, unsigned deposition transcript by counsel for the Designating Party, such counsel shall advise opposing counsel and the court reporter of the pages, lines and exhibits (if such exhibits are not otherwise so designated) in which Confidential Information appears. The court reporter shall supplement the transcript to indicate the designations. Failure to particularize a designation to opposing counsel within the allotted time shall result in the loss of any designation and shall entitle recipients of the deposition to treat the transcript as non-confidential.

iii. If a party objects to a page, line, and exhibit designation made pursuant to paragraph 13(b)(ii) of this Order, the party may make an objection using the procedure provided in paragraph 17 of this Order and the procedures of paragraph 17 shall apply to resolution of the objection. The designations shall remain effective until and unless an objection is made and finally resolved.

15. No one may attend, or review the transcripts of, the portions of any depositions at which Confidential Information is shown or discussed, other than persons authorized to receive access to Confidential Information.

**<u>Filing or Use of Confidential Information as Evidence</u>**

16. No party shall provide any Confidential Information or information derived therefrom to the Court absent a good faith belief that such information is necessary to the resolution of a contested issue. Confidential Information or information derived therefrom shall be lodged with the Court under Practice Book Sections 7-4B and 7-4C. After Confidential Information is lodged with the Court pursuant to Practice Book Sections 7-4B and 7-4C, the designating party shall promptly file an appropriate motion under Practice Book Section 11-20A requesting that the information be filed under seal. No Confidential Information or information derived therefrom

- 7 -

**Page 68 of 73**

shall be filed with the Court until such time that the Court has ruled on the designating party's motion under Practice Book Section 11-20A.

## Objections to Designations

17. Any party may, not later than sixty (60) days prior to the trial of this case, object to a designation by notifying the Designating Party in writing of that objection and specifying the designated material to which the objection is made. The parties shall confer within fifteen (15) days of service of any written objection. If the objection is not resolved, the Designating Party shall, within fifteen (15) days of the conference, file and serve a motion to resolve the dispute and shall bear the burden of proof on the issue. If no such motion is filed within the stated time period, the material shall cease to be treated as Confidential. If a motion is filed, information subject to dispute shall be treated consistently with its designation until further order of the Court. With respect to any material which is re-designated or ceases to be subject to the protection of this Protective Order, the Designating Party shall, at its expense, provide to each party which so requests additional copies thereof from which all confidentiality legends affixed hereunder have been adjusted to reflect the re-designation or removed as appropriate.

## Inadvertent Waiver

18. Inadvertent failure to designate any information pursuant to this Protective Order shall not constitute a waiver of any otherwise valid claim for protection, so long as such claim is asserted within thirty (30) days of the discovery of the inadvertent failure. At such time, arrangements shall be made for the Designating Party to substitute properly labeled copies. However, until the receiving party is notified that the information is designated as Confidential Information, the receiving parties shall be entitled to treat the material as non-confidential.

19. In the interest of expediting discovery in these proceedings and avoiding unnecessary costs: (1) inadvertent disclosure in this litigation of privileged information and/or work product shall not constitute a waiver of any otherwise valid claim of privilege, immunity, or other protection; and (2) failure to assert a privilege and/or work product in this litigation as to one document or communication shall not be deemed to constitute a waiver of the privilege, immunity, or protection

- 8 -

as to any other document or communication allegedly so protected, even involving the same subject matter. In the case of inadvertently produced privileged and/or work product documents, upon request of the Producing Party, the documents together with all copies thereof and any notes made therefrom shall be returned forthwith to the party claiming privilege and/or work product immunity. Any party may, within five (5) court days after notification of inadvertent disclosure under this Paragraph, object to the claim of inadvertence by notifying the Designating/Producing Party in writing of that objection and specifying the designated/produced material to which the objection is made. The parties shall confer within fifteen (15) days of service of any written objection. If the objection is not resolved, the Designating Party shall, within fifteen (15) days of the conference, file and serve a motion to resolve the dispute and shall bear the burden of proof on the issue. If a motion is filed, information subject to dispute shall be treated consistently with the Designating/Producing Party's most recent designation until further order of the Court.

## **Non-Termination**

20. Any information or documents designated as Confidential Information shall continue to be treated as such until such time as (a) the Designating Party expressly agrees in writing that the information, documents, testimony or other materials in question are no longer Confidential or (b) there is a finding by the Court that the information or documents are not the proper subject of protection under this Protective Order. Issues regarding the protection of Confidential Information during trial may be presented to the Court as each party deems appropriate.

21. The obligations and protections imposed by this Protective Order, as to any documents not admitted into evidence at trial unless sealed by the Court, shall continue beyond the conclusion of this action, including any appeals, or until the Court orders otherwise. The Court defers consideration of destruction, return and deletion of Confidential Information at the conclusion of this case.

## **Public Health and Safety**

22. Nothing in this Order is intended to prevent any party from raising with the Court any

EXHIBIT 42

concern that the non-disclosure of Confidential Information may have a possible adverse effect upon the general public health or safety, or the administration or operation of government or public office.

### **Continuing Jurisdiction**

23. Any party may petition the Court for a modification of the terms of this Protective Order for good cause shown, after notice and opportunity for a hearing. This Court shall have continuing jurisdiction to modify, amend, enforce, interpret or rescind this Protective Order notwithstanding the termination of this action.

Dated: Bridgeport, Connecticut

February _____, 2019

_____
Hon. Barbara Bellis

EXHIBIT 42

EXHIBIT A

**EXHIBIT 42**

| DOCKET NO: FBT-CV18-6075078-S: | : | SUPERIOR COURT |
| | : | |
| ERICA LAFFERTY, ET AL., | : | J.D. OF FAIRFIELD |
| | : | |
| VS. | : | AT BRIDGEPORT |
| | : | |
| ALEX EMRIC JONES, ET AL. | : | |

## CONFIDENTIALITY AGREEMENT

The undersigned hereby acknowledges and agrees:

1. I am aware that a Protective Order has been entered in the above-captioned action. I have had the opportunity to read the Protective Order and understand that my willful disclosure of Confidential Information may constitute contempt of court. I consent to the jurisdiction of this Court for enforcement of the terms of this Protective Order.

2. I will not disclose copies of any Confidential Information to any other person, and will not discuss any Confidential Information with any person except those persons described in the Protective Order under the procedures therein specified.

Name: _____

Address: _____

Telephone No.: _____

Dated: _____