**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22-33553** |
| | § | |
| **ALEXANDER E. JONES** | § | **(Chapter 7)** |
| | § | |
| **Debtor.** | § | |
| | § | |

**DEBTOR'S SUPPLEMENT TO THE CONSOLIDATED OBJECTION TO PROOFS OF
CLAIM FILED BY CONNECTICUT PLAINTIFFS
[DOCKET #705]**

Alexander E. Jones ("Jones") individually and as a Debtor in his Chapter 7 case, and as representative of Free Speed Systems, LLC ("FSS") related to the common appeals of the Judgments made of the basis of this objection to the claim  (Jones and FSS collectively "Jones"), Jones in the above-referenced chapter 7 case, pursuant to 11 U.S.C. § 502, hereby files this Supplement to the Consolidated Objection (the "Objection") to the following Proofs of Claim (the "Claims") filed by the Connecticut Plaintiffs, as amended[1]:

| POC Number | Creditor | Scheduled by Debtor[2] |
|---|---|---|
| Proof of Claim No. 6-1 | Richard M. Coan, Trustee of the Bankruptcy Estate of Erica Garbatini aka Erica Lafferty | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 7-1 | Carlee Soto Parisi | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 8-1 | Carlos Mathew Soto | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 9-1 | David Wheeler | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |

---

[1] Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto, Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash

[2] As such schedules are amended.

| POC Number | Creditor | Scheduled by Debtor[2] |
|---|---|---|
| Proof of Clam No. 10-1 | Donna Soto | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 11-2 | Erica L. Ash | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 12-1 | Francine Wheeler | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 13-1 | Ian Hockley | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 14-1 | Jacqueline Barden | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 15-1 | Jennifer Hensel | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 16-1 | Jillian Soto-Marino | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 17-1 | Mark Barden | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 18-1 | Nicole Hockley | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 19-1 | Robert Parker | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 20-1 | William Aldenberg | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |
| Proof of Claim No. 21-1 | William Sherlach | Contingent and Disputed, Schedule E/F, Docket No. 231, March 30, 2023 |

In support of the Objection and this Supplement, Jones respectfully states as follows:

## I.     JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).   Jones has standing to make this Supplement to the original Proof of Claim filed by the Connecticut Plaintiffs and to assert his

and the FSS objections and this Supplemental Objections to the Connecticut Plaintiffs claims.

2.        Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory predicates for the relief sought are 11 U.S.C. §§ 105(a), 502(b), Federal Rule of Bankruptcy Procedure 3007, and Local Rules 9013-1, and 3007-1 for the Southern District of Texas Bankruptcy Court.

## II.        **BACKGROUND**

4.        On December 2, 2022 (the "Petition Date"), Alexander E. Jones filed his voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.         On June 14, 2024 the chapter 11 case was converted to Chapter 7 [Dkt. 708].

6.        Each of the Claims were scheduled by the Debtor-Jones as contingent and disputed as they are the subject of litigation that is currently on appeal.  Not only are the underlying litigation and judgments currently the subject of appeal but the estoppel rulings in the dischargeability suits filed in the instant case are also under appeal.  Thus, once the multiple appeals are fully and resolved, Jones believes he will not be liable to the Connecticut Plaintiffs in the full amount of the Claims as detailed therein. Therefore, Jones would seek that the Claims not be allowed until such time as all appeals have been fully and finally resolved.

## III.        **OBJECTION**

7.        A filed proof of claim is deemed allowed, unless a party in interest objects. 11 U.S.C. § 502(a). Further, section 502(b)(1) of the Code provides that the court shall "determine the amount of such claim. . . as of the date of filing the petition, and shall allow such claim in such amount, except to the extent that –such claim is unenforceable against Jones and the property of the debtor…" 11 U.S.C. § 502(b)(1).  Whether a claim is allowable is generally determined by "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

8.      A proof of claim loses its prima facie presumption of validity under Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency. *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). At that time, the burden reverts to the claimant to prove the validity of their claim (though the ultimate burden always lies with the claimant). *Id.*

9.      In the appeals process, as well as the dischargeability litigation, Jones has raised substantive issues that refute more than one of the allegations that are essential to the Connecticut Plaintiffs' Claims. Jones asserts he will be ultimately successful in both appeals, and thus the Claims should not be allowed, at least until both appeals have been resolved in their entirety.

10.     Attached hereto and incorporated by reference for all purposes as if fully set out herein is the filed Motion for Reconsideration attached as Exhibit "1" [Dkt. 127].

## IV.     <u>RESERVATION OF RIGHTS</u>

11.     This Objection is limited to the grounds set forth herein and the substantive arguments set forth in the Appeals. Jones expressly reserves all further substantive or procedural objections he may have. Nothing herein should be construed as an admission as to the validity of any pre-petition claim against Jones or a waiver of any party's right to dispute any pre-petition claim on any grounds.  In the event that the relief requested herein is not granted, Jones hereby reserves all rights to object to further Connecticut Plaintiffs' Claims (or any amended claims) on any grounds. Jones also continues to reserve all rights to amend, modify, or supplement the objections asserted herein and to file additional objections to the Plaintiffs' Claims.

WHEREFORE, Alexander E. Jones individually and on the limited behalf of Free Speech Systems, LLC, respectfully request that the Court enter an Order sustaining the Objection in its entirety and granting such other and further relief as is just and proper under the circumstances.

Dated: February 4, 2025

*/s/ Shelby A. Jordan*
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**[3]

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@broockslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**[4]

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on February 4, 2025 as well as the following parties.

*/s/ Shelby A. Jordan*
Shelby A. Jordan

---

[3]     The representation of FSS is with respect to only appellate rights to protect and prosecute common appeals with joint and several liability.

[4]     *See*, Note 2, supra.

**EXHIBIT 1**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE:  ALEX E. JONES | § | |
| | § | CASE NO. 23-33553 (CML) |
| | § | |
| Debtor. | § | Chapter 7 |

| | | |
|---|---|---|
| David Wheeler, Francine Wheeler, et. al. | § | |
| Plaintiff | § | |
| vs. | § | Adversary Pro. 23-03037 (CML) |
| | § | |
| Alex E. Jones, as debtor and as owner | § | |
| and sole Manager of Free Speed Systems, | § | |
| LLC | § | |
| Defendants | § | |

**ALEX JONES'S MOTION TO RECONSIDER THIS COURT'S ORDER
DETERMINING THAT CONNECTICUT JUDGMENT ON APPEAL BARS
CHALLENGES TO JONES'S DISCHARGEABILIY**

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I | | JURISDICTION…………………………………………………… | 3 |
| II | | SUMMARY OF ARGUMENTS WHY RECONSIDERATION IS MANDATORY………………………………………………….. | 4 |
| | A | RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE CUTPA REVERSAL (I) MEANS CUTPA PUNITIVES ARE GONE AND (II) REVEALS ILLEGAL MULTIPLE RECOVERY………………………………………………. | 5 |
| | i | *$150,000,000 IN CUTPA PUNITIVE DAMAGES ARE GONE……………………..* | 5 |
| | ii | *CUTPA REVERSAL REVEALS ILLEGAL MULTIPLE DAMAGES……………………* | 6 |
| | B | RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE REVERSAL OF CUTPA ALSO MEANS THE DEATH PENALTY SANCTIONS -- WHICH THIS COURT WRONGLY FELT BOUND BY -- WERE WRONGLY ISSUED…………………………………….................................................. | 7 |
| | C | RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG FEDERAL LAW ON COLLATERAL ESTOPPEL APART FROM CONNECTICUT'S COLLATERAL ESTOPPEL LAW………………………………………… | 10 |
| | D | RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG CONNECTICUT LAW ON COLLATERAL ESTOPPEL………………………………………………................. | 11 |
| | E | RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE FEDERAL LAW REQUIRES AN INDEPENDENT REVIEW OF THE CLAIMS WHICH HAS NOT AND CANNOT OCCUR………………………………………………………… | 12 |
| | F | RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE U.S. CONSTITUTIONAL LAW THAT PREEMPTS CONNECTICUT STATE LAW HAS BEEN IGNORED……………………………………………………….. | 13 |
| | G | ALLOWING AN IRREVOCABLE §363 SALE OF ASSETS IS DEVASTATINGLY INEQUITABLE ……………………………………………………… | 15 |
| III | | IGNORED WERE THE FACTS THAT (i) SANDY HOOK AND ITS AFTERMATH WERE MATTERS OF PUBLIC CONCERN; (ii) THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES; AND (iii) ALEX JONES WAS A MEDIA DEFENDANT; THERE HAS BEEN NO "LIABIITY TRIAL" IN CONNECTICUT – THERE IS NOTHING TO "COLLATERALLY ESTOP………………………………………………………………… | 17 |

**EXHIBIT 1**

A   THE SANDY HOOK TRAGEDY AND ITS VERY PUBLIC AFTERMATH WERE MATTERS OF PUBLIC CONCERN…………………………………………………………   17

B   THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES……………………………   18

C   ALEX JONES IS A MEDIA DEFENDANT ENTITLED TO ALL FIRST AMENDMENT FREEDOM OF THE PRESS PROTECTIONS……………………………………………..   23

D   ALEX JONES GOES ON MEGAN KELLY SHOW IN JUNE 2017 WHICH PROMPTS SUIT…………………………………………………………………………..   24

E   THE CONNECTICUT PLAINTIFFS SUE MR. JONES AND THE TRIAL COURT ENTERS DEATH PENALTY SANCTIONS CRUSHING JONES'S CONSTITUTIONAL RIGHTS ……………………………………………………………………   24

IV   FEDERAL COLLATERAL ESTOPPEL LAW REQUIRES THAT BOTH (I) A STATE COURT HAVE USED THE CORRECT STANDARDS AND (II) OVERRIDING PUBLIC POLICY ISSUES TAKE PRECEDENCXE……………………………………………………   25

A   GROGAN REQUIRES APPLICATION OF A CLEAR AND CONVINCING STANDARD, NOT A PREPONDERANCE OF THE EVIDENCE STANDARD AS THIS COURT INCORRECTLY STATES…………………………………………………………………….   25

B   GROGAN REQUIRES THAT CONNECTICUT HAVE USED THE SAME CORRECT STANDARDS IN STATE COURT BEFORE COLLATERAL ESTOPPEL CAN APPLY……………………………………………………………………..   27

C   GROGAN REQUIRES THAT BEFORE COLLATERAL ESTOPPEL CAN APPLY TO A STATE ACTION, THERE ARE NO "OVERRIDING PUBLIC POLICY GROUNDS THAT WOULD BE VIOLATED OR AFFRONTED…………………….   28

V   THE COURT HAS BEEN LED TO MISSTATE CONNECTICUT LAW ON COLLATERAL ESTOPPEL………………………………………………   28

A   THIS COURT HAS BEEN LED TO CONFLATE (I) COLLATERAL ESTOPPEL IN A SUBSEQUENT CASE AFTER FULL TRIAL IN THE FIRST FASE; (II) DEFAULTS WHEN ADDRESSED IN SAME CASE ON DIRECT APPEAL; AND (III) COLLATERAL ESTOPPEL WHERE THERE HAS BEEN A SEPARATE DEFAULT JUDGMENT……………………………………........................................   29

B   CONNECTICUT LAW ON COLLATERAL ESTOPPEL HAS BEEN MISSTATED; IT MANDATES A FLEXIBLE, NONMECHANICAL APPROACH THAT AVOIDS INJUSTICE AND YIELDS TO PUBLIC POLICY…………………………………………………   29

**EXHIBIT 1**

C      Connecticut Law On Default Judgments Has Been Misstated And Misapplied……………………………………………………………..    32

D      Connecticut Law On Collateral Estoppel In The Context Of Default Judgments Has Been Misstated – The General Rule Is There Is No Collateral Estoppel Where There Has Been A Default Judgment…………………………………………………………….    34

E      This Case Is Nothing Like Scarbrough v. Purser ………………………………    37

VI      **THE CONNECTICUT COURT OF APPEALS REVERSAL OF CUTPA IS OF ENORMOUS SIGNIFICANCE…………………………………………………………**    41

A      The Connecticut Court Of Appeals Has Determined Cutpa Claims Were Not Valid -- Mandating Change Of This Court's Dischargeability Ruling On CUTPA Punitive Damages…………………………………………………..    41

B      Reversal of CUTPA Requires Reconsideration of Cutpa Compensatory Damages Which In Turn Reveals Illegal Multiple Damages………………    41

C      Because Of The CUTPA Reversal, The Death Penalty Sanctions Were Invalid As A Matter Of Law………………………………………………………    44

i      *This Court Should Review This Issue As Both Federal and Connecticut Collateral Estoppel Requirements Mandate Equity and Fairness Considerations As Part Of Collateral Estoppel Analysis………………………………………………………………*    44

ii      *The Death Penalty Sanctions Were Not Entered For "Repeated Violation Of Discovery Orders" But For Three Specific And Trivial Reasons………………………………………………………………*    46

iii      *Two Of The Three Reasons For the Death Penalty Sanction Were Tied To The Now-Reversed CUTPA Cause Of Action, Not Defamation………………………………………………………………*    47

iv      *The Third Basis Of The Death Penalty Sanction Was Noticing Hillary Clinton's Deposition Which Was Not A Reason To Issue Death Penalty Sanctions, And Certainly Not By Itself………………………………………………*    50

v      *Fairness And Equity Demand This Court's Review Of This Issue…………….*    52

VII      **THIS COURT HAS AN INDEPENDENT DUTY TO EVALUATE THE EVIDENCE AND NOT BLINDLY ACCEPT THE CONNECTICUT TRIAL**

EXHIBIT 1

| | | COURT'S DEATH PENALTY.................................................................................. | 53 |
|---|---|---|---|
| | A | THE U.S. SUPREME COURT REQUIRES THIS COURT TO MAKE AN INDEPENDENT REVIEW OF THE DEFAMATION FACTS AND ENSUING CONNECTICUT JUDGMENT............................................................................. | 53 |
| | B | THE DUTY TO CONDUCT AN INDEPENDENT REVIEW OF DEFAMATION FACTS IS CRUCIAL BY ITSELF WHEN CONSTITUTIONAL ISSUES ARE AT STAKE AS HERE.................................................................................. | 55 |
| VIII | | **SOME OF THE IGNORED CONSTITUTIONAL ISSUES THAT SUPERSEDE ALL OTHER LAW INCLUDING COLLATERAL ESTOPPEL LAWS** ................................................................................. | 58 |
| | A | IT IS FUNDAMENTAL ERROR FOR THIS COURT TO RECOGNIZE CLEAR CONSTITUTIONAL ERRORS MADE IN CONNECTICUT AND BELIEVE IT IS BOUND TO ABIDE BY CLEARLY UNCONSTITUTIONAL HOLDINGS AND FINDINGS ............................................................................. | 58 |
| | B | THE CONNECTICUT PLAINTIFFS WERE NOT REQUIRED TO AND DID NOT PRESENT ANY EVIDENCE OR EVEN PLEADING OF SPECIFIC DEFAMATORY STATEMENTS MADE BY JONES ............................................................................. | 58 |
| | i | *The Connecticut Complaint Does Not Contain Anywhere Near Required Detail And Most Of What Is Referenced Occurred Outside the Statute Of Limitations And Is a Prototected Opinion or Hyperbole*........................................................................... | 59 |
| | C | FALSITY-- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED <u>FALSITY</u> OF SPECIFIC STATEMENTS BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE –WHICH DID NOT HAPPEN....................... | 66 |
| | D | FAULT-- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED <u>FAULT</u> BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE –WHICH DID NOT HAPPEN.................................................... | 67 |
| | E | INTENTIONAL INFLICTION CLAIMS AND DAMAGES WERE CLEARLY SUBMITTED ON THE WRONG STANDARD AND ARE DISCHARGEABLE................................... | 69 |
| | F | DAMAGES CANNOT CONSTITUTIONALLY BE PRESUMED............................... | 72 |
| | G | IT IS UNCONSTITUTIONAL TO FIND JONES LIABLE FOR ACTS OF THIRD PARTIES........................................................................... | 74 |

EXHIBIT 1

| H | PROFIT MOTIVE IS IRRELEVANT IN MEDIA DEFAMATION………………………………………………………………… | 78 |
|---|---|---|
| I | THE AWARD OF PUNITIVE DAMAGES WAS UNCONSTITUTIONAL ………… | 78 |
| | **CONCLUSION**…………………………………………………………………. | 78 |

### Exhibits

| 1 | Connecticut Jury Verdict Damages |
|---|---|
| 2 | Lafferty v. Jones, 229 Conn. App. 487, 490 (2024) |
| 3 | Transcript Connecticut Death Penalty Sanctions 11.15.21 |
| 4 | Plaintiffs Motion for Sanctions |
| 5 | Transcript Megan Kelly show |
| 6 | Connecticut Plaintiffs Connecticut Complaint |
| 7 | Protective Order |
| 8 | Notice Depo Clinton |
| 9 | Transcript of Connecticut Hearing 10.20.2021 |
| 10 | Intentionally Omitted |
| 11 | Connecticut Jury Charge |
| 12 | Memorandum of Opinion Judgment |
| 13 | Notice of Defenses Filed After Default |
| 14 | Plaintiffs' Redlined Amended Complaint |
| 15 | Aldenberg testimony pages |
| 16 | Aldenberg testimony pages |

**EXHIBIT 1**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

Alex E. Jones ("Jones") respectfully moves this Court to reconsider its October 19, 2023 Memorandum Decision (the "Order") granting Connecticut Plaintiffs' Motion for Summary Judgment on the nondischargeability of their Connecticut judgment. [Dkt. 76]. Reconsideration is imperative to address significant errors of law and fact that underlie the Order and to ensure the proper administration of justice regarding the nondischargeability of the Connecticut plaintiffs' Connecticut judgment. [Dkt. 76].

1.      As will be specified towards the end of this Motion, many if not most of the errors this Court has been led to, are errors of Constitutional magnitude.  These issues merit a trial alongside the matters the Court has already designated for a dischargeability hearing.

2.      This Court must find dischargeable—or at the very least, identify genuine issues of material fact regarding—the Connecticut judgment's awards of "compensatory damages" and punitive damages under the Connecticut Unfair Trade Practices Act ("CUTPA") reversed by the Connecticut Court of Appeals.  *Lafferty v. Jones,* 229 Conn. App. 487, 537 (2024).  **Ex. 2** hereto.

3.      Critically, this Court's Order rests on several fundamental errors that require correction, many of which deal with the U.S. Constitution. Accurate application of the law is essential to preserve the integrity of the broader judicial system.  This case presents unprecedented and highly significant legal issues not fully or correctly considered in the Order including:

> a.  The intersection of state court penalty-based default judgment rules that conflict with constitutional principles as interpreted by the U.S. Supreme Court involving media defendants, public controversies, and public figure plaintiffs;
>
> b.  The intersection of federal bankruptcy law with constitutional principles and conflicting state court penalty-based default judgment rules, all involving media defendants, public controversies, and public figure plaintiffs;

1

    c.    Errors in the Order's understanding and application of federal and state collateral estoppel doctrines; and

    d.    Misstatements concerning state appellate procedures, particularly those that have not corrected previous errors.

To Jones's knowledge, no other case has presented this unique convergence of issues. The Court's decision will inevitably be studied and scrutinized by higher courts, the legal community, the media, and the public at large. It is critical that the Order withstands such scrutiny.

4.    This Court's decision will also reverberate throughout the media world, among broadcasters and commentators who are reporting on cutting edge, controversial issues of the day.

5.    But the Order is crucial to Alex Jones personally.  It imposes an unconscionable and insurmountable burden on Jones.  A judgment exceeding $1,000,000,000, compounded by pre- and post-judgment interest rates as high as 10%, would result in annual interest obligations alone of approximately $100,000,000. This extraordinary liability — one that no human being could bear—constitutes an excessive financial penalty and, effectively, involuntary servitude in violation of the Thirteenth Amendment. It also undermines the fundamental purpose of bankruptcy law: to provide individuals with a meaningful opportunity for a "fresh start." And it has been awarded to plaintiffs who have not experienced any physical harm to themselves or their property – only their feelings.

6.    Furthermore, the Order left unchanged, the Trustee and the Connecticut Plaintiffs are even now attempting to arrange a "settlement" by the sale of Jones's assets based on the assumed validity of the Connecticut Judgment and this Court's prior determination that a majority of that judgment is non-dischargeable – the many errors of which this Motion points out.  As noted hereafter, once that §363 sale is accomplished, even if the Connecticut judgment is reversed and/or

this Court's nondischargeability determinations are changed (whether by reconsideration or reversal), the §363 sale based thereon will place Jones's assets beyond his reach when they should not have been sold to begin with.

7.    This Court's 18-page, single-spaced Order [Dkt. 76] is not only a judgment on Jones, but a precedent for our nation and its First Amendment jurisprudence.  The complexity of the issues and the breadth of errors necessitate a detailed motion. This submission, while lengthy, seeks to assist the Court in revisiting the significant and intertwined legal principles at stake, rather than merely cataloging objections and citing authorities without adequate explanation.

8.    Given the life-altering implications for Jones, the far-reaching effects on constitutional and bankruptcy jurisprudence, and the imminence of an irrevocable §363 sale of assets by the Trustee to people bent on the permanent destruction of Jones, this Court must reconsider its Order.

## I
## JURISDICTION

9.    Reconsideration requests are routinely made under either or both FRCP 60(b)(1) and 60(b)(6) as they are here.  As to errors of law, the Supreme Court has stated that a trial court's errors of law can be reconsidered under FRCP 60(b)(1).  *See Kemp v. United States*, 596 U.S. 528, 530, 142 S. Ct. 1856, 1860 (2022) ("We conclude, based on the text, structure, and history of Rule 60(b), that a judge's errors of law are indeed 'mistakes' under Rule 60(b)(1).") (cleaned up).

10.    As to other errors, FRCP 60(b)(6) can and should be invoked "in extraordinary circumstances" which include cases where the order to be reconsidered involves "the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process." *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs.*

*Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)). Such is the case here.

11.     Particularly where an order is interlocutory, as here, bankruptcy courts have universally recognized their inherent right to reconsider an order. Moore's Federal Practice, § 59.30[7] (Matthew Bender 3d ed.). *See also, Anderson Living Tr. v. WPX Energy Prod., LLC*, 308 F.R.D. 410, 433 (D. N.M. 2015); *In re Energy Future Holdings Corp.*, 575 B.R. 616 (Bankr. D. Del. 2017).

**II**
**SUMMARY OF ARGUMENTS WHY RECONSIDERATION IS MANDATORY**

12.     The Connecticut judgment awarded the following unprecedented damages, all of which are dischargeable, or at the very least fact issues as to dischargeability exist:

| Conn. Pls. | Defamation Slander | Emotional Distress | Common law Punitives | CUTPA Punitives | TOTALS |
|---|---|---|---|---|---|
| R. Parker | $60,000,000 | $60,000,000 | $40,000,000 | $10,000,000 | $170,000,000 |
| W. Aldenberg | $45,000,000 | $45,000,000 | $30,000,000 | $10,000,000 | $130,000,000 |
| E. Lafferty | $18,000,000 | $58,000,000 | $25,300,000 | $10,000,000 | $111,300,000 |
| I. Hockley | $38,000,000 | $43,600,000 | $27,200,000 | $10,000,000 | $118,800,000 |
| N. Hockley | $32,000,000 | $41,600,000 | $24,530,000 | $10,000,000 | $108,130,000 |
| J. S. Marionio | $30,000,000 | $38,800,000 | $22,930,000 | $10,000,000 | $101,730,000 |
| C. S. Parisi | $30,000,000 | $36,000,000 | $22,000,000 | $10,000,000 | $98,000,000 |
| M. Barden | $25,000,000 | $32,600,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| C. M. Soto | $18,600,000 | $39,000,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| W. Sherlach | $9,000,000 | $27,000,000 | $12,000,000 | $10,000,000 | $58,000,000 |
| D. Wheeler | $25,000,000 | $30,000,000 | $18,330,000 | $10,000,000 | $83,330,000 |
| F. Wheeler | $24,000,000 | $30,000,000 | $18,000,000 | $10,000,000 | $82,000,000 |
| J. Hensel | $21,000,000 | $31,000,000 | $17,330,000 | $10,000,000 | $79,330,000 |

| D. Soto | $18,000,000 | $30,000,000 | $16,000,000 | $10,000,000 | $74,000,000 |
| J. Barden | $10,000,000 | $18,800,000 | $9,600,000 | $10,000,000 | $48,400,000 |
| TOTALS | $403,600,000 | $561,400,000 | $321,620,000 | $150,000,000 | $1,436,620,000 |

**Ex. 1** (Conn. Jury Verdict, Conn. Dkt No. 1010] & **Ex. 12** (Memorandum Opinion Judgment). This Court's Order previously denied the Connecticut Plaintiffs' motion for summary judgment that the common law punitive damages were nondischargeable.

A. ***RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE CUTPA REVERSAL (I) MEANS CUTPA PUNITIVES ARE GONE AND (II) REVEALS ILLEGAL MULTIPLE RECOVERY.***

13.     This Court stated: "The ultimate amount of this nondischargeable debt could change if Jones succeeds on his state court appeal." [Order, pp.15-16]. This Court is now aware that the Connecticut Appeals Court has reversed the Connecticut trial court's determination that CUTPA was a valid cause of action. This reversal has profound consequences for the damages that were assessed in the Connecticut trial court, referenced in the damages chart above.

*i.     $150,000,000 In CUTPA Punitive Damages Are Gone*

14.     First and most obviously, the reversal of any CUTPA claims reverses the award of CUTPA punitive damages. *Lafferty v. Jones,* 229 Conn. App. 487, 537 (2024) ("The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. **For the reasons that follow, we agree.**") See **Exhibit 2** hereto (emphasis added). This, in turn, necessitates that this Court revisit its grant of summary judgment and now find dischargeable, the extinguished punitive damages totaling $150,000,000.

15.     The CUTPA punitive damage award is invalid and must be held dischargeable for the additional reason that it was not issued based on clear and convincing evidence, as required by

the Constitution, which requirement has been repeatedly reaffirmed by the U.S. Supreme Court. See extensive discussion, *infra*.

      ii.   *CUTPA Reversal Reveals Illegal Multiple Damages*

16.    But CUTPA did not just award punitive damages, it awarded compensatory damages as well, the Charge of the Connecticut Trial Court stating: "Damages due to the defendants' violation of [CUTPA] are included in the other damages measures that I am describing to you and you will not assess them separately." **Ex. 11,** Court Charge, p. 11, p. 24.  Thus, the CUTPA compensatory damage award must be reversed too.  And determining what those reversable CUTPA compensatory damages are shows what can most simply be called a dramatic "multiple recovery."

17.    In a defamation case, the jury may award the plaintiff damages for the injury to a plaintiff's reputation and the mental suffering and emotional distress caused by the defamation. *Chugh v. Kalra*, 342 Conn. 815, 850-51, 271 A.3d 993, 1012-13 (2022) (*citing Battista v. United Illuminating Co*., 10 Conn. App. 486, 492, 523 A.2d 1356)).

18.    The same reputational injury and emotional distress is compensable as a result of intentional infliction, invasion of privacy and CUTPA.

19.    The jury charge indicated that the damages across all causes of action (defamation, intentional infliction of emotional distress, invasion of privacy/false light, and violation of CUTPA were assessed based on these overlapping concepts of reputational injury and emotional distress. See, e.g. **Ex. 11**, Connecticut Jury Charge, pp. 21-2.  And the grouping of injuries into reputational and emotional distress is conclusively shown when the Charge states that damages under CUTPA are "included in the other damages measures" and "will not be assessed separately."  Again, this confirms that the trial court intended to merge the damage components for all causes of action.

20.     Yet the jury verdict form the jury completed asked the jury for "defamation/slander damages" and "emotional distress damages" as shown by the verdict question for FBI agent William Aldenberg:



21.     The verdict form thus separately stated defamation/slander damages which include emotional distress and then emotional distress again.  At the very minimum this means the damages awarded include multiple recoveries for emotional distress or an unlawful "double award."  *See Duran v. Town of Cicero,* 653 F.3d 632, 640 (7th Cir. 2011) (explaining that plaintiff cannot be compensated twice for same injury, even if multiple theories support damages award or multiple defendants may be held liable).

22.     Further, "emotional distress" damages for intentional infliction as explained *infra*, cannot stand either constitutionally or under 11 U.S.C. § 523(a)(6), as it uses a "knew or should have known" standard, which is negligence, when the Supreme Court has specifically held that for media defendants the *New York Times v. Sullivan* standards apply to claims of intentional infliction.  *Snyder v. Phelps,* 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011).

B.  ***RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE REVERSAL OF CUTPA ALSO MEANS THE DEATH PENALTY SANCTIONS -- WHICH THIS COURT WRONGLY FELT BOUND BY -- WERE WRONGLY ISSUED.***

23.     It is unquestioned that this Court did not analyze in any detail the underlying reasons the death penalty sanctions were entered by the Connecticut trial court but rather accepted the characterizations of the Connecticut plaintiffs' lawyers that they were entered for "repeated violations of discovery orders."  See e.g., Order p.1.   This Court's decision to not examine the underlying factors that precipitated the Death Penalty Sanctions, means this Court felt itself without authority to reject them no matter how unjust; however, the finding of the Court of Appeals that CUTPA was not a viable cause of action as a matter of law means the Death Penalty Sanctions were wrongly assessed as they were largely tied to CUTPA.

24.     As will be demonstrated, the transcript of the fateful November 15, 2021, hearing where the Death Penalty Sanctions were imposed [**Ex. 3** hereto] states there were only three reasons – all trivial – for entry of the Death Penalty Sanctions.  The first reason was that Jones's lawyers sought to depose Hillary Clinton, which (i) is not a violation of a discovery order, (ii) does not relate to CUTPA and (iii) was unjust, as will be discussed in detail *infra*.  The two other reasons for the Death Penalty were tied <u>directly</u> to the now reversed CUTPA claim:

a.  **Analytics**.  Jones's lawyers could not retrieve in satisfactory form, never-used Analytics data allegedly showing the number of vitamin supplement sales made during broadcasts when the subject of a media broadcast mentioned Sandy Hook; and

b.  **Sub-journal Entries to Jones's Financials.** Jones's lawyers could not retrieve in a form and format to the liking of the Connecticut Plaintiffs, accounting "subaccounts" from their accounting journal entries, again which the Connecticut Plaintiffs hoped to use to show a profit motive.

25.     There are no other court-enumerated bases for the Death Penalty Sanction ordered by the Connecticut trial court.

26.     The Connecticut Plaintiffs clearly claimed that these two categories of financial information (i.e., those in ¶25(a) & (b) above) were "critical" to their now-dismissed CUTPA

claims, advising the Connecticut trial court that Jones allegedly employed "false narratives about the Sandy Hook shooting" and that he did so "as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."  The Connecticut Plaintiffs elaborated further that Jones stories, including Sandy Hook, "elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money ..." **Ex. 4** hereto, p. 15.   The Connecticut Plaintiffs themselves then tied all this to CUTPA plainly so stating:

> "**These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims.** Id. ¶¶ 465–474 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy").

**Ex. 4,** pp. 14-15 (emphasis added).

27.     But these have nothing to do with libel, intentional infliction or invasion of privacy, only CUTPA.  The U.S. Supreme Court has plainly stated a profit motive is irrelevant in libel cases and causes based on First Amendment speech issues. See, e.g., *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels.").  Thus, the claims of need for these scant materials was not to demonstrate libel/defamation, but rather to advance their now-rejected CUTPA claim.

28.     This Court "cleared the runway for Jones to appeal," [Order, p. 12], and Jones did just that appealing, *inter alia*, the inappropriateness of the Death Penalty Sanction and also the fact that CUTPA was not a viable cause of action.  The Court of Appeals determined CUTPA was not a valid claim but did not address what the effect of that finding was on the Death Penalty Sanctions

9

that were tied to the CUTPA claims. Hence, this issue has not been addressed in the appeal process and may never be as appeal to the Connecticut Supreme Court is by discretionary petition for *certiorari* -- thus not assured. That in turn means the impact of CUTPA reversal on the Death Penalty sanctions will not have been reviewed by an appellate court.

29. Surely the hands of this United States Bankruptcy Court are not tied and the United States Bankruptcy laws rendered impotent in this context. Whether this Court's initial decision to defer to the Connecticut court was valid at the time the Order was entered, given this state of the record at this time, this Court is duty-bound to reconsider its dischargeability order as the Death Penalty Sanctions were clearly not appropriate in light of the vacating of the CUTPA cause of action.

### C. *RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG FEDERAL LAW ON COLLATERAL ESTOPPEL APART FROM CONNECTICUT'S COLLATERAL ESTOPPEL LAW*

30. Apart from (a) the Constitutional requirements and restrictions referenced below in this summary and fully addressed fully *infra* in the argument section hereof, and (b) Connecticut collateral estoppel, this Court was misled into an erroneous interpretation of federal collateral estoppel law. This Court cited *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (hereafter, "*Grogan*") for the proposition that a "creditor must prove nondischargeability of a debt by a preponderance of the evidence." Order, p. 7. This is an incomplete statement at best, as the Supreme Court in *Grogan* recognized an exception to the "preponderance" standard where a "clear and convincing" standard would apply. That burden-shifting exception occurs where "particularly important individual interests or rights are at stake" which is clearly the case here. *Grogan*, 498 U.S. at 286. Misled by the Connecticut plaintiffs, this

EXHIBIT 1

Court disregarded the "if particularly important individual interests or rights are at stake" caveat, that shifts the dischargeability burden to clear and convincing. This wrong standard necessitates reconsideration.

### D. RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE THIS COURT APPLIED THE WRONG CONNECTICUT LAW ON COLLATERAL ESTOPPEL

31.     This Court has been badly misled on Connecticut law of collateral estoppel. For example, this Court has been misled into stating that collateral estoppel applies rigidly, if "[1] the issues … have been fully and fairly litigated in the first action, [2] it must have been actually decided, and [3] the decision must have been necessary to the judgment." Order, p. 8. But this is again incomplete at best.

32.     As explained in detail *infra*, in *Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 15 A.3d 601, 613 (Conn. 2011) the Connecticut Supreme Court cautioned that these three points *were not to be applied mechanically* as the Connecticut plaintiffs convinced this Court to do. Rather, the Connecticut Supreme Court held these three points were to be viewed flexibly with equity in mind and are particularly inapplicable when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id*. And Connecticut law's "focus on resulting injustice and other social policies" in deciding collateral estoppel issues, was a reiteration of that holding referenced by the Connecticut Supreme Court in *Cumberland Farms v. Town of Groton*, 262 Conn. 45, 59-60, 808 A.2d 1107, 1117 (2002).

33.     Furthermore, the Constitutional issues briefly addressed below in this summary and fully addressed *infra* in the argument section hereof, are not only independent bases for reconsidering the grant of partial summary judgment on the dischargeability issue,  the denial to

Jones of his Constitutional rights "works an injustice" and "frustrates other social policies based on values equally or more important than the convenience afforded by finality in legal controversies" which themselves are bases for denying collateral estoppel effect to the catastrophic Death Penalty Sanctions of the default judgment entered against Jones pursuant to Connecticut law.

E. **R**ECONSIDERATION **I**S **R**EQUIRED **A**S **A** **M**ATTER **O**F **L**AW **B**ECAUSE **F**EDERAL **L**AW **R**EQUIRES **A**N **I**NDEPENDENT **R**EVIEW OF THE **C**LAIMS **W**HICH **H**AS **N**OT **A**ND **C**ANNOT **O**CCUR

34.     The U.S. Supreme Court requires an independent court to have made a separate evaluation and determination on Constitutional issues, which as will be demonstrated, is what this case is about in its entirety:

> In cases raising First Amendment issues we have repeatedly held that **an appellate court has an obligation to make an independent examination of the whole record** in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.

*Bose Corp. v. Consumers Union*, 466 U.S. 485, 499, 104 S. Ct. 1949, 1958-59 (1984) (hereafter, "*Bose*").    Here, however, the Connecticut Court of Appeals refused to make such independent examination, or to even consider the Constitutional issues in light of the Death Penalty Sanctions default, holding briefing on that issue to have been "bereft of any substantive legal analysis" and therefore deemed "abandoned."    **Ex. 2,** *Lafferty v. Jones*, 229 Conn. App. 487, 510 n.26 (2024).

35.     The United States Supreme Court places an unwaivable duty on a federal court such as this one to "review findings of fact by a state court where a federal right has been denied on the basis of a fact without evidence to support it and where a conclusion of law as to a federal right and a finding of fact are so intermingled to require analysis of the facts."   *Bose*, 466 U.S. 485, 506 n.24 (citing *Fiske v. Kansas*, 274 U.S. 380, 385-387 (1927)); *see also Peter Scalamandre & Sons*

**EXHIBIT 1**

*v. Kaufman*, 113 F.3d 556, 560 (5th Cir. 1997) (citing *Bose*) ("Rather, in such cases, we have an obligation to make an independent examination of the entire record to ensure the judgment is supported by clear and convincing evidence of actual malice.").

36.     U.S. Supreme Court thus mandates this Court to evaluate these issues, especially since the Connecticut Court of Appeals has not and there is no assurance the Connecticut Supreme Court will grant cert and if it does, will grant cert on this issue.   This is mandate is particularly important in the context of ensuring the correct application of 11 U.S.C. § 523(a)(6).

37.     And the "independent evaluation" will require evidentiary proceedings since the Death Penalty Sanctions precluded development of an evidentiary record.,

### F.  RECONSIDERATION IS REQUIRED AS A MATTER OF LAW BECAUSE U.S. CONSTITUTIONAL LAW THAT PREEMPTS CONNECTICUT STATE LAW HAS BEEN IGNORED

38.     Given the Constitutional importance of the First Amendment, a preemptive body of federal law supersedes all state laws to the contrary, as the Connecticut Supreme Court itself has acknowledged: "Beyond these common-law principles, there are numerous federal constitutional restrictions that govern the proof of the tort of defamation…" *Gleason v. Smolinski*, 319 Conn. 394, 431, 125 A.3d 920, 947 (2015) (hereafter, "*Gleason*").   Among the litany of ignored, preempting "federal constitutional restrictions," were the U.S. Supreme Court's pronouncements in a host of cases, such as *New York Times v. Sullivan,* 376 U.S. 254 (1964) (hereafter, "*Sullivan*"), *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) (hereafter, "*Hustler*") and more recently *Snyder v. Phelps,* 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) (hereafter "*Snyder*").   Ignoring these U.S. Supreme Court preempting mandates robbed the Connecticut trial court's judgment of any collateral estoppel vitality, such that a state court judgment that ignores Constitutional requirements has not employed the correct standard and thus is not to be enforced

via collateral estoppel.

39.     Specifically, and as will be explained more fully *infra*, in *Sullivan*, the Supreme Court commanded that in order to recover, the Connecticut plaintiffs here were required to prove by "clear and convincing evidence" that specific statements Mr. Jones himself made about them were in fact false.

40.     Further, *Sullivan* required that the fifteen Connecticut plaintiffs prove also by "clear and convincing evidence" that Jones himself <u>*subjectively*</u> knew they were false. Only then were compensable defamation damages recoverable: "We previously have noted that, under *New York Times Co. v. Sullivan*, … the plaintiff also must prove that the defamatory statement was made with actual malice, such that the statement, when made, was made with actual knowledge that it was false or with reckless disregard of whether it was false." *Gleason*, 125 A.3d at 948 (citing *Sullivan*) (cleaned up; internal citations and quotations omitted). **None of that happened in the Connecticut trial.**

41.     And these Constitutional principles apply to claims of intentional infliction of emotional distress and invasion of privacy.  In *Hustler*, the Supreme Court said the *Sullivan* standards applied to the tort of intentional infliction of emotional distress. 485 U.S. at 56-57.  This was reaffirmed very recently by the U. S. Supreme Court in *Snyder*, as recognized by the Connecticut Supreme Court: "The first amendment bars damages under the generally applicable laws of intentional and negligent infliction of emotional distress where those claims are based on constitutionally protected conduct." *Gleason*, 125 A.3d at 933 (cleaned up).  **Again, this did not happen in the Connecticut trial either**.

42.     In fact, as to the Connecticut plaintiffs claim for $561,400,000 for emotional distress, this Court itself quotes language from the Connecticut Court's jury charge, which shows

that while called *intenti̲o̲n̲a̲l̲* infliction, that cause of action was submitted based on a negligence standard, this Court stating: "The defendants intended to inflict emotional distress or . . . *k̲n̲e̲w̲ ̲o̲r̲ s̲h̲o̲u̲l̲d̲ ̲h̲a̲v̲e̲ ̲k̲n̲o̲w̲n̲* that emotional distress was the likely result of their conduct." Order, p. 13 (emphasis added). See also Order, p. 3 & 14.

43.     However, "knew or should have known" is the legal standard of negligence. See *Erickson Prods. v. Kast,* 921 F.3d 822, 833 (9th Cir. 2019) ("A 'should have known' instruction does not fit within this framework because it is a negligence standard."). See also *Mirjavadi v. Vakilzadeh,* 310 Conn. 176, 195, 74 A.3d 1278, 1289 (2013)]. And the negligence "knew of should have known" standard is forbidden by US Supreme Court mandate.

44.     Thus, disregarding of preempting Constitutional requirements is not to wait on the Connecticut judiciary but are issues this Court must address now, mandating the reconsideration of its previous grant of summary judgment without addressing these issues.

## G.  *A̲L̲L̲O̲W̲I̲N̲G̲ ̲A̲N̲ ̲I̲R̲R̲E̲V̲O̲C̲A̲B̲L̲E̲ ̲§363 S̲A̲L̲E̲ ̲O̲F̲ ̲A̲S̲S̲E̲T̲S̲ ̲I̲S̲ ̲D̲E̲V̲A̲S̲T̲A̲T̲I̲N̲G̲L̲Y̲ ̲I̲N̲E̲Q̲U̲I̲T̲A̲B̲L̲E̲*

45.     This case has progressed to the point where this Court has erroneously but irrevocably, found a debt non-dischargeable where at a minimum (a) a significant percentage of the debt has now been reversed by the Court of Appeals, (b) another large percentage has been based on a negligence standard and thus is erroneous as a matter of law; and (c) errors of Constitutional significance have not been independently addressed and may or may not get presented to the Connecticut Supreme Court because of the discretionary nature of appeal to that body.

46.     Yet because the Order is essentially treated as irrevocable, it allows an irreversible §363 sale of the Defendants' assets – including the all-important "InfoWars" brand and intellectual property -- to fund distributions to creditors whose claims have neither been allowed (nor may ever

be allowed) and where these crucial issues have yet to be decided. Upon reversal, for example, Jones has no remedy to recover his assets or obtain relief for the loss of the going concern value of, for instance, InfoWars. [1] This is unfair and inequitable.

47. To be even more precise, the sale of assets is being considered to those bent on Jones's destruction, pursuant to a Constitutionally infirm Connecticut judgment. Apart from whether the Connecticut Supreme Court grants discretionary review, this Court's judgment will be appealed, if necessary, to the District Court, the Fifth Circuit and the U.S. Supreme Court. Reversal in whole or in part could occur at any of these tribunals. The irreversible nature of a §363 sale, however, will allow those bent on Jones's destruction to permanently take over Jones's business interests and operate them to destroy his brand by creating at a minimum, customer confusion and at worst wreaking consumer havoc and depriving Jones of his assets and livelihood, based on an invalid judgment which may take significant time to judicially declare. [2]

48. To have granted the Connecticut plaintiffs' motion for summary judgment on dischargeability, this Court was led into legal and factual error. To rectify these errors in light of the ensuing irrevocable damage to Jones, this Court should (a) reconsider the erroneous ruling it was led to make that the Connecticut Judgment is nondischargable; (b) deny the plaintiffs' motion

---

[1] In contrast, Texas statutes provide that upon a premature judgment sale and later reversal of the judgment, the judgment creditor must return the property or its full value at the time of the sale. This is almost certainly why the Connecticut Plaintiffs do not even attempt to "credit bid" the sale of the Infowars brand.

[2] *See Pennzoil Co. v. Texaco, Inc*., 481 U.S. 1, 22, 107 S. Ct. 1519, 1532 (1987) and *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979). As reflected by these cases, a section 363 sale does not contain a provision similar to Texas law for liability of the Judgement Creditor for a premature execution on a judgment, that would allow Alex Jones to *recover from the judgment creditor the market value of the property sold at the time of the sale.* Thus, if the joint and several judgments against Jones and FSS are reversed on appeal in any substantial amount Alex Jones may be relegated to collecting nothing, because the Connecticut Plaintiffs, are arranging this purchase in order to such down and destroy the value of the going concern of FSS, and can keep and select property (such as their splitting of the Onion's revenue for a period of time), "as if" they have a valid and enforceable judgment. The Connecticut Judgment has been stayed on appeal by the Connecticut Statutes.

for summary judgment on dischargeability; (c) set the dischargability issue for an evidentiary trial; and (d) at the conclusion of that trial, find that the damages awarded by the Connecticut trial court are all dischargeable.  In the alternative this Court should stay any action on the sale of Jones's assets until these issues are fully and finally resolved whether in Connecticut or in the federal system.

**III.**

**IGNORED WERE THE FACTS THAT (i) SANDY HOOK AND ITS AFTERMATH WERE MATTERS OF PUBLIC CONCERN; (ii) THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES; AND (iii) ALEX JONES WAS A MEDIA DEFENDANT; THERE HAS BEEN NO "LIABIITY TRIAL" IN CONNECTICUT – THERE IS NOTHING TO "COLLATERALLY ESTOP"**

**A. THE SANDY HOOK TRAGEDY AND ITS VERY PUBLIC AFTERMATH WERE MATTERS OF PUBLIC CONCERN**

49.     The tragic Sandy Hook murders took place in December, 2012 in Newtown, Connecticut, a small town with a population of under 30,000 and captivated the entire world. In the United States alone, major news outlets such as The New York Times, The Washington Post, CNN, and NBC News, alongside numerous local papers and online publications, produced extensive coverage immediately following the incident and, in the years, since.  Although it is impossible to say with precision, estimates are that at least 10,000 to 20,000 articles were generated within the U.S. about this.  International reporting likely produced an additional 5,000 to 10,000 articles initially, with periodic follow-ups and anniversary reports.  Globally, Sandy Hook coverage extended to major international news organizations, including BBC, Al Jazeera, The Guardian, Le Monde, and The Sydney Morning Herald, along with other regional publications.

### B. THE CONNECTICUT PLAINTIFFS WERE PUBLIC FIGURES

50.     The Sandy Hook tragedy quickly morphed the Connecticut Plaintiffs into significant public figures as driving forces for gun control.  After 2012, the Connecticut Plaintiffs gave scores of public interviews and/or made statements and/or formed or joined advocacy campaigns, many through organizations or initiatives they founded to prevent similar tragedies via gun control.  Some of the Connecticut Plaintiffs were invited to attend President Barack Obama's 2013 State of the Union address as guests, a gesture that highlighted their very public gun control advocacy.   There President Barack Obama advocated for gun reform following the tragedy, where President Obama after paying tribute to the Connecticut Plaintiffs called for Congress to act on gun violence prevention.

51.     Nicole Hockley and Mark Barden were among the parents who worked closely with the Obama administration on these issues and were publicly recognized in various ways as part of the administration's push for change in gun policy.

52.     Based on public records and media coverage David and Francine Wheeler were even asked to substitute for President Obama himself in his weekly, nationally televised address to publicly advocate these issues:



53.    Francine Wheeler gave widely broadcasted speeches and was involved in Sandy Hook-related gun control advocacy.

54.    Nicole Hockley and Ian Hockley, were active in the media and Mark Barden and Jacqueline Barden frequently gave interviews and public statements.  William Sherlach joined in public advocacy for changes in gun laws and mental health reform.  Mark and Jackie Barden, Nicole Hockley, and William Sherlock co-founded Sandy Hook Promise, which holds itself out on its publicly accessible web site as follows:



https://www.sandyhookpromise.org/who-we-are/about-us/.

55.     Connecticut plaintiff Aldenberg is a law enforcement official with the FBI who was on site at Sandy Hook leading the investigation there. **Ex. 6**, Connecticut Complaint, ¶28.   As a federal law enforcement official, Aldenberg was unquestionably a public figure.   *See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262 (1968) (deputy sheriff); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069-70 (5th Cir. 1987); *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1431 (8th Cir. 1989) (Federal Bureau of Investigation agent); *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir. 1977) (federal narcotics agents); *Simien v. Freeman*, No. 04-cv-701, 2007 U.S. Dist. LEXIS 116972, 2007 WL 9701229, at *5-6 (M.D. La. May 16, 2007) (collecting cases).

56.     At the 2016 Democratic National Convention Erica Lafferty (her maiden name) gave a five-minute speech on gun control and Hillary Clinton, and was shown in close support of Secretary Clinton given her positions on gun control:

**EXHIBIT 1**



57.     The publicity they received from Sandy Hook and their efforts at gun control, were increased when they sued Remington Arms, the manufacturer of the weapon used by the murderer in a highly publicized suit.   *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 64, 202 A.3d 262, 271 (2019).   That case and its settlement for $73,000,000 was publicized world-wide, referring to the Connecticut Plaintiffs as the "Sandy Hook Families":



**EXHIBIT 1**



58.     Jennifer Hensel and Jeremy Richman were public and vocal advocates for mental health awareness. Jeremy Richman founded the Avielle Foundation, often speaking publicly about the connection between mental health and violence.   Carlee Soto-Parisi and Jillian Soto, sisters of teacher Victoria Soto, became vocal advocates for gun reform and school safety and participated in marches and public forums.

59.     There is thus no question that the Connecticut Plaintiffs were "public figures," which has Constitutional significance:

> "…a majority of the Court agreed with Mr. Chief Justice Warren's conclusion that the *New York Times* test should apply to criticism of public figures as well as public officials.  The Court extended the constitutional privilege announced in that case to protect defamatory criticism of nonpublic persons who are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large."

*Gertz v. Robert Welch*, 418 U.S. 323, 336-37, 94 S. Ct. 2997, 3010 (1974) (internal quotes omitted) (hereafter, "*Gertz*").  As such and as will be discussed in detail *infra*, the U.S. Supreme has continuously reiterated that "the plaintiff in such an action must prove that the defamatory publication 'was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *St. Amant v. Thompson*, 390 U.S. 727, 728, 88 S. Ct. 1323, 1324 (1968) (citing "the rule" of *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964)).  Without question, this "rule" was abandoned in the Connecticut trial and not reviewed by the Connecticut Court of Appeals.

### C.  ALEX JONES IS A MEDIA DEFENDANT ENTITLED TO ALL FIRST AMENDMENT FREEDOM OF THE PRESS PROTECTIONS

60.     Jones is a media defendant.  Recognized by both supporters and critics, Jones has been at the forefront of media for nearly three decades, with his career spanning radio, online broadcasting, film, and commentary.

61.     Though some controversies have followed him, Jones has maintained his dedication to free speech, individual rights, and against gun control, positioning himself as a steadfast proponent of questioning mainstream narratives.  The Connecticut Plaintiffs readily admit this.  **Ex. 6,** Connecticut Complaint, ¶7, 30-35 & 40.   Currently, he hosts The Alex Jones Show from Austin, Texas, which is the longest-running online news and politics talk show today

and was previously broadcast by the Genesis Communications Network across the United States via syndicated and internet radio.  As such he was entitled to, but denied, all the Constitutional protections afforded media defendants.

### D.  ALEX JONES GOES ON MEGAN KELLY SHOW IN JUNE 2017 WHICH PROMPTS SUIT

62.  In June 2017, NBC talk show host and political commentator Megyn Kelly hosted Alex Jones on a live broadcast on NBC.  The interview covered many subjects and lasted approximately 17.5 minutes in its entirety.  Approximately 4.5 minutes of that airtime involved (a) Kelly talking about Sandy Hook, which included her own comments and commentary, (b) Kelly asking question of and making allegations against Jones; and (c) Kelly interviewing Neil Heslin, a parent of one of the murdered children who sued Jones in Texas.   A copy of what is believed to be an accurate transcript of relevant portions of the June 2017 Megyn Kelly interview is attached hereto as **Exhibit 5**.  [3] Even a casual review shows nothing remotely resembling defamation is found in that interview.

### E.  THE CONNECTICUT PLAINTIFFS SUE MR. JONES AND THE TRIAL COURT ENTERS DEATH PENALTY SANCTIONS CRUSHING JONES'S CONSTITUTIONAL RIGHTS

63.  Over five years after the Sandy Hook tragedy, on May 23, 2018, the Connecticut Plaintiffs sued Mr. Jones in Waterbury, Connecticut (population approximately 115,000) and their complaint (**Ex. 6** hereto) sets forth causes of action for (i) invasion of privacy, (ii) defamation and defamation per se, (iii) intentional infliction of emotional distress, and (iv) violations of the Connecticut Unfair Business Practices ACT.  See Order, p. 2.

---

[3] Plaintiffs' Amended Complaint [**Ex. 14**] cites the youtube version of this interview at ¶391, n. 51.  The attached transcript is a true and correct copy of the youtube interview the Connecticut Plaintiffs reference.

64.     The Connecticut statute of limitations is two years for defamation (Sec. Conn. Gen. Stat. 52-597) and three years for intentional infliction (Conn. Gen. Stat. § 52-577).  Almost all of the events complained of occurred well outside of the statute of limitations and yet were the subject of the grossly excessive damage awards.

65.     This Court knows that "Death Penalty Sanctions" were rendered on November 14, 2021.  **Ex. 3**.  But for this Court to state that the case was "thoroughly litigated" for three years before those sanctions [Order, p. 1] is simply wrong.   Upon filing suit, Jones filed a motion to dismiss under the Connecticut anti-Slapp laws, which effectively stayed the case which stay continued when the anti-Slapp denial went to the Connecticut Supreme Court.   As the Court of Appeals itself recently stated: "The proceedings in the underlying consolidated actions were stayed pending our Supreme Court's resolution of the public interest appeal, and, on October 27, 2020, the trial court denied a request by the Jones defendants to stay discovery further."  *Lafferty v. Jones*, 229 Conn. App. 487, 496 n.8 (2024).

66.     Thus, the case was not "litigated" for three years as this Court was led to believe and incorrectly stated.

## IV.
## FEDERAL COLLATERAL ESTOPPEL LAW REQUIRES THAT BOTH (I) A STATE COURT HAVE USED THE CORRECT STANDARDS AND (II) OVERRIDING PUBLIC POLICY ISSUES TAKE PRECEDENCE

67.     This Court correctly cites *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (hereafter, "*Grogan*") that makes collateral estoppel available in dischargeability cases.  [Order, p. 8].  However, this Court makes fatal mistakes in its explanations of the holding and application of the holding of *Grogan*.

### A.  GROGAN REQUIRES APPLICATION OF A CLEAR AND CONVINCING STANDARD, NOT A PREPONDERANCE OF THE EVIDENCE STANDARD AS THIS COURT INCORRECTLY STATES

**EXHIBIT 1**

68.     *Grogan* dealt with the question of whether or not in determining dischargeability, a preponderance of the evidence standard should apply versus a clear and convincing standard. The Court in *Grogan* held it should be a preponderance of the evidence, but with the exception that a clear and convincing standard would apply if "particularly important individual interests or rights are at stake." *Grogan*, 498 U.S. at 286.  Induced by the plaintiffs here, the "if particularly important individual interests or rights are at stake" caveat that shifts the dischargeability burden to clear and convincing, was omitted from even discussion; clearly it was not applied. That was error.

69.     The preponderance of the evidence standard is generally applied where there is a monetary dispute between private parties, where society has a minimal concern with the outcome. Therefore, litigants "share the risk of error in roughly equal fashion." *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 1808 (1979).

70.     In bankruptcy proceedings, for example, the preponderance of the evidence standard is used in cases that determine whether debts will be excepted from the debtor's discharge pursuant to Section 523(a).  *Grogan*, 498 U.S. at 286.  The U.S. Supreme Court has plainly stated, however, that a clear and convincing standard applies in cases where the interests at stake are deemed to be more substantial than mere loss of money:

> The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal" and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." … One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases.

*Addington*, 441 U.S. at 424.

71.     In *In re Mark*, 336 B.R. 260, 265 (Bankr. D. Md. 2006) the bankruptcy court referenced that clear and convincing evidence is used to overcome the statutory presumption of bad faith in Section 362(c)(3)(A)). This heightened standard of proof necessitates a showing of high probability or reasonable certainty, but short of unequivocal. See *Kent K. v. Bobby M.,* 210 Ariz. 279, 110 P.3d 1013, 1018-19 (Az. 2005); *Judicial Inquiry and Review Com'n of Virginia v. Peatross*, 269 Va. 428, 611 S.E.2d 392, 400 (Va. 2005).   Additionally, it should apply if that is the standard that was supposed to have been employed in the Connecticut trial court as it was here.

72.     And logic dictates that uses of the clear and convincing standard shows the issue is not whether all the Connecticut plaintiffs needed to show was that Death Penalty Sanctions were entered.  To the contrary, use of that standard underscores that it is the underlying merits that are to be analyzed, not a non-issue related sanction, particularly one that has been shown to be irrelevant given the CUTPA reversal.

**B.  GROGAN REQUIRES THAT CONNECTICUT HAVE USED THE SAME CORRECT STANDARDS IN STATE COURT BEFORE COLLATERAL ESTOPPEL CAN APPLY**

73.     First, the Supreme Court does indeed clarify that as suggested in *Brown v. Felsen*, 442 U.S. at 139, n.10, collateral estoppel does apply in bankruptcy proceedings.  But it is not a blanket application.  Rather collateral estoppel only applies if the prior state court proceeding used "standards identical" to the standards of §523, which clearly implies compliance with the Constitution, a fact absent here.  Specifically, if the U.S. Constitution mandates a different standard for defamation actions against media defendants than was used in Connecticut – for example the requirement for falsity and fault to be proved by clear and convincing evidence – a state court

judgment based on a no fault finding, or even based on negligence, is not an action where the standards are the same. This has happened here in numerous instances.

### C. GROGAN REQUIRES THAT BEFORE COLLATERAL ESTOPPEL CAN APPLY TO A STATE ACTION, THERE ARE NO "OVERRIDING PUBLIC POLICY GROUNDS THAT WOULD BE VIOLATED OR AFFRONTED

74. Additionally, collateral estoppel can only apply if there are no overriding public policy grounds, which there are here which were ignored by this Court's Order. *Brown v. Felsen*, 99 S. Ct. 2205, 2213 n. 10. Here, as will be conclusively demonstrated, the Constitutional issues that were completely disregarded, create significant "overriding public policy grounds" that deny collateral estoppel effect to the Connecticut judgment. And this Court should not and indeed cannot disregard its duties and defer to a Connecticut state court tribunal in the face of them.

### V.
### THE COURT HAS BEEN LED TO MISSTATE CONNECTICUT LAW ON COLLATERAL ESTOPPEL

75. First and foremost, the Fifth Circuit has made plain that "collateral estoppel" should be applied by a bankruptcy court in "limited circumstances":

> Because Congress granted bankruptcy courts exclusive jurisdiction to determine whether a debt is dischargeable based on the bankruptcy courts' expertise, *Brown v. Felsen*, 442 U.S. 127, 135-36, 60 L. Ed. 2d 767, 99 S. Ct. 2205 (1979), "in only limited circumstances may bankruptcy courts defer to the doctrine of collateral estoppel and thereby ignore Congress' mandate to provide plenary review of dischargeability issues." *Dennis v. Dennis (In re Dennis)*, 25 F.3d 274, 278 (5th Cir. 1994).

*Schwager v. Fallas (In re Schwager),* 121 F.3d 177, 181 (5th Cir. 1997). And the Fifth Circuit has also made plain that "collateral estoppel" should be strictly construed against creditors:

> "It is a well recognized principle in bankruptcy law that exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor. This is based on the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start.'" In re

*Marvin*, 139 Bankr. 202, 205 (Bankr. W.D. Wis. 1992) (*citing Gleason v. Thaw*, 236 U.S. 558, 35 S. Ct. 287, 59 L. Ed. 717 (1915)).

*Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

### A. THIS COURT HAS BEEN LED TO CONFLATE THREE BODIES OF LAW: (I) COLLATERAL ESTOPPEL IN A SUBSEQUENT CASE AFTER FULL TRIAL IN THE FIRST CASE; (II) DEFAULTS WHEN ADDRESSED IN SAME CASE ON DIRECT APPEAL; AND (III) COLLATERAL ESTOPPEL WHERE THERE HAS BEEN A SEPARATE DEFAULT JUDGMENT

76. Bearing these requirements in mind, this Court's Opinion incorrectly states Connecticut law on collateral estoppel. Additionally, it conflates holdings in (a) collateral estoppel cases where there has been a full trial or full evidentiary determination in a prior case, (b) default judgment cases where the default is addressed on direct appeal and (c) collateral estoppel cases when there was a default judgment in the first matter and the subject of the default was sought to be used in a later action by collateral estoppel. The distinctions among these three types of cases are crucial to maintain for proper case analysis and yet their distinctions have been blurred beyond recognition. Jones respectfully submits that this Court has been misled in its interpretation by conflating these three distinct areas and also in its analysis of each of these separate bodies of law. This, in turn, has resulted in erroneous statements of the law and erroneous applications to this case.

### B. CONNECTICUT LAW ON COLLATERAL ESTOPPEL HAS BEEN MISSTATED; IT MANDATES A FLEXIBLE, NONMECHANICAL APPROACH THAT AVOIDS INJUSTICE AND YIELDS TO PUBLIC POLICY

77. As stated, this Court's Opinion incorrectly states Connecticut law on collateral estoppel in general apart from default in earlier cases. This Court's Opinion states mechanistic case recitals but omits Connecticut's commands for flexibility in applying collateral estoppel

where public policy issues prevail and where injustices would otherwise occur and disregards the Fifth Circuit's caution of use in only "limited circumstances." *Id. In re Schwager.*

78.     This Court correctly quotes a portion of *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 15 A.3d 601, 613 (Conn. 2011) stating that "under Connecticut law, collateral estoppel 'prohibits the re-litigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim.'" But this Court omits the most relevant portion of the holding of *Lighthouse* which appears a few sentences later, where the Connecticut Supreme Court emphasizes these rules are not to be applied mechanically but rather flexibly with equity in mind and particularly not to apply when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." Specifically, *Lighthouse* explains this requirement shortly after the paragraph this Court quotes, which profoundly changes this Court's Opinion:

> Additionally, application of the doctrine of collateral estoppel is neither statutorily nor constitutionally mandated. The doctrine, rather, is a judicially created rule of reason that is enforced on public policy grounds.  Accordingly, as we have observed in regard to the doctrine of res judicata, the decision whether to apply the doctrine of collateral estoppel in any particular case should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close  and the competing interest of the plaintiff in the vindication of a just claim.  These underlying purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." (*Cumberland Farms, Inc. v. Groton,* 262 Conn. 45, 58-59, 808 A.2d 1107 (2002).  **We also have explained that courts should be careful that the effect of the doctrine does not work an injustice**.  **Thus, the doctrines of preclusion should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies."**

*Lighthouse Landings,* 15 A.3d at 613-14 (cleaned up; emphasis added). Elaborating on the required flexibility in applying collateral estoppel, the court noted mechanical application of collateral estoppel rules as this Court was led to do, can yield harsh results.

79. And the *Cumberland Farms* case, also cited briefly by this Court but not analyzed, is even clearer that Connecticut's version of collateral estoppel commands the avoidance of the very mechanistic application of collateral estoppel rules this Court here was led to apply, in lieu of flexibly looking at the totality of facts. In the *Cumberland Farms* case, the Connecticut Supreme Court stated:

> We also have recognized, however, that the application of the collateral estoppel doctrine has dramatic consequences for the party against whom the doctrine is applied. **Consequently, courts should be careful that the effect of the doctrine does not work an injustice. Thus, the doctrines of preclusion should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded** by finality in legal controversies. *See also Quinones Candelario v. Postmaster General of the United States,* 906 F.2d 798, 801 (1st Cir. 1990), cert. denied, 499 U.S. 919, 111 S. Ct. 1307, 113 L. Ed. 2d 242 (1991) (eschewing automatic or rigid application of doctrine of res judicata to determinations in administrative proceedings in face of contrary public policy).

*Cumberland Farms,* 808 A.2d at 1117 (cleaned up; internal citations omitted; emphasis added).

80. Also in *Cumberland Farms,* after stating the mandate for flexibility in analysis, the Connecticut Supreme Court went on to note there are several "exceptions" to the general rules of preclusion doctrines, stating

> "In establishing exceptions to the general application of the preclusion doctrines, we have identified several factors to consider, including: (1) whether another public policy interest outweighs the interest of finality served by the preclusion doctrines; (2) whether the incentive to litigate a claim or issue differs as between the two forums; (3) whether the opportunity to litigate the claim or issue differs as between the two forums; and (4) whether the legislature has evinced an intent that the doctrine should not apply.

*Cumberland Farms,* 808 A.2d at 1117 (cleaned up; internal citations omitted).

81. In fact, in *Cumberland*, the Connecticut Supreme Court rejected the mechanical application of collateral estoppel in that case where "for policy reasons, the doctrine of collateral estoppel does not bar the plaintiff from litigating, in its inverse condemnation action, any and all factual issues relevant to its claim of inverse condemnation regardless of whether those issues were decided…" *Id*. at 1115. And the reason collateral estoppel was deemed irrelevant for policy reasons was because it involved a "constitutional takings claim" and protecting constitutional issues always is public policy concern. *Id.* at 1118.

82. The mandate that collateral estoppel does not apply if it would work an injustice is also the law in the Fifth Circuit, which this Court was led to ignore:

> For collateral estoppel to apply, a party must have had a full and fair opportunity to litigate the issue in the prior action and there must be *no undue unfairness* to the party estopped. Caton clearly had a full and fair opportunity to contest the issue in the state proceeding, and we find no injustice in applying the doctrine of collateral estoppel in this case.

*Caton v. Trudeau (In re Caton),* 157 F.3d 1026, 1029 (5th Cir. 1998).

83. Thus, while these cases were cited by the Connecticut Plaintiffs and this Court itself, the critical aspects of the Connecticut law of collateral estoppel particularly applicable to Jones, were omitted. To this extent, the legal basis for this Court's Opinion is incorrect and must be reconsidered and corrected.

### C. CONNECTICUT LAW ON DEFAULT JUDGMENTS HAS BEEN MISSTATED AND MISAPPLIED.

84. Initially, it must again be stated that there is a distinction in Connecticut law on the law of default judgments in direct appeals versus what collateral estoppel effect is given to a prior default in a different case. The case of *Smith v. Snyder*, 267 Conn. 456, 458, 839 A.2d 589, 592 (2004) which this Court cites at Order p. 9, is a direct appeal in a default judgment case, and thus is irrelevant here. In fact, the term "collateral estoppel" is not found in that case. *Snyder* does,

**EXHIBIT 1**

however, cite *De Blasio v. Aetna Life & Cas. Co., 186* Conn. 398, 401, 441 A.2d 838, 839 (1982) (hereafter, "*DeBlasio*") as does this Court. But this Court has again been led into error in its analysis of Connecticut law even on defaults alone, apart from collateral estoppel. In summary, in Connecticut, Jones was denied the ability to make any defense and the jury instructed that he was deemed liable for defamation, intentional infliction and other causes as a matter of law, all arising from the November 15, 2021, Death Penalty Sanctions. See **Ex. 3**. But that is not Connecticut law according to the Connecticut Supreme Court in *De Blasio.*

85.     In *De Blasio*, a case this Court cites,

"The entry of the default, however, does not preclude the defendant from raising a defense at the hearing in damages. If timely written notice is furnished to the plaintiff, the defendant may offer evidence contradicting any allegation of the complaint. The defendant may also challenge the right of the plaintiff to maintain the action or prove any matter of defense. If the defendant appears in the action and furnishes the required notice, the subsequent hearing in damages takes on the nature of a supplemental trial involving the determination of questions of law and fact, and the determination of the damages to be assessed after such trial."

*De Blasio* 441 A.2d at 839 (cleaned up; citations omitted). Yet here, even though Jones filed a notice of defenses [**Exhibit 13**], he was still precluded from raising his defenses both in Connecticut and here as well. If Jones is permitted in Connecticut to raise defenses even after default, unquestionably he should be able to do so here. Further, because he was not permitted to raise his defenses, the issues there were not litigated at all, and certainly not "fully and fairly."

86.     Thus, *Smith v. Snyder* is irrelevant in the collateral estoppel context, and even if it were the holding of *De Blasio* makes clear that a default judgment does not deprive a defaulting party of mounting defenses – rights Jones was denied which are another reason to not find Jones is here collaterally estopped. But more importantly, pure default judgment cases are not relevant to the issue of collateral estoppel.

**EXHIBIT 1**

### D. CONNECTICUT LAW ON COLLATERAL ESTOPPEL IN THE CONTEXT OF DEFAULT JUDGMENTS HAS BEEN MISSTATED – THE GENERAL RULE IS THERE IS NO COLLATERAL ESTOPPEL WHERE THERE HAS BEEN A DEFAULT JUDGMENT

87. *De Blasio* leads to the case of *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993), which is the only *authoritative* Connecticut case that Jones is aware of, addressing collateral estoppel when the first case is a default judgment.

88. This Court references only three cases where collateral estoppel has been applied to a prior default judgment. The **first** is *Custom Pools v. Underwriters Inc.*, No. CV 940135908, 1996 WL 66264, at *2 (Conn. Super. Ct. 1996), a 1996 district court case that has only been cited by this Court in its Opinion. [4] The **second** is *Leblanc-Jones v. Massie (In re Massie)*, No. 14-50579, 2018 WL 3218847, at *3 (Bankr. D. Conn. 2018), a Connecticut bankruptcy case that has similarly only been cited once and that is by this Court in its Opinion. Both cases are based on odd facts not applicable for consideration here and should not be considered authoritative.

89. The **third** and by far most significant case where collateral estoppel has been applied to a prior default judgment is the Connecticut Supreme Court's decision in *Jackson v. R.G. Whipple, Inc.*, 627 A.2d 374, 380 (Conn. 1993) (hereafter "*Whipple*"). While *Whipple* appears to be the leading case on the subject, it was only cursorily cited by this Court, merely referenced for the banal proposition that the phrase "full and fairly litigated" means the party to be estopped, here Jones, "had an adequate opportunity to litigate the matter in the earlier proceeding." Order pp, 9 & 10. But this Court has overlooked some of the most important points of *Whipple,* demonstration of which involves examining the facts of that case.

---

[4] *Custom Pools* is a factually confused opinion, in part because it suggests there had been an appellate review of the case when such appears to have not occurred. That case involved two suits, one by an insurance broker for the premium due and the other by the actual insurance company itself for the premium due. The insured had paid the broker, but for reasons that are never explained, defaulted in the similar suit filed by the insurance company itself.

90.     In the *Whipple* case, Gloria Jackson owned a mobile home situated on the lot that she leased from Whipple trailer park. Whipple won a summary proceeding to evict her from the trailer park, which was appealed, but later dismissed.   The trial court order contained an eviction date for some point in the future. While the execution of eviction order was still pending in the first case, Whipple commence a collection action against Ms. Jackson to recover legal fees, incurred in the summary proceeding in which Whipple obtained a pre-judgment attachment of the mobile home itself and removed it from the mobile home park. In the collection action, Whipple obtained a default judgment.

91.     Ms. Jackson moved to open the default judgment in the collection action and an evidential hearing was held which she lost. When the mobile home was sold at auction, Ms. Jackson initiated a multi-count complaint against the defendant, alleging improprieties in both the eviction and the collection actions.  Whipple filed a  motion to strike the abuse of process cause of action, arguing that collateral estoppel applied to the entire original complaint, which the trial court granted but the Connecticut Supreme Court rejected.

92.     In rejecting the application of collateral estoppel, the Supreme Court first noted that Connecticut follows the Restatement of Judgments, which it quoted, stating the general rule followed in Connecticut but not referenced by the Order, that default judgments are generally not afforded collateral estoppel effect:

> Whether a prior default judgment has issue preclusive effect in a subsequent action involving a different cause of action has not been settled by this court.  The Restatement adopts the position that "presence" of the parties is a necessary condition for a matter to be "actually litigated" for the purpose of issue preclusion. **In the comments to the section on issue preclusion in the Restatement, it is stated that "in the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated**." (Emphasis added.) 1 Restatement (Second), Judgments § 27, comment (e) (1982). Professors James and Hazard, two prominent supporters of the Restatement state "if a defendant over whom jurisdiction has been obtained defaults of appearance or fails to plead or otherwise defend,

nothing is put in issue save possibly the facts needed to give the court jurisdiction over the subject matter. No other matter or point, then, becomes binding on the parties in later actions upon different claims." *Whipple*, 627 A.2d at 378.

93.     Embracing the flexible, non-mechanical application of the rules that would later be enunciated in general collateral cases discussed above, the Connecticut Supreme Court indicated that the general rule in the context of a default judgment was that the matter was not actually litigated, but that should not be mechanically applied finding that

> "Adherence to this requirement, however, should not demand that in all circumstances a default judgment should mechanically be deprived of any issue preclusive effect. Such a demand would make inflexible the doctrine of issue preclusion, which we have noted must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Whipple*, 627 A.2d at 379

94.     In flushing this out, it reiterated that the critical inquiry was whether Ms. Jackson had a full and fair opportunity to litigate the issues which the trial court later precluded from litigation with respect to the plant claims for abuse of process:

> "Under the circumstances of this case, it is unclear whether the prior collection action afforded the plaintiff a full and fair opportunity to litigate the issues that the trial court later precluded from litigation with respect to the plaintiff's claims of abuse of process." *Whipple*, 627 A.2d at 380.

95.     In even posing that question, the court there makes it clear that a prior entry of a default judgment is not the issue.   Rather, the focus of the Supreme Court was on the ability to litigate the specific issues in question, not litigate in general [5] and notwithstanding the default, held that "…the [trial] court misapplied the doctrine of res judicata and improperly granted the defendants' motion for summary judgment." *Id*. In so doing, the Connecticut Supreme Court cited

---

[5] *Whipple*, 627 A.2d at 380 ("The defendants maintain that the hearing on the plaintiff's motion to open the default judgment … provided this full and fair opportunity to **contest the issues** in question and that **these issues were actually litigated** and necessarily determined."); *Id.* at 380-81 ("We cannot say, therefore, that she was afforded a full and fair opportunity to explore the factual issues she later sought to litigate in her abuse of process claims. Nor can we conclude that the default judgment in the collection action necessarily determined" all of the issues that were later precluded.")

the Restatements' strong policy considerations ***against*** collateral estoppel where prior defaults were concerned.  *Whipple*, 627 A.2d at 379 n. 8.

96.     Hence, Connecticut law on the collateral estoppel effect of a prior default judgment leans strongly against giving a prior default effect, a fact the Opinion ignores and actually goes goes against.

### E.  THIS CASE IS NOTHING LIKE *SCARBROUGH V. PURSER (IN RE SCARBROUGH)*.

97.     No doubt due to the confusion the Connecticut Plaintiffs have created, this Court was led to erroneously conclude that "…this case is like the bankruptcy court decision in *In re Scarbrough*."   Order, pp. 14-15.  This case is nothing like *Scarbrough*.   Reiterating once again, this Court has been led to conflate three separate bodies of law: (a) collateral estoppel cases where there has been a full trial a full evidentiary showing in the prior case; (b) default judgments addressed in direct appeals; and (c) the collateral estoppel effects of prior default judgments in later filed cases (i.e., not in direct appeals).  Adding to the confusion, in each of these three discrete categories, this Court also conflates all of Connecticut, Fifth Circuit and Texas law on these points.

98.     The case of *In re Scarbrough,* 516 B.R. 897 (Bankr. W.D. Tex. 2014) *aff'd sub nom., Scarbrough v. Purser (In Re Scarbrough),* 836 F.3D 447, 456 (5th Cir. 2016) dealt with the collateral estoppel effects of a Texas jury verdict in a later filed case, i.e., a determination of bankruptcy dischargeability.  The phrase "default" appears nowhere in the case.   The *In re Scarbrough* case is based on a horrendous set of facts, involving four general "character groups":

    a.  the first was Mr. Gary Purser, a wealthy, elderly man who was in badly declining mental and physical health;

    b.  The second "character group" consisted of the ailing Mr. Purser's wife and children (the "Family");

    c.   the third " character group" consisted of two much younger women (Melissa Deaton and Denise Steele) who sought to financially exploit the ailing Mr. Pursuer and alienate him from his Family; and

    d.   the fourth "character group" was an unscrupulous lawyer named Jerry W. Scarbrough, who represented the exploiting women, Deaton and Steele, and was the Debtor in his later filed bankruptcy that is the subject of the *In re Scarbrough* case.

99.    In short summary, among other things, in the course of a general plot spearheaded by the unscrupulous lawyer, Jerry Scarborough, audio tapes had been made including one made by his exploiting clients (Deaton and Steele) when they were in a hot tub with the ailing Mr. Pursuer first talking in fantasy terms of sexual activity and then telling Mr. Purser he could not trust his Family.

100.    Also, under odd circumstances, another audio tape made by Scarborough himself was discovered, where Scarborough "discussed with his wife how each of the Pursers should have to pay one million dollars to him in settlement of Ms. Deaton's claims in the lawsuit." [516 B.R. at 909-10]. This audio tape along with the "hot tube" tape were called the "Secret Recordings."

101.    Although all tapes were requested to be produced in discovery, the Secret Recordings were not produced. Chiefly for failure to produce the Secret Recordings, Scarborough himself was personally sanctioned $54,261.50. [516 B.R. at 918.]

102.    As attorney for his two exploiting clients (Deaton and Steele), the unscrupulous lawyer, Jerry Scarborough, not only filed a host of suits and motions within those suits, all to embarrass the Family, Scarborough (a) filed a false police report claiming Mr. Purser's wife had threatened to kill Deaton (one of the women exploiting Mr. Purser); (b) urged others to support the appointment of a guardian ad litem for Mr. Purser to "protect" him from his Family; (c) reported to the Texas Department of Adult Protective Services ("APS"), that the Family was

committing "elder abuse" of Mr. Purser, including by "overdosing" Mr. Purser on his prescription medicines, causing APS to initiate an investigation in which they found Scarborough's allegations to be invalid; (d) when Mr. Pursuer later died of pneumonia in the hospital, Scarborough "reported to the funeral home, two local justices of the peace, the Temple Police Department, the Killeen Police Department, and the Texas Rangers that the Purser Family had 'murdered' or 'killed' Gary Purser by overdosing him on prescription drugs because they wanted his money," which the Killeen Police Department determined the accusations were "unfounded"; [516 B.R. at 909] and (e) after Purser's funeral, "cold-called" one of Mr. Purser's cousins where Scarborough "implied" he represented Mr. Purser and discussed Scarborough's theories that some members of the Family used illegal drugs and "that the Family abused and killed Gary Purser by overdosing him on prescription drugs." [516 B.R. at 908-09].

103.    Scarborough's antics also were conducted out of court where he posted You Tube videos claiming bad things against one of the Family members who was running for the Killen School Board, which she lost as a result. [516 B.R. at 913].

104.    While Deaton and Steele (the two exploiting women) represented by Scarborough were the initiating plaintiffs, the Family countersued and added Scarborough as a defendant, the Family claiming they were the victims of defamation and fraud.  After a *full trial*, where all the evidence was presented and witnesses examined and cross examined, the jury returned a verdict against Scarbrough, Deaton and Steele jointly and severally.

105.    Scarborough filed bankruptcy seeking discharge of both the (a) the jury verdict rendered against him and (b) the monetary sanctions award of the trial court entered against him personally for his having hidden the Secret Recordings.

106.    The bankruptcy court held collateral estoppel rules of Texas applied to the damages the jury had awarded and then analyzed whether the debts were nondischargeable.  As to the dischargeability issue on defamation, the bankruptcy court noted all the evidence that had been presented to the jury, and noted that after weighing the evidence

> "The jury found that Debtor's statements were defamatory per se. Included in the defamation per se jury question was the characterization that the Debtor made statements 'he knew were false or which he made with a high degree of awareness that were probably false, to an extent that he in fact had serious doubts as to the truth of the statement(s).'"

107.    But the bankruptcy court did not just accept the paper record and assertions of counsel, as the Fifth Circuit observed, the bankruptcy court conducted a "nine-day trial on the merits."

108.    Apparently, the only issue resolved by the bankruptcy court by summary judgment was the nondischargeabilithy of the monetary sanction.  As to the defamation claims, the Fifth Circuit explained that the evidence presented was what led them to affirm, explaining:

> "Several incidents lead this court to affirm the lower court's judgment. Among them was Scarbrough's (1) false reporting to Adult Protective Services; (2) posting a video of a personal family conflict on YouTube in an attempt to hinder JoAnn Purser's bid for a school board seat; and (3) conspiring to make false statements and reports that JoAnn Purser threatened to kill others and that Appellees consumed illegal drugs. *See, e.g., French v. French*, 385 S.W.3d 61, 72 (Tex. App.—Waco 2012, pet. denied) ("A statement that falsely charges a person with the commission of a crime is defamatory per se." (*citing Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984))). We find no error in the lower court's ruling.

*Scarbrough v. Purser (In re Scarbrough)*, 836 F.3d 447, 455-56 (5th Cir. 2016)

109.    Here no jury found anything to do with Mr. Jones's underlying liability but rather were repeatedly "instructed" by the Connecticut trial court that "the law" had determined Jones liability and the jury's only task was to assess damages, which will be quoted in detail, *infra*.   See **Ex. 1.**  And this Court has heard no evidence of the underlying "defamations."

**EXHIBIT 1**

110.    Not only did the jury make no factual determinations concerning Mr. Jones, neither did the trial court, which "determined" liability because of three minor issues, referenced herein.

**VI**

**THE CONNECTICUT COURT OF APPEALS REVERSAL OF CUTPA IS OF ENORMOUS SIGNIFICANCE**

**A. THE CONNECTICUT COURT OF APPEALS HAS DETERMINED CUTPA CLAIMS WERE NOT VALID -- MANDATING CHANGE OF THIS COURT'S DISCHARGEABILITY RULING ON CUTPA PUNITIVE DAMAGES**

111.    This Court is now aware that the Connecticut Appeals Court has reversed the award of CUTPA punitive damages which are of $150,000,000. *Lafferty v. Jones,* 229 Conn. App. 487, 537 (2024) ("The defendants' final claim is that the trial court improperly concluded that the plaintiffs asserted a legally viable CUTPA claim. For the reasons that follow, we agree.") See **Ex. 2** hereto. Hence, this Court's determination on the issue of CUTPA punitive damages requires this Court to revisit the issue of dischargeability of the CUTPA punitive damages in the amount of $150,000,000 and find them dischargeable as a matter of law.

112.    Additionally, as discussed in detail *infra*, these punitive damage awards were not established by clear and convincing evidence. See, e.g., *Milkovich,* 497 U.S. at 15-16 ("…States [can] not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice.").

**B. REVERSAL OF CUTPA REQUIRES RECONSIDERATION OF CUTPA COMPENSATORY DAMAGES WHICH IN TURN REVEALS ILLEGAL MULTIPLE DAMAGES**

113.    The trial court awarded compensatory damages based on CUTPA. "Damages due to the defendants' violation of [CUTPA] are included in the other damages measures that I am describing to you and you will not assess them separately." **Ex. 11,** Court Charge, p. 11, p. 24.

Thus, the CUTPA compensatory damage award must be reversed too.  And examining what those reversable CUTPA compensatory damages are, shows what can most simply be called a dramatic "multiple recovery."

114.     A plaintiff is entitled to allege respective theories of liability in separate claims. Here the Connecticut Plaintiffs alleged defamation, intentional infliction of emotional distress, false light, invasion of privacy, and violation of the Connecticut Unfair Trade Practices Act. While the elements of each were different, the Connecticut trial court stated that the damages for each were the same.  See, e.,g., **Ex.** 11, Connecticut Jury Charge pp.23 ("Damages due to the defendants' violation of [CUTPA] are included in the other damages measures that I am describing to you and you will not assess them separately.").   The "damage measures" the trial court "described" consisted of reputational damage and emotional distress -- the same two measures of damage for each cause of action asserted.

115.     As the CUTPA claim was reversed, the compensable damages associated therewith are similarly excluded.  But what are they?   The jury verdict includes two damage numbers for each plaintiff, consisting of "**defamation/slander damages**" and "**emotional distress**" as the representative portion of the verdict form for Robbie Parker shows:



See Jury Verdict, **Ex 1 & Ex. 12**. Notably the charge does not state reputational damages and emotional distress, but **defamation damages** and **emotional distress**. In a defamation case, the jury may award the plaintiff damages for the injury to his reputation and the mental suffering and emotional distress caused by the defamation. *Chugh v. Kalra*, 342 Conn. 815, 850-51, 271 A.3d 993, 1012-13 (2022) *(citing Battista v. United Illuminating Co.*, 10 Conn. App. 486, 492, 523 A.2d 1356)). The same reputational injury and emotional distress is compensable as a result of intentional infliction, invasion of privacy and CUTPA.

116.     But as **defamation damages** includes both reputation and emotional distress, in awarding both **defamation damages** and **emotional distress**, there has been a "double recovery," revealed by the required removal of CUTPA damages necessitated by CUTPA reversal.

117.     Even though a plaintiff may assert different causes of action, he or she is not entitled to recover twice for harm growing out of the same transaction, occurrence or event. *Jonap v. Silver*, 1 Conn. App. 550, 561-62, 474 A.2d 800 (1984). The rule precluding double recovery is

a "simple and time- honored maxim" that a plaintiff "may be compensated only once for his just damages for the same injury . . . ."  *Rowe v. Goulet,* 89 Conn. App. 836, 849, 875 A.2d 564, 571 (2005) *citing Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 22 n.6, 699 A.2d 964 (1997).

118.    Federal law is the same.  *See Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 332 (Bankr. N.D. Tex. 2011) ("Farooqi has proven the following claims against Inc.: (i) fraudulent inducement, with actual and exemplary damages of $88,500; and (ii) violation of §17.46(b)(12) and §17.46(b)(24) of the DTPA, with actual and exemplary damages of $88,500. Farooqi has also proven that Carroll is personally liable for Farooqi's damages. Because Texas law forbids double recovery, Farooqi can only recover once for his $88,500 of damages.")

119.    The problem here is that the Connecticut Plaintiffs cannot "choose" which damage model they want, as **defamation damages** includes **emotional distress**.   As such the entirety of the damage cannot be determined by summary judgment and thus the previous grant of summary judgment must be reconsidered and denied.

### C.  BECAUSE OF THE CUTPA REVERSAL, THE DEATH PENALTY SANCTIONS WERE INVALID AS A MATTER OF LAW

120.    While the Court of Appeals reversed the trial court's CUTPA determination, the impact of this reversal should have been felt on the Death Penalty Sanctions which were all based on the CUTPA cause of action.  They were not, as the impact of the CUTPA reversal on the Death Penalty Sanctions was not addressed by the Court of Appeals and thus must be addressed by this Court.

> i.    *This Court Should Review This Issue As Both Federal and Connecticut Collateral Estoppel Requirements Mandate Equity and Fairness Considerations As Part Of Collateral Estoppel Analysis*

EXHIBIT 1

121.    As explained in detail *supra*, this Court was led to an incorrect understanding of both federal and Connecticut state collateral estoppel requirements.  On the federal level, *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) states that a federal court sitting in diversity on state claims looks to the law of the tribunal that rendered the judgment, here Connecticut, subject to the important caveat that such is the case unless there are overriding policy reasons to not do so, which often results in a "fair and equitable" analysis.

122.    Connecticut collateral estoppel law amplifies this "fair and equitable" requirement in application of the collateral estoppel effects of Connecticut judgments:

> "Thus, the doctrines of preclusion should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies."

*Lighthouse Landings, Inc. v. Conn. Light & Power Co*., 15 A.3d 601, 613-14 (Conn. 2011) (cleaned up; emphasis added).

123.    Based on these requirements, in the appeal to the Connecticut Court of Appeals, Jones's counsel raised the issues that (a) the Death Penalty Sanction of default judgment was not warranted and (b) CUTPA claims were not cognizable.   The Court of Appeals disagreed with the first point but agreed with the second.  What was not addressed by the Court of Appeals, however, was what the result would be to the Death Penalty Sanctions if the CUTPA claims on which they were principally based were eliminated – which is exactly what happened.  Hence the issue here presented, which this Court must address, is precisely that:  should this Court in fairness and equity give effect to Death Penalty Sanctions when the primary bases for their issuance was based on issues associated with a cause of action that was legally improper and has been eliminated by the Court of Appeals.

**EXHIBIT 1**

124.     Particularly as appeals from the Court of Appeals to the Connecticut Supreme Court are limited and not a matter of right (as explained elsewhere herein), this issue may never be presented to or ruled on by the Connecticut judicial system.  Thus fairness and equity demands that this Court examine this issue.  And for the reasons set forth below, this Court will conclude that when the CUTPA cause of action was eliminated, the primary bases for the Death Penalty Sanction was eliminated as well, and as such this Court should not give collateral estoppel effect to that sanction.

ii.     *The Death Penalty Sanctions Were Not Entered For "Repeated Violation Of Discovery Orders" But For Three Specific And Trivial Reasons*

125.     First, this Court said the Death Penalty Sanctions were entered for "repeated violation of discovery orders" [Order, p. 2].  This is simply wrong.

126.     The "Death Penalty" was entered because of three discrete acts plainly stated in the transcript of the hearing that occurred November 15, 2021 [**Ex. 3**] where the Connecticut trial court articulated the three reasons for her order of death to the U.S. Constitution.  It is important to note there were only three reasons for the Death Penalty Sanctions, since this Court recites some of the inflammatory and incorrect commentary supplied by the Connecticut Plaintiffs surrounding these three trivial reasons, making is sound as if there were other reasons, this Court stating its apparent misunderstanding:

**EXHIBIT 1**

> In November 2021, the state court entered a default judgment against the defendants for repeated violation of discovery orders.[5] The court stated on the record that the Jones defendants withheld analytics and information that were "critical to the plaintiffs' ability to conduct meaningful discovery and to prosecute their claims."[6] That the "callous disregard of their obligations to fully and fairly comply with discovery and Court orders on its own merits a default against the Jones defendants."[7] And that "the Jones defendants were not just careless" but "their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders" was a "consistent pattern of obstructive conduct.[8]
>
> [5] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ. J. Ex. 74, ECF No. 59-24.
> [6] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ. J. Ex. 74 at 14:12–15, ECF No. 59-24.
> [7] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ J. Ex. 74 at 14:15–18, ECF No. 59-24.
> [8] Decl. of Alinor C. Sterling in Supp. of Pls' Mot. for Summ. Ex. 74 at 15:1–4, ECF No. 59-24.

Order p, 2]. These grandiose charges, stated as if they are accurate summaries, are belied by the text of the Death Penalty Order itself which states there were only three reasons.

127.    The first of the three reasons for the Death Penalty Sanctions was because Jones's lawyers asked for a commission to take Hillary Clinton's deposition. The other two were Jones's unsatisfactory answers to discovery questions directly related to the Plaintiffs' now-reversed CUTPA claim. We will first address the now-irrelevant CUTPA related requests and conclude with why the trial court's penalties for requesting Clinton's deposition is no impediment to this Court.

   *iii.* <u>Two Of The Three Reasons For the Death Penalty Sanction Were Tied To The Now-Reversed CUTPA Cause Of Action, Not Defamation</u>

128.    Bearing in mind that the Supreme Court has clearly stated that a "profit motive" has nothing to do with defamation claims against media defendants [*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989)] so financial documents showing "financial motive" are irrelevant to the defamation-related claims.

**EXHIBIT 1**

129.    They may be relevant, however, to the CUTPA-related claims, which were the alleged failure by Jones to (i) submit analytics in the custody and control of third parties, e.g. Google, Twitter and Facebooks and (ii) accounting sub-ledgers showing more detail in sales, all of which was requested to show how many vitamin supplements were sold in relation to the airing of any Sandy Hook - related story.

130.    The "failure" regarding analytics was one of the reasons the trial court there had initially denied Jones's statutory rights to an anti-Slapp motion.   On that issue, the Connecticut Supreme Court analyzed the relevance of the materials the Connecticut Plaintiffs sought, demonstrating its sole relevance was to CUTPA, the Connecticut Supreme Court writing, especially footnote 35:

> In the present case, the record supports the trial court's implicit finding that the defendants' noncompliance was prejudicial to the plaintiffs because, each time the defendants did not comply with the court ordered discovery, the plaintiffs were unable to access information that could assist them in proving probable cause that they would succeed on the merits of their complaints. For example, access to the defendants' marketing data would be relevant to proving a financial connection between the defendants' actions and the statements made during the broadcast.[35]
>
> FN 35
> The plaintiffs' counsel argued that the Google Analytics would show "[s]ales, pricing, web traffic, that is, hits on the website and hits on the Infowars store website." He further argued that "Infowars [LLC] and Free Speech Systems [LLC] [generate] millions and millions and millions of dollars of revenue each year. The content that they broadcast, including the content about Sandy Hook, they use to drive traffic to their website. That's why we're entitled to this stuff.

*Lafferty v. Jones,* 336 Conn. 332, 378, 246 A.3d 429, 459 & n. 35 (2020).  This is purely CUTPA-related.

131.    In their Motion for Sanctions filed after the Connecticut Supreme Court returned the case to the trial court, the Connecticut Plaintiffs again explained that the "critical importance" of this was tied to their now-dismissed CUTPA claim:

**EXHIBIT 1**

Moreover, the materials sought here are significant to important aspects of the plaintiffs' case, and their deprivation is prejudicial. The plaintiffs' complaint alleges that "Jones has deliberately employed [] false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." Sherlach Compl. ¶ 11. It alleged that "the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money . . . not because they are eager to educate or even to entertain their audience." Id. ¶ 103. It alleged that "[t]he false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience." Id. ¶ 98. **These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims. Id. ¶¶ 465–474 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy")**. Web-analytics and social media data for the Jones defendants' websites and social media profiles is potentially key for demonstrating these points.

**Ex. 4,** pp. 14-15.

132.     The Connecticut trial court concluded the defendants had failed to provide "full and fair compliance" (i.e., the google analytics and accounting subledgers) with a request for the data, thus willfully withholding information that was of "critical importance" to the plaintiffs in pursuing their CUTPA claims resulting in the Death Penalty Sanctions.  In the Death Penalty Order itself, the Connecticut trial judge explained the CUTPA-related "prejudice":

> "As pointed out by the plaintiffs, they are attempting to conduct discovery on what the defendants publish and the defendants' revenue. And the failure of the defendants to produce the analytics impacts the ability of the plaintiffs to address what is published and the defendants' failure to produce the financial records such as sub-ledgers and trial balances affects the ability of the plaintiffs to address the defendants' revenue."

133.     And this intended use for CUTPA purposes was picked up by the Court of Appeals in its recent opinion when it stated:

> With regard to the prejudice factor, the court found that the purpose of the plaintiffs' discovery requests was to determine (1) what the defendants published and (2) the defendants' revenue, which purpose was thwarted by the defendants' failure to produce the analytics data, the subsidiary ledgers, and the trial balances requested by the plaintiffs. The court further found that the defendants' conduct "interfere[d] with the ability of the

EXHIBIT 1

plaintiffs to conduct meaningful discovery and prevent[ed] the plaintiffs from properly prosecuting their claims."

*Lafferty v. Jones*, 229 Conn. App. 487, 521 (2024).

134.    Again, the adequacy of the financial information the Connecticut Plaintiffs were complaining about was related only to CUTPA, not defamation, intentional infliction or false light, as to which the Supreme Court has clearly held that a "profit motive" has nothing to do with Constitutional protected rights involved here.  *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989).  Here, the only possible relevance of these items was to prove a CUTPA case, which the Court of Appeals said was not legally viable.

   *iv. The Third Basis Of The Death Penalty Sanction Was Noticing Hillary Clinton's Deposition Which Was Not A Reason To Issue Death Penalty Sanctions, And Certainly Not By Itself*

135.    Turning finally to what the trial court called the "cavalier actions" of Jones's lawyers regarding their motion to depose Hillary Clinton, that amounted, in the trial court's view, to "willful misconduct."  By way of background, a  protective order had been entered in the case and that is attached hereto as **Exhibit 7**.  It provided that information covered could be used for the preparation and trial of this case.  **Ex. 7**, p. 4, ¶9.  As the deposition of one of the plaintiffs began, it became apparent that plaintiffs' counsel would resist any testimony about how the plaintiffs all happened to find themselves in the same law office six years after the Sandy Hook shootings.  It was the collective belief that the prosecution of Jones was orchestrated by those motivated to have their revenge on him for his support of Donald Trump's successful campaign against Hillary Clinton in 2016 – Mr. Trump appeared as a guest on one of Mr. Jones' broadcast during the campaign. To that end, counsel for Mr. Jones sought a commission to take the deposition of Ms. Clinton, then a resident of New York. In the motion for a commission, Mr. Jones's counsel

explained why Clinton's deposition was being sought.  The Death Penalty Sanctions were assessed because of **two sentences** used in that request:

> "On advice of counsel, at least one plaintiff has refused to answer how so many of the clients all ended up represented by the same firm. The witness claimed not to know how her legal fees were being paid."[6] **Exhibit 8** hereto.

136.    Notably, the name and gender of the deponent were not mentioned; the deposition was characterized, not quoted. [7]  Nevertheless, the trial court took grave exception to this, referring to it as "frightening."  *Lafferty v. Jones*, 229 Conn. App. 487, 501 (2024).  The trial judge then denied the request for a commission to take Clinton's deposition [**Ex. 10**], which should have been sanction enough if a violation did in fact occur.   Instead, the Connecticut trial court used this as the only non-CUTPA related ground for the Death Penalty Sanctions.

137.    Importantly the witness refused to answer questions about choice of counsel or who was financing the litigation, so the two offending sentences did not disclose testimony but only a refusal to answer.  Thus, there was nothing of substance revealed.  Even if there was a violation, the decision to rely on that conduct as part of a motion to default the defendants and deny Jones his Constitutional rights is inexplicable.

---

[6] At a hearing on October 20, 2021, Counsel for Connecticut Plaintiffs admitted that these two sentences were the only ones at issue allegedly violating the protective order, stating: "There were no other sentences of their motion for commission that were drawn from the deposition…. But the only two sentences are the ones that were specifically drawn from the deposition itself, are the ones that we cited in our motion."  **Exhibit 9** (Transcript of Connecticut Hearing, Conn. Dkt No. 525.20, p. 72).

[7] At that October 20, 2021, hearing Counsel for Connecticut Plaintiffs himself revealed the unnamed person referenced as Plaintiff Erica Lafferty and stated it was "public knowledge" about Ms. Lafferty's involvement with the failed Clinton campaign, Counsel stating on the record:

> "We do think that including them in a motion for commission for Hillary Clinton's deposition and some of the other statements within the motion, were designed to ostensibly identify who the plaintiff was, because it's public knowledge about Ms. Lafferty's involvement in Ms. Clinton's campaign."  **Exhibit 9** (Transcript of Connecticut Hearing, Conn. Dkt No. 525.20, p. 72).

**EXHIBIT 1**

138.     The effect of these Death Penalty Sanctions was that the jury of six Connecticut citizens were instructed that Mr. Jones had intentionally and maliciously committed every act that the Connecticut Plaintiffs accused him of – no matter how farfetched and in some cases preposterous, as will be discussed *infra*, and Mr. Jones could literally say nothing in his own defense, an error the Connecticut Court of Appeals refused to consider.  *Lafferty v. Jones*, 229 Conn. App. 487, 491 (2024).  This Court must.

139.     Clearly (a) the deposition of Clinton was unrelated to any of the Connecticut Plaintiffs' claims, and (b) as to the other two, the only possible relevance of this information was related to CUTPA. Thus, virtually all of the Death Penalty Sanctions were wrongly assessed and it would be inequitable and unfair to conclude the finality of the Death Penalty Sanction to the U.S Constitution blindly and without questioning its vitality in light of the CUTPA reversal.

   *v.*   *Fairness And Equity Demand This Court's Review Of This Issue*

140.     Imagine that a prisoner is on death row about to be executed and and evidence exonerating that prisoner was not presented to the fact finder.   No one would dispute that fairness and equity, and certainly the Constitution, would require that that newly discovered evidence be evaluated.   Such is the case here.  The Connecticut Court of Appeals did not review the issue of the effect of the Death Penalty Sanction when the primary bases on which it was issued were removed.   There is no assurance the Connecticut Supreme Court will hear this issue.   So, the independent duty falls to this Court to do so, particularly in connection with its duty to conduct the dischargeability trial.

EXHIBIT 1

## VII.
## THIS COURT HAS AN INDEPENDENT DUTY TO EVALUATE THE EVIDENCE AND NOT BLINDLY ACCEPT THE CONNECTICUT TRIAL COURT'S DEATH PENALTY

### A. THE U.S. SUPREME COURT REQUIRES THIS COURT TO MAKE AN INDEPENDENT REVIEW OF THE DEFAMATION FACTS AND ENSUING CONNECTICUT JUDGMENT

141.     It is crucial to bear in mind this this case does not just involve First Amendment freedom of speech.  Rather it involves (a) a media defendant protected by the freedom of the press and freedom speech provisions of the First Amendment; (b) reporting on matters of public concern; and (c) addressed to public figures who had become such by voluntarily injecting themselves in public controversies. This Court, however, not only does not recognize this, but repeatedly references the Death Penalty Sanction as if it eliminates these issues or renders them irrelevant.

142.     It is a though a state court judge's death penalty removes all duties otherwise imposed on this Court. But that is not the law.

143.     It is axiomatic that the factual findings underlying the facts of this case, must be independently reviewed by this Court and they have not been:

> In cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free pression. Although such statements have been made most frequently in cases [that]…arose in state courts, respondent argues that the constitutional principle is equally applicable to federal litigation. We quite agree; surely it would pervert the concept of federalism for this Court to lay claim to a broader power of review over state-court judgments than it exercises in reviewing the judgments of intermediate federal courts.

*Bose,* 466 U.S. at 499 (internal citations and quotations omitted).    This Court is particularly required to "review findings of fact by a state court where a federal right has been denied  on the basis of a fact without evidence to support it and where a conclusion of law as to a federal right and a finding of fact are so intermingled to require analysis of the facts."  *Bose*, 466 U.S. 485, 506

n.24 (*citing Fiske v. Kansas*, 274 U.S. 380, 385-387 (1927)). Particularly as the Connecticut Court of Appeals did not do so, the burden falls to this Court:

> "Even where a question of fact may have constitutional significance, we normally accord findings of state courts deference in reviewing constitutional claims here. But that deference is **predicated on our belief that at some point in the state proceedings some factfinder has made a conscious determination of the existence or nonexistence of the critical fact. Here the record before us affords no basis for such a conclusion**."

*Time, Inc. v. Firestone*, 424 U.S. 448, 463, 96 S. Ct. 958, 969-70 (1976) (emphasis added) (*citing Lyons v. Oklahoma*, 322 U.S. 596, 602-603 (1944); *Gallegos v. Nebraska*, 342 U.S. 55, 60-61 (1951)). The key issue in the above quote is that the Supreme Court requires among other things, the inquiry into whether "critical facts" were resolved and that they were resolved by a fact finder. Here there is no question that they were not. Rather, they were judicially decreed as a punishment.

144.    The Order this Court entered states

> "[t]his Court cleared the runway for Jones to appeal the Connecticut judgment, including the amount of punitive damages, and nothing in this bankruptcy case affects that appellate right. He may raise … his constitutional arguments with the appropriate state appellate forum. It is not, however, a basis for this Court to ignore the plain language of the state court's default judgment or the damages awards." Order, p. 12.

145.    This is clearly erroneous as first, it is simply not the law. While federal courts are bound by a state court's interpretations of state laws, federal constitutional issues are to be resolved by federal courts. *Mullaney v. Wilbur*, 421 U.S. 684, 690-91 (1975). It would be unthinkable to suggest that in a case that involves (a) a media defendant protected by the freedom of the press and freedom speech provisions of the First Amendment; (b) reporting on matters of public concern; and (c) addressed to public figures, a federal court plays no role and must rely exclusively on what a state court system does. Yet that is the net effect.

146.    Second, in deferring to the Death Penalty Sanctions, this Court has implicitly held that those Death Penalty Sanctions removed the Supreme Court's review mandate.

147.    Third and perhaps most importantly, the Connecticut Court of Appeals did not review this issue.

148.    In performing its duties, this Court cannot defer the decisions it is required to make here to the Connecticut judicial system.  To the contrary this Court has a Constitutional duty to review the Connecticut judgment and the supporting evidence, particularly since the Connecticut Court of Appeals did not.  While Jones fully intends to attempt to present his issues to the Connecticut Supreme Court, there is no appeal to that body as a matter of right and thus there is no assurance that the "merits" will ever be reviewed by the Connecticut judiciary.

**B.  THE DUTY TO CONDUCT AN INDEPENDENT REVIEW OF DEFAMATION FACTS IS CRUCIAL BY ITSELF WHEN CONSTITUTIONAL ISSUES ARE AT STAKE AS HERE**

149.    The First Amendment to the Constitution clearly distinguishes between freedom of speech and freedom of the press:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the *freedom of speech*, or *of the press*; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S.C.S. Const. Amend. 1 (emphasis added).  While distinct and independent, freedom of speech and press are interrelated, as Justice Brennan said in his concurring opinion in *McDonald v. Smith*:

> It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, . . . and therefore are united in the First Article's assurance."

*McDonald v. Smith*, 472 U.S. 479, 489-90, 105 S. Ct. 2787, 2793 (1985) (J. Brennan concurrence; cleaned up).

150.    Freedom of the press – versus freedom of speech – issues have not been focused on by this Court or the Connecticut judicial system, and yet issues associated with it lie at the bedrock basis of most of the errors the Connecticut trial court, the Connecticut Court of Appeals, and this Court have made. For example, the single fact that Alex Jones is a media defendant implicates Constitutional doctrines and scores of United States Supreme Court cases that distinguish normal garden-variety defamation cases from defamation cases asserted against media defendants, like Jones.  *See, e.g., Milkovich v. Lorain Journal Co*., 497 U.S. 1, 3, 110 S. Ct. 2695, 2697 (1990) (hereafter, "*Milkovich*") ("...the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a ***media defendant*** for speech of public concern…. Foremost, where ***a media defendant*** is involved, a statement on matters of public concern must be provable as false before liability can be assessed…") (emphasis added; internal citations omitted). This, coupled with the fact that (a) the Sandy Hook tragedy and the ensuing efforts to achieve gun control legislation nationwide, were and still are public controversies and matters of public concern and (b) the plaintiffs are public figures who have voluntarily thrust themselves into those public controversies,   transformed the Connecticut case into a case of Constitutional dimensions, subject to Supreme Court mandates and exacting Constitutional requirements that preempt any conflicting state laws – substantive or procedural – as the Supreme Court has repeatedly stated:

- "The First Amendment 'guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker."  *Sullivan*, 376 U.S. at 271;

- "In 1964, we decided in *New York Times Co. v. Sullivan*, …that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for "a federal rule…".  *Milkovich*, 497 U.S. at 15-17 (citations omitted).

**EXHIBIT 1**

- "The First Amendment limits California's libel law in various respects." *Masson v. New Yorker Magazine*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429 (1991)

151.     Thus, where Constitutional issues are concerned, this Court cannot blindly accept the actions of a Connecticut trial court that simply ignore the Constitution, but must exercise its own independent assessments.     This obligation is neither novel nor new, having been established long ago by the U.S. Supreme Court:

"Clearly, then, **this Court has an obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments, and in doing so this Court cannot avoid making an independent constitutional judgment on the facts of the case**. The simple fact is that First Amendment questions of constitutional fact compel this Court's de novo review. ….. In these cases **our duty** is not limited to the elaboration of constitutional principles; **we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.** *New York Times Co. v. Sullivan*, …. Our independent analysis of the record leads us to agree with the Court of Appeals that none of the proofs, considered either singly or cumulatively, satisfies the constitutional standard with the convincing clarity necessary to raise a jury question whether the defamatory falsehoods were broadcast with knowledge that they were false or with reckless disregard of whether they were false or not."

*Rosenbloom v. Metromedia*, 403 U.S. 29, 55, 91 S. Ct. 1811, 1825 (1971) (internal cites and quotations omitted; emphasis added).

152.     It is important to stress that this rule of independent review emphasizes that this Court's duty is not limited to making sure the trial court elaborated or espoused constitutional principles.  Rather, the review mandated on this Court requires the examination of the "content, form, and context" of each alleged libel "as revealed by the whole record." *Snyder*, 562 U.S. at 453.   The review is a de novo review where this Court must examine for itself the specific statements at issue and the circumstances under which they were made to determine whether each and every alleged libelous statement is of a character that the principles of the first amendment are protected.  S*ee, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105

**EXHIBIT 1**

S. Ct. 2939, 86 L. Ed. 2d 593 (1985); *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Bose*, 466 U.S. at 499; *Sullivan* 376 U.S. at 284-286.

153.    Here, no fact finder has weighed and determined Constitutional issues.  Rather they were deemed "established" by judicial fiat via Death Penalty Sanctions. Thus, this Court not only should not, it also can not accord finality to a wildly excessive compensatory damage award, where no fact finder made any liability findings and there has been no independent review.

## VIII.
## SOME OF THE IGNORED CONSTITUTIONAL ISSUES THAT SUPERSEDE ALL OTHER LAW INCLUDING COLLATERAL ESTOPPEL LAWS

154.    The specific Constitutional issues that were not litigated in Connecticut, or litigated with the incorrect standards, are overwhelming.  What follows are some of the Constitutional issues that the Connecticut trial court and Connecticut Court of Appeals ignored.  As they were ignored, it was error to give collateral estoppel effect to the Connecticut Judgment.

**A.  IT IS FUNDAMENTAL ERROR FOR THIS COURT TO RECOGNIZE CLEAR CONSTITUTIONAL ERRORS MADE IN CONNECTICUT AND NEVERTHELESS BELIEVE IT WAS BOUND TO ABIDE BY CLEARLY UNCONSTITUTIONAL HOLDINGS AND FINDINGS**

155.    As a preliminary matter, little need be said that when this Court finds Constitutional deficiencies, it cannot ignore them.  Indeed, the very purpose of the "**obligation to make an independent examination of the whole record**" is in order to make sure that the judgment does not constitute "a forbidden intrusion on the field of free expression."  *Bose,* 466 U.S. at 499.

156.    That is not possible here given the Death Penalty Sanctions that not just obviated a fact finding trial – it precluded one.

**B.  THE CONNECTICUT PLAINTIFFS WERE NOT REQUIRED TO AND DID NOT PRESENT ANY EVIDENCE OR EVEN PLEADING OF SPECIFIC DEFAMATORY STATEMENTS MADE BY JONES**

157.     What the trial court did in its Memorandum Opinion [**Ex. 12**], is simply lift quotes from the Plaintiffs' complaint [**Ex. 6**] and repeatedly instruct the jury that that they were to assume those "facts" were actually statements made by Jones, they were defamatory, they were actually made by Jones, were false and they were made with legal malice.  Further, the jury was instructed that Jones was liable for everything third parties said and did.   The Connecticut trial court repeatedly instructed the damages jury:

> "As you will recall, here you are tasked with addressing the issue of damages**, as the court previously determined that the defendants are liable.** As a result this trial focused on damages. **As I previously instructed you, you are not to speculate as to why the court previously determined that the defendants were liable but you are simply to accept it as a given** and focus on the amount of damages to be awarded and the degree of the defendants' wrongdoing."

See also **Ex. 11,** Connecticut Jury Charge p. 2.   See also **Ex. 11**, Connecticut Jury Charge pp.12-13 ("The defendants have been found liable…"); p. 13 ("As I have instructed you, the court has determined that the defendants are liable ….It is established"); p. 14 ("…court has determined that the defendants are liable…");  pp. 14-15 ("The court has determined that the defendants are liable for defamation."); p. 20 ("…the defendants violated the plaintiffs' privacy…"); p. 17 ).

158.     Again, each of the quotes in the Connecticut trial court's Memorandum Opinion [**Ex. 12**] came from the Complaint in the "damages trial" with no fact finder making a determination that the precise words (particularly given their context) were defamatory, false or made with legal malice, or even made by Jones himself.

159.     The U.S. Supreme Court, however, has repeatedly emphasized that it is an absolute Constitutional requirement that each alleged defamatory statement be precisely identified in

context, focusing particularly on "what was said, where it was said, and how it was said" as the following quote from *Snyder*, particularly the last sentence, plainly states:

> Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public… The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. Deciding whether speech is of public or private concern ***requires us to examine the content, form, and context of that speech,*** as revealed by the whole record. As in other First Amendment cases, the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate ***all the circumstances of the speech, including what was said, where it was said, and how it was said***.

*Snyder*, 562 U.S. at 453-54 (emphasis added; internal quotes and cites omitted; cleaned up). This duty was particularly incumbent on the Connecticut trial court and it did not occur given the Death Penalty Sanction. It must occur now and this Court has no record with which to make those determinations, therefore necessitating a trial on dischargeability.

          *i.* THE CONNECTICUT COMPLAINT DOES NOT CONTAIN ANYWHERE NEAR REQUIRED DETAIL AND MOST OF WHAT IS REFERENCED OCCURRED OUTSIDE THE STATUTE OF LIMITATIONS AND IS A PROTECTED OPINION OR HYPERBOLE

160. As a result of the Death Penalty Sanction, the only "what, where and how" of alleged defamatory statements was in the Connecticut Complaint. See **Ex. 6**. Even in the face of a default, a complain must still articulate valid claims, as evidenced by the Court of Appeals reversal of the CUTPA claims even though a default judgment had been entered on them.

161. For starters, most of the acts complained of, occurred well outside of the two year statute of limitations. (Sec. Conn. Gen. Stat. 52-597). See, e.g., **Ex. 6** Complaint, complaining of events that occurred in **2012** (e.g., ¶¶ 102 & n. 20; 139; 167); **2013** (e.g., ¶¶ 96 & n. 17, 106 & n.

21); 111 & n. 22; 120-128); **2014** (e.g., ¶¶ 120; 129 & n. 24; 145-170; 189 -228); 2015 (e.g., ¶¶ 60; 76; 81-82; 180-228).  and **2016** (e.g., ¶¶ 229 – 256).

162.    Additionally, the Complaint inserts its own summaries of meanings, interspersed with article headlines, surrounding factual anomalies, leaving a reviewing court to have to guess to determine precisely what was the defamatory "statement" and more importantly, why it was defamatory.

163.    In other places, statements are made that convey no possible defamatory meaning. As one example of numerous, in several places, the Complaint purports to quote someone saying that CNN reporter Anderson Cooper was operating behind a greenscreen as his nose would disappear when he would move.  See e.g., **Ex. 6,** Connecticut Complaint, ¶¶222; 230; 240; 259; 264.  Was this defamatory?  Was it true?  The jury was told it was maliciously defamatory without explanation.

164.    In another example, the **Ex. 6,** Connecticut Complaint at ¶111-117 states the following about one of the parents laughing and using cue cards.  The following is what the Complaint alleges:

> *111. On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax." Just over a month had passed since the shooting at Sandy Hook.*

> *112. Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event* ***Unfortunately, evidence is beginning to come out that points more and more in that direction,*** *and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."*

> *113. Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see*

*the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' **he's laughing, and then he goes over, a**nd starts, um, breaking down and crying."*

*114. Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.*

*115. Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."*

*116. As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious .... that killed thousands, our government, to blame the Second Amendment, they'd stage anything."*

*117. Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns .... Something though, really, is starting to get suspicious here ... . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."*

165.    What Jones was referring to was Robbie Parker.  Here are just a few of the shots

Jones was referring to when he referenced one of the parents laughing at a news conference:

**EXHIBIT 1**



166.   As to the reference to holding "cue cards" Jones was referring to these



167.    These comments are neither false nor defamatory.

168.    Similarly, Jones said:

> "*Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment.*"

169.    These are not a defamatory statements of fact, but expressions of constitutionally protected opinion.   Yet for these, Robbie Parker was awarded $120,000,000 in compensatory damage:



```
TO PLAINTIFF ROBERT PARKER:

A. DEFAMATION/SLANDER DAMAGES
   (PAST AND FUTURE)                          $ 60,000,000.00

B. EMOTIONAL DISTRESS DAMAGES                 $ 60,000,000.00
   (PAST AND FUTURE)


        TOTAL FAIR, JUST AND REASONABLE
        DAMAGES TO PLAINTIFF ROBERT
        PARKER AND AGAINST ALEX JONES
        AND FREE SPEECH SYSTEMS
        (ADD LINE A AND LINE B)
                                              $ 120,000,000.00
```

See Jury Verdict, **Ex 1 & Ex. 12.**   To this, the trial court appended $50,000,000 in punitive damages for a total award of $170,000,000.

170.    Connecticut Plaintiff William Aldenberg, an FBI agent who was listed as a "first responder," testified at the damages trial and made no accusations that Alex Jones ever spoke about him, aired information about him, or directed harassment toward him. When asked, "Did Mr. Jones

direct his audience to Mr. Halbig's website (Halbig being a show-guest)?" Aldenberg responded, "To be honest, certain, I just don't recall that. I don't." (Pg. 54: 22–25). In fact Aldenberg testified he only learned of Jones through his conversations with an FBI counselor. (Pg. 46: 16-17, 20). As to how it affected him, he said: "You can say whatever you want about me. I don't care; just say whatever you want. I'm a big boy, I can take it. But they want to make profits; they want to make millions and millions of dollars." (Pg. 50: 13-17, 23-26). [The referenced pages from Aldenberg's testimony at the damages trial are collectively attached as **Exhibit 16**]. And for this testimony which the trial court instructed the jury was false, defamatory and made with malice, and the jury awarded him $90,000,000 in "compensatory damages"



To this the trial court appended another $40,000,000 in punitive damages for a total award of $130,000,000.

171.    And Mr. Jones was powerless to refute the any of the allegations given the Death Penalty Sanctions rendered against him.

172.    For these reasons alone, it was error for this Court to give collateral estoppel effect to the Connecticut judgment and find it nondischargeable.

C. **FALSITY -- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED _FALSITY_ OF SPECIFIC STATEMENTS BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE – WHICH DID NOT HAPPEN**

173.    This point is four-fold: (i) specific statements must be identified that are allegedly defamatory; (ii) there must be a specific adjudication of falsity as to each; (iii) it was the Connecticut plaintiffs' burden to prove the falsity of each; and (iv) the falsity must have been proved and found by a jury by clear and convincing evidence.  None of this happened.

174.    As to falsity, this Court has been led to erroneously state the elements of a defamation claim in Connecticut at Order p. 13, which mentions neither falsity nor fault:

> "A defamatory statement is "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." _Hopkins v. O'Connor_, 925 A.2d 1030, 1042 (Conn. 2007). To establish a prima facie case of defamation in Connecticut, the plaintiff must show that the defendant published a defamatory statement, which identified the plaintiff to a third person, and that the plaintiff's reputation suffered because of the statement.  _Cweklinsky v. Mobil Chem. Co._, 837 A.2d 759, 763–64 (Conn. 2004)."

175.    This is neither Connecticut nor federal law.  Rather, echoing U.S. Supreme Court requirements, the Connecticut Supreme Court has stated that to establish defamation liability, a plaintiff must also prove falsity and do so by clear and convincing evidence.

176.    In approving a jury charge in _Holbrook v. Casazza_, 204 Conn. 336, 358-59, 528 A.2d 774, 785 (1987) the Connecticut Supreme Court stated precisely that:

> "First, that the challenged statements are defamatory … in some actionable way and were uttered and published by a defendant. That issue must be proved by her by a preponderance of the evidence. **Second, that any actionable, defamatory statement is false in some material respect.  That burden is by clear and convincing evidence**.

177.    These are mere repetitions of U.S. Supreme Court mandates and they were ignored:

> "Our opinions to date have chiefly treated the necessary showings of fault rather than of falsity. Nonetheless, as one might expect given the language of the Court in _New York Times_, … a public-figure plaintiff must show the falsity of the statements at issue in order

to prevail in a suit for defamation. … Here, as in *Gertz*, the plaintiff is a private figure and the newspaper articles are of public concern. **In _Gertz_, as in _New York Times_, the common-law rule was superseded by a constitutional rule. We believe that the common law's rule on falsity -- that the defendant must bear the burden of proving truth – must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages**."

*Phila. Newspapers v. Hepps*, 475 U.S. 767, 775-76, 106 S. Ct. 1558, 1563 (1986).

178.    This was not done. The Connecticut trial court determined these issues by judicial fiat on grounds that had nothing to do with the merits.

### D. FAULT -- THERE CAN BE NO LIABILITY WITHOUT THE CONNECTICUT PLAINTIFFS HAVING PROVED *FAULT* BY CLEAR AND CONVINCING EVIDENCE– NOT JUDICIAL DECREE – WHICH DID NOT HAPPEN

179.    Another ignored black-letter Constitutional requirement is that liability of a media defendant cannot be entered without a finding of fault and that fault can not be negligence. *Gertz,* 418 U.S. at 347: "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *See Milkovich,* 497 U.S. at 15-16 ("In other words, [in *Gertz*] the Court fashioned 'a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.'").

180.    And fault had to be fault that rose to the level of intentional or recklessness which the Connecticut Plaintiffs had the burden to prove by **clear and convincing evidence** as to each and every alleged libelous statement Jones was accused of making:

"…under this Court's First Amendment jurisprudence, [the Connecticut Plaintiffs] cannot establish libel without proving by clear and convincing evidence that [Mr. Jones] acted with actual malice—that is with knowledge that the published material was false or with reckless disregard of whether it was false."

*Berisha v. Lawson*, 141 S. Ct. 2424, 2424 (2021) (explanatory brackets supplied) (*citing Sullivan*, 376 U. S. at 280; *Gertz,* 418 U. S. at 334-335, 342; and *Curtis Publishing Co. v. Butts*, 388 U. S.

**EXHIBIT 1**

130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967). Here there was no finding of fault – only by Death Penalty Sanctions.

181.    Making it abundantly clear that in the ensuing "damages" trial, fault was not at issue, the Connecticut trial court specifically instructed the jury to that effect in many places including the following (emphasis added in each case):[8]

> "As you will recall, here you are tasked with addressing the issue of damages**, as the court previously determined that the defendants are liable.** As a result this trial focused on damages. **As I previously instructed you, you are not to speculate as to why the court previously determined that the defendants were liable but you are simply to accept it as a given** and focus on the amount of damages to be awarded and the degree of the defendants' wrongdoing."

**Ex. 11,** Connecticut Jury Charge p. 2.   See also **Ex. 11**, Connecticut Jury Charge pp.12-13 ("The defendants have been found liable …."; p. 13 ("As I have instructed you, the court has determined that the defendants are liable…"); p. 14 ("…court has determined that the defendants are liable … It is established that by their conduct…."); pp. 14-15 ("The court has determined that the defendants are liable for defamation. …"); p. 20 ("…the defendants violated the plaintiffs' privacy…."); and p. 17 ("… the court has already determined that the defendants are liable to the plaintiffs…").

182.    In fact, as a result of the Death Penalty Sanctions for three seemingly trivial offenses, the Connecticut trial court even instructed the Connecticut jury that it had found Jones conduct extreme and outrageous, instructing the jury: "…you may consider that it is already established that the defendants' conduct was extreme and outrageous."   **Ex. 11,** Connecticut Jury Charge p. 21.

---

[8] The Jury Charge referenced is the one the Connecticut Plaintiffs filed in this Court and this Court's blue ECF page numbering at the top is what is referenced.

183. This Court's own Order demonstrates in its analysis of the Connecticut Jury Charge [**Ex. 11**] that the requisite level of fault was not used by the trial court even in the damages trial. This Court's Order not only examined but quoted from the jury charge employed in the "damages only" trial and that charge clearly demonstrates the use of the wrong legal standards when standards are even mentioned at all. As to defamation there no mention in the Connecticut jury charge about applicable standards and certainly nothing even suggesting the *Sullivan* "clear and convincing" evidentiary standard. As explained in the immediately following section, as to intentional infliction, the trial court's references to intentional infliction and its use of a "knew or should have known" standard – that of negligence – was clearly erroneous. Thus, without standards – or with the wrong standards -- these issues were never fully and fairly litigated.

184. And topping off the improprieties in the subsequent "damages" trial, Jones's testimony was deeply restricted – an issue the Court of Appeals refused to consider. *Lafferty v. Jones*, 229 Conn. App. 487, 491 (2024). Again, these issues were never fully and fairly litigated.

185. There was no trial in Connecticut; there was only an execution. And the execution was not just of Mr. Jones, it was of the U.S. Constitution itself.

E. **INTENTIONAL INFLICTION CLAIMS AND DAMAGES WERE CLEARLY SUBMITTED ON THE WRONG STANDARD AND ARE DISCHARGEABLE**.

186. Another Constitutional error is this Court's holding the emotional distress damages -- which total $561,000,400 – are nondischargeable. Those damages are well over half of the compensatory damages awarded:

| Conn. Pls. | Defamation Slander | Emotional Distress | Common law Punitives | CUTPA Punitives | TOTALS |
|---|---|---|---|---|---|
| R. Parker | $60,000,000 | $60,000,000 | $40,000,000 | $10,000,000 | $170,000,000 |

| | | | | | |
|---|---|---|---|---|---|
| W. Aldenberg | $45,000,000 | $45,000,000 | $30,000,000 | $10,000,000 | $130,000,000 |
| E. Lafferty | $18,000,000 | $58,000,000 | $25,300,000 | $10,000,000 | $111,300,000 |
| I. Hockley | $38,000,000 | $43,600,000 | $27,200,000 | $10,000,000 | $118,800,000 |
| N. Hockley | $32,000,000 | $41,600,000 | $24,530,000 | $10,000,000 | $108,130,000 |
| J. S.Marionio | $30,000,000 | $38,800,000 | $22,930,000 | $10,000,000 | $101,730,000 |
| C. S. Parisi | $30,000,000 | $36,000,000 | $22,000,000 | $10,000,000 | $98,000,000 |
| M. Barden | $25,000,000 | $32,600,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| C. M. Soto | $18,600,000 | $39,000,000 | $19,200,000 | $10,000,000 | $86,800,000 |
| W. Sherlach | $9,000,000 | $27,000,000 | $12,000,000 | $10,000,000 | $58,000,000 |
| D. Wheeler | $25,000,000 | $30,000,000 | $18,330,000 | $10,000,000 | $83,330,000 |
| F. Wheeler | $24,000,000 | $30,000,000 | $18,000,000 | $10,000,000 | $82,000,000 |
| J. Hensel | $21,000,000 | $31,000,000 | $17,330,000 | $10,000,000 | $79,330,000 |
| D. Soto | $18,000,000 | $30,000,000 | $16,000,000 | $10,000,000 | $74,000,000 |
| J. Barden | $10,000,000 | $18,800,000 | $9,600,000 | $10,000,000 | $48,400,000 |
| **TOTALS** | $403,600,000 | $561,400,000 | $321,620,000 | $150,000,000 | $1,436,620,000 |

**Ex. 1** (Conn. Jury Verdict, Conn. Dkt No. 1010] & **Ex. 12** (Memorandum Opinion Judgment).

187.    In *Hustler*, 485 U.S. at 56-57, the U.S. Supreme Court clearly stated that the "actual malice by clear and convincing evidence" standards articulated in *New York Times Co. v. Sullivan* applies to claims of intentional infliction of emotional distress:

> "We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with actual malice, i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a blind application of the *New York Times* standard, … it reflects our considered judgment that such a standard is necessary to give adequate breathing space to the freedoms protected by the First Amendment."

188.   This has been repeatedly reaffirmed.  *See, e.g., Snyder*, 562 U.S. at 451.

189.   Yet this Court itself quotes from the Connecticut Court's jury charge that uses the wrong standards: "The defendants intended to inflict emotional distress or . . . knew *or should have known* that emotional distress was the likely result of their conduct."  Order, p. 13 (emphasis added).  See also Order, p. 14 ("The jury was instructed, among other things, that the defendants were liable for intentional infliction of emotional distress: … the defendants … the defendants knew or should have known that emotional distress was the likely result of their conduct."); Order, p. 3.

190.   The standard of "knew or should have known" is the legal standard of negligence.  In *Erickson Prods. v. Kast,* 921 F.3d 822, 833 (9th Cir. 2019), the Ninth Circuit succinctly so stated:

> A "should have known" instruction does not fit within this framework because it is a negligence standard. To say that a defendant "should have known" of a risk, but did not know of it, is to say that he or she was "negligent" as to that risk. *See Global-Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 770, 131 S. Ct. 2060, 179 L. Ed. 2d 1167 (2011); *see also BMG Rights Mgmt. (US) LCC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 310 (4th Cir. 2018) ("The formulation 'should have known' reflects negligence"); *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001) (noting that "should have known" is a negligence standard).  Negligence is a less culpable mental state than actual knowledge, willful blindness, or recklessness, the three mental states that properly support a finding of willfulness.

*See also Mirjavadi v. Vakilzadeh*, 310 Conn. 176, 195, 74 A.3d 1278, 1289 (2013)  ("As  we have observed, the test for the existence of a legal duty in a negligence action is "whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result . . . .") and *Coppola Constr. Co. v. Hoffman Enters. Ltd. P'ship*, 309 Conn. 342, 351-52, 71 A.3d 480, 487 (2013) ("Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that

the defendant made a misrepresentation of fact (2) that the  defendant ***knew or should have known was false***, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." [emphasis added]).

191.    Clearly the negligence "knew of should have known" standard this Court's Order acknowledges was used by the Connecticut trial court as to intentional infliction, is not sufficient to find these claims nondischargeable under 11 U.S.C. § 523(a)(6) and additionally invalidates the cause of action entirely as that standard is forbidden by US Supreme Court mandate.

192.    And, because the wrong standard was used, it is not eligible for collateral estoppel purposes.  As noted above, the Fifth Circuit has made clear that for collateral estoppel to apply, the legal standards must be the same:

> As one treatise points out, however, "courts have readily perceived that for purposes of preclusion, "issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same.' " … *See also Brister,* 946 F.2d at 354 n. 1 (5th Cir.1991) (explaining that "not only the facts, but also the legal standard used to assess them, must be identical").

*Recoveredge, L.P. v. Pentecost,* 44 F.3d 1284, 1291 (5th Cir. 1995).

193.    In the jury being instructed that intentional infliction damages can be awarded based on a "knew or should have known," or a negligence, standard, the standards in Connecticut and those required for determination of dischargeability (which certainly assume the correct Constitutional standards were used) are clearly not the same and there is thus no collateral estoppel.

194.    Hence, at the very least, there is no collateral estoppel as regards the intentional infliction of emotional distress claims of $561,000,000 in "compensatory" damages.

## F.  DAMAGES CANNOT CONSTITUTIONALLY BE PRESUMED – BUT THEY WERE

195.    The Supreme Court has clearly stated that where a media defendant is concerned, damages cannot be presumed but must be proved:

"… we held that the States could not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice. See 418 U.S. at 350 ("Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship . . .").

*Milkovich,* 497 U.S. at 15-16.  The Connecticut jury charge, to the contrary, repeatedly instructs the jury that damages are **presumed** – their task was only to figure out how much those presumed damages were:

- "The law **presumes** that there is injury to the plaintiffs' reputations. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover, as general damages for injury to his or her reputation and for humiliation and mental suffering." **Ex. 11,** Connecticut Jury Charge, p. 22.

- "The law **conclusively presumes** that there is injury to the plaintiff's reputation. A plaintiff is not required to prove that his or her reputation was damaged. The plaintiff is entitled to recover as general damages for the injury to his or her reputation and for the humiliation and mental suffering caused.… I hereby charge you that causation of the plaintiffs' damages is already established." **Ex. 11,** Connecticut Jury Charge, p. 15.

- "Causation of harm has been established by virtue of the court's prior rulings to the satisfaction of the law." **Ex. 11,** Connecticut Jury Charge, p. 16.

- "In sum, it has been established that the defendants caused harm to the plaintiffs in all the ways I just described. The defendants' statements and conduct caused reputational harm to the plaintiffs, invasion of privacy, and emotional distress. The extent of the harm is what you will be measuring in your verdict. The cause of the harm is not in question." **Ex. 11,** Connecticut Jury Charge, p. 16.

- "As I have already instructed you here, it has already been established that the defendants' wrongful conduct proximately caused harm to each plaintiff."  **Ex. 11,** Connecticut Jury Charge, p. 18.

196.    These "presumptions" are both unconstitutional and not subject to collateral estoppel effect.  It was error for this Court to have done so.

### G. It Is Unconstitutional To Find Jones Liable For Acts Of Third Parties

197.    This Court quotes the jury charge that "[D]efendants proximately caused harm to the plaintiffs by …urging their audience and the public to investigate and look into the plaintiffs and to stop the people supposedly [behind] the Sandy Hook hoax." Order, pp. 3-4.  The actual charge itself goes on to state that this "result[ed] in members of the defendants' audience and the public cyberstalking, attacking, harassing, and threatening the plaintiffs, as you have heard the evidence in this case." **Ex. 11,** Connecticut Jury Charge, p. 16.

198.    The trial court also instructed the jury that Jones was legally responsible for all statements of its guests: "I instruct you that it is established that the defendants are legally responsible for the statements of these guests on Infowars." **Ex. 11,** Conn. Jury Charge, p. 8.

199.    These instructions to the jury were based solely on allegations in the Connecticut Complaint.  In one example of many, the Connecticut Plaintiffs identified Defendant Wolfgang Halbig as an independent journalist and investigator who resides in Sorrento, Florida and who was the creator and operator of "the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com."  It also identified Defendant Cory T. Sklanka as a journalist who works with Halbig. **Ex. 6,** Connecticut Complaint, ¶¶ 36 & 37.  Although Halbig's name is used over 77 times in the Connecticut Compliant, other than a few references to Halbig's appearance as an occasional guest on Mr. Jones' show **[Ex. 6,** Connecticut Complaint, ¶ 68] there are no allegations that would even remotely make Mr. Jones responsible for Halbig's statements and actions other than the completely unverified and conclusory allegation that "Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut."  **Ex. 6,** Connecticut Complaint, ¶ 74.  The lone exception is the unverified, unsupported, conclusory and inaccurate statement that Halbig was "at all relevant times a servant, agent, apparent agent, employee, and/or

**EXHIBIT 1**

joint venturer of the Jones defendants." **Ex. 6,** Connecticut Complaint, ¶87. This lone, conclusory allegation is nothing but sheer conjecture and certainly nothing that overcomes Mr. Jones's first amendment rights. Yet the jury was told Mr. Jones was maliciously responsible for everything Halbig did. [9]

200.     Further, the Connecticut Complaint is replete with acts of third parties in allegedly stalking some of the Connecticut Plaintiffs, with no evidentiary tie to Jones.   **Ex. 6,** Connecticut Complaint, ¶¶ 14; 15 ("They have confronted strange individuals videotaping them and their children."); 16; 55 ("In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.). With no allegation and certainly no evidence, all of these acts were simply laid at the feet of Alex Jones and the jury was told Mr. Jones was maliciously responsible for these acts.

201.     This is blatantly unconstitutional.

202.     Justice Sotomayer in her recent concurrence in *Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) summarized the law forbidding liability for "incitement" of third parties to act:

> Less than two weeks after the Fifth Circuit issued its opinion, this Court decided *Counterman v. Colorado*, 600 U. S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023). In Counterman, the Court made clear that the First Amendment bars the use of an objective standard like negligence for punishing speech, and it read *Claiborne* and other incitement cases as demanding a showing of intent. The Court explained that the First Amendment precludes punishment for incitement, whether civil or criminal, unless the speaker's words were intended (not just likely) to produce imminent disorder."

---

[9] In fact when in the damages trial Connecticut Plaintiff Aldenberg was asked about Halbig, Aldenberg described Halbig as "an associate of Mr. Jones and Infowars," due to his appearance on Alex Jones' show (Pg. 53: 25-27, Pg. 54: 8-10). During cross-examination, Pattis challenged this reasoning, asking if being a guest on a talk show implies affiliation, to which Aldenberg replied, "To me it does," even agreeing that appearing on CNN would make someone a CNN affiliate (Pg. 73: 8-12). **Ex. 15** hereto.

*Mckesson v. Doe*, 144 S. Ct. 913, 914 (2024) (*citing NAACP v. Claiborne Hardware Co*., 458 U. S. 886, 927-929, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) (internal quotations omitted; cleaned up)).

203.    In *NAACP v. Claiborne Hardware Co*., 458 U. S. 886, 927-929, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982), cited in *McKesson*, the Supreme Court went so far as to acknowledge that even advocacy of the use of force or violence is protected by the First Amendment when acts of violence are alleged to have been encouraged and committed:

> "This Court has made clear, however, that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment. In *Brandenburg v. Ohio*, 395 U.S. 444, we reversed the conviction of a Ku Klux Klan leader for threatening 'vengeance' if the "suppression" of the white race continued; we relied on  the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

204.    Here, telling viewers to "investigate" for themselves, even if true, is purely protected by the Constitution which the Connecticut judgment ignores. [10]  The case of *NAACP v. Claiborne Hardware Co*., dealt with civil rights activist Medgar Evers, whose urgings to his listeners to employ violence was not actionable even though vastly more inflammatory than Jones's encouragement of his listeners to simply investigate for themselves, the Supreme Court stating

> "[s]trong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore

---

[10] Notwithstanding his Constitutional protections, it must be clearly understood that there was no evidence or even an allegation that Mr. Jones ever one time urged violence; rather, the Connecticut Plaintiffs simply claimed that unrelated third parties harassed them because on a few occasions Jones suggested his listeners investigate matters for themselves. However, this does not even approach the Constitution's boundaries where speakers do actually encourage specific violence against specific people.  *See Brandenburg v. Ohio*, 395 U.S. 444 (dealing with KKK threats of vengeance)

the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open."

*See also Watts v. United States*, 394 U.S. 705 (reversing the conviction of a person drafted for Vietnam who said "…if they ever make me carry a rifle the first man I want to get in my sights is L. B. J." dismissing it as "a kind of very crude offensive method of stating a political opposition to the President.). Here, by virtue of the Death Penalty Sanctions, Jones was decreed liable for everything any Connecticut Plaintiff complained happened to them by strangers – a preposterous proposition by itself and certainly unconstitutional in its effect.

### H. PROFIT MOTIVE IS IRRELEVANT IN MEDIA LIBEL

205.    As referenced earlier, was noted above that a media defendant's profit motive is Constitutionally irrelevant in a media libel case:

> "If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."

*Harte-Hanks Commc'ns v. Connaughton,* 491 U.S. 657, 667, 109 S. Ct. 2678, 2686 (1989).

206.    This principle has been repeated by the Fifth Circuit. *See, e.g., Peter Scalamandre & Sons v. Kaufman*, 113 F.3d 556, 561 (5th Cir. 1997), holding that "That a defendant publishes statements anticipating financial gain likewise fails to prove actual malice: a profit motive does not strip communications of constitutional protections. … As long as a defendant does not act knowing his statement is false or with reckless disregard of its truth, actual malice will not be present." (*citing Harte-Hanks*).

207.    Notwithstanding this, in the damages trial, particulary in the Connecticut Plaintiffs' closing argument, the Jury was advised of Jones's "profit motive" was repeatedly emphasize by the Connecticut Plaintiffs.

## I. THE AWARD OF PUNITIVE DAMAGES WAS UNCONSTITUTIONAL

208.    Not only was the failure to follow the requirements of *Sullivan*, *Gertz* and the other unquestioned Supreme Court mandates fatal to the Connecticut judgment, the Connecticut trial court's failures mean there could be no award of punitive damages without compliance with the standards of *New York Times Co. v. Sullivan*, and thus without a finding of malice by clear and convincing evidence, there can be no punitive damages:

> "[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury."

209.    *Gertz v. Robert Welch,* 418 U.S. 323, 350, 94 S. Ct. 2997, 3012 (1974).  In *Herbert v. Lando*, 441 U.S. 153, 161-62, 99 S. Ct. 1635, 1641 (1979), the Supreme Court held that "deeply rooted in the common-law rule, predating the First Amendment, [is the requirement for] a showing of malice on the part of the defendant [by] plaintiffs to recover punitive or enhanced damages."

210.    Yet punitive damages were awarded.  Fortunately, this Court has held common law punitive damages nondischargeable.  But award of punitive damages under CUTPA is unconstitutional and that too will be held no longer relevant in light of the CUTPA reversal.

### CONCLUSION

WHEREFORE, Alex Jones prays that this Court reconsider its decision in granting Plaintiffs' motion for partial summary judgment on the dischargeability of the Connecticut judgment, set the dischargeability issue for trial, and award Jones such other relief to which he may be justly entitled at law and in equity.

Dated: January 13, 2024

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
**Jordan & Ortiz, P.C.**
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
         aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**COUNSEL FOR ALEX JONES**

/s/ Ben Broocks
Ben C. Broocks
State Bar No. 03058800
Federal Bar No. 94507
William A. Broocks
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM P.L.L.C.
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@brookslawfirm.com
**CO-COUNSEL FOR ALEX JONES**

**EXHIBIT 1**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court on January 13, 2025, and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system.

/s/ Shelby A. Jordan
Shelby A. Jordan