**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| **IN RE:  ALEXANDER E. JONES** | § | **CASE NO. 22-33553 (CML)** |
| | § | |
| Debtor | § | **Chapter 7** |

**MOTION FOR RECONSIDERATION OF THIS COURT'S**
**DETERMINATION THAT NO AUCTION OF FREE SPEECH SYSTEMS**
**ASSETS WILL BE CONDUCTED BY THE JONES CHAPTER 7 ESTATE**

**This motion seeks an order that may adversely affect you.  If you oppose the motion, you should immediately contact the moving party to resolve the dispute.  If you and the moving party cannot agree, you must file a response and send a copy to the moving party.  You must file and serve your response within 21 days of the date this was served on you.  Your response must state why the motion should not be granted.  If you do not file a timely response, the relief may be granted without further notice to you.  If you oppose the motion and have not reached an agreement, you must attend the hearing.  Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

This Motion For Reconsideration of This Court's Determination That No Auction of Free Speech Systems Assets Will Be Conducted By the Jones Chapter 7 Estate (the "Jones Estate" which is which currently administered by its Chapter 7 Trustee Christopher R. Murray (the "Trustee") and is filed by Alexander E. Jones ("Jones") for himself and as manager of the non-debtor company, Free Speech Systems, LLC ("FSS") [Collectively Jones and FSS are sometimes referred to as "Jones"].

**I.**
**PRELIMINARY STATEMENT**

1.      Jones has the statutory and common law authority to represent Free Speech Systems, LLC ("FSS") as manager and in the common interest of preservation of value of the FSS assets including (i) preservation of the ongoing appellate proceedings; (ii) defense of the pending

dischargeability proceedings, and (iii) matters before this Court, including this Motion seeking reconsideration of the Order of this Court bench order of February 5, 2025, to the extent that:

(a)     this Court has exercised jurisdiction to enter, then "void," its order that is now on appeal; and

(b)     Jones' desire to be heard involves his personal and financial rights and pecuniary interests in such orders and assets, giving Jones standing to assert these matters;  and

(c) Jons responds to the Plaintiffs' misstatement and misrepresentations in their recent opposition to FUAC's request for an auction of the FSS assets.

2.     Jones seeks reconsideration of the status of the "Supplemental Order" of this Court [FSS Dkt. 1021, September 25, 2024], that has twice previously been the basis of the Trustee's proposed auction of the FSS assets and twice manipulated and improperly orchestrated by the two largest creditors (herein collectively the "Plaintiffs" and separately the "Connecticut Plaintiffs" or the "Texas Plaintiffs") in coordination with this Court's Trustee to accomplish an illegitimate purpose and intent of the Supplemental Order.   The cost to the Jones Estate of these two improper efforts was almost $2+ million in attorney's and professional fees.

3.     Importantly, this Motion raises issues not considered by this Court, or at least not expressed in the record of its ruling and the most recent denial of the proposed continuation of an FSS asset auction raised by FUAC, LLC.  Court determined FUAC had no standing to seek that relief.

4.     Although this Motion points out that the total chaos caused by the Trustee and Plaintiffs in their now well-documented manipulations of an otherwise simple bankruptcy auction process, that is not the basis of this Motion.  That wasteful chaos caused by a tortured attempt to manipulate this Court's Supplemental Order to accomplish a purpose never intended by this Court, should not result in the punishment of the other creditors or the Jones and FSS interests, as the

case may be.  Jones summarizes this Motion and Jones' arguments as follows:

a.    **T<span>HIS</span> M<span>OTION</span> S<span>EEKS</span> R<span>ECONSIDERATION OF</span> T<span>HE</span> C<span>OURT'S</span> I<span>MPROPER</span> D<span>ECLARING THE</span> S<span>UPPLEMENTAL</span> O<span>RDER</span> "N<span>ULL AND</span> V<span>OID</span>."**    On June 21, 2024 this Court entered its Order giving the Trustee control of FSS bank accounts and cash (the "Cash Order")(FSS Dkt. 956).  Then on September 25,  2024 this Court entered its so-called Supplemental Order which *supplemented* the prior Cash Order and gave the Trustee control of and supervisory powers over FSS's assets that were generating the new cash in addition to the Cash Order (Dkt. 1021).  At a hearing on February 5, 2025 this Court discussed its lack of jurisdiction to void the Supplemental Order.  However, in a subsequent Order entered on February 5, 2025[1] this Court declared that the Supplemental Order was "null and void."  This Motion requests the reconsideration of that declaration as the Supplemental Order, now on appeal, cannot be declared null and void, as a matter of law, as previously stated by this Couret.[2]  This Court, in making its most recent ruling from the bench (that the Supplement Order is now considered "null and void") does not consider its earlier acknowledgment that the Supplemental Order is on appeal and, as this Court previously stated that because *such Supplemental Order is on appeal, this Court lacked jurisdiction to void the order*:

> 15.    *-- no, I should back up and mention that the*
> 16.    *supplemental order was appealed by the Texas families. I*
> 17.    *think that matter is still pending.*
> 18.    *MR. JORDAN: It is, Judge.*
> 19.    *THE COURT: I lose jurisdiction over that*

---

[1]    This second order noted that First United America Company ("FUAC") lacked standing to request reconsideration.  As will be explained infra, there is no question of Jones's standing given his personal and financial rights and pecuniary interests which unquestionably give Jones standing to assert these matters.

[2]    *Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal).

*immediately.*

[*See*, **Exhibit "1"** Hearing transcript, February 5, 2025, pg. 8, lines 15-19.].   The Court was clear that although it would likely set aside the Supplemental Order (out of pure frustration over the efforts to pervert the purpose of its entry), it had no jurisdiction to do so. The Court's observation was correct when first made and remains correct now.[3] However, the non-stayed appeal does not prevent this Court from enforcing its unstayed orders even if on appeal:

> "In addition to its remaining jurisdiction on matters unrelated to the appeal, a *bankruptcy court retains substantial jurisdiction as to the order that is the subject of the interlocutory appeal.*" *Id.* 'The *appeal only deprives the bankruptcy court of the power to alter, expand or vacate the order at issue.*' *Id.* (citing *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000)). "*The [lower] court retains jurisdiction over [\*7]  all other matters that it must undertake to implement or enforce the judgment or order* [that is on appeal]." *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 967 (9th Cir. 2007).

*In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at \*5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added] [*See*, Note 3 *Supra*].   This appeal is active, and no stay has been sought or entered.[4]   Accordingly, this Court may implement and enforce the Supplemental Order, which is the relief sought by this Motion.

The Court's act of voiding the Supplemental Order was imminently justified, borne from frustration of the combined machinations of the Trustee with the assistance of the 15 Connecticut Plaintiffs and the two Texas Plaintiffs (collectively, the "Plaintiffs") who thwarted this Court's clear instruction for the Trustee to conduct a simple bankruptcy

---

[3]     *See, e.g., Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at \*20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] citing *In re Port Neches Fuels, LLC*, No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, \*12 (D. Del. Mar. 27, 2024).

[4]     *See*, pending *Case No. 22-60043* - Judge Charles Eskridge, U.S District Court, SD-TX.

auction. However justified the Court's frustration, the remedy of declaring the Supplemental Order void, was (i) legally impermissible, (ii) inequitable, (iii) creates virtually insurmountable complications and chaos of undoing events of the past 7 months; and (iv) overlooks the much more practical remedy of simply Ordering the auction, even if required to replace the disobedient and compromised Trustee. Holding to the position that the Supplemental Order is void will create past, present and future chaos. It would mean that for now, everything previously done under the authority of that Supplemental Order was invalid and must be reversed. In the present sense, it makes the companion Cash Order currently in place meaningless and makes the Trustee an intentional tortfeasor in retaining property he seized that belongs to FSS and has not returned. But perhaps the most pernicious is the fact that the Plaintiffs will act as though it is void and begin collections only to find that it is not void, and their actions violated the automatic stay or the discharge injunction, and thus themselves are void. The ripple effects from this one improvident act, will reverberate in numerous directions.

b.      Second, Jones is continuing his appeals of the Plaintiffs judgments, the reversal in whole or in any substantial part, will likely render Jones Estate solvent. Jones, as the sole manager of FSS, is also continuing the appeals on behalf of FSS, at no expense to the Jones Estate, likewise if reversed on appeal will render FSS solvent. For this and several other reasons and recent Supreme Court authority discussed below, Jones has standing to seek the relief requested herein and this Court has the jurisdiction to order the relief sought.

c.      Third, this Motion seeks to inform the Court of not only the need pursue its prior-ordered auction, considered ordinary in most every Chapter 7 case (specifically, the Chapter 7 Trustee's conducting of a public, non-collusive, auction of assets to the highest

bidder for cash) but also a matter *now opposed* by the Plaintiffs *and silently ignored by the Jones Estate Trustee* in furtherance of the same history of manipulation.  This Court may take judicial notice that  (i) a § 363 Sale with title vesting free and clear of all liens, claims and encumbrances, greatly enhances the public's participation in an auction and thus, a bankruptcy Trustee's public sale to the highest bidder is generally considered the premier way to recover the highest return for creditors and the bankruptcy Estate.  This is true primarily because it is promoted, advertised, and conducted only by professionals in such process, (including the professional Trustee, his legal counsel and retained auction professionals, all supervised by a business Bankruptcy Judge).[5]  Contrast this professional approach to the Texas state ordered Writ of Execution and auction by a Sheriff's or Constable's sale, where the officer's only participation is to levy the property and at the auction read the contents of the writ of execution before asking for offers, that is if anyone shows up other than the judgment holder planning on making only a "credit bid."

      d.      Fourth, in addition to the gross disparity in auction results, contrast that process to (i)  the fact that the Connecticut Plaintiffs were stayed from all collection efforts by both Connecticut Statute and recent ruling of the Connecticut Court of Appeals during the two prior Ordered auctions the Plaintiffs attempted to manipulate;[6] and (ii) the likelihood that both judgments will be stayed because Texas, by statute, *mandates a stay*

---

[5]      The bankruptcy bidding process is neither complex nor out of the ordinary.  It is a mainstay of bankruptcy estates' ability to satisfy the maximum recovery, of critical importance in circumstances that likely will not pay 100% of the creditors' claims.  And as Jones argues, it is a matter of judicial notice that a State law Constable's or Sheriff's sale is conducted exclusively by a deputy sheriff or constable with no obligation to advertise or otherwise maximize the sale price, and where other bidders must compete with credit-bidding of the judgment holder that significantly chills the bidding, the price obtained never reflects, much less reaches anywhere near the fair market value.

[6]      The stay of the Connecticut Judgment is problematic at this point since the Connecticut Supreme Court denied certification of the Jones and FSS appeal, and a stay is limited in duration until, and if, the Connecticut Court of Appeals agrees to extend the stay, or the US Supreme Court grants a stay pending *certiorari* or pending a ruling if *certiorari*. is granted.

when a money-judgment debtor posts a bond or collateral equivalent to 50% of the judgment debtor's **_net worth_** (the "net worth" of FSS is a negative multi-millions of dollars);[7] and the fact that neither Judgment is supported by a final order of non-dischargebility, thus, no execution is appropriate (which did not stop the Connecticut Plaintiffs form seeking to violate the Connecticut Stay by making false claims to the State Court *of this Court's orders*, including the claim that this Court had entered a *final order* determining the Judgment to be nondischargeable.[8] Instead of this chaos,[9] this Court should simply and clearly order the bankruptcy auction to liquidate all assets of the Chapter 7 estate and thereby (i) stop all of the extravagant legal and Trustee's fees from continuing to support Plaintiffs' manipulation of the bankruptcy process; and (ii) allow the appellate processes to conclude.  The Estate, at that point, needs no further "administration" and

---

[7]    Fifth, with both judgments stayed, both Jones and FSS will then be entitled to remain in possession of their assets (with, as to FSS, only "ordinary course operations allowed") until the appellate stays are lifted by final orders of the Connecticut and Texas courts, *and* only if these judgments are not reversed on appeal.  This totally re-adjusts **_back to this Court's expressed intention_** to conduct a bankruptcy auction and to not allow the manipulation of its orders to frustrate the auction process and send the auction (writ of execution) process to State Court to deal with any sale.  Instead of this Court sending matters back to State Court where (i) a stay of all collection will be in place for potentially both judgment holders; (ii) this Court's jurisdiction is lacking to void the Supplement Order while on appeal (an unstayed appeal), and (iii) the Trustee remains in possession of all of those operating assets which Jones continued efforts have protected and increased.

[8]    Although the Connecticut Plaintiffs Judgment has always been subject to a stay of any execution or effort to recover on the non-final Connecticut Judgment, as this Court may note, the Connecticut Plaintiffs nevertheless attempted to have an Austin State District Court appoint a receiver pursuant to, and execute on the Connecticut Judgment over Jones' assets, falsely telling the Austin District Court that this Court had entered a "final order" finding the Connecticut Judgment non-dischargeable **_and_** not mentioning to the Austin District Court that their collection efforts were stayed by the State of Connecticut's statutory stay of money judgment.  That case was removed to the Federal Court and referred to this Court by the District Court, Western District of Texas (Austin Division).  [*See, also infra*, Note 23].

[9]    As discussed below, the Connecticut Plaintiffs previously ignored the stay of collection and filed in the State District Courts an action to seize Jones property and appoint a receiver over Jones property, (i) telling the State district court that this Court bankruptcy court ruled the Connecticut Judgment non-dischargeable *by final order*; and (ii) telling the State district court **_nothing_** about the Connecticut statutory stay from execution, as also ordered in Connecticut by the appellate courts.  As a result, the action was timely removed to Federal District Court where a counterclaim was filed based on diversity and bankruptcy jurisdiction against the Connecticut Plaintiffs.  That case was transferred to the US District Court for the Houston Division and referred to this bankruptcy court.   It is now pending a Motion to Dismiss pursuant to Federal Rule 12(b)(6) incorporated into the Bankruptcy Rules of Procedure.

because it has been liquidated, simply remains open until the judgments are reversed or affirmed in whole or in part.

e.      Fifth:  The Obvious Abuse of Process Must Be Eliminated:  Ultimately, to the extent that any part of these two Plaintiffs' Judgments is rendered final on appeal, the rights of Jones to *a reasonable effort to achieve a maximum credit against those Judgments* should include the Debtor's right to actually achieve the highest value reasonably obtainable from the sale process most reliably capable of achieving that result – a bankruptcy auction.  It is the sale proceeds that must then be applied to those Judgments as credits of the sale proceeds, and depending on the outcome of the appeals, may allow payment in full of one or both of these judgments.  Allowing the operation and protection of these assets has and will continue to be for the benefit of the creditors and the Jones Estate until the auction concludes, which will not be the result if a State law execution sale is conducted or if the Connecticut Plaintiffs acquire the assets in other than a fair, non-collusive § 363 Auction.[10]  Although Connecticut Plaintiffs have been consistent in their demand *to destroy Jones' ability to earn an income from his exclusively-owned "persona" (his image, name, voice, etc.)* to silence his free expression of political and other opinions as an "on air" news media, not only that position is irrelevant to the economic interest of the bankruptcy system itself   but also when it rises to the level of abuse of process that uses the bankruptcy system to accomplish an unconstitutional political goal (to take away Jones First Amendment right).[11]  In fact, abuse of process conduct it is contrary to the

---

[10]      Although the Plaintiffs are free to acquire the FSS assets through a fair bidding process for cash, the stated purpose of the purchase is to destroy the value of the "Infowars" or "Alex Jones" brand.  This perverted motive is addressed below, and its impact on the claims allowance process.

[11]      *See, e.g.* the Fifth Circuit opinion in *Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020):

bankruptcy fresh start, even where a claim is found non-dischargeable. If the demands of Connecticut are to have its debt declared nondischargeable then it cannot, under any good faith application of ay bankruptcy policy approved by the Supreme Court or Congressional intent, be consistent with destroying the Debtor's ability to earn an income to pay its non-dischargeable debts.  This counter-intuitive position is the definition of "abuse of process" or its modern counter-part, "lawfare" - when a political agenda, as here, is the ulterior motive, defined as taking a lawful legal position only to advance a contrary political agenda.[12]  Bankruptcy Courts have the jurisdiction to remedy and sanction abuse of process and lawfare, and do so.[13]

5.      For the reasons set out above and below, Jones request this Court reconsider its prior rulings and order what this Court originally ordered.  This Court should order the Trustee or the Trustee's replacement (without manipulation or interference by the Plaintiffs or their affiliates) to do what the Trustee and Plaintiffs have thus far have refused to accomplish without abusive manipulations of the simple bankruptcy auction process.   Although this Court has made clear its

---

The Bankruptcy Code 'provides equitable powers for the bankruptcy court to use at its discretion.' *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This [*428] includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ('[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.'). *Id.* at 428.

[12]      "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy. The term "lawfare" is also a clever play on words, a pun, and a neologism that needs to be deconstructed in order to explain the linguistic and political power of the term. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448

[13]      *Ridgeway v. Stryker Corp. (In re Ridgeway)*, 973 F.3d 421, 427-28 (5th Cir. 2020).
Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423.  … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages."). *Id.* at 427-428.

frustration and distrust "of the process" conducted by the current Trustee, the injury to the other creditors, admittedly small (but only in comparison to the Plaintiffs *non final Judgments*) and to Jones' and FSS's rights to a fair process, compels this result.

## II.
## JURISDICITON

6.      This is a core proceeding pursuant 28 U.S.C. § 157, 1334 over which this Court has exclusive jurisdiction. *See, also Stern v. Marshall*, 564 U.S. 462, 494 (2011); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).  Here the basis for reconsideration is the injustice to the parties and bankruptcy system itself. Fed.R.Civ.P. 60(b)(6) can be invoked "in extraordinary circumstances" that include cases where the order to be reconsidered involves "***the risk of injustice to the parties' and the risk of undermining the public's confidence in the judicial process***." *Gonzales v. Davis*, 788 F. App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp*., 486 U.S. 847, 863-64, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).   Such is the case here.

## III.
## STANDING OF JONES TO SEEK THIS RELIEF

7.      Plaintiffs, through Paul Weiss, wrongly assert that Jones and FUAC are parties that have no economic standing in the case— [*See*, Connecticut Plaintiff's Response to FUAC's request for status conference, pg. 2, ¶1, Dkt. 1113]:

> The Families no longer see any benefit to pursuing a costly and litigious sale process in this Court. [*See*, pg. ¶ Response to FUAC Auction Motion];  ….  Another contested sale process would significantly harm creditors' recoveries—which have already been delayed by years, *while millions of dollars are paid to estate professionals*. Counsel to the Trustee alone has incurred over $1.4 million in fees through January 31, 2025. Nearly $800,000 of such fees were incurred between November 2024 and January 2025, the period of time during which the first contested sale hearing took place. *See* Interim Fee Application.  [*See*, pg. 6, ¶ 9 Response to FUAC Auction Motion].

8.      This Court, however, has previously recognized Jones standing regarding the auction orders.  In fact, Jones, as the Chapter 7 Debtor and FSS as a party in interest, has constitutional and bankruptcy code standing to bring this request for relief,[14] and for the purpose of both of the appeals of the Plaintiff Creditors' Judgments (and objections to their claims) and the enforcement of this Courts Supplemental Order to conduct a public auction. In both instances, standing is individually and as the sole managing member of FSS, a party in interest.

9.      Additionally, the standing doctrine is required by the Constitution's text including the due process clause of the Fifth and Fourteenth Amendments.  The Due Process clause prohibit courts from depriving a person of "life, liberty, or property without due process of law."  As Justice Amy Coney Barrett has explained, *stare decisis* can often function similarly to preclusion, and

---

[14]      Jones has standing as the Chapter 7 Debtor pursuant to Section [§1109(b)] that provides "[a] party in interest . . . may appear and be heard on any issue in a case under this chapter." The section goes on to say that parties in interest include:

> "*the debtor*, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."

> •. *Truck Ins. Exch. v. Kaiser Gypsum Co*., 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*to entities that are potentially concerned with or affected by a proceeding*."];  *See, also In re Team Sys. Int'l, LLC*, Nos. 22-10066 (CTG), 561, 2024 Bankr. LEXIS 2573 (Bankr. D. Del. Oct. 21, 2024) [*citing Truck Insurance Exchange* as defining the scope of a party in interest right to participate].

>  ; *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A*., 530 U. S. 1, 7 (2000);

> •. *Willard v. O'Neil (In re Willard)*, 240 B.R. 664, 669 (Bankr. D. Conn. 1999). As the court explained in In re Toms, 229 B.R. 646, 651 (Bankr. E.D. Pa. 1999):

>> [I]f there were a claim asserted in a chapter 7 case which would not be discharged, and which is not likely to be paid in full by the trustee, then the chapter 7 debtor will be legally responsible for payment of any remaining claim after the bankruptcy case is concluded. Due to this continuing obligation, the debtor has a pecuniary interest in the disallowance of the claim. Were the claim disallowed or reduced in amount, the debtor's continuing liability after bankruptcy could be affected.

> •. *In re Morgan*, No. 05-34981-SGJ-7, 2007 WL 2669341, at *4 (Bankr. N.D. Tex. Sept. 6, 2007) [after considering the claims register, the trustee's report of assets, and the fact that the trustee hired accountants to investigate the assets of the debtor, concluded that given the uncertainty of total assets and claims, the debtor had a pecuniary interest in the outcome of the claim objection]; *See, also,  In re Curry*, 409 B.R. 831, 838 (Bankr. N.D. Tex. 2009)the debtor has a pecuniary interest in the outcome of any claims objection and so standing to object if there might be a surplus to be returned to the debtor after satisfying all debts.  Additionally, a debtor may be afforded standing to object to an excessive dischargeable claim whose holder would receive distributions that otherwise would be made to the holder of a nondischargeable claim.  The debtor certainly wants to maximize the distribution to the holder of a nondischargeable claim, because to the extent that this claim is satisfied, the debtor is relieved from some or all of the claim of that creditor which would survive the bankruptcy case. See 4 Collier on Bankruptcy § 502.02[c] at 502-13 (Resnick & Sommers ed. 15th ed. rev. 2009).

consequently the application of *stare decisis* can deprive litigants of their life, liberty, or property rights without due process of law.**15**

10.     Jones Standing in this case is supported not only by the recent instruction of the Supreme Court in *Truck Ins. Exch. v. Kaiser Gypsum Co*., 22-1079 (Sup. Ct. June 6, 2024) [standing extends "*… to entities that are <u>potentially concerned with or affected by</u> a proceeding*."], but also on the merits and nature of the constitutional rights of Jones set out in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S. Ct. 1519 (1987), *citing with approval Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (5th Cir. 1979).   The Fifth Circuit in *Henry* v. *First National Bank of Clarksdale* dealt with collection of a judgment and non-final appeals and the avoidance of irreparable harm for particular constitutionally driven appealed cases such as the Judgments against the NAACP and here, Alex Jones dealing with "*fundamental constitutional rights.*" *Id. Pennzoil at* U.S. 23. as discussed in *Pennzoil* dealing precisely with the issues before this Court (in rejecting Texaco's argument to avoid its own bankruptcy).  *Pennzoil*, however, made two critical distinctions in its holdings significant to this case.  In contrasting to a case involving a politically sensitive defendant (the NAACP [or here, Alex Jones]) efforts to appeal a judgment it could not pay nor afford the appeal bond:

> First, relevant to this Court's consideration, is the holding that "[w]hile 'a cost requirement, *valid on its face*, may offend due process because it operates to foreclose a particular party's opportunity to be heard,' [citing *Boddie* v. *Connecticut*, 401 U.S. 371, 380 (1971)]…." *Id. Pennzoil at* U.S. 22.

Next, the Supreme Court made specific reference to the reason Texaco was note entitled to relief because of the size of the required bond, noting the distinction where relief would be appropriate:

> the claim [of Pennzoil] that the Texas bond and lien provisions violated the due process and equal protection clauses was without merit, because (a) the New York company could exercise its right to appeal even if it were forced to file for

---

15        Stare Decisis and Due Process, https://scholarship.law.nd.edu/lawfacultyscholarship/450/

bankruptcy, and (b) *the underlying issues in the case--arising out of a commercial contract dispute--did not involve fundamental constitutional rights.*

*Id. Pennzoil,* 107 S. Ct. at 1535 [Brennan, J., joined by Marshall, J., concurring]  (Emphasis Added).  The Supreme Court, in rejecting Texaco's right to receive relief from an un-affordable appeal bond, cited the Fifth Circuit case where special relief was justified:

> "in the more troublesome situation where a particular corporate litigant has such special attributes as an organization that a trustee in bankruptcy, in its stead, *could not effectively advance the organization's interests on an appeal*"[16]

*Id. Pennzoil,* 107 S. Ct. at  1529 [Justice Scalia, with whom Justice O'Connor joins, concurring], *citing* with approval, the Fifth Circuit opinion in *Henry* v. *First National Bank of Clarksdale*, 595 F.2d 291, 299-300 (CA5 1979) that did, in fact, deal with the deprivation of "*fundamental constitutional rights*":

> (bankruptcy of NAACP would make state appellate review of First Amendment claims "so difficult" to obtain that federal injunction justified), cert. denied *sub nom. Claiborne Hardware Co.* v. *Henry*, 444 U.S. 1074 (1980).

11.     The Supreme Court, in recognizing that the rights to seize a judgment debtors assets by State law execution and order a sale of the judgment debtor's assets, held that notwithstanding the state statute that required a cost bond that would bankrupt the NAACP, the exception recited in *Henry v. First National Bank* "… involved fundamental constitutional rights" that would be lost if the execution went forward.   In *Henry v. First National Bank*, because "…the underlying issues *did involve fundamental constitutional rights*" to boycott, and having suffered a $3 million

---

[16]     Here the Chapter 7 Trustee of Jones, in his campaign to damage Jones, was willing to allow Jones' Connecticut Appeal to lapse by not permitting Jones to file, at his own cost, his and the Free Speech Systems, LLC appeal brief for certification to the Connecticut Supreme Court.  Further, the Trustee proposed to this Court a "settlement agreement" among only the Jones Estate and the Plaintiffs that provided that the Trustee could dismiss the appeals or could **sell to Plaintiffs** as assignees the Jones and FSS right to appeal and they could dismiss, or cause the dismissal of, the appeals to satisfy the appellees' desire to have an allowed claim *untested by the due process rights to a full appeal*.  This Court denied that relief.

judgment in Mississippi state court for supporting a boycott of certain white-owned businesses, federal injunctive relief (to permit an unbonded appeal) was appropriate.[17]

12.     This is precisely the standing Jones relies, and the fundamental First Amendment constitutional rights of Jones as a media defendant his free speech rights, that must be protected until the opportunity for Supreme Court review.

## IV.
## RELEVANT BACKGROUND FACTS TO THE RELIEF REQUESTED AND THE PLANTIFFS RESPONSIVE MISSTATEMENTS

13.     This Court previously ordered the dismissal of the Chapter 7 Free Speech Systems, LLC, ("FSS") Chapter 11 case (the Debtor-Jones 100% owned limited liability company) but included in such order the transfer all of the "cash" account assets of FSS to the Trustee's Chapter 7 estate of Jones (the "**Initial Cash Transfer Order**").  That cash was significant (in excess of $4 million, and through Jones' continued service to the Trustee, the cash has grown to more than $7 million, less $3 million paid by the Trustee to the Trustee's law firm and the Trustee's special counsel and retained professionals, and other costs of administration.

14.     At the request of the Trustee of the Jones Estate for a clarifying order as to the ownership of the Debtor-Jones' company FSS *non-cash assets*, this Court entered an order clarifying that all FSS assets would be transferred to the Jones Estate (the "**Supplemental Order**").

15.     The Texas Plaintiffs' did not appeal the Initial Cash Transfer Order which is a final order.   The Texas Plaintiffs' (after attempting a state court Turnover of the FSS assets and that proceeding's removal by the Trustee to this Court) appealed the Supplemental Order and the

---

[17]     The Fifth Circuit upheld the District Court's injunction prohibiting the execution on the judgment involving all of the Mississippi NAACP assets including the name NAACP owned by the Mississippi Chapter, and all the confusion that would have caused, until the NAACP could prosecute its appeal of the Constitutional right to boycott. Ultimately, the Supreme Court decided the case on the merits and reversed the state court judgment as constitutionally infirm. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S. Ct. 3409 (1982).

appeal is ongoing.  [*See, supra* Note 3].[18]   The Texas Plaintiffs did not seek a stay pending that appeal of the Supplemental Order and accordingly, this Court has unfettered jurisdiction to *enforce* that order, it cannot vacate the order.  *In re M & C P'ship*, No. 19-11529, 2021 Bankr. LEXIS 1135, at *5-7 (Bankr. E.D. La. Apr. 28, 2021). [Emphasis Added].   This principal has been affirmed time and again.[19]   As such this Court's pronouncement that the Supplemental Order is void, is itself void.  The Supplemental Order still exists and is enforceable in accordance with its terms.[20]   Both the Jones Estate through its Trustee and/or Jones have consented to the sale of substantially all of the assets of FSS now in the Court-ordered possession of the Jones Estate Trustee.  If sold at a bankruptcy Auction as sought herein, the estate could be administratively closed until the Plaintiffs claims are allowed and distributions of those proceeds are made.   If this is not done, and both Judgments are stayed, the assets may simply remain idle.    If   ultimately the State Courts become the arbiter of the method and manner of the writs of execution or otherwise there will be no prompt sale of those assets remaining in the possession of the Trustee. The auction sale, already ordered by this Court is the only prompt solution to this dilemma.

16. And active participants are awaiting a fair sale auction.  The Trustee has *never initiated any bidding procedures as an ordinary course asset auction, nor has the Trustee even attempted  to deal the outstanding $8 million cash offer*.  In the prior two Trustee attempts at an auction driven by the Plaintiffs, neither the cash bidders nor the Debtor, nor FSS did anything to

---

[18]        Judge Charles Eskridge, U.S District Court, SD-TX, *Case No. 22-60043*.

[19]        *See e.g., Avery v. Gonzalez (In re Gonzalez),* Nos. 2:15-bk-25283-RK, 2:16-ap-01037-RK, 2024 Bankr. LEXIS 1038, at *9 (Bankr. C.D. Cal. May 1, 2024) (the court lacked jurisdiction to consider a Rule 60(b)(1) motion for relief from judgment during the appeal); *Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)* Nos. Chapter 11, Case No. 16-11626, Adv. Proc. No. 17-51210, Related Docket No. 1020, 2024 Bankr. LEXIS 856, at *20 (Bankr. D. Del. Apr. 8, 2024) ["it is true that when a case is on appeal, a lower court loses jurisdiction over the subject matter involved in the appeal…"] *citing In re Port Neches Fuels, LLC,* No. 23-255, 660 B.R. 177, 2024 U.S. Dist. LEXIS 55757, 2024 WL 1298590, *12 (D. Del. Mar. 27, 2024).

[20] Even the Texas Plaintiffs successfully moved to dismiss their appeal, this would not retroactively affect the invalidity of the initial voiding or remedy the consequences herein stated.

interfere with the bidding process – only the Plaintiffs and their partner the Global Tetrahedron

(the "Onion") and their acting agent, the Trustee.  Thus, because there is no stay pending the appeal

of the Supplemental Order and enforcement of the Supplemental Order is what this Motion seeks,

by ordering a simple auction for sale at the highest cash price obtained through the sales effort and

sale by the current Trustee or his successor replacement.[21]

<div align="center">

**V.**
**"THE RISK OF INJUSTICE TO THE PARTIES' AND THE RISK OF**
**UNDERMINING THE PUBLIC'S CONFIDENCE IN THE JUDICIAL PROCESS.**"[22]
--------------------------------------------------------------------------
**ALL EQUITIES FAVOR ORDERING AN AUCTION**

</div>

**A.**     **Equity Abhors Manipulation and Loss of Rights or Property by Forfeiture or**
         **Loss of Basic Constitutional Rights - Equity will not allow a trust to fail for**
         **want of a trustee.[23]  Equity delights to do justice, and not by halves[24]**

17.     The auction process has been manipulated by the Plaintiffs and the Trustee to assure

the Plaintiffs win.  Each time the Trustee initiated the out-of-the-ordinary process and each time

this Court refused to approve the Plaintiffs-driven process adopted by the Trustee.  If the State

Court is to auction FSS assets, that will not occur until the Texas State Judgment is final on appeal

---

[21]     **THERE IS A SIMPLE SOLUTION:  REPLACE THE TRUSTEE AND CONDUCT AN AUCTION:**  There is no
question that the Court's declaration that the Supplemental Order was void was precipitated by the Trustee's stubborn
and persistent unwillingness to obey the Court's stated purposes to affect a sale of FSS assets for the benefit of all
creditors.  It was for this purpose the current Trustee himself prevailed on this Court to issue the Supplemental Order
in the first place.  The remedy for such recalcitrance is, among other remedies, the replacement of the Trustee, not a
legally improper declaration the Supplemental Order is void.

       The simple solution is to appoint a replacement Trustee who will obey the Court and conduct an auction.
Any creditor looking to get paid, would welcome this as it assures the highest recovery.  The Plaintiffs DO NOT want
this because they don't want money; they want Alex Jones and his business as a trophy they can display at their
political fund raisers and social events where their abuse of the legal system to achieve ridiculous and indefensible
judgments is worn as a badge of honor.  This Court should not countenance that unmasked, naked hatred.

[22]     Proof of which is grounds for amending or altering a decision of a court.  *See*, *Gonzales v. Davis*, 788 F.
App'x 250, 253 (5th Cir. 2019) (*quoting Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 108 S.
Ct. 2194, 100 L. Ed. 2d 855 (1988)) (Emphasis Added).

[23]     *See, e.g., Fulk & Needham, Inc. v. U.S.*, 288 F. Supp. 39, 44 (M.D.N.C. 1968).

[24]     *Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. 1990).

and there is final or unstayed judgments ruling the Plaintiffs' proofs of claims non-dischargeable in whole or in part.  If reversed as anticipated, an auction will not happen until a retrial.  The Connecticut Appellate Court and Connecticut Statute stayed the Connecticut Judgment.  However, the Connecticut Supreme Court has denied Jones' and FSS's Motion for Certification and both Jones and FSS are seeking a continuation of that stay pending their Petition for *Certioraria* with the U.S. Supreme Court pursuant to the Connecticut statutory provision allowing for a discretionary stay.

> **B.**      **Even If This Court Could Declare the Supplemental Order Void, To Do So Is Facially Inequitable And Rewards The Wrongdoers**

18.      The Trustee's negotiations on their illicit "settlement agreement" took several months, during which Trustee *never initiated any bidding procedures ordered by this Court* to deal with the outstanding $8 million cash offer.  When they finally reached the terms of the "settlement agreement" the Court again rejected the Trustee's proposed Settlement Agreements and for good reason and the Trustee has gone silent on holding the ordered auction.

19.      While the second round of misconduct is referenced above, a few more details shed light on the radical inequities perpetrated as the tip of the tension among the Plaintiffs that was revealed in the first farcical auction, primarily revolving around how to split the FSS carcass the Plaintiffs hoped their non-final judgments would recognize.  Anxious not to wait for any appellate outcome, the Texas Plaintiffs were adamant that the split should be 75/25 and threatened to disrupt the Connecticut Plaintiffs collection efforts if agreement were not reached.  According to the fifteen Connecticut Plaintiffs, they had collective judgments totaling approximately $1,500,000,000, whereas on the other hand, two Texas Plaintiffs (Heslin and Lewis) claimed judgments totaling only approximately $50,000,000. Thus, the split should have been 97% Connecticut and 3% Texas.  However, the Texas Plaintiffs flipped that argument putting the

Connecticut Plaintiffs' ridiculous judgment at risk.  They argued that the same Sandy Hook events had occurred *to all plaintiffs* and their damages should have been the same but for the prejudice of the Connecticut plaintiffs trying the case approximately 28 miles from the murder site, since liability was judicially decreed in both Texas and Connecticut and only damages were to be tried. *Yet for the same event* the fifteen Connecticut Plaintiffs received as non-punitive damages, at total of $965,000,000 – or approximately $65,000,000 each – *whereas for the same event the Texas plaintiffs received only $2,000,000 each*, or 3.5% of the Connecticut non-punitive damage amount. The Texas plaintiffs' receipt of only 3% of what the Connecticut Plaintiffs got, was unfair and only explainable as the result of local prejudice.[25]  Instead, the Texas Plaintiffs proposed a different view simply "counting heads" as that was the only rational way to divide FSS up given that other means based on the sizes of the respective judgments was indefensible.  And as there are three other Texas Plaintiffs who have not even proceeded to trial and thus had and have no judgments, counting them resulted in 15 Connecticut Plaintiffs and 5 Texas Plaintiffs – or a compromise division of 75/25.

20.     The problem with this was that (a) judgment creditors are counted by the dollar amounts of their claims, not on a "per capita" basis which if pursued by Connecticut risked exposure by Texas and (b) the prospect that either or both judgments were very likely to be

---

[25] While this Court has declared most aspects of the Connecticut and Texas judgments non-dischargeable, making that interlocutory ruling final will require this Court to explain how the same event – Sandy Hook – where liability was judicially decreed in both Connecticut and Texas, resulted in "victims" who sued in Connecticut receiving awards 32 times greater than "victims" who sued in Texas.  While this fact will be difficult for the Court to explain, so will its disregard of the requirements of the Connecticut Supreme Court stated in *Lighthouse Landings, Inc. v. Conn. Light & Power Co.,* 15 A.3d 601, 613 (Conn. 2011) that collateral estoppel rules were  not to be applied mechanically as the Connecticut plaintiffs convinced this Court to do,  but were to be viewed flexibly with equity in mind and are particularly inapplicable when to do so would "work an injustice" or "frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Id*.  Equally difficult for the Court will be its explanation of its disregard of *Jackson v. R.G. Whipple, Inc*., 627 A.2d 374, 380 (Conn. 1993), which in the context of collateral estoppel involving default judgments, re-emphasized the Restatement of Torts' comments that where the prior action was a default, the matter was not actually litigated, creating yet another basis for finding dischargeability which this Court ignored.

radically reduced if not eliminated on appeal, would throw their respective division of the financial body of Jones and FSS into complete jeopardy.  Thus, instead of continuing the auction, the Trustee and the Plaintiffs devoted their time and FSS's treasure to reaching a completely illegal arrangement where in summary, (a) the two Texas Plaintiffs' $50,000,000 judgment would be deemed fully "allowed"; (b) the fifteen Connecticut Plaintiffs claims of $1,438,139,546 would be deemed fully "allowed," even though the Connecticut Court of Appeals had reversed $150,000,000 of that related to CUTPA punitive damages; (c) *the three Texas plaintiffs* whose cases had yet to be tried would be given deemed "allowed" claims of more than $375 million, which coupled with the $50,000,000 held by the other Texas Plaintiffs would yield a dollar amount as between Connecticut and Texas equal to 75/25; (d) the Texas Plaintiffs would drop their appeal of the Supplemental Order; and  (e) since the Texas claims had not yet been bonded and the Connecticut Plaintiffs were statutorily precluded from collection, the Texas Plaintiffs would assign their new allowed claim of $425 million to Connecticut.  Plaintiffs would then proceed to collect *in this Court* on the Texas judgement and the Trustee would pay the Texas Plaintiffs $4,000,000 from cash he held belonging to the Jones Estate (including mainly FSS money).  The fact that the claims were deemed "allowed" would mean, critically, that nothing that occurred on appeal would disturb their rights.  And importantly, among other things, the Connecticut Plaintiffs proceeding to collect on the Texas judgment would effectively mean there would be nothing left to auction.  Hence once again the Court's intentions of the Supplemental Order were intentionally and unfairly thwarted.

21.     On both occasions denying the proposed auction procedure, this Court expressed at length its concerns and displeasure with the proposals that did not come close to resembling a normal bankruptcy public bid process.  Exhibit "1" illustrates again this Court's frustration over the Trustees continued efforts to "arrange" matters to encumber a simple bidding procedure and

auction to favor Plaintiffs.   Neither the cash bidder nor the Debtor nor FSS had anything to do with these manipulated bidding process – only the Plaintiffs and their agent-Trustee.

### C.      The Manipulation Continues As the Abuse of Process Continues

22.     When FUAC filed its motion seeking a status conference based on its outstanding $8 million non-responded-to cash bid, an interesting response from the Trustee and the Plaintiffs resulted.  Notably, the *Trustee responded by silence*, likely fearing the rath of the Plaintiffs as their position has done a 180-degree change to not wanting an auction that they could not control.

23.     Even though twice before the Plaintiffs and Trustee were actively pursuing his version of an auction process, not so this time– *it is now the Connecticut Plaintiffs and the Texas Plaintiffs that do not want a bankruptcy auction – in truth, not an auction **that they cannot control*** and win.  [*See*, Plaintiffs' objection to FUAC's Request for Status Conference (and notice of its bid, Dkt. 1113].   And whatever the Plaintiffs demand the Trustee follows.  Even with the opportunity to re-establish the Court's and the public's confidence in the Trustee's supervision of a fair bankruptcy auction process, the Trustee stands down, to not conflict with the Plaintiffs new position of no auction.

24.     The impact of the Creditors' manipulations and overt efforts to ignore the economics of this bankruptcy and to seek only a political goal of removing Jones from the airwaves and destroying the "InfoWars" brand, is all designed to prevent news media-Jones' First Amendment rights by censoring his ability to exercise those rights.[26]  This ulterior motive has not

---

[26]      Set out below are only a few of the many examples of the Connecticut Plaintiffs and the Texas Plaintiffs declared purpose in bringing and prosecuting the suits against Jones and FSS was political and sought to deny Jones his right to freedom of the press and free speech.  Motivating this litigation is not, and never has been, the recovery of a monetary damages for an actual and legally recognized injury (which has yet to be fairly determined), or even allowing punitive damages reflecting any reasonable application of punitive or exemplary damages law or statutes, but is the political activism and political motive to accomplish the goal to taking Alex Jones and incredibly popular "The Alex Jones Show" of the air and "out of the public discourse" by demanding exaggerated and illegal recoveries of punitive damages:

only thwarted Jones efforts at a legitimate bankruptcy resolution (including Plaintiffs rejection of multiple proposals to resolve these claims *by payments to these Plaintiffs in the high 8-figures*) but reflects manipulation that goes well beyond this Court's limits in protection of creditors and imposes risks on debtors and the bankruptcy process that is repugnant to any bankruptcy right or policy.

25.     Even if, however, the prospect of a resolution with these Plaintiffs is not available because of the political agenda of the Plaintiffs, the bankruptcy code and bankruptcy policy still require this Court to consider the *economics and motives* of creditors, including these Plaintiffs, as an element of most every decision the Court has, and is, to make.  Just as a non-creditor claims-purchaser cannot acquire a creditor's claim (for the purpose of obtaining standing), then file the claim, and then assert the claim in bankruptcy to block a reorganization, *if there is an alternative motive to the mandated "open and honest" economics of claims recovery* the bankruptcy code will impose a remedy.[27]  In this case of such high stakes and profiled, the issue of "motive" permeates

---

> **"Berkowitz said his clients may be willing to settle with Jones for less money if it means *Jones would end his broadcasting career*." "If he wants to agree to some sort of terms that hold him accountable for all he's done, we'll be open to listening.   Whether that means *walking away from public life*, to paying Sandy Hook families *in full* …."**
> https://www.washingtonpost.com/investigations/2022/11/21/alex-jones-sandy-hook-lawsuit/

> ***Damages "should be awarded in an amount that assures Alex Jones is off any platform … taken out of this discourse* …."**
>
> Quotes from *Texas Plaintiffs' closing arguments; See, also Connecticut Plaintiffs opening statement YouTube* https://www.youtube.com/watch?v=xFaxgchQczg  "take Alex Jones platform … away … and make certain he cannot rebuild the platform.  Take him Jones out of this discourse … that is punishment.)

[27]     The law is clear that an ulterior motive and purpose, and malice to cause damage to an estate bars the right to purchase a claim and utilize the claim in a bankruptcy case.  *In re Lichtin/Wade, LLC,* No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10-11 (Bankr. E.D.N.C. Dec. 17, 2012) explains the prohibited process, citing the Ninth Circuit, noted:
> If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. *On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a*

every aspect of the Plaintiffs counter-intuitive, abnormal demand to *destroy the value of the Jones Estate and FSS assets* and destroy the ability of Jones to earn a living so as to pay the Plaintiffs claims, while at the same time demanding their debt be both allowed and found nondischargeable. This abuse of process conduct, or "lawfare" in more current political terms, should not go unaddressed, when Plaintiffs make economic demand of this Court for their creditor rights and treatment of their claims, yet motivated to impede the entire bankruptcy case by destruction of the real value of the Estate's assets and thereby destruction of the Debtors' ability to earn an income by the exercise of their First Amendment rights to uncensored media and free speech. Those constitutional rights are valued in the millions yet in this case the Plaintiffs want that value to be as near as zero as they can possibly manipulate to take Jones "off the air" and out of the public discourse (reciting opening and closing jury arguments in the Plaintiffs' respective trials).

26.     This bankruptcy "lawfare" has not, however, gone unnoticed. The Paul Weiss law firm as purported "*pro bono*" counsel to the Sandy Hook Plaintiffs (all of whom have received multi-million-dollar settlement funds from the Remington $70+ million-dollar settlement payment), has recently settled its similar "lawfare" litigation after being sued by President Trump for their participation with prosecutor Alvan Bragg in the New York City prosecution of the victimless crime of real estate valuations by the affiliated entities owned by President Trump. Paul Weiss agreed with President Trump to settle his claims by Paul Weiss performing $40 million of "*pro bono*" *non-political*, legal work in exchange for a release of the damages claims made by the

---

*competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior*.

*Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am.* (*In re Figter Ltd.*), 118 F.3d 635, 638-639 (9th Cir. 1997) (citing *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa. 1942)); *In re Lichtin/Wade, LLC*, No. 12-00845-8-RDD, 2012 Bankr. LEXIS 5785, at *10 (Bankr. E.D.N.C. Dec. 17, 2012) ("The test is "whether a creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *In re Gilbert*, 104 B.R. 206, 216 (Bankr. W.D. Mo. 1989) (citing *In re A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr. D.N.J. 1988); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986)).

President.  Upon information and belief, there is a written settlement agreement, but Jones does not have a copy.

27.     In this reorganization case and later in the Chapter 7 case, it has been Paul Weiss that has directed that Plaintiffs actions throughout these two bankruptcies.  Paul Weiss has directed the same lawfare conduct that its firm admittedly attempted against President Trump.  Apparently unknown to the President, Paul Weiss considers *pro bono* representation of millionaires in this bankruptcy (the Connecticut Plaintiffs shared in the $70+ million settlement of the gun manufacturer litigation).  The Connecticut Plaintiffs and their espousing their ideological political agenda of gun control by partnering with the Onion, was all designed to acquire "InfoWars" brand and IP and *remove Alex Jones from his career as a news media and champion of free speech and freedom of the press*, and according to Paul Weiss' webpage, it considers these Plaintiffs to be as "pro bono" work (hardly in compliance with its settlement of the President's claims.)[28]

28.     In truth, Plaintiffs' counsel, including Paul Weiss, have adopted and pursued lawfare[29] in the handling of the Plaintiffs' purported judgment claims "as if" the Plaintiffs were creditors holding claims that were being pursued for the economic recovery of those claimants. Nothing is further from the truth in this case.   As the Fort Worth Court of Appeals recently noted:

> Lawfare is an ugly tool by which to seek the … policy changes the California Parties desire, *enlisting the judiciary to do the work that the other two branches of government cannot or will not do. …*"

---

[28]     On the Paul Weiss web site, the firm continues to claim that the Connecticut Plaintiffs representation is *pro bono*, although *pro bono* legal work is generally not considered representing politically aligned millionaires to destroy someone's constitutional Free Speech rights.  It is believed that this position by Paul Weiss is being investigated as a breach of their settlement agreement.

[29]     "Lawfare" has been defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021):
    The term "Lawfare" is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people. Here, Plaintiff motions to prohibit Defendant Barbounis from using Lawfare under Rule 402 and 403, alleging that it is unduly prejudicial and irrelevant.

*City of S.F. v. Exxon Mobil Corp.,* No. 02-18-00106-CV, 2020 Tex. App. LEXIS 5226 at 58-59 (Tex. App. June 18, 2020).[30]   More to the specifics, "Lawfare" is a weapon designed to destroy the enemy by using, misusing, and abusing the legal system and the media in order to raise a public outcry against that enemy.   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866448.   And these Jones and FSS Bankruptcy cases have been the textbook example of "lawfare," as here:

    a.    a creditor obtains a judgment that it brings to the bankruptcy court, files both the claims ***and*** an objection to the dischargeability of that claim (*i.e.*, wanting to appear to be legally seeking to be paid notwithstanding all other creditors discharge in the bankruptcy);

    b.    yet these participants with an ulterior motive, using the claims "standing" and with the help of third party "partners" (in one instance, the Trustee, and another, the Onion, indirectly affiliated with Bloomberg, a well-known advocate of gun control) seek to acquire all of Jones' and FSS's assets, not for their economic value, but *for the express purpose of destroying the InfoWar brand's value and thereby Jones ability to earn an income*; and

    c.    done all in the pursuit, not of a financial return on their claim, but implementation of an ulterior motive and purpose in the claims filing and objection to dischargeability *to further a political agenda of depriving Jones and FSS of their Constitutional rights to the free exercise of the First Amendment through freedom of the press and freedom of speech by which both earned their individual and corporate living.*

29.    It is not only the bad faith that ulterior motives in filing the claims are pursued (*e.g.*, refusing to mediate in good faith, and seeking to control the bankruptcy process so as to acquire the Jones and FSS assets as cheaply as possible and for the purpose of destruction of those assets

---

[30]    More generically "Lawfare" is defined in *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 U.S. Dist. LEXIS 249912, at *1 n.1 (E.D. Pa. Dec. 10, 2021) as follows:
        The term 'Lawfare' is a play on litigation and warfare. The term itself is often used to describe the act of using litigation to harass people.

value, only to further their ulterior motive to destroy these debtors ability to exercise their "fundamental constitutional rights". *Id. Pennzoil,* 107 S. Ct. at 1535 [*See, Supra*, pg. 12]. The intention and goal of using a claim in bankruptcy for the purpose of depriving a debtor of its rights to free speech and freedom of the press, and to earn a living, makes this case and the conduct of the Connecticut Plaintiffs and the Texas Plaintiffs repugnant to every bankruptcy policy approved by the Supreme Court of the United States. Once this Court refused to allow the Plaintiffs to manipulate the auction process, they simply pivoted to opposing *any* bankruptcy auction. Now the agenda is to use the State Court system to continue the same unlawful abuse of process.

30.    Below Jones will address the most egregious misstatements set out in the Plaintiffs' Response to the FUAC auction motion, in which they now oppose any bankruptcy auction sale, in favor of a state court action *that they are prohibited from participating pursuant to the stay (and expected stay) pending the appeal of their Judgment.*[31]

## VI.
## THE CONNECTICUT PLAINTIFFS' LAWFARE IN PURSUIT OF THE ULTERIOR MOTIVES AND PURPOSES

**"The Sandy Hook Families have not yet received—and are no closer to receiving—*a single dollar in distributions* from either Jones or FSS through the bankruptcy cases [Plaintiffs' *Joint Objection to an Auction* Pg. 1, ¶1]**

31.    It is important to recognize that this statement on behalf of the Plaintiffs in support of their sudden reversal of their position on an auction, is intended to mislead and obfuscate the Plaintiffs' ulterior motive - that these bankruptcy cases *are not about distributions or money*, but about taking Alex Jones out of the public discourse and off the air, and the motive is shared by other significant players in the political arena. Below Jones will address the misstatements set out

---

[31]    As pointed out herein several times, simply because Paul Weiss is prohibited by a court and a statute from taking an action does not mean Paul Weiss will not take the action (*e.g.* the WD-TX removed case now in this Court where Paul Weiss attempted to obtain a receiver over all of Alex Jones assets by false representations to the State Courts. Paul Weiss simply ignores this Courts stays and likely its injunctions.

in the Plaintiffs Response to the FUAC auction motion in which they now oppose any bankruptcy auction sale, in favor of a state court action they are prohibited from participating pursuant to the stay pending or prospective stays of the appeal of their Judgment, or the automatic say or the discharge injunction.

A. **Alex Jones Estate Received approximately $6 Million From FSS and Post-Conversion Alex Jones Services During These Bankruptcies, That Has Now Been Reduced to $4 Million as a Result of Administrative Costs Pursuing Auctions and Plaintiffs Claimed Settlements**

32.    Plaintiffs, in obtaining the grossly unfair and unconstitutional Judgments, were permitted to argue to the jury that Alex Jones should be punished by an award *that assured he could never continue in his profession*.  [*See, supra*, Note 18].  The Connecticut Plaintiffs and their announced partner, the Onion, told the public that the purpose of acquisition of the FSS assets was to destroy the InfoWars brand and business and use the customer data to further a parody of the InfoWars brand to its customers.[32]  All during this process Alex Jones continued to broadcast his show and, in the process, allowed FSS to amass more than $6 million in cash (net of the over $2 million the Trustee's lawyer and professionals have spent on fees).  The order placing that cash in the Jones Estate is a final order.

33.    Just like the auction orders, and although ordered twice by this Court, the Plaintiffs refused to mediate, first of all, at all with Hon. Judge Isgur, and the second time, not in good faith, conduct wholly consistent with the goals of the Plaintiffs.  And all during this time Jones continued to profitably render his services to FSS or through FSS, InfoWars and its brand, for the Estate.

B. **The Jones/FSS Litigation and This Bankruptcy Has Increased the Sandy Hook Foundations by Hundreds of Millions of Dollars**

---

[32]    Although nothing would have prevented the Connecticut Plaintiffs from bidding at any Jones Estate auction for assets, that is not what the Connecticut Plaintiffs did.  In addition to other manipulations the Connecticut Plaintiffs attempted to use their *non-final stayed judgment as if some sort of cash equivalent* for the purpose of that bidding – in other words, to "collect" on their judgment in violation of the Connecticut Statute, and currently, the Connecticut Court of Appeals, stay of all collections.

34.     After having negotiated a $70+ million settlement with the gun manufacturers and sellers, several of the Connecticut Plaintiffs formed charitable foundations in support of gun control (Jones does not yet know how many have been formed, but at least three are known.  Those foundations received public donations to further their purpose. However, with modest contributions through five years after the Sandy Hook tragedy, the Connecticut Plaintiffs finally decided to sue Jones and FSS along with an immediate, well-financed, public campaign of adverse public-relations "news releases" all raising the claims and allegations of these plaintiffs in the post-suit public press.  On information and belief, the PR firms used later became the same PR firms used in the New York suit against President Trump, bragging at the time that it worked against Jones as a test of its success.

35.     Thus, when Jones and FSS were sued in 2018 for defamation in 2018 and the news releases began flooding the news, not surprisingly and almost immediately the funds began to increase.  However, the major increases were leading up to the trials, including (shortly before *each trial was to begin*) grants from the United States Department of Justice, and other governmental agencies that reached a highpoint at the beginning of the Connecticut trial.  This multi-million government funding allowed, for example, one foundation's founding member and Sandy Hook parent, to earn in excess of $240,000.00 plus in her annual salary from the foundation that, according to published records, used 46% of all donations for salaries.

36.     Jones has reviewed the ".gov" public records of at least three (3) Sandy Hook foundations whose contributions were flat for the several (up to 4+ years prior to the litigation), and that upon suit and publicity of the trial, doubled or tripled or more, through among other things, **DOJ grants**, and public contributions in excess of $100,000,000.00 to these three Connecticut Plaintiffs' charitable foundations – increases almost singularly driven by the Alex Jones suit and

the professional publicity of public relations firms that have bragged about their success in the Jones case.

C.   **The Going Concern Value of FSS and Alex Jones Operations Could Gross $50 Million or More a Year, Yet Plaintiffs Want All Operations to Cease – and Retain Their Non-Dischargeable Debt**

37.   Since his appointment, and at the suggestion of Jones, Trustee Murray has never stopped production work through the use of the FSS assets and leasehold estate, work headed by Jones and aided by the Supplemental Order, which work has earned the Estate several million dollars and preserved the assets intact, such that the bid price with all assets intact has risen from $4m to $8m.   This success has been after all of the adverse publicity of the Plaintiffs' bankruptcy.

38.   However, as the Court recalls, immediately upon "announcing" (without Court review or approval) that the Onion was the winning bidder based on judgment credits, the Trustee shut down and took "dark" the InfoWars production and web presence.   This was accompanied by the Onion publicly announced its intention to only use the Website and IP for parody of Jones and to support gun control.   In other words, a business enterprise valued in the multi-million dollars was to be acquired for parody, in fact designed to destroy the brand and destroy the income that the InfoWars brand earned up to the date the Trustee claimed to have sold it the Onion.

39.   In face of the continued monetary success of Jones continuing FSS's operations, Trustee Murray has continually reflected an attitude that is impossible to explain.   For instance, when he would not agree that FSS and Jones Connecticut appeals were authorized to be filed, and claimed he intended to allow the appeals to expire for lack of briefing (and actually criticized Jones and threatened the lawyers that timely filed those briefs).   Other examples include the Trustee's unconventional conduct in pursuing two failed auctions and joining in a settlement with the Plaintiffs that at a minimum would have violated the law.   Finally, after ignoring the $8 million second offer of FUAC for two months in favor of those failed "settlement agreement" negotiations,

when FUAC wanted to participate in an auction as the Court had instructed the Trustee to do, the Trustee remained silent and refused to take a position (or even seek to initiate bid procedures) on the FUAC's second $8 million cash bid.

40.     To be clear, Christopher Murray is a capable and competent Trustee but has at best "frozen at the wheel" in both his logic and capabilities because, insofar as Jones believes, and capitulated to the Plaintiffs' demands on, and possibly expressed or implied threats made to, the Trustee, with repercussions if the Trustee did not do as the Plaintiffs' demand to permit them to dictate the auction process that both times was rejected by this Court.  This belief would explain the following:

      i.     Why the Trustee arranged the terms of the first sale process so randomly and incompletely, simply because that was the extent to which the Plaintiffs wanted to be bound, and it guaranteed their success.

      ii.     Why the Trustee would need to drive at 5:00 AM from Houston to Austin on the day of his intended announced selection of the Plaintiff's & Onion joint partnership bid, to order the "shut down" of FSS operations and require the FSS broadcast crew take the Alex Jones Show "dark" (dropping weekly sales from an average of more than $80,000 to less $20,000.00 when re-started 48 hours later) while at the same time the Onion announced to the public through news interviews and redirection of the FSS URL to the Onion new URL – falsely <u>announcing that it had purchased "InfoWars.</u>

      iii.     Why the Trustee, after what is reported as over $12 million spent on accounting investigations and fraud auditing of FSS and Alex Jones by the Chapter 11 Committee and professionals, there were no assets or transactions (save a single vehicle) omitted from the FSS and Jones schedules and disclosures, he decided to retain in the Chapter 7 case additional professionals to investigate Jones Chapter 7 FSS business conduct and spent $2 Million in

administrative costs pursuing two Trustee-driven failed auctions.

iv.     Why, when the Trustee received on December 19, 2024 an $8 million offer to acquire the assets of FSS, the Trustee never initiated a sale process but for some reason substituted his "negotiations" for the next six-weeks *with the Plaintiffs* to ultimately propose giving the Texas Plaintiffs an allowed claim more than 10 times the amount of their judgment, and giving an "allowed" claim in the full amount of the Connecticut Plaintiffs Claims even though no Plaintiffs' claims was allowed because both were, and are, still on appeal and stayed by the Connecticut statutes and Connecticut Court of Appeals Order and the automatic stay.  This belief is also based on the announced motives of the Plaintiffs, to take Alex Jones off the air and destroy his ability to continue in the public discourse.  This motive, stated by both the Connecticut and Texas Plaintiffs in the opening and closing jury arguments, explains why the Onion announced after it claimed it won the bid, that it would shut down all FSS operations and use Infowars for Alex Jones parody – by utilizing his database of customers and followers.

41.     This conduct clearly evidences the ulterior motives using and driving these bankruptcy cases to accomplish a political agenda, initiated by Plaintiffs' trial counsel and continued by Plaintiffs' bankruptcy counsel.  This Court has the jurisdiction and power to prevent such unfair and unlawful conduct which should not be simply sent to the State Courts to repeat the injury.   The Fifth Circuit instructs on this Court's ability to control this conduct:

> Christopher Martin Ridgeway and his former employer have waged scorched-earth lawfare against one another… Id. at 423.  … The Bankruptcy Code "provides equitable powers for the bankruptcy court to use at its discretion." *In re Sadkin*, 36 F.3d at 478-79; *see* 11 U.S.C. § 105(a). This  [*428]  includes the power to sanction a party.  *See Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 816 (5th Cir. 2017); 2 Collier on Bankruptcy ¶ 105.02[6][b] (16th ed. 2020) ("[Bankruptcy courts] may sanction attorneys or their clients for abuses of process and other harms. The ability to sanction may take the form of civil contempt, sanctions not otherwise authorized in the Code or Bankruptcy Rules[,] or general damages.").  *Id.* at 427-428.

*Ridgeway v. Stryker Corp. (In re Ridgeway),* 973 F.3d 421, 427-28 (5th Cir. 2020).

**D.     This Court Should Not Reward These Abuses of the Bankruptcy Process to Continue the Lawfare of the Plaintiffs**

42.     As remarkable as it sounds, the multiple large international law firms including Paul Weiss and Akin Gump, see nothing wrong with announcing a strategy to deprive Alex Jones of his freedom of the press and his right to free speech.   It was Paul Weiss that settled the lawfare suit against President Trump, by acknowledged the wrongdoing of its former partner Mark Pomerantz in the New York Alvin Bragg litigation and agreed to dedicate the equivalent of $40 million in non-political "*pro bono legal services*".   Contrast Paul Weiss' settlement with President Trump to the Paul Weiss current web page claiming that its current partner Kyle Kempler:

> "maintains a significant pro bono practice. *He is currently representing a group of families of the victims of the Sand Hook Elementary School Shooting in the bankruptcy proceeding of … Alex Jones and Jones' wholly owned Company Free Speech Systems* …."

It is generally accepted that Lawyer "pro bono" work means free legal representation to those who cannot afford the legal fees or by representing non-political public interest groups without funds to advance their public cause.  Pro Bono work is not claiming to be doing free work for rich people pursuing a political agenda or doing free work to pursue the censoring of an individual's freedom of the press and free speech.

43.     In fact, all of the Plaintiffs' lawyers and the purported *pro bono* law firms, have repeatedly claimed that they are not interested in the money, but in taking Alex Jones off the air and out of the public discourse forever.  This is the ultimate form of censorship by abuse of process – to be allowed to argue to a jury that they the jury has the power through an award of punitive damages, to take away a person's constitutional right to freedom of the press and free speech, then use that success to force a bankruptcy and then intentionally destroy the debtor's ability to earn a living.  These lawyers have argued this ulterior motive repeatedly over and over and even including the Onion (that their partnership with the Connecticut Plaintiffs was to acquire the FSS assets and

the name and brand "Infowars" so that it can be destroyed by their use of it to parody Alex Jones and his right to freedom of the press and free speech (certainly not to realize its brand value).

44.     This is exactly what President Trump experienced and exactly what President Trump thought he was ending by the terms of this settlement. Not so - Paul Weiss simply "repackaged" their definition of "pro bono" into representing rich individuals for free if the political message is correct.  Notwithstanding that the families are neither poor nor, according to their lawyers, interested in money damage (not only have many of the Connecticut Plaintiffs shared the $70+ million payment by Remington and other gun manufacturers, but the several foundations that many of the families have set up or participate in, have received over $100 million in DOJ grants, loans from the US Government and public donations) according to the governmental databased ".gov."

## VII.
## CONCLUSION

45.     Notwithstanding the above, Plaintiffs, through "Pro Bono Paul Weiss", assert that Jones and FUAC are parties that have no economic standing in the case to complain of their conduct. — [*See*, Supra, ¶ 7, pg. 10].  This Court has previously recognized Jones standing regarding the auction orders.

46.     This Court should exercise its jurisdiction to enforce all of its prior auction-related orders, including the Orders authorizing an auction as well as the Supplemental Order.  This Court should enter its order for the Trustee, or a replacement Trustee if requiring replacement [*See, supra* Note 21] to conduct a sale that is not controlled or driven by the Plaintiffs and simply allow the process to conclude.   All parties in interest, even the Plaintiffs as bidders, and the public, will have a fair opportunity and right to participate in a fair and honest outcome if not controlled by Plaintiffs. All other matters arising from the lawfare conduct of the Connecticut Plaintiffs will be left to other

Courts or other proceedings to determine, but as to this Court and its clear jurisdiction to accomplish fairness in the auction process, and the public policy of having its orders observed and not manipulated, this Court should order the auction of the assets covered by the Supplemental Order.

WHEREFORE, Movant Alexander E. Jones individually, and a manager of Free Speech Systems, LLC, seek an order as above requested, and for such other and further relief to which Movants may be justly entitled, at law and in equity.

Dated: April 28, 2025

<div style="margin-left:40%">

/s/ Shelby A. Jordan
SHELBY A. JORDAN
State Bar No. 11016700
S.D. No. 2195
ANTONIO ORTIZ
State Bar No. 24074839
S.D. No. 1127322
Jordan & Ortiz, P.C.
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX  78401
Telephone: (361) 884-5678
Facsimile:  (361) 888-5555
Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
Copy to: cmadden@jhwclaw.com
**CO-COUNSEL FOR ALEX JONES and FSS**

BEN C. BROOCKS
State Bar No. 03058800
Federal Bar No. 94507
WILLIAM A. BROOCKS
St. Bar No. 24107577
Federal Bar No. 3759653
BROOCKS LAW FIRM PLLC
248 Addie Roy Road, Suite B301
Austin, Texas 78746
Phone: (512) 201-2000
Fax: (512) 201-2032
Email: bbroocks@brookslawfirm.com
**CO-COUNSEL FOR ALEX JONES And FSS**

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing pleading was served upon all parties registered to receive notices via the Court's ECF noticing system on April 28, 2025.

*/s/ Shelby A. Jordan*
Shelby A. Jordan